**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.,* | Case No. 22-11068 (JTD) |
| | (Jointly Administered) |
| Debtors | |

## DECLARATION OF MALCOLM MOLLER

I, MALCOLM MOLLER, pursuant to 28 U.S.C. *§* 1746, do hereby declare and state as follows:

1.  I am a licensed lawyer in the Republic of Seychelles and the Managing Partner of a Seychelles law firm, Appleby International Services (Seychelles) Ltd of Suite 202, 2nd Floor, Eden Plaza, Eden Island, Mahe, Seychelles.

2.  On November 11, 2022 and November 14, 2022, FTX Trading Ltd. and 101 affiliated debtors (collectively, the **Debtors**), including Maclaurin Investments Ltd. (formerly known as Alameda Ventures Ltd.), an international business company incorporated under the Seychelles International Business Act, 2016 (the **Act**) bearing registration number 217617 (the **Company**), each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the **Bankruptcy Code**) in the United States Bankruptcy Court for the District of Delaware (the **Bankruptcy Court**).

3.  I was retained by FTX Trading Ltd. to represent the Debtors with respect to the laws of Seychelles, including the Act.

4.  On October 27, 2023, Patrick Gruhn, Robin Matzke and Lorem Ipsum UG filed a Motion to Dismiss as parties-in-interest in the Chapter 11 cases requesting, *inter alia*, the Court to dismiss the bankruptcy case of the Company (Case No. 22-11087-JTD) on the ground that its filing was not properly authorized (the **Motion to Dismiss**).

5.  I have now been asked to provide an opinion regarding the authority of the Company to file its voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court (the **Petition**) under the applicable laws of Seychelles, including the Act.

6.  To that end, I submit this declaration (**Declaration**).

## A.  PERSONAL BACKGROUND

7.  I was admitted as a legal practitioner of the Supreme Court of New South Wales in 1998, solicitor and barrister of the High Court of Australia in 1999, a solicitor of England and Wales (non-practising) in January 2003, and solicitor and barrister of the Supreme Court of Bermuda in 2004. I have also obtained a Master of Laws Degree in Corporate and Commercial Law from the University of New South Wales, Sydney, Australia in 2000.

8. I am member of the Law Society of England and Wales (non-practising), the Bermuda Bar Association and the Law Society of Australia and specialises in advising financial institutions on financial regulation, regulatory capital issues, financial institution M&A, derivatives transactions and securities offerings, as well as a range of corporate and corporate finance transactions.

9. I am also a duly authorised legal practitioner pursuant to the Licence No. 20221006 issued by the Registrar of the Supreme Court in Seychelles and have extensive experience representing corporations, financial institutions and other entities and has worked on a number of transactions involving foreign and Seychelles corporate law aspects.

10. In preparing this Declaration, I have relied upon the information, materials and documents supplied to me. Such facts and matters, insofar as they are within my own knowledge, are true and insofar as they are not within my personal knowledge, are true to the best of my knowledge and belief being derived from instructions and/or documents provided to me by the Sullivan & Cromwell LLP,

## B.  DOCUMENTS REVIEWED

11. In giving this Declaration, I have reviewed the following documents:

    a. Petition dated November 11, 2022 (Doc 1).

    b. Omnibus Corporate Authority dated November 10, 2022 (Doc 1) (the **Omnibus Corporate Authority**).

    c. Declaration of John J. Ray III in support of Chapter 11 Petition dated November 17, 2022 (Doc 24) (the **Ray Declaration**).

    d. Preliminary Organizational Chart dated November 17, 2023 (Doc 24).

    e. The Memorandum and Association and Articles of Association of the Company dated September 26, 2022 (the **M&A**).

    f. Register of Members and Share Ledger of the Company dated December 24, 2019 (the **Register of Members**).

    g. Register of Directors of the Company dated November 7, 2023 (the **Register of Directors**).

    h. Written Resolutions of the Sole Shareholder of the Company dated February 6, 2023 (the **Shareholder Ratification**).

    i. Written Resolutions of the Board of Directors of the Company dated February 6, 2023 (the **Board Ratification**).

    j. Motion to Dismiss dated October 27, 2023 (Doc 3399).

    k. Declaration of Edith Wong dated October 26, 2023 (Doc 3399) (**Declaration of Edith**).

## C.  RELEVANT FACTS

12. The following facts are relevant to my analysis of the applicable law:

2

a. On November 10, 2022, pursuant to the Omnibus Corporate Authority, Samuel Benjamin Bankman-Fried (**Bankman-Fried**), as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the **Top Companies**), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the **FTX Group**), authorized, instructed and consented to, among other things, (i) the appointment of John J. Ray III (the **CEO**) as Chief Executive Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Chapter 11 and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group and (ii) the appointment of individuals chosen by the CEO and not affiliated with Bankman-Fried or the CEO as new directors of the Top Companies and the other members of the FTX Group.

b. On November 11, 2022 (the **Petition Date**), according the Register of Directors, Bankman-Fried was the sole director of the Company.

c. The Company is a 100% owned direct subsidiary of Debtor Alameda Research Ltd., which is a 100% owned direct subsidiary of Debtor and Top Company Alameda Research LLC, and therefore a member of the FTX Group under the Omnibus Corporate Authority.

d. On the Petition Date, the Company filed the Petition, signed by the CEO as an authorized representative of the Company pursuant to the Omnibus Corporate Authority.

## D. <u>SEYCHELLES LAW ANALYSIS</u>

13. The Republic of Seychelles has a mixed legal system based on the English Common Law and French Civil law. Relevant cases from common law jurisdictions notably commonwealth judgments from the Privy council are perceived as persuasive authorities by the courts in Seychelles and the Courts in Seychelles may be guided by the judgments of the domestic courts of commonwealth countries to the extent that the statutes are mirrored to the domestic laws of Seychelles. Likewise, where a provision of an English statute is mirrored with the relevant Seychelles statute, the Court may look at the interpretation of the English Courts as guidance. In *Vijay Construction (Proprietary) Limited v Eastern European Engineering Limited (SCA 15 & 18/2017*, it was held that English jurisprudence is referred to in Seychelles courts as persuasive authority, albeit the reference to English jurisprudence should not be misconstrued as a license to graft or introduce new laws to the legislation already in place in Seychelles.

3

14.  The Company is an International Business Company under the Act.

15.  The Seychelles law for regulating International Business Companies is contained in the Act.

16.  According to the M&A, the directors have the authority to manage the business and affairs of the Company, unless there are any specific limitations mentioned. Therefore, in the absence of a special resolution altering the articles, the directors possess the necessary authority to manage the Company's affairs. The M&A contain no such restrictions.

17.  Under Section 150(4) of the Act, the register of directors is considered prima facie evidence of any matters directed or permitted by the Act to be included in it. The Register of Directors reflects that Bankman Fried was the sole director of the Company on the Petition Date. The Register of Directors reflects the resignation of Luk Wai Chan and Wing Man Charis Law as directors of the Company on November 10, 2022. The Register of Directors does not at any time reflect Caroline Ellison as a director of the Company.

18.  Under Section 39 of the Act, a company, subject to its memorandum and articles, can appoint a person as its attorney through a written instrument, either generally or for specific matters. Actions undertaken by an attorney appointed in accordance with such an instrument are legally binding for the company. There are no relevant restrictions on appointment of attorneys under the M&A. The M&A also stipulate, in Article 11.27 thereof, that the Company's Board (being the board of directors from time to time) "*may by _resolution_ of directors delegate to…any other person, any one or more of its powers*…" subject to certain exceptions which include the approval of any voluntary winding up of the company (the **Winding Up Exclusion**) and the approval "*of any plan…or arrangement*" (the **Reorganisation Exclusion**). The Winding Up Exclusion and the Reorganisation Exclusion appear to have been included in the M&A because the provisions of the Act (sections 132 and 132A) regulating delegation by directors of their powers prevent delegation of the powers to approve a voluntary winding-up of the company under Sub-Part II or Sub-Part III of Part XVII of the Act and to approve any plan or merger, consolidation or arrangement.

19.  In Seychelles a voluntary winding-up, and in particular a voluntary winding up of an insolvent company under Sub-Part III of Part XVII, is a formal domestic insolvency procedure allowing for liquidation of the company, the rules of which are prescribed by the Act. Generally, in a voluntary winding-up procedure (whether initiated by members of the company where the company is solvent, or by creditors where the company is insolvent), the assets of the company are realised and distributed to creditors in a statutory order of priority pursuant to procedures under the Act, and at the conclusion of the winding-up procedure the company is dissolved.

20.  In contrast, Chapter 11 reorganisation proceedings of the kind initiated by the Company pursuant to the Petition would not, under Seychelles law, constitute a voluntary winding-up procedure for purposes of the Act. Chapter 11 of the US Bankruptcy Code sets out a statutory procedure for reorganisation proceedings under US bankruptcy law which bears no relation

to an insolvency procedure of the type constituted by a voluntary winding-up. The initiation of Chapter 11 proceedings does not require the debtor to be insolvent (as would be the case in a creditor's voluntary winding-up procedure) and does not predict the eventual dissolution of the company. It is rather a procedure regulating reorganisation proceedings entered into by a company and stipulating protections from creditors for the duration of those proceedings. If there is any proceeding under the US Bankruptcy Code that a voluntary winding-up procedure would be analogous to, it appears that it would be Chapter 7 which sets out a procedure for governing the liquidation of the assets of the debtor. No Chapter 7 filing was made in the instant case.

21. Further, and for the avoidance of doubt, all filing the Petition would have done would have been to trigger the worldwide automatic stay of creditor's enforcement rights under Chapter 11. The approval of any plan of reorganisation by the requisite classes of creditors and the Bankruptcy Court can only happen at the end of the process. As such, the Reorganisation Exclusion could not have prevented the delegation of the power to file the Petition, as that act could not be said to constitute an "approval" of any reorganisation plan later formulated during the Chapter 11 proceedings.

22. The filing of the Petition was therefore within the scope of the powers that Bankman-Fried could, as sole director of the Company, delegate to any person, including the CEO, under the Articles as it was not related to the domestic voluntary winding-up of the kind contemplated by the prohibitions on delegation under the provisions of the M&A and the Act.

23. The next point to consider is whether the Omnibus Corporate Authority, in substance, would be said to constitute a valid "*resolution*" of the board of the Company under Article 11.27. The M&A expressly state in Article 11.8 thereof that the Company may have at minimum one director, and in Article 12.9 that "*a resolution of the directors shall be passed by written consent by the sole director and without the need for any notice.*" No requirements are stipulated by the M&A as to the form or content of such written consent. The Omnibus Corporate Authority is therefore in substance a valid resolution for the purposes of the M&A and would be upheld by the principles of Seychelles law applicable to the interpretation of company articles of association. In addition, the Omnibus Corporate Authority clearly makes mention of all direct and indirect owned subsidiary of the Top Companies including that of Alameda Research LLC. Given that the Company is a wholly owned subsidiary of Alameda Research Ltd, the delegation of power pursuant to the Omnibus Corporate Authority in my view complies with S132A of the Act which states that the directors may appoint any person, including a person who is a director, to be an agent of the company.

24. Under Section 39(3) of the Act, an instrument appointing an attorney can either be executed as a deed or signed by a person acting with the explicit or implied authority of the company. Because the Omnibus Corporate Authority was signed by Bankman-Fried (including in his

capacity as director of the Company), the Omnibus Corporate Authority was valid under the applicable laws of Seychelles, including the Act, and the actions of the CEO, acting as an attorney of the Company, legally bind the Company.

25. As a result of the foregoing, on the Petition Date, the CEO was duly authorized to manage the business and affairs of the Company pursuant to the Omnibus Corporate Authority, and the Company was duly authorized to file the Petition, in each case under the applicable laws of Seychelles, including the Act to the extent permitted.

26. In addition, on February 6, 2023, the sole shareholder of the Company passed the Shareholder Ratification that, among other things, removed all of the directors of the Company and appointed a new sole director, as well as ratifying and confirming various matters, including: (i) the appointment of the CEO as the Chief Executive Officer of the Company, (ii) the filing of the Petition and all other actions related to the Bankruptcy Cases, and (iii) any other actions taken by the CEO prior to the aforementioned resolutions.

27. On February 6, 2023, the new sole director of the Company also passed the Board Ratification that, among other things, removed all of the officers of the Company, as well as ratifying and confirming various matters, including: (i) the appointment of the CEO as the Chief Executive Officer of the Company, (ii) the filing of the Petition and all other actions related to the Bankruptcy Cases, and (iii) any other actions taken by the CEO prior to the aforementioned resolutions.

28. At common law, an act or transaction done or entered into on behalf of a company may be ratified by the directors, if they have power to do or enter into such an act or transaction on behalf of the company[1].

29. The Board Ratification constituted an express ratification, by Kurt Steven Knipp as the sole director of the Company at the date thereof, of the filing of the Petition by the CEO on the Petition Date. It was within the scope of the powers of Knipp, as the then sole director of the Company, to do an act under Seychelles law and the M&A such as the filing of the Petition. Therefore, the effect of the Board Ratification in relation to the Petition, at common law, would have been to invest the Company, on whose behalf the act ratified (the filing of the Petition) was done, the CEO who filed the Petition, and third parties, with the same rights, duties, immunities and liabilities in all respects as if the act had been done with the previous authority of the board[2]. On that basis, the Petition filed with the Bankruptcy Court on the Petition Date would be, by virtue of the ratification, as good and valid on the Petition Date as it would have been had Bankman-Fried, as the then sole director of the Company, signed and filed it himself on the Petition Date.

---

[1] See Reuter v. Electric Telegraph Co. (1856) 6 E&B. 341; Wilson v. West Hartlepool Ry & Harbour Co. (1865) 2 De G.J. & S. 475; and Hooper v. Kerr, Stuart & Co. Ltd (1901) 83 L.T. 729.

[2] Wilson v. Tunman and Fretson (1843) 6 M. & G. 236; Bird v. Brown (185) 4 Exch. 786

30. Under applicable law, shareholders, acting unanimously, have the authority to make management decisions. In the Privy Council case of **Meridian Global Funds Management Asia v Securities Commission**[3], which originated from New Zealand, Lord Hoffman stated that a unanimous decision by all the shareholders in a solvent company regarding any matter within the company's power under its memorandum of association shall be deemed as the decision of the company.

31. Similarly, there is a consistent line of common law authority (which a Seychelles court may deem to be persuasive) that provides that if an act is within a company's corporate capacity (as the filing of the Petition was), but is carried out by the director(s) in excess of their authority, such act may be ratified by all of the shareholders of the company where acting informally (and a majority of the shareholders where by ordinary resolution), and will therefore be binding on the company[4]. As Alameda Research was the direct sole shareholder of the company, and signed written resolutions expressly ratifying the filing of the Petition in the form of the Shareholder Ratification, any defects in Bankman-Fried's initial delegation of powers pursuant to the Omnibus Corporate Authority (and it does not appear that any such defects existed) would have been cured by the Shareholder Ratification.

32. More generally, ratification or adoption of acts performed by an individual lacking authority has a retrospective effect and can provide relief, and there are numerous precedents that demonstrate how subsequent ratification can rectify any defects arising from the commencement of proceedings without proper authority. This principle is supported by the Privy Council case of **New Falmouth Resorts Ltd v International Hotels Jamaica Ltd [2013 UKPC 11]**. In this case the agent had no actual or ostensible authority to enter into the transaction but the company ratified the transaction, which meant that it was no longer able to rely on the lack of authority of the agent. The court stated: "*the acts of an agent on behalf of the principal outside his actual authority may be adopted and ratified*" and "*if there is ratification it has retrospective effect, i. it renders the transaction with the company binding on it from the time it was entered into by the agent*."

33. In the case of **Massey (trading as Massey Bailey, Solicitors & Consultants) v Wales [2003] NSWCA 212**, the Court determined that if proceedings are initiated in the name of the plaintiff without proper authority, such proceedings are considered null and can be stayed at any time. However, it is within the purview of the purported plaintiff to ratify the actions of the solicitor who initiated the proceedings and subsequently adopt the proceedings. This ratification, in accordance with the standard principles of principal and agent and the doctrine of ratification, effectively cures the initial defect in the proceedings as originally constituted. [emphasis added].

---

[3] Meridian Global Funds Management Asia v Securities Commission [1995] 3 NZLR 7 (PC) at 12

[4] Spackman v Evans (1868) L.R. 3 H.L. 171; Re Express Engineering Works Ltd [1920] 1 Ch. 466; Re Oxted Motor Co. [1921] 3 K.B. 32

34. Similarly, in the case of ***Ox Operations Pty Ltd v Land Mark Property Developments (Vic) Pty Ltd (in liq) [2007] FCA 1221***, the Court held that an action brought without authority is not considered void ab initio without the possibility of subsequent ratification. It is well-established that a company can ratify the unauthorized act of a solicitor initiating an action in its name, despite the lack of actual or implied authority. Consequently, when an action is commenced without authority, it is not immediately stayed or dismissed. Instead, the company is allowed to convene a general meeting or a meeting of its directors to decide whether to adopt the action. This practice has been developed to accommodate the possibility of ratification.

35. Furthermore, in the case of ***Essential Media and Entertainment Pty Limited [2020] NSWSC 990***, the Court made the following observation: "A step taken by a director without authority may be ratified. Ratification has the effect that the company is entitled to take advantage of the act as if the director had been authorized when he or she acted...."

36. In the present case, even if the Company had not been duly authorized to file the Petition on the Petition Date, as a result of each of the Shareholder Ratification and the Board Ratification the CEO was duly authorized to manage the business and affairs of the Company, and the Company was duly authorized to file the Petition, in each case under the applicable laws of Seychelles, including the Act to the extent permitted.

## E. <u>CONCLUSIONS</u>

37. For the reasons set forth above, on the Petition Date, it is my opinion that the Company was duly authorized to file the Petition under the applicable laws of Seychelles, including the Act.

38. In addition, it is my opinion that, even if the Company had not been duly authorized to file the Petition on the Petition Date, the Shareholder Ratification and Board Ratification each duly authorized the CEO to file the Petition on behalf of the Company under the applicable laws of Seychelles, including the Act, with retrospective effect as of the Petition Date.

39. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on December 11, 2023


_____

Malcolm Moller

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.,* | Case No. 22-11068 (JTD) |
| | (Jointly Administered) |
| Debtors | |

## BUNDLE OF AUTHORITIES

### *CASE LAW*

| 01 | **Vijay Construction (Proprietary) Limited v Eastern European Engineering Limited (SCA 15 & 18/2017** |
|---|---|
| 02 | **Reuter v. Electric Telegraph Co. (1856) 6 E&B. 341** |
| 03 | **Wilson v. West Hartlepool Ry & Harbour Co. (1865) 2 De G.J. & S. 475** |
| 04 | **Hooper v. Kerr, Stuart & Co. Ltd (1901) 83 L.T. 729** |
| 05 | **Bird v. Brown (185) 4 Exch. 786** |
| 06 | **Meridian Global Funds Management Asia v Securities Commission** |
| 07 | **Spackman v Evans (1868) L.R. 3 H.L. 171** |
| 08 | **Express Engineering Works Ltd [1920] 1 Ch. 466** |
| 09 | **Oxted Motor Co. [1921] 3 K.B. 32** |
| 10 | **New Falmouth Resorts Ltd v International Hotels Jamaica Ltd [2013 UKPC 11]** |
| 11 | **Massey (trading as Massey Bailey, Solicitors & Consultants) v Wales [2003] NSWCA 212** |
| 12 | **Ox Operations Pty Ltd v Land Mark Property Developments (Vic) Pty Ltd (in liq) [2007] FCA 1221** |
| 13 | **Essential Media and Entertainment Pty Limited [2020] NSWSC 990,** |

# Case Law 01

**Vijay Construction (Proprietary) Limited v Eastern European Engineering Limited (SCA 15 & 18/2017)**

# IN THE SEYCHELLES COURT OF APPEAL

[**Coram:**    B. Renaud (J.A), M. Burhan (J.A), R. Govinden (J.A)]

## Civil Appeal SCA 15 & 18/2017

### (Appeal from Supreme Court Decision CC 33/2015)

---

Vijay Construction (Proprietary) Ltd

Appellant

& Cross Respondent

Versus

Eastern European Engineering Ltd

Respondent

& Cross Appellant

---

Heard:        25 November 2017

Counsel:      Mr. Bernard Georges Attorney at Law for the Appellant

Mr. Nichol Gabriel Attorney at Law for the Respondent

Mrs. Samantha Aglae Attorney at Law for the Respondent

Miss Alexandra Madeleine Attorney at Law for the Respondent

Delivered:    13 December 2017

**JUDGMENT**

B. Renaud (J.A)

1.    This matter is before the Seychelles Court of Appeal on Appellant Vijay Construction (Proprietary) Limited's ("Vijay") amended notice of appeal filed on 21 June 2017.

2.    In its amended notice of appeal, Vijay raises several grounds of appeal against the decision of Learned Judge Robinson J (as she was then) which was delivered on 18 April 2017, wherein it was declared that an international arbitral award in favor of Respondent Eastern European Engineering Limited ("EEEL") was enforceable in the Seychelles.

1

**RELEVANT BACKGROUND FACTS**

3.     Vijay and EEEL are companies incorporated in the Seychelles. In 2011, EEEL hired
       Vijay to carry out construction work for a hotel called "Savoy Resort and Spa"
       (hereinafter referred to as "Savoy") through six contracts.

4.     The Six Contracts concluded for the execution of various construction works were dated
       as follows: Contract 1 (15 April 2011); Contract 2 (4 August 2011); Contract 3 (30
       August 2011); Contract 4 (30 September 2011); Contract 5 (19 October 2011); and
       Contract 6 (23 December 2011).

5.     It is to be observed that each contract in the Six Contracts included similar arbitration
       clauses, which provided that:

> (i)     *any dispute, disagreement or claim arising under or from the
>         contracts, including disputes on breach, termination and
>         validity of the contracts shall be finally settled by arbitration
>         under the rules of Arbitration of the International Chamber of
>         Commerce;*
>
> (ii)    *the arbitral tribunal would consist of a sole arbitrator; and*
>
> (iii)    *the place of arbitration would be in Paris.*

6.     Thereafter a dispute arose and EEEL filed a Request for Arbitration on 10 September
       2012 before the International Chamber of Commerce ("ICC") in Paris, France.  The sole
       Arbitrator was Andrew Lotbiniere McDougall, who delivered an award dated 14
       November 2014 generally in favor of EEEL (hereinafter referred to as the "Award").

7.     In summary, the Award declared that EEEL had validly terminated the Six Contracts and
       ordered Vijay to pay EEEL the following sums at an interest rate of 8 % per annum:

> a.  € 12, 857, 171.04 under Contract 6 for damages,
>     overpayments to complete the Savoy, and provision of
>     reinforcement steel;
> b.  € 150, 000 under Contract 6 for breaching its
>     confidentiality provisions;
> c.  € 600, 449.32 under Contracts 1-5 for damages for delays
>     and provision of reinforcement steel;
> d.  € 640, 811.53 representing 80 % of EEEL's costs for the
>     arbitration; and
> e.   $ 126, 000 representing 80 % of EEEL's costs to the ICC.

8.    Additionally, the Award ordered EEEL to pay Vijay the following sums at an interest rate of 8% per annum:

      f.    € 905, 849 under Contracts 1-5 for the value of work performed by Vijay and the Acceleration Fee for the timely completion of work under Contract 4; and

      g.    € 250, 000 for damages resulting from EEEL's occupation of Vijay's temporary building.

9.    Subsequently, EEEL initiated proceedings in the Supreme Court of the Seychelles to have the Award recognised and enforced. Vijay in response challenged the enforcement of the Award, on the following grounds:

      (a)    the Supreme Court had no power to enforce the Award under statute or common law;

      (b)    the Arbitrator lacked jurisdiction to hear the dispute;

      (c)    the Arbitrator violated its due process rights by accepting a third report by EEEL's expert, Mr. Danny Large, and allegedly did not accord it an equal opportunity to respond;

      (d)    EEEL bribed, blackmailed, and harassed Mr. Sergei Egorov, the former Project Director of the Savoy and a potentially material witness, to change his statement to support EEEL and to discourage him from attending the evidentiary hearing in the proceedings; and

      (e)    the Arbitrator failed to completely address Vijay's argument that Article 1230 of the Civil Code of the Seychelles ("Seychelles Civil Code") required that EEEL send notice before claiming any damages in relation to the Savoy construction works.

**SUMMARY OF JUDGE ROBINSON'S FINDINGS**

10.    Upon review, in a 119 page ruling, the Learned Judge made the following findings:

      (a)    the Supreme Court had the power to enforce the Award;

      (b)    the Arbitrator had jurisdiction to hear the dispute;

      (c)    the Arbitrator did not violate Vijay's due process rights;

(d) Vijay waived or was estopped from raising the witness tampering defense; and

(e) that the Arbitrator correctly dismissed Vijay's defense regarding the notice requirement under Article 1230 of the Seychelles Civil Code.

## GROUNDS OF APPEAL

11.   The Appellant has advanced the following grounds of appeal:

**Ground 1**

The Learned Trial Judge erred in her finding at paragraph 208 of the Judgment that the issue of the arbitrator's lack of jurisdiction was not able to be raised in the matter as such an issue is possible by law only in respect of domestic arbitration.

**Ground 2**

The Learned Trial Judge erred at paragraph 215 of the Judgment in holding that the arbitrator's finding in his Interim Award on the interpretation of the arbitration Clause of the Contracts was correct.

**Ground 3**

The whole tenor of the judgment shows a clear predisposition by the Learned Trial Judge to find for the Respondent and to tailor all her findings to that end, thus rendering her significant finding unsafe and unsatisfactory.

**Ground 4**

The Learned Trial Judge erred in her finding at paragraph 185 of the Judgment that the provisions of section 4 of the Courts Act applied in Seychelles to enable the powers, authorities and jurisdiction of the High Court in England to be exercised by the Supreme Court of Seychelles in addition to (but not in the absence of) the jurisdiction of the Supreme Court and in consequence, having correctly found at paragraph 173 of the Judgment that the Award was incapable of being enforced and recognised in terms of the New York Convention in Seychelles erred in importing the powers of the High Court in England under the English Common Law and concluding that the Supreme Court had jurisdiction under section 4 of the Courts Act to enforce and recognise that award.

**Ground 5**

The Learned Trial Judge erred in her endorsement of the Award in that she:

a.  Erred in finding that the arbitrator had not denied the Appellant a fair hearing by allowing the Respondent to introduce the third report by the witness, Mr. Danny Large, after the close of evidentiary part of the arbitration.

b.  Erred in her finding at paragraph 241 of the Judgment that Mr. Toitmilan (sic) assisted counsel for the Appellant in the cross-examination of Mr. Large and that this required Mr. Large to prepare and the Respondent to submit the third report of Mr. Large.

c.  Erred in her finding at paragraph 243 of the Judgment where she accepted the clearly erroneous proposition of the expert witness at the trial – without herself assessing the propriety in terms of Seychelles principles of public policy – that, because counsel for the Appellant had been informed by counsel for the Respondent would be producing a further report, and without disclosing that report to the Appellant as the Respondent had promised to do, this was sufficient to make the production proper.

d.  Erred in her assessment of the issue at paragraph 248 of the judgment insofar as she gratuitously supported the Respondent's position, clearly demonstrating a propensity to support the Respondent without a fair and balanced assessment of the issue.

e.  Erred in her refusal at paragraph 253 of the Judgment to follow the important authorities of *Morel and Cable & Wireless* for the reasons given, and in particular, erred in her finding that third Report of Mr. Large had not 'introduced matters not previously addressed in his first two reports', which finding is contradicted, *inter alia*, by the arbitrator that Mr. Large's third report introduced 'new evidence.'

f.  Erred in not accepting that the suborning by the Respondent of the witness, Mr. Egorov, to change his statement filed with the arbitration was contrary to public policy, irrespective of the fact that the Appellant had not brought this to the attention of the arbitrator.

g.  Erred in her assessment of the law with regard to the requirement of notice before terminating the contracts for breach.

**Ground 6**

The whole judgment of the Learned Trial Judge amounts to an endorsement of the denial of due process and the granting of impunity to those who clearly set out to suborn witnesses and prevent the course of justice from proceeding independently. In that respect, the Judgment as a whole contravenes the provisions of Article 19 of the Constitution of Seychelles and Article 6 (e) and (g) of the Treaty Establishing the

Common Market for Eastern and Southern Africa.

**Ground 7**

The Learned Trial Judge erred in dismissing the motion to deny the Respondent judgment on the basis of the contempt shown to the Supreme Court by the Respondent in preventing the witness, Mr. Egorov, from testifying before the arbitration, and in attempting to prevent the witness from testifying before the Supreme Court, in that the Learned Trial Judge:

      a.  Made a wholly wrong assessment of the behaviour of the witness, Mr. Egorov, and

      **b.**  Was selective in her assessment of the evidence place before her by the Appellant, leaving out crucial documents which supported the Appellant's case and Mr. Egorov's credibility.

**GROUNDS OF CROSS-APPEAL**

12.    The Respondent cross-appealed on the following grounds:

**Ground 1**

The Learned Trial Judge erred in law in treating and considering the issue – from paragraph 69 to 173 of the Judgment – as one of enforcement under the New York Convention on Recognition and Enforcement of Foreign Arbitral Awards 1958 instead of treating and considering the issue as one of enforcement in terms of Articles 146 to 150 of the Commercial Code of Seychelles.

**Ground 2**

The Learned Trial Judge erred in law in holding that Articles 146 and 150 of the Commercial Code did not have legal effect since Seychelles is not a signatory and party to the New York Convention on Recognition and Enforcement of Foreign Arbitral Awards 1958.

**Ground 3**

The Learned Trial Judge erred in law and on evidence in holding that there was no "reciprocity" in terms of Article 146 of the Commercial Code of Seychelles between Seychelles and France.

**Ground 4**

6

The Learned Trial Judge erred in law and on the evidence in holding that "reciprocity" in terms of Article 146 would have been applicable solely if Seychelles was a signatory and party to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

**RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS AND THE POWER OF THE SUPREME COURT OF SEYCHELLES TO ENFORCE THE AWARD**

13.    We are of the considered view that at the very outset, we ought to consider Ground 4 of the Appellant's grounds of appeal as well as Ground 1 to 4 of the Respondent's Grounds of cross-appeal, as these are issues which would determine the threshold issue of whether the Supreme Court of Seychelles has the jurisdiction to recognise and enforce the Award referred to herein.

14.    We would therefore first proceed to carefully consider the issues framed by the Learned Trial Judge and her reasoning and determination in respect of same on these Grounds. The Learned   Trial Judge framed the issues presented for the Supreme Court's determination as follows:

> **(i)**    whether the 1958 New York Convention on Recognition and Enforcement of Foreign Arbitral Awards (hereinafter referred to as the "NY Convention") applies so as to render a foreign arbitral award enforceable in the Seychelles; and

> **(ii)**    whether the Supreme Court is empowered by the Seychelles Courts Act to look to English law and thereby conclude that it has the power to enforce a foreign arbitral award in the Seychelles.

15.    In establishing that the Award could not be enforced in terms of the NY Convention, the Learned Judge first referred to Article 227 of the Seychelles Code of Civil Procedure, which provides in relevant part that:

> *"Arbitral awards under the [NY Convention], as provided under articles 146 and 148 of the Commercial Code of Seychelles, shall be enforceable ..."*

16.    Referring to Articles 146 and 147 of the Commercial Code of Seychelles, the Learned Judge accepted Vijay's argument that while Articles 146-150 regarding the NY Convention *"ha[s] been enacted as part of the Commercial Code"* of Seychelles, the articles have no legal effect because Seychelles is not a party to the NY Convention and there is no reciprocity – in terms of the NY Convention – between Seychelles and member States to the NY Convention.

7

17.     In accepting Vijay's argument, the Learned Judge dismissed EEEL's claim that the said reciprocity was not based on the NY Convention. Robinson J supported her conclusion by applying the holding in *Omisa Oil Management v Seychelles Petroleum Company Limited* [2001] SLR 50 to conclude that the enactment of Articles 146-150 of the Commercial Code as municipal law of Seychelles does not bind France to any degree or extent and that France's obligation under the NY Convention is only towards other States party to the said Convention.  For those reasons, she held that the Award could not be enforced in terms of the NY Convention.

18.     Having found that the Award could not be enforced in terms of the NY Convention, the learned Judge then went on and framed the issue for the court's determination as follows:

- whether the court is *"entitled to resort to English common law enabling enforcement of foreign arbitral awards if there are provisions of the written laws of Seychelles which exist."*

19.     Given the absence of an effective provision enabling the enforcement of a foreign arbitral award, it appears that the Learned Judge was of the opinion that the court *"should fill the gap somehow on the basis that it is inconceivable that a trading nation such as ours would unfairly protect its nationals from the consequences of their international obligations freely entered into."*

20.     To support her decision to resort to English law, the Learned Judge first referred to Article 125 of the Constitution of the Republic of Seychelles, which provides that in addition to the jurisdiction specified therein, the Supreme Court shall have such other jurisdiction as may be conferred by an Act. Relying on the decided case of *Finesse v Banane* [1981] SLR 103 – which interpreted section 4 (then 3) of the Courts Act as enabling the Supreme Court to exercise all the powers, authorities and jurisdiction of the High Court of Justice in England as at 22 June 1976, she concluded that in addition to its own jurisdiction, the Supreme Court had all the powers, authorities, and jurisdiction of the High Court in England.

21.     In response to Vijay's argument that relied on section 17 of the Courts Act to claim that section 4 is only applicable where Seychellois law is silent, the Learned Judge emphasized that section 11 of the Courts Act, which provides that the jurisdiction of the court shall extend through the Seychelles, shall not be construed as diminishing any jurisdiction of the Supreme Court relating to matters arising outside Seychelles.

22.     In support, she cited *Albyazov v Outen & Ors.* [2015] SCCA 23, a case regarding the enforcement of a receiving order, wherein the Seychelles Court of Appeal affirmed recognition of a receiving order and in so doing stated that the Supreme Court *"has the same powers as the High Court of England and Wales."* She concluded by stating that

8

*"even if it can be successfully argued that our written laws in respect of the enforcement of [a] foreign arbitral award are not silent, section 4 of the Courts Act is still applicable."*

23.   The Learned Judge then indicated that other than enforcement under the NY Convention, there were two methods of enforcing a foreign arbitral award in England: section 26 or section 40(a) of the United Kingdom's Arbitration Act of 1950 (the "UK Arbitration Act"). Accepting the parties' suggestion that section 26 was not the method used by EEEL, she referred to section 40(a) of the UK Arbitration Act, the law applicable in June 1976, which provided that:

> *"Nothing in this Part of this Act shall - . . . (a) prejudice any rights which any person would have had of enforcing in England any award or of availing himself in England of any award if neither this Part of this Act nor Part I of the Arbitration (Foreign Awards) Act. 1930, had been enacted."*

24.   The Learned Judge found that Rule 199 (White Book) established that a foreign arbitral award would be enforced in England if the award were;

(i)   in accordance with an agreement to arbitrate that was valid by its proper law; and

(ii)   valid and final according to the law governing the arbitration proceedings.

25.   Reading section 40(a) of the UK Arbitration Act together with Rule 199 of the English Rules of the Conflict of Laws (the law applicable in June 1976), she concluded that the High Court of England had the power to enforce a foreign arbitral award and that therefore the Supreme Court of Seychelles had the same power.

**OUR FINDINGS ON THE ISSUE OF RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS AND THE POWER OF THE SUPREME COURT OF SEYCHELLES TO ENFORCE THE AWARD**

26.   We have given careful and thoughtful consideration to the written and oral submissions of all Learned Counsel on this issue and the reasons contained in the Judgment of Robinson J.

27.   The Appellant contends in its appeal that the Leaned Judge erred in using the provisions of section 4 and other provisions of the Courts Act to extend to the Supreme Court of

Seychelles, the statutory powers exercised by the High Court of Justice of England under the UK Arbitration Act.

28.     The Cross-Appellant, on the other hand, advances the proposition that the Learned Judge should have treated the matter of enforcement under Article 146 of the Commercial Code as a domestic law issue with no necessity of treaty reciprocity, since the NY Convention is incorporated in our law, and that as such, the ruling that non-accession by Seychelles to the NY Convention meant non-reciprocity in term of the article was therefore wrong.

29.     Learned Counsel for both the Appellant and Cross-Appellant submitted at length on this point with interjections, as and when necessary from the bench.  Much time was spent in the discussions and interactions on this issue given its crucial importance in this case.

30.     We are of the firm view that given that the issue of jurisdiction raised in the different grounds of appeal and cross-appeal are heavily interrelated, they will be best addressed as one issue by this Court. The question before us therefore is as follows:

> • **Did the Learned Judge err when she relied on the reception provisions of section 4 of the Courts Act to resort to English law and recognize and enforce the Award in the Seychelles, given that the Seychelles legislature had seemingly domesticated the provisions of the NY Convention?**

31.     We will answer this question by dealing with what we consider to be three cardinal issues arising in this case:

**(A) the reception of English statutory law and its application in the case;**

**(B) the constitutional justification for such a reception**; and

**(C) the constitutionality of the treaty-making process applicable in this case**.

**LEGISLATIVE HISTORY OF ARTICLES 146-150 OF THE COMMERCIAL CODE**

32.     Before we address these issues, it is essential that we set out the legislative history of Articles 146-150 of the Commercial Code. There has been some confusion regarding the history of these Articles and reliance on UK statutes in the court below. In fact, the Appellant contends that Articles 146-150 of the Commercial Code were legislated with a view of subsequently ratifying the NY Convention. We feel this matter ought to be clarified, given its relevancy to the issues arising on appeal in this case.

33.     In this regard, we proceed to consider the history prior to the coming into force of the Commercial Code, which came into effect on the 13th of January 1977. The NY Convention came into force on the 7th of June 1959. The United Kingdom acceded to the New York Convention by instrument dated 24th September 1975. At the time the United Kingdom acceded to the NY Convention, Seychelles was a colony of Britain.

34.     On Seychelles gaining independence from the British in 1976, pursuant to an exchange of Notes between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Seychelles concerning Treaty Succession, an agreement was reached, whereby all obligations and responsibilities of the Government of the United Kingdom and Northern Ireland, which arose from any valid international instruments, as from the 29th of June 1976, were to be assumed by the Government of Seychelles insofar as such instruments may have been held to have had application to Seychelles.

35.     The then President, Sir James Mancham, confirmed that the Government of Seychelles was in agreement with the provisions set out in the Note. Therefore, at the time the Commercial Code came into existence on the 13th of January 1977, Seychelles by this instrument had from the 29th of June 1976 succeeded to all obligations and responsibilities arising from any valid instrument. Included in these instruments was the NY Convention, as the United Kingdom had acceded to it on the 24th of September 1975.

36.     Based on this history, we are therefore inclined to disagree with the contention of Learned Counsel for the Appellant that Articles 146 to 150 of the Commercial Code were legislated with a view that the Seychelles would in the near future ratify the NY Convention. At the time, Articles 146 to 150 of the Commercial Code of Seychelles were enacted, Seychelles had succeeded to the NY Convention, hence their inclusion in the Commercial Code.

37.     Subsequently, however, pursuant to Article 8.1 of Vienna Convention on the Succession of States in Respect of Treaties ("VCSSRT"), the Ministry of Foreign Affairs, by Note No. 37/79, notified the British Government that it did not consider itself bound by treaties which came within the ambit of the Treaty Succession Agreement.

38.     Article 8.1 of the VCSSRT, which deals with "Agreements for the devolution of treaty obligations or rights from a predecessor State to a successor State", reads as follows:

> "*The obligations or rights of a predecessor State under treaties in force in respect of a territory at the date of a succession of States do not become the obligations or rights of the successor State towards other States Parties to those treaties by reason only of the fact that the predecessor State*

> *and the successor State have concluded an agreement*
> *providing that such obligations or rights shall devolve upon*
> *the successor State*."

39. The Ministry of Foreign Affairs of Seychelles informed Britain that Seychelles reserved the right to review such treaties and decide to adopt or terminate the rights and obligations arising from such treaties.

40. Thereafter on 12 July 1985, Seychelles sent a communiqué to the Secretary-General of the United Nations regarding the current legal status of treaties covered by the Treaty Succession Agreement. With regard to multilateral treaties covered by the Treaty Succession Agreement, save in respect of treaties acceded to by the Republic of Seychelles, Seychelles indicated that it did not regard any of the relevant treaties as continuing in force in Seychelles.

41. We find that with the repudiation of the Treaty Succession Agreement, all obligations and responsibilities of the Government of United Kingdom and Northern Ireland arising from any valid international instrument, which would have included the NY Convention, ceased to have effect. This repudiation resulted in the non-applicability of Articles 146-150 of the Commercial Code of Seychelles. Importantly, there is no evidence to indicate that Seychelles acceded to the said NY Convention thereafter.

42. It is to be borne in mind that the 1979 Constitution of Seychelles declared Seychelles to be a Sovereign Socialist Republic State, a one party State with a unilateral party system and a positive system of non-alignment which would explain the change of stance by Seychelles in not pursuing a more open, treaty and convention friendly international policy.

### (a)   The Reception of English Statutory Law and Its Application in the Case

43. To what extent does English law apply in the Republic of Seychelles in the year 2017? In answering this question, we re-visit the decision in the case of *Sultan Gemma Finesse v Marie Leopold Banane* [1981] SLR 103.

44. This question arises 24 years after Seychelles adopted a Constitution that proclaimed in Article 1 that *"Seychelles is a sovereign democratic Republic"* and 41 years following our independence from the United Kingdom. This is a very significant question of law that has very far-reaching consequences and we are aware of the impact that our decision will have on the practice and precedents of the courts. Nonetheless, it is one that has to be addressed.

45. Whilst English common law applies by virtue of section 4 of the Courts Act, the applicability of English statutory law remains unclear given the current constitutional realities that we live in, as pronouncedly depicted in this case. The issue appears to be one of interpretation of the reception provisions in our laws in the light of articles in our Constitution that give jurisdiction to our courts, especially the Supreme Court.

46. These reception statutes and provisions were extended to most of the former colonies of the United Kingdom. It was a way for the new nations to adopt or receive the pre-independence English common law, to the extent that it was not explicitly rejected by the legislative bodies or the constitutions of these new nations.

47. Well aware of the limitations and deficiencies in the legal environment of the newly independent States, these reception provisions were meant to keep open the door to the applications of English law so as to prevent a situation of total absence of law and a breakdown in the Rule of Law.

48. Generally, the reception statutes and provisions allowed the receipt of the English common law dating prior to the independence and operated as the default law in the absence or *lacunae* in the local law. Given this concern for the breakdown in the Rule of Law, many Commonwealth States have more or less the same provisions as section 4 of our Courts Act in their legislation. New Zealand, India, Belize, Mauritius and various Caribbean and African nations adopted the English common law through reception statutes; although they did not inevitably seek to copy the English law.

49. Many of them now draw on decisions of other common law jurisdictions, however, more former British colonies are revisiting the scope and extent of the applicability of these reception provisions in their laws, based on their current constitutional and statutory constraints.

50. For instance, in the British Virgin Island, the relevant reception provision is section 11 of the Eastern Caribbean Supreme Court (Territory of the Virgin Islands) Act. According to that section:

> "*the jurisdiction vested in the High Court in civil proceedings and in probate, divorce, and matrimonial causes, shall be exercised in accordance with the provisions of this Ordinance and any other law in operation in the territory and rules of court, and where no special provisions is therein contained such jurisdiction shall be exercised as nearly as may be in conformity with the law and practice administered for the time being in the High Court of Justice in England'.*

51.   In *Panacom International Inc. v Sunset Investment Ltd. and Another* (1994) 47 WIR 139, the Court of Appeal of the Eastern Caribbean had to consider the scope of section 11 of the Supreme Court Act of Saint Vincent and the Grenadines, which is identical to that of the British Virgin Island. The court made two crucial points: Firstly, it held that section 11 relates solely to the manner of the exercise of a pre-existing jurisdiction and was intrinsically a procedural provision, and secondly, the words "law" and "practice" were *"evidently intended to be references to procedural (as distinct from) substantive law"*.

52.   Likewise, in *Veda Doyle v Agnes Deane of Eastern Caribbean* HCVAP 2011/020, the Eastern Caribbean Court of Appeal was faced with a similar issue as to whether the Judgment Act 1838 of England, which provided for the automatic attachment of post-judgment interest on judgment debt, could be imported into the law of the Grenadines in the absence of local law governing the award of interest following judgment.

53.   Although the facts were similar to those in the case of *Dominica and Industrial Development Bank v Mavis William* (Commonwealth of Dominica Civil Appeal No. 20 of 2005), where the court had held that section 11 was capable of importing English statutes,  the court in *Veda Doyle* held that the English law intended to be imported by section 11 was the procedural law administered in the High Court of Justice in England and not English statute nor English procedural law which is adjectival and purely ancillary to English substantive law.

54.   The judgment in *Veda Doyle* relied on legislative intention to conclude that what was not intended was the importation of English law generally to fill *lacunae*, however desirable filling the gap may seem. To emphasize the point, the Learned Judge in that case said that such a construction would leave much to be desired in any sovereign State and would create uncertainty as to what laws a citizen may be subject to at any given point without regards to its own parliament which is constitutionally mandated to enact laws for the State as it may deem necessary for the State's good governance.

55.   Finally, in *Ocean Conversion v Attorney General of the Virgin Islands* (BVI HCV2008/0192), the issue before the court was whether to award pre-judgment interest by reference to the English Law Reform (Miscellaneous Provisions) Act 1938, since there were no express powers in the British Virgin Island which permitted the Judge to do so.  There, the plaintiff sought to rely on section 7 of the West Indies Associated States Supreme Court (Virgin Islands) Act, which provided as follows:

> *"The High Court shall have and exercised within the territory all such jurisdiction (save and except the jurisdiction in admiralty) and the same powers and authorities incidental to such jurisdiction as on the 1*$^{st}$* day of January 1940, were vested in the High Court of Justice in England"*.

56.    The court in *Ocean Conversion,* rejected the argument that section 7 conferred it jurisdiction to grant pre-award interest. Instead, the court held that when section 7 refers to powers and authorities incidental to such jurisdiction, it is referring to the court's inherent jurisdiction and not referring to specific powers conferred on the High Court under particular statutes.  The court felt that such powers were not vested in the High Court, but were made available by legislation to the High Court for that purpose.

57.    In Seychelles, our reception provisions can be found in the Courts Act (CAP 52) (hereinafter referred to as "the Act"). Section 4 of the Act provides that: *"The Supreme Court shall be a court of record and in addition to any other jurisdiction conferred under this Act and any other law, shall have and may exercise the powers, authority and jurisdiction possessed and exercised by the High Court of Justice in England"*.

58.    Section 5 of the Act vests in the Supreme Court full original jurisdiction in civil matters and in so exercising such powers gives to that court all powers, privileges, authority and jurisdiction which is exercised by the High Court of Justice in England. And Section 6 of the Act contains the equitable jurisdiction of the Supreme Court in cases where no sufficient legal remedy is provided by the law of Seychelles.

59.    Moreover, section 7 gives to the Supreme Court admiralty jurisdiction as possessed by the High Court of Justice in England under the Administration of Justice Act 1956 and section 9 vests in the Supreme Court all criminal jurisdiction as vested in the High Court of Justice of England.

60.    The Seychelles Supreme Court has previously addressed the scope of section 4 of the Courts Act and the applicability of English law in Seychelles. In *Finesse*, Judge Sauzier (as he then was) held that section 4 (formerly section 3A) of the Courts Act, vests in the Supreme Court powers, authority and jurisdiction of the High Court of Justice of England and that these include both the inherent powers and jurisdiction and powers under statutory laws of England, provided that they predate 22 June 1976. The 22nd of June 1976 being the date of the enactment of Ordinance 13 of 1976, the amendment that promulgated the Ordinance in our law.

61.    Having found these English statutes applicable, Judge Sauzier applied the provisions of the Matrimonial Procedure and Property Act 1970 of the United Kingdom in the Seychelles.

62.    In so doing, Judge Sauzier chose not to follow the Mauritian Supreme Court case of *Koo Poo Sang v Koo Poo Seng* 1957 MR 104, which held that section 15 of the Mauritian Courts Ordinance (CAP 150), which is nearly in the same terms as that of section 4 of the Act, did not give to the Supreme Court of Mauritius the jurisdiction which the High Court in England had under section 18(1) of the Matrimonial Causes Act 1950.

15

63.     The Learned Judge in the *Koo Poo Seng's* case based himself on the Mauritian Supreme Court precedents of *Michel v Colonial Government* 1896 MR 54 and *B v Attorney General* 1914 MR 94. These two cases being authorities for the principle that section 15 of the Mauritian Courts Ordinance vested the Supreme Court of Mauritius with only inherent powers of the High Court of England and not jurisdiction granted by statutes.

64.     However, the holding in *Finesse* and resort to English statutes is tempered by the holding in *Kim Koon & Co. Ltd v Republic (*1969) SCAR 60. In *Kim Koon*, the Seychelles Court of Appeal was faced *inter alia* with an issue as to the application of the English Criminal Evidence Act 1965 to the Seychelles. In finding that this statute was inapplicable to the Seychelles, the court referred to section 3 of the Seychelles Judicature Ordinance, enacted on 15 October 1962, which as amended, provided that:

> *"12. Except where it is otherwise provided by special laws now in force in the Colony or hereafter enacted, the English Law of Evidence for the time being shall prevail." (Kim Koon* (1969) SCAR 60 at p. 64).

Applying this provision to the facts before it, the Court of Appeal held that:

> *"We have no doubt that it is not competent for the Seychelles Legislature to delegate the power to legislate, and that so far as section 12 of the Evidence Ordinance as may purport to apply to Seychelles future amendments of the English law of evidence, it is inoperative. In our judgment the effect of the section is to apply to Seychelles the English law of evidence as it stood on the 15th October 1962, the date of enactment of the Seychelles Judicature Ordinance, 1962. Accordingly, the Criminal Evidence Act 1965, does not apply in Seychelles."*

65.     Despite the fact that the Criminal Evidence Act of 1965 was a statute in force in England that conferred certain powers and jurisdiction on the High Court of Justice in England, the Court of Appeal found that given that local Seychelles law (*i.e.*, the Judicature Ordinance) had given primacy to the evidentiary rules as found in the English Law of Evidence, other statutory evidentiary rules were not applicable to the Seychelles.

66.     Relying on the principle enunciated in *Kim Koon* as regard to the applicability of the English Law of Evidence in the Seychelles, several Court of Appeal decisions have stated that it should be applicable *"only if it is not otherwise inconsistent with the 1993 Constitution which provides for equal protection of the law and if considered relevant and keeping in line with the modern notions of the law of evidence acceptable in other democratic counties." **Lucas v Republic, SCA 17/2009**,* 22 adding that - *"Paragraph 2(1) of Schedule 7 of the 1993 Constitution should be given a fair and liberal meaning and the continuation in force of existing law should not be understood as making applicable to the Seychelles the English law of evidence which has now been abrogated".*

67.    In the instant case before us, the Learned Judge applied the reception provision of section 4 of the Courts Act in accordance with the principles enunciated in *Finesse*. The Learned Judge first found that the provisions of Article 146 of the Commercial Code were not enforceable due to the lack of ratification on the part of Seychelles, hence absence of reciprocity. She supported her conclusion by applying the ratio in *Omisa Oil Management v Seychelles Petroleum Company* [2001] SLR 50 ("*Omisa Oil*").

68.    Having come to this conclusion, she went on to apply the reception provisions of section 4 of the Act and imported the provisions of the UK Arbitration Act. The Learned Judge also referred to article 125(1) (d) of the Constitution of Seychelles and concluded that the Act that grants jurisdiction and powers to the Supreme Court, other than the Constitution of Seychelles, is the Courts Act -- as determined in *Finesse*.

69.    Having reached this determination, the Learned Judge thereafter accepted the submissions of both counsel that in terms of section 40(a) of the UK Arbitration Act read with Rule 199, the High Court of England, as at June 1976, had powers, authorities and jurisdiction to enforce an arbitral award. The Learned Judge held that:

> "*On the other hand, the Supreme Court has all the powers, authorities and jurisdiction of the High Court of England <u>in addition to (but not in the absence of), the jurisdiction of the Supreme Court. In addition, the powers, authorities and jurisdiction granted to the Supreme Court by section 4 of the Court Act is in addition to and independent of, any other powers, authorities and jurisdiction that the Supreme Court may have</u>. The court agrees. If accepted, Vijay's interpretation would be contrary to the clear and explicit wording of article 125 (d) of the Constitution of the Republic of Seychelles and section 4 of the Courts Act. The court agrees <u>that even if it can be successfully argued that our written laws in respect of the enforcement of foreign arbitral award are not silent, section 4 of the Court's Act is still applicable</u>.*" (Our emphasis).

70.    In the present case, although Article 227 of the Civil Procedure Code, discussing the NY Convention, and Articles 146-150 of the Commercial Code exist as law on the statute books, they cannot be enforced because of Seychelles' decision not to ratify the NY Convention.

71.    As is the practice in countless cases in Seychelles, courts regularly refer to English jurisprudence as persuasive authority for assistance in clarifying and understanding Seychellois law. However, the reference to English jurisprudence should not be

misconstrued as a license to graft or introduce new laws to the legislation(s) already in place in the Seychelles.

72.     To do so would amount to a violation of the separation of powers between the National Assembly and the Judiciary, and -- in some cases – of the Executive. Article 85 of the Constitution clearly indicates that legislative power is vested in the National Assembly; this power cannot be delegated to a foreign legislative making body.

73.     Finally, the Supreme Court's reliance on section 11 of the Courts Act to hold that section 17 should not be read as diminishing the court's jurisdiction is equally unconvincing. Section 11 provides that:

> "*Extent of jurisdiction of the Supreme Court*
>
> *11.       The jurisdiction of the Supreme Court in all its functions shall extend throughout Seychelles:*
>
> *Provided that this section shall not be construed as diminishing any jurisdiction of the Supreme Court relating to persons being, or to matters arising, outside Seychelles."*

74.     The phrase *"Provided that this section"* indicates that it is section 11 that should not be read as diminishing the jurisdiction of the Supreme Court, but not other sections in the Courts Act.

75.     With respect to its interpretation of section 11, the Supreme Court erred because it is not section 11 that is diminishing the court's jurisdiction; it is Article 125(1)(b) of the Constitution read together with Article 227 of the Civil Procedure Code and Articles 146-150 of the Commercial Code that diminish or circumscribe the court's jurisdiction, as these articles make it clear that the Supreme Court is legislatively empowered with regard to the enforcement of foreign arbitral awards, but that exercise of such powers will be ineffective given the reciprocity provision of Article 146 of the Commercial Code.

### (b) The Constitutional Justification for such a Reception

76.     Article 125(1) of the Constitution provides that:

> "125 (1) *There shall be a Supreme Court which shall, in addition to the jurisdiction and powers conferred by this Constitution, have*

18

> (a) *Original jurisdiction in matters relating to the application, contravention, enforcement or interpretation of this Constitution;*
>
> (b) *Original jurisdiction in civil and criminal matters;*
>
> (c) *Supervisory jurisdiction over subordinate courts , tribunals and adjudicating authority and, in this connection, shall have power to issue injunctions, directions, orders or writs including writs or orders in the nature of habeas corpus, certiorari, mandamus, prohibition and quo warranto as may be appropriate for the purpose of enforcing or securing the enforcement of its supervisory jurisdiction; and*
>
> (d) *such other original, appellate and other jurisdiction as may be conferred on it by or under an Act."*

77.     Jurisdiction is the authority "which a court has to decide matters that are litigated before it…." *See Ernesta & Ors. v R*  [2017] SCCA 24. On the other hand, "powers" of the court are catered for in the wordings of the legislations that empower the courts in their adjudicative functions. Hence powers and jurisdiction are not interchangeable notions. They are two distinct terminologies that carry significant differences in meanings in the law and the Constitution.

78.     Considering how Article 125(1) (a) to (d) of the Constitution is drafted, the Supreme Court cannot have more jurisdiction and powers other than those granted to it by the Constitution itself and with respect to jurisdiction, as further provided under an Act. This leaves us to scrutinise Article 125(1)(a), (b), (c) and (d) of the Constitution to see whether they could legitimately allow for the existence of the reception provisions of section 4 to be used as an extra jurisdictional clause, as the Supreme Court did in this case.

79.     The Learned Judge relied on sub-article (d) of Article 125 (1) by holding that the Supreme Court has "*all the powers, authorities and jurisdiction of the High Court of England in addition (but not in absence of), the jurisdiction of the Supreme Court. In addition, the powers, authorities and jurisdiction granted to the Supreme Court by section 4 of the Courts Act is in addition to and independent of any other powers, authorities and jurisdiction that the Supreme Court may have*."

80.     To our minds the Learned Judge erred. Article 125 (1) read as a whole, does not allow the Supreme Court to rely on the statutes of the United Kingdom, be they pre-22nd June 1976 or not. If jurisdictions exist under Article 125(1) (a) to (c), an Act promulgated under Article 125 (1) (d) cannot confer the same jurisdiction. This would mean duplicity of

similar jurisdictions, with one imported from abroad under Article 125(1) (d); that Act would be *ultra vires* Article 125 (1) and in contravention of Article 5, which provides that the Constitution is the supreme law of Seychelles and that any law inconsistent with the Constitution is void.

81.    Sub-article 125(1) (d) was therefore meant to cover a new jurisdiction, not one already existing in sub-article 125 (1) (a) to (c); and it was meant to cover a new jurisdiction which had its basis in domestic law, not a foreign statute.

82.    In the instant case before us, the Supreme Court received the UK Arbitration Act in our law and applied it to the facts of this case. It did so through section 4 of the Courts Act and it based its ruling on the Supreme Court case of *Finesse*. It did so as the Supreme Court sitting in its original jurisdiction in civil matters under article 125(1) (b) of the Constitution.

83.    With the advent of the 1993 Constitution of Seychelles our reference point should be articles of the Constitution. The Supreme Court had jurisdiction expressly conferred by the Constitution. The court was sitting as the Supreme Court in its original civil jurisdiction under article 125 (1) (b) of the Constitution and was deciding a case based on a Plaint.

84.    Having been enjoined with such Constitutional jurisdiction, the court had to adjudicate on the enforceability of Article 146 of the Commercial Code of Seychelles. It was given this power by the laws of Seychelles in the form of the Commercial Code. It could and should have exercised that jurisdiction without having to resort to a jurisdiction under Article 125(1) (d) of the Constitution.

85.    This exercise of original civil jurisdiction should have been carried out regardless of the outcome of the case. A court should never seek to construct a jurisdiction in order to suit or accommodate the facts of the case. Given that it had jurisdiction under Article 125(1) (b) of the Constitution, it may be argued that what the court did was attempt to use powers given to the High Court under the UK Arbitration Act. However, this was not permissible as the court was already so empowered by Article 146 of the Commercial Code.

86.    We note that there is an ever increasing tendency on the part of courts in the Seychelles to be very quick in resorting to the power, authority and jurisdiction of the English High Court in attempts to do justice in a case by using the reception provisions of the Courts Act. Such practice though is doubtful when the law is unambiguously clear as in this case.

87.    In our view, Article 125(1)(d) grants to the Supreme Court jurisdictions other than  civil, criminal, constitutional and supervisory jurisdiction over other bodies, as those are already provided in sub article 125(1)(a) to (c). This interpretation is more in line with

20

Article 1 of the Constitution and the legislative supremacy of our National Assembly to enact laws, pursuant to Article 85 of the Constitution, and an ever increasing amount of foreign case laws that limit the extra-territorial application of colonial reception laws.

88.    It is to be noted, however, that Article 125(1) of the Constitution would not take away the power of the Supreme Court to seek inspiration from the common law of the United Kingdom as an aid to interpretation of statutes inspired by the common law or that from the rules, practice and precedents of the English High Court, which in the case of common law would not be of a binding nature. It would also not take away the inherent powers of the Supreme Court as received by the High Court.

### (c)  The Constitutionality of the Treaty-Making Process Applicable in this Case

89.    Our Constitution separates the three arms of Government. It grants to the Executive, the Judiciary and the Legislature separate and distinct powers. This concept of separation of powers was thought of by the French political philosopher Baron de Montesquieu as a means to prevent authoritarianism. He made the proposition that democracy and liberty are best served when the arms of the State exercise their powers independently from each other.

90.    With the powers being exercised separately and independently there arises the need to ensure that one arm of the State checks and balances the powers of the others through an intricate constitutional oversight system. Exercised in such a manner, the powers of each one prevent that of the other from being supreme and unchecked.

91.    In Article 49 of the Constitution, the people of Seychelles have, amongst other things, defined our democracy as one where there is a balance of powers between the Executive, Judiciary and Legislative arms of the State.

92.    Our Constitution, similarly to other constitutions setting up a Presidential system of Government, entrusted the powers of execution of international treaties to the President of the Republic, as part of his powers as Head of State.

93.    Article 64 (3) of the Constitution provides as follows:

> *"The President may receive or cause to be executed treaties,*
> *agreement or conventions in the name of the Republic".*

94.    The execution of international treaties is therefore a matter for the discretionary powers of the President vested in him by the Constitution. No other arms of Government can constitutionally and/or legally usurp or interfere with the exercise of that power. There is

no constitutional obligation on the President that compels him to execute treaties, agreements or conventions.

95.    The reception of those instruments or their execution would depend on the policy of the Government of the day, through the execution of some of those instruments by the comity of nations and their universal execution by the international community may lead the Executive with little discretion in that respect.    This would be so, especially in international human rights matters, where even the Constitutional Court and this Court is empowered by the Constitution in Article 48 to take judicial notice of international instruments containing the human rights obligations when deciding cases brought under Chapter III of our Constitution.

96.    However, consonant with the balance of powers principle, the Constitution has set up a dualist as compared to a monist system of treaty making. The monist system exists only in matters of Chapter III relating to constitutional enforcements.    Hence, though the President receives, executes or causes treaties and conventions to be executed, it is the constitutional role of the National Assembly to ratify them and cause them to be domesticated and be made applicable in the domestic law of Seychelles. This ratification, however, applies only in instances where the instruments would affect international relations.

97.    Article 64(4) of our Constitution is relevant here and it states that:

> "A treaty, agreement or convention of international relations which is to be or is executed by or under the authority of the President shall not bind the Republic unless it is ratified by:
>
> (a)    An Act; or
> (b)    a resolution passed by the votes of a majority of the members of the National Assembly.

98.    Therefore, though the President starts and initiates the first step in treaty implementation, unless the National Assembly enacts a law or passes a resolution, the Treaty will not be domesticated. The power is therefore shared and balanced between these two arms of Government in order to ensure that the President and the National Assembly check each other, in the interest of the people of Seychelles. And only those instruments that are deemed in the national interest of the Republic are entered into by Seychelles and constrain the rights of people in Seychelles.

99.    In this case, Article 146 of the Commercial Code calls for reciprocity of signature or execution by the Executive and ratification of the New York Convention by the National Assembly. "Reciprocity" here can only have one meaning; it would be what is invited by Article 1(3) of the NY Convention itself.    This article allowed State Parties to ratify or sign the NY Convention subject to non-reciprocal treatment for non-State Parties. When

the treaties, including the NY Convention, was devolved by the United Kingdom upon Seychelles in June 1976, this is the treaty arrangement that we inherited.

100.  At the time of the promulgation of the Commercial Code on the 1st of January 1977, Article 146 was therefore fully operational, it was working, provided that the other transacting State was a member of the NY Convention. As we have seen, this was so by virtue of the British ratification of the NY Convention and the subsequent Seychelles Independence Order.

101.  However, it was short lived. Through the conscious and deliberate act of repudiation and renunciation in 1979, the NY Convention ceased to have its domestic application, though the text of the Article 146 and others remained part of our domestic law.  This article needs to have life breathed in into in order to waken it from its slumber. The only way is to follow the dictate of our supreme law.

102.  In 1993, the Seychelles enacted its Constitution. In order to give life to the NY Convention in our domestic law, the President would have to execute it and the National Assembly would have to ratify it. Ratification may properly be done in this case by way of a resolution of the National Assembly, given the existing provisions of Article 146 of the Commercial Code.

103.  This Court only adjudicates on laws properly enacted by the National Assembly and assented to by the President.  This Court cannot usurp the powers of the National Assembly and the President to implement international instruments in the domestic law of the Republic, irrespective of how important the parties may feel the instruments to be.

104.  If in all his wisdom the President of the Republic feels that it is not in the best interest of the Republic to execute or cause the execution of the New York Convention, the Court cannot execute or cause its execution by resorting to an execution done by another Sovereign State. This is not constitutionally possible. To do so would be to disrespect the balance of powers and would be an intrusion on a presidential prerogative.

105.  We take judicial notice that there are many other areas of law where the repudiation of the colonial treaty arrangements in 1979 may have affected or could potentially affect the application of the law. For example, the Extradition Act (CAP 78) is dependable on treaty arrangements in order to allow Seychelles, based on reciprocity, to extradite persons to other States. So far, only Kenya and the United Kingdom has been scheduled as applicable jurisdictions and no new Extradition Treaties have been entered into with a foreign State under section 3(1)(b).

106.  The same applies to mutual assistance in criminal matters under the Mutual Assistance in Criminal Matters Act (CAP 284). Even there, there would be a need for us to comply with the dictate of the provisions of our Constitution. No bilateral or multilateral mutual

assistance in criminal matters treaties have been entered into by Seychelles under section 4(1) (b) since the promulgation of this Act in 1995.

107.  The Court cannot have recourse to colonial treaties executed by the United Kingdom given the constraints of Article 64 of the Constitution. It may be advisable that the President and the National Assembly consider doing an evaluation of our situation in that respect and ensure that priority is given to execution and domestication of the relevant international instruments which are in our national interest, including the New York Convention.

108.  The Constitution of 1993 is fundamentally based on the doctrine of Separation of Powers. The duty of the Judiciary is to interpret the existing laws. Article 64 of the Constitution specifically grants the President, as Head of State, the power to decide on whether to sign, ratify, or accede to any international treaties and the Legislature to pass the necessary laws once ratified and acceded to as part of the dualist system reflected within the said Article.

109.  It would be improper for the Judiciary to usurp the powers in this arena as it is vested in the Executive and based on government policy. If any *lacunae* exist as suggested in this Judgment, the concerned authorities should move to ensure that necessary steps are taken to fill up the void for the benefit of the nation.

110.  For the aforementioned reasons, we proceed to hold as follows:

1.  With respect to **Ground 4** of Vijay's appeal, we find that the Learned Trial Judge **ERRED** in finding that provisions of section 4 of the Courts Act applied in Seychelles to enable the powers, authorities and jurisdiction of the High Court in England to be exercised by the Supreme Court of Seychelles in addition to (but not in the absence of) the jurisdiction of the Supreme Court.

Ground 4 of Vijay's appeal is therefore **UPHELD**.

2.  With respect to **Ground 1 to Ground 4** of EEEL's cross-appeal, we find that the Learned Trial Judge **DID NOT ERR** in:

i.  Treating the issue as one of  enforcement under the NY Convention instead of treating it as one of enforcement under Articles 146-150 of the Commercial Code (**Ground 1**);

ii.  Holding that Articles 146-150 of the Commercial Code did not have legal effect since Seychelles is not a party to the NY Convention (**Ground 2**);

iii.   Holding that there was no reciprocity in terms of Article 146 of the Commercial Code between Seychelles and France (**Ground 3**); and

iv.   Holding that reciprocity in terms of Article 146 of the Commercial Code would have been applicable solely if Seychelles was a party to the NY Convention (**Ground 4**).

**Ground 1 to Ground 4** of EEEL's cross-appeal are therefore **DISMISSED** with costs to the Appellant/Cross-Respondent.

111.   We therefore hold that the Award, referred to herein, is not enforceable in the Seychelles.

112.   We therefore proceed to hold as follows:

1.   The New York Convention is not applicable to the Seychelles and accordingly Articles 146 to 150 of the Commercial Code have no legal effect.

113.   In view of our conclusion here above, there is no necessity to consider the other grounds of appeal.

B. Renaud (J.A)                **M. Burhan (J.A)**              **R. Govinden (J.A)**

Signed, dated and delivered at Palais de Justice, Ile du Port on 07 December 2017

# Case Law 02

**Reuter v. Electric Telegraph Co. (1856) 6 E&B. 341**

trial by eleven jurymen: no consent in writing is necessary for that purpose.] But the jurisdiction here arises only under the statute, which requires a consent in writing. [Alderson B. In a case under that section, a record would be sent down without any jury process at all: this is altogether a different proceeding.] Consent cannot give jurisdiction. It is true that a Judge might, if he and the parties pleased, sit as an arbitrator; but then his decision would take effect as an award, and would not authorize a postea and judgment in this form. There would be no authority to order a verdict to be entered, unless that were expressly contained in the submission.

Lush, contrà, was not called upon.

Jervis C.B. I am of opinion that the judgment of the Court of Queen's Bench should be affirmed.

Pollock C.B., Alderson B., Cresswell J. and Crowder J. concurred.

Willes J. Nothing appears on the record shewing ground for invalidating this judgment: the case comes under the rule that concensus tollit errorem.

Judgment affirmed.

[341]  REUTER *against* THE ELECTRIC TELEGRAPH COMPANY.  Friday, May 2d, 1856.  A company were incorporated by Royal charter for trading purposes. By the deed of settlement, the directors were to manage the business of the Company; but all contracts, above a certain value, were to be signed by at least three individual directors, or sealed with the seal of the Company under the authority of a special meeting.  Plaintiff sued the Company on an agreement above the prescribed value.  It was within the scope of the Company's business, and was made by parol with the chairman, who, with his own hand, entered a memorandum of it in the minute book of the Company.  It was recognised in correspondence with the secretary; plaintiff did work under it, and received payments by cheques for it.  These payments passed into the accounts of the Company, and were audited and allowed; but there never was any contract signed by three directors, or under the seal of the Company.  On a case stating these facts, with power to draw inferences of fact,—Held, that the contract was ratified, if not authorized, by the Company, and binding.

[S. C. 26 L. J. Q. B. 46; 2 Jur. N. S. 1245.  Referred to, *South of Ireland Colliery Company* v. *Waddle*, 1868-69, L. R. 3 C. P. 470; L. R. 4 C. P. 617; *Hunt* v. *Wimbledon Local Board*, 1878, 3 C. P. D. 214; 4 C. P. D. 48.]

The matters in difference in this cause were by order of a Judge referred to a barrister.  Amongst other provisions in the order of reference, it was agreed that no objection should be raised on the ground that a particular contract was made, not with the defendants, but with The International Telegraph Company.  The arbitrator made an award in favour of the plaintiff for 300l.; and, in his award, awarded in addition 217l., if the Court should be of opinion, on a case stated in the award, that this contract was binding on The International Telegraph Company.  This case proving not to be stated with sufficient distinctness to enable the Court to form a judgment, a supplemental case was, by order of the Court, agreed on by the parties, in which the facts were stated, and power was given to the Court to draw inferences.

The statements in the award and the supplemental case, so far as are material to the points decided, were, in substance: That The International Telegraph Company was incorporated by Royal Charter, bearing date 29th July 1853, for the purpose of establishing telegraphic communications between Great Britain and other coun-[342]-tries by means of a submarine telegraph to Holland.  The charter directed that the business of the Company should be carried on according to the provisions of a deed of settlement, which it required to be prepared and executed.  The charter contained provisions for securing to Her Majesty's Government the use of the telegraph for state purposes; and the following proviso: "Provided always, and this Our Royal Charter is upon the express condition that, subject to the aforesaid provisions giving Us and Our aforesaid officers on Our behalf as aforesaid the prior right to use such telegraph as aforesaid for Our service, such telegraphs shall be open for the sending and receiving of messages by all persons alike, without favour or preference, and subject to such equitable charges and to such reasonable regulations as may from time to time be made by the said Company."

The deed of settlement provided for the appointment of directors, and contained the following stipulation. "The directors shall conduct and manage the affairs of the Company, and shall exercise all the powers which may be exercised by the Company at large, and shall fulfil all the duties of the Company, except such powers and duties as are reserved to general meetings by these presents or the said charter." It contained also provisions for the election of a secretary, who was to have the actual custody of the seal of the Company, and of the books, and was to act under the controul of the directors. It contained also the following provisions. "Contracts, other than bills of exchange or promissory notes, for the purchase of any article the consideration for which does not exceed 50l., or for any labour or services, the duration or period of which does not exceed **[343]** six months, nor the consideration money 50l., may be entered into on behalf of the Company by any officer authorized by the directory. Contracts for the purchase or sale of any article, or for the hire of any labour or services, or in respect of any arrangement with any other Company for the exercise of the powers and privileges of the said Company, or of any such other Company, or otherwise, in any of the matters incidental to the carrying on the affairs of the said Company, may be entered into on behalf of the Company by the directors; but such contracts shall be signed by at least three individual directors, or shall be sealed with the seal of the Company under the authority of a special meeting, or a resolution of the directors." There were other provisions as to bills and notes, and contracts for the purchases of lands; and this stipulation: "All contracts, whether under seal or not, including bills and notes, shall be immediately reported to the secretary." There was no express provision that contracts should not be binding unless made in this stipulated manner.

The case set out an agreement, dated the 14th September 1853, between the plaintiff and the Company, by which the plaintiff, who had been in business on the Continent as a collector and transmitter of messages, agreed for a year, and from thence or so long as the parties pleased, to send all messages through the Company's telegraph, except where the sender of the message had specially directed it should be sent in some other way. The Company agreed to allow him seven per cent. on the amount they should receive; and the plaintiff bound himself not to enter into any contract with any other telegraph Company during the continuance of this agreement. The instrument was under **[344]** the seal of the Company. The supplemental case stated that, after the making of this deed, and whilst the same was in force, the chairman of the Company, "as such chairman, then being the offices of the said Company, and professing to act on behalf of the said Company, made a parol agreement with the plaintiff, by which the said chairman agreed, on the representation of the plaintiff that he was about to establish a new class of business, that plaintiff should be allowed 50 per cent. on all messages sent or received by him through the Company's lines containing public intelligence; and that the chairman did, shortly after, and before anything was done under such agreement, with his own hand, write down the terms of such agreement in the minute book of The International Telegraph Company, a copy of which minute is as follows.

12th January, 1854. That during pleasure 50 per cent. be returned to Mr. Reuter on all messages transmitted by him containing public intelligence.

The said chairman did not sign the said minute; nor did any of the directors or secretary sign the same." The case also set out a previous correspondence, comprising, amongst other documents, the prospectus of the plaintiff's new undertaking; by which it appeared that he proposed that, in addition to his existing business of collector and transmitter of messages for persons who desired to send them, the plaintiff was to become collector of public, political and commercial news, which he proposed to transmit to this country and communicate to subscribers. The following letter was sent by the plaintiff to the secretary of the Company. "London, 31st December, 1853. Dear Sir,—By the enclosed circular you will observe that my new undertaking will **[345]** commence on 1st January, 1854; and, as, according to an arrangement with your chairman, 50 per cent. will be returned to me of all charges of dispatches which I receive or send through your lines, I beg to ask which way you desire our accounts to be kept: if I am to pay you the whole amount for the messages: or whether I am only to pay you half of the usual charge each time. Awaiting your early reply." A letter of 14th January addressed to the plaintiff, in answer to this letter and others, contained the following passage: "As regards your proposition, the

Company prefer, as a matter of convenience, that you should pay in the whole charge for a message, and receive back your percentage subsequently." This letter was signed "H. R. Wilson pro. Secretary," the secretary himself being then absent. After this, accounts were from time to time sent in on this principle, in which the Company were charged with 50 per cent. on such messages ; and these accounts were paid, and the amounts passed into the Company's books, which were audited. The Court had by the supplemental case power to draw inferences of fact. In the award the arbitrator found that " the services rendered by the plaintiff under the said parol agreement were calculated to be beneficial to the interests of the said Company in their business, but were not absolutely necessary. I find also that the terms of such agreement were never written but as above stated, and were never affirmed by having affixed to them the seal of the Company." And the only question he referred to the Court was, if the agreement was binding upon the Company.

The case was now argued (a)[1].

[346] Hugh Hill, for the plaintiff. The defendants, being a corporation for trading purposes, may be bound by an agreement not under seal, made in furtherance of the purposes of their incorporation ; Henderson v. Australian Royal Mail Navigation Company (5 E. & B. 409). [Lord Campbell C.J. I was not a party to that judgment ; but I highly approved of it. The decision in it must at all events be binding on us ; it is therefore incumbent on the counsel for the defendants to distinguish the present case from that.]

The Court then called on

Sir Fitzroy Kelly, for the defendants. Though a trading corporation may be bound by a parol contract, it must be made by some one having authority to contract for the corporation. It is to be borne in mind that the shareholders are a fluctuating body : and the question is whether all of the present shareholders are bound. They are, if the contract was made by those authorized to contract : but here the authority is limited by the deed of settlement to contracts signed by three directors. Neither the chairman nor the secretary is entrusted with authority to make contracts for the corporation. [Erle J. A trading corporation like the present holds a position intermediate between a municipal corporation and an ordinary copartnership. Do you go so far as to say that, if every existing shareholder personally knew of and assented to the contract, it still would not bind the corporation?] Such a contract would bind the individuals ; but it probably would not bind the corporation, consisting of persons who might [347] afterwards acquire shares in ignorance of the contract, unless the formalities prescribed by the constitution of the Company had been complied with. But that question does not arise here ; for it cannot be assumed that all the shareholders were cognizant of this transaction. [Lord Campbell C.J. But there is ample evidence that the directors, who were trusted by the shareholders to conduct the business of the Company, knew of and recognised the contract ; and that is evidence both of ratification on their part, and also of previous authority given by them (a)[2].] The contract is altogether ultra vires of the directors ; it is not a part of the business of the Company to collect political news ; and the plaintiff was already bound to transmit all his messages by the Company. Besides, the effect of the agreement is to give the plaintiff fifty per cent. advantage over his competitors, and so to frustrate the provision in the charter providing for equal charges.

Hugh Hill was heard in reply.

Cur. adv. vult.

Lord Campbell C.J., on a subsequent day (May 8), delivered judgment.

We are of opinion that the plaintiff is entitled to our judgment.

No reliance can be placed upon the objection that the defendants are a corporation, and that the agreement on which they are sued is not under seal. They are a corporation for carrying on a particular business ; and the services done by the plaintiff were in the direct course of the business which by their charter they were [348] to carry on. We adhere to the decision of this Court in Copper Miners' Company v. Fox (16 Q. B. 229, 236) and Henderson v. Australian Royal Mail Steam Navigation Company (5 E. & B. 409).

The next objection is that, at all events, according to the deed of settlement, the

---

(a)[1] Before Lord Campbell C.J. Wightman, Erle and Crompton Js.

(a)[2] See Smith v. The Hull Glass Company, 11 Com. B. 897.

contract ought to have been "signed by at least three individual directors." We do not think it necessary to decide whether the consideration money here must be taken to exceed 50l. ; for, assuming that the contract was originally ultra vires of the chairman, we think that it has been adopted and ratified by the Company, so as to render them liable upon it. We must first observe that this contract, which was entered into on the 12th of January 1854, does not appear to us to be at variance or at all inconsistent with the prior agreement of 14th September 1853. The new business of collecting public intelligence by the plaintiff's personal exertions, and transmitting it by the telegraph, had not been before contemplated ; and the remuneration for it was provided for on a totally different footing. Might not the contract entered into by the chairman, although originally without authority, and not binding, be ratified by the Company ? The deed of settlement declares that "the directors shall conduct and manage the affairs of the Company, and shall exercise all the powers which may be exercised by the Company at large." Then the documents set out in the supplemental case afford abundant evidence that the directors were made acquainted with the new contract, approved of it, and acted upon it. The entry of it in the minute book by the chairman was for their information ; and we, having power to draw inferences from the evidence, do infer that they saw it and sanctioned it. The plaintiff [349] acted under it for many months ; during this period he corresponded respecting it with the secretary, the proper functionary of the Company for carrying on such correspondence ; he, from time to time, rendered accounts to the Company, taking credit for business done under the agreement ; and payments were made to him of sums for which he so took credit by cheques which the directors must have drawn. We are bound to suppose that the directors, before they drew the cheques, examined the accounts and approved of what the plaintiff had done. It is found by the arbitrator, indeed, that, although he was to recover a larger remuneration under the new agreement than under the old, the services to be done by the plaintiff under the new agreement were calculated to be beneficial to the interests of the Company. The accounts shew that he thus brought custom to the Company, and that they profited by the services which they must be considered as requesting him to continue.

We have only further to dispose of Sir Fitzroy Kelly's last objection, founded upon the proviso in the charter, that the telegraphs of the Company "shall be open for the sending and receiving of messages by all persons alike, without favour or preference, subject to such equitable charges and to such reasonable regulations as may from time to time be made by the said Company." It is urged that this agreement gives a preference to the plaintiff by allowing him to send his messages at half price. Grave doubts may be entertained whether this proviso, although it may be made the foundation of complaints against the Company, can be rendered available to them in resisting a demand under a contract into which they have entered. But the allowance to [350] the plaintiff seems rather a remuneration to him for his services in collecting public intelligence and bringing custom to the Company than any preference or partiality to him in the use of the telegraph ; and there is nothing to shew that their dealings with him, which they now contend to be illegal, are not according to "equitable charges" and "reasonable regulations."

For these reasons we think that the defendants are liable for the additional sum of 217l. under the new agreement, and give judgment for the plaintiff.

Judgment for the plaintiff.

SAMUEL JEWEL AND GABRIEL SCOTT *against* WILLIAM STEAD. Friday, May 2d, 1855. By a turnpike Act, the trustees were authorized to erect toll bars, but not within three miles of B.—Held, that the distance from B. must be measured on the straight line on the horizontal plane ; the circumstance that the Act was a turnpike Act not being sufficient to indicate an intention that it should be measured along the road.

[S. C. 25 L. J. Q. B. 294 ; 2 Jur. N. S. 783 ; 4 W. R. 544. Applied, *Mouflet v. Cole*, 1872, L. R. 7 Ex. 73.]

This was a case stated without pleadings. The defendant was clerk to the trustees of the Whiteparish, Romsey and Southampton turnpike roads. The plaintiffs brought the action to recover back tolls which had been taken from them at a toll gate called

# Case Law 03

**Wilson v. West Hartlepool Ry & Harbour Co.
(1865) 2 De G.J. & S. 475**

thereof as belonged to the passengers in and upon the said omnibus, and the portion which did not belong to any of such passengers.

If the court shall be of opinion that the plaintiffs were so entitled, then the defendant's plea is to be withdrawn, and the plaintiffs are to be at liberty to sign judgment by confession, for the amount of the said tolls, or so much thereof as the court shall determine that the plaintiffs were entitled to demand and take. But if the court shall be of opinion that the plaintiffs were not entitled to demand and take any part of the said toll, then the defendant is to be at liberty to **[235]** sign judgment of non-pros., or otherwise, as the court shall direct.

Channell Serjt. for the plaintiffs. Before the plaintiffs can take tolls, they are required by their act to affix a table of the tolls payable at their bridge (supra, 230). This they have done. It will be necessary to draw the attention of the court to the particular objects of the act, which are very different from those in the ordinary case of acts imposing tolls on roads, or on bridges. Though this is called a bridge, it is in reality a boat propelled by machinery or by steam. [Tindal C. J. It is a ferry boat.] From the 80th section, it appears that tolls may be taken from "travellers," which seems to be a larger word than "passengers." The language of that section is large enough to embrace all travellers, whether sitting in an omnibus or not. [Maule J. You ask to be allowed to put the tolls on the loading and upon the carriage which contains it as well.] Besides the toll upon the horse, a separate toll was due on the rider as a passenger. The company are not to lose the tolls of the passengers because they bring horses with them. [Tindal C. J. Do you include gentlemen riding in their own carriages as passengers liable to pay for themselves, and then suggest that there should be an additional toll for their carriages? If so, the company might ransack every carriage for carpet-bags. If the bill had asked for this, the clause would have been struck out in the House of Lords. Whoever seeks to impose tolls must support his claim by plain words.]

Per curiam.  Judgment for the defendant.

**[236]** WILSON AND ANOTHER *v.* TUMMAN AND FRETSON.  June 15, 1843.

[S. C. 6 Scott, N. R. 894 ; 1 D. & L. 513 ; 12 L. J. C. P. 306. Applied, *Ancona* v. *Marks*, 1862, 7 H. & N. 695. See *Brook* v. *Hook*, 1871, L. R. 6 Ex. 96. Applied, *Morris* v. *Salberg*, 1889, 22 Q. B. D. 620. Discussed, *Keighley* v. *Durant*, [1901] A. C. 246 ; *Connor* v. *Butler*, [1902] 2 Ir. R. 576. Adopted, *O'Keeffe* v. *Walsh*, [1903] 2 Ir. R. 712.]

Where A. does an act as agent for B., without any communication with C., C. cannot, by afterwards adopting that act, make A. his agent, and thereby incur any liability, or take any benefit, under the act of A.

Trespass, de bonis asportatis. Plea, by each defendant separately, not guilty.

At the trial before Parke B., at the last assizes for the county of York, the following facts appeared.

In November 1842, the plaintiffs took possession of the goods in question, under a deed of assignment from Jeremiah New, to whom the goods had previously belonged, and in whose house they still were.

On the 3d of December 1842, these goods were seized and taken away under some process directed to the sheriff in respect of a debt due from New to Tumman. Neither of the defendants authorized this seizure before, or at the time, it was made. Both the defendants were, on the same day, served with notice that the plaintiffs claimed the goods.

On the 3d of December, the defendant Fretson, who was Tumman's attorney, gave a notice in writing to Mrs. Fearn,—to whose house the goods had been removed the day before,—in which he said, " I am coming about the goods which were seised," and desired her not to part with the goods to any person except Tumman. On the 5th of December Fretson sent her a written indemnity for retaining them.

On the 19th of January 1843, notice was given to the defendants that an action would be brought against them and the sheriff and his officers for the seizure. The person who served Tumman with the notice asked if he had any claim on the goods ; to which he answered " Yes, I have ; and a just claim, I consider."

Upon this evidence the learned judge directed the jury, that as the order given by Fretson had not **[237]** been acted upon by any refusal on the part of Mrs Fearn to

WILSON *v.* TUMMAN

deliver the goods to the plaintiffs, the only question for their consideration was, whether the seizure on the 3d of December was made by order of the defendants or either of them. That an order to seize the goods was in this case necessary, to charge the defendants with the trespass ; that although the subsequent assent and ratification by B. of an act done by A., professing to act for and on account of B. is sufficient to make that act the act of B., by relation, here, the sheriff's officers acted as ministers of the law, without any intention to act as agents of the party suing out the process ; that as to Fretson, the question of ratification did not arise, inasmuch as the seizure could not be for his benefit. The learned judge therefore asked the jury to find, whether the defendants, or either of them, gave any previous authority for making the seizure, and whether the defendant Tumman had authorized or had merely given a subsequent assent to a seizure. The jury found that neither of the defendants had originally authorized the seizure, but that Tumman had subsequently sanctioned and authorized such seizure. The learned judge directed the verdict to be entered for both of the defendants, reserving leave to the plaintiffs to move to enter a verdict for 2l. 16s. against Tumman, if the court should be of opinion that his ratification made him liable as a trespasser.

Bompas Serjt. in the following term moved to enter a verdict for 2l. 16s. against Tumman, or for a new trial on the ground of misdirection.

Upon the first branch of his motion he referred to Com. Digest, Trespass C. 1, *Barker* v. *Braham* (2 W. Bla. 866), *Hull* v. *Pickersgill* (1 Bro. & Bingh. 282, 3 J. B. Moore, 612), and *Wilson* v. *Barker* (4 B. & Ad. 614, 1 N. & M. 409).

**[238]** In support of his application for a new trial, he relied upon the indemnity given by Fretson to Mrs. Fearn.

Tindal C. J. You may take a rule for entering a verdict against Tumman ; there is no pretence for making Fretson a trespasser.

June 1.—Byles Serjt. now shewed cause. It does not appear whether the goods were seized under process or not. [Cresswell J. The words used by Fretson were, " I am coming about the goods that were seized." Bompas Serjt. It was left to the jury ; and they found that the goods had been taken under process. Maule J. The judge reports that he said there might be a difference between a seizure under process, and a seizure by a stranger alleging that he was authorized by the defendant to seize. Bompas Serjt. I am bound to admit that the officers seized as acting for the sheriff. Maule J. They claimed an authority by law, but did not claim to act by the authority of Tumman.] It is true that no writ was put in, and that the nature of the legal process under which the seizure was made, did not appear. It may have been a distringas to compel an appearance. The writ is actually in court, though the defendants are not entitled now to produce it. Neither did it appear for what purpose, or for whose use, the seizure was made. There are numerous cases, beginning as far back as the reign of Henry IV., which shew that a subsequent adoption of a trespass will not affect a third person, unless the act were originally done in his name, or for his use. The same rule prevails in matters ex contractu. There can be no adoption of an act or contract unless the act be done, or the contract made, in the name of the principal, or for his use. The principle, indeed, goes much further. Not only is a party unable to take advantage of an act which was not done in his name, or expressly **[239]** to his use, but he cannot defend himself under such act. 7 H. 4, s. 35 (a) ; *Wilson* v. *Barker* ;

*(a)* The case cited here, and also in 2 M. & S. 487, as 7 H. 4, 35, is evidently the case in H. 7 H. 4, fo. 34, pl. 1, which was a decision of Gascoigne, C. J. of K. B. at nisi prius, and is thus reported :—" An inquest was charged between two parties on a writ of trespass of certain cattle taken against the peace, in which the defendant had justified as bailiff for services arrear to his lord ; whereas the plaintiff said that he was not bailiff of his lord at the time of the taking. And the plaintiff said in evidence, that the defendant took the beasts claiming heriot for himself, so that he could not at that time be bailiff to another. And after their charge, Gascoigne said to them, that if the defendant took them claiming property in himself by way of heriot, although the lord afterwards agreed to that taking for the services due to him, still he could not be said to be his bailiff for that time. But if, without command, he had taken (the cattle) for services due to the lord, and the lord had afterwards agreed to the taking, he should be adjudged as bailiff, although he was not his bailiff in any place before the taking, Quod nota." With respect to the last part of the Chief Justice's statement, it is however observable that Lord Brooke, after abridging or rather tran-

WILSON *v.* TUMMAN

in which the distinction taken by Lord Coke in 4 Inst. 447, is **[240]** referred to and recognised by Parke J. The same distinction is applied to actions ex contractu in *Saunderson* v. *Griffiths* (5 B. & C. 904, 8 D. & R. 643), and in *Vere* v. *Ashby* (10 B. & C. 298). Suppose the goods to have been seized under legal process, or, to put it most unfavourably for the defendants, under a writ of fi. fa. ; if the execution creditor took a bill of sale, he would be liable in trespass, in case it turned out that the goods seized under the execution, were the goods of a stranger, and not the goods of the execution debtor. But if the execution creditor merely received the proceeds of the sale of the goods, though he might be liable in trover, he would not be a trespasser ; *Parsons* v. **[241]** *Lloyd* (3 Wils. 341), is a very different case from the present. There, a ca. sa. against Parsons was set aside for irregularity. The imprisonment of Parsons could not therefore be justified by Lloyd, who had sued out the process, and against whom the case stood precisely as if he had directed the arrest to be made without having sued out any writ of execution. Here, the process has not been impeached. To make Tumman liable for the wrongful act of the officers, it should have been shewn, either that he was personally active in the seizure, *Balme* v. *Hutton* (9 Bingh. 471, 3 Moo. & Sc. 1) ; or that these particular goods were seized by his previous or contemporaneous authority.

Bompas Serjt. (with whom was Cleasby), in support of the rule. The seizure was made on account of Tumman, and for his use. *Parsons* v. *Lloyd.* [Cresswell J. In

---

scribing this case, adds, " Quod quære inde, for if he was once a trespasser without authority, the agreement cannot help him, for an action was vested before." Bro. Trespass, pl. 86. In T. 22 E. 4, Fitz. Bayllye, pl. 4, a distinction is taken between a person acting as bailiff and a person acting as servant, a precedent authority being said to be necessary for the latter, though not for the former. Vide *Chambers* v. *Donaldson*, 11 East, 65.

In *Buller's case*, 1 Leon. 50, it was held that a plea to a cognizance of a distress for rent, taken by the defendants, as bailiffs to A.—that two strangers had right to the locus in quo, and that the defendants, by their command, took the cattle as damage feasant ; absque hoc, that the defendants took the cattle as bailiffs of A. was good.

Among the regulæ juris which Gregory IX. and Boniface VIII. appended to the Decretals (in imitation of Justinian's concluding title " De regulis juris," in the Digest,) is a rule or maxim which accurately enounces the principle laid down in the year-book of 7 H. 4, " Ratum quis habere non potest, quod ipsius nomine non est gestum." The learned Friar, Anacletus Reiffenstuel, in commenting on this rule, after shewing its reasonableness from the nature of ratihabition, adds, " Cui accedit etiam illa ratio, quod si quis ratum habere valeret id, quod ipsius nomine non est gestum, facilè præjudicium emergere posset tertio, cum quo negotium gestumest ; cùm is, forsan, ex justâ causâ negotium cum tali habere noluisset, ac propterea, si scivisset, negotium nomine illius agi, à negotio, v. g. contractu, abstinuisset." Reiffenstuel, Tractatus de regulis juris, Ingolstadt, 1733, p. 41. This observation, founded upon a consideration of the uncertainty in which third persons would be placed if A. might adopt as his own, an act which was represented by the agent as the act of B., is similar to that which is implied in the foregoing quære of Lord Brooke. In confirmation of the distinction. Reiffenstuel refers to the text of the canon law for an illustration, which he appears to have regarded with no ordinary complacency. " Probatur et declaratur responsio ulterius clarissime, multùm allegabili exemplo Juris—c cùm quis, 23, de Sentent. Excommun. in 6 ibi.—Cùm quis, absque tuo mandato, mānus injecit in clericum tuo nomine violentas, si hoc ratum habueris, excommunicationem, latam à canone. incunctanter incurris ; cùm ratihabitio retrotrahatur, et mandato debeat comparari. Si vero injectio eadem tuo nomine non sit facta, tunc, licèt pecces ratam habendo eandem, non tamen propter hoc excommunicationis vinculo innodaris ; cùm quis ratum habere nequeat, quod suo nomine non est gestum."

And see P. 9 H. 6, fo. 1. pl. 1 ; H. 15 H. 7, fo. 17, pl. 11 ; *Anon.* 2 Leon. 196, case 146 ; *Fuller and Trimwell's case*, ib. 215 ; *Routh* v. *Thompson*, 13 East, 274 ; *Hull* v. *Pickersgill*, supra, 237, referred to by Parke J. in *Muskett* v. *Drummond*, 10 B. & C. 153, 157, 5 Mann. & Ryl. 210, 214 ; *Foster* v. *Bates*, 12 M. & W. 226, 232 ; *Governor, &c. of the Poor of Bristol* v. *Wait*, 3 N. & M. 359, 368, 369 ; 4 N. & M. 804, per Littledale J. ; *Battley* v. *Lewis*, ante, vol. i. 155, 581, n. ; *Battley v. Bailey*, 1 Scott, N. R. 143 ; Story, on Agency, sect. 242, n. 2 ; post, 243 (*b*).

WILSON *v.* TUMMAN

that case Lloyd had directed the issuing of a ca. sa. against Parsons; and no question could arise, as here, upon the authority. Maule J. Were the sheriff's officers the agents of Tumman in making the seizure?] It is submitted that they were. In *Menham* v. *Edmonson* (1 B. & P. 369) it was held that an execution-creditor, who had given a bond to the sheriff, was liable for the acts of the sheriff's officer. [Maule J. There, the bond, being given before, operated as a command, and not as a ratification.] But whether the execution-creditor indemnifies the sheriff or not, the latter is the agent of the party by whom he is set in motion. *Kelcey* v. *Minter* (1 New Cases, 721, 1 Scott, 616); *Groves* v. *Cowan* (10 Bingh. 5, 3 Moo. & Sc. 352). [Maule J. It was not shewn that at the time of the seizure, the officers assumed to act under any authority from Tumman. Coltman J. As the nature of the process under which the officers **[242]** proposed to act is not shewn, how does it appear that the seizure was to the use of Tumman?] The act of the officers being adopted by Tumman, it is immaterial whether the seizure was made with or without process, and whether it was made by parties professing to act on account of Tumman or not.

Cur. adv. vult.

TINDAL C. J. now delivered the judgment of the court. This case comes before us on a rule obtained by the plaintiffs, by leave of the learned judge at the trial, to enter a verdict for them against the defendant Tumman, for 2l. 16s. if the court should think that his subsequent ratification made him liable, as a trespasser, for the original seizure.

The seizure of the plaintiffs' goods was made by some officers of the sheriff, without any precedent authority from Tumman, who appeared upon the evidence at the trial to be a plaintiff in some suit, the nature of which did not transpire, but who is found by the jury, not to have given any precedent authority to take the goods of the plaintiffs, but to have ratified the taking after it was made. The question, therefore, is a dry question of law, whether the subsequent ratification by this defendant, of a taking under such circumstances, is the same, in its consequences, as a precedent command of the defendant. And we think, under the authorities, and upon the reason of the thing itself, that it is not.

That an act done, for another, by a person, not assuming to act for himself, but for such other person, though without any precedent authority whatever, becomes the act of the principal, if subsequently ratified by him, is the known and well established rule of law. In that case the principal is bound by the act, whether it be for his detriment or his advantage, and whether it be founded on a tort or a contract, to the same extent as by, **[243]** and with all the consequences which follow from, the same act done by his previous authority. Such was the precise distinction taken in the Year-book, 7 Hen. 4, fo. 35 (i.e. H. 7 H. 4, fo. 24, pl. 1. Vide ante, 239 (a))—that if the bailiff took the heriot, claiming property in it himself, the subsequent agreement of the lord would not amount to a ratification of his authority, as bailiff at the time; but if he took it, at the time, as bailiff of the lord, the subsequent ratification by the lord made him bailiff at the time. The same distinction is also laid down by Anderson C. J. in Godbolt's Reports, 109 (b). "If one have cause to distrain my goods, and a stranger, of his own wrong, without any warrant or authority given him by the other, takes my goods, not as bailiff or servant to the other, and I bring an action of trespass against him, can he excuse himself by saying that he did it as his bailiff or servant? can he also father his misdemeanor upon another? He cannot; for once he was a trespasser, and his intent was manifest."

In the present case the sheriff's officers, who were the original trespassers by taking the goods of the plaintiffs, were not servants or agents of the defendant Tumman, but the agents of a public officer or minister, obeying the mandate of a court of justice. They did not assume to act, at the time, as agents or bailiffs of the then plaintiff Tumman, but they acted as the servants of another, viz., the sheriff, by virtue of the process directed to him by the court. And this forms the distinction between the present case and that of *Parsons* v. *Lloyd* relied upon in the argument. In the present case the sheriff, or the sheriff's officers, seized under process, which is not suggested to have been void or irregular, but must be taken to be valid process. In the case in

_____

(b) P. 110. There Shuttleworth Serjt. said, "What, if he distrain generally, not shewing his intent, nor the cause wherefore he distrained, &c.? Ad hoc non fuit responsum." Ib.

Wilson, **[244]** the writ had been set aside as irregular; and, consequently, the arrest had been made without any authority. In that case, therefore, the sheriff had acted, not under any authority of the court, but under the direction of the plaintiff in the original action, who, by suing out void process, was in the same situation as if he had orally desired the sheriff or his officer to make the arrest. And on the latter supposition, where a ca. sa. or fi. fa. has been set aside for irregularity, it becomes a nullity, and no doubt the sheriff acts as the servant, and by the command, of the plaintiff who sued it out, and who is consequently liable, as a principal, for the act of his agent.

If the defendant Tumman had directed the sheriff to take the goods of the present plaintiffs, under a valid writ, requiring him to take the goods of another person than the defendant in the original action, such previous direction would undoubtedly have made him a trespasser, on the principle that all who procure a trespass to be done are trespassers themselves, and the sheriff would be supposed not to have taken the goods merely under the authority of the writ, but as the servant of the plaintiff. But where the sheriff, acting under a valid writ by the command of the court and as the servant of the court, seizes the wrong person's goods, a subsequent declaration by the plaintiff in the original action, ratifying and approving the taking, cannot, upon the distinction above taken, alter the character of the original taking, and make it a wrongful taking by the plaintiff in the original action.

On the ground of this distinction, we think the defendant Tumman is not shewn to be a trespasser, and that the rule must be discharged.

Rule discharged.

**[245]** Tapfield *v.* J. Hillman, W. Thomson, T. A. Mantell, H. Mantell, and J. Capson. June 8, 1843.

[S. C. 6 Scott, N. R. 967; 12 L. J. C. P. 311; 7 Jur. 771.]

An assignment, by way of mortgage, from a lessee to his lessor of furniture and stock in trade in, about, upon, and belonging to an inn, with a power, upon non-payment, to enter into, possess, hold, and enjoy the inn for the residue of the assignor's term therein, and "to take, possess, hold, and enjoy all the goods, chattels, effects, and premises," passes nothing but what was in, upon, or about the inn at the time of the assignment.—Secus, if power had been given to enter upon default, and take the goods, chattels, and effects then in, upon, or about the inn; per Tindal C. J.

Trespass, for breaking and entering the plaintiff's dwelling house at East Grinstead, Sussex, called the Swan Inn, &c., expelling the plaintiff and his family, and seizing, taking, and carrying away, and converting to the use of the defendants, certain cattle, goods, and chattels of the plaintiff.

The defendants pleaded first, not guilty; then two pleas to the entry and expulsion; and fourthly, as to so much of the declaration as related to seizing and taking the cattle, goods, and chattels,—that the plaintiff was not possessed of the same, or of any of them, modo et formâ; on all which pleas issue was joined.

At the trial before Patteson J., at the last Sussex assizes, it appeared that the plaintiff had occupied the Swan Inn at Forest Row, near East Grinstead, as tenant to Hillman and Thomson, who were brewers at Lewes. The demise was "for a year from the 29th of September 1838, and so on from year to year, until the expiration of three months' notice in writing, to be given by either party to the other, expiring on a quarter day in any one year," at 54l. rent.

The defendants Hillman and Thomson having agreed to lend the plaintiff 200l. upon the security of his furniture, stock, and effects, by an indenture bearing date the 25th of January 1839, the plaintiff assigned to Hillman and Thomson "all and singular the household furniture, plate, linen, china, glass, brewing utensils, post-chaises, carriages, horses, flys, harness, stock in **[246]** trade, goods, chattels, and effects of him the said John Tapfield, in, upon, about, or belonging to all that inn or tavern called or known by the name of the Swan Inn, at Forest Row, aforesaid, and also the tap, yard, stables, buildings, and premises, adjoining or belonging thereto, as the same now are in the tenure or occupation of the said John Tapfield, and all the right, &c. : to have, hold, &c. unto the said Hillman and Thomson, as their own property and effects absolutely." The deed contained a proviso for redemption, on

# Case Law 04

**Hooper v. Kerr, Stuart & Co. Ltd
(1901) 83 L.T. 729**

it. On these grounds I think that this motion is misconceived. Then I am told that it is necessary to bring this forward and have it discussed in this form, because in the Palatine Court the present respondents are suing the applicants, and the applicants, as I understand it, are in a position of considerable difficulty, at least, so I un[...]
must fight on [...]
take it, if the [...]
Court of App [...]
It is not part [...]
any manner [...]
Palatine Cou [...]
application ur [...]
ence to the r [...]
mark, and I d [...]
point of view. I think, therefore, that the application is wrong, and must be refused with costs.

Supplied by
**Law Society Library**
**Lawdocs**
020 7320 5946
library@lawsociety.org.uk
www.lawsociety.org.uk/Library

Solicitors: *Rowcliffes*, *Rawle*, and *Co.*, for *John Wall*, Wigan; *Robinson* and *Bradley*, for *Brown* and *Co*, Stockport; *The Solicitor to the Board of Trade*.

---

### *Nov. 21 and 28*, 1900.
(Before COZENS-HARDY, J.)

### *Re* COWLEY. (a)

*Infant—Minority— Management of land—Conveyancing and Law of Property Act* 1881 (44 & 45 *Vict. c.* 61), *s.* 42, *sub-s.* 1—*Land Transfer Act* 1897 (60 & 61 *Vict. c.* 65), *s.* 2, *sub-s.* 1.

*The heir-at-law of an intestate, who died after the coming into operation of the Land Transfer Act* 1897, *applied for the appointment of trustees under sect.* 42, *sub-sect.* 1, *of the Conveyancing and Law of Property Act* 1881. *The infant's mother and guardian made the application, and she was the administratrix of the intestate.*

*Held ( following* Re Glover (1899) 1 *Ir. Rep.* 337), *that sect.* 42, *sub-sect.* 1, *of the Conveyancing Act* 1881 *extends to land which descended. If the mother had not disclaimed her rights, there might have been some difficulty, but, under the circumstances, the order might be made as asked.*

THIS was an *ex parte* application by the mother and guardian of an infant for the appointment of trustees under and for the purposes of sect. 42.

The infant had become entitled, as heir-at-law of a deceased great-uncle, to the fee simple in possession of certain real estate.

The great-uncle had died since the Land Transfer Act 1897 (60 & 61 Vict. c. 65) came into operation, and the infant's mother and guardian was his administratrix.

In Hood and Challis's Conveyancing and Settled Land Acts, 5th edit., p. 113, it is said :

The language of this section points only to the case of infants taking under a settlement—that is, a disposition which creates successive interests. It cannot be assumed that this language will be extended to include infants taking by descent or otherwise entitled in fee simple.

In Wolstenholme's Conveyancing and Settled Land Acts, 6th edit., p. 98, it is stated that sect. 42, sub-sect. 1, of the Conveyancing Act 1881 includes the case where an infant takes by descent.

The summons asked that, pursuant to sect. 42, sub-sect. 1, of the Conveyancing Act, two proper persons might be appointed trustees for all the purposes of that section, and that the persons so appointed might be at liberty to enter into and continue in possession of the real estate to which the infant was entitled by descent or otherwise and to manage the same during his minority, and [...] thereof and lay out the residue [...] er provided by the above Act, [...] at the same persons might be [...] se the powers by the Settled [...] l on tenants for life under the [...] lf of the infant during his [...] of all the said real estate.

[...] e Conveyancing and Law of [...] 44 & 45 Vict. c. 41) provides :

[...] y person who would but for this section be beneficially entitled to the possession of any land is an infant, and being a woman is also unmarried, the trustees appointed for this purpose by the settlement, if any, or if there are none so appointed, then the persons, if any, who are for the time being under the settlement trustees with power of sale of the settled land, or of part thereof, or with power of consent to or approval of the exercise of such a power of sale, or if there are none then any persons appointed as trustees for this purpose by the court, on the application of a guardian or next friend of the infant, may enter into and continue in possession of the land ; and in every such case the subsequent provisions of this section shall apply.

Sect. 2, sub-sect. 1, of the Land Transfer Act 1897 provides :

Subject to the powers, rights, duties, and liabilities hereinafter mentioned, the personal representatives of a deceased person shall hold the real estate as trustees for the person by law beneficially entitled thereto, and those persons shall have the same power of requiring a transfer of real estate as persons beneficially entitled to personal estate have of requiring a transfer of such personal estate.

*Fellows* for the applicant.—*Re Glover* (1899) 1 Ir. Rep. 337) decides the point in accordance with Wolstenholme's contention. But the mother may be a trustee under the Land Transfer Act 1897, s. 2, sub-s. 1 (*Re Smith*, 61 L. T. Rep. 363 ; 42 Ch. Div. 302) ; she will disclaim if necessary.

The application stood over and a disclaimer from the mother was produced, and the summons was amended by entitling it in the matter of the Settled Land Acts.

COZENS-HARDY, J.—I will follow *Re Glover*. I should have hesitated to make an order adverse to the mother's right as guardian, but, as she has now disclaimed, I feel no difficulty, the summons being amended by being entitled in the Settled Land Acts.

Solicitors: *E. Carleton Holmes* and *Son*.

---

### *Tuesday, Dec.* 18, 1900.
(Before COZENS-HARDY, J.)

### HOOPER v. KERR, STUART, AND CO. LIMITED. (a)

*Company — Extraordinary general meeting — Notice—Unauthorised notice—Ratification.*

*On the 10th Dec.* 1900 *the secretary of a company sent out a notice convening an extraordinary general meeting to be held on the 18th Dec. The*

---

(a) Reported by G. B. HAMILTON, Esq., Barrister-at-Law.

(a) Reported by G. B. HAMILTON, Esq., Barrister-at-Law.

*notice purported to be issued by order of the board. A requisition had been served on the company in accordance with the articles requiring the calling of the meeting. In fact no meeting of directors was held after the receipt of the requisition, but a meeting of directors was held on the 16th Dec., the day after the writ was issued, at which it was resolved that the directors should adopt, ratify, and confirm the action of the secretary in issuing the notice convening the meeting.*

*The only question for determination was whether the meeting had been validly summoned.*

*Held, that on ratification by the directors the notice became good for all purposes.*

THIS was a motion (*inter alia*) for an injunction to restrain the defendant company from holding a meeting in accordance with a notice issued on the 10th Dec. 1900 by the secretary of the company.

The plaintiff was a director of the company, but certain differences had arisen between him and other directors with regard to a proposed conversion of preference into ordinary shares, and with regard to a new issue of ordinary shares at par when their market value was 25*l*.

On the 10th Dec. 1900 a requisition was made in writing pursuant to the articles requiring the directors to convene an extraordinary general meeting.

The secretary on his own authority issued a notice convening such meeting on the 10th Dec.

On the 13th Dec. the plaintiff issued his writ asking for an injunction restraining the meeting.

On the 14th Dec. a meeting of directors was held at which it was resolved to adopt and ratify the action of the secretary in sending out the notice convening the extraordinary general meeting.

*Eve*, Q.C. and *G. B. Hamilton* for the motion. —The notice given by the secretary could not be ratified except while the directors were able to give proper notice of a meeting. *Re Portuguese Consolidated Company*; *Steel's* case (62 L. T. Rep. 88; 42 Ch. Div. 160) is exactly in point. *Re Portuguese Consolidated Company*; *Badman and Bosanquet's* case (62 L. T. Rep. 179; 45 Ch. Div. 16) is quite different, for there was no repudiation in that case.

*Vernon Smith*, Q.C. and *Eustace Smith*.—On ratification the notice related back. The case is just like *Bolton* v. *Lambert* (60 L. T. Rep. 687; 41 Ch. Div. 395).

*Eve*, Q.C. replied.

COZENS-HARDY, J.—This motion raises an important point, but, as I have made up my mind, I will not reserve judgment. The plaintiff was one of the directors of a company. The directors can be removed by special resolution. Art. 55 says: "The directors may whenever they think fit, and they shall upon a requisition made in writing by two or more members of the company, holding together at least one-sixth of the issued capital, convene an extraordinary general meeting." The requisition according to this resolution was signed and served on the company on the 10th Dec. On the same day notice was issued for an extraordinary general meeting to be held on the 18th Dec., at which a resolution was to be proposed that the plaintiff should be removed from his office of

director. In fact there had been no meeting of the board after the receipt of the requisition. On the 14th Dec. a meeting of the board of directors was held, of which the plaintiff had notice, at which meeting a resolution was passed ratifying and confirming the action of the secretary in issuing the notice of the 10th Dec. The question is whether, although the notice was not authorised beforehand, it has been so ratified now as to make it a good and valid notice. In my opinion it has. The principle of the cases, which I do not propose to go through, is that the ratification of an act purporting to be done by an agent on your behalf dates back to the performance of the act. I must treat this as an exercise by the board of directors of their duties under art. 55. This being so, I refuse the motion as far as the injunction is concerned.

Solicitors: *Bonner, Thompson, Burnie*, and Co.; *Morse, Hewitt*, and *Farman*.

---

### *Dec. 9 and 19, 1900.*

(Before COZENS-HARDY, J.)

### KNIGHT v. WILLIAMS. (a)

*Title deeds—Lessor and lessee—Right to lease— Grant of new lease—Surrender in law.*

*A. was lessee of premises for a term of sixty-one years from the 29th Sept. 1859, subject to an underlease of part of the premises to B. for twenty-one years from the 29th Sept. 1880. In March 1900 negotiations took place as to the granting of a new lease of the whole of the property for the remainder of A.'s term. This was ultimately agreed, but A.'s solicitor refused to complete unless the lease for twenty-one years was given up. B.'s solicitor refused to give up the lease unless the counterpart lease was handed over to him. The question was now raised on a motion for judgment on admissions in the pleadings. For A. it was said that the grant of a new lease was equivalent to a purchase of the existing lease, and that A. was therefore entitled to have it delivered up. The counterpart, it was said, was only part of the lease.*

*Held, that the lessee was entitled to retain the lease.*

THIS was a motion for judgment on admissions in the pleadings.

The plaintiff was the lessee of premises at Clerkenwell for the term of sixty-one years from the 29th Sept. 1859, subject to an underlease to the defendant of part of the property for a term of twenty-one years from the 29th Sept. 1880.

In March 1900 negotiations took place for the surrender of the underlease and the granting of a new lease of the whole of the property.

An agreement was made on the 11th April 1900, but the plaintiff's solicitor refused to complete unless the underlease was given up. The defendant's solicitor declined to give up the underlease unless the counterpart was given to him.

*Eve*, Q.C. and *St. John Clerke* for the plaintiff. —The grant of a new lease is equivalent to a purchase of the existing lease, and we are therefore entitled to delivery of it. We were not

(a) Reported by G. B. HAMILTON, Esq., Barrister-at-Law.

# Case Law 05

**Bird v. Brown (185) 4 Exch. 786**

BIRD *v.* BROWN 1433

but with that we have nothing to do. Upon the true construction of the deed, the amount is payable by way of liquidated damages, and not as a penalty.

ALDERSON, B. I am of the same opinion. The case of *Kemble* v. *Farren* was rightly decided, upon this principle, that it was improbable and absurd to suppose that the parties intended to apply a penalty of a large amount to a particular stipulation, which merely required the payment of a small weekly sum. If that had been the only stipulation in the deed, and coupled with a penalty of 1000l., it would, no doubt, have been absurd to say, that, for the non-payment of 2l. 10s. a week, 1000l. was to be paid. Then, if so to construe the covenant with respect to that one stipulation, if it had stood alone, would have been absurd, it follows that the sum named must be, with respect to all, a penalty and not liquidated damages. So in the case of *Horner* v. *Flintoff*, where the defendant undertook to pay certain rates and taxes, the Court said, that if the stipulation in question had been the only one, common sense would require that the word "penalty" should be substituted for "liquidated damages." Now, if we apply the same principle to any one of the stipulations in this case, we shall not come to the same absurdity, because all the stipulations require an amount of uncertain damage. If the parties choose to measure the breach of any one of the stipulations by 10,000l., we cannot say that they are wrong, inasmuch as the damages are uncertain. Therefore the words must be taken to mean that the parties agree that 1000l. shall be paid in case of the breach of any one of the stipulations, which are of uncertain damage. Then, with respect to the restriction as to the defendant's **[785]** residence, the reason why he should reside at a distance is, that there is a palpable benefit to him in being allowed to practise as a physician accoucheur, which might be injurious to the plaintiff, if the defendant resided too near him. My Brother Parke has sufficiently pointed out that there is nothing illegal in such a stipulation. Then, as to the other point, the plaintiff has a right to measure by the usual ways of communication; and it might be a question whether the usual ways did not include all the ways of access.

PLATT, B. I also think that my Brother Rolfe was right in his construction of the covenant. When we refer to the facts, we see why the parties stipulated that the amount of 1000l. should be paid as liquidated damages, in the event of a breach of any one of the covenants. The defendant takes the plaintiff into partnership for the term of three years, for the purpose of introducing him to the business, and the plaintiff pays 400l. on executing the indenture, and is to pay 380l. more on the termination of the partnership. The three years having expired, and the partnership being at an end, the 1000l. was intended to protect the plaintiff from any interference with his business by the defendant; for the two sums paid by the plaintiff to the defendant, together with interest, would nearly amount to 1000l. So that, in the event of the defendant residing within the prescribed distance, which might damage the business of the plaintiff, it is stipulated that he shall be recouped the money which he has paid. Looking, therefore, to the deed itself, there appears reasonable ground for stipulating that the purchase-money should be returned. With regard to the motion in arrest of judgment, I need add nothing to the observations made by my learned Brothers. Then, with respect to the other objection, the distance is to be measured by any of the public ways that are ordinarily used.

Rule refused.

---

**[786]** BIRD AND OTHERS, Assignees of Carne & Telo, Bankrupts *v.* BROWN AND OTHERS. Jan. 22, 1850.—C. & T., merchants at Liverpool, sent orders to I., a merchant at New York, to purchase for them certain goods; which were accordingly shipped by I. in five vessels bound to Liverpool, and consigned to C. & T., who, after the receipt of the goods by one of the vessels, stopped payment on the 7th of April, 1846. I. had drawn bills for the goods, partly on C. & T., and partly on R. & Co., with whom C. & T. had dealings. B. & Co., who were merchants at Liverpool, and who also had a house of business at New York, purchased there several of the bills, which were drawn at sixty days' sight, and were dated, some on the 28th of March, and the rest on the 30th. On the 8th of May a fiat in bankruptcy issued against C. & T. The four other vessels arrived at Liverpool respectively on the 3rd, 5th, 6th, and 9th of May; and immediately on the arrival of each, and whilst the transitus of the goods on

board continued, B. & Co., on behalf of I., gave notice to the master and consignees of each ship, claiming to stop the goods in transitu. B. & Co. were not the general agents of I., nor had they received from him any authority to make this stoppage. On the 11th of May, the assignees of C. & T. made a formal demand of the goods from the master and consignees of each of the four ships, at the same time tendering the freight; but they refused to deliver them, and on the same day delivered the whole to B. & Co. On the next day, the assignees made a formal demand of the goods from B. & Co., but they refused to deliver them up, claiming title under the stoppage in transitu. On the 28th of April, I. heard at New York that C. & T. had stopped payment; and on the next day, he executed a power of attorney to H. of Liverpool, authorising him to stop the goods in transitu. This was received by H. on the 13th of May, and he on that day adopted and confirmed the previous stoppage by B. & Co. I. afterwards adopted and ratified all that had been done both by H. and B. & Co. In trover by the assignees of C. & T. against B. & Co.—Held, first, that there could be no valid stoppage in transitu after the formal demand of the goods by the assignees on the 11th of May, and the subsequent delivery of them to the defendants; secondly, that the ratification of the stoppages by I., after the conversion by the defendants, had not the effect of altering retrospectively the ownership of the goods, which had already vested in the plaintiffs.

[S. C. 19 L. J. Ex. 154; 14 Jur. 132. Distinguished, *Hutchings* v. *Nunes*, 1863, 1 Moore, P. C. (N. S.) 243; *Bolton Partners* v. *Lambert*, 1889, 49 Ch. D. 307. Applied, *Ainsworth* v. *Creeke*, 1868, L. R. 4 C. P. 486; *Smart* v. *Pessol*, 1874, 30 L. T. 633. Approved, *Lyell* v. *Kennedy*, 1889, 14 A. C. 462. Followed, *Dibbins* v. *Dibbins*, [1896] 2 Ch. 348; *Ford* v. *North*, [1901] 1 K. B. 692. Considered and report questioned, *Keighley* v. *Durant*, [1901] A. C. 240. Referred to, *In re Portuguese Consolidated Copper Mines*; *Ex parte Badman*, 1890, 45 Ch. D. 35.]

This was an action of trover. In the first count of the declaration, the plaintiffs declared on the possession of the bankrupts before their bankruptcy; and in the second, on their own possession as assignees; and in both, the conversion was laid after the bankruptcy. The defendants pleaded, first, not guilty. Secondly, to the first count, a denial of the possession of the bankrupts. Thirdly, to the same, a denial of the goods being the property of the plaintiffs as assignees. Fourthly, to the last count, a denial of the possession of the plaintiffs as assignees; on which pleas issues were joined. At the trial, before Cresswell, J., at the Liverpool Summer Assizes, 1849, a verdict was found for the plaintiffs, damages 10,142l. 7s. 4d., subject to a case, the material part of which is as follows:—

The plaintiffs are the assignees of Messrs. Carne & Telo, against whom a fiat in bankruptcy issued on the 8th of May, 1846. Messrs. Carne & Telo, before their bankruptcy, were merchants in Liverpool. The defendants are also merchants in Liverpool, trading under the firm of Brown, **[787]** Shipley, & Co. On the 3rd of March, 1846, Messrs. Carne & Telo sent to Charles Illins, a merchant at New York, extensive orders to purchase for them corn, flour, tallow, and other articles. In pursuance of these orders, Illins made purchases to the amount of about 14,000l., and shipped the goods by five vessels bound to Liverpool, namely, two vessels, each called the "Ashburton," and three others, respectively called the "Europe," the "New York," and the "Hottinguer." These were general vessels, and by the bills of lading the goods were made deliverable to Messrs. Carne & Telo, or order, and invoices were signed by Illins, headed, "Shipped by undersigned, p. order and for account of Messrs. Carne & Telo." The shipments were all made in March, 1846. The goods shipped on board the "Hottinguer" were received by Messrs. Carne & Telo early in April, 1846, and have been sold by them, and the proceeds have become part of their general estate. On the 7th of April Messrs. Carne & Telo stopped payment. On the 16th the bills of lading for the goods shipped on board the "Europe" were received by them, and on the 4th of May the bills of lading of those shipped on board the vessels called the "Ashburton," and also of those on board the "New York" were received by them. Illins, pursuant to directions from Messrs. Carne & Telo, drew bills of exchange in payment of the several shipments, partly on Messrs. Carne & Telo, and partly on the firm of Richards, Little, & Co., with whom Messrs. Carne & Telo had dealings. These bills were sold by Illins, in the usual course of business,

on the Exchange at New York, and rather more than one half such bills were purchased by the defendants' house at New York. The bills were dated, some on the 28th, and the rest on the 30th of March, 1846, and were all payable sixty days after sight. These bills were transmitted to the defendants' house at Liverpool for collection, and reached the defendants' hands on the 16th of April, and on presentation were all dishonoured.

[788] The "Europe" arrived at Liverpool on the 3rd of May, one of the "Ashburtons" on the 5th and the other on the 6th of May, and the "New York" on the 9th of May.

After Messrs. Carne & Telo had stopped payment, and whilst they were insolvent, and whilst the goods remained on board the said respective ships undelivered, and whilst their transitus continued, the following notices were served and delivered, on the respective days they bear date, to the respective persons addressed therein :—that is to say, on the 4th of May the following notice was served by the defendants on the master of the "Europe" and the consignees of the same vessel respectively :—

"Liverpool, 4th of May, 1846.

"To the Master of the ship 'Europe,' of New York, and
the Consignees of said vessel.

"We hereby, on behalf of Charles Illins, of New York, stop in transitu and demand delivery from you of 7915 bushels of wheat and 500 salted hides, shipped on board your vessel at New York by the said Charles Illins, and consigned to Messrs. Carne & Telo, of Liverpool, they having stopped payment, and being unable to pay their engagements. And we hereby give you notice, on behalf of the said Charles Illins, that if you deliver the said goods to any other persons than ourselves, as his agents, you will be held answerable for all consequences. And we hereby offer and agree, that, on delivery of the said goods to us, we will indemnify and save you harmless from the claims of all other persons, and all charges and expenses.—Yours respectfully,                                    "BROWN, SHIPLEY, & CO."

And on the 5th, 7th, and 9th of May respectively, the defendants served on the masters and consignees of the two vessels called "Ashburton" and the "New York," similar [789] notices, mutatis mutandis, with respect to the goods shipped by Illins on board those vessels.

On the 8th of May, the goods shipped on board the "Europe" and one of the "Ashburtons," remaining still on board, a demand was made on the captains and consignees of these vessels respectively, by Messrs. Carne & Telo, for the delivery of such goods to them, and the freight due in respect of such goods was at the same time tendered to the captains and consignees respectively, but delivery was refused. On the 11th of May, the goods shipped in the "Europe," the two "Ashburtons," and the "New York" remaining still on board, a demand was made on the captains and consignees of these vessels respectively, by the plaintiff Bird, the official assignee of the estate of Messrs. Carne & Telo, for the delivery of such goods to the assignees ; and the freight due in respect of such goods was at the same time tendered to the captain and consignees respectively, but delivery was refused. The defendants on the 11th of May obtained possession of the respective shipments, in consequence of their said notices. On the 12th of May a demand was made on the defendants by the plaintiff Bird, as assignee, for delivery to the said assignees of the said shipments received by the defendants, but delivery was refused. On the 28th of April Illins received intelligence of the stoppage of Carne & Telo, and on the 29th of April he executed a power of attorney in favour of Mr. Joseph Hubback, of Liverpool, merchant, authorising him to stop the goods in transitu, and to hold them for the benefit of the defendants and the other holders of his dishonoured drafts on Carne & Telo ; and on its receipt, on the 13th of May, the said Mr. Hubback adopted and confirmed the defendants' said stoppage in transitu of the goods in question in this cause ;· and Illins, on hearing of the said stoppage and adoption, and long before the commencement of this suit, ratified, confirmed, and adopted both the said stoppage and the said adoption thereof. [790] The defendants, at the time of the serving the above notices respectively, were not the general agents of Illins.

The question for the opinion of the Court is, whether the plaintiffs are entitled to recover the value of the said shipments in this action.

Cowling argued for the plaintiffs in last Michaelmas Term (November 14). The plaintiffs are entitled to recover. On the 11th of May they demanded the goods and tendered the freight, so that a right of action then vested in them; and the question is, whether that right was divested by the subsequent stoppage in transitu. Now, the defendants were not the agents of Illins, nor had they received from him any authority to stop the goods in transitu; and Hubback was not in a situation to make any valid stoppage, for he did not receive his authority, or act, until the 13th, at which time the transitus was at an end. The confirmation of the defendants' stoppage could have no effect. The doctrine, "Omnis ratihabitio retrotrahitur et mandato æquiparatur," does not apply to cases of this kind. Independently of authority, it would be prejudicial to commercial transactions to allow ratification to have such an effect. The real motive of the defendants in making the stoppage was not to protect Illins, but their own interest, they having purchased some of the bills. Where, indeed, a party acting ministerially does some act, which, unless sanctioned by another, would be a trespass, a subsequent ratification by that other will exonerate him. But that has no application to this case, because here the party purporting to be the agent, by stopping the goods in transitu, does something contrary to what the principal has done before. It is like the case of an informal notice to quit, which cannot be rendered valid by any subsequent recognition: *Right* v. *Cuthell* (5 East, 491). There the notice was signed by two only of three joint tenants, the proviso in [791] the lease requiring it to be under their respective hands; and it was held, that the notice being one to defeat an estate, in order to be good it ought to be binding on all the parties at the time it was given, and not to depend for its validity in part upon any subsequent recognition by one of them. The same principle applies here: the property vested in the consignees, and if it is to be divested by the act of another, the parties to be affected by that act ought to know whether it is authorised. Where a notice to quit is given by an unauthorised agent, a subsequent recognition of his authority by the landlord will not render the notice valid: *Doe d. Mann* v. *Walters* (10 B. & C. 626). Another reason why the doctrine of ratification will not apply is, that the interests of third persons are affected by it. In 4 Inst. 317, Lord Coke says:—"By the common law, he that receiveth a trespass, and agreeth to a trespass after it is done, is no trespasser, unless the trespass was done to his use or for his benefit, and then his agreement subsequent amounteth to a commandment, for in that case 'Omnis ratihabitio retrotrahitur et mandato æquiparatur.'" Besides, how could it be known whether the act of the defendants would be ratified or not? And on that ground the case falls within the principle of the decision in *Waring* v. *Dewberry* (1 Str. 97). In the case of perishable goods, are they to remain and rot until notice of confirmation is received? Besides, ratification would render the captain a wrong doer by relation; but in *Butler and Baker's case* (3 Rep. 29 b.) it was said, that "no relation shall make that tortious which was lawful; for relations are fictions in law, which will never do wrong." The point was raised, but not decided, in *Whitehead* v. *Anderson* (9 M. & W. 518), and *Nicholls* v. *Le Feuvre* (2 Bing. N. C. 81), and slightly alluded to in *Bailey* v. *Culverwell* (8 B. & C. 448).

[792] Crompton (Heath with him), for the defendants. First, the stoppage in transitu by Hubback, on the 13th of May, operated on the property so as to keep alive the vendor's right, and prevent the vendees from getting an indefeasible right of possession. The language of Tindal, C. J., in *Nicholls* v. *Le Feuvre* (2 Bing. N. C. 81), shews that there may be a ratification of an illegal act after a right of action has vested. The nature of a vendee's right is explained by Bayley, J., in *Bloxam* v. *Sanders* (4 B. & C. 941). A stranger may be permitted to interfere in a case like the present; for, knowing the consignor, he is certain that the act will be ratified. In all the cases as to the vesting of some right for a particular period, and the preventing of some other right from becoming absolute, the interest of third parties must to some extent be interfered with. This case falls within the rule, and not within the exception. *Bailey* v. *Culverwell* (8 B. & C. 448) shews that the doctrine of ratification is applicable to mercantile transactions. Bayley, J., there says, that "There are cases innumerable establishing that the subsequent ratification of an act done by an agent relates back to the time when it was done." In modern times the doctrine of ratification has been extended, so as to defeat a vested right of action:

*Buron* v. *Denman* (2 Exch. 167), *Whitehead* v. *Taylor* (10 A. & E. 210). An entry by a stranger, without authority, is good to take advantage of a condition, if it be afterwards assented to : *Fitchet* v. *Adams* (2 Str. 1128). This case is the same in principle. There an estate was created defeasible on some act being done ; here there was a vested right of possession of the goods, subject to its being under certain circumstances defeated by the act of the vendor. [Parke, B. Mr. Justice Story, in his book on Agency (sect. 246, n. 2), says, "that the cases on this subject are not entirely in harmony with each other."] **[793]** Reference is there (sect. 246, n. 2) made to the Year Book, 7 Hen. 4, pl. 35, where it is said, "A party justified as bailiff, taking a heriot for services due to the lord ; and the issue was on the point, that he was not bailiff ; and it was held, that if he took the heriot, claiming property therein for himself, the subsequent agreement of the lord would not amount to a ratification, making him bailiff at the time. But if he took at the time as bailiff of the lord, and not for himself, without command of the lord, yet the subsequent ratification made good his act, and made him bailiff at the time." The maxim "Omnis ratihabitia retrotrahitur," &c., has been applied to contracts of insurance : *Hagedorn* v. *Oliverson* (2 M. & Sel. 485), *Wolff* v. *Horncastle* (1 Bos. & P. 317), *Routh* v. *Thompson* (13 East, 274). Also to contracts for the purchase of goods within the Statute of Frauds : *Maclean* v. *Dunn* (4 Bing. 722). [Parke, B., referred to *Hull* v. *Pickersgill* (1 B. & B. 282).] The rule is thus stated by Tindal, C. J., in *Wilson* v. *Tummann* (6 M. & G. 236): "That an act done for another, by a person not assuming to act for himself but for such other person, though without any precedent authority whatever, becomes the act of the principal if subsequently ratified by him, is the known and well-established rule of law. In that case the principal is bound by the act, whether it be for his detriment or his advantage, and whether it be founded on a tort or a contract to the same extent as by, and with all the consequences which follow from, the same act done by his previous authority." No doubt the act done must be for the benefit of the principal : *Wilson* v. *Barker* (4 B. & Ad. 614) ; and if so, his subsequent recognition renders it valid by relation : *Goodtitle* v. *Woodward* (3 B. & Ald. 689). Upon that rule some exceptions have been engrafted, but they resolve themselves chiefly into questions **[794]** of notices to quit : *Right* v. *Cuthell* (5 East, 491), *Doe d. Mann* v. *Walters* (10 B. & C. 626). The same principle governs those cases as that of a demand and refusal, which, in order to vest a right of action, must be made by an authorised person, and not by a stranger : *Coore* v. *Callaway* (1 Esp. 115), *Solomans* v. *Dawes* (id. 83), *Coles* v. *Bell* (1 Camp. 479, n.). He also referred to *Siffken* v. *Wray* (6 East, 371).]

Secondly, assuming that the stoppage by Hubback was insufficient, the facts shew a ratification of the stoppage by Illins before the transitus was at an end. There is no authority to the effect that a demand of goods by a consignee, and refusal by the captain, operates as a delivery. The stoppage in transitu restored to the owner his right of possession, and placed him in the same situation as if he had not parted with the goods : *Clay* v. *Harrison* (10 B. & C. 99). In *Smith* v. *Goss* (1 Camp. 282), Lord Ellenborough ruled, that the right of a consignor to stop goods in transitu was not divested by the goods while in their transit being attached by process out of the Court of the Mayor of London at the suit of a creditor of the consignee. So, where goods were consigned, but, the duties not being paid, were lodged in the King's stores, Lord Kenyon ruled that the consignor might stop them in transitu before they were actually sold : *Northey* v. *Field* (2 Esp. 613). It is clear, from the case of *Jackson* v. *Nichol* (5 Bing. N. C. 508), that a mere demand by the vendee, without any delivery before the voyage has completely terminated, will not deprive the consignor of his right of stoppage. [He also referred to *Bryan* v. *Nix* (4 M. & W. 775), and Abbott on Shipping, p. 334, 8th edit.]

Cowling, in reply, argued that the stoppage was ineffectual, inasmuch as the parties stopping had no title at the **[795]** time of the stoppage, but were mere strangers, and that the ratification by Illins did not take place until after the rights of the consignees had vested. [Pollock, C. B., referred to Jacob's Law Dict., tit. "Relation."]

Cur. adv. vult.

The judgment of the Court was now delivered by

ROLFE, B. This was an action of trover to recover the value of several cargoes of corn and other goods, sent from New York to this country.

It was tried at Liverpool, and a verdict was found for the plaintiffs, subject to

BIRD *v.* BROWN

our opinion on a case reserved. The case was argued before us last term, when the material facts appeared to be as follows :—Carne & Telo, merchants at Liverpool, early in 1846 sent out extensive orders to Charles Illins, a merchant at New York, to purchase for them corn, flour, tallow, and other articles.

In pursuance of these orders, Illins made purchases to the amount of about 14,000*l.*, and shipped the goods by five vessels bound to Liverpool, namely, two vessels each called the "Ashburton," and three others, called respectively the "Europe," the "New York," and the "Hottinguer." These were all general vessels, and the goods were consigned to Messrs. Carne & Telo.

The shipments were all made in the month of March, 1846. The goods shipped by the "Hottinguer" were received by Carne & Telo before the 6th of April, 1846, on which day they stopped payment. Illins, pursuant to directions from Carne & Telo, had drawn bills for the goods, partly on Carne & Telo themselves, partly on a firm of Richards, Little & Co., with whom Carne & Telo had dealings. The defendants, who are merchants at Liverpool, and who also have a house of business at New York, purchased there several of the bills so drawn by Illins, [796] to the amount of about 7000*l.* ; and those bills were remitted in regular course to them at Liverpool. The bills were all drawn at sixty days' sight, and were dated, some on the 28th of March, the rest on the 30th.

On the 8th of May a fiat in bankruptcy issued against Carne & Telo, and they were duly found bankrupts, and the plaintiffs are their assignees. The "Europe" arrived at Liverpool on the 3rd of May, one of the "Ashburtons" on the 5th, the other on the 6th, and the "New York," on the 9th ; and immediately on the arrival of each of these ships, and while the transitus of the goods on board continued, the defendants, on behalf of Illins, gave notice to the master and consignees of each ship, claiming to stop the goods in transitu. The defendants were not agents of Illins, nor had they received from him any authority to make this stoppage. On the 11th of May the plaintiff Bird, as official assignee of Carne & Telo, made a formal demand of the goods from the master and consignee of each of the four ships, at the same time tendering the freight. The goods were then still on board undelivered, but the master and consignees refused to deliver the goods to the plaintiffs, and, on the same day, delivered the whole of them to the defendants.

On the next day the plaintiff Bird made a formal demand of the goods from the defendants, but they refused to deliver up the same, claiming title under the stoppage in transitu. On the 28th of April, Illins heard at New York that Carne & Telo had stopped payment, and on the next day he executed a power of attorney to Joseph Hubback of Liverpool, authorising him to stop the goods in transitu. This was received by Hubback on the 13th of May, and he on that day adopted and confirmed the previous stoppage by the defendants. Illins afterwards, and long before the commencement of this action, adopted and ratified all which had been done both by Hubback and the defendants.

[797] The only point for our decision is, whether the title of Carne & Telo had been divested by the stoppage in transitu ; for if not, then, undoubtedly, the goods belonged to the plaintiffs as their assignees; and as there was a clear conversion by the defendants, the plaintiffs would be entitled to recover. Mr. Crompton, for the defendants, made two points :—first, that there was a good stoppage on the 13th, under the power to Hubback ; and, secondly, if that be not so, still that the subsequent ratification by Illins made the previous stoppages by the defendants good.

As to the first point, we are of opinion that there could be no valid stoppage in transitu, after the formal demand of the goods by Bird on the 11th of May, and the subsequent delivery of them to the defendants. The goods had then arrived at Liverpool, and were ready to be delivered to the parties entitled. Bird, on behalf of the assignees, demanded the goods, and tendered the amount due for the freight. Assuming that there had been no previous stoppage in transitu, the masters of the several ships were thereupon bound to deliver up the goods to Bird, as representing Carne & Telo, and they could not, by their wrongful detainer of them and delivering them over to other parties, prolong the transitus, and so extend the period during which stoppage might be made. The transitus was at an end when the goods had reached the port of destination, and when the consignees, having demanded the goods and tendered the amount of the freight, would have taken them into their possession but for a wrongful delivery of them to other parties.

On this part of the case we never entertained any doubt. The other point, namely,

BIRD *v.* BROWN

whether the several stoppages by the defendants, before the 11th of May, without any previous authority from Illins, were made good by his subsequent ratification of what had been done, appeared to us one of more nicety; but on full consideration, we are of [798] opinion that here too the defendants must fail. In the first place, the power of attorney to Hubback, and his subsequent confirmation of the acts of the defendants, may be laid out of our consideration. The authority to Hubback was no doubt executed by Illins while the goods were in transitu; but that is not material, unless the stoppage itself took place pending the transitus; and, so far as Hubback is concerned, that certainly was not the case, for he did not receive his authority nor attempt to act in the matter till the 13th, that is, not till the day after the conversion complained of in this action. It is true that he then, so far as he lawfully could, adopted and ratified the acts of the defendants, but this was afterwards, and before the commencement of this action, done by Illins himself; and so, if such ratification is good, there is no necessity for relying on the ratification of Hubback.

This, therefore, brings us to the real question, which is, whether the ratification by Illins, after a conversion by the defendants, can have the effect of altering retrospectively the ownership of the goods, so as to prevent the plaintiffs from saying that the goods were theirs at the time of the conversion, which, if no subsequent ratification had occurred, certainly were theirs at that time, and would have so continued. We are of opinion that the ratification by Illins had no such effect. The doctrine, "Omnis ratihabitio retrotrahitur et mandato æquiparatur," is one intelligible in principle, and easy in its application, when applied to cases of contract. If A. B., unauthorised by me, makes a contract on my behalf with J. S., which I afterwards recognise and adopt, there is no difficulty in dealing with it as having been originally made by my authority. J. S. entered into the contract on the understanding that he was dealing with me, and when I afterwards agreed to admit that such was the case, J. S. is precisely in the condition in which he meant to be; or, if he did not believe A. B. to be acting for me, [799] his condition is not altered by my adoption of the agency, for he may sue A. B. as principal, at his option, and has the same equities against me, if I sue, which he would have had against A. B.

In case of tort, there is more difficulty. If A. B., professing to act by my authority, does that which prima facie amounts to a trespass, and I afterwards assent to and adopt his act, there he is treated as having from the beginning acted by my authority, and I become a trespasser, unless I can justify the act, which is to be deemed as having been done by my previous sanction. So far there is no difficulty in applying the doctrine of ratification even in cases of tort. The party ratifying becomes as it were a trespasser by estoppel; he cannot complain that he is deemed to have authorised that which he admits himself to have authorised.

But the authorities go much further, and shew that in some cases where an act which, if unauthorised, would amount to a trespass, has been done in the name and on behalf of another, but without previous authority, the subsequent ratification may enable the party on whose behalf the act was done, to take advantage of it and to treat it as having been done by his direction. But this doctrine must be taken with the qualification, that the act of ratification must take place at a time, and under circumstances, when the ratifying party might himself have lawfully done the act which he ratifies. Thus, in *Lord Audley's case,*(a) a fine with proclamation was levied of certain land, and a stranger within five years afterwards, in the name of him who had right, entered to avoid the fine. After the five years, and not before, the party who had the right to the land ratified and confirmed the act of the stranger. This was held to be inoperative; though such ratification within the five years would probably have [800] been good. Now, the principle of this case, which is reported in many books, and is cited with approbation by Lord Coke, in *Margaret Podger's case* (9 Rep. 104 a.), appears to us to govern the present. There the entry, to be good, must have been made within the five years: it was made within that time, but till ratified it was merely the act of a stranger, and so had no operation against the fine. By the ratification, it became the act of the party in whose name it was made; but that was not till after the five years. He could not be deemed to have made an entry till he ratified the previous entry, and he did not ratify until it was too late to do so. In the present case, the stoppage could only be made during the transitus. During

(a) Cro. Eliz. 561; Moore, 457; Poph. 176, nom. *Lord Awdeley's case.*

that period the defendants, without authority from Illins, made the stoppage. After the transitus was ended, but not before, Illins ratified what the defendants had done. From that time the stoppage was the act of Illins, but it was then too late for him to stop. The goods had already become the property of the plaintiffs, free from all right of stoppage.

We are therefore of opinion, that there must be judgment for the plaintiffs.

Judgment for the plaintiffs.

[801]    MACGREGOR *v.* KEILY. Jan. 12, 1850.—An action having been brought against the defendant, a provisional committee man of a certain Railway Company provisionally registered, for work done for and on behalf of the Company, and judgment having been recovered against him, and a writ of ca. sa. issued thereon, an order absolute was made for winding up the affairs of the Company under the Winding-up Act, 11 & 12 Vict. c. 45, and an official manager was appointed The Court stayed the proceedings until after proof by the plaintiff of his debt before the Master appointed by the said Act.

[S. C. 1 L. M. & P. 182 ; 19 L. J. Ex. 126.]

In this case the plaintiff had brought an action against the defendant, to recover for professional services rendered by him for and on behalf of the Midland Grand Junction Railway Company, provisionally registered, of the provisional committee of which Company the defendant was a member. The plaintiff obtained a verdict in that action ; and a writ of ca. sa. having issued against the defendant for the costs, he was arrested under that writ, but was discharged under a Judge's order. A rule nisi was subsequently obtained to rescind that order, which was, by the agreement of the parties, to abide the event of the following application. On the 3rd of November last, an order absolute was made, for the purpose of winding up the affairs of the Company, under the provisions of the 11 & 12 Vict. c. 45, in pursuance whereof an official manager had been appointed. It was stated in the defendant's affidavit, that he believed himself liable to be called upon under the provisions of the Act, as a contributory to the said Company.

Corrie now moved, upon affidavits of the preceding facts, for a rule calling upon the plaintiff to shew cause why all proceedings should not be stayed until after proof, or exhibiting such proof as the plaintiff might give before the Master appointed for winding up the affairs of the Company under the provisions of the 11 & 12 Vict. c. 45. The defendant is a contributory within the meaning of the 11 & 12 Vict. c. 45. The 73rd section of that statute supports the present application. That section enacts, "that, after the first appointment of an official manager, no creditor or other person shall, except so far as the Master shall permit, have power to commence or to proceed with any action against the official manager, or against the Company or [802] any other person representing the same, or who is sued as a contributory thereof, until after proof, or exhibiting or making such proof as he may be able of his debt or demand, before the Master, as hereinafter mentioned ; and it shall be lawful for any Judge of the Court in which such action shall be pending, upon summons taken out before him for that purpose, to order that all further proceedings in such action shall be stayed until after such proof shall have been made or exhibited before the Master." And by the 3rd section, "The word 'contributory' shall include every member of a Company, and also every other person liable to contribute to the payment of any of the debts, liabilities, or losses thereof, whether as heir, devisee, &c., of a deceased member," &c.    "And the word 'creditor' shall include every person having any debt or demand enforceable against any Company, in any Court of law, &c. In this case the work was done for the Company. In *Thompson* v. *The Universal Salvage Company* (3 Exch. 310), Parke, B., said, in delivering his judgment, "By the true construction of the 11 & 12 Vict. c. 45, so long as there is a reasonable prospect of obtaining payment by proving the debt under the provisions of that Act, it is our duty to prevent individual creditors from having execution against the shareholders of the Company."

A rule nisi being granted by the Court,

Willes shewed cause in the first instance. There are two objections to this application. In the first place, this is not the debt of the Company. The recent decisions

# Case Law 06

**Meridian Global Funds Management
Asia v Securities Commission**

*Privy Council Appeal No. 48 of 1994*
**Meridian Global Funds Management Asia Limited** *Appellants*
*v.*
**The Securities Commission** *Respondent*
FROM
**THE COURT OF APPEAL OF NEW ZEALAND**
JUDGMENT OF THE LORDS OF THE JUDICIAL
COMMITTEE OF THE PRIVY COUNCIL,
Delivered the 26th June 1995

*Present at the hearing: -*
Lord Keith of Kinkel
Lord Jauncev of Tullichettle
Lord Mustill
Lord Lloyd of Berwick
Lord Hoffmann
*[Delivered by Lord Hoffmann]*

• In 1990 a group of people in New Zealand, Malaysia and Hong Kong tried to gain control of a cash-rich publicly listed New Zealand company, Euro-National Corporation Ltd. ("ENC"), and use its assets for their own purposes. The predators included a New Zealand businessman called David Lee Sian Mun, two Hong Kong investment managers called Norman Koo Hai Ching ("Koo") and Norman Ng Wo Sui ("Ng"), who were employed by the appellants Meridian Global Funds Management Asia Limited ("Meridian"), and members of a Malaysian sharebroking firm called Hwang & Yusoff Securities Sdn Bhd ("Hwang & Yusoff"). Their scheme required the purchase, through apparently respectable New Zealand merchant bankers, of a 49% controlling holding in ENC for NZ$18.2 million. The intention was to fund this purchase out of ENC's own assets, but bridging finance was needed to fill the gap between buying the shares and gaining control of the company's money. This was provided by Koo and Ng out of funds managed by Meridian. Meridian is a substantial Hong Kong investment management company, a subsidiary of National Mutual Life Association of Australasia Limited. Koo was its Chief Investment Officer, Ng a senior portfolio manager. Their Lordships do not know exactly how they were to receive their share of the spoils. But they funded the scheme by improperly using their authority to buy and sell Asian shares. They contracted on behalf of Meridian, through Hwang & Yusoff, to buy a parcel of shares in Malaysian and Indonesian companies from ENC for S21 million and at the same time to resell the same shares to ENC for a slightly greater price, Payment for the purchase was made to Hwang & Yusoff on 30th October and payment for the resale was to be made by ENC on 19th November. ENC did not own the shares in question and the persons who purported to sell on its behalf had at that stage no authority to do so, but Meridian paid the money and on 9th November Hwang & Yusoff used $18.2 million to buy the shares in ENC. But the scheme to pay Meridian back out of ENC's money on 19th November was frustrated by the independent directors of ENC, who imposed conditions on the use of the company's funds with which the predators could not comply. Unable to get their hands on the company's money, they had to unwind the scheme as best they could. It is unnecessary to go into the details of how the participants tried to extricate themselves except to notice two matters. First, that on 10th December 1990 Koo, on behalf of Meridian, agreed to release its rights under me original funding arrangements and accept instead a payment and undertakings from Hwang & Yusoff. Secondly, that the net result was that the funds under Meridian's management suffered a loss, which the Australian parent company had to make good to the beneficial owners of the funds when the affair was discovered some six or seven months later.

• Stockmarket regulators have found that one way to help boards and investors to resist such raids is to require immediate disclosure to the target company and the stock exchange of the identity of anyone acquiring a substantial interest of any kind in the company's shares. This enables the board and the investors to know who is behind the respectable nominees. Part II of the New Zealand Securities Amendment Act 1988 was intended, among other things, to introduce such transparency in dealings in publicly quoted securities. The relevant duties of disclosure are contained in section 20(3) and (4):-

"(3) Every person who, after the commencement of this section, becomes a substantial security holder in a public issuer shall give notice that the person is a substantial security holder in the public issuer to -

(a) The public issuer; and

(b) Any stock exchange on which the securities of the public issuer are listed.

(4) Every notice under subsection (3) of this section shall -

(a) Be in the prescribed form; and

(b) Contain the prescribed information; and

(c) Be accompanied by, or have annexed, such documents, certificates, and statements as may be prescribed; and

(d) Be given in the prescribed manner; and

(e) Be given as soon as the person knows, or ought to know, that the person is a substantial security holder in the public issuer."

• A "public issuer" means a company listed on the New Zealand Stock Exchange and "substantial security holder" means a person who has a "relevant interest" in 5 percent or more of the voting securities in the public issuer. The definition of "relevant interest" in section 5 is both complicated and comprehensive, but there is no need to examine its terms because, although the matter was disputed in the courts below, the appellants have accepted before their Lordships' Board that the effect of the transaction was to give Meridian a relevant interest in the 49% holding in ENC between 9th November 1990, when its money was used to buy it, and 10th December 1990 when the scheme was unwound. It gave no notice under section 20(3).

• Section 30 of the Act provides that where there are "reasonable grounds to suspect" that a substantial security holder has not complied with, among other provisions, section 20, the Court may, on the application of the Securities Commission, make one or more of a number of orders mentioned in section 32. These range from ordering the substantial security holder to comply with the Act to forfeiting the shares in which he has an interest. After holding its own inquiry in March 1991, the Commission applied for orders against various participants in the scheme. Meridian was not among the original defendants but was joined a few days before the trial began.

• Heron J. held that Meridian knew on 9th November that it was a "substantial security holder" in ENC for the purposes of section 20(4)(e). He arrived at this conclusion by attributing to Meridian the knowledge of Koo and Ng, who undoubtedly knew all the relevant facts. He did not go into the juridical basis for this attribution in any detail. It seemed obvious to him that if Koo and Ng had authority to enter into the transaction, their knowledge that they had done so should be attributed to Meridian. It had therefore been in breach of its duty to give notice under section 20(3). In view of the fact that its relevant interest had ceased on 10th December 1990 the judge made no order against Meridian except that it should pay $50,000 towards the Commission's costs and $15,000 towards the costs of a minority shareholder in ENC. The finding that Meridian was in breach was incorporated in a declaration made by the judge at the request of Meridian so that it could have an order against which to appeal. The Court of Appeal affirmed the decision of Heron J. on somewhat different grounds. It decided that Koo's knowledge should be attributed to Meridian because

he was the "directing mind and will" of the company. The Court of Appeal received some evidence about how Meridian functioned. The members of the board lived partly in Hong Kong and partly in Australia and met only once a year, for the formal business before the annual general meeting. Other matters which required a board resolution were circulated by post. Koo used *to* be managing director but was replaced by a Mr. Armour on 1st August 1990. Although Koo thereafter in theory reported to Mr. Armour, in the matter of buying and selling securities he went on in the same way as before. The ENC purchases and sales were openly recorded in the books but Koo did not specifically report them to Mr. Armour, who only found out about them after Koo had left. Nor did Koo report anything else and there was no evidence that Mr. Armour or the other members of the board tried to supervise what he was doing. By leave of the Court of Appeal, Meridian now appeals to their Lordships' Board. It says that its only directing mind and will was that of its board, or possibly of Mr. Armour, but not Koo, whom the Court of Appeal correctly described as "under Mr. Armour" in the corporate hierarchy.

• The phrase "directing mind and will" comes of course from the celebrated speech of Viscount Haldane L.C. in *Lennard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.* [1915] A.C. 705, 713. But their Lordships think that there has been some misunderstanding of the true principle upon which that case was decided. It may be helpful to start by stating the nature of the problem in a case like this and then come back to *Lennard's* case later.

• Any proposition about a company necessarily involves a reference to a set of rules. A company exists because there is a rule (usually in a statute) which says that a *persona ficta* shall be deemed to exist and to have certain of the powers, rights and duties of a natural person. But there would be little sense in deeming such a *persona ficta* to exist unless there were also rules to tell one what acts were to count as acts of the company. It is therefore a necessary part of corporate personality that there should be rules by which acts are attributed to the company. These may be called "the rules of attribution".

• The company's primary rules of attribution will generally be found in its constitution, typically the articles of association, and will say things such as "for the purpose of appointing members of the board, a majority vote of the shareholders shall be a decision of the company" or "the decisions of the board in managing the company's business shall be the decisions of the company". There are also primary rules of attribution which are not expressly stated in the articles but implied by company law, such as "the unanimous decision of all the shareholders in a solvent company about anything which the company under its memorandum of association has power to do shall be the decision of the company": see *Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd.* [1983] Ch. 258.

• These primary rules of attribution are obviously not enough to enable a company to go out into the world and do business. Not every act on behalf of the company could be expected to be the subject of a resolution of the board or a unanimous decision of the shareholders. The company therefore builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency. It will appoint servants and agents whose acts, by a combination of the general principles of agency and the company's primary rules of attribution, count as the acts of the company. And having done so, it will also make itself subject to the general rules by which liability for the acts of others can be attributed to natural persons, such as estoppel or ostensible authority in contract and vicarious liability in tort.

• It is worth pausing at this stage to make what may seem an obvious point. Any statement about what a company has or has not done, or can or cannot do, is necessarily a reference to the rules of attribution (primary and general) as they apply to that company. Judges sometimes say that a company "as such" cannot do anything; it must act by servants or

agents. This may seem an unexceptional, even banal remark. And of course the meaning is usually perfectly clear. But a reference to a company "as such" might suggest that there is something out there called the company of which one can meaningfully say that it can or cannot do something. There is in fact no such thing as the company as such, no *ding an sich,* only the applicable rules. To say that a company cannot do something means only that there is no one whose doing of that act would, under the applicable rules of attribution, count as an act of the company.

• The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person "himself", as opposed to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the *actus reus* and *mens rea* of the defendant himself. How is such a rule to be applied to a company?

• One possibility is that the court may come to the conclusion that the rule was not intended to apply to companies at all; for example, a law which created an offence for which the only penalty was community service. Another possibility is that the court might interpret the law as meaning that it could apply to a company only on the basis of its primary rules of attribution, i.e. if the act giving rise to liability was specifically authorised by a resolution of the board or a unanimous agreement of the shareholders. But there will be many cases in which neither of these solutions is satisfactory; in which the court considers that the law *was* intended to apply to companies and that, although it excludes ordinary vicarious liability, insistence on the primary rules of attribution would in practice defeat that intention. In such a case, the court must fashion a special rule of attribution for the particular substantive rule. This is always a matter of interpretation: given that it was intended to apply to a company, how was it intended to apply? Whose act (or knowledge, or state of mind) was <u>for this purpose</u> intended to count as the act etc. of the company? One finds the answer to this question by applying the usual canons of interpretation, taking into account the language of the rule (if it is a statute) and its content and policy.

• The fact that the rule of attribution is a matter of interpretation or construction of the relevant substantive rule is shown by the contrast between two decisions of the House of Lords, *Tesco Supermarkets Ltd. v. Nattrass* [1972] A.C. 153 and *In re Supply of Ready Mixed Concrete (No. 2)* [1994] 3 W.L.R. 1249. In *Tesco* the question involved the construction of a provision of the Trade Descriptions Act 1968. Tesco were prosecuted under section 11(2) for displaying a notice that goods were "being offered at a price less than that at which they were in fact being offered ...". Its supermarket in Northwich had advertised that it was selling certain packets of washing powder at the reduced price of 2s 11d, but a customer who asked for one was told he would have to pay the normal price of 3s 11d. This happened because the shop manager had negligently failed to notice that he had run out of the specially marked low-price packets. Section 24(1) provided a defence for a shop owner who could prove that the commission of the offence was caused by "another person" and that:-

"He took all reasonable precautions and exercised all due diligence to avoid the commission of such an offence by himself or any person under his control."

• The company was able to show that it owned hundreds of shops and that the board had instituted systems of supervision and training which amounted, on its part, to taking reasonable precautions and exercising all due diligence to avoid the commission of such offences in its shops. The question was: whose precautions counted as those of the company?

If it was the board, then the defence was made out. If they had to include those of the manager, then it failed.

- The House of Lords held that the precautions taken by the board were sufficient for the purposes of section 24(1) to count as precautions taken by the company and that the manager's negligence was not attributable to the company. It did so by examining the purpose of section 24(1) in providing a defence to what would otherwise have been an absolute offence: it was intended to give effect to "a policy of consumer protection which does have a rational and moral justification" (per Lord Diplock at pages 194-5). This led to the conclusion that the acts and defaults of the manager were not intended to be attributed to the company. As Lord Diplock said at page 203:-

"It may be a reasonable step for an employer to instruct a superior servant to supervise the activities of inferior servants whose physical acts may in the absence of supervision result in that being done which it is sought to prevent. This is not to delegate the employer's duty to exercise all due diligence; it is to perform it. To treat the duty of an employer to exercise due diligence as unperformed unless due diligence was also exercised by all his servants to whom he had reasonably given all proper instructions and upon whom he could reasonably rely to carry them out, would be to render the defence of due diligence nugatory and so thwart the clear intention of Parliament in providing it."

- On the other hand, in *Ready Mixed Concrete,* a restrictive arrangement in breach of an undertaking by a company to the Restrictive Practices Court was made by executives of the company acting within the scope of their employment. The board knew nothing of the arrangement; it had in fact given instructions to the company's employees that they were not to make such arrangements. But the House of Lords held that for the purposes of deciding whether the company was in contempt, the act and state of mind of an employee who entered into an arrangement in the course of his employment should be attributed to the company. This attribution rule was derived from a construction of the undertaking against the background of the Restrictive Trade Practices Act 1976: such undertakings by corporations would be worth little if the company could avoid liability for what its employees had actually done on the ground that the board did not know about it. As Lord Templeman said, at pages 1254-1255, an uncritical transposition of the *Nattrass* construction:-

"... would allow a company to enjoy the benefit of restrictions outlawed by Parliament and the benefit of arrangements prohibited by the courts provided that the restrictions were accepted and implemented and the arrangements were negotiated by one or more employees who had been forbidden to do so by some superior employees identified in argument as a member of the 'higher management' of the company or by one or more directors of the company identified in argument as 'the guiding will' of the company."

- Against this background of general principle, their Lordships can return to Viscount Haldane. In *Lennard's* case the substantive provision for which an attribution rule had to be devised was section 502 of the Merchant Shipping Act 1894, which provided a shipowner with a defence to a claim for the loss of cargo put on board his ship if he could show that the casualty happened "without his actual fault or privity". The cargo had been destroyed by a fire caused by the unseaworthy condition of the ship's boilers. The language of section 502 excludes vicarious liability; it is clear that in the case of an individual owner, only his own fault or privity can defeat the statutory protection. How is this rule to be applied to a company? Viscount Haldane rejected the possibility that it did not apply to companies at all or (which would have *come to* the same thing) that it required fault *or* privity attributable under the company's primary rules. Instead, guided by the language and purpose of the section, he looked for the person whose functions in the company, in relation to the cause of the casualty, were the same as those to be expected of the individual shipowner to whom the language primarily applied. Who in the company was responsible for monitoring the

condition of the ship, receiving the reports of the master and ship's agents, authorising repairs etc.? This person was Mr. Lennard, whom Viscount Haldane described as the "directing mind and will" of the company. It was therefore his fault or privity which section 502 attributed to the company.

• Because Lennard's Carrying Company Ltd. does not seem to have done anything except own ships, there was no need to distinguish between the person who fulfilled the function of running the company's business in general and the person whose functions corresponded, in relation to the cause of the casualty, to those of an individual owner of a ship. They were one and the same person. It was this coincidence which left Viscount Haldane's speech open to the interpretation that he was expounding a general metaphysic of companies. In *H.L. Bolton (Engineering) Co. Ltd. v. T.J. Graham & Sons Ltd.* [1957] 1 Q.B. 169 Denning LJ. certainly regarded it as a generalisation about companies "as such" when, in an equally well-known passage at page 172, he likened a company to a human body:-
"It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre."

But this anthropomorphism, by the very power of the image, distracts attention from the purpose for which Viscount Haldane said he was using the notion of directing mind and will, namely to apply the attribution rule derived from section 502 to the particular defendant in the case:-

"For if Mr. Lennard was the directing mind of the company, then his action must, unless a corporation is not to be liable at all, have been an action which was the action of the company itself <u>within the meaning of s. 502</u>." (At page 713; emphasis supplied.)

• The true nature of the exercise became much clearer, however, in later cases on the Merchant Shipping Act 1894. In *The Truculent* [1952] P. 1, an action to limit liability for damage caused by collision under section 503, which also required the owner of the ship which caused the collision to show that the casualty happened without his "actual fault or privity", the offending ship was a Royal Navy submarine. Her collision with a fishing vessel had been caused by the inadequate system of navigation lights then carried by submarines. Willmer J. held that for this purpose the "directing mind and will" of the Crown, which owned the submarine, was the Third Sea Lord, to whom the Board of Admiralty had entrusted the function of supervising such matters as the systems of navigation lights carried by warships. That function was one which an individual owner of a ship would be expected to fulfil. In *The Lady Gwendolen* [1965] P. 294 the owners of the ship were Arthur Guinness, Son & Company (Dublin) Ltd. The collision occurred because the master, in accordance with his custom, had taken his vessel laden with stout up the Mersey Channel to Liverpool at full speed in dense fog without more than the odd casual glance at his radar. Owning ships was a very subsidiary part of the company's activities. It had a traffic department which managed the ships under the general supervision of a member of the board who was a brewer and took no interest in the safety of their navigation. The manager of the traffic department knew about railways but took equally little interest in ships. The marine superintendent, one beneath him in the hierarchy, failed to observe that the master of *The Lady Gwendolen* was given to dangerous navigation although, as Willmer LJ. said at page 338:-
"It would not have required any very detailed examination of the engine room records in order to ascertain that *The Lady Gwendolen* was frequently proceeding at full speed at times when the deck log was recording dense fog."

In applying section 503 of the Merchant Shipping Act 1894, Sellers LJ. said of the company at page 333:-

"In their capacity as shipowners they must be judged by the standard of conduct of the ordinary reasonable shipowner in the management and control of a vessel or of a fleet of vessels."

The court found that a reasonable shipowner would have realised what was happening and given the master proper instruction in the use of radar. None of the people in the company's hierarchy had done so.

• It is difficult to see how, on any reasonable construction of section 503, these findings would not involve the actual fault or privity of Guinness. So far as anyone in the hierarchy had functions corresponding to those to be expected of an individual owner, his failure to discharge them was attributable to the company. So far as there was no such person, the superior management was at fault in failing to ensure that there was. In either case, the fault was attributable to the company. But the Court of Appeal found it necessary to identify a "directing mind and will" of the company and lodged it in the responsible member of the board or (in the case of Willmer LJ.) the railway expert who managed the traffic department.

• Some commentators have not been altogether comfortable with the idea of the Third Sea Lord being the directing mind and will of the Crown or the traffic manager being the directing mind and will of Guinness. Their Lordships would agree that the phrase does not fit the facts of *The Truculent* or *The Lady Gwendolen* as happily as it did those of *Lennard's* case. They think, however, that the difficulty has been caused by concentration on that particular phrase rather than the purpose for which Viscount Haldane was using it. It will often be the most appropriate description of the person designated by the relevant attribution rule, but it might be better to acknowledge that not every such rule has to be forced into the same formula.

• Once it is appreciated that the question is one of construction rather than metaphysics, the answer in this case seems to their Lordships to be as straightforward as it did to Heron J. The policy of section 20 of the Securities Amendment Act 1988 is to compel, in fast-moving markets, the immediate disclosure of the identity of persons who become substantial security holders in public issuers. Notice must be given as soon as that person knows that he has become a substantial security holder. In the case of a corporate security holder, what rule should be implied as to the person whose knowledge for this purpose is to count as the knowledge of the company? Surely the person who, with the authority of the company, acquired the relevant interest. Otherwise the policy of the Act would be defeated. Companies would be able to allow employees to acquire interests on their behalf which made them substantial security holders but would not have to report them until the board or someone else in senior management got to know about it. This would put a premium on the board paying as little attention as possible to what its investment managers were doing. Their Lordships would therefore hold that upon the true construction of section 20(4)(e), the company knows that it has become a substantial security holder when that is known to the person who had authority to do the deal. It is then obliged to give notice under section 20(3). The fact that Koo did the deal for a corrupt purpose and did not give such notice because he did not want his employers to find out cannot in their Lordships' view affect the attribution of knowledge and the consequent duty to notify.

• It was therefore not necessary in this case to inquire into whether Koo could have been described in some more general sense as the "directing mind and will" of the company. But their Lordships would wish to guard themselves against being understood to mean that whenever a servant of a company has authority to do an act on its behalf, knowledge of that act will for all purposes be attributed to the company. It is a question of construction in each

case as to whether the particular rule requires that the knowledge that an act has been done, or the state of mind with which it was done, should be attributed to the company. Sometimes, as in *Ready Mixed Concrete* and this case, it will be appropriate. Likewise in a case in which a company was required to make a return lor revenue purposes and the statute made it an offence to make a false return with intent to deceive, the Divisional Court held that the *mens rea* of the servant authorised to discharge the duty to make the return should be attributed to the company: see *Moore v. I. Bresler Ltd.* [1944] 2 All E.R. 515. On the other hand, the fact that a company's employee is authorised to drive a lorry does not in itself lead to the conclusion that if he kills someone by reckless driving, the company will be guilty of manslaughter. There is no inconsistency. Each is an example of an attribution rule for a particular purpose, tailored as it always must be to the terms and policies of the substantive rule.

# Case Law 07

**Spackman v Evans (1868) L.R. 3 H.L. 171**

of those gifts over, they were to remain untouched as given in the will.

LORD COLONSAY:—

My Lords, I have nothing to add to what has been said by my noble and learned friends, except that I fully concur with them.

*Judgment affirmed, and appeal dismissed, with costs.*

*Lords' Journals,* June 22, 1868.

Solicitor for the Appellant: *P. Burrowes Sharkey.*
Solicitors for the Respondent: *Baxter, Rose, Norton, & Co.*

———

JOSEPH SPACKMAN . . . . . . . . . APPELLANT;

AND

LEWIS H. EVANS (OFFICIAL MANAGER) AND
    THOMAS HUGHES (CREDITORS' REPRE-
    SENTATIVE) . . . . . . . . . . .
} RESPONDENTS.

*Company—Conditions of Retirement—Directors' Powers.*

Though the directors of a company may grant to a dissenting shareholder leave to retire from the company on conditions which they deem prudent and advisable to be granted in his case, yet if such conditions are not in accordance with the terms of the deed of settlement, or with conditions for retirement, notice of which was distinctly given to all the shareholders, and which were agreed on at a public meeting of the shareholders, though he performs the conditions on which such leave was granted, and his name is for years removed from the lists of the shareholders, and the company changes its form of conducting its business (of which he has no notice), and dividends are received (in which he does not participate), he is liable to have his name inserted in the list of contributories on the final winding-up of the company (*diss.* Lord *St. Leonards* and Lord *Romilly*).

A joint stock company was formed: a deed of settlement was executed, which had in it various clauses as to the admission and withdrawal of shareholders, and the transfer and forfeiture of shares. On difficulties arising in its business a proposition was made to allow, on certain conditions, dissenting shareholders to retire on the forfeiture of their shares. This proposal, of which distinct notice had been given to all, was adopted at a public meeting of the

1      R 2

ENGLISH AND IRISH APPEALS. [L. R.

shareholders. *S.*, a shareholder, who owned shares both by allotment and purchase, and who had executed the deed of settlement, dissented from these conditions, and sought by proceedings in Chancery to have the company wound up. He was not successful in the attempt. An action was brought against him for overdue calls. He defended the action. After a time, and while the litigation with him was still going on, the directors entered into an agreement with him to allow him to retire upon conditions which were not those named in the deed of settlement, nor in the proposal agreed to at the public meeting. No notice of these conditions thus entered into with *S.* was shewn to have been communicated to the other shareholders, but the fact of *S.'s* retirement was known to them, and there was no imputation of any fraudulent concealment. The name of *S.* (who had performed all the conditions on which leave to retire was granted to him) was removed from the list of shareholders at the end of 1849. Changes were afterwards made in the mode of carrying on the company's business, and dividends were received ; but he was not informed of the changes, he never received a dividend, and he never was called on to take, and never did take, any part in the affairs of the company. In 1861 the company was ordered to be wound up :—

*Held (diss.* Lord *St. Leonards* and Lord *Romilly),* that his name was rightly placed on the list of contributories.

T HIS was an appeal against a decision of Lord Chancellor *Westbury,* pronounced on the 11th of February, 1865 (1), which had reversed a previous decision of the Master of the Rolls.

The following is a brief summary of the facts, which are stated fully in detail in the judgments of their Lordships :—

In 1845 a company was formed for the purpose of effecting agricultural assurances. There was a deed of settlement prepared (2).

(1) 34 L. J. (Ch.) 321.

(2) The following are the parts of the deed referred to in the argument to shew the relative rights and liabilities of the shareholders and directors :—

" 125. That upon the neglect or refusal of any holder of shares for the time being in the company, to pay any instalment or subscription which may be called for or in respect thereof under the provisions hereinbefore contained, within two calendar months after the day to be fixed for the payment thereof as aforesaid, or upon the neglect or refusal of any person after his or her being approved of as a shareholder by

the directors for the time being, to execute within the time hereafter prescribed for such purpose either these presents or such deed of covenants as hereinafter is mentioned : Then, and in either of the said cases, it shall be lawful for the board of directors, by notice in writing under their hands delivered or sent by post to such shareholder, &c., to declare that the share or shares in respect whereof there shall be such neglect or refusal, and all money paid to the company thereon, and all the benefit and advantage whatsoever attending the same, shall thenceforth be forfeited to the company, in which case such forfeiture shall take place accord-

The Appellant became an allottee of 300 shares, and afterwards purchased 400 other shares. In 1848, there were difficulties in carrying on the business of the company. A call of £1 per share was made, which he paid; another call of £1 per share was made,

1868

SPACKMAN
*v.*
EVANS.

---

ingly; *nevertheless it shall be lawful for such directors, if they shall think fit, to enforce the payment of any such instalment, and such interest for the same as aforesaid, from such shareholder, or his or her executors, administrators, or assigns, instead of declaring such share or shares forfeited.*

"126. That it shall and may be lawful for the directors, if they shall think fit so to do, but not otherwise, in case any share or shares shall, under the provisions hereinbefore in that behalf contained, have been forfeited to the company, to discharge such share or shares from forfeiture, and restore the same to the holder thereof on his or her paying to the company such sum by way of fine in respect of such share or shares as the board of directors shall think fit."

"175. That the husband of any female shareholder, or any executor or administrator of any deceased shareholder, may, in the manner and upon the terms in these presents mentioned, become a shareholder in respect of any share or shares held by him or her in the company in either of those capacities, but any such husband, executor, or administrator, who may be desirous of becoming a shareholder in respect of any share or shares held by him or her in that capacity, shall leave notice in writing at the office of the company of his or her desire, and shall describe in such notice his or her name and place of abode, and the number or numbers of the share or shares in respect of which he or she is desirous of becoming a shareholder.

"176. That the holder or holders of any share or shares in the company, whether such holder or holders shall be a shareholder, or the husband of a female shareholder, or the executor or administrator of a deceased shareholder, or the assignee or assignees of a bankrupt or insolvent shareholder, may procure some other person or persons to become a shareholder or shareholders of all or any of the shares held by him, her, or them in the company, or sell the same to the board of directors for the time being of the company subject to the provisions hereinafter made.

"177. That whenever any such holder or holders shall have procured some other person or persons to become a shareholder or shareholders in respect of all or any of the shares held by him, her, or them, in the company, he, she, or they shall give notice thereof in writing at the office of the company, and shall describe in such notice the name and residence of the proposed shareholder, and the number or numbers of the share or shares in respect of which he, she, or they shall have procured such person or persons to become a shareholder or shareholders.

"178. That the holder or holders who shall have procured any person or persons to become a shareholder or shareholders in respect of any share or shares in the company, and who shall be approved of by the directors of the company, shall transfer the same to the proposed shareholder or shareholders at such place and in such form as the said directors shall think proper, and every deed or instrument of transfer of any such share or shares shall be left at the office of the company in order that an

1868

SPACKMAN
*v.*
EVANS.

which he did not pay. An action was brought against him for this second call. He defended the action. A meeting was held in *London*, at which it was proposed that a larger call should be made, and that those who dissented from it should be compelled to pay a

extract or minute thereof may be entered in the share register book, and to receive thereon an endorsement of such entry, and when the same shall have been left at the said office of the company for the space of seven clear days, exclusive of the day of leaving the same, the party or parties to whom the same share or shares shall have been so transferred shall be entitled to receive the same upon application being made for the same by him, her, or them respectively."

"182. *That it shall be lawful for the directors for the time being, for and on behalf of the company, to sell at such price or prices, and upon such terms as they shall think proper, all or any of the shares as shall from time to time be forfeited under the provisions in these presents contained, to any person or persons who shall be approved of by the directors as fit to become a shareholder or shareholders in respect thereof, and either with or without the dividends which may have been declared to or in respect of such shares in the interval between the forfeiture and purchase thereof and the sale thereof: Provided always, that when any one or more shares shall have been forfeited for non-payment of any call within the time hereinbefore limited for the payment thereof, the directors shall not sell, nor direct to be sold, any more of such shares than shall be sufficient, as near as may be, to pay the amount of the sum payable by the shareholder for the time being in respect of such shares, and legal interest thereupon, and the expenses attending such sale, and all shares which shall remain unsold shall again revert to and become the property of the person*

*or persons to whom the same shall have belonged immediately upon such forfeiture as aforesaid, in the same manner as if such call had been duly and regularly paid.*

"183. *That any general meeting of the shareholders, whether annual or special, may authorize the directors to sell any share or shares which shall or may have been purchased under the provisions of these presents in any manner and time, and subject to such conditions for sale, limitations, restrictions, and other conditions, with power to buy in and afterwards resell the same subject to such and the like or other conditions for sale, limitations, restrictions, and other conditions, and at such price or prices, and upon such terms, as to such meeting, or to the directors, if the power should be delegated to them, shall seem fit, and such authority to sell shall or may extend, in the discretion of such meeting, either to any particular occasion of selling, or to any occasion whatsoever which may happen to occur during any specific time or period to be resolved upon by such meeting.*"

"198. That when and so often as any shareholder shall break, or refuse or neglect to perform or comply with, any of the covenants, agreements, and provisions contained in these presents, and which on his, her, or their part, ought to be performed or complied with, or when and so often as the default or misconduct of any person or persons who, in pursuance of the directions hereinbefore contained, may either solely or with securities have given security to the directors of the company, or any of them, or any trustee or trustees of

portion of this call, and that their shares should be forfeited for non-payment of the rest. To give the opportunity of fully considering this proposition, the matter was adjourned to a meeting to be held at *Chippenham*, on the 13th of November, 1848. That meeting was held, and certain terms afterwards known as the "*Chippenham* arrangement" were then agreed on. The Appellant not assenting thereto, presented to the Court of Chancery a Petition to have the company wound up. This Petition was dismissed by Vice-Chancellor *Knight Bruce*, and the dismissal was, on appeal, confirmed by Lord Chancellor *Cottenham* (1). A fresh action was then brought against the Appellant, which he defended, and put in several special pleas, contesting his liability in every way. After some little time, and while the litigation was still continuing, negotiations were entered upon by the Appellant (in common with six other shareholders) and the directors, and these seven persons were, at the end of 1849, allowed to retire from the company on paying a sum of money less than that which they would have had to pay under the *Chippenham* arrangement. It did not appear that the terms on which they were allowed to retire had been,

1868

SPACKMAN
*v.*
EVANS.

---

the company, shall, in the opinion of such directors, render any action, suit, or other proceeding necessary upon such security, it shall be lawful for the directors to bring, commence, carry on, and prosecute any action or actions, suit or suits, or other proceedings at law or in equity, and that it shall also be lawful for such directors, when and so often as they shall think fit, to bring, commence, carry on, and prosecute any action or actions, suit or suits, or other proceedings against any person or persons for or on account of any of the property or funds of the company, or for or on account of any contract or engagements with or on behalf of the company, or for or on account or in respect of any other matter, cause, or thing concerning the rights or interests thereof, and at any time afterwards, to stay, compromise, or compound any such action, suit, or other proceeding,

and also from time to time to refer to arbitration any disputes or differences in anywise concerning the company upon which there may, in the opinion of the directors, be cause for any such action, suit, or other proceeding, and either before or after the commencement of any action, suit, or other proceeding relative thereto, and that the said directors and trustees respectively, and their respective heirs, executors, and administrators, shall be reimbursed out of the funds or property of the company all loss, costs, charges, damages, and expenses which they shall respectively bear, pay, sustain, or be put unto by reason or in consequence of any such actions, suits, or other proceedings, or any such reference to arbitration as aforesaid."

(1) 1 Mac. & G. 170; 1 H. & T. 229; 18 L. J. (Ch.) 261.

ENGLISH AND IRISH APPEALS. [L. R.

1868

SPACKMAN
*v.*
EVANS.

in fact, communicated to the other shareholders. These seven persons fulfilled the terms imposed upon them, and their names were removed from the register; they never received notice of meetings; changes took place in the conduct of the business of the company, and dividends were paid, of all which they knew nothing. In 1861 the company was ordered to be wound up, and the Appellant's name was then put on the list of contributories. He complained of this, and the case having been heard before the Master of the Rolls, His Honour, acting upon a previous decision of his own in *Brotherhood's Case* (1), which had been affirmed by the Lords Justices (2), ordered his name to be removed from the list. This decision was reversed by Lord Chancellor *Westbury* (3). This appeal was then brought.

Sir *R. Palmer*, Q.C., and Mr. *J. Pearson*, Q.C., appeared for the Appellant.

Mr. *Amphlett*, Q.C., and Mr. *Simpson*, appeared for the Respondent *Evans*.

Mr. *Druce*, Q.C., and Mr. *F. W. Bush*, appeared for the Respondent *Hughes*.

For the Appellant it was contended, that the forfeiture of the shares of the Appellant was valid at Law, and could not be impeached in Equity; that under the circumstances existing here, the shareholders must be taken to have been cognisant of the transaction, and to have acquiesced in it, so as to be bound by it even if there had been any irregularity in the mode by which it was carried into effect; that the Appellant's arrangement with the directors was beneficial to the company and prudent on the part of the directors; that long acquiescence in it, and the changes that had been made in the mode of conducting the business of the company—changes effected without notice to the Appellant—entirely released him from any connection with the company; and that there was not now any debt existing which had been due from the company when he was allowed to retire from it.

(1) 31 Beav. 365.          (2) 31 L. J. (Ch.) 861.
(3) 34 L. J. (Ch.) 321.

For the Respondent *Evans* it was contended, that the call of
£4 per share made in November, 1848, was irregular, and con-
sequently did not confer on the directors power to forfeit the
shares for disregard of it; that the compromise made with the
Appellant, not being in accordance with the *Chippenham* arrange-
ment, was *ultrà vires* of the directors; that the alleged forfeiture
declared as to the Appellant's shares in 1849, was not a *bonâ fide*
forfeiture, but a mere machinery employed to carry into effect
an invalid agreement; that this agreement could not have been
adopted by the other shareholders, who had no notice of it, and
that the agreement was not entered into for the purpose of pro-
moting the objects of the company.

For the Respondent *Hughes*, who adopted the reasons of his
Co-respondent, it was, in addition, contended, that the Appellant,
by being a shareholder of the company, was liable to its debts,
and (unless with the consent of the creditors of the company)
could only be released from such liability by having ceased for
three years to be a shareholder of the company, and that he had
not so ceased, because his retirement was not warranted by the
provisions of the deed of settlement.

The following cases were cited and commented on in the course
of the arguments: *Brotherhood's Case* (1); *Belhaven's Case* (2);
*Stanhope's Case* (3); *Stewart's Case* (4); *Spackman's Case* (5);
*Carlisle* v. *The South-Eastern Railway Company* (6); *Nicol's
Case* (7); *Prendergast* v. *Turton* (8); *Clegg* v. *Edmondson* (9);
*Clark* v. *Hart* (10); *Taylor* v. *Hughes* (11); *Bargate* v. *Short-
ridge* (12); *Ex parte Brown* (13); *Morgan's Case* (14); *Lawes'
Case* (15); *Bennett's Case* (16); *Barton's Case* (17); *The Society
for the Illustration of Practical Knowledge* v. *Abbott* (18); *Oakes* v.

1868
〰〰
SPACKMAN
*v.*
EVANS.
———

(1) 31 Beav. 365; 8 Jur. (N. S.)
926.
(2) 3 De G. J. & S. 41.
(3) 3 De G. & Sm. 198; Law Rep.
1 Ch. Ap. 161.
(4) Law Rep. 1 Ch. Ap. 511.
(5) 1 Mac. & G. 170.
(6) Ibid. 689.
(7) 3 De G. & J. 441.
(8) 1 Y. & C. (Ch.) 98.

(9) 8 De G. M. & G. 787.
(10) 6 H. L. C. 633.
(11) 2 Jo. & Lat. 24.
(12) 5 H. L. C. 297.
(13) 19 Beav. 97–104.
(14) 1 Mac. & G. 225.
(15) 1 De G. M. & G. 421.
(16) 18 Beav. 339; 5 De G. M. &
G. 284.
(17) 4 Drew. 535.
(18) 2 Beav. 559.

ENGLISH AND IRISH APPEALS.    [L. R.

1868

SPACKMAN
*v.*
EVANS.

*Turquand* (1); *Beresford's Case* (2); *Barton's Case* (3); *Leonard* v. *Leonard* (4); *Longridge* v. *Dorville* (5); *Clarke* v. *Dickson* (6); *Sanderson's Case* (7); *Hitchcock's Case* (8); *Sutton's Case* (9).

June 23.  LORD CRANWORTH :—

My Lords, this case, which occupied some time in its discussion a few weeks ago, arises under the *Winding-up Act,* upon the winding up of the *Agriculturists' Cattle Assurance Company.* That company was formed in the year 1845, under the *Joint Stock Companies Act* then in force, the 7 & 8 Vict. c. 110. The company was duly registered according to that Act on the 1st of September, 1845. Its nominal capital was £500,000, divided into 25,000 shares of £20 each, and it commenced business in that year; 300 shares were allotted to the Appellant, on which he paid £300, as required by the terms of the association. A deed was duly prepared as required by the statute. Under that statute the incorporation was not made, as it has been under a subsequent statute, simply by registration of the document, but a deed was required to be executed. That deed was executed in this case; it was executed by the Appellant in the month of November in the same year, 1845. In the year 1847 he became purchaser in the market of 400 more shares. On the 1st of February, 1848, a call was made of £1 per share, and that call was duly paid by the Appellant; and on the 3rd of August, 1848, a second call of £1 per share was made, which he did not pay.

About this time it appears that great losses occurred in the business of the company; and there was great division of opinion amongst the shareholders as to whether it would be prudent to continue to carry on the business, or whether they ought not rather to have the business wound up and so put an end to. These discussions took place, and an action was brought against the Appellant for the amount of that second call. But while those

(1) Law Rep. 2 H. L. 325.     (5) 5 B. & Ald. 117.
(2) 3 De G. & Sm. 175.        (6) El. Bl. & El. 148.
(3) 4 De G. & J. 53.          (7) 3 De G. & Sm. 66.
(4) 2 Ball. & Beat. 179.      (8) Ibid. 92.
                (9) 3 De G. & Sm. 262.

discussions were going on, a special general meeting of the company was duly called, as had been suggested by some shareholders on the 2nd of November, 1848. I take it now as stated by the Appellant, which, however, is completely borne out by the evidence. At that meeting, after a long discussion, it was proposed that a call of £3 per share should be made by the directors of the company, and that those of the shareholders who were desirous of leaving the company should pay a part of that call, and that the shares which they held respectively in the capital of the company should be declared forfeited for non-payment of the rest of the call. And in order that this proposal might be considered by the shareholders of the company, a resolution was passed that the meeting be adjourned, to be held at the *New Hall, Chippenham,* and that all legal proceedings then pending against the shareholders in respect of the August call should be stayed till after that meeting; and that notice should be given at the general meeting of the proposal made by a considerable body of shareholders present, either personally present or represented at the meeting, in order that the opinion of all of them might be taken.

My Lords, in conformity with that resolution a circular of the 4th of November was sent to every shareholder, the particulars of which it is necessary to state, though not perhaps quite at full length. It was dated at the office of the company, *Chatham Place, Blackfriars,* 4th November, 1848, and it was thus:—

"SIR,—I am instructed by the directors of this company to inform you that the enclosed propositions were made by a considerable body of shareholders at the special general meeting held yesterday."

That was a mistake. It was the 2nd of November. But that is immaterial.

"And we request that you will sign the accompanying form, should you wish to retire from the company upon the proposed terms. The special general meeting has been adjourned to be held at the *New Hall, Chippenham,* on Monday, the 13th instant, at twelve o'clock at noon, precisely; and in case you should not attend, or return the accompanying form, duly signed, on or before that date, you will be held as declining to concur in the propositions submitted to the meeting."

Then the terms are given, to which I shall have to call your Lordships' attention more in detail. I will, therefore, now only say that the proposition made was in substance this, that a call of £3

1868

SPACKMAN
*v.*
EVANS.

ENGLISH AND IRISH APPEALS.        [L. R.

per share should be made; and that shareholders wishing to retire might do so on paying certain specified proportions of that call. Persons holding only a small number of shares, under 100, were to pay £2 10*s.* per share; above 100 and under 200 to pay £2 per share; 200 and under 500 to pay £1 10*s.* per share; and those who held 500 shares and upwards were only to pay £1 per share.

The meeting was held at *Chippenham* on the day specified, namely, on the 13th of November; and at that meeting an agreement was come to, which was signed by several of the shareholders, the material parts of which are these:

" We, the undersigned, being shareholders of the *Agriculturists' Cattle Insurance Company,* do hereby testify our consent to a call of £4 per share being made by the directors of the said company, in addition to the first call of £1 per share already made, and we hereby severally agree to carry out the proposal made at a meeting held in *London* on the 2nd day of November instant, and hereunto annexed, and to pay to the directors of the said company, within one month from the date hereof, the amounts set opposite to our respective names, for moneys due on the calls already made, and for the rateable proportion of the said call of £4, to be made on the faith and understanding that the directors shall, in default of our not paying any farther or larger proportion of the call to be so made, cause a forfeiture of our respective shares so as to effect a dissolution of partnership as regards ourselves in the interest of the said company, and making a return, under the provisions of the *Joint Stock Companies Act,* of a list of shareholders of the said company exclusive of our names."

It went on to state the dates at which the payments were to be made. The date of this meeting being the 13th of November, a portion of the call, half I think, was to be paid immediately, and another half within a month; that would be on or before the 13th of December.

My Lords, on the 21st of November, in pursuance of what was so resolved, a call of £4 per share was made, and notice of that call was given by circular to all the shareholders. It is dated the 24th of November, 1848, and signed at the office of the company in *London,* and sent to every shareholder. And it is in the following words:—

" SIR,—In pursuance of a resolution of the board of directors of this company, held at the offices on the 21st day of November instant:—' That a call of £4 per share on the capital of the company be made, and that the same be payable, and paid on Saturday, the 23rd day of December next, at one of the under-mentioned banks,' "

naming certain banks, some in the country, some in *London,*

" ' and that circular letters be sent to the shareholders accordingly.' You are hereby

required to pay on or before Saturday, the said 23rd day of December next, a call of £4 per share, amounting to £ [     ] on [     ] shares standing in your name in the books of the company, to any of the above-mentioned banks."

1868

Sᴘᴀᴄᴋᴍᴀɴ
*v.*
Eᴠᴀɴs.

It is necessary to explain, the original proposal having been £3 per share, how it came to be made £4 per share. It appears that the call that had been made in August was one that was supposed to be, for some reason or other, irregular. It was suggested that it had been made too soon after receiving the other, and therefore it was proposed, as many shareholders had not paid the August call, to add £1 to the £3—making it £4—but that those who had paid the August call should only be called upon to pay the £3. That was the reason why what was originally £3 became £4.

That was explained to the shareholders in a circular on the following day, the 25th of November, in these words:—

"Sɪʀ,—By a previous post you will have received notice of a further call of £4 per share having been made by the directors of this company; and as it may create alarm among the shareholders that such an amount should be called for at the present time, the directors desire me to explain to you that this call has been made to the extent of £3 out of the £4, in furtherance of a proposition made by the shareholders to the directors at the special meeting held here on the 3rd instant (a copy of which proposition was sent you on the day following the meeting). With respect to the remaining £1 per share, the directors deemed it advisable, in consequence of doubts having arisen as to whether some technical irregularity did not exist in the notice of the call made on the 3rd of August last, to make that call over again, giving those shareholders who have paid it credit for the amount so paid as paid in advance of the present call, and allowing them interest thereon accordingly. Shareholders accordingly electing to remain in the company who have duly paid the call of the 3rd of August last, will be required to pay 10s. per share only, and those who have not paid that call, £1 10s. per share only on account of this last call of £4."

My Lords, the Appellant, I think, was not present at the *Chippenham* meeting; though whether he was or not is not important. At any rate he did not accede to the terms. That is all it is important to state. He was still of opinion, with a great many others, that the speculation was hopeless, and that the sooner it could be put an end to the better. He therefore presented a Petition to the Court of Chancery for the winding up of the company, stating circumstances which he thought a sufficient foundation for the prayer of that Petition. It was heard before the then Vice-Chancellor *Knight Bruce*, and His Honour dismissed the Petition. From that, Mr. *Spackman*, the Appellant, appealed to the Lord Chan-

1868

SPACKMAN
*v.*
EVANS.
———

cellor, Lord *Cottenham*, who considered the case very attentively, and came to the same conclusion as the Vice-Chancellor, that no sufficient grounds had been made for winding up the company, and dismissed the Petition, I believe, with costs (1). That was done on the 19th of April, 1849.

In the meantime, I believe before the hearing before Vice-Chancellor *Knight Bruce*, certainly before the hearing before the Lord Chancellor, a fresh action had been brought against the Appellant in respect of the £4 call. The other actions had been stayed, and, I think, abandoned. To that fresh action the Appellant pleaded fraud, and a number of other pleas, which would be all bars to the action if established in point of fact; when the attempt to wind up the affairs became hopeless, then the Appellant, together with six other persons who are mainly concerned, seven in all, entered into a negotiation with the directors, through means of a very long correspondence, to be allowed to retire upon terms different from those which had been proposed at the *Chippenham* meeting. They differed mainly in this—that whereas by the *Chippenham* arrangement, if it had been carried into effect in pursuance of its terms, they would have had to pay £6725, it was eventually, after some discussion, agreed between these seven gentlemen and the directors that they should be allowed to retire from that company on the payment of £4000, and then they were to have their shares declared forfeited, and so get out of the concern by paying £4000 instead of £6725. That arrangement was completed after a great deal of discussion, and I confess it does not appear to me that there was any concealment attempted as regarded the transaction. I think the transaction was perfectly open as between these seven gentlemen and the directors. So far as that goes, there was no concealment as between them at all. First of all, a sum much less than £4000, I think £2500, was proposed, and then £3000, until at last they came to an agreement that they should be allowed to retire on payment of £4000.

Then the directors, at a meeting held on the 6th of June, came to this resolution :—

"It was resolved that, by reason of the neglect and refusal on the part of the under-mentioned holders of shares" (that is to say, the Appellant, and the six

———

(1) 1 Mac. & G. 170; 1 H. & T. 229; 18 L. J. (Ch.) 261.

others) " in the above company to pay the instalment or subscription of £4 per share which has been called for in respect thereof, under the provisions contained in the said company's deed of settlement, within two calendar months after the 23rd day of December, 1848, the day fixed for the payment thereof, the shares which are held by the said under-mentioned shareholders, or to which they are entitled in the said company, numbered opposite their respective names hereunder written, and all money paid to the said company thereon, and all the benefit and advantage whatsoever attending the same, shall henceforth be forfeited to the said company, and such shares are forfeited accordingly."

Then the numbers of shares are indicated.  So that, substantially, an agreement was come to between those seven gentlemen and the directors that their shares should be declared forfeited upon their paying £4000, by certain instalments that were stipulated.  The £4000 were paid at the times stipulated, the last payment being in August, 1849, and the names of these persons were, from that time, removed from the register, and the business was thenceforward carried on without them.  But the terms of this arrangement were not communicated to the other shareholders.

After that date the company was carried on, first upon the original terms, and afterwards very material alterations were made in the terms of the company, which I shall presently have occasion to allude to more particularly.  On the 20th of April in the year 1861, the company having become insolvent, an order was made for winding it up.  The name of the Appellant was placed on the list of the contributories, but, on the 8th of July, 1864, the Master of the Rolls made an order that his name should be removed. The official liquidator (the manager under the old Act) presented a Petition to the Lord Chancellor complaining of that order, and the Lord Chancellor made the order which is now under appeal, reversing the order of the Master of the Rolls, and placing the Appellant's name upon the list (1).

My Lords, I have thought it necessary, even though the case had been so recently before your Lordships, to call your attention to a short outline of the facts, in order to make the view I have taken of this case more intelligible.

The Appellant rests his case on two grounds.  First: he says that by the payment of the stipulated sum of £4000 by himself and the six other shareholders associated with him, he ceased both

(1) 34 L. J. (Ch.) 321.

1868

SPACKMAN
*v.*
EVANS.

at Law and in Equity to be a shareholder. That payment was completed on the 30th of August, 1849, and the Appellant contends that according to the provisions of the deed of settlement he thenceforth ceased to be a shareholder. Secondly : he says that whether the effect of that payment was or was not absolutely to discharge him, yet, in fact, he was never after the month of August, 1849, treated as being a shareholder; and the conduct of all those who continued to be shareholders was such as to preclude them before the winding-up order was made, and now to prevent the official liquidator, from raising any question as to the legal validity of the arrangement by which the directors assumed to have made him cease, by virtue of that payment, to be a shareholder from the end of August, 1849.

I will consider these two questions separately. And, first, was the Appellant effectually removed from his position as a shareholder by the payments completed in August, 1849, and made in pursuance of the arrangement with the directors in the previous month of June ?

This question must be solved by inquiring whether, if on the 1st of September, 1849, any shareholder had disputed the validity of what had been done, and had instituted legal proceedings for compelling the directors to replace the name of the Appellant on the list of shareholders, the Appellant could have effectually resisted such proceedings.

It is certain that when the Appellant executed the deed of settlement he bound himself to become a partner for fifty years with the other persons parties to the deed, and that, without the consent of all his copartners, he could not retire from the partnership except in the mode stipulated for in the deed. The only mode provided by the deed whereby a shareholder may cease to be a shareholder (putting aside for the moment the clause of forfeiture) is by sale and transfer of his shares.

The mode of effecting a sale and transfer is provided by the 176th and some following clauses. By the 176th clause it is provided that any shareholder may procure any other person to become a shareholder in his place by selling and transferring to him his shares. But then, by the next two clauses, the shareholder so proposing to sell and transfer is bound to give notice to the

directors of his intention, and they are to certify to the shareholder their approbation or disapprobation of the person to whom the transfer is to be made; and, though it is not said in terms, that if they disapprove the proposed transferee no transfer can be made, yet that is plainly to be inferred. Supposing the directors to approve the person to whom the transfer is to be made, the shares sold are to be transferred to him in the mode approved by the directors, and he is to execute a deed of covenant binding himself to observe the rules and regulations of the company. When this has been done, and the shareholder selling has paid up all sums, if any, then due from him to the company in respect of the shares sold, he is thenceforth to cease to be a shareholder, and is entitled to a certificate from the directors that he is no longer a holder of the shares so sold. There are some slight variations in the mode of proceeding where the sale of shares is made (as within certain limits it may be made) to the company itself, but it is not necessary to observe upon them. I have adverted to these clauses only for the purpose of calling attention to the great anxiety manifested by the deed that no shareholder should retire without putting a solvent and respectable substitute in his place.

But besides this mode, by which the shareholder is enabled, if he desires it, and if the directors approve, to substitute another shareholder in his place, and so cease to be a partner, the deed contains provisions by which the company is enabled, by its directors, to get rid of any shareholder who fails to pay sums to the payment of which he may, under the terms of the deed, have made himself liable. The 125th clause provides, that upon the neglect of the holder of any shares to pay any instalment called for under the terms of the deed within two months after the day fixed for the payment, the directors may declare such shares to be forfeited.

It is under this clause that the Appellant contends he has ceased to be a shareholder. He neglected or refused to pay the £4 call made in pursuance of the *Chippenham* arrangement. The directors declared his shares forfeited, and so, as he contends, he ceased to be a shareholder. The question is, whether this was the result of what took place; whether if a shareholder had, in September, 1849, instituted proceedings to call in question the arrangement

1868

SPACKMAN
v.
EVANS.

ENGLISH AND IRISH APPEALS.

1868
⌣
SPACKMAN
*v.*
EVANS.
———

with the Appellant, he could have done so successfully ?   I am of opinion that he could.

The deed, it is true, gives to the directors the power of declaring a forfeiture of shares the holders of which refuse or neglect to pay their calls.   But it is plain that this is a power intended to be exercised only when the circumstances of the shareholder may make its exercise expedient for the interests of the company, not a power to be exercised for the interest, or supposed interest, of the shareholder.   This is plain from the very nature of the power, and it is made even more obvious from various provisions and stipulations contained in some other clauses in the deed.   In the 125th clause, which confers the power of declaring a forfeiture, it is expressly stipulated that the directors, instead of declaring a forfeiture, may, if they think fit, enforce payment of the instalment, meaning obviously by means of legal proceedings.   In the next clause (the 126th) they are empowered to restore the forfeited share to the holder on payment of a fine ; and by the 182nd clause, the directors are empowered to sell forfeited shares, but only so many of them as shall be sufficient to raise the sum for non-payment whereof the forfeiture was incurred and the expenses, and all shares not so sold are to revert and be restored to the person who held them at the time of the forfeiture.

These provisions are strong to shew that the power to declare shares forfeited was intended only to give to the directors additional means of compelling payment of calls, or other money due from the shareholder to the company by virtue of the deed.   The shares are, in substance, made a security to the company for the money from time to time becoming due from the shareholder. The duty of the directors, when a call is made, is to compel every shareholder to pay to the company the amount due from him in respect of that call ; and they are guilty of a breach of their duty to the company if they do not take all reasonable means for enforcing that payment.   In the present case it has never been even suggested that the Appellant was insolvent, that he was not perfectly able to pay the full 30s. per share, which was the amount of his call ; and it was a plain breach of trust in the directors to take, in discharge of money due from the Appellant, shares over which they had power as a security only for the money due, but

which shares they knew to be valueless. They were bound, as trustees for the body of shareholders, to enforce payment of the whole 30s. per share, and for that purpose to take all proper legal proceedings, unless they *bonâ fide* believed that he was not in circumstances which would enable him to pay the sum for which he was sued, and there has never been even a suggestion that this was the case.

It was, however, strongly pressed in argument that the directors could not have successfully proceeded in the action which they had brought against the Appellant; the circumstances attending the call, it was urged, were such as to make it impossible for the directors to enforce payment of the sums called for; the call, it was said, was legally invalid and the Appellant had pleaded several pleas to the action on which, if the parties had proceeded to trial, it was contended he must have been successful, and so that it was a prudent course to come to some arrangement whereby the proceedings in those actions should be stayed.

This argument does not make the case of the Appellant at all better. Under the 120th clause of the deed, the directors are empowered to make calls on the shareholders within certain limits; and the four following clauses prescribe the course to be pursued when calls are made. That a call of at least 30s. per share, including the 20s. call in August, 1848, was necessary for enabling the affairs of the company to be carried on, is not, I presume, disputed. It was therefore the duty of the directors to make such a call, and to make it in the mode prescribed by the deed, so that they might be able to enforce its payment. If it be true, as I will assume it was, that the call actually made in pursuance of the *Chippenham* arrangement was not properly made, and so that the Appellant would have succeeded in the action brought against him, the proper course to be taken by the directors was, *primâ facie* at least, to abandon that call, and to make another which should be in all respects conformable to the deed. If such a valid call had been made, there could have been no difficulty in enforcing it against the Appellant. But such a course would have thrown on the company the costs which the Appellant had incurred in resisting the action. It might therefore have been a prudent and justifiable course on the part of directors acting for the company to come to

terms with the Appellant by way of compromise, under the power for that purpose conferred on them by the deed of settlement.

The power on which the Appellant relies as justifying the directors in such a course, is that contained in the 198th clause of the deed. It is there provided—

"That when any shareholder shall refuse or neglect to perform or comply with any of the covenants, agreements, and provisions contained in the deed, and which on his part ought to be performed or complied with, it shall be lawful for the directors to commence and prosecute any actions or suits at law or in equity, and at any time afterwards to stay, compromise, or compound, any such action or suit." And the clause further provides, " that it shall be lawful for the directors to commence, carry on, and prosecute any action or suit against any person or persons on account of the property or funds of the company, or on account of any contract or engagement with or on behalf of the company, or for or on account of any other matter or thing concerning the rights or interests thereof, and at any time afterwards to stay, compromise, or compound, any such action, suit, or other proceeding."

There is an earlier clause (the 164th) which also gives power to the directors in certain cases to make any compromise or composition with respect to claims made against or owing to the company, as they may think fit. I do not, however, advert farther to that clause, because I think it doubtful whether that clause is not confined to the case of disputes between the company and strangers, and, at all events, it does not carry the power of compromise beyond what is contained in the 198th clause. The question, therefore, is, whether the 198th clause justifies the directors in making the arrangement of the 6th of June, 1849.

In order to justify the compromise under the first member of the clause, the Appellant must admit the validity of the call made upon him: for, unless the call was a valid call, he did not, by refusing to pay the sum called for, refuse or neglect to comply with any of the provisions of the deed which on his part ought to be complied with. This first member of the clause seems to be inapplicable in cases where there has been no breach of duty on the part of the shareholder, as would be the case if the call for which the action was brought was one which the Appellant was not bound to pay. The compromise must therefore be justified (if at all) under the second member of the clause, that which empowers the directors to bring actions against any person or persons in respect of any matter concerning the rights and interests of the

company, and afterwards to stay, compromise, or compound any such action. The situation of the parties was this:—The directors had brought an action to enforce a call, which there were strong reasons for contending was a call which they could not enforce. There was a strong probability that they would fail in the action. The Appellant had pleaded, but the cause had proceeded no farther. If the directors abandoned the action they would have to pay the Appellant his costs incurred up to and including his pleas; but then they might have made a fresh call for 30s., under which the Appellant would have certainly become liable to pay that sum, i.e., £1050 on his 700 shares. It might be a reasonable and prudent course for the directors to consent to stay the action, and accept £800, which was his proportion of the £4000, instead of abandoning the action, paying the Appellant's costs up to and including his pleas, and proceeding to make a fresh call. The company received from the Appellant less by £250 than could have been obtained from him by means of a fresh call; but, on the other hand, the company was absolved from all demand on account of the Appellant's costs, and was saved the necessity of making a fresh call, as to which there were some difficulties, and thus the company escaped all the risks of litigation. This would have been an arrangement, both in letter and in spirit, within the 198th clause, and I do not see that any one could have objected to it. But this, though included in the arrangement made on the 6th of June, 1849, was not the whole of it. The material part of the arrangement was, that in consideration of the payment of a stipulated sum, the Appellant's share of which was £800, he and the six other shareholders acting with him should cease to be shareholders, and this result was to be obtained by the directors declaring their shares forfeited for non-payment of the whole amount of the call made in pursuance of the *Chippenham* arrangement.

I have already intimated my opinion, that in thus using the clause of forfeiture, the directors were applying it to a purpose foreign to that to which alone they would be justified in acting on it. There was no real forfeiture such as the deed contemplated in the 198th clause. I do not attribute moral fraud to the Appellant, but the whole transaction was fictitious. As was said by Lord *Westbury*, there was *aliud simulatum, aliud actum.* That which

1868

SPACKMAN
v.
EVANS.

1868
SPACKMAN
*v.*
EVANS.

the directors did was, therefore, what is called a fraud on the power, a breach of trust, to which the Appellant was a party. The circumstance that this use of it was connected with, and formed part of, a compromise which, so far as relates to the action, might be good, does not help the argument of the Appellant. The substance of the agreement was, that certain actions against the Appellant and others should be compromised on payment by them of a stipulated sum to the directors, they undertaking on their part to do that which I consider to have been a breach of trust in favour of the persons making the payment.

I have been looking at this case, it will be observed, as it would have stood if the disputed transactions had been called in question recently after they took place by a shareholder no party to them, and ignorant of all which had occurred. He would have been entitled to say :—" I became a shareholder, relying on the names of those who were engaged with me in this partnership; I delegated the management to certain directors with defined powers and duties; it was part of the stipulations of the deed of partnership that none of my fellow-shareholders should quit the partnership except by substituting in his place some other person approved by the directors ;—this was, I thought, a sufficient security to me that, in the event of my being called on by a creditor who, having recovered judgment against the company, should proceed to enforce payment against me, I had solvent partners from whom I might obtain contribution; and now I find that, without any authority from me, you, the directors, have taken on yourselves to enable several of my partners to withdraw from the partnership by a proceeding which I never authorized." I confess that to such a complaint I do not see what answer could have been made.

But the other question remains to be considered. Assuming that the Appellant was not effectually discharged from being a shareholder by the arrangement in June, 1849, is it now open to the official liquidator, who may be taken to represent those who were shareholders at that time, and still remain so, to dispute what was then done ? I have come to the conclusion that it is.

The act of the directors in cancelling the shares of the Appellant, though not warranted by the deed of settlement, would be valid if it was either previously authorized or subsequently ratified

1868

SPACKMAN
*v.*
EVANS.

by all the shareholders. There certainly was no previous authority from the shareholders authorizing the directors to allow the Appellant to retire on the terms agreed on in June, 1849. It is equally certain that there was no express subsequent ratification. But the Appellant contends that there was, on the part of all the shareholders, such acquiescence as amounts to approval and confirmation. He contends that the shareholders so conducted themselves as to have put it out of their power, long before the winding-up order, to dispute the validity of what had been done by the directors. In order to sustain such an argument, it is incumbent on the Appellant to shew, in the first place, that all the shareholders knew, or must be deemed to have known, that he had been allowed to retire in a mode not authorized by the deed, and on terms not communicated to them. The first thing, therefore, to be done is to examine the evidence critically, in order to ascertain how far it does or does not shew knowledge, or means of knowledge, in the shareholders on this subject. The evidence bearing on this part of the case consists, first, of the circulars addressed to the shareholders relating to the *Chippenham* compromise; and, secondly, of that relating to the acts of the company subsequent to the retiring of the Appellant.

By a circular of the 18th of October, 1848, notice was given to every shareholder that a special general meeting would be held on the 2nd of November then next, at which it would be considered how far it would be practicable and desirable to permit certain shareholders to retire from the company on certain terms. The special general meeting was held on the 2nd of November; and another circular of the 4th of November informed every shareholder what the terms were which had been proposed at that meeting by the shareholders who wished to retire. They were as follows :—

" *Agriculturists' Cattle Assurance Company.*

"Terms proposed by shareholders who wish to withdraw from the above company :—All calls to the present time to be paid up. That a call of £3 per share be made on the capital stock of the company, and that the directors be empowered to forfeit shares of retiring shareholders on payment by them, in proportion to the number of their shares, as follows :—Holders of shares under 100 to pay £2 10*s.* per share; holders of 100 shares and under 200, to pay £2 per share; holders of 200 shares and under 500, to pay £1 10*s.* per share; holders of 500 shares and upwards to pay £1 per share. That 10*s.* only of the above call be paid by share-

holders remaining in the company, or a sum equivalent to that amount, be provided as a guarantie fund for the security of retiring shareholders. That a committee of retiring shareholders be appointed with the directors to guarantee the funds received from retiring shareholders being paid in liquidation of present liabilities."

The same circular informed every shareholder that the meeting had been adjourned, to be held at the *New Hall, Chippenham,* on the 13th instant.

I do not find evidence to shew that notice was sent to the shareholders of what was resolved at the adjourned meeting. But on the 24th of November notice was given to every shareholder that the directors had, on the 21st instant, made a call of £4 per share. This, however, was followed by another circular on the next day, which gave notice to every shareholder that if he *elected to remain* in the company he would only have to pay 10s. per share if he had paid the August call, or £1 10s. if he had not. I think every shareholder would almost necessarily infer from this circular that if he *did not elect* to remain in the company, he might, so far as the special general meeting could authorize it, retire on the terms indicated to him by the circular of the 4th instant, unless those terms had been in any manner altered or modified by the adjourned meeting at *Chippenham.* He would, however, also know that the authority so given, if it was given, by the general meeting was *ultrà vires,* and would not be binding on him unless he acquiesced. I do not find evidence of any farther communication to the shareholders in general of an intention to allow any of their body to retire; but about four months after the Appellant had been allowed to retire, two balance sheets of the affairs of the company were duly prepared and audited in accordance with the provisions of the deed, the one for the half-year ending the 31st of December, 1848, and the other for the half-year ending the 30th of June, 1849, and a copy of them was, as provided by the deed of settlement, forwarded to every shareholder, together with the auditor's report, previously to the general annual meeting of the company in November, 1849. These balance sheets informed every shareholder that, in the half-year ending on the 31st of December, 1848, shares had been cancelled to an amount which reduced the sum of £52,400 payable on the £4 call by a sum of £11,310 10s.; and that in the half-year ending on the 30th of

June, 1849, there had been farther cancellations of shares, reducing the claim of the company in respect of the £4 call by a sum of £13,857 10s.

The important question is, what information as to the cancellation of shares did these balance sheets communicate? If they conveyed information that the directors had been taking on themselves to cancel shares to a very large extent in a manner not warranted by the deed of settlement, and on terms not communicated to the continuing shareholders, then I think that the subsequent conduct of the shareholders was such as to preclude them from saying that the retiring shareholders had never ceased to be shareholders. They knew that the directors were carrying on the business of the company with a greatly diminished number of shares and shareholders. If the affairs of the company should be unprosperous, this would be a disadvantage to those who remained, for the losses would have to be borne by a diminished number of partners. If, on the contrary, the business should prosper, the reduction of the number of shares would probably add materially to the profits of the shareholders who remained. In such circumstances I should be strongly inclined to hold that mere passive acquiescence would preclude the shareholders from afterwards contesting the validity of the cancellations. It would be a dishonest act on their part to allow the directors to carry on the business as if the company consisted only of the reduced number of shareholders, and then, if its affairs should turn out unfavourable, to insist on the invalidity of the cancellations by which they knew that shareholders had retired, and were therefore for ever precluded from claiming to be shareholders if the affairs should turn out prosperous. But here there was not mere passive acquiescence. During the six or seven years which followed the retirements in June, 1849, important changes were made in the terms of the partnership, materially affecting the interest of all who were to be treated as shareholders. I will only advert to two of them. By the original deed of settlement there was no power of borrowing money; but by changes made in it after 1849, under the 27th clause, powers were given for borrowing, first, £15,000, and afterwards £10,000 more, and these sums, or nearly all of them, were actually borrowed, and so became charges on the company and its

1868

SPACKMAN
*v.*
EVANS.

shareholders. The original deed provides, by clause 20, that every shareholder is to have notice of every special general meeting, at which alone changes can be made in the deed. But every con-- tinuing shareholder must have known that no notice would be given to those who had been allowed to retire, so that these im- portant changes affecting his interest would be made behind his back. Again, in April, 1857, a dividend was declared and paid of £6 per cent. per annum on the paid-up capital of the company for the half-year ending the 31st of December, 1856. The continuing shareholders received this dividend, though they must have known that those who had retired would not be allowed to participate in the sum to be divided.

Looking to all which was thus done, I should certainly hold that the conduct of the continuing shareholders amounted to a ratification of the illegal or irregular acts of the directors, provided it be clear that the shareholders knew that they were illegal or irregular, that is, knew that they were acts not authorized by the deed, and not done in pursuance of the notice given to every shareholder by the circular of the 4th of November, 1848. The important question is, whether the information communicated to them did communicate this knowledge. I have, but not without reluctance, come to the conclusion that it did not. Every share- holder knew that, under the 125th clause of the deed, the directors had in certain circumstances the power to declare shares forfeited, and that it might become their duty to exercise that power, and to cancel the shares. But, farther, every shareholder knew that it had been proposed at *Chippenham* to enable shareholders to retire on complying with certain terms, the particulars of which had been communicated to him by the circular of the 4th of Novem- ber, 1848. From the very great number of shares which it was obvious from the balance sheets must have been cancelled, every shareholder must, I think, be presumed to have known that many shareholders had been allowed to retire according to the proposals the particulars of which had been communicated to him in Novem- ber, 1848. Though never formally assenting to what was so pro-- posed, he might be of opinion that it would be to his advantage to allow shareholders to retire on those terms, and there was nothing in the information communicated by the balance sheets to shew

that the terms on which shares had been cancelled, if they were
not cancelled under the 125th clause of the deed (and this, from
the great extent of the cancellations, was hardly possible), were
different from those of which he had been apprised by the circular
to which I have referred.  The absent shareholder might, therefore,
have abstained from disputing the validity of the cancellations,
either because he did not know that they were not validly made
under the provisions of the deed of settlement, in which case he
could not successfully have questioned them, or because, knowing
that it had been proposed to allow cancellations of shares on cer-
tain specified terms, he would naturally suppose those terms to
have been adhered to; and if they were adhered to, he might
think it inexpedient to oppose the retirement of shareholders who
retired on those terms.  If the directors, or the shareholders who
retired in June, 1849, had communicated by circular to every
shareholder the terms on which it had been agreed that the retire-
ments then sanctioned should be allowed, and if no objection had
been made to what was proposed, I think that no shareholder
could, at the time the winding-up order was made, have disputed
the validity of the retirements.  But no such notice was given,
and there was nothing to inform absent shareholders that the can-
cellations referred to in the balance sheet of 1849 were not cancel-
lations either under the ordinary provisions of the deed of settle-
ment, or on the terms communicated to them by the circular of the
4th of November, 1849.

Some stress was laid in argument on the report of the auditor
of the 12th of October, 1849, which accompanied the two balance
sheets.  The following passage in that report was relied on, I
suppose, as shewing that the shareholders who were allowed to
retire in June, 1849, did so on terms different from those which
had been proposed at *Chippenham.*  After adverting to the im-
portance of paying all outstanding calls, the report proceeds
thus:—"Many of the shareholders resisted payment, but, after
much and expensive litigation, they found it their interest to
make arrangements with the directors, which, if entered into a
year before would have essentially saved delay and expense.  They
did at last what they might have done at first."  It is very difficult
to see how this passage can be made to bear on the present question.

1868
⌒
SPACKMAN
*v.*
EVANS.
——

ENGLISH AND IRISH APPEALS.            [L. R.

It is not at all obvious that it had any reference to the retirement of shareholders; but, if it had, then I think the words "They did at last what they might have done at first," would lead those to whom they were addressed to suppose that the retirements in June, 1849, had been on the same terms as those previously allowed.

It was argued that there was nothing like fraud or concealment in the conduct of the parties to the arrangement in June, 1849. But in order to bind the absent shareholders, it is not enough to say that there was no concealment. The Appellant and the directors' knew that unless they informed absent shareholders of the terms on which the shares of him, and the others who retired with him, were cancelled, those absent shareholders would be altogether ignorant of them. It is not necessary to impute to the Appellant any fraudulent intention to conceal what had been done; but he must have known that there was nothing in the documents communicated to absent shareholders which would inform them of the terms of the arrangement. I am ready to believe that if an absent shareholder had made inquiries of the directors, they would have told him the whole truth. But there was nothing making it the duty of the shareholder to institute any such inquiry, so that he has a right to say that the facts, if not communicated to, were concealed from him.

It was said that all the facts must have been known to the auditors, and that they being appointed by the shareholders must be treated as their agents. The auditors may be agents of the shareholders so far as relates to the audit of the accounts. For the purpose of the audit the auditors will bind the shareholders; and, attending to the language of the 107th clause of the deed, it may be that any special matter contained in their report as to the state of the accounts and the assets of the company must be considered as having come to the knowledge of every shareholder. But with respect to the two balance sheets reported on by the auditor in October, 1849, I can see nothing even tending to shew what were the terms on which the Appellant had been allowed to retire.

On these grounds, which I have endeavoured to state concisely, I have come to the conclusion that the Order of Lord Chancellor

*Westbury* was right, and so that this appeal ought to be dismissed; but, considering the great difference of opinion which has existed on this and other similar cases among the highest authorities, I think there ought to be no costs.

1868
SPACKMAN
*v.*
EVANS.

LORD ST. LEONARDS :—

My Lords, the question before the House is, whether Mr. *Spackman* is to be a contributory in the winding-up, under the Court of Chancery, of what is still called the *Agriculturists' Cattle Assurance Company?* It comes before us in a singular shape, inasmuch as although the dispute is between the company as represented by the official manager, in whom is vested all the property of the company, and whose duty it is to administer the funds and to pay the debts; yet the creditors' representative is a party to the appeal. He upon this occasion contents himself, in his printed case, with the defence of the official manager. The counsel for the latter, however, appear to me to have preferred arguing the case as if they represented not the company for whom they do appear, but the creditors for whom they do not appear; indeed, the junior counsel carried his argument to this extent, that a shareholder in a case like this cannot have any equity; he can only quit the company in one of two ways,—by a legal transfer, or by a legal forfeiture. In *Brotherhood's Case* (1), the first on this point, I observe that the counsel for the creditors opened the case, and were followed by the official manager. I think that the defence rests with the counsel of the latter. Indeed, there is not a creditor remaining who was such when *Spackman* was allowed to withdraw from the company, so that new creditors cannot, in my opinion, establish any claim against him, although they might obtain a benefit if the company could compel a contribution from *Spackman*. I dismiss, therefore, from consideration altogether any claim set up on the part of the creditors, or by the official manager on their behalf. In my opinion the question to be decided is as between the company and *Spackman*. But we must not be misled by the title of the company. Long after *Spackman* had been allowed, whether legally or not, to withdraw from the company, the most important parts of the deed of partnership were altered, without, of course, any concurrence of

(1) 31 Beav. 365.

his. Borrowing powers were introduced, and have been acted upon, and many other important alterations were made in the deed, more especially in " the object and business of the company," which were largely extended, and included objects requiring large capital and experienced directors, and secretaries, and solicitors, and actuaries, and agents of all sorts. The company did not allow its title to be expanded with this increase of business. " *The Agriculturists' Cattle Assurance Company*" but feebly describes a company with its new powers, and yet this is the company to which the Respondent desires to introduce the Appellant as the very company from which he withdrew so many years ago. On the 2nd of November, 1848, when the arrangement was first made for the withdrawal of members, there were 155 persons holding 13,100 £20 shares, and now, notwithstanding the creation of 25,000 preference shares under the powers newly created by the company, the contributories are stated to be, I think, thirty-nine.

Now that we understand the position and the claims of the Appellant and the Respondent, we may enter into the consideration of the facts upon which our resolution must depend.

The deed of settlement authorized the directors, upon non-payment of calls, to declare them forfeited, or to compel payment of them, and when they altered the deed in 1855, power was given to forfeit the shares and to enforce payment of the instalment, and forfeited shares were to be cancelled. They were authorized to sell forfeited shares, but not more than sufficient to pay the calls, and the remaining shares were to revert to the owner. The directors had power to discharge the forfeiture, and restore the shares to the holder on his paying such fines as the directors should think fit. Power was reserved to two special general meetings to dissolve the company.

The company commenced their operations in 1845, and as early as 1848 the losses exceeded the assets (independently of unpaid capital) by £17,000. Lord *Cottenham*, in 1849, observed that the capital of the company was not all realized by calls, but remained outstanding on the liability of the parties who had engaged to furnish the capital as it was required ; in fact, they were the holders of the capital to the extent of the shares they had taken until it was required by the company. This explains the first arrange-

ment.  In order to meet the demands of the company a first call
of £1 a share was made, and that was followed by a second call of
£1 a share.  The first call was generally paid.  Amongst those
who paid the second call was a Mr. *Brotherhood.*  Amongst those
who declined to pay it, although they had paid the first call of £1,
was Mr. *Spackman,* the Appellant.  Actions were brought against
shareholders who resisted the second call.  The shares were of no
value in the market.  In this state of the affairs of the company
the shareholders formed two classes, one which desired to carry on
the concern and considered the shares valuable, the other which
desired altogether to withdraw from it.  This led to what is termed
the *Chippenham* arrangement.  It was agreed, with full notice, as
it was considered, to all the shareholders, that those who desired it
should be allowed to withdraw upon payment of certain sums, upon
a scale according to the number of shares they severally held, in
satisfaction of a call to be made, and that a call should be made,
which was ultimately fixed at £4, and included the second call of
£1, but was not to be wholly paid, and the portion left unpaid was
to enable the directors, according to the arrangement, to declare a
forfeiture of the shares of the retiring members.  This was carried
into execution.  Ten shillings only of the call were to be paid by
shareholders remaining in the concern, or a sum equivalent to that
amount was to be provided as a guarantee fund for the security of
retiring shareholders.  This was a *bonâ fide* arrangement, and the
shareholders who desired to carry on the concern never attempted
to disturb it.  The forty-two retiring members, holding 4354 shares,
paid under this arrangement £5245, but they agreed at various
times to the terms proposed, and to the time of carrying the same
out.  Several of them made the arrangement after the 13th of
November, 1848, the day originally appointed, and two of them as
late as January or February, 1850, and their shares were declared
to be forfeited under the *Chippenham* arrangement.  The directors
repeatedly waived the time originally appointed for retiring mem-
bers to withdraw and pay.  The continuing members were thus
enabled to carry on the concern, for, in fact, they were not bound
to pay even the 10s. a share upon the £4 call, but only to provide
an equivalent sum to protect the remaining members from the
then present liabilities.  It should be kept in view that no call was

1868

SPACKMAN
*v.*
EVANS.

1868

SPACKMAN
v.
EVANS.

made by the company or by the directors before the year 1855, except the calls already mentioned.

In order to guard against the possibility of the forfeited shares once more vesting in the retiring owners, they, with the concurrence of the directors, transferred their shares to paupers, and gave the directors a regular deed of indemnity for consenting to the arrangement, and then the shares were forfeited in the names of the men of straw, and registered accordingly. This, no doubt, was an illegal operation, and, in point of fact, the declaration of forfeiture was never made against the real owners, but still even that circumstance has not been held to vitiate the transaction after the lapse of time. No such difficulty exists in the case of the Appellant.

We may now consider the real nature of the *Chippenham* arrangement. All the shareholders were invited to come in, and if they had so pleased they might have had a voluntary winding-up. But they split into two parties. Those who desired to remain took care to make those who retired find capital for the carrying on of the business. The call of £4 was not properly a call, for it did not affect those shareholders who remained in the business; even the 10s. a share was only a guarantee against the outstanding debts. As far as the call affected the shareholders who retired, it was not a call to carry on the business for their benefit in common with the other shareholders, but a fund exclusively for the benefit of the latter, and they manifestly carried on the business with it. The transaction did not properly put an end to the partnership, but a certain number of the partners remained who were to carry on the concern and take all the profits, and pay the outstanding debts and future engagements with the aid of the contributions of those who retired,—a *bonâ fide* and reasonable arrangement, and one from which neither party, when executed, could depart. The retiring members who paid could not claim either the repayment of their money, or any right to subsequent profits, nor could the company any longer charge them as co-partners. Their machinery might not have enabled them to carry out this arrangement legally, unless they had all, in effect, consented to or acquiesced in it; but time ran against any shareholder, although he had not accepted the proposed arrangement or expressed any

acquiescence in it. And the binding nature of the contract in 1862, after the winding up of the company in 1861, was established, first, by the Master of the Rolls, who, relying upon the subsequent dealings of the company and the knowledge of all parties, and more especially the time which had elapsed, held that *Brotherhood* (1) was not a contributory in the winding-up. The costs were to come out of the estate. From this decision the official manager appealed to the Lords Justices, and the appeal was dismissed with costs, which again were thrown on the estate. Lord Justice *Turner*, in giving his opinion, made an important statement, in which I entirely concur. He said that (2) " the fair test of the question whether a person ought to be held to be a contributory or not was this, whether he could have been compelled to contribute in equity if the number of partners had not prevented that remedy." He was satisfied that a Court of Equity would not have maintained a bill by any of the shareholders against Mr. *Brotherhood,* and would not have allowed him to be sued at law upon the deed for their or any of their benefits.

Although the House is not directly called upon to give any opinion on the *Chippenham* arrangement, yet I have found it necessary to consider it, because, in my opinion, it was the foundation of all the subsequent compromises and forfeitures of the company. The case was, I think, rightly decided.

I must now draw your Lordships' attention to the proceedings by and against Mr. *Spackman.* He attended the meeting at *Chippenham,* and refused to enter into the arrangement, and especially objected to forfeiture of shares. In December, 1848, *Spackman* and a brother, who was also a shareholder, presented a Petition for winding up the company, which was heard early in 1849 by Vice-Chancellor *Knight Bruce,* who dismissed it with costs, and upon appeal to Lord Chancellor *Cottenham,* the appeal was dismissed with costs ; but the Lord Chancellor manifestly thought the *Chippenham* arrangement a binding one. The retiring members, he observed, were permitted to retire on terms beneficial to them, and beneficial also, he must presume, to those who offered the terms. All the facts were before the Vice-Chancellor and the Lord Chancellor, and they treated the arrangement as a binding

1868

SPACKMAN
*v.*
EVANS.

(1) 31 Beav. 365.                    (2) 31 L. J. (Ch.) 867.

one. Both parties, the one who still desired to withdraw, and the other who desired to remain and carry on the business, were naturally led to believe that their common object could be further accomplished by an arrangement between them. Both parties, as we shall see, acted upon this belief, and neither attempted to disturb it. Too little weight has, I think, been given to these proceedings.

Now one leading question which this House is called upon to consider is, whether the arrangement to which I am about to call your Lordships' attention between *Spackman* and the company was a *bonâ fide* and open one, or a concealed and fraudulent one. He had attended at the *Chippenham* meeting and openly declined to enter into the proposed arrangement. The company brought actions against him for the fourth call, which he defended, and no doubt would, in my apprehension, have succeeded in the defence; but instead of entering into any secret or fraudulent agreement with the company, as composed of those shareholders who remained in it, he sought a public and, of course a *bonâ fide*, an adverse winding up of the company, and persisted in carrying his object before the Appellate Tribunal at the risk of costs. Now, what would success have done for him? It would have put an end to the company, (but not prevented the establishment of a new one); and all the outstanding debts would have been paid, and the shareholders have been freed from farther liability. But this could only have been accomplished by *Spackman*, in common with his brother shareholders, paying in full all calls required for payment of the creditors, and of the working of the winding-up. A plainer proof of fair dealing with the company could not be shewn. Success in his movement could afford him no benefit beyond what he sought, the payment of the full and fair portion of his liabilities, and his legal discharge as a shareholder in the company. From this conduct we shall find, I think, he never swerved. In regard to the important question which we have to consider, whether the shareholders generally had notice of the proceedings between *Spackman* and the company, the action against him was a *lis pendens*, and his Petition for winding up was another, which fixed every shareholder, however inattentive to the working of the concern, with notice of the litigation between their

company and *Spackman*. If, therefore, we find that the action is compromised, and that *Spackman* failed in his attempt to wind up the company, and yet quitted it upon a compromise of which the company availed itself without complaints for upwards of twelve years, and even up to the actual winding-up under the Court, it will be difficult to establish an ignorance of the compromise by any shareholder which will enable the company when broken up to establish their right to include *Spackman* amongst their contributories. With the knowledge fixed upon them they were bound to inquire where the thousands came from by which their trade was carried on, and who were their partners during twelve long years. It should be borne in mind that the company, by their official manager, challenged the transaction with *Brotherhood* as well as that with *Spackman*.

We may now consider the actual arrangement between *Spackman* and the directors. They were, in fact, a continuation of the *Chippenham* arrangement, and were so treated by the counsel of the Respondent in his argument at the Bar. The directors went on making compromises; and sums classed under payments for cancelled shares were mixed up with payments from *Spackman* and those who acted with him.

In consequence of the winding-up Petition of the *Spackmans*, fresh actions were immediately commenced against them, and those acting with them, for the £4 call, but with a notification that a less sum would be accepted; and the directors called a special general meeting to consider the general affairs of the company, and the meeting was held accordingly. A treaty then commenced between the directors and *Spackman*, and his friends, for their retiring, and they offered £2500, £3000, and ultimately £4000, which latter sum was accepted, for the calls due and their shares. A new company was in contemplation, and the basis of it was that of introducing influential agriculturists on the directory, and procuring new capital by the means of shares. These proceedings occupied from the 19th of April, 1849, to the 6th of June, 1849, with a long correspondence between the solicitors of both parties, and references to the directors, and to counsel for advice. In a letter of the 31st of May, 1849, from the solicitor of the company to the solicitor of the *Spackmans*, he stated that no time should

be lost in carrying out the arrangement, as everything depended upon their moving promptly to preserve the company. The moneys paid by the retiring members, amounting to many thousands of pounds, saved the company. On this 6th of June, 1849, in pursuance of the plan agreed upon, the directors declared the shares of *Spackman* and the others forfeited. The actions were to be stayed, and were abandoned; and the directors and the other parties were to execute a deed to carry out the agreement. The £4000 were to be paid, in certain proportions agreed upon between themselves, by the shareholders retiring; and the Appellant's share was £800. A deed of the 26th of June, 1849, was accordingly executed by the company, and the Appellant and others, by which the latter released all their rights to the forfeited shares and to future profits, and the company covenanted not to do any act to revest the forfeited shares in the owners, or to charge them with more of the past calls or any future call. *Jacob Carpenter*, who had agreed to the *Chippenham* arrangement at the time it was made, was a party to this deed. The £4000 were paid by instalments according to the deed.

In the share register books of the company, corrected to the 1st of November, 1848, the Appellant's name is contained as a shareholder with his 700 shares. A proper return was made to the Registrar of Joint Stock Companies, and accordingly the Registrar, on the 8th of June, 1849, registered, amongst others, the acquisition by the company of the Appellant's 700 shares by forfeiture, leaving him none; and on the 1st of November, 1849, the list of shareholders in the share register book of the company did not contain, nor did any subsequent list contain, the name of the Appellant, or of the other contributors to the £4000. The eight shareholders, including *Spackman*, the Appellant, who withdrew upon this occasion, held 2925 shares. After August, 1849, *Spackman* ceased to be treated as a member of the company. The shareholders who remained in the company formed the company, and carried on the business, and, as we have seen, enlarged and altered it just as they thought proper, until they were wound up in April, 1861. In April, 1857, these shareholders received a half-yearly dividend of £6 per cent. per annum; but of course no portion of it was paid to, or claimed by, the Appellant, or the other

contributors to the £4000.  The auditor, in his report of the 12th of October, 1849, to the directors and shareholders, stated that many of the shareholders resisted payment, but after much and expensive litigation, they found it their interest to make an arrangement with the directors, which, if entered into a year before, would have essentially saved delay and expense.  The cash accounts were regularly kept, and the moneys received from retiring members duly entered.  No doubt the business was carried on with the aid of these payments.  The company was insolvent, and no other call was made before 1855.  After *Spackman* and his friends retired, nine other shareholders, who held 1245 shares, retired upon terms, and their shares were declared forfeited.  Six others of the shareholders, who held 1500 shares, were directors when the *Chippenham* arrangement was made; and four of them, holding 400 shares, afterwards retired by transfer or forfeiture; the remaining two are on the list of contributories.  Twenty-one others of the shareholders who held 2608 shares in 1855, 1856, and 1857, were, from death or insolvency, no longer members, and the forfeiture of their shares was declared.  These deductions left but few shareholders in the company, but this continued course of dealing by the company after, and certainly on the foundation of, the *Chippenham* agreement, shews, if this appeal should fail, to what an extent litigation would be carried on, for the directors for the time being made contracts with shareholders for retiring upon such terms and at such times as they thought to the interests of the company.  The directors were frequently changed, and of the eight directors when the £6 dividend was declared, not one remained when the concern was wound up; at that period there were only five directors, all appointed subsequently to the dividend.  The special general meetings appear to have been attended by very few members.  I have considered it necessary to give an outline of the numerous facts and proceedings in this case.  The official manager, with a desire to enlarge the number of contributories, in June, 1862, made his first attack upon *Brotherhood*, and, as we have already seen, failed in his attempt.  In March, 1864, he proceeded against the Appellant.

Now, before I draw the attention of the House to the decisions upon this case, I think we may here consider it independent

1868

SPACKMAN
v.
EVANS.

of those judgments. After an anxious consideration of the case, I am of opinion that the Appellant has not properly been declared a contributory upon the winding-up. I do not think that the question is, whether the agreement between the company, that is his fellow shareholders, and himself, was strictly legal, but whether it was *bonâ fide* and binding upon all, so as to prevent his being made a contributor in 1864. We must bear in mind that the claim is on the part of members of the company who remained such, against *Spackman* in 1864. The agreement between him and the company was, as it appears to me, thoroughly *bonâ fide*, and carried into effect openly and not secretly, and the remaining members, as representing the company from time to time, received the many thousands of pounds paid by the retiring members as the price of their being allowed to withdraw as members, and be no longer liable to calls or to debts; and the moneys so paid were applied to the carrying on of the business, which it clearly appears could not have been done without that aid. If we bear in mind that the application to charge the Appellant is to a Court of Equity, and that the *Winding-up Act* was intended simply to afford a remedy where the large number of a company before the Act rendered it difficult to obtain redress in Equity, and apply the test to this case suggested by Lord Justice *Turner*, we shall have to inquire what relief can be given to the remaining shareholders against those who, like *Spackman*, retired by agreement so long since. No shareholder complained before the winding-up. If any one had, what relief in Equity could he have obtained? What could he have asked? Surely not to compel *Spackman* to return to the company. That, indeed, if obtained, would at once have led to a winding-up, and the money paid by him must, of course, have been returned to him. It was so manifestly opposed to the object and interest of the remaining shareholders to disturb the transaction, that we cannot be surprised at no attempt to disturb it. If the remaining shareholders before the winding-up could not have compelled *Spackman* to re-enter the company, I am of opinion that they cannot do so now for the purpose of making him a contributory for the payment of their debts contracted after he had, with their permission, withdrawn from the company. I can find no trace of fraud in the transaction

—no benefit even to the directors in which the other shareholders did not participate; and it is not pretended that the moneys received were not applied for the benefit of the company, nor, in my opinion, was *Spackman* answerable for the application by the directors of the moneys they received. The accounts appear to have been regularly kept, and the continual change of directors would, no doubt, have led to the discovery of any malpractices of their predecessors. But, so far from such a charge being made, at a general annual meeting of the company on the 3rd of December, 1851, after a statement of their cheerful prospects, and of the issue of £25,000 new preference shares, it was moved, seconded, and carried unanimously, "That the best thanks of this meeting be given to the directors for the able, persevering, and energetic manner in which they have conducted *all* the operations of the society." Not a word against one of their principal operations, viz., the sale to shareholders of the right to withdraw from the company. Secrecy I can find no trace of. All that can be said is, that the particulars of the arrangement with *Spackman*, for example, was not communicated to every individual shareholder, and, therefore, as it was *ultrà vires*, *Spackman* is properly made a contributor. Five shareholders of small amounts, resident in *Scotland*, filed affidavits, copies of each other, by which they swore they were ignorant of the arrangement with *Spackman* and the others from 1849 up to the winding-up; and a shareholder, described as a publisher in *London*, who had transferred his shares to another, and disputed his liability to be a contributory as settled by the official manager, also swore in like manner. Now, all these persons, of course, had knowledge of the *Chippenham* arrangement, and that was, in my opinion, carried out in the several later arrangements for withdrawal by shareholders. They were all, in the eye of the law, cognisant of the actions against *Spackman*, and of his Petition for the winding up of the company, and their negligence in not attending to the proceedings of the company whilst it was carried on with the moneys obtained by the very dealings of which they would now complain, cannot be listened to in a Court of Equity. It is absurd to suppose that they or the other shareholders could have obtained any relief against *Spackman*. In regard to the remaining body of the shareholders carrying on the

1868

SPACKMAN
*v.*
EVANS.

concern, there never was any dispute between them and their various directors, and all must, in my opinion, be considered as having acquired full knowledge of all the proceedings. I agree that a strict hand should be held over directors, and that if they do an act *ultrà vires* it cannot be maintained against shareholders who had not notice of it; but individual shareholders cannot abstain from taking any part in the transactions of the company, and participate for years in the profits obtained by the company by their management, and then, when a crash comes, seek in Equity to set aside the very proceedings without which the company would have necessarily been wound up at an early period. Besides, after the judicial proceedings, they were bound to inquire; they knew that *Spackman* had attempted by legal means to wind up the company, and I should hold them bound, by implied notice, of his subsequent withdrawal by purchase from the directors. A man may become a contributory to a company by his acts, although he has not made himself legally a member of it. This is proved by many cases, as Lord *Denman*, C.J., observed in *Cheltenham, &c.*, v. *Great Western Railway Company* (1), all difficulties arising from not adopting the machinery of the Act of Parliament are got over by the conduct of parties who claim to be in the situation of proprietors, and are so placed accordingly. And this rule, may, to a certain extent, be applied to acts done by the company. Whether rightly or not, I find from the citations at the Bar that I have at least been consistent in my opinion on this subject. I refer to the cases cited at the Bar: *Taylor* v. *Hughes* (2), before me in Ireland in 1844, and *Bargate* v. *Shortridge* (3), in this House in 1855, in which I delivered my opinion upon the appeal.

There remains the question of time, upon which, without inquiring whether the acts done could be deemed valid when they were done, yet, as I am of opinion that all was done *bonâ fide*, without secrecy or any attempt to conceal the transactions, which, indeed, are not shewn to have been other than beneficial to the company, I am of opinion that neither the company, nor any shareholder in it, nor the official manager now before the House, can be allowed to open or set aside the arrangements, and to

(1) 2 Q. B. 281.          (2) 2 Jo. & Lat. 24.
(3) 5 H. L. C. 297.

charge the Appellant as a contributor under the *Winding-up Act.*
The time which has elapsed, and the conduct of the company
during that long period, do not permit me to entertain any doubt
upon this point. Your Lordships may be surprised to hear this
opinion after my long examination of the other facts in the case;
but I felt it necessary to establish the view which I take of those
facts, and which authorizes me to give that operation as to time
which is adverse to the claim of the official manager.

I have still to bring before your Lordships the adverse decisions
in the Courts below in this case, which will render it necessary to
refer also to the other decided cases upon contributories to this
company, and then the whole case will be before the House.
*Spackman's Case* came before the Master of the Rolls in June,
1864, and His Lordship held that *Spackman* could not be placed
on the list of contributories; he considered the case to be
governed by *Brotherhood's Case;* that the directors had power to
compromise the actions; that there was no actual fraud; that the
continuing shareholders must be treated as having a knowledge
that *Spackman* had ceased to be a shareholder, which, indeed, was
admitted in the argument for the creditors; and, finally, under all
the circumstances, he held the time was a bar to any relief which
the company might have obtained at an earlier period. From
this decision there was an appeal to the Lord Chancellor, Lord
*Westbury;* and he, in an elaborate judgment, reversed the decision
at the Rolls, and authorized *Spackman* to be placed on the list of
contributories. From this decision the case before us is an appeal.
In the case of Lord *Belhaven,* in my opinion one much more
difficult to deal with than *Spackman's Case,* the Master of the
Rolls placed Lord *Belhaven's* name on the list of contributories to
this company; but upon an appeal to the Lords Justices in April,
1865, this decision was reversed. Lord Justice *Knight Bruce*
observed, that it seemed to him that the Master of the Rolls would
have determined otherwise than he had done, and in favour of
Lord *Belhaven,* but for the view he took of the Lord Chancellor's
decision in *Spackman's Case,* which he, however, considered to be
inconsistent with the claim of Lord *Belhaven.* The Lord Justice
thought that there was not any such inconsistency, and that the
judgment in *Spackman's Case* rested on suppression, concealment,

1868

SPACKMAN
*v.*
EVANS.

and fraud, and that it was possible to decide in favour of Lord *Belhaven* without contradicting the judgment in *Spackman's Case.* Lord Justice *Turner* concurred, and observed that *Spackman's Case* did not rule the case before them. In *Spackman's Case* the transaction was described by the Lord Chancellor as a proceeding wholly collusive and unreal, and the judgment mainly, if not wholly, rested on that ground. The Lord Justice was of opinion that the 198th clause of the deed gave the power to the directors to compromise, in which opinion I concur; and the power to compromise must necessarily give power over the terms of compromise, and he saw nothing to prevent the release of a shareholder being made part of the terms. Upon this point we are not called upon to give any opinion. Time also was relied upon, and I cannot doubt that if this case had come before the Lords Justices standing upon its own merits, they would have supported the decision of the Master of the Rolls.

The question came once more before the Master of the Rolls in *Stanhope's Case* (1), in November, 1865. He treated it as similar to *Lord Belhaven's Case* and to *Spackman's Case,* and he expressed his approbation of the decision of the Lords Justices in *Lord Belhaven's Case,* and his disapproval of Lord *Westbury's* judgment in *Spackman's Case;* he could not reconcile the cases, and he therefore followed his own opinion, and held that the party before him was not a contributory. In December, 1866, this decision was reversed upon appeal by the Lord Chancellor, Lord *Cranworth,* who thought it impossible to find any distinction between the case and that of *Spackman;* he could not think there was any conflict between *Lord Belhaven's Case* and that of *Spackman.* In the former case there was no concealment; there was not, as Lord *Westbury* considered there was in *Spackman's Case, aliud simulatum, aliud actum.* Fully acting on and adopting the view taken by Lord *Westbury* in *Spackman's Case,* he reversed Lord *Romilly's* decision. The Lord Chancellor placed his decision upon the same grounds as those which governed Lord *Westbury's* judgment. That case, I believe, is to follow the fate of your Lordships' decision in *Spackman's Case.* There are two other cases upon this company before the House on appeal; but as I did not hear the

(1) Law Rep. 1 Ch. Ap. 161.

arguments, I shall abstain from voting upon those appeals. In one of the cases the Master of the Rolls, contrary to his own opinion, decided without argument according to the opinion expressed by the Lord Chancellor in a prior case; and in the other case before the House, the Master of the Rolls held that it came within *Brotherhood's Case*, and refused to make the party a contributory.

I have thus brought before your Lordships the views taken by the judicial authorities upon Lord *Westbury's* reversal of Lord *Romilly's* decision in *Spackman's Case*. It has been considered as resting upon suppression, concealment, and fraud, and this is, I think, the true view of that elaborate judgment, in the conclusions of which I should agree if I saw the facts in the same light. The judgment rests upon the adoption by the Lord Chancellor of the contention of the official manager, that the alleged forfeiture was a proceeding wholly collusive and unreal; that it was a fraud upon the other shareholders; that there was a false statement, involving a fraudulent concealment of the truth; that it was a collusive contract; that this invalid transaction was concealed from the shareholders. These are selected from the judgment, which deserves a careful perusal, simply to shew upon what grounds it was mainly rested. The Lord Chancellor added, that he did not mean by his decision in any manner to question or depart from the principles laid down by the Lords Justices in their judgment in the case of *Brotherhood;* but, on the contrary, to pronounce a decision which was in strict conformity with those principles.

My Lords, I ask you to do precisely what Lord *Westbury* said he would do if he saw the facts of the case in the light in which we now see them; he tells you, in so many words, not to be misunderstood, that he did not mean by his decision in any manner to question or depart from the principles laid down by the Lords Justices in their judgment in the case of *Brotherhood;* but, on the contrary, to pronounce a decision in strict conformity with those principles. That is all I have to say. Act upon the principles laid down by the Lords Justices in the case of *Brotherhood*, and it is not possible, in my opinion, to come to a decision against the Appellant in this case. My Lords, I am not able to reconcile the decision given upon that occasion by Lord *Westbury* with the

principles laid down by the Lords Justices in *Brotherhood's Case*. They had before them all the circumstances of the case, which, as I observed, were in my opinion more difficult to deal with than those in the present case. Lord *Westbury* considered that the alleged forfeiture of shares was a proceeding wholly collusive and unreal, the real transaction being an agreement that for £4000 the retiring shareholders should be released from all existing and future liabilities to the company. This was an abuse of the power of forfeiture, and a fraud upon the other shareholders. If a declaration of forfeiture really proceeds upon and is the result of a collusive agreement, but is entered by the directors in the books of the company as if it were a *bonâ fide* adverse proceeding, the entry is a false statement involving a fraudulent concealment of the truth; for the suppression of the truth is a form of falsehood, and falsehood is fraud; and it is impossible, under such circumstances of imposition on the other shareholders, that the shareholder who sets up the forfeiture can make a case of acquiescence, or derive any benefit from lapse of time, whilst the truth remains unknown. In these propositions the Lord Chancellor had condensed the arguments for the official manager, and to those propositions he gave his consent.

Now, it appears to me, with deference, that these cases do not, at this distance of time at all events, depend upon the legal validity of the forfeiture, but upon the *bona fides* of the transaction. The power of forfeiture was openly exercised only as a means to the end in view, which was to allow the shareholders to retire from the company upon payment of a contribution or fine to the company. The forfeiture, even in its imperfect operation, was the only way in which the real transaction could be brought before the company, as it existed from time to time, and the public, so as to be placed regularly on the register of shares by the company, and on the public register; and this was accomplished, and worked so well that the bargain really made between the company and the retiring shareholders was never disturbed for the many years which elapsed before the final crash. The bargains were fair ones, and the moneys paid were regularly carried to account; nothing was concealed.

In comparing *Brotherhood's Case* with *Spackman's*, now before

the House, it must be borne in mind that all the machinery which is now objected to as fraudulent and secret, and founded upon a fraudulent and illegal exercise of the power of forfeiture, was the work of the *Chippenham* arrangement at the special meeting of the company on the 13th November, 1848. The directors and *Brotherhood*, and other shareholders, entered into an agreement that the latter should pay certain sums to the directors, which included a rateable proportion of the £4 call, on the faith that the directors would, on the default of the shareholders to pay any farther portion of the call, cause a forfeiture of their shares, so as to effect a dissolution of partnership as regarded the retiring shareholders in the interests of the company, and make a return under the Act of a list of shareholders of the company exclusive of those retiring. These terms were fully carried into execution, and have been so far held binding as to save the retiring shareholders from being placed upon the list of contributories. They were treated as having been brought before the general body of the shareholders. It will be observed that the call was nominally for £4, which was not intended to be wholly enforced against the retiring shareholders, in order that the part to be left unpaid should enable the directors to forfeit the shares of the retiring shareholders. Of course the forfeiture was then, as at later periods, not a real proceeding, for the retiring shareholders had nothing to forfeit, inasmuch as the shares were worse than valueless. When, as in the army, a man has something of value to give up or transfer upon retiring from a position, he is properly represented as selling out; but here the shareholders had, upon retiring, to buy out. Every one of the steps which are now objected to were taken in the *Chippenham* arrangement, but the objectionable transfer of the shares to a pauper, and the declaration of forfeiture against him after he was registered as a shareholder, and the deed of indemnity to the directors for agreeing to the transfer, no doubt were not communicated to the shareholders generally. The knowledge fixed upon the shareholders in that case, of course, could not give validity to an illegal exercise of the forfeiting power, although it might prevent them from disturbing it.

I must now, once more, draw your Lordships' attention to the opinions expressed by the Lords Justices upon the appeal to them

1868
⌣
SPACKMAN
*v.*
EVANS.
———

in *Brotherhood's Case*, in strict conformity with which the Lord Chancellor intended to decide.    Lord Justice *Knight Bruce* thought that at an earlier period the transaction of 1848 might have been impeached, but it was not disputed until the winding up of the company ; nor between 1848 and 1861 had *Brotherhood* been treated as a member of the company.    For more than twelve years all persons concerned seemed practically to have treated the transaction as valid and effectual, and the Respondent as not a partner.    The Lord Justice alluded to the alphabetical lists of shareholders during this period, those lists not including the Respondent's name.    No notice was sent to him after the 31st of December, 1848.    The dividend of April, 1857, was not paid on the shares forfeited under the arrangement of November, 1848.    There was no debt due from the company to any creditor of the company who was a creditor before the 1st January, 1849, in respect of any debt due from the company on the 1st of January, 1849.    In these circumstances, independently of the probability, or more than probability, shewn, he thought, by the evidence to exist, that in the year 1848 or 1849 every shareholder assented to the transaction, he agreed with the Master of the Rolls that it was too late to question it, and that the appeal should be dismissed with costs.    Lord Justice *Turner* was of the same opinion.    In referring to the facts, he referred to the transfer to the pauper, which he thought was invalid in Equity, and possibly at Law, subject to the question whether all the other shareholders had notice and assented to the terms of the arrangement.    If it were necessary to decide the point, he was strongly disposed to think that the evidence was sufficient to establish such notice.    The circumstance brought forth by the official manager, that some shareholders in the company had not paid deposits on their shares, and some of them stated that they did not receive notice of the proposed arrangement, was not, in his opinion, sufficient to rebut the presumption that the secretary did his duty.    There were, however, strong grounds upon which the Order of the Master of the Rolls ought to be supported, and he did not, therefore, say more on the question of notice and assent.    Upwards of twelve years had elapsed, and the arrangement was unimpeached, and *Brotherhood*, for all practical purposes, ceased, and was treated as having ceased, to be a member of the company.    He then referred

to the facts that no notices were sent to him, and no part of the £6
dividend was paid to him, and the later alterations made in the
deed of settlement of the company, and that it did not appear that
any debts contracted while *Brotherhood* was a shareholder were
then due from the company. And the learned Judge concluded
by stating his view of the *Winding-up Act,* to which I have already
called your Lordships' attention, and added that a Court of Equity
would not have maintained a bill by any of the shareholders against
*Brotherhood,* and would not have allowed him to be sued at law
upon the deed for the benefit of all or any of them.

  I have thought it right to bring fully before your Lordships the
grounds upon which the Lords Justices decided upon the appeal to
them in *Brotherhood's Case.* It appears to me that their judgment
was founded upon the lapse of time and the acts of the company
during that period, assuming that the transaction in 1848 was
originally valid, and irrespective of actual notice to every share-
holder being proved. There, as here, the forfeiture was used
simply to carry out, not a real forfeiture, but the compromise
between the company and the retiring shareholder, but there in a
form open to objections which do not apply to this case. There, as
here, the retiring shareholder had been treated for upwards of
twelve years as no longer a member of the company; and these
circumstances, coupled with the acts of the company, were held a
bar to the claim to place the retiring shareholder on the list of
contributories.

I cannot reconcile the decision of the Lords Justices with the
judgment of the Lord Chancellor. Some reliance was placed by
him on the circumstance that the facts in this case could not
be ascertained by the official manager until he obtained access to
the papers of the deceased solicitor of the company in the transac-
tion with *Spackman;* but nothing is more usual than for a solicitor
to retain the correspondence which goes through his hands; these
letters were of no value, and could not have been kept back
for any improper purpose. And some weight was given to the
application of a considerable part of the £4000 by the directors in
payment to themselves of fees, allowances, and law charges, which,
in the existing state of the finances of the company, there could be
little hope of their obtaining in any other manner. The company's

1868
SPACKMAN
*v.*
EVANS.

balance at the bankers did not exceed £73. It does not appear to me that the retiring shareholders were responsible for the application of their money by the directors. Any improper application was adverse to their interests, inasmuch as they remained liable to the debts of the company, and they were anxious to be relieved from that responsibility. A misapplication of the fund was never alleged, and the payments in question were, no doubt, necessary to keep the staff at their posts. Lastly, the Lord Chancellor, in answer to facts relied upon by the Master of the Rolls, shewing that the retiring shareholders had not been treated as shareholders during eleven years, observed that all this was the result of the belief of the shareholders that the shares of the Respondents had been duly forfeited, and that they had *bonâ fide* ceased to be shareholders; and that belief was produced by misrepresentation and concealment of the truth by the directors, for which the Respondents were equally responsible. There is no proof whatever of the belief of the shareholders who remained in the company; they manifestly left the directors to sell out shareholders desirous of retiring upon the best terms they could obtain, and never objected to what was, for a few years, an important part, I may say, of the trade of the company; it produced many thousands of pounds obtained from the retiring members, without which the trade must have been altogether abandoned.

The Scotch shareholders who, in 1864, made the same affidavit, merely denied any knowledge prior to 1861 of the transaction of 1849, not that having knowledge of it they believed it to be a legal transaction, nor do they state that any one of them had any knowledge of any other trading by the company. They no doubt were aware that the law fixed them with notice of the legal proceedings by and against *Spackman;* and of course they were ignorant of the many thousands of pounds received from retiring shareholders with which their trade was carried on.

The result of my consideration of the case in all its bearings is, that the order complained of should be reversed. My view, as I have shewn your Lordships, is not unsupported by authority, but still I am aware that it may seem to be opposed to the opinions which have been expressed by several of my noble and learned friends. It was my duty to fully examine those opinions and the

grounds upon which they rested, and I have endeavoured to do so consistently with the respect which I entertain for their judgments and the regret which I should feel in differing from them in the present instance.

My Lords, it is perhaps time for me to close what I have to say, but I shall be forced to occupy a little more of your Lordships' time. I am placed in a singular and ˙embarrassing position as regards this case. My noble and learned friends who heard this case had all, except my noble and learned friend opposite (Lord *Colonsay*), I will not say committed themselves, but they had all expressed themselves in judgments unfavourable to the Appellant. The Lord Chancellor had been counsel, and had succeeded in all the cases, and therefore he very naturally felt unwilling himself to sit upon the case. Therefore I was the only Law Lord who had expressed no opinion upon this case. And although I have, as far as I can do so, retired from public life, and do not without necessity attend the hearing of appeals, yet being the only Law Lord who had expressed no opinion upon the case, (and, indeed, had formed none, for I knew nothing of the case before hearing it,) it was thought only just to the Appellant that he should have at least one Law Lord present who had not been called upon to give any opinion on one side or the other. Now when the argument at the Bar closed I felt it my duty, in the course of a short conference with my noble and learned friends, to state what my opinion was, and the short grounds upon which it rested. But I was not aware till their opinions were printed and circulated among us what their present opinions were. I had not seen the opinion of my noble and learned friend which has been read to your Lordships, nor the other opinions which will presently be read; so far as my own opinion is concerned the Appellant has not had the benefit of my noble and learned friends seeing the grounds on which my opinion is formed before they formed their own deliberate judgments.

My Lords, when I came to look at my position with reference to this case I found that I stood somewhat in this position :—The appeal in this case was from Lord *Westbury's* decision. When I looked at that able judgment I entirely agreed with it, and I should at once have said so without any farther difficulty, only that it was my duty to make myself master of the facts, and when I

1868

SPACKMAN
*v.*
EVANS.

sat down to a serious consideration of the facts I found myself compelled to come to the conclusion that the grounds upon which that decision was formed did not exist; that there was no fraud, no collusion, no concealment. In that I 'find that we are all agreed. My noble and learned friends are all agreed with me that there was no fraud, no collusion, no concealment. Therefore what I believed to be the ground of that decision, the ground upon which it was rested, and upon which alone it could stand, was really at an end. But then what do I find besides? My noble and learned friends, who retain an opinion adverse to the views which I have been submitting to your Lordships, now rely wholly upon that other ground of time, which, when I had removed (as I thought, and, as it appears, my learned friends agreed with me) the other grounds upon which the judgment under review solely rested, I supposed admitted of no fair discussion; and, in point of fact, if this case is decided contrary to the opinion I have taken the liberty of submitting to your Lordships, it must be decided upon what I must call a new ground, not on Lord *Westbury's* ground, but I should say in direct opposition to the ground upon which Lord *Westbury's* decision rested. Lord *Westbury* said, "I find fraud, I find concealment, I find collusion, I find everything wrong." And if that ground was sound, then his judgment was sound. But that ground is now given up by my noble and learned friends. In this position of the case I set myself last night to put down what my views were of that which is now the question before us, but which Lord *Westbury* did not make the question, namely, what is the effect of time upon this case now that we are all agreed that there was no fraud, no collusion, no concealment. And I have now to submit to your Lordships what my opinion is upon the effect of time.

My Lords, my object was to shew that the ground upon which the reversal of the Master of the Rolls' decree depended could not be supported, and that being removed I considered it to be clear that the Order itself could not be affirmed. Now I find that no attempt is made to support the grounds of fraud and concealment. My noble and learned friend who has just spoken takes a new view; he says it is not enough to bind the absent shareholders to say that there was no concealment. The Appellant and the

directors knew that unless they informed absent shareholders of the terms on which the shares of him and the others who retired with him were cancelled, those absent shareholders would be altogether ignorant of them. It was not necessary to impute to the Appellant any fraudulent intention to conceal what had been done, but he must have known that there was nothing in the documents communicated to absent shareholders which would inform them of the terms of the arrangement. But why, I ask, is such knowledge attributed to the Appellant? "I am ready," said my noble and learned friend, "to believe that if an absent shareholder had made inquiries of the directors they would have told him the whole truth." But there was nothing making it the duty of the shareholder to institute any such inquiry, so that he has a right to say that the facts, if not communicated to, were concealed from him. This I think is dangerous doctrine. My noble and learned friend who has not yet spoken disagrees with Lord *Westbury's* view as to fraud, he thinks the proceedings were *bonâ fide*, and that the parties acted upon their belief that the arrangement was within their competency, and that there was no intention to disguise the transaction, but he considers that knowledge should be brought home to every shareholder. He differs with Lord *Cranworth* as to the compromise. He would, I believe, reverse the decision in *Brotherhood's Case.* It is said by my noble friend who has spoken, that we must consider what was the right of any absent shareholder at the time of the transaction. The case has now a new aspect. Fraud is no longer imputed. All legal and other knowledge is imputed to the Appellant, but an absent shareholder is not bound to inquire. It may be thought dangerous doctrine that shareholders need not inquire for any number of years. I hold it to be clear, that if your Lordships decide against the Appellant in this case, that decision will be, as far as it goes, a reversal of that in *Brotherhood's Case.*

The main ground now relied upon is, that immediately on the arrangement being made an absent shareholder might have had relief. Let it be admitted; but look at the then state of affairs. What sane shareholder would have taken such a step? None did, and for a very good reason. Consider the case as it stood at the time of the first compromise, or even of the second. How

difficult it is to maintain a hard and fast line.  We are told what steps should have been taken.  But at the moment the ship was sinking.  The waters were yawning for her—without instant relief she would have sunk to the bottom of the deep deep sea.  The Appellant and his comrades saved the sinking ship, and she walked, as it has been said, once more on the waters as a living thing.  A hard and fast line would have operated to the ruin of the absent shareholders.  But clearly there is no such hard line.  It is right that the absent shareholders should not be bound by an act of the directors, *ultrà vires,* to which they have not consented.  The cases clearly shew that although the act be *ultrà vires,* yet if the absent shareholders acquiesce they will be bound.  But it is said they must know that it is illegal.  Let us assume that to be so, yet we must inquire whether acquiescence cannot be fixed upon absent shareholders, not only by clear direct information, but by the course of things and their means of information.  It should be borne in mind that of the absent shareholders many resided in various parts of *Scotland,* and did not answer the directors' letters, or even take part in the general meetings of the company.  It would be impossible to prove knowledge by such shareholders.  They left the directors to take their own course.  But in this case the course pursued was the salvation of the company generally, and the absent shareholders took without scruple all the benefits of the acts now complained of.  No shareholder ever did, and assuredly no shareholder ever would have challenged those acts, although the official manager has, as their representative, done so.

We must consider what rules govern this case.  We are in a Court of Equity, and we act not merely as final Judges of Appeal in Equity but here we act also as a jury.  I think if an ordinary jury were here I would satisfy them that what the shareholders never attempted to disturb the official manager cannot do.  There are, as I shall shew, sufficient grounds to bind the shareholders without mere aid of time ; but in this case time alone is a bar. The rule is, *vigilantibus et non dormientibus jura subveniunt.*  Courts of Equity have always placed great reliance upon time.  Even when the *Statute of Limitations,* making time a bar, did not apply to Courts of Equity, those Courts, by analogy, applied the same rules to claims in their Courts, but never held themselves bound

by the statutes. The new statutes, which did include Courts of
Equity and equitable rights, expressly reserved the power of those
Courts to act on the old rule of acquiescence, and did not take
away their former jurisdiction on this head. In the case of *Sibb-
wing* v. *Balcarres* (1), in which the Plaintiff sought to set aside the
sale of a reversion, and the legal time of limitation had not
elapsed, the Vice-Chancellor observed that it was the duty of the
Court to act upon that presumption which a Court of justice most
properly entertains against stale demands, and which can never be
more properly applied than to a case like the present, where the
burden of proof (as in this case) upon a most material point in
controversy is thrown on the Defendant. The learned Vice-
Chancellor was of opinion that there was not sufficient to resist the
presumption in favour of the transaction arising from length of
time. Justice and reason appeared to him to require that the bill
should be dismissed with costs. I have looked through all the
cases, and I can find none which would justify the dismissal of this
appeal.

But this case does not depend upon time alone, it has the proof
required by Equity, that the party whose right you desire to bar
knew, or had means of knowledge, of the nature of the dealings
which he now desires to be considered to be illegal. Now, in
Equity (and we sit as a Court of Equity) it is sufficient to charge
a man with knowledge that he had that before him which, if he
had used due diligence, would have afforded the knowledge which
he desires. This rule is applied with great severity by Courts of
Equity, even against *bonâ fide* purchasers; for example, if the
purchaser had a document with regard to another, and the latter
would have disclosed an incumbrance, but he had not thought it
necessary to inquire for it, he would be held to have implied notice
of the charge, and implied notice is equivalent to express notice.
Are we to hold that an owner of a £20 share in this concern,
residing in the *Highlands of Scotland,* and wholly neglecting the
interests of the trade in which he is interested, may sleep for
twelve years perfectly silent, never inquiring, never complaining,
but receiving all benefits and having no burdens, and that after
that he may challenge transactions like those before us when he

(1) 3 De G. & Sm. 737.

1868
SPACKMAN
*v.*
EVANS.

1868

SPACKMAN
v.
EVANS.

awakes? He must inquire whether he had not the means of knowledge which will bind him. No Court of Equity ought to assist a man who, after so long a slumber, attempts to throw upon another the proof that every shareholder knew the terms of a given transaction. As to actual knowledge and means of knowledge where, as in this case, there is neither fraud nor concealment, I cannot agree that a shareholder in a company shall be at liberty, at the end of twelve years, to question an important transaction, and to assert that he knows nothing of the transactions of the directors.

It is said that the absent shareholders in this case are not bound by the arrangement unless the Appellant can prove that every one of them knew the exact nature of the transaction. How can he prove this at the close of so many years? In *Brotherhood's Case* it was held that they had notice—not that, in point of fact, such notice was proved. The *Chippenham* arrangement it is too late now to quarrel with. I am entitled to assume that every shareholder knew of that arrangement. That fixes him with knowledge that the concern had no money to go on with, and was burdened with £17,000 debt, and with knowledge also that the shareholders were divided into two classes, and that extreme remedies were proposed to save the company from absolute ruin. The law forced upon him the knowledge of the actions against *Spackman* and his class, and the result of them, and also with results of his endeavours to wind up the concern. He knew that *Spackman* had refused to accept the *Chippenham* arrangement; he, in my opinion, must, as a partner, be held to have known who, from time to time, were acknowledged to be new partners, and which of the old partners had quitted the concern, and were no longer considered to be partners. He knew how adversely *Spackman* had acted, and he knew, that he had been allowed to withdraw from the company; he knew that the trade was being carried on, and that no calls were made upon him for several years. If he required to be informed of particulars of the transaction, he was, in my opinion, bound to inquire, and it is admitted that if he had inquired he would have had a truthful answer, and that is proved by the evidence. The balance sheets, shewing the large sums received for "cancelled shares," are clear evidence binding him

to the knowledge that the large sums received by the company were the prices paid for the cancelled shares. Here, then, if a *bonâ fide* purchaser had had such notice, and had not chosen to ask how the payments were regulated, it would have been deemed *crassa negligentia,* and he would have been fixed with notice of the particulars of the transaction. This applies with still more force in this case, where a partner has actual knowledge that shares are, to a great extent, being cancelled. Again, the auditor, in his report, of which the absent shareholders had actual notice, speaks generally of an arrangement between the directors and the retiring members. Here, again, clearly a *bonâ fide* purchaser would be held bound to inquire, and so be fixed with notice; and still more strongly the rule applies to this case. And farther, of course no shareholder pretends ignorance of the sixth dividend which he received; and every such shareholder must have known that if the arrangements with those who had withdrawn were impeachable, he was quietly receiving more than belonged to him, whilst he reserved the right to attack those whose dividends he was receiving. Was this honest? Does it not forbid relief in a Court of Equity? But still farther, the remaining shareholders assumed to be, as in fact they were, the company, and accordingly, of their own power, they assumed new and extensive lines of business, created loans, admitted new members with different rights, and placed the company, in fact, as a new company springing out of the old one; and they rendered it impossible that they could ever restore that company to which the retiring members belonged, and which, if any relief were given against them, they would naturally expect to find ready to receive them.

These acts, without any attempt to obtain the concurrence of retiring shareholders, are, in my opinion, undeniable proof that they acquiesced in past arrangements, and elected to consider themselves alone members of the company. They would, of course, have resisted any claim of the others to participate in the dividend, or to interfere with their new and important arrangements. Let it be kept in view that the retiring members could not have maintained a claim to re-enter the company as partners. We have already seen that the real contest is between the members of the company only—the two classes. Every one of the movements of

1868

Spackman
*v.*
Evans.

1868

SPACKMAN
v.
EVANS.

the company, after the arrangements for cancelling shares, was, in my opinion, an acquiescence by all in the arrangements which left the remaining members the sole members of the company.

To me it seems perfectly clear that upon all the rules which guide our Courts of Equity it is much too late for the actual members of the late company at the time of the crash to impeach any of the transactions complained of. No such attempt was made by the company or by any of its members, and what they could not do their official manager cannot accomplish. When could any remaining member have impeached the transaction if he had desired to do so? An early period after the payment of the £4000 would not have been selected, for he who seeks equity must do equity, and, of course, the thousands paid by the retiring members must have been returned, and, instead of paying £10 a share, they must have paid the past calls in full. In fact, a winding-up would have been inevitable, the very thing they desired to avoid. No other period could have been selected which would not have interfered with their own arrangements.

If the Lord Chancellor's Order is to be supported upon new grounds, it cannot remain without qualification. This is a claim by members of the company. They, without reference to creditors, must yet do equity to *Spackman*. He must have credit for his £800 and interest, and they must be charged with their dividend, for example, and they cannot, in my opinion, throw upon him any contribution to their loan or the debts of their new establishment. It would, in fact, require much care to do simple justice between the parties, assuming the right to be established to charge *Spackman* in any respect as a shareholder. It is to be lamented that the claimants, having so long slept over their supposed rights, should have awakened only at the moment when they had ruined the concern.

LORD CHELMSFORD :—

My Lords, it is quite true, as my noble and learned friend who last addressed your Lordships has said, that at the time I prepared my judgment in this case I had not had the advantage of seeing what he had written on the subject. But I need not add that when I received it I read it with great care and attention, and

with that respect which is due to his high legal authority and judicial experience, and with a mind open to every conviction which it might receive from an opinion justly entitled to so much consideration. I confess that, although I examined with the most minute care and attention that opinion, it did not induce me to change the judgment which I had prepared to deliver after very mature and anxious consideration.

My Lords, although I had given judgment upon a former occasion upon a very small part of this case—namely, upon the question whether time was of the essence of the *Chippenham* arrangement—yet I hope that I am not so far wedded to any opinion which I may have previously delivered as that my mind would not be open to yield to any argument in opposition.

My Lords, with respect to that which I must call the supplemental part of my noble and learned friend's judgment, it has been directed principally to a critical examination of the opinion which has been delivered by my noble and learned friend who is now occupying the woolsack, and in anticipation of that which I am about to deliver to your Lordships, and it has consisted of arguments in opposition to those opinions. My Lords, I believe that upon every point to which my noble and learned friend has last addressed himself my judgment will be found to be applicable, and therefore I shall, without further preface, submit to your Lordships the consideration of that judgment which I have prepared.

The question upon this appeal is, whether the Appellant, at the time of the winding-up order of the 20th of April, 1861, ought to have been placed upon the list of contributories of the *Agriculturists' Cattle Assurance Company.*

The case of the Appellant is, that he ceased to be a shareholder of the company in the year 1849, and that, from that time until the winding-up order was made, his retirement from the company was acquiesced in by the whole body of the shareholders.

In order fully to understand the position of the Appellant it is necessary to advert to some of the transactions which took place in the company, and also to his own conduct in reference to them before the time when the arrangement was made under which he alleges that he ceased to belong to the company.

1868

SPACKMAN
*v.*
EVANS.

1868

SPACKMAN
*v.*
EVANS.

The validity of what is called the *Chippenham* arrangement is not in question upon the present occasion, but the circumstances connected with it, and the part which the Appellant took in respect of it, are not immaterial in the consideration of his case.

In the month of November, 1848, the affairs of the company were not in a satisfactory state. Many of the shareholders were anxious that it should be wound up, and that its liabilities should be ascertained and discharged. The directors and others of the shareholders were desirous of carrying on the company, in the hopes of retrieving its position, and creating a profitable business. For the purpose of ascertaining which of the shareholders wished to continue in the company, and which to withdraw, and whether it was practicable and desirable to permit the latter class to retire from the company, a special general meeting was called for the 2nd of November, 1848.

At this meeting it was proposed that the shareholders who were desirous of retiring from the company should be permitted to do so upon their complying with certain conditions; and the meeting having been adjourned to the 13th of November, a circular was sent to all the shareholders, with a form to be signed by such as should wish to retire from the company upon the proposed terms, and with an intimation that in case they should not attend the meeting of the 13th of November, or return the form duly signed on or before that date, they would be held as declining to concur in the propositions submitted to the meeting.

The only part of the proposed terms necessary to be noticed is, "that a call of £3 per share should be made on the capital stock of the company, and that the company should be empowered to forfeit the shares of retiring shareholders on payment by them of proportions of the call, varying according to the number of their shares, and that 10s. only of the above call should be paid by shareholders remaining in the company."

Several of the shareholders acceded to this arrangement, some of them, like *Brotherhood*, who is regarded as the representative of this class, intimating their compliance with the terms on the day named in the circular, and others being allowed to come in afterwards from time to time; so that when the Appellant withdrew from the company, thirty-four shareholders, holding 4026 shares,

had been allowed to retire upon the footing of the *Chippenham* arrangement. Many of the shareholders took no notice of the circular, and were assumed to have elected to continue members of the company.

The Appellant attended the meeting of the 13th of November, and expressly refused to accede to the arrangement, and manifested his hostility to it by making it the foundation of an application to the Court of Chancery for winding up the company. Both Vice-Chancellor *Knight Bruce* and the Lord Chancellor (*Cottenham*) were of opinion that the *Chippenham* arrangement formed no ground for bringing the company under the operation of the *Winding-up Act,* and the Petition of the Appellant was dismissed with costs.

It was supposed in the argument for the Appellant, that the Lord Chancellor entertained an opinion favourable to the validity of the *Chippenham* arrangement ; but the question was not before him, and any expressions which he may have used upon the subject cannot, therefore, be much insisted upon. Since his decision all the Judges who have been called upon to consider this arrangement have uniformly treated it as being *ultrà vires* of the directors.

It was argued for the Appellant, that when his Petition for winding up the company was dismissed, he had no means of impeaching the *Chippenham* arrangement but by a suit in Chancery, and that this was impracticable, as the case of each shareholder was distinct. But I can see nothing which would have prevented the Appellant from filing a bill to have the shareholders restored to the register from which they had been improperly removed, or to restrain the company from acting upon the *Chippenham* arrangement.

On the 3rd of August, 1848, the directors had made a call of £1 per share, payable on the 3rd of September, 1848, which the Appellant and others refused to pay on the ground of its being irregular. The company brought five actions for this call against the Appellant and the others, but after the *Chippenham* arrangement the actions were discontinued, and the costs of the Defendants were paid.

On the 24th of November, 1848, the directors made a call of £4 per share, payable on the 23rd of December. On the following

day a circular letter was sent to the shareholders to prevent their being alarmed at such an amount being called for, and explaining that the call, to the extent of £3 out of the £4, was made in furtherance of the proposition which led to the *Chippenham* arrangement, and the remaining £1 per share in consequence of doubts whether there was not some technical irregularity in the notice of the call made on the 3rd of August. The shareholders were therefore informed, that those who elected to remain in the company, and had paid the August call, would be required to pay 10s. per share only, and those who had not paid that call, £1 10s, only on account of the other call of £4.

The call of £4 not having been made in regular course, and for the ordinary purposes of the company, but in order to carry out the *Chippenham* arrangement, to which the Appellant was strongly opposed (his Petition for winding up the company on the ground of its having been entered into being then actually pending), it is quite clear that he could not be bound to pay this £4 call, or any part of it.

Nevertheless, in the month of January, 1849, the company commenced actions for the call of £4 against the Appellant and the other Defendants in the former actions.

The particulars of demand in the action against the Appellant, stated, that the action was brought to recover the sum of £2800, the amount of the instalment of capital, or call, which fell due on the 23rd of December, 1848, with interest, but that the Plaintiffs were willing to take £1050 with interest. The £2800 was the amount of the £4 call upon the Appellant's 700 shares, and the £1050 would have been £1 10s. upon these shares, being £1 for the August call, and 10s. the amount to be paid by a continuing shareholder under the *Chippenham* arrangement.

The Appellant pleaded several pleas, most of which were either for the purpose of compelling the company to formal proofs, or to enable the Defendant to raise technical objections; and there was one general plea of fraud to the whole action.

After the dismissal of the Appellant's Petition by Lord *Cottenham*, negotiations were entered into for the retirement from the company of the Appellant and six other shareholders against whom actions had been brought, and for settling those actions. By

a minute of the board of directors of the 29th of May, 1849, the
company's solicitor was instructed to arrange terms with the share-
holders' solicitors for the forfeiture of the shares standing in the
names of their respective clients. It was ultimately agreed that
the company should accept a sum of £4000, and that the parties
should be released from all further liability, and their shares for-
feited, and that a Judge's Order should be obtained on each action
to stay proceedings on payment of the above sum in three instal-
ments. The mode in which the arrangement was carried out was,
that on the 6th of June, 1849, a resolution was passed by the
directors declaring the shares of the Appellant and the others to
be forfeited, by reason of their neglect and refusal to pay the
instalment or subscription of £4 per share which had been called
for under the provisions contained in the company's deed of settle-
ment, and ordering that summonses should be taken out to stay
proceedings in the actions upon the payment of the £4000 by the
Defendants, in certain proportions; the Appellant's share of that
sum being £800. On the same day, the 6th of June, a Judge's
Order was made to stay farther proceedings in the action against
the Appellant, upon payment of the £800 in discharge of debt
and costs, by three instalments. On the 8th of June an entry was
made in the register of the forfeiture of the Appellant's shares.

From this time the Appellant was considered to have ceased to
be a member of the company. No notices of meetings were sent
to him, no calls were made upon him, and, although a dividend of
£6 per cent. upon the paid-up capital of the company was declared
on the 11th of April, 1857, and paid to all the continuing share-
holders, no dividend was paid upon any of the shares which had
been held by the Appellant, or by those shareholders who retired
under the arrangement with him and them. Subsequently to the
Appellant's retirement, resolutions were passed at meetings of the
company altering very materially the provisions of the deed of
settlement as to the amount of the shares and the liabilities of the
shareholders, and also considerably changing and enlarging the
character and extent of the business of the company.

Thus matters stood with respect to the Appellant during the
twelve years which elapsed between the arrangement under which
his shares were forfeited and the winding-up order of the 20th of

April, 1861. The Master of the Rolls removed the Appellant from the list of contributories, upon which he had been placed by the official manager, but Lord Chancellor *Westbury*, upon appeal, reversed the order of the Master of the Rolls, and ordered the Appellant's name to be included in the list. Your Lordships are now called upon to determine which of these opposite views of the Appellant's position in relation to the company is correct.

I do not agree with the Lord Chancellor, that the transaction with the Appellant and the other shareholders can be properly characterized as having been the result of fraudulent collusion between them and the directors; or that the entry of it in the minute book of the directors was a fraudulent concealment of the truth. I see no reason to doubt that the dealings of the directors with the shareholders who were desirous of retiring from the company proceeded upon a *bonâ fide* belief that the arrangement for the purpose was within their competency, and that there was no intention to disguise the transaction by omitting to mention in the entry on their minutes that the forfeiture of the shares was the result of an agreement with the retiring shareholders.

But I am clearly of opinion that (what I may call for distinction) the *Spackman* arrangement was not within the powers of the directors. The Appellant relies in support of it on the 125th and the 198th clauses of the deed of settlement of the company; by the former of which the directors are empowered, upon the neglect or refusal of any holder of shares to pay any instalment which may be called for under the provisions of the deed within two months after the day fixed for payment thereof, to declare that the shares in respect of which there shall be such neglect or refusal be thenceforth forfeited. And by the 198th clause the directors are empowered to bring actions, suits, and other proceedings, and at any time afterwards to stay, compromise, or compound any such action, suit, or other proceeding.

It does not appear to me that the transaction can be justified under the 125th clause. The only forfeiture of shares which can be declared under this clause is upon the neglect or refusal to pay instalments which may be called for under the provisions of the deed. But the £4 call, for the non-payment of which the Appellant's shares were declared to be forfeited, was not a call made

under the provisions of the deed, but for the purpose of carrying out the *Chippenham* arrangement (itself beyond the powers of the directors); and I have no hesitation in saying that a declaration of forfeiture of the shares of any shareholder for refusing to pay that call would have been an illegal act.

1868

STACKMAN
*v.*
EVANS.

But greater reliance was placed by the Appellant upon the power given to the directors to compromise or compound actions by the 198th clause of the deed. It was said that actions having been brought against the Appellant and the others for non-payment of the £4 call, and the Defendants having pleaded to these actions, the arrangement for the forfeiture of the shares upon the agreement to pay £4000, and the stay of proceedings in the actions upon payment of that sum in different proportions amongst the shareholders, was a real staying, compromising, or compounding the actions under the deed, and was binding upon all the shareholders of the company.

But it appears to me that the transaction with the Appellant and other shareholders was not a compromise of the actions, nor did it even assume that shape. It was from the beginning to the end an arrangement to enable the Appellant and the others to withdraw from the company, and to purchase that withdrawal by the payment of a sum of money amongst them. Perhaps there cannot be a stronger proof of this than the order entered in the minute book of the directors under date of the 29th of May, 1849 (which I have already mentioned), that the company's solicitor be instructed to arrange terms with the solicitors of the shareholders "for the forfeiture of the shares standing in the names of their respective clients." This order was made after the negotiations and discussion of the terms upon which the shareholders should be allowed to retire from the company had resulted in an agreement to accept the sum of £4000, which the Appellant and the others agreed to pay "solely on the condition of their being properly released from all further liability, and their shares forfeited." This agreement was carried out by the resolution of the 6th of June, 1849, whereby the forfeiture of the shares was declared, and by the Judge's order of the same date staying the actions on payment by instalments of the agreed sum by the several Defendants in certain proportions. It seems to me impossible fairly to represent this

1868

SPACKMAN
v.
EVANS.

transaction as a compromise of the actions, although the staying the proceedings on payment of the sum agreed to be paid for the retirement of the shareholders by the forfeiture of their shares was a necessary supplement to their performance of the terms of the agreement.

But supposing that the transaction could be regarded as a compromise of the actions, unless the directors were at liberty at any time to allow shareholders to retire from the company, and relieve themselves from all liability by payment of an agreed sum of money, I could not see how they could be justified in doing so, by making the forfeiture of their shares the consideration for staying actions which they had brought for calls against the shareholders.

The 198th clause of the deed must be taken only to confer upon the directors the power to compromise actions upon terms within their competency, and not to give them a discretion in dealing with actions to enforce existing liabilities of the shareholders, to discharge them from all future liabilities by allowing them to withdraw from the company.

I am satisfied that the *Spackman* arrangement cannot be regarded as a compromise of the actions which were pending, but that it was, to all intents and purposes, a purchase by the shareholders of the liberty of withdrawing from the company. And even if it can be fairly viewed as a compromise, it was one into which it was not competent for the directors to enter.

This arrangement, unlike the *Chippenham* arrangement, was not made known to the shareholders. It has been said that it was only carrying on the *Chippenham* arrangement, and allowing the Appellant and the other shareholders to come in under it, and, therefore, if the shareholders must be taken to have acquiesced in the *Chippenham* arrangement, the want of notice of the arrangement with the Appellant and others was immaterial.

But this appears to me not to be a correct view of the case. Putting aside the consideration of whether the accession to the *Chippenham* arrangement was to be notified within a limited time, it must be borne in mind that the Appellant positively refused to accede to it. It is true that the action against him was founded upon the non-payment of a call which was made for the purpose of carrying out the *Chippenham* arrangement. But the Appellant

never came in to that arrangement, but was allowed to retire from the company upon entirely different terms, and therefore the notice which the shareholders may have had of the *Chippenham* arrangement could never communicate to them any knowledge of the agreement by which the Appellant and the other shareholders are said to have ceased to be members of the company.

The forfeiture of the shares under the *Spackman* arrangement being beyond the powers of the directors, the transaction could only be made good by the consent of all the shareholders at the time, or by their ratification of it afterwards. Express consent is out of the question, but it is contended that sufficient information of the arrangement was given to the shareholders to bind them by acquiescence, especially after the lapse of twelve years, and that the various subsequent proceedings of the company after the retirement of the Appellant and the others, and particularly the alteration of the deed of settlement, and the payment of a dividend to the remaining shareholders, prevented them from impeaching the validity of the arrangement.

It is necessary to consider the question of acquiescence apart from that of time. The *Spackman* arrangement being *ultrà vires* of the directors could only be subsequently made good by the acquiescence of all the shareholders with knowledge of the transaction. But mere time alone, without such knowledge, could never, in my opinion, grow into proof of acquiescence, or render valid that which, without the consent of all the shareholders, was absolutely void *ab initio*. I mention this, because it appears to me that both in *Brotherhood's Case* (1) and the present case my noble and learned friend, the Master of the Rolls, relied very much in his judgment upon the length of time during which the different arrangements with the retiring shareholders had been acted upon. In *Morgan's Case* (2), in which, like the present, the question arose upon the directors having allowed a shareholder to withdraw from a company in a manner not authorized by their deed of settlement, the winding-up order was made nearly five years after the transaction, which had never been impeached. Lord *Cottenham*, although he considered the case a very hard one, yet, as he saw nothing in the way of acquiescence " to bind each and every member of the

(1) 31 Beav. 365.                    (2) 1 Mac. & G. 225.

1868

SPACKMAN
*v.*
EVANS.

company," held that *Morgan* was properly placed on the list of contributories.

Notwithstanding, therefore, the long interval of time between the arrangement with the Appellant and the winding-up order, the question to be determined is, whether at the date of such order the Appellant had ceased to be a member of the company by reason of the acquiescence in that arrangement by the continuing shareholders.

It is quite clear that to render valid an act of the directors of a company which is *ultrà vires*, the acquiescence of the shareholders must be of the same extent as the consent which would have given validity from the first, viz., the acquiescence of each and every member of the company. Of course this acquiescence cannot be presumed unless knowledge of the transaction can be brought home to every one of the remaining shareholders. But it was argued that if the shareholders had the means of knowledge it would be sufficient to bind them, and Lord Justice *Turner's* opinion in *Nicol's Case* (1), was cited to this effect. But even if that opinion was correct as applicable to the particular case of a shareholder complaining that he had been induced to purchase shares by the fraudulent representations of the directors of a company, it can hardly be said that acquiescence by a dispersed body of shareholders in the illegal acts of directors can be presumed, because they might have discovered that the acts were in excess of the powers conferred by the deed of settlement. I cannot think that in such a case it is sufficient to shew that the shareholders, by the examination of the books of the company, might have made themselves acquainted with the unauthorized acts of the directors ; for such an examination would, in most cases, be to many of them impracticable or useless ; but knowledge of these acts ought to be brought home to them, either expressly or by necessary implication, before any presumption of acquiescence in them can be fairly raised.

But assuming that means of knowledge would be as effectual as actual knowledge to establish acquiescence, let us examine what were the supposed means of knowledge within the reach of the shareholders in this case. Considerable discussion took place at

(1) 3 De G. & J. 441.

the Bar as to the books to which the shareholders had the right of access, and particularly whether the minute book of the directors was open to their inspection. I do not think it necessary to enter minutely into this question. Perhaps upon a critical examination of the statute of the 7 & 8 Vict. c. 110, and of the clauses of the deed of settlement referred to upon the point, it would be found that the minute book of the directors is not one of those which, under the 33rd clause of the deed, is open to " the inspection and transcription " of the shareholders. But I prefer to assume that all the books, without exception, were within reach of the shareholders, and might have been examined by them. What they would have learnt from the books appears from an affidavit of the official manager, who says: "None of the books and papers in the company's office at the time of the winding-up order gave me any information as to the terms of the arrangement under which *Joseph* and *George Spackman* and the six other persons retired, and although I was informed that, in fact, they retired in pursuance of an arrangement made with the directors, and I was advised to place their names upon the list of contributories made out by me in this matter, I was unable to discover the terms of such arrangement until I obtained from Mr. *Kane*, in 1863, access to the papers of the late Mr. *Westmacott*."

After this it is impossible for the Appellant to rely upon the balance sheet of 1849 as notice to the shareholders of the *Spackman* arrangement. All that this balance sheet conveyed to their minds was, that a large amount of shares had been cancelled, but under what circumstances it afforded no information. As, however, the directors had, under the deed, a power of declaring the forfeiture of shares for non-payment of calls, the entry of " Cancelled Shares " would not suggest to the shareholders the necessity of farther inquiry.

It was said, that although the shareholders might have been kept in ignorance of the arrangement with the Appellant and others, yet that it must have been known to the auditors of the company, and that their knowledge must be imputed to the shareholders. In support of this proposition the opinion of Lord Justice *Turner* in *Nicol's Case* was again referred to, where he said : " There were auditors of this company appointed by the shareholders.

1868

SPACKMAN
*v.*
EVANS.

These auditors were, within the scope of their duty, at least as much the agents of the shareholders as the directors were, and the false and fraudulent representations were discoverable by them." But with great respect for every opinion entertained by the late learned Lord Justice, I cannot help expressing a doubt whether he was correct in treating the auditors in that case as the agents of the shareholders, or in holding that in the exercise of their duty they would necessarily have discovered the fraudulent representations of the directors. Under the deed of settlement in this case the two auditors (after the first two) are to be appointed by the shareholders at an annual general meeting. It seems to me that it would be an unreasonable conclusion, from this mode of appointment of these officers, that they were thereby constituted agents so as to conclude the shareholders by their knowledge of any unauthorized acts of the directors. It would be no part of their office to inquire into the validity of any transaction appearing in the accounts of the company. Under the 107th clause of the deed of settlement the duty prescribed for the auditors is "to inspect, examine, and check the receipts, payments, vouchers, and accounts of the company."

The report of the auditors of the 12th of October, 1849, addressed to the directors and shareholders of the company (which by a note n the margin is said not to be entered in the minute book, but to be found in the papers of the company) was not within the duties of their office. But if it were, it certainly gave no information of the nature of the *Spackman* arrangement, though it is supposed to have done so in the following passage : " Many of the shareholders resisted payment " (of outstanding calls), " but after much and expensive litigation they found it their interest to make arrangements with the directors, which if entered into a year before would have essentially saved delay and expense. They did at last what they might have done at first."

It appears to me that there was no knowledge of the *Spackman* arrangement, nor any means of knowledge (even if the shareholders were bound to avail themselves of it), and consequently no actual acquiescence in it by the shareholders, and that acquiescence cannot be inferred from the length of time during which the arrangement remained unimpeached.

But it is contended on behalf of the Appellant that he cannot be placed upon the list of contributories because, as far as respects his relation to the other shareholders since his retirement from the company, alterations have been made in the deed of settlement by which "the objects and business" of the company have been considerably extended, and there has been a dividend paid to the shareholders in which the Appellant did not participate. With respect to the creditors, it is admitted that all the debts due from the company at the time of the winding-up were incurred after the arrangement with the Appellant.

The Master of the Rolls in his judgment in this case appears to make the alteration of the deed of settlement a proof that the Appellant and others had ceased to be members of the company. His Lordship said: "Since these gentlemen left the company you have altered the whole of the system of laws, you have altered the deed of settlement, you have made a complete series of rules, every one of these gentlemen ought to have been summoned if they were to be bound by these rules. How were the acts done under this legal, if the shareholders had not been duly summoned?"

But, with great submission, is not this making the belief of the directors that the Appellant and the others had ceased to be members of the company a proof that they had ceased to be members of the company? No notices nor summonses were sent to the Appellant and the other retiring shareholders, because it was supposed that their shares had been regularly forfeited. What effect the want of notice to them might have upon the validity of the alterations in the deed of settlement it is unnecessary to inquire. But if this objection were urged by themselves it might fairly be answered: "You must be taken to have known that the arrangement by which you were allowed to retire from the company was not within the competency of the directors, and that there was in the deed of settlement a power given to the shareholders, at a special general meeting, to extend the business of the company; you voluntarily placed yourself in a situation in which you could not expect to receive any more notices as a shareholder, and you can hardly complain of alterations in the deed, which would otherwise be binding upon you, because you had no previous

1868

SPACKMAN
*v.*
EVANS.

1868

SPACKMAN
v.
EVANS.

notice of the meeting at which they were proposed to be and were made."

There appears to me to be nothing in favour of the Appellant's case to be derived from the circumstance of the dividend which was paid to the shareholders after the Appellant's retirement, and which he would be entitled to if he continued a member of the company. There will be no difficulty in adjusting the claims of the different contributories *inter se* under the winding-up order.

The only question to be determined upon this appeal is, whether the Appellant at the date of the winding-up order had ceased to be a member of the company. If he had not, it is quite immaterial that the debts to which he is to be made contributory were incurred after the time when he supposed that his connection with the company had been brought to an end. The debts which are to be liquidated under a winding-up order are the debts of the company, to which every shareholder must be contributory.

The only inquiry which the official manager has to make in settling the list of contributories is, who are the existing shareholders of the company. And every one who has at any time become a shareholder, and is unable to shew that at the date of the order he had ceased to belong to the company, either by the forfeiture or transfer of his shares, or in some other authorized manner, must be placed upon the list.

There may be equities between the shareholders *inter se*, which may be adjusted in the course of working out the order; but with these the official manager and the creditors have nothing to do. The former must ascertain who are the existing shareholders of the company, and the latter must bring in their claims against the company; and those claims must be satisfied by the contributions of all who are shareholders of the company at the date of the winding-up order.

The Appellant's case is a hard one, as he might very well believe, especially after such a lapse of time, that he was entirely separated from the company by the arrangement for the forfeiture of his shares.

But the transaction was originally void, it was not made good by the consent or acquiescence of the shareholders, nor could the

length of time during which it remained undisturbed operate to give it validity. The Appellant, therefore, continued to be a shareholder at the time of the winding-up order, and was properly placed on the list of contributories.

I agree with my noble and learned friend occupying the woolsack that the appeal ought to be dismissed, and also that, in consequence of the great difference of opinion that has occurred in the case, nothing ought to be said about costs.

LORD ROMILLY :—

My Lords, this is an appeal from an Order of the Lord Chancellor, directing the name of Mr. *Spackman* to be restored to the register of shareholders.

The arrangement under which his name was taken from the list of shareholders took place in June, 1849. The order to wind up the company was in April, 1861; and the application to put him on the list of shareholders was made first in the month of March, 1864.

The first question to be considered in this case is, whether the transaction is tainted by fraud. If it be, it is quite clear that no time can cure it, and that whenever the fraud is discovered the persons who suffer by that fraud can apply to the Courts of this country to give them redress, and to restore the name to the register. I have very carefully considered this case with that view, and gone through every step of the transaction between the directors of the *Agriculturists' Cattle Assurance Company* and Mr. *Spackman* and the persons who acted with him. In doing so, it is necessary to define what that fraud is which taints a transaction, and renders it incapable of being cured by time. Fraud, I apprehend, means where a person endeavours to gain a personal advantage to himself, either by concealment of the truth, or by inducing another to believe that to be true which is not so. This may be done by one person, or by two or more persons who may concert together to do something which may be injurious to another person or to a class of other persons. This, if wilfully concealed from them, constitutes fraud; but it is essential to the commission of fraud that the person who commits it should obtain, or believe that he obtains, a personal advantage to himself, and that he

1868

SPACKMAN
*v*
EVANS.

deceives or misleads the person injured by the transaction, either by false representation or by intentional concealment.

As I believe the doctrines of Equity to be founded on the highest principles of morality, truth, and justice, so I hold it to be a paramount duty that Courts of Equity should not confound culpable acts with those which, though irregular, are done honestly and *bonâ fide*. To do so is to confound the distinction between right and wrong. It is, therefore, with some dissatisfaction that I hear the occasional use of such expressions as a constructive fraud, or a fraud which is only one in contemplation of a Court of Equity, and the like. The landmarks of morality, which it is the peculiar duty of Courts of Equity to maintain, would be obliterated if that which is not morally culpable were termed fraud, and if it were visited with the penalties which are properly attached to dishonest conduct.

The first question, therefore, in this case is, did Mr. *Spackman* and those who acted with him, on the one hand, and the directors of the company, on the other hand, act *bonâ fide* and openly in this transaction? I think it impossible to say that they did not. They were at arms' length, acting hostilely towards each other; *Spackman* and his associates resisting the *Chippenham* arrangement, endeavouring to wind up the company, and to bring all the matters to a conclusion; the directors, on the other hand, doing all they could to benefit and maintain the company. In this state of things the compromise in question is entered into. I assume, without expressing any opinion, that the compromise was not warranted by the deed of settlement of the company. But unquestionably the powers contained in clause 164 are very large, and especially when combined with clause 198; and the directors might well believe, and I think did conscientiously believe, that they had the power to make this compromise. Mr. *Spackman* and those who acted with him could not come into the *Chippenham* arrangement, for they had always insisted that it was illegal and invalid. They were determined to have nothing more to do with the company, if they could possibly escape from it. They defended all actions, and resisted all calls. They were doing this openly, employing their own solicitors, who were acting against the solicitors of the company. If this state of things continued, it

1868
⁓
SPACKMAN
*v.*
EVANS.

was obvious that the company must come to an end. The directors thought it might be profitably continued if these ruinous proceedings could be stayed. In this state of things a compromise is suggested; the terms of it are openly discussed, the offers made are considered in the most open manner, they are rejected, and new offers made, not a word said about concealment on either side, not the suspicion of a pecuniary advantage to any one, and an offer is finally made and accepted, that *Spackman* and his associates should give a sum of £4000, and be permitted to retire from the company. This is accepted. The mode of retirement is immaterial; the directors did it by making a nominal call, and forfeiting the share for non-payment of it. I must confess it does appear to me to be as *bonâ fide* and open a transaction as ever was entered into, and one where both parties sincerely and *bonâ fide* believed that they were acting within the scope of the deed of settlement, the partnership articles by which they were bound.

I agree entirely with the reasoning of the judgment of Lord *Westbury* (1). The consequences he points out necessarily follow if any badge of fraud could be discovered in this transaction. But it is very material to be observed, that his Lordship founds his judgment solely and exclusively on the dishonesty of the transaction between Mr. *Spackman* and the directors, and approves of *Brotherhood's Case* (2), because there was no dishonesty in it. Therefore, in the opinion of the Lord Chancellor, and also of the Lords Justices, the questions in this case turn upon whether the arrangements were fraudulent—that is, dishonest—or not.

It is one of the misfortunes of this mode of proceeding by summons, that as there are no pleadings, so the case relied on by the complaining party is difficult to be ascertained, and the ordinary rules of Equity cannot be observed. If a bill were filed, the facts constituting the fraud relied upon must be distinctly alleged and clearly proved, or the case fails; but in a summons everything is at large, and in this case, upon the affidavits of the official liquidator, there does not appear to be any allegation of fraud of any description, except that the transaction was concealed from the shareholders. But in what does the concealment consist? It consists simply in this, that the transaction was not proclaimed

(1) 34 L. J. (Ch.) 321.          (2) 31 Beav. 365.

openly at a public meeting, or by a circular; for, in my opinion, the whole transaction might easily have been discovered by an examination of the books, and the subsequent correspondence discovered by the official liquidator only confirms the *bona fides* of the transaction. The books were open to the inspection of the shareholders, and the auditors who reported on the matter must have known the whole transaction, and, indeed, they refer to it in their circular which was sent to the shareholders before the public meeting.

But the remarkable thing in this case is, that if the concealment be proved, it amounts to nothing. It is not the concealment of Mr. *Spackman*, or those who acted with him. Concealment to constitute fraud must not only be wilful, but it must also be concealment by the person who is sought to be made answerable for the consequences of such concealment; whereas in this case *Spackman* and his associates, who are sought to be made answerable, concealed nothing. They had ceased to be members of the company. They had no power over the books; they had no power of sending circulars, if such were necessary, to the various members of the association. They had every reason to believe that the directors would do all that was proper to be done, and they were justified in relying on that belief.

But was there any concealment? In fact, did not every person who was a shareholder in the company either know it, or had he not the means of knowledge, and was he not put on inquiry?

Mr. Baron *Parke*, in the case of *May* v. *Chapman* (1), says, that "Notice is actual knowledge, or the means of knowledge, to which parties wilfully shut their eyes." Try this case by that test. Take, for instance, the evidence of a witness, Mr. *Pateman*, who says that he was wholly ignorant of the transaction. He attended the meeting of November, 1848; he seconded *Spackman's* motion of adjournment; he knew of the *Chippenham* arrangement; he knew of the proceedings in Chancery; he never speaks openly on the subject, but in private disapproves of the arrangement. He must have known that *Spackman*, who had taken so active a part against the *Chippenham* arrangement, was no longer a member of the company, and he might have seen all the books, and ascertained exactly how the

(1) 16 M. & W. 355, 361.

matter stood. In a less degree this observation applies to several of the other witnesses. I think that the remaining shareholders must be held to have known that *Spackman* was no longer on the list of the shareholders.

In *Lane's Case* (1) the Lord Chancellor held that slight circumstances are sufficient to shew that the shareholders were cognizant of what it was the duty of the directors to bring before them. In this case it is obvious that the shareholders were divided into two great classes, one who wished to retire, and one who wished to remain. Both classes knew that a great remodelling of the company was about to take place, and that many of the shareholders dissented, and that these were got rid of either under the *Chippenham* arrangement or by compromise, which prevented the opposition which would have arisen from their continuing to be members of the company. Is it competent for these persons, after the lapse of twelve years, to say that the whole transaction must be set aside, when it is impossible to restore the parties to their original position?

It is obvious that both the Lords Justices, *Knight Bruce* and *Turner*, and my Lord *Westbury*, concurred in this, that unless for fraud inherent in the transaction itself, and fraud on the part of the person who dealt with the company, the transaction could not be set aside, and that time had barred all remedy in this respect. This is on a principle which it is of the greatest interest for society that Equity should maintain, and which has been carried out very strictly in those cases relating to joint stock companies, viz., that all persons who come to enforce their rights should do so speedily. It is the more necessary to do this in a case where it is impossible for the Court to put these parties in the same situation as they were in before the compromise. Mr. *Spackman* might have sold his shares to another holder for a nominal sum, or even given him money to take them, and this, if done *bonâ fide*, Equity sanctions. This is settled by *De Pass's Case*, and several other cases. If the company had prospered it is obvious *Spackman* could not have returned to the company. The company is entirely altered. He pays a large sum of money and gets no dividend; he has no means of preventing the mismanagement of a company to which he no

1868

*Spackman*
*v.*
Evans.

(1) 1 De G. J. & S. 504.

longer belongs. Unless, therefore, the transaction was in itself *ipso facto* void, I think that it cannot be set aside after so long a lapse of time.

I admit that if the transaction was originally absolutely void, and not simply voidable, the necessary consequences follow, and Mr. *Spackman* has always been, and must now continue to be, a member of the company. But I think that to hold the striking the name of Mr. *Spackman* off the register by the directors, and the forfeiture of his shares, to be a transaction in itself *ipso facto* void, would be to overrule a long series of settled authorities.

In the first place, it seems to me to be admitted, that if all the members of the company had thought fit to assent to the transaction, it would have been good. This, to use the expression of Lord *Mansfield* in the great case of *Zouch* d. *Abbott* v. *Parsons* (1), proves it to be voidable only, for a void transaction is incapable of confirmation.

Then, again, the shareholders might have compelled *Spackman* to abide by the arrangement if the company had turned out profitable; if so, it follows that the transaction was voidable, and not void—I take it to be a cardinal rule, that whenever the validity of an irregular transaction depends on the confirmation of any one or more persons, that transaction is voidable only, and not void. Of course, if this company had bought mines or entered into a contract to set up a steam packet business, this would have been simply void, and would not have bound the company or any one, because they could do nothing that was beyond the objects of the company; but, on the other hand, the directors might do anything, however irregular, in promoting the objects of the company, provided it was done *bonâ fide;* and this could not be avoided unless steps were speedily taken for this purpose.

This is, as I believe, the distinction which is taken in all the cases on this subject. The short result of them may, I think, be stated to be, that the directors are the agents of the company, that the company are not bound by any acts done by them for objects which the company has no power to entertain, and that these are the only acts which, if the directors do, are *ipso facto* void. But that not only do the acts of the directors bind the company when

(1) 3 Burr. 1794, 1807.

done within the scope of their authority, but also that where the acts of the directors, however irregular, belong to a class of acts which class is authorized by the deed of settlement, in these cases the company is absolutely bound when the acts are done with strangers who act *bonâ fide* with the company, and when these acts are done with the shareholders of the company then that these acts are voidable only, and that the other shareholders must take active steps to set aside the transaction, and that when there is no dishonesty, time bars the remedy. Amongst these acts there is none that more clearly belongs to the class of acts authorized by the deed of settlement than the forfeiting of shares, and the striking off from the register, or adding on to it, the name of a shareholder. No Judge hitherto has treated the transaction as *ipso facto* void. The rule of a Court of Equity has, I believe, always been that where acts are not void in themselves, but simply voidable—if they are done *bonâ fide* time bars the remedy, and the time begins to run from the period when the act was done. If the act is tainted with fraud the time begins to run from the time when the fraud was first discovered by the person injured thereby. That is reasonable time,—what that is, may vary in different cases, but in all cases that I am aware of the Courts of Equity have held that such a period of time as twelve years has barred the right of any person to impeach the transaction, and this was obviously the opinion of the Lords Justices. I think, therefore, that the sole question in this case is a question of fact, and simply that on which Lord *Westbury* puts it, viz., was there fraud or not in the transaction? I see none, and I think that Mr. *Spackman* cannot himself be made liable, because the persons with whom he dealt omitted to do their duty in informing the shareholders of what they had arranged with him, or because the other shareholders thought fit not to inquire into the case.

I am, therefore, of opinion that Mr. *Spackman* ought not to be restored to the list of shareholders.

LORD COLONSAY :—

My Lords, in common with the rest of my noble and learned friends who have addressed the House, I have considered this case and the evidence upon which it rests with all the care and atten-

1868

SPACKMAN
*v.*
EVANS.

1868

SPACKMAN
*v.*
EVANS.

tion I could command; and I have formed an opinion upon each of the points involved in it. My noble and learned friends have explained very fully the facts of the case, and given a history of the company, including that of the transaction now in question. I, therefore, do not intend to occupy the time of the House by repeating that history. I propose to confine myself to brief statements of what appear to me to be the main questions raised by the case, and the brief results of my opinion upon each of those questions.

The winding-up order was made in April, 1861. The question is, whether the Appellant is to be on the list of contributories. That depends on whether he had ceased to be a partner. He says he had ceased in 1849. He does not say that he had sold and transferred his shares. But he says that his shares were forfeited by the directors in respect of the non-payment of a call; and he refers to sect. 125 of the deed of settlement, which undoubtedly gives to the directors power to forfeit shares for non-payment of calls. If it appears that the shares were duly forfeited under the powers so given to the directors, that of itself must be held to have terminated the Appellant's character of shareholder from the date of such forfeiture.

This raises the question whether the forfeiture was made in the due and regular exercise of the powers given to the directors by sect. 125. I am of opinion that it was not. It was indeed in form a forfeiture for non-payment of a call, but of a call made not under the provisions of the deed, and with a view to its being paid as a call, but under an arrangement with a view to its not being paid in order that the non-payment might be made the nominal basis for forfeiture of the shares, and thereby enabling certain shareholders to withdraw from the company on certain terms.

It does not, however, necessarily follow that a transaction or arrangement of that kind, sanctioned or acquiesced in by the other shareholders, might not be effectual. That raises the question whether the arrangement under which the Appellant's shares were forfeited was so sanctioned or acquiesced in. I am of opinion that there are not sufficient grounds for holding that it was sanctioned or acquiesced in by the other shareholders.

I shall not repeat the history of what has been called the *Chip-*

1868
SPACKMAN
v.
EVANS.

*penham* arrangement. I assume that all the shareholders got notice of that proposal, and were aware that many had agreed to its terms and had gone out under it. But I think that the Appellant did not go out under that arrangement. He refused from the beginning to agree to it. He attempted by judicial proceedings unsuccessfully to get the company wound up. He resisted the call on grounds of alleged illegality. He kept the directors at bay for a length of time, and finally he, and five or six others who were associated with him, transacts on terms essentially different from those of the *Chippenham* arrangement. It does not appear that this transaction was submitted to the consideration of the shareholders, or that any notice of it was given to them, or any attempt made to do so, or that it came to their knowledge in any way. I think I am right in saying that there is no direct evidence to that effect. Direct evidence, however, is not necessary. But I do not think that there are sufficient circumstances to infer or presume knowledge on the part of the absent shareholder. There is some, though not much, direct evidence the other way. Without knowledge, actual or presumed, there could not be acquiescence. Lapse of time is a very important element in the question of acquiescence, but I am not disposed to accept it as a substitute for knowledge. I shall afterwards advert to the influence due to time as a separate and independent agent in reference to the facts of this case.

But there was a clause in the deed, sect. 198, whereby the directors had power to enter into compromises of actions, and the transaction with the Appellant and his associates involved the settlement of their litigation. That raises the question whether the arrangement for the forfeiture of the shares was a thing within the scope of the power to compromise conferred on the directors. I am of opinion that it was not. The litigations did not involve any question as to the Appellant being or not being a partner of the company, or being or not being entitled to be released from the position of a shareholder. The whole proceeding was a device to obtain an ostensible ground for forfeiture, and the real question was, how much money the Appellant and his associates were to pay.

Now, although I have called this a device, and although I think it was a proceeding not sanctioned by the constitution of the com-

pany and *ultrà vires* of the directors, and as such illegal, I do not regard it as fraudulent on either side. I do not think that it is tainted by *mala fides*, or intentional concealment. But I think it was invalid, and did not legally put an end to the Appellant's character of shareholder, though he may have honestly thought that it did. If he has not legally ceased to be a shareholder I do not think that the changes made in the constitution and objects of the company will sustain him in his present contention.

But although the transaction of 1849 had not the effect of legally severing the Appellant from the company at that time, the question remains, and it is the question on which I have felt most difficulty in forming my opinion, whether the subsequent lapse of time does not operate as an effectual obstacle to the demand of the official liquidator. The transaction was not fraudulent on the part of the Appellant. The directors acted, as they believed, for the interests of the company. The Appellant ceased to be treated as a shareholder, and in the interval important changes were made in the constitution and objects of the company.

Two of my noble and learned friends think that notwithstanding the original illegality of the transaction, and the non-communication of it to the shareholders, and their continued excusable ignorance of it, the mere lapse of time operates a cure and makes the transaction effectual. With unfeigned respect for every opinion of my noble and learned friends, and having listened with great interest to the outpouring of a mind from which all of us have often derived instruction, I have not been able to arrive at that conclusion. I regret this, because I think the case a hard one for the Appellant. But, on the other hand, I think it is a principle of importance that absent shareholders should not be prejudiced by illegal transactions entered into not only without their knowledge, but without any step having been taken to inform them, or put them on their guard, or any reasonable means having been afforded them of becoming aware of what was going on, or what had been done, or even anything having been presented to their minds which ought to have put them on their inquiry. For these reasons, and those which have been more fully stated by two of my noble and learned friends, I think that the order appealed from should be affirmed.

Mr. *Amphlett*:—Your Lordships will allow the official manager to have his costs out of the fund.

LORD CRANWORTH :—Yes.

It was Ordered and adjudged that the Order of the Court of Chancery, of the 11th of February, 1865, so far as complained of in the said appeal, be affirmed, and that the appeal be dismissed ; and it is farther ordered, that the costs incurred by the said Respondents *Lewis Henry Evans*, the official manager of the *Agriculturists' Cattle Insurance Company*, and *Thomas Hughes*, Esq., Member of Parliament, the creditors' representative, in respect of the said appeal, be paid out of the assets of the said company.

Solicitors for the Appellant : *Whitakers & Woolbert.*
Solicitors for the Respondent *Evans* : *Horn & Murray.*
Solicitors for the Respondent *Hughes* : *Warry, Robins, & Burges.*

1868
~~
SPACKMAN
*v.*
EVANS.

———

LEWIS H. EVANS, OFFICIAL MANAGER OF THE AGRICULTURISTS' CATTLE ASSURANCE COMPANY . . . . . . } APPELLANT ;

AND

AARON SMALLCOMBE, AND ANOTHER, EXECUTORS OF AARON SMALLCOMBE, SEN., DECEASED, AND THOMAS HUGHES, THE CREDITORS' REPRESENTATIVE . . . } RESPONDENTS.

1868
~~
*May* 22—25;
*June* 25.

———

*Company—Arrangement—Notice—Costs.*

An arrangement (*sic* the previous case) allowing members of a company to retire from the company under certain conditions therein agreed to by a public meeting of the shareholders, convened after due notice to all the shareholders, is not in itself valid, unless made in accordance with the provisions of the deed of settlement, and if not assented to directly or indirectly, after due notice, by all the shareholders, may be impeached by any one of them. But if the means of notice to all appear sufficient, so as to raise a clear presumption of knowledge and acquiescence, and the arrangement is left unimpeached by any one for a great many years, the shareholder who has been allowed to retire, and whose name has been removed from the lists of

# Case Law 08

**Express Engineering Works Ltd [1920]
1 Ch. 466**



© United States Shipping Board v Laird Line Ltd

Overview    |    [1924] AC 286,    |    93 LJPC 123,    |    16 Asp MLC 302,    |    130 LT 552,    |    [1923] All ER Rep Ext 850

---

# Re Express Engineering Works Limited [1920] All ER Rep Ext 850

Also reported: [1920] 1 Ch 466 ↗; 89 LJ Ch 379; 122 LT 790; 36 TLR 275

COURT OF APPEAL

LORD STERNDALE, MR, WARRINGTON, YOUNGER, LJJ

12 FEBRUARY 1920

**Company — "Private company" — Contract or arrangement by directors disentitled to vote thereon — Directors the sole shareholders — Validity of transaction.**

The five directors of a "private company" were the sole shareholders thereof, and at a meeting described in the minutes as a "board meeting" they purported to enter into an agreement, which the articles of association of the company precluded directors from doing, because it prohibited them from voting in respect of any contract or arrangement in which they might be interested.

**Held:** that as all the five shareholders were present at the so-called board meeting, which they practically treated as a meeting of the shareholders, the transaction was intra vires and could not be set aside.

*Re George Newman and Co Limited,* [1895] 1 Ch 674; 72 LT 697, distinguished.

*Salomon v Salomon and Co Limited,* [1897] AC 22; 75 LT 426, considered and applied.

Decision of Astbury, J, affirmed.

## Notes

Distinguished: *Re Sander's Ltd* (1932) 49 WN (NSW) 220.

Applied: *Commercial Bank of Australia Ltd v Furey and Associates Ltd (In liquidation),* [1954] NZLR 851.

See Halsbury's Laws of England, 3rd ed, vol 6, pp 229, 230.

## Cases referred to:

*Newman (George) & Co Ltd, Re,* [1895] 1 Ch 674; 72 LT 697.

*Salomon v Salomon & Co Ltd,* [1897] AC 22; 75 LT 426; [1895-9] All ER Rep 33.

---

## Appeal from the Chancery Division

Re Express Engineering Works Limited [1920] All ER Rep Ext 850, [1920] All ER Rep Ext 850

In February 1918 the above-named company was registered as a "private company" pursuant to the provisions of s 121 of the Companies (Consolidation) Act 1908.

By art 9 of the articles of association of the company, it was provided that a director might contract with and be interested in any contract or arrangement with the company; but that no director should, as a director, vote in respect of any contract arrangement in which he might be interested.

The main object of the company was to acquire the assets of a syndicate which consisted of five persons. They became the only shareholders of the company--two of them being signatories of its memorandum of association.

In March 1918 a meeting described in the minutes as the first board meeting of the company was held at which all the five shareholders were present, and at that meeting they were all appointed as directors.

At that meeting it was resolved that the company should purchase the assets of the syndicate for a specified amount to be satisfied by the issue and delivery of a like amount of debentures bearing interest at a specified rate.

-------------------------------------------------------------------  *[1920] All ER Rep Ext 850 at 851*

The debentures were duly issued, and at a subsequent meeting held a short while afterwards the seal of the company was affixed thereto. Later on the same debentures were transferred to another syndicate which consisted of the members of the company.

In March 1919 the company was ordered to be wound up and a liquidator was duly appointed.

A summons was taken out by the liquidator asking for a declaration that the issue and transfer of the debentures were invalid, and should be set aside, because the directors were precluded by art 9 from voting on the contract; and that although the five shareholders could enter into the contract it ought to have been done in general meeting.

It was decided by Astbury, J, that the liquidator was not entitled to the declaration claimed by him. His Lordship was of opinion that there was no suggestion in the evidence of any conspiracy by the five persons in question to defraud future shareholders or creditors; that even if art 9 precluded the directors from doing the act complained of, it was a contract into which the company could enter if proper steps were taken to validate it, that there was no authority requiring that ratification by shareholders must be given in any formal manner; and that in the present case all the five shareholders had fully ratified the transaction.

From that decision the liquidator now appealed.

*Clauson, KC,* and *P B Morle* for the appellant.

*Maugham, KC,* and *P F Wheeler* for the respondents.

12 FEBRUARY 1920

**LORD STERNDALE MR:**

(stated the facts of the case and continued)

It has been contended, on the one hand, that the transaction was invalid because all the five directors, being

Re Express Engineering Works Limited [1920] All ER Rep Ext 850, [1920] All ER Rep Ext 850

interested parties, were precluded by art 9 from making the contract, and that though those five persons as the corporators undoubtedly could make the contract they could only do so in general meeting.

On the other hand, it was argued that the contract could not be called invalid if every shareholder knew of and sanctioned it; and further, that whatever the draftsman of the minutes may have styled the meeting, it was in fact a meeting of all the corporators, and they were able, whatever they might call themselves, to waive technicalities and to meet together and make any contract they chose.

The appellant had relied on a passage in *Re George Newman and Co Limited* ([1895] 1 Ch 674; 72 LT 697), where Lord Lindley said at p 686 of ([1895] 1 Ch): "It may be true and probably is true, that a meeting, if held, would have done anything which Mr George Newman desired; but this is pure speculation, and the liquidator as representing the company in its corporate capacity, is entitled to insist upon, and to have the benefit of the fact that even if a general meeting could have sanctioned what was done, such sanction was never obtained. Individual assents given separately may preclude those who give them from complaining of what they have sanctioned, but for the purpose of binding a company in its corporate capacity individual assents given separately are not equivalent to the assent of a meeting."

There are, however, two differences between that case and the present one. First, the transaction there was *ultra vires,* and, secondly, in that case there never was a meeting of the corporators. In the present case, the five persons concerned were all the corporators of the company and they did

------------------------------------------------------------------

all meet, and did all agree that these debentures should be issued. Therefore it seems that the case comes within the meaning of what was said by Lord Davey, in *Salomon v Salomon and Co Limited* ([1897] AC 22; 75 LT 426): "I think it an inevitable inference from the circumstances of the case that every member of the company assented to the purchase, and the company is bound in a matter *intra vires* by the unanimous agreement of its members."

It was said here that the meeting was a directors' meeting. But it might equally well be considered a general meeting of the company, for although it was headed in the minutes as a board meeting, yet if the five persons present had said, "We will now constitute this a general meeting," it would have been within their powers to do so, and it appears to me that that was in fact what they did.

This appeal must therefore be dismissed.

**WARRINGTON LJ:**

(stated the facts and continued)

It appears that the five directors were the only shareholders of the company, and it is not disputed that those five persons, acting together as shareholders, could have authorised these debentures. It comes to this, that these five persons as directors could not, but as five shareholders could have made the agreement in question. They were the only shareholders.

It was quite competent for them to waive notices and formalities and at once resolve themselves into a meeting of shareholders. The resolution to issue these debentures was passed by them all. Inasmuch as they could effectually do in one capacity what they could not do in another, it seems clear to me that as business men they must be assumed to have acted in the capacity which gave them power to act. Therefore, in my judgment, they must be held to have acted as shareholders, and not as directors.

I agree, therefore, that this appeal must be dismissed.

Re Express Engineering Works Limited [1920] All ER Rep Ext 850, [1920] All ER Rep Ext 850

**YOUNGER LJ:**

I am of the same opinion. The decision in *Salomon's Case, supra,* was that a company is bound, in a matter which is *intra vires,* by the unanimous agreement of the corporators.

No fraud is alleged in respect of the transaction in the present case. It seems to me that the effect of the resolution on 11 March was that the company by the voice of al its shareholders, was absolutely bound by this contract, and I agree with the view that when all the shareholders of a company are present at a meeting that is in fact a general meeting, and there is no necessity for the observance of any formality to make it so.

The true view, I think, is that if you have all the shareholders present, then all the requirements in connection with a meeting of the company are observed, and every resolution is binding on the company.

In my opinion this contract was neither void nor voidable, and I agree therefore, that this appeal must be dismissed.

Appeal dismissed.

E A SCRATCHLEY, BARRISTER-AT-LAW

---

**End of Document**

# Case Law 09

**Oxted Motor Co. [1921] 3 K.B. 32**



Oxted Motor Co Ltd, Re

Overview    |    [1921] 3 KB 32,    |    90 LJKB 1145,    |    [1921] B & CR 155,    |    **[1921] All ER Rep 646**,    |    **126 LT 56**,    |    37 TLR 757

---

# Re Oxted Motor Co [1921] All ER Rep 646

Also reported [1921] 3 KB 32 ⬀; 90 LJKB 1145; 126 LT 56; 37 TLR 757; [1921] B & CR 155

KING'S BENCH DIVISION

Lush and Greer JJ

26 MAY 1921

**Company — Director — Ultra vires act — Act ultra vires the directors, but intra vires the company — Ratification by shareholders.**

**Company — General meeting — Formalities necessary to constitute — Waiver by agreement of all shareholders.**

**Company — Winding — up — Voluntary winding — up — Extraordinary resolution — No notice of resolution given — Resolution unanimously passed, and minute thereof signed, by all shareholders — Companies (Consolidation) Act, 1908 (8 Edw 7, c 69) ss 69, 182.**

---

Any act of the directors of a company which is ultra vires the directors but not ultra vires the company may be ratified by the company in general meeting, or at an informal meeting of all the shareholders. The formalities otherwise necessary to constitute a general meeting need not be complied with if all the shareholders agree to waive them.

The giving of the "notice specifying the intention to propose the resolution as an extraordinary resolution" required by s 69 of the Companies (Consolidation) Act, 1908, was held to have been waived when, there being no question of fraud, all the shareholders of a company entitled to vote were present at a

---------------------------------------------------------------------*[1921] All ER Rep 646 at 647*

meeting and there unanimously passed, and signed, a minute of an extraordinary resolution, of which no such notice had been given, that the company should be voluntarily wound-up.

*Re Express Engineering Works, Ltd* (1) [1920] 1 Ch 466, applied.

## Notes

Section 278(1) of the Companies Act, 1948, contains the provision formerly contained in s 182(3) of the Act of 1908, but s 141(1) (5) of the 1948 Act now defines an extraordinary resolution in terms slightly different from those of s 69 of the Act of 1908, and requires specification of the actual nature of an extraordinary resolution to be made in the notice thereof. Despite these changes it seems that the decision set out in the second paragraph

of the headnote would still be applied, but there has not yet been any express decision on this point.

As to acts ultra vires, see 6 HALSBURY'S LAWS (3rd Edn) 299, as to different kinds of company meetings, see ibid 329 et seq, as to extraordinary resolutions, see ibid 345, and as to voluntary winding-up, see ibid 733 et seq; and for cases see 9 DIGEST (Repl) 601, 602, 618. For the Companies Act, 1948, see 3 HALSBURY'S STATUTES (2nd Edn) 452.

### Case referred to:

(1) *Re Express Engineering Works, Ltd*, [1920] 1 Ch 466; 89 LJ Ch 379; 122 LT 790; 36 TLR 275, CA; 9 Digest (Repl) 606, 4016.

## Appeal from Croydon County Court.

An application was made to the registrar of the Croydon County Court by a judgment creditor of the Oxted Motor Co for an order that the appointment of certain liquidators of the company be set aside on the ground that a resolution for the voluntary winding-up of the company had not been properly passed. All the shares in the company were held by the two directors, GH Henry and EL Tessier. On 2 November 1920, Captain Welling Laurie obtained a judgment against the company for 875 pounds and costs. On November 3 a warrant to levy execution was issued to the sheriff, but he was already in possession under another judgment. On November 2 Henry and Tessier, the only shareholders of the company, met at the offices of the company, and passed a resolution that the company could not by reason of its liabilities continue its business, and that it was advisable to wind-up the same. A formal resolution for the voluntary winding-up of the company on these grounds was then signed by Henry and Tessier, and one BB McCullum was appointed liquidator. No previous notice of the intention to propose this resolution as an extraordinary resolution had been given to the shareholders. The voluntary liquidation was confirmed at a meeting of creditors of the company on 22 November 1920, when one Sunderland was appointed joint liquidator with McCollum. On 3 December 1920, Sunderland's appointment was confirmed by an order of the registrar of the Croydon County Court, and a committee of inspection, including the judgment creditor, was appointed. Cross proceedings followed, by the liquidators to restrain the judgment creditor from proceeding with the execution under his judgment, and by the judgment creditor for the removal of the liquidators on the ground that no valid resolution to wind-up the company had been passed. The contention of the judgment creditor was upheld by the registrar, and he set aside the appointment of the liquidators. The liquidators appealed to the county court judge, who affirmed the order of the registrar setting aside the appointment of the liquidators. The liquidators appealed to the Divisional Court.

By the Companies (Consolidation) Act, 1908:

"Section 69. A resolution shall be an extraordinary resolution when it has been passed by a majority of not less than three-fourths of such members entitled to vote as are present in person or by proxy … at a general meeting of which notice specifying the intention to propose the resolution as an extraordinary resolution has been duly given … Section 182. A company may be wound-up voluntarily … (3) if the company resolves by extraordinary

---------------------------------------------------------------------------------------------*[1921] All ER Rep 646 at 648*

resolution to the effect that it cannot by reason of its liabilities continue its business and that it is advisable to windup."

Luxmoore, KC, and CAJ Bonner for the liquidators.

W Higgins and Engelbach for the judgment creditor.

26 May 1921

Re Oxted Motor Co [1921] All ER Rep 646, [1921] All ER Rep 646

**LUSH J:**

This appeal must be allowed. There is no doubt that all the shareholders in this company - there were in fact only two - met at the office of the company and passed a resolution that the company could not by reason of its liabilities continue its business, and that it was advisable to wind it up, and accordingly that it be wound-up voluntarily. It is argued that notwithstanding the fact that all the shareholders in the company were present and supported that resolution, it was not a valid extraordinary resolution to wind-up the company, because the requirements of s 69 of the Companies (Consolidation) Act, 1908, had not been complied with That section defines an extraordinary resolution. There is no doubt that no notice had been given before the shareholders met intimating an intention to propose this resolution as an extraordinary resolution. It is contended that unless the notice contemplated by that section has been given a resolution is not valid as an extraordinary resolution, and it is said that, notwithstanding that all the shareholders in the company were present and were dealing with a matter which was intra vires, and were all supporting the resolution, and notwithstanding that there was no fraud, still this resolution was invalid as an extraordinary resolution to wind-up the company voluntarily because the statutory requirements of s 69 with regard to notice had not been complied with. In my opinion, that contention is not well founded. It would be an extraordinary result if, after all the shareholders of a company had been present at a meeting and had unanimously passed a resolution to wind-up the company voluntarily, anyone else could impeach that resolution on the ground that the shareholders had not had notice of the intention to propose the resolution as an extraordinary resolution, and that, therefore, the requirements of s 69 had not been complied with. In my opinion the shareholders are just as much entitled to waive the formality of notice for the purpose of turning a resolution into an extraordinary resolution as for any other purpose.

*Re Express Engineering Works, Ltd* (1) is an authority in support of the view that the statutory requirements with regard to notice can be waived. It is true that in that case the resolution was not a resolution to wind-up the company, but a resolution to issue certain debentures. What happened there was this: all the shareholders of the company there were only five - were also directors, and met as directors at a board meeting, and afterwards passed the resolution to issue the debentures without constituting themselves into a meeting of shareholders and without any notice having been given for the calling of a general meeting of shareholders, as required by s 67 of the Companies (Consolidation) Act, 1908. The company was afterwards wound-up, and it was contended by the liquidator that as the requirements of the statute had not been complied with the resolution to issue the debentures was invalid. The Court of Appeal affirmed the decision of ASTBURY, J, that the requirements of the statute were intended for the protection of the shareholders, and that if the resolution was a matter intra vires the members of the company, and there was no fraud, the shareholders could waive all formalities as regards notice, and that the resolution was just as valid as if the requisite notice had been given WARRINGTON, LJ, said:

> "It happened that these five directors were the only shareholders of the company, and it is admitted that the five, acting together as shareholders, could have issued these debentures. As directors they could not, but as shareholders acting together they could have made the agreement in question. It was competent to them to waive all formalities as regards notice of meetings, &c, and to resolve themselves into a meeting of shareholders and unanimously pass the resolution in question."

----------------------------------------------------------------------------------------*[1921] All ER Rep 646 at 649*

If that is true in the case of a resolution to issue debentures, it seems to me that it is equally true in the case of a resolution to wind-up a company voluntarily, such as the resolution in the present case. It is said that in the case of an extraordinary resolution the legislature has made it imperative that the notice required by s 69 should be given, in order to give an opportunity for the shareholders to consider whether the resolution should be passed, and that it is not competent to waive that formality. I cannot see any reason why shareholders should not be able to do in that case what they can do in any other case. In the absence of fraud I think that shareholders can waive the notice in this case just as freely as they could in *Re Express Engineering Works, Ltd* (1). For these reasons I think that the judgment of the county court judge was wrong, and that the appeal must be allowed.

Re Oxted Motor Co [1921] All ER Rep 646, [1921] All ER Rep 646

**GREER J:**

I agree that this appeal must be allowed. The question is whether the resolution that was passed was a valid and effective resolution to wind-up the company. It is said that the resolution cannot be valid as an extraordinary resolution within s 182 of the Companies (Consolidation) Act, 1908, owing to the absence of the notice required by s 69 of that Act Under s 182 a company can only be wound-up voluntarily in three ways. The third method is the one which is material in this case, which is that if the company resolves by extraordinary resolution to the effect that it cannot by reason of its liabilities continue its business, and that it is advisable to wind-up. There was a general meeting of the company in the sense that there was a meeting of the shareholders of the company at which all the shareholders were present, but there had been no notice given of an intention to propose an extraordinary resolution at that meeting or otherwise, unless the request to sign the minute of the resolution is a notice of intention to propose the resolution as an extraordinary resolution. The liquidators may put their case in two ways; they may say that notice was duly given by reason of what took place between the two shareholders, and that the requirement that the notice should be a seven days' notice was waived. It may also be said that whether the notice required by s 69 has been duly given or not that is a matter that concerns the shareholders alone, because the legislature has given the shareholders the right to say whether or not a company shall be voluntarily wound-up. The creditors of the company have no voice in the matter, and they cannot object to the validity of a resolution to wind-up voluntarily by saying that the proper notice to pass that resolution as an extraordinary resolution has not been given. This view is supported by the decision of the Court of Appeal in *Re Express Engineering Works, Ltd* (1). That is a case in which it might be said that the creditors had an interest in the matter, because it arose after the company was being wound-up, and when the interest of the creditors of the company had come into conflict with the interests of the shareholders.

Appeal allowed.

Reported by TW MORGAN, Esq, Barrister-at-Law.

# Case Law 10

**New Falmouth Resorts Ltd v
International Hotels Jamaica Ltd
[2013 UKPC 11]**



[2013] UKPC 11
Privy Council Appeal No 0031 of 2012

# JUDGMENT

## New Falmouth Resorts Limited (Appellant) *v* International Hotels Jamaica Limited (Respondent)

### From the Court of Appeal of Jamaica

before

**Lord Neuberger**
**Lord Walker**
**Lord Mance**
**Lord Sumption**
**Sir Alan Ward**

## JUDGMENT DELIVERED BY

## SIR ALAN WARD

## ON

## 7 MAY 2013

### Heard on 30 January 2013

|  |  |
|---|---|
| *Appellant* | *Respondent* |
| Tracy Angus QC | Dr Lloyd Barnett |
| Juliet Mair Rose | Weiden Daley |
| Jamaican Bar | Tracey Long |
|  | Jamaican Bar |
| (Instructed by Harcus Sinclair) | (Instructed by Charles Russell LLP) |

**SIR ALAN WARD:**

*Introduction*

1.     This appeal concerns the right to possession of 4 ¾ acres of land known as Lot 3A adjacent to the Starfish Hotel in the parish of Trelawny in Jamaica. The appellant, New Falmouth Resorts Ltd, seeks possession of the land from the respondent, International Hotels Jamaica Ltd, and claims damages for its wrongful use and occupation. On 20th February 2009 Hibbert J sitting in the Supreme Court of Justice of Jamaica in Civil Division held that the appellant's claims must fail and judgment was accordingly entered in favour of the respondent with costs. On 15th April 2011 the Jamaican Court of Appeal dismissed the appellant's appeal with costs but later on 23rd January 2012 granted final leave to appeal to Her Majesty in Council.

*The issue in the appeal*

2.     It was as long ago as 17th February 1982 that the appellant agreed to sell Lot 3A to National Hotels and Properties Ltd ("NHP") for $184,000 payable by way of a deposit of $62,000 with the balance to be paid on completion which was fixed for 31st March 1982. A remarkable feature of the case is that completion has still not taken place. This agreement was signed on the appellant's behalf by John H. Phelan III, ("John"). The central issues which arise on the appeal are whether John was authorised to sign on the company's behalf, alternatively whether the company ratified the agreement on 21st June 1982 at a properly constituted meeting of the board of directors.

*The background*

3.     Although the issue relates to the validity of the agreement for the sale of the land, the underlying dispute is, and for decades has been, a facet of a long battle that has been waged in a number of actions between Mr James Henry Chisholm ("Mr Chisholm") and John and other members of the Phelan family over control of the appellant company. The company was incorporated in 1967 as a vehicle for the Phelan family who were resident in Texas to conduct real estate business in Jamaica. John was the principal shareholder and he was one of the first directors appointed to the board. Frank Phelan ("Frank") also acquired shares in the company and he was appointed a director on 6th July 1970. A third brother, David, was appointed a director on 26th January 1973 and later became chairman. At that same meeting Mr Chisholm was appointed to the board as managing director.

4.     Mr Chisholm's involvement in the company seems to have come about in this way. The company owned large tracts of property in western Jamaica and, in order to

1

develop the land, needed to procure the injection of additional funds to put in the necessary roads, water supply and other infra-structure. The Phelans heard of Mr Chisholm who was an established realtor in Jamaica with connections in the USA, in particular in Florida where he had a licence to engage in real estate business. As an inducement for Mr Chisholm to raise the necessary finance, the appellant seems by a letter dated 26th October 1972 to have offered him a 51% shareholding in the company upon his providing the company with a loan commitment for $1 million to provide the working capital for the development of the lots in the first phase. It was also suggested that on payment of the sum of $10,000 Mr Chisholm would take over management of the project as managing director. He was accordingly appointed to the board as manager on 26 January 1973 at the same meeting when David was appointed. He is now in control of the company: indeed he describes it as "my company".

5.      John was adjudged bankrupt by an order of the United States Southern District Court for Texas on 12th July 1972 but discharged from bankruptcy by a later order of the same court made on 30th October 1974. By virtue of article 97 of the Articles of Association the office of the director shall be vacated if he becomes bankrupt. In any event, John admitted in evidence in one of the rounds of litigation involving these protagonists that he had resigned as a director of the company during the course of 1971 and that he had "thereafter had no dealings with the company as a director or other officer thereof till after I had been discharged from bankruptcy". Whether or not he was ever validly reappointed is a matter of dispute in this appeal.

6.      The Trelawny Beach Hotel, later known as the Starfish Hotel, was built on land adjacent to Lot 3A. NHP had purchased the Trelawny Beach Hotel in 1978. At the time of the purchase and for many years thereafter, it was thought that Lot 3A upon which the hotel tennis courts were situated formed part of the land that had been acquired by NHP. However, in 1981 at a time when NHP was considering a sale of the hotel it was discovered that Lot 3A was not in fact part of the hotel property but was still owned by the appellant. Contact was accordingly made with the appellant and Mr Moses Matalan acting for NHP had some negotiations with Mr Chisholm for the purchase of Lot 3A for $184,000. In Mr Chisholm's absence the appellant's attorney, Mrs Brown Young, prepared an agreement of sale and Mr Rodney signed it on behalf of NHP. Mr Chisholm refused to sign because he believed the land was subject to a lease with an option to renew and to purchase. He also considered that the offer was far too low. It seems, however, that John then entered into discussion with NHP regarding the sale. Mr Chisholm became aware of these negotiations. He had also been informed that John and Frank had purported at a board meeting of the company held on 24 November 1981 to appoint John as managing director and to dismiss him, Mr Chisholm. He wrote to NHP on 12th January 1982 informing them that he was "the appointed legal Managing Director" and shareholder of the company and that John and Frank were not shareholders or directors and that NHP should not negotiate with them for the purchase of Lot 3A. What action, if any, NHP took after receipt of that letter is not clear. It seems that Mr Vincent Chen, an attorney-at-law and partner in the firm of Clinton Hart & Co, representing, or purporting to represent, the appellant, prepared an agreement in almost identical terms to Mrs Brown Young's whereby the appellant agreed to sell and NHP to purchase Lot 3A for the sum of $184,000 payable by way of a deposit of $62,000 on

the signing of the agreement and the balance on or before 31 March 1982. John signed this agreement on 17 February 1982, giving no indication of the capacity in which he signed on the company's behalf nor of the position he held in the company. It is the validity of this agreement that lies at the heart of this appeal.

7.      When completion did not take place as scheduled, Mr Chen, who under the terms of the agreement had carriage of the sale, wrote to NHP's attorneys informing them that: "We have consulted with Mr John Phelan, the Managing Director and duly authorised agent of the company who has authorised us to advise you that your client may take possession of the land purchased under the Agreement for Sale." NHP continued in occupation. In due time a sewage treatment pond and treatment plant was built on part of the land beyond the tennis courts. By a deed of assignment dated 20th December 1989 NHP assigned the agreement to Linval Ltd which in turn assigned the agreement to the respondent on 22nd May 2000.

8.      A judgment of Edwards J in other litigation cleared the way for the appellant to give good title to the purchaser and in August 2001 the respondent requested the appellant to take immediate steps to bring the agreement to completion by the execution of a transfer of Lot 3A in the respondent's favour in exchange for the balance of the purchase price net of the deposit of $62,000 due to the appellant under the agreement. Mr Chisholm, describing himself as "chairman and managing director" of the appellant asserted in response that neither the appellant nor "its legally appointed managing director from January 1973" was a party to "any purported agreement of sale" to NHP. As a result there was more litigation, this time a claim by the respondent against the appellant for specific performance of the agreement. In its defence to that claim the appellant challenged John's authority to sign the agreement as well as the efficacy of the chain of assignments pursuant to which the respondent claimed to be entitled to maintain the action against the appellant. There is, therefore, an obvious overlap between the issues in that suit and this claim and, as the Court of Appeal observed, it is not at all clear, and no reason was given, as to why that action had not been brought on for trial.

9.      This claim for possession commenced on 24th October 2002 after the appellant served notice to quit. The defence pleaded the respondent's entitlement to be registered as the proprietor of the land by virtue of the agreement of 17th February 1982, the benefit of which had been assigned to the respondent as set out above. By an amendment the respondent alleged that as it and its predecessors had been in continuous possession of the land since 1982, the appellant was barred by section 3 of the Limitation of Actions Act from bringing any action for the recovery of the land and that any right or title to the land had been extinguished by section 30 of that Act. Another curiosity of this litigation is that no reply was filed but in its pre-trial memorandum the appellant indicated that it would contend that the respondent was not entitled to rely on the agreement because at the material time John was not authorised to sign any agreement on the appellant's behalf, that the agreement was statute barred and that the respondent was not a proper assignee of NHP.

10.     The trial was before Hibbert J for 5 days in July and 4 days in November 2006 and a day in January and February 2007. Hibbert J gave judgment on 20th February 2009. He concluded that:

> "The evidence presented to the Court, particularly the contents of the Annual Returns made to the Registrar of Companies and the minutes of the meetings of the Board of Directors clearly demonstrates that at the time of the agreement for sale, John Phelan III was regarded by N.F.R. as a director of the company."

He held further that even if there was a defect in the appointment or qualification of John Phelan III the acts of a director or manager were nonetheless valid notwithstanding any defect that might afterwards be discovered in his appointment or qualification by virtue of section 172 of the Companies Act 1965. He concluded:

> "Moreover, I am of the opinion that the ratification of the Agreement for Sale at the meeting of the Board of Directors held on 21st June 1982 should lay to rest any question as to the validity of the Agreement for Sale."

He was satisfied that the agreement had been validly assigned. He dismissed the argument that the respondent was affected by laches and he accordingly found that the respondent was not a trespasser but was entitled to possession.

11.     Four issues were raised in the appeal to the Court of Appeal:

      i)      the validity of the agreement;

      ii)     the effect of the assignments;

      iii)    the position of the respondent as occupiers of Lot 3A; and

      iv)    the question of laches and limitation.

The Court of Appeal held that the assignments were valid, that the respondent was not a trespasser, that limitation had not been pleaded by either party so it was not clear how it would arise on the facts of this case and that there was no basis for the appellant's "distinctly obscure statement … that "the purchaser is guilty of laches, and the contract would be outside the limits permitted by the statute of limitations"."

12.     Morrison JA giving the lead judgment with which Panton P and Phillips JA agreed, held at [36]:

4

> "Although the evidence does not point directly to his [John's] reappointment as a director, there was, it seems to me, considerable evidence to suggest that, by the time of the signing of the agreement in 1982, Mr Phelan was regarded, treated and held out by NFR as a director of the company."

As for the argument that section 172 served to validate John's acts, he held:

> "[40] In the instant case, there being no evidence whatever of any purported (or defective) reappointment of Mr Phelan as a director in the post-1974 period, I therefore agree with Miss Davis [counsel for the appellant] that section 172 cannot apply in these circumstances."

But that was not the end of the matter because:

> "[44] … by its representation to the world at large in the successive annual returns filed with the Registrar of Companies that Mr Phelan was a director of NFR during the relevant period, the company is estopped from denying to IHJ that he had the authority to enter into the agreement on behalf of the company."

Finally, he agreed with Hibbert J's conclusion that:

> "[46] … The actions of Mr Phelan were validly ratified and the agreement properly approved by the Board at its meeting of 21st June 1982."

The appeal was dismissed accordingly.

## *The issues on this appeal*

13.   Much of what was in dispute has fallen by the wayside during the long progress of this case through the courts. All that is left are the issues of John's authority to enter into a contract of sale; alternatively the issue of ratification.

## *Authority*

14.   To quote Diplock LJ from his seminal judgment in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, 502:

> "It is necessary at the outset to distinguish between an 'actual' authority of an agent on the one hand, and an 'apparent' or 'ostensible' authority on the other. Actual authority and apparent authority are quite independent of one another. Generally they co-exist and coincide, but either may exist without the other and their respective scopes may be different."

### *Did John have the actual authority of the company to act on its behalf?*

15.    A concise description of actual authority is given by Lord Denning MR in *Hely-Hutchinson v Brayhead Ltd* [1967] 1 QB 549, 583:

> "… actual authority may be express or implied. It is express when it is given by express words, such as when a board of directors pass a resolution which authorises two of their number to sign cheques. It is implied when it is inferred from the conduct of the parties and the other circumstances of the case, such as when the board of directors appoint one of their number to be managing director. They thereby impliedly authorise him to do all such things as fall within the usual scope of that office."

16.    Article 87 of the Articles of Association of the company provides that the business of the company shall be managed by the directors but under article 118 the directors may entrust to or confer upon a managing director all or any of the powers exercisable by them. In considering whether or not John had any *express* authority, it does not much matter whether or not he was a director since an ordinary member or employee of the company may be expressly authorised by the board or the managing director to transact company business, even to enter into a contract for the sale of the company's land. There is, however, no evidence whatsoever that John was given any such express authority pursuant to any resolution passed by the board.

17.    He may have had implied authority if he were, as he said he was, the duly appointed managing director of the company as at 17th February 1982 when he signed the agreement on the company's behalf. Leaving aside for the moment the question whether he was duly re-appointed a director of the company after his bankruptcy, he was not its managing director as at that time. That office was held by Mr Chisholm who was appointed on 26th January 1973 when Mr Charles Swann was relieved of his duties as manager and it was decided to appoint Mr Chisholm as manager of the company with immediate effect. At a meeting of the directors held on 22nd February 1973 it was resolved:

> "8. … that the managing director of New Falmouth Resorts Ltd, Mr J. Henry Chisholm, shall have the absolute authority of his Co-

Director/Directors and the company as from the date of this meeting to:-

> (a) Sign Contracts and Transfers for the purchase of real estate, for the company and for the sale of real estate owned by the company. …

> 11. … Mr J. Henry Chisholm shall have the absolute authority as from the date of this meeting to carry negotiations for the sale of real estate and other assets owned by the company, determine the sale price thereof and pay commissions thereon, for and on behalf of the company."

It is convenient now to note that at that meeting David was elected chairman and it was resolved that he should have:

> "the absolute Authority of his Co-Director/Directors and the company as from the date of this meeting to remove the Managing Director of New Falmouth Resorts Ltd without any prior notice; if, the Managing Director fails to carry out satisfactorily the duties as Managing Director, and to immediately appoint a successor."

18.    By virtue of article 116 of the Articles of Association a director appointed to the office of Managing Director would not, whilst holding that office, be subject to retirement by rotation or to be taken into account in determining the rotation of retirement of other directors. His appointment would, however, be determined automatically if he ceased from any cause to be a director.

19.    The annual return for the company made up to 24th October 1972, i.e. before Mr Chisholm was appointed, was filed on 10th February 1973 but thereafter there is a woeful failure to comply with the company's obligations to file returns and absent any evidence that he had ceased to be a director, it must be assumed that Mr Chisholm continued in office as the company's managing director.

20.    A handwritten document entitled "Minutes of the Board Meeting of November 24th 1981 between Frank D. Phelan and John H. Phelan III" may be some evidence to the contrary. That document records that:

> "We have decided to appoint John H. Phelan III managing director of New Falmouth Resorts Ltd. Mr Jim Chislom (sic) is not any longer with the above mentioned company."

7

The document appears to have been signed by John and Frank. It certainly suggests that the company had been treating him as the Managing Director at that time but in other respects it is a document of questionable validity. At a meeting of the Board held on Monday June 21st, 1982 under the heading "Minutes of Last Meeting" the chairman, David, sought to obtain confirmation of the "Directors' meeting held on November 24th 1981" but the minutes then record that "Mr Chisholm raised objections and the chairman withdrew his request. The minutes of May 28th 1976 were taken by the meeting as the last properly constituted minutes of the company." In the light of those minutes, the purported dismissal of Mr Chisholm can be ignored. The minutes of the meeting of 21 June were signed by David as chairman but there is another document where each of David, John, Frank and Mr Chisholm signed above their typed name and the word "director" was then written alongside their signature. The document states that:

> "the undersigned being directors of New Falmouth Resorts Limited do hereby waive all requirements as to the length of time for the holding of a Directors' Meeting and all formalities in relation to the giving of notice in respect of the said meeting" [to be held on 21st June 1982].

21.    At that meeting it was resolved by three votes to one, Mr Chisholm being the dissenting voter, that John be appointed managing director "as of November 24th 1981, the date when Mr James H. Chisholm was dismissed from the post." The retrospective effect of that resolution will be discussed in due time when ratification is considered. The important point is that the minutes acknowledge that it was Mr Chisholm who was in fact in office as Managing Director when the agreement of sale was signed in February 1982, not John.

22.    John may have described himself in the negotiations for the sale as managing director but his own assertion cannot confer authority on him: it is the board's actions which give rise to the necessary implication. There is no evidence that Mr Chen, the attorney, was authorised to describe John as the managing director when later giving the licence to occupy. In those circumstances, it is impossible to see how John could claim to be clothed with implied actual authority to sign the agreement of sale.

### Did John have ostensible authority?

23.    The judgment of Diplock LJ in *Freeman & Lockyer* has stood the test of time. He said at 503-505:

> "'apparent' or 'ostensible' authority … is a legal relationship between the principal and the contractor created by a representation, made by the principal to the contractor, intended to be and in fact acted upon by the contractor, that the agent has authority to enter on behalf of the

principal into a contract of a kind within the scope of the 'apparent' authority, so as to render the principal liable to perform any obligations imposed upon him by such contract. … The representation, when acted upon by the contractor by entering into a contract with the agent, operates as an estoppel, preventing the principal from asserting that he is not bound by the contract. …

The representation which creates 'apparent' authority may take a variety of forms of which the commonest is representation by conduct, that is, by permitting the agent to act in some way in the conduct of the principal's business with other persons. By so doing the principal represents to anyone who becomes aware that the agent is so acting that the agent has authority to enter on behalf of the principal into contracts with other persons of the kind which an agent so acting in the conduct of his principal's business has usually 'actual' authority to enter into. …

The commonest form of representation by a principal creating an 'apparent' authority of an agent is by conduct, namely, by permitting the agent to act in the management or conduct of the principal's business. Thus, if in the case of a company the board of directors who have 'actual' authority under the memorandum and articles of association to manage the company's business permit the agent to act in the management or conduct of the company's business, they thereby represent to all persons dealing with such agent that he has authority to enter on behalf of the corporation into contracts of a kind which an agent authorised to do acts of the kind which he is fact permitted to do usually enters into in the ordinary course of such business. The making of such a representation is itself an act of management of the company's business. Prima facie it falls within the 'actual' authority of the board of directors, and unless the memorandum or articles of the company either make such a contract ultra vires the company or prohibit the delegation of such authority to the agent, the company is estopped from denying to anyone who has entered into a contract with the agent in reliance upon such 'apparent' authority that the agent had authority to contract on behalf of the company."

24.     There was nothing on the face of the contract for sale to indicate what position John held in the company. He was certainly not held out as the managing director. Hibbert J found and the Court of Appeal accepted that there was considerable evidence to suggest that by the time of the signing of the agreement in 1982 John was "regarded, treated and held out by NFR as a director of the company". He was named as a director in the 1972 annual return even though his own evidence was that he resigned in 1971 but no further return was filed until the annual return was made for the year ending 31st December 1981. He was named as a director in that return and again in the return for the year ending 31st December 1982. The Court of Appeal relied on those returns to

9

justify their conclusion that he was a director during the relevant period and so the company was estopped from denying that he had authority to enter into the agreement. The difficulty about that conclusion is that the 1981 and 1982 returns were not filed until 7th February 1992, a decade and more after the contract was made. The representations contained in those late returns could not have been made with the intention that that they be acted upon or that they were in fact acted upon by the purchaser. Mr Chisholm's letter denouncing John may be another reason, not discussed in the courts below, for doubting whether NHP relied on John's assertions that he was the true managing director. There is no other conduct other than the returns for 1981 and 1982 capable of constituting the representation by the company necessary to create some apparent authority vesting in John as a mere director to enter into contracts on the company's behalf.

25.    There is, moreover, an even more fundamental hurdle to overcome. As set out above, John on his own admission ceased to be a director in 1971. He was made bankrupt in 1972 with the consequence that he was disqualified from holding office. He was discharged from bankruptcy in 1974 but there is absolutely nothing to show that he was re-appointed except for his signing the dubious minute in November 1981 and his attending the important meeting in June 1982 and signing in as "Director". There is nothing to show when or by whom he was re-elected. The Court of Appeal was, therefore, correct in concluding that there was "no evidence whatever of any purported (or defective) reappointment of Mr Phelan as a director in the post-1974 period." Section 172 of the Companies Act 1965, which was in force at the time, to the effect that "the acts of a director or manager shall be valid notwithstanding any defect that may afterwards be discovered in his appointment or qualification" cannot rescue John because the section "cannot be utilized for the purpose of ignoring or overriding the substantive provisions relating to such appointment", per Lord Simonds in *Morris v Kanssen* 1946 A.C. 459, 472. The Court of Appeal was right to conclude that where "the evidence pointed to non-appointment of the affected persons as directors, rather than to a defective appointment," then section 172 could not be prayed in aid to validate their appointments.

26.    In those circumstances, it cannot be said that John had ostensible authority to bind the company.

### *Did the company, nevertheless, ratify the sale?*

27.    At the crucial meeting of the Board on June 21st 1982 the sale of the land to National Hotels and Properties came up for discussion and Mr Chen, attorney-at-law, who was representing the Phelan family confirmed that there was a sale agreement signed by John. The minutes of the meeting record:

> "The meeting at three to one voted to approve the following resolution moved and seconded by Messrs David and Frank Phelan respectively.

RESOLVED

That the sale agreement dated February 17th, 1982 and presented at this meeting be approved and that the authority vested in John Phelan by the board of directors to act for and on behalf of the board in such transaction be endorsed."

The dissenting voice was Mr Chisholm's. In this appeal both John's and Frank's appointments as directors have been questioned. If neither was validly appointed, voting would have been split between David and Mr Chisholm and article 106 provides that: "In case of an equality of votes, the chairman [David] shall have a second or casting vote." It is submitted by Ms Tracy Angus QC for the appellant that it is apparent on the face of the resolution that the chairman did not consider the need to cast and did not cast a second vote. If Frank were a properly appointed director, that interesting argument need not be considered.

28.    Frank was appointed a director on July 6th 1970 at a meeting of the directors, John, Mr Charles Swann and Mr Hugh Hart, whose firm of attorneys were acting for the company at that time. The annual return made up to 28th July 1971, signed by Mr Hart and filed on 3rd January 1972, shows Frank as a director. So does the return to 24th October 1972 signed by Mr Hart and lodged with the registrar on 10th February 1973. It thus seems that he was re-elected at the next following annual general meeting after his appointment would have automatically expired pursuant to article 104. It is true that there is no record of Frank having been re-elected at the next following annual general meeting, but the company's records as to such meetings were exiguous, and subsequent documentary evidence strongly suggests that he was duly re-elected as a director. The returns for December 1981 and December 1982 albeit belatedly filed in 1992 as already set out above still show Frank as a director. Unlike John, there was no supervening event which would have disqualified Frank from holding office. Under the articles of association one third of the directors must retire each year but under article 100 a retiring director is eligible for re-election. Article 101 provides that the company at the meeting at which a director retires may fill the vacated office by electing a person thereto but in default the retiring director shall if willing to continue in office be deemed to have been re-elected unless at such meeting it is expressly resolved not fill such vacated office or unless a resolution for the re-election of such a director shall have been put to the meeting and lost.

29.    In conclusion on this issue, there is a document recording Frank's election in 1970, there are a number of subsequent formal documents recording him as a director (see paras 20, 27 and 28 above), he was competent to continue as a director, there is no resolution declining to re-elect him, he behaved as if he were a director, and the only reason for doubting whether he was a director in 1982, the absence of a document formally recording his re-election, is explicable by the very limited and patchy nature of the company's record-keeping. In those circumstances the proper conclusion to be drawn, at any rate on the unusual facts of this case, is that Frank had not ceased to be a director before the end of 1982. In those circumstances there is nothing to suggest that

Frank ceased to be a director. If he was in post on June 21, 1982, then the resolution approving the sale agreement was properly passed by a majority of at least 2-1 and no casting vote was needed to carry the resolution.

*Conclusion*

30.     The Court of Appeal was, therefore, correct to decide that "the acts of an agent on behalf of the principal outside his actual authority may be adopted and ratified" and that "if there is ratification, it has retrospective effect, i.e. it renders the transaction with the company binding on it from the time it was entered into by the agent." There was a clear ratification of the contract for the sale of Lot 3A to NHP which cures any original want of authority for John to have entered into it as he did. The sale is valid. The respondent is entitled to possession of the land and the appellant's claims were rightly dismissed. For that reason the Board will humbly advise Her Majesty to dismiss the appeal with costs.

# Case Law 11

**Massey (trading as Massey Bailey, Solicitors & Consultants) v Wales [2003] NSWCA 212**

NEW SOUTH WALES COURT OF APPEAL

CITATION:    Massey & Anor. v. Wales & Ors; Massey & Anor. v. Cooney & Anor.
[2003]  NSWCA 212


FILE NUMBER(S):
40521/02 and CA40794/02

HEARING DATE(S):        7 May 2003 and 27 June 2003

JUDGMENT DATE:        04/08/2003

PARTIES:
Daniel Massey and Marion Bailey t/as Massey Bailey, Solicitors & Consultants -
claimants
John Andrew Wales - 1st opponent
Downunder Pty. Ltd. - 2nd opponent
Eli Barel - 3rd opponent
Damiz Pty. Limited - 4th opponent
Isaac Barel - 5th opponent
Dennis Cooney - 6th opponent
Zimmerman Holdings Pty. Ltd. (In Liq) - 7th opponent
Yaqob Rajwan - 8th opponent
Baruch Rajwan - 9th opponent

JUDGMENT OF:      Meagher JA Beazley JA Hodgson JA

LOWER COURT JURISDICTION:        Supreme Court - Equity Division

LOWER COURT FILE NUMBER(S):      ED4586/01 and ED5093/01

LOWER COURT JUDICIAL OFFICER:   Bryson J

COUNSEL:
Mr. J. Gleeson SC with Mr. P. Walsh for claimants
Mr. S. Gibb SC for 1st-5th opponents
Mr. D. Williams with Mr. I. Griseti for 6th opponent
Mr. J. Darvall for Mr. Cooney

SOLICITORS:
Turtons, Sydney for claimants
McClellands, Sydney for 1st-5th opponents
Riley Gray-Spencer for 6th opponent
Ashlars, Sydney for Mr. Cooney

CATCHWORDS:

CORPORATIONS - Management - Deadlock of board of directors - Reserve powers of general meeting - Whether general meeting can authorise commencement of legal proceedings.

LEGISLATION CITED:
Corporations Act 2001 ss.236-7, 239, 1322

DECISION:
1. Leave to appeal granted. 2. Direct filing of Notice of Appeal within 14 days. 3. Appeal dismissed with costs.


JUDGMENT:

- 27 -
**IN THE SUPREME COURT**
**OF NEW SOUTH WALES**
**COURT OF APPEAL**

**CA 40521/02**
**CA 40794/02**
**ED 4586/01**
**ED 5093/01**

**MEAGHER JA**
**BEAZLEY JA**
**HODGSON JA**

**Monday 4 August 2003**

**MASSEY & ANOR.  V.  WALES & ORS.**
**MASSEY & ANOR.  V.  COONEY & ANOR.**


**Judgment**

1      **MEAGHER JA**:  I agree with Hodgson JA.

2      **BEAZLEY JA:**  I agree with Hodgson JA.

3      **HODGSON JA:**  On 14 September 2001, proceedings No. 4586 of 2001 in the Equity Division were commenced by solicitors Massey Bailey in the name of Zimmerman Holdings Pty. Ltd. (ZH) against John Wales, Downunder Pty. Limited and Eli Barel.  A fourth defendant, Damiz Pty. Limited was added by amendment on 26 September 2001.  Two further defendants, Isaac Barel and Dennis Conney were added later.  A Statement of Claim filed 23 October 2001 joined Yaqob Ragwan and Baruch Rajwan as second and third plaintiffs.

4      On 28 September 2001, a statutory demand was served on ZH by Dennis Cooney, and on 17 October 2001, proceedings No. 5093 of 2001 in the Equity Division were commenced by Massey Bailey in the name of ZH against Mr. Cooney, seeking to set aside that statutory demand.

5      On 22 February 2002, Eli Barel commenced proceedings No. 1639 of 2002 in the Equity Division seeking to wind up ZH on the ground of oppression and on the just and equitable ground.

6      On 5 March 2002, Yaqob Rajwan filed a Notice of Motion in proceedings No. 4586 of 2001 seeking leaving to intervene in those proceedings for the purpose of taking responsibility of behalf of ZH for those proceedings (Corporations Act s.236).

7      On 3 April 2002, Mr. Cooney filed a Notice of Motion in proceedings No. 5093 of 2001 challenging the retainer of Massey Bailey, and seeking an order that the proceedings be dismissed as incompetent and an order that Massey Bailey pay Mr. Cooney's costs of the proceedings.

8      That Notice of Motion was part-heard by Master McLaughlin on 3 and 4 April 2002, and then adjourned to 18 April 2002.  On 18 April 2002, ZH (or Massey Bailey on its behalf) sought an adjournment until after a meeting of shareholders of ZH, proposed to be held on 6 May 2002.  That application was refused, and Master McLaughlin completed the hearing and reserved his decision.

9      On 3 May 2002, Master McLaughlin delivered his reserved judgment, in which he dismissed the proceedings No. 5093 of 2001 as incompetent, and ordered Massey Bailey to pay Mr. Cooney's costs of those proceedings.

10     At a meeting of shareholders of ZH on 6 May 2002, a resolution was carried in the following terms:

> *Ratification of the appointment of Massey Bailey, Solicitors as solicitors for Zimmerman Holdings Pty. Limited in relation to the proceedings numbered 4586 of 2001, 5093 of 2001, 1636 of 2002 and 1639 of 2002 issued in the Supreme Court and proceedings No.1437 of 2001 in the District Court.*

11     Between 6 May 2002 and 17 May 2002, three Notices of Motion were filed by various defendants in proceedings No.4586 of 2001, seeking orders that the proceedings be dismissed as incompetent and that Massey Bailey pay the defendants' costs of those proceedings; and on 16 May 2002, Massey Bailey filed a Notice of Motion in proceedings No.4586 of 2001 for orders pursuant to s.1322(4) of the Corporations Act to the effect that ZH's act in retaining Massey Bailey for the purposes of these proceedings was "not invalid".  Similar orders were sought by a Notice of Motion dated 16 May 2002 by Yaqob Rajwan and Baruch Rajwan.

12     On 16, 17, 20, 22 and 23 May 2002, the various Notices of Motion in proceedings No.4586 of 2001 and No. 1639 of 2002 were heard by Bryson J.  He gave the principal judgment on 22 May, and on that day he made the following orders:

> 1.    *On the sixth defendant's Notice of Motion of 6 May 2002, the first and second defendants' Notice of Motion of 10 May 2002 and the third, fourth and fifth defendants' Notice of Motion of 16 May 2002 I order that the allegations and claims of the first plaintiff be dismissed as incompetent.*
>
> ...
>
> 4.    *In proceedings 4586 of 2001 the Notice of Motion of Massey Bailey Solicitors dated 16 May 2002 is dismissed with costs.*
>
> 5.    *In proceedings 4586 of 2001 the Notice of Motion of the second and third plaintiffs dated 17 May 2002 is dismissed with costs.*
>
> 6.    *In proceedings 1639 of 2002, the Notice of Motion of Massey Bailey Solicitors dated 16 May 2002 is dismissed with costs.*

The first order I have given in the form to which it was amended on 23 May 2002.

13      On 24 May 2002, Bryson J ordered in proceedings No.1639 of 2002 that ZH be wound up and that Neil Cussen be appointed liquidator.

14      On 31 May 2002, Bryson J ordered that Massey Bailey pay the costs of the defendants in proceedings No. 4586 of 2002 on an indemnity basis, and that the Rajwans pay Massey Bailey the costs of the defendants, liability for which falls on Massey Bailey.

15      Meanwhile, on 28 May 2002 Massey Bailey had filed an application for leave to appeal from the judgment of Master McLaughlin dated 3 May 2002.  This was removed to the Court of Appeal by Campbell J on 4 September 2002.

16      On 20 September 2002, Massey Bailey filed an application for leave to appeal from Bryson J's decision of 31 May 2002 and from so much of his decision of 22 May 2002 as provided a basis for that decision; and also for an extension of time.

17      This Court has heard both applications for leave, on the basis that, if leave is granted, the appeals will be decided without further argument.

### CIRCUMSTANCES
18      As from 7 February 2001, ZH had two directors, Eli Barel and Yaqob Rajwan; and its 100 shares were held by Eli Barel (34 shares), Yaqob Rajwan (33 shares) and Baruch Rajwan (33 shares).

19      On 28 August 2001, Yaqob Rajwan held a purported meeting of directors of ZH, of which no notice had been given to Eli Baruch and at which only he was present.  He purported to pass a resolution that Baruch Rajwan be appointed a director of ZH; and this purported appointment was notified to and recorded by ASIC.  However, Article 73 of ZH's Articles of Association provided to the effect that the presence of two directors was necessary to constitute a quorum for a board meeting; so this purported appointment was invalid, and Eli Baruch and Yaqob Rajwan remained the only two directors of ZH.

20      The primary judge found to the effect that the Board of ZH was at this time in a state of deadlock; and it seems clear that this continued until the hearing before the primary judge.

21      On 10 September 2001, the two Rajwans gave instructions to Massey Bailey to commence the proceedings No. 4586 of 2001.  Subsequently, they gave instructions to Massey Bailey to commence proceedings No. 5093 of 2001.

22      I have already referred to various Notices of Motion which were determined by Master McLaughlin and Bryson J, and to the resolution passed at the General Meeting of ZH on 6 May 2002.

### ARTICLES AND STATUTORY PROVISIONS
23      Apart from Article 73, to which I have referred, Article 58 and Article 66(1) and Article 66(2) of ZH's Articles of Association are relevant to this appeal.  Those Articles are as follows:

> 58.     *The Director(s) or the Company in a General Meeting may at any time appoint any person to be a Director, either to fill a casual vacancy or as an addition to the Board.*
>
> ...
>
> 66(1)    *Subject to the Law and to any other provisions of these Regulations, the business of the Company shall be managed by the Director(s), who may pay all expenses incurred in promoting and forming the Company, and may exercise all*

*such powers of the Company as are not, by the Law or by these Regulations, required to be exercised by the Company in General Meeting.*

*66(2)    Without limiting the generality of Sub-Regulation (i), the Director(s) may exercise all the powers of the Company to borrow money, to charge any property or business of the Company or all or any of its uncalled capital and to issue debentures or give any other security for a debt, liability or obligation of the Company or of any other person.*

24    The provisions of the Corporations Act 2001 of relevance to these proceedings are ss.236-7, 239 and 1322.  Those sections are as follows:

*236(1)    A person may bring proceedings on behalf of a company, or intervene in any proceedings to which the company is a party for the purpose of taking responsibility on behalf of the company for those proceedings, or for a particular step in those proceedings (for example, compromising or settling them), if:*

*(a)    the person is:*

  *(i)    a member, former member, or person entitled to be registered as a member, of the company or of a related body corporate; or*

  *(ii)    an officer or former officer of the company; and*

*(b)    the person is acting with leave granted under section 237.*

*(2)    Proceedings brought on behalf of a company must be brought in the company's name.*

*(3)    The right of a person at general law to bring, or intervene in, proceedings on behalf of a company is abolished.*

*Note 1: For the right to inspect company books, see subsections 247A(3) to (6).*

*237(1)    A person referred to in paragraph 236(1)(a) may apply to the Court for leave to bring, or to intervene in, proceedings.*

*(2)    The Court must grant the application if it is satisfied that:*

*(a)    it is probable that the company will not itself bring the proceedings, or properly take responsibility for them, or for the steps in them; and*

*(b)    the applicant is acting in good faith; and*

*(c)    it is in the best interests of the company that the applicant be granted leave; and*

*(d)    if the applicant is applying for leave to bring proceedings---there is a serious question to be tried; and*

*(e)    either:*

  *(i)    at least 14 days before making the application, the applicant gave written notice to the company of the intention to apply for leave and of the reasons for applying; or*

  *(ii)    it is appropriate to grant leave even though subparagraph (i) is not satisfied.*

*(3)    A rebuttable presumption that granting leave is not in the best interests of the company arises if it is established that:*

*(a)    the proceedings are:*

  *(i)    by the company against a third party; or*

  *(ii)    by a third party against the company; and*

*(b)    the company has decided:*

  *(i)    not to bring the proceedings; or*

  *(ii)    not to defend the proceedings; or*

  *(iii)    to discontinue, settle or compromise the proceedings; and*

*(c)    all of the directors who participated in that decision:*

  *(i)    acted in good faith for a proper purpose; and*

  *(ii)    did not have a material personal interest in the decision; and*

  *(iii)    informed themselves about the subject matter of the decision to the extent they reasonably believed to be appropriate; and*

> > *(iv)   rationally believed that the decision was in the best interests of the company.*

*The director's belief that the decision was in the best interests of the company is a rational one unless the belief is one that no reasonable person in their position would hold.*

*(4)   For the purposes of subsection (3):*

*(a)   a person is a third party if:*

> > *(i)    the company is a public company and the person is not a related party of the company; or*
> > *(ii)   the company is not a public company and the person would not be a related party of the company if the company were a public company; and*

*(b)   proceedings by or against the company include any appeal from a decision made in proceedings by or against the company.*

...

*239(1)   If the members of a company ratify or approve conduct, the ratification or approval:*

*(a)   does not prevent a person from bringing or intervening in proceedings with leave under section 237 or from applying for leave under that section; and*

*(b)   does not have the effect that proceedings brought or intervened in with leave under section 237 must be determined in favour of the defendant, or that an application for leave under that section must be refused.*

*(2)   If members of a company ratify or approve conduct, the Court may take the ratification or approval into account in deciding what order or judgment (including as to damages) to make in proceedings brought or intervened in with leave under section 237 or in relation to an application for leave under that section. In doing this, it must have regard to:*

*(a)   how well-informed about the conduct the members were when deciding whether to ratify or approve the conduct; and*

*(b)   whether the members who ratified or approved the conduct were acting for proper purposes.*

...

*1322(1)   In this section, unless the contrary intention appears:*

*(a)   a reference to a proceeding under this Act is a reference to any proceeding whether a legal proceeding or not; and*

*(b)   a reference to a procedural irregularity includes a reference to:*

> > *(i)    the absence of a quorum at a meeting of a corporation, at a meeting of directors or creditors of a corporation, at a joint meeting of creditors and members of a corporation or at a meeting of members of a registered scheme; and*
> > *(ii)   a defect, irregularity or deficiency of notice or time.*

*(2)   A proceeding under this Act is not invalidated because of any procedural irregularity unless the Court is of the opinion that the irregularity has caused or may cause substantial injustice that cannot be remedied by any order of the Court and by order declares the proceeding to be invalid.*

*(3)   A meeting held for the purposes of this Act, or a meeting notice of which is required to be given in accordance with the provisions of this Act, or any proceeding at such a meeting, is not invalidated only because of the accidental omission to give notice of the meeting or the non-receipt by any person of notice of the meeting, unless the Court, on the application of the person concerned, a person entitled to attend the meeting or ASIC, declares proceedings at the meeting to be void.*

*(3A)   If a member does not have a reasonable opportunity to participate in a meeting of members, or part of a meeting of members, held at 2 or more venues, the meeting will only be invalid on that ground if:*

(a)  the Court is of the opinion that:

    (i)  a substantial injustice has been caused or may be caused; and

    (ii)  the injustice cannot be remedied by any order of the Court; and

(b)  the Court declares the meeting or proceeding (or that part of it) invalid.

(3B)    If voting rights are exercised in contravention of subsection 259D(3) (company controlling entity that holds shares in it), the meeting or the resolution on which the voting rights were exercised will only be invalid on that ground if:

(a)  the court is of the opinion that:

    (i)  a substantial injustice has been caused or may be caused; and

    (ii)  the injustice cannot be remedied by any order of the court; and

(b)  the court declares the meeting or resolution invalid.

(4)    Subject to the following provisions of this section but without limiting the generality of any other provision of this Act, the Court may, on application by any interested person, make all or any of the following orders, either unconditionally or subject to such conditions as the Court imposes:

(a)  an order declaring that any act, matter or thing purporting to have been done, or any proceeding purporting to have been instituted or taken, under this Act or in relation to a corporation is not invalid by reason of any contravention of a provision of this Act or a provision of the constitution of a corporation;

(b)  an order directing the rectification of any register kept by ASIC under this Act;

(c)  an order relieving a person in whole or in part from any civil liability in respect of a contravention or failure of a kind referred to in paragraph (a);

(d)  an order extending the period for doing any act, matter or thing or instituting or taking any proceeding under this Act or in relation to a corporation (including an order extending a period where the period concerned ended before the application for the order was made) or abridging the period for doing such an act, matter or thing or instituting or taking such a proceeding;

and may make such consequential or ancillary orders as the Court thinks fit.

(5)    An order may be made under paragraph (4)(a) or (c) notwithstanding that the contravention or failure referred to in the paragraph concerned resulted in the commission of an offence.

(6)    The Court must not make an order under this section unless it is satisfied:

(a)  in the case of an order referred to in paragraph (4)(a):

    (i)  that the act, matter or thing, or the proceeding, referred to in that paragraph is essentially of a procedural nature;

    (ii)  that the person or persons concerned in or party to the contravention or failure acted honestly; or

    (iii)  that it is just and equitable that the order be made; and

(b)  in the case of an order referred to in paragraph (4)(c) - that the person subject to the civil liability concerned acted honestly; and

(c)  in every case - that no substantial injustice has been or is likely to be caused to any person.

## FIRST INSTANCE DECISIONS

25    There is now no dispute that the Rajwans did not have authority to give instructions on behalf of ZH to Massey Bailey to commence the two sets of proceedings.  The primary question argued on appeal was whether the resolution of the general meeting on 6 May 2002 had the effect of ratifying those instructions, or otherwise authorising the commencement and maintenance of those proceedings.  If it did not, as held by Bryson J, then questions as to the exercise of discretion by Master McLaughlin in refusing the adjournment would not arise.  I will accordingly focus on Bryson J's decision.

26    When Bryson J admitted evidence of the resolution of the general meeting of ZH on 6 May 2002, he limited its use to the application made under s.1322 of the Corporations Act.  He did so on the basis that

the powers of the meeting of shareholders did not extend to resolving on the appointment of solicitors to conduct proceedings or resolving to bring proceedings. The primary judge said that an organ of a company cannot ratify a purported exercise of power unless that exercise of power was within the power of the ratifying organ; and that bringing legal proceedings was not within the power of the general meeting (Article 66).

27      The primary judge rejected a submission for the Rajwans that the general meeting had residual authority to use powers which might otherwise be exclusively vested in directors, as discussed in <u>Alexander Ward & Co. Limited v. Samyang Navigation Co. Limited</u> [1975] 1 WLR 673.

28      The primary judge also rejected an application under s.1322 of the Corporations Act on the basis that the lack of notice to Mr. Barel and the lack of a quorum were not procedural irregularities, and on the basis that it was not just and equitable that an order for validation be made. He also rejected arguments based on delay against dismissing the proceedings as incompetent.

29      He ordered that Massey Bailey pay the defendants' costs of the proceedings on an indemnity basis. He did not apparently expressly consider whether the proceedings could be effectively continued by the Rajwans, except to the extent that he dealt with, or failed to deal with, Yaqob Rajwan's application under s.236 of the Corporations Act filed on 5 March 2002. However, as I have noted, he ordered that the Rajwans pay to Massey Bailey any costs which they had to pay to the defendants.

### GROUNDS OF APPEAL

30      Massey Bailey seek to rely on the following grounds of appeal in relation to Master McLaughlin's decision:

1.  *That the Master erred in refusing to grant an adjournment at the hearing of the proceedings.*
2.  *That the Master erred in failing to recognise that a company in general meeting may effect ratification retrospectively of acts which at the time when they were purported to be done were a nullity, those acts being the appointment of Baruch Rajwan as a director, the retainer of solicitors to institute proceedings on behalf of the company and the institution of those proceedings.*
3.  *That the Master erred in dismissing the proceedings as incompetent and ordering the Appellant to pay costs of the motion and the proceedings.*
4.  *That the Master erred in refusing to grant a stay of his Orders.*

31      They seek to rely on the following of grounds of appeal in relation to Bryson J's decision:

1   *On the question of whether the Appellant should pay the costs of the Respondents:*
a)  *His Honour erred in holding that the resolution of the general meeting of shareholders of Zimmerman Holdings Pty Limited ("the company") passed on 6 May 2002 did not effect a ratification by the company of the proceedings then before his Honour.*
b)  *His Honour erred in holding that only the directors of the company had the power to ratify the proceedings in circumstances where:*
    i)   *the constitution of the company conferred on the directors the power to manage the business of the company and did not confer such power on the shareholders in general meeting; and*
    ii)  *there was a deadlock at board level.*
c)  *His Honour should have held that, in the circumstances:*
    i)   *the shareholders in general meeting had a residual power to ratify the proceedings; and*
    ii)  *the shareholders in general meeting did ratify the proceedings.*
d)  *His Honour should have found that the failure to convene a meeting of the board of the company prior to 6 May 2002 was a procedural*

> *irregularity for the purposes of s 1322 of the Corporations Act 2001,*
> *which did not cause substantial injustice and should have held pursuant*
> *to s 1322(4) that the proceedings brought by the company were not*
> *invalid by reason of the failure to obtain the formal ratification of the*
> *board.*
>
> e)     *His Honour failed to deal with or provide any reasons for not dealing*
> *with the Eighth Respondent's Notice of Motion filed 5 March 2002*
> *seeking leave for the Eighth Respondent to intervene for the purpose of*
> *taking responsibility on behalf of the company for the proceedings.*
>
> f)     *His Honour erred in ordering the Appellants to pay the First to Sixth*
> *Respondents' costs of the proceedings.*
>
> g)     *His Honour erred in finding that the Appellant continued to act for the*
> *company after 3 May 2002.*

32        The respondents other than Mr. Cooney have put on a Notice of Contention, relying on the following grounds:

> *If, contrary to the principal submissions of the Sixth Opponent/Sixth Respondent*
> *it is held that the Eighth Respondent did press his application for leave to*
> *intervene pursuant to s236 and 237 of the Corporations Act, Bryson J was still*
> *correct in making final the draft orders for the dismissal of the proceedings and*
> *the costs orders against the solicitors, because:*
>
> (a)     *the decision as to what was to be done in connection with any possible*
> *cause of action rested with the Liquidator after his appointment;*
>
> (b)     *there was no impediment to the Liquidator prosecuting any cause of*
> *action on behalf of the company if he determined such a course was*
> *appropriate;*
>
> (c)     *the best interests of the company would be considered by the Liquidator*
> *in connection with that decision;*
>
> (d)     *the Eighth Respondent could not show that the company would not itself*
> *bring proceedings (as required by s237(2)(a) of the Corporations Act);*
>
> (e)     *there had already been findings by Bryson J inconsistent with the good*
> *faith requirement contained in s237(2)(b) of the Corporations Act;*
>
> (f)     *the proceedings in respect of which intervention was sought were a*
> *nullity;*
>
> (g)     *the First-Fifth Opponents/Respondents were entitled to the orders which*
> *followed from their successful challenge to the solicitors' retainer.*

33        Mr. Cooney has put on a similar Notice of Contention.

34        There is evidence before this Court that the costs involved in the proceedings are very substantial indeed, running into some hundreds of thousands of dollars.  However, no challenge has been made to the decision of the primary judge on the ground that the defendants did not bring their applications challenging Massey Bailey's retainer promptly, but brought them at a time when enormous costs had already been incurred.  I note also that there was no Notice of Contention put on relying on delay in ratification as an answer to reliance on the resolution of 6 May 2002, or upon possible changes in the financial position of the company between the original instructions and the purported ratification.  Accordingly, it is not necessary for this Court to consider those matters.

35        Also, no argument was advanced to the effect that the primary judge's decision not to validate the purported directors' meeting of 28 August 2001 was incorrect.  There were in substance two issues that were argued, which I will consider in turn:  first, the efficacy of the purported ratification by the resolution of the general meeting on 6 May 2002; and second, the failure of the primary judge to dispose of the s.236 application.

**EFFICACY OF RATIFICATION**

**Submissions**

36      Mr. Gleeson SC for Massey Bailey submitted that the primary judge found that the Board of ZH was deadlocked; and accordingly, he submitted, the general meeting had power to act.  In particular, he submitted, it had power to act in relation to the commencement of Court proceedings.  In support of these propositions, he referred to the following authorities:  Barron v. Potter [1914] 1 Ch. 895 at 902-3; Foster v. Foster [1916] 1 Ch. 532 at 551-2; Danish Mercantile Co. Limited v. Beaumont [1951] 1 Ch. 680 at 686-7; Alexander Ward at 427-9 and 432-3; Winthrop Investments Limited v. Winns Limited [1975] 2 NSWLR 666 at 673-4 and 682-4; Entsch v. Mr. Crocodile Pty. Limited (1990) 3 ACSR 720; Poliwka v. Heven Holdings Pty. Limited (1992) 6 WAR 505 at 518; Victoria Teachers Credit Union Limited v. KPMG [2000] 1 VR 654 at 662; Gower, The Principles of Modern Company Law, 2nd Ed. (1957) pp.127 and 508, and 6th Ed. (1997) pp.187-8 and 707; Ford's Principles of Corporations Law, par.7.130; and Palmer's Company Law, par.8.801.

37      Mr. Williams for Mr. Cooney (in proceedings No.4582 of 2001) submitted that, quite apart from any questions of the power of the general meeting, the terms of the resolution, referring as they did to the appointment of solicitors, were not adequate to ratify the commencement of proceedings.

38      Next, Mr. Williams submitted that, subject to whatever was the correct principle concerning reserve powers of the general meeting, the general meeting did not have power to take a management decision, such as commencement of court proceedings:  Automatic Self-Cleansing Filter Syndicate Co. Limited v. Cunninghame [1906] 2 Ch. 34; Gramophone and Typewriter Limited v. Stanley [1908] 2 KB 89; and Quin & Astens Limited v. Salmon [1909] AC 442; Kraus v. J.G. Lloyd Pty. Limited [1965] VR 232 at 236-7.

39      Mr. Williams submitted that the general meeting had a reserve power to act, when the Board was unable to act, only where this was a matter of necessity; and where, as here, the general meeting could resolve the matter by appointing additional directors (Article 58) there was no implied or reserve power to do anything else.  In any event, the content of the reserve power was in general only such that the general meeting could act by constituting a Board which was able to act.

40      Mr. Gibb SC for the other opponents adopted Mr. Williams' submissions.  He pointed out that the case of Marshall's Valve Gear Co. Limited v. Manning Wardle & Co. Limited [1909] 1 Ch. 267, which suggested there was a power in the general meeting to authorise the commencement of proceedings, was decided before Quin and should be considered as overruled or disapproved by Quin.

41      Mr. Darvall for Mr. Cooney in proceedings No.5093 of 2001 also adopted Mr. Williams' submissions.  He also submitted that, in any event, no error was shown in the exercise of Master McLaughlin's discretion.

42      In reply, Mr. Gleeson submitted that Article 58 did not exclude the existence of a reserve power in the general meeting:  he submitted that the Articles of Association of the companies involved in cases such as Barron had a power in the general meeting to remove directors and replace; and nevertheless a reserve power was held to exist.  Furthermore, he submitted, the reserve power was not limited to the appointment of new directors:  this would not necessarily remove a deadlock, and in any event, unless and until it did so, in the absence of a reserve power the company would be without any organ able to exercise any management functions.  The law would not countenance that this would be the situation: cf. Alexander Ward at 427-9, 432-3.  An article conferring powers of management on a board of directors does not thereby prohibit any exercise of that power by the general meeting.

**Decision**

43      Dealing first with Mr. Williams' first point, in my opinion the resolution that was passed sufficiently manifested an intention to ratify the commencement of proceedings.  If the general meeting did have power to do this, the wording of the resolution was adequate to achieve this end.

44      Turning to the main point, I will later be referring in some detail to the text books to which we have been referred and also some of the authorities; and it will be seen that in general terms, the text writers are somewhat tentative in the views they express and somewhat uncertain as to the principles that are involved; and it will be seen that the authorities are also somewhat unclear as to the principles being applied.  In those circumstances, I propose to take the course of first discussing the question on the basis of principle, and then considering whether the views I express are consistent with the authorities.

45      Where, as is usual, the Articles of Association of a company provide that the business of the company is to be managed by the directors, there is generally no power in the general meeting to make management decisions or to control or direct the board of directors in the management of the company:  see Automatic Self-Cleansing, Gramophone & Typewriter and Quin.  In general terms, this applies to the commencement of legal proceedings, just as to any other aspect of management of the company's business: Kraus.

46      Furthermore, there is reason to see this as a significant aspect of the contract between the members constituted by the memorandum and articles of the company.  It is of significance that management of the company should be by a body of persons who each have a fiduciary duty to act in the interests of the company as a whole, rather than a body where the majority is free to favour its own interests over those of the minority.  The general meeting does have power to approve transactions undertaken by directors which might otherwise be a breach of fiduciary duty; but this requires that there be full disclosure by the board to the general meeting, and it is also subject to the requirement that there not be "fraud on the minority" or oppression.  Despite this power in the general meeting, it is reasonable to see the entrusting of management to a body of persons subject to fiduciary duties to act in the interests of the company, as a whole, as giving greater protection to minority shareholders than they would have if the general meeting could simply make majority decisions on management matters.

47      I have stated a general position; and there is strong authority that this is subject to a qualification to the effect that, where the board is unable or unwilling to act, the general meeting does have some kind of reserve power.  In my opinion, the source of this reserve power must be considered a matter of implication or presumed intention of the members, on the basis of business efficacy or necessity.  It seems reasonable to say that it could not have been the intention of the members, and could not have been the intention of the memorandum and articles of association, that the company be rendered powerless to act in circumstances where the board is unwilling or unable to act.  However, especially where the articles contain an express power to appoint additional directors, as in this case, it does not seem to me reasonable to regard a deadlock arising from disagreement between the only two board members as giving rise to any general power of management, when the deadlock can be resolved by the general meeting exercising its power to appoint additional directors.  It may be that, even if the articles do not provide for the appointment by general meeting of additional directors, the power which the general meeting has to remove directors and replace them with other directors would itself be sufficient to prevent the implication of any general reserve powers in the general meeting to undertake management decisions.

48      Mr. Gleeson argued that this approach does not deal with the question of management of the company in the period between the time when the deadlock or other inability or unwillingness of the Board to act arises, and the time when a newly constituted Board is able to undertake management functions.  In my opinion, except in cases where there is unanimity among the members, that argument has little force, because, unless there is unanimity, a general meeting can only act when it is called with proper notice.  There would thus be no period of time before the general meeting could re-constitute the Board, in which the general meeting could itself make management decisions.  That may leave some circumstances in which, as a matter of business efficacy or necessity, some term could be implied by which a general meeting could exercise emergency powers, namely, where an urgent decision is required and the members are unanimous, or where no-one ready, willing and able to accept an appointment as director, so as to resolve a deadlock, could be found.

49      In the present case, it seems to me that the general meeting could have appointed additional directors on 6 May 2002; and the Board so constituted would then have had power to ratify the

commencement of proceedings. However, in those circumstances the directors would have been subject to fiduciary duties to the company, and would have had to take into account that, in ratifying the commencement of proceedings, they were for the first time making the company potentially liable for very large costs to its own solicitors, and also subjecting it to the risk of very substantial costs payable to the other parties to the proceedings. The decision would also have had possible implications in relation to insolvent trading, and the situation could have been one where the fiduciary duties of the directors would have required them to have considered the interests of creditors of the company. Although no independent argument was put on the basis of Kinsela v. Russell Kinsela Pty. Limited (In Liquidation) (1986) 4 NSWLR 722, the possibility that the company may have been in a situation where interests of creditors had to be taken into account is of some significance where there is a question whether commencement of proceedings can be authorised by members, or only by directors.

50      I will now consider the main authorities that have been cited, with a view to seeing how they stand with the principles, as I understand them to be.

51      The headnote of Barron v. Potter [1914] 1 Ch. 895 stated:

> Where the articles of association of a company incorporated under the Companies (Consolidation) Act 1908, give to the board of directors the power of appointing an additional director, and owing to differences between the directors no board meeting can be held for the purpose, the company retains power to appoint additional directors in general meeting.

At 902, Warrington J referred to Isle of Wight Railway Co. v. Tahourdin (1883) 25 Ch.D. 332 and continued at 903:

> Those observations express a principle which seems to me to be as applicable to the case of a limited company incorporated under the Companies (Consolidation) Act, 1908, as to a case falling under the Companies Clauses Consolidation Act, 1845, and moreover to be a principle founded on plain common sense. If directors having certain powers are unable or unwilling to exercise them - are in fact a non-existent body for the purpose - there must be some power in the company to do itself that which under other circumstances would be otherwise done. The directors in the present case being unwilling to appoint additional directors under the power conferred on them by the articles, in my opinion, the company in general meeting has power to make the appointment.

52      It is to be noted that there was no submission in that case that the matter could have been dealt with by dismissing one or more of the existing directors and appointing other directors in their place; and it is also to be noted that the only action held to have been authorised was the appointment of additional directors. If the statement made by Warrington J on 903 is given a wider interpretation, to the effect that the company in general meeting can exercise any powers that the directors are unable or unwilling to exercise, then it would be wider than the principles I have suggested. However, I do not consider the case should be regarded as authority for the wider proposition, and I would not regard the wider proposition as sound.

53      The case of Foster v. Foster [1916] 1 Ch. 532 has a headnote that asserts:

> That the principle of Barron v. Potter [1914] 1 Ch. 895 also applied, and that, the directors being in the circumstances unable to exercise the powers conferred upon them by the articles the company in general meeting could make the appointment.

The appointment there referred to was the appointment of a managing director. At 551, Peterson J said this:

> *From a business point of view it seems to me that there are only two persons who are possible managing directors, and the board has been reduced to the position that it is unable, owing to internal friction and faction, to appoint anybody as a managing director.   In those circumstances I should apply the decision of Warrington J in <u>Barron v. Potter</u>.*

Peterson J then quoted the passage set out above from that judgment and continued at 552:
> *The result is that this question relating to the appointment of Mrs. Foster as managing director is one with which the general meeting of the company can deal, and recourse must be had to a general meeting; and therefore, having regard to the authorities, I think that this part of the plaintiff's case also fails.*

54      It is to be noted that the judge there decided that there were only two persons who were possible managing directors, and that the board was unable to make the appointment.  In my view, it is in accordance with the principles I have discussed that, in those circumstances, the general meeting should be able to appoint a managing director.

55      The headnote in <u>Danish Mercantile Co. Limited v. Beaumont</u> [1951] 1 Ch. 680 states as follows:
> *Where proceedings are started in the name of a plaintiff without proper authority, so long as the matter rests there, the action is not properly constituted. In that sense it is a nullity and can be stayed at any time, provided that the aggrieved defendant does not unduly delay his application. It is, however, open at any time to the purported plaintiff to ratify the act of the solicitor who started the action, and to adopt the proceedings. When that has been done, then, in accordance with the ordinary law of principal and agent, and in accordance with the ordinary doctrine of ratification, the defect in the proceedings as originally constituted is cured, and it is no longer open to the defendant to object that the proceedings then ratified and adopted were in the first instance brought without proper authority.*

The following passage appears in the judgment of Jenkins LJ at 686-7:
> *I would refer to the passage in Buckley on the Companies Acts (12th ed.), p.169, where the relevant law is, in my view, correctly summarized. The passage occurs in the course of a discussion on the circumstances in which a company's name can be used as plaintiff in an action and the exceptions to the general rule that a company is the only proper plaintiff in respect of a wrong done to the company, a discussion, in short, of the aspect of company law related to what is commonly called the rule in Foss v. Harbottle.*
>
> *The relevant passage (in Buckley) for the present purpose is in these terms: "If the case be one in which the company ought to be plaintiff, the fact that the seal is in the possession of the adverse party will not necessarily preclude the intending plaintiffs from using the company's name. Neither will it be necessary to obtain the resolution of a general meeting in favour of the action before the writ is issued. In many cases the delay might amount to a denial of justice. In a case of urgency, the intending plaintiffs may use the company's name at their peril, and subject to their being able to show that they have the support of the majority. In an action so constituted, the court may give interlocutory relief, taking care that a meeting be called at the earliest possible date to determine whether the action really has the support of the majority or not".*
>
> *That passage, where it refers to the calling of a meeting, accords with the well-settled practice of the court in cases in which, in proceedings brought by a company, a dispute arises as to the authority with which the company's name has been used as plaintiff. It is common practice in such cases to adjourn any motion*

*brought to strike out the company's name, with a view to a meeting being called to see whether the company desires the action to be brought or not. At first sight, that procedure is wholly inconsistent with Mr. Shelley's contention that an action brought without authority is a nullity which cannot be validated by ratification, as it would be entirely idle, if Mr. Shelley is right, to hold such a meeting at all. But Mr. Shelley seeks to extricate himself from that difficulty by an argument on these lines. He admits that it is the practice of the court in such cases to direct a meeting to be held; but the meeting is called, not to find out whether the corporators desire the action to proceed at the date of the meeting, but to find out whether, at the date on which the writ was issued, the corporators, if consulted on the matter, would have agreed to the action being brought.*

Jenkins J went on to reject the last argument of Mr. Shelley.

56    It is implicit in that passage from the judgment of Jenkins LJ that a company in general meeting has power to ratify the commencement of legal proceedings in the company's name.  However, in that case there was no issue argued as to whether the appropriate organ to ratify was the general meeting or the board of directors; and in my opinion the passage should be taken as authority only for the proposition that, in circumstances where there is a question as to whether proceedings have been properly brought on behalf of a company, it may often be appropriate to adjourn the proceedings so that such meeting or meetings can be held as will appropriately determine the will of the company.  It may be that the appropriate meeting is just a meeting of the board of directors.  It may be that the appropriate meeting is a general meeting which will constitute a board, which will then make a decision as to the proceedings.  In so far as the passage is taken to assert that the general meeting can generally ratify the commencement of proceedings, I would respectfully disagree with it.

57    <u>Alexander Ward</u> was a case where proceedings were commenced by a company at a time when the company had no directors.  Later, after the company went into liquidation, the liquidator purported to ratify the commencement of proceedings.  The House of Lords had to consider an argument that, because at the time the proceedings were commenced the company as principal could not itself have commenced the proceedings, therefore the commencement of the proceedings was not capable of subsequent ratification by the liquidator.  The articles of association of the company had the usual provision that the business of the company should be managed by directors.  In dealing with this argument, Lord Hailsham at 428-9 said this:

*With respect, however, this argument is a non sequitur which would only become cogent if one adopted a false and question-begging meaning to the word "competent".  In my opinion at the relevant time the company was fully competent either to lay arrestments or to raise proceedings in the Scottish courts.  The company could have done so either by appointing directors or as I think by authorising proceedings in general meeting which, in the absence of an effective board, has a residual authority to use the company's powers.  It had not taken, and did not take, the steps necessary to give authority to perform the necessary action.  But it was competent to have done so, and in my view it was therefore a competent principal within the meaning of the second of Wright J's three conditions.*

Lord Hailsham then referred to a passage from Gower's <u>Modern Company Law</u>, to which I will come later.

58    At 432, Lord Kilbrandon said this:

*My Lords, I must say I have the gravest doubts as to the soundness of the proposition pleaded. I am not at all convinced that, the management of a company having been confided to the directors, and the instructing of actions at law being an act of management, then, if the company has for the time no directors, it cannot during that time take steps to recover its debts. I think the*

> *article probably means no more than this, that the directors, and no one else, are responsible for the management of the company, except in the matters specifically allotted to the company in general meeting. This is a term of the contract between the shareholders and the company. But it does not mean that no act of management, such as instructing the company's solicitor, can validly be performed without the personal and explicit authority of the directors themselves. In any case I have even graver doubts whether the validity of the company's act, resting as it must on a construction of the contract with the shareholders, can in such a matter be challenged by someone whose only relationship with the company is one of indebtedness. The point, however, does not seem to, have been taken in this form in the Court of Session, and I will therefore say no more about it.*

59      In so far as Lord Hailsham and Lord Kilbrandon suggest that a company, the management of whose business is given to the directors, can in general meeting authorise the commencement of proceedings, I would respectfully disagree.  I note that Lord Hailsham's expression of that view is tentative, it is supported by reference to a passage from Gower, which, as will be seen, relies in part on the case of Marshall's Valve Gear referred to earlier which, as was submitted, would appear to have been substantially discredited by Quin.  In my opinion, the decision in Alexander Ward is supportable on the basis that a company can be a competent principal, for the purposes of later ratification of an act purportedly done on its behalf by an unauthorised agent, even if at the time of the act it had no agent or organ immediately available to act on its behalf.  To the extent that it supports a proposition that, in the absence of a competent board, a general meeting can authorise the commencement of legal proceedings, I would respectfully disagree.

60      Turning to Winthrop Investments Limited v. Winns Limited (1975) 2 NSWLR 666, the most pertinent passage is that by Samuels JA at 682-3, as follows:

> *But there are, no doubt, circumstances in which the shareholders in general meeting may exercise powers vested in the directors. I exclude from consideration the effect of any doctrine of residual powers which, as I understand it, contends that the shareholders may still act in areas of decision which the articles prima facie exclude from their ambit. I need not decide whether any such doctrine exists, or, if it does, whether the present circumstances would attract its application. If it does exist it would enable the shareholders to make their own decision in place of a decision by the directors. It looks to an original decision by the general meeting, and not to a resolution approving a decision to be taken by the directors. So it has no operation in this case. Nor indeed, and for the same reason, has the principle that the shareholders have more clearly defined default powers, so that if "for some reason the board cannot or will not exercise the powers vested in them, the general meeting may do so": Gower, op. cit., p. 136. Examples of action by the shareholders on this ground are said to be the existence of a deadlock on the board: Barron v. Potter, where Warrington J. observed: "For practical purposes there is no board of directors at all."; or the absence of an effective quorum as in Foster v. Foster, where the board "owing to internal friction and faction" was unable to appoint a managing director. Peterson J. applied Barron v. Potter and held that the directors being unable to exercise the powers conferred upon them by the articles, the company in general meeting could make the appointment. Apart from Quin & Axtens Ltd. v. Salmon, the other cases which Gower cites in support of his proposition are strictly examples of ratification. Neither Grant v. United Kingdom Switchback Railways Co. nor Irvine v. Union Bank of Australia seem to me to illuminate what the learned author means when he exemplifies a board which "will not" exercise its powers. Certainly, I would suppose that, if the directors for some reason refuse to act, so that, to borrow the words of Cotton L.J. in Isle of Wight Railway Co. v. Tahourdin, "the business of the company" is at a deadlock, the shareholders could themselves intervene.*

> *All these instances are remote from the present situation, and the cases which establish them do not authorize the resolutions in suit as the product of some general supervisory power in the general meeting. No such power exists. The shareholders may have ultimate control, because they can alter the articles or remove the directors; but they cannot interfere in the conduct of the company's business where management, as here, is vested in the board. The general meeting has power to intervene to resolve a deadlock, other than one produced by the application of power secured by the articles, e.g. Quin & Axtens case which prevents the company's business from being carried on at all; and it has power to ratify an act of the directors done in breach of their duty, or to authorize the doing of an act which would be in breach of duty. In each of the last two cases the shareholders are waiving their right to object or avoid: see e.g. Foster v. Foster, a passage questioned by Williams J. in Grant's case, but apparently approved in the Harlowe's Nominees case. But they have no general power to transact the company's business, or to give effective directions about its management. As Jordan C.J. said in Clifton v. Mount Morgan Ltd.: "But there is no universal rule that shareholders in general meeting may by ordinary resolution bind or represent the company with respect to anything and everything."*

61      It will be noted that Samuels JA does not decide whether a wide doctrine of residual powers exists: my view is that it does not. The remainder of the passage is entirely consistent with the views I have expressed.

62      I do not think there is anything in the other cases referred to by Mr. Gleeson that conflicts with what I have said; and what I have said is positively supported by <u>Kraus</u>.

63      Turning to the text books, the second edition of Gower, at p.127, contains the following paragraph:

> *It seems that if for some reason the directors cannot or will not exercise the powers vested in them, the general meeting may do so. On this ground, action by the general meeting has been held effective where there was a deadlock on the board and where an effective quorum could not be obtained. Moreover, although the general meeting cannot restrain the directors from conducting actions in the name of the company, it still seems to be the law (as laid down in Marshall's Valve Gear Co. v. Manning, Wardle & Co.) that the general meeting can commence proceedings on behalf of the company if the directors fail to do so. These exceptions are convenient, but difficult to reconcile in principle with the strict theory of a division of powers. Their exact limits are not entirely clear. They can hardly mean that, although the members cannot restrain positive action by the directors, they can always take action if the directors have resolved against it. There must, it is submitted, normally be a failure by the directors validly to exercise their discretion; only then will their discretionary powers revert to the members.*

64      There are footnotes referring to <u>Barron v. Potter</u> and <u>Foster v. Foster</u>. The footnote to the last sentence is as follows:

> *But anomalously this does not seem to apply when it is a question of commencing legal proceedings on behalf of the company. Though the general meeting cannot interfere with the directors' decision to take proceedings (Shaw & Sons (Salford), Ltd. v. Shaw, supra) it can, apparently, reverse a decision by the directors not to take proceedings: see further, Chap. 25, infra. But quaere whether this latter rule is not limited to infra-corporate disputes.*

65      I have already expressed the view that the <u>Marshall's Valve Gear</u> case was discredited by <u>Quin</u>; and in so far as the passage suggests that there is a general reserve or residual power of the general meeting to make management decisions generally, I would respectfully disagree with it.

66      In the same edition of Gower, at 508, there is the following statement:

> *But, as we have seen, the general meeting is regarded as having power to act in place of the board if, for any reason, the board cannot function. If, therefore, a proper quorum cannot be obtained at a directors meeting or there is deadlock on the board, the general meeting may act instead.*

The footnote to that passage refers merely to <u>Barron v. Potter</u> and <u>Foster v. Foster</u>; and I consider the proposition to be too widely stated.

67      In the 6th Edition of Gower, there is a significant change to the earlier of the two passages. At pp.187-8 there appears the following passage:

> *Despite what has been said above, it seems that if for some reason the board cannot or will not exercise the powers vested in them, the general meeting may do so. On this ground, action by the general meeting has been held effective where there was a deadlock on the board; where there were no directors; where an effective quorum could not be obtained or the directors were disqualified from voting. Moreover, although the general meeting cannot normally abort legal proceedings commenced by the board in the name of the company, it still seems to be the law that the general meeting can, in some circumstances, commence proceedings or ratify unauthorised proceedings already commenced by someone on behalf of the company if the directors fail to pursue the claim. These exceptions are convenient, but difficult to reconcile in principle with the strict theory of a division of powers. Their exact limits are not entirely clear.*

There is reference in the footnotes to <u>Alexander Ward</u>, rather than <u>Marshall's Valve Gear</u>. The author, correctly in my view, expresses doubt as to the extent of the propositions he has discussed.

68      In the current loose-leaf service of Ford's <u>Principles of Corporations Law</u>, there appears the following at par.[7.130]

> *[7.130] Even where the constitution gives wide powers to the board to be exercised independently, there are some situations in which the power can be exercised by the general meeting.*
>
> *1. Board unable to act*
> *A provision in the constitution conferring power over a certain matter on the board exclusive of the general meeting is not taken to prevent the general meeting exercising the power in certain extraordinary situations. An example is where the directors are in such conflict among themselves as to be deadlocked and incapable of exercising the power (Barron v Potter [1914] 1 Ch 895), at least where the shareholders have ordinary powers of appointing directors. Barron v Potter may not apply where in a joint venture company two groups of shareholders have each the exclusive right to appoint their own nominee directors: Berlei Hestia (NZ) Ltd v Fernyhough [1980] 2 NZLR 150 at 155.*
>
> *2. Not enough directors in office to form a quorum*
> *Another case where the general meeting can act in place of the board is where the number of directors in office has fallen below the number required for a quorum and the power of appointing new directors is given by the constitution to the board: Isle of Wight Railway Co v Tahourdin (1883) 25 Ch D 320 as*

> *explained in Barron v Potter, above; Foster v Foster [1916] 1 Ch 532; cf s 201H(1), which is a replaceable rule providing that the directors of a company may appoint a person as a director.*
>
> *The juridical basis for these very convenient propositions is unclear. Perhaps they illustrate the preparedness of courts to find an implied exception in the constitution, as in other contracts, where it is necessary to do so in order to avoid a nonsensical outcome.*

It would appear from that paragraph that Ford is not supporting a wider principle than that which I have adopted.

69    Finally, in Volume 2 of the current loose-leaf edition of Palmer's <u>Company Law,</u> as par.8.801, there appears the following:

> *Where the directors of a company can be shown to have broken the duties, described above, owed by them to a company, no special legal difficulties attend the initiation of litigation by the company against the errant directors. Such litigation may be initiated by the organs of the company having authority under the company's articles of association to commence legal actions in the company's name. Under Table A such authority is normally vested in the board and the shareholders in general meeting cannot forbid by ordinary resolution the exercise by the directors of this power. No doubt, a board containing a majority of errant directors is unlikely to initiate litigation against themselves by the company, but, such litigation may be initiated by a new board. Such litigation may also, of course, be brought by a receiver or liquidator. It would also seem that the shareholders in general meeting can by ordinary resolution bring litigation in the company's name, at least where the directors are alleged to be party to the wrongdoing, no matter what provisions the company's articles make in respect of the initiation of litigation.'*

The footnote to the final sentence is as follows:

> *Marshall's Valve Gear Co. Ltd. v. Manning Wardle & Co. Ltd. [1909] 1 Ch. 267, Alexander Ward & Co. Ltd. v. Samyang Navigation Co. Ltd. [1976] 1 W.L.R. 673, 679, but cf. Breckland Group Holdings v. London & Suffolk Properties [1989] B.C.L.C 100. These two cases do not fully support the proposition stated in the text, but it is submitted that, unless that proposition is correct, the rule in Foss v. Harbottle (1843) 2 Hare 461 (see para. 8.806, post) makes no sense.*

70    As indicated previously, I do not consider <u>Marshall's Valve Gear</u> to be good law now.  I do not understand why the author should suggest that, unless the proposition stated in the text is correct, the rule in <u>Foss v. Harbottle</u> makes no sense.  On the contrary, I would have thought that the inability of a general meeting to authorise the commencement of proceedings is a reason why, in some circumstances, an individual shareholder should be permitted to do so.

71    I do not regard the authorities relied on by Mr. Gleeson as justifying a different view from that which I expressed at the outset of this discussion.  In my opinion, the general meeting on 6 May could have appointed additional directors, but did not have the power to ratify the commencement of legal proceedings.

### SECTION 236 APPLICATION

72    Counsel for the Rajwans submitted to the primary judge that his decision on the ratification question did not justify dismissal of the company's claims, because the liquidator when appointed could still ratify the proceedings, and also because the s.236 application had still to be dealt with.  Ultimately, the following exchange occurred (transcript p.96, 22 May 2002):

> *WILLIAMS: Your Honour, in the time that is still available your Honour may be prepared to make order 1 of the draft orders or deal with any submissions in relation to why the proceedings should not be dismissed as incompetent because I certainly press for that order.*
>
> *HIS HONOUR: That was debated earlier. I really came to a conclusion that I should do that.*
>
> *WILLIAMS: I ask your Honour to make that draft order a final order.*
>
> *HARPER: We would resist that, your Honour.*
>
> *HIS HONOUR: You have put some matters to me before, Mr Harper. Is there anything else I should consider?*
>
> *HARPER: If your Honour was to make that order, it would make more difficult my submission for anybody to deal with the caveat position. In my submission in light of the way the costs argument is developing it might be a bit precipitous to do that this afternoon.*
>
> *HIS HONOUR: The applicants' entitlement to draft order 1 was established before there was an apparent difficulty about representation and when the application under section 239 appeared more pressing than it does to be here. I really see draft order 1 as something the applicants are entitled to.*
>
> *HARPER: Except that if the instructions are to press the section 236 application, that will have an impact upon that order being made and in what proceedings it is made.*
>
> *HIS HONOUR: I have considered that. The turn of events relating to prospective liquidation had changed the balance for consideration. The ruling is that draft order 1 which I pronounced earlier today is adopted as the order. Draft order 2 has not been adopted.*

73      Draft Order 1 referred to there was the order dismissing the proceedings as against the company. Mr. Williams was Counsel for Mr. Cooney, and Mr. Harper Counsel for the Rajwans.  Thus, the primary judge apparently took the view that, once he had decided to appoint a liquidator, the question of appointing someone else to take responsibility for the company in the proceedings did not really arise, and he dismissed the proceedings as brought by the company without disposing of the s.236 application.

### Submissions

74      Mr. Gleeson made no challenge to the primary judge's decision, in so far as he did not wait for a decision by the liquidator whether to ratify the proceedings; but he did submit that the s.236 application was never dealt with and should have been dealt with by the primary judge.  In substance, he submitted that, since the liquidator was not before the primary judge expressing a view as to what should happen to the proceedings, the judge should have heard a party who was there ready, willing and able to put a view on behalf of the company:  that is, he should have considered the issues raised by the s.236 application.  It was now too late for this Court to give effect to the s.236 application, but this Court could and should set aside the costs order made against Massey Bailey.

75      Mr. Williams submitted, in circumstances where the s.236 application was not pressed, there was no error in the primary judge making the order dismissing the claim as brought by the company.  He noted that the applicant in the s.236 application had not challenged the decision:  and he submitted that the s.236 application was hopeless in any event, inter alia because of the primary judge's findings that the Rajwans did not act in good faith.

**Decision**

76      In my opinion, the primary judge has not been shown to be in error in dismissing the proceedings as brought by the company prior to determination of the s.236 application, which was not ultimately pursued.  In my opinion, Massey Bailey's submissions have some artificiality in circumstances where they make no complaint that the liquidator was not given a chance to consider the matter, and where no complaint is made by the party who actually made the s.236 application.  In my opinion also, the application had negligible chance of success in circumstances where a liquidator of the company had been appointed.

**CONCLUSION**

77      I have held that there was no effective ratification of the commencement of the proceedings; and in those circumstances an adjournment as sought before Master McLaughlin could have served no useful purpose.  It is not necessary to consider discretionary matters relating to that adjournment application.

78      For the reasons I have given, the appeals would fail on their merits.  However, they did raise substantial issues, and I think it appropriate to grant leave to appeal.  For those reasons, I propose the following orders in both cases:

    1.      Leave to appeal granted.

    2.      Direct filing of Notice of Appeal within 14 days.

    3.      Appeal dismissed with costs.

**********

LAST UPDATED:          18/08/2003

# Case Law 12

**Ox Operations Pty Ltd v Land Mark
Property Developments (Vic)
Pty Ltd (in liq) [2007] FCA 1221**

# FEDERAL COURT OF AUSTRALIA

## Ox Operations Pty Ltd v Land Mark Property Developments (Vic) Pty Ltd (in liq) [2007] FCA 1221

**PRACTICE AND PROCEDURE** – action commenced in name of company without authority – action not authorised – application to dismiss proceeding – proceedings adopted by all members – effect of ratification

**CORPORATIONS** – meeting of members – management and administration – powers of members – whether power to ratify legal proceedings

*Corporations Act 2001* (Cth)

*Compaction Systems Pty Ltd and the Companies Act, Re* [1976] 2 NSWLR 477
*Daimler Company Ltd v Continental Tyre & Rubber Company (Great Britain) Ltd* [1916] 2 AC 307
*Danish Mercantile Co Ltd v Beaumont* [1951] Ch 680
*Duomatic Ltd, In re* [1969] 2 Ch 365
*Duckett v Gover* (1877) LR 6 Ch D 82
*East Pant Du United Lead Mining Co (Limited) v Merryweather* (1864) 2 H&M 254 [(1864) 71 ER 460]
*Massey v Wales* (2003) 57 NSWLR 718
*Newbiggin-by-the-sea Gas Company v Armstrong* (1879) LR 13 Ch D 310
*S.B.A. Properties Ltd v Craddock* [1967] 1 WLR 716

IN THE MATTER OF OX OPERATIONS PTY LTD

OX OPERATIONS PTY LTD v LAND MARK PROPERTY DEVELOPMENTS (VIC) PTY LTD (IN LIQUIDATION)

VID 532 of 2007

FINKELSTEIN J
10 AUGUST 2007
MELBOURNE

GENERAL DISTRIBUTION

**IN THE FEDERAL COURT OF AUSTRALIA**

**VICTORIA DISTRICT REGISTRY**                                    **VID 532 of 2007**

**IN THE MATTER OF OX OPERATIONS PTY LTD**

| | |
|---|---|
| **BETWEEN:** | **OX OPERATIONS PTY LTD**<br>**Plaintiff** |
| **AND:** | **LAND MARK PROPERTY DEVELOPMENTS (VIC) PTY LTD (IN LIQUIDATION)**<br>**Defendant** |

| | |
|---|---|
| **JUDGE:** | **FINKELSTEIN J** |
| **DATE OF ORDER:** | **10 AUGUST 2007** |
| **WHERE MADE:** | **MELBOURNE** |

**THE COURT ORDERS THAT:**

1.      The interlocutory process filed on 19 June 2007 be dismissed.

2.      There be no order as to costs.

Note:   Settlement and entry of orders is dealt with in Order 36 of the Federal Court Rules.

GENERAL DISTRIBUTION

**IN THE FEDERAL COURT OF AUSTRALIA**

**VICTORIA DISTRICT REGISTRY**                                              **VID 532 of 2007**

**IN THE MATTER OF OX OPERATIONS PTY LTD**

| | |
|---|---|
| **BETWEEN:** | **OX OPERATIONS PTY LTD**<br>**Plaintiff** |
| **AND:** | **LAND MARK PROPERTY DEVELOPMENTS (VIC) PTY LTD (IN LIQUIDATION)**<br>**Defendant** |
| **JUDGE:** | **FINKELSTEIN J** |
| **DATE:** | **10 AUGUST 2007** |
| **PLACE:** | **MELBOURNE** |

### REASONS FOR JUDGMENT

1        Paul Egan & Associates are a firm of solicitors.  On behalf of Ox Operations Pty Ltd they filed an application under s 459G of the *Corporations Act 2001* (Cth) to set aside a statutory demand that had been served on the company by Land Mark Property Developments (Vic) Pty Ltd (in liq).  The instruction to file the application was given by John Grezos.  Mr Grezos has been, but was not at the time he gave the instruction, a director of Ox Operations.  The action, then, was not properly constituted and Land Mark Property seeks an order that it be dismissed.

2        The usual course when a company is improperly made a plaintiff is to stay or dismiss the action and require the solicitor who purported to act for the company to pay the costs: *Newbiggin-by-the-sea Gas Company v Armstrong* (1879) LR 13 Ch D 310; *East Pant Du United Lead Mining Co (Limited) v Merryweather* (1864) 2 H&M 254 [(1864) 71 ER 460]; *Duckett v Gover* (1877) LR 6 Ch D 82; *Daimler Company Ltd v Continental Tyre & Rubber Company (Great Britain) Ltd* [1916] 2 AC 307.  The cases also show that the action though brought without authority is not a nullity in the sense that it is void *ab initio* without the possibility of subsequent ratification.  To the contrary, it is well established that it is possible for the company to ratify the unauthorised act of the solicitor in bringing an action in its name without its actual or implied authority:  *Danish Mercantile Co Ltd v Beaumont* [1951] Ch

680.   And, because ratification is possible, a practice has developed that when an action is brought without authority it will not be stayed or dismissed forthwith, but the company will be permitted to convene a general meeting or a meeting of its directors to consider whether to adopt the action:  *S.B.A. Properties Ltd v Craddock* [1967] 1 WLR 716, 722.

3          The plaintiff contends that at a meeting of its members (in fact there is only one member) held on 27 June 2007 it was decided that the action should continue.  According to the minutes of that meeting "it was unanimously RESOLVED that [the] actions of Mr John Grezos on behalf of the company in instructing the firm of Paul Egan & Associates on 16 June 2007 [to] defend the winding up application brought against the company by Land Mark Property Developments (Vic) Pty Ltd (in liquidation) be ratified."  Putting to one side for a moment the effect of this resolution, the defendant says that because the Constitution of the company vests the power of management in the directors there is no power in a general meeting to ratify the institution of legal proceedings.  Reliance is placed on *Massey v Wales* (2003) 57 NSWLR 718.  There it was held that where the articles of association of a company provided that the business of the company was to be managed by the directors, there was no power in a general meeting to make management decisions or to control or direct the board of directors in the management of the company.   This rule was said to apply to the commencement of legal proceedings just as to any other aspect of management of the company's business:  *Massey v Wales* (2003) 57 NSWLR at 730.  But this case is different because ratification (if the resolution constitutes ratification) was by the assent of all shareholders (Ox Group Pty Ltd, a company belonging to Mr Grezos, holds all 100 ordinary shares in the company) and it is well established that if all shareholders signify their assent to a transaction which is within power their decision will be effective provided also the transaction is honest:  *In re Duomatic Ltd* [1969] 2 Ch 365; *Re Compaction Systems Pty Ltd and the Companies Act* [1976] 2 NSWLR 477.

4          Returning to the resolution, the defendant points out that it is not specifically directed to the institution of an action to set aside a statutory demand, but is confined to authorising the solicitors to "defend the winding up application brought against the company."  Notwithstanding the inelegance in its language, the resolution covers this case.  In the present context an instruction to defend a winding up application authorises the solicitor to take whatever action is necessary to set aside a statutory demand.  After all, a statutory demand is

- 3 -

but a precursor to an application to wind up a company and an application to set aside the demand can properly be characterised as a step in the defence of a winding up application.

5          Accordingly, the relief sought will be refused.  It is not, however, appropriate for the costs to follow the event.  While the action was brought without authority, the plaintiff did not let the defendant know the action had been authorised until the application to dismiss was filed.  In all the circumstances the costs should lie where they fall.


I certify that the preceding five (5) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Finkelstein.


Associate:


Dated:      10 August 2007


| | |
|---|---|
| Counsel for the Plaintiff: | H A Aizen |
| Solicitor for the Plaintiff: | Paul Egan & Associates |
| Counsel for the Defendant: | P Fary |
| Solicitor for the Defendant: | Comlaw |
| Date of Hearing: | 31 July 2007 |
| Date of Judgment: | 10 August 2007 |

# Case Law 13

**Essential Media and Entertainment Pty Limited
[2020] NSWSC 990**



Supreme Court

New South Wales

| | |
|---|---|
| Case Name: | In the matter of Essential Media and Entertainment Pty Limited |
| Medium Neutral Citation: | [2020] NSWSC 990 |
| Hearing Date(s): | 24 July 2020 |
| Date of Orders: | 31 July 2020 |
| Decision Date: | 31 July 2020 |
| Jurisdiction: | Common Law |
| Before: | Rees J |
| Decision: | Statutory demand set aside. |
| Catchwords: | CORPORATIONS — Statutory demand — Application to set aside — whether affidavit accompanying demand complied with s 459E(3) Corporations Act 2001 (Cth) – affidavit sworn by director – no resolution of board authorising demand – importance of affidavit at [49]-[54] – principles regarding authority of director at [55]-[58] – whether can ratify unauthorised demand – statute overrides common law – creditor to authorise statutory demand when issued or possibly cure within the 21 days for payment – otherwise cannot retrospectively confer authority by ratification at [59]-[67] – as a matter of fact, director was authorised.

CORPORATIONS — Winding up — Statutory demand — Genuine dispute — principles at [76]-[80] — loan apparently arranged by common director of lender and borrower — advance of loan not otherwise authorised by lender – receipt of loan not otherwise authorised by borrower — lender and borrower both appear to consider common director liable — genuine dispute. |

CORPORATIONS — dispute whether "due and payable" under s 459E Corporations Act 2001 - principles at [96]-[102] — genuine dispute.

| | |
|---|---|
| Legislation Cited: | Corporations Act 2001 (Cth), ss 236, 237, 459E(1), 459E(3), 459H(1)(a), 459J(1)(b)<br>Supreme Court (Corporations) Rules 1999, r 5.2 |
| Cases Cited: | A R Pilot Pty Ltd v Gouriotis [2007] NSWSC 396<br>Adnunat Pty Ltd v ITW Construction Systems Australia Pty Ltd [2009] FCA 499<br>AspectFP Pty Ltd v Messer [2019] VSC 249<br>Australian Securities and Investments Commission v Rich (2009) 75 ACSR 1; [2009] NSWSC 1229<br>AWA Limited v Daniels trading as Deloitte Haskins & Sells (1992) 7 ACSR 759<br>Britten-Norman Pty Ltd v Analysis & Technology Australia Pty Ltd (2013) 85 NSWLR 601; [2013] NSWCA 344<br>Britten-Norman Pty Ltd v Analysis & Technology Australia Pty Ltd (2013) 85 NSWLR 601<br>Chadmar Enterprises v IGA Distribution Pty Ltd [2005] ACTSC 39; (2005) 53 ACSR 645<br>Chase Manhattan Bank Australia Limited v Oscty Pty Limited [1995] FCA 1208; 17 ACSR 128<br>Commercial Union Assurance Co of Australia Ltd v Ferrcom Pty Ltd (1991) 22 NSWLR 389<br>Commissioner of Taxation (Cth) v Sara Lee Household & Body Care (Australia) Pty Ltd [2000] HCA 35 at [20]; (2000) 201 CLR 520<br>David Grant & Co Pty Ltd v Westpac Banking Corp [1995] HCA 43; (1995) 184 CLR 265<br>Dennis Hanger Pty Limited v Kanambra Pty Limited (1992) 10 ACLC 284<br>Eumina Investments Pty Ltd v Westpac Banking Corp [1998] FCA 824; 84 FCR 454<br>Evans v Levy [2011] NSWCA 125<br>Eyota Pty Ltd v Hanave Pty Ltd (1994) 12 ACSR 785<br>Haller v Ayre [2005] 2 Qd R 410<br>HL Diagnostics Pty Ltd v Psycadian Ltd [2005] WASC 234<br>Horizon Star Pty Ltd v Carina Holdings Pty Ltd [2003] WASCA 94<br>In the matter of Access Elevators Australia Pty Ltd |

[2016] NSWSC 739

In the matter of Forza Plumbing Systems Pty Ltd [2013] NSWSC 1234

In the matter of Gorji Property Investment Pty Limited [2018] NSWSC 1671

In the matter of Halal Meats Pty Ltd [2015] NSWSC 2041

In the matter of JF Essential Power Pty Limited [2018] NSWSC 435

In the matter of Litigation Insurance Pty Limited [2017] NSWSC 334

In the matter of Longjing Pty Ltd (2017) 123 ACSR 456; [2017] NSWSC 1534

In the matter of MK Group Phoenix Pty Ltd [2014] NSWSC 1467

In the matter of PostNet Australia Pty Ltd [2017] NSWSC 160

In the matter of Pulse Interactive Pty Limited (in liquidation) [2019] NSWSC 22; (2019) 134 ACSR 461

In the matter of ReNu Waste Pty Limited [2020] NSWSC 108

In the matter of Shot One Pty Ltd (in liquidation) [2017] VSC 741

In the matter of Tuffrock Pty Ltd [2015] NSWSC 738

In the matter of Unity Resources Group Australia Pty Limited [2015] NSWSC 1174

Jones v Dunkel (1959) 101 CLR 298

Junker v Hepburn [2010] NSWSC 88

Katsilis v Broken Hill Proprietary Co Ltd (1977) 18 ALR 181

Kern Group (Paddington) Pty Limited v Armstrong [2011] QSC 133

Kisimul Holdings Pty Ltd v Clear Position Pty Ltd [2014] NSWCA 262

Livingspring Pty Ltd v Kliger Partners (2008) 20 VR 377; [2008] VSCA 93

Macleay Nominees v Belle Property East Pty Ltd [2001] NSWSC 743

Main Camp Tea Tree Oil Limited v Australian Rural Group Ltd (2002) 20 ACLC 726; [2002] NSWSC 219

McHugh v Eastern Star Gas Ltd [2012] NSWCA 169

MNWA Pty Ltd v Deputy Commissioner of Taxation (2016) 250 FCR 381; [2016] FCAFC 154

NA Investment Holdings Pty Limited v Perpetual Nominees Limited (2010) 79 ACSR 544; [2010] NSWCA 2010

Northside Developments Pty Ltd v Registrar-General (1990) 170 CLR 146

NT Resorts Pty Limited v Deputy Commissioner of Taxation (1998) 16 ACLC 957; (1998) 153 ALR 359

Ogilvie v Adams [1981] VR 1041

Ox Operations Pty Ltd v Land Mark Property Developments (Vic) Pty Ltd (in liq) [2007] FCA 1221

Panel Tech Industries (Aust) Pty Ltd v Australian Skyreach Equipment Pty Ltd (No 2) [2003] NSWSC 896

Papadimitropoulos v R (1957) 98 CLR 249; [1958] ALR 21

Portrait Express (Sales) Pty Limited v Kodak (Australasia) Pty Limited [1996] NSWSC 199; (1996) 20 ACSR 746

Range Resources Limited v Lind Asset Management LLC [2015] WASC 238

Re Elgar Heights Pty Ltd (1985) 9 ACLR 846; [1985] VR 657

Re Morris Catering (Australia) Pty Ltd (1993) 11 ACLC 919; (1993) 11 ACSR 601

Remuneration Data Base Pty Ltd v Pauline Goodyer Real Estate Pty Ltd [2007] NSWSC 59

Rinfort Pty Ltd v Arianna Holdings Pty Ltd [2016] NSWSC 251; (2016) 306 FLR 413

Saferack Pty Ltd v Marketing Heads Australia Pty Ltd (2007) 214 FLR 393; (2007) 25 ACLC 1392; [2007] NSWSC 1143

Scanhill v Century 21 Australasia [Pty Ltd (1993) 47 FCR 451

Smith v Henniken-Major & Co (A Firm) (2002) 3 WLR 1848

Spencer Constructions Pty Ltd v G&M Aldridge Pty Ltd [1997] FCA 681; (1997) 76 FCR 452

Telstra Corporation Limited v Ivory; Telstra Corporation Limited v Solar-Mesh (Australia) [2008] QSC 123

TR Administration Pty Ltd v Frank Marchetti & Sons Pty Ltd (2008) 66 ACSR 67; [2008] VSCA 70

Whitton v Regis Towers Real Estate Pty Ltd (2007) 161 FCR 20; [2007] FCAFC 125

Willard King Organisation (1978) Pty Ltd v CT

|                    |                                                                  |
|--------------------|------------------------------------------------------------------|
|                    | Franchises Pty Ltd [2009] NSWSC 97                               |
|                    | Zaccardi v Caunt [2008] NSWCA 202                                |
| Texts Cited:       | Dal Pont, Law of Agency, (2001) 200                              |
|                    | Farid Assaf, Statutory Demands and Winding Up in                 |
|                    | Insolvency (2nd ed, 2012, LexisNexis Butterworths)               |
|                    | Professor Ian Ramsay and Dr Robert (Bob) Austin,                 |
|                    | Ford, Austin and Ramsay's Principles of Corporations             |
|                    | Law (15th ed, 2012, LexisNexis Butterworths)                     |
|                    | Perry Herzfeld and Thomas Prince, Interpretation (2nd            |
|                    | ed, 2020, Thomson Reuters)                                       |
| Category:          | Principal judgment                                               |
| Parties:           | Plaintiff: Essential Media and Entertainment Pty Ltd             |
|                    | Defendant: Hilton Cordell & Associates Pty Limited               |
| Representation:    | Counsel:                                                         |
|                    | Mr JP Knackstredt (Plaintiff)                                    |
|                    | Mr EA Walker (Defendant)                                         |
|                    |                                                                  |
|                    | Solicitors:                                                      |
|                    | Somerville Legal (Plaintiff)                                     |
|                    | K&L Gates (Defendant)                                            |
| File Number(s):    | 2020/111804                                                      |

## JUDGMENT

1   **HER HONOUR:** This is an application to set aside a statutory demand issued by Hilton Cordell & Associates Pty Limited to Essential Media and Entertainment Pty Ltd. The demand sought payment of $190,000 said to be owed pursuant to loans advanced in February and March 2019. The perhaps unusual features of this application is that the lender and borrower are television producers; the monies came from a bank account holding royalties which would not ordinarily be used to make loans; whilst the lender and borrower had a common director who appears to have instigated the transfer of funds, his co-directors on either side of the transaction were unaware of it and would not have agreed to it; the statutory demand was issued in the midst of the controversy generated by discovery of the transfers; on the borrower providing documents indicating the common director's knowledge and

involvement in the transfer, support for the demand was withdrawn but re-instated on payment of money by the common director.

2      Essential Media seeks to set aside the demand on three bases:

   (a)   the affidavit accompanying the demand did not comply with section 459E(3) of the *Corporations Act 2001* (Cth) as it was not sworn by a person with the authority of the creditor company;

   (b)   there is a genuine dispute about the existence of the debt within the meaning of section 459H(1)(a) of the *Corporations Act*; and

   (c)   if there is a loan, then there is a genuine dispute as to whether the loan is "due and payable" within the meaning of section 459E(1) of the *Corporations Act*.

3      In support of the application, Essential Media relied on the evidence of Gregory Quail, the sole director and chief executive officer of Essential Media, and Darren Taylor, chief financial officer. Neither was required for cross-examination. Hilton Cordell called no witnesses but tendered documents.

## FACTS

4      Hilton Cordell is a company which operates in the television production sector. Christopher Hilton and Michael Cordell are directors and equal shareholders. Mr Hilton is a television producer. Whilst the company is no longer producing television shows, it continues to collect royalties from past shows.

5      Essential Media also produces television shows including documentaries, television drama, factual series and lifestyle programs. The company was established by Mr Hilton, his wife Sonja Armstrong and their business partner Ian Collie. Essential Media has offices in Sydney, Los Angeles, Dallas, Vancouver and Auckland. Essential Media derives income from network production payments and royalties accruing from television programs which it has produced. Popular shows produced by Essential Media include "Rake", "Doctor Doctor", "Gourmet Farmer" and "Texas Flip N Move". As the shows continue to be broadcast on television channels and streaming networks locally and internationally pursuant to licencing agreements, Essential Media continues to generate income from royalties.

6      Hilton Cordell and Essential Media each have a "collections account" which holds royalties received and, at regular intervals, distributes the royalties to

stakeholders involved in the creation and production of television shows including Screen Australia, Screen NSW, the Australian Broadcasting Corporation (ABC) and the Special Broadcasting Service (SBS). Mr Quail explained that the purpose of a collections account is to collect royalties from television shows, hold the monies on trust and disburse the royalties to the stakeholders involved in the production. The funds in the collections account are kept separate from the general operating bank account or, at least, the evidence was that this was how the monies should be held. According to Mr Quail:

> …In my many years in the television industry I had never seen a collections account used as a loan facility, nor to fund company operating expenses.
>
> …Using a collections account as a loan facility … goes against the very purpose of these accounts as it means that funds are not available to be disbursed immediately, if and when our contracts dictate that royalties need to be paid.

This understanding was shared, at least, by Mr Cordell. In response to Mr Hilton saying a member of staff frequently used the collections accounts to manage cash flow, Mr Cordell replied, "For the [r]ecord [my company] has never used collections accounts as a de-facto loan [f]acility."

7    In 2012, Mr Quail and Mr Hilton began to co-produce a television show for the American market and, in July 2018, Mr Quail became a director of Essential Media. Mr Hilton became the Chief Executive Officer overseeing the financial side of the business and Mr Quail became Chief Content Officer and Executive Producer, overseeing the production side of the business. Mr Quail spent much of his time in the United States, overseeing the production and sale of television programmes. Mr Quail and Mr Hilton held fortnightly management meetings at which Mr Hilton reported on the financial performance of the company.

8    The Chief Financial Officer of Essential Media was Darren Taylor, whose primary role was to manage the cash flow of Essential Media and associated companies within the Essential Media group. Mr Taylor was assisted by a number of accounts staff, including Lorraine Pickering, described by Mr Quail as "Production Accountant" and by Mr Taylor as "Company Accountant". Ms Pickering had worked for Mr Hilton for many years, including at Hilton

Cordell where she was Head of Accounts at the same time as she was employed by Essential Media.

9    In January 2019, Mr Taylor and Mr Quail became concerned about Essential Media's financial position. Mr Taylor noticed the cash resources of Essential Media were low. Mr Taylor arranged weekly meetings with two of the main accounts staff, Ms Pickering and Bianca Panuccio, and also arranged a fortnightly meeting with Mr Hilton to review the cash forecast and payments. Mr Quail formed the view that the company had excessive overheads. Whilst Mr Quail had not viewed the company's accounting records, he was aware how much revenue the television programmes he was producing might generate and formed the view that the company needed to make serious cutbacks.

10    In January 2019, Mr Quail spoke to Mr Hilton about his concerns and said that Essential Media was losing money and needed to reduce expenditure including staff and overheads. Mr Quail also expressed a concern that Mr Hilton was exaggerating income projections and considered that there was not enough television programmes to cover current expenditure; drastic steps were needed. Mr Quail organised a meeting of management staff, including Mr Hilton, and set out a plan to facilitate major cutbacks in expenditure. This is confirmed by an email from Mr Quail to Mr Hilton, Mr Taylor and others of 21 January 2019 entitled "Difficult decisions we will make this week" including a "brutal" list of staff cuts, pay cuts and ceasing production on various shows.

11    However, by the end of January 2019, Mr Hilton told Mr Quail that he had spoken to another director of Essential Media and there would be no cutbacks as Mr Hilton had demonstrated that his income projections were correct. None of Mr Quail's suggestions were implemented. At subsequent management meetings, Mr Hilton advised that the company's cash flow position was strong and meeting income forecasts. Mr Quail continued to produce television programs and was reliant upon what he was told by Mr Hilton about the financial state of the business.

**Three transfers**

12    On 28 February 2019, according to a Westpac payment summary, Ms Pickering transferred $50,000 from Hilton Cordell's collection account to

Essential Media's collections account with the description recorded on the Westpac payment summary of "Loan HCA". The monies were then transferred from Essential Media's collections account to Essential Media's general operations account and expended. According to Essential Media's MYOB accounting records – which were entered by Ms Pickering – the monies were recorded as "Loa[n] HCA Coll". Thus, according to Hilton Cordell's bank statement and the MYOB records of Essential Media at least, the $50,000 was a loan, most likely from Hilton Cordell to Essential Media.

13    On about 4 March 2019 at a weekly cash flow meeting, Ms Pickering told Mr Taylor that she had used some of Hilton Cordell's funds to pay expenses of Essential Media. Mr Taylor asked why she had done this and Ms Pickering said that they did not have enough cash to pay suppliers and payroll. Mr Taylor asked how the transaction had been accounted for and was told by Ms Pickering, "I have entered it into the MYOB as a loan so that we can repay it later".  Mr Taylor assumed, based on what Ms Pickering told him, that the funds came from Hilton Cordell. Mr Taylor was aware that Mr Hilton was associated with Hilton Cordell. Mr Taylor was willing to allow the accounting entry to stand as he understood that Ms Pickering had personal knowledge of the transaction. Mr Taylor says that, if Ms Pickering had asked his permission before transferring the funds, he would have asked that she not borrow from another entity but delay payments to suppliers instead.

14    Mr Taylor reviewed the company's accounting records and saw that Ms Pickering had transferred $50,000 into Essential Media's collection account and then transferred the monies to Essential Media's general operating bank account. Mr Taylor sent an email to Mr Hilton as he thought the transfer from Hilton Cordell was strange. In Mr Taylor's experience, it was uncommon to borrow money from another company to pay expenses and he felt the need to report it to Mr Hilton in case he was not already aware of the transaction. Mr Taylor advised in the email, "Lorraine … has dipped into the Hilton Cordell royalty account to cover pay". Mr Taylor did not receive a reply to his email. Mr Taylor also saw Mr Hilton that day and told him that Ms Pickering had borrowed cash from the Hilton Cordell collections account. Mr Hilton simply replied, "Yep OK" and did not appear surprised or unhappy.

15    On 4 March 2019, Ms Pickering transferred $100,000 from Hilton Cordell's collections account to Essential Media's collections account with the description recorded on the Westpac payment summary of "Loan". According to Essential Media's MYOB accounting entry made by Ms Pickering, the receipt was recorded as "Loan HCA". Thus, according to Hilton Cordell's bank statement and the MYOB records of Essential Media at least, the $50,000 was a loan, most likely from Hilton Cordell to Essential Media.

16    On 7 March 2019, in the course of reviewing accounting records, Mr Taylor became aware of the second transfer. He spoke to Ms Pickering and asked whether she had borrowed more money from Hilton Cordell and Ms Pickering said, "Yes, I just made another transfer of $100,000 to [Essential Media]". Mr Taylor sent another email to Mr Hilton bringing it to his attention, advising "Lorraine has borrowed $150k from the HCA collections account (more than she originally said she would) …". Mr Taylor wanted to make sure that Mr Hilton was aware that a higher amount was being used. Mr Taylor received no reply.

17    On 14 March 2019, Ms Pickering paid $40,000 from Hilton Cordell's collections account to Essential Media's collections account with the description recorded on the Westpac payment summary of "Loan eme". According to Essential Media's MYOB accounting entry made by Ms Pickering, the receipt was recorded as "loan hca" and the accounting entry in respect of the transfer to Essential Media's general operating account indicated that the transfer was for credit card reimbursement. About a fortnight later, Mr Taylor became aware of the third transfer. Having brought the first two transfers to Mr Hilton's attention, Mr Taylor felt no need to report the third transfer.

18    It is less clear from Hilton Cordell's bank statement and the MYOB records of Essential Media whether this was a loan to Essential Media, or repayment of a loan from Essential Media advanced through the use of an Essential Media credit card. Essential Media's credit cards included a corporate American Express card for Mr Hilton. Mr Hilton used the American Express credit card frequently. According to Mr Quail, Mr Hilton and his wife used the American Express card for personal expenses and Essential Media's accounts staff set

up a personal loan account within the MYOB system. The expenses charged to this account included expenses incurred for a trip to London and France in June 2019 and a trip to Europe in September and October 2019.

19    On 22 March 2019, Mr Taylor sent an email to Ms Pickering and Ms Panuccio advising of changes to the cash forecast including "Repay HCA: deferred to mid-May". Hilton Cordell relies on this as evidence of an acknowledgement by Essential Media of an obligation to repay the advances, whilst Essential Media says it reflects that Mr Taylor was relying on what Ms Pickering had told him.

**Termination of Mr Hilton's employment**

20    On 2 April 2019, Mr Hilton was issued with a notice of improper conduct in respect of matters unrelated to these proceedings. On 25 October 2019, at the conclusion of an investigation by the Human Resources Department, Mr Hilton's employment was terminated for cause by reason of alleged serious misconduct. Upon Mr Hilton's termination, Mr Quail became chief executive officer of Essential Medial and took over the financial operations as well as the production side of the business.

21    About two days later, Mr Quail came to learn that over time some $950,000 had been transferred from Essential Media's collections account to its operations account to pay general company debts. Indeed, the collections account had been in debit since at least 2009. The indebtedness of the collections account had worsened by some $400,000 since Mr Quail became a director of Essential Media. Mr Quail said that it appears that Essential Media's collections account was effectively used as an overdraft facility since 2009. Mr Quail was not aware of this until he became chief executive officer in October 2019. Had he been aware, Mr Quail would have immediately stepped in to stop this happening; having a collections account with a negative balance posed a number of risks to the company.

22    Further, Mr Quail came to learn that the company had failed to report collections revenue to stakeholders. Mr Quail contacted representatives of the ABC, Screen Australia and Screen NSW to explain what had happened and to enter into a payment plan to meet Essential Media's obligations to

stakeholders. In evidence are several emails and agreements evidencing Mr Quail's efforts to regularise the company's dealings with its stakeholders.

**Discovery of transfers**

23    In addition, Mr Quail came to learn of the three transfers from Hilton Cordell to Essential Media in February and March 2019. Mr Quail says that the transfers were likely made into Essential Media's operating account to improve the apparent financial position of the company. Essential Media's cash flow report incorporated the opening and closing bank balances for each week and the movement of cash. This report created a detailed forecast on Essential Media's cash balances. When these transfers were made, the cash flow forecast was dire. Mr Hilton was under significant pressure to lower this indebtedness when the transfers were made. Mr Quail said that the transfer of Hilton Cordell's funds "propped up" Essential Media's bank accounts which were used as a guide to the company's overall financial position when considering its assets and liabilities. The accounts were then used by Mr Hilton to suggest to management that Essential Media was performing well.

24    Mr Cordell was also unaware that the transfers had been made. As Mr Cordell later described it, in January 2020 Mr Hilton "casually mentioned $190K had gone missing". In January 2020, Mr Quail spoke to Mr Cordell about the transfers. Mr Cordell told Mr Quail that he did not know anything about the transfers until Mr Hilton had called him that week and, "Chris said he didn't know anything about it either and had only just found out about it himself in January 2020". Mr Quail advised that this was "rubbish" as he had been informed by Mr Taylor that Mr Hilton authorised the transfers.

25    Although Mr Hilton and Mr Cordell did not give evidence, a series of emails and text messages between them were produced on subpoena and tendered by Essential Media. On 14 February 2020, Mr Hilton sent an email to Mr Cordell,

> Look forward to receiving some emails from Lorraine [Pickering] proving that [E]ssential was holding [Hilton Cordell] money in trust to disburse to [i]nvestors/owners. She and I no longer have access to our Essential [e]mails. … Meanwhile Lorraine told me there's about $31,500 in the 3 [Hilton Cordell] bank accounts. She says no-one from Essential has got the ability [t]o log in to these accounts so the money should be safe.

Mr Hilton asked that Ms Pickering send Mr Cordell and himself $15,000 each from Hilton Cordell's remaining funds. The suggestion from Mr Hilton's email appears to have been that Essential Media was holding Hilton Cordell money in its collections account to disburse to stakeholders. There was also a suggestion that Essential Media had been able to access Hilton Cordell's bank accounts in the past.

26   On 17 February 2020, Mr Cordell replied that he was not comfortable transferring funds from Hilton Cordell, and further:

> I'd like to [g]et some clarity around the outstanding $190k loan from [Hilton Cordell] to Essential [t]hat you mentioned in our call. As a director of [Hilton Cordell] can you let me know [h]ow much has been loaned to Essential and on what terms. I'm [c]oncerned about this on a number of levels.

27   Mr Hilton replied:

> $190k was borrowed from [Hilton Cordell's] Collections Account in 3 tranches in [2]019. There is no documentation of the loan which is why it's [i]mportant that we demonstrate that [Essential Media] was disbursing funds as a matter [o]f history.
>
> Given you probably don't have a copy of our original emails [a]greeing to this arrangement the best way of demonstrating this is the [e]mails and reports from Lorraine to you.
>
> If you don't want to help try to secure this money that[']s up to you.

The suggestion in this email was that Essential Media had been using Hilton Cordell's collections account monies "as a matter of history" and that there was an email or emails, apparently with Mr Cordell, agreeing to the arrangement and, in addition, reports from Ms Pickering to Mr Cordell reporting on implementation of the arrangement.

28   Mr Cordell disclaimed that he had agreed to such an arrangement:

> I'm willing to help secure the money but it's [d]isturbing to learn [Hilton Cordell] funds were loaned to [Essential Media]. I wouldn't [h]ave agreed to that. Can I get better sense of where the $190k is [l]ikely to be disbursed if it can be retrieved …

29   On 19 February 2020, Mr Cordell sought further information from Mr Hilton, noting that he was considering taking legal action.

> I'm keen to get more detail on what happened with the 190k as [i]t has potential implications for me as a Director of [Hilton Cordell]. …
>
> … who actually authorised the transfers from [Hilton Cordell] to Essential [Media]?

> Why was there no documentation of the loan?
>
> … What are your exact plans in terms of recovering the money lent to [E]ssential?
>
> … As a Director I'm anxious this money is retrieved and [d]isbursed as it should be to investors and shareholders. …

Mr Cordell requested a copy of the account ledger showing the $190,000 borrowed from Hilton Cordell's collections account.

30    On 20 February 2020, Mr Hilton informed Mr Cordell that a draft settlement agreement was being circulated between himself and Essential Media and the $190,000 would form part of that agreement. On 21 February 2020, Mr Cordell again requested a copy of the account ledger. On 24 February 2020, Mr Hilton reported that "Essential has now marked up the Settlement Deed and deleted [a]ny reference to the [Hilton Cordell] loan". Mr Hilton suggested that it was time for Mr Cordell to approach Mr Quail directly. Mr Cordell replied:

> Would you please advise [m]e who actually authorised Lorraine to make the three transactions from [Hilton Cordell] to [Essential Media] in early 2019.

Mr Hilton replied, "I presume it was [D]arren Taylor (CFO)". Mr Cordell replied, "They say it was [y]ou".

31    Mr Hilton replied,

> "Well they would [w]ouldn't they. I was never asked to authorise any of [t]hose three payments …
>
> … and it doesn't mean they don't owe the [m]oney (the majority of which is to me).

The bracketed text is significant, as it may indicate that Mr Hilton considered that the loan, or part of it, was repayable to him rather than Hilton Cordell, I infer, because of Mr Hilton's entitlement to a portion of the monies in Hilton Cordell's collections account.

32    Mr Cordell asked, "In that case when did [y]ou become aware the funds had been transferred?" Mr Hilton advised that he only became aware that the funds had been transferred on 10 January 2020, being the day after a settlement meeting with Mr Quail when Mr Hilton said that he rang Ms Pickering to ask whether there were any loans to Hilton Cordell that should be included in the agreement. To this, Mr Cordell expressed disbelief:

> I [f]ind it difficult to believe you weren't aware of transfers of [$]190k from [Hilton Cordell] to [Essential Media] while you were a Director of [Essential Media] in early 2019 and [s]till involved in the company. Even if the transfer was requested by [s]omeone else, as you claim, surely Lorraine would have consulted [y]ou.
>
> As [a] Director of [Hilton Cordell] permission should have been sought from me before [t]he transfers to place, which would never have been given. At the very [l]east I should have been advised by either yourself and/or Lorraine [i]mmediately after the transfers happened.
>
> I'm taking legal advice on what [a]ction I should take and will advise Screen Australia that investors [f]unds were removed from the [Hilton Cordell] collections account without my [p]ermission.

Mr Hilton replied, "You can believe what you want. Lorraine [i]s my witness".

33    On 28 February 2020, Mr Cordell emailed Mr Hilton asking whether he was seeking to retrieve the $190,000 from Essential Media and asked to be kept advised on the progress of settlement discussions with Mr Quail, so far as it related to Hilton Cordell. On 1 March 2020, Mr Cordell wrote to Mr Hilton in stronger terms referring to the "illegally transferred" $190,000 and that Mr Cordell was "only alerted about the misappropriation of these funds" recently. Whilst Mr Cordell said he had willingly given his assistance to Mr Hilton to recover the funds, he now understood that Mr Hilton was not seeking to recover the full amount from Essential Media. Mr Cordell suggested that Mr Hilton was in breach of his obligations as a director of Hilton Cordell, including by failing to seek permission from the board, including Mr Cordell as joint director, regarding the company's course of action over the misappropriated funds. Mr Cordell forbade Mr Hilton from entering into any agreement which did not result in full recovery of the $190,000, reserving his right to take action against Mr Hilton personally.

> I remain deeply [c]oncerned about the original transfer of $190,000 from [Hilton Cordell] to [Essential Media] in [e]arly 2019 and who authorised, or was aware of, these three separate [p]ayments. You did not alert me until mid-February 2020 about the [m]isappropriation of this money. …
>
> If, as you claim, the funds were [t]ransferred without your knowledge or authorisation then [Hilton Cordell] needs to [t]ake urgent legal action for their full recovery. Please advise me of [y]our position on this.

34    Mr Hilton replied that he was "very sorry [t]hat I let these funds [g]et transferred without your approval". Mr Hilton assured Mr Cordell that he was working very

hard to recover the full amount and would personally cover the legal costs necessary to do so.

> If [n]ecessary we will file a Statutory Demand. Your co-operation might [be] required to prepare such a document.

> … Again I am very [s]orry that this happened on my watch.

35    On 10 March 2020, Mr Cordell sought an update from Mr Hilton on his efforts to have the $190,000 returned to Hilton Cordell's collections account. Mr Hilton advised:

> K&L Gates are sending a letter of [d]emand tomorrow giv[ing] one week to pay before a Statutory Demand is [f]iled for the winding up of [Essential Media].

> To prepare the Stat Demand we may need [y]ou to sign an affidavit.

36    On 13 March 2020, K&L Gates sent a letter of demand to Essential Media seeking the repayment of funds loaned by Hilton Cordell. It was said that $190,000 was transferred to Essential Media as a loan due and payable upon demand. Hilton Cordell called for immediate repayment of the loan. It was said that Screen Australia had been notified that Essential Media had refused to return the funds and, further, that there was no doubt that Essential Media, especially its chief financial officer, Darren Taylor, was well aware of the agreement reached between the parties. Repayment of the loan was sought by 4.00pm on 18 March 2020, failing which a statutory demand would be issued.

**The demand and withdrawal**

37    On 20 March 2020, the statutory demand was issued and Mr Hilton swore the affidavit accompanying the demand, deposing that he was authorised by Hilton Cordell to make the affidavit. Mr Hilton expressed a belief that there was no genuine dispute about the existence or amount of debt, which was said to be due and payable. The belief so expressed was a curious one given that the emails between Mr Cordell and Mr Hilton indicated that there was no ready acceptance by Mr Quail that Essential Media was obliged to repay the monies. In particular, I have in mind Mr Hilton's email of 24 February 2020, when he advised that Essential Media had made amendments to the settlement deed by deleting any reference to a loan from Hilton Cordell.

38    On 24 March 2020, the statutory demand was served. On receipt, Mr Quail called Mr Cordell and asked whether he knew about the statutory demand. Mr

Cordell said that Mr Hilton had mentioned that Essential Media owed Hilton Cordell money but did not explain why. "He just said he was going to demand it back". Mr Quail said that he had emails from Mr Taylor indicating that Mr Hilton knew all about the transfers and Mr Cordell requested a copy of the emails "so I have some clear evidence". Further, Mr Cordell said,

> If I knew Chris had made the transfer himself, I wouldn't have gone along with it and approved the statutory demand.

This evidence was admitted as evidence of what Mr Cordell said, not the truth of what he said. Mr Quail asked whether Mr Cordell now agreed with the statutory demand, and Mr Cordell replied "No I don't, Chris has gone behind my back on all of this". Mr Quail forwarded the statutory demand to Mr Cordell who replied, "The sooner we can get evidence from Darren proving Chris's mis deeds the better". Mr Cordell requested a copy of Mr Taylor's emails to Mr Hilton in respect of the transfers and a statutory declaration from Mr Taylor. Mr Cordell enquired as to whether he could use this material, "If/when I advise Chris I am withdrawing from the Statutory Demand he has launched on 'our' behalf?"

39    On 2 April 2020, Essential Media's solicitor asked Mr Cordell whether Mr Hilton was authorised to swear the affidavit in support of the statutory demand. Mr Cordell replied:

> I was certainly aware that Chris Hilton took that action. However, given that Chris Hilton has breached his director's duties and [disbursed] money from the Hilton Cordell collections account without authorisation I would not have authorised it. I certainly no longer support the statutory demand and I'm willing to do something to assist you.

40    On 4 April 2020, Mr Taylor signed a statutory declaration setting out the circumstances in respect of each transfer, already described. The statutory declaration, supporting emails and MYOB records were provided to Mr Cordell. Mr Cordell observed that it was "clear proof that Chris Hilton was aware of the transfers from [Hilton Cordell] to [Essential Media]. He failed to inform me of this as a fellow director". Later that day, Mr Cordell emailed Mr Hilton seeking electronic access to the bank statements for the Hilton Cordell collections account. On 7 April 2020, Mr Cordell wrote to Mr Hilton in light of the material supplied by Essential Media.

1.   It has now been made clear to me you were aware of the three 'loans' made from the Hilton Cordell Collections Account to Essential Media in early 2019… Whether you initiated the transfers in the first place or not, you were clearly made aware of them a year ago and tacitly approved them by failing to object. You did not advise me as a Director of [Hilton Cordell] that company funds were being used to cash-flow another business of yours. Nor was there a loan agreement in place. These are clear breaches of director's duties. I no longer believe your claim that you first learned about the transfers on 10th January this year.

2.   Given your close and long-standing relationship with Lorraine Pickering managing the finances of [Hilton Cordell] and Essential Media it also stretches credibility that you did not communicate with her about the transfers from [Hilton Cordell] involving such substantial sums. If you did not personally direct Lorraine to make the transfers I believe she would have sought your permission….

…

5.   …I withdraw my support for the Statutory Demand recently issued by [Hilton Cordell] against Essential Media….

Mr Cordell sought a response to these matters "so we can work out the next steps and retrieve the missing [Hilton Cordell] funds in an appropriate manner". Mr Cordell forwarded his email to Essential Media's solicitor, who Mr Cordell also asked to make a search for any emails between Mr Hilton and Ms Pickering around the time of the three transfers. Mr Hilton responded, "It sounds to [m]e like you are colluding with Essential [Media] on this matter in which case [y]ou'd be in breach of your Directors duties".

41    On 7 April 2020, Essential Media's solicitors wrote to K&L Gates requesting that the statutory demand be withdrawn as the monies claimed in the statutory demand were not a debt owed by Essential Media but a debt owed by Mr Hilton. It was said that the monies claimed had been transferred into the operating account of Essential Media without the knowledge or consent of Mr Quail. "The transfer was solely for personal benefit of Mr Hilton to cover up his failings as a financial manager. The money was transferred in secret and in direct breach of his duty as a director to act in good faith, in the best interests of the company and not to put his own personal interests before that of the company". On 8 April 2020, Mr Cordell emailed Mr Hilton:

You are clearly involved [i]n a much broader, complex and bitter battle with Essential Media. It is [n]ot a battle I wish to be part of. You have a responsibility to make [g]ood on the money that went missing on your watch and then be left to [s]ettle your own disputes with Essential [Media].

42    Mr Hilton promptly replied:

> Lorraine clearly had a habit of … dipping into the [C]ollections Accounts to make payroll and then to repay when cash came [i]n. I think the evidence is clear that I didn't [o]rchestrate as much as turn a blind eye. …
>
> You say I have a responsibility to make [g]ood on the money. But how can I do that if you side with [Essential Media] and undermine the legal strategy to recover the funds?
>
> … Pressing a Statutory Demand is the [s]urest way to make sure this debt get's repaid soon …
>
> I am appealing [for] your support to [r]ecover the money by supporting the Statutory Demand as I thought we had [a]greed to do.

43   On 9 April 2020, Mr Hilton wrote to Mr Cordell again,

> I don't understand what you [t]hink is inappropriate about the legal advice I have been following. Essential has the money and the path we were on, until it was [d]erailed, was the way to exert maximum pressure.

**A deal to support demand**

44   On 9 April 2020, Mr Cordell replied:

> I was [h]appy to support the Statutory Demand when you made repeated assurances [y]ou had no involvement in the transfer of [Hilton Cordell] funds. Upon making my own [e]nquiries with Essential Media about the transfers I discovered you were [b]eing dishonest with me. The emails and the stat dec reveal you had full [k]nowledge of the transfers and approved of them without informing me. [T]his is a black and white breach of your director's [d]uties…
>
> It is abundantly clear … that Essential [M]edia, Greg Quail and yourself are in a complex, protracted and deeply [a]crimonious series of legal battles that I don't want to be [d]rawn into. You have a personal obligation as a director of [Hilton Cordell] to make [g]ood on the money that's missing and be left to fight these battles on [y]our own.
>
> My [p]osition is that you bear the immediate personal responsibility as a [d]irector who breached his duties, to return the missing [Hilton Cordell] funds. I [w]ill only support the Statutory Demand if you immediately disburse my [s]hare of the $190,000 that has gone missing on the understanding that we [a]gree to disburse funds to creditors in an appropriate manner.
>
> I also reserve my right to report this breach to [A]SIC.

Thus, Mr Cordell saw the primary responsibility to repay the money as resting on Mr Hilton.

45   Mr Hilton agreed to Mr Cordell's request and requested confirmation that Mr Cordell continued to support the statutory demand as Mr Hilton was concerned that he would be liable for indemnity costs if the statutory demand was set aside on the basis that Mr Cordell did not support it. Mr Cordell advised that he would agree to withdraw his objection to the statutory demand on the receipt of $80,000 as an initial down payment on his share of the funds

but, until the entire matter was satisfactorily resolved, reserved his right to refer Mr Hilton's actions to the Australian Securities and Investments Commission (*ASIC*). Negotiations ensued and ultimately Mr Cordell agreed that, if he received $40,000 that day, he would instruct K&L Gates to proceed with the statutory demand. The money was paid.

46   On 10 April 2020, Mr Cordell called Mr Quail and informed him of the arrangement reached with Mr Hilton. On 14 April 2020, these proceedings were commenced.

47   On 10 April 2020, Mr Cordell sent Mr Hilton a draft agreement regarding the outstanding debt. Recitals to the agreement drafted by Mr Cordell's solicitor provided:

> …
>
> B.   In early 2019, Hilton breached his director's duties to [Hilton Cordell] by allowing the transfer of $190,000 held in [Hilton Cordell]'s Collections Account to Essential Media ….
>
> C.   The transfer was made by Essential [Media] personnel in three tranches without Cordell's knowledge or permission on 28 February 2019 ($50,000), 4 March 2019 ($100,000), and 14 March 2019 ($40,000) (the "**Debt**"). The Debt was incurred when Hilton was also a director of Essential [Media].
>
> D.   In February 2020, Hilton obtained Cordell's support to issue a creditor's statutory demand on behalf of [Hilton Cordell] to recover the Debt from Essential ("**Statutory Demand**"). Since the Statutory Demand was issued, Cordell has become aware that Hilton knew of the transfers in early 2019 and intentionally elected not to inform Cordell.
>
> E.   As an interim resolution to the issues between them, Cordell has agreed to accept a partial payment of the Debt from Hilton on the terms and subject to the conditions of this Agreement.

48   The draft agreement provided that, following receipt of $40,000 in partial payment of the Debt, "Cordell will not withdraw his support for the Statutory Demand, and will advise Essential [Media] that the Statutory Demand remains on foot". The agreement further provided that, if the statutory demand was successful, then the recovered monies would be held in Hilton Cordell's collections account. Mr Hilton would agree not to make any arrangements to settle the Debt or the statutory demand without consultation with and approval of Mr Cordell. If the statutory demand was unsuccessful, then the draft agreement provided that Mr Hilton would be personally liable for and would return the balance of the Debt to Hilton Cordell's collections account by no later

than 31 April 2020 regardless of any efforts made by Mr Hilton to recover the Debt from Essential. That is, Mr Cordell regarded the three transfers as constituting a debt owed by Mr Hilton to Hilton Cordell.

49   The agreement was never signed (a subpoena issued to Mr Cordell did not result in production of an executed copy). Rather, a circulating resolution was passed by the directors of Hilton Cordell, signed by Mr Hilton on 14 May 2020 and Mr Cordell on 18 May 2020. The recitals noted that the company had issued a statutory demand, these proceedings had been commenced supported by an affidavit from Mr Quail setting out his conversations with Mr Cordell regarding the withdrawal of his support for the demand and "Cordell has since advised the Company of his support for the Statutory Demand". The directors resolved that all actions carried out by Mr Hilton to issue the statutory demand and swear the affidavit in support of it be ratified and confirmed. Mr Hilton was also authorised to act on behalf of Hilton Cordell to continue to instruct K&L Gates to act for the company as defendant in the proceedings.

## AFFIDAVIT ACCOMPANYING DEMAND

50   Section 459E(1) of the *Corporations Act 2001* (Cth) provides that a person may serve a demand on a company relating to a debt or debts that the company owes which are "due and payable". Section 459E(3) provides:

> **459E Creditor may serve statutory demand on company**
>
> …
>
> (3) Unless the debt, or each of the debts, is a judgment debt, the demand must be accompanied by an affidavit that:
>
> (a)   verifies that the debt, or the total of the amounts of the debts, is due and payable by the company; and
>
> (b)   complies with the rules.

51   Rule 5.2 of the Supreme Court (Corporations) Rules 1999 provides:

> **5.2   Affidavit accompanying statutory demand (Corporations Act s 459E (3))—Form 7**
>
> > For the purposes of subsection 459E(3) of the Corporations Act, the affidavit accompanying a statutory demand relating to a debt, or debts, owed by a company must:
> >
> > (a)   be in accordance with Form 7 and state the matters mentioned in that Form, and

> (b)  be made by the creditor or by a person with the authority of the creditor or creditors …

52    Form 7 contains the following paragraph:

> 3  *[State the source of the deponent's knowledge of the matters stated in the affidavit in relation to the debt or each of the debts, eg 'I am the person who, on behalf of the creditor(s), had the dealings with the debtor company that gave rise to the debt', 'I have inspected the business records of the creditor in relation to the debtor company's account with the creditor'].*

53    As Barrett J explained in *Saferack Pty Ltd v Marketing Heads Australia Pty Ltd* (2007) 214 FLR 393; (2007) 25 ACLC 1392; [2007] NSWSC 1143 at [35]:

> It is made clear by rule 5.2(b) that, if the creditor is a corporation and therefore incapable of swearing an oath (*Pathe Freres Cinema Ltd v United Electric Theatres Ltd* [1914] 3 KB 1253), the affidavit must be sworn by an individual acting with the creditor's authority. Form 7 in Schedule 1 to the Supreme Court (Corporations) Rules requires that the deponent of the affidavit state his or her relationship to the creditor, "eg … 'a director of the creditor' …". The making of the affidavit by a corporate creditor's director is therefore, not surprisingly, a common occurrence expressly contemplated.

54    As his Honour further explained at [39]:

> … It is thus envisaged by the legislation not only that a company which claims to be a creditor will state in the demand itself that the debt is due and payable but also that some human being acting with the authority of that company and capable of swearing an affidavit (and therefore being punished for perjury) will independently form and state an opinion that the debt is due and payable…

55    In *Portrait Express (Sales) Pty Limited v Kodak (Australasia) Pty Limited* [1996] NSWSC 199; (1996) 20 ACSR 746, Bryson J considered that there was a clear distinction between a defect in a demand and a defect in an affidavit verifying the demand as an affidavit which was incorrect had a different and higher order of importance than an incorrect demand. The requirement of verification, and the responsibilities attaching to it, which fell on the officer swearing the verification and on the creditor were "more than another form to fill in": at 758. The exercise of verifying a demand "must be carried out in a responsible way, and regard must be paid, with a strictness appropriate for verification, to the need to review the available information and observe whether what is being verified confirms to the information in the creditor's own hands": at 758.

**Authority of deponent**

56    The best evidence that a creditor company has conferred its authority on a director to swear an affidavit accompanying a statutory demand is a resolution

of the board. As Hammerschlag J explained in *Junker v Hepburn* [2010] NSWSC 88 at [42]:

> Ordinarily, where a company has more than one director, a single director does not have authority to bind it. A director's normal power is to bind the company only by joining with other directors in a collective resolution of the board of directors: *Northside Developments Pty Ltd v Registrar-General* (1990) 170 CLR 146 at 198, 205.

57     But a resolution may not be necessary where the deponent's role and responsibilities encompass such matters. For example, in *Telstra Corporation Limited v Ivory; Telstra Corporation Limited v Solar-Mesh (Australia)* [2008] QSC 123, the General Counsel in Dispute Resolutions for Telstra was considered to have authority as part of her ordinary duties to instruct solicitors to commence proceedings to set aside a statutory demand; it was not necessary for there to be a resolution of the board of directors of Telstra: per Lyons J at [82]-[83] citing Rodgers CJ in *AWA Limited v Daniels trading as Deloitte Haskins & Sells* (1992) 7 ACSR 759. Her Honour noted that the scope of authority conferred on an officeholder was an enquiry of fact to be determined having regard to the size of the company, the nature of its commercial undertakings and the role and responsibility of the officeholder: at [87], citing Dal Pont, *Law of Agency,* (2001) 200.

58     In the context of issuing a statutory demand, McKechnie J, with whom Murray and Wheeler JJ agreed, observed in *Horizon Star Pty Limited v Carina Holdings Pty Limited* [2003] WASCA 94 that the issue of authority is a question of fact, citing *Dennis Hanger Pty Limited v Kanambra Pty Limited* (1992) 10 ACLC 284. In *Horizon Star*, a director of the creditor company signed the demand and the accompanying affidavit but did so in the absence of a meeting of the board of directors authorising her to do so. In fact, there was a disagreement between the directors and it was clear that, if a meeting had taken place, no authority to issue the demand would have been given by the deadlocked board. The Court of Appeal concluded that the notice of demand was a nullity. Whilst the statements of authority of the director who issued the demand were *prima facie* evidence of the fact, that evidence had been displaced: at [19]. At [20]:

> Mrs Franke had no ostensible authority to act on behalf of Carina Holdings. Her only function was to participate in proceedings of the Board: *Northside Developments Pty Ltd v Registrar General* [1990] HCA 32; (1989-90) 170 CLR 146 per Dawson J at 205; *Smith v Henniken-Major & Co (A Firm)* (2002) 3 WLR 1848. The Master may be right in his surmises as to what might have occurred if a meeting had taken place. However, the fact remains that no meeting was held and in consequence no authority was given to Mrs Franke to issue the notice of statutory demand.

59    *Horizon Star* was distinguished in *Kern Group (Paddington) Pty Limited v Armstrong* [2011] QSC 133 where the affidavit verifying the demand of a creditor trust was sworn by one of its two trustees, where the terms of the trust deed gave a wide discretion to the trustees as to the exercise of their powers: per Boddice J at [16]-[18]. *Horizon Star* was also distinguished in *Range Resources Limited v Lind Asset Management LLC* [2015] WASC 238, where Master Sanderson considered that it was disingenuous to suggest that the plaintiff was unsure of the authority of the officer signing the affidavit verifying the demand or to call into question his capacity to sign the demand: at [23]. At [25]:

> … I am satisfied Mr Easton had authority to sign the affidavit. The purpose of the affidavit in support is for someone with knowledge of the debt to give sworn evidence that 'the subject of the demand exists, is due and payable and therefore there is an absence of a genuine dispute': see Assaf F, *Statutory Demands and Winding Up in Insolvency* (2nd ed) [3.29]. As Mr Easton was the person intimately involved in this transaction it is he who should properly have signed the affidavit. For instance, if Ms Brownstein had signed the affidavit there may have been some doubt as to whether or not she was sufficiently connected with the transaction to be able to verify a genuine belief there was no dispute as to the amount demanded. There is no substance in the plaintiff's complaints.

Both *Kern Group* and *Range Resources* simply reflect the fact that the judicial officer was satisfied on the evidence that the person swearing the affidavit verifying the demand did, in fact, have authority to do so.

## Retrospective authority?

60    There is no doubt as a general proposition that a company can ratify the acts of its directors and retrospectively cure any want of authority. The question is whether the common law principle applies unabated in the statutory context of section 459E. Consistent with the notion of parliamentary sovereignty, legislation can modify the common law and, in the case of inconsistency, legislation prevails over the common law: Perry Herzfeld and Thomas Prince,

*Interpretation* (2nd ed, 2020, Thomson Reuters) at [9.40] and the cases there cited.

61     Section 459E(3) provides in terms that "the demand *must be accompanied by an affidavit*" that verifies the debt and complies with the rules. The terms of the statute indicate that its requirements in respect of the affidavit be satisfied *when the demand is issued* or so proximate in time that it may fairly be described as "accompanying" the demand. Such a construction is consistent with the approach taken by Brereton J in *In the matter of Unity Resources Resources Group Australia Pty Limited* [2015] NSWSC 1174 where the affidavit accompanying the statutory demand was sworn before the date on which the demand was issued. Brereton J held that it was implicit in section 459E(3) that the affidavit must be sworn on the date of the demand and not on an earlier date: at [5]. Nor could a later affidavit sworn months after the demand was served cure the problem. At [12]:

> … The better view, it seems to me, is that if an updating affidavit is made on or after the date of the demand and served in circumstances that can be regarded as accompanying the demand, that may well cure the problem. But, at the very least, that would require service within the 21 day period for compliance with the demand and it may well require service contemporaneously with the demand. A similar view was taken in Chadmar Enterprises v IGA Distribution.

62     Further, Brereton J held that it was necessary to set aside a statutory demand that was not accompanied by an affidavit complying with section 459E(3) in order to preserve the undistorted operation of Part 5.4 of the *Corporations Act* and to promote the objects which it was intended to serve, as described in *Kisimul Holdings Pty Ltd v Clear Position Pty Ltd* [2014] NSWCA 262: at [14]. Brereton J considered that the absence of a proper and compliant accompanying affidavit would typically, if not invariably, result in the demand being set aside: at [15].

63     The authorities referred to by Brereton J bear reproduction. In *Chadmar Enterprises v IGA Distribution Pty Ltd* [2005] ACTSC 39; (2005) 53 ACSR 645, Higgins CJ observed at [52]:

> A debtor only has 21 days to apply to set aside the demand. If a later "updating affidavit" could be effective, a debtor could be deprived of its right to have the demand set aside save on the ground of "genuine dispute".

64    In *Kisimul Holdings*, Barrett JA was concerned with the absence of a statement

in the accompanying affidavit that the creditor believed there was no genuine

dispute as to the amount demanded. The importance of strict adherence to the

requirements of the rules was explained at [32]-[34]:

> [32]   The quality of the debt as undisputed is central to the proper working of
> Part 5.4. A presumption of insolvency can be allowed to arise through non-
> compliance with a demand for payment of a debt only if the debt is
> uncontroversially owing, due and payable. Unless the debt is of that kind, it
> cannot safely be presumed that non-payment is the product of inability to pay.
>
> [33]   A creditor seeking the benefit of a statutory presumption of insolvency
> through service of a statutory demand has a responsibility to ensure that, so
> far as it is aware, the debt relied on is owing, due, payable and undisputed —
> or, more accurately, a responsibility not to rely on the debt unless it genuinely
> believes it to be of that kind. And the company served with the demand has a
> right, secured to it by s 459E(3)(b) and the provision of the rules requiring
> adherence to Form 7, to be assured that the demanding creditor recognises
> that responsibility and has conscientiously formed a belief that the
> responsibility has been discharged.
>
> [34]   The statement by the deponent of the s 459E(3) affidavit of belief of
> absence of genuine dispute therefore provides a significant measure of
> assurance that the objectives of Part 5.4 are being observed by the creditor.
> Absence of the statement means that that measure of assurance is lacking
> and puts the recipient company into a position of uncertainty from which the
> legislation intends that it should be protected.

65    I consider that the same analysis can be applied to the requirement that the

affidavit be sworn by the creditor or by someone with the authority of the

creditor. The recipient of a statutory demand is entitled to be assured on

receipt of a demand that it is issued with the authority of the creditor, and that

the person swearing the accompanying affidavit has authority to state the

matters there set out. The recipient of the demand can then choose to pay it or

not by reference to the critical consideration, being the recipient's solvency.

Failure to pay will be a clear indicator of insolvency, consistent with the

presumption that failure to pay gives rise. As Barrett J put it more eloquently in

*Willard King Organisation (1978) Pty Ltd v CT Franchises Pty Ltd* [2009]

NSWSC 97 in the context of an accompanying affidavit which did not depose

that the debt was due and payable at [23]:

> … The company is entitled to know that the creditor has satisfied itself that the
> debt is due and payable and is thus of the quality necessary to sustain a
> statutory demand. If that assurance is not given, the company cannot fairly be
> put to the choice of paying the claimed amount, seeking to have the demand
> set aside or suffering the imposition of a presumption of insolvency.

66      If a creditor company could retrospectively cure an absence of authority when
        a demand was issued, the safeguards afforded by the requirement that the
        affidavit accompanying the demand be sworn by an authorised person, as
        described in *Saferack* and *Portrait Express,* would be eroded. The
        requirements of section 459E(3) must be satisfied when the demand is issued
        in order to preserve the undistorted operation of Part 5.4 of the *Corporations
        Act*. Thus I conclude that section 459E(3) overrides the common law rule that
        any want of authority can be cured by a ratifying resolution. The person making
        the affidavit which accompanies a demand must have authority to do so when
        the demand is issued or, possibly, within the 21 day period before payment is
        required.

67      In *Ox Operations Pty Ltd v Land Mark Property Developments (Vic) Pty Ltd (in
        liq)* [2007] FCA 1221, the directors ratified the plaintiff company's
        commencement of proceedings to set aside a statutory demand, which
        Finkelstein J held had the result of retrospectively authorising the
        commencement of legal proceedings by the company. It will be recalled that
        section 459G of the *Corporations Act* requires such an application to be filed
        within 21 days of service of the demand, failing which the Court has no
        jurisdiction to set aside the demand: *David Grant & Co Pty Ltd v Westpac
        Banking Corp* [1995] HCA 43; (1995) 184 CLR 265 per Gummow J for the
        Court at 276-7. Other cases addressing the same difficulty were canvassed by
        Black J in *Rinfort Pty Ltd v Arianna Holdings Pty Ltd* [2016] NSWSC 251;
        (2016) 306 FLR 413 at [26]-[37]. In *Rinfort*, leave was granted under section
        237 to bring proceedings on behalf of a company to set aside a statutory
        demand where the proceedings had been commenced in time but without the
        requisite authority. As to why the Court how power to do so notwithstanding
        that the proceedings had not been properly commenced within the 21 day
        period, Black J held at [38]-[39]:

>       [38]   … As a matter of the construction of s 459G of the *Corporations Act*, an
>       application to set aside the Demand was here filed within the 21 day period
>       specified in the *Act*, albeit it was irregularly filed. It does not seem to me that
>       the policy of s 459G of the *Corporations Act*, to which I have referred above,
>       would be promoted by the position for which Arianna Holdings contends. A
>       policy that any issue in respect of a creditor's statutory demand should be
>       identified and determined promptly is satisfied where an application to set it
>       aside is filed within the 21 day period, so as to place the creditor on notice of

the dispute, even if there is an issue as to whether that application was properly authorised, which is subsequently resolved by ratification, or by the grant of leave under ss 236–237 of the *Corporations Act*, or by the dismissal of the proceedings if neither ratification nor the grant of such leave occurs.

[39]    I can also see no reason in the terms of ss 236–237 of the *Corporations Act* or in its policy … why a company should be less able to bring a meritorious application to set aside a creditor's statutory demand where its directors are deadlocked than where they are not.

See, more recently, *In the matter of Ulan Stone Pty Ltd* [2020] NSWSC 937.

68    *Ox Operations* is not authority for the proposition that a company may retrospectively authorise the issue of a statutory demand with the consequence that any non-compliance with section 459E is cured. The language of section 459E and the policy behind the statutory demand regime require a different result. Recipients of statutory demands must be able to decide within the 21 day period whether they should pay the demand or not. A significant factor in that decision is the assumption – which the recipient is entitled to make – that the demand was issued with the authority of the creditor.

**Submissions**

69    Essential Media submits that Mr Hilton's affidavit in support of the statutory demand contained a false statement, being "I am authorised by the Creditor to make this affidavit on its behalf." Thus, it is said that the affidavit is defective which is sufficient reason to have the demand set aside pursuant to section 459J(1)(b) of the *Corporations Act*. Essential Media relied on *Spencer Constructions Pty Ltd v G&M Aldridge Pty Ltd* [1997] FCA 681; (1997) 76 FCR 452, where the Full Federal Court (Northrop, Merkel and Goldberg JJ, at 458) confirmed that a defect in a document relating to a statutory demand may be sufficient for the grant of relief under section 459J(1)(b). The affidavit was a document that related to the demand and thus a defect in the affidavit was sufficient to have the demand set aside. Lack of approval by the creditor can lead to a statutory demand being set aside: *In the matter of Access Elevators Australia Pty Ltd* [2016] NSWSC 739.

70    Essential Media submitted that, as Hilton Cordell had two directors at the time, the position was as stated by Hammerschlag J in *Junker v Hepburn* [2010] NSWSC 88 at [42], being a single director does not have authority without a resolution of the board of directors. As Hilton Cordell had not produced any

evidence to show that Mr Hilton was authorised to swear the affidavit at the time it was sworn, an adverse inference should be drawn: *Katsilis v Broken Hill Proprietary Co Ltd* (1977) 18 ALR 181 at 196-198 (Barwick CJ); *Commercial Union Assurance Co of Australia Ltd v Ferrcom Pty Ltd* (1991) 22 NSWLR 389 at 418-419 (Handley JA); *Evans v Levy* [2011] NSWCA 125 at [43] (Campbell and Young JJA and Sackville AJA agreeing); *Zaccardi v Caunt* [2008] NSWCA 202 at [27] (Campbell JA, Allsop P and Barr J agreeing); generally, *Jones v Dunkel* (1959) 101 CLR 298. It was submitted that Mr Cordell's position had vacillated from denying awareness of the amounts said to have been lent by Hilton Cordell to Essential Media, admitting awareness of the statutory demand but denying any support for it, to supporting the demand. It was submitted that any support by Mr Cordell for the pursuit of the demand arose after the supporting affidavit was sworn. Alternatively, Essential Media submitted that if Mr Cordell did authorise the issuing of the demand, he did so on the basis of Mr Hilton's deceit and his consent was void: *Papadimitropoulos v R* (1957) 98 CLR 249; [1958] ALR 21. With respect, this submission was pitched too high.

71    Further, it was submitted that Hilton Cordell could not ratify the affidavit so as to retrospectively cure the defect: *Unity Resources* per Brereton J at [5] and [12]; *Chadmar Enterprises v IGA Distribution Pty Ltd* at [52]. A circulating resolution prepared *after* that 21-day period had expired could not retrospectively cure an otherwise defective affidavit. Further, Essential Media submitted that the existence of the circulation resolution supported the lack of authority as at 20 March 2020: why would it be thought necessary to ratify something that was already authorised? If there had been a resolution or even an informal agreement between the directors that the action could be taken, then it wouldn't matter if Mr Cordell changed his mind and there would be no need to ratify what had already happened. Rather, there was no evidence from Mr Cordell, no evidence from Mr Hilton and no document establishing there was an authorisation for the statutory demand to be issued being evidence which only the defendant could supply.

72    Hilton Cordell agreed that where one director of a two director company causes a statutory demand to be issued without authority, the statutory demand might be a nullity and liable to be set aside under section 459J of the *Corporations*

*Act*: *Horizon Star Pty Ltd v Carina Holdings Pty Ltd* [2003] WASCA 94. However, Hilton Cordell submitted that the evidence showed that the affidavit was sworn with the approval of Mr Cordell and was not in any way irregular. The suggestion that the affidavit was false rested upon communications Mr Quail had with Mr Cordell after the demand was issued. Those communications showed that Mr Cordell was aware of the demand being issued and "approved the statutory demand" but was willing to remove his support for the demand after speaking to Mr Quail. A deal was then done between Mr Hilton and Mr Cordell where money was paid by Mr Hilton to Mr Cordell to maintain his support for the demand. Any payment of money by Mr Hilton to Mr Cordell was said to be of no moment but an internal matter concerning only Hilton Cordell and its principals; all that mattered was that the demand was issued regularly with the support of all directors of Hilton Cordell, and Hilton Cordell maintained the demand.

73      Even if Mr Cordell removed his support for Hilton Cordell maintaining the demand, that was irrelevant as Mr Cordell reversed his position and, for the sake of certainty, Hilton Cordell ratified Mr Hilton's conduct in causing the demand to be served and Hilton Cordell to defend the proceedings. To the extent there was any irregularity, it had been cured in the ordinary way. A step taken by a director without authority may be ratified. Ratification has the effect that the company is entitled to take advantage of the act as if the director had been authorised when he or she acted: Professor Ian Ramsay and Dr Robert (Bob) Austin, *Ford, Austin and Ramsay's Principles of Corporations Law* (15th ed, 2012, LexisNexis Butterworths) at [15.110] and [15.150]; *Commissioner of Taxation (Cth) v Sara Lee Household & Body Care (Australia) Pty Ltd* [2000] HCA 35 at [20]; (2000) 201 CLR 520 at 533; *McHugh v Eastern Star Gas Ltd* [2012] NSWCA 169 at [48]. Ratification by the board of directors of the unauthorised commencement of proceedings by a company to set aside a statutory demand has been held to cure the irregularity and avoid the action being void *ab initio*: *Ox Operations*. The same principle was said to apply to regularise a statutory demand served without authority.

**Conclusion**

74    There was no resolution of the directors of Hilton Cordell authorising Mr Hilton
to issue the statutory demand or swear the affidavit in support, or at least no
resolution on or before the day that the affidavit was sworn. But that is not the
end of the matter. It is clear that, once Mr Cordell became aware that $190,000
had been transferred from Hilton Cordell's collections account to Essential
Media, he wanted the money back and he wanted Mr Hilton to pursue the
retrieval of the funds with expedition and without compromise. On learning that
Mr Hilton was in settlement discussions with Essential Media, Mr Cordell stated
emphatically that Mr Hilton should not discount the amount of money to be paid
to Hilton Cordell but should recover every penny. On 1 March 2020, Mr Hilton
assured Mr Cordell that he was taking appropriate steps, which may include
issuing a statutory demand: at [33]. On 10 March 2020, Mr Hilton advised that
K&L Gates were sending a letter of demand before a statutory demand would
be issued and Mr Cordell's assistance may be needed in signing the affidavit
for the statutory demand: at [34].

75    Whilst there is a gap in contemporaneous documents from 10 March 2020 until
the statutory demand was issued on 20 March 2020, and thus there is no
evidence that Mr Cordell either expressly approved or sought to dissuade
Mr Hilton from this course of action, the contemporaneous documents indicate
that Mr Cordell was aware that a statutory demand may issue and was content
for this to be done. Mr Hilton was entitled to infer from his communications with
Mr Cordell that he was authorised to take that step. Why Mr Hilton did not get
Mr Cordell to swear the affidavit, as he earlier indicated he may need to, is not
known but is consistent with an apprehension by Mr Hilton that he had
authority to swear the affidavit himself.

76    That Mr Hilton had such authority is consistent with what Mr Cordell
represented to Mr Quail on 24 March 2020, being that Mr Cordell had
"approved the statutory demand". It is consistent with what Mr Cordell told
Essential Media's solicitor on 2 April 2020 when asked whether Mr Hilton was
authorised to swear the affidavit being, "I was certainly aware that Chris Hilton
took that action". It is consistent with Mr Hilton's email to Mr Cordell of 8 April
2020, at [42], that he thought they had agreed to seek to recover the money by

issuing the statutory demand. It is also consistent with Recital D in the draft agreement prepared by Mr Cordell's solicitor on 10 April 2020: at [46]. On the balance of probabilities, I find that Mr Hilton did have the authority of Hilton Cordell to issue the statutory demand and swear the affidavit in support on 20 March 2020. If I am wrong about this, then I consider that Hilton Cordell's circulating resolution of May 2020 did not cure any lack of authority.

**"GENUINE DISPUTE"**

77   Section 459H of the *Corporations Act* provides that, on an application under section 459G, the Court may set aside a statutory demand where there is a genuine dispute about the existence or amount of debt or where there is an offsetting claim in an amount greater than the debt. The principles relating to both genuine disputes and offsetting claims are well-settled. The threshold to establish a genuine dispute about the existence of a debt is a relatively low one. Black J conveyed the principles in *In the matter of Gorji Property Investment Pty Limited* [2018] NSWSC 1671 at [14] to [15]:

> [14]   … In *Spencer Constructions Pty Ltd v G & M Aldridge Pty Ltd* [1997] FCA 681; (1997) 76 FCR 452 at 464, the Full Court of the Federal Court held that a "genuine dispute" must be bona fide and truly exist in fact, and the ground for that dispute must be real and not spurious, hypothetical, illusory or misconceived. In *Panel Tech Industries (Aust) Pty Ltd v Australian Skyreach Equipment Pty Ltd (No 2)* [2003] NSWSC 896 at [18], Barrett J (as his Honour then was) formulated that proposition as follows, in a proposition applied in subsequent cases:

> "Once the company shows that even one issue has a sufficient degree of cogency to be arguable, a finding of genuine dispute must follow. The court does not engage in any form of balancing exercise between the strengths of competing contentions. If it sees any factor that, on rational grounds, indicates an arguable case on the part of the company, it must find that a genuine dispute exists, even where any case apparently available to be advanced against the company seems stronger."

78   In *Britten-Norman Pty Ltd v Analysis & Technology Australia Pty Ltd* (2013) 85 NSWLR 601; [2013] NSWCA 344, the Court of Appeal (Beazley P, Meagher and Gleeson JJA) said in the context of an offsetting claim, at [30]:

> It is settled law that s 459H requires the Court to be satisfied that there is a "serious question to be tried": see *Scanhill v Century 21 Australasia* [Pty Ltd (1993) 47 FCR 451] at 467, or "an issue deserving of a hearing" as to whether the company has such a claim against the creditor: see *Chase Manhattan Bank Australia Limited v Oscty Pty Limited* [1995] FCA 1208; 17 ACSR 128 at [42] per Lindgren J; *Eumina Investments Pty Ltd v Westpac Banking Corp* [1998] FCA 824; 84 FCR 454 per Emmett J (as his Honour then was). The

claim must be made in good faith: *Macleay Nominees v Belle Property East Pty Ltd* [2001] NSWSC 743]. In that case, Palmer J observed, at [18], that good faith, in this context, meant that the offsetting claim was arguable on the basis of facts that were asserted "with sufficient particularity to enable the Court to determine that the claim is not fanciful".

Their Honours make it clear that a similar standard of proof is required whether an offsetting claim or a genuine dispute is alleged.

79     It is not for the Court to engage in an assessment of a deponent's credit on an application such as this: *Britten-Norman* at [46]. What is called for is an assessment of the kind described by McLelland CJ in Eq in *Eyota Pty Ltd v Hanave Pty Ltd* (1994) 12 ACSR 785 at 787; (1994) 12 ACLC 669 at 671 (approved in *Britten-Norman* at [46]) (citations omitted):

> This does not mean that the court must accept uncritically as giving rise to a genuine dispute, every statement in an affidavit "however equivocal, lacking in precision, inconsistent with undisputed contemporary documents or other statements by the same deponent, or inherently improbable in itself, it may be" not having "sufficient prima facie plausibility to merit further investigation as to [its] truth", or "a patently feeble legal argument or an assertion of facts unsupported by evidence".

80     In *TR Administration Pty Ltd v Frank Marchetti & Sons Pty Ltd* (2008) 66 ACSR 67; [2008] VSCA 70, Dodds-Streeton JA, with whom Neave and Kellam JJA put the test in the following terms, at [71]:

> As the terms of s 459H of the *Corporations Act* and the authorities make clear, the company is required, in this context, only to establish a genuine dispute or off-setting claim. It is required to evidence the assertions relevant to the alleged dispute or off-setting claim only to the extent necessary for that primary task. The dispute or off-setting claim should have a sufficient objective existence and prima facie plausibility to distinguish it from a merely spurious claim, bluster or assertion, and sufficient factual particularity to exclude the merely fanciful or futile. …

81     Often cited is the judgment of Thomas J in *Re Morris Catering (Australia) Pty Ltd* (1993) 11 ACLC 919; (1993) 11 ACSR 601 at 605, which provides useful guidance:

> It is often possible to discern the spurious, and to identify mere bluster or assertion. But beyond a perception of genuineness (or the lack of it), the court has no function. It is not helpful to perceive that one party is more likely than the other to succeed, or that the eventual state of the account between the parties is more likely to be one result than another.

> The essential task is relatively simple — to identify the genuine level of a claim (not the likely result of it) and to identify the genuine level of an offsetting claim (not the likely result of it).

82    Here, Mr Quail and Mr Taylor were not cross-examined and Hilton Cordell
      called no witnesses. Thus, I have proceeded on the basis that Mr Quail and Mr
      Taylor's evidence of what was said and done is correct. I also have the benefit
      of contemporaneous records of communications between Mr Hilton and Mr
      Cordell already described.

**Submissions**

83    Essential Media submitted that there was no evidence of a written or oral loan
      agreement with Hilton Cordell, and there was evidence to the contrary.
      Mr Hilton was, at the time of the purported loans, a director of both Essential
      and Hilton Cordell but did not tell his fellow directors at Essential Media
      (Mr Quail) or at Hilton Cordell (Mr Cordell) of the fact that they had a liability
      and an asset respectively.  Nor had Mr Hilton recorded anywhere, or informed
      any of his co-workers (or the Court) of, the terms of these dealings of which he
      was fully aware.  This was said to raise concerns as to whether Mr Hilton had
      elected to hold back important information which related to the enforceability
      (or otherwise) of any loan. It was submitted that an adverse inference ought be
      drawn: *Katsilis v Broken Hill*; *Commercial Union Assurance Co of Australia Ltd
      v Ferrcom*; *Evans v Levy*; *Zaccardi v Caunt*; *Jones v Dunkel*.

84    Essential Media submitted that the absence of loan documents meant that the
      Court would need to infer the existence of a loan agreement from the conduct
      of the parties. This required compelling evidence: *Adnunat Pty Ltd v ITW
      Construction Systems Australia Pty Ltd* [2009] FCA 499 per Sundberg J at [39]-
      [40]. There was no such compelling evidence here, and certainly no evidence
      from Hilton Cordell. As a result, it was submitted that there was a genuine
      dispute as to whether the transfers from Hilton Cordell to Essential Media were
      a loan or something else and the demand ought be set aside: *In the matter of
      Tuffrock Pty Ltd* [2015] NSWSC 738 at [15] (Black J).

85    Hilton Cordell submitted that the suggested genuine dispute was in truth a
      dispute with Mr Hilton in his performance as a director of Essential Media
      rather than a genuine dispute as to the existence of the debt owed to Hilton
      Cordell. As to the latter, at the time of transfers, Mr Hilton was a director and
      Chief Executive Officer of Essential Media. Essential Media had cash flow

difficulties. There was no doubt that the monies were transferred. The transfers were recorded in Essential Media's MYOB records as a loan. This was admissible evidence of the existence of the loans: sections 286, 1305, and the definition of 'books' in section 9 of the *Corporations Act*. Mr Taylor's emails to Mr Hilton in March 2019 evidenced an understanding by Mr Taylor that the transfers were to be used to meet the operating expenses of Essential Media, that Ms Pickering had "borrowed $150k from the HCA collections account" and that Hilton Cordell would be repaid.

86    Whilst Hilton Cordell accepted that there was no written loan agreement, a contract can be formed orally or by conduct. It was submitted that the evidence clearly showed that, at the time the transfers were made, Essential Media was in need of the funds, was aware (through Mr Taylor) that Hilton Cordell was transferring money to assist, used the funds and considered itself obliged to repay the money. The suggestion that Mr Hilton was personally liable to repay the money was said to be fanciful. Impugning Mr Hilton's conduct as a director of Essential Media did not make Mr Hilton liable to Hilton Cordell in Essential Media's stead.  Even if Essential Media was able to establish any of the allegations it made against Mr Hilton, it would have no more than a claim against Mr Hilton in relation to his directorship of Essential Media.  Such a case could not absolve Essential Media of its liability to Hilton Cordell.  Essential Media's argument it was not liable to repay the money failed to exhibit any plausible contention, was patently feeble, and did not warrant setting aside the demand.

**Conclusion**

87    On the evidence before the Court on this application, there is no doubt that $190,000 was transferred from Hilton Cordell's collections account to Essential Media's collections account. Further, Mr Cordell was unaware that the transfers were made at the time and, if he had been asked, would not have agreed to the funds being transferred, including because the collections account held royalties on behalf of stakeholders. Whether Ms Pickering and/or Mr Hilton had authority to advance a loan on behalf of Hilton Cordell in the absence of Mr Cordell's knowledge and approval is unclear.

88   It also appears that – at the receiving end of the transfer – Mr Quail, a director
     of Essential Media, was unaware of the transfers until seven months later. The
     fact that Mr Quail was unaware of the transfers at the time may not be
     surprising given the differing roles which he and Mr Hilton performed at the
     company. Nor was Mr Taylor aware until after the transfers had been made. Mr
     Taylor says that, if he had been asked by Ms Pickering whether to make the
     transfers, he would not have agreed. Whether Ms Pickering and/or Mr Hilton
     had authority to borrow funds on behalf of Essential Media in the absence of
     Mr Quail's knowledge and approval is unclear.

89   A loan is just like any other contract: there must be offer and acceptance,
     consideration and an intention to create legal relations. It is difficult to divine
     these elements, particularly given the apparent absence of knowledge and
     agreement by either the lender or borrower, and the lack of consideration
     received by Hilton Cordell.

90   Hilton Cordell's bank records and Essential Media's MYOB records *are*
     evidence that the transfers were loans. The application of section 1305 was,
     however, elucidated by Austin J in *Australian Securities and Investments
     Commission v Rich* (2009) 75 ACSR 1; [2009] NSWSC 1229 at [397]-[398]:

> **[397]**   Section 1305(1) does not make the company's books conclusive
> evidence of the matters they contain, in the sense of requiring the tribunal of
> fact to make a finding in terms of the content of the books in the absence of
> proof to the contrary by the opposing party. The books are prima facie
> evidence of the matters stated in them, but the weight of that evidence is to be
> measured in accordance with the common sense of the tribunal of fact
> (*Phipson on Evidence*, 16th edn (2005), at [7–17]).

> **[398]**   In my view it would be open to the tribunal of fact to find that the prima
> facie evidence constituted by the company's books is outweighed by other
> evidence (including evidence adduced by the proponent of the books, even if
> the opponent does not give evidence about them); or by some quality or
> characteristic of the books themselves, even if there is no other evidence. In
> particular, if a book has the appearance of a draft or (being electronic) has a
> file title indicating that it is a draft, that alone may be sufficient (all other things
> being equal) for the tribunal of fact to reject the book as evidence of the matter
> stated in it, notwithstanding that the book is prima facie evidence of that
> matter; a fortiori if, in addition to having the appearance of a draft, the book
> contains inconsistencies or ambiguities or the matter otherwise demands
> explanation.

See also *Whitton v Regis Towers Real Estate Pty Ltd* (2007) 161 FCR 20;
[2007] FCAFC 125; *Livingspring Pty Ltd v Kliger Partners* (2008) 20 VR 377;

[2008] VSCA 93; *In the matter of Shot One Pty Ltd (in liquidation)* [2017] VSC 741 at [243]-[244]; *In the matter of Pulse Interactive Pty Limited (in liquidation)* [2019] NSWSC 22; (2019) 134 ACSR 461.

91    The veracity of the evidence comprising Hilton Cordell's bank records and Essential Media's MYOB records is diminished by the fact that the records were made by Ms Pickering, who appears to have been acting on the instructions of Mr Hilton. The veracity of Mr Taylor's emails to Mr Hilton in March 2019 suffer from the same defect, being that Mr Taylor gave unchallenged evidence that he was relying on what Ms Pickering had told him about the transfers.  In the case of the third transfer, the contemporaneous banking and MYOB records are unclear and are consistent with the transfer being repayment of a loan *from* Essential Media advanced through the use of the company's credit card.

92    Assuming for the moment that the transfers were loans, then the further question is whether the loans were by Hilton Cordell or by Mr Hilton from his entitlement to a portion of the funds in Hilton Cordell's collections account. Mr Cordell's emails with Mr Hilton after he became aware of the transfers are consistent with Mr Cordell, at least, regarding Mr Hilton as primarily liable to repay the monies.

93    It is not necessary on an application such as this to decide which characterisation of events will prevail. The only issue is whether there is a genuine dispute as to the existence of the debt within the meaning of section 459H as interpreted by the cases to which I have referred. It seems to me that there is a *bona fide* dispute which truly exists in fact, on grounds which are real and not spurious, hypothetical, illusory or misconceived. Essential Media's stance that, whatever the transfers were, the monies were not loans by Hilton Cordell to Essential Media has a sufficient degree of cogency to be arguable. To suggest that it is not obliged to repay funds which were unsolicited is not a novel legal proposition. Thus I find that a genuine dispute exists and the statutory demand must be set aside.

**"DUE AND PAYABLE"**

94   It is thus not necessary for me to consider the third issue but in deference to the parties' detailed submissions, I will briefly do so. Essential Media submitted that if the Court finds there was a loan, then it was not "due and payable" when the statutory demand was issued, or there is a genuine dispute as to whether the loan is due and payable: *Tuffrock* at [12]-[13] and [15]. As to the first matter, Essential Media submitted that where a debt is alleged to have arisen under a loan, it is critical to examine the terms of the loan to determine if the debt is actually due and payable: *In the matter of Litigation Insurance Pty Limited* [2017] NSWSC 334 at [34]-[39] (Gleeson JA). Since there was no written loan agreement or any evidence of an oral agreement, the Court could not assess the terms of the loan to identify whether the loan was actually "due and payable". Thus, the oft-cited principle that, where a loan is found to exist but terms of repayment are absent, the loan is repayable on demand, cannot be applied here: cf. *Ogilvie v Adams* [1981] VR 1041 at 1043 (Fullagar J). As to the second matter, Essential Media submitted that the factual circumstances surrounding the purported loan meant it could not be due and payable as Essential Media was in dire need of money at the time and it could not have been intended that the loan be immediately repaid. The situation was said to be analogous with *Tuffrock* at [17], where the loan was repayable either after reasonable notice had been given or when the company was able to repay it, having regard to its own operating and financial constraints.

95   Hilton Cordell submitted that a simple contract of loan which does not provide for the time of repayment is understood to create an obligation to repay immediately: *Haller v Ay*re [2005] 2 Qd R 410 at [19]-[22], [26]-[32] citing *Ogilvie v Adams*. Thus in the present case, the loans were due and payable. The facts and arguments advanced in *Tuffrock* were said to be different and have no relevance here. In *Tuffrock*, the issue was not whether there was a *loan simpliciter* repayable on demand but whether the terms of the loan required repayment upon the recipient of the loan considering it appropriate to do so having regard to the company's financial and operating position. The observation made by Black J at [17] that the loan did not become due for payment until a reasonable time after the statutory demand was served was

responsive to a submission made to the effect that it was an implied term of the loan that it was repayable upon reasonable notice being given. What Black J said was not a statement of principle applicable to *loans simpliciter*. Even if what Black J said was a statement of general principle, it would be inconsistent with *Ogilvie* and the later decisions noted by Keane JA in *Haller* at [19]-[22] and [26]-[32], and should not be followed.

**Conclusion**

96      Drawing on my judgment in *In the matter of ReNu Waste Pty Limited* [2020] NSWSC 108 at [22]-[32], *s*ection 459E(1) of the *Corporations Act* provides that a person may serve a demand on a company relating to a debt or debts that the company owes which are "due and payable". A debt is 'due and payable' when it is ascertainable, immediately payable and presently recoverable or enforceable by action: Re Elgar Heights Pty Ltd (1985) 9 ACLR 846; [1985] VR 657 at 669 and 671 (per Ormiston J); Remuneration Data Base Pty Ltd v Pauline Goodyer Real Estate Pty Ltd [2007] NSWSC 59 at [39]-[42] (per White J); *NA Investment Holdings Pty Limited v Perpetual Nominees Limited* (2010) 79 ACSR 544; [2010] NSWCA 2010 at [63] (per Lindgren AJA); *Main Camp Tea Tree Oil Limited v Australian Rural Group Ltd* (2002) 20 ACLC 726; [2002] NSWSC 219 per Barrett J at [17].

97      The learned author of Farid Assaf, Statutory Demands and Winding Up in Insolvency (2nd ed, 2012, LexisNexis Butterworths) considers that such an interpretation is consistent with the underlying policy and purpose of Part 5.4 of the *Corporations Act* as the statutory presumption of insolvency should arise only in clear cases of indebtedness and the debt in question is one about which no other inference can be drawn in the event of non-payment, other than that the company was unable to pay it: at [2.36]. Further, in determining whether a debt is 'due and payable' for the purposes of section 459E, the courts tend to adopt a pragmatic and commercial approach: at [2.38]. See, for example, *HL Diagnostics Pty Ltd v Psycadian Ltd* [2005] WASC 234 per Master Newnes at [30]; *Binshell Pty Limited v Broadway Australia Pty Limited* [2002] NSWSC 54 per Barrett J at [39]-[40].

98      A company may not dispute the existence of the debt claimed by the creditor, but dispute that the debt is "due and payable".  The courts have vacillated as to whether such a dispute should be dealt with under section 459H(1)(a), section 459J(1)(a) or section 459J(1)(b): see *Portrait Express* at 751 per Bryson J cf *NT Resorts Pty Limited v Deputy Commissioner of Taxation* (1998) 16 ACLC 957; (1998) 153 ALR 359 at 367 per Finkelstein J; *A R Pilot Pty Ltd v Gouriotis* [2007] NSWSC 396 per Barrett J at [19] and *In the matter of Forza Plumbing Systems Pty Ltd* [2013] NSWSC 1234 per Brereton J at [19]. In *In the matter of MK Group Phoenix Pty Ltd* [2014] NSWSC 1467, Black J concluded that a statutory demand claiming monies which were not due and payable gave rise to a defect in the demand that would cause substantial injustice for the purposes of section 459J(1)(a), would also be an abuse of the statutory demand procedure for the purposes of section 459J(1)(b), and, in that case, should also be set aside by reason of a genuine dispute as to whether the monies were due and payable: at [27] and [41]. In *Tuffrock*, Black J noted that a genuine dispute as to whether the debt is due and payable can provide a sufficient basis to set aside a creditor's statutory demand under section 459J(1)(b), and was satisfied in that case that a genuine dispute had been established as to whether the debt was due and payable and set the demand aside under section 459J(1)(b): at [15] and [18].

99      The same approach was taken by Barrett AJA in *In the matter of PostNet Australia Pty Ltd* [2017] NSWSC 160 at [16]-[17] and Gleeson JA in *In the matter of Longjing Pty Ltd* (2017) 123 ACSR 456; [2017] NSWSC 1534 at [44]. More recently, in *AspectFP Pty Ltd v Messer* [2019] VSC 249, Gardiner AsJ concluded that the plaintiff's proposed construction of a loan agreement was completely untenable, being that interest would only be payable at the plaintiff's whim if and when it decided to repay the principal debt: at [23]. On the proper construction of the loan agreement, interest was due and payable. There was thus no genuine dispute under section 459H that the interest was due and payable.

100    As to the onus and standard of proof, Gleeson JA noted in *Longjing* at [46]:

> … it is common ground that the same approach in terms of "onus" should
> apply under s 459J(1)(b) to the issue whether the debt the subject of the

demand is not presently due and payable, as would be the case if the issue arose in the context of whether there was a "genuine dispute" in relation to the debt under s 459H(1). That is, the relevant question is whether there is a "plausible contention requiring investigation" that the debt is not presently due and payable: Britten-Norman Pty Ltd v Analysis & Technology Australia Pty Ltd (2013) 85 NSWLR 601 at [55] (Beazley P, Meagher JA and Gleeson JA).

101   In this regard, Gleeson JA expressed doubt as to the majority view in *MNWA Pty Ltd v Deputy Commissioner of Taxation* (2016) 250 FCR 381; [2016] FCAFC 154 that proof on the balance of probabilities applied, noting that the majority's comments were *obiter*: at [47]-[48]. Those doubts were shared by Black J in *In the matter of JF Essential Power Pty Limited* [2018] NSWSC 435 at [24], where his Honour followed the dissenting judgment in MNWA:

> … It is only necessary for [the plaintiff] to establish that there is a plausible contention requiring investigation that the debt is not presently due and payable, and it need not establish that matter on the balance of probabilities: MNWA Pty Ltd v Deputy Commissioner of Taxation [2016] FCAFC 154; (2016) 117 ACSR 446 at [131]; Re Longjing Pty Ltd … at [46].

In *JF Essential Power*, there was a genuine dispute whether there was a loan as opposed to an investment of capital or a gift in an inter-family transaction. The evidence established that there was a serious question to be tried as to whether any debt owed was due and payable on demand or only when the borrower had the capacity to pay it, a condition which was not then satisfied.

102   Thus, when a company applies to set aside a statutory demand on the basis that there is a genuine dispute, not as to the existence or the amount of the debt, but whether it is due and payable within the meaning of section 459E, then the Court may set it aside either under section 459H(1)(a), 459J(1)(a) or 459J(1)(b) but, whichever route is taken, the Court must be satisfied before doing so that there is a *"plausible contention requiring investigation" that the debt is not presently due and payable*.

103   Returning to the facts at hand, when the transfers were made, Essential Media had significant cash flow difficulties. A contention by Essential Media that it was a term of the loan that the monies were repayable within a reasonable period of time of a demand being made or repayable when Essential Media was able to do so seems to be a plausible one. That Hilton Cordell intended to be repaid once Essential Media's operating cash flow improved cannot be said to be a spurious argument devoid of merit.

104 Of course, demand was made a year later, on Friday, 13 March 2020 at 12.36pm. Repayment was sought by 4pm on Tuesday, 18 March 2020. This allowed Essential Media four calendar days – or two business days – to pay $190,000. Whether this was a reasonable period of time, or whether Essential Media was obliged to repay the monies or not given its ability to do so (of which there was no evidence) also seems to be a plausible contention requiring investigation. Thus, I would also have set aside the statutory demand on this basis.

105 Finally, it is important to note that the creditors' statutory demand regime under Part 5.4 of the *Corporations Act* does not exist to collect debts that are the subject of dispute or debts where significant offsetting claims are known to exist. The provisions of Part 5.4 of the *Corporations Act* are intended to create a summary procedure to give rise to a presumption of insolvency rather than to collect debts: *In the matter of Halal Meats Pty Ltd* [2015] NSWSC 2041 at [23] (Black J). This was classically a case where a statutory demand should not have been issued as it must have been clear to Hilton Cordell that Essential Media disputed its obligation to repay the transferred funds. Whilst Mr Hilton considered that pressing the demand was the "[s]urest way to make sure this debt get's repaid soon" and "was the way to exert maximum pressure", that is not the purpose of a statutory demand.

**ORDERS**

106 For these reasons, I make the following orders:

(1)   Pursuant to section 459G of the *Corporations Act 2001* (Cth), order that the statutory demand dated 20 March 2020 issued by Hilton Cordell & Associates Pty Limited to Essential Media and Entertainment Pty Ltd be set aside.

(2)   Order the defendant to pay the plaintiff's costs of these proceedings.

**********

DISCLAIMER - Every effort has been made to comply with suppression orders or statutory provisions prohibiting publication that may apply to this judgment or decision. The onus remains on any person using material in the judgment or decision to ensure that the intended use of that material does not breach any such order or provision. Further enquiries may be directed to the Registry of the Court or Tribunal in which it was generated.