# Exhibit A

Omnibus Corporate Authority

I, Samuel Benjamin Bankman-Fried, as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), hereby authorize, instruct and consent to the following corporate actions with respect to all members of the FTX Group:

(i)    the appointment of John J. Ray III (the "CEO") as Chief Executive Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group;

(ii)    the execution and delivery of any agreements, documents or instruments the CEO determines to be appropriate in connection with the foregoing;

(iii)    the retention of counsel and other advisors, and the execution and delivery of any agreements, documents or instruments in connection with the foregoing;

(iv)    the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of FTX Trading Ltd.;

(v)    the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of Alameda Research Ltd.;

(vi)    the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of West Realm Shires Inc.;

(vii)    if the CEO shall so determine, the appointment of one or more individuals chosen by the CEO and not affiliated with me as director of other members of the FTX Group;

(iv)    the performance of any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect the foregoing.

It is my wish that the CEO consult with my counsel at Paul, Weiss, Rifkind, Wharton & Garrison LLP with respect to the foregoing director appointments.

Date:  November 10, 2022

_Samuel Benjamin Bankman-Fried_
672DA88132804B9...

Samuel Benjamin Bankman-Fried

# Exhibit B

**BE IT KNOWN THAT WE, STERLING TRUST & FIDUCIARY LIMITED**, of Suite F20, 1ˢᵗ Floor, Eden Plaza, Eden Island, Seychelles, **LICENCED CORPORATE SERVICE PROVIDER** residing in the **REPUBLIC OF SEYCHELLES** having seen the originals of the attached documents for **Alameda Ventures Ltd,** IBC Number 217617: -

> ➢ Certificate of Incorporation
> ➢ Resolution of the Subscriber
> ➢ Certificate of Good Standing
> ➢ Certificate of Incumbency

**DO HEREBY CERTIFY THAT** the attached documents represent true copies of the originals.

**Dated this 23ʳᵈ day of December 2019**



....................................................................
**STERLING TRUST & FIDUCIARY LIMITED**
**Authorised Signatory**



## Republic of Seychelles
**INTERNATIONAL BUSINESS COMPANIES ACT, 2016**
**(Act 15 of 2016)**

*Certificate of Incorporation*

THIS IS TO CERTIFY that, having satisfied all the requirements in respect of incorporation under the International Business Companies Act, 2016,

**Alameda Ventures Ltd**

is incorporated in the Republic of Seychelles as an International Business Company,

on this **23**rd day of **December 2019**

Given at Victoria, Seychelles.

*Company No:* 217617

REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES



**Alameda Ventures Ltd**
(the "Company")

Company number 217617

Incorporated in Seychelles

FIRST RESOLUTION OF THE SUBSCRIBER OF THE COMPANY

Pursuant to the International Business Companies Act, 2016 we, the undersigned, being the subscriber of the Company, hereby appoint the following to be the first Directors of the Company:

| | |
|---|---|
| Name: | Samuel Benjamin Bankman-Fried |
| Date of Birth: | 5-Mar-1992 |
| Passport Number: | 507223181 |
| Passport Issue Date: | 15-Jun-2013 |

| | |
|---|---|
| Name: | Wing Man Charis Law |
| Date of Birth: | 16-Feb-1985 |
| Passport Number: | K02969381 |
| Passport Issue Date: | 20-Sep-2012 |

| | |
|---|---|
| Name: | Luk Wai Chan |
| Date of Birth: | 9-Jan-1981 |
| Passport Number: | KJ0274128 |
| Passport Issue Date: | 12-Apr-2013 |

Dated this 23rd day of December 2019



..............................................................
**STERLING TRUST & FIDUCIARY LIMITED**
*By Authorised Signatory*
Subscriber



# Republic of Seychelles
## INTERNATIONAL BUSINESS COMPANIES ACT, 2016
### (Act 15 of 2016)

### Certificate of Good Standing

## Alameda Ventures Ltd

### Company Number 217617
### Incorporated On: 23rd December 2019

This is to certify that:

1. The above company has been duly incorporated under the International Business Companies Act, 2016.

2. The name of the company is still on the Register of the International Business Companies and the Company has paid all fees, license fees and penalties due and payable under the provisions of the International Business Companies Act, 2016.

3. The Company has not submitted, to the Registrar, Articles of Merger or Consolidation that have not yet become effective.

4. The Company has not submitted, to the Registrar, Articles of Arrangement that have not yet become effective.

5. The Company is not in the process of being wound-up or dissolved.

6. No proceedings have been instituted to strike the name of the company off the said Register.

7. In so far as is evidenced by the documents filed with the Registrar, the Company is in good legal standing.

Given at Victoria, Seychelles on this 24th day of December 2019

REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES

## CERTIFICATE OF INCUMBENCY
### OF
### Alameda Ventures Ltd

We, **STERLING TRUST & FIDUCIARY LIMITED**, a duly licensed and regulated Seychelles International Corporate Services Provider (ICS – 046) and Registered Agent of Alameda Ventures Ltd ("the Company") an International Business Company incorporated in Seychelles on the 23rd day of December 2019, with company number 217617 do hereby confirm the following:

1. The Registered Office of the Company is situated at F20, 1st Floor, Eden Plaza, Eden Island, Seychelles.

2. The authorised capital of the Company is USD 100.00 divided into 10,000 Ordinary shares of par value USD 0.01 each.

3. The current Directors of the Company are as follows:

   Samuel Benjamin Bankman-Fried
   Wing Man Charis Law
   Luk Wai Chan

4. There is no Secretary currently appointed.

5. The current Shareholders of the Company representing all of the issued shares is as follows:

   | Name | Class of Share | Current Holding |
   |------|----------------|-----------------|
   | ALAMEDA RESEARCH LTD | Ordinary | 1,000 |

6. Pursuant to the Company's Memorandum and Articles of Association and certain resolutions adopted by the directors, the persons designated to serve in the above-entitled capacity were given sufficient authority to act on behalf of and to bind the Company.

7. There are no charges registered against the Company at the Registered Office.

8. No action has been taken or threatened to wind up or otherwise dissolve the Company.

9. The Company is in existence and in good standing in the Seychelles.

Dated this 23rd day of December 2019

**Renatha Philoé**
*Authorised Signatory*
**STERLING TRUST & FIDUCIARY LIMITED**
**Registered Agent**

# Exhibit C

**BE IT KNOWN THAT I, SERGE ROUILLON,** of Suite 14, First Floor, Kingsgate House, Victoria, Mahé, Seychelles, **NOTARY PUBLIC,** duly appointed and sworn, residing and practicing in the **REPUBLIC OF SEYCHELLES,** having seen the original of the following document for **Maclaurin Investments Ltd.,** with Company Number **217617:** -

❖  **Certificate of Incorporation of Change of Name**

**DO HEREBY CERTIFY THAT** the document attached hereto represents a true copy of the original.

**Dated this 10ᵗʰ day of May 2023**



Mr Serge Jean-Luc Rouillon B.A  L.L.B  (Linc's
Attorney-at-Law and Notary Public
Suite 14, Kingsgate House  P.O. Box 1075
Victoria, Mahe, Republic of Seychelles
Tel  +(248) 422 52 76 / +(248) 422 51 57
Fax  +(248) 422 58 46 Email  director@sergerouillon.com
Email  manager@sergerouillon.com

**Serge Rouillon**
**Notary Public & Attorney at Law**
**Suite 14, First Floor**
**Kingsgate House, Victoria**
**Mahé, Seychelles**

**Tel: + (248) 4 22 52 76   + (248) 4 22 51 57**
**Fax: + (248) 4 22 58 46**





**Republic of Seychelles**

**INTERNATIONAL BUSINESS COMPANIES ACT, 2016**

**(Act 15 of 2016)**

*Certificate of Incorporation of Change of Name*

THIS IS TO CERTIFY that,

**Alameda Ventures Ltd**

has changed its name and is now incorporated under the name of

**Maclaurin Investments Ltd.**

on this **26**th day of **September 2022**

Given at Victoria, Seychelles.

*Company No:* 217617

for REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES

# Exhibit D

SEYCHELLES

THE INTERNATIONAL BUSINESS COMPANIES ACT 2016

**MEMORANDUM OF ASSOCIATION**

**AND**

**ARTICLES OF ASSOCIATION**

**OF**

**Maclaurin Investments Ltd.**

A COMPANY LIMITED BY SHARES

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
REPUBLIC OF SEYCHELLES

2 6 SEP 2022

Company registration no: 217617

This document replaces in its entirety the Company's original
Memorandum and Articles of Association dated the 23rd day of December 2019

Incorporated in Seychelles the 23rd day of December 2019
As amended on the 26th day of September 2022

Registered Agent: STERLING TRUST & FIDUCIARY LIMITED
F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelles

2

THE INTERNATIONAL BUSINESS COMPANIES ACT 2016

## MEMORANDUM OF ASSOCIATION

### OF

### Maclaurin Investments Ltd.

(the "**Company**")

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
REPUBLIC OF SEYCHELLES

2 6 SEP 2022

1.    **DEFINITIONS AND INTERPRETATION**

1.1    In the Memorandum and the Articles, if not inconsistent with the context:

"**Act**" means the International Business Companies Act 2016 and includes any regulations made under the Act;

"**Articles**" means the attached articles of association of the Company as amended from time to time;

"**authorised capital**", in relation to the Company, means the maximum amount of share capital that it is authorised by the Memorandum to issue;

"**beneficial owner**" means, for the purposes of Article 9 and 10, as defined in Article 9.3;

"**Board**" means the board of directors of the Company from time to time;

"**bonus Share**" means a Share issued for no consideration to an existing Shareholder, which shall be treated in all respects as having been a fully paid Share on issue;

"**Chairman of the Board**" means as defined in Article 13;

"**charge**" means any form of security interest, including, without limitation, a charge, by way of fixed or floating charge, a mortgage, a pledge or a hypothecation, over property, wherever situated, other than an interest arising by operation of law;

"**Distribution**", in relation to a distribution by the Company to a Shareholder:

(a)    means the direct or indirect transfer of an asset, other than Shares, to or for the benefit of the Shareholder, or the incurring of a debt to or for the benefit of the Shareholder, in relation to Shares held by the Shareholder, and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of Shares, a transfer of indebtedness or otherwise, and includes a Dividend; but

(b)    does not include a distribution by way of a distribution of assets to Shareholders on the Company's winding up;

"**Dividend**" means every Distribution of the Company's assets to its Shareholders, except Distributions by way of:

(a)    an issue of Shares as bonus Shares;

(b)    a redemption or purchase of any of the Company's own Shares or financial assistance for a purchase of the Company's own Shares; or

(c)    a reduction of Share capital;

"**listed company**" means, for the purposes of Article 9 and 10, a company whose securities are listed on a recognised exchange or a company which is a subsidiary of a body corporate, partnership or trust whose securities are listed on a recognised exchange;

"**Member**" means a Shareholder;

"**Memorandum**" means this Memorandum of Association of the Company as amended from time to time;

"**ordinary resolution**" means:

(a)    a resolution passed at a meeting of Shareholders on a show of hands by in excess of half of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(b)    a resolution passed at a meeting of Shareholders on a poll taken by Shareholders representing in excess of half of the total votes of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(c)    a resolution passed and consented to in writing by Shareholders representing in excess of half of the total votes of the Shareholders entitled to vote on the resolution;

"**person**" includes an individual, a corporation, a foundation, a trust (acting by its trustees), the estate of a deceased individual, a partnership and an unincorporated association of persons;

"**pledge**" means any form of security interest, including a pledge, a charge or a hypothecation over one or more shares in a company, other than an interest arising by operation of law, and "**pledged**", "**pledgee**" and "**pledgor**" shall be construed accordingly;

"**recognised exchange**" means a securities exchange licensed under the Securities Act 2007, a recognised overseas securities exchange as defined in the Securities Act 2007 or any other exchange that is a member of the World Federation of Exchanges;

"**Register of Beneficial Owners**" means as defined in Article 9.1;

"**Register of Charges**" means as defined in Article 16.2;

"**Register of Directors**" means as defined in Article 11.25;

"**Register of Members**" means as defined in Article 2.7;

"**Registrar**" means the Registrar as defined in the Act;

"**resolution of directors**" means:

(a)    a resolution passed at a meeting of directors of the Company by the affirmative vote of in excess of half of the directors present at the meeting who were present at the meeting and entitled to vote on the resolution; or

(b)    a resolution passed and consented to in writing by directors of the Company representing in excess of half of the total votes of directors entitled to vote on the resolution and without the need for any notice;

"**Seal**" means any seal which has been adopted as the common seal of the Company;

"**Securities**", in relation to the Company, means as defined in section 2(1) of the Securities Act 2007, including Shares and debt obligations of every kind of the Company and options, warrants and other rights to acquire Shares or the Company's debt obligations;

"**Share**" means a par value share issued or to be issued by the Company;

"**share capital**", in relation to the Company, means the sum of the aggregate par value of all the issued and outstanding par value shares of the company and shares with par value held by the Company as Treasury Shares and the amounts as may be from time to time transferred from surplus to share capital by a resolution of the directors;

"**Shareholder**" means a person whose name is entered in the Company's Register of Members as the holder of one or more Shares or fractional Shares;

"**special resolution**" means:

(a)    a resolution passed at a meeting of Shareholders on a show of hands by not less than two-thirds of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(b)    a resolution passed at a meeting of Shareholders on a poll taken by Shareholders representing not less than two-thirds of the total votes of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(c)    a resolution passed and consented to in writing by Shareholders representing not less than two-thirds of the total votes of the Shareholders entitled to vote on the resolution;

"**surplus**", in relation to the Company, means the excess, if any, at the time of the determination, of total assets of Company over the sum of its total liabilities, as shown in the books of account plus its share capital;

"**Treasury Share**" means a Share that was previously issued but was repurchased, redeemed or otherwise acquired by the Company and not cancelled; and

"**written**" or any term of like import includes all forms of writing, including (but not limited to) information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange, electronic mail, telegram, telex or telecopy, and "**in writing**" shall be construed accordingly.

1.2    In the Memorandum and the Articles, unless the context otherwise requires a reference to:

(a)    an "**Article**" is a reference to a clause of the Articles;

(b)    a "**Clause**" is a reference to a clause of the Memorandum;

(c)    the Act or other legislation is a reference to the Act or other legislation as extended, applied, amended or re-enacted and includes any subordinate legislation; and

(d)     the singular includes the plural and vice versa and the masculine gender shall include the feminine and the neuter.

1.3     Any words or expressions defined in the Act shall have the same meaning in the Memorandum and Articles unless otherwise required by the context or unless otherwise defined in this Memorandum or the Articles.

1.4     Headings are inserted for convenience only and shall be disregarded in the construction of or the interpretation of the Memorandum and Articles.

## 2.     NAME

2.1     The name of the Company is Maclaurin Investments Ltd.

2.2     Subject to Clause 2.3, the Company may amend its Memorandum and Articles to change its name by ordinary resolution or resolution of directors.

2.3     A change of the Company's name takes effect from the date of the certificate of change of name issued by the Registrar following registration of a certified copy or extract of the resolution referred to in Clause 2.2 filed in accordance with the Act.

## 3.     TYPE OF COMPANY

3.1     The Company is:

(a)     an international business company (as defined in the Act);

(b)     a company limited by shares (as defined in the Act);

(c)     a par value company (as defined in the Act); and

(d)     not authorised to issue no par value shares.

3.2     The liability of a Shareholder arising from the Shareholder's holding of any Share is limited to the amount (if any) unpaid on it.

## 4.     REGISTERED AGENT IN SEYCHELLES

4.1     The Company's registered agent is STERLING TRUST & FIDUCIARY LIMITED of F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelles.

4.2     Subject to Clause 4.3, the Company may amend its memorandum to change its registered agent by ordinary resolution or resolution of directors.

4.3     A change of the Company's registered agent takes effect from the date of the registration by the Registrar of the certified copy or extract of the resolution referred to in Clause 4.2 filed in accordance with the Act.

## 5.     REGISTERED OFFICE

5.1     The registered office of the Company is located at F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelles.

5.2     Subject to Clauses 5.3 and 5.4, the Company may amend its Memorandum to change the location of its registered office by ordinary resolution or resolution of directors.

5.3    The Company's registered office shall be the same address as the principal place of business in Seychelles of its registered agent.

5.4    A change of the Company's registered office takes effect on the registration by the Registrar of the certified copy or extract of the resolution referred to in Clause 5.2 filed in accordance with the Act.

6.    **CAPACITY AND POWERS**

6.1    Subject to the Act and any other written law of Seychelles, the Company has, irrespective of corporate benefit:

(a)    full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

(b)    for the purposes of paragraph (a), full rights, powers and privileges.

6.2    There are no limitations on the business that the Company may carry on other than as referred to in Clause 7.

7.    **LIMITATIONS ON THE COMPANY'S BUSINESS**

7.1    The Company shall not:

(a)    subject to Clause 7.2, carry on business in Seychelles;

(b)    own an interest in immovable property situated in Seychelles, or a lease of immovable property situated in Seychelles otherwise than as referred to in section 5(3)(f) of the Act;

(c)    carry on banking business (as defined in the Financial Institutions Act 2004) in or outside Seychelles;

(d)    carry on insurance business (as defined in the Insurance Act 2008):

(i)    in Seychelles; or

(ii)    outside Seychelles unless it is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business;

(e)    carry on business providing international corporate services, trustee services or foundation services (as defined in the International Corporate, Trustee and Foundation Service Providers Act 2016) except:

(i)    to the extent permitted under the International Corporate, Trustee and Foundation Service Providers Act 2016; and

(ii)    in the case of carrying on such business outside Seychelles, if the company is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business;

(f)    carry on securities business (as defined in the Securities Act 2007):

      (i)     in Seychelles; or

      (ii)    outside Seychelles unless it is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business;

(g)    carry on business as a mutual fund (as defined in the Mutual Fund and Hedge Fund Act 2008) unless it is licensed or otherwise legally able to do so under the Mutual Fund and Hedge Fund Act 2008 or under the laws of a recognized jurisdiction (as defined in the Mutual Fund and Hedge Fund Act 2008); or

(h)    carry on gambling business (as defined in the Seychelles Gambling Act 2014), including interactive gambling business:

      (i)     in Seychelles; or

      (ii)    outside Seychelles unless it is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business.

7.2    For the purposes of Clause 7.1(a) and the Act, the Company shall not be treated as carrying on business in Seychelles by reason only that:

(a)    it opens and maintains an account with a bank licensed under the Financial Institutions Act 2004;

(b)    it engages the services of or otherwise deals with counsel, attorneys-at-law, accountants, book-keepers, international corporate service providers, trustee service providers, foundation service providers, mutual fund administrators or managers, securities dealers, investment advisers or other similar persons carrying on business in Seychelles;

(c)    it prepares or maintains its books and records within Seychelles;

(d)    it holds meetings of its directors or Shareholders, or passes written consent resolutions of its directors or Shareholders, in Seychelles;

(e)    it concludes or signs contracts in Seychelles, and exercises in Seychelles all other powers, so far as may be necessary for the carrying on of its business outside Seychelles;

(f)    it holds shares, debt obligations or other securities in a company incorporated under the Act or the Companies Act 1972;

(g)    it has any interest or entitlement as a beneficiary of a foundation registered under the Foundations Act 2009;

(h)    it has any interest or entitlement as a beneficiary of a trust registered under the Trusts Act 2016;

(i)    it has any interest in a partnership registered under the Limited Partnerships Act 2003;

(j)    it operates as a licensed mutual fund under the Mutual Fund and Hedge Fund Act 2008;

(k)     shares, debt obligations or other securities in the company are owned by a resident person;

(l)     it is listed on a licensed securities exchange under the Securities Act 2007;

(m)    it holds a licence under the International Trade Zone Act 1995; or

(n)     subject to the provisions of the International Corporate, Trustee and Foundation Service Providers Act 2016, any of its directors are resident persons.

7.3     The Company may own or manage a vessel registered in Seychelles under the Merchant Shipping Act 1992 and the vessel may visit or be situated in Seychelles waters, provided that the Company shall not carry on any business in Seychelles in contravention of Clause 7.1(a), including, without limitation, fishing, charter or tourism business involving the vessel.

## 8.     AUTHORISED CAPITAL

8.1     The Shares shall be issued in the currency of the US Dollar.

8.2     The authorised capital of the Company is USD 100.00 divided into 10,000 Ordinary shares of par value USD 0.01 each.

8.3     The Company may issue fractional Shares and a fractional Share shall have the corresponding fraction of liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole Share of the same class of Shares.

## 9.     CLASSES AND SERIES OF SHARES

Subject to Clause 14, the Shares shall be divided into such classes and series as the directors may by resolution of directors determine from time to time and unless so divided shall comprise one class and series of Shares as referred to in Clause 8.2.

## 10.    RIGHTS ATTACHING TO SHARES

10.1    Each issued Share shall confer on its holder:

(a)     the right to one vote at a meeting of the Shareholders or on any resolution of the Shareholders;

(b)     the right to an equal share in any Dividend paid by the Company; and

(c)     the right to an equal share in the distribution of the surplus assets of the Company (remaining after payment of its liabilities) on its liquidation.

10.2    Subject to Article 3, the directors may by resolution of directors redeem, purchase or otherwise acquire all or any of the Shares.

## 11.    REGISTERED SHARES

11.1    The Company shall only issue registered shares.

11.2    The Company shall not, and has no power to: issue a bearer share; convert a registered Share into a bearer share; exchange a registered Share for a bearer share; or convert any other securities into, or exchange any other securities for, bearer shares.

12.     **VARIATION OF RIGHTS**

If at any time the Shares are divided into different classes, the rights attached to any class may only be varied, whether or not the Company is in liquidation, with the consent in writing of or by a resolution passed at a meeting by the holders of not less than 50 percent of the issued Shares in that class.

13.     **RIGHTS NOT VARIED BY THE ISSUE OF SHARES PARI PASSU**

The rights conferred upon the holders of the Shares of any class shall not, unless otherwise expressly provided by the terms of issue of the Shares of that class, be deemed to be varied by the creation or issue of further Shares ranking *pari passu* therewith.

14.     **AMENDMENT**

14.1    Subject to Clauses 12 and 14.2 and to Article 7, the Company may amend all or any provisions of its Memorandum or Articles by ordinary resolution or resolution of directors.

14.2    No amendment may be made by resolution of directors:

(a)     to restrict the rights or powers of the Shareholders to amend the Memorandum or Articles;

(b)     to change the percentage of Shareholders required to pass a resolution of Shareholders to amend the Memorandum or Articles;

(c)     in circumstances where the Memorandum or Articles cannot be amended by the Shareholders; or

(d)     to Clauses 10, 11, 12, 13 or this Clause 14.

14.3    An amendment to the Memorandum or Articles only has effect from the date of the registration by the Registrar of the amendment filed in accordance with the Act.

Dated this 26th day of September 2022

**Certified True Original of the Amended Memorandum of Association**

...................................................

Signed for and on behalf of
**STERLING TRUST & FIDUCIARY LIMITED**
By Authorised Signatory

...................................................

**Witness Name: Rebecca Hoareau**
Occupation: Corporate Services Officer
Address: Saint Louis, Mahé, Seychelles

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
REPUBLIC OF SEYCHELLES

2 6 SEP 2022

THE INTERNATIONAL BUSINESS COMPANIES ACT 2016

## ARTICLES OF ASSOCIATION

### OF

### Maclaurin Investments Ltd.

(the "**Company**")

> REGISTRAR OF INTERNATIONAL
> BUSINESS COMPANIES
> REPUBLIC OF SEYCHELLES
>
> 2 6 SEP 2022

1. **SHARE CERTIFICATES**

1.1    Every Shareholder is entitled on request and without payment to a certificate issued by the Company specifying the number and class of Shares held by him and signed by a director or other officer of the Company or by any other person authorised by resolution of directors or under Seal, and the signature of the director, officer or other authorised person, and the Seal, may be a facsimile.

1.2    The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

1.3    Any Shareholder receiving a certificate shall indemnify and hold the Company and its directors and other officers harmless from any loss or liability which it or they may incur by reason of any wrongful or fraudulent use or representation made by any person by virtue of the possession of the certificate. If a certificate for Shares is defaced, worn out, lost or destroyed it may be renewed on production of the defaced or worn out certificate or on satisfactory proof of its loss or destruction together with such indemnity as may be required by a resolution of directors.

2. **SHARES**

2.1    Shares and other Securities may be issued at such times, to such persons, for such consideration and on such terms as the directors may by resolution of directors determine.

2.2    Section 57 of the Act (*Pre-emptive rights*) does not apply to the Company.

2.3    Subject to Articles 2.4, 2.5 and 2.6, a Share may be issued for consideration in any form, including money, a promissory note, or other written obligation to contribute money or property, immovable property, movable property (including goodwill and knowhow), services rendered or a contract for future services.

2.4    Subject to section 55 of the Act, the consideration for a Share shall not be less than the par value of the Share. If a Share is issued for consideration less than the par value, the person to whom the Share is issued is liable to pay to the Company an amount equal to the difference between the issue price and the par value.

2.5    The Company may issue bonus Shares, partly paid Shares and nil paid Shares and may accept payment of consideration for such a Share in such instalment amounts and at such times after issue of the Share as the Company may approve; and a Share certificate shall be endorsed with a description of such Shares as being bonus, partly paid or nil paid as the case may be. The

Shareholder of partly paid or nil paid Shares shall be entitled to request a replacement Share Certificate without endorsement upon payment of the unpaid Share price.

2.6    No Shares, other than bonus Shares, may be issued for a consideration other than money (whether in whole or in part), unless a resolution of directors has been passed stating:

    (a)    the amount to be credited for the issue of the Shares;

    (b)    their determination of the reasonable present cash value of the non-money consideration for the issue of the Shares; and

    (c)    that, in their opinion, the present cash value of the non-money consideration and money consideration (if any) for the issue is not less than the amount to be credited for the issue of the Shares.

2.7    The Company shall keep at its registered office in Seychelles a register to be known as a register of members (the "**Register of Members**") containing:

    (a)    the names and addresses of each person who holds any Share;

    (b)    the number of each class and series of Shares held by each Shareholder;

    (c)    the date on which the name of each Shareholder was entered in the Register of Members; and

    (d)    the date on which any person ceased to be a Shareholder.

2.8    The Register of Members may be in such form as the directors may approve but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.

2.9    A Share is deemed to be issued when the name of the Shareholder is entered in the Register of Members.

## 3.    REDEMPTION OF SHARES AND TREASURY SHARES

3.1    The Company may redeem, purchase or otherwise acquire and hold its own Shares except that the Company may not redeem, purchase or otherwise acquire its own Shares without the consent of each Shareholder whose Shares are to be redeemed, purchased or otherwise acquired, unless the Company is permitted by the Act or any other provision of the Memorandum or Articles to redeem, purchase or otherwise acquire the Shares without their consent.

3.2    The Company may only offer to redeem, purchase or otherwise acquire Shares if the directors are satisfied, on reasonable grounds, that the Company will, immediately after the redemption, purchase or other acquisition, be able to pay its debts as they become due and the value of the Company's assets will be greater than the value of its liabilities. The resolution of directors authorising a redemption, purchase or other acquisition of Shares shall contain a statement that, in the opinion of the directors, the Company will, immediately after the redemption, purchase or other acquisition, be able to pay its debts as they become due and the value of the Company's assets will be greater than the value of its liabilities.

3.3    The Company shall not redeem or purchase a Share unless it is fully paid.

3.4    Sections 74 (*Process for redemption or purchase of own shares*), 75 (*Offer to one or more shareholders under section 74(1)(b)(ii)*) and 76 (*Shares redeemed at the option of a shareholder*) of the Act shall not apply to the Company.

3.5    Shares that the Company redeems, purchases or otherwise acquires may be cancelled or held as Treasury Shares provided that the Company may only hold such Shares as Treasury Shares if:

(a)    the directors resolve by resolution of directors that Shares to be redeemed, purchased or otherwise acquired shall be held as Treasury Shares; and

(b)    the number of Shares purchased, redeemed or otherwise acquired, when aggregated with Shares of the same class already held by the Company as Treasury Shares, does not exceed 50 percent of the Shares of that class previously issued by the Company, excluding Shares that have been cancelled.

3.6    All rights and obligations attaching to a Share held as a Treasury Share are suspended and shall not be exercised by the Company while it holds the Share as a Treasury Share.

3.7    Treasury Shares may be transferred by the Company on such terms and conditions (not inconsistent with the Act or the Memorandum and Articles) as the Company may by resolution of directors determine.

3.8    Where Shares are held by another body corporate of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other body corporate, all rights and obligations attaching to the Shares held by the other body corporate are suspended and shall not be exercised by the other body corporate.

4.    **PLEDGES OF SHARES**

4.1    Shareholders may pledge, charge or otherwise create security interests over ("**pledge**") their Shares.

4.2    There shall be entered in the Register of Members at the written request of the Shareholder:

(a)    a statement that the Shares held by him are pledged;

(b)    the name and address of the pledgee; and

(c)    the date on which the particulars specified in paragraphs (a) and (b) are entered in the Register of Members.

4.3    If particulars of a pledge over Shares are entered in the Register of Members, such particulars may be cancelled:

(a)    with the written consent of the named pledgee or anyone authorised to act on his behalf; or

(b)    upon evidence satisfactory to the directors of the discharge of the liability secured by the pledge and the issue of such indemnities as the directors shall consider necessary or desirable.

4.4    Whilst particulars of a pledge over Shares are entered in the Register of Members:

(a)    no transfer of any Share the subject of those particulars shall be effected;

(b)    the Company may not redeem, purchase or otherwise acquire any such Share; and

(c)    no replacement certificate shall be issued in respect of such Shares,

without the prior written consent of the named pledgee.

## 5.   FORFEITURE

5.1   The Company may:

    (a)    in accordance with this Article cause any of its Shares which have been issued otherwise than as fully paid to be forfeited for failure to pay any sum due and payable on them; or

    (b)    accept the surrender of such Shares instead of causing them to be forfeited.

5.2   A written notice of call specifying the date for payment to be made shall be served on the Shareholder who defaults in making payment in respect of the Shares.

5.3   The written notice of call referred to in Article 5.2 shall name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which the payment required by the notice is to be made and shall contain a statement that in the event of non-payment at or before the time named in the notice the Shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

5.4   Where a written notice of call has been issued pursuant to Article 5.3 and the requirements of the notice have not been complied with, the directors may, at any time before tender of payment, forfeit and cancel the Shares to which the notice relates.

5.5   The Company is under no obligation to refund any moneys to the Shareholder whose Shares have been cancelled pursuant to Article 5.4 and that Shareholder shall be discharged from any further obligation to the Company.

## 6.   TRANSFER OF SHARES

6.1   In accordance with section 62(2) of the Act but subject to Article 6.2, the Shares shall be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, provided that the instrument of transfer shall not be invalidated if it is signed by both the transferee and the transferor.

6.2   The instrument of transfer shall be signed by the transferee (as well as the transferor) if the Share is not fully paid up or if registration as a holder of the Share otherwise imposes a liability to the Company on the transferee.

6.3   The instrument of transfer of a Share shall be sent to the Company for registration. The Company shall, on receipt of a written instrument of transfer, enter the name of the transferee of the Share in the Register of Members unless by resolution of directors the directors resolve to refuse or delay the registration of the transfer for reasons that shall be specified in the resolution.

6.4   The directors of the Company may refuse or delay the registration of a transfer of Shares if the transferor has failed to pay an amount due in respect of those Shares.

6.5    The transfer of a Share is effective when the name of the transferee is entered in the Register of Members.

6.6    If the directors of the Company are satisfied that an instrument of transfer relating to Shares has been signed but that the instrument has been lost or destroyed, they may resolve by resolution of directors:

(a)    to accept such evidence of the transfer of Shares together with such indemnity as they consider appropriate; and

(b)    that the transferee's name should be entered in the Register of Members notwithstanding the absence of the instrument of transfer.

6.7    In the event of the death of a joint holder of a Share, legal title in such Share shall be transferred to the surviving Shareholder at his request in accordance with the doctrine of survivorship and the rules of joint tenancy upon receipt by the Company of evidence of the death of the joint Shareholder.

