DocuSign Envelope ID: 26AC5B66-45BG-417G-908B-D0FC1AA3SC37

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors.[1] | (Jointly Administered) |

## DECLARATION OF STEPHEN HOUSEMAN KC

I, Stephen Houseman KC, state as follows:

### Introduction

1.      I am a barrister and one of His Majesty's Counsel in independent practice in England & Wales.  I was Called to The Bar in November 1995 and took silk (Queen's Counsel) in March 2013, becoming King's Counsel upon the accession of King Charles III upon the death of The Late Queen Elizabeth II in September 2022.

2.      I have been requested by Sullivan & Cromwell LLP to provide this declaration containing my opinion on aspects of Antiguan law (as defined below) in light

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

of and in response to the Declaration of Craig L. Jacas dated 26 October 2023 ("**Jacas Declaration**").  The Jacas Declaration has been filed in support of a motion to dismiss ("**Motion to Dismiss**") the bankruptcy case of FTX Trading Limited ("**FTXT**") initiated by petition filed on 11 November 2022 ("**Petition**").

3.    I set out below my professional experience which is relevant to my qualification to opine on such matters.

Professional Experience

4.    I have been a member of Essex Court Chambers in London for my entire professional life, commencing on 1 January 1997.  My practice involves a broad range of international commercial and modern chancery disputes as summarised in my current curriculum vitae attached as **Exhibit A**.  I have a separate profile for other specialist injunctive and arbitral challenge work which I do not exhibit.

5.    I have been admitted or registered as advocate in a number of jurisdictions around the world, including: British Virgin Islands, Cayman Islands, St. Lucia, Antigua & Barbuda, Singapore International Commercial Court (SICC), Dubai International Financial Centre (DIFC), and Isle of Man.  For simplicity I refer to Antigua & Barbuda as 'Antigua' and hence refer to 'Antiguan law' as shorthand.

6.    I was admitted as an Attorney-at-Law in the Eastern Caribbean Supreme Court ("**ECSC**") in Antigua in 2018.  The admission was licensed in order that I could act as lead advocate representing the claimant (minority shareholder) in an action against a company in the High Court in the case of *1Globe Capital LLC v. Sinovac Biotech Limited* (ANUHVC 2018/0120) ("**Sinovac**").  That action was

brought pursuant to s.122 of the International Business Corporations Act (Cap.122) Revised Laws of Antigua & Barbuda 1992 ("**IBCA**").

7.  The *Sinovac* case remains pending before the Judicial Committee of the Privy Council ("**JCPC**") in the United Kingdom.  This follows a decision of the Eastern Caribbean Court of Appeal ("**ECCA**") in December 2021 dismissing my client's appeal, then ECCA's own grant of (conditional, which became unconditional) leave to appeal in February 2022 and subsequent grant of special leave to appeal on separate issues by the JCPC.  I no longer represent the appellant/claimant after a change of instructing solicitors and hence leading counsel during 2022.

8.  I represented the claimant at trial and on appeal before the ECCA in the *Sinovac* case during mid-2018 to mid-2022, leading Lenworth Johnson and Andreen Vanriel of the Antiguan Bar.  I note that Mr Jacas attended in person on a "*watching brief*" on behalf of certain identified Interested Parties both at first instance (December 2018) and the substantive appeal hearing (September 2019).  I am not aware of whether he was permitted to attend the contested leave to appeal motion that was determined at a further contested oral hearing in February 2022.

9.  I attach a copy of each judgment for reference: see **Exhibit B** ("**Trial Judgment**") and **Exhibit C** ("**Appeal Judgment**").  A summary of the ECCA's grant of leave to appeal in February 2022 is publicly available by searching the name "*Sinovac*" on my chambers' website (*www.essexcourt.com*); but is not exhibited hereto.

10. The *Sinovac* case marked the first time that important sections of the IBCA had been considered judicially in Antigua: see Trial Judgment [16]; Appeal

Judgment [25], [30].  The IBCA is modelled closely on the Canadian equivalent legislation.  Although the statute refers to a "*corporation*", I use the phrase 'Antiguan company' to mean the same thing in this Declaration.

11.     The main issues in *Sinovac* concerned the interplay between common law and statute in the context of notification of shareholder meetings and amendments to motions for (re-)election of directors of a company registered in Antigua. Certain issues engaged provisions of the International Business Corporation Regulations 1985 (S.I. No.43 of 1985) ("**IBCR**") made pursuant to delegated legislative power contained in the IBCA.  The main issue, however, concerned the effect of s.71 IBCA.

12.     These central issues were certified by the Court of Appeal, comprising the Chief Justice of the ECSC (The Hon. Dame Janice Periera, DBE) and two other Justices of Appeal, as being of "*great general or public importance*" in accordance with s.122(2)(a) of the Constitution.  I understand that it is very rare for leave to be granted on this ground in respect of a dispute about company or commercial law.