6.8    If a Shareholder dies:

(a)    the survivor or survivors, where the Shareholder was a joint holder; or

(b)    where the Shareholder was a sole holder or the only survivor of joint holders, the executor or administrator (each the "**personal representative**") of the deceased Shareholder or such other person legally entitled to transmission of the deceased Shareholder's Shares or interest in Shares,

shall be the only persons recognised by the Company as having any title to the deceased Shareholder's Shares or interest in Shares; but nothing in these Articles shall release the estate of a deceased Shareholder (whether sole or joint) from any liability in respect of any Share which had been held by him.

6.9    A transfer of a deceased Shareholder's Share made by the deceased Shareholder's personal representative, although the personal representative is not a Shareholder, is as valid as if the personal representative had been a Shareholder at the time of execution of the instrument of transfer.

6.10    A person becoming entitled to a Share in consequence of the death, bankruptcy or other incapacity of a Shareholder may, upon supplying to the Company such evidence as the directors may reasonably require to show his title to the Share, either be registered himself as holder of the Share upon giving to the Company notice to that effect or transfer such Share to some other person by executing an instrument of transfer of the Share to that person in accordance with Article 6.

6.11    Subject to Article 6.8, a person becoming entitled to a Share in consequence of the death, bankruptcy or other incapacity of a Shareholder (upon supplying to the Company such evidence as the directors may reasonably require to show his title to the Share) shall have the same rights as those to which he would be entitled if he were the registered Shareholder of the Share, except that in respect of such Share he shall not be entitled to attend any Shareholders' meeting or to vote on any resolution of Shareholders until he has been registered as a Shareholder in respect of the Share.

7.    **ALTERATION IN SHARE CAPITAL**

7.1    Subject to Articles 7.2 and 7.3, the Company may amend its Memorandum to:

    (a)    alter its authorised capital;

    (b)    increase its share capital by creating new shares of such amount as it thinks fit;

    (c)    combine all or any of its shares (whether issued or not) into a smaller number of shares with a larger par value amount than its existing shares;

    (d)    divide all or any of its shares into a larger number of shares with a smaller par value amount than its existing shares; and

    (e)    change the currency denomination of its share capital or any class of its share capital.

7.2    A division or combination of Shares, including issued Shares, of a class or series shall be for a larger or smaller number, as the case may be, of Shares in the same class or series.

7.3    Where Shares are divided or combined under Article 7.1, the aggregate par value of the new Shares must be equal to the aggregate par value of the original Shares.

7.4    The Company may increase its share capital up to the limit of its authorised share capital by creating new Shares of such amount as it thinks fit.

7.5    Subject to the provisions of the Act, the Company may by ordinary resolution reduce its share capital in any way, and in particular (but without prejudice to the generality of the foregoing) may:

    (a)    extinguish or reduce the liability on any of its Shares in respect of share capital not paid up;

    (b)    with or without extinguishing or reducing liability on any of its Shares, cancel any paid up share capital which is lost or unrepresented by available assets; or

    (c)    with or without extinguishing or reducing liability on any of its Shares, refund any paid up share capital which is in excess of the needs of the Company,

and if and so far as is necessary, alter the Memorandum accordingly.

7.6    A reduction of the Company's share capital under Article 7.5 shall not be subject to confirmation by the Court if the Company's directors pass a resolution authorising the reduction if they are satisfied, on reasonable grounds, that the Company will, immediately after the reduction, be able to pay its debts as they become due and the value of the Company's assets will be greater than the value of its liabilities. The resolution of directors authorising a reduction of the Company's share capital shall contain a statement that, in the opinion of the directors, the Company will, immediately after the reduction, be able to pay its debts as they become due and the value of the Company's assets will be greater than the value of its liabilities.

8.    **MEETINGS AND WRITTEN CONSENTS OF SHAREHOLDERS**

8.1    A meeting of the Shareholders may be held at such time and in such place within or outside Seychelles as the convener of the meeting considers appropriate.

8.2    The directors of the Company may convene a meeting of the Shareholders at any time.

8.3    The directors of the Company shall call a meeting of the Shareholders if requested in writing to do so by Shareholders entitled to exercise at least 20 percent of the voting rights in respect of the matter for which the meeting is requested.

8.4    A written request under Article 8.3 shall state the objects of the meeting, be signed by or on behalf of the requesting Shareholders and be given to the directors at the Company's registered office or principal place of business, and may consist of several documents in similar form each signed by or on behalf of one or more requesting Shareholders.

8.5    If the directors of the Company do not, within 21 days from the date of service of the written request under Article 8.3, call a meeting to be held within 2 months of that date, the requesting Shareholders, or any of them representing more than one half of the total voting rights of all of the requesting Shareholders, may themselves call a meeting, but a meeting so called shall not be held after 3 months from that date.

8.6    A meeting called under Article 8.3 by requesting Shareholders shall be called in the same manner, as nearly as possible, as that in which meetings are to be called by directors.

8.7    A person or persons convening a meeting of the Shareholders shall give to those Shareholders whose names, on the date the notice is given, appear as Shareholders in the Register of Members and are entitled to vote at the meeting:

(a)    in the case of a meeting for the passing of an ordinary resolution, not less than 7 days' notice in writing; and

(b)    in the case of a meeting for the passing of a special resolution, not less than 21 days' notice in writing.

8.8    Notwithstanding Article 8.7, a meeting of Shareholders held in contravention of the requirement to give notice is valid if Shareholders holding at least 90 percent of the total voting rights on all the matters to be considered at the meeting have waived notice of the meeting and, for this purpose, the presence of a Shareholder at the meeting shall be deemed to constitute a waiver on his part.

8.9    The inadvertent failure of the convener or conveners of a meeting of Shareholders to give notice of the meeting to a Shareholder, or the fact that a Shareholder has not received the notice, does not invalidate the meeting.

8.10   A Shareholder is entitled by written instrument signed by him or on his behalf to appoint another person as his proxy to speak and vote on his behalf at any meeting of the Company at which the Shareholder is entitled to attend and vote at.

8.11   The instrument appointing a proxy shall be produced at the place designated for the meeting before it is due to commence, provided that the notice of the meeting may specify an alternative or additional place or time at which the instrument appointing a proxy shall be produced to the Company.

8.12   An instrument appointing a proxy shall be in substantially the following form or any other form accepted by the chairman of the meeting as properly evidencing the wishes of the Shareholder appointing the proxy:

[COMPANY NAME]

I/We, being a Shareholder of the above Company, HEREBY APPOINT ..........................
of ...................................................................to be my/our proxy to vote for
me/us at the meeting of Shareholders to be held on the ........day of ........, 20...., and at any
adjournment of that meeting.

(Restrictions on voting, if any, to be inserted here)

Signed this ......day of ..............., 20....

...................................................
Shareholder (Name and Signature)

8.13 The following applies where Shares are jointly owned:

    (a)    if two or more persons hold Shares jointly each of them may be present in person or by proxy at a meeting of Shareholders and may speak as a Shareholder;

    (b)    if only one of the joint Shareholders is present in person or by proxy he may vote on behalf of all joint Shareholders; and

    (c)    if two or more of the joint Shareholders of Shares are present in person or by proxy they must vote as one and in the event of disagreement between any of the joint Shareholders then the vote of the joint Shareholder whose name appears first (or earliest) in the Register of Members in respect of such Shares shall be recorded as the vote attributable to the Shares.

8.14 No business shall be transacted at any meeting of Shareholders unless a quorum is present. A quorum shall be present if at the commencement of the meeting there are present, in person or by proxy, Shareholders entitled to exercise at least 50 percent of the votes of the Shares or class or series of Shares entitled to vote on resolutions of Shareholders to be considered at the meeting.

8.15 A Shareholder is deemed to be present at a meeting of Shareholders if he participates by telephone or other electronic means and all Shareholders participating in the meeting are able to hear each other.

8.16 If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened by or upon a request of Shareholders, shall be dissolved; in any other case it shall stand adjourned to the next business day in the jurisdiction in which the meeting was to have been held at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the Shares or each class or series of Shares entitled to vote on the matters to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

8.17 At every meeting of Shareholders, the Chairman of the Board shall preside as chairman of the meeting. If there is no Chairman of the Board or if the Chairman of the Board is not present at the meeting, the Shareholders present shall choose one among themselves to be the chairman. If the Shareholders are unable to choose a chairman, then the person representing the greatest number of voting Shares present in person or by proxy at the meeting shall preside as chairman failing which the oldest individual Shareholder or representative of a Shareholder present shall take the chair.

8.18    The chairman of the meeting may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting), adjourn the meeting from time to time and from place to place, but no business shall be transacted at an adjourned meeting other than business left unfinished at the meeting from which the adjournment took place.

8.19    At any meeting of the Shareholders the chairman of the meeting is responsible for deciding in such manner as he considers appropriate whether any resolution proposed has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes of the meeting. If the chairman has any doubt as to the outcome of the vote on a proposed resolution, he shall cause a poll to be taken of all votes cast upon such resolution. If the chairman fails to take a poll then any Shareholder present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall cause a poll to be taken. If a poll is taken at any meeting, the result shall be announced to the meeting and recorded in the minutes of the meeting.

8.20    A Shareholder that is a body corporate or other non-individual may by resolution of its directors or other governing body authorise such individual as it thinks fit to act as its representative at any meeting of Shareholders or of any class of Shareholders; and the right of any individual to represent a Shareholder shall be determined by the law of the jurisdiction where the Shareholder is constituted or derives its existence. In case of doubt, the Company's directors may in good faith seek legal advice from a legal practitioner in the jurisdiction where the Shareholder is constituted or derives its existence and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any Shareholder or the Company.

8.21    The chairman of a meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

8.22    A director of the Company may attend and speak at any meeting of Shareholders and at any separate meeting of the holders of any class or series of Shares but may not vote unless he is a Shareholder.

8.23    An action that may be taken by Shareholders at a meeting of Shareholders or any class of Shareholders may also be taken by resolution of Shareholders (an ordinary resolution or special resolution, as the case may be) consented to in writing without the need for any notice. A resolution of Shareholders by written consent:

(a)    may consist of several documents, including written electronic communications, in like form each signed or assented to by one or more Shareholders; and

(b)    shall be deemed to be passed when the written consent instrument, or the last of several instruments, is last signed or otherwise assented to or on such later date as is specified in the resolution.

9.    **REGISTER OF BENEFICIAL OWNERS**

9.1    The Company (unless it is a listed company) shall keep at its registered office in Seychelles a register to be known as a register of beneficial owners (the "**Register of Beneficial Owners**") containing:

(a)    the name, residential address, date of birth and nationality of each beneficial owner of the Company;

(b)     particulars of each beneficial owner's beneficial interest in the Company and how it is held;

(c)     the date on which a person became a beneficial owner of the Company; and

(d)     the date on which a person ceased to be a beneficial owner of the Company.

9.2     The Register of Beneficial Owners may be in such form as the directors may approve but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.

9.3     For the purposes of Article 9.1 and Article 10 but subject to sections 355(2), (3) and (4) of the Act, **"beneficial owner"** means any individual (excluding a nominee who acts on behalf of another) who in respect of the Company:

(a)     ultimately owns (directly or indirectly and whether alone or jointly with another person or entity) more than 25% of the Shares;

(b)     exercises (directly or indirectly and whether alone or jointly with another person or entity) ultimate control over more than 25% of the total voting rights of Shareholders;

(c)     is entitled (directly or indirectly and whether alone or jointly with another person or entity) to appoint or remove a majority of the directors of the Company; or

(d)     is otherwise entitled to exercise or actually exercises control over the Company or its management.

## 10.    DISCLOSURE OBLIGATIONS RELATING TO BENEFICIAL OWNERSHIP

10.1    In this Article:

**"registrable particulars"** means the information to be kept in the Company's Register of Beneficial Ownership pursuant to Article 9 and section 356 of the Act; and

a **"relevant change"** in relation to a person occurs if:

(a)     the person ceases to be a beneficial owner in relation to the Company; or

(b)     any other change occurs as a result of which the registrable particulars stated for the person in the Company's Register of Beneficial Owners are incorrect or incomplete.

10.2    Within 30 days of a person becoming a beneficial owner in relation to the Company he shall give written notice to the Company of the registrable particulars relating to him.

10.3    If a relevant change occurs in relation to a person, he shall within 30 days of the relevant change give written notice to the Company of:

(a)     the relevant change;

(b)     the date on which it occurred; and

(c)     any information needed to update the Register of Beneficial Owners.

10.4    Within 30 days of a person (including a Shareholder or beneficial owner) receiving a notice given by the Company under section 359 of the Act, he shall comply with such notice by providing in writing to the company the information requested in the notice.

10.5    The disclosure obligations referred to in Article 10.2 to 10.4 do not apply if the Company is a listed company.

## 11.    DIRECTORS

### Management of the Company

11.1    The business and affairs of the Company shall be managed by, or under the direction or supervision of, the directors of the Company.

11.2    The directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company.

11.3    The directors may pay all expenses incurred preliminary to and in connection with the incorporation of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or the Articles required to be exercised by the Shareholders.

11.4    The directors may by resolution of directors exercise all the powers of the Company to incur indebtedness, liabilities or obligations and to secure indebtedness, liabilities or obligations whether of the Company or of any third party.

11.5    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of directors.

### Duties of directors

11.6    Subject to Article 11.7, each director of the Company, in exercising his powers and performing his duties, shall:

(a)    act in accordance with the Memorandum and Articles;

(b)    act honestly and in good faith and in what the director believes to be in the best interests of the Company; and

(c)    exercise the care, diligence and skill that a reasonably prudent person would exercise in the same circumstances.

11.7    If the Company is a wholly-owned subsidiary, a director of the Company may, when exercising powers or performing duties as a director, act in a manner which he believes is in the best interests of the Company's parent even though it may not be in the best interests of the Company.

### Appointment, resignation and removal of directors

11.8    Subject to Article 11.9, the minimum number of directors shall be one and there shall be no maximum number.

11.9    The first director or directors of the Company shall, within nine months of the date of the Company's incorporation, be appointed in writing by the subscriber to the Memorandum.

Subsequent directors of the Company may be appointed by ordinary resolution or by resolution of directors.

11.10   A director holds office for the term, if any, fixed by the resolution appointing him, or until his successor takes office or until his earlier death, resignation or removal.

11.11   The directors of the Company may appoint one or more directors to fill a vacancy on the board in the event that a director dies or otherwise ceases to hold office as a director prior to the expiration of his term of office. In such a case, the directors may not appoint a director for a term exceeding the term that remained when the person who ceased to be a director left or otherwise ceased to hold office.

11.12   A director is not required to hold a Share as a qualification for office.

11.13   A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company or from such later date as may be specified in the notice. A director shall resign forthwith as a director if he is, or becomes, prohibited from acting as a director under the Act.

11.14   A director of the Company may be removed from office:

(a)      by ordinary resolution:

(i)      passed at a meeting of Shareholders called for the purpose of removing the director or for purposes including the removal of the director; or

(ii)     passed and consented to in writing by Shareholders representing in excess of half of the total votes of the Shareholders entitled to vote on the resolution;

(b)      by resolution of directors:

(i)      passed at a meeting of directors called for the purpose of removing the director or for purposes including the removal of the director; or

(ii)     passed and consented to in writing by directors of the Company representing in excess of half of the total votes of directors entitled to vote on the resolution.

**Alternate directors**

11.15   Subject to Article 11.16, a director may appoint as an alternate another director or any other person who is not prohibited from appointment as a director under section 133 of the Act to exercise the appointing director's powers and to carry out the appointing director's responsibilities in relation to the taking of decisions by the directors in the absence of the appointing director.

11.16   The appointment of an alternate director shall be in writing and written notice of the appointment shall be given by the appointing director to the Company. The appointment of an alternate director does not take effect until written notice of the appointment has been given to the Company.

11.17   The appointing director may at any time in writing terminate the alternate's appointment and shall give written notice of the termination to the Company. The termination of the appointment of an alternate director does not take effect until written notice of the termination has been given to the Company, except that if a director shall die or cease to hold the office of director, the

appointment of his alternate shall thereupon cease and terminate immediately without the need of notice.

11.18  An alternate director has no power to appoint an alternate, whether of the appointing director or of the alternate director.

11.19  An alternate director has the same rights as the appointing director in relation to any directors' meeting and any written resolution circulated for written consent. Any exercise by the alternate director of the appointing director's powers in relation to the taking of decisions by the directors, is as effective as if the powers were exercised by the appointing director.

11.20  An alternate director does not act as an agent of or for the appointing director, and is liable for his own acts and omissions as an alternate director.

11.21  An alternate director is not entitled to receive any remuneration from the Company for services as an alternate director. The remuneration of an alternate director (if any) shall be payable as may be agreed between such alternate and the director appointing him.

**Reserve directors**

11.22  Where the Company only has one Shareholder who is an individual and that Shareholder is also the sole director of the Company, the sole Shareholder/director may, by instrument in writing, nominate a person who is not disqualified from being a director of the Company as a reserve director of the Company to act in the place of the sole director in the event of his death.

11.23  The nomination of a person as a reserve director of the Company ceases to have effect if:

(a)  before the death of the sole Shareholder/director who nominated him, he resigns as reserve director, or the sole Shareholder/director revokes the nomination in writing; or

(b)  the sole Shareholder/director who nominated him ceases to be able to be the sole Shareholder/director of the Company for any reason other than his death.

**Remuneration of directors**

11.24  The directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

**Register of Directors**

11.25  The Company shall keep at its registered office in Seychelles a register to be known as a register of directors ("**Register of Directors**") containing:

(a)  the name and address of each person who is a director or alternate director of the Company and of any person who has been nominated as a reserve director of the Company, identifying whether the person is a director, alternate director or reserve director;

(b)  the date on which each person whose name is entered in the register was appointed as a director or alternate director, or nominated as a reserve director, of the Company;

(c)  the date on which each person named as a director or alternate director ceased to be a director or alternate director of the company; and

24

(d)      the date on which the nomination of any person nominated as a reserve director ceased to have effect.

11.26    The Register of Directors may be in such form as the directors may approve but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.

**Committees and delegation of directors' powers**

11.27    The Board may by resolution of directors delegate to a committee of directors, a director or employee of the company, or to any other person, any one or more of its powers, except that the directors have no power to delegate the following powers:

(a)      to approve Distributions;

(b)      to amend the Memorandum or Articles;

(c)      to designate committees of directors;

(d)      to delegate powers to a committee of directors;

(e)      to appoint or remove directors;

(f)      to appoint or remove an agent;

(g)      to approve a plan or merger, consolidation or arrangement; or

(h)      to approve the Company's voluntary winding up.

11.28    If the Board delegates a power under Article 11.27 it is responsible for the exercise of the power by the delegate as if the power had been exercised by the Board, unless the Board believed on reasonable grounds at all times before the exercise of the power that the delegate would exercise the power in conformity with the duties imposed on directors by the Act and the Memorandum and Articles and the Board has monitored, by means of reasonable methods properly used, the exercise of the power by the delegate.

11.29    The meetings and proceedings of a committee of directors consisting of two or more directors shall be governed *mutatis mutandis* by the provisions of the Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution of directors establishing the committee.

**Body corporate director**

11.30    A director which is a body corporate may appoint any individual as its duly authorised representative for the purpose of representing it at meetings of the directors, with respect to the signing of consents or otherwise.

**Approvals in respect of certain dispositions of assets**

11.31    A sale, transfer, lease, exchange or other disposition, other than a mortgage, charge, pledge or other encumbrance or the enforcement thereof, of more than 50 percent in value of the assets of the Company, if not made in the usual or regular course of the business carried on by the Company, shall be made as follows:

(a) the sale, transfer, lease, exchange or other disposition shall be approved by the directors by resolution of directors;

(b) upon approval of the sale, transfer, lease, exchange or other disposition, the directors shall submit details of the disposition to the Shareholders for it to be approved by ordinary resolution;

(c) if a meeting of Shareholders is to be held, notice of the meeting, accompanied by an outline of the disposition, shall be given to each Shareholder, whether or not he is entitled to vote on the sale, transfer, lease, exchange or other disposition; and

(d) if it is proposed to obtain the written consent of Shareholders, an outline of the disposition shall be given to each Shareholder, whether or not he is entitled to consent to the sale, transfer, lease, exchange or other disposition.

11.32 For the purposes of the Article 11.31 and section 206 of the Act, the directors may by resolution of directors determine that any sale, transfer, lease, exchange or other disposition is in the usual or regular course of the business carried on by the Company and such determination is, in the absence of fraud, conclusive.

## 12. MEETINGS AND WRITTEN CONSENTS OF DIRECTORS

12.1 Any one director of the Company may call a meeting of the directors by sending a written notice to each other director.

12.2 The directors of the Company or any committee of directors may meet at such times and in such manner and places within or outside Seychelles as the directors may determine to be necessary or desirable.

12.3 A director shall be given not less than two days' notice of meetings of directors, but a meeting of directors held without two days' notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting waive notice of the meeting, and for this purpose the presence of a director at a meeting shall constitute a waiver by that director.

12.4 The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

12.5 A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than half of the total number of directors, unless there are only two directors in which case the quorum is two.

12.6 A director is deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

12.7 If the Company has only one director:

(a) the provisions in this Article for meetings of directors do not apply and the sole director has full power to represent and act for the Company in all matters as are not by the Act, the Memorandum or the Articles required to be exercised by the Shareholders;

(b) a resolution of directors shall be passed by written consent by the sole director and without the need for any notice.

12.8 At meetings of directors at which the Chairman of the Board is present, he shall preside as chairman of the meeting. If there is no Chairman of the Board or if the Chairman of the Board

is not present, the directors present shall choose one among themselves to be chairman of the meeting.

12.9    An action that may be taken by directors at a meeting of directors may also be taken by a resolution of directors consented to in writing without the need for any notice. A resolution of directors by written consent:

(a)    may consist of several documents, including written electronic communications, in like form each signed or assented to by one or more directors; and

(b)    shall be deemed to be passed when the written consent instrument, or the last of several instruments, is last signed or otherwise assented to or on such later date as is specified in the resolution.

## 13.    OFFICERS AND AGENTS

13.1    The Company may by resolution of directors appoint officers of the Company at such times as may be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a president and one or more vice-presidents, secretaries and treasurers and such other officers as may from time to time be considered necessary or expedient. Any number of offices may be held by the same person.

13.2    The officers shall perform such duties as are prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors. In the absence of any specific prescription of duties it shall be the responsibility of the Chairman of the Board to preside at meetings of directors and Shareholders, the president to manage the day to day affairs of the Company, and the vice-presidents to act in order of seniority in the absence of the president but otherwise to perform such duties as may be delegated to them by the president.

13.3    The emoluments of all officers shall be fixed by resolution of directors.

13.4    The officers of the Company shall hold office until their successors are duly appointed, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors. Any vacancy occurring in any office of the Company may be filled by resolution of directors.

13.5    The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an agent of the Company.

13.6    An agent of the Company shall have such powers and authority of the directors, including the power and authority to affix the Seal, as are set out in the Articles or in the resolution of directors appointing the agent, except that no agent has any power or authority with respect to the non-delegable powers referred to in paragraphs (a) to (h) of Article 11.27.

13.7    The resolution of directors appointing an agent may authorise the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

13.8    The directors may remove an agent appointed by the Company under Article 13.5 and may revoke or vary a power conferred on him.

14.    **CONFLICT OF INTERESTS**

14.1    Where a director of the Company has an interest in a transaction entered into or to be entered into by the Company which to a material extent conflicts or may conflict with the interests of the Company, the director shall, within 7 days after becoming aware of the fact that he has such an interest, disclose the interest to all other directors of the Company.

14.2    A director of the Company is not required to comply with Article 14.1, if the transaction or proposed transaction is between the director and the Company and the transaction or proposed transaction is or is to be entered into in the ordinary course of the Company's business and on usual terms and conditions.

14.3    For the purposes of Article 14.1, a disclosure to all other directors of the Company to the effect that a director is a member, director, other officer or trustee of another named company or other person and is to be regarded as interested in any transaction which may, after the date of the entry or disclosure, be entered into with that company or other person, is a sufficient disclosure of interest in relation to that transaction.

14.4    A director of the Company who is interested in a transaction entered into or to be entered into by the Company may:

(a)    vote on a matter relating to the transaction;

(b)    attend a meeting of directors at which a matter relating to the transaction arises and be included among the directors present at the meeting for the purposes of a quorum; and

(c)    sign a document on behalf of the Company, or do any other thing in his capacity as a director, that relates to the transaction.

14.5    A transaction entered into by the Company in respect of which a director is interested is voidable by the Company unless:

(a)    the director's interest was disclosed to the other directors in accordance with Article 14.1 prior to the Company entering into the transaction;

(b)    the director's interest was not required to be disclosed by virtue of Article 14.2;

(c)    the material facts of the interest of the director in the transaction are known by the Shareholders entitled to vote at a meeting of Shareholders and the transaction is approved or ratified by a resolution of Shareholders; or

(b)    the Company received fair value for the transaction.

15.    **INDEMNIFICATION**

15.1    Subject to Article 15.2, the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a)    is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director of the Company; or

    (b)    is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

15.2    The indemnity in Article 15.1 does not apply unless the person acted honestly and in good faith and in what he believed to be in the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful. The Company shall not indemnify a person in breach of this Article 15.2 and any indemnity given in breach of this Article 15.2 is void and of no effect.

15.3    For the purposes of Article 15.2 a director acts in the best interests of the Company if he acts in the best interests of the Company's parent or a Shareholder or Shareholders, in either case, in the circumstances specified in Article 11.7.

15.4    The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a *nolle prosequi* does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

15.5    Expenses, including legal fees, incurred by a director in defending any legal, administrative or investigative proceedings may be paid by the company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the director to repay the amount if it shall ultimately be determined that the director is not entitled to be indemnified by the Company in accordance with Article 15.1.

15.6    Expenses, including legal fees, incurred by a former director in defending any legal, administrative or investigative proceedings may be paid by the company in advance of the final disposition of such proceedings upon receipt of an undertaking by or on behalf of the former director to repay the amount if it shall ultimately be determined that the former director is not entitled to be indemnified by the company in accordance with Article 15.1 and upon such other terms and conditions, if any, as the Company deems appropriate.

15.7    The indemnification and advancement of expenses provided by, or granted pursuant to, this Article is not exclusive of any other rights to which the person seeking indemnification or advancement of expenses may be entitled under any agreement, resolution of Shareholders, resolution of disinterested directors or otherwise, both as to acting in the person's official capacity and as to acting in another capacity while serving as a director of the Company.

15.8    If a person referred to in Article 15.1 has been successful in defence of any proceedings referred to in Article 15.1, the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

15.9    The Company may purchase and maintain insurance in relation to any person who is or was a director, officer or liquidator of the Company, or who at the request of the Company is or was serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another body corporate or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power or obligation to indemnify the person against the liability under Article 15.1.

## 16.    CHARGES

16.1    The Company may by an instrument in writing create a charge over all or any of its property.

16.2   The Company shall keep at its registered office in Seychelles a register of charges ("**Register of Charges**") containing in respect of each charge created by it:

    (a)   if the charge is a charge created by the Company, the date of its creation or, if the charge is a charge existing on property acquired by the Company, the date on which the property was acquired;

    (b)   a short description of the liability secured by the charge;

    (c)   a short description of the property charged;

    (d)   the name and address of the chargee, who may be acting as a trustee or security agent for other persons; and

    (e)   details of any prohibition or restriction, if any, contained in the instrument creating the charge on the power of the company to create any future charge ranking in priority to or equally with the charge.

16.3   The Register of Charges may be in such form as the directors may approve but if it is in magnetic, electronic or other data storage form, the company must be able to produce legible evidence of its contents.

## 17.   KEEPING OF RESOLUTIONS AND ACCOUNTING RECORDS

17.1   The Company shall keep:

    (a)   minutes of all meetings of directors and any committees of directors;

    (b)   copies of all written resolutions consented to by its directors and any committees of its directors;

    (c)   minutes of all meetings of the Shareholders and any class of Shareholders; and

    (d)   copies of all written resolutions consented to by the Shareholders and any class of Shareholders.

17.2   The Company shall keep the documents referred to in Article 17.1 (together referred to as the "**resolutions**") at such place inside or outside of Seychelles as the directors shall determine. Where the Company does not keep the resolutions at its registered office, it shall notify in writing its registered agent of the physical address of the place at which its resolutions are kept.

17.3   Where there is a change in the place at which the Company's resolutions are kept, the Company shall, within 14 days of the change, notify in writing its registered agent of the physical address of the place at which the resolutions are kept.

17.4   The Company shall keep reliable accounting records that:

    (a)   are sufficient to show and explain the Company's transactions;

    (b)   enable the financial position of the Company to be determined with reasonable accuracy at any time; and

    (c)   allow for accounts of the Company to be prepared (notwithstanding that the Company is not required under the Act to prepare accounts).

17.5   For the purposes of this Article, "**accounting records**" mean documents in respect of the Company's assets and liabilities, the receipts and expenditure of the Company and the sales, purchases and other transactions to which the Company is a party.

17.6   The Company shall keep its accounting records at its registered office or such place inside or outside Seychelles as the directors think fit. Where the Company's accounting records are kept at a place other than at its registered office, the Company shall inform its registered agent in writing of the physical address of that place.

17.7   Where the place at which the Company's accounting records are kept is changed, the Company shall inform its registered agent in writing of the physical address of the new location of the accounting records within 14 days of the change of location.

18.   **SEAL**

18.1   The Company may (but is not required to) have a Seal.

18.2   If a Seal is adopted by the Company, it shall have the Company's name in legible characters on it and the directors shall provide for its safe custody. The Company may have more than one Seal and references in these Articles to the Seal shall be references to every Seal which shall have been duly adopted by resolution of directors.

18.3   Except as otherwise expressly provided in the Articles, the Seal when affixed to any written instrument shall be witnessed and attested to by the signature of any one director or other person so authorised from time to time by resolution of directors. Such authorisation may be before or after the Seal is affixed, may be general or specific and may refer to any number of sealings.

18.4   The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been attested to as described in Article 18.3.

19.   **DISTRIBUTIONS**

19.1   The directors of the Company may, by resolution of directors, authorise a Distribution (including by way of Dividend) at such time and of such an amount as they think fit if they are satisfied, on reasonable grounds, that the Company will, immediately after the Distribution, be able to pay its debts as they become due and the value of the Company's assets will be greater than the value of its liabilities.

19.2   A resolution of directors passed under Article 19.1 shall contain a statement that, in the opinion of the directors, the Company will, immediately the Distribution, be able to pay its debts as they become due and the value of the Company's assets will be greater than the value of its liabilities.

19.3   A Distribution may be in the form of money, Shares or any other property.

19.4   If multiple persons are registered as joint holders of any Share, any of them may give effectual receipt for a Distribution payable in respect of that Share.

19.5   Notice of a Distribution that may have been declared shall be given to each Shareholder and all Distributions unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

19.6   No Distribution shall bear interest against the Company and no Distribution shall be paid on Treasury Shares.

20.   **NOTICES**

20.1   Any notice, information or written statement to be given by the Company shall be in writing and may be given by personal service, mail, courier, email, or fax to such address as shown in the Register of Members or Register of Directors to such email address or fax number as notified to the Company in writing from time to time.

20.2   Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

20.3   Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, prepaying and posting a letter containing notice, and shall be deemed to be received on the fifth business day following the day on which the notice was posted.  Where a notice is sent by fax or email, notice shall be deemed to be effected by transmitting the email or fax to the address or number provided by the intended recipient and service of the notice shall be deemed to have been received on the same day that it was transmitted.

21.   **VOLUNTARY WINDING UP AND DISSOLUTION**

Subject to Sub-Part II of Part XVII to the Act, the Company may by ordinary resolution voluntarily commence to wind up and dissolve the Company.

22.   **CONTINUATION**

Subject to Part XII of the Act, the Company may by ordinary resolution or by resolution of directors continue as a company incorporated under the laws of a jurisdiction outside Seychelles in the manner provided under those laws.

32

Dated this 26th day of September 2022

Certified True Original of the Amended Articles of Association

...........................................................................