13.     The JCPC itself later granted special leave to appeal on a distinct challenge to the validity of the board's adoption of a defensive shareholder rights plan - known colloquially as a 'poison pill'.  This special leave was granted on the basis of detailed grounds which I prepared and signed as leading counsel in April 2022.  That analysis concerned the scope of powers of the board of directors by reference to provisions of the IBCA as well as the articles and by-laws of the Antiguan company.  When the appeal is heard and determined by the JCPC it will be the first time that such analysis has been conducted in respect of a 'poison pill' defensive rights plan by an appellate court sitting in the UK.  The issue turns on scope of delegated authority to statutory directors.

14.   I understand that *Sinovac* is one of the leading authorities on the approach to interpretation of the IBCA, including the relationship between its provisions and common law (including equitable) principles as applicable to companies and corporate contexts. I am aware of international media interest in that litigation - some of which concerns the fact that the company itself developed one of the most widely-used vaccinations for Covid-19. There was parallel litigation in Delaware concerning the disputed effect of the 'poison pill' rights plan.

15.   In addition to my practice as a barrister, I was appointed as a Deputy Judge of the High Court in November 2019 by the Lord Chief Justice of England & Wales. My appointment covers both the Chancery Division, where I have sat in the Business List, Insolvency & Companies Court, Property Trusts & Probate List; and (what is now) the King's Bench Division, where I am authorised by the Lord Chancellor and Lord Chief Justice to sit in the Commercial Court. I sit regularly in this capacity as well as taking appointments in international arbitration.

16.   I believe that my close familiarity with the IBCA and IBCR from involvement as lead advocate in *Sinovac* in Antigua during 2018-2022, as well as my experience over 26 years in practice and over four years sitting as a Deputy High Court Judge in London, qualify me to give this opinion on Antiguan law.

17.   I give this opinion on identified aspects of Antiguan law on behalf of FTXT. I have assumed for present purposes that Antiguan law is applicable for such purposes, this being a matter for the Court applying its own private international law rules and principles: cf. Jacas Declaration, paragraph 7.

18.    It is not clear from Mr Jacas's exhibited CV whether he has acted as an attorney or undertaken academic research or published writing concerning the IBCA.

Jacas Declaration: Summary

19.    The focus of the Jacas Declaration is the validity of the Omnibus Authority (so defined by him in paragraph 14.c.) as a matter of Antiguan law.   For completeness I attach a copy of the document entitled "*Omnibus Corporate Authority*" dated 10 November 2022 (**Exhibit D**).  I too refer to this instrument by its given title, i.e. Omnibus Corporate Authority.

20.    At paragraph 23 Mr Jacas opines that the Omnibus Corporate Authority was invalid according to Antiguan law.  Mr Jacas accordingly concludes that John J. Ray III ("**JR**") was not validly appointed as CEO of FTXT by Samuel Bankman-Fried ("**SBF**") and, therefore, had no corporate authority to cause the company to petition for bankruptcy in the US courts on 11 November 2022 (which he defines as the Petition Date).

21.    The basis for this opinion is a purported, but inaccurate, summary of the relevant factual position (paragraph 14) and an overview of selected provisions of the IBCA (paragraphs 18 to 22).  A total of 10 sections or sub-sections from the IBCA are identified by Mr Jacas, one of which - s.175(a), as paraphrased in paragraph 21 - involves a definition.  No reference is made to the Articles of Association of FTXT dated 18 January 2022 ("**Articles**") or the company's By-laws as last amended on 19 March 2019 ("**By-laws**").   I attach these constitutional documents together as **Exhibit E**.

22.    The purported statutory position is introduced in paragraphs 16 and 17 of the Jacas Declaration.  I agree with those two broad propositions as a matter of

6

Antiguan law in so far as they go, and subject to two important observations or qualifications at this stage.  In particular:

a.    First, as the statement in paragraph 16 makes clear and as further evidenced by Mr Jacas' own citation of authority in his footnote 1 and paragraph 22, the common law permeates the relationship between a company, its directors and shareholders.  (I use 'common law' to denote principles of equity, obviously.)  I disagree with the prior assertion by Mr Jacas - as contradicted by his own later citation of authority - that the IBCA somehow ousts the common law altogether save as "*interpretative guidance in instances of ambiguity*": cf. Jacas Declaration, paragraphs 8 and 9.  I observe that Mr Jacas mentions no ambiguity in any of the statutory sections he identifies.

b.    Secondly and relatedly, it is not correct to assume that the IBCA alone contains an exhaustive code as to the circumstances in which authority may be delegated to or through one of more directors or officers of an Antiguan company, let alone the circumstances in which any formal defect in delegation of authority may be challenged or corrected, still less the range of legal effects of such circumstances.  These matters are governed by the company's internal contractual instruments, its Articles and By-laws, as well as general principles of common law.