Signed for and on behalf of
**STERLING TRUST & FIDUCIARY LIMITED**
By Authorised Signatory

.......................................................................

**Witness Name: Rebecca Hoareau**
Occupation: Corporate Services Officer
Address: Saint Louis, Mahé, Seychelles

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
REPUBLIC OF SEYCHELLES

2 6 SEP 2022

# Exhibit E

## Register of Directors

| Name of company:   Maclaurin Investments Ltd. | Company Number: 217617 |
|---|---|

| Name and Given names: | **Samuel Benjamin Bankman-Fried** | | |
|---|---|---|---|
| Former names: | | NRIC/UIN/FIN number: | |
| Aliases: | | Passport number: | 507223181, United States Of America |
| Usual residential address: | Unit 311 West Bay Street Lot, New Providence NP, Bahamas | Nationality: | American |
| | | Date of birth: | 5-Mar-1992 |
| | | Business occupation: | |
| | | Position: | **Director** |
| Business address: | - | Date of appointment: | 23-Dec-2019 |
| | | Date of resignation: | 6-Feb-2023 |
| | | Notes: | Termination |
| | | Particulars of other directorships: | |

| Name and Given names: | **Wing Man Charis Law** | | |
|---|---|---|---|
| Former names: | | NRIC/UIN/FIN number: | |
| Aliases: | | Passport number: | HJ2060822, China |
| Usual residential address: | 8H, Block 6, Oak Mansions, Whampoa Garden, Hung Hom, Kowloon, Hong Kong | Nationality: | Chinese |
| | | Date of birth: | 16-Feb-1985 |
| | | Business occupation: | |
| | | Position: | **Director** |
| Business address: | - | Date of appointment: | 23-Dec-2019 |
| | | Date of resignation: | 9-Nov-2022 |
| | | Notes: | |
| | | Particulars of other directorships: | |

# Register of Directors

| Name of company:   Maclaurin Investments Ltd. | Company Number: 217617 |
|---|---|

| Name and Given names: | **Luk Wai Chan** | | |
|---|---|---|---|
| Former names: | | NRIC/UIN/FIN number: | |
| Aliases: | | Passport number: | KJ0274128, China |
| Usual residential address: | Flat B 12/F Block A&B, Branksome Grande, 3 Tregunter Path, Hong Kong | Nationality: | Chinese |
| | | Date of birth: | 9-Jan-1981 |
| | | Business occupation: | |
| | | Position: | **Director** |
| Business address: | - | Date of appointment: | 23-Dec-2019 |
| | | Date of resignation: | 9-Nov-2022 |
| | | Notes: | |
| | | Particulars of other directorships: | |

| Name and Given names: | **Kurt, Steven Knipp** | | |
|---|---|---|---|
| Former names: | | NRIC/UIN/FIN number: | |
| Aliases: | | Passport number: | 599089090, United States of America |
| Usual residential address: | 87 E Long Lake Rd, Valparaiso, Indiana, 46383-1187 United States | Nationality: | American |
| | | Date of birth: | 15-Sep-1956 |
| | | Business occupation: | Director |
| | | Position: | **Director** |
| Business address: | - | Date of appointment: | 6-Feb-2023 |
| | | Date of resignation: | |
| | | Notes: | New Independent Director |
| | | Particulars of other directorships: | |

Date printed: 7 November, 2023

Page 2 of 2

# Exhibit F

EXECUTION VERSION

## WRITTEN RESOLUTIONS OF THE SOLE SHAREHOLDER

### OF

### Maclaurin Investments Ltd. (the "Company")

An International Business Company
incorporated in Seychelles with IBC registration no.217617
under the International Business Companies Act, 2016 (the "**IBC Act**")

### February 6, 2023

The undersigned, being the sole shareholder of the Company (the "Sole Shareholder"), acting in accordance with the IBC Act and the Company's Memorandum and Articles of Association (as amended), hereby waives all notice of time, place or purpose of a meeting and consents to, approves and adopts the following recitals and resolutions for entry in the Company's records:

**WHEREAS**, on November 10, 2022, Mr. Samuel Benjamin Bankman-Fried (the "Founder"), as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird, Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), authorized, instructed and consented to, among other things, (i) the appointment of John J. Ray III (the "CEO") as Chief Executive Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Bankruptcy Code ("Chapter 11") and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group and (ii) the appointment of individuals chosen by the CEO and not affiliated with the Founder or the CEO as new directors of the Top Companies and the other members of the FTX Group (such authorization, instruction and consent, the "Omnibus Corporate Authority").

**WHEREAS,** on November 11, 2022 and November 14, 2022, the Company and certain other affiliated debtors filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Petitions") and the bankruptcy cases are pending before the Honorable John T. Dorsey and the Debtors have requested joint administration of the cases under Case No. 22-11068 (JTD) (the "Bankruptcy Cases").

**WHEREAS**, the Company's Memorandum and Articles of Association (as amended) provide that a director of the Company may be removed from office by ordinary resolution passed at a meeting of Shareholders called for the purpose of removing the director or for purposes including the removal of the director; or passed and consented to in writing by Shareholders representing in excess of half of the total votes of the Shareholders entitled to vote on the date hereof.

**WHEREAS**, the Sole Shareholder deemed it in the best interest of the Company to remove all directors from the board of the Company (the "Board"), including, for the avoidance of doubt, Samuel Bankman-Fried, Luk Wai Chan and Wing Man Charis Law, currently serving as directors of the Company and to revoke all currently existing delegations of authority from the Board to any person.

**WHEREAS**, the Sole Shareholder deemed it in the best interest of the Company to elect and appoint Kurt Steven Knipp (the "New Independent Director") as sole director to the Board of the Company.

**WHEREAS**, West Realm Shires Inc., a Delaware corporation, and the New Independent Director entered into that certain Independent Director Agreement, dated as of December 20, 2022 (the "Independent Director Agreement"), among other things, confirming the terms on which the New Independent Director may be appointed to Company's board of directors and providing for the terms of such appointment (including, without limitation, with respect to compensation payable, reimbursement of expenses and indemnification of liabilities).

**WHEREAS**, the Sole Shareholder desires and deems it in the best interest of the Company to extend the terms of the Independent Director Agreement with respect to indemnification of liabilities to the New Independent Director in his capacity as a member of the Board of the Company.

**NOW, THEREFORE, BE IT RESOLVED**, that the appointment of the CEO as the Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the removal of all prior officers of the Company and directors from the Board be, and hereby is, confirmed, ratified, authorized and approved and, to the extent that there are currently any officers or directors of the Company (excepting the CEO and the New Independent Director), such officers and directors be, and they hereby are, removed from acting in such capacity.

**FURTHER RESOLVED**, that the revocation of all prior delegations of authority from the Board (excepting the Omnibus Corporate Authority) be, and hereby is, confirmed, ratified, authorized and approved, and shall be revoked, extinguished and of no further effect and, to the extent that there are any currently existing delegations of authority from the Board (excepting the Omnibus Corporate Authority), such delegations be, and each of them hereby is, revoked, extinguished and of no further effect.

**FURTHER RESOLVED**, that the New Independent Director, who has consented to act in such capacity, be, and he hereby is, elected and appointed as sole director to the Board with effect from the date hereof, with such New Independent Director to hold office until his successor is duly elected and qualified or until his earlier death, resignation or removal, in each case accordance with the Company's Memorandum and Articles of Association (as amended) of the Company.

**FURTHER RESOLVED**, that, in connection with the foregoing election and appointment, the terms of the Independent Director Agreement with respect to indemnification of liabilities be, and they hereby are, extended to the New Independent Director in his capacity as a member of the Board.

**FURTHER RESOLVED**, that the CEO and the New Independent Director shall be indemnified to the fullest extent permitted by law and to the fullest extent permitted under existing indemnification arrangements applicable to all members of the Board and officers of the Company, including as provided in the Company's Memorandum and Articles of Association (as amended), and in the Independent Director Agreement, and such indemnification shall continue even if such person no longer serves as an officer or director of the Company and shall inure to the benefit of his heirs, executors and administrators.

**FURTHER RESOLVED**, that the filing of the Petitions and all other actions taken in connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved.

4865-0718-7278 v.2

**FURTHER RESOLVED**, that any and all other actions heretofore taken by the CEO in furtherance of the foregoing resolutions are hereby confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that all certificates, agreements, instruments and other documents previously signed on behalf of the Company by the CEO in connection with or in furtherance of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, that are substantially consistent with the foregoing resolutions be, and they hereby are, in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such certificate, agreement, instrument or other document had been specifically authorized in advance by resolution of the Board and that the CEO did execute the same.

**FURTHER RESOLVED**, that the CEO be, and hereby is, authorized and directed, in the name and on behalf of the Company to execute and deliver all further certificates, agreements, instruments and other documents, which they may deem necessary or advisable in order to effectuate the purposes of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, and the execution by the CEO of any such certificate, agreement, instrument or document shall conclusively establish their authority therefor from the Company and the approval and ratification by the Company of the documents so executed.

**FURTHER RESOLVED**, that the power and authority granted to the CEO pursuant to the foregoing resolutions shall include the power and authority to cause any direct or indirect consolidated subsidiary of the Company to take action that is in furtherance of or consistent with the purposes of the foregoing resolutions.

**FURTHER RESOLVED**, that the CEO is hereby authorized and directed, in the name and on behalf of the Company, to take such actions as such officer shall determine to be necessary or appropriate to authorize and cause any direct or indirect consolidated subsidiary of the Company to authorize, execute and deliver any and all agreements, authorizations, instruments or other documents as such officer shall determine to be necessary or appropriate in connection with any of the matters described in any of the foregoing resolutions, each such determination to be conclusively evidenced by the taking of such actions.

**FURTHER RESOLVED**, that the CEO shall have the authority, from time to time, to delegate such officer's authority conferred pursuant to any of the foregoing resolutions to any employee of the Company (whether or not such employee is an officer of the Company), provided that the person to whom such authority is delegated shall not have the power to further delegate such authority to any other person.

**FURTHER RESOLVED**, that the Registered Agent of the Company be hereby instructed to update the Company's Register of Directors accordingly and file the same with the Financial Services Authority, as soon as practicable and by no later than 30 days of the date of the passing of these resolutions.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned has duly executed these resolutions as of the date first written above.

SIGNED FOR AND ON BEHALF OF THE SOLE SHAREHOLDER (ALAMEDA RESEARCH LTD):

Signature:

Name: Matthew R. Rosenberg
Title: Director

# Exhibit G

EXECUTION VERSION

# WRITTEN RESOLUTIONS OF THE BOARD OF DIRECTORS

## OF

## Maclaurin Investments Ltd. (the "Company")

An International Business Company
incorporated in Seychelles with IBC registration no.217617
under the International Business Companies Act, 2016 (the "**IBC Act**")

## February 6, 2023

The undersigned, constituting all of the duly elected, qualified and serving as sole director of the board of directors (the "Board") of the Company, acting in accordance with the IBC Act and the Company's Memorandum and Articles of Association (as amended), hereby waives all notice of time, place or purpose of a meeting and consents to, approves and adopts the following recitals and resolutions for entry in the Company's records:

**WHEREAS**, on November 10, 2022, Mr. Samuel Benjamin Bankman-Fried (the "Founder"), as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird, Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), authorized, instructed and consented to, among other things, (i) the appointment of John J. Ray III (the "CEO") as Chief Executive Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Bankruptcy Code ("Chapter 11") and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group and (ii) the appointment of individuals chosen by the CEO and not affiliated with the Founder or the CEO as new directors of the Top Companies and the other members of the FTX Group (such authorization, instruction and consent, the "Omnibus Corporate Authority").

**WHEREAS,** on November 11, 2022 and November 14, 2022, the Company and certain other affiliated debtors filed a voluntary petition for relief under Chapter 11 (the "Petitions") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the bankruptcy cases are pending before the Honorable John T. Dorsey and the Debtors have requested joint administration of the cases under Case No. 22-11068 (JTD) (the "Bankruptcy Cases").

**WHEREAS**, the Company's Memorandum and Articles of Association (as amended) provide that a director of the Company may be removed from office by ordinary resolution passed at a meeting of Shareholders called for the purpose of removing the director or for purposes including the removal of the director; or passed and consented to in writing by Shareholders representing in excess of half of the total votes of the Shareholders entitled to vote on the date hereof.

**WHEREAS**, the sole shareholder of the Company terminated the appointment of all directors existing on the date hereof and elected and appointed Kurt Steven Knipp (the "New Independent Director") as sole director to the Board.

**WHEREAS**, West Realm Shires Inc., a Delaware corporation, and the New Independent Director entered into that certain Independent Director Agreement, dated as of December 20, 2022 (the "Independent Director Agreement"), among other things, confirming the terms on which the New Independent Director may be appointed to the Company's Board and providing for the terms of such appointment (including, without limitation, with respect to compensation payable, reimbursement of expenses and indemnification of liabilities).

**WHEREAS**, the sole shareholder of the Company desires and deems it in the best interest of the Company to extend the terms of the Independent Director Agreement with respect to indemnification of liabilities to the New Independent Director in his capacity as a director of the Board.

**WHEREAS**, the Board deems it in the best interest of the Company to remove all officers appointed as of the date hereof (other than the CEO) and all current delegations of authority from the Board to any person (other than the CEO).

**NOW, THEREFORE, BE IT RESOLVED**, that the appointment of the CEO as the Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the removal of all prior officers of the Company be, and hereby is, confirmed, ratified, authorized and approved and, to the extent that there are currently any officers of the Company (excepting the CEO), such officers be, and they hereby are, removed from acting in such capacity.

**FURTHER RESOLVED**, that the termination of the appointment of any existing director and the appointment of the New Independent Director as director of the Company in accordance with the Company's Memorandum and Articles of Association (as amended) be, and hereby are, confirmed, authorized and approved.

**FURTHER RESOLVED**, that the revocation of all prior delegations of authority from the Board (excepting the Omnibus Corporate Authority) be, and hereby is, confirmed, ratified, authorized and approved, and shall be revoked, extinguished and of no further effect and, to the extent that there are any currently existing delegations of authority from the Board (excepting the Omnibus Corporate Authority), such delegations be, and each of them hereby is, revoked, extinguished and of no further effect.

**FURTHER RESOLVED**, that, in connection with the election and appointment of the New Independent Director, the terms of the Independent Director Agreement with respect to indemnification of liabilities be, and they hereby are, extended to the New Independent Director in his capacity as a member of the Board.

**FURTHER RESOLVED**, that the CEO and the New Independent Director shall be indemnified to the fullest extent permitted by law and to the fullest extent permitted under existing indemnification arrangements applicable to all members of the Board and officers of the Company, including as provided in the Company's Memorandum and Articles of Association (as amended) and in the Independent Director Agreement, and such indemnification shall continue even if such person no longer serves as an officer or director of the Company and shall inure to the benefit of his heirs, executors and administrators.

**FURTHER RESOLVED**, that the filing of the Petitions and all other actions taken in connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that any and all other actions heretofore taken by the CEO in furtherance of the foregoing resolutions are hereby confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that all certificates, agreements, instruments and other documents previously signed on behalf of the Company by the CEO in connection with or in furtherance of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, that are substantially consistent with the foregoing resolutions be, and they hereby are, in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such certificate, agreement, instrument or other document had been specifically authorized in advance by resolution of the Board and that the CEO did execute the same.

**FURTHER RESOLVED**, that the CEO be, and hereby is, authorized and directed, in the name and on behalf of the Company to execute and deliver all further certificates, agreements, instruments and other documents, which they may deem necessary or advisable in order to effectuate the purposes of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, and the execution by the CEO of any such certificate, agreement, instrument or document shall conclusively establish their authority therefor from the Company and the approval and ratification by the Company of the documents so executed.

**FURTHER RESOLVED,** that the CEO is authorized to sign, for and on behalf of the Company, any and all checks and other orders for the payment of money drawn on the name of the Company, as applicable, from any accounts held by the Company.

**FURTHER RESOLVED**, that the power and authority granted to the CEO pursuant to the foregoing resolutions shall include the power and authority to cause any direct or indirect consolidated subsidiary of the Company to take action that is in furtherance of or consistent with the purposes of the foregoing resolutions.

**FURTHER RESOLVED**, that the CEO is hereby authorized and directed, in the name and on behalf of the Company, to take such actions as such officer shall determine to be necessary or appropriate to authorize and cause any direct or indirect consolidated subsidiary of the Company to authorize, execute and deliver any and all agreements, authorizations, instruments or other documents as such officer shall determine to be necessary or appropriate in connection with any of the matters described in any of the foregoing resolutions, each such determination to be conclusively evidenced by the taking of such actions.

**FURTHER RESOLVED**, that the CEO shall have the authority, from time to time, to delegate such officer's authority conferred pursuant to any of the foregoing resolutions to any employee of the Company (whether or not such employee is an officer of the Company), provided that the person to whom such authority is delegated shall not have the power to further delegate such authority to any other person.

**FURTHER RESOLVED** that the Registered Agent of the Company be hereby instructed to update the Company's Register of Directors accordingly and file the same with the Financial Services Authority, as soon as practicable and by no later than 30 days of the date of the passing of these resolutions.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the sole director of the Company has duly executed these written resolutions as of the date first written above.

Signature:

Name: Kurt Steven Knipp
Title: Director

*[Maclaurin Investments Ltd. Board Written Resolutions]*

# Exhibit H

IBC No.: **17180**



**ANTIGUA AND BARBUDA**
**FINANCIAL SERVICES REGULATORY COMMISSION**

# CERTIFICATE OF INCORPORATION

## FTX TRADING LTD.

The undersigned **HEREBY CERTIFIES**, pursuant to Section 9 of the International Business Corporations Act, Cap. 222, of the Revised Laws of Antigua and Barbuda, that the above named company was incorporated under the laws of Antigua and Barbuda and has complied with all the requirements of the said Act.

**Chief Executive Officer**
*Financial Services Regulatory Commission*

**REGISTERED AT:** **ST. JOHN'S ANTIGUA, ON APRIL 02, 2019**

# Exhibit I

**Register of Directors of**

## FTX TRADING LTD.

| Name and Address of Director | Date of Appointment | Date of Resignation |
|---|---|---|
| **Corporate & Trust Services (Caribbean) Limited Lower Factory Road St. John's Antigua** | **2-April-2019** | 24-Feb-20 |
| **Samuel Benjamin Bankman-Fried 45 Lansing Street, Apt. 3709 San Francisco, CA 94105** | **24-Feb-2020** | 14-Nov-22 |
| **Luk Wai Chan Flat A 15/F Formwell Garden 46-48 Blue Pool Rd., Hong Kong** | **30-Nov-2020** | 4-Mar-2021 |

| | | |
|---|---|---|
| **Wing Man Charis Law**<br>**Flat/Room H Fl. 8 Block 6 Oak Mansions**<br>**Whampoa Garden Site 5 7 Tak Fung St.**<br>**Hung Horn, Hong Kong** | **30-Nov-20** | 4-Mar-2021 |
| **Jonathan Cheesman**<br>**Walnut Cottage, Asthall**<br>**Burford OX18 4HW**<br>**England** | **10-Aug-21** | 2-Jun-22 |
| **Arthur G. B. Thomas**<br>**Clarke's Hill**<br>**St. John's**<br>**Antigua** | **10-Aug-21** | 8-Nov-22 |
| **Nishad Singh**<br>**Unit 209 West Bay**<br>**Street Lot 5 & 6**<br>**New Providence, Bahamas** | **2-Jun-22** | 14-Nov-22 |
| **Matthew A. Doheny**<br>**303 Paddock Street, Watertown**<br>**New York, 13601 USA** | **14-Nov-22** | - |

| | | |
|---|---|---|
| Joseph J. Farnan Jr.<br>114 Montchan Drive, Wilmington<br>Delaware 19807 USA | 14-Nov-22 | - |



# Exhibit J

**From:**          Ryne Miller[ryne@ftx.us]
**Sent:**          Thur 11/10/2022 6:14:02 PM (UTC)
**To:**            Nishad Singh[nishadsingh@gmail.com]
**Cc:**            Altman, Peter[paltman@akingump.com]
**Bcc:**           tim@ftx.com[tim@ftx.com]
**Subject:**       Re: Resignation

Thank you received.

Ryne Miller

FTX US
General Counsel
ryne@ftx.us
(405) 517 7570


On Nov 10, 2022, at 1:12 PM, Nishad Singh <nishadsingh@gmail.com> wrote:

Ryne, here are the details of my resignation. Peter is my counsel.

---------- Forwarded message ---------
From: **Sam Bankman-Fried** <sam@ftx.com>
Date: Thu, Nov 10, 2022 at 11:56 AM
Subject: Re: Resignation
To: Nishad Singh <nishadsingh@gmail.com>


I understand, and would be happy for you to carry out various data and technological services to help with the transition.

—
Sam Bankman-Fried
.

On November 10, 2022 at 11:42 AM EST nishadsingh@gmail.com wrote:

Dear Sam,

I hereby resign my post as director of FTX Trading Ltd, and with it any officer role or other positions I may have held in connection with my association with FTX and its affiliates.

I'm willing to assist with the transition and would be happy to discuss the best way to handle that. I will make myself available to discuss this.
Best,
Nishad

# Exhibit K

## ANTIGUA AND BARBUDA

### International Business Corporations Act, CAP. 222
### A Company Limited by Shares

### ARTICLES OF INCORPORATION
### OF
### FTX TRADING LTD.

As last amended on October 18, 2021

### ARTICLE I



The name of the company is FTX Trading Ltd. (the **"Company"**).

### ARTICLE II

## REGISTERED OFFICE AND AGENT

The Registered Agent of the Company shall be **CORPORATE & TRUST SERVICES (CARIBBEAN) LIMITED**, whose office is situated at Lower Factory Road, in the city of Saint John's, Antigua and Barbuda, the said office shall be the Registered Office of the Company.

### ARTICLE III

## CAPITAL

The Share Capital of the Company shall be 808,087,056 registered shares divided into 755,438,749 shares of US$0.0000026 each par value common shares, which shall be designated **"Common Shares,"** and 52,648,307 shares of preferred shares US$0.0000026 each par value, of which 0 shall be designated **"Series A Preferred Shares"**, 38,532,578 shall be designated **"Series B Preferred Shares"**, 3,220,729 shall be designated **"Series B-1 Preferred Shares"** and 10,895,000 shall be designated **"Series C Preferred Shares"** (the Series A Preferred Shares, the Series B Preferred Shares, the Series B-1 Shares and the Series C Preferred Shares are collectively referred to herein as the **"Preferred Shares"**). Both classes of shares may be issued in series and the directors shall have the authority to fix the number of shares in, or to determine the designation of, and the rights, privileges, restrictions and conditions attaching to, the shares of each series.

The Company shall have the power to increase or reduce said capital, and to issue any part of its capital as special privilege, or subject to any postponement of rights, or to any conditions or restrictions; and so that unless the conditions of issue shall otherwise expressly declare, every issue of shares, whether declared to be preference or otherwise, shall be subject to the power therein contained.

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of shares of the Company.

## A.   COMMON SHARES

1.   _General._ The voting, dividend and liquidation rights of the holders of the Common Shares are to the extent set forth herein subject to and qualified by the rights, powers and preferences of the holders of the Preferred Shares.

2.   _Voting._ The holders of the Common Shares are entitled to one vote for each share of Common Shares held at all meetings of shareholders (and written actions in lieu of meetings). The number of authorized shares of Common Shares may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of preferred shares that may be required by the terms of these Articles) the affirmative vote of the holders of shares of the Company representing a majority of the votes represented by all outstanding shares of the Company entitled to vote in accordance with the International Business Corporations Act.

## B.   PREFERRED SHARES

1.   _Dividends._

**JAN 1 8 2022**

**FILED**

The Company shall not declare, pay or set aside any dividends on shares of any other class or series of capital equity of the Company unless (in addition to the obtaining of any consents required elsewhere in these Articles) the holders of the Preferred Shares then outstanding shall first receive, or simultaneously receive, a dividend on each Preferred Share in an amount at least equal to (i) in the case of a dividend on Common Shares or any class or series that is convertible into Common Shares, that dividend per Preferred Shares as would equal the product of (A) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Common Shares and (B) the number of Common Shares issuable upon conversion of a Preferred Share, in each case calculated on the record date for determination of holders entitled to receive such dividend or (ii) in the case of a dividend on any class or series that is not convertible into Common Shares, at a rate per Preferred Share determined by (A) dividing the amount of the dividend payable on each share of such class or series of capital equity by the original issuance price of such class or series of capital equity (subject to appropriate adjustment in the event of any share dividend, share split, combination or other similar recapitalization with respect to such class or series) and (B) multiplying such fraction by an amount equal to the applicable Original Issue Price; provided that, if the Company declares, pays or sets aside, on the same date, a dividend on shares of more than one class or series of capital equity of the Company, the dividend payable to the holders of Preferred Shares pursuant to this Section 1 shall be calculated based upon the dividend on the class or series of capital equity that would result in the highest Preferred Share dividend. The **"Original Issue Price"** shall mean, with respect to the Series A Preferred Shares, $0.18972 per share, with respect to the Series B Preferred Shares, $26.21 per share, with respect to the Series B-1 Preferred Shares, $36.41 per share and with respect to the Series C Preferred Shares, $46.3518 per share in each case subject to appropriate adjustment in the event of any dividend, share split, combination or other similar recapitalization with respect to the Preferred Shares.

The Company when paying dividends to the Shareholders in accordance with the provisions set forth herein may make such payment either in cash or in shares of the Company,

2

with such amount of dividend to be set forth in the sole discretion of the Board of Directors of the Company. Further, the Company shall only declare, pay or set aside any dividends in fiscal years during which the Company is profitable, and, in no case shall dividends be declared, paid or set aside other than in accordance with the laws of Antigua and Barbuda.

      2.      Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales.

      2.1      Preferential Payments to Holders of Preferred Shares. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the holders of Preferred Shares then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its shareholders before any payment shall be made to the holders of Common Shares by reason of their ownership thereof, an amount per share equal to the greater of (i) one times the applicable Original Issue Price, plus any dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had all Preferred Shares been converted into Common Shares pursuant to Section 4 immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Preferred Share Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the assets of the Company available for distribution to its shareholders shall be insufficient to pay the holders of Preferred Shares the full amount to which they shall be entitled under this Subsection 2.1, the holders of Preferred Shares shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

      2.2      Payments to Holders of Common Shares. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of Preferred Shares in accordance with Section 2.1, the remaining assets of the Company available for distribution to its shareholders shall be distributed among the holders of shares of Common Shares, pro rata based on the number of shares held by each such holder.

      2.3      Deemed Liquidation Events.

      2.3.1      Definition. Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of at least a majority of the outstanding Preferred Shares (voting together as a single class) (the "**Requisite Holders**") elect otherwise by written notice sent to the Company prior to the effective date of any such event:



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

  (a)    a merger or consolidation in which

      (i)    the Company is a constituent party or

      (ii)    a subsidiary of the Company is a constituent party and the Company issues shares in its capital pursuant to such merger or consolidation,

3

except any such merger or consolidation involving the Company or a subsidiary in which the capital equity of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital equity that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital equity of (1) the surviving or resulting Company; or (2) if the surviving or resulting Company is a wholly owned subsidiary of another Company immediately following such merger or consolidation, the parent Company of such surviving or resulting Company ; or

(b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company; provided, however, that in no event shall a sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions of one or more digital assets, or any similar transaction, be considered a Deemed Liquidation Event.

### 2.3.2    Effecting a Deemed Liquidation Event.

(a)    The Company shall not have the power to effect a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(i) unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the shareholders of the Company shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2.

(b)    In the event of a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(ii) or 2.3.1(b), if the Company does not commence the winding-up of the Company under the International Business Corporations Act within ninety (90) days after such Deemed Liquidation Event, then: (i) the Company shall send a written notice to each holder of Preferred Shares no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to request the repurchase of such Preferred Shares, and (iii) if the Requisite Holders so request in a written instrument delivered to the Company not later than one hundred twenty (120) days after such Deemed Liquidation Event, the Company shall use the consideration received by the Company for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Company), together with any other assets of the Company available for distribution to its shareholders, all to the extent permitted by Antigua law governing distributions to shareholders (the "**Available Proceeds**"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event, to repurchase all outstanding Preferred Shares at a price per share equal to the Preferred Share Liquidation Amount. Notwithstanding the foregoing, in the event of a repurchase pursuant to the preceding sentence, if the Available Proceeds are not sufficient to repurchase all outstanding Preferred Shares, the Company shall ratably repurchase each holder's Preferred Shares to the fullest extent of such Available Proceeds and shall repurchase the remaining shares as soon as it may lawfully do so under Antigua law governing

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

distributions to shareholders. The provisions of Section 6 shall apply, with such necessary changes in the details thereof as are necessitated by the context, to the repurchase of the Preferred Shares pursuant to this Subsection 2.3.2(b). Prior to the distribution or repurchase provided for in this Subsection 2.3.2(b), the Company shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event or in the ordinary course of business.

2.3.3   Amount Deemed Paid or Distributed. The amount deemed paid or distributed to the holders of capital equity of the Company upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or repurchase shall be the cash or the value of the property, rights or securities paid or distributed to such holders by the Company or the acquiring person, firm or other entity. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Company.

2.3.4   Allocation of Escrow and Contingent Consideration. In the event of a Deemed Liquidation Event pursuant to Subsection 2.3.1(a)(i), if any portion of the consideration payable to the shareholders of the Company is payable only upon satisfaction of contingencies (the **"Additional Consideration"**), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial Consideration**") shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2 as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the shareholders of the Company upon satisfaction of such contingencies shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2 after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this Subsection 2.3.4, consideration placed into escrow or retained as holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

3.   Voting.

3.1   General. On any matter presented to the shareholders of the Company for their action or consideration at any meeting of shareholders of the Company (or by written consent of shareholders in lieu of meeting), each holder of outstanding Preferred Shares shall be entitled to cast the number of votes equal to the number of whole Common Shares into which the Preferred Shares held by such holder are convertible as of the record date for determining shareholders entitled to vote on such matter. Except as provided by law or by the other provisions of these Articles, holders of Preferred Shares shall vote together with the holders of Common Shares as a single class.

3.2   Election of Directors. The holders of record of the Common Shares, exclusively and as a separate class, shall be entitled to elect the total number of directors of the Company. Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the Financial Services capital shares entitled to elect such director or directors, given either at a special meeting of such shareholders duly called for that purpose or pursuant to a written consent of shareholders. If the

5

JAN 1 8 2022

FILED

holders of Common Shares fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this Subsection 3.2, then any directorship not so filled shall remain vacant until such time as the holders of the Common Shares elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by shareholders of the Company other than by the shareholders of the Company that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this Subsection 3.2, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this Subsection 3.2.

3.3     Protective Provisions. At any time when at least fifty percent (50%) of the aggregate number of originally issued Series B Preferred Shares, Series B-1 Preferred Shares and Series C Preferred Shares are outstanding, the Company shall not, either directly or indirectly by amendment, merger, consolidation, recapitalization, reclassification, or otherwise, do any of the following without (in addition to any other vote required by law) the written consent or affirmative vote of the Requisite Holders given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void ab initio, and of no force or effect:

3.3.1     amend, alter or repeal any provision of these Articles in a manner that adversely affects the powers, preferences or rights of the Series B Preferred Shares, Series B-1 Preferred Shares or Series C Preferred Shares (or any series thereof);

3.3.2     (i) create or authorize the creation of or issue any new class or series of shares or any other security convertible into or exercisable for any equity security (by reclassification, amendment or alteration of any existing security, or otherwise), having liquidation rights senior to or on parity with the Series B Preferred Shares, Series B-1 Preferred Shares or Series C Preferred Shares, or (ii) increase the authorized number of shares of Preferred Shares or any additional class or series of capital stock of the Company unless the same ranks junior to the Preferred Shares with respect to its rights, preferences and privileges;

3.3.3     liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or any other Deemed Liquidation Event, or consent to any of the foregoing, in each case, unless the holders of Preferred Shares receive at least one times the applicable Original Issue Price; or

3.3.4     pay or declare any dividend or make any distribution on, any shares of capital stock of the Company other than (i) dividends or distributions on the Preferred Shares as expressly authorized herein, (ii) dividends or other distributions payable on the Common Shares solely in the form of additional shares of Common Shares and (iii) dividends or other distributions paid on any shares of capital stock of the Company in an amount necessary to permit the holders of such capital stock to pay all of the U.S. federal, state and local income tax liabilities



JAN 1 8 2022

FILED

6

attributable to such holder of capital stock's ownership of such shares of capital stock, as determined in good faith by the Board of Directors of the Company.