23.    I do not propose to explain at length in this Declaration why I disagree with the broad proposition made by Mr Jacas as to the limited role or admissibility of common law in the context of matters covered by the IBCA.  This is because I do not understand that sweeping juridical proposition to underpin his own conclusion in this instance; added to the fact that Mr Jacas cites common law

authority in the absence of any alleged ambiguity in the statutory provisions he himself has identified.

24.     The key point to note in this context is that English common law applies (i.e. "*is in force*") in Antigua "*so far as it stands unaltered by any written Laws of these Islands, or some of them*" according to section 2 of the Common Law (Declaration of Application) Act 1705, Cap.92 ("**1705 Act**"): see <u>**Exhibit F**</u>.  It is only where a local statute modifies or supplants the common law that it is excluded.  There is nothing in the IBCA which suggests that this is the case for delegation of corporate authority to or within a board of directors or upon a senior corporate officer such as a Managing Director ('MD' for short) or Chief Executive Officer 'CEO' for short).  Indeed, the *Sinovac* case illustrates how common law applies even where a section of the statute regulates a specific aspect of the constitutional relationship, i.e. notice of meetings.  Positive prescription by statute does not imply ouster.

<u>Relevant Factual Position</u>

25.     The summary contained in paragraph 14 of the Jacas Declaration is materially inaccurate and incomplete.  I base this statement and my legal analysis upon the factual position set out in the Declaration of Edgar W. Mosley III, a final draft version of which I have been shown in preparing this opinion ("**Mosley Declaration**").

26.     I proceed on the following factual basis:

   a.     Prior to its financial difficulties, there was no history of FTXT operating in accordance with its Articles and By-laws.  There is no evidence that

regular (or any) board meetings were held.  Instead, there is evidence that FTXT was under the *de facto* sole control of SBF alone.

b.    SBF held himself out to third parties and to the other directors at all material times and for all practical purposes as the CEO and/or MD of FTXT, including his unilateral execution of contracts in the name of FTXT.  SBF exercised this functional dominion over the affairs of the company irrespective of (and prior to) his appointment as a statutory director.  In particular, during a period from at least 15 April to 27 November 2019, when he was not registered as a statutory director of FTXT, SBF unilaterally entered into contracts on behalf of and binding on FTXT in the exercise of such sole executive function.

c.    The other directors of FTXT acquiesced in and endorsed SBF conducting himself in this way and FTXT functioning as a corporate entity through SBF in this manner.

d.    SBF was the sole director of FTXT at the date of both the Omnibus Corporate Authority and the filing of the Petition.  His pre-existing co-director, Mr Singh, had unequivocally resigned his directorship of FTXT by email on the morning of 10 November 2022, the day prior to the date of execution of the Omnibus Corporate Authority.  Accordingly, paragraph 14.h. of the Jacas Declaration is not accurate in stating that there were four directors at the time of execution of the Omnibus Corporate Authority and/or the Petition Date.

e.   At the time of the Omnibus Corporate Authority and the filing of the Petition, FTXT was in a dire financial position requiring emergency action for the protection of creditors.

f.   On 21 November 2022, Paper Bird Inc. (majority shareholder with over 80% of the issued shares in FTXT) executed a document entitled "*Action By Consent of the Shareholder*" ("**21 November Shareholder Resolution**") by which it consented to and ratified matters including the appointment of JR as CEO of FTXT; the appointment of new directors; and the filing of the Petition for Chapter 11 bankruptcy (**Exhibit G-1**).  Notice of the same and other relevant steps was given to all shareholders on 14 December 2022 (**Exhibit G-2**).

g.   Gruhn and Matzke, following notification of the Chapter 11 proceedings, each submitted a proof of claim against FTXT in accordance with applicable procedures.  They did not object to the corporate authority behind the decision to place the company into Chapter 11 process until much later, following a related claim made against them within such proceedings.

The Authority Issue

27.  The issue is whether, as a matter of Antiguan law, SBF had authority as a matter of Antiguan law to appoint JR as CEO of FTXT pursuant to the Omnibus Corporate Authority and delegate to him the powers set out in that document, in particular the power to file the Petition.  I refer to this as the "**Authority Issue**".

28.     In my view, based on the facts set forth in the Mosley Declaration, there are at least three bases on which SBF had authority to appoint JR as CEO of FTXT and delegate to him the power to file the Petition:

a.      SBF had actual formal (i.e. constitutional) authority to do so, because he was sole director of FTXT at the relevant time and duly empowered to act for the company both ordinarily and in such extra-ordinary circumstances (see paragraphs 30 to 33 below: "**Formal Authority**"); alternatively

b.      SBF had actual implied authority to do so, by reason of his consistent functional dominion over corporate affairs acting as *de facto* MD and/or CEO of FTXT (see paragraphs 34 to 41 below: "**Implied Authority**"); alternatively

c.      JR's appointment as CEO and the delegation to him of relevant authority by SBF may, in any event, be deemed valid in accordance with section 81 IBCA (see paragraphs 42 to 46 below: "**Statutory Validation**").