4.      Optional Conversion.

The holders of the Preferred Shares shall have conversion rights as follows (the "**Conversion Rights**"):

4.1      Right to Convert.

4.1.1      Conversion Ratio. Each share of Preferred Shares shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable Common Shares as is determined by dividing the applicable Original Issue Price by the applicable Conversion Price (as defined below) in effect at the time of conversion. The "**Conversion Price**" shall initially be equal to $0.18972 with respect to the Series A Preferred Shares, $26.21 with respect to the Series B Preferred Shares, $36.41 with respect to the Series B-1 Preferred Shares and $46.3518 with respect to the Series C Preferred Shares. Such applicable Conversion Price, and the rate at which Preferred Shares may be converted into Common Shares, shall be subject to adjustment as provided below.

4.1.2      Termination of Conversion Rights. In the event of a liquidation, dissolution or winding up of the Company or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Preferred Shares.

4.2      Fractional Shares. No fractional Common Shares shall be issued upon conversion of the Preferred Shares. In lieu of any fractional shares to which the holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by the fair market value of a share of Common Shares as determined in good faith by the Board of Directors of the Company. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of Preferred Shares the holder is at the time converting into Common Shares and the aggregate number of Common Shares issuable upon such conversion.

4.3      Mechanics of Conversion.

4.3.1      Notice of Conversion. In order for a holder of Preferred Shares to voluntarily convert Preferred Shares into Common Shares, such holder shall (a) provide written notice to the Company's transfer agent at the office of the transfer agent for the Preferred Shares (or at the principal office of the Company if the Company serves as its own transfer agent) that such holder elects to convert all or any number of such holder's Preferred Shares and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such Preferred Shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such

7

FINANCIAL SERVICES
REGULATORY COMMISSION

DATE: 2022

FILED

certificate), at the office of the transfer agent for the Preferred Shares (or at the principal office of the Company if the Company serves as its own transfer agent). Such notice shall state such holder's name or the names of the nominees in which such holder wishes the Common Shares to be issued. If required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Company if the Company serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion Time**"), and the Common Shares issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date. The Company shall, as soon as practicable after the Conversion Time (i) effect a compulsory repurchase of the specified Preferred Shares and the issuance of the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof through updating, or causing to be updated, the register of members of the Company , (ii) issue and deliver to such holder of Preferred Shares, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the Preferred Shares represented by the surrendered certificate that were not converted into Common Shares, (ii) pay in cash such amount as provided in Subsection 4.2 in lieu of any fraction of a share of Common Shares otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the Preferred Shares converted.

        4.3.2   Reservation of Shares. The Company shall at all times when the Preferred Shares shall be outstanding, reserve and keep available out of its authorized but unissued capital equity, for the purpose of effecting the conversion of the Preferred Shares, such number of its duly authorized Common Shares as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Shares; and if at any time the number of authorized but unissued Common Shares shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Shares, the Company shall take such corporate action as may be necessary to increase its authorized but unissued Common Shares to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to these Articles. Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value of the Common Shares issuable upon conversion of the Preferred Shares, the Company will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and non-assessable Common Shares at such adjusted applicable Conversion Price.

        4.3.3   Effect of Conversion. All Preferred Shares which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive Common Shares in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in Subsection 4.2 and to receive payment of any dividends declared but unpaid thereon.

        4.3.4   No Further Adjustment. Upon any such conversion no adjustment to the applicable Conversion Price shall be made for any declared but unpaid dividends

8

FINANCIAL SERVICES

REGULATORY COMMISSION

JAN 1 8 2022

FILED

on the Preferred Shares surrendered for conversion or on the Common Shares delivered upon conversion.

4.3.5    Taxes. The Company shall pay any and all issue and other similar taxes (if any) that may be payable by the Company in respect of any issuance or delivery of Common Shares upon conversion of Preferred Shares pursuant to this Section 4. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of Common Shares in a name other than that in which the Preferred Shares so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company , that such tax has been paid.

4.4    Adjustments to Conversion Price for Diluting Issues.

4.4.1    Special Definitions. For purposes of this Article III, the following definitions shall apply:

(a)    **"Option"** shall mean rights, options, debentures or warrants to subscribe for, purchase or otherwise acquire Common Shares or Convertible Securities.

(b)    **"Series C Original Issue Date"** shall mean the date on which the first share of Series C Preferred Shares was issued.

(c)    **"Convertible Securities"** shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Shares, but excluding Options.

(d)    **"Additional Common Shares"** shall mean all Common Shares issued (or, pursuant to Subsection 4.4.3 below, deemed to be issued) by the Company after the Series C Original Issue Date, other than (1) the following Common Shares and (2) Common Shares deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, **"Exempted Securities"**):



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

(i)    Common Shares, Options or Convertible Securities issued as a dividend or distribution on Preferred Shares;

(ii)    Common Shares, Options or Convertible Securities issued by reason of a dividend, share split, split-up or other distribution on Common Shares that is covered by Subsection 4.5, 4.6, 4.7 or 4.8;

(iii)    Common Shares or Options issued to employees or directors of, or consultants or advisors to   the Company or any of its

9

subsidiaries or affiliates pursuant to a plan, agreement or arrangement;

(iv)   Common Shares or Convertible Securities actually issued upon the exercise of Options or Common Shares actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)   Common Shares, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction;

(vi)   Common Shares, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services;

(vii)   Common Shares, Options or Convertible Securities issued pursuant to the acquisition of another Company by the Company whether by merger, stock purchase, exchange of shares, purchase of substantially all of the assets or other reorganization or to a joint venture agreement; and

(viii)   Common Shares, Options or Convertible Securities issued in connection with sponsored research, collaboration, technology license, development, OEM, marketing, endorsement or other similar agreements or strategic partnerships.



4.4.2   No Adjustment of Conversion Price. No adjustment in the applicable Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Common Shares if the Company receives written notice from the Requisite Holders agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Common Shares.

4.4.3   Deemed Issue of Additional Common Shares.

(a)   If the Company at any time or from time to time after the Series C Original Issue Date shall issue any Options or Convertible Securities (excluding

Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of Common Shares (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Common Shares issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)    If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of Common Shares issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Company upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the applicable Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such applicable Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the applicable Conversion Price to an amount which exceeds the lower of (i) the applicable Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the applicable Conversion Price that would have resulted from any issuances of Additional Common Shares (other than deemed issuances of Additional Common Shares as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)    If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4 (either because the consideration per share (determined pursuant to Subsection 4.4.5) of the Additional Common Shares subject thereto was equal to or greater than the applicable Conversion Price then in effect, or because such Option or Convertible Security was issued before the Series C Original Issue Date), are revised after the Series C Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of Common Shares issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Common Shares subject thereto (determined in the manner provided in Subsection 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

11

FINANCIAL SERVICES.
REGULATORY COMMISSION

JAN 18 2023

FILE

(d) Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, the applicable Conversion Price shall be readjusted to such applicable Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e) If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the applicable Conversion Price provided for in this Subsection 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Subsection 4.4.3). If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the applicable Conversion Price that would result under the terms of this Subsection 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the applicable Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

4.4.4 Adjustment of Conversion Price Upon Issuance of Additional Common Shares. In the event the Company shall at any time after the Series C Original Issue Date issue Additional Common Shares (including Additional Common Shares deemed to be issued pursuant to Subsection 4.4.3), without consideration or for a consideration per share less than the applicable Conversion Price in effect immediately prior to such issue, then the applicable Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a) "$CP_2$" shall mean the applicable Conversion Price in effect immediately after such issue of Additional Common Shares

(b) "$CP_1$" shall mean the applicable Conversion Price in effect immediately prior to such issue of Additional Common Shares;

(c) "A" shall mean the number of Common Shares outstanding immediately prior to such issue of Additional Common Shares (treating for this purpose as outstanding all Common Shares issuable upon exercise of Options and the conversion of Preferred Shares, in each case, outstanding immediately prior to such issue but excluding any

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

Common Shares issuable upon conversion or exchange of any other Convertible Securities then outstanding);

(d) "B" shall mean the number of Common Shares that would have been issued if such Additional Common Shares had been issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Company in respect of such issue by $CP_1$); and

(e) "C" shall mean the number of such Additional Common Shares issued in such transaction.

4.4.5 <u>Determination of Consideration</u>. For purposes of this Subsection 4.4, the consideration received by the Company for the issue of any Additional Common Shares shall be computed as follows:

(a) <u>Cash and Property</u>: Such consideration shall:

(i) insofar as it consists of cash, be computed at the aggregate amount of cash received by the Company, excluding amounts paid or payable for accrued interest;

(ii) insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Company; and

(iii) in the event Additional Common Shares are issued together with other shares or securities or other assets of the Company for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors of the Company .



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

(b) <u>Options and Convertible Securities</u>. The consideration per share received by the Company for Additional Common Shares deemed to have been issued pursuant to Subsection 4.4.3, relating to Options and Convertible Securities, shall be determined by dividing:

(i) The total amount, if any, received or receivable by the Company as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto,

without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(ii) the maximum number of Common Shares (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

4.4.6  Multiple Closing Dates. In the event the Company shall issue on more than one date Additional Common Shares that are a part of one transaction or a series of related transactions and that would result in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, then, upon the final such issuance, the applicable Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5  Adjustment for Share Splits and Combinations. If the Company shall at any time or from time to time after the Series C Original Issue Date effect a subdivision of the outstanding Common Shares, the applicable Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of Common Shares issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of Common Shares outstanding. If the Company shall at any time or from time to time after the Series C Original Issue Date combine the outstanding Common Shares, the applicable Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of Common Shares issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of Common Shares outstanding. Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6  Adjustment for Certain Dividends and Distributions. In the event the Company at any time or from time to time after the Series C Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive,

14

a dividend or other distribution payable on the Common Shares in additional Common Shares, then and in each such event the applicable Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the applicable Conversion Price then in effect by a fraction:

        (1)    the numerator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

        (2)    the denominator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of Common Shares issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the applicable Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the applicable Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Preferred Shares simultaneously receive a dividend or other distribution of Common Shares in a number equal to the number of Common Shares as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

        4.7    <u>Adjustments for Other Dividends and Distributions</u>. In the event the Company at any time or from time to time after the Series C Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive, a dividend or other distribution payable in securities of the Company (other than a distribution of Common Shares in respect of outstanding Common Shares) or in other property and the provisions of Section 1 do not apply to such dividend or distribution, then and in each such event the holders of Preferred Shares shall receive, simultaneously with the distribution to the holders of Common Shares, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

        4.8    <u>Adjustment for Merger or Reorganization, etc</u>. Subject to the provisions of Subsection 2.3, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Company in which the Common Shares (but not the Preferred Shares) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Subsections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Preferred Shares shall thereafter be convertible in lieu of the Common Shares into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of Common Shares of the Company issuable upon conversion of one share of Preferred Shares immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in

15



JAN 1 8 2022

FILED

such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Company ) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Preferred Shares, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the applicable Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Shares. For the avoidance of doubt, nothing in this Subsection 4.8 shall be construed as preventing the holders of Preferred Shares from exercising any dissenters rights to which they are otherwise entitled under the Companies Act, nor shall this Subsection 4.8 be deemed conclusive evidence of the fair value of the Preferred Shares in any such proceeding.

        4.9    Certificate as to Adjustments. Upon the occurrence of each adjustment or readjustment of the applicable Conversion Price pursuant to this Section 4, the Company at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Shares a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Preferred Shares is convertible) and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Shares (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the applicable Conversion Price then in effect, and (ii) the number of Common Shares and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Preferred Shares.

        4.10    Notice of Record Date. In the event:

        (a)    the Company shall take a record of the holders of its Common Shares (or other capital equity or securities at the time issuable upon conversion of the Preferred Shares) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of any class or any other securities, or to receive any other security; or

        (b)    of any capital reorganization of the Company, any reclassification of the Common Shares of the Company, or any Deemed Liquidation Event; or

        (c)    of the voluntary or involuntary liquidation or winding-up of the Company,

then, and in each such case, the Company will send or cause to be sent to the holders of the Preferred Shares a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Shares (or such other capital equity or securities at the time issuable upon the conversion of the Preferred Shares) shall be entitled to exchange their Common Shares (or such other capital equity or securities) for securities or other property deliverable upon

JAN 18 2022

FILED

such reorganization, reclassification, consolidation, merger, transfer, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Preferred Shares and the Common Shares. Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

     5.     Mandatory Conversion.

     5.1     Trigger Events. Upon either (a) a Qualified IPO (as defined below), (b) a Qualified SPAC Transaction (as defined below) or (c) a Qualified Direct Listing Transaction (as defined below) or (d) the date and time, or the occurrence of an event, specified by vote or written consent of the Requisite Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "**Mandatory Conversion Time**"), then (i) all outstanding Preferred Shares shall automatically be converted into Common Shares, at the then effective conversion rate as calculated pursuant to Subsection 4.1.1 and (ii) such shares may not be reissued by the Company.

     5.2     For purposes of this Section 5, the following definitions shall apply:

     5.2.1     A "**Qualified IPO**" means the closing of a firm commitment underwritten public offering with a price of at least 150% of the Series C Preferred Share Conversion Price and gross proceeds to the Company of not less than $400 million.

     5.2.2     A "**Qualified SPAC Transaction**" means a transaction or series of transactions which constitute the acquisition of the Company by, or merger of the Company with, a special purpose acquisition company or a new holding company (each, a "**SPAC**") and which results in the surviving entity being listed on NASDAQ or other internationally recognized stock exchange (the "**Applicable Exchange**" and the transaction, the "**SPAC Transaction**") provided that either: (i) the proposed SPAC Transaction ascribes a per share equity valuation of the Common Shares immediately prior to the SPAC Transaction (assuming conversion of all securities convertible into Common Shares immediately prior to the SPAC Transaction and exercise of all issued and outstanding options to purchase Common Shares) that is at least equal to 110% of the Conversion Price of the Series C Preferred Shares; or (ii) the Company's Common Shares has an average daily closing price on the Applicable Exchange at the end of any calendar month of at least 150% of the Series C Preferred Share Conversion Price with respect to all trading days occurring within such calendar month.

     5.2.3     A "**Qualified Direct Listing Transaction**" means the Company's voluntary registration of its common stock with the SEC and listing the Applicable Exchange, provided that the Company's Common Shares has an average daily closing price on the Applicable Exchange at the end of any calendar month of at least 150% of the Series C Preferred Share Conversion Price with respect to all trading days occurring within such calendar month.

     5.3     Procedural Requirements. All holders of record of Preferred Shares shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such Preferred Shares pursuant to this Section 5. Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time. Upon receipt of such notice, each holder of Preferred Shares in certificated form shall surrender his, her or its certificate

17

FINANCIAL SERVICES, REGULATORY COMMISSION

JAN 1 8 2022

FILED

or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such certificate) to the Company at the place designated in such notice. If so required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Preferred Shares converted pursuant to Subsection 5.1, including the rights, if any, to receive notices and vote (other than as a holder of Common Shares), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this Subsection 5.2. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Preferred Shares, the Company shall (a) effect a compulsory repurchase of all outstanding Preferred Shares and the issuance of the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof through updating, or causing to be updated, the register of members of the Company, (b) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable on such conversion in accordance with the provisions hereof and (c) pay cash as provided in Subsection 4.2 in lieu of any fraction of a share of Common Shares otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the Preferred Shares converted.

6.     Non-Redeemable Preferred Shares.  The Preferred Shares are not redeemable at the option of any holder thereof.

7.     Waiver.  Any of the rights, powers, preferences and other terms of the Preferred Shares set forth herein may be waived on behalf of all holders of Preferred Shares by the affirmative written consent or vote of the holders of at least a majority of the Preferred Shares then outstanding. Notwithstanding the foregoing, any rights, powers, preferences and other terms specific and unique to (i) Series B Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series B Preferred Shares, (ii) Series B-1 Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series B-1 Preferred Shares and (iii) Series C Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series C Preferred Shares.

8.     Notices.  Any notice required or permitted by the provisions of this Article III to be given to a holder of Preferred Shares shall be mailed, postage prepaid, to the post office address last shown on the records of the Company, or given by electronic communication, and shall be deemed sent upon such mailing or electronic transmission.

**ARTICLE IV**

**BOARD OF DIRECTORS**

18



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

The powers of the Company shall be exercised by the Board of Directors of the Company, which shall be empowered to name one or more Managing Directors. Subject to any restrictions in the appointing resolution, an act of a Managing Director shall bind the Company as if said act had been approved by the Board of Directors. Only a member of the Board of Directors shall serve as a Managing Director. The Company shall have a minimum of 1 and a maximum of 11 directors.

## ARTICLE V

**CORPORATE PURPOSE**

The objects for which the Company is established are:

a) Software Platform; and all business activities permitted by the laws of the State of Antigua and Barbuda other than International Banking, Trust and Insurance, Betting and Bookmaking or any activity which requires a Licence under the International Business Corporations Act.

b) To acquire and deal with any property, real or personal, to erect any buildings, and generally to do all acts and things which, in the opinion of the Company or the Directors, may be conveniently or profitably, or usefully acquired and dealt with, carried on, erected or done by the Company in connection with said property.

c) To generally have and exercise all powers, rights and privileges necessary and incident to carrying out properly the objects herein mentioned.

## ARTICLE VI

**EXISTENCE**

The Company shall have perpetual existence unless sooner dissolved in accordance with the laws of the Antigua and Barbuda. The date on which corporate existence shall begin is the date on which these Articles of Incorporation are filed with the Director of International Business Corporations of Antigua and Barbuda.

## ARTICLE VII

**LIABILITY OF SHAREHOLDERS**

The liability of a shareholder is limited to the amount, if any, unpaid on the shares held or subscribed to by said shareholder.

## ARTICLE VIII

**INDEMNIFICATIONS**

The Company shall indemnify any and all of its Directors, officers, employees or agents or former Directors, officers, employees or agents or any person or persons who may have served at its request as a Director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise in which it owns capital shares or of which it is a creditor, to the full extent permitted by law. Said indemnification shall include, but not limited to, the expenses, including

19

**JAN 1 8 2022**

**FILED**

the cost of any judgements, fines settlements and counsel's fees, actually and necessarily paid or incurred in connection with any action, suit or proceeding, whether civil, criminal, administrative or investigative, and any appeals thereof, to which any such person or his legal representative may be a party or may be threatened to be made a party by reason of his being or having been a Director, officer, employee or agent as herein provided. The foregoing right of indemnification shall not be exclusive of any rights to which any Director, officer, employee or agent may be entitled as a matter of law or which he may be lawfully granted.

## ARTICLE IX

### **CHARTER CONTINUANCE**

The Company is authorised to transfer its charter to any jurisdiction, which permits continuation of a foreign corporation.

### **SECURITIES**

No Securities of the Company will be distributed to the public in the Antigua and Barbuda in contravention of Section 365 of the International Business Corporations Act, 1982.

## ARTICLE XI

### **INCORPORATORS**

The name and address of the Company's incorporators are:

**ARTHUR G. B. THOMAS**          **LISA M. JOHN-WESTE**
Clarkes Hill                                   English Harbour
St. John's                                      St. Paul's
Antigua                                         Antigua

**REGISTERED**

Dated this 20th Day of January, 2022 at St. John's, Antigua



FINANCIAL SERVICES
REGULATORY COMMISSION

**JAN 1 8 2022**

FILED

20

# Tab 3

\* \* \*

## ANTIGUA AND BARBUDA

## INTERNATIONAL BUSINESS CORPORATIONS ACT CAP. 222

### GENERAL BY-LAW

As last amended on March 19, 2019

### TABLE OF CONTENTS

| | Chapter |
|---|---|
| INTERPRETATION | 1 |
| REGISTERED OFFICE | 2 |
| SEAL | 3 |
| DIRECTORS | 4 |
| BORROWING POWERS OF DIRECTORS | 5 |
| MEETINGS OF DIRECTORS | 6 |
| REMUNERATION OF DIRECTORS | 7 |
| SUBMISSION OF CONTRACTS OF SHAREHOLDERS | 8 |
| FOR THE PROTECTION OF DIRECTORS AND OFFICERS | 9 |
| INDEMNITIES TO DIRECTORS AND OFFICERS | 10 |
| OFFICERS | 11 |
| SHAREHOLDERS' MEETINGS | 12 |
| SHARES | 13 |
| TRANSFERS OF SHARES AND DEBENTURES | 14 |
| DIVIDENDS | 15 |

FINANCIAL SERVICES REGULATORY COMMISSION

JAN 1 8 2022

FILED

21

VOTING IN OTHER COMPANIES      16

INFORMATION AVAILABLE TO SHAREHOLDERS      17

NOTICES      18

CHEQUES, DRAFTS AND NOTES      19

EXECUTION OF INSTRUMENTS      20

SIGNATURES      21

FINANCIAL YEAR      22

INITIAL DIRECTORS      23

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

## ANTIGUA AND BARBUDA
## INTERNATIONAL BUSINESS CORPORATIONS ACT Cap. 222

### A COMPANY LIMITED BY SHARES
### GENERAL BY-LAW (NO. 1)

A by-law relating generally to the conduct of the affairs of **FTX TRADING LTD.** (hereinafter called the "Company")

**BE IT ENACTED** as the general by-law of the Company as follows:

1. **INTERPRETATION**
1.1. In this by-law and all other by-laws of the Company, unless the context otherwise requires:
   (a)     "Act" means the International Business Corporations Act 1982 as from time to time amended and every statute substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Act shall be read as references to the substituted provisions therefor in the new statute or statutes;
   (b)     "Regulations" means any Regulations made under the Act, and every regulation substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Regulations shall be read as references to the substituted provisions therefor in the new regulations;
   (c)     "By-Laws" means any by-law of the Company from time to time in force;
   (d)     all terms contained in the by-laws and defined in the Act or the Regulations shall have the meanings given to such terms in the Act or the Regulations; and
   (e)     the singular includes the plural and the plural includes the singular; the masculine gender includes the feminine and neuter genders; the word "person" includes bodies corporate , companies, partnerships, syndicates, trusts and any association of persons; and the word "individual" means a natural person.

22

## 2. **REGISTERED OFFICE**

2.1 The registered office of the company shall be in Antigua and Barbuda at such address as the directors may fix from time to time by resolution.

## 3. **SEAL**

3.1 The common seal of the Company shall be such as the directors may by resolution from time to time adopt.

## 4. **DIRECTORS**

4.1 Powers: Subject to any unanimous shareholder agreement, the business and affairs of the Company shall be managed by the directors

4.2 Number: There shall be not less than 1 and no more than 11 directors.

4.3 Election: Directors shall be elected by the shareholders on a show of hands unless a ballot is demanded in which case such election shall be by ballot.

4.4 Tenure: Unless his tenure is sooner determined, a director shall hold office from the date on which he is elected or appointed until his resignation, death or removal, or the close of the annual meeting of the shareholders next following but he shall be eligible for re-election if qualified.

4.4.1. A director who is also an officer shall continue to be a director until he ceases to be an officer.

4.4.2. A director shall cease to be a director:

    (a)    if he becomes bankrupt or compounds with his creditors or is declared insolvent;

    (b)    if he is found to be of unsound mind; or

    (c)    if by notice in writing to the Company he resigns his office and any such resignation shall be effective at the time it is sent to the Company or at the time specified in the notice whichever is later.

4.4.3 The shareholders of the Company may, by ordinary resolution passed at a special meeting of the shareholders, remove any director from office and a vacancy created by the removal of a director may be filled at the meeting of the shareholders at which the director is removed.

4.5 Committee of Directors: The directors may appoint from among their number a committee of directors and subject to section 80 of the Act may delegate to such committee any of the powers of the directors.

## 5. **BORROWING POWERS OF DIRECTORS**

5.1 The directors may from time to time:

**FINANCIAL SERVICES REGULATORY COMMISSION**

**JAN 1 8 2022**

FILED

23

(a)    borrow money upon the credit of the Company;
(b)    issue, reissue, sell or pledge debentures of the Company
(c)    subject to section 53 of the Act, give a guarantee on behalf of the Company to secure
       performance of an obligation of any person; and
(d)    mortgage, charge, pledge or otherwise create a security interest in
       all or any property of the Company, owned or subsequently acquired, to secure any
       obligation of the Company.

5.2.    The directors may from time to time by resolution delegate to any officer of the Company
        all or any of the powers conferred on the directors by paragraph 5.1 hereof to the full extent
        thereof or such lesser extent as the directors may in any such resolution provide.

5.3.    The powers conferred by paragraph 5.1 hereof shall be in supplement of and not in
        substitution for any powers to borrow money for the purposes of the Company possessed
        by its directors or officers independently of a borrowing by-law.

## 6.    MEETINGS OF DIRECTORS
6.1     Place of Meeting: Meeting of the directors and of any committee of the directors may be
        held within, or outside Antigua and Barbuda, at a place to be determined by the Board of
        Directors.

6.2     Notice: A meeting of the directors may be convened at any time by any director or the
        Secretary, when directed or authorised by any director. Subject to subsection 76 (1) of the
        Act the notice of any such meeting need not specify the purpose of or the business to be
        transacted at the meeting. Notice of any such meeting shall be served in the manner
        specified in paragraph 18.1 hereof not less than two days (exclusive of the day on which
        the notice is delivered or sent but inclusive of the day for which notice is given) before the
        meeting is to take place. A director may in any manner waive notice of a meeting of the
        directors and attendance of a director at a meeting of the directors shall constitute a waiver
        of notice of the meeting except where a director attends a meeting for the express purpose
        of objecting to the transaction of any business on the grounds that the meeting is not
        lawfully called.

6.2.1   It shall not be necessary to give notice of a meeting of the directors to a newly elected or
        appointed director for meeting held immediately following the election of directors by the
        shareholders or the appointment to fill a vacancy among the directors.

6.3     Quorum: The presence of a majority of the then current directors shall constitute a quorum
        for the transaction of business and, notwithstanding any vacancy among the directors; a
        quorum may exercise all the powers of the directors. No business shall be transacted at a
        meeting of directors unless a quorum is present. If a quorum shall fail to attend any meeting,
        a majority of those present may adjourn the meeting to another place, date or time without
        further notice thereof.

24



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

6.3.1 A director may, if all the directors consent, participate in a meeting of directors or of any committee of the directors by means of such telephone or other communications facilities as permit all persons participating in the meeting to hear each other and a director participating in such a meeting by such means is deemed to be present at that meeting.

6.4 Voting: Questions arising at any meeting of the directors shall be decided by a majority of votes. In case of an equality of votes the chairman of the meeting in addition to his original vote shall have a second or casting vote.

6.5 Resolution in lieu of meeting: Notwithstanding any of the foregoing provisions of this by-law a resolution in writing signed by all the directors entitled to vote on that resolution at a meeting of the directors or any committee of the directors is as valid as if it had been passed at a meeting of the directors or any committee of the directors.

## 7. **REMUNERATION OF DIRECTORS**

7.1 The remuneration to be paid to the directors shall be such as the directors may from time to time determine and such remuneration may be in addition to the salary paid to any officer or employee of the Company who is also a director. The directors may also award special remuneration to any director undertaking any special services on the Company's behalf other than the routine work ordinarily required of a director and the confirmation of any such resolution or resolutions by the shareholders shall not be required. The directors shall also be entitled to be paid their travelling and other expenses properly incurred by them in connection with the affairs of the Company.

## 8. **SUBMISSION OF CONTRACTS OR TRANSACTIONS TO SHAREHOLDERS FOR APPROVAL**

8.1 The directors in their discretion may submit any contract, act or transaction for approval or ratification at any annual meeting of the shareholders or at any special meeting of the shareholders called for the purpose of considering the same and, subject to the provisions of section 89 of the Act, any such contract, act or transaction that is approved or ratified or confirmed by a resolution passed by a majority of the votes cast at any such meeting (unless any different or additional requirement is imposed by the Act or by the Company (articles or any other by-law) shall be as valid and as binding upon the Company and upon all the shareholders as though it had been approved, ratified or confirmed by every shareholder of the Company.

**JAN 1 8 2022**

## 9. **FOR THE PROTECTION OF DIRECTORS AND OFFICERS**

9.1 No director or officer of the Company shall be liable to the Company for:-

    (a) the acts, receipts, neglects or defaults of any other director or employee or for joining in any receipt or act for conformity;

    (b) any loss, damage or expense incurred by the Company through the insufficiency or deficiency of title to any property acquired by the Company or for or on behalf of the Company;

25


FILED

(c) the insufficiency or deficiency of any security in or upon which any of the monies of or belonging to the Company shall be placed out or invested;

(d) any loss or damage arising from the bankruptcy, insolvency or tortuous act of any person, including any person with whom any monies securities or effects shall be lodged or deposited;

(e) any loss, conversion, misapplication or misappropriation of or any damage resulting from any dealings with any monies, securities or other assets belonging to the Company;

(f) any other loss, damage or misfortune whatever which may happen in the execution of the duties of his respective office or trust or in relation thereto; unless the same happens by or through his failure to exercise the powers and to discharge the duties of his office honestly and in good faith with a view to the best interests of the Company and in connection therewith to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

9.2 Nothing herein contained shall relieve a director or officer from the duty to act in accordance with the Act or regulations made thereunder or relieve him from liability for a breach thereof.

9.2.1 The directors for the time being of the Company shall not be under any duty or responsibility in respect of any contract, act or transaction whether or not made, done or entered into in the name or behalf of the Company, except such as are submitted to and authorised or approved by the directors.

9.2.2 If any director or officer of the Company is employed by or performs services for the Company otherwise than as a director or officer or is a member of a firm or a shareholder, director or officer of a body corporate which is employed by or performs services for the Company, the fact of his being a shareholder, director of officer of the Company shall not disentitle such director or officer or such firm or body corporate, as the case may be from receiving proper remuneration for such services.

## 10. INDEMNITIES TO DIRECTORS AND OFFICERS

10.1 Subject to section 97 of the Act, except in respect of an action by or on behalf of the Company to obtain a judgement in its favour, the Company shall indemnify a director or officer of the Company, a former director or officer of the Company or a person who acts or acted at the Company's request as a director or officer of a body corporate of which the Company is or was a shareholder or creditor, and his personal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgement, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made party by reason of being or having been a director or officer of such company, if:

(a) he acted honestly and in good faith with a view to the best interests of the Company; and

REGULATORY COMMISSION

JAN 1 8 2022

FILED

26

(b)     in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, he had reasonable grounds for believing that his conduct was lawful.

## 11.    **OFFICERS**

11.1    Appointment: The directors shall as often as may be required appoint a Secretary and, if deemed advisable, may as often as may be required appoint any or all of the following officers: a Chairman, a Deputy Chairman, a President, one or more Vice-Presidents, a Treasurer, one or more Assistant Secretaries or one or more Assistant Treasurers. A director may be appointed to any office of the Company but none of the officers except the Chairman, the Deputy Chairman, the President and Vice-President need be a director. Two or more of the aforesaid offices may be held by the same person. In case and whenever the same person holds the offices of Secretary and Treasurer he may but need not be known as the Secretary-Treasurer. The directors may from time to time appoint such other officers and agents as they deem necessary who shall have such authority and shall perform such duties as may from time to time be prescribed by the directors.

11.2    Remuneration: The remuneration of all officers appointed by the directors shall be determined from time to time by resolution of the directors. The fact that any officer or employee is a director or shareholder of the Company shall not disqualify him from receiving such remuneration as may be determined.

11.3    Powers and Duties: All officers shall sign such contracts, documents or instruments in writing as require their respective signatures and shall respectively have and perform all powers and duties incident to their respective offices and such other powers and duties respectively as may from time to time be assigned to them by the directors.