29.     If all three of the above theories were to be rejected by the Court, it is nevertheless the case that, as a matter of Antiguan law:

a.      FTXT may validly ratify the Omnibus Corporate Authority and all steps taken pursuant to it by JR as CEO after the event (paragraphs 0 to 52 below: "**Ratification**"); and

b.      The movants in the Motion to Dismiss may be precluded from contending that the Chapter 11 petition was filed without the authority

or approval of FTXT due to their own delay in raising the point after having themselves made proofs of claim against FTXT (paragraphs 53 to 59 below: "**Preclusion**").

Formal Authority

30.    SBF was a statutory director of FTXT at all material times.  At the time of executing the Omnibus Corporate Authority, he was the <u>sole</u> director of the company following Mr Singh's resignation (see paragraph 26.d. above). Further:

    a.    Such resignation was effective immediately without need for an 'ink signature' under Antiguan law: see section 69 IBCA; By-laws 4.4.2(c) and 18.7.

    b.    FTXT was permitted to function with a minimum of one director: see Article IV and By-law 4.2.

    c.    The business and affairs of FTXT were to be managed by its "*directors*" (By-law 4.1) or "*Board of Directors*" (Article IV).  In this context, the plural includes the singular where there happens to be a single or sole director: see section 370(i) IBCA.

    d.    A sole director may constitute a board meeting (s.78 IBCA) or pass a written resolution which is valid as if passed at a board meeting (By-law 6.5).

    e.    The directors, including sole director, may delegate all of the board's powers to a single director to act as MD: see s.80 IBCA and Article IV (addressed below in the context of Implied Authority).

    f.    The Articles and the By-laws further provide for delegation of powers by the board of directors to an "*officer*", who may be an individual who is not a statutory director: see sections 2(1)(k) and 93 IBCA and By-laws 11.1, 11.4 and 11.12 (also addressed further below).

    g.    By-law 20.1(b) also empowers the directors to authorise agents to sign documents on behalf of FTXT.

31.    In light of this clear legal position, I conclude that SBF constituted the board of FTXT at the material time. In that capacity he held full formal authority to appoint JR as CEO and authorise him to take steps such as placing the company into Chapter 11 proceedings (see paragraph 21 of the Jacas Declaration). The Omnibus Corporate Authority was an exercise of such board power, being in the nature of a written resolution of the sole director (and hence statutory board) on behalf of FTXT. Such resolution was, therefore, valid according to Antiguan law.

32.    The contrary conclusion expressed by Mr Jacas is premised on a misconception as to the literal (i.e. plural) meaning of "*directors*" as it appears in some operative sections of the IBCA, coupled with or flowing from a factual misapprehension as to the number of directors of FTXT at the material time. As explained above, the statutory and constitutional framework applicable to this legal analysis makes it clear that the execution of the Omnibus Corporate Authority by SBF as sole director of FTXT constituted valid action of the FTXT board under both the IBCA and the Articles and By-laws.

33.  This *de jure* position is the short and complete answer to the authority issue as a matter of Antiguan law.  I cover the alternative theories below for good measure and so as to assist the Court.

## Implied Authority

34.  There is no documentary evidence showing that, during those periods where he was not the sole statutory director of FTXT, SBF was explicitly delegated powers by the board of FTXT or that he was formally appointed as MD or CEO or any other position as a matter of *de jure* capacity.

35.  The general rule is that, absent proper delegation, (i) the act of one director (in a context where a board of directors is constituted of two or more persons) does not bind the company (*Gore-Browne on Companies* at para 14[2] **Exhibit H**)); (ii) if a board constituted of two or more directors wants to delegate its powers it should do so by a resolution – a director cannot self-authorise himself to act for the company (*Mitchell & Hobbs v. Mill* [1996] 2 BCLC 102 (**Exhibit I**)); and (iii) where the board consists of two individuals and a resolution requires a majority to pass, in the absence of any 'tie-break' provisions in the Articles or By-laws it will require both directors to vote in favour (see, by analogy, *Hood-Barrs v. IRC* [1946] 2 All ER 768 at 770 (**Exhibit J**)).

36.  However, in my view the facts set out above (in particular paragraphs 26.a to 0. above) would establish, even in the event that SBF were not the only statutory director of FTXT at the date of the Omnibus Corporate Authority, that SBF had actual implied authority to act unilaterally on behalf of FTXT without the need for such acts to be formally approved at a board meeting.