11.4    Delegation: In case of the absence or inability to act of any officer of the Company or for any other reason that the directors may deem sufficient the directors may delegate all or any of the powers of such officer to any other officer or to any director.

11.5    Chairman: A chairman shall, when present, preside at all meetings of the directors, and any committee of the directors or the shareholders.

11.6    Deputy Chairman: If the Chairman is absent or is unable or refuses to act, the Deputy Chairman (if any) shall, when present, preside at all meetings of the directors, and any committee of the directors, or the shareholders.

11.7    President: A President shall be the Chief Executive Officer, Managing Director, of the Company and shall exercise such powers and have such authority as may be delegated to him by the directors in accordance with the provisions of section 80 of the Act. He shall be vested with and may exercise all the Powers and shall perform all the duties of a Chairman and Deputy Chairman if none be appointed or if the Chairman and the Deputy Chairman are absent or are unable or refuse to act.

JAN 1 8 2022

FILED

27

11.8 Vice-President: A Vice President or, if more than one, the Vice-Presidents, in of order seniority, shall be vested with all the powers and shall perform all the duties of the President in the absence or inability or refusal to act of the President.

11.9 Secretary: The Secretary shall give or cause to be given notices for all meetings of the directors, any committee of the directors and the shareholders when directed to do so and shall have charge of the minute books and seal of the Company and, subject to the provisions of paragraph 14.1 hereof, of the records (other than accounting records) referred to in section 130 of the Act.

11.10 Treasurer: Subject to the provisions of any resolution of the directors, a Treasurer shall have the care and custody of all the funds and securities of the Company and shall deposit the same in the name of the Company in such bank or banks or with such other depository or depositories as the directors may direct. He shall keep or cause to be kept the accounting records referred to in section 132 of the Act. He may be required to give such bond for the faithful performance of his duties as the directors in their uncontrolled discretion may require but no director shall be liable for failure to require any such bond or for the insufficiency of any such bond or for any loss by reason of the failure of the Company to receive any indemnity thereby provided.

11.11 Assistant Secretary and Assistant Treasurer: The Assistant Secretary or, if more than one, the Assistant Secretaries in order of seniority, and the Assistant Treasurer or, if more than one, the Assistant Treasurers in order of seniority, shall respectively perform all the duties of the Secretary and the Treasurer, respectively, in the absence or inability or refusal to act of the Secretary or the Treasurer, as the case may be.

11.12 General Manager or Manager: The directors may from time to time appoint one or more General Manager or Managers and may delegate to him or them full power to manage and direct the business and affairs of the Company (except such matters and duties as by law must be transacted or performed by the directors or by the shareholders) and to employ and discharge agents and employees of the Company or may delegate to him or them any lesser authority. A General Manager or Manager shall conform to all lawful orders given to him by the directors of the Company and shall at all reasonable times give to the directors or any of them all information they may require regarding the affairs of the Company. Any agent or employee appointed by the General Manager or Manager may be discharged by the directors.

11.13 Vacancies: If the office of any officer of the Company becomes vacant by reason of death, resignation, disqualification or otherwise, the directors by resolution shall, in the case of the Secretary, and may, in the case of any office, appoint a person to fill such vacancy.

## 12. **SHAREHOLDERS' MEETINGS**

12.1 Annual Meeting: Subject to the provisions of section 102 of the Act, the annual meeting of the shareholders shall be held on such day in each year and at such time and place as to be determined by the directors.



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

28

12.2    Special Meetings: Special meetings of the shareholders may be convened by order of the Chairman, the Deputy Chairman, the President, Vice-President or by the directors at any date and time and at any place within Antigua and Barbuda or, if all the shareholders entitled to vote at such meeting so agree, outside the Antigua and Barbuda.

12.2.1 The directors shall on the requisition of the holders of not less than five percent of the issued shares of the Company that carry a right to vote at the meeting requisitioned, forthwith convene a meeting of shareholders, and in the case of such requisition the following provisions shall have effect:

(1)    The requisition must state purposes of the meeting and must be signed by the requisitionist and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more of the requisitionists.

(2)    If the directors do not, within twenty-one days from the date of the requisition being so deposited, proceed to convene a meeting, the requisitionists or any of them may themselves convene the meeting, but any meeting so convened shall not be held after three months from the date of such deposit.

(3)    Unless subsection (3) of section 120 of the Act applies, the directors shall be deemed not to have duly convened the meeting if they do not give such notice as is required by the Act within fourteen days from the deposit of the requisition.

(4)    Any meeting convened under this paragraph by the requisitions shall be called as nearly as possible in the manner in which meetings are to be called pursuant to the by-laws and Division E of the Act.

(5)    A requisition by joint holders of shares must be signed by all such holders.

12.3    Notice: A notice stating the day, hour and place of meeting shall be given by serving such notice on each shareholder entitled to vote at such meeting, on each director and on the auditor of the Company in the manner specified in paragraph 18.1 hereof, not less than fifteen days or more than sixty days before the date of the meeting.

12.4    Waiver of Notice: A shareholder and any other person entitled to attend a meeting of shareholders may in any manner waive notice of a meeting of shareholders and attendance of any such person at a meeting of shareholders shall constitute a waiver of notice of the meeting except where such person attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

12.5    Omission of Notice: The accidental omission to give notice at any meeting or any irregularity in the notice of any meeting or the non-receipt of any notice by any shareholder, director or the auditor of the Company shall not invalidate any resolution passed or any proceedings taken at any meeting of the shareholders.

12.6    Votes: Every question submitted to any meeting of shareholders shall be decided in the first instance by a show of hands unless a person entitled to vote at the meeting has demanded a ballot and, if the articles so provide, in the case of an equality of votes the Chairman of the meeting shall on a ballot have a casting vote in addition to any votes to which he may be otherwise entitled.

FINANCIAL SERVICES REGULATORY COMMISSION

JAN 1 8 2022

FILED

29

12.6.1. At every meeting at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder who is present in person shall have one vote on a show of hands. Upon a ballot at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder shall, subject to the articles, have one vote for every share held by the shareholder.

12.6.2 At any meeting unless a ballot is demanded, a declaration by the Chairman of the meeting that a resolution has been carried or carried unanimously or by a particular majority or lost or not carried by a particular majority shall be conclusive evidence of the fact.

12.6.3 When the Chairman, the Deputy Chairman, the President and the Vice-President are absent, the persons who are present and entitled to vote shall choose another director as Chairman of the meeting; but if no director is present or all the directors present decline to take the chair, the persons who are present and entitled to vote shall choose one of their number to be Chairman.

12.6.4 A ballot, either before or after any vote by a show of hands, may be demanded by any person entitled to vote at the meeting. If at any meeting a ballot is demanded on the election of a Chairman or on the question of adjournment it shall be taken forthwith without adjournment. If at any meeting a ballot is demanded on any other question or as to the election of directors, the vote shall be taken by ballot in such manner and either at once, later in the meeting or after adjournment as the Chairman of the meeting directs. The result of a ballot shall be deemed to be the resolution of the meeting at which the ballot was demanded. A demand for a ballot may be withdrawn.

12.6.5 If two or more persons hold shares jointly, one of those holders present at a meeting of shareholders may, in the absence of the other, vote the shares; but if two or more of those persons who are present, in person or by proxy vote, they must vote as one on the shares jointly held by them.

12.7    Proxies: Votes at meetings of shareholders may be given either personally or by proxy or, in the case of a shareholder who is a body corporate or association, by an individual authorised by a resolution of the directors or governing body of that body corporate or association to represent it at meetings of shareholders of the Company.

12.7.1 A proxy shall be executed by the shareholder or his attorney-in-fact authorised in writing and shall not be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy.

12.7.2 A person appointed by proxy need not be a shareholder.

12.7.3 Subject to the provisions of sections 13-15 inclusive of the Regulations a proxy may be in the following form or as near thereto as circumstances require or permit:



30

The undersigned shareholder of_____ hereby appoints_____ of _____
_____ , or failing him,_____ of_____ as the nominee of the
undersigned to attend and act for the undersigned and on behalf of the undersigned at the
meeting of the shareholders of the said Company to be held on the_____ day of
_____ 202__ and at any adjournment or adjournments thereof in the same manner, to the
same extent and with the same powers as if the undersigned were present at the said
meeting or such adjournment or adjournments thereof.

Dated this _____ day of _____ 202__

Signature of shareholder

_____

12.8   Adjournment: The Chairman of any meeting may with the consent of the meeting adjourn
the same from time to time to a fixed time and place and no notice of such adjournment
need be given to the shareholders unless the meeting is adjourned by one or more
adjournments for an aggregate of thirty days or more in which case notice of the adjourned
meeting shall be given as for an original meeting. Any business that might have been
brought before or dealt with at the original meeting in accordance with the notice calling
the same may be brought before or dealt with at any adjourned meeting for which no notice
is required.

12.9   Quorum: Subject to the Act, and except in the case of a Company having only one
shareholder a quorum for the transaction of business at any meeting of the shareholders
shall not consist of fewer than one- third of the shares entitled to vote thereat, or a duly
appointed proxy holder or representative of a shareholder so entitled. If a quorum is present
at the opening of any meeting of the shareholders, the shareholders present or represented
may proceed with the business of the meeting notwithstanding a quorum is not present
throughout the meeting. If a quorum is not present within 30 minutes of the time fixed for
a meeting of shareholders, the persons present and entitled to vote may adjourn the meeting
to a fixed time and place but may not transact any other business.

12.10  Resolution in lieu of meeting: Notwithstanding any of the foregoing provisions of this by-
law a resolution in writing signed by all the shareholders entitled to vote on that resolution
at a meeting of the shareholders is subject to section 119 of the Act as valid as if it had
been passed at a meeting of the shareholders.

13.   **SHARES**
13.1   Allotment and Issuance: Subject to the Act, the articles and any unanimous shareholder
agreement, shares in the capital of the Company may be allotted and issued by resolution
of the directors at such times and on such terms and conditions and to such person or class
of persons as the directors determine.

JAN 1 8 2022

FILED

31

13.2 Certificates: Share certificates and the form of share transfer shall (subject to section 138 of the Act) be in such form as the directors may by resolution approve and such certificates shall be issued in registered form only and signed by a Chairman or a Deputy Chairman or a President or a Vice-President and the Secretary or an Assistant Secretary holding office at the time of signing.

13.2.1 The directors or any agent designated by the directors may in their or his discretion direct the issuance of a new share or other such certificate in lieu of and upon cancellation of a certificate that has been mutilated or in substitution for a certificate claimed to have been lost, destroyed or wrongfully taken, on payment of such reasonable fee and on such terms as to indemnity, re-imbursement of expenses and evidence of loss and of title as the directors may from time to time prescribe, whether generally or in any particular case.

## 14.   **TRANSFER OF SHARES AND DEBENTURES**

14.1 Transfer: The shares or debentures of a Company may be transferred by a written instrument of transfer signed by the transferor and naming the transferee.

14.2 Registers:   Registers of shares and debentures issued by the Company shall be kept at the registered office of the Company or at such other place in the island of Antigua as may from time to time be designated by resolution of the directors.

14.3 Surrender of Certificates:   Subject to Section 136 of the Act, no transfer of shares or debentures shall be registered unless or until the certificate representing the shares or debentures to be transferred has been surrendered for cancellation.

14.4 Shareholder indebted to the Company:   If so provided in the articles, the Company has a lien on a share registered in the name of a shareholder or his personal representative for a debt of that shareholder to the Company. By way of enforcement of such lien the directors may refuse to permit the registration of a transfer of such share.

## 15.   **DIVIDENDS**

15.1 The directors may from time to time by resolution declare and the company may pay dividends on the issued and outstanding shares in the capital of the Company subject to the provisions (if any) of the articles and sections 51 and 52 of the Act.

15.1.1 In case several persons are registered as the joint holders of any shares, any one of such persons may give effectual receipts for all dividends and payments on account of dividends.

## 16.   **VOTING IN OTHER COMPANIES**

16.1 All shares or debentures carrying voting rights in any other body corporate that are held from time to time by the Company may be voted at any and all meetings of shareholders, debenture holders (as the case may be) of such other body corporate and in such manner and by such person or persons as the directors of the Company shall from time to time



32

determine. The officers of the Company may for and on behalf of the Company from time to time:

(a)     execute and deliver proxies; and

(b)     arrange for the issuance of voting certificates or other evidence of the right to vote; in such names as they may determine without the necessity of a resolution or other action by the directors.

## 17.    **INFORMATION AVAILABLE TO SHAREHOLDERS**

17.1    Except as provided by the Act, no shareholder shall be entitled to any information respecting any details or conduct of the company's business which in the opinion of the directors it would be inexpedient in the interest of the Company to communicate to the public.

17.2    The directors may from time to time, subject to rights conferred by the Act, determine whether and to what extent and at what time and place and under what conditions or regulations the documents, books and registers and accounting records of the Company or any of them shall be open to the inspection of shareholders and no shareholder shall have any right to inspect any document or book or register or accounting record of the Company except as conferred by statute or authorised by the directors or by a resolution of the shareholders.

## 18.    **NOTICES**

18.1    Method of giving notice: Any notice or other document required by the Act, the Regulations, the articles or the by-laws to be sent to any shareholder, debenture holder, director or auditor may be delivered personally or sent by prepaid mail or cable or electronic communication or telex to any person at his latest address or electronic mail address as shown in the records of the Company or its transfer agent and to any such director at his latest address or electronic mail address as shown in the records of the Company or in the latest notice filed under section 74 of the Act, and to the auditor at his business address or electronic mail address.

18.2    Waiver of notice: Notice may be waived or the time for the notice may be waived or abridged at any time with the consent in writing of the person entitled thereto.

18.3    Undelivered notices: If a notice or document is sent to a shareholder or debenture holder by prepaid mail in accordance with this paragraph and the notice or document is returned on three consecutive occasions because the shareholder or debenture holder cannot be found, it shall not be necessary to send any further notices or documents to the shareholder or debenture holder until he informs the Company in writing of his new address.

18.4    Shares and debentures registered in more than one name: All notices or other documents with respect to any shares or debentures registered in more than one name shall be given to whichever of such persons is named first in the records of the Company and any notice



JAN 1 8 2022

FILED

33

or other documents so given shall be sufficient notice of delivery to all the holders of such shares or debentures.

18.5 Persons becoming entitled by operation of law: Subject to section 184 of the Act every person who by operation of law, transfer or by any other means whatsoever becomes entitled to any share is bound by every notice or other document in respect of such share that, previous to his name and address being entered in the records of the Company is duly given to the person from whom he derives his title to such share.

18.6 Deceased Shareholders: Subject to section 141 of the Act, any notice or other document delivered or sent by prepaid mail, cable or telex or left at the address of any shareholder as the same appears in the record of the Company shall, notwithstanding that such shareholder is deceased, and whether or not the Company has notice of his death, be deemed to have been duly served in respect of the shares held by him (whether held solely or with any other person) until some other person is entered in his stead in the records of the Company as the holder or one of the holders thereof and such service shall for all purposes be deemed sufficient service of such notice or document on his personal representative and on all persons, if any, interested with him in such shares.

18.7 Signature to notices: The signature of any director or officer of the Company to any notice or document to be given by the Company may be written, stamped, typewritten or printed or partly written, stamped, typewritten or printed.

18.8 Computation of time: Where a notice extending over a number of days or other period is required under any provision of the articles or the by-laws the day of sending the notice shall, unless it is otherwise provided, be counted in such number of days or other period.

18.9 Proof of service: where a notice required under paragraph 18.1 hereof is delivered personally to the person to whom it is addressed or delivered to his address as mentioned in paragraph 18.1 hereof, service shall be deemed to be at the time of delivery of such notice.

18.9.1 Where such notice is sent by post, service of the notice shall be deemed to be effected forty-eight hours after posting if the notice was properly addressed and posted by prepaid mail.

18.9.2 Where the notice is sent by cable or telex, service is deemed to be effected on the date on which the notice is so sent.

18.9.3 A certificate of an officer of the Company in office at the time of the making of the certificate or of any transfer agent of shares of any class of the Company as to facts in relation to the delivery or sending of any notice shall be conclusive evidence of those facts.

19. **CHEQUES, DRAFTS AND NOTES**



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

34

19.1 All cheques, drafts or orders for the payment of money and all notes and acceptances and bills of exchange shall be signed by such officers or persons and in such manner as the directors may from time to time designate by resolution.

## 20. EXECUTION OF INSTRUMENTS
20.1 Contracts, documents or instruments in writing requiring the signature of the Company may be signed by:

(a) a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or

(b) any one Director, and all contracts, documents and instruments in writing so signed shall be binding upon the Company without any further authorization or formality. The directors shall have power from time to time by resolution to appoint any officers or persons on behalf of the Company either to sign certificates for shares in the Company and contracts, documents and instruments in writing generally or to sign specific contracts, documents or instruments in writing.

20.1.1. The common seal of the Company may be affixed to contracts, documents and instruments in writing signed as aforesaid or by any officers specified in paragraph 20.1 hereof.

20.1.2 Subject to section 125 of the Act, a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or any two directors shall have authority to sign execute (under the seal of the Company or otherwise) all the instruments that may be necessary for the purpose of selling,
assigning, transferring, exchanging, converting or conveying any such shares, stocks, bonds, debentures, rights, warrants or other securities.

## 21. SIGNATURES
21.1 The signature of a Chairman, a Deputy Chairman, a President, a Vice-President, the Secretary, the Treasurer, an Assistant Secretary or an Assistant Treasurer or any director of the Company or of any officer or person, appointed pursuant to paragraph 20 hereof by resolution of the directors may, if specifically authorised by resolution of the directors, be printed, engraved, lithographed or otherwise mechanically reproduced upon any certificate for shares in the Company or contract, document or in writing, bond, debenture or other security of the Company executed or issued by or on behalf of the Company. Any document or instrument in writing on which the signature of any such officer or person is so reproduced shall be deemed to have been manually signed by such officer or person whose signature is so reproduced and shall be as valid to all intents and purposes as if such document or instrument in writing had been signed manually and notwithstanding that the officer or person whose signature is so reproduced has ceased to hold office as at the date on which such document or instrument in writing is delivered or issued.

35

22.    **FINANCIAL YEAR**

22.1   The directors may from time to time by resolution establish the financial year of the Company.

23.    **INITIAL DIRECTORS**

23.1   The initial Board of Directors shall be composed of the following members:

**CORPORATE & TRUST SERVICES (CARIBBEAN) LIMITED**



FINANCIAL SERVICES
REGULATORY COMMISSION

**JAN 1 8 2022**

FILED

36

# Exhibit L

EXECUTION VERSION

## ACTION BY WRITTEN CONSENT OF THE SHAREHOLDER

### OF

### FTX TRADING LTD. (the "Company")

### November 21, 2022

The undersigned, constituting the shareholder of the Company, acting in accordance with applicable law and the Company's Articles of Association and By-Laws consents to, approves and adopts the following recitals and resolutions by written consent:

**WHEREAS,** on November 10, 2022, Mr. Samuel Benjamin Bankman-Fried (the "Founder"), as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird, Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), authorized, instructed and consented to, among other things, (i) the appointment of John J. Ray III (the "CEO") as Chief Executive Officer and Chief Restructuring Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Bankruptcy Code ("Chapter 11") and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group and (ii) the appointment of individuals chosen by the CEO and not affiliated with the Founder or the CEO as new directors of the Top Companies and the other members of the FTX Group (such authorization, instruction and consent, the "Omnibus Corporate Authority").

**WHEREAS,** on November 11, 2022 and November 14, 2022, the Company and certain other affiliated debtors filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Petitions") and the bankruptcy cases are pending before the Honorable John T. Dorsey and the Debtors have requested joint administration of the cases under Case No. 22-11068 (JTD) (the "Bankruptcy Cases").

**WHEREAS,** the Company's By-Laws provide that any director may be removed, with or without cause, from or appointed to the Board of Directors of the Company the ("Board") by a resolution of the members entitled to vote.

**WHEREAS,** the CEO, on behalf of the shareholder and acting pursuant to the Omnibus Corporate Authority, deemed it in the best interest of the Company to remove from the Board all directors currently serving as such and to revoke all currently existing delegations of authority from the Board to any person.

**WHEREAS,** the CEO, on behalf of the sole shareholder and acting pursuant to the Omnibus Corporate Authority, deemed it in the best interest of the Company to elect and appoint Matthew A. Doheny and Joseph J. Farnan Jr. (together, the "New Independent Directors") to the Board.

**WHEREAS,** the Company entered into (i) that certain Independent Director Agreement, dated as of November 14, 2022, with Matthew A. Doheny (the "Doheny Independent Director Agreement") and (ii) that certain Independent Director Agreement,

dated as of November 13, 2022, with Joseph J. Farnan Jr. (the "Farnan Independent Director Agreement" and together with the Doheny Independent Director Agreement, the "Independent Director Agreements"), among other things, confirming the election and appointment of each New Independent Director to the Board and providing for the terms of such appointment (including, without limitation, with respect to compensation payable, reimbursement of expenses and indemnification of liabilities).

**NOW, THEREFORE, BE IT RESOLVED**, that the appointment of the CEO as the Chief Restructuring Officer and Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the removal of all prior officers of the Company and directors from the Board be, and hereby is, confirmed, ratified, authorized and approved and, to the extent that there are currently any officers or directors of the Company (excepting the CEO and the New Independent Directors), such officers and directors be, and they hereby are, removed from acting in such capacity.

**FURTHER RESOLVED**, that the revocation of all prior delegations of authority from the Board (excepting the Omnibus Corporate Authority) be, and hereby is, confirmed, ratified, authorized and approved, and shall be revoked, extinguished and of no further effect and, to the extent that there are any currently existing delegations of authority from the Board (excepting the Omnibus Corporate Authority), such delegations be, and each of them hereby is, revoked, extinguished and of no further effect.

**FURTHER RESOLVED**, that the election and appointment of the New Independent Directors, and all terms of such appointment as set forth in the Independent Director Agreements, be, and hereby are, confirmed, ratified, authorized and approved, with such New Independent Directors to hold office until his successor is duly elected and qualified or until his earlier death, resignation or removal, in each case accordance with the By-Laws of the Company and the terms and conditions of the applicable Independent Director Agreements, and the registered agent of the Company be and is hereby instructed by copy of these resolutions to update the Register of Directors of the Company to note the change of directors, all as set out in these resolutions and to make the necessary filing with the Financial Services Regulatory Commission in respect of the appointment and removal of the directors.

**FURTHER RESOLVED**, that the terms of the Independent Director Agreements, including, without limitation, with respect to compensation payable, reimbursement of expenses and the indemnification of the New Independent Directors, are hereby acknowledged, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the CEO and the New Independent Directors shall be indemnified to the fullest extent permitted by law and to the fullest extent permitted under existing indemnification arrangements applicable to all members of the Board and officers of the Company, including as provided in the By-laws of the Company, and in the Independent Director Agreements, and such indemnification shall continue even if such person no longer serves as an officer or director of the Company and shall inure to the benefit of his heirs, executors and administrators.

**FURTHER RESOLVED**, that the filing of the Petitions and all other actions taken in connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that any and all other actions heretofore taken by the CEO in furtherance of the foregoing resolutions are hereby confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that all certificates, agreements, instruments and other documents previously signed on behalf of the Company by the CEO in connection

with or in furtherance of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, that are substantially consistent with the foregoing resolutions be, and they hereby are, in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such certificate, agreement, instrument or other document had been specifically authorized in advance by resolution of the Board and that the CEO did execute the same.

**FURTHER RESOLVED**, that the CEO be, and hereby is, authorized and directed, in the name and on behalf of the Company to execute and deliver all further certificates, agreements, instruments and other documents, which they may deem necessary or advisable in order to effectuate the purposes of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, and the execution by the CEO of any such certificate, agreement, instrument or document shall conclusively establish their authority therefor from the Company and the approval and ratification by the Company of the documents so executed.

**FURTHER RESOLVED**, that the power and authority granted to the CEO pursuant to the foregoing resolutions shall include the power and authority to cause any direct or indirect consolidated subsidiary of the Company to take action that is in furtherance of or consistent with the purposes of the foregoing resolutions.

**FURTHER RESOLVED**, that the CEO is hereby authorized and directed, in the name and on behalf of the Company, to take such actions as such officer shall determine to be necessary or appropriate to authorize and cause any direct or indirect consolidated subsidiary of the Company to authorize, execute and deliver any and all agreements, authorizations, instruments or other documents as such officer shall determine to be necessary or appropriate in connection with any of the matters described in any of the foregoing resolutions, each such determination to be conclusively evidenced by the taking of such actions.

**FURTHER RESOLVED**, that the CEO shall have the authority, from time to time, to delegate such officer's authority conferred pursuant to any of the foregoing resolutions to any employee of the Company (whether or not such employee is an officer of the Company), provided that the person to whom such authority is delegated shall not have the power to further delegate such authority to any other person.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this written consent as of the date first written above.

SIGNED FOR AND ON BEHALF OF **PAPER BIRD INC.**:

Signature:

_____
Name: John J. Ray III
Title: Chief Executive Officer and
Chief Restructuring Officer

# Exhibit M

**NOTICE OF**
**ACTION BY WRITTEN CONSENT OF THE SHAREHOLDERS**
**OF FTX TRADING LTD.**

December *14*, 2022

To:    Shareholders of FTX Trading Ltd. (the "Company")

   Re:    Notice of Written Action in Lieu of Meeting

Dear Ladies and Gentlemen:

1. This notice is provided to you in your capacity as a shareholder of the Company, in discharge of any and all existing obligations owed to you by the Company pursuant to the Company's Articles of Incorporation, as last amended on October 18, 2021, and By-Laws, as last amended on March 19, 2019, and the laws of Antigua and Barbuda.

2. As you are aware, on November 11, 2022 and November 14, 2022, the Company and certain other affiliated debtors filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Petitions").

3. In connection with the Chapter 11 Petitions, we hereby further inform you that on November 21, 2022, a written action in lieu of a meeting of the shareholders of the Company was adopted to, among other things, effect the removal of the current directors of the board of the Company (the "Board") and to effect the appointment of new independent directors to the Board.

4. The Board now consists of the following independent directors: Mr. Matthew A. Doheny and Mr. Joseph J. Farnan Jr.

Yours faithfully,

**FTX Trading Ltd.**

By:    _____
Name: John J. Ray III
Title:   Chief Executive Officer and Chief Restructuring Officer

# Exhibit N

EXECUTION VERSION

**ACTION BY WRITTEN CONSENT OF THE BOARD OF DIRECTORS**

**OF**

**FTX TRADING LTD (the "Company")**

**December 22 , 2022**

The undersigned, constituting all of the duly elected, qualified and serving members of the board of directors (the "Board") of the Company, acting in accordance with applicable law and the Company's Articles of Incorporation and By-laws, hereby waive all notice of time, place or purpose of a meeting and consent to, approve and adopt the following recitals and resolutions by written consent. It is noted that for the purposes of Section 89 and 90 of the International Business Corporations act, Cap 222 (as amended) the directors have disclosed any interests in the matters the subject of these resolutions (if applicable) and request that the following be treated as general notice of such.

**WHEREAS,** on November 10, 2022, Mr. Samuel Benjamin Bankman-Fried (the "Founder"), as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird, Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), authorized, instructed and consented to, among other things, (i) the appointment of John J. Ray III (the "CEO") as Chief Executive Officer and Chief Restructuring Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Bankruptcy Code ("Chapter 11") and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group and (ii) the appointment of individuals chosen by the CEO and not affiliated with the Founder or the CEO as new directors of the Top Companies and the other members of the FTX Group (such authorization, instruction and consent, the "Omnibus Corporate Authority").

**WHEREAS,** on November 11, 2022 and November 14, 2022, the Company and certain other affiliated debtors (the "Debtors") filed a voluntary petition for relief under Chapter 11 (the "Petitions") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the bankruptcy cases are pending before the Honorable John T. Dorsey and the Debtors have requested joint administration of the cases under Case No. 22-11068 (JTD) (the "Bankruptcy Cases").

**WHEREAS,** on November 21, 2022, the CEO, on behalf of the shareholder and acting pursuant to the Omnibus Corporate Authority, deemed it in the best interest of the Company to elect and appoint Matthew A. Doheny and Joseph J. Farnan Jr. (each a "New Independent Director" and, together, the "New Independent Directors") to the Board.

**WHEREAS,** the Board has deemed it to be in the best interest of the Company to terminate the appointment of any Managing Director existing on the date hereof and to appoint the New Independent Directors as the Managing Directors of the Company, in accordance with the Company's Articles of Incorporation and By-laws.

**WHEREAS,** the Board has deemed it to be in the best interest of the Company to terminate the appointment of any General Manager existing on the date hereof and to appoint the CEO as the General Manager of the Company, in accordance with the Company's Articles of Incorporation and By-laws.

**WHEREAS**, the Company entered into (i) that certain Independent Director Agreement, dated as of November 14, 2022, with Matthew A. Doheny (the "Doheny Independent Director Agreement"), and (ii) that certain Independent Director Agreement, dated as of November 13, 2022, with Joseph J. Farnan Jr. (the "Farnan Independent Director Agreement" and, together with the Doheny Independent Director Agreement, the "Independent Director Agreements"), among other things, confirming the election and appointment of each New Independent Director to the Board and providing for the terms of such appointment (including, without limitation, with respect to compensation payable, reimbursement of expenses and indemnification of liabilities).

**WHEREAS**, on November 21, 2022, the CEO, on behalf of the shareholder and acting pursuant to the Omnibus Corporate Authority, acknowledged, confirmed, ratified, authorized and approved the appointment of each New Independent Director to the Board.

**NOW, THEREFORE, BE IT RESOLVED**, that the appointment of the CEO as the Chief Restructuring Officer and Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the removal of all prior officers of the Company be, and hereby is, confirmed, ratified, authorized and approved and, to the extent that there are currently any officers of the Company (excepting the CEO), such officers be, and they hereby are, removed from acting in such capacity.

**FURTHER RESOLVED**, that the termination of the appointment of any existing Managing Director and the appointment of the New Independent Directors as Managing Directors of the Company in accordance with the Company's Articles of Incorporation and By-laws be, and hereby are, confirmed, authorized and approved.

**FURTHER RESOLVED**, that the termination of the appointment of any existing General Manager and the appointment of the CEO as General Manager of the Company in accordance with the Company's Articles of Incorporation and By-laws be, and hereby are, confirmed, authorized and approved.

**FURTHER RESOLVED**, that the revocation of all prior delegations of authority from the Board (excepting the Omnibus Corporate Authority) be, and hereby is, confirmed, ratified, authorized and approved, and shall be revoked, extinguished and of no further effect and, to the extent that there are any currently existing delegations of authority from the Board (excepting the Omnibus Corporate Authority), such delegations be, and each of them hereby is, revoked, extinguished and of no further effect.

**FURTHER RESOLVED**, that the terms of the Independent Director Agreements, including, without limitation, with respect to compensation payable, reimbursement of expenses and the indemnification of each New Independent Director, are hereby acknowledged, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the CEO and the New Independent Directors shall be indemnified to the fullest extent permitted by law and to the fullest extent permitted under existing indemnification arrangements applicable to all members of the Board and officers of the Company, including as provided in the By-laws of the Company, and in the Independent Director Agreements, and such indemnification shall continue even if such person no longer serves as an officer or director of the Company and shall inure to the benefit of his heirs, executors and administrators.

**FURTHER RESOLVED**, that the filing of the Petitions and all other actions taken in connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved.

4857-0798-8287 v.2

**FURTHER RESOLVED,** that any and all other actions heretofore taken by the CEO in furtherance of the foregoing resolutions are hereby confirmed, ratified, authorized and approved.

**FURTHER RESOLVED,** that all certificates, agreements, instruments and other documents previously signed on behalf of the Company by the CEO in connection with or in furtherance of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, that are substantially consistent with the foregoing resolutions be, and they hereby are, in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such certificate, agreement, instrument or other document had been specifically authorized in advance by resolution of the Board and that the CEO did execute the same.

**FURTHER RESOLVED,** that the CEO be, and hereby is, authorized and directed, in the name and on behalf of the Company to execute and deliver all further certificates, agreements, instruments and other documents, which they may deem necessary or advisable in order to effectuate the purposes of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, and the execution by the CEO of any such certificate, agreement, instrument or document shall conclusively establish their authority therefor from the Company and the approval and ratification by the Company of the documents so executed.