37.   <u>First</u>, the IBCA, the Articles and By-laws establish that it was within the powers of the board of directors of FTXT to appoint one of their number as "*Managing Director*" whose acts would then be treated for all purposes as the acts of the board, and it was also possible for the board to delegate its powers to an individual who was not a director:

a.   Article IV of FTXT's Articles provides: "*The powers of the Company shall be exercised by the Board of Directors of the Company, which shall be empowered to name one or more Managing Directors. <u>Subject to any restrictions in the appointing resolution, an act of a Managing Director shall bind the Company as if the said act had been approved by the Board of Directors</u>. Only a member of the Board of Directors shall serve as a Managing Director…*" That reflects section 80(1) IBCA, which gives the directors power to "*appoint from their number a managing director or a committee of directors and delegate to the managing director or committee any of the powers of the directors*." By-law 11.7 provides that the directors may delegate powers to a "President" who shall be "*Chief Executive Officer, Managing Director*" *of the company*". I take the view that, as a matter of interpretation, the terms "Chief Executive Officer", "President" and "Managing Director" are used interchangeably such that an individual who is appointed as the "Chief Executive Officer" should be treated for the purposes of the Articles, and in particular Article IV, as the "Managing Director".

b.   The Articles and the By-laws further provide for delegation of powers by the board of directors to an "officer", who may be an individual who is not a statutory director: see sections 2(1)(k) and 93 IBCA and By-laws 11.1, 11.4 and 11.12.

38.     Accordingly:

    a.      It was open to the board, subject to section 80(2) IBCA, to delegate all of its powers: (i) to one director as "Managing Director" under Article IV and/or section 80(1) IBCA; or (ii) to any "*officer*" (who did not have to be a statutory director) under By-laws 11.4, 11.12 and section 93(a) ICBA.

    b.      It would have been open to the board of FTXT to designate JR as CEO and delegate to him the powers "*capable of delegation…including without limitation in connection with a voluntary filing for protection from creditors under Title 11…*"  Put another way, and for practical purposes, it was open to the board of FTXT to grant the Omnibus Corporate Authority to JR (subject to the non-delegable powers in section 80(2) IBCA).

    c.      If SBF was the "Managing Director" of FTXT then his acts would be treated as acts of the entire board.  Accordingly, if SBF was the MD then he was entitled to grant the Omnibus Corporate Authority and his action in doing so would be deemed to be an action approved by the entire board.

    d.      In this scenario, there would be a chain of delegation by which the board delegated its powers to SBF as MD and he in turn was entitled to delegate powers to JR on behalf of the board (again, subject to section 80(2) IBCA).

39.     <u>Second</u>, an individual director may be appointed as the MD, or delegated the powers of the board as if he was MD, without a formal resolution.  There are different bases or doctrines at common law:

a.  <u>Implied actual authority</u>: It is possible for an agent of a company to have implied actual authority as explained in <u>Hely-Hutchinson v. Brayhead</u> [1968] 1 QB 549 at 583 per Lord Denning MR (**<u>Exhibit K</u>**): "*…actual authority may be express or implied. It is express when it is given by express words, such as when a board of directors pass a resolution which authorises two of their number to sign cheques. <u>It is implied when it is inferred from the conduct of the parties and the circumstances of the case, such as when the board of directors appoint one of their number to be managing director. They thereby impliedly authorise him to do all such things as fall within the usual scope of that office</u>...*" (emphasis added).  The principle is well-established that a director of a company may derive his authority not from any formal resolution, but from "*the conduct of the parties and the circumstances of the case*": see <u>Bowstead & Reynolds on Agency</u> (22nd ed. 2020) at 3-043 (**<u>Exhibit L</u>**); <u>New Falmouth Resorts v. International Hotels Jamaica</u> [2013] UKPC 11 at [13]-[22].  (**<u>Exhibit M</u>**).  <u>Gore-Browne on Companies</u> at para. 8[18], relying on <u>Hely-Hutchinson</u>, states that "*failure to exercise the power to delegate may be overcome by implied actual authority from the board allowing one of its number to operate as though he has an executive position*" (**<u>Exhibit H</u>**).  In these cases, the director who is impliedly authorised to act on behalf of the company is sometimes described as a "*de facto managing director*" (see, in Australia, <u>Brick and Pipe Industries v. Occidental Life</u> (1992) 10 ACLC 232 (**<u>Exhibit N</u>**)).  Whether a statutory director has implied actual authority, or is a "*de facto managing director*", is a question to be determined on the facts of the case.

b.  <u>'Duomatic principle'</u>: Another way of approaching that issue is by reference to the so-called Duomatic principle: "*where it can be shown that the shareholders who have a right to attend and vote at a general meeting of the*

company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be" *Re Duomatic* [1969] 2 Ch. 365 at [373] (**Exhibit O**). Importantly, the directors may bind the company by exercising their powers informally outside a board meeting provided <u>all</u> the directors have assented to or acquiesced in the relevant decision: see *Barron v. Potter* [1914] Ch. 895 (**Exhibit P**); *Hunter v. Senate Support Services* [2005] EWHC 1085 (Ch); [2005] 1 BCLC 175 at [103]: "*That directors, provided they act unanimously, can act informally appears clearly established*" (**Exhibit Q**). Accordingly, it is open to the board informally to appoint an individual as MD or otherwise authorise him to act on behalf of the company. Whether that was the case is a question of fact.