**FURTHER RESOLVED,** that each of the CEO is authorized to sign, for and on behalf of the Company, any and all checks and other orders for the payment of money drawn on the name of the Company, as applicable, from any accounts held by the Company.

**FURTHER RESOLVED,** that the power and authority granted to the CEO pursuant to the foregoing resolutions shall include the power and authority to cause any direct or indirect consolidated subsidiary of the Company to take action that is in furtherance of or consistent with the purposes of the foregoing resolutions.

**FURTHER RESOLVED,** that the CEO is hereby authorized and directed, in the name and on behalf of the Company, to take such actions as such officer shall determine to be necessary or appropriate to authorize and cause any direct or indirect consolidated subsidiary of the Company to authorize, execute and deliver any and all agreements, authorizations, instruments or other documents as such officer shall determine to be necessary or appropriate in connection with any of the matters described in any of the foregoing resolutions, each such determination to be conclusively evidenced by the taking of such actions.

**FURTHER RESOLVED,** that the CEO shall have the authority, from time to time, to delegate such officer's authority conferred pursuant to any of the foregoing resolutions to any employee of the Company (whether or not such employee is an officer of the Company), provided that the person to whom such authority is delegated shall not have the power to further delegate such authority to any other person.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this written consent as of the date first written above.

Signature:

Matt Doheny (Dec 21, 2022 19:41 EST)
Name: Matthew A. Doheny
Title: Director

Name: Joseph J. Farnan Jr.
Title: Director

_____

[Signature Page to Board Resolution – FTX Trading Ltd]

# Exhibit O

## SOFTWARE LICENSE, TOKENIZATION, AND CO-MARKETING AGREEMENT

This Software License, Tokenization, and Co-Marketing Agreement (this "**Agreement**"), effective as of April 15, 2019 (the "**Effective Date**"), is by and between Cottonwood Grove Limited, a Hong Kong company ("**Licensor**") and FTX Trading Ltd, a company established under the laws of Antigua and Barbuda ("**Licensee**"). Licensor and Licensee may be referred to herein collectively as the "**Parties**" or individually as a "**Party**".

WHEREAS, Licensor has developed a proprietary software platform described in <u>Exhibit A</u> attached hereto (the "**Cottonwood Platform**");

WHEREAS, FTX is a cryptocurrency derivatives exchange that offers futures, leveraged tokens, and OTC trading who wishes to use the Cottonwood Platform as part of its business activities (the "**Exchange**");

WHEREAS, Licensor desires to license the Cottonwood Platform to Licensee, and Licensee desires to purchase a license to use the Cottonwood Platform, and in each case, subject to the terms and conditions of this Agreement;

WHEREAS, Licensor desires to sell blockchain-based cryptographic tokens (the "***Tokens***") to the public that provide holders an economic return linked to payments made to Licensor by Licensee in consideration of the Cottonwood Platform license;

WHEREAS, Licensor desires Licensee's assistance in marketing and promoting the Token and Licensee desires Licensor's assistance in marketing and promoting the Exchange;

WHEREAS, in connection with marketing the Tokens, Licensee is willing to list the Tokens for trading on the Exchange, treat the Tokens as good collateral on the exchange, and provide Token holders with promotional rates for trading costs;

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  <u>Definitions</u>.

    (a)  "**Documentation**" means the operator and user manuals, training materials, specifications, minimum system configuration requirements, compatible device and hardware list and other similar materials in hard copy or electronic form provided or made available by Licensor to Licensee (including any revised versions thereof) to assist with or describe the Software, which may be updated from time-to-time upon notice to Licensee.

    (b)  "**Intellectual Property Rights**" means patent rights (including patent applications and disclosures), copyrights, trademarks, trade secrets, know-how and any other intellectual property rights recognized in any country or jurisdiction in the world.

    (c)  "**Licensor IP**" means the Software, any other products and services provided by Licensor under this Agreement (including the Professional Services and support services provided hereunder), all improvements, modifications or enhancements to, or derivative works of, the foregoing, and all Intellectual Property Rights in and to any of the foregoing.

    (d)  "**Person**" means any individual, corporation, partnership, trust, limited liability company, association, governmental authority or other entity.

(e)    **"Software"** means: (i) the Cottonwood Platform, whether in source code or object code; (ii) any other computer program, routine, code, instruction, script, macro, application programming or other interface, tool, document display definition, object library or software tool, provided by Licensor to Licensee under this Agreement, whether in source code or object code; and (iii) Documentation.

(f)    **"Territory"** means worldwide to the exclusion of the United States and Hong Kong.

(g)    **"Usage Limitations"** means the numbers, types and/or identifiers of servers, server cores, and/or disks; data volume, capacity, and/or rate; query volume, capacity, and/or rate; users and/or locations, and other usage limitations which may be specified in Exhibit A.

(h)    **"Updates"** means patches, bug fixes, updates, upgrades (including both major and minor product release), enhancements and other modifications to the Cottonwood Platform. For purpose of this Agreement, Updates form part of the Cottonwood Platform.

(i)    **"Use"** means to use, access and/or operate the Software in accordance with this Agreement and the Documentation.

2.    License.

(a)    Grant of License. Subject to Licensee's compliance with the terms and conditions of this Agreement (including fulfilling its payment obligations), Licensor hereby grants Licensee a limited, perpetual, revocable, non-exclusive, non-transferable and non-sublicensable right to Use, reproduce, adapt, modify and improve the Software, in accordance with this Agreement and any other requirement or instruction given by Licensor to Licensee from time to time.

(b)    Source Code. Licensee will not disclose any Software source code received from Licensor to any third party, except, subject to Licensee's compliance with its confidentiality obligations in Section 4, to Licensee's employees and contractors who need to use the source code for Licensee's exercise of its rights under this Agreement. Licensee acknowledges that the source code constitutes Licensor's Confidential Information. For greater certainty, all changes, modification and improvements to the Software (including to the source code) made by Licensee under this Agreement constitute Licensed IP, are owned by Licensor and licensed to Licensee under Section 2(a).

(c)    License Restrictions. Licensee will not, and will not permit any Person to, use the Software in any manner beyond the scope of the rights expressly granted in this Agreement. Licensee will not at any time, directly or indirectly, and will not permit any Person to: (i) distribute any portion of the Software or any derivatives of any portion of the Software to any third party; (ii) subject to Section 2(b), distribute, transfer or otherwise provide any Software source code to any third party; (iii) Use, copy, merge or compile all or any portion of the source code or object code of the Software except as expressly provided in this Agreement or as approved by Licensor in writing; (iv) alter, remove or cover proprietary notices in or on the Software or storage media; (v) modify or create derivative works of the Software other than as expressly permitted by this Agreement; (vi) reverse engineer, disassemble, decompile, decode or otherwise attempt to derive or gain improper access to any Software, in whole or in part; (vii) sell, resell, rent, license or lease use of the Software to any other Person, or otherwise allow any Person to use or access the Software in a context outside of or inconsistent with this Agreement; (viii) use the Software, Documentation or any other Licensor Confidential Information to develop, commercialize, license or sell any product, service or technology that could, directly or indirectly, compete with the Software or Licensor's products and services; or (ix) use the Software in any way that exceeds any applicable Usage Limitations.

(d)    <u>End Users</u>. Licensee will not permit any other Person to access, use or operate the Software, except that Licensee may permit its end users to Use the Software; provided that Licensee will ensure that each end user complies with all applicable terms and conditions of this Agreement, and Licensee is fully and directly responsible to Licensor for any act or omission by each end user in connection with their use of the Software. Licensee will promptly notify Licensor if Licensee or any end user knows or reasonably suspects any unauthorized use of the Software.

(e)    <u>Third Party Services</u>. Certain features and functionalities of the Software as Licensor determines in its sole discretion may allow Licensee to interface or interact with, access and/or use compatible third-party services, products, technology and content (collectively, "**Third Party Services**") through the Software. Licensee hereby acknowledges and agrees that: (i) Licensor is not the provider of the Third Party Services and is not responsible for any compatibility issues, errors or bugs in the Software or Third Party Services caused in whole or in part by the Third Party Services or any update or upgrade thereto; and (ii) Licensee is solely responsible for maintaining the Third Party Services and obtaining any associated licenses and consents necessary to use the Third Party Services in connection with the Software.

(f)    <u>Ownership and Reservation of Rights</u>. Nothing in this Agreement or the performance thereof will operate to grant Licensee any right, title or interest, whether by implication, estoppel or otherwise, in or to the Licensor IP, other than as expressly set forth in this Agreement. Subject to any rights and licenses granted to Licensee hereunder: (i) as between the Parties, Licensor will exclusively own all right, title and interest in and to the Licensor IP; and (ii) all Intellectual Property Rights created in any such Licensor IP will vest solely in Licensor upon creation, and to the extent that sole ownership does not originally vest in Licensor, such Intellectual Property Rights are hereby automatically and irrevocably assigned by Licensee to Licensor. Licensee will take any and all actions and execute any and all documents necessary to give effect to the preceding sentence. Licensee hereby appoints Licensor as its attorney-in-fact to execute documents on behalf of Licensee for this limited purpose. Each Party hereby expressly reserves all Intellectual Property Rights not expressly granted hereunder.

(g)    <u>Updates</u>. During the Term, Licensor will provide Updates to Licensee. Licensee hereby agrees that it will promptly install (and require its end users to install) any Updates that Licensor requires or otherwise makes available to Licensee.

3.    <u>Fees and Payment</u>.

(a)    <u>Fees</u>. Licensee will pay Licensor the royalty fee set forth in <u>Exhibit A</u>. Licensor will pay Licensor all accrued royalty fees no later than 10 days before the end of each calendar quarter.

(b)    <u>Payments</u>. All amounts due to Licensor under this Agreement will be paid in U.S. currency or any other property agreed on by the Parties, including but not limited to cryptocurrencies, by check, wire transfer of immediately available funds to an account designated by Licensor, or such other payment method mutually agreed by the Parties, and will be non-refundable.

(c)    <u>No Set-Off</u>. Neither Party will have any right to set off, discount or otherwise reduce or refuse to pay any amounts due to the other Party under this Agreement for any reason.

(d)    <u>Taxes</u>. Licensee will be responsible for, and will promptly pay, all taxes and duties of any kind (including but not limited to sales, use and withholding taxes) associated with this Agreement or Licensee's receipt or use of the Software, except for taxes based on Licensor's net income. In the event that Licensor is required to collect any tax for which Licensee is responsible, Licensee will pay such tax directly to Licensor. If Licensee pays any withholding taxes that are required to be paid under applicable law, Licensee will furnish Licensor with written documentation of all such tax payments, including receipts.

3

4.    <u>Tokenization</u>. If Licensor chooses to create and distribute tokens with respect to the royalty described in Section 3 of this Agreement (the "***Tokens***"), Licensee agrees to each of the following:

(a)    <u>Partial Fee Assignments</u>. Licensor may subdivide and partially assign its rights to receive royalty payments pursuant to Section 3 to any Affiliate of Licensor acting as co-issuer of the Tokens, or to any Token holder, provided that Licensor provides Licensee with an updated list of assignee wallet addresses and payment amounts at least 3 business days before any scheduled payment, and further provided that Licensee may refuse to permit any such partial assignment to the extent that Licensee determines in good faith that such payments would be in violation of applicable law or would subject Licensee to greater costs than would be incurred making such payments to Licensor.

(b)    <u>Token Listing</u>. Licensee agrees to list the Tokens for trading on the Exchange and on the Exchange's over-the-counter trading service as soon as practicable following the date hereof.

(c)    <u>Token Utility</u>. Licensee agrees to provide the following additional services on the Exchange to Token holders:

(i)    *Contract Collateral*. Licensee agrees that the rules of the Exchange will be updated to provide that the Tokens will be accepted as good collateral for all obligations under futures contracts traded on the Exchange. The Tokens shall be valued for such purposes at their fair market value as determined by the Exchange in good faith using commercially reasonable methods.

(ii)    *Promotional Rates*. From time to time, Licensee will offer discounted promotional rates to Token holders on Exchange fees and quoted prices on its over-the-counter trading services.

(d)    <u>Burning Tokens</u>. The Parties agree to conduct burning of the applicable Tokens from time to time in accordance with the rules with respect to the rules of the Token supply.

(e)    <u>Marketing Plan</u>. The parties will, throughout the term of this Agreement, cooperatively and actively promote the Exchange and the Tokens, each in accordance with a plan to be jointly developed and agreed between the parties, as such plan may be updated or modified by the parties' mutual agreement from time to time.

(f)    <u>Marketing Conduct</u>. Each party agrees: (i) to conduct its marketing and promotion activities under this Agreement in compliance with all applicable laws and regulations and in a manner that reflects favorably upon the other party and its products and services; (ii) not to grant (or purport to grant) any warranties or contractual rights on behalf of the other party; and (iii) not to make any representations or claims regarding the features or functionality of the other party's products or services that are not in conformance with such other party's published specifications or user documentation.

5.    <u>Confidential Information</u>.

(a)    Any information that one Party provides to the other Party during the Term of this Agreement that is identified at the time of disclosure as confidential or, given the circumstances of disclosure or the nature of the information, reasonably should be considered to be confidential will be "**Confidential Information**" of the disclosing Party (the "**Disclosing Party**"). For clarity, the Software is Confidential Information of Licensor.

4

(b)    Each Party (the "**Receiving Party**") will maintain the other Party's Confidential Information in strict confidence, and will not use the Confidential Information of the Disclosing Party except as necessary to perform its obligations or enforce its rights under this Agreement. The Receiving Party will not disclose or cause to be disclosed any Confidential Information of the Disclosing Party, except: (i) to those employees, representatives, or contractors of the Receiving Party who have a bona fide need to know such Confidential Information to perform under this Agreement and who are bound by written agreements with use and nondisclosure restrictions at least as protective as those set forth in this Agreement; or (ii) as such disclosure may be required by the order or requirement of a court, administrative agency or other governmental body, subject to the Receiving Party providing to the Disclosing Party reasonable written notice to allow the Disclosing Party to seek a protective order or otherwise contest the disclosure.

(c)    Nothing in this Agreement will prohibit or limit either Party's use of information: (i) rightfully known to it prior to receiving it from the Disclosing Party; (ii) independently developed by or for it without use of or access to the other Party's Confidential Information; (iii) permissibly acquired by it from a third party which is not under an obligation of confidence with respect to such information; or (iv) which is or becomes publicly available through no breach of this Agreement. Without limiting the foregoing, nothing in this Agreement will limit or restrict Licensor's ability to use or disclose any general know-how, experience, concepts and/or ideas that Licensor or its personnel acquire or obtain in connection with the performance of Licensor's obligations hereunder.

(d)    The terms and conditions of this Agreement will constitute Confidential Information of each Party, but may be disclosed on a confidential basis to a Party's advisors, attorneys, actual or bona-fide potential acquirers, investors or other sources of funding (and their respective advisors and attorneys) for due diligence purposes.

(e)    Without limiting Section 15(g), each Party acknowledges that damages for improper disclosure of Confidential Information may be irreparable; therefore, the injured Party is entitled to seek equitable relief, including temporary restraining order(s) or preliminary or permanent injunction, in addition to all other remedies, for any violation or threatened violation of this Section 4.

6.    Services. Licensor will provide support and other services to the Licensee as specified in Exhibit A.

7.    Feedback. From time to time Licensee, its employees and end users may provide Licensor with suggestions, comments and feedback with regard to the Software (collectively, "**Feedback**"). Licensee will promptly communicate to Licensor any Feedback from any customer or employee. Licensee, on behalf of itself and its employees and end users, hereby grants Licensor a perpetual, irrevocable, royalty-free and fully-paid up license to use and exploit all Feedback in connection with Licensor's business purposes, including the testing, development, maintenance and improvement of the Software.

8.    Representations and Warranties.

(a)    Each Party hereby represents and warrants to the other Party that: (i) it is duly organized, validly existing and in good standing under its jurisdiction of organization and has the right to enter into this Agreement; and (ii) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of such Party and have been duly authorized by all necessary corporate action on the part of such Party, and constitute a valid and binding agreement of such Party.

(b)     Licensor warrants that, for a period of 12 months after the Software is made available to Licensee, the Software will be capable of performing in all material respects in accordance with the functional specifications set forth in the applicable Documentation.

9.     <u>Indemnification.</u>

(a)     <u>Licensor Indemnification</u>. Subject to Sections 10(b) and 10(d), Licensor will defend and pay all damages finally awarded against Licensee pursuant to a final, valid and binding judgment or order, or a final settlement agreement with respect to any claim, suit or proceeding brought by a third party against Licensee arising from infringement of third party Intellectual Property Rights by the Software.

(b)     <u>Exclusions</u>. Licensor's obligations under Section 10(a) will not apply if the underlying third-Party claim arises from or as a result of: (i) Licensee (including any end users)'s breach of this Agreement, negligence, willful misconduct or fraud; (ii) modifications to the Software by anyone other than Licensor; or (iii) combinations of the Software of with software, data or materials not provided by Licensor.

(c)     <u>IP Remedies</u>. If Licensor reasonably believes the Software (or any component thereof) could infringe any third party's Intellectual Property Rights and Licensor has an indemnity obligation to Licensee pursuant to Section 10(a), Licensor may, at its sole option and expense, use commercially reasonable efforts to: (i) procure the right for Licensee to continue using the Software (or any infringing component thereof) to make it non-infringing without materially reducing its functionality; or (ii) replace the Software (or any infringing component thereof) with a non-infringing alternative that is functionally equivalent in all material respects. If the foregoing remedies are not available to Licensor on commercially reasonable terms, then Licensor may suspend or terminate Licensee's use of the Software upon notice to Licensee. The rights and remedies set forth in this Section 10 will constitute Licensee's sole and exclusive remedy for any intellectual property infringement by the Software.

(d)     <u>Indemnification Procedures</u>. The Party seeking defense and indemnity (the "**Indemnified Party**") will promptly notify the other Party (the "**Indemnifying Party**") of any and all such claims and will reasonably cooperate with the Indemnifying Party with the defense and/or settlement thereof. The Indemnifying Party will have the sole right to conduct the defense of any claim for which the Indemnifying Party is responsible hereunder (provided that the Indemnifying Party may not settle any claim without the Indemnified Party's prior written approval unless the settlement unconditionally releases the Indemnified Party from all liability, does not require any admission by the Indemnified Party, and does not place restrictions upon the Indemnified Party's business, products or services). The Indemnified Party may participate in the defense or settlement of any such claim at its own expense and with its own choice of counsel or, if the Indemnifying Party refuses to fulfill its obligation of defense, the Indemnified Party may defend itself and seek reimbursement from the Indemnifying Party.

10.     <u>DISCLAIMER</u>. EXCEPT AS EXPRESSLY SET FORTH HEREIN, LICENSEE ACKNOWLEDGES THAT THE SOFTWARE AND SUPPORT SERVICES ARE PROVIDED ON AN "AS IS" BASIS, AND LICENSOR MAKES NO WARRANTIES OR REPRESENTATIONS TO LICENSEE OR ITS END USERS OR TO ANY OTHER PARTY REGARDING THE SOFTWARE AND SUPPORT SERVICES OR ANY OTHER SERVICES PROVIDED HEREUNDER. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LICENSOR HEREBY DISCLAIMS ALL WARRANTIES AND REPRESENTATIONS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. WITHOUT LIMITING THE FOREGOING, LICENSOR HEREBY DISCLAIMS

ANY WARRANTY THAT USE OF THE SOFTWARE WILL BE ERROR-FREE, BUG-FREE OR UNINTERRUPTED.

11.    LIMITATIONS OF LIABILITY

(a)    Exclusion of Damages. IN NO EVENT WILL LICENSOR BE LIABLE TO LICENSEE OR ITS END USERS OR ANY THIRD PARTY FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF INCOME, DATA, PROFITS, REVENUE OR BUSINESS INTERRUPTION, OR THE COST OF SUBSTITUTE SOFTWARE OR SERVICES OR OTHER ECONOMIC LOSS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE.

(b)    Total Liability. IN NO EVENT WILL LICENSOR'S TOTAL LIABILITY TO LICENSEE OR ITS END USERS OR ANY THIRD PARTY IN CONNECTION WITH THIS AGREEMENT EXCEED THE FEES ACTUALLY PAID BY LICENSEE TO LICENSOR IN THE SIX (6) MONTH PERIOD PRECEDING THE CLAIM OR ACTION GIVING RISE TO SUCH LIABILITY, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE.

(c)    Basis of the Bargain. THE PARTIES HEREBY ACKNOWLEDGE AND AGREE THAT THE LIMITATIONS OF LIABILITY IN THIS SECTION 11 ARE AN ESSENTIAL PART OF THE BASIS OF THE BARGAIN BETWEEN LICENSOR AND LICENSEE, AND WILL APPLY EVEN IF THE REMEDIES AVAILABLE HEREUNDER ARE FOUND TO FAIL THEIR ESSENTIAL PURPOSE.

12.    Term and Termination.

(a)    Term. The term of this Agreement begins on the Effective Date and will remain in effect thereafter unless terminated earlier in accordance with the terms of this Agreement (the "**Term**"). The term of the Software license granted by Licensor hereunder will begin upon the date of shipment by Licensor of the Software and will remain in effect thereafter unless Licensee discontinues use of such Software or unless terminated earlier by either party in accordance with the terms of this Agreement.

(b)    Termination. Without limiting any right or remedy available to either Party, either Party may terminate this Agreement or the Software license granted hereunder, effective on written notice to the other Party, if the other Party breaches any material term of this Agreement, and such breach: (i) is incapable of cure; or (ii) being capable of cure, remains uncured thirty (30) days after the non-breaching Party provides the breaching Party with written notice of such breach.

(c)    Termination by Mutual Agreement. The Parties may terminate this Agreement by mutual agreement in writing.

(d)    Survival. This Section 12(c) and Sections 1, 2(a), 2(b), 2(c), 2(d), 2(e), 2(f) , 3, 4, 5, 7, 8, 9, 10, 11, 12(e), 13 and 14 survive any termination or expiration of this Agreement.

(e)    Effect of Termination. Upon expiration or termination of this Agreement: (i) in the event the Agreement is terminated by Licensor pursuant to Section 13(b): (a) the rights granted pursuant to

Section 2(a) will terminate automatically; and (b) Licensee will and will ensure its end users will, promptly cease to use or access the Software; (ii) in the event the Agreement is terminated by Licensor pursuant to Section 13(b), Licensee will return or destroy, at Licensor's sole option, all Licensor Confidential Information in its possession or control, including permanent removal of such Licensor Confidential Information (consistent with customary industry practice for data destruction) from any storage devices or other hosting environments that are in Licensee's possession or under Licensee's control, and at Licensor's request, Licensee will certify in writing to Licensor its compliance with the provisions of this Section 13(e). In the event that the Agreement expires or is terminated pursuant to a provision other than Section 13(b), Licensee is only required to return or destroy Licensor's Confidential Information that is not necessary for Licensee's exercise of the license granted to it under Section 2(a); and (iii) for clarity, Licensee will pay all previously accrued amounts due to Licensor hereunder in accordance with Section 3, and will continue to provide the services to Token holders under Sections 4(b) and 4(c) for as long as the Tokens remain outstanding.

13.    <u>Trademarks</u>. The parties hereby grant each other a limited, non-exclusive, royalty-free license to use and display their name, designated trademarks and associated logos (collectively "**Marks**") during the Term in connection with each of their marketing and promotional efforts for their products and services. All goodwill and improved reputation generated by a party's use of the other party's Marks inures to the exclusive benefit of the owner of the Marks. The parties will use the other party's Marks in the form stipulated by the owner of the Marks and will conform to and observe such standards as the owner of the Marks prescribes from time to time in connection with the license granted hereunder. At no time during or after the term of this Agreement will either party challenge or assist others to challenge the other party's Marks or the registration thereof or attempt to register any trademarks, marks or trade names confusingly similar to the other party's Marks.

14.    <u>Miscellaneous</u>.

(a)    <u>Entire Agreement</u>. This Agreement, together with any other documents incorporated herein by reference, constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, and representations and warranties, both written and oral, with respect to such subject matter.

(b)    <u>Notices.</u> All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page hereto, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section  15(b). If notice is given to the Licensor, a copy shall also be sent to Fenwick & West, LLP, 1191 2nd Avenue, 10th Floor, Seattle, Washington, 98101, Attn: Dan Friedberg or to Dan Friedberg at dfriedberg@fenwick.com.

(c)    <u>Amendment and Modification;</u> No amendment to or modification of this Agreement is effective unless it is in writing and signed by an authorized representative of each Party.

(d)    <u>Severability</u>. If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties will negotiate in good faith to modify this Agreement so as to effect their original intent as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(e)     Governing Law; Jurisdiction. This Agreement will be governed by and construed in accordance with the laws of Antigua and Barbuda, without regard to any conflict of law rules of such jurisdiction. The Parties agree that the United Nations Convention on Contracts for the International Sale of Goods will not apply to this Agreement. The Parties hereby acknowledge and agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement will be brought in the court of competent jurisdiction located in the courts of Antigua and Barbuda, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court, and each Party hereby irrevocably consents to service of process in connection with any such suit, action or proceeding by registered mail to such Party at the applicable address set forth in Section 15(b).

(f)     Assignment. Subject to Section 4(a), neither Party may assign or transfer this Agreement, in whole or in part, by operation of law or otherwise, without the other Party's express prior consent. Notwithstanding the foregoing, each Party may assign this Agreement in case of merger, acquisition or sale by the assigning Party of all or substantially all of the assets to which this Agreement relates; provided that any such assignee agrees in writing to be bound by all the obligations of the assigning Party under this Agreement. Any attempt to assign or transfer this Agreement, in contravention of the foregoing will be null and of no effect. Subject to the foregoing, this Agreement will bind and inure to the benefit of each Party's permitted successors and assigns.

(g)     Equitable Relief. Each Party hereby acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations hereunder would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity or otherwise.

(h)     Nonexclusive Remedy. Except as expressly set forth in this Agreement, the exercise by either party of any of its remedies under this Agreement will be without prejudice to its other remedies under this Agreement or otherwise.

(i)     Waiver. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement: (i) no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; and (ii) no single or partial exercise of any right, remedy, power, or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(j)   <u>Force Majeure</u>. Neither Party will be responsible for any failure or delay in its performance under this Agreement (except for any payment obligations) due to causes beyond its reasonable control, including labor disputes, strikes, lockouts, shortages of or inability to obtain energy, raw materials or supplies, denial of service or other malicious attacks, communications failure or degradation, material changes in law, war, terrorism, riot, or acts of God.

(k)   <u>Subcontracting</u>. Licensor may use subcontractors, vendors and other third-Party providers in connection with the performance of its obligations hereunder as it deems appropriate; provided that Licensor remains responsible for the performance of each such subcontractor, vendor or third-Party provider and its compliance with the terms of this Agreement.

(l)   <u>Arms'-Length Transaction</u>. The Parties hereby acknowledge and agree that: (i) this Agreement and all of the services, obligations and activities set forth herein or contemplated hereby, is an arms'-length commercial transaction; (ii) the Parties have full and independent judgment of the commercial benefit and risk involved and, except as set forth herein, have not relied on any representation made by one Party to the other in entering into this Agreement; (iii) no Party will by virtue of this Agreement be deemed to be the representative, employee or agent of the other Party for any purpose whatsoever; and (iv) no Party will have the power or authority as agent or in any other capacity to represent, act for, bind, or otherwise create or assume any obligation on behalf of any other Party for any purpose whatsoever.

(m)   <u>No Third-Party Beneficiaries</u>. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the Parties and their respective successors and assigns.

(n)   <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

(o)   <u>Territory</u>. All transactions contemplated in this Agreement shall not be concluded or otherwise take place outside the Territory, and all servers necessary to fulfill this agreement will be located outside of Hong Kong.

(p)   <u>No Partnership</u>. The Parties do not intend to create a partnership with each other; nothing in the Agreement shall be construed as the creation of a partnership between the parties; and the parties shall not represent to any third that they are in a partnership with each other.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

**COTTONWOOD GROVE LIMITED**

By: _____

Samuel Bankman-Fried, CEO

**FTX TRADING LTD**

By: _____

Samuel Bankman-Fried, CEO

11

# Exhibit P

**Execution Version**

**VOTING AGREEMENT**

**November 27, 2019**

# TABLE OF CONTENTS

Page

1. Voting Provisions Regarding the Board.................................................................1

   1.1  Size of the Board ....................................................................................1
   1.2  Board Composition .................................................................................1
   1.3  Failure to Designate a Board Member .....................................................2
   1.4  Removal of Board Members .....................................................................2
   1.5  No Liability for Election of Recommended Directors................................2
   1.6  No "Bad Actor" Designees .......................................................................2

2. Vote to Increase Authorized Common Shares .........................................................3

3. Covenants ..............................................................................................................3

4. Remedies ...............................................................................................................4

   4.1  Definitions. ...............................................................................................4
   4.2  Specific Enforcement. ...............................................................................4
   4.3  Covenants of the Company .......................................................................4
   4.4  Irrevocable Proxy and Power of Attorney .................................................4
   4.5  Remedies Cumulative ...............................................................................4

5. "Bad Actor" Matters. ............................................................................................4

   5.1  Definitions ...............................................................................................4
   5.2  Representations .........................................................................................5
   5.3  Covenants .................................................................................................5

6. Term ......................................................................................................................5

7. Miscellaneous ........................................................................................................6

   7.1  Additional Parties .....................................................................................6
   7.2  Transfers ...................................................................................................6
   7.3  Successors and Assigns .............................................................................6
   7.4  Governing Law ..........................................................................................6
   7.5  Counterparts. .............................................................................................6
   7.6  Titles and Subtitles ...................................................................................7
   7.7  Notices ......................................................................................................7
   7.8  Consent Required to Amend, Modify, Terminate or Waive........................7
   7.9  Delays or Omissions .................................................................................8
   7.10 Severability ..............................................................................................8
   7.11 Entire Agreement ......................................................................................8
   7.12 Share Certificate Legend ..........................................................................8
   7.13 Share Splits, Share Dividends, etc. ...........................................................8
   7.14 Manner of Voting .....................................................................................9
   7.15 Further Assurances ...................................................................................9
   7.16 Dispute Resolution ...................................................................................9
   7.17 Costs of Enforcement ...............................................................................9
   7.18 Aggregation of Shares ..............................................................................9

Schedule A    -    Investors
Schedule B    -    Key Holders
Exhibit A      -    Adoption Agreement

i

## VOTING AGREEMENT

THIS VOTING AGREEMENT (this "***Agreement***"), is made and entered into as of this 27th day of November, 2019 (the "***Effective Date***"), by and among FTX Trading Ltd., a company established under the laws of Antigua and Barbuda (the "***Company***"), each holder of the Series A Preferred Shares of the Company ("***Series A Preferred Shares***" or "***Preferred Shares***") listed on Schedule A (together with any subsequent investors, or transferees, who become parties hereto as "Investors" pursuant to Subsections 7.1(a) or 7.2 below, the "***Investors***"), and those certain shareholders of the Company listed on Schedule B (together with any subsequent shareholders, or any transferees, who become parties hereto as "Key Holders" pursuant to Subsection 7.2 below, the "***Key Holders***," and together collectively with the Investors, the "***Shareholders***").

## RECITALS

A.    Concurrently with the execution of this Agreement, the Company and the Investors are entering into a Series A Preferred Share Purchase Agreement (the "***Purchase Agreement***") providing for the sale of shares of the Series A Preferred Shares, and in connection with that agreement the parties desire to provide the Investors with the right, among other rights, to designate the election of certain members of the board of directors of the Company (the "***Board***") in accordance with the terms of this Agreement.

B.    The Amended and Restated Memorandum and Articles of Association of the Company (the "***Restated Articles***") provides that the holders of record of the shares of Common Shares, voting as a separate class, shall be entitled to elect one director of the Company.