c.  <u>Agency of necessity</u>:  Where an agent has been granted some actual authority on behalf of a principal, it may be that extreme circumstances necessarily require them to act in excess of that authority in order to preserve and protect the interests of the principal/company.  If it is impossible or impractical for the agent to obtain instructions from their principal; they act in a manner necessary to protect the principal; they act in good faith and in the best interests of the principal; and their acts are not contrary to any express instructions, then the principal will be bound by such acts, even though beyond the scope of original authority. This is referred to as the doctrine of 'agency of necessity': *Bowstead & Reynolds* at 4-001*ff* (**Exhibit L**). In effect, the agent's authority is extended by the circumstances in which they finds themselves (indeed, it may be better to view 'agency of necessity' as a situation in which the agent had actual implied authority to act: *Goff & Jones: The Law of Unjust Enrichment* (10th ed. 2022) at 18-48. (**Exhibit R**).

40.   <u>Third</u>, the salient facts, if proved, would establish that SBF was the "*de facto managing director*" of FTXT at all material times: see, in particular, paragraph 26.a. above.  As to this characterisation:

a.     I consider the facts of this case to be analogous to those in <u>Hely-Hutchinson</u>.  In that case Mr Richards was found to have authority to enter into contracts on behalf of the company which was "*implied from the conduct of the parties and the circumstances of the case.*"   In particular, he habitually or consistently: (i) made the final decision on any matter concerning finance; (ii) committed the company to contracts without board approval, reporting to the board afterwards at which point the board acquiesced; and (iii) his position was "*as de facto managing director*". In this case, the facts as set out in the Mosely Declaration show that SBF exercised complete control over the affairs of FTXT and habitually held himself out, and operated as, the sole director and/or Chief Executive Officer of FTXT with the acquiescence of the board of directors and FTXT's shareholders.

b.     The facts are also broadly analogous with those in <u>Brick and Pipe Industries v. Occidental Life</u> (1992) 10 ACLC 232 (**Exhibit N**).  There the director was found to be the "*alter ego of each of*" the companies in a group; he made "*all the relevant decisions*"; and the other directors acquiesced in this course of conduct.  That was said to amount to a finding that the director had actual authority to manage the business of the company and, accordingly, authority to cause it to enter into the transactions.

41.   <u>Fourth</u>, accordingly, SBF had (actual implied) authority from the board to act as MD, and to do anything the board could have done.  His acts were acts of the company.  As noted above, under the By-laws it was open to the board to appoint JR as CEO and delegate to him the power to file the Petition.  It follows that SBF, acting as MD, had the same power to appoint JR as CEO and delegate to him the power to file the Petition.  Those provisions of the Omnibus Corporate Authority by which SBF appointed JR as CEO and authorised him to the Petition should be treated as valid acts of FTXT, in my opinion.

<u>Statutory Validation: s.81 IBCA</u>

42.   In my view, section 81 IBCA can operate to validate JR's appointment as CEO <u>even if</u> (contrary to the above analysis at paragraphs 30 to 33) there were some irregularity affecting it.

43.   Section 81 IBCA provides: "*An act of a director or officer is valid notwithstanding any irregularity in his election or appointment or any defect in his qualification*".

44.   The equivalent provision in the Companies Act 2006 is section 161.[2]   A provision in materially this form has been part of English companies legislation since at least 1862.

---

[2]    Section 161(1): "*The acts of a person acting as a director are valid notwithstanding that it is afterwards discovered— (a) that there was a defect in his appointment; (b) that he was disqualified from holding office; (c) that he had ceased to hold office; (d) that he was not entitled to vote on the matter in question*"

45.    I draw attention to the following principles in respect of the operation of this statutory provision, by reference to the case law under the equivalent provision in England:

a.    The effect of the English provision was summarised in *Buckley on the Companies Act* at para [358] (**Exhibit S**) as follows: *"Endangering accuracy for the sake of brevity, it may be said that the effect of this section is that, as between the company and persons having no notice to the contrary, directors, etc., de facto are as good as directors, etc., de jure."*

b.    The purpose of the provision was described in *Channel Collieries Trust v. Dover* [1914] 2 Ch. 506 at 515 (**Exhibit T**) as follows: *"Common sense really requires that there shall be some provision giving legal effect to acts in respect of which there is a technical informality because some slip has been made, where the acts have been done in good faith and where the slip has occurred because the parties have not had present to their minds the legal difficulties in the way of doing what they honestly think they are entitled to do."*

c.    It has been said that the section may validate acts in respect of the internal affairs of the company, such as making calls on members which are approved by directors with defective appointments (see *Dawson v. African Consolidated Land* [1898] 1 Ch. 6 (**Exhibit U**); *Gore-Browne* at 14[6] (**Exhibit H**); *Buckley* at [368]-[369] (**Exhibit S**). It may be invoked by the company when faced with an allegation from third parties that a particular act of the company was invalid because the director's appointment or qualification was defective as was the case in e.g. *Dawson* and in *Channel Collieries v. Dover*).