NOW, THEREFORE, the parties agree as follows:

1.    Voting Provisions Regarding the Board.

1.1    Size of the Board. Subject to Subsection 1.2(b) below, each Shareholder agrees to vote, or cause to be voted, all Shares (as defined below) owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set and remain at one director. For purposes of this Agreement, the term "***Shares***" shall mean and include any securities of the Company that the holders of which are entitled to vote for members of the Board, including without limitation, all Common Shares and Series A Preferred Shares, by whatever name called, now owned or subsequently acquired by a Shareholder, however acquired, whether through share splits, share dividends, reclassifications, recapitalizations, similar events or otherwise.

1.2    Board Composition. Each Shareholder agrees to vote, or cause to be voted, all Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of shareholders at which an election of directors is held or pursuant to any written consent of the shareholders, subject to Section 5, the following persons shall be elected to the Board:

(a)    Samuel Bankman-Fried (the "***Founder***") for so long as he remains an officer of the Company, except that if he declines or is unable to serve, his successor shall be designated by the holders of a majority of the Common Shares outstanding; and

(b)    If, in connection with an investment in the equity capital of the Company from a third-party unaffiliated with the Company, any investor designee is elected to serve on the Board, then Binance Capital Management Co. Ltd. ("***Binance***") shall have the right to appoint one (1) individual to serve on the Board, for so long as such other incoming investor has a designee serving on the Board.

For purposes of this Agreement, an individual, firm, corporation, partnership, association, limited liability company, trust or any other entity (collectively, a "***Person***") shall be deemed an "***Affiliate***" of another Person who, directly or indirectly, controls, is controlled by or is under common control with such Person, including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or registered investment company now or hereafter existing that is controlled by one or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such Person.

      1.3    <u>Failure to Designate a Board Member</u>. In the absence of any designation from the Persons or groups with the right to designate a director as specified above, the director previously designated by them and then serving shall be re-elected if still eligible and willing to serve as provided herein and otherwise, such Board seat shall remain vacant.

      1.4    <u>Removal of Board Members</u>. Each Shareholder also agrees to vote, or cause to be voted, all Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that:

      (a)    no director elected pursuant to <u>Subsections 1.2</u> or <u>1.3</u> of this Agreement may be removed from office other than for cause unless (i) such removal is directed or approved by the affirmative vote of the Person(s), or of the holders of at least a majority of the shares of equity, entitled under <u>Subsection 1.3</u> to designate that director; or (ii) the Person(s) originally entitled to designate or approve such director or occupy such Board seat pursuant to <u>Subsection 1.3</u> is no longer so entitled to designate or approve such director or occupy such Board seat;

      (b)    any vacancies created by the resignation, removal or death of a director elected pursuant to <u>Subsections 1.2</u> or <u>1.3</u> shall be filled pursuant to the provisions of this <u>Section 1</u>; and

      (c)    upon the request of any party entitled to designate a director as provided in <u>Subsection 1.2(a)</u> or <u>1.2(b)</u> to remove such director, such director shall be removed.

All Shareholders agree to execute any written consents required to perform the obligations of this <u>Section 1</u>, and the Company agrees at the request of any Person or group entitled to designate directors to call a special meeting of shareholders for the purpose of electing directors.

      1.5    <u>No Liability for Election of Recommended Directors</u>. No Shareholder, nor any Affiliate of any Shareholder, shall have any liability as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director of the Company, nor shall any Shareholder have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

      1.6    <u>No "Bad Actor" Designees</u>. Each Person with the right to designate or participate in the designation of a director as specified above hereby represents and warrants to the Company that, to such Person's knowledge, none of the "bad actor" disqualifying events described in Rule 506(d)(1)(i)-(viii) under the Securities Act of 1933, as amended (the "***Securities Act***") (each, a "***Disqualification Event***"), is applicable to such Person's initial designee named above except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable, is hereinafter referred to as a "Disqualified Designee". Each Person with the right to designate or participate in the designation of a director as specified above hereby covenants and agrees (A) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee and (B) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as

2

promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee.

      2.    <u>Vote to Increase Authorized Common Shares</u>. Each Shareholder agrees to vote or cause to be voted all Shares owned by such Shareholder, or over which such Shareholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to increase the number of authorized shares of Common Shares from time to time to ensure that there will be sufficient shares of Common Shares available for conversion of all of the shares of Preferred Shares outstanding at any given time.

      3.    <u>Covenants</u>. For so long as Binance holds more than 25% of the Series A Preferred Shares originally issued to Binance pursuant to the Purchase Agreement, the Company will not, without the written consent of Binance, take any of the following actions:

      (a)  Accept an investment in capital equity or any instrument convertible or exchangeable for capital equity from a digital asset exchange;

      (b)  For the first $200,000,000 of cumulative profits, with such computation commencing from the date of Closing (the "***Initial Profits***"), award bonuses to employees that are equal to or greater than 25% of the Company's annual profits for the immediately preceding fiscal year;

      (c)  For profits in excess of the Initial Profits, award bonuses to employees that are equal to or greater than 50% of the Company's annual profits for the immediately preceding fiscal year. Annual profits shall be reasonably determined by the Board in accordance with the information delivered by the Company to Binance under Section 3 (Information Rights) of the Investor's Rights Agreement entered into between the Company and Binance concurrently with the execution of this Agreement;

      (d)  Accept an investment in capital equity or any instrument convertible or exchangeable for capital equity from an unaffiliated third party, other than Binance (such consent not to be unreasonably withheld);

      (e)  Alter or change the rights, preferences or privileges of the Preferred Shares in a manner that is materially adverse to the Preferred Shares; *provided*, that the creation of any new class or series of shares shall be deemed to not be materially adverse to the Preferred Shares;

      (f)  Effect a recapitalization, reclassification, split-off or spin off that would be reasonably expected to have any material adverse effect on the holders of Preferred Shares shareholding or rights in the Company;

      (g)  Amend any provision of the Restated Articles that would be reasonably expected to have any material adverse effect on the holders of Preferred Shares shareholding or rights in the Company; or

      (h)  Pass any resolution approving liquidation, dissolution or winding up or the initiation of bankruptcy proceedings or apply for the appointment of a receiver, judicial manager or like officer; *provided*, that the Company shall not need the written consent of Binance to pass a resolution enacting any of the foregoing actions that are taken in connection with any merger, acquisition or similar transaction involving a Sale of the Company or all or substantially all of its assets.

Except as otherwise provided in the foregoing, Binance agrees that it shall execute such consents, waivers, documents and/or instruments and to take such actions as may be reasonably necessary to ensure that the Company will have full operational independence.

4.        Remedies.

4.1    Definitions. A "*Sale of the Company*" shall mean either: (a) a transaction or series of related transactions in which a Person, or a group of related Persons, acquires from stockholders of the Company shares representing more than fifty percent (50%) of the outstanding voting power of the Company; or (b) a transaction that qualifies as a "*Deemed Liquidation Event*" as defined in the Restated Articles.Specific Enforcement. Each party acknowledges and agrees that each party hereto will be irreparably damaged in the event any of the provisions of this Agreement are not performed by the parties in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that each of the Company and the Shareholders shall be entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions in any action instituted in any court of the United States or any state having subject matter jurisdiction.

4.3    Covenants of the Company. The Company agrees to use its best efforts, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement. Such actions include, without limitation, the use of the Company's best efforts to cause the nomination and election of the directors.Irrevocable Proxy and Power of Attorney. Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby grants a power of attorney to the Samuel Bankman-Fried, with full power of substitution, with respect to the matters set forth herein, including, without limitation, votes to increase authorized shares pursuant to Section 2 hereof, and hereby authorizes each of them to represent and vote, if and only if the party (i) fails to vote, or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such party's Shares in favor of (x) the election of persons as members of the Board determined pursuant to and in accordance with the terms and provisions of this Agreement, (y) the increase of authorized shares or approval of any Sale of the Company and (z) any of the enumerated Company actions set forth in Section 4, pursuant to and in accordance with the terms and provisions of Sections 1 and 2 of this Agreement or to take any action reasonably necessary to effect Sections 1 and 2 of this Agreement.  The power of attorney granted hereunder shall authorize Samuel Bankman-Fried to execute and deliver all related documentation on behalf of any party failing to do so within ten (10) business days of a request by the Company.  Each of the proxy and power of attorney granted pursuant to this Subsection 4.4 is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Section 6 hereof. Each party hereto hereby revokes any and all previous proxies or powers of attorney with respect to the Shares and shall not hereafter, unless and until this Agreement terminates or expires pursuant to Section 6 hereof, purport to grant any other proxy or power of attorney with respect to any of the Shares, deposit any of the Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Shares, in each case, with respect to any of the matters set forth herein.

4.5    Remedies Cumulative. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

5.        "Bad Actor" Matters.

5.1    Definitions. For purposes of this Agreement:

(a)    "*Company Covered Person*" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1).

(b) "***Disqualified Designee***" means any director designee to whom any Disqualification Event is applicable, except for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

(c) "***Disqualification Event***" means a "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) promulgated under the Securities Act.

(d) "***Rule 506(d) Related Party***" means, with respect to any Person, any other Person that is a beneficial owner of such first Person's securities for purposes of Rule 506(d) under the Securities Act.

5.2    <u>Representations</u>.

(a) Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement hereby represents that (i) such Person has exercised reasonable care to determine whether any Disqualification Event is  applicable to such Person, any director designee designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable and (ii) no Disqualification Event is applicable to such Person, any Board member designated by such Person pursuant to this Agreement or any of such Person's Rule 506(d) Related Parties, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable. Notwithstanding anything to the contrary in this Agreement, each Investor makes no representation regarding any Person that may be deemed to be a beneficial owner of the Company's voting equity securities held by such Investor solely by virtue of that Person being or becoming a party to (x) this Agreement, as may be subsequently amended, or (y) any other contract or written agreement to which the Company and such Investor are parties regarding (1) the voting power, which includes the power to vote or to direct the voting of, such security; and/or (2) the investment power, which includes the power to dispose, or to direct the disposition of, such security.

(b) The Company hereby represents and warrants to the Investors that no Disqualification Event is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3) is applicable.

5.3    <u>Covenants</u>. Each Person with the right to designate or participate in the designation of a director pursuant to this Agreement covenants and agrees (i) not to designate or participate in the designation of any director designee who, to such Person's knowledge, is a Disqualified Designee, (ii) to exercise reasonable care to determine whether any director designee designated by such person is a Disqualified Designee, (iii) that in the event such Person becomes aware that any individual previously designated by any such Person is or has become a Disqualified Designee, such Person shall as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement designee who is not a Disqualified Designee, and (iv) to notify the Company promptly in writing in the event a Disqualification Event becomes applicable to such Person or any of its Rule 506(d) Related Parties, or, to such Person's knowledge, to such Person's initial designee named in <u>Section 1</u>, except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii) or (iii) or (d)(3) is applicable.

6.    <u>Term</u>. This Agreement shall be effective as of the date hereof and shall continue in effect until and shall terminate upon the earliest to occur of: (a) the consummation of the Company's first underwritten public offering of its Common Shares (other than a registration statement relating either to the sale of securities to employees of the Company pursuant to its share option, share purchase or similar plan or an SEC Rule 145 transaction); (b) the consummation of a Sale of the Company and distribution of

proceeds to or escrow for the benefit of the Shareholders in accordance with the Restated Articles; (c) termination of this Agreement in accordance with <u>Subsection 7.8</u> below; or (d) two (2) years from the Effective Date unless otherwise extended for additional one-year periods upon mutual written agreement of the Company and Binance; *provided* that <u>Section 3</u> of this Agreement shall not be terminated pursuant to clauses (a), (b), (c) or (d) of this <u>Section 6</u> unless, if at any point, Binance holds less than twenty-five (25%) of the Series A Preferred Shares issued pursuant to the Purchase Agreement, then at which point, (x) if more than two (2) years has passed since Effective Date and any extended term has expired, <u>Section 3</u> terminates automatically or (y) if less than two (2) years has passed since the Effective Date, <u>Section 3</u> terminates pursuant to clause (d) of this <u>Section 6</u>.

       7.     <u>Miscellaneous</u>.

       7.1     <u>Additional Parties</u>.

       (a)     Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of Series A Preferred Shares after the date hereof, as a condition to the issuance of such shares the Company shall require that any purchaser of such shares become a party to this Agreement by executing and delivering (i) the Adoption Agreement attached to this Agreement as <u>Exhibit A</u>, or (ii) a counterpart signature page hereto agreeing to be bound by and subject to the terms of this Agreement as an Investor and Shareholder hereunder. In either event, each such person shall thereafter be deemed an Investor and Shareholder for all purposes under this Agreement.

       7.2     <u>Transfers</u>. Each transferee or assignee of any Shares subject to this Agreement shall continue to be subject to the terms hereof, and, as a condition precedent to the Company's recognition of such transfer, each transferee or assignee shall agree in writing to be subject to each of the terms of this Agreement by executing and delivering an Adoption Agreement substantially in the form attached hereto as <u>Exhibit A</u>. Upon the execution and delivery of an Adoption Agreement by any transferee, such transferee shall be deemed to be a party hereto as if such transferee were the transferor and such transferee's signature appeared on the signature pages of this Agreement and shall be deemed to be an Investor and Shareholder, or Key Holder and Shareholder, as applicable. The Company shall not permit the transfer of the Shares subject to this Agreement on its books or issue a new certificate representing any such Shares unless and until such transferee shall have complied with the terms of this <u>Subsection 7.2</u>. Each certificate instrument, or book entry representing the Shares subject to this Agreement if issued on or after the date of this Agreement shall be notated by the Company with the legend set forth in <u>Subsection 7.12</u>.

       7.3     <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Notwithstanding the foregoing or anything to the contrary set forth elsewhere herein, the rights granted to Binance under Section 3 of this Agreement shall not be assignable without the prior written consent of the Company.

       7.4     <u>Governing Law</u>. This Agreement shall be governed by the internal laws of Hong Kong, without regard to conflict of law principles that would result in the application of any law other than such laws.

       7.5     <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature via www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

      7.6    <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

      7.7    <u>Notices</u>.

      (a)    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on <u>Schedule A</u> or <u>Schedule B</u> hereto, or to such email address, facsimile number or address as subsequently modified by written notice given in accordance with this <u>Subsection 7.7</u>. If notice is given to the Company, a copy shall also be sent to Fenwick & West, LLP, 1191 2nd Avenue, 10th Floor, Seattle, Washington, 98101, Attn: Andrew Albertson or to Andrew Albertson at aalbertson@fenwick.com and if notice is given to Shareholders, a copy shall also be given to Paul Hastings LLP, 43/F, Jing An Kerry Center Tower II, 1539 Nanjing West Road, Shanghai 200040, PRC, Attn: David Wang or to David Wang at davidwang@paulhastings.com.

      (b)    <u>Consent to Electronic Notice</u>. Each Investor and Key Holder consents to the delivery of any shareholder notice pursuant to the Antigua and Barbuda Companies Act, 1995, as amended or superseded from time to time, by electronic transmission at the electronic mail address or the facsimile number as on the books of the Company. Each Investor and Key Holder agrees to promptly notify the Company of any change in its electronic mail address, and that failure to do so shall not affect the foregoing.

      7.8    <u>Consent Required to Amend, Modify, Terminate or Waive</u>. This Agreement may be amended, modified or terminated (other than pursuant to <u>Section 6</u>) and the observance of any term hereof may be waived (either generally or in a particular instance and either retroactively or prospectively) only by a written instrument executed by (a) the Company; (b) the Key Holders holding a majority of the Shares then held by the Key Holders; and (c) the holders of a majority of the shares of Common Shares issued or issuable upon conversion of the shares of Preferred Shares held by the Investors (voting together as a single class). Notwithstanding the foregoing:

      (a)    this Agreement may not be amended, modified or terminated and the observance of any term of this Agreement may not be waived with respect to any Investor or Key Holder without the written consent of such Investor or Key Holder unless such amendment, modification, termination or waiver applies to all Investors or Key Holders, as the case may be, in the same fashion;

      (b)    the provisions of <u>Subsection 1.2(a)</u>, <u>Subsection 4.4</u> and this <u>Subsection 7.8(b)</u> may not be amended, modified, terminated or waived without the written consent of the Founder;

      (c)    the provisions of <u>Subsection 1.2(b)</u>, <u>Section 3</u> and this <u>Subsection 7.8(c)</u> may not be amended, modified, terminated or waived without the written consent of Binance; and

      (d)    any provision hereof may be waived by the waiving party on such party's own behalf, without the consent of any other party.

The Company shall give prompt written notice of any amendment, modification, termination, or waiver hereunder to any party that did not consent in writing thereto. Any amendment, modification, termination, or waiver effected in accordance with this <u>Subsection 7.8</u> shall be binding on each party and all of such

party's successors and permitted assigns, whether or not any such party, successor or assignee entered into or approved such amendment, modification, termination or waiver. For purposes of this Subsection 7.8, the requirement of a written instrument may be satisfied in the form of an action by written consent of the Shareholders circulated by the Company and executed by the Shareholder parties specified, whether or not such action by written consent makes explicit reference to the terms of this Agreement.

7.9     Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default previously or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

7.10     Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

7.11     Entire Agreement. This Agreement (including the Exhibits hereto), the Restated Articles and the other Transaction Agreements (as defined in the Purchase Agreement) constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

7.12     Share Certificate Legend. Each certificate, instrument, or book entry representing any Shares issued after the date hereof shall be notated by the Company with a legend reading substantially as follows:

> "THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME, (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN."

The Company, by its execution of this Agreement, agrees that it will cause the certificates instruments, or book entry evidencing the Shares issued after the date hereof to be notated with the legend required by this Subsection 7.12 of this Agreement, and it shall supply, free of charge, a copy of this Agreement to any holder of such Shares upon written request from such holder to the Company at its principal office. The parties to this Agreement do hereby agree that the failure to cause the certificates, instruments, or book entry evidencing the Shares to be notated with the legend required by this Subsection 7.12 herein and/or the failure of the Company to supply, free of charge, a copy of this Agreement as provided hereunder shall not affect the validity or enforcement of this Agreement.

7.13     Share Splits, Share Dividends, etc. In the event of any issuance of Shares or the voting securities of the Company hereafter to any of the Shareholders (including, without limitation, in

connection with any share split, share dividend, recapitalization, reorganization, or the like), such Shares shall become subject to this Agreement and shall be notated with the legend set forth in Subsection 7.12.

7.14    Manner of Voting. The voting of Shares pursuant to this Agreement may be effected in person, by proxy, by written consent or in any other manner permitted by applicable law. For the avoidance of doubt, voting of the Shares pursuant to the Agreement need not make explicit reference to the terms of this Agreement.

7.15    Further Assurances. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to carry out the intent of the parties hereunder.

7.16    Dispute Resolution. Any controversy or claim arising out of or relating to this Agreement or the interpretation, breach, termination or validity hereof shall be resolved through arbitration in accordance with the Hong Kong International Arbitration Centre Arbitration Rules. The language to be used in the arbitral proceedings shall be English and the seat of the arbitration shall be Hong Kong.

7.17    Costs of Enforcement. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings, the non-prevailing party shall pay all costs and expenses incurred by the prevailing party, including, without limitation, all reasonable attorneys' fees.

7.18    Aggregation of Shares. All Shares held or acquired by a Shareholder and/or its Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement, and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Voting Agreement as of the date first written above.

**FTX TRADING LTD.**

By: _____

Name: Samuel Bankman-Friend

Title:  Chief Executive Officer

**KEY HOLDER:**

Signature: _____

Name: Samuel Bankman-Fried

**BINANCE CAPITAL MANAGEMENT CO. LTD**.

By: _____

Name: Changpeng Zhao

Title:  Chief Executive Officer

**SCHEDULE A**

**INVESTORS**

| **Name and Address** | **Number of Shares Held** |
| --- | --- |
| **Binance Capital Management Co. Ltd.**<br>30 de Castro Street, Wickhams Cay 1<br>P.O. Box 4519<br>Road Town, Tortola, British Virgin Islands | 250 (Series A Preferred Shares) |

**SCHEDULE B**

**KEY HOLDERS**

| <u>Name and Address</u> | <u>Number of Shares Held</u> |
| --- | --- |
| Samuel Bankman-Fried | 1,000 (Common Shares) |

Samuel Bankman-Fried
*Prior to December 15, 2019:* 20/F, Lee Garden 3, 10
Hysan Ave, Causeway Bay, Hong Kong

*After December 15, 2019:* 35/F, Two Pacific Place,
88 Queensway, Admiralty, Hong Kong

## EXHIBIT A

## ADOPTION AGREEMENT

This Adoption Agreement ("**Adoption Agreement**") is executed on _____, 20__, by the undersigned (the "**Holder**") pursuant to the terms of that certain Voting Agreement dated as of November 27, 2019 (the "**Agreement**"), by and among the Company and certain of its Shareholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows.

1.1    Acknowledgement. Holder acknowledges that Holder is acquiring certain shares of the capital shares of the Company (the "**Shares**") for one of the following reasons (Check the correct box):

☐    As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Shareholder" for all purposes of the Agreement.

☐    As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Shareholder" for all purposes of the Agreement.

☐    As a new Investor in accordance with Subsection 7.1(a) of the Agreement, in which case Holder will be an "Investor" and a "Shareholder" for all purposes of the Agreement.

☐    In accordance with Subsection 7.1(b) of the Agreement, as a new party who is not a new Investor, in which case Holder will be a "Shareholder" for all purposes of the Agreement.

1.2    Agreement. Holder hereby (a) agrees that the Shares, and any other shares of capital equity or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3    Notice. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:** _____    ACCEPTED AND AGREED:

By: _____    **FTX TRADING LTD.**
Name and Title of Signatory

Address: _____    By: _____

_____    Title: _____

Facsimile Number: _____

# Exhibit Q

Execution Version

## SERVICES AGREEMENT

THIS SERVICES AGREEMENT (this "**Agreement**"), is made as of November 27, 2019 (the "**Effective Date**"), by and among FTX Trading Ltd., a company established under the laws of Antigua and Barbuda (the "**Company**"), and Binance Capital Management Co., Ltd., a company established under the laws of British Virgin Islands ("**Binance**"). The Company and Binance may individually be referred to herein as a "**Party**", and together referred to herein as the "**Parties**".

## RECITALS

**WHEREAS,** the Company and Binance Capital Management Co. Ltd., a company established under the laws of the Cayman Islands (the "**Investor**") are parties to that certain Series A Preferred Share Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Investor has agreed to purchase Series A Preferred Shares of the Company ("**Series A Preferred Shares**") in exchange for the consideration set forth therein;

**WHEREAS**, this Agreement constitutes the agreement referred to in Section 1.3(d)(i) of the Purchase Agreement, and is being delivered as a condition of the Closing (as defined below);

**WHEREAS**, the Company and Binance desire to set forth certain obligations in connection with marketing activities;

**NOW, THEREFORE**, in consideration of the foregoing promises and the mutual covenants contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions.  For purposes of this Agreement:

    1.1   "**BNB**" means the cryptographic token with the symbol 'BNB' that is commonly referred to as the "Binance Coin".

    1.2   "**Closing**" has the meaning set forth in the Purchase Agreement.

    1.3   "**Exchange**" means the cryptographic token exchange at binance.com.

2.  Obligations.

    2.1   Binance covenants and agrees that the Exchange shall provide a priority listing of the tokens that provide leveraged exposure to the underlying digital assets created from time to time by LT Baskets Limited and are currently identified at https://ftx.com/tokens (such tokens, the "**Leveraged Tokens**") after the Exchange completes its internal evaluation of such Leveraged Tokens; provided, however, that the Exchange shall undertake such evaluations as promptly as practicable. Notwithstanding the foregoing, the Exchange will use commercially reasonably efforts to list an initial Leveraged Token (such Leveraged Token to be agreed upon by the Parties) within two (2) months after the Closing; provided, however, that the Company will use commercially reasonable efforts to support the Exchange's token listing team and respond promptly to the Exchange's token listing team's requests throughout the evaluation and listing process; provided, further, that the Parties will address any material issues and consider postponing the listing, or ceasing the attempt such listing or delisting such Leveraged Token, as may be appropriate.  The Parties will consider in good faith listing additional Leveraged Tokens on the Exchange and the quantities and listing schedule shall be discussed and agreed upon by the Parties.

2.2     Notwithstanding anything to the contrary, the Leveraged Tokens shall not be tradeable to or otherwise sold through the Exchange to U.S. Persons (as defined in Regulation S under the Securities Act of 1933, as amended).

2.3     Binance covenants that the Exchange will place prominent links to FTX on Binance.com in a manner that is reasonably agreeable to the Parties (potentially including a homepage banner or link at top of page or at least above the fold).

2.4     As soon as practicable after the Closing, in the form mutually agreed to by the Parties, the Exchange will provide notice to its clients regarding the consummation of the Transaction, in a manner that the Exchange determines to be appropriate.

2.5     Binance and the Exchange will provide marketing support for the Company, including social media posts, in a manner that Binance determines to be appropriate.

2.6     The Parties will work together and consider in good faith enabling Binance Oauth for FTX. The Parties will work together and consider in good faith (a) allowing on-click off-chain transfers between Exchange and FTX accounts that share common login credentials or (b) 0-confirmation transfers.

2.7     If requested by Binance, the Company will provide advice and guidance to Binance regarding the following: (i) Rate Limit designs; (ii) Fees; (iii) Structuring margin and liquidations; (iv) Structured product design; (v) VIP customer management; and Such other matters as maybe reasonably requested within the expertise of the Company.

2.8     The Company shall place prominent links to Binance.com on the FTX website, list BNB spot market, BNB collateral and BUSD collateral, in a manner that is reasonably agreeable to the Parties.

2.9     All services provided by the Parties hereunder are provided without warranty of any nature. NEITHER PARTY MAKES ANY WARRANTY WHATSOEVER WITH RESPECT TO THE SERVICES PROVIDED HEREUNDER, AND SUCH WORK PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND.

3.     <u>Miscellaneous</u>.

3.1     <u>Successors and Assigns</u>.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

3.2     <u>Governing Law/Dispute Resolution</u>.  This Agreement shall be governed by the internal laws of Hong Kong, without regard to conflict of law principles that would result in the application of any law other than such laws. Any controversy or claim arising out of or relating to this Agreement or the interpretation, breach, termination or validity hereof shall be resolved through arbitration in accordance with the Hong Kong International Arbitration Centre Arbitration Rules. The language to be used in the arbitral proceedings shall be English and the seat of the arbitration shall be Hong Kong.

3.3     Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

3.4     Titles and Subtitles. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

3.5     Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth on Schedule A hereto, or to the principal office of the Company and to the attention of the Chief Executive Officer, in the case of the Company, or to such email address, facsimile number, or address as subsequently modified by written notice given in accordance with this Subsection 3.5. If notice is given to the Company, a copy shall also be sent to Fenwick & West, LLP, 1191 2nd Avenue, 10th Floor, Seattle, Washington, 98101, Attn: Andrew Albertson or to Andrew Albertson at aalbertson@fenwick.com and if notice is given to Shareholders, a copy shall also be given to Paul Hastings LLP, 43/F, Jing An Kerry Center Tower II, 1539 Nanjing West Road, Shanghai 200040, PRC, Attn: David Wang or to David Wang at davidwang@paulhastings.com.

3.6     Amendments and Waivers. Any term of this Agreement may be amended, modified or terminated and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the parties; provided that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

3.7     Severability. In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

3.8     Entire Agreement. This Agreement (including the related Schedule) constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

3.9     Dispute Resolution. Any controversy or claim arising out of or relating to this Agreement or the interpretation, breach, termination or validity hereof shall be resolved through arbitration in accordance with the Hong Kong International Arbitration Centre Arbitration Rules. The

3

language to be used in the arbitral proceedings shall be English and the seat of the arbitration shall be Hong Kong.

          3.10    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

*[Remainder of Page Intentionally Left Blank]*

4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**FTX TRADING LTD.**

By: _____

Name: Samuel Bankman-Fried

Title:  Chief Executive Officer

**BINANCE CAPITAL MANAGEMENT CO., LTD.**

By: _____

Name: Changpeng Zhao

Title: Chief Executive Officer

**Schedule A**

**Addresses**

**Binance Capital Management Co. Ltd.**
30 de Castro Street, Wickhams Cay 1
P.O. Box 4519
Road Town, Tortola, British Virgin Islands

**FTX Trading Ltd.**
c/o Sam Bankman-Fried
*Prior to December 15, 2019:* 20/F, Lee Garden 3, 10 Hysan Ave, Causeway Bay, Hong Kong

*After December 15, 2019:* 35/F, Two Pacific Place, 88 Queensway, Admiralty, Hong Kong

# Exhibit R

## INTERCOMPANY LOAN AGREEMENT

This Loan Agreement (as from time to time amended, supplemented, restated, or otherwise modified, this "***Agreement***") is entered into effective November 27, 2019 (the "***Effective Date***") by and between FTX Trading, Ltd., a company organized under the laws of Antigua and Barbuda, ("***Lender***") and Alameda Research, Ltd., an company organized under the laws of the British Virgin Islands ("***Borrower***").

## RECITALS

**WHEREAS**, Lender desires to loan a certain amount of cryptocurrency to Borrower and Borrower wishes to borrow a certain amount of cryptocurrency from Lender;

**NOW THEREFORE**, in consideration of the mutual promises, representations, warranties and covenants set forth in this Agreement, Lender and Borrower hereby agree as follows:

1.    <u>**AMOUNT AND TERMS OF LOAN.**</u>

1.1    <u>**Loan.**</u>  Subject to the terms and conditions of this Agreement, Lender shall loan Borrower the principal amount of 1,002,739  BNB (the "***Loan***") to be repaid in whole or in part to the Lender in accordance with the conditions stipulated herein.

1.2    <u>**Loan Fee.**</u>  Borrower shall pay to Lender a Loan Fee, which shall, for each respective year, be equivalent in value to 10% of the outstanding amount of the Loan.  The Loan Fee shall be calculated based on the value of the Loan as of each anniversary of the Effective Date. All payments hereunder shall be made in lawful tender of the United States, or in cryptocurrency as agreed upon by the parties.  If payment is made in cryptocurrency, the fair market value of such cryptocurrency must be equal in value to the Loan Fee if such fee had been paid in lawful tender of the United States.

1.3    <u>**Maturity of Loan.**</u>  The unpaid principal amount of this Loan and all unpaid interest accrued thereon, together with any other related fees, expenses or costs, will be immediately due and payable to Lender in full on the date (the "***Maturity Date***") that is the earlier to occur of: (i) 60 months from the Effective Date or (ii) the date on which the unpaid principal amount and interest due under this Loan becomes due and payable in full under Section 2.1.

1.4    <u>**Prepayment.**</u>  Borrower may prepay the unpaid principal and interest due under this Loan at any time, without penalty, in whole or in part.  Each prepayment will be applied as follows: (i) first to the payment of accrued interest, and (ii) second, to the extent that the amount of such prepayment exceeds the amount of all such accrued interest, to the payment of principal on this Loan.

2. **DEFAULT BY BORROWER.**

    2.1   **Default.**  Borrower will be deemed to be in default of this Loan if: (a) Borrower fails to pay Lender the full amount due under this Loan on or before the date such payment is due; and Borrower does not cure this failure to pay within sixty calendar days after such failure to pay, or (b) Borrower files for or goes into any bankruptcy or insolvency proceeding.

    2.2   **Remedies Upon Default.**  Upon Borrower's default of this Loan, Lender may declare all of Borrower's obligations to Lender, whether evidenced by this Agreement or otherwise, immediately due and payable without notice or demand on the part of the Lender, and the Lender will have full recourse against any real, personal or intangible asset of the Borrower, and may pursue any legal or equitable remedies that are available. The rights and remedies of Lender herein provided will be cumulative and not exclusive of any other rights or remedies provided by law or otherwise.

3. **MISCELLANEOUS.**

    3.1   **Successors and Assigns; Assignment.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Lender may assign any of its rights and obligations under this Agreement. Borrower shall not assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Lender. An assignment by operation of law includes, without limitation, (i) a merger, reorganization, consolidation or other transaction in which the shareholders of such party before such merger, reorganization, consolidation or other transaction own less than fifty percent (50%) of the outstanding voting equity securities of the surviving corporation, (ii) a sale or other transfer of all or substantially all of the assets of such party, or (iii) a transfer of more than fifty percent (50%) of the outstanding voting equity securities of such party in one transaction or a series of related transactions.