DocuSign Envelope ID: 26AC5B66-45BC-417C-080B-D9F61AA8CC37

d.   The section applies only where there is a defect in an appointment made by persons who had the ability/authority to make the appointment had they complied with proper procedures, and does not apply to appointments made by persons without authority to make the appointment.  To take an extreme example: three strangers cannot walk into a company board room and purport to pass a resolution, and then contend that, although they were never appointed as directors, the resolution is nevertheless valid.  The point was made in *Morris v. Kanssen* [1946] AC 459 at 471 per Lord Simonds (**Exhibit V**).

46.   Section 81 may operate to validate JR's appointment and acts as CEO such as to bind FTXT even if, contrary to my views above, SBF lacked actual (i.e. formal or implied) authority to appoint him and empower him through the Omnibus Corporate Authority.  In particular:

a.   Section 81 applies to the acts of an "*officer*" notwithstanding any "*irregularity in his…appointment*".  Assuming SBF had not been formally appointed as MD, that defect in SBF's own prior appointment would infect JR's appointment as CEO - effectively, a chain of defective or irregular appointments (akin to *nemo dat quod non habet* in equity).  In my view, section 81 should be held by an Antiguan Court to cover a situation in which an officer is appointed by a board which is not quorate, or where the director approving the officer's appointment has not formally had delegated to him by the board the power to make the appointment but the board would have formally delegated such power if the omission had been pointed out.

b.    Further, if for any reason there was some procedural irregularity in the Omnibus Corporate Authority, it is arguable in such a situation that JR's appointment and corporate acts should be held to be valid in accordance with section 81 IBCA.

<u>Ratification</u>

47.    In general, where an agent of the company (including a director) acts in excess of their authority, the agent's acts may be ratified by the company *qua* principal either by way of a board resolution or shareholders' resolution.   There is no fixed or formal time limit on when such ratification can occur.   There are some acts which are not capable of ratification, such as illegal transactions or transactions in breach of the companies legislation.   Those categories are not relevant here, in my opinion.

48.    In <u>*New Falmouth*</u> (cited above) it was held that a sale of land by the company executed by a director in excess of his authority (and without board approval at the time) was ratified at a subsequent board meeting.   The JCPC concluded at [30]: "*The Court of Appeal was, therefore, correct to decide that "the acts of an agent on behalf of the principal outside his actual authority may be adopted and ratified" and that "if there is ratification, it has retrospective effect, i.e. it renders the transaction with the company binding on it from the time it was entered into by the agent."*"

49.    The ability of a company to ratify acts done purportedly on its behalf is summarised in <u>*Bowstead & Reynolds on Agency*</u> (**Exhibit L**) at 2-069: "*An act or transaction done or entered into on behalf of a company may be ratified by the directors,*

*if they have power to do or enter into such an act or transaction on behalf of the company: and a ratification by the directors may be implied from part performance made or permitted by the company. Where an act or transaction is beyond the powers of the directors, it can only be effectively ratified by the shareholders. An act done by the directors in excess of their powers, but within the scope of the articles of association, may be ratified by ordinary resolution of the shareholders, or by an informal meeting of all the shareholders. A number of cases go further and indicate that a ratification by the shareholders may be implied if they can be regarded as having acquiesced in such an act with knowledge of the circumstances, even in the absence of a formal meeting.*"

50.    Ratification may be express or implied.  Express ratification of a particular act would require a resolution of the board or an ordinary resolution of the shareholders at a properly convened shareholders' meeting.  Implied ratification is based on the conduct of the company.  The conduct of the company may amount to ratification if the company has knowledge of the essentials of what the agent has done, even if the company did not know that the agent had acted without authority: see <u>Bowstead & Reynolds</u> at 2-07 (**Exhibit L**).

51.    Ratification has retrospective effect.  It renders the transaction with the company or the relevant act binding on the company as from the time it was entered into by the agent:  <u>Gower's Principles of Modern Company Law</u> (10th ed.) at 8-028 (**Exhibit W**).

52.    Subject to any restrictions on the ability of shareholders to pass resolutions while the company is subject to Chapter 11 proceedings, it should still be possible for the shareholders of FTXT to ratify the Omnibus Corporate Authority and the decision to file the Chapter 11 petition as a matter of

Antiguan law. That would require a properly convened shareholders' meeting to be called, observing the relevant notice periods provided for in the Articles and By-laws, and for the resolution ratifying those matters to be passed by the requisite majority of shareholders in compliance with applicable formalities. This can take place if, for example, it were found or assumed that the 22 November Shareholder Resolution (as notified to shareholders) was not a valid express or implied ratification pursuant to Antiguan law by reference to the principles summarised above.