    3.2   **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the British Virgin Islands, without giving effect to that body of laws pertaining to conflict of laws.

    3.3   **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed given if sent by prepaid registered or certified airmail, return receipt requested (if available), or sent by telex, facsimile or similar communication, and confirmed by such airmail, postage prepaid, addressed to each respective party at its principal address.

    3.4   **Further Assurances.**  The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

    3.5   **Titles and Headings.**  The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.

**3.6** **Entire Agreement.** This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

**3.7** **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.

**3.8** **Severability.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement. Notwithstanding the forgoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then this Agreement will not be enforceable against such affected party and both parties agree to renegotiate such provision(s) in good faith.

**3.9** **Facsimile Signatures.** This Agreement may be executed and delivered by facsimile and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

**3.10** **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought. Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

**3.11** **No Third-Party Beneficiaries.** Nothing in this Agreement, express or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the Effective Date.

LENDER:                          **FTX TRADING, LTD.**

By: _____
                                 Samuel Bankman-Fried, CEO


BORROWER:                        **ALAMEDA RESEARCH, LTD.**

_____
                                 By:Samuel Bankman-Fried, CEO

4

# Exhibit S

**PAYOFF AGREEMENT**

THIS PAYOFF AGREEMENT (this "Agreement") is entered into as of the Effective Date set forth below, by and between FTX Trading, Ltd., a company organized under the laws of Antigua and Barbuda, ("Lender") and Alameda Research, Ltd., a company organized under the laws of the British Virgin Islands ("Borrower")..

**RECITALS**

A. Borrower obtained a loan in the original principal amount of 1,002,739 BNB (the "Loan") from the Lender pursuant to that certain Intercompany Loan Agreement dated as of November 27, 2019 (the "Loan Agreement").

B.  Lender has agreed to accept a cash payment from Borrower in full and complete satisfaction of all obligations of Borrower under the Loan Agreement on and subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing, and the various agreements set forth herein below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledge, the parties hereto agree as follows:

1. Payoff Amount; Satisfaction of Debt. Lender accepts a cash payment of $130,123,133.73 the ("Payoff Amount") to be paid by Borrower on February 17th, 2021 (the "Effective Date") in full and complete satisfaction of all obligations of Borrower to Lender under the Loan Agreement. The parties acknowledge that the Payoff Amount is based upon the agreed volume weighted average price of BNB over the 168 hours proceeding the Effective Date. Each party hereto releases the other from all obligations arising under the Loan Agreement.

2.  Entire Agreement. This Agreement embodies the entire agreement between the parties with respect to the subject matter hereof and there are no agreements, representations or warranties, oral or written, between or among the parties other than those set forth in this Agreement.

3.  Successors and Assigns Bound. This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

4. Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF ANTIGUA AND BARBUDA.

5. Counterparts. This Agreement may be executed by manual or facsimile signature or email signature sent in .pdf or .tif format in any number of counterparts, each of which shall be an original, but which together constitute one and the same instrument.

6.  Third Party Beneficiaries. No person other than a party hereto shall be entitled or be deemed to be entitled to any benefits or rights hereunder, nor be authorized or entitled to enforce any rights or remedies hereunder or by reason hereof.

Executed as a binding contract on the Effective Date:

FTX TRADING LTD. ("Lender")                    ALAMEDA RESEARCH, LTD. ("Borrower")

By:_____                   By:_____
   Samuel Bankman-Fried, CEO                       Samuel Bankman-Fried, CEO

# Exhibit T
# Patrick Gruhn Proof of Claim

# FILED UNDER SEAL
# PURSUANT TO COURT ORDER

# Exhibit U

# FTX Non Customer Proof of Claim Form

## Electronic Proof of Claim ID

If you have an EPOC ID please enter it below and select next to proceed with your claim submission.  EPOC IDs can be located on the pre-printed proof of claim forms sent via first-class mail.

EPOC ID

EPOC IDs are not required to submit a claim.  If you cannot locate your EPOC ID or do not have an EPOC ID, please select next to continue with your claim submission.

## Instructions

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

☐ Check here to see further instructions on completing your claim form:

**Claim Number: 44476**

## Debtor Selection

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

- ⦿ FTX Trading Ltd. (Case No. 22-11068)
- ○ Alameda Aus Pty Ltd (Case No. 22-11104)
- ○ Alameda Global Services Ltd. (Case No. 22-11134)
- ○ Alameda Research (Bahamas) Ltd (Case No. 22-11105)
- ○ Alameda Research Holdings Inc. (Case No. 22-11069)
- ○ Alameda Research KK (Case No. 22-11106)
- ○ Alameda Research LLC (Case No. 22-11066)
- ○ Alameda Research Ltd (Case No. 22-11067)
- ○ Alameda Research Pte Ltd (Case No. 22-11107)
- ○ Alameda Research Yankari Ltd (Case No. 22-11108)
- ○ Alameda TR Ltd (Case No. 22-11078)
- ○ Alameda TR Systems S. de R. L. (Case No. 22-11109)
- ○ Allston Way Ltd (Case No. 22-11079)
- ○ Analisya Pte Ltd (Case No. 22-11080)
- ○ Atlantis Technology Ltd. (Case No. 22-11081)
- ○ Bancroft Way Ltd (Case No. 22-11082)
- ○ Blockfolio, Inc. (Case No. 22-11110)
- ○ Blue Ridge Ltd (Case No. 22-11083)
- ○ Cardinal Ventures Ltd (Case No. 22-11084)
- ○ Cedar Bay Ltd (Case No. 22-11085)
- ○ Cedar Grove Technology Services, Ltd. (Case No. 22-11162)
- ○ Clifton Bay Investments LLC (Case No. 22-11070)
- ○ Clifton Bay Investments Ltd (Case No. 22-11111)
- ○ Cottonwood Grove Ltd (Case No. 22-11112)
- ○ Cottonwood Technologies Ltd (Case No. 22-11136)
- ○ Crypto Bahamas LLC (Case No. 22-11113)
- ○ DAAG Trading, DMCC (Case No. 22-11163)
- ○ Deck Technologies Holdings LLC (Case No. 22-11138)
- ○ Deck Technologies Inc. (Case No. 22-11139)
- ○ Deep Creek Ltd (Case No. 22-11114)
- ○ Digital Custody Inc. (Case No. 22-11115)
- ○ Euclid Way Ltd (Case No. 22-11141)
- ○ FTX (Gibraltar) Ltd (Case No. 22-11116)
- ○ FTX Canada Inc (Case No. 22-11117)
- ○ FTX Certificates GmbH (Case No. 22-11164)
- ○ FTX Crypto Services Ltd. (Case No. 22-11165)
- ○ FTX Digital Assets LLC (Case No. 22-11143)
- ○ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118)
- ○ FTX EMEA Ltd. (Case No. 22-11145)
- ○ FTX Equity Record Holdings Ltd (Case No. 22-11099)
- ○ FTX EU Ltd. (Case No. 22-11166)
- ○ FTX Europe AG (Case No. 22-11075)
- ○ FTX Exchange FZE (Case No. 22-11100)
- ○ FTX Hong Kong Ltd (Case No. 22-11101)
- ○ FTX Japan Holdings K.K. (Case No. 22-11074)
- ○ FTX Japan K.K. (Case No. 22-11102)
- ○ FTX Japan Services KK (Case No. 22-11103)
- ○ FTX Lend Inc. (Case No. 22-11167)
- ○ FTX Marketplace, Inc. (Case No. 22-11168)
- ○ FTX Products (Singapore) Pte Ltd (Case No. 22-11119)
- ○ FTX Property Holdings Ltd (Case No. 22-11076)
- ○ FTX Services Solutions Ltd. (Case No. 22-11120)
- ○ FTX Structured Products AG (Case No. 22-11122)
- ○ FTX Switzerland GmbH (Case No. 22-11169)
- ○ FTX Trading GmbH (Case No. 22-11123)
- ○ FTX US Services, Inc. (Case No. 22-11171)
- ○ FTX US Trading, Inc. (Case No. 22-11149)
- ○ FTX Ventures Ltd. (Case No. 22-11172)
- ○ FTX Zuma Ltd (Case No. 22-11124)
- ○ GG Trading Terminal Ltd (Case No. 22-11173)
- ○ Global Compass Dynamics Ltd. (Case No. 22-11125)
- ○ Good Luck Games, LLC (Case No. 22-11174)
- ○ Goodman Investments Ltd. (Case No. 22-11126)

- ○ Hannam Group Inc (Case No. 22-11175)
- ○ Hawaii Digital Assets Inc. (Case No. 22-11127)
- ○ Hilltop Technology Services LLC (Case No. 22-11176)
- ○ Hive Empire Trading Pty Ltd (Case No. 22-11150)
- ○ Innovatia Ltd (Case No. 22-11128)
- ○ Island Bay Ventures Inc (Case No. 22-11129)
- ○ Killarney Lake Investments Ltd (Case No. 22-11131)
- ○ Ledger Holdings Inc. (Case No. 22-11073)
- ○ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177)
- ○ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155)
- ○ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156)
- ○ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157)
- ○ LedgerPrime LLC (Case No. 22-11158)
- ○ LedgerPrime Ventures, LP (Case No. 22-11159)
- ○ Liquid Financial USA Inc. (Case No. 22-11151)
- ○ Liquid Securities Singapore Pte Ltd (Case No. 22-11086)
- ○ LiquidEX LLC (Case No. 22-11152)
- ○ LT Baskets Ltd. (Case No. 22-11077)
- ○ Maclaurin Investments Ltd. (Case No. 22-11087)
- ○ Mangrove Cay Ltd (Case No. 22-11088)
- ○ North Dimension Inc (Case No. 22-11153)
- ○ North Dimension Ltd (Case No. 22-11160)
- ○ North Wireless Dimension Inc. (Case No. 22-11154)
- ○ Paper Bird Inc (Case No. 22-11089)
- ○ Pioneer Street Inc. (Case No. 22-11090)
- ○ Quoine India Pte Ltd (Case No. 22-11091)
- ○ Quoine Pte Ltd (Case No. 22-11161)
- ○ Quoine Vietnam Co. Ltd (Case No. 22-11092)
- ○ Strategy Ark Collective Ltd. (Case No. 22-11094)
- ○ Technology Services Bahamas Limited (Case No. 22-11095)
- ○ Verdant Canyon Capital LLC (Case No. 22-11096)
- ○ West Innovative Barista Ltd. (Case No. 22-11097)
- ○ West Realm Shires Financial Services Inc. (Case No. 22-11072)
- ○ West Realm Shires Inc. (Case No. 22-11183)
- ○ West Realm Shires Services Inc. (Case No. 22-11071)
- ○ Western Concord Enterprises Ltd. (Case No. 22-11098)
- ○ Zubr Exchange Ltd (Case No. 22-11132)

## Part 1: Identify the Claim

**1. Who is the current Creditor?**

Name of the current creditor (the person or entity to be paid for this claim)

Is the current Creditor an Individual?

- ⦿ No
- ○ Yes

Creditor Name

> Lorem Ipsum RM UG

Other names the creditor used with the debtor

Email the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

- ⦿ No
- ○ Yes

From whom?

FTX Non Customer Proof of Claim Form

**3. Where should notices and payments to the Creditor be sent?**

[Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)]

**Where should notices to the Creditor be sent?**

Name:

Lorem Ipsum RM UG

Address 1 (Street address, "Care of:", or "Attention To:"):

Attention To: Morrison Cohen LLP, Attn; Heath D. Rosenblat, Esq. , Jason P. Gottlieb, Esq.

Address 2:

909 Third Avenue, 27th Floor

Address 3:

Address 4:

City:

New York

State or Province (use 2-letter abbreviation if US or Canada):

New York

Zip Code | Postal Code:

10022

**Is the creditor address outside of the US?**

○ No
● Yes

Country (if outside of the US):

Germany

Contact phone:

212-735-8600

Contact email:

hrosenblat@morrisoncohen.com

**Should payments go to a different address?**

○ No
● Yes

Name:

Lorem Ipsum RM UG

Address 1 (Street address, "Care of:", or "Attention To:"):

Care Of: Lambda Law

Address 2:

Bergstrasse 23

Address 3:

Address 4:

City:

Berlin

State or Province (use 2-letter abbreviation if US or Canada):

Germany

Zip Code | Postal Code:

10115

Is the creditor address outside of the US?

○ No
◉ Yes

Country (if outside of the US):

Germany

Contact phone:

212-735-8600

Contact email:

hrosenblat@morrisoncohen.com

**Would you like to add any additional noticing addresses?**

◉ No
○ Yes

**4. Does this claim amend one already filed?**

◉ No
○ Yes

Claim number on court claims registry (if known)

**5. Do you know if anyone else has filed a Proof of Claim for this claim?**

◉ No
○ Yes

Who made the earlier filing?

Part 2a: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

◉ No
○ Yes

Last 4 digits of the debtor's account or any number you use to identify the debtor:

## If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**

| $ | No less than $62,011,656.25 (See Supplement) |

Does this amount include interest or other charges?

○ No
○ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide:**

(i) the currency type:

FTX Non Customer Proof of Claim Form

(ii) the amount in such currency

(iii) a conversion rate to U.S. dollars

**7b. List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

Please use only numerals and decimals in the Count fields, up to a maximum of 21 digits or 20 digits and 1 decimal.

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| | | | |
| Coin List | Count | Coin List | Count |
| | | | |
| Coin List | Count | Coin List | Count |
| | | | |

## Part 2b: Give Information About the Claim as of the Date the Case Was Filed

**8. What is the basis of the claim?**

See Supplement

**9. Is all or part of the claim secured?**

◉ No
○ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate

☐ Motor vehicle

☐ Other

Describe:

**Basis for perfection:**

**Value of property (all amounts in US $ dollars):**

**Amount of the claim that is secured (all amounts in US $ dollars):**

**Amount of the claim that is unsecured (all amounts in US $ dollars):**

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars):**

Annual Interest Rate (when case was filed) % -
○ Fixed
○ Variable

Annual Interest Rate (when case was filed) %:

**10. Is this claim based on a lease?**

◉ No
○ Yes

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars).**

_____

**11. Is this claim subject to a right of setoff?**

- ◉ No
- ○ Yes

Identify the property.

_____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

- ◉ No
- ○ Yes

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

- ◉ No
- ○ Yes.

**Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions above on what further information is required.**

_____

## Part 3: Electronic Signature

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**

**18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

- ⦿ I am the creditor.
- ○ I am the creditor's attorney or authorized agent.
- ○ I am the trustee, or the Debtor, or their authorized agent. Bankruptcy Rule 3004.
- ○ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

### Executed on date (Calculated in UTC)

06/30/2023

Signature



I certify that I have completed my Proof of Claim form on the Kroll Restructuring Administration Portal. I hereby agree that my electronic signature herein complies with the ESIGN Act, and accordingly shall have the same legal effect as my original signature.

☑ I agree

**Name of the person who is completing and signing this claim:**

First Name/Middle Name/Last Name:

Robin Matzke

Title/Company:

Managing Director of LI

FTX Non Customer Proof of Claim Form

Address 1:

Bergstrasse 23

Address 2:

City:

Berlin

State or Province (use 2-letter abbreviation if US or Canada):

Germany

Zip Code | Postal Code:

110115

Is this address outside of the US?

○ No
● Yes

Country (if outside of the US):

Germany

Contact phone:

212-735-8600

Contact email:

hrosenblat@morrisoncohen.com

## Supporting Documentation

**Attach Support Documentation (limited to a single PDF attachment that is less than 5 megabytes in size):**

● I have supporting documentation
○ I do not have supporting documentation

**Attach a single PDF attachment that is less than 5 megabytes in size**

| FTX POC w Supp.pdf | 375 KB |

**Attachment Filename**

FTX POC w Supp.pdf

## United States Bankruptcy Court, District of Delaware

**Check the box to identify the Debtor against whom you assert a claim (select only one Debtor per claim form):**

| | | | |
|---|---|---|---|
| ☑ FTX Trading Ltd. (Case No. 22-11068) | ☐ Alameda Aus Pty Ltd (Case No. 22-11104) | ☐ Alameda Global Services Ltd. (Case No. 22-11134) | ☐ Alameda Research (Bahamas) Ltd (Case No. 22-11105) |
| ☐ Alameda Research Holdings Inc. (Case No. 22-11069) | ☐ Alameda Research KK (Case No. 22-11106) | ☐ Alameda Research LLC (Case No. 22-11066) | ☐ Alameda Research Ltd (Case No. 22-11067) |
| ☐ Alameda Research Pte Ltd (Case No. 22-11107) | ☐ Alameda Research Yankari Ltd (Case No. 22-11108) | ☐ Alameda TR Ltd (Case No. 22-11078) | ☐ Alameda TR Systems S. de R. L. (Case No. 22-11109) |
| ☐ Allston Way Ltd (Case No. 22-11079) | ☐ Analisya Pte Ltd (Case No. 22-11080) | ☐ Atlantis Technology Ltd. (Case No. 22-11081) | ☐ Bancroft Way Ltd (Case No. 22-11082) |
| ☐ Blockfolio, Inc. (Case No. 22-11110) | ☐ Blue Ridge Ltd (Case No. 22-11083) | ☐ Cardinal Ventures Ltd (Case No. 22-11084) | ☐ Cedar Bay Ltd (Case No. 22-11085) |
| ☐ Cedar Grove Technology Services, Ltd. (Case No. 22-11162) | ☐ Clifton Bay Investments LLC (Case No. 22-11070) | ☐ Clifton Bay Investments Ltd (Case No. 22-11111) | ☐ Cottonwood Grove Ltd (Case No. 22-11112) |
| ☐ Cottonwood Technologies Ltd (Case No. 22-11136) | ☐ Crypto Bahamas LLC (Case No. 22-11113) | ☐ DAAG Trading, DMCC (Case No. 22-11163) | ☐ Deck Technologies Holdings LLC (Case No. 22-11138) |
| ☐ Deck Technologies Inc. (Case No. 22-11139) | ☐ Deep Creek Ltd (Case No. 22-11114) | ☐ Digital Custody Inc. (Case No. 22-11115) | ☐ Euclid Way Ltd (Case No. 22-11141) |
| ☐ FTX (Gibraltar) Ltd (Case No. 22-11116) | ☐ FTX Canada Inc (Case No. 22-11117) | ☐ FTX Certificates GmbH (Case No. 22-11164) | ☐ FTX Crypto Services Ltd. (Case No. 22-11142) |
| ☐ FTX Digital Assets LLC (Case No. 22-11143) | ☐ FTX Digital Holdings (Singapore) Pte Ltd (Case No. 22-11118) | ☐ FTX EMEA Ltd. (Case No. 22-11145) | ☐ FTX Equity Record Holdings Ltd (Case No. 22-11099) |
| ☐ FTX EU Ltd. (Case No. 22-11166) | ☐ FTX Europe AG (Case No. 22-11075) | ☐ FTX Exchange FZE (Case No. 22-11100) | ☐ FTX Hong Kong Ltd (Case No. 22-11101) |
| ☐ FTX Japan Holdings K.K. (Case No. 22-11074) | ☐ FTX Japan K.K. (Case No. 22-11102) | ☐ FTX Japan Services KK (Case No. 22-11103) | ☐ FTX Lend Inc. (Case No. 22-11167) |
| ☐ FTX Marketplace, Inc. (Case No. 22-11168) | ☐ FTX Products (Singapore) Pte Ltd (Case No. 22-11119) | ☐ FTX Property Holdings Ltd (Case No. 22-11076) | ☐ FTX Services Solutions Ltd. (Case No. 22-11120) |
| ☐ FTX Structured Products AG (Case No. 22-11122) | ☐ FTX Switzerland GmbH (Case No. 22-11169) | ☐ FTX Trading GmbH (Case No. 22-11123) | ☐ FTX US Services, Inc. (Case No. 22-11171) |
| ☐ FTX US Trading, Inc. (Case No. 22-11149) | ☐ FTX Ventures Ltd. (Case No. 22-11172) | ☐ FTX Zuma Ltd (Case No. 22-11124) | ☐ GG Trading Terminal Ltd (Case No. 22-11173) |
| ☐ Global Compass Dynamics Ltd. (Case No. 22-11125) | ☐ Good Luck Games, LLC (Case No. 22-11174) | ☐ Goodman Investments Ltd. (Case No. 22-11126) | ☐ Hannam Group Inc (Case No. 22-11175) |
| ☐ Hawaii Digital Assets Inc. (Case No. 22-11127) | ☐ Hilltop Technology Services LLC (Case No. 22-11176) | ☐ Hive Empire Trading Pty Ltd (Case No. 22-11150) | ☐ Innovatia Ltd (Case No. 22-11128) |
| ☐ Island Bay Ventures Inc (Case No. 22-11129) | ☐ Killarney Lake Investments Ltd (Case No. 22-11131) | ☐ Ledger Holdings Inc. (Case No. 22-11073) | ☐ LedgerPrime Bitcoin Yield Enhancement Fund, LLC (Case No. 22-11177) |
| ☐ LedgerPrime Bitcoin Yield Enhancement Master Fund, LP (Case No. 22-11155) | ☐ LedgerPrime Digital Asset Opportunities Fund, LLC (Case No. 22-11156) | ☐ LedgerPrime Digital Asset Opportunities Master Fund LP (Case No. 22-11157) | ☐ LedgerPrime LLC (Case No. 22-11158) |
| ☐ LedgerPrime Ventures, LP (Case No. 22-11159) | ☐ Liquid Financial USA Inc. (Case No. 22-11151) | ☐ Liquid Securities Singapore Pte Ltd (Case No. 22-11086) | ☐ LiquidEX LLC (Case No. 22-11152) |
| ☐ LT Baskets Ltd. (Case No. 22-11077) | ☐ Maclaurin Investments Ltd. (Case No. 22-11087) | ☐ Mangrove Cay Ltd (Case No. 22-11088) | ☐ North Dimension Inc (Case No. 22-11153) |
| ☐ North Dimension Ltd (Case No. 22-11160) | ☐ North Wireless Dimension Inc. (Case No. 22-11154) | ☐ Paper Bird Inc (Case No. 22-11089) | ☐ Pioneer Street Inc. (Case No. 22-11090) |
| ☐ Quoine India Pte Ltd (Case No. 22-11091) | ☐ Quoine Pte Ltd (Case No. 22-11161) | ☐ Quoine Vietnam Co. Ltd (Case No. 22-11092) | ☐ Strategy Ark Collective Ltd. (Case No. 22-11094) |
| ☐ Technology Services Bahamas Limited (Case No. 22-11095) | ☐ Verdant Canyon Capital LLC (Case No. 22-11096) | ☐ West Innovative Barista Ltd. (Case No. 22-11097) | ☐ West Realm Shires Financial Services Inc. (Case No. 22-11072) |
| ☐ West Realm Shires Inc. (Case No. 22-11183) | ☐ West Realm Shires Services Inc. (Case No. 22-11071) | ☐ Western Concord Enterprises Ltd. (Case No. 22-11098) | ☐ Zubr Exchange Ltd (Case No. 22-11132) |

# Modified Form 410
## Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**This claim form should not be used to assert claims against Emergent Fidelity Technologies Ltd.**

**Fill in all the information about the claim as of November 14, 2022 for Debtor West Realm Shires Inc. and as of November 11, 2022 for all other Debtors.**

| **Part 1:** | **Identify the Claim** |
| --- | --- |

**1. Who is the current creditor?**

Lorem Ipsum RM UG
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

Email(s) the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Morrison Cohen LLP
Attn: Heath D. Rosenblat, Esq.
Attn: Jason P. Gottlieb, Esq.
909 Third Avenue, 27th Floor
New York, New York 10022

Contact phone   212-735-8600

Contact email   hrosenblat@morrisoncohen.com

Where should payments to the creditor be sent? (if different)

Lorem Ipsum RM UG
c/o Lambda Law
Bergstrasse 23,
10115 Berlin, Germany

Contact phone   212-735-8600

Contact email   hrosenblat@morrisoncohen.com

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.   Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☒ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  _____ _____ _____ _____

If filing a claim for cryptocurrency, please fill in 7b.

**7a. How much is the claim?**   $ No less than $62,011,656.25 (See Supplement)

Does this amount include interest or other charges?

☐ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

If asserted liability is in a currency other than U.S. dollars or cryptocurrency, provide (i) the currency type _____; (ii) the amount in such currency _____; and (iii) a conversion rate to U.S. dollars _____.

**7b.  List the number of each type and quantity of each coin owed as of the date the case was filed (November 11, 2022)**

| Coin List | Count | Coin List | Count |
| --- | --- | --- | --- |
|  |  |  |  |
|  |  |  |  |

Proof of Claim

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>## See Supplement |

| | |
|---|---|
| **9. Is all or part of the claim secured?** | ☒ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br><br>**Amount of the claim that is secured:** $_____<br><br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| **10. Is this claim based on a lease?** | ☒ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____ |

| | |
|---|---|
| **11. Is this claim subject to a right of setoff?** | ☒ No<br>☐ Yes. Identify the property: _____ |

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br>☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |

| | | |
|---|---|---|
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No<br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. If claim is for both goods and services, provide your total claim amount (goods & services) in section 7a. and the value of the goods here. Attach documentation supporting such claim. See the instructions below on what further information is required.** | $_____ |

| Part 3: | Sign Below |
|---------|------------|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒  I am the creditor.

☐  I am the creditor's attorney or authorized agent.

☐  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  06/30/2023
                  MM  /  DD  /  YYYY

/s/ Robin Matzke

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Robin Matzke | | |
|------|--------------|---|---|
| | First name | Middle name | Last name |
| Title | Managing Director of  LI | | |
| Company | Lorem Ipsum RM UG | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | Bergstrasse 23 | | |
| | Number        Street | | |
| | 10115 Berlin, Germany | | |
| | City | State | ZIP Code |
| Contact phone | 212-735-8600 | Email | hrosenblat@morrisoncohen.com |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENT TO PROOF OF CLAIM OF LOREM IPSUM RM UG**

Lorem Ipsum RM UG (haftungsbeschränkt) ("**LI**") submits the following supplement (this "**Supplement**") to its proof of claim ("**Proof of Claim**") against FTX Trading Ltd. ("**FTXTL**") and further states as follows:

      **A.**    **The Debtors' Chapter 11 Filings**

1. On November 11, 2022 and November 14, 2022 (collectively, "**Petition Date**"), FTXTL and 101 affiliated debtors (collectively, "**Debtors**")[1] each commenced, in the United States Bankruptcy Court for the District of Delaware (this "**Bankruptcy Court**"), a voluntary case under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 ("**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures and an order [ECF No. 128] of this Bankruptcy Court, the Debtors' cases ("**Chapter 11 Cases**") have been consolidated for procedural purposes only and are being jointly administered.

---

[1]   The last four digits of FTXTL and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

3.      By order [ECF No. 1519], dated May 19, 2023, of the Bankruptcy Court, the last day by which non-customers can file claims against the Debtors is June 30, 2023.

## B.      LI, the Debtors, and the Claim

4.      LI is a non-US based entity that was a seller under that certain *Share Purchase Agreement*, dated November 14, 2021 ("**Agreement**"), by and among, Patrick Gruhn, LI, and Brandon Williams, as seller, and FTXTL, as purchaser. The Agreement, and any amendments, supplements, or modifications thereto, and other related materials and documents (collectively, "**Relationship Documents**") setting forth LI's claim are too voluminous to attach and, upon information and belief, already in the possession of the Debtors. Copies of the Relationship Documents will be made available to either the Debtors or the Bankruptcy Court upon request.

5.      Under the Agreement, FTXTL was a purchaser of certain shares owned by LI in an entity named Digital Asset DA AG, in return for which FTXTL promised to pay various forms of consideration to LI. FTXTL did not and has not paid the consideration due under the Agreement and the Relationship Documents.

6.      As of the Petition Date, due to FTXTL's failure to pay the consideration due under the Agreement and Relationship Documents, LI has a claim against FTXTL of no less than $62,011,656.25[2], ***plus*** all additional actual and consequential damages including, but not limited to, reputational damage, loss of business, loss of goodwill, or loss of profits. In addition, LI has various other claims against FTXTL in connection with, related to, or arising from FTXTL's breach of the Relationship Documents, including, but not limited to, breach of contract, fraud, or

---

[2]    Included in this amount is the value of 1,144,373 common shares of FTXTL owed to LI under the Agreement that it is unclear if FTXTL transferred, assigned, and properly registered them to LI or not. LI will also assert these amounts in a proof of interest out of an abundance of caution.

2

fraudulent inducement *plus* all costs and attorney's fees in connection therewith (collectively, "**Claim**").

C.      **General Provisions**

7.      This Supplement and the Proof of Claim represent all currently known claims of LI against FTXTL. To the extent there are additional claims that subsequently become known to LI arising from the Agreement, the Relationship Documents, or otherwise, such claims are deemed included in the Claim and this Supplement and any other supplements or amendments hereto.

8.      The Proof of Claim and this Supplement serve, and are intended to serve, as a notice of a claim for any amount due or to become due from FTXTL under the Agreement or any of the Relationship Documents, whether or not summarized or identified specifically in the Proof of Claim and/or this Supplement, and all interested parties are on notice thereof.

9.      In filing the Proof of Claim and this Supplement, LI does not waive his right, title or interest to any other amounts that LI may be entitled to receive under the Agreement or the Relationship Documents, applicable law, in equity, or otherwise.

10.     LI reserves the right to amend or supplement the Proof of Claim and this Supplement at any time and in any and all respects, including, without limitation, for the purpose of:   (a) asserting additional, supplementary or amended proofs of claim based on events, information and/or documents obtained through discovery or otherwise of changing the basis or the amount of the Claim described in this Supplement, including, without limitation, professional fees, expenses and other costs that LI incurred in connection with the filing of the Proof of Claim and this Supplement; (b) further describing the Claim; and (c) providing further evidence of the Claim.

3

11.    The Proof of Claim and this Supplement are not intended and shall not be construed to be an election of remedies, waiver of any past, present or future breaches, defaults, or events of default, or a limitation of any rights, remedies, claims, or defenses of LI, including, but not limited to, LI's right:  (a) to have final orders in non-core matters entered only after *de novo* review by the District Court; (b) to trial by jury in any proceeding so triable in the Chapter 11 Cases or any case, controversy, or proceeding related to the Chapter 11 Cases or to invoke the dispute resolutions provision of the Agreement; (c) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or (d) to any other rights, claims, actions, set-offs, or recoupments to which LI are or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, set-offs, and recoupments LI expressly reserves and preserves.

12.    The Proof of Claim and this Supplement do not encompass claims that LI may have that arose after the Petition Date and that are entitled to an administrative expense priority, and LI expressly reserves and preserves his rights to file such claim or any similar claim at the appropriate time.

[*Text Continued On Next Page*]

4

13.    All notices concerning the Proof of Claim shall be sent to:

Morrison Cohen LLP
Attn: Heath D. Rosenblat, Esq.
Attn: Jason P. Gottlieb Esq.
909 Third Avenue, 27th Floor
New York, New York  10022

Telephone:  (212) 735-8600
E-mail:  hrosenblat@morrisoncohen.com
E-mail:  jgottlieb@morrisoncohen.com

5

FTX Non Customer Proof of Claim Form

## Confirmation of Submission

### Your Form has been successfully submitted...

DOCUMENT ID

5c0ab0ec7a56b92181db137e7c2c30ba192dc2a6

Submitted Date Time

2023-06-30T15:32:26.784Z

Status

Submitted

CONFIRMATION ID

3265-69-OESTC-677377750

## Submission Information

When you press "Submit" you will receive an email from "noreply.efiling@ra.kroll.com." Please add this email to your allowed senders list. This email will have a PDF copy of your claim filing (with your supporting documents as a separate attachment), as well as your Confirmation ID.

Orbeon Forms 2022.1.3.202304130216 PE

# Exhibit V
# Robin Matzke Proof of Claim

# FILED UNDER SEAL
# PURSUANT TO COURT ORDER