## Preclusion: Estoppel & Laches

53. As a matter of Antiguan law, a party may be precluded from arguing that a particular corporate act is void or invalid if, in all the circumstances, it would be unjust to permit them to do so. I set out below, in broad terms, the equitable doctrines which may apply. I appreciate that it is a matter for the Court as to whether it looks to Antiguan law on such preclusive concepts, or regards them as procedural and therefore subject to its own *lex fori* principles.

54. In *The Indian Endurance & The Indian Grace* [1998] AC 878 (HL) at 913-4 (**Exhibit X**) Lord Steyn described estoppel by convention as follows: *"an estoppel by convention may arise were parties to a transaction act on an assumed state of facts or law, the assumption being either shared by them both or made by one and acquiesced in by the other. The effect of an estoppel by convention is to preclude a party from denying the assumed facts or law if it would be unjust to allow him to go back on the assumption."* In *ING Bank v. Ros Rosa* [2012] 1 WLR 472 at [66] (**Exhibit Y**) Carnwath LJ distilled the relevant questions as follows *"(i) was there a relevant assumption of fact or law, either shared by the two parties, or made by [A] and*

*acquiesced in by [B]; (ii) If so, would it be unjust (or "unconscionable") to allow [B] to go back on the assumption?"*

55.  The equitable doctrine of laches applies where B has so delayed bringing his claim for relief against A that in all the circumstances it would be inequitable to grant the relief to B.  It usually requires A to have acted to its detriment in the period of the delay.  It is a fact-sensitive question whether equity will bar a remedy on the basis of delay or laches.

56.  In *Re Bailey, Hay & Co. Ltd.,* at 1367-8 (**Exhibit Z**) Brightman J relied on the following summary of the principles: "*The doctrine of laches in courts of equity is not an arbitrary or a technical doctrine. Where it would be practically unjust to give a remedy, either because the party has, by his conduct done that which might fairly be regarded as equivalent to a waiver of it, or where, by his conduct and neglect he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterwards to be asserted, in either of these cases lapse of time and delay are most material. But in every case if an argument against relief, which otherwise would be just, is founded upon mere delay, that delay of course not amounting to a bar by any statute of limitations, the validity of that defence must be tried upon principles substantially equitable. Two circumstances always important in such cases are the length of the delay and the nature of the acts done during the interval, which might affect either party and cause a balance of justice or injustice in taking the one course or the other, so far as relates to the remedy.' I have looked in vain for any authority which gives a more distinct and definite rule than this; and I think, from the nature of the inquiry, it must always be a question of more or less, depending on the degree of diligence which might reasonably be required, and the degree of change which has occurred, whether the balance of justice or injustice is in favour of granting the remedy or withholding it. The determination of such a question must*

26

*largely depend on the turn of mind of those who have to decide, and must therefore be*
*subject to uncertainty; but that, I think, is inherent in the nature of the inquiry."*

57.    The doctrine has been applied to refuse an application to declare invalid a
purported resolution to wind up a company on the basis that the directors
lacked authority to pass it where it would be practically unjust to treat the
liquidation as void ab initio: see <u>Re Bailey</u>, supra., at pp.1367-8; and see <u>Re
Sherlock Holmes Society</u> [2017] EWCA Civ 1875] [2018] BCC 110 at [51]-[55]
(**Exhibit AA**).

58.    In light of the position summarised in paragraph 26.f. above, there are good
grounds on which, as a matter of Antiguan law, Gruhn and Matzke should be
precluded from contending that the Chapter 11 proceedings were not properly
authorised.  They have had a substantial period of time in which to raise the
*vires* challenge and failed to do so.  Instead, they have proceeded on the basis
or assumption – shared by FTXT and JR – that the Chapter 11 proceedings were
properly authorised and competently instituted, including by reference to
subsequent acts of (purported) ratification as described above.  They made it
clear that they shared that assumption by filing their claims in the bankruptcy
proceedings.

59.    It strikes me that this is a clear case in which respondents should be estopped
by convention from contending that the Chapter 11 was not properly
authorised by FTXT and/or they should be barred by the equitable doctrine of
laches from arguing that the Chapter 11 is void or of no effect.  The authority
challenge looks like tactical and unconscionable opportunism.

I declare under penalty of perjury of the laws of the United States of America that the foregoing in true and correct to the best of my knowledge, information, and belief.

DocuSigned by:

*Stephen Houseman*

D8B0032A1132460...

Stephen Houseman KC

Essex Court Chambers

24-28 Lincoln's Inn Fields

London WC2A 3EG

England, United Kingdom