**<u>EXHIBIT A</u>**

# ESSEX COURT CHAMBERS

BARRISTERS



## STEPHEN HOUSEMAN KC

Call: 1995 | Silk: 2013
shouseman@essexcourt.com

24 Lincoln's Inn Fields, London WC2A 3EG, UK
T +44 (0)20 7813 8000 | F +44 (0)20 7813 8080
DX 320 Chancery Lane
E clerksroom@essexcourt.com

## PROFESSIONAL PRACTICE

Described as the "*complete package*" and "*the best barrister I have seen on his feet*", the "*highly commercial*" and "*savvy*" Stephen Houseman KC handles a wide range of international commercial and corporate disputes across the spectrum of business and financial sectors. His silk practice has a focus on banking, finance & investment, shareholder & company disputes as well as specialist arbitration-related injunction work. Many of his cases are substantial and complex in nature, often involving multi-jurisdictional contexts or foreign law elements or interplay between arbitration and court. The international profile of Stephen's practice means he appears regularly in courts and tribunals around the world. He is admitted/registered in offshore jurisdictions including the Isle of Man, the Cayman Islands, St Lucia, Antigua & Barbuda, the British Virgin Islands, the Dubai International Financial Centre (DIFC) and the Singapore International Commercial Court (SICC) and their respective appellate courts.

As well as frequent engagement in interlocutory, jurisdictional and injunctive matters, for which he is so well-known, Stephen has been involved in heavyweight trials in the Commercial Court and Chancery Division throughout his 26 years in practice. He was lead advocate, instructed by Clifford Chance on behalf of a principal defendant, in a seven-week fraud trial in *Yukos Finance v. Lynch & others* during 2019. He leads a multi-set team of silk and junior counsel acting for the claimant in *ENRC v SFO & others (No.2)* which is set down for a seven-week trial in the Commercial Court in 2024.

Stephen sits as a Deputy Judge of the High Court in London, King's Bench Division (Commercial Court) and Chancery Division (Business List, Insolvency & Companies Court,

Property Trusts & Probate). He also acts as arbitrator in commercial disputes and has provided

expert evidence, including oral testimony, on English law in proceedings in foreign jurisdictions including Switzerland, Ukraine, USA and Canada.

Stephen has been recognised in the main legal directories in several practice areas: Commercial Dispute Resolution / Commercial Litigation; Banking & Finance; International Arbitration; Energy & Utilities; Insurance & Reinsurance; Offshore. He has attracted praise for his "*superb judgment*" as well as "*technical excellence … on complex points of law and contractual elucidation*". He is known for being "*very bright*", "*talented*" and "*strategically superb*"; an "*extremely clever*" all-rounder who "*focuses on the real issues, handles the client well and has a good sense of humour*".

Clients and observers have consistently praised Stephen for his abilities both inside and outside the courtroom. He is described as an "*exceptional advocate*", "*terrific cross-examiner*", "*great courtroom advocate*", "*a master of the courtroom*" with "*an extremely strong reputation in the commercial arena*"; an "*uber competent advocate*" who is "*very quick to spot the most pertinent points*" and who has an "*assertive and to-the-point approach*" when presenting cases on behalf of his clients. His style on his feet ensures that "*judges trust him*" and that he in turn "*can be trusted with the most difficult and sensitive of cases*". He is also recognised for his "*good strategic sense*" and "*exemplary judgement*" when advising and guiding on tactical aspects of complex proceedings. On a more personal level, market commentators describe Stephen as a "*delight to work with*", "*thorough and charming to deal with*" and "*utterly reliable*", reflecting his "*down-to-earth*" and "*good–humoured*" manner with judges, tribunals, clients and fellow professionals. He is acknowledged as a "*real team player*".

---

## SUMMARY OF PRACTICE

Stephen commenced practice in 1997. He took silk 16 years later in 2013 after taking two extended periods of paternity leave (amounting to a year) as a senior junior. His work over the last 26 years has evolved through a broad spectrum of international commercial disputes with a current emphasis on banking, finance & investment, shareholder & corporate disputes as well as specialist arbitration-related injunction work. His portfolio of reported and decided cases speaks for itself: it can be found online and is not summarised in this CV. Further details of specific experience in any particular practice area, economic market/sector or legal/procedural context can be provided upon request.

Stephen has noted and extensive experience of interlocutory, appellate and injunctive work, in particular arbitration-related anti-suit injunctions. Prominent recent cases have considered the arbitrability of foreign insolvency-related claims or procedures: see *Nori Holding v. PJSC Bank Otkritie Financial* Corp [2018] 2 Lloyd's Rep. 80 (Males J); *RiverRock Securities v. International Bank of St. Petersburg JSC* [2020] 2 Lloyd's Rep. 591 (Foxton J); *Louis Dreyfus Company*

*Suisse SA v. International Bank of St. Petersburg JSC* [2021] Costs L.R. 441 (Calver J). Others such as *C v. D* and *Sulamerica* (both Court of Appeal) are well-known to international arbitration practitioners. A separate up-to-date profile of Stephen's anti-suit and related injunction experience is available here.

Stephen's appellate work includes recent or pending cases in the Court of Appeal on substantive appeals from both Chancery Division (e.g. *Dinglis Management Ltd. & another v. Dinglis Property Ltd.* [2019] EWCA Civ 127) and Commercial Court (e.g. *Vale SA v. Steinmetz* [2021] EWCA Civ 1087); the Singapore Court of Appeal (*Singapore Airlines v. CSDS* [2022] SGCA (I) 3 in January 2022, on appeal from trial judgment [2021] SICC(I) 3); the Eastern Caribbean Court of Appeal (*1Globe Capital v. Sinovac* during 2019-2022 – appeal pending in Privy Council); *Xin Gang Power Investments v. Kenworth Industrial* (appeal from BVI Commercial Court in May 2023); and the Privy Council (e.g. *Airport Authority v. Western Air* [2020] UKPC 29).

In terms of 'big trial' experience, Stephen has been involved throughout his practice in high-profile and heavyweight battles. These include, as junior counsel, *ICS v. West Bromwich* (Chancery Division, 1998; equity release mortgages / lender's duty of care), *Society of Lloyd's v. Jaffray* (Commercial Court, 2000; asbestos-related liabilities / fraud claim), *Digicel v. Cable & Wireless* (Chancery Division, 2009) (interconnection of telecoms networks / conspiracy claim); and then, as junior silk together with David Foxton KC (now Mr Justice Foxton) in *BVG v. JP Morgan* (Commercial Court, 13 weeks during 2013; alleged mis-selling of credit default swaps) and *Dar Al Arkan* (Commercial Court, 10 weeks during 2015; conspiracy / misuse of confidential information in Islamic financing context). Stephen acted as lead counsel, instructed by Clifford Chance and leading Sebastian Isaac (appointed silk in 2022) on behalf of a principal defendant, in a seven-week fraud trial in the Commercial Court during 2019 in *Yukos Finance BV v. Lynch & others* (judgment of Sir Michael Burton GBE [2019] EWHC 2621 (Comm), one of The Lawyer's Top 20 Trials of the Year, rejecting all claims against the defendants relating to participation in an allegedly rigged auction of Yukos assets by the Russian State during 2007). He leads a multi-set team of silk and junior counsel acting for the claimant in *ENRC v SFO & others (No.2)* which is set down for a seven-week trial in the Commercial Court in 2024.

Stephen has been involved in a wide range of banking, finance and investment-related disputes with particular experience in bondholder/noteholder and trustee disputes: e.g. *Concord Trust v. Law Debenture Trust Corporation* [2005] 1 WLR 1591 (House of Lords); recent arbitral proceedings on behalf of note trustee (MadPac) in *Madison Pacific Trust Ltd. v. JSC Commercial Bank Privatbank* [2020] EWHC 610 (Ch); rectification claim concerning security instrumentation acting on behalf of defendant security agent in *FSHC Group Holdings Ltd. v. Barclays Bank plc* [2018] EWHC 1558 (Ch).

A noted trend within Stephen's silk practice has been increasing demand for his involvement in shareholder disputes, both onshore and offshore, court or arbitration, as well as what may be called 'corporate misappropriation' disputes following the breakdown of a contractual arrangement (e.g. joint venture / quasi-partnership) or failed merger or acquisition or consolidation. These cases often involve allegations of misuse of confidential information or intellectual property infringement as well as economic torts such as conspiracy and/or unfair prejudice to shareholders. A separate summary of this type of work can be provided upon request. Current or recent examples include: *Trappit SA v. American Express Europe LLC* [2021] EWHC 1344 (Ch) (airfare re-booking system); *Crypton Digital Assets v. Blockchain Luxembourg SA & others* [2021] EWHC 3194 (Ch) (cryptocurrency exchange/platform); *MedImpact v. Dimensions Healthcare* (pharmaceutical dispensary software: DIFC-LCIA arbitration and now winding up proceedings in the Cayman Islands); and a high-value shareholder dispute relating to the market-leading food delivery service in the Kingdom of Saudi Arabia (DIFC-LCIA arbitration).

In both his silk practice and sitting as a Deputy Judge of the High Court, Stephen increasingly handles disputes involving cryptocurrency and other digital property – for example, giving judgment in *Wang v. Darby* [2021] EWHC 3054 (Comm); [2022] Bus LR 121 which was the first contested hearing in this jurisdiction concerning trusts over cryptocurrency.

---

## CAREER

**2023** Admission to the High Court of the Isle of Man

**2021** Admission to the Bar of the British Virgin Islands

**2021** Full registration as a foreign lawyer in the Singapore International Commercial Court (SICC)

**2020** Admission to Grand Court of the Cayman Islands

**2019** Registration as a foreign lawyer in the Dubai International Financial Centre (DIFC)

**2018** Admission to the Eastern Caribbean Supreme Court (Antigua & Barbuda; St .Lucia)

**2013** Appointed Queen's Counsel

**2006** Appointed Junior Counsel to the Crown ('B' Panel)

**1998** Attorney at Walkers, Cayman Islands (2 months)

**1997** Joined Essex Court Chambers

**1995** Lecturer in Public & Administrative Law, Hertford College, Oxford University (until 2000)

**1995** Called to the Bar (Inner Temple)

---

## EDUCATION

1995 Inns of Court School of Law

1994 Bachelor of Civil Law (First Class), Oxford University

1992 BA Jurisprudence (First Class), Oxford University

---

## AWARDS

1994 Major Scholarship, Inner Temple

1992 Martin Wronker Prize (joint), Oxford University

1990 College Scholarship, Hertford College

**EXHIBIT B**

**IN THE EASTERN CARIBBEAN SUPREME COURT
ANTIGUA AND BARBUDA**

**IN THE HIGH COURT OF JUSTICE**

ANUHCV 2018/0120

BETWEEN:

**1 GLOBE CAPITAL, LLC.**

Claimant

**and**

**SINOVAC BIOTECH LTD.**

Defendant

**Interested Parties:**
Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li

**APPEARANCES:**
Mr. Stephen Houseman QC, Mr. Lenworth Johnson and Ms. Andreen Vanriel for the Claimant
Mr. Stewart Alford QC, Mr. Rushaine Cunningham and Ms. Yoshi Rampersad for the Defendant
Mr. Craig Jacas holding watching brief for the Interested Parties

---

2018:    December 3rd, 4th 5th
         December 19th

---

**JUDGMENT**

[1]    **SMITH J:**  This case is about a fight to control the board of directors of the defendant, Sinovac Biotech Ltd, a China-based, biopharmaceutical company, with about 3,300 shareholders and a market capitalization of US$447.3 million, listed on the Nasdaq stock exchange (the "Company").  The Company is registered under the **International Business Companies Act**[1] ("IBCA") of Antigua and Barbuda.

[2]    The claimant, 1 Globe Capital LLC, a Delaware limited liability company and shareholder in the Company, has applied pursuant to section 122 of the IBCA, for

---

[1] Chapter 222, Laws of Antigua and Barbuda.

the Court to determine a controversy with respect to an election of directors at an annual general meeting ("AGM") of the Company. The claimant seeks certain declarations and orders.

[3]     The controversy may be stated shortly.  On 6th February 2018, the Company held an AGM in Beijing, China.  The claimant contends that, at that AGM, Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li were duly elected as directors of the Company ("the New Directors").  The Company disputes this and says that Weidong Yin, Simon Anderson, Kenneth Lee, Yuk Lam Lo and Meng Mei ("the Incumbent Directors") are the valid directors of the Company. The Incumbent Directors remained in control of the Company following the disputed election.

**The section 122 Claim**

[4]     Section 122 provides as follows:

> "(1) A corporation or a shareholder or director thereof may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.
> (2) Upon an application made under this section, the court may make any order it thinks fit including, without limiting the generality of the foregoing -
>> (a) an order restraining a director or auditor whose election or appointment is challenged from acting pending determination of the dispute;
>> (b) an order declaring the result of the disputed election or appointment;
>> (c) an order requiring a new election or appointment and including in the order directions for the management of the business and affairs of the corporation until a new election is held or appointment made; and
>> (d) an order determining the voting rights of shareholders and of persons claiming to own shares." (Underlining supplied)

[5]     The claimant sought the following declarations and orders under section 122:

> "1. A declaration that the following persons were duly elected at the AGM: Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pengfei Li

2. An order that Yuk Lam Lo, Guowei Wang, Jianzeng Cao, Hoi Fung Qui and Pingfei Li be installed as the Company's Board of Directors.

3. A declaration that Weidong Yin, Simon Anderson, Kenneth Lee, and Meng Mei are no longer the Company's directors, and an order that any actions taken on behalf of the Company at their direction after the AGM are null and void."

[6]  The Company resists the claim and contends that the votes cast by those shareholders ("the Dissenting Shareholders") in favor of the New Directors were not valid because:

1. Their method of nominating individuals to the Company's board of directors, the proxy forms they used and the ballots they voted on did not conform to Antiguan law;

2. There was no full, fair and plain disclosure to shareholders, in breach of section 71(2) of the IBCA, to enable them to make a fully informed decision regarding the election of the Company's board of directors;

3. A Rights Agreement, governed by Delaware Law, was triggered by the conduct of the Dissenting Shareholders prior to, during and after the AGM, which affected the vote at the AGM by dilution of the shareholding of a significant proportion, if not all, of the Dissenting Shareholders who voted to elect the New Directors;

4. The claimant, and other shareholders, breached United States securities laws by failing to make appropriate filings and, as a result, the business purportedly conducted at the AGM and/or the votes cast by those shareholders have been invalidated.

### Issues

[7]  The parties agreed, in a pre-trial memorandum, that the following issues arise for determination:

1. Was section 71(2) of the IBCA complied with in relation to notices of the AGM? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace the Incumbent Directors?

2. Was the vote to remove and replace the Incumbent Directors in conformity with Antigua and Barbuda law? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace them?

3. Is the Rights Agreement valid and effective as a matter of Antigua and Barbuda law? If so, could the Rights Agreement, if triggered, affect the vote at the AGM?

4. Was there a breach of the US Securities laws, namely, section 13 of the United States **Securities Exchange Act 1934**, by the claimant? If so, what is the relevance, if any, to the outcome of the vote at the AGM?

[8]    At the commencement of the trial, the claimant applied to adduce two fresh affidavits and to be relieved from sanctions. The Court refused the application and promised to provide the reasons for so doing in this judgment. Firstly, the claimant had failed to file its affidavits in accordance with the deadlines set in the Court's case management directions. On 23rd November 2018, at the pre-trial review of this matter, the claimant applied for permission to file those affidavits on 20th November 2018. The Court therefore ordered those affidavits to be deemed properly filed and served on 20th November 2018. At that pre-trial review, the claimant gave no indication that it wished to file further evidence. Secondly, the Court is satisfied that the fresh evidence in one of the affidavits sought to be adduced has been available to the claimant for some time and, in fact, is already before the Court in another document. Thirdly, I am satisfied that the application is not being made promptly and that no prejudice whatsoever will befall the claimant if it is not permitted to rely on this fresh evidence.

**Proceedings of the AGM**

[9]    The Company issued formal notice of the AGM on 28th December 2017. That notice identified three items of business, namely: (1) the re-election of the existing board of directors; (2) approval of the audited, consolidated financial statements of the Company for 2017; and (3) the appointment of Ernst & Young Hua Ming LLP as independent auditor for 2017. The AGM took place in Beijing at 9 am (local time) on 6th February 2018. A transcript of those proceedings, translated from Mandarin

to English, was produced to the Court based on an audio recording of the AGM.  At
the trial, both parties accepted and relied on that transcript which I shall therefore
treat as part of the *res gestae*.

[10]    Given that much turns on what transpired at the AGM, I cannot avoid burdening the
judgment with a lengthy extract from those proceedings:

"119.    James Chang: Everyone of us needs to sign in.
120.    James Chang: We need two, because he is together with me.
121.    Yang Guang: But, you have one legal proxy. One proxy, one ballot.
122.    Yang Guang: Yes, I will collect all the ballots and legal proxies I have given you, and then they will be placed on file.
123.    James Chang: But I have a question. If you collect all the present shareholders' legal proxies, you should have known the corresponding number of ballots who attend the meeting in person, right? And you also know the share numbers for online [vote]. Could you please tell us the quorum?
124.    Yang Guang: Certainly. Now let's go to the result. As of December 26th, 2017, by far the aggregate shares held by all registered shareholders are 57,269,861. Let me project this data on the computer.
125.    Yang Guang: Well this is the date for our meeting and this represents the number of total share outstanding. Our record date is December 26th, 2017.
126.    James Chang: They are all outstanding shares, right?
127.    Yang Guang: Yes, all issued and outstanding shares as of the date of the record day of December 26, 2017. We have 21,000,000 shares who voted online. The number on site has 28,900,000 shares.
128.    James Chang: You mean the ones [who attend AGM] in person, right?
129.    Yang Guang: Yes, at presence. So here we have over 50-million in total, [i.e.] more than 50,000,000 shares participated in the vote. And that represents 87% of the total shares, exceeding the quorum of 50% as required in the company's rules of procedures. Therefore, the legitimacy of this meeting is justified and we are allowed to proceed on the next step. Now here is what we are going to do. Please fill out your ballots and then I will count the papers and declare the result.
130.    James Chang: Okay, thank you very much. On behalf of shareholders, I'd like to ask for your permission to say something. Please allow me, Mr. Chairman.
131.    James Chang: Thank you very much. Let me introduce myself first. I am James Chang, the proxy of JPMorgan, and I hold voting rights representing 118,000 shares of common stocks of the company.

First of all, I would like to point out to all of you that we are offered three options in the ballots provided by the company: For All, Withhold all and For All Except. According to what our lawyers in Antigua suggested, the "Withhold All" means abstaining from voting, so it is not quite the equivalent of a "vote against". Given this, our first request is to change the current voting model and add an option named "Against All" next to the existing "For All" option. Second, on behalf of JP Morgan, I propose that, all of you, as shareholders, consider removing the incumbent board members, and I mean all of them except Lo Yuk Lam. Last but not least, I would like to nominate the following four candidates to board member positions and they are Wang Guowei, Qiu Haifeng, Cao Jianzeng and Li Pengfei. And that is the request from me as the proxy of JP Morgan. In short, that is all I want to say as a speaking shareholder. What I have proposed is just for your reference. So here is my question, is there anyone present who seconds me? Anyone?

132.    Zhang Yue: Yes, I second. Dear Mr. Chairman, my name is Zhang Yue and I am the proxy of Citibank, holding 856,000 shares of common stocks. As far as I am concerned, most of the incumbent board members are no longer qualified for their positions. Therefore, here I second the nominations proposed by that shareholder and agree to the new candidates proposed by him. Thank you.

133.    James Chang: Mr. Chairman, Mme. Secretary, actually, we have prepared our own ballots. And we will distribute them to the shareholders if you have no objection. We also ask for a voting by ballot instead of by hand this time.

134.    Yang Guang: Well, this meeting is held in accordance with the law in Antigua and our company's procedure rules. Your suggestion will be taken down and sent to our lawyers later. But right now, I'm afraid I cannot give you any answer for sure. Since the directors' election is one of the three subject matters of this meeting, you are free to express your opinions on that and fill out your ballot or just abstain. We will take down your suggestions and responses will be made after our discussion with lawyers in Antigua.

135.    James Chang: According to Articles 114 and 109 of Antigua law, shareholders have a constitutional right to replace board members and can propose the matter on any annual general meeting. This does not need the confirmation by the company's counsel. This is our inalienable right.

136.    Yang Guang: That is true. But as our procedure, we should comply with the laws in this meeting. Since you mentioned that in accordance with the Antigua law, we also need to check that before we can finish this process. And that is why we will write down your words in details.

137.   James Chang: As required by Antigua law, we will hand in our legal proxies and ballots to the company's scrutineer, that is you. If you are not willing to accept, actually we also bring our own scrutineer to accept these documents. In which case, I assure you, it is in complete compliance with the legal process. If you refer to your company's articles and Antigua's International Business Corporation Act, <u>it is clear that a shareholder has the right to raise a proposal, after the proposal, if someone else seconds it, the proposal must be decided by vote. Must be decided by vote.</u>

138:   Yang Guang: It is a regret that we did not bring a lawyer here to attend this meeting. Since I do not have Antigua's law [background] myself, nor do you, I suppose. We will take down your request. According to Antigua law, we invite you here to vote and then collect the ballots. If the number of attendees reaches quorum, which means we can proceed with the procedure, we will count the result to see whether the matter is approved by vote and announce the result. According to the company's procedure rules, if a matter is not approved, there will be some follow-up procedures.  For example, if we all choose the "withhold" option instead of voting for incumbent directors or others, we will record that. And if the quorum and the vote approval rate are met, we will proceed and give announcements in an open manner as required by law of the country, that is, the home country, and procedure rules of our company.

139.   Wang Nan: I agree. Like we said before, we will send it to our company's lawyers in Antigua and we will request their instructions as to what to do next.

140.   James Chang: No problem. If it helps, my colleague the lawyer Li will send a ballot to each shareholder. The filled ballots will be given to you for your lawyers' reference. Lawyer Li, please.

141.   James Chang: Did management personnel vote online or do you have a legal proxy to vote at this meeting?

142.   Wang Nan: We all voted online.

143.   James Chang: Everyone finished, I see. Thank you. Actually, our ballot has two copies. We hope that you can cast your vote with your genuine information and opinions.

144.   Yang Guang: Then, I would like to make clear with you that please give me your legal proxies and the ballots provided by our company after you have filled out. According to the current legal process of the company, if you abstain, we may need to confirm each final ballot of the vote.

145.   James Chang: <u>We suggest, of course, it is only a suggestion of our own, that you change the "Withhold" option provided to you by the company into "Against" option. Then you can fill it out one. Lawyer Li will assist in this regard.</u>

146.  Yang Guang: As to any modification to the ballots, we are no experts, and I remind you, that we need to confirm its validity if the current ballot is modified.

147.  James Chang: Let me be noted on the record that we provided our own ballot. So in case of any disagreement, please refer to our ballots which shall control.

148.  Yang Guang: We might need our lawyer to eventually confirm this. I think you are free to make your own statements. But I would like to confirm to everyone that he is not our lawyer, after all. If he has any law enforcement qualification of Antigua, I suggest he present it to us so that we can follow your suggestion. If not, then please do not forget to consider the validity of the ballot.

149.  James Chang: Or if there is any concern, please feel free to leave a blank ballot provided by the company. But if you ask us, we suggest to the company filling out the ballot provided by us and filling out two copies.

150.  Yang Guang: I'm sorry, I'm afraid it's unacceptable to the company. We have distributed ballots to some shareholders before and those ballots have the same effect with these we distribute today. All the ballots we have distributed before are valid.

151.  James Chang: I only ask you one question today. Do you accept my ballot or not?

152.  Yang Guang: If you fill in the ballot we provide, I will accept it. Then, I would like to confirm with you that.

153.  James Chang: Not the company's ballots, but our own ballots. Do you accept or not?

154.  Yang Guang: You listen to my question, you listen to my question is that as for the ballots you provide, you want to know how to submit and confirm them and you want to give them to me, right?

155.  James Chang: We will give them to you after all stockholders have filled in the ballots because you are the scrutineer today. Meanwhile, we will give another copy to our own scrutineer.

156.  Wang Nan: If you are willing to formally submit the ballots to the company, no matter the ballots are provided by us or by you, we will accept and record them. We can also submit them to the lawyer. However, we cannot use the ballots you provide as [the basis] in counting valid ballots under the guidance of our lawyer.

157.  James Chang: The law has its own judgment.

158.  Yang Guang: OK, I will collect the ballots provided by the company. Will you give me back a filled ballot or unfilled one?

159.  James Chang: Every participant has the right to decide whether to fill in or not. If you will fill in, I suggest that you change the "Withhold" option to "Against". [The spelling is] against.

160.  Yang Guang: The meeting will end at ten o'clock shortly, because we have other arrangement after the meeting.

161.  Unidentified male speaker]: it will be definitely before 10:00.

8

162.  Yang Guang: You must have made your decision. So I can take it back.

163.  James Chang: If you want to fill in the company's ballots, we still suggest changing "Withhold" to "Against", and then choose "Against All" or "Against All Except". We think Lu Yulin can remain, but if you feel troublesome, you can consider [not filling in], this is our personal suggestion.

164.  James Chang: Mme Secretary, as far as we know, this meeting should be held in Beijing and Antigua at the same time in theory. The meeting in Antigua is held at the address of your company's law firm, so if you arrange the meeting according to the proxy statement you have provided, the door of Antigua's law firm should be open now and there should be an Antiguan lawyer on the spot. So, I require to record these matters and I ask you to communicate with the Antiguan lawyer now. This is the first point.

165.  Yang Guang: I will try.

166.  James Chang: Secondly, I request that you accept the ballots we provide and record the percentage of our ballots in the present voting on the record.

167.  Yang Guang: Then, that is to say, I personally have no way to confirm whether I can accept the ballots provided by you, but I can collect the ballots and then count them with the lawyer.

168.  James Chang: But I request you to tell us the percentage of our ballots in the total number of present voting.

169.  Yang Guang: You mean the total ballots?

170.  James Chang: Yes, exactly. Thank you.

171.  Yang Guang: That's OK.

172.  James Chang: Great. Thank you.

173.  [Unidentified Female Speaker]: do you give all of your ballots back?

174:  James Chang: We will give on copy to the scrutineer.

175.  Yang Guang: The filled ballots provided by JP Morgan that I have collected have 26,103,784 shares, representing 45.58% of the total share outstanding.

176.  James Chang: How about the present and voting, please?

177.  Yang Guang: Are you talking about the results of the election of directors?

178.  James Chang: Present and voting is a fraction whose denominator is the number of persons present in the meeting and whose numerator is us, what is it?

179.  Yang Guang: Those who attend the meeting in person today?

180.  James Chang: not in person today, I mean the numbers both from online and in person.

181.  Yang Guang: Including the numbers online?

182.  James Chang: Yes. present and voting.

183.  Yang Guang: 55.19%.

184.  James Chang: Thank you.

185.  Yang Guang: <u>Then I can only record the ballots you provided. I really have no qualification to judge whether they are valid or not. We will raise this issue and confirm it again.</u>

186.  James Chang: The law will judge whether they are valid or not. Thank you.

187.  Yang Guang: <u>And today, for the emergence of the new ballots, we can't declare the outcome of the meeting now. Please give us some time to consult the lawyer to determine the outcome. We will publish the outcome of the meeting through information announcements.</u> What does everyone think about it. The main subject matter on our side should be.

188.  James Chang: Can you find an Antigua lawyer? Theoretically, there should be at least a lawyer at the meeting in Antigua, I think.

189.  Yang Guang: We used to communicate with the lawyer to transfer the meeting. This was what we used to do in earlier years. However, he said, in recent years, we do not need this practice anymore, so we held the meeting in Beijing.

190.  Yin Weidong: We used to have teleconferences.

191.  Yang Guang: They used to make a call and he gave us the seat of the chairman. If you have any requirement, we will consult with the Antigua lawyer. We can fix a time to discuss it if necessary.

192.  James Chang: I think we should respect the opinions of the shareholders on the spot.

193.  Yang Guang: Or I have a suggestion. Now that I have given my business card, you are welcome to contact me anytime on any questions in this regard. We will respond positively, no matter you want to communicate with the lawyer or with the company, including any person at any level from our company. Ok?

194.  James Chang: Ok.

195.  Yang Guang: That's all for the meeting agenda today. Thank you.

196.  Yin Weidong: The meeting is over. (Underlining supplied)

[11]  From the above transcript, the Court makes the following factual findings:

(1)  No one at the AGM disputed the validity of the notice issued for the convening of the AGM;

(2)  A quorum was declared by, Guang Yang (Helen Yang), the scrutineer/inspector of the election at the AGM;

(3)  A motion to (a) amend the ballot to include the option of voting against the Incumbent Directors and (b) to nominate four directors to the board, was moved and seconded;

(4)  The Dissenting Shareholders cast their vote on an amended version of the ballots provided by the Company;

10

(5) Guang Yang collected the Dissenting Shareholders' ballots but repeatedly stated that she had to confirm the validity of those ballots with the Company's Antigua attorneys;

(6) There was a tabulation of the votes cast which showed that the New Directors had obtained the majority of votes, but there was no declaration of the results of the election. Guang Yang repeatedly stated that she needed to confirm the validity of the votes cast with Antigua counsel.

**The Notice Point**

[12]   Mr. Houseman's argument can be stated succinctly.   It is that, on a proper construction of the language of section 71 of the IBCA, the only notice required is the notice of the AGM to be given to directors which, in the instant case, had been provided.  Mr. Alford, on the other hand, pitched his argument more broadly.  He contends that section 71 must be construed against the contextual framework that shareholders should receive full, fair and plain disclosure to have a reasonable opportunity to express their will on company matters.   The shareholders were deprived of this opportunity because the Dissenting Shareholders, acting in secret and colluding in breach of a Rights Agreement entered into by the Company and in breach of United States Securities law, hijacked the AGM and nominated an alternative board of directors without any notice whatsoever.  This, he says, is conduct for which the Court, in the exercise of its broad powers under section 122, should refuse their claim.

[13]   Section 71 provides:

"(1) A director of a corporation is entitled to receive notice of, and to attend and be heard at, every meeting of shareholders.
(2) A director
        (a)  who resigns,
        (b)  who receives a notice or otherwise learns of a meeting of shareholders called for the purpose of removing him from office, or
        (c)  who receives a notice or otherwise learns of a meeting of directors or shareholders at which another person is to be

11

appointed or elected to fill the office of director, whether because of his resignation or removal or because his term of office has expired or is about to expire, may submit to the corporation a written statement giving the reasons for his resignation or the reasons why he opposes any proposed action or resolution.

(3) The corporation shall forthwith send a copy of the statement referred to in subsection (2) to the Director and to every shareholder entitled to receive notice of any meeting referred to in subsection (1).

(4) No corporation or person acting on its behalf incurs any liability by reason only of circulating a director's statement in compliance with subsection (3)."

[14]   Mr. Houseman submitted that: (1) the Company complied with section 71 (1) as each of the Incumbent Directors was given notice of and permitted to attend the AGM; (2) section 71 (1) contains the <u>only</u> notification obligation in the whole of section 71; (3) section 71 (2) contains no additional or specific obligation to provide notice to any director; rather, it assumes that no such notification may have been given because sub-sections (b) and (c) both say "or otherwise learns of"; (4) section 71 (2) confers upon a director <u>an opportunity</u> to submit a written statement giving reasons as to why he opposes the proposed resolution; (5) sub-section (3) imposes an ancillary or contingent obligation on the Company to provide copies of any such written statement to shareholders; and (6), in any event, section 71 is silent as to the consequences, if any, of non-compliance with its obligations and therefore it cannot be said that non-compliance would somehow vitiate the conduct or outcome of a shareholders' meeting. Clear statutory language would be needed to create such legal effect. In these circumstances, it is difficult to see how the Incumbent Directors were entitled to any additional or specific notification of their proposed removal at the AGM, other than notice under section 71 (1).

[15]   Mr. Alford submitted that, at the AGM, the claimant and the Dissenting Shareholders, without prior warning, proposed a motion to amend the ballot paper; impose a cap on the number of director candidates that members could vote in favour of; and to add four new candidates. Shareholders who did not attend the AGM had no advance notice of any of these proposals and so were unable to

consider, let alone vote on, them.   At previous AGMs, very few shareholders
attended in person and the routine business was dealt with largely through proxy
voting online in advance of the meeting and that, knowing this, the claimant and the
Dissenting Shareholders ambushed the meeting with the result that the
shareholders:

(a) Had no advance warning that the AGM was going to consider anything other
than the routine re-appointment of the Incumbent Directors;

(b) Had no advance warning that a group of shareholders were planning to take
control of the board;

(c) Had no advance warning that alternative director candidates were to be
proposed for election on the day of the AGM;

(d) Had no advance warning as to identity, abilities or qualifications of any of the
alternative slate;

(e) Had no opportunity to decide, with the benefit of knowing the full facts, whether
to participate in the meeting, either in person or online; and

(f) Had no ability to exercise proxy votes against any of the alternative slate.


[16]     It does not appear that the Eastern Caribbean Supreme Court has previously
considered the interpretation of sections 71 or 122 of the IBCA. Mr. Alford assisted
the Court with extracts from the **Canada Business Corporations Act**, the **Canada
Non-Profit Corporations Act** and the **Ontario Business Corporations Act**. From
an examination of these various pieces of legislation, it appears that the IBCA is
indeed based on what might be termed as the Canadian model.  Section 122 of the
IBCA, for example, mirrors section 145 of the **Canada Business Corporations Act**,
while section 71 (2) of the IBCA mirrors section 123 of the **Business Corporations
Act**.  In this regard, I consider Canadian authorities dealing with similar sections to
be helpful.


[17]     Mr. Alford relied on **Kluwak v Pasternak**,[2] a decision of the Ontario Superior Court,
as authority for the proposition that shareholders are entitled to full, fair and plain

---

[2] [2006] CanLII 41292.

disclosure to make an informed decision on affairs of the company which call for a vote. In **Kluwak**, the applicant spearheaded the dissident shareholders in a proxy fight for control of the board of directors of the respondent corporation. The respondent, Pasternak, chaired the annual general meeting at which he disallowed the dissident proxies on the basis of what he viewed as material misrepresentations in the dissident proxy circular. As a result, he declared the management's slate of directors elected. In that judgment, Mesbur J stated:

> "[14]    The author of *Shareholder Remedies in Canada* makes the comment that 'case law requires that <u>all information be disclosed that a reasonable investor would consider important in deciding whether to vote</u>.' He refers to the philosophy and standard of disclosure discussed as long ago as 1934 in *In re Dorman, Long and Co.* where Maugham J noted: 'It is perhaps not unfair to say that in nearly every big case not more than five percent of the interest involved are present in person at the meeting. It is for this reason that the Court takes the view that it is essential to see explanatory circulars sent out by the board of the company are perfectly fair and, <u>as far as possible, give all information reasonably necessary to enable the recipients to determine how to vote</u>.' What is true for a board circular is equally applicable to a dissident information circular. Shareholders must have all the information they need in order to make an informed decision about voting.
> ...
> [16]    In essence, then, an information circular must contain <u>full, fair and plain disclosure, that has sufficient information concerning the pertinent matters set out 'in sufficient detail to permit shareholders to form a reasoned judgment concerning the matter.</u>'" (Underlining supplied)"

[18]    I consider the reasoning of Mesbur J in **Kluwac** to be sound, logical and persuasive. It stands for the unobjectionable principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. In the instant case, it is not in dispute that: (1) the company has about 3,300 shareholders located in various parts of the world; (2) the board of directors had been re-elected, unopposed, at every AGM for many years and there had never been alternative candidates proposed; (3) shareholders typically voted online and by proxy in advance of the AGM; those who

voted online or by proxy card in advance of the AGM would only have known of the Incumbent Directors, there being no indication of alternate candidates; and (5) a number of shareholders did not vote at all. Based on those facts, it is a reasonable inference that shareholders who voted in advance of the AGM, or those who chose not to vote, had no reason to think that anything would be different at the 2017 AGM. If they knew that an alternate slate was to be proposed, that might have determined whether and how some shareholders voted at the AGM. In these circumstances, can it be said that the shareholders had full, fair and plain disclosure on the important matter of the election of the board of directors of a valuable international company to permit them to make an informed decision?

[19]     Mr. Houseman relied on **Betts & Co Limited v Macnaughten**.[3] In that case, the notice of the annual general meeting of a company stated that its purpose was the passing of certain resolutions, one of which was the appointment of three named individuals as directors. At the meeting, an amendment was carried that, in addition to those three, two additional named directors should be appointed. The company's articles of association provided that the notice of an ordinary general meeting, at which special business was to be transacted, should specify the general nature of such special business. It also provided that the number of directors should be no more than seven or less than three.

[20]     Eve J, in concluding that the business transacted at the meeting was within the scope of the special business indicated in the notice, stated:

> "Ought I to hold that the amendment which purported to reappoint the three gentlemen named in the notice as directors for the ensuing twelve months and to add two other gentlemen as additional directors was an amendment so inconsistent with the object of the meeting as stated in the notice and so irregular as to be beyond the power of the meeting? Was it, in short, such an amendment as no reasonable man would have regarded as competent to be put forward at a meeting so convened? ... I think I must assume that the shareholders who received this notice were alive to this possible contingency, and, further, were aware that in the matter of electing directors the only restriction on the power of the company is to be found in the article

---

[3] [1910] 1 Ch. 430.

which limits the maximum number to seven. With these facts present in his mind I think a reasonable man reading this notice must have appreciated that those present at the meeting would regard themselves as empowered to make such appointments to the board for the ensuing year as they thought fit so long as they did not do anything contrary to the company's regulations. No one could have thought that the meeting was convened to appoint the three named individuals without the power to substitute other qualified persons for all or any of such individuals, and there is nothing in the notice to indicate that the company will not, if they fit so to do, exercise their power of increasing the number of directors under ...The special business indicated in the notice being the election of directors for the ensuing year, I think a recipient of the notice must be taken to have known that the company in general meeting might make any appointments within the limit imposed by their regulations..." (Underlining supplied)

[21]     Extrapolating the **Betts** principle to the instant case, Mr. Houseman argues that the shareholders, reading the notice of the AGM that there would be an election, were alive to the possibility that an amendment could be proposed resulting in the election of a different board of directors than the one proposed. Indeed, there appears to be nothing in the IBCA, the IBCA Regulations, the bye-laws of the Company or its articles of association that prohibit or restrict the proposing of amendments to resolutions or motions at an AGM.  I think, however, that the instant case is materially distinguishable from **Betts** for the following reasons:

(1)  In **Betts**, two additional directors were nominated in addition to the three proposed for nomination while, in the instant case, the proposed amendment was for the replacement of the proposed nominees, except for one;

(2)  In **Betts**, the proposed amendment for two additional nominees to the board was within the articles of association which limited the board to a maximum of seven.  In the instant case, the Dissenting Shareholders proposed a cap on the number of elected directors that was below the fifteen member limit prescribed in the articles of association.

(3)  **Betts**, a 1910 case, was in a different era.  The internet had not yet been invented and so the concept and possibility of voting online, in advance of the AGM, did not exist.  The instant case involves a company (with multi-national investors, incorporated in Antigua, doing business in China, listed on Nasdaq and regulated by US securities law) whose shareholders routinely voted online

in advance of an AGM and therefore had no notion that an entirely different slate from that on which they voted would have materialized at the AGM.

[22]    I accept, in principle, that shareholders who receive notice of an AGM for the election of directors must be alive to the possibility that an amendment to the motion can be proposed, resulting in a different board of directors.   But the globally accepted, modern practice of voting online in advance of an election introduces a new dimension to the hitherto conventional practice of proposing amendments to motions on the floor of the AGM.   That practice might be unobjectionable where the shareholders of a company are all situated in the same jurisdiction and attend AGMs in person.   In today's world, however, where technology allows for internet voting and thousands of shareholders of a company are spread across the globe, physical attendance at meetings is an effete convention.   This Court therefore finds itself at the intersection of two corporate cultures.   One the one hand, there is the practice of moving amendments to motions on the floor of the AGM. On the other hand, there is the modern practice of shareholders voting online in advance of an AGM and not physically attending, which closes them off from what transpires at the AGM.

[23]    Where the company's articles of association and the governing law are silent as to how one might reconcile online voting in advance of an AGM with the right to move an amendment to a motion at an AGM, the best that the Court can do is to insist on a minimum standard of basic fairness.   Those shareholders who voted online in advance of the AGM were following a routine practice, voting for one slate that had been re-elected for many years, had no reason or warning to expect anything different and certainly had no idea that a different slate of candidates would have been proposed at the convention.   They, as well as those who chose not to vote, did not have an opportunity to make an informed decision.   The Dissenting Shareholders, as will be seen later in this judgment, had been planning in secret to propose an alternate slate and therefore had no good reason for not giving advance notice of their intended amendment.   This undermines basic fairness to which the shareholders, as a whole, were entitled.

[24]     Returning to the language of section 71, I accept that it does not state that notice must be given to directors (or shareholders) where it is proposed to elect another person to the office of director.  However, in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is to be contested ought to be given some kind of notice.  If a director receives no notice, he cannot submit the written statement referred to in section 71(2), in which case the Company cannot send a copy of such statement to the shareholders as required by section 71(3).  The shareholders would therefore not have received full and fair disclosure to make an informed decision on an important company matter.  Shareholders in a valuable, publicly traded company surely would be interested in reading what an incumbent director, whose position is challenged, might have to say about the qualifications and experience of a proposed nominee for his seat on the board of directors.  As stated above, there was no good reason for failing to give effect to the spirit and intent of section 71 (2) and (3).

[25]     In my view, the spirit and intent of section 71 was breached and while the section is silent as to the effect, if any, of non-compliance on the election or the AGM, it is certainly a factor for this Court to weigh in deciding whether or not to grant relief.

### Validity of Amended Motion, Ballots & Proxy Forms

[26]     As the transcript of the proceedings of the AGM shows, the Dissenting Shareholders voted to amend the Company ballot paper to include the option of voting against the Incumbent Directors.  Their votes were therefore cast on an amended version of the Company's ballot paper.  The Company submits that their ballot was not validly amended because, firstly, the Dissenting Shareholders did not allow any review or consideration of the written terms of the proposed ballot by Weidong Yin, the Chairman of the AGM, or Guang Yang as inspector of the AGM.  Secondly, the Company ballot (setting out the motions in the AGM notice) had already been distributed, therefore the shareholders present at the AGM had two contradictory ballots with no clarity as to how many should be completed and in which order,

resulting in procedural confusion. Those shareholders who voted by proxy never got to see the alternative ballot at all. Thirdly, the Dissenting Shareholders did not allow any opportunity for debate on why the number of directors that could be voted for was limited to five when the articles of association allowed for fifteen, or on the identity and qualifications of the proposed new slate. Fourthly, the first two matters proposed at the AGM by the Dissenting Shareholders (to amend the Company ballot and to propose a vote for not more than five of nine nominees including the alternative) were not validly proposed or voted on. Fifthly, the proxy form used by the Dissenting Shareholders at the AGM did not comply with the requirements of section 15 of the IBCA Regulations, rendering those votes invalid. In these circumstances, the Company submits, the claimant is not entitled to the declaratory relief sought.

[27]   There is nothing in either the IBCA or the IBCA Regulations that prohibits an amendment to an ordinary resolution being proposed by shareholders attending an AGM. Section 109 of the IBCA, read together with section 370, suggests that the business of election of directors is an ordinary motion or resolution carried by a simple majority of the votes cast by shareholders voting on that resolution:

> "108 (1)  Notice of the time and place of a meeting of shareholders must be sent not less than twenty-one days nor more that fifty days before the meeting...
> ...
> 109 (1) All business transacted at a special meeting of shareholders and all business transacted at an annual meeting of shareholders is special business, except
>     (a)  the consideration of the financial statements,
>     (b)  the auditor's report,
>     (c)  the election of directors, and
>     (d)  the re-appointment of the incumbent auditor
> ....
> 370(l)  "ordinary resolution" means a resolution passed by a majority of the votes cast by the shareholders who voted in respect of that resolution."

[28]   Section 7.4 of the Company's bye-laws is to the same effect as section 109 (1) of the IBCA. It is therefore clear that the election of directors at the AGM was not special business; it was an ordinary resolution that could have been passed by a

majority of the votes cast by the shareholders who voted in respect of that resolution. It does not appear that there were any technical breaches, if I might put it like that, of Antiguan law in proposing the amendments to the motion at the AGM.   The matter cannot, however, be analyzed in isolation from the Court's earlier finding that the shareholders as a whole were entitled to full and fair disclosure.   Amending the company's motion to include an alternate slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the Court to consider in deciding whether or not to grant relief under section 122.

[29]   I now turn to the question of the validity of the proxy form used by the Dissenting Shareholders.  The claimant complains that it would be procedurally unfair to permit the defendant to rely on this point because the defendant only gave notice, on Friday, 30th November 2018, that it intended to take this point at the trial on Monday, 1st December 2018.  I do not think the claimant is prejudiced for two reasons.  Firstly, as pointed out by the defendant, it was the claimant which first referred to sections 13-15 of the IBCA Regulations in its written submissions.  Having done so, it could not now complain if the defendant introduced an argument based on section 15.  Secondly, at the claimant's request, the Court consented to the filing of post-hearing submissions on this point to allow the claimant time to research and submit a full response on this issue.  The claimant filed eight pages of written submissions on this issue.  There can therefore be no serious allegation of procedural unfairness.

[30]   On the matter of proxies, the IBCA Regulations provide as follows:

> "14.   A form of proxy may confer discretionary authority in respect of amendments to matters that properly come before the meeting and that were not identified in the notice of meeting.
> 15.   A form of proxy must not confer authority to vote in respect of an auditor or the election of a director unless a bona fide proposed nominee for the appointment or election is named in the form of proxy."

[31]   The Company argues that the proxy forms conferring authority upon representatives of the Dissenting Shareholders at the AGM failed to comply with regulation 15 and,

consequently, the votes cast pursuant to those proxies should be ignored or rendered invalid. The claimant submitted that regulation 15 applies <u>only</u> to proxy forms issued by or on behalf of the company when it gives notice of the AGM, namely, the so-called 'proxy card'. The Company says that it applies to <u>all</u> proxy forms used to enable shareholders to cast their vote.

[32]    I am of the view that the object and intent of regulation 15 is clear and unmistakable: it is to ensure that, on important matters such as the appointment of an auditor and the election of directors, the will of the shareholder (the proxy-giver) is effected and that all shareholders have been provided with full information concerning the election of directors. Such a requirement has greater relevance and consequences for a publicly traded company with thousands of shareholders who vote online and through brokers, than, for example, a small family-run company. On the evidence of Mr. Pengfei Li, given on behalf of the claimant, neither the claimant as beneficial shareholder nor TD Ameritrade Clearing Inc. as registered shareholder, knew that the alternative slate was to be put forward at the AGM at the time the registered shareholder granted the proxy to Mr. Li. Mr. Li, who was himself nominated to the board by the Dissenting Shareholders, said he had no idea that he was going to be nominated. This is not full, fair and plain disclosure. It appears to be an ambush.

[33]    The claimant says that the company waived any procedural defect in the Dissenting Shareholders' proxy forms by counting them at the AGM for the purposes of declaring a quorum and then by counting them in favour of the amended motion. It is clear, however, from the transcript of the proceedings at the AGM, that Guang Yang was at pains to point out that, while she would <u>collect</u> the ballots, she could not pronounce on the validity of the ballots that had been amended by the Dissenting Shareholders until the matter had been reviewed by Antiguan counsel. Guang Yang did not say anything about the proxy forms at the AGM, but her reserving any declaration on the result of the election meant that it was open to the Company's Antigua counsel to review the validity of the process. I am therefore of the view that the defect in the proxy forms was not waived by the Company.

[34]     Both sides relied on **Ambassador Industries Ltd v Camfrey Resources Ltd.**[4] In
this case, the dissident shareholder's proxy form was upheld by the Court because
both rival information circulars sent to all the shareholders had a full list of all the
proposed director candidates.   Each information circular listed out the rival
candidates for appointment and explained the rival positions. The court therefore
had no difficulty upholding the form of proxy in that case.   The court in **Ambassador**
stated:

> "These [rival circulars] make very clear to all concerned who is running and
> whether that candidate is part of the management slate or the dissident
> slate. I also bear in mind that the petitioner's information circulars expressly
> refer to the circulars being sent out by Camfrey management.
> I find that in deciding whether or not this proxy is valid, the test I have to
> apply is whether under the circumstances of the information circulars sent
> out by the petitioner referring, as they do, to the circulars sent out by
> Camfrey, it can be said that there is sufficient information to conclude that
> a shareholders is in a position to come to an intelligent decision as to
> whether he should vote for or against the directors on their respective
> slates."

[35]     I am of the view that **Ambassador** is persuasive authority for the proposition that,
where a proxy form is called into question, the Court is concerned to examine the
position of all the shareholders, not just those who signed the proxy in question.  In
the instant case, none of the Dissenting Shareholders provided any advance notice
to the Company or the shareholders, as a whole, prior to the AGM, of a proposal to
replace the board or of the identity of their nominees for election, nor did their proxy
form name any nominee for election.

[36]     The Court, in the final analysis, must weigh the right of the shareholders to full
information to be able to come to an intelligent decision against the right of
shareholders who voted not to be unfairly disenfranchised.  For this reason, I will
not make any ruling on the validity of the proxy form but consider it as a factor, in
the round, when exercising the Court's discretion under section 122.

---

[4] [1991] CanLii 593 (BC SC)

**Conduct of the Claimant**

[37] The Company invites this Court to conclude that the claimant and the Dissenting Shareholders colluded and orchestrated a secret plan to elect a new board, without notice to the Incumbent Directors or the shareholders as whole. As evidence of this, the Company relies on the following:

(1) The year-end personal work summary of Tao Fuwu dated 12th January 2017;

(2) A draft Amended and Restated Consortium Agreement;

(3) The transcript of teleconference held on 8th January 2018;

(4) An open letter from Sinobioway to all shareholders of Sinovac Biotech Limited; and

(5) An email from "one shareholder Tang".

*Personal Work Summary of Tao Fuwu*

[38] In this document, authored by Mr. Tao Fuwu, on the letterhead of Peking University V-Ming (Shanghai) Investment Holdings Co. Ltd, he set out his role as "one of the supervisors" in the matter of the privatization of the defendant and summarized his main work in 2017 to include:

> "...prepare to hold Sinovac special shareholders' conference and demonstration (including without limitation, repeated discussion and persuasion of 1G, especially assistance in analysis of poison pill plan, meeting order, analysis of the barriers and plans, shareholder proxies handling, and hiring of intermediary agent) preparation and opining on Sinovac's annual shareholders conference participation and change of the board of directors (repeatedly opine of plan risks, discuss rivals' obstructionism and opine on an appropriate response, opine on procedures, coordination among shareholders and documentation of authorized agent); the related media public relations work.
> ...
> worked with 1G to achieve substantial progress and signed cooperation agreement and framework agreement...We are fundamentally prepared for changing the board of directors of Sinovac at the shareholders' conference."

[39] Mr. Pengfei Li was the only witness of fact for the claimant. During cross-examination, he stated that he was delegated by the claimant to manage its

investment risk regarding the Company when the Company started being privatized. He described his role as being to understand the situation, the processes and the risks involved in the privatization. He stated, repeatedly, that the claimant entrusted him with full authority so he did not have to report to anyone there, even though the claimant had over a million shares in the defendant valued at between US $50-60 million dollars. He was free, he said, to make any decision, in consultation with the claimant's United States lawyers since the Company was listed in the United States. He stated that most of the strategic advice in relation to the Company came from him and he did not need advice from anyone at the claimant. He flatly denied, however, knowing anything about what was contained in the work summary and said he was puzzled by it. He questioned whether, in fact, Mr. Tao Fuwu had really written it. He stated that competing groups in the privatization process would say anything to gain support but that the claimant had remained neutral and had not sided with the Sinobioway Consortium as alleged by the defendant.

*Draft Amended and Restated Consortium Agreement*

[40]    This is a draft consortium agreement which lists 1 Globe Capital LLC and PKU-Ming (Shanghai) Investment Holdings Co. Ltd, among others, as parties to it. This document suggests that the claimant was part of the Sinobioway Consortium to attempt to purchase the Company. Under cross-examination, Mr. Pengfei Li said he was really surprised to see this document and had never seen it before. He expressed doubt as to its authenticity since any communication would have to have been through him as the claimant's designated representative in this matter. He said he believed that that so-called consortium agreement might be forged or fabricated, but declined Mr. Alford's invitation to say who might have forged it. He said he had his suspicions about the placing of that document before this Court.

*Transcript of Teleconference*

[41]    This document is under the heading "Peking University V-MING (Shanghai) Investment Holdings Co. Ltd." and is a teleconference among Tao Fuwu, James Chang (called "Attorney Zhang"), "Attorney Chen" and "Attorney Bao" in which,

24

among other things, the AGM is discussed and the eventuality of changing the board of directors. These plans included a rehearsal to prepare shareholder representatives for potential issues which the Dissenting Shareholders might face at the AGM and a media strategy to turn shareholders against the Incumbent Directors in the days before the AGM.

[42]   Mr. Pengfei Li, during cross-examination, denied that he knew anything about that teleconference and said that it was the first time he was seeing this document. He stated that each group seeking to purchase the Company would say that it had the claimant's support, but the claimant had remained neutral throughout.

*Open Letter from Sinobioway*

[43]   In this document dated 31st January 2018, it is alleged that Mr. Weidong Yin, chairman and CEO of the defendant, bribed a senior official of the China Food and Drug Administration and was not qualified to serve as a director of the defendant; the defendant is accused of incompetence, not acting in the best interest of shareholders and infringing the voting rights of shareholders through the voting card prepared for the AGM. It ended by recommending that shareholders attend the AGM and oppose the re-election of the current board. Mr. Pengfei Li, again, denied any knowledge of involvement in this document.

*Email from Tang*

[44]   In this email to the defendant, the sender, describing himself as "one shareholder Tang", points out that the voting card prepared by the Company provided no option to vote "against" the re-election of the Incumbent Directors and requested the inclusion of the option to vote "against" on the voting card. The sender's email address was 2300721606@qq.com. On 8th February, a press release was sent out from Shandong Sinobioway Biomedicine Co. Ltd announcing the defeat of the Incumbent Directors and the election of the New Directors at the AGM. The release was sent from the email address 2300721606@qq.com. Under cross-examination,

Mr. Li admitted that Tang, whose real name was Joyce, was a younger colleague of his who worked at the claimant. He admitted that the email was written, at his request, by Joyce but did not know why she used the name "Tang" instead of her real name. He speculated that maybe if Guang Yang knew whom it was she would not have answered the email. He was perplexed as to why the email of Joyce matched that of Sinobioway.

[45]    Mr. Pengfei Li maintained under cross-examination that he never knew James Chang, even though it was Mr. Chang who nominated him to be a director on the Company's board. He said he was surprised to have been nominated and did not know the other three individuals who were nominated to replace the Incumbent Directors. He had remained silent throughout the AGM. The next day he chaired a meeting of the Company despite the fact that Guang Yang clearly had not declared the results of the election. I find it difficult to believe that Mr. Li did not know that he was going to be nominated. I find it equally difficult to believe that he did not need the claimant's approval to accept the nomination and did not need to consult the claimant on anything having to do with the Company. He was at a loss to explain why the email address from which his junior colleague sent an anonymous email to the Company matched the email address of Sinobioway which, on the evidence, had been involved in planning to oust the Incumbent Directors and spreading negative publicity about them. The haste with which he took charge of the Company, even before an official election result was declared, suggests that he knew of the plan to oust the Incumbent Directors. He said that Weidong Yin had called him to urge him to attend the meeting yet, instead of raising concerns with Mr. Yin, he instructed his junior colleague to send an email under a fictitious name. Taken in the round, I do not find the evidence of Mr. Pengfei Li to be at all credible. I am convinced, on a balance of probabilities, that there was a secret plan to take control of the Company and that the claimant, through Mr. Li, knew of and acquiesced in this plan.

[46]    When I consider the scale and detail of the secret plan, the absence of full and fair information which deprived shareholders of the opportunity to make an informed and intelligent decision and the defective proxy forms, I am obliged to conclude that this was not conduct that should be rewarded with relief under section 122.  The claimant says that the defendant is not blameless and that the Incumbent Directors ran the Company in an undemocratic fashion by not preparing ballots that allowed for shareholders to vote "against" them.   While there was no option of voting "against" on the ballot, shareholders had the option of "withholding" their votes.  If the majority of votes were withheld from the Incumbent Directors, they could not have been deemed elected and therefore a fresh election would have to be called. In any event, a complaint about the Company's ballot was not good reason to keep secret an intention to propose an alternate slate.

[47]    In **Dumont v Manitoba Metis Federation**[5], the Court of Appeal of Manitoba, in considering section 139 of the **Corporations Act** (the equivalent of section 122 of the IBCA), stated that the court is free to exercise a discretion to make the order it thinks fit.   The Court, at paragraph 56 of its judgment, stated that evidence of wrongdoing and the essential fairness of the electoral process are factors that might influence the exercise of judicial discretion.  I therefore conclude that the claimant's knowledge of the secret plan, and the unfairness to other shareholders of the execution of that plan at the AGM, is enough for this Court to refuse the relief sought by the claimant.  While that conclusion is sufficient to fully dispose of this claim, I will go on to consider the validity of the Rights Agreement since both sides considered that this Court's declaration will be of practical utility to the parties in other proceedings.

### Validity of Rights Agreement

[48]    It is common ground between the parties that: (1) the Company entered into a Rights Agreement governed by Delaware law designed to "guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain

---

[5] [2004] MBCA 149.

control of the Company"; (2) the Rights Agreement provides that certain conduct of shareholders of the Company can trigger the dilution of their shareholding; (3) the question of whether the conduct of the claimant and others prior to the AGM constituted a "triggering event" entitling the Company to dilute their shareholding is currently pending before a Delaware court; (4) the Delaware court is the proper court to determine whether there was a "trigger event" under the Rights Agreement and whether that trigger event operated to dilute the Dissenting Shareholders' shareholding; (5) the Delaware Court has stated that it would benefit from a judgment of the Antiguan Court regarding the validity of the Rights Agreement as a matter of Antiguan law; and (6) this Court should indeed make a declaration on the validity of the Rights Agreement under Antiguan law.

[49]    The claimant argues, firstly, that Antigua, which applies English law, does not allow defensive shareholder rights plans without stockholder consent (and there was no such consent). Secondly, the Rights Agreement was not validly adopted under Antigua law because the provisions of the IBCA were not complied with. The defendant, in reply, relies on the Bermuda case of **Stena Finance BV v Sea Containers**[6] which upheld the validity of a rights plan, and contends that the Rights Agreement in the instant case was validly adopted under Antigua law.

[50]    In **Stena**, Astwood CJ held that the distribution of rights to existing shareholders in anticipation of a possible hostile takeover bid is not unlawful, provided that the directors have the requisite powers under the company's bye-laws to issue such rights, that they exercise those powers bona fide (i.e. not for the purpose of entrenching the existing management of the company) and fairly as between shareholder. Astwood CJ stated:

> "The directors stated the purpose for adopting the plan in the letter of 9 May 1988. On review, their purpose appears to be legitimate and I have no reason to differ from them. The principles expounded by the Privy Council in *Howard Smith Ltd. v Ampol Petroleum* [1974] AC 821, have not, in my opinion, been breached. The plan seems to be favourable to all shareholders of record at the date of adoption of the plan, and those who

---

[6] (1989) 39 WIR 83.

became shareholders after that date did so knowing what the terms of the plan were. Therefore, they cannot now be heard to say that the plan is unfavorable to their aspirations in making a bid to take over the company.

On a review of the plan, I tend to agree with Mr. Steinfeld that the plan did not do any of the following things: (a) it did not in any way alter or purport to alter (pending the exercise of the rights) the existing share capital of the company or the votes attached to the common shares; and (b) it, without in any way intending to penalize any existing shareholders (that would indeed have been expropriatory and improper), operated quite indiscriminately between all existing shareholders."

[51]     I agree with Mr. Alford that, in the instant case, there is no allegation of any *mala fides* on the part of the Company's board or any suggestion that it entered into the Rights Agreement other than in accordance with its fiduciary duties.  There is in evidence minutes of the board meeting approving the Rights Agreement which record the board's belief that it would "contribute to the preservation of the Company's long-term value."

[52]     Corporate hostile takeovers are not a usual feature in the company law landscape of the Eastern Caribbean.  Several jurisdictions within the Eastern Caribbean (like the British Virgin Islands, Anguilla, Saint Christopher and Nevis and Antigua and Barbuda) have, however, introduced international business company legislation, resulting in the incorporation of some large companies with multi-national shareholders. These companies, as in the instant case, cannot carry on business in the jurisdiction of incorporation but are domiciled there to take advantage of tax advantages and other benefits and features available under the legislation.  It seems to me that, if Antigua wishes to attract international business to companies to incorporate in the jurisdiction, it has to recognize that defensive shareholder rights plans are part of that corporate landscape.  I would therefore adopt the approach taken by Chief Justice Astwood in **Stena** and say that, provided the Rights Agreement is not contrary to the IBCA or the Company's articles and bye-laws, and provided it was not entered into to entrench the Incumbent Directors, it should be considered as valid.  I would add that it should perhaps not be contrary to Antiguan laws or public policy.

[53]    I must therefore examine both the IBCA as well as the articles of association of the Company to see whether the company could lawfully enter into the Rights Agreement.

[54]    The articles of association of the Company provides as follows:

"**ARTICLE III. CAPITAL**
1.  The Corporation is authorized to issue 100,000,000 bearer or registered shares of US$0.0001 each par value common stock which shall be designated "Common Shares" and 50,000,000 Preferred shares of US$0.0001 par value which shall be designated "Preferred Shares".
2.  No pre-emptive rights shall attach to the shares to be issued in respect of any class.
3.  Both classes of shares may be issued in series and the directors shall have the authority to fix the number of shares in, or to determine the designation of, and the rights, privileges, restrictions and conditions attaching to the shares of each series. (Underlining supplied)
4.  The Corporation shall have the power to increase or reduce said capital, and to issue any part of its capital, original or increased, with or without any preference, priority, or special privilege, or subject to any postponement of rights, or to any conditions or restrictions, and so that, unless the conditions of issue shall otherwise expressly declare, every issue of shares, whether declared to be preference or otherwise shall be subject to the power herein contained.

**ARTICLE IV. BOARD OF DIRECTORS**
The powers of the Corporation shall be exercised by the Board of Directors of the Corporation which shall be empowered to name one or more officers as President and Vice-President of the Corporation, subject to any restrictions in the appointing resolution an act of a President shall bind the Corporation as if the said act had been approved by the Board of Directors. The Corporation shall have a minimum of one and a maximum of fifteen directors. (Underlining supplied)

**ARTICLE V. CORPORATE PURPOSE**
The objects for which the Company is established are:
1.  To conduct any and all business activities permitted by the laws of the State of Antigua and Barbuda as an International Business Corporation.
2.  To acquire and deal with any property, real or personal, to erect any buildings, and generally to do all acts and things which, in the opinion

30

of the Company or the Directors, may be conveniently, or profitably, or usefully, acquired and dealt with, carried on, erected or done by the Company in connection with said property.

3.  To generally have and exercise all powers, rights and privileges necessary and incident to carrying out properly the objects herein under the International Business Corporation Act.

The Company shall not engage in International banking, Trust, Insurance, Betting and Bookmarking or any other activity which requires a License under the International Business Corporation Act.

The Company shall be primarily engaged in research, development and commercialization of human vaccines for infectious diseases."

[55]    Paragraph 8.9 of the bye-laws of the Company provides that the Board may exercise all such powers of the Corporation as are not by the Act or by the bye-laws required to be exercised by the corporation in an AGM.  It would therefore appear to me that the power to make distributions, as contemplated by the Rights Agreement, is not reserved to the members and is therefore exercisable by the Board.  I note as well that, under section 35 of the IBCA, the power of the Company to grant conversion privileges, options or rights to acquire shares of the corporation is exercisable by the board and not its members.

[56]    Mr. Houseman relies on sections 161 and 163 of the IBCA to support his contention that Rights Agreement could not be adopted without amending the Company's articles of association. Those sections are as follows:

"(1) Subject to sections 162 and 163, the articles of a corporation may, by special resolution, be amended -
   (a) to change its name;
   (b) to add, change or remove any restriction upon the business that the corporation can carry on;
   (c) to change any maximum number of shares that the corporation is authorised to issue;
   (d) to create new classes of shares;
   (e) to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued; (underlining supplied)

31

(f) to change the shares of any class or series, whether issued or unissued, into a different number of shares of the same class or series or into the same or a different number of shares of other classes or series;"

[57]    Section 163 provides as follows:

"(1) The holders of shares of a class or, subject to subsection (2), of a series are, unless the articles otherwise provide in the case of an amendment described in paragraph (a) or (b), entitled to vote separately, as a class or series, upon a resolution to amend the articles -

...

(c)

(iv) to add, remove or change prejudicially conversion privileges, options, voting, transfer or pre-emptive rights, or rights to acquire shares or debentures of a corporation, or sinking fund provisions."

[58]    I do not view the distribution of shares, triggered by the Rights Agreement, resulting in a dilution of a shareholders' shareholding, as changing the designation of or removing any rights or privileges attaching to or in respect of any shares. Neither do I see the applicability of section 163 of the IBCA. I therefore conclude that the Rights Agreement is valid under Antigua law.

[59]    Finally, it is accepted between the parties that the question of whether the claimant acted in breach of US securities laws is a matter for the United States Courts; consequently, I will make no findings on this matter.

[60]    I therefore make the following orders:

(1) The Claimant's claim is dismissed.

(2) It is declared that the Rights Agreement was validly adopted as a matter of Antigua law.

Godfrey P. Smith
High Court Judge

By the Court
Registrar

32

**<u>EXHIBIT C</u>**

## THE EASTERN CARIBBEAN SUPREME COURT
## IN THE COURT OF APPEAL

**ANTIGUA AND BARBUDA**

**ANUHCVAP2019/0005**

**BETWEEN:**

### 1GLOBE CAPITAL LLC

Appellant

**and**

### SINOVAC BIOTECH LTD.

Respondent

**Before:**
| | |
|---|---|
| The Hon. Mr. Davidson Kelvin Baptiste | Justice of Appeal |
| The Hon. Mde. Louise Esther Blenman | Justice of Appeal |
| The Hon. Mde. Gertel Thom | Justice of Appeal |

**Appearances:**
Mr. Stephen Houseman QC, with him Mr. Lenworth Johnson for the Appellant
Mr. Stuart Alford QC, with him Mr. Rushaine Cunningham for the Respondent
Mr. Craig Jacas holding a watching brief

_____

2019:   September 18
2021:   December 9.

_____

*Civil appeal – Validity and effect of vote to determine company's directors at shareholders' annual general meeting - Power of court to determine any controversy surrounding an election or appointment of directors - Section 122 of the International Business Corporations Act – Whether the learned judge's refusal to grant relief under section 122 plainly wrong - Whether specific notice required to directors whose re-election is contested at forthcoming annual general meeting - Section 71 of the International Business Corporations Act – Shareholders' right to full and fair information - Whether court may insist on a basic standard of fairness being afforded to shareholders to reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting – Whether learned judge erred in his interpretation of regulation 15 of the International Business Corporation Regulations 1985 – Regulation 15 of the International Business Corporation Regulations 1985 - Whether the learned judge erred in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders – Conduct of party seeking section 122 relief - Whether the learned judge erred*

1

*by considering 1Globe's knowledge of the secret plan to oust the incumbent directors of Sinovac in refusing to grant relief under section 122 – Whether the learned judge erred in finding that the rights agreement between 1Globe and Sinovac was valid under Antiguan law*

1Globe Capital LLC ("1Globe") is a shareholder in Sinovac Biotech Ltd. ("Sinovac"), a China based company registered in Antigua and Barbuda under the International Business Corporations Act ("the IBCA"). On 28th December 2017, Sinovac issued formal notice of an annual general meeting to be held on 6th February 2018 ("the AGM"). Among the items of business listed for the meeting was the re-election of the existing board of directors. In advance of the AGM, shareholders who sought to oust the existing board ("the dissenting shareholders") formed a secret plan to take control of Sinovac. 1Globe knew of and acquiesced in this plan. Neither the board nor the other shareholders knew of the secret plan. At the AGM, without prior warning, the dissenting shareholders proposed alternative resolutions in order to secure the election of their own slate of directors. 1Globe contended that the new directors were validly elected whereas Sinovac maintained that the incumbent directors remained in control of Sinovac. As a result of the contested election, 1Globe applied under section 122 of the IBCA for the court to determine the controversy surrounding the validity of the election of the new directors. 1Globe sought, inter alia, a declaration that the new directors were validly elected at the AGM and an order that they be installed as Sinovac's new directors. Sinovac resisted the claim.

The learned judge dismissed 1Globe's claim and refused to grant relief under section 122. He found that there was a secret plan by the dissenting shareholders to oust the incumbent directors which 1Globe knew of and acquiesced in. The incumbent directors and other shareholders were given no notice of this secret plan and shareholders were effectively deprived of the opportunity to make an informed and intelligent decision on an important matter affecting Sinovac. The learned judge considered these factors, as well as the defective proxy forms and 1Globe's conduct, in coming to his decision to refuse to grant relief under section 122.

1Globe, being dissatisfied with the learned judge's decision, appealed. 1Globe argued, inter alia, that the learned judge (i) erred in his interpretation of section 71 of the IBCA, (ii) erred in finding that the principle permitting amendments to motions at shareholders' meetings, as laid down in Betts & Co. Ltd. v Macnaghten, was inapplicable to a modern corporate context, (iii) erred in finding that the proxy forms used by the dissenting shareholders were non-compliant with regulation 15 of the International Business Corporation Regulations 1985 ("the IBC Regulations"), (iv) erred in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders, by counting such votes as present for the purposes of declaring a quorum at the AGM (v) erred in considering 1Globe's conduct and knowledge of the secret plan to refuse to grant relief under section 122, (vi) erred in finding that the rights agreement between 1Globe and Sinovac was valid under Antiguan law and (vii) erred in the interpretation and exercise of his discretion under section 122 of the IBCA.

**Held:** dismissing the appeal; affirming the order of the learned judge and awarding prescribed costs to the respondent in the court below and costs in the appeal in the sum of 2/3 of the prescribed costs in the court below, that:

1. Absent local authority and case law on the interpretation of a particular section in legislation, authorities from another jurisdiction on corresponding legislative provisions are instructive. The learned judge found that the IBCA was modelled on corresponding Canadian legislation and section 71 mirrored section 110 of the Canada Business Corporations Act. Whilst section 71 of the IBCA had never been considered by the Eastern Caribbean Supreme Court, the corresponding legislative provisions had been the subject of judicial decision in Canada. Consequently, the learned judge did not err when he relied on and sought guidance from Canadian authorities dealing with similar provisions.

2. In construing legislation, the court's task is to give effect to Parliament's purpose. Provisions should be read in light of the statute as a whole, which, in turn, should be read in light of its historical context. The IBCA was modelled on Canadian legislation and Canadian authorities showed that the appropriate model was for full and fair disclosure of information to all shareholders. Thus, where shareholders are called to vote on important company matters, they are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. Whilst section 71 of the IBCA did not make it mandatory to give notice to the incumbent directors that there was a proposal by the dissenting shareholders to elect other persons in their place, in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is contested must be given some kind of notice. If no notice is given, then he would not be able to submit a written statement of his objections as per section 71(2) and the company would not be able to send that statement to the shareholders as per section 71(3). Consequently, shareholders would not have received full and fair disclosure to make an informed decision on an important company matter. The learned judge therefore did not err in his interpretation of section 71 in holding that the spirit and intention of the section had been breached by the dissenting shareholders' failure to give notice of the proposal to elect the new directors.

   Section 71 of the **International Business Corporations Act** Cap. 222, Revised Laws of Antigua and Barbuda 1992 applied; **Kluwak v Pasternak** 2006 CanLII 41292 (ON SC) applied; **Regina (Quintavalle) v Secretary of State for Health** [2003] UKHL 13 applied.

3. Where a company's articles of association and the governing law are silent as to how one may reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting, the court will insist on a minimum standard of basic fairness being afforded to all shareholders. Whilst there was nothing in the IBCA, the IBC Regulations or Sinovac's articles of association prohibiting an amendment to an ordinary resolution being proposed by the dissenting shareholders attending the AGM, by amending

the company's motion to include their alternative slate without notice to the other shareholders and after so many had voted in advance of the AGM, this undermined the basic fairness to which the shareholders, as a whole, were entitled. It would generally be in the company's best interests for shareholders to make fully informed decisions regarding the election of directors. The learned judge therefore did not err when he distinguished the case of Betts & Co. Ltd. v Macnaghten from the present facts since that was a 1910 case, before the internet had been invented and the possibility of voting online and in advance of the annual general meeting did not exist.

**Betts & Co. Ltd. v Macnaghten** [1910] 1 Ch. 430 distinguished.

4. Where a proxy form is called into question the court is concerned with examining the position of all shareholders and not just those who signed the proxy in question. A plain reading of regulation 15 of the IBC Regulations reveals that it applies to all proxies and that its object is to ensure that on important matters such as the election of directors, the will of the proxy giver, the shareholder, is effected and that all shareholders have been provided with full information concerning the election of directors. The learned judge therefore did not err in his interpretation of regulation 15. Furthermore, contrary to 1Globe's assertion, the learned judge expressly declined to make a ruling on the validity of the proxy forms. Instead, he considered the defective proxy forms as a factor to be considered when exercising the court's discretion under section 122.

Regulation 15 of the **International Business Corporation Regulations 1985** S.I. No. 43 of 1985 applied; **Ambassador Industries Ltd. v Camfrey Resources Ltd.** [1991] CanLII 593 (BC SC) applied.

5. Waiver refers to a voluntary, informed and unequivocal election by a party not to claim a right or raise an objection which it is open to that party to raise or claim. The words voluntary, informed, and unequivocal capture the essence of what is needed for a waiver of any kind to be valid. The learned judge found that at the AGM, the inspector of the election said nothing about the proxy forms and reserved a declaration as to result of the election. The inspector's evidence as well as the fact that the dissenting shareholders had a secret plan which neither the other shareholders nor the incumbent directors knew of, meant that the criteria for a valid waiver were not met. Consequently, Sinovac did not waive any technical deficiency in the proxy forms used by the dissenting shareholders by counting such votes as present for the purposes of declaring a quorum at the AGM.

**Millar v Dickson** [2002] 1 WLR 1615 applied; **McGowan v B** [2011] UKSC 54 applied.

6. An appellate court is constrained in interfering with findings of fact by a trial judge and must not interfere with such findings unless compelled to do so. This applies not only to findings of primary facts but also to the evaluations of those facts and to inferences to be drawn from them. Appellate interference requires a finding that

4

there was no evidence to support the challenged factual finding or that the finding was one which no reasonable trial judge could have made. Further, an appellate court is rarely justified in overturning findings of fact made by a trial judge which turn on the credibility of a witness. On the facts, the trial judge listed the items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan, and the documents were put to 1Globe's sole witness. The trial judge set out the witness' evidence in relation to each item and concluded that on the facts, the witness was not credible and there was a secret plan to take control of Sinovac which 1Globe knew of and acquiesced in. Such findings were open to the learned judge based on the evidence. Further, the court's exercise of its discretion under section 122 involves consideration of the facts and circumstances of the case at hand, with the conduct of the parties being one of the factors relevant to the exercise of the court's discretion.

**Fage UK Ltd. and another v Chobani UK Ltd. and another** [2014] EWCA Civ. 5 applied; **Mutual Holdings (Bermuda) Limited and others v Diane Hendricks and others** [2013] UKPC 13 applied.

7. For a rights agreement to have been validly entered into, it ought not be contrary to the governing law or the company's constitution. In coming to his decision that the rights agreement was valid under Antiguan law, the learned judge found that the rights agreement was not contrary to the IBCA or Sinovac's articles of association and bye-laws and that it was not entered into to entrench the incumbent directors. The learned judge did not err is his decision and the agreement was validly entered into since it was within the powers afforded to the directors under Sinovac's constitution and the IBCA.

**Stena Finance BV and Another v Sea Containers Ltd. and Others** (1989) 39 WIR 83 applied.

8. An appellate court will not interfere with the exercise of a discretion entrusted to a trial judge unless the judge has misdirected himself in law, taken account of irrelevant matters, failed to take account of relevant matters, or has made a decision which has exceeded the generous ambit within which reasonable disagreement is possible. Section 122 of the IBCA confers a very broad discretion in determining any controversy and on its plain wording, the court has a broad remedial discretion to make any order it sees fit. The exercise of the court's discretion in granting relief under section 122 and the form of that relief are inextricably linked to the facts of the particular case. Such facts necessarily include equitable principles such as the conduct of the party seeking relief. In refusing to grant relief under section 122, the learned judge considered the relevant factual context including 1Globe's conduct, the scale and detail of the secret plan and the absence of full and fair information to shareholders. Consequently, the learned judge did not err in his interpretation and exercise of discretion under section 122 in refusing to grant the section 122 relief.

**Dumont v Manitoba Metis Federation** [2004] MBCA 149 applied.

**JUDGMENT**

[1]     **BAPTISTE JA**:  This appeal stems from Smith J's dismissal of a claim brought by 1Globe Capital LLC ("1Globe") against Sinovac Biotech Ltd. ("Sinovac") under the remedial provision, section 122 of the **International Business Corporations Act**[1] ("**IBCA**"). The claim emanated from a dispute between 1Globe and Sinovac concerning a contested annual general meeting of Sinovac held in Beijing on 6th February 2018 ("the AGM"). 1Globe is a Delaware limited liability company and a shareholder in Sinovac, a China based company registered under the **IBCA**. Smith J described the case before him as a fight to control the board of directors of Sinovac, a company with about 3,300 shareholders, a market capitalization of US$447.3 million and listed on the Nasdaq stock exchange.

**Background**

[2]     The primary focus of the section 122 claim and the appeal concerned the validity and effect of the vote at the AGM whereby a vote was taken to remove the former directors of Sinovac ("the incumbent directors") and replace them with a new board of directors ("the new directors"). 1Globe contends that the new directors were duly elected as directors of Sinovac. Sinovac disputes this and posits that the incumbent directors, who had remained in control of Sinovac following the disputed election, are the valid directors of Sinovac.

[3]     In the court below, 1Globe sought a declaration that the new directors were validly elected at the AGM, an order that the new directors be installed as Sinovac's board of directors, a declaration that the incumbent directors are no longer Sinovac's directors, and an order that any action taken on behalf of Sinovac at their direction after the AGM are null and void.

[4]     Sinovac resisted the claim, contending that the votes cast by those shareholders in favour of the new directors ("the dissenting shareholders") were not valid because:

---

[1] Cap.222, Revised Laws of Antigua and Barbuda 1992.

(1) Their method of nominating individuals to Sinovac's board of directors, the proxy form used and the ballots they voted on did not conform to Antigua and Barbuda law ("Antiguan law").

(2) There was no full, fair, and plain disclosure to the shareholders in breach of section 71(2) of the **IBCA**, to enable them to make a fully informed decision regarding the election of Sinovac's board of directors.

(3) A right's agreement governed by Delaware law, was triggered by the conduct of the dissenting shareholders prior to, during and after the AGM, which affected the vote at the AGM by dilution of the shareholding of a significant proportion, if not all, of the dissenting shareholders who voted to elect the new directors.

(4) 1Globe and other shareholders, breached United States' securities laws by failing to make appropriate filings and, as a result, the business purportedly conducted at the AGM and/or the votes cast by those shareholders have been invalidated.

[5]    The issues before Smith J were:

(1) Was section 71(2) of the **IBCA** complied with in relation to the notices of the AGM? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace the incumbent directors?

(2) Was the vote to remove and replace the incumbent directors in conformity with Antiguan law? If not, what, if any, are the consequences in relation to the validity of the vote to remove and replace them?

(3) Is the rights agreement valid and effective as a matter of Antiguan law? If so, could the rights agreement, if triggered, affect the vote at the AGM?

(4) Was there a breach of section 13 of the United States **Securities Exchange Act of 1934**[2], by 1Globe? If so, what is the relevance, if any, to the outcome of the vote at the AGM?

[6]    Sinovac issued formal notice of the AGM on 28th December 2017, indicating three items of business, namely (1) the re-election of the existing board of directors, (2) approval of the audited consolidated financial statements of the company for 2017 and (3) the appointment of an independent auditor. This form of notice had been

[2] 15 U.S.C. 78a.

7

used by Sinovac and the relevant resolutions passed at the annual general meetings during the previous four years.

[7]    The court found that, in advance of the AGM, the dissenting shareholders formed a secret plan to take control of Sinovac by ousting the incumbent board. This plan involved ambushing the AGM on the day and attempting to secure the election, without notification to other shareholders or the board, of their own slate of directors, in place of the incumbent board. Smith J found that 1Globe had known of and acquiesced in the plan.

[8]    Shareholders holding shares constituting 82.5% of the issued share capital were present either in person or by proxy at the AGM. Almost half of those had voted in advance of the AGM by proxy or electronic voting. Critically, 17.4% of the issued shares were not voted. Both the advance proxy votes and those who had not voted were unaware of the proposal to elect the alternate slate of directors.

[9]    At the AGM, 1Globe and other dissenting shareholders, without prior warning, proposed resolutions to amend the ballot paper provided by Sinovac, impose a cap on the number of director candidates that shareholders could vote in favour of, and add four new candidates ("the alternative slate"), no information in respect of which had been provided to Sinovac or the other shareholders.

[10]    Smith J recognised that much turned on what transpired at the AGM and made the following factual findings from the transcript of the meeting:

> (1)    No one at the AGM disputed the validity of the notice issued for the convening of the AGM.
>
> (2)    A quorum was declared by Guang Yang, the scrutinizer/inspector of the election at the AGM.
>
> (3)    A motion to (a) amend the ballot to include the option of voting against the incumbent directors and (b) to nominate four directors to the board, was moved and seconded.

(4) The dissenting shareholders cast their vote on an amended version of the ballots provided by Sinovac.

(5) Guang Yang collected the dissenting shareholders' ballots but repeatedly stated that she had to confirm the validity of those ballots with Sinovac's Antiguan attorneys.

(6) There was a tabulation of the votes cast which showed that the new directors had obtained the majority of votes, but there was no declaration of the results of the election. Guang Yang repeatedly stated that she needed to confirm the validity of the votes cast with the Antiguan counsel.

[11]    Smith J stated that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. In Smith J's view, the spirit and intent of section 71 of the **IBCA** was breached and while the section is silent as to the effect, if any, of non-compliance on the election or the AGM, it is certainly a factor for the court to weigh in deciding whether or not to grant relief.

[12]    The learned judge recognised that there was nothing in the **IBCA** or the **International Business Corporation Regulations 1985**[3] ("**the IBC Regulations**") prohibiting an amendment to an ordinary resolution being proposed by shareholders attending an annual general meeting, and that, it did not appear that there were any technical breaches of Antiguan law in proposing the amendments to the motion at the AGM. However, he reasoned that the matter could not be analyzed in isolation from the court's earlier finding that the shareholders, as a whole, were entitled to full and fair disclosure. Smith J further reasoned that amending the company's motion to include an alternative slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the court to consider in deciding whether or not to grant relief under section 122.

---

[3] S.I. No. 43 of 1985.

[13]    While Smith J did not make any ruling on the validity of the proxy form, he considered it as a factor, in the round, when exercising the court's discretion under section 122. He also considered Sinovac's invitation to conclude that 1Globe, and the dissenting shareholders colluded and orchestrated a secret plan to elect a new board without notice to the incumbent directors or the shareholders as a whole. After reviewing the evidence, Smith J found that there was a secret plan to take control of Sinovac and that 1Globe through Mr. Pengfei Li, 1Globe's only witness of fact and who the judge did not find to be credible, knew of and acquiesced in the plan.

[14]    Smith J concluded at paragraph 46 of his judgment that:

> "When I consider the scale and detail of the secret plan, the absence of full and fair information which deprived shareholders of the opportunity to make an informed and intelligent decision and the defective proxy forms, I am obliged to conclude that this was not conduct that should be rewarded with relief under section 122."

He dismissed the claim and declared that the rights agreement was validly adopted as a matter of Antiguan law.

**The appeal**

[15]    Being aggrieved by the judge's order and declaration, 1Globe filed nine grounds of appeal contending, among other things, that Smith J made numerous and material errors of fact and law. From a general level, 1Globe submits that the AGM vote claim/appeal is predominantly, if not entirely, a legal question governed by Antiguan law as the corporate seat. There was little, if any, factual dispute that is material to the determination of this central issue, yet the trial judge made factual findings which have no legal relevance to the proper determination of the pure legal issues underpinning the AGM vote analysis.

[16]    1Globe argues that an obvious and fundamental legal error vitiating the judgment is the judge's invocation of the discretionary remedial functions of section 122 of the **IBCA** to obfuscate pure questions of law and/or influence his determination of the section 122 claim by reference to extraneous findings of fact as to 1Globe's

knowledge of a "secret plan" to hijack the AGM. 1Globe further contends that the error of analysis by reference to the literal wording of section 122 appears to have allowed the learned judge to run distinct legal issues together into some kind of 'mix' rather than disposing of them on their own terms. 1Globe invites this Court to conduct the legal analysis afresh by reference to the discrete issues of company law involved.

[17]    For its part, Sinovac contends that the appeal is misconceived and lacks merit. In that regard, it asserts that 1Globe seeks to ignore factual findings based on Smith J's assessment of witnesses, notably, his rejection of 1Globe's sole witness, Mr. Li, as not "at all credible". Further, 1Globe seeks to ignore the fact that the judge's refusal to grant relief under section 122 of the **IBCA** involved the exercise of discretion and there is no basis for finding that the court exceeded the generous ambit of that discretion. Additionally, in circumstances where all the relevant Antiguan statutory provisions are derived from Canadian legislation, which differs significantly from English legislation in relation to the election of directors, it was entirely appropriate that Smith J had regard to Canadian authorities. Extensive Canadian case law shows that the appropriate model is for full disclosure by dissenting shareholders to allow all shareholders to make fully informed decisions. Sinovac also submits that the plain wording of section 122 confers a judicial discretion whether to grant relief and in what form. It gives the court a power to "determine any controversy …" and to "make any order it thinks fit …". The court has a broad discretion to make a just order under the circumstances in determining "any controversy".

### Ground 1

[18]    I now consider the grounds of appeal. Ground one alleges that the learned judge erred in law in interpreting the words "make any order it thinks fit" in section 122 of the **IBCA** to confer upon the court a broad or general discretion as to the proper legal analysis of the validity of a vote taken at a meeting of shareholders including an annual general meeting. Section 122 provides that:

"(1) A corporation or a shareholder or director thereof may apply to the court to determine any controversy with respect to an election or appointment of a director or auditor of the corporation.

(2) Upon an application made under this section, the court may make any order it thinks fit including, without limiting the generality of the foregoing,

    (a) an order restraining a director or auditor whose election or appointment is challenged from acting pending determination of the dispute;

    (b) an order declaring the result of the disputed election or appointment;

    (c) an order requiring a new election or appointment and including in the order directions for the management of the business and affairs of the corporation until a new election is held or appointment made; and

    (d) an order determining the voting rights of shareholders and of persons claiming to own shares."

[19]  Sinovac submits that on the plain wording of section 122 of the **IBCA** there is a clear judicial discretion whether to grant relief and in what form. It gives the court the power to "determine any controversy …" and to "make any order it thinks fit …". Sinovac posits that it is self-evident that such an exercise of discretion involves a consideration of the facts and circumstances of the case, and points to the heavy burden cast upon 1Globe in seeking to disturb the exercise of the judge's discretion. 1Globe must show that Smith J exceeded the generous ambit within which reasonable disagreement is possible. Sinovac submits that there is no basis for interfering with the exercise of Smith J's discretion.

[20]  It would be prudent to defer further consideration of this ground to later in the judgment.

**Ground 2**

[21]  Ground 2 alleges that the judge erred in law in concluding that (a) section 71 of the **IBCA** contains a specific obligation to notify directors that their re-election is to be

12

contested at a forthcoming meeting and (b) the "spirit and intent" of section 71 was breached in the present case and (c) notions of "basic fairness" to shareholders entitled to vote at meetings should inform or condition the proper meaning and effect of section 71, concerning notice to directors.

[22]     Section 71 states:

> "(1) A director of a corporation is entitled to receive notice of, and to attend and be heard at every meeting of shareholders.
>
> (2) A director
>     (a) who resigns,
>
>     (b) who receives a notice or otherwise learns of a meeting of shareholders called for the purpose of moving him from office, or
>
>     (c) who receives a notice or otherwise learns of a meeting of directors or shareholders at which another person is to be appointed or elected to fill the office of director, whether because of his resignation or removal or because his term of office has expired or is about to expire,
>
> may submit to the corporation a written statement giving the reasons for his resignation or the reasons why he opposes any proposed action or resolution.
>
> (3) The corporation shall forthwith send a copy of the statement referred to in subsection (2) to the Director and to every shareholder entitled to receive notice of any meeting referred to in subsection (1).
>
> (4) No corporation or person acting on its behalf incurs any liability by reason only of circulating a director's statement in compliance with subsection (3)."

[23]     1Globe asserts that Smith J erred in law in his interpretation of section 71 of the **IBCA** and argues that the proper meaning and effect of section 71 is a pure question of law, that is, statutory construction, and there is no room for factual circumstances to influence the answer. Section 71 is concerned with protecting a director's legitimate expectations in advance of a meeting where his tenure of office may be brought to an end. Further, section 71 did not impose a specific obligation upon Sinovac to give advance notice to the incumbent directors of any specific contest

for their re-election, and that the statutory requirement for notice was complied with in the AGM notice. 1Globe further submits that the learned judge erred in law by augmenting the statutory language under the influence of his own erroneous and extraneous factual findings and/or broad propositions of company law that have no bearing on the distinct point of statutory interpretation.

[24]    Further, 1Globe argues that Smith J erred in construing section 71 by reference to his own adopted concept of "full and fair disclosure" gleaned from Canadian case law, and what he called the "spirit and intent" of the provision. 1Globe submits that in so far as this amounts to the imposition by implication of a specific obligation of notification to a director of a meeting "called for the purpose of removing him from office", at which another person is to be appointed or elected to fill the office of director, then such construction is illegitimate as it contradicts the language and scheme of the provision which is unjustified. 1Globe invites this Court to construe section 71 properly and find that it was not breached, and further, even if breached, that it would not vitiate the outcome of the vote held at the AGM, it would, at most, give the incumbent directors a potential claim against Sinovac for damages for breach of statutory duty.

[25]    Sinovac posits that section 71 provides a right in favour of an existing director, where it is sought to elect a person in his place, to have a written statement circulated to all shareholders in advance of the meeting giving reasons why he opposes that proposal. Sinovac noted that while section 71 of the **IBCA** has not been considered by the Eastern Caribbean Supreme Court, it has been the subject of judicial consideration in Canada. Sinovac referred to the case of **Kaiser v Borillia Holdings Inc.**[4] Sinovac submits that Smith J's conclusion that, in order to give meaningful effect to section 71 of the **IBCA**, the director must be given advanced notice of a proposal to elect another person in his place, is consistent with the section and its legislative purpose.

---

[4] [2007] CanLII 18144 (ON SC).

[26]    Sinovac contends that 1Globe's failure to explain why the dissenting shareholders gave no notice of their intention to seek the election of the alternative slate spoke volumes, particularly given that:

    (a) Smith J found that the dissenting shareholders had been taking covert steps to seek the replacement of the incumbent board with the alternative slate for many weeks prior to the AGM; and

    (b) Sinobioway, acting in conjunction with the dissenting shareholders, had published an open letter by newswire targeted at Sinovac's shareholders, calling on them to vote against the re-election of the incumbent board at the upcoming AGM, though, significantly, not indicating that they would be seeking the election of the alternative slate, or anyone would be seeking the election of any alternative directors.

[27]    Sinovac asserts that the dissenting shareholders did not give notice of their intention to seek the election of the alternative slate precisely because they did not want the shareholders or the directors to know what they were up to. In addition, this meant that the incumbent board was deprived of the opportunity to provide a written statement to all shareholders, and to make the decision on whether to attend the AGM because of the proposed motion. In advance of the meeting, shareholders had no idea that alternative candidates were being proposed, let alone any information about the alternative slate proposed on the day of the AGM.

[28]    Smith J considered the parties' competing submissions on section 71 of the **IBCA**. He noted 1Globe's position that on a proper construction of the language of section 71, the only notice required is the notice of the annual general meeting to be given to directors which, in the instant case, had been provided. Each of the incumbent directors was given notice of and permitted to attend the AGM. 1Globe argued that it is difficult to see how the incumbent directors were entitled to any additional or

specific notification of their proposed removal at the AGM, other than notice under section 71.

[29]    Also considered was Sinovac's contention that section 71 must be construed against the contextual framework that shareholders should receive full, fair, and plain disclosure to have a reasonable opportunity to express their will on company matters. The shareholders were deprived of this opportunity. Smith J also noted Sinovac's submission that at the AGM, 1Globe and the dissenting shareholders, without prior warning, proposed a motion to amend the ballot paper, impose a cap on the number of director candidates that members could vote in favour of, and add four new candidates. Shareholders who did not attend the AGM had no advanced notice of any of these proposals and so were unable to consider, let alone, vote on them.

[30]     Smith J approached section 71 of the **IBCA** against the backdrop that the Eastern Caribbean Supreme Court had not previously considered its interpretation and that the **IBCA** was based on what he termed "the Canadian model". The learned judge noted that section 71(2) of the **IBCA** mirrors section 110(2)[5] of the **Canada Business Corporations Act**[6] ("**the Canadian Act**") and section 122 of the **IBCA** mirrors section 145 of **the Canadian Act**. In this regard, he considered Canadian authorities dealing with similar sections to be helpful.

[31]    There is nothing in my view that is exceptional about considering the relevant Canadian authorities. Absent local authority on the interpretation of section 71, Canadian authorities on corresponding legislative provisions are undoubtedly instructive. In the circumstances, Smith J's reliance on those authorities cannot be faulted. It was certainly permissible for him to rely on or seek guidance from them.

---

[5] In the judgment of Smith J, it was stated erroneously that section 71(2) of the IBCA mirrored section 123 of the Canadian Act.
[6] R.S.C., 1985, c. C-44.

[32]     Smith J properly accepted the reasoning in **Kluwak v Pasternak**,[7] a case relied on by Mr. Alford QC, for Sinovac, as authority for the principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them.

[33]     In **Kluwak**, there was a proxy fight for the control of the board of directors of the Griffin Corporation. Kluwak spearheaded the dissident shareholders in the fight. The respondent, Pasternak chaired the annual general meeting at which he disallowed the dissident proxies on the basis of what he viewed as material misrepresentations in the dissident proxy circular. As a result, he declared the management's slate of directors elected. Kluwak sought relief under sections 107 and 248 of the **Ontario Business Corporations Act**[8] ("**OBCA**") wishing the court to declare the board proposed by the dissident shareholders elected instead. Sub-sections (1) and (2) of section 107 of the **OBCA** are in terms identical to section 122 of the **IBCA** of Antigua and Barbuda. The court determined that section 107 gives the court an extremely broad discretion in determining any controversy regarding an election.

[34]     At paragraph 14 of **Kluwak**, Mesbur J stated:

> "The author of *Shareholder remedies in Canada* makes the comment that "case law requires that all information be disclosed that a reasonable investor would consider important in deciding whether to vote". He refers to the philosophy and standard of disclosure discussed as long ago as 1934 in *In re Dorman, Long and Co. [Ltd.]* where Maugham J noted: "It is perhaps not unfair to say that in every nearly big case not more than five percent of the interests involved are present in person at the meeting. It is for this reason that the Court takes the view that it is essential to see that explanatory circulars sent out by the board of the company are perfectly fair and, as far as possible, give all information reasonably necessary to enable the recipients to determine how to vote." What is true for a board circular is equally applicable to a dissident information circular. Shareholders must have all the information they need in order to make an informed decision about voting."

---

[7] 2006 CanLII 41292 (ON SC).
[8] R.S.O. 1990, c. B.16.

Mesbur J continued at paragraph 16:

> "In essence, then, an information circular must contain full, fair and plain disclosure, that has sufficient information concerning the pertinent matters set out "in sufficient detail to permit shareholders to form a reasoned judgment concerning the matter"."

At paragraph 31 Mesbur J found:

> "When looking generally at the best interests of the company, it must be that it is in the company's interests for shareholders to make a fully informed decision regarding the election of directors."

[35]    Smith J described the reasoning of Mesbur J as sound, logical and persuasive, stating that it stands for the unobjectionable principle that shareholders who are called upon to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision has been provided to them. I agree. There is no basis to differ from that position.

[36]    Smith J found that (1) Sinovac has about 3,300 shareholders located in various parts of the world, (2) the board of directors had been re-elected un-opposed, at every annual general meeting for many years and there had never been alternative candidates proposed, (3) shareholders typically voted online and by proxy in advance of the annual general meeting, (4) those who voted by proxy in advance of the AGM would only have known of the incumbent directors, there being no indication of alternate candidates, and (5) a number of shareholders did not vote at all. Those facts led Smith J to draw the reasonable inference that shareholders who voted in advance of the AGM, or those who chose not to vote, had no reason to think that anything would be different at the 2018 AGM. In these circumstances, Smith J posed the question, "…. can it be said that the shareholders had full, fair, and plain disclosure on the important matter of the election of the board of directors of a valuable international company to permit them to make an informed decision?"

[37]    Smith J accepted that section 71 does not say that notice must be given to directors where it is proposed to elect another person to the office of director. He however

reasoned that in order to give meaningful effect to section 71, it must be construed to mean that a director whose re-election is to be contested ought to be given some kind of notice. If a director receives no notice, he cannot submit the written statement referred to in section 71(2), in which case the company cannot send a copy of such statement to the shareholders as required by section 71(3). The shareholders would therefore not have received full and fair disclosure to make an informed decision on an important company matter. Smith J opined that a shareholder in a valuable, publicly traded company would be interested in reading what an incumbent director, whose position is challenged, might have to say about the qualifications and experience of a proposed nominee for his seat on the board of directors. He found that there was no good reason for failing to give effect to the spirit and intent of sections 71(2) and (3).

[38]     In my judgment, Smith J clearly reasoned how he arrived at his conclusion, and it cannot be said that he was wrong. The learned judge found that the spirit and intent of section 71 was breached and while the section is silent as to the effect of any non-compliance on the election or the AGM, it is certainly a factor for the court to weigh, in deciding whether or not to grant relief. I agree. Although 1Globe criticizes Smith J's interpretation and effect of section 71, I am of the view that such criticism is not merited. As stated by Lord Bingham of Cornhill in **Regina (Quintavalle) v Secretary of State for Health**[9] at paragraph 8:

> "The court's task, within the permissible bounds of interpretation, is to give effect to Parliament's purpose. So, the controversial provisions should be read in the context of the statute as a whole, and the statute as a whole should be read in the historical context of the situation which led to its enactment."

In my judgment, Smith J's interpretation of section 71 was consistent with that position.

[39]     Smith J was cognizant of the absence of authorities from the Eastern Caribbean Supreme Court and noting that the **IBCA** was modelled on corresponding Canadian

---

[9] [2003] UKHL 13.

legislation, quite properly considered and applied the relevant Canadian authorities. It was quite legitimate for him to so do. Further, Smith J was alive to the historical context, the legislative purpose, and the philosophy and standard of disclosure discussed as long ago as 1934, as referred to by Mesbur J in **Kluwak**.

[40]    I agree with Sinovac that Smith J's approach entailed an entirely orthodox application of the overarching legal principles governing the Antiguan court's supervision of company meetings, which is also consistent with Canadian law. Canadian case law shows that the appropriate model is for full disclosure by dissenting shareholders to allow all shareholders to make fully informed decisions. The overarching requirements are that shareholders be provided with full and fair information so as to allow them to determine whether to attend a meeting in person, by voting in advance, or by proxy, and how to vote. Shareholders who are called to vote on an important company matter are entitled to expect a process that is fair, transparent and democratic, and in which all the information necessary to make an informed decision is provided to them.

[41]    For the reasons advanced, ground 2 accordingly fails.

**Grounds 3, 4 and 5**

[42]    Ground 3 asserts that the judge erred in law in finding that the common law principle permitting amendments to motions at shareholders meetings, as exemplified in **Betts & Co. Ltd. v Macnaghten**,[10] was inapplicable and inappropriate in a modern corporate context or was otherwise distinguishable from the present case.

[43]    Smith J stated that there was nothing in the **IBCA** or the **IBC Regulations** prohibiting an amendment to an ordinary resolution being proposed by shareholders attending an annual general meeting and it does not appear that there were any technical breaches of Antiguan law in proposing the amendments to the motion at the AGM. He however reasoned that the matter could not be analyzed in isolation

---

[10] [1910] 1 Ch. 430.

from the court's earlier finding that the shareholders as a whole were entitled to full and fair disclosure. Amending the company's motion to include an alternative slate, without notice to shareholders and after many had voted online in advance of the AGM, are certainly circumstances for the court to consider in deciding whether or not to grant relief under section 122.

[44]   1Globe submits that there are no applicable statutory or corporate constitutional provisions governing the process of amendments to motions at shareholders' meetings. In the absence of specific provisions in a company's bye-laws or articles, the common law position regulates amendments to motions at shareholders' meetings, including motions to re-elect directors. 1Globe's position is that a motion at a shareholders' meeting may be amended by a proposal made from the floor of the meeting itself so long as the amendment falls within the subject matter of the original motion. 1Globe asserts that it cannot be disputed that the amended motion, calling for the election of four new directors and the re-election of one existing director, fell comfortably within the parameters of the original motion as notified to shareholders in the AGM notice.

[45]   1Globe argues that Smith J sought to distinguish **Betts** on spurious or immaterial factual grounds and erroneously described **Betts** as "in a different era" and invoked notions of "corporate cultures" in order to depart from such well-established common law principles. 1Globe submits that there is no basis for distinguishing **Betts** on the facts. The fact that the amendment to the motion in **Betts** increased the number of directors from three to five, is immaterial.

[46]   1Globe posits that notice given to shareholders of a meeting, such as an annual general meeting at which the re-election of incumbent directors is a matter of business, necessarily informs or warns shareholders that something may change in the meantime or at the meeting which means that "some or all of" those incumbent directors are not re-elected. That change or risk may come about because, pursuant to common law principles as exemplified in the **Betts** decision, amendments are

proposed to such motion which create a contest for election to the board of directors. Armed with this information/warning at the outset, a shareholder can mitigate the risk by voting in advance in favour of re-election of the incumbent board. There is no prejudice.

[47]    Smith J referred to 1Globe's reliance on **Betts**. In **Betts**, the notice of the annual general meeting of a company stated that the purpose was the passing of certain resolutions, including the appointment of three named individuals as directors. At the meeting, an amendment was carried that, in addition to those three, two additional named directors should be appointed. The company's articles of association provided that the notice of an ordinary general meeting, at which special business was to be transacted, should specify the general nature of such special business. It also provided that the number of directors should be no more than seven or less than three. Eve J concluded that the business transacted at the meeting was within the scope of the special business indicated in the notice.

[48]    Eve J posed the questions:

> "Ought I to hold that the amendment which purported to reappoint the three gentlemen named in the notice as directors for the ensuing twelve months and to add two other gentlemen as additional directors was an amendment so inconsistent with the object of the meeting as stated in the notice and so irregular as to be beyond the power of the meeting? Was it in short, such an amendment as no reasonable man would have regarded as competent to be put forward at a meeting so convened.?.....I think I must assume that the shareholders who received this notice were alive to this possible contingency, and, further, were aware that in the matter of electing directors the only restriction on the power of the company is to be found in the article which limits the maximum number to seven. With these facts present in mind I think a reasonable man reading this notice must have appreciated that those present at the meeting would regard themselves as empowered to make such appointments to the board for the ensuing year as they thought fit so long as they did not do anything contrary to the company's regulations. No one could have thought that the meeting was convened to appoint the three named individuals without the power to substitute other qualified persons for all or any of such individuals, and there is nothing in the notice to indicate that the company will not, if they see fit so to do, exercise their power of increasing the number of directors under article 83. The special business indicated in the notice being the election of directors

for the ensuing year, I think a recipient of the notice must be taken to have known that the company in general meeting might make any appointment within the limit imposed by their regulations…."

[49]     Smith J noted that 1Globe extrapolated the **Betts** principle to the present case and its argument that the shareholders, reading the notice of the AGM that there would be an election, were alive to the possibility that an amendment could be proposed, resulting in the election of a different board of directors than the one proposed. He however found that the instant case was materially distinguishable from **Betts** for the following reasons:

(1)  In **Betts**, two additional directors were nominated in addition to the three proposed for nomination while, in the present case, the proposed amendment was for the replacement of the proposed nominees, except for one.

(2)  The proposed amendment in **Betts** for two additional nominees to the board was within the articles of association which limited the board to a maximum of seven. In the instant case, the dissenting shareholders proposed a cap on the number of elected directors that was below the fifteen-member limit prescribed in the articles of association.

(3) **Betts**, a 1910 case, was in a different era. The internet had not yet been invented and so the concept and possibility of voting online, in advance of the annual general meeting, did not exist. The instant case involves a company, with multi-national investors, incorporated in Antigua, doing business in China, listed on Nasdaq and regulated by US securities law, whose shareholders routinely voted online in advance of an annual general meeting and therefore had no notion that an entirely different slate from that on which they voted would have materialized at the AGM.

[50]     Smith J accepted in principle, that shareholders who received notice of an annual general meeting for the election of directors must be alive to the possibility that an

amendment to the motion can be proposed, resulting in a different board of directors. He however stated that the globally accepted modern practice of voting online in advance of an election, introduces a new dimension to the hitherto conventional practice of proposing amendments to motions on the floor of the annual general meeting. That practice might be unobjectionable where the shareholders of a company are all situated in the same jurisdiction, and they attend annual general meetings in person. In today's world, however, where technology allows for internet voting and thousands of shareholders of a company are spread across the globe, physical attendance at meetings is an effete convention. The court therefore finds itself at the intersection of two corporate cultures. On the one hand, there is the practice of moving amendments to motions on the floor of the annual general meeting. On the other hand, there is the modern practice of shareholders voting online in advance of an annual general meeting and not physically attending, which closes them off from what transpires at the annual general meeting.

[51]     Smith J reasoned that where the company's articles of association and the governing law are silent as to how one might reconcile online voting in advance of an annual general meeting with the right to move an amendment to a motion at an annual general meeting, the best that the court can do is to insist on a minimum standard of basic fairness. He found that those shareholders who voted online in advance of the AGM were following a routine practice, voting for one slate that had been re-elected for many years, had no reason or warning to expect anything different and certainly had no idea that a different slate of candidates would have been proposed at the convention. They, as well as those who chose not to vote, did not have an opportunity to make an informed decision. The dissenting shareholders had been planning in secret to propose an alternative slate and therefore had no good reason for failing to give advanced notice of their intended amendment. This undermines basic fairness to which the shareholders, as a whole, were entitled.

[52]     In my judgment, Smith J properly explained the bases on which he distinguished the instant case from **Betts**. He did so in clear and easily understandable terms.

24

Looking at the matter in the round, the reasons advanced for distinguishing the case, cannot be properly described as spurious. Further, having regard to the reasoning which led Smith J to his conclusion as a whole, I am not of the view that Smith J applied an incorrect legal test. His insistence on a minimum standard of basic fairness is consistent with the relevant Canadian authorities.

[53]    Ground 4 asserts that Smith J erred in law by imposing a novel test of "good reason" for shareholders in a publicly traded company to justify not giving advanced notice of an intention to propose amendments to a motion, concerning the re-election of directors at a meeting such as an annual general meeting. I am not of the view that Smith J was imposing a test of "good reason." The context in which Smith J made his statement does not admit such a test being laid down by him. Essentially, Smith J was addressing the issue of basic fairness to which shareholders as a whole were entitled, in the circumstances of the case.

[54]    Ground 5 alleges that Smith J misdirected himself in law in finding that the reasoning of Mesbur J in **Kluwak** was "sound, logical and persuasive" relative to the instant proceedings. In my view, this ground cannot be sustained. Mesbur J recognised that when looking generally at the best interests of the company, it must be that it is the company's interests for shareholders to make a fully informed decision regarding the election of directors. To my mind, that proposition is unassailable and there is no basis to differ.

[55]    For the reasons indicated, grounds 3, 4 and 5 fail.

**Ground 6**

[56]    Ground 6 asserts that the judge erred in law in finding that the proxy forms used by the dissenting shareholders to vote their shares at the AGM on 6th February were non-compliant with Antiguan law, specifically regulation 15 of the **IBC Regulations**. Sinovac points out, and I agree, that Smith J made no such finding. In fact, he

expressly declined to make a ruling on the validity of the proxy form. Thus, at paragraph 36, Smith J specifically stated:

> "….I will not make any ruling on the validity of the proxy form but consider it as a factor, in the round, when exercising the Court's discretion under section 122."

[57] Regulation14 provides that:

> "A form of proxy may confer discretionary authority in respect of amendments to matters that properly come before the meeting and that were not identified in the notice of meeting."

Regulation 15 states:

> "A form of proxy must not confer authority to vote in respect of an auditor or the election of a director unless a bona fide proposed nominee for the appointment is named in the form of proxy."

[58] At the trial, Smith J considered 1Globe's submission that regulation 15 applies only to proxy forms issued by or on behalf of Sinovac itself when it gives notice of the annual general meeting, namely, the so-called 'proxy card', while Sinovac's position was that it applied to all proxy forms used to enable shareholders to cast their vote. In support of its position Sinovac relies on Canadian authorities, which it states indicates that the equivalent Canadian rule applies to all proxies and not just those issued on behalf of the company or existing management. Sinovac also contends that its position is also consistent with the plain wording of regulation 15 which is stated to apply to "a form of proxy" and is not limited to "a form of proxy issued by the company itself, or by third parties acting under instructions from the company". I agree with Sinovac's position.

[59] Smith J noted that both sides relied on the Canadian authority of **Ambassador Industries Ltd. v Camfrey Resources Ltd.**.[11] He held that **Ambassador** is persuasive authority for the proposition that where a proxy form is called into question, the court is concerned to examine the position of all shareholders, not just those who signed the proxy in question. The learned judge noted that none of the

---

[11] [1991] CanLII 593 (BC SC).

dissenting shareholders provided any advanced notice to Sinovac or the shareholders, as a whole, prior to the AGM, of a proposal to replace the board or of the identity of their nominees for election, nor did their proxy form name any nominee for election.

[60]     Smith J held that the object and intent of regulation 15 is clear and unmistakable. It is to ensure that, on important matters such as the appointment of an auditor and the election of directors, the will of the shareholder, the proxy giver, is effected and that all shareholders are provided with full information concerning the election of directors. Such a requirement has greater relevance and consequences for a publicly traded company with thousands of shareholders who vote online and through brokers, than, for example, a small family-run company.

[61]     Sinovac submits and I agree, that in view of the authorities and the plain wording of regulation 15, and the scheme of the **IBCA** generally, including section 71, Smith J's conclusion regarding the object and intent of regulation 15 was entirely appropriate.

[62]     Smith J concluded that in the final analysis, the court must weigh the right of the shareholders to full information to be able to come to an intelligent decision against the right of shareholders who voted not to be unfairly disenfranchised. For this reason, Smith J made no ruling on the validity of the proxy form but regarded it as a factor in the round, in the exercise of his discretion under section 122.

[63]     I also agree with Sinovac that 1Globe's suggestion, that Smith J's conclusion as to the object and intent of regulation 15 renders the regulation ultra vires the enabling provision, section 351 of the **IBCA**, is also wrong. The power to make regulations under section 351 is provided "for the better administration of this Act" and the relevant sub paragraphs are expressly stated to be "without limiting the generality of the foregoing".

27

[64]     1Globe complains that regulation 15 is inconsistent with the common law position relating to amendments to ordinary resolutions, that is, **Betts**. Sinovac, rejects this complaint and submits that regulation 15 is consistent with Canadian case law, and in any event, it is a creature of statute, modelled on well-established Canadian provisions in respect of which there is a body of supportive case law. I agree.

[65]     For the reasons given, ground 6 also fails.

**Ground 7**

[66]     Ground 7 deals with waiver. It asserts that Smith J erred in fact and in law in finding that Sinovac did not waive any legal defect in the proxy forms used by the dissenting shareholders at the AGM, in particular, after having counted their shares, on the basis of such proxy forms, as present for the purposes of declaring quorum at the AGM.

[67]     Smith J dealt with the issue at paragraph 33 of his judgment. He recited 1Globe's complaint that Sinovac waived any procedural defect in the dissenting shareholders' proxy forms by counting them at the AGM for the purposes of declaring a quorum and then counting them in favour of the amended motion. Smith J reasoned that it was clear from the transcript of the proceedings at the AGM, that Guang Yang was at pains to point out that, while she would collect the ballots, she could not pronounce on the validity of the ballots that had been amended by the dissenting shareholders until the matter had been reviewed by Antiguan counsel. Smith J also observed that Guang Yang did not say anything about the proxy forms at the AGM. He however concluded that Guang Yang, in reserving any declaration on the result of the election, meant that it was open to Sinovac's Antiguan counsel to review the validity of the process. In the circumstances, the learned judge found that the defect in the proxy forms was not waived by Sinovac. In my view, it was a conclusion that was properly open to him.

[68]     1Globe, however, posits that Smith J only dealt with the point about Sinovac's reliance upon or acceptance of the relevant proxy forms at the AGM for the purpose of counting of the vote. It argues that Smith J did not consider the real thrust of the waiver case, that is, that by counting and accepting the votes of the relevant shareholders, attending by proxies, for the purpose of establishing quorum at the AGM, Sinovac thereby waived any formal legal defect in the relevant proxy forms.

[69]     Sinovac submits that 1Globe's argument regarding the waiver of defects in the dissenting shareholders' proxy forms is moot in circumstances where Smith J, expressly declined to make any findings regarding the validity, or otherwise, of these proxy forms. There is, accordingly, no issue in relation to the quorum of the AGM. Further, Sinovac submits that even if there were an issue, this would not assist 1Globe. In that regard, Sinovac refers to regulation 8 of its bye-laws which provides that:

> "… Each director shall hold office unless removed as provided in these presents, until the next Annual Shareholders' meeting and until his successor shall have been elected."

Sinovac also utilizes section 67(4) of the **IBCA** which states that:

> "Notwithstanding subsection (2) of section 65 or subsections (1) and (3) of this section, if directors are not elected at a meeting of shareholders, the incumbent directors continue in office until their successors are elected."

[70]     Sinovac also submits that if the AGM had been inquorate, neither slate of directors could have been elected with the result that, pursuant to regulation 8.1 and section 67 of the **IBCA**, the incumbent board remained in office.

[71]     In considering the arguments of the parties, it is instructive to point out that in most litigious situations the expression 'waiver' is used to describe a voluntary, informed and unequivocal election by a party not to claim a right or raise an objection which

it is open to that party to raise or claim as per Lord Bingham of Cornhill in **Millar v Dickson**.[12] As noted in **McGowan v B**[13] at paragraph 17:

> "The words "voluntary, informed and unequivocal" captures the essence of what is needed for a waiver of any kind to be valid."

[72]    Given that the essence of a valid waiver and Smith J's conclusion with respect to the evidence of Guang Yang, I am not of the view that the criteria for a valid waiver were met. In the circumstances, Sinovac did not waive any technical deficiency in the relevant proxy forms, inter alia, by counting such votes as present for the purposes of declaring quorum at the AGM. This ground accordingly fails.

**Ground 8**

[73]    Ground 8 alleges that the learned judge erred in fact and in law in concluding that (a) 1Globe had knowledge of a "secret plan" in advance of the AGM and (b) such knowledge and/or consequent "unfairness to other shareholders" constituted a sufficient reason for the court to refuse its power under section 122 of the **IBCA**.

[74]    1Globe contends that the key point in this context is the extent to which the learned judge allowed his views as to the motives of 1Globe or other shareholders to influence his determination of distinct questions of law throughout the judgment.

[75]    At paragraph 37 of his judgment, Smith J dealt with Sinovac's invitation to conclude that 1Globe and the dissenting shareholders colluded and orchestrated a secret plan to elect a new board, without notice to the incumbent directors or the shareholders as a whole. Smith J listed the five items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan to elect a new board. These were:

> (1) The year-end personal work summary of Tao Fuwu dated 12th January 2017.

---

[12] [2002] 1 WLR 1615.
[13] [2011] UKSC 54.

(2)  A draft amendment and restated consortium agreement.

(3) The transcript of a teleconference held on 8th January 2018.

(4) An open later from Sinobioway to all shareholders of Sinovac; and

(5) An email from "one shareholder Tang".

[76]    Each document was put to 1Globe's witness, Mr. Li, in cross-examination. Smith J set out Mr. Li's evidence in relation to each. Having done that Smith J set out his conclusion, regarding that on the evidence, there had indeed been a plan and that Mr. Li's evidence was not credible.

[77]    The personal work summary was authored by Tao Fuwu, who set out his role as "one of the supervisors" in the matter of the privatisation of Sinovac and summarised his main work in 2017 to include:

> " … prepare to hold Sinovac special shareholders' conference and demonstration  (including without limitation, repeated discussions and persuasion of 1G[lobe], especially assistance in analysis of poison pill plan, meeting order, analysis of the barriers and plans, shareholder proxies handling, and hiring of intermediary agent) preparation and opining on Sinovac's annual shareholders conference  participation and change of the board of directors (repeatedly opine of plan risks, discuss rivals' obstructionism, opine on an appropriate response, opine on procedures, coordination among shareholders and documentation of authorized agent); the related media public relations work……worked with 1G[lobe] to achieve substantial progress and signed cooperation agreement and framework agreement…..We are fundamentally prepared for changing the board of directors of Sinovac at the shareholders' conference."

[78]    Smith J referred to Mr. Li's evidence in cross-examination that he was delegated by 1Globe to manage its investment risk when it started being privatised. He was entrusted with full authority and he was free to make any decision in consultation with 1Globe's United States lawyer. Most of the strategic advice in relation to 1Globe came from him and he did not need advice from anyone at 1Globe. He flatly denied, however, knowing anything about what was contained in the work summary and

said he was puzzled by it and questioned whether in fact Mr. Fuwu had really written it.

[79]    The draft consortium agreement suggests that 1Globe was part of the Sinobioway Consortium to attempt to purchase Sinovac. Under cross–examination, Mr. Li expressed surprise at the document and said that he had never seen it before, expressing doubt as to its authenticity, since any communication would have to come through him as 1Globe's designated representative in the matter. He stated that the consortium agreement might be forged or fabricated but declined to say who might have forged it.

[80]    With respect to the transcript of the teleconference, the AGM was discussed and the eventuality of changing the board of directors. These plans included a rehearsal to prepare shareholder representatives for potential issues which the dissenting shareholders might face at the AGM and a media strategy to turn shareholders against the incumbent directors in the days before the AGM. Smith J noted that during cross-examination, Mr. Li denied knowing anything about that teleconference and said that it was the first time he was seeing the document.

[81]    The open letter from Sinobioway dated 31st January 2018, alleged that the chairman and CEO of Sinovac, bribed a senior official of the China Food and Drug Administration and was not qualified to serve as a director of Sinovac. Sinovac was accused of incompetence, not acting in the best interests of shareholders and infringing the voting rights of shareholders through the voting card prepared for the AGM. It ended by recommending that shareholders attend the AGM and oppose the re-election of the current board. Smith J noted that Mr. Li again denied any knowledge of involvement in this document.

[82]    Lastly, Smith J referred to the email to Sinovac from a sender named Tang, who described himself as "one shareholder Tang". The email points out that the voting card prepared provided no option to vote "against" the re-election of the incumbent

directors and requested the inclusion of the option to vote "against" on the voting card. Under cross-examination Mr. Li admitted that Tang, whose real name was Joyce, was a younger colleague of his who worked at 1Globe and admitted that the email was written at his request by "Joyce" but did not know why she used the name "Tang" instead of her real name.

[83]    Smith J stated that Mr. Li maintained under cross-examination that he never knew James Chang, even though it was Chang who nominated him to be a director on Sinovac's board. He said he was surprised to have been nominated and did not know the other three individuals who were nominated to replace the incumbent directors. He had remained silent throughout the AGM.

[84]    Smith J found it difficult to believe that Mr. Li did not know that he was going to be nominated and found it equally difficult to believe that he did not need 1Globe's approval to accept the nomination and did not need to consult 1Globe on anything having to do with Sinovac. Smith J found that Mr. Li was at a loss to explain why the email address from which his junior colleague sent an anonymous email to Sinovac matched the email address of Sinobioway which, on the evidence, had been involved in planning to oust the incumbent directors and spreading negative publicity about them. The haste with which he took charge of Sinovac even before the official election result was declared, suggests that he knew of a plan to oust the incumbent directors. Smith J concluded:

> "Taken in the round, I do not find the evidence of Mr. Pengfei Li to be at all credible. I am convinced, on a balance of probabilities, that there was a secret plan to take control of the Company [Sinovac] and that the claimant [1Globe], through Mr. Li, knew of and acquiesced in this plan."

[85]    An appellate court is constrained in interfering with findings of fact by a trial judge and must not interfere with such findings unless compelled to do so. This applies not only to findings of primary facts but also to the evaluations of those facts and to inferences to be drawn from them as had been noted in **Fage UK Ltd. and another**

**v Chobani UK Ltd. and another**.[14] Appellate interference requires a finding that there was no evidence to support the challenged factual finding or that the finding was one which no reasonable trial judge could have made. On the issue of credibility, an appellate court is rarely justified in overturning a finding of fact by a trial judge which turns on the credibility of a witness as had been noted at paragraph 28 in **Mutual Holdings (Bermuda) Limited and others v Diane Hendricks and others**.[15]

[86]     As indicated, Smith J listed the items of written evidence relied on by Sinovac in support of its contention that the dissenting shareholders were parties to a secret plan to elect a new board. The documents were put to Mr. Li, 1Globe's witness, in cross-examination and the learned judge set out his evidence in relation to each item. He then set out his conclusion that there was a secret plan to take control of Sinovac and that 1Globe, through Mr. Li, knew of and acquiesced in the plan. Smith J had also found that Mr. Li was not credible. It cannot be said that there was no evidence to support the factual findings, or that the findings were ones which no reasonable judge could have reached. The findings were clearly open to him on the evidence. 1Globe has not met the high threshold for appellate interference in the judge's factual findings. This ground of appeal accordingly fails.

[87]     1Globe asserts, incorrectly, in my view, that these findings of fact have no proper bearing on the determination of the legal issues impacting the determination of the section 122 claim and should not have been allowed to otherwise influence its outcome. Sinovac submits correctly, in my judgment, that the court's exercise of its discretion involves consideration of the facts and circumstances of the case at hand. This is supported by Canadian case law dealing with the equivalent to section 122 of the **IBCA**, which demonstrates that the conduct of the parties is one of the factors relevant to the exercise of the court's discretion.

---

[14] [2014] EWCA Civ. 5.
[15] [2013] UKPC 13.

**Ground 9**

[88]     The subject of Ground 9, a discrete ground of appeal, is the validity of the rights agreement between 1Globe and Sinovac. 1Globe asserts that the learned judge erred in law in finding that the rights agreement is valid as a matter of Antiguan Law.

[89]     The rights agreement was entered into to "guard against partial tender offers, open market accumulations and other abusive or coercive tactics to gain control of the company [Sinovac]". It provides that certain conduct of shareholders of Sinovac can trigger the dilution of their shareholding.

[90]     1Globe disputes the validity of the rights agreement on two bases. First, Antiguan law does not allow defensive shareholder rights plans absent stockholder consent and there was no such consent. Secondly, the rights agreement was not validly adopted under Antiguan law because the provisions of the **IBCA**, sections 161 and 163, were not complied with in respect thereof. Sinovac relies on the Bermuda case of **Stena Finance BV and Another v Sea Containers Ltd. and Others**,[16] which upheld the validity of a rights plan, and contends that the rights agreement was validly adopted under Antiguan law.

[91]     Smith J considered and rejected 1Globe's both arguments for disputing the validity of the rights agreement. He also noted Sinovac's reliance, in reply, on **Stena**, which upheld the validity of a rights plan and its contention that the rights agreement was validly adopted under Antiguan Law.

[92]     In **Stena**, Astwood CJ held that the distribution of rights to existing shareholders in anticipation of a possible hostile takeover bid is not unlawful, provided that the directors have the requisite powers under the company's bye-laws to issue such rights, that they exercise those powers bona fide (that is, not for the purpose of entrenching the existing management of the company) and fairly as between shareholders. Astwood CJ stated:

---

[16] (1989) 39 WIR 83.

"The directors stated the purpose for adopting the plan in the letter of 9[th] May 1988. On review, their purpose appears to be legitimate, and I have no reason to differ from them. The principles expounded by the Privy Council in *Howard Smith Ltd. v Ampol Petroleum* Limited [1974] AC 821, have not, in my opinion, been breached. The plan seems to be favourable to all shareholders of record at the date of adoption of the plan, and those persons who became shareholders after that date did so knowing what the terms of the plan were. Therefore, they cannot now be heard to say that the plan is unfavourable to their aspirations in making a bid to take over the company.

On a review of the plan, I tend to agree … that the plan did not do any of the following things: (a) it did not in any way alter or purport to alter (pending the exercise of the rights) the existing share capital of the company or the votes attached to the common shares; and (b) it, without in any way intending to penalize any existing shareholders (that would indeed have been expropriatory and improper), operated quite indiscriminately between all existing shareholders."

[93]    Smith J agreed with Sinovac that there was no allegation of any mala fides on the part of its board or any suggestion that it had entered into the rights agreement other than in accordance with its fiduciary duties. There is, in evidence, minutes of the board meeting approving the rights agreement which record the board's belief that it would "contribute to the preservation of the company's long-term value".

[94]    Smith J proceeded to say that:

"….if Antigua wishes to attract international business…..to incorporate in the jurisdiction, it has to recognize that defensive shareholder rights plans are part of that corporate landscape."

Smith J adopted the approach taken in **Stena** and stated that:

"….provided the Rights Agreement is not contrary to the **IBCA** or the Company's articles and bye-laws, and provided it was not entered into to entrench the Incumbent Directors, it should be considered as valid."

His Lordship went on to examine both the **IBCA** as well as Sinovac's articles of association to see whether Sinovac could lawfully enter into the rights agreement.

[95]     1Globe submits that Smith J erred in adopting and applying the reasoning of Astwood CJ in **Stena**, as the rights plan in that case dealt with a different corporate scenario, that is, hostile takeover bids, and fell to be construed against a different statutory regime than applicable in Antigua and Barbuda. Further, Smith J erroneously assumed that permitting defensive shareholder agreements was an intrinsically desirable thing "if Antigua wishes to attract international business … to incorporate in the jurisdiction".

[96]     1Globe asserts that the factual premise for Smith J's analysis was the assumption, in favour of Sinovac, that the rights agreement was adopted by the former directors in March 2016 in the "best interests of the shareholders as a whole". 1Globe described this as dubious. A further complaint was that Smith J made no attempt to analyze section 163 of the **IBCA**, but simply stated "[n]either do I see the applicability of section 163 of the **IBCA**", in reaching his conclusion as to the non-applicability of sections 161 and 163 to the rights agreement. Further, in reaching his conclusion as to the non-applicability of sections 161 and 163 to the rights agreement, Smith J made a fundamental misapprehension as to the legal effect of a 'trigger event' upon the legal rights attaching to shares held by 'acquiring persons', that is, the relevant shareholders, which involves the removal of voting rights and/or acquisition rights attaching to shares in Sinovac. It is difficult, 1Globe argues, to see how neither section 161 nor 163(1)(c)(iv) could be engaged.

[97]     As indicated, 1Globe criticized Smith J's reliance on **Stena**. In my judgment, Smith J was right in adopting and applying the reasoning in **Stena**. Although 1Globe sought to distinguish **Stena** on the ground that it dealt with a different corporate scenario, I agree with Sinovac's contention that there is no meaningful difference between the two cases. The rights plan in **Stena** was adopted in the context of competing takeover bids, while the rights agreement in the present case was adopted in the context of competing going private proposals. A distinction without a difference. Further, 1Globe's assertion that the rights plan in **Stena** fell to be

construed against a different statutory regime, is devoid of details as to the differences.

[98]     1Globe's attack on the bona fides of Sinovac's board in entering into the rights agreement is not justified. There was no pleaded allegation of mala fides on the part of Sinovac's board. Also, that was not a ground of appeal. I also note that there is no challenge to Smith J's finding that "there is no allegation of any mala fides on the part of the company's [Sinovac] board or any suggestion that it entered into the rights agreement other than in accordance with its fiduciary duties".

[99]     Smith J examined both the **IBCA** and the articles of association in considering whether Sinovac could lawfully enter into the rights agreement. He took cognizance of the class of shares Sinovac was allowed to issue, the directors' authority to fix the number of shares or to determine the designation of, and the rights privileges, restrictions and conditions attaching to the shares of each series, and that the powers of the corporation shall be exercised by its board of directors. Smith J also referred to paragraph 8.9 of the bye-laws which provides that the board may exercise all such powers of the corporation as are not by the **IBCA** or bye-laws required to be exercised by the corporation in an annual general meeting. He opined that the power to make distributions, as contemplated by the rights agreement, is not reserved to the members and is therefore exercisable by the board.

[100]    Smith J noted 1Globe's reliance on sections 161 and 163 of the **IBCA** to support the contention that the rights agreement could not be adopted without amending the Sinovac's articles of association. Section 161 states:

> "Subject to sections 162 and 163, the articles of a corporation may, by special resolution, be amended -
>   (a)  to change its name;
>
>   (b)  to add, change or remove any restriction upon the business that the corporation can carry on;
>
>   (c)  to change any maximum number of shares that the corporation is authorized to issue;

(d)  to create new classes of shares;

(e)  to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued;

(f)  to change the shares of any class or series, whether issued or unissued, into a different number of shares of the same class or series or into the same or a different number of shares of other classes or series;"

Section163(1)(c)(iv) provides:

"(1) The holders of shares of a class or, subject to subsection (2), of a series are, unless the articles otherwise provide in the case of an amendment described in paragraph (a) or (b), entitled to vote separately, as a class or series, upon a resolution to amend the articles:
(c) to add, change or remove the rights, privileges, restrictions or conditions attached to the shares of that class and, in particular, without limiting the generality of the foregoing,
(iv) to add, remove or change prejudicially conversion privileges, options, voting, transfer or pre-emptive rights, or rights to acquire shares or debentures of a corporation, or sinking fund provisions."

[101]  Smith J did not view the distribution of shares, triggered by the rights agreement, resulting in a dilution of a shareholders' shareholding, as changing the designation of/or removing any rights or privileges attaching to, or in respect of any shares. Neither did he see the applicability of section 163 of the **IBCA**. He therefore declared that the rights agreement was valid under Antiguan law.

[102]  1Globe submits that in determining the applicability of sections 161 and 163 of the **IBCA,** Smith J made a "fundamental misapprehension" in failing to appreciate that the rights agreement involved "the removal of voting rights and/or the acquisition rights attaching to shares in the company". I do not accept that submission. I am persuaded by Sinovac's position, that the rights agreement is similar to that in **Stena**, where the court found that entering into a rights plan was within the directors' powers. Further, as in **Stena**, the rights agreement did not involve (a) the alteration

of the rights attaching to the company's common stock rather, it involved the distribution of a right to acquire shares, that is, an option, to all holders of the company's common stock, (b) the removal of voting rights rather, it is an acquiring person's rights, not its voting rights in its existing shares, which, under the original terms of the rights agreement, are avoided upon the happening of a trigger event.

[103]     As in **Stena**, in the present case, neither the adoption nor the implementation of the rights agreement involved or required an amendment to the articles of association, nor any other step requiring shareholder consent. In that regard:

> (a) article iii (3) of the articles of association permits Sinovac to issue shares in series and the directors are authorized to fix the number of shares in, and to determine the designation of, and the rights, privileges, restrictions and conditions attaching to shares of each series;

> (b) article iv provides that the powers of Sinovac are exercised by the board;

> (c) by virtue of bye–law 8.9 the board may exercise all such powers of Sinovac as are not by the **IBCA** or by the bye-laws required to be exercised by Sinovac in an annual general meeting;

> (d) the power to make distributions is not reserved to the members and is therefore exercisable by the board;

> (e) likewise, the power granted to Sinovac pursuant to section 35 of the **IBCA** to grant conversion privileges, options or rights, to acquire shares of the corporation is also not reserved to the members and is therefore exercisable by the board.

[104]     In the premises, the board was empowered to grant options or rights to acquire shares, and to fix the rights, privileges, restrictions and conditions attaching to shares, and also to make distributions. The rights agreement was validly entered into. It was within the powers afforded to the directors under Sinovac's constitution and the **IBCA**. This ground of appeal accordingly fails.

40

[105]    I return to the issue of the court's discretion under section 122 of the **IBCA**, which provides for a corporation, shareholder or director thereof to apply to the court with respect to any controversy with respect to the election of a director. Section 122 gives the court a very broad discretion in determining any controversy. On its plain wording, the section confers on the court, a broad remedial discretion to make any order it thinks fit and enumerates examples of permissible orders. The exercise of the discretion whether or not to grant relief and in what form, is inextricably linked to the facts of the particular case. In **Dumont v Manitoba Metis Federation**,[17] the court noted that the power to grant declaratory relief (under the equivalent section to section 122) entitled it to take account of equitable principles such as the conduct of the party seeking the relief.

[106]    1Globe's contention that the conduct of the parties "lack[s] any legal relevance" to the section 122 claim is unmeritorious and wrong in law. The court cannot exercise its discretion in a vacuum. The factual context is important. The reasons for the judge's exercise of discretion in refusing relief under section 122 of the **IBCA** are clearly set out in his judgment. Included therein are breach of the spirit and intent of section 71, amending the Sinovac's motion to include an alternative slate without notice to shareholders and after many had voted online in advance of the AGM, the right of the shareholders to full information and the absence of full and fair information depriving the shareholders of the opportunity to make an informed and intelligent decision, the conduct of 1Globe and the scale and detail of the secret plan to take control of Sinovac which 1Globe knew of and acquiesced in.

[107]    Smith J stated that in **Dumont**, the court stated that the evidence of wrongdoing and essential unfairness of the electoral process are factors that might influence the exercise of discretion. He therefore concluded that 1Globe's knowledge of the secret plan and the unfairness to other shareholders of the execution of the plan at the AGM, is enough for the court to refuse the relief sought by 1Globe.

---

[17] [2004] MBCA 149.

[108]    Is there a proper basis for disturbing the judge's exercise of discretion? There are well established principles governing appellate interference with the exercise of a judicial discretion. An appellant has a high hurdle to surmount when challenging the exercise of a judicial discretion. This court will not interfere with the exercise of a discretion entrusted to a trial judge unless the judge has misdirected himself in law, taken into account irrelevant matters, failed to take account of relevant matters or has made a decision which has exceeded the generous ambit within which reasonable disagreement is possible. Even if an appeal court would have preferred a different answer, unless the decision was plainly wrong, it will be left undisturbed.

[109]    Given the law regarding appellate interference with the exercise of the discretion of a judge, I am satisfied that there is no proper basis warranting such interference. It cannot be said that the learned judge's decision refusing relief to 1Globe under section 122 of the **IBCA** exceeded the generous ambit within which reasonable disagreement is possible or was plainly wrong.

**Order**

[110]   It is ordered that:

(1)   The appeal is dismissed.

(2)   The order of Smith J dismissing 1Globe's claim is thus affirmed, so also is the declaration that the rights agreement was validly adopted as a matter of Antiguan law.

(3)   The respondent, Sinovac, having succeeded in the court below and also in resisting the appeal, is entitled to prescribed costs in the court below and costs on the appeal being, 2/3 of the prescribed costs in the court below.

I concur.
**Louise Esther Blenman**
Justice of Appeal

I concur.
**Gertel Thom**
Justice of Appeal

**By the Court**

**Chief Registrar**

**<u>EXHIBIT D</u>**

DocuSign Envelope ID: 245C6A4E-CB66-4118-0B31-D662AAE86C9A

## Omnibus Corporate Authority

I, Samuel Benjamin Bankman-Fried, as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), hereby authorize, instruct and consent to the following corporate actions with respect to all members of the FTX Group:

(i)      the appointment of John J. Ray III (the "CEO") as Chief Executive Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group;

(ii)     the execution and delivery of any agreements, documents or instruments the CEO determines to be appropriate in connection with the foregoing;

(iii)    the retention of counsel and other advisors, and the execution and delivery of any agreements, documents or instruments in connection with the foregoing;

(iv)     the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of FTX Trading Ltd.;

(v)      the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of Alameda Research Ltd.;

(vi)     the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of West Realm Shires Inc.;

(vii)    if the CEO shall so determine, the appointment of one or more individuals chosen by the CEO and not affiliated with me as director of other members of the FTX Group;

(iv)     the performance of any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect the foregoing.

It is my wish that the CEO consult with my counsel at Paul, Weiss, Rifkind, Wharton & Garrison LLP with respect to the foregoing director appointments.

Date:  November 10, 2022

*Samuel Benjamin Bankman-Fried*
672DA88132804B9...

Samuel Benjamin Bankman-Fried

**<u>EXHIBIT E</u>**

## ANTIGUA AND BARBUDA

### International Business Corporations Act, CAP. 222
### A Company Limited by Shares

### ARTICLES OF INCORPORATION
### OF
### FTX TRADING LTD.



As last amended on October 18, 2021

### ARTICLE I

The name of the company is FTX Trading Ltd. (the "**Company**").

### ARTICLE II

## REGISTERED OFFICE AND AGENT

The Registered Agent of the Company shall be **CORPORATE & TRUST SERVICES (CARIBBEAN) LIMITED**, whose office is situated at Lower Factory Road, in the city of Saint John's, Antigua and Barbuda, the said office shall be the Registered Office of the Company.

### ARTICLE III

## CAPITAL

The Share Capital of the Company shall be 808,087,056 registered shares divided into 755,438,749 shares of US$0.0000026 each par value common shares, which shall be designated "**Common Shares,**" and 52,648,307 shares of preferred shares US$0.0000026 each par value, of which 0 shall be designated "**Series A Preferred Shares**", 38,532,578 shall be designated "**Series B Preferred Shares**", 3,220,729 shall be designated "**Series B-1 Preferred Shares**" and 10,895,000 shall be designated "**Series C Preferred Shares**" (the Series A Preferred Shares, the Series B Preferred Shares, the Series B-1 Shares and the Series C Preferred Shares are collectively referred to herein as the "**Preferred Shares**"). Both classes of shares may be issued in series and the directors shall have the authority to fix the number of shares in, or to determine the designation of, and the rights, privileges, restrictions and conditions attaching to, the shares of each series.

The Company shall have the power to increase or reduce said capital, and to issue any part of its capital as special privilege, or subject to any postponement of rights, or to any conditions or restrictions; and so that unless the conditions of issue shall otherwise expressly declare, every issue of shares, whether declared to be preference or otherwise, shall be subject to the power therein contained.

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of shares of the Company.

A.    COMMON SHARES

1.    <u>General</u>. The voting, dividend and liquidation rights of the holders of the Common Shares are to the extent set forth herein subject to and qualified by the rights, powers and preferences of the holders of the Preferred Shares.

2.    <u>Voting</u>. The holders of the Common Shares are entitled to one vote for each share of Common Shares held at all meetings of shareholders (and written actions in lieu of meetings). The number of authorized shares of Common Shares may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of preferred shares that may be required by the terms of these Articles) the affirmative vote of the holders of shares of the Company representing a majority of the votes represented by all outstanding shares of the Company entitled to vote in accordance with the International Business Corporations Act.

B.    PREFERRED SHARES

1.    <u>Dividends</u>.

JAN 1 8 2022

FILED

The Company shall not declare, pay or set aside any dividends on shares of any other class or series of capital equity of the Company unless (in addition to the obtaining of any consents required elsewhere in these Articles) the holders of the Preferred Shares then outstanding shall first receive, or simultaneously receive, a dividend on each Preferred Share in an amount at least equal to (i) in the case of a dividend on Common Shares or any class or series that is convertible into Common Shares, that dividend per Preferred Shares as would equal the product of (A) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Common Shares and (B) the number of Common Shares issuable upon conversion of a Preferred Share, in each case calculated on the record date for determination of holders entitled to receive such dividend or (ii) in the case of a dividend on any class or series that is not convertible into Common Shares, at a rate per Preferred Share determined by (A) dividing the amount of the dividend payable on each share of such class or series of capital equity by the original issuance price of such class or series of capital equity (subject to appropriate adjustment in the event of any share dividend, share split, combination or other similar recapitalization with respect to such class or series) and (B) multiplying such fraction by an amount equal to the applicable Original Issue Price; provided that, if the Company declares, pays or sets aside, on the same date, a dividend on shares of more than one class or series of capital equity of the Company, the dividend payable to the holders of Preferred Shares pursuant to this Section 1 shall be calculated based upon the dividend on the class or series of capital equity that would result in the highest Preferred Share dividend. The **"Original Issue Price"** shall mean, with respect to the Series A Preferred Shares, $0.18972 per share, with respect to the Series B Preferred Shares, $26.21 per share, with respect to the Series B-1 Preferred Shares, $36.41 per share and with respect to the Series C Preferred Shares, $46.3518 per share in each case subject to appropriate adjustment in the event of any dividend, share split, combination or other similar recapitalization with respect to the Preferred Shares.

The Company when paying dividends to the Shareholders in accordance with the provisions set forth herein may make such payment either in cash or in shares of the Company,

with such amount of dividend to be set forth in the sole discretion of the Board of Directors of the Company. Further, the Company shall only declare, pay or set aside any dividends in fiscal years during which the Company is profitable, and, in no case shall dividends be declared, paid or set aside other than in accordance with the laws of Antigua and Barbuda.

2.    Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales.

2.1    Preferential Payments to Holders of Preferred Shares. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the holders of Preferred Shares then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its shareholders before any payment shall be made to the holders of Common Shares by reason of their ownership thereof, an amount per share equal to the greater of (i) one times the applicable Original Issue Price, plus any dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had all Preferred Shares been converted into Common Shares pursuant to Section 4 immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Preferred Share Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the assets of the Company available for distribution to its shareholders shall be insufficient to pay the holders of Preferred Shares the full amount to which they shall be entitled under this Subsection 2.1, the holders of Preferred Shares shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

2.2    Payments to Holders of Common Shares. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of Preferred Shares in accordance with Section 2.1, the remaining assets of the Company available for distribution to its shareholders shall be distributed among the holders of shares of Common Shares, pro rata based on the number of shares held by each such holder.

2.3    Deemed Liquidation Events.

2.3.1    Definition. Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of at least a majority of the outstanding Preferred Shares (voting together as a single class) (the "**Requisite Holders**") elect otherwise by written notice sent to the Company prior to the effective date of any such event:



(a)    a merger or consolidation in which

(i)    the Company is a constituent party or

(ii)    a subsidiary of the Company is a constituent party and the Company issues shares in its capital pursuant to such merger or consolidation,

3

except any such merger or consolidation involving the Company or a subsidiary in which the capital equity of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital equity that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital equity of (1) the surviving or resulting Company; or (2) if the surviving or resulting Company is a wholly owned subsidiary of another Company immediately following such merger or consolidation, the parent Company of such surviving or resulting Company ; or

(b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company; provided, however, that in no event shall a sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions of one or more digital assets, or any similar transaction, be considered a Deemed Liquidation Event.

### 2.3.2   Effecting a Deemed Liquidation Event.

(a) The Company shall not have the power to effect a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(i) unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the shareholders of the Company shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2.

(b) In the event of a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(ii) or 2.3.1(b), if the Company does not commence the winding-up of the Company under the International Business Corporations Act within ninety (90) days after such Deemed Liquidation Event, then: (i) the Company shall send a written notice to each holder of Preferred Shares no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to request the repurchase of such Preferred Shares, and (iii) if the Requisite Holders so request in a written instrument delivered to the Company not later than one hundred twenty (120) days after such Deemed Liquidation Event, the Company shall use the consideration received by the Company for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Company), together with any other assets of the Company available for distribution to its shareholders, all to the extent permitted by Antigua law governing distributions to shareholders (the "**Available Proceeds**"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event, to repurchase all outstanding Preferred Shares at a price per share equal to the Preferred Share Liquidation Amount. Notwithstanding the foregoing, in the event of a repurchase pursuant to the preceding sentence, if the Available Proceeds are not sufficient to repurchase all outstanding Preferred Shares, the Company shall ratably repurchase each holder's Preferred Shares to the fullest extent of such Available Proceeds and shall repurchase the remaining shares as soon as it may lawfully do so under Antigua law governing

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

4

distributions to shareholders. The provisions of Section 6 shall apply, with such necessary changes in the details thereof as are necessitated by the context, to the repurchase of the Preferred Shares pursuant to this Subsection 2.3.2(b). Prior to the distribution or repurchase provided for in this Subsection 2.3.2(b), the Company shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event or in the ordinary course of business.

2.3.3 <u>Amount Deemed Paid or Distributed</u>. The amount deemed paid or distributed to the holders of capital equity of the Company upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or repurchase shall be the cash or the value of the property, rights or securities paid or distributed to such holders by the Company or the acquiring person, firm or other entity. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Company.

2.3.4 <u>Allocation of Escrow and Contingent Consideration</u>. In the event of a Deemed Liquidation Event pursuant to Subsection 2.3.1(a)(i), if any portion of the consideration payable to the shareholders of the Company is payable only upon satisfaction of contingencies (the **"Additional Consideration"**), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the **"Initial Consideration"**) shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2 as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the shareholders of the Company upon satisfaction of such contingencies shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2 after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this Subsection 2.3.4, consideration placed into escrow or retained as holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

3.    <u>Voting</u>.

3.1    <u>General</u>. On any matter presented to the shareholders of the Company for their action or consideration at any meeting of shareholders of the Company (or by written consent of shareholders in lieu of meeting), each holder of outstanding Preferred Shares shall be entitled to cast the number of votes equal to the number of whole Common Shares into which the Preferred Shares held by such holder are convertible as of the record date for determining shareholders entitled to vote on such matter. Except as provided by law or by the other provisions of these Articles, holders of Preferred Shares shall vote together with the holders of Common Shares as a single class.

3.2    <u>Election of Directors</u>. The holders of record of the Common Shares, exclusively and as a separate class, shall be entitled to elect the total number of directors of the Company. Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the ~~FINANCIAL SERVICES~~ capital shares entitled to elect such director or directors, given either at a special meeting of ~~RECLAMATION COMMISSION~~ shareholders duly called for that purpose or pursuant to a written consent of shareholders. If the

5

JAN 1 8 2022

FILED

holders of Common Shares fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this Subsection 3.2, then any directorship not so filled shall remain vacant until such time as the holders of the Common Shares elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by shareholders of the Company other than by the shareholders of the Company that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this Subsection 3.2, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this Subsection 3.2.

      3.3    Protective Provisions. At any time when at least fifty percent (50%) of the aggregate number of originally issued Series B Preferred Shares, Series B-1 Preferred Shares and Series C Preferred Shares are outstanding, the Company shall not, either directly or indirectly by amendment, merger, consolidation, recapitalization, reclassification, or otherwise, do any of the following without (in addition to any other vote required by law) the written consent or affirmative vote of the Requisite Holders given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void ab initio, and of no force or effect:

      3.3.1    amend, alter or repeal any provision of these Articles in a manner that adversely affects the powers, preferences or rights of the Series B Preferred Shares, Series B-1 Preferred Shares or Series C Preferred Shares (or any series thereof);

      3.3.2    (i) create or authorize the creation of or issue any new class or series of shares or any other security convertible into or exercisable for any equity security (by reclassification, amendment or alteration of any existing security, or otherwise), having liquidation rights senior to or on parity with the Series B Preferred Shares, Series B-1 Preferred Shares or Series C Preferred Shares, or (ii) increase the authorized number of shares of Preferred Shares or any additional class or series of capital stock of the Company unless the same ranks junior to the Preferred Shares with respect to its rights, preferences and privileges;

      3.3.3    liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or any other Deemed Liquidation Event, or consent to any of the foregoing, in each case, unless the holders of Preferred Shares receive at least one times the applicable Original Issue Price; or

      3.3.4    pay or declare any dividend or make any distribution on, any shares of capital stock of the Company other than (i) dividends or distributions on the Preferred Shares as expressly authorized herein, (ii) dividends or other distributions payable on the Common Shares solely in the form of additional shares of Common Shares and (iii) dividends or other distributions paid on any shares of capital stock of the Company in an amount necessary to permit the holders of such capital stock to pay all of the U.S. federal, state and local income tax liabilities



REGISTERED AGENT SERVICES

JAN 1 8 2022

FILED

attributable to such holder of capital stock's ownership of such shares of capital stock, as determined in good faith by the Board of Directors of the Company.

4.    Optional Conversion.

The holders of the Preferred Shares shall have conversion rights as follows (the "**Conversion Rights**"):

4.1    Right to Convert.

4.1.1    Conversion Ratio. Each share of Preferred Shares shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable Common Shares as is determined by dividing the applicable Original Issue Price by the applicable Conversion Price (as defined below) in effect at the time of conversion. The "**Conversion Price**" shall initially be equal to $0.18972 with respect to the Series A Preferred Shares, $26.21 with respect to the Series B Preferred Shares, $36.41 with respect to the Series B-1 Preferred Shares and $46.3518 with respect to the Series C Preferred Shares. Such applicable Conversion Price, and the rate at which Preferred Shares may be converted into Common Shares, shall be subject to adjustment as provided below.

4.1.2    Termination of Conversion Rights. In the event of a liquidation, dissolution or winding up of the Company or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Preferred Shares.

4.2    Fractional Shares. No fractional Common Shares shall be issued upon conversion of the Preferred Shares. In lieu of any fractional shares to which the holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by the fair market value of a share of Common Shares as determined in good faith by the Board of Directors of the Company. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of Preferred Shares the holder is at the time converting into Common Shares and the aggregate number of Common Shares issuable upon such conversion.

4.3    Mechanics of Conversion.

4.3.1    Notice of Conversion. In order for a holder of Preferred Shares to voluntarily convert Preferred Shares into Common Shares, such holder shall (a) provide written notice to the Company's transfer agent at the office of the transfer agent for the Preferred Shares (or at the principal office of the Company if the Company serves as its own transfer agent) that such holder elects to convert all or any number of such holder's Preferred Shares and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such Preferred Shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such


FINANCIAL SERVICES REGULATORY COMMISSION

FILED

7

certificate), at the office of the transfer agent for the Preferred Shares (or at the principal office of the Company if the Company serves as its own transfer agent). Such notice shall state such holder's name or the names of the nominees in which such holder wishes the Common Shares to be issued. If required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Company if the Company serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion Time**"), and the Common Shares issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date. The Company shall, as soon as practicable after the Conversion Time (i) effect a compulsory repurchase of the specified Preferred Shares and the issuance of the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof through updating, or causing to be updated, the register of members of the Company , (ii) issue and deliver to such holder of Preferred Shares, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the Preferred Shares represented by the surrendered certificate that were not converted into Common Shares, (ii) pay in cash such amount as provided in Subsection 4.2 in lieu of any fraction of a share of Common Shares otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the Preferred Shares converted.

        4.3.2   Reservation of Shares. The Company shall at all times when the Preferred Shares shall be outstanding, reserve and keep available out of its authorized but unissued capital equity, for the purpose of effecting the conversion of the Preferred Shares, such number of its duly authorized Common Shares as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Shares; and if at any time the number of authorized but unissued Common Shares shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Shares, the Company shall take such corporate action as may be necessary to increase its authorized but unissued Common Shares to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to these Articles. Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value of the Common Shares issuable upon conversion of the Preferred Shares, the Company will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and non-assessable Common Shares at such adjusted applicable Conversion Price.

        4.3.3   Effect of Conversion. All Preferred Shares which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive Common Shares in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in Subsection 4.2 and to receive payment of any dividends declared but unpaid thereon.

        4.3.4   No Further Adjustment. Upon any such conversion no adjustment to the applicable Conversion Price shall be made for any declared but unpaid dividends

8

FINANCIAL SERVICES
REGULATORY COMMISSION
JAN 1 8 2022
FILED

on the Preferred Shares surrendered for conversion or on the Common Shares delivered upon conversion.

4.3.5    Taxes. The Company shall pay any and all issue and other similar taxes (if any) that may be payable by the Company in respect of any issuance or delivery of Common Shares upon conversion of Preferred Shares pursuant to this Section 4. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of Common Shares in a name other than that in which the Preferred Shares so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company , that such tax has been paid.

4.4    Adjustments to Conversion Price for Diluting Issues.

4.4.1    Special Definitions. For purposes of this Article III, the following definitions shall apply:

(a)    **"Option"** shall mean rights, options, debentures or warrants to subscribe for, purchase or otherwise acquire Common Shares or Convertible Securities.

(b)    **"Series C Original Issue Date"** shall mean the date on which the first share of Series C Preferred Shares was issued.

(c)    **"Convertible Securities"** shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Shares, but excluding Options.

(d)    **"Additional Common Shares"** shall mean all Common Shares issued (or, pursuant to Subsection 4.4.3 below, deemed to be issued) by the Company after the Series C Original Issue Date, other than (1) the following Common Shares and (2) Common Shares deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, **"Exempted Securities"**):

(i)    Common Shares, Options or Convertible Securities issued as a dividend or distribution on Preferred Shares;

(ii)    Common Shares, Options or Convertible Securities issued by reason of a dividend, share split, split-up or other distribution on Common Shares that is covered by Subsection 4.5, 4.6, 4.7 or 4.8;

(iii)    Common Shares or Options issued to employees or directors of, or consultants or advisors to   the Company or any of its



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

9

subsidiaries or affiliates pursuant to a plan, agreement or arrangement;

(iv)    Common Shares or Convertible Securities actually issued upon the exercise of Options or Common Shares actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)    Common Shares, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction;

(vi)    Common Shares, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services;

(vii)    Common Shares, Options or Convertible Securities issued pursuant to the acquisition of another Company by the Company whether by merger, stock purchase, exchange of shares, purchase of substantially all of the assets or other reorganization or to a joint venture agreement; and



(viii)    Common Shares, Options or Convertible Securities issued in connection with sponsored research, collaboration, technology license, development, OEM, marketing, endorsement or other similar agreements or strategic partnerships.

4.4.2   No Adjustment of Conversion Price. No adjustment in the applicable Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Common Shares if the Company receives written notice from the Requisite Holders agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Common Shares.

4.4.3   Deemed Issue of Additional Common Shares.

(a)    If the Company at any time or from time to time after the Series C Original Issue Date shall issue any Options or Convertible Securities (excluding

10

Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of Common Shares (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Common Shares issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of Common Shares issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Company upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the applicable Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such applicable Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the applicable Conversion Price to an amount which exceeds the lower of (i) the applicable Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the applicable Conversion Price that would have resulted from any issuances of Additional Common Shares (other than deemed issuances of Additional Common Shares as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)     If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4 (either because the consideration per share (determined pursuant to Subsection 4.4.5) of the Additional Common Shares subject thereto was equal to or greater than the applicable Conversion Price then in effect, or because such Option or Convertible Security was issued before the Series C Original Issue Date), are revised after the Series C Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of Common Shares issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Common Shares subject thereto (determined in the manner provided in Subsection 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

11

(d)    Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, the applicable Conversion Price shall be readjusted to such applicable Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)    If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the applicable Conversion Price provided for in this Subsection 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Subsection 4.4.3). If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the applicable Conversion Price that would result under the terms of this Subsection 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the applicable Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

4.4.4    Adjustment of Conversion Price Upon Issuance of Additional Common Shares. In the event the Company shall at any time after the Series C Original Issue Date issue Additional Common Shares (including Additional Common Shares deemed to be issued pursuant to Subsection 4.4.3), without consideration or for a consideration per share less than the applicable Conversion Price in effect immediately prior to such issue, then the applicable Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a)    "$CP_2$" shall mean the applicable Conversion Price in effect immediately after such issue of Additional Common Shares

(b)    "$CP_1$" shall mean the applicable Conversion Price in effect immediately prior to such issue of Additional Common Shares;

(c)    "A" shall mean the number of Common Shares outstanding immediately prior to such issue of Additional Common Shares (treating for this purpose as outstanding all Common Shares issuable upon exercise of Options and the conversion of Preferred Shares, in each case, outstanding immediately prior to such issue but excluding any



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

12

Common Shares issuable upon conversion or exchange of any other Convertible Securities then outstanding);

(d)     "B" shall mean the number of Common Shares that would have been issued if such Additional Common Shares had been issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Company in respect of such issue by $CP_1$); and

(e)     "C" shall mean the number of such Additional Common Shares issued in such transaction.

4.4.5     Determination of Consideration. For purposes of this Subsection 4.4, the consideration received by the Company for the issue of any Additional Common Shares shall be computed as follows:

(a)     Cash and Property: Such consideration shall:

(i)     insofar as it consists of cash, be computed at the aggregate amount of cash received by the Company, excluding amounts paid or payable for accrued interest;

(ii)     insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Company; and

(iii)     in the event Additional Common Shares are issued together with other shares or securities or other assets of the Company for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors of the Company .



(b)     Options and Convertible Securities. The consideration per share received by the Company for Additional Common Shares deemed to have been issued pursuant to Subsection 4.4.3, relating to Options and Convertible Securities, shall be determined by dividing:

(i)     The total amount, if any, received or receivable by the Company as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto,

13

without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(ii) the maximum number of Common Shares (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.



4.4.6 Multiple Closing Dates. In the event the Company shall issue on more than one date Additional Common Shares that are a part of one transaction or a series of related transactions and that would result in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, then, upon the final such issuance, the applicable Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5     Adjustment for Share Splits and Combinations. If the Company shall at any time or from time to time after the Series C Original Issue Date effect a subdivision of the outstanding Common Shares, the applicable Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of Common Shares issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of Common Shares outstanding. If the Company shall at any time or from time to time after the Series C Original Issue Date combine the outstanding Common Shares, the applicable Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of Common Shares issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of Common Shares outstanding. Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6     Adjustment for Certain Dividends and Distributions. In the event the Company at any time or from time to time after the Series C Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive,

14

a dividend or other distribution payable on the Common Shares in additional Common Shares, then and in each such event the applicable Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the applicable Conversion Price then in effect by a fraction:

(1)     the numerator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(2)     the denominator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of Common Shares issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the applicable Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the applicable Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Preferred Shares simultaneously receive a dividend or other distribution of Common Shares in a number equal to the number of Common Shares as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

4.7     Adjustments for Other Dividends and Distributions. In the event the Company at any time or from time to time after the Series C Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive, a dividend or other distribution payable in securities of the Company (other than a distribution of Common Shares in respect of outstanding Common Shares) or in other property and the provisions of Section 1 do not apply to such dividend or distribution, then and in each such event the holders of Preferred Shares shall receive, simultaneously with the distribution to the holders of Common Shares, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

4.8     Adjustment for Merger or Reorganization, etc. Subject to the provisions of Subsection 2.3, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Company in which the Common Shares (but not the Preferred Shares) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Subsections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Preferred Shares shall thereafter be convertible in lieu of the Common Shares into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of Common Shares of the Company issuable upon conversion of one share of Preferred Shares immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in

15



JAN 1 8 2022

FILED

such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Company ) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Preferred Shares, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the applicable Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Shares. For the avoidance of doubt, nothing in this Subsection 4.8 shall be construed as preventing the holders of Preferred Shares from exercising any dissenters rights to which they are otherwise entitled under the Companies Act, nor shall this Subsection 4.8 be deemed conclusive evidence of the fair value of the Preferred Shares in any such proceeding.

4.9     Certificate as to Adjustments. Upon the occurrence of each adjustment or readjustment of the applicable Conversion Price pursuant to this Section 4, the Company at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Shares a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Preferred Shares is convertible) and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Shares (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the applicable Conversion Price then in effect, and (ii) the number of Common Shares and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Preferred Shares.

4.10     Notice of Record Date. In the event:

(a)     the Company shall take a record of the holders of its Common Shares (or other capital equity or securities at the time issuable upon conversion of the Preferred Shares) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of any class or any other securities, or to receive any other security; or

(b)     of any capital reorganization of the Company, any reclassification of the Common Shares of the Company, or any Deemed Liquidation Event; or

(c)     of the voluntary or involuntary liquidation or winding-up of the Company,

then, and in each such case, the Company will send or cause to be sent to the holders of the Preferred Shares a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Shares (or such other capital equity or securities at the time issuable upon the conversion of the Preferred Shares) shall be entitled to exchange their Common Shares (or such other capital equity or securities) for securities or other property deliverable upon

16

FILED

JAN 18 2022

such reorganization, reclassification, consolidation, merger, transfer, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Preferred Shares and the Common Shares. Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

     5.    Mandatory Conversion.

     5.1    Trigger Events. Upon either (a) a Qualified IPO (as defined below), (b) a Qualified SPAC Transaction (as defined below) or (c) a Qualified Direct Listing Transaction (as defined below) or (d) the date and time, or the occurrence of an event, specified by vote or written consent of the Requisite Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the **"Mandatory Conversion Time"**), then (i) all outstanding Preferred Shares shall automatically be converted into Common Shares, at the then effective conversion rate as calculated pursuant to Subsection 4.1.1 and (ii) such shares may not be reissued by the Company.

     5.2    For purposes of this Section 5, the following definitions shall apply:

     5.2.1    A **"Qualified IPO"** means the closing of a firm commitment underwritten public offering with a price of at least 150% of the Series C Preferred Share Conversion Price and gross proceeds to the Company of not less than $400 million.

     5.2.2    A **"Qualified SPAC Transaction"** means a transaction or series of transactions which constitute the acquisition of the Company by, or merger of the Company with, a special purpose acquisition company or a new holding company (each, a **"SPAC"**) and which results in the surviving entity being listed on NASDAQ or other internationally recognized stock exchange (the **"Applicable Exchange"** and the transaction, the **"SPAC Transaction"**) provided that either: (i) the proposed SPAC Transaction ascribes a per share equity valuation of the Common Shares immediately prior to the SPAC Transaction (assuming conversion of all securities convertible into Common Shares immediately prior to the SPAC Transaction and exercise of all issued and outstanding options to purchase Common Shares) that is at least equal to 110% of the Conversion Price of the Series C Preferred Shares; or (ii) the Company's Common Shares has an average daily closing price on the Applicable Exchange at the end of any calendar month of at least 150% of the Series C Preferred Share Conversion Price with respect to all trading days occurring within such calendar month.

     5.2.3    A **"Qualified Direct Listing Transaction"** means the Company's voluntary registration of its common stock with the SEC and listing the Applicable Exchange, provided that the Company's Common Shares has an average daily closing price on the Applicable Exchange at the end of any calendar month of at least 150% of the Series C Preferred Share Conversion Price with respect to all trading days occurring within such calendar month.

     5.3    Procedural Requirements. All holders of record of Preferred Shares shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such Preferred Shares pursuant to this Section 5. Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time. Upon receipt of such notice, each holder of Preferred Shares in certificated form shall surrender his, her or its certificate

17

FINANCIAL SERVICES
REGULATORY COMMISSION

**JAN 1 8 2022**

FILED

or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such certificate) to the Company at the place designated in such notice. If so required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Preferred Shares converted pursuant to Subsection 5.1, including the rights, if any, to receive notices and vote (other than as a holder of Common Shares), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this Subsection 5.2. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Preferred Shares, the Company shall (a) effect a compulsory repurchase of all outstanding Preferred Shares and the issuance of the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof through updating, or causing to be updated, the register of members of the Company, (b) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable on such conversion in accordance with the provisions hereof and (c) pay cash as provided in Subsection 4.2 in lieu of any fraction of a share of Common Shares otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the Preferred Shares converted.

6.    Non-Redeemable Preferred Shares. The Preferred Shares are not redeemable at the option of any holder thereof.

7.    Waiver. Any of the rights, powers, preferences and other terms of the Preferred Shares set forth herein may be waived on behalf of all holders of Preferred Shares by the affirmative written consent or vote of the holders of at least a majority of the Preferred Shares then outstanding. Notwithstanding the foregoing, any rights, powers, preferences and other terms specific and unique to (i) Series B Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series B Preferred Shares, (ii) Series B-1 Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series B-1 Preferred Shares and (iii) Series C Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series C Preferred Shares.

8.    Notices. Any notice required or permitted by the provisions of this Article III to be given to a holder of Preferred Shares shall be mailed, postage prepaid, to the post office address last shown on the records of the Company, or given by electronic communication, and shall be deemed sent upon such mailing or electronic transmission.

**ARTICLE IV**

**BOARD OF DIRECTORS**

18

FINANCIAL SERVICES REGULATORY COMMISSION

JAN 1 8 2022

FILED

The powers of the Company shall be exercised by the Board of Directors of the Company, which shall be empowered to name one or more Managing Directors. Subject to any restrictions in the appointing resolution, an act of a Managing Director shall bind the Company as if said act had been approved by the Board of Directors. Only a member of the Board of Directors shall serve as a Managing Director. The Company shall have a minimum of 1 and a maximum of 11 directors.

## ARTICLE V

### CORPORATE PURPOSE

The objects for which the Company is established are:

a) Software Platform; and all business activities permitted by the laws of the State of Antigua and Barbuda other than International Banking, Trust and Insurance, Betting and Bookmaking or any activity which requires a Licence under the International Business Corporations Act.

b) To acquire and deal with any property, real or personal, to erect any buildings, and generally to do all acts and things which, in the opinion of the Company or the Directors, may be conveniently or profitably, or usefully acquired and dealt with, carried on, erected or done by the Company in connection with said property.

c) To generally have and exercise all powers, rights and privileges necessary and incident to carrying out properly the objects herein mentioned.

## ARTICLE VI

### EXISTENCE

The Company shall have perpetual existence unless sooner dissolved in accordance with the laws of the Antigua and Barbuda. The date on which corporate existence shall begin is the date on which these Articles of Incorporation are filed with the Director of International Business Corporations of Antigua and Barbuda.

## ARTICLE VII

### LIABILITY OF SHAREHOLDERS

The liability of a shareholder is limited to the amount, if any, unpaid on the shares held or subscribed to by said shareholder.

## ARTICLE VIII

### INDEMNIFICATIONS

The Company shall indemnify any and all of its Directors, officers, employees or agents or former Directors, officers, employees or agents or any person or persons who may have served at its request as a Director, officer, employee or agent of another corporation, partnerships joint venture, trust or other enterprise in which it owns capital shares or of which it is a creditor, to the full extent permitted by law. Said indemnification shall include, but not limited to, the expenses, including

19



RECUPERATORY COMMISSION
JAN 18 2022
FILED

the cost of any judgements, fines settlements and counsel's fees, actually and necessarily paid or incurred in connection with any action, suit or proceeding, whether civil, criminal, administrative or investigative, and any appeals thereof, to which any such person or his legal representative may be a party or may be threatened to be made a party by reason of his being or having been a Director, officer, employee or agent as herein provided. The foregoing right of indemnification shall not be exclusive of any rights to which any Director, officer, employee or agent may be entitled as a matter of law or which he may be lawfully granted.

## ARTICLE IX

**CHARTER CONTINUANCE**

The Company is authorised to transfer its charter to any jurisdiction, which permits continuation of a foreign corporation.

**SECURITIES**

No Securities of the Company will be distributed to the public in the Antigua and Barbuda in contravention of Section 365 of the International Business Corporations Act, 1982.

## ARTICLE XI

**INCORPORATORS**

The name and address of the Company's incorporators are:

**ARTHUR G. B. THOMAS**　　　　　　　**LISA M. JOHN-WESTE**
Clarkes Hill　　　　　　　　　　　　　　English Harbour
St. John's　　　　　　　　　　　　　　　St. Paul's
Antigua　　　　　　　　　　　　　　　　Antigua

REGISTERED

Dated this 20th Day of January, 2022 at St. John's, Antigua



20

* * *

ANTIGUA AND BARBUDA

INTERNATIONAL BUSINESS CORPORATIONS ACT CAP. 222

GENERAL BY-LAW

As last amended on March 19, 2019

TABLE OF CONTENTS

| | Chapter |
|---|---|
| INTERPRETATION | 1 |
| REGISTERED OFFICE | 2 |
| SEAL | 3 |
| DIRECTORS | 4 |
| BORROWING POWERS OF DIRECTORS | 5 |
| MEETINGS OF DIRECTORS | 6 |
| REMUNERATION OF DIRECTORS | 7 |
| SUBMISSION OF CONTRACTS OF SHAREHOLDERS | 8 |
| FOR THE PROTECTION OF DIRECTORS AND OFFICERS | 9 |
| INDEMNITIES TO DIRECTORS AND OFFICERS | 10 |
| OFFICERS | 11 |
| SHAREHOLDERS' MEETINGS | 12 |
| SHARES | 13 |
| TRANSFERS OF SHARES AND DEBENTURES | 14 |
| DIVIDENDS | 15 |

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

21

VOTING IN OTHER COMPANIES                                    16

INFORMATION AVAILABLE TO SHAREHOLDERS                        17

NOTICES                                                      18

CHEQUES, DRAFTS AND NOTES                                    19

EXECUTION OF INSTRUMENTS                                     20

SIGNATURES                                                   21

FINANCIAL YEAR                                               22

INITIAL DIRECTORS                                            23

FINANCIAL SERVICES
REGULATORY COMMISSION

**JAN 1 8 2022**

FILED

**ANTIGUA AND BARBUDA**
**INTERNATIONAL BUSINESS CORPORATIONS ACT Cap. 222**

**A COMPANY LIMITED BY SHARES**
**GENERAL BY-LAW (NO. 1)**

A by-law relating generally to the conduct of the affairs of **FTX TRADING LTD.** (hereinafter called the "Company")

**BE IT ENACTED** as the general by-law of the Company as follows:

1. **INTERPRETATION**
1.1.    In this by-law and all other by-laws of the Company, unless the context otherwise requires:
(a)    "Act" means the International Business Corporations Act 1982 as from time to time amended and every statute substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Act shall be read as references to the substituted provisions therefor in the new statute or statutes;
(b)    "Regulations" means any Regulations made under the Act, and every regulation substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Regulations shall be read as references to the substituted provisions therefor in the new regulations;
(c)    "By-Laws" means any by-law of the Company from time to time in force;
(d)    all terms contained in the by-laws and defined in the Act or the Regulations shall have the meanings given to such terms in the Act or the Regulations; and
(e)    the singular includes the plural and the plural includes the singular; the masculine gender includes the feminine and neuter genders; the word "person" includes bodies corporate , companies, partnerships, syndicates, trusts and any association of persons; and the word "individual" means a natural person.

22

## 2.    **REGISTERED OFFICE**
2.1    The registered office of the company shall be in Antigua and Barbuda at such address as the directors may fix from time to time by resolution.

## 3.    **SEAL**
3.1    The common seal of the Company shall be such as the directors may by resolution from time to time adopt.

## 4.    **DIRECTORS**
4.1    Powers: Subject to any unanimous shareholder agreement, the business and affairs of the Company shall be managed by the directors

4.2    Number: There shall be not less than 1 and no more than 11 directors.

4.3    Election: Directors shall be elected by the shareholders on a show of hands unless a ballot is demanded in which case such election shall be by ballot.

4.4    Tenure: Unless his tenure is sooner determined, a director shall hold office from the date on which he is elected or appointed until his resignation, death or removal, or the close of the annual meeting of the shareholders next following but he shall be eligible for re-election if qualified.

4.4.1.    A director who is also an officer shall continue to be a director until he ceases to be an officer.

4.4.2.    A director shall cease to be a director:
   (a)    if he becomes bankrupt or compounds with his creditors or is declared insolvent;
   (b)    if he is found to be of unsound mind; or
   (c)    if by notice in writing to the Company he resigns his office and any such resignation shall be effective at the time it is sent to the Company or at the time specified in the notice whichever is later.

4.4.3    The shareholders of the Company may, by ordinary resolution passed at a special meeting of the shareholders, remove any director from office and a vacancy created by the removal of a director may be filled at the meeting of the shareholders at which the director is removed.

4.5    Committee of Directors: The directors may appoint from among their number a committee of directors and subject to section 80 of the Act may delegate to such committee any of the powers of the directors.

## 5.    **BORROWING POWERS OF DIRECTORS**
5.1    The directors may from time to time:



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

23

(a)     borrow money upon the credit of the Company;

(b)     issue, reissue, sell or pledge debentures of the Company

(c)     subject to section 53 of the Act, give a guarantee on behalf of the Company to secure performance of an obligation of any person; and

(d)     mortgage, charge, pledge or otherwise create a security interest in all or any property of the Company, owned or subsequently acquired, to secure any obligation of the Company.

5.2.    The directors may from time to time by resolution delegate to any officer of the Company all or any of the powers conferred on the directors by paragraph 5.1 hereof to the full extent thereof or such lesser extent as the directors may in any such resolution provide.

5.3.    The powers conferred by paragraph 5.1 hereof shall be in supplement of and not in substitution for any powers to borrow money for the purposes of the Company possessed by its directors or officers independently of a borrowing by-law.

## 6.     **MEETINGS OF DIRECTORS**

6.1     Place of Meeting: Meeting of the directors and of any committee of the directors may be held within, or outside Antigua and Barbuda, at a place to be determined by the Board of Directors.

6.2     Notice: A meeting of the directors may be convened at any time by any director or the Secretary, when directed or authorised by any director. Subject to subsection 76 (1) of the Act the notice of any such meeting need not specify the purpose of or the business to be transacted at the meeting. Notice of any such meeting shall be served in the manner specified in paragraph 18.1 hereof not less than two days (exclusive of the day on which the notice is delivered or sent but inclusive of the day for which notice is given) before the meeting is to take place. A director may in any manner waive notice of a meeting of the directors and attendance of a director at a meeting of the directors shall constitute a waiver of notice of the meeting except where a director attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

6.2.1   It shall not be necessary to give notice of a meeting of the directors to a newly elected or appointed director for meeting held immediately following the election of directors by the shareholders or the appointment to fill a vacancy among the directors.

6.3     Quorum: The presence of a majority of the then current directors shall constitute a quorum for the transaction of business and, notwithstanding any vacancy among the directors; a quorum may exercise all the powers of the directors. No business shall be transacted at a meeting of directors unless a quorum is present. If a quorum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another place, date or time without further notice thereof.



24

6.3.1   A director may, if all the directors consent, participate in a meeting of directors or of any committee of the directors by means of such telephone or other communications facilities as permit all persons participating in the meeting to hear each other and a director participating in such a meeting by such means is deemed to be present at that meeting.

6.4   Voting: Questions arising at any meeting of the directors shall be decided by a majority of votes. In case of an equality of votes the chairman of the meeting in addition to his original vote shall have a second or casting vote.

6.5   Resolution in lieu of meeting: Notwithstanding any of the foregoing provisions of this by-law a resolution in writing signed by all the directors entitled to vote on that resolution at a meeting of the directors or any committee of the directors is as valid as if it had been passed at a meeting of the directors or any committee of the directors.

## 7.   **REMUNERATION OF DIRECTORS**

7.1   The remuneration to be paid to the directors shall be such as the directors may from time to time determine and such remuneration may be in addition to the salary paid to any officer or employee of the Company who is also a director. The directors may also award special remuneration to any director undertaking any special services on the Company's behalf other than the routine work ordinarily required of a director and the confirmation of any such resolution or resolutions by the shareholders shall not be required. The directors shall also be entitled to be paid their travelling and other expenses properly incurred by them in connection with the affairs of the Company.

## 8.   **SUBMISSION OF CONTRACTS OR TRANSACTIONS TO SHAREHOLDERS FOR APPROVAL**

8.1   The directors in their discretion may submit any contract, act or transaction for approval or ratification at any annual meeting of the shareholders or at any special meeting of the shareholders called for the purpose of considering the same and, subject to the provisions of section 89 of the Act, any such contract, act or transaction that is approved or ratified or confirmed by a resolution passed by a majority of the votes cast at any such meeting (unless any different or additional requirement is imposed by the Act or by the Company or the Articles or any other by-law) shall be as valid and as binding upon the Company and upon all the shareholders as though it had been approved, ratified or confirmed by every shareholder of the Company.

JAN 1 8 2022

## 9.   **FOR THE PROTECTION OF DIRECTORS AND OFFICERS**

9.1   No director or officer of the Company shall be liable to the Company for:-

(a)   the acts, receipts, neglects or defaults of any other director or employee or for joining in any receipt or act for conformity;

(b)   any loss, damage or expense incurred by the Company through the insufficiency or deficiency of title to any property acquired by the Company or for or on behalf of the Company;



(c)      the insufficiency or deficiency of any security in or upon which any of the monies of or belonging to the Company shall be placed out or invested;

(d)      any loss or damage arising from the bankruptcy, insolvency or tortuous act of any person, including any person with whom any monies securities or effects shall be lodged or deposited;

(e)      any loss, conversion, misapplication or misappropriation of or any damage resulting from any dealings with any monies, securities or other assets belonging to the Company;

(f)      any other loss, damage or misfortune whatever which may happen in the execution of the duties of his respective office or trust or in relation thereto; unless the same happens by or through his failure to exercise the powers and to discharge the duties of his office honestly and in good faith with a view to the best interests of the Company and in connection therewith to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

9.2      Nothing herein contained shall relieve a director or officer from the duty to act in accordance with the Act or regulations made thereunder or relieve him from liability for a breach thereof.

9.2.1      The directors for the time being of the Company shall not be under any duty or responsibility in respect of any contract, act or transaction whether or not made, done or entered into in the name or behalf of the Company, except such as are submitted to and authorised or approved by the directors.

9.2.2      If any director or officer of the Company is employed by or performs services for the Company otherwise than as a director or officer or is a member of a firm or a shareholder, director or officer of a body corporate which is employed by or performs services for the Company, the fact of his being a shareholder, director of officer of the Company shall not disentitle such director or officer or such firm or body corporate, as the case may be from receiving proper remuneration for such services.

## 10.    INDEMNITIES TO DIRECTORS AND OFFICERS

10.1      Subject to section 97 of the Act, except in respect of an action by or on behalf of the Company to obtain a judgement in its favour, the Company shall indemnify a director or officer of the Company, a former director or officer of the Company or a person who acts or acted at the Company's request as a director or officer of a body corporate of which the Company is or was a shareholder or creditor, and his personal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgement, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made party by reason of being or having been a director or officer of such company, if:

(a)      he acted honestly and in good faith with a view to the best interests of the Company; and


REGULATORY COMMISSION

JAN 1 8 2022

FILED

26

(b)    in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, he had reasonable grounds for believing that his conduct was lawful.

## 11.    **OFFICERS**

11.1    Appointment: The directors shall as often as may be required appoint a Secretary and, if deemed advisable, may as often as may be required appoint any or all of the following officers: a Chairman, a Deputy Chairman, a President, one or more Vice-Presidents, a Treasurer, one or more Assistant Secretaries or one or more Assistant Treasurers. A director may be appointed to any office of the Company but none of the officers except the Chairman, the Deputy Chairman, the President and Vice-President need be a director. Two or more of the aforesaid offices may be held by the same person. In case and whenever the same person holds the offices of Secretary and Treasurer he may but need not be known as the Secretary-Treasurer. The directors may from time to time appoint such other officers and agents as they deem necessary who shall have such authority and shall perform such duties as may from time to time be prescribed by the directors.

11.2    Remuneration: The remuneration of all officers appointed by the directors shall be determined from time to time by resolution of the directors. The fact that any officer or employee is a director or shareholder of the Company shall not disqualify him from receiving such remuneration as may be determined.

11.3    Powers and Duties: All officers shall sign such contracts, documents or instruments in writing as require their respective signatures and shall respectively have and perform all powers and duties incident to their respective offices and such other powers and duties respectively as may from time to time be assigned to them by the directors.

11.4    Delegation: In case of the absence or inability to act of any officer of the Company or for any other reason that the directors may deem sufficient the directors may delegate all or any of the powers of such officer to any other officer or to any director.

11.5    Chairman: A chairman shall, when present, preside at all meetings of the directors, and any committee of the directors or the shareholders.

11.6    Deputy Chairman: If the Chairman is absent or is unable or refuses to act, the Deputy Chairman (if any) shall, when present, preside at all meetings of the directors, and any committee of the directors, or the shareholders.

11.7    President: A President shall be the Chief Executive Officer, Managing Director, of the Company and shall exercise such powers and have such authority as may be delegated to him by the directors in accordance with the provisions of section 80 of the Act. He shall be vested with and may exercise all the Powers and shall perform all the duties of a Chairman and Deputy Chairman if none be appointed or if the Chairman and the Deputy Chairman are absent or are unable or refuse to act.

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

27

11.8 Vice-President: A Vice President or, if more than one, the Vice-Presidents, in of order seniority, shall be vested with all the powers and shall perform all the duties of the President in the absence or inability or refusal to act of the President.

11.9 Secretary:   The Secretary shall give or cause to be given notices for all meetings of the directors, any committee of the directors and the shareholders when directed to do so and shall have charge of the minute books and seal of the Company and, subject to the provisions of paragraph 14.1 hereof, of the records (other than accounting records) referred to in section 130 of the Act.

11.10 Treasurer: Subject to the provisions of any resolution of the directors, a Treasurer shall have the care and custody of all the funds and securities of the Company and shall deposit the same in the name of the Company in such bank or banks or with such other depository or depositories as the directors may direct. He shall keep or cause to be kept the accounting records referred to in section 132 of the Act. He may be required to give such bond for the faithful performance of his duties as the directors in their uncontrolled discretion may require but no director shall be liable for failure to require any such bond or for the insufficiency of any such bond or for any loss by reason of the failure of the Company to receive any indemnity thereby provided.

11.11 Assistant Secretary and Assistant Treasurer: The Assistant Secretary or, if more than one, the Assistant Secretaries in order of seniority, and the Assistant Treasurer or, if more than one, the Assistant Treasurers in order of seniority, shall respectively perform all the duties of the Secretary and the Treasurer, respectively, in the absence or inability or refusal to act of the Secretary or the Treasurer, as the case may be.

11.12 General Manager or Manager: The directors may from time to time appoint one or more General Manager or Managers and may delegate to him or them full power to manage and direct the business and affairs of the Company (except such matters and duties as by law must be transacted or performed by the directors or by the shareholders) and to employ and discharge agents and employees of the Company or may delegate to him or them any lesser authority. A General Manager or Manager shall conform to all lawful orders given to him by the directors of the Company and shall at all reasonable times give to the directors or any of them all information they may require regarding the affairs of the Company. Any agent or employee appointed by the General Manager or Manager may be discharged by the directors.

11.13 Vacancies: If the office of any officer of the Company becomes vacant by reason of death, resignation, disqualification or otherwise, the directors by resolution shall, in the case of the Secretary, and may, in the case of any office, appoint a person to fill such vacancy.

## 12.   **SHAREHOLDERS' MEETINGS**

12.1   Annual Meeting: Subject to the provisions of section 102 of the Act, the annual meeting of the shareholders shall be held on such day in each year and at such time and place as to be determined by the directors.



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

28

12.2 Special Meetings: Special meetings of the shareholders may be convened by order of the Chairman, the Deputy Chairman, the President, Vice-President or by the directors at any date and time and at any place within Antigua and Barbuda or, if all the shareholders entitled to vote at such meeting so agree, outside the Antigua and Barbuda.

12.2.1 The directors shall on the requisition of the holders of not less than five percent of the issued shares of the Company that carry a right to vote at the meeting requisitioned, forthwith convene a meeting of shareholders, and in the case of such requisition the following provisions shall have effect:

(1)     The requisition must state purposes of the meeting and must be signed by the requisitionist and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more of the requisitionists.

(2)     If the directors do not, within twenty-one days from the date of the requisition being so deposited, proceed to convene a meeting, the requisitionists or any of them may themselves convene the meeting, but any meeting so convened shall not be held after three months from the date of such deposit.

(3)     Unless subsection (3) of section 120 of the Act applies, the directors shall be deemed not to have duly convened the meeting if they do not give such notice as is required by the Act within fourteen days from the deposit of the requisition.

(4)     Any meeting convened under this paragraph by the requisitions shall be called as nearly as possible in the manner in which meetings are to be called pursuant to the by-laws and Division E of the Act.

(5)     A requisition by joint holders of shares must be signed by all such holders.

12.3 Notice: A notice stating the day, hour and place of meeting shall be given by serving such notice on each shareholder entitled to vote at such meeting, on each director and on the auditor of the Company in the manner specified in paragraph 18.1 hereof, not less than fifteen days or more than sixty days before the date of the meeting.

12.4 Waiver of Notice: A shareholder and any other person entitled to attend a meeting of shareholders may in any manner waive notice of a meeting of shareholders and attendance of any such person at a meeting of shareholders shall constitute a waiver of notice of the meeting except where such person attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

12.5 Omission of Notice: The accidental omission to give notice at any meeting or any irregularity in the notice of any meeting or the non-receipt of any notice by any shareholder, director or the auditor of the Company shall not invalidate any resolution passed or any proceedings taken at any meeting of the shareholders.

12.6 Votes: Every question submitted to any meeting of shareholders shall be decided in the first instance by a show of hands unless a person entitled to vote at the meeting has demanded a ballot and, if the articles so provide, in the case of an equality of votes the Chairman of the meeting shall on a ballot have a casting vote in addition to any votes to which he may be otherwise entitled.

29

12.6.1. At every meeting at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder who is present in person shall have one vote on a show of hands. Upon a ballot at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder shall, subject to the articles, have one vote for every share held by the shareholder.

12.6.2 At any meeting unless a ballot is demanded, a declaration by the Chairman of the meeting that a resolution has been carried or carried unanimously or by a particular majority or lost or not carried by a particular majority shall be conclusive evidence of the fact.

12.6.3 When the Chairman, the Deputy Chairman, the President and the Vice-President are absent, the persons who are present and entitled to vote shall choose another director as Chairman of the meeting; but if no director is present or all the directors present decline to take the chair, the persons who are present and entitled to vote shall choose one of their number to be Chairman.

12.6.4 A ballot, either before or after any vote by a show of hands, may be demanded by any person entitled to vote at the meeting. If at any meeting a ballot is demanded on the election of a Chairman or on the question of adjournment it shall be taken forthwith without adjournment. If at any meeting a ballot is demanded on any other question or as to the election of directors, the vote shall be taken by ballot in such manner and either at once, later in the meeting or after adjournment as the Chairman of the meeting directs. The result of a ballot shall be deemed to be the resolution of the meeting at which the ballot was demanded. A demand for a ballot may be withdrawn.

12.6.5 If two or more persons hold shares jointly, one of those holders present at a meeting of shareholders may, in the absence of the other, vote the shares; but if two or more of those persons who are present, in person or by proxy vote, they must vote as one on the shares jointly held by them.

12.7     Proxies: Votes at meetings of shareholders may be given either personally or by proxy or, in the case of a shareholder who is a body corporate or association, by an individual authorised by a resolution of the directors or governing body of that body corporate or association to represent it at meetings of shareholders of the Company.

12.7.1 A proxy shall be executed by the shareholder or his attorney-in-fact authorised in writing and shall not be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy.

12.7.2 A person appointed by proxy need not be a shareholder.

12.7.3 Subject to the provisions of sections 13-15 inclusive of the Regulations a proxy may be in the following form or as near thereto as circumstances require or permit:



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

30

The undersigned shareholder of_____hereby appoints_____of _____
_____ , or failing him,_____of_____as the nominee of the
undersigned to attend and act for the undersigned and on behalf of the undersigned at the
meeting of the shareholders of the said Company to be held on the_____day of
_____202_ and at any adjournment or adjournments thereof in the same manner, to the
same extent and with the same powers as if the undersigned were present at the said
meeting or such adjournment or adjournments thereof.

Dated this _____day of _____202_

Signature of shareholder

_____

12.8    Adjournment: The Chairman of any meeting may with the consent of the meeting adjourn
the same from time to time to a fixed time and place and no notice of such adjournment
need be given to the shareholders unless the meeting is adjourned by one or more
adjournments for an aggregate of thirty days or more in which case notice of the adjourned
meeting shall be given as for an original meeting. Any business that might have been
brought before or dealt with at the original meeting in accordance with the notice calling
the same may be brought before or dealt with at any adjourned meeting for which no notice
is required.

12.9    Quorum: Subject to the Act, and except in the case of a Company having only one
shareholder a quorum for the transaction of business at any meeting of the shareholders
shall not consist of fewer than one- third of the shares entitled to vote thereat, or a duly
appointed proxy holder or representative of a shareholder so entitled. If a quorum is present
at the opening of any meeting of the shareholders, the shareholders present or represented
may proceed with the business of the meeting notwithstanding a quorum is not present
throughout the meeting. If a quorum is not present within 30 minutes of the time fixed for
a meeting of shareholders, the persons present and entitled to vote may adjourn the meeting
to a fixed time and place but may not transact any other business.

12.10   Resolution in lieu of meeting: Notwithstanding any of the foregoing provisions of this by-
law a resolution in writing signed by all the shareholders entitled to vote on that resolution
at a meeting of the shareholders is subject to section 119 of the Act as valid as if it had
been passed at a meeting of the shareholders.

## 13.     **SHARES**

13.1    Allotment and Issuance: Subject to the Act, the articles and any unanimous shareholder
agreement, shares in the capital of the Company may be allotted and issued by resolution
of the directors at such times and on such terms and conditions and to such person or class
of persons as the directors determine.

JAN 1 8 2022

FILED

31

13.2    Certificates: Share certificates and the form of share transfer shall (subject to section 138 of the Act) be in such form as the directors may by resolution approve and such certificates shall be issued in registered form only and signed by a Chairman or a Deputy Chairman or a President or a Vice-President and the Secretary or an Assistant Secretary holding office at the time of signing.

13.2.1  The directors or any agent designated by the directors may in their or his discretion direct the issuance of a new share or other such certificate in lieu of and upon cancellation of a certificate that has been mutilated or in substitution for a certificate claimed to have been lost, destroyed or wrongfully taken, on payment of such reasonable fee and on such terms as to indemnity, re-imbursement of expenses and evidence of loss and of title as the directors may from time to time prescribe, whether generally or in any particular case.

## 14.    **TRANSFER OF SHARES AND DEBENTURES**
14.1    Transfer: The shares or debentures of a Company may be transferred by a written instrument of transfer signed by the transferor and naming the transferee.

14.2    Registers:       Registers of shares and debentures issued by the Company shall be kept at the registered office of the Company or at such other place in the island of Antigua as may from time to time be designated by resolution of the directors.

14.3    Surrender of Certificates:       Subject to Section 136 of the Act, no transfer of shares or debentures shall be registered unless or until the certificate representing the shares or debentures to be transferred has been surrendered for cancellation.

14.4    Shareholder indebted to the Company:       If so provided in the articles, the Company has a lien on a share registered in the name of a shareholder or his personal representative for a debt of that shareholder to the Company. By way of enforcement of such lien the directors may refuse to permit the registration of a transfer of such share.

## 15.    **DIVIDENDS**
15.1    The directors may from time to time by resolution declare and the company may pay dividends on the issued and outstanding shares in the capital of the Company subject to the provisions (if any) of the articles and sections 51 and 52 of the Act.

15.1.1  In case several persons are registered as the joint holders of any shares, any one of such persons may give effectual receipts for all dividends and payments on account of dividends.

## 16.    **VOTING IN OTHER COMPANIES**
16.1    All shares or debentures carrying voting rights in any other body corporate that are held from time to time by the Company may be voted at any and all meetings of shareholders, debenture holders (as the case may be) of such other body corporate and in such manner and by such person or persons as the directors of the Company shall from time to time



determine. The officers of the Company may for and on behalf of the Company from time to time:

(a)    execute and deliver proxies; and

(b)    arrange for the issuance of voting certificates or other evidence of the right to vote; in such names as they may determine without the necessity of a resolution or other action by the directors.

## 17.    INFORMATION AVAILABLE TO SHAREHOLDERS

17.1    Except as provided by the Act, no shareholder shall be entitled to any information respecting any details or conduct of the company's business which in the opinion of the directors it would be inexpedient in the interest of the Company to communicate to the public.

17.2    The directors may from time to time, subject to rights conferred by the Act, determine whether and to what extent and at what time and place and under what conditions or regulations the documents, books and registers and accounting records of the Company or any of them shall be open to the inspection of shareholders and no shareholder shall have any right to inspect any document or book or register or accounting record of the Company except as conferred by statute or authorised by the directors or by a resolution of the shareholders.

## 18.    NOTICES

18.1    Method of giving notice: Any notice or other document required by the Act, the Regulations, the articles or the by-laws to be sent to any shareholder, debenture holder, director or auditor may be delivered personally or sent by prepaid mail or cable or electronic communication or telex to any person at his latest address or electronic mail address as shown in the records of the Company or its transfer agent and to any such director at his latest address or electronic mail address as shown in the records of the Company or in the latest notice filed under section 74 of the Act, and to the auditor at his business address or electronic mail address.

18.2    Waiver of notice: Notice may be waived or the time for the notice may be waived or abridged at any time with the consent in writing of the person entitled thereto.

18.3    Undelivered notices: If a notice or document is sent to a shareholder or debenture holder by prepaid mail in accordance with this paragraph and the notice or document is returned on three consecutive occasions because the shareholder or debenture holder cannot be found, it shall not be necessary to send any further notices or documents to the shareholder or debenture holder until he informs the Company in writing of his new address.

18.4    Shares and debentures registered in more than one name: All notices or other documents with respect to any shares or debentures registered in more than one name shall be given to whichever of such persons is named first in the records of the Company and any notice



33

or other documents so given shall be sufficient notice of delivery to all the holders of such shares or debentures.

18.5    Persons becoming entitled by operation of law: Subject to section 184 of the Act every person who by operation of law, transfer or by any other means whatsoever becomes entitled to any share is bound by every notice or other document in respect of such share that, previous to his name and address being entered in the records of the Company is duly given to the person from whom he derives his title to such share.

18.6    Deceased Shareholders: Subject to section 141 of the Act, any notice or other document delivered or sent by prepaid mail, cable or telex or left at the address of any shareholder as the same appears in the record of the Company shall, notwithstanding that such shareholder is deceased, and whether or not the Company has notice of his death, be deemed to have been duly served in respect of the shares held by him (whether held solely or with any other person) until some other person is entered in his stead in the records of the Company as the holder or one of the holders thereof and such service shall for all purposes be deemed sufficient service of such notice or document on his personal representative and on all persons, if any, interested with him in such shares.

18.7    Signature to notices: The signature of any director or officer of the Company to any notice or document to be given by the Company may be written, stamped, typewritten or printed or partly written, stamped, typewritten or printed.

18.8    Computation of time: Where a notice extending over a number of days or other period is required under any provision of the articles or the by-laws the day of sending the notice shall, unless it is otherwise provided, be counted in such number of days or other period.

18.9    Proof of service: where a notice required under paragraph 18.1 hereof is delivered personally to the person to whom it is addressed or delivered to his address as mentioned in paragraph 18.1 hereof, service shall be deemed to be at the time of delivery of such notice.

18.9.1 Where such notice is sent by post, service of the notice shall be deemed to be effected forty-eight hours after posting if the notice was properly addressed and posted by prepaid mail.

18.9.2 Where the notice is sent by cable or telex, service is deemed to be effected on the date on which the notice is so sent.

18.9.3 A certificate of an officer of the Company in office at the time of the making of the certificate or of any transfer agent of shares of any class of the Company as to facts in relation to the delivery or sending of any notice shall be conclusive evidence of those facts.

## 19.    **CHEQUES, DRAFTS AND NOTES**



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

34

19.1     All cheques, drafts or orders for the payment of money and all notes and acceptances and bills of exchange shall be signed by such officers or persons and in such manner as the directors may from time to time designate by resolution.

## 20.    **EXECUTION OF INSTRUMENTS**

20.1    Contracts, documents or instruments in writing requiring the signature of the Company may be signed by:

(a)    a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or

(b)    any one Director, and all contracts, documents and instruments in writing so signed shall be binding upon the Company without any further authorization or formality. The directors shall have power from time to time by resolution to appoint any officers or persons on behalf of the Company either to sign certificates for shares in the Company and contracts, documents and instruments in writing generally or to sign specific contracts, documents or instruments in writing.

20.1.1. The common seal of the Company may be affixed to contracts, documents and instruments in writing signed as aforesaid or by any officers specified in paragraph 20.1 hereof.

20.1.2 Subject to section 125 of the Act, a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or any two directors shall have authority to sign execute (under the seal of the Company or otherwise) all the instruments that may be necessary for the purpose of selling,
assigning, transferring, exchanging, converting or conveying any such shares, stocks, bonds, debentures, rights, warrants or other securities.

## 21.    **SIGNATURES**

21.1    The signature of a Chairman, a Deputy Chairman, a President, a Vice-President, the Secretary, the Treasurer, an Assistant Secretary or an Assistant Treasurer or any director of the Company or of any officer or person, appointed pursuant to paragraph 20 hereof by resolution of the directors may, if specifically authorised by resolution of the directors, be printed, engraved, lithographed or otherwise mechanically reproduced upon any certificate for shares in the Company or contract, document or in writing, bond, debenture or other security of the Company executed or issued by or on behalf of the Company. Any document or instrument in writing on which the signature of any such officer or person is so reproduced shall be deemed to have been manually signed by such officer or person whose signature is so reproduced and shall be as valid to all intents and purposes as if such document or instrument in writing had been signed manually and notwithstanding that the officer or person whose signature is so reproduced has ceased to hold office at the date on which such document or instrument in writing is delivered or issued.

ATORY COMMISSION

JAN 1 8 2022

FILED

35

22. **FINANCIAL YEAR**

22.1    The directors may from time to time by resolution establish the financial year of the Company.

23. **INITIAL DIRECTORS**

23.1    The initial Board of Directors shall be composed of the following members:

**CORPORATE & TRUST SERVICES (CARIBBEAN) LIMITED**



36

**<u>EXHIBIT F</u>**

# CHAPTER *92*

## THE COMMON LAW (DECLARATION OF APPLICATION) ACT

Arrangement of Sections
Section

1. Short title.
2. How far the Common Law of England is in force here, etc.

———————

COMMON LAW (DECLARATION OF APPLICATION)

(20th *June,* 1705.)       **31/1705.**

AN ACT FOR PREVENTING TEDIOUS AND CHARGEABLE LAWSUITS, AND FOR DECLARING THE RIGHTS OF PARTICULAR TENANTS.

WHEREAS Law Suits and Controversies frequently arise between the Inhabitants of these Islands, principally occasioned by the different Nature and Circumstances of our Estates from those in England, whereby it sometimes hath happened, through the Partiality of some, and Ignorance of others, that contradictory Judgments have been given in cases founded on the same Rules and Principles of Law and Reason; for the redressing of which Mischiefs, and establishing a constant and certain Uniformity in the Proceedings of the Courts of the several Islands under this Government, and for declaring the Rights of particular Tenants in these Islands.

*2*      *CAP. 92)*      *Common Law (Declaration of Application)*

Short title.

**1.** This Act may be cited as the Common Law (Declaration of Application) Act.

How far the Common Law of **England is in** force **here, etc.**

**2.** We your Majesty's most dutiful and loyal Subjects, the Commander in Chief of your Majesty's Leeward Charibbee Islands, the General Council, and General Assembly of the said Islands, now met at Nevis, do humbly pray your Majesty that it may be declared, and it is hereby declared by the Authority aforesaid, That the Common Law of England, as far as it stands unaltered by any written Laws of these Islands, or some of them, confirmed by Your Majesty, or some of your Royal Predecessors in Council, or by some Act or Acts of Parliament of the Kingdom of England, extending to these Islands, is in force in each of these your Majesty's Leeward Charibbee Islands, and is the certain Rule whereby the Rights and Properties of your Majesty's good Subjects inhabiting these Islands, are and ought to be determined; and that all Customs or pretended Customs, or Usages, contradictory thereunto, are illegal, null, and void.

**3.**

**4.**

**5.** ............................................

**6.** ..........................................................................................................

**7.** ..........................................................................................................

## EXHIBIT G-1

## ACTION BY WRITTEN CONSENT OF THE SHAREHOLDER

### OF

### FTX TRADING LTD. (the "Company")

### November 21, 2022

The undersigned, constituting the shareholder of the Company, acting in accordance with applicable law and the Company's Articles of Association and By-Laws consents to, approves and adopts the following recitals and resolutions by written consent:

**WHEREAS**, on November 10, 2022, Mr. Samuel Benjamin Bankman-Fried (the "Founder"), as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird, Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), authorized, instructed and consented to, among other things, (i) the appointment of John J. Ray III (the "CEO") as Chief Executive Officer and Chief Restructuring Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Bankruptcy Code ("Chapter 11") and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group and (ii) the appointment of individuals chosen by the CEO and not affiliated with the Founder or the CEO as new directors of the Top Companies and the other members of the FTX Group (such authorization, instruction and consent, the "Omnibus Corporate Authority").

**WHEREAS,** on November 11, 2022 and November 14, 2022, the Company and certain other affiliated debtors filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Petitions") and the bankruptcy cases are pending before the Honorable John T. Dorsey and the Debtors have requested joint administration of the cases under Case No. 22-11068 (JTD) (the "Bankruptcy Cases").

**WHEREAS**, the Company's By-Laws provide that any director may be removed, with or without cause, from or appointed to the Board of Directors of the Company the ("Board") by a resolution of the members entitled to vote.

**WHEREAS**, the CEO, on behalf of the shareholder and acting pursuant to the Omnibus Corporate Authority, deemed it in the best interest of the Company to remove from the Board all directors currently serving as such and to revoke all currently existing delegations of authority from the Board to any person.

**WHEREAS**, the CEO, on behalf of the sole shareholder and acting pursuant to the Omnibus Corporate Authority, deemed it in the best interest of the Company to elect and appoint Matthew A. Doheny and Joseph J. Farnan Jr. (together, the "New Independent Directors") to the Board.

**WHEREAS**, the Company entered into (i) that certain Independent Director Agreement, dated as of November 14, 2022, with Matthew A. Doheny (the "Doheny Independent Director Agreement") and (ii) that certain Independent Director Agreement,

dated as of November 13, 2022, with Joseph J. Farnan Jr. (the "Farnan Independent Director Agreement" and together with the Doheny Independent Director Agreement, the "Independent Director Agreements"), among other things, confirming the election and appointment of each New Independent Director to the Board and providing for the terms of such appointment (including, without limitation, with respect to compensation payable, reimbursement of expenses and indemnification of liabilities).

**NOW, THEREFORE, BE IT RESOLVED**, that the appointment of the CEO as the Chief Restructuring Officer and Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the removal of all prior officers of the Company and directors from the Board be, and hereby is, confirmed, ratified, authorized and approved and, to the extent that there are currently any officers or directors of the Company (excepting the CEO and the New Independent Directors), such officers and directors be, and they hereby are, removed from acting in such capacity.

**FURTHER RESOLVED**, that the revocation of all prior delegations of authority from the Board (excepting the Omnibus Corporate Authority) be, and hereby is, confirmed, ratified, authorized and approved, and shall be revoked, extinguished and of no further effect and, to the extent that there are any currently existing delegations of authority from the Board (excepting the Omnibus Corporate Authority), such delegations be, and each of them hereby is, revoked, extinguished and of no further effect.

**FURTHER RESOLVED**, that the election and appointment of the New Independent Directors, and all terms of such appointment as set forth in the Independent Director Agreements, be, and hereby are, confirmed, ratified, authorized and approved, with such New Independent Directors to hold office until his successor is duly elected and qualified or until his earlier death, resignation or removal, in each case accordance with the By-Laws of the Company and the terms and conditions of the applicable Independent Director Agreements, and the registered agent of the Company be and is hereby instructed by copy of these resolutions to update the Register of Directors of the Company to note the change of directors, all as set out in these resolutions and to make the necessary filing with the Financial Services Regulatory Commission in respect of the appointment and removal of the directors.

**FURTHER RESOLVED**, that the terms of the Independent Director Agreements, including, without limitation, with respect to compensation payable, reimbursement of expenses and the indemnification of the New Independent Directors, are hereby acknowledged, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that the CEO and the New Independent Directors shall be indemnified to the fullest extent permitted by law and to the fullest extent permitted under existing indemnification arrangements applicable to all members of the Board and officers of the Company, including as provided in the By-laws of the Company, and in the Independent Director Agreements, and such indemnification shall continue even if such person no longer serves as an officer or director of the Company and shall inure to the benefit of his heirs, executors and administrators.

**FURTHER RESOLVED**, that the filing of the Petitions and all other actions taken in connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that any and all other actions heretofore taken by the CEO in furtherance of the foregoing resolutions are hereby confirmed, ratified, authorized and approved.

**FURTHER RESOLVED**, that all certificates, agreements, instruments and other documents previously signed on behalf of the Company by the CEO in connection

with or in furtherance of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, that are substantially consistent with the foregoing resolutions be, and they hereby are, in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such certificate, agreement, instrument or other document had been specifically authorized in advance by resolution of the Board and that the CEO did execute the same.

**FURTHER RESOLVED**, that the CEO be, and hereby is, authorized and directed, in the name and on behalf of the Company to execute and deliver all further certificates, agreements, instruments and other documents, which they may deem necessary or advisable in order to effectuate the purposes of the foregoing resolutions, including in connection with the Petitions and the Bankruptcy Cases, and the execution by the CEO of any such certificate, agreement, instrument or document shall conclusively establish their authority therefor from the Company and the approval and ratification by the Company of the documents so executed.

**FURTHER RESOLVED**, that the power and authority granted to the CEO pursuant to the foregoing resolutions shall include the power and authority to cause any direct or indirect consolidated subsidiary of the Company to take action that is in furtherance of or consistent with the purposes of the foregoing resolutions.

**FURTHER RESOLVED**, that the CEO is hereby authorized and directed, in the name and on behalf of the Company, to take such actions as such officer shall determine to be necessary or appropriate to authorize and cause any direct or indirect consolidated subsidiary of the Company to authorize, execute and deliver any and all agreements, authorizations, instruments or other documents as such officer shall determine to be necessary or appropriate in connection with any of the matters described in any of the foregoing resolutions, each such determination to be conclusively evidenced by the taking of such actions.

**FURTHER RESOLVED**, that the CEO shall have the authority, from time to time, to delegate such officer's authority conferred pursuant to any of the foregoing resolutions to any employee of the Company (whether or not such employee is an officer of the Company), provided that the person to whom such authority is delegated shall not have the power to further delegate such authority to any other person.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have duly executed this written consent as of the date first written above.

SIGNED FOR AND ON BEHALF OF **PAPER BIRD INC.**:

Signature:

_____

Name: John J. Ray III
Title: Chief Executive Officer and
Chief Restructuring Officer

**<u>EXHIBIT G-2</u>**

# NOTICE OF
## ACTION BY WRITTEN CONSENT OF THE SHAREHOLDERS
## OF FTX TRADING LTD.

December 14, 2022

To:     Shareholders of FTX Trading Ltd. (the "Company")

Re:     Notice of Written Action in Lieu of Meeting

Dear Ladies and Gentlemen:

1. This notice is provided to you in your capacity as a shareholder of the Company, in discharge of any and all existing obligations owed to you by the Company pursuant to the Company's Articles of Incorporation, as last amended on October 18, 2021, and By-Laws, as last amended on March 19, 2019, and the laws of Antigua and Barbuda.

2. As you are aware, on November 11, 2022 and November 14, 2022, the Company and certain other affiliated debtors filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Petitions").

3. In connection with the Chapter 11 Petitions, we hereby further inform you that on November 21, 2022, a written action in lieu of a meeting of the shareholders of the Company was adopted to, among other things, effect the removal of the current directors of the board of the Company (the "Board") and to effect the appointment of new independent directors to the Board.

4. The Board now consists of the following independent directors: Mr. Matthew A. Doheny and Mr. Joseph J. Farnan Jr.

Yours faithfully,

**FTX Trading Ltd.**

By:     _____
Name: John J. Ray III
Title:  Chief Executive Officer and Chief Restructuring Officer

# EXHIBIT H

Chapter 14

# Management of a Company

## Introduction to Management of a Company

**14[1]** This chapter deals with the law relating to management of a company, including the relationship between the board and the shareholder body. It covers the law relating to directors' meetings and resolutions and the regular and irregular acts of directors. Other officers of a company are also considered. The chapter also considers obligations relating to the register of people with significant control. From 6 April 2016 companies registered under the Companies Act 2006 have been generally required to maintain an internal register of people with significant control over the company ('PSC register'). The obligation arises under Part 21A of the Companies Act 2006.[1] The purpose of the PSC register is to provide transparency in relation to persons with significant influence or control over companies, including through formal or informal involvement in a company's management. Changes to the PSC reporting regime and an extension of the entities subject to it were made in mid-2017. The right of a director to inspect a company's books is also considered. Aspects of the 2018 UK Corporate Governance Code are explored. Following the Financial Reporting Council's 2022 Review of Corporate Governance Reporting, consultations on a new Code are taking place in 2023 with the intention that a revised Code will apply to periods commencing or on after 1 January 2024.

---

[1] Inserted by the Small Business, Enterprise and Employment Act 2015, Sch 3. See also the European Public Limited-Liability Company (Register of People with Significant Control) Regulations 2016, SI 2016/375 and the Limited Liability Partnerships (Register of People with Significant Control) Regulations 2016, SI 2016/340.

---

## Relationship between Board and General Meeting

**14[1A]**  The standard legal position under a company's articles is that the day-to-day running of a company is delegated by the shareholder body to the board. Under art 3 of the model articles for both private companies (Sch 1 to SI 2008/3229) and public companies (Sch 3 to SI 2008/3229), the directors 'are responsible for the management of the company's business, for which purpose they may exercise all the powers of the company'.[1] This statutory default position has major significance for the power balance within companies, with responsibility for day-to-day management resting with the directors. By contrast, the default position for shareholders is that very limited control powers rest with the shareholder body. For both private companies and public companies, where art 4 of the relevant 2008 model articles is adopted, the shareholders have a reserve power that

---

can only be exercised by special resolution: '[t]he shareholders direct the directors to take, or refrain from taking, specified action'.[2] This power of the general meeting to give directions represents a more specific addition to the general power of the shareholders to alter the articles prospectively by special resolution.

Consequently, the courts have repeatedly confirmed that this allocated power balance between the corporate organs means that the members cannot, except by special resolution, take the conduct of the business out of the directors' hands, or compel them to adopt a particular line of action, such as sealing a draft deed or effecting a sale of the company's property[3] or discontinuing legal proceedings commenced in the name of the company on the instructions of the board.[4] Under reg 70 of the Companies (Tables A to F) Regulations 1985 and reg 4 of the 2008 model articles for public companies and private companies limited by shares[5] the general meeting may give directions to the board by special resolution (as opposed to altering the articles by special resolution).[6]

In *Frontsouth (Witham) Ltd (In Administration)*,[7] it was unsuccessfully argued that if it was constitutionally open to the shareholders to procure the necessary action by the board, it must be open to the shareholders to make the necessary decision themselves when it was not practicable to convene a board meeting. Here it was accepted by both parties that where the articles of a company included a provision delegating the day-to-day running to the board (reg 70), as a matter of general company law the decision whether or not to place the company into administration was one to be taken by the directors. It was held that a corollary of this was that the decision could not be taken by an ordinary resolution of the shareholders; the only manner in which the shareholders could act was by passing a special resolution in order to direct the board to take such a step.

Nonetheless the shareholders are understood as possessing certain residual powers where the board of directors is unable to act. Thus if the directors are unable to exercise the powers conferred upon them, whether by reason of there being no independent quorum or by reason of disputes among the directors, the company in general meeting can perform the duties that the directors fail to carry out.[8] In *Barron v Potter*,[9] the company's two directors were not on speaking terms and effective board meetings could not, therefore, be held. The claimant had requisitioned a shareholders' meeting at which additional directors had been appointed to the board but the defendant objected on the ground that, under the articles, only the directors could make such appointments. It was held that where the board is deadlocked, the power to appoint additional directors reverted to the general meeting. Warrington J observed:

> '[I]n ordinary cases where there is a board ready and willing to act it would [not] be competent for the company to override the power conferred on the directors by the articles except by way of special resolution for the purpose of altering the articles. But the case which I have to deal with is a different one. For practical purposes there is no board of directors at all . . . The directors in the present case being unwilling to appoint additional directors under the power conferred on them by the articles, in my opinion, the company in general meeting has power to make the appointment.'[10]

The House of Lords held in *Alexander Ward & Co Ltd v Samyang Navigation Co Ltd*[11] that the absence of validly appointed directors does not prevent a company taking proceedings to recover its debts. Lord Kilbrandon had this to say about an article similar to SI 1985/0805, reg 70 of the 1985 Table A, art 3 in the 2008 model articles in respect of the management of the company's business:

> 'I think the article probably means no more than this, that the directors, and no one else, are responsible for the management of the company, except in the matters specifically allotted to the company in general meeting. This is a term of the contract between the shareholders and the company. But it does not mean that no act of management, such as instructing the company's solicitor, can validly be performed without the personal and explicit authority of the directors themselves.'[12]

Lord Kilbrandon also doubted whether the validity of the company's act, 'resting as it must on a construction of the contract with the shareholders can in such a matter be challenged by someone whose only relationship with the company is one of indebtedness'.

The court can appoint a receiver and manager where the company is in a condition in which there is no properly constituted governing body, or there are such dissensions in the governing body that it is impossible to carry on the business with advantage to the parties interested. The general jurisdiction to appoint a receiver is given statutory expression in s 37 of the Senior Courts Act 1981 (originally titled the Supreme Court Act 1981), which allows the High Court to appoint a receiver where 'just and convenient to do so'. As summarised by Harman J in *Re A Co No 00596*[13] 'the court will not interfere with the ordinary day-to-day management of a company and yet they hold that a receiver can be appointed, although for a limited time, when there are serious dissensions and a high degree of difficulty in managing the company properly while the dissensions are sorted out'. Such an appointment would only be made for a limited time, ie until a meeting of the company could be held and directors appointed.[14]

---

1   The same applies to companies incorporated prior to 1 October 2009: see reg 70 of the Companies (Tables A to F) Regulations 1985.

2   For companies incorporated prior to 1 October 2009 see reg 70 of the Companies (Tables A to F) Regulations 1985.

3   *Automatic Self-Cleansing Filter Co v Cunninghame* [1906] 2 Ch 34, CA; *Gramophone and Typewriter v Stanley* [1908] 2 KB 89 at 105, CA; *Salmon v Quin & Axtens* [1909] AC 442, HL. See also *Campbell v Rofe* [1933] AC 91 at 99, PC; *Kelly v Electrical Construction Co* (1907) 16 OLR 232, Ex D (Ont); *Macson Development Co Ltd v Gordon* (1959) 19 DLR (2d) 465, SC (NS); *Kraus v Lloyd* [1965] VR 232 at 236 to 237, SC (Vic). On the question whether such an article empowers the directors to dispose of the company's business, see *Strong v J Brough & Son (Strathfield) Pty Ltd* (1991) 5 ACSR 296, SC (NSW).

4   *John Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113, CA; *Scott v Scott* [1943] 1 All ER 582, CA; *Black, White & Grey Cabs Ltd v Fox* [1969] NZLR 825, CA (NZ); contra, see *Marshall's Valve Gear Co v Manning, Wardle & Co* [1909] 1 Ch 267. Where a shareholder's agreement and the articles require board approval for legal proceedings, a corporate majority shareholder may not commence proceedings: *Breckland Group Holdings v London & Suffolk Properties* (1988) 4 BCC 542.

5   SI 2008/3229. Article 4 is titled 'Shareholders' reserve power'.

6    Regulation 70 of the Companies (Tables A to F) Regulations 1985 further makes clear
     that the powers it confers are not limited by any special powers given to the directors by
     other provisions in the company's articles of association.

7    [2011] EWHC 1668 (Ch), [2012] 1 BCLC 818.

8    It has been held in Australia that this is a purely residual power and may not be relied on
     where the general meeting has power under the articles to resolve the difficulty, eg by
     appointing additional directors: *Massey v Wales* (2003) 177 FLR 1, CA (NSW).

9    [1914] 1 Ch 895. See also *Foster v Foster* [1916] 1 Ch 532; *Ben-Tovim v Ben-Tovim*
     2001 (3) SA 1074, CPD (S Afr). This may not be the case, however, where the
     shareholders do not have the conventional power to appoint directors, eg where (as in a
     joint venture company) two groups of shareholders each have exclusive power to appoint
     their own directors: *Berlei Hestia (NZ) Ltd v Fernyhough* [1980] 2 NZLR 150 at 155,
     SC (NZ). In *Massey v Wales* (2003) 47 ACSR 1, CA (NSW) it was held that the
     shareholders' residual power to act in place of the directors may be invoked only as a
     matter of business efficacy or necessity, and not where it is open to the shareholders to
     take an alternative course, such as the appointment of new or additional directors.

10   See also the decision of the Singapore Court of Appeal in *Chan Siew Lee v TYC
     Investment Pte Ltd* [2015] 5 SLR 409 to the effect that shareholders have reserve powers
     to act where the board is deadlocked.

11   [1975] 2 All ER 424. See also *CHS (Real Estate) v Hewison and Potts* [1986] PCC 113
     (Isle of Man).

12   *CHS (Real Estate) v Hewison and Potts* [1986] PCC 113.

13   (1986) 2 BCC 99063 at 99067.

14   *Featherstone v Cooke* (1873) LR 16 Eq 298; *Trade Auxiliary Company v Vickers* (1873)
     LR 16 Eq 303; *Stanfield v Gibbon* [1925] WN 11; *Re A Co No 00696* (1986) 2 BCC
     99063.

## Directors' Managerial Powers

**14[2]**   Article 3 of the 2008 model articles for public companies and for
private companies limited by shares confers virtual managerial autonomy
on the directors.[1] The model article provides: 'Subject to the articles, the
directors are responsible for the management of the company's business,
for which purpose they may exercise all the powers of the company.'[2] It
has been held that the power to order the commencement of proceedings
must be exercised by the board as a whole and not by any individual
director or even by a managing director.[3] As to the right of a majority of
the shareholders to commence proceedings in the name of the company,
see *Marshall's Valve Gear Co v Manning, Wardle & Co*.[4] But it is clear
that a majority in general meeting cannot compel the board of directors to
commence proceedings or, on the other hand, prevent the board from
doing so.[5] The right of the majority to commence proceedings in the name
of the company was endorsed by the House of Lords in *Alexander Ward
& Co Ltd v Samyang Navigation*.[6]

The directors are thus the proper persons to do any act in the name of the
company, and in particular to commence actions in the name of the
company, to make contracts, and to affix the seal of the company to deeds.
*Fusion Interactive Communications Ltd v Venture Investment Place-
ment Ltd*[7] concerned a deadlocked board. Two of the four directors of
Fusion (F) had been appointed by the respondent company, Venture (V).
The dispute in question arose over the appointment of an administrative
receiver to V. It was alleged that there had been a default under a
debenture and so V demanded payment of the outstanding balance,

subsequently threatening to appoint administrative receivers. In response, F had instructed its solicitors to bring proceedings for relief. V argued that the solicitors lacked authority to commence such an action because the board of F had not authorised it: only two of the four directors had agreed their appointment. Further, it was alleged that there had not been a resolution appointing the solicitors. It was held that sufficient authority to appoint the solicitors could, on the particular facts, be derived from a course of conduct given that in the past V had recognised the solicitors as having authority to act on behalf of the company.

If a company's articles authorise it, but not otherwise,[8] the board may delegate any of its powers to a person or committee, which may consist even of a single director,[9] but the board does not by making such delegation lose its power to act in the matter,[10] and the board cannot deprive itself of power to control the company's business.[11] Indeed, art 5 of both the 2008 model articles for public companies and for private companies limited by shares provide that:

> '(1)    Subject to the articles, the directors may delegate any of the powers which are conferred on them under the articles –
>    (a)    to such person or committee;
>    (b)    by such means (including by power of attorney);
>    (c)    to such an extent;
>    (d)    in relation to such matters or territories; and
>    (e)    on such terms and conditions;
>
> as they think fit.'[12]

In a multi-director company, in the absence of specially delegated power, a director acting alone does not have power to bind the company. Nor can a number of the directors, even though they constitute a majority, act without meeting or at a meeting of which notice has not been given to the whole body,[13] and acts done by a majority of the board not duly convened as a board meeting (eg on the occasion of a general meeting of the company) are not valid.[14] Under s 280 of the Companies Act 2006, a provision requiring or authorising a thing to be done by a director and the secretary is not satisfied by its being done by one person purporting to act in both capacities.

Directors may bind the company by exercising their powers informally outside a board meeting provided all the directors have assented to or acquiesced in the relevant decision.[15]

---

[1]    SI 2008/3229.
[2]    Regulation 70 of the Companies (Tables A to F) Regulations 1985 is in similar terms.
[3]    *Mitchell & Hobbs (UK) Ltd v Mill* [1996] 2 BCLC 102.
[4]    [1909] 1 Ch 267.
[5]    *John Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113, CA.
[6]    [1975] 2 All ER 424, [1975] 1 WLR 673. See in particular the speech of Lord Hailsham at 679.
[7]    [2005] BCLC 250, ChD.
[8]    *Howard's Case* (1886) 1 Ch App 561.
[9]    *Re Taurine Co* (1884) 25 ChD 118, CA; *Harris's Case* (1872) 7 Ch App 587; in *Re Fireproof Doors* [1916] 2 Ch 142. Compare *Horn v Faulder & Co* (1908) 99 LT 524. See

1948 Table A, art 102 and 1985 Table A, reg 72. See art 5 of the 2008 model articles for private companies limited by shares and art 5 of the 2008 model articles for public companies (SI 2008/3229).

[10]   *Huth v Clarke* (1890) 25 QBD 391.

[11]   *Horn v Faulder & Co* (1908) 99 LT 524.

[12]   SI 2008/3229.

[13]   *Re Portuguese Consolidated Copper Mines* (1899) 42 ChD 160, CA; *Re Homer District Gold Mines* (1888) 39 ChD 546, CA; *Re Bank of Syria* [1900] 2 Ch 272, [1901] 1 Ch 115.

[14]   *Barber's Case* (1877) 5 ChD 963, CA, where the nomination of a person approved by six out of seven directors was held not sufficient.

[15]   *Re Bonelli's Telegraph Co* (1871) LR 12 Eq 246; *Charterhouse Investment Trust Ltd v Tempest Diesels Ltd* [1986] BCLC 1; *Runciman v Walter Runciman Plc* [1992] BCLC 1084; *Municipal Mutual Insurance Ltd v Harrop* [1998] 2 BCLC 540; *Hunter v Senate Support Services Ltd* [2004] EWHC 1085 (Ch), [2005] 1 BCLC 1157.

## Directors' Meetings

**14[3]**  It is expected that directors will exercise their decision-making powers formally by meeting collectively at a duly convened board meeting and considering whether to pass a resolution or in the form of a directors' written resolution.[1] Decision-making is on the basis of unanimous or majority assent. It is not open to individual members of a board to take it upon themselves to exercise the powers of the board.[2]

The directors must not exclude any of their body from their meetings, and an excluded director may obtain an injunction restraining continued exclusion.[3] More usually, wrongful exclusion of a director from management may found an unfair prejudice petition under s 994 of the Companies Act 2006.[4] However, it is possible for the articles to confer a power to remove a director on the board. In *Smith v Butler*[5] the Court of Appeal held that the managing director of a company had exceeded their authority in suspending the company's chairman and excluding them from the premises. The managing director had no express authority to so act, nor did they have implied powers by virtue of holding the office of managing director. Implied powers were limited to those that would be ordinarily exercisable by a managing director and did not extend to dismissing the chairman.

[1]   Article 7 of the model articles for public companies (SI 2008/3229); art 7 and art 8 of the model articles for private companies (SI 2008/3229).

[2]   *Mohamed v The Egyptian Association in Great Britain Ltd* [2018] EWCA Civ 879, [2018] Bus LR 1354, [2018] All ER (D) 120 (Apr).

[3]   *Pulbrook v Richmond Consolidated Mining Co* (1878) 9 ChD 610; *Hayes v Bristol Plant Hire Ltd* [1957] 1 All ER 685; *Kraus v Lloyd* [1965] VR 232, SC (Vic) (where it was also held that an injunction could be obtained by any shareholder). Cf *Barlows Manufacturing Co Ltd v RN Barrie (Pty) Ltd* 1990 (4) SA 608, PD (Cape).

[4]   *Re Flex Associates Ltd*; *Hussain v Cooke* [2009] EWHC 3690 (Ch); *Orr v DS Orr & Sons (Holdings) Ltd* [2013] CSOH 116. On unfair prejudice see generally **Chapter 19**.

[5]   *Smith v Butler* [2012] EWCA Civ 314, [2012] 1 BCLC 444. See also *Mitchell & Hobbs (UK) Ltd v Mill* [1996] 2 BCLC 102.

### Notice and participation

**14[3A]**  Subject to a company's articles, generally a person who is not a director will not have the capacity to request the convening of a board meeting.[1] Notice of the meeting must be given to each director.[2] Notice does not have to be in writing.[3] The notice must indicate:

(1)    the proposed date and time of the meeting;
(2)    where it is to take place; and
(3)    if it is anticipated that directors participating in the meeting will not be in the same place, how it is proposed that they should communicate with each other during the meeting.[4]

Business done at a meeting of which some directors had no notice is invalid.[5] This will not be cured by a quorum being present at a directors' meeting.[6] However, it has been held in Australia that subject to any contrary provisions in the company's constitution, a directors' meeting may sometimes be valid even where notice has not been given to a director. This is only where there are exceptional circumstances and notice cannot be given to the director without the necessary business at the proposed meeting being seriously hampered.[7]

Notice of a directors' meeting need not be given to directors who waive their entitlement to notice of that meeting, by giving notice to that effect to the company not more than seven days after the date on which the meeting is held. Where such notice is given after the meeting has been held, that does not affect the validity of the meeting, or of any business conducted at it.[8] There is old authority that suggests that where a director is abroad and out of reach of notices, a meeting held without notice to them is valid.[9] However, it is unlikely that a court today would not take account of modern technological advances in considering a failure to give notice and thus the prudent course of action would be to make appropriate efforts to notify all directors. Indeed, there is Australian authority to suggest that the mere fact that a director is abroad is not sufficient if the director can be reached.[10] There is a conflict of judicial opinion as to whether it is necessary to give notice of a board meeting to a director who, under the articles, has no vote, eg an ordinary director, when all the powers of the directors are vested in permanent directors.[11]

Failure to give appropriate notice to those entitled to receive notice will mean that a board meeting is not validly convened and that any resolutions passed at it will not bind the company. In *Baker v London Bar Co Ltd*[12] it was held that the appointment of administrators to the company was invalid as one director was not given notice of the relevant board meeting and a statutory provision permitting majority decisions could not override the provisions of the company's articles.

If no period of notice is prescribed by the articles the period must be fair and reasonable; past practice is an important factor in determining this.[13] The notice may be a very short one; even a few minutes' notice will suffice if the director can attend, and where he objects to the shortness of the notice he should make his objection at once, or it will not prevail. Failure to give notice of board meetings may ground an unfair prejudice petition under s 996 of the Companies Act 2006.[14]

It is not necessary that the notice should state what business is to be transacted,[15] unless the articles require that certain business shall only be transacted at a meeting specially convened for that purpose, in which case the notice must sufficiently indicate the business to be considered.[16] In a case where there were only two directors of a company, and one did not attend a duly convened meeting, but the other, meeting him shortly after in the passage to his office, proposed the election of a third director, and, on objection being made, declared that by his casting vote as chairman he carried the resolution, his action was valid;[17] but a casual meeting of the two directors of a company, even at the company's office, cannot be converted into a board meeting if one of them denies that it is a board meeting and has not received notice calling such a meeting.[18] However, a director's declaration that they do not recognise a properly convened board meeting or their refusal to attend will not invalidate the meeting.[19]

Under art 10 of the model articles in SI 2008/3229 for private companies, and art 9 for public companies, as long as each director can hear the other contributions and participate, it is immaterial that the meeting was achieved by modern means of communication. As seen above, the model articles for public companies and private companies refer to directors 'participating in a directors' meeting'.[20] This is satisfied when:

(1)    the meeting has been called and takes place in accordance with the articles; and

(2)    they can each communicate to the others any information or opinions they have on any particular item of the business of the meeting.[21]

In determining whether directors are participating in a directors' meeting, where any director is located or how the directors communicate with each other is immaterial.[22] It is accepted that directors may participate in board meetings without their physical presence being required, for example, by telephone.[23] As Judge Keyser QC stated in *Muduroglu v Reddish LLP*[24] 'A meeting involves some form of mutual communication during the course of the meeting. That used to require physical presence together  . . .  More modern articles envisage that communication may take place by means of technology, such as telephone or video link'. A duly called meeting cannot be postponed or cancelled unless the articles permit it.[25]

---

1    *Sneddon v MacCallum* [2011] CSOH 59, 2011 GWD 13-292.

2    Articles 8(1)–(5) of the 2008 model articles for public companies (SI 2008/3229); and arts 9(1) and (3) of the 2008 model articles for private companies limited by shares.

3    Article 8(5) of the 2008 model articles for public companies (SI 2008/3229); and art 9(3) of the 2008 model articles for private companies limited by shares: *Browne v La Trinidad* (1888) 37 ChD 1 at 9, CA.

4    Article 8(4) of the 2008 model articles for public companies (SI 2008/3229); and art 9(2) of the 2008 model articles for private companies limited by shares.

5    *Baker v London Bar Co Ltd* [2011] EWHC 3398 (Ch), [2012] BCC 69; *Orr v DS Orr & Sons (Holdings) Ltd* [2013] CSOH 116.

6    *Baker v London Bar Co Ltd* [2011] EWHC 3398 (Ch), [2012] BCC 69.

7    *Summerdowns Rail Ltd v Stevens* [2015] NSWSC 321.

8    Article 8(6) of the 2008 model articles for public companies (SI 2008/3229); and art 9(4) of the 2008 model articles for private companies limited by shares.

9    *Halifax Sugar Refining Co Ltd v Francklyn* (1890) 59 LJ Ch 591.

[10] *Mitropoulos v Greek Orthodox Church* (1993) 10 ACSR 134, SC (NSW). On the meaning of 'out of reach', see *African Organic Fertilisers & Associated Industries Ltd v Premier Fertilisers Ltd* 1948 (3) SA 233, PD (Natal), where the question whether a director was within reach was considered to depend in part on the seriousness of the business of the proposed meeting.

[11] *John Shaw & Sons (Salford) v Shaw* [1935] 2 KB 113 per Greer LJ at 133 and per Slesser LJ at 138 to 141, CA.

[12] [2011] EWHC 3398 (Ch), [2012] BCC 69.

[13] *Toole v Flexihire Pty Ltd* (1991) 6 ACSR 455, SC (Qld).

[14] *Orr v DS Orr & Sons (Holdings) Ltd* [2013] CSOH 116.

[15] *La Compagnie de Mayville v Whitley* [1896] 1 Ch 788, CA; contrast *Toole v Flexihire Pty Ltd* (1991) 6 ACSR 455, SC (Qld), where only one item of business was specified in the notice and the meeting was in fact convened to deal with a good deal more. In *Eastern Resources of Australia Ltd v Glass Reinforced Products (GRP) Pty Ltd* (1986) 10 ACLR 496, SC (Qld) it was held improper for a quorum of directors present at a meeting to adjourn the meeting to another date of which the remaining directors had no notice, and then transact unusual business which it might be expected those other members would oppose.

[16] *Young v Ladies' Imperial Club* [1920] 2 KB 523, CA.

[17] *Smith v Paringa Mines* [1906] 2 Ch 193.

[18] *Barron v Potter* [1914] 1 Ch 895.

[19] *Smith v Paringa Mines Ltd* [1906] 2 Ch 193.

[20] Articles 8(4)(c) and 9 of the 2008 model articles for public companies (SI 2008/3229); and arts 9(2)(c) and 10 of the 2008 model articles for private companies limited by shares.

[21] See footnote above.

[22] See **fn 13** above.

[23] See the discussion in *Sneddon v MacCallum* [2011] CSOH 59 at [273] on the importance of having speakerphone capability so that all participants can hear and be heard where there is participation by telephone.

[24] [2015] EWHC 1044 (Ch), [2015] All ER (D) 140 (Apr) at [143].

[25] *Bell Resources Ltd v Turnbridge Pty Ltd* (1988) 13 ACLR 429 SC (WA); *Kaye v Oxford House (Wimbledon) Management Co Ltd* [2019] EWHC 2181 (Ch), [2019] All ER (D) 55 (Aug).

---

### *Quorum*

**14[3B]** Although all board members must be given notice of a board meeting, the presence of all the directors at a board meeting is not essential to ensure the validity of business carried on at board meetings if (as is usually the case) the articles provide that a specified number of directors shall form a quorum.[1] An alternate director, whose appointer is not present, is counted in establishing a quorum.[2]

If a quorum is not so prescribed a majority of the board is required to attend,[3] unless the number to form a quorum can be established by the practice of the board.[4] If the articles so provide, questions may be decided by a majority of the directors present; but where such provision is made and controlling powers are vested in joint governing directors those powers must be exercised by all of them.[5]

If there is a clause in the articles that the continuing directors may act notwithstanding vacancies, a number less than the minimum number of directors prescribed by the articles is capable of binding the company.[6] The articles may, however, provide that not less than the minimum number of directors can act, and in one case where the minimum was four,

but only two were named in the articles, it was held that these two were not 'continuing' directors, and could not act until a full board was appointed.[7] In *Randhawa v Turpin (as former Joint Administrators of BW Estates Ltd)*,[8] the purported appointment of joint administrators to a company by its sole director was held to be invalid by the Court of Appeal in circumstances where the company's articles required a quorum of two directors. However, since the enactment of the Companies Act 2006, there is an understanding that where management of a company by sole director is permitted, a company's articles may be read so as to allow decision-making other than by way of collective decision-making. Thus, in *Re Active Wear Ltd*,[9] the appointment by an administrator by a sole director was upheld and the general rule about collective decision-making by the directors was deemed not to apply. Where the number remaining in office is less than a quorum, it has been doubted whether they can act,[10] but in a case under the Companies Clauses Act 1845 where there was a provision that the continuing directors may act notwithstanding vacancies, it was held that a single director could act although the quorum was three,[11] and the same reasoning would likely apply under the usual articles. In calculating a quorum, directors not entitled to vote (eg as being interested in the contract under discussion) must not be counted.[12] If two directors are interested in a transaction the objection will not be removed by splitting up the resolution and each director voting only on the part affecting the other,[13] and a resolution reducing the quorum for the purpose of enabling those not interested to pass the resolution will be invalid. The fiduciary duties of a director interested, directly or indirectly, in a contract with the company[14] are examined in **Chapter 15** and **Chapter 16**.

A transaction approved at an inquorate board meeting is not binding on the company.[15] Thus, for example, the purported appointment of an administrator will be invalid if a quorum of directors as prescribed by the articles is not present to pass the appropriate resolution.[16] A director (also chairman) wishing to enforce such an invalid transaction may not invoke s 40 of the Companies Act 2006 (see **Chapter 8**).[17]

---

1    Regulation 10(2) of the 2008 model articles for public companies (SI 2008/3229) provides that the quorum for directors' meetings may be fixed from time to time by a decision of the directors, but it must never be less than two, and unless otherwise fixed it is two. For private companies, see reg 11(2) of the 2008 model articles for private companies limited by shares. See also the Companies (Table A to F) Regulations 1985, SI 1985/805, reg 89.

2    Regulation 26(3) of the 2008 model articles for public companies (SI 2008/3229).

3    *York Tramways Co v Willows* (1882) 8 QBD 685, CA.

4    *Re Regent's Canal Iron Co* [1867] WN 79; *Lyster's Case* (1867) LR 4 Eq 233.

5    *Perrott & Perrott Ltd v Stephenson* [1934] Ch 171. But see *Bersel Manufacturing Co v Berry Ltd* [1968] 2 All ER 552, HL where a husband and wife were the two permanent life directors who had the power under the articles to terminate the directorship of the ordinary directors. It was held, on the construction of the article in question, that the power was exercisable by the husband after the wife's death.

6    *Re Scottish Petroleum Co* (1883) 23 ChD 413, CA.

7    *Re Sly, Spink & Co, Hertslet's Case* [1911] 2 Ch 430 per Neville J. But see *La Compagnie de Mayville v Whitley* [1896] 1 Ch 788, CA.

8    [2017] EWCA Civ 1201, [2018] Ch 511, [2018] 2 WLR 1175.

9    [2022] EWHC 2340 (Ch), [2023] BCC 14.

[10]  See *Re Bank of Syria* [1900] 2 Ch 272 and [1901] 1 Ch 115; *Newhaven Local Board v Newhaven School Board* (1885) 30 ChD 351, CA.

[11]  *Channel Collieries Trust v Dover Railway Co* [1914] 1 Ch 568, aff'd [1914] 2 Ch 506, CA.

[12]  *Yuill v Greymouth-Point Elizabeth Railway* [1904] 1 Ch 32; *Victors v Lingard* [1927] 1 Ch 323; *Re Cleadon Trust* [1939] Ch 286, CA; and *Colin Gwyer & Associates Ltd v London Wharf (Limehouse) Ltd* [2002] EWHC 2748 (Ch), [2003] 2 BCLC 153.

[13]  *Re North Eastern Insurance Co* [1919] 1 Ch 198; *Ireland Alloys Ltd v Buchanan* 1999 SLT 267; see also *Claremont Petroleum NL v Cummings* (1992) 10 ACLC 1685, Fed C (Aus), aff'd (1992) 9 ACSR 583, Fed C (Gen Div).

[14]  See art 16 of the 2008 model articles for public companies (SI 2008/3229); and art 14 of the 2008 model articles for private companies limited by shares. See also the Companies (Tables A to F) Regulations 1985, SI 1985/805, regs 84 to 86 and 94 to 97.

[15]  *Yuill v Greymouth-Point Elizabeth Railway* [1904] 1 Ch 32; *Re North Eastern Insurance Co Ltd* [1919] 1 Ch 198.

[16]  *Re Melodious Corporation; Chan Pui-Kwan v Leung Kam-Ho* [2015] EWHC 621 (Ch), [2015] 1 BCLC 518.

[17]  *Smith v Henniker Major & Co* [2002] BCC 544, ChD; affirmed [2002] EWCA Civ 762, [2003] Ch 182. As to Companies Act 2006, s 35A, see **8[4]**.

---

## Chairman

**14[3C]**  The directors may appoint a director to chair their meetings.[1] Articles usually declare that the chairman shall have a casting vote in case of the directors being equally divided upon any question.[2] However, the casting vote cannot be exercised if, under the articles, the chair is not to be counted as participating for quorum, voting or agreement purposes.[3] An appointment of a chairman made in contravention of the articles of association is invalid, and a resolution carried by the casting vote of a person so appointed is inoperative even though the irregular appointment has been acquiesced in by the board.[4]

The decision of the Federal Court of Australia in *Australian Securities and Investments Commission v Mitchell (No 2)*[5] contains an interesting discussion of the role and duties of a chairman in a contemporary context. In his judgment Beach J stated:

> 'Clearly, [a chairman] has no power or authority to manage the corporation. [Their] primary function is to preside at board meetings and accordingly to exercise procedural control. But save for that, and [their] power to exercise a casting vote (if applicable), [they have] no greater authority than an ordinary director. [They are] not some sort of directorial overlord. But [they do] have the power and authority to manage board meetings and to that extent [they] may have greater responsibility for the performance of the board as a whole.'[6]

In this case, although it was recognised that the chairman has a role in setting the board agenda for meetings and in ensuring that the board receives documentation so as to be sufficiently informed, it was considered reasonable in this case for the chairman to have relied upon the CEO in deciding what documents should have be disclosed to the board. The case highlights the importance of companies defining the role of the chair on these matters relative to other corporate actors such as the managing director or CEO and the company secretary. In *Kaye v Oxford House (Wimbledon) Management Co Ltd*,[7] a case in relation to a requisition from members to call a general meeting under s 303 of the Companies Act

---

2006, it was held that the chair of a general meeting had no power to refuse to put resolutions to the meeting. Where the chairman of a meeting acts in good faith and on erroneous legal advice, those acts in relation to the meeting and their consequences may nonetheless be challenged.[8]

---

1    Article 12(1) of the 2008 model articles for public companies (SI 2008/3229); and art 12(1) of the 2008 model articles for private companies limited by shares.
2    SI 2008/3229, arts 14 and 13, respectively.
3    SI 2008/3229, arts 14(2) and 13(2), respectively.
4    *Clark v Workman* [1920] 1 I R 107. See also *Re Bradford Investments Plc* [1990] BCC 740.
5    [2020] FCA 1098.
6    At [1409].
7    [2019] EWHC 2181 (Ch), [2020] BCC 117.
8    *Byng v London Life Association Ltd* [1990] Ch 170; *Kaye v Oxford House (Wimbledon) Management Co Ltd* [2019] EWHC 2181 (Ch), [2020] BCC 117.

---

### Minutes of directors' meetings

**14[4]** Decision-making at meetings must be formally recorded in minutes.[1] Minutes which are authenticated by the chairman of the meeting or the chairman of the next directors' meeting are evidence of the proceedings at the meeting.[2] 'Authenticated' is not defined for the purposes of s 249 of the Companies Act 2006. No doubt minutes will generally be signed although if kept only in electronic form, some other method of authentication is clearly permitted. Where minutes exist, there is a rebuttable presumption that a directors' meeting was duly held and convened, that the proceedings at the meeting duly took place and any appointments made at the meeting were valid.[3] The 2008 Model Articles contemplate that the directors may make additional rules in relation to decision-making.[4]

Earlier legislation did not stipulate how long minutes should be kept, but s 248(2) of the Companies Act 2006 now lays down the requirement to keep them for ten years from the date of the meeting. Failure to make and keep minutes as required by s 248 is a criminal offence, applying to every officer of the company who is in default.[5]

Sections 1134 and 1135 of the 2006 Act confer the power to keep company records (including minutes) in electronic form. Where minutes have been kept in accordance with the provisions of s 248 then, until the contrary is proved, every such meeting is deemed to have been duly held and convened, and all proceedings to have been duly had, and all appointments of directors, managers, or liquidators are deemed to be valid.[6]

If there is no record in the minutes of a resolution, the courts will assume that no such resolution was passed, but direct evidence will be admitted to show that the minutes are inaccurate and have omitted something that in fact was done.[7]

A minute signed by the chairman is a sufficient memorandum to satisfy s 40 of the Law of Property Act 1925.[8]

---

There may be competing views as to the accuracy of the minutes; the New South Wales Court of Appeal has ventured to suggest that this does not in itself mean that the minutes are inaccurate as recollections of the meeting may differ.[9] In *Sneddon v MacCallum*[10] it was argued that approval of minutes of a board meeting at the next board meeting constituted an implied ratification of the business of a preceding board meeting even if it was originally invalid. This argument was, however, rejected by the Outer House of the Court of Session on the facts as the original board meeting was not validly constituted. The adoption of minutes at a subsequent meeting of directors does not make those taking part in such adoption responsible for the acts done at the earlier meeting if such acts were complete before the minutes came up for consideration.[11]

The Australian High Court has stated that the minutes of board meetings are evidence of what they represented.[12] Also, the court said that if minutes were prepared before a meeting is actually held they could be representative of what was discussed and said and it could not be necessarily implied that they did not record accurately what transpired at the meeting. Where the approved minutes are inaccurate, it may be appropriate in certain cases to apply to court for an order of rectification. Rectification is a discretionary remedy that the courts apply sparingly. Thus in *Crest Nicholson (Wainscott) v Crest Nicholson Operations Ltd*,[13] rectification of a members' resolution was permitted, but not rectification of relevant board minutes as the rectified written resolution authorised the relevant act.

---

1   Companies Act 2006, s 248.
2   Companies Act 2006, s 249(1).
3   Companies Act 2006, s 249(2).
4   Article 16 of the 2008 model articles for private companies limited by shares (SI 2008/3329).
5   Companies Act 2006, s 248(3) and (4).
6   Companies Act 2006, s 249(2).
7   See **12B[1]**.
8   *Jones v Victoria Graving Dock Co* (1877) 2 QBD 134, CA. This does not apply to Scotland.
9   *ET-China.com International Holdings Ltd v Cheung* [2021] NWWCA 24.
10  [2011] CSOH 59.
11  *Re Lands Allotment Co* [1894] 1 Ch 616 at 634, CA; *Burton v Bevan* [1908] 2 Ch 240; *Lucas v Fitzgerald* (1905) 20 TLR 16.
12  *Australian Securities and Investments Commission v Hellicar* [2012] HCA 17, (2012) 286 ALR 501.
13  [2014] EWHC 1979 (Ch).

---

### Written resolutions

**14[5]** The model articles for both public companies and private companies contemplate that a written resolution can be used where there is unanimous agreement by the directors entitled to vote to a particular decision being taken.[1] Copies of the resolution can be signed by each eligible director or, in the case of private companies also where assent is otherwise indicated in writing.[2] It will not be possible to use the written

resolution procedure where the eligible directors would not constitute a quorum at a meeting. Judge Keyser QC stated in *Muduroglu v Reddish LLP*[3] that 'the signing of a document does not constitute a meeting of those named on it; that is why a written resolution is not a meeting'.

Where a company has not drafted or amended its articles to unambiguously provide for written resolutions, a court is unlikely to read in such a power. This has been held to be the case in relation to shareholder written resolutions.[4] Although it has been said that in the absence of a provision permitting written resolutions, the directors cannot act without meeting,[5] there is authority for the proposition that directors can act unanimously but informally.[6] It remains to be seen how these disparate lines of authority will be reconciled. Where only a majority of the directors give oral assent informally, such assent does not amount to a valid resolution.[7] However, this defect can be cured by a subsequent resolution at a board meeting. This may take the form of authorising the chairman to sign minutes, which record that a particular resolution has been passed. This effectively ratifies an informal oral resolution of a majority of the directors.[8]

---

1    Article 18(1) of the model articles for public companies (SI 2008/3329); art 8(1) of the model articles for private companies (SI 2008/3329).

2    Article 7 of the model articles for public companies (SI 2008/3329); art 8(2) of the model articles for private companies (SI 2008/3329).

3    [2015] EWHC 1044 (Ch) at [143].

4    *Puzitskaya v St Paul's Mews (Islington) Ltd* [2017] EWHC 905 (Ch).

5    *D'Arcy v Tamar, Kit Hill and Callington Railway Co* (1867) LR 2 Ex 158; *Re Haycraft Gold Reduction Co* [1900] 2 Ch 230; *Re Homer District Gold Mines* (1888) 39 ChD 546, CA. In these cases there was not unanimous agreement, only the informal consensus of a quorum. See also *Collie's Claim* (1871) LR 12 Eq 246 at 258 and *Southern Counties Deposit Bank v Rider* (1895) 73 LT 374, CA.

6    See art 8 of the 2008 model articles for private companies limited by shares (SI 2008/3229). See also *Collie's Claim* (1871) LR 12 Eq 246 at 258; *Bolton Engineering Ltd v T J Graham & Sons Ltd* [1957] 1 QB 159; *Runciman v Walter Runciman plc* [1992] BCLC 1084 at 1092; *Charterhouse Investment Trust plc v Tempest Diesels Ltd* [1986] BCLC 1 at 9. See also *Southern Witwatersrand Exploration Co Ltd v Bisichi Mining plc* 1998 (4) SA 767, LD (Wits), where the consent of some directors had been communicated to the others by fax. However, there must be a 'demonstrable expression of will' on the part of those approving the resolution, and concurrence with the resolution must be expressed by each director in that capacity, for the purpose of resolving on affairs of the company: *Poliwka v Heven Holdings Pty Ltd* (1992) 8 ACSR 747, FC (WA). See also *Wey Education plc v Atkins* [2016] EWHC 1663 (Ch).

7    *Municipal Mutual Insurance Ltd v Harrop* [1998] 2 BCLC 540 at 551.

8    *Municipal Mutual Insurance Ltd v Harrop* [1998] 2 BCLC 540 at 551 to 553, applying *Re Portuguese Consolidated Copper Mines Ltd* (1890) 45 ChD 16.

---

## Irregular Acts and Invalid Appointments

**14[6]** Section 161 of the Companies Act 2006 provides that a person's acts as a director will be valid despite defects in his appointment, disqualification from holding office, the fact that he had ceased to hold office or that he was not entitled to vote on the matter in question. The cases on the question of the effect of an irregularity upon acts affecting

shareholders are conflicting. It has been held that, notwithstanding the provisions of s 161 of the 2006 Act[1] if the directors are not properly appointed according to the articles of association,[2] or if they continue to act without re-election,[3] they cannot allot shares, make valid calls, forfeit shares or appoint directors. Equally, if the articles fix a minimum number of directors, a smaller number cannot act, and anything they purport to do is invalid unless power is given to act notwithstanding vacancies.[4] But, on the other hand, the Court of Appeal has held that if the articles contain provisions that acts shall be valid notwithstanding any irregularity subsequently discovered, shareholders as well as strangers are bound by and may take advantage of such acts, the irregularity being cured by such an article even though the facts constituting the irregularity are known, provided that the directors act in good faith and believe that they have power to do the act in question.[5] Moreover, a meeting of the company ordered to be called by directors not forming a quorum may pass valid resolutions,[6] while a call made by directors appointed at a meeting irregularly summoned is also valid.[7] In *Katan v Feroze*[8] the court applied the principle in *Sharma v Sharma Ltd*[9] on acquiescence in relation to an irregular director appointment having the effect of barring a subsequent challenge.

The question of whether acts bind the company will involve an application of the rules of agency. The Privy Council has opined that is not possible for a person to confer authority on themselves to act as managing director by their own actions in holding themselves out as the managing director.[10] Rather, in the absence of actual authority, it is a matter of establishing implied actual authority or ostensible authority based on the board's actions.[11] Alternatively, it is possible for a company to ratify acts that lacked appropriate authority to bind the company where it is considered beneficial to do so. Ratification will have retrospective effect to the time the transaction was entered into.[12] Where the directors purporting to remove the original directors were not properly appointed, the purported removal was held to be ineffective in the *Business Mortgage Finance 4 Plc v Hussain*.[13] Section 293(2) of the Companies Act 2006 contemplates a power of members to require circulation of written resolutions and it has been held that a failure to circulate a written resolution as required had the effect of rendering the purported appointment of directors ineffective.[14]

If directors not properly appointed, or otherwise acting irregularly, have dealings with strangers who do not know of the irregularity, they may be treated as agents of the company, which may be bound by their acts.[15] The position would be otherwise if the persons dealing with the company through its directors, or apparent directors, are put upon inquiry as to any irregularity, or as to the validity of the appointment of a director.[16] These questions are governed by what is known as 'the rule in *Turquand's Case*'.[17]

There has been a judicial attempt to align the interpretation of s 161 with the rule in *Turquand's Case*. It has been held in *Re Sherlock Holmes International Society Ltd; Aidiniantz v The Sherlock Holmes International Society Ltd* that a former sole director could not invoke s 161 to validate continuing to purport to provide instructions to a solicitor on behalf of a company after his directorship had ceased. This case shows

that where a director has participated in an irregular act, it will not be validated under the rule in *Turquand's Case*.[18]

---

1    Which came into force on 1 October 2007; examined in **Chapter 13** above.
2    *Re London and Southern Counties Land Co* (1885) 31 ChD 223; *Garden Gully United Quartz Mining Co v McLister* (1875) 1 App Cas 39; *Howbeach Coal Co v Teague* (1860) 5 H&N 151.
3    *Tyne Mutual, etc, Association v Brown* (1896) 74 LT 283; *Morris v Kanssen* [1946] AC 459, HL; *Re Australian Continental Resources Ltd* (1975) 1 ACLR 405, SC (ACT); *Kirton v Venture Acceptance Corpn Ltd* (1986) 10 ACLR 347, CA (NSW); contrast *Essendon Land & Finance Assn Ltd v Kilgour* (1897) 24 VLR 136 at 146 to 147, SC (Vic). In *Cyberscene Ltd v i-Kiosk Internet & Information (Pty) Ltd* 2000 (3) SA 806, CPD (S Afr) it was held that a director who continued to act while subject to a disqualification order could bind the company by his acts, but (in the absence of evidence that the company had held him out as having authority), this must surely be questionable.
4    *Re Alma Spinning Co* (1880) 16 ChD 681; *Re Scottish Petroleum Co* (1883) 23 ChD 413, CA.
5    *Dawson v African Consolidated Co* [1898] 1 Ch 6, CA; *British Asbestos Co v Boyd* [1903] 2 Ch 439; *Channel Collieries Trust v Dover Railway Co* [1914] 2 Ch 506, CA.
6    *Southern Counties Deposit Bank v Rider* (1895) 73 LT 374, CA.
7    *Briton Medical, General and Life Assurance Association v Jones* (1889) 61 LT 384.
8    [2021] 7 WLUK 390 (ChD).
9    [2014] BCC 73.
10   *New Falmouth Resorts Ltd v International Hotels Jamaica Ltd* [2013] UKPC 11, [2013] All ER (D) 214 (Jun).
11   The leading authority on ostensible authority is *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, CA.
12   *New Falmouth Resorts Ltd v International Hotels Jamaica Ltd* [2013] UKPC 11, [2013] All ER (D) 214 (Jun).
13   [2021] EWHC 171 (Ch), [2021] All ER (D) 35 (Feb).
14   *Re Sprout Land Holdings Ltd; Tighe v Fraser-Peters* [2019] EWHC 3693 (Ch).
15   *Re County Life Assurance Co* (1870) 5 Ch App 288; *Mahoney v East Holyford Mining Co* (1875) LR 7 HL 869; *County of Gloucester Bank v Rudry Merthyr Co* [1895] 1 Ch 629, CA; *Re Bank of Syria* [1900] 2 Ch 272, [1901] 1 Ch 115.
16   *B Ligett (Liverpool) Ltd v Barclays Bank* [1928] 1 KB 48; *Walker v Kenns* [1937] 1 All ER 566.
17   *Royal British Bank v Turquand* (1856) 6 E&B 327.
18   [2016] EWHC 1392 (Ch), [2016] 4 WLR 173, [2017] 2 BCLC 38.

---

# Officers of a Company

**14[7]–[8]**  For the purposes of the Companies Act 2006, 'officer' in relation to a body corporate includes a director, manager or secretary.[1] The position of directors has already been discussed, and it is now proposed to say something of other usual officers of a company. The terms of their employment depend upon their contract, whether written or verbal, with the company, though the position of a managing director may in some respects be governed by the articles.

A statement in the articles of association that a particular person is or shall be the secretary, manager, or other officer is not a personal contract,[2] and each officer should protect themselves by seeing that their appointment is

duly made by a resolution of the board of directors or, if necessary, of the company in general meeting, or by an agreement executed by the company after its incorporation.

---

1    Companies Act 2006, s 1173(1); see also *R v Scott* (1990) 2 ACSR 470, SC (NSW). On the meaning of 'manager', see *R v Mall*, 1959 (4) SA 607, PD (Natal).

2    *Eley v Positive Government Assurance Co* (1876) 1 ExD 88, CA; *Browne v La Trinidad* (1888) 37 ChD 1, CA.

---

### Managing and other executive directors

**14[9]**  A managing director (however styled) may either be one of the directors appointed as managing director or be actually appointed as the manager. The powers of a managing director may be delegated to the managing director by the board in accordance with the articles or, if they are silent, such powers will be deemed to be delegated as in a similar business would usually be entrusted to a managing director or manager. The term 'chief executive officer' is also used as an alternative to or in addition to the term 'managing director'. This form of description of an officer-holder is not reflected in the model articles or in the Companies Act 2006, but the term 'chief executive' is used in the UK Corporate Governance Code.[1] Such an officer would generally have the power of a managing director. It is also common practice in public companies (or substantial private companies) to appoint a number of executive directors with particular functions allocated to them such as finance director or personnel director.

As with earlier companies legislation, the Companies Act 2006 does not prevent a managing director's managerial duties being limited by the board. The status and powers of a managing director depend both upon the articles that confer a power on the board to appoint a managing director and upon the terms of the contract by which he is employed. Although a managing director must be a director, the status of managing director derives from appointment by the board to this office. The holder of this office is thus both a director and, as managing director, an employee of the company.[2] Model art 5 of the 2008 Regulations (SI 2008/3329) for private companies and public companies permits delegation of any powers to a person to such an extent and on such terms as the directors see fit. Under reg 72 of the 1985 Table A (delegation of directors' power) the board of directors may delegate any of their powers to 'any managing director or any director holding any other executive[3] office'.[4] It has been suggested that the power of the managing director to manage a company's business does not extend to determining that business.[5] It is within the usual authority of the managing director of a company to give instructions to the company's solicitors as to the payment of money held in a client account on trust for that company.[6] A person dealing with a company through its manager or managing director may assume that the usual and proper powers for carrying on the business have been delegated to them, and, even if there has been no express delegation, the contracts made by them with a stranger will be binding on the company.[7] The usual powers of a managing director do not extend to borrowing money to

---

enable the company to pay off its debts, this not being a transaction in the ordinary course of the company's business.[8] The suspension of the chairman of a company has also been treated as falling outside the scope of a managing director's implied authority to take decisions within the scope of the day-to-day running of a company's business.[9] It has also been held that a managing director had no authority to take critical decisions following the presentation of a petition to wind up the company (including a decision to instruct solicitors to oppose the petition on the company's behalf).[10] The failure of the board to intervene where the managing director has exceeded his authority may imply ratification.[11]

The power to bring proceedings in the name of the company is conferred on directors by art 3 (Directors' general authority) of the 2008 model articles. Although the decision in *Mitchell & Hobbs (UK) Ltd v Mill*[12] indicated that delegation by the board of a power to commence proceedings on behalf of the company is not to be presumed by the fact of appointment as a managing director, dicta of Arden LJ in *Smith v Butler* indicated that *Mitchell* should best be regarded as confined to its facts.[13]

For companies with a premium listing, and other companies choosing to comply voluntarily with the UK Corporate Governance Code,[14] a separation between the chief executive officer and the board is expected. Provision 9 provides that the chair should be independent when appointed, having regard to the criteria set out in Provision 10. And Provision 9 provides that one person should not be both chair and chief executive. Under Principle 14 the division of responsibilities between the chair, chief executive, senior independent director, board and board committees should be agreed by the board and laid down in writing.

Principle F of the UK Corporate Governance Code (2018) states:

> 'The chair leads the board and is responsible for its overall effectiveness in directing the company. They should demonstrate objective judgement throughout their tenure and promote a culture of openness and debate. In addition, the chair facilitates constructive board relations and the effective contribution of all non-executive directors, and ensures that directors receive accurate, timely and clear information.'

---

1   Financial Reporting Council, UK Corporate Governance Code (2018): see **Chapter 41A**.
2   See *Anderson v James Sutherland (Peterhead) Ltd* [1941] SC 203, where Lord Carmont relied upon *Southern Foundries Ltd v Shirlaw* [1940] AC 701, HL and *Fowler v Commercial Timber Co* [1903] 3 KB 1. See also *Trussed Steel Concrete v Green* [1946] Ch 115; *Lee v Lee's Air Farming Ltd* [1961] AC 12 (PC); *Boulting v ACTAT* [1963] QB 600, CA.
3   Whether a person is in fact an executive director is a question of fact, and may depend on the company's constitution or the conduct of the board: *Jacques v AIG Australia Ltd* [2014] VSC 269.
4   If power is not given in the articles to directors to delegate their powers they cannot do so, and must themselves do all acts except such as are usually done by servants or agents.
5   *Interactive Technology Corpn Ltd v Ferster* [2016] EWHC 2896 (Ch).
6   *Lexi Holdings (In Administration) v Pannone* [2009] EWHC 2590 (Ch), [2009] All ER (D) 285 (Oct) at [86].
7   *Biggerstaff v Rowatt's Wharf* [1896] 2 Ch 93, CA.
8   *Re Tummon Investments Pty Ltd* (1993) 11 ACSR 637, SC (Qld).
9   *Smith v Butler* [2011] EWHC 2301 (Ch), [2012] 1 BCLC 444.

10   *Re Quintex Ltd (No 2)* (1990) 2 ACSR 479, SC (Tas).
11   *Macari v Celtic Football and Athletic Co Ltd* 1999 SLT 138.
12   [1996] 2 BCLC 102 at 107 to 108.
13   *Smith v Butler* [2011] EWHC 2301 (Ch), [2012] 1 BCLC 444 at [36].
14   Financial Reporting Council, UK Corporate Governance Code (2018), see **Chapter 41A**.

### Alternate directors

**14[9A]**  The office of director is a personal responsibility[1] and can only be discharged by the person holding that office, except to the extent that the company's articles make special provision. It is a fairly common practice for the articles to provide for the representation of a director who will be absent from board meetings for a lengthy period by enabling that director to appoint an 'alternate director' or a 'substitute director'. The power to appoint an alternate director is 'a power vested in an existing director to appoint someone who can take his place temporarily at board meetings when the appointing director cannot attend'.[2] The 2008 model articles for public companies, art 25,[3] provide that:

> 'any director (the 'appointor') may appoint as an alternate any other director, or any other person approved by resolution of the directors to:
>
> (a)    exercise that director's powers, and
> (b)    carry out that director's responsibilities,
>
> in relation to the taking of decisions by the directors in the absence of the alternate's appointor.'

In similar terms, the 1985 Table A[4] in regs 65 and 66 also makes provision for the appointment of alternate directors. Such a director is not entitled to remuneration.[5] It should be noted that where a person who is to be appointed as an alternate director is not already a director of the company, art 25(2) of the 2008 model articles (in the case of public companies) requires both appointment and removal of an alternate director to be 'effected by notice in writing to the company signed by the appointor, or in any other manner approved by the directors'.[6] In *Sneddon v MacCallum*[7] it was not possible to establish that a person who was not an existing director of the company had been appointed as an alternate director in the absence of a resolution of the directors or notice in writing to the company or proof that an alternative method of appointment had been approved.

An alternate director acts in their own right and not as agent of his appointor. Thus, they will not be imputed with notice of a matter known to their appointor,[8] and are not required to disclose an adverse interest in a transaction or disqualified from voting or being counted towards a quorum if the interest is not their own but that of their appointor.[9] The appointor is not liable for an alternate director's actions.[10] In the eyes of the law, an alternate director is in the same position as any other director, and is subject to the usual fiduciary and other duties of a director.[11] But a person named as an alternate director who is not called upon to act is under no statutory (or, presumably, any other) duties.[12] Under art 27 of the 2008 model articles for public companies, an alternate director vacates office when the appointor vacates office, unless the appointor retires by rotation and is immediately reappointed.

---

1   Thus, the power to act as director cannot be delegated under a power of attorney: *Mancini v Mancini* (1999) 17 ACLC 1570, SC (NSW). A third party dealing with the company in good faith may, however, be protected: *TCB Ltd v Gray* [1986] Ch 621.

2   *Re Information Governance Ltd* [2013] EWHC 2611 (Ch), [2013] All ER (D) 262 (Oct) [15], per Richards J.

3   SI 2008/3229.

4   Companies (Tables A to F) Regulations 1985, SI 1985/805.

5   Article 16(4) of the 2008 model articles for public companies, SI 2008/3229.

6   This mirrors a similar requirement in the 1985 Table A Regulations, reg 68: Companies (Tables A to F) Regulations 1985, SI 1985/805.

7   [2011] CSOH 59.

8   See the 2008 model articles for public companies, art 26(2)(d), which provides that an alternate director is not deemed to be the agent of the appointor.

9   *Anaray Ltd v Sydney Futures Exchange Ltd* (1988) 6 ACLC 271, SC (NSW). Conversely, the alternate director will be disqualified from voting if they have an adverse interest, even though their appointor has no disqualifying interest: *ASIC v Doyle* (2001) 38 ACSR 606, SC (WA).

10  *Re Associated Tool Industries Ltd* (1963) 5 FLR 55, SC (ACT).

11  *Markwell Bros Pty Ltd v CPN Diesels (Qld) Pty Ltd* (1982) 7 ACLR 425 at 433, SC (Qld); cf *Corporate Affairs Commission v Drysdale* (1978) 22 ALR 167, HC (Aus) (de facto director).

12  *Playcorp Pty Ltd v Shaw* (1993) 11 ACLC 641, SC (Vic).

---

### Nominee directors

**14[9B]**  Nominee directors are recognised as a category of director although the term 'nominee director' is not subject to statutory definition. A nominee director is nominated for appointment to a company's board by a particular interest grouping such as a shareholder or class of shareholder or a lender.[1] Nominee directors are frequently used in relation to venture capital arrangements and joint ventures. It is usually expected that a nominee director will provide information in relation to the company's affairs to their appointer. Nominee directors are usually considered to be subject to the same fiduciary duties as other directors irrespective of the level of remuneration paid (if any).[2]

---

1   If a board refuses to accept the person nominated by a shareholder or other party with the right to nominate, the board has the burden of establishing the unsuitability of the person nominated: *The Wellness Group Ltd v Paris Investment Pte* [2018] SGCA 47 at [33].

2   *Central Bank of Ecuador v Conticorp SA* [2015] UKPC 111, [2016] 1 BCLC 26.

---

### Company secretary

**14[10]**  Section 270 of the Companies Act 2006, from its entry into force on 6 April 2008, dispensed with the requirement of private companies having a secretary, although if a company secretary is expressly required in a private company's articles, that will remain the case unless the articles are amended.[1] However, s 271 of the 2006 Act retains the requirement of a secretary for public companies. Section 12 of the Companies Act 2006, which came into force on 1 October 2009, requires that the statement of the first directors (to be delivered at the time of registration of

a company) must also give the name of the first secretary (or joint secretaries). Under s 12(3) this statement must contain a consent signed by each of the persons named as a director or secretary (or joint secretaries).[2] Section 273 makes provision in respect of the qualifications of company secretaries of public companies. Section 273(1) makes it the duty of the directors of a public company, when appointing the secretary of the company, to take all reasonable steps to secure that the secretary, or each joint secretary, is a person who appears to them to have the requisite knowledge and experience to discharge the functions of secretary of the company. Furthermore, such a person must have one of the following types of experience or professional qualification specified in s 273(2). Section 273(2)(a) allows the appointment of anyone who has held the office of secretary of a public company for at least three years of the five years immediately preceding the appointment. In addition the directors of a public company may appoint a member of the Institute of Chartered Secretaries and Administrators or a member of any of the Institutes of Chartered Accountants in England and Wales, or Scotland or Ireland or a member of the Chartered Association of Certified Accountants.[3] They may also appoint someone who has been called or admitted in any part of the UK as a barrister, solicitor or advocate.[4] They may also appoint a member of the Institute of Cost and Management Accountants or the Chartered Institute of Public Finance and Accountancy.[5] The directors may also appoint a person, who by virtue of his holding or having held any other position, or his being a member of any other body, appears to the directors capable of discharging the function of secretary.[6] In larger companies the role of company secretary is often combined with that of general counsel.

If at any time the office of secretary is vacant, or there is no secretary capable of acting, their functions may be carried out by any assistant or deputy secretary; or if there is no assistant or deputy secretary, by any officer authorised generally or specially by the directors.[7] A provision[8] requiring or authorising anything to be done by or to a director and the secretary is not satisfied by being done by or to the same person acting both as director and as, or in the place of, the secretary.[9]

As to the particulars of the secretary to be contained in the register of directors and secretaries and the confirmation statement, see 33[2].

The company secretary has a duty to ensure that a company acts lawfully.[10] As one of the principal officers of the company, the secretary is wholly or partly responsible for the accuracy of documents lodged with the Registrar. A company secretary also has a role to play in implementing the UK Corporate Governance Code.[11] 'Officer' is defined by ss 1121(2) and 1173(1) as including a secretary, and if default is made by a company in complying with the requirements of the Act, the liability to a fine is almost invariably incurred by a secretary who is knowingly and wilfully a party to the default. However, in other contexts, it has been held that a company secretary will not normally be regarded as concerned in the management of a company.[12]

Rather than having a managerial role, the secretary of a company is the agent through whom the administration of the company is done.[13] They

must obey the orders of the directors, and give effect to their resolutions by issuing notices, sending circulars, writing letters, etc. The secretary will also prepare the agenda for board meetings and committees of board and general meetings of the company, and usually draw up the minutes of such meetings. There is often an expectation that the company secretary will drive good corporate governance within a company. However, although putting this on a legal footing has been mooted at a policy level,[14] this has not yet materialised.

A secretary will become personally liable if they omit the word 'Limited' from the name of the company upon any bill of exchange, promissory note, cheque, or order for money or goods, unless the company pays the amount.[15]

The duty of the secretary includes certifying transfers in the ordinary course, and receiving and registering, when necessary, notices on behalf of the company; but where the same person is secretary to two companies knowledge acquired by them as secretary of one company is not necessarily treated as notice to the other.[16] Nor is notice received by a secretary or other officer not in the course of the company's business, or under such circumstances that it is not their duty to communicate it to the company, ascribed to the company.[17] It is not part of his duty to answer inquiries about moneys owing from the company to persons with whom it has dealings, or to make representations on behalf of the company in any matters except those things that fall directly within the scope of the business of the company. The company secretary's duty is to the company, not to individual shareholders.[18]

The secretary of a company has no authority to request anyone to pay money to a third party for the benefit of that company; nor is the knowledge of the secretary that a payment is being so made by someone who expects that the company will reimburse them, and the acquiescence by the secretary in the making of such payment, the knowledge and acquiescence of the company.[19] A secretary has no authority to institute proceedings in the company's name.[20]

The position of the secretary in respect of share transfers (eg as to the issue of share certificates as the certification of transfers) is discussed at **23[19]–23[20]**.

In *Keymed (Medical & Industrial Equipment) Ltd v Hillman*[21] Smith J ruled that a company secretary has fiduciary duties. As an officer of the company the secretary owes fiduciary duties to it, including a duty of loyalty, a duty not to make secret profits or accept bribes and secret commissions, a duty to act with care and skill and a duty not to place themselves in a position where their personal interest, or their duty to others, conflicts with their duty to the company.[22]

The articles of association frequently prescribe that the secretary shall countersign deeds sealed by the company and cheques drawn on its behalf. Even where not obligatory, this is an advisable course to adopt.

As any contract which if made between private persons would not be required to be under seal may be made on behalf of the company by any

person acting under the express or implied authority of the company, it will frequently happen that the manager or secretary has power to contract for the company; but whether they have this power or not will be a question of fact in each case. If the articles direct that some acts can be done by the directors only, it will be obvious that these cannot be delegated; but if delegation is possible, the questions will be:

(1)     Has any such delegation been expressly made?
(2)     If none has been expressly made, has the course of business been such as to give an implied authority?

The answers must depend upon the facts of each case. In *Panorama Development (Guildford) Ltd v Fidelis Furnishing Fabrics Ltd* the Court of Appeal recognised that as the company's chief administrative officer, the secretary may be considered to have customary or ostensible authority in day-to-day administrative matters (eg ordering the hire of cars),[23] but this would not extend to 'signing a contract related to the commercial management of the company'.[24] Although possessing a certain amount of authority associated with the office, a company secretary should be careful not to exceed their authority in making representations to third parties.

Legal proceedings should be issued against a company itself rather than its company secretary where they pertain to legal obligations of the company.[25] When legal proceedings are brought against a company, it frequently happens that interrogatories are administered, the usual direction being that the company shall answer them by its secretary, to the best of their knowledge, information, and belief. In answering for the company, the secretary must get such information as they can from other servants of the company who have personally conducted the transaction in question. They do not answer sufficiently by saying 'I do not know'. They should go on to say that having made inquiries of other officers and agents of the company, they have no information enabling them to answer further, or, if upon inquiry he obtained information, state what it was.[26]

The notes of board meetings and the meetings of audit and risk management committees made by a company secretary may be privileged if counsel attends the meetings and legal advice is rendered during the course of the meetings.[27]

---

1     5th Commencement Order, Sch 4, para 4(1).
2     See **14**[10]. It has been held in New Zealand (on reasoning which it is submitted would be applicable also in this country) that a partnership firm may not be the secretary of a company: *Commercial Management Ltd v Registrar of Companies* [1987] 1 NZLR 744, CA (NZ).
3     Companies Act 2006, s 273(2)(b) and (3).
4     Companies Act 2006, s 273(2)(c).
5     Companies Act 2006, s 273(2) and (3).
6     Companies Act 2006, s 273(2)(d).
7     Companies Act 2006, s 274.
8     'Provision' is not expressed to be limited to 'statutory provision', and the enactment presumably applies to provisions in the articles: eg an article requiring the presence and signatures of a director and the secretary for the affixing of the seal.
9     See Companies Act 2006, s 280. See also *Elim Court RTM Co Ltd v Avon Freeholds Ltd* [2017] EWCA Civ 89.
10    *Raine v HMRC* [2016] UKFTT 0448 (TC) at [152].

[11] The Financial Reporting Council, *The UK Corporate Governance Code* (2018), Principle I.

[12] *Re Maidstone Buildings Provisions Ltd* [1971] 3 All ER 363.

[13] *Keymed (Medical & Industrial Equipment) Ltd v Hillman* [2019] EWHC 485 (Ch), [2019] All ER (D) 68 (Mar).

[14] All Party Parliamentary Corporate Governance Group, *Elevating the Role of the Company Secretary: Lessons from the FTSE All Share Group* (2012).

[15] *Penrose v Martyr* (1858) EB&E 499; see also **3A[28]** and **61[25]**.

[16] *Re Fenwick, Stobart & Co* [1902] 1 Ch 507.

[17] *Société Générale v Tramways Union Co* (1885) 14 QBD 424, CA; (1886) 11 App Cas 20, HL; *Collier v Electrum Acceptance Pty Ltd* (1986) 66 ALR 613 at 652, Fed C (Aus).

[18] *Kelly v Kelly* 1986 SLT 101.

[19] *Re Cleadon Trust* [1939] Ch 286, CA. But see now *Panorama Developments (Guildford) Ltd v Fidelis Furnishing Fabrics* [1971] 2 QB 711, CA.

[20] *Club Flotilla (Pacific Palms) Ltd v Isherwood* (1987) 12 ACLR 387, SC (NSW).

[21] [2019] EWHC 485 (Ch), [2019] All ER (D) 68 (Mar).

[22] *McKay's Case* (1876) 2 ChD 1, CA; *De Ruvigne's Case* (1877) 5 ChD 306, CA; *Minilabs Ltd v Assaycorp Pty Ltd* (2001) 37 ACSR 509, SC (WA).

[23] [1971] 2 QB 711, [1971] 3 All ER 16. See further **8[18]**.

[24] [1971] 2 QB 711 at 718, [1971] 3 All ER 16 per Salmon LJ. The secretary may, in a particular case, have been held out as having a wider authority. This paragraph is based on English law. In Scots law the signature of the secretary is valid execution of any document on behalf of the company.

[25] *Riniker v Mattey* [2013] EWHC 1851 (Admin), [2013] 2 P & CR D46.

[26] *Kirby v Centro Properties Ltd (No 2)* [2012] FCA 70, 87 ACSR 229.

[27] *Bank of Russian Trade v British Screen Productions* [1930] 2 KB 90, CA (in which all the material authorities are referred to).

### Register of people with significant control

**14[11]** Companies with voting shares registered under the Companies Act 2006 (other than those trading on a UK or EU regulated market) are generally required to maintain an internal register of people with significant control (PSCs) over the company.[1] The duty falls on directors to ensure that any changes to the company's details of people with significant control are notified to Companies House. The obligation arises under Part 21A of the Companies Act 2006.[2] The regime was subsequently extended to further entities such as AIM and NEX Growth Market Companies.[3] The regime applies to LLPs and the Scottish Partnerships (Register of People with Significant Control) Regulations 2017 apply the PSC regime to Scottish limited partnerships and certain Scottish general partnerships from 24 July 2017.[4] The PSC register also applies on an equivalent basis to public limited liability companies registered under the Companies Act 2006. The purpose of the PSC register is to provide transparency in relation to persons who own or control companies, including through formal or informal involvement in a company's management. Previously information from a company's PSC register had to be provided to Companies House in the company's annual confirmation statement. On enactment and entry into force, it is intended that the Economic and Corporate Transparency Bill introduced in 2022 will introduce new identity verification requirements for PSCs. In terms of reporting timelines, relevant entities must update their PSC register within

14 days[5] and inform Companies House of relevant changes within 14 days of the PSC entry.[6] Thus ongoing monitoring and reporting is required.

A person will have significant control over a company in accordance with Part 21A of the Companies Act 2006 if they hold more than 25 per cent of the shares or voting rights in the company or have the power to appoint or remove the majority of the board. Persons deemed to have 'significant influence or control' may also satisfy the definition.[7] Statutory guidance in this area suggests that where a person can dictate how the company is run in relation to important matters such as the appointment or removal of the CEO, the company's business plan or a power of veto in relation to, for example, the alteration of the company's constitution, this would be likely to qualify as the exercise of significant influence or control.[8] A shadow director would be likely to fall within this definition given their level of influence in directing the management of the company. However, professional advisers generally would not.

[1]   Companies Act 2006, s 790B (as amended by Companies Limited Liability Partnerships and Partnerships (Amendment etc) (EU Exit) Regulations 2019, SI 2019/348, Sch 1, para 10 with effect from 31 December 2020). Companies House and the Department for Business, Energy & Industrial Strategy published guidance on compliance with the PSC requirements: https://www.gov.uk/government/publications/guidance-to-the-people-wit h-significant-control-requirements-for-companies-and-limited-liability-partnerships.

[2]   Inserted by the Small Business Enterprise and Employment Act 2015, Sch 3 and effective as of 6 April 2016. See also the European Public Limited-Liability Company (Register of People with Significant Control) Regulations 2016, SI 2016/375 and the Limited Liability Partnerships (Register of People with Significant Control) Regulations 2016, SI 2016/340. Amendments to comply with the Fourth Money Laundering Directive were effected by the Information about People with Significant Control (Amendment) Regulations 2017, SI 2017/693.

[3]   The obligation took effect from 24 July 2017: the Information about People with Significant Control (Amendment) Regulations 2017, SI 2017/693.

[4]   SI 2017/694.

[5]   Companies Act 2006, s 790M(2).

[6]   Companies Act 2006, s 790M(6).

[7]   On the meaning of 'significant influence or control', see further the statutory guidance issued by the Secretary of State for Business Innovation and Skills: Department for Business Innovation & Skills, *Statutory Guidance on the meaning of 'significant influence or control' over companies in the context of the Register of People with Significant Control* (2016).

[8]   Department for Business Innovation and Skills, *Statutory Guidance on the meaning of 'significant influence or control' over companies in the context of the Register of People with Significant Control* (2016), paras 2.1–2.11.

## Director's Right to Inspect Company Books

**14[12]**  The general law, rather than statute, confers on directors a broad right to inspect the company's books either at a board meeting or elsewhere.[1] This right extends to the minutes of directors' meetings,[2] the company's accounting records[3] and other company documents.[4] This is supplemented by s 388(1)(b) of the Companies Act 2006, which requires that a company's accounting records to be open to inspection at all times by its officers. In *Conway v Petronius Clothing Co*,[5] Slade J viewed the

common law right as conferred on a director, not for their own advantage, but to enable them to carry out their duties as a director for the benefit of the company.[6] It follows from this that the right to inspect terminates on a director's removal from or vacation of office. However, a court will not allow a director to abuse their right of inspection by disregarding the confidence imposed on them as a director. Nonetheless, in the absence of clear proof it will be assumed that they are exercising their right for the company's benefit. In *Conway*, where misconduct was alleged against the two plaintiff directors, and where a meeting to consider their removal from the board was held, Slade J held that the balance of convenience was against the making of an immediate order. The leading case is *Oxford Legal Group Ltd v Sibbasbridge Services plc*,[7] where the Court of Appeal confirmed that the right of a director to inspect the company's accounting records existed for the purpose of enabling that director to perform their duties. Usefully, in *Dilato Holding Pty Ltd v Learning Possibilities*,[8] it was subsequently clarified that a director is allowed access to all company documents subject to the proviso that sight of them should only be used for the purpose of performance of their duties as a director. In *Oxford Legal Group*, the Court of Appeal held that a director's right to inspect the books cannot be exercised when their intention is improper, eg where the director is seeking the inspection in relation to a dispute over the net asset value of the company for the purpose of fixing a price at which their shares would be bought out pursuant to a finding of unfair prejudice.[9] Thus, where an application is made to court by a director seeking an order to facilitate inspection, the courts have not viewed the right as an absolute one and have retained judicial discretion to refrain from granting an order, such as in circumstances where the director's removal from office is imminent.[10] Furthermore, a director's right of inspection does not compel a company to create documents that do not exist.[11]

A director exercising their right of inspection is entitled to the assistance of an expert, eg an accountant[12] (subject to the court's discretion to order otherwise or to impose conditions). But the company in its turn is entitled to a reasonable time to consider whether to object to the proposed expert.[13]

---

[1]   The right is unqualified and the director must be given unfettered access to the company's records at all reasonable times. It is not open to their fellow directors to offer to provide them with such particular documents as they may request: *Fox v Gadsden Pty Ltd* (2003) 46 ACSR 713, SC (NSW).

[2]   See *McCusker v McRae* 1966 SC 253. Note that the Scottish court held that the director was entitled to be accompanied by an adviser of their choice. English authorities (see below), which establish the directors' right to inspect accounting records, do not discuss that point.

[3]   *Burn v London and South Wales Coal Co* [1890] WN 209. The right may be exercised even though the company is in receivership, provided that the inspection will not impede the receiver in the exercise of their functions or prejudice the interests of the charge-holder: *Re Geneva Finance Ltd* (1992) 7 ACSR 415, SC (WA).

[4]   *Dilato Holding Pty Ltd v Learning Possibilities* [2015] EWHC 592 (Ch), [2015] 2 BCLC 199.

[5]   [1978] 1 All ER 185, applying *Burn v London and South Wales Coal Co* [1890] WN 209 and the dictum of Street J in *Edman v Ross* (1922) SR (NSW) 351 at 361.

[6]   See also *Constantien Medien AG v Ecclestone* [2013] EWHC 2674 (Ch), [2013] All ER (D) 30 (Sep).

---

7   [2008] EWCA Civ 387, [2008] 2 BCLC 381.

8   [2015] EWHC 592 (Ch), [2015] 2 BCLC 199.

9   Companies Act 2006, s 994.

10   *Oxford Legal Group Ltd v Sibbasbridge Services plc* [2008] EWCA Civ 387, [2008] 2 BCLC 381 at [12].

11   *Kang v Kang* [2013] EWHC 2828 (Ch) at [14].

12   A director was held entitled to the assistance of an accountant in exercising their right of inspection in *Healy v Healy Homes Ltd* [1973] IR 308.

13   *Wes-Transvaalse Boeresake (Edms) Bpk v Pieterse* 1955 (2) SA 464, PD (Tvaal).

---

**<u>EXHIBIT H</u>**

# Chapter 8

# Transactions Binding the Company

## Brexit Changes

**8[1]** The rules governing the ability of companies to enter into transactions (including making gifts) are largely a matter of UK domestic law. However, the traditional UK approach to ultra vires transactions and more generally those outwith the authority of the board of directors were amended to meet the requirements of Arts 9 and 10 of the European First Company Law Directive, now the same articles of EU Directive 2017/1132. Implementation of those articles into UK law has not been without difficulties, but it does mean that what are now ss 39 to 42 of the Companies Act 2006 remain 'EU derived domestic legislation' after 1 January 2021. In this connection, it should be noted that Art 10 was interpreted very literally and narrowly by the European Court in *Cooperatieve Rabobank 'Vecht en Plassengebied' BA v Minderhoud*.[1]

---

[1]   (1997) C-104/96, ECLI:EU:C:1997:610, [1997] ECR I-7211, [1998] 1 WLR 1025. See 2[6].

---

## Introduction to Transactions Binding the Company

**8[1A]** The legal restrictions on a company's freedom to enter into transactions (including making gifts) arise from a variety of different sources. Since, except in the smallest companies, the number of decisions which are taken formally by boards of directors, let alone the company in general meeting, are limited, the actions being challenged under these restrictions can often be those of individual directors or other agents of the company (who may be quite lowly employees). The principal categories of restrictions have been:

(1)   **General illegality.** Agents of a company frequently break the criminal law, commit torts and enter illegal contracts. In the early case of *Ranger v Great Western Railway*,[1] the House of Lords held that no party could avoid a transaction where the company's agents had broken these general restrictions merely on the argument that illegal acts must be beyond the capacity of the company. The circumstances in which the illegal behaviour of an agent may be attributed to the company were discussed in **Chapter 7A**. The consequences of such an act should usually be the same for a company as a principal as for a natural person.

(2)   **Corporate illegality.** These are restrictions specific to companies, usually in the Companies Act 2006, such as paying dividends otherwise than out of realised profits, offering financial assistance

to buy their own shares, or making loans to their directors.[2] These transactions are illegal and unratifiable even with shareholder unanimity and can be void or at least unenforceable.[3]

(3)  **Ultra vires.** These were restrictions in the memorandum of the company, generally arising from the objects clause, but there could be other entrenched restrictions.[4] Traditionally, these restrictions were held to limit the *capacity* of the company and any transaction breaching them was therefore ultra vires and unratifiable even with shareholder unanimity.[5] Any such transaction was also said to be void.[6] It could be avoided by the company and probably by any other party, but the Court of Appeal doubted that another party should be allowed to avoid payment for services fully executed by the company.[7]

(4)  **Restrictions on authority.** These are generally found in the articles of the company or in resolutions passed under them,[8] and restrict the *authority* of the board of directors (and sometimes its members), such as borrowing limits. Traditionally, transactions breaching these restrictions were not beyond the *capacity* of the company and could therefore be ratified.[9] They were generally only voidable and so might bind the company unless the other party knew of the breach.[10] However, a transaction made without any authority can be akin to theft and be treated as illegal and void.[11]

(5)  **Fiduciary duties.** These are imposed on directors individually and include duties to exercise powers for a proper purpose, to promote the success of the company, not to accept benefits from third parties.[12] Again they restrict the *authority* of the board of directors through restricting the actions of each director. As with category 4, transactions in breach of these duties could be ratified[13] and are otherwise voidable.

(6)  **Rules of agency.** Clearly even individual directors, let alone other more lowly agents have restrictions on the actual authority delegated to them to bind the company. Where the other party knows of these restrictions, any transaction breaching them is voidable although ratifiable. Where the other party does not know of the restrictions, the company will be bound by the transaction if its agent appears to have acted within his ostensible authority.[14]

As part of the removal of both the memorandum of association and the need for an objects clause, the law on companies' capacity has been amended to remove most traces of the ultra vires doctrine except in respect of charitable companies. This is discussed in **8[3]–8[11]** and came into force on 1 October 2009.

This chapter also looks at the contractual formalities required for English and Welsh companies and separately, because they differ, for Scottish ones. The 2005 reforms to document formalities have been incorporated into the Companies Act 2006, with some tidying up, particularly to powers of attorney. This is discussed in **8[27]** below. Again this came into force on 1 October 2009, except for s 44 of the Companies Act 2006 dealing with formal execution of documents, which came into force on 6 April 2008 because from that date private companies no longer had to have a company secretary.

1    (1854) 5 HL Cas 72 at 86.

2    Although not outlawing certain other actions, the Companies Act 2006 may reserve decisions on them to a general meeting of members, often requiring a special resolution, like changing the articles, raising the authorised share capital and waiving pre-emption rights. There are more of both types of restriction for public than for private companies.

3    *South Western Mineral Water Co Ltd v Ashmore* [1967] 1 WLR 1110; *Precision Dippings Ltd v Precision Dippings Marketing Ltd* [1986] Ch 447, CA; *Re DPR Futures Ltd* [1989] 1 WLR 778; *Brady v Brady* [1989] AC 755, HL(E). See also **8[2]** below.

4    In *Re Cleveland Trust* [1991] BCC 33, a restriction in the memorandum provided that any surplus arising from the realisation of property was not to be available for the payment of dividends.

5    *Ashbury Railway Carriage and Iron Company Ltd v Riche* (1875) LR 7 HL 653, HL(E).

6    Eg *York Corporation v Henry Leetham & Sons Ltd* [1924] 1 Ch 557 at 583, per Russell J: 'an ultra vires agreement cannot become *intra vires* by reasons of estoppel, lapse of time, ratification, acquiescence or delay'.

7    *Bell Houses Ltd v City Wall Properties Ltd* [1966] 2 QB 656 per Salmon LJ at 694 where he said: 'It seems strange that third parties could take advantage of a doctrine manifestly for the protection of shareholders  . . . .'

8    In small private companies, further restrictions are often imposed by formal or informal shareholders' agreements.

9    Subject to the so-called exceptions to the rule in *Foss v Harbottle* (1843) 2 Hare 461, and what are unratifiable breaches: see **Chapter 18**.

10    Whether the other party had 'knowledge' was often an interesting struggle between the doctrine of constructive notice of everything contained in a company's filed documents and the rule in *Royal British Bank v Turquand* (1856) 6 E&B 327 that all the internal requirements of a company's constitution be presumed to have been complied with.

11    *Clark v Cutland* [2003] EWCA Civ 810, [2003] 2 BCLC 393.

12    *Extrasure Travel Insurances Ltd v Scattergood* [2002] EWHC 3093 (Ch), [2003] 1 BCLC 598; *Re Capitol Films Ltd* [2010] EWHC 2240 (Ch), [2011] 2 BCLC 359. For a recent discussion by the House of Lords, see *Criterion Properties plc v Stratford UK Properties LLC* [2004] 1 WLR 1846, HL(E).

13    Subject again to what are unratifiable breaches. It has been suggested obiter that directors paying bribes might always be ultra vires or illegal: *E Hannibal & Co v Frost* (1988) 4 BCC 3, CA.

14    *Freeman and Lockyer (a firm) v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, CA: see **8[19]** below.

## Illegality

**8[2]**  The general effects of illegal contracts (category 1 above) lie outside the scope of this work and the particular effects of corporate illegality (category 2) are dealt with in the relevant chapters covering the substantive law. It should, however, be pointed out that the courts have treated directorial efforts to circumvent corporate illegality as unratifiable breaches of directors' duties. For example, in *Re Halt* (1964) Garage Ltd[1] transactions described as a non-executive director's remuneration were held, on examination of their true purpose, to be unlawful, as were interest payments unrelated to outstanding capital in *Ridge Securities Ltd v IRC*.[2] In *Aveling Barford Ltd v Perion Ltd*, a sale of land to a company controlled by the same person as controlled the plaintiff shortly before it became insolvent, 'was known and intended to be a sale at an undervalue which made it an unlawful distribution'.[3] Following those cases, it was

**[2]** Transactions Binding the Company

held in *Sasea Finance Ltd v KPMG*[4] that a payment from a parent to its wholly owned subsidiary and described as a loan, was not repayable if it had never been for the subsidiary's benefit. It appeared to have been spent at the parent's behest on supporting the parent's share issue. In all of these cases, the acts were intra vires and unanimously ratified by shareholders.

The basis of these decisions has been at different points described as an 'unlawful return of capital', 'not a genuine exercise of power' and a 'fraud on the creditors',[5] even 'ultra vires'.[6] The concept that certain acts by a company's agent are unratifiable, at least by a simple majority of shareholders, is not new. It was the basis of the 'fraud on the minority' exception to the rule in *Foss v Harbottle*.[7] Despite this exception's name, non-ratifiable breaches did not need proof of mala fides, nor are they really wrongs against the minority but against the company.[8]

The courts have always taken a stringent line against what they consider directors' misuse of a power.[9] In the liquidation cases, although determining the purpose of the transaction has been vital, no mala fides has had to be shown.[10] In most circumstances, the exact categorisation of the breach will not matter, but the judges do not seem to treat these cases as just part of the general rules of agency. Throughout they refer to the acts as being 'unlawful', not just a 'breach of authority'.[11] If these are a breach of a common law extension to category 2 restrictions, the courts have a freer hand to determine when and how a remedy may be obtained.[12] However, now that derivative actions may more easily be brought and directors and their associates cannot use their votes to excuse a breach of duty, s 239, the courts may be more circumspect in declaring directors' conduct unratifiable.

---

[1]  [1982] 3 All ER 1016.

[2]  [1964] 1 WLR 479.

[3]  [1989] BCLC 626 at 666, per Hoffmann J.

[4]  (2001) 10 May (unreported).

[5]  The last was also used as the basis in *West Mercia Safetywear Ltd v Dodd* [1988] BCLC 250, CA.

[6]  *Progress Property Co Ltd v Moore* [2010] UKSC 55, [2011] 1 WLR 1, though on the facts of the case, was found not to be an unlawful distribution.

[7]  Eg *Cook v Deeks* [1916] 1 AC 554, PC, see **Chapter 18**.

[8]  *Daniels v Daniels* [1978] Ch 406; Wedderburn [1958] CLJ 93.

[9]  *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, PC; *Bishopsgate Investment Management Ltd v Maxwell (No 2)* [1994] 1 All ER 261, CA cf *Re Smith & Fawcett* [1942] Ch 304, CA.

[10]  *Re Halt Garages (1964) Ltd* [1982] 3 All ER 1016 at 1042, per Oliver J. What needs to be proved was reviewed by the Supreme Court in *Progress Property Co Ltd v Moore* [2010] UKSC 55, [2011] 1 WLR 1.

[11]  In *Clark v Cutland* [2003] EWCA Civ 810, [2003] 2 BCLC 393, the Court of Appeal took a slightly different line and treated payments into a director's pension fund as without any authority and void as being akin to theft (treating a category 4 breach like a category 1 breach).

[12]  For example, in *Re Halt Garages*, the remuneration paid to the invalid non-executive director was apportioned between a legitimate amount for holding the office and the excess that had to be returned.

---

## Ultra Vires

**8[3]**  The decision of the House of Lords in *Ashbury* that the objects clause of a registered company's memorandum restricted the capacity of the company was not inevitable. At first instance, Blackburn J held that registered companies, like chartered corporations, should have full legal capacity.[1] However, the House of Lords viewed objects clauses (which once accepted by the Registrar of Companies on incorporation, at that time remained unalterable[2]) as restricting a registered company's capacity in the same way as did the restricted purposes granted to statutory companies.[3]

This position was partially reversed on the accession of the United Kingdom to the then European Economic Community on 1 January 1973, and the position further revised by the Companies Act 1989. Section 39(1) of the Companies Act 2006 repeats the revised wording:[4]

> '(1) The validity of an act done by a company shall not be called into question on the ground of lack of capacity by reason of anything in the company's constitution.'

The only change was substituting the word 'constitution' for 'memorandum' because from 1 October 2009,[5] no existing or new memorandum contains an objects clause or any other restrictions. Indeed from 1 October 2009, the old obligation contained in the 1985 Act, s 2(1)(c) that company must have an objects clause, even if only a general commercial one,[6] was repealed and Companies Act 2006, s 31(1) states:

> '(1) Unless a company's articles specifically restrict the objects of the company, its objects are unrestricted.'

Although this means that after 1 October 2009 companies may be formed and registered without objects, objects clauses are not going to disappear because:

(1)     all companies already formed and registered under the Companies Acts before 1 October 2009 will continue to have objects clauses, albeit now as part of their articles,[7] unless and until removed by amending those articles and having the Registrar of Companies register the formal notice of the change;[8] and

(2)     some new companies will deliberately include objects clauses in their articles because they have to have restricted objects, most notably community interest companies (CICs) and charitable companies.

Indeed, to some extent, the ultra vires doctrine still applies to charitable companies, see **8[11]** below.

---

[1]     *Riche v Ashbury Railway Carriage & Iron Company Ltd* (1874) LR 9 Exch 224 following *Sutton's Hospital* (1612) 10 Co Rep 1a, 23a, although statutorily defined corporations like industrial and provident societies and local authorities have restricted capacity: *Halifax Building Society v Meridian Housing Association Ltd* [1994] 2 BCLC 540; *Hazell v Hammersmith and Fulham LBC* [1992] 2 AC 1, HL(E). Even though chartered companies are not so restricted, members can still seek injunctions to stop the corporation acting outside its objects and the Attorney General can seek to revoke the charter: *Jenkin v Pharmaceutical Society of Great Britain* [1921] 1 Ch 392.

2    Companies Act 1862, s 12. Alteration to objects clauses still required court approval
     until the Companies Act 1948.

3    *Bagshaw v Eastern Union Railway Co* (1849) 7 Hare 114, *affirmed* (1850) 2 Mac & G
     389; *Eastern Counties Railway Co v Hawkes* (1855) 5 HL Cas 331 at 368. These
     companies, unlike registered companies, often had wide powers to expropriate land that
     needed to be restrained.

4    Companies Act 1989, s 108 inserted a new s 35(1) into the Companies Act 1985.

5    8th Commencement Order.

6    Companies Act 1985, s 3A.

7    Companies Act 2006, s 28.

8    Companies Act 2006, s 31(2).

_____

### Ultra vires as lack of authority

**8[4]**  The Companies Act 1989 also introduced a new s 35(3) of the Companies Act 1985 that provided:

> '(3) It remains the duty of the directors to observe any limitation on their powers flowing from the company's memorandum and action by the directors which, but for subs (1), would be beyond the company's capacity may only be ratified by the company by special resolution.
>
> A resolution ratifying such action shall not affect any liability incurred by the directors or any other person; relief from such liability must be agreed to separately by special resolution.'

This subsection preserved a special status for restrictions 'flowing from the company's memorandum'. Although third parties dealing with the company were not affected by lack of capacity, ratification by the company needed a special resolution.

Since 1 October 2009, and the transfer of existing objects clauses and any other restrictions from the memorandum to the articles,[1] the last remnants of the ultra vires doctrine seems to have disappeared (except for charitable companies). Section 39 of the Companies Act 2006 does not re-enact the provisions of the old s 35(3), which just leaves the bold statement in s 31(1) of the 2006 Act.

Since any such restriction cannot now affect the capacity of the company,[2] it can only restrict the authority of the board, but that still begs three questions:

(1)    Will objects clauses in articles override any other contradictory articles, particularly if the objects clause was formerly in the memorandum?

(2)    Will objects clauses continue to be interpreted in the same way after 1 October 2009 as they were before?

(3)    Will a breach of an objects clause in the articles be treated differently from breaches of any other restriction on directors' authority (category 4 above)?

_____

1    Companies Act 2006, s 28.

2    Companies Act 2006, s 39, formerly 1985 Act, s 35.

_____

## Do Objects Clauses Override?

**8[5]**  Before 1 October 2009, it was clear that the contents of a company's memorandum overrode any apparently contradictory provision in the company's articles.[1] Now that objects clauses have been 'demoted' to being articles, has this overriding position been removed? In theory the answer must be yes, but in practice, the very nature and drafting of objects clauses, particularly those previously contained in a memorandum, means that other articles are almost bound to be read in the light of the objects and powers contained in such a clause.

---

[1]  *Ashbury v Watson* (1885) 30 ChD 376; *Re Duncan Gilmour & Co Ltd* [1952] 2 All ER 871.

---

## Interpreting Objects Clauses

**8[6]**  If the wording of the old s 35(3) is compared with the wording of the new s 31(1), it does appear that the interpretative approach to objects clauses should change. The old section refers to 'any limitation . . . flowing from the company's memorandum' whereas the new section refers to 'articles [that] specifically restrict the objects'. However, most objects clauses do not 'specifically restrict the objects'; they state the objects and the powers positively and it is the courts since the decision in *Ashbury Carriages* that have implied that objects and/or powers not specified are excluded. Thus the old s 35(3) wording seems more apt. Indeed, the new wording makes no reference to powers at all. Take for example a company that has relied upon s 3A of the Companies Act 1985 and adopted 'the object . . . to carry on business as a general commercial company'. Although that section states that that object allows a company 'to carry on any trade or business whatsoever, and . . . to do all such things as are incidental or conducive to the carrying on of any trade or business by it', draftsmen of memoranda were concerned that without going on to specify powers to grant pensions, make non-statutory redundancy payments or gifts, these may not be implied. It can now be argued that with the new s 31(1), no restriction is 'specified' by this wording, just implied, and so such further elaboration is redundant. This does presume that unrestricted objects incidentally imply unrestricted powers.[1]

However, if the literal meaning of the new s 31(1) were applied to objects clauses so that they were held only to restrict directors' authority where the restrictions were explicit, that could be said fundamentally to change the terms of the s 33 (formerly the s 14) contract with members, something that in other areas the Government has been careful to avoid. In particular, charitable companies are not free to amend their articles without complying with the respective charity legislation in England and Wales, Scotland or Northern Ireland.[2] Therefore, pending any decisions, it is probably safest to assume that the courts will continue to interpret objects clauses, particularly those previously in a memorandum, as they did before 1 October 2009. As will be seen, for commercial companies the adoption of

long-form objects clauses and the decision in *Rolled Steel Products (Holdings) Ltd v British Steel Corporation*,[3] make it unlikely that practical difficulties will often arise.

The traditional approach to interpreting objects clauses was probably best expressed by Buckley LJ in *Attorney General v Mersey Railway*:[4]

> 'To ascertain whether any particular act is ultra vires or not, the main purpose must first be ascertained; then the special powers for effectuating that purpose must be looked for; and then if the act is not within either the main purpose or the special powers expressly given by the statute, the inquiry remains whether the act is incidental to or consequential upon the main purpose, and is a thing reasonably to be done for effectuating it.'

However, as will be seen, this rather restrictive approach, dominated as it was by the concept of 'the main purpose' was forced to change in the face of the long-form objects clauses developed by company lawyers.

---

[1]   *Attorney-General v Great Eastern Railways* (1880) 5 App Cas 473. See **8[7]** below.
[2]   Companies Act 2006, s 21.
[3]   [1986] Ch 246, CA at 289, per Slade LJ.
[4]   [1907] 1 Ch 81, CA at 99.

---

### Long-form objects clauses

**8[7]**   To avoid the problems created by the House of Lords in *Ashbury* company lawyers drafted ever-wider objects clauses in an attempt to avoid arguments about ultra vires. In particular, they resorted to three types of clauses that will continue to be found in many pre-2009 objects clauses:

(1)   **Ancillary powers clause:** eg 'To do all such other things as are incidental or conducive to the attainment of all or any of the above objects.'
      In fact such clauses probably add little to the powers that, following the House of Lords decision in *Attorney General v Great Eastern Railway*, the courts would imply anyway.[1] Powers have to relate to the objects and cannot become separate objects themselves.[2] However, distinguishing between objects and powers can be difficult, particularly where an 'independent objects clause' has been included.

(2)   **Independent objects clause:** eg 'Each paragraph of this clause shall, except where otherwise expressed in such paragraph, be in nowise limited or restricted by reference to or inference from the terms of any other paragraph or the name of the company.'
      This is designed to circumvent the decision in cases like *Re German Date Coffee Co* and *Re Crown Bank*[3] where it was held that objects clauses should normally be construed as having a major or dominant object and everything else be treated as ancillary objects or powers. In *Cotman v Brougham*[4] the House of Lords somewhat grudgingly accepted that if the Registrar of Companies had ac-

cepted such wording it had to be given effect. Such a clause still left the danger of a company embarking upon an activity that was not expressly listed, which draftsmen tried to meet with the 'subjective objects clause'.

(3)   **Subjective objects clause:** eg 'To carry on any other trade or business whatsoever, which can, in the opinion of the board of directors, be advantageously carried on by the company in connection with or as ancillary to the general business of the company.' In *Bell Houses Ltd v City Wall Properties Ltd*[5] such a clause was held to be effective in allowing a property developer to broker a mortgage facility for a third party for a commission, despite there being no such object listed in its memorandum. Salmon LJ stressed that the directors did not have to be proved correct in their view, just honestly to hold the view.[6]

---

[1]   (1880) 5 App Cas 473. This was the view was expressed in *Rolled Steel Products (Holdings) Ltd v British Steel Corporation* [1986] Ch 246, CA at 287, per Slade LJ. Earlier, more restrictive views on implied powers may now be in doubt. Examples of powers that have been implied include: borrowing and granting security, *General Auction Estate & Monetary Co Ltd v Smith* [1891] 3 Ch 432; appointing employees and other agents, *Taupo Totara Timber Co Ltd v Darcy Kevin Rowe* [1978] AC 537, PC at 546 per Lord Wilberforce; entering joint ventures *Newstead (Inspector of Taxes) v Frost* [1979] 2 All ER 129, CA cf earlier cases *Joint Stock Discount Co v Brown* (1869) LR 8 Eq 381; *Re European Society Arbitration Acts* (1878) 8 Ch D 679, CA cited for there being no implied power to subscribe or purchase shares, although neither is so sweeping on its facts. A power will be implied even if it is peculiar to making a particular business more effective: *Deuchar v Gas Light & Coke Co Ltd* [1925] AC 691, HL(E), here manufacturing rather than purchasing vital supplies.

[2]   *Attorney General v Mersey Railway Co* [1907] AC 415, HL(E), a railway company might be able to run buses to its stations but not develop a stand-alone bus business. This decision might, however, have been different if there had been a 'subjective objects clause'.

[3]   (1882) 20 Ch D 169, CA, and (1890) 44 Ch D 634, both, however, were substratum cases.

[4]   [1918] AC 514, HL(E). For example, in *Re Crown Bank* where there was no such clause, property development as a named object had to be read as ancillary to the first named object of banking, whereas in *Anglo-Overseas Agencies Ltd v Green* [1961] 1 QB 1 where there was such a clause, property development as a named object was held to be independent of the first named object of importing and exporting goods. The approach in *Cotman v Brougham* was accepted without any hesitation by the House of Lords in *Brady v Brady* [1989] AC 755, HL(E) at 772, per Lord Oliver.

[5]   [1966] 2 QB 656, CA.

[6]   [1966] 2 QB 656, CA at 690, although this was a case where the main business was still carried on, at 691; cf *Re Introductions Ltd* [1970] 1 Ch 199, CA.

---

### Continuing problems of construction

**8[8]**  Now that objects clauses are optional (at least for non-charitable, non-CIC companies), and a company's objects (and impliedly its powers) are unrestricted unless the contrary is stated,[1] where they are adopted in articles, they can state this as the base position and then just list any restrictions that are being imposed[2]. However, unless and until companies

that had compulsory objects clauses in their memoranda amend them, those old clauses will still need to be construed, probably as they were before 1 October 2009.

Despite the development of the long-form objects clause, directors were still occasionally found to act ultra vires. For example, in *Re Introductions Ltd*,[3] a company set up to deal with visitors to the Festival of Britain terminated that business and went into pig farming. Its memorandum contained all three of the above clauses but no express object of pig farming. The court held that the company's bank, which had a copy of the memorandum and knew that its loans were being used for pig farming, could not claim that the power to borrow contained in the company's objects clause could be an independent object. It was by its nature an ancillary power.[4] This decision raised the concern that the doctrine of the 'dominant object' might return through the reclassification of other objects as ancillary powers. This approach, although not doubted, was not extended in *Re Horsley & Weight Ltd*[5] where the granting of pensions to directors and ex-directors was treated as an independent object and it was generally confirmed that a company could have independent charitable and other non-commercial objects.

In *Rolled Steel Products (Holdings) Ltd v British Steel Corporation*,[6] a loans and guarantee clause was treated as merely an ancillary power because it had the words 'such terms as may seem expedient' which implied expedient for the objects of the company. Nevertheless, the Court of Appeal held that, provided the transaction fell within the terms of the power, it remained intra vires despite not being for the benefit of one of the company's objects. In effect, whether something is an object or a power was irrelevant for the purposes of determining *capacity*. However, the demarcation did matter for determining the directors' authority. Slade LJ went on to reinterpret cases like *Re Introductions Ltd* that seemed to turn on the knowledge of those dealing with the company, not as turning on a want of *capacity* (category 3 restrictions), but on a want of *authority* through the directors' misuse of a power (category 5 restrictions).[7]

Since 1991, objects clauses (at least for non-charitable companies) have no longer been an issue of lack of capacity, but of want of authority. Provided s 40 of the Companies Act 2006[8] applies, third parties will only be affected by constitutional limitations (be they objects or powers) if they are acting mala fides (see **8[15]** below). Directors (and others involved) still have to be careful, as they may not be able to claim such protection and can remain personally liable 'by reason of the directors' exceeding their powers'.[9]

---

[1]   Companies Act 2006, s 31.
[2]   As, for example, has been the case with many borrowing restrictions in articles.
[3]   [1970] 1 Ch 199.
[4]   Another power that could not really be an independent object would be writing cheques, *Thompson v J Barke & Co (Caterers) Ltd* 1975 SLT 67. It was suggested in *Re Horsley & Weight Ltd* [1982] 1 Ch 442, CA at 448, per Buckley LJ that advertising might be as well.
[5]   [1982] Ch 442, CA.
[6]   [1986] Ch 246, CA at 289, per Slade LJ.

---

7    [1986] Ch 246 at 295. The decisions in cases like *Re David Payne & Co Ltd* [1904] 2 Ch
     608, CA, and *Charterbridge Corporation Ltd v Lloyds Bank Ltd* [1970] 1 Ch 62 have
     not been challenged, but their rationales may now be different.

8    Formerly Companies Act 1985, s 35A.

9    Companies Act 2006, s 40(5). See also *Smith v Henniker-Major* [2002] EWCA Civ 762,
     [2002] 2 BCLC 655.

---

## Members' Enforcement of Objects Clauses

**8[9]**  Under s 35 of the Companies Act 1985 (as amended), it was made
clear in sub-section (2) that provided the company had not entered a
binding legal position a member could seek an injunction to stop an ultra
vires act. It was also clear from sub-section (3) and the exceptions to the
rule in *Foss v Harbottle* that derivative actions could be brought against
directors for losses arising from ultra vires acts.[1] Such special provisions
have not been re-enacted and now that objects clauses have been 'de-
moted' to the articles, have these rights of enforcement been reduced?

On the first point, although the extent to which any single member could
seek to enforce the s 33 contract has been a matter of controversy,[2] the
enforcement of the objects of the company must fall within even the most
limited view of the s 33 contract and remain a 'right of a member of the
company to bring proceedings to restrain the doing of an action that is
beyond the powers of the directors'.[3]

On the second point, there is now a new statutory derivative action that,
if anything, is less restrictive than the previous exceptions to the rule in
*Foss v Harbottle*.[4] However, with the demotion of objects clauses to the
articles and breach of them to want of board authority, such an action
could be defeated now by just an ordinary resolution ratifying, unless the
want of authority amounted to illegality.[5]

---

1    Though the courts could stop an action not supported by the majority of independent
     shareholders (*Smith v Croft (No 2)* [1988] Ch 114).

2    Wedderburn [1957] CLJ 193; Goldberg (1972) 33 MLR 362; Prentice (1980) 1 CoLaw
     179; Gregory (1981) 44 MLR 526; Goldberg (1985) 48 MLR 121; Drury [1989] CLJ
     219.

3    Companies Act 2006, s 40(4); see **8[16]** below.

4    See **18[2]**. The old law may still apply to double or multiple derivative claims.

5    See **8[2]** above. Indeed, a court could refuse a derivative action if there is evidence that the
     unconnected majority do not wish to pursue it, see Chapter 18.

---

## Alteration of the Objects Clause

**8[10]**  Now that objects clauses just form part of the articles, the former
special arrangements for altering objects clauses in the Companies Act
1985, ss 4 to 6 have been repealed from 1 October 2009 and have not been
replaced.

---

## Charitable Companies

**8[11]**  In 1991, when the then new ss 35 and 35A removed the effects of breach of category 3 and 4 restrictions in respect of gifts as well as other transactions, they did not apply in full to companies that were charities.[1] The exception is, if anything, more bluntly put in the Companies Act 2006, s 42(1), which states: '(1) Sections 39 and 40 (company's capacity and powers of directors to bind company) do not apply to the acts of a company that is a charity  . . . .'

This would appear to leave the full effects of the ultra vires doctrine and of constructive notice. However, this position is then mitigated by the exceptions in s 42(1) (formerly Charities Act 1993, s 65) that state:

'except in favour of a person who:
  (a)     does not know at the time the act is done that the company is a charity, or
  (b)     gives full consideration in money or money's worth in relation to the act in question and does not know (as the case may be) –
            (i)     the act is not permitted by the company's constitution, or
            (ii)    that the act is beyond the powers of the directors.'

So, if a charitable company makes a gift outside its objects, that gift can be reclaimed unless the recipient did not know the company was a charity. That should be rare as charitable companies must show their charitable status on all their stationery etc.[2] If a charitable company enters into a contract outside its objects, that contract can be avoided and property reclaimed unless either:

(1)     the other party does not know that the company is a charity; or
(2)     the other party does know that the company is a charity but does not know of the restriction and has given full consideration.

However, the party alleging that a person had notice of the restrictions has the burden of proving that that person had actual knowledge at the relevant time of the company's charitable status and (if full consideration has been given) of the restrictions affecting the transaction.[3] Also, subsequent purchasers of any property for full consideration without notice are protected.[4]

Transactions involving directors or their associates cannot be affirmed by a charitable company without prior written consent, in England and Wales of the Charity Commission, and in Northern Ireland of the Department for Social Development.[5] Indeed any alteration by it of its objects clause, or any other provision in its articles directing or restricting the manner in which property may be used or applied, is ineffective without such prior consent.[6]

These charitable provisions do not apply in Scotland because charity law is now a devolved matter. However, similar provisions concerning charitable companies' transactions in Scotland are retained in s 112 of the Companies Act 1989 (as amended), which has not been repealed.

The general operation of charity law is a specialised area lying outside the scope of this work.

---

1   Companies Act 1985, ss 35(4) and 35A(6).
2   Charities Act 1993, s 68.
3   Section 42(3), restating Charities Act 1993, s 65(3). On what amounts to 'full consider-
    ation', cases under Insolvency Act 1986, s 238, on transactions at an undervalue,
    may give some guidance.
4   Section 42(2), restating Charities Act 1993, s 65(2). This limits the English nemo dat
    principle operating against such purchasers, eg *Ingram v Little* [1961] 1 QB 31, CA.
5   Section 42(4).
6   Section 31(4).

---

# Authority of the Board

### Introduction

**8[12]**  From 1 October 2009, there is no really separate doctrine of ultra
vires (category 3 restrictions) except for charitable companies. Objects
clauses are now just category 4 restrictions in the articles on the authority
of the board, in the same way as for example, borrowing clauses. How-
ever, the changes required to UK Company Law by Art 9 of the First
EEC Company Law Directive (now EU Directive 2017/1132) were not
just to category 3 restrictions, but also on the effects of 'limits on the
powers of the organs of the company arising under the statutes or from a
decision of the competent organs'.[1] UK company law has never developed
a clear concept of a company's organs because within the special statutory
restrictions limiting a company's actions and reserving certain matters to
its general meetings (category 2), it has left companies free to determine
their own internal decision-making arrangements. In practice, most com-
panies' articles delegate to a board of directors nearly all decision-making
powers that are not statutorily reserved to general meetings. The board
may in turn sub-delegate to committees or individual executive directors
and impliedly on down through the company.[2] The Government took the
view that the 'limits on the powers of the organs' referred to in the
Directive must mean any limitations under the memorandum and ar-
ticles on the authority of the board of directors. These were dealt with by
the European Communities Act 1972, s 9, which was subsequently
consolidated into the Companies Act 1985 as s 35. From 1991, however,
s 35 was replaced and the issue of constitutional limitations on a
board's authority (ss 35A, 35B and 322A) dealt with separately from
those of capacity (a new s 35). Sections 35A, 35B and 322A of the
1985 Act have now been replaced by virtually identical wording, albeit in
a slightly different order, in ss 40 and 41 of the Companies Act 2006.

The most obvious way that a company can be bound to a transaction is
when the body or individual that decided on the transaction on its behalf
has actual authority to do so. Within the category 1 restrictions of the
general law[3] and the category 2 restrictions of the company legislation, the
founders of companies are largely free to allocate decision-making powers
as they wish. Since 1 October 2009, any further (category 4) limits can be
imposed on the authority of the board[4] by:

---

(1)    creating or retaining an objects clause or other restrictions in the articles;[5]

(2)    reserving more than the minimum matters required by category 2 restrictions to be decided on by general meetings;[6]

(3)    restricting the board's power to sub-delegate certain decisions;[7] or

(4)    authorising a different body or individual to take certain decisions (eg direct authority given to a managing director).[8]

These category 4 restrictions can be changed later by the shareholders in general meeting (requiring at least a special resolution) and can also be added to by ad hoc special resolutions[9] or by shareholders' agreements.[10]

Finally, even if the board does have the necessary powers, the individual directors are subject to fiduciary duties (category 5 restrictions) and so agreeing to transactions that, for example, do not promote the success of the company or that involve the use of powers for improper purposes must be beyond the board's actual authority.[11] Such a case is most likely to arise from one of the directors claiming delegated authority and acting personally in breach of his duty,[12] but logically if the board cannot have actual authority to act in breach of directors' duties, it cannot delegate such actual authority to a non-director either.

---

[1]    1968/151/EEC, Art 9.2.

[2]    Category 2 restrictions may also prevent the board sub-delegating certain matters within its authority: *Guinness plc v Saunders* [1990] 2 AC 663, HL(E).

[3]    A board cannot be assumed to have authority to enter into an illegal contract, *Equiticorp Industries Group Ltd v The Crown* [1998] 2 NZLR 481 HC (NZ) at 720 per Smellie J.

[4]    This could be a sole director if that is its structure.

[5]    See **8[3]** above.

[6]    Eg 1948 Table A, art 79 in respect of borrowing. This is not repeated in subsequent default articles.

[7]    There is some doubt about whether a board's authority to delegate to individual directors can be implied from silence in the articles: *Freeman & Lockyer v Buckhurst Park Properties Ltd* [1964] 2 QB 480, CA at 492 per Willmer LJ and 500 per Pearson LJ; cf at 506 per Diplock LJ.

[8]    1985 Table A, reg 70 makes it clear that any such direct authority does not reduce the board's authority. The very presence of this proviso suggests that without it, the board's authority would be reduced. The 2006 Model Articles make no reference to the issue.

[9]    2006 Model Articles, art 4 in each Schedule; 1985 Table A, reg 70. Ordinary resolutions that attempt to restrict the delegation allowed in the articles have been held to be a nullity: *Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113, CA; *Scott v Scott* [1943] 1 All ER 582. See also *Black White & Grey Cabs Ltd v Fox* [1969] NZLR 824, CA (NZ).

[10]    Such arrangements to restrict authority are very common with small private companies.

[11]    For directors' duties in general, see **Chapters 15 and 16**; for a discussion of want of authority through the directors' misuse of powers, *Rolled Steel Products (Holdings) Ltd v British Steel Corporation* [1986] Ch 246, CA. See also *Criterion Properties plc v Stratford UK Properties LLC* [2004] 1 WLR 1846, HL(E).

[12]    *Re Capitol Films Ltd* [2010] EWHC 2240 (Ch), [2011] 2 BCLC 359.

---

### Constructive notice

**8[13]** Generally a company's constitutional documents are publicly available to anyone wishing to deal with a company, but it is not practical in the fast-moving commercial world to call them, except perhaps for

the most significant transactions. Also the documents will not reveal whether any necessary procedures have been followed, like appointments being made or powers exercised by properly notified and quorate meetings. The most drastic failure would be to fail validly to appoint a board since then nobody (other than perhaps a general meeting) would have actual authority to bind the company to anything.[1]

Nevertheless it was established by the House of Lords very early in the history of UK company law that a company's memorandum and articles of association (as registered documents open to public inspection) gave constructive notice not only to shareholders but to anyone else dealing with the company.[2] Other restricted documents to which the doctrine applies are charges, special resolutions (ordinary resolutions do not have to be registered) and details of the directors.[3] It is not clear whether the doctrine would apply to other information disclosed in documents filed with the Registrar, notably, the accounts and details of directors' and others' shareholdings.

On the other hand, the problem of being unable to see whether processes had been followed correctly was dealt with by the rule in *Turquand*.

---

[1]  *Mahony v East Holyford Mining Co* (1875) LR 7 HL 869 (I).

[2]  *Ernest v Nichols* (1857) 6 HL Cas 401 at 419 per Lord Wensleydale. There has never been a provision in the companies legislation equivalent to Law of Property Act 1925, s 198, expressly imposing constructive notice.

[3]  *Wilson v Kelland* [1910] 2 Ch 306 at 313 per Eve J; *Irvine v Union Bank of Australia* (1877) 2 App Cas 366, PC at 379 per Sir Barnes Peacock. Details of the company secretary must also be registered. Actual knowledge that details are wrong can override constructive notice, *Pyramid Building Society v Scorpion Hotels Pty Ltd* (1966) 20 ACSR 214.

---

### Rule in Turquand

**8[14]**  In *Royal British Bank v Turquand*[1] the board's power to borrow was subject to a limit of 'such sum or sums of money as shall from time to time, by resolution passed at a general meeting of the Company, be authorised to be borrowed'.[2] The directors had actually obtained a resolution, but it did not set a limit and the company later refused to acknowledge the indebtedness. Jervis CJ believed the resolution might have been valid but even if it was not he believed the company was bound because:

(1)    nothing on the face of the registered documents revealed the lack of authority;

(2)    nothing else put a third party on enquiry;

(3)    that party had the right to assume that the 'indoor management' of the company had been conducted correctly.[3]

The first point is the doctrine of constructive notice again. On the second point, actual knowledge of the irregularity will clearly defeat the rule.[4] Being put on enquiry or knowing circumstances from which a reasonable person would have realised the true position are also enough.[5] On the third point, the rule only covers procedural irregularities, generally a

failure to pass valid board or shareholder resolutions.[6] It does not, for example, mean that where the articles allow delegation to a managing director, a third party can, without evidence of an individual being allowed to act as a managing director, assume such delegation has taken place. However, if there is such evidence, the company cannot then plead that the individual was not properly appointed.[7]

Although the rule is normally stated in terms of outsiders, members (at least vis-à-vis the conduct of board meetings),[8] even possibly directors (if they have not acted for the company in the matter)[9] may be able to invoke the protection of the rule. Where the third party is a company, only notice to those in the company who are involved in the deal will defeat the rule. This does mean that two companies sharing directors and/or company secretaries are not, by that reason alone, put on notice of the irregularities of the other.[10] However, insiders will generally find it very hard to show that they were not at least put on enquiry.

Part of the value of the rule in *Turquand* seemed, at first sight, to have been superseded by the Companies Act 1985, s 285. However, in *Morris v Kanssen*,[11] the House of Lords construed this section very narrowly, restricting it to the case where there was some technical defect in the appointment and not to where there was no appointment at all. Companies Act 2006, s 161 seems to be more widely drawn, but still does not seem to cover this.[12]

Since the original decision in *Turquand*, the general law of agency, and in particular the concept of ostensible authority, has developed and some commentators apply the term 'the rule in *Turquand*' to the whole application of ostensible authority in the context of companies as principals. Perhaps the term should be dropped. At most, the rule in *Turquand* should be seen as just a particular application of ostensible authority to the difficulties of ascertaining whether the proper procedures for the internal management of a company have been followed.[13] However, it still seems to be treated a separate rule because:

(1)    it has been used to bind a company where the whole board had not been appointed properly;[14] and

(2)    it must be separately pleaded as a matter of mixed fact and law.[15]

---

[1]    (1856) 6 E&B 327, Exch Ch. It has been held in Canada that the rule in *Turquand*'s case does not apply to bodies incorporated by statute: *Francis v Condominium Plan No 8222909* [2003] 11 WWR 469, CA (Alberta).

[2]    Many companies still have a borrowing limit in these terms, eg 1948 Table A, art 79, but that article provides that only *actual* knowledge that the limit is being broken will defeat a creditor's rights.

[3]    (1856) 6 E&B 327, Exch Ch at 332. The third party does not seem to have known of the possibly defective resolution. Companies Act 2006, ss 249(2) and 356(5), formerly 1985 Act, s 382(4), creates a presumption that minuted shareholders', directors' and managers' meetings and the appointments of directors, managers and liquidators were regular. However, this is only a presumption which can be rebutted.

[4]    *National Australia Bank v Sparrow Green Pty Ltd* (1999) 17 ACLC 1,665, SC (SA).

[5]    *B Liggett (Liverpool) Ltd v Barclays Bank Ltd* [1928] 1 KB 48 at 56 per Wright J; *Morris v Kanssen* [1946] AC 459 HL(E) at 475 per Lord Simonds; *Rolled Steel Products (Holdings) v British Steel Corporation* [1986] Ch 246 per Slade LJ; *Bank of New Zealand v Fiberi Pty Ltd* (1993) 14 ACSR 736, CA (NSW); *Pyramid Building Society v Scorpion Hotels Pty Ltd* (1996) 20 ACSR 214, SC (Vic).

6   For example, resolutions passed at inquorate meetings, *Duck v Tower Galvanizing Co Ltd* [1901] 2 KB 314.

7   *Houghton & Co v Nothard, Lowe and Wills* [1927] 1 KB 246, CA at 266 per Sargant LJ. See also, *Kreditbank Cassel GmbH v Schenkers Ltd* [1927] 1 KB 246; *Rama Corporation Ltd v Proved Tin and General Investments Ltd* [1952] 2 KB 147.

8   Members have a right to call for the minutes of shareholders' meetings but not board meetings, Companies Act 2006, s 358 (formerly 1985 Act, s 383).

9   *Hely-Hutchinson v Brayhead Ltd* [1968] 1 QB 549 at 566 per Roskill J provided they are not under a duty to verify it (affirmed on different grounds) but see *Morris v Kanssen* [1946] AC 459, HL(E) at 475 per Lord Simonds; *Howard v Patent Ivory Co* (1888) 38 Ch D 156; *Grant v John Grant & Sons Pty Ltd* (1950) 82 CLR 1, HCA; *Smith v Henniker-Major & Co* [2002] EWCA Civ 762, [2002] 2 BCLC 655.

10  *Re Marseilles Extension Railway Co* (1872) 7 Ch App 161; *Re Hampshire Land Co* [1986] 2 Ch 743; *Re Fenwick, Stobart & Co* [1902] 1 Ch 507; *Re David Payne & Co* [1904] 2 Ch 608, CA; *Advance Distribution Co Ltd v Shun Yip Ltd* [2003] 2 HKLRD 493, CFI (HK).

11  [1946] AC 459, HL(E) at 471 per Lord Simonds.

12  For a recent application of the rule in the *Turquand* case, see *Business Development Bank of Canada v 0792989 BC Ltd* (2014) BCSC 11.

13  *Australian Capital Television Pty Ltd v Minister for Transport & Communication* (1989) 86 ALR 119, Fed CA, where the doctrine was applied to persons other than those contracting with the company and it was held the doctrine could only operate against the company, like an estoppel, 'a sword, not a shield'. See also *Northside Development Pty Ltd v Registrar General* (1989) 170 CLR 146, HCA at 172 per Brennan J.

14  *Mahony v East Holyford Mining Co* (1875) LR 7 HL 869 (I). The estoppel would usually arise from a board with actual authority making representations about an individual's authority (or at least allowing them to be made) to third parties. It is interesting that in *Mahony* some of the judges emphasised that the original signatories of the articles and someone they treated as the company secretary were found at the registered office (eg at 880 and 895). A requirement of reliance on such a physical representation by members would be unlikely to be imposed now given the need to comply with the First EEC Company Law Directive, now EU Directive 2017/1132, Art 9.

15  *Rolled Steel Products v British Steel Corporation* [1986] Ch 246, CA at 286 per Slade LJ.

### Restricting the doctrine of notice

**8[15]**  As has already been noted, the Companies Act 2006 restricts the doctrine of notice in basically the same way as the Companies Act 1985 (as amended). Section 40(1) of the 2006 Act provides:

> '(1) In favour of a person dealing with a company in good faith, the power of the directors to bind the company, or authorise others to do so, is deemed to be free of any limitation under the company's constitution.'

As a deeming provision, this overrides any wording to the contrary in the constitution, but unlike the wording of s 39, here it is clear that the company cannot claim the protection. Thus, for a company to enforce a contract in breach of a category 4 restriction, ratification by an ordinary resolution of the company in general meeting would seem to be required.

The protection covers category 3 and 4 restrictions and to avoid any doubt is extended by s 40(3) to 'limitations deriving from' resolutions and agreements of the members or a class of them. This would cover a restriction in the articles as in *Turquand* requiring directors to obtain an ordinary resolution to authorise certain borrowings and ad hoc special resolutions[1] or shareholder agreements limiting authority otherwise delegated to directors. It must also cover direct restrictions imposed in the

articles on, for example, managing directors, as they are indirect limitations on the board to grant a wider authority.[2] Its wording would seem not to cover procedural failings like not appointing a board at all or attempting to do so in a meeting that is inquorate or for which proper notice has not been given. However, in *Ford v Polymer Vision Ltd*[3] failure to meet notice and jurisdiction requirements for a board meeting laid down in articles were viewed as covered and the Court of Appeal in *Smith v Henniker-Major & Co*[4] has held that s 40 (then s 35A) may cover inquorate meetings, although it may not be relied upon by the director at the 'meeting'.[5] This strained interpretation could have been avoided if such matters had been left to the rule in *Turquand*.[6] This expansive interpretation of what is now s 40 may extend to category 5 restrictions at least on directors when acting as a board,[7] but not to category 6 where, to bind the company, a third party will still have to prove ostensible[8] authority. It has also not been extended to allow shareholders to keep an improper bonus issue of shares as that did not involve 'dealing with the company'.[9]

To be protected, the third party does not have to be dealing directly with the board, nor does the transaction have to be a contract – it can be a gift – provided the third party is dealing in good faith.[10] The suggestion in *EIC Services Ltd v Phipps*[11] that the section only contemplates a bilateral transaction is clearly wrong, although the bonus issue in that case might still be void if shareholders *qua* shareholders are not protected by s 40.

Good faith is presumed and even proving a person knew of the restriction may not be enough to overturn this presumption.[12] This may be very important where an employee or agent of a party dealing with the company has known of the restriction, but the employee or agent now negotiating the transaction does not. His principal will not be acting mala fides because of the earlier 'deemed knowledge'. It would also cover someone who knows of the restriction and innocently misinterprets it.

The presumption against mala fides is supported by s 40(2)(b)(i) which provides that:

> '(b)   a person dealing with a company:
> > (i)   is not bound to enquire as to any limitation on the powers of the directors to bind the company or authorise others to do so
> > > . . . '

This appears not just to remove any positive duty on a third party to enquire into category 4 restrictions (now including objects clauses) in the constitution, but also into whether directors are in breach of their fiduciary duties (category 5).[13] The directors' behaviour or proposals may still put the third party on notice of such a breach. This duty to enquire if put on notice is hard to apply if the breach is purely of a category 4 restriction because s 40(2)(b)(iii) provides that actual knowledge of the breach may not of itself be mala fides. In *Ford v Polymer Vision Ltd*,[14] on an application for summary judgment, the court accepted that the recipient of a debenture in return for money the company needed must be acting in good faith, even if it was assumed he knew of procedural failings (see above) but the same could not be said of a sweeping option.

1   Eg 2006 Model Articles, article 4 in each Schedule; 1985 Table A, reg 70.

2   In fact, the 2006 Act only refers to 'directors' not 'the board of directors' as in the 1985 Act.

3   [2009] EWHC 945 (Ch), [2009] 2 BCLC 160, ChD.

4   [2002] EWCA Civ 762, [2002] 2 BCLC 655.

5   Neuberger J in *EIC Services Ltd v Phipps* [2003] EWHC 1507 (Ch) interpreted the decision in *Henniker-Major* as holding that s 40 did not extend to any director responsible for the breach of authority, even innocently. The Court of Appeal decision was less clear, [2004] EWCA Civ 1069, [2005] 1 WLR 1377.

6   Thus the rule in *Turquand* would still be required for cases like *Mahony*: see 8[14] above. Cf *McAteer v Devencroft Developments Ltd* [2002] 5 WWR 338, QB (Alta) (failure to comply with provision in unanimous shareholders' agreement). In *Henniker-Major* at first instance, [2002] BCC 544, Rimer J thought a quorum was a pre-condition to there being a board and so subject to *Turquand*. The change of wording to 'directors' in the Companies Act 2006 strengthens the position taken by the Court of Appeal.

7   This seems to be assumed by both Lords Nicholls and Scott in *Criterion Properties plc v Stratford UK Properties LLC* [2004] 1 WLR 1846, HL(E) at [2] and [29]. Again, this may be strengthened by the reference to 'directors' in the 2006 Act rather than 'board of directors' in the 1985 Act.

8   The suggestion from some commentators that s 40 might give every director unlimited ostensible authority is not supported by the words 'any limitation under the company's constitution' and its partial definition in s 40(3).

9   *EIC Services Ltd v Phipps* [2005] 1 All ER 338, CA. Peter Gibson LJ suggested that this argument would even apply to rights issues.

10  Section 40(2)(a). The words 'or other act' removed former doubts whether gifts were covered, eg *Re Halt Garages* (1964) Ltd [1982], 3 All ER 1016 at p 1039. For an obiter discussion of good faith under the old s 35, see *Barclays Bank v TOSG Trust Fund* [1984] BCLC 1, CA at 18 per Nourse LJ where he stressed its subjective nature.

11  [2004] EWCA Civ 1069, [2005] 1 All ER 338 at [35].

12  Section 40(2)(b)(ii) and (iii).

13  There are slight wording changes from the 1985 Act. 'A person dealing with' does now clearly cover gifts, but by making the removal of any duty to enquire 'for this purpose' rather than a separate section (s 35B) may remove the contrast of 'any limitation' here as against 'any limitation under company's constitution' under s 40(1), which was an argument against the wide interpretation of s 40(1).

14  [2009] 2 BCLC 160, ChD.

### Retention of liability

**8[16]**  Section 40(4) provides:

> '(4) This section does not affect any right of a member of the company to bring proceedings to restrain the doing of an act which is beyond the powers of the directors.
>
> But no such proceedings shall lie in respect of an act to be done in fulfillment of a legal obligation arising from a previous act of the company.'

The right to enforce restrictions in the articles (category 4) as part of the s 33 (formerly s 14) contract has never been clearly defined. This subsection is careful not to create such a right in circumstances where it did not exist before.

Section 40(5) retains the liability not just of directors for exceeding their powers, but of any other person. It is arguable whether a director merely acting in excess of actual authority without, for example, any improper

purpose, is liable for a breach of his duties.[1] To prevent use of the new statutory derivative action, ratification will have to take place, though generally this may be by ordinary resolution.[2]

Where mala fides is proved, then money paid by the company should be recoverable as money had and received and the value of goods or services provided, paid for on a quantum meruit. If the other party has not performed any of its obligations, property may be claimed back for a total failure of consideration.[3] However, the most promising remedy is probably equitable, based on the knowledge of the directors' or other agents' breach of duty. This can be 'knowing receipt' of misapplied assets[4] or being an 'accessory' to the breach of a fiduciary duty (formerly referred to as 'knowing assistance'). It was thought that for 'accessory liability' a breach of a category 4 restriction might need some proof of dishonesty on the part of the company's agents as well as the recipient of the assets, but this no longer seems to be the case.[5]

The effect of s 40(5), however, may be to preserve this equitable liability even though s 40(1) has protected the transaction for failure to prove mala fides.[6] This is because a third party's knowledge need only be 'unconscionable' for knowing receipt and 'objectively dishonest' for accessory liability.[7] When reforms were being considered in 1989 by Parliament, there was a heated debate between Lord Wedderburn and the Government Minister, Lord Fraser, about whether mere knowledge on the part of a third party that the directors were in breach of their actual authority was enough to impose a constructive trust upon him.[8] By requiring a degree of impropriety on the part of the third party, the subsequent cases do seem to have restricted this equitable liability to cases at least involving more than that.[9] Indeed, in the rather inconclusive ruling of the House of Lords in *Criterion Properties plc v Stratford UK Properties LLC*, Lord Nicholls seemed to consider the enforceability of a contract in breach of directors' fiduciary duties to be a matter purely of agency law as applied to companies and that, if valid, equitable liabilities had no part to play. Lord Scott, who gave the leading judgment, agreed on enforceability, but was less categoric on the equitable liabilities.[10] A company profiting from opportunities diverted to it by the director of another company was held liable because the latter's controlling director knew or was at least reckless as to the breach of fiduciary duty.[11]

The protection of s 40 does not apply in full for charitable companies (see 8[11] above) or generally for directors and their associates.[12]

---

[1]   For the whole uncertainty of this area see *Hansard* (1989) Vol 505 HL cc 1243 to 1247.
[2]   Unless the articles themselves prohibit such ratification, *Boschoek Pty Co Ltd v Fuke* [1906] 1 Ch 148; *Imperial Hydropathic Hotel Co, Blackpool v Hampson* (1882) 23 Ch D 1. For more on non-ratifiability, see **18[13]**.
[3]   *Bell Houses v City Wall Properties* [1966] 1 QB 207 at 226, per Mocatta J, albeit *obiter*. This would meet the concerns of Salmon LJ on the appeal [1996] 2 QB 656 at 694 and would be consistent with the approach based on unjust enrichment taken in *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] AC 669, HL(E), overruling the restrictive approach in *Sinclair v Brougham* [1914] AC 398, HL(E).
[4]   *International Sales and Agencies v Marcus* [1982] 3 All ER 551.
[5]   *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, PC, although it was admitted that it would be unusual if dishonesty could only be shown on the accessory's side (per Lord

Nicholls (at 392), see **16[6]**. This is a Privy Council decision and is based on a breach of trust, not of directors' duties, but the decision is based on first principles, following *Powell v Thompson* [1991] 1 NZLR 597 rather than *Belmont Finance Corp Ltd v Williams Furniture Ltd* [1979] Ch 250, CA; see also **8[7]** above.

6    This seems to have been the case under the old s 35, *International Sales and Agencies v Marcus* [1982] 3 All ER 551.

7    *BCCI (Overseas) Ltd v Akindele* [2001] Ch 437, CA at 455, per Nourse LJ; *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, PC at 390 per Lord Nicholls: see **16[6]**.

8    *Hansard* (1989) Vol 505 HL cc 1243 to 1247, in particular whether the reforms reversed the decision in *Selangor United Rubber Estates Ltd v Cradock (No 3)* [1968] 1 WLR 1555. But see now *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, PC; *BCCI (Overseas) Ltd v Akindele* [2001] Ch 437, CA.

9    *BCCI (Overseas) Ltd v Akindele* [2001] Ch 437, CA.

10   [2004] 1 WLR 1846, HL(E) at [4] and [27].

11   *Crown Dilmun v Sutton* [2004] EWHC 52 (Ch), [2004] 1 BCLC 468. This was so even though it hurt another innocent shareholder in the company. Such attribution may be the modern explanation of many of the façade cases for 'piercing the veil', see **Chapter 7**.

12   Companies Act 2006, s 40(6).

### Directors and their associates

**8[17]**  The protection of s 40 does not apply to directors of the company or its holding company (including connected persons and associated companies) whose transactions with the company involve a breach of any category 4 restriction.[1] Section 41 provides that such transactions are voidable at the instance of the company.[2] This requires the company to act for a director's position to be affected.[3] Where such a transaction also involves a person who *is* protected by s 40, it remains valid for him and 'the court may, on the application of the company or any such party, make an order affirming, severing or setting aside the transaction, on such terms, as appear to the court to be just'.[4]

A transaction covered by s 41 is not voidable if:

(1)    restitution is no longer possible;
(2)    the company is indemnified for any losses;
(3)    rights purchased by a third party bona fide for value without actual notice would be affected; or
(4)    the transaction has been affirmed by the company.[5]

As this list is not stated to be exhaustive, common law laches may also still apply. Traditionally directors and their associates could use their votes in any ratification of a transaction,[6] but s 239 now requires those votes to be excluded for any ratification of, inter alia, a breach of duty and s 171 makes it a duty for a director 'to act in accordance with the company's constitution'. Whether a formal affirmation of a transaction (leaving the potential liability of the directors and others untouched)[7] has to exclude those votes is less clear.

Section 41 does not merely restore the common law position when dealing with directors and their associates and so it may in certain circumstances restrict the rule in *Turquand*. Where a transaction with a director or his associates is in breach of a category 4 restriction, that transaction is voidable, whether or not the party could, in the past, have claimed that it was only a procedural failure of which he did not have notice.[8]

Directors and their associates remain liable to account for gains and indemnify for losses, although anyone other than a director of the company itself can raise as a defence that he did not know of the breach.[9]

---

[1]   Companies Act 2006, s 41 replacing 1985 Act, s 322A, inserted by Companies Act 1989, s 109. Connected persons etc are now defined in Companies Act 2006, s 252. Section 41 does not seem to extend to shadow directors (separately defined in s 251). For further details, see **Chapters 15–17**. Such a limitation on the protection of s 40 is compatible with the First EEC Company Law Directive, now EU Directive 2017/1132, Art 9, *Cooperatieve Rabobank 'Vecht en Plassengebied' BA v Minderhoud* [1998] 1 WLR 1025.

[2]   This is why s 41 did not affect the position of the director in *Henniker-Major*.

[3]   This is why s 41 did not affect the position of the director in *Henniker-Major*.

[4]   Section 41(6).

[5]   Section 41(4). Subsection (d) no longer refers to 'in general meeting' now that generally written resolutions will be used by private companies. In England and Wales, affirmation by a charitable company would only become effective on Charity Commission's consent (or the Department for Social Development in Northern Ireland), s 42(4) which applies to any consent determined on or after 1 October 2009, Companies Act 2006 (Consequential Amendments, Transitional Provisions and Savings) Order 2009, SI 2009/1941, art 6.

[6]   *North West Transportation Co v Beatty* (1887) 12 App Cas 589.

[7]   Companies Act 2006, s 41(3).

[8]   See 8**[14]** above.

[9]   Sections 40(3) and (6). If unratified, the directors may still be excused from liability under s 1157 (formerly 1985 Act, s 727), *Re Claridge's Patent Asphalte Co* [1921] 1 Ch 543.

---

## Authority Below the Board

**8[18]**   For all but the smallest companies or the most major decisions, transactions are decided upon not by the board, but instead by individual directors or more lowly employees or indeed outside agents. Of course, the board cannot delegate to anyone more authority than it itself has and so category 1 to 5 restrictions apply to the actual authority of all these other agents.[1] As already noted, cases of breaching directors' fiduciary duties (category 5), have generally involved individual director's actions,[2] though logically the restriction could apply to other agents. Again there can be the problem of whether the procedures to delegate authority (proper appointment etc) were followed, but the biggest problem in sub-board delegation of actual authority is ascertaining the scope of the authority that has been delegated (category 6 restrictions). Even if a third party dealing with the company could see the agent's contract with the company (usually an employment contract) it would be rare for his actual authority to be clearly defined therein. For a major transaction, a specific board resolution delegating authority for that transaction may be asked for. Otherwise the courts have interpreted the actual authority of individual directors and other agents to be:

–   the 'usual authority' of a person in that position in the circumstances of the company;

–   plus any additional authority expressly or impliedly delegated;[3]

–   less any express restrictions on that authority;

– less the implied restriction that the person must not act dishonestly or otherwise in breach of his fiduciary duties.[4]

The office of director (including that of chairman) does not have much, if any, usual authority because directors are supposed to take decisions corporately as a board, although they do normally have authority to execute documents.[5] An executive director (eg the finance director) and any other manager will possess the usual authority that his particular functions require.[6] In the case of a chief executive or managing director, this may be very wide, particularly if the company is small and management functions have not been divided up amongst specialists.[7] Where three companies were controlled by one individual, who was the major shareholder in, and chairman, managing director and the organiser of, each of the three companies, it was held that the individual controlling them must be regarded as having actual or ostensible authority to act for any of them.[8] Indeed, failure to exercise the power to delegate may be overcome by implied actual authority from the board allowing one of its number to operate as though he has an executive position.[9]

The courts, however, presume that without express delegation, the decision to embark on major legal proceedings is retained by the board.[10] This point was stretched in one case where directors were refusing to allow a board to authorise proceedings to restrain the shareholder/creditor they represented putting the company into administrative receivership. Their breach of fiduciary duty was not allowed to stop the other directors and the company's solicitors launching proceedings, not least because the shareholder/creditor had already accepted the solicitors as being authorised to defend against its claim.[11]

Traditionally company secretaries were held to have very limited usual authority, although again they are often involved in executing formal documents.[12] However, in many listed companies, the company secretary is the head of a major department dealing with all the legal and administrative affairs of the group. In at least one case, it has been accepted that a company secretary has some authority to enter 'contracts connected with the administrative side of the company's affairs'.[13] Indeed, the usual authority of company secretaries may have been extended by the case of *First Energy (UK) Ltd v Hungarian International Bank Ltd*.[14] There it was held that, although a bank manager did not have authority to offer a large facility on behalf of the bank, he did have usual authority to communicate head office approval to the applicant.[15] As it is usually the company secretary who is asked to confirm the authority of the board and/or others to take decisions, his statements about others' authority in the company may bind a company.[16]

Companies must be careful about giving employees job titles merely because they sound grand. In *SMC Electronics Ltd v Akhter Computers Ltd*,[17] an employee selling power supply units (PSUs) had been given the title 'Director PSU Sales' even though he was not a director of any company. His contract of employment said he was required to 'perform such duties as may be reasonably associated with [his] job title'. The Court of Appeal held that the employee had express actual authority under his employment contract to bind the company to supply PSUs to customers

introduced by a competitor. He also had express or implied actual author-
ity to negotiate 50 per cent of the company's profits on these sales as a
commission to the competitor, because entering into commission arrange-
ments was either ordinarily incidental to his duties or implied from the
wide discretion to agree payment terms that he had been allowed in the
past. In *Shepherds Investments Ltd v Walters*,[18] an employee who was
allowed to call himself 'Sales Director' and become responsible for invest-
ment business was viewed as a de facto executive director. On the other
hand, being appointed 'Deputy Managing Director' has been held not to
imply anything like the authority of a Managing Director.[19]

Nevertheless, however wide a job title may be, the actual authority is
always subject to an implied condition that the employee or other agent
acts honestly and in the interests of the company.[20] If a company is
insolvent, the director's fiduciary duty to creditors can restrict his actual
authority, for example, to transfer property.[21] Sections 39 to 42 may
largely remove the doctrine of constructive notice in respect of constitu-
tional (and possibly wider) limitations on the authority of the board and
its authority to delegate, but it does not say that authority becomes actual
authority. Whether a company remains bound by a director or an em-
ployee or any other agent in breach of these limitations or fiduciary duties
depends on whether he personally still appears to the contracting party to
have ostensible authority albeit after the fairly sweeping presumptions a
third party is allowed to make under these sections.[22]

The requirements for signing (and/or sealing) formal documents are dealt
with at 8**[21]** and following below, but confusion can arise with informal
documents. In *Hamid v Francis Bradshaw Partnership*[23] a contract was
partly written and partly oral, but on the written document, the director
had signed above the trading name of the company and gave no indication
that he was signing on behalf a limited company. The Court of Appeal held,
using extrinsic evidence, that the contract was with the director personally,
not the company. This contrasts with the case of *Badgerhill Properties Ltd
v Cottrell*,[24] where the signature appeared above the word 'director'.

1   Another body or individual could have an authority not possessed by the board if very
unusually the articles delegated that authority directly.
2   *Criterion Properties plc v Stratford UK Properties LLC* [2004] 1 WLR 1846, HL; *Re
Capitol Films Ltd* [2010] EWHC 2240 (Ch), [2011] 2 BCLC 359.
3   *Armagas Ltd v Mundogas SA* [1986] AC 717, HL(E). Two extensions to usual authority
for specific contracts did not imply a general extension.
4   *Hopkins v TL Dallas Group Ltd* [2004] EWHC 1379 (Ch), [2005] 1 BCLC 543, at [89],
Lightman J maintained a director in breach of his fiduciary duty cannot be acting within
his actual authority.
5   *Rama Corporation Ltd v Proved Tin & General Investments Ltd* [1952] 2 QB 147;
*Houghton & Co v Nothard, Lowe & Wills Ltd* [1927] 1 KB 247, CA (affirmed on other
grounds, [1927] AC 1 HL(E)). Some cases have suggested that chairmen may have an
extensive usual authority, but that was not the view in *Hely-Hutchinson v Brayhead Ltd*
[1968] 1 QB 549, CA at 586 per Lord Wilberforce. The issues have been much litigated
in Australia, eg *Brick & Pipe Industries Ltd v Occidental Life Nominees Pty Ltd*
(1991) 6 ACSR 464, AD (Vic); *Northside Developments Pty Ltd v Registrar General*
(1990) 170 CLR 146, HCA; *Equiticorp Finance Ltd (in liq) v Bank of New Zealand*
(1993) 11 ACSR 642, SC (NSW); *Pyramid Building Society v Scorpion Hotels PTY Ltd*
(1996) 20 ACSR 214, SC (Vic).

6   *Kreditbank Cassel GmbH v Schenkers* [1927] 1 KB 826, CA; *British Bank of the Middle East v Sun Life Assurance Co of Canada Ltd* [1983] 2 Lloyd's Rep 9, HL.

7   *Hely-Hutchinson v Brayhead Ltd* [1968] 1 QB 549, CA, although for a non-trading company, the usual authority of a managing director may be narrow, *Bank of New Zealand v Fiberi Pty Ltd* (1992) 8 ACSR 790, SC (NSW).

8   *Ford Motor Credit Co v Harmack* (1972) *The Times*, July 7, CA.

9   *Hely-Hutchinson v Brayhead Ltd* [1968] 1 QB 549, CA. Implied actual authority may similarly be inferred in the case of an employee or other non-director: *De Villiers v BOE Bank Ltd* [2004] 2 All SA 457, SCA.

10  *Mitchell & Hobbs (UK) Ltd v Mill* [1996] 2 BCLC 102 (proceedings against the company secretary); *Nece Pty Ltd v Ritek Incorporation* (1997) 24 ACSR 38, Fed CA (resisting a winding-up petition).

11  *Fusion Interactive Communication Solutions Ltd v Venture Investment Placement Ltd (No 1)* [2005] EWHC 224 (Ch), [2005] 2 BCLC 250 and *(No 2)* [2005] EWHC 736 (Ch), [2005] 2 BCLC 571.

12  *Barnet, Hoares & Co v South London Tramways Co* (1887) 18 QBD 815; *George Whitechurch Ltd v Cavanagh* [1902] AC 117, HL at 124 per Lord Macnaghten: 'the duties of a company's secretary . . . are of a limited and of a somewhat humble character.'

13  *Panorama Development (Guildford) Ltd v Fidelis Furnishing Fabrics Ltd* [1971] 2 QB 711, CA at 717 per Lord Denning MR.

14  [1993] 2 Lloyd's Rep 194, CA.

15  The case was criticised by Professor Reynolds in (1994) 110 LQR 21 and narrowly distinguished from *Armagas Ltd v Mundogas SA* [1986] AC 717, HL(E).

16  For the problem of forged documentation though, see **8[22]** below.

17  [2001] 1 BCLC 433, CA.

18  [2006] EWHC 836 (Ch), [2007] 2 BCLC 202. The case itself was not about the authority of the employee but the fiduciary duties he owed.

19  *Hopkins v TL Dallas Group Ltd* [2004] EWHC 1379 (Ch), [2005] 1 BCLC 543.

20  [2004] EWHC 1379 (Ch), [2005] 1 BCLC 543 at [89], Lightman J maintained a director in breach of his fiduciary duty cannot be acting within his actual authority.

21  *Re Capitol Films Ltd* [2011] 2 BCLC 359. If the recipient remains unaware of the restriction, there may still be ostensible authority.

22  *Hopkins v TL Dallas Group Ltd* [2004] EWHC 1379 (Ch), [2005] 1 BCLC 543. On the facts, the third party was on notice of the breach.

23  [2013] EWCA Civ 470, 148 Con LR 205.

24  [1991] BCC 463.

---

### Ostensible authority

**8[19]** In *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd*,[1] the leading case on ostensible authority in the company context, Diplock LJ said:

> 'It must be shown: (1) that a representation that the agent had authority to enter on behalf of the company into a contract of the kind sought to be enforced was made to the contractor; (2) that such representation was made by a person or persons who had "actual" authority to manage the business of the company, either generally or in respect of those matters to which the contract relates; (3) that he (the contractor) was induced by such a representation to enter into the contract, that is, that he in fact relied upon it; and (4) that under its memorandum or articles of association, the company was not deprived of the capacity either to enter into a contract of the kind sought to be enforced or to delegate authority to enter into a contract of that kind to the agent.'

On the first point, an express representation will be rare. The most common form of representation is made by the board and/or managers in

the business appointing an individual to a certain position or allowing him to assume that position even if he has not been validly appointed. This represents that that individual has the usual authority of that position.[2] An individual may have wider ostensible authority if it is apparent to a third party that the individual has been allowed to deal with matters outside the usual authority of his position.[3] On the other hand, if a third party knows or is put on enquiry, perhaps by suspicious circumstances, that the individual does not have the authority claimed, the transaction will not bind the company.[4] For example, in *Hopkins v TL Dallas Group Ltd*,[5] the court held that the signing of an undertaking and acknowledgement of indebtedness by a deputy managing director was sufficiently abnormal to put the other party on enquiry. Indeed, on the facts, the court held the letters were so abnormal as to allow the inference of actual knowledge (on the part of the other party) of the deputy managing director's breach of fiduciary duty. Apparent authority to renegotiate contractual terms does not represent ostensible authority to agree a complete departure from the essential nature of the contract.[6] Being put on enquiry could also make benefits received by the third party subject to a constructive trust or other equitable remedies.[7]

On the second point, the representation must come from someone or some body that has actual authority.[8] However, since the decision in *First Energy (UK)*, this may be actual authority to represent rather than to do oneself.[9] For example, although a company secretary's usual authority to act himself is limited, his usual authority to represent to third parties the position and authority of others in the company may be extensive. As for irregularities in meetings to appoint those making the representations (even if it is the whole board), they can be overcome by the rule in *Turquand*, or possibly by s 40.[10] Indeed, the issue has logically been taken one stage further in *ING Re (UK) Ltd* where Toulson J said:

> 'I accept that the same principle can also apply at one remove where T relies on a representation made by an agent having ostensible (but not actual) authority to make such a representation on behalf of P. Thus, where P represents to T that A1 has authority to represent to T that A2 has authority to act on P's behalf, and T deals with A2 as P's agent on the faith of such representations, P is bound by A2's acts to the same extent as if he had the authority which he was represented as having. The critical requirement is that A2's authority must be able to be traced back to the principal by a representation or chain of representations upon which T acted and whose authenticity P is estopped from denying by his representation through words or conduct.'[11]

The representation must relate to the company's outward conduct with respect to third parties, and cannot be a part of an internal arrangement or even an arrangement with the company's agents.[12]

The third point is obvious if any estoppel claim is to succeed. It was at one time thought that a third party was under a positive duty to read the memorandum and articles before he could claim to have relied upon a representation. That view was rejected in *Freeman & Lockyer*.[13] The Privy Council in *Kelly v Fraser*[14] (on appeal from the Jamaican Court of Appeal) indicated that a representor would generally be estopped from resiling from his representation where there had been a detrimental reliance on it by the representee. Perhaps the most common form of

detriment was, according to the Judicial Committee, that as a result of reliance on the representation the representee has lost an opportunity to protect his interests by taking some alternative course of action.[15] The Committee added that while detriment has to be proved, it may be proved by establishing facts from which detriment can be inferred by a court.[16]

As point 4 makes clear, before 1973 category 3 or 4 restrictions prevented a third party relying upon any representation claiming an authority that breached them. That was part of the doctrine of constructive notice, now dealt with by ss 39 to 42 of the Companies Act 2006. However, even before, failure to read the articles did not invalidate reliance on representations that were not in breach of these restrictions.[17] On the other hand, as has already been noted, the mere existence of powers to delegate in the articles does not mean that they have been exercised and third parties may still be affected by category 5 and 6 restrictions of which they have notice. This most obviously arises where knowledge of the restriction can be attributed to the third party because of the involvement of the director or other agent on both sides.[18]

In most cases, the actual authority of an individual and his ostensible authority coincide (ie his usual authority plus any extra implied authority). The courts are sometimes unclear as to which is being referred to. The key difference is that actual authority binds the company whatever has been represented to the third party. Ostensible authority requires proof of a relevant representation. There is a suggestion in Diplock LJ's judgment in *Freeman & Lockyer* that the representation had to be subjectively 'intended' by the principal to be acted on,[19] but the test must be objective, how a reasonable person would view the representation, although as was pointed out in *ING Re (UK) Ltd*:

> 'If, however, the circumstances are such that the person dealing with the supposed agent knew or ought reasonably to have appreciated that the representation relied upon was not intended to be made to him or for his benefit, then there is no good reason in principle why that person should be entitled to rely on the representation to create a contract.'[20]

A court has held that where a manager directed a contracting party to make payments to third parties rather than the company for services received from it, the debt remained outstanding because the manager had no actual authority to redirect the payments, and the neither company nor any representative of the company with actual authority to do so had made any representation that the manager could give such directions.[21]

---

[1]   [1964] 2 QB 480, CA; *National Australia Bank v Sparrow Green Pty Ltd* (1999) 17 ACLC 1,665, SC (SA).

[2]   For the usual authority attaching to particular positions, see 8[18] above.

[3]   *Armagas Ltd v Mundogas SA* [1986] AC 717, HL(E) at 778 per Lord Keith, the previous extension to usual authority was not known to the third party; *Ebeed v Soplex Wholesale Supplies Ltd* [1985] BCLC 404, CA at 412 per Browne-Wilkinson LJ, the whole conduct of the representors needs to be considered; *Re a Company (No 8688 of 2011)* [2012] All ER (D) 41 (Feb), ChD, company not previously objected to the breach of actual authority.

[4]   *Russo-Chinese Bank v Li Yau Sam* [1910] AC 174, PC; *AL Underwood Ltd v Bank of Liverpool* [1924] 1 KB 775, CA; *Rolled Steel Products v British Steel Corporation*

[1986] Ch 246, CA; *EBM Co v Dominion Bank* [1937] 3 All ER 555; *Thompson v J Barke (Caterers) Ltd* 1975 SLT 67; *Hua Rong Finance Ltd v Mega Capital Enterprises Ltd* [2001] 2 HKLRD 1, CFI (HK).

[5] [2005] 1 BCLC 543.

[6] *Hudson Bay Apparel Brands LLC v Umbro International Ltd* [2010] EWCA Civ 949.

[7] *Selangor United Rubber Estates Ltd v Cradock (No 3)* [1968] 1 WLR 1555; *Karak Rubber Company Ltd v Burden* [1972] 1 WLR 602. The width of these decisions on constructive trusts has been questioned but equitable remedies can arise from, for example, knowing receipt, see **8[16]** above. Benefiting from an unauthorised contract does not necessarily amount to knowing receipt even if the contract is unconscionable, *Criterion Properties plc v Stratford UK Properties LLC* [2004] UKHL 28, [2004] 1 WLR 1846. A more detailed consideration of modern equitable remedies lies outside the scope of this work.

[8] *British Bank of the Middle East v Sun Life Assurance Co of Canada (UK) Ltd* [1983] 2 Lloyd's Rep 9, HL.

[9] [1993] 2 Lloyd's Rep 194, CA, but see *Armagas Ltd v Mundogas SA* [1986] AC 717 HL(E) at 779 per Lord Keith who approved Goff LJ's reluctance to make this distinction in the Court of Appeal.

[10] See **8[14]** and **8[15]** above.

[11] *IGN Re (UK) Ltd v R&V Versicherung* [2007] 1 BCLC 108 at [100].

[12] *Mercantile Financial Services Ltd v Entegrity Wind Systems Inc* [2009] PESC 23 (Pr Ed Isl SC).

[13] [1964] 2 QB 480, CA.

[14] [2012] UKPC 25, [2012] 3 WLR 1008.

[15] [2012] UKPC 25 at [17].

[16] [2012] UKPC 25 at [18].

[17] Any doubt on this point is now removed by Companies Act 2006, s 40(2)(b)(i), formerly 1985 Act, s 35B.

[18] *Re Capitol Films Ltd* [2010] EWHC 2240 (Ch), [2011] 2 BCLC 359, ChD.

[19] [1964] 2 QB 480 at 503.

[20] [2007] 1 BCLC 108 at [104].

[21] *Acute Property Developments Ltd v Apostolou* [2013] EWHC 200 (Ch).

---

### *Ratification and liability*

**8[20]**  The company clearly cannot ratify an illegal transaction (category 1), nor one in breach of the companies legislation (category 2) unless there is statutory provision to do so. Ultra vires acts (category 3) are now generally treated as breaches of the authority of the board. Restrictions in the articles (including objects clauses) or breaches of duty like improper purposes (categories 4 and 5) limit the authority of the board and acts in breach of them may generally be ratified by ordinary resolution of the company.[1] It has, however, been noted that some behaviour that could be viewed as breaches of board authority can be treated as unratifiable, ie in effect category 1 or 2 breaches.[2] Other limitations on the actual authority delegated to an agent (category 6) can be ratified by the board.[3]

In *ING Re (UK) Ltd* two issues concerning ratification were examined, the required state of knowledge and the ratificatory conduct. On the first, Toulson J drew a distinction between the full knowledge of the unauthorised act and its circumstances that the principal must have before the defaulting agent can claim relief from liability and the knowledge of the essentials that would be 'sufficient knowledge for the purposes of ratification of the agent's conduct vis-à-vis the third party'.[4]

On the second point, ratification can be express or implied,[5] but where it is based on silence or inactivity, an inference 'must depend on whether it is the only reasonable conclusion to draw in all the circumstances'.[6]

The company (be it the shareholders or the board) may refuse to ratify the contract. In this situation, the third party should be able to recover from the company in quasi-contract any money paid over or goods and services provided.[7] He may also be able to sue the agent for breach of warranty of authority,[8] but this will not usually be a profitable course of action. Indeed, the third party may not have lost anything since in many cases he will still be able to bind the company to the transaction under the agency principle of ostensible authority or ss 39 and 40. Procedural failings may also be overcome either under these sections or separately by the rule in *Turquand*.

---

1   *Grant v United Kingdom Switchback Railway Co* (1889) 40 Ch D 135, CA; *Phosphate of Lime Co v Green* (1871) LR 7 CP 43; *Campbell's Case* (1873) 9 Ch App 1. An ordinary resolution will not be sufficient to circumvent a protected right in the articles: *Quin & Axtens Ltd v Salmon* [1909] AC 442, HL.

2   See 8[2] above.

3   *Goh Kim Hai Edward v Pacific Can Investment Holdings Ltd* [1996] 2 SLR 109, HC (S'pore). Alternatively, ratification may be inferred from acquiescence by the directors without a formal resolution: *De Villiers v BOE Bank Ltd* 2004 (3) SA 1, SCA (S Afr).

4   *ING Re (UK) Ltd v R&V Versicherung* [2006] EWHC 1544 (Comm), [2007] 1 BCLC 108 at [152] and [153].

5   *Suncorp Insurance and Finance v Milano Assicurazioni SpA* [1993] 2 Lloyd's Rep 225 at 234.

6   *ING Re (UK) Ltd v R&V Versicherung* [2006] EWHC 1544 (Comm), [2007] 1 BCLC 108 at [158] and [161].

7   Unauthorised borrowings could be claimed back by banks even where they knew of the restriction by 'standing in the shoes' of the creditors who had been paid: *Reversion Fund & Insurance Co v Maison Cosway Ltd* [1913] 1 KB 364; *B Liggett (Liverpool) v Barclays Bank Ltd* [1928] 1 KB 48 at 61 per Wright J; but see *Re Cleadon Trust Ltd* [1939] Ch 286. The company must 'know' at a suitably high level of the loan, *Houghton & Co v Nothard , Lowe & Wills* [1928] AC 1 at p 18. The restriction on such claims in the case of ultra vires transactions has been removed by Companies Act 2006, s 39 formerly 1985 Act, s 35: see 8[3] above. For the modern approach to unjust enrichment, see *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] AC 669, HL(E).

8   *Hely-Hutchinson v Brayhead Ltd* [1968] 1 QB 549, CA at 586 per Lord Denning MR. Because of the doctrine of constructive notice, this could not generally be done for breaches of category 3 and 4 restrictions. However, where the breach could not be seen from the face of the document (eg that limited borrowing power is being exceeded), the directors have been held liable, *Chapleo v Brunswick Building Society* (1881) 6 QBD 696, CA. An alternative might be an action for deceit or negligent misrepresentation.

---

## Formal Validity of Documents

**8[21]**   Certain special rules apply to the execution of documents. Here, a distinction has to be drawn between *formal* authority to execute a document and *substantive* authority to enter into the transaction (which is then clothed with formal validity by the execution of the document). Although the substantive validity of a major transaction will normally require a decision by the board of directors or a managing director, the execution of documents will usually be left to lesser officers of the

company. So long as the requirements of the articles have been complied with, the outsider will not have to prove that there was actual authority to execute the document. Where a document has to be sealed, most articles provide that this may be done by a director and the secretary, or by two directors.[1] The cases established that where a document was executed with the signature or signatures that the articles require, its formal validity could not be contested by the company,[2] but where this was not the case, the document was not binding on the company.[3]

However, statute has reduced the scope for claiming a company's formal document has been invalidly executed. As well as any general protection for bona fide third parties offered by what is now s 40 of the Companies Act 2006,[4] s 74(1) of the Law of Property Act 1925 afforded specific protection to a 'purchaser for value without notice'[5] in whose favour a deed had been sealed in the presence of the secretary and a director of a 'corporation aggregate'.[6] Where s 74 was complied with, it overrode any provision in the articles in respect of the execution of deeds, since it provided that 'the deed shall be deemed to have been executed in accordance with the requirements of this section, and to have taken effect accordingly'.[7] Section 74 was very specific in its application, but now such statutory protection has been considerably widened with the relaxation of the execution rules for company documents.[8]

As a general matter, English contract law does not impose many formality rules. Deeds are required for the transfer of most interests in land and to make gratuitous promises binding. Traditionally, this required a company to have the document signed and impressed with its common seal. The seal was also used for securities and documents evidencing securities.[9] However, since 31 July 1990, companies have not been required to have a common seal, and alternative arrangements were introduced by s 130 of the Companies Act 1989. For companies, however, there remained some anomalous features of the law governing formal documents and after a Law Commission Report,[10] the Government used its powers under the Regulatory Reform Act 2001 to clarify the law in this area, with a statutory instrument that came into force from 15 September 2005.[11] Neither set of reforms was retrospective.[12] These reforms have now been consolidated into Part 4 of the Companies Act 2006, in particular ss 43 to 52.

---

[1]  Eg 1948 Table A, art 113 and the 1985 Table A, reg 101.

[2]  *County of Gloucester Bank v Rudry Merthyr, etc, Colliery Co* [1895] 1 Ch 629, CA; *Duck v Tower Galvanizing Co* [1901] 2 KB 314.

[3]  *TCB v Gray* [1986] 1 All ER 587 at 595; upheld by the Court of Appeal: [1988] BCLC 281.

[4]  [1986] 1 All ER 587 at 595–597. In the case of cheques or other negotiable instruments, it appears that a single director has usual authority to sign on behalf of the company; *Re Land Credit Co of Ireland* (1869) LR 4 Ch App 460. See also Companies Act 2006, s 52 (formerly 1985 Act, s 37). This section is discussed below at 8**[29]** below in the context of the form of company contracts. See also *Dey v Pullinger Engineering Co* [1921] 1 KB 77.

[5]  See the definition of purchaser in the Law of Property Act 1925, s 205(1)(xxi).

[6]  This includes, of course, registered and statutory companies. The section refers also to 'clerk' and to 'council' or 'governing body' as equivalent to the secretary and board of

directors in corporate bodies other than registered companies. This Act does not apply in Scotland.

7    Law of Property Act 1925, s 74(1).

8    Eg it did not apply to a seal attached to a share certificate because that did not make it a deed; *South London Greyhound Racecourses v Wake* [1931] 1 Ch 496 at 503 per Clausen J.

9    See Companies Act 2006, s 768, formerly 1985 Act, s 186 (Chapter 23). A company that has a common seal may have 'for this purpose a facsimile of its common seal with the addition on its face of the word "Securities"'; see Companies Act 2006, s 50(2), formerly 1985 Act, s 40.

10   *The Execution of Deeds and Documents by or on behalf of Bodies Corporate*, Comm No 253, August 1998.

11   Regulatory Reform (Execution of Deeds and Documents) Order 2005, SI 2005/1906 ('Reform Order 2005').

12   Reform Order 2005, art 1(2).

### Oddity of forgery

**8[22]**  There is authority from the House of Lords for the proposition that a forgery as such is a *nullity* and cannot bind the company.[1] On the other hand, if an organ or official of the company with the authority to bind the company held out the person who committed the forgery as having authority to execute the document in question, the company may be estopped from denying the validity of the forgery.[2] In *Ruben v Great Fingall Consolidated*,[3] a company secretary, without authority to do so, issued a share certificate with the company's seal attached and under his own signature and the forged signatures of two directors. The execution of the share certificate was, therefore, a nullity, and there was no ground for holding the company estopped from denying this. In other cases, a director or other official has been held to have 'forged' his own signature to a parole agreement.[4] This would seem to be a misuse of the word 'forgery', and such cases should have been decided instead on the basis of lack of authority (whether actual or ostensible). Indeed, it is difficult to see why even forgery, as in *Ruben*'s case, must be treated as being governed by a special rule. So far as actual authority is concerned, a forgery is clearly a nullity. However, whether or not it binds the company should depend on general agency principles. It is clear that under general agency law,[5] forgeries are not treated differently from other fraudulent acts which may be binding on the principal if the agent acts within his ostensible authority.[6] In particular, the company secretary may have a wide authority to represent that minutes and other documents are valid.[7] This was the approach taken in *Lovett v Carson Country Homes Ltd*.[8] Indeed, Davis J considered (obiter) that the recipient bank could have relied upon Companies Act 2006, s 44(5) if there had not been actual or ostensible authority.

1    *Ruben v Great Fingall Consolidated* [1906] AC 439, HL per Lord Loreburn at 443.

2    For a recent instance of a case where a company was bound by a document that contained a forged signature, on the basis that the one relying on the document had apparent authority to act, see the decision of the New South Wales Court of Appeal in *ANZ Banking Group Ltd v Frenmast Pty Ltd* [2013] NSWCA 459.

3    [1906] AC 439, HL; see further *Slingsby v District Bank* [1931] 2 KB 588 at 605 per Wright J (affirmed at [1932] 1 KB 544, CA).

4    *Kreditbank Cassel GmbH v Schenkers Ltd* [1927] 1 KB 826; *South London Greyhound Racecourses v Wake* [1931] 1 Ch 496; see further *Northside Developments Pty Ltd v Registrar General* (1990) 170 CLR 146, HCA.

5    *Uxbridge Building Society v Pickard* [1939] 2 KB 248, CA. See the application of this case in *United Bank of Kuwait Ltd v Hammond* [1988] 1 WLR 1051, CA.

6    *Lloyd v Grace, Smith & Co* [1912] AC 716, HL.

7    *First Energy (UK) Ltd v Hungarian International Bank Ltd* [1993] 2 Lloyd's Rep 194, CA.

8    [2009] EWHC 1143 (Ch), [2009] 2 BCLC 196 where *Gore-Browne* was cited with approval at [93]–[95].

### Companies with common seals

**8[23]**    Section 45[1] provides that a company need not have a common seal, but if it does it 'shall have its name engraved in legible characters on the seal'. If an officer of a company, or any person on its behalf, 'uses or authorises the use of any seal purporting to be a seal of the company on which its name is not engraved', he is liable to a fine.[2] The name of a company should be correctly given in every detail. This is especially necessary in the case of the common seal, which is the official signature of the company. However, the use of a trading name rather than the registered name when sealing a bond does not make the bond unenforceable.[3]

Facsimiles of the common seal may be used for sealing company securities or for sealing documents outside the United Kingdom, but must be marked with 'securities' or with the place where they are to be used respectively.[4] In the case of overseas seals, the company may formally (under seal) authorize any agent to affix it for a period or until terminated or revoked and notified to any person dealing with the agent. The agent must certify in writing on any document the date and place at which the seal was affixed. The position in Scotland differs and is described in **8[29]** below.

The seal is impressed upon the share and stock certificate, deed or other important document. Articles can provide that its use requires the authority of the directors, and the presence of one or more directors who sign the document, which is then countersigned by the secretary.[5] An impression made in ink with a wooden or rubber block has been held to be a valid sealing,[6] but a printed circle with the letters 'LS' or words 'Place for Seal' is not.[7]

However, the use of common seals has become comparatively unusual.

1    Formerly 1985 Act, s 350(1), as substituted by the Companies Act 1989, s 130(7), Sch 17.

2    Section 350(2) and Sch 24.

3    *OTV Birwelco Ltd v Technical and General Guarantee Co Ltd* [2002] EWHC 2240 (TCC), [2002] 2 BCLC 723.

4    Companies Act 2006, ss 49 and 50, formerly 1985 Act, ss 39 and 40.

5    The current 2006 Act Public Company Model Articles, reg 81(6) delegates responsibility just to the company secretary or a person authorised by the company secretary.

6    *R v St Paul's Covent Garden* (1845) 7 QB 232; but such a block should not be used as the seal of a company, as its name is not 'engraved' thereon.

---

7    *Re Balkis Company* [1888] WN 3.

---

## Formal Documents under English Law

**8[24]**  Sections 43 and 44 of the Companies Act 2006 concern the form of company contracts and the execution of documents by a company under the law of England and Wales or Northern Ireland and s 48 under Scottish law.[1] The distinction made for Scots law relates *not* to English or Northern Ireland registered and Scottish registered companies, but to the execution of documents by a company (wherever registered) under the general law of the respective companies. For the Scottish position, see 8[28] below.

---

1    Formerly 1985 Act, ss 36, 36A and 36B. For application of these sections to unregistered companies, see the Unregistered Companies Regulations 2009, SI 2009/2436, particularly reg 3 and Sch 1 and to overseas companies, see Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009, SI 2009/1917, particularly reg 4.

---

### Executing the document

**8[25]**  Section 44(1) provides that a contract may be made (a) 'by a company, by writing under its common seal', or (b) 'on behalf of a company, by any person acting under its authority, express or implied'.[1] As to formalities required under the general law, s 44(2) provides that any formalities required by law in the case of a contract made by an individual also apply, unless a contrary intention appears, to a contract made by, or on behalf of, the company. The contrary intention (requiring additional formalities, eg additional signatures by company officers) might be inferred from the company's articles, or from the usual corporate practice (or trade custom) relating to the contract in question.

Although a company may still execute a document by affixing the common seal, as such a seal is no longer needed. Before 6 April 2006, a document signed by a director and the secretary of a company, or by two directors of the company, and expressed (in whatever form of words) to be executed by the company, has the same effect as *if executed under the common seal of the company*.[2] From 6 April 2008, private companies have no longer had to have a company secretary. Since then, under the Companies Act 2006, s 44, formal execution of documents by a company may be by two authorised signatories (who are any directors and, where there is one, the company secretary) or by a director with an attesting witness.[3]

Section 44(4) (formerly s 36A(6)) makes provision to protect third parties. In favour of a purchaser, a document is deemed to have been duly executed by a company 'if it purports to be signed' as required by the section. A 'purchaser' has the usual meaning of a purchaser in good faith for valuable consideration, but s 44(5) (formerly s 36A(6)) further provides that this definition 'includes a lessee, mortgagee or other person who for valuable

---

consideration acquires an interest in the property'.[4] The meaning of 'purports to be signed' covers any lack of authority to sign the document in question. Thus, if two directors sign, a 'purchaser' will not have to show that there was actual or ostensible authority for their decision to sign the document. Whether this would cover a 'forged' signature of actual company officers (as opposed to genuine signatures by unauthorised officers) is open to argument. If this were held to be the case, the provisions would, in effect, repeal *Ruben v Great Fingall Consolidated*,[5] in respect of those company documents to which it applies.[6]

The wording of Companies Act 1985, s 36A for registered companies, allowing two directors as an alternative to a director and the secretary and covering documents, not just deeds, was clearly wider than that in s 74 of the Law of Property Act 1925. The 2005 reforms brought the wording of s 74 (covering corporations aggregate) into line with the wider s 36A,[7] but the further relaxation to a director and any other attesting witness in the Companies Act 2006, s 44 does not seem to have been applied.

Other anomalies surrounding execution of documents by companies were cleared up by the 2005 reforms. Where a director or company secretary is a corporation, signing or attesting for the purposes of s 74(1) or what is now s 44 of the 2006 Act may be by the signature of any person authorised to do so on its behalf (removing an area of doubt).[8] For what is now s 44, where a director or secretary is signing for more than one company, they must sign separately.[9] However, where it is clear from the document as a whole that they are signing for themselves and the company, they do not have to sign twice and it does not have to be specifically stated that they are signing 'on behalf of' the company.[10]

---

[1]   As to the agency principles applicable to those acting on behalf of a company, see **8[18]** above.

[2]   Companies Act 1985, s 36A(4).

[3]   Commencement No 5 Order, Sch 4, para 1 clarifies that if the signatures straddle the commencement date, the new law applies.

[4]   See the definition of 'purchaser' in the Law of Property Act 1925, s 205(1)(xxi). Note the somewhat narrower ambit of s 74(1). For a case where the Australian statutory provision equivalent to s 36A(6) was applied in favour of a bank, see *ANZ Banking Group Ltd v Australian Glass & Mirrors Pty Ltd* (1991) 4 ACSR 14, SC (Vic).

[5]   [1906] AC 439, HL. See **8[22]** above.

[6]   See **8[22]** above for the more general doubts about *Ruben v Great Fingall Consolidated*.

[7]   Reform Order 2005, art 3.

[8]   Companies Act 2006, s 44(7) partly replacing Reform Order 2005, Sch 1, paras 2 and 11 inserting s 74(1)B and what was s 36A(8) respectively.

[9]   Companies Act 2006, s 44(6) replacing Reform Order 2005, Sch 1, para 10 inserting what was s 36A(4A).

[10]  *Williams v Redcard Ltd* [2011] EWCA Civ 466, [2011] 2 BCLC 350.

---

### Deeds and delivery

**8[26]**  It is often said that a deed must be 'signed, sealed and delivered'. As has already been noted, the requirement for sealing has been removed. There is therefore an increased danger that it is hard to tell whether a document is a deed or not. The Law of Property (Miscellaneous

Provisions) Act 1989 requires that for a document to be a deed, it must be clear on its face that it is intended by the parties to be so (the 'face-value requirement'). The 2005 reforms amended the 1989 Act to make it clear that this is a requirement even if the document is sealed, to distinguish it clearly from a mere contract under seal.[1]

Another element of the 2005 reforms concerned the requirement in respect of deeds of delivery. The Law of Property Act 1925 makes no reference to delivery at all. The Law of Property (Miscellaneous Provisions) Act 1989 is clear that a deed, to become effective, must be delivered. This allows a deed to be signed in advance and then held for later delivery, usually on the satisfaction of some condition. To assist in this, the 1989 Act imposes an irrebuttable presumption in favour of the purchaser of an interest in land that, where a solicitor, licensed convey-ancer or notary public purports to deliver an instrument on behalf of a client, that person is authorised to do so. However, although under s 36A(5) of the Companies Act 1985 there was a rebuttable presumption that a document intended as a deed and executed by a company was delivered on being executed, s 36A(6) made the presumption irrebuttable in favour of a purchaser if the document is signed by two directors or a director and the secretary. This removed the flexibility for a company of signing and holding a deed pending the satisfaction of some condition.

From 15 September 2005, the irrebuttable presumption in the 1989 Act was no longer restricted to interests in land,[2] but the irrebuttable presump-tion in the Companies Act 1985 was replaced by a presumption of delivery that may be rebutted by proving a contrary intent, so allowing a company to sign and hold a deed for later delivery.[3]

---

[1]   Reform Order 2005, art 8 inserting s 1(2A).
[2]   Reform Order 2005, art 9 amending s 1(5).
[3]   Companies Act 2006, s 46 replacing Reform Order 2005, arts 5 and 6 amending s 36A(6) and inserting s 36AA. The Law of Property Act 1925 was also brought into line, Reform Order 2005, art 4 inserting s 74A. This was an issue in *Bolton Metropolitan Borough Council v Torkington* [2003] EWCA Civ 1634, [2004] Ch 66, [2004] 4 All ER 238.

---

### Powers of attorney

**8[27]–[28]** The general English law governing powers of attorney was amended by the Powers of Attorney Act 1971 (the relevant provisions of which do not apply in Scotland). Section 7 of the 1971 Act provides that the donee of a power of attorney may execute or do any assurance, instrument or thing in, and with, his own name and signature, and under his own seal where sealing is required, in the name of the donor of the power. Attention should also be drawn to ss 5 and 6, protecting persons acting under a power, and s 10, which protects third parties relying upon a general power of attorney in the form set out in the 1971 Act or expressed to be made under it. In that case, the donee of the power has power to do, on behalf of the donor, anything which the donor can lawfully do by attorney.

The 2005 reforms clarified the ability of companies to grant powers of attorney and for deeds to be executed by persons acting under such powers. Section 7 of the Power of Attorney Act 1971 referred to the signature of the donor (which a company cannot provide) and s 1 of the Law of Property (Miscellaneous Provisions) Act 1989 only allowed deeds to be executed by the person making it or the parties thereto. Both were amended to make it clear that companies can grant powers of attorney[1] and such attorneys can execute deeds.[2]

Section 47 of the Companies Act 2006 extended s 38 of the 1985 Act to make it clear that under the law of England and Wales or Northern Ireland a company may, by instrument executed as a deed, empower any person to act as its attorney to execute deeds on its behalf within or without the UK.[3] The section also now clearly specifies that when appointing an attorney to execute deeds or other documents on its behalf, a company should, like an individual, do so by instrument in writing executed as a deed, either generally or for specified purposes, both inside and outside the UK (not just outside).[4]

The actual power to appoint powers of attorney is normally given to the directors. The more elaborate provisions of 1948 Table A, art 81, have been simplified in reg 71 of the 1985 Table A and in reg 5 of both the 2006 Act Public and Private Company Model Articles.

---

1   Reform Order 2005, Sch 1, paras 5 to 8 amending s 7.
2   Reform Order 2005, Sch 1, paras 13 to 15, amending s 1.
3   It does not apply in Scotland, but a Scottish company may grant similar authority in writing subscribed in accordance with the Requirements of Writing (Scotland) Act 1995, or simply authorise the execution of documents abroad by resolution of its directors; see 8[28] below.
4   Companies Act 2006, s 47, replacing 1985 Act, s 38. Section 47 applies to powers of attorney executed on or after 1 October 2009, 8th Commencement Order, Sch 2, para 16.

---

## Execution of Documents by Companies under Scots Law

**8[29]** Any document granted by a company is to be signed on the last page of the substantive text (excluding any annexation) by a director, its secretary[1] or a person authorised to sign the document on its behalf.[2] Any annexation is to be regarded as incorporated if it is referred to in the substantive text and is identified on the face of the annexation as that document,[3] but if the document refers to land and the annexation describes or shows any part of that land it must also be signed on each page (if it is a plan or other representation) or on the last page of the annexation if it is an inventory, appendix, schedule or other writing.[4] Where applicable, the document may be signed by the company's administrator, administrative receiver or liquidator.[5] An English decision[6] that, if the signatory had the necessary authority at the time of the document's execution, it was immaterial that he had ceased to do so when the document was delivered is equally applicable in Scots law.

Scots law requires a document subscribed on behalf of a company in the foregoing manner only if it relates to an interest in land, constitutes a gratuitous unilateral obligation (other than in the course of business) or constitutes a trust whereby the company is the sole trustee of its own property.[7]

The Land Registration etc (Scotland) Act 2012 amends the Requirements of Writing (Scotland) Act 1995 (discussed in this paragraph) to allow documents to be authenticated electronically. The substantive amendments are not yet (March 2017) in force. The Legal Writings (Counterparts and Delivery) (Scotland) Act 2015 (effective 1 July 2015) introduced to Scots law provision for documents to be executed 'in counterpart', ie two or more copies executed by the parties separately, and to be held as delivered when delivered to all parties or their nominees.

---

[1]   Including a deputy or assistant secretary; Companies Act 2006, s 274. The cross-heading to ss 274–280 indicates that this only applies to a public company or a private company that has appointed a secretary.

[2]   Requirements of Writing (Scotland) Act 1995, s 7(1) and Sch 2, para 3.

[3]   Requirements of Writing (Scotland) Act 1995, s 8(1).

[4]   Requirements of Writing (Scotland) Act 1995, s 8(2).

[5]   Requirements of Writing (Scotland) Act 1995, Sch 2, para 3(2)(b). Section 283(3) of the Companies Act 1985, referred to in the Requirements of Writing (Scotland) Act 1995, Sch 2, para 3(2)(a) is repealed but its effect is preserved by s 274 of the 2006 Act, referred to above.

[6]   *Re Armstrong Brands Ltd (In Administration)* [2015] EWHC 3303 (Ch), [2015] All ER (D) 172 (Nov).

[7]   Requirements of Writing (Scotland) Act 1995, s 1(1) and (2). The Requirements of Writing (Scotland) Act 1995, which took effect on 1 August 1995, substantially reformed Scots law both on the need for writing and the manner of execution of documents. Section 1(3)–(5) provides for circumstances in which a contract, obligation or trust not reduced to writing but which has been acted upon may be treated as effective. The provisions of the Act are subject to any express provision in any enactment (including a statutory instrument (Requirements of Writing (Scotland) Act 1995, s 12(1); Companies Act 2006, s 1293).

---

**8[30]**   Under Scots law a company (wherever incorporated) need not have a common seal, and for the purposes of any enactment referring to execution under seal a document signed or subscribed (or, the case of an electronic document), authenticated on behalf of a company in accordance with the Requirements of Writing (Scotland) Act 1995 ('the 1995 Act') has effect as if so executed.[1]

---

[1]   Companies Act 2006, s 48, which re-enacts s 36B(1) and (2) of the Companies Act 1985, as inserted by Requirements of Writing (Scotland) Act 1995, Sch 4, para 51; Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009, SI 2009/1917, para 5. Reference to electronic authentication inserted by the Land Registration etc (Scotland) Act 2012, Sch 5, para 50(2) with effect from 8 December 2014.

---

**8[31]**   It is to be presumed[1] that a document is subscribed on behalf of the company if either:

(1)    it bears to have been signed on behalf of the company by a director, the secretary or a person bearing to have been authorised to subscribe the document and it bears to have been signed by a second person as a witness to that signature whose name and address are given; or

(2)    it bears to have been signed by two directors of the company, or a director and its secretary or two persons bearing to have been authorised to subscribe.[2]

There is, however, no presumption that a person signing as director, secretary or authorised signatory did in fact hold that office or authority.[3] If a document is to be recorded or registered in the property registers or in the court books for preservation it is to be executed in one of the manners described in this paragraph.[4]

---

[1]    Provided that there is no contrary indication in the document (Requirements of Writing (Scotland) Act 1995, s 3(1)(c), as applied by Sch 2, para 3). This presumption is rebuttable; Requirements of Writing (Scotland) Act 1995, s 3(4)–(6).

[2]    Requirements of Writing (Scotland) Act 1995, s 3(1) and (1A) applied as above para 3(5). 'Secretary' includes an assistant or deputy secretary; **8[29]** above.

[3]    Requirements of Writing (Scotland) Act 1995, s 3(1)(c) applied as above.

[4]    Requirements of Writing (Scotland) Act 1995, s 6. Although the Act refers only to the Register of Sasines and there is no statutory requirement to this effect in respect of the Land Register it is understood that this is a requirement of the Keeper under his statutory discretion.

---

**8[32]**   What is stated in the foregoing paragraphs **8[29]–8[31]** is Scots law as it has been since the Requirements of Writing (Scotland) Act 1995 came into force on 1 August 1995. Prior to that date, where Scots law required the execution of a 'probative deed', ie one which was presumed to be valid, or where the parties wished the deed to benefit from this presumption[1] a deed granted by a company could be signed by any person having the appropriate authority with two witnesses (that being the general common law) or it could be sealed with the company's common seal and subscribed by two directors or one director and the secretary.[2] For a brief period (31 July to 30 November 1990) the applicable legislation was the Companies Act 1989, s 130(3) which provided that a deed granted by a company was to be treated as 'probative' if signed by a director, secretary or authorised person with either a single witness or the company seal. This, however, was replaced by provisions[3] in identical terms to the current law as contained in the 1995 Act[4] which were stated to take effect retrospectively from 31 July 1990 so that a deed executed in accordance with those provisions while the 1989 Act was in force would be regarded as 'probative' even if it did not confirm to the 1989 Act.[5]

---

[1]    Requirements of Writing (Scotland) Act 1995 abolished the concept of 'probative deed' and replaced it with the requirements for execution described in **8[31]**; Requirements of Writing (Scotland) Act 1995, Sch 4, para 1.

[2]    Companies Act 1985, s 36 (repealed), re-enacting the provisions of previous Companies Acts. The requirement to execute a probative deed on every page was abolished by the Conveyancing and Feudal Reform (Scotland) Act 1970, s 44.

[3]    Law Reform (Miscellaneous Provisions) (Scotland) Act 1990, s 72.

[4]    See **8[31]**.

5    Law Reform (Miscellaneous Provisions) (Scotland) Act 1990 referred to above made a number of further amendments to the 1989 provisions in Sch 8, paras 33–35 and Sch 9 (Repeals), but these were effective from 30 November 1990, ie not retrospectively, and have been superseded by the Companies Act 2006.

# **EXHIBIT I**

# Mitchell & Hobbs (UK) Ltd v Mill    *a*

QUEEN'S BENCH DIVISION

ANTHONY MACHIN QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT

25 JULY 1995

*b*

*Legal proceedings on behalf of company – Power of company director to commence legal proceedings in company name – Power exercisable by board of directors – Managing director holding majority shares in company commencing legal action in company's name – Legal proceedings against company secretary to recover money withdrawn from company's bank account – Proceedings brought without approval of board – Whether action valid – Whether managing director having power over and above powers held by other directors – Companies (Tables A to F) Regulations 1985, SI 1985/805, Sch, Table A, regs 70, 72.*

*c*

R was the managing director of the plaintiff company. R initiated an action *d* in the name of the plaintiff company against M (the company secretary) to recover £3,900 and interest which M had withdrawn from the bank account of the company and obtained an order to enter summary judgment against M. M appealed against the order and sought to strike out the action on the grounds that R had no authority to instruct solicitors to issue the proceedings. There was no evidence that a board meeting had been held to *e* authorise the commencement of the action or that R, as the managing director, had been authorised to do so. R contended that any one director of a company without reference to other directors or shareholders could bring proceedings in the name of the company by virtue of reg 70 of Table A or alternatively, R, as managing director, had authority to bring the action in *f* the name of the company.

**Held** – The action initiated by R in the name of the company against M should be struck out since reg 70 was intended to vest power to manage the affairs of a company in the board of directors as a whole and accordingly the power to institute proceedings on behalf of the company could not be *g* exercised by one director alone. Regulation 72 did not give any power to a managing director over and above the other directors to manage the business of the company, unless such powers had been delegated to him. In the present case no such delegation had been made in favour of R. The action should accordingly be struck out.

*h*

**Cases referred to in judgment**

*Automatic Self-Cleansing Filter Syndicate Co Ltd v Cuningham* [1906] 2 Ch 34, CA.

*Breckland Group Holdings Ltd v London and Suffolk Properties Ltd* [1989] BCLC 100.    *i*

*Shaw (John) & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113, [1935] All ER Rep 456, CA.

*a*

*Smith (Howard) Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974]
AC 821, [1974] 2 WLR 687, PC.

**Cases also cited or referred to in skeleton arguments**
*Ashburton Oil NL v Alpha Minerals NZ* [1971] CLR 614.
*Club Flotilla (Pacific Palms) v Isherwood* (1987) 12 ACLR 387.
*Daimler Co Ltd v Continental Tyre & Rubber (GB) Ltd* [1916] 2 AC 307,

*b*
   HL.
*Haycroft Gold Reduction and Mining Co, Re* [1900] 2 Ch 230.
*Marshall's Valve Gear Co Ltd v Manning Wardle & Co Ltd* [1909] 1 Ch
   167.

**Appeal**

*c*
By a notice of appeal the defendant, Peter Mill, appealed to a judge in
chambers against the order of District Judge de Castilione given on 3 July
1995 to enter final judgment against the defendant under RSC Ord 14 issued
by the plaintiff, Mitchell & Hobbs (UK) Ltd. The appeal was heard and the
judgment was given in chambers but the judgment is reported with the

*d*
consent of the parties. The facts are set out in the judgment.

*Stuart Hornett* (instructed by *Cripps Harries Hall*, Tunbridge) for the
   plaintiff.
*Thomas Grant* (instructed by *Jeremy Simon & Co*, Watford) for the
   defendant.

*e*

**ANTHONY MACHIN QC.** This is an appeal by the defendant, Mr Peter
Mill, against a decision of District Judge de Castilione given on 3 July 1995
when he heard an RSC Ord 14 summons issued by the plaintiff company,
Mitchell & Hobbs (UK) Ltd, asking for final judgment to be entered against
the defendant in a sum of £3,900 with interest. The district judge made an

*f*
order in those terms and, by the notice of appeal lodged by the defendant and
dated 6 July 1995, the defendant asks that the order for summary judgment
be set aside, that the action be struck out, alternatively stayed, alternatively
that he be given unconditional leave to defend and costs.

It appeared, as Mr Grant proceeded with his submissions on behalf of the

*g*
defendant, that there was in the case what could very conveniently and
properly be tried as a preliminary issue and indeed this was Mr Grant's
principal contention for the purpose of the appeal as set out in his skeleton
argument, that is to say the issue whether this action was instituted with or
without proper authority on behalf of the plaintiff. I have heard Mr Grant
and Mr Hornett on that issue and since my view is that Mr Grant's

*h*
contention relating to that issue is correct, I have not gone on to consider any
further issues which might have arisen had I been of a different opinion.

This was a small private company and at the material times (because it is
now, I think, being wound up or at least is no longer trading) Mr Pearce was,
with a Mr Radford, one of the two directors of this company. It is agreed that
Mr Radford was the managing director and that Mr Mill was the company

*i*
secretary. Mr Grant has submitted that I ought to regard Mr Mill as a quasi
director but I decline to do that because I do not see any evidence from which
I could conclude that he occupied the position of a director; therefore I decide

the matter on the basis that the directors were (as I have said) Mr Radford and Mr Pearce.

a

Mr Radford was not only the managing director but he was the major shareholder, owning 66 shares in the company, there being 100 shares issued. Mr Mill held 17 and Mr Pearce the remaining 17 shares. It is quite plain from the affidavits that Mr Radford on the one hand, and Mr Pearce and Mr Mill on the other hand, have fallen out but I am not concerned in any way with the rights and wrongs of their dispute. What I am concerned with b is whether this action was brought properly, in the sense that it was authorised on behalf of the company that it should be brought. What happened and what generated the action was that admittedly Mr Mill, in December 1994, withdrew from the company's banking account the sum claimed, that is to say £3,900, for the purpose (as he says in his defence) to protect that money from being dissipated by Mr Radford in breach of his c fiduciary duty to the company and its creditors. It is not in issue that that money has not in any way been tampered with, if I can put it that way, by Mr Mill. It has been placed in an account in the name of the company's accountants as it were by the directions of a court. There it is, still part of the company's assets, but withdrawn in the manner I have described. The d purpose of the action which has been motivated by Mr Radford was to regain possession of the £3,900.

Mr Grant has submitted that Mr Radford had no authority to instruct solicitors to issue the proceedings in this case and he has taken me through a number of authorities which draw a clear distinction between on the one hand the powers of shareholders of a company, and on the other the powers e of directors of a company. He referred me, first, to *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126 at 1135–1136, [1974] AC 821 at 837. There, the dichotomy between the powers of directors and the powers of shareholders is set out by the Privy Council in these terms:

f

'The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors, within their g management powers, may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office (*Automatic Self-Cleansing Filter Syndicate Co Ltd v Cuninghame* [1906] 2 Ch 34), so it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose h of destroying an existing majority, or creating a new majority which did not previously exist.'

I was then taken to a much earlier case in the Court of Appeal which is a i recognised authority on this aspect of company law, namely *John Shaw & Sons (Salford) Ltd v Shaw* [1935] 2 KB 113 at 134, [1935] All ER Rep 456 at 464, where Greer J said:

a
'A company is an entity distinct alike from its shareholders and its directors. Some of its powers may, according to its articles, be exercised by directors, certain other powers may be reserved for the shareholders in general meeting. If powers of management are vested in the directors, they and they alone can exercise these powers. The only way in which the general body of the shareholders can control the exercise of the powers vested by the articles in the directors is by altering their articles,

b
or, if opportunity arises under the articles, by refusing to re-elect the directors of whose actions they disapprove. They cannot themselves usurp the powers which by the articles are vested in the directors any more than the directors can usurp the powers vested by the articles in the general body of shareholders.'

c
I think the only other authority to which I need refer (and it is a helpful authority because it is a very recent authority) is *Breckland Group Holdings Ltd v London and Suffolk Properties Ltd* [1989] BCLC 100, a decision of Harman J. That judge considered precedent authority when he came to his decision. It was conceded in that case that the proceedings in question had

d
been instituted without authority, so that point was not in issue. What was in issue was whether in the future there could be a validation of the position at a board meeting which was to be held thereafter.

I need not go, I think, through the facts of the case and I turn to the general statement of the law which the judge set out as follows (at 106):

e
'Thus, as it seems to me, there is little doubt that the law is that, where matters are confided by articles such as art 80 to the conduct of the business by the directors, it is not a matter where the general meeting can intervene. Counsel for the defendants sought to distinguish the cases by

f
saying that in the cases which have been referred to the directors had come to one decision and the general meeting sought to overrule them and come to an opposite decision. In my belief that factor or distinction which undoubtedly exists is not a distinction which in law affects the principles which I have to try and apply. The principle, as I see it, is that

g
art 80 confides the management of the business to the directors and in such a case it is not for the general meeting to interfere. It is a fortiori when the shareholders coming together have specifically resolved some matters be required to have their joint consent and have confided that matter particularly to the directors. That seems to me to reinforce the general proposition which I derive from the authorities cited. Thus, as it

h
seems to me, the action was, as is admitted, wrongly brought: it cannot at present be known whether the board will adopt or ratify it on 3 August. If the board do not adopt it, a general meeting would have no power whatever to override that decision of the board and to adopt it for itself. Thus at the moment there can be no certainty whatever as to what

i
would happen. It seems to me that in those circumstances I ought to restrain further steps in this action pending a decision whether the company will by its proper organ, that is the board, adopt it. It may do so. If so, it will be valid and ratified and adopted from its initiation.'

I follow the principles which are set out in the speech in the Privy Council, in the judgment in the Court of Appeal and in the judgment of Harman J in arriving at my decision in the present case, and I ask myself: what is the evidence which is presently before me as to authority in relation to the institution of these present proceedings?

The only affidavit I have on behalf of Mr Radford is the formal affidavit sworn in support of the RSC Ord 14 summons on 17 May 1995 in which he says, in para 1:

'I am and have been at all material times the managing director of and major shareholder of the plaintiff company and I am authorised to make this affidavit on its behalf. The contents of this affidavit are within my own knowledge.'

He then gives the usual evidence as to the indebtedness of the defendant and the moneys owing and there being no defence.

That affidavit does not in any way touch upon the question which I have to decide, which is whether Mr Radford had any authority to instruct solicitors on behalf of the plaintiff company to issue the present proceedings. Mr Grant has suggested that Mr Radford had no authority to make this affidavit because if he had no authority to institute the proceedings that would follow. I need not decide that point.

What I have to decide, and it is decisive of the summons, is whether Mr Radford had the authority to instruct solicitors on behalf of the plaintiff to issue the writ.

Now that, as I say is the only evidence adduced on behalf of Mr Radford. On the other hand, both Mr Mill and Mr Pearce deal with this aspect of the matter in their respective affidavits and Mr Mill, in para 4 of his affidavit, whilst admitting that Mr Radford is the managing director and major shareholder of the plaintiff company, says:

'. . . at no time was the decision to take legal action in this matter ratified by a board meeting, by myself or Mr. James Pearce, who is the second director of the plaintiff company. It is therefore denied that Mr. Peter Radford is authorised by the plaintiff company to make affidavits on its behalf.'

I turn next to the affidavit of Mr Pearce. In para 5 of that affidavit he deposes as follows:

'The Board of Mitchell & Hobbs (U.K.) Limited have never ratified a decision to take action against the defendant and, therefore, I can only contend that Mr. Radford was not authorised by the plaintiff to make the affidavit in support of the summons for judgment against the defendant. Any decision to take action against the defendant should have been made with my approval and since I disagree with the nature of the action I would state that Mr. Radford has no authority to instruct the plaintiff's solicitors in this action.'

Finally, there is a short affidavit by Miss Rampall, who is a solicitor having conduct of the matter on behalf of the defendant who says, in para 2, that she—

*a*

 'verily believes and is informed by Mr. Mill that the articles of association governing the plaintiff company are as provided by the Companies Act 1985. I am further informed by Mr. Mill that neither the memorandum nor any special resolution of the company either does or has altered these articles of association.'

*b*

That is something which is not in dispute as I understand it between the parties.

There being no evidence of any resolution of the board of the plaintiff company to institute proceedings, I ask myself how it comes about that they can be validly instituted. Mr Hornett, who has said everything I think that could be said on behalf of the plaintiff company, has made a bold submission and he has taken me to reg 70 of Table A (Powers of Directors) (see the Schedule to the Companies (Tables A to F) Regulations 1985, SI 1985/805), which is in the following terms:

*c*

*d*

 'Subject to the provisions of the Act, the memorandum and the articles and to any directions given by special resolution, the business of the company shall be managed by the directors who may exercise all the powers of the company.'

*e*

Then it deals with alteration to the memorandum or articles which I need not quote, and then reg 70 concludes:

 'The powers given by this regulation shall not be limited by any special power given to the directors by the articles and a meeting of directors at which a quorum is present may exercise all powers exercisable by the directors.'

*f*

Regulation 72 provides that '[the directors] may . . . delegate to any managing director . . . such of their powers as they consider desirable . . .' There is no evidence in the present case of any such delegation.

The proceedings of directors are regulated by art 88 and art 89 provides:

*g*

 'The quorum for the transaction of the business of the directors may be fixed by the directors and unless so fixed at any other number shall be two . . .'

*h*

In the event of a resolution being placed before the board and there being an equality of votes, then the chairman has a casting vote but there is no evidence in the present case as to whether a chairman has been appointed and, if he has, who he is.

There being, as I say, no resolution of the board authorising these proceedings, Mr Hornett is driven to submit to me that any director of the company by virtue of the powers conferred by reg 70 has the power, without reference to any other directors, and a fortiori without reference to shareholders, to cause proceedings to be instituted in the name of the

*i*

company. It must follow from that submission that if a company has, shall one say, 24 directors, any of them at any time could institute proceedings against anyone else in the name of the company and there might well be a plurality of proceedings, some of which were approved by some directors, some of which were disapproved of by some directors, and so on. I do not read reg 70 as empowering a single director, where there is a board of directors, to institute proceedings without reference to his co-directors. I believe that reg 70, in its proper intent, means that the power to manage the company (and in this respect the business of the company (to use the wording of reg 70) must include the institution of proceedings in its name) is a power to be exercised by the board of directors. I do not believe that such business, and in particular the institution of such proceedings, can be carried on by a single director acting, as it were, as the board of directors.

Mr Hornett then submitted that, if he were wrong about that, Mr Radford's capacity as managing director imbued him with powers over and above those enjoyed by a non-managing director, notwithstanding that there was no evidence that any powers had been delegated to Mr Radford as managing director. He submitted to me that a managing director, ex virtute officii, had the power to institute proceedings. I do not find that in any way a matter which the articles in Table A provide for. The managing director of a company is not under the articles given any powers over and above other directors in relation to the business of the company. As I say and as reg 72 makes clear, in a particular case the managing director may have powers over and above those enjoyed by his co-directors because they may have delegated those powers to him and, if they have done, so be it. There being in the present case no such delegation, in my view, reg 72 does not assist the plaintiff company.

It is for these reasons that I hold, on what I call this 'preliminary issue', that these proceedings were instituted without authority. In those circumstances, there not being in this case in contemplation any board meeting, as there was in contemplation in *Breckland Group Holdings Ltd v London and Suffolk Properties Ltd* a meeting which might ratify ab initio what had been done, I take the view that this action has to be struck out and not merely stayed, and that is the order which I make.

*Action struck out.*

K Mydeen Esq    Barrister.

# **EXHIBIT J**

What has intention to do with it ? We are dealing with the question of substratum, and to say that the substratum can exist at one moment and cease to exist a moment later, or *vice versa* simply through a change of intention of the board or of the shareholders (I know not which) seems to me to lead into a morass.

Those observations are binding on me, and with respect, I agree with every word of them. They seem to me to apply to this case with full force and effect. Apart from authority, it appears to me that the common sense of the matter demands that the existence or non-existence of a concrete scheme at the time the petition comes before the court should be regarded as a wholly irrelevant matter, otherwise it would be impossible for the court to draw any safe line in any particular case. Where is the court to draw the line ? What period is to be allowed to elapse ? What is to be regarded as satisfactory evidence of the intention of the company to go forward into some new venture ? The court clearly is not called on to adjudge the merits or demerits of any scheme, and this fact appears to me to make the consideration by the court of the existence or non-existence of a particular scheme all the less fruitful. If this point were well taken, it would follow that a shareholder who desired a company to be wound up would be well advised, as soon as the resolution for the sale of the company's business had been passed, immediately to put a petition on the file, and bring the petition on in circumstances in which he could accurately allege that there was no scheme before the court.

For these reasons, and treating this case, so far as reasoning is concerned, as completely covered by the judgment of LORD GREENE, M.R., in *Re Kitson & Co., Ltd.* (1), I dismiss this petition with costs.

*Petition dismissed with costs.*

Solicitors : *Slaughter & May* (for the petitioner and the supporting contributories) ; *Linklaters & Paines* (for the opposing contributories).

[*Reported by* B. ASHKENAZI, ESQ., *Barrister-at-Law.*]

---

# HOOD-BARRS *v.* COMMISSIONERS OF INLAND REVENUE,

[COURT OF APPEAL (Lord Greene, M.R., Cohen and Asquith, L.JJ.), November 19, 20, 21, 1946.]

*Income Tax—Liability—Income settled on children—" Settlement "—Transfer of assets—Transfer of shares to daughters as an absolute gift—Dividends declared after transfer—Assessment of settlor in respect of amount of dividends—Recovery from children of amount of tax—Finance Act, 1922 (c. 17), s. 20 (2)—Finance Act, 1936 (c. 34), s. 21 (1), (9) (b) (c).*

*Income Tax—Practice—Appeal—Hearing by two special commissioners—Competence—Income Tax Act, 1918 (c. 40), ss. 62 (5); 137 (1), (4); 230 (2).*

In July, 1938, a father transferred in equal amounts shares to the value of £45,000 to his two daughters who were infants and unmarried, providing the consideration from his own resources. The transfer was absolute, the father not retaining any right or claims in respect of the shares. After the transfer had been effected, dividends were declared amounting to £4,200 for the year ending in April, 1939. The Commissioners of Inland Revenue claimed surtax from the father on this sum on the ground that the transaction was a " settlement " within s. 21 (1) and (9) (b) of the Finance Act, 1936, and, accordingly, the income arising therefrom was to be treated under s. 21 (1) as that of the father. An appeal to the special commissioners by the father was heard by two commissioners and the present appeal was based on a Case stated by them.

HELD : (i) it was competent for two commissioners to hear the appeal and state a Case for the opinion of the High Court.

(ii) for a meeting of special commissioners to be a lawful meeting it was not necessary that all the special commissioners should have been summoned to it.

*Qy.*: whether it was open to the taxpayer to raise the question of the jurisdiction of the special commissioners in an appeal based on a Case stated by those commissioners.

(iii) the transaction entered into by the father was a settlement within s. 21 (1) of the Finance Act, 1936, being a " transfer of assets " within the interpretation section, s. 21 (9) (b) (the transaction mentioned in the latter provision not being confined to revocable transactions) ; in consequence of that settlement and during the life of the father income had been paid for the benefit of the father's children who were infants and unmarried ; and, therefore, the income was to be treated for income tax purposes as the income of the father.

A
(iv) by s. 20 (2) of the Finance Act, 1922, the father was entitled to recover from the children (as " persons to whom the income was payable by virtue or in consequence of the disposition ") the amount of tax paid by him.

(v) per COHEN, L.J. : The father was a " settlor " within the definition of that word in s. 21 (9) (c) of the Finance Act, 1936.

[As to DISPOSITIONS IN FAVOUR OF CHILDREN, see HALSBURY, Hailsham Edn.,
B Vol. 17, pp. 267-270, paras. 537-538 ; and FOR CASES, see DIGEST, Supp., Income Tax. Nos. 575a-575e.]

Cases referred to :—
  (1) Hood-Barrs v. Inland Rev. Comrs. [1945] 1 All E.R. 500 ; Digest Supp.
  (2) R. v. Hood-Barrs [1943] 1 All E.R. 665 ; [1943] 1 K.B. 455 ; 112 L.J.K.B. 420 ;
      168 L.T.408 ; Digest Supp.
  (3) Chamberlain v. Inland Revenue Comrs., [1943] 2 All E.R. 200 ; 25 Tax Cas. 317 ;
C     Digest Supp.
  (4) Quinn v. Pratt (1908), 2 K.B. (Irish) 69.

APPEAL from decision of WROTTESLEY, J. (1). The taxpayer transferred shares to his two daughters, who were infants and unmarried. Dividends having been paid on the shares, the taxpayer was assessed to surtax in the sum of £4,200 for the year ended April 5, 1939, under s. 21 (1) of the Finance Act, 1936. The special commissioners of income tax dismissed an appeal by the taxpayer
D against the assessment and their decision was confirmed by WROTTESLEY, J. (1). The taxpayer now appealed to the Court of Appeal.

Serjeant Sullivan, K.C. and T. J. Sophian for the taxpayer.
Sir David Maxwell Fyfe, K.C., D. L. Jenkins, K.C. and Reginald P. Hills for the Commissioners of Inland Revenue (respondents).

E      LORD GREENE, M.R. : In this appeal two questions are raised. It will be convenient to deal first with the second. This relates to the jurisdiction of two special commissioners to hold a meeting to hear an appeal, and, when requested to do so, to sign a Case. The practice of two commissioners acting alone for the hearing of an appeal has persisted certainly from the year 1877. An example of it is to be found in 1 Tax Cases at p. 138. The practice was challenged by the present taxpayer in an appeal by him against a conviction of perjury which was
F heard by the Court of Criminal Appeal : see Rex v. Hood-Barrs (2). The perjury of which he had been convicted was committed at a hearing of an income tax appeal by him before two special commissioners. He took the point before the Court of Criminal Appeal and also before HUMPHREYS, J., who held the trial, that that was not a properly constituted court. That argument was rejected by the Court of Criminal Appeal for reasons which will appear a little later. There
G is thus a decision, not, it is true, binding on this court, but one of great persuasive authority, to the effect that two special commissioners are competent to hear an income tax appeal.

In the present case the argument has had two branches. First, there is the identical contention which was raised before the Court of Criminal Appeal, namely, that two special commissioners could not form a quorum. The other point was that no meeting of special commissioners could be a lawful meeting
H unless it had been summoned by notice addressed to all the special commissioners, so that, even if two could lawfully form a quorum, the meeting itself would be invalid if the remaining special commissioners had not been called. The Crown is prepared to have these points dealt with on the assumption, which in practice I have no doubt is a right assumption, that no summoning of the whole body of special commissioners ever took place.

Turning back to the question of quorum, not only has the practice subsisted for all these years and not only has a decision been given on it by the Court of Criminal Appeal, but it appears to me that the provisions of the Act are quite

clear on the subject. The position of the special commissioners and their powers in reference to the carrying out of the Income Tax Acts are to be found in the Income Tax Act, 1918, s. 67 (2) which provides :

In cases in which the special commissioners have authority to make, sign or allow assessments, or to hear appeals, they shall possess and exercise all the powers of the additional commissioners and general commissioners with respect to assessments, appeals, and the collection and recovery of tax.

By s. 230 (2) :

Anything required under this Act to be done by the general commissioners, the additional commissioners, the special commissioners, or any other commissioners may, save as otherwise expressly provided by this Act, be done by any two or more commissioners.

One thing is clear, and it is the main reason for the judgment of the Court of Criminal Appeal. Nowhere in this Act is to be found an express provision that the special or other commissioners meeting to hear an appeal are not to act by two of their number as commissionerr. I should have thought that that by itself was sufficient to get rid of the argument that two cannot form a quorum. It is, however, said that there is an express stipulation in the provision in s. 137 (4) of the Act that the appeal is to be decided by a majority of commissioners hearing it, and, if there are only two commissioners sitting, there can be no such thing as a majority. In one sense that may be true. In another sense a majority of a court of two may be considered as consisting of both of them. Unless both are agreed, there is no majority. Whatever the correct practice may be where two commissioners sitting together differ on fact or law, it seems to me impossible to read a provision that the commissioners' decision shall be a decision of the majority as equivalent to an express provision within the meaning of s. 230 (2). I do not think that anything more need be said about the question of quorum, which appears to me to be beyond any possible doubt.

The other question, as to the necessity of summoning a meeting, calls for these observations. First of all, as was pointed out by counsel for the Crown there is no provision anywhere in the Act from beginning to end either saying in terms that all the commissioners shall be summoned to a meeting of the commissioners or indicating any method of summoning such a meeting save in a special case, and there may be more than one. The case we were referred to was that under s. 66 (6), referring to the dismissal of the clerk to commissioners, a meeting of commissioners is to be called for that purpose, and the sub-section provides :

Any such meeting as last aforesaid shall be summoned by a notice in writing, signed by the commissioners, or in Scotland by their respective conveners, and served upon each commissioner qualified for the division.

There is no provision of that kind in relation to the summoning of ordinary meetings of commissioners for any purposes, whether executive or quasi-judicial, but that by itself, of course, would not dispose of the matter. Another point that also by itself does not dispose of the question is what one may call the argument of convenience. It is said that the inconvenience would be so great that it cannot be supposed that Parliament so intended, and it is pointed out that the special commissioners include all the Commissioners of Inland Revenue. That appears in s. 67 (1) which says :

The Commissioners of Inland Revenue, together with such other persons as the Treasury by warrant may from time to time appoint, shall be commissioners for the special purposes of the Income Tax Acts (herein referred to as " special commissioners.")

It would be a strange position if no meeting of special commissioners to hear an appeal could be a valid meeting unless all the Commissioners of Inland Revenue had received a summons to attend a meeting. There again, however, that is not an argument which by itself could carry the day, but it is an indication, if no more than an indication, that Parliament can scarcely have required all the special commissioners to be summoned. That is the more so, perhaps, in that in many cases the special commissioners are the body who hear appeals from the Commissioners of Inland Revenue. I have always understood that where special commissioners sit to hear an appeal from an assessment of surtax made by special commissioners, the commissioners who made the assessment are never invited to form part of the tribunal to hear the appeal. For that there seems to be very good reason, but the matter must depend on the true construction of the Act itself.

It is provided by s. 230 (2), which I have already read, that anything required to be done under the Act may

save as otherwise expressly provided by this Act, be done by any two or more commissioners.

One of the things required to be done under this Act is to hold a meeting. One of the things that is required by implication also to be done is to summon a meeting. The argument on the question of the necessity of summoning all the

A commissioners really depends as its central point on the language of s. 137 (1). That is applicable to the special commissioners, though in terms it relates to the general commissioners.

The general commissioners shall cause notice of the day for hearing appeals to be given to every appellant, and shall meet together for the hearing of appeals from time to time, with or without adjournment, until all appeals have been determined.

B It is said that this is a direction that the general commissioners, and in this case the special commissioners, shall meet together, and that must mean that they shall all be summoned. I do not see why it should mean that they should all be summoned. It seems to me that the words really mean, taking the context of the Act as a whole, the commissioners, who are, by other provisions of the Act, competent to sit as an effective tribunal of appeal, that is to say, two commissioners are competent to sit as an effective tribunal of appeal. When s. 137 (1)

C says : "The general commissioners . . . shall meet together," it means no more than the commissioners who are competent to sit for the appeal shall meet together. I cannot spell out of that any obligation to summon all of the commissioners. One other section of the Act was referred to, namely, s. 62 (5), which provides :

Not less than two additional commissioners shall be competent to form any meeting and any act, authorised by this Act, shall be valid, if done by the authority of the

D majority of the additional commissioners present.

That is made applicable to the case of special commissioners by s. 67 (2), to which I have already referred. That reinforces the argument that two special commissioners are competent to form a meeting. I am reminded that precisely the same point arises under s. 64 (2), which provides :

The general commissioners and additional commissioners and the Land Tax Com-

E missioners respectively shall, for the execution of such of their duties as are required by this Act to be done at a meeting, meet together from time to time, within the times prescribed by this Act within their respective divisions.

That does not appear to carry the argument of the appellant any further on this point.

Therefore, it appears to me, that this point lacks substance. Speaking for myself, I am in entire agreement with the decision of the Court of Criminal

F Appeal on the point of quorum. On the point as to the necessity of summoning all the commissioners in order to constitute a valid meeting, I have already given my reasons.

Before I leave this part of the case, there is another point to which I must make reference. The appeal comes before us by way of Case Stated. That Case Stated was obtained by the taxpayer in the usual way, by expressing dissatisfaction with

G the decision of the commissioners, which was against him, and going through the steps necessary to obtain a Case and bring it before this court. Having done that, he comes to this court and says : " The document on which I am appealing to this Court is a nullity." He justifies himself by pointing out that at the adjourned, not the original, meeting of the special commissioners counsel took the point that two of them were not competent to sit. The special commissioners, in stating the Case, noted that the point had been taken, but followed the autho-

H rity I have referred to, which concluded the matter so far as they were concerned. Now the Case comes to this court. Whether the point was mentioned before WROTTESLEY, J. I do not know, but I think I am right in saying that he does not refer to it in his judgment. However, the taxpayer comes to this court and says : " I am entitled before the Court of Appeal to take the point that this very document is a nullity because it purports to be a decision and a Case Stated, but it cannot lawfully be so owing to the fact that the commissioners had no jurisdiction." It must not be thought for one moment from anything that I have said on the merits that I accept the position that it is open to the taxpayer,

in those circumstances, to raise this point in this way in this court. It seems to me that, if he wished to take exception to the jurisdiction of the tribunal which purported to hear the appeal, there were other means of taking exception to it and ensuring that the tribunal, if he were right in his contention, should consist of at least three commissioners. Those steps he did not take. He proceeded with the hearing and comes now before this court in the way I have indicated. As I say, all I wish to do is to enter a *caveat* to the effect that it must not be taken for one moment that it is competent to him to raise the point in this court. I have dealt with the case on the merits as I see them because it has been argued on the merits, and the Crown was not anxious to have the point dismissed on the ground that it was not open to the taxpayer in these proceedings.

I now come to the matter of substance which was first argued in the appeal. The taxpayer is appealing against an assessment to surtax in respect of sums received by way of dividends by his two infant unmarried daughters on shares in a company. The shares had originally belonged to him, but, at the date of the dividend, they were registered in the names of his two daughters. The manner in which the daughters came to acquire those shares is set out in the Case. The finding of fact is that the shares were transferred to them by the taxpayer without any consideration or restriction. The assessment appealed against was based on the provisions of the Finance Act, 1936, which deals with income settled on children. Section 21 (1) of that Act provides as follows :

Where, by virtue or in consequence of any settlement to which this section applies and during the life of the settlor, any income is paid to or for the benefit of a child of the settlor in any year of assessment, the income shall, if at the commencement of that year the child was an infant and unmarried, be treated for all the purposes of the Income Tax Acts as the income of the settlor for that year and not as the income of any other person.

It was said on behalf of the Crown in the present case that there was a settlement, and, by virtue or in consequence of that settlement, income was paid for the benefit of these infant children, and that that income was to be treated as the income of the present taxpayer. If the word " settlement " in that subsection had been left without any interpretation, I probably would accept the argument that the transaction in the present case could not, in any ordinary sense of the term, be called a settlement, but the legislature found it convenient, as a matter of drafting, to use one word which, *prima facie*, in its ordinary meaning, would not cover everything that the legislature wished to cover, and then, by an interpretation section, provided that it should cover a greatmany other things. The interpretation is to be found in s. 21 (9) (b) :

The expression " settlement " includes any disposition, trust, covenant, agreement, arrangement or transfer of assets.

I must confess, speaking for myself, that I should have felt no difficulty in construing those very plain words. Here is a transaction which falls exactly within the phrase " transfer of assets " because the father, the taxpayer, was found as a fact to have transferred assets, namely, shares, to his infant children. The dividends which they have received clearly accrued to those children by virtue or in consequence of that transfer.

The first argument, however, which was put before us was based on the proposition that the phrase " transfer of assets " cannot include an absolute gift by a parent to a child, and it was pointed out that such a gift was not, apparently, within the mischief of the Finance Act, 1922, which dealt up to a point with benefits conferred by parents on infant children. As I understand it, it was said that, an absolute transfer not being within the mischief of the Act of 1922, it was to be assumed that Parliament viewed such a transaction in a kindly manner and must not be expected to have wished to hit it, but, in talking of the mischief at which a taxing act aims, it is not always easy to see anything which the ordinary man in the street would consider as a mischief. The mischief which taxing Acts often aim at is the mischief that the revenue is not obtaining from certain types of transactions all that it would like to obtain. Therefore, it is common to find that the net is progressively spread wider and wider. I find nothing in the limited scope of the Act of 1922 enabling me to limit in any way what appears to me to be the plain language of the Act of 1936.

A further argument was based on a proposition which, it was said, could be

extracted from the speech of Lord Macmillan in *Chamberlain* v. *Inland Revenue Commissioners* (3). The argument was put in these two ways. First, it was said that the transfer of assets, to fall within the meaning of the interpretation clause, must be something in the nature of a settlement in the ordinary meaning of that word. Junior counsel for the taxpayer, putting it in rather different language, but, I think, intending to make the same point, contended that the expression " transfer of assets " in subs. (9) (b) must be read *ejusdem generis* with the other

A  matters dealt with, all of which were in the nature of settlements in the ordinary meaning of that word. Incidentally, as WROTTESLEY, J. points out in his judgment, the idea of *ejusdem generis* does not seem very applicable to this string of words. COHEN, L.J. in the present case asked, in the course of the argument, the question : " What is the genus to which ' transfer of assets ' belongs ? " He received no answer to that question, but, as WROTTESLEY, J. points out by way of example, a " covenant " need not bear any resemblance to a " settle-

B  ment " in the ordinary sense. A covenant can be, as I pointed out in argument, by deed poll. There can be a covenant for the benefit of a child, without the intervention of a trustee, in a deed poll by a father for the payment of income to his child. I can find no justification for suggesting that such a covenant is excluded from the operation of the section, although it bears no resemblance to anything which, in the ordinary sense of the word, could be described as a

C  settlement. It lies in covenant and nothing else. There is no intervention of a trustee. It is a pure matter of contract by document under seal which is binding on the settlor and can be enforced by the child. I find no justification whatever for accepting the argument that " transfer of assets " can be limited in that way.

Counsel for the taxpayer argued that one can only go to such an interpretation clause as this if it is doubtful whether the transaction in question falls within the word used in the original subsection, namely, in this case the word " settle-

D  ment." In other words, if you find in the word " settlement " in s. 21 (1) something of doubtful import, you then turn to the interpretation clause to see whether that clause throws any light on it. Speaking for the moment without reference to authority, that appears to me to restrict the operation of such an interpretation clause as this in a quite unwarranted and unprecedented manner. The whole object of an interpretation clause expressed in this way I should have thought was to give a word, which, for the sake of convenience, is used in the body of the

E  section, an extended meaning which it would not otherwise bear. Irrespective of what it originally may mean, and taken by itself, it is to have that extended meaning, and I can see no justification in principle or on authority for cutting it down in the way suggested. The arguments addressed to us are based on the language used by LORD MACMILLAN in *Chamberlain* v. *Inland Revenue Commissioners* (3), which arose under the Finance Act, 1938. It was a case of very complicated facts, in which it was alleged by the Crown that the income of a cer-

F  tain company was to be treated as the income of the taxpayer because, by virtue of what was said to be an " arrangement," the shares in question had been put into a certain position by virtue of which infant children were obtaining income. The House consisted of LORD SIMON, L.C., LORD THANKERTON, LORD ATKIN, LORD MACMILLAN and LORD ROMER. I cannot find anything in any of the speeches, omitting for the moment the passage in the speech of LORD MACMILLAN

G  which is relied on, which lends any support to the suggestion that an interpretation clause is to be dealt with in the manner suggested by counsel for the taxpayer. On the contrary, the language used appears to me to point in quite the opposite direction. The section under consideration there was s. 38 of the Act of 1938 which used the same word " settlement." The interpretation is to be found in s. 41 (4) (b) of the Act of 1938, which provides as follows :

H  The expression " settlement " includes any disposition, trust, covenant, agreement or arrangement.

It has not the phrase " transfer of assets " in it as we have here. LORD THANKERTON, with whose opinion the LORD CHANCELLOR and LORD ATKIN agreed, said, [1943] 2 All E.R. 200, at p. 203 :

Further, it seems to me that, while the word " settlement " is defined in the widest terms, the more crucial point is likely to be the determination of what the " property comprised in the settlement " consists of in the particular case.

His opinion was based entirely on the point that the property alleged by the Crown

in that case to be comprised in the settlement was not what was, in fact, comprised in the settlement. On that ground, the Crown failed in the House of Lords.

There is nothing in that language to suggest any narrow construction of the interpretation clause. On the contrary, it is obvious that the members of the House thought it should be widely interpreted. I think LORD ROMER took the same view as to the wide meaning of the interpretation clause, though some of his reasoning was not quite the same as that of the other Lords. It is only from the speech of LORD MACMILLAN that any kind of support for counsel's interpreta-    **A** tion is sought to be extracted. LORD MACMILLAN uses the following words (*ibid.* p. 204) :

I accept the view that the statutory expansion of the term " settlement," which includes an " arrangement," justifies and, indeed, requires a broad application of s. 38 of the 1938 Act.

There LORD MACMILLAN is agreeing with the other members of the House that the interpretation clause is a statutory expansion of the term " settlement."    **B** He goes on, and this is what is relied on :

But a settlement or arrangement to come within the statute must still be of the type which the language of the section contemplates.

That has been read as though it meant that a settlement or arrangement to come within the statute must still be of the type which the word " settlement " in the section contemplates. With all respect, I think it cannot mean that.    **C** If I may say so with the utmost respect, I cannot bring myself to believe that LORD MACMILLAN intended to make a suggestion as to the meaning and operation of such an interpretation clause so subversive as that for which counsel argues. If by any chance that were the meaning of his words, I hope I shall not be thought disrespectful if I say that I would not, sitting in this court, accept that as binding on me, for those words, at the most, are merely *dicta* of one of the noble and    **D** learned Lords.

The argument as presented by counsel for the taxpayer, in my opinion, does scant justice to LORD MACMILLAN, because, as I read LORD MACMILLAN's observation, it is not more than this :—Where you find a word which is interpreted in an interpretation clause, you must look at the section as a whole and see what is the true interpretation in the whole of the context, namely, the whole of the section as related to the type of document with which the section is dealing.    **E** You may limit the meaning of the interpretation clause by reference to that context, as, indeed, you may limit the meaning of any word by reference to the context, but it certainly does not, in my opinion, mean that when you look at the word " arrangement " in the interpretation clause—that was the word which was in issue in that case—you are to limit the scope of that word by reference to the one word " settlement " in regard to which the interpretation    **F** clause is made. If you did that, it would lead to the extraordinary result that no arrangement could be an arrangement unless it were something which could be described as falling within the ordinary meaning, whatever that may be, of the word " settlement." LORD MACMILLAN's proposition, as I interpret it, seems to me to say no more than what is obvious. You never construe a word in a statute, whether it be in the body of the statute or in an interpretation clause, without reference to the context in which it appears. That is not a proposition which    **G** is anything near what was suggested to us by counsel for the taxpayer. I can find no justification for putting any limitation of the kind suggested on the phrase " transfer of assets," which is the phrase we have to deal with here.

There are one or two subsidiary points, certainly one, about which perhaps I may say a word. If a transfer of shares such as we have here is to be regarded as a settlement, and if the parent who transfers them is to be regarded as a settlor (the interpretation of which I perhaps should have read because it includes any    **H** person " who has provided or undertaken to provide funds directly or indirectly for the purpose of the settlement,"), it is said that the settlor, the father, would be struck with liability for tax and would not have the right to recover the tax from his children which is given by the legislature to persons who pay tax on what is artificially treated as their income. The provision under which the settlor who pays tax can recover it is the Finance Act, 1922, s. 20 (2), and it was said that under the language of that subsection the parent in such a case as the present would not be entitled to recover from the children the tax that

he paid on what is said to be notionally his income. It provides :

Where by virtue of para. (b) or para. (c) of sub-s. (1) of this section any income tax or super tax becomes chargeable on and is paid by the person by whom the disposition was made, that person shall be entitled to recover from any trustee or other person to whom the income is payable by virtue of or in consequence of the disposition the amount of the tax so paid.

This subsection is made applicable to the Act of 1936 by s. 21 (5). I cannot see
A how the argument can be supported. The right to recover is a right to recover from any trustee or other person to whom the income is payable. There is no question of any trustee here. The persons to whom the income is payable are the two children. I see no justification for excluding from the wide phrase " or other person to whom the income is payable " the children to or for whose benefit the income is paid. It is suggested that the words " other person " must be limited to cases of trustees, or agents, or other intermediaries, and do not include
B the actual beneficiary children. I can see no justification for that. Indeed, if it were true, it would be possible to defeat the purpose of the Act by omitting any trustee from the disposition. In other words, a disposition by a father in favour of his children direct, as was done here, would escape the taxation, whereas if he were foolish enough to execute a deed in which he assigned the shares to a trustee in trust for his children absolutely it would expose him to liability for tax. It seems to me that the language of the section is not to be construed in such
C a way as to produce so ridiculous a result.

One more argument counsel for the taxpayer advanced. It is that the " disposition, trust, covenant, agreement, arrangement or transfer of shares," mentioned in the interpretation clause of the Act of 1936, must be confined to transactions which in their nature or by virtue of some power are revocable. I can find no justification anywhere for putting any such limit on them.

D COHEN, L.J. : I agree. I only desire to add a very few words. On what I may call the procedural point, I do not think we can get any assistance from the decision in Quinn v. Pratt (4) on which counsel for the taxpayer relied. That Irish case turned on the construction of a provision of the relevant Summary Jurisdiction Act, the terms of which are so different from those of the Income Tax Act that I do not think the case affords us any help in the matter before us. Counsel also relied on that case as giving some support for the procedure his client
E adopted of not applying for any other form of relief, but seeking to raise the question of jurisdiction on this appeal. I do not think it helps that argument either, because in that case what the plaintiff was doing was seeking to treat the order as null and void in an independent action. It may well be that an order made without jurisdiction would have no force in independent proceedings, but that would not help counsel for the taxpayer in the present case. If we were
F to hold the decision of the special commissioners to be invalid, it might be that the taxpayer would find himself still faced with the assessment made by the special commissioners, which had not been challenged.

On the merits, I do not desire to repeat anything on the points with which my Lord has already dealt, but there were two subsidiary points to which I desire to refer. Counsel for the taxpayer, in the course of his argument, having first argued that the transfer of shares was not a transfer of assets within the meaning
G of the interpretation clause, went on to say that, in any event, there was no income because the receipt of dividends was not a receipt of income. He sought to support that argument by saying that it was merely the distribution of assets which already belonged to the shareholders. In my opinion, that is a complete misconception of the rights of a shareholder. He has no property in, nor right to, any particular asset. He has only the right to have all the assets administered by the directors in accordance with the constitution of the company, and his right
H to a dividend only arises when the dividend is declared. I think there can be no doubt, if he desired to commence proceedings to recover that dividend, he could proceed in debt for a debt due from the company. Therefore, in my view, it is true to say that the dividends received by the daughters were payments of income and, as my Lord has already said, the transfer of shares was a transfer of assets.

The last point I wish to deal with is the question raised by counsel for the taxpayer, that in the present case there was no gift of shares but only a gift of cash. I entirely agree with what my Lord has said, that, on the findings of fact of the special commissioners in this case, this point is not open, but I should like

to add that, if it were open, I think the argument which was addressed to us by counsel for the Crown would require consideration. As I followed his argument, it amounted to this. The provision of the sum in question and the transfer of shares were an " arrangement " within the meaning of the interpretation clause. The transfer of the shares was a " transfer of assets," and, in those circumstances, the taxpayer would be a settlor within the meaning of the definition in s. 21 (9) of the Act of 1936. That subsection includes in the definition of settlors

... any person who has provided or undertaken to provide funds, directly or indirectly,  A
for the purpose of the settlement ...

Counsel for the Crown suggested that in the circumstances of this case the taxpayer would fall within that definition. I do not desire to express a concluded opinion on the point, but I only desire to make it clear that, even if counsel for the taxpayer got over the first fence, I do not think he would necessarily have stayed to the end of the course.

ASQUITH, L.J. :  I agree with both judgments which have been delivered and desire to add nothing.

*Appeal dismissed with costs.*

Solicitors :  *J. de Mega & Co.* (for the taxpayer) ; *Solicitor of Inland Revenue* (for the Crown).

[*Reported by* F. GUTTMAN, ESQ., *Barrister-at-Law.*]

---

# R. *v.* MILLS ; R. *v.* LEMON.

[COURT OF CRIMINAL APPEAL (Lord Goddard, C.J., Humphreys and Lewis, JJ.), December 9, 1946.]

*Criminal Law—Evidence—Confession—Confession prompted by verbal information given by confederate of statement—Judges Rules, r. 8.*

By r. 8 of the Judge's Rules :  " When two or more persons are charged  E
with the same offence and statements are taken separately from the persons charged, the police should not read these statements to the other persons charged, but each of such persons should be furnished by the police with a copy of such statements . . . and nothing should be said or done by the police to invite a reply . . ."

Where, however, contrary to this rule, a precis of the confederate's  F
statement was given verbally to the prisoner by the police and the prisoner was asked if he wished to make a reply and then made a confession which was intelligible without evidence being given of the preceding circumstances and of the objectionable question put to him by the police.

HELD :  the confession is admissible.

*R.* v. *Gardner and Hancox* (1) *followed.*

[AS TO CONFESSIONS BY THE ACCUSED, see HALSBURY, Hailsham Edn., Vol. 9,  G
pp. 203-207, para. 291 ; and FOR CASES, see DIGEST, Vol. 14, pp. 410-426, Nos. 4303-4498.]

Case referred to :
    (1) *R.* v. *Gardner and Hancox* (1915), 85 L.J.K.B. 206 ; 114 L.T. 78 ;  80 J.P. 135 ;
        11 Cr. App. Rep. 265 ; 14 Digest 393, *4138.*

APPEAL against a conviction before the Recorder of Bristol.  H
The appellants, Mills and Lemon, were convicted of highway robbery. Statements and questions by the police, contrary to the Judge's Rules, elicited from the prisoners confessions which were given in evidence. The prisoners contended that the confessions were inadmissible. The facts appear in the judgment of LORD GODDARD, C.J.

*Cyril Lavington* for the appellant, Mills.
*F. J. Bate* for the appellant, Lemon.
*C. H. Grundy* for the Crown.

**<u>EXHIBIT K</u>**

A  on the job because if he had done so he would at least have given
some thought to rejoining the Transport union to avoid dismissal.
His refusal to rejoin was not due to any desire to support a moral
principle but was due to the influence of Hammond, whose motives
remain obscure. There is no reason whatever to suppose that he
would have remained as a lockman until he retired at 65, and I
B  think that a fair estimate of his continuance in that employment
would have been five years from his dismissal. An appropriate
round figure to represent his loss would be £425 and there will be
judgment against Mr. Fry and Mr. Harrall for that sum.

1967<br>Morgan<br>v.<br>Fry<br>WIDGERY J.

C
> *Judgment for the plaintiff with*
> *half his costs.*
> *Leave to appeal.*

Solicitors: *Lawford & Co.; Pattinson & Brewer.*

D

[COURT OF APPEAL]

HELY-HUTCHINSON v. BRAYHEAD LTD., AND ANOTHER

1966<br>*Dec.* 15, 16,<br>19, 20, 21

E  [1965 H. No. 3997]

ROSKILL J.<br>———<br>C. A.<br>1967<br>*June* 20, 21,<br>22

*Agency—Authority—Company—Chairman acting as managing director
—Usual business transaction of company—Contract with other
director of same company—Validity.*

*Company—Director—Authority—Power of board of directors to ap-
point managing director—No formal appointment—Chairman
F  acting as de facto managing director and chief executive—Whether
implied authority—Contract for company with another director.*

*Company—Director—Contract with—Director acting in private capa-
city—Validity at common law—Articles of company permitting
contracts by directors subject to disclosure of interest—Interests
not disclosed—Effect—Companies Act, 1948 (11 & 12 Geo. 6, c.
38), s. 199.*

LORD<br>DENNING<br>M.R.,<br>LORD<br>WILBERFORCE<br>and<br>LORD<br>PEARSON

G     R., the chairman of the defendant company, B., acted as its
de facto managing director. He was the chief executive who made
the final decision on any matters concerning finance. He often
committed B. to contracts without the knowledge of the board
and reported the matter afterwards. The board knew of and
acquiesced in that. In July, 1964, the plaintiff, the chairman and
managing director of a public company, P., gave a personal
guarantee to bankers for a loan of £50,000 to P. Towards the

1966
——
Hely-
Hutchinson
v.
Brayhead
Ltd.
——

A

end of 1964 P. was sustaining losses and needed financial assistance.
B. was prepared to help, with the intention eventually to obtain
control of P. In January, 1965, B. bought 750,000 P. ordinary
shares from the plaintiff for over £100,000 and proposed to
inject £150,000 into P. About the same time the plaintiff became
a director of B., but did not attend any board meetings until May
19, 1965. After that meeting, in an office outside, in a discussion
between R. and the plaintiff, the plaintiff agreed to put more

B

money into P. if B. would secure his position. To that end R., on
behalf of B., as chairman signed two letters on B.'s paper dated
May 19, 1965, and addressed to the plaintiff. In one B. purported
to indemnify the plaintiff against loss on his personal guarantee of
£50,000 and in the other B. purported to guarantee to repay money
lent by the plaintiff personally to P. In reliance on those letters
the plaintiff advanced £45,000 to P.

C

Article 99 of B.'s articles of association provided that " A
director may contract with and be interested in any contract . . .
with the company . . . and shall not be liable to account for any
profit made by him by reason of any such contract . . . provided
that the nature of the interest of the director in such contract . . .
be declared at a meeting of the directors as required by . . .
section 199 of the Companies Act, 1948,[1] but no disclosure of
the two contracts was in fact made to the board.

D

Despite the plaintiff's and other advances by B., P.'s
financial position remained hopeless and it went into liquidation.
The plaintiff was called on to honour his guarantee. He paid the
bankers £50,000 and claimed that sum and the £45,000 lent to P.,
from B. B. denied liability contending that R. had no authority
to sign the letters, alternatively, that since the plaintiff had not
disclosed his interest in the contracts as required by article 99 of

E

B.'s articles of association and section 199 of the Companies Act,
1948, the contracts were unenforceable. Roskill J. held that
although R. had no actual authority to enter into contracts, he
had ostensible or apparent authority to do so; that the plaintiff's
breach of article 99 of B.'s articles of association and section 199
of the Act of 1948, only rendered the contracts voidable, not void
or unenforceable; and that the plaintiff was entitled to recover.

F

On appeal by B.:—

*Held*, dismissing the appeal, (1) that, on the facts, R. had
actual authority to be implied from the conduct of the parties and
the circumstances of the case to enter into the two contracts with
the plaintiff (post, pp. 584F, 588E, 592D, 593F).

G

[1] Companies Act, 1948, s. 199
(1): " Subject to the provisions of
this section, it shall be the duty of
a director of a company who is in
any way, whether directly or
indirectly, interested in a contract
or proposed contract with the com-
pany to declare the nature of his
interest at a meeting of the directors
of the company . . . (4) Any director

who fails to comply with the pro-
visions of this section shall be liable
to a fine not exceeding £100. (5)
Nothing in this section shall be
taken to prejudice the operation of
any rule of law restricting directors
of a company from having any
interests in contracts with the
company."

A    *Freeman & Lockyer v. Buckhurst Park Properties (Mangal)
     Ltd.* [1964] 2 Q.B. 480; [1964] 2 W.L.R. 618; [1964] 1 All E.R. 630,
     C.A., applied.

     *Quaere*: Whether a director of a company can rely on
     ostensible authority or on the principle in *Royal British Bank* v.
     *Turquand* (1856) 6 E. & B. 327 when suing on a contract pro-
     fessed to be made on behalf of the company (post, pp. 584ɢ—
B    585ᴀ, 593ɢ—594ᴀ).

     *Per* Lord Denning M.R. Ostensible or apparent authority is
     the authority of an agent as it *appears* to others. It often coincides
     with actual authority. But sometimes ostensible authority exceeds
     actual authority (post, p. 583ᴄ–ᴅ).

     *Per* Lord Pearson. If the question arises between the principal
     and the agent—either of them claiming against the other—actual
     authority must be proved. There is no question of ostensible
C    authority as between those two parties (post, p. 593ꜰ).

     (2) That while section 199 of the Companies Act, 1948, imposed
     a statutory duty of disclosure under sanction of a monetary pen-
     alty, non-disclosure did not render a contract void, but only void-
     able at the instance of the company (post, pp. 585ʙ–ᴅ, 589ᴅ–ᴇ, ɢ),
     for the effect of article 99 was that proper disclosure validated
     a contract which might otherwise be unenforceable at the
D    instance of the company and relieved the director from the
     consequences of the general law relating to contracts uberrimae
     fidei, but that it did not otherwise alter the effects of non-disclosure
     (post, pp. 585ꜰ—586ᴀ, 594ᴅ–ᴇ); and that, accordingly, the
     plaintiff's failure to disclose his interest merely rendered the con-
     tracts voidable and, it being conceded that avoidance was no
     longer possible, both contracts were enforceable by the plaintiff
E    (post, pp. 586ᴀ–ʙ, 591ɢ, 595ᴅ).

     *In re Cape Breton Co.* (1884) 26 Ch.D. 221; (1885) 29 Ch.D.
     795; 1 T.L.R. 450, C.A. and *Transvaal Lands Co.* v. *New Belgium
     (Transvaal) Land and Development Co.* [1914] 2 Ch. 488; 31
     T.L.R. 1, C.A. applied.

     *Kaye v. Croydon Tramways* [1898] 1 Ch. 358; 14 T.L.R. 244,
     C.A. considered.

F    *Semble*, if R. had had no authority he would have been liable
     to the plaintiff for breach of implied warranty of authority
     (post, pp. 586ᴄ, 591ɢ—592ᴀ, 595ᴇ).

     Decision of Roskill J., post, p. 556; [1967] 2 W.L.R. 1312;
     [1967] 2 All E.R. 14 affirmed.

     Aᴘᴘᴇᴀʟ from Roskill J.[2]

G    From about 1956, the plaintiff, Richard Michael John Hely-
     Hutchinson, commonly called Viscount Suirdale, was chairman
     and managing director of Perdio Electronics Ltd. (Perdio), a
     public company from 1962, until its compulsory liquidation in
     October, 1965. In 1956 Lord Suirdale met Anthony James

[2] Post, p. 556; [1967] 2 W.L.R. 1312; [1967] 2 All E.R. 14.

*(right margin:)* 1966
Hely-
Hutchinson
v.
Brayhead
Ltd.

1966

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

Richards, who had an interest in Perdio, which was then a small     A
company.  Subsequently Lord Suirdale acquired a controlling
interest in Perdio while Mr. Richards remained a shareholder
and a director of the company.  Mr. Richards, a professional
accountant, extended his business interests and acquired control of
a company, Surtees Investments Ltd., which in 1962 acquired
control of Brayhead Ltd., (Brayhead), the first defendants.     B
In turn Brayhead expanded under Mr. Richards' direction and
became a public company, acquiring extensive interests, including
interests in the electronic field.  In 1964 and 1965 Brayhead
acquired a number of companies concerned with electronics, with
which Perdio was also concerned.

Business relations between Lord Suirdale and Mr. Richards     C
remained close, based on mutual respect.  At the end of 1964
Perdio began to incur losses; discussions took place between the
plaintiff and Mr. Richards, and on January 1, 1965, " Heads of
Agreement " were drawn up with the object that Brayhead should
ultimately acquire control of Perdio, the intention being that Bray-
head should get some 60 per cent. of the shares in Perdio, thus     D
obtaining effective control.  The agreement provided for the
immediate sale to Brayhead of a total of 850,000 Perdio shares,
as to 750,000 by Lord Suirdale and as to the remaining 100,000
by a Mr. Willmott, so that Brayhead, on payment of 3s. 3d. a share,
would obtain about 30 per cent. of the issued ordinary share capital
of Perdio.  Those shares were sold by Lord Suirdale and Mr. Will-     E
mott to Brayhead and were bought by Brayhead for about £130,000,
of which Lord Suirdale and certain family trusts received a major
share, and Lord Suirdale became possessed, apart from other
considerable assets, of a sum in cash of some £70,000. The agree-
ment also contemplated that, subject to certain checks by
accountants on the net asset values and net earning capacities of     F
Brayhead electronic subsidiaries, Perdio should acquire such
subsidiaries from Brayhead in a return for the issue of Perdio
shares to Brayhead, but that part of it was in fact never carried out,
and in the autumn of 1965 Perdio went into liquidation.  To comply
with the requirements of the London Stock Exchange the directors
of Perdio (including Lord Suirdale and Mr. Richards) gave the     G
brokers Joseph Sebag & Co. an undertaking that they would buy
any of the remaining ordinary shares of Perdio which might be
offered for sale on the London Stock Exchange for not less than
3s. 3d. a share, so that outside shareholders would receive equal
treatment with the directors of Perdio, who were selling their shares
under the agreement.

**1 Q.B.**          QUEEN'S BENCH DIVISION          553

A          As a result of the agreement Lord Suirdale became a director of
Brayhead on January 14, 1965; his appointment was duly filed on
January 25, 1965, and he remained a director until the late summer
of 1965, although he did not attend a board meeting of Brayhead
until May 19, 1965. He never read, or even saw, a copy of the
memorandum and articles of association of Brayhead, and was at
B     all times wholly unaware of their contents. He remained chairman
and managing director of Perdio, and Mr. Richards and his brother
also remained on the board of Perdio.

Towards the end of 1964 Perdio had obtained a revocable
revolving acceptance credit facility from merchant bankers,
Guinness Mahon & Co. Ltd., in the sum of £50,000 and on July 20,
C     1964, Lord Suirdale had given his own personal guarantee to
Guinness Mahon in respect of that acceptance credit facility. That
and Perdio's overdraft facilities were insufficient, and after January
1, 1965, Brayhead agreed to inject into Perdio the sum of £150,000
in cash. In addition to the revolving acceptance credit facility with
D     Guinness Mahon, and to the overdraft facilities with their bankers
and to the £150,000 promised by Brayhead, of which only £125,000
was advanced before May 19, 1965, Perdio had the benefit of
substantial acceptance credits from other merchant bankers,
Kleinwort Benson. In order to help Perdio, Brayhead, in addition
to making available the sum of £125,000, took over as their own
E     liability the liability to Kleinwort Benson hitherto borne by Perdio,
so becoming deeply involved in the financial affairs of Perdio in
the hope of the position improving during the summer and autumn
of 1965.

By the beginning of May, 1965, however, it was clear that
matters were becoming extremely serious. A report dated June 9,
F     1965, by a Mr. Harle (a senior accountant with Brayhead), sent by
him both to Lord Suirdale and to Mr. Richards on or about that
date, showed the financial pressure upon Perdio as at that date, and
that the estimated shortfall as at September 30, 1965, would not be
far short of £300,000. Both Lord Suirdale and Mr. Richards thought
G     that estimate was somewhat pessimistic, but they both realised that if
Perdio were to be kept going drastic action would have to be taken,
and that there was no other source of finance available than them-
selves. Lord Suirdale had £70,000 in cash readily available; Bray-
head had not at that time provided the whole of the £150,000,
and in a discussion between them Lord Suirdale made it plain to
Mr. Richards that if he were going to lend his own money to Perdio,

*1966*

*Hely-
Hutchinson
v.
Brayhead
Ltd.*
—

A    first, he must be relieved of the liability to purchase the shares
of the other shareholders in Perdio, and, secondly, he must be
relieved of his liability to Guinness Mahon.

On May 19, 1965, there was a board meeting of Brayhead
at which the draft accounts of Perdio were discussed and a report
was made of the purchase of 850,000 ordinary shares in Perdio.
B    Lord Suirdale informed the board of directors about the closing
of the Sunderland factory of Perdio and Mr. Richards pointed out
that Brayhead had agreed to lend £150,000 to Perdio and had
accepted responsibility for the Kleinwort Benson acceptance credits.
Mr. Richards said nothing about what was to happen at the con-
clusion of the board meeting. After the meeting Mr. Richards
C    and Lord Suirdale met in Mr. Richards' office, and their discussion
was continued. The agreement reached was that the plaintiff,
subject to that amount being available, was willing to advance up
to £70,00 to Perdio provided that Brayhead gave him the necessary
protection in regard both to his contingent liability to the open-
market shareholders in Perdio and his liability to Guinness Mahon,
D    but there was no binding oral contract by the plaintiff to advance
£70,000 to Perdio. After that stage was reached in the negotiations
four documents were signed, first C. 24 and C. 25, and then C. 23
and C. 26. C. 25, which was signed by the plaintiff, for Brayhead
(by Mr. Surtees) for Surtees Investments Ltd., and by certain
E    directors of Brayhead who were also shareholders in Perdio, was
an agreement by the signatories that they would take up certain
Perdio shares publicly held. C. 24 was a letter, dated May 19, 1965,
addressed to the plaintiff reading: " It is hereby agreed that your
maximum liability under the supplementary agreement signed will
be £10,000, or more at your option and Brayhead Ltd. will take up
F    any additional shares offered by shareholders," and was signed
by Mr. Richards on behalf of Brayhead: Mr. Richards thought
the other Brayhead directors who signed C. 25 had probably seen
the letter or were aware of its contents. C. 23, called an indemnity,
read:

G    　　　" re: Perdio Electronics Ltd.—Acceptance Credits. Dear Lord
　　　Suirdale, This letter may be taken as an undertaking to
　　　indemnify you against any loss which may occur by you having
　　　to fulfil your personal guarantee to Guinness Mahon & Co.
　　　Ltd. for a figure not to exceed £50,000. It is agreed that the
　　　consideration for this indemnity will be a personal loan by you
　　　to Perdio Electronics Ltd. in a sum not exceeding £10,000.
　　　Yours sincerely,"

A   and it was signed " A. J. Richards, Chairman."

C. 26, called a guarantee, was similarly headed, and read:
"It is hereby agreed that Brayhead Ltd. will guarantee
repayment of any moneys loaned by you personally to Perdio
Electronics Ltd. It is a condition of this guarantee that at
least six months' notice will be given by you to Brayhead Ltd.
should the guarantee have to be implemented,"

B

and it was signed " Yours sincerely, A. J. Richards, Chairman."

By June 11, the plaintiff had advanced a total of £45,000 to
Perdio, because of and in reliance on the promises contained in
C. 23 and C. 26, and upon the authority which Mr. Richards
appeared to have to sign them on behalf of Brayhead. Despite
C   those advances, and a further £17,500 advanced by Brayhead,
Perdio required more money. At about the same time Guinness
Mahon had frozen part of the plaintiff's bank account, as a result
of which the funds out of which he had hoped to advance the
remainder of the £70,000 were not available to him. Subsequently
£10,000 and £15,000 was advanced to Perdio by Brayhead and by
D   Mr. Richards and his brother, and ultimately, on September 27,
the plaintiff gave a formal notice of resignation from the board of
Brayhead. The giving of the guarantee and indemnity were not
reported to any board meeting of Brayhead, nor was the interest
in them of the plaintiff and Mr. Richards formerly disclosed in
accordance with section 199 of the Companies Act, 1948, and
E   article 99 [3] of Brayhead's articles of association.   No formal
appointment of Mr. Richards as managing director by Brayhead
had ever been made, although Brayhead's articles of association
contained an express power to do so, but Mr. Richards at all times
acted as chief executive and managing director, as well as chair-
man, and never thought that there was any limitation on his right
F   to sign the documents.

On November 17, 1965, the plaintiff, who had had to meet his
obligations to Guinness Mahon, issued a writ against Brayhead
claiming almost £100,000 in respect of principal and interest under
C. 23, and a declaration that he was entitled under C. 26 to recover
the £45,000 lent to Perdio with interest thereon. At the trial it was
G   conceded that, since the six months' period for notice under C. 26
had by then expired, the position under both documents was the
same and the whole claim could be treated as one for both sums.
Brayhead, inter alia, denied the authority of Mr. Richards to sign
the documents and contended, inter alia, that the contracts were
unenforceable.

[3] See post, p. 559e.

1966

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

The contentions raised by the pleadings are more fully referred    A
to in the judgment of Roskill J. (post).

*R. A. MacCrindle Q.C.* and *G. Slynn* for the plaintiff.
*M. Finer Q.C.* and *R. Instone* for the defendants.

The following cases, in addition to those referred to in the    B
judgment, were cited in argument: *British Thomson-Houston Co.
Ltd.* v. *Federated European Bank Ltd.*[4]; *B. Liggett (Liverpool)
Ltd.* v. *Barclays Bank Ltd.*[5]; *Kreditbank Cassel G.m.b.H.* v.
*Schenkers Ltd.*[6]; *A. L. Underwood Ltd.* v. *Bank of Liverpool*[7];
*William Irvine* v. *Union Bank of Australia*[8]; *Cavendish Bentinck*
v. *Fenn*[9]; *Biggerstaff* v. *Rowatt's Wharf Ltd.*[10]; *Ladywell Mining*    C
*Co.* v. *Brookes*[11]; *Transvaal Lands Co.* v. *New Belgium (Trans-
vaal) Land and Development Co.*[12]

ROSKILL J. Were it not that it is now rather later than the
eleventh hour on the eve of the Christmas vacation I should have
preferred to put my judgment in this case into writing in view of    D
its importance to the parties and the number of difficult points to
which it gives rise, but having regard to the admirable arguments
to which I have listened on both sides and to the conclusions
which I have reached I propose to give my judgment at once,
notwithstanding the obvious attendant disadvantages of so doing.

The plaintiff, Lord Suirdale, sues the first defendants, Brayhead    E
Ltd. (to whom I will refer as " Brayhead "), upon two documents
both dated May 19, 1965, documents C. 23 and C. 26. The total
sum which he seeks to recover under those two documents is not far
short of £100,000. Those two documents on their face were clearly
given on behalf of Brayhead, being on their headed writing paper.
Each was signed by the second defendant, Mr. Anthony James    F
Richards, in his capacity as chairman of Brayhead, which is a
public company whose shares are quoted on the London Stock
Exchange, a post which he still holds. By their original defence in
this action (the defence has since been amended a number of times)
the first defendants denied the authority of Mr. Richards to sign
those two documents. Accordingly Lord Suirdale joined Mr.    G

---

[4] [1932] 2 K.B. 176, C.A.
[5] [1928] 1 K.B. 48; 43 T.L.R.
449.
[6] [1927] 1 K.B. 826; 43 T.L.R.
237, C.A.
[7] [1924] 1 K.B. 775; 40 T.L.R.
302, C.A.

[8] (1877) 2 App.Cas. 366, P.C.
[9] (1887) 12 App.Cas. 652.
[10] [1896] 2 Ch. 93, C.A.
[11] (1887) 35 Ch.D. 400; 3 T.L.R.
546, C.A.
[12] [1914] 2 Ch. 488; 31 T.L.R. 1,
C.A.

A Richards as second defendant, claiming in the alternative against him damages for breach of warranty of authority, and saying that if (which Lord Suirdale denied) there was no authority in Mr. Richards to sign those two documents, Mr. Richards had, in all the circumstances, warranted his authority to sign them on behalf of Brayhead so as to render Mr. Richards personally liable for the sums which Lord Suirdale could not recover from Brayhead, by
B reason of the alleged lack of authority in Mr. Richards to do that which he purported to do.

The history of this matter is long and complicated, and it is necessary to go into a certain amount of back history in order to understand the events of the early part of 1965 which culminated
C in a meeting between Lord Suirdale and Mr. Richards on May 19, 1965 (immediately after a board meeting of Brayhead), at which meeting between Lord Suirdale and Mr. Richards these two documents came into existence.

[His Lordship considered the evidence and stated the facts substantially as set out above, and continued:] It was suggested, and
D pleaded by an amendment which I gave leave to make, that Lord Suirdale had promised without qualification to advance £70,000. I have no hesitation in finding that he did not. I think that on May 19 both parties were negotiating, and when the documents sued upon were signed were contracting in both documents, with reference to this position: Lord Suirdale had £70,000 available but
E he was by no means certain that all that sum was going to be available for Perdio. He was willing, subject to that sum being available, to advance that sum, or up to that sum, provided that he got out of Brayhead, that is to say, Mr. Richards acting on behalf of Brayhead, the necessary protection as respects both his contingent liability to the open-market shareholders in Perdio and his
F Guinness Mahon liabilities. I have no hesitation whatever in finding that there was no express oral contract to lend £70,000 without qualification, and if Mr. Richards thought otherwise he was in fact wholly mistaken. I am convinced that Lord Suirdale made the position abundantly clear to him.

It was pleaded, again only by way of amendment, that the
G provision of the £70,000 was a condition precedent to any liability under C. 23 and C. 26. Even if I were wrong—which I am convinced I am not—in what I have just said, I should find it impossible to hold, even on Mr. Richards' own evidence, that there was here anything approaching a condition precedent or what was suggested as being a fundamental term of the bargain. [His Lordship referred to the documents C. 23 and C. 26, and continued:]

1966

Hely-
Hutchinson
v.
Brayhead
Ltd.
—
ROSKILL J.

1966
———
Hely-
Hutchinson
v.
Brayhead
Ltd.
———
ROSKILL J.
———

It is necessary to deal with one or two points in relation to the  **A**
events of June 11, or thereabouts. It is suggested, first, that as a
result of the non-advance by Lord Suirdale of the balance of £25,000
the alleged condition precedent to liability under C. 23 and C. 26,
the advance of £70,000, was broken; secondly, that Lord Suirdale
thereby repudiated the contract in consideration of which C. 23
and C. 26 were given; and, thirdly, and I think alternatively, that  **B**
in the circumstances both parties agreed that the whole deal should
be called off.

I have already said that there was no binding contract to
advance £70,000 and that really disposes of the first two of those
points. But, as I said earlier, even had I found otherwise, I would
find it quite impossible to say that the alleged agreement to advance  **C**
£70,000 was a condition precedent so that the guarantee was not
to attach until the whole £70,000 had been advanced, and that, in
other words, Lord Suirdale was to be responsible for every penny
advanced up to £70,000 and would have no claim if he advanced
only £45,000 or any lesser sum than £70,000. That suggestion
seems to me to be without any commercial reality whatever and  **D**
I reject it. Secondly, I am satisfied that there was never any
repudiation by Lord Suirdale of his obligations. Thirdly, I am
equally clear that there was never any agreement by Lord Suirdale
to forgo or abandon his rights under C. 23 and C. 26 (whatever they
may have been) because he had only advanced £45,000 and not
£70,000.                                                                  **E**

Those points in the end were not seriously pressed by Mr. Finer
but they were canvassed during the trial, they were put to Lord
Suirdale in cross-examination and, therefore, for completeness I
must make my findings upon them. [His Lordship referred to the
subsequent history of the matter, and continued:]

The defences, apart from those of which I have already disposed  **F**
by my findings of fact, can be summarised in this way: First, it is
said that there was in Mr. Richards at the time he signed those
documents no actual authority and no ostensible or apparent
authority. Second, it is said that if, contrary to the latter of those
defences, there would have been ostensible or apparent authority
upon which a "stranger" or a "third party" could rely in  **G**
accordance with what is sometimes called the rule in *Royal British
Bank* v. *Turquand*,[1] yet Lord Suirdale was at all times a director
of Brayhead and though he had not read the articles of association
he must be treated for all purposes as having been put on notice

———
[1] (1856) 6 E. & B. 327.

A   of the contents of those articles, including article 99, which in
    turn refers to section 199 of the Companies Act, 1948, and must
    be taken to have been aware of any lack of authority and could not
    rely upon the ostensible or apparent authority of Mr. Richards.
    Thirdly and independently, it was said that upon the cases—of
    which there are a very large number—dealing with the position

B   where a third party relies upon an act done with apparent or
    ostensible authority, the rule in *Turquand's* case [1] had no present
    application because the transactions in question were not " usual "
    transactions within the meaning of those cases both because of
    their own nature and because in entering into these contracts Lord
    Suirdale had acted in breach of his obligations and duties under

C   article 99 and/or section 199 of the Companies Act.

        It was said, fourthly, that by reason of the provisions of article
    99 both Lord Suirdale and Brayhead had no contractual capacity,
    or at least Lord Suirdale had no contractual capacity, and that
    for that reason these contracts, all else apart, were void or voidable
    or at least unenforceable. Mr. Finer was not prepared to take his

D   argument to the extent of saying that these contracts were, by
    virtue of section 199 or article 99, illegal, though he argued in the
    alternative that at the worst for his clients, these were unenforceable
    unless and until the provisions of that section or that article had
    been complied with.

        Article 99 reads:

E       " A director may contract with and be interested in any
        contract or proposed contract with the company either as
        vendor, purchaser or otherwise, and shall not be liable to
        account for any profit made by him by reason of any such
        contract or proposed contract, provided that the nature of the
        interest of the director in such contract or proposed contract
        be declared at a meeting of the directors as required by and

F       subject to the provisions of section 199 of the Act. No director
        shall vote as a director in respect of any contract or arrange-
        ment in which he shall be interested, and if he do so vote his
        vote shall not be counted . . ."

        Within these major points which I have mentioned there are a
    number of other points which have to be dealt with. I think the
G   right starting-point is to deal with the question of ostensible or
    apparent authority. Mr. MacCrindle did not put ostensible or
    apparent authority in the forefront of his argument. He claimed
    first that there was here implied authority in Mr. Richards by
    virtue of the position which he occupied as chairman of directors
    and de facto managing director.

                            [1] 6 E. & B. 327.

1966

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

ROSKILL J.

560                              QUEEN'S BENCH DIVISION                    **[1968]**

1966

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

ROSKILL J.

It is convenient to say at this point that although, as one would **A**
expect, the articles of Brayhead contain power to appoint a
managing director (see art. 90), no formal appointment of a
managing director was ever made. But I have no doubt at all, on
the evidence to which I have listened and from what I have read
in the documents, that Mr. Richards was at all times in the position
of a managing director and was running Brayhead as if he were **B**
its managing director, and that he was at all times its chief
executive in addition to being chairman.

The question to what extent there may be implied authority
in a chairman or managing director acting as such as distinct from
express authority, so as to bind a company to acts done by him in
the course of his duties as chairman or managing director or chief **C**
executive, is one of considerable difficulty and one upon which
there appears to be little or no relevant authority. The conception
of implied authority in such a person as distinct from express
authority is not easy having regard to the cases on this branch of
the law on ostensible or apparent authority. I was urged by Mr.
MacCrindle that as Mr. Richards was both chairman and de facto **D**
managing director there was for that reason alone implied authority
in him to do what he did. I have some difficulty in accepting that.
I would not be prepared to hold that there is implied authority
in a chairman of a company, merely by reason of his office, to do
what Mr. Richards did in this particular case in signing C. 23 and
C. 26. I do not think that mere status, derived from the holding **E**
of a particular office such as chairman or managing director or
chief executive, of itself implies an authority which would not
otherwise exist.

There may be cases where such an implication can be made,
but I do not propose to decide this issue on this point because I **F**
am quite satisfied, for the large number of reasons I shall endeavour
to give, that there was ostensible or apparent authority in Mr.
Richards to do what he did.

The set-up in Brayhead is easy to envisage. It was an industrial
holding company with a large number of subsidiaries. Its directors
were in the main working directors, each in charge of a section **G**
of the holding company's subsidiaries. One would look after
electronics, another engineering, and so on. They would all come
back to Mr. Richards for advice and—which is more important—
decision from time to time on matters concerning their own
particular group. The final decision—and the final decision most
especially on any matter concerning finance—was Mr. Richards'

A  and nobody else's. Sometimes, I dare say, the directors persuaded
him to take or to refrain from taking a particular step; no doubt,
like any wise chief executive, he sought and obtained advice before
he made up his mind; but in all these cases the final decision,
I am quite satisfied, rested with him and with nobody else.

   If one goes through the minutes and documents which have been
B  put before me, one can see repeated examples of Mr. Richards
acting in this way. Sometimes, of course, the matter would come
back to the board for formal ratification after he had committed
Brayhead, perhaps technically without express authority. On other
occasions, of which there are a number of examples in the minutes,
he plainly committed Brayhead and then, as it were, reported the
C  matter afterwards. There is a striking example of this, as Mr.
MacCrindle pointed out, in connection with a Mr. Short and his
company. It is worth noting that in connection with the agreement
to advance £150,000 to Perdio and the taking over of the Kleinwort
Benson acceptance credits there is no reference that I can find until
a much later date, May 19, 1965, to Mr. Richards having reported
D  this or obtained formal authority to enter into these commitments.
More important, perhaps, in this connection is what is revealed
by one of the documents early in the C bundle, that Mr. Richards,
acting for Brayhead, varied the agreement of January, 1965, by a
document signed by him "A. J. Richards. A director duly
authorised for and on behalf of Brayhead Ltd." This came to the
E  notice of Brayhead's then solicitors, who wrote a letter to Mr.
Bond saying it would be necessary for the directors to ratify the
signing of that document and enclosing a draft minute for this
purpose. That minute, I am told by Mr. Bond, was never in fact
signed. I can understand that sort of thing happening in a busy
office, but the importance of the point is not that the minute was
F  not signed, but that the whole incident is illustrative of the sort
of thing which Mr. Richards was doing. It is just what one would
expect a busy man in his position to do. I have no doubt that the
board knew that he was doing this sort of thing all the time, and
that whenever he thought it was necessary he assumed, or purported
G  to assume, authority to bind Brayhead, and that the board allowed
him to do it and acquiesced in his doing it. That is not to say, to
use Mr. Finer's phrase yesterday, that all the directors were " Yes
men "; I am sure they were nothing of the kind. Mr. Richards was
a forceful personality; he knew his own mind. I think he quite
clearly was allowed by Brayhead to hold himself out as having
ostensible or apparent authority to enter into commitments of

*1966*

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

ROSKILL J.

562                    QUEEN'S BENCH DIVISION                    **[1968]**

1966

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

ROSKILL J.

A    the kind which he entered into, or purported to enter into, when he signed C. 23 and C. 26. As I have already said, the defendants have not sought to say that the commitments were entered into without authority.

It seems plain on the cases that if Lord Suirdale was a "third party," as it is sometimes called, or an outside party, or a B    "stranger" in relation to these transactions, he would prima facie be entitled to rely upon the rule in *Royal British Bank* v. *Turquand*.[2] I would respectfully borrow the statement of that rule from the language which Lord Simonds in turn borrowed from Halsbury's Laws of England, Vol. 5, 2nd ed. (1954), p. 423, in his speech in *Morris* v. *Kanssen*.[3] Lord Simonds said[4]:

C        "The so-called rule in *Turquand's* case[5] is, I think, correctly stated in Halsbury's Laws of England, Vol. 5, 2nd ed. (1954), p. 423: 'But persons contracting with a company and dealing in good faith may assume that acts within its constitution and powers have been properly and duly performed and are not bound to inquire whether acts of internal management have been regular.'"

D    The cases on this branch of the law are numerous, and until recently they were by no means easy to reconcile. They extended over more than a century and, until the recent decision of the Court of Appeal in *Freeman & Lockyer* v. *Buckhurst Park Properties (Mangal) Ltd.*,[6] were by no means easy to understand. But I am absolved from any detailed consideration of the earlier cases E    by the fact that in the *Freeman* case[6] the Court of Appeal exhaustively reviewed and analysed those earlier cases, and laid down, in terms which are binding upon me, what the law applicable to this part of the case is.

I do not want to lengthen this judgment by extensive citations from the judgments of Willmer, Pearson and Diplock L.JJ., but F    there are one or two passages from which I should quote.

Towards the end of his judgment Willmer L.J. said[7]:

        "The plaintiffs here rely on the fact that Kapoor"—who was the director of the defendant company concerned—"to the knowledge of the defendant company's board, was acting throughout as managing director, and was therefore being held out by the board as such. The act of Kapoor in engaging G    the plaintiffs was clearly one within the ordinary ambit of the authority of a managing director. The plaintiffs accordingly

---

[2] 6 E. & B. 327.
[3] [1946] A.C. 459; 62 T.L.R. 306; [1946] 1 All E.R. 586, H.L.
[4] [1946] A.C. 459, 474.
[5] 6 E. & B. 327.

[6] [1964] 2 Q.B. 480; [1964] 2 W.L.R. 618; [1964] 1 All E.R. 630, C.A.
[7] [1964] 2 Q.B. 480, 497.

1966

Hely-
Hutchinson
v.
Brayhead
Ltd.

ROSKILL J.

A    do not have to inquire whether he was properly appointed.
It is sufficient for them that under the articles there was in
fact power to appoint him as such."

The end of the headnote summarises another passage in
Willmer L.J.'s judgment [8] where, after referring to three cases on
this branch of the law, it says that these

B        " are cases of unusual transactions in none of which were the
         plaintiffs in a position to allege that the person with whom
         they contracted was acting within the scope of such authority
         as one in his position would be expected to possess."
     Pearson L.J. said [9]:

         " On the facts as found the plaintiffs were entitled to rely
C        on Kapoor's ostensible authority to give them instructions on
         behalf of the company because there was a holding out of
         Kapoor by the company as its agent to conduct its business
         within the ordinary scope of that business. The expressions
         ' ostensible authority ' and ' holding out ' are somewhat vague.
         The basis of them, when the situation is analysed is an estoppel
         by representation."

D    Diplock L.J. summarises the relevant law in these words [10]:

         " If the foregoing analysis of the relevant law is correct, it
         can be summarised by stating four conditions which must be
         fulfilled to entitle a contractor to enforce against a company
         a contract entered into on behalf of the company by an agent
         who had no actual authority to do so. It must be shown:
         (1) that a representation that the agent had authority to enter
E        on behalf of the company into a contract of the kind sought
         to be enforced was made to the contractor; (2) that such
         representation was made by a person or persons who had
         ' actual ' authority to manage the business of the company
         either generally or in respect of those matters to which the
         contract relates; (3) that he (the contractor) was induced by
         such representation to enter into the contract, that is, that he
F        in fact relied upon it; and (4) that under its memorandum
         or articles of association the company was not deprived of
         the capacity either to enter into a contract of the kind sought
         to be enforced or to delegate authority to enter into a contract
         of that kind to the agent."

     Let me first dispose of the fourth point. There is no suggestion
     that what Mr. Richards purported to do on May 19 was ultra
G    vires Brayhead. No such defence was pleaded and Mr. Finer
     expressly disclaimed any reliance upon such a defence.

     Coming back to the first of Diplock L.J.'s points, I have no
     doubt whatever Mr. Richards represented to Lord Suirdale that

[8] [1964] 2 Q.B. 480, 491, 494.     [10] Ibid. 505, 506.
[9] Ibid. 498.

1966

Hely-
Hutchinson
v.
Brayhead
Ltd.

Roskill J.

he had authority, on behalf of Brayhead, to enter into contracts of this kind. On his second point I have no doubt that Mr. Richards was, by virtue of his position as de facto managing director of Brayhead or, as perhaps one might more compendiously put it, as Brayhead's chief executive, the man who had, in Diplock L.J.'s words, " actual authority to manage," and he was acting as such when he signed those two documents. I have already said I have not the slightest doubt that Lord Suirdale was induced to advance the £45,000 by the representations which were made to him.

What is first said in answer to those contentions is this: Well, never mind about that. Lord Suirdale was a director of Brayhead, and as a director of Brayhead (even though there would, vis-à-vis a true third party, be ostensible or apparent authority) Lord Suirdale cannot take advantage of the rule in *Turquand's* case [11] because be is not, for the purposes of that rule, a " stranger," or an " outsider," or a " third party," whichever phrase one chooses to use.

Mr. Finer, naturally, based this branch of his argument upon the decision of the House of Lords, to which I already referred, in *Morris* v. *Kanssen*.[12] The complex facts of that case are summarised in the headnote. Suffice it to say that Mr. Morris, the appellant, had thought that he was a director of a company when he was not a director and he thought he had acquired certain shares in that company, having along with other purported directors purported to allot them to himself. He sought to rely upon the rule in *Turquand's case* [13] for the purpose of establishing rights against the respondent, Kanssen. Lord Simonds, who delivered the leading speech, rejected the argument (the argument appears previously to have been rejected in the Court of Appeal in the judgment of Lord Greene M.R.[14]). After stressing [15] that Morris had been himself acting as a director in the allotment and issue of the shares to himself and others and that he was at all times the officer and agent of the company for that purpose, his Lordship said [16]:

> " What then is the position of the director or acting director who claims to hold the company to a transaction which the company has not, though it might have, authorised? Your Lordships have not in this case to consider what the result might be if such a director had not himself purported to act on behalf of the company in the unauthorised transaction.

[11] 6 E. & B. 327.
[12] [1946] A.C. 459.
[13] 6 E. & B. 327.

[14] [1944] Ch. 346, 356–359.
[15] [1946] A.C. 459, 474.
[16] Ibid. 475.

**1 Q.B.**                QUEEN'S BENCH DIVISION                565

A

For here Morris was himself purporting to act on behalf of the company in a transaction in which he had no authority. Can he then say that he was entitled to assume that all was in order? My Lords, the old question comes into my mind, ' Quis custodiet ipsos custodes?' "

1966

Hely-
Hutchinson
v.
Brayhead
Ltd.

Roskill J.

Later his Lordship said [17]:

B

" Admit, as to my mind one must admit, that a director is not for the purpose of the rule in the same position as a stranger; then it is as immaterial how long he has been a director, as it is whether he is an idle or diligent director or a robust or sick director."

It must be observed in relation to the two passages which I have just read that Morris, the alleged director, in doing what he did, had been acting for and on behalf of the company. As I read Lord Simonds' speech it was the fact that he had been acting for and on behalf of the company which disentitled him later to turn round as allottee of the shares and seek to take advantage of the rule in *Turquand's* case [18] in his own favour.

C

Mr. Finer, at a very late stage of the trial, produced a case which perhaps more nearly supported the proposition for which he contends on this branch of his argument than any other, namely, *Howard* v. *Patent Ivory Manufacturing Co.*[19] The facts can be briefly stated. That company was to be formed at the instigation of a number of persons, of whom one was called Jordan and another was called Commans, and was to acquire an invention and certain related patents. The company was then formed. The consideration for the purchase was to be £36,500 payable as to £6,500 in cash to Jordan, who had become a director, and as to £30,000 by the allotment to Jordan and Commans of fully paid-up shares. The borrowing powers of the company were limited to £1,000 at any one time. Unfortunately at a meeting at which Jordan was present as a director it was resolved that Jordan should receive (and Jordan agreed to accept) £3,000 in cash and £3,500 in certain debenture stock, which was issued in breach of the limitation upon borrowing powers to which I have just referred. Later the company went into liquidation. Jordan and another sought to enforce the debentures against the liquidators.

D

E

F

G

I need not read anything in Kay J.'s judgment until towards the end [20]:

" But then a very much more serious question has been raised, and that is this. These debentures were issued by the directors, and it is said that the power of the directors

[17] [1946] A. C. 459, 476.
[18] 6 E. & B. 327.
[19] (1888) 38 Ch.D. 156.
[20] Ibid. 170.

QUEEN'S BENCH DIVISION                    **[1968]**

1966
Hely-
Hutchinson
v.
Brayhead
Ltd.

Roskill J.

to issue debentures is limited, and the limit is very plain when A
you look at article 95," and his Lordship read it, and con-
tinued: " So that when the directors have borrowed up to
£1,000, and there are existing loans unpaid to that amount,
the borrowing power of the directors is exhausted, and no
more can be borrowed without the authority of a general
meeting of shareholders. Then the next clause is: ' To secure
the repayment of any moneys so borrowed, together with the B
interest, by debentures.' Therefore the directors could only
issue valid debentures for moneys borrowed by themselves,
without the assent of a general meeting, to the extent of the
borrowing power. Beyond that, in order to authorise them-
selves to borrow and to issue debentures, there must be the
assent of the general meeting.

" Now in this case, unfortunately for the holders of these C
debentures, they are all directors, and therefore the well-
known authority which makes it unnecessary to see whether
the internal regulations of a company have been observed
or not do not apply; because, of course, the directors must
be taken to know that the internal requirements of the com-
pany had not been observed in the case of these debentures.
Accordingly, I am very sorry to say that I cannot treat the
debentures as valid to the extent of more than £1,000." D

The present defendants rely upon this statement of the law
as showing that a director dealing with a company of which he
is a director must be taken for all purposes to have knowledge
of the powers and obligations of and limitations on those powers
under the articles. As I read Lord Simonds' speech in *Morris* v.
*Kanssen*,[21] his Lordship was expressly dealing with a case where E
the director, Morris, had been acting on behalf of the company
in relation to the matter there in question, namely, the purported
allotment of shares to himself. Similarly in *Howard's* case [22]
the directors, including Jordan, were acting as directors on behalf
of the company in connection with the issue and allotment of the
debentures to Jordan and others. But do those cases go so far F
as to compel a court to say that where a director of a company
not acting as such but in his personal and individual capacity
makes a contract with that company which in relation to that
contract acts not by that director but by another director who is
in fact the chairman and chief executive of that company, the
individual director is to be treated as possessed of constructive G
knowledge (for Lord Suirdale had no actual knowledge) of any
defect in the authority of that other director, so as to exclude the
operation of the rule in *Turquand's* case,[23] notwithstanding that

[21] [1946] A.C. 459.            [23] 6 E. & B. 327.
[22] 38 Ch.D. 156.

**1 Q.B.**                QUEEN'S BENCH DIVISION                567

1966

Hely-
Hutchinson
v.
Brayhead
Ltd.

Roskill J.

A   other director's representations as to his authority. It is quite plain that Lord Simonds was not dealing with such a case, because he said [24]:

> " Your Lordships have not in this case to consider what the result might be if such a director had not himself purported to act on behalf of the company in the unauthorised transaction."

B

Nor do I think that Kay J. had such a case in mind.

Lord Suirdale did not act on behalf of Brayhead in relation to the allegedly unauthorised transaction. But both Mr. Finer and, in his admirable argument following his leader, Mr. Instone said it was enough to exclude the operation of the rule in C   *Turquand's* case [25] that Lord Suirdale was a party to the transaction and was a director of Brayhead, even though he did not act for Brayhead. With the utmost respect to that argument and the skill with which it was advanced both by Mr. Finer and Mr. Instone, I find nothing in these cases which compels me to go so far as they have invited me to go. In some cases—and of course D   *Morris's* case [26] is one and *Howard's* case [27] is another—a director is quite plainly anything but a " stranger," or an " outsider," or a " third party," but I do not think the mere fact that a man who is a director of a company makes a contract with that company in a capacity other than that of a director automatically affects him in the capacity in which he is contracting, with con-E   structive knowledge of such disabilities and limitations as he might be deemed to know were he also acting for the company in the transaction in question. As Mr. MacCrindle said in the course of his reply, to extend this doctrine in the way suggested would have very far-reaching ramifications on ordinary day-to-day business transactions and would or might involve very often F   considerable inquiry before a contract could be signed as to what the respective position and authority was of a particular individual by whom it was proposed that a contract should be signed. I regard the decisions in *Morris* v. *Kanssen* [28] and in *Howard's* case [29] as decisions where, on the facts of those particular cases, the rights sought to be enforced by the plaintiffs concerned arose G   from acts done by them as directors which were so closely interwoven with their duties and acts as directors as to make it impossible for the directors involved to say that they were not for

---

[24] [1946] A.C. 459, 475.    [27] 38 Ch.D. 156.
[25] 6 E. & B. 327.    [28] [1946] A.C. 459.
[26] [1946] A.C. 459.    [29] 38 Ch.D. 156.

568                        QUEEN'S BENCH DIVISION                    **[1968]**

1966

Hely-
Hutchinson
v.
Brayhead
Ltd.
——
ROSKILL J.

all purposes to be treated as possessed of knowledge of the limita-    A
tions upon their powers as directors. In the present case Bray-
head's agreement with Lord Suirdale had nothing to do with his
duties and obligations as a director of Brayhead. What he was
doing was to agree to advance money to an associated company
of Brayhead of which he was chairman and managing director
against a guarantee and indemnity from Brayhead, who were    B
expected to become the parent company of that associated com-
pany. He was acting, as I think, otherwise than in his capacity
as a director of Brayhead in making that agreement. He was act-
ing as an individual, for it was he who was going to advance the
money in consideration of the agreement into which Mr. Richards
was purporting to enter on behalf of Brayhead. He was going to    C
be the other contracting party. I think, therefore, that this
argument fails.

   But Mr. Finer had a number of further strings to his bow, if
I may so describe his argument, for he said that even assuming
he was wrong on the point which I have just decided, this trans-
action was an " unusual " transaction for the purposes of the    D
exceptions to the rule in *Tarquand's* case.[30] He put the argument
in two ways: first, he said it was not the sort of transaction one
would expect to be entered into in those circumstances by a
managing director with somebody who was, in fact, also a director
of the same company; and, secondly, he sought to say that it was
" unusual " by reason of the provisions of article 99. I should    E
emphasise that this argument is independent of his principal sub-
mission based on article 99.

   I will deal with these points first because I can take them
briefly. He relied in particular upon the well-known decision of
the Court of Appeal in *Houghton* v. *Nothard, Lowe & Wills*,[31]
a case considered by the Court of Appeal in *Freeman's* case.[32] If    F
one attempts to look at this through the eyes of an ordinary busi-
ness man I cannot see anything in the least unusual in this
transaction. The loan was being made by Lord Suirdale. The
parent company (as it was hoped Brayhead would become in
relation to Perdio) was going to give a guarantee and an indem-
nity. Brayhead itself had already made a very large investment    G
in Perdio: it had lent money; it had accepted obligations under
the acceptance credits; and it was obviously going to assist towards
helping Brayhead's investment in Perdio if Perdio could be kept

[30] 6 E. & B. 327.                    [32] [1964] 2 Q.B. 480.
[31] [1927] 1 K.B. 246.

**1 Q.B.**        QUEEN'S BENCH DIVISION        569

A    afloat a little longer with the aid of Lord Suirdale's money, par-
ticularly as Brayhead itself might be going to put in further money.
Therefore, as between "usual" and "unusual" transactions, I
see no reason for thinking there was anything "unusual" in the
transaction in the sense in which that adjective has been used in
the cases. Nor do I think that the fact that the agreements were

B    or may have been contracts in which Lord Suirdale was "in-
terested" within the meaning of article 99 makes that which was
not commercially an "unusual" transaction "unusual" in the
sense to which I have just referred.

That leaves the major question under article 99. This is,
perhaps, the most difficult point in the case, if only because one

C    is in a field of law in which, notwithstanding the help I have had
from counsel, the seas seem uncharted. Both Mr. Finer and Mr.
Instone, while shrinking, as I have already said, from saying a
contract entered into in breach, if that is the right word, of
article 99 and section 199 is illegal, boldly took their stand upon
the proposition that it was unenforceable, either because it was

D    void, or because it was voidable, or because there was in either
or both of the parties a want of capacity to contract. It is remark-
able that, if this be the law, there is no reflection of it in any case
which counsel on either side has been able to discover since the
joint stock company came into existence in the middle of the last
century. Section 199 itself does not avoid a contract entered into

E    in breach of the provisions of subsection (1) of that section, though
subsection (4) imposes a small financial penalty upon a director
who fails to comply with the provisions of the section. The con-
struction of section 199 is itself by no means easy, though I do
not think it is necessary to discuss all the matters which have been
touched upon in argument in relation to this section. It may well

F    be, as Mr. Instone said, that the section is concerned primarily with
the duty of disclosure and with the machinery by which disclosure
shall be made rather than with the consequences upon the contract
itself of non-disclosure of the director's interest.

Some help—not a great deal, but some—by way of analogy
is available from a case which Mr. MacCrindle cited to me, a

G    decision of the House of Lords in *Wright* v. *Horton*,[33] and in
particular from the speech of Lord Halsbury.[34] The headnote
reads:

"Debentures in a company incorporated under the Com-
panies Act, 1862, were issued to a director of the company.

[33] (1887) 12 App.Cas. 371, H.L.        [34] Ibid.

1966
———
Hely-
Hutchinson
*v.*
Brayhead
Ltd.
———
Roskill J.

1966

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

Roskill J.

A

They were not registered in accordance with the requirements of section 43 of the Act. The company having gone into liquidation and the validity of these debentures being contested by unsecured creditors, and also by debenture holders, as to whom it was not shown that they had made any inquiry as to the charges on the company's property or the existence of a register: —

B

"*Held,* reversing the decision of the Court of Appeal, that the mere omission to register, without concealment, did not invalidate the debentures; at all events as between the director and such creditors."

Lord Halsbury said [35]:

C

"Notwithstanding the high authority of James, Mellish and Baggallay L.JJ. it is impossible to acquiesce in the bald statement that there is a 'rule' or an 'equitable principle' that an unregistered mortgage or debenture is invalid as against a director, without some further exposition of what the 'rule' or the 'principle' is by which it is rendered invalid. The statute, for very obvious reasons, in constituting a code for the regulation of trading companies, has enacted that they shall keep an account of mortgages or charges specifically affecting their property. Had the legislature thought right it might have rendered all mortgages or charges invalid unless they had been entered in this account; it has not done so."

D

E

Following the language of Lord Halsbury, it is remarkable that if it had been the intention of the legislature to say that a contract entered into without compliance with section 199 or article 99 should be wholly void or that the parties to it, or one of them, should be treated as possessed of no contractual capacity, it has not clearly said so. The true principle is this—although I accept that there is little or no authority to support it: There is no rule of common law that a director could not validly contract with a company of which he is a director. But equity ensured that the company could, when appropriate, recover any profit made by the director as a result of his making such a contract with the company by reason of his fiduciary position, unless he was relieved from the obligation so to account by compliance with the relevant article or statutory provision. Further, in certain cases equity would permit the company to avoid the contract. But with one exception to which I will refer in a moment, no case has been produced to me in which there has been a breath of a suggestion that a contract entered into in those circumstances is void or unenforceable. I think, therefore, the true principle is that which I have endeavoured to state, and I find support for that view in the fact that section 199 does not itself refer to the

F

G

**1 Q.B.**                QUEEN'S BENCH DIVISION                    571

1966

Hely-
Hutchinson
v.
Brayhead
Ltd.

ROSKILL J.

A  consequences of non-compliance with subsection (1) and subsection (2) beyond the provision for the imposition of a fine in subsection (4). Nor do I think that article 99 on its true construction leads to any different result.

I was referred by Mr. MacCrindle to one passage in Professor Gower's book on The Principles of Modern Company Law, 2nd ed. B  (1957), p. 481, in which the author said: ". . . it seems clear that a breach . . . brings the basic equitable principle into operation; in other words, the contract is voidable by the company and any profits made by the interested director are recoverable." No authority was cited for that and, with all respect to the author, I venture to think that the passage is somewhat too widely stated.

C  I think the same criticism is to be made of a passage to which Mr. Finer referred me at the end of Mr. MacCrindle's reply in the notes in Halsbury, Laws of England, Vol. 6, 3rd ed. (1954), p. 302:

> " A contract between a company and a director or his firm, or a company in which he is interested as a director or share-
D  > holder even though only a trustee of the shares, is voidable at the option of the company,"

a statement which, as Mr. Finer accepted, does not appear to be supported by all the authorities cited.

In the present case Brayhead has never sought to avoid these contracts or to claim rescission of them and, as Mr. MacCrindle E  pointed out, it is far too late for them now to seek to do so, since Lord Suirdale has acted in reliance on the representations made to him and restitution to the original position as it was on May 19, 1965, is now wholly impossible.

For those reasons—which I am afraid I have dealt with at great length—I have come to the conclusion that there was ostensible or apparent authority in Mr. Richards; that the board of F  Brayhead knew of and acquiesced in Mr. Richards acting as de facto managing director of Brayhead; that Lord Suirdale relied upon the representations made to him and, relying upon them, made these advances totalling £45,000. I hold that his right to rely upon those representations is not affected by the fact that he G  was a director of Brayhead at the time. I also hold that his rights are not affected by the fact that these contracts were—or perhaps I should say " may have been "—in breach of or at any rate without compliance with section 199 or article 99. I say " may have been " merely for this reason, that Mr. MacCrindle made no formal admission that these contracts were caught by the article or the section. In my view these were contracts in which technically

1966
Hely-
Hutchinson
v.
Brayhead
Ltd.
——
ROSKILL J.

Lord Suirdale was "interested" although, in my view, neither    A
is a contract of the type to which these provisions were in truth
intended to be directed. I fully accept Mr. Finer's submission
that the court must not seek to diminish the stringent rule that
directors must fulfil their duties to their companies, and that the
strict limitations upon their freedom of action to their personal
advantage which have been imposed over the years should be    B
preserved in the interests of shareholders and the public; all that
goes without saying. But in the present case, as I think I have
already said, these contracts were at least as much in Brayhead's
interests and Mr. Richards' interests as in Lord Suirdale's. Let
there be no mistake about that.

The case to which Mr. Finer referred me at the last moment    C
was *Toms* v. *Cinema Trust Co. Ltd.*[36] It has the great merit, parti-
cularly in this court, of being a judgment of Scrutton J. From a
superficial reading Scrutton J. does appear to say that a contract
made between a director of a company and that company for
that director's remuneration was void, because he disallowed the
plaintiff's claim to recover and gave judgment for the company    D
on the counterclaim to recover that which the plaintiff had already
received from them.

I will not spend time analysing this case since the report is so
brief as to make it difficult to deduce principles from it. As I
understand it, the alleged contractual right to remuneration arose
from an alleged board meeting at which were present the plaintiff    E
(who was a director) and another gentleman who was not a director.
In order to comply with the requirements of article 25, the fact of
the plaintiff's disclosure of his interest had to be entered in the
minutes of the company. This was never done. I think that the
ratio decidendi was that there was never on the facts a valid
agreement entered into for the plaintiff's remuneration. With all    F
the respect that any judgment of Scrutton J. commands this decision
does not affect the conclusions which I have reached after the long
and careful arguments to which I have listened in this case.

The result is that the plaintiff is entitled to recover from
Brayhead upon the indemnity against his advances to Perdio and
also to the declaration which he seeks with respect to his liability    G
to Guinness Mahon which he has discharged. It is necessary to
deal with one other matter which only arises if the conclusion
which I have reached is wrong. It was said on behalf of Mr.
Richards that if Brayhead were not liable, there was no claim

[36] [1915] W.N. 29.

**1 Q.B.**            QUEEN'S BENCH DIVISION            573

A    against Mr. Richards for breach of warranty of authority. It was
said on the other side that Mr. Richards had warranted his
authority to do what he did and if the plaintiff could not recover
from Brayhead, he could recover from Mr. Richards that which
he could not recover from Brayhead for want of Mr. Richards'
authority. In my judgment that is right. I do not think Mr. Finer's
B    point that there was no warranty of authority is well founded and,
therefore, had I reached a different conclusion from that in fact
reached I should nonetheless have held that the plaintiff was en-
titled to recover against Mr. Richards on the alternative claim
for breach of warranty of authority. As, in my judgment, that
matter does not arise I do not propose to say more about it. All
C    the arguments to which I have listened are open elsewhere if
necessary.

C. A.
1966
Hely-
Hutchinson
v.
Brayhead
Ltd.

Roskill J.

*Judgment for the plaintiff for £79,920 3s. 9d.
with interest at 7 per cent. and costs
against the first defendants; judgment for
Mr. Richards against the first defendants
without costs (which were not asked for).
Stay of execution on terms pending appeal.*

Solicitors: *Linklaters & Paines; T. W. Stuchbery & Son,
Windsor.*

E

[Reported by Miss DIANA GRAVESON, Barrister-at-Law.]

Brayhead appealed on the grounds, inter alia, that Mr.
Richards had no actual authority to contract on behalf of Bray-
head with Lord Suirdale, who could not rely on any ostensible
F    authority of Mr. Richards since, (1) as a director of Brayhead,
Lord Suirdale was himself a member of the board in which actual
authority was rested, and (2) he had constructive notice of the
provisions of article 99 and actual notice that those provisions had
not been complied with. By a respondent's notice Lord Suirdale
relied on breach of warranties of authority by Mr. Richards and
G    sought judgment against him personally.

C. A.
1967
Hely-
Hutchinson
v.
Brayhead
Ltd.

*Michael Wheeler Q.C.* and *Ralph Instone* for the first and
second defendants. We accept the facts as found by Roskill J. but
dispute his application of the law to those facts, particularly in so
far as his decision was based on the ostensible authority of Mr.
Richards to bind Brayhead.

QUEEN'S BENCH DIVISION   **[1968]**

C. A.
1967

Hely-
Hutchinson
*v.*
Brayhead
Ltd.

Three questions of law arise on the appeal. (1) Did the signing   **A**
of the letters of indemnity and guarantee result in contracts which
were binding on Brayhead at all?   If not, is Brayhead estopped
from asserting the contrary?   This turns partly on the authority
of Mr. Richards to bind Brayhead and partly on whether Lord
Suirdale is entitled to the benefit of the rule in *Royal British Bank
v. Turquand.*[1]   (2) If the contracts were binding on Brayhead, is   **B**
Lord Suirdale entitled to enforce them in view of his failure to
disclose his interest at a board meeting of Brayhead as required
by section 199 of the Companies Act, 1948?   This turns mainly
on the true construction of article 99 of Brayhead's articles of
association.   (3) If questions (1) and (2) are answered in favour
of Brayhead, what rights, if any has Lord Suirdale against Mr.   **C**
Richards personally?

As to question (1).   It is common ground that Mr. Richards
had no *actual* authority to bind Brayhead but Roskill J. held [2]
that he had *ostensible* authority to do so.   Ostensible authority
was considered at length in *Freeman & Lockyer* v. *Buckhurst
Park Properties (Mangal) Ltd.*[3]   It proceeds, in the case of an   **D**
agent of a company, on the assumption that the board of the
company have, by their conduct, represented that the agent (in
this case Mr. Richards) had authority to bind the company.   We
accept that if Lord Suirdale had been an " outsider " he could, on
the facts, have relied on Mr. Richards' ostensible authority.   But
Lord Suirdale was himself a director of Brayhead and in order to   **E**
establish Mr. Richards' ostensible authority Lord Suirdale would
in effect have to rely on a representation assumed to have been
made by the board of Brayhead (of which he himself was a
member) *to himself.*   As to the *Turquand* [4] rule, it is not clear
whether the rule is based on ostensible authority, so as to involve
a representation as to the agent's authority, or whether it is a rule   **F**
of convenience based simply on the inability of an " outsider " to
ascertain matters of indoor management (*Mahony* v. *East Holy-
ford Mining Co.*[5]) and a presumption in his favour, unless he is
put on inquiry, that acts of indoor management have been properly
done: *B. Liggett (Liverpool) Ltd.* v. *Barclays Bank Ltd.*[6]   A   **G**
director cannot be an " outsider " so as to be entitled to the
benefit of the rule because, as a director—and irrespective of his
actual knowledge—he has the means of finding out the facts,

[1] (1856) 6 E. & B. 327.
[2] Ante, p. 560F.
[3] [1964] 2 Q.B. 480; [1964] 2
W.L.R. 618; [1964] 1 All E.R. 630,
C.A.

[4] 6 E. & B. 327.
[5] (1875) L.R. 7 H.L. 869, H.L.
[6] [1928] 1 K.B. 48; 43 T.L.R.
449.

C. A.

1967

Hely-
Hutchinson
v.
Brayhead
Ltd.

A    Admittedly, in *Morris* v. *Kanssen*,[7] Lord Simonds [8] reserved for
future consideration the application of the rule to the case, such
as the present, where the director concerned was not himself pur-
porting to act on behalf of the company; hut Lord Simonds
expressly hased the rule on the need to protect outsiders " who
are entitled to assume, just because they cannot know, that the
B    person with whom they deal has the authority which he claims."
This reasoning is inapplicable to an " insider," e.g., a director:
*Howard* v. *Patent Ivory Manufacturing Co.*,[9] which was not cited
in *Morris* v. *Kanssen*.[10] If this be wrong and Lord Suirdale was
prima facie entitled to the benefit of the rule, he had constructive
notice of Brayhead's articles of association and must be taken to
C    have known that by reason of article 99 Brayhead could only enter
into a binding contract with him upon the terms of that article—
which were not complied with.

   As to question (2). The general equitable principle is that a
director of a company, by reason of his fiduciary position, cannot
D    enter into a binding contract with his company where he has
a personal interest which conflicts, or may conflict, with the
interests of those whom he is bound, by his fiduciary duty, to
protect: *Transvaal Lands Co.* v. *New Belgium (Transvaal) Land
and Development Co.*[11] If he does so, then (unless the articles
of association of the company otherwise provide or unless the
E    contract is approved or ratified by a general meeting) he cannot
enforce the contract and is accountable to the company for any
profit. Originally, section 29 of the Joint Stock Companies Act,
1844 made any contract in which a director was interested (with
certain exceptions) of no effect until confirmed by the shareholders:
but this appears to have been the only statutory attempt to govern
F    the formation of such a contract. In contrast, section 85 of the
Companies Clauses Consolidation Act, 1845, dealing with com-
panies incorporated by special Act, merely provided that a director
who was directly or indirectly interested in any contract with the
company (except an interest merely as a shareholder of another
company) should be disqualified and vacate office: the Act of
G    1845 was silent as to the enforceability and effect of the contract
which accordingly fell to be determined according to the general
equitable principle. This approach was adopted in subsequent

---

   [7] [1946] A.C. 459; 62 T.L.R.
306; [1946] 1 All E.R. 586, H.L.
   [8] [1946] A.C. 459, 475, 476.
   [9] (1888) 38 Ch.D. 156.

   [10] [1946] A.C. 459.
   [11] [1914] 2 Ch. 488; 31 T.L.R.
1, C.A.

C. A.
1967

Hely-
Hutchinson
v.
Brayhead
Ltd.

A

B

C

D

E

F

G

Companies Acts which included provisions to the same effect in the optional articles: Joint Stock Companies Act, 1856, Table B and Table A of the Acts of 1826 and 1908. It was also retained in Table A of the Act of 1929 but section 149 of the Act of 1929 for the first time imposed a statutory duty on directors to disclose their interests in such contracts at a board meeting. This statutory duty is now contained in section 199 of the Act of 1948; but regulation 84 in Part I of the 1948 Table A, instead of providing for the disqualification of interested directors, contains a number of relaxations of the general equitable principle, which commercial experience has shown to be necessary or desirable. We do not suggest that the introduction of the statutory duty to disclose directors' interests altered the law in any other way. You cannot contract out of this statutory duty but the circumstances in which, and the extent to which, the general equitable principle may be relaxed is primarily a matter for the articles of the company concerned; and if, on the true construction of the articles, this relaxation is made conditional upon compliance with the statutory duty, non-compliance with section 199 will deprive the director of the benefit afforded by the articles. This was the position in this case and article 99 of Brayhead's articles made compliance with section 199 an essential condition of any contract between Lord Suirdale and Brayhead.

[LORD DENNING M.R. At what time must the director's interest be disclosed?]

Section 199 does not deal with this except to the extent indicated in subsection (2) and the proviso to subsection (3). It appears to assume that contracts between a company and its directors will be entered into—or at least disclosed to—a board meeting.

[LORD PEARSON. There might have been a partial compliance with section 199: would that make the contract void?]

No, but it could make it unenforceable. There is no time limit within which the contract has to be disclosed but two consequences follow from a failure to disclose, namely (i) the director in default would be liable to the statutory penalty under section 199 (4) and (ii) he would be unable to enforce the contract, which would be voidable at the instance of the company.

We accept that in the present case no question of rescission can now arise. But as to Lord Suirdale's inability to enforce the

A contracts, see *Flanagan* v. *Great Western Railway Co.*[12] (a case of specific performance) and *per* Lindley M.R. in *Kaye* v. *Croydon Tramways.*[13]

As to question (3). This assumes that Brayhead is not liable on the contracts and depends on whether Lord Suirdale in that event has a claim against Mr. Richards personally for breach of
B warranty of authority. We say "no." Ex hypothesi, Lord Suirdale cannot rely on Mr. Richards having any actual or ostensible authority: moreover Lord Suirdale was on notice of the contractual restrictions imposed by article 99 so that he could not rely on a warranty by Mr. Richards which resulted in a contract made in breach of that article. Finally, on the facts, was there any
C representation at all or did Lord Suirdale merely assume, without inquiry, that Mr. Richards had the necessary authority?

*Peter Oliver Q.C.* and *G. Slynn* for the plaintiff, Lord Suirdale. It is conceded that there was no disclosure to the board of directors, as such, of Lord Suirdale's interest in the contracts such as to entitle him to rely upon article 99 of the company's articles
D of association. This, however, in no way affects the validity of the contracts. The equitable principle, which applies in the absence of an article such as the present article 99, is that a contract between a company and a director who fails to disclose his interest is not invalid, but is liable to be set aside at the suit of the company if, but only if, the status quo is capable of being
E restored. The basis of rescission is restitutio in integrum and once this has become impossible the contract can no longer be rescinded but remains enforceable on both sides. Article 99 is a dispensatory provision which enables a director, by complying with its terms, to avoid the disadvantage which attends a contract with the company in which he is interested, i.e., that it is liable to
F rescission at the option of the company. Failure to disclose merely results in his being unable to rely on the dispensation. It in no way affects the validity of the contract; and it is wrong to speak of him as being " in breach " of the article. He merely fails to avail himself of its protection. It enables him to hold the contract without possibility of rescission if he dicloses his interest, but it
G does not not prohibit him from contracting unless he discloses his interest.

There is a long line of authority which establishes that the contract in which the non-disclosing director is interested is void-able only and that the only right of the company is to rescind.

[12] (1868) L.R. 7 Eq. 116.          [13] [1898] 1 Ch. 358, 367-369; 14 T.L.R. 244, C.A.

C. A.
1967

Hely-
Hutchinson
v.
Brayhead Ltd.

Once the right of rescission is lost the contract remains; it cannot
be repudiated in part and adopted in part, for the court has no
right to make a new contract for the parties: *Great Luxembourg
Railway Co.* v. *Magnay (No.* 2) [14]; *In re Cape Breton Co.*[15];
*Transvaal Lands Co.* v. *New Belgium (Transvaal) Land and
Development Co.*[16]; and *Cook* v. *Deeks.*[17] Although the cases cited
are cases in which the contracts in question had been completed, the
same principle must apply where the right of rescission has been
lost but the contract yet remains to some extent executory. If, for
instance, a man sells property to a company of which he is a
director, without disclosing his interest, on terms that the purchase
price shall be payable by instalments and the company then
subsells to a third party so that rescission is no longer possible,
the company cannot claim to be excused from payment of the
outstanding balance of the purchase price.

The validity of the contract is likewise not affected by any
failure to comply with section 199 of the Companies Act, 1948.
This is purely a penal provision and does not purport to affect the
validity of any contract entered into in breach of its terms.

Even if Mr. Richards did not in fact have any actual authority
to enter into the contracts with Lord Suirdale the latter was
entitled to assume such authority. The transactions were not
unusual transactions which an outsider would not expect Mr.
Richards to have authority to conclude and Lord Suirdale is
entitled to rely on the rule in *Royal British Bank* v. *Turquand.*[18]
*Howard* v. *Patent Ivory Manufacturing Co.*[19] is relied on as
showing that a director cannot rely upon the rule but when the
facts of that case are analysed the inference is that the case was
one where the director had actual notice of the failure to comply
with the articles. The principal argument against the application
of the rule is based on the speech of Lord Simonds in *Morris* v.
*Kanssen,*[20] but there the case of a director who did not himself
participate as a director in the transaction in question was left
open. If there be any rule that a director is, by virtue of his office,
debarred from relying upon *Turquand's* case [21] and from assuming
an authority which does not in fact exist it must rest upon some
logical basis; and the only logical basis can be that he has con-
structive notice of the want of authority by virtue simply of his
ability to satisfy himself from the records of the company to which

A
B
C
D
E
F
G

[14] (1858) 25 Beav. 586.
[15] (1884) 26 Ch.D. 221; (1885) 29
Ch.D. 795; 1 T.L.R. 450.
[16] [1914] 2 Ch. 488.
[17] [1916] 1 A.C. 554.

[18] 6 E. & B. 327.
[19] 38 Ch.D. 156.
[20] [1946] A.C. 459, 467.
[21] 6 E. & B. 327.

A  he has access as a director, i.e., that the means of knowledge are equivalent to knowledge. But the authorities show that a director does not, in general, have constructive notice of entries in the company's books, although he may be fixed with such knowledge where he is actively engaged as a director in the transaction in question. Thus in *In re Newcastle-upon-Tyne Marine Insurance*

B  *Co., ex parte Brown* [22] the director was fixed with constructive notice because it was part of his duty to find out. Similarly, *In re Esparto Trading Co.* [23] In the absence however of a particular duty to inquire in relation to the transaction in question, the director is not fixed with constructive notice of what he might have discovered had he investigated: *Hallmark's Case* [24];

C  *Cartmell's Case* [25]; *In re Printing, Telegraph & Construction Co. of Agence Hayas, ex parte. Cammell* [26]; *In re Denham & Co.* [27] Thus in *In re Hampshire Land Co.* [28] the lender company was not fixed with constructive notice of the lack of authority of the borrowing company's directors even though both companies had some common directors: see also *Dovey* v. *Cory* [29] and *In re*

D  *Coasters Ltd.* [30] The logical basis for the inability of the director in *Morris* v. *Kanssen* [31] to rely upon the rule in *Turquand's* case [32] is that he was acting as a director in the transaction concerned and therefore was under a duty to inquire which fixed him with notice of the invalidity. But in the present case Lord Suirdale was not acting as a director and was not bound to inquire into

E  the authority of the person with whom, as an outsider, he was dealing. He was, therefore, entitled to rely upon the rule.

It is conceded that to found a case of ostensible authority there must be a representation made either actually or impliedly by the supposed principal and not simply and solely by the person purporting to act as agent. It is argued that Lord Suirdale could

F  not rely upon any representation made to him by the supposed principal because the supposed principal was the board of directors of which he was himself a member and he could not hold out to himself. The representation was a continuing one made by the board before Lord Suirdale became a director and that it continued to operate at all material times. It seems that there can be a

G  " holding out " by a majority of a board of directors: *Mahony* v.

[22] (1854) 19 Beav. 97.
[23] (1879) 12 Ch.D. 191.
[24] (1878) 9 Ch.D. 329, C.A.
[25] (1874) 9 Ch.App. 691.
[26] [1894] 1 Ch. 528; [1894] 2 Ch. 392; 10 T.L.R. 441, C.A.
[27] (1883) 25 Ch.D. 752.

[28] [1894] 2 Ch. 632; [1896] 2 Ch. 743; 12 T.L.R. 517.
[29] [1901] A.C. 477, H.L.
[30] [1911] 1 Ch. 86.
[31] [1946] A.C. 459.
[32] 6 E. & B. 327.

C. A.

1967

Hely-
Hutchinson
*v.*
Brayhead Ltd.

580                    QUEEN'S BENCH DIVISION            **[1968]**

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

*East Holyford Mining Co.*[33]  Similarly a company may be held    **A**
to an implied promise made to one of its directors even though
the directors had no authority in fact to contract: *Craven-Ellis* v.
*Canons Ltd.*[34]

It is, however, unnecessary to rely on a holding out in the
present case. Ostensible authority needs to be relied on only where
there is no actual authority.  But actual authority may be express    **B**
or implied and here Mr. Richards had in fact actual implied
authority from the board.  Implied authority may attach to the
office held, but the inquiry does not end there and the court must
look at all the circumstances to see whether an actual authority has
been impliedly conferred. Mr. Richards signed the documents as
chairman but he was acting and had for years acted with the con-    **C**
currence of the board as de facto managing director.  He was not
simply held out as having authority to bind the company: he was
impliedly authorised to do so.  If a person is impliedly authorised
to act in a particular office he is impliedly authorised to bind the
company within the powers which a de jure appointment to that
office would import: *Clay Hill Brick & Tile Co. Ltd.* v. *Rawlings*.[35]    **D**
Implied authority is a species of actual authority and may very
often overlap with ostensible authority: *Freeman & Lockyer* v.
*Buckhurst Park Properties (Mangal) Ltd.*[36] and in cases where they
co-exist it is often unnecessary to look beyond ostensible authority.
But the two are not in any sense mutually exclusive.

As regards Mr. Richards' personal position, even supposing    **E**
that there was no implied authority and that Lord Suirdale cannot
rely upon ostensible authority, there remains the liability for breach
of warranty of authority.  Any agent contracting as agent gives a
personal warranty of his authority to contract and the fact (if
it be so) that Lord Suirdale might, as a member of the board,
have discovered that there was no actual authority affords no    **F**
defence.  Nothing short of actual knowledge would suffice.

*Michael Wheeler Q.C. replied.*

*Cur. adv. vult.*

June 22. LORD DENNING M.R.: In opening this appeal Mr.
Wheeler paid tribute to the judgment of Roskill J.[1]  He said it was    **G**
a tour de force.  I agree.  It was delivered straightaway after a

[33] L.R. 7 H.L. 869, H.L.
[34] [1936] 2 K.B. 403; 52 T.L.R.
657; [1936] 2 All E.R. 1066, C.A.
[35] [1938] 4 All E.R. 100; 55 T.L.R.
103.

[36] [1964] 2 Q.B. 480.
[1] Ante, p. 556, [1967] 2 W.L.R.
1312; [1967] 2 All E.R. 14.

**1 Q.B.**          QUEEN'S BENCH DIVISION          581

A  five-day hearing at the end of the term.  His findings of fact have
been accepted by both parties before us.  The discussion has been
on the correct legal principles to be applied.  I need myself only
summarise the salient facts.

Lord Suirdale, the plaintiff, was for many years chairman and
managing director of a public company dealing in electronics
B  called Perdio Electronics Ltd. (Perdio).  He held a great number
of its shares and had guaranteed a loan to it from merchant
bankers called Guinness Mahon & Co. for £50,000.  Mr. Richards,
a professional accountant, was the chairman of another public
company called Brayhead Ltd. (Brayhead).  It also dealt in elec-
tronics.  Towards the end of 1964 Perdio was sustaining losses.
C  It needed financial assistance.  Brayhead was ready to help.  Its
intention was eventually to get control of Perdio.  At the end of
1964 Lord Suirdale sold 750,000 shares in Perdio to Brayhead at
3s. 3d. a share, a deal involving over £100,000.  About the same
time Brayhead proposed to inject a sum of £150,000 into Perdio.
On January 14, 1965, Lord Suirdale became a director of Bray-
D  head.  He did not attend a board meeting of Brayhead until May
19, 1965.  At that meeting many matters were discussed and
recorded in the minutes.  But after the board meeting, in an office
outside, there was a discussion between the directors.  Agreements
were then reached between Mr. Richards on behalf of Brayhead,
he being the chairman, and Lord Suirdale.  The upshot of it was
E  that Lord Suirdale agreed to put more money into Perdio.  But he
was not prepared to do so unless his position was secured by
Brayhead Ltd.  That was done by two letters.  They form the
subject-matter of these proceedings.

One letter which is called the indemnity is on the paper of
Brayhead Ltd. dated May 19, 1965, addressed to Viscount Suirdale.
F  It reads:

" Re Perdio Electronics Ltd. Acceptance Credits.
Dear Lord Suirdale,

This letter may be taken as an undertaking to indemnify
you against any loss which may occur by you having to fulfil
your personal guarantee to Guinness Mahon & Co. Ltd. for a
G  figure not to exceed £50,000.  It is agreed that the considera-
tion for this indemnity will be a personal loan by you to
Perdio Electronics Ltd. in a sum not exceeding £10,000.

Yours sincerely,
A. J. Richards,
Chairman."

C. A.
1967
—
Hely-
Hutchinson
v.
Brayhead Ltd.
—
LORD
DENNING
M.R.
—

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
DENNING
M.R.

Then there is a letter called the guarantee, also dated May 19, **A**
1965, likewise on the paper of Brayhead and likewise addressed to
Viscount Suirdale:

" Re Perdio Electronics Ltd.  Loan.

Dear Lord Suirdale,

It is hereby agreed that Brayhead Ltd. will guarantee
repayment of any moneys loaned by you personally to Perdio **B**
Electronics Ltd.  It is a condition of this guarantee that at
least six months' notice will be given by you to Brayhead Ltd.
should the guarantee have to be implemented.

Yours sincerely,
A. J. Richards,
Chairman."          .        **C**

On the same occasion two other letters were signed for con-
nected transactions.

In reliance on those letters Lord Suirdale advanced further
sums to Perdio: in all a sum of £45,000.  Brayhead also lent
Perdio large sums.  Unfortunately their efforts were unavailing to **D**
save Perdio.  It went into liquidation.  On September 27, 1965,
Lord Suirdale resigned from the board of Brayhead.  He had been
a director for some nine months.

The merchant bankers, Guinness Mahon, called on Lord
Suirdale to honour his guarantee.  He paid them £50,000, and then **E**
claimed that sum from Brayhead under the letter of indemnity of
May 19, 1965.  He also wanted repayment of the £45,000 which
he had lent Perdio.  He claimed this sum under the letter of
guarantee of May 19, 1965, and gave the requisite notice to Bray-
head to repay.  On November 27, 1965, he issued a writ against
Brayhead.                                                        **F**

The defence of Brayhead is twofold: First, they say that the
letter of indemnity and the letter of guarantee are not binding on
the company, because Mr. Richards had no authority, actual or
ostensible, to write those letters: and that Lord Suirdale, being
himself a director of Brayhead, had notice of that want of
authority.  So there was no contract by the company.  Second, **G**
they say that if there was a contract by the company, it is unen-
forceable by Lord Suirdale because he was a director and had an
interest which he did not disclose at any board meeting.  Lord
Suirdale challenges those defences.  But he says if they are avail-
able to the company he can come down on Mr. Richards personally
as upon a warranty of authority.

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

Lord
Denning
M.R.

A   I need not consider at length the law on the authority of an
agent, actual, apparent, or ostensible. That has been done in the
judgments of this court in *Freeman & Lockyer* v. *Buckhurst Park
Properties (Mangal) Ltd.*[2] It is there shown that actual authority
may be express or implied. It is *express* when it is given by
express words, such as when a board of directors pass a resolution
B   which authorises two of their number to sign cheques. It is
*implied* when it is inferred from the conduct of the parties and the
circumstances of the case, such as when the board of directors
appoint one of their number to be managing director. They
thereby impliedly authorise him to do all such things as fall within
the usual scope of that office. Actual authority, express or implied,
C   is binding as between the company and the agent, and also as
between the company and others, whether they are within the
company or outside it.

Ostensible or apparent authority is the authority of an agent as
it *appears* to others. It often coincides with actual authority.
Thus, when the board appoint one of their number to be managing
D   director, they invest him not only with implied authority, but also
with ostensible authority to do all such things as fall within the
usual scope of that office. Other people who see him acting as
managing director are entitled to assume that he has the usual
authority of a managing director. But sometimes ostensible
authority exceeds actual authority. For instance, when the board
E   appoint the managing director, they may expressly limit his
authority by saying he is not to order goods worth more than £500
without the sanction of the board. In that case his *actual* authority
is subject to the £500 limitation, but his *ostensible* authority
includes all the usual authority of a managing director. The com-
pany is bound by his ostensible authority in his dealings with those
F   who do not know of the limitation. He may himself do the
"holding-out." Thus, if he orders goods worth £1,000 and signs
himself "Managing Director for and on behalf of the company,"
the company is bound to the other party who does not know of the
£500 limitation, see *British Thomson-Houston Co. Ltd.* v. *Fede-
rated European Bank Ltd.*,[3] which was quoted for this purpose by
G   Pearson L.J. in *Freeman & Lockyer.*[4] Even if the other party
happens himself to be a director of the company, nevertheless the
company may be bound by the ostensible authority. Suppose the
managing director orders £1,000 worth of goods from a new director

[2] [1964]  2  Q.B.  480;  [1964]  2
W.L.R.  618;  [1964]  1  All  E.R.  630,
C.A.

[3] [1932] 2 K.B. 176, C.A.
[4] [1964] 2 Q.B. 480, 499.

C. A.
1967
───
Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
DENNING
M.R.
───

who has just joined the company and does not know of the £500 **A** limitation, not having studied the minute book, the company may yet be bound. Lord Simonds in *Morris* v. *Kanssen*,[5] envisaged [6] that sort of case, which was considered by Roskill J.[7] in the present case.

Apply these principles here. It is plain that Mr. Richards had no express authority to enter into these two contracts on behalf of **B** the company: nor had he any such authority implied from the nature of his office. He had been duly appointed chairman of the company but that office in itself did not carry with it authority to enter into these contracts without the sanction of the board. But I think he had authority implied from the conduct of the parties and the circumstances of the case. The judge did not rest his decision **C** on implied authority, but I think his findings necessarily carry that consequence. The judge finds that Mr. Richards acted [8] as de facto managing director of Brayhead. He was the chief executive who made the final decision on any matter concerning finance. He often committed Brayhead to contracts without the knowledge of the board and reported the matter afterwards. The judge said [9]: **D**

> "I have no doubt that Mr. Richards was, by virtue of his position as de facto managing director of Brayhead or, as perhaps one might more compendiously put it, as Brayhead's chief executive, the man who had, in Diplock L.J.'s words,[10] 'actual authority to manage,' and he was acting as such when he signed those two documents."

**E**

And later he said [11]:

> "the board of Brayhead knew of and acquiesced in Mr. Richards acting as de facto managing director of Brayhead."

The judge held [12] that Mr. Richards had ostensible or apparent authority to make the contract, but I think his findings carry with **F** it the necessary inference that he had also actual authority, such authority being implied from the circumstance that the board by their conduct over many months had acquiesced in his acting as their chief executive and committing Brayhead Ltd. to contracts without the necessity of sanction from the board.

This finding makes it unnecessary for me to go into the ques- **G** tion of ostensible authority; or into the rule in *Royal British Bank* v. *Turquand* [13]; or into the question whether a director has

[5] [1946] A.C. 459; 62 T.L.R. 306; [1946] 1 All E.R. 586, H.L.(E.).
[6] [1946] A.C. 459, 475, 476.
[7] *Ante,* p. 564D–E.
[8] *Ante,* p. 560A–B.
[9] *Ante,* p. 564A.
[10] [1964] 2 Q.B. 480, 506.
[11] *Ante,* p. 571F.
[12] *Ibid.*
[13] (1856) 6 E. & B. 327.

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
DENNING
M.R.
———

A  constructive notice. I do not say that the judge was in error in
what he said on these subjects. All I say is that I do not find it
necessary to express any opinion on it.

Accepting that Mr. Richards had actual authority to make
these contracts, there still remains the second point: Lord Suirdale
was a director of Brayhead. He had an interest in these contracts
B  and did not disclose it. He failed to comply with section 199 of
the Companies Act, 1948, and with article 99 of the articles of
association. He did not disclose the nature of his interest to any
board meeting as he should have done. His failure is a criminal
offence. It renders him liable to a fine not exceeding £100. But
how does it affect the contract? It was urged before us, quoting
C  the words of Lord Lindley in *Kaye* v. *Croydon Tramways*,[14] that
" he cannot enforce, as against the company, any contract which he
has entered into with that personal interest."

It seems to me that when a director fails to disclose his interest,
the effect is the same as non-disclosure in contracts uberrimae fidei,
or non-disclosure by a promoter who sells to the company pro-
D  perty in which he is interested: see *Re Cape Breton Co.*[15]; *Burland*
v. *Earle*.[16] Non-disclosure does not render the contract void or a
nullity. It renders the contract voidable at the instance of the
company and makes the director accountable for any secret profit
which he has made.

At first sight article 99 does present difficulties. It says that:
E
" A director may contract with and be interested in any con-
tract or proposed contract with the company either as vendor,
purchaser or otherwise, and shall not be liable to account for
any profit made by him by reason of any such contract or
proposed contract, provided that the nature of the interest of
the director in such contract or proposed contract be declared
at a meeting of the directors as required by and subject to the
F  provisions of section 199 of the Act."

On the wording it might be suggested that there is no contract
unless the director discloses his interest. In other words, that
disclosure is a condition precedent to the formation of a contract.
But I do not think that is correct. All that article 99 does is to
G  validate every contract when the director makes proper disclosure.
If he discloses his interest, the contract is not voidable, nor is he
accountable for profits. But if he does not disclose his interest, the

———
[14] [1898] 1 Ch. 358, 368; 14 T.L.R. 244, C.A.
[15] (1884) 26 Ch.D. 221; (1885) 29 Ch.D. 795; 1 T.L.R. 450, C.A.
[16] [1902] A.C. 83, 99; 18 T.L.R. 41, P.C.

586                          QUEEN'S BENCH DIVISION                    **[1968]**

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
DENNING
M.R.
——

effect of the non-disclosure is as before: the contract is voidable    **A**
and he is accountable for secret profits.

In this case, therefore, the effect of the non-disclosure by Lord
Suirdale was not to make the contract void or unenforceable. It
only made the contract voidable. Once that is held, everyone
agrees that it is far too late to avoid it. It is impossible to put the
parties back in the same position, or anything like it. The con-    **B**
tracts are, therefore, valid and, I would add, enforceable. So
Lord Suirdale can sue upon them.

I need only add one word about warranty of authority. If
Lord Suirdale had failed in his action because of a failure by him
to disclose his interest, it would be his own fault and he could not
claim on a warranty of authority; or if he failed because he knew    **C**
that Mr. Richards had no authority, he could not claim on any
implied warranty. But if he failed because, unbeknown to him,
Mr. Richards had no authority, actual or ostensible, I think that
Mr. Richards would have been liable for breach of an implied
warranty of authority. But that question does not arise, seeing
that Mr. Richards had actual authority.    **D**

I would, therefore, dismiss the appeal.

LORD WILBERFORCE. I take the benefit of the summary of the
relevant facts which Lord Denning M.R. has given and of the fuller
findings accepted by both sides which are to be found in the judg-
ment of Roskill J.[17]    **E**

I consider first the question of Mr. Richards' authority. I
agree, of course (and there is no dispute about this), that Mr.
Richards had no actual express authority to enter into the two
agreements of May 19, 1965, on which this action is brought. But
the question remains whether he had implied authority to do so.
Now, when one is considering whether he had implied authority,    **F**
one asks first: From what is the implication to be drawn? The
suggestion was made that his authority might be implied from the
mere fact of his holding the office of director and chairman of
Brayhead at the relevant time. The judge [18] dealt with that and
held that, merely by virtue of his position as chairman, he would
not have the necessary authority to enter into these agreements. I    **G**
agree with that; but the question as to implication does not stop
there. I quote some words in this connection from Diplock L.J.'s
judgment in *Freeman & Lockyer* v. *Buckhurst Park Properties
(Mangal) Ltd.*[19] He says:

[17] Ante, p. 556.                    [19] [1964] 2 Q.B. 480, 502.
[18] Ante, p. 560C–D.

C. A.
1967
Hely-
Hutchinson
v.
Brayhead Ltd.
LORD
WILBERFORCE

A    " An ' actual ' authority is a legal relationship between prin-
cipal and agent created by a consensual agreement to which
they alone are parties. Its scope is to be ascertained by
applying ordinary principles of construction of contracts,
including any proper implications from the express words
used, the usages of the trade, or the course of business between
the parties."

B    I think, therefore, that it is legitimate to go on and consider,
over and above the powers he had as chairman, what the actual
circumstances of the relationship between him and the board of
directors may show. Looking at it in that way, it seems to me clear
from the findings of the judge that Mr. Richards in fact impliedly
had authority to do what he did by these two agreements. I take
C    that in two ways. First, quite generally, the judge deals [20] with
the nature of Brayhead's business and the nature of the respon-
sibility of Mr. Richards, in particular, as against the other directors
of the board. I shall not read the passage at length. He points
out that the set-up of this company was unusual in that the direc-
tors were in the main working directors looking after various
D    subsidiaries and that Mr. Richards took and was allowed to take
authority to deal with general, financial and policy questions,
acting in the role of chief executive, without having to consult on
each occasion the other members of the board. Brayhead, and
Mr. Richards as directing Brayhead, were at this time and for
some time back had been engaged in an empire-building operation
E    involving the acquisition and take-over of various companies and
it seems clear that operations of that kind were entrusted to
Mr. Richards to carry out. I need not refer in detail to the
numerous passages, to some of which Lord Denning M.R. has
already referred, which show that Mr. Richards, with the consent
and acquiescence of the board, was allowed to act as chief execu-
F    tive and to make decisions relating to these financial questions.

Those are the general considerations, but one can carry them
further in relation to the particular company, Perdio. There had
been contact between Brayhead and Perdio since January, 1964,
and the question of their closer association had been under con-
sideration, at any rate at the end of 1964 and the beginning of 1965.
G    On January 1, 1965, there were heads of agreement entered into
between Lord Suirdale on behalf of Perdio and Mr. Richards on
behalf of Brayhead with the object of obtaining for Brayhead a
substantial holding in Perdio. Mr. Richards entered into them on
behalf of Brayhead. There is no dispute that that part of the

[20] Ante, p. 560G.

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
WILBERFORCE

A    arrangement was authorised by the board of directors of Brayhead. I would regard the subsequent transactions as flowing from that initial step and as covered by the authority, which Mr. Richards to my mind had on the judge's finding, to enter into that transaction. As the judge points out,[20a] a number of subsequent arrangements were made by Mr. Richards on his own responsibility. Between January 1, 1965, and May 19, 1965, he agreed on behalf of Brayhead to advance £150,000 to Perdio: he agreed to take over certain acceptance credits provided by Kleinwort Benson, and on February 5, 1965, he entered into and signed on behalf of Brayhead an agreement varying the agreement of January 1, 1965.

That leads one to the conclusion, which I think follows directly from the judge's analysis, that on May 19, 1965, Mr. Richards, when he made the further agreement with the object of bolstering up the finances of Perdio, was doing so under the authority which he had to enter into such arrangement on behalf of Brayhead. I add this significant fact, that after the board meeting which was held on May 19, 1965, and Mr. Richards and Lord Suirdale adjourned to another room to enter into the documents in question, there were two other transactions entered into which were evidenced by documents C.25 and C.24, some of them in the presence of other Brayhead directors, as to which it is not disputed that they were valid and binding on Brayhead. It seems to me, therefore, to follow that Mr. Richards is to be taken to have had authority from the board to carry through to a conclusion those arrangements for the support of Perdio which had been started on January 1, 1965.

I, therefore, reach the conclusion, both on Mr. Richards' general position with regard to the financial conduct and management of Brayhead and in relation to the particular transactions with Perdio, that he had implied authority from the board to enter into the two documents in question.

That makes it unnecessary to consider the question of ostensible authority, which, as Lord Denning M.R. has pointed out, may in some cases coincide with, and in most cases will overlap, the question of implied authority. I do not find it necessary, since actual authority exists, to consider whether it was necessary or possible for Lord Suirdale to rely on ostensible authority.

That then validates the transaction at the Brayhead end of it, and I now proceed to the second point, which requires consideration

[20a] Ante, pp. 560d, 561.

**1 Q.B.**          QUEEN'S BENCH DIVISION          589

A    of the other end of the transaction, that is at Lord Suirdale's          C. A.
end. The transaction is attacked at that end on the ground that          1967
Lord Suirdale did not disclose, as in fact he did not, his interest in          ────
these transactions to the board of directors of Brayhead, and it is          Hely-
Hutchinson
said that that circumstance disabled Lord Suirdale from suing on          v.
those contracts. That does raise a question of some general          Brayhead Ltd.
B    importance in relation to the duty to disclose, and I therefore add          ────
LORD
a few words on it, although I find myself in agreement with what          WILBERFORCE
the judge has said [21] and also with what has fallen from Lord          ────
Denning M.R.

Mr. Wheeler gave us an interesting historical account of the
origin of the present legislation with regard to the disclosure of
C    directors' interests. For a great many years he showed us that this
particular matter was usually dealt with through articles of asso-
ciation derived from the Companies Clauses Consolidation Act,
1845, under which a director was disqualified and had to vacate
office if he did not make proper disclosure. But in 1929 for the
first time the legislature intervened by introducing a section similar
D    to section 199 in the Companies Act, 1948, which imposed a duty
on directors to disclose their interest. I shall not read the section,
but it is clear to my mind that what it does is to impose a statutory
duty on directors of companies to disclose their interest in con-
tracts or proposed contracts under sanction of a monetary penalty
and that it says nothing directly as to the effect upon a contract or
E    proposed contract of failure to do so. It does contain, however, in
subsection (5) a statement that nothing in the section shall be
taken to prejudice the operation of any rule of law restricting
directors of a company from having any interest in contracts with
the company.

If the matter rested there, it would be plain that the civil law
F    relations between a director and his company with regard to a
contract or proposed contract would be governed by normal
principles of law and equity relating to contracts made by persons
in a fiduciary position, such principles as govern the position of
such persons as trustees or solicitors or anyone else in a similar
position. The normal consequences which follow from a contract
G    made by a person in such a fiduciary position are that the contract
may be voidable at the instance of, in this case, the company and
that in certain cases a director may be called upon to account for
profits which he has made out of the transaction. The application
of this doctrine of equity to companies is very clearly brought out

[21] Ante, p. 570E–F.

C. A.
1967
Hely-
Hutchinson
v.
Brayhead Ltd.
LORD
WILBERFORCE

in the case of *Transvaal Lands Co.* v. *New Belgium (Transvaal)*  **A**
*Land and Development Co.*,[22] a strong case because the contract
was between two companies, in one of which a director had an
interest. Astbury J. at first instance and the Court of Appeal went
into the general principles of law which relate to these matters in
some detail, both of them quoting the well known passage, which
I shall not repeat, from Lord Cranworth's speech in *Aberdeen*  **B**
*Railway Co.* v. *Blaikie Brothers.*[23] Astbury J.[24] pointed out that in
certain circumstances the appropriate remedy might be to deprive
the director of the profits which he had made, but in relation to that
particular type of contract, both Astbury J. and the Court of
Appeal came to the conclusion that the contract was voidable.

With that in mind, one can see what the meaning of article 99  **C**
of the company's articles of association is, an article which other-
wise might appear to be rather obscure in its drafting. It is couched
in a clearly permissive form. It says first that a director may take
an interest in a contract, and then says he shall not be liable for the
profit provided he has made the statutory disclosure. It seems to
me what that means is this, that if the statutory disclosure is made,  **D**
then a director's contracts with a company are exempted from the
normal consequences which would follow under the general law
where one person who is in a fiduciary position enters into a con-
tract with a person to whom he owes the fiduciary duty; and there
is also the second consequence, that the person in the fiduciary
position does not have to account for any profit. There is nothing  **E**
in this article which positively attaches any consequences to a
failure to disclose. All that it does is to relieve a contracting
director from the consequences which would attach under the
general law, and those consequences as regards the validity of a
contract are in my opinion that the contract is voidable at the option
of the company.  **F**

Mr. Wheeler, in seeking to contend that a further consequence
follows, namely, non-enforceability by the director, was not able
to point to any decision either relating to companies or otherwise
to persons holding a fiduciary position which went so far. He
relied on two cases. The first was *Flanagan* v. *Great Western*
*Railway Co.*,[25] where specific performance was sought of an agree-  **G**
ment to grant a lease over the refreshment rooms on the down
platform at Reading station. That, however, does not seem to me
to support the proposition for which he is contending, for I would

---

[22] [1914] 2 Ch. 488; 31 T.L.R. 1,          [24] [1914] 2 Ch. 488, 496.
C.A.          [25] (1868) L.R. 7 Eq. 116.
[23] (1854) 1 Macq. 461, 471, H.L.

**1 Q.B.**          QUEEN'S BENCH DIVISION                    591

A    regard a refusal to grant specific performance really as the counter-
part on the director's side of avoidance of the contract on the side
of the company.  It seems to me a very different thing to say that
a contract if not fully implemented need not be specifically per-
formed and to say that when it is too late to avoid a contract, the
other side has no right to enforce it.

B        The other authority on which he relied was *Kaye* v. *Croydon
Tramways*,[26] to which my Lord has referred.  There is nothing in
the decision which supports his argument.  There is only a passage
in the judgment of Lord Lindley M.R.,[27] where he says that the
director cannot enforce as against the company any contract.  Now

C    anything, of course, which falls from Lord Lindley in this context
commands considerable respect but I do not think that in that
passage he can have intended to introduce a new category of
remedy or defence to be available to a company when a director
has failed to disclose his contract.  The case itself had nothing to
do directly with the enforcement by directors of a contract.  It was

D    a case between two companies and he is dealing there with the
argument that as the director has failed to disclose and as there
was an article saying that a director should not be capable of being
interested, that made the contract ultra vires the company.  That
of course is not an argument which we are concerned with here.

E    The words in question are contained in a short passage in which in
very general terms he describes the legal consequences of a failure
to disclose and should not, I think, be read as a definition of the
circumstances in which a contract may or may not be binding on
a company or as in any way a statement of the remedy, certainly
not of a new remedy, which a company may possess.  I cannot

F    read it as supporting the proposition that non-enforceability of a
contract which it is too late to avoid is a consequence of a failure
to disclose.

         I, therefore, come to the conclusion, which is substantially that
reached by the judge, that the failure to disclose merely rendered
the contract voidable and, it being conceded that avoidance is not

G    now possible, both contracts are enforceable by Lord Suirdale
against the company.

         That is sufficient to dispose of the appeal and I would only add,
as has Lord Denning M.R., that had the question of warranty of
authority arisen for decision, I would agree both with him and the

C. A.

1967

Hely-
Hutchinson
*v.*
Brayhead Ltd.

LORD
WILBERFORCE

---

[26] [1898] 1 Ch. 358.          [27] Ibid. 368.

**A**

judge that really no answer could be shown to Lord Suirdale's claim to recover damages against Mr. Richards for breach of warranty of authority.

I would, therefore, dismiss the appeal.

**B**

LORD PEARSON.  Mr. Richards on May 19, 1965, signed a contract of guarantee and a contract of indemnity in favour of Lord Suirdale in connection with the affairs of the Perdio Company in which they were both concerned.  Mr. Richards purported to enter into these contracts on behalf of the Brayhead company.  Lord Suirdale, who was a director of Brayhead, ought to have disclosed his interest in the contract at a meeting of the directors of Brayhead, but he failed to do so.  Now Lord Suirdale is in substance suing Brayhead for sums due under these two contracts.

**C**

There are broadly two main questions arising: (1) Did Mr. Richards have actual or ostensible authority to contract on behalf of Brayhead, or is Lord Suirdale entitled to succeed in reliance on the principle of *Royal British Bank* v. *Turquand* [28]? (2) How, if at all, are the contracts affected by Lord Suirdale's failure to disclose his interest to the board of directors of Brayhead?

**D**

On the first question I agree that on the judge's findings of fact, which are not disputed, there is proof that Mr. Richards had actual authority to make the contracts on behalf of Brayhead.  The points to which I attach most importance in coming to this conclusion are these.  First, Mr. Richards, while acting as de facto managing director and chief executive and entering into large transactions on behalf of the company, would sometimes merely report the transactions and not seek prior authority or subsequent confirmation by the board, and the board acquiesced in this course of dealing.  Secondly, these two contracts, though they seem large and hazardous, were within the scope of Brayhead's business.  Brayhead were a holding company and their business involved taking over other companies and operating them as subsidiaries.  In the present case Brayhead were taking over the Perdio Company with a view to operating it as a subsidiary and they were pouring in money for the purpose of keeping it alive, though they failed to do so.  These contracts were intended to assist in keeping the Perdio Company alive.

**E**

**F**

**G**

The difference and the relationship between actual authority and ostensible authority were explained by Diplock L.J. in *Freeman & Lockyer* v. *Buckhurst Park Properties (Mangal) Co. Ltd.* [29]

[28]  6 E. & B. 327.                    [29]  [1964] 2 Q.B. 480, 502, 503.

**1 Q.B.**          QUEEN'S BENCH DIVISION          593

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
PEARSON

**A** There is, however, an awkward question arising in such cases as to how the representation which creates the ostensible authority is made by the principal to the outside contractor. There is this difficulty. I agree entirely with what Diplock L.J.[30] said that such representation has to be made by a person or persons having actual authority to manage the business. Be it supposed for convenience that such persons are the board of directors. Now there **B** is not usually any direct communication in such cases between the board of directors and the outside contractor. The actual communication is made immediately and directly, whether it be express or implied, by the agent to the outside contractor. It is, therefore, necessary in order to make a case of ostensible authority **C** to show in some way that such communication which is made directly by the agent is made ultimately by the responsible parties, the board of directors. That may be shown by inference from the conduct of the board of directors in the particular case by, for instance, placing the agent in a position where he can hold himself out as their agent and acquiescing in his activities, so that it can be **D** said they have in effect caused the representation to be made. They are responsible for it and, in the contemplation of law, they are to be taken to have made the representation to the outside contractor.

For the present purpose it is important to note that actual authority and ostensible authority are not mutually exclusive, and **E** indeed, as Diplock L.J.[31] pointed out, they generally co-exist and coincide. Therefore, the decision of the judge in the present case that there was ostensible authority does not preclude or stand in the way of a decision by this court on the facts found that there was actual authority, and for the reasons which have been given, which I need not seek to repeat, I would hold that there was proof **F** of actual authority in this case.

I will, however, add this. If the question arises between the principal and the agent—either of them claiming against the other —actual authority must be proved. There is no question of ostensible authority as between those two parties, the principal and the agent. If the contractor is claiming against the principal on a **G** contract made by the agent professedly on behalf of the principal, the contractor can succeed by proving actual or ostensible authority, but usually it is easier for him to prove ostensible authority and that is what he chooses to do. The peculiarity of the present case is that the proof of ostensible authority, which

[30] [1964] 2 Q.B. 480, 506.          [31] Ibid. 502.

C. A.

1967

Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
PEARSON

otherwise would have been easy, is complicated by the existence of a doubt whether, generally or on the facts of this particular case, a director can rely on ostensible authority or on the principle of *Turquand's* case [32] when he is suing on a contract professedly made on behalf of the company of which he is a director. It can be suggested that a director has by virtue of his office the means of knowing the true facts about the alleged authority and that therefore he is not entitled to rely on the representation of authority. That may or may not be right. I am not expressing any opinion as to how that doubt should be resolved. There is ample proof of actual authority in the present case, and that is a sufficient ground for deciding the first main question in favour of Lord Suirdale.

The second main question is: How, if at all, are the contracts affected by Lord Suirdale's failure to disclose his interests? Section 199 of the Companies Act, 1948, and article 99 of Brayhead's articles of association contain the provisions relied on by Brayhead. It is not contended that section 199 in itself affects the contract. The section merely creates a statutory duty of disclosure and imposes a fine for non-compliance. But it has to be read in conjunction with article 99. The first sentence of that article is obscure. If a director makes or is interested in a contract with the company, but fails duly to declare his interest, what happens to the contract? Is it void, or is it voidable at the option of the company, or is it still binding on both parties, or what? The article supplies no answer to these questions. I think the answer must be supplied by the general law, and the answer is that the contract is voidable at the option of the company, so that the company has a choice whether to affirm or avoid the contract, but the contract must be either totally affirmed or totally avoided and the right of avoidance will be lost if such time elapses or such events occur as to prevent rescission of the contract: *Great Luxembourg Railway Co.* v. *Magnay* [33]; *In re Cape Breton Co.*[34]; *Kaye* v. *Croydon Tramways Co.*[35]; *Transvaal Lands Co.* v. *New Belgium (Transvaal) Land and Development Co.*[36]; and *Cook* v. *Deeks.*[37]

An argument was based on the language used by Lord Lindley

[32] 6 E. & B. 327.
[33] (1858) 25 Beav. 586, 593, 594.
[34] 26 Ch.D. 221, 223, 228, 229, 234.
[35] [1898] 1 Ch. 358, 368.
[36] [1914] 2 Ch. 488, 505.
[37] [1916] 1 A.C. 554, 563, 564, P.C.

**1 Q.B.**          QUEEN'S BENCH DIVISION                    595

A  M.R., in *Kaye* v. *Croydon Tramways Co.*[38] where he stated the
   consequences of a director being interested in a contract with
   the company.  He said [38]:

> " secondly, there is what I may call the general legal conse-
> quence, that he cannot enforce, as against the company,
> any contract which he has entered into with that personal
> interest."

B

It was contended that a contract which is unenforceable by
the director is radically different from a contract which is void-
able by the company.  But I am not able to agree.  The contract,
though unenforceable by the director, is enforceable by the
C  company.  If the company chooses to enforce it, they must affirm
the whole contract, performing their part of it as well as requiring
performance by the director of his part of it.  If the company
chooses not to enforce it, the contract is of no effect.  The con-
sequences are the same as if the contract were voidable by the
company, and indeed I do not think there is more than a verbal
D  difference between saying that the contract is unenforceable by
the director and saying that it is voidable by the company.

In this case, therefore, the two contracts were only voidable,
and on the facts it is conceded that rescission became impossible
and so Brayhead have lost their right to avoid the contracts.

Therefore, the second main question also must be decided in
E  favour of Lord Suirdale.

On the further question relating to breach of warranty of
authority, which would only arise if a different view be taken on
the earlier question, I agree with what has been said and have
nothing to add.

I would dismiss the appeal.

F

*Appeal dismissed with costs.*

Solicitors: *Cartwright, Cunningham,* for *T. W. Stuchbery &
Son, Windsor*; *Linklaters & Paines.*

G          [38] [1898] 1 Ch. 358, 368.

[Reported by HOOSEN COOVADIA, ESQ., Barrister-at-Law.]

C. A.
1967

Hely-
Hutchinson
v.
Brayhead Ltd.

LORD
PEARSON

**EXHIBIT L**

# Bowstead & Reynolds on Agency 22nd Ed.
## Consolidated Mainwork Incorporating Second Supplement
## Chapter 3 - Authority of Agents
## Section 1. - Actual and Apparent Authority

## Article 22

## General Principles

(1) **3-001**

The authority of an agent may be—

   (a) actual (express or implied) where it results from a manifestation of assent that the agent should represent or act for the principal expressly or impliedly made by the principal to the agent; or

   (b) apparent, where it results from such a manifestation made by the principal to third parties.[1]

(2) The burden of establishing a conferral of authority rests on the party asserting its existence.

(3) A conferral of authority does not remove the principal's privilege to perform the same tasks personally.

(4) A principal cannot rely on the unauthorised acts of an agent unless the principal ratifies those acts.

The propositions contained in Articles 23 to 32 relate directly to actual authority only; but they may also be relevant to the ascertainment of apparent authority.

## Comment

### 3-002

The notion of authority is explained in Article 1 and this Article broadly follows the scheme there adopted. It has already been pointed out that the placing together of the concepts of actual and apparent authority can easily be criticised,[2] and this point is now due for further discussion. This chapter deals primarily with actual authority, and the rules for determining what is and what is not to be regarded as actually authorised. The scope of an agent's authority may require to be investigated from the point of view of any of three relationships: (i) that of principal and third party dealing with the agent; (ii) that of principal and agent; and (iii) that of agent and third party. Thus where there is actual authority, the principal will prima facie be liable to, and entitled to sue, the third party on the agent's transactions; the principal may be liable to indemnify and reimburse the agent and/or entitled to proceeds received by the agent; and the agent will be free from liability for breach of warranty of authority to the third party. In this chapter no distinction is expressly made between these three relationships, to all of which the agent's actual authority may be relevant. Other general aspects of authority, including the fact that a conferral of authority is not usually to the exclusion of the principal's own powers, and the issue of the onus of proving a conferral of authority, are dealt with in the following paragraphs.

## Actual authority

### 3-003

Actual authority is the authority which the principal has given the agent wholly or in part by means of words or writing (called here express authority) or is regarded by the law as having given the agent because of the interpretation put by the law on the relationship and dealings of the two parties. Although founded in the principal's assent, the conferral of authority is judged objectively:

## Authority Implied from Course of Dealing and Circumstances of Case

### 3-042

An agent has, in addition to the forms of authority indicated in Articles 27 to 31, such authority as is to be inferred from the conduct of the parties and the circumstances of the case.[341]

## Comment

### 3-043

The types of authority indicated in Articles 27 to 31 do not exhaust the notion of implied authority, for it is clear that over and above authority to do incidental acts, the acts usually performed by a person holding the position in question, the acts usually performed by a person following the agent's particular profession or occupation, and authority to follow usages customary in the place, market or business concerned, an agent may have an authority peculiar to the circumstances of the particular case where such authority can be inferred. The question as to implication does not stop at the matters previously mentioned, but goes on to involve consideration of the whole circumstances of the agent's position. This may lead to an agent's having a wider authority initially, or to the agent's authority being enlarged by the principal's acquiescence in the assumption of further powers.[342] Thus in *Hely-Hutchinson v Brayhead Ltd*[343] the chairman of a company acted as de facto managing director and chief executive of it, and entered into larger transactions on its behalf which he would sometimes merely report to the board without seeking prior authority or subsequent ratification. The Board acquiesced in this course of dealing. The chairman was held to have had actual authority equivalent to that of a managing director, though he was acting beyond the normal powers of a chairman.

This type of implied authority corresponds to the implied appointment of an agent dealt with in Article 8. It results from the application of the general rules as to interpretation and construction of contracts and agreements. There may of course also be cases where such facts may merely be taken, as a matter of evidence, to point to the fact that express authority was actually conferred.[344] For the relevance of a course of dealing to the concept of apparent authority, see below, para.8-014.

---

154.  *Pole v Leask (1860) 28 Beav. 562 at 574–575 (affirmed (1863) 33 L.J.Ch. 155); SMC Electronics v Akhter Computers Ltd [2001] 1 B.C.L.C. 433; Bayley v Wilkins (1849) 7 C.B. 886; Collen v Gardner (1856) 21 Beav. 540; Nyyar v Sapte [2009] EWHC 3218 (QB); [2010] P.N.L.R. 15* at [132]; and see Illustrations.

155.  *Howard v Baillie (1796) 2 H.Bl. 618* at 619, per Eyre CJ. See too *The West of England Ship Owners Mutual P. & I. Assoc. v Hellenic Industrial Development Bank SA [1999] 1 Lloyd's Rep. 93.*

156.  e.g. *Beaufort v Neeld (1845) 12 C. & F. 248; Dingle v Hare (1859) 7 C.B.(N.S.) 145; Wiltshire v Sims (1808) 1 Camp. 258.*

157.  cf. above, para.3-005. See *Ryan v Pilkington [1959] 1 W.L.R. 403*; criticised by Powell, pp.51–52 and finally disapproved by the House of Lords in *Sorrell v Finch [1977] A.C. 728.*

158.  *United Bank of Kuwait Ltd v Hammoud [1988] 1 W.L.R. 1051* at 1066–1067.

159.  Powell, p.46.

160.  See Illustrations 2 and 10; and *Smith v Peter & Diana Hubbard Pty Ltd [2006] NSWCA 109.*

161.  e.g. *Gokal Chand-Jagan Nath v Nand Ram Das-Atma Ram [1939] A.C. 106*; see below, para.4-007.

162.  *Rosenbaum v Belson [1900] 2 Ch. 267*; the relevant provision is now s.2 of the Law of Property (Miscellaneous Provisions) Act 1989. And see *Gavaghan v Edwards [1961] 2 Q.B. 220*; Article 6.

163.  *Smith v MacGowan [1938] 3 All E.R. 447.* See also *Smith v Webster (1876) 3 Ch.D. 49*; *Van Praagh v Everidge [1902] 2 Ch. 266, reversed on other grounds [1903] 1 Ch. 434.* But sales by auction no longer require a memorandum, nor to be in writing: Law of Property (Miscellaneous Provisions) Act 1989 s.2.

164.  *Kaye v Brett (1850) 5 Exch. 269* at 274.

165.  See *Sanderson v Bell (1833) 2 C. & M. 304.*

166.  *Lettice v Judkins (1840) 9 L.J.Ex. 142.*

167.  *Butwick v Grant [1924] 2 K.B. 483*, Illustration 1 to Article 81. See also *Drakeford v Piercy (1866) 7 B. & S. 515.*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

168. *International Sponge Importers Ltd v Andrew Watt & Sons [1911] A.C. 279*, Illustration 2 to Article 81; *Capel v Thornton (1828) 3 C. & P. 352*. See further Articles 28 and 81.

169. *Bayley v Wilkins (1849) 7 C.B. 886.*

170. *Metropolitan Waste Disposal Authority v Willoughby Waste Disposals Ltd (1987) 9 N.S.W.L.R. 7.* See also *Paget v Pearson (1949) 49 S.R. (N.S.W.) 235* (authority to obtain possession of premises included authority to sign notice to quit).

171. *Bank of Scotland v Dominion Bank (Toronto) [1891] A.C. 592.*

172. *Benmag Ltd v Barda [1955] 2 Lloyd's Rep. 354* at 357 (but on the facts of the case such authority could be inferred from the conduct of the parties); cf. *Abrahams v Spitz (1963) 107 S.J. 113* (agent to sell car had authority to warrant that it was insured).

173. *Woodin v Burford (1834) 2 Cr. & M. 391.*

174. *Whittaker v Forshaw [1919] 2 K.B. 419.*

175. *Leckenby v Wolman [1921] W.N. 100.*

176. *Tappenden v Artus [1964] 2 Q.B. 185.* See further cases cited above, para.1-033.

177. *Strover v Harrington [1988] Ch. 390* at 409–410.

178. *Cleveland Mfg. Co Ltd v Muslim Commercial Bank Ltd [1981] 1 Lloyd's Rep. 646.*

179. *Norwich Union Life & Pensions Ltd v Strand Street Properties Ltd [2009] EWHC 1109 (Ch)* at [231].

180. *Underwood, Son & Piper v Lewis [1894] 2 Q.B. 306* at 310. Lodging a notice of appeal in time may also be within the solicitor's incidental authority, but proceeding to hearing without fresh authorisation is unlikely to be incidental to the original retainer: see *Donsland Ltd v van Hoogstraten [2002] EWCA Civ 253; [2002] P.N.L.R. 26* at [26].

181. *Donsland Ltd v van Hoogstraten [2002] EWCA Civ 253; [2002] P.N.L.R. 26* at [26].

182. See Comment and Illustrations. See also Comment to Article 81; Article 27, Illustration 2; Article 30, Illustrations 6 and 7.

183. See further above, para.3-022.

184. Apart from banks as receiving agents, see *Cheng Yuen v Royal Hong Kong Golf Club [1998] I.C.R. 131* at 138 (PC) (golf club as collecting agent for caddies).

185. *Sweeting v Pearce (1859) 7 C.B.(N.S.) 449* at 480, 484; affirmed (1861) 9 C.B.(N.S.) 534, Illustration 4; *Farrer v Lacy, Hartland & Co (1885) 31 Ch.D. 42; Papé v Westacott [1894] 1 Q.B. 272; Blumberg v Life Interests and Reversionary Securities Corp Ltd [1897] 1 Ch. 171; [1898] 1 Ch. 27; Studholme v Government Advances to Settlers Office Superintendent (1899) 18 N.Z.L.R. 257; Southbourne Investments Ltd v Greenmount Manufacturing Ltd [2008] 1 N.Z.L.R. 30 (NZSC)* at [19] (solicitor has no implied authority to accept payment of deposit by cheque in relation to land transaction).

186. Though if he does he may be estopped against the principal from saying that he has not received the money: *Gillard v Wise (1826) 5 B. & C. 134.*

187. See Articles 25, 27, 29 and 30.

188. See Article 31.

189. See Comment to Article 31.

190. See *Houghton v Matthews (1803) 3 B. & P. 485* at 489; *Pelham v Hilder (1841) 1 Y. & C.C.C. 3; Boden v French (1851) 10 C.B. 886; Papé v Westacott [1894] 1 Q.B. 272* at 278; *R. & E. Tingey & Co Ltd v John Chambers & Co Ltd [1967] N.Z.L.R. 785.*

191. *D. & C. Builders Ltd v Rees [1966] 2 Q.B. 617.*

192. *Bridges v Garrett (1870) L.R. 5 C.P. 451; International Sponge Importers Ltd v Andrew Watt & Sons [1911] A.C. 279; Papé v Westacott [1894] 1 Q.B. 272; Bradford & Sons v Price Brothers (1923) 92 L.J.K.B. 871* (authorities reviewed); *Clay Hill Brick & Tile Co Ltd v Rawlings [1938] 4 All E.R. 100.*

193. *Blumberg v Life Interests and Reversionary Securities Corp Ltd [1897] 1 Ch. 171.*

194. *Farrer v Lacy, Hartland & Co (1885) 31 Ch.D. 42; Papé v Westacott [1894] 1 Q.B. 272; Kearney v Cullen [1955] I.R. 18* (solicitor).

195. See *Underwood v Nicholls (1855) 17 C.B. 239* at 244; *Papé v Westacott [1894] 1 Q.B. 272* at 278, 283 (estate agent); *Farrer v Lacy, Hartland & Co (1885) 31 Ch.D. 42* (auctioneer). In many transactions the supporting of a cheque by a cheque card or credit card may be normal. As to notification that only certain forms of cheque are acceptable, see *International Sponge Importers Ltd v Andrew Watt & Sons [1911] A.C. 279; Bradford & Sons v Price Brothers (1923) 92 L.J.K.B. 871.* As to payment

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

by cheque under a stipulation for payment in cash, see *Tankexpress A/S v Cie. Financière Belge des Petroles SA [1949] A.C. 76.* Where the delivery of goods has the effect of releasing a lien, it may be held that a mere driver, for instance, is not authorised to deliver against a cheque, which may not be met: see *Esterhuyse v Selection Cartage (Pty) Ltd (1965) 1 S.A. 360*; *McGraw-Edison (Canada) Ltd v Direct-Winters Tpt. Ltd [1969] 1 O.R. 663.* See further van Zyl (1974) 91 S.A.L.J. 337 (on South African cases).

196. *Re Charge Card Services Ltd [1989] Ch. 497.*

197. *Pearson v Scott (1878) 9 Ch.D. 198* at 205, per Fry J; and see in general Illustrations.

198. See Article 31; *Sweeting v Pearce (1859) 7 C.B.(N.S.) 449; affirmed (1861) 9 C.B.(N.S.) 534*, Illustration 4.

199. *Gokal Chand-jagan Nath v Nand Ram Das-Atma Ram [1939] A.C. 106* at 113, per Lord Wright.

200. *Gokal Chand-jagan Nath v Nand Ram Das-Atma Ram [1939] A.C. 106* at 113, per Lord Wright.

201. *Williams v Evans (1866) L.R. 1 Q.B. 352*; *Sykes v Giles (1839) 5 M. & W. 645*. See also *Hogarth v Wherley (1875) L.R. 10 C.P. 630*; *Howard v Chapman (1831) 4 C. & P. 508* (no authority to accept payment in goods). cf. *Farrer v Lacy, Hartland & Co (1888) 31 Ch.D. 42* (cheque).

202. *Hine Brothers v Steamship Insurance Syndicate Ltd (The Netherholme) (1895) 72 L.T. 79* (but facts rather special).

203. *Barker v Greenwood (1837) 2 Y. & C. Ex. 414.*

204. *Pearson v Scott (1878) 9 Ch.D. 198*; *Blackburn v Mason (1893) 68 L.T. 510*; *Crossley v Magniac [1893] 1 Ch. 594*; *Anderson v Sutherland (1897) 13 T.L.R. 163* (all stockbroker cases). As to custom, see Article 31. See also *Underwood v Nicholls (1855) 17 C.B. 239*; *Wrout v Dawes (1858) 25 Beav. 369*; *Coupe v Collyer (1890) 62 L.T. 927* (solicitors).

205. *Sweeting v Pearce (1859) 7 C.B.(N.S.) 449; affirmed (1861) 9 C.B.(N.S.) 534*; *Stewart v Aberdein (1838) 4 M. & W. 211*; *Legge v Byas, Mosley & Co (1901) 7 Com.Cas. 16*; *Matveieff & Co v Crosfield (1903) 51 W.R. 365*; *McCowin Lumber and Export Co v Pacific Marine Insurance Co (1922) 38 T.L.R. 901*; *Stolos Cia. SA v Ajax Insurance Co Ltd (The Admiral C) [1981] 1 Lloyd's Rep. 9.* But see *Trading & General Investment Co v Gault Armstrong & Kemble Ltd (The Okeanis) [1986] 1 Lloyd's Rep. 195* at 200 where reference is made to evidence given that certain accounts of the customs of insurance companies were "completely out of date". See in general *Hodgin, Insurance Intermediaries: Law and Practice (1992).*

206. *Breming v Mackie (1862) 3 F. & F. 197.* But there may be a custom permitting this: *Catterall v Hindle (1867) L.R. 2 C.P. 368*; *Heisch v Carrington (1833) 5 C. & P. 471*; see Article 31.

207. See Article 29, Illustration 7 (insurance agent); *New Zealand Tenancy Bonds Ltd v Mooney [1986] 1 N.Z.L.R. 280* (estate agent); cf. *Jawara v Gambian Airways [1992] E.G.C.S. 54 (PC)* (lawyer).

208. *Campbell v Hassel (1816) 1 Stark. 233.* But a contract can be varied by custom: see Article 31.

209. Illustrations 1 and 4.

210. Illustrations 2, 4, 5 and 9.

211. Illustrations 3, 6, 10 and 11.

212. Illustrations 2, 3, 7 and 10. See too *Taylor v Van Dutch Marine Holding Ltd [2019] EWHC 1951 (Ch); [2019] Bus. L.R. 2610* at [270] (limited power to borrow on principal's behalf).

213. See *Taylor v Rhino Overseas Inc [2020] EWCA Civ 353; [2020] Bus. L.R. 1486* at [34]–[36].

214. *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549* at 583, per Lord Denning MR. See further Illustration 4.

215. See, e.g. *Smith v M'Guire (1858) 3 H. & N. 554*; see Article 72.

216. e.g. *Barrett v Irvine [1907] 2 I.R. 462.*

217. See above, para.1-045.

218. As to this term see above, para.3-005.

219. e.g. *Collen v Gardner (1856) 21 Beav. 540*, Illustration 2; *Wright v Glyn [1902] 1 K.B. 745* (coachman); *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549* at 583. See also *Brady v Todd (1861) 9 C.B.(N.S.) 592*; *Howard v Sheward (1866) L.R. 2 C.P. 148*; *Brooks v Hassall (1883) 49 L.T. 560*; *Baldry v Bates (1885) 52 L.T. 620.* These are cases where the usual authority of the agent is relied on, and therefore the representation giving rise to apparent authority would be very general indeed: see Comment to Article 72.

220. *Sea Emerald SA v Prominvestbank-Joint Stockpoint Commercial Industrial and Investment Bank [2008] EWHC 1979 (Comm)* at [70].

221. ⚠ *Peers v Sneyd (1853) 17 Beav. 151.*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

222. ⚠ *Papillon v Brunton (1860) 5 H. & N. 518; Jones v Phipps (1868) L.R. 3 Q.B. 567; Townsends Carriers Ltd v Pfizer Ltd (1977) 33 P. & C.R. 361; Peel Developments (South) Ltd v Siemens Plc [1992] 2 E.G.L.R. 85.*

223. ⚠ *Re Pearson and I'Anson [1899] 2 Q.B. 618.*

224. ⚠ *Pearse v Boulter (1860) 2 F. & F. 133.*

225. ⚠ *Roe d. Rochester (Dean & Chapter) v Pierce (1809) 2 Camp. 96.*

226. ⚠ *Collen v Gardner (1856) 21 Beav. 540.*

227. ⚠ *The Huntsman [1894] P. 214; Barker v Highley (1863) 15 C.B.(N.S.) 27.*

228. ⚠ *Robinson v Gleadow (1835) 2 Bing. N.C. 156.*

229. ⚠ *Thomas v Lewis (1878) 4 Ex.D. 18.* See *Scrutton on Charterparties (17th edn),* Article 16 (omitted in later eds). Quaere as to the present day.

230. ⚠ *Re Haycraft Gold Reduction and Mining Co Ltd [1900] 2 Ch. 230; Houghton & Co v Nothard Lowe & Wills Ltd [1927] 1 K.B. 246 at 267; Northside Developments Pty Ltd v Registrar-General (1990) 170 C.L.R. 146 at 205; Hughes v NM Superannuation Pty Ltd (1993) 29 N.S.W.L.R. 653* (chairperson of directors); *Colin R Price & Associates Pty Ltd v Four Oaks Pty Ltd [2017] FCAFC 75* at [150]; *Neale v Ku De Ta SG Pte Ltd [2015] SGCA 28; Bishop Warden Property Holdings Ltd v Autumn Tree Ltd [2018] NZCA 285; [2018] 3 N.Z.L.R. 809* at [27]; *East Asia Co Ltd v PT Satria Tirtatama Energindo [2019] UKPC 30* at [58].

231. ⚠ See further, para.8-040 below.

232. ⚠ *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549; Rimpacific Navigation Inc v Daehan Shipbuilding Co Ltd [2009] EWHC 2941 (Comm); [2010] 2 Lloyd's Rep. 236.*

233. ⚠ *Dey v Pullinger Engineering Co [1921] 1 K.B. 77.*

234. ⚠ *Biggerstaff v Rowatt's Wharf Ltd [1896] 2 Ch. 93.*

235. ⚠ *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549.*

236. ⚠ *AMB Generali Holding AG v SEB Trygg Liv, etc. [2005] EWCA Civ 1237; [2006] 1 Lloyd's Rep. 318* at [32]; *Hawksford v Hawksford (2005) 191 F.L.R. 173; Smith v Butler [2012] EWCA Civ 314; [2012] Bus. L.R. 1836* at [36]. But context (such as with internal disputes) may lead to the conclusion that the commencement of litigation is a matter for the whole board: *Rushbrooke UK Ltd v 4 Designs Concept Ltd [2022] EWHC 1110 (Ch)* at [44].

237. ⚠ *Bank of New South Wales v Goulburn Valley Butter Co Pty Ltd [1902] A.C. 543 (PC); Corporation Agencies v Home Bank of Canada [1927] A.C. 318 (PC).*

238. ⚠ See *Midland Bank Ltd v Reckitt [1933] A.C. 1.*

239. ⚠ *Acute Property Developments Ltd v Apostolou [2013] EWHC 200 (Ch)* at [40].

240. ⚠ *Newcastle International Airport Ltd v Eversheds LLP [2012] EWHC 2648 (Ch); [2013] P.N.L.R. 5* at [111]; affirmed on this point [2013] EWCA Civ 1514; [2014] 1 W.L.R. 3073 at [76] (but finding of express authority).

241. ⚠ See *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 Q.B. 480* at 509; *Smith v Butler [2012] EWCA Civ 314; [2012] Bus. L.R. 1836* at [30]; *Spedley Securities Ltd v Greater Pacific Investments Pty Ltd (1992) 7 A.C.S.R. 155* at 16; *Thanakharn Kasikorn Thai Chamchat v Akai Holdings Ltd (In Liquidation) (2010) 13 HKCFAR 479* at [110]. It is doubtful whether a board of directors would any longer be expected to delegate total management power to a managing director: the broad dicta in *Biggerstaff v Rowatt's Wharf Ltd [1896] 2 Ch. 93* at 102, 106, should be viewed in the light of later authorities.

242. ⚠ *Interactive Technology Corp Ltd v Ferster [2016] EWHC 2896 (Ch)* at [188]; *East Asia Co Ltd v PT Satria Tirtatama Energindo [2019] UKPC 30* at [58].

243. ⚠ *E. Hannibal & Co Ltd v Frost (1988) 4 B.C.C. 3.* But cf. *Morgan v Babcock & Wilcox Ltd (1929) 43 C.L.R. 163.* See further Watts [2011] J.B.L. 214 at 215.

244. ⚠ *Lexi Holdings Plc v Pannone & Partners [2009] EWHC 2590 (Ch).*

245. ⚠ *Smith v Butler [2012] EWCA Civ 314; [2012] Bus. L.R. 1836* at [31].

246. ⚠ See *Left Bank Investments Pty Ltd v Ngunya Jarjum Aboriginal Corp [2020] NSWCA 144.*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

247. ⚠ *Panorama Developments (Guildford) Ltd v Fidelis Furnishing Fabrics Ltd [1971] 2 Q.B. 711*, recognising the change in the function of company secretaries since the early years of that century. As to a secretary's usual authority to communicate board decisions, see *Mahony v East Holyford Mining Co (1875) L.R. 7 H.L. 869* at 887 and 902; *Montreal and St Lawrence Light and Power Co v Robert [1906] A.C. 196* at 203 (joint representation of president and secretary). See too *Daimler Co Ltd v Continental Tyre & Rubber Co [1916] 2 A.C. 307* at 323 (but cf. 326).

248. ⚠ *Telstra Corp Ltd v Ivory [2008] QSC 123* at [89].

249. ⚠ *Kelly v Fraser [2012] UKPC 25; [2013] 1 A.C. 450* at [13].

250. ⚠ *Walker v Great Western Ry Co (1867) L.R. 2 Ex. 228.*

251. ⚠ *Cox v Midland Ry Co (1849) 3 Exch. 268.* See also *Houghton v Pilkington [1912] 3 K.B. 308*; cf. *Langan v Great Western Ry Co (1873) 30 L.T. 173.* See also Article 33.

252. ⚠ *Acey v Fernie (1840) 7 M. & W. 151.* See *MacGillivray on Insurance Law (14th edn), para.7-068 onwards.*

253. ⚠ *Linford v Provincial, etc., Ins Co (1864) 34 Beav. 291.* See Article 77, Illustrations 8, 9 and 10.

254. ⚠ *Wilkinson v General Accident Fire and Life Insurance Co Ltd [1967] 2 Lloyd's Rep. 182.*

255. ⚠ *The Unique Mariner [1978] 1 Lloyd's Rep. 438*; but see below, para.4-008.

256. ⚠ *Ashford Shire Council v Dependable Motors Pty Ltd [1961] A.C. 336.*

257. ⚠ *Bank of New South Wales v Owston (1879) 4 App.Cas. 270*, where there is a full review of the authorities; *Abrahams v Deakin [1891] 1 Q.B. 516.* But many of the old cases on false imprisonment may be out of date in England at least. Whereas in former times a person was "given in charge", the increased speed of communications today means that police officers are normally able to arrive soon enough to effect arrests on their own responsibility. See *Atiyah, Vicarious Liability in the Law of Torts (1967), pp.266–267.*

258. ⚠ *Ashton v Spiers & Pond (1893) 9 T.L.R. 606.*

259. ⚠ *Stedman v Baker & Co (1896) 12 T.L.R. 451.*

260. ⚠ *McKeand v Thomas (2006) 12 B.P.R. 23, 593* at [74] (NSWSC).

261. ⚠ *Toll (FGCT) Pty Ltd v Alphapharm Pty Ltd (2004) 219 C.L.R. 165.*

262. Illustrations 1, 2 and 7. See too *AIB Group (UK) Plc v Mark Redler & Co (A Firm) [2012] EWHC 35 (Ch) at [21]–[22]; affirmed on different grounds [2014] UKSC 58; [2015] A.C. 1503* (solicitor's usual authority in disbursing client moneys).

263. Illustrations 3–6.

264. See *Taylor v Rhino Overseas Inc [2020] EWCA Civ 353; [2020] Bus. L.R. 1486* at [34]–[36].

265. See above, para.3-028.

266. *United Bank of Kuwait Ltd v Hammoud [1988] 1 W.L.R. 1051* at 1063; *Sea Emerald SA v Prominvestbank-Joint Stockpoint Commercial Industrial and Investment Bank [2008] EWHC 1979 (Comm)* at [108] (experts should give evidence of their experience not just opinion); *Seiwa Australia Pty Ltd v Beard (2010) 75 N.S.W.L.R. 74* at [269] onwards (deprecating use of judicial notice in this context). See also Illustration 5.

267. See above, para.3-005.

268. See above, para.3-028.

269. *Hatch v Hale (1850) 15 Q.B. 10.* Tender to a man left in possession by the bailiff is ineffective: *Boulton v Reynolds (1859) 2 E. & E. 369.*

270. *Howard v Sheward (1866) L.R. 2 C.P. 148; Baldry v Bates (1885) 52 L.T. 620.* See also *Bank of Scotland v Watson (1813) 1 Dow. 40* at 45. But this question is now of less importance in view of warranties implied by statute.

271. *Brady v Todd (1861) 9 C.B.(N.S.) 592.*

272. *Brooks v Hassall (1883) 49 L.T. 569*; see Article 31.

273. *Antisell v Doyle [1899] 2 I.R. 275.*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

274.  *Blandy Bros & Co Ltd v Nello Simoni Ltd [1963] 2 Lloyd's Rep. 393.* cf. *Sickens v Irving (1858) 29 L.J.C.P. 25* (no authority to make substantially new contract); *Lindsay & Son v Scholefield (1897) 24 R. (Ct. of Sess.) 530.* See in general as to ship's agents Trappe [1978] L.M.C.L.Q. 595; Morris [1982] L.M.C.L.Q. 218; also *Intermediaries in Shipping (Grönfors ed., Gothenburg Maritime Law Association, 1990).* As to agency in chartering, see Anderson (2000) 31 J.M.L.C. 89.

275.  *Toepfer v Warinco AG [1978] 2 Lloyd's Rep. 569.* See further as to authority to waive contract terms *Dawson Line Ltd v Aktiengesellschaft für Chemische Industrie [1932] 1 K.B. 433; Ismail v Polish Ocean Lines [1976] Q.B. 893; Mardorf Peach & Co Ltd v Attica Sea Carriers Corp (The Laconia) [1977] A.C. 850* (authority of bank to accept late payment); *Surrey Shipping Co Ltd v Cie. Continentale (France) SA (The Shackleford) [1978] 1 W.L.R. 1080* (receiver of goods had authority to waive defects in notice of readiness); *The Happy Day [2002] EWCA Civ 1068; [2002] 2 Lloyd's Rep. 487* (receivers' agents); *The Northgate [2007] EWHC 2796; [2008] 2 All E.R. (Comm) 330* at [108] (implied power to waive in relation to notice of readiness); *State Rail Authority of NSW v Heath Outdoor Pty Ltd (1986) 7 N.S.W.L.R. 170* at 194 (advertising manager had authority to indicate circumstances in which employer would terminate advertising contract, but not to vary contract); *Nowrani Pty Ltd v Brown [1989] 2 Qd.R. 582* (solicitor had no authority to insert term into sale of land). See further *Restatement, Third, § 6.08* and Comment.

276.  ⚠ *Waugh v H.B. Clifford & Sons Ltd [1982] Ch. 374* (authorities reviewed); *Lucke v Cleary (2011) 111 S.A.S.R. 134; Nandrame v Ramsaran [2015] UKPC 20; Pavlovic v Universal Music Australia Pty Ltd [2015] NSWCA 313; (2015) 90 N.S.W.L.R. 605* at [7]; *Owners of Strata Plan No 57164 v Yau [2017] NSWCA 341* at [177]; *Ramsook v Crossley [2018] UKPC 9* (admissions of liability by attorney); *R v Mallick [2020] EWCA Crim 348* at [24] (criminal proceedings). But cf. *Re Newen [1903] 1 Ch. 812; Little v Spreadbury [1910] 2 K.B. 658; Thompson v Howley [1977] 1 N.Z.L.R. 16; Holmes v Kennard & Son (1984) 44 P. & C.R. 202* (solicitor for purchaser had no authority to cancel notice on land register); *Donnellan v Watson (1990) 21 N.S.W.L.R. 335* (no authority to agree to different compromise from that authorised); *Cordery, Solicitors (8th edn), p.80* (not reproduced in later editions); Fridman (1987) 36 U. New Brunswick L.J. 9. cf. above, para.3-005. It has been held that a Citizens' Advice Bureau worker had a somewhat wider authority: *Freeman v Sovereign Chicken Ltd [1991] I.C.R. 853.*

277.  *Re Munro Ex p. Singer [1981] 1 W.L.R. 1358; IVI Pty Ltd v Baycrown Pty Ltd [2005] QCA 205* at [33] (notice of revocation of offer given to purchaser's solicitor held ineffective where negotiations had principally been face-to-face). cf. *Von Essen Hotels 5 Ltd v Vaughan [2007] EWCA Civ 1349* at [36] (see below, para.8-206). See further Article 94.

278.  *Cherney v Deripaska [2007] EWHC 965 (Comm); [2007] 2 All E.R. (Comm) 785; Lantic Sugar Ltd v Baffin Investments Ltd [2009] EWHC 3325 (Comm); [2010] 2 Lloyd's Rep. 141* at [44]; *Glencore Agriculture BV v Conqueror Holdings Ltd [2017] EWHC 2893 (Comm); [2017] Bus. L.R. 2090.* cf. *Sino Channel Asia Ltd v Dana Shipping and Trading PTE Singapore [2017] EWCA Civ 1703.*

279.  *Lockett v Norman-Wright [1925] Ch. 56; James v Evans [2000] 3 E.G.L.R. 1; Vella v Permanent Mortgages Pty Ltd [2008] NSWSC 505* at [207]; *Pavlovic v Universal Music Australia Pty Ltd [2015] NSWCA 313; (2015) 90 N.S.W.L.R. 605* at [6].

280.  *Domb v Isoz [1980] 1 Ch. 548.* See also *Wise Think Global Ltd v Finance Worldwide Ltd [2013] H.K.E.C. 1790* (authority to receive deposit). cf. *Southbourne Investments Ltd v Greenmount Manufacturing Ltd [2008] 1 N.Z.L.R. 30 (NZSC)* at [19] (no authority to receive deposit in form of cheque).

281.  *Hamer v Sharp (1874) L.R. 19 Eq. 108; Prior v Moore (1887) 3 T.L.R. 624; Chadburn v Moore (1892) 61 L.J.Ch. 674; Thurman v Best (1907) 97 L.T. 239; Lewcock v Bromley (1920) 37 T.L.R. 48; Keen v Mear [1920] 2 Ch. 574; Wragg v Lovett [1948] 2 All E.R. 968;* (but cf. *Jawara v Gambian Airways [1992] E.G.C.S. 54, PC*); *Law v Robert Roberts & Co [1964] I.R. 292* (authorities reviewed). He is a "canvassing" or "introducing" agent: above, para.1-020. This does not exclude the possibility of other usages in other countries, e.g. *Powierza v Daley [1985] 1 N.Z.L.R. 558; Ngoi v Wen [2017] NZCA 519* (receipt of acceptance of counter-offer by vendor's agent).

282.  *Rosenbaum v Belson [1900] 2 Ch. 267; Allen & Co v Whiteman (1920) 89 L.J.Ch. 534; Wragg v Lovett [1948] 2 All E.R. 968; Spiro v Lintern [1973] 1 W.L.R. 1002.*

283.  *Keen v Mear [1920] 2 Ch. 574; Wragg v Lovett [1948] 2 All E.R. 968.* cf. *Wisecal Ltd v Conwell International Ltd [2011] 4 H.K.L.R.D. 275* at [22].

284.  *Mullens v Miller (1882) 22 Ch.D. 194.* But cf. *Overbrooke Estates Ltd v Glencombe Properties Ltd [1974] 1 W.L.R. 1335; Presser v Caldwell Estates Pty Ltd [1971] 2 N.S.W.L.R. 471.*

285.  *Sorrell v Finch [1977] A.C. 728.* See Articles 92 and 111. See also *New Zealand Tenancy Bonds Ltd v Mooney [1986] 1 N.Z.L.R. 280* (no authority to accept late payment of deposit); cf. *Kohn v Devon Mortgage Ltd (1985) 20 D.L.R. (4th) 480* (mortgage broker had authority to receive capital).

286.  See *Mynn v Joliffe (1834) 1 Moo. & Rob. 326; Petersen v Moloney (1951) 84 C.L.R. 91; Smith v Peter & Diana Hubbard Pty Ltd [2006] NSWCA 109;* cf. *Butwick v Grant [1924] 2 K.B. 483.*

287.  *Hill v Harris [1965] 2 Q.B. 601.*

288.  *Lo v Russell [2016] VSCA 323* at [37].

289.  *Emmerson v Heelis (1809) 2 Taunt. 38; White v Proctor (1811) 4 Taunt. 209; Kenneys v Proctor (1820) 1 Jac. & W. 350; Earl of Glengal v Barton (1836) 1 Keen 769* at 788; *Bell v Balls [1897] 1 Ch. 663; Chaney v Maclow [1929] 1 Ch. 461.* cf. *Van Praagh v Everidge [1903] 1 Ch. 434.* By virtue of s.2 of the Law of Property (Miscellaneous Provisions) Act 1989 the contract

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

must now be in writing; but this does not apply in public auctions, which now require neither writing nor memorandum. Quaere whether an auctioneer has authority to sign a written contract. See *Murdoch, Law of Estate Agency (5th edn), p.174 onwards.*

290. See *Mynn v Joliffe (1834) 1 Moo. & Rob. 326*; cf. *Butwick v Grant [1924] 2 K.B. 483.*

291. See, e.g. *Smith v Land and House Property Corp (1884) 28 Ch.D. 7.* But cf. *Overbrooke Estates Ltd v Glencombe Properties Ltd [1974] 1 W.L.R. 1335*; and *Collins v Howell-Jones (1980) 259 E.G. 331,* where this authority was excluded.

292. See *Sykes v Giles (1830) 5 M. & W. 645; Murdoch, Law of Estate Agency (5th edn), p.229 onwards.*

293. cf. Factors Act 1889 s.12(3); *Chelmsford Auctions Ltd v Poole [1973] Q.B. 542.*

294. *Nelson v Aldridge (1818) 2 Stark. 435.*

295. *Payne v Lord Leconfield (1882) 51 L.J.Q.B. 642; Gardiner v Grigg (1938) 38 S.R.(N.S.W.) 524.*

296. *Seton v Slade (1802) 7 Ves. 265 at 276.*

297. *Daniel v Adams (1764) Ambl. 495; Marsh v Jelf (1862) 3 F. & F. 234.* cf. *Else v Barnard (1860) 28 Beav. 228; Bousfield v Hodges (1863) 33 Beav. 90.* See in general *Murdoch, Law of Estate Agency (5th edn), Ch.3.*

298. *Seiwa Australia Pty Ltd v Beard (2010) 75 N.S.W.L.R. 74* at [310] (general discussion of usual authority of accountants).

299. Illustrations 1–7; *Sutton v Tatham (1839) 10 A. & E. 27; Ex p. Howell, re Williams (1865) 12 L.T. 785.* There is a useful discussion of the requirement and effects of custom in *Law Com. C.P. No. 124, Fiduciary Duties and Regulatory Rules (1992), pp.63–76.*

300. *Robinson v Mollett (1874) L.R. 7 H.L. 802,* Illustration 8.

301. *Harker v Edwards (1887) 57 L.J.Q.B. 147;* and see Comment. Rules (1) and (2) were cited with approval in *Anglo Overseas Transport (United Kingdom) Ltd v Titan Industrial Corp (United Kingdom) Ltd [1959] 2 Lloyd's Rep. 152* at 160.

302. Illustrations 8 and 9. See also *Accidia Foundation v Simon C. Dickinson Ltd [2010] EWHC 3058 (Ch)* at [75] (appointment of art sales sub-agent on terms that contemplated suppression of terms of remuneration).

303. Illustration 10.

304. *Re North Western Rubber Co Ltd and Hüttenbach & Co [1908] 2 K.B. 907* at 919, per Fletcher Moulton LJ. The case itself was overruled in *Produce Brokers Co Ltd v Olympia Oil & Cake Co Ltd [1916] 1 A.C. 314,* which contains a detailed consideration of much of this topic. See also *Drexel Burnham Lambert International NV v El Nasr [1986] 1 Lloyd's Rep. 356* at 365, per Staughton LJ: "What has to be shown by evidence is that the custom is recognised as imposing a binding obligation".

305. See Articles 27–30.

306. See *Hamilton v Young (1881) 7 L.R.Ir. 289; Ex p. Howell, Re Williams (1865) 12 L.T. 785; Cunliffe-Owen v Teather & Greenwood [1967] 1 W.L.R. 1421* at 1438; *General Reinsurance Corp v Forsakringsaktiebolaget Fenna Patria [1983] Q.B. 856.*

307. *Stag Line Ltd v Board of Trade (1950) 83 Lloyd's Rep. 356* at 360. See also *Blandy Bros v Nello Simoni [1963] 2 Lloyd's Rep. 24 at 29; [1963] 2 Lloyd's Rep. 393* at 400, 404.

308. Thus in *Anglo-African Merchants Ltd v Bayley [1970] 1 Q.B. 311* at 323 Megaw J said that the court would not uphold a custom which contradicted the principle that an agent might not serve both parties simultaneously. This was followed in *North and South Trust Co v Berkeley [1971] 1 W.L.R. 470,* Illustration 3 to Article 5; but cf. *Goshawk Dedicated Ltd v Tyse & Co Ltd [2006] EWCA Civ 54.* And see Article 44, Illustration 5.

309. These well-known principles were accepted in *Oricon Waren-Handels GmbH v Intergraan NV [1967] 2 Lloyd's Rep. 82* at 96 and in *Cunliffe-Owen v Teather & Greenwood [1967] 1 W.L.R. 1421* at 1439. See also *Con-Stan Industry of Australia Pty Ltd v Norwich Winterthur Insurance (Australia) Ltd (1986) 160 C.L.R. 226.* As to (v) see further *Palgrave, Brown & Son Ltd v SS Turid [1922] 1 A.C. 397* at 406; *London Export Corp v Jubilee Coffee Roasting Co [1958] 1 W.L.R. 661* at 675; *Kum v Wah Tat Bank [1971] 1 Lloyd's Rep. 437; Accidia Foundation v Simon C. Dickinson Ltd [2010] EWHC 3058 (Ch)* at [69] and [71] (art agent not authorised to appoint sub-agent on terms that the latter could keep as commission any sums in excess of floor price).

310. *Tucker v Linger (1883) 8 App.Cas. 508* at 511, per Lord Blackburn.

311. *Benjamin v Barnett (1903) 19 T.L.R. 564.*

312. *Harker v Edwards (1887) 57 L.J.Q.B. 147; Cunliffe-Owen v Teather & Greenwood [1967] 1 W.L.R. 1421.* But see *Anderson v Sutherland (1897) 13 T.L.R. 163.*

313. *Union Corp Ltd v Charrington & Brodrick (1902) 19 T.L.R. 129; Benjamin v Barnett (1903) 19 T.L.R. 564.* And see, on the changing of rules, *Doyle v White City Stadium Ltd [1935] 1 K.B. 110.*

The icon 🅸 indicates a paragraph or footnote that contains consolidated text from the supplement.

314. *Harker v Edwards (1887) 57 L.J.Q.B. 147*; *Reynolds v Smith (1893) 9 T.L.R. 474*; *Bell Group Ltd v Herald and Weekly Times [1985] V.R. 613*.

315. e.g. *Pearson v Scott (1878) 9 Ch.D. 198*, Illustration 3 to Article 28; *Blackburn v Mason (1893) 9 T.L.R. 286*; *Anderson v Sutherland (1897) 13 T.L.R. 163*; *Sweeting v Pearce (1861) 9 C.B.(N.S.) 534*; *Hamilton v Young (1881) 7 L.R.Ir. 289*; *Harker v Edwards (1887) 57 L.J.Q.B. 147*; *Benjamin v Barnett (1903) 19 T.L.R. 564*; *Reynolds v Smith (1893) 9 T.L.R. 474*.

316. The matter is exhaustively discussed in *Robinson v Mollett (1874) L.R. 7 H.L. 802*. But in *Perry v Barnett (1885) 15 Q.B.D. 388* the two grounds are treated as the same: see 393–394.

317. See *Bailey v Rawlins (1829) 7 L.J.(O.S.) K.B. 208*; *Josephs v Pebrer (1825) 3 B. & C. 639*, Illustration 3 to Article 61, where it was held that an agent was not entitled to reimbursement for illegal transactions.

318. Banking Companies (Shares) Act 1867; repealed by Statute Law Revision Act 1966.

319. *Perry v Barnett (1885) 15 Q.B.D. 388*.

320. Following *Neilson v James (1882) 9 Q.B.D. 546*. And see *Coates v Pacey (1892) 8 T.L.R. 351*.

321. *Perry v Barnett (1885) 15 Q.B.D. 388* at 394, 395 and 397–398.

322. *Seymour v Bridge (1885) 14 Q.B.D. 460*.

323. *Read v Anderson (1884) 13 Q.B.D. 779*.

324. This result was reversed by the Gaming Act 1892; and the whole problem has been removed by the Gambling Act 2005.

325. See *Read v Anderson (1884) 13 Q.B.D. 779* at 783.

326. Preamble (though this was deleted by the Statute Law Revision Act 1893).

327. Above.

328. See *Sweeting v Pearce (1859) 7 C.B.(N.S.) 449* at 481–482, 484 and 486; affirmed (1861) 9 C.B.(N.S.) 534.

329. *Dingle v Hare (1859) 7 C.B.(N.S.) 145*. Most of the following Illustrations are out of date; but they represent useful examples of principle.

330. *Lienard v Dresslar (1862) 3 F. & F. 212*.

331. *Pollock v Stables (1848) 12 Q.B. 765*; *Hodgkinson v Kelly (1868) L.R. 6 Eq. 496*.

332. *Young v Cole (1837) 3 Bing.N.C. 724*.

333. *Benjamin v Barnett (1903) 19 T.L.R. 564*.

334. *Foster v Pearson (1835) 1 C.M. & R. 849*.

335. *Cropper v Cook (1868) L.R. 3 C.P. 194*.

336. *Robinson v Mollett (1874) L.R. 7 H.L. 802* (but the dissenting opinion of Blackburn J has much force: cf. above, para.1-022). For a case where the principal was held to have accepted a usage of similar effect see *Limako BV v Hentz & Co Inc [1978] 1 Lloyd's Rep. 400. Robinson v Mollett* was distinguished in cases concerning the right of stockbrokers to buy quantities of shares in a single contract and allocate quantities to particular clients: e.g. *Scott & Horton v Godfrey [1901] 2 K.B. 76*; *Consolidated Gold Fields of South Africa v E. Spiegel & Co (1909) 100 L.T. 351*. As to "marrying" of buying and selling transactions by a broker, see *Jones v Canavan [1972] 2 N.S.W.L.R. 236* (custom to do so in Sydney and Brisbane held reasonable).

337. *Hamilton v Young (1881) 7 L.R.Ir. 289*. See also *Thornley v Tilley (1925) 36 C.L.R. 1* (custom that broker can deal on his own behalf with shares bought for principal unreasonable).

338. See Article 28, Illustration 4.

339. See Article 28, Illustration 3.

340. *AJU Remicon Co Ltd v Alida Shipping Co Ltd [2007] EWHC 2246 (Comm)* at [11]; following *Polish SS Co v A.J. Williams Fuels (Overseas Sales) Ltd, The Suwalki [1981] 1 Lloyd's Rep. 511*. But cf. *Woodstock Shipping Co v Kyma Compania Naviera SA (The "Wave") [1981] 1 Lloyd's Rep. 521*; *BP Oil International Ltd v Target Shipping Ltd [2012] EWHC 1590 (Comm)* at [221].

341. *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549* at 583; *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 Q.B. 480* at 502; *Brick and Pipe Industries Ltd v Occidental Life Nominees Pty Ltd [1992] 2 V.R. 279* at 362; *Equiticorp Finance Ltd v Bank of New Zealand (1993) 32 N.S.W.L.R. 50*.

342. *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549* at 583; *Pole v Leask (1860) 28 Beav. 560*; affirmed (1864) 33 L.J.Ch. 155.

The icon 🟡 indicates a paragraph or footnote that contains consolidated text from the supplement.

343.   *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549.* Perhaps the court in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 Q.B. 480* was too cautious in rejecting on the facts a finding of actual authority by acquiescence.

344.   *Mechem, Outlines of Agency (4th edn), pp.30–31.* See, e.g. *A/S Dan Bunkering Ltd v F.G. Hawkes (Western) Ltd [2009] EWHC 3141 (Comm)* (evidence on discovery that agent had been undertaking similar transactions without objection from principal for some time); *Aviva Life & Pensions UK Ltd v Strand Street Properties Ltd [2010] EWCA Civ 444.*

**<u>EXHIBIT L</u>**

# Bowstead & Reynolds on Agency 22nd Ed.

## Consolidated Mainwork Incorporating Second Supplement

## Chapter 4 - Agency of Necessity

### Article 33

### Doctrine of Agency of Necessity

(1)  **4-001**

A person may have authority to act on behalf of another in certain cases where that person is faced with an emergency in which the property or interests of that other are in imminent jeopardy and it becomes necessary, in order to preserve the property or interests, so to act.

(2)  In some cases this authority may entitle the agent to affect the principal's legal position by making contracts or disposing of property. In others it may merely entitle the agent to reimbursement of expenses or indemnity against liabilities incurred in so acting, or to a defence against a claim that what the agent did was wrongful as against the person for whose benefit the action was taken.[1]

### Comment

### Introduction

### 4-002

The term "agency of necessity" is used to indicate a general notion derived from a group of cases in which a person is regarded as justified in taking action for the benefit of another in an emergency. They are said to create a special category of agency which arises by operation of law in such situations. In earlier editions these cases were treated in Chapter 2 under the heading of "Creation of Agency". They cannot, however, be classified entirely as creating agency, for although some can be regarded as recognising agency powers in persons who had none before the event concerned, the majority refer to a person who is already an agent, but is by this doctrine given greater powers. This, together with the fact that it is highly doubtful whether any coherent doctrine is to be derived from them for the modern law, makes it appropriate now to place the topic apart in its own chapter.

The cases from which the doctrine stems seem to be analytically of two quite different types, and treating these two groups of cases as components of a single doctrine has caused confusion. The two types of cases have been treated together because it is said that similar specific rules regarding the emergency requisite to trigger off certain legal results apply to both; and that these are rules which create a special form of agency or authority by operation of law. It is suggested below that the first proposition does not now appear to be true: that the emergency rules do not apply to all the cases. It is also suggested that even if the second proposition was formerly regarded as true, the notion of a special type of authority by operation of law is in this context at the present time no longer necessary or appropriate.

### The traditional cases: the shipmaster and the acceptor for honour

### 4-003

The two traditional cases from which the concept of agency of necessity derives are those of the shipmaster, who has wide powers to bind by contract the owner, and also sometimes the cargo owners, in situations of emergency[2]; and the person who accepts a bill of exchange for honour and succeeds to the rights of the holder against the person for whom the acceptor accepts.[3] The second case appears to originate from the law merchant[4] and is now statutory[5]: it may in effect confer a right to reimbursement on the acceptor but its relation to agency is tenuous from the start. The dissimilarity between these two cases is enough to indicate immediately that a category comprising them both is unlikely to be a satisfactory one.

### First category: the shipmaster

## 4-004

The first category, based on the case of the shipmaster, creates full agency in that it involves both the external and the internal aspects of the agency relationship. As to the external aspect, the master can create contracts binding and conferring rights on the principal (usually the shipowner or demise charterer), make dispositions of the principal's property and receive money and property for the principal also. The agent has also the internal entitlement to reimbursement and indemnity against the principal in respect of what the agent has done[6]; even if that is not needed, the agent has a defence to any action brought by the principal in respect of the acts done. And the act will be valid where validity is in issue. Thus there is old authority that the master can sell[7] or hypothecate[8] the ship, enter into a salvage agreement regarding it[9] and contract for the cargo to be transhipped and carried forward.[10] The master can also sell or hypothecate the cargo, whether together with or separately from the ship,[11] and enter into a salvage agreement regarding it.[12] There are a few cases suggesting that these powers may apply also to land carriers.[13] The actual decisions concerning the latter type of carrier involve only claims to reimbursement and indemnity between principal and agent and so may only be examples of the second category: they are further referred below in that connection. It is there submitted, however, that they should in fact be attributed to the first category if that category can be enlarged and re-explained on a broader basis than that of agency by operation of law.

In respect of the shipmaster selling, hypothecating or contracting for salvage of the ship, this can be treated as involving no more than the extension of the authority of one who is already an agent in the full sense, for the master obviously has already in many situations actual authority, express or implied, from the shipowner (or demise charterer) to make normal trading contracts. However, where the action taken relates to the *cargo*, the master as such has no legal relationship with the cargo owner; and it can therefore be said that the master is by the emergency created an agent where there was no agency before, and that this requires special rules. Yet the master is still agent for the shipowner, who is bailee of the cargo: and although the shipowner may well have had no agency powers prior to the emergency, the shipowner's position as bailee means that it has a legal relationship with the cargo owner which is in principle capable of giving rise to such powers, which can be exercised through the master, who is its agent. So the significance of the distinction between ship and cargo is doubtful.

## Rules determining necessity

## 4-005

The traditional rules applicable to the exercise of this authority may be stated as follows. They derive largely from the shipmaster case, and it will be obvious later that they are in large measure inapplicable to the second category. Indeed in *The Winson*,[14] discussed below, Lord Diplock said that they should be confined to cases of the first category[15]:

(a)  It must be impossible, or at any rate impracticable, for the agent to communicate with the principal. Some cases imply that communication must be impossible,[16] but this seems too strict: as long ago as 1851 Parke B spoke of the principal's being unable to be "conveniently communicated with",[17] and in 1895 Lord Esher MR of an "opportunity to consult".[18] In *Springer v Great Western Railway Co* Bankes LJ approved the phrase "practically impossible"[19] and Scrutton LJ spoke of communication as being "commercially impossible".[20] This would include situations where there are too many principals to consult (e.g. owners of cargo shipped under bills of lading on liner terms[21]).

(b)  The action taken must be necessary[22] for the benefit of the principal.[23] The agent's opinion as to the necessity is irrelevant. It is, however, sufficient if a reasonable person would think there was a necessity.[24] Mere inconvenience does not create necessity.[25] The necessity must of course be for the protection of the interests of the principal, not of the agent.

(c)  The agent must have acted bona fide in the interests of the principal.[26]

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

(d)  The person in whose interest the agent is acting must be competent: for example, a dissolved corporation,[27] or an alien enemy,[28] cannot be a principal under these rules. This limitation is inevitable if the doctrine is one of agency, but its results can be criticised.[29]

(e)  It would also seem that in both types of situation the authority could not prevail against express instructions to the contrary: this follows from the fact that it does not operate where the principal can be consulted.[30] The inference is that the principal could forbid the action at the time: if so, the principal can do so in advance.[31]

## Second category: the acceptor for honour

### 4-006

The second type of case involves situations where a person who acts for another in an emergency seeks only reimbursement or indemnity from the person benefited, or to raise a defence in respect of what that person has done in an action for breach of contract (if there is a contract) or in tort (usually conversion, which might otherwise have been committed by the dealing with property of the principal). No issue arises as regards third parties: if this is an example of agency reasoning, it involves only the internal relationship between principal and agent. Although in 1841 Parke B said that the acceptor for honour was, after the shipmaster, the only other example of agency of necessity,[32] it is clear that the second category is not in fact confined to the acceptor for honour. Thus it has been held that a carrier may make a contract for the stabling of an uncollected horse and recover the charges from the consignor[33]; that the carrier is justified in selling perishable goods which remain uncollected and are deteriorating[34]; and that a salvor may warehouse goods on behalf of their owner at the termination of the salvage service and recover the cost of doing so.[35] These cases may in fact be examples of the first category: it may be that these carriers made or could have made contracts binding the goods owners to third parties. The actual decisions, however, relate only to the internal relationship between principal and agent. It has also been held that an agent for sale was justified in shipping the goods elsewhere, even contrary to instructions, where they were in danger because of potentially hostile conditions.[36] On the other hand it has been held that a bailee of furniture was liable in conversion when the bailee sold it after fruitless attempts to contact the owner: though in this case it appears that necessity, as opposed to inconvenience, had not arisen.[37] It should be noted that in these cases the supposed agent may have no prior relationship with the principal, as in the leading case of the acceptor for honour: but equally the actor may already be an agent, and is at any rate likely to have some relationship with the person for whom he or she acts, such as that of bailee.

Since cases in the second category only give rise to internal rights, duties and defences between the person acting and the person benefited, they are not dissimilar to the negotiorum gestio of Roman law, which is a quasi-contractual institution entitling the gestor, a person intervening in situations of necessity, to reimbursement and also making the intervenor liable for acting inappropriately.[38] As such they seem in the modern law more appropriately dealt with as part of the law of restitution. The second category in fact contains a limited number of rather miscellaneous situations where the law of agency was pressed into service long ago to provide a way of dealing with problems which probably ought nowadays to be approached differently. The cases usually involve an inappropriate use of agency reasoning, as in another context does the use of a notion of irrevocable agency to create what are really property or security interests.[39] The problems of this category should nowadays, therefore, be considered against the background not of agency but of a possible general principle of necessitous intervention within the law of restitution.[40]

## Only first category a true example of agency

### 4-007

Thus only the first category is a true example of agency reasoning, and only that category is therefore really relevant for discussion in this book. It is also much less significant than it was, for modern communications will normally make dramatic actions by shipmasters, or indeed others, unnecessary even in remote places: even in maritime salvage situations a master may often be in touch by radio.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

Situations can obviously still arise, however, where communication is impossible or impracticable; and as regards cargo, where the ship contains goods covered by many bills of lading it may be impracticable to trace and/or communicate with all the cargo owners.[41] Cases may also arise where the cargo owner does not answer, or does not answer clearly, requests for instructions.[42]

This type of agency of necessity seems in origin to be a primitive example of what would now be regarded as vicarious liability reasoning. To impose liability on the principal in such cases was more important than to think of any correlative rights for the principal. A justification given in 1808 was that the master "is seldom of ability to make good a loss of any considerable amount"[43]: hence the owner should be liable. The idea of authority arising in specified circumstances by operation of law is not, however, so satisfactory as the combination of the more general rules of implied and apparent authority, which (particularly the latter) have been developed subsequently to the old cases. For the old rules require that the third party dealing with the agent take the risk as to whether the circumstances creating authority by operation of law have arisen—whether there really is an emergency and whether it really is impracticable for the agent to communicate with the principal. Furthermore, if it is correct, as is suggested above, that there is no possibility of authority if the principal has been communicated with and has forbidden the act in question, this also is not easy to reconcile with the idea of authority by operation of law. Yet as the law at present stands, if the full requirements are not complied with, the agency power does not exist, whatever the appearance to the third party. Such an approach is much less sensitive to the merits of the cases than the normal rules of implied and apparent authority.[44] It is true that under the doctrine of apparent authority the third party cannot rely merely on the statement of an agent that the agent has authority, so that if the requirements for operation of the doctrine have not arisen but the master says that they have, the third party will not on that ground alone be protected.[45] But if there was an appearance of authority, modern doctrine would make the shipowner liable in some cases where old cases would not—for example, where it appeared that the act was justified; where the act had been forbidden by the principal but this was not known to the third party; and perhaps where the agent gave the impression that the principal could not be consulted.[46]

The old English rules were much more elaborately worked out than the corresponding law in the US, which has been content with the idea of implied (incidental) authority to act in emergency.[47] There is, however, some other English case law which approaches the question of emergency powers simply on the basis of implied (and hence in appropriate cases apparent) authority, suggesting that the authority of an agent may be enlarged in situations of emergency. This reasoning has been used to justify delegation by an agent of the agent's powers,[48] lending on unusual terms[49] and giving credit in circumstances where this would not be normal.[50] It is submitted that this is the correct approach. If it is correct, it entails that the person acting already has a legal relationship with the principal. It is necessary, however, to add to it the proposition, to be derived from *Tappenden v Artus* and *The Winson*, discussed below, that a person already in some other legal relationship with the principal which is not one of agency (such as a bailee) may likewise have agency powers in certain situations, some of which may involve emergencies. If such an approach is followed, the supposedly separate notion of agency of necessity, or at any rate much of it, could, and, it is submitted, should be absorbed into the general law relating to implied and apparent authority.

## Salvage contracts: an opportunity for improved analysis

### 4-008

In the case of salvage agreements, where rapid decisions may be required, the advantages of detaching from the ancient, strict rules and subsuming the problem under the general rules of authority can readily be seen. The first step in doing so was taken by Brandon J in *The Unique Mariner*,[51] where in a salvage situation he held owners bound by the master's signature on Lloyd's Open Form on the basis of apparent authority, without reference to the old rules (which probably were not satisfied, because the master had already been in touch with the owners at the time). The case only concerned salvage in respect of the *ship*, for whose owner the master is certainly agent. Subsequently however in *The Choko Star*[52] the Court of Appeal applied the ancient case law to hold that the master's signature to a Lloyd's Open Form did not bind *cargo* unless it had been impracticable to consult cargo (which was not so).

The icon 🛈 indicates a paragraph or footnote that contains consolidated text from the supplement.

The main reason given was that though a master is agent of the *owner*, the master is not an agent for *cargo*, and so cannot act for it except when the special rules of agency of necessity are complied with. There are certainly abundant old dicta to that effect against the background of shipping operations in the nineteenth century. Against this it may be said, as has been suggested above, that the master acts for the shipowner, and the shipowner as bailee may be regarded as having implied and therefore normally also apparent authority to do what is necessary to preserve the cargo during the voyage. This argument was rejected on the basis that there were no grounds for implying such a power (beyond what the agency of necessity doctrine permits) into the contract of carriage between cargo owner and shipowner. The rules regarding the implication of terms into contracts are of course strict[53]: perhaps too much so. But even if those rules are accepted, despite suggestions that "[a]gency of necessity is traditionally regarded as part of the law of contract",[54] it is not clear that questions of authority are always to be determined by reference to implied terms of the contract between the supposed principal and the supposed agent. Particular relationships, such as that of bailor and bailee, may carry their own implications of implied, and hence apparent, authority. Implied *authority* is inferred "from the conduct of the parties and the circumstances of the case",[55] which is quite different reasoning from that relating to implied *terms of contracts*.

In the third of the three principal recent cases on the doctrine, *The Winson*,[56] a salvor procured the warehousing of the goods salved, after completion of the salvage service, and claimed reimbursement of the cost of so doing. This was therefore a case in the second, not the first, category. The full requirements for the operation of traditional agency of necessity were not operative, for the salvor was able to communicate with the cargo owners (who did not give a clear answer) and was in any case acting partly for personal benefit (to preserve a lien). But the salvor was held able to recover, Lord Diplock saying that the strict requirements were inapplicable to the second (negotiorum gestio) category.[57] It was said that the salvor was under a duty to the goods owner to care for the goods, and that the salvor had "a correlative right to charge the owner of the goods with the expenses reasonably incurred".[58] But with subsequent development of principle, it may be argued that the strict rules are not needed in the first category either. It can then be argued that the bailment relationship is sufficient to give the bailee authority not only to do things entitling the bailee to reimbursement but also to make contracts binding on the principal. On this basis the principal might in an appropriate case have been liable directly to the warehouse proprietor. (Though in this particular situation, if the salvor warehoused to protect his lien, the salvor would be unlikely to do so on behalf of another.) Thus in *Tappenden v Artus*[59] it was held that the bailee of a car could leave it for repair in circumstances creating a lien against the owner. The case is not directly in point, because the decision was based on the bailee's right to use the goods, and hence to keep them in a usable state: but the reasoning is relevant.

The statement by Lord Diplock in *The Winson* that the strict rules should be eliminated from the assessment of cases of the second category is therefore to be welcomed in so far as it provides support for the detachment of the second category from the first. But it does not follow that all the cases where the only questions that have arisen were as to the internal relationship between principal and agent, and in particular the case of the bailee who makes a contract in respect of the goods bailed, are really no more than examples of the second category. Some may in fact be real agency cases, attributable to the first category, and now to be explained on the basis of implied or apparent authority. It has already been suggested that this is true of the land carrier decisions. It is submitted therefore that the old strict rules should no longer have any part to play in cases of the first category any more than in the second; and that the substance of all cases in the first category should be assimilated to the general rules as to implied and apparent authority. On this basis a master may be held to have a general implied authority (under the category of incidental authority) to sign a salvage agreement for ship and (because of the bailment reasoning above) cargo, except perhaps where consultation is practicable and expected; and hence apparent authority even in some circumstances where the implied authority is not applicable (e.g. because the owner has forbidden the contract, or could easily have been consulted). As for the more drastic acts of selling or hypothecating ship or cargo, this would normally require consultation, and it may well be that the third party's belief that the master's act is justified is less likely to appear reasonable under the doctrine of apparent authority.

## The present law as to the first category

## 4-009

As regards salvage contracts, the matter is now settled by statute. Article 6 of the International Convention on Salvage of 1989, now law under the Merchant Shipping Act 1995,[60] gives the master or owner the power to sign a salvage contract for cargo. But although the Court of Appeal in *The Choko Star*[61] had thought this topic an unsuitable one for judicial development, it is submitted that the Supreme Court should, if the opportunity arises, take the opportunity to bring the case law on situations of necessity into line so far as possible with present-day thinking on agency authority, which no longer needs a special and rather rigid notion of agency by operation of law, a notion which antedates the development of the doctrine of apparent authority, and even the full development of that of implied authority, and depends on the existence of facts which may not be known or even knowable to the third party.

## Development of the second category: restitutionary doctrine

## 4-010

In this area, the analogy of agency is a mistaken one, perhaps caused by the lack of the civil law concept of negotiorum gestio. If any wider principle in respect of necessitous intervention is to emerge from the cases in the second category, however, creative development of a different order within the principles of restitution would be required. In 1924 McCardie J, in a case of the first category, spoke strongly in favour of enlarging the whole doctrine of agency of necessity, and was prepared in principle to apply it to an agent for purchase who was unable because of wartime conditions to forward goods purchased to his principal in Romania and resold them in England.[62] The dicta were, however, doubted by Scrutton LJ three years later in a case of the second category,[63] and other dicta against extension of the reasoning can be cited.[64] Proper analysis has been hampered by the running together of the two categories. Any attempt at development within the second category has to contend initially with the dictum of Bowen LJ in 1886 that "work or labour done or money expended by one man to preserve or benefit the property of another do not according to English law create any lien upon the property saved, nor even, if standing alone, create any obligation to repay the expenditure".[65] Nevertheless, though they were said by Bowen LJ to be a special exception, the rules of maritime salvage,[66] including the decision in *The Winson*, can be used to justify movement towards generalisation; as can certain cases concerning the payment of funeral expenses of a deceased person[67]; and an established line of cases remunerating liquidators and other insolvency practitioners for work done in preserving and realising property belonging to others but in the possession of the company or other insolvent person.[68] On the other hand it has been held that no lien arises in favour of a person who succours a stray animal,[69] or conveys timber on the bank of a river to a place of safety.[70] Though writers strongly advocate the development of generalised principle, the picture remains unclear and the case law very limited indeed.[71] Other doctrines may sometimes secure a similar result by different means. Thus where there is an established cause of action, the damages awarded may cover expenses incurred in emergencies[72]; and a person who seeks to recover property may sometimes be able to do so only if payment is made for work done on it.[73] But the appropriate reasoning for cases of necessitous intervention in general must be found outside the law of agency, and further discussion is beyond the scope of this work.[74]

## Agency of deserted wives

## 4-011

Until comparatively recently a line of cases whereby a deserted wife was regarded as having, even if forbidden to do so, authority to pledge her husband's credit for necessaries was said to be a further instance of agency of necessity, and of agency by operation of law. These cases made any general principle behind the notion even more difficult to extract, for the necessity in such cases was that of the agent and not of the principal. This seems another example of agency law being deployed to achieve a desired result which did not at the time seem attainable by other means. This method of protecting deserted wives has, however, been superseded by other institutions for that purpose, and the doctrine inherent in the cases has in consequence been abolished in England by statute.[75] Discussion of these cases is therefore omitted: a full account appeared in the thirteenth edition of this work.

The icon 🗒️ indicates a paragraph or footnote that contains consolidated text from the supplement.

## Mentally incapacitated persons

### 4-012

The Mental Capacity Act 2005 creates what may be called a statutory form of agency of necessity. It permits a person intervening on behalf of a mentally incapacitated person to pledge that person's credit and use that person's money for acts in connection with his or her care or treatment: the person intervening may also be entitled to indemnity for expenditure incurred.[76] This does not affect any power or any other power which a person may have who has lawful control of the mentally incapacitated person's property or power to spend money for his or her benefit.[77]

### Illustrations

(1) **4-013**

A salvor, after the completion of the salvage operation, warehouses salved goods at a nearby port, principally to preserve them but partly with a view to preserving his lien. He asks the cargo owner to make arrangements to accept the goods at that port. The cargo owner does not respond. The salvor was bailee of the cargo owner from the time the goods were put into the vessels which he provided, and even if the salvage service was finished when the vessels arrived at the port, he remained bailee of the cargo owner thereafter. As such he had a duty to the cargo owner to take reasonable measures to preserve the cargo, and a correlative right to charge its owner with the warehousing expenses, which had been reasonably incurred in fulfilling that duty.[78]

(2) A ship strands in the River Paraná in Argentina. The master signs a salvage agreement on Lloyd's Open Form with Greek salvors, though local salvors are available. There is only one cargo owner, who could have been consulted but was not. The master has no authority to sign for cargo (as opposed to the ship itself) except under the agency of necessity rules, which are not satisfied because of the lack of consultation, quite apart from the question whether the act of the master was reasonable or the third party was aware of the lack of consultation.[79]

(3) A ship strands. The master contacts his owners, who notify him that a tug will be sent. By chance the captain of another tug with different owners is completing a salvage service nearby. He notices the stranded ship, goes to it and offers his services. The master takes this to be the tug sent by his owners and signs a salvage agreement. As his owners are already sending another tug, he is not authorised to do so, and the agency of necessity rules do not apply: but his owners are nevertheless liable under the doctrine of apparent authority.[80]

---

1. See Comment. See also Powell, Ch.IX; Treitel (1954) 3 U. Western Australia L.Rev. 1; W.B. Williston (1944) 22 Can. Bar Rev. 492; Wade (1966) 19 Vanderbilt L.Rev. 1183; Birks [1971] Current Legal Problems 110; Hunter (1974) 23 U.New Brunswick L.J. 5; Marasinghe (1976) 8 Ottawa L.Rev. 573; McCamus (1979) 11 Ottawa L.Rev. 297; Matthews [1981] C.L.J. 340; Rose (1989) 9 O.J.L.S. 167; Brown (1992) 55 M.L.R. 414; McMeel (2000) 116 L.Q.R. 387 at 408–410; *Goff and Jones, Law of Unjust Enrichment (9th edn), Ch.18*; *Burrows, Law of Restitution (3rd edn), Ch.18*; *Virgo, Principles of the Law of Restitution (3rd edn, 2015), Ch.11*. But the relevance of discussion in books and articles on the law of restitution to pure agency issues is doubtful: see Comment.

2. See below, para.4-004.

3. Bills of Exchange Act 1882 ss.65–68; and see *Hawtayne v Bourne (1841) 7 M. & W. 595* at 599.

4. See *Hawtayne v Bourne (1841) 7 M. & W. 595* at 599 at 599.

5. See fn.3 above.

6. See Article 62.

7. *The Glasgow (1856) Swab. 145*; *The Australia (1859) Swab. 480*; *Atlantic Mutual Insurance Co v Huth (1880) 16 Ch.D. 474*.

8. *The Gratitudine (1801) 3 Ch. Rob. 240*; *The Bonaparte (1853) 8 Moo.P.C. 459*; *The Hamburg (1864) 2 Moo.P.C.(N.S.) 289*; *The Onward (1873) L.R. 4 A. & E. 38*; *Gunn v Roberts (1874) L.R. 9 C.P. 331* at 337; *Kleinwort, Cohen & Co v Cassa Maritima of Genoa (1877) 2 App.Cas. 156* (cases of bottomry, viz. hypothecating the cargo also).

The icon 🟡 indicates a paragraph or footnote that contains consolidated text from the supplement.

9.  *The Renpor (1883) 8 P.D. 115; The Unique Mariner [1978] 1 Lloyd's Rep. 438*, Illustration 3, discussed also below.

10. See *The Soblomsten (1866) L.R. 1 A. & E. 293; Scrutton on Charterparties (24th edn), Arts 140–141.*

11. As to sale, see *Tronson v Dent (1853) 8 Moo.P.C. 419; Australasian S.N. Co v Morse (1872) L.R. 4 P.C. 222; Acatos v Burns (1878) 3 Ex. D. 282; Atlantic Mutual Insurance Co v Huth (1880) 16 Ch.D. 474.* As to hypothecation, see cases cited in fn.8 above.

12. *The Winson [1982] A.C. 939*, Illustration 1. See below, para.4-008.

13. *Great Northern Ry Co v Swaffield (1874) L.R. 9 Ex. 132* (stabling uncollected horse); *Sims & Co v Midland Ry Co [1913] 1 K.B. 103* (sale of uncollected goods); cf. *Springer v Great Western Ry Co [1921] 1 K.B. 257.*

14. *China Pacific SA v Food Corp of India (The Winson) [1982] A.C. 939*, Illustration 1, also discussed below.

15. *China Pacific SA v Food Corp of India (The Winson) [1982] A.C. 939 at 958.*

16. e.g. *Prager v Blatspiel, Stamp & Heacock Ltd [1924] 1 K.B. 566 at 571.*

17. *Beldon v Campbell (1851) 6 Exch. 886 at 890.* See also *Australasian S.N. Co v Morse (1872) L.R. 4 P.C. 222.*

18. *Gwilliam v Twist [1895] 2 Q.B. 84 at 87.*

19. *Springer v Great Western Railway Co [1921] 1 K.B. 257 at 265.*

20. *Springer v Great Western Railway Co [1921] 1 K.B. 257 at 268.* And see *Barker v Burns, Philp & Co Ltd (1944) 45 S.R. (N.S.W.) 1* (communication possible despite wartime conditions); *Sachs v Miklos [1948] 2 K.B. 23.*

21. See *The Choko Star [1990] 1 Lloyd's Rep. 516*, Illustration 2, also discussed below.

22. For the meaning of "necessary", see *Prager v Blatspiel, Stamp & Heacock Ltd [1924] 1 K.B. 566 at 571–572; The Australia (1859) Swab. 480; Australasian S.N. Co v Morse (1872) L.R. 4 P.C. 222; Atlantic Mutual Ins. Co v Huth (1879) 16 Ch.D. 474.* And see *Phelps, James & Co v Hill [1891] 1 Q.B. 605.*

23. See *Burns, Philp & Co Ltd v Gillespie Bros Pty Ltd (1947) 74 C.L.R. 148* (doctrine inapplicable where measures undertaken (in wartime) for security of ship and cargo considered as one adventure).

24. *Tetley & Co v British Trade Corp (1922) 10 Ll. Rep. 678.*

25. *Sachs v Miklos [1948] 2 K.B. 23.*

26. *Prager v Blatspiel, Stamp & Heacock Ltd [1924] 1 K.B. 566 at 570; Tronson v Dent (1853) 8 Moo.P.C. 419 at 449–452; The Winson [1982] A.C. 959*, Illustration 1, discussed also below; *Re F (Mental Patient: Sterilisation) [1990] 2 A.C. 1 at 75*, per Lord Goff of Chieveley.

27. *Re Banque des Marchands de Moscou [1952] 1 T.L.R. 739.*

28. *Jebara v Ottoman Bank [1927] 2 K.B. 254; reversed [1928] A.C. 269.*

29. See *Goff and Jones, Law of Restitution (7th edn), para.17-006* (not carried forward in subsequent editions).

30. See Illustrations 1 and 2. See also Goddard [1984] L.M.C.L.Q. 255; but cf. *Great Northern Ry Co v Swaffield (1874) L.R. 9 Ex. 132.*

31. But in *Graanhandel T. Vink BV v European Grain & Shipping Ltd [1989] 2 Lloyd's Rep. 531 at 533*, Evans J said that there could be circumstances where "it might well be argued that the seller's refusal to acknowledge these facts would not prevent the buyer from alleging that the agency did exist". The deserted wife's agency of necessity, now obsolete, applied even though the husband had forbidden the act: see below, para.4-011.

32. *Hawtayne v Bourne (1841) 7 M. & W. 595 at 597.*

33. *Great Northern Ry Co v Swaffield (1874) L.R. 9 Ex. 132.*

34. *Sims & Co v Midland Ry Co [1913] 1 K.B. 103;* cf. *Springer v Great Western Ry Co [1921] 1 K.B. 257.*

35. *The Winson [1982] A.C. 939*, Illustration 1: see below.

36. *Tetley & Co v British Trade Corp (1922) 10 Ll. Rep. 678.* See too *Liu Wing Ngai v Lui Kok Wai [1996] 3 Singapore L.R. 508.*

37. *Sachs v Miklos [1948] 2 K.B. 23;* followed in *Anderson v Erlanger [1980] C.L.Y. 133.* See also *Munro v Wilmott [1949] 1 K.B. 295* (similar facts). In *Ridyard v Roberts Unreported May 16, 1980, CA* a bailee of ponies was held justified in selling them when the owner in breach of contract failed to remove them. In *Coldman v Hill [1919] 1 K.B. 443 at 456* Scrutton LJ suggested that a bailee of cattle from whom they are stolen ought, if he cannot contact the owner, to "act as agent of necessity on behalf of and at the expense of the owner". Sometimes statute gives a power of sale: e.g. unpaid seller's right to resell: Sale of Goods

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

Act 1979 s.48(3); Protection of Animals Act 1911 s.7; Unsolicited Goods and Services Act 1971 as amended; Torts (Interference with Goods) Act 1977 ss.12 and 13.

38. See *Buckland, Textbook of Roman Law (3rd edn), pp.537–538.*

39. See Article 118.

40. See Goff and Jones, fn.1 above; *Tongue v Royal Society for the Prevention of Cruelty To Animals [2017] EWHC 2508 (Ch)* at [68].

41. See *The Choko Star [1990] 1 Lloyd's Rep. 516,* Illustration 2, also discussed below.

42. As in *The Winson [1982] A.C. 939,* Illustration 1, also discussed below.

43. *Abbott, Merchant Ships and Seaman (3rd edn),* cited in Holdsworth, H.E.L. VIII, p.250.

44. See in general below, para.4-008. The same can in fact be said of the Factors Acts: see Article 89.

45. *Armagas Ltd v Mundogas SA (The Ocean Frost) [1986] A.C. 717.*

46. cf. *United Bank of Kuwait Ltd v Hammoud [1988] 1 W.L.R. 1051,* where a solicitor was held liable on an unauthorised and fraudulent transaction by an assistant where the transaction could have been authorised had a certain background of facts existed: the third party was entitled to assume from the conduct of the agent that it did. "The bank, knowing that [X] was a practising solicitor with established firms, were entitled to assume the truth of what he said unless alerted to the fact that the contrary might be the case"—per Lord Donaldson of Lymington MR at 1066. But cf. *Hirst v Etherington [1999] Lloyd's Rep. P.N. 938* and below, para.8-021.

47. See *Restatement, Third, § 2.02, Comments e, f.*

48. *De Bussche v Alt (1878) 8 Ch.D. 286,* Illustration 7 to Article 34. See also *Walker v G.W. Ry Co (1867) L.R. 2 Ex. 228; Langan v G.W. Ry Co (1873) 30 L.T. 173* (railway officials ordering medical attention for passengers: company liable: but here the emergency is not that of the principal, the company).

49. *Montaignac v Shitta (1890) 15 App.Cas. 357,* Illustration 15 to Article 72.

50. *Gokal Chand-Jagan Nath v Nand Ram Das-Atma Ram [1939] A.C. 106.*

51. *The Unique Mariner [1978] 1 Lloyd's Rep. 438,* Illustration 3.

52. *The Choko Star [1990] 1 Lloyd's Rep. 516,* Illustration 2; noted [1991] L.M.C.L.Q. 1; (1992) 55 M.L.R. 414; followed in *The Pa Mar [1999] 1 Lloyd's Rep. 338.*

53. See *Liverpool City Council v Irwin [1977] A.C. 239.*

54. Goff and Jones, *Law of Restitution (7th edn), para.17-006* (not carried forward in subsequent editions); citing *Notara v Henderson (1872) L.R. 7 Q.B. 225;* and *Cargo ex Argos (1873) L.R. 5 P.C. 134.* It is not clear exactly what this means. If it indicates that it stems from an extension of authority granted by contract, this may be so in most cases, but agency can be gratuitous (as indeed the text goes on to point out).

55. *Hely-Hutchinson v Brayhead Ltd [1968] 1 Q.B. 549* at 583.

56. *The Winson [1982] A.C. 939,* Illustration 1. See too *Brasileiro SA (Petrobas) [2012] UKSC 17; [2012] 2 A.C. 164.*

57. *The Winson [1982] A.C. 939* at 958.

58. *The Winson [1982] A.C. 939* at 960.

59. *Tappenden v Artus [1964] 2 Q.B. 185.*

60. Merchant Shipping Act 1995 s.224(1) and Sch.11. See this provision applied in *The Altair [2008] EWHC 612 (Comm); [2008] 2 All E.R. (Comm) 805.*

61. *The Choko Star [1990] 1 Lloyd's Rep. 516,* Illustration 2. The judgment of Sheen J at first instance repays study.

62. *Prager v Blatspiel, Stamp & Heacock Ltd [1924] 1 K.B. 566.* In this category, extension in cases where the principal has forbidden the act might be easier: cf. *Tetley & Co v British Trade Corp (1922) 10 Lloyd's Rep. 678;* above, para.4-006.

63. *Jebara v Ottoman Bank [1927] 2 K.B. 254* at 270–271; reversed [1928] A.C. 269 (selling goods overseas after outbreak of war).

64. *Gwilliam v Twist [1895] 2 Q.B. 84* at 87, per Lord Esher MR (substitute driver where official driver drunk); *Sachs v Miklos [1948] 2 K.B. 23* at 35–36, per Lord Goddard CJ.

65. *Falcke v Scottish Imperial Insurance Co (1886) 34 Ch.D. 234* at 248; *Glasgow v ELS Law Ltd [2017] EWHC 3004 (Ch); [2018] 1 W.L.R. 1564* at [42]. See *Birks, Introduction to the Law of Restitution (1989), p.194 onwards.*

The icon ⚠️ indicates a paragraph or footnote that contains consolidated text from the supplement.

66. See *Goff and Jones, Law of Unjust Enrichment (9th edn), Ch.18.*

67. *Jenkins v Tucker (1788) 1 H.Bl. 90; Tugwell v Heyman (1812) 3 Camp. 298; Rogers v Price (1829) 3 Y. & J. 28; Ambrose v Kerrison (1851) 10 C.B. 776; Shallcross v Wright (1850) 12 Beav. 558; Bradshaw v Beard (1862) 12 C.B.(N.S.) 344; Rees v Hughes [1946] K.B. 517; Croskery v Gee [1957] N.Z.L.R. 586.* See also *Matheson v Smiley [1932] 2 D.L.R. 787* (medical expenses).

68. See *Re Berkeley Applegate (Investment Consultants) Ltd [1989] Ch. 32; Green v Bramston [2010] EWHC 3106 (Ch).* See too *MF (Australia) Ltd v Meadow Springs Fairway Resort Ltd [2009] FCAFC 9.*

69. *Binstead v Buck (1776) 2 Wm. Bl. 1117.* But there may in appropriate cases be distress damage feasant. See *Sorrell v Paget [1950] 1 K.B. 252,* where both matters are discussed. See also Protection of Animals Act 1911 s.7.

70. *Nicholson v Chapman (1793) 2 H.Bl. 254.* See also *J. Gadsden Pty Ltd v Strider 1 Ltd (The AES Express) (1990) 20 N.S.W.L.R. 57* (carriage of goods after termination of time charter).

71. For example, as to the relevance of the fault of the person concerned in getting into the situation of emergency, it has been held that a car recovery company instructed by the police to remove an abandoned stolen car did not act as agent of necessity for the owner: *Surrey Breakdown Ltd v Knight [1999] R.T.R. 84 CA;* and see *Lambert v Fry [2000] C.L.Y. 113.* The *Surrey Breakdown* case is doubtful authority, as it appears to proceed on the basis that the company was agent for the owner (with whom it had no prior connection), and was claiming reimbursement of expenses under the second category of agency of necessity. The argument had been however that the *police* were agent for the owner to make a contract with the company, which sued for its normal charges: i.e. a first category situation. In this category the police, having no prior relationship with the owner, have by private law at least no authority to make such a contract for another. See *Kortmann, Altruism in Private Law (2005), pp.167–169.*

72. *Schneider v Eisovitch [1960] 2 Q.B. 430* (tort); *Kolfor Plant Ltd v Tilbury Plant Ltd (1977) 121 S.J. 390* (sale of rejected goods).

73. *Munro v Wilmott [1949] 1 K.B. 295; Greenwood v Bennett [1973] 1 Q.B. 195.*

74. See *Goff and Jones, Law of Restitution (7th edn, not carried forward in subsequent editions), para.17-009 onwards* (which, since it approaches the law from a different angle, should be taken into account by any reader of this chapter); *Birks, Introduction to the Law of Restitution (1989), p.193 onwards.*

75. See above, para.3-041.

76. See Mental Capacity Act 2005 ss.5, 6 and 8. The Act also provides for the appointment of a "deputy" who may have more extensive powers.

77. As under a lasting power of attorney, created by the 2005 Act.

78. *China Pacific SA v Food Corp of India (The Winson) [1982] A.C. 939.* Quaere, however, whether the salvage service was really terminated: if it had not been, the case would have been more easily solved.

79. *Industrie Chimiche Italia v Alexander G. Tsavliris & Sons Maritime Co (The Choko Star) [1990] 1 Lloyd's Rep. 516.* But see Comment above.

80. *The Unique Mariner [1978] 1 Lloyd's Rep. 438.*

**EXHIBIT L**

# Bowstead & Reynolds on Agency 22nd Ed.

## Consolidated Mainwork Incorporating Second Supplement

## Chapter 2 - Creation of Agency

## Section 3. - Ratification

### Article 13

### General Principle

### 2-047

Where an act is done purportedly in the name or on behalf of another by a person who has no actual authority to do that act, the person in whose name or on whose behalf the act is done may, if the third party had believed the act to be authorised, by ratifying the act, make it as valid and effectual, subject to the provisions of Articles 14 to 20, as if it had been originally done by his authority, whether the person doing the act was an agent exceeding his authority, or was a person having no authority to act for him at all.[297]

### Comment

### 2-048

This Article sets out by way of introduction the general principle of ratification, which is that it is "equivalent to an antecedent authority".[298] The whole notion is much criticised and is often treated as exceptional,[299] mainly in the context of contract because of the lack of reciprocity: the third party may be in the power of the principal while the latter decides whether or not to ratify. It is submitted, however, that in typical contract situations ratification is not anomalous. The primary application of the doctrine is indeed in the law of contract, where it fills a practical need in validating the acts of agents who act outside their authority in circumstances where it appears advisable to do so. As the comment to *Restatement, Second* says, "It operates normally to cure minor defects in an agent's authority, minimising technical defences and preventing unnecessary lawsuits".[300] In such a case, as between principal and third party, where the principal seeks to intervene and enforce the contract, the third party is getting exactly what he bargained for. Where the third party seeks to enforce the contract against a ratifying principal he cannot possibly be prejudiced, and the principal is simply held to the transaction which he chose to adopt. Since a master can be liable even for forbidden acts done by an employee in the scope of his employment, it is not surprising that a principal can sometimes be liable for what he has actually ratified.[301] It would seem that ratification should be regarded as providing a normal case of agency, but one where the intention of the parties is given effect to retrospectively.

The position between principal and agent requires slightly more careful formulation. In many cases it is possible to say that the agent, by purporting to act on the principal's behalf, makes an offer to the principal to act as his agent (though not necessarily as his contractual agent), or (where he is already an agent) as his agent in respect of the act concerned, which the principal accepts by ratifying. But the acting outside authority may be a breach of contract; and it seems that there may be cases where the principal ratifies but nevertheless reserves his right to treat the agent as liable to him for the cost of so doing.[302]

Overall it is also true that the potentially retrospective nature of the doctrine of ratification requires special rules to prevent its application having oppressive results, and this makes it a topic requiring special treatment. It does not follow that it is anomalous; and it is certainly convenient:

"The various requirements of ratification, as given in the books, sound largely in terms of a principal who wishes in cold blood to become bound on a contract made in his name but by a purported agent who lacked authority. This is quite unrealistic. Rarely indeed is the principal trying to ratify: he is trying to escape from ratification."[303]

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

As stated above, the doctrine is primarily applicable to contract, and the tendency is largely to think of it in this connection. However, the term, and the general notion, are used in other parts of the law also. Different considerations arise in different cases, and it is misleading to think that there is any set of rules for ratification applicable to all parts of the law.[304] Many of the cases where the general notion of ratification is invoked are properly to be classified as involving questions of restitution, conversion, formation or performance of contract, novation, waiver, estoppel, notification or notice. Indeed, it may be that such cases form the majority, and that situations of deliberate ratification of unauthorised acts are rare.[305] Cases where the general notion of ratification is employed should therefore be examined carefully in order to ascertain exactly what is in issue.[306]

Ratification of itself only creates agency in respect of the transaction ratified, though a ratification may sometimes be used as evidence of already existing authority,[307] and a series of ratifications may on the facts be held to confer authority for the future, or to generate apparent authority.[308] For this reason it is to be distinguished from the other examples of creation of agency contained in this chapter. Like apparent authority it can apply where the person whose act is ratified is already an agent, and where he is not an agent at all, though cases of the second type are rarer.[309]

## Ratification in advance of act ratified

### 2-049

Powers of attorney and other documents frequently contain clauses whereby the principal purports to ratify in advance acts which the attorney may do. Such a clause cannot constitute ratification. It operates, if anything, as a grant of authority; as creating apparent authority; possibly as a contractual offer, whether to agent or third party, which may be accepted by some form of action in reliance; if consideration can be found, as part of a contract; or as evidence supporting an alleged subsequent ratification.[310]

## Juristic nature of ratification[311]

### 2-050

Ratification seems to be a notion sui generis. It involves the idea that in certain circumstances a person can by expression of will adopt a transaction entered into by another on his behalf on which he is not liable or entitled so as to become liable and/or entitled as if he had made it at the time. It requires no consideration; and a novation would be juristically different.[312] In so far as it depends on the choice of the person concerned, it can be said to be an application of the doctrine of election. But in the case of election to treat a contract as discharged, there is a choice of remedies in respect of a legal relationship already existing: the innocent party to a breach of contract can choose to treat it as discharged, but if he does not do so the contract continues.[313] The other form of election normally cited is that between inconsistent existing rights.[314] In both these cases it is usually said that the election must be communicated to the other party involved, and that it is irrevocable once made.[315] It would appear, however, that ratification need not be communicated to anyone if it can be established by probative material[316]; that a party who initially refused to ratify may in some circumstances later do so[317]; and that the doctrine overlaps with estoppel and restitutionary doctrine, which is manifested especially in the case of ratification by acquiescence or inactivity.[318]

## Ratification in the Restatements

### 2-051

In *Restatements, Second* and *Third* it appears that the role left for ratification is rather different from its function in English law. First, *Restatement, Third* gives as its sphere of application "acts done without actual or apparent authority".[319] In this it follows *Restatement, Second*, which refers to ratification as "affirmance by a person of an act which did not bind him",[320] and clearly proceeds on the basis of the view of Professor Seavey, the Reporter, that where there is apparent authority the principal is not only bound but also entitled.[321] This leaves a very limited role for ratification. In particular, it appears to mean that the safeguards against unfair ratification do not apply against a principal who seeks to enforce a

contract under which he would be liable under the doctrine of apparent authority only, for he is not ratifying but enforcing an existing contract. Thus it would appear to mean that a third party who discovers that the agent had no actual authority could not on that ground alone withdraw from the contract, despite the uncertainties of establishing apparent authority. This is an unattractive proposition. Ratification in the *Restatements* therefore appears to be confined to situations where there is no apparent authority because the third party's belief in the agent's authority was unreasonable, or where the third party actually knew or had reason to know that the agent had no authority or that the agent was genuinely uncertain as to the extent of his authority, yet in either case did not expressly contract subject to ratification.[322] It is indeed expressly stated in the Comment to *Restatement, Third,* that "Ratification is effective even when the third party knew that the agent lacked authority to bind the principal but nonetheless dealt with the agent".[323]

This leads to a second point, under which ratification in the *Restatements* appears by contrast to have a wider operation than it would in English common law. In English law it is submitted that a transaction with an agent known to have no authority would be a complete nullity, a contract with the agent himself, or what might be called a transaction "subject to ratification". The last mentioned would actually be no more than an offer by or to the third party to be bound on certain terms.[324] The third party might be regarded as promising the agent to keep an offer open or to accept an offer made to him. Consideration might be found in some promise by the agent to seek his principal's adoption of the transaction. But the result of such reasoning is that if the third party withdraws before the principal has adopted the contract, his liability if any is to the agent only and recourse to ratification doctrine is unnecessary and inappropriate.[325]

## European sources[326]

### 2-052

Since quite an important point of principle is involved, it seems appropriate to go further. The *UNIDROIT Principles of International Commercial Contracts* appear to apply ratification to cases of lack of actual authority[327]; but they seem also to contemplate it where the third party knows that the agent is unauthorised, for they give such a third party the right to specify a reasonable time for ratification; though if he did not know of the lack of authority, they also allow him to withdraw from the transaction when he discovers the fact. The *Principles of European Contract Law* and the *Draft Common Frame of Reference* appear to take the same approach.[328] Of course, the problem of the revocability of an offer is a common law one and not necessarily to be taken account of in such international codifications. However, the approach taken in this work is to confine the special ratification rules, with their retroactivity and consequent protective features, to situations where the third party believed the agent to have authority: it is only to such situations that the rather rough and ready rationale of ratification, that the third party gets what he expected,[329] applies. The text of Article 13 has been modified to make this clear.[330]

## Illustrations

(1)  **2-053**

A entered into and signed a written contract on behalf of B, without authority. A memorandum of the contract was required by statute to be in writing. B subsequently ratified the contract. Not only was the contract itself effective, but A was also deemed to have been B's duly authorised agent to sign the memorandum.[331]

(2)  An agent, without authority, insures goods on behalf of his principal. The principal ratifies the policy. The policy is as valid as if the agent had been expressly authorised to insure the goods.[332]

(3)  An agent of the Crown does an act, which would normally be a tort, outside the realm and in excess of his authority. The Crown ratifies the act. The act is deemed to be an act of state and the agent is not liable for it.[333]

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

**Article 14**

**What Acts May Be Ratified**

**2-054**

Every unauthorised act, whether lawful or unlawful,[334] which is capable of being done by means of an agent (except an act which is in its inception void[335]) is capable of ratification by the person in whose name or on whose behalf it was purportedly done.[336]

**Comment**

**Lawful or unlawful: contracts**

**2-055**

As indicated in the Comment to Article 13, the doctrine, and therefore this Article, applies primarily to transactions, normally contracts. The making of a contract on behalf of another without authority could perhaps be described as unlawful, but such a contract can certainly be ratified. Even a contract induced by a fraudulent, and therefore tortious, profession of agency can be ratified, though the agent might be liable to the principal. The right to rescind for misrepresentation, whether fraudulent or innocent, is clearly extinguished.[337]

**Torts**

**2-056**

The words "lawful or unlawful" are included primarily to indicate that the doctrine can apply to torts. From them it would follow that a principal by ratification may retrospectively turn what was previously an act wrongful against the principal, e.g. an unauthorised sale by the agent, or against a third party, e.g. a wrongful distress, into a legitimate one; or become liable for the tort of another by ratifying. The first proposition is clearly valid: ratification can make an unlawful act lawful ex post facto.[338] But as regards liability, the importance of ratification in the law of torts generally is nowadays, except as regards conversion and trespass to goods, open to question.[339] For the cases giving the widest operation to the doctrine of ratification in tort represent an attempt to extend the notion of command to commit a tort, and originate before the establishment of a general doctrine of vicarious liability.[340] Since the acceptance of a general doctrine, these cases will not usually be relevant, save possibly where the act ratified is not within the course of the servant's employment, or where the tortfeasor is not a servant: and even here the doctrine of casual delegation may cover the situation.[341] It may obviously, furthermore, be extremely difficult to determine what constitutes ratification in non-proprietary torts.[342] It may therefore be suggested that the doctrine of ratification, in so far as it makes one person liable for the torts of another (as opposed to providing a defence to an action in tort), normally applies only to conversion, and possibly also to trespass to goods, where the fields of contract, tort and property overlap[343] and liability is strict; and that in torts requiring personal fault it should not be regarded as significant.

Even in the restricted field suggested it will rarely be crucial to the result, since many of the cases can be explained alternatively on the basis of contract, in that they deal with principals who by accepting goods ratify unauthorised contracts[344]; and further, an act said to be a ratification of a conversion may itself be regarded as a conversion.[345] The cases that depend most obviously on the doctrine of ratification are those envisaging ratification of unlawful distress levied by a bailiff[346]; but most are cases of trespass or conversion, and in many of them liability was denied on the grounds that there was no acting for the supposed principal, or that the supposedly ratifying principal did not know the facts. In some cases the possibility of ratifying other torts has been considered,[347] but the decision has usually been that there was no ratification.

However, other situations can be envisaged where the doctrine of ratification could arise incidentally in a tort case. Thus a coach proprietor might ratify an unauthorised hiring of one of his coaches in order to demand payment for the hire, thereby rendering himself liable for negligence causing damage during

the journey: and the owner of a car might ratify unauthorised use of it in order to take advantage of the insurance policy.[348]

## Notices and court filings

### 2-057

The notion of ratification arises also in other contexts, such as that of the unauthorised commencement of court proceedings,[349] and the validity of a notice issued by a person who was at the time of issue unauthorised, but whose act was subsequently ratified.[350] Where the notice affects property rights, as in the case of a notice to quit, ratification may not be permitted.[351] Other cases arise in a public law context and may turn on the interpretation of statutes or otherwise raise special considerations.[352]

## Void acts: companies

### 2-058

The proposition that a nullity cannot be ratified is in principle uncontroversial. However, much turns on what is meant by "nullity" or "void act". An unauthorised act could in some contexts be regarded as void, but the starting point of ratification is that such an act can be ratified. There are in fact few situations where such a principle is significant. The main context for its application was formerly that of ultra vires acts of companies. But even if the notion of ratification was relevant in this context, the changes to the ultra vires rule made by the companies legislation[353] actually permit ratification,[354] so that the point ceases to require discussion in this context.

## Forgeries

### 2-059

It has been held that a forgery cannot be ratified, and the reason given that a forgery is a nullity. The leading case[355] seeks to make a distinction between voidable acts, which can be ratified, and void acts, such as forgery, which cannot. As a general criterion, however, this is unsatisfactory. It is certainly true that in the case of some voidable acts, e.g. the contract of a mentally incapable person, the terminology of ratification has been used.[356] But acts done without authority, e.g. the unauthorised issue of a writ, are not appropriately called voidable. If anything, they could be called void; but they can often be regarded as simply suffering from a defect that can be cured.[357] As regards forgery, it is submitted that the true reason why there can normally be no ratification is that the forger who counterfeits a signature or seal makes no profession of being an agent, so that agency doctrines do not apply to him.[358] An unauthorised signature or affixing of a seal for another may also, however, constitute a forgery[359]; and in such a case it seems that there can be ratification.[360]

This proposition is sometimes criticised as being over-technical.[361] It is submitted, however, that it is correct: a forger who counterfeits a signature or seal no more professes agency than does a person who disguises himself as another. The reason why the notion of ratification is invoked in these cases is that an adoption of a forgery would often be treated as a promise requiring consideration.[362] Nevertheless, the proper solution to the problem of the adoption of forgeries must, as in many other cases where ideas of ratification, adoption and acquiescence are invoked, lie within the areas of formation of contract, waiver, estoppel, and perhaps the rules as to gifts. Thus it has been held that an estoppel can be raised against a person who induces a third party to believe that a signature is his, if the third party acts on the representation.[363]

## Illegality

### 2-060

It has been said that "life cannot be given by ratification to prohibited transactions"[364]; and in that case ratification of a prohibited insurance contract was refused validity. The extent to which it is correct to regard a transaction affected by illegality as actually void will, however, turn on the nature of the illegality,

the wording of any relevant statute, and the extent of the illegality. The law is far from clear. A detailed treatment is beyond the scope of this work.[365]

### Illustrations

(1) **2-061**

A, on B's behalf but without his authority, purchases from C a chattel which C has no right to sell, under such circumstances that the purchase of the chattel is a conversion. B ratifies the purchase. B is guilty of converting the chattel.[366]

(2) A, an agent of a corporation, assaults B on its behalf. The corporation ratifies the assault. The corporation is civilly liable to B for the assault. Sed quaere.[367]

(3) A distrains B's goods in the name of B's landlord, but without the landlord's authority. The landlord may ratify the distress, and it is then deemed to have been levied by his authority.[368]

(4) The managing director of a company, without having authority to do so, instructed solicitors to commence an action in the name of the company. An order for the winding-up of the company having been made, the liquidator adopted the action. A motion to strike out the name of the plaintiff company failed; for, although not properly constituted when commenced (so that the defendant acting promptly could have obtained a stay), the action was not a nullity, and the subsequent ratification cured the defect in the proceedings as originally constituted.[369]

(5) A signs an instrument in B's name without his authority and with intent to defraud. B cannot ratify the signature.[370] But if B, knowing of the forgery, by his conduct induces a third person to believe that the signature is his, and if such third person acts on that belief to his detriment, B will be estopped from denying that it is his signature in any action between him and such third person[371]; as he will be if, knowing of the forgery, he delays in repudiating the signature, so that the third person's chance of recovering from the forger is materially prejudiced.[372]

(6) B in Hong Kong authorises A in London to write marine insurance risks on his behalf, subject to financial limitations as to the size of the risk. He also has an open cover reinsurance policy. A exceeds the limits in writing risks on B's behalf and declares the risks to the reinsurers. The insurances are void and unenforceable by statute because B is not authorised to carry on insurance business in Great Britain. Claims are made under the insurances. B ratifies the insurances and claims on the reinsurance policy. The original insurances are void whether made with B's authority or not and so cannot be ratified. There is thus no claim on the reinsurance policy.[373]

## Article 15

## Who may Ratify

## 2-062

The only person who has power to ratify an act is the person in whose name or on whose behalf the act was purported to be done,[374] and it is necessary that he should have been in existence at the time when the act was done,[375] and competent at that time and at the time of ratification to be the principal of the person doing the act[376]; but it is not necessary that at the time the act was done he was known, either personally or by name, to the third party.[377] Ratification can be effected on the principal's behalf by an agent who has authority to ratify; usually such agent will have authority to do an act of the type in question.[378]

## Comment

## Person acted for: agent must purport to have authority to bind principal

## 2-063

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

It is clear that ratification only applies where the person whose act is in question professed or purported at the time of acting to do so as agent and to have authority to bind the principal.[379] Although if the agent had authority at that time, an undisclosed principal could take the benefit of the contract and likewise would be liable to be sued,[380] it has been held that an undisclosed principal cannot ratify. The reason given in the leading case of *Keighley, Maxsted & Co v Durant*[381] is that "civil obligations are not to be created by, or founded upon, undisclosed intentions".[382] It is however difficult to see that this is not exactly what happens under the doctrine of the undisclosed principal. A more general reason sometimes given is that to allow ratification in such a case would be to allow too easy intervention upon a contract by a person not in truth connected with it. In one sense this is obvious: the doctrine of ratification would not be appropriately invoked to allow intervention by a person, uncontemplated by the purported agent, who simply found it convenient to ratify the transaction. This would, indeed, not be ratification by an undisclosed principal. But *Keighley Maxsted*'s case did not involve such a situation. The person whose acts were purportedly ratified was already an agent, and had merely exceeded his authority in respect of the price at which he agreed to buy. Furthermore, the principal chose to ratify and it was the third party who, in suing the principal, sought to rely on the ratification. He was not permitted to do so. It is arguable therefore that at the very least a principal who ratifies should be held liable in the situation where a person who is already an agent exceeds his authority; and possibly should be able to sue in such a case, the third party being adequately protected by the normal restrictions against unfair results of ratification.[383] The decision is however clear that ratification in such a case is ineffective, and is one of the House of Lords.[384]

Conversely, however, where the agent purports to act for a principal but actually intends to act for himself the principal can ratify.[385] And where the agent purports to act for one person, no other person can ratify[386]:

"If there is one legal principle better established than another it is this, that nobody can ratify a contract purporting to be made by an agent except the party on whose behalf the agent purported to act."[387]

It is under this principle that some forgeries cannot be ratified, for a forger does not usually purport to act for someone else but as someone else.[388] In tort cases, it is clear that in principle there can be no ratification of a tort unless the tortfeasor has in some way purported to act for the party who subsequently ratifies[389] but exactly what interpretation is to be given to the idea of "purporting to act" in this context is a difficult matter.[390]

### In existence when act done

### 2-064

⚠️ The requirement that the principal exist at the time of the alleged contract arises most commonly in relation to contracts made on behalf of companies not yet registered.[391] ⚠️ Where the promoters of a prospective company enter into a contract on its behalf before its incorporation, the company cannot after incorporation ratify the contract, because it was not in existence at the time when the contract was made and so could not have made the contract at that time.[392] ⚠️ The company may make a new contract on the same terms as the old,[393] ⚠️ and this may be proved by part performance,[394] ⚠️ but it cannot ratify the contract with retrospective effect. Other remedies have sometimes been found in respect of pre-incorporation contracts[395]; but it has also been held that a company is not bound in equity to pay for work done before its formation, even though it has taken the benefit of the work.[396] ⚠️ Such results have proved inconvenient in practice and in some jurisdictions are changed by statute.[397] ⚠️ Issues relating to the existence of the principal also arise with unidentified principals and are discussed below.[398] ⚠️

### Competent at the time when the act was done

### 2-065

Again, a person cannot ratify an act which he was not competent to do at the time it was done: an example appears in Illustration 9. Apart from alien enemies, with whom Illustration 9 is concerned,[399] the main case for considering this requirement is that of minors. Where a contract made for a minor would, if made by the minor himself, be valid,[400] it can presumably be ratified in the normal way. Other contracts are void against the minor but bind the other party: they can be "ratified" by the minor after reaching full age. If entered into through an agent, they can likewise presumably be ratified by the minor personally or through an agent: except that it was long ago held that a penal bond could not be ratified.[401] The distinction between void and voidable acts may regulate the ratification by mentally incapable persons of contracts made on their behalf: they can ratify, when of sound mind, acts which if effected by themselves would have been voidable.[402]

### Competent at the time of ratification

### 2-066

A minor clearly cannot ratify a contract that would not bind him, while still under age, nor a mentally incapable person while still incapable (at least unless he appeared to be sane to the party to whom the ratification was communicated), nor a person who is an alien enemy, even if he was not such when the act was done.[403]

### Unidentified principal

### 2-067

In general, as will be seen from the above rules regarding the existence and competence of the principal, the rules for ratification follow those for initial authority: the test is to inquire whether the principal could have entered into such a transaction at the time when the agent originally acted. If this analogy is followed, since an agent need not always name his principal but may and often does act for a completely unidentified principal (e.g. "bought for our principals"), ratification should be possible in such a case also. If the third party is willing to deal on this basis, he should arguably be bound under the doctrine of ratification just as under the normal principles of authority. A number of dicta however suggest that the principal must be known or ascertainable by the third party at the time of contracting. Thus in one case it was said that:

> "The law obviously requires that the person for whom the agent professes to act must be a person capable of being ascertained at the time. It is not necessary that he should be named; but there must be such a description of him as shall amount to a reasonable designation of the person intended to be bound by the contract."[404]

An example of the latter category is that of an agent who acts for the heirs of property, whoever they are.[405] Such dicta would, if applied as a rule, restrict the scope of ratification. If there is any policy reason for doing this, it is that the ability to ratify where the principal was completely unidentified and undescribed will depend on the agent having had a particular person in mind; and this may effectively permit him at a later stage to choose the person who is to ratify by declaring that this was the person whom he had originally had in mind. This is not, at least in theory, true in ordinary dealings on behalf of unidentified principals, where actual authority would in the event of dispute need to be proved. Even in such cases however there may be an element of choice, for agents may have identical instructions from several principals and thus be free in practice to choose to which principal a particular contract should be allocated. There is also some possibility of such choice where the question of the intervention or liability of an undisclosed principal arises.[406] Such uncertainties are not therefore unknown to agency law. The dicta quoted come from a nineteenth-century case on insurance, where the difficulty of distinguishing between identifying the person who can sue on the policy as principal and identifying the interests covered by the policy is notorious.[407]

⚠ A carefully reasoned judgment of Colman J confirms the above view.[408] It also states (in wording appropriate to its context, that of insurance) that:

"Evidence as to whether in any particular case the principal assured or other contracting party did have the relevant intention may be provided by the terms of the policy itself, by the terms of any contract between the principal assured or other contracting party and the alleged co-assured or by any other admissible material showing what was subjectively intended by the principal assured."[409] ⚠️

Although this decision and these dicta seem, with respect, correct, they do raise considerable problems of evidence, whether within or outside the context of insurance. Where an agent has no principal in mind at the time of the act, but proposes to "allocate" the contract, there can in principle be no ratification. Where he has a principal in mind, there can. The two situations may be difficult to distinguish.

A related point arises from the fact that policies of marine insurance on goods have long been taken out for the benefit of "all those to whom they do, may or shall appertain", or similar wording; and it has often been assumed that beneficiaries of such policies may sue on them. It seems that in such a case the understanding is that the agent who procures the insurance need not at the moment have in mind any particular person or persons as the intended principal or principals, provided that there is some general contemplation as to the person or persons intended to benefit.[410] Although there are dicta to the contrary it is submitted that, as regards agency reasoning, a person who had no interest at the time of the insurance should not in principle be able to ratify, and therefore should not be able to sue on such a policy as principal.[411] The analogy of authorised contracts should again be followed, and a contract could not be validly made on behalf of a person who might at a future time acquire a particular qualification.[412] Trust reasoning is not so limited. It is possible for a policy on goods to be taken out which covers the interests of such persons; and the person who takes it out may have an insurable interest to do so and be able to recover an indemnity in respect of loss incurred by such persons, which he would hold in trust.[413] Equally such a policy may be assigned; and in an appropriate case such a policy might be held to convey a contractual offer to persons later acquiring the qualification mentioned. It is submitted that it is on this basis that such provisions should be explained, and that their efficacy in favour of future beneficiaries cannot satisfactorily be based on reasoning that there is agency for a person not at the time ascertainable.[414]

## Ratification by agents

### 2-068

⚠️ Ratification can clearly be effected by an agent, subject to the normal principles of authority.[415] The agent who ratifies requires only authority to ratify, not authority to have performed the act ratified.[416] Conversely, the mere fact that an agent has authority to perform an act of the type purportedly being ratified does not entail that that agent has authority to retrospectively approve the transaction of another agent. Equally obviously, it is not necessary that the agent who ratifies had been an agent at the date of the purported entry into the transaction in question.[417] ⚠️ The authority may in appropriate cases be apparent.

## Ratification by companies

### 2-069

An act or transaction done or entered into on behalf of a company may be ratified by the directors, if they have power to do or enter into such an act or transaction on behalf of the company[418]: and a ratification by the directors may be implied from part performance made or permitted by the company.[419] Where an act or transaction is beyond the powers of the directors, it can only be effectively ratified by the shareholders.[420] An act done by the directors in excess of their powers, but within the scope of the articles of association, may be ratified by ordinary resolution of the shareholders,[421] or by an informal meeting of all the shareholders.[422] A number of cases go further and indicate that a ratification by the shareholders may be implied if they can be regarded as having acquiesced in such an act with knowledge of the circumstances, even in the absence of a formal meeting.[423] In some circumstances, the third party will be protected by statute against unauthorised acts of directors.[424]

The icon ⚠️ indicates a paragraph or footnote that contains consolidated text from the supplement.

**Illustrations**

(1) **2-070**

A sheriff, acting under a valid writ of execution, wrongfully seizes goods which are not the property of the debtor. The execution creditor does not, by becoming a party to an interpleader issue or otherwise, ratify the act of the sheriff so as to render himself liable for the wrongful seizure, because the act was not done by the sheriff on his behalf, but in performance of a public duty.[425]

(2) A enters into an agreement professedly on behalf of B's wife and C. B cannot ratify the agreement so as to give himself a right to sue upon it jointly with his wife and C.[426]

(3) A is authorised to buy wheat on the joint account of himself and B, with a certain limit as to price. A, intending to buy on the joint account of himself and B, and expecting that B will ratify the contract, but not disclosing such intention to the seller, enters into a contract in his own name to buy at a price which is above the limit. B ratifies, but later refuses to take the wheat. He cannot be sued by the seller.[427]

(4) A sells wheat to X on P's behalf, and repurchases it himself. He then purports to sell it to Q, R and S on P's behalf, knowing that Q, R and S would not deal with him personally. He really intends to carry through the whole transaction on his own behalf. Q, R and S repudiate the transaction. P may ratify.[428]

(5) A contracts on behalf of a volunteer corps with B, both parties thinking that the corps as an entity may be bound. The corps as an entity cannot be bound. The contract cannot be ratified by individual members of the corps, because it was not made on their behalf as individuals.[429]

(6) A contract for the supply of goods is made by "A, B and C on behalf of" a company not yet formed. This company cannot when formed render itself liable by ratification for the price of the goods.[430]

(7) A person may act on behalf of an heir, or an administrator, or the owner of particular property, whoever he may be, though unascertained and unknown to him, and the person on whose behalf the act was done may ratify it.[431]

(8) A policy of insurance is taken out describing the assured as "X, all its subsidiary associated and related companies, all contractors and subcontractors and/or suppliers". A subcontractor appointed in the following year cannot ratify the contract so as to sue on it as a party to it by virtue of the law of agency.[432]

(9) A trawler owned by a French company is at an English port when, as a result of enemy occupation of France, the company becomes an alien enemy. While this state of affairs continues, A, without the company's authority, acts as manager of the trawler. A's conduct cannot subsequently be ratified by the company, which was not at the time of A's acts competent to be A's principal.[433]

(10) A daughter purporting to act on behalf of her mother in respect of the prospective sale of the latter's interest in land orally indicates she will need to get her mother's consent to proposed terms but indicates that her mother would be likely to accept her recommendation. Mother later signs a receipt for part-payment of the purchase price. Ratification was not available because the daughter did not purport to have present authority to bind her mother, and the receipt was not unequivocal evidence that her mother understood what was alleged to have been agreed.[434]

**Article 16**

**Knowledge Necessary for Ratification**

**2-071**

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

In order that a person may be held to have ratified an act done without his authority, it is necessary that, at the time of the ratification, he should have full knowledge of all the material circumstances in which the act was done,[435] unless he intended to ratify the act and take the risk whatever the circumstances may have been.[436] But knowledge of the legal effect of the act may be imputed to him,[437] and it is not necessary that he should have notice of collateral circumstances affecting the nature of the act.[438]

## Comment

### 2-072

This proposition has appeared in all editions of this work, and it is therefore preserved as a general guide. It is a rule protecting the principal against being found to have ratified sooner than is appropriate. It is obvious that some sort of rule to this effect is appropriate, both for ratification and for situations where similar reasoning is employed.[439] Although most rules relating to ratification are directed towards protecting the third party against unfair results, this rule protects the principal against being too easily treated as having ratified. But it is in fact doubtful whether any satisfactory formulation can in fact be found for all the different circumstances in which such reasoning is encountered.

Many of the clearest cases from which this rule is to be derived concern unlawful distress, and conclude that there was no ratification. It has already been argued that the doctrine of ratification has only limited application to torts.[440] In so far as ratification is applicable to make a person liable in tort, it would seem that the requirement of knowledge should be more strictly interpreted in that branch of the law,[441] whereas in a contractual situation a "blanket ratification" (as by receipt of goods) should be more easily able to be established. The objective interpretation of contractual situations, and the related notion that a person may be taken to know matters of which he might be expected to be aware,[442] may obviously allow the inference of ratification where this would not be permissible in a tort case, and it is right that it should.[443] Thus where a person ratified a lease negotiated by an agent under a misapprehension as to its provisions which would not have affected the validity of the contract had the parties made it without an intermediary, he was held bound by it.[444] But where a person to whom a duty of disclosure was owed purported to ratify a transaction (not effected through an agent) which was to his prejudice and voidable as such, this was held inoperative since he did not know that the transaction was voidable.[445] The burden of proof is on the person alleging ratification.[446] Where the principal is aware of the agent's acts and the terms of the purported contract, it appears not to be necessary that the principal had realised, perhaps because of lack of internal records, that the agent had exceeded his authority.[447] Assent may otherwise be manifested by the principal's commencing to perform the contract, and where, to the principal's knowledge, the third party commences to act on it, the principal may become estopped from disowning it.[448] Much may turn on whether the retrospective effect of ratification is important. A principal who, for instance, is simply confirming a sale of a chattel or accepting a payment in respect of a sale, may be able to do so without knowing or caring that an agent had ineffectively purported to sell it the week before. But if much turns on the transaction being backdated, it is likely to be more important that the principal is aware that its decision will have retrospective effect. There is some authority that the knowledge of a director of the relevant facts may be sufficient to bind the director's company,[449] though quaere whether the knowledge does not have to be held by all persons whose assent is necessary to constitute ratification.[450] This is a situation where the claimant is seeking to enforce a contract, and not merely seeking restitution.

## Illustrations

(1) **2-073**

An agent wrongfully distrains goods which were neither on the debtor's land nor his property, without the authority of the principal, and pays over the proceeds to the principal. The principal is not deemed to have ratified the wrongful distress by receiving the proceeds, unless he received them with knowledge of the irregularity, or intended without inquiry to take the risk upon himself.[451]

(2)    An agent, with authority to distrain for rent, wrongfully seized and sold a fixture, and paid the proceeds to the principal, who received them without notice that it was a fixture which had been sold. Held, that the principal had not ratified the trespass.[452]

(3)    An agent, without authority, signed a distress warrant and, after the distress, informed his principal, who said that he should leave the matter in the agent's hands. Held, that this was a ratification of the whole transaction, though there had been irregularities in levying the distress of which the principal had no knowledge.[453]

(4)    An agent purchased a chattel on his principal's behalf from a person who had no right to sell it, and the principal ratified the purchase. Held, that the principal was guilty of a conversion of the chattel, though he had no knowledge at the time of the ratification that the sale was unlawful. Here, the circumstances rendering the transaction a conversion were collateral to, and did not form part of, the contract ratified. The ratification of the purchase as such was however sufficient to make the principal liable for conversion, liability for which is strict.[454]

(5)    An agent entered into an unauthorised contract for the purchase of land on behalf of his principal. A letter from the principal, saying that he did not know what the agent had agreed to, but that he must support him in all he had done, was held to be sufficient ratification of the agreement, whatever it might be.[455]

(6)    The master of a ship sells it in circumstances where no agency of necessity arises. The owner receives the proceeds of the sale by bills of exchange, believing that a situation of necessity had in fact arisen. On hearing the true facts he arrests the ship, presents the bills for payment and pays the money into court. He has not ratified the sale.[456] But he may be held to have done so if in similar circumstances the only irregularity unknown to him was as to the procedure by which the sale was effected.[457]

(7)    An estate agent makes a contract to sell his principal's land. The principal ratifies, not knowing that the estate agent has subsequently received an inquiry about the land from someone else. The ratification is effective.[458]

(8)    An estate agent thinking he is entitled to commission lodges a claim with the vendor's solicitor who simply pays the sum. This is not an act of ratification, since the vendor was unaware of the facts.[459]

## Article 17

## What Constitutes Ratification

(1)    **2-074**

Ratification may be express or by conduct.

(2)    An express ratification is a manifestation by one on whose behalf an unauthorised act has been done that he treats the act as authorised and becomes a party to the transaction in question.[460] It need not be communicated to the third party.[461]

(3)    Ratification will be implied whenever the conduct of the person in whose name or on whose behalf the act or transaction is done or entered into is such as to amount to clear evidence that he adopts or recognises such act or transaction[462]: and may be implied from the mere acquiescence or inactivity of the principal.[463]

(4)    The adoption of part of a transaction operates as a ratification of the whole.[464]

(5)   It is not necessary that the ratification of a written contract should be in writing,[465] but the execution of a deed can only be ratified by deed.[466]

## Comment

### Rule (1)

### 2-075

Just as a grant of authority may be express or implied, so may ratification. Thus suing on a transaction, or basing a defence on it, will (subject to any rules as to ratifications which come too late[467]) often amount to an implied ratification of it.[468] So also receipt or retention of money with knowledge of the circumstances of a contract under which it is paid will normally constitute ratification of that contract,[469] as will use or disposal of goods received under it,[470] unless the supposed principal did not assent to the transaction and had no alternative but to receive them and use them as they were, e.g. where they were already his own.[471] It is clear therefore that ratification of an executed contract will be easier to establish than ratification of an executory contract, for there are few cases where a person can keep another's property, or benefit otherwise at the expense of another, without paying, unless he is unaware of the circumstances.[472] However, where the principal was unaware of the circumstances of receipt of property, liability, if any, may more appropriately be founded in conversion or in the law of restitution, than in contract. Such cases are different from those in which inactivity is no more than evidence of a voluntary ratification.[473]

⚠ The same factors as can vitiate the granting of authority, such as duress and undue influence, can also affect ratification.[474] ⚠

### Rule (2): Express ratification

### 2-076

This needs no explanation: it is obvious that if the principle of ratification is accepted at all, an express statement will constitute its prime example. It would seem that a conditional ratification would, if the condition was as to a future event, take effect only as a promise to ratify, and only bind if supported by consideration or the requirements of estoppel.

### Rule (3): Implied ratification

### 2-077

Express ratification will however be comparatively rare, and a ratification will more often be implied from words or conduct.[475] Such words or conduct must be unequivocal: they must not be such that they could be accounted for by other interpretations,[476] e.g. that the principal is simply resuming possession of his own property.[477] It is possible too that a principal may have made a book entry by accident or tentatively; a principal "may have dipped its toe in the Rubicon but had not crossed it".[478] Such reasoning is necessary to protect the principal against too easily being held liable as having ratified. Ratification can, however, be implied from a position taken in litigation.[479]

### Ratification need not be communicated, so long as manifested

### 2-078

There is in principle no necessity for the ratification to be communicated to the other party: it seems long established that it operates, if proved, as a unilateral manifestation of will.[480] It will normally be communicated, or at least manifested, to the agent, or sometimes to the third party only. It is sometimes said that ratification need not be communicated at all.[481] But it is not clear that a principal could not have a change of mind if ratification had not yet been communicated to either agent or third party, such as by tearing up a letter of ratification before sending it, or, in the case of a company, revoking a board resolution[482] Where the manifestation is to the third party it can operate as a form of estoppel, should,

for instance, there have been an inconsistent communication to the agent. Equally, a court may conclude that there has been a novation of a transaction rather than a ratification.

In accordance with general principles, it is objective appearances that matter not the internal intentions of the principal:

> "It seems to me that it should not be open to a principal, who to the outside world by his conduct, or that of his duly authorised agents, appears to have adopted a transaction to be able to prove subjectively that in fact he had not."[483]

### Ratification by inactivity and acquiescence[484]

#### 2-079

The issue whether ratification can be inferred from inactivity or acquiescence is more likely to arise with executory contracts, since in the cases of executed contracts it will be difficult to remain totally inactive, except in the case of unasked-for improvements to one's own property[485] (though, as seen, the possibility of an analysis based on conversion or the law of restitution may also be preferable in some such cases[486]). If inactivity of the principal can be taken as manifesting assent, it may constitute ratification.[487] Several cases involving executory contracts have been explained in this way.[488] However, it is also true that "silence or inaction may simply reflect an unwillingness or inability on the part of the principal to commit himself",[489] and there can be a range of other explanations for inactivity that make a finding of an intention to ratify unproven.[490] It has been held that to the extent that silence can amount to ratification, the third party cannot assume assent without allowing at least a reasonable period for (assumed) deliberation to pass.[491]

Past inactivity in respect of what was done by agents may also be held to confer actual or apparent authority[492]: a person who acts by representatives runs risks in doing so, and may owe a duty to make his position clear where a person acting alone would not. In all these cases, the principal is more likely to be bound where the person concerned is already an agent than when he is not.[493]

### Estoppel

#### 2-080

⚠ Ratification merges almost imperceptibly into estoppel.[494] ⚠ When the silence or inactivity is known to and relied on by the third party, an estoppel may in appropriate cases arise against the principal, who may be estopped from saying that he has not ratified.[495] This will be different from an implied ratification if it comes as later and unrelated conduct, or if there is some difficulty as to the ratification, e.g. in respect of form or capacity.[496] Conversely, an estoppel may arise if the principal leads the third party to believe that he will not ratify, or does not do so within a reasonable time.[497]

### Rule (4)

#### 2-081

The principal cannot adopt the favourable parts of a transaction and disaffirm the rest: he cannot approbate and reprobate, for this would enable him to effect a transaction into which the third party had never intended to enter.[498] He must therefore adopt or reject the transaction in toto, and where it can be said that this has not been done, the conclusion may be drawn that there was no ratification[499] (though where an agent has effected several separate transactions, the principal may ratify certain transactions individually and refuse to ratify others[500]). This does not, however, mean that there are no circumstances whatever where he may ratify a transaction for one purpose while rejecting it for another. Thus in *Harrisons & Crossfield Ltd v London and North Western Ry Co*[501] a principal whose servant had, while on sick leave, stolen, before the commencement of transit, consignments which the principal had been employed to carry, ratified the transaction to the extent of laying the possession in himself for the purpose of the law of larceny. It was held that he had not ratified so as to vest possession in himself under the contract of carriage, so as to make him liable as a common carrier for non-delivery.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

## Rule (5)

### 2-082

Since authority to execute a contract required to be in writing, or to be evidenced in writing, need not be in writing,[502] it follows that ratification need not be in writing either.[503] But authority to execute a deed must be conferred by deed,[504] and hence ratification of such an action must equally be by deed.[505] But what appears to be a parol ratification may in fact amount to a second delivery[506]; and if a deed was not necessary for the transaction, the document executed may be treated as a written instrument so that a parol ratification of it is valid.[507]

### Illustrations

(1) **2-083**

A shipmaster without authority of the owner sells his ship. The owners receive the purchase money with full knowledge of the circumstances in which the ship was sold. The receipt of the purchase money is a ratification of the sale.[508]

(2) A is a bankrupt. B, at the request of A's wife, purchases certain bonds with A's money, and hands them to her. The trustee in bankruptcy seizes some of the bonds as part of A's estate. The trustee in bankruptcy has ratified the act of B, and thereby discharged him from liability in respect of money used for purchasing the other bonds.[509]

(3) A is a bankrupt. B wrongfully sells part of A's property. The trustee in bankruptcy accepts the proceeds or part of them, or otherwise recognises B as his agent in the transaction. B is deemed to have been duly authorised by the trustee to sell the property.[510]

(4) An agent purchases goods on behalf of his principal at a price exceeding his limit. The principal objects to the contract, but disposes of some of the goods as his own. He is deemed to have ratified the contract, and is bound by it.[511]

(5) A employs a broker to execute a distress warrant. The broker, in executing the warrant, illegally seizes goods belonging to B. In answer to a letter from B demanding compensation, A writes that he is at a loss to understand the threat of proceedings, but that his solicitor will accept service of any process B thinks proper to issue. This reply is evidence of a ratification by A of the wrongful seizure.[512]

(6) A receives the rents of certain property for many years without the authority of the owner (who is unknown, it not being clear who inherited the land on the death of the previous owners). The owner sues A for possession, and for an account of the rents and profits. The action is a sufficient ratification to render A the agent of the owner from the commencement.[513]

(7) The chairman and deputy-chairman of directors, and the secretary, of a manufacturing company, respectively, ordered goods which were necessary for the purposes of the business of the company, and the goods were supplied and used therein. Held, that though the goods were ordered without authority, the directors must be taken to have known that they had been supplied and used in the business, and that therefore the company was liable for the price.[514]

(8) A contracts to do certain specified repairs to a ship. An agent of the shipowner, whose authority is to the knowledge of A limited to the repairs so specified, sanctions certain variations in the work, and the repairs are executed according to the contract as varied. The shipowner sells the ship as repaired. The sale is not a ratification of the unauthorised variations.[515]

(9) A ships goods to Calcutta and entrusts them to the captain of the ship to dispose of them as best he can in the interest of A, and to invest the proceeds in certain specified articles, or in bills at the exchange of the day. The captain sells the goods and invests the proceeds in unauthorised goods.

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

A, on hearing of this, does nothing for ten weeks, after which he attempts to repudiate the captain's act. A is bound by the sale.[516]

(10) D, the managing owner of a ship, sells it, through a broker, without authority. The other owners formally ratify the sale and receive their shares of the purchase money. They are liable to the selling agent for commission, the employment of a broker being an essential part of the whole transaction.[517] But ratification by a joint owner of the sale of a house may not constitute ratification of the contract with the estate agent who effects the sale, for the house need not have been sold through such an agent and there is therefore no need to regard the acquiescence in one contract as covering the other.[518]

(11) A, who was B's manager, fraudulently and without authority obtained from B's bankers, in exchange for cheques drawn by B upon the bankers, drafts drawn by the bankers upon themselves, payable to bearer and crossed "not negotiable". A paid these drafts into an account which he had with the C Bank, and the C Bank collected the amounts. In an action by B against the C Bank for conversion of the drafts it was held that B must, in order to have a title to sue, ratify A's act in obtaining the drafts; but that B could not ratify this act without also ratifying A's payment of the drafts into his account with the C Bank, for the form of the drafts necessitated payment into some bank for collection; and that the action therefore failed.[519]

(12) D instructs an estate agent to act in the sale of a house, no.17. No.7 is also on the agent's books. A purchaser wishing to acquire no.7 is persuaded to sign a contract relating to no.17 and to pay a deposit, on the agent's representation that the properties are the same. D objects to some of the terms of the contract and refuses to sign it. The agent refuses to return the deposit without an order from D. D by letter requests the agent to return the deposit but the agent again refuses. There is evidence from which it could be determined that D has ratified the agent's receipt of it and may be liable to repay it.[520]

## Article 18

## Events Not Preventing Ratification

### 2-084

⚠ Ratification is effective—

(1) although the person ratifying had refused at first to recognise the act,[521] ⚠ unless to allow ratification would unfairly prejudice the third party[522] ⚠;

(2) although proceedings have been commenced against the person purporting to act as agent[523] ⚠;

(3) of a contract or other transaction, notwithstanding that the third party has given notice to the principal of his withdrawal from it,[524] ⚠ unless the contract or transaction: (a) was made by the agent expressly or impliedly subject to ratification, and the third party withdraws before ratification occurs[525] ⚠; or (b) (it seems) the agent and third party surrender any rights they may have against one another before ratification occurs.[526] ⚠

## Comment

## Rule (1)

### 2-085

It has been held that where the principal refused to ratify but, being nevertheless urged to do so, eventually did, he could sue the third party[527]: but that where he indicated that he would not do so, and the third party acted to his prejudice on that basis, the principal could not subsequently ratify.[528] It has also been held that an *uncommunicated* refusal to ratify can be reversed, so that the principal can take

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

advantage of the act ratified.[529] In general it seems, therefore, that the rule is correctly expressed as above: a ratification may be effective against the principal though originally he refused to ratify, and also in his favour unless the third party has relied on a previous refusal in a way that would make a subsequent ratification unfairly prejudicial. These conclusions seem better based on the rules as to limits on ratification than an estoppel, since there may be difficulties concerning representations of intention as founding estoppel. The reasoning seems best based on an analogy with the grant of preceding authority, which cannot be withdrawn as regards the transaction authorised once acted on: since the agent's action has already taken place, a ratification cannot without the consent of the other party be withdrawn. A refusal to ratify, on the other hand, is merely equivalent to a refusal to grant authority: this does not prevent a subsequent grant of authority, subject to the doctrine of estoppel. The other limitations on the power to ratify are of course also applicable.[530]

## Rule (2)

### 2-086

This proposition covers cases where ratification renders lawful an act which was initially a tort, notwithstanding that proceedings have been instituted against the agent prior to ratification: an example appears in Illustration 4. In the case of contract, there is authority that where proceedings have been commenced against a *principal*, he may ratify thereafter and so render himself liable.[531] But a purported ratification by the principal after the commencement of proceedings against the agent would sometimes not be within a reasonable time[532] and so inoperative against a third party who did not wish to take advantage of it.[533]

## Rule (3)

### 2-087

⚠ The rationale for Rule (3) is unclear. It may simply be a conspicuous and controversial application of the technical notion that ratification creates authority which relates back to the time of the act ratified. It is often referred to as the rule in *Bolton Partners v Lambert*,[534] ⚠ a leading case which appears as Illustration 1. Such a rule is rejected in *Restatement, Third*,[535] ⚠ and the case has been criticised by distinguished writers as giving an inappropriately full effect to the doctrine of relation back.[536] ⚠ The third party, though he may not know it, is in the power of the principal, not merely as to whether he has made a contract, but also as to whether he must already answer for breach of it. Furthermore, when the third party discovers before any ratification that the agent is unauthorised (which was not the case in *Bolton Partners v Lambert*), it may well be argued that he should be able to escape from the transaction rather than have to wait, if only for a reasonable time, to see if he has a contract. In *Fleming v Bank of New Zealand*[537] ⚠ the Privy Council reserved the right to reconsider the case.

⚠ It is certainly true that the judgments in *Bolton Partners v Lambert* itself consist largely of assertion. It is also true that the rule can only work fairly if it is made the subject of exceptions, discussed in the next Article, which are difficult to formulate. The rule has however been assumed to be binding on the Court of Appeal.[538] ⚠ Perhaps the rule's strongest rationale is that the third party's inability to withdraw is the consideration for the agent's warranty of authority; "I will warrant my authority so long as you permit the principal to ratify if I am wrong". If this is right, it ought to follow that if the agent consents to the third party's withdrawal from the contract, or those parties otherwise resile from any rights they have against one another, the principal ceases to be able to ratify.[539] ⚠ If the agent gave no warranty of authority, then perhaps either party can withdraw from the transaction before the principal ratifies. These qualifications are reflected in limb (b) of Rule (3), above.

If the English courts had a free hand, however, it is unlikely that many would disagree with the proposition that if a third party at the time of contracting believes an agent to be authorised, and subsequently finds that this was not so, he should, if he wishes, be able to withdraw from the transaction on that ground alone, and should not remain potentially bound until the principal decides whether or not to ratify. But the matter is less clear if the third party, not knowing of the lack of authority and believing himself to be bound, simply repudiates the contract, i.e. refuses or can be shown to be unable to perform, even if he uses the word "withdraw" to refer to his conduct—and it is this which appears to have been *Bolton*

The icon ⚠ indicates a paragraph or footnote that contains consolidated text from the supplement.

*Partners v Lambert* itself (with the added feature that the third party there apparently "withdrew" because he believed that the negotiations had not reached the stage at which he was bound at all). If one assumes that such a third party would normally have believed on reasonable grounds that the agent had authority, he can rely on the doctrine of apparent authority (or even ratification) and sue the principal for non-performance. In such a situation it is therefore the supposed principal, if he cannot ratify, who is potentially bound until the third party decides whether or not to proceed against him. *Restatement, Third* rejects the reasoning behind *Bolton Partners v Lambert* completely and treats the third party as being able to "withdraw" in this second situation also[540]; but the scope of ratification in the *Restatements* is in some respects different from that under English common law.[541] It is not clear that a party, X, who believed themselves bound (and perhaps anticipating being bound) and is able to sue even only if apparent authority (or ratification) is established, is fairly released by the fact that unknown to X the person with whom X had dealt had no actual authority. Perhaps X's release could be based for English law on the known rule that a party who gives one reason justifying what appears to be a repudiation of contract may subsequently give another if it was in existence at the time of the original repudiation.[542] But as stated above, the *Bolton Partners* case, whatever it stands for, is binding on any court in England and Wales other than the Supreme Court.

It is in any case clear that where a contract is made expressly or impliedly subject to ratification, it is not binding at all and there is nothing to ratify.[543] Such an interpretation can be put on most cases where the third party is aware of the lack of authority, whatever the reasons for it. The purported ratification, would in fact simply create the contract, unless the other party had previously withdrawn. The case is the same as that where the agent does not purport to have authority.[544] The third party's promise is at best one made to the agent, not to withdraw from the transaction, and unless there is independent consideration does not bind him. Although it is possible to enter into a contract which binds in the sense that neither party may withdraw from the moment of agreement, but the main obligation does not come into operation unless certain events occur,[545] it is difficult to see that such a contract can be found to exist where the condition relates to the question whether one purported party is bound at all.

It seems also that the rule in *Bolton Partners v Lambert* is one of agency law only and to be restricted to cases of lack of authority. If the original agreement is ineffective for any other reason (e.g. lack of a deed) there is no contract to withdraw from and the doctrine of relation back does not apply.[546]

It has further been held that where the act the subject of purported ratification ceases to be operative before ratification, there is nothing to ratify.[547] The case in question involved unauthorised payment of a debt, and it was said that in such a case the party to whom the debt was paid was entitled to return the money on discovering that the payment had been unauthorised, and apply to his debtor for payment.[548]

## Illustrations

(1) **2-088**

A made an offer to B, the managing director of a company, and it was accepted by him on the company's behalf. B had no authority to accept the offer. Not knowing of the lack of authority, but on the basis of disagreement in subsequent negotiations, which appear to have led him to assume that he was not yet bound, A gave the company notice that he withdrew his offer. The company subsequently ratified B's unauthorised acceptance. Held, that the ratification dated back to the time of the acceptance, rendering the purported withdrawal of the offer a breach. Specific performance was decreed against A.[549]

(2) A, without B's authority, pays a debt owed by B. The creditor, upon discovering that A was not authorised to pay the debt, returns the money to him. B cannot subsequently ratify or take advantage of the payment.[550]

(3) A offers land to a charity at a certain price. The chairman and 14 of the 18 members of the board of the charity visit the property. They tell A that they have all made up their minds to purchase it and that a board meeting to be summoned to approve the purchase will be a mere formality. A

## EXHIBIT L

The Common Law Library

# BOWSTEAD AND REYNOLDS

## ON

## AGENCY

## TWENTY-SECOND EDITION

BY

### PETER WATTS QC, LLM (Cantab), FRSNZ

*Senior Research Fellow, Harris Manchester College, Oxford*
*GENERAL EDITOR*

AND

### F.M.B. REYNOLDS QC (Hon), DCL, FBA

*Honorary Bencher of the Inner Temple; Professor of Law Emeritus in the*
*University of Oxford and Emeritus Fellow of Worcester College, Oxford*

**SWEET & MAXWELL**

 THOMSON REUTERS

General

## Article 4

### Capacity to Act as Principal

Capacity to contract or do any other act by means of an agent is co-extensive with the capacity of the principal alone to make the contract or do the act which the agent is authorised to make or do.[11]    **2-006**

#### Comment

"It would seem that the proper view should be that anyone may be a principal who has the mental power to act at all, and that if he is a person of no, or limited, contractual power, his incapacity should be reflected solely in the contract made for him by his agent, which contract would stand on the same footing as if he had made it in person."[12]    **2-007**

Such a simple approach, which is also formulated in this Article, cannot however be left without further comment, for where, as often, incapacity leads to voidable transactions, a more complex analysis may be necessary. As with most principles, there are likely also to be some exceptional cases.[13] It seems right to confirm, however, a general principle that if the would-be principal cannot bring about a legal result personally, it cannot be effected by an agent.[14]

**Minors** In old cases it is suggested that minors cannot appoint agents at all.[15] The dicta were wider than was necessary for the decisions in connection with which they were uttered,[16] and are nowadays interpreted restrictively. The following judicial statement may provide a better guide: "Whenever a minor can lawfully do an act on his own behalf, so as to bind himself, he can instead appoint an agent to do it for him".[17] This to some extent follows from the general principle that whatever a person may do personally can be done through an agent.[18] Thus a minor may by an agent enter into a contract that binds the minor in accordance with the general law[19]; and it has been held that a minor may authorise another to make admissions, even contrary to the minor's interest.[20] On the other hand, contracts which would not otherwise bind a minor will not do so merely because made through an adult agent; and a minor cannot by an agent, any more than is possible personally, make an ir-revocable disposition taking effect by deed, for such a disposition is avoidable by the minor within a reasonable time of coming of age,[21] and the interposition of an agent should make no difference. This latter proposition probably does not,    **2-008**

---

[11]    See further Article 6, below.

[12]    Mechem, *Outlines of Agency* (4th edn), p.9. See also *Restatement, Third*, § 3.04.

[13]    See Article 6.

[14]    So, for example, if a partner cannot sue his or her partners in relation to moneys lent to or invested in the partnership except as part of an equitable accounting, neither can a receiver appointed to the affairs of the partner: see *Re Pinata Pty Ltd* [2012] NSWSC 162 at [52].

[15]    *Zouch d. Abbot and Hallett v Parsons* (1765) 3 Burr. 1794 at 1804; *Doe d. Thomas v Robert* (1847) 16 M. & W. 778.

[16]    See *Chaplin v Leslie Frewin (Publishers) Ltd* [1966] Ch. 71 at 96–97.

[17]    *G. (A.) v G. (T.)* [1970] 2 Q.B. 643 at 652, per Lord Denning MR, limiting earlier dicta of his own in *Shephard v Cartwright* [1953] Ch. 728 at 735; affirmed on another point [1955] A.C. 431.

[18]    Article 6.

[19]    See *R. v Longnor (Inhabitants)* (1833) 4 B. & Ad. 647; *Doyle v White City Stadium Ltd* [1935] 1 K.B. 110.

[20]    *G. (A.) v G. (T.)* [1970] 2 Q.B. 643, (where it was held that in the event there had been no authority).

[21]    *Edwards v Carter* [1893] A.C. 360; *Paget v Paget* (1882) 11 L.R.Ir. 26; *Burnaby v Equitable*

**EXHIBIT M**



[2013] UKPC 11
Privy Council Appeal No 0031 of 2012

# JUDGMENT

# New Falmouth Resorts Limited (Appellant) *v* International Hotels Jamaica Limited (Respondent)

## From the Court of Appeal of Jamaica

before

**Lord Neuberger**
**Lord Walker**
**Lord Mance**
**Lord Sumption**
**Sir Alan Ward**

## JUDGMENT DELIVERED BY

## SIR ALAN WARD

## ON

## 7 MAY 2013

**Heard on 30 January 2013**

|                                    |                                       |
| ---------------------------------- | ------------------------------------- |
| *Appellant*                        | *Respondent*                          |
| Tracy Angus QC                     | Dr Lloyd Barnett                      |
| Juliet Mair Rose                   | Weiden Daley                          |
| Jamaican Bar                       | Tracey Long                           |
|                                    | Jamaican Bar                          |
| (Instructed by Harcus Sinclair)    | (Instructed by Charles Russell LLP)   |

**SIR ALAN WARD:**

### Introduction

1.     This appeal concerns the right to possession of 4 ¾ acres of land known as Lot 3A adjacent to the Starfish Hotel in the parish of Trelawny in Jamaica. The appellant, New Falmouth Resorts Ltd, seeks possession of the land from the respondent, International Hotels Jamaica Ltd, and claims damages for its wrongful use and occupation. On 20th February 2009 Hibbert J sitting in the Supreme Court of Justice of Jamaica in Civil Division held that the appellant's claims must fail and judgment was accordingly entered in favour of the respondent with costs. On 15th April 2011 the Jamaican Court of Appeal dismissed the appellant's appeal with costs but later on 23rd January 2012 granted final leave to appeal to Her Majesty in Council.

### The issue in the appeal

2.     It was as long ago as 17th February 1982 that the appellant agreed to sell Lot 3A to National Hotels and Properties Ltd ("NHP") for $184,000 payable by way of a deposit of $62,000 with the balance to be paid on completion which was fixed for 31st March 1982. A remarkable feature of the case is that completion has still not taken place. This agreement was signed on the appellant's behalf by John H. Phelan III, ("John"). The central issues which arise on the appeal are whether John was authorised to sign on the company's behalf, alternatively whether the company ratified the agreement on 21st June 1982 at a properly constituted meeting of the board of directors.

### The background

3.     Although the issue relates to the validity of the agreement for the sale of the land, the underlying dispute is, and for decades has been, a facet of a long battle that has been waged in a number of actions between Mr James Henry Chisholm ("Mr Chisholm") and John and other members of the Phelan family over control of the appellant company. The company was incorporated in 1967 as a vehicle for the Phelan family who were resident in Texas to conduct real estate business in Jamaica. John was the principal shareholder and he was one of the first directors appointed to the board. Frank Phelan ("Frank") also acquired shares in the company and he was appointed a director on 6th July 1970. A third brother, David, was appointed a director on 26th January 1973 and later became chairman. At that same meeting Mr Chisholm was appointed to the board as managing director.

4.     Mr Chisholm's involvement in the company seems to have come about in this way. The company owned large tracts of property in western Jamaica and, in order to

develop the land, needed to procure the injection of additional funds to put in the necessary roads, water supply and other infra-structure. The Phelans heard of Mr Chisholm who was an established realtor in Jamaica with connections in the USA, in particular in Florida where he had a licence to engage in real estate business. As an inducement for Mr Chisholm to raise the necessary finance, the appellant seems by a letter dated 26th October 1972 to have offered him a 51% shareholding in the company upon his providing the company with a loan commitment for $1 million to provide the working capital for the development of the lots in the first phase. It was also suggested that on payment of the sum of $10,000 Mr Chisholm would take over management of the project as managing director. He was accordingly appointed to the board as manager on 26 January 1973 at the same meeting when David was appointed. He is now in control of the company: indeed he describes it as "my company".

5.     John was adjudged bankrupt by an order of the United States Southern District Court for Texas on 12th July 1972 but discharged from bankruptcy by a later order of the same court made on 30th October 1974. By virtue of article 97 of the Articles of Association the office of the director shall be vacated if he becomes bankrupt. In any event, John admitted in evidence in one of the rounds of litigation involving these protagonists that he had resigned as a director of the company during the course of 1971 and that he had "thereafter had no dealings with the company as a director or other officer thereof till after I had been discharged from bankruptcy". Whether or not he was ever validly reappointed is a matter of dispute in this appeal.

6.     The Trelawny Beach Hotel, later known as the Starfish Hotel, was built on land adjacent to Lot 3A. NHP had purchased the Trelawny Beach Hotel in 1978. At the time of the purchase and for many years thereafter, it was thought that Lot 3A upon which the hotel tennis courts were situated formed part of the land that had been acquired by NHP. However, in 1981 at a time when NHP was considering a sale of the hotel it was discovered that Lot 3A was not in fact part of the hotel property but was still owned by the appellant. Contact was accordingly made with the appellant and Mr Moses Matalan acting for NHP had some negotiations with Mr Chisholm for the purchase of Lot 3A for $184,000. In Mr Chisholm's absence the appellant's attorney, Mrs Brown Young, prepared an agreement of sale and Mr Rodney signed it on behalf of NHP. Mr Chisholm refused to sign because he believed the land was subject to a lease with an option to renew and to purchase. He also considered that the offer was far too low. It seems, however, that John then entered into discussion with NHP regarding the sale. Mr Chisholm became aware of these negotiations. He had also been informed that John and Frank had purported at a board meeting of the company held on 24 November 1981 to appoint John as managing director and to dismiss him, Mr Chisholm. He wrote to NHP on 12th January 1982 informing them that he was "the appointed legal Managing Director" and shareholder of the company and that John and Frank were not shareholders or directors and that NHP should not negotiate with them for the purchase of Lot 3A. What action, if any, NHP took after receipt of that letter is not clear. It seems that Mr Vincent Chen, an attorney-at-law and partner in the firm of Clinton Hart & Co, representing, or purporting to represent, the appellant, prepared an agreement in almost identical terms to Mrs Brown Young's whereby the appellant agreed to sell and NHP to purchase Lot 3A for the sum of $184,000 payable by way of a deposit of $62,000 on

the signing of the agreement and the balance on or before 31 March 1982. John signed this agreement on 17 February 1982, giving no indication of the capacity in which he signed on the company's behalf nor of the position he held in the company. It is the validity of this agreement that lies at the heart of this appeal.

7.      When completion did not take place as scheduled, Mr Chen, who under the terms of the agreement had carriage of the sale, wrote to NHP's attorneys informing them that: "We have consulted with Mr John Phelan, the Managing Director and duly authorised agent of the company who has authorised us to advise you that your client may take possession of the land purchased under the Agreement for Sale." NHP continued in occupation. In due time a sewage treatment pond and treatment plant was built on part of the land beyond the tennis courts. By a deed of assignment dated 20th December 1989 NHP assigned the agreement to Linval Ltd which in turn assigned the agreement to the respondent on 22nd May 2000.

8.      A judgment of Edwards J in other litigation cleared the way for the appellant to give good title to the purchaser and in August 2001 the respondent requested the appellant to take immediate steps to bring the agreement to completion by the execution of a transfer of Lot 3A in the respondent's favour in exchange for the balance of the purchase price net of the deposit of $62,000 due to the appellant under the agreement. Mr Chisholm, describing himself as "chairman and managing director" of the appellant asserted in response that neither the appellant nor "its legally appointed managing director from January 1973" was a party to "any purported agreement of sale" to NHP. As a result there was more litigation, this time a claim by the respondent against the appellant for specific performance of the agreement. In its defence to that claim the appellant challenged John's authority to sign the agreement as well as the efficacy of the chain of assignments pursuant to which the respondent claimed to be entitled to maintain the action against the appellant. There is, therefore, an obvious overlap between the issues in that suit and this claim and, as the Court of Appeal observed, it is not at all clear, and no reason was given, as to why that action had not been brought on for trial.

9.      This claim for possession commenced on 24th October 2002 after the appellant served notice to quit. The defence pleaded the respondent's entitlement to be registered as the proprietor of the land by virtue of the agreement of 17th February 1982, the benefit of which had been assigned to the respondent as set out above. By an amendment the respondent alleged that as it and its predecessors had been in continuous possession of the land since 1982, the appellant was barred by section 3 of the Limitation of Actions Act from bringing any action for the recovery of the land and that any right or title to the land had been extinguished by section 30 of that Act. Another curiosity of this litigation is that no reply was filed but in its pre-trial memorandum the appellant indicated that it would contend that the respondent was not entitled to rely on the agreement because at the material time John was not authorised to sign any agreement on the appellant's behalf, that the agreement was statute barred and that the respondent was not a proper assignee of NHP.

3

10.     The trial was before Hibbert J for 5 days in July and 4 days in November 2006 and a day in January and February 2007. Hibbert J gave judgment on 20th February 2009. He concluded that:

> "The evidence presented to the Court, particularly the contents of the Annual Returns made to the Registrar of Companies and the minutes of the meetings of the Board of Directors clearly demonstrates that at the time of the agreement for sale, John Phelan III was regarded by N.F.R. as a director of the company."

He held further that even if there was a defect in the appointment or qualification of John Phelan III the acts of a director or manager were nonetheless valid notwithstanding any defect that might afterwards be discovered in his appointment or qualification by virtue of section 172 of the Companies Act 1965. He concluded:

> "Moreover, I am of the opinion that the ratification of the Agreement for Sale at the meeting of the Board of Directors held on 21st June 1982 should lay to rest any question as to the validity of the Agreement for Sale."

He was satisfied that the agreement had been validly assigned. He dismissed the argument that the respondent was affected by laches and he accordingly found that the respondent was not a trespasser but was entitled to possession.

11.     Four issues were raised in the appeal to the Court of Appeal:

    i)     the validity of the agreement;

    ii)    the effect of the assignments;

    iii)   the position of the respondent as occupiers of Lot 3A; and

    iv)   the question of laches and limitation.

The Court of Appeal held that the assignments were valid, that the respondent was not a trespasser, that limitation had not been pleaded by either party so it was not clear how it would arise on the facts of this case and that there was no basis for the appellant's "distinctly obscure statement … that "the purchaser is guilty of laches, and the contract would be outside the limits permitted by the statute of limitations"."

12.     Morrison JA giving the lead judgment with which Panton P and Phillips JA agreed, held at [36]:

> "Although the evidence does not point directly to his [John's] reappointment as a director, there was, it seems to me, considerable evidence to suggest that, by the time of the signing of the agreement in 1982, Mr Phelan was regarded, treated and held out by NFR as a director of the company."

As for the argument that section 172 served to validate John's acts, he held:

> "[40] In the instant case, there being no evidence whatever of any purported (or defective) reappointment of Mr Phelan as a director in the post-1974 period, I therefore agree with Miss Davis [counsel for the appellant] that section 172 cannot apply in these circumstances."

But that was not the end of the matter because:

> "[44] … by its representation to the world at large in the successive annual returns filed with the Registrar of Companies that Mr Phelan was a director of NFR during the relevant period, the company is estopped from denying to IHJ that he had the authority to enter into the agreement on behalf of the company."

Finally, he agreed with Hibbert J's conclusion that:

> "[46] … The actions of Mr Phelan were validly ratified and the agreement properly approved by the Board at its meeting of 21st June 1982."

The appeal was dismissed accordingly.

### *The issues on this appeal*

13.    Much of what was in dispute has fallen by the wayside during the long progress of this case through the courts. All that is left are the issues of John's authority to enter into a contract of sale; alternatively the issue of ratification.

### *Authority*

14.    To quote Diplock LJ from his seminal judgment in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 QB 480, 502:

"It is necessary at the outset to distinguish between an 'actual' authority of an agent on the one hand, and an 'apparent' or 'ostensible' authority on the other. Actual authority and apparent authority are quite independent of one another. Generally they co-exist and coincide, but either may exist without the other and their respective scopes may be different."

### Did John have the actual authority of the company to act on its behalf?

15.    A concise description of actual authority is given by Lord Denning MR in *Hely-Hutchinson v Brayhead Ltd* [1967] 1 QB 549, 583:

"… actual authority may be express or implied. It is express when it is given by express words, such as when a board of directors pass a resolution which authorises two of their number to sign cheques. It is implied when it is inferred from the conduct of the parties and the other circumstances of the case, such as when the board of directors appoint one of their number to be managing director. They thereby impliedly authorise him to do all such things as fall within the usual scope of that office."

16.    Article 87 of the Articles of Association of the company provides that the business of the company shall be managed by the directors but under article 118 the directors may entrust to or confer upon a managing director all or any of the powers exercisable by them. In considering whether or not John had any *express* authority, it does not much matter whether or not he was a director since an ordinary member or employee of the company may be expressly authorised by the board or the managing director to transact company business, even to enter into a contract for the sale of the company's land. There is, however, no evidence whatsoever that John was given any such express authority pursuant to any resolution passed by the board.

17.    He may have had implied authority if he were, as he said he was, the duly appointed managing director of the company as at 17th February 1982 when he signed the agreement on the company's behalf. Leaving aside for the moment the question whether he was duly re-appointed a director of the company after his bankruptcy, he was not its managing director as at that time. That office was held by Mr Chisholm who was appointed on 26th January 1973 when Mr Charles Swann was relieved of his duties as manager and it was decided to appoint Mr Chisholm as manager of the company with immediate effect. At a meeting of the directors held on 22nd February 1973 it was resolved:

"8. … that the managing director of New Falmouth Resorts Ltd, Mr J. Henry Chisholm, shall have the absolute authority of his Co-

Director/Directors and the company as from the date of this meeting to:-

> (a) Sign Contracts and Transfers for the purchase of real estate, for the company and for the sale of real estate owned by the company. …

> 11. … Mr J. Henry Chisholm shall have the absolute authority as from the date of this meeting to carry negotiations for the sale of real estate and other assets owned by the company, determine the sale price thereof and pay commissions thereon, for and on behalf of the company."

It is convenient now to note that at that meeting David was elected chairman and it was resolved that he should have:

> "the absolute Authority of his Co-Director/Directors and the company as from the date of this meeting to remove the Managing Director of New Falmouth Resorts Ltd without any prior notice; if, the Managing Director fails to carry out satisfactorily the duties as Managing Director, and to immediately appoint a successor."

18.     By virtue of article 116 of the Articles of Association a director appointed to the office of Managing Director would not, whilst holding that office, be subject to retirement by rotation or to be taken into account in determining the rotation of retirement of other directors. His appointment would, however, be determined automatically if he ceased from any cause to be a director.

19.     The annual return for the company made up to 24th October 1972, i.e. before Mr Chisholm was appointed, was filed on 10th February 1973 but thereafter there is a woeful failure to comply with the company's obligations to file returns and absent any evidence that he had ceased to be a director, it must be assumed that Mr Chisholm continued in office as the company's managing director.

20.     A handwritten document entitled "Minutes of the Board Meeting of November 24th 1981 between Frank D. Phelan and John H. Phelan III" may be some evidence to the contrary. That document records that:

> "We have decided to appoint John H. Phelan III managing director of New Falmouth Resorts Ltd. Mr Jim Chislom (sic) is not any longer with the above mentioned company."

7

The document appears to have been signed by John and Frank. It certainly suggests that the company had been treating him as the Managing Director at that time but in other respects it is a document of questionable validity. At a meeting of the Board held on Monday June 21st, 1982 under the heading "Minutes of Last Meeting" the chairman, David, sought to obtain confirmation of the "Directors' meeting held on November 24th 1981" but the minutes then record that "Mr Chisholm raised objections and the chairman withdrew his request. The minutes of May 28th 1976 were taken by the meeting as the last properly constituted minutes of the company." In the light of those minutes, the purported dismissal of Mr Chisholm can be ignored. The minutes of the meeting of 21 June were signed by David as chairman but there is another document where each of David, John, Frank and Mr Chisholm signed above their typed name and the word "director" was then written alongside their signature. The document states that:

> "the undersigned being directors of New Falmouth Resorts Limited do hereby waive all requirements as to the length of time for the holding of a Directors' Meeting and all formalities in relation to the giving of notice in respect of the said meeting" [to be held on 21st June 1982].

21.    At that meeting it was resolved by three votes to one, Mr Chisholm being the dissenting voter, that John be appointed managing director "as of November 24th 1981, the date when Mr James H. Chisholm was dismissed from the post." The retrospective effect of that resolution will be discussed in due time when ratification is considered. The important point is that the minutes acknowledge that it was Mr Chisholm who was in fact in office as Managing Director when the agreement of sale was signed in February 1982, not John.

22.    John may have described himself in the negotiations for the sale as managing director but his own assertion cannot confer authority on him: it is the board's actions which give rise to the necessary implication. There is no evidence that Mr Chen, the attorney, was authorised to describe John as the managing director when later giving the licence to occupy. In those circumstances, it is impossible to see how John could claim to be clothed with implied actual authority to sign the agreement of sale.

### Did John have ostensible authority?

23.    The judgment of Diplock LJ in *Freeman & Lockyer* has stood the test of time. He said at 503-505:

> "'apparent' or 'ostensible' authority … is a legal relationship between the principal and the contractor created by a representation, made by the principal to the contractor, intended to be and in fact acted upon by the contractor, that the agent has authority to enter on behalf of the

principal into a contract of a kind within the scope of the 'apparent' authority, so as to render the principal liable to perform any obligations imposed upon him by such contract. … The representation, when acted upon by the contractor by entering into a contract with the agent, operates as an estoppel, preventing the principal from asserting that he is not bound by the contract. …

The representation which creates 'apparent' authority may take a variety of forms of which the commonest is representation by conduct, that is, by permitting the agent to act in some way in the conduct of the principal's business with other persons. By so doing the principal represents to anyone who becomes aware that the agent is so acting that the agent has authority to enter on behalf of the principal into contracts with other persons of the kind which an agent so acting in the conduct of his principal's business has usually 'actual' authority to enter into. …

The commonest form of representation by a principal creating an 'apparent' authority of an agent is by conduct, namely, by permitting the agent to act in the management or conduct of the principal's business. Thus, if in the case of a company the board of directors who have 'actual' authority under the memorandum and articles of association to manage the company's business permit the agent to act in the management or conduct of the company's business, they thereby represent to all persons dealing with such agent that he has authority to enter on behalf of the corporation into contracts of a kind which an agent authorised to do acts of the kind which he is fact permitted to do usually enters into in the ordinary course of such business. The making of such a representation is itself an act of management of the company's business. Prima facie it falls within the 'actual' authority of the board of directors, and unless the memorandum or articles of the company either make such a contract ultra vires the company or prohibit the delegation of such authority to the agent, the company is estopped from denying to anyone who has entered into a contract with the agent in reliance upon such 'apparent' authority that the agent had authority to contract on behalf of the company."

24.     There was nothing on the face of the contract for sale to indicate what position John held in the company. He was certainly not held out as the managing director. Hibbert J found and the Court of Appeal accepted that there was considerable evidence to suggest that by the time of the signing of the agreement in 1982 John was "regarded, treated and held out by NFR as a director of the company". He was named as a director in the 1972 annual return even though his own evidence was that he resigned in 1971 but no further return was filed until the annual return was made for the year ending 31st December 1981. He was named as a director in that return and again in the return for the year ending 31st December 1982. The Court of Appeal relied on those returns to

justify their conclusion that he was a director during the relevant period and so the company was estopped from denying that he had authority to enter into the agreement. The difficulty about that conclusion is that the 1981 and 1982 returns were not filed until 7th February 1992, a decade and more after the contract was made. The representations contained in those late returns could not have been made with the intention that that they be acted upon or that they were in fact acted upon by the purchaser. Mr Chisholm's letter denouncing John may be another reason, not discussed in the courts below, for doubting whether NHP relied on John's assertions that he was the true managing director. There is no other conduct other than the returns for 1981 and 1982 capable of constituting the representation by the company necessary to create some apparent authority vesting in John as a mere director to enter into contracts on the company's behalf.

25.    There is, moreover, an even more fundamental hurdle to overcome. As set out above, John on his own admission ceased to be a director in 1971. He was made bankrupt in 1972 with the consequence that he was disqualified from holding office. He was discharged from bankruptcy in 1974 but there is absolutely nothing to show that he was re-appointed except for his signing the dubious minute in November 1981 and his attending the important meeting in June 1982 and signing in as "Director". There is nothing to show when or by whom he was re-elected. The Court of Appeal was, therefore, correct in concluding that there was "no evidence whatever of any purported (or defective) reappointment of Mr Phelan as a director in the post-1974 period." Section 172 of the Companies Act 1965, which was in force at the time, to the effect that "the acts of a director or manager shall be valid notwithstanding any defect that may afterwards be discovered in his appointment or qualification" cannot rescue John because the section "cannot be utilized for the purpose of ignoring or overriding the substantive provisions relating to such appointment", per Lord Simonds in *Morris v Kanssen* 1946 A.C. 459, 472. The Court of Appeal was right to conclude that where "the evidence pointed to non-appointment of the affected persons as directors, rather than to a defective appointment," then section 172 could not be prayed in aid to validate their appointments.

26.    In those circumstances, it cannot be said that John had ostensible authority to bind the company.

***Did the company, nevertheless, ratify the sale?***

27.    At the crucial meeting of the Board on June 21st 1982 the sale of the land to National Hotels and Properties came up for discussion and Mr Chen, attorney-at-law, who was representing the Phelan family confirmed that there was a sale agreement signed by John. The minutes of the meeting record:

> "The meeting at three to one voted to approve the following resolution moved and seconded by Messrs David and Frank Phelan respectively.

RESOLVED

> That the sale agreement dated February 17th, 1982 and presented at this meeting be approved and that the authority vested in John Phelan by the board of directors to act for and on behalf of the board in such transaction be endorsed."

The dissenting voice was Mr Chisholm's. In this appeal both John's and Frank's appointments as directors have been questioned. If neither was validly appointed, voting would have been split between David and Mr Chisholm and article 106 provides that: "In case of an equality of votes, the chairman [David] shall have a second or casting vote." It is submitted by Ms Tracy Angus QC for the appellant that it is apparent on the face of the resolution that the chairman did not consider the need to cast and did not cast a second vote. If Frank were a properly appointed director, that interesting argument need not be considered.

28.    Frank was appointed a director on July 6th 1970 at a meeting of the directors, John, Mr Charles Swann and Mr Hugh Hart, whose firm of attorneys were acting for the company at that time. The annual return made up to 28th July 1971, signed by Mr Hart and filed on 3rd January 1972, shows Frank as a director. So does the return to 24th October 1972 signed by Mr Hart and lodged with the registrar on 10th February 1973. It thus seems that he was re-elected at the next following annual general meeting after his appointment would have automatically expired pursuant to article 104. It is true that there is no record of Frank having been re-elected at the next following annual general meeting, but the company's records as to such meetings were exiguous, and subsequent documentary evidence strongly suggests that he was duly re-elected as a director. The returns for December 1981 and December 1982 albeit belatedly filed in 1992 as already set out above still show Frank as a director. Unlike John, there was no supervening event which would have disqualified Frank from holding office. Under the articles of association one third of the directors must retire each year but under article 100 a retiring director is eligible for re-election. Article 101 provides that the company at the meeting at which a director retires may fill the vacated office by electing a person thereto but in default the retiring director shall if willing to continue in office be deemed to have been re-elected unless at such meeting it is expressly resolved not fill such vacated office or unless a resolution for the re-election of such a director shall have been put to the meeting and lost.

29.    In conclusion on this issue, there is a document recording Frank's election in 1970, there are a number of subsequent formal documents recording him as a director (see paras 20, 27 and 28 above), he was competent to continue as a director, there is no resolution declining to re-elect him, he behaved as if he were a director, and the only reason for doubting whether he was a director in 1982, the absence of a document formally recording his re-election, is explicable by the very limited and patchy nature of the company's record-keeping. In those circumstances the proper conclusion to be drawn, at any rate on the unusual facts of this case, is that Frank had not ceased to be a director before the end of 1982. In those circumstances there is nothing to suggest that

Frank ceased to be a director. If he was in post on June 21, 1982, then the resolution approving the sale agreement was properly passed by a majority of at least 2-1 and no casting vote was needed to carry the resolution.

## *Conclusion*

30.    The Court of Appeal was, therefore, correct to decide that "the acts of an agent on behalf of the principal outside his actual authority may be adopted and ratified" and that "if there is ratification, it has retrospective effect, i.e. it renders the transaction with the company binding on it from the time it was entered into by the agent." There was a clear ratification of the contract for the sale of Lot 3A to NHP which cures any original want of authority for John to have entered into it as he did. The sale is valid. The respondent is entitled to possession of the land and the appellant's claims were rightly dismissed. For that reason the Board will humbly advise Her Majesty to dismiss the appeal with costs.

**<u>EXHIBIT N</u>**



## Australasian Legal Information Institute

**Victorian Reports**

# Brick and Pipe Industries Ltd v Occidental Life Nominees Pty Ltd and Others [1992] VicRp 68; [1992] 2 VR 279 (20 December 1991)

BRICK AND PIPE INDUSTRIES LTD v OCCIDENTAL LIFE NOMINEES PTY LTD and Others

SUPREME COURT OF VICTORIA APPEAL DIVISION

ORMISTON J (1), MCGARVIE (2), MARKS (2) and BEACH (2) JJ

9-10, 14-17, 21-24, 28-31 May, 4-7, 12-13 June, 20 December 1990

19-23, 26 August 1991, 20 December 1991

**Ormiston J.:** This proceeding concerns a claim for $57,982,593 against the plaintiff, Brick and Pipe Industries Ltd. (Brick and Pipe), by the first defendant Occidental Life Nominees Pty Ltd (Occidental Life Nominees) on behalf of the second and third defendants, Occidental Life Insurance Company of Australia Ltd. (Occidental Life) and Regal Life Insurance Ltd (Regal Life), pursuant to a document described as a "deed of guarantee and indemnity" dated 22 December 1989 but said to have been executed on 16 January 1990. The defendants allege that by that document Brick and Pipe, among a number of other companies in what I shall call "the Goldberg Group", as well as Mr. Abraham Goldberg, agreed to guarantee repayment of sums provided to or drawn down by another company in the Goldberg Group, Spersea Pty Ltd (Spersea), pursuant to a bill facility agreement also bearing the date 22 December 1989 but likewise said to have been executed on 16 January 1990. On the latter day Occidental Life provided $32,340,234.52 to Spersea; and Regal Life on the same day provided to Spersea $23,244,543.56, apparently by drawing down on the facility and secured by 74-day bills of exchange drawn in favour of Occidental Life Nominees. Within three days it appeared publicly that the Goldberg Group was in dire financial difficulties and within less than a fortnight an "event of default" within the meaning of the bill facility agreement occurred, in that receivers and managers were appointed on 26 January 1990 over Linter Group Ltd., a company in the Goldberg Group which was a "relevant company" within the meaning of the bill facility agreement as it was a co-surety pursuant to the deed of guarantee and indemnity. Within a few weeks of the demise of the Goldberg Group proceedings were commenced by the apparent surety, Brick and Pipe,

which has sought, from the commencement of the proceeding on 21 February 1990 declarations that both the bill facility agreement and the deed of guarantee and indemnity were void or ineffective or (in the case of the deed) unenforceable against it, although the form of its statement of claim has been since amended several times. The defendants' claims (in this proceeding) to be indemnified pursuant to the deed of guarantee and indemnity in respect of the moneys Spersea has failed to pay pursuant to the bill facility agreement were first set out, together with a number of related claims in aid of the recovery of those sums, in the counterclaim filed and served on 1 March 1990, a pleading also amended several times thereafter.

Essentially Brick and Pipe now say that what was ostensibly done on its behalf, but at the behest of the Goldberg Group and in particular Mr. Goldberg and Mr. Zev Furst, by apparently executing the deed of guarantee and indemnity, was unauthorised, ineffective, illegal and contrary to s230 of the Companies (Victoria) Code (the Code) and, secondly, that the agreement the subject of the apparent guarantee or indemnity, namely the bill facility agreement, was a sham, or alternatively, illegal, void, and unenforceable. The illegality pleaded by the plaintiff as tainting both documents was raised for the first time by an amendment to the defence to counterclaim made at the outset of the trial, and relies upon allegations, in particular, that the execution date appearing on each document as 22 December 1989 was inserted in order to facilitate a scheme to obviate the need to pay stamp duty on what was said to be an earlier loan facility agreement with respect to the same moneys and also to mislead the Comptroller of Stamps, the Commissioner for Corporate Affairs and creditors of "the companies which gave the security", namely the co-sureties.

The various allegations will have to be explained later in some further detail but it is important to know something of the background of the transactions in order to understand why it is that Brick and Pipe is now, so soon after the events, challenging the effectiveness and validity of a deed of guarantee and indemnity which it appears on its face to have executed by the affixing of its attested common seal; and also why it is that it is challenging the effectiveness and validity of the bill facility agreement which was executed at about the same time by parties other than Brick and Pipe.

That background may throw some light upon the practices of certain corporate entities, at least up to the beginning of this year, although it may not reflect a great deal of credit upon them.

A. The circumstances giving rise to the litigation

    "(i) The background

In the first place it should be understood that Brick and Pipe was taken over as recently as June last year by the Goldberg Group for some $400 million and that 100 per cent of its shareholding came into the hands of that group and in particular of one company in the group called Arnsberg Pty Ltd (Arnsberg). Throughout the succeeding months, and indeed to the time of the trial, Brick and Pipe's Chairman, Mr. John Philip Shergold, and a

substantial number of its other directors remained on its board but in addition Mr. and Mrs. Goldberg and their son in-law, Mr. Zev Furst, had been also appointed to the board last year and took effective control of the company. Moreover, shortly after the apparent execution of the documents presently in issue, when the Goldberg Group failed, the malaise affecting that group did not affect, subject to the outcome of the present proceeding, the viability of Brick and Pipe which has continued to carry on its brick-making and other operations, so that when the Arnsberg shares in Brick and Pipe came into the hands of the relevant receiver and manager, they were sold (although not for $400 million) to another company, which continues to carry on its existing businesses, but which indirectly seeks to challenge the claims made by the defendants, which I shall describe together as "the Occidental Group". In further explanation of the present dispute it should also be realised that the challenged deed of guarantee and indemnity was agreed to, came into existence and was apparently executed without any knowledge of those events by the former and continuing members of the board of Brick and Pipe, i.e. those directors other than the Goldbergs and Mr. Furst; nor was any meeting of that board convened or held to consider the transaction in that period, namely between mid-December 1989 and mid-January 1990, or at all, although certain minutes were brought into existence.

It is also necessary to know something of the circumstances in which the Occidental Group came to lend Spersea the moneys said to form the primary subject matter of the bill facility agreement and which are alleged to be guaranteed by the deed of guarantee and indemnity. However, these earlier events were not the subject of any allegations in the pleadings so that the evidence about these events arose incidentally and thus was not entirely consistent.

It appears that the question of the loan facility was first raised by Mr. Abraham Goldberg in early September when Mr. Goldberg approached Mr. Robert Roeder, a director of each of the defendants and who was also a director of a public company, Battery Group Ltd. (Battery Group), which was the holding company of the two defendant life insurance companies, Occidental Life and Regal Life. The object of the approach was to obtain funds to "retire" a loan of $112 million which had been made by Citibank Ltd. to Spersea on behalf of the Goldberg Group. The proposal, agreed to by 18 September 1989, was that some $50 million should be advanced in the first place from the Occidental Group, together with a fee of $5 million, which was said variously to be either a fee for arranging the loan facility or a fee for providing certain advice in relation to the proposed take-over of IEL Ltd. by another company in the Goldberg Group, namely Corama Pty Ltd There was also some arrangement, ill-defined on the evidence, whereby the Occidental Group would engage in raising the remaining $62 million to pay out Citibank. Spersea was the Goldberg Group company which in fact owed the money to Citibank Ltd., so that when the moneys were promptly advanced on 18 and 19 September 1989 the loan facility was said to be in favour of Spersea, although for reasons peculiar to enterprises of that kind which deal in millions of dollars, Spersea had no bank account and it was necessary therefore for the moneys to be paid into what was described as the "banker" of the Goldberg Group, Gibraltar Factors Pty Ltd (Gibraltar Factors). On 18 September, Occidental Life advanced $31 million and Regal Life $19 million,

and on the following day $1 million was advanced for the purpose of repayment as a fee by Occidental and $4 million for that purpose by Regal Life.

Another remarkable aspect to this initial transaction, remarkable at least to the outsider, was that these moneys amounting to $55 million were advanced by life insurance companies upon what, even at that time, was clearly inadequate security. The only true security at the time of the advance was share scrip and blank transfers in favour of the lenders in respect of 8,295,945 shares in Linter, which had at the time a value based on net tangible assets backing of only $4.25 per share, namely a total value of approximately $35,257,766. There was also, for what it was worth, an irrevocable instruction to Citibank Ltd. to release the balance of the scrip for some 89,287,631 shares in Linter which admittedly were to be handed over only upon the raising and payment of the additional $62 million facility which the defendants had agreed to procure but which for various reasons was never obtained. The only other "security" was a guarantee of the loans by Mr. Goldberg himself, but not founded on the provision of any security by Mr. Goldberg, although it should be said that there was no known reason at the time of the advance to doubt Mr. Goldberg's solvency.

Nevertheless, it is not surprising that the so-called security thus far obtained by the Occidental Group was soon seen to be inadequate. Such security as had been received came only from Spersea and not from the Goldberg Group in general, although it is possible that the Linter scrip received was in the names of two other members of the group. Moreover, although the Occidental Group had engaged Messrs. Arnold Bloch Leibler (through one Steven Skala) to act on their behalf, the only document produced and executed at the time of the advance was the guarantee, in quite elaborate terms, signed by Mr. Goldberg on 19 September 1989. Neither a loan agreement nor any charge or other security over the Linter shares was then prepared, although Arnold Bloch Leibler had some general instructions to act on behalf of the Occidental Group. Most importantly for the purposes of the present case, neither Brick and Pipe nor any shares in it were the subject of any security in favour of the Occidental Group, nor was there any agreement to that effect at the time.

It was the concern, ultimately expressed towards the latter part of October 1989, about the adequacy of security which led eventually to the involvement of Brick and Pipe in the transaction, though not apparently for a further two months. By the end of October it was clear that the further $62 million could not be raised for Spersea by Occidental Group, nor was the $62 million liability to Citibank likely then to be paid out so as to free sufficient Linter shares for the agreed additional security. Moreover, at least by this time, the Occidental Group was insisting that there be a covenant in the agreement that the liabilities of Linter should not exceed $148 million. The Goldberg Group had also engaged Arnold Bloch Leibler to act on their behalf, this time in the person of another partner, Mr. Michael Fast, but despite the apparent convenience of this arrangement no further documents seemed to have been prepared until the latter part of November. At that time, as a result of the somewhat desultory correspondence between the relevant parties and their solicitors, especially between Mr. Roeder on behalf of the Occidental Group and Mr. John Durlacher on behalf of the Goldberg

Group, it became apparent that no assurance could be given, and thus no covenant given nor fulfilled, that Linter's external liabilities would not exceed $148 million.

By the end of November or the beginning of December 1989 the parties seem to have agreed that the original proposal for security over Linter shares was unsatisfactory and that something would have to be substituted in its place. By early December 1989, Mr. Goldberg had agreed that at the least there should be a second mortgage over the shares owned by Arnsberg in Brick and Pipe, the first mortgage being held by CIBC Australia Ltd. Thus it was agreed between the parties that the substituted securities should be share mortgages by Arnsberg over the 96,149,155 shares in Brick and Pipe and a further share mortgage given by another Goldberg Group company Bacharach Pty Ltd (Bacharach) over the only two issued shares in Arnsberg, its fully owned subsidiary. Moreover, the deed of guarantee and indemnity was no longer to be confined to one given by Mr. Goldberg personally but was to include a string of Goldberg Group companies in addition, namely Pochette Nominees Pty Ltd, both on its own behalf and on behalf of two Goldberg family trusts, Pochette Holdings Pty Ltd, Ollincoe Pty Ltd, Istacat Pty Ltd, Danomic Investments Ltd., Parkston Ltd., Entrad Corporation Ltd., Entrad Ltd., Linter Group Ltd., and last but most significantly for present purposes, Brick and Pipe Industries Ltd.

What is said to be significant in this summary of relevant events up to December 1989 is that Brick and Pipe took no direct benefit from the original advance of $55 million, nor had it guaranteed, or promised to provide security for, those advances. When Brick and Pipe was introduced as a guarantor in December last year, it appears that nobody involved in that company took part in the apparent agreement to sign the deed of guarantee and indemnity other than those representing the Goldberg interests, namely Mr. Goldberg, his son in law, Mr. Furst, and Mr. Durlacher. Even Mr. Durlacher, who seems to have been Mr.

Goldberg's general factotum for the purposes of these transactions, was not an officer of Brick and Pipe, and was merely financial controller of a number of Goldberg Group companies, although he had been secretary of a large number of them, including Arnsberg, up to 15 December 1989.

"(ii) The events of December 1989 and January 1990

Nevertheless the issues raised in this section concern subsequent events. After execution of the bill facility agreement was completed on 16 January 1990, the original advance was repaid and the borrowers drew down on the facility, drawing bills of exchange pursuant to the agreement and being paid cheques pursuant thereto. It was the liability under that agreement which in the end is the subject of the deed of guarantee and indemnity apparently executed by Brick and Pipe, although there is an alternative claim which the defendants make with respect to the earlier loan facility agreement executed only by Spersea on 22 December 1989. It is the events which surround the preparation of those documents and their ultimate apparent execution which must be examined in order to see what issues have been raised by the parties with respect to those transactions. What I shall say about that evidence will necessarily be compressed, for it is not practicable in relation to

a case heard in this Commercial List for every item of evidence to be examined in detail, especially as in the present case the trial extended for close on five weeks - there are some nine volumes of documentary exhibits in lever arch files, over 20 witness statements and nearly a thousand pages of transcript of oral evidence including cross-examination. Nevertheless I shall try to provide a summary of the critical events and some of the detailed evidence, including the terms of the relevant documents, will be referred to later, insofar as it relates to issues to be determined.

The subsequent events and the circumstances which led to the apparent execution of the documents in question in these proceedings took the following course, although there is an element of uncertainty as to some of those circumstances and the precise order of events. That uncertainty may be attributed partly to the profusion of documents generated between the middle of December 1989 and the middle of January 1990 and partly to the fact that three witnesses who might have been called from the Goldberg "camp" did not give oral evidence, namely Mr. Goldberg, who it was not disputed had left the country and was living in Los Angeles, Mr. Furst, whose absence was never directly explained, and Miss Danielle Hunter Smith, an articled clerk with Arnold Bloch Leibler, who was the only lawyer working with Mr. Fast on behalf of the Goldberg Group and who, although called to produce certain documents from the Spersea file, give no direct evidence as to the events in which she took part. I should mention, however, that it was not entirely surprising that Mr. Goldberg and Mr. Furst were not called, as the control of Brick and Pipe has now changed, but there was no explanation as to the reason for Mr. Furst's absence nor any explanation for the failure to call Miss Hunter-Smith, any privilege which Spersea might otherwise have claimed having already been waived for the purpose of Mr. Fast giving evidence.

The negotiations relating to the provision of the new security documents were conducted in the first place between Mr. Roeder and Mr. Goldberg. By 15 December 1989 they were able to sign joint instructions to Mr. Skala to prepare the necessary documents including a second mortgage over Arnsberg's Brick and Pipe shares. Mr. Roeder had, on 6 December, already recorded his frustration with the lack of progress and, in writing to Mr. Skala on 18 December, he expressed the view that when the documents had been altered they should be signed by the Goldberg interests by 22 December 1989. It appeared that Mr. Roeder was concerned because Mr. Skala was going overseas and the Goldberg Group would be closing for the Christmas holidays for some days. Nevertheless, although he left Mr. Skala and Mr. Goldberg with the impression that he was anxious that the matter should be completed before the holidays, Mr. Roeder himself did not treat the ultimate execution of the documents with such urgency. I reach this conclusion partly because Mr. Roeder went overseas on either 17 or 18 December 1989 for approximately five days taking no steps to ensure that any officers in the Occidental Group had authority to execute the documents, and partly because, apart from asking Mr. Skala to use his commercial and legal initiative to deal with any issues not yet covered (of which there were several), he left nobody at the Occidental Group in a position to deal with any of those issues. It was suggested that it was sufficient to obtain execution by the Goldberg Group, but although that was theoretically possible with any guarantee to be executed by Brick and Pipe or any other Goldberg Group

company, the formal document drafted required execution by the defendants and more particularly the loan facility agreement and mortgages required execution by them. It is, however, apparent that, so far as the evidence went, Mr. Goldberg conceived it his obligation to complete the execution of all relevant documents by 22 December and that provides some explanation for events on that day.

As Mr. Skala was leaving for overseas during that week, he brought in another solicitor, Mr. Michael Dodge, an employee of Arnold Bloch Leibler, to settle the documentation with another articled clerk employed by that firm, Mr. Thomas Lidstrom. Those documents, consisting of a loan facility agreement, two share mortgages and a guarantee, were sent to Mr. Durlacher on 21 December, together with certain ancillary documents, including minutes and s230 certificates. Whether or not the parties intended that agreement should be reached upon the exchange of executed copies of all the relevant agreements, there can be little doubt that in the afternoon of 22 December 1989, in fact on the afternoon of the last working day before Christmas, the Goldberg Group and Mr. Goldberg attempted to execute their parts of those agreements, and there is just as little doubt that there was no attempt by the Occidental Group to execute those documents on that day or indeed at any time.

Considerable difficulty arises as to the precise events that afternoon since the only person present at any stage who gave evidence was Mr. Durlacher and I do not accept that another director of Brick and Pipe, Mr. John Blood, was present at any time. So far as one can ascertain, the relevant meetings, if meetings they were, took place at the Goldberg Group's offices in Oxford Street, Collingwood, and the only directors of Brick and Pipe present were Mr. Goldberg and Mr. Furst.

Insofar as the loan facility agreement was concerned Spersea was the only relevant party in the Goldberg "camp" and it was executed on its behalf by Mr. Goldberg as attorney-under-power in the presence of Mr. Furst. The two mortgages, one by Arnsberg and the other by Bacharach, were executed under the common seal of each of those companies in the presence of Mr. Goldberg and Mr. Furst as director and secretary, respectively, of each of those companies. Insofar as the guarantee was concerned, Mr. Goldberg executed on his own behalf and the common seals were duly affixed on behalf of Pochette Nominees Pty Ltd, Pochette Holdings Pty Ltd, Ollincoe Pty Ltd, Istacat Pty Ltd, Danomic Investments Ltd., Parkston Ltd., Entrad Corporation Ltd., Entrad Ltd., and Linter Group Ltd., but there was a difficulty with respect to the execution by Brick and Pipe. There was no seal kept at the office in Collingwood, the only seals being in the head office in William Street, Melbourne and in Sydney, and it was said that it was not then practicable to get the secretary, Mr. Welch, to bring the seal to Collingwood. Consequently it appears that the seal of Brick and Pipe was not affixed that afternoon, but signatures purporting to be those of a director and a secretary as attesting the seal were placed on the document by Mr. Goldberg and Mr. Furst respectively. However, not only was there no seal, but up to that time Mr. Furst had not been the secretary of the company and had been only a director, and so, at some stage in the afternoon, it seems that the word "secretary" was crossed out and the word "director" put in its place under Mr. Furst's signature. So far as one can ascertain, the Brick and Pipe seal was placed sideways on the document several days later in the offices of Arnold Bloch

Leibler. Whether or not it was intended that Mr. Furst should attest the affixing of the seal as secretary of Brick and Pipe, the certificate prepared for the purposes of s230(8) of the Companies Code also contemplated signature by the secretary of the company. It seems that some attempt was then made to appoint Mr. Furst as secretary. No formal board meeting had been called to approve execution of the guarantee and none of the other directors were given notice or indeed knew anything about the meeting. It seems that Mr. Goldberg would not be denied and so Mr. Goldberg and Mr. Furst agreed to appoint Mr. Furst as, presumably, an additional secretary in the presence of Mr. Durlacher, although the company had both a principal secretary in Melbourne, Mr. Welch, and a secretary appointed for the Sydney registry, Miss Boskovitz. Likewise for that purpose no board meeting had been called and none of the other directors had been given notice or knew anything about Mr. Furst's appointment. Although at that time two was a sufficient quorum for a meeting of directors, it was not seriously suggested that Mr. Furst had been appointed secretary by resolution of the board of directors.

The documents executed in this way were returned to Arnold Bloch Leibler either on that day or immediately after Christmas. As I have said before, the documents were not executed by the Occidental Group either in the form executed by the Goldberg Group or on counterparts. Although the draft documents had been sent to the Occidental Group's offices on 21 December, there had been a number of issues outstanding at that time. The following day a letter written either by Mr. Skala or Mr. Lidstrom and bearing their initials put a number of questions to Mr. Roeder, apparently to be answered on his return from overseas. At the same time Mr. Fast and Miss Hunter-Smith had advised Mr. Goldberg and Mr. Durlacher that a number of alterations should be made to the documents but that Mr. Dodge and Mr. Skala could not get instructions on behalf of the Occidental Group during that week relating to those amendments. Thus, although the matter was not known to Mr. Roeder, Mr. Fast had written to Messrs. Goldberg and Durlacher advising them of these difficulties relating to drafting and recommending that they should not execute the documents, at the same time pointing out that the facility agreement would attract stamp duty in an amount of some $220,000 and that it should be structured as a bill facility. At all events Mr. Roeder did not seek to sign the existing documents and it is clear that during the week from Christmas to the New Year a further set of documents was drafted containing a number of amendments to the set executed by the Goldberg Group and making some not insubstantial alterations. It is sufficient to mention only that a further mortgage was to be given by Arnstadt Pty Ltd (Arnstadt) and that three additional guarantors were added to the deed of guarantee and indemnity, namely Arnsberg, Bacharach and Arnstadt. This new set of documents was sent to Mr. Roeder on 29 December and, after his approval, to Mr. Durlacher on 2 January 1990. The facility agreement still took the form of a loan facility, reciting the existing advances. There seemed no indication of urgency on the part of Mr. Roeder to have these documents executed, although he was not entirely happy about the delays.

The first clear suggestion that the loan facility should be abandoned and that a bill facility agreement should be substituted for it came only on 3 January 1990. Mr. Roeder suggested in evidence that it had been discussed in the middle of December and not pursued at that

time, and it is clear that Mr. Goldberg and Mr. Durlacher received advice from Mr. Fast as to the inadvisability of paying unnecessary stamp duty if that could be avoided. Whether the proposal came from Mr. Durlacher to Mr. Roeder or during a conversation on other matters in the afternoon of 3 January between Mr. Goldberg and Mr. Roeder, Mr. Dodge said in evidence that be was authorised by Mr. Roeder to redraw the documentation by way of a bill facility. There was a good deal of evidence as to the precise order of events on that day but again there did not appear to be any particular air of urgency about the matter. In fact Arnold Bloch Leibler, through Messrs. Fast and Dodge, prepared a further draft set of documents and sent them out to the parties on 5 January 1990, with the principal agreement being for the first time a bill facility agreement. Even then the parties did not appear to demand immediate execution for there were further discussions which led to a further redrafting of the documents and the final versions were eventually sent out on 11 January 1990 to both sides. Although it was asserted by Mr. Durlacher in his statement that the parties believed the loan agreement was legally binding and effective from 22 December 1989, his evidence and that of the other witnesses made it clear that the Goldberg interests were aware, at least by the end of December 1989, that the Occidental Group had not executed the documents and the final form of those documents had yet to be agreed upon. The first stage of the execution of the final version of the documents took place on 12 January 1990 at the Oxford Street offices of the Goldberg Group. That morning there were present at first Mr. Goldberg and Mr. Furst and, as.representing each side at Arnold Bloch Leibler, Mr. Dodge and Miss Hunter-Smith. Not only was there the bill facility agreement, the deed of indemnity and guarantee and the three mortgages, but there were the minutes of the relevant Goldberg Group meetings, and s230(8) certificates. Those representing the Goldberg Group proceeded to execute the documents by applying the relevant seals which were stated in each case to have been affixed by authority of the resolution of the board of directors in the presence of Mr. Goldberg as director, and Mr. Furst as secretary. But there were several difficulties. The first related to the date which should be put on the documents as the date from which the various security documents would be made effective and the second was whether Mr. Furst had authority to sign as secretary of all the relevant companies.

There is no doubt that when ultimately executed each of the documents bore the date 22 December 1989 and those documents included not only the security documents but also the purported minutes of meetings and the s230(8) certificates. When that decision was made is by no means so clear but I am satisfied that it came as a proposal from Mr. Goldberg. Late in the argument an ingenious theory was put based on an attack on Mr. Roeder's credibility, namely, that the idea was Mr. Roeder's and that it was at his request that Mr. Goldberg sought to date the documents as at 22 December 1989. Not only was that submission contrary to the pleadings in relation to the plea of illegality but it was conceded that it had never been put in cross-examination to the relevant witnesses. Moreover, I have no reason to doubt the evidence of Mr. Dodge and Mr. Skala, solicitors for the Occidental Group, who each said that the proposal had first come to them through Miss Hunter-Smith on 11 January. Miss Hunter-Smith, who had acted for the Goldberg Group, was not called for questioning on this issue and that strengthens my belief that Mr. Dodge's and Mr. Skala's version was accurate, and it was supported indirectly by Mr. Roeder's and Mr. Durlacher's evidence

although they could not be precise about dates. Why precisely Mr. Goldberg wished to backdate the documents was never made clear but that is not surprising in the absence of evidence from Miss Hunter-Smith, Mr. Goldberg and Mr. Furst. It may have been that he wished to keep to a promise that he would complete the execution of the documents by 22 December but I accept that Mr. Roeder was indifferent to Mr. Goldberg's request and was prepared to go along with the suggestion when it was insisted upon at the time of execution. The most precise that one can be about its timing is that Mr. Dodge said that he was first advised by Miss Hunter-Smith on 11 January that Mr. Goldberg wished to make the documents effective as at 22 December and that he then discussed the matter with both Mr. Skala and Mr. Fast and had a later discussion, probably on that day with Mr. Roeder, who said he did not propose to interfere. At the actual time of execution there was a further discussion between Mr. Goldberg and Mr. Furst, with Mr. Furst suggesting that the security documents could be made effective from 22 December but the bill facility should be made effective from 12 January 1990. However Mr. Dodge explained to them that the dating of the documents should be consistent and so it was that all documents were dated accordingly on that morning. When Mr. Roeder later that morning attended the Goldberg Group's offices he made no objection and indeed in due course executed the documents bearing that date.

The second question raised on the morning of 12 January 1990 was the authority of Mr. Furst to witness the affixing of the seal of a number of the Goldberg Group of companies, in particular for present purposes as Brick and Pipe's secretary, as well as having the necessary authority to attend the relevant meetings for which minutes were to be provided and to sign the s230(8) certificates. Mr. Dodge required proof of these matters by production of registered forms containing particulars and changes of particulars in register of directors, principal executive officer and secretaries, known as "forms 61", prescribed by the Companies Regulations. Mr. Dodge had arranged for searches of all relevant companies but they had made it clear that up to that time Mr. Furst was not a secretary of Brick and Pipe. By this time Mr. Roeder had arrived, presumably to execute the relevant documents if that was practicable, but Mr. Dodge was not satisfied and insisted on the forms 61 being provided. The conversation took place with Mr. Durlacher in the presence of Mr. Goldberg and Mr. Furst and he proceeded to give a personal assurance that the correct people had signed all the documents and that there had been recent changes to the officers of the relevant companies which had occurred in mid-December 1989. Messrs. Goldberg and Furst said nothing when Mr. Durlacher gave this assurance, but nevertheless Mr. Dodge was not satisfied and said that they would not settle that day but hoped to do so on Monday, 15 January 1990. All other documents were apparently completed at this time, including minutes which had been originally drafted to include a date in January 1990, but during the course of the morning instructions had been given to Arnold Bloch Leibler to change the date to 22 December 1989 and to include the persons present as Messrs. Goldberg and Furst, and those altered documents were brought out during the latter part of the morning and signed.

On 15 January 1990 settlement did not take place. The appropriate forms 61 referring to Mr. Furst as secretary had not been received and questions arose about the face value of the bills of exchange to be drawn and accepted pursuant to the bill facility, since by that time

interest had accrued on the moneys lent in 1989 and Mr. Durlacher wished to discharge completely Spersea's obligations thereunder. So it was agreed that settlement would not take place until the following day.

On the morning of 16 January 1990, Mr. Roeder was again in touch with Mr. Dodge who advised him that still no forms 61 had been provided, although a number of other incidental matters had been clarified. By this stage Mr. Roeder thought the matter had been dragging on for too long and was prepared to complete, notwithstanding the absence of the forms 61 and two other presently irrelevant matters. Consequently that morning both Mr. Roeder and the secretary of the defendant companies, Mr. Gardiner, executed all relevant documents at the offices of Arnold Bloch Leibler.

Later that morning Mr. Roeder and Mr. Dodge, together with Mr. Lidstrom and Miss Hunter-Smith, travelled to the Goldberg Group offices in Collingwood. There agreed alterations were made to the facility limit in the bill facility agreement, so as to enable the complete discharge of the existing liabilities and the alterations were appropriately initialled. Mr. Lidstrom returned to the city offices of Arnold Bloch Leibler in order that the stamping and registration of all necessary documents could be effected as soon as practicable. Again the authority of Mr. Furst was raised but Mr. Durlacher was still unable to provide the necessary forms 61. On this occasion the representatives of the Occidental Group were prepared to accept his undertaking that they would be forwarded within the next couple of days. Consequently, the transactions were settled with the final steps being the provision of cheques by Spersea for repayment of the loans to Occidental Life and Regal Life, and the delivery of two bills of exchange payable to Occidental Life Nominees and Regal Life signed by Mr. Goldberg and Mr. Furst on behalf of Spersea as drawer. Of course, the cheques again were drawn on an account of Gibraltar Factors, the one payable to Occidental Life Nominees being for $32,340,234.52, and that payable to Regal Life for $23,244,543 56. It was not disputed that there were insufficient funds in the account of Gibraltar Factors to honour the two cheques, but it was likewise understood that the account would be replenished by cheques to be received pursuant to a draw down on the bill facility agreement later that day. To enable this to occur, of course, the bills of exchange were drawn for somewhat higher amounts to permit their discounting for sums sufficient to pay out Gibraltar Factors' overdraft. The bill of exchange drawn by Spersea in favour of Occidental Life Nominees was in the sum of $33,734,745, drawn on Occidental Life, dated 15 January 1990 with a due date of 30 March 1990. Similarly, the bill of exchange drawn by Spersea payable to Regal Life bore the same date, but on this occasion was drawn on Regal Life itself in the sum of $24,247,848 also due on 30 March 1990. The bills did not contemplate acceptance by a bank but by the named members of the Occidental Group and in fact neither bill was accepted on that day nor for some time thereafter.

Notwithstanding the various difficulties, Mr. Roeder decided to settle that afternoon. After discovering that the necessary documents had been stamped and lodged for registration, he decided that the two bills of exchange should be "discounted" by the defendant payees at approximately 3.30 p.m. on 16 January 1990. At that time cheques in favour of Spersea, being the discounted proceeds of the bills calculated in accordance with the formula set out

in the bill facility agreement, were paid to Spersea, in each case being sufficient to satisfy the amount drawn that morning on the Gibraltar Factors Pty Ltd account. As I have said, the two bills were not then accepted but were accepted on 14 March 1990. News that the Goldberg Group was in difficulty was published in the newspapers three days later, on 19 January 1990, and receivers and managers were appointed to Linter on 26 January 1990. Although there were some attempts to show that Mr. Roeder was aware of the financial difficulties of the Goldberg Group before the transactions were completed, I am not satisfied on the evidence before me that he was so aware. In general, I found his evidence to be reliable on the critical issues, although there were some unusual lapses of memory in relation to earlier matters which were not the direct subject of dispute on the pleadings.

The appointment of receivers and managers over Linter provoked a notice declaring all sums due and payable and a demand for $57,982,593 was made by the first defendant to Spersea on 31 January 1990. Subsequently, on 1 February 1990, Occidental Life Nominees, on behalf of the Occidental Group, demanded payment from the plaintiff of that sum pursuant to the deed of guarantee and indemnity. No moneys have been paid as a result of either demand. Because of the doubts raised by this action, a further set of demands was made based on the loan facility agreement executed only by the Goldberg interest on 22 December 1989, each demand being dated 2 April 1990. Pursuant to the Rules of Court the counterclaim was amended to include a claim based upon the latter two demands.

What I have attempted to do so far is to give a narrative of the events and it will be necessary to return to some matters of fact in greater detail in considering the issues raised by the parties.

B. The issues

It is next necessary to state what issues were raised on the pleadings and at the trial. For this purpose I shall ignore the form of the earlier pleadings and those matters which were not in issue at the trial. However, I shall deal with the claims in the order they appear on the pleadings.

The plaintiff sought declarations that both the facility agreements and the deed of guarantee and indemnity were void or unenforceable and an injunction restraining enforcement of the latter. The plaintiff first alleged that it had not agreed to become a party to the deed of guarantee and indemnity and that the apparent execution of that document was made without its authority. In particular it said that there was no meeting of the plaintiff's board of directors to approve execution or alternatively that any meeting was neither properly called nor constituted. Further it claimed that the common seal of the plaintiff was not affixed in accordance with the requirements of art. 107 of its articles of association in that the common seal was not affixed in the presence of a director and the secretary, reliance being placed on the non appointment of the signatory Mr. Furst as secretary. Next it was alleged that, if there were an agreement authorising the execution of the deed of guarantee and indemnity, Mr. Goldberg and Mr. Furst were disqualified from voting to approve the deed as they were both interested, within the meaning of art. 89 of Brick and Pipe's articles of association, in Spersea, the subject of the guarantee, so that the quorum of two required for a meeting of

the board of directors was not satisfied. Thirdly, it was alleged that the bill facility agreement was a sham and the parties were really bound, if at all, by the loan agreement signed earlier by Mr. Goldberg and Mr. Furst. However, at the trial this allegation was abandoned and in its place, although without amendment to the pleading, it was asserted that the loan transaction was still on foot because there was no genuine repayment of the moneys on 16 January 1990, nor any new advance pursuant to the bill facility agreement, primarily because the cheque for repayment could only be satisfied after the drawing down on the facility. Fourthly, the plaintiff relied upon a breach of s230 of the Code in that it was said that Brick and Pipe had given a guarantee in connection with a loan made to Spersea, which was, within the meaning of para(a) (iv) of subs(1), a corporation where a director or a relative of such a director had a relevant interest in shares in that company which was not less than 10 per cent of the nominal value of its issued capital. As it was said that no proper certificate had been provided pursuant to s230(8) of the Code, the agreement was alleged to be unenforceable against Brick and Pipe.

Although the matter was not included in the amended statement of claim, the plaintiff made a further significant attack on the enforceability of both the bill facility agreement and the deed of guarantee and indemnity in its amended defence to counterclaim by alleging that both documents were tainted by illegality. The amendments were made at the outset of the trial and raised two specific grounds, the first being an intent to evade payment of stamp duty arising out of the substitution of a bill facility agreement for the loan agreement and the second, relying on the inclusion of the date 22 December 1989 in the two deeds finally executed on 16 January 1990, alleged that the intention for inserting a false date was to mislead third parties, the Comptroller of Stamps, the Commissioner for Corporate Affairs and "the creditors of the companies which gave the security". A number of detailed particulars were given of the allegations, but in substance it was said that Mr. Durlacher, on behalf of the Goldberg Group, requested Mr. Roeder that the loan facility be "restructured" as a bill acceptance facility and that Miss Hunter-Smith, on behalf of Spersea, requested Mr. Roeder that the documents be executed bearing the date 22 December 1989, and that the defendants were knowingly party to the arrangements having the effect set out in the principal allegations.

The defendants counterclaimed on the deed of guarantee and indemnity, alternatively relying upon that as guaranteeing payment under the facility agreement or under the earlier loan agreement apparently executed by the various members of the Goldberg Group. The latter claim was predicated upon the bill facility being held to be a sham and might therefore be seen as no longer relevant. However, the plaintiff sought to argue that, although the agreement was not a sham, the repayment of the loan was a sham and there was no drawing down on the bill facility, so that I understood thereby that the plaintiff was saying that any moneys owing by Spersea were owing by way of loan and in consequence the defendants sought to keep alive their alternative claim, if the latter submissions were made out. In order to overcome the plaintiff's allegations the defendants raised in their defence, and consequently in support of their counterclaim, a number of matters supporting the validity of their claims. Without dealing with each matter the defendants relied particularly

upon the following contentions. They asserted that it was sufficient, for the purposes of art. 107 of Brick and Pipe's articles of association, that Mr. Furst was a director and attested the affixing of the seal in that capacity; secondly, in order to maintain the validity of the deed of guarantee and indemnity the defendants relied originally on the rule in Royal British Bank v Turquand (1856) 6 E. and B. 327, but, substantially abandoning that claim, relied in the alternative on s68A of the Code said to have been introduced as a codified substitute for that rule. In addition, the defendants relied upon the provisions of s68 of the Code to overcome the want of authority in particular of Mr. Furst, in relation to the execution of the deed. Further the defendants relied upon the provisions of s74 of the Property Law Act 1958 in relation to the execution of instruments by corporations. Finally, in answer to the claims of invalidity, the defendants alleged that as Arnsberg owned all the issued capital of Brick and Pipe and was entitled to exercise all votes at a general meeting and that because all those in control of Arnsberg agreed that Brick and Pipe should execute the deed of guarantee and indemnity, so the deed should be treated as validly executed in reliance upon what has come to be called the "Duomatic rule": see Re Duomatic Ltd. [1969] 2 Ch. 365. In reply to the plaintiff's claims of unenforceability based on s230 of the Code, the defendant said that the bill facility was not a "loan" within the meaning of the sections, and that the deed of guarantee and indemnity was not a "guarantee" or "security" within the meaning of the subs(1)(b) because of the inclusion of a primary liability by way of indemnification in the deed. Moreover, it said that, as the company Spersea was a corporation in which the directors of Brick and Pipe had a necessary relevant interest for the purposes of subs(1), then the companies were related and the giving of the guarantee was authorised by a resolution of Brick and Pipe's directors, presumably relying upon the apparent resolution passed by Messrs. Goldberg and Furst. The details of these pleas will be set out when I examine each of the claims made.

C. Execution of the deed of guarantee and indemnity

It is first necessary to examine the execution of the deed of guarantee and indemnity, for the plaintiff's first line of attack was to characterise the deed as one not binding on Brick and Pipe because that company had not authorised its execution and it was not otherwise shown to have been validly executed by Brick and Pipe. The issue raised a large number of technical arguments and led to a response by the defendants relying on a variety of statutory provisions and other rules of law, whereby the validity of the deed's execution was argued interminably. (Some five volumes of photocopied authorities were provided for my assistance on all issues.) Events subsequent to the deed's execution perhaps made this element of the dispute not surprising, as none of those responsible for its preparation and disputed execution remained on the board of Brick and Pipe and those directors (and the secretary) who survived the downfall of the Goldberg Group of companies knew nothing of the deed at the time of its alleged execution.

The principal matters challenged by the plaintiff were the formalities surrounding the execution of the deed of guarantee and indemnity. For this purpose they relied in part on arts 89 and 107 of Brick and Pipe's articles of association, which for present purposes read:

"89. No director shall be disqualified by his office from holding any office or place of profit under any company in which this company shall be a shareholder or otherwise interested or from contracting with the company either as vendor purchaser or otherwise nor shall any such contract or any contract or arrangement entered into by or on behalf of the company in which any director shall be in any way interested be avoided nor shall any director be liable to account to the company for any profit arising from any such contract or arrangement by reason only of such director holding that office or of the fiduciary relations thereby established but the nature of his interest must be declared by him at the meeting of the directors at which the contract or arrangement is determined on if his interest then exists or in any other case at the first meeting of the directors after the acquisition of his interest. No director shall as a director vote in respect of any contract or arrangement in which he is so interested as aforesaid and if he does so vote his vote shall not be counted, but this prohibition shall not apply to any contract by or on behalf of any other company in which this company is a shareholder or otherwise interested nor to any contract or arrangement by this company and any such company with any other person firm or corporation. A general notice to all other directors for the time being that a director is a member of a specified firm or company and is to be regarded as interested in all transactions with that firm or company shall be sufficient declaration under this article as regards such director and the said transactions and after such general notice it shall not be necessary for such director to give a special notice relating to any particular transaction with that firm or company. Notwithstanding the foregoing any interested director may attest the affixing of the common seal of the company to any instrument to which the company is a party. ...

"107. (a) The directors shall provide a common seal of the company and such a seal shall be kept by such person and in such place and in such manner as the directors may think fit and the directors shall have power to use such seal in the execution of all or any of the powers hereby vested in them but the seal shall not be affixed to any instrument except by authority of a resolution of the board of directors and in the presence of at least one director and the secretary or such other person in the absence of the secretary as the directors may appoint for that purpose who shall sign every instrument to which the seal of the company is so affixed in their presence and their attestation shall be sufficient evidence of the authority to affix the seal." The rest of art. 107 makes provision with respect to the certificates for shares and stock and the use of a duplicate common seal.

Although I have set out these articles and they are of some relevance to other matters, there was no serious attempt by the defendant to argue that the execution of the deed conformed to the requirements of the articles. In the first place there was no meeting of the board of directors of Brick and Pipe validly called to approve and authorise the execution of the deed. This was established by evidence from all the other members of the board. The only persons present at the time of the passing of the alleged resolution, bearing date 22 December 1989, a copy of which was handed over at settlement on 16 January 1990, were Mr. Goldberg and Mr. Furst. Although they were both undoubtedly directors of Brick and Pipe, no meeting of directors was called in accordance with the articles or at all, so that although two persons sufficed for a quorum at the time (as was then provided by art. 94), no

valid board meeting was held to consider the execution of the deed. It was thus unnecessary to consider further the effects of the allegation that both Mr. Goldberg and Mr. Furst were "interested" within the meaning of art. 89.

Secondly, in considering the executed deed, I must conclude that Brick and Pipe did not comply with the requirements of art. 107 as the affixation of the company seal was not attested by a secretary of the plaintiff company. If one excludes for the present the effect of s68A of the Code, that article required the seal to be affixed in the presence of one director and the secretary or such other person as the directors might appoint for the purpose. There was no evidence that any other person was validly appointed for the purpose by the board of directors, but Mr. Goldberg as director and Mr. Furst as "secretary" witnessed the affixation of the seal. Mr. Goldberg was a director, as was Mr. Furst, but I am not satisfied on the evidence that Mr. Furst was ever appointed secretary. The only alleged appointment of Mr. Furst occurred at the same "meeting" of Mr. Goldberg and Mr. Furst on 22 December 1989 to which I have already referred. In particular I am not satisfied that there was ever a purported appointment by Messrs. Goldberg and Furst on that day. Mr. Durlacher's evidence on this issue was unsatisfactory and never directly alleged that an appointment had been made in his presence. No minute was ever drawn up to that effect, although other minutes were prepared which related to that "meeting". The absence of Mr. Furst was relied upon so as to strengthen an inference which I was asked to draw as to his appointment, but I am not obliged to draw such an inference and I do not do so. The appointment of a secretary required a resolution of the board of directors and I am inclined to the conclusion that Mr. Goldberg believed that, by virtue of Arnsberg's control of Brick and Pipe and of his own control of Arnsberg, he could do as he wished and so "appoint" his son in-law, Mr. Furst, as it suited him. However, whatever be the operation of s68A and the application of the "Duomatic rule" (Re Duomatic Ltd.), the board of directors must appoint any secretary: s236(2) of the Code. As there was no power to ignore the requirements of the Code as to the calling of a meeting of the board of directors for his appointment and as no such meeting was ever called or took place on that day for the reasons already stated, I am not satisfied that any valid appointment was made, nor indeed am I satisfied that any resolution of appointment was put to the alleged "meeting", consisting as it did of Mr. Goldberg and Mr. Furst.

The essence of the allegations thus established was that the plaintiff company had not agreed to enter into the deed of guarantee and indemnity and had not complied with the requirements of its articles of association and the general law as to the calling and conduct of directors' meetings or the affixation of the company seal. So it followed that because of the absence of any board resolution to execute the deed and because of non compliance with the articles, nobody was authorised to affix the seal of Brick and Pipe to the deed. Further it was correctly asserted that one of the persons who witnessed the affixation of the seal, namely Mr. Furst, had no authority or power to do so as secretary. These assertions were answered by the defendants by reliance in turn on s68 and s68A of the Code and upon what I have called the "Duomatic rule". There can be little doubt that, but for the defendants' claim to rely on the sealed document or alternatively the acts of the plaintiff's principal

shareholder, there was no regular, formal approval by Brick and Pipe of the deed before or at the time of its execution. The failure to call or give notice of any board meeting in any other manner would have the result that no meeting of the board of directors occurred, although Messrs. Goldberg and Furst purported to so act. For this purpose it matters little whether they were each disqualified as being interested within the meaning of art. 89, so I have not examined that issue further. Even if two directors were present at what they chose to call a "meeting of directors" there cannot be said to have been any valid board meeting or any meeting of directors at all, unless all directors had been present, or, if they had not been, reasonable notice had been given to those who were absent and a quorum attended the meeting so called. Here there was no attempt to call a board meeting in the conventional way and no reliance was placed on any article or statutory provision which would have permitted Messrs. Goldberg and Furst to have conducted a board meeting on their own. The defendants are therefore obliged to call in aid some rule of law which entitled them to rely on the conduct of those who purported to act for Brick and Pipe at the time.

"(i) S68 of the Code

The defendants first relied on s68 of the Code, substituted in 1983 and amended in 1985. The relevant provisions now read:

"68. (1A) The rules of a company may contain an express restriction on, or an express prohibition of, the exercise by the company of a power of the company.

"Where -

> (a) a company exercises a power contrary to an express restriction on, or an express prohibition of, the exercise of that power, being a restriction or prohibition contained in the rules of the company; or

> (b) the memorandum of a company contains a provision stating the objects of the company and the company does an act otherwise than in pursuance of those objects, the company contravenes this subsection.

"(2) Where an officer of a company is in any way, by act or omission, directly or indirectly, knowingly concerned in or party to a contravention by the company of subs(1), the officer contravenes this subsection.

"(3) A company that contravenes subs(1), or an officer of the company who contravenes subs(2), is not guilty of an offence by virtue of this section or s570.

"(4) Where, by exercising a power as mentioned in para(1)(a) or by doing an act as mentioned in para(1)(b), a company contravenes subs(1), the exercise of the power, or the act, as the case may be, is not invalid by reason only of the contravention.

"(5) An act of an officer of a company is not invalid by reason only that, by doing the act, the officer contravenes subs(2).

"(6) The fact that -

(a) by exercising a power as mentioned in para(1)(a), or by doing an act as mentioned in para(1)(b), a company contravened, or would contravene subs(1); or

(b) by doing a particular act, an officer contravened, or would contravene, subs(2), may be asserted or relied only in-

(c) a prosecution of a person for an offence against this Code;

(d) an application for an order under s227A;

(e) an application for an order under s320;

(f) an application for an injunction under s574 to restrain the company from entering into an agreement;

(g) proceedings (other than the application for an injunction) by the company, or by a member of the company, against the present or former officers of the company; or

(h) an application by the Commission or by a member of the company for the winding up of the company.

"(7) Where, if subs(6) had not been enacted, the Court would have power under s574 to grant, on the application of a person, an injunction restraining a company, or an officer of the company, from engaging in particular conduct constituting a contravention of subs(1) or subs(2), as the case may be, the Court may, on the application of that person, order the first-mentioned company, or the officer, as the case may be, to pay damages to that person or any other person."

For the purposes of this argument it is also necessary to bear in mind the provisions of s66B, s66C and s67. I start, perhaps illogically, with s67 relating to the legal capacity of the company:

"67. (1) A company has, both within and outside the State, the legal capacity of a natural person and, without limiting the generality of the foregoing, has, both within and outside the State, power -

(a) to issue and allot fully or partly paid shares in the company;

(b) to issue debentures of the company;

(c) to distribute any of the property of the company among the members, in kind or otherwise;

(d) to give security by charging uncalled capital;

(e) to grant a floating charge on property of the company;

(f) to procure the company to be registered or recognised as a body corporate in any place outside the State; and

(g) to do any other act that it is authorised to do by any other law.

"(2) Subs(1) has effect in relation to a company -

(a) subject to this Code (other than subs68(1));

(b) in the case where the rules of the company contained an express or implied restriction on, or an express or implied prohibition of, the exercise by the company of any of its powers - notwithstanding any such restriction or prohibition:

(c) in a case where the memorandum of the company contains a provision stating the objects of the company - notwithstanding that fact; and

(d) notwithstanding subs68(1).

"(3) The fact that the doing of an act by a company would not be, or is not, in the best interests of the company does not affect the legal capacity of the company to do the act."

S66B is an interpretation section and reads:

"In this section and in s66C, s67 and s68 -

(a) a reference to a company is a reference to a company whether incorporated before, on or after 1 January 1984:

(b) a reference to the doing of an act by a company includes a reference to the making of an agreement by the company and a reference to a transfer of property to or by the company;

(c) a reference to a restriction on or a prohibition of, the exercise by a company of any of its powers, being a restriction or prohibition contained in the rules of the company is, in the case of a company incorporated before 1 January 1984, a reference to such a restriction or prohibition whether or not the restriction or prohibition was so contained immediately before that day;

(d) a reference to legal capacity includes a reference to powers; and

(e) a reference to the rules of a company is a reference to the memorandum and articles of the company."

Finally for the purpose of construing the section it is important to have regard to its object set out in s66C of the Code, as follows:

"The object of s67 and s68 is -

(a) to abolish the doctrine of ultra vires in its application to companies; and

(b) without affecting the validity of the dealings of a company with outsiders, to ensure that provisions of the rules of a company relating to objects or powers of the company are given effect to by the company's officers and members; and those sections shall be construed, and have effect, accordingly."

The latter section makes it clear what is the reason behind the sections, namely the abolition of the doctrine of ultra vires. Once that is recognised, the inapplicability of s68 in this case is clear. This is not an appropriate occasion to discuss that doctrine or what remains of it in this country, but it is concerned with the legal capacity of corporations and their power to do specific acts. Occasionally reference is made to a "wider" basis of ultra vires, but the doctrine is clearly to be distinguished from the internal rules of a company whereby particular persons are authorised to represent or act on behalf of the company: cf. Gower: Principles of Modern Company Law, 4th ed., pp. 162 (fn. 8) and 181. See also ANZ Executors and Trustee Co Ltd v Qintex Australia Ltd. (Receivers and Managers Appointed) (1990) 8 ACLC 980, at pp. 988-9 (Qd FC).

In the present case there is no doubt that Brick and Pipe had the power to give a guarantee and provide an indemnity, whether one looks to its memorandum and articles, in particular para13 of the objects clause II (CL2) of the memorandum, or the Code, in particular the new s67, noting also the effect of s66B(a) and s66B(c). The only issue is whether those acting on behalf of the plaintiff company exercised that power, not whether it had such a power. Nevertheless the defendants submitted a closely reasoned argument, set out in an 11-page memorandum, in reliance on s68, to the effect that the plaintiff could not rely on the failure of those who acted on behalf of the company to comply with the provisions of its articles and the general law relating to directors' meetings. The contentions in question which were said to be precluded by the operation of s68 included those which alleged the failure of the board of directors to authorise the entry into the deed, the failure properly to convene any meeting of the board and the failure to comply with arts 89 and 94 insofar as the presence of interested directors denied a quorum to that alleged meeting.

In my opinion the argument misunderstands the nature and effect of s68 and its convoluted related sections, but it is necessary briefly to look at what was said in reliance upon them. The requirements of the articles and the general law relating to meetings of directors, including those set out in arts 89 and 94, were said to constitute "express restrictions" on the exercise of a power of the plaintiff company, namely of its power to enter into the deed of guarantee and indemnity. So it was argued on behalf of the defendants that, assuming Brick and Pipe had purported to exercise a power contrary to those express restrictions, it might be said to have contravened subs(1) of s68. The argument proceeded to assert that the exercise of the power was not invalid and the alleged contravention by the company could only be relied upon in the kinds of proceedings referred to in subs(6) or to recover damages pursuant to subs(7), but, by reason of the operation and effect of subs(4), could not be relied upon by the plaintiff to defeat the defendants' claims pursuant to the deed of guarantee and indemnity.

One has only to state the steps in the argument to realise how misconceived it is. It sought to characterise the general requirements of the articles, and even of the general law, as to the exercise of a company's power as "express restrictions" on each of the specified powers in the memorandum, and indeed on any power which may now be exercised by a company by reason of s67. Moreover it sought to characterise rules as to internal management as limitations upon the right of a company to act, the very thing that amending s66A to s68 were intended to avoid. The rules relied upon by the plaintiff are rules intended to control the acts of the directors and other organs of the company, so as to deny the power of those directors and organs to act on behalf of a company if not complied with, but in no way are they or were they intended to restrict the powers of a company. The issues raised by the plaintiff go only to whether Brick and Pipe has acted, or some individual or individuals acted on behalf of the company, but no question was raised that, if the acts are characterised as the acts of the company, they are or would have been beyond its capacity, or to adopt the Latin but convenient expression, ultra vires.

This attempt to assimilate the requirements under the articles and the general law relating to the authority of directors and the holding of board meetings with express restrictions imposed on the exercise of company's powers cannot be accepted. Of course the exercise of any power, however important or unimportant, must be carried out by one or more of the organs of the company in conformity with requirements of its memorandum and articles of association as well as with the general law, including the provisions of the Code. Many of the rules relating to the acts of directors are prescribed ordinarily in the articles of association, but a number are in fact left to the general law, including the Code. Indeed the defendants, perhaps appreciating this latter factor, advanced a subsidiary argument to the effect that no meeting of the directors is now necessary in order that they may act to bind the company, because such a requirement is merely a restriction "implied" from the articles and so unenforceable in litigation such as the present. It was argued that the reference to "express" restrictions and prohibitions as to the exercise of a power contained in s68 evinced an intention to abolish all implied restrictions as to the exercise of powers, even, although the matter was not clearly spelt out, denying the methods of enforcement set out in subs(6) and subs(7) of s68. It might have been preferable not to express a final opinion on this issue, as it is conceivable that some case will raise the possibility of restrictions which may be implied from the language of specific powers.

However it would be wrong to treat every internal requirement laid down by the articles as some form of restriction or prohibition on the exercise of the company's powers. No doubt those requirements restrict and inhibit those entrusted with acting on behalf of the company, but, as already stated, these restrictions have no bearing on the extent of the powers of a company. They affect the exercise of all powers, but only in the sense that the officers of the company will have to comply with them. They do not provide a restriction or prohibition of the kind referred to in s68: cf. Darvall v North Sydney Brick and Tile Co Ltd (No. 4) (1988) 6 ACLC 1095, at pp. 1104-5, per Bryson J. No relevant implied restriction is imposed on the exercise of any powers in this way. The powers of the company are no greater and no less by reason of the rules laid down for the method of their exercise. The fact that the general

law denies that directors can determine any matter except by way of a meeting imposes no restriction on a company's powers, only a restriction on the powers of those who are appointed directors of the company. As Dawson J. restated recently, "Directors can only act collectively as a board and the function of an individual director is to participate in decisions of the board": Northside Developments Pty Ltd v Registrar General [1990] HCA 32; (1990) 170 CLR 146, at p. 205; [1990] HCA 32; 64 ALJR 427, at p. 452. It would be remarkable if this well-recognised rule should have been abolished by s68, for it is fundamental to an understanding of the manner in which directors are obliged to act. That rule is not a restriction implied from the terms of the articles, as was suggested in the argument, although it is conceivable that it might be varied by the articles as, in a sense, occurs when certain powers of the directors are vested in a managing director: cf. art. 93 of the plaintiff's articles of association.

Nevertheless, even if the rule as to the necessity of directors acting through the board were to be considered a restriction implied from the articles, I would not accept that it is negated by the operation of s68 and I would reject the argument that after the passing of the amended s68 (especially subs(1A) and subs(1)) "there is no room for internal 'implied' prohibitions" or restrictions of the kind under discussion. As stated previously, the section has no application to the restrictions imposed on the directors and other officers of the company and is confined to restrictions and prohibitions expressly imposed by the memorandum or articles on the exercise of specific powers. Moreover the plaintiff is not precluded by reason of s68 from asserting that neither the board of directors of Brick and Pipe, nor anybody acting on behalf of the company, acted so as to bind that company under the deed of guarantee and indemnity. It is unnecessary to examine further the specific provisions as to interested directors, but I would believe the same conclusion should be reached in relation to the provisions of arts 89 and 94. No attempt was made in argument to rely on s68 in relation to the requirements of art. 107. I should add that great weight was placed upon the provisions contained in s66C, para(b) as indicating that the operation of s68 was wider than the ultra vires rule but, for reasons which require no elaboration, I can see nothing in that paragraph which would extend the operation of s68 as it is explicitly confined to "provisions of the rules of the company relating to objects or powers".

  "(ii) S68A of the Code

In addition the defendants have relied, however, on what might appear to be more relevant provisions of the Code dealing with the right of outsiders to rely upon assumptions as to the proper internal management of companies, now contained in s68A and s68D of the Code. On careful examination the latter provisions, introduced at the same time as the sections just discussed and also amended in 1985, are quite independent of s66A to s68, although they have a common purpose, namely to protect outsiders from unreasonable reliance by a company on any failure to comply with the requirements of the memorandum and articles or any other rules of law relating to the administration of a company. The defendants relied on s68A as an alternative to a plea originally based on what is known as the rule in Royal British Bank v Turquand (1856) 6 E. and B. 327. Because the defendants conceded that

s68A covered for practical purposes the same ground as the rule in Turquand's Case, it did not pursue that plea, so that it is unnecessary to inquire further whether the rule has any continuing existence, nor is it necessary to examine the detailed discussion of that rule by the High Court in Northside Developments Pty Ltd v Registrar General.

It is necessary to set out the relevant terms of s68A:

"68A. (1) A person having dealings with the company is, subject to subs(4), entitled to make, in relation to those dealings, the assumptions referred to in subs(3) and, in any proceedings in relation to those dealings, any assertion by the company that the matters that the person is so entitled to assume were not correct shall be disregarded.

"(3) The assumptions that a person is, by virtue of subs(1) . . . entitled to make in relation to dealings with a company . . . are -

> (a) that, at all relevant times, the memorandum and articles of the company have been complied with;

> (b) that a person who appears, from returns lodged with the Commission under s238 or s263 or with the Commissioner for Corporate Affairs or the Registrar of Companies under a corresponding provision of a previous law of the State, to be a director, the principal executive officer or a secretary of the company has been duly appointed and has authority to exercise the powers and perform the duties customarily exercised or performed by a director, by the principal executive officer or by a secretary, as the case may be, of a company carrying on a business of the kind carried on by the company;

> (c) that a person who is held out by the company to be an officer or agent of the company has been duly appointed and has authority to exercise the powers and perform the duties customarily exercised or performed by an officer or agent of the kind concerned;

> (d) that an officer or agent of the company who has authority to issue a document on behalf of the company has authority to warrant that the document is genuine and that an officer or agent of the company who has authority to issue a certified copy of a document on behalf of the company has authority to warrant that the copy is a true copy;

> (e) that a document has been duly sealed by the company if -

>> (i) it bears what appears to be an impression of the seal of the company; and

>> (ii) the sealing of the document appears to be attested by 2 persons, being persons one of whom, by virtue of para(b) or para(c), may be assumed to be a director of the company and the

other of whom, by virtue of para(b) or para(c), may be assumed to be a director or to be a secretary of the company; and

(f) that the directors, the principal executive officer, the secretaries, the employees and the agents of the company properly perform their duties to the company.

"(4) Notwithstanding subs(1), a person is not entitled to make an assumption referred to in subs(3) in relation to dealings with a company if -

(a) he has actual knowledge that the matter that, but for this subsection, he would be entitled to assume is not correct; or

(b) his connection or relationship with the company is such that he ought to know that the matter that, but for this subsection, he would be entitled to assume is not correct; and where, by virtue of this subsection, a person is not entitled to make a particular assumption in relation to dealings with a company, subs(1) has no effect in relation to any assertion by the company in relation to the assumption."

Subs(2) and subs(5) deal with assumptions which persons may make in relation to acquisitions of title to property from companies and are not presently relevant. S68B was repealed by the amendments made in 1985. S68C makes provision, not presently relevant, that persons are not to be taken to have knowledge of documents filed with the Commissioner for Corporate Affairs, except in respect of registrable charges. S68D, also not presently relevant, provides that persons are entitled to make certain assumptions pursuant to s68A although the officer or employee of a company has acted fraudulently or has forged a document apparently sealed on behalf of the company. As may be seen from an examination of those sections, they deal with aspects of the rule in Turquand's Case in what may be seen as an attempt to codify or at least reformulate it, but the issue of the attempted codification was not argued and is not relevant to any matter raised before me: cf Australian Capital Television Pty Ltd v Minister for Transport and Communications (1989) 86 ALR 119; 7 ACLC 525.

In reliance on s68A the defendants pleaded that the various assertions made by the plaintiff as to the want of authority for and the non execution of the deed of guarantee and indemnity ought to be disregarded pursuant to subs(1) of that section. To this end the defendant sought to overcome not only the allegation that Brick and Pipe had not authorised entry into the deed by reason of the failure to call any or any proper meeting of the board but also the allegations that the board had not authorised the affixation of the company seal and that the seal had not been properly attested by the appropriate officer, in that Mr. Furst had no authority to attest its affixation as secretary. In one way or another the defendants then called in aid s68A to overcome the various breaches of the requirements of the articles and of the general law by those responsible for the execution of the deed which had been made out on the facts.

In broad terms the defendants sought to hold Brick and Pipe to the transaction it ostensibly entered into on 16 January 1990. To do so various provisions of s68A were relied upon, which might be said to allow the other party to ignore irregularities and deficiencies in the administration or management of a company in similar manner to that allowed under the rule known as the rule in Turquand's Case. For present purposes it will be unnecessary to examine s68C and s68D, although their importance should not be overlooked, for they significantly modify the operation of the rule in Turquand's Case, albeit not by expressly varying that rule but by qualifying the operation of its apparent reenactment in s68A. SO no question presently arises as to actual knowledge of the Brick and Pipe memorandum and articles (which in any event were known to the defendants) or as to matters of fraud or forgery. In particular the description of Mr. Furst as "secretary" cannot be and was not relied upon as amounting to a forgery, especially in the light of s68D(d), even if that be a proper characterisation of the execution of the deed.

Moreover many of the provisions of s68A themselves are expressed in terms different from those customarily adopted in describing the rule in Turquand's Case, although the precise legal basis for that rule was described, if I might say so with respect, in varying terms in the judgments of the High Court in Northside Developments Pty Ltd v Registrar General. I should add, although I shall return to the question, that the critical issue in the latter case, namely whether the other party was put upon inquiry, does not arise directly under s68A.

Three issues in particular were raised as to the section's operation. First, the plaintiff argued that the defendants had not had "dealings" with the company so as to bring the section into operation. Secondly, it was said that the defendants had no or no sufficient basis upon which to make any of the assumptions described in subs(3) and in particular those referred to in para(a), para(c) and para(e) of the subsection. Thirdly, the plaintiff contended that it could rely on subs(4) in that the defendants either had knowledge of the facts it was claiming to assume or, by reason of their "connection or relationship" with the plaintiff company, the defendants ought to have known of those facts.

In the first place the plaintiff denied the operation of the section by contending it could only be relied upon by a party who had had a series of "dealings" with the plaintiff and could not be applied where the parties had entered into on)y a single transaction. For this purpose it relied on the use of the plural "dealings" as indicating an intention that the section should not apply to a case of a single dealing. It was not suggested why the legislature had restricted this beneficent provision in this way and I cannot see logically it should be so confined. It is not merely a question of reading plural words as including the singular; it is rather a matter of giving a normal English meaning to the word "dealings". Reference was properly made to the Oxford English Dictionary, where in the 2nd edition (vol. IV, pp. 297-8) the following relevant definition numbered 2 is given:

"Intercourse, friendly or business communication, connection. Now usually pl." Examples given in the text of this plural usage commenced as early as 1586 and in my opinion it is a common usage. In any event it might be said that the negotiations from December 1989 to January 1990 should be characterised as a series of dealings for the purpose of this section.

Consequently I would not accept the plaintiff's construction, so that in the circumstances the section might apply if the relevant assumptions could be made.

The second question is whether the defendants were entitled to make any of the assumptions set out in subs(3) so that they could persuade the court that the plaintiff's various assertions as to the defects in the calling of the meetings and execution of the deed should be disregarded. Whenever common law rules are adopted and put in statutory form difficulties of expression arise. One of the paragraphs, namely para(a), has a simplicity about it which provoked an argument to the effect that it was sufficient for the defendants' purposes to rely on that assumption alone, for in effect the plaintiff's principal arguments depended on non compliance with the memorandum and articles of association. Two difficulties face that argument, even if it be accepted, in that one of the grounds relied on by the plaintiff was the failure to comply with the general requirement of the law that directors had no power to decide matters except by way of resolution at a board meeting, excepting for the present those matters specifically dealt with in articles or the Code. The defendants could not therefore say that there had been a meeting authorising entry into the deed of guarantee and indemnity merely by looking at para(a), for it says nothing about the general law rule. Rather the defendants had to rely upon the mode of execution of the deed and the various assumptions that could be made in relation to it. For that purpose not only did they have to establish that the provisions of art. 107 could be disregarded but they had to show also that the person who purported to attest the affixation of the seal might be assumed to be a person entitled to do so. Assumed compliance with the articles would therefore not be sufficient in relation to the matter of execution. Alternatively, the assumption contained in para(e) is intended to deal comprehensively with the question of due sealing by the company, for the requirements as to the use of the seal are almost invariably laid down in the articles.

For practical purposes one may therefore concentrate on the operation of para(e), which enables a party to assume that a document has been duly sealed, if certain conditions are satisfied, and the other party's assertions to the contrary might thereby be disregarded. The conditions that must be fulfilled include, in the first place, a requirement that the document should bear an apparent impression of the company's seal and, secondly, that the sealing be apparently attested by certain persons. Here the deed of guarantee and indemnity clearly bore the seal of Brick and Pipe. The second condition requires closer examination, for it in turn refers to assumptions which might be made pursuant to para(b) and para(c) of s68A(3). The language of the condition in sub-para(e)(ii) should be repeated in that it permits the assumption that a document has been duly sealed by the company if "the sealing of the document appears to be attested by 2 persons, being persons one of whom, by virtue of para(b) or para(c), may be assumed to be a director of the company and the other of whom, by virtue of para(b) or para(c), may be assumed to be a director or to be a secretary of the company". Again one of those who attested the apparent sealing by Brick and Pipe, namely Mr. Goldberg, not only appeared to be a director, but there is no doubt that he held that post. However, the other attesting signature, that of Mr. Furst, purported to be that of a secretary

of Brick and Pipe, but I have held that he was not so appointed. Could he be assumed to have been so appointed by virtue of para(b) or para(c) of subs(3)?

For the purposes of para(b) Mr. Furst appeared from the return lodged with the Commissioner for Corporate Affairs to have been appointed a director but not a secretary, so he could be assumed only to have been duly appointed as such and to have the authority to exercise the powers of a director of a company of the relevant kind. If one omits for the present the operation of para(c), that appointment would not appear to be of help to the defendants. Nevertheless an ingenious argument was put to the effect that it was sufficient for the purposes of para(e) if Mr. Furst might be assumed by virtue of para(b) to be either a director or a secretary of the company, even though his capacity as attesting witness was stated to be "secretary". It was said that it was of no consequence that Mr. Furst attested as secretary, for, so long as it appeared from a return that he was either a director or secretary, the sealing appeared to have been attested by a person who might be "assumed to be a director or to be a secretary of the company". There can be little doubt that the mode of sealing usually to be found in the articles of association of companies requires attestation by either two directors or a director and a secretary, although there is no legal restriction on who may be chosen to be attesting witnesses. Thus the paragraph makes allowance for either method. Perhaps the literal words of the paragraph might point to indifference whether the signatory purports to act as secretary or director. I cannot agree. If a party is entitled by virtue of para(b) (or para(c) for that matter) to assume that a person is a director of a company, it cannot be correct to say that he may also assume that a document was duly sealed if that person purports to attest as secretary. Whether or not subs(4) could then be called in aid, the only attestation by Mr. Furst in the present case was in the role of secretary and no assumption can properly be made in favour of the defendants in those circumstances. I would concede that the section talks only of assumptions which may be made and need not necessarily reflect the actual assumptions made by the parties seeking to rely on s68A. Nevertheless, if the only source for the proper making of such an assumption is a return showing a person to be a director. he cannot be assumed to be a secretary for the purposes of para(e). Moreover the assumption in para(b) is not merely that a person should be assumed to be a director or secretary but also that he has the "authority to exercise the powers and perform the duties customarily exercised or performed" by a director or secretary. A director cannot be assumed to have authority to exercise the powers of a secretary and vice versa, so I would reject the defendants' arguments on this point.

A more difficult issue arises as to the application of para(c) in relation to the assumptions referred to in para(e). The only remaining question is whether Mr. Furst was held out by the plaintiff company to be a secretary of that company, having authority to exercise the powers customarily exercised by a secretary of a company. If he was so held out to be a secretary of Brick and Pipe, then each of the relevant elements of para(e) would have been satisfied as Mr. Furst purported to attest as secretary the affixation of Brick and Pipe's seal. So the plaintiff could not deny proper attestation of the deed, subject only to the application of subs(4). The defendants asserted that Mr. Furst had been held out to them as secretary of the company because of representations made expressly or impliedly by Mr. Durlacher and

by Mr. Goldberg and Mr. Furst as to Mr. Furst's appointment at the time when the defendants and their solicitors were seeking assurances that he had been so appointed.

The principal conversation took place on the morning of 12 January 1990 when the plaintiff purported to execute the guarantee. Mr. Dodge, as the defendants' solicitor, in the presence of Mr. Goldberg, Mr. Furst, Mr. Durlacher and Miss Hunter-Smith, sought the relevant assurances as to the persons who had that morning attested to the sealing of all documents proferred on behalf of the Goldberg Group including the plaintiff company. Mr. Durlacher was asked to provide the necessary "forms 61", but said that he could not do so that day. He gave Mr. Roeder a personal assurance that the correct people had signed the documents and that Mr. Furst was secretary of all guarantor companies including the plaintiff. Mr. Goldberg and Mr. Furst participated in the conversation but did not disagree with or qualify the assurances then given by Mr. Durlacher. There was some discussion of recent changes of officers in the Goldberg companies and the settlement was left until Mr. Durlacher could provide the forms 61. Again on 15 January, Mr. Durlacher was unable to provide the forms, but on the following morning Mr. Roeder decided to proceed to settlement notwithstanding the absence of the forms but in the light of the assurances given. So it came about that later that morning the defendants executed their parts of the documents including the deed, and they were exchanged.

From those facts I would clearly infer that Mr. Durlacher was representing on 12 January that Mr. Furst was secretary of the plaintiff company and that both Mr. Goldberg and Mr. Furst concurred in the assurances given by their "employee" on that day. The ultimate question is whether those persons or any of them were able to hold out on behalf of Brick and Pipe that Mr. Furst had been duly appointed and had authority to sign the deed.

The difficulties are not unfamiliar to those who have had to consider the rule in Turquand's Case. Some of them were expressed by Diplock LJ in Freeman and Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 QB 480, at p. 503, in a judgment which has recently received approval in several judgments of the High Court in Northside Developments Pty Ltd v Registrar General. His Lordship said, at pp. 503-4: "In ordinary business dealings the contractor at the time of entering into the contract can in the nature of things hardly ever rely on the 'actual' authority of the agent. His information as to the authority must be derived either from the principal or from the agent or from both, for they alone know what the agent's actual authority is. All that the contractor can know is what they tell him, which may or may not be true. In the ultimate analysis he relies either upon the representation of the principal, that is, apparent authority, or upon the representation of the agent, that is, warranty of authority. "The representation which creates 'apparent' authority may take a variety of forms of which the commonest is representation by conduct, that is, by committing the agent to act in some way in the conduct of the principal's business with other persons. By so doing the principal represents to anyone who becomes aware that the agent is so acting that the agent has authority to enter on behalf of the principal into contracts with other persons of the kind which an agent so acting in the conduct of his principal's business has usually 'actual' authority to enter into."

Of course it does not follow that the cases in which the rule in Turquand's Case was necessarily are applicable in the interpretation of s68A. Unfortunately there is surprisingly little authority on the meaning of the section and such as there is relates to circumstances different from the present and so is of little assistance in this case. The only authority which bears a resemblance to the present is Re Madi Pty Ltd (1987) 12 ACLR 45 in which Southwell J. applied s68A in circumstances where the assumption apparently relied on was the holding out of a person as secretary for the purpose of attesting the seal of a guarantee. However the factual basis in that case derived from the other board members allowing the person to attest the document as secretary and the circumstances appeared to call for little discussion as to the proper interpretation of para(c).

I am rather inclined to take the same course here. The discussion at the Goldberg Group's office on 12 January took place in the presence of Brick and Pipe's controlling shareholder or more precisely the person who unmistakably controlled that shareholder, Arnsberg Pty Ltd and each of its holding companies. Whatever else is unclear in this litigation, it is abundantly clear that Mr. Goldberg not only had actual control, but also invariably asserted control over each of the companies within his group, including the plaintiff company. Throughout the dealings with the Occidental Group, Mr. Goldberg had been known as the alter ego of each of the Goldberg Group of companies. Up to that time, and indeed until the transactions were concluded, he had made all the relevant decisions. Nothing had occurred to indicate that he found it necessary to refer to any board, nor had any board attempted to interfere. It must be conceded that in the case of most of the companies only family members comprised the balance of the board whereas, by chance, in the case of Brick and Pipe there was still a considerable number of outside directors. Moreover it was not until early December that Brick and Pipe had been mooted as an additional guarantor. Nevertheless it was well known that Mr. Goldberg had taken over Brick and Pipe and that company was now a wholly owned subsidiary of a company within the group, namely Arnsberg. There could be no doubt that Mr. Goldberg spoke on behalf of each of the companies, even though on paper he was merely a member of the board. Negotiations had proceeded for about a month at the time the document came to be executed on 12 January 1990 and settlement was completed on 16 January 1990, and there had been no indication that Mr. Goldberg was unable to speak for the plaintiff company. In the circumstances it would be remarkable if that company could now say that Mr. Goldberg was not a person who could hold out on its behalf that a particular person held a position in that company.

Of course the actual statement was made by Mr. Durlacher, but it was made in circumstances in which it had the silent acquiescence of Mr. Goldberg, as well as Mr. Furst himself. Moreover Mr. Durlacher had acted as employee or agent of each of the Goldberg companies throughout the months of negotiations relating to the financing of the Spersea facility. He had acted as financial controller of many of the Goldberg companies without there ever being any indication that he was not acting with the full authority of each of those companies. It would be unrealistic to say that Mr. Durlacher was not held out by each of the companies, including the plaintiff company, as a person who could speak on its behaLf in relation to the transactions securing the provision of finance from Spersea. Moreover it

would be surprising if Mr. Roeder was not entitled, within the meaning of s68A, to make an assumption that Mr. Durlacher held a similar position in Brick and Pipe and could likewise speak for that company and that he likewise could hold out Mr. Furst as secretary of the company. Indeed searches revealed returns in which Mr. Durlacher was named as secretary of each of the Goldberg Group of companies, excluding Brick and Pipe, but including Arnsberg. Finally, although it related to his own position, Mr. Furst was known to be a director of most of the Goldberg companies and in this case including Brick and Pipe, so that his acquiescence was entirely consistent with Brick and Pipe holding out that he was its secretary. In the circumstances any conclusion to the contrary, namely any conclusion the plaintiff company had not held out that Mr. Furst was its secretary, would be highly unrealistic and contrary to the purpose of the provision.

The plaintiff said that none of these conclusions could be drawn because there was no proof that Brick and Pipe had authorised Mr. Furst or Mr. Durlacher to speak on its behalf and, lest it be thought that I have ignored the plaintiff's submissions, I shall deal briefly with them. In so far as they rely upon the lack of any formal authority to Mr. Goldberg and Mr. Durlacher in particular, there can be no doubt that no such formal authority existed. It was likewise said that Mr. Goldberg held no managerial position in any of the companies of the group and in particular in Brick and Pipe, but in my opinion that is to ignore the fact that the board after the takeover by the Goldberg interests acquiesced in his control. He was a director at all relevant times and it was apparent from the evidence from the other directors that they recognised the practical control which the takeover had effectively vested in him during the negotiations, relatively brief though they were with respect to Brick and Pipe. There was not the slightest indication to Mr. Roeder and the Occidental Group interests that Mr. Goldberg lacked the necessary control of the plaintiff company. As to Mr. Durlacher's position, again it must be conceded that he held no formal position in Brick and Pipe; yet it was made clear by Mr. Goldberg to Mr. Roeder that Mr. Durlacher, as a senior financial executive in the Goldberg Group, had all necessary power to speak on behalf of each of the Goldberg companies, albeit that that was said before Brick and Pipe had been put forward as a guarantor. Mr. Durlacher was in fact the person who negotiated and acted throughout as Mr. Goldberg's general factotum for the purposes of these transactions, again without there being any indication to the Occidental interests that he was not authorised to act on behalf of those companies. Whether or not it requires a direct reference to the Duomatic rule (which will be discussed later), Mr. Goldberg representing the controlling shareholders was thereby holding out Mr. Durlacher as having all necessary authority, so that it was Mr. Durlacher who held out that Mr. Furst had been appointed secretary, though in the presence of both Mr. Goldberg and Mr. Furst. Moreover for the purpose of the sealing of this document the corporate seal of Brick and Pipe had been produced at the Goldberg Group's offices in circumstances where an outsider such as Mr. Roeder might fairly have assumed that it had been brought there with the authority of the plaintiff company. In all the circumstances it is proper to accept that Brick and Pipe held out that Mr. Furst was that company's secretary.

The plaintiff also relied, in response to the arguments put on behalf of the defendants, on the exceptions contained in subs(4) of s68A. For this purpose the combined operation of subs(1)

and subs(3) might be denied if the person apparently entitled to make any of the assumptions referred to in subs(3) had actual knowledge to the contrary of any matter which it was asserted he might assume (para(a)) or if his connection or relationship with the subject company was such that he ought to know the matter was not correct (para(b)). It should first be observed that subs(4), as with subs(5), appears to impose a somewhat more limited restriction upon the ability of outsiders to make certain assumptions against companies than that which is accepted in the general law as denying the operation of the rule in Turquand's Case: cf. Lyford v Media Portfolio Ltd. (1989) 7 ACLC 271, at pp. 280-1, per Nicholson J. Whereas the rule in Turquand's Case denies the making of certain assumptions where the outsider is put upon inquiry, as appears from the elaborate examination of that rule in Northside Developments Pty Ltd v Registrar General, subs(4) and subs(5) allow the company to point only to knowledge or a "connection or relationship with the company" from which the outsider ought to have the relevant knowledge. Fortunately in the present case it is unnecessary to examine para(b) of subs(4) and the precise significance of the expression "connection or relationship", for the plaintiff expressly denied in argument on its behalf that it was relying on that paragraph.

The plaintiff therefore relied only on "actual knowledge" which it said the defendants had of matters which they would otherwise be entitled to assume pursuant to subs(3). That knowledge was moreover limited in the course of argument to knowledge of a breach of art. 89 and it was not suggested that any person on behalf of the defendants had actual knowledge that Mr. Furst had not been appointed secretary. The matter raised went only to an assertion that Mr. Dodge, as solicitor on behalf of the defendant companies, knew that the participants at the alleged meeting of Brick and Pipe which agreed to give the guarantees were both interested within the meaning of art. 89, or at least that Mr. Goldberg was so interested, with the consequences that less than two persons attended the "meeting" and that there was no quorum present. I should mention that I am by no means satisfied that Mr. Dodge had the relevant actual knowledge at any time before completion of the transaction, but in any event reliance by the plaintiff on subs(4) goes only to the assumption in para(a) of subs(3), namely that the memorandum and articles of the company had been complied with. Such an answer would be irrelevant to the operation of the assumption in para(e) relating to due sealing and I did not understand the argument to be directed to that paragraph of subs(3). Even if it were, the fact that an interested director attested the seal is irrelevant for the purposes of art. 89 of Brick and Pipe's articles of association which explicitly in the last sentence states that "Any interested director may attest the affixing of the common seal of the company".

Rather I understood the plaintiff's argument to be directed to reliance by the defendants upon compliance generally with the articles of association. There might appear to be some differences of opinion in the judgments of the High Court in Northside Developments Pty Ltd v Registrar General as to the effect of an apparently properly sealed document and as to the extent to which one might, without having regard to s68A, go behind the sealing to investigate whether the transaction was authorised by the company.

However, it was apparent the defendants did not need to rely upon the assumption referred to in para(a) of subs(3) for present purposes because it sought to assert that the deed of guarantee and indemnity was duly sealed by reason of the assumption referred to in para(e), which could not in the circumstances be disregarded. In my opinion the object of the inclusion of para(e) in the form that it bears was to overcome in part the supposed rule in Ruben v Great Fingall Consolidated [1906] AC 439, which was also examined by the High Court in the Northside Developments Case: see also s68D.

In my opinion para(e) is not dependent upon proof that the company had complied with all its memorandum and articles or that it had authorised the document which was apparently sealed on its behalf. The object of making an assumption that a document has been duly sealed is that the recipient might fairly accept that all necessary steps had been taken for the purpose of executing the document with the authority of the company, whatever form that might be required to take. If, as I have held, that assumption might have been made by the defendant companies, it is irrelevant to go further to examine whether a further assumption should be made with respect to compliance with the memorandum and articles. Moreover, as I have already pointed out, the real vice within the internal workings of the plaintiff company was not the failure to comply with the articles but the failure to hold any meeting at all at which the giving of a guarantee might have been authorised. Of that the defendants knew nothing. The contentions of the plaintiff therefore with respect to para(a) are thus irrelevant. Thus the assertions by the plaintiff that the deed of guarantee and indemnity was not validly executed should be disregarded.

Having rejected the plaintiff's assertions, I therefore treat the deed of guarantee and indemnity as having been validly executed by the plaintiff. So it is strictly unnecessary to examine two other bases upon which the defendants sought to uphold the effectiveness of the deed. Nevertheless I am also of the opinion that the plaintiff is bound by the deed by reason of what I have called the Duomatic rule, although I would reject the defendants' arguments based on s74 of the Property Law Act 1958.

> "(iii) S74 of the Property Law Act 1958

So I will first deal briefly with the further alternative argument put on behalf of the defendants relying on subs(1) of s74 of the Property Law Act which reads:

"In favour of a purchaser a deed shall be deemed to have been duly executed by a corporation aggregate if its seal be affixed thereto in the presence of and attested by its clerk, secretary or other permanent officer or his deputy, and a member of the board of directors, council or other governing body of the corporation, and where a seal purporting to be the seal of a corporation has been affixed to a deed, attested by persons purporting to be persons holding such offices as aforesaid, the deed shall be deemed to have been executed in accordance with the requirements of this section, and to have taken effect accordingly."

Although the deed of guarantee and indemnity might appear to have been executed in a manner contemplated by that section, nevertheless s74(1) has a specific and limited purpose. The assumptions allowed by this section are to be made only in favour of

"purchasers". Although that word has an expanded definition, it does not include persons having only the benefit of a contractual stipulation, such as the defendants, unless they also acquire an interest in property. The word is defined for present purposes in s18 as follows:

"'Purchaser' means a purchaser in good faith for valuable consideration and includes a lessee, mortgagee or other person who for valuable consideration acquires an interest in property . . ." I did not understand that the defendants could contend that by virtue of the deed they acquired any interest in property, except to assert that the contractual rights that they obtained thereby satisfied the definition. In my opinion they clearly did not and no authority cited to me went any way to bring the defendants within the section. Their arguments relying on s174(1) must therefore be rejected.

> "(iv) The "Duomatic rule"

The defendants' final basis for upholding the validity of the execution of the deed of guarantee and indemnity was what I have described as the "Duomatic rule". Although the rule had perhaps its most detailed exposition in the judgment of Buckley J. in that case (Re Duomatic [1969] 2 Ch. 365), its history goes back many years and it is by no means universally known by that name: see the succinct description of the development of the rule in Gower: Principles of Modern Company Law, 4th ed., pp. 1334. Indeed no reference was made to that case when Buckley LJ, as a member of the Court of Appeal, later restated the rule in these terms in Re Horsley and Weight Ltd [1982] Ch. 442, at p. 454: "A company is bound in a matter which is intra vires the company by the unanimous agreement of its members (per Lord Davey in Salomon v Salomon and Co Ltd [1978] AC 22, 57; and see In re Express Engineering Works Ltd. [1920] 1 Ch. 466) even where that agreement is given informally: Parker and Cooper Ltd v Reading [1926] Ch. 975."

In the present case the defendants contended that, if there was no board meeting and if the deed was otherwise irregularly sealed, nevertheless they could point to the unanimous support of the membership of Brick and Pipe, in the sense that its only member at that time, namely Arnsberg Pty. Ltd., clearly supported the giving of the guarantee in that its spokesman and director Mr. Goldberg had given the necessary instructions for its preparation and execution.

Indeed a principal argument advanced against the application of the Duomatic rule was that the rule was not intended for circumstances such as the present, but was confined to internal disputes. I confess that this proposition originally had some attraction, in the sense that the present seemed an unusual application of the rule, one for which I could find no precise precedent. However, that apparent difficulty must be placed in the context that in most cases outsiders will have been able to rely upon either the rule in Turquand's Case or now s68A of the Code. The problems overcome by this rule arise most often in circumstances where the directors or shareholders may be expected to have notice of the irregularity, or at least should be aware of the irregularity in a manner excluding the rule in Turquand's Case or s68A, but they nevertheless are able to hold the company to arrangements reached between them and the company because it would be unreasonable

for the corporation to rely on the irregularity, if all those in a position as members to control the company had agreed on the proposed course. Nothing, however, stated in the authorities would so confine it and counsel for the plaintiff had great difficulty showing in what way the principle could not be applied to the present case, at least from the terms in which it had been expressed in those authorities. Upon that basis, notwithstanding my hesitation on the matter, I see no reason why it could not be applied to the present circumstances.

I should add that a very large number of authorities were cited or referred to in argument, on this issue and generally with respect to the argument based on informal assent of the corporators. It is desirable that I set them out at this stage: Salomon v A. Salomon and Co Ltd [1897] AC 22; Re George Newman and Co. [1895] 1 Ch. 674; Re Express Engineering Works Ltd. [1920] 1 Ch. 466; Re Oxted Motor Co Ltd [1921] 3 KB 32; Parker and Cooper Ltd v Reading [1926] 1 Ch. 975; EBM Co Ltd v Dominion Bank [1937] 3 All ER 555; Re Duomatic Ltd. [1969] 2 Ch. 365; Cane v Jones [1980] 1 WLR 1451;Re Horsley and Weight Ltd [1982] Ch 442; Multinational Gas and Petrochemical Co. v Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258; Re Fletcher Hunt (Bristol) Ltd. [1989] BCLC 108; Re Meyer Douglas Pty Ltd [1965] VR 638; EH Dey Pty Ltd v Dey [1966] VicRp 65; [1966] VR 464; Re Compaction Systems Pty Ltd [1976] 2 NSWLR 477; Re U Drive Pty Ltd (1986) 10 ACLR 565 (Young J.); Swiss Screens (Australia) Pty Ltd v Burgess (1987) 11 ACLR 756 (Bryson J.); Northside Developments Pty Ltd v Registrar General (1987) 11 ACLR 513 (Young J); Versteeg v R (1988) 14 ACLR 1 (FCWA); Peter Buchanan Ltd. v McVey [1954] IR 89 and Bobbie Pins Ltd. v Robertson [1950] NZLR 301. Indirect reference was made in argument also to Ho Tung v Man On Insurance Co Ltd [1902] AC 232 and Attorney General for Canada v Standard Trust Co. of New York [1911] AC 498. To that I should add a reference to the recent brief decision of the New South Wales Court of Appeal in Herrman v Simon (1990) 8 ACLC 1094. It may be conceded that a large number of these cases arose in the course of liquidations but in the majority of cases contractual rights were in issue, albeit that often those contractual rights were between the company or its directors or shareholders. Those persons frequently have knowledge of a kind which would deny them the benefit of those rules which have been devised either by the general law or by the legislature for the protection of outsiders, but that does not mean that the Duomatic rule is not equally applicable to them. Frequently the rights asserted and maintained by the rule are contractual rights of a kind otherwise protected by those rules specifically designed for "outsiders".

I should add that that principle has been restated in somewhat different terms in the recent Court of Appeal decision to which I referred, Herrman v Simon, by Meagher J.A., at p. 1096: ". .. where it can be shown that all shareholders having a right to attend and vote at a general meeting of a company assent with full knowledge and consent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be. In other words, it is a doctrine dispensing with the consumptive effect of formalities. It is a doctrine that formalities may be disregarded if they have been waived by all shareholders acting in concert who want the same substantial result."

That restatement does not, in my opinion, deny its possible applicability to claims made by persons other than insiders. It is the more applicable in circumstances where the "outsiders", namely the defendants, were properly acting under the belief that the plaintiff was controlled by its single shareholder, Arnsberg, and its alter ego Mr. Goldberg.

It was next argued the rule should not be applied in circumstances where there had not been at least an informal meeting of the company's shareholders. There is some authority which might support that contention, but one may doubt the practicability of such a restriction in cases such as the present where the whole of the company's shares were held at the relevant time by one shareholder, namely Arnsberg Pty Ltd For most purposes, subject to any provision or implication to the contrary, it is accepted that it is not ordinarily possible to have a one-man "meeting": see, for example Re Hastings Deering Ltd. (1985) 3 ACLC 474 and Ford's Company Law, 5th ed., para1805 - para1806, and the cases cited therein. Moreover, it is by no means obvious what is the rationale behind the distinction between circumstances where an irregular meeting is held at which all shareholders approve of the transaction and circumstances from which it appears the whole membership approves of the particular transaction. The most that can be said is that it is sometimes more difficult to establish the necessary unanimity, but the physical presence of the members at the one time would appear to have little relevance if, as one must assume, there are other irregularities relating to that meeting or transaction.

Some of the authorities referred to suggested that the rule might be confined to circumstances where all the necessary shareholders attended a meeting, whatever its formal deficiencies might be, and approved the relevant transaction. This was said to flow from the decision of the Court of Appeal in Re George Newman and Co [1895] 1 Ch. 674, where Lindley LJ for the Court of Appeal consisting of himself and Lord Halsbury and AL Smith LJ said in relation to a gift made to a director, at p. 686:

"Individual assents given separately may preclude those who give them from complaining of what they have sanctioned: but for the purpose of binding a company in its corporate capacity individual assents given separately are not equivalent to the assent of a meeting. The company is entitled to the protection afforded by a duly convened meeting, and by a resolution properly considered and carried and duly recorded. The articles of this company, wide as they are, do not authorise such presents as those impeached by the liquidator."

Consequently in the case which is frequently said to be the first direct application of the rule, Re Express Engineering Works Ltd. [1920] 1 Ch. 466, the judgment proceeded upon the basis that, "if you have all the shareholders present, then all the requirements in connection with a meeting of the company are observed, and every competent resolution passed for which no further formality is required by statute becomes binding on the company": per Younger LJ, at p. 471. The views there expressed appear to have been adopted the following year in Re Oxted Motor Co Ltd [1921] 3 KB 32, although there was little discussion of the precise basis for the application of the rule.

The defendants, however, rely upon the judgment of Astbury J. given a few years later in Parker and Cooper Ltd. v Reading [1926] Ch. 975 where the validity of a regularly sealed

debenture was attacked. Astbury J. carefully considered the judgment of Lindley LJ in Re George Newman but said of it, at pp. 982-3: "But what he really means is that where a transaction is intra vires the company and honest the sanction of all the members of the company, however expressed, is sufficient to validate it, especially if it is a transaction entered into for the benefit of the company itself." Likewise after considering the Express Engineering Case, his Lordship said, at p. 984: "I do not think it matters in the least whether that assent is given at different times or simultaneously."

These views were followed by Buckley J. in Re Duomatic Ltd., but the plaintiff pointed to a number of observations in earlier judgments which expressed doubts as to the width of Astbury J.'s reasoning, in particular the judgment of the Privy Council in EBM Co Ltd v Dominion Bank [1937] 3 All ER, at p. 566, and the judgments in this court of Gowans J. in Re Meyer Douglas (in a passage appearing only at p. 466 of Dey's Case) and of McInerney J. in EH Dey Pty Ltd v Dey, especially at pp. 465-8. In none of those cases, however, was it necessary for the Judicial Committee or the court to reach conclusions on the method by which shareholders might express their consent, for on the facts it was not necessary to consider that question. In the light of the judgments to which I am about to refer, I see those expressions as no more than dicta expressing doubts without reaching conclusions as to the applicable principle. Thereafter almost every one of the judgments decided expresses the principle in the widest terms and without the requirement of a members' meeting. So Buckley J. reached a conclusion in Re Duomatic consistent with that of Astbury J. (see at p. 372) and stated the principle he thought applicable, at p. 373:

"I proceed upon the basis that where it can be shown that all shareholders who have a right to attend and vote at a general meeting of the company assent to some matter which a general meeting of the company could carry into effect, that assent is as binding as a resolution in general meeting would be."

His Lordship repeated similar views in the passage which I have already cited from Re Horsley and Weight Ltd. Similar views were expressed by each of the members of the Court of Appeal in Multinational Gas and Petrochemical Co. v Multinational Cas and Petrochemical Services Ltd 11983] 1 Ch., at p. 269, per Lawton LJ; at p. 280, per May LJ and, at pp. 289-90, per Dillon LJ Dillon LJ expressed the opinion: "It would equally matter not if the decisions were made by all the shareholders informally and without any meeting at all": at p. 289. See also Re Fletcher Hunt (Bristol) Ltd [1989] BCLC, at p. 113, per Knox J. Although Bowen C.J. in Eq. found it unnecessary to express a final conclusion in Re Compaction Systems Pty Ltd., at pp. 484-5, the wider view seems to have been accepted by Bryson J. in Swiss Screens (Australia) Pty Ltd v Burgess, at p. 759, and by Young J. in Northside Developments v Registrar General (1987) 11 ACLR, at p. 519. Likewise the wider view seems to have been accepted by Finlay J. in Bobbie Pins Ltd. v Robertson [1950] NZLR, at p. 304 and by Kingsmill Moore J. in Peter Buchanan Ltd v McVey, at pp. 96-7. As was pointed out by Finlay J. in the Bobbie Pins Case the relevant test was perhaps best expressed by Viscount Haldane on behalf of the Privy Council in Attorney General for Canada v Standard Trust Co. of New York [1911] AC, at pp. 504-5, as follows: ". . . the only persons beneficially interested in the company were the four members of the syndicate. The law gave them

complete control of its action. Under that control the company gave effect to the policy of the only persons who had any beneficial interest in its capital. The case is not one in which the apparent procedure can be said to have been unreal, or to have been a cloak under which a conspiracy to defraud was concealed. Under these circumstances, their Lordships are of opinion that the company, notwithstanding that no general meeting, apart from the meeting of directors, appears to have been held for the purpose, was completely bound by the transactions sought to be impeached, and that the appellant, who has certainly no title higher than that of the company against the assets of which he claims, is bound likewise."

In short there is no reason in principle why the assent of the membership of the company cannot be expressed in whatever way is appropriate to establish the fact. The principle derives from the simple statement of Lord Davey in Salomon v A. Salomon and Co Ltd [1897] AC, at p. 57, where he said: "The company is bound in a matter intra vires by the unanimous agreement of its members." The plaintiff's contention that the members must express their agreement in general meeting is therefore rejected.

The next contention is largely answered by this conclusion. On behalf of the plaintiff it was first argued the rule does not apply to a public company required to have an auditor, although as developed the argument was put more widely so as to apply to every non exempt proprietary company, that is every company which is obliged to have an auditor. This was said to flow from the requirements relating to auditors and in particular subs(8) of s285 of the Code which reads:

"An auditor of a company or his agent authorised by him in writing for the purpose is entitled to attend any general meeting of the company and to receive all notices of, and other communications relating to, any general meeting that a member is entitled to receive, and to be heard at any general meeting that he attends on any part of the business of the meeting that concerns the auditor in his capacity as auditor, and is entitled so to be heard notwithstanding that he retires at that meeting or a resolution to remove him from office is passed at that meeting."

So it was said that, if the members might determine a matter without the necessity to meet, then the auditors would be deprived of their right to attend and speak on matters concerning their duties. In support of this proposition some dicta by Bowen C.J. in Eq. in Re Compaction Systems Pty. Ltd., at p. 485, and by Young J, in Re U Drive Pty. Ltd., at p. 566 were relied upon. But in each case the most that was said was that the principle might have to be qualified by reference to the significance of this statutory requirement and no final conclusion had to be expressed in either case.

I confess that, important though the duties of auditors are, I see no basis to qualify the Duomatic principle. The assumption in each of the cases where the principle has been applied is that the requirements of at least the articles have not been fulfilled, but the consent of all the members may cure the defect, where the matter is intra vires and no question of dishonesty arises. The power of the auditor to attend meetings has existed now for some time (since 1948 in the United Kingdom and since 1961 in most Australian jurisdictions), but in none of the other cases has this qualification been pursued. I cannot

believe that the rule should be qualified for non exempt proprietary companies by reference to the provision, however beneficial it might be. Moreover there must be some doubt as to whether the matters upon which the auditor may speak would be broad enough to cover the matters the subject of the alleged consent in this case. More importantly, I have already determined that the consents may be made manifest otherwise than at a meeting, so that it is the unanimity of agreement which is significant, not the manner in which it is obtained. I therefore reject this argument on behalf of the plaintiff.

Finally it was contended on behalf of the plaintiff that there was no agreement or approval by the sole shareholder of the plaintiff company, Arnsberg Pty Ltd. The plaintiff argued that, if the corporate entity was the sole shareholder, more must be shown than that a controller, up the line of control, impliedly agreed to or consented to the transaction. I would not so restrict the rule for in each case the consent or approval must be shown by evidence of the relevant cogency. There was clearly no formal document from Arnsberg approving its subsidiary's execution of the deed nor was there evidence that Mr. Goldberg or any other person had been given direct authority to speak for Arnsberg or had been appointed its managing director. There was, however, not the slightest doubt that Mr. Goldberg spoke for Arnsberg and that he had appointed Mr. Durlacher as his spokesman for all incidental matters relating to each of the companies in the Goldberg Group, including Arnsberg. I need not repeat what I have already said, with respect to Brick and Pipe, but it is all equally applicable to Arnsberg. Arnsberg had been throughout a participant in the transaction. It would be unrealistic to say that the decision by Brick and Pipe to enter into this deed of guarantee and indemnity was not approved by Arnsberg. It was a party to the same deed and its directors included both Mr. Goldberg and Mr. Furst and that company was in turn owned by Bacharach which was in turn owned by Arnstadt, the trustee for one of the Goldberg family trusts. Mr. Goldberg's control over Arnsberg was apparent throughout the transaction and there were in the case of Arnsberg, as with Bacharach and Arnstadt, not even any outside directors. The request that Brick and Pipe be joined as a guarantor came from Mr. Goldberg speaking on behalf of each of the relevant companies. I am satisfied that those who could and did speak for Arnsberg approved the transaction into which its subsidiary was entering. Thus all the necessary conditions for the application of what I have called the "Duomatic rule" have been made out and Brick and Pipe is thereby bound by the deed.

D. Defence under s230 of the Code Apart from denying that it had not validly executed the deed of guarantee and indemnity, Brick and Pipe relied on s230 of the Companies Code to show that the deed was not enforceable against it. It is necessary to set out those parts of s230 which are relevant to this claim:

"(1) A company shall not, whether directly or indirectly -

    (a) make a loan to -

        (i) a director of the company, a spouse of such a director, or a relative of such a director or spouse;

(ii) a director of a corporation that is related to the company, a spouse of such a director or a relative of such a director or spouse; ... or

(iv) a corporation, where a person referred to in sub-para(i) or (ii) has, or 2 or more such persons together have, a relevant interest or relevant interests in shares in the corporation the nominal value of which is not less than 10% of the nominal value of the issue share capital of the corporation; or

(b) give a guarantee or provide security in connection with a loan made or to be made by another person to a natural person or a corporation referred to in para(a).

"(3) Nothing in subs(i) applies -

(a) to anything done by a company that is an exempt proprietary company;

(b) to a loan made by a company to, or a guarantee given or security provided by a company in relation to, a corporation that is related to the company if the making of the loan, the giving of the guarantee or the provision of the security has been authorised by a resolution of the directors; . . .

"(8) If a person has made a loan in relation to which a company has given a guarantee or provided security in contravention of this section, the person may enforce the guarantee or security against the company if, and only if -

(a) in a case where the company is a proprietary company - a certificate signed by a director and a secretary of the company certifying that the company was an exempt proprietary company was furnished to the person before the guarantee was given or the security was provided; or

(b) in any case - a certificate signed by a director and a secretary of the company certifying that the company was not prohibited by this section from giving the guarantee or providing the security was furnished to the person before the guarantee was given or the security was provided and the person did not know, and had no reason to believe, that the certificate was incorrect . . ."

The meaning of the expression "relevant interest" is stated in s8 of the Code and in particular in subs(1) it is said that a person "has a relevant interest in a share in a body corporate . . . for the purposes of s230 . . . if that person has power to dispose of, or to exercise control over the disposal of, that share."

On the application of s230 to the facts of this case three principal matters were raised by the defendants: first it was said that no loan was made by the Occidental group of companies to Spersea; secondly, that no guarantee was given or security provided by Brick and Pipe in connection with the alleged loan from the Occidental group of companies to Spersea; and

thirdly, in reliance on subs(3)(b), that the guarantee given was given in relation to a corporation that was related to the company Brick and Pipe and that the giving of the guarantee had been authorised by a resolution of the directors of Brick and Pipe. I should add that two documents were tendered which purported to be certificates pursuant to s230(8) of the Companies Code, each bearing date 22 December 1989. No reliance was placed on either of these documents as they purported to certify that Brick and Pipe was an exempt proprietary company within the meaning of s5(1) of the Code. There was no submission made that Brick and Pipe satisfied that definition as it was ostensibly a public company throughout that time although control rested solely in the hands of Arnsberg. Moreover one certificate contained the signature of Mr. Furst as a director, so that there was no signature of a secretary of the company to the certificate and the other purported to be signed by Mr. Furst as secretary, but, for reasons already stated, there was no evidence that Mr. Furst had been properly appointed a secretary of the company, nor was there any basis for asserting that his signature should be treated as that of a secretary for the purposes of this section.

"(i) Was there a "loan" to Spersea?

It is desirable then to turn to the question whether the transactions between the Occidental Group of Companies and Spersea constituted a loan within the meaning of s230, since the prohibition against giving a guarantee or providing security relied upon by the plaintiff depended upon the guarantee or security arising in connection with a loan of the kind referred to in para(a) of s230(1).

The plaintiff contended that the bill facility agreement between Spersea and the Occidental Group in substance provided for the making or continuation of loans to Occidental Life and Regal Life, whereas the defendant said that the nature of the transactions contemplated by the agreement comprehended the drawing, accepting and discounting of bills of exchange, the provision of funds thereunder, and either the indemnification by the drawer of the acceptor upon each bill's maturity or the placing of the acceptor in funds before payment on the bill was required. It is clear that in form the agreement provided the machinery for a bill discounting facility, but the plaintiff argued that the facility was only a means for advancing or lending money to the defendant companies and that the word "loan" in s230 should be read broadly to comprehend any transaction whereby moneys were raised for a director or a corporation in which he has a relevant interest within the meaning of subs(1) of s230.

There is no direct authority on the meaning of the relevant provisions of s230, although it is not a section new to the Code. Strangely the word "loan" has not been frequently defined and in the many authorities cited, although the concept of lending was assumed to be understood, only one definition appears, namely in the judgment of Richardson J. in Re Securitibank Ltd. (No. 2) [1978] 2 NZLR 136, at p. 167: "... the essence of a loan of money is the payment of a sum of money on condition that at some future time an equivalent amount will be repaid." Compare also Kilgariff v Morris [1955] HCA 8; (1955) 91 CLR 524, at pp. 527-8.

It was said on behalf of the defendants that, properly analysed, a bill facility is not a loan and that in particular the present bill facility did not come within the section. For this purpose they relied upon a number of well known authorities which have sought for various purposes to distinguish between lending and raising moneys pursuant to a bill facility. The most succinct and frequently cited passages appear in the judgment of Lord Devlin, on behalf of the Judicial Committee of the Privy Council consisting of himself, Lord Denning and the Rt. Hon. LMD de Silva, in Chow Yoong Hong v Choong Fah Rubber Manufactory [1962] AC 209, at pp. 215, 216-7:

"The business of buying bills at a discount, that is, for their value at the date of purchase, is well-known and is quite distinct from money lending. Nowadays the buyer is usually a bank or a discount house, but the fact that he cannot be put into either of those categories does not alter the nature of the transaction, neither does the designation of the discount as interest. There is here no loan of money and no promise of repayment." "There are many ways of raising cash besides borrowing. One is by selling book debts and another by selling unmatured bills, in each case for less than their face value. Another might be to buy goods on credit or against a post dated cheque and immediately sell them in the market for cash. Their Lordships are, of course, aware . . . that transactions of this sort can easily be used as a cloak for money lending. The task of the court in such cases is clear. It must look at the nature of the transaction which the parties have agreed. If in form it is not a loan, it is not to the point to say that its object was to raise money for one of them or that the parties could have produced the same result more conveniently by borrowing and lending money."

These two passages were recently cited with approval by a majority of the High Court consisting of Mason, Wilson, Deane and Dawson JJ. in Handevel Pty Ltd v Comptroller of Stamps (Victoria) [1985] HCA 73; (1985) 157 CLR 177, at pp. 194-5, although that appeal concerned whether a deed and charge supporting the creation of redeemable cumulative preference shares amounted to a "mortgage" for the purposes of the Stamps Act 1958. The passages were also cited with approval by Aickin J., in whose judgment Mason J. concurred, in KD Morris and Sons Pty Ltd v Bank of Queensland Ltd. [1980] HCA 20; (1980) 146 CLR 165, at p. 194 and, although in that judgment Aickin J. dissented on the question whether the rolling over of bills amounted to a post liquidation liability by the liquidator, there is nothing in the judgments of the majority, Stephen, Wilson and Murphy JJ., which indicated disapproval of that line of authority. Chow Yoong Hong's Case was also directly applied by the New Zealand Court of Appeal in Re Securitibank Ltd. (No. 2) and the second passage cited, at pp. 146 and 166-7. The conclusions stated are consistent with other authorities cited on behalf of the defendants as to the meaning of words such as "moneylender" and "borrowed money" and no cases reaching an opposite conclusion were cited on behalf of the plaintiff: see Commissioners of Inland Revenue v Port of London Authority [1923] AC 507: Olds Discount Co Ltd v John Playfair Ltd [1938] 3 All ER 275; Inland Revenue Commissioners v Rowntree and Co. Ltd. [1948] 1 All ER 482; Dieta Investments Pty Ltd v Sharp [1968] WAR 86 and Willingale (Inspector of Taxes) v International Commercial Bank Ltd. [1978] AC 834.

Of course in each case it is important to look at not merely the form but also the substance of each transaction, as appears from the sentence which immediately follows the second

passage from Lord Devlin's judgment in Chow Yoong Hong's Case appearing above, at p. 217: "But if the court comes to the conclusion that the form of the transaction is only a sham and that what the parties really agreed upon was a loan which they disguised, for example as a discounting operation, then the court will call it by its real name and act accordingly."

This passage may have been significant if the plaintiff had pursued its original plea that the bill facility agreement was a sham but during the course of argument counsel on its behalf explicitly abandoned any such claim. In its place, that is, in place of an allegation that the agreement was "not intended by the parties to represent the true nature of their relationship and the transactions between them" (para21 of the statement of claim), the plaintiff sought to pursue contentions, outside any matter alleged in its pleadings, that the substitution of the advance by way of discounting the bills of exchange on 16 January 1990 in place of the former loan and the repayment of that loan by crediting the proceeds of the discounted bills were said to be in themselves sham transactions, so that the moneys outstanding by Spersea remained owing to the defendants pursuant to the original loan arrangements made in September 1989. This change of tack bore some faint resemblance to the contention ultimately rejected by the New Zealand Court of Appeal in Re Securitibank Ltd. (No. 2) that there could be some "halfway house" between a sham and an unassailable transaction which could lead to the characterisation of the effect of a bill facility as a "loan" for certain purposes. For the purposes of this present case I shall return briefly to this alternative contention, but in order to deal with this primary argument in reliance on s230 I am able, in the light of the concession made, to disregard any contention that the bill facility agreement was a sham. It remains for me to examine whether the "financial accommodation" (see recital A of the agreement) provided by the defendants pursuant to the bill facility agreement should be characterised as a "loan" for the purposes of s230. For this purpose it is necessary to look at the 65-page agreement entered into between Spersea and the Occidental Group as well as the steps apparently taken by Spersea to draw down upon it. It should first be observed, however, that bill facility agreements are not uniform in their operation, as appeared from the evidence of a chartered accountant, Mr. Aubrey Whitear, although these differences do not appear to have been analysed in detail in any of the reported authority drawn to my attention except incidentally in Re Securitibank Ltd. (No. 2). However see a paper by JRF Lehane, "Commercial and Bank Bills", delivered 25 November 1981 at the University of Sydney and published by the Committee for Post Graduate Studies in the Department of Law under the title Public Company Finance (1982) and Ch. 17 of Ellinger: Law of Banking (1987).

Various forms of bill facilities or bill lines may be briefly described, as they apply to companies, although they may likewise be agreed with individuals.

Perhaps the most common is an arrangement between a company and its banker or other financier whereby the company draws bills of exchange on the bank or financier payable to itself which, after acceptance by the bank or financier, are discounted in the bill market either specifically by arrangement with another financier or generally, whereby the proceeds of that discounting are made available for the company's general purposes. In the ordinary case the bills will fall due for payment after say 60, 90 or 180 days, at which time it will be necessary

for the bills to be "rolled over". By this procedure further bills are drawn, accepted and discounted which enable the company having the benefit of the facility to indemnify the acceptor against its liability on the bills but, after substituting the new bills for the old, the company retains the proceeds of the original drawing down. On each occasion the bills are rolled over the company suffers the expense incurred in discounting the bills which may be seen as an expense broadly equivalent to the payment of interest under a conventional loan, albeit that this expense is incurred only once every 60, 90 or 180 days, whatever be the life of the bills. Sometimes the company itself negotiates the discount of the bills for itself but more frequently engages the bank or financier to act as its agent in raising the funds on the market. An alternative method of bill finance which is said to be that applicable to the present transaction is one whereby the bank or financier not only accepts the bills but also discounts them itself, so that the proceeds are paid directly from the bank or financier to the company and the rolling over of the bills on maturity may require merely the further provision of bills drawn by the company to the bank or financier, although the company must on each occasion pay from its own funds the cost of the discount and all other fees. There is, of course, ordinarily no restriction on the bank or financier even in these circumstances from trading the bills in the market during their currency, in which case the company will again indemnify the accepting bank or financier upon maturity. As another alternative a facility may provide for bills already accepted by another party to be endorsed by the bank or financier, so that on maturity the bank or financier is responsible for payment only if the acceptor is unable to meet the bills, with a right of recourse to the drawer. As Mr. Lehane says on p. 1 of his paper: "The essential common characteristics of all these permutations is that a financier agrees to lend its name to a series of bills; by doing so it gives the company a means whereby it may raise money through its possession of an instrument which may readily be sold in a market": Public Company Finance, p. 266.

I turn therefore to the facility agreement dated 22 December but executed on 16 January 1990. The named parties were Spersea (the company) Regal Life, Occidental Life, and Occidental Life Nominees (the agent). It is possible to select only parts of this large, 65-page document in order to summarise its effect. It should first be noted that the single recital A states that the company and each guarantor have requested the agent to arrange and Regal Life and Occidental Life to provide the company with financial accommodation up to a maximum amount of $57,982,593.

After a definition clause which extends for 14 pages and to the relevant parts of which I shall return where necessary, "the facilities" are described in CL2.1:

"Subject to the terms and conditions of this agreement, each lender agrees with the company to make available to the company its participation in the facility through its accommodation office but so that the aggregate of the principal amount of its participation in all outstanding portions of the facility shall not at any time exceed its commitment."

The following definitions are relevant to this clause. "Lenders" is defined to mean: "Occidental Life, Regal Life and each bank" [in turn defined to include both corporations licensed to carry on banking business and certain other financial institutions] "which

provided a commitment in relation to financial accommodation to the company by virtue of an assignment or novation . . ." "Facility" is defined to mean: "The facility provided under CL2 under which the lenders agree to accept and discount bills as provided in that clause." Each of the words in the expression "outstanding portions" is separately defined. "Portion" is defined to mean "each amount of financial accommodation drawn under the facility having the same accommodation period" and those latter two words are defined to mean "the period commencing on each accommodation date and ending on the next accommodation date or in the case of the last accommodation period the termination date". In turn "accommodation date" is defined to mean each of 16 January, 1 April and 1 July 1990 and the "termination date" is defined to mean the earlier of 28 September 1990, (or such later date as the lenders may agree) and the date on which the facility is repaid in full. Returning to the word "outstanding" that is defined to mean: "In relation to a portion those bills which have been drawn accepted and discounted pursuant to this agreement other than those bills which have matured, the full face value amount having been paid to the payee specified thereon or the holder in due course thereof (as the case may be) in accordance with the terms of the bill and have been discharged and retired accordingly." "Face value amount" is in turn defined to mean the amount shown on the face of a bill as the amount payable at maturity. Finally the word "commitment" is defined to mean:

> "(a) in relation to Regal or Occidental, the obligation to accept and discount bills under the facility having an aggregate face value amount not in excess of the amount set out against its name in item 3 of the first schedule; and (b) in relation to any bank or other financial institution which by assignment or novation ... holds rights or assumes obligations under this agreement, the obligation to accept and discount bills under the facility having an aggregate face value amount" [which is fixed in accordance with the notice given under the clause relating to assignment and novation], "less in each case such amount as may from time to time be reduced or cancelled under this agreement."

The rest of CL2 deals primarily with the allocation of rights and obligations amongst the lenders but CL2.2 states:

"The company shall draw under the facility simultaneously and ratably according to the respective aggregate of the commitment of each lender participating in the facility . . ." and CL2.6 states that the agent shall not be responsible for the obligations of any lender.

CL4 states that the company is obliged to draw, use and apply the proceeds of the facility only for the purposes of its working capital.

CL6.1 reads:

"Whenever the company wishes to make a drawing utilising any of the undrawn commitments it shall give a notice of drawing to the agent, to be received not later than 11 a.m. five (5) business days prior to the proposed draw down date (which shall be a business day) or such lesser period as the agent may agree." CL6.2 requires that each notice of drawing shall be in the form of the notice in the 4th schedule to the agreement, which among

other things requires particulars to be given to the agent of the draw down date, the net proceeds to be drawn and the accommodation period, and contains requests that the proceeds be remitted to a named account and that bills be provided which are to be comprised in each portion under CL12, to which I shall turn in a moment. CL6.3 provides that the company shall not give a notice for drawing until the conditions set out in CL5 have been satisfied, those conditions requiring the provision of a large number of documents, including duly executed transaction documents, an expression which is in turn defined in CL1.1 and further defined in CL1.7 so as to include any agreement, certificate, notice, instrument or document of any kind.

CL12 sets out the requirements of the bill facility itself. CL12.2 deals with the preparation of bills and requires the agent to deliver a sufficient number of bills of exchange to the company three days before the first accommodation date and for the company to prepare, sign as drawer and deliver to the agent the bills to be accepted and discounted two days before that date. CL12.3(c) provides that:

"the bills constituting a portion shall be expressed to be drawn on the lenders in accordance with their respective proportion of the relevant portion and the name of the payee shall be the lender".

And then by CL12.6 it is provided:

"Not later than 3 p.m.... one (1) business day before each accommodation date with respect of the facility, the agent shall deliver to each lender ... the bills to be accepted and discounted on that accommodation date which are drawn on that bank in accordance with the terms of this CL12."

It will be recalled that the word "bank" is defined to include not only banks but certain financial institutions which would be wide enough to cover members of the Occidental Group. Acceptance and discount is dealt with in CL12.8 which reads:

"Subject to this agreement and to compliance by the company with its obligations under this clause, on each accommodation date on which it is required to discount bills, each lender shall:

(a) accept those bills;

(b) insert as payee itself or such other person who is to purchase the bills; and

(c) procure the discounting of those bills and subject to CL12.11 pay to the agent in immediately available funds not later than 12 noon on that accommodation date, subject to CL12.11 an amount equal to the aggregate face value amount of those bills accepted by it on that accommodation date less the amounts payable under CL12.9 and upon receipt the agent shall pay the proceeds in accordance with this agreement."

CL12.9 headed "Payments" deals with the sums to be deducted on payment of the proceeds of the bills and it reads:

"On each accommodation date the company shall pay to the agent for the account of each lender in relation to those bills accepted by it on that accommodation date an amount equal to the aggregate of:

> (1) a discount amount in respect of each of those bills being such as to result in a yield to maturity on that bill calculated at the bank bill rate applicable . . .;

> (2) an acceptance fee equal to the margin to be calculated on a daily basis on the face value amount . . .;

> (3) any applicable stamp duty including financial institutions duty . . .; and

> > (d) any applicable fees."

For this purpose "bank bill rate" is defined to mean:

"The rate of discount determined by the agent to be the average of the rates . . . expressed as a yield per cent per annum to maturity quoted on the page numbered 'BBSW' of the Reuters Monitor System as the rate at which trading banks would, as at or about 10 a.m. on the relevant accommodation date, be prepared to purchase bills of exchange accepted by a trading bank of a tenor of ninety (90) days and in an aggregate amount similar to the amount of the principal outstanding . . ." For the purposes of CL12.9(2) the "margin" is defined to mean 4 per cent 25 per annum.

CL12.10 headed "Primary Liability" reads:

"As between each lender and the company, the company shall be primarily liable in respect of all bills accepted by that lender and accordingly:

> (a) as between the company and that lender, the liability of the company with respect of any bills shall not be taken to have been discharged by reason of that lender becoming the holder of that bill on or before or after its maturity; and

> (b) subject to CL13, the company shall not later than 11 a.m. on each day on which a bill falls due for payment, pay to the agent (which shall thereupon account to the relevant lender) an amount equal to the face value amount of such bill."

In addition to the primary liability clause. CL12.11 makes this provision with respect to "indemnities":

"The company shall indemnify each lender and keep each of them at all times fully indemnified and saved harmless against all liabilities of that lender in its capacity as acceptor of the bills comprised in each portion of the facility and against all actions claims liabilities losses costs and expenses brought made or incurred in relation to any bill accepted by that lender . . . Due payment by the company in respect of a bill under CL12.10(b) shall satisfy this indemnity insofar as it relates to such bill . . ."

Over the next four pages there is set out in CL14 a series of representations and warranties and on the succeeding six pages there is set out in CL15 a series of undertakings, including undertakings that the company will duly and punctually comply with all of the provisions of and observe and perform all the obligations under each transaction document (CL15.1(k)), and that it will procure that Brick and Pipe would not create or suffer to permit to remain outstanding any indebtedness (excluding debts of $25 million each owed to the National Australia Bank Ltd. and $25 million to Amro Australia Ltd. (CL15.1(m)), together with a negative pledge clause on behalf of the company in para(p) of CL15.1.

Default is dealt with in CL16. A series of events of default and their consequences are set out in CL16.1, which in part reads:

"If any of the following events occur:

(a) (non payment): The company fails to make, in the manner and currency required, any payment under any transaction document on the due date;

(b) (other obligations): Any relevant company fails to observe or perform, or breaches any of its obligations under any transaction document and (if in the reasonable opinion of the agent such default is capable of remedy), the relevant company shall not have remedied such default within seven days of written notice by the agent to the company specifying such default and requiring its remedy; ...

(f) (receiver): A liquidator, official manager, trustee and bankruptcy, receiver or receiver and manager or similar officer is appointed in respect of any of the assets of any relevant company" [which is in turn defined in CL1.1 to include "the company, each guarantor which is a corporation (and) each mortgagor"]; . . . then in any such event, and at any time thereafter, unless the agent has waived (at the direction or with the consent of the lenders) that particular event in writing, the agent may and shall if so directed by lenders by notice to the company:

(A) declare all moneys owing under this agreement (whether actually or contingently) to be immediately due and payable, whereupon, without prejudice to any other obligation arising upon such declaration) the company shall immediately pay the secured moneys together with accrued interest and all such other moneys; and/or

(B) enforce the securities, any collateral securities and any other security interest the agent or the lenders may have; and/or

(C) cancel the lender's commitment and terminate the obligation of the lenders and the agent to the company under this agreement."

"Guarantor" is defined to mean each person named in item 2 of the 1st schedule which included among others Arnsberg, Bacharach, Arnstadt, Linter, Brick and Pipe and Mr. A. Goldberg. "Secured moneys" is defined to mean: "all moneys which each of the company, the mortgagors and the guarantors . . . presently is or in the future becomes actually or contingently liable to pay to or for the account of the lenders whether alone or with any other person on any account whatsoever under or in connection with any transaction document (including without limitation by way of principal, interest, fees, costs, charges, expenses, indemnity or damages)."

By CL21 interest on overdue amounts is dealt with as follows:

"21.1 The company shall on demand by the agent from time to time pay interest on all amounts due and payable by it under or in respect of any transaction document and unpaid (including interest payable under this CL21).

"21.2 Such interest shall accrue from day to day from the due date up to the date of actual payment, before and (as a separate and independent obligation) after judgment at a rate determined by the agent to be the aggregate of 5 per cent per annum and the higher of:

> (a) the rate (if any) applicable to such amount immediately prior to the due date; or

> (b) the rate of discount expressed as a yield per cent per annum to maturity at which the lenders would at or about 10 a.m. on the relevant date be prepared to accept trading bank accepted bills of exchange with a tenor of 30 days and in an aggregate amount similar to the overdue amount."

There are a large number of other and for present purposes subsidiary clauses, but I return to CL8 headed "Reduction of Facility" which reads

"8.1 Obligations of repayment The company shall not later than the termination date, repay the amount of the principal outstanding as at the termination date together with all other moneys then payable by the company under this agreement and unpaid.

"8.2 Prepayment

> (a) On giving not less than thirty (30) days prior written notice to the agent (which shall promptly notify the lenders) or such lesser period as the agent may in its absolute discretion agree and subject to the condition set out in CL8.3 and this CL8.2 the company may reduce the amount of the facility then outstanding . . ."

The rest of the clause deals with the machinery for prepayment but the expression "principal outstanding" is defined as meaning "the aggregate principal amount of all outstanding portions".

It can be seen that, at least in the form of this facility agreement, there were provisions which appear to sit uncomfortably with the conventional view that a bill facility, or at least

that kind of facility in which there are three parties, does not involve the lending of moneys. There was no sale of the bill to an outsider on the bill market contemplated in the ordinary course of events, but the question remains whether the drawing and delivery of bills of exchange by the company in return for a discounted sum received from the financier who both accepts and discounts the bills amounts to the making of a "loan" by the financier within the meaning of s230.

There was no authority to which I was taken in the course of argument in which it has been explicitly said that the fact that the financier both accepted and discounted the bills under a bill facility altered the conclusion that the provision of funds by way of a bills facility is different from the lending of money, unless that is to be gleaned from the judgments of the New Zealand Court of Appeal in Re Securitibank (No. 2). Although considerable emphasis had been there placed in argument and thus in the judgments upon a contention that the accepting financier was the alter ego of a related company which discounted the bills, I was taken to no passage in those judgments which explicitly stated that the identicality of the parties would have altered their conclusions, except those which suggested that the result would have been that the transaction might have been held to be a sham.

Otherwise counsel for the plaintiff took me to no other authority which would support such a conclusion. However, counsel did rely upon a passage in Mr. Lehane's paper, at pp. 4-5 (Public Company Finance, pp. 269-70) which reads:

"Where, however, the arrangement is that the financier who accepts the bills will also discount them, the position may well be entirely different. In such a case there is a payment or advance of money made by the financier and a promise to place the same financier in funds in an amount equal to the face value of the bills. The principles enunciated by Lord Devlin and Richardson, J. (both quoted above) do not apply. Perhaps more fundamentally, it is difficult to characterise the discounting transaction, in those circumstances, as a genuine transaction of sale and purchase. The difficulty is with the subject matter of the purchase: The financier is not buying an instrument evidencing an indebtedness of the third party (obviously a kind of asset that can be bought and sold) but is 'buying' an instrument on which he would himself be primarily liable (if a third party were its holder) but in respect of his liability on which he is indemnified by the 'seller', to whom, on maturity, he is entitled to look for payment of the face value of the bill, even if he (the financier) continues to hold it. The transaction is probably a loan for both Moneylending Act and Stamps Act purposes." It is by no means obvious that the learned author's conclusions are correct, but the passage is quoted because it sets out the only basis relied upon before me for distinguishing the present bill facility from those discussed in the authorities. Mr. Lehane expresses the opinion that the position "may well be entirely different" and does so in the context of the discussion in particular of the expanded definition of "loan" in Acts such as the former Moneylenders Acts. For myself I would doubt that the passages he cited from the judgments of Lord Devlin (at p. 215: see above) and Richardson J. (at pp. 176, 177) should be read so narrowly as to exclude bill facilities where bank or financier is both acceptor and discounter; rather, as the author suggests, it may be difficult to characterise those discounting transactions, in the particular circumstances, as genuine transactions of sale and purchase. If he is suggesting

that the facts of a specific case may show that the purported sales by way of discount are not intended to be genuine, then the bill facility and the transactions thereunder may properly be characterised as a sham or a series of shams, designed to disguise a loan facility and a series of loans. However the plaintiff has here abandoned any such attack on the bill facility agreement and according to its alternative, unpleaded contention it was the exchange of cheques by which the price of the bills was substituted for the moneys lent in September which amounted to a sham.

I must therefore accept that the bill facility agreement was intended to and did take the place of the informal loan agreement of September 1989 with the Occidental Group of companies. It would also follow that the facility agreement was intended to and did provide a new and different legal structure for the provision of financial accommodation by the Occidental Group to Spersea. I am also inclined to the conclusion that the only basis upon which that agreement could operate was upon repayment of the existing loans and by the drawing down of funds in reliance upon the new facility. Although the plaintiff challenges those repayments, there can be no doubt that the exchange of cheques took place and none of the authorities relied upon by the plaintiff satisfied me that I could ignore or treat as shams those repayments or the subsequent drawing down of funds, even if the plaintiff had properly raised that issue in its pleadings. To observe that the Gibraltar Factors bank account used for this purpose was overdrawn for a period of less than a day before it was replenished by the later cheques cannot in itself show that the repayment transaction was a sham. If the facility agreement had been a sham, different consequences might have resulted, but that argument has now been abandoned. There was thus a genuine basis for the procedure whereby Spersea drew down on the facility and the Occidental Group of companies paid cheques to the company in accordance therewith. It is difficult therefore in this case to accept Mr. Lehane's contention that the facility agreement was not genuine. However, if all that that learned author meant was that the steps taken pursuant to the bill facility cannot be characterised as the sale and purchase of bills rather than as a loan, then the characterisation question remains to be answered by an analysis of the terms of the facility agreement and the procedures to be adopted under it.

There are certainly factors which could be said to point to a conclusion that the parties may have viewed the transaction as involving the lending of moneys. Disingenuously the Occidental Group of companies are described and defined in the agreement as the "lenders". The amounts drawn down are described and defined as the "principal outstanding". The first operative clause, CL2.1, states that each of the lenders agrees with the company to make available to the company its participation in the facility.

The Occidental Group of companies were not only both the payees of the bills and the persons on whom the bills were drawn (CL12.3(c)) but were under a direct obligation to pay the "face value amount" of the bills, less discount, fees and duty, through the agent to the company (CL12.8(c)). Moreover, apart from agreeing that the face value amount should be reduced by the discount, acceptance fee, stamp duty and other fees, there was an additional obligation imposed by CL12.9 on the company to "pay" to the Occidental Group of companies that same discount, acceptance fee, stamp duty and other fees. Finally, in

respect of payment of the bills there was a direct liability of the company to pay the agent the amount of the face value of each bill on each day the bills fall due for payment (CL12.10), in addition to the company's obligation to indemnify pursuant to CL12.11. At the termination date there was an expressed obligation in CL8.1 for the company to "repay" the amount of the principal outstanding.

Nevertheless, if one looks to the nature of the transactions contemplated by the agreement, it is by no means so clear that the provisions by which moneys were to be advanced should be characterised as a loan. Taking CL2.1 as an example, although the language suggests that a principal sum is made available to Spersea, what is in fact made available is a participation in the "facility", defined to be a facility "under which the lenders agree to accept and discount bills", and the principal amount is not to exceed the Occidental Group's "commitment", again defined viz. "an obligation to accept and discount bills" to a stated face value.

More importantly the procedure whereby moneys were advanced clearly involved drawing and discounting of bills of exchange and their regular rolling over. That procedure elaborately described, in particular, in CL12 required the company to draw bills on the Occidental Group and then required the Occidental Group to accept the bills and then to "procure the discounting of those bills" and pay the discounted proceeds to the company. Thus Spersea obtained the advanced funds in return for the drawing and delivery of bills, which on their face were choses in action which might be expected to have some value, at least when accepted.

However, instead of agreeing merely to accept the proceeds of the bill when discounted, the company also undertook separately by CL12.9 to "pay" the discount (if that be possible), acceptance fee, stamp duty and other fees to the Occidental Group. One might have expected separate payment of the acceptance fee of 4 per cent, but the clause otherwise on its face appears to impose an obligation to make payments in return for the advancing of the moneys which might be said to be of a kind akin to interest upon a loan. Nevertheless, although it is easy to accept that the financial benefit would be similar to the interest formerly payable under the loans, the concept of a discount is quite different in operation and reflects the effective yield obtained by a purchaser where an asset such as a bill is sold on the bill market. Whereas interest ordinarily accrues from day-to-day, week-to-week, etc., the discount must be calculated (and thus becomes known) once only in the life of each bill, assuming of course that it is not sold again on the market. Moreover that calculation occurs at or very close to the beginning of the life of each bill, whether that be 90 days or any other period, so that insofar as the relevant rate is variable (as it is in the present definition of bank bill rate) the discount agreed is fixed at the date of discount. It might also seem that the yield is earned at the outset of the bill's life, or at least when it is discounted, but upon analysis the discounting party (the Occidental Group) merely pays a lesser sum than the bill's face value when it is discounted and does not receive the full face value including the amount of the discount until it falls due for payment, albeit that the difference is calculated and known from the time it is discounted. These conclusions appear to have been accepted by the majority of the House of Lords in Willingale (Inspector of Taxes) v International Commercial Bank

Ltd., although the case was primarily directed to questions of corporation tax. As Lord Keith of Kinkel said, at p. 852: "The substance as well as the form of these transactions are such, in my opinion, that the respondent bank is by them acquiring assets which in the future they expect to realise at a profit." Likewise Lord Fraser of Tullybelton said, at p. 845: "In my opinion there is an essential difference between interest and discount, so much so that to speak of 'earning' discount, seems to me wrong. Interest accrues from day to day, or at other fixed intervals, but discount does not. Two consequences follow. Firstly, when periodical interest is received (or is due to be received) the profit or gain on the loan is realised from time to time. But when a bill is discounted nothing is realised until the bill matures or is sold, and the whole profit is postponed or rolled up until one of these events occurs ..." (The second consequence described by his Lordship related primarily to bills discounted on the market.) Lord Salmon expressed similar views, saying, at p. 842: "I would also point out that to imagine a bank or any other commercial institution lending money at interest none of which is payable until the principal is repayable is a very bizarre conception. I doubt whether any such a loan has ever been made or ever will be."

Next it was said that the company was in practical terms under an obligation to "repay" the sums advanced pursuant to the bill facility in a way similar to an obligation to repay the principal of a loan. First, attention was drawn to CL12.10 under which there was a "primary" liability and a direct obligation imposed on the company to pay Occidental Life Nominees the face value of each bill when it fell due. Secondly, and perhaps more significantly, CL8.1 imposed an obligation on the company to "repay the amount of the principal outstanding" as at the termination date by no later than that date. It was argued that an obligation to repay principal is inconsistent with obligations under a bill facility in that under a true bill facility the obligation is no greater than one of indemnifying the acceptor or compensating a holder or endorser if the bill be dishonoured. This obligation to repay was said to show that the sum had been advanced or lent, for there could not otherwise be an obligation to "repay" unless the sums advanced and to be repaid were identical. So the clause might appear to impose the condition referred to in Richardson J.'s judgment in Re Securitibank (No. 2) that "at some future time an equivalent amount will be repaid".

On their face these clauses suggest that the parties (or the various solicitors at Messrs. Arnold Bloch Leibler) had not fully thought out the conversion of the former loan facility to the bill facility. CL8.1 certainly appeared in substantially identical form as CL6.1 of the last draft of the unexecuted loan facility agreement, stamped with the date 29 December 1989. Nevertheless the terms used in the clause had been redefined and in particular the expression "principal outstanding" in the bill facility now meant the aggregate of all outstanding portions, in turn defined to include the amount of financial accommodation drawn under the facility but confined to the value of those bills which had been drawn, accepted and discounted but excluding those which had been paid and thereby discharged and retired. So defined the principal outstanding may be no greater than the total of all sums for which the company should remain responsible on the bills. Notwithstanding these definitions it must be conceded that the obligation to "repay" suggests payment previously to the company of an equivalent sum or sums.

With some hesitation I have concluded, nevertheless, that the use of the word "repay" and the obligation of direct payment imposed by CL12.10 cannot deny the fact that the obligation remains the payment by the company of the face value of the bills of exchange drawn, accepted and discounted pursuant to the terms of the facility agreement. Moreover on no view of the facts was each sum received by the company a sum identical to that face value. The only way it could be argued that a loan was required to be repaid is by assuming that the company's obligation was to repay the sums earlier received by it from the Occidental Group, together with the sum which must be treated for the purpose of argument as interest. In the 45 first place I have already said why I do not consider that those sums should be characterised as interest. Secondly, to reach the conclusion that there was a loan one would have to ignore the provisions explicitly requiring the drawing and delivery of bills by the company, their acceptance by the members of the Occidental Group and the discounting of those bills. Having regard to the fact that the plaintiff abandoned its plea that the facility agreement was a sham, it is not possible to disregard the existence of the bills and their effect in law. In substance the company was receiving the price for those bills and, although that price was fixed by reference to the method of discount fixed by CL12.8 and CL12.9, the members of the Occidental Group were obliged to procure the discounting of those bills and to pay the proceeds of the discounting to the company. What the Occidental Group received was therefore a series of bills which it might choose to discount itself or to discount through the bill market. There was nothing unusual in that procedure. Frequently the bill facilities oblige the accepting bank or financier to act as the agent for the drawer in discounting bills and it is also common for the bank or financier to discount the bills themselves. CL12.8(c) in the facility leaves it to the financier to choose what course it will take, although it will take the risk that the discounted sum obtained on the market may be less than the sum it is obliged to pay to the company.

This process of discounting bills has been analysed in the authorities to which I have referred. Both in economic and practical terms it is different from lending moneys. In particular, in contrast to a loan whereby moneys are paid by the lender who obtains in return only a right to seek repayment of the moneys upon demand or on a fixed date, together with interest, under a bill facility the banker or financier discounting the bill obtains an asset in the form of a negotiable bill which provides in practical terms a hedge against liquidity pressures in that that asset may be sold on the bill market if necessary. Although a sum must be provided by the bank or financier it thus receives in return a negotiable bill. There is no suggestion in the present case that each bill should be treated as a security, although the Occidental Group was not obliged to realise the bills on the market. Nevertheless, in return for the moneys paid out the Occidental Group was entitled to and did receive a negotiable asset which it could have realised and for which it could have obtained funds before the bill fell due. What the value of those bills, accepted by the companies, would have been in the market is not known but it is not to be assumed that the Occidental Group could not have got in funds by selling them. Moreover, as the argument based on a sham has been abandoned, I cannot reach the conclusion that the obligation to "procure" the discounting of the bills and the implied power to realise them which the Occidental Group had during their currency were hollow rights which were not intended to be effective. It might be said that

some difficulty would arise if the bills were discounted into the market, but I cannot agree. The company as drawer remained jointly liable on the bills with the acceptors in the usual way (cf. s60(1) of the Bills of Exchange Act), whether or not these bills could be truly described as accommodation bills, as was assumed with respect to a tripartite facility in Morris v Bank of Queensland but which was queried by Lehane at pp. 271-2 and in Ellinger, pp. 522-5: cf. also Tyree: Banking Law of Australia (1990), para10.7 - para10.8. Moreover, although the Occidental Group of companies might become holders in due course upon discounting them and could retain them until their maturity, the effect of s66 of the Bills of Exchange Act was negated by the express terms of CL12.10(a) of the facility agreement and would, if the bills were truly accommodation bills, have been qualified by s64(3) of the Act. In any event, if a member of the Occidental Group had sold any bill on the market, the purchaser would have then become holder in due course before maturity and s66 would not have applied. I should add that although there was a direct obligation upon the company to pay the Occidental Group imposed by CL12.10(b), that obligation was directed to satisfying the liability of the Occidental Group of companies as acceptors. If the company were called upon directly to pay a third party in its capacity as drawer, the obligation under CL12.10 would impliedly be discharged upon its payment of the bill.

Finally one cannot ignore the procedure laid down by the facility agreement for the rolling over of the bills. Each bill was to be paid out at the end of each accommodation period and new bills were to be drawn and discounted. If the facility was not a sham, a new liability was thereby to be created upon the accepting and discounting of bills subsequently drawn pursuant to the terms of the facility. The liability would arise not by virtue of any lending of moneys, but by virtue of the existence of the obligation imposed pursuant to the terms of each of the new bills as qualified by the terms of the facility agreement.

For these reasons I have concluded, as I have said with some hesitation, that the liability imposed on the company cannot properly be characterised as an obligation to repay a "loan" within the meaning of s230. I should add that no authority cited to me supported the view that the word "loan" should be read as applying to some wider concept for the advancing of moneys so as to comprehend the obligations imposed under the bill facility as I have analysed it.

"(ii) Was a "guarantee"given or "security" provided by Brick and Pipe?

It is desirable, however, to see whether in any event the deed of guarantee and indemnity amounted to the giving of a "guarantee" or the provision of "security" by Brick and Pipe within the meaning of s230, if the bill facility should otherwise be characterised as a loan. Again the document said to amount to a guarantee or security was expressed expansively, over 29 pages, and it is necessary to look to the language employed by the parties in that deed. As already stated it is described as a "deed of guarantee and indemnity" which bore the date 22 December 1989 but which was in effect executed on 16 January 1990. The parties were Occidental Life Nominees on its own behalf and as agent for the other Occidental Group companies, of the one part, and each of the parties described in item 3 of the schedule who were collectively called "the guarantors", of the other part. I have already

mentioned the names of the 14 guarantors which included Brick and Pipe. At the beginning of the deed the recital was expressed as follows:

"In consideration of the agent having agreed at the request of each guarantor to arrange and the lenders (as hereinafter defined) having agreed to provide certain financial accommodation to the company (including, without limitation, pursuant to the facility agreement (as hereinafter defined)) the guarantors have agreed to enter into this deed."

The operative words of the deed then commenced: "Now therefore for the consideration provided by the lenders described in the recital and for other valuable consideration passing from the lenders to the guarantors, this deed witnesses and it is hereby agreed as follows . . ."

After a definition clause extending over four pages the first operative clause of the deed was headed "Guarantee and Indemnity" and read:

"2.1 Guarantee and indemnity "Each guarantor hereby irrevocably and unconditionally:

(a) Jointly and severally guarantees to the agent for the benefit of the lenders the due and punctual payment by the company as and when due of any and all of the secured moneys and each guarantor hereby jointly and severally covenants and agrees with the agent for the benefit of the lenders to pay to the agent for the benefit of the lenders the secured moneys upon any demand in writing being made by the agent on the guarantors in the same manner as the company is required to pay the secured moneys to the lenders and each guarantor jointly and severally guarantees to the agent for the benefit of the lenders, the due performance and observance by the company of all the covenants contained in or implied by each transaction documents and on the part of the company to be performed or observed; and

(b) Agrees with the agent for the benefit of the lenders as separate severable and additional covenants and obligations to jointly and severally indemnify and at all times hereafter to keep indemnified the agent for the benefit of the lenders from and against all claims, actions, proceedings, liabilities, obligations, damages, loss, harm, charges, costs, expenses, duties, taxes or other outgoings of whatever nature that the agent and/or the lenders may suffer or incur by reason of the failure or default of the company to duly and punctually pay the secured moneys or to duly perform and observe all of the covenants contained in or implied by each transaction document and on the part of the company to be performed and observed and each guarantor hereby further agrees and acknowledges that each of the provisions hereinafter contained that applies or is capable of application to this deed when it is construed as an indemnity shall apply to the indemnities hereby given by each of them."

A number of the expressions used are defined. "Agent" and "guarantors" are defined in the manner I have described as applying to the parties to the deed. "Lenders" is defined as

including Occidental Life and Regal Life, as well as any assignees. "Secured moneys" is defined to mean: "All moneys which the company either alone or with any other person presently or in the future becomes actually prospectively or contingently liable to pay (whether as principal debtor or surety or otherwise) to or for the account of the lenders or either of them, whether jointly, severally or jointly and severally on any account whatsoever including without limitation under or in relation to or in connection with any of the transaction documents (including without limitation by way of principal, interest, fees, costs, charges, expenses, indemnity or damages) and all amounts referred to in other clauses of this deed as being added to or forming part of the secured moneys; . . ."

"Transaction document" is defined to mean: "The facility agreement, each security interest and guarantee given in favour of the agent for the benefit of the lenders to secure the obligations of the company and/or the guarantors to the agent and/or the lenders and any document or agreement which the parties have agreed in writing is to be a transaction document for the purpose of this deed; . . ."

Again in turn "facility agreement", "security interests" and "guarantee" are defined. the facility agreement meaning the facility agreement already described, "security interests" being widely defined to include mortgages, debentures, pledges, liens, charges or any other security, and "guarantee" is defined to mean "any guarantee, indemnity, letter of credit or suretyship, or any other obligation (whatever called and of whatever nature) . . ." to pay, indemnify or be responsible for a number of liabilities which it is unnecessary to describe further.

CL3 of the deed of guarantee and indemnity sets out the obligations of the parties. CL3.1 provides that the guarantees and indemnities are to be "continuing guarantees and indemnities" so that "neither this deed nor any obligation of each guarantor hereunder shall be discharged or released in any way or be considered or be deemed to be discharged or released in any way other than by the payment by the company of the secured moneys and by the payment performance and observance by the company of all its obligations . . ."

CL3.2 headed "Principal Obligations" reads: "Each obligation of each guarantor hereunder shall be a principal obligation and shall not be treated as ancillary or collateral to any other obligation howsoever created or arising to the intent that each of the provisions of this deed shall be enforceable unless the same shall have been satisfied according to the terms of this deed notwithstanding that any obligation arising under any of the transaction documents shall be in whole or in part extinguished, released or unenforceable whether by reason of any law or for any other reason whatsoever. Notwithstanding that as between each guarantor and the company the position of each guarantor is that of surety only, nevertheless as between each guarantor and the agent for the benefit of the lenders, each guarantor is liable hereunder as a principal and as a primary debtor for the payment of the secured moneys."

The word "release" is defined widely in terms which need not be examined further. CL4 deals with the "non release of obligations". It is sufficient to refer to the first three paragraphs of CL4.1 which read:

"The liability of each guarantor under this deed shall not be affected by any act, omission, matter or thing which but for this provision might operate to release or otherwise exonerate any of them from their obligations in whole or in part including, without limitation:

> (a) the grant to any one or more of the relevant parties or to any person of time, waiver or other indulgence or consideration or concession, approval or consent, or the release or discharge of any one or more of the relevant parties;

> (b) the compounding, dealing, or compromise with or release of any one or more of the relevant parties or other persons in relation to all or any part of the secured moneys;

> (c) the agreement to any new terms for or any extension or other variation of any transaction document or any innovation or assignment of any interest right or obligation of any party to any transaction document . . ."

The rest of the clause deals with such matters as non release by reason of postponement of rights or forbearance to enforce rights, as well as the failure of any party to take any act pursuant to the facility agreement. The expression "relevant party" is defined to include the company, the guarantors and any person who creates or permits to subsist a guarantee or security in respect of moneys owing under the deed of guarantee or indemnity. CL4.2 extends the operation of CL4.1 to any acts of the agent.

Likewise CL5 headed "Enforceability" provides that:

"This deed shall at all times be absolute, unconditional, valid and enforceable against each guarantor and shall not be subject to any reduction, termination or other impairment by any setoff, deduction, counterclaim, agreement, defence, suspension, deferment or otherwise and no guarantor shall be released, relieved or discharged from any obligations hereunder nor shall any obligations be prejudiced or affected by any reason whatsoever including . . ." and there follows a list of matters such as default, misrepresentation, negligence, action or inaction on the part of any member of the Occidental Group in the customary very wide terms.

There follow a variety of conventional but extensive clauses relating to subrogation, covenants of the customary kind, and other clauses relating to exchange risk, currency conversion, marshalling, and moratorium and similar legislation. Among those clauses is a clause relating to severability, being CL23 which reads:

"Any provision of this deed which is prohibited, unenforceable or not authorised in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non authorisation without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in the other jurisdiction."

As the case was presented to this court, no argument was put on behalf of the plaintiff that the deed did not include a separate indemnity or primary obligation by Brick and Pipe to pay the amounts due on or in respect of the bills pursuant to the facility agreement. All that was

said was that s230 would be "useless" in circumstances where the section might otherwise apply because it "could simply be avoided by including an indemnity in the guarantee document". The argument appeared to accept what was put on behalf of the Occidental Group that, as a matter of proper analysis of the deed, there was both a guarantee of Spersea's liability and an independent covenant to pay the sums due under the bills by way of an independent "indemnity" in respect of claims or losses to be incurred by the defendants under the facility. Counsel for the defendants had contended that, although those obligations under the deed which amounted to a guarantee of Spersea's liability might be struck down by s230 if there were shown to be a relevant "loan", not otherwise excepted from the operation of the section, there would remain on foot an independent and severable liability by way of indemnity which was not struck down by the section. It appeared that the plaintiff's counsel accepted that overall analysis but instead contended that the deed amounted to an agreement to "provide security in connection with a loan" within the meaning of s230(1)(b). Thus the argument sought to characterise the obligations under the deed (other than those by way of guarantee) as amounting to the provision of "security" for the purposes of the section.

The defendants' characterisation of the nature of the obligations imposed by the deed thus remained unimpeached, relying upon what has been accepted as the conventional distinction between a guarantee and an indemnity in a number of cases in which that accepted distinction has been applied: see, for example, Yeoman Credit v Latter [1961] 1 WLR 828 (CA); Goulston Discount Co Ltd v Clark [1967] 2 QB 493 (CA) and Argo Caribbean Group Ltd. v Lewis [1976] 2 Lloyds Rep. 289. The indemnity was thus said to be set out in CL2(1)(b) of the deed and was reinforced by CL3.2 requiring the plaintiff's obligations to be treated as principal and not collateral obligations, enforceable against the plaintiff regardless of the fact that any other obligation should be unenforceable. I have already held that the obligation under the facility agreement was not a loan, but it was argued, and not challenged, that, even if it were to be so characterised, the obligations by way of guarantee might be treated as unenforceable but the indemnity provisions could stand on their own and be enforced separately: CL3.2 and cf. also CL23.1, which is, however, confined to questions of jurisdiction. I should mention parenthetically that I drew attention to the excellent discussion of these conceptual matters in Ch. 1 of O'Donovan and Phillips: The Modern Law of Guarantee (1985), but no attempt was made in argument to rely upon the well-known analysis by Jordan C.J. speaking for the Full Court of New South Wales in Perpetual Trustee Co. of NSW Ltd v Hinks [1934] NSWStRp 13; (1934) 34 SR (NSW) 130, at pp. 137-40, restated by him in Jowitt v Callaghan (1938) 38 SR (NSW) 512, at pp. 516-17, in turn approved by a majority (at least) of the High Court in Australasian Conference Association Ltd. v Mainline Constructions Pty Ltd [1978] HCA 45; (1978) 141 CLR 335, at pp. 348, 376. I have therefore assumed that that analysis would not in the end have assisted the plaintiff's arguments.

Nevertheless the plaintiff has contended that the entry into this deed of guarantee and indemnity amounted to the provision of security in respect of a loan and was thus prohibited by s230. There is no doubt that the word "security" may have different meanings according

to the context in which it is found. The concept that a security may be either a "real security" or a "personal security" goes back at least to the judgment of Chitty J. in Grimwade v Mutual Society (1884) 52 LT (NS) 409, where his Lordship said, at pp. 4 and 5: "The term personal security is now well understood. It is found in an ordinary textbook, such as Lewin on Trustees. It was used by Lord Kenyon in his judgment in Holmes v Dring (2 Cox 1) and by Lord Cottenham in Clough v Bond (3 M. and C. 490). It occurs in the 16th and 18th sections of the Friendly Societies Act 1875. It includes every case where nothing more is obtained than the personal liability of the borrower, or of the borrower and sureties. It is the same thing as a loan on personal credit only."

More recently the issue was discussed by Lee J. in Broad v Commissioner of Stamp Duties [1980] 2 NSWLR 40, at pp. 44-5: "The word 'security' has a wide meaning. Jowitt's Dictionary of English Law defines 'security' as 'something which makes the enjoyment or enforcement of a right more secure or certain'. It is defined in Stroud's Judicial Dictionary as 'Speaking generally . . . anything that makes the money more assured in its payment or more readily recoverable.' "

A number of authorities were cited, especially on behalf of the plaintiff, but nearly every case depended upon the form and purpose of the provision there being construed: see National Telephone Company Ltd. v Inland Revenue Commissioners [1899] 1 QB 250; Singer v Williams [1921] 1 AC 41, especially at pp. 49, 57 and 59; Stirling v John [1923] 1 KB 557; Temperance Loan Fund Ltd. v Rose [1932] 2 KB 522; Maddaford v De Vantee [1951] SASR 259; YZ Finance Company Pty Ltd v Cummings [1964] HCA 12; (1964) 109 CLR 395; Argo Caribbean Group Ltd. v Lewis, at p. 295 and Broad v Commissioner of Stamp Duties. In the forefront of the plaintiff's submissions was a passage from Hanbury and Waldock on the Law of Mortgages, 1st ed., (1938), p. 2 which suggested that the word "security" may comprehend any additional method of enforcing an obligation, either personal or real, and which defined "personal security" in terms of suretyship: but cf. Waldock 2nd ed., (1950), p. 2. For myself I prefer the description given by Professor Sykes at the outset of his work on The Law of Securities (4th ed), p. 3: "The general concept of security involves a transaction whereby a person to whom an obligation is owed by another person called the 'debtor' is afforded, in addition to the personal promise of the debtor to discharge the obligation, rights exercisable against some property of the debtor in order to enforce discharge of the obligation." Compare per Lord Wrenbury in Singer v Williams, at p. 59. Moreover, as a matter of principle, Professor Sykes rightly concludes, in my opinion, when considering "securities" by way of guarantee, that "the so-called personal security is not a security at all": at p. 11. Why the word "securities" has in certain contexts been given such a broad meaning need not further be examined here, although I would not doubt that in the authorities cited above the words "securities" and "security" have both been considered in particular contexts to comprehend the giving of a guarantee.

The question must, however, be answered by a consideration of the language of s230(1)(b). Again there is no direct authority as to the meaning of the relevant provision. The prohibition in s230(1) is and always has been primarily against the making of loans to directors and to persons and companies bearing the relevant relationship to them. The consequential

prohibition in para(b) is against the giving of guarantees and the provision of security "in connection with the loan" of the proscribed kind. I have already dealt with the meaning of the word "guarantee" and concluded that its proper meaning in this context does not extend to an indemnity of the kind given in the deed. It was contended that the word "security" was intended to comprehend an indemnity of the present kind but, notwithstanding the careful arguments advanced, I have concluded that the alternative prohibition in the paragraph is not directed against the giving of an indemnity.

In the first place, if it were so intended, then there would appear to have been little reason for the separate prohibition against the giving of guarantees. Indeed, although in certain contexts "security" has been held to include a guarantee, I was cited no authority and have found none myself in which an indemnity was held to be comprehended by the word "security". If it were an independent obligation, then it may be doubted whether an indemnity could be described as a personal security and the issue would be whether the independent obligation amounted itself to a loan. If the document was confined to an indemnity against loss, then it would be "a promise by the promisor that he will keep the promisee harmless against loss as a result of entering into transaction with a third party", as it was described by Mason C.J. in Sunbird Plaza Pty Ltd v Maloney [1988] HCA 11; (1988) 166 CLR 245, at p. 254. I would doubt that such an indemnity could be described as either a security or a personal security for it does not provide a "secondary action of debt against [the] third party", as Hanbury and Waldock would have it.

What it provides is a liability to recompense the obligee in circumstances where the principal debtor or obligor fails to pay or perform his obligations as the case may be. Although it gives the obligee a benefit over and above that received from the debtor or other principal obligor, it does not "secure" the payment or performance; rather it assumes non performance and compensates for any resulting loss. But, whether that be a correct distinction or not, the present section is drafted in terms which provide a direct prohibition against the giving of a guarantee. If it were thought by the draftsman that a guarantee, or any similar obligation, was comprehended by the term "security", then the final prohibition in the paragraph might more logically have been expressed against the provision of "any other security". I see no basis for assuming that the draftsman had in mind, in prohibiting the provision of security, those other obligations such as indemnities which are akin to guarantees but are not comprehended within the meaning of that word. If it had been intended to prohibit these so-called personal securities, whatever form they might take, and regardless of the extent to which they might be said to "secure" the repayment of a loan to a director, then para(b) should properly have taken a different and simpler form. The "normal meaning" (cf. Viscount Cave in Singer v Williams, at p. 49) of "security" is a right to resort to some property or fund to assure payment. In the present case, where guarantees are expressly prohibited, the legislature was intending also to prohibit the provision of real securities in support of loans to directors and it did not intend in my opinion to prohibit the kind of obligations which were undertaken by Brick and Pipe under this deed other than those by way of guarantee, even assuming there to have been a "loan" within the meaning of the section. Of course, in the context of para(b), the security proscribed must be a collateral security in that the assumed

lender must be a third party, but that does not affect the proper construction of the section, for frequently that collateral security will be given without any express undertaking by way of guarantee. Whatever be the nature of the obligation thereby impliedly undertaken, it remains essential to the prohibition against the provision of security that there must be a specific property or fund to which the lender may look as security for repayment. For these reasons I have concluded that no part of the deed of guarantee and indemnity amounted to the provision of security by the plaintiff within the meaning of the section.

These conclusions make it unnecessary to examine in detail a further answer put on behalf of the defendants whereby they relied on the exception contained in subs(3)(b) of s230. The paragraph permits the giving of loans guarantees or security by a company to or in relation to a corporation which is related to the company if the loan guarantee or security has been authorised by a resolution of the directors. I shall not examine the contentions whereby it was said that Spersea was related to Brick and Pipe within the complicated and artificial meaning given to that expression in the Companies Code. There was some dispute as to the precise relationship of the parties at the time that the deed of guarantee and indemnity was entered into, but the exception also requires as a condition of its application that the giving of the guarantee or the provision of the security has been authorised by a resolution of the directors of the company. Although among the many documents provided at the time of settlement there was included a document which purported to be the minutes of a meeting of directors of Brick and Pipe held purportedly on 22 December 1989, it is clear from the matters already described that no valid or proper meeting of the directors of Brick and Pipe was held either on that day or immediately before the execution of the deed of guarantee and indemnity, for the only persons who were said to be present were Mr. Goldberg and Mr. Furst and there was no dispute that no notice was given to the other members of the board, nor was there any other basis put forward for suggesting that the deed had been authorised by a valid resolution by the directors of Brick and Pipe. The conditions necessary for the proof of the exception were therefore not made out. But, as I have already said, the plaintiff has not otherwise satisfied me that its entry into the deed of guarantee and indemnity contravened the provisions of s230 of the Code. It is likewise unnecessary to examine further the relationship between subs(7) and subs(8) of s230 and the consequences of furnishing a defective certificate under s230(8) if an exception to the operation of the section had otherwise been made out. The latter subsection of course applies only where there has been the giving of a guarantee or the provision of security in contravention of the section.

For the reasons I have endeavoured to state the plaintiff has not made out its defence pursuant to the provisions of s230 of the Code.

E. The defence of "sham" As originally pleaded in para21 of its statement of claim the plaintiff alleged that "The facility agreement is a sham and was not intended by the parties to represent the true nature of their relationship and the transactions between them". It was alleged that the real agreement was the loan facility agreement executed on behalf of Spersea on 22 December 1989, which in fact was never executed or exchanged by the defendants. It was therefore said that there was no liability under the bill facility agreement

guaranteed by the plaintiff. In the course of argument these contentions were properly abandoned. Counsel for the plaintiff, however, proceeded to allege that the provision of approximately $57m. to Spersea pursuant to the bill facility agreement was itself a sham, so that there was no guaranteed liability. The contention rested on the basis that the exchange of cheques effected on 16 January 1990 was not genuine, as Gibraltar Factors had insufficient funds to repay the September loan and the cheques could not have been honoured, and the transaction depended upon the reimbursement of that account by the further payment from the defendants later that day.

No application was made to amend the plaintiff's pleadings to allege this form of sham and, bearing in mind the seriousness of the allegation, I would not have allowed the amendment at the time it was put forward in the course of argument. It is therefore unnecessary to deal with the defence of sham as such. Nevertheless I shall deal briefly with the contentions, as it was suggested by counsel for the plaintiff that the same arguments might deny that any moneys were provided pursuant to the bill facility agreement which was guaranteed by the plaintiff.

In the first place it was said that the exchange of cheques amounted to a "round robin", so that that exchange was a sham. Reliance was placed on a number of High Court decisions.Joseph v Campbell [1933] HCA 34; (1933) 50 CLR 317, at pp. 325-6; Hancock v Federal Commissioner of Taxation [1961] HCA 90; (1961) 108 CLR 258, at p. 301 and Scott v Federal Commissioner of Taxation (No. 2) (1966) 40 ALJR 265, at p. 279, although it was conceded that not every round robin is a sham and that each case must depend upon its circumstances. I am not persuaded that the present circumstances give rise to the type of sham transaction described in those authorities. Merely because there were insufficient funds in the Gibraltar Factors account does not mean of itself that the transaction was not genuine for I have no doubt that the defendants intended that the cheques they provided should be honoured, as indeed they were. I have already held that the surrounding transaction was not a loan so that the provision of funds pursuant to the bill facility agreement was of a different legal character to the loan which bad previously existed.

The plaintiff also asserted that the provision of funds in this way was not genuine because the bills were not accepted until 14 March 1990. I cannot accept this contention for, although the defendants were under an obligation to accept those bills pursuant to the terms of the bill facility agreement, their primary obligation was to provide funds pursuant thereto when bills drawn by Spersea were presented to them in accordance with the terms of the agreement. In accordance with the analysis I have already made of the agreement, acceptance was primarily a means of enabling the defendants, if they chose, to place the bills in the market, but it was not an essential condition to their obligations.

Finally, a curious argument was put to the effect that the drawee and payee were the same person on the two bills of exchange, so that, as I understood the argument, the bills were unenforceable and ineffective.

Reliance was placed on a passage in Riley on Bills of Exchange, 3rd ed., p. 31 and on the early case of R v Bartlett (1841) Mood. and R. 362; [1841] EngR 480; 174 ER 317. The

submission, and for that matter the passage in Riley, misunderstands the effect of the passing of the Bills of Exchange Act 1882 in the United Kingdom, especially s5, and its equivalent in the Bills of Exchange Act 1909 (Cth), s10. Those sections explicitly state that a bill of exchange "may be drawn payable to, or to the order of, the drawee": see subs(1). The apparent effect of Bartlett's Case was thus overcome and it is not even cited in the latest edition of Byles on Bills of Exchange. The passage in Riley also misunderstands a passage contained in Chalmers on Bills of Exchange (cf. 12th ed., p. 21) where the example given by Riley in general terms is confined to circumstances where a bill is drawn in the form "pay to your own order" where the drawee acts in two different capacities. It was only in those circumstances that Chalmers said that the bill was unenforceable until it was endorsed away, whereas Riley appears to state it in general terms with respect to all bills drawn in accordance with s10(1). The argument is unsustainable.

For these reasons, even if the matter of this sham were properly raised in the proceedings, I do not accept that the exchange of cheques made on 16 January 1990 was a sham or otherwise ineffective.

F. The defence of illegality Having abandoned the defence of a sham, the final defence relied on by the plaintiffs was that of illegality, although there were also objections made to proof by the defendants on the defendants' counterclaim. As to illegality, I have already mentioned that the plea was added by way of amendment at the outset of the trial. It was formulated, at least at the stage when the amendment was allowed, with some particularity. This was only appropriate where allegations of such seriousness are being made, for it is essential that the other parties should know what case it has to meet, especially when allegations of this kind frequently impute breaches of the criminal law. In the present case the allegations were of some seriousness, in that it was alleged that the bill facility and the guarantee were entered into pursuant to an arrangement between Spersea and the defendants, in the first place, to evade the payment of stamp duty and, secondly, to mislead the Comptroller of Stamps, the Commissioner of Corporate Affairs and third parties, including creditors, as to the date of execution of the document. It is therefore important to know precisely what is alleged, so that it is desirable to set out those allegations as they appear in para50 of the amended defence to counterclaim as follows:

"50. The plaintiff says further:

"(a) The bill facility agreement and second guarantee were entered into in furtherance of an agreement or arrangement between Spersea and the defendants made on or about 3 January 1990 that (with intent to evade payment thereof) stamp duty that was or might be payable in respect of the loan acknowledgment agreement and the first guarantee would not be paid.

"PARTICULARS

"The agreement or arrangement was partly oral and partly to be implied.

"(1) Insofar as it was oral the agreement or arrangement was constituted by a conversation between John Peter Durlacher on behalf [of] Spersea Pty. Ltd. and Robert Edward Roeder on behalf of the defendants in early January 1990. In substance Durlacher requested that Roeder have the loan facility restructured as a bill acceptance and discount facility and thus obviate the need for the substantial ad valorem stamp duty to be paid in respect of the loan facility documentation. Roeder told Durlacher that he was agreeable and stated that he would instruct Steven Skala of Messrs. Arnold Bloch Leibler to prepare the bill facility documentation on behalf of the defendants.

"(2) Insofar as it was to be implied the agreement or arrangement is to be implied from the following facts and circumstances:

(a) In about September 1989 the defendants lent to Spersea the sum of $55,000,000.

(b) Messrs. Arnold Bloch Leibler were appointed by the defendants and by Spersea as their solicitors respectively to document a loan by the defendants to Spersea on the terms and conditions set out in a letter from Arnold Bloch Leibler to the defendants dated 24 October 1989.

(c) On and from 24 October 1989 the defendants knew:

(i) that substantial stamp duty would be payable in respect of documents to be executed;

(ii) that an alternative proposal of repayment of the loan and subsequent drawing and accepting of bills of exchange would be a fiction and may amount to a sham designed to minimise stamp duty which a court might strike down.

(d) On 22 December 1989 the loan acknowledgment agreement was executed by Spersea. the first guarantee was purportedly executed by, among others, the plaintiff and various mortgages were executed by Arnsberg Pty Ltd and Bacharach Pty Ltd

(e) The defendants and Spersea intended that the loan acknowledgment agreement and other documentation that was executed or purportedly executed on 22 December 1989 would be binding and effective and so conducted themselves until the bill facility agreement was made on 12 January 1990.

(f) The defendants and Spersea knew that stamp duty was payable in respect of the documents that had been executed on 22 December 1989, including the loan acknowledgment agreements.

(g) The plaintiff relies upon and repeats the conversation referred to above.

(h) The transaction documents were redrafted on behalf of the defendants and Spersea so as to delete from them any reference to the loans that had been made by the defendants to Spersea in September 1989.

(i) The defendants and Spersea knew that the facility agreement and the second guarantee and other supporting security documents that were prepared and executed in early January 1990 were all to be dated and were in fact dated 22 December 1989 thereby falsely representing on the face of each document that it was made or created or entered into on that day.

(j) The defendants and Spersea knew that Spersea did not have the funds to repay the loans made in September 1989. As a consequence Spersea and the defendants arranged for an exchange of cheques amounting to a pretended repayment of the loans and a pretended new advance under the bill facility.

(k) The defendants and Spersea knew that the facility agreement and other security documents would be lodged and were subsequently lodged for stamping with the Comptroller of Stamps on or about 16 January 1990 each bearing the date 22 December 1989 and omitting any reference to the loans that were made in September 1989 or to the agreements that were made on 22 December 1989.

(l) The defendants and Spersea knew that the share mortgages that were executed on or about 12 January 1990 would be submitted and were subsequently submitted by the solicitors acting on their behalf to the Corporate Affairs Commission for registration declaring the same to have been created on 22 December 1989 when they were not.

(m) The defendants and Spersea knew or must have known that third parties such as the Comptroller of Stamps, the Commissioner for Corporate Affairs and the creditors of the companies which gave the security would or may rely upon the date stated on the documents that were created on 12 January 1990 and dated 22 December 1989.

"(b) On 12 January 1990, in furtherance of the said agreement or arrangement and further or in the alternative, in order to mislead third parties, the parties thereto agreed or arranged to insert the 22nd day of December 1989 as the date of execution in the bill facility agreement, in the second guarantee and in all other relevant transaction documents and minutes of meetings.

"PARTICULARS

"The agreement or arrangement to insert the 22nd day of December as the date of execution was partly oral and partly to be implied. "Insofar as it was oral it was constituted by conversations between Ms. Hunter-Smith on behalf of Spersea and Dodge on behalf of the defendants and between Dodge and Roeder on about 11 January 1990. In substance,

Hunter-Smith told Dodge that her client wished to make the documents effective as at 22 December 1989. Dodge told Roeder of the proposal and said that he was not in favour of this course of action. Roeder stated that he did not propose to interfere. "Insofar as it was to be implied the agreement or arrangement was implied from the facts and circumstances referred to in para(2) of the particulars subjoined to sub-para50(a).

> "(c) On 16 January 1990, in furtherance of the said agreements or arrangements, the bill facility agreement and the second guarantee were submitted by the defendants' solicitors with the Commissioner for Corporate Affairs bearing and verifying as true a false date.

> "(d) As a consequence of the foregoing, the enforcement of the second guarantee or any other rights of the defendants against the plaintiff should be denied on the grounds of illegality and public policy."

I have set this pleading out in full in order to contrast it with what was in fact argued. The particulars make it clear that the illegality was there alleged to flow from a conversation between Mr. Durlacher and Mr. Roeder in early January 1990 wherein Mr. Durlacher requested Mr. Roeder that the loan facility be "restructured" as a bill facility: sub-para(i). Apart from the circumstantial material alleged in sub-para(ii), largely dependent on alleged assumed knowledge, the additional or alternative claim set out in para(b) was expressed to flow from a conversation between Miss Hunter-Smith and Mr. Dodge on behalf of the defendants on 11 January 1990 wherein Miss Hunter-Smith told Mr. Dodge that her client Mr. Goldberg wished to make the documents effective as from 22 December 1989. So each pleaded conversation appeared to allege that the Goldberg Group of companies was the instigating party, and the claim against the defendants was thus based merely upon Mr. Roeder's passive acquiescence and willingness to accede to Mr. Goldberg's wishes, presumably together with his necessary knowledge of the circumstances.

However, that factual basis was not developed at all in argument by counsel for the plaintiff, albeit that the facts relating to the conversations themselves were largely not disputed. Instead counsel developed an argument based on an alleged conversation between Mr. Roeder and Mr. Goldberg in which, so it was suggested, Mr. Roeder was the instigator of the plan to backdate the document for the benefit of the defendants. Not only was this critical conversation never pleaded but no attempt was made to amend the plaintiff's pleadings on this issue. The best that can be said for it is that in para(a) the date, 3 January 1990, was alleged as the date of the supposed agreement, and the argument postulated that the conversation in which Mr. Roeder put forward his idea to Mr. Goldberg took place on that same date. No cross-examination had been directed to the claim as thus formulated, whether of Mr. Roeder or of another witness called on behalf of the defendant. Nor had the absence of two critical witnesses as to the incidental circumstances of the plaintiff's case. Mr. Furst and Miss Hunter-Smith, the author of the request alleged in para(b), been explained, so that they had failed to give any oral evidence on the issue.

Counsel for the defendants indignantly rejected the proposal to argue the matter on this basis, and rightly so in my opinion. In substance a serious allegation, or so it was conceded to be by the plaintiff, was made against Mr. Roeder and the defendants which had never seen the light of day until final addresses, indeed not until after counsel for the plaintiff had addressed the court as to the pleaded illegality.

In the absence of any amendment, and of any application to amend, I do not propose to examine the plaintiff's contentions in detail. Nor in the absence of supporting argument for the matter pleaded do I propose to examine the issue as to illegality as contained in the amended para50. It would indeed have been difficult to sustain the claim based on the plea in the absence of evidence from Miss Hunter-Smith and, to a lesser extent, from Mr. Furst, in the light of the fact that, on the defendants' evidence, there was an unexplained request by Mr. Goldberg for the backdating.

It is thus unnecessary to examine the vast array of authorities on illegality, about 37 in all, which were provided for my assistance and examined to a greater or lesser extent by counsel on both sides. Nevertheless I should make the following comments, lest it be thought that a substantial objection to the enforcement of the guarantee was being ignored by reason of the rules of pleading, although in the light of the nature of the allegations made, I would prefer to describe them as rules of common fairness.

In the first place I do not accept the premise upon which the plaintiff's argument was founded, namely that there was some mysterious conversation between Mr. Roeder and Mr. Goldberg on 3 January at which Mr. Roeder put forward the plan for backdating on behalf of the defendants. I have already stated my findings as to what occurred between the parties. Although it was conceded that there was a conversation between them that day, together with others, the highest the case came in the course of any evidence was during the cross-examination of Mr. Roeder himself, in which he conceded that there was a possibility a discussion took place about backdating earlier than 11 January 1990, the day on which Miss Hunter-Smith spoke to Mr. Dodge. Furthermore, so far as this aspect of this case is concerned, I have reached the conclusion that Mr. Roeder was a witness of truth and was not attempting to hide anything from the court, certainly nothing to do with any plan on the part of the defendants to backdate the document. Whatever his defects as a witness were in relation to the earlier events and matters not directly raised in this litigation, I have already expressed the view that I have no reason to disbelieve him on the events surrounding the execution of the documents.

Secondly, as was conceded by counsel for the plaintiff in argument, there was no concluded agreement by way of a loan facility agreement made on 22 December 1989. It is therefore impossible to view the rearrangement of the transaction as the substitution of the bill facility agreement for any agreement entered into on 22 December, albeit that it is common ground that it was substituted, together with the additional securities and guarantees, for the September 1989 loan. I do not accept that the parties attempted to hide any transaction liable to stamp duty which had been entered into on 22 December as no concluded agreement had then been reached. Thirdly, I know of no serious basis upon which the

defendants wished to have the documents backdated, for it was of no significance what date was chosen for this purpose so far as stamp duty was concerned, which in any event was being borne by the Goldberg Group of companies. Moreover I do not accept that Mr. Roeder had any belief as to the insolvency of any of the Goldberg Group, which might have formed the basis of a motive to mislead creditors or anyone else. Finally, so far as the plea of illegality was based on an argument of intention to evade stamp duty, I am inclined to the conclusion that the decision of the Full Court of South Australia in Iannotti v Corsaro (1984) 36 SASR 127 would have provided a powerful basis for denying any claim of illegality based on the circumstances of the present case, although it is not necessary to express a final conclusion upon it.

For these reasons the plaintiff's pleas of illegality are rejected.

G. Proof The plaintiff also objected to the defendants' proof of their counterclaim, in particular proof by way of a certificate pursuant to CL18.1 of the deed of guarantee and indemnity and in conformity with decisions such as Dobbs v National Bank of Australasia Ltd. [1935] HCA 49; (1935) 53 CLR 643.

That certificate dated 16 May 1990, signed by Mr. Roeder stated that the liability of the plaintiff was for $57,982,593 by way of principal, $4,387,996 for accrued interest and $42,192 per day for interest from the date of the certificate.

In the first place it was argued that the certificate was not pleaded and could not be relied upon. No authority was cited for this proposition and I doubt that any could be found, for the certificate is a matter of proof, albeit pursuant to a conclusive proof clause. The argument is rejected.

It was then said that the certificate could not be relied upon as it contained a number of "manifest errors", excepted from the benefit of conclusive proof by the language of CL18.1. No authority was cited as to what constitutes "manifest error", but, upon proper analysis, no error was made out.

The first alleged error depended largely on the argument that the exchange of cheques was a sham, so that no moneys were said to have been provided by the defendants pursuant to the bill facility. For reasons already stated that argument is rejected.

The second error was said to arise because no moneys had been, in terms of the certificate, "outstanding on 31 January 1990", when the defendants made their original demand for repayment. Even if this could be said to be a "manifest error" I reject the argument. It depended upon the use of the word "outstanding" in the certificate and treating it as synonymous with the word defined in CL1.1 of the bill facility agreement. The word is there defined in relation to a "portion", also defined. However, the obligation in question arose under CL16 of the agreement, being based on an event of default, namely the appointment of a receiver, and the right to declare "all moneys owing under the agreement", whereby the company was bound to pay the "secured moneys" (as defined), interest, costs and expenses. The plaintiff, however, sought to point to CL8.1 and CL12.10 of the agreement, each of which deal with questions of liability, but do not affect the definition of "secured

moneys". Briefly that definition covers all moneys which . . . the company ... presently is or in the future becomes actually or contingently liable to pay to or for the account of the lenders .. . on any account whatsoever under or in connection with any transaction document". Although the certificate referred to the fact that bills of exchange were outstanding as at 31 January 1990, in my opinion that referred to the liabilities, actual or contingent, of the company with respect to any moneys provided pursuant to the bill facility. By reason of s60 of the Bills of Exchange Act the company as drawer was contingently liable to pay on the bills regardless of whether or not they had been accepted by that time. Counsel for the plaintiff referred to obligations of repayment referred to specifically in CL8.1 and CL12.10 but, as to CL8.1. that referred only to the amount payable as at the termination date and, as to CL12.10, that dealt with who was primarily liable as between the lender and the company. Insofar as those clauses or the terms referred to in them require bills to have been accepted before liability arises, they are irrelevant to the definition of secured moneys and the liability of the plaintiff.

Finally an error was said to have arisen with respect to the certification of interest which is due pursuant to CL21.2 of the bill facility agreement.

Reference to the terms of that clause, set out earlier, shows that interest accrues at a rate determined by the agent which is the aggregate of 5 per cent plus the higher of two rates specified in the clause. The second rate was not the subject of proof but the question is whether there was manifest error in the certificate. It was also said that the rate referred to in para(a) of that clause was unascertainable since there was no interest rate, only a discount rate, referred to in the bill facility agreement. Although the agreement is not ideally drafted on this matter there is a definition of "bank bill rate" which refers to the rate of discount expressed as a yield per cent per annum which may be ascertained from the terms of the definition. In my opinion this is clearly the rate to which CL21.2(a) is referring. An officer of the defendants was therefore entitled to certify the amount which was the appropriate interest rate without further proof thereof, for there was, in my opinion, no manifest error in the certificate tendered in evidence.

The plaintiff's arguments as to proof of the counterclaim by the defendants are therefore rejected.

H. Conclusion It should be apparent from my reasons that the plaintiff's claim for declarations must be rejected and the defendants' claims ought to be accepted, although in the circumstances I think it unnecessary to make the declarations sought, but simply to give judgment for the moneys to which they are entitled. I regret to say these reasons have extended over many pages and perhaps have not done justice to the arguments put to me by counsel on both sides, but I have endeavoured to consider each of those arguments in reaching the conclusions already expressed. Insofar as matters raised in the pleadings have not been discussed, they were not pursued in argument. The amount to which the plaintiff is entitled by virtue of the certificate is $62,370,589 together with interest at the rate of $42,192 per day, which on my calculation amounts to $9,240,048. There will therefore be judgment for the defendants on the claim and on the counterclaim there will be judgment for the

defendants against the plaintiff in the sum of $71,610,617. Although the defendants have failed on some issues, in the light of the application made to amend to raise the ground of illegality and the arguments thereafter advanced without application for further amendment, which I consider would deserve an order on that issue on a solicitor/client basis, I am disposed to the conclusion that it would be proper and fair that there should be an order that the plaintiff pay the defendants' costs of both claim and counterclaim including reserved costs. I will however reserve liberty to apply to enable any matter arising from this judgment to be raised, including any specific questions relating to the costs of proceedings.

Judgment for the defendants. Solicitors for the plaintiff: Marshall Marshall and Dent.

Solicitors for the defendant: Corrs Australian Solicitors.

On appeal to the Full Court: BJ Shaw QC, DM Clarke, JT Healy and JG Judd for the appellant. AC Archibald QC and Dr. IJ Hardingham for the respondents.

Cur. adv. vult.

The Full Court (**McGarvie, Marks and Beach JJ.**) delivered the following judgment: This is an appeal from a judgment on 20 December 1990 for $71,610,617 and costs in favour of the respondents on a counterclaim against the appellant (to which we shall refer as "Brick and Pipe").

The first respondent Occidental Life Nominees Pty Ltd (Occidental Life Nominees) claimed an amount, which together with interest constitutes the judgment sum, on behalf of the second and third respondents Occidental Life Insurance Co. of Australia Ltd. (Occidental Life) and Regal Life Insurance Ltd. (Regal Life) pursuant to a document described as a "deed of guarantee and indemnity" (to which we shall refer as "the guarantee and indemnity") dated 22 December 1989 which was executed on 16 January 1990.

The principal issue below and on this appeal surrounds the execution of the guarantee and indemnity on behalf of Brick and Pipe particularly as to its authorisation and compliance with the requirements of its articles. The ultimate question concerns its enforceability against Brick and Pipe.

Brick and Pipe was one only of some 14 parties to the guarantee and indemnity which purported to provide support for a bill facility under another agreement (the bill facility agreement) also dated 22 December 1989 and executed on 16 January 1990 between Spersea Pty Ltd (Spersea) and the respondents.

The 14 parties included a Mr. Abraham Goldberg (Goldberg) who through direct or indirect shareholding controlled the corporate entities which made up the other 13. We refer to the latter together with Spersea as "the Goldberg Group".

Under the bill facility agreement, according to what it deemed to be the "commitment", Regal Life agreed to provide $24,247,848 and Occidental Life $33,734,745 by way of bill facility.

This "facility" was defined by the agreement to mean "the facility provided under CL2 under which the lenders agree to accept and discount bills as provided in that clause".

On 16 January 1990, pursuant to the bill facility Occidental Life provided $32,340,234.52 and Regal Life provided $23,244,543.56 and received 74-day bills of exchange drawn by Spersea in favour of Occidental Life Nominees.

The difference, of course, between the total of these amounts ($55,584,778.08) and the total of the "commitment" took care of "interest" or its equivalent by way of fee or charge for provision of the facility.

Within three days it became public knowledge that the Goldberg Group was in serious financial difficulties and within less than a fortnight an "event of default" within the meaning of the bill facility agreement occurred. On 26 January 1990, receivers and managers were appointed in respect of Linter Group Ltd. (Linter) which was a member of the Goldberg Group and a "relevant company" within the meaning of the bill facility agreement, it being also a signatory and therefore a co-surety to the guarantee and indemnity.

In the proceeding, Brick and Pipe sought declarations that both the bill facility agreement and the guarantee and indemnity were void or ineffective or (in the case of the latter) unenforceable against it. By counterclaim the respondents sought indemnity pursuant to the guarantee and indemnity in respect of the moneys Spersea failed to pay on the "event of default" pursuant to the bill facility agreement.

In essence, Brick and Pipe claimed that what was ostensibly done on its behalf, but at the behest of the Goldberg Group and in particular by its then directors Goldberg and his son in law Mr. Zev Furst (Furst), by attesting the execution of the guarantee and indemnity, was unauthorised, ineffective, illegal and contrary to s230 of the Companies (Victoria) Code (the Code). The pleadings are very lengthy and raise many issues which are not relevant in this appeal.

In or about June 1989, Brick and Pipe was taken over by the Goldberg Group for some $400m. and 100 per cent of its shareholding came into the hands of a company in the group, called Arnsberg Pty Ltd (Arnsberg). At all relevant times all the shares in Arnsberg were owned by Bacharach Pty. Ltd. (Bacharach), all the shares in which were in turn owned by Arnstadt Pty Ltd (Arnstadt) which was trustee of a Goldberg family trust. Furst and Goldberg were directors of Bacharach, Arnsberg and Brick and Pipe. After the takeover of Brick and Pipe, however, several directors then in office remained on the board. They were Shergold, Peterson, Hauser, Ferguson, Hawkins and Blood, a number of whom gave evidence below. Furst and Goldberg were also directors of Spersea, all the shares in which were owned by Pochette Holdings Pty Ltd, the shares in which in turn were owned by Pochette Nominees Pty Ltd, the shares of which were owned by Goldberg and his wife. Goldberg and his wife and Furst were also directors of Spersea and Pochette Holdings Pty Ltd

The significance of this information is that Goldberg and his companies clearly had an interest which was in conflict with that of Brick and Pipe at the time the guarantee and indemnity was executed.

The learned judge found that following the takeover and indeed to the time of trial the chairman of Brick and Pipe, Mr. John Phillip Shergold, remained on its board in addition to Mr. and Mrs. Goldberg and Furst, notwithstanding that the latter three were appointed to it and Goldberg took effective control. The learned judge also found that the guarantee and indemnity was agreed to, came into existence and was apparently executed without any knowledge by the former and continuing members of the board of Brick and Pipe other than the Goldbergs and Furst; nor was any meeting of the board convened or held to consider the transaction in the period between mid-December 1989 and mid-January 1990 or at all, although certain minutes were brought into existence suggesting that such a meeting was held.

When the Goldberg Group failed, the Arnsberg shares in Brick and Pipe came into the hands of the relevant receiver and manager who sold them to another company which continues to carry on the existing businesses of Brick and Pipe and which indirectly challenged the claim of the respondents and now challenges the correctness of the judgment below.

Further relevant background includes there having been discussion in early September 1989 between Goldberg and Mr. Robert Roeder (Roeder) a director of each of the respondents and of a public company, Battery Group Ltd., which was the holding company of Occidental Life and Regal Life. Goldberg sought to obtain funds to pay back a loan of $112,000,000 which had been made by Citibank Ltd., a merchant bank, to Spersea on behalf of the Goldberg Group. By 18 September 1989, it was agreed that some $50,000,000 would be advanced in the first place from the respondents together with a fee of $5,000,000, the anatomy of which is not here relevant. There was also an ill-defined arrangement that the respondents, or one or more of them, would raise the remaining $62,000,000 to pay out Citibank. On 18 and 19 September 1989, $31,000,000 was lent by Occidental and $19,000,000 by Regal Life to Spersea. In addition, $1,000,000 was lent on 19 September by Occidental and $4,000,000 by Regal Life. Spersea did not have a bank account and moneys were paid into what was described as the "banker" of the Goldberg Group, namely Gibraltar Factors Pty Ltd (Gibraltar Factors). In the result, $55,000,000 was advanced by the respondents upon only the security provided by share scrip and blank transfers in favour of the lenders in respect of 8,295,945 shares in Linter which had at the time a value based on net tangible assets of only $4.25 per share, namely a total value of approximately $35,257,766. There was an arrangement for provision of some further scrip upon the raising and payment of the additional $62,000,000 facility but this did not occur and has no relevance here. The only other backing was a guarantee of the loans by Goldberg himself but not founded on the provision of any security by him.

His solvency at the time was thought to be beyond doubt.

In the following months, discussions took place between the parties concerning the adequacy of the security and these led to the agreements of 16 January 1990.

Discussion occurred pointedly in the latter part of October 1989 by which time it was clear that the remaining $62,000,000 could not be raised for Spersea by the respondents, nor was

discharge of the liability in that amount to Citibank likely to be forthcoming so as to free sufficient shares in Linter for the agreed additional security. The legal firm of Arnold Bloch Leibler was engaged by the respondents and Goldberg and the companies which he controlled. In the critical discussions between October 1989 and January 1990, lawyers Steven Skala, Sharp, Dodge and Lidstrom of that firm acted on behalf of Occidental Life, Regal Life and Occidental Life Nominees while other lawyers, Fast and Hunter-Smith, of the same firm, Arnold Bloch Leibler, acted for Goldberg and his interests. The principal person giving instructions and negotiating on behalf of the respondents was Roeder who was a director of each.

The learned judge found that by the end of November or beginning of December 1989 the parties agreed that the original proposal for security over Linter shares was unsatisfactory and by early December 1989 Goldberg had agreed that at least there should be a second mortgage over the shares owned by Arnsberg in Brick and Pipe. The first mortgage was held by CIBC Australia Ltd. It was agreed that share mortgages by Arnsberg over the 96,149,155 shares in Brick and Pipe and a further share mortgage should be given by Bacharach and substituted as securities for the advance already made in September. It was also agreed that there would be a new deed of guarantee and indemnity by a large number of the companies controlled by Goldberg including Brick and Pipe.

Brick and Pipe took no direct benefit from the original advance of $55,000,000 nor had it guaranteed or promised to provide security for it.

The learned judge found that when Brick and Pipe was introduced as a guarantor in December 1989, nobody involved in that company took part in the apparent agreement to sign the deed of guarantee and indemnity other than Goldberg, Furst, and a Mr. Durlacher (Durlacher), who the learned judge said was a general factotum of Goldberg for the purpose of the transactions. Durlacher was not an officer of Brick and Pipe but a "financial controller" of a number of the Goldberg companies. He had been secretary of a large number of them including Arnsberg until 15 December 1989, but was not an officer of Brick and Pipe.

On 22 December 1989, Goldberg and Furst at Goldberg's office in Collingwood signed the guarantee for Brick and Pipe. Each signed as director against an execution clause from which the word "secretary" was deleted. The word "director" was inserted by hand in its place.

The seal of Brick and Pipe was not kept at that office and accordingly was not fixed at the time. On the same day a facility agreement between the respondents and Spersea was executed for Spersea by Goldberg in the presence of Furst. The facility agreement recorded the loan of $55,000,000 made in September 1989. These documents were dated 22 December 1989 but the respondents did not execute them in that form. Roeder, who had gone overseas on about 17 December, returned to Australia a week or so later.

Either on that day or soon after Christmas, Roeder returned three copies of the guarantee to Dodge of Arnold Bloch Leibler unsealed by Brick and Pipe and requested that the common seal of Brick and Pipe, which was in the possession of Arnold Bloch Leibler, be affixed.

On or about 3 or 4 January 1990, Durlacher or Goldberg asked Roeder whether it would be acceptable to him to restructure the transaction as a bill facility agreement. Roeder agreed and instructed Dodge that the facility was to be by way of bill acceptance and discount. The facility agreement was revised from a loan facility to a bill facility agreement and the guarantee and indemnity revised to include guarantees by Arnstadt and Bacharach.

On 12 January 1990, the share mortgage over the shares in Brick and Pipe held by Arnsberg, the share mortgage over the shares in Arnsberg held by Bacharach, the share mortgage over the shares in Bacharach held by Arnstadt and the deed of guarantee and indemnity were executed at Goldberg's Collingwood office. The bill facility agreement was executed by Goldberg and Furst for Spersea.

The guarantee and indemnity was executed by Goldberg as director and Furst as secretary on behalf of Brick and Pipe. On that day, minutes of Brick and Pipe were also signed purporting to testify to a meeting of the board of directors which gave the authority of Brick and Pipe to guarantee the obligations of Spersea to Occidental Life and Regal Life, as also were minutes of an extraordinary general meeting of the members of Brick and Pipe to change art. 89 (the interested directors' clause) by adopting a draft prepared by Arnold Bloch Leibler. These minutes, however, were brought into existence without the knowledge of or notice to directors of Brick and Pipe other than Goldberg and Furst. Article 89 was not then amended and it is common ground that Goldberg was "interested" within its meaning and therefore ineligible to vote. Its significance is that while the minutes purported to evidence a decision of the board of directors of Brick and Pipe and thus conformity with its article which required board authority for the execution of the guarantee and indemnity, the "minutes" showed that Goldberg participated in the vote despite his being an "interested" director. Thus the minutes, even if genuine, did not on their face testify to a valid authorisation.

At this time Michael Dodge represented the interests of the Occidental Group as Skala, his superior, had gone overseas.

On 12 January 1990 at Goldberg's office, the documents which were dated "22-12-89" were executed, by the Goldberg side, Goldberg, Furst, Durlacher, Dodge and Hunter-Smith being present. After that was done, Dodge observed that Furst had witnessed the fixing of common seals as company secretary whilst his searches failed to confirm that Furst had that position in a number of the companies.

Dodge told the meeting that according to his search, Furst was not company secretary in all cases where he signed as such but did not particularise. Durlacher said that the correct people had signed all the documents and that there had been changes in December 1989. Goldberg and Furst remained silent. Durlacher undertook to supply Dodge with "forms 61" (the forms authorised by s238 of the Code) which would verify the change. Dodge asked for their immediate production but Durlacher said that they were not kept at the office.

By January 1990 no form 61 concerning the appellant was supplied. On 16 January 1990, Roeder gave instructions to settle the documents notwithstanding the non supply of the

promised form 61. Consequently, on that morning Roeder and David Gardner, secretary of the respondents, executed on their behalf all relevant documents.

Later on the same morning, Spersea provided cheques in purported repayment of the September loan, one in the sum of $32.340,234.52 drawn by Gibraltar Factors payable to Occidental Life and another in the sum of $23,244. 543.56 drawn by Gibraltar Factors payable to Regal Life. Gibraltar Factors did not have sufficient funds in its account to meet the cheques. Spersea delivered two bills of exchange payable to Occidental Life and Regal Life signed by Goldberg and Furst on behalf of Spersea as drawer. They were drawn for higher amounts to permit their discounting for a sum sufficient to pay out the overdraft of Gibraltar Factors. One bill of exchange was drawn by Spersea on Occidental Life in favour of Occidental Life Nominees in the sum of $33,734,745 and dated 15 January 1990 with due date 30 March 1990. The other bill of exchange was drawn by Spersea on Regal Life payable to Regal Life in the sum of $24,247,848 and dated 15 January 1990 with due date 30 March 1990.

Later that day, cheques in favour of Spersea for the discounted proceeds of those bills calculated in accordance with the formula set out in the bill facility agreement were drawn by Occidental Life and Regal Life respectively and paid to Spersea. The bills were not then accepted but each was retained respectively by Occidental Life and Regal Life until 14 March 1990 on which date they were accepted.

The two bills of exchange were "discounted" by the respondent payees at approximately 3.30 p.m. on 16 January 1990 and then the cheques in favour of Spersea for the abovementioned discounted proceeds were paid to Spersea, in each case sufficient to satisfy the drawing that morning on the Gibraltar Factors account.

On 19 January 1990, the press carried news of the financial difficulties of the Goldberg Group. On 26 January 1990, receivers and managers were appointed to Linter. The learned judge found that Roeder was not aware of the financial difficulties of the Goldberg Group before completion of the transactions.

On 31 January 1990, following the appointment of the receivers and managers over Linter, a notice under the bill facility agreement declaring all sums due and payable together with a demand for $57,982,593 was made by Occidental Life Nominees to Spersea. Subsequently, on 1 February 1990, Occidental Life Nominees on behalf of the respondents demanded payment from Brick and Pipe of that sum pursuant to the guarantee and indemnity. No moneys were paid as a result of either demand. The claim for these amounts, as previously appears, was the subject of the successful counterclaim below.

Brick and Pipe was the plaintiff in the proceeding which it issued on 21 February 1990 to seek a declaration, among other things that the guarantee and indemnity was void, or alternatively, unenforceable.

The failure of Brick and Pipe on its claim in the court below led naturally to the success of the counterclaim.

The hearing of the proceeding took place between 9 May 1990 and 13 June 1990 and judgment was delivered on 20 December 1990. In essence, the learned judge held that the guarantee and indemnity was not authorised by Brick and Pipe and accordingly it could only be enforceable by reference to provisions of the Code which entitled the respondents to assume that the necessary authorisation had been given. His Honour found that s68 was not applicable but held that the respondents were entitled to make the assumption in s68A(3)(e) of the Code on the basis that Furst was held out as company secretary by Brick and Pipe within the meaning of s68A(3)(c).

His Honour also held that the principle (the Duomatic rule) attributed to Re Duomatic Ltd. [1969] 2 Ch. 365 and developed in subsequent cases, applied to empower the holder of all the shares in Brick and Pipe, namely Arnsberg through Goldberg, to give effect to the guarantee and indemnity without regard to the formality prescribed by the articles of association of Brick and Pipe. The learned judge also held that s230(1)(b) of the Code did not render the guarantee and indemnity illegal or unenforceable because the money which was the subject of the counterclaim was not the subject of a loan within the meaning of that section and in any event the claim thereunder was not under a "guarantee" nor a "security" as there provided.

On this appeal it was accepted on both sides that the guarantee and indemnity was not validly executed because: (a) the actual execution was not authorised in accordance with art. 107 of Brick and Pipe, Furst was not its secretary and attestation required the signature of one director and the secretary "or such other person in the absence of the secretary as the directors may appoint . . ."; (b) the execution was not authorised by a meeting of the board of directors called in accordance with the articles. Article 84 committed the management of the business of Brick and Pipe to the directors and defined their powers. Article 89 prohibited a director from voting in respect of a contract or arrangement in which he was "interested", which Goldberg was by virtue of his interest in Spersea; (c) minutes of the meeting between Goldberg and Furst purporting to be a meeting of a "quorum" (art. 94 provided for a quorum of two) was not a properly constituted meeting of the directors of Brick and Pipe as provided by the articles, no notice having been given to the other directors and Goldberg being disqualified by art. 89 from casting a vote.

On this appeal, as in the court below, the respondents relied on s68A, s68 and the Duomatic rule to support the enforceability of the guarantee and indemnity notwithstanding the above irregularities.

A further issue on this appeal is whether the guarantee and indemnity is invalid as contravening s230 of the Code, it being contended on behalf of Brick and Pipe that the learned judge was wrong in failing to hold that it is a "guarantee" or "security" and the transaction a "loan" within the meaning of s230(1)(b) which prohibits a company directly or indirectly from giving a guarantee or providing security "in connection with a loan made or to be made" by a person, such as one or more of the respondents, where a director of the company giving the guarantee or security is "interested" as Goldberg was: see s230(1)(iv).

It is common ground that if the bill facility agreement provided for a "loan" and moneys drawn down pursuant to it amounted to "a loan" and if the guarantee and indemnity constituted a guarantee or provision of a security, then s230 applied to render the guarantee and indemnity invalid or unenforceable. It is contended on behalf of the respondents that these criteria were all absent and that s230(1)(b) does not apply.

It is convenient to turn first to s68A, the provisions of which were applied by the learned judge in favour of the respondents.

S68A

S68A of the Code (so far as relevant) as it stood at the relevant time provided:

"68A. (1) A person having dealings with a company is, subject to subs(4), entitled to make, in relation to those dealings, the assumptions referred to in subs(3) and, in any proceedings in relation to those dealings, any assertion by the company that the matters that the person is so entitled to assume were not correct shall be disregarded.

"(2) A person having dealings with a person who has acquired or purports to have acquired title to property from a company (whether directly or indirectly) is, subject to subs(5), entitled to make, in relation to the acquisition or purported acquisition of title from the company, the assumptions referred to in subs(3) and, in any proceedings in relation to those dealings, any assertion by the company or by the second-mentioned person that the matters that the first-mentioned person is so entitled to assume were not correct shall be disregarded.

"(3) The assumptions that a person is, by virtue of subs(1) or subs(2), entitled to make in relation to dealings with a company, or in relation to an acquisition or purported acquisition from a company of title to property, as the case may be, are -

(a) that, at all relevant times, the memorandum and articles of the company have been complied with;

(b) that a person who appears, from returns lodged with the Commission under s238 or 263 or with a prescribed State authority under a corresponding provision of a previous law of the State, to be a director, the principal executive officer or a secretary of the company has been duly appointed and has authority to exercise the powers and perform the duties customarily exercised or performed by a director, by the principal executive officer or by a secretary, as the case may be, of a company carrying on a business of the kind carried on by the company;

(c) that a person who is held out by the company to be an officer or agent of the company has been duly appointed and has authority to exercise the powers and perform the duties customarily exercised or performed by an officer or agent of the kind concerned:

(d) that an officer or agent of the company who has authority to issue a document on behalf of the company has authority to warrant that the document

is genuine and that an officer or agent of the company who has authority to issue a certified copy of a document on behalf of the company has authority to warrant that the copy is a true copy;

(e) that a document has been duly sealed by the company if -

> (i) it bears what appears to be an impression of the seal of the company; and

> (ii) the sealing of the document appears to be attested by 2 persons, being persons one of whom, by virtue of para(b) or (c), may be assumed to be a director of the company and the other of whom, by virtue of para(b) or (c), may be assumed to be a director or to be a secretary of the company; and

(f) that the directors, the principal executive officer, the secretaries, the employees and the agents of the company properly perform their duties to the company.

"(4) Notwithstanding subs(1), a person is not entitled to make an assumption referred to in subs(3) in relation to dealings with a company if -

(a) he has actual knowledge that the matter that, but for this subsection, he would be entitled to assume is not correct; or

(b) his connection or relationship with the company is such that he ought to know that the matter that, but for this subsection, he would be entitled to assume is not correct, and where, by virtue of this subsection, a person is not entitled to make a particular assumption in relation to dealings with a company, subs(1) has no effect in relation to any assertion by the company in relation to the assumption."

Mr. Shaw QC, senior counsel for Brick and Pipe, submitted that the learned judge was wrong in deciding that the respondents were entitled to make the assumption in s68A(3)(e) that the guarantee and indemnity had been duly sealed by the company.

It is common ground that the guarantee and indemnity was impressed with the seal of Brick and Pipe and had been signed by Goldberg and Furst who were directors. Furst, however, signed as secretary but the learned judge found that he did not hold that office. His Honour did find, however, that Furst had been held out by Brick and Pipe to be its secretary within the meaning of s68A(3)(O. It is this finding which Mr. Shaw first challenged, although he also relied on s68A(4)(a). It is convenient to mention at this point that he also sought to rely on s68A(4)(b) to the effect that the respondents ought to have known that the guarantee and indemnity was not duly sealed but as this argument was specifically abandoned on behalf of the respondents in the court below and the cogency of the argument depends significantly

on findings of fact which the learned judge, by reason of the concession, did not make, we ruled that we would not entertain the argument.

Holding out The evidence bearing on the applicability of s68A(3)(c) was the subject of a finding by the learned judge as follows ([1992] 2 VR 279, at p. 309):

"The defendants asserted that Mr. Furst had been held out to them as secretary of the company because of representations made expressly or impliedly by Mr. Durlacher and by Mr. Goldberg and Mr. Furst as to Mr. Furst's appointment at the time when the defendants and their solicitors were seeking assurances that he had been so appointed. "The principal conversation took place on the morning of 12 January 1990 when the plaintiff purported to execute the guarantee. Mr. Dodge, as the defendants' solicitor, in the presence of Mr. Goldberg, Mr. Furst, Mr. Durlacher and Miss Hunter-Smith, sought the relevant assurances as to the persons who had that morning attested to the sealing of all documents proffered on behalf of the Goldberg Group including the plaintiff company. Mr. Durlacher was asked to provide the necessary 'forms 61', but said that he could not do so that day. He gave Mr. Roeder a personal assurance that the correct people had signed the documents and that Mr. Furst was secretary of all guarantor companies including the plaintiff. Mr. Goldberg and Mr. Furst participated in the conversation but did not disagree with or qualify the assurances then given by Mr. Durlacher. There was some discussion of recent changes of officers in the Goldberg companies and a settlement was left until Mr. Durlacher could provide the forms 61. Again on 15 January, Mr. Durlacher was unable to provide the forms, but on the following morning Mr. Roeder decided to proceed to settlement notwithstanding the absence of the forms but in the light of the assurances given. So it came about that later that morning the defendants executed their parts of the documents including the deed, and they were exchanged.

"From those facts I would clearly infer that Mr. Durlacher was representing on 12 January that Mr. Furst was secretary of the plaintiff company and that both Mr. Goldberg and Mr. Furst concurred in the assurances given by their 'employee' on that day. The ultimate question is whether those persons or any of them were able to hold out on behalf of Brick and Pipe that Mr. Furst had been duly appointed and had authority to sign the deed."

In Royal British Bank v Turquand (1856) 6 E. and B. 327; [1856] EngR 470; 119 ER 886, a six member Court of Exchequer Chamber held that a party to a deed was entitled to infer the fact of a resolution authorising that which "on the face of the document appeared to be legitimately done". Thereafter, the common law courts developed what has come to be called "the indoor management rule" a principle of law which was recently expressed by Mason C.J. in Northside Developments Pty Ltd v Registrar General [1990] HCA 32; (1990) 170 CLR 146, at p. 154, to mean that "persons dealing with a company in good faith may assume that acts within its constitution and powers have been duly performed and are not bound to inquire whether acts of internal management have been regular".

Mason C.J. cited with approval the statement of the rule by Lord Simonds in Morris v Kanssen [1946] AC 459, at pp. 474-5: "It is a rule designed for the protection of those who are entitled to assume, just because they cannot know, that the person with whom they deal

has the authority which he claims. This is clearly shown by the fact that the rule cannot be invoked if the condition is no longer satisfied, that is, if he who would invoke it is put upon his inquiry. He cannot presume in his own favour that things are rightly done if inquiry that he ought to make would tell him that they were wrongly done."

The facts and circumstances of Northside were markedly analogous to those here. Moreover, it may be observed that members of the High Court in Northside were strongly of the view that where, as here, a company gives a guarantee which is of no apparent benefit to the company itself the other party to it is to be regarded as having been put upon inquiry as to due authorisation and perhaps otherwise depending on the circumstances. It may well be, therefore. that the rule in Turquand's Case may not have assisted the respondents. However, the mortgage said to have been improperly executed in Northside was executed in 1979, some five years before s68A was introduced into the Code: see Northside, at p. 154.

Although s68A was undoubtedly inspired by the rule in Turquand's Case and is in a sense a codification of it, the section does not incorporate the concept of being "put upon inquiry" and we are obliged to have regard to the assumptions, as defined by the section, which the respondents were entitled to make subject to the exceptions in subs(4).

It was submitted on behalf of Brick and Pipe that the evidence does not support the conclusion that the personal assurance given by Durlacher (and not contradicted by Goldberg or Furst) that the correct persons had signed the documents which were executed on 12 January 1990, was an assurance given by him on behalf of Brick and Pipe. Mr. Shaw submitted that a personal assurance is one given personally and that in any case Durlacher had no authority to speak for Brick and Pipe and he did not expressly purport to do so. He submitted, as in his evidence Dodge conceded, that Brick and Pipe was not specifically referred to at all in the conversation. He contended that as Durlacher was not and never had been an officer of Brick and Pipe and his position as group financial controller, did not, as the evidence showed, extend to Brick and Pipe and its subsidiaries, nothing which Durlacher said, was said on behalf of Brick and Pipe. It was further submitted that Goldberg and Furst, although directors, had no individual authority to make admissions binding on Brick and Pipe, or to give assurances or make representations for which Brick and Pipe was responsible.

In Northside, Mason C.J., at p. 161, expressed the opinion that the Turquand principle applicable to instruments executed under the common seal of a company is "an organic principle of company law rather than a principle of the law of agency": see, at p. 160. A similar view was taken by Dawson J. who, at pp. 201-2, said: "The organic theory, which was originated by Lord Haldane LC in Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd [1915] AC 705, at pp. 713-714 (see also HL Bolton (Engineering) Co. Ltd v TJ Graham and Sons Ltd. [1957] 1 QB 159, at pp. 172-173, and The Lady Gwendolen [1965] P. 294, at pp. 342-345, 355-356), has been used to impose liability upon companies beyond that which could be imposed by the application of the principles of agency alone.... But the organic theory merely extends the scope of an agent's capacity to bind a company and there must first be authority, actual or apparent. It is only then that a person may be regarded not only

as the agent of a company, but also as the company itself - an organic part of it - so that 'the state of mind of [the agent] is the state of mind of the company': HL Bolton (Engineering) Co Ltd v TJ Graham and Sons Ltd. [1957] 1 QB, at p. 172, per Denning LJ"

The appellant argued that the respondents' case necessarily relied on the ostensible authority of Goldberg to hold out Furst as secretary. It was put that the principle of Crabtree Vickers Pty Ltd v Australian Direct Mail Advertising and Addressing Co. Pty Ltd [1975] HCA 49; (1975) 133 CLR 72 precluded that reliance. In that case it was held that a person with only ostensible authority to do an act or to make a representation cannot make a representation which may be relied upon as giving another agent ostensible authority to do that act.

In Crabtree-Vickers there was a question whether a purchase order signed by an employee bound the company where that employee purported to act on the authority of the managing director. If the managing director had actual authority to make the purchase contract then in that position he had authority to hold out the employee as having authority to make it: see, at p. 80. That is because he would have had actual authority to manage the business of the company in the relevant respect and actual authority in such a position as managing director to represent that another officer of the company had authority to make the contract. In the absence of actual authority but with ostensible authority. the managing director had no authority to make a representation which would give ostensible authority to another. The court accepted as correct the principles stated in the judgments of the Court of Appeal in Freeman and Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 QB 480 which were again adopted by the High Court in Northside Developments.

It may be accepted, as was explained by Dawson J. in Northside, that persons merely holding the office of director are not thereby authorised to commit the company to contracts. At p. 245, Dawson J. observed that an ordinary individual director of a company does not have ostensible authority to bind the company. However, the decision of the learned judge rested on his finding that Goldberg was more than an ordinary director. By virtue of his control of Arnsberg which owned all the shares in Brick and Pipe, Goldberg assumed the role of managing director with the acquiescence of the members of the board of directors who regarded him as the "owner" of Brick and Pipe.

The learned judge found, [1992] 2 VR, at pp. 310-11: "The discussion at the Goldberg Group's office on 12 January took place in the presence of Brick and Pipe's controlling shareholder, or more precisely the person who unmistakably controlled that shareholder, Arnsberg Pty Ltd and each of its holding companies. Whatever else is unclear in this litigation, it is abundantly clear that Mr. Goldberg not only had actual control, but also invariably asserted control over each of the companies within his group, including the plaintiff company. Throughout the dealings with the Occidental Group, Mr. Goldberg had been known as the alter ego of each of the Goldberg Group of companies. Up to that time, and indeed until the transactions were concluded, he had made all the relevant decisions. Nothing had occurred to indicate that he found it necessary to refer to any board, nor had any board attempted to interfere. It must be conceded that in the case of most of the

companies only family members comprised the balance of the board whereas, by chance, in the case of Brick and Pipe there was still a considerable number of outside directors. Moreover it was not until early December that Brick and Pipe had been mooted as an additional guarantor. Nevertheless it was well known that Mr. Goldberg had taken over Brick and Pipe and that company was now a wholly owned subsidiary of a company within the group, namely Arnsberg. There could be no doubt that Mr. Goldberg spoke on behalf of each of the companies, even though on paper he was merely a member of the board. Negotiations had proceeded for about a month at the time the document came to be executed on 12 January 1990 and settlement was completed on 16 January 1990, and there had been no indication that Mr. Goldberg was unable to speak for the plaintiff company. In the circumstances it would be remarkable if that company could now say that Mr. Goldberg was not a person who could hold out on its behalf that a particular person held a position in that company." Needless to say, this finding was not challenged and there was ample evidence to support it. It included evidence that on numerous occasions after the Goldberg takeover, Goldberg obtained board approval of transactions to which he had already committed Brick and Pipe without first seeking authorisation of its board. Individual directors in evidence confirmed the acquiescence of board members in the activity of Goldberg which culminated in completed transactions for which they gave no prior authorisation. In most, if not all, cases, the transactions committed assets of Brick and Pipe or its subsidiaries as security for borrowings by other Goldberg companies.

In our opinion, what was said by the learned judge amounted to a finding that Goldberg had actual authority to manage the business of Brick and Pipe and to hold out that Furst was the secretary of that company. There was ample justification for that finding in application of the principle of Hely Hutchinson v Brayhead Ltd. [1968] 1 QB 549: see also Corporate Affairs Commission (NSW) v Transphere Pty Ltd (No. 2) (1985) 9 ACLR 1005.

The finding by the learned judge that, by remaining silent when Durlacher gave the assurance that Furst was secretary of all guarantor companies, Goldberg is to be regarded as concurring in the assurance, was a finding which was justified on the evidence. Goldberg by implication gave the same assurance. Although Goldberg gave no indication that he was concurring on behalf of one guarantor company rather than another, he is to be taken as having concurred, on behalf of all guarantor companies on whose behalf he had power to concur: Re Express Engineering Works Ltd. [1920] 1 Ch. 466, at p. 471 and JW Broomhead (Vic) Pty Ltd v JW Broomhead Pty Ltd [1985] VicRp 88; [1985] VR 891, at p. 932. He is therefore to be taken as having held out on behalf of Brick and Pipe that Furst was its secretary.

We consider that the learned judge was entitled to hold, as he did, that Furst had, within the meaning of s68A(3)(c), been held out by Brick and Pipe to be its secretary, so as to entitle the respondents to make the assumption permitted by s68A(3)(e).

Assumption a director Mr. Shaw, however, contended that the learned judge was in error in holding that Brick and Pipe was unable to rely on s68A(4) which disentitles entitlement to

make an assumption referred to in subs(3) if the party in question has "actual knowledge that the matter that, but for this subsection, he would be entitled to assume is not correct".

The expression "actual knowledge" means, we think, what it says. It does not lend itself to definition or elaboration. What amounts to "actual knowledge" is largely dependent on the facts and circumstances in a particular case and the inference they allow. Here, Dodge, the solicitor for the respondents, had actual knowledge of at least some provisions of the articles of association and certainly arts 89 and 107 (respectively the interested directors' article and the article as to use of the company seal). It was submitted on behalf of Brick and Pipe that Dodge knew that the guarantee and indemnity had not been duly sealed because he knew that the only meeting which purported to authorise its execution had not done so because it was said to have taken place on 22 December 1989 at which time the documents were not in existence. Also, the meeting was in breach of art. 89 and other articles for its due convening.

As the learned judge pointed out, this submission would be an answer to an attempted reliance by the respondents on s68A(3)(a) but the respondents relied on assumption (e) which is discrete and confined to due sealing. The legislature could not be taken to have intended that an assumption as to due sealing is not available in circumstances like the present where there was actual knowledge of non compliance with articles not concerned with authority to fix the company seal and attest it. Accordingly, any actual knowledge of Dodge, which may be attributed to the respondents, of Goldberg's interest and his disqualification to vote on any board resolution goes only to assumption (a) of s68A(3).

We did not understand Mr. Shaw to submit that Dodge had actual knowledge that Furst was not the secretary. This submission, we consider, was not available because the evidence showed only that Dodge was not satisfied that Furst was the secretary and was given an assurance that he was. It was a matter on which he was to receive a form 61 from Durlacher but did not. His state of mind was absence of knowledge whether Furst was or was not the secretary. He had no "actual" knowledge one way or the other. Then he received positive instructions from Roeder to proceed without a confirming form 61 which was expected.

It was also submitted on behalf of the respondents that in any event the learned judge should have upheld a submission that they were not required to establish the holding out because s68A(3)(b) was available as Furst was a director and shown to be so on the form 61. His Honour described this submission as "ingenious" and although it is unnecessary to consider this alternative, as we do not differ from his Honour as to his conclusions on the prime submission, we do not agree entirely in what his Honour said in this respect.

The mere fact that Furst signed as "secretary" when he was not, may not in all circumstances shut out entitlement of a party to rely on the fact that he was a director according to the form 61 for the purposes of assumption (e). We consider that the conclusion of his Honour is not to be disturbed for a rather different reason, namely, that the evidence before his Honour was capable of establishing "actual knowledge" on the part of Dodge that "due sealing" required the attesting signatures of a director and the secretary of Brick and Pipe. It is true that the article provided that the board of directors may appoint a person other

than its secretary to be the attesting witness but the only information which Dodge had was that the signature of the secretary was required. Accordingly, he had actual knowledge that the attesting signatures of two directors alone would not constitute "due sealing" pursuant to art. 107 unless the board had passed a resolution to that effect. Dodge, of course, had no information of any such resolution. In those circumstances it may well have been difficult for the learned judge to have been satisfied that Dodge was entitled to make assumption (e) on the alternative basis. As we understand it, this in substance was the submission of Mr. Shaw for Brick and Pipe and in this respect we consider the submission to have been well founded.

It is desirable, however, that we elaborate a little on our views as to the operation of s68A(3)(e) in combination with (b). In his reasons the learned judge said, at pp. 308-9: "If a party is entitled by virtue of para(b) (or para(c) for that matter) to assume that a person is a director of a company, it cannot be correct to say that he may also assume that a document was duly sealed if that person purports to attest as secretary. Whether or not subs(4) could then be called in aid, the only attestation by Mr. Furst in the present case was in the role of secretary and no assumption can properly be made in favour of the defendants in those circumstances. I would concede that the section talks only of assumptions which may be made and need not necessarily reflect the actual assumptions made by the parties seeking to rely on s68A. Nevertheless, if the only source for the proper making of such an assumption is a return showing a person to be a director, he cannot be assumed to be a secretary for the purposes of para(e). Moreover the assumption in para(b) is not merely that a person should be assumed to be a director or secretary but also that he has the 'authority to exercise the powers and perform the duties customarily exercised or performed' by a director or secretary. A director cannot be assumed to have authority to exercise the powers of a secretary and vice versa, so I would reject the defendants' arguments on this point."

However, we do not understand the submission on behalf of the respondents to involve a party being required to make conflicting assumptions. It is predicated on the possible circumstance that a party is unable by reference to a form 61 to confirm that a signatory is the secretary but is able to confirm that the person is a director. If then by virtue of the section it may be assumed that the document has been signed by two directors even though one of them has purported to be the secretary, it would seem that the criteria of para(e) are met. Accordingly, a party may not seek entitlement to make the assumption that a person is both director and secretary. The party may know or believe that a person is not the secretary but know or be entitled to assume that the person is a director. This as we understand it, was essentially the submission which was made on behalf of the respondents. In this case, it was in effect that if Brick and Pipe had not held out Furst as secretary and therefore assumption (e) was not available on that basis, then it was available on the basis that he was a director according to the form 61.

It must be borne in mind that a person might be both a director and secretary and that articles might authorise "due sealing" in the presence of two directors or alternatively a director and the secretary. The articles of a company might authorise both methods and the methods might vary between them from company to company. It follows that the mere

presence of the word "secretary" opposite the signature of a person known not to be secretary does not necessarily mean that the document has not been duly sealed and that a party seeing it thereby has "actual knowledge" that the assumption is not correct.

The criteria of assumption (e) provided by the section do not include any requirement that a signatory must fit his or her description on the document. In the present case the criteria of the subsection were literally met. It is true, however, that there was evidence that the exception was capable of application because Dodge knew the contents of art. 107, that is, that for due sealing a signatory must be the secretary unless the board had approved of someone else.

Nevertheless, we are of the opinion that a party may be entitled to make assumption (e) (which in effect creates by virtue of s68A(1) an estoppel against Brick and Pipe) if the criteria are met notwithstanding the presence of a wrong designation of the post held by a signatory. We emphasise, of course, that the wrong designation is not for all purposes irrelevant. It might well assist to establish "actual knowledge" within the meaning of subs(4) that the document had not indeed been "duly sealed", as might have been the case here but for the holding out and the lack of knowledge whether Furst was or was not the secretary. Nevertheless, for the reasons set out above, we are of the opinion that the learned judge was entitled to decide as he did that the respondents were entitled to make the assumption referred to in s68A(3)(e).

S68

It was contended by the respondents that the failure of those who acted on behalf of Brick and Pipe to comply with the provisions of arts 89, 94 and 107 could not be relied upon by Brick and Pipe to defeat the respondents' claims pursuant to the deed of guarantee and indemnity by virtue of the provisions of s68 of the Code and in particular subs(4) of that section.

S68 of the Code as it then stood provided:

"68. (1A) The rules of a company may contain an express restriction on, or an express prohibition of, the exercise by the company of a power of the company.

"(1) Where -

    (a) a company exercises a power contrary to an express restriction on, or an express prohibition of, the exercise of that power, being a restriction or prohibition contained in the rules of the company; or

    (b) the memorandum of a company contains a provision stating the objects of the company and the company does an act otherwise than in pursuance of those objects, the company contravenes this subsection.

"(2) Where an officer of a company is in any way, by act or omission, directly or indirectly, knowingly concerned in or party to a contravention by the company of subs(1), the officer contravenes this subsection.

"(3) A company that contravenes subs(1), or an officer of a company who contravenes subs(2), is not guilty of an offence by virtue of this section or s570.

"(4) Where, by exercising a power as mentioned in para(1)(a), or by doing an act as mentioned in para(1)(b), a company contravenes subs(1), the exercise of the power, or the act, as the case may be, is not invalid by reason only of the contravention.

"(5) An act of an officer of a company is not invalid by reason only that, by doing the act, the officer contravenes subs(2).

"(6) The fact that -

> (a) by exercising a power as mentioned in para(1)(a), or by doing an act as mentioned in para(1)(b), a company contravened, or would contravene, subs(1); or

> (b) by doing a particular act, an officer of a company contravened, or would contravene, subs(2), may be asserted or relied on only in -

> (c) a prosecution of a person for an offence against this Code;

> (d) an application for an order under s227A;

> (e) an application for an order under s320;

> (f) an application for an injunction under s574 to restrain the company from entering into an agreement;

> (g) proceedings (other than an application for an injunction) by the company, or by a member of the company, against the present or former officers of the company: or

> (h) an application by the Commission or by a member of the company for the winding up of the company.

"(7) Where, if subs(6) had not been enacted, the Court would have power under s574 to grant, on the application of a person, an injunction restraining a company, or an officer of a company, from engaging in particular conduct constituting a contravention of subs(1) or subs(2), as the case may be, the Court may, on the application of that person, order the first-mentioned company, or the officer, as the case may be, to pay damages to that person or any other person."

S68 cannot be viewed in isolation but must be considered in the light of the provisions of s66B, s66C and s67 which read:

"66s. In this section and in sections 66c, 67 and 68 -

> (a) a reference to a company is a reference to a company whether incorporated before, on or after 1 January 1984;

(b) a reference to the doing of an act by a company includes a reference to the making of an agreement by the company and a reference to a transfer of property to or by the company;

(c) a reference to a restriction on, or a prohibition of, the exercise by a company of any of its powers, being a restriction or prohibition contained in the rules of the company, is, in the case of a company incorporated before 1 January 1984, a reference to such a restriction or prohibition whether or not the restriction or prohibition was so contained immediately before that day;

(d) a reference to legal capacity includes a reference to powers; and

(e) a reference to the rules of a company is a reference to the memorandum and articles of the company.

"66C. The object of s67 and s68 is -

(a) to abolish the doctrine of ultra vires in its application to companies; and

(b) without affecting the validity of the dealings of a company with outsiders, to ensure that provisions of the rules of a company relating to objects or powers of the company are given effect to by the company's officers and members, and those sections shall be construed, and have effect, accordingly.

"67. (1) A company has, both within and outside the State, the legal capacity of a natural person and, without limiting the generality of the foregoing, has, both within and outside the State, power -

(a) to issue and allot fully or partly paid shares in the company;

(b) to issue debentures of the company;

(c) to distribute any of the property of the company among the members, in kind or otherwise;

(d) to give security by charging uncalled capital;

(e) to grant a floating charge on property of the company;

(f) to procure the company to be registered or recognised as a body corporate in any place outside the State; and

(g) to do any other act that it is authorised to do by any other law.

"(2) Subs(1) has effect in relation to a company -

(a) subject to this Code (other than subs68(1));

(b) in a case where the rules of the company contain an express or implied restriction on, or an express or implied prohibition of, the exercise by the company of any of its powers - notwithstanding any such restriction or prohibition;

(c) in a case where the memorandum of the company contains a provision stating the objects of the company - notwithstanding that fact; and

(d) notwithstanding subs68(1).

"(3) The fact that the doing of an act by a company would not be, or is not, in the best interests of the company does not affect the legal capacity of the company to do the act."

As the learned judge pointed out in his reasons for judgment, those latter sections make it clear that the reason behind the sections is the abolition of the doctrine of ultra vires, a doctrine which is to be distinguished from the internal rules of a company whereby particular persons are authorised to represent or act on behalf of the company. The view his Honour took of the matter was that s68 was not applicable to the present case because the articles of Brick and Pipe which had been contravened by Goldberg and Furst were not articles which restricted the powers of the company within the meaning of s68(1) but were articles intended only to control the acts of the directors and other organs of the company so as to deny the power of those directors and organs to act on behalf of the company if not complied with.

There can be no doubt but that Brick and Pipe had the power to give a guarantee and to provide an indemnity: see CL13 of its memorandum of association. The only question, therefore, is whether there was any express restriction on, or express prohibition of, the exercise of that power in the articles in question. Article 84 and the articles which must be read together with it read:

"84. The management of the business of the company shall be vested in the directors who in addition to the powers and authorities by the company's articles or otherwise conferred upon them may exercise all such powers and do all such acts and things as may be exercised or done by the company and are not by the company's articles or by statute expressly directed or required to be exercised or nevertheless to the provisions of the Code and of the company's articles and to any direction from time to time made or given by the company in general meeting PROVIDED THAT no direction so made or given shall invalidate any prior act of the directors which could have been valid if such direction had not been made or given but the director shall not at any time sell or otherwise dispose of the main undertaking of the company except subject to the ratification by the members of the company in general meeting."

"89. No director shall be disqualified by his office from holding any office or place of profit under any company in which this company shall be a shareholder or otherwise interested or from contracting with the company either as vendor purchaser or otherwise nor shall any such contract or any contract or arrangement entered into by or on behalf of the company in

which any director shall be in any way interested be avoided nor shall any director be liable to account to the company for any profit arising from any such contract or arrangement by reason only of such director holding that office or of the fiduciary relations thereby established but the nature of his interest must be declared by him at the meeting of the directors at which the contract or arrangement is determined on if his interest then exists or in any other case at the first meeting of the directors after the acquisition of his interest.

No director shall as a director vote in respect of any contract or arrangement in which he is so interested as aforesaid and if he does so vote his vote shall not be counted, but this prohibition shall not apply to any contract by or on behalf of the security for advances or by way of indemnity not so any other company in which this company is a shareholder or otherwise interested nor to any contract or arrangement by this company and any such general notice to all other directors for the time being that a director is a member of any specified firm or company and is to be regarded as interested in all transactions with that firm or company shall be sufficient declaration under this article as regards such director and the said transactions and after such general notice it shall not be necessary for such director to give a special notice relating to any particular transaction with that firm or company. Notwithstanding the foregoing any interested director may attest the affixing of the common seal of the company to any instrument to which the company is a party."

"94. The directors may meet together for the despatch of business adjourn and otherwise regulate their meetings and proceedings as they think fit and may determine the quorum necessary for the transaction of business. Until otherwise determined two directors shall be a quorum."

"107(a) The directors shall provide a common seal of the company and such seal shall be kept by such person and in such place and in such manner as the directors may think fit and the directors shall have power to use such seal in the execution of all or any of the powers hereby vested in them but the seal shall not be affixed to any instrument except by the authority of a resolution of the board of directors and in the presence of at least one director and the secretary or such other person in the absence of the secretary as the directors may appoint for that purpose who shall sign every instrument to which the seal of the company is so affixed in their presence and their attestation shall be sufficient evidence of the authority to affix the seal. In the case of certificates of shares or stock the directors may by resolution determine either generally or in any particular case the signature of any director, secretary or other persons as aforesaid and the impression of the seal itself may be affixed by some mechanical means to be specified in such resolution PROVIDED THAT the use of such means is by such resolution restricted to certificates which have first been approved for sealing by the auditors of the company in writing.

(b) The company may obtain and use a duplicate common seal pursuant to the provisions of the Code."

In our opinion, there is nothing in any of those articles which restricts or prohibits Brick and Pipe's power to give a guarantee and to provide an indemnity. The articles do no more than

regulate the authority of the directors, the manner in which the board of directors meets, and the manner in which documents are attested by the company. They are internal requirements which although restricting and inhibiting those acting on behalf of the company do not have any bearing on the extent of the powers of the company. In that situation we also are of the view that s. 68 of the Code has no application to the case.

The Duomatic rule In view of the conclusions we have reached it is unnecessary to decide whether the respondents are also entitled to rely on the Duomatic rule to establish that Brick and Pipe is bound by the guarantee and indemnity.

S230

The relevant parts of s230 are these:

"(1) A company shall not, whether directly or indirectly -

(a) make a loan to -

(i) a director of the company, a spouse of such a director, or a relative of such a director or spouse;

(ii) a director of a corporation that is related to the company, a spouse of such a director, or a relative of such a director or spouse; . . . or

(iv) a corporation, where a person referred to in sub-para(i) or (ii) has, or 2 or more such persons together have, a relevant interest or relevant interests in shares in the corporation the nominal value of which is not less than 10% of the nominal value of the issue share capital of the corporation; or

(b) give a guarantee or provide security in connection with a loan made or to be made by another person to a natural person or a corporation referred to in para(a).

"(3) Nothing in subs(1) applies -

(a) to anything done by a company that is an exempt proprietary company;

(b) to a loan made by a company to, or a guarantee given or security provided by a company in relation to, a corporation that is related to the company if the making of the loan, the giving of the guarantee or the provision of the security has been authorised by a resolution of the directors; . . .

"(8) If a person has made a loan in relation to which a company has given a guarantee or provided security in contravention of this section, the person may enforce the guarantee or security against the company if, and only if -

(a) in a case where the company is a proprietary company - a certificate signed by a director and a secretary of the company certifying that the company was an exempt proprietary company was furnished to the person before the guarantee was given or the security was provided; or

(b) in any case - a certificate signed by a director and a secretary of the company certifying that the company was not prohibited by this section from giving the guarantee or providing the security was furnished to the person before the guarantee was given or the security was provided and the person did not know, and had no reason to believe, that the certificate was incorrect."

It was common ground that if the guarantee and indemnity otherwise bound Brick and Pipe, s230 precludes the respondents from enforcing the counterclaimed rights on which they succeeded below, if they are seeking to enforce a guarantee given or a security provided by Brick and Pipe in connection with loans made by the respondents to Spersea. On the appeal the three issues are whether the respondents by the bill facility agreement made or agreed to make a loan or loans to Spersea, and if so, whether their counterclaim seeks to enforce a guarantee given or a security provided in connection with such a loan or loans.

After a careful examination of the bill facility agreement the relevant authorities and the views of writers on the subject, the learned judge concluded with some hesitation that the liability imposed on Spersea was not an obligation to repay a loan. That question arose to be considered by the learned judge in an atypical litigious setting. The appellant's pleading raised the issue of whether the bill facility agreement was a sham. Its statement of claim alleged that the agreement was not intended by the parties to represent the true nature of their relationship and the transactions between them. In the course of argument before the learned primary judge counsel for the appellant explicitly abandoned that allegation. As we have reached firm conclusions adverse to the appellant on both the other related issues, it is not necessary for us to decide whether the bill facility agreement brought into existence a loan or loans within the meaning of s230.

The learned judge held that even if the bill facility agreement involved a loan or loans, the respondents were not seeking to enforce a guarantee or security within the meaning of s230. We regard those conclusions as clearly correct.

The guarantee and indemnity imposed on Brick and Pipe obligations of the type conventionally regarded as those of guarantee and other obligations of the type conventionally regarded as those of indemnity: see Yeoman Credit Ltd. v Latter [1961] 1 WLR 828. Authorities were cited to this court to show that the concept of guarantee is sufficiently flexible to be given a meaning which comprehends obligations of the type conventionally regarded as indemnities. Reference was made to cases such as Moschi v Lep Air Services Ltd [1973] AC 331, at pp. 344-5.

It was argued that in order to effect the purpose of s230 the word "guarantee" should be given a meaning which includes the obligation of indemnity on which the respondents sue. In our opinion there are two reasons for rejecting that submission. First, when used in a

statute the word "guarantee" more readily conveys the concept of an obligation to answer for the debt, default or miscarriage of another. The second is that it is a wholesome and established approach to legislation to treat Parliament, which can alter any rights present or future by an expression of intention, as not intending to alter the rights which would otherwise exist, to a greater extent than is shown by the words it uses or by a consideration of the statute as a whole, to have been its clear intention. There is weight in the argument that within the area with which s230 deals an indemnity is socially and commercially as undesirable as a guarantee. There is, however, nothing in the context which indicates that Parliament used the word "guarantee" with a meaning which extends beyond its usual and conventional meaning.

The position is similar with the word "security". It can be used to comprehend a personal security such as a guarantee or indemnity. As the learned judge pointed out, the notion of security usually conveys that rights exercisable against some property are given. In our opinion, the word has that meaning in s230. As the judge also mentioned, the use of the word in the expression in s230(1)(b) "give a guarantee or provide a security" tends to confirm that the word "security" is used in that sense. There is no context to indicate that the word was intended to include a personal security.

Interest There was a ground of appeal to the effect that, if the respondents are entitled to succeed in their claims, there is an error in the calculation of the amount of interest included in the judgment.

We consider there was an error. It flows from the certificate relied on under CL18 of the bill facility agreement as evidence of the amount due. The certificate includes in its calculation of the rate of interest due under the agreement on overdue moneys, an amount of 4 per cent as a margin. We accept the appellant's argument that the margin of 4 per cent is, under CL12.9, an acceptance fee and is not part of the interest payable under CL21.2. The certificate is conclusive evidence of what is certified, save for manifest error. The inclusion of the margin was a manifest error. The rate of interest payable on overdue amounts is therefore 22.56 per cent, not 26.56 per cent, the rate used in calculating the interest included in the judgment below.

The respondents by leave amended their counterclaim to include a separate claim for the margin. We accept the appellant's argument that the event on which the margin was to become payable did not occur.

Outcome

The result is that the appeal will be allowed to the extent of amending the amount of the judgment so that interest on overdue amounts is calculated at the lower rate of 22.56 per cent per annum but that, in substance, the appeal will be dismissed.

Orders accordingly.

Solicitors for the plaintiff/appellant: Marshalls and Dent

Solicitors for the defendants/respondents: Freehill Hollingdale and Page.

**EXHIBIT O**

**2 Ch.**

A

### *In re* DUOMATIC LTD.

[No. 00601 of 1966]

1968  Nov. 12, 13.                                    Buckley J.

B
*Company—Director—Misfeasance—Payment for loss of office—*
*No consideration—Failure to take legal advice—Companies Act*
*1948 (11 & 12 Geo. 6, c. 38), ss. 191, 448 (1).*
*Company—Director—Remuneration—Not authorised by resolution*
*—Accounts subsequently passed by controlling shareholders—*
*Draft account approved by controlling shareholder—Whether*
*remuneration validly paid.*

C
A company incorporated in 1960, with a share capital of 100
£1 ordinary shares and 80,000 £1 non-voting redeemable prefer-
ence shares, had originally three directors, E., H., and T., who
held all the ordinary shares. E. and T. became critical of the
way in which H. performed his duties and could have voted
him off the board, but since he threatened, if dismissed, to sue
the company they paid him £4,000 to leave the company.
He ceased to be a director on April 1, 1963, and later trans-
ferred his shares to E. On April 17, 1964, W., a representative
of a finance company, B. Ltd., who were financing the
D
company's hire-purchase business, became a director. In
July, 1964, E. transferred some of his shares to W., and some
to C. and K., two other officers of B. Ltd. On August 13, 1964,
the capital of the company was increased by the creation of
25,000 additional ordinary shares and thereafter the ordinary
shareholders consisted of E., T., W., C., K., B. Ltd. and another
company.

E
The company's articles of association incorporated article 76
of Table A in the Schedule to the Companies Act, 1948,[1] but
no resolution authorising directors to receive remuneration
was ever passed. None of the directors had contracts of
service. They drew sums according to their personal needs,
and at the end of each financial year the sums so drawn were
totalled, grossed up for tax and entered in the accounts as
" directors' salaries." In the year ending April 30, 1963, E.
drew £10,151 0s. 8d., and H., £5,510 1s. 0d., and on that occasion
F
the accounts showing these figures were signed and approved
by them as directors, at a time when they were also the only
ordinary shareholders. In the year ended April 30, 1964,
when E. was in control of the company, E. drew £9,000, but

---

[1] Companies Act, 1948, s. 191: " It shall not be lawful for a company to make
to any director of the company any payment by way of compensation for loss
of office, or as consideration for or in connection with his retirement from office,
G without particulars with respect to the proposed payment (including the amount
thereof) being disclosed to members of the company and the proposal being approved
by the company."

S. 448: " (1) If in any proceeding for negligence, default, breach of duty or
breach of trust against an officer of a company . . . it appears to the court hearing
the case that that officer . . . is or may be liable in respect of the negligence, default,
breach of duty or breach of trust, but that he has acted honestly and reasonably, and
that, having regard to all the circumstances of the case, including those connected
with his appointment, he ought fairly to be excused for the negligence, default,
H breach of duty or breach of trust, that court may relieve him, either wholly or
partly, from his liability on such terms as the court may think fit."

Sch. 1, Table A, Part 1, art. 76: " The remuneration of the directors shall from
time to time be determined by the company in general meeting. Such remuneration
shall be deemed to accrue from day to day . . ."

**In re Duomatic Ltd.**                                    **[1969]**

no final accounts were agreed. When W. had become a
director in April, 1964, E. had agreed with the shareholders  A
to draw a lower rate of remuneration of £60 a week, although
no meeting was held or resolution passed, but in the period May
1, 1964, to October 23, 1964, when the company went into
voluntary liquidation, he drew a sum in excess of that rate.

On a summons by the liquidators seeking (1) repayment of
the sums paid to E. and H. respectively as salaries on the
ground that such sums had never been voted in general
meeting, (2) repayment of the £4,000 paid to H. as compensation  B
for loss of office on the ground that the sum was excessive,
unauthorised and not bona fide for the benefit of the company,
and (3) declarations that both E. and H. were guilty of mis-
feasance:

*Held,* (1) that where it could be shown that all the shareholders
with the right to attend and vote at a general meeting had
assented to some matter which a general meeting of the
company could carry into effect, the assent was as binding  C
as a resolution in general meeting, and that since the preference
shareholder had no right to attend and vote at general meetings,
and since E. and H. had, at a time when they were the only
ordinary shareholders, approved the accounts showing the
payments to them of £10,151 0s. 8d. and £5,510 1s. 0d.
respectively, the payments could not now be disturbed (post,
pp. 372E–G, 373A–E).

*In re Express Engineering Works Ltd.* [1920] 1 Ch. 466, C.A.  D
and *Parker & Cooper Ltd.* v. *Reading* [1926] Ch. 975 applied.

*In re George Newman & Co. Ltd.* [1895] 1 Ch. 674, C.A.
considered.

(2) That similarly E. was entitled to retain a sum calculated
at the rate of £60 a week for his services between May 1 and
October 23, 1964, but that any excess over and above that
figure must be repaid (post, pp. 373F–374C).                E

(3) That although there had been no resolution approving
the payment to E. of £9,000 for the year ending April 30,
1964, and the draft accounts had not been approved by the
ordinary shareholders, since E. was then the majority share-
holder, and was continuing a practice adopted in the preceding
year and since it was an oversight that no resolution had
been passed, E. had not acted unreasonably and that in the
special circumstances he ought to be excused under section 448  F
of the Act of 1948 and could accordingly retain the £9,000
(post, pp. 373E–F, 375B, H—376C).

(4) That since no disclosure of the payment of £4,000 to
H. as compensation for loss of office had been made to the
preference shareholders pursuant to section 191 of the Act of
1948 it was ultra vires, and E. and H. were liable for misappli-
cation of the company's funds; and that as E. had failed to take
legal advice he had not acted reasonably and therefore ought  G
not to be excused under section 448 of the Act, and accord-
ingly, E. and H. were jointly and severally liable to repay the
sum of £4,000 to the liquidator (post, pp. 374D–375A, 376D–G,
377A–G).

The following cases are referred to in the judgment:

*Express Engineering Works Ltd., In re* [1920] 1 Ch. 466, C.A.,  H
*Newman (George) & Co. Ltd., In re* [1895] 1 Ch. 674, C.A.
*Parker & Cooper Ltd.* v. *Reading* [1926] Ch. 975.
*Salomon* v. *Salomon & Co. Ltd.* [1897] A.C. 22, H.L.

A

The following additional cases were cited in argument:

*City Equitable Fire Insurance Co. Ltd., In re* [1925] 1 Ch. 407, C.A.
*Claridge's Patent Asphalte Co., Ltd., In re* [1921] 1 Ch. 543.
*Richmond Gate Property Co., Ltd., In re* [1965] 1 W.L.R. 335; [1964]
    3 All E.R. 936.
*Selangor United Rubber Estates Ltd.* v. *Cradock (No.* 3) [1968] 1 W.L.R.
    1555; [1968] 2 All E.R. 1073.

B

ORIGINATING SUMMONS.

The following statement of facts is taken substantially from the judg-
ment of Buckley J.:

Duomatic Ltd., (hereinafter called " the company ") was incorporated
in January, 1960, with an issued share capital of 100 ordinary shares and
80,000 non-voting redeemable preference shares, all of £1. The ordinary

C shares were held by the three directors, Mr. James Elvins, Mr. William
Hanly, and Mr. Patrick East, in the following proportions: —Mr. Elvins 76,
Mr. Hanly 22, and Mr. East two. The non-voting preference shares were
all held by a Dutch company, A. G. Bondo N.V. Mr. Hanly quarrelled
with his co-directors, who felt that they had reason to be extremely critical
of him in regard to the performance of his duties and wished to be rid
of him. They could, of course, have voted him off the board at any time,

D but since he threatened, if dismissed, to sue the company, and generally
to make the position of the company as awkward as he could, he was paid
£4,000 as an inducement to leave the company without making trouble,
although he had no contract of service with the company. On April 1,
1963, he ceased to be a director, and in May, 1963, he transferred his
22 shares to Mr. Elvins. The company's business of selling washing

E machines was not prospering, when, on April 17, 1964, Mr. Wood, a
representative of Bentworth Credits Ltd., the finance company that was
financing the company's hire-purchase business, joined the board of direc-
tors. In July, 1964, Mr. Elvins transferred 32 of his shares to Mr. Wood,
and 32 shares each to Mr. Weikersheim and Mr. Conisbee, two other officers
of the finance company, and he was thus left with only two shares.

F     On August 13, 1964, the capital of the company was increased by the
creation of 25,000 ordinary shares of £1 each, and thereafter the ordinary
shareholders consisted of Mr. Elvins, Mr. East, Mr. Wood, Mr. Weiker-
sheim, Precast Concrete Ltd., and Bentworth Credits Ltd. At the same
time Mr. Middleton-Smith joined the board of the company, so that thence-
forth the board consisted of Mr. Elvins, Mr. East, Mr. Wood and Mr.
Middleton-Smith.

G     The articles of the company incorporated by reference article 76 of
Table A in the Schedule to the Companies Act, 1948, which required that
the remuneration of directors should be determined from time to time by
the company in general meeting. However, no resolution was ever passed
authorising the directors to receive any remuneration. The directors
drew sums from the company from time to time as their personal needs

H required, and at the end of each financial year these drawings were totalled
and the totals were then grossed up in order to account for tax. In the
year ended April 30, 1963, Mr. Elvins drew £10,151 0s. 8d., and Mr. Hanly,
£5,510 1s. 0d., and the total of those amounts was shown in the profit and

loss account as " directors' salaries." These accounts were signed and
approved by Mr. Elvins and Mr. East as directors. In the following **A**
financial year Mr. Elvins drew £9,000, which appeared in the draft profit
and loss account, but no final accounts were ever prepared or approved.
When Mr. Wood joined the board in April 1964, Mr. Elvins agreed,
in view of the company's financial position, to accept a lower rate of
remuneration of £60 per week. However, during the period from May 1,
1964, to October 23, 1964, when the company went into voluntary **B**
liquidation, Mr. Elvins drew £2,197 15s. 3d., a sum in excess of that rate.
No managing director was ever appointed, and none of the directors had
any contract of service.

By this summons the liquidator claimed from Mr. Elvins the sum of
£21,348 15s. 11d., the total of the amounts paid to him between April 30,
1963, and the liquidation of the company, on the ground that he was not
entitled to retain any of the amounts paid to him, none of them having **C**
been voted by the company in general meeting. Against Mr. Hanly he
claimed repayment of (1) the sum of £5,510 1s. 0d., and (2) the sum of
£4,000, paid to him as compensation for loss of office on the ground that
it was excessive, not duly authorised and not bona fide for the benefit of the
company. He also claimed that Mr. Elvins and Mr. Hanly were guilty
of misfeasance as directors in permitting a payment to the other, and an **D**
order against them jointly and severally to repay the sum of £4,000.

*R. A. K. Wright* for the liquidator. None of the payments of remunera-
tion which are in issue were voted by the company in general meeting as
required by the Articles of Association. Further, the payment of com-
pensation for loss of office to Mr. Hanly was not approved by the company
in general meeting as required by section 191 of the Companies Act 1948. **E**
A director is not entitled to remuneration on a quantum meruit.

It is pleaded in the defence that all these payments were approved by
Mr. East and Mr. Elvins who held the only shares conferring the right to
vote and that this makes the payments as valid as if they had been approved
by the company in general meeting. The authorities do not support this
view. They establish that the unanimous consent of all the corporates may **F**
bind a company as effectively as a formal resolution. In this case there was
a holder of preference shares who did not consent.

Further, even if this be wrong, in the case of the payments of remunera-
tion so that the consent of the voting shareholders alone would validate
these payments, section 191 of the Companies Act required disclosure of the
proposed payment of compensation to all members.

If Mr. Elvins be otherwise liable he should not be excused under section **G**
448 of the Companies Act 1948. He acted honestly but not reasonably.
In any case the section cannot be used to excuse him from repaying money
which he received himself.

*Ian McCulloch* for the respondent Mr. Elvins. The pleadings amount
really to a confession and avoidance. It is admitted that Mr. Elvins and
Mr. Hanly received the sums of money alleged, and it is admitted that **H**
those sums were paid to them, not strictly in accordance with the com-
pany's articles. Such a confession relieves the liquidator of the burden of
proof as to the payments, but, by way of avoidance, it is contended that

A the payments were made with the full knowledge and consent of all the available voting shareholders in the company at the relevant times, so that the absence of a formal resolution by the company at a duly convened meeting of the company is irrelevant. Alternatively it is contended that in doing what he did, Mr. Elvins acted honestly and reasonably, and ought fairly to be excused, under section 448 of the Companies Act, 1948. Where this claim has most force is in relation to the payments made by

B the company to Mr. Elvins between May 1, 1964, and October 23, 1964, when the company went into liquidation.

The evidence shows that though not formally approved in general meeting the payments to Mr. Elvins and to Mr. Hanly in the financial year ending on March 31, 1963, were in fact agreed to by persons who should properly agree to them, at the appropriate times. The accounts for the year ending March 31, 1963, were signed and approved by Mr.

C Elvins and Mr. East, who together held a majority of the voting shares at the time, the accounts showing the relevant payments having been explained to them by the company's auditor, Mr. Preston. The position is the same with regard to the £4,000 paid to Mr. Hanly as compensation for his loss of office. Mr. Hanly had retired as director on April 1, 1963. He had threatened to sue the company if he were voted off the board,

D and to sell his shares to Rolls Razor Ltd., a rival company in the manufacturing and sale of washing machines. His co-directors, wishing to be rid of him, thought it proper to offer him compensation if he agreed to retire. Mr. Elvins and Mr. East were at the time the only other ordinary shareholders and were therefore the only persons who could properly object, and, since they approved, no question as to the applicability of section 448 of the Companies Act, 1948, arises in relation to the financial

E year ended March 31, 1964. On the other hand, it is admitted that unless Mr. Elvins can be excused under section 448, he is liable to repay the liquidator, since in that year the draft accounts were never finally agreed. He was however the majority shareholder and he was merely continuing the practice which had been adopted in the preceding year. It is therefore submitted that he ought fairly to be excused.

F As to the payments to Mr. Elvins between May 1, 1964, and the date of the company's liquidation it is conceded that he must repay anything in excess of what he was entitled to draw under the agreement whereby he agreed to a reduced salary of £60 a week. The arrangement, whereby this weekly rate of payment was agreed to, was known to all the other ordinary shareholders and approved of by them, i.e., by Mr. East, Mr. Wood, Mr. Weikersheim and Mr. Conisbee. It is true that after August

G 13, 1964, Bentworth Credits Ltd. and Precast Concrete Ltd. became shareholders, but Mr. Wood, Mr. Weikersheim and Mr. Conisbee had held merely as nominees for these companies. After August 1964, relief under section 448 is clearly required.

In support of the above contentions, see *In re Express Engineering Works Ltd.* [1920] 1 Ch. 466, which establishes the principle that where

H all the corporators in fact approve, the mere absence of the technicality of a formal resolution in general meeting is immaterial: see *per* Lord Sterndale M.R., at p. 469, where he cites Lindley L.J. in *In re George Newman & Co. Ltd.* [1895] 1 Ch. 674, and Lord Davey in *Salomon* v.

*Salomon & Co. Ltd.* [1897] A.C. 22; and also *per* Warrington L.J. and
Younger L.J., in *In re Express Engineering Works Ltd.* [1920] 1 Ch. 466,    A
at pp. 470, 471, respectively.   The principle there established was extended
by Astbury J., in *Parker & Cooper Ltd.* v. *Reading* [1926] Ch. 975, 984,
which shows that the approval of the corporators does not have to be at
a meeting but can be given at different times and places.

As to the exercise of the court's power to excuse breaches of duty,
breaches of trust, etc., see *Selangor United Rubber Estates Ltd.* v.    B
*Cradock (No. 3)* [1968] 1 W.L.R. 1555, *per* Ungoed-Thomas J., at p. 1660;
*In re Claridge's Patent Asphalte Co. Ltd.* [1921] 1 Ch. 543; *In re
Richmond Gate Property Co. Ltd.* [1965] 1 W.L.R. 335 and *In re City
Equitable Fire Insurance Co. Ltd.* [1925] 1 Ch. 407, *per* Romer L.J., at
p. 441, and Pollock L.J., at p. 517.

The question whether to excuse or not seems to be in each case one
for the judge, as to which authority is of little assistance.   In this case    C
Mr. Elvins acted honestly and at all times consulted the company's
auditor, Mr. Preston, and in these circumstances he should be excused.

The respondent, Mr. Hanly, did not appear and was not represented.

BUCKLEY J. stated the facts and continued:                      D
It is common ground that none of the sums which I have mentioned
were authorised by any resolution of the company in general meeting, nor
were they authorised by any resolution of any formally constituted board
meeting; but it is said on behalf of Mr. Elvins that the payments were
made with the full knowledge and consent of all the holders of voting
shares in the company at the relevant times, and he contends that in those
circumstances the absence of a formal resolution by the company in duly    E
convened meeting of the company is irrelevant.   Alternatively, he relies on
section 448 of the Companies Act, 1948, which empowers the court to grant
relief in certain cases where an officer of the company has acted honestly
and reasonably and where, having regard to all the circumstances of the
case, he ought fairly to be excused.

In support of the first part of his argument Mr. McCulloch has relied on    F
two authorities.   The first was *In re Express Engineering Works, Ltd.* [1920]
1 Ch. 466 where five persons formed a private company in which they were
the sole shareholders, and they sold to it for £15,000, which was in fact
secured by debentures of the company, property which they had acquired
for £7,000 a few days before.   The contract for sale to the company and the
issue of debentures was carried out at a meeting of the five individuals,
who thereupon appointed themselves directors of the company.   That    G
meeting was described in the books of the company as a board meeting.
The articles forbade any director to vote in respect of any contract or
arrangement in which he might be interested; and in a winding up of the
company the liquidator claimed that the issue of the debentures was invalid.
In the Court of Appeal it was held, there being no suggestion of fraud, that
the company was bound in a matter intra vires by the unanimous agreement    H
of its members.   Lord Sterndale M.R. in his judgment, at p. 469, referred
to the earlier decision of the Court of Appeal in *In re George Newman &
Co. Ltd.* [1895] 1 Ch. 674 and cited a passage from the judgment of

**A** Lindley L.J. in that case, at p. 686, and went on himself to say that there were two differences between *Newman's* case and *Express Engineering Works*, first, the transaction in *Newman's* case was ultra vires, and, secondly, there never was a meeting of the corporators. Lord Sterndale M.R. in *In re Express Engineering Works Ltd.* [1920] 1 Ch. 466, 470, went on:

**B** "In the present case these five persons were all the corporators of the company and they did all meet, and did all agree that these debentures should be issued. Therefore it seems that the case came within the meaning of what was said by Lord Davey in *Salomon* v. *Salomon & Co. Ltd.* [1897] A.C. 22," and he quotes from Lord Davey. Lord Sterndale M.R. goes on: "It is true that a different question was there under discussion, but I am of opinion that this case falls **C** within what Lord Davey said. It was said here that the meeting was a directors' meeting, but it might well be considered a general meeting of the company, for although it was referred to in the minutes as a board meeting, yet if the five persons present had said, 'We will now constitute this a general meeting,' it would have been within their powers to do so, and it appears to me that that was in fact what they did."

**D** Warrington L.J. said, at p. 470:

"It was competent to them "—that is, the five corporators of the company—" to waive all formalities as regards notice of meetings, etc., and to resolve themselves into a meeting of shareholders and unanimously pass the resolution in question. Inasmuch as they could not in one capacity effectually do what was required but could do it **E** in another, it is to be assumed that as business men they would act in the capacity in which they had power to act. In my judgment they must be held to have acted as shareholders and not as directors, and the transaction must be treated as good as if every formality had been carried out."

Younger L.J. said, at p. 471:

**F** "I agree with the view that when all the shareholders of a company are present at a meeting that becomes a general meeting and there is no necessity for any further formality to be observed to make it so. In my opinion the true view is that if you have all the shareholders present, then all the requirements in connection with a meeting of the company are observed, and every competent resolution passed for **G** which no further formality is required by statute becomes binding on the company."

In that case there were no non-voting shares, but Mr. McCulloch contends that the presence of the non-voting shares in the present case does not matter. If he can establish that those who were entitled to attend and vote at general meetings of the company in fact agreed to all or any **H** of these payments, then he says that that is tantamount to a resolution passed at a general meeting of the company, and that the agreement of those persons is binding on the company in the same way as a resolution of a general meeting is binding on the company.

In *Parker and Cooper Ltd.* v. *Reading* [1926] Ch. 975, the second    A
case relied upon by Mr. McCulloch, the directors of a company had
created a debenture and proceedings were commenced to establish that the
debenture and the resolution which authorised its issue and the appointment
of a certain receiver under it were invalid. Astbury J. referred to *In re
Express Engineering Works Ltd.* [1920] 1 Ch. 466 and to *In re George
Newman & Co. Ltd.* [1895] 1 Ch. 674 and himself expressed this view [1926]
Ch. 975, at p. 984:                                                   B

> " Now the view I take of both these decisions is that where the trans-
> action is intra vires and honest, and especially if it is for the benefit of
> the company, it cannot be upset if the assent of all the corporators is
> given to it. I do not think it matters in the least whether that assent
> is given at different times or simultaneously."

Thus, the effect of his judgment was to carry the position a little further  C
than it had been carried in *In re Express Engineering Works Ltd.* [1920] 1
Ch. 466, for Astbury J. expressed the view that it was immaterial that the
assent of the corporators was obtained at different times, and that it was
not necessary that there should be a meeting of them all at which they
gave their consent to the particular transaction sought to be upheld.
In *Parker & Cooper Ltd.* v. *Reading* [1926] Ch. 975, as in *In re Express*  D
*Engineering Works Ltd.* [1920] 1 Ch. 466, no question arose about the
position of any shareholders whose shares conferred no right of attending
or voting at general meetings of the company.

The evidence in the present case, I think, establishes that Mr. Elvins and
Mr. East both approved the accounts of the company for the year ended
April 30, 1963, and, indeed, they signed a copy of those accounts; and the
evidence is that that was done on an occasion when they met together with  E
the auditor of the company, Mr. Preston, and that on that occasion Mr.
Preston explained to them the make-up of the aggregate figure of
£15,661 1s. 8d. for directors' salaries shown in the profit and loss account.
He explained to them what proportion of that figure was in respect of
Mr. Elvins and what proportion in respect of Mr. Hanly, and he explained
to them the method by which the figure was arrived at. It is not clear from  F
the evidence precisely when that meeting took place, but I think it must be
before Mr. Wood joined the board, and at a time when Mr. Elvins and
Mr. East were the only two directors of the company, and the only share-
holders in the company were Mr. Elvins and Mr. East and the preference
shareholder. No attempt has been made to show that the preference
shareholder ever knew anything about the remuneration of the directors
or their drawings or about any of the matters with which I am concerned;  G
and it follows, of course, that no attempt has been made to show that the
preference shareholder agreed to any of those matters.

Mr. Wright, for the liquidator, has contended that where there has been
no formal meeting of the company and reliance is placed upon the informal
consent of the shareholders the cases indicate that it is necessary to establish
that all shareholders have consented. He argues that as the preference  H
shareholder is not shown to have consented in the present case, that require-
ment is not satisfied, and that the assent of those shareholders—that is to
say, Mr. Elvins and Mr. East—who knew about these matters, and who did

A approve the figures relating to them in the accounts for the year ending
April 30, 1963, is of no significance. It seems to me that if it had occurred
to Mr. Elvins and Mr. East, at the time when they were considering the
accounts, to take the formal step of constituting themselves a general
meeting of the company and passing a formal resolution approving the
payment of directors' salaries, that it would have made the position of
the directors who received the remuneration, Mr. Elvins and Mr. Hanly,
B secure, and nobody could thereafter have disputed their right to retain their
remuneration. The fact that they did not take that formal step but that
they nevertheless did apply their minds to the question of whether the
drawings by Mr. Elvins and Mr. Hanly should be approved as being on
account of remuneration payable to them as directors, seems to lead to the
conclusion that I ought to regard their consent as being tantamount to a
resolution of a general meeting of the company. In other words, I proceed
C upon the basis that where it can be shown that all shareholders who have a
right to attend and vote at a general meeting of the company assent to some
matter which a general meeting of the company could carry into effect, that
assent is as binding as a resolution in general meeting would be. The
preference shareholder, having shares which conferred upon him no right
to receive notice of or to attend and vote at a general meeting of the
D company, could be in no worse position if the matter were dealt with
informally by agreement between all the shareholders having voting rights
than he would be if the shareholders met together in a duly constituted
general meeting.

Accordingly, the evidence that I have heard leads to the conclusion
that the drawings by Mr. Elvins and Mr. Hanly during the accounting year
ending April 30, 1963, which are covered by the item of directors' salaries
E £15,661 1s. 8d. in the profit and loss account cannot now be disturbed.

The position for the year ending on April 30, 1964, is different: the
draft accounts were at no time finally agreed, and Mr. McCulloch does not
dispute that unless Mr. Elvins can be excused under section 448 of the Act
of 1948, he is liable to repay to the liquidator the sum of £9,000 which is
shown in the profit and loss account for that year as being his salary. In
F that respect he relies upon the power conferred on the court by section 448
to excuse a director where he has acted honestly and reasonably and in
circumstances in which he ought to be excused. I should first say some-
thing about the other sums involved. As regards the drawings after April
30, 1964, amounting to £2,197 15s. 3d., it is not disputed that to the extent
that they exceed what it was legitimate for Mr. Elvins to draw under the
arrangement of £60 a week, Mr. Elvins must repay the excess. It is said
G by Mr. McCulloch that the arrangement relating to drawings at the rate
of £60 per week was one which was approved by all the relevant share-
holders—that is to say, all the shareholders at the relevant time other than
the preference shareholder.

The evidence, in my judgment, does establish that Mr. East knew of
the existence of such an arrangement between Mr. Elvins and Mr. Wood, and
H that Mr. Weikersheim and Mr. Conisbee also knew. I have not had the
advantage of any evidence from either of them, but I have this from Mr.
Wood: he says that both Mr. Weikersheim and Mr. Conisbee knew the
figure which it was agreed that Mr. Elvins should draw a week and that

they approved that arrangement.  So that at a time when the ordinary shares
were held exclusively by Mr. Elvins, Mr. East, Mr. Wood, Mr. Weikersheim    A
and Mr. Conisbee, I think it is established that all those shareholders
knew of, and agreed to, an arrangement under which Mr Elvins would
henceforth draw not more than £60 a week.  At that stage, had a resolution
of the company in general meeting been passed to that effect, there would
be no question that from May 1, 1964, to the date of the winding-up
resolution, Mr. Elvins would have been entitled to draw at that rate by way    B
of remuneration; and that would be so, I think, notwithstanding that at a
later date two other shareholders were added to the list of ordinary
shareholders, for those two additional shareholders would be bound by
what had been constitutionally done within the company before they
became members of it.

The conclusion I reach, therefore, with regard to the drawings after
April 30, 1964, is that Mr. Elvins is liable to repay to the liquidator only    C
such excess as there may be over what he would have been entitled to draw
on the basis of the £60-a-week arrangement.  That, I take it, would be the
amount which he could draw, calculated at £60 a week, less the appropriate
sum for income tax having regard to his P.A.Y.E. liability.

With regard to the compensation for loss of office, the £4,000 paid to
Mr. Hanly, the requirements of section 191 of the Companies Act, 1948,    D
were not complied with.  That section provides:

> " It shall not·be lawful for a company to make to any director of the
> company any payment by way of compensation for loss of office, or
> as consideration for or in connection with his retirement from office,
> without particulars with respect to the proposed payment (including
> the amount thereof) being disclosed to members of the company and    E
> the proposal being approved by the company."

That section must, I think, require disclosure to all members of the
company, and it must require disclosure while the payment is still a
proposed payment, that is to say, before the payment is made; and it
further requires that the proposal be approved by the company, which
must, I think, mean by the company in general meeting.    F

In the present case it is clear that no particulars of this payment of
£4,000 were, before the date that the payment was made, given to all the
members of the company, for no such disclosure was at any time made to the
preference shareholder.  There would, I think, be good reason for making
such disclosure to him, notwithstanding that he would have no right to
attend at any general meeting convened for the purpose of approving the
payment, because although he was not, by virtue of his preference share-    G
holding, entitled to receive notice of general meetings or attend and vote at
them, he might nevertheless wish to make his views known to those who
would attend and vote at the general meeting, and therefore notice to him of
the proposal to make the payment might well be a matter of some impor-
tance to him and of some ultimate consequence in the affairs of the com-
pany.  It follows that the payment was an ultra vires payment, for it was a    H
payment which the section says it was not lawful for the company to make.
The directors responsible for making it are liable in respect of it on the
grounds of misapplication of the company's funds unless they ought to be

A  excused under section 448. The section enables the court to grant relief where three circumstances are shown to exist. First of all the position must be such that the person to be excused is shown to have acted honestly; secondly, he must be shown to have acted reasonably; and thirdly, it must be shown that, having regard to all the circumstances of the case, he ought fairly to be excused.

B  Let me say at once that nobody has impugned Mr. Elvin's honesty in respect of any of these matters, and having seen him in the witness-box I should be the last to do so. I therefore proceed upon the footing that both in respect of the £4,000 and in respect of his drawings in the year to April 30, 1964, he acted honestly. Did he act reasonably in those respects, and are the circumstances such that he ought fairly to be excused?

C  I will deal first with his drawings. Those drawings were made in continuation of the practice adopted in the previous year, which had the approval of his co-director, and it is said on his behalf that he could not be expected to work for the company for nothing and that it was reasonable for him to expect to be remunerated, and that it was reasonable for him to expect that, when the time came, the company would approve his having drawn on account of his remuneration in the way he did. More particularly it is said it was reasonable that he would anticipate that

D  because he was himself the majority shareholder. The mistake arose from the fact that it never occurred to anybody to pass the necessary resolution. On the other hand, the regulations of the company, by reference to article 76 of Table A, specifically required that the remuneration of a director should be voted by the company in general meeting, from which it follows that in law a director of a company is not entitled to any remuneration at all unless and until it is voted. He is not entitled to say, after a period of

E  service, " I have served the company well and I have earned remuneration and I require the company to vote me a reasonable remuneration for what I have done." He is not entitled to make a claim on a quantum meruit basis, and if he chooses to draw on the company in anticipation of a resolution sanctioning those drawings and then, for some reason or another, no such resolution is ever passed, he is not entitled to say: " It

F  is right that I should be allowed to retain what I have drawn." In these circumstances can it be said that a director acts reasonably when he makes drawings on account of remuneration to which he is not presently entitled but to which he hopes to become entitled as the result of some resolution to be passed in the future? Whether he acts reasonably or not must, it seems to me, to some extent depend upon the way in which matters have been handled in the company in the past, and I think that it is difficult to say

G  that Mr. Elvins did not act reasonably in continuing to make his drawings in the same sort of way in which he had made drawings in the previous year. In fact he drew a smaller sum in all in the latter of the two years.

But ought he to be excused from his liability to repay the amount of those drawings having regard to the legal position in which he stood? It would be a very undesirable thing that a director, acting on his own

H  initiative, should make drawings and thereby put the company in the invidious position of saying, " These drawings were unreasonable. The director ought not to have made them. We are going to claim them all back." The director would be putting the company in a very difficult

376
**Buckley J.**                      **In re Duomatic Ltd.**                      **[1969]**

position. Directors must, I think, take the trouble to discover just what
their rights and obligations are, and if they draw on account of remuneration    A
to which they are not entitled in anticipation of its being voted to them in the
future, then normally the director could not be said to be acting reasonably
and ought not to be excused.

However, there is in the present case, I think, this important circum-
stance, that at the time he made these drawings Mr. Elvins was in control
of this company. He could have passed, in general meeting, any resolution    B
he chose. It was an oversight that no resolution was ever passed
authorising him to retain the amount of these drawings. He has not held
the company to ransom in any way by what he did. As I see the position
he has not put the company in an embarrassing position by drawing sums
to which he might or might not become entitled in the future. Here the
error was one of substance, but still of a technical nature. It was just that
he did not appreciate that, in order to retain what he had in all honesty    C
drawn as his remuneration from the company, he ought to procure the
passing of a resolution.

In the special circumstances of this case I think that it is one in which
I can excuse Mr. Elvins in respect of the drawings during the year ended
April 30, 1964.

As regards the £4,000 paid to Mr. Hanly. He was not in a strong    D
position to stipulate for any compensation for loss of office. He had no
contract of service, he had no security of tenure of his seat on the board,
his conduct during the 12 months or so preceding his departure from the
board appears, from the evidence, to have been such as to merit very
little consideration from the point of view of remuneration for his services
during that period. He had been constantly in default in the performance
of his duties and had been causing his co-directors a great deal of trouble,    E
and his conduct seems to have been likely to have caused the company
considerable damage. Nevertheless, in respect of the last 12 months
or so of his service as a director of the company he received remuneration
of the order of £5,000, and there really was no ground at all on which
he could claim any compensation for loss of office as a director of the
company. On the other hand, I think it is very probable that Mr. Elvins    F
and Mr. East were justified in their view that he could have made himself
a considerable nuisance to the company had he chosen to do so after he
had ceased to be a director. It never seems to have occurred to Mr.
Elvins or to Mr. East that it would be desirable to obtain any professional
advice as to the strength of Mr. Hanly's bargaining position. They
obtained no legal advice and no professional advice of any other kind,
except so far as they had advice from their accountant and auditor, Mr.    G
Preston.

The figure of £4,000 was one which was negotiated by Mr. Elvins with
Mr. Hanly, and Mr. Elvins was influenced by what he considered to be a
precedent in his actual experience, an earlier occasion when the company,
or some company in which he was concerned, had got rid of an executive
who had a service agreement with some years to run, who was paid compen-    H
sation when he was dismissed. But that case, of course, was really no
kind of precedent for Mr. Hanly's case because, as I pointed out, Mr.
Hanly had no contract and no security of tenure in his office as a director

A  at all.  Neither Mr. Elvins nor Mr. East appear to have taken into account that, under the Companies Act, 1948, the company could have removed Mr. Hanly from his office as a director, and that under the regulations of the company they could have, in proper circumstances, refused to register any transfer by Mr. Hanly of his shares to an unsuitable transferee.

In my judgment a director of a company dealing with a matter of this kind who does not seek any legal advice at all but elects to deal with the
B  matter himself without a proper exploration of the considerations which contribute, or ought to contribute, to a decision as to what should be done on the company's behalf, cannot be said to act reasonably.  In my judgment Mr. Elvins did not act reasonably in this respect.  He failed to take those steps which, as a director of the company, he should have taken before making the bargain which he made with Mr. Hanly.  It may be that, after considering legal advice, and any other advice that he might have sought, he
C  still would have thought it desirable to pay Mr. Hanly something to get rid of him with as little friction as possible, but it does not follow that the sum which he would have paid him would have been £4,000.  The question which I have to ask myself is whether, in acting in the way in which he did, Mr. Elvins acted reasonably.  I do not think that he was acting in the way in which a man of affairs dealing with his own affairs with reasonable
D  care and circumspection could reasonably be expected to act in such a case, for I think that any such imaginary character would take pains to find out all the relevant circumstances, many of which in this case depended upon some knowledge of the law, and ought to have encouraged Mr. Elvins to seek the assistance of a legal adviser.  Moreover, it was Mr. Elvins' failure to seek legal advice that resulted in this payment being made in contravention of section 191 of the Act and constituted it an ultra vires
E  payment which the company could not lawfully make.  In these circumstances I do not think that the provisions of section 448 avail Mr. Elvins in respect of this sum.

To summarise the result of this judgment, I therefore reach the conclusion that the claim put forward by the liquidator fails as regards all the sums claimed except the £4,000 and so much of the £2,197 15s. 3d. as
F  constitutes an excess over the amount which Mr. Elvins was properly entitled to draw under the £60-a-week arrangement.

A condition of his being excused from liability in respect of the £9,000 should be, I think, that he should pay the liquidator's costs of this application.

I have been directing my mind to Mr. Elvins throughout this judgment. Of course, it does mean that Mr. Hanly is also liable in respect of the £4,000,
G  with interest.

> *Order for repayment of £4,000 and so much*
> *of the sum of £2,197 15s. 3d. as constituted*
> *excess over the agreed rate of remuneration*
> *of £60 per week, with interest and costs*
> *against both respondents jointly and severally.*

H
Solicitors: *Fairchild, Greig & Co.; Lovell, White & King* for *Saffman & Co., Leeds.*

                                        T. C. C. B.

**EXHIBIT P**

CHANCERY DIVISION.

BARRON *v.* POTTER.

POTTER *v.* BERRY.

[1914 B. 638.]

[1914 P. 92.]

WARRING-
TON J.

1914

*March* 13.

*Company — Additional Directors — Appointment by Board of Directors —*
*Informal Meeting—Unable or unwilling to act—Power of Company in*
*General Meeting—Companies (Consolidation) Act, 1908 (8 Edw. 7, c. 69),*
*Table A, cl. 85.*

A board meeting of directors can be held under informal circum-
stances, but the casual meeting of two directors even at the office of
the company cannot be treated as a board meeting at the option of one
against the will and intention of the other, and it makes no difference
that a notice convening a board meeting has been sent by the one to
the other if such notice has not in fact been received by the other.

*Smith* v. *Paringa Mines* [1906] 2 Ch. 193 distinguished.

Where the articles of association of a company incorporated under
the Companies (Consolidation) Act, 1908, give to the board of directors
the power of appointing an additional director, and owing to differences
between the directors no board meeting can be held for the purpose,
the company retains power to appoint additional directors in general
meeting.

Observations of Cotton and Fry L.JJ. in *Isle of Wight Ry. Co.* v.
*Tahourdin* (1883) 25 Ch. D. 320, 332, 335, followed.

*Blair Open Hearth Furnace Co.* v. *Reigart* (1913) 108 L. T. 665
distinguished.

CROSS-MOTIONS.

The British Seagumite Company, Limited, was incorporated
under the Companies (Consolidation) Act, 1908, as a private
company in January, 1912.  Article 21 of the articles of associa-
tion provided that the number of directors should be not less
than two or more than ten.  Article 26 provided that the quorum
of directors for transacting business should, unless otherwise
fixed by the directors, be two.  The articles also incorporated
clause 85 of Table A, which provides : " The directors shall have
power at any time, and from time to time, to appoint a person as
an additional director who shall retire from office at the next
following ordinary general meeting, but shall be eligible for
election by the company at that meeting as an additional
director."  The articles also incorporated clause 87 of Table A,

WARRING-
TON J.

1914

BARRON
*v.*
POTTER.

POTTER
*v.*
BERRY.

which gives power to the directors to regulate their business as they think fit and gives the chairman a second or casting vote in case of equality.

In the commencement of the year 1914 there were two directors only, W. J. Potter, the chairman and managing director, and Canon Barron. The conduct of the company's business was at a standstill as Canon Barron refused to attend any board meeting with Mr. Potter. On February 9 Canon Barron (pursuant to the provisions of s. 66 of the Companies (Consolidation) Act, 1908) sent out a notice convening an extraordinary general meeting for February 24, at 28, Fleet Street, the registered office of the company, for the purpose of passing a resolution terminating the appointment of Mr. Potter as managing director of the company, and a resolution that one Charles Berry be appointed an additional director.

On February 21 Mr. Potter sent through the post to Canon Barron a notice requesting him to attend a board meeting at the company's office on February 24 at 2.40 P.M. This notice, however, was not in fact received by Canon Barron, who lived in the country, until a later date after his return from London.

Canon Barron arrived by train at Paddington Station on February 23, and on his arrival was met on the platform by Mr. Potter, who there purported under the circumstances presently stated to hold a board meeting and by his casting vote to appoint three persons as additional directors of the company. Canon Barron came to the company's office on February 24 with the intention of attending not a board meeting but the extraordinary meeting of the company. Mr. Potter met him in the office before the meeting and under the circumstances presently stated again proposed the appointment of additional directors. Canon Barron disregarded the proposal, whereupon Mr. Potter purported to vote and declared them elected.

The extraordinary meeting of the company was then held, at which the first resolution was put to the meeting and carried on a show of hands. Mr. Potter then demanded a poll, stating that he would fix a place and time. In default of the chairman, Canon Barron put the second resolution to the meeting, which, together with an amendment adding two other persons as

additional directors, he declared to be carried.    Mr. Potter,
however, ruled it to be illegal, as the power lay with the directors
and not with the company.

On February 24, 1914, Canon Barron issued his writ (to which
the company was afterwards added as co-plaintiff) against Mr.
Potter and the persons purporting to have been appointed as
additional directors at the alleged board meetings for an
injunction to restrain the defendants, other than Mr. Potter, from
acting as directors and for a declaration that they had not been
validly appointed as directors ; and on March 6, 1914, Mr. Potter
issued his writ in the cross-action, claiming a declaration that the
appointment of the additional directors at the general meeting
was ultra vires and invalid, and an injunction ; and the respective
plaintiffs now moved for interlocutory injunctions.

The questions raised by each motion were the same, namely,
(1.) whether what had taken place between Mr. Potter and
Canon Barron amounted to a valid appointment by the board
of the additional directors proposed by Mr. Potter ; and (2.) if
not, then whether the resolution of the company in general
meeting was a valid appointment of the persons named in the
resolution.

Mr. Potter's evidence on the first point was that owing to the
refusal of Canon Barron to attend any board meeting the position
of the affairs of the company was becoming so serious that he
was advised in the interests of the company to meet Canon
Barron wherever he could be found and to use his casting vote
as chairman in case Canon Barron should refuse to agree
to the appointment of additional directors.    Accordingly on
February 23 he met the train at Paddington by which he
expected Canon Barron to arrive, and seeing him alight from it
walked by his side along the platform and said to him, " I want
to see you, please." Canon Barron replied, " I have nothing to
say to you."    Mr. Potter then said, " I formally propose that we
add the Reverend Charles Herbert, Mr. William George Walter
Barnard, and Mr. John Tolehurst Musgrave as additiona
directors to the board of the British Seagumite Company
Limited.    Do you agree or object ? " Canon Barron replied,
" I object and I object to say anything to you at all."    Mr.

WARRING-
TON J.
1914

BARRON
v.
POTTER.
POTTER
v.
BERRY.

CHANCERY DIVISION. **[1914]**

WARRING-
TON J.

1914

BARRON
*v.*
POTTER.
POTTER
*v.*
BERRY.

Potter then said, "In my capacity as chairman I give my casting vote in their favour and declare them duly elected." He continued to walk with Canon Barron a few steps and then said, "That is all I want to say; thank you. Good day."

According to Canon Barron's evidence, on his arrival at Paddington Station he engaged a porter to carry his luggage to a taxicab. On the way to it he saw Mr. Potter coming towards him, who said, "I want a word with you." He replied, "I shall hold no communication with you. I shall have nothing to do with you." Mr. Potter then laid his hand upon Canon Barron's arm and said, "I propose Mr. . . . . as a director." Canon Barron did not catch the name and turned his back and continued towards his taxicab. He then heard Mr. Potter hurriedly say, "Have you any amendment? Then I give my casting vote."

As to the alleged board meeting on February 24, Mr. Potter stated that Canon Barron arrived at the office of the company with the object of attending the extraordinary general meeting called by him. Mr. Potter thereupon proposed to Canon Barron that Mrs. Clara Rose Potter, Miss Florence Millicent Hewitt, and Mr. Frank Burnett should be appointed additional directors of the company, proposing each name separately. Canon Barron disregarded the proposals and refused to vote thereon, whereupon Mr. Potter voted in favour of them and declared the persons named to be duly elected directors.

According to Canon Barron's evidence, he attended at the registered office of the company at 3 o'clock P.M. to attend the extraordinary general meeting, and as he entered the inner room where the meeting was to be held Mr. Potter came after him and said, "I propose Mrs. Clara Rose Potter and (mentioning another name) as directors. Have you any amendments?" Canon Barron answered laughingly, "Yes, I have plenty of amendments which we shall discuss." Here Mr. Potter interrupted him and said, "Then I give my casting vote; they are elected."

*H. Terrell, K.C.,* and *Sheldon,* for the motion in Barron's action. First, there was no valid appointment of the additional

WARRING-
TON J.

1914

BARRON
*v.*
POTTER.

POTTER
*v.*
BERRY.

directors at any board meeting. The persons attending a board meeting must attend as directors and vote as directors. These requirements were not satisfied by what took place either at Paddington Station or on the second occasion at the office of the company. A directors' meeting may no doubt be held informally : *Smith* v. *Paringa Mines* (1) ; but that case bears no resemblance to the present. Secondly, notwithstanding the delegation by the articles of the power of appointing an additional director, the company retained a concurrent power under circumstances such as existed in the present case : *Isle of Wight Ry. Co.* v. *Tahourdin.* (2) Otherwise there would be a complete deadlock, and there is nothing in *Blair Open Hearth Furnace Co.* v. *Reigart* (3), *Automatic Self-cleansing Filter Syndicate Co.* v. *Cuninghame* (4), and *Salmon* v. *Quin & Axtens* (5) which conflicts with this view. *Automatic Self-cleansing Filter Syndicate Co.* v. *Cuninghame* (4) was explained by Neville J. in *Marshall's Valve Gear Co.* v. *Manning, Wardle & Co.* (6)

*Clauson, K.C.,* and *H. E. Wright,* for the respondents. As to the first point we do not rely on the meeting at Paddington Station, but on the subsequent occasion on February 24 there was every ingredient of a valid board meeting. Notice summoning the meeting had been duly sent through the post by Mr. Potter even if it had not then been received by Canon Barron, and the place of actual meeting was at the registered office of the company. The meeting was no more informal than in *Smith* v. *Paringa Mines* (1), and it was not open to Canon Barron to nullify it by his conduct. Secondly, the resolution carried at the general meeting was in any case invalid. The express power of appointing an additional director conferred by the articles on the directors excludes the existence of a concurrent power in the company : *Blair Open Hearth Furnace Co.* v. *Reigart* (3); *Automatic Self-cleansing Filter Syndicate Co.* v. *Cuninghame* (4); *Gramophone and Typewriter* v. *Stanley.* (7) The case

(1) [1906] 2 Ch. 193.
(2) 25 Ch. D. 320, 332, 335, per Cotton and Fry L.JJ.
(3) 108 L. T. 665.
(4) [1906] 2 Ch. 34.
(5) [1909] 1 Ch. 311 ; affirmed in

H. L. sub nom. *Quin & Axtens* v. *Salmon* [1909] A. C. 442.
(6) [1909] 1 Ch. 267.
(7) [1908] 2 K. B. 89, 98, per Fletcher Moulton L.J.

CHANCERY DIVISION.   **[1914]**

WARRING-
TON J.
1914
—
BARRON
*v.*
POTTER.
POTTER
*v.*
BERRY.
—

of *Isle of Wight Ry. Co.* v. *Tahourdin* (1), which is relied on
against us, is inapplicable; since that was a case under the
Companies Clauses Consolidation Act, 1845, which contains. an
express provision making the exercise. of the directors' powers
subject to the control of a general meeting, and it was dis-
tinguished on that ground in *Automatic Self-cleansing Filter
Syndicate Co.* v. *Cuninghame* (2) and in *Salmon* v. *Quin &
Axtens.* (3)

*H. Terrell, K.C.,* was called on to reply only as to the alleged
board meeting on February 24. What took place between
Mr. Potter and Canon Barron on that occasion was not business
·transacted at a board meeting. Canon Barron attended at the
office of the company for the purposes of the extraordinary
general meeting only and without any intention of attending a
board meeting with Mr. Potter. One director cannot force
another to hold a board meeting against his will. The facts in
*Smith* v. *Paringa Mines* (4) were totally different.

WARRINGTON J. In the present case there are two cross-
motions, the objects of which are the same, though the position
of the parties is reversed. The question is whether certain
additional directors appointed at a general meeting of the
company were validly appointed or whether certain additional
directors were validly appointed at a directors' meeting, in which
case the resolution of the company in general meeting would be
invalid. [His Lordship stated the facts and continued:] Mr.
Potter originally insisted that what took place on the platform of
Paddington Station was a directors' meeting at which a sufficient
proposal was made for the appointment of the three persons
named as additional directors, and that if Canon Barron did not
vote it was competent to Mr. Potter to vote and carry the
resolution, or if Canon Barron did vote, then it was competent
for Mr. Potter to carry it by his own casting vote. It is not,
however, now contended that what took place on that occasion
was a valid appointment of the additional directors, but it is
contended that what took place the next day immediately before

(1) 25 Ch. D. 320.            (3) [1909] 1 Ch. 311.
(2) [1906] 2 Ch. 34            (4) [1906] 2 Ch. 193.

the general meeting did amount to a valid appointment. I will first refer to the articles of association under which the company is substantially governed by Table A, clause 85 of which provides that " the directors shall have power at any time, and from time to time, to appoint a person as additional director . . . . ," and clause 87 gives power to the directors to regulate their business as they think fit and gives the chairman a second or casting vote in case of equality. Another article provides that the quorum of directors, unless otherwise fixed by the directors, shall be two. [His Lordship then referred to what took place between Canon Barron and Mr. Potter immediately before the general meeting on February 24 and said that there was no substantial difference between the accounts which they gave respectively, and continued :] What then took place is said to have been a directors' meeting at which a valid appointment was made of the three additional directors proposed by Mr. Potter. The answer, in my opinion, is that there was no directors' meeting at all for the reason that Canon Barron to the knowledge of Mr. Potter insisted all along that he would not attend any directors' meeting with Mr. Potter or discuss the affairs of the company with him, and it is not enough that one of two directors should say " This is a directors' meeting" while the other says it is not. Of course if directors are willing to hold a meeting they may do so under any circumstances, but one of them cannot be made to attend the board or to convert a casual meeting into a board meeting, and in the present case I do not see how the meeting in question can be treated as a board meeting. In my opinion therefore the true conclusion is that there was no board meeting, but that Canon Barron came with the deliberate intention of not attending a board meeting. If he had received the notice sent to him by Mr. Potter summoning him to a board meeting different considerations might have arisen, but he had not received it and came with the fixed intention of not attending any such meeting. There was therefore no board meeting at which Canon Barron was present. Mr. Potter was alone present, so that there was no quorum, and I must hold that the three additional directors named by him were not validly appointed.

WARRING-
TON J.

1914

BARRON
*v.*
POTTER.

POTTER
*v.*
BERRY.

CHANCERY DIVISION.    **[1914]**

WARRING-
TON J.

1914

BARRON
*v.*
POTTER.
POTTER
*v.*
BERRY.

The question then arises, Was the resolution passed at the general meeting of the company a valid appointment? The argument against the validity of the appointment is that the articles of association of the company gave to the board of directors the power of appointing additional directors, that the company has accordingly surrendered the power, and that the directors alone can exercise it. It is true that the general point was so decided by Eve J. in *Blair Open Hearth Furnace Co.* v. *Reigart* (1), and I am not concerned to say that in ordinary cases where there is a board ready and willing to act it would be competent for the company to override the power conferred on the directors by the articles except by way of special resolution for the purpose of altering the articles. But the case which I have to deal with is a different one. For practical purposes there is no board of directors at all. The only directors are two persons, one of whom refuses to act with the other, and the question is, What is to be done under these circumstances? On this point I think that I can usefully refer to the judgment of the Court of Appeal in *Isle of Wight Ry. Co.* v. *Tahourdin* (2), not for the sake of the decision, which depended on the fact that it was a case under the Companies Clauses Consolidation Act, 1845, but for the sake of the observations of Cotton and Fry L.JJ. upon the effect of a deadlock such as arose in the present case. Cotton L.J. says (3): "Then it is said that there is no power in the meeting of shareholders to elect new directors, for that under the 89th section the power would be in the remaining directors. The remaining directors would no doubt have that power if there was a quorum left. But suppose the meeting were to remove so many directors that a quorum was not left, what then follows? It has been argued that in that case, there being no board which could act, there would be no power of filling up the board so as to enable it to work. In my opinion that is utterly wrong. A power is given by the 89th section to the remaining directors 'if they think proper so to do' to elect persons to fill up the vacancies. I do not see how it is possible for a non-existent body to think proper

(1) 108 L. T. 665.        (2) 25 Ch. D. 320.
(3) 25 Ch. D. 332.

to fill up vacancies. In such a case a general meeting duly summoned for the purpose must have power to elect a new board so as not to let the business of the company be at a deadlock." Fry L.J. says this (1): "Then with regard to the objection that a general meeting cannot elect directors to fill up vacancies, it appears to me that a general meeting would at any rate have that power in the event of all the directors being removed. In my judgment it is quite impossible to read the 89th section as the only section relating to the filling up of vacancies in the office of directors. That applies only where there are remaining directors, and those remaining directors think proper to exercise their power. That does not, in my judgment, deprive the general meeting of the power to elect directors, where there are no directors, or where the directors do not think fit to exercise their powers." Those observations express a principle which seems to me to be as applicable to the case of a limited company incorporated under the Companies (Consolidation) Act, 1908, as to a case falling under the Companies Clauses Consolidation Act, 1845, and moreover to be a principle founded on plain common sense. If directors having certain powers are unable or unwilling to exercise them—are in fact a non-existent body for the purpose—there must be some power in the company to do itself that which under other circumstances would be otherwise done. The directors in the present case being unwilling to appoint additional directors under the power conferred on them by the articles, in my opinion, the company in general meeting has power to make the appointment. The company has passed a resolution for that purpose, and though a poll has been demanded no date or place has yet been fixed for taking it. The result therefore is that I must grant an injunction on the motion in Canon Barron's action and refuse the motion in Mr. Potter's action.

WARRING-
TON J.

1914

BARRON
*v.*
POTTER.

POTTER
*v.*
BERRY.

Solicitors: *Bartlett & Gluckstein; A. J. Greenop & Co.*

(1) 25 Ch. D. 335.

A. C.

**EXHIBIT Q**

# Hunter v Senate Support Services Ltd and others

## [2004] EWHC 1085 (Ch)

CHANCERY DIVISION

JOHN RANDALL QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT

2–5, 23–27 FEBRUARY, 1 APRIL, 17 MAY 2004

*Shareholder – Action – Forfeiture of shares – Locus standi – Whether shareholder entitled to bring action to set aside forfeiture of shares.*

*Meeting – Board of directors – Whether meeting of board of directors validly convened – Whether informal agreement reached by all directors amounting to valid decision by board.*

*Director – Disclosure of interest – Forfeiture of shares – Directors indirectly benefiting from forfeiture – Directors informally disclosing possible conflict of interest – Shareholder failing to respond to call for payment of shares – Whether decision to make call properly made – Companies Act 1985, s 317 – Companies (Tables A to F) Regulations 1985, SI 1985/805, Table A, regs 85, 112, 115.*

*Shares – Forfeiture of shares – Shareholder failing to respond to call for payment of shares – Whether forfeiture of shares inevitable result of non-payment of call – Whether directors having discretion not to forfeit shares – Whether directors' failure to consider exercise of discretion rendering decision to forfeit voidable.*

In 1999 the claimant agreed to merge his security business into a larger group in return for a 12.5% holding (ie 125 £1 shares) in the group. In July 2000, in the course of restructuring the group, the claimant sold a 7.5% interest (ie 75 shares) in the group at par to the major shareholder in return for being allotted a 25% shareholding in one group subsidiary and 2.5% shareholdings in two other subsidiaries. The allotments were made at par (ie £250 for the 25% shareholding and £25 for each of the 2.5% shareholdings) but at no stage did the claimant make payment for the shares. However, notes appended to the audited balance sheets of each of the three subsidiaries at 30 June 2001 erroneously described the entire share capital as 'Allotted, called up and fully paid'. In September 2002, when it was proposed to wind up one of the subsidiaries and distribute its assets following the sale of its business, it was discovered that the claimant had not paid for his shares and was therefore not entitled to participate in any distribution by way of dividend. On 27 September the directors of the three subsidiaries, having received legal advice and having agreed to do so at an informal meeting the day before, resolved to make a call for payment of the shares in accordance with reg 12 of Table A and the claimant was duly

notified to that effect. However, he chose to ignore the call. On 15 October *a*
the directors resolved to issue a further call notice in accordance with reg 18
of Table A and on 16 October a further call notice was sent to the claimant,
who claimed never to have received it and on 24 October the directors
agreed that in what was considered to be the unlikely eventuality of
non-payment by the claimant the procedure for forfeiture of his shares
should be carried out. On 2 November the time for payment under the *b*
second call notice expired without payment being made by the claimant. On
3 November formal board meetings of each of the three subsidiaries
resolved to forfeit the claimant's shares for non-payment of the call and to
transfer his shares to the group holding company. The claimant brought
proceedings to have the forfeiture declared invalid and set aside and the
register of members of the companies rectified to show the claimant as the *c*
holder of the shares. The claimant contended (i) that the companies were
estopped by representation or convention from denying that his shares were
fully paid up or were credited to him, by virtue of the note to the balance
sheets that the entire share capital was allotted, called up and fully paid, (ii)
that the meetings at which the call resolutions were passed were not validly *d*
convened and the directors' decisions to make the calls were invalidated by
reason of an undeclared conflict of interest between their duties to the
company and their personal interests or duty owed to the claimant, and/or
an improper purpose on their part, and (iii) that the second call notice had
not been 'properly addressed' because it had not been posted to him 'at his
registered address'. Under art 8.1 of the three subsidiaries' articles of *e*
association a director who had disclosed his interest could vote in respect of
any contract, proposed contract or any arrangement in which he was
interested directly or indirectly. The articles of association also incorporated
reg 85 of Table A under which a director was entitled to vote 'provided that
he … disclosed to the directors the nature and extent of any material
interest', reg 112 of Table A, which provided that a company 'may give any *f*
notice' by posting it to the member at his registered address, and reg 115 of
Table A, under which 'Proof that an envelope containing a notice was
properly addressed, prepaid and posted [was] conclusive evidence that [the]
notice was given'.

**Held** – (1) The claimant had locus standi to bring the claim by virtue of *g*
having either a direct personal or representative right to bring a claim to set
aside the forfeiture of his own shares (it being unnecessary to differentiate
between the two because he was the only shareholder affected by the
decisions to forfeit and the underlying call, and therefore he alone was the
whole body of affected shareholders), because the substance of a claim to *h*
set aside a forfeiture of shares was an alleged infringement of the claimant's
individual rights as a shareholder, not in substance a claim where a wrong
had been done to the company, nor a claim where the rights infringed
belonged to the company alone. (See [192]–[193], [199], below.) *Sweney v
Smith* (1869) LR 7 Eq 324 and dicta of Lord Wilberforce in *Howard
Smith Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126 at 1133, *i*
1135–1136, [1974] AC 821 at 834, 837 and of Hoffmann J in *Re a
company* (*No 005136 of 1986*) [1987] BCLC 82 at 84–85 applied.
  (2) Although the claimant was a director of one of the subsidiary
companies and was therefore under a legal obligation pursuant to ss 226

*a* and 233 of the 1985 Act to prepare and approve its accounts, given the factual circumstances in that the company did not prevent him from advancing a claim that the audited accounts of all three subsidiary companies contained a clear and unequivocal representation that his shares were fully paid up or were credited to him. The directors of the three subsidiaries ought reasonably to have expected the claimant to rely on the

*b* representations contained in the erroneous notes appended to the accounts, but in fact the representations had not caused him to believe that his shares were fully paid up or were credited to him and they had no operative effect on his mind at any time prior to the forfeiture, since he did not even consider the question of whether his shares were or were not paid up until after he received the call letter and once he received the call letter, it would

*c* have been unreasonable for him to rely on the representations without further inquiry. Furthermore, to the extent that there were representations in the draft accounts of one of the subsidiaries, they would not have been binding on that company because the draft accounts were expressly subject to alteration and were therefore not clear and unequivocal, and although

*d* provided to the claimant on the directors' authority they were only a representation by the auditors as to the present state of their work in progress and were not, pending the directors' approval or in the absence of clear words, a representation made by the company. (See [69]–[72], [74]–[76], [79]–[83], [86], below.)

(3) The parties' dealings did not give rise to an estoppel by convention

*e* because prior to the call resolution on 27 September 2002 there was no assumption by the directors or the claimant that his shares were paid up, since nobody had ever considered the matter, but even if the claimant had conducted his dealings on the basis of a mistaken assumption that his shares were fully paid up, the defendants had not contributed in any active way towards the creation or continuance of that mistaken assumption. (See

*f* [89]–[91], [95], [99], below.) *Norwegian American Cruises A/S v Paul Mundy Ltd, The Vistafjord* [1988] 2 Lloyd's Rep 343 at 352 and dictum of Brooke J in *Bank of Scotland v Wright* [1991] BCLC 244 at 261 applied.

(4) The meetings of 27 September at which the first call resolutions were passed were validly convened and the minutes accurately reflected the substance of what occurred. In any event, the informal agreement reached

*g* by all the directors the day before those meetings would have sufficed as decisions of the three boards to make the call. Similarly, the informal agreement reached by all the directors on 15 October to issue the further call notices sufficed as decisions of the three boards to do so. (See [100], [103], [123]–[124], below.) Dicta of Sir James Bacon V-C in *Re Bonelli's*

*h* *Telegraph Co, Collie's claim* (1871) LR 12 Eq 246 at 258 and of Simon Brown J in *Runciman v Walter Runciman plc* [1992] BCLC 1084 at 1092 applied.

(5) It was not clear whether the common law rule prohibiting directors from putting themselves in a position where there was a possible conflict of interest between their duties to the company and their personal interests or

*i* any duty owed to another person applied where they were simply exercising a power, such as making a call or declaring a dividend, as opposed to procuring the company to enter into a contract. However, even if the rule applied it had not been infringed by the directors' decisions to make the call resolutions, since at the time the resolutions were passed the directors' only

potential conflict of interest was anything but immediate being multiply contingent, principally on how the claimant (as the only shareholder affected) reacted to the calls, which was a matter wholly outside the directors' control. In any event, although the directors could not rely on art 8.1 of the articles of association to authorise their participation in a decision in which they had a possible conflict of interest, because any disclosure under art 8.1 had to be made at a meeting of the directors and in accordance with s 317 of the Companies Act 1985 and no such disclosure had been made at the relevant meetings, they were entitled to rely on reg 85 of Table A under which the relevant disclosure could be made informally, as had in fact happened by virtue of the fact that all the directors were aware of each other's shareholdings in the group holding company to which the claimant's shares were transferred. Furthermore, the decision to make the call in each of the three subsidiaries was made for proper purposes. (See [106], [113], [117]–[119], [121], [129]–[131], below.) *Re National Provincial Marine Insurance Co, Gilbert's case* (1870) 5 Ch App 559 distinguished; *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461 considered.

(6) Even assuming that the claimant did not receive the second call notice, he was nevertheless to be treated as having received the notice by virtue of reg 115 of Table A. Regulation 112 was permissive and not mandatory and accordingly regs 112 and 115 of Table A did not require that service of a notice on a member by the company by post had to be to his registered address. Instead, a notice was 'properly addressed' if it was accurately addressed. (See [136]–[137], [140]–[141], below.) Dictum of Vaisey J in *Rayfield v Hands* [1958] 2 All ER 194 at 196 applied.

(7) Although the decisions of the directors of the three subsidiaries made on 3 November 2002 to forfeit the claimant's shares for non-payment of the call and to transfer the forfeited shares to the group holding company were not made for any improper purpose they were nevertheless flawed because the directors had proceeded on the mistaken basis that the only course available to them was forfeiture of the shares. The directors regarded forfeiture to be the inevitable result of non-payment of the second call notice and had acted without giving any consideration to possible alternative courses of action or exercising a genuine discretion whether to forfeit, as they were bound to do. In particular, they could have informed the claimant that his shares would not be forfeited but in the absence of payment he would be excluded from any future dividend. Their failure to consider the exercise of such a discretion amounted to a failure to take into account matters which they ought reasonably to have taken into account and the evidence showed that had they done so they would or might have reached a different decision. The directors' decision to forfeit the claimant's shares was therefore voidable at the instance of the claimant. In all the circumstances the resolutions forfeiting the claimant's shares would be set aside. (See [157], [159]–[160], [164]–[168], [179], [182]–[184], [187]–[188], [203], below.) Dicta of Harman J in *Re a company, ex p Glossop* [1988] BCLC 570 at 577 applied; *Abacus Trust Co v Barr* [2003] 1 All ER 763 at [28]–[33] (Lightman J) and dicta of Sir Nicolas Browne-Wilkinson V-C in *Byng v London Life Association Ltd* [1989] BCLC 400 at 412, of Lord Woolf MR in *Equitable Life Assurance Society v Hyman* [2000] 2 All ER 331 at [17]–[21], of Pennycuick J in

a  *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185 at 1194, and of Helsham J in *Provident International Corp v International Leasing Corp* [1969] 1 NSWLR 424 at 439 and 441 considered.

**Cases referred to in judgment**

b  *Abacus Trust Co v Barr* [2003] EWHC 114 (Ch), [2003] 1 All ER 763, [2003] Ch 409, [2003] 2 WLR 1362.

*Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461, [1843–60] All ER Rep 249, HL.

*Allied Maples v Simmons & Simmons* [1995] 4 All ER 907, [1995] 1 WLR 1602, CA.

c  *Amalgamated Investment & Property Co Ltd* (*in liq*) *v Texas Commerce International Bank Ltd* [1981] 1 All ER 923, [1982] QB 84, [1981] 2 WLR 554; *affd on other grds* [1981] 3 All ER 577, [1982] QB 84, [1981] 3 WLR 565, CA.

*AMP* (*UK*) *v Barker* [2001] PLR 77.

d  *Associated Provincial Picture Houses Ltd v Wednesbury Corp* [1947] 2 All ER 680, [1948] 1 KB 223, CA.

*Bank of Scotland v Wright* [1991] BCLC 244.

*Barron v Potter* [1914] 1 Ch 895.

*Bonelli's Telegraph Co, Re, Collie's claim* (1871) LR 12 Eq 246.

*Byng v London Life Association Ltd* [1989] BCLC 400, [1990] 1 All ER
e  560, [1990] Ch 170, [1989] 2 WLR 738, CA.

*Canada and Dominion Sugar Co Ltd v Canadian National* (*West Indies*) *Steamships Ltd* [1947] AC 46, PC.

*Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, [1970] Ch 62, [1969] 3 WLR 122.

f  *Charterhouse Investment Trust Ltd v Tempest Diesels Ltd* [1986] BCLC 1.

*Company, Re a* (*No 005136 of 1986*) [1987] BCLC 82.

*Company, Re a, ex p Glossop* [1988] BCLC 570, [1988] 1 WLR 1068.

*Edge v Pensions Ombudsman* [1999] 4 All ER 546, [2000] Ch 602, [2000] 3 WLR 79, CA.

*Equitable Life Assurance Society v Hyman* [2000] 3 All ER 961, [2002]
g  1 AC 408, [2000] 3 WLR 529, HL; *affg* [2000] 2 All ER 331, [2002] 1 AC 408, [2000] 2 WLR 798, CA.

*Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189.

*Garden Gully United Quartz Mining v McLister* (1875) 1 App Cas 39.

*General Preserving Co Ltd, Re* [1937] 1 All ER 693.

h  *Greenwood v Martins Bank Ltd* [1933] AC 51, [1932] All ER Rep 318, HL.

*Hamel-Smith v Pycroft and Jetsave Ltd* (5 February 1987, unreported), Ch D.

*Hartley Baird Ltd, Re* [1954] 3 All ER 695, [1955] Ch 143.

*Hastings-Bass* (*decd*), *Re, Hastings v IRC* [1974] 2 All ER 193, [1975]
i  Ch 25, [1974] 2 WLR 904, CA.

*Hearn v Younger* [2002] WTLR 1317.

*Hiscox v Outhwaite* [1991] 3 All ER 124, [1992] 1 AC 562, [1991] 2 WLR 1321, CA; *affd* [1991] 3 All ER 641, [1992] 1 AC 562, [1991] 3 WLR 297, HL.

*Holmes v Lord Keyes* [1958] 2 All ER 129, [1959] Ch 199, [1958] 2 WLR *a*
    772, CA.
*Lee Panavision v Lee Lighting* [1991] BCLC 575; *affd* [1992] BCLC
    22, CA.
*Lokumal (K) & Sons (London) Ltd v Lotte Shipping Co Pte Ltd, The
    August Leonhardt* [1985] 2 Lloyd's Rep 28, CA.
*McNaughton (James) Papers Group Ltd v Hicks Anderson & Co (a firm)* *b*
    [1991] BCLC 163, [1991] 1 All ER 134, [1991] 2 QB 113, CA.
*National Provincial Marine Insurance Co, Re, Gilbert's case* (1870) 5 Ch
    App 559.
*Neptune (Vehicle Washing Equipment) v Fitzgerald* [1995] 1 BCLC 352,
    [1995] 3 All ER 811, [1996] Ch 274, [1995] 3 WLR 108.          *c*
*Norwegian American Cruises A/S v Paul Mundy Ltd, The Vistafjord* [1988]
    2 Lloyd's Rep 343, CA.
*Percival v Wright* [1902] 2 Ch 421.
*Provident International Corp v International Leasing Corp* [1969]
    1 NSWLR 424.
*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] *d*
    1 All ER 354, [1982] Ch 204, [1982] 2 WLR 31, CA.
*Rayfield v Hands* [1958] 2 All ER 194, [1960] Ch 1, [1958] 2 WLR 851.
*Roith (W & M) Ltd, Re* [1967] 1 All ER 427, [1967] 1 WLR 432.
*Runciman v Walter Runciman plc* [1992] BCLC 1084.
*Scott v National Trust* [1998] 2 All ER 705.
*Smith (Howard) Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974] *e*
    AC 821, [1974] 2 WLR 689, PC; affg *Ampol Petroleum v RW Miller
    Holdings* [1972] 2 NSWLR 850, NSW SC.
*Stannard v Fisons Pension Trust* [1991] PLR 225, CA.
*Sweney v Smith* (1869) LR 7 Eq 324.
*Trane (UK) Ltd v Provident Mutual Life Assurance* [1995] EGLR 33.    *f*
*Transvaal Lands Co v New Belgium (Transvaal) Land and Development Co*
    [1914] 2 Ch 488.
*Yorkshire & North-Midland Rlwy Co v Hudson* (1845) 16 Beav 485, 51
    ER 866.

**Action**                                                        *g*
The claimant, Keith Lindsay Hunter, applied for declarations that the
forfeiture of his minority shareholdings in the first, second and third
defendant companies, Senate Support Services Ltd, Acquire Services Ltd,
and Eat Dot Ltd, was invalid and that the fourth defendant,
Servicespan Ltd, was bound to transfer the shares to the claimant, and also
applied for rectification of the registers of the first, second and third    *h*
defendants to show the claimant as the holder of the shares. The facts are
set out in the judgment.

*Peter Griffiths* (instructed by *Reid Minty*) for the claimant.
*Edward Davies* (instructed by *Hammonds*) for the defendants.        *i*

*Cur adv vult*

17 May 2004. The following judgment was delivered.

*a*  JOHN RANDALL QC.

INTRODUCTION

[1] In this action the claimant, Mr Keith Hunter, seeks to impugn the forfeiture of his minority shareholdings in the first, second and third defendant companies (respectively SSS, Acquire and EAT; together referred

*b*  to as 'the three subsidiaries'). The shares in question have all been transferred to the fourth defendant (SVSP), which is the group holding company of the three subsidiaries as well as other companies. SVSP is effectively controlled by Mr Tim Cookson (the vast majority of whose former shareholding in SVSP has been transferred to a discretionary trust for members of his family, including himself) and Mr Vic Tippins and

*c*  Mrs Pam Tippins (I shall refer to the three of them together as 'the majority'). There are also minority shareholders, including a Mr Roy Farrier and a Mr Edward Bevan.

[2] As his counsel Mr Griffiths frankly acknowledged when opening the case, the claimant's underlying but substantive purpose in bringing this

*d*  action is to gain locus standi to bring petitions under s 459 of the Companies Act 1985 (the 1985 Act) in the three subsidiaries, and most particularly in SSS, where he perceives that his forfeit shareholding had the greatest value.

[3] On a superficial review of the facts giving rise to this action, a world-weary cynic might well conclude that what occurred must have been

*e*  some form of 'set-up', deliberately instigated and carried through by the majority so as to get rid of someone they regarded as a troublesome minority shareholder and to appropriate the benefit of his shareholdings for themselves. Were it so, the resolution of the case would have been straightforward. However, the longer the trial went on, the clearer it became that the picture was in truth very different.

*f*  [4] At trial the claimant called two witnesses (including himself), and the defendants five (plus a sixth, whose evidence was taken as read). There were five bundles of documents. After the close of the evidence the claimant obtained transcripts of the evidence, to which I shall refer.

*g*  THE WITNESSES

[5] Prior to his involvement with the majority the claimant, a retired police officer who had previously been involved with another company which had not prospered, owned and ran Oasis Support Services Ltd (Oasis), which had a security business. Through transactions I shall summarise below, he joined in first Mr Cookson's company Senate Food

*h*  Services Ltd (Senate Food) and then the newly formed SVSP group. He plainly feels a strong sense of grievance against his opponents in this litigation in respect of a number of matters, including but by no means limited to their involvement in the forfeiture of his shares in the three subsidiaries. However, I am satisfied that it was the claimant who was primarily responsible for the breakdown in communication and working

*i*  relations between himself and the majority which occurred in and around September 2002, and which has indirectly led to this lengthy and doubtless expensive litigation: he had a tendency to assert that agreements had previously been reached when they had not (eg his letter of 30 June 2000 – as to which see para [19] below); he was primarily responsible for the

increasingly acrimonious tenor of the emails exchanged; he it was who *a* came to refuse to speak to the majority (see email of 19 September), having declined to ring back in response to an answer-phone message left by Mr Tippins earlier that morning; he it was who recklessly failed to take seriously at least the first call notice (which he accepts receiving) and did not (contrary to the terms of his own email dated 16 October) take *b* professional advice about it. Short but telling descriptions or characterisations of him incidentally emerged (I am sure genuinely, rather than in any deliberate attempt to 'smear' him) in the course of the evidence of a number of his former colleagues within the SVSP group, not limited to the majority. He was described as 'bloody-minded', and the sort of person who might be expected to pay a sum of a few hundred pounds late on the last possible day entirely in small coins, just to make a point. Mr Farrier at *c* one point said of the claimant (in the context of not having paid the £300 by 24 October) 'he was being Keith – awkward'. Having read quite a number of his emails, and observed him in the witness box, I am satisfied there is substance in these descriptions or characterisations of the claimant. He was not always, in particular from late August 2002 onwards, an easy *d* man to deal with.

[**6**] Although I can accept much of his evidence, there were particular aspects of it about which I have reservations. At points in his cross-examination he appeared himself to be a little uncomfortable in the evidence that he gave; a particular example is when dealing with his assertion that it was reliance on certain words in note 10 to the accounts *e* which had been sent to him on 6 September which (in contrast to the terms of his own email dated 16 October) caused him to decide that he could safely decline to pay the call. I have also had anxiously to consider whether I can accept his evidence that he did not receive the second call notice (dated 16 October). I shall revert to these points below.

[**7**] A Mr Hudson, formerly employed in the accounts department of SVSP *f* reporting to and sharing an office with Mrs Pam Tippins, was called for the claimant on the topic of whether the sums comprised in the management charges by SVSP to the three subsidiaries, and in particular SSS, were calculated on a proper or fair basis. When he gave oral evidence it rapidly became clear that his witness statement markedly over-stated the evidence which he was in fact able to give. I accept his oral evidence. In essence, he *g* said that he was not in a position to impugn any of the sums included as not being fair allocations of relevant expenditure. Insofar as there were round sums which appeared to have been set so as roughly to match (and thus eliminate) the profit which would have been reported without their inclusion, there was no example he could point to in respect of the years and the companies with which he was familiar where the round sum *h* represented an increase (as opposed to a reduction) of the sum which would otherwise have been arrived at.

[**8**] Given the serious case (in part tantamount to a conspiracy theory) put against them, and given that some personal advantage accrued to them (through SVSP) from the ultimate transfer of the claimant's shares to SVSP, *i* I have of course had to scrutinise the evidence of the two male members of the majority especially closely. Having done so, and taking full account of the corrections each had to make as to what documents they had available to them on 26 and 27 September 2002 (as to which see below), I find each

*a*  of them to have been impressive and scrupulously honest witnesses.

[9] Mr Cookson was the majority shareholder in Senate Food from its incorporation in July 1999 until the creation of the SVSP group in July 2000 (Mrs Pam Tippins held 15% of its shares). In October 1999 Senate Food acquired the entire issued share capital of the claimant's company, Oasis, which upon becoming a subsidiary of Senate Food was renamed SSS.

*b*  By January 2000 he was involved in negotiations with Mr and Mrs Tippins concerning a possible merger of their respective business interests. Implementation of that proposal commenced in April 2000, with the incorporation of SVSP as the intended holding company of their new group. He gave his evidence in a calm and measured way, and impressed me as a witness. He was generally quite precise in his use of language including in

*c*  his interpretation of questions, but subject to that was willing to accept points put to him in cross-examination where appropriate. His evidence when later recalled was mostly of a similarly impressive character, though at one point he was honestly mistaken, I believe through some confusion (see para [152] below).

*d*  [10] Mr Tippins and his wife were the majority shareholders in Catercheck Purchasing Group Ltd and Catercheck Consultancy Services Ltd from their respective incorporations in 1997 and 1999 (Mr Cookson held a minority shareholding in the former, and Senate Food in the latter). Mr Tippins did his best to maintain temperate communication with the claimant when that became increasingly difficult. He took the initiative to

*e*  use Mr Paul Martin, a chartered accountant in private practice who acted as accountant and auditor to SVSP and its group, as a channel of communication (the claimant had known and dealt with Mr Martin for longer than the majority). As he himself observed, the worst thing he said in a very difficult sequence of email correspondence was a sentence in his email timed at 16.15 on 4 September 2002: 'I further suggest that in an

*f*  attempt to bring sanity to the situation, your advisers deal with Paul [Martin], and cut out the wild, irrational correspondence you continue to enter into.' Read against some of the emails sent to him by the claimant (including that timed at 14.30 on the same day), that does not merit much criticism. Under cross-examination he was calm, clear and unflustered. It was noteworthy that Mr Tippins did not always agree with Mr Cookson's

*g*  evidence, more or less all of which he had heard sitting in court. One example was in relation to whether the claimant's shares in Acquire and EAT were valuable when he acquired them in July 2000. When recalled to deal with questions arising from the disclosure of privileged documents, Mr Tippins remained calm, at his ease, and in my judgment conspicuously direct and realistic in his answers, whereas many witnesses in his position

*h*  would (understandably) have been uncomfortable and defensive. An example is afforded by some of his answers (identified by reference to the transcript of evidence). Similarly, when asked whether he agreed with Mr Farrier's evidence on the 'inevitability' of forfeiture in the event of non-compliance with the second call notice (and once the crucial point had

*i*  been put to him clearly), he gave clear and to my mind strikingly honest affirmative answers in circumstances in which he must have sensed that this was unhelpful to his cause. Mr Tippins too impressed me as a witness.

[11] Mr Paul Martin was called by the defendants. He was a witness of fact, though his professional knowledge and expertise inevitably impacted

upon his evidence at various points. I was most impressed by the whole *a*
manner in which he gave his evidence. He was precise in his answers, and
gave them with noteworthy calm and clarity. It is possible that on one
highly technical (and, given his entirely understandable belief or assumption
that the shares in question would have been fully called up upon issue,
entirely theoretical) question as to the proper accounting treatment of
issued but uncalled share capital – in effect a question of professional *b*
opinion rather than fact – he was wrong (see the citation of para 4.005
from *Palmer's Company Law* (25th (looseleaf) edn) at para [26] below). I
make no finding on that question, because it is unnecessary for me to do so
and because it has not been fully explored in submissions. In every other
respect – factual and professional – I have no hesitation in accepting
Mr Martin's evidence as reliable.                                         *c*

[**12**] Mr Roy Farrier, one of the minority shareholders in SVSP and a
director of Acquire and (from 5 April 2001) SVSP, gave evidence. He
initially spoke very quietly, I think reflecting some nervousness at the
experience of giving evidence in court. However he soon relaxed somewhat,
and throughout his evidence again impressed me as a witness who was *d*
making every effort accurately to answer the questions put to him.

[**13**] Mr Edward Bevan, another minority shareholder in SVSP and a
director of EAT and (from 9 September 2002) SVSP, was the defendants'
final witness. He was a straightforward witness, who again took obvious
care in answering the questions put to him. One example was when he
declined simply to reconfirm en bloc a passage in his witness statement put *e*
to him in cross-examination with a single 'Yes', despite being prompted by
Mr Griffiths to do so, but instead set about going slowly through it
clause by clause (in the event, reconfirming all of it).

[**14**] The four director witnesses for the defendants were asked about a
number of common points. Where dependent on recollection, those
recollections naturally enough differed as to some detail, and as to the *f*
words they used to express them, but not as to the general thrust. That in
no way causes me to criticise the evidence of any of them; on the contrary
I am confident that each was doing his honest and careful best to give
accurate evidence. Where it appears material to do so, I will indicate my
preference between their evidence on particular points below.

[**15**] The evidence of Kyla Whitefoot proving posting of the second call *g*
notice on 16 October 2002 by first class post was ultimately taken as read
without her being required for cross-examination.


FINDINGS OF FACT AND INCIDENTAL LEGAL POINTS UP TO 2000          *h*

[**16**] As indicated above, prior to the formation of the SVSP group, the
Tippins ran the two Catercheck companies I have mentioned, which had
apparently been successful. Mr Cookson ran Senate Food, which had mixed
fortunes in its early trading after incorporation in 1999 (see its accounts for
the 11 month period ended 20 June 2000). The claimant ran Oasis.

[**17**] In October 1999 Senate Food acquired the entire share capital of *i*
Oasis, and in return for his shares the claimant received a 12.5% holding in
Senate Food (125 £1 shares). Thus this transaction can properly be
described as a 'share swap', in that the consideration the claimant received
for transferring away (Oasis) shares already vested in him was the transfer

*a*   to him of other (Senate Food) shares.

[**18**] From late 1999 or very early 2000, Mr Cookson and the Tippins were involved first in discussions over, and then in planning, the merger of their business interests, to be implemented by means of the creation of a group of companies headed by a (new) holding company. In the event that was SVSP. This process was of course to affect the interests of others

*b*   involved with them in one or more of their companies. The claimant, Mr Bevan and Mr Farrier were three such persons.

[**19**] By 12 May 2000 the proposals had become sufficiently advanced that Mr Tippins was able to write to the claimant setting out the shareholdings with which it had been agreed he would end up. The phraseology of the letter suggests that he was to be allotted (rather than to

*c*   retain) a 5% shareholding in SFS, but nothing turns on whether that was an oversight, or whether that was the method of implementation envisaged at that date. The claimant replied on 30 June 2000, in the course of which letter he asserted that 'at the discussion stage with Tim [Cookson] in relation to the allocation of shares I was promised … that in [EAT] I would

*d*   be issued with 5% and not 2.5% … I have since had a conversation with Tim [Cookson] and he assured me that this was an error on his part …' I find both those assertions (original promise and assurance of error) to have been inaccurate, and accept Mr Cookson's evidence that he was simply 'amused' by it at the time and chose not to make an issue of it. I reject the claimant's evidence (as expanded in cross-examination) that both

*e*   Mr Cookson and later Mr Tippins apologised to him for any error in this respect.

[**20**] Although formal completion of the restructuring took place on 27 July 2000, in fact trading commenced in at least some of the companies which were to form the new group from 1 July 2000 (the first day of their financial years), and the relevant entries in the three subsidiaries' nominal

*f*   ledger accounts recording the allotment of shares to the claimant and others, and the creation of a debt owed by the claimant in respect of the unpaid face or par value of the shares allotted to him, were dated 1 July 2000.

[**21**] At or about the time of the restructuring, the shares of at least some of the group companies were subdivided (£1 shares being sub-divided into

*g*   100 1p shares). For this reason it will generally be simplest for me to refer to shareholdings by reference to the percentage which they represented of the entire issued share capital of the company in question.

[**22**] Though the claimant now alleges that he always understood the nature of the July 2000 transaction, so far as it involved him, to be a single

*h*   transaction in the nature of another share swap, in that he received shares in the three subsidiaries 'in return for' transferring away 75 shares representing a 7.5% interest in Senate Food, that is an over-simplification of what happened. In truth there was a two stage process. The first stage was (spelling it out in legal language which will not have been that used by the claimant and Mr Cookson) that the claimant sold the 75 shares in Senate

*i*   Food to Mr Cookson in return for payment of their face or par value (£75) plus Mr Cookson's agreement to procure that the claimant was offered the opportunity to subscribe at par for a 25% shareholding in SSS and 2.5% shareholdings in Acquire and EAT upon the imminent restructuring. This was attractive to the claimant because there were at the time high hopes

that such shareholdings would become valuable (if they were not so already), and because he was keen to move back into a company whose main business was in security. This was attractive to Mr Cookson because it enabled him to assemble a sufficient shareholding in Senate Food to make the required contribution to the overall merger as between himself and the Tippins.

[23] This was the reason why the 75 shares were not transferred direct to SVSP by the claimant. He may not recall the detail of it now, but I am satisfied that at the time the claimant did understand the two stage nature of the process, and did understand the terms of the first stage as between himself and Mr Cookson. At the 27 July 2000 completion meeting, Mr Cookson joked with the claimant about owing him £75, because that (modest) sum had not in fact changed hands. In the course of oral evidence Mr Cookson volunteered a less than certain recollection that this £75 may have been the subject of a 'double or quits' bet which he and the claimant made at about this time over which of the football teams they supported (Leeds and Chelsea respectively) would finish higher in the next season's Premiership (how times have changed!). Whether or not it was made the subject of such a bet, the very fact that such a personal debt of £75 was (as I find) the subject of jocular discussion between them on 27 July 2000 evidences knowledge on the claimant's part that 75 of his £1 shares in Senate Food had been transferred to Mr Cookson personally at par. I should add that the same was quite clear on the face of the share transfer form which the claimant signed at the time.

[24] The second stage of the process which involved the claimant was the allotment of shares to him by each of the three subsidiaries (he retained his remaining 5% shareholding in Senate Food). These allotments were in accordance with the agreement recorded in the letter dated 12 May 2000, namely 25% in SSS and 2.5% in each of Acquire and EAT. In accordance with the agreement with Mr Cookson, it was intended that the claimant pay for the same at par. However (no doubt in large part because the sums were so small) the implementation of that intention was subsequently overlooked by all concerned: the claimant did not volunteer payment and the respective companies did not make any call for it (prior to that of September/October 2002).

[25] It should be noted that at the same time Mr Bevan was allotted 5% shareholdings in each of SSS, Acquire, EAT and Senate Food. In Mr Bevan's case this was apparently a new experience for him, and he was excited about it. He remembered physically reaching inside his jacket for his cheque book at the 27 July 2000 meeting, and volunteering to pay for his allotments there and then. However Mr Cookson brushed his offer aside, saying something to the effect that Mr Bevan should not worry and would be asked for the payment in due course. Thereafter the matter of either making or calling for payment was overlooked for some considerable time in Mr Bevan's case too.

[26] In law, the effect in the case of the claimant's and Mr Bevan's shareholdings is straightforward and provided for by the scheme of the 1985 Act, though as a matter of practice it is unusual. By agreeing to take the shares (which both the claimant and Mr Bevan clearly did), they agreed to pay for them at par. In the (unusual) absence of an accompanying call, there was an unpaid (and arguably contingent) liability on each of the

*a* shareholders for the unpaid sum. *Palmer's Company Law*, para 4.005 states
the position thus :

> 'When the nominal capital is allotted in whole or in part, each of the
> persons to whom it is allotted becomes liable to pay to the company the
> nominal value of the shares taken. The Act envisages that the obligation
*b* of the shareholder shall be payable either on the company making a call
> on him or by way of instalment fixed on the issue of the shares or by
> the articles. Calls are in practice very rare … As long as anything
> remains uncalled on an issued share, there is an unpaid liability for the
> balance, and the total amount of these liabilities will be regarded in the
> books of the company as the uncalled capital.'

*c* And at para 6.201:

> 'A member is under a liability to pay up in accordance with the
> articles the amount for the time being unpaid on his shares. If his shares
> have been issued as paid up or partly paid up, whether for cash or
> otherwise, or if he or some prior holder has paid them up wholly or in
*d* part, he would be wholly or pro tanto exempt from calls; but prima
> facie his liability is to pay the full amount … The nature of this liability
> is defined by s 14. A shareholder is bound to pay the full amount
> unpaid on his shares, but, unless the terms of the issue so provide, he is
> not bound to pay up at once.'

*e* [**27**] In due course the books of each of the affected companies came to be
written up by someone in the accounts department, either Mrs Tippins
herself or someone responsible to her. Credit entries were made in each of
the three subsidiaries 'share capital' ledger accounts in respect of the par
value of all the issued shares. I infer that such entries were made on the
*f* understandable assumption (which accorded with what had been intended)
that all the issued shares were fully called up (as is, after all, very commonly
the case in respect of shares in private companies). Accordingly, matching
debits had to be entered in the books if only to ensure that the double entry
system balanced. In the case of each of the three subsidiaries, accounts
entitled 'unpaid shareholding' followed by the shareholder's name were
*g* created for each shareholder to whom shares had been issued, and debited
with the appropriate sum. This I infer was done as a purely mechanical
exercise, in particular given that in the case of SVSP its accounts so named
were (despite the word 'unpaid' in the account name) immediately cleared
by corresponding credit entries which charged the like sums to its loan
accounts with the three subsidiaries (on each of which there was a net
*h* balance in favour of SVSP). The presence of small debit balances on the
corresponding accounts for the claimant and Mr Bevan did not attract
anyone's attention for some time, and no-one was prompted to consider the
need for each of the three subsidiaries to make a call for payment of the
very modest sums involved on either the claimant or Mr Bevan. However,
the debit balances were there in the books, and those balances did in due
*i* course (modestly) contribute to the debtors' figure in each of the three
subsidiaries' balance sheets at 30 June 2001, the next financial year end.
　[**28**] In drawing up and auditing such balance sheets, reflecting the
treatment in the companies' ledgers, Mr Martin in turn made the at least
subconscious and again understandable assumption that all the issued

shares were fully called up. He did not notice that the claimant's and *a* Mr Bevan's shares remained unpaid. In compiling the relevant note to the share capital figure in the balance sheets [together 'the three erroneous notes'] he used a standard template without modifying the relevant wording. Accordingly, in the case of each of the three subsidiaries the relevant note to the audited balance sheet at 30 June 2001 erroneously described the entire share capital (so necessarily including the claimant's and *b* Mr Bevan's shares) as 'Allotted, called up and fully paid'. In his evidence, Mr Martin acknowledged that the words 'fully paid' were – to the extent of the claimant's and Mr Bevan's shares – used in error, by reason of an oversight. Very strictly, it appears to me that the words 'called up' were also in error at least as regards the claimant's shares, since the evidence before me discloses no call having been made until that on the claimant's shares *c* dated 27 September 2002 (as to which see below). However, I would not criticise Mr Martin for this, because the company's ledgers implied that the shares were fully called up, and therefore his assumption that all shares issued were also called up was understandable. To expect an auditor of a private limited company to seek positive confirmation that a call had *d* accompanied the issue of unpaid shareholdings with very modest par values in such circumstances would, I think, be a counsel of perfection.

[**29**] Once the restructuring I have described had occurred, the relevant position within each of the defendant companies up to the forfeitures was as follows:

*e*

*SSS*
*Directors*: Mr Cookson, the claimant (until his resignation on 29 August 2002), and Mr Tippins (from his appointment as such by Mr Cookson on 27 September 2002).
*Shareholders* (ordinary shares): SVSP plus initially Mr Bevan, Mr Cookson *f* and the claimant. Messrs Bevan's and Cookson's shareholdings were transferred to SVSP on 1 November 2001 and 22 April 2002 respectively.
*Articles of association* : Incorporate the regulations in Table A of the Companies (Tables A to F) Regulations 1985, SI 1985/805 (Table A) modified as stated (and prior to their amendment on 22 December 2000 by the Companies Act 1985 (Electronic Communications) Order 2000, *g* SI 2000/3373 – see s 8(2) and (3) the 1985 Act).
*Name change*: Oasis changed its name to Senate Support Services Ltd pursuant to a special resolution passed on 1 July 2000; thus Oasis and SSS are one and the same company.

*h*

*Acquire*
*Directors*: Mr Cookson, Mr Tippins and Mr Farrier.
*Shareholders* (ordinary shares): SVSP plus initially Mr Bevan, Mr Cookson and the claimant. Messrs Bevan's and Cookson's shareholdings were transferred to SVSP on 1 November 2001 and 22 April 2002 respectively.
*Articles of association* : Incorporate the regulations in Table A, modified as *i* stated.

*EAT*
*Directors*: Mr Cookson. Mr Tippins and Mr Bevan.

a   *Shareholders* (ordinary shares): SVSP plus initially Mr Bevan, Mr Cookson and the claimant. Messrs Bevan's and Cookson's shareholdings were transferred to SVSP on 1 November 2001 and 22 April 2002 respectively.
    *Articles of association* : Incorporate the regulations in Table A, modified as stated.

b   *SVSP*
    *Directors*: Mr Cookson, Mr and Mrs Tippins, Mr Farrier (from 5 April 2001), a Mr Millard (from 1 September 2001) and Mr Bevan (from 9 September 2002).
    *Shareholders*: Mr Cookson (or from 15 April 2002 Cookson trustees),
c   Mr and Mrs Tippins, Mr Farrier (from 5 April 2001), and Mr Bevan (from 1 November 2001).

[30] At the end of the transaction there were a number of other direct subsidiaries of SVSP, including Senate Food and Total Retail Security Ltd (Total Retail).

d   [31] Somewhat confusingly, the group's security businesses were split between two companies. Whilst a majority of the security business was in SSS, some of it was carried on by Total Retail.

[32] All dates or months given in the remainder of this judgment are, save where otherwise stated, in 2002.

e   FINDINGS OF FACT AND INCIDENTAL LEGAL POINTS – 2001–2002

[33] In or about November 2001 Mr Bevan entered into an agreement with SVSP whereby he transferred to SVSP his shareholding(s) in each of the three subsidiaries and in Senate Food in return for which SVSP allotted him 22,401 shares in SVSP. Those transfers went through without anyone
f   noticing that the shares in each of the three subsidiaries which SVSP received were not paid up.

[34] However, this was subsequently noticed by Mrs Tippins, the finance director of SVSP, on or about 28 June. She therefore, in Mr Bevan's words, took it upon herself to make the necessary payment on his behalf straightaway. She did so by paying the three subsidiaries (and I assume
g   Senate Food) the requisite sums (£50 re each of SSS and Acquire, and £100 re EAT) by debiting them against the substantial sums standing to the credit of the loan account she and her husband held with SVSP. As a matter of bookkeeping they will have been credited to the accounts of the three subsidiaries in the books of SVSP and debited to the accounts of SVSP in the books of each of the three subsidiaries (all three of those inter-company
h   accounts had a credit balance in favour of SVSP). The final credit clearing the 'unpaid shareholding' accounts of Mr Bevan which had been created in the books of each of the three subsidiaries in July 2000 appears in the respective ledger accounts dated 28 June and bearing the caption 'EB shares paid by Tippins'. Mrs Tippins told Mr Bevan of her discovery and what she had done about it within a day or so, and he reimbursed her with the
i   requisite total sum (£200) within a week or so, in early July.

[35] It should be noted that in so acting, Mrs Tippins was ensuring that SVSP was not left with an unexpected liability to the three subsidiaries qua holder for the time being of shares which were not fully paid up : see the extracts from *Palmer's Company Law*, cited in para [26] above. I infer that

it was because she came across the fact that what had formerly been *a*
Mr Bevan's shares were unpaid in this context, that it did not occur to her
at the time that there was likely also to be an equivalent problem in respect
of the shares still held by the claimant.

[**36**] In August Mr Martin or his firm undertook, or at least commenced,
the task of auditing the accounts of the SVSP group for the year to 30 June
2002. On 27 August Mr Martin was informed that the business and assets *b*
of SSS had been sold to Temple Security Ltd (there had previously been
dealings with another prospective purchaser), and at a meeting with
Mr Cookson and Mr and Mrs Tippins on 3 September he was instructed to
deal with all the post-completion matters which needed sorting out, in order
to prepare for the (at least informal) winding up of SSS. He had also been *c*
asked by the claimant for a full analysis of the accounts and of the
management charges borne by SSS up to the date of its sale. It was while
undertaking this work that on some date between 6 and 16 September,
during which period he was in almost daily contact with Mr or
Mrs Tippins, it came to Mr Martin's attention that the claimant still owed
£250 in respect of the face or par value of his shares in that company. *d*
Mr Martin told Mrs Tippins by telephone about this, drawing her attention
to the inclusion of this sum within 'other debtors' in the (then draft)
accounts for the year to 30 June 2002, and informing her that the effect of
this was that the claimant would not qualify for inclusion in any dividend
paid to shareholders. The latter point was made in the context of an
anticipated dividend in respect of the anticipated surplus at the end of the *e*
winding-up process following the sale of SSS's business and assets to Temple
Security Ltd, and was based on the provisions of reg 104 of Table A, which
is incorporated into SSS's articles of association. Mrs Tippins mentioned
this to her husband, who himself spoke with Mr Martin to confirm the
position. Within the following week or so it then occurred to Mr Martin
that the claimant's shares in Acquire and EAT had also never been paid for, *f*
and he duly told Mr Tippins about this too.

[**37**] Over the period from July to September the claimant (who at various
stages involved professional advisers on his behalf, in particular a
Mr Jacques Cadranel (an accountant), a Mr Adrian Learer, and a Mr James
Jacobson (a solicitor)) had been pressing for a variety of further information
about SSS, the proposed sale, and its financial affairs generally. The trial *g*
bundles contain a considerable volume of emails generated over a relatively
short period of time. They, and in particular many of those emanating from
the claimant, demonstrate one of the potential disadvantages of email as a
method of communication, namely that a recipient who chooses to reply
immediately will type while still affected by any emotional reaction which *h*
first sight of the incoming email has provoked, and may thus end up
sending back a less considered or temperate response than would have been
the case after the time-lag inherent in dictating and later signing off a
traditional letter.

[**38**] For a time the directors used Mr Martin as a channel of
communication with the claimant. This phase was initiated by Mr Tippins' *i*
emails to the claimant timed at 09.59 and 16.15 on 4 September. In
particular, Mr Martin by letter dated 6 September sent the claimant a
number of accounting documents relating to SSS and SVSP, including copies
of SSS's audited accounts for the year to 30 June 2001 and its draft

*a*    accounts for the following year (having first obtained the express authority
of the majority to do so, at some time during that day between the emails
timed at 11.15 and 16.07). Then by letter dated 12 September Mr Martin
sent the claimant a number of statutory and accounting documents relating
to various companies in the SVSP group, including copies of the audited
accounts for the opening 15½ month period to 30 June 2001 of Acquire
*b*    and for the year to 30 June 2001 of EAT (having again first obtained the
express authority of his clients at some time during that day between the
emails timed at 09.03 and 12.24). The three sets of audited accounts
specifically mentioned in this paragraph contained, in the relevant section of
the note attached to the figure for 'share capital' in the balance sheet, the
three erroneous notes, and the like erroneous caption ('Allotted, called up
*c*    and fully paid') appeared in the draft accounts of SSS for the year to
30 June 2002.

[39] At some time around the weekend of 20/21 September, Messrs
Cookson and Tippins decided to instruct Mr Martin to cease dealing with
the claimant's inquiries. Hence Mr Martin's short letter of 23 September
*d*    indicating that SSS would be writing to him directly regarding his further
queries. They explained this essentially on the grounds of cost, in that it
appeared to them (in essence) that the claimant was asking for the same
information repeatedly, and that however much information was provided
to him he would not be satisfied. Whether or not with hindsight this was a
good decision is debatable, but I am satisfied that it was a reasonable one,
*e*    made in good faith, at the time. The claimant reacted badly. He had already
refused to return Mr Tippins' phone call of 19 September, having previously
declined to have any further discussions with Mr Cookson (both are
evidenced by his email of 19 September, timed at 09.24). The tone of his
email of 24 September timed at 09.59, in response to Mr Martin's short
letter, was characteristically robust. Having summarised Mr Martin's
*f*    changed instructions he continued:

'I have NO intention of dealing directly with your clients as I feel
there are areas of serious conflict. I would therefore suggest the proper
course of action here is for it to remain with yourselves or with their
appointed lawyers, either way this is the agreed way to progress. In
*g*    relation to my lawyers I have now been referred to lawyers specialising
in the areas of concern and I will forward there (sic) details onto you
and Robert Hamill once I have had the opportunity of instructing them
with James Jacobson next week.'

[40] On the same day Mrs Catherine Fatani, a solicitor with the City of
*h*    London office of the firm then known as Hammonds Suddard Edge
(Hammonds Suddard), wrote what for present purposes may be regarded as
an initial letter of advice addressed to the directors of SSS dated
24 September. It records in its second paragraph that:

'You have asked us to advise you in relation to your obligations to
*i*    Keith as a 25% shareholder of [SSS] in light of the recent sale and the
proposed winding up and distribution of the assets of [SSS].'

The underlying request for this advice had come from Mr Cookson, as the
opening greeting ('Dear Tim') reflects. The background to this request for
advice was the majority's perception that the claimant was asking for the

same information repeatedly, and that however much information was
provided to him he would not be satisfied. Hence the subject-matter of the
advice in the letter included the extent of information which the claimant
was entitled to receive as a minority shareholder, and the costs involved in
reviewing the company's affairs.

[41] A reflection of the majority's continuing desire to have temperate
communication with the claimant is the sending to him the next day by
Mr Cookson of an email headed 'Bygones', with a copy of Mrs Fatani's
letter as an attachment. This set out Mr Cookson's view of some of the
history expressed in moderate terms, finished with what amounts to a
warning about the professional fees which will be incurred by both sides if
they fight each other rather than move forward, and was signed off in a
light-hearted manner. This did not produce a constructive response. Rather
(as the documents now show) the claimant forwarded it to his then solicitor
Mr Jacobson under cover of an email dated 26 September which, having
suggested that they discuss it, added 'I really want to put the pressure on
them and I have some interesting documents which shows (sic) the lies and
hiding profit.' The majority would not have seen that until some time later,
but it is an indication of the claimant's state of mind at that time. He sent
an email to Mr Martin the same day acknowledging receipt of
Mr Cookson's 'Bygones' email and expressly requesting that Mr Martin
advise his client 'not to contact me directly until I have had the opportunity
to discuss my issues with my advisors'. The claimant's email was (rather
more darkly) headed 'Re unanswered questions.'

[42] It was on all accounts Mr Tippins who sought and obtained advice
on the question immediately in issue from Mrs Fatani, prompted by the
advice his wife and then he had received from Mr Martin about the
claimant's shares being unpaid and the effect in those circumstances of
reg 104 of Table A, coupled with the increasingly acrimonious and hostile
tone of the claimant's emails and the increasing difficulty in temperate
communication with the claimant. This request was for advice on what
should be done about the claimant's shares having been discovered to be
unpaid. It is to be noted that Mrs Fatani was already aware that they were
working towards a 'proposed winding up and distribution of the assets of
[SSS]' when she dictated the second paragraph of her letter dated
24 September. There is an issue between the parties as to when her advice
on the question immediately in issue was first requested and given.

[43] During the course of the trial (on 26 February 2004), and after
Mr Griffiths had indicated that he would if necessary argue that the
defendants had waived privilege in respect of relevant advice received at this
time, the defendants voluntarily disclosed some additional documents from
their solicitors Hammonds Suddard, together with linked documents
(including telephone records) of the defendants. Hammonds Suddard
(through their clients' counsel) indicated that they had produced all the
potentially relevant documents they had, and Mr Griffiths accepted that
without requiring further or more formal proof from them. Both
Mr Tippins and Mr Cookson were recalled to answer further questions
about them the next day, which was the last day of the evidence.
Mr Griffiths relies on them (and on what is not amongst them) in support
of his argument that no advice on this topic had been obtained from
Hammonds Suddard at the time that the executive team meeting took place

*a*  on 26 September (and hence that the defendants' evidence about the discussions on that day was unreliable).

[44] I have considered the point carefully. At first sight the documents appear to lend some support to Mr Griffiths' contention. Nevertheless, having considered those documents closely, and also considered all the other evidence bearing on the point, including of course that of all four witnesses

*b*  who were present at the 26 September executive team meeting, I find that, notwithstanding the absence of an earlier Hammonds Suddard attendance note than that dated 27 September and Mr Griffiths' other arguments, Mr Tippins had discussed the making of a call with Mrs Fatani of the companies' solicitors Hammonds Suddard prior to the executive team meeting of 26 September, and reported the substance of it to that meeting in

*c*  good faith. I am not persuaded by Mr Griffiths' argument that the wording of the Hammonds Suddard attendance note dated 27 September can safely be taken as indicating that it necessarily recorded her first conversation with Mr Tippins on the point. I take into account the 29 minute telephone call to a direct line number within her firm's offices (that of her senior partner,

*d*  Mr Hamill) on 24 September, the presence in her firm's time-costing records of an entry in respect of Mrs Fatani (but not Mr Hamill) dated 24 September for two hours work 'Preparation of letter to Senate directors *and telephone conversation with VT*' (my emphasis), the evidence of Mr Tippins himself when cross-examined after these documents had been disclosed (on both 26 and 27 February 2004), and the evidence of the other

*e*  directors at the executive team meeting that he reported to them on having obtained advice not only from Mr Martin but also from Mrs Fatani/the companies' solicitors. I was particularly impressed by Mr Cookson's evidence upon his recall to the effect that it was obvious to him from the language Mr Tippins was using that he had received lawyers' advice on the point prior to the meeting, evidence which struck me at the time he gave it

*f*  as quite obviously true. I would reject any argument that Mr Tippins may have told the meeting that he had received Mrs Fatani's advice, when in truth he had not. I can see no sensible motive for him to mislead his three fellow directors in that way, and am satisfied that he did not do so. The reason he told his fellow directors that he had received such advice was because he had indeed done so. I also find that Mr Tippins had copies of

*g*  Table A available to him at the 26 September executive team meeting which had not come from Mrs Fatani (though she sent him an extract by fax on the afternoon of 27 September to support the first paragraph of her email), and that the probable source of this was his wife (in accordance with his evidence upon recall, albeit that his recollection of this had apparently been

*h*  prompted by a conversation with his wife, who did not herself give evidence).

[45] As to the 26 September executive team meeting itself, it was attended by Mr Cookson, Mr and Mrs Tippins, Mr Farrier and Mr Bevan. No minutes of this meeting were kept, because Mr Cookson's personal assistant (who usually took such minutes) had just gone on maternity leave, and it

*i*  seems not to have occurred to anyone to make alternative arrangements. It was the usual practice of these companies that any formal directors' business requiring attention was discussed at the end of executive team meetings. This is what occurred on 26 September. It is important to note that all four of the directors of the three subsidiaries (Messrs Cookson,

Tippins, Farrier and Bevan – together 'the four directors') were present. The *a* question of the claimant's shares in the three subsidiaries, Mr Martin's discovery that they had never been paid for, and the possible implications of this in relation to the informal winding up of SSS was discussed. I accept Mr Farrier's specific and positive evidence that Mr Tippins did specifically mention in this context the desire to pay a members' dividend at the conclusion of the informal winding up of SSS and the group's security *b* business (ie to the claimant as well as SVSP). As I have just found, legal advice as to what formal procedure was available to make a call on shares had been obtained orally by Mr Tippins from Mrs Fatani, and was passed on to the meeting by him. He had a copy of Table A with him. The four directors unanimously agreed that the three subsidiaries should make a call in accordance with that procedure, and Messrs Cookson and Tippins were *c* deputed to hold formal, minuted board meetings the next day to that end.

[**46**] Mr Griffiths explored the question of why the four directors chose to deal with the question of the call on the claimant's shares formally through solicitors rather than by some informal approach to the claimant. He suggested that the fact that the solicitors' fees incurred exceeded the amount of the call suggested an ulterior motive, namely a desire to bring about a *d* forfeiture of the claimant's shares if possible. I reject that suggestion. I accept the defendants' explanation that it was simply because of the increasing difficulty in conducting temperate communication with the claimant (for which in my judgment the claimant was at least largely responsible). Mrs Fatani was, at least in general terms, aware of the *e* difficulties being encountered in communication with the claimant (see again her letter of 24 September) and in those circumstances it would have been entirely understandable for her to recommend use of the formal procedure under the articles of association. Indeed, it ill lies in the mouth of the claimant to complain about the absence of an informal approach to him at this time, when his email to Mr Martin of 26 September had specifically *f* requested that the defendants should cease contacting him directly.

[**47**] The question of whether as a matter of fact formal board meetings took place on 27 September and resolved to make the call, essentially as reflected by the minutes produced, is the subject of issue 4 below, and I shall deal with it there. For the sake of the narrative, however, it is convenient to state simply it will be my finding that they did. *g*

[**48**] Following the formal board resolutions of 27 September, a letter was sent to the claimant by Mr Tippins as a director of each of the three subsidiaries (one letter, which had been drafted by Mrs Fatani, dealt with all three subsidiaries) making the call in accordance with the terms of reg 12 of Table A ('the call letter'). The claimant admits receipt of the call letter, and *h* makes no complaint about its form and efficacy.

[**49**] On 11 October Mr Cadranel sent a short email to Mr Martin. It ended with a request that Mr Martin confirm to the claimant that as far as he was aware the information that he had already forwarded was accurate. This appears to have been the first contact from the claimant or his representatives after the email the claimant sent to Mr Martin on *i* 26 September. The requested confirmation was given orally by telephone on 18 October, as is evidenced by Mr Cadranel's email to the claimant of that date, which encouraged the claimant to take some comfort from it even if

*a*  he felt that he had not received all the information necessary.

[50] 15 October was the last day for payment under the terms of the call letter. As it happened there was a meeting held that day attended by all the four directors. It was primarily concerned with issues arising from an agreement which had been entered into by Acquire and others regarding an investment in Acquire by Compass Purchasing Ltd. Mr Farrier described it

*b*  as being in essence 'my meeting'. The defendants' case (in answer to the point being put in issue by the claimant by the late re-amendment mentioned in para [122] below) is that the four directors on behalf of the three subsidiaries duly decided to issue a further call notice in accordance with reg 18 of Table A at this meeting, albeit informally. The question of whether they in fact did so is the subject of issue 6 below though ultimately,

*c*  in the light of the evidence of all four of the relevant directors on the point, Mr Griffiths confined his submissions on this issue to two points. I shall deal with them when I reach issue 6. Again for the sake of the narrative, however, it is convenient simply to state that it will be my finding that the directors did duly decide to issue a further call notice at this meeting.

*d*  [51] On 16 October no payment from the claimant arrived in the morning post, and accordingly a further notice (the second call notice) calling for payment in accordance with the terms of reg 18, which had been signed by Mr Tippins as a director of each of the three subsidiaries was duly posted to the claimant. Again, it had been drafted by Mrs Fatani, and dealt with all three subsidiaries. The claimant denies receipt of the second call notice, and

*e*  I shall deal with that aspect under issue 8 below. Subject to non-receipt, however, the claimant makes no other complaint about its form and efficacy.

[52] Mr Tippins attended a meeting on the morning of 16 October, and had left it to his secretary, Kyla Whitefoot, to check the morning post for any payment from the claimant and, if appropriate, to post the second call

*f*  notice. It was only after this meeting, and after Miss Whitefoot had duly posted the second call notice, that he received the claimant's (emailed) response to the call letter, albeit timed at 08.11 that morning. It read:

> 'Vic,
> I am in receipt of your letter dated 27 of September in relation to the
*g*  > demand for payment of the costs of the shares listed, namely [SSS, EAT and Acquire]. It is being looked into and I will come back to you very soon after my advice.
> Is there also a payment demanded for my shares in SFS? All these outstanding amounts are no doubt shown in the completed company accounts.
*h*  > Many thanks
> Keith.'

[53] Mr Tippins responded on 21 October, in the following terms:

> 'Keith
> With reference to your e-mail of 16 October, I can confirm there is no
*i*  > demand for payment in regard of SFS, as there is no debt owing. As far as outstanding amounts are concerned, I believe they are accounted for under the heading of debtors within the company accounts. I have asked Paul Martin to confirm this to me. As stated in my correspondence to you, interest is accruing on the outstanding amount

of £300. The rate of this interest is 5% per annum from and including *a*
16 October 2002 until the date on which payment is made. I hope this
answers your questions. I will get back to you once Paul Martin has
confirmed my belief on outstanding amounts.
  Vic'

[54] On 24 October the next executive team meeting was held. At the end *b*
of this meeting there was, for the first (and only) time, a considered
discussion between all the four directors about what should happen were
the undesired and unexpected situation of outright non-payment by the
claimant to arise at the end of the time period set by the second call notice.
They agreed that if such eventuality should occur then the forfeiture
procedure should be followed and that as before (ie on 27 September, *c*
following the discussion at the end of the executive team meeting on
26 September) Messrs Cookson and Tippins were to hold the necessary
formal board meetings to that end. All were aware that there would be no
effective decision to forfeit until then; all were aware that a further decision
was required to effect a forfeiture; none of them expected or desired that
situation to arise; however all agreed that forfeiture should take place in the *d*
event of non-payment. I must return to this meeting and the basis for that
agreement under issue 9(ii) below.

[55] Emails were exchanged between the claimant and Mr Tippins on the
topic of realisations from the sale of the security businesses and related
issues between 17 October and 15 November.
  *e*
[56] On 2 November time for payment under the second call notice
expired. Contrary to the expectations and desire of all the four directors,
the claimant still had not paid the call.

[57] On 3 November the majority held formal board meetings of each of
the three subsidiaries (Mrs Tippins attended as company secretary),
resolving to forfeit the claimant's shares for non-payment of the call, and to *f*
transfer the same to SVSP. These meetings were conducted in accordance
with draft minutes prepared by Mrs Fatani, which in each case duly
provided for disclosure of the directors' interests as shareholders in SVSP.

[58] Mrs Fatani wrote to the claimant the next day notifying him of the
forfeiture, and enclosing copies of the relevant board minutes. When the
claimant's present solicitors replied on his behalf on 25 November, in which *g*
letter receipt of the second call notice was immediately denied, battle lines
were in effect drawn.


THE CLAIMANT'S 'THREE ISSUES'/THE DEFENDANTS' MOTIVATION FOR
PURSUING THE CALL PROCESS          *h*

[59] Mr Griffiths for the claimant emphasised the existence of three
unresolved issues between the claimant and the majority. In short form,
these were disputes as to the level of costs re-charged to SSS as management
charges by SVSP, as to the invoicing arrangements with Temple, and as to
the proposed payment of an interim distribution to the claimant in respect *i*
of the informal winding up of SSS.

[60] He submitted that these unresolved issues were the key to why this
forfeiture had ever taken place. These three issues were, Mr Griffiths
submitted, insuperable. The whole forfeiture process was, according to the
claimant's case, all a plan or set-up conceived and pursued for the purpose

*a*  of getting rid of him as a shareholder, and benefiting the majority through the vehicle of SVSP. The advancing of this case was not the result of any over-enthusiasm in the oral advocacy of Mr Griffiths on the spur of the moment. The claimant himself is quite convinced of it. I quote brief passages from his two witness statements, both duly verified without modification in his evidence in chief : 'I have no doubt whatsoever that
*b*  Mr Cookson and Mr Tippins made the calls and forfeited my shares to avoid paying me any of the proceeds of sale of the assets of SSS or any share of the profits left in SSS or any of the other companies'; 'They were setting me up to forfeit my shares'.

[**61**] I emphatically reject this part of the claimant's case. I specifically find that none of the four directors had or were motivated by a desire to deprive
*c*  the claimant of his shares or their value at any stage in the process up to and including the resolutions to forfeit and transfer to SVSP of 3 November which marked its conclusion. In deciding to make the call, and then to issue the second call notice, their intention was to get a shareholder whom they reasonably regarded as awkward and uncooperative, and with whom temperate communication had become effectively impossible, to pay the
*d*  nominal or par value for his shares, in the case of SSS in order thereby to facilitate the expeditious and efficient completion of the informal winding-up process, and in the case of each of the three subsidiaries (ie including SSS) as a matter of corporate 'good housekeeping'. Contrary to the claimant's case, neither of these decisions, nor the decisions to forfeit
*e*  themselves, were made pursuant to any plan or plot to remove the claimant as a shareholder, nor for the purpose or with the intention of benefiting SVSP (other than incidentally, when it came to the consequential transfers). There was no 'set-up' of the nature alleged. I shall deal with the question of what was their motivation for the actual decisions to forfeit under issue 9(ii) below.
*f*

THE ISSUES REQUIRING DETERMINATION

[**62**] At the conclusion of the evidence, it was agreed that the issues requiring my determination are as follows :
*g*  (1) On the evidence as a whole, were the claimant's shares in each of the three subsidiaries in fact fully paid up or agreed to be so credited – and if so, how?

(2) Is each of the three subsidiaries estopped by representation from denying that the claimant's said shares were fully paid up or agreed to be so credited? To that end:
*h*  (a) (i) Did they make a clear and unequivocal representation to that effect, and, if so, how? (ii) If so, did they do so intending it to be relied on or in circumstances where they ought reasonably to have expected it to be so?

(b) (i) Did such representation in fact cause the claimant so to believe? (ii) If so, was such resultant belief reasonable in all the circumstances?

(c) Did the claimant change his position on the basis of such (reasonable)
*i*  belief such as to render it inequitable or unconscionable for the defendants so to deny?

(3) Further or alternatively to issue (2), is each of the three subsidiaries estopped by convention from so denying? To that end:

(a) Did the parties (or one of them) make a mistaken assumption as to the

same – and if one-sided, did the other acquiesce in it?                              *a*

(b) Did both parties conduct themselves on the basis of such mistaken assumption/acquiescence such as to render it inequitable or unconscionable for the defendants so to deny?

(4) Did the directors of each of the three subsidiaries decide to make a call on the claimant's shares on or about 27 September 2002 as (purportedly) recorded in the minutes?                                                    *b*

(5) (a) If so, is such decision in some way invalidated by reason of any (undeclared) conflict of interest; and/or (b) did they so decide for an improper purpose?

(6) Did the directors of each of the three subsidiaries duly decide to issue a further call notice in accordance with reg 18 of Table A on or about 15 October 2002?                                                           *c*

(7) (a) If so, is such decision in some way invalidated by reason of any (undeclared) conflict of interest; and/or (b) did they so decide for an improper purpose?

(8) (a) Did the claimant actually receive the (purported) further call notice? (b) If not, is he nevertheless to be treated as having done so by virtue of reg 115 of Table A?                                              *d*

(9) Were the decisions of the directors of each of the three subsidiaries made on or about 3 November 2002 (a) to forfeit the claimant's shares for non-payment of the call, and (b) to transfer the forfeited shares to SVSP, (i) made for an improper purpose; (ii) flawed because all or some of the directors made the decision on the mistaken basis that that was the only available course?                                                          *e*

(10) If Yes to any limb(s) of issues (5) or (7) or (9), is the claimant entitled to rely on such point(s)?

(11) If Yes to any of issues (1)(c), (2), (3), or any limb(s) of (5), (7) or (9), or if No to issues (4) to (6), or to both limbs of issue (8), then

(a) Is SVSP bound to re-transfer/return the (purportedly) forfeited shares to the claimant? and                                                         *f*

(b) Should the register of members of each of the companies be rectified so as to show the claimant as the holder of the (purportedly) forfeited shares?

[63] In addressing these issues it is neither practicable nor convenient entirely to separate out the questions of fact and of law involved.                *g*

ISSUE 1: ON THE EVIDENCE AS A WHOLE, WERE THE CLAIMANT'S SHARES IN EACH OF THE THREE SUBSIDIARIES IN FACT FULLY PAID UP OR AGREED TO BE SO CREDITED – AND IF SO, HOW?                                         *h*

[64] This issue encompasses two distinct arguments which were advanced by the claimant or on his behalf at various stages. The first, which flies in the face of the documents and was therefore only ever capable of being based on the claimant's evidence of his understanding, was that the claimant's shares in the three subsidiaries were allotted to the claimant pursuant to some sort of share for share exchange, or share swap. This is dealt with by my findings at paras [22]–[23] above. As I have found, at the time of their allotment the claimant did understand the two stage nature of the process which I have described, and did understand the essential terms of the first stage, including that it was between himself and Mr Cookson.    *i*

*a*  This argument was, rightly in my judgment, not pursued by Mr Griffiths.

[**65**] The second, the origin of which seems to have been the claimant's lawyers rather than the claimant himself, was to the effect that the claimant had paid for his shares, by means of the amount payable thereon being debited to his loan accounts with each of the three subsidiaries: see para 1 of the reply. The claimant disowned knowledge of any such loan accounts *b*  in his oral evidence. There is no trace of any such account in the books of the three subsidiaries, the relevant entries in which I have described in para [27] above. The point was never more than a speculative one, probably inspired by the caption 'Loans – Shareholding Hunter' in the SSS management accounts to 31 July 2002 (one of which is misdated in its heading), and there is therefore some force in Mr Davies' criticisms of the *c*  signing of a statement of truth at the foot of this pleading. Be that as it may, in his written and oral submissions in reply Mr Griffiths has wisely not pursued it.

[**66**] It follows that the claimant's shares in the three subsidiaries are not paid up.

*d*

ISSUE 2: IS EACH OF THE THREE SUBSIDIARIES ESTOPPED BY REPRESENTATION FROM DENYING THAT THE CLAIMANT'S SAID SHARES WERE FULLY PAID UP OR AGREED TO BE SO CREDITED?

[**67**] The first limb of this issue raises the questions of (i) whether the *e*  three subsidiaries made a clear and unequivocal representation to the claimant that his shares were fully paid up or agreed to be so credited, and, if so, how; and (ii) if so, whether they did so intending the representation to be relied on or in circumstances where they ought reasonably to have expected it to be so.

[**68**] Mr Griffiths submits that the necessary representations were made by *f*  the sending (with his clients' express authority in each case) of Mr Martin's letters dated 6 and 12 September with the enclosed accounts mentioned in para [38] above. He relies on the caption in the respective notes to the balance sheets I have already identified 'Allotted, called up and fully paid'. At the close of the evidence, he further submitted that he would rely on the absence of any communication to the claimant since the July 2000 *g*  transaction up to the time of these two letters suggesting that his shares were not fully paid up, in other words silence on the point. However, in the absence of a legal duty to speak as to a particular fact, no representation will be inferred from silence, as Mr Davies rightly submitted, citing *Greenwood v Martins Bank Ltd* [1933] AC 51 at 57 per Lord Tomlin and *h*  Spencer Bower *Law Relating to Estoppel by Representation* (4th edn) para 111.4.1. Mr Griffiths did not seek to support reliance on silence in his submissions in reply.

[**69**] Mr Davies realistically concedes that the audited accounts of Acquire and of EAT to 30 June 2001 do contain representations to the effect that their entire share capital was fully paid up. He submits, however, that they *i*  ceased to be unequivocal on the point once the call letter had been sent to the claimant. There is obviously force in this argument. Given that the claimant had not read or focussed on, let alone relied on, the crucial caption prior to receiving the letter of 27 September, however, I consider that this argument is more conveniently addressed in the context of the second

question under the second limb of this issue (reasonableness of reliance).          *a*

[70] Mr Davies submits that the position in respect of the audited accounts of SSS to the same date is different, because the claimant himself was a director of this company throughout the financial year in question, and indeed when the accounts were adopted, namely 7 May (he resigned on 29 August). He argues that, as one of the two directors of SSS, the claimant was responsible for preparing those accounts under s 226 of the 1985 Act          *b* and approving them under s 233 of the 1985 Act, and should therefore be treated as responsible for any representations they contain. I am not persuaded that the conclusion must follow from the premise in every case. In my judgment the factual position in respect of the particular company and the particular accounts in question must also be considered. Here, (a)          *c* the claimant's employment within the group had ended in late 2000, (b) although thereafter he was still invited to the executive team meetings at which any formal board business was also dealt with as and when required (they were held to a regular pattern, established before he had left employment within the group) in practice he did not attend, (c) he was not given notice of any formal board business which was to be dealt with in this          *d* manner, including in particular (as I find) that the audited accounts would be tabled for approval on 7 May, (d) when he was sent these accounts on 6 September by Mr Martin, neither Mr Martin nor the majority who expressly authorised the sending of this letter suggested that he had already been sent them, from which I infer that he had not. In these circumstances I am not persuaded that for the purposes of whether he can raise an          *e* estoppel by representation, the claimant must be treated as himself being responsible for the making of the representation relied on by reason of his said legal obligations under the 1985 Act, and I reject Mr Davies' submission accordingly. In my judgment the audited accounts of SSS for the year to 30 June 2001 coupled with the letter dated 6 September 2001 are not materially different to those of Acquire and EAT coupled with the letter          *f* dated 16 September 2001. Each of the three erroneous notes contains a representation to the effect that the relevant company's entire share capital was fully paid up.

[71] Mr Davies also submits that the position in respect of the draft (and unaudited) accounts of SSS to 30 June 2002 is different. The covering letter of 6 September said of them that they 'have not been finalised at this stage,          *g* although we have completed our fieldwork at the client and do not envisage there will be any material changes'. Mr Davies submits that in the circumstances, these draft accounts should not be treated as a clear and unequivocal representation by SSS of the truth of all the facts and matters stated therein. In essence he makes two points:          *h*

    (i) they were expressly subject to alteration and therefore not clear and unequivocal: see *Canada and Dominion Sugar Co Ltd v Canadian National (West Indies) Steamships Ltd* [1947] AC 46 at 56, where Lord Wright (giving the opinion of the Board) said 'the whole case of estoppel fails if the statement is not sufficiently clear and unqualified';

    (ii) although provided to the claimant on the authority of the directors of          *i* SSS, these draft accounts (particularly when read with the covering letter) were not, pending approval by the board of directors or in the absence of clear words, a representation by SSS, but only a representation by the auditors as to the present state of their work in progress. As draft accounts,

*a*  the position is a fortiori that of the signed and audited accounts considered by Bennett J in *Re General Preserving Co Ltd* [1937] 1 All ER 693 esp at 697; see also *James McNaughton Papers Group Ltd v Hicks Anderson & Co (a firm)* [1991] BCLC 163 at 175–176, [1991] 2 QB 113 at 127–128 per Neill LJ.

*b*  [72] I accept Mr Davies' submissions on this point. The draft accounts of SSS for the year to 30 June 2002 coupled with the letter of 6 September did not contain the clear and unequivocal representation contended for, even before the letter of 27 September was sent to the claimant.

[73] The second question which arises under this first limb is whether the three subsidiaries made the representation which I have found in paras [69] and [70] above intending it to be relied on or in circumstances where they ought reasonably to have expected it to be so. It is common ground that the objective test indicated by the latter words of this formulation will be applied in the absence of actual intention: see e g *Spencer Bower* at paras 1.2.2–1.2.3 and *Trane (UK) Ltd v Provident Mutual Life Assurance* [1995] EGLR 33 at 38–39 per Judge Cooke.

*d*  [74] As indicated in para [28] above, I accept Mr Martin's evidence that the words of a standard template, which included the crucial ones, were used without modification in error by reason of an oversight. It is quite clear that there was no such actual intention that the representation be relied on, as the crucial words represented a simple error on the part of Mr Martin, and there is nothing to suggest that any of the four directors *e* had addressed their minds to or noticed the wording of the relevant notes. However, applying the objective test, ought the three subsidiaries reasonably to have expected them to be relied on? Mr Davies accepts so, in respect of the three sets of audited accounts in question.

[75] The second limb of this issue raised the questions of (i) whether such representation in fact caused the claimant to believe that his shares were *f* fully paid up or so credited, and (ii) if so whether such resultant belief was reasonable in all the circumstances.

[76] It is quite clear that the claimant did not even consider the question of whether his shares in any of the three subsidiaries were or were not paid up until after he received the call letter. He accepted this in cross-examination, and indeed until his receipt of that letter it is very hard *g* to imagine why that question should ever have occurred to him. Insofar as para 2 of his second witness statement suggests to the contrary I unhesitatingly reject it.

[77] The case which the claimant's oral evidence went to support is that put forward in para 3 of his second witness statement, namely that when he *h* received the call letter of 27 September he thought the assertion that his shares were unpaid was odd but—

'[I] thought I would check the position and the only documents I had to hand were the audited accounts for the period ended 30 June 2001. I checked the notes to those accounts and they confirmed the issued *i* share capital in all three companies were fully paid up. I therefore assumed that Mr Tippins has made a mistake in his letter … The audited accounts were quite clear on this point … I did not, therefore, give the letter the urgency it may have deserved because I was quite

confident that my shares were fully paid up. There was no doubt in my
mind. It was something that could be clarified in due course but I did
not regard it as urgent.'

In cross-examination the claimant asserted that following receipt of the
call letter he went back and looked at the accounts for all of the three
subsidiaries, found the three erroneous notes indicating that the
shareholding was allotted, called up and fully paid, and concluded that the
call letter was—

'very bizarre. I just did not know where it was coming from … I
checked and double checked the accounts. They showed it as fully paid
up. I really did not know where this was going but clearly why make a
payment for something which I could see for myself was not a true
demand'.

[78] I reject the claimant's evidence on this matter. I find the terms of his
email response to the call letter, which he sent on 16 October, to be
inconsistent with the claimant's evidence and to belie it. They are not
credibly reconcilable. That email, which was addressed to Mr Tippins, was
also copied to the lawyer and the accountant then advising him, Messrs
Jacobson and Cadranel respectively. I have already set it out in full in
para [52] above. In cross-examination the claimant said that the last
sentence was a 'facetious remark', made knowing the opposite to be true.
He said that the email was copied to his lawyer for the purpose of
impressing Mr Tippins with his seriousness rather than in fact to seek legal
advice. He said that the last sentence of the first paragraph was 'a bit of
bravado'.

[79] I simply do not believe that if the claimant had made the checks he
now says he made, and if his state of mind when he set about composing his
email response to the call letter was that he was quite certain that the call
was based on an error, and that his shares were fully paid up and shown as
such in notes to the statutory accounts, he would have written in these
terms. Furthermore, the claimant is not the sort of man who, if he thought
he had a knock-out point available to him which would make the majority
look foolish, would eschew the opportunity to throw it back at them in a
very direct way in his next response, or who would plump for subtle irony
instead. There is also a narrower point on the exact wording used. Even if
the final sentence had been intended as a facetious, or perhaps ironic,
observation, if (which I find it was not) it had been prompted by a specific
consideration of the wording of three erroneous notes, it would have been
expressed in relation to their subject matter, and have read something along
the lines of 'all these unpaid shares are no doubt shown in the completed
company accounts'. The wording which in fact appears is directed to the
appearance or non-appearance in the accounts of a debt or outstanding
sum. This ties in much better with the claimant having at least at the back
of his mind the caption 'Loans – Shareholding Hunter' that appeared on
whichever of the management account documents he had received in early
September. Further, if the claimant did consult the audited accounts but on
the question of debtors (as opposed to share capital) there would indeed
have been room for some genuine (rather than feigned) uncertainty given
the limited breakdown of that figure shown.

[80] The probable explanation for the claimant's inaction is that he

*a* simply did not treat the call letter with the seriousness it deserved. I note that it took him over two weeks to get round to responding to it at all, even by email. The claimant did intend to seek legal advice about it in due course, but was not in any hurry to do so. He appears to have been focused on other issues at the time. The bloody-minded streak in him came into play. He sent the email reply he did – which no doubt deliberately strikes a
*b* somewhat unconcerned tone – intending to look at the matter further in his own time. However, he then did not get round to doing so until it was too late.

[81] I find that the presence in the audited accounts to 30 June 2001 for each of three subsidiaries of the caption in the three erroneous notes containing the representation relied on had no operative effect on the mind
*c* of the claimant at any time prior to the forfeiture.

[82] I shall nevertheless briefly deal with the second question under the second limb under this issue. Even if I were wrong about the first question, I am satisfied that the claimant's asserted belief founded on the representation contained in the caption relied on was not a reasonable one
*d* in all the circumstances. Even on his own account of matters, the claimant had not read or focused on, let alone relied on, the crucial caption in the three erroneous notes prior to receiving the call letter.

[83] Mr Davies submits that the information in the call letter regarding the shares was highly specific, and clearly contradicted any representation by the captions in the three erroneous notes to the effect that the shares
*e* were fully paid. Accordingly, he submits, the call letter rendered any such prior representation to that effect equivocal. Another way of looking at the same underlying factual point is to say that once the call letter had been received, it would have been unreasonable for the claimant to rely on the representation contained in the three erroneous notes without further inquiry. That, if it were to become relevant, is my conclusion. Given that the
*f* claimant had not read or focused on, let alone relied on, the three erroneous notes prior to receiving the letter of 27 September, it follows that there was never a time at which he could reasonably have relied on the representation they contained.

[84] If and insofar as the burden of proof would be relevant to the effect on reasonableness of reliance of the terms of the call letter when set
*g* alongside the terms of the three erroneous notes (as to which I was referred to *Spencer Bower* at para IV 3.6), the defendants have established to my satisfaction that in all the circumstances it would not have been reasonable for the claimant after receipt of the call letter to have read the three erroneous notes (had that happened at all) independently of, rather than in
*h* conjunction with, the terms of the call letter, nor to have relied on the representation which those notes taken alone contained.

[85] The third and final limb of this issue raises the question of whether the claimant changed his position on the basis of such (reasonable) belief, such as to render it inequitable or unconscionable for the defendants now to deny the accuracy of their representation.

*i* [86] As follows from my answers to the second limb of this issue, the claimant did not do so. His actions were uninfluenced by the representation which was there to be found in the notes to the accounts I have described.

ISSUE 3 : FURTHER OR ALTERNATIVELY TO ISSUE (2), IS EACH OF THE THREE *a*
SUBSIDIARIES ESTOPPED BY CONVENTION FROM SO DENYING?

[87] As to estoppel by convention generally, a convenient starting point is
the three-part formulation approved by the Court of Appeal in *Norwegian
American Cruises A/S v Paul Mundy Ltd, The Vistafjord* [1988] 2 Lloyd's
Rep 343 at 352 and by Brooke J in *Bank of Scotland v Wright* [1991] *b*
BCLC 244 at 261 (citing an unreported judgment of Peter Gibson J (in
*Hamel-Smith v Pycroft and Jetsave Ltd* (5 February 1987, unreported) with
approval): (1) the parties must have established, by their construction of
their agreement or a common apprehension as to its legal effect, a
conventional basis; (2) on that basis, the parties have regulated their
subsequent dealings; (3) one party would suffer detriment if the other were *c*
permitted to resile from that convention; provided that one bears in mind in
relation to (1), as Mr Griffiths rightly submits, that the existence of an
agreement or contract as such is not a sine qua non for an estoppel by
convention arising (see *The Vistafjord* [1988] 2 Lloyd's Rep 343 at 351 per
Bingham LJ, citing another passage of the same unreported judgment of
Peter Gibson J with approval). Thus the wording of (1) may therefore have *d*
to be adapted to fit the factual context.

[88] There are two limbs to issue 3. The first raises the question of
whether the parties (or one of them) made a mistaken assumption that the
claimant's shares were fully paid up or agreed to be so credited – and if
one-sided, whether the other acquiesced in it.

*e*

*First limb – the position prior to 27 September*

[89] Mr Griffiths correctly reminds me that there is evidence that each of
the four directors was surprised to learn that the claimant's shares were not
fully paid up. However, I am satisfied that such surprise arose because none
of the four of them had at any stage hitherto formed any view or made any
assumption one way or the other as to whether or not those shares were *f*
paid up, and because those of them who in July 2000 had it in mind that a
payment for the shares would be needed from the claimant had thereafter
simply forgotten about that need, which was overlooked by all concerned.
There was no assumption on their, and hence the defendants', part that the
claimant's shares were fully paid up or agreed to be so credited. None of *g*
them had turned their minds to the point.

[90] That being so, there was no assumption on their part in respect of
which to consider the further question of whether such an assumption (or
conduct founded on it) 'crossed the line' between the defendants and the
claimant (see *K Lokumal & Sons* (*London*) *Ltd v Lotte Shipping Co
Pte Ltd, The August Leonhardt* [1985] 2 Ll Rep 28 at 34–35 per Kerr LJ). *h*
Mr Griffiths argues that the assumption for which he contends did 'cross
the line' when the audited accounts to 30 June 2001 were sent to the
claimant on 6 September (as to Acquire and EAT, it was 12 September – see
para [38] above). No such assumption was ever made by the defendants.
They either had not turned their minds to the point or (once Mr Martin had
noticed and raised the point, which was between 6 and 16 September in the *i*
case of SSS, and shortly thereafter in the cases of Acquire and EAT – see
paras 12 and 14 of his first witness statement, which I accept) they believed
to the contrary.

[91] Nor did the claimant himself make any assumption on the point. He

*a* too had been aware in July 2000 that he would have to make a modest payment for the shares in due course (see paras [22]–[24] above). He too thereafter simply forgot about that need, which as I have said was overlooked by all concerned. Thus there was no assumption on his part either that his shares were fully paid up or agreed to be so credited. Once he forgot about the need to make that modest payment, he did not turn his

*b* mind to the point again until he received the call letter. Nor, if (contrary to my finding) any relevant assumption was made by the defendants, did the claimant acquiesce in it. Mr Griffiths submits that he did so by making no objection to the three erroneous notes following receipt of the sets of audited accounts containing them. Whether or not such an argument would be well-founded if the claimant had read those notes and consciously

*c* refrained from objecting to them on the basis that the defendants were assuming to the contrary and had communicated that assumption to him, in my judgment it has no substance where (as I have found) the claimant did not read or consider them at all.

[92] Mr Griffiths also submits that I should infer that the four directors

*d* knew or suspected that the claimant assumed that his shares were fully paid up, because otherwise they would not have incurred the legal fees they did in relation to the forfeiture process, the drafting of related documents and so forth. I do not so infer. The reason why they went to solicitors was because they had come to the view (reasonably, in my judgment) that normal and constructive communication with the claimant had become

*e* increasingly difficult (see para [46] above), and they felt that the only way of resolving the difficulty over unpaid shares raised by Mr Martin was by formal means, which should be dealt with entirely properly and accurately.

*First limb – the position after 27 September*

*f* [93] After 27 September there can be no question that the defendants assumed that the claimant's shares were fully paid up or agreed to be so credited. Indeed, in the further information he provided under para 24(10) of his amended particulars of claim, the claimant disavowed any such suggestion. Nor could it realistically be suggested that the defendants, having made the call on 27 September which involved an assertion of the

*g* direct opposite, and thereafter following it through, were in any way acquiescing in such an assumption on the claimant's part.

*Second limb*

[94] The second limb of this issue raises the question of whether both

*h* parties conducted themselves on the basis of the mistaken assumption/acquiescence such as to render it inequitable or unconscionable for the defendants so to deny. In the factual context of this case, it is important to bear in mind the following statement of one of the requirements for raising such an estoppel made by Brooke J in *Bank of Scotland v Wright* [1991] BCLC 244 at 261, cited to me by both counsel:

*i*          'There is, however, an important feature of this type of estoppel, which Robert Goff J had found as a fact to have been present in the post-contract dealings between the parties before him [in *Amalgamated Investment & Property Co Ltd (in liq) v Texas Commerce International Bank Ltd* [1981] 1 All ER 923, [1982] QB 84], and this is that the

party who is sought to be estopped must have contributed in some
active way towards the creation or continuance of the mistaken basis on
which the parties thereafter conducted their dealings, so that it would
be unconscionable to allow him to resile from the stance he had taken,
which had to a certain extent influenced the other party to behave as it
did.'

[95] Further to my findings in relation to the first limb of this issue, I am
satisfied that, even if (contrary to my finding) the claimant did conduct his
dealings on the basis of a mistaken assumption on his own part that his
shares were fully paid up or agreed to be so credited, the defendants had
not contributed in some active way towards the creation or continuance of
that mistaken assumption on his part.

[96] Up to 27 September there was no 'mutually manifest conduct' based
on any assumption (whether express or implied) that the claimant's shares
were fully paid up or agreed to be so credited as is required for an estoppel
by convention (see *The August Leonhardt* [1985] 2 Lloyd's Rep 28 at
34–35 per Kerr LJ; contrast the facts of the other cases there discussed and
*Hiscox v Outhwaite* [1991] 3 All ER 124, [1992] 1 AC 562 in the Court of
Appeal (the estoppel point was not considered in the House of Lords)). As
to the matters pleaded in the particulars set out at paras 24(1)–(7) of the
reamended particulars of claim, they do not support a case of 'mutually
manifest conduct' for the reasons set out in Mr Davies' written closing
submissions at para 48.

[97] After 27 September, as I have already found, there can be no question
that the defendants either themselves assumed that the claimant's shares
were fully paid up or agreed to be so credited, or in any way acquiesced in
such an assumption on the claimant's part. In any event, the claimant did
not in fact make any such assumption: see his email dated 16 October and
my findings at [78]–[81] above. Accordingly there can be no basis for any
estoppel by convention in respect of conduct after that date.

[98] I reject the claimant's suggestion that the defendants or their
directors had hatched some sort of plan to forfeit the claimant's shares,
and/or had incurred legal costs in order to seek to take unfair advantage of
some known or suspected mistaken assumption on the claimant's part to the
same end.

[99] Finally on this issue, I am quite satisfied that there is nothing in the
circumstances of this case which renders it inequitable or unconscionable
for the defendants now to deny that the claimant's shares were fully paid up
or agreed to be so credited.

ISSUE 4: DID THE DIRECTORS OF EACH COMPANY DECIDE TO MAKE A CALL ON
THE CLAIMANT'S SHARES ON OR ABOUT 27 SEPTEMBER 2002 AS
(PURPORTEDLY) RECORDED IN THE MINUTES?

[100] I am satisfied that the board meetings of 27 September did take
place, essentially as described in the evidence of Messrs Cookson and
Tippins, and reflected in the minutes. Having been specifically deputed at
the end of the executive team meeting on the previous day formally to hold
such meetings, it would have been odd for them not to have done so.
Mr Cookson chaired the first in time, being that of the board of SSS which
both he and Mr Tippins attended at the companies' offices in Hartley

*a* Wintney, before leaving for a business appointment in Leicester by car. Later that morning the meetings of the boards of Acquire and EAT were held. Mr Tippins, still at the offices, chaired these and Mr Cookson participated by (hands free) mobile telephone from his car en route to Leicester. The minutes produced fairly reflect the substance of what occurred.

*b* [101] The background to them was, as I have found in paras [44]–[45] above, that on the previous day the subject matter had been discussed informally towards the end of the executive team meeting by all the four directors, they had come to the unanimous view that a call should be made on the unpaid shares (in practice that was only the claimant's), and Messrs Farrier and Bevan had approved the holding of formal meetings of the boards on the next day although they were unable to attend – Mr Farrier being due to take a day's leave and Mr Bevan being due to work at home that day (see their respective witness statements).

*c*

[102] The claimant's case on this issue is simply that, as matters of fact, the formal board meetings never took place, and thus that the decisions to make the call recorded in the minutes were never made, at least in the manner alleged, rather than raising any narrower point regarding the formal convening of the meetings or the like. That case fails, on the basis of the findings of fact I have just made. Given the terms of Mr Griffiths' submissions on this point, I should perhaps add that I am not persuaded that the differences in the evidence given by Messrs Cookson and Tippins before and after disclosure of the Hammonds Suddard documents to which he refers (with regard to whether pre-prepared minutes were or were not read out in terms) demonstrate that they or either or them fabricated any part of their evidence about these meetings. Both impressed me as honest and straightforward witnesses, doing their best accurately to recollect events. Mr Cookson initially used the phrase 'it is very likely that I would have read through this' in respect of the reading out of draft minutes on 27 September, thereby indicating that his evidence was at least in part based on extrapolation or reconstruction rather than direct recollection. It was only when pushed by Mr Griffiths putting to him that his use of such qualified language was 'extraordinary really' that he changed to an unqualified verbal formulation on this point. He was then challenged as to the change, to which he replied 'Because you required a Yes or No answer'. Mr Cookson's answers when recalled after disclosure of the documents from Hammonds Suddard were in my judgment reasonable and measured. There may well have been some form of note available to him from which to 'run' the SSS board meeting which he chaired before leaving the office, and available to Mr Tippins when he chaired the equivalent (with regard to the call) meetings of the Acquire and EAT boards. Further or alternatively, Messrs Cookson and/or Tippins may well have confused the process followed at different but essentially similar, formal board meetings over this period. Mr Tippins volunteered this possible explanation in his cross-examination when recalled. It may well be right. His willingness to accept the inaccuracy in his earlier oral evidence without hesitation or equivocation, and the responses he then gave, certainly impressed me. Whatever the extent to which the 27 September meetings were scripted, I am confident in my finding that they all took place, and that the minutes

*d*

*e*

*f*

*g*

*h*

*i*

produced fairly reflect the substance of what occurred.                     *a*

[**103**] In those circumstances I shall deal only very briefly with the defendants' alternative case, which was that if necessary they would rely on the unanimous agreement of all four of the relevant directors that such call should be made, which was made informally at the end of the executive team meeting held on the previous day. As Simon Brown J said in *Runciman v Walter Runciman plc* [1992] BCLC 1084 at 1092:          *b*

> 'That directors, provided they act unanimously, can act informally appears clearly established – *Re Bonelli's Telegraph Co*, *Collie's claim* (1871) LR 12 Eq 246 and *Charterhouse Investment Trust Ltd v Tempest Diesels Ltd* [1986] BCLC 1 so decide …'

*c*

I have already found that Mr Tippins had received initial legal advice on the matter prior to this meeting, and reported the substance of it to the meeting in good faith (para [44] above). I have made my other findings as to what occurred at the relevant part of the meeting on 26 September (para [45] above). Had it been necessary, I would have held that the unanimous decision reached, albeit less formally than at the meetings on *d* 27 September, by all four directors at the end of the executive team meeting on 26 September sufficed as decisions of the three boards to make the call under reg 12 of Table A, and satisfied the terms of the dictum of Sir James Bacon V-C in *Re Bonelli's Telegraph Co*, *Collie's claim* (1871) LR 12 Eq 246 at 258 cited to me by both counsel:

*e*

> 'If you are satisfied that the persons whose concurrence is necessary to give validity to the act did so concur, with full knowledge of all that they were doing, in my opinion the terms of the law are fully satisfied, and it is not necessary that whatever is done by directors should be done under some roof, in some place, where they are all … assembled.'

[**104**] I do not consider that the fact that one of the four present *f* (Mr Cookson) had formed his own unspoken view that if the matter went all the way to forfeiture (contrary to their joint and several expectation) the claimant's shares were likely to end up being transferred to SVSP, but had not expressly stated that view to any of the others, would invalidate such a decision for want of the requisite knowledge on the part of all present. That view was not in any sense a necessary part of the decision the board was *g* making at that stage, and was no more than the private thoughts of one of their number, which were in no sense either an inevitable outcome or binding on them or the companies.

ISSUE 5 : IF SO, (A) IS SUCH DECISION IN SOME WAY INVALIDATED BY REASON *h* OF AN (UNDECLARED) CONFLICT OF INTEREST; AND/OR (B) DID THEY SO DECIDE FOR AN IMPROPER PURPOSE?

[**105**] As to (a), the suggested conflicting interest, which affects each of the four persons who were directors of one or more of the three subsidiaries at the material time, is the holding of shares in SVSP, to which company each of the forfeited shares were in the event transferred. In the case of *i* Mr Cookson, Mr Griffiths additionally relies on his oral evidence that by 26 September he had formed the unspoken conclusion that if the procedure were to lead to forfeiture of the claimant's shares, they would then be transferred to SVSP. Though Mr Cookson apparently assumed that his three

*a*  fellow directors would also (independently, since the matter was not discussed until much later) have come to the same conclusion, none of them in fact did so – the question of what would happen to the shares after any forfeiture (which none of the four expected would happen) simply did not occur to them.

*b*  [**106**] The decision made formally on 27 September, having been agreed informally the previous day, was to make a call on shares (pursuant to reg 12 of Table A). It was not a decision to forfeit shares. At worst, it was a decision which, depending on how the claimant (as the only shareholder affected) reacted to it, was capable of giving rise to a situation in which the board could in the future make a further decision (to issue a further notice requiring payment of the call, pursuant to reg 18 of Table A), which in turn
*c*  was capable, depending on how the claimant reacted to that, of giving rise to a situation in which the board could (aliter, would have the opportunity to) resolve to forfeit the claimant's shares pursuant to reg 19 of Table A. The passage of such a resolution for forfeiture would in turn give rise to the powers to sell, re-allot or otherwise dispose of the same provided for by
*d*  reg 20 of Table A.

[**107**] When the nature of this decision is thus analysed, it is unsurprising that Mr Griffiths did not pursue any argument that the provisions of s 317 of the 1985 Act are of any direct application to it. The resolution did not concern a contract or proposed contract (see sub-s (1)), even taking into account the expanded definition of those words to include a transaction or
*e*  arrangement (see sub-s (5)).

[**108**] Mr Griffiths relies on the general prohibition (described by Gower & Davies' *Principles of Modern Company Law* (7th edn, 2003) as 'the common law rule') on directors (like other species of fiduciary) putting themselves in a position where there is a conflict (actual or potential) between their duties to the company and their personal interests (or any
*f*  duty owed to another person). For this he cites *Palmer's Company Law* at para 8.516 and *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461 at 471 per Lord Cranworth LC:

> 'A corporate body can only act by agents, and it is of course the duty of those agents so to act as best to promote the interests of the
*g*  corporation whose affairs they are conducting. Such agents have duties to discharge of a fiduciary nature towards their principal (see Mr Hudson's case [*Yorkshire & North-Midland Rlwy Co v Hudson* (1845) 16 Beav 485, 51 ER 866]). And it is a rule of universal application, that no one, having such duties to discharge, shall be allowed to enter into engagements in which he has, or can have, a
*h*  personal interest conflicting, or which possibly may conflict, with the interests of those whom he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into.'

*i*  I have also helpfully been referred by Mr Davies to Gower & Davies' *Principles of Modern Company Law* (7th edn, 2003) pp 380–381 and 391–416.

[**109**] The references in that citation to 'engagements' and to 'a contract so entered into' are noteworthy. The case of *Transvaal Lands Co v New Belgium* (*Transvaal*) *Land and Development Co* [1914] 2 Ch 488 which he

also cites was a case concerning two contracts entered into in breach of the *a* above principle. It is authority on the sufficiency of a shareholding qua trustee in the other contracting party to amount to a conflicting personal interest, but does not help on the possible application of the principle to non-contractual situations, and in particular the exercise of powers.

[**110**] Mr Davies submits that the application of this principle in the context of a simple exercise of a power by directors, such as the power to *b* make a call or declare a dividend, is not well established. In particular, he submits that it is not clear in a case where the directors have simply exercised a power, as opposed to procured the company to enter into a contract, in what circumstances the directors will be found to have an interest which may possibly conflict with their duties to the company.

[**111**] Mr Griffiths cites *Re National Provincial Marine Insurance Co*, *c* *Gilbert's case* (1870) 5 Ch App 559. The factual circumstances were fundamentally different from the present case, in that there the directors decided that a call was necessary in the interests of a company some of whose shareholders were threatening to transfer their partly-paid shares. However they postponed the declaration of such call for a few days, in *d* order to give at least one of their number a window of opportunity first to transfer away partly-paid shares of his own and/or to have such transfers registered, with the intention of thereby escaping liability on the call. Their failure, in the result, to succeed in that intention is wholly unsurprising. In the course of his judgment Giffard LJ (at 565) described the directors as having— *e*

> 'what was unquestionably a discretion to exercise with regard to a fiduciary power – namely, a power to decide whether at a particular time a call ought or ought not to be made'.

He stated (on 566) that any disinterested directors would— *f*

> 'if they had any regard to the due interests of the shareholders and of the company, have made the call, as it was their plain duty to do, on that day. I have no hesitation in saying that I can find but one reason why the directors did not make the call on that day, and that reason was that their duty and their interests lay in totally opposite directions; and if persons having to exercise a fiduciary power choose to place *g* themselves in this position, that their interests pull one way while their duty is plainly to do something quite different, and for that reason they abstain from exercising that power, they must be held to all the same consequences as though that power has been exercised.'

That was achieved not by impugning or reversing the call, but by holding *h* the transfers of directors' shares registered during that window of opportunity void (which it may be noted was a remedy for the benefit of the company).

[**112**] The conflicting personal interest in that case was immediate and direct: at the time of the decision to make the call the directors, including in particular Mr Gilbert, were the registered holders of partly-paid shares *i* which were (or were to be) subject to the proposed call. The directors were only bound to register a transfer if it was lodged before the call on the subject shares had been made. Hence the reason for the short postponement. Strictly, the objectionable decisions of the directors tainted

a   by conflicting self-interest were those to postpone implementation of the
agreed call and/or to register the directors' own transfers away during the
short window of opportunity their decision to postpone had created.
Putting it another way, those two decisions were made for an improper
purpose.

b   [113] The circumstances of the present case are wholly different. When
deciding whether to make the call on 27 (or 26) September, the only
potentially conflicting interest of the directors was anything but immediate,
being multiply contingent, with the two principal contingencies depending
on voluntary actions of the claimant wholly outside the directors' control
(see para [106] above). Furthermore, I have been satisfied (see para [61]
above) that the directors' decision to make this call was made for motives
c   or purposes which Mr Griffiths accepted in opening are (if correct) to be
regarded as proper ones (see para [121] below). In these circumstances I do
not consider it necessary for me to attempt an overarching analysis in
abstract terms as to when and how what *Gower* calls the 'common law
rule' will or will not be applied to decisions of directors which constitute
d   the exercise of powers (the description of which as 'fiduciary powers' may
import different things in different contexts or for different legal purposes).
Assuming without deciding that the common law rule is applicable to the
decision to make the call, I am satisfied that it was not infringed on these
facts. Accordingly, the decision to make the call is not invalidated by reason
of any (undeclared) conflict of interest.

e   [114] Mr Davies takes the further point that even if the common law rule
had been infringed, the directors of the three subsidiaries were nevertheless
authorised to participate in making such a decision by the companies'
respective articles of association.

[115] As to this Mr Griffiths in essence submits, building on his
submissions as to the general rule summarised in para [108] above, that (i)
f   in the case of directors, their ability to act when under a relevant conflict is
dependent on the existence of an applicable relaxation of the general
principle in the company's articles of association, (ii) the relaxation found in
art 8.1 is not applicable on these facts, and (iii) that is the only relevant
relaxation in the articles. I agree with submissions (i) and (ii), but not with
(iii).

g   [116] My acceptance of submission (i) is founded on general principle.
Mr Davies does not dispute the point, and it therefore requires no
elaboration. As to submission (ii), art 8.1 in each of the three subsidiaries'
articles of association is in identical terms. It provides :

h   'A director who is in any way, whether directly or indirectly,
interested in a contract or proposed contract with the company will
declare the nature of his interest at a meeting of the directors or a
committee of the directors in accordance with s 317 of the Act. A
director who has disclosed his interest may vote in respect of any
contract, proposed contract or any arrangement in which he is
interested directly or indirectly and such director will be counted in the
i   quorum present at any meeting at which such contract or proposed
contract or arrangement is being considered. Regulations 94 and 95 of
Table A will not apply to the company.'

[117] The express authorisation to vote on a matter in which the director

is interested is dependent on that director having 'disclosed his interest'. *a*
Those words, which appear at the beginning of the second sentence, are to
be read as meaning disclosed in accordance with the provisions of the first
sentence. Those provisions require the disclosure to be made at a meeting of
the directors, and in accordance with s 317 of the 1985 Act. No such
disclosure was made at any such meeting until those held on 3 November.
Therefore the express authorisation contained in art 8.1 cannot be relied on *b*
in respect of decisions made prior to those meetings. The presence of the
word 'arrangement' in the second but not the first sentence of this article
appears odd; given the reference to s 317 of the 1985 Act in the first
sentence one might have expected 'transaction or arrangement' to be
included in the first and second sentences (see s 317(5)). Be that as it may,
all I need say about it for the purposes of this judgment is that I am satisfied *c*
that the presence of the word 'arrangement' in the second but not the first
sentence of art 8.1 would not assist the defendants on the present facts in
any event.

[**118**] However, Mr Davies relies on the provisions of reg 85 of Table A,
which is incorporated into the articles of association of each of the three *d*
subsidiaries. In contrast to art 8.1 considered above, this does not require
the disclosure to fellow directors to have been made at a meeting nor in
accordance with s 317 of the 1985 Act: the material words simply read
'provided that he has disclosed to the directors the nature and extent of any
material interest of his'. Given that all four of the directors well knew of
each other's shareholdings in SVSP, their respective material interests were *e*
disclosed, albeit informally. I am not persuaded by Mr Griffiths that
Mr Cookson's thought processes described in paras [104] and [105] above
constituted any additional 'material interest' on his part requiring
disclosure. In a case such as the present, where s 317 of the 1985 Act does
not apply to the decision in question (contrast the facts on which the
decision of Harman J in *Lee Panavision v Lee Lighting* [1991] BCLC 575 *f*
was made), the opening words of reg 85 ('Subject to the provisions of this
Act') do not in my judgment add anything to the other requirements set out
in reg 85.

[**119**] Therefore, if and so far as the defendants need to and can rely on
the provisions of paras (a)–(c) of reg 85 (this aspect of the alternative
submission has not been fully developed), I find on the facts that the *g*
proviso for disclosure is satisfied so as to enable them to do so. Thus
Mr Griffiths' submission (iii) on this point (as set out in para [115] above)
fails. As I have already found for the defendants on their primary
submission that there was no infringement of the common law rule in any
event, I do not think it necessary to develop my ruling on this alternative *h*
point any further.

[**120**] Had I come to a different view on this issue, further questions
would have arisen as to what the appropriate sanction would be. Given the
findings I have already made on this issue above, I do not consider it
necessary or desirable that I lengthen this judgment further by going into
Mr Davies' submissions in that regard. Similarly, given what I have said in *i*
para [107] above, I do not need to resolve the interesting question raised by
Mr Davies as to whether the court would or should set aside a decision
reached in breach of the formal disclosure requirements of s 317 of the
1985 Act in circumstances where full disclosure of the material conflicting

*a*  interest had been made albeit informally, a submission which he founded on the observations of the Court of Appeal in *Lee Panavision v Lee Lighting* [1992] BCLC 22 at 33 per Dillon LJ (with whom Stocker LJ and Sir David Croom-Johnson agreed (at 33)); as to which see also *Neptune (Vehicle Washing Equipment) v Fitzgerald* [1995] 1 BCLC 352 esp at 360 (Lightman J), cited by Mr Griffiths.

*b*  [121] As to limb (b), improper purpose, in most cases of a directors' decision to make a call on shares, the only likely proper purpose will be to raise the capital sum involved for the use of the company concerned. However, towards the end of his opening, having reflected overnight on a question posed by me, Mr Griffiths conceded that if the facts were as the directors and their witnesses (including importantly Mr Martin) asserted,

*c*  and that their purpose in the case of SSS was to facilitate the payment of a dividend rateably to all shareholders (including the claimant) at the conclusion of the informal winding-up process (given the provisions of reg 104 of Table A, which Mr Martin had drawn to their attention), coupled with a desire for good corporate housekeeping in the case of all of

*d*  the three subsidiaries, that could not in the unusual circumstances of this case be impugned as an improper purpose. I would add that in my view that concession was realistic and rightly made. As I have found, contrary to Mr Griffiths' submissions, the facts to be as the directors and their witnesses asserted in this regard (see para [61] above), there is no further dispute for me to resolve in respect of limb (b). The decision to make the

*e*  call in each of the three subsidiaries was made for proper purposes.

ISSUE 6: DID THE DIRECTORS OF EACH COMPANY DULY DECIDE TO ISSUE A FURTHER CALL NOTICE IN ACCORDANCE WITH REG 18 OF TABLE A ON OR

*f*  ABOUT 15 OCTOBER 2002?

[122] By a re-amendment to para 17 of the particulars of claim, which was first intimated before the end of Mr Griffiths' opening, and which I permitted despite Mr Davies' opposition before the end of the claimant's case, the claimant has put in issue whether any sufficient decision to issue the second call notice pursuant to reg 18 of Table A was ever made. The

*g*  defendants were given the opportunity to add to their evidence to deal with this new point, which they did, and one result was that Messrs Farrier and Bevan became witnesses in the case.

[123] Mr Davies accepts that a valid exercise of the power to give notice under reg 18 of Table A requires a decision by the board of directors, but submits that there is no requirement under the respective articles of

*h*  association for such a decision only to be taken at a formally convened meeting of the board. As to that he is right, and the principle already stated in para [103] above as to directors acting unanimously but informally applies equally here.

[124] As to the simple factual question, the defendants have satisfied me that the four directors did unanimously agree to issue the second call notice

*i*  towards the end of a meeting on 15 October. Their evidence on this matter, which I accept, was (as Mr Davies has rightly submitted) to the following effect:

(i) a meeting was held at about 9 am on 15 October (being the day by which payment of the call had to be received), attended by Messrs

Cookson, Tippins, Bevan and Farrier;

(ii) after the principal business of the meeting, namely the consideration of an arrangement for an investment in Acquire by Compass Purchasing Ltd had been completed, Mr Tippins informed Messrs Cookson, Bevan and Farrier that the claimant had still not paid up his shares;

(iii) the question of what the three subsidiaries should do in the light of the claimant's failure to pay up his shares (if it was not rectified that day, or by any payment received in the post the next morning) was discussed at the meeting;

(iv) it was unanimously agreed and decided between the four directors that: (a) the procedure under the three subsidiaries' respective articles of association should be followed and, therefore, a further notice demanding payment of the sums unpaid on the claimant's shares should be sent to him in accordance with the terms of reg 18 of Table A, and (b) Mr Tippins was authorised to prepare the letter containing such notice, with the assistance of Mrs Fatani at Hammonds Suddard and, unless the claimant had paid the sums due on his shares in the three subsidiaries by the morning of 16 October, to send it to him.

[**125**] Ultimately, and in the light of such evidence on the part of all the four directors, Mr Griffiths has confined his submissions on this issue to two points.

[**126**] First, rehearsing a submission already made in the context of issue 4, he submits that the directors present were insufficiently informed to enable them to make a valid decision on the matter at an informal meeting (see the citation from *Collie's claim* at para [103] above). The matters he relies on are (i) not having legal advice passed on to them, (ii) not knowing of the erroneous caption within the relevant notes in the three audited accounts to 30 June 2001 and the draft accounts of SSS to 30 June 2002, and (iii) not knowing of Mr Cookson's unspoken conclusion that in the event of forfeiture SVSP was likely to receive the forfeit shares. As to (i), the point about legal advice is wrong on the facts. The four directors were given a fair and accurate summary of the substance of the legal advice which had been received. As to (ii), I do not consider that ignorance of the presence of the erroneous captions in any way impugns the validity of the decisions to make or pursue the call. They were mere clerical errors in one note to each of the accounts in question which (when discovered) would require correction in any event. Even if (contrary to my findings) the claimant had seen, read and assumed them to be accurate prior to the call being made, that would not in my judgment invalidate a decision to make the call (though it might have affected questions of estoppel and so forth, depending on how the facts unfurled from then on). As to (iii), Mr Cookson's unspoken conclusion, again that was not a matter of which the other directors required knowledge in order to be able properly to decide whether to make a call. It was simply one director's thoughts as to what might happen in the future. I have already held that it was not a 'material interest' requiring disclosure to satisfy the proviso in reg 85 of Table A.

[**127**] Second, Mr Davies submits that by virtue of the words 'the directors may regulate their proceedings as they think fit' in what is currently reg 88 of Table A, explained by the dicta of Warrington J in *Barron v Potter* [1914] 1 Ch 895 at 901, 'it would be entirely unrealistic to characterise what took place towards the end of the meeting on

*a*  15 October … as other than a meeting of the board of directors of each of SSS, Acquire and EAT'. Mr Griffiths submits otherwise, because the four directors, though all present on 15 October, made 'no decision to treat [that] informal meeting … as a formal board meeting.' Given that the principle already stated in para [103] above as to directors acting unanimously but informally applies here, this difference is at best a *b* theoretical dispute which makes no difference to the outcome, and I do not therefore propose to go into it.

[128] As to whether the final paragraph of the minutes of the executive team meeting held on 24 October are an accurate reflection of what else might have been said at the 15 October meeting, see para [132] under issue 7 below.

*c*

ISSUE 7: IF SO, (A) IS SUCH DECISION IN SOME WAY INVALIDATED BY REASON OF ANY (UNDECLARED) CONFLICT OF INTEREST; AND/OR (B) DID THEY SO DECIDE FOR AN IMPROPER PURPOSE?

[129] As regards the allegation of conflict of interest, Mr Davies submits *d* that 'there is no material distinction … between the decision to authorise the making of calls in respect of the shares and the decision to give further notice of such calls under reg 18.' Though the number of contingencies mentioned in paras [106] and [113] above has by this stage in the process reduced by one, I nevertheless agree.

[130] For like reasons to those I have already given in respect of issue 5(a) *e* above, assuming without deciding that the common law rule is applicable to the decision to issue the second call notice, I am satisfied that it was not infringed. Accordingly, the decision to issue such a notice is not invalidated by reason of any (undeclared) conflict of interest.

[131] As to (b), improper purpose, Mr Griffiths does not make the same concession as he made about the defendants' alleged purpose for making *f* the call in the first place. He submits that this decision was made 'for the purpose of forfeiting [the claimant's] shares and/or benefiting [SVSP] rather than any proper purpose'. I do not agree. I find (see para [61] above) that the defendants' purposes in making this decision were essentially the same as those for making the call in the first place. I accept the clear evidence of *g* all the four directors that they firmly believed that the claimant would pay before the time for payment allowed under the second call notice expired. Given that their purpose and intentions had not changed, and that the second call notice (like the original call letter) was not one which could itself effect a forfeiture of the claimant' s shares, the same purposes were proper ones this time just as they were on the previous occasion. *h* Furthermore, given that a call had now been made but not complied with, at the time of this decision there is an additional proper purpose in that the directors are under a duty, once a call has been made, to compel every shareholder to pay the sum thus demanded, and to take all reasonable steps for enforcing payment: *Palmer's Company Law* at para 6.212.

[132] Mr Griffiths draws attention to the terms of the final paragraph *i* (any other business) of the minutes of the executive team meeting held on 24 October, made as it happens by Mrs Tippins, as affording some record of what had taken place on 15 October ('A discussion took place, again concluding that the view reached on 15 October that the Directors of SSS, Acquire and [EAT] should follow the guidance of their professional advisors

if the call remained unpaid, they should resolve that [the claimant] forfeit *a*
his shares'). The four directors were closely cross-examined about this text
(which suffers from poor punctuation and grammar in any event), and the
extent to which it is a fair reflection of what had occurred on 15 October.
I accept the evidence of Messrs Tippins, Cookson and Bevan that insofar as
this minute appears to record that a decision had been taken on 15 October
that in the event of non-payment of the second call notice by the claimant *b*
his shares would (as opposed to could) be forfeit, it is inaccurate.

ISSUE 8 : (A) DID THE CLAIMANT ACTUALLY RECEIVE THE (PURPORTED)
FURTHER CALL NOTICE? (B) IF NOT, IS HE NEVERTHELESS TO BE TREATED AS
HAVING DONE SO BY VIRTUE OF REG 115 OF TABLE A?
                                                                    *c*
[**133**] As to (a), the claimant denies that he received the second call notice.
He accepts that it was entirely accurately addressed. The evidence of
posting in the witness statement of Kyla Whitefoot is unchallenged. The
second call notice was not returned undelivered. Both the copies that were
posted at the same time (to Mr Martin and to Mrs Fatani) were duly
received the next day.                                               *d*

[**134**] In contending that I should reject the claimant's evidence on this
point, and find that the second call notice was in fact received by him,
Mr Davies also draws attention to the passage in Mr Tippins' email to the
claimant dated 21 October (the receipt of which is not disputed) which
states: 'As stated in my correspondence to you, interest is accruing on the
outstanding amount of £300.' The claimant did not respond with any *e*
inquiry as to what correspondence Mr Tippins was referring. Mr Davies
invites me to infer that this was because the claimant had by then received
the second call notice, which spells out the fact that interest is accruing on
the £300 in its third paragraph.

[**135**] Mr Griffiths relies heavily on the fact that the claimant has denied *f*
receipt of the second call notice from the very start of the solicitors'
correspondence in this matter (see his solicitors' letter of 25 November). As
to the suggested inference from the absence of any inquiry in response to
the email of 21 October, he responds that there was a reference, albeit
short, to the possibility of interest accruing in the final sentence of the call
letter, and that in those circumstances the suggested inference is not a safe *g*
one.

[**136**] As I have indicated above, this is a question on which I have
reflected anxiously. I have had to reject the claimant's evidence on other
points. The circumstances do give rise to some grounds for scepticism over
the claimant's evidence on this point. However, having so reflected on the
matter, and bearing in mind that given the very early denial of receipt there *h*
is no realistic basis on which one could conclude that the claimant's case on
this point was wrong by reason of a mistake, lapse of memory, or
retrospective self-justificatory reasoning, I have come to the conclusion that
there are not sufficient grounds for rejecting the claimant's evidence on this
point. I therefore find and proceed on the basis that he did not receive the
second call notice.                                                 *i*

[**137**] It follows that (b) is an important issue for the resolution of this
case. As to this, my conclusion is that the claimant is nevertheless to be
treated as having received the second call notice by virtue of reg 115 of
Table A. The relevant part of that regulation, which was incorporated into

*a*  the articles of association of each of the three subsidiaries (before the amendments to Table A introduced by the Companies Act 1985 (Electronic Communications) Order 2000, SI 2000/3373, came into force on 22 December 2000 (see ss 8(2) and (3) of the 1985 Act)), provides as follows:

*b*        'Proof that an envelope containing a notice was properly addressed, prepaid and posted shall be conclusive evidence that that notice was given …'

[**138**] On the face of things, such proof has been provided, indeed on the facts is uncontested. However, Mr Griffiths ingeniously submits that the words 'properly addressed' must be construed as meaning 'posted to the *c*  member at his registered address', which words appear in reg 112. He points out that on this construction of the opening words of reg 115 the second call notice has not been so proved in respect of any of the three subsidiaries, because:

(i) in the cases of SSS and Acquire the claimant's address as it appeared in *d*  the register of members was stated as '26 Wellfield Gardens, Carshalton, Surrey' (inaccurately omitting the word 'Beeches' after Carshalton). Mr Griffiths disavows reliance on the addition of the (correct) postcode to the registered address on the second call notice (which was posted in a 'window' envelope). I observe that in the earlier though superseded page of the SSS register of members the claimant's address appeared with the *e*  postcode (but without the county);

(ii) in the case of EAT no address for the claimant was shown in its register of members (which again, rather than the register of applications and allotments, is the relevant document for the purposes of this submission).

*f*  [**139**] Mr Griffiths' argument runs thus:

(i) in order for the first sentence of reg 112 to have any operative effect, the word 'may' in 'the company may give any notice' has to be read as 'must';

(ii) once reg 112 is so read, 'properly' in reg 115 is to be read as meaning in the manner required (aliter the only manner permitted) by reg 112;

*g*  (iii) if the address in the register of members is wrong, the company is free to address a notice correctly but (unless it first rectifies the address in the register of members) if it does so it loses the benefit of the conclusive deeming provision in reg 115;

(iv) any deeming provision is bound to have absurd results, because the nature of such a provision is to deem something to be what it is not;

*h*  (v) there is no greater absurdity in this argument than there would be in deeming the claimant to have received something which he did not.

[**140**] Mr Davies submits that the claimant's approach to the interpretation of reg 115 is misconceived and should be rejected for the following reasons:

*i*  (i) it restricts the ordinary scope of the words 'properly addressed' in circumstances where there is no need, in terms of making sense of the words, to do so;

(ii) in so far as it involves taking into account the terms of reg 112, it misunderstands the purpose of reg 112, which is to provide certainty for the company when giving notice at the registered address, rather than to

stipulate that service by post must be to the registered address;                                                                      *a*

(iii) it results in absurdity in that it may, as in the present case (according to the claimant's evidence), require service on an address that does not exist. This is contrary to the established approach to the construction of articles of association, which was set out by Vaisey J in *Rayfield v Hands* [1958] 2 All ER 194 at 196, c f [1960] Ch 1 at 4, as follows:

*b*

'It has been said that articles of association ought not to be construed too meticulously. See *Re Hartley Baird Ltd* [1954] 3 All ER 695 at 696, [1955] Ch 143 at 146 where Wynn-Parry J said: "In my view, interpreting such a commercial document as articles of association, the maxim ut res magis valeat quam pereat should certainly be applied, and I propose to interpret these articles in the light of that maxim." I am not      *c* aware that this maxim has ever been put into English, but I suggest that it directs us to "validate if possible". And see also *Holmes v Lord Keyes* [1958] 2 All ER 129 at 138 in which Jenkins LJ said: "… articles of association of the company should be regarded as a business document and should be construed so as to give them reasonable business efficacy … in preference to a result which would or might prove      *d* unworkable".'

[141] I find no necessity for construing the permissive word 'may' in the first sentence of reg 112 as if it were the mandatory word 'must', and prefer Mr Davies' submissions on this point. It would in my judgment be somewhat absurd, and contrary to the approach commended by Vaisey J in      *e* the passage cited above, to construe the phrase 'properly addressed' in such a way that a notice in all respects accurately addressed (as was the case in respect of the second call notice) is nevertheless not 'properly addressed', and I would reject such a construction unless there was no other way of giving effect to the express words. That is by no means the position here, and the words 'properly addressed' can and should be given their natural      *f* meaning. Any absurdity (as Mr Griffiths would put it) inherent in the operation of a conclusive deeming provision need not and should not be added to with any further and avoidable absurdity in its construction. I would also observe that in most cases, the effect of construing regs 112 and 115 in such a manner as conclusively to deem the addressee to have received an inaccurately addressed notice would be to disadvantage – and      *g* potentially to cause considerable hardship to – the addressee; it just so happens that on the facts of the present case such a construction would fortuitously advantage the claimant.

ISSUE 9(I) : WERE THE DECISIONS OF THE DIRECTORS OF THE THREE      *h* SUBSIDIARIES MADE ON OR ABOUT 3 NOVEMBER 2002 (A) TO FORFEIT THE CLAIMANT'S SHARES FOR NON PAYMENT OF THE CALL, AND (B) TO TRANSFER THE FORFEITED SHARES TO SVSP MADE FOR AN IMPROPER PURPOSE?

[142] The decision to forfeit, contrary to the claimant's case, was not made pursuant to any plan or plot to remove the claimant as a shareholder, nor for the purpose or with the intention of benefiting SVSP. I have rejected      *i* that suggestion at both the earlier stages of what has been called the 'forfeiture process', and I reject it in respect of these two decisions made formally on 3 November, and informally in advance (in case the unexpected eventuality of non-payment by 2 November should occur) on or about

*a*  24 October. It is true that the relevant formal meetings were held on a Sunday, which at first blush could give the impression of indecent haste and/or snatching at a welcome opportunity. More prosaically, however, I accept the defendants' evidence that the day was simply chosen for convenience, as both Mr and Mrs Tippins were working in the office on that day in any event. At that time Mr Tippins was doing a lot of work for *b*  IBM, and was not to be in the office the next day. Mrs Tippins attended the meetings as company secretary. Mr Cookson participated by telephone.

[143] Understandably, Mr Griffiths seeks to make play of what I am satisfied were some rather confused answers of Mr Cookson in which at times he appeared to be saying that he was acting in the interests of SVSP when the decision to forfeit the claimant's shares were made. Whilst he did *c*  not always express himself clearly, I am satisfied that what he was trying to say overall was that until the resolution to forfeit the claimant's shares had been passed, in dealing with first the call (both stages) and then the forfeiture, he was seeking to act in the interests of the shareholders of SSS as a whole.

*d*  [144] The passages mentioned by Mr Griffiths have to be read in the context of the pages which preceded them. Mr Cookson first agreed (as is obvious in an objective sense) that the forfeiture of the claimant's shares and their transfer to SVSP was in the interests of SVSP (aliter benefited SVSP). I would observe that, given that by the time of the forfeiture SVSP held all the remaining (ordinary) shares in each of the three subsidiaries, and given *e*  the alternatives as to how forfeited shares may be dealt with provided for by reg 20 of Table A, SVSP would almost inevitably benefit from a forfeiture, simply viewing the matter objectively.

[145] The subject of the questioning then moved to intention to benefit SVSP. After an intervention by me to ensure that Mr Cookson distinguished between two distinct points covered by the same question Mr Cookson *f*  stated (as to the relevant point):

> 'In respect of Mr Hunter's shares … I was acting in the interests of the shareholders of [SSS] in seeking to bring about the closure and winding up of the security business.'

*g*  His answers on the following pages are undoubtedly somewhat confused, but that which I find most nearly reflected what he was trying to state was when he sought to clarify previous answers as to the point at which he thought he had ceased acting in the interests of the shareholders of SSS as a whole and started acting in the interests of SVSP, by saying it was 'at the point when the resolution for forfeiture had been passed … that was the *h*  point where I was advised that [the claimant] no longer became a shareholder.'

[146] Once the forfeiture had occurred, SVSP was the sole (ordinary) shareholder in each of the three subsidiaries, and so its interests and those of the whole body of (ordinary) shareholders were one and the same thing. Neither party has made any submission suggesting that the existence of a *i*  comparatively small number of issued A shares in each of the three subsidiaries should make any difference to the outcome of this or indeed any other issue in the case.

[147] Nor do I accept the suggestion that the directors wanted to get rid of the claimant as a shareholder because they were at loggerheads with him

as regards various unresolved issues relating to the distribution of the  *a*
proceeds of sale of the security business. As Mr Davies rightly submits, and
as both Mr Cookson and Mr Tippins indicated in their evidence, none of
the matters relied upon on behalf of the claimant as such unresolved issues
(principally, the disputes as to the level of costs charged to SSS by
Servicespan, as to the invoicing arrangements with Temple and as to his
expectation of receiving an interim distribution) would have prevented the  *b*
parties proceeding with the proposed winding up of the security business.
Nor, I would add, were they insoluble by any means other than removing
him as a shareholder. If a consensual resolution was impossible, there was
always the fall-back recourse of legal proceedings.

[**148**] Mr Griffiths is on stronger ground, however, when he raises the
question of what the true purpose of passing these resolutions was. In the  *c*
case of SSS, a forfeiture would ex hypothesi not facilitate the payment of a
dividend rateably to all shareholders (including the claimant) at the
conclusion of the informal winding-up process. In the case of each of the
three subsidiaries, good corporate housekeeping is an entirely credible
purpose for making a call for payment of modest sums amounting in
aggregate to £300 on the claimant's shares, but on the face of things a  *d*
forfeiture of the claimant's shares would appear wholly disproportionate
merely for that purpose, and thus at least prima facie lack credibility as an
explanation for taking that step. The answer as to why these two
resolutions were passed lies in issue 9(ii) to which I must in a moment turn.

[**149**] So far as the decision to transfer the forfeited shares to SVSP is  *e*
concerned, given that SVSP was by the time of the forfeiture the only other
(ordinary) shareholder in each of the three subsidiaries, I find nothing
improper in the making of that further and consequential decision pursuant
to reg 20 of Table A once the decision to forfeit had been taken.

ISSUE 9(II) : WERE THE DECISIONS OF THE DIRECTORS OF THE THREE  *f*
SUBSIDIARIES MADE ON OR ABOUT 3 NOVEMBER 2002 (A) TO FORFEIT THE
CLAIMANT'S SHARES FOR NON-PAYMENT OF THE CALL, AND (B) TO TRANSFER
THE FORFEITED SHARES TO SERVICESPAN FLAWED BECAUSE ALL OR SOME OF
THE DIRECTORS MADE THE DECISION ON THE MISTAKEN BASIS THAT THAT
WAS THE ONLY AVAILABLE COURSE?
                                                                          *g*
[**150**] None of the four directors actively wished or desired to forfeit the
claimant's shares. All of them wanted him to pay the call, so that the
informal winding up could proceed without avoidable difficulty.
Furthermore, they were all convinced that he would pay, if only at the last
minute and perhaps with a large quantity of small coins, just to be
awkward or make a point. Thus the non-receipt of the payments due from  *h*
the claimant on the call by the expiration of the second 14 day period
represented an undesired and unexpected situation for them all.

[**151**] As I have already found at para [54] above, the first (and only) time
when there was a considered discussion about what should happen should
this undesired and unexpected situation arise between all four of the
directors was at the end of the executive team meeting held on 24 October.  *i*
They agreed that if such eventuality should occur then the forfeiture
procedure should be followed and that as before (ie on 27 September,
following the discussion at the end of the executive team meeting on
26 September) Messrs Cookson and Tippins were to hold the necessary

*a*  formal board meetings to that end. Each of the four were of course cross-examined as to their reasons or purpose for agreeing or deciding that (in such eventuality) the claimant's shares should be forfeited.

[152] Mr Cookson, having first made it clear that he had had no desire adversely to affect the claimant, stated that 'it was a case of bringing the matter … all matters to a conclusion … I was called upon to vote on the

*b*  grounds that [the claimant] had been asked to make payment for his shares along the lines of advice given to us by our legal advisers and voted accordingly'. By the time he was recalled the subject of this issue had emerged, and he was asked about it. By that stage in the hearing its potential significance must have been obvious to him. That makes what I find to be the scrupulously fair and honest nature of his answers on this

*c*  point the more impressive. He said: 'I believe the advice Mr Tippins received was that we could [in contrast to 'should' in the question] forfeit [the claimant's] shares – if he did not pay them up … I do not recall any other option, although I do recall vividly the fact that none of us believed the shares would remain unpaid … I do not recall any other option being

*d*  discussed'. When asked 'When [Mr Tippins] reported on what advice had been given, he did not give any other option than forfeiture in the event of Mr Hunter not paying for his shares?' he answered 'I do not believe so'. I find that his later oral evidence to the effect that the question of what was to be done if the claimant did not pay by the expiration of the time set by the second call notice was not specifically raised, and that no decision was

*e*  taken about that, was honestly mistaken (my finding on this is set out in the preceding paragraph); my impression was (though I intervened to try and avoid this) that Mr Cookson had become somewhat confused at that stage. However, he then confirmed, in answer to me, that the intended meaning of the relevant passage in his witness statement was an acknowledgment that 'if we followed the procedure laid out in the articles and if [the claimant]

*f*  failed to pay them, then that would result in his forfeiting the shares'.

[153] Mr Tippins stated that it was at the meeting on 24 October that the four directors agreed that, although they all still expected that the claimant would pay the moneys required by the call, if unexpectedly he did not then the result would be the forfeiture of the claimant's shares. Later, having said that it was 'unthinkable' that the claimant would not pay for his shares, he

*g*  added:

> 'obviously … if he did not pay for his shares, then we had to go to the next step. There would seem little point in doing the whole process if we did not follow it as per the next step.'

*h*
A few minutes later he added:

> 'I wanted to follow the articles of association, as I was instructed to do, advised to do. I mean, if we have articles of association within the company and we follow them step by step, I could see that that had to

*i*  be right. It seemed proper. Everybody thought it was proper.'

Shortly thereafter he said:

'We did what we were instructed to do. Mr Hunter had on two *a* occasions been written to asking to pay his call and he did not do under the articles. And I was given the process to do, which I did.'

When recalled the next day, Mr Tippins agreed with Mr Farrier that, on the basis that the unexpected happened and the claimant did not pay in response to the second call notice, there was an inevitability that forfeiture *b* would be the result.

[**154**] Mr Farrier's evidence also indicated that it was on 24 October that the outcome in the event of non-payment by the claimant was canvassed. He said that his understanding of the legal advice which had been received was to the effect that if the claimant did not pay for his shares by 2 November, the directors should resolve to forfeit his shares, though he *c* later added that he could not specifically recall that the directors were advised that they should forfeit the shares. His past experience in personnel law had been that:

'if there is a process to be followed, it must be followed properly to the letter, and that way everyone is protected. And it was because of *d* that, that I was saying that if we have taken advice and we have started a process, we must follow it, as per the book'.

Very revealingly, having described forfeiture as 'a natural outcome' in the event of non-payment, and in the context of the 24 October meeting, he described being advised that the claimant's shares should be forfeited as: *e*

'like a sinking feeling, thinking "Goodness, we have got ourselves into this and in following the routine there was the potential for [the claimant] to lose his shares".'

He agreed that in the event of non-payment 'there [was] a sort of *f* inevitability about it'. It came across clearly when Mr Farrier gave this evidence that he had not wanted the claimant to lose his shares, but had understood there to be no real alternative to resolving to forfeit if the claimant did not pay; he felt himself to be locked into a process which, on the advice received, required him to make a decision he did not want to make. *g*

[**155**] Mr Bevan in para 10 of his witness statement also confirmed that there was a discussion about what would happen if the claimant failed to pay for his shares by 2 November. He further stated:

'we unanimously agreed that if the claimant failed to pay the sum of £300 by 2 November 2002 the forfeiture procedure should be followed. It was agreed that as before Tim Cookson and Vic Tippins would hold *h* the necessary statutory meetings.'

He specifically re-confirmed the first of those sentences in cross-examination. He also agreed that if the claimant did not pay for his shares, there was an inevitability about forfeiture.

[**156**] As to the discussion on 24 October, there is also the final paragraph *i* of the minutes prepared by Mrs Tippins. Whilst there is a question as to their accuracy as an indirect record of what had been said on 15 October, the only qualifications suggested by the defendants' witnesses as to their accuracy so far as the discussion on 24 October is concerned are that there

a   should be a comma or full stop after 'advisors' and that the word 'should' (immediately before 'resolve') ought more accurately to have read 'could'. On this basis the relevant passage would record as follows: 'A discussion took place … concluding that … the directors of [the three subsidiaries] should follow the guidance of their professional advisors. If the call remained unpaid, they could resolve that [the claimant] forfeit his shares.'

b   [157] The evidence of Mr Martin was also noteworthy in this regard. Having stated that as an accountant he was aware of what a call on shares meant and the process which leads to forfeiture of shares, he added that he was certainly aware 'of the procedures and what was the inevitable outcome if the shares and calls were not paid'. At the conclusion of his evidence he said in answer to me that he believed that if a shareholder does

c   not pay a call, it was inevitable that forfeiture would follow. There is no evidence that Mr Martin ever gave advice to the directors about the forfeiture process as such. However, he was in regular contact with them over the relevant period, and if the directors had been advised, or howsoever else become aware, that they had a genuine discretion whether to forfeit in the event of non-payment, the exercise of which they were

d   bound to consider, I think it likely that this would have come up in conversation with Mr Martin. The terms of Mr Martin's answer about his own understanding of 'inevitability' is, therefore, some further indication that the directors had not been advised or become aware that they had a genuine discretion whether to forfeit in the event of non-payment, the

e   exercise of which they were bound to consider. As appears from the preceding paragraphs, the effect of the evidence of three of the four directors (similarly to that of Mr Martin) was that (save for the possibility of complete inaction), they regarded forfeiture as the effectively inevitable result of non-payment of the second call notice. At least three of them indicated that this was the effect of the legal advice they had received.

f   [158] Three points should be made about the significance of whatever legal advice had been given to the directors. First, saying what the legal advice was begs the question of what advice had been requested, and on the basis of what instructions. Second, the fact that a certain course of action may have been advised or recommended by lawyers does not divest their clients of responsibility for acting on it, if they choose to do so, nor gives

g   them carte blanche to do that which if not advised or recommended by lawyers would have been improper (cf *Re W & M Roith Ltd* [1967] 1 All ER 427, [1967] 1 WLR 432, cited in *Tolley's Company Law* para D3005 (considered further infra) at (ii)). Third, I do not know to what extent – if at all – Mrs Fatani's suggestion (in her email of 27 September)

h   that if the three subsidiaries got to a stage when neither the first nor the second call notice had been complied with she should, in addition to preparing draft board resolutions for forfeiture, 'advise you further on the forfeiture process in accordance with the Companies Act' was in the event taken up by her clients. There is nothing in the evidence to suggest that the defendants obtained legal advice as to the call and/or the forfeiture process

i   from any source other than Mrs Fatani or her firm Hammonds Suddard over the relevant period.

   [159] Save insofar as privilege has been waived, it is not for me to speculate as to what advice was sought by or given to the directors about any possible resolution to forfeit after the initial advice given orally prior to

the 26 September and by email of the following day, and on what instructions. Amongst the documents in which privilege was waived was a short email from Mrs Fatani to Mr Tippins dated 15 October. Its primary function was to enclose the draft of what became the second call notice, for use 'if payment has not been received in the meantime'. In the present context, however, its second paragraph is noteworthy:

> 'Before the shares can be forfeited you need to pass a board resolution. I will prepare this for you a few days before 2 November so the paperwork is ready in the event payment is not received on the due date.'

This does not cause me to believe that the four directors (contrary to their evidence) either desired to forfeit the claimant's shares or had already made a firm decision to do so in the event of non-payment of the second call notice. However, bearing firmly in mind the need to guard against speculation which I have just mentioned, it does seem to me if anything to suggest an assumption on the author's part that such non-payment would be followed by a resolution to forfeit as a matter of course: it makes no reference to any other possible course of action, and provides for the 'paperwork' for such a course to be prepared before the time for payment has expired. In any event, whatever the reason or cause, I find it to be clear from the evidence that the four directors agreed upon proceeding to a forfeiture of the claimant's shares in the event of non-payment without giving any consideration to (and quite possibly without even being consciously aware of) any alternative course of action (other than inactivity) available to them, or to the existence of a genuine discretion as to whether to forfeit, the exercise of which they were bound to consider.

[160] They were aware, at least in general terms, that they had to pass another resolution to forfeit the claimant's shares (and hence that forfeiture was not the automatic consequence of non-payment), but only on the very limited basis that there was the alternative of doing nothing. They proceeded on the basis that, having received legal advice to proceed to forfeiture in this event (or on the understanding that such was the effect of their legal advice), they had no real alternative but to do so.

[161] In many cases the obvious alternative would have been to issue proceedings to recover by means of a money judgment the capital and interest due under the terms of the call. *Palmer's Company Law* at para 6.212 states :

> 'It is now common to sue for a call on a specially indorsed writ. After judgment has been obtained against the defaulting shareholder the company can, if needs be, proceed against him in bankruptcy, or, if it has these powers in its articles, declare his shares as forfeit.'

However, in the unusual circumstances of this case, where raising the capital was not the purpose of the call, and where the amount is so modest that the cost of prosecuting such a claim even under the small claims track in the county court would be thought by many to be uneconomic or disproportionate, Mr Griffiths (realistically in my view) does not rely on this as a course which any reasonable board of directors would have considered.

[162] Mr Griffiths does however put forward a number of other

*a* alternative courses of action which he submits could reasonably have been taken, and therefore should at least have been considered by the boards before making a decision to forfeit:

(i) one of the directors simply telephoning the claimant. Whilst Mr Griffiths did not spell it out, I understood him to be envisaging that the substance of such a telephone call would be to explain the reasons why the *b* call had been made, to warn of the risk of forfeiture, and to ask for payment;

(ii) asking Mr Martin to make a similar telephone call on the directors' behalf;

(iii) writing to the claimant, again to similar effect;

*c* (iv) taking no action by way of forfeiture, and when ready to make any distribution (which would in practice only arise in relation to SSS, at least for the foreseeable future) doing so without regard to the terms of reg 104 of Table A (ie so as to include the claimant pro rata). A possible refinement mentioned by Mr Griffiths would have been to accompany (or perhaps precede) such a distribution with an invitation to the claimant to join in a *d* unanimous agreement to disapply the terms of reg 104, perhaps by means of a written resolution. Another possible refinement would perhaps have been to recover the capital and interest due under the terms of the call (at least in SSS) by setting the same off against the first such distribution;

(v) without forfeiting his shares, writing to the claimant to inform him that in the absence of payment he would be excluded from any future *e* dividend by virtue of the operation of reg 104.

[**163**] Whilst at first blush a number of these suggestions may come across as improbable or unconvincing, where ex hypothesi the companies concerned had already gone through the formal two stage process laid down by regs 2–18 of Table A, in fairness to Mr Griffiths' submission they have to be considered against the background of the unusual circumstances *f* mentioned in para [161] above. Even so, given that the claimant had declined to reply to a telephone call (in which an answer-phone message was left) from Mr Tippins on 19 September, having declined to speak with Mr Cookson the previous week, and that normal communications between the claimant and the majority had broken down more generally, I do not consider alternative (i) to have been a realistic alternative requiring *g* consideration by any reasonable board of directors in the circumstances of this case.

[**164**] As to SSS, a company whose business and assets had already been sold, and whose informal (and solvent) winding up was already under way, I consider that alternative (v) did require serious consideration. Forfeiture of *h* shares in such circumstances is a particularly harsh course. Not only would alternative (v) have been short, quick and economic to implement, being effectively self-executing once the letter had been sent, but also, as a matter of common sense, it seems probable that it would have proved highly effective in bringing about prompt payment even from an awkward or bloody-minded person such as the claimant. Although the claimant had not *i* made payment in response to either of the two call notices, that was in the context that he had not been told the reasons for the call, and had not acknowledged receipt of the second call notice. Given that conclusion in respect of alternative (v), I do not have to reach a firm view in respect of alternatives (ii), (iii) and (iv). In the circumstances of a conventional call,

alternatives (ii) and (iii) would not impress me, as amounting to a self-imposed requirement for an extra or third warning, when the procedure under the articles of association provides for two. However, in the circumstances of the present case there is something to be said for them. Alternative (iv) possibly merited consideration in the present circumstances, although it is more contrived than alternative (v), with little that I can detect by way of countervailing advantages over it.

[**165**] Turning to the law, Mr Griffiths submits that the directors, in agreeing to or deciding on forfeiture, neglected to take into account matters which they ought reasonably to have taken into account, and that on such ground their decision can be set aside. This language is of course familiar in the context of the so-called Wednesbury principles (*Associated Provincial Picture Houses Ltd v Wednesbury Corp* [1947] 2 All ER 680, [1948] 1 KB 223). He refers to para D3005 of *Tolley's Company Law*, which is too lengthy conveniently to set out within the body of this judgment, but is very much in point and should be treated as here incorporated en bloc. He also relies on three cases, cited in para D3005, to which I now turn.

[**166**] In *Re a company, ex p Glossop* [1988] BCLC 570 Harman J had before him an application to amend a petition for relief under ss 459–461 of the 1985 Act and in the alternative for a just and equitable winding up, to add allegations concerning the directors' failure (as it was alleged) to recommend payment of a dividend. In the event it succeeded in part (as to the claim for the latter relief only). Harman J said (at 577):

'It is, in my judgment, vital to remember that actions of boards of directors cannot simply be justified by invoking the incantation "a decision taken bona fide in the interests of the company" … If it were to be proved that directors resolved to exercise their powers to recommend dividends to a general meeting … without regard to the right of members to have profits distributed so far as was commercially possible, I am of opinion that the directors' decision would be open to challenge. This is an application, in a sense, of the principle affirmed in so many local government cases and usually called "the *Wednesbury* principle".'

[**167**] In *Byng v London Life Association Ltd* [1989] BCLC 400, [1990] Ch 170 the defendant company's AGM was convened at a location which proved of wholly inadequate capacity for the number of members who attended. The chairman adjourned the meeting until later that day at a different location with a greater capacity. The court first held that in any circumstances where there is a meeting at which the views of the majority cannot be validly ascertained, the chairman has a residual common law power to adjourn 'so as to give all persons entitled a reasonable opportunity of voting' and speaking (see [1989] BCLC 400 at 411, [1990] Ch 170 at 188 per Sir Nicolas Browne-Wilkinson V-C). The question then arose of whether the chairman exercised that discretion validly. As to that the Vice-Chancellor said ([1989] BCLC 400 at 412, [1990] Ch 170 at 189):

'The chairman's decision will not be declared invalid unless on the facts which he knew or ought to have known he failed to take into account all relevant factors, took into account irrelevant factors, or reached a conclusion which no reasonable chairman, properly directing himself as to his duties, could have reached, ie the test is the same as

a        that applicable on judicial review in accordance with the principles of *Associated Provincial Picture Houses Ltd v Wednesbury Corp* [1947] 2 All ER 680, [1948] 1 KB 223.'

(For the decision on the facts see [1989] BCLC 400 at 413–414, [1990] Ch 170 at 190–191; see also [1989] BCLC 400 at 416–417, [1990] Ch 170 at 194 per Mustill LJ and Woolf LJ.)

b        [168] Mr Griffiths also referred me to *Equitable Life Assurance Society v Hyman* [2000] 3 All ER 961, [2002] 1 AC 408. I note the dicta of Lord Woolf MR ([2000] 2 All ER 331 at [17]–[21], [2002] 1 AC 408 at [17]–[21]) in the Court of Appeal, which are valuable in the context of this question. These should be treated as here incorporated en bloc.

c        [169] Mr Davies submits that the suggestion that a decision of a board of directors could be invalid if taken by directors labouring under some mistake of fact or law is a radical proposition. He argues that directors of companies must frequently make decisions without a full and/or accurate understanding of the relevant factual or legal position and that it cannot be correct that all such decisions are invalid. He accepts that a mistake in the

d        context of a decision taken to enter a contract may have consequences as a matter of contract law, but submits that there is no basis for contending that the decision itself is invalid as an exercise of the directors' power to manage the affairs of the company.

[170] He seeks narrowly to confine each of the three cases (or dicta from cases) considered above to their particular factual circumstances, and

e        submits that the editor of and contributors to *Tolleys' Company Law* responsible for para D3005 have seriously overstated the position.

[171] In view of Mr Davies' somewhat in terrorem submission, I have considered the current position in relation to decisions of trustees. In doing so I have firmly in mind that the analogy between directors (who are fiduciaries) and trustees as such is not an exact one : see *Gower and Davies*,

f        pp 380–381. Provided that point is borne in mind, however, there is in my view some value in making this comparison.

[172] The relevant modern trustee cases generally involve consideration of the application and ambit of what is often referred to as the rule in *Re Hastings-Bass (decd), Hastings v IRC* [1974] 2 All ER 193, [1975] Ch 25 – which it may be noted concerned a private trust, not a pension trust). The

g        case of *Stannard v Fisons Pension Trust* [1991] PLR 225 concerned, as its name suggests, trustees of a pension fund. The relevant passage is in the judgment of Dillon LJ at paras [34]–[39]. He cites an earlier unreported decision of the Court of Appeal, in which a decision of pension trustees was held ineffective because they had failed to give a properly informed consideration to the subject claim for incapacity benefit. A finding that, if

h        the trustees had taken into account the matter which they had not, it might materially have affected their decision had been sufficient for their decision to be held ineffective (see para [36]). The *Stannard* case itself was similarly resolved, applying the 'might materially have affected' test (see para [39]). The applicability of that test, rather than the tougher 'would' test suggested

i        by *Hastings Bass* itself, was supported by Lawrence Collins J in another pension trust case, *AMP (UK) v Barker* [2001] PLR 77 at 96, in para [90] of his judgment.

[173] *Edge v Pensions Ombudsman* [1999] 4 All ER 546, [2000] Ch 602 (cited by Lord Woolf MR in para [17] of his judgment in *Equitable Life*

*Assurance Society v Hyman*) was again a case concerning pension trustees. *a*
The judgment of the court was given by Chadwick LJ. The relevant passage
is [1999] 4 All ER 546 at 567–570, [2000] Ch 602 at 627–630. He referred
to—

> 'the ordinary duty which the law imposes on a person who is
> entrusted with the exercise of a discretionary power: that he exercises *b*
> the power for the purpose for which it is given, giving proper
> consideration to the matters which are relevant and excluding from
> consideration matters which are irrelevant.'

(See [1999] 4 All ER 546 at 567, [2000] Ch 602 at 627.)
Having cited a decision of Carnwath J in which the learned judge had *c*
observed that the principles applicable to valid decision making by pension
trustees were virtually identical to the so-called *Wednesbury* principles,
Chadwick LJ went on to say ([1999] 4 All ER 546 at 567–568, [2000]
Ch 602 at 628):

> 'It seems to us no coincidence that courts, considering the exercise of *d*
> discretionary powers by those to whom such powers have been
> entrusted (albeit in different contexts), should reach similar and
> consistent conclusions; and should express those conclusions in much
> the same language.'

*e*

He went on to cite extensively from Lord Greene MR's judgment in the
*Wednesbury* case. It is right to add that at the end of that citation
Chadwick LJ went on to draw a comparison between the grounds on which
the pension trustees in that case were chosen and Lord Greene MR's
exposition of the reason why Parliament entrusts local authorities with
various discretionary powers (see at 630B-C). *f*

[**174**] The *Hastings Bass* principle as it now stands in light of subsequent
cases was concisely summarised by Etherton J in another pension trust case,
*Hearn v Younger* [2002] WTLR 1317 at 1338, para [86] thus:

> 'a decision of trustees to exercise a discretion will be void if (a) the
> trustees have failed to take into account a material consideration, and *g*
> (b) that consideration might have materially affected their decision.'

[**175**] In using the word 'void' rather than 'voidable' in para [90] of his
judgment, Etherton J was agreeing with the earlier observations on that
point of Lawrence Collins J in *AMP (UK) v Barker*. *h*

[**176**] *Abacus Trust Co v Barr* [2003] EWHC 114 (Ch), [2003] 1 All ER
763, [2003] Ch 409 (Lightman J), like *Hastings Bass* itself, concerned a
private trust, not a pension trust. The learned judge (in paras [16]–[20] of
his judgment) considered the present state of the rule in *Hastings Bass*, and
concluded that 'the choice between the two criteria ['would' or 'might' have
taken a different decision] remains open', citing *Scott v National Trust* *i*
[1998] 2 All ER 705, 718. Later he went on to consider the 'void' or
'voidable' question in paras [28]–[33] of his judgment. Contrary to the
views of inter alios Etherton and Lawrence Collins JJ mentioned above,
Lightman J concluded that—

a        'A successful challenge made to a decision under the rule [in *Hastings Bass*] should in principle result in the decision being held voidable and not void.'

[**177**] In the company law context Mr Griffiths submits that a decision made by directors who have failed to take into account a material consideration in breach of the *Wednesbury* principles is 'unconstitutional' in

b   the language of Lord Wilberforce in *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974] AC 821, adopted by Dillon LJ in *Lee Panavision v Lee Lighting* [1992] BCLC 22 at 29–30. However, that language, even if applicable to such cases, does not expressly address the 'void' or 'voidable' distinction. Looking back at two of Mr Griffiths' main

c   cases on this point, in the passage from *Re A company, ex p Glossop* [1988] BCLC 570 already cited (in para [166] above) Harman J spoke of decisions being 'open to challenge'. I am confident he was not contemplating such decisions being void even without being set aside by the court. The language used and relief granted in *Byng v London Life Association* (the chairman's decision to adjourn was said and declared to have been 'invalid' and a

d   declaration made that the proceedings conducted at the resumed and relocated meeting were 'invalid and of no effect' (see [1989] BCLC 400 at 414 per the Vice-Chancellor)) does not unambiguously address the distinction.

[**178**] Finally on this issue. Mr Davies cites *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, [1970] Ch 62. In that case

e   Pennycuick J's primary ruling was that in construing the ambit of purposes and powers expressly provided for by a company's memorandum of association (for the purposes of an issue as to ultra vires), there should be no implied limitation by reference to the state of mind of the directors dealing with the transaction (see [1969] 2 All ER 1185 at 1194, [1970]

f   Ch 62 at 74). Pennycuick J then went on to consider (in case his primary ruling was wrong) the consequences of an earlier finding which he had made that the directors had failed to give separate consideration to the benefit of the particular company concerned (as opposed to its group as a whole). The effect of the passage in his judgment which follows ([1969] 2 All ER 1185 at 1194, [1970] Ch 62 at 74–75) is that provided an

g   intelligent and honest man in the position of a director of the relevant company could, in the whole of the existing circumstances, have reasonably believed that the transactions were for the benefit of the company, the decision would not be set aside notwithstanding the earlier finding I have mentioned. This cannot be directly equated with the 'would' test considered in the trust cases mentioned above, but it is certainly the application of an

h   objective test to uphold a decision which had been made without taking into account a material consideration (the benefit to the particular company concerned).

[**179**] In the absence of any clearer guidance on the 'void' or 'voidable' question in the context of company law, and in particular decisions of directors, in any of the cases cited to me on this point, I conclude that the

i   appropriate legal consequence of a relevant failure by directors to take into account a material consideration is voidability. Pragmatic considerations undoubtedly point in favour of relief in such cases being discretionary. This fits in with the judgment of Pennycuick J in *Charterbridge Corp Ltd v Lloyds Bank Ltd*. This would also appear to accord with general principles

in relation to what in old fashioned language would have been described as *a*
'fraud on a (director's) power' (as to which I note the observations of
Helsham J in a New South Wales case, *Provident International Corp v
International Leasing Corp* [1969] 1 NSWLR 424 at 439, citing Dixon J,
and then in the passage I cite in para [196] below), and is consistent with
the views of Lightman J in *Abacus Trust v Barr*, the most recent of the
series of trustee cases discussed above.     *b*

[**180**] Thus, as the directors' decision to forfeit the claimant's shares is
(subject to locus standi) voidable not void, I must go on to consider the
'would' or 'might' question for the purposes of deciding whether the
resolution to forfeit should be set aside, in case it makes a material
difference on the facts of this case.     *c*

[**181**] Mr Davies points out that because this point was not pleaded, none
of the four directors dealt with how they would have decided the forfeiture
issue if they had been conscious of the existence of a genuine discretion as
to whether to forfeit, and duly considered the alternative courses of action
(beyond mere inactivity) available to them, in their witness statements. Nor
were they cross-examined as to such. This is correct, though it is a     *d*
by-product of the way in which the factual basis for this particular point
emerged during the course of the trial. He submits that in these
circumstances it would be unfair to assume against the directors that they
would have acted differently. That submission is only applicable to the
application of the 'would' test. Further, if the 'would' test is the one which
should be applied, what this submission amounts to is a warning against     *e*
assumption and perhaps also against speculation without a sufficient
evidential basis; such a warning is a proper one. That said, any finding as to
how a person or persons would have acted in hypothetical circumstances
can only be a matter of inference to be determined from all the
circumstances (*Allied Maples v Simmons & Simmons* [1995] 4 All ER 907
at 915, [1995] 1 WLR 1602 at 1610 per Stuart-Smith LJ). Further, there are     *f*
considerable inherent limitations to the value of witnesses' evidence, albeit
honest and well-intentioned, as to what they would have done in
hypothetical situations; a fortiori where they have any sort of interest in the
outcome.

[**182**] Mr Davies submitted that so far as the 'would' test is concerned, the
appropriate finding looking at the evidence overall is that the directors     *g*
would have decided to proceed to forfeiture in any event. He referred in
particular to Mr Farrier's answers in cross-examination. I have already
quoted some passages in para [154] above. I find Mr Farrier's evidence
helpful on this hypothetical question, but it does not point me towards the
same conclusion as that which Mr Davies urges. I am confident that     *h*
Mr Farrier at least (the witness who described his 'sinking feeling') would
almost certainly have preferred a sensible and constructive alternative to
forfeiture (such as alternative (v) mentioned in para [162] above) had one
been considered by him, and I so infer. I do not consider that his earlier
answer about following a process through having started it undermines
such an inference. In the hypothetical circumstances now under     *i*
consideration, one approaches the question on the assumption that
(assuming the directors would have received legal advice and would have
had that in the forefront of their minds) they would have been advised that
in the event of non-payment within the time limited by the second call

*a*  notice served pursuant to reg 18 of Table A, they had a genuine discretion as to whether to forfeit, and should consider the realistic alternative courses of action available to them (as to which see para [162] above). If the 'would' test rather than the 'might' test should be applied, in all the circumstances of the case the inference I draw, applying the balance of probabilities, is that the board would have made a different decision, in

*b*  particular with regard to SSS. I believe they would have been anxious to preserve unanimity, and Mr Farrier's desire to avoid forfeiture if possible would therefore have been influential. This inference is also consistent with the directors' own case as to purpose (which I have accepted), namely that in the case of SSS their purpose was to get the claimant to pay the nominal or par value for his shares, in order thereby to facilitate the expeditious and

*c*  efficient completion of the informal winding-up process, as well as (in common with Acquire and EAT too) as a matter of corporate 'good housekeeping' (see para [61] above).

[183] The 'might' test is of course an objective one. Applying this test, I have no hesitation in finding that the directors might have made a different

*d*  decision, ie one other than to proceed to forfeit the claimant's shares, had they been conscious of the existence of a genuine discretion as to whether to forfeit, and duly considered the alternative courses of action (beyond mere inactivity) available to them.

[184] Thus in the event, on the historical and hypothetical facts of this case as I find them, both the 'would' and the 'might' test lead to the same,

*e*  affirmative, answer. In these circumstances it is unnecessary for me further to investigate yet another legal issue in order to determine which of these tests should be applied in the present context, and I shall not do so.

[185] Before leaving this issue, however, I would add a more general observation. As *Palmer's Company Law* para 6.903 explains:

*f*      'Forfeiture is treated very strictly by the courts, and directors seeking to enforce it must pursue exactly the course of procedure marked out by the articles. A slight irregularity is as fatal as the greatest.'

The authors go on to give examples of procedural and formal defects. It would in my view be odd and regrettable if the law were to take that

*g*  approach with regard to procedural and formal defects, yet turn a blind eye to a serious flaw in the substantive decision making process.

[186] It occurs to me that there may be other ways of analysing or expressing the legal implications of the same underlying point, in particular:

(i) there has been no genuine exercise of the discretion conferred on the directors by reg 19 of Table A; and/or

*h*  (ii) although the decision to forfeit was not made for any purpose which can sensibly be described as improper, it was made out of a misplaced sense of inevitability.

[187] However, for the reasons I have given I accept Mr Griffiths' submission on this issue in any event. The directors' decision to forfeit was flawed for neglecting to take into account matters which they ought to have

*i*  taken into account, is one which would or might have been different but for that flaw, and is therefore voidable. In my judgment on the facts of this case such decision should be set aside, at least in respect of SSS, subject to the claimant having locus standi on the matter. As to this, see issue 10 below. This is a convenient point for me to mention that the need for a claimant to

have locus standi to seek to invalidate a particular decision of a board of
directors would appear to be one important reason why there is not and
should not be a flood of such claims. In most circumstances the status of
shareholder without more will not give such locus standi. Attempts to use
derivative actions to circumvent absence of locus standi and to pursue
claims seeking to impugn decisions of boards of directors will not, where
inappropriate, survive the procedural hurdle which they will face
immediately after the issue of proceedings, namely the need for the court's
permission to continue the same: see CPR 19.9(3).

[188] As for the decisions to forfeit in Acquire and EAT, the case for
saying that the directors were bound first to consider alternatives other than
mere inaction is not as strong. However, given the conclusion I have
reached in respect of the decision to forfeit the claimant's shares in SSS, and
that in reality the decisions in respect of the three subsidiaries were made
together throughout, I have concluded that it would be artificial to uphold
the validity of what in reality was one decision as regards shares in two
companies whilst simultaneously setting it aside as regards shares in the
third, SSS. If the directors had decided to take another course in respect of
the claimant's shares in SSS, I find it hard to imagine that they would
nevertheless have proceeded to forfeit his shares in Acquire and EAT and
the inference I draw, applying the balance of probabilities, is that they
would not have done so.

[189] For completeness I would add that if the decision to forfeit the
claimant's shares pursuant to reg 19 of Table A had not been flawed, I
would not have found there to be any flaw in the consequential resolution
pursuant to reg 20 to transfer the forfeit shares to SVSP. However, if the
decision to forfeit pursuant to reg 19 is to be set aside, the consequential
decision pursuant to reg 20 must fall with it.

[190] In conclusion on this point, I would observe that there is some irony
in the fact that the claimant's ultimate success on this point, which only
emerged during the course of the trial, is largely founded upon what I have
found to be the scrupulously honest evidence on the point given by the four
directors.

ISSUE 10 : IF YES TO ANY LIMB(S) OF ISSUES 5 OR 7 OR 9, IS THE CLAIMANT
ENTITLED TO RELY ON SUCH POINT(S)?

[191] The one relevant issue which I have answered in the affirmative is
issue 9(ii) above. As to that, therefore, I have to consider Mr Davies'
submission that the claimant does not have standing in these proceedings to
pursue his claims, which Mr Davies in effect submits are all one way or
another in the nature of claims for breach of fiduciary duty. He rightly
submits that, as a general starting point the fiduciary duties of a director
are, in principle, owed to the company of which he is a director, and not to
the individual shareholders in that company, citing *Percival v Wright* [1902]
2 Ch 421.

[192] Particularly given the considerable length of this judgment, I will
not follow Mr Davies down the ultimately rather sterile, though
understandable and doubtless forensically satisfying, path of going through
the less felicitous formulations which have been put forward of the legal
basis for the claimant's case on locus standi, and then exhaustively
analysing their flaws. In my judgment the claimant's best point in respect of

*a* this issue is that on authority the claimant has a direct personal or representative right to bring a claim to set aside the forfeiture of his own shares. In opening the case Mr Griffiths put this submission in the context of a claim brought on the grounds that the directors' decision to forfeit was invalid by reason of an improper purpose. However, if that is right, then it seems to me that the same must follow in relation to such a claim brought

*b* on the grounds that the directors' decision to forfeit was invalid by reason of a failure to take into account matters which they ought to have taken into account, as mentioned under issue 9(ii) above. Discussion of whether such a direct right is to be regarded as a 'representative' (rather than 'personal') one is not germane on the facts of this case because in the case of all three subsidiaries the claimant is the only shareholder affected by the

*c* decisions to forfeit and indeed by the underlying call, and therefore he alone is the whole body of affected shareholders.

[193] In my judgment, of the cases cited to me that most directly in point is *Sweney v Smith* (1869) LR 7 Eq 324, a decision of Lord Romilly MR. The case was one brought by an individual shareholder in a company called

*d* (for short) Spence. The primary claim was that the purported forfeiture of the plaintiff's shares in Spence, and of those of 'all persons in a similar position with him', might be declared void and cancelled (see at 324 and 326 – the facts strongly suggest that, as in the present case, the plaintiff was the only person in a similar position); originally there had also been a claim to set aside two purchases of patents as ultra vires, but in argument the

*e* plaintiff seems to have indicated that (provided he regained the status of shareholder) he was content for the decision whether to proceed with those purchases to be made by the shareholders (see at 328) and comparatively little was said about this claim in the judgment. Though the report of the argument for the defendants on the primary claim is very short and plainly (from the judgment at 333) incomplete, it seems clear that the very point

*f* which Mr Davies takes here was taken for the defendants in that case. Lord Romilly MR said (at 332–333):

> 'It is necessary, however … to consider the objections the defendants make to the cancellation of the forfeiture. On the merits they have said little; indeed there is not much to be said … But many technical reasons
> *g* are alleged against it … *The third objection, that the suit is not in the name of the company* is a more serious objection, but it *does not apply to the question of forfeiture*; it applies to the other branch of relief which the bill seeks.' (Emphasis added.)

The words I have emphasised directly answer Mr Davies' point on locus

*h* standi. I do not accept his argument that the reasoning is dependent on (as he asserts) the refusal of a tendered payment meaning that the forfeiture had not been carried out validly under the articles of association. and that the Master of the Rolls' ruling on this point was because the shareholder had an action against the company for breach of the contract between them constituted by the articles of association (now reflected in s 14 of the 1985

*i* Act). Were it so, one might have expected those points to be at least mentioned, however briefly, in the judgment (the brevity of the report of the plaintiff's argument at 328 greatly weakens any similar point made in relation to that). I would also observe that the words emphasised appear unsurprising, given that a resolution to forfeit directly expropriates the

property of the shareholder(s) affected, in contrast to most resolutions of   *a*
directors, which directly affect the company's property or other interests
and only indirectly (via the value of their shareholding) those of the
shareholders.

[194] More recent cases, though not concerning resolutions to forfeit,
tend to support the decision on this point in *Sweney v Smith*. *Howard
Smith Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974] AC 821   *b*
was a decision of the Privy Council, on appeal from Street J (as he then
was) sitting in the Equity Division of the Supreme Court of New South
Wales. Ampol brought a successful claim in the Supreme Court to set aside
an allotment of shares by the directors of RW Miller (Holdings) Ltd
('Miller') and for consequential rectification of Miller's share register.
Ampol and another company called Bulkships with which it was associated,   *c*
between them held approximately 55% of the shares in Miller. The
allotment which was challenged had the effect of diluting that combined
holding to 36.6%. Street J found that although Miller had needed capital,
and although the directors who resolved to make the challenged allotment
to Howard Smith (a company which had announced a take-over bid for   *d*
Millers, which Ampol and Bulkships had rejected) had not been motivated
by any purpose of personal gain or advantage, nor by a desire to retain their
own positions on the board, their primary purpose was to reduce the
proportionate shareholding of Ampol and Bulkships, so as to enable
Howard Smith's take-over bid to proceed. Such a purpose was outside the
constitutional role of the directors of a limited company, and therefore the   *e*
exercise of their power to allot was invalid and set aside. The plaintiff in the
suit was Ampol, and the defendants Howard Smith (the allotee), Millers, 11
directors and Millers' registrar. Having accepted that an allotment of shares
was within the directors' powers under Millers' articles of association (cl 8),
Lord Wilberforce giving the opinion of the Privy Council said ([1974]
1 All ER 1126 at 1133, 1135–1136, [1974] AC 821 at 834, 837):   *f*

> '… intra vires though the issue may have been, the directors' power
> under this article is a fiduciary power: and it remains the case that an
> exercise of such a power though formally valid, may be attacked on the
> ground that it was not exercised for the purpose for which it was
> granted … [continuing at [1974] 1 All ER 1126 at 1135, [1974] AC   *g*
> 821 at 837] Just as it is established that directors, within their
> management powers, may take decisions against the wishes of the
> majority of shareholders, and indeed that the majority of shareholders
> cannot control them in the exercise of these powers while they remain
> in office … so it must be unconstitutional for directors to use their
> fiduciary powers over the shares in the company purely for the purpose   *h*
> of destroying an existing majority, or creating a new majority which did
> not previously exist. To do so is to interfere with that element of the
> company's constitution which is separate from and set against their
> powers".

   *i*

[195] For the immediate purposes of this case, the key point is that the
successful plaintiff, Ampol, brought the case in its own name and not as a
derivative action (the company, Millers, was one of the defendants, though
it seems that only Ampol and Howard Smith took an active part in the

*a*   proceedings before the Privy Council). Lord Wilberforce observed ([1974] 1 All ER 1126 at 1136, [1974] AC 821 at 838) that:

> 'It was not disputed that an action to set aside the allotment and for rectification of the register was properly brought by Ampol as plaintiff.'

*b*   However, there is nothing to indicate that Lord Wilberforce felt that this point should have been disputed, or that such a dispute if raised would have succeeded. Mr Davies correctly points out that the report of the action at first instance before Street J (sub nom *Ampol Petroleum v RW Miller Holdings* [1972] 2 NSWLR 850) contains no indication that Ampol's locus standi had been disputed below, either.

*c*
   **[196]** The industry of Mr Griffiths, however, has unearthed a possible explanation. He draws to my attention that one of the numerous cases cited to Street J in the *Ampol* case which were dealt with in the unreported part of his judgment was another decision of the Supreme Court of New South Wales made only three years earlier, *Provident International Corp v*
*d*   *International Leasing Corp* [1969] 1 NSWLR 424 (Helsham J). This was another case in which a shareholder sued in his own name to set aside an allotment of shares to others. Before trial the defendant had filed a demurrer to raise the issue that Provident was not a proper plaintiff, which demurrer was overruled by Street J on 1 September 1967 in an unreported judgment. At trial, Helsham J nevertheless permitted the defendant to
*e*   demur ore tenus which in general terms (pace the more precise analysis of Helsham J [1969] 1 NSWLR 424 at 427) had the effect that the defendant was able to take a locus standi point again (see at 426–427). The locus standi point again failed. Helsham J said (at 439) in connection with the claim to set aside, and then (at 441) in connection with the claim to rectify the register:
*f*
> 'the rule in *Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189 does not apply in the case of a fraud on the powers of directors at any rate where the abuse of power concerns a purported issue of shares, and I am of the opinion that this is so where the fraud consists of no dishonesty but a mere attempt to use the power for purposes other than that for which
*g*     it is given … [continuing at p 441] there is not the slightest doubt that no restriction of the nature of the rule in *Foss v Harbottle* is placed on a shareholder's action if he relies on his statutory right to rectify the register … although exactly the same issues will be involved.'

*h*   **[197]** Finally on this issue, Mr Griffiths cited dicta of Hoffmann J in *Re a Company* (*No 005136 of 1986*) [1987] BCLC 82. I have in mind (as Mr Davies rightly submits) that this was a case brought under s 459 of the 1985 Act, that the central allegation was that directors had breached their fiduciary duties by the improper exercise of the power to allot shares, just as in *Howard Smith v Ampol Petroleum*, and that the result of the
*i*   application before Hoffmann J, namely that the petitioner was not entitled to an indemnity from the company for his costs, was entirely consistent with the orthodox approach to costs in the context of s 459 petitions. Hoffmann J said (at 84–85):

'Although the alleged breach of fiduciary duty by the board is in
theory a breach of its duty to the company, the wrong to the company
is not the substance of the complaint. The company is not particularly
concerned with who its shareholders are. The true basis of the action is
an alleged infringement of the petitioner's individual rights as a
shareholder … Professor Gower in his *Principles of Modern Company
Law* … distinguishes between the derivative action and the member's
personal action. The former is brought when "a wrong has been done
to the company and action is brought to restrain its continuance, or to
recover the company's property or compensation due to it". In such a
case, says Professor Gower, the company is the only true plaintiff. In the
member's personal action the dispute is an internal one between those
interested in the company. A shareholder in such an action may sue as
representative of himself and other shareholders who have identical
interests but he does not in substance assert a right which belongs to the
company alone. It is perhaps worth observing that in cases concerning
the improper allotment of shares like *Howard Smith Ltd v Ampol
Petroleum Ltd* there is no suggestion that the plaintiff sues on behalf of
the company or in any capacity other than as an individual
shareholder.'

[**198**] Although for the reasons submitted by Mr Davies I entirely accept
that the above passages must be regarded as obiter dicta, nevertheless they
are of course extremely persuasive, and in my judgment are entirely
consistent with the other authorities I have already cited on this issue

[**199**] If a shareholder has the right to sue in his own name to set aside a
decision of directors to make an allotment which has had the effect of
diluting his shareholding and thereby reducing its value, one would surely
expect a right to sue in his own name to set aside a decision of directors to
forfeit his shareholding to follow a fortiori. The substance of a claim to set
aside a forfeiture of shares, such as the present, is indeed an alleged
infringement of the claimant's individual rights as a shareholder; it is not in
substance a claim where a wrong has been done to the company, which
needs to restrain its continuance, or to recover its own property or
compensation due to it, nor a claim where the rights infringed belong to the
company alone.

[**200**] I conclude that the claimant has locus standi and is entitled to rely
on the point at issue 9(ii) above in his own right.

[**201**] In these circumstances I do not need to consider Mr Griffiths'
alternative submissions in respect of what he also called a representative
action. Nor do I find it necessary to analyse the extent to which the
various submissions for the claimant under this head are properly to be
regarded as exceptions to the rule in (1843) 2 Hare 461, 67 ER 189, as
conveniently restated by the Court of Appeal in *Prudential Assur-
ance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354 at
357, [1982] Ch 204 at 210 (as opposed to not being within the scope of
that rule in the first place). For the reasons I have just given, I would
reject his further alternative submissions in respect of a possible (if
somewhat last minute) conversion of these proceedings into a derivative
action as inappropriate and unnecessary.

*a*  ISSUE 11 : IF YES TO ANY OF ISSUES 1 (C), 2, 3, OR ANY LIMB(S) OF ISSUES 5, 7 OR
9, OR IF NO TO ISSUES 4 TO 6, OR TO BOTH LIMBS OF ISSUE 8, THEN (A) IS
SERVICESPAN    BOUND    TO    RETRANSFER/RETURN    THE    (PURPORTEDLY)
FORFEITED SHARES TO THE CLAIMANT? AND (B) SHOULD THE REGISTER OF
MEMBERS OF EACH OF THE COMPANIES BE RECTIFIED SO AS TO SHOW THE
CLAIMANT AS THE HOLDER OF THE (PURPORTEDLY) FORFEITED SHARES?

*b*  [202] This is not a case where the forfeiture is void ab initio by virtue of
some formal invalidity underlying it, such as *Garden Gully United Quartz
Mining v McLister* (1875) 1 App Cas 39, a decision of the Privy Council on
appeal from the Supreme Court of Victoria (in Equity) cited by
Mr Griffiths, where a number of members of the board of directors which
passed the resolution to forfeit had not been duly elected in the first place.

*c*  [203] This is a case where I have found the resolution for forfeiture to
have been voidable for the reasons considered under issue 9(ii) above, and
have decided that it is appropriate in all the circumstances for it to be set
aside. Given the roles in SVSP of the directors of the three subsidiaries,
SVSP took the transfers of the claimant's shares with full knowledge of the
*d*  material facts and circumstances which have led in law to the voidability
and setting aside of the forfeiture. It is fixed with notice that the resolutions
to forfeit were passed without taking into account matters which ought to
have been taken into account. It is in no stronger position to retain the
claimant's shares than Howard Smith was to retain the newly allotted
shares in the *Ampol* case: see per Street J at [1972] 2 NSWLR 850,
*e*  882–883. SVSP has properly been a defendant to these proceedings
throughout, as transferee of the claimant's shares. In these circumstances I
can detect no right in SVSP to resist an order effecting the transfer of the
claimant's shares back to him. Once that has happened, Mr Davies'
submissions do not appear to raise any further objection to a consequential
rectification of the register pursuant to s 359 of the 1985 Act.

*f*  [204] However, given the complexities of the case, and the considerable
attention to detail which is apparent in counsel's submissions to date, I will
hear counsel further on the exact form which my order should take. Given
that this is a case in which the defendants have succeeded on more or less
all disputed issues of fact, yet the claimant has in the end won on a point
which emerged during the course of the trial, they will no doubt also wish
*g*  to address me on the issue of costs in any event.

*Declarations and rectification of registers granted.*

Victoria Parkin   Barrister.

**EXHIBIT R**

Chapter 18

# NECESSITY

1. Introduction

In Roman law a stranger who undertook the unsolicited management of another person's affairs was entitled in some circumstances to recover his reasonable costs. *Negotiorum gestio*—"the management of affairs"—was a bilateral legal relationship that created rights and obligations on both sides, and although the Romans viewed the action of the party assisted *against* the intervener (the *actio negotiorum gestorum directa*) as the main action arising out of the parties' relationship, they also held that the intervener could bring an action to recover his expenses (the *actio* (*negotiorum gestorum*) *contraria*).[1] Modern civilian and mixed legal systems typically have a similar doctrine under which benevolent interveners are entitled not only to recover benefits conferred on the party assisted but also to recover their expenses, and possibly also a reward for their intervention.[2]

**18-01**

In contrast, many common law jurisdictions, including England, have tended to reject any doctrine of *negotiorum gestio*, seemingly fearful that this would " … breed overnight a nation of busy-bodies anxious to perform useless and meddlesome services for others and to try their luck with the courts",[3] and contending that

**18-02**

---

[1]  E.G. Lorenzen, "The *Negotiorum Gestio* in Roman and Modern Civil Law" (1928) 13 Cornell L.Q. 190; F. Schulz, *Classical Roman Law* (Oxford: Clarendon Press, 1951), p.624; P.G. Stein (ed.), W.W. Buckland, *Text Book of Roman Law from Augustus to Justinian*, 4th edn (Cambridge: CUP, 2003), p.537; J. Kortmann, *Altruism in Private Law: Liability for Nonfeasance and Negotiorum Gestio* (Oxford: OUP, 2004), pp.44-47.

[2]  J.P. Dawson, "*Negotiorum Gestio*: The Altruistic Intermeddler" (1961) 74 Harvard L.R. 817 and 1073; R. Zimmermann, *The Law of Obligations: Roman Foundations of the Civilian Tradition* (Oxford: OUP, 1996), Ch.14 and pp.875-878; R.D. Leslie "*Negotiorum Gestio* in Scots Law: The Claim of the Privileged Gestor" [1983] J.R. 12; S.J. Stoljar, "*Negotiorum Gestio*" in E. von Caemmerer and P. Schlechtriem (eds), *International Encyclopedia of Comparative Law, Vol.10: Restitution—Unjust Enrichment and Negotiorum Gestio* (Tübingen, Mohr, The Hague: Nijhoff, 1984), Ch.17; D.H. Van Zyl, *Negotiorum Gestio in South African Law* (Durban: Butterworths, 1989); N.R. Whitty, "*Negotiorum Gestio*", in *The Laws of Scotland: Stair Memorial Encyclopaedia*, Vol.15 (Edinburgh: Butterworths and the Law Society of Scotland, 1996); J. Kortmann, Altruism in *Private Law: Liability for Nonfeasance and Negotiorum Gestio* (Oxford: OUP, 2004), Ch.10. See too C. von Bar et al (eds), *Principles, Definitions and Model Rules of European Private Law, Draft Common Frame of Reference, Book V: Benevolent Intervention in Another's Affairs*, interim outline edn (Munich: Sellier, 2008), considered in N. Jansen, "*Negotiorum Gestio* and Benevolent Intervention in Another's Affairs: Principles of European Law?" (2007) 15 Z.Eu.P. 958; T.W. Dornis, "The Doctrines of Contract and *Negotiorum Gestio* in European Private Law: Quest for Structure in a No Man's Land of Legal Reasoning" [2015] R.L.R. 73.

[3]  E.W. Hope, "Officiousness" (1930) 15 Cornell L.Q. 25, p.36, regarding this outcome as unlikely. Cf. J.P. Dawson, "Rewards for the Rescue of Human Life?" in K. Nadelmann et al (eds), *Twentieth Century Comparative and Conflicts Law: Legal Essays in Honour of Hessel E. Yntema* (Leyden:

## (f)  Remedies

**18-44**     According to Lord Watson in *Strang, Steel & Co v A Scott & Co*[149]:

> "Each owner of jettisoned goods becomes a creditor of ship and cargo saved, and has a direct claim against each of the owners of ship and cargo, for a pro rata contribution towards his indemnity, which he can enforce by a direct action."

Shipowners also have a personal claim to recover the value of sacrifices and expenditure from cargo owners, and the common law also gives them a possessory lien over the cargo to support this claim. As noted by Clarke LJ in *Mora Shipping Inc v Axa Corporate Solutions Assurance SA*[150]:

> "Cargo owners have no such lien because they do not have possession of cargo which is laden on board the vessel but owned by others. However, it is the duty of the ship-owner to exercise a lien on the cargo, not only for his own contribution but also for that of cargo owners who may be entitled to contribution. Failure to do so exposes the ship-owner to liability and damages."

**18-45**     The shipowner's lien is normally released in exchange for the defendant's giving an average bond[151] and security in the form of a cash deposit[152] or (more usually) a guarantee from his insurer.[153] An average adjuster will then be appointed to assess the rights and liabilities of all the parties and at the conclusion of this (often lengthy) process, the defendant's insurer will generally pay the contribution that is found to be due.[154] If a shipowner refuses to deliver cargo to a consignee who has offered to pay a reasonable sum by way of deposit or to put up a reasonable security, he may be liable in conversion.[155]

### 4.  OTHER CASES OF PRESERVATION OF PROPERTY

## (a)  Problems with "Agency of Necessity" Reasoning

**18-46**     Besides salvage awards and awards of general average contribution, awards have also been made to other claimants who have intervened to preserve another's property in an emergency. Historically, many of these have been made on the basis that emergencies can generate an "agency of necessity". However, there are good

---

[149] *Strang, Steel & Co v A Scott & Co* (1889) 14 App. Cas. 601 at 606.

[150] *Mora Shipping Inc v Axa Corporate Solutions Assurance SA* [2005] EWCA Civ 1069; [2005] 2 Lloyd's Rep. 769 at [25]. See too *Strang, Steel & Co v A Scott & Co* (1889) 14 App. Cas. 601 at 606.

[151] With the result that a new contractual relationship is created between the parties that supersedes their previous rights and obligations: *Castle Insurance Co Ltd v Hong Kong Islands Shipping Co (The Potoi Chau)* [1984] A.C. 226 at 239–241.

[152] On which, see the York-Antwerp Rules 2016 r.XXII.

[153] *Metall Market OOO v Vitorio Shipping Co Ltd (The Lehmann Timber)* [2013] EWCA Civ 650; [2014] Q.B. 760: shipowner which reasonably requested both a bond and an insurers' guarantee or a cash deposit, and which received only an insurers' guarantee, did not forego its lien.

[154] Though N.B. the adjustment is not generally binding on the parties: *Wavertree Steamship Co Ltd v Love* [1897] A.C. 373; *Attaleia Marine Co Ltd v Bimeh Iran (The Zeus)* [1993] 2 Lloyd's Rep. 497; *Sameon Co SA v NV Petrofina (The World Hitachi Zosen)* unreported 30 April 1997 CA.

[155] *Anderson Tritton & Co v Ocean Steamship Co* (1884) 10 App. Cas. 107 at 115.

reasons for doubting the coherence of this supposed doctrine, and for thinking that the cases in which it has been invoked are best understood in other ways.[156]

One reason is that the idea of "agency of necessity" derives from two different groups of cases arising out of situations where one party acted for another party's benefit in necessitous circumstances. The first group concerned the question whether the intervener had the power to bind another party to a contract with a third party who agreed to supply the intervener with the means of rescue. The second group concerned the question whether the intervener had the right to recover his own expenditure from the other party. In *China Pacific SA v Food Corp of India (The Winson)*,[157] Lord Diplock considered that it would be "an aid to clarity of legal thinking" if the term "agency of necessity" were only used in cases which were concerned with the first of these questions, because:  **18-47**

> "… where reimbursement is the only relevant question all of those conditions that must be fulfilled in order to entitle one person to act on behalf of another in creating direct contractual relationships between that other person and a third party may not necessarily apply."

We would add that many cases falling within the first group concerned the actions of an intervener who had previously been appointed to act as the other party's agent, whose actions went beyond the scope of his express actual authority, but who would now be said to have had the power to bind his principal to a contract with a third party either because he had implied actual authority to do so,[158] or because he had apparent authority—a type of authority that was not fully recognised by the courts until some time after many of the relevant cases were decided.[159]  **18-48**

Turning to the second group of cases, we also find that "agency of necessity" reasoning requires the courts to ask, first, whether the necessitous circumstances of the case make it appropriate for the law to deem the intervener to have acted as the defendant's agent, and, secondly, whether he is therefore entitled to recover his costs pursuant to the general rule of agency law that every agent is entitled to be reimbursed expenses incurred in the execution of his authority.[160] This is an unnecessarily complex and roundabout way of explaining why a necessitous intervener should be entitled to recover his expenditure. The same result could be reached more simply, without interposing a deemed agency relationship of doubtful authenticity, by holding that necessitous interveners have a general right of recovery under English law.  **18-49**

For all of these reasons we shall not concern ourselves too closely with the ques-  **18-50**

---

[156] For general discussion, see P.G. Watts (ed.), *Bowstead and Reynolds on Agency*, 22nd edn (London: Sweet & Maxwell, 2020), Ch.4. See too G. McMeel, "Philosophical Foundations of the Law of Agency" (2000) 116 L.Q.R. 387, 408–410.

[157] *China Pacific SA v Food Corp of India (The Winson)* [1982] A.C. 939 at 958.

[158] Cf. *Walker v Great Western Railway Co* (1866–67) L.R. 2 Ex. 228 (implied actual authority to engage doctor to attend employee); *De Bussche v Alt* (1878) 8 Ch. D. 286 (implied actual authority to delegate powers); *Montaignac v Shitta* (1890) 5 App. Cas. 357 (implied actual authority to lend on unusual terms); *Gokal Chand-Jagan Nath v Nand Ram Das-Atma Ram* [1939] A.C. 106 (implied actual authority to give credit in unusual circumstances).

[159] In Diplock LJ's seminal decision in *Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd* [1964] 2 Q.B. 480.

[160] Reasoning of this sort underpinned e.g. *Tetley & Co v British Trade Corp* (1922) 10 Ll. L. Rep. 678 and *The Argos* (1873) L.R. 5 P.C. 134 at 165.

tion of whether "agency of necessity" reasoning was used in the cases discussed in the rest of this chapter.

### (b)  Shipmasters

**18-51**     The master of a ship has long had the power to take extraordinary steps to deal with the ship or her cargo in an emergency. For example, he may, to preserve the ship for the remainder of the cargo, dispose of part, and sometimes even the whole, of the cargo in various ways: he may jettison the goods to lighten the ship[161]; he may sell[162] part or hypothecate[163] part or even the whole of the cargo to raise money to pay for such repairs as are necessary to enable the ship to continue her voyage; and he may enter into a salvage agreement on the part of the cargo owner.[164] The master also has an extensive power in cases of necessity to deal with the ship herself.[165] But in all of these cases, whether he is dealing with the ship or with her cargo, it is essential for the master to show not only that his actions were necessary,[166] but also that they were wise and prudent in the circumstances and that it was impracticable for him to communicate with the owner of the ship or her cargo as the case may be.[167] Where he can establish these things, he is entitled to charge the owners with expenses properly incurred by him.[168]

### (c)  Bailees

**18-52**     Bailees have also been entitled to recover expenses they have incurred in preserving the bailor's property. An example is *Great Northern Railway Co v Swaffield*,[169] where the defendant sent his horse by railway but failed to collect it from the station. The stationmaster arranged for the horse to be kept at a nearby livery stable, but the defendant refused to pay the livery charges and after four months the plaintiff railway company therefore paid the charges itself and delivered the horse to the

---

[161] *The Gratitudine* (1801) 3 Ch. Rob. 240 at 258; 167 E.R. 450 at 457 per Lord Stowell.

[162] *Gunn v Roberts* (1873-74) L.R. 9 C.P. 331 at 337 per Brett J.

[163] *The Gratitudine* (1801) 3 Ch. Rob. 240; 167 E.R. 450.

[164] *China Pacific SA v Food Corp of India (The Winson)* [1982] A.C. 939. And see now International Convention on Salvage 1989 art.6, given force of law in the UK by the Merchant Shipping Act 1995 s.224 and Sch.1, which gives the master or owner the power to sign a salvage contract for cargo.

[165] *Robertson v Carruthers* (1819) 2 Stark. 571; 171 E.R. 739; *The Glasgow* (1856) Swab. 145; *The Australia* (1859) Swab. 480; *Atlantic Mutual Insurance Co v Huth* (1880) 16 Ch. D. 474.

[166] *Australasian Steam Navigation Co v Morse* (1872) L.R. 4 P.C. 222 at 230; *Phelps, James & Co v Hill* [1891] 1 Q.B. 605 at 610; *Prager v Blatspiel, Stamp & Heacock Ltd* [1924] 1 K.B. 566 at 571–572; *John Koch Ltd v C&H Products Ltd* [1956] 2 Lloyd's Rep. 59 at 69; *Industrie Chimiche Italia Centrale and Cerealfin SA v Tsavliris (Alexander G.) Maritime Co (The Choko Star)* [1990] 1 Lloyd's Rep. 516.

[167] *Beldon v Campbell* (1851) 6 Exch. 886 at 890; *Australasian Steam Navigation Co v Morse* (1872) L.R. 4 P.C. 222; *Industrie Chimiche Italia Centrale and Cerealfin SA v Tsavliris (Alexander G.) Maritime Co (The Choko Star)* [1990] 1 Lloyd's Rep. 516.

[168] *The Argos* (1873) L.R. 5 P.C. 134 at 165 per Sir Montagu Smith; *Notara v Henderson* (1871–72) L.R. 7 Q.B. 225; *Hingston v Wendt* (1876) 1 Q.B.D. 367.

[169] *Great Northern Railway Co v Swaffield* (1874) L.R. 9 Ex. 132. See too *Notara v Henderson* (1872) L.R. 7 Q.B. 225; *Garriock v Walker* (1873) 1 R. 100; *Sims & Co v Midland Railway Co* [1913] 1 K.B. 103 at 112; *Coldman v Hill* [1919] 1 K.B. 443 at 456; *Springer v Great Western Railway Co* [1921] 1 K.B. 257; *Sachs v Miklos* [1948] 2 K.B. 23 at 35–36; *Munro v Wilmott* [1949] 1 K.B. 295 at 297.

OTHER CASES OF PRESERVATION OF PROPERTY

defendant. According to Kelly CB in the Court of Exchequer the company[170]:

"… had no choice, unless they would leave the horse at the station or in the high road to his own danger and the danger of other people, but to place him in the care of a livery stable keeper, and as they are bound by their implied contract with the livery stable keeper to satisfy his charges, a right arises in them against the defendant to be reimbursed those charges which they have incurred for his benefit."

In *The Winson*[171] the Indian Government chartered a vessel to take a cargo of wheat from US ports to Bombay but the vessel stranded on a reef and the master retained salvors on behalf (severally) of the ship and cargo interests. Over a period of two-and-a-half months the salvors salved six parcels of wheat and stored them in warehouses at the salvors' expense. The shipowners then notified the cargo owners that they were abandoning the voyage and the contract of carriage came to an end. The cargo owners accepted liability for the warehouse storage charges thereafter but submitted that until that time the shipowners were responsible for the charges rather than the cargo owners because the master, when making the salvage agreement, had only been acting on the shipowners' behalf. **18-53**

The House of Lords held that possession had been transferred from the shipowners to the salvors when the cargo was off-loaded into barges, and that the direct bailment relationship thereby created between the cargo owners and the salvor had continued to exist until the cargo owners took possession of the wheat from the warehouse owners (who had become sub-bailees of the salvors). According to Lord Diplock[172]: **18-54**

"[S]o long as that relationship of bailor and bailee continued to subsist the salvors … owed a duty of care to the cargo owner to take such measures to preserve the salved wheat from deterioration by exposure to the elements as a man of ordinary prudence would take for the preservation of his own property. For any breach of such duty the bailee is liable to his bailor in damages for any diminution in value of the goods consequent upon his failure to take such measures; and if he fulfils that duty he has … a correlative right to charge the owner of the goods with the expenses reasonably incurred in doing so."

These dicta were echoed in *ENE 1 Kos Ltd v Petroleo Brasiliero SA, The Kos (No.2)*, where Lord Sumption held that the appellant shipowners could recover the cost of retaining their vessel in port while the respondents' cargo remained on board because[173]: **18-55**

"(i) … the cargo was originally bailed to the owners under a contract which came to an end while the cargo was still in their possession, (ii) … as a matter of law their obligation to look after the cargo continued notwithstanding the termination of the charterparty, and (iii) … the only reasonable or practical option open to them once the charterparty had come to an end was to retain the cargo until it could be discharged at the port where the vessel was then located."

Lord Diplock's dicta in *The Winson* were also noted in *Guildford BC v Hein*.[174] **18-56**

---

[170] *Great Northern Railway Co v Swaffield* (1874) L.R. 9 Ex. 132 at 136.
[171] *China Pacific SA v Food Corp of India (The Winson)* [1982] A.C. 939.
[172] *China Pacific SA v Food Corp of India (The Winson)* [1982] A.C. 939 at 960.
[173] *ENE 1 Kos Ltd v Petroleo Brasiliero SA, The Kos (No.2)* [2012] UKSC 17; [2012] 2 A.C. 164 at [28]–[29].
[174] *Guildford BC v Hein* [2005] EWCA Civ 979; [2005] B.L.G.R. 797.

The defendant was disqualified from having custody of dogs for a time and so the claimant council lawfully removed them from her custody, becoming bailees of the dogs for the relevant period. When the court orders expired the council sought to retain possession because it was concerned that the defendant would commit further offences and it obtained an injunction prohibiting her from keeping dogs. Clarke LJ said that the council could not have recovered the costs of keeping the dogs before obtaining the injunction because, once the orders expired, they were obliged to return them to the defendant. After the injunction had been granted, however, they became "bailees of necessity" because they would not be allowed to redeliver the dogs and so they would have a correlative right to the reasonable cost of looking after them "and, perhaps, to a reasonable remuneration for doing so".[175]

**18-57**    Note, finally, that recovery services which remove vehicles from the public highway and store them at the request of the police may be entitled to recover their costs from the owners. For example, in *Surrey Breakdown Ltd v Knight*,[176] a garage pulled a stolen car out of a pond at the request of the police. Sir Christopher Staughton was prepared to accept that it could recover its costs from the owner if necessity compelled its intervention. But the Court of Appeal rejected its claim on the ground that:

"… it cannot reasonably be said that [the plaintiffs] in taking the car out of the pond [were] doing so because necessity compelled them to do so without the authority … of the owner."

There is also a statutory power to levy charges for the removal, storage and disposal of vehicles in the Road Traffic Regulation Act 1984 s.102.

### (d)   Tenants

**18-58**    In *Weigall v Waters*,[177] a lease contained a covenant by the tenant to keep the property in good repair, "casualties by fire and tempest excepted". The property was damaged in a storm and the tenant paid for the costs of repair. He sought to set off his expenditure against subsequent rent payments, but in decisions that were "heavy [with] procedural and jurisdictional content",[178] the set-off was refused both by the Court of Exchequer (exercising its equity jurisdiction) and by the Court of King's Bench. For both courts the problem was that the amount laid out had to be assessed by a jury and was therefore an uncertain sum. However, they would both have allowed the tenant to set off his expenditure as money paid to the landlord's

---

[175] *Guildford BC v Hein* [2005] EWCA Civ 979; [2005] B.L.G.R. 797 at [51]. Contrast *Tongue v RSPCA* [2017] EWHC 2508 (Ch); [2018] B.P.I.R. 229, where Newey LJ distinguished the cases cited in the previous paragraphs and declined to order a farmer to reimburse the RSPCA for the costs of caring for cattle he had been mistreating; the main point of difference seems to have been that stated at [80]: "the RSPCA … is a charity and, moreover, one whose aim is to improve the lives of animals. Undertaking the care of animals on a gratuitous basis would thus accord with its objects."

[176] *Surrey Breakdown Ltd v Knight* [1999] R.T.R. 84. See too *White v Troups Transport* [1976] C.L.Y. 33 (County Ct); *Service Motor Polices at Lloyd's v City Recovery Ltd* [1997] EWCA Civ 2073; *Lambert (t/a Lambert Commercials) v Fry* [2000] C.L.Y. 113 (County Ct). And cf. *R. v Howson* (1966) 55 D.L.R. (2d) 582 at 593; *Suburban Towing and Equipment Pty Ltd v Suttons Motor Finance Pty Ltd* [2008] NSWSC 1346.

[177] *Weigall v Waters* (1795) 6 Term. Rep. 488; 101 E.R. 663. Earlier proceedings at (1795) 2 Anst. 575; 145 E.R. 971.

[178] *Eller v Grovecrest Investments Ltd* [1995] Q.B. 272 at 276 per Hoffmann LJ.

use if the amount spent had been certain (or had not been challenged), and this is how a case of this kind would now be decided, following *Lee-Parker v Izzet*,[179] and *British Anzani (Felixstowe) Ltd v International Marine Management (UK) Ltd*.[180]

### (e)   Trustees and Liquidators

Unless there is a charging clause in the trust deed, trustees must act gratui-tously,[181] but the courts have an inherent jurisdiction to make remuneration awards in cases where trustees have gone to unusual lengths to preserve or enhance the value of the trust property; the power to make such awards also finds statutory expression in the Trustee Act 2000 s.29, which applies only to trustees acting in a professional capacity. The courts' inherent jurisdiction "should be exercised only sparingly and in exceptional cases",[182] and the court should[183]: **18-59**

> "… balance two influences which are to some extent in conflict. The first is that the of-fice of trustee is, as such, gratuitous; the court will accordingly be careful to protect the interests of the beneficiaries against claims by the trustees. The second is that it is of great importance to the beneficiaries that the trust should be well administered. If therefore the court concludes, having regard to the nature of the trust, the experience and skill of a particular trustee and to the amounts which he seeks to charge when compared with what other trustees might require to be paid for their services and to all the other circumstances of the case, that it would be in the interests of the beneficiaries to increase the remunera-tion, then the court may properly do so."

In *Foster v Spencer*,[184] remuneration was awarded to the trustees of a decaying cricket ground that they were finally able to sell with planning permission after 20 years of work that went far beyond their contemplation when they were first ap-pointed as unpaid trustees. The court held that retrospective remuneration was ap-propriate because the true extent of the trustees' services could not be known until it was possible to market and sell the land, and because no money had been avail-able to pay them any remuneration for a long time. **18-60**

The principles governing special trustee remuneration have also been applied in cases involving company liquidators. For example, in *Re Berkeley Applegate (Investment Consultants) Ltd*,[185] a liquidator was remunerated and reimbursed out **18-61**

---

[179] *Lee-Parker v Izzet* [1971] 1 W.L.R. 1688.

[180] *British Anzani (Felixstowe) Ltd v International Marine Management (UK) Ltd* [1980] Q.B. 137 at 146–148.

[181] The underlying reason for this rule is to ensure that the interest and duty of a trustee are not put into conflict: *Bray v Ford* [1896] A.C. 44 at 51–52.

[182] *Re Worthington (Deceased)* [1954] 1 W.L.R. 526 at 530 per Upjohn J.

[183] *Re Duke of Norfolk's ST* [1982] Ch. 61 at 79 per Fox LJ. Note that the beneficiaries' consent is not required, but their objections will be considered, as in e.g. *Polly Peck International Plc v Henry* [1999] 1 B.C.L.C. 407.

[184] *Foster v Spencer* [1996] 2 All E.R. 672. See too *Robinson v Pett* (1734) 3 P. Wms 249; 24 E.R. 1049; *Marshall v Holloway* (1820) 2 Swan. 432; 36 E.R. 681; *Forster v Ridley* (1864) 4 De G. J & S. 452; 46 E.R. 993; *Re Freeman's ST* (1887) 37 Ch. D. 148; *Re Masters* [1953] 1 W.L.R. 81; *Re Drexel Burnham Lambert UK Pension Plan* [1995] 1 W.L.R. 32; *Pearson v Parklane Holdings Ltd* unreported 26 November 1997 NZ CA; *Rathbone Trust Co (Jersey) Ltd v Kane* [2004] JRC 041 at [28]; *HSBC Trustees (CI) Ltd v Rearden* [2005] JRC 130; *Landau v Anburn Trustees Ltd* [2007] J.L.R. 250; *Regent Trust Co Ltd v RJD* [2009] JRC 117. But compare *Brudenell-Bruce v Moore* [2014] EWHC 3679 (Ch); [2015] W.T.L.R. 373 at [227]–[236] where the judge concluded that an award of remuneration was not justified on the facts.

[185] *Re Berkeley Applegate (Investment Consultants) Ltd* [1989] Ch. 32. See too *Ontario (Securities Com-*

of the company's own assets and assets which it held on trust for others, the court holding that if:

> "… the liquidator had not done this work, it is inevitable that the work, or at all events a great deal of it, would have had to be done by someone else."[186]

### 5.  PRESERVATION OF CREDIT

**18-62**    A third party may accept a bill of exchange for the honour of the drawer,[187] but his acceptance can only be made after a protest for non-acceptance[188] and is subject to the consent of the holder of the bill,[189] for the latter may wish to exercise his right of recourse which arises on non-acceptance. The acceptor for honour undertakes that he will:

> "… on due presentment, pay the bill according to the tenor of his acceptance, if it is not paid by the drawee, provided it has been duly presented for payment, and protested for non-payment, and that he receives notice of these facts."[190]

If the bill is so paid, the payer for honour is subrogated to the rights and succeeds to the duties of the holder as regards the party for whose honour he pays and all parties liable to that party.[191] This seems to be another example of necessitous intervention.[192] The stranger's intervention takes the form of fulfilment of the contractual duty of the person assisted; and since his action preserves the latter's commercial credit which would otherwise be endangered, he is entitled to reimbursement in respect of his expenditure.

### 6.  CARE OF THE SICK AND MENTALLY INCAPABLE

**18-63**    The courts have often made awards to claimants who have provided medical and nursing care or the necessaries of life to the sick and incapacitated, sometimes against the people to whom they have supplied these benefits, and sometimes against third parties who were under a legal duty to provide them. An example of

---

mission) v Consortium Construction Inc (1992) 93 D.L.R. (4th) 321; *Re GB Nathan & Co Pty Ltd (In Liquidation)* (1991) 24 N.S.W.L.R. 674; *13 Coromandel Place Pty Ltd v CL Custodians Pty Ltd (In Liquidation)* [1999] FCA 144; (1999) 30 A.C.S.R. 377; *Re Application of Sutherland* [2004] NSWSC 798; (2004) 50 A.C.S.R. 297; *Dean-Willcocks v Nothintoohard Pty Ltd (In Liquidation)* [2006] NSWCA 311; *Coad v Wellness Pursuit Pty Ltd (In Liquidation)* [2009] WASCA 68; *Trio Capital Ltd (Admin. App.) v ACT Super Management Pty Ltd* [2010] NSWSC 941; (2010) 79 A.C.S.R. 425. And cf. *Monks v Poynice Pty Ltd* (1987) 8 N.S.W.L.R. 662, where an award was made to an invalidly appointed receiver.

[186] *Re Berkeley Applegate (Investment Consultants) Ltd* [1989] Ch. 32 at 47.

[187] Bills of Exchange Act 1882 s.65(1). On notice of dishonour, see *Eaglehill Ltd v J Needham Builders Ltd* [1973] A.C. 992.

[188] *Vandewall v Tyrrell* (1827) M. & M. 87; 173 E.R. 1090; *Geralopulo v Wieler* (1851) 10 C.B. 690; 138 E.R. 272; Bills of Exchange Act 1882 s.65(1).

[189] *Mitford v Walcot* (1700) 12 Mod. 410; 88 E.R. 1416; Bills of Exchange Act 1882 s.65(1).

[190] Bills of Exchange Act 1882 s.66(1).

[191] Bills of Exchange Act 1882 s.68(5).

[192] Cf. *Hawtayne v Bourne* (1841) 7 M. & W. 595 at 599; 151 E.R. 905 at 908, where Parke B, although he took a most restricted view of the rights of the necessitous intervener, accepted the link between the rights of the acceptor for honour and of the master of a ship who deals with the ship or cargo in an emergency.

**EXHIBIT S**

# Companies Act 2006, Part 10

PART 10

A COMPANY'S DIRECTORS

CHAPTER 1

APPOINTMENT AND REMOVAL OF DIRECTORS
*Requirement to have directors*

**[1]**

**154  Companies required to have directors**

   (1)   A private company must have at least one director.

   (2)   A public company must have at least two directors.

---

**[2]**

Date in force: 1 October 2007: see SI 2007/2194, art 2(1)(d).

**DERIVATION**

**[3]–[5]**

Sub-s (1) derived from the CA 1985, s 282(3); sub-s (2) derived from the CA 1985, s 282(1).

**DEFINITIONS**

**[6]**

For 'director' see Companies Act 2006 (CA 2006), s 250; for 'private company' see CA 2006, s 4(1); for 'public company' see CA 2006, s 4(2), (3).

**CROSS-REFERENCES**

**[7]**

For appointment of directors, see CA 2006, ss 157–161; for removal, CA 2006, ss 168–169; for disqualification, Company Directors Disqualification Act 1986 ('CDDA 1986'); and for register of directors and particulars to be registered, CA 2006, ss 162–167.

**[8]**

This section applies to all companies, whenever incorporated. There is no longer (as there was under CA 1985, s 282) an exception for public companies incorporated before 1 November 1929 (the date on which Companies Act 1929 came into force and implemented the first predecessor to CA 2006, s 154).

---

**DEFINITIONS**

**[256]**

For 'company' see CA 2006, s 1(1); for 'director' see CA 2006, s 250; for 'the register' see CA 2006, s 1080(2); for 'the registrar' see CA 2006, s 1060(3).

**GENERAL NOTE**

**[257]**

This section automatically removes from office persons who, on commencement, were directors under the age of 16. The company must make consequential amendments to its records, but need not specifically inform the Registrar of Companies. Of course, the company's next annual return will have to contain a correct (appropriately modified) list of directors.

**[258]–[300]**

CA 2006, s 159(4) empowers the Registrar to amend the register of the company's directors he holds without notification from the company of the director's removal: the Registrar may act on the basis of information already held at Companies House (eg the date of birth of the person in question as provided to Companies House when that person was originally appointed a director under the old law).

———————————————

**[301]**

**160  Appointment of directors of public company to be voted on individually**

(1)   At a general meeting of a public company a motion for the appointment of two or more persons as directors of the company by a single resolution must not be made unless a resolution that it should be so made has first been agreed to by the meeting without any vote being given against it.

(2)   A resolution moved in contravention of this section is void, whether or not its being so moved was objected to at the time.

But where a resolution so moved is passed, no provision for the automatic reappointment of retiring directors in default of another appointment applies.

(3)   For the purposes of this section a motion for approving a person's appointment, or for nominating a person for appointment, is treated as a motion for his appointment.

(4)   Nothing in this section applies to a resolution amending the company's articles.

———————————————

**[302]**

Date in force: 1 October 2007: see SI 2007/2194, art 2(1)(d).

**DERIVATION**

**[303]–[305]**

This section derived from the CA 1985, s 292.

**DEFINITIONS**

**[306]**

For 'articles' see CA 2006, s 18(4); for 'director' see CA 2006, s 250; for 'public company' see CA 2006, s 4(2), (3).

**CROSS-REFERENCES**

**[307]**

For general meetings and resolutions generally, see CA 2006, Pt 13; a resolution altering the company's articles must be at least a special resolution, as to which see CA 2006, ss 21, 283; and more restrictive conditions will apply under CA 2006, ss 22–24 for amending any article entrenched under CA 2006, s 22.

**GENERAL NOTE**

**[308]**

This section, which only applies in the case of public companies, will not apply when directors are appointed otherwise than by the company in general meeting. Where three directors were appointed by separate resolutions at a general meeting convened on requisition but the resolution proposed by the requisitionists was in the form of a single resolution, it was held that the separate resolutions were outside the scope of the business authorised to be transacted[1].

1   *Cheshire v Gordon Hotels Ltd* (1953) Times, 13 February; discussed in 97 Sol Jo 465, distinguishing *Betts & Co Ltd v MacNaughten* [1910] 1 Ch 430, 79 LJ Ch 207. Cf *PNC Telecom plc v Thomas* [2002] EWHC 2848 (Ch), [2004] 1 BCLC 88, [2003] BCC 202 at [23]–[26].

**[309]–[350]**

The acts of a director appointed by a resolution which is void under this section may nevertheless be valid[1].

1   See CA 2006, s 161 and **[357]** ff.

———————————

**[351]**

———————————

**161  Validity of acts of directors**

(1)   The acts of a person acting as a director are valid notwithstanding that it is afterwards discovered—

(a)     that there was a defect in his appointment;

(b)     that he was disqualified from holding office;

(c)     that he had ceased to hold office;

(d)     that he was not entitled to vote on the matter in question.

(2)   This applies even if the resolution for his appointment is void under section 160 (appointment of directors of public company to be voted on individually).

———————————

**[352]**

Date in force: 1 October 2007: see SI 2007/2194, art 2(1)(d); for transitional provisions and savings see art 9, Sch 3, para 4 thereto.

**DERIVATION**

**[353]–[355]**

This section derived from the Companies Act 1985, s 285.

**DEFINITIONS**

**[356]**

For 'director' see CA 2006, s 250.

**CROSS-REFERENCES**

**[357]**

For appointment and qualification of directors, see CA 2006, ss 157–161; by CA 2006, s 356(4), (5) the appointment of a director or manager will be deemed valid, until the contrary is proved, if proper minutes are kept of the meeting at which the appointment is made.

**INVALID APPOINTMENT OF DIRECTORS, ETC**

**[358]**

Endangering accuracy for the sake of brevity, it may be said that the effect of this section is that, as between the company and persons having no notice to the contrary, directors, etc, de facto are as good as directors, etc, de jure[1].

---

[1]    Cited in the 9th edition with apparent approval by Swinfen Eady LJ (with whom Pickford LJ agreed) in *Channel Collieries Trust Ltd v Dover, St Margaret's and Martin Mill Light Rly Co* [1914] 2 Ch 506 at 515, 84 LJ Ch 28, and see **Division N, [741]**, 'director'.

**[359]**

Section 161(1)(a) applies where there has been a purported but ineffective appointment, but not where there has been no appointment at all[1]. Similarly, the acts of a person alleged to be an alternate director were not validated by this section where there had been no genuine attempt to appoint that person as an alternate director[2]. Though the language of CA 2006, s 161(1)(a), (b) differs a little from its predecessor, CA 1985, s 285, such differences should not affect this point. However, it may be possible for a court to infer that a de facto director who has not been formally appointed as a director, but who has been permitted by the company to act as a director, has been 'appointed', so as to bring into play the provisions of CA 2006, s 161[3].

Section 161(1) is broader than predecessor sections (CA 1985, s 285 and its forebears). It widens the circumstances in which acts of a person acting as a director are treated as valid by adding new provisions in sub-paras (c), (d). Section 161(1)(c), which validates the acts of a person whose appointment as a director has ceased, but who continues to act as a director, applies to all the circumstances where a director has ceased to hold office, including where his appointment has expired: eg as a result of a provision in the articles that a director appointed by the board only retains office until the last date upon which the next annual general meeting must be held: see Mark Anderson QC obiter in *Aidiniantiz v The Sherlock Holmes International Society Ltd* [2016] EWHC 1391 (Ch) at [54]–[57] and the principal judgment at [2016] EWHC 1076 at [52], [102].

Whether or not s 161 applies, an outsider may be able to rely upon the rule in *Royal British Bank v Turquand*[4], CA 2006, s 40, or, the actual or ostensible authority of the person with whom the outsider was dealing. Quaere, whether in some cases a director of the company may for this purpose be an 'outsider': *Hely-Hutchinson v Brayhead Ltd*[5], where Roskill J, who rested his decision on ostensible authority, thought that the claimant was acting in the transaction as an individual and not as a

director and was therefore not affected with constructive knowledge that the chairman had no actual authority to enter into the transaction on behalf of the company; the Court of Appeal unanimously held that the chairman had actual authority so that the point did not arise, but Lord Denning MR, thought that in certain cases a director could rely on a co-director's ostensible authority.

1    See *Morris v Kanssen* [1946] AC 459, [1946] 1 All ER 586, HL; *Craven-Ellis v Canons Ltd* [1936] 2 KB 403, [1936] 2 All ER 1066; and *Re New Cedos Engineering Co Ltd* [1994] 1 BCLC 797, 120 Sol Jo 146.

2    *Sneddon v MacCallum* [2011] CSOH 59.

3    *Macnabs LLP v Fordlane Ltd* [2014] SLT (Sh Ct) 80.

4    (1855) 5 E & B 248, 24 LJQB 327, affd (1856) 6 E & B 327, 25 LJQB 317.

5    [1968] 1 QB 549, [1967] 3 All ER 98.

**[360]–[365]**

This section and its forebears long predate the First Directive[1], but it resembles Art 8 of that Directive, under which registration of the particulars of the directors[2] constitutes 'a bar to any irregularity in their appointment being relied upon as against third parties'.The First Directive has now been repealed and replaced by Directive 2017/1132. Article 8 of this Directive replicates Art 8 of the First Directive.

1    Council Directive 68/151/EEC OJ L65, 13.3.68; OJ Special Ed 86(1) pp 41–45.

2    See CA 1985, ss 42(1)(c), 288(2) and 711(1)(c).

**[366]**

As against the director himself the section may render his acts as director valid[1].

1    *York Tramways Co v Willows* (1882) 8 QBD 685, 51 LJQB 257.

**[367]**

If absence of notice to the contrary be rightly taken to be of the essence[1], it follows, as has been held, that while the section applies to acts done before the invalidity of the appointment is shown[2], yet when a defect has been discovered, it does not give validity to subsequent acts[3]. And the same has been held where the person dealing with the company has been put on inquiry as to the validity of the invalid appointment[4].

1    As it undoubtedly is in cases to which the principle in *Royal British Bank v Turquand* (1855) 5 E & B 248, 24 LJQB 327, affd (1856) 6 E & B 327, 25 LJQB 317.

2    *Hallows v Fernie* (1868) 3 Ch App 467, 473, 16 WR 873; *British Asbestos Co v Boyd Ltd* [1903] 2 Ch 439, 73 LJ Ch 31; and see *Murray v Bush* (1873) LR 6 HL 37, 53, 69, 80, 42 LJ Ch 586; *Newhaven Local Board v Newhaven School Board* (1885) 30 Ch D 350, 34 WR 172.

3    *Re Bridport Old Brewery Co* (1867) 2 Ch App 191, 15 WR 291; *Harben v Phillips* (1883) 23 Ch D 14, 27, 34, 31 WR 173; *Tyne Mutual Steamship Insurance Association v Brown* (1896) 1 Com Cas 345, 74 LT 283.

4    *Kanssen v Rialto (West End) Ltd* [1944] Ch 346, 357, [1944] 1 All ER 751, 756, CA; on appeal sub nom *Morris v Kanssen* [1946] AC 459, [1946] 1 All ER 586, the House of Lords declined to express a final view on this point; and see *B Liggett (Liverpool) Ltd v Barclays Bank Ltd* [1928] 1 KB 48, [1927] All ER Rep 451; *Craven-Ellis v Canons Ltd* [1936] 2 KB 403, [1936] 2 All ER 1066, CA. *Cf Abdelmamoud v The Egyptian Association of Great Britain Ltd* [2015] EWHC 1013 (Ch), [2015] Bus LR 928.

**[367.1]**

Section 161(1) generally operates to validate unauthorised actions by a person acting as a director in favour of those dealing with a company. If a person dealing with the company chooses not to invoke s 161 because the act done by a person who is acting as a director is hostile to him (such as causing the company to bring legal proceedings against him) that act will not be validated by s 161(1): see Mark Anderson QC obiter in *Aidiniantz v The Sherlock Holmes International Society Ltd* [2016] EWHC 1392 at [61].

## INTERNAL EFFECT

### [368]

In making calls[1], and in like matters of internal administration, acts done by persons purporting to act as directors, but who are not such in fact on account of some fundamental defect in their appointment[2], are not binding on the shareholders. Those are cases in which a company is seeking to enforce against a member duties purporting to be imposed upon him by persons to whom he and his co-shareholders have never delegated the authority of imposing such duties.

[1]  *Howbeach Coal Co Ltd v Teague* (1860) 5 H & N 151, 29 LJ Ex 137; doubted in *York Tramways Co v Willows* (1882) 8 QBD 685, 51 LJQB 257; and criticised in *Dawson v African Consolidated Land Trading Co* [1898] 1 Ch 6, 67 LJ Ch 47, CA; see *Re London and Southern Counties Freehold Land Co* (1885) 31 Ch D 223, 55 LJ Ch 224; *Boschoek Pty Co Ltd v Fuke* [1906] 1 Ch 148 at 162, 75 LJ Ch 261, in forfeiting shares (*Garden Gully United Quartz Mining Co v McLister* (1875) 1 App Cas 39, 24 WR 744).

[2]  See *Dawson v African Consolidated Land Trading Co* [1898] 1 Ch 6 at 13, 67 LJ Ch 47, CA.

### [369]

But this section may cover the point and validate the acts of the director not only as between the company and outsiders, but as between the company and the members or the members inter se[1]. Thus, where a call was made by directors who had been appointed at a meeting of which insufficient notice had been given[2], and where a call was made by directors one of whom had for a short time been disqualified but had afterwards regained his qualification[3], shareholders were prevented from setting up the irregularity as a defence to action for the calls.

[1]  *Dawson v African Consolidated Land Trading Co* [1898] 1 Ch 6 at 16, 67 LJ Ch 47, CA, where the defect was not proved to have been known to the directors when the call was made; *British Asbestos Co Ltd v Boyd* [1903] 2 Ch 439, 73 LJ Ch 31; *Channel Collieries Trust Ltd v Dover, St Margaret's and Martin Mill Light Rly Co* [1914] 2 Ch 506, 84 LJ Ch 28, CA overruling *Re Staffordshire Gas and Coke Co, ex p Nicholson* (1892) 66 LT 413; *Transport Ltd v Schonberg* (1905) 21 TLR 305; *Sneddon v MacCallum* [2011] CSOH 59 at [219] (obiter).

[2]  *Re Briton Medical, General and Life Assurance Association v Jones (2)* (1889) 61 LT 384.

[3]  *Dawson v African Consolidated Land Trading Co* [1898] 1 Ch 6 at 13, 67 LJ Ch 47, CA.

### [369.1]

A sole director involved in a transaction cannot invoke s 161 to validate the transaction which is invalid because of some defect caused by a breach of his duty to see that the affairs of the company are properly conducted[1].

[1]  See Mark Anderson QC obiter in *Aidinantz v Sherlock Holmes International Society Ltd* [2016] EWHC 1392 (Ch) at [59]–[60]; *Re Sprout Land Holdings Ltd (in administration)* [2019] EWHC 807 (Ch) at [5]–[6].

### [370]

While the section in proper circumstances validates the person's acts as if he held the office, it does not validate his tenure of the office, eg so as to entitle him to the remuneration attached to it[1]. But a managing director de facto may be able to recover on a quantum meruit in respect of specific professional services rendered[2].

[1]  *Re Allison, Johnson and Foster Ltd, ex p Birkenshaw* [1904] 2 KB 327, 73 LJKB 763.

[2]  *Craven-Ellis v Canons Ltd* [1936] 2 KB 403, [1936] 2 All ER 1066, CA distinguished on this point in *Guinness plc v Saunders* [1990] 2 AC 663 at 693, [1991] 2 WLR 324 at 335, HL, per Lord Templeman; contrast *Re Richmond Gate Property Co Ltd* [1964] 3 All ER 936, [1965] 1 WLR 335.

**SECTION 161(2)**

**[371]–[372]**

The words now in CA 2006, s 161(2) were transferred on the 1985 consolidation from the 1948 predecessor of CA 2006, s 160 to CA 1985, s 285, the direct predecessor of CA 2006, s 161. Notwithstanding the decision in *Morris v Kanssen*[1] and that by the terms of CA 2006, s 160(2)[2] an appointment of a director by a resolution moved in contravention of that section is void, the acts of a director so appointed are validated by these words.

[1]    [1946] AC 459, [1946] 1 All ER 586.
[2]    See **[307]** ff.

**LIABILITY OF DE FACTO DIRECTOR FOR OFFENCES COMMITTED BY A COMPANY**

**[373]**

A person purporting to act in the capacity of a director or manager may be held liable for default on the part of the body corporate in respect of which he is acting[1].

[1]    See also CA 2006, s 1121 and *R v Lawson* [1905] 1 KB 541, 69 JP 122. Liability need not arise only under CA 2006, s 1121(2)(b), but in any case where the court holds that a director (whether de jure or otherwise) is a director for the purposes of the rule in question.

**INDOOR MANAGEMENT**

**[374]**

Outsiders are bound to know what Lord Hatherley called the 'external position of the company'[1]; but are not bound to know its 'indoor management'. If persons are held out as, and act as, directors, and the shareholders do not prevent them from doing so, outsiders are entitled to assume that they are directors, and, as between the company and such outsiders, the acts of such directors de facto will bind the company[2].

[1]    *Mahony v East Holyford Mining Co* (1875) LR 7 HL 869 at 893, [1874–80] All ER Rep 427.
[2]    *Mahony v East Holyford Mining Co* (1875) LR 7 HL 869, [1874–80] All ER Rep 427; *Gloucester County Bank v Rudry Merthyr Steam and House Coal Colliery Co* [1895] 1 Ch 629, 64 LJ Ch 451; *cf Re Bank of Syria, Owen and Ashworth's Claim, Whitworth's Claim* [1900] 2 Ch 272; on appeal [1901] 1 Ch 115, CA; *Duck v Tower Galvanizing Co* [1901] 2 KB 314, 70 LJKB 625; see also *Davies v R Bolton & Co* [1894] 3 Ch 678, 63 LJ Ch 743, where a special article provided that, notwithstanding irregularities, the instrument should bind the company. Contrast *Premier Industrial Bank Ltd v Carlton Manufacturing Co and Crabtree Ltd* [1909] 1 KB 106, 78 LJKB 103.

**[375]**

A stranger[1] dealing with a company has a right to assume, as against the company, that all matters of internal management have been duly complied with[2]. And, therefore, where a person effected at the office of an insurance company a policy, which was signed by three persons who were acting directors de facto, although not directors de jure, and sealed with what purported to be the company's seal, it was held that the policy was binding on the company[3]; and where the directors had by the articles power to fix their quorum, a third party was entitled to assume that a proper quorum had attended to complete an instrument which purported to be duly executed by the company[4]. And where the company's bankers received from the company's office a formal notice signed by the 'secretary' that they were to pay cheques signed by 'either two of the following three directors' they were entitled to pay on cheques so signed although no directors or secretary had really ever been appointed[5].

[1]    Quaere whether in some cases a director of the company may for this purpose be a 'stranger': *Hely-Hutchinson v Brayhead Ltd* [1968] 1 QB 549, [1967] 3 All ER 98. Roskill J, who rested his decision on ostensible authority, thought that the plaintiff was acting in the transaction as an individual and not as a director and was therefore not affected with

**[375]** Companies Act 2006, Part 10, s 161

constructive knowledge that the chairman had no actual authority to enter into the transaction on behalf of the company. The Court of Appeal unanimously held that the chairman had actual authority so that the point did not arise, but Lord Denning MR, at pp 583–584, thought that in certain cases a director could rely on a co-director's ostensible authority.

2   *Royal British Bank v Turquand* (1855) 5 E & B 248, 24 LJQB 327, affd (1856) 6 E & B 327, 25 LJQB 317; *Totterdell v Fareham Blue Brick and Tile Co Ltd* (1866) LR 1 CP 674, 35 LJCP 674; *Re Romford Canal Co* (1883) 24 Ch D 85, 52 LJ Ch 729; *Gloucester County Bank v Rudry Merthyr Steam and House Coal Colliery Co* [1895] 1 Ch 629, 64 LJ Ch 451; *Re Hampshire Land Co* [1896] 2 Ch 743, 65 LJ Ch 860; *Montreal and St Lawrence Light and Power Co v Robert* [1906] AC 196 at 222, 75 LJPC 33, PC; *Morris v Kanssen* [1946] AC 459, [1946] 1 All ER 586, HL.

3   *Re County Life Assurance Co* (1870) 5 Ch App 288, 39 LJ Ch 471; but see *Wandsworth and Putney Gas-Light and Coke Co v Wright* (1870) 18 WR 728, 22 LT 404, where the third party was the solicitor to the company and had notice.

4   *Gloucester County Bank v Rudry Merthyr Steam and House Coal Colliery Co* [1895] 1 Ch 629, 64 LJ Ch 451.

5   *Mahony v East Holyford Mining Co* (1875) LR 7 HL 869 at 893, [1874–80] All ER Rep 427. Secus if there be constructive notice: *Irvine v Union Bank of Australia* (1877) 2 App Cas 366 at 379, 46 LJPC 87, PC.

**[376]**

In *Clay Hill Brick and Tile Co Ltd v Rawlings*[1] a member of the public dealing in good faith with a de facto managing director was held to be entitled to assume that the latter had authority to receive on the company's behalf payment in cash of sums due to the company for goods sold, and that a cheque drawn in favour of the managing director personally and cashed by him was tantamount to a payment to him of cash and so was good payment to the company. As against the director himself the section may render his acts as director valid[2].

1   [1938] 4 All ER 100, 82 Sol Jo 909.
2   *York Tramways Co v Willows* (1882) 8 QBD 685, 51 LJQB 257.

**[376.1]**

The indoor management rule does not permit a third party to circumvent the normal rules of agency. It cannot be used to create authority where none otherwise exists. It merely entitles an outsider in the absence of anything putting him on inquiry, to presume regularity in the internal affairs of the company when dealing with a person who has apparent authority from the company. It is therefore not enough that there is a provision in a company's constitution permitting delegation to the purported agent. The third party must establish independently that the person they dealt with had apparent authority[1]. This requires that the company, by a representation traceable back to an authorised officer, has held out the agent as having authority. Only then is the third party entitled to assume that any procedures set out in the company's constitution or other public documents governing the delegation of power to the agent have been complied with[2].

1   Sargant LJ in *Houghton & Co v Nothard, Lowe and Wills Ltd* [1927] 1 KB 246, at p 266; *Northside Developments Pty Ltd v Registrar General* [1990] 170 CLR 146, 93 ALR 385 cited with approval by Lord Neuberger in the Court of Final Appeal of Hong Kong in *Chamkat (Mahachon) v Akai Holdings Ltd (in liq)* [2010] HKFCA 64 at [59] and *East Asia Co Ltd v PT Satria Tirtatama Energindo (Bermuda)* [2019] UKPC 30 at [62]–[65].

2   *Business Mortgage Finance 6 plc v Roundstone Technologies Ltd* [2019] EWHC 2917 at [48]–[57].

**[377]**

### 161A  Alternative method of record-keeping

Sections 162 to 167 must be read with sections 167A to 167E (which allow for an alternative method of record-keeping in the case of private companies).

---

**AMENDMENT**

**[378]**

This section was inserted by the Small Business, Enterprise and Employment Act 2015, s 94, Sch 5, Pt 1, paras 5, 6 as from 30 June 2016: see SI 2016/321, reg 6(c).

**GENERAL**

**[379]–[400]**

Sections 167A–167E give private companies the option to put information which would otherwise be required to be kept in the company's own register of directors and register of directors' residential addresses on the register kept by the registrar at Companies House, thereby dispensing with the need for the company to keep its own registers in relation to these matters.

---

*Register of directors, etc*

**[401]**

### 162  Register of directors

(1)  Every company must keep a register of its directors.

(2)  The register must contain the required particulars (see sections 163, 164 and 166) of each person who is a director of the company.

(3)  The register must be kept available for inspection—

    (a)    at the company's registered office, or

    (b)    at a place specified in regulations under section 1136.

(4)  The company must give notice to the registrar—

    (a)    of the place at which the register is kept available for inspection, and

    (b)    of any change in that place,

unless it has at all times been kept at the company's registered office.

(5)  The register must be open to the inspection—

    (a)    of any member of the company without charge, and

    (b)    of any other person on payment of such fee as may be prescribed.

(6)  If default is made in complying with subsection (1), (2) or (3) or if default is made for 14 days in complying with subsection (4), or if an inspection required under subsection (5) is refused, an offence is committed by—

    (a)    the company, and

    (b)    every officer of the company who is in default.

For this purpose a shadow director is treated as an officer of the company.

**EXHIBIT T**

506                    CHANCERY DIVISION.                [1914]

C. A.      CHANNEL COLLIERIES TRUST, LIMITED · v. DOVER,
1914           ST. MARGARET'S AND MARTIN MILL LIGHT
July 8, 9.     RAILWAY COMPANY.

[1913 C. 2951.]

*Company—Directors—Casual Vacancy—Election by Sole Remaining Director—*
*Qualification—Appointment of Unqualified Persons—Irregular Allotment*
*—Validation of Irregular Acts—Companies Clauses Consolidation Act,*
*1845 (8 & 9 Vict. c. 16), ss. 14—17, 81, 85, 89, 90, 92, 99.*

The defendant company was incorporated by an Order, confirmed by
the Board of Trade, under the Light Railways Act, 1896. This Order
incorporated the provisions of the Companies Clauses Consolidation Act,
1845, and provided, inter alia, that the number of directors should be
five, but that the company might vary the number if it was not less
than three nor more than seven; that the qualification of a director
should be not less than 250*l.* in the share capital; that the quorum at
a directors' meeting should be three, but that if the number was
reduced to three the quorum should be two; and that P., J., and C.,
and two other persons nominated by them, should be the first directors.
P., J., and C. never nominated any other directors, but allotted to each
of themselves his qualifying shares, and one share each to four other
persons. At the first ordinary meeting the number of directors was
reduced to three, and P., J., and C. were continued in office. P. and C.
afterwards transferred their qualification shares to the plaintiff com-
pany, and thereby ceased to be directors. J. subsequently appointed
X. and Y. to be directors. At the time of their appointment neither of
them held the necessary qualification shares, but at the same meeting
J., X., and Y. (acting in the bona fide belief that the appointment of
X. and Y., subject to their at once acquiring their qualification shares,
was good) purported to allot such shares to them. In an action by the
plaintiff company against the railway company and J., X., and Y. :—

*Held* by the Court of Appeal, affirming the decision of Sargant J.
[1914] 1 Ch. 568, that although the power to elect directors in the case
of casual vacancies was by s. 89 of the Act of 1845 given to " the
remaining directors," it was unnecessary to the exercise of that power
that there should be in office the number of directors prescribed by the
Order, and therefore that J. had power to elect new directors; that the
holding of the required qualification shares was a condition precedent
to the election of a director, and therefore that X. and Y. had not been
duly appointed and could not act as directors; but that the irregular
allotment by J., X., and Y. of the qualification shares to X. and Y. was
an act done by de facto directors, which was validated by s. 99 of the
same Act, the test being whether the directors in making the allotment
had acted bona fide, which was not disputed in this case.

Provisions like s. 99 are to be construed broadly as between

companies and their members as well as between companies and outsiders.

*Dawson* v. *African Consolidated Land and Trading Co.* [1898] 1 Ch. 6 and *British Asbestos Co.* v. *Boyd* [1903] 2 Ch. 439 followed.

*In re Staffordshire Gas and Coke Co.* (1892) 66 L. T. 413 overruled.

APPEAL from a decision of Sargant J. (1)

The defendant company was incorporated by an Order confirmed by the Board of Trade in 1909 under the Light Railways Act, 1896 (59 & 60 Vict. c. 48). This Order incorporated the provisions of the Companies Clauses Act, 1845, and provided, inter alia, that the number of the directors of the company should be five, but that the company might vary that number so that it was not less than three nor more than seven; that the qualification of a director should be the possession in his own right of not less than 250*l.* in the share capital of the company; that the quorum at a directors' meeting should be three, but if the number of directors was reduced to three the quorum was to be two; and that the first directors should be Sir Weetman Dickinson Pearson (afterwards created Lord Cowdray), Sir John Jackson, Sir William Henry Crundall, and two other persons to be nominated by them. The capital of the company was to be 60,000*l.* in 6000 shares of 10*l.* each.

On July 20, 1910, the three original directors allotted to each of themselves twenty-five shares in the company, and to four other persons one share each. The same three original directors never nominated any other directors under the provisions of the Order, and at a general meeting held on July 20, 1910, the following resolution was passed:—" That the number of directors be reduced to three, and that the three following directors continue in office : The Right Hon. Lord Cowdray (referred to in the Order as Sir Weetman Dickinson Pearson), Sir John Jackson, M.P., and Sir William Henry Crundall." There were present at this general meeting the three original directors and two out of the four other shareholders. The three original directors continued in office until April 21, 1913, when Lord Cowdray and Sir W. H. Crundall transferred their shares to the plaintiff company, which was registered as the holder of the fifty

*C. A.*

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

(1) [1914] 1 Ch. 568.

C. A.

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.
——

shares so transferred. The transferors thus ceased to be directors.

On July 29, 1913, Sir John Jackson, the sole remaining director, purported to fill up the vacancies on the board by appointing John Proffitt and Arthur Jackson to be directors of the defendant company. Proffitt was then the holder of one share, but subsequently at the same meeting Sir John Jackson, Proffitt, and A. Jackson purported to allot twenty-four shares to Proffitt and twenty-five shares to A. Jackson. This was done in the bona fide belief that an appointment of directors subject to their at once acquiring their qualification shares was good.

On August 26, 1913, the plaintiff company transferred twenty-five of their fifty shares in the defendant company to R. T. Smith and the other twenty-five to E. O. Brown, but at the date of the motion below referred to these transfers had not been registered.

In an action by the Channel Collieries Trust, and Smith and Brown (suing on behalf of all the shareholders in the defendant company except Sir John Jackson), against the defendant company, Sir John Jackson, Proffitt, and A. Jackson, the plaintiffs moved for an injunction to restrain Proffitt and A. Jackson from acting as directors or shareholders in respect of the shares purported to have been allotted to them ; an order rectifying the register of shareholders (*a*) by removing therefrom the names of Proffitt and A. Jackson and (*b*) by entering therein the names of Smith and Brown ; an injunction to restrain Sir J. Jackson, as the sole director, from purporting to act as a board of directors of the defendant company except for the purpose of filling up vacancies on the board ; an order on Sir J. Jackson to fill up the vacancies on the board by appointing Smith and Brown as directors ; and an order on Sir J. Jackson to convene a meeting of the shareholders of the defendant company to regularize its constitution and proceedings.

Upon the hearing of the motion Sargant J., after deciding a question as to the validity of the resolution passed at the general meeting on July 20, 1910, whereby the number of directors was reduced to three (as to which there was no appeal), held (1.) that although the power to elect directors in the case of casual

vacancies was, by s. 89 of the Act of 1845, given to "the remaining directors," it was unnecessary, for the exercise of the power, that there should be in office the number of directors prescribed by the Order, and, therefore, that Sir J. Jackson had power to elect new directors; (2.) that by s. 85 of the Act of 1845 the holding of the required qualification shares was a condition precedent to the election of a director, and, therefore, that Proffitt and A. Jackson had not been duly appointed and could not act as directors; (3.) that the irregular allotment of the shares to Proffitt and A. Jackson was validated by s. 99 of the Act of 1845; (4.) that Smith and Brown were entitled to have the register of shareholders rectified by inserting their names as holders of the shares transferred to them ; and (5.) that Sir J. Jackson must be ordered to convene a general meeting at an early convenient date.

Against this decision the plaintiffs appealed.   The only points argued upon the appeal were whether Sir J. Jackson as sole remaining director had power to elect Proffitt and A. Jackson as directors, and, assuming that he had power to do so, whether the holding of the required qualification was a condition precedent to their election as directors, and further whether the allotment to Proffitt and A. Jackson of their qualification shares was a good allotment having regard to s. 99 of the Act of 1845, which provides that " all acts done by any meeting of the directors, or of a committee of directors, or by any person acting as a director, shall, notwithstanding it may be afterwards discovered that there was some defect in the appointment of any such directors or persons acting as aforesaid, or that they or any of them were or was disqualified, be as valid as if every such person had been duly appointed and was qualified to be a director."

*Romer, K.C.*, and *Roope Reeve*, for the appellants, repeated the arguments urged by them in the Court below in support of their contention upon the above mentioned points, and cited in addition the following cases : *In re Alma Spinning Co.* (1) and *In re Allison & Co.* (2)

(1) (1880) 16 Ch. D. 681.                    (2) [1904] 2 K. B. 327.

C. A.

1914.

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

C. A.
1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

*Martelli, K.C.,* and *H. S. Preston,* for the respondents, were not called upon.

LORD COZENS-HARDY M.R.  This appeal raises a point of general importance to companies, whether under the Companies Acts or parliamentary companies governed by the Companies Clauses Act, 1845.  The facts can be very shortly stated. The defendant company is a light railway company; it was incorporated in August, 1909.  There were three directors, Sir W. H. Crundall, Lord Cowdray, and Sir John Jackson.  The number of directors was originally to be five, but that number was properly reduced to three, of which two were to form a quorum. There was a qualification of shares for the directors.  For reasons which do not concern us Lord Cowdray and Sir W. H. Crundall were minded to retire: they transferred all their shares and ceased to be eligible to act as or to be directors of the company. Sir John Jackson thus became sole director.  What was his power?  Under the Companies Clauses Act, 1845, as continuing director, he had power to fill up the vacancies on the board. The fact that a person exercising that power does not constitute a quorum is not really a relevant matter.  The generality of the language used in s. 99 is so clear that it is impossible for us to overlook it.  Any other view on that point would paralyse many a company.  It is very common indeed to have a company the directors of which are merely the quorum, and therefore, unless there is a power for the continuing director or directors to fill up a vacant place in the directorate, the company would be at a deadlock, and nothing could be done except by the intervention of the Court in the manner suggested by Mellish L.J. in *Macdougall* v. *Gardiner* (1), an intervention which seems to me rather difficult to justify except on the ground of absolute necessity.  I think, therefore, that Sir John Jackson had power to fill up the vacancy caused by the retirement of his two colleagues.  That does not get over the difficulty.  Assume he had the power, he could only appoint persons who had the requisite qualification as shareholders. What he did on July 29 of last year was this.  He

(1) (1875) L. R. 10 Ch. 606.

purported to appoint Proffitt and Arthur Jackson to be
directors, and at the same meeting, or subsequently on the
same day, the necessary qualification shares were allotted to
these two. That was not, in my opinion, sufficient to make
Proffitt and Arthur Jackson directors, because the subsequent
obtaining of qualification shares did not validate the original
appointment. What happened was this. All the parties con-
cerned, that is to say, Sir John Jackson, Proffitt, and A. Jackson,
acting, as the learned judge has found, in perfect good faith,
were not aware of the invalidity of the appointment by reason of
the want of qualification, and they honestly believed that it was
sufficient if contemporaneously with, although in point of time
immediately after, their appointment they obtained the qualifying
shares. What is the principle which ought to be applied in a case
like that ? The relevant section is s. 99 of the Companies Clauses
Act, 1845. That section, or a section in equivalent terms, has been
construed by this Court, and by Farwell J. as a judge of first in-
stance, in a manner which is binding upon us. It is binding so far
as it is a decision of the Court of Appeal whether we agree with it
or not, and so far as it is a decision of Farwell J. it would be followed
by us unless for good reason we came to the conclusion that it was
wrong. It has been held by the Court of Appeal in *Dawson* v.
*African Consolidated Land and Trading Co.* (1) that s. 99 is not
limited to dealings between the company and outsiders, but that
it applies also to dealings between the company and persons who
are inside the company. I am using a neutral word as far as I
can. It has also been held by Farwell J. that the words " not-
withstanding it may be discovered afterwards that there was some
defect " do not mean merely notwithstanding that the facts which
shew the defect were afterwards made known, but that they mean
notwithstanding that the defect itself, the defect arising from the
facts, was afterwards discovered. That seems to me to be, if I
may respectfully say so, plainly right. That is the view which
Farwell J. in terms adopted in the case of *British Asbestos
Co.* v. *Boyd* (2), and he applied it to the case in which the
defendants to the action were directors themselves who were
relying upon, acting upon, and claiming the benefit of s. 99, or

C. A.

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

Lord
Cozens-
Hardy M.R.

(1) [1898] 1 Ch. 6.            (2) [1903] 2 Ch. 439.

. CHANCERY DIVISION.          **[1914]**

C. A.

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED

v.

DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

Lord
Cozens-
Hardy M.R.

the equivalent section under the Companies Act, 1862. (1)  It has
been argued for the appellants with great force that this is a
clause which ought not to be relied upon by persons who were
aware of the facts, although not aware of the legal conclusions
resulting from those facts, because such persons must be
taken to know the law, and it would be wrong that they should
take the benefit of s. 99.   I am quite unable to accept that
view.  It seems to me that the question may be put very
shortly: Aye or No, were the parties in this transaction acting
in 'good faith ?  If they were, s. 99 ought to be available for all
parties, including the directors themselves.  If there is a lack of
good faith, then of course the Court will not allow those who are
lacking in good faith to take the benefit of it.  Our attention has
been called to a decision of Kekewich J. in *In re Staffordshire Gas
and Coke Co.* (2), in which he took the view that the section applied
only where the parties had no notice of the actual defect in point
of fact.  Sargant J. passed that case by with the remark that it
was before the decision of this Court in *Dawson* v. *African
Consolidated Land and Trading Co.* (3), and, of course, before
the decision of Farwell J. in *British Asbestos Co.* v. *Boyd.* (4)
I cannot but conclude, if the decision of the Court of Appeal in
*Dawson* v. *African Consolidated Land and Trading Co.* (3) had
been before the judge, that he would have taken a different view.
So far as I am aware the decision of the learned judge in
the *Staffordshire Case* (2) has never before been brought to the
attention of the Court.  It has never been followed, and I feel
bound to say that I think it is wrong.  If there is good faith,
and I emphasize that, the mere fact that the person claiming
the benefit of the section had notice of the existence of the facts
which led to the disability is not sufficient to disentitle him
to rely upon it if he can honestly say " I was not aware of the
defect and the consequences of the facts I knew, I was not aware
of the disqualification which now exists."  That, I think, is
really the point of the case.   Lindley M.R. in *Dawson* v.
*African Consolidated Land and Trading Co.* (3) points out very

(1) Sect. 67 [reproduced in s. 74
of the Companies (Consolidation)
Act, 1908 (8 Edw. 7, c. 69)].

(2) 66 L. T. 413.
(3) [1898] 1 Ch. 6.
(4) [1903] 2 Ch. 439.

forcibly that some such provision should apply to matters of this kind. The language of the section enables us to give it the wide interpretation which this Court and Farwell J. have attributed to it, and I should be sorry indeed that we should be tempted by the able argument we have heard to narrow the construction of that section, to narrow its highly beneficial and proper application in the manner we have been asked to. I think Sargant J.'s judgment in this case was perfectly right, and in my opinion the appeal should be dismissed with costs.

C. A.

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

SWINFEN EADY L.J. I agree. In this case the company had fixed the quorum of directors at two, and the number of directors had been limited to three. It was further provided that the qualification of directors should be 250*l.*, that is to say, holding 25 shares of 10*l.* each. There were for a time three directors, Sir Weetman Pearson, afterwards Lord Cowdray, Sir John Jackson, and Sir William Crundall. Lord Cowdray and Sir William Crundall transferred their shares, and thereupon ceased to be directors, so that Sir John Jackson was the sole director. Being the sole director, he proposed to appoint two additional directors, and on July 29 there was a board meeting at which he was present and took the chair. The minute of that meeting runs: " Sir John Jackson as the sole remaining director appointed Mr. Arthur Jackson and Mr. John Proffitt as directors in place of Lord Cowdray and Sir William Crundall." Then the minute proceeds: " Mr. Arthur Jackson and Mr. John Proffitt accepted the office of director, Mr. Arthur Jackson applied for an allotment of twenty-five shares of the company, and Mr. John Proffitt for an allotment of twenty-four shares of the company, the latter making, with the one share already held by Mr. Proffitt, his qualification of twenty-five shares: the above shares were allotted to them respectively in accordance with their applications." The first question which arises is whether Sir John Jackson as the sole remaining director had power to appoint additional directors ; in other words, whether he had power to fill up these casual vacancies which had occurred. The argument was that as there was less than a quorum of the board

C. A.

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

Swinfen
Eady L.J.

Sir John Jackson could not do so at all; it required at least two, and there was only one remaining director. In my opinion that is covered by s. 89 of the Companies Clauses Act, 1845, when read in connection with the interpretation clause. The interpretation clause, s. 3, says that in the Act the following words shall have the several meanings assigned to them unless there be something in the subject or the context repugnant to such construction; and then, " words importing the plural number only shall include the singular number." Then s. 89 provides : " If any director die or resign, or become disqualified or incompetent to act as a director, or cease to be a director by any other cause than that of going out of office by rotation as aforesaid, the remaining directors,"—in the plural—" if they think proper so to do, may elect in his place some other shareholder, duly qualified, to be a director." I think that the context requires that the words " the remaining directors " should include the case of a remaining director. It is obvious that the number of the board may, by death or resignation or otherwise, be so reduced that it may be below the quorum, as well as that there may be vacancies occurring in the board whilst still leaving a quorum, but in either case it is necessary or proper that the vacancy should be filled up. In my opinion the necessity of the case requires that " the remaining directors " should be read as including the case of a remaining director, so that if and so long as there is any remaining director he may proceed to fill up the board by appointing persons when casual vacancies occur. For these reasons I am of opinion that it was open to Sir John Jackson as the sole remaining director, under s. 89, to appoint duly qualified persons to be directors in the place of the two who had ceased to be members of the board. Then a slip was made. The appointed persons were not at the moment of the appointment qualified. They applied for and obtained their qualification, or thought they obtained their qualification, at the same meeting. It is manifest, it is not disputed, that a slip was made, and that in order for them to be validly appointed directors they must have had a qualification at the date of appointment, but nevertheless, acting in good faith, they accepted the shares and they acted and

continued to act as directors. The question is whether their acts
as de facto directors are protected by s. 99 of the Companies.
Clauses Act, 1845. It has been said that in substance the law
is stated in a very short passage in Buckley on the Companies
Acts, 9th ed. p. 169, where it is summed up in these words:
it is the note to s. 74 of the new Act: "Endangering accuracy
for the sake of brevity, it may be said that the effect of this section
is that, as between the company and persons having no notice to
the contrary, directors &c. de facto are as good as directors &c.
de jure." That is the note to s. 74 of the Companies (Consolidation)
Act, 1908, but it is equally applicable to s. 99, which applies to com-
panies governed by the Companies Clauses Act, 1845. It is now
settled that this section protects acts both with regard to insiders
and outsiders, and having regard to the law as laid down by the
Court of Appeal in *Dawson* v. *African Consolidated Land and
Trading Co.* (1), and to the view subsequently of Farwell J., with
which I must say I entirely concur, I think that it is a beneficial
construction to put upon the section. Common sense really
requires that there shall be some provision giving legal effect
to acts in respect of which there is a technical informality
because some slip has been made, where the acts have been done
in good faith and where the slip has occurred because the parties
have not had present to their minds the legal difficulties in the
way of doing what they honestly think they are entitled to do.
In most of the cases that arise I think that the directors or persons
acting as directors know the facts of the case, and of course are
presumed to know the articles of the company, but it is not
present to their minds that they are not carrying out the matter
in a properly formal way. Here it does not appear to have been
present to the minds of the two new directors that it was
necessary for them to have had their qualification shares at the
time of their appointment, and that it would not validate
their appointment if they acquired them a moment afterwards.
These matters were done at one and the same board meeting.
I think that the judgment of Farwell J. in *British Asbestos
Co.* v. *Boyd* (2) is not only good law but very good sound

C. A.

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

Swinfen
Eady L.J,

(1) [1898] 1 Ch. 6.                    (2) [1903] 2 Ch. 439.

CHANCERY DIVISION. **[1914]**

C. A.

1914

CHANNEL
COLLIERIES
TRUST,
LIMITED
*v.*
DOVER, ST.
MARGARET'S
AND MARTIN
MILL LIGHT
RAILWAY.

common sense, and I entirely concur in it and in the judgment already pronounced by the Master of the Rolls.

PICKFORD L.J. I am of the same opinion. I do not think it necessary to add anything.

Solicitors: *Birkbeck, Yeo & Co.; Batten, Proffitt & Scott.*

G. A. S.

C. A.

1914

*July* 17,
20, 30.

## STEPHENS *v.* JUNIOR ARMY AND NAVY STORES, LIMITED.

[1913 S. 3381.]

*Landlord and Tenant — Lease—Covenant to build — Covenant to repair — Covenant to deliver up—Continuing Breach—Waiver—Re-entry—Measure of Damages.*

Where there is an express covenant to build, both as to time and mode of building, no further covenant to build can be implied from a covenant to repair.

Dictum of Stirling J. to the contrary in *Jacob* v. *Down* [1900] 2 Ch. 156 disapproved.

Waiver of forfeiture for not building in accordance with such a covenant carries with it a waiver of forfeiture for breach of a covenant to repair the said buildings if and when erected.

Decision of Joyce J. reversed.

APPEAL from a decision of Joyce J.

The following statement of facts is taken substantially from the judgment of Lord Cozens-Hardy M.R.

By a lease dated September 20, 1901, and made between the plaintiff of the one part and the defendants of the other part, the plaintiff demised unto the defendants for a term of ninety-nine years from June 24, 1901, certain hereditaments in the parish of Shipton Bellinger in the county of Hants at the yearly rent during the first five years of the said term of 6*l.* and thereafter of 50*l.* and subject to the covenants on the part of the lessee and the conditions therein contained.

The lease contained (amongst other provisions) covenants on the part of the defendants in the following terms :—" The

**EXHIBIT U**

6                          CHANCERY DIVISION.              [1898]

C. A.        an order at all, to exercise the greatest caution in doing so.  In
1897         the present case, as bankers usually balance their customers'
POLLOCK      accounts half-yearly, the plaintiff, in order to ascertain the
*v.*         balance of the company's account on December 2, 1895, must
GABLE.
             investigate the account from the time when the last previous
Chitty L.J.  balance was struck—that is, for about five months.   He could
             look at the names and the various items, and so in fact would
             obtain discovery of all the receipts and payments of the com-
             pany during that period.   In my opinion, s. 7 was not intended
             to be used for any such purpose; and I agree that it would
             inflict great injustice on third persons if it were to be worked
             in such a way as to support the order under appeal.

             Solicitors for appellant: *Cheston & Sons.*
             Solicitor for plaintiff: *H. F. Pollock.*
             Solicitors for company: *Wilson, Bristows & Carpmael.*

                                                                H. C. J.

C. A.        DAWSON *v.* AFRICAN CONSOLIDATED LAND AND
1897                       TRADING COMPANY.
*Nov.* 10.
                              [1896 R. 1320.]

        *Company—Directors—Clause validating the Acts of de facto Directors.*

             No. 114 of the articles of a company provided that all acts done at any
        meeting of directors or by any person acting as a director should, notwith-
        standing that it should be afterwards discovered that there was some
        defect in the appointment of such directors or persons acting as aforesaid,
        or that they or any of them were disqualified, be as valid as if every such
        person had been duly appointed and was qualified to be a director.  T., N.,
        and S., the de facto directors, made a call, payment of which was resisted
        by some of the shareholders on the ground that T., N., and S. were not de
        jure directors.  To shew that they were not, various irregularities were
        alleged, the most important of which was that N. had according to the
        articles vacated his office by parting with all his shares.  After six days
        he acquired other shares sufficient for a qualification, and continued to act
        as director.  His co-directors, who had power to fill up the casual vacancy
        occasioned by his parting with his shares, did not formally reappoint him,
        but all along treated him as a director; and it did not appear that they ever
        knew that for six days he had not been a shareholder:—
             *Held,* by the Court of Appeal, that a clause such as art. 114 did not
        operate only as between the company and outsiders, but also as between

the company and its members, and was sufficient to cover such irregularities as those alleged, and that the call was valid.

*Howbeach Coal Co.* v. *Teague*, (1860) 5 H. & N. 151, considered.

T. was an undischarged bankrupt. One of the articles provided that a director should vacate his office if he became bankrupt:—

*Held*, that this did not prevent the appointment of a bankrupt to be a director.

Decision of Ridley J. reversed.

C. A.

1897

DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

THIS was an appeal by the defendants, Thompson, Nielsen, and Sanders, and the company, from an order of Ridley J. restraining the appellants until judgment or further order from forfeiting or declaring forfeited all or any portion of the shares held by the plaintiffs and the other shareholders; and from selling or allotting, or otherwise disposing of such shares or any of them; and from taking or continuing proceedings to recover the amount of an alleged call of 3s. on each share, which had been made or alleged to be made by Thompson, Nielsen, and Sanders; and from parting with any proceeds of the call money in their hands, or to be received under the call.

The company was registered on February 19, 1894. By clause (40.) of the articles shares might, in default of payment of calls after notice, be forfeited by a resolution of the directors to that effect. (90.) "The number of the directors shall be not less than three nor more than seven." (91.) "The first directors shall be appointed in writing by the subscribers to the memorandum of association or a majority of them." (92.) "The directors shall have power to appoint any other persons to be directors at any time before the ordinary general meeting to be held in the year 1896, but so that the total number of directors shall not at any time exceed the maximum fixed as above." (93.) "No person other than the first directors shall be qualified to be a director who is not the holder of shares of the company of the nominal value of 200*l.*" (95.) "The continuing directors may act notwithstanding any vacancy in that body, but so that if the number falls below the minimum above fixed the directors shall not, except for the purpose of filling a vacancy, act so long as the number is below the minimum." (96.) "The office of a director shall be vacated if he become bankrupt, or suspend payment, or compound with his creditors; if he be

8 .                                CHANCERY DIVISION.                        [1898] .

C. A.

1897

DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

found lunatic or become of unsound mind ; if he ceases to hold the required amount of shares to qualify him for office ; . . . ." Arts. 97 and 99 provided for the retirement of directors by rotation, and for the filling up of the vacant places by the company in general meeting.    (103.) " Any casual vacancy occurring among the directors may be filled up by the directors ; but any person so chosen shall retain his office only in rotation, and so long only as the vacating director would have retained the same if no vacancy had occurred."    (105.) " . . . . Until otherwise determined two directors shall be a quorum."

Art. 114 : " All acts done at any meeting of the directors or of a committee of directors, or by any person acting as a director, shall, notwithstanding that it shall be afterwards discovered that there was some defect in the appointment of such directors or persons acting as aforesaid, or that they or . any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a director."

On February 21, 1894, the subscribers to the memorandum duly elected Dr. Bradford, the defendant Sanders, and Griffiths to be directors.    On December 21, 1896, Griffiths died.    On December 30, 1896, Bradford and Sanders appointed Nielsen a director in his room.    No general meeting of the company was held in that year.    Bradford died on April 19, 1897, and on April 21 Sanders and Nielsen appointed the defendant Thompson in his room.    Two days afterwards the first general meeting was held, and approved of all the proceedings of the directors, including the appointment of Thompson, who at that meeting retired, and was reappointed.

Nielsen at the time of his appointment held the shares necessary for a qualification ; but on June 17, 1897, he transferred them all.    It did not appear whether his co-directors knew of this.    On the 23rd of the same month he acquired shares sufficient for a qualification ; and at a meeting of the board on June 24 he acted as director, but he never was formally reappointed.

Thompson, at the time of his appointment and of the meeting of shareholders on April 23, 1897, was an uncerti-

ficated bankrupt. There was no evidence as to whether his co-directors or the shareholders knew of this.

On June 30, 1897, the three directors, Thompson, Nielsen, and Sanders, passed a resolution for a call of 3s. per share. The plaintiffs, who were shareholders, commenced this action on behalf of themselves and the other shareholders, except the defendants, against the company, the directors, and Bifeldt, a promoter of the company, asking an injunction to the effect of the order appealed from, and also seeking to set aside certain agreements between the company and Bifeldt. Ridley J. having granted an interlocutory injunction as above, the company and directors appealed.

The ground of objection taken against the call was that there was no duly constituted board of directors when the call was made. Several irregularities were relied on as establishing this : (1.) That Sanders and Nielsen had no power to appoint Thompson on April 21, 1897 ; (2.) That Sanders ought to have retired in 1897, as being the director longest in office ; that he did not retire, and was not re-elected ; (3.) That the notice convening the meeting of April, 1897, ought to have stated that it was proposed to elect Thompson, the election of a director not in the place of one retiring by rotation being special business ; (4.) That Thompson, being an undischarged bankrupt, was disqualified to be a director ; (5.) That Nielsen vacated his office by the sale of his shares on June 17, 1897, and had never been reappointed. Only objections 4 and 5 were specifically noticed by the Court of Appeal. On the appeal motion it was also contended that the call was made for an improper purpose, namely, to repay the directors sums which they had paid to the promoters under the contracts which it was sought to set aside.

*Alexander*, Q.C., and *W. Higgins*, for the appeal. It was urged by the plaintiffs that Thompson was ineligible because he was an undischarged bankrupt. But the only qualification prescribed by art. 93 is that a person should be the holder of shares of the nominal value of 200l., not even saying " in his own right." Thompson had acquired his shares since his

C. A.

1897

DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

C. A.

1897

DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

bankruptcy, and they would not vest in the trustee, though he might take steps to lay hold of them—till he intervenes they belong to the bankrupt. The office is vacated by bankruptcy that the company may have an opportunity of determining whether they will keep a bankrupt as a director; but this cannot be construed as saying that a bankrupt cannot be appointed. As regards Nielsen he no doubt ceased to be a director by parting with his shares; but this was a casual vacancy which the other directors could fill up under art. 103. They, therefore, could reappoint him as soon as he acquired his new qualification. They never, it is true, made any formal appointment of him, but they treated him as a director; and it does not appear that they knew of his having been six days unqualified. But whatever irregularities there may have been in the appointment of directors are remedied by art. 114: *Briton Medical Life Association* v. *Jones* (1); *Newhaven Local Board* v. *Newhaven School Board* (2); Palmer's Company Precedents, 6th ed. p. 359.

*Bramwell Davis, Q.C.,* and *Stewart-Smith,* for the respondents. Nielsen vacated his office, and no appointment was made to fill up the vacancy. He therefore was not at the time of making the call a duly constituted director. The question is whether this was remedied by art. 114. Mr. Buckley, dealing with similar words in s. 67 of the Companies Act, 1862 (Buckley on the Companies Acts, 7th ed. p. 219), says: "Endangering accuracy for the sake of brevity, it may perhaps be said that the effect of the last sentence of this section and of the similar provision frequently found in articles of association is that, as between the company and persons having no notice to the contrary, directors, &c., de facto are as good as directors, &c., de jure." Here the clause is a limited one: it applies to a defect in the appointment of directors, but does not deal with the case of a director having vacated his office. The case of *Howbeach Coal Co.* v. *Teague* (3) shews that a rule of this nature only applies between the company and outsiders, not between the company and its members.

(1) (1889) 61 L. T. 384.          (2) (1885) 30 Ch. D. 350, 363.
(3) 5 H. & N. 151.

[LINDLEY M.R. referred to the remarks on that case in *York Tramways Co.* v. *Willows*. (1) ]

As to Thompson, his appointment is against the spirit if not the letter of art. 96. It is indeed against the letter, for an uncertificated bankrupt is in a constant state of suspending payment. If the contention of the appellants as to art. 114 is right, then three persons, each of whom knows that none of them are duly appointed directors, may meet and pass resolutions which will bind the company—even three strangers coming into the board room might do so.

LINDLEY M.R. This appeal is against an order of Ridley J. granting an injunction restraining the defendants from forfeiting shares and from selling or reallotting such shares, and from taking proceedings to recover money raised by calls. The ground upon which the motion was made before him was that there were irregularities in the appointment of the directors making the call, and that they therefore were not competent to act. Before us other grounds have been urged to which I will allude presently. Now, the various irregularities suggested when they come to be examined are nothing more than small irregularities. There is no radical defect in any one of the appointments. Take the best of the objections (I do not propose to allude to any of the others, because I think they are too insignificant)—take the best—the cases of Nielsen and Thompson. It appears that there were originally three directors appointed by the proper parties, the subscribers to the memorandum of association. Those three were Bradford, Sanders, and Griffiths. Nobody quarrels with their appointment. Bradford died on April 19, 1897; and on the 21st Mr. Thompson was appointed director in his place under an article which clearly authorized that appointment, subject to the point that he was an undischarged bankrupt. What I mean is this —that it was a casual vacancy which the other two directors had power to fill, and they filled it by appointing him. There was afterwards a meeting of the shareholders, and Mr. Thompson then retired and was re-elected. It was said that

*Margin:*
C. A.
1897
DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

(1) (1882) 8 Q. B. D. 685.

CHANCERY DIVISION.    [1898]

C. A.
1897

DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

Lindley M.R.

the shareholders did not know that he was an undischarged bankrupt, and our attention is called to a clause that a director vacates his appointment if he becomes bankrupt; but that clause does not apply to the facts with which we have to deal, and it appears to me to be perfectly competent for the shareholders, if they chose, to appoint Mr. Thompson. Mr. Nielsen was appointed in succession to Mr. Griffiths, who died in December, 1896. That was a correct appointment. Mr. Nielsen was a properly qualified director, and remained such till June 17, 1897, when it appears that he transferred all his shares, and for six days, from June 17 to June 23, he had no shares; so under the 96th of the articles of association he vacated his office. On June 23 he acquired other shares and became qualified. There was a meeting of the directors on June 24 at which he was present, and he acted as a director. Nielsen's parting with his shares caused a casual vacancy which the other two directors had power to fill up, and, although it is true that they did not go through the form of passing a resolution appointing him a director, they accepted him as a director, and they allowed him to act as one; and when this call which is impeached was made, namely, on June 30, 1897, it was made by Mr. Thompson, Mr. Sanders, and Mr. Nielsen; and Mr. Nielsen had then the requisite qualification for a director; so that this irregularity, which is supposed to upset everything that was done, is reduced to this: that two of the directors who might have passed a resolution appointing Mr. Nielsen did not go through that form, but acted with him as a duly appointed director. If that is not an irregularity in his appointment such as was intended to be cured by art. 114, I cannot conceive what irregularities were aimed at by that article.

Art. 114 is as follows : [His Lordship read the article.]

Now it is reducing that clause to a nullity to say that it does not apply to such trivial irregularities as those with which we have to deal here. But it is said that we must, under the stress of the case of the *Howbeach Coal Co.* v. *Teague* (1), hold that this article does not apply between the company and its members. I do not understand how the case of the *Howbeach*

(1) 5 H. & N. 151.

*Coal Co.* v. *Teague* (1) can be cited as an authority to the effect that such an article only applies to outsiders dealing bonâ fide with the company without notice.    Of course it applies to and covers all such transactions ; but I cannot find anything in the judgments in the case of *Howbeach Coal Co.* v. *Teague* (1) which warrants the contention that such a clause does not apply as between the company on the one side and the shareholders on the other side.    The case is intelligible up to a certain point ; and as to the rest of it, it is so reported that I confess I do not thoroughly understand it.    In that case, the directors who made the call had been improperly appointed by three out of seven of the subscribers to the memorandum of association, which was entirely wrong, and the Court held that the validity clause there, which was similar in its terms to art. 114 here, did not cure that radical defect in their appointment. That was the ratio decidendi, and that I follow perfectly well. .Then comes a part of the case which I do not follow with equal ease.    Granting that the appointment of these gentlemen was altogether wrong, as it obviously was, and granting that the validating clause there did not apply to make their appointment valid, I do not see myself that it necessarily follows that what they did, although they had been improperly appointed, would not be validated, and I do not see that any of the judges, in giving judgment in that case, addressed himself to that point.    There may have been very good grounds for the decision ; it may be that the clause did not apply even to that extent, because there was no subsequent discovery, the whole thing having been aboveboard and the defect known to everybody.    I do not know how that may be ; but the case is no authority, to my mind, for the proposition for which it was put forward, and which will alone assist the respondents in this case, namely, that art. 114 does not apply to such matters as forfeiture of shares—that is to say, to matters between the company on the one side and the shareholders on the other.    I cannot conceive why we should cut down such general language as that of the article and say that it applies only to non-members.    I think that is wrong.    It appears to me, therefore, that these objections,

C. A.

1897

Dawson
*v.*
African
Consoli-
dated Land
and Trading
Company.

Lindley M.R.

(1) 5 H. & N. 151.

14                           CHANCERY DIVISION.                    [1898]

C. A.
1897
DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

Lindley M.R.

whatever they might be worth but for this clause—and I do not think they would be worth much—are absolutely worthless with it.

Another point was taken before us, which would be a much more serious one if there were any evidence to support it. We are asked to restrain this proceeding of forfeiting shares and otherwise enforcing payment of a call, because the call had been made for an improper purpose; namely, not for the purpose of bonâ fide carrying on the company, but for the purpose of recouping directors who have paid off the promoters what they claimed under agreements which the writ in this action asks to have rescinded. This is a case which might have become important. We are told that the agreements have been carried out, and it is difficult for one shareholder to sue, on behalf of himself and others, to rescind an agreement between the company on the one side and the promoters on the other. It needs a very strong case to justify such an action; but apart from that, there is no evidence to support such a case. There is a mere suggestion of fraud and misconduct—a mere suggestion as to which we have nothing reliable to act upon. The appeal must be allowed, and the order discharged with costs here and below.

CHITTY L.J. I agree. I desire to say one word as to the 114th article. It is not framed so as to render valid a resolution passed by any persons who without a shadow of title assume to act as directors of a company. The case put by Mr. Stewart-Smith, that if three or four strangers went into the board room and passed a resolution the clause would, according to the contention of the appellants, support their acts and make them valid, is disposed of by the mere reading of the clause. The clause is addressed, as is shewn by the words " some defect in the appointment of such directors or persons acting as aforesaid, or that they or any of them were disqualified," to cases of defective appointment or disqualification.

As regards the case of Nielsen, he was six days without the necessary qualification for a director—namely, from June 17 to 23. There is no evidence whatever to shew that the other two directors were aware that he had parted with all his shares so

as no longer to hold his qualification.  It is said, and rightly said upon reading the articles, that he ceased to be a director on June 17 because he ceased to hold the requisite number of shares ; but on June 23 he held the requisite number, and he went on acting as director with the other directors, and they treated him as a director.  They did not indeed formally reappoint him, but they had power to do so, and there cannot be the slightest question that if the defect had been pointed out they would have appointed him to fill up the vacancy. The point here is the defect in the appointment.  There was no defect in the original appointment of Nielsen : the defect was that he had become disqualified.  It was argued that the words " were disqualified " in art. 114 refer only to want of qualification at the time of appointment ; but the words are not " were non-qualified at the time of appointment," but " were disqualified," which plainly include a subsequent loss of the qualification which is required in order to enable a man to act as a director.  That is exactly within the words of the article, and is one of those defects, irregularities, or whatever else one ought to call them, which are remedied by the article.

It is then said the article is not to operate as between the company on the one hand and the members of the company on the other, but is only to be applied to outsiders.  The answer to that is that in the article itself no such distinction is made. Whether in any case a distinction might be taken is quite another matter.  It cannot be taken upon the facts of this case ; and I am quite satisfied that in the present case the article does apply as between the company on the one hand and the member who is being sued for a call on the other.

It is hardly necessary to add anything about the *Howbeach Case*. (1)  There it was quite plain that the directors who were purporting to act, and whose appointment was derived from the acts of the signatories, were not well appointed.  The reasons are not given by the learned judges why they held that the 60th clause in that case did not apply so as to validate their acts ; but it was quite open to say that in that particular case the appointment was so radically bad that the defect did

(1) 5 H. & N. 151.

C. A.

1897

DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

Chitty L.J.

C. A.

1897

DAWSON
*v.*
AFRICAN
CONSOLI-
DATED LAND
AND TRADING
COMPANY.

Chitty L.J.

not fall within the protection. For these reasons, and in conformity with what has fallen from the Master of the Rolls, I think that all these points with reference to irregularity fall to the ground, and I think it is quite unnecessary to go through other somewhat similar matters which have been mentioned. Nielsen's case seems to me to be the only one that requires anything like a formal judgment.

Then there is the other point which was put forward at the bar before us on this appeal, that the call was made for a fraudulent or improper purpose; that the directors made the call in the interests of some one of them; and that the call on that ground could not be supported. It would require a strong case to justify us in saying on motion that the call was fraudulently made; and the simple answer that we have to give is that the evidence has not proved in any material degree the kind of case that was shadowed out by the counsel for the respondents.

I reserve to myself the full power of considering whether some of the shareholders can, on any such materials as have been presented to us, sue on behalf of themselves and the other shareholders for the rescission of the company's contract. That point does not arise because there is no case brought forward to shew a preponderating control by the directors over the company's affairs such as to make a general meeting of shareholders nugatory.

VAUGHAN WILLIAMS L.J. I entirely agree. I only wish to say that it is not necessary to decide anything about the true meaning of the words "afterwards discovered" because, as the Master of the Rolls has already pointed out, in this case there is no evidence whatever that the directors did know of the defects at the time of the passing of the resolution for a call.

Solicitors: *Burgoyne Watts & Co.; Wyatt Digby & Co.*

H. C. J.

**EXHIBIT V**

**A. C.**           AND PRIVY COUNCIL.                    459

[HOUSE OF LORDS.]                    H. L. (E.)*

MORRIS  .   .   .   .   .   .  . APPELLANT        1946

AND                                  ————
                                              *Feb.* 11, 12,
KANSSEN AND OTHERS  .   .   .  . RESPONDENTS.    13, 14, 18,
                                              20, 21, 22;
                                              *Mar.* 22.

*Company — Director — De facto directors — Purported appointment of*
*director—Purported issue of shares—Companies Act,* 1929 (19 &*
*20 Geo.* 5, *c.* 23), *s.* 143 *; sch. I., Table A, art.* 88.

By s. 143 of the Companies Act, 1929 : " The acts of a director
" or manager shall be valid notwithstanding any defect that may
" afterwards be discovered in his appointment or qualification."

By art. 88 of Table A, in sch. I. : " All acts done by any meeting
" of the directors or of a committee of directors, or by any person
" acting as a director, shall, notwithstanding that it be afterwards
" discovered that there was some defect in the appointment of any
" such director or person acting as aforesaid, or that they or any
" of them were disqualified, be as valid as if every such person
" had been duly appointed and was qualified to be a director."*

On February 1, 1940, C. and K. were the only directors and the
only shareholders in a company, holding one share each. The
articles of association incorporated art. 88 of Table A. C. and one
S. falsely claimed that at a meeting held on that date S. was duly
appointed a director and a minute was concocted to record the alleged
appointment. On April 9, 1940, C. and S., in purported exercise
of the power conferred by the articles of association, requested K.
to resign his office and on April 12, 1940, they purported to hold a
meeting of directors and to issue one share to S. and seven more
shares to C. On April 26, 1940, an extraordinary general meeting
of the company was held at which C., K. and S. were present ;
C. moved and S. purported to second a resolution to confirm the
appointment of S. as a director. C. voted in favour of the resolution
and K. against it and S. having purported to vote in favour of it,
it was treated as carried, so that S. thereafter purported to act as a
director. No general meeting was held in 1941 and accordingly,
by the effect of art. 73 of Table A as varied by art. 22 of the
company's articles of association, there were thereafter no de jure
directors. In March, 1942, C. and S. purported to hold a meeting
of directors and thereat to appoint one M. a director ; all three
then purported to allot thirty-four shares to M. ; thirty-two more
shares to S. and twenty-four more shares to C. Subsequently S.
transferred seventeen of his shares to M.

*Held* that the invalid appointment of M. as a director and the
invalid allotment of shares to him were not validated by s. 143 of
the Act nor by art. 88 of Table A, since these were designed as
machinery to avoid questions being raised as to the validity of
transactions where there had been a slip in the appointment of a
director and not to override substantive provisions relating to such

———————————
* *Present :* VISCOUNT SIMON, LORD THANKERTON, LORD PORTER,
LORD SIMONDS and LORD UTHWATT.

H. L. (E.)

1946

─────

Morris
*v.*
Kanssen.

─────

appointments. This was not a·case·where there was a defective appointment in the case of C. and S. but one where after 1941 there was no appointment of them as directors at all, so that their acts could not be validated. Further, the rule in *Royal British Bank* v. *Turquand* (1856) 6 E. & B. 327 did not apply to the allotment of shares to M.; since in the transaction he was himself purporting to act as a director.

Decision of the Court of Appeal (sub nom. *Kanssen* v. *Rialto (West End), Ld.*) [1944] Ch. 346, affirmed.

APPEAL from the Court of Appeal.

·The.facts, stated by Lord Simonds, were as follows : In two consolidated actions, in which this appeal was brought, the respondent Theodore Kanssen, a Dutchman, the plaintiff in both actions, in which the respondent company, Rialto· (West End), Ld. and the appellant Lewis Morris and two other persons, Robert Cromie and Eric Paul Strelitz, were defendants, sought to have it determined who were the directors and who were the shareholders and what shares they held of the respondent company. The company was incorporated on December 27, 1939, with the primary purpose of taking up a lease of the Rialto Cinematograph Theatre in Coventry Street, London. Its nominal capital was 100*l*. in 1*l*. shares. On its incorporation two shares were allotted to the subscribers to the memorandum of association, and they transferred them, the one to Cromie, the other to Kanssen. There was no question as to the validity of the issue and transfer of these two shares. At the same time the same subscribers to the memorandum, in exercise of the authority conferred on them by the articles of association of the company, appointed Cromie and Kanssen to be the first directors of the company. This was a regular and valid appointment. The company in due course embarked on the business for which it was incorporated. It entered into possession of the Rialto Theatre and acquired a lease of it. Soon disputes arose between Cromie and Kanssen, the merits of which were irrelevant to this appeal. Cromie made an alliance with Strelitz and together they concocted a scheme for getting rid of Kanssen. It was an essential part of this scheme that Strelitz should be· appointed a director, so that Cromie and he could, under art. 8 (7) of the company's articles, call upon Kanssen to resign. They claimed, .but falsely claimed, that at a meeting of directors held on February 1, 1940, at which Cromie and Kanssen were present, Strelitz was duly appointed a director,.

and they concocted a minute to this effect, which was entered
in the company's minute book and in due course signed by
Cromie.  Strelitz assumed to act as director, and on April 9,
1940, Cromie and he in purported exercise of their power under
the articles requested Kanssen to resign his office of director.
The request was a nullity and Kanssen remained a director.
On April 12, 1940, Cromie and Strelitz purported to hold a
meeting of directors, and thereat issued one share to Strelitz
and seven more shares to Cromie.  The issue was invalid and
of no effect.  On April 26, 1940, an extraordinary general
meeting of the company was held.  Cromie was there ;  so
were Kanssen and Strelitz, but the latter had no right to be
there.  At that meeting Cromie moved and Strelitz seconded
a resolution to confirm the appointment of Strelitz as a director.
It was carried by the votes of Cromie and Strelitz against the
opposition of Kanssen.  There was no appointment to confirm.
Strelitz had no right to second a resolution or to vote for it :
Cromie could lawfully use one vote only.  No resolution was
effectively passed and no valid appointment emerged from
these proceedings.  Kanssen withdrew protesting, and con-
tinued  to  protest.  Nevertheless  from  that  time  onward
throughout 1940 and 1941 Strelitz acted as a director with
Cromie.  There was in fact little to be done, as the cinema
was closed as the result of enemy action.  No general meeting
of the company was held in 1941.  It was not disputed, there-
fore, that at the end of 1941 both Cromie and Strelitz (if he
was a director) ceased to be directors under art. 73 of Table A
as varied by art. 22 of the company's articles.  From
January 1, 1942, there were no directors of the company.
Early in 1942 it appeared that the cinema might be able to
reopen.  Further finance was needed, and for that purpose
Cromie got into touch with Morris and made an arrangement
with him under which (inter alia) he was to become a director
of the company and certain shares were to be allotted to
him.  In pursuance of this arrangement, on March 30, 1942,
Cromie and Strelitz held a meeting of directors with the
company's solicitor in attendance.  The minute was as
follows :  " (1.) Mr Cromie, told the directors that he had
" received certain proposals from Mr. Lewis Morris which would
" enable the Rialto Cinema to be reopened and he, as a share-
" holder, proposed to write a letter to Mr. Morris setting out
" the terms of the arrangement.  The letter was produced
" and read.  (2.) It was resolved that Mr. Lewis Morris be

H. L. (E.)
1946
———
MORRIS
*v.*
KANSSEN.
———

" appointed a director of the company and that he be made
" managing director of the company.  Mr. Lewis Morris
" then joined the Board.  (3.) An application from Mr. Cromie
" for ninety shares of 1*l.* each in the capital of the company,
" together with his cheque for 90*l.* was received.  At his
" request the application asked that the shares be allotted
" thirty-four to Mr. Lewis Morris, thirty-two to Mr. Strelitz
" and twenty-four to Mr. Cromie himself.  It was resolved
" that the shares be allotted as follows :

| " Mr. Lewis Morris | .. | 34 shares numbered | 11 to 44 |
| " Mr. E. P. Strelitz | .. | 32   ,, | ,, | 45 to 76 |
| " Mr. Robert Cromie | .. | 24   ,, | ,, | 77 to 100 |

" It was resolved that share certificates be issued for all
" the shares which had been allotted in the company."  There
were certain further proceedings which were irrelevant to
this appeal.  On or about April 20, 1942, Strelitz transferred
seventeen of his shares to Morris.  If all the shares had been
validly issued, the position then would have been that
Kanssen held one share, Morris fifty-one shares, Cromie
thirty-two shares and Strelitz sixteen shares.  In the mean-
time, on March 30, 1942, and on April 13, 1942, Kanssen
issued his writs in the two actions, which were afterwards
consolidated.  In effect he claimed (inter alia) that the only
shares validly issued were the two shares issued to the sub-
scribers and by them transferred to Cromie and to him and
that the register of the company should be rectified by altering
Cromie's holding to one share and removing the names of all
other persons except himself therefrom.  He also claimed
a declaration that he and Cromie were the only directors of
the company and that Strelitz and Morris were not directors.
Cohen J. held that Strelitz and Morris were not directors
and that, as no annual general meeting was held in 1941, all
the directors went out of office on December 31, 1941 and that
therefore there were no directors of the company.  He also
held that the only persons whose names should be on the
register of shareholders were Kanssen and Cromie in respect of
one each, and Morris in respect of fifty-one shares; on the
ground that he was entitled to rely on s. 143 of the Act and
art. 88 of Table A as validating the issue of shares to him.
He ordered the register of shareholders to be rectified
accordingly.  Kanssen appealed and Morris cross-appealed.
The Court of Appeal allowed the appeal, holding that Morris

could not rely on s. 143 or reg. 88, and dismissed the cross-appeal.  Morris appealed to the House of Lords, the respondents being (*a.*) Kanssen, who did not appear and was not represented on the appeal, having been adjudicated bankrupt on July 28, 1944 ; (*b.*) the company ; and (*c.*) Charles Walker, the trustee of the property of Kanssen.

*Christie K.C.* and *Hillaby* for the appellant.  The questions to be decided are (*a.*) whether the appellant is a director of the company and (*b.*) whether the shares were so allotted to him that he is entitled to remain on the register in respect of them.  Though neither Cromie nor Strelitz has been a director since the end of 1941, the appellant at all material times believed them to be duly appointed directors and acted throughout with complete bona fides.  Now Kanssen is debarred by his laches and acquiescence from alleging the invalidity of the issue of shares.  For some two years before the commencement of this action the company's returns and its register showed Cromie and Strelitz as the only directors and as members holding between them nine out of ten of the issued shares.  Kanssen took no steps to rectify the register or amend the returns.  Accordingly he is estopped from disputing the validity of the acts of Cromie and Strelitz as directors so far as they affect the appellant.  It would be inequitable to allow a retrospective rectification of the register by the removal of the name of Strelitz to prejudice the position of the appellant, who is an innocent third party.  Moreover, at the time of the meeting of March 30, 1942, the defect in the appointment of Strelitz and the disqualification of Cromie had not been discovered and their acts were validated by the Companies Act, 1929, s. 143 and art. 88 of Table A in sch. I. The defect in this case is one which falls within the words defect in " qualification " in the section and " disqualified " in the article.  Further, the section and the article are just as applicable to the appointment of an additional director as to any other act of a de facto board of directors·  [They referred to *British Asbestos Co., Ld.* v. *Boyd* (1) ; *Channel Collieries Trust, Ld.* v. *Dover, St. Margaret's and Martin Mill Light Ry. Co.* (2) ; *Dawson* v. *African Consolidated Land & Trading Co.* (3) and *Tyne Mutual Steamship Insurance*

(1) [1903] 2 Ch. 439.
(2) [1914] 1 Ch. 568, 578 ;
[1914] 2 Ch. 506.

(3) [1898] 1 Ch. 6.

3      2 N 2

H. L. (E.)

1946

———

MORRIS
*v.*
KANSSEN.

———

*Association* v. *Brown* (1).] The test to be applied is the good faith of the person relying on the section, the fact that he did not know the appointment in question to be invalid. Though a de facto director cannot continue to act after a " defect " in his appointment has become known to him, yet if thereafter, acting as a de facto director he takes part in appointing as a director a third party who is unaware of the irregularity, that third party can pray in aid the section and the article, provided he acted in good faith. Thus the fact that in this case the other acting directors knew of the defect in their appointment does not prevent the appellant from taking advantage of the section and the article. [They referred to *Murray* v. *Bush* (2) ; *Mahoney* v. *East Holyford Mining Co., Ld.* (3) ; *Transport, Ld.* v. *Schonberg* (4) ; *A. L. Underwood, Ld.* v. *Bank of Liverpool and Martins* (5) ; *B. Liggett (Liverpool), Ld.* v. *Barclays Bank, Ld.* (6).] The appellant is entitled to rely on the section and the article because at all material times he had not discovered the defect in question. The knowledge of Cromie cannot be imputed to him, for Cromie was not acting as his agent and in any event Cromie was practising a fraud on him. [They referred to Halsbury's Laws of England, 2nd ed., vol. I., p. 291, para. 477 : *Société Générale de Paris* v. *Tramways Union Co., Ld.* (7) ; *Saffron Walden Second Benefit Building Society* v. *Rayner* (8) ; and *Wells* v. *Smith* (9).] Cromie was not the appellant's agent because the actual contract under which the appellant became a shareholder was made between him and the company. Further, under the general law the appellant was entitled to treat the shares as validly issued. In any event, he was entitled, as a person dealing with a company in good faith, to assume that acts within its constitution and powers had been duly performed and he was not bound to inquire whether acts of internal management had been regular : *Royal British Bank* v. *Turquand* (10). Acting in good faith, he was entitled to treat the shares as validly allotted, since three directors of the company could allot them and three persons purporting to act as directors did so. An outsider is one who is neither an officer nor a member of the company and before

(1) (1896) 74 L. T. 283.

(2) (1872) L. R. 6 H. L. 37.

(3) (1875) L. R. 7 H. L. 869.

(4) (1905) 21 T. L. R. 305.

(5) [1924] 1 K. B. 775.

(6) [1928] 1 K. B. 48.

(7) (1884) 14 Q. B. D. 424.

(8) (1880) 14 Ch. D. 426.

(9) [1914] 3 K. B. 722.

(10) (1856) 6 E. & B. 327.

**A. C.**          AND PRIVY COUNCIL.                              465

the meeting of March 30, 1942, the appellant was neither.
Even after his purported appointment as a director, which
took place immediately before the unauthorized allotment of
shares he had in fact no opportunity of becoming acquainted
with the true state of affairs. Had the allotment of shares
been made first there could have been no doubt but that the
appellant could have invoked *Royal British Bank* v.
*Turquand* (1).  It would be absurd if a difference in the order
of proceedings should have this effect.  The appellant was not
in a position to know any more about the affairs of this com-
pany than were the bankers to know about the affairs of the
company in *Mahoney* v. *East Holyford Mining Co., Ld.* (2).
He made all reasonable inquiries.

*Richmount* for the respondent company.  This respondent
places itself in the hands of the House while submitting that
its costs should be provided for.

*Jennings K.C.* and *M. Albery* for the respondent Walker.
The appellant had notice of Kanssen's claims before the
meeting of March 30, 1942, and yet made no proper inquiry
as to their validity or otherwise but took the risk of their
being well founded and, accordingly, he is not entitled to
rely on s. 143 of the Companies Act, 1929, or art. 88 of Table A.
[They referred to *Ex parte Snowball* (3) ; *Mahoney* v. *East
Holyford Mining Co., Ld.* (2) ; *County of Gloucester Bank* v.
*Rudry Merthyr Steam and House Coal Colliery Co.* (4) ; *A. L.
Underwood, Ld.* v. *Bank of Liverpool and Martins* (5) and the
Companies Act, 1929, s. 372.] Discovery means discovery by
the directors.  In this case, since Cromie and Strelitz knew all
along of the defect, it was not " afterwards discovered "
within art. 88.  In any event, there was no " defect "
in the appointment of Strelitz as a director within
the meaning of s. 143 and art. 88, since he was never appointed
at all : see *Tyne Mutual Steamship Insurance Association* v.
*Brown* (6) which has been impliedly approved by the legis-
lature by its re-enactment of the same provision in successive
Companies Acts.  Further, after the end of 1941 neither Cromie
nor Strelitz were directors, their period of service being over, so
that there was no question of any " defect " since there was
a complete vacancy : see *In re Consolidated Nickel Mines,
Ld.* (7).  If this can be called a " defect," by an

H. L. (E.)

1946

Morris
*v.*
Kanssen.

(1) 6 E. & B. 327.
(2) L. R. 7 H. L. 869.
(3) (1872) L. R. 7 Ch. 534, 548.
(4) [1895] 1 Ch. 629, 636.

(5) [1924] 1 K. B. 775.
(6) 74 L. T. 283.
(7) [1914] 1 Ch. 863, 888.

H. L. (E.)

1946

———

MORRIS
*v.*
KANSSEN

———

unusual use of the word, it is a defect of a radical sort with which the section and the article are not concerned. The only two kinds of defect which the section and the article can remedy are defects (*a.*) in appointment and (*b.*) in qualification. Such defects are not present in this case. If a man ceases to be a director by expiry of his term of office that is a defect neither in appointment nor in qualification. *Mahoney* v. *East Holyford Mining Co., Ld.* (1) on a proper reading of the facts was a case of defective appointment rather than of no appointment. [They referred to *Dawson* v. *African Consolidated Land and Trading Co.* (2) ; *British Asbestos Co., Ld.* v. *Boyd* (3) ; *Channel Collieries Trust, Ld.* v. *Dover, St. Margaret's and Martin Mill Light Ry. Co.* (4) and *Murray* v. *Bush* (5).] Moreover, Cromie was the agent of the appellant and Cromie's knowledge must be imputed to him so as to disentitle him to rely on the section and the article. Alternatively the appellant was a mere nominee of Cromie in respect of the shares allotted to him so that he had no privity of contract with the company and the section and the article did not operate to validate his title. The arrangement was between Cromie and the appellant and Cromie was acting as a shareholder in his private capacity and not as a director. Though he was undertaking to procure the company to do various things, that did not make him its agent and the mere fact that it knew of the arrangement between him and the appellant did not prevent the appellant being a mere nominee as between himself and the company. There is nothing in the section or the article to permit a person with a derivative title to take advantage of them. Further, the appellant cannot rely on the principle in *Royal British Bank* v. *Turquand* (6). For the purposes of the application of that principle he is not an outsider. An outsider only sees what an outsider can see, whereas a director can see all the business documents of the company ; a person who can do that is not an outsider but an insider and it does not matter whether he is a de jure or a de facto director. All the authorities proceed on the footing that an outsider is seeking the benefit of the rule ; none of them approaches the point on the footing that it is revelant whether an insider has had · a reasonable opportunity of finding out the facts. [They referred to *Mahoney* v. *East Holyford Mining Co., Ld.* (7) ;

---

(1) L. R. 7 H. L. 869, 872, 882.      (5) L. R. 6 H. L. 37.
(2) [1898] 1 Ch. 6, 15.               (6) 6 E. & B. 327.
(3) [1903] 2 Ch. 439, 444, 445.       (7) L. R. 7 H. L. 869, 894.
(4) [1914] 2 Ch. 506, 511.

**A. C.**          AND PRIVY COUNCIL.          467

*County of Gloucester Bank* v. *Rudry Merthyr Steam and House Coal Colliery Co.* (1) and Buckley on the Companies Acts, 11th ed., p. 305.]

*Christie K.C.* in reply. The appellant at the material time had not discovered the invalidity of the appointments. *In re Canadian Land Reclaiming and Colonizing Co.* (2) ; *Craven-Ellis* v. *Canons, Ld.* (3). This case comes within the section and the article. There is here, if not a defect in appointment, at any rate a disqualification : see *British Asbestos Co., Ld.* v. *Boyd* (4). As regards the allotment of the shares, the appellant was to be the beneficial owner.

H. L. (E.)

1946

MORRIS
*v.*
KANSSEN.

THE HOUSE took time for consideration.

Mar. 22.  VISCOUNT SIMON.  My Lords, the opinion which Lord Simonds has prepared in this appeal and which he is about to deliver covers the whole ground, and I need say no more than that I concur in every respect with his conclusions. As regards costs, the question which I should propose to put to the House when the appeal is dismissed is : That the appellant do pay the respondent Walker his costs in this House and that the respondents Rialto (West End), Ld. do bear and pay their own costs in this House. I move that the appeal be dismissed.

LORD THANKERTON.  My Lords, I also have had the opportunity of considering the opinion about to be delivered by my noble and learned friend, Lord Simonds, and I concur in it.

LORD PORTER.  My Lords, I have had the like opportunity and likewise concur.

LORD SIMONDS, having stated the facts, continued : I will dispose at once and in a few words of the question of directorship. Though it appears not to have been realized until then, it was in the course of the trial appreciated what was the effect of art. 73 of Table A as varied by the company's art. 22, and it was admitted then and at the bar of the House that neither Cromie nor Strelitz has in any view been a director since the end of 1941. The same consideration applies to

(1) [1895] 1 Ch. 629, 633.          (3) [1936] 2 K. B. 403.
(2) (1880) 14 Ch. D. 660.          (4) (1898) 1 Ch. 6, 15.

H. L. (E.)

1946

———

Morris
*v.*
Kanssen.

———

Lord Simonds.

———

Kanssen. Whether or not he ceased to be a director at an earlier date, at any rate he did so at the end of 1941. Morris rests his claim upon his appointment by Cromie and Strelitz at the meeting of March 30, 1942. But, apart from the considerations which apply equally to the allotment of shares and to this appointment, it is, I think, clear that neither the section of the Companies Act and the article, which I shall have to consider, nor the general law can avail to establish him in his office of director when he was not in fact appointed a director. To Cohen J. and to the Court of Appeal this seemed too plain for argument.

I turn then to the more difficult question of the shares. It is clear that no shares were in fact validly issued except the one share each held by Cromie and Kanssen, and Cohen J. accordingly, having decided the long and hotly contested question of fact in favour of Kanssen, ordered the register to be rectified by striking out the name of Cromie as the holder of any but one share and the name of Strelitz altogether. It remained to consider the case of Morris. Morris, faced with the fact that the shares ·were not validly issued, relied on defences arguable by him but not open to Cromie or Strelitz. He claimed the benefit of s. 143 of the Companies Act, 1929, and of art. 88 of Table A. I do not pause here to set them out. I will do so later. He further claimed under the general law that, even if the shares were not validly issued, yet he was entitled to treat them as validly issued, a claim that must have been faintly pursued in the courts below, since it finds no mention in any judgment. He further claimed that Kanssen was debarred by his laches from alleging the invalidity of the issue of shares. This last claim has no justification. I observe that neither Cohen J. nor the Court of Appeal deal with it, presumably because to them as to me it appeared upon the facts to be incapable of serious argument.

At the hearing before Cohen J. and in the Court of Appeal the major argument turned upon the section and article to which I have referred, the defence on which Morris relied being met by the plea that in the circumstances of the case neither section nor article was relevant and, even if they were, they would not avail him since he was put upon his inquiry and might, if he had made proper inquiries, have discovered the truth. Several questions of difficulty seem to be here involved ; first, whether either section or article has any application to the present case ; second, what amounts to discovery of a defect for the

**A. C.**          AND PRIVY COUNCIL.                     469

H. L. (E.)

1946
———
MORRIS
*v.*
KANSSEN.

Lord Simonds.
———

purpose of either section or article and whether any party is debarred from its benefit unless and until he has himself discovered the defect ; third (an elaboration perhaps of the second question) whether, if a party is put upon his inquiry and he might if he made inquiry discover the defect, he can still say that he has not discovered it, and fourthly, in the circumstances of the present case whether Morris was in fact put upon his inquiry and, being so put, made the proper inquiry. It seems that in both courts below it was on the first question assumed (not indeed by counsel for Kanssen but in the judgments of the court) that the section and article were relevant. In both courts too, on the second question it was decided that Morris could rely on them unless he discovered the defect : it was immaterial that Cromie and Strelitz were at all times well aware of it. On the third question both courts decided that Morris was put on his inquiry, holding that, if he relied on the section or article he must be subject to the same obligation as if he was relying on the general law as stated in *Royal British Bank* v. *Turquand* (1) to which I refer later. It was upon the fourth question that the courts diverged, Cohen J. holding that, being put upon his inquiry, he made the inquiries that the circumstances demanded, the Court of Appeal holding that he had not made such inquiries and therefore could not be allowed to say that he had not discovered this defect. I have ventured to state in this compendious form judgments which covered a wide field. I have done so because the conclusion to which I understand that your Lordships have unanimously come on the first question, makes it unnecessary to consider the other questions. They arise only if the circumstances of the present case bring it within the scope of section or article.

Before I consider this first question I may dispose of two other matters. First, I agree with the Court of Appeal that in any view of the case Morris cannot maintain that the seventeen shares allotted to Strelitz and by him transferred to Morris were validly allotted. Strelitz at all times knew of the defect and Morris could get no better title. Secondly I observe that Lord Greene M.R. (2) dismissed Morris's plea on the additional ground that either Cromie was a principal as between himself and the company (in which case Morris was merely a nominee between whom and the company there was no privity) or that he was acting as agent for Morris in applying

(1) 6 E. & B. 327.          (2) [1944] Ch. 346, 360.

470                                    HOUSE OF LORDS                              **[1946]**

H. L. (E.)

1946
———
MORRIS
*v.*
KANSSEN.
———
Lord Simonds.
———

for the shares allotted to him.   I do not think that the first alternative is on the facts a tenable view.   But the Master of the Rolls goes on to say that if the latter view is right the knowledge of the defect which the agent had must be imputed to the principal, Morris thus being affected with Cromie's knowledge.   My Lords, I would not be taken as assenting to this view which appears to ignore both the capacity in which Cromie acquired the relevant knowledge and the fact that Cromie was acting fraudulently as well towards Morris as to other parties.

The first question to which I return is whether (1.) s. 143 of the Companies Act, 1929, or (2.) art. 88 of Table A which was adopted by the company has any relevance to the circumstances of the present case.   Section 143 of the Companies Act, 1929, which is in the same terms as corresponding sections in previous Acts, provides that : " The acts of a director or " manager shall be valid notwithstanding any defect that may " afterwards be discovered in his appointment or qualification." Article 88 of Table A, which does not materially differ from similar articles in earlier Tables, provides that " All acts done " by any meeting of the directors or of a committee of directors, " or by any person acting as a director, shall, notwithstanding " that it be afterwards discovered that there was some defect " in the appointment of any such director or person acting as " aforesaid, or that they or any of them were disqualified, be " as valid as if every such person had been duly appointed " and was qualified to be a director."   The section can be invoked only where there is a defect afterwards discovered in the appointment or qualification of a director ; in the article the condition is that it is afterwards discovered that there was some defect in the appointment of a director or person acting as a director or that he was disqualified to act as a director.   Though the language of the section differs in some respects from that of the article, it does not appear that the difference is material for the purpose of the present case.

The facts relevant to the question now under consideration have already been stated.   I will very briefly tabulate them : (1.) On February 1, 1940, Cromie and Kanssen were the only directors and the only shareholders holding one share each. (2.) On or about that date the fraudulent assumption of office by Strelitz and a minute concocted to record an appointment which did not take place.   (3.) On April 9, 1940, an ineffective attempt to expel Kanssen from his office.   (4.) On April 12,

1940, the ineffective allotment of one share to Strelitz and
seven shares to Cromie at a purported meeting of directors.
(5.) On April 26, 1940, an extraordinary general meeting
of the company at which as I have pointed out nothing was
effectively done. (6.) At the end of 1941 the determination
of the term of office of Cromie and Kanssen and of Strelitz, if
he was a director, and from that date no directors of the
company.

It is in these circumstances that the question arises
whether the section or article can be called in aid by
Morris in order to validate the transactions of March 30, 1942,
namely, the allotment to him of shares or the appointment of
him as a director. Do the facts that I have stated establish
a defect in the appointment or qualification of Cromie or
Strelitz ? There is, as it appears to me, a vital distinction
between (*a.*) an appointment in which there is a defect or,
in other words, a defective appointment, and (*b.*) no appoint-
ment at all. In the first case it is implied that some act is
done which purports to be an appointment but is by reason of
some defect inadequate for the purpose ; in the second case
there is not a defect, there is no act at all. The section does
not say that the acts of a person acting as director shall be
valid notwithstanding that it is afterwards discovered that
he was not appointed a director. Even if it did, it might well
be contended that at least a purported appointment was
postulated. But it does not do so, and it would, I think, be
doing violence to plain language to construe the section as
covering a case in which there has been no genuine attempt to
appoint at all. These observations apply equally where the
term of office of a director has expired, but he nevertheless
continues to act as a director, and where the office has been
from the outset usurped without the colour of authority.
Cromie's acts after the end of 1941 were not validated by the
section : Strelitz's acts were at no time validated. I have so
far dealt with defect in " appointment " and what I have said
in regard to the section covers the article also where the same
words are repeated. Some argument was founded by counsel
for the appellant upon the words in the section " or qualifica-
" tion " and in the article " disqualified." This argument is
not easy to follow. So far as both Cromie and Strelitz were
concerned, there was no defect in their qualification after the
end of 1941. They were not disqualified. They were, so far
as I know, qualified to act, but they had not been appointed.

H. L. (E.)

1946
———
MORRIS
*v.*
KANSSEN.

Lord Simonds.
———

H. L. (E.)

1946
———
MORRIS
*v.*
KANSSEN.
———
Lord Simonds.
———

I do not suggest that qualification refers only to the holding of qualification shares. But whatever extended meaning may be given to " qualification " or " disqualified " I find it impossible to say that it covers the case of Cromie or of Strelitz. The point may be summed up by saying that the section and the article, being designed as machinery to avoid questions being raised as to the validity of transactions where there has been a slip in the appointment of a director, cannot be utilized for the purpose of ignoring or overriding the substantive provisions relating to such appointment.

I have come to this conclusion unaided by authority, but I am glad to find that it is supported by clear and cogent authority. In *Tyne Mutual Steamship Insurance Association* v. *Brown* (1), the meaning of the corresponding section of the Companies Act then in force and of a strictly comparable article had to be considered, where the facts were that directors had continued to act after their term of office had expired, and Lord Russell of Killowen C.J., having read the article, thus expressed himself (2) : " What does this provide ? It provides for the " cure of defects in the appointment or qualification of directors. " Here there has been no appointment at all." He held, therefore, that the article had no application to the case. This authority has stood unchallenged for fifty years, and, though on two occasions since its decision the whole law relating to limited companies has been reviewed by expert committees and amended by the legislature, it has in this respect remained unaltered. This affords strong support for a construction which in any case appears to me to be the correct one. I would add that, though no other express authority has been called to the attention of the House, yet the language of Lord Lindley M.R. and Chitty L.J. in *Dawson* v. *African Consolidated Land and Trading Co.* (3), of Farwell J. in *British Asbestos Co. Ld.* v. *Boyd* (4) and of Lord Cozens-Hardy M.R. and Swinfen Eady L.J. in *Channel Collieries Trust, Ld.* v. *Dover, St. Margaret's and Martin Mill Light Ry. Co.* (5), clearly indicates that in the opinion of those learned judges the section and article alike deal with slips or irregularities in appointment not with a total absence of appointment, and still less with a fraudulent usurpation of authority. Coming to this conclusion, I do not find it neces-

(1) 74 L. T. 283.
(2) Ibid. 285.
(3) [1898] 1 Ch. 6.

(4) [1903] 2 Ch. 439.
(5) [1914] 2 Ch. 506.

**A. C.**          AND PRIVY COUNCIL.                          473

sary to express any opinion on the question what is the meaning of the words " afterwards discovered " in the section. I would not be taken as either assenting to or dissenting from the proposition, which appears to have been accepted in the courts below, that the section or article can be called in aid by a third party unless and until he has himself discovered the defect in the appointment or qualification of a director. Nor would I express any final view on what for this purpose amounts to " discovery," and in particular whether the rule as to inquiry is to be imported into the consideration of it.

The appellant having failed, for the reason that I have indicated, to establish his case upon the section or the article, was allowed by the indulgence of the House, although he had not raised the point in his formal case, to contend that he was in any case entitled to succeed by virtue of the rule of law which is conveniently called the rule in *Turquand's* case (*Royal British Bank* v. *Turquand*) (1). On this contention the House has not the benefit of the opinion either of Cohen J. or the Court of Appeal, before whom the point, if taken at all, appears not to have been pressed. The claim under this head refers only to the allotment of the thirty-four shares which were allotted to Morris on March 30, 1942. On this contention two questions appear to arise : (1.) whether Morris can in the circumstances invoke the rule and (2.) whether, if he can otherwise do so, he is nevertheless debarred from relief under it upon the ground that he was put upon his inquiry and might, if he had made proper inquiries, have learned the truth. The first question involves, first, a consideration of Morris's position when the shares were allotted to him, and secondly an examination of the rule in order that it may be determined whether Morris comes within its scope. Though little credence could be attached to the uncorroborated testimony of Cromie or Strelitz, Morris was accepted by Cohen J. as a witness of truth, and his evidence agreed with that of the recorded minute of March 30, 1942, which itself is made prima facie evidence by s. 120, sub-s. 2, of the Companies Act, 1929. It appears then that the board meeting held on that day fell into two parts. There were first present as directors Cromie and Strelitz, with the company's solicitor in attendance. Cromie " told the directors " (so runs the minute) " that he " had received certain proposals from Mr. Lewis Morris which " would enable the Rialto cinema to be reopened and he, as

(1) 6 E. & B. 327.

H. L. (E.)

1946

MORRIS
*v.*
KANSSEN.

Lord Simonds.

"a shareholder, proposed to write a letter to Mr. Morris " setting out the terms of the arrangement. The letter was " produced and read." Upon this it was resolved that Morris be appointed a director of the company and that he be made managing director of the company. Morris, it is recorded, then joined the board. What I must regard as the second part of the meeting with the new board then began, and the minute records that an application from Cromie for ninety shares of 1*l*. each in the capital of the company together with his cheque for 90*l*. was received and that at his request the application asked that the shares be allotted thirty-four to Morris, thirty-two to Strelitz and twenty-four to Cromie, and that it was resolved that the shares be so allotted (the numbers of the shares being given) and that it was further resolved that share certificates be issued for all the shares which had been allotted in the company. There were certain further proceedings to which I need not refer. From this narrative it is clear that Morris himself acted as a director in the allotment and issue of the shares, including those allotted and issued to himself. It is, I think, an irrelevant consideration that he had only become a director immediately before that event. On this I will say something later. He in fact acted as a director and was the officer and agent of the company in the allotment and issue of shares. That neither his acts nor those of his colleagues were valid is for the purpose of this argument assumed. The question is whether he can nevertheless under the rule in *Turquand's* case (1) claim that he is entitled as between himself and the company to treat that act as done with the authority of the company, which was in fact and in law done without its authority.

My Lords, I think that this question admits of an easy answer. The so-called rule in *Turquand's* case (1) is, I think, correctly stated in Halsbury's Laws of England, 2nd ed., vol. V., at p. 423 : " But persons contracting with a company " and dealing in good faith may assume that acts within its " constitution and powers have been properly and duly " performed and are not bound to inquire whether acts of " internal management have been regular." It was competent for three directors of the company to allot its shares ; three persons purporting to act as directors did allot its shares ; therefore Morris, who acted in good faith, was entitled to treat the shares as validly allotted. Thus runs the argument.

(1) 6 E. & B. 327.

I leave aside the question what in the application of the rule
is the meaning of " good faith " and whether Morris, according
to the true meaning of those words, acted in good faith, and
ask whether Morris can in any event bring himself within the
scope of the rule. My Lords, I think it is clear on principle
that he cannot. In the transaction which he would sustain
and Kanssen seeks to impeach, he was himself acting as
a director. I asked learned counsel for the appellants whether
there was any authority for the proposition that a director or
de facto director could invoke the rule so as to validate
a transaction which was in fact irregular and unauthorized.
He could point to none. My own researches, though in such
a matter they cannot easily be complete, have disclosed no
case in which such a proposition has been affirmed. Nor
have I met any case in which such a person has without
discussion of the principle obtained such relief. Nor had
I even heard the proposition put forward until I heard it at
the bar of the House in this case. The reason is not far to
seek. One of the fundamental maxims of the law is the
maxim " omnia praesumuntur rite esse acta." It has many
applications. In the law of agency it is illustrated by the
doctrine of ostensible authority. In the law relating to
corporations its application is very similar. The wheels of
business will not go smoothly round unless it may be assumed
that that is in order which appears to be in order. But
the maxim has its proper limits. An ostensible agent cannot
bind his principal to that which the principal cannot lawfully
do. The directors or acting directors or other officers of
a company cannot bind it to a transaction which is ultra vires.
Nor is this the only limit to its application. It is a rule
designed for the protection of those who are entitled to assume,
just because they cannot know, that the person with whom
they deal has the authority which he claims. This is clearly
shown by the fact that the rule cannot be invoked if the
condition is no longer satisfied, that is, if he who would invoke
it is put upon his inquiry. He cannot presume in his own
favour that things are rightly done if inquiry that he ought
to make would tell him that they were wrongly done. What
then is the position of the director or acting director who
claims to hold the company to a transaction which the
company has not, though it might have, authorized ? Your
Lordships have not in this case to consider what the result
might be if such a director had not himself purported to act

H. L. (E.)

1946

———

MORRIS
*v.*
KANSSEN.

———

Lord Simonds.

———

on behalf of the company in the unauthorized transaction. For here Morris was himself purporting to act on behalf of the company in a transaction in which he had no authority. Can he then say that he was entitled to assume that all was in order? My Lords, the old question comes into my mind, " Quis custodiet ipsos custodes ? " It is the duty of directors, and equally of those who purport to act as directors, to look after the affairs of the company, to see that it acts within its powers and that its transactions are regular and orderly. To admit in their favour a presumption that that is rightly done which they have themselves wrongly done is to encourage ignorance and condone dereliction from duty. It may be that in some cases, it may be that in this very case, a director is not blameworthy in his unauthorized act. It may be that in such a case some other remedy is open to him, either against the company or against those by whose fraud he was led into this situation, but I cannot admit that there is open to him the remedy of invoking this rule and giving validity to an otherwise invalid transaction. His duty as a director is to know ; his interest, when he invokes the rule, is to disclaim knowledge. Such a conflict can be resolved in only one way.

It was urged upon your Lordships that the purported appointment of Morris as a director having taken place immediately before the unauthorized allotment of shares, he had in fact no opportunity of learning the true state of affairs, and it was pointed out that, had the proceedings at the meeting of March 30, 1942, been taken in the reverse order first the allotment of shares, then the appointment of Morris as a director, the result would be different. And then it was said that it was so absurd that there should be a different result according to the order of proceedings that the original conclusion could not be accepted. This argument has for me no weight or substance. Admit, as to my mind one must admit, that a director is not for the purpose of the rule in the same position as a stranger : then it is as immaterial how long he has been a director, as it is whether he is an idle or diligent director or a robust or sick director.

Concluding as I do that Morris is not a person who in respect of this transaction comes within the scope of the rule, I do not find it necessary to consider the further question whether in any case he would be deprived of its benefit by reason of the fact that even regarded as an outsider he was put upon his inquiry and did not make the

inquiry that he should have made.  This is a question of fact on which different views have been, and may well be, entertained.  In my opinion the appeal should be dismissed.

LORD UTHWATT.  My Lords, I agree.

*Appeal dismissed.*

Solicitors for appellant : *Billinghurst, Wood & Pope.*
Solicitors for the respondent company : *Paisner & Co.*
Solicitors for the respondent Walker : *Ashurst, Morris, Crisp & Co.*

[HOUSE OF LORDS.]

PONTYPRIDD AND RHONDDA JOINT
   WATER BOARD    .    .    .    . APPELLANTS

AND

OSTIME (INSPECTOR OF TAXES).    . RESPONDENT.

*Revenue—Income tax—Water undertaking—Part of income provided out of general rate—Trading receipt—Pontypridd and Rhondda Water Act, 1910 (10 Edw. 7 & 1 Geo. 5, c. CXX), s. 91—Income Tax Act, 1918 (8 & 9 Geo. 5, c. 40), sch. D., Case I.*

Payments in the nature of a subsidy from public funds made to an undertaker to assist in carrying on the undertaker's trade or business are trading receipts to be brought into account in arriving at the balance of profits or gains under Case I of sch. D. of the Income Tax Act, 1918, save in the case where the undertaker is a rating authority and the subsidy is the proceeds of rates imposed by it or comes from a fund belonging to it.

Acting under statutory authority, a water undertaking issued precepts calling for lump sums duly apportioned to be contributed by its two constituent local authorities to meet an estimated deficiency in its anticipated revenue during the succeeding twelve months derived from payments in respect of water supplied. The local authorities paid the sums, levying them on their ratepayers, though they had also power to pay them out of their district funds.  Had either of them failed to do so the undertaking had power to levy a rate in the district of the defaulting council, but it had otherwise no power to levy a rate.  The undertaking

* *Present :* VISCOUNT SIMON, LORD THANKERTON, LORD WRIGHT, LORD PORTER and LORD SIMONDS.

**EXHIBIT W**

# Gower

# Principles of Modern Company Law

### Eleventh Edition

**Paul L. Davies QC (Hon), FBA**

*Allen & Overy Professor of Corporate Law Emeritus*
*Senior Research Fellow*
*Commercial Law Centre*
*Harris Manchester College*
*University of Oxford*

**Sarah Worthington, DBE, QC (Hon), FBA**

*Downing Professor of the Laws of England*
*University of Cambridge*

**Christopher Hare**

*Travers Smith Associate Professor of Corporate and Commercial Law*
*University of Oxford*
*Tutorial Fellow*
*Somerville College*

with a contribution from

**Professor Eva Micheler**

*London School of Economics and Political Science*
*Ao Universitätsprofessor*
*Wirtschaftsuniversität Wien*

authority on the agent's part is that the transaction is void. It is not binding on the company unless ... take up the transaction or to treat it as not binding on it. Determining who has the power to ratify the transaction is a matter for the company's constitution.[98] There is no requirement in the Act, as there is for breaches of directors' duties, that ratification must be by the shareholders,[99] though it appears the shareholders will usually be able to ratify unauthorised actions of the board or sub-board agents.[100] Normally, it is a matter of finding who, under the company's constitution, has actual authority to enter into the transaction, and then securing their approval of it. In addition, it is not necessary that ratification should take the form of an express decision to approve the transaction. Ratification can be implied from conduct[101] and the conduct may amount to ratification if the company has knowledge of the essentials of what the agent has done, even if it did not know that the agent had acted without authority.[102] If there is ratification, it has retrospective effect, i.e. it renders the transaction with the company binding on it as from the time it was entered into by the agent. It is sometimes difficult to distinguish a subsequent ratification (which is a unilateral act of the company) from the entering into by the company and the third party of a new transaction which replaces the one entered into by the agent without authority.[103] There is also a time limit on the ratification process in the sense that ratification will not be permitted if it would unfairly prejudice a third party.[104]

## The ultra vires doctrine and the objects clause

**8–029** Before finishing our consideration of corporate contracting, we need briefly to consider the ultra vires doctrine and its relationship with a particular type of clause, though one now increasingly rarely found in the articles, namely, the objects clause. Although the ultra vires doctrine caused a lot of anxiety to third

---

170 C.L.R. 146; [1993] A.L.R. 385 which had been cited with approval by Lord Neuberger NPJ in *Akai* [2010] HKCFA 64; [2011] 1 H.K.C. 357 at [59].
[99] And the parties able to ratify an agent's unauthorised dealing to make it binding on the company are not necessarily the same parties as would be required to give the agent such authority for all future dealings, nor the same as might be required in order to remedy other wrongs; all depends on the company's constitution, and who is give the different powers to exercise: *Irvine v Union Bank of Australia* (1877) 2 App. Cas. 366 PC.
[100] See paras 10–111 to 10–118.

**<u>EXHIBIT X</u>**

878

[1998]

[HOUSE OF LORDS]    A

REPUBLIC OF INDIA AND ANOTHER    .    .    .    .    APPELLANTS

AND

INDIA STEAMSHIP CO. LTD.    .    .    .    .    .    RESPONDENTS

(No. 2)

B

1996  April 1, 2, 3; 23    Staughton, Simon Brown and Auld L.JJ.

1997  June 9, 10, 11, 12;    Lord Browne-Wilkinson, Lord Steyn,
      Oct. 16    Lord Hoffmann, Lord Cooke of Thorndon and
                 Lord Hope of Craighead

Conflict of Laws—Foreign judgment—Recognition of foreign judgment—    C
    Proceedings in India in personam for damage to plaintiffs' cargo
    carried on defendants' vessel—Subsequent English proceedings in
    rem—Whether "between the same parties, or their privies"—Whether
    defendants estopped by convention or acquiescence from relying on
    statutory bar—Whether English proceedings commenced before
    judgment in India "brought"—Civil Jurisdiction and Judgments Act
    1982 (c. 27), s. 34
Ships' Names—Indian Endurance—Indian Grace    D

        In June 1987 a cargo of munitions was laden on board the
    defendants' vessel Indian Grace in Sweden for carriage to Cochin
    in India and delivery to the plaintiffs. In the course of the voyage
    a fire occurred in no. 3 hold and was extinguished with water.
    Some of the cargo was jettisoned. The plaintiffs notified two
    separate claims to the defendants, one being for total loss of the    E
    cargo in no. 3 hold due to damage and the other a small claim in
    respect of the cargo jettisoned. On 1 September 1988 they issued
    a plaint in the subordinate judge's court in Cochin seeking
    damages in respect of the jettisoned cargo, and in December 1989
    judgment was given in their favour in rupees to a sterling
    equivalent of £7,200. An appeal against that judgment was
    pending. On 25 August 1989 the plaintiffs issued a writ in rem in
    the Admiralty Court in England, and on 4 May 1990 it was    F
    served on the defendants' vessel Indian Endeavour at Tees Dock,
    Middlesbrough. The parties subsequently agreed to the application
    of English law, and the defendants submitted to the jurisdiction
    of the Admiralty Court. On the provision of a letter of indemnity
    the Indian Endeavour was allowed to sail. The plaintiffs served a
    statement of claim, in Swedish kronor, in respect of damage to all
    the cargo in no. 3 hold, the sterling equivalent being £2·5m.
    Following proceedings before Sheen J. and appeals to the Court    G
    of Appeal and the House of Lords, the House of Lords ruled that
    the matter ought to be remitted to the High Court for
    consideration of the question whether there had been waiver or
    estoppel defeating the operation of section 34 of the Civil
    Jurisdiction and Judgments Act 1982[1] and whether the judgment
    in the Cochin court, being in personam, was on the same cause
    of action as that which the plaintiffs asserted in the Admiralty    H
    Court action. Clarke J. ordered preliminary issues to be tried and
    subsequently held on those issues that the plaintiffs were not

[1] Civil Jurisdiction and Judgments Act 1982, s. 34: see post, p. 883E–F.

A.C.                Republic of India v. India Steamship Co. (No. 2) (H.L.(E.))

A    debarred from bringing the proceedings in the Admiralty Court.
The Court of Appeal allowed an appeal by the defendants.

     On appeal by the plaintiffs:—

     *Held,* dismissing the appeal, (1) that, although the judgment in personam in Cochin had not yet been obtained when the action in rem had been begun in England, an action that was continued was "brought" within the meaning of section 34 of the Act of 1982; that an action in rem was in reality an action against the

B    owner of the ship and should not be allowed to proceed where a foreign judgment in personam had been obtained on the same cause of action; and that, the plaintiffs' claim in the Admiralty Court having been "brought" on a cause of action in respect of which judgment had been given in their favour in the Cochin court in proceedings "between the same parties, or their privies" within the meaning of section 34, their action was, subject to the

C    issue of estoppel, barred (post, pp. 903H, 909B, E–910A, G–H, 912F–G, 913B–C, 916D–E).

     Dicta of Lord Brandon of Oakbrook in *The August 8* [1983] 2 A.C. 450, 456, P.C. and *The Deichland* [1990] 1 Q.B. 361, C.A. applied.

     *The Nordglimt* [1988] Q.B. 183 overruled.

     (2) That the Court of Appeal had been entitled to hold that the defendants were not estopped by convention or acquiescence

D    from relying on section 34 (post, pp. 903H, 915E–916B, D–E).

     Decison of the Court of Appeal, post, pp. 882E et seq.; [1997] 2 W.L.R. 538; [1996] 3 All E.R. 641 affirmed.

     The following cases are referred to in the opinion of Lord Steyn:

*Arantzazu Mendi, The* [1939] A.C. 256; [1939] 1 All E.R. 719, H.L.(E.)
*August 8, The* [1983] 2 A.C. 450; [1983] 2 W.L.R. 419, P.C.

E    *Banco, The* [1971] P. 137; [1971] 2 W.L.R. 335; [1971] 1 All E.R. 524, C.A.
*Burns, The* [1907] P. 137, C.A.
*Compania Naviera Vascongada v. S.S. Cristina (The Cristina)* [1938] A.C. 485; [1938] 1 All E.R. 719, H.L.(E.)
*Deichland, The* [1990] 1 Q.B. 361; [1989] 3 W.L.R. 478; [1989] 2 All E.R. 1066, C.A.
*Dictator, The* [1892] P. 304

F    *Gemma, The* [1899] P. 285, C.A.
*Harmer v. Bell* (1851) 7 Moo.P.C. 267, P.C.
*Henderson v. Henderson* (1843) 3 Hare 100
*India (Republic of) v. India Steamship Co. Ltd.* [1992] 1 Lloyd's Rep. 124, C.A.;
   ·   [1993] A.C. 410; [1993] 2 W.L.R. 461; [1993] 1 All E.R. 998, H.L.(E.)
*James v. South Western Railway Co.* (1872) L.R. 7 Ex. 287
*Jupiter, The* [1924] P. 236, C.A.

G    *Lokumal (K.) & Sons (London) Ltd. v. Lotte Shipping Co. Pte. Ltd.* [1985] 2 Lloyd's Rep. 28, C.A.
*Maciej Rataj, The* (Case C-406/92) [1995] 1 Lloyd's Rep. 302; (sub nom. *The Tatry*) [1994] E.C.R. I-5439, E.C.J.
*Milor S.r.l. v. British Airways Plc.* [1996] Q.B. 702; [1996] 3 W.L.R. 642; [1996] 3 All E.R. 537, C.A.
*Moorgate Mercantile Co. Ltd. v. Twitchings* [1977] A.C. 890; [1976] 3 W.L.R.

H    66; [1976] 2 All E.R. 641, H.L.(E.)
*Nordglimt, The* [1988] Q.B. 183; [1988] 2 W.L.R. 338; [1988] 2 All E.R. 531
*Northcote v. Owners of the Henrich Björn* (1886) 11 App.Cas. 270, H.L.(E.)
*Norwegian American Cruises A/S (formerly Norwegian American Lines A/S) v. Paul Mundy Ltd.* [1988] 2 Lloyd's Rep. 343, C.A.

*Parlement Belge, The* (1880) 5 P.D. 197, C.A.                                A
*Tervaete, The* [1922] P. 259, C.A.


The following additional cases were cited in argument in the House of Lords:

*Amalgamated Investment & Property Co. Ltd. v. Texas Commerce International Bank Ltd.* [1982] Q.B. 84; [1981] 3 W.L.R. 565; [1981] 3 All E.R. 577, C.A.
*Anna H, The* [1995] 1 Lloyd's Rep. 11, C.A.
*Barrow v. Bankside Agency Ltd.* [1996] 1 W.L.R. 257; [1996] 1 All E.R. 981, B
C.A.
*Bengal, The* (1859) Swab. 468
*Furness Withy (Australia) Pty. Ltd. v. Metal Distributors (U.K.) Ltd.* [1990] 1 Lloyd's Rep. 236, C.A.
*Griefswald, The* (1859) Swab. 430
*Hiscox v. Outhwaite* [1992] 1 A.C. 562; [1991] 3 W.L.R. 297; [1991] 3 All E.R. 641, H.L.(E.)                                                        C
*John and Mary, The* (1859) Swab. 471
*Kammins Ballrooms Co. Ltd. v. Zenith Investments (Torquay) Ltd.* [1971] A.C. 850; [1970] 3 W.L.R. 287; [1970] 2 All E.R. 871, H.L.(E.)
*Longford, The* (1889) 14 P.D. 34, C.A.
*Nautik, The* [1895] P. 121
*Nord Sea, The* [1989] 1 Lloyd's Rep. 388
*Pacol Ltd. v. Trade Lines Ltd.* [1982] 1 Lloyd's Rep. 456                    D
*Rena K, The* [1979] Q.B. 377; [1978] 3 W.L.R. 431; [1979] 1 All E.R. 397
*St. Elefterio, The* [1957] P. 179; [1957] 2 W.L.R. 935; [1957] 2 All E.R. 374
*Sardinia Sulcis, The* [1991] 1 Lloyd's Rep. 201, C.A.
*Stolt Loyalty, The* [1993] 2 Lloyd's Rep. 281
*Yeo v. Tatem* (1871) L.R. 3 P.C. 696, P.C.


The following cases are referred to in the judgment of the Court of Appeal:  E

*Anna H., The* [1995] 1 Lloyd's Rep. 11, C.A.
*Arnold v. National Westminster Bank Plc.* [1991] 2 A.C. 93; [1991] 2 W.L.R. 1177; [1991] 3 All E.R. 41, H.L.(E.)
*Barrow v. Bankside Agency Ltd.* [1996] 1 W.L.R. 257; [1996] 1 All E.R. 981, C.A.
*Cella, The* (1888) 13 P.D. 82, C.A.
*Compania Naviera Vascongada v. S.S. Cristina (The Cristina)* [1938] A.C. 485; F
[1938] 1 All E.R. 719, H.L.(E.)
*Conoco Britannia, The* [1972] 2 Q.B. 543; [1972] 2 W.L.R. 1352; [1972] 2 All E.R. 238
*Deichland, The* [1990] 1 Q.B. 361; [1989] 3 W.L.R. 478; [1989] 2 All E.R. 1066, C.A.
*Furness Withy (Australia) Pty. Ltd. v. Metal Distributors (U.K.) Ltd.* [1990] 1 Lloyd's Rep. 236, C.A.                                               G
*Henderson v. Henderson* (1843) 3 Hare 100
*Hiscox v. Outhwaite* [1992] 1 A.C. 562; [1991] 3 W.L.R. 297; [1991] 3 All E.R. 641, H.L.(E.)
*India (Republic of) v. India Steamship Co. Ltd.* [1992] 1 Lloyd's Rep. 124, C.A.; [1993] A.C. 410; [1993] 2 W.L.R. 461; [1993] 1 All E.R. 998, H.L.(E.)
*Joannis Vatis (No. 2), The* [1922] P. 213
*John and Mary, The* (1859) Swab. 471                                         H
*Jupiter, The* [1924] P. 236, C.A.
*Keen v. Holland* [1984] 1 W.L.R. 251; [1984] 1 All E.R. 75, C.A.
*Lokumal (K.) & Sons (London) Ltd. v. Lotte Shipping Co. Pte. Ltd.* [1985] 2 Lloyd's Rep. 28, C.A.

A

*Maciej Rataj, The* [1995] 1 Lloyd's Rep. 302; sub nom. *The Tatry* [1994] E.C.R. I-5439, E.C.J.

*Milor S.r.l. v. British Airways Plc.* [1996] Q.B. 702; [1996] 3 W.L.R. 642; [1996] 3 All E.R. 537, C.A.

*Moorgate Mercantile Co. Ltd. v. Twitchings* [1977] A.C. 890; [1976] 3 W.L.R. 66; [1976] 2 All E.R. 641, H.L.(E.)

*Nelson v. Couch* (1863) 15 C.B.(N.S.) 99

B

*Nordglimt, The* [1988] Q.B. 183; [1988] 2 W.L.R. 338; [1988] 2 All E.R. 531

*Norwegian American Cruises A/S (formerly Norwegian American Lines A/S) v. Paul Mundy Ltd.* [1988] 2 Lloyd's Rep. 343, C.A.

*Paal Wilson & Co. A/S v. Partenreederei Hannah Blumenthal* [1983] 1 A.C. 854; [1982] 3 W.L.R. 1149; [1983] 1 All E.R. 34, H.L.(E.)

*Pacol Ltd. v. Trade Lines Ltd.* [1982] 1 Lloyd's Rep. 456

*Parlement Belge, The* (1880) 5 P.D. 197, C.A.

C

*Rena K, The* [1979] Q.B. 377; [1978] 3 W.L.R. 431; [1979] 1 All E.R. 397

*Stolt Loyalty, The* [1993] 2 Lloyd's Rep. 281

*Sylt, The* [1991] 1 Lloyd's Rep. 240

*Talbot v. Berkshire County Council* [1994] Q.B. 290; [1993] 3 W.L.R. 708; [1993] 4 All E.R. 9, C.A.

*Tervaete, The* [1922] P. 259, C.A.

*Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581; [1975] 2 W.L.R. 690, P.C.

D

The following additional cases were cited in argument in the Court of Appeal:

*August 8, The* [1983] 2 A.C. 450; [1983] 2 W.L.R. 419, P.C.

*Gemma, The* [1899] P. 285, C.A.

*Gleeson v. J. Wippell & Co. Ltd.* [1977] 1 W.L.R. 510; [1977] 3 All E.R. 54

*Kherson, The* [1992] 2 Lloyd's Rep. 261

E

*Linda, The* [1988] 1 Lloyd's Rep. 175

*Mali Ivo, The* (1869) L.R. 2 A. & E. 356

The following additional cases, although not cited, were referred to in the skeleton arguments in the Court of Appeal:

*Al-Kandari v. J.R. Brown & Co.* [1988] Q.B. 665; [1988] 2 W.L.R. 671; [1988] 1 All E.R. 833, C.A.

F

*Amalgamated Investment & Property Co. Ltd. v. Texas Commerce International Bank Ltd.* [1982] Q.B. 84; [1981] 3 W.L.R. 565; [1981] 3 All E.R. 577, C.A.

*Bengal, The* (1859) Swab. 468

*Brikom Investments Ltd. v. Carr* [1979] Q.B. 467; [1979] 2 W.L.R. 737; [1979] 2 All E.R. 753, C.A.

*Business Computers International Ltd. v. Registrar of Companies* [1988] Ch. 229; [1987] 3 W.L.R. 1134; [1987] 3 All E.R. 465

G

*Compania Portorafti Commerciale S.A. v. Ultramar Panama Inc. (No. 2)* [1990] 2 Lloyd's Rep. 395, C.A.

*Dictator, The* [1892] P. 304

*Gibbs v. Cruikshank* (1873) L.R. 8 C.P. 454

*Griefswald, The* (1859) Swab. 430

*Gubisch Maschinenfabrik K.G. v. Palumbo* (Case 144/86) [1987] E.C.R. 4861, E.C.J.

H

*Harmer v. Bell* (1851) 7 Moo.P.C. 267, P.C

*House of Spring Gardens Ltd. v. Waite* [1991] 1 Q.B. 241; [1990] 3 W.L.R. 347; [1990] 2 All E.R. 990, C.A.

*Nippon Yusen Kaisha v. Pacifica Navegacion S.A.* [1980] 2 Lloyd's Rep. 245

*Orient, The* (1871) L.R. 3 P.C. 696, P.C.                                                    A

*S.-L. (Restraint Order: External Confiscation Order), In re* [1996] Q.B. 272;
          [1995] 3 W.L.R. 830; [1995] 4 All E.R. 159, C.A.

*Sardinia Sulcis, The* [1991] 1 Lloyd's Rep. 201, C.A.

APPEAL from Clarke J.

By a notice of appeal dated 17 November 1994 the defendants, India
Steamship Co. Ltd., appealed from the decision of Clarke J. on 25 May          B
1994, on the trial of preliminary issues in an action brought by the
plaintiffs, the Republic of India and the Government of the Republic of
India (Ministry of Defence), the owners of cargo lately laden on board the
defendants' vessel *Indian Grace*, that (i) the defendants were estopped from
relying on section 34 of the Civil Jurisdiction and Judgments Act 1982;
(ii) the parties to an action in personam were not the same as the parties
to an action in rem; and (iii) the plaintiffs' claim was not barred by the          C
principle of res judicata. The judge ordered that judgment be entered for
the plaintiffs on the issues raised by paragraph 13 of the amended defence,
by the amended reply and by a rejoinder so that they were at liberty to
continue to pursue their claim made in the amended statement of claim.
The case had been remitted to the Admiralty Court by the House of
Lords.                                                                                          D

The facts are stated in the judgment of the court.

*Kenneth Rokison Q.C.* and *Jeffrey Gruder* for the defendants.
*Timothy Charlton Q.C.* and *Alan Roxburgh* for the plaintiffs.

                                                                    *Cur. adv. vult.*

                                                                                          E

23 April. STAUGHTON L.J. handed down the following judgment of
the court. On 26 June 1987 a part cargo of munitions was loaded on
board the vessel *Indian Grace* at Uddevala in Sweden for carriage to
Cochin in India. The plaintiffs in this action are the Republic of
India—that is not in dispute. They were or became the owners of the
munitions and the holders of the bills of lading. But there is to some          F
extent a dispute as to who are the defendants. The *Indian Grace* (and
likewise the *Indian Endurance*) was at all material times owned by India
Steamship Co. Ltd. We will call the parties the government and the
owners.

On 1 July 1987, in the course of the voyage, a fire was discovered in
the hold which contained the munitions. It was put out with water. But
the water affected another part cargo, of wood pulp stowed under the          G
munitions. The vessel put into Cherbourg and stayed there for a month.
Then she continued on the voyage, and reached Cochin early in September.
The cargo was discharged by 4 September. At some stage a small part of
the munitions cargo had been thrown overboard—51 artillery shells and
10 charges. But the case for the government is that the whole of their
cargo was damaged and worthless; or at any rate damaged to the extent of
half its value.                                                                                H

The casualty has given rise to legal proceedings in three different places.

(i) On 8 August 1988 the owners started an action against Oriental
Insurance Co. Ltd. in Calcutta for general average contribution. Oriental

A   were the cargo insurers who had given an average guarantee at the port of discharge. No doubt the claim was in respect of expenses and loss in connection with the fire and the call at Cherbourg, to the extent that the York–Antwerp Rules 1974 allow. At some stage Oriental answered that the cargo might turn out to have no contributory value.

(ii) On 1 September 1988 the government started an action in the subordinate judge's court at Cochin against the owners. The claim was in respect of the cargo shortage only, and was for Rs.189,508·67. That action was begun within the one-year time limit in the Hague Rules.

(iii) On 25 August 1989 a writ in rem was issued in England on behalf of the government against the *Indian Grace* and 15 other vessels in the same ownership. The principal claim was for loss of or damage to the cargo. In amount it came to Sw.Kr.27,104,984. At the date of the writ that was about 360 times the size of the claim referred to at (ii) above, and equivalent to £2·6m. This claim, too, was in time, as the government had obtained an extension pursuant to the Gold Clause Agreement.

We are not concerned with action No. (i), about general average contribution, except to note the suggestion that the cargo had no contributory value. Action No. (ii) came to trial; and on 16 December 1989 judgment was given for the government for the full amount claimed.

D   Action No. (iii) took a step forward on 4 May 1990, when the writ was served at Middlesbrough on the *Indian Endurance*, a sister ship of the *Indian Grace*. There was no arrest of the vessel, but the owners entered an appearance and their protection and indemnity association gave an undertaking to the government and their insurers to pay any damages awarded.

E   There was then an application to strike out action No. (iii) based (after amendment) on section 34 of the Civil Jurisdiction and Judgments Act 1982, which provides:

"No proceedings may be brought by a person in England and Wales or Northern Ireland on a cause of action in respect of which a judgment has been given in his favour in proceedings between the same parties, or their privies, in a court in another part of the United Kingdom or in a court of an overseas country, unless that judgment is not enforceable or entitled to recognition in England or, as the case may be, in Northern Ireland."

It was said that the judgment of the subordinate judge's court in Cochin brought that section into operation, and prevented the government from proceeding with their Admiralty action in England.

G   That argument succeeded before Sheen J., and on appeal before Glidewell, McCowan and Leggatt L.JJ. [1992] 1 Lloyd's Rep. 124. However, the House of Lords [1993] A.C. 410 on 18 February 1993 remitted the case to the Admiralty Court to consider whether there was an estoppel or waiver which prevented the owners from relying on section 34; they also remitted a new point that had been raised, as to whether an Admiralty action in rem involved the same parties and the same cause of action as an action in personam.

On 24 June 1993 in the Admiralty Court it was ordered that there be a trial of preliminary issues (for the action had still not progressed beyond

that point) as follows. (1) Whether the defendants waived reliance upon or   A
are estopped or are otherwise precluded from relying upon section 34 of
the Civil Jurisdiction and Judgments Act 1982. (In the event, it was also
argued that the owners were estopped from relying on *Henderson v.
Henderson* (1843) 3 Hare 100.) (2) Whether the fact that the action brought
by the plaintiffs in the courts of Cochin was an in personam action
whereas the present action was commenced as an in rem action has the
effect that the cause of action in the present proceedings was not a cause   B
of action in respect of which a judgment has been given in the plaintiffs'
favour in proceedings between the same parties for the purpose of section
34 of the Civil Jurisdiction and Judgments Act 1982. (3) Whether the
plaintiffs' claim is barred by reason of the principle of res judicata set out
by Sir James Wigram V.-C. in *Henderson v. Henderson.*

Those issues came before Clarke J. [1994] 2 Lloyd's Rep. 331. He   C
answered all three in favour of the government: (i) the owners were
estopped from relying on section 34 and on *Henderson v. Henderson*;
(ii) the parties to an action in personam were not the same as the parties
to an action in rem (although the cause of action was the same); and
(iii) the government's claim was not barred by the principle in *Henderson
v. Henderson*. The owners now appeal. The critical path from their point
of view is this: in order to succeed on the appeal they must show on issue   D
(i) that there is no estoppel, and also that the judge was wrong on either
issue (ii) or issue (iii). Per contra, the government must succeed *either* on
issue (i) or on both of issues (ii) and (iii) to retain their judgment.

*Further facts*
                                                                              E
After discharge was completed at Cochin in September 1987 there is a
long history until the present application to strike out was launched on
16 August 1990. The story was set out with care by the judge over
28 pages of his judgment, and we hope that we may be forgiven if we
abbreviate it to some extent.

The seeds of the present problem were sown, so it would seem, within
two or three months of discharge. On 18 November 1987 Lt. Cdr.   F
Nagarajan of the government's embarkation headquarters in Madras gave
notice of a claim in a letter to the owners' agents at Madras. The letter
said that the cargo had been received in damaged condition, but a footnote
referred to "deficient items." Three weeks later Mr. Malhotra, an under
secretary at the Ministry of Defence in New Delhi, wrote to the owners:

  "the cargo shipped under the above mentioned B/Ls has been received   G
  in damaged condition and the entire items are unserviceable and have
  been treated as total loss to the government. Accordingly we call upon
  you to pay immediately a sum of Rs.13·62 Cr. being the c.i.f. value of
  the entire consignment ..."

Those two letters, written by different officials from different offices, were
the ancestors of the proceedings in Cochin and in England respectively.   H

On 3 February 1988 Lt. Cdr. Nagarajan, having obtained the figures
for a shortage claim, wrote again to the owners' agents in Cochin enclosing
a survey report and asking for settlement in the sum of Rs.189,508·67. The

A  owners replied in a letter dated 29 February and headed "Without Prejudice:"

> "we would advise that the Government of India, Ministry of Defence have already lodged with us ... a claim in the sum of Rs.13·62 crores for alleged total loss of entire consignments covered by B/Ls nos. 0633–2 and 0633–3 ... As Government of India have already filed with us a consolidated claim ... and as we will therefore deal this matter with them as and when they revert, we suggest that you get in touch with them directly."

B

Lt. Cdr. Nagarajan, described by the judge as a most conscientious officer, reacted appropriately. He asked the Ministry of Defence in New Delhi for advice as to what he should do. Receiving no reply, he sent a reminder on five occasions.

C  On 9 June 1988 Oriental Insurance Co. Ltd. wrote to the owners, saying that they were interested in the government's claim as insurers, and asking for an extension of time under the Gold Clause Agreement. This request was repeated on behalf of Oriental by Mr. Medhekar, a claims adjuster, on 17 June 1988; he enclosed a claim bill for Rs.13·62 crores. On 21 June he asked the owners to notify the damage sustained in that amount to the general average adjusters.

D  Mr. Malhotra in New Delhi then returned to the action. On 15 July he wrote to the owners asking for a crossed cheque for Rs.13·62 crores. On 21 July he wrote again asking for an extension of the time limit, and continued:

> "Further M/S Oriental Insurance Co. Ltd. our underwriters, and/or their recovery agent Shri A.H. Medhekar, Bombay or any other recovery agent appointed/ authorised by them, is authorised to pursue and follow-up the claim including litigation thereon with you on behalf of Govt. of India/Min. of Def."

E

Next there came on the scene W.E. Cox & Co. (Recoveries) Ltd. They were the fifth person to write on behalf of the government or Oriental to the owners in connection with this casualty, and the fourth to request an extension of time. This they did by telex on 29 July. They referred to a claim for Rs.13·62 crores, and concluded: "Failure to grant extn. will of course mean legal action being taken to preserve time and all the costs thereof will be for your account." Within a few days the owners granted an extension of one year and also, at the request of Cox, agreed to English law and jurisdiction (which was said to follow from the Gold Clause Agreement) for the "alleged total loss of cargo."

F

G  Those last communications were copied to Mr. Malhotra in New Delhi. But it would seem that nobody thought to tell Lt. Cdr. Nagarajan, despite further reminders from him. So on 1 September 1988, when the one-year period provided by the Hague Rules was about to expire, he caused a plaint to be filed on behalf of the government against the owners in the subordinate judge's court at Cochin. In paragraph 1 of the plaint, which contains more in the way of narrative than would be usual in this country, there is this passage:

H

> "However the claim bill papers were returned by the carriers stating that the Government of India, Ministry of Defence, had

already lodged a claim for Rs.13·62 crores for alleged total loss of    A
entire consignment covered under the Bill of Lading No. 0633–2 and
0633–3."

That was of course true. The plaint went on to refer to "items found
deficient" on discharge to the value of Rs.189,508·67. In paragraph 4 it
said: "It is submitted that this suit is confined to the claim referred to
above." Then there is paragraph 7:                                         B

"The value of the suit for the purpose of jurisdiction and court fee
is Rs.189,508·67 and court fee under section 22 of the Kerala Court
Fees and Suit Valuation Act is Rs. 18,936·00."

A defence to the Cochin claim was filed on 9 January 1989.
Mr. Charlton for the government observes that it did not plead to the
allegation that the suit was confined to a claim for Rs.189,508·67.    C
Mr. Rokison for the owners submits that there is no reason why it should
have done.
     On 21 April 1989 the Ministry of Defence in New Delhi, in response
to yet another request for information from Lt. Cdr. Nagarajan, wrote:

"The damaged goods are being inspected by a team of D.G.I., in
the presence of a consultant appointed by the insurance company. The    D
report of the team is awaited. The claim will be finalised in the light
of the report as soon as it is received."

Clarke J. accepted the evidence of Mr. Malhotra that in his view it was for
the ministry to claim against Oriental as their insurers, but they did not
have enough information to press ahead; the insurers would then claim
against the carriers. Mr. Malhotra knew that the small claim was in    E
principle included in the larger claim, but did not wish to make a decision
until he had the report from the D.G.I. That was a perfectly sensible view
to take, provided that he did not allow the time limit to expire—or do
anything else which reduced the prospects of a recovery from the owners.
     On 26 April 1989 Oriental served their defence to the general average
claim in Calcutta. It included this passage:                             F

"It appears that the consignee has treated the said damaged [sic]
as total loss and if on investigation and tests it is so found that the
cargo is totally useless then the cargo will have a nil contributory
value. . . ."

That too was correct, unless the loss or damage to cargo was itself made
good in general average (see rule XVII of the York–Antwerp Rules 1974).    G
     Clarke J. at this stage said [1994] 2 Lloyd's Rep. 331, 338:

"No one on the defendants' side could have thought thus far that the
plaintiffs had abandoned their claim or potential claim for a total
loss, although the defendants and their club can be forgiven for being
sceptical having regard to the fact that the plaintiffs had so far
produced no supporting documents whatsoever."                           H

We agree with that conclusion.
     There followed an episode in which the owners made two offers to
settle the Cochin claim in without prejudice correspondence. The first, on

A    5 May 1989, was for Rs. 150,000, which was just under 80 per cent. of the
claim:

> "in full and final settlement of all claims of the plaintiffs against
> us/defendants in respect of loss of/damage to/deficiency ex the
> consignment covered by Uddevalla/Cochin B/L No. 0633–2."

B    Of the two bills of lading covering the whole consignment, that was the
one relied on for the shortage claim in Cochin. The reason given for the
offer was that the costs involved in contesting the case would be
disproportionately high.

Lt. Cdr. Nagarajan asked for instructions from New Delhi; he was
evidently aware, and said in terms, that in order to protect the recovery
rights of the insurers, the suit in Cochin could not be withdrawn. The
C    answer from Mr. Malhotra was:

> "As already stated, we are separately processing the recovery of
> damages to the entire consignment in ship *Indian Grace.* We cannot
> settle this case separately. Our claim is against the insurance company
> and not against the carrier. Please keep these papers pending till the
> entire matter is finalised."

D    The second offer was made on 8 June 1989, and was for the full
amount of the Cochin claim plus 50 per cent. of the court fees and of the
government's lawyers' fees. It contained the same term as to full and final
settlement. That offer was likewise not accepted.

It was submitted before Clarke J. that the owners' motive in making
these offers was that they feared a much larger claim and realised that, in
E    order to avoid it, it would be to their advantage to settle the smaller claim
in full. The judge said of this argument, at p. 338: "On the face of it there
appears to me to be a good deal of force in those submissions." At a later
stage the judge expressed the view that there appeared to be no other
explanation of the offer to settle the claim for 100 per cent. We are not
sure that we would wholly agree. Whilst the apparent generosity of the
owners' offer certainly makes one suspect an ulterior motive, can one reject
F    out of hand their explanation that the cost of contesting the claim would
be disproportionately high? And why was the term as to settlement
confined to one only of the two bills of lading? That last point was not
taken in argument before us, so perhaps we should not act upon it. All
things considered, we do not feel that we should disturb the judge's finding
(if such it was) that the owners' motive in making the two offers was to
G    achieve a settlement of both shortage and damage claims. Whether that
finding improves the government's position in law seems to us open to
question.

At about this time, in June or July 1989, there was a meeting between
Mr. Rajan of Crowe Boda & Co. Pvt. Ltd., the agents in Madras of the
Steamship Mutual Underwriting Association Ltd., and Lt. Cdr. Nagarajan.
According to Mr. Rajan he was told that the Law Ministry were not in
H    favour of legal proceedings from the beginning; that the Ministry of
Defence had instructed embarkation headquarters to file suit for
Rs.189,508·67; and that the Ministry of Defence had told Lt. Cdr.
Nagarajan that the claim for Rs.13·62 crores was to be pursued against the

underwriters only and not against the carriers. During the meeting,  A
according to Mr. Rajan, he was shown a letter from the ministry which
said so.

That evidence was disputed. But the judge found that a conversation
along the lines stated by Mr. Rajan did take place, and that it is more
probable than not that Lt. Cdr. Nagarajan did give Mr. Rajan sight of a
letter from the ministry. However, he did not think that Lt. Cdr. Nagarajan
said anything which led or could have led Mr. Rajan or anyone else to        B
think that the claim for Rs.13·62 crores would not be pursued against the
owners. We were not asked to reconsider the judge's findings in that
respect.

Mr. Rajan reported these matters to Captain Amulya Kumar Singh of
the Steamship Mutual Association, who appears to have been in overall
charge of the defence in this case. In evidence Captain Singh (as he was        C
called in the documents and throughout the trial) said that he did not
think that the claim for Rs.13·62 crores would be pursued. The judge in
terms accepted that evidence. But he added, at p. 340:

"in my judgment both Captain Singh and the defendants (especially
their claims department in Calcutta) appreciated that there remained
a risk that the claim might be advanced ..."        D

and that if the government pursued their claim against their insurers,
Captain Singh and the owners would expect the insurers then to seek to
recover from the owners.

At this stage the government received a report from those instructed to
examine the cargo, which concluded that half of the cargo (to a value of
Rs. 6·61 crores) was not acceptable. Mr. Malhotra told Oriental in July        E
that the government's claim was now that amount (which was at one time
the equivalent of the sum in Swedish kronor later claimed in the English
action). Another event, on 31 July 1989, was that Lt. Cdr. Nagarajan
retired. This the judge described as most unfortunate, since no one
thereafter kept an eye on the relationship between the large claim and the
small claim, which he was sure the commander would have continued
to do.        F

Clyde & Co., solicitors in London, now appeared as part of the many-
headed hydra (if they will forgive the description) presenting the
government's claim. They had been instructed by Cox, the recovery agents
engaged by Oriental. Their first action was to ask the owners, in a telex of
1 August 1989, for a further one-year extension of time. The owners
replied on 9 August:        G

"having considered the matter we feel the claimants had enough
opportunity of processing the claim documents but they have failed to
produce any documents even to show that a prima facie claim as large
as they mention exist. We therefore consider that further extension
need not be granted."

However, the owners referred Clyde & Co. (and Cox) to Captain Singh for        H
a definite answer.

On 14 August there was a telephone conversation between Captain
Singh of the Steamship Mutual Association and Mr. Wilson of Clyde

A & Co., which assumed great importance at the trial. Both gave evidence about what was said. In addition there were a number of contemporary documents which might be expected to reflect the content of the conversation. These were (i) a brief handwritten attendance note of Mr. Wilson, (ii) a telex that he sent to Cox on the same day, (iii) a telex from Captain Singh to the owners, also on 14 August, and (iv) a further telex from Mr. Wilson to Cox on 24 August. These features of the

B telephone conversation (among others) became common ground: (a) that a further extension of time was refused, (b) that Captain Singh mentioned the existence of proceedings in India, and (c) that Mr. Wilson asked what they were and was told that there were proceedings in Cochin for a particular average loss and proceedings in Calcutta for a general average loss. The judge found that at the end of the conversation Captain Singh

C was left with the impression that Clyde & Co. would issue a writ.

What is in dispute is a passage in Captain Singh's telex to the owners listed at (iii) above:

> "We also said that in view of proceedings in Cochin and Calcutta, we will strongly resist any attempt by them to establish (by service of proceedings) English jurisdiction."

D Mr. Wilson in evidence denied that this was said. The dispute was of some importance, for the government's case of estoppel by convention or acquiescence would be difficult to maintain if Captain Singh made such a statement to Mr. Wilson.

Clarke J. concluded [1994] 2 Lloyd's Rep. 331, 342:

> "if this point was mentioned at all by Captain Singh it was not
E impressed upon Mr. Wilson ... if Captain Singh had the possibility of a dispute as to jurisdiction in mind he either did not mention it at all or, if he did, he did so in passing in such a way that it did not impress itself on Mr. Wilson."

Mr. Rokison for the owners criticises this finding of the judge—or rather the lack of a finding. We can see force in his argument, seeing that Captain

F Singh had no reason to deceive the owners in his telex as to what he had said to Mr. Wilson. But equally Mr. Wilson would not have sent his two telexes to Cox in the terms that he did if Captain Singh had threatened to contest English jurisdiction. In our judgment the judge's conclusions must stand as they are.

The remaining events can be shortly told. Clyde & Co. issued a writ in

G rem in the High Court on 24 August 1989. The action in Cochin came on for trial early in December. It was defended on behalf of the owners, who called as witnesses their master, their superintendent and an expert. Nevertheless judgment was given for the full amount claimed in favour of the government on 16 December. The principal sub-judge referred in his judgment to the claim for Rs.13·62 crores, and later said:

> "the parties herein this suit are at issue only in respect of the
H liability of the carriers in regard to the deficiency of the cargo landed at the port of Cochin. The point in dispute in this case also confines to the liability or otherwise of the carriers regarding the deficiency of the cargo at the time of delivery. This I say at the outset, because the

plaintiff appears to have a case that the damages caused to the    A
consignment in question is much more than the amount claimed in
this plaint. That question also did not arise for consideration in this
suit."

We have already mentioned that the writ in the English action was served,
and the owners acknowledged service and provided security from the
Steamship Mutual Association. Then on 16 August 1990 the owners    B
(i) served their defence relying on issue estoppel, and (ii) issued a summons
seeking to strike out the government's claim under R.S.C., Ord. 18, r. 19.

### Issue (1): waiver or estoppel

Before Sheen J. there does not appear to have been any argument that
the owners were bound by any waiver or estoppel. The question was    C
whether the government's claim was defeated by section 34 of the Act of
1982, or by the doctrine of *Henderson v. Henderson*, 3 Hare 100, and in
particular whether the cause of action sought to be enforced in England
was the same as the cause of action which gave rise to the judgment in
Cochin. Sheen J. held that it was, and decided in favour of the owners on
section 34; if the application to strike out had rested on *Henderson v.*    D
*Henderson* alone he would have allowed the action to go to trial.

In the Court of Appeal [1992] 1 Lloyd's Rep. 124 (Glidewell, McCowan
and Leggatt L.JJ.) the case was again decided on section 34 alone, although
Leggatt L.J., at p. 133, declined to express agreement with Sheen J. on the
other point. On this occasion there was evidently some argument that, by
agreement or reservation, the government had preserved a right to sue in
England despite obtaining a judgment in Cochin. The court held that there    E
could be no agreement or reservation to override section 34.

It was on that last point that an appeal succeeded in the House of
Lords. It was there held that section 34 did not go to the jurisdiction of
the court, and might be the subject of waiver, estoppel or contrary
agreement. So the case was remitted to the Admiralty judge. Clarke J.
held, as we have already mentioned, that the owners were estopped from
relying on section 34 or on the doctrine of *Henderson v. Henderson*. He    F
further held, in effect, that the estoppel was not needed, since neither
section 34 nor *Henderson v. Henderson* would in any event be a bar to the
government's claim. Logically we should take that point first; but the
estoppel against the owners was taken first in the argument, and we adopt
the same course.

Before Clarke J. the government's case was based on (1) the events of    G
August 1989, and (2) the proceedings at Cochin. As to (1), the government
relied on estoppel by representation, or by convention, or by acquiescence.
They failed on all three before Clarke J., and do not now renew the first
two arguments. But they maintain the case that there was estoppel by
acquiescence. As to (2), the proceedings at Cochin, the judge held that
there was estoppel by convention. The government seek to uphold that
conclusion; in the alternative they rely on estoppel by acquiescence.    H

The owners in their outline argument submit that the essentials of
estoppel by convention are—(1) a mistaken assumption of fact (2) induced
by A. in the mind of B. and shared by him (3) in reliance upon which

A    both parties have conducted their affairs: *Chitty on Contracts*, 27th ed. (1994), p. 223, para. 3–081; *Keen v. Holland* [1984] 1 W.L.R. 251, 261–262 and *Norwegian American Cruises A/S v. Paul Mundy Ltd.* [1988] 2 Lloyd's Rep. 343. Mr. Charlton disputed that there was any requirement of inducement; and Mr. Rokison in reply did not insist upon it. But he submitted that there must be some statement or conduct which at least encourages the continuation of the mistaken assumption. He relied on a

B    passage in the judgment of Kerr L.J. in *K. Lokumal & Sons (London) Ltd. v. Lotte Shipping Co. Pte. Ltd.* [1985] 2 Lloyd's Rep. 28, 35:

> "There cannot be any estoppel unless the alleged representor has said or done something, or failed to do something, with the result that—across the line between the parties—his action or inaction has induced some belief or expectation in the mind of the alleged
>
C    > representee, so that, depending upon the circumstances, it would thereafter no longer be right to allow the alleged representor to resile by challenging the belief or expectation which he has engendered."

A little earlier Kerr L.J. had said, at pp. 34–35:

> "in cases of so-called estoppels by convention, there must be some mutually manifest conduct by the parties which is based on a common
>
D    > but mistaken assumption."

That was accepted as correct by Bingham L.J. in *Norwegian American Cruises A/S v. Paul Mundy Ltd.* [1988] 2 Lloyd's Rep. 343, 351. It appears to us to be the very least that can be required to constitute convention, which in this context must mean agreement or something very close to it.

E    A different test is to be found in the judgment of Dillon L.J. in *Furness Withy (Australia) Pty. Ltd. v. Metal Distributors (U.K.) Ltd.* [1990] 1 Lloyd's Rep. 236, 251:

> "The modern formulation of the question to be asked where there is a question of estoppel by convention is that the court should ask whether in the particular circumstances it would be unconscionable for a party to be permitted to deny that which knowingly or
>
F    > unknowingly he has allowed or encouraged another to assume to his detriment."

However, in *Hiscox v. Outhwaite* [1992] 1 A.C. 562, 575, Lord Donaldson of Lymington M.R. in the Court of Appeal referred to the judgment of Bingham L.J. in *Norwegian Cruises A/S v. Paul Mundy Ltd.* and continued:

> "For present purposes all that need be said is that his judgment is
>
G    > authority for the proposition that estoppel by convention is not confined to an agreed assumption as to fact, but may be as to law … that the court will give effect to the agreed assumption only if it would be unconscionable not to do so and that, once a common assumption is revealed to be erroneous, the estoppel will not apply to future dealings."

H    In our judgment it is essential that the assumption be agreed for there to be an estoppel by convention; but agreement need not be express and may be inferred from conduct, or even from silence.

How then stands the judge's conclusion that there was an estoppel by

convention arising out of the court proceedings in Cochin? The way that    A
he put it was as follows [1994] 2 Lloyd's Rep. 331, 346:

> "The failure of the defendants to react to the way in which the
> claim was put in the plaint and understood by the judge in Cochin
> amounted in my judgment to a manifestation of consent to the basis
> upon which the Cochin action was proceeding, namely that it was
> limited to the shortage claim and that the larger claim could proceed
> elsewhere. It is to be inferred that the plaintiffs made the assumption    B
> that was the attitude of the defendants. It was I think a reasonable
> assumption because of the history of the matter which I have set out
> above and in the light of the express terms of the plaint and of the
> fact that the defendants at no time said that they did not accept that
> the larger claim was being or could be proceeded with elsewhere.
> However, if the plaintiffs were mistaken and the defendants did not    C
> make the same assumption, it was because of the defendants' failure
> to make their position clear both to the plaintiffs and to the court."

One first has to ask what the assumption was that the government
made. In Mr. Charlton's submission it was that the government could
conduct the action in Cochin without prejudice to their claim in London.
But he has to be a little more precise, and say that the government could
proceed to judgment in Cochin without prejudice to a claim here. We    D
doubt whether Lt. Cdr. Nagarajan, or anybody in New Delhi, made that
assumption, or that Oriental, Cox or Clyde & Co. did. But it seems
probable that the assumption was made by people conducting the
government's case in Cochin at the time of the trial.

There is nothing whatever to show that the owners made the same
assumption. If the test requires both parties to be under the same mistake,    E
it was not fulfilled. But we think that Mr. Charlton is right in saying that,
if the assumption is agreed, it does not matter that the owners themselves
were under no illusion.

Did the owners know of the government's mistaken belief? We regard
that as doubtful. Captain Singh, as the judge found, did not think that the
larger claim would be pursued; Mr. Rajan had been shown a letter from
the Ministry of Defence saying that it would be pursued against the    F
underwriters only and not against the carriers. But even if the owners did
know of the government's mistaken assumption, we cannot find that they
ever agreed to it, or that they allowed or encouraged the government to
make it, or that there was any mutually manifest conduct which was based
on a common assumption (i.e. one held by both parties). It is difficult to
think of any reason why the owners would wish to agree to the
government's assumption—there was no advantage to them in being sued    G
to judgment in two different countries for two parts of the same claim. As
will presently appear in connection with acquiescence, there were steps
taken by the owners which might well have avoided that result. We
therefore hold that there was no estoppel by convention arising from the
proceedings at Cochin.

As to estoppel by acquiescence, the parties are agreed that the test is
to be found in the dissenting speech of Lord Wilberforce in *Moorgate*    H
*Mercantile Co. Ltd. v. Twitchings* [1977] A.C. 890, 903:

> "In order that silence or inaction may acquire a positive content
> it is usually said that there must be a duty to speak or to act in a

A    particular way, owed to the person prejudiced ... What I think we are looking for here is an answer to the question whether, having regard to the situation in which the relevant transaction occurred, as known to both parties, a reasonable man, in the position of the 'acquirer' of the property, would expect the 'owner,' acting honestly and responsibly, if he claimed any title to the property, to take steps to make that claim known ..."

B

See also *Pacol Ltd. v. Trade Lines Ltd.* [1982] 1 Lloyd's Rep. 456, and *The Stolt Loyalty* [1993] 2 Lloyd's Rep. 281 where Clarke J. said, at p. 290:

"I agree ... that the court should indeed be careful before acceding to arguments which assert duties of disclosure in new situations. I also accept the points he makes that Clyde & Co. are experienced solicitors

C    and that there can be no general duty upon one party to litigation or potential litigation to point out the mistakes of another party or his legal advisers. However each situation must be judged in the light of its particular circumstances."

As Mr. Rokison put it, a party to litigation is not obliged to be the nursemaid of his opponent, at any rate if the opponent is not an untutored

D    individual but as well acquainted with commercial litigation as the government of India. The law does sometimes impose a burden on solicitors and counsel to help their opponent's case; but the burden should only be imposed when it is truly necessary as otherwise, to quote Griffiths L.J. in *Paal Wilson & Co A/S v. Partenreederei Hannah Blumenthal* [1983] 1 A.C. 854, 879, the client will be tempted to ask, "Whose side are

E    you on?"

In this case the owners on two separate occasions pointed out to the government that there was a duplication of claims. The first was in their letter of 29 February 1988 to Lt. Cdr. Nagarajan in Cochin. The second was in the telephone conversation between Captain Singh and Mr. Wilson on 14 August 1989, when it was pointed out that there were already proceedings in Cochin on a particular average claim. What more would a

F    reasonable solicitor expect his opponent, acting honestly and responsibly, to say? Should Captain Singh have told Mr. Wilson that if the government proceeded to judgment in Cochin any claim here would be barred by section 34 of the Civil Jurisdiction and Judgments Act 1982? In our judgment the owners owed no duty to say more than was in fact said by Captain Singh. The argument for estoppel by acquiescence likewise fails.

G
*Issue (2): section 34 of the Civil Jurisdiction and Judgments Act 1982*

It is now accepted that the proceedings in Cochin and in this country are on the same cause of action. But it is said that they are not between the same parties or their privies, because the English proceedings have, in part, the character of an action in rem.

When an Admiralty action in rem is commenced by the issue and

H    service of a writ, it does not without more become a proceeding against any natural or legal person. Judgment can be entered against the ship which has been served, but not against any person. But if and when there is an acknowledgement of service by someone, there is both an action in

rem and an action in personam. The argument for the government is that,     A
in those circumstances, the action is not *brought* against the person who
owns the ship, even if subsequently the shipowner acknowledges service
and becomes a party, either to the one action or to two concurrent actions.

At first sight it is hard to believe that such a distinction was intended
by Parliament in framing section 34. The mischief which the section was
intended to remedy was explained by Lord Goff of Chieveley in earlier
proceedings in the present action [1993] A.C. 410, 417–418:                  B

"The distinction between cause of action estoppel and issue
estoppel on the one hand, and the principle of merger in judgment on
the other hand, has been of great importance where the judgment in
question is the judgment of a foreign court in the sense of a non-
English court. This is because, whereas it has been recognised that the
judgment of a non-English court may give rise to a cause of action     C
estoppel where the judgment is in favour of the defendant (see, e.g.
*Ricardo v. Garcias* (1845) 12 Cl. & F. 368), and more recently to an
issue estoppel (see *Carl Zeiss Stiftung v. Rayner & Keeler Ltd. (No. 2)*
[1967] 1 A.C. 853), nevertheless such a judgment, in favour of the
plaintiff, did not at common law constitute a bar against proceedings
in England founded upon the same cause of action. This was because    D
the principle of merger in judgment did not apply in the case of a
non-English judgment: see *Spencer Bower and Turner, Res Judicata*,
pp. 363–364, and cases there cited. It was to remove this anomaly that
section 34 of the Civil Jurisdiction and Judgments Act 1982 was
enacted."

There are other provisions in Schedule 1 to the Act which have given     E
rise to similar problems. Thus article 21 of the Convention on Jurisdiction
and the Enforcement of Judgments in Civil and Commercial Matters 1968
provides:

"Where proceedings involving the same cause of action and
between the same parties are brought in the courts of different
contracting states, any court other than the court first seised shall of
its own motion decline jurisdiction in favour of that court."          F

It was held by the European Court of Justice in *The Maciej Rataj* [1995]
1 Lloyd's Rep. 302 that two actions were still between the same parties
although the first was an action in personam and the second, in which the
ship was arrested, started as an action in rem and continued both in rem
and in personam. As Mr. Advocate General Tesauro said, what is           G
important is whether the issues which the court is called upon to examine
are the same.

A similar conclusion has been reached by the Court of Appeal in
England in *The Deichland* [1990] 1 Q.B. 361. That case was concerned with
article 2 of the Convention:

"Subject to the provisions of this Convention, persons domiciled
in a contracting state shall, whatever their nationality, be sued in the   H
courts of that state. Persons who are not nationals of the state in
which they are domiciled shall be governed by the rules of jurisdiction
applicable to nationals of that state."

Case 22-11068-JTD   Doc 4621-1   Filed 12/11/23   Page 595 of 676

895

A.C.          Republic of India v. India Steamship Co. Ltd. (No. 2) (C.A.)

A   The writ in an English action in rem was served on the vessel. There was no arrest, but the demise charterers arranged for their protection and indemnity association to give security. They then applied for the proceedings to be set aside on the ground that they should have been sued in the Federal Republic of Germany. Sheen J. rejected the application. He said, at p. 369:

B       "while the action is solely in rem there are no 'defendants,' despite the wording of the writ. The demise charterers must decide whether they will submit to the jurisdiction of this court or allow the action in rem to proceed by default."

    That is exactly the argument of the government in the present case. It was rejected by this court in *The Deichland*. Neill L.J. said, at p. 373, that the
C   right approach was to have regard to the purpose or purposes of the Convention, and referred, at p. 374, to "the reality of the matter." Sir Denys Buckley said, at p. 389:

        "In reality, distinguished from formal aspects, the instant action is, in my judgment, as much a suit against Deich as would be an action in personam against it founded on the same complaint."

D
    Mr. Charlton seeks to distinguish *The Maciej Rataj* [1995] 1 Lloyd's Rep. 302 and *The Deichland* [1990] 1 Q.B. 361 on the ground that they were both concerned with articles of the Convention, where the European Court was considering a wider field than merely the national law of England and Wales, and favoured a purposive construction. But the English courts have long been adopting a purposive approach to most
E   classes of statute.
    Other authorities from different contexts were relied on. Mr. Rokison referred us to *Milor S.r.l. v. British Airways Plc.* [1996] Q.B. 702, a case concerned with carriage by air under the Warsaw Convention 1929. It was held that the word "brought" in the convention meant commenced and pursued, or resolved. We were also referred to the Admiralty cases concerning sovereign immunity: *The Parlement Belge* (1880) 5 P.D. 197;
F   *The Tervaete* [1922] P. 259; *The Jupiter* [1924] P. 236 and *Compania Naviera Vascongada v. S.S. Cristina (The Cristina)* [1938] A.C. 485. All reached the conclusion that a foreign sovereign was either directly or indirectly impleaded by an action in rem against a ship that was his property. On a number of occasions the court drew attention to the form of writ in an Admiralty action in rem, which describes the defendants as *the owners* of
G   one or more vessels. One can contrast that with the judgment of Hobhouse J. in *The Nordglimt* [1988] Q.B. 183, 200, and the case which he cites.
    We do not travel through all the other cases that were cited on one side or the other, although all were of some relevance, but proceed straight to those which seem to us most important to the government's case. It is well established since the time of Dr. Lushington that a plaintiff who has an unsatisfied judgment in personam can proceed by an action in rem.
H   (Presumably there would be no advantage in doing so unless there had been a change in ownership of the vessel; otherwise the plaintiff could employ ordinary methods of execution. The circumstances in which an Admiralty action in rem can be brought against a vessel which is no longer

in the same ownership as when the cause of action arose have changed over the years. They are now set out in sections 20 and 21 of the Supreme Court Act 1981). Similarly a plaintiff who has proceeded in rem, recovered judgment against the vessel, and is left with it only partially satisfied, may start a second action in personam. Those two propositions emerge from *The John and Mary* (1859) Swab. 471; *Nelson v. Couch* (1863) 15 C.B.(N.S.) 99; *The Cella* (1888) 13 P.D. 82; *The Joannis Vatis (No. 2)* [1922] P. 213 and *The Rena K* [1979] Q.B. 377. In that last case Brandon J. said, at p. 405:

A

B

"It has, however, been held that a cause of action in rem, being of a different character from a cause of action in personam, does not merge in a judgment in personam, but remains available to the person who has it so long as, and to the extent that, such judgment remains unsatisfied ..."

C

The problem was faced by Mr. Rokison in argument. He was prepared to accept that, probably, it would make a difference if the action in rem was brought against a vessel in new ownership where section 21 of the Supreme Court Act 1981 allows that course; in such a case it would *not* be an action between the same parties as an action in personam against the previous owner of the vessel. But that only deals with a small part of the principles laid down from Dr. Lushington onwards. It is no answer to say that the plaintiff with an unsatisfied judgment in personam could seek to enforce the judgment, rather than the original claim, by an Admiralty action in rem. The cause of action on a judgment is not within the Admiralty jurisdiction under the Supreme Court Act 1981 (*The Sylt* [1991] 1 Lloyd's Rep. 240, 244), although a judgment can, as we have said, be enforced against a ship within the jurisdiction which is owned by the judgment debtor.

D

E

Can it be that by section 34 Parliament has, in a case where the first of two actions is brought in a foreign court (but not if it was brought in England and Wales or Northern Ireland), abolished the well-established rule that a judgment in personam is no bar to an action in rem and vice versa? If so, it is hard to see the rhyme or reason of it. We are however convinced that section 34 must have been intended, like articles 2 and 21 of the Convention, to prevent the same cause of action being tried twice over between those who are, in reality, the same parties. Where the owners of the vessel served in an Admiralty action in rem are the same person as would be liable in an action in personam, that test is satisfied, as it is in this case. We therefore hold that the government's claim is barred by section 34. The effect of section 34 where an action in rem is brought against a ship in new ownership, or where for any other reason some other person acknowledges service in such an action, can be left until another day. Since the hearing we have looked at some observations of Brandon J. in *The Conoco Britannia* [1972] 2 Q.B. 543, particularly at p. 555. It is not in our view essential to consider them in order to decide this case; and we forbear to do so without assistance from counsel.

F

G

H

There is also no need to consider Mr. Rokison's alternative argument that the two actions, if not between the same parties, are between their privies.

A    *Issue (3): Henderson v. Henderson*

It is not strictly necessary for us to decide this issue; but we do so because the point on section 34 is certainly not free from doubt whereas in our opinion the answer on this issue is plain.

We can take the doctrine from the passage in the speech of Lord Goff of Chieveley [1993] A.C. 410, 417:

B    "'there is a wider sense in which the doctrine [of res judicata] may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings:' see *Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581, 590, *per* Lord Kilbrandon, citing the locus classicus of *Henderson v. Henderson* (1843) 3 Hare 100, 115, *per* Wigram V.-C."

C

It is said for the government that this is not a case where the larger claim could, or at any rate should, have been raised in the earlier action. As an example of such a situation we were referred to *Barrow v. Bankside Agency Ltd.* [1996] 1 W.L.R. 257. But that was an unusual case (*per* Sir Thomas Bingham M.R., at p. 263) and certainly very different from this one. It is said that the court fees in the state of Kerala are unusually high

D    even by Indian standards, at 10 per cent. of the amount claimed, and would be a powerful inducement to sue somewhere else. But the government chose to sue in Cochin in the first place.

There is, however, in *Henderson v. Henderson*, 3 Hare 100, 115 an exception of special circumstances. In *Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581, 590 Lord Kilbrandon said:

E    "The shutting out of a 'subject of litigation'—a power which no court should exercise but after a scrupulous examination of all the circumstances—is limited to cases where reasonable diligence would have caused a matter to be earlier raised; moreover, although negligence, inadvertence or even accident will not suffice to excuse, nevertheless 'special circumstances' are reserved in case justice should

F    be found to require the non-application of the rule. For example, if it had been suggested that when the counterclaim in no. 969 came to be answered Mr. Lai was unaware, and could not reasonably have been expected to be aware, of the circumstances attending the sale to Choi Kee, it may be that the present plea against him would not have been maintainable. But no such averment has been made."

G    In *Arnold v. National Westminster Bank Plc.* [1991] 2 A.C. 93, 109 it was held in a rent review case that a change in the law could count as special circumstances "which could not by reasonable diligence have been adduced in" the earlier proceedings.

Finally there is *Talbot v. Berkshire County Council* [1994] Q.B. 290. It was there held that the seriousness of the plaintiff's injuries, the negligence of his solicitors, and the defendants' knowledge of his claim could not

H    amount to special circumstances. Stuart-Smith L.J. said, at p. 299:

"With all respect to the judge I do not agree that these amount to special circumstances. The mere fact that a party is precluded by the rule from advancing a claim will inevitably involve some injustice to

him, if it is or may be a good claim; but that cannot of itself amount    A
to a special circumstance, since otherwise the rule would never have
any application. The court has to consider why the claim was not
brought in the earlier proceedings. The plaintiff may not have known
of the claim at that time (see, for example, *Lawlor v. Gray* [1984] 3 All
E.R. 345 where the claim for interest by the revenue which the plaintiff
sought to pass on to the defendant had not been made at the time of
earlier proceedings) or there may have been some agreement between    B
the parties that the claim should be held in abeyance to abide the
outcome of the first proceedings; or some representation may have
been made to the plaintiff on which he has relied, so that he did not
bring the claim earlier. These would be examples of special
circumstances, though of course they are not intended to be an
exhaustive list."                                                        C

In truth there is nothing whatever in the present case which could
qualify as a special circumstance. The answer to Stuart-Smith L.J's
question, why the claim was not brought in the earlier proceedings, is
simply incompetence. If the result is injustice because there is a large sum
at stake, then as Leggatt L.J. observed in the earlier proceedings [1992]
1 Lloyd's Rep. 124, 133, that is:                                        D

"no more than the price that must logically be paid to obviate the
risk of conflicting decisions and to avoid the need for a party to have
to defend itself more than once against the same attack."

We decide this issue also in favour of the owners.
Clarke J. made it a condition of his judgment in favour of the    E
government that they should, as it seems, bear their own costs and pay the
owners' costs, in each case of the proceedings in Cochin and perhaps also
of the previous proceedings in this country. We are not sure where the
judge derived power to impose that condition; perhaps it was offered
enthusiastically on behalf of the government. It is also of some significance
that the government, as Clarke J. records, disclaimed reliance on anything
decided in Cochin as an aid to success in the English action. But suppose    F
that this concession had not been made. Could not the government have
relied in England on the subordinate judge's findings in India, for example
as to the propriety of loading munitions on top of woodpulp? Yet it is
said that there would be no estoppel as to the amount of damages. The
government's disclaimer thus tended to conceal an inherent anomaly in
their case. We doubt whether Clarke J. could have imposed a condition to    G
that effect if there had been no such disclaimer.
Since the hearing we have come across the judgment of this court in
*The Anna H.* [1995] 1 Lloyd's Rep. 11. Whilst it deals with the nature of
an Admiralty action in rem in some detail, we do not find in the judgments
of Hoffmann and Hobhouse L.JJ. anything to the contrary of the views
that we have expressed. We set aside the order of Clarke J., and answer the
preliminary issues (1) No, (2) No, and (3) Yes.                          H

*Appeal allowed with costs.*
*Leave to appeal refused.*

A     25 July.   The Appeal Committee of the House of Lords (Lord Browne-Wilkinson, Lord Mustill and Lord Hoffmann) allowed a petition for leave to appeal.

*Solicitors: Ince & Co.; Clyde & Co.*

B                                    [Reported by JILL SUTHERLAND, Barrister]

The plaintiffs appealed.

*Timothy Charlton Q.C.* and *Alan Roxburgh* for the plaintiffs. The defendants are estopped by convention or acquiescence from relying on section 34 of the Act of 1982 or on *Henderson v. Henderson* (1843) 3 Hare

C   100.
Estoppel by convention applies where the outward behaviour of the parties towards one another demonstrates a common assumption either of fact or of law: see *Amalgamated Investment & Property Co. Ltd. v. Texas Commerce International Bank Ltd.* [1982] Q.B. 84, 122C. There is no additional requirement for further communication or agreement, express

D   or implied, between the parties. Although it is necessary for the assumption to be mutually manifest, acceptance of the assumption by the party against whom the estoppel is raised may be inferred from conduct, which may include silence: *K. Lokumal & Sons (London) Ltd. v. Lotte Shipping Co. Pte. Ltd.* [1985] 2 Lloyd's Rep. 28, 34–35. It does not, generally, matter whether the common assumption is the result of any misrepresentation made by one party inducing a mistake on the part of the other, or of each

E   party making the same mistake: see *Furness Withy (Australia) Pty. Ltd. v. Metal Distributors (U.K.) Ltd.* [1990] 1 Lloyd's Rep. 236, 247. If the common assumption is established the court will give effect to it where it would be unconscionable not to do so: see *Norwegian American Cruises A/S (formerly Norwegian American Lines A/S) v. Paul Mundy Ltd.* [1988] 2 Lloyd's Rep. 343, 352; *Hiscox v. Outhwaite* [1992] 1 A.C. 562, 575F–G and the *Furness Withy* case, p. 251. [Reference was also made to *Spencer*

F   *Bower and Turner, Estoppel by Representation,* 3rd ed. (1977), p. 157 and *Norwegian American Cruises* case, at pp. 351–352.]
The defendants are estopped by convention because the outward conduct of both parties showed that the Cochin proceedings were conducted on the basis that those proceedings and any judgment given in them would not prejudice the plaintiffs' right to a trial on the merits of

G   the larger claim.
An estoppel by acquiescence arises where a reasonable man would expect the person against whom the estoppel is raised, acting honestly and responsibly, to bring the true facts to the attention of the other party known by him to be under a mistake as to their respective rights and obligations. It is only in that sense that this type of estoppel depends on the existence of a "duty to speak;" there is no requirement that one party

H   should owe to the other an independent duty of care: see *Moorgate Mercantile Co. Ltd. v. Twitchings* [1977] A.C. 890, 902G–903F; *Pacol Ltd. v. Trade Lines Ltd.* [1982] 1 Lloyd's Rep. 456, 465; *The Stolt Loyalty* [1993] 2 Lloyd's Rep. 281, 288, 291 and *Kammins Ballrooms Co. Ltd. v. Zenith*

*Investments (Torquay) Ltd.* [1971] A.C. 850, 871H–872A, 882H. Estoppel by    A
silence can arise in the course of ligitation even where the party relying on
it is represented.

As to section 34 of the Act of 1982, the present action is not "between
the same parties, or their privies" as the Cochin action. When proceedings
in rem are commenced by the issue and service of a writ in rem, the only
parties to the proceedings are the plaintiffs. The res is the subject matter
of the action, not a party to it. These features exist whether the proceedings    B
in rem are founded on a maritime lien or on a statutory right of action in
rem. They also exist irrespective of whether the res is arrested and of
whether bail or other security is given to secure its release from arrest.
When an acknowledgement of service is given in an action in rem, an
action in personam is constituted between the plaintiffs and those
acknowledging service. However, the action in rem remains extant, and    C
those acknowledging service become parties only to the in personam
element of the action. The owners of the res are not the privies of any
party to the action in rem. Section 34 does not therefore apply to this
action in so far as it is an action in rem. But neither does it apply in so
far as it is an action in personam, because the action in personam has not
been "brought" by the plaintiffs against the defendants; rather, the
defendants have chosen to undertake personal liability for any claim    D
established against the res in order that they may be permitted to defend
the action in rem. [Reference was made to *The Nautik* [1895] P. 121; *The
Sardinia Sulcis* [1991] 1 Lloyd's Rep. 201; *The Burns* [1907] P. 137; *The
Nordglimt* [1988] Q.B. 183; *The August 8* [1983] 2 A.C. 450; *The Maciej
Rataj* (Case C-406/92) [1995] 1 Lloyd's Rep. 302; sub nom. *The Tatry*
[1994] E.C.R. I-5439 and *The Anna H* [1995] 1 Lloyd's Rep. 11.] Further,    E
the wording of section 21(4) of the Supreme Court Act 1981 does not
indicate that a personal right must exist, objectively, against the owner;
that subsection merely prescribes the mode of exercise of the Admiralty
jurisdiction, which can be invoked even if a good defence is later proved:
see *The St. Elefterio* [1957] P. 179.

A judgment in personam does not bar a subsequent action in rem on
the same cause of action (and vice versa), because the necessary identity    F
of parties is lacking: see *Yeo v. Tatem* (1871) L.R. 3 P.C. 696 and *The Rena
K* [1979] Q.B. 377. Whether the owner of a res is directly or indirectly
impleaded by an action in rem, Clarke J. [1994] 2 Lloyd's Rep. 331, 355
was right to say that he does not become a party unless and until he
acknowledges service.

The Court of Appeal's conclusion, ante, p. 896F, that section 34    G
establishes a different regime in cases where a prior judgment has been
given by a foreign court is wrong. It does not reflect the legislative purpose
of section 34, explained by Lord Goff of Chieveley in *Republic of India v.
India Steamship Co. Ltd.* [1993] A.C. 410, 417–418. The section was
enacted to cure an anomaly of the common law by which a cause of action
merged in the judgment of a domestic court but not in the judgment of a
foreign court. However, the doctrine of merger never applied to bar an    H
action in rem by reason of a previous judgment in personam. The Court
of Appeal, in holding that the same approach should be adopted for the
construction of section 34 as was appropriate for articles 2 and 21 of the

A    Brussels Convention on Jurisdiction and the Enforcement of Judgments in
     Civil and Commercial Matters (Schedule 1 to the Act of 1982), was
     wrongly influenced by decisions on the meaning of differently worded
     provisions in the Convention, in particular *The Deichland* [1990] 1 Q.B.
     361 and *The Maciej Rataj* (Case C-406/92) [1995] 1 Lloyd's Rep. 302.

        Just as an estoppel per rem judicatam depends upon identity of parties
B    in the two proceedings, so too does the doctrine of merger: see *Spencer
     Bower and Turner, Res Judicata,* 2nd ed. (1969), para. 461, p. 383. The
     defendants contended that there was "privity of interest" between them
     and the *Indian Endurance,* but the ship is not a party to an action in rem;
     it is merely the physical subject matter of such an action that provides the
     asset from which a plaintiff's claim may be met.

        The issue as to the applicability of the rule in *Henderson v. Henderson,*
C    3 Hare 100, 115 arises only if it is decided that the defendants are not
     estopped from relying on the effect of the Cochin proceedings but that
     section 34 does not bar the present action. It would then become necessary
     to decide whether, if the rule is prima facie applicable, there are special
     circumstances that take the case outside it. [Reference was made to *Barrow
     v. Bankridge Agency Ltd.* [1996] 1 W.L.R. 257.]

        *Kenneth Rokison Q.C., Jeffrey Gruder Q.C.* and *Daniel Jowell* for the
D    defendants. The defendants are not estopped from relying on, nor have
     they waived, section 34 of the Act of 1982. As the Court of Appeal
     correctly held, Clarke J.'s conclusions were wrong, both on the facts and
     in law. His approach was fundamentally flawed. He did not distinguish
     estoppel by convention from estoppel by acquiescence.

        The essential requirements of the former are (i) a common (or agreed)
E    mistaken assumption of law or fact; (ii) which is induced or encouraged in
     the mind of the party alleging estoppel by some mutually manifest conduct
     of the party estopped; (iii) in reliance on which both parties have conducted
     their affairs; (iv) such that it would be unconscionable to permit the party
     estopped to resile from it: see *K. Lokumal & Sons (London) Ltd. v. Lotte
     Shipping Co. Pte. Ltd.* [1985] 2 Lloyd's Rep. 28, 34–35; *Norwegian American
     Cruises A/S (formerly Norwegian American Lines A/S v. Paul Mundy Ltd.*
F    [1988] 2 Lloyd's Rep. 343, 349–352; and *Amalgamated Investment
     & Property Co. Ltd. v. Texas Commerce International Bank Ltd.* [1982] Q.B.
     84, 126, 130.

        The Court of Appeal, ante, p. 891D, were right to say that for there to
     be an estoppel by convention there has to be an agreement or something
     very close to it. Just as for estoppel by representation the representation
G    has to be clear and unequivocal, so for estoppel by convention the
     assumption has to be mutually manifested and unequivocal. Clarke J.
     correctly rejected the plaintiffs' case on estoppel by representation that
     the defendants were estopped from relying on section 34, but he referred [1994]
     2 Lloyd's Rep. 331, 346 to the assumed basis upon which the proceedings
     in Cochin  were being conducted by both sides. There is nothing in the
     plaint in the Cochin proceedings to justify his conclusion.
H
        As to estoppel by acquiescence, the remarks of Lord Wilberforce in
     *Moorgate Mercantile Co. Ltd. v. Twitchings* [1977] A.C. 890, 903 ought not
     to be interpreted or applied as a general principle that wherever a
     reasonable man, acting honestly and responsibly, would make something

known silence or inaction requires a positive content. The parties to    A
litigation are in an adversarial position and are only regulated by the rules
of the court or the rules of professional conduct. They do not owe each
other a duty of care. There can be no general duty on one party to point
out the mistakes of the other party or his legal advisers: see *The Stolt
Loyalty* [1993] 2 Lloyd's Rep. 281, 289.

The Cochin judgment would have precluded a further action in
personam against the defendants in this country in respect of the larger    B
claim. It would be contrary to the policy of section 34 if it were open to
the plaintiffs to bring the present action because it was an action in rem,
especially since they were proceedings on the same cause of action and
between the same parties or their privies: see *The Tatry* (Case C-406/92)
[1994] E.C.R. I-5439, 5451–5452, 5477, paras. 19, 47, 48. Proceedings are
"brought" not only when they are initiated but also when they are    C
continued: see *Milor S.r.l. v. British Airways Plc.* [1996] Q.B. 702. [Reference
was also made to *The Banco* [1971] P. 137 and *The Nord Sea* [1989]
1 Lloyd's Rep. 388.] There is no rational basis for drawing a distinction
between an Admiralty action in personam against the defendants and an
Admiralty action in rem against the "Owners of the vessel *Indian
Endurance*" who are the defendants.

In the light of the decision of the European Court in *The Tatry*, the    D
decision of Hobhouse J. in *The Nordglimt* [1988] Q.B. 183 can no longer
be regarded as good law. Morever, his views are inconsistent with the
decision of the Court of Appeal in *The Deichland* [1990] 1 Q.B. 361. An
owner of a vessel sued in rem is himself party to those proceedings. By
section 21(4) of the Act of 1981, the right to arrest and bring an action in
rem in the present case was dependent on the assertion of a cause of    E
action in personam against the defendants. In the historical account of the
distinction between actions in rem and actions in personam by Jeune J. in
*The Dictator* [1892] P. 304, 310–313 there is no suggestion that the res
itself was ever a party or a defendant to an action in rem. [Reference was
made to *Harmer v. Bell* (1851) 7 Moo.P.C. 267; *Northcote v. Owners of the
Henrich Björn* (1886) 11 App.Cas. 270; *The Gemma* [1899] P. 285; *The
Jupiter* [1924] P. 236, 242, 244; *Compania Naviera Vascongada v.*    F
*S.S. Cristina (The Cristina)* [1938] A.C. 485, 491, 492, 505; *The Tervaete*
[1922] P. 259, 270 and *The Arantzazu Mendi* [1939] A.C. 256, 262–263.] In
so far as *The Longford* (1889) 14 P.D. 34 and *The Burns* [1907] P. 137 are
inconsistent with the analysis in *The Cristina,* the latter case is to be
preferred. [Reference was also made to *The August 8* [1983] 2 A.C. 450,
456.]    G

Except in a case where there is a maritime lien and change of
ownership, an action in rem is an action against the owner of the ship.
Even, if the owner is not a party to the action in rem ab initio, he clearly
becomes a party when he acknowledges service. The defendants have
appeared and acknowledged service, and in this situation the alleged
distinction between actions in rem and actions in personam has no
practical effect and is purely academic. There is no res before the court    H
that can be adjudged liable and sold. There is no bail representing the res.
The defendants' personal liability is the subject of a guarantee. The present
action is proceeding in personam and the plaintiffs are seeking an in

A    personam judgment with which to operate the guarantee. [Reference was made to *The Sardinia Sulcis* [1991] 1 Lloyd's Rep. 201, 214–215.]

As to the anomaly referred to by the Court of Appeal, ante, p. 896E–F, the alleged "well-established rule" only applies where, and to the extent to which, the plaintiff's claim is *unsatisfied*: see *Yeo v. Tatem*, L.R. 3 P.C. 696, 702 and *The Rena K* [1979] Q.B. 377, 405. [Reference was also made to *The Bengal* (1859) Swab. 468; *The John and Mary* (1859) Swab. 471 and

B    *The Griefswald* (1859) Swab. 430.] The fact that the plaintiffs failed to bring the whole of their claim in Cochin does not render the judgment in Cochin unsatisfied. On a proper construction of section 21(4) of the Act of 1981 there is no anomaly. In any event, the rule that an unsatisfied judgment in personam does not merge with a subsequent action in rem is not founded on the notion that the two types of action are between

C    different parties. The legislative purpose behind section 34 was not to "invoke the highly technical doctrine of merger" (*Republic of India v. India Steamship Co. Ltd.* [1993] A.C. 410, 424) but rather "[to achieve] the same practical result ... by the simple words chosen in the section." The purpose of the section was, generally, to prevent a multiplicity of actions by forcing the plaintiff to bring his entire claim in one set of proceedings. As Lord Goff of Chieveley acknowledged, the principle on which section 34 is

D    founded is the public interest in the finality of litigation. Such a principle would be thwarted by permitting the plaintiffs to bring an action in rem in circumstances where they would be precluded from bringing a further action in personam. Where there is no maritime lien and no change of ownership of the vessel, the plaintiff in an action in rem is in law and reality bringing a claim on the same cause of action against the same

E    party as in an action in personam. The Court of Appeal was correct in its conclusion.

Neither the Court of Appeal nor Clarke J. considered the arguments addressed to the effect that, even if the action in England was not between the same parties as the action in Cochin, the defendants were the privies of the vessel that was, apparently, the "defendant" to the action in rem. Res judicata applies not only to those who were parties to the original

F    decision but also to those who were privies to it. The concept of "privity" is intended to be an extension to the rule that res judicata affects parties. A "privy" is ex hypothesi not a party but is someone who is so closely connected to a party that it is just that he can be bound by and take the benefit of the previous decision. If the defendants were not parties to the action in rem, their relationship to the ship, which, ex hypothesi, is a party, could not have been closer.

G    The Court of Appeal was correct in finding that this was a case where the larger claim could and therefore should have been raised in the earlier action and that, therefore, the plaintiffs' claim is barred by reason of the principle of res judicata in *Henderson v. Henderson*, 3 Hare 100.

*Charlton Q.C.* replied.

H    Their Lordships took time for consideration.

16 October.  LORD BROWNE-WILKINSON.  My Lords, for the reasons given by my noble and learned friend, Lord Steyn, in his speech, a copy of which I have seen in draft, I would dismiss the appeal.

LORD STEYN.   My Lords, in June 1987 the respondent defendants'  A
vessel *Indian Grace* loaded a cargo of munitions in Sweden for carriage to
Cochin in India and delivery to the appellant plaintiffs, the Indian
Government. The vessel sailed. A few days later a fire occurred in the
no. 3 hold of the vessel. The master and crew extinguished the fire with
water. They also jettisoned 51 artillery shells and 10 charges. The vessel
put into Cherbourg for survey and to repack and restow the cargo in
no. 3 hold. Upon completion of the necessary work the vessel resumed her  B
voyage to Cochin. She arrived at Cochin in early September, and the cargo
was cleared by 4 September 1987.

In the next few months the Indian Government notified two separate
claims to the defendants. The first was a claim for the total loss of the
cargo of munitions. The second was a small claim for short delivery based
on the loss of the cargo jettisoned after the fire. On 1 September 1988 the  C
Indian Government issued a plaint in the subordinate judge court in
Cochin, seeking damages for the 51 shells and 10 charges which had not
been delivered. The owners served a defence. This action came on for final
hearing in December 1989. After a contested trial the judge gave judgment
for the Indian Government for the amount of its claim in rupees. At that
time the sterling equivalent was £7,200. An appeal against this judgment is  D
still pending.

On 25 August 1989 (i.e. before judgment in the action in Cochin) the
Indian Government caused a writ in rem to be issued in the Admiralty
Court in England. On 4 May 1990 the writ was served on the *Indian
Endurance*, a sister ship of the *Indian Grace*, at Tees Dock, Middlesbrough.
In due course the parties agreed to the application of English law and the
owners submitted to the jurisdiction of the Admiralty Court. The plaintiffs  E
threatened to arrest the vessel in order to obtain security for their claim
against the defendants. Upon the provision of a letter of undertaking by
Steamship Mutual Underwriting Association Ltd. to pay the claim, if
proved, the *Indian Endurance* was allowed to sail. The statement of claim,
as subsequently amended, was in respect of damage to all the cargo in
no. 3 hold. The plaintiffs' case was that the munitions were subjected to  F
radiant heat by the fire, and were consequently unreliable and worthless.
The claim was largely made in Swedish kronor. The sterling equivalent
was £2·6m.

Initially, the defendants pleaded issue estoppel as a defence to the
claim: they said that the plaintiffs could and should have brought their
whole claim before the court in Cochin. The defendants applied to strike
out the claim. The summons came before the Admiralty judge who was  G
then Sheen J. The judge allowed the defendants to amend their defence to
rely upon section 34 of the Civil Jurisdiction and Judgments Act 1982.
Section 34 provides:

"No proceedings may be brought by a person in England and
Wales ... on a cause of action in respect of which a judgment has
been given in his favour in proceedings between the same parties, or  H
their privies ... in a court of an overseas country, unless that judgment
is not enforceable or entitled to recognition in England and
Wales ..."

A Sheen J. held that the cause of action was the same as that on which the plaintiffs had relied when they obtained judgment in India. He held that section 34 of the Act of 1982 was an absolute bar to the English proceedings. He struck out the proceedings. The plaintiffs appealed. The Court of Appeal dismissed the appeal: *Republic of India v. India Steamship Co. Ltd.* [1992] Lloyd's Rep. 124. The Court of Appeal ruled that the causes of action were the same and that section 34 applied. The plaintiffs

B sought to argue that the defendants were debarred by agreement, waiver or estoppel from relying on section 34. The Court of Appeal held that section 34 defined the jurisdiction of the court and that parties cannot by agreement, waiver or estoppel confer a jurisdiction upon the court which it did not have. The plaintiffs appealed to the House of Lords: *Republic of India v. India Steamship Co. Ltd.* [1993] A.C. 410. Counsel for the plaintiffs

C argued that the causes of action in the foreign and English proceedings were distinct. The House ruled that there was an identity between causes of action in the two sets of proceedings. But Lord Goff of Chieveley, speaking for a unanimous House, held that section 34 operated as a bar against proceedings rather than as an exclusion of jurisdiction. Accordingly, the operation of section 34 could in principle be defeated by agreement,

D waiver or estoppel. Lord Goff concluded that the matter ought to be remitted to the Admiralty Court to consider the issue of estoppel or waiver. Lord Goff further observed, at p. 424, that the plaintiffs sought to raise for the first time in the House of Lords the argument that the judgment of the Cochin court was not a judgment between the same parties as the plaintiffs asserted in the Admiralty action, because it was a judgment in personam, whereas the action was an Admiralty action in

E rem. This matter too was remitted for consideration of the Admiralty judge.

The present Admiralty judge, Clarke J., ordered preliminary issues to be tried. After a six-day trial he gave a detailed and careful judgment [1994] 2 Lloyd's Rep. 331. He ruled that: (i) the defendants were estopped from relying upon section 34 by an estoppel by convention and an estoppel

F by acquiescence; (ii) in any event, the English action being an Admiralty action in rem, although an action brought on the same cause of action as the Cochin action, was an action brought against a different party, viz. the ship rather than the owners; and (iii) that the principle laid down in *Henderson v. Henderson* (1843) 3 Hare 100, 115 did not prevent the plaintiffs from bringing in rem proceedings in the Admiralty Court. The

G defendants appealed. The Court of Appeal, ante, pp. 882E et seq., came to a contrary conclusion on all three issues and allowed the appeal.

Reversing the order in which the issues were considered in the courts below I propose to examine first whether the English action in rem is "between the same parties, or their privies" within the meaning of section 34 as the action in which the plaintiffs obtained judgment in Cochin. If the answer to that question is "Yes," the question arises whether the

H defendants are estopped from relying on section 34. If the defendants fail on both the principal issues the further question arises whether the defendants can rely on the principle in *Henderson v. Henderson*, 3 Hare 100, viz. abuse of process, to defeat the action in rem.

*The nature of an Admiralty action in rem*                                      A

Clarke J. [1994] Lloyd's Rep. 331, 350 concluded that the authorities
show that, although an action in personam and an action in rem may
involve the same cause of action, historically they have been regarded as
being between different parties. Recognising that an action in rem affects
the owners, the judge cited the dictum of Fletcher Moulton L.J. in *The
Burns* [1907] P. 137, 149 that "the action in rem is an action against the    B
ship itself." He also relied on the judgment of Hobhouse J. in *The
Nordglimt* [1988] Q.B. 183 along the same lines. Accordingly, the judge
held that section 34 is inapplicable because the parties in the two sets of
proceedings were different. Counsel for the plaintiffs supported this
reasoning and amplified it in a helpful argument. It is necessary to
understand the nature of the pending action in rem.

                                                                               C

*The pending action*

The claims endorsed on the writ do not involve maritime liens. Instead
the claims of the plaintiffs invoked the enlarged Admiralty jurisdiction of
the High Court. The grounds of jurisdiction relied on by the plaintiffs are
two paragraphs in section 20(2) of the Supreme Court Act 1981, namely:

"(g) any claim for loss of or damage to goods carried in a ship;         D
(h) any claim arising out of any agreement relating to the carriage of
goods in a ship or to the use or hire of a ship;..."

The indispensable conditions upon which in such cases, among others,
the jurisdiction of the Admiralty Court is predicated is defined in
section 21(4) of the Act of 1981. Section 21(4) provides that in the case of
claims of the type under consideration (i.e. falling within section 20(2)(g)   E
and (h)) an action in rem may be brought where:

"(a) the claim arises in connection with a ship; and (b) the person *who
would be liable on the claim in an action in personam* ... was, when the
cause of action arose, the owner or charterer of, or in possession or
in control of, the ship." (My emphasis.)                                   F

This is the statutory basis upon which the Indian Government invoked the
jurisdiction of the Admiralty Court.

The manner in which the Indian Government invoked the jurisdiction
of the Admiralty Court was by the issue and service of a writ in the
form prescribed by R.S.C., Ord. 75, r. 3(1), read with Form No. 1 in
Appendix B. The writ is expressed to be directed to the owners of the ship   G
as defendants and other persons interested in her.

*The historical perspective*

The historical context of the problem before the House of Lords is
noteworthy. Before the Judicature Acts 1873–75 the courts of King's Bench
regarded the High Court of Admiralty as in a sense a superior court but
being of limited jurisdiction, amenable to restraint by prohibition: *James v.   H
South Western Railway Co.* (1872) L.R. 7 Ex. 287. The common law courts
effectively blocked the assumption by the High Court of Admiralty of in
personam jurisdiction. This was done by writs of prohibition to restrain

A the expansion of the jurisidiction of the High Court of Admiralty. The writ of prohibition did not extend to the Admiralty jurisdiction over the ship. Maritime liens over the ship were immune from the writ of prohibition: see the valuable discussion in *Thomas, Maritime Liens* (1980), p. 7. Admiralty practitioners and judges used the concept that the ship is a defendant in an action in rem as a means of defending and extending the jurisdiction of the High Court of Admiralty. An enlarged view was

B taken of what constitutes a maritime lien. The personification theory flourished. But this struggle for power was ended by the Judicature Acts.

In the 19th century it was believed that an admiralty action could only be brought in respect of a maritime lien: *Harmer v. Bell* (1851) 7 Moo.P.C. 267. By statute actions in rem were subsequently permitted in new categories. But only after the Judicature Acts was it established that the

C new categories did not involve maritime liens: *Northcote v. Owners of the Henrich Björn* (1886) 11 App.Cas. 270. While the action in rem was still confined to maritime liens, courts sometimes ascribed personality to a ship. The ship was regarded as both the source and limit of liability. The ship herself was the "wrongdoer." After the Judicature Acts the personification theory fell into decline.

D The interaction, and cumulative effect, of a number of factors contributed to the decline of this theory. First, there is the factor, already noted, that actions in rem were permitted in new categories which did not involve maritime liens. It became less easy to personify the ship as the real defendant. Secondly, before 1873 actions in rem were commenced by a form of writ which did not name the owners of the ship as defendants. By 1883 the modern form of process, which named the owners as defendants,

E had evolved. This development made it easier to regard an action in rem as an action against the owners of the vessel. An argument that the procedural changes brought about no change in substance was expressly rejected by Jeune J. in *The Dictator* [1892] P. 304, 307. The procedural change influenced the reasoning of judges in subsequent important decisions: *The Tervaete* [1922] P. 259, 274, *per* Atkin L.J.; *The Jupiter* [1924]

F P. 236, 245, *per* Atkin L.J.; *Compania Naviera Vascongada v. S.S. Cristina (The Cristina)* [1938] A.C. 485, 492, *per* Lord Atkin and *per* Lord Wright, at p. 505. In *The Arantzazu Mendi* [1939] A.C. 256, the plaintiffs sought to avoid a plea of sovereign immunity by issuing a writ naming the ship as a defendant. Lord Atkin observed, at pp. 262–263, that the writ was wholly irregular since it "purported to make a chattel (the ship) a defendant and to order the chattel to enter an appearance." The other Law Lords agreed.

G Thirdly, until the Judicature Acts, it was not possible to combine an action in rem with an action in personam in the Admiralty. Since *The Dictator* was decided in 1892 the law has been that once the owners enter an appearance (or in modern phraseology when they acknowledge issue of the writ) there are two parallel actions: an action in personam and an action in rem. From that moment the owners are defendants in the action in personam. This development militated against the personification theory.

H It became implausible to say that the owners are the defendants in the action in personam but the ship is the defendant in the action in rem or, alternatively, as counsel for the Indian Government suggested, there is no defendant in the action in rem. Fourthly, judges, steeped in Admiralty

history with its civilian roots, tended to be more sympathetic to the    A
personification theory than judges trained in the common law. At appellate
level common law judges tended to take the robust view that a ship is an
inanimate thing, incapable of making contracts and committing torts, and
devoid of legal personality. In authoritative judgments common law judges
eschewed the mystique of the personification theory.

The personification theory gave way to a more realistic view of the
nature of actions in rem. This development took place in the context of    B
the changes which I have sketched. The breakthrough came in *The
Dictator.* In one of his first sittings as President of the new Probate,
Divorce and Admiralty Division Sir Francis Jeune, a common lawyer,
undertook a comprehensive review of the development of actions in rem.
He concluded, at p. 320, that when the defendants do appear the action in
rem:    C

"not only determines the amount of the liability, and in default of
payment enforces it on the res, but is also a means of enforcing
against the appearing owners, if they could have been made personally
liable in the Admiralty Court, the complete claim of the plaintiff so
far as the owners are liable to meet it."

This was the procedural theory which subsequently became dominant. The    D
historical analysis in *The Dictator* has been criticised: *Wiswall, The
Development of Admiralty Jurisdiction and Practice since 1800* (1970), ch. 6.
On the other hand the foremost historian of Admiralty history has
supported it: *Select Pleas in the Court of Admiralty,* edited by
R. G. Marsden for the Selden Society, vol. 1 (1894), pp. 1xxi–1xxii. *The
Dictator* was followed and endorsed by the Court of Appeal in *The Gemma*    E
[1899] P. 285. It is true that a few years later, in *The Burns* [1907] P. 137,
149, Fletcher Moulton L.J. appeared in effect to be repudiating the
procedural theory by saying that "the action in rem is an action against
the ship" and by acknowledging only that "the action indirectly affects
them" (the owners). That observation was made on a point of statutory
construction and did not reflect the reasoning of the majority. The
reasoning in *The Dictator* prevailed. In *The Tervaete* [1922] P. 259, 270    F
Scrutton L.J. said that it was established that an action in rem was not
based upon the wrongdoing of the ship personified as an offender but was
a means of bringing the owner of the ship to meet this personal liability
by seizing his property. Atkin L.J., at p. 274, expressed a similar view. See
also *The Jupiter* [1924] P. 236. In *The Cristina* [1938] A.C. 485 the House
of Lords unambiguously rejected the personification theory, and adopted    G
the realist view that in an action in rem the owners were the defendants.

This historical account of the evolution of the procedural theory must
be qualified. *Thomas, Maritime Liens,* p. 7, n. 40, p. 8, n. 44, has pointed
out that the procedural theory does not explain why a maritime lien may
be enforced against a bona fide purchaser and that it is not entirely
consistent with the fact that certain maritime liens accrue independently of
personal liability of the shipowner. These may be regarded as distant    H
echoes of the personification theory. But this case is not concerned with
maritime liens. That is a separate and complex subject which I put to one
side.

A    Given this general historical perspective, counsel for the plaintiffs acknowledged that the procedural theory became dominant but argued that it tells us nothing about the answer to the question before the House. He said that the procedural theory is a neutral fact. That is unrealistic. The procedural theory stripped away the form and revealed that in substance the owners were parties to the action in rem.

B    *The sovereign immunity cases*

The reality that an action in rem is an action against the owner of the ship is supported by the line of sovereign immunity cases. I will refer only to the most significant cases. In *The Parlement Belge* (1880) 5 P.D. 197 the Court of Appeal held that an action in rem *indirectly* impleaded a sovereign who was the owner of the vessel served because his property was
C    affected by the judgment of the court. In this century the courts have gone further and held that a sovereign whose ship is served in an action in rem is in fact *directly* impleaded as a defendant. This appears clearly from the judgments in *The Cristina* of Lord Atkin, at p. 491, Lord Thankerton, at p. 493, Lord Macmillan, at p. 498, and Lord Wright, at p. 505. A perusal of those judgments show clearly that the reasoning of the House of Lords depended in the first place not on principles of international law but on
D    an analysis of the development of the action in rem in English law. Because the sovereign was held to be directly impleaded the principle of sovereign immunity was then applied. The decision of the House of Lords in *The Arantzazu Mendi* [1939] A.C. 256 was to the same effect. The proposition that the foreign sovereign is directly impleaded as a defendant by service on his vessel is therefore conclusively established. That proposition must
E    carry with it the legal consequence that the sovereign is a party to the action in rem.

*Further developments*

Confining myself to the more important decisions only, there are other decisions of high authority for the proposition that the true defendant in a duly constituted action in rem are the owners of the ship. In *The August 8*
F    [1983] 2 A.C. 450, 456, Lord Brandon of Oakbrook, a former Admiralty judge, explained:

"By the law of England, once a defendant in an Admiralty action in rem has entered an appearance in such action, he has submitted himself personally to the jurisdiction of the English Admiralty Court, and the result of that is that, from then on, the action continues
G    *against him* not only as an action in rem but also as an action in personam ..." (My emphasis.)

More importantly, in *The Deichland* [1990] 1 Q.B. 361 the Court of Appeal held that the owner of a vessel which is served with proceedings in rem is "sued" for the purpose of article 2 of Schedule 1 to the Act of 1982. The essential basis of the decision is to be found in the observation of Sir
H    Denys Buckley, at p. 389, that

"In reality, distinguished from formal aspects, the instant action is, in my judgment, as much a suit against Deich as would be an action in personam ..."

This reasoning was based on a perception of the true nature of an action   A
in rem in English law. It is a view that I share.

### The decision of the European Court of Justice in The Maciej Rataj

In *The Maciej Rataj* (Case C-406/92) [1995] 1 Lloyd's Rep. 302 the
European Court of Justice had to consider the applicability of article 21
of the Brussels Convention on Jurisdiction and the Enforcement of   B
Judgments in Civil and Commercial Matters (Schedule 1 to the Act of
1982) to actions in rem and in personam. Article 21 provides:

"Where proceedings involving the same cause of action and
between the same parties are brought in the courts of different
contracting states, any court other than the court first seised shall of
its own motion decline jurisdiction in favour of that court."   C

The European Court held that an action in rem and an action in personam
involve the same cause of action, the same object and the same parties:
paragraphs 47 and 48. The Advocate General observed, at paragraph 19
of his opinion (sub nom. *The Tatry* [1994] E.C.R. I-5439, 5452):

"No importance must therefore be attached to the fact that the   D
proceedings in question may possibly be of a different nature under
the civil procedural law of one or other of the states concerned—What
is important is whether or not the substantive issues which the court
is called upon to examine are the same."

Counsel for the plaintiffs has emphasised that, unlike article 21, section 34
of the Act of 1982 is a provision of domestic origin designed to address a   E
problem of domestic law. That is true. On the other hand, a comparison
of article 21 and section 34 reveal a striking similarity in language. In
drafting section 34 the draftsman must have taken article 21 as a model.
In these circumstances it would be curious if one were to arrive at a
decision on "the same parties" in respect of section 34 which diverges from
that which applies to article 21. This consideration reinforces the view that   F
I take on a consideration of the nature of an action in rem judged from
the perspective of domestic English law.

### The purpose of section 34

The function of section 34 was to overcome the anomaly created by
the fact that the doctrine of merger did not apply in the case of foreign,   G
i.e. non-English, judgments: *Republic of India v. India Steamship Co.* [1993]
A.C. 410, 423, *per* Lord Goff of Chieveley. The rationale of the bar against
proceedings caught by section 34 is that it is unjust to permit the same
issue to be litigated afresh between the same parties: *per* Lord Goff of
Chieveley, at p. 422H. Given this legislative objective, it would in my view
be wrong to permit an action in rem to proceed despite a foreign judgment   H
in personam obtained on the same cause of action. The purpose of section
34 militates in favour of the bar created by it applying to the action in
rem. That seems to me to be a factor weighing strongly against the
arguments of the plaintiffs.

A

*The Nordglimt*

Clarke J. relied on the judgment of Hobhouse J. in *The Nordglimt* [1988] Q.B. 183. Hobhouse J. had to consider whether in the context of article 21 a Belgian action in personam against owners was between "the same parties" as an Admiralty action in rem. Hobhouse J. held that at the date of its commencement an action in rem was not between the same

B parties as an action in personam. That was always a very narrow view. Given the decision of the European Court of Justice in *The Maciej Rataj (The Tatry)* the decision in *The Nordglimt* is no longer good law. But Clarke J. relied on *The Nordglimt* for its exposition of the nature of an action in rem. Hobhouse J. in turn founded his decision on the observations of Fletcher Moulton L.J. in *The Burns* [1907] P. 137 encapsulated by the statement, at p. 149, that "the action in rem is an action against the ship

C itself." In the light of the development of the action in rem after the Judicature Acts that proposition can no longer be accepted. It has been overtaken by the developments which I have described in this century, notably the analysis in the sovereign immunity cases. Those decisions were apparently not cited to Hobhouse J. and he did not mention them. His analysis can no longer be supported.

D

*The anomaly*

Counsel for the plaintiffs relied on a suggested anomaly which may arise if section 34 is held to bar the present action. That anomaly was identified by Staughton L.J. He observed, ante, pp. 895–896:

"It is well established since the time of Dr. Lushington that a plaintiff

E who has an unsatisfied judgment in personam can proceed by an action in rem. (Presumably there would be no advantage in doing so unless there had been a change in ownership of the vessel; otherwise the plaintiff could employ ordinary methods of execution. . . .) Similarly a plaintiff who has proceeded in rem, recovered judgment against the vessel, and is left with it only partially satisfied, may start a second action in personam. Those two propositions emerge

F from *The John and Mary* (1859) Swab. 471; *Nelson v. Couch* (1863) 15 C.B.(N.S.) 99; *The Cella* (1888) 13 P.D. 82; *The Joannis Vatis (No. 2)* [1922] P. 213 and *The Rena K* [1979] Q.B. 377."

Staughton L.J. continued:

"Can it be that by section 34 Parliament has, in a case where the first of two actions is brought in a foreign court (but not if it was

G brought in England and Wales or Northern Ireland), abolished the well-established rule that a judgment in personam is no bar to an action in rem and vice versa? If so, it is hard to see the rhyme or reason of it."

Nevertheless, Staughton L.J. held that section 34 must have been intended to prevent the same cause of action being tried twice over between those

H who are, in reality, the same parties.

Counsel were agreed that the rule to which Staughton L.J. referred was established in cases involving maritime liens. The House was not referred to authority extending the rule beyond maritime liens. It is an ancient and

strange rule which I would not wish to extend beyond the limits laid down   A
by authority. To that extent the scope of any anomaly is less than may
have been apparent in the Court of Appeal. But counsel for the defendants
argued that the anomaly disappears on a proper construction of section
21(4) of the Act of 1981. The argument runs as follows: In cases of
maritime liens the Admiralty Court's jurisdiction does not necessarily
depend on the personal liability of the owner: see section 21(3) of the Act   B
of 1981. On the other hand, in cases falling within section 21(4), such as
the present case, proof of personal liability of the owner is essential. In
order to succeed in the Admiralty action in rem the plaintiffs must prove
the personal liability of the owners: *per* Clarke J. [1994] 2 Lloyd's Rep. 331,
355. In the case of an unsatisfied foreign or domestic judgment in
personam, further action in personam between the same parties is barred.
That leaves the possibility of a foreign or domestic judgment in personam   C
and a subsequent action in rem in the Admiralty court. But in a
subsequent action in rem the plaintiffs would be unable to establish the
personal liability of the owners. For these reasons counsel for the
defendants argued that the anomaly disappears in fact. It is, however, not
merely a defensive point. If it is correct it affords an independent reason
why the plaintiffs cannot succeed in the pending action in rem. This point   D
was not remitted by the House to be decided by Clarke J. He did not do
so. It was not put before the Court of Appeal. In these circumstances
I propose to express no view on it. Finally, I must point out that there is
an argument that the old rule has simply been abolished by section 34: see
*Briggs and Rees, Civil Jurisdiction and Judgments,* 2nd ed. (1977), p. 359.
Since this point has not been explored in argument, I will express no final
view on it. If any anomaly exists, it is quite insufficient to displace the   E
compelling arguments in favour of the applicability of section 34 in the
present case.

### Was the pending action "brought" within the meaning of section 34?

That brings me to a discrete point. When the English action in rem   F
was launched no judgment in personam in Cochin had yet been obtained.
In these circumstances Clarke J. held, at p. 356, that the bar in section 34
is, in any event, inapplicable. This is a short point. Counsel for the
plaintiffs argued that the action in rem in the Admiralty Court was merely
continued, and not "brought" within the meaning of section 34 after the
judgment in Cochin. This issue turns on the meaning of the word
"brought" in section 34. I consider that where proceedings are continued   G
one can quite naturally describe those proceedings as brought. That
construction also gives a sensible and purposive meaning to section 34.
I am reinforced in this view by the fact that in an analogous context, viz.
article 28 of the Warsaw Convention (1929) (Part B of Schedule 2 to the
Carriage by Air Acts (Application of Provisions) Order 1967 (S.I. 1967
No. 480)), the Court of Appeal interpreted the word "brought" as   H
embracing the initiation and pursuit of the proceedings: *Milor S.r.l. v.
British Airways Plc.* [1996] Q.B. 702. I would therefore reject the argument
of the plaintiffs on this point.

A     *Conclusion on the action in rem point.*

The role of fictions in the development of the law has been likened to the use of scaffolding in the construction of a building. The scaffolding is necessary but after the building has been erected scaffolding serves only to obscure the building. Fortunately, the scaffolding can usually be removed with ease: *Fuller, Legal Fictions* (1967) p. 70. The idea that a ship

B    can be a defendant in legal proceedings was always a fiction. But before the Judicature Acts this fiction helped to defend and enlarge Admiralty jurisdiction in the form of an action in rem. With the passing of the Judicature Acts that purpose was effectively spent. That made possible the procedural changes which I have described. The fiction was discarded.

It is now possible to say that for the purposes of section 34 an action in rem is an action against the owners from the moment that the Admiralty

C    Court is seized with jurisdiction. The jurisdiction of the Admiralty Court is invoked by the service of a writ, or, where a writ is deemed to be served, as a result of the acknowledgement of the issue of the writ by the defendant before service: *The Banco* [1971] P. 137. From that moment the owners are parties to the proceedings in rem.

Subject to the plea of estoppel, section 34 is therefore a bar to the

D    action in rem.


*Estoppel: the law*

The plaintiffs rely in the alternative on estoppel by convention and estoppel by acquiescence to defeat the applicability of the bar created by section 34. A general review of the requirement of these estoppels is not

E    necessary. It is settled that an estoppel by convention may arise where parties to a transaction act on an assumed state of facts or law, the assumption being either shared by them both or made by one and acquiesced in by the other. The effect of an estoppel by convention is to preclude a party from denying the assumed facts or law if it would be unjust to allow him to go back on the assumption: *K. Lokumal & Sons*

F    *(London) Ltd. v. Lotte Shipping Co. Pte. Ltd.* [1985] 2 Lloyd's Rep. 28; *Norwegian American Cruises A/S v. Paul Mundy Ltd.* [1988] 2 Lloyd's Rep. 343; *Treitel, The Law of Contract,* 9th ed. (1995), pp. 112–113. It is not enough that each of the two parties acts on an assumption not communicated to the other. But it was rightly accepted by counsel for both parties that a concluded agreement is not a requirement for an estoppel by convention.

G    So far there was no disagreement about the law. But it was argued for the plaintiffs that Staughton L.J. had held in the Court of Appeal that a concluded agreement was a requirement of an estoppel by convention. That argument was based on the observation by Staughton L.J., ante, p. 891H, that "it is essential that the assumption be agreed for there to be an estoppel." At first glance that observation seems to bear out the argument. But earlier Staughton L.J. had referred to an "agreement

H    or something very close to it." Reading the observations in context I do not accept that the Court of Appeal misdirected itself on this point.

That brings me to estoppel by acquiescence. The parties were agreed that the test for the existence of this kind of estoppel is to be found in the

dissenting speech of Lord Wilberforce in *Moorgate Mercantile Co. Ltd. v. Twitchings* [1977] A.C. 890. Lord Wilberforce said, at p. 903, that the question is:

> "whether, having regard to the situation in which the relevant transaction occurred, as known to both parties, a reasonable man, in the position of the 'acquirer' of the property, would expect the 'owner' acting honestly and responsibly, if he claimed any title in the property, to take steps to make that claim known ..."

Making due allowance for the proprietary context in which Lord Wilberforce spoke, the observation is helpful as indicating the general principle underlying estoppel by acquiescence.

The question was debated whether estoppel by convention and estoppel by acquiescence are but aspects of one overarching principle. I do not underestimate the importance in the continuing development of the law of the search for simplicity. I, also, accept that at a high level of abstraction such an overarching principle could be formulated. But Mr. Rokison, for the defendants, persuaded me that to restate the law in terms of an overarching principle might tend to blur the necessarily separate requirements, and distinct terrain of application, of the two kinds of estoppel. (In passing I would pay tribute to the argument of Mr. Rokison, presented with his customary flair in his last case in the House of Lords.)

*Estoppel by convention: the facts*

Clarke J. [1994] 2 Lloyd's Rep. 331 set out the primary facts and his inferences in detail. Staughton L.J. summarised the facts and the findings of the judge in his judgment. It is unnecessary for me to cover the same ground. Instead I deal with the matter quite shortly. Clarke J., at p. 346, found established a manifestation of consent to the basis upon which the proceedings in Cochin were proceeding, namely that it was limited to the shortage claim and the larger claim could proceed elsewhere. It is, however, not enough to show that the defendants by their conduct manifested that they knew that the larger claim would be put forward in other proceedings. It is true that the common assumption does not have to extend specifically to the bar under section 34. But in order to establish an estoppel by convention the plaintiffs had to prove that the defendants evinced by their conduct that they were content that the taking of a judgment in Cochin would not prejudice the resolution of other proceedings on their merits, that is, that in future proceedings no plea or defence on the basis of a judgment in Cochin would be raised whatever the outcome of the proceedings in Cochin.

Once this distinction is kept in mind it is clear that there was insufficient evidence to warrant a finding that an estoppel by convention was established. Ultimately, on appeal to the House of Lords, counsel for the plaintiffs relied on two aspects of the evidence. The first was a telephone conversation on 14 August 1989 between Captain Singh of Steamship Mutual Underwriting Association Ltd. (representing the defendants) and Mr. Wilson of Clyde & Co. (the plaintiffs' solicitors). Mr. Wilson was unaware of any Indian proceedings. Captain Singh

A   mentioned that there were two sets of proceedings pending in India, viz.
proceedings for particular average loss in Cochin and proceedings in
Calcutta for general average loss. Mr. Wilson asked for an extension of
time to serve a writ in England. Captain Singh refused this request.
Captain Singh was left with the impression that Clyde & Co. would issue
a writ in the Admiralty Court. Contrary to the defendants' case the judge
found that Captain Singh did not mention that English jurisdiction would
B   be contested, or, if he did so, that it was done in a way not calculated to
impress itself on Mr. Wilson. This evidence shows merely that the plaintiffs'
solicitors informed the defendants that there would be English proceedings.
It falls markedly short of establishing a common assumption, manifested
by the exchanges between the parties, that no plea arising from the fact of
a judgment would be taken in the English proceedings.

C       In the second place the plaintiffs relied on the way in which the
proceedings in Cochin were conducted. The plaintiff made clear in the
plaint that the claim was confined to the short delivery of a small quantity
of cargo. The plaint recited that the plaintiffs had notified the defendants
of a large claim in respect of an "alleged total loss of entire consignment."
In his judgment the judge pointed out that the claim before him was only
in respect of the small claim in respect of short delivery. He noted that the
D   plaintiffs appeared to have a further and much larger claim. That is the
extent of the relevant evidence. The statements by the advocates admitted
in evidence do not reveal that anything more of significance was said by
either side about the basis on which the claim was being conducted. All
that can be inferred from the conduct of the proceedings in Cochin is that
there was a larger claim which would be pursued elsewhere. The evidence
E   does not begin to show that the defendants evinced an attitude that they
were content that judgment should be given in Cochin, and that whatever
the outcome of the proceedings in Cochin they would not raise a plea or
defence elsewhere on the basis of the fact of a judgment in Cochin. There
was no evidence to warrant such a finding.

        The distinction that I have drawn about the facta probanda of an
F   estoppel by convention in the present case may not have been squarely
placed in argument before the judge. It was crucial. The judge did not
therefore approach his findings of fact in the way which I have outlined.
In any event, there was insufficient evidence before him to justify findings
of estoppel by convention of the type which I have described. In these
circumstances the Court of Appeal were entitled to conclude that no
estoppel by convention was established.

G

   *Estoppel by acquiescence: the facts*

        It is overwhelmingly probable, as both sides accepted, that until after
the judgment in Cochin was handed down neither side gave any thought
to the implications of that judgment on any further proceedings. Both
sides were in ignorance of the potential consequences of a judgment in
H   Cochin. There were no special circumstances which could even arguably
have required the defendants to put the plaintiffs on their guard as to the
risk flowing from the taking of a judgment in Cochin. The defendants also
did nothing by conduct or silence which could have led the plaintiffs to

**Lord Steyn**        **Republic of India v. India Steamship Co. (No. 2) (H.L.(E.))**                    **[1998]**

think that the plaintiffs could safely take a judgment in Cochin without    A
any risk of a plea or defence in any further proceedings.

Clarke J. [1994] 2 Lloyd's Rep. 331, 346 said that the defendants are
"estopped either by convention or by acquiescence (if that is different)..."
So far as the judge rested his judgment on estoppel by acquiescence, I am
satisfied that the separate requirements of this kind of estoppel were not
satisfied. In my judgment the Court of Appeal was entitled to reverse
Clarke J. on this point.                                                     B

### Henderson v. Henderson

In view of my conclusion that section 34 is applicable, and not defeated
by estoppel, it is unnecessary to express any view on the separate issue
whether the principle in *Henderson v. Henderson*, 3 Hare 100 applies.      C

### The disposal of the appeal

Acknowledging my indebtedness to the judgment of Staughton L.J.,
I conclude that for the reasons I have given the appeal ought to be
dismissed.

                                                                            D

LORD HOFFMANN.  My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend, Lord Steyn. For the
reasons which he gives, I agree that the appeal should be dismissed.

LORD COOKE OF THORNDON.  My Lords, I have had the advantage of
reading in draft the speech of my noble and learned friend, Lord Steyn,    E
and for the reasons given by him I, too, would dismiss the appeal.

LORD HOPE OF CRAIGHEAD.  My Lords, I have had the advantage of
reading in draft the speech which has been prepared by my noble and
learned friend, Lord Steyn.  I agree with it, and for the reasons which he
has given I, also, would dismiss the appeal.                                F

*Appeal dismissed with costs.*

*Solicitors: Clyde & Co.; Ince & Co.*

                                                        M. G.       G

————

                                                                            H

**EXHIBIT Y**

Court of Appeal                                    A

## *ING Bank NV *v* Ros Roca SA

### [2011] EWCA Civ 353

2010  Nov 29, 30;                          Rix, Carnwath, Stanley Burnton LJJ
2011  March 31                                                          B

*Contract — Construction — Fee agreement — Parties disputing amount of fee due
    under agreement — Correct approach to construction — Whether estoppel
    precluding party from relying on full contractual rights*
*Estoppel — Convention, by — Shared assumption — Contract specifying formula by
    which claimant's fees to be calculated — Parties proceeding on shared
    assumption that fees to be calculated on different basis — Whether claimant
    estoppel from relying on full contractual rights*                     C
*Practice — Claim — Part 8 procedure — Unsuitability where party raising issue of
    estoppel — CPR r 8.1(2)[1]*

The defendant company engaged the claimant bank to act as its financial adviser
in its search for an investor to develop its business.  In addition to a fixed fee,
provision was made by clause 2(b) of their agreement for an additional fee related to
the ratio of the enterprise value ("EV") to the earnings before interest, tax,       D
depreciation and amortisation ("EBITDA").  The clause provided that the additional
fee would be "based on the enterprise value/EBITDA 2006 entry multiple implicit in
the transaction".  At the time of the agreement it was assumed that the transaction
would occur in 2006: in fact it did not happen until the end of 2007.  The parties
jointly estimated the net financial debt, including transaction costs, at €4m.  The
bank realised that that figure was wholly inconsistent with application of the
EBITDA 2006 figure but allowed the discussions between it and the company to       E
continue on the basis that €4m was the correct figure.  When the bank subsequently
claimed a fee based on the EBITDA 2006, the company paid a substantially lower
amount based on the EBITDA 2007.  The bank issued a Part 8 claim form seeking a
declaration that its construction of clause 2(b) was correct and judgment in its
favour for the difference between the amount paid and the amount which would
be payable under that construction.  The judge held that clause 2(b) should be       F
construed as though the reference to the EBITDA 2006 were a reference to the
company's then current EBITDA figure, namely the 2007 figure, and that the bank's
additional fee should be calculated accordingly, but rejected the company's
alternative argument that, if on the true construction of the clause the bank's
additional fee should be calculated by reference to the EBITDA 2006, there was an
estoppel by convention which prevented the bank from asserting that its fee should
be so calculated.                                                           G
    On the bank's appeal—
    *Held,* (1) that in construing the clause, the court should consider first whether it
was clear that something had gone wrong with the language, and secondly, if so,
whether it was clear what a reasonable person would have understood the parties to
have meant; that since the reference to EBITDA 2006 had been intentional nothing
had gone wrong with the language, rather the mistake had been in failing to
anticipate its consequences; that it was not possible to identify objectively another   H
EBITDA which could be said to be implicit in the transaction; and that, accordingly,
the bank's interpretation of clause 2(b) was correct (*post,* paras 22, 24–25, 28–30,
75, 79–84, 109).

---

[1] CPR r 8.1(2): "A claimant may use the Part 8 procedure where— (a) he seeks the court's
decision on a question which is unlikely to involve a substantial dispute of fact . . ."

473

A    *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101, HL(E) applied.
     But (2), dismissing the appeal, that the agreed estimate of the net financial debt
implied a shared assumption that, notwithstanding the reference to the EBITDA
2006 in clause 2(b), that was not the basis on which the fees were to be calculated;
that the parties had been engaged in a joint project, in which each was entitled to
assume that the other would act consistently, and would not knowingly conceal
information of significance; that a reasonable man in the defendant's position would
B    have expected its financial adviser to have taken steps to make its position known;
that it would be unjust to permit the bank to go back on the shared assumption that
EBITDA 2006 was not be used; that, therefore, an estoppel by convention or
acquiescence was established; and that, accordingly, the appropriate remedy was to
confine the bank to a fee based on the EBITDA 2007 figure (post, paras 70–74, 76,
79, 85, 95, 106–107, 109–110).
     Dicta of Lord Wilberforce in *Moorgate Mercantile Co Ltd v Twitchings* [1977]
C    AC 890, 903, HL(E) and *Republic of India v India Steamship Co Ltd (The Indian
     Endurance and The Indian Grace) (No 2)* [1998] AC 878, HL(E) applied.
     *Per curiam.* In general CPR Pt 8 proceedings are wholly unsuitable for the trial
of an issue of estoppel. Once such a claim is disputed, save in exceptional cases, the
proceedings will cease to comply with CPR r 8.1(2)(a), since they will cease to be
proceedings in which the parties seek the court's decision only on questions which are
"unlikely to involve a substantial dispute of fact". A disputed claim of estoppel
D    should be carefully pleaded. The contents of the note at *Civil Procedure 2011*, vol 1,
para 8.0.2 are strongly endorsed (post, paras 49, 77, 79).
     *Per* Rix LJ. Alternatively, the shared assumption gave rise to a promissory
estoppel, supported by the bank's duty to speak. That better expresses the essence of
the context (post, paras 85–86).
     Decision of Walker J [2010] EWHC 50 (Comm) affirmed on different grounds.

E    The following cases are referred to in the judgments:

     *Amalgamated Investment & Property Co Ltd v Texas Commerce International Bank
          Ltd* [1982] QB 84; [1981] 3 WLR 565; [1981] 3 All ER 577; [1982] 1 Lloyd's
          Rep 27, CA
     *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios)* [1985] AC 191; [1984]
          3 WLR 592; [1984] 3 All ER 229; [1984] 2 Lloyd's Rep 235, HL(E)
F    *Baird Textile Holdings Ltd v Marks & Spencer plc* [2001] EWCA Civ 274; [2002]
          1 All ER (Comm) 737, CA
     *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38; [2009] AC 1101; [2009]
          3 WLR 267; [2009] Bus LR 1200; [2009] 4 All ER 677; [2010] 1 All ER (Comm)
          365, HL(E)
     *Combe v Combe* [1951] 2 KB 215; [1951] 1 All ER 767, CA
     *East v Pantiles (Plant Hire) Ltd* [1982] 2 EGLR 111, CA
G    *Gillett v Holt* [2001] Ch 210; [2000] 3 WLR 815; [2000] 2 All ER 289, CA
     *Grundt v Great Boulder Pty Gold Mines Ltd* (1937) 59 CLR 641
     *India (Republic of) v India Steamship Co Ltd (The Indian Endurance and The Indian
          Grace) (No 1)* [1993] AC 410; [1993] 2 WLR 461; [1993] 1 All ER 998; [1993]
          1 Lloyd's Rep 387, HL(E)
     *India (Republic of) v India Steamship Co Ltd (The Indian Endurance and The Indian
          Grace) (No 2)* [1994] 2 Lloyd's Rep 331; [1998] AC 878; [1997] 2 WLR 538;
H         [1996] 3 All ER 641; [1996] 2 Lloyd's Rep 12, CA; [1998] AC 878; [1997]
          3 WLR 818; [1997] 4 All ER 380, HL(E)
     *KPMG LLP v Network Rail Infrastructure Ltd* [2007] EWCA Civ 363; [2007]
          Bus LR 1336, CA
     *Lokumal (K) & Sons (London) Ltd v Lotte Shipping Co Pte Ltd (The August
          Leonhardt)* [1985] 2 Lloyd's Rep 28, CA

*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749;                A
    [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)
*Moorgate Mercantile Co Ltd v Twitchings* [1977] AC 890; [1976] 3 WLR 66; [1976]
    2 All ER 641, HL(E)
*Rainy Sky SA v Kookmin Bank* [2010] EWCA Civ 582; [2011] 1 All ER (Comm) 18;
    [2011] 1 Lloyd's Rep 233, CA
*Tradax Export SA v Dorada Cia Naviera SA (The Lutetian)* [1982] 2 Lloyd's Rep
    140                                                                                      B
*Troop v Gibson* [1986] 1 EGLR 1
*Woodhouse AC Israel Cocoa SA v Nigerian Produce Marketing Co Ltd* [1971]
    2 QB 23; [1971] 2 WLR 272; [1971] 1 All ER 665; [1971] 1 Lloyd's Rep 25, CA;
    [1972] AC 741; [1972] 2 WLR 1090; [1972] 2 All ER 271; [1972] 1 Lloyd's Rep
    439, HL(E)

No additional cases were cited in argument.                                                 C

The following additional case, although not cited, was referred to in the skeleton
arguments:

*Argy Trading Development Co Ltd v Lapid Developments Ltd* [1977] 1 WLR 444;
    [1977] 3 All ER 785; [1977] 1 Lloyd's Rep 67
*Crédit Suisse v Allerdale Borough Council* [1995] 1 Lloyd's Rep 315; [1997] QB 306;
    [1996] 3 WLR 894; [1996] 4 All ER 129; [1996] 2 Lloyd's Rep 241, CA             D
*Dun & Bradstreet Software Services (England) Ltd v Provident Mutual Life
    Assurance Association* [1998] 2 EGLR 175, CA

**APPEAL** from Walker J
    By a Part 8 claim form the claimant bank, ING Bank NV, which had been
engaged by the defendant company, Ros Roca SA, to act as its financial
adviser in its search for an investor to develop its business ("the                         E
transaction"), sought (i) a declaration that by clause 2(b) of the agreement
between them, which provided that the claimant was to be entitled to an
additional fee related to the ratio of the defendant's enterprise value ("EV")
to the earnings before interest, tax, depreciation and amortisation
("EBITDA"), was entitled to an additional fee based on the EBITDA value in
2006; and (ii) payment of the difference between the amount actually paid                    F
by the defendant by way of an additional fee (based on the 2007 value of
EBITDA, which had been current when the transaction had taken place) and
the amount which was payable on its construction of clause 2(b).  By a
judgment dated 21 January 2010 Walker J [2010] EWHC 50 (Comm)
dismissed the claim.
    By an appellant's notice filed on 11 February 2010 the claimant                          G
appealed on the ground that the judge had misconstrued clause 2(b) of the
agreement and ought to have held that on a true construction the fee was
to be calculated by reference to the enterprise value attributed to the
defendant in the transaction and the EBITDA for 2006; that, further, the
judge had erred in his approach to construction in that (1) he had failed to
give any or any adequate weight to the fact that the agreement had been
concluded between commercial parties so as to produce a precise formula                      H
containing specific values expressed in language specifically chosen by
them, which included several specific and definite references to EBITDA
2006; (2) he had wrongly concluded that, if construed as the claimant
submitted, the language of clause 2(b) involved a linguistic mistake or

*A*  produced commercially absurd results; (3) he had failed to give any or any adequate weight to the importance of commercial certainty, and wrongly preferred a construction which was apt to leave the relevant EBITDA figure vague and indeterminable and thereby to produce commercial uncertainty; and (4) he had impermissibly rewritten clause 2(b) so that a value which the parties had expressly agreed to be a constant formula for calculating fees instead became liable to be changed on an unspecified and

*B*  indeterminate future date or dates.

By a respondent's notice the defendant sought to uphold the judge's decision on the additional or further ground that, if the claimant's construction of clause 2(b) was correct, then it was estopped from claiming a fee based on EBITDA 2006.

The facts are stated in the judgment of Carnwath LJ.

*C*
*Stephen Phillips QC* and *Paul Stanley QC* (instructed by *Allen & Overy LLP*) for the claimant.
*Charles Graham QC* and *Simon Colton* (instructed by *Izod Evans*) for the defendant.

The court took time for consideration.

*D*
31 March 2011. The following judgments were handed down.

**CARNWATH LJ**

*Introduction*

*E*  1  This appeal concerns the construction of a clause governing the calculation of an "additional fee" for financial services provided by ING Bank NV ("ING") to Ros Roca SA ("Ros Roca"). In monetary terms ING claims €6,700,000; on Ros Roca's interpretation, upheld by the judge, the correct amount is €943,922·44. The cross-appeal is based on the contention that, even if ING succeeds on the construction issue, it is precluded by estoppel from relying on that construction.

*F*  2  Ros Roca is a Spanish company specialising in waste and environmental services. ING is a Dutch bank, which in 2006 acted as financial adviser to Ros Roca in connection with negotiations for the purchase of another company, Dennis Eagle Group Ltd. ING also provided financial assistance by underwriting a bridging facility of up to €63,500,000. It was a term of that arrangement that the funds provided

*G*  would be repaid through a capital increase to be subscribed by a third party investor (or "partner"). Under a separate agreement, Ros Roca engaged ING as its exclusive financial adviser in connection with the search for such an investor.

3  The terms of that agreement were set out in a letter dated 31 October 2006. For reasons explained by the judge this agreement has been referred to as "the Hawk retainer". In due course a suitable investor was identified,

*H*  Deyà Capital SCR SA ("Deyà"). Under an investment agreement dated 7 December 2007 Deyà made an equity investment of €63,500,000, which enabled Ros Roca to repay the bridging facility. The appeal turns on the construction of the formula for calculating ING's fees, described by the judge as the "entry ratio".

*The Hawk retainer*                                                          A

4  ING undertook to act for Ros Roca—"in connection with the search of a partner to subscribe a capital increase in Ros Roca . . . ('the transaction') on the terms set out in this letter ('the engagement')"

5  By section 1 ("Engagement and scope of work") Ros Roca retained ING as "its exclusive financial adviser".  The services to be provided as appropriate included:                                            B

"(a) using information provided by the company for the purposes of the engagement, provide the company with a valuation of the Ros Roca's assets that form part of the transaction; (b) advising on the best long term financial structure for Ros Roca; (c) preparation, with the assistance of the management of the company, of the information which will be made available to the potential buyers, including the elaboration    C
of a descriptive sale memorandum, with detailed information of the businesses and its economic financial situation; (d) in consultation with the company, developing, updating and reviewing a list of potential purchasers (the 'list') and contacting those in the list which have been approved by the company; (e) advising the company on the conduct of the transaction, including advising on obtaining confidential undertakings    D
from potential purchasers in respect of confidential information, dealing with inquiries from potential purchasers, accompanying potential purchasers as required on due diligence meetings with the company and management and site visits, and distributing further information; (f) advising and assisting in the negotiations the company may hold with potential purchasers or any other party in the transaction and its advisers and/or investors and, if appropriate, the advice on tactics which    E
the company may wish to adopt in relation to such negotiations; (g) assisting the company on the final terms of the transaction; (h) collaboration and co-ordination of the company's other advisers, which will prepare the economic, financial, administrative, technical, tax and legal information (vendor due diligence and data room) to be delivered to the potential interested parties; and (i) co-ordination of, and    F
assistance with the preparation of any documentation required to execute the transaction."

6  ING was to assist in co-ordination of the work of other advisers, but not so as to make it responsible for "any due diligence" on behalf of the company.  Further:

"It is solely the company's responsibility to ensure that the information    G
and advice relating to any due diligence and the implementation of any transaction contemplated in connection with the engagement is received and considered by the company as adequate for its purposes under the engagement."

7  Section 2 ("Fees and expenses") provided for payment of fees to be paid "upon the successful completion of the transaction".  Section 2(a)    H
provided for a fixed fee of 1% of "the higher of the equity bridge facility or the equity investment in Ros Roca". Section 2(b), which is at the heart of the appeal, provided for an additional fee as follows; payable on top of the fixed fee. It was in these terms:

*A*      "(b) an *additional fee* based on the Enterprise Value/EBITDA 2006
('EV/EBITDA 06') entry multiple implicit in the transaction.

| For an implicit EV/EBITDA 06 multiple in the following range | An additional fee per 0·1 × multiple of |
|---|---|
| Below 8·9 × | €0 |
| Larger than 8·9 × and below/equal to 9·2 × | €25,000 |
| Larger than 9·2 × and below/equal to 9·5 × | €50,000 |
| Larger than 9·5 × and below/equal to 10 × | €75,000 |
| Larger than 10 × and below/equal to 10·5 × | €100,000 |
| In excess of 10·5 × | €200,000 |

*D*      In this letter of agreement, the term 'enterprise value' means the
pre-money valuation of the partner's economic offer for its equity
investment, plus any debt outstanding in Ros Roca before completion.
     "*Illustrative example*: in case of total equity raising from a financial
partner of €60m at an entry EV/EBITDA 06 multiple of 9·5 ×, proceeds
for ING would amount to a total of €825,000 (fixed fee of €600,000 plus
additional fee of €75,000 + €150,000)."

*E*   *The construction issue*

     **8**   The first issue turns on the proper construction of the formula:

     "the Enterprise Value/EBITDA 2006 ('EV/EBITDA 06') entry multiple
     implicit in the transaction."

*F*      **9**   There is no dispute about the numerator, that is the enterprise value as
defined (or "EV"). It is common ground that "the pre-money value" referred
to the valuation of the whole of Ros Roca prior to the investment, to which
was to be added any debt outstanding, and that on that basis the amount of
the enterprise value "implicit" in the transaction was €441m.
     **10**   As to the denominator, it is also common ground that "EBITDA"
refers to earnings before interest, tax, depreciation and amortisation; and
*G*   that this is a measure widely used in financial markets to value companies.
As the judge observed: "the higher the EV/EBITDA multiple, the higher the
capital value which the purchaser is prepared to ascribe to the company in
comparison with what is known about its underlying profits."
     **11**   The dispute arises because of the specific reference to the date
("EBITDA 2006") in relation to a transaction which did not take place until
the end of 2007. It is common ground that calculation of the denominator
*H*   by reference to the 2006 EBITDA would result in a denominator of
€33·1m, and an entry ratio of 13·3. If instead the 2007 EBITDA is
taken (as current at the time of the transaction in December 2007), the
corresponding figure for the denominator becomes €42·6m, and the entry
ratio 10·35.

12    As already noted, the difference is very substantial. By an invoice    A
dated 6 May 2008, ING claimed fees of €7,350,749·05, made up of a fixed
fee of €635,000, expenses of €15,749·05, and an "additional fee" of
€6,700,000, based on an entry ratio of 13·3. Ros Roca has paid €1,594,671
made up of the same fixed fee and expenses, but an additional fee of
€943,922·44, based on an entry ratio of 10·35. The difference between the
parties accordingly is over €5·7m.                                          B

*Additional background facts*

13    The judge [2010] EWHC 50 (Comm) at [23] made certain additional
findings as to "surrounding circumstances . . . known to both parties" at the
time of the agreement:

"(1) The Hawk retainer was part of the arrangements that were    C
required in order to enable Ros Roca's purchase of DEG to take place in
late 2006, and it and ING's underwriting of the bridging finance were
mutually conditional.

"(2) At the time of the Hawk retainer neither party could say what
form the offer(s) to invest would take.

"(3) If Project Hawk achieved its aim, the successful bid to invest might    D
explicitly identify an enterprise value in the sense used in the Hawk
retainer. If it did not then, because bidders would have to say how many
shares they wanted for a fixed amount of money, it would always be
possible to extrapolate that value.

"(4) At the time of the Hawk retainer it was not contemplated that
ING would have any control over which offer was eventually accepted,
which was always a matter for Ros Roca (and in reality for Ros Roca's    E
shareholders). Indeed, there was to be no obligation on the part of Ros
Roca to accept the 'highest' offer. In this regard there was an element of
risk to ING.

"(5) At the time of the Hawk retainer neither the EBITDA for 2006 nor
the EBITDA for 2007 could be known as a definite number. But the
parties had forecasts of the EBITDA for both 2006 and 2007. The    F
forecast for EBITDA 2006 for the combined enterprise of Ros Roca and
Dennis Eagle was about €28m. The forecast for EBITDA 2007 was just
over €30m—a figure which made no allowance for 'synergies' resulting
from merger, such synergies not being expected to increase gross margin
until 2010 onwards. Of these forecasts, the forecast for 2006 could be
expected to be more accurate than that for 2007, since it could be based    G
on 9–10 months of actual performance whereas the projection for 2007
was a pure estimate.

"(6) At the time of the Hawk retainer Ros Roca was acquiring Dennis
Eagle at an 8·6 multiple, and both parties knew that two current
purchases in the sector were taking place at entry multiples relative to
EBITDA of 9 and 9·4. A minority share would attract, other things being
equal, a lower valuation than that for purchase of the entire share capital    H
of a company. As against that, however, the prospect of synergies
increasing gross margin from 2010 onwards would tend to increase the
valuation of Ros Roca following the imminent acquisition of Dennis
Eagle Group Ltd.

A    "(7) It was market practice that when valuing a company, or comparing valuations, the 'current' figures for Enterprise Value and EBITDA would generally be used—and in the case of EBITDA the 'current' figure might well be a forecast."

14    He added, at para 29, in relation to points (6) and (7):

B    "While I do not have the benefit of expert evidence, the matters set out at para 23(6) and 23(7) above demonstrate the use of EV/EBITDA comparables in the market. They reflect the acceptance by ING's witnesses that valuations for actual transactions would use the figures for enterprise value and EBITDA current at the time of the transaction—which in the case of EBITDA might be a forecast."

C    15    There was an issue as to when, viewed at the time of the Hawk retainer, the parties expected the transaction to be completed. ING contended that it was not reasonably in contemplation that it would be completed in 2006 or by early 2007. This was relevant to whether, at the time of the retainer, the parties foresaw completion during the period when valuations would naturally be based on the 2006 EBITDA. The judge held that at that time there was "at least a realistic possibility that the transaction would be concluded by May 2007": para 26.

D

*The judge's view*

16    It is unnecessary to repeat the judge's detailed and painstaking analysis of the various alternatives. The principal difference between the parties before him can be seen in his summary at para 38(4) of their respective interpretations of the words "implicit in the transaction", at para 38(4):

E

"(a) [*ING's view*] One must determine a value for the concept in question by identifying the value for the concept stated or implied in the transaction. ING . . . acknowledges that on this basis the denominator it contends for ('EBITDA 2006') is not implicit in the transaction and accordingly it says that the words 'implicit in the transaction' apply only to the numerator . . .

F

"(b) [*Ros Roca's view*] One must determine a value for the concept in question by using figures current at the time when the transaction was completed—which might or might not have been stated or implied in the transaction. Ros Roca accepted that their interpretation involved ignoring the reference to 2006."

G

17    The judge, applying the principles set out by Lord Hoffmann in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101, paras 21 and 25, asked himself whether "it is clear that something has gone wrong with the language, and if so is it clear what a reasonable person would have understood the parties to have meant?": para 40.

H    18    He rejected ING's construction as "commercial nonsense". He said, at paras 42–43:

"42. . . . I do not consider that ING's construction of the words used to express the entry ratio is merely idiosyncratic. In my view it is so unreasonable in its result that the parties cannot have intended it—or if

they had intended it they would have taken steps to make that intention   *A*
abundantly clear.

"43. The key point here is not only that valuations generally use
current values for both numerator and denominator when computing an
entry multiple, but also that this is done for good reason. Only by using
the EBITDA which is 'current' for the actual or proposed purchase in
question can one measure the extent to which the purchase price   *B*
constitutes a high or low assessment of the company's intrinsic worth
by reference to its earnings. The obvious purpose of an additional fee is
to give ING a success fee over and above its fixed fee to reflect the
extent to which the eventual purchaser has made a high rather than
a low assessment of Ros Roca's intrinsic worth. On the assumption
that EBITDA 2006 would be the current EBITDA at the time of the
transaction this was exactly what the words used to express the entry   *C*
ratio achieved."

19   At the time the Hawk retainer was drafted, there was a realistic
possibility that EBITDA 2006 would be the current EBITDA at the time of
the transaction. In those circumstances he did not find it surprising that the
parties referred to "EBITDA 2006", and that, "neither party spotted that this
overlooked the possibility that 2006 might no longer be apposite at the time   *D*
of the transaction": para 44. He did not rest his decision on "the undoubted
fact" that ING's construction would lead to a high overall fee:

"45. The crucial points here are that on this premise one will not be
comparing like with like, and there is no obvious relationship between a
denominator of EBITDA 2006 and a numerator achieved by calculating
the enterprise value for a transaction at a time when EBITDA 2006 is no   *E*
longer current."

20   Finally, he considered whether Ros Roca's interpretation was
"commercially problematic", in that the concept of "current EBITDA"
was relatively "ill-defined". He said, at para 48:

"It is common ground that when valuing or comparing values it is   *F*
general practice to identify such an EBITDA, which may be a forecast
rather than an actual figure. If this can be done as a matter of general
practice then there is no reason to conclude that it will involve
insuperable commercial problems in the context of the Hawk retainer."

21   He concluded, at para 49:

"I consider it clear that a reasonable person would have understood the   *G*
parties, when using the words they did in expressing the entry ratio, to
have included references to 2006 by oversight, and to have intended that
the denominator should be EBITDA without linking this to a specified
year."

*Discussion*   *H*

22   Like the judge I would start from Lord Hoffmann's guidance in the
*Chartbrook* case [2009] AC 1101. That requires that it should be clear
(a) that something has gone wrong with the language and (b) what a
reasonable person would have understood the parties to have meant.

A     23   I will take the two requirements in turn. On any view the wording of
the formula creates problems. Ros Roca's interpretation involves ignoring
the reference to the year 2006 altogether. ING's interpretation involves
treating the words "implicit in the transaction" as applying only to the
numerator, rather than, as the word order suggests, to the "entry multiple"
as a whole. In these circumstances, I sympathise with the judge's view that
B the reasonable observer would be looking for an alternative interpretation,
and that his choice would be guided by the purpose of the exercise. As he put
it, at para 43 (see above):

        "Only by using the EBITDA which is 'current' for the actual or
     proposed purchase in question can one measure the extent to which the
     purchase price constitutes a high or low assessment of the company's
C     intrinsic worth by reference to its earnings."

His explanation for the reference to "EBITDA 2006" was that the parties
had expected the transaction to be concluded reasonably promptly, and had
overlooked the possibility that it might be overtaken by events.
     24   I am not convinced that this is sufficient to bring Lord Hoffmann's
two-stage test into play. On this view nothing has gone wrong with the
D *language* as such. The reference to EBITDA 2006 was intentional. The
mistake was not in the language, but in failing to anticipate its consequences.
     25   In any event, I think the interpretation also falls down at stage 2.
The question is not whether the judge's approach produces a fairer result,
but whether it represents the clear alternative interpretation. The underlying
assumption of this part of the judgment seems to be that, at whatever time
E the transaction might eventually take place, it would be possible objectively
to identify "the current EBITDA", which could thus be said to be "implicit"
in the transaction. This view does not appear to be supported by the
evidence.
     26   The judge had himself commented on the likely perceptions of
the parties at the time of the Hawk retainer, at para 23(5):

F     "At the time of the Hawk retainer neither the EBITDA for 2006 nor the
     EBITDA for 2007 could be known as a definite number. But the parties
     had forecasts of the EBITDA for both 2006 and 2007. The forecast for
     EBITDA 2006 for the combined enterprise of Ros Roca and Dennis Eagle
     was about €28m . . ."

This passage to my mind is consistent with ING's submission that there is
G not necessarily a "current EBITDA" objectively ascertainable at any time.
It is a matter of judgment depending on the circumstances, and involving a
choice between actual and forecast figures. As Mr Phillips QC put it in his
skeleton argument:

        "The choice of EBITDA will always involve elements of judgment.
     Suppose, for instance, a valuation made mid-year; no exactly equivalent
H     EBITDA figure (e g an EBITDA figure for the 12 months immediately
     preceding the valuation date) will be available. Comparison is necessarily
     to either a historical figure (e g the last audited figure) or to a forecast
     figure, which incorporates elements of speculation about what will
     happen after the valuation date."

27   The judge acknowledged the potential uncertainty, but he did not see
this as an "insuperable objection" to his construction.  He relied on the fact
that when valuing or comparing values it was "general practice" to identify a
"current" EBITDA, which might be a forecast rather than an actual figure.
This seems to me to pose the wrong question.  What has to be ascertained,
on Ros Roca's construction, is the "EBITDA implicit in the transaction".
No doubt, if the parties had chosen a formula depending in terms on
identifying the "current EBITDA" at the time of the transaction, it would
have been possible for the court on suitable evidence to arrive at an
appropriate figure.  However, it does not follow that such a figure would be
"implicit" in the transaction, nor that the reasonable observer would have so
understood that term.

28   The phrase "implicit in the transaction" suggests a more direct
relationship with the terms of the transaction than a purely temporal one.
In relation to the numerator, those words can reasonably be read as
importing the specific definition of "enterprise value".  On that basis, as the
judge found (in para 23(3) of his judgment, quoted at para 13 above) the
enterprise value would either be expressed in the transaction or could be
readily extrapolated.  On the other hand there was no expectation that the
transaction would necessarily be linked to any form of EBITDA valuation.
It is equally plausible that the very uncertainty of the concept would have led
the parties to wish to define EBITDA by reference to a particular year.  If so,
it is understandable that they should have adopted the year 2006, given their
reasonable expectation that the transaction would be concluded within a
timescale for which the 2006 EBITDA would remain relevant.  The fact that
no one may have contemplated the actual transaction being delayed beyond
that time is not in itself a reason for rewriting the agreed formula.

29   It is true that ING's interpretation sits uneasily with the word order,
which appears to relate the expression "implicit in the transaction" to the
whole formula.  However, disregarding that awkwardness of word order
does significantly less violence to the language of the clause than ignoring
altogether the specific reference to 2006.

30   For these reasons, with some reluctance, I conclude that ING's
construction is correct.  I would therefore allow the appeal on this issue.

*Estoppel by convention—the cross-appeal*
  *The factual case in outline*

31   Ros Roca's alternative estoppel case arises out of the events in the
last quarter of 2007 leading to the successful conclusion of the transaction.

32   By October 2007 it was clear that Deyà was likely to subscribe
€63·5m, by way of a capital injection in exchange for a shareholding in
what would become Ros Roca's parent company.  Ros Roca needed ING's
advice as to what shareholding should be allocated to Deyà in exchange
for its proposed capital injection.  The shareholding was to reflect the ratio
between the capital injection and a sum equivalent to the value of the
company after the capital injection, less its estimated net financial debt.
Part of that debt was made up of outstanding transaction costs, including
fees of professional advisers such as ING.

33   Although the actual debt would be calculated by auditors following
completion, an estimate of the net financial debt figure was needed to adjust

*A*  the agreed value of Ros Roca on the date of Deyà's investment, so as to calculate the percentage shareholding. If the audited net debt was found in due course to be larger than the estimate, then an adjustment would be made, either by increasing Deyà's shareholding or by payment of a cash sum. There was no provision for downward adjustment. Between September and November 2007 Ros Roca and ING exchanged estimates of

*B*  net financial debt, including estimates of transaction costs of between €3 and 4m. They settled on an estimate of €4m which was used in finalising the details of the transaction completed in 7 December 2007 (in what became annex 6.8.1).

34  That estimate, it is argued, implied a mutual understanding that the fees would be based on EBITDA 2007, and was wholly inconsistent with the much higher figure which would have resulted from use of EBITDA 2006.

*C*  Furthermore, ING's internal documents show that they had done their own calculations using EBITDA 2006, but had persisted in the use of the lower figure, and acquiesced in Ros Roca doing the same.

*The judge's view*

35  As will be seen, the arguments on this point have developed
*D*  considerably since the hearing before the judge. In any event, having found for Ros Roca on the construction issue, the judge did not need to deal with their alternative case at any length. He considered that "none of the various ways" in which the estoppel claim was formulated established a shared assumption of the kind needed: para 64.

36  As the case was finally put to him, there were two alleged
*E*  assumptions (identified as "closing assumptions 1 and 2"):

"1. Ros Roca's total transaction costs for Project Hawk, for ING and for its other advisers, would be in the region of €4m; and 2. This €4m transaction costs figure was calculated on the basis of an additional fee calculated using an 'EV/EBITDA . . . entry multiple implicit in the transaction' of 10·35 ×": para 53.

*F*  Assumption 1, in his view, did not go far enough; it did not imply that ING could not claim a fee over the estimate: para 57. Assumption 2 was unsupported by the evidence, at paras 60, 62:

"60. Ros Roca is wholly unable to point to any part of the history which involved an express assertion by either party that the entry ratio in the Hawk retainer was 10·35 or was to be computed by reference to
*G*  anything other than EBITDA 2006 . . ."

"62. . . . At best from Ros Roca's point of view all that can be said is that a figure of €4m as transaction costs could have been derived by using 10·35 as the entry ratio applicable under the Hawk retainer. Consistently with all these matters, however, ING—and for that matter Ros Roca— could have identified €4m as transaction costs on the basis that it
*H*  appeared to be a reasonable 'ball park' figure without going to the trouble of working out what the entry ratio would be."

37  In this court, having held in favour of ING on the construction issue, I must examine the factual and legal basis of the alternative case in more detail.

*The evidence reviewed*                                                      A

38   The officers principally involved in the discussions during the
relevant period were Mr Gomà, chief financial officer of the Ros Roca group,
and Mr Muro-Lara, managing director of ING's Spanish subsidiary.   Also
involved for ING on financial matters was Mr Fernandez.

39   The first estimate of transaction costs was given in a presentation by
Ros Roca's management in September 2007, when neither the identity of the     B
investor, nor the likely enterprise value was known.   A figure of €4m was
proposed by Mr Gomà.   In October 2007, after the receipt of various offers
including that of Deyà, Mr Fernandez of ING prepared an analysis for Ros
Roca.   In respect of Deyà's offer (equivalent at that stage to EV €436m)
Mr Fernandez inserted a figure for transaction costs of €3m.

40   By the beginning of November 2007 Deyà had raised its offer to the
equivalent of EV €441m.   By this time the audited EBITDA 2006 of €33·1m      C
and forecast EBITDA 2007 of €42·1m were known.   On 6 November 2007,
Mr Fernandez sent an e-mail to Mr Muro-Lara.   In an attachment
Mr Fernandez showed the calculation of both the EV/EBITDA 2006 ratio
(13·3 ×) and the EV/EBITDA 2007 ratio (10·3 ×).   His calculation based on
the EBITDA 2006 showed a total fee of €7,335,000.   In the e-mail he
commented:                                                                    D

"Looking at the mandate, I couldn't resist calculating the fees
(attached) and I don't know if Excel has gone wrong (and isn't calculating
properly) or this is going to cost RR 0·6% of the RR capital."

41   This calculation did not result in any change to the estimates of
transaction costs in the exchanges with Mr Gomà.   Two days later, on
8 November 2007, Mr Fernandez sent by e-mail to Mr Gomà a document             E
setting out "the net financial debt details", which repeated the previous
figure for transaction costs of €3m.   On 12 November 2007 Mr Fernandez
sent another e-mail to Mr Gomà attaching a revised calculation, showing
transaction costs of €4m.

42   At the hearing this change was explained in Mr Fernandez's witness
statement:                                                                     F

"At some point in November . . . I recall asking Mr Muro-Lara
whether €3m or the €4m stated in the September 2007 management
presentation should be used for transaction costs.   Mr Muro-Lara
suggested that €4m would be more appropriate in order to maintain
consistency with the management presentation of September 2007."

His evidence was that these estimates were not made by any "scientific        G
calculation", nor in particular by reference to the entry multiple formula.
Of the calculation of ING's fees in his e-mail to Mr Muro-Lara, he said that
he had done the exercise "out of curiosity", and that it "did not cross
(his) mind" that there was an inconsistency with the figure being used for
transaction costs.

43   Mr Gomà spoke in his witness statement of how Ros Roca would             H
have reacted if they had been alerted to ING's calculation of a fee of over
€7·3m:

"there would have been a clear opposition on the side of Ros Roca . . .
We would have done our best, including to seek the assistance of the

A    lending banks, to settle the issue in reasonable terms. €7·3m represents almost 13% of the total capital raised . . . We would certainly also have explored the possibility of changing the terms upon which Deya was investing (to increase the agreed enterprise value) so as to offset the additional and unexpected cost of the transaction."

B    44  He also gave oral evidence as to his understanding of the basis of the €4m estimate. He referred to a spreadsheet which gave a "running estimate" of professional fees, as at December 2007, including an "estimated" figure for ING's fees of €1·536m. However, it seems that little weight can be attached to this spreadsheet, which first came to light during the hearing. It remained unclear what if any earlier versions there had been at the time the estimates were being discussed, and in any event Mr Gomà did not claim that it had been seen by, or discussed with, Mr Fernandez.

C    45  Mr Muro-Lara referred in his witness statement to the discrepancy between Mr Fernandez' calculation and the estimates of transaction costs as discussed with Ros Roca:

    "when Mr Fernandez calculated ING's potential contractual fee under the retainer letter, on 6 November 2007, it was not for the purpose of checking the transaction costs figure. I did not, at any time, discuss with
D    Mr Fernandez whether the transaction costs figure should be amended to reflect the calculation of 6 November. I was generally aware that the potential contractual fee under the retainer letter was higher than the transaction costs figure but did not consider the difference to be material for the purposes of what annex 6.8.1 required . . . In any event, it was not in any of the parties' interests to change the transaction costs figure given
E    the limited significance attached to the figure (as opposed to the fact the item was included at all) and given the potential disruption that changing it may have caused to the transaction."

In cross-examination, when asked what he meant by "potential disruption", he referred to the "situations" mentioned by Mr Gomà in the passage quoted above.

F    *Comments on the evidence*

    46  There are obvious dangers in interpreting "raw" evidence at the appellate level, in the absence of considered findings by the judge. However, as I understand ING's position, they do not materially dispute the matters outlined above as matters of fact. Rather, they seek to put them in context of
G    the dealings between the parties as a whole.

    47  In the first place, they emphasise that, from Ros Roca's perspective and that of its shareholders, an under-estimate of the net debt, unlike an over-estimate, could be remedied. If the net debt was underestimated, the adjustment provisions would ensure that Deyà would ultimately acquire the same percentage of the capital that it would have acquired if the estimate had been accurate (or there would be a compensating financial payment).
H    There was no equivalent provision for adjustment in the event of an over-estimate. Accordingly, even if Mr Fernandez had appreciated that the estimate of transaction costs was too low, he would have seen it as an error on the right side as far as Ros Roca was concerned, which would not cause them any ultimate prejudice. Secondly, the amount involved was minimal,

in relation to the overall figures.  By the time of the investment agreement,      A
the total estimated net debt was €216·7m, of which €4m (about 1·8%)
represented the estimate of transaction costs.

48    Mr Phillips helpfully summarised ING's position in his skeleton:

"ING's position at the trial—from which it does not resile on this
appeal—was that the most that could be said of these communications
was that (as set out in its closing outline submissions, emphasis added)      B
'In the period from late September 2007 up to and including December
2007, the parties shared an assumption (sufficiently evidenced by mutual
communications between them) that a reasonable figure *for total
transaction costs for the purposes of preparing the estimated net debt
required by an annex to the agreement with Deyà was in the region
of €4m . . .*'  The italicized words are important.  The estimate was only      C
an estimate: it was not intended to be precisely accurate, as Mr Gomà
accepted.  And it was an estimate *for a particular purpose*, namely
inclusion in the estimated net debt calculation, with respect to which it
constituted (a) only a very small part of a much larger whole and (b) in
relation to which underestimation was, from Ros Roca's perspective,
clearly preferable to overestimation."
                                                                              D

*Ros Roca's evolving case*

49    Ros Roca's case has developed, or mutated, over the course of the
proceedings.  Unfortunately, since this proceeded as a Part 8 claim, there
were no formal pleadings.  (I agree with Stanley Burnton LJ's comments at
para 77 on this aspect.)  The agreed list of issues (prepared for a case
management conference in February 2009) included the following:                 E

"(a) Was there a shared common assumption of the parties as to the
effect of the phrase 'the Enterprise Value/EBITDA 2006 ('EV/EBITDA
06') entry multiple implicit in the transaction', as manifested by conduct
crossing the line between the parties?  (b) Did the claimant clearly and
unequivocally represent to the defendant at any material time that its
additional fee would be calculated by reference to the relevant EBITDA      F
current at the time of the transaction?"

(I take the expression "crossing the line" as a reference to the words of
Kerr LJ in *K Lokumal & Sons (London) Ltd v Lotte Shipping Co Pte Ltd
(The August Leonhardt)* [1985] 2 Lloyd's Rep 28, 35: something done
"across the line between the parties".)
                                                                              G
50    In his closing submissions before the judge (judgment, para 53),
counsel for Ros Roca identified two shared assumptions:

"(1) Ros Roca's total transaction costs for Project Hawk, for ING
and for its other advisers, would be in the region of €4m; *and* (2) this
€4m transaction costs figure was calculated on the basis of an additional
fee calculated using an 'EV/EBITDA . . . entry multiple implicit in the
transaction' of 10·35 × ."                                                    H

It having been pointed out to him that the former was an "assumption as
to the future", rather than one of fact or law, he proposed an alternative
based on promissory estoppel.  The judge was reluctant to allow such a late

A    reformulation of the case, but in any event could not find "[any] basis for
     identifying any express or implicit promise": paras 51–56.

     51    In this court, by the end of the argument, Ros Roca had reformulated
     its case on estoppel by convention in the form of proposed amended grounds
     of appeal.  The key element is the alleged "assumption" and its implications:

          "the parties had shared the mistaken assumption that €4m was a
B         reasonable estimate of the transaction costs.  It was implicit in that
          assumption that the additional fee in the ING element of transaction costs
          would not be charged on the basis of an EV/EBITDA 2006 multiple,
          but rather on the basis of the current EV/EBITDA multiple, being
          EV/EBITDA 2007."

     They maintained their alternative case based on promissory estoppel, relying
C    on ING's alleged "promise" not to charge a fee "which would take the total
     transaction costs over about €4m".

     52    ING objects to Ros Roca being permitted to reformulate its case in
     this way.  It argues that the estoppels now raised are of a different character
     to those originally advanced, but are equally unfounded.  They complain
     that they have been required to shoot at a moving target.

D    53    I have some sympathy with their complaint, but I would allow the
     amendment.  In my view, the proper foundation of this aspect of the case is
     estoppel by convention.  Like the judge, I find it difficult to see how the case
     can properly be based on promissory estoppel, in the absence of anything
     which could be categorised in ordinary language as a promise.  However,
     even if the alleged understanding is recast in such terms, as suggested in the
     judgment of Rix LJ, I do not think it materially alters the substance of the
E    case.

     54    As to estoppel by convention, the underlying contention has not
     changed fundamentally.  Essentially, it depends on establishing a shared
     assumption, express or implied, that notwithstanding the words of the
     formula, the fees would be not be calculated by reference to EBITDA 2006,
     but rather on an alternative basis consistent with the estimates of total cost.
F    The relevant facts are not materially in dispute.  The differences are as to
     what can legitimately be inferred from them.  The variations in the
     formulations from time to time can be seen as arising from a possibly
     misguided attempt to over-refine what is, or should be, a relatively simple
     concept.  The complications arise not from the concept, but from the need to
     relate it to a complex and unusual factual context.  For that purpose I see the
     reformulated grounds of appeal as a useful aid to analysis, rather than as
G    indicative of a substantial change in the nature of the case.

     *Estoppel by convention—the law*

     55    We have the (relatively unusual) advantage of a succinct statement of
     the modern law, adopted without dissent or qualification by the full House
     of Lords.  This is found in the speech of Lord Steyn in *Republic of India v
H    India Steamship Co Ltd (The Indian Endurance and The Indian Grace)
     (No 2)* [1998] AC 878, 913–914.

     56    A brief summary of the long and unusual background of that case
     is sufficient to set the speech in context.  It started with a fire on a ship
     carrying munitions to Cochin in India, for delivery to the Indian

Government.   The Government sought and obtained judgment in the      A
Cochin court for damages in respect of a limited part of the cargo, having
previously issued but not served a writ in the Admiralty Court in England
for total loss. The defendants sought to strike out the English claim under
section 34 of the Civil Jurisdiction and Judgments Act 1982 (as one "in
respect of which a judgment has been given in his favour in proceedings
between the same parties"). In the House of Lords [1993] AC 410 the      B
Government argued successfully that the case should not be struck out, but
should be remitted to the Admiralty Court to investigate whether the
procedural bar had been defeated by waiver or estoppel. On the remitted
hearing, Clarke J [1994] 2 Lloyd's Rep 331 held that the Cochin
proceedings had been conducted on the common assumption that the larger
claim would proceed in England, and that accordingly the defendants were
estopped from relying on the bar. That decision was reversed in the Court      C
of Appeal [1998] AC 878 and the House of Lords, but principally on the
facts rather than the law.

    57   Lord Steyn stated the applicable principles as follows, at p 913:

    "It is settled that an estoppel by convention may arise where parties to
    a transaction act on an assumed state of facts or law, the assumption
    being either shared by them both or made by one and acquiesced in by the      D
    other. The effect of an estoppel by convention is to preclude a party from
    denying the assumed facts or law if it would be unjust to allow him to go
    back on the assumption: *K Lokumal & Sons (London) Ltd v Lotte
    Shipping Co Pty Ltd (The August Leonhardt)* [1985] 2 Lloyd's Rep 28;
    *Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord)*
    [1988] 2 Lloyd's Rep 343; *Treitel, The Law of Contract*, 9th ed (1995),      E
    pp 112–113. It is not enough that each of the two parties acts on
    an assumption not communicated to the other. But it was rightly
    accepted by counsel for both parties that a concluded agreement is not a
    requirement for an estoppel by convention."

Later in the same passage, he referred to "estoppel by acquiescence",      F
pp 913–914:

    "That brings me to estoppel by acquiescence. The parties were agreed
    that the test for the existence of this kind of estoppel is to be found in
    the dissenting speech of Lord Wilberforce in *Moorgate Mercantile Co Ltd v
    Twitchings* [1977] AC 890. Lord Wilberforce said, at p 903, that the
    question is 'whether, having regard to the situation in which the relevant
    transaction occurred, as known to both parties, a reasonable man, in the      G
    position of the "acquirer" of the property, would expect the "owner"
    acting honestly and responsibly, if he claimed any title in the property,
    to take steps to make that claim known . . .' at p 903. Making due
    allowance for the proprietary context in which Lord Wilberforce spoke,
    the observation is helpful as indicating the general principle underlying
    estoppel by acquiescence."
                                                                                H
Lord Steyn rejected the suggestion that the two concepts should be treated as
aspects of "one overarching principle", in order not to blur "the necessarily
separate requirements, and distinct terrain of application" of the two kinds
of estoppel: p 914C–D.

A    58    The Government's appeal failed on the facts in respect of both forms of estoppel. As to the former, the exchanges between the parties showed no more than that there had been mention of expected English proceedings, but fell "markedly short" of establishing a common assumption that no plea arising from the fact of the judgment would be taken in the English proceedings: p 915A–E. As to the latter, it was "overwhelmingly probable"

B    that until after the Cochin judgment had been handed down, no one gave any thought to its implications for the English proceedings; and there were no "special circumstances" which required the defendants to put the Government on guard as to the risks of taking judgment in Cochin: p 915H.

59    With regard to the suggested division between the two forms of estoppels, I note the following comment in *Spencer Bower: Estoppel by Representation*, 4th ed (2004), para VIII.2.3:

C
"It is submitted, notwithstanding the refusal of Lord Steyn in *The Indian Endurance*, to formulate an overarching principle of estoppel, that the only distinction between an estoppel by convention and other forms of estoppel now lies in the manner in which the party to be estopped assumes responsibility for the proposition from which he is to be estopped from departing, namely by mutual assent rather than

D    unilateral assertion."

Others have expressed doubts about the desirability of sub-division of this "most flexible" of doctrines: see, e g, *Baird Textile Holdings Ltd v Marks & Spencer plc* [2002] I All ER (Comm) 737, para 50, per Judge LJ, citing Robert Goff J in *Amalgamated Investment & Property Co Ltd v Texas Commerce International Bank Ltd* [1982] QB 84.

E    60    In any event, Lord Steyn's formulation implicitly recognised a degree of overlap, since he treated "acquiescence" as one possible foundation for estoppel by convention. In deciding for the latter purpose whether an assumption is "made by one and acquiesced in by the other" it would be illogical to disregard Lord Wilberforce's guidance on that aspect. As will be seen, I regard it as of considerable assistance in relation to the facts of the

F    present case.

*Additional authorities*

61    Without disrespect to the otherwise excellent arguments before us, I do not propose to comment in detail on the many authorities which have been cited to us or included in the bundles. They include the judgments from

G    more than 20 cases on this topic, ranging over a period of more than 100 years. Some are classic authorities, such as *Grundt v Great Boulder Pty Gold Mines Ltd* (1937) 59 CLR 641, *Woodhouse AC Israel Cocoa SA v Nigerian Produce Marketing Co Ltd* in the Court of Appeal [1971] 2 QB 23 and House of Lords [1972] AC 741, and the *Amalgamated Investment* case [1982] QB 84.

H    62    These earlier cases of course represent important milestones in the development of the law. But we are here engaged, not in legal history, but in the application of developed, modern principles to a particular set of facts. We have also been referred to a number of more recent applications of the established principles at High Court or Court of Appeal level, but mostly these are of little more than illustrative value. It is not surprising that one

finds differences of emphasis in the various judgments, reflecting the    A
different factual situations under consideration.

63   Mr Phillips provided an apparently straightforward summary of
"the relevant principles", with citations from some of these cases.
It included the following propositions:

> "(i) An assumption of 'fact' must be an assumption of present fact, and
> not as to the future: *Argy Trading Development Co Ltd v Lapid*    B
> *Developments Ltd* [1977] 1 WLR 444, 457A–B (Croom-Johnson J).
> (ii) The shared common assumption must be sufficiently certain: see
> *Troop v Gibson* [1986] 1 EGLR 1, 6D–F. (iii) The parties should have had
> the objective intention to make, affect or confirm a legal relationship:
> *Baird Textile Holdings v Marks & Spencer plc* [2002] 1 All ER (Comm)
> 737, para 92 (Mance LJ). (iv) The estoppel must arise in the context of a    C
> particular transaction, and is effective only for the purposes of that
> transaction: *Troop v Gibson* [1986] 1 EGLR 1, 5M–6A. (v) It must be
> unconscionable for the party estopped to be permitted to depart from the
> shared common assumption: see, e g, *Crédit Suisse v Allerdale Borough
> Council* [1995] 1 Lloyd's Rep 315, 367 (affirmed on other grounds [1997]
> QB 306). That means that the party asserting that there is an estoppel
> must show that it has relied on the shared assumption to its detriment."    D

64   On examination, none in my view can stand without qualification:
(i) *Present fact.* This proposition accurately records what was said in the
1977 case. But that was relatively early in the development of the law,
before even the general restatement of the principles in the *Amalgamated
Investment* case [1982] QB 84. It is inconsistent with the basis on which the    E
*Indian Endurance* case proceeded at all levels. Although Lord Steyn spoke
of an assumption of "fact", the alleged assumption related to what was
expected to happen in the English proceedings in the future. The parties'
common understanding on that issue, if established, would have been
sufficient to found the estoppel. That shows that the understanding may
relate to the factual or legal basis on which a current transaction is
proceeding, even if that understanding includes reference to events in the    F
future.

(ii) *Sufficiently certain.* The proposition refers to a comment in the
concurring judgment of Ralph Gibson LJ in *Troop v Gibson* [1986]
1 EGLR 1, 6 on a point which he acknowledged was unnecessary for the
decision. With respect, I find more persuasive the way in which the point
was expressed in the leading judgment of Sir John Arnold P. After referring    G
to the extensive argument on the need for a "representation" to be clear and
unequivocal to found an estoppel, he said that the same question did not
arise in relation to estoppel by convention, at p 3K–L:

> "Since this is of a consensual character and the terms of the
> convention, just as those of a contract once the language is established by
> the evidence, must be interpreted by the court and the only true meaning    H
> is that decided upon by the court."

(iii) *Intention to affect legal relationship.* This again comes from a
concurring judgment, rather than one agreed by the other members of the
court, and on a point which was not essential to the decision. Although

A    Mance LJ treated the proposition as relevant to both "promissory and
conventional estoppel", the direct reference is to a case on the former:
*Combe v Combe* [1951] 2 KB 215.

     (iv) *Particular transaction.*  This proposition is based on a passage in the
concurring judgment of Purchas LJ in *Troop v Gibson*, not adopted in
the other judgments.  That refers in turn to a statement by Eveleigh LJ
B    in *Amalgamated Investment & Property Co Ltd v Texas Commerce
International Bank Ltd* [1982] QB 84, 126:

          "The estoppel does not go beyond the transaction in which it arose.
     The representation or assumed state of facts are not to be held irrefutable
     beyond the purpose for which the representation or assumption was
     made."

C    In so far as there is a tension between the first sentence, which might be said
to limit consideration to the ambit of a particular transaction, and the
second which looks more widely at its "purpose", I would prefer the latter;
but I doubt if Purchas LJ intended such a precise definition.

     (v) *Need for detriment.*  This proposition is not particularly controversial,
but it is not clear what is gained by referring to a 1995 first instance decision.
D    It would have been more useful to refer to a recent statement in the Court of
Appeal of the correct approach to "detriment", requiring: "a broad inquiry
as to whether repudiation of an assurance is or is not unconscionable in all
the circumstances": *Gillett v Holt* [2001] Ch 210, 232D, per Robert
Walker LJ; discussed in *Spencer Bower*, 4th ed (2004), para V.5.16–V.5.17.

     65    Generally, I see these observations as no more than glosses on the
underlying principles, as stated authoritatively by the House of Lords.
E

     *Discussion*

     66    Under Lord Steyn's formulation the issue can be reduced to two
questions.  (i) Was there a relevant assumption of fact or law, either shared
by the two parties, or made by Ros Roca and acquiesced in by ING? (ii) If so,
would it be unjust (or "unconscionable") to allow ING to go back on the
F    assumption?  By "relevant", I mean one which can be linked directly to the
use of EBITDA 2007, rather than 2006, in the calculation of fees.

     67    Under (i), as already noted, Mr Phillips accepts that there was a
shared assumption, to the effect that "a reasonable figure for total
transaction costs for the purposes of preparing the estimated net debt
required by an annex to the agreement with Deyà was in the region of €4m".
G    He says that it is not relevant in the sense I have defined, because it was only
an estimate, not intended to be precise; and because it was an estimate for a
particular purpose, namely inclusion in the estimated net debt calculation,
not for calculating ING's fees.

     68    I am not persuaded by the latter point.  It is true that the immediate
purpose of the estimate was as part of the calculation of the net debt, in the
context of the dealings with Deyà.  However, it seems to me unrealistic to
H    separate the two purposes.  ING and Ros Roca were engaged in a joint project
directed to the conclusion of the investment transaction with Deyà.  Although
estimation of ING's fees had a specific relevance to that part of the project, it
could only be done by reference to the terms of the Hawk retainer, under
which the fees would in due course be paid.  As between ING and Ros Roca

there was a single overall project, of which both the Deyà shareholding and    A
the ING fees were part, and there was only one set of ING fees.

69    The first point is true as far as it goes.  The estimate was not intended
to be, and could not be, a final figure.  But there is no reason to think that it
was to be other than a genuine estimate on the information then available,
albeit one that might need to be revised.  I see nothing to support the judge's
suggestion the parties might have intended no more than a "ball park"
figure.  Furthermore, even if the assumption related overtly to the total       B
transaction costs, the court is entitled to inquire what that necessarily
implied in relation to the assumed ING fees, on the information known
to the parties.  Adopting Sir John Arnold's words, it is for the court to
"interpret" the assumption, so as to arrive at its correct meaning for the
purposes of the alleged estoppel.

70    The Fernandez e-mail is important in this context.  It shows, first,      C
that by early November, all the elements needed to make an accurate
estimate of ING's fees were available, and, secondly, that the assumed
amount of transaction costs was irredeemably inconsistent with a
calculation of fees based on EBITDA 2006.  At the very least the estimate
implied a shared assumption that, notwithstanding the reference to EBITDA
2006 in the agreement, that was not the basis on which the fees were to be      D
calculated.

71    Would it be unjust or unconscionable to allow ING to go back on
that assumption?  In my view, it would.  I do not see this as depending on the
precise terms of the agreement, nor (as was discussed in argument) on
whether they gave rise to, or negated, a "duty to speak" on the part of ING.
It is enough that ING and Ros Roca were engaged in a joint project, in which
each was entitled to assume that the other would act consistently, and would   E
not knowingly conceal information of significance to the project or their
relationship in it.  Applying the words of Lord Wilberforce, a reasonable
man, in Ros Roca's position, would have expected its financial adviser,
acting "honestly and responsibly", and with Mr Fernandez's knowledge of
the figures, to have taken steps to make its position known.  By contrast with
the facts of *The Indian Endurance* [1998] AC 878, these were "special        F
circumstances" which required ING to do more than simply acquiesce in Ros
Roca's continued use of a calculation which they believed, or had reason to
believe, was wrong.

72    It does not matter, in my view, that Mr Fernandez may not have been
alive to the full significance of the point.  He clearly was surprised by the
result of his calculation, to the extent that he wondered if there was an error  G
in the spreadsheet.  However, he and his superior decided to ignore it to
avoid "potential disruption", and they allowed the discussions to continue
on the basis of a figure for transaction costs which they knew, or should have
known, to be wholly inconsistent with application of EBITDA 2006.  As to
detriment, there was no material challenge to Mr Gomà's evidence as to how
he would have reacted if he had been told.  The very fact that Mr Muro-Lara
was keen to avoid disruption impliedly confirms that Ros Roca would have      H
had a negotiating position, which they might have been able to exploit.
If detriment is needed, loss of that opportunity is sufficient.

73    That conclusion may not take Ros Roca all the way.  It leaves open
the question whether the assumption went beyond the negative to the

A   positive.  Did it merely negate use of EBITDA 2006, or did it positively
    imply use of EBITDA 2007?  This question can be treated as relevant at
    either of two stages.  It may be relevant to fixing the content of the shared
    assumption; alternatively, it may simply come in at the later stage of
    determining the remedy.  On either basis, in my view, the answer is
    dictated by the realities of the position, as known to the parties.  Once the
B   other elements relevant to calculation of the formula had become known,
    the only variable was the choice of EBITDA.  From what we have heard,
    there were only two realistic alternatives at the relevant time.  In the
    factual context known to both parties, negation of the use of EBITDA
    2006 implied use of EBITDA 2007.  In other words, if it is unjust to permit
    ING to go back on the shared assumption that EBITDA 2006 was not to
    be used, so that an estoppel by convention or acquiescence is established,
C   then the appropriate remedy is to direct the use of EBITDA 2007.
    The flexibility of the equitable doctrine is sufficient to achieve that result
    without legalistic analysis.

    *Conclusion*

       74   For these reason I would allow the cross-appeal, with the result that
D   the effect of the judge's order is preserved, but by a different route.

    **STANLEY BURNTON LJ**
       75   I agree with both of Carnwath and Rix LJJ's judgments on the
    construction issue, and have nothing to add.
       76   In relation to the estoppel issues, I have been less certain as
    to whether the requirements of a binding estoppel were established by
E   Ros Roca, but I have been convinced by Carnwath and Rix LJJ's cogent
    judgments.  I incline to the view that this is not a case of promissory estoppel,
    but of estoppel by convention, but I think it unnecessary for me to decide this
    question, which is largely one of terminology.
       77   This case proceeded under CPR Part 8.  In general Part 8 proceedings
    are wholly unsuitable for the trial of an issue of estoppel.  Once such a claim
F   is disputed, save in exceptional cases, the proceedings will cease to comply
    with CPR r 8.1(2)(a), since they will cease to be proceedings in which the
    parties do not seek the court's decision only on questions which are "unlikely
    to involve a substantial dispute of fact".  A disputed claim of estoppel should
    be carefully pleaded.  I strongly endorse the contents of the note at para 8.0.2
    of *Civil Procedure 2011* (vol 1):

G        "In essence, the Part 8 procedure is in general terms designed for the
         determination of relevant claims without elaborate pleadings.  If the
         procedure is misused, the defendant can object and equally the court of its
         own motion, and as part of its function to manage claims, will order the
         claim to proceed under the general procedure and allocate a track and
         give appropriate directions."

H      78   In the present case, the parties should have agreed or applied for
    directions for the exchange of pleadings on the estoppel issue.  Pleadings
    would have clarified precisely how Ros Roca put its case and what facts were
    in dispute.  In the event, this court has been able to determine the issue
    of estoppel on the basis of the judge's findings of fact.  However, his

determination of the factual issues would have been easier, and the risk of injustice less, if the parties had pleaded their respective cases.

**RIX LJ**

79  I agree and add a judgment of my own as we are differing from the judge on both points, although dismissing the appeal. I am most grateful to Carnwath LJ for setting out the material in this case.

*The construction issue*

80  It is impossible in my judgment to ignore and rewrite, or delete, the reference to EBITDA 2006, or to turn it into a reference to a current and different EBITDA. The parties had a choice as to how to express the reference to EBITDA as part of their formula, and they deliberately chose to refer to EBITDA 2006. They did so at a time when that figure was itself a forecast figure, since the financial year 2006 was not yet at an end, and when there existed further forecasts, such as for 2007. It is impossible to regard the inclusion of EBITDA 2006 as done "by oversight" [2010] EWHC 50 (Comm) at [49]. As it happened, the transaction was not closed until December 2007, over a year after the October 2006 contract between Ros Roca and ING, by which time EBITDA 2006 had become historic and Ros Roca was prospering to an extent greater than had been anticipated in the previous year. The error was in not anticipating these facts or providing for them in the formula. That might have been done in a number of ways, including by the imposition of a cap. Or the error could be expressed in another way, as the failure to re-address the formula in the light of the new events as the fulfilment of the transaction approached (as to which more below). Ros Roca was not obliged to close the deal, and it could have raised the question of the appropriate formula for renegotiation. However, these are errors of negotiation or commercial intuition, not errors of language in the expression of an agreement.

81  The fact that these commercial errors occurred does not mean that the original contract on ING's construction of it was a "commercial nonsense", or that it is to be concluded that "something must have gone wrong with the language". Since the contract would have operated perfectly well if it had gone ahead on a timetable as originally contemplated, it is hard to see why a straightforward application of its language should be castigated as nonsense. On any view, moreover, an entry multiple was "implicit" in the transaction whichever EBITDA was used. And on any view it might be difficult to say, as of any particular time, which was the "current" EBITDA by reference to which an entry ratio might be calculated. Hence the contract's adoption of a fixed reference point.

82  I therefore agree that neither of Lord Hoffmann's conditions for the application of the doctrine in *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101 are here to be found fulfilled. It will be recalled that Lord Hoffmann adopted those conditions (see at p 1114) from the judgment of Brightman LJ in *East v Pantiles (Plant Hire) Ltd* [1982] 2 EGLR 111, as qualified by Carnwath LJ in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336. In the former case Brightman LJ said, at p 112: "first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake."

A   In the latter case, Carnwath LJ pointed out that in deciding whether there is a clear mistake, the court is not confined to reading the document without regard to its background or context.

83   In this case, however, neither condition was met.  Time and circumstance may always test the flaws in a contract.  Whereas the error in the *Chartbrook* case always existed.  In such a case as this, I would respectfully refer to the observations of Patten LJ in *Rainy Sky SA v Kookmin Bank* [2011] 1 All ER (Comm) 18, paras 41–42.

84   I therefore agree that ING's appeal, on the issue of construction, should be allowed.

### *Estoppel*

85   I am more than content to adopt Carnwath LJ's solution in terms of estoppel by convention.  However, I also consider that the same solution can be found in the doctrine of promissory estoppel, and is supported by a duty to speak.  This should not perhaps come as a surprise since what we are concerned with is an estoppel which alters the effect of a contract by preventing a party from making an assertion or claim contrary to a position adopted mutually between its parties.  Although a shared assumption may be lacking from many situations, a representation which is relied upon to the detriment of the representee includes many of the critical aspects of the doctrine of estoppel by convention.  Moreover, in a situation in which it is plain that, *internally*, ING did *not* share the assumption concerning transaction costs which *externally and objectively*, it affected and purported to share, there is, to my mind, good sense in considering the matter through the eyes of an estoppel by representation.

86   In my judgment the representation with which we are concerned in this case is the representation, implicit in what I can for convenience call the shared assumption, that ING's fee would not be charged on the basis of EBITDA 2006.  Or to put the matter another way, it was implicit in the express representation that a genuine and reasonable estimate of the transaction costs was €4m, that ING would not be charging its fee based on EBITDA 2006.  That is in effect what Carnwath LJ has concluded in paras 69–70 above.  That implied representation can be put forward as a representation of fact ("We are not intending to charge you a fee based on EBITDA 2006" or "We are working on a calculation of our fee which does not take EBITDA 2006 as its basis"), or as a promissory representation ("We will not charge you a fee based on EBITDA 2006").  In the circumstances of this case, there is not much to choose between these formulations of the representation: but I would on balance prefer to think of it in terms of promissory representation and promissory estoppel, because I think that better expresses the essence of the context.  The question becomes: what fee is ING *entitled* to charge?  In formulating its estimate first at €3m and then, by agreement and acquiescence with Ros Roca, at €4m, ING is representing and agreeing that that figure will encompass the fee which ING is entitled to charge on the transaction.  Part and parcel of the inquiry, "What is a reasonable estimate of our transaction costs?", is the question: "What will you, ING, be charging us as your fee?"  The express answer is: "A fee which is encompassed within €4m."  It matters not that that could also be expressed as "€4m or thereabouts".  On any view such an

answer was fundamentally inconsistent with charging a fee based on the  A
contractual formula involving EBITDA 2006.

87   In this connection, I consider that it is relevant, although not
necessarily vital, that ING had a duty to speak.  Its duty can be expressed in
two ways, depending on whether one concentrates on ING's contractual
obligations, or on its obligations as an honest business partner in the light of
circumstances as they arose.                                                  B

88   As for the former, ING's contractual obligations, they certainly
included collaboration and co-ordination with Ros Roca's other advisers
who would prepare the financial information to be delivered to potential
investors, and the co-ordination of and assistance with the preparation of
any documentation required to execute the transaction: see in particular
section 1(h) and (i) of the contract, set out at para 5 above.  It was in this
setting that ING was involved, contractually involved, in agreeing with Ros  C
Roca a figure for the estimated transaction costs.  It follows that ING had an
obligation under the contract to join with Ros Roca in developing a genuine
and reasonable estimate of transaction costs.

89   In this connection, Mr Phillips on behalf of ING submitted that
ING is free of any obligation by reason of the exemption clause contained
in clause 3 of the contract's appendix, containing "Terms and conditions",  D
and in particular in reliance on the sentence:

    "The company [Ros Roca] agrees with ING Corporate Finance that
    ING Corporate Finance will not be responsible for the verification of any
    such information and shall accept no responsibility for its accuracy and
    completeness."
                                                                              E
However, in my judgment that is an exemption clause against liability.
It does not prevent otherwise due legal effect being given to an estoppel
based either on a shared understanding of the methodology of the contract
or on ING's representations as to the fees to be charged under it.  Ros Roca is
not seeking to hold ING liable for any verification or any inaccuracy, but to
operate the contract according to their shared assumptions and/or ING's
representations as to its own fees.                                           F

90   As for ING's obligations as a business partner in the light of
circumstances as they arose, what happened has been set out in
Carnwath LJ's judgment above.  ING made its own internal calculations as
to its fee, and concluded that €7·335m would be payable under the contract,
calculated by applying EBITDA 2006 to Deyà's investment offer, thus
producing an entry multiple of 13·3.  An alternative calculation applying the  G
current forecast for EBITDA 2007 and producing an entry multiple of 10·3
was also set out.  The rest was the mechanical operation of the contract's
formula, which produced the money figures payable on either basis.
Thereupon ING considered at the highest level, that of Mr Muro-Lara, who
was ING's managing director, whether ING should revisit the discrepancy
between the estimate of transaction costs which had passed between the
parties and the calculation of ING's contractual fee.  It was decided that the  H
figure should not be revisited, given, as Mr Muro-Lara put it in his witness
statement, the "potential disruption" that might be caused.  When he was
asked about this in his cross-examination, he accepted that he had in mind
the possibility of a dispute with or an attempt at renegotiation on the part of

A    Ros Roca, i e the "situations" mentioned by Ros Roca's Mr Gomà in his
     witness statement: see para 43 above.
          91    In my judgment, however, there was in these circumstances a duty
     on ING to raise with Ros Roca the question of ING's fee and the related
     question of the estimate of transaction costs. Such costs were directly related
     both to the number of shares to be issued to Deyà by reason of its
     investment, i e were directly related to the operation of the transaction on
B    which ING was advising (even if an under-estimate of transaction costs was
     less dangerous than an over-estimate), but were also relevant to the business
     sense of the transaction as a whole. Would it make sense for Ros Roca to
     enter into a transaction when ING's fee alone would amount to some 13% of
     the investment capital to be raised? No doubt Ros Roca was primarily and
     ultimately responsible for looking out for its own interests, but ING was also
C    responsible under its contract with Ros Roca to advise its client on the
     transaction, its conduct and negotiation, in general: see section 1 passim.
     Mr Phillips accepted in argument that in such circumstances ING's position,
     subject only to the niceties of the law of estoppel, was unconscionable.
          92    What then does the law say about such a situation? Outside the
     insurance context, there is no obligation in general to bring difficulties and
D    defects to the attention of a contract partner or prospective contract partner.
     Caveat emptor reflects a basic facet of English commercial law (the growth
     of consumer law has been moving in a different direction). Nor is there any
     general notion, as there is in the civil law, of a duty of good faith in
     commercial affairs, however much individual concepts of English common
     law, such as that of the reasonable man, and of waiver and estoppel itself,
E    may be said to reflect such a notion. In such circumstances, silence is golden,
     for where there is no obligation to speak, silence gives no hostages to
     fortune. If, however, the contractor speaks, then he may have to live up to
     what he says; so also where what is unsaid is sufficiently closely connected
     with what he has said to render what has been left unsaid misleading.
     In general, however, there is no duty of disclosure. As *Chitty on Contracts*,
F    30th ed (2008), vol 1, para 6-014 puts it:

          ". . . For the same reason it is not possible to set up an estoppel on the
          basis of an omission to disclose unless a duty to disclose can be established
          in the particular circumstances of the case. Tacit acquiescence in another's
          self-deception does not itself amount to misrepresentation, provided that
          it has not previously been caused by a positive misrepresentation."

G         93    Nevertheless, particular circumstances can make a difference, and it
     is possible to formulate a general principle as to why that should be so. Thus
     in *Moorgate Mercantile Co Ltd v Twitchings* [1977] AC 890, 903 Lord
     Wilberforce, in a dissenting speech but which in this respect has borne fruit,
     spoke of the possibility that, in a particular situation which affected two
     parties, a reasonable man would expect the other party, "acting honestly and
     responsibly" either to make something known or face the consequences of
H    not doing so. In *Republic of India v India Steamship Co Ltd (The Indian
     Endurance and The Indian Grace) (No 2)* [1998] AC 878, 914 Lord Steyn
     approved Lord Wilberforce's observation as "helpful as indicating the
     general principle underlying estoppel by acquiescence". As Bingham J had
     put it some years earlier in *Tradax Export SA v Dorada Cia Naviera SA*

*(The Lutetian)* [1982] 2 Lloyd's Rep 140, 157, after citing *Spencer Bower &*     A
*Turner, Estoppel by Representation*, 3rd ed (1977), p 49:

> "More recently, Lord Wilberforce in *Moorgate* . . . provided
> persuasive authority for the proposition that the duty necessary to found
> an estoppel by silence or acquiescence arises where a reasonable man
> would expect the person against whom the estoppel is raised, acting
> honestly and responsibly, to bring the true facts to the attention of the     B
> other party known by him to be under a mistake as to their respective
> rights and obligations. (Lord Wilberforce dissented on the outcome, and
> expressed the principle in proprietary terms appropriate to that case, but
> neither of these things in my judgment diminishes the significance of what
> he said.)"

94   Bingham J there applied the principle to a dispute about withdrawal      C
under a time charter, in other words it affected parties to an existing
contract. The charterers had tendered payment of hire in an amount which
they believed to be correct, as the owners knew. The penalty of failure to pay
punctual hire was that owners had the power to withdraw the vessel. By
keeping silent about their own calculations of hire, the owners thwarted the
charterers' attempt to live up to their contract. The owners were held to     D
be estopped from exercising their right to withdraw: see issue (7), p 156.
Bingham J concluded, at p 158:

> "The relationship of owner and charterer is not one of the utmost good
> faith.   One must be careful not to impute unrealistically onerous
> obligations to those who may choose to conduct their relations in a tough
> and uncompromising way.  There is none the less a duty not to conduct     E
> oneself in such a way as to mislead. I have no doubt that the owners knew
> that the charterers believed they had paid the right amount. It was their
> duty, acting honestly and responsibly, to disclose their own view to the
> charterers.   They did not do so and indeed thwarted the charterers'
> attempts to discover their views. Their omission to disclose their own
> calculation led the charterers to think, until a very late stage, that no     F
> objection was taken to their calculation.  It would in my view be unjust in
> the circumstances if the owners could rely on the incorrectness of a
> deduction which they had every opportunity to point out at an earlier
> stage and which their failure to point out caused the charterers to
> overlook. I answer this question in favour of the charterers."

95   In my judgment, the facts of our case are relevantly analogous, but     G
ours is an a fortiori case. The relationship between an advising bank and its
client is closer, and more professional, than that between an owner and a
charterer of a vessel. Although such an owner and his charterer co-operate
on what is hoped to be the success of their maritime adventure, that is
commerce in the raw. In our case, the bank is advising its client on its
potential transaction, and is earning its fee for doing so and for a successful
outcome. Moreover, the contract required the parties to co-ordinate their     H
estimates of the transaction costs, and that is what ING outwardly
purported to do, while internally intending to charge a fee which was totally
inconsistent with its outward show of agreement with its client. It was not
honest and responsible for ING, but unconscionable as Mr Phillips had in

A  effect to accept, to fail to disclose to Ros Roca, in the run-up to the closing of its transaction, that Ros Roca and ING differed on the calculation of ING's fee. Just as the owner in *The Lutetian* [1982] 2 Lloyd's Rep 140 was estopped from denying the accuracy of the charterer's calculation of hire for the purpose of its monthly payment and thus for the purpose of preventing the owner's right to withdraw, because it had represented by its silence

B  that the charterer's calculation was correct, so in my judgment ING is estopped from saying that its calculation based on EBITDA 2006 is the correct calculation. In both cases, one party has represented by his silence (in truth on the facts of this case by more than silence) that the other party's understanding of the situation is correct. ING sought its own advantage in keeping quiet, when it knew that speaking out would lead to a dispute and to a renegotiation. Ultimately, the dispute could not be avoided, and has

C  occurred, but ING considered that its position would be strengthened if the dispute only took place after the event.

96  One question that arises is, of course, whether, assuming that Ros Roca has relied on ING's representation, it would be acceptable to allow ING to withdraw from the position which its silence and seeming acquiescence has created.

D  97  Indeed Mr Phillips has raised a number of issues to the effect that ING's representation or acquiescence should not be legally effective as an estoppel. He submits that there was no intent to affect legal relations; that there was no sufficient certainty in any representation or no relevant representation; that there was no reliance and no detriment; and that it would not be unconscionable for ING to be permitted to withdraw from its representation or acquiescence. He also relies on a pleading point.

E  98  In my judgment, all these points fail.

99  As for the intent to affect legal relations, Mr Phillips relied on *Baird Textile Holdings Ltd v Marks & Spencer plc* [2002] 1 All ER (Comm) 737, para 92, per Mance LJ in order to submit that the parties here lacked "the objective intention to make, affect or confirm a legal relationship". However, the point is misconceived. The parties were in a legal, contractual,

F  relationship (which in *Baird* was not the case). Their relations with one another took effect within that relationship.

100  As for the representation in question, I have dealt with this above. It seems to me that the agreement on €4m necessarily meant that ING's fee would not be charged at a rate which involved the use of EBITDA 2006. On any view, that was sufficiently certain, for otherwise ING's fee alone

G  would have exceeded €7m. I agree with Carnwath LJ that, when the terms of a representation can be found, its meaning and effect is for the court, even though it is possible to argue about that, as in the case of so many a contractual provision. The requirement of sufficient certainty, or, as is often said of representations in general, that they should be clear and unequivocal, is that the corpus of the representation should partake of that requirement. Here the parties were agreed, or appeared to each other to be, that the

H  estimate of €4m covered all the transactional costs. It does not matter whether that agreement was intended to be precise or approximate, conservative or otherwise: it could not accommodate what ING intended to charge, what ING was entitled to charge under the contract as I would construe it. It was necessarily inconsistent with ING's construction (and, as

it turns out, albeit not in the opinion of the judge, what is in my judgment the    A
true construction). That was sufficient for present purposes. Mr Phillips
was constrained to accept in the course of argument that the agreed figure
was inconsistent with ING invoicing and recovering its €7·3m figure.

101   It is another question whether it was also necessarily inherent in the
parties' agreed figure that the fee would be charged on the basis of an entry
ratio derived from EBITDA 2007, i e the current EBITDA. I would conclude
that it was, for it was in practice the only other alternative. The internal    B
evidence of ING's e-mail reflects that conclusion, but of course does not
drive it. There was also similar internal evidence from Ros Roca's side,
reflecting the make-up of the estimated transaction costs which included
ING's fee based on an entry ratio of 10.3 (the EBITDA 2007 derived
multiple): that was found on a spreadsheet which Mr Gomà had kept.
The spreadsheet was only disclosed at a very late stage, during and as a result    C
of cross-examination at the trial itself. In the circumstances, the spreadsheet
became a controversial document (although Mr Gomà's evidence about it
was not challenged as untruthful). However, it is unnecessary to found upon
such internal documents or subjective evidence. The fact remains that the
10·3 entry ratio derived from EBITDA 2007 was the only real alternative.
Mr Phillips's submissions that the €4m figure could have reflected some    D
compromise figure, based on a renegotiation, seems to me to be merely
fanciful. It is an entirely different question what figure the parties might
have ended with, if they had once entered into a negotiation based on
different views as to the effect of the contract which they had made.
Contractually, however, the fee agreement could only have led to a figure
based on one or other of EBITDA 2006 or EBITDA 2007. The exclusion of
the one necessitated the adoption of the other.    E

102   In any event, it seems to me to be sufficient for the purposes of
Ros Roca's cross-appeal that there is an estoppel negativing the imposition
of an EBITDA 2006 based fee.

103   As for reliance and detriment, Mr Phillips submitted that at best
Ros Roca made its own mistake, unassisted by any contribution from ING's
side. He also disputed the evidence given at trial that Ros Roca even believed    F
that ING's fee would not be chargeable on the basis of EBITDA 2006 but
would be chargeable on the current, 2007 EBITDA. Therefore there was no
reliance, and could be no detriment. However, the internal evidence that
Ros Roca was working on the basis of a fee under the contract with
ING utilising an entry multiple of 10·3 (i e one based on EBITDA 2007) was
entirely consistent with all the material in the case, and with the essential
indisputable fact that the parties agreed on the figure of €4m as an estimate    G
for all the transaction costs involved. It was also consistent with ING's
internal evidence that ING's fee could sensibly have been based on only the
2006 or 2007 EBITDA figure. It was also consistent with the evidence,
reflected in the formulation of section 2(b) of the contract itself, that an entry
multiple in the region of 9/10 or thereabouts would be a success. I have no
doubt that, whatever the strength or weakness of the evidence about    H
Mr Gomà's spreadsheet, Ros Roca did believe in a fee based on EBITDA
2007. Moreover, as *The Lutetian* case itself demonstrates, the question that
has to be asked is what would have happened if ING had acted as it should
have done, and raised with Ros Roca the question of its fee. It is inevitable in

A   such circumstances that there was reliance on ING's agreement on the €4m figure and otherwise on ING's failure to speak. That is demonstrated by ING's unwillingness to broach with Ros Roca the subject matter of its much larger fee, because of the danger of "potential disruption" to the transaction. There would, in my judgment, undoubtedly have been a demand to renegotiate the contract; and I equally have no doubt that to a greater or lesser extent such a renegotiation would have born fruit. In my judgment,

B   Ros Roca relied on the implied representation and suffered detriment as a result.

    104   In such circumstances, I also consider that it would have been unconscionable for ING to be entitled to resile from the position that it had adopted. That position was not acceptable in a business context, as *The Lutetian* [1982] 2 Lloyd's Rep 140 demonstrates, as Mr Muro-Lara's

C   evidence as to "potential disruption" confirms, and as Mr Phillips's acceptance in argument as to the unconscionability of ING's position also underpins.

    105   The question then arises what fee ING is entitled to charge. The estoppel does not amount to a variation of the contract. However, it does mean that ING is not entitled to charge a fee inconsistent with the

D   estoppel. It therefore cannot charge the fee which, on the construction issue's determination, would have been available to it, just as, in *The Lutetian*, the owners could not withdraw the vessel under their contractual right to withdraw. Although a right to withdraw a vessel for non-payment or, as there, under-payment of hire, is not the same as a positive right to charge a fee, nevertheless the consequence is as or more

E   serious. Vessels are withdrawn from solvent charterers to take advantage in a rise in market rates, and the value to a shipowner of a charter-free vessel when rates have risen is potentially enormous.

    106   In the present case, the failure of the contractual fee formula leaves ING's remedy in the hands of the court. In the context of proprietary estoppel it is familiar territory for the court to fashion its own remedy to meet the equity of the situation. This is less familiar in a commercial

F   context. However, the principle must be the same. In such circumstances, I would reject the submission that ING's remedy is to receive the difference between the other transaction costs, now fully known, and the agreed figure (which was always only a reasonable estimate) of €4m. That submission, on the part of Ros Roca, has led to considerable debate as to the figure to be adopted, and that debate has also led, but unjustifiably, to infect the issue as

G   to the sufficient certainty of the implied representation. In my judgment, in agreement with Carnwath LJ, the necessary implication embraced the only other feasible alternative for a fee, that of one premised on EBITDA 2007 and the entry multiple of 10·3. Therefore, there could be no injustice in confining ING to a remedy on that basis, that is to say to a total fee amounting to €1,578,922, made up of the fixed fee of €635,000 and an additional fee of €943,922 (plus expenses). Ros Roca has already paid

H   that amount.

    107   Indeed, I would consider that, in any event, the appropriate remedy would be to confine ING to a fee based on the 2007 EBITDA. For the reasons explained by the judge, even though they have not persuaded me on the construction issue, there would be no unfairness in such a result in

circumstances where ING had lost the right to enforce an additional remedy  *A*
based on EBITDA 2006. It is the natural alternative, even if a renegotiation
might have come to some other figure as a matter of compromise.

108   As for a pleading point, in my judgment there is none available.
The matter was not assisted by ING's commencement of proceedings under
Part 8: but the point has always been sufficiently present to the parties.

*Conclusion*                                                                     *B*

109   In sum, ING has won on construction, and has lost on estoppel.
Both appeal and cross-appeal should in my judgment be allowed. The result
is that overall, but by a different route, Ros Roca has retained its success at
trial.

110   Although this result differs from his analysis, the judge reached the  *C*
right result, albeit, in my respectful opinion, for the wrong reasons. In such
circumstances, it is in my judgment relevant to make the following
observations. Construction cannot be pushed beyond its proper limits in
pursuit of remedying what is perceived to be a flaw in the working of a
contract. It is now clear, in a less literal era, that where a contract makes
commercial nonsense on its own terms, it should be interpreted in a way
which avoids the absurdity. *Antaios Cia Naviera SA v Salen Rederierna*  *D*
*AB (The Antaios)* [1985] AC 191, which contains Lord Diplock's famous
dictum at p 201E, illustrates that well, for it concerned an arbitration award
where three arbitrators concluded that "any other breach of this charter
party" in a time charter's withdrawal clause did not, in context, include any
breach of any kind but only any breach of a repudiatory kind: p 200E–G. In
such a case, there is a choice to be made, on the contractual language,       *E*
between an absurd interpretation and a commercial interpretation. Such
cases are not uncommon. More rarely, something has indeed gone wrong
with the language, and it is possible and indeed necessary to remedy the
error, applying Brightman LJ's and Lord Hoffmann's two conditions.
In such cases, however, the contractual language carries its own error within
its own terms, as understood in context (as, for instance, where there has
been a misdescription, specifying the wrong date, but the context of the     *F*
document made the intended date obvious to anyone concerned: see *Mannai*
*Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, the
case of a contractual notice). More often, however, the contract will work
perfectly sensibly in the context in which it was made, but it contains a flaw
in that it does not provide for all eventualities. In such cases, the courts may
not be able to find a solution within the four walls of the contract itself.   *G*
Moreover, there is a danger, frequently warned against in such cases, of the
courts seeking to remake contracts for the parties on the basis of what
the courts consider would have been reasonable, or more sensible, for the
contract to have said. Judges should not see in *Chartbrook Ltd v Persimmon*
*Homes Ltd* [2009] AC 1101 an open sesame for reconstructing the parties'
contract, but an opportunity to remedy by construction a clear error of
language which could not have been intended.                                   *H*

111   On the other hand, the doctrine of estoppel is a flexible doctrine
which can take account of what Bingham J regarded as the honest and
responsible interaction of business parties to a contract. Where there
is room for disagreement as to the meaning or effect of a contract but

503

*A*    the parties have clearly chosen (or purported to choose) their own
       understanding of it and have dealt with one another on the basis of that
       understanding, whether that mutuality is found in a common assumption, or
       in acquiescence, or in one party's reliance on another's representation, the
       doctrine of estoppel allows the court in a proper case to give effect to the
       parties' objectively ascertainable and mutual dealings with one another.
*B*    This is especially appropriate in a case such as this, where there is room for
       renegotiation in new circumstances and one party is not obliged to proceed if
       it chooses not to.  Of course, such dealings cannot make a contract out of
       nothing, where one does not exist, nor can it make a new contract by
       variation unless the conditions for that are available.  However, it can
       prevent one party from taking advantage of a contractual remedy where an
       estoppel, reflecting the parties' dealings with one another, would make it
*C*    unconscionable for that remedy to be exercised.
          112   The law should in this way reflect the exigencies and structure of
       commercial life.  The contract is the foundation upon which commercial
       men operate, and it should remain, for its true construction, unchanged in
       changing circumstances.  However, the parties' dealings with one another
       in the light of new circumstances may affect their contractual rights so
*D*    as to make it unconscionable to seek and unjust to permit enforcement
       of them.  I would emphasise Bingham J's wise words about the danger of
       imputing unrealistically onerous obligations where commerce is conducted
       in tough and uncompromising ways.  Nevertheless, commerce is premised
       on honest and responsible dealings, even if parties also fall below the
       expected standards.

*E*                                                          *Appeal dismissed.*

                                                      JOHN SPENCER, Barrister

*F*                               ─────────

*G*

*H*

## EXHIBIT Z

1 W.L.R.

A

[CHANCERY DIVISION]

\* *In re* BAILEY, HAY & CO. LTD.

[No. 001533 of 1969]

B    1971 March 2, 3, 4, 5, 8, 9, 10                    Brightman J.

*Company—Winding up—Voluntary liquidation—Notice of meeting defective—All corporators present—Corporators unaware of inadequacy of notice—Validity—Whether acquiescence or laches*

C        Notices convening an extraordinary general meeting of a company to pass resolutions for the voluntary winding up of the company and the appointment of a liquidator were one day short of the period required by the articles of association, namely, 14 clear days' notice. The meeting was, however, attended by all five corporators and the resolutions were passed by the votes of two shareholders who between them held 500 shares. Two other shareholders, who together
D    held 300 shares, deliberately abstained from voting and refrained from casting the 200 votes of an associated company of which, as managing director and chairman respectively they were in control. One of the abstaining shareholders shortly afterwards discovered that the notices had been defective, but beyond mentioning that fact some months later to an accountant appointed by the creditors to investigate the affairs of the company, did nothing to challenge the validity of the
E    liquidation and co-operated with the liquidator. About three and a half years later the liquidator issued an originating summons claiming that certain payments made by the company to the associated company constituted a fraudulent preference and seeking repayment. The associated company disputed the validity of the liquidation, and the status of the liquidator was first challenged in the affidavits of the abstaining shareholders.

F        On a direction by the registrar that the question whether the company was in voluntary liquidation should be heard as a preliminary issue:—

    *Held*, (1) that the resolution, being intra vires the company, must be deemed to have been passed with the unanimous agreement of all the company's corporators, and those who abstained from voting must be treated as having acquiesced by their conduct, both at the meeting and subsequently, in the
G    company being wound up voluntarily on that day (post, pp. 1366F—1367B).

    *In re Express Engineering Works Ltd.* [1920] 1 Ch. 466, C.A. and *Parker and Cooper Ltd.* v. *Reading* [1926] Ch. 975 applied.

    (2) That, additionally, the associated company was debarred by laches from asserting that the company was not and never had been in liquidation (post, p. 1367D–E).

H        Dictum of Lord Blackburn in *Erlanger* v. *New Sombreró Phosphate Co.* (1878) 3 App.Cas. 1218, 1279, P.C. applied.

The following cases are referred to in the judgment:

*Erlanger* v. *New Sombrero Phosphate Co.* (1878) 3 App.Cas. 1218, P.C.
*Express Engineering Works Ltd., In re* [1920] 1 Ch. 466, C.A.
*Lindsey Petroleum Co.* v. *Hurd* (1874) L.R. 5 P.C. 221, P.C.
*Parker and Cooper Ltd.* v. *Reading* [1926] Ch. 975.

The following additional cases were cited in argument:                    A

*British Sugar Refining Co., In re* (1857) 3 K. & J. 408.
*Browne* v. *La Trinidad* (1887) 37 Ch.D. 1, C.A.
*Duomatic Ltd., In re* [1969] 2 Ch. 365; [1969] 2 W.L.R. 114; [1969] 1 All
    E.R. 161.
*Foss* v. *Harbottle* (1843) 2 Hare 461.
*Ho Tung* v. *Man On Insurance Co. Ltd.* [1902] A.C. 232, P.C.
*Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358, C.A.                    B
*M'Leod (Neil) & Sons Ltd.*, 1967 S.C. 16.
*Newman (George) & Co. Ltd., In re* [1895] 1 Ch. 674, C.A.
*Orton* v. *Bristow* (1916) 32 T.L.R. 352, C.A.
*Oxted Motor Co. Ltd., In re* [1921] 3 K.B. 32, D.C.
*Pearce Duff & Co. Ltd., In re* [1960] 1 W.L.R. 1014; [1960] 3 All E.R.
    222.
*Railway Sleepers Supply Co., In re* (1885) 29 Ch.D. 204.                    C
*Ramsden* v. *Dyson* (1865) L.R. 1 H.L. 129, H.L.(E.).
*Rex* v. *Essex Justices, Ex parte Perkins* [1927] 2 K.B. 475, D.C.
*Salomon* v. *Salomon & Co. Ltd.* [1897] A.C. 22, H.L.(E.).
*Southern Counties Deposit Bank Ltd.* v. *Rider and Kirkwood* (1895)
    73 L.T. 374, C.A.
*Wenlock (Baroness)* v. *River Dee Co.* (1887) 36 Ch.D. 674.
*Willmott* v. *Barber* (1880) 15 Ch.D. 96.                    D

PRELIMINARY ISSUE

On August 25, 1969, the liquidator of a company, Bailey, Hay & Co.,
issued an originating summons against Bailey Fertilizers Ltd., an associated
company, under section 320 of the Companies Act 1948 (1) for a declara-
tion that payments totalling £7,105 18s. 5d. made between July 1, 1965,
and September 16, 1965, by the company to Bailey Fertilizers Ltd.    E
constituted a fraudulent preference of Bailey Fertilizers Ltd. and was
void accordingly, and (2) for an order that Railey Fertilizers Ltd. should
repay to the liquidator that sum with interest from September 16 down
to the date of payment. The validity of the liquidator's appointment
was challenged by Mr. Peter Henry Oscar Kinolow and Mr. Kenneth
John Bailey, the managing director and chairman respectively of Bailey
Fertilizers Ltd., in their affidavits sworn on December 10, 1969. On    F
February 27, 1970, Mr. Registrar Berkeley ordered that the question
whether the company was in voluntary liquidation should be tried as
a preliminary issue.

The facts are stated in the judgment.

*Allan Heyman Q.C.* and *M. K. I. Kennedy* for the liquidator.    G
*P. J. Millett* for Bailey Fertilizers Ltd.

BRIGHTMAN J.  This is an application by Mr. Walter Thomas Wells
Tickler, a member of the firm of Messrs. W. H. Cork, Gully & Co., the
well-known accountants. Mr. Tickler has acted as liquidator of Bailey,
Hay & Co. Ltd. since December 1965. He seeks a declaration that
payments totalling some £7,000, made between July and September 1965    H
to Bailey Fertilizers Ltd., constitute a fraudulent preference. The defence
is the bold one—unique, I think, in the experience of the counsel before
me—that the company, despite all outward appearances, is not really in
liquidation at all.

Bailey, Hay & Co. Ltd. ("the company"), was incorporated on July
24, 1963, with a capital of £1,000 divided into £1 shares. Its purpose
was to act as agents for Bailey Fertilizers Ltd. ("the fertilizer company").

A    The shareholders of the company at all relevant times were Mr. and Mrs. Hay, with 250 shares each, Mr. Kinslow with 250 shares, Mr. Bailey with 50 shares and the fertilizer company with 200 shares. The board of the company consisted originally of the four individual shareholders—Mr. and Mrs. Hay, Mr. Kinslow and Mr. Bailey, Mr. Kinslow being the chairman. Mr. Bailey was the chairman of the board of the fertilizer company, and Mr. Kinslow was the managing director. Accordingly,

B    Mr. Kinslow and Mr. Bailey and the fertilizer company in which they held high office could exercise 50 per cent. of the voting power of the company at general meetings.

The company's year ended on June 30. During its first broken year it traded at a loss of about £11,000, and during its second year, ending on June 30, 1965, it traded at a loss of £5,000. On September 16, 1965,

C    Mr. Kinslow and Mr. Bailey resigned from the board of the company. On November 24, 1965, notices were sent to the shareholders convening an extraordinary general meeting of the company. The notice was for the purpose of considering, and if thought fit, passing the following resolutions as extraordinary resolutions:

D    "(a) That it has been proved to the satisfaction of this meeting that the company cannot by reason of its liabilities continue its business, and that the company be wound up voluntarily. (b) That Walter Thomas Wells Tickler of the firm of W. H. Cork, Gully & Co. . . . be, and is hereby, appointed as liquidator of the company for the purpose of the voluntary winding up."

The notice is dated November 20, but, as I have mentioned, it was not actually given until November 24, being received on November 25. Mr.

E    Kinslow and Mr. Bailey stated that they were very much shocked by the proposed liquidation: they did not like to feel that their names would be associated with a bankrupt concern.

On December 8, the day before the meeting was due to be held, Mr. Kinslow and Mr. Bailey, acting on behalf of the fertilizer company, sought advice from one Mr. McGonigal, a solicitor who had qualified the

F    previous June and was employed by Messrs. Coward, Chance & Co. He advised, I think, that there was not really sufficient information to enable Mr. Kinslow and Mr. Bailey to judge whether the company ought or ought not to be put into liquidation. He told me that the point that all three of them had in mind was that there would be criticism if the company continued in existence but was in fact hopelessly insolvent. He said that the only logical course for Mr. Kinslow and Mr. Bailey to take in

G    those circumstances was to abstain from voting. He was well aware that they controlled, through their own personal holdings and the holding of the fertilizer company, sufficient votes to defeat the winding up resolution. He told me in evidence that he was quite certain that he so informed Mr. Kinslow and Mr. Bailey. I see no reason to doubt his evidence on this point.

H    Mr. Kinslow and Mr. Bailey caused Mr. McGonigal to be appointed as the representative of the fertilizer company. They instructed him to attend the meeting on behalf of the fertilizer company and to abstain from voting, as indeed they intended to do themselves: in other words, Mr. Kinslow and Mr. Bailey and the fertilizer company decided they would deliberately leave to Mr. and Mrs. Hay, the persons who prima facie were possessed of full information about the company, the responsibility of deciding whether or not the time had come to liquidate the

Brightman J.      In re Bailey, Hay & Co. Ltd. (Ch.D.)      [1971]

company. They were all aware that, by abstaining, the resolution to  A
liquidate would in all probability, if not for a certainty, be passed. On
December 9 the meeting of shareholders was held. Those present
consisted of Mr. Hay, a proxy for Mrs. Hay, Mr. Kinslow, Mr. Bailey
and Mr. McGonigal, as the representative of the fertilizer company.
The resolution to wind up was put; it was passed by the votes of
Mr. and Mrs. Hay without any dissentient voice, as Mr. Kinslow and
Mr. Bailey and Mr. McGonigal must have known would be the case.  B

The shareholders' meeting was followed by the statutory meeting of
creditors. At the latter meeting, Mr. Tickler was appointed liquidator.
The statement of affairs showed an estimated deficiency as regards un-
secured creditors, subject to costs of realisation, in excess of £25,000. I
quote, for reasons which will appear later, from the liquidator's report,
dated December 30, of the statutory meeting of creditors. Messrs. W. H.  C
Cork, Gully & Co. say this:

> " Confusion also exists concerning the motor vehicles of the com-
> pany and the correct title of these assets. Certain vehicles have
> been transferred out of the company into other names, and Mr. Hay
> has also been paying out the hire-purchase on two of the vehicles
> concerned. An independent valuation of six vehicles has been under-  D
> taken, but for the purpose of the statement of affairs we have included
> three vehicles only at a realisable value of £1,450. Two of these
> vehicles, however, are subject to hire-purchase in the sum of £1,067.
> Here, again, the position concerning motor vehicles will also have to be
> examined by the liquidator."

Then, a little later:      E

> " Creditors present were extremely dissatisfied with the affairs of the
> company, and an investigation will take place by the liquidator in
> due course."

Thereafter the resolution to wind up was duly filed; the usual advertise-
ments were inserted in the London Gazette on December 24, 1965, and in
the local newspapers on December 30 and 31.      F

Shortly before December 22, 1965, Mr. Kinslow, who throughout this
matter displayed a remarkably detailed and accurate knowledge of com-
pany law, discovered that the notice convening the meeting of December
9 had been one day short. The meeting had been convened by an
ordinary 14 days' notice and not, as specifically required by the articles, a
clear 14 days' notice. He so informed Mr. McGonigal, and on December
22 he wrote, as the managing director of the fertilizer company, to Mr.  G
McGonigal in these terms:

> " Enclosed with the letter "—that is, a letter which had been sent
> by an associated company to Mr. McGonigal—" are bank statements
> and cheques in connection with Messrs. Bailey, Hay & Co. Ltd.
> These make very interesting reading, as they relate to the period just
> before the board of Bailey, Hay & Co. Ltd. decided to propose to  H
> the shareholders to go into liquidation, and just afterwards. I have
> made photostat copies of these statements and cheques for any
> future reference. I should be much obliged if you would send these
> statements and cheques to Messrs. D. H. Ortmans & Co. . . ., who
> were, or are, the auditors of Messrs. Bailey, Hay & Co. Ltd. I
> prefer this way instead of to Mr. Tickler, of Messrs. W. H. Cork
> Gully & Co., as you know we reserve the right to dispute Mr. Tickler's

A appointment as liquidator, in that the notice given for the share-holders' meeting was inadequate. Naturally, we are not suggesting at this stage, or necessarily at any stage, that we challenge his authority; but if the statements and cheques are sent to Ortmans it would not mean we have acknowledged his position as liquidator."

B Mr. McGonigal did not at this moment of time express any view as to Mr. Kinslow's proposition that the resolution to liquidate was invalid. Later he considered the matter, and in January or February 1966 he reported back to Mr. Kinslow, that Mr. Kinslow was probably technically correct, so that the meeting was not validly convened. He did not communicate this view to Mr. Tickler at that time.

In the meantime a point arose in connection with a lorry which was the subject matter of a hire-purchase agreement made by the company C but which the fertilizer company had agreed to buy from the company. Mr. Kinslow, writing again in his capacity as managing director of the fertilizer company, addressed the following query to Mr. McGonigal in a letter of January 27, 1966:

D "... this lorry now is a burden to us. It must have been misused at Midhurst. It is costing us too much to run, and we propose to get rid of it. However, in view of Bailey, Hay being in process of liquidation, and also there is a hire-purchase agreement concerned, we wish to know the legal position before actually selling the vehicle."

There followed a correspondence between Messrs. Coward, Chance & Co. and Messrs. W. H. Cork, Gully & Co. It began with a letter of E March 8, 1966, the second paragraph of which I quote:

"Our clients intend to pay off the remaining instalments, exercise their option to purchase, and then sell the vehicle. In view of the uncertainty of the legal position as regards the assignment we would be grateful if you will confirm that no claim will be made on behalf of Bailey, Hay & Co. by the liquidator to the ownership of the F vehicle or to any part of the proceeds of sale."

The liquidator replied on March 21, in effect reserving his rights; and finally, the following letters were exchanged. There was a letter dated April 22, 1966, addressed by Messrs. Coward, Chance & Co. to Mr. Tickler: "We wish to make it quite clear that our clients reserve their rights in this matter against you, as liquidator of the above company." G A letter of May 10, from Messrs. Coward, Chance & Co. to Mr. Tickler:

"Re Bailey, Hay & Co. Ltd. (Liquidation). Bedford truck ... We thank you for your letter of May 6 and apologise for the error in our previous letter. Our intention was, of course, to reserve our clients' rights against the company in liquidation. We regret that we cannot agree that the company in liquidation is entitled to take possession of this lorry. We thought that we had made the position H clear to you, but evidently some misunderstanding has arisen. The company sold this lorry to our clients. As the lorry was the subject of a hire-purchase agreement prohibiting such transfer, this sale does not bind Lombank, the owners of the lorry. But it is binding on Bailey, Hay & Co. Ltd., and also on Bailey's Fertilizers Ltd., unless and until Bailey's Fertilizers Ltd. repudiate the sale. This they propose to do in the interests of the creditors of Bailey, Hay & Co. Ltd., but we must make it clear that this repudiation is made on

Brightman J.        In re Bailey, Hay & Co. Ltd. (Ch.D.)        [1971]

terms that our clients reserve their rights against Bailey, Hay & Co.   A
Ltd. We should be grateful if you would confirm that the lorry is
accepted back on these terms so that no further misunderstanding
can arise."

Then a letter written by the liquidator to Messrs. Coward, Chance &
Co., and dated May 11, 1966, reads:

  " Re Bailey, Hay & Co. Ltd. (In liquidation). Bedford truck. . . .   B
  I am grateful to you for your letter of the 10th instant. I assume
  that in the second paragraph of your letter you are reserving your
  rights against the company in so far as you wish it to be agreed
  that any claim in respect of loss sustained will be the basis of a
  claim in the liquidation upon which a dividend will be payable if
  admitted. This I am prepared to agree, provided that the claim      C
  does not include a figure for damages other than expenses incurred
  and moneys paid away, for which no benefit has been received."

Finally, on May 16, from Messrs. Coward, Chance & Co. to Mr.
Tickler, a letter in these terms:

  " Bailey, Hay & Co. Ltd. (In liquidation). Bedford truck. . . .
  Thank you for your letter of May 11. We agree that any claim       D
  to be made by our clients will be a claim in liquidation upon which a
  dividend will be payable if admitted. We do not feel that at this
  stage we can agree to limit our clients' claim to expenses incurred
  and moneys paid out for which no benefit has been received. We
  have not investigated the quantum of any claims which our clients
  might have as at this stage they do not propose to raise any. We
  hope you will be satisfied with this position."                     E

And I believe that, in the end, no proof was lodged in the liquidation by
the fertilizer company.

The committee of inspection had instructed Mr. Tickler to engage
accountants to make a preliminary investigation into the affairs of the
company. On February 1, 1966, Mr. Tickler engaged Messrs. Donald
Bruce & Co., chartered accountants, to undertake that investigation. By  F
letters dated March 4, Mr. Bruce of the latter company, requested Mr.
Kinslow and Mr. Bailey for an interview because he thought that they
could assist him in his inquiries. This interview was arranged for
March 22. The meeting took place and was also attended by Mr.
McGonigal. Mr. Bruce made rough notes during the meeting, and he
also wrote a letter dated March 24 to Messrs. W. H. Cork, Gully &
Co. recording what occurred. Paragraph 3 of the letter reads—and I  G
must quote almost the whole of it:

  " At the conclusion of the meeting, however, he "—that is to say,
  Mr. Kinslow—"specifically requested that we should acquaint him
  with the following points which, apparently, he regarded as of some
  importance: (a) he stated that he had received inadequate notice of
  the meeting at which the company was liquidated; (b) referring to   H
  September 16, 1965, the date of his resignation, Mr. Kinslow said
  that Mr. Hay had given him the specific undertaking that the debts
  of the company would be met; . . . (c) he complained that your
  private and confidential communication of December 30, 1965, . . .
  contained an inaccuracy in sub-paragraph (a) of the third paragraph
  on page 2. According to Mr. Kinslow, Cork, Gully did not say that
  one of the reasons why the company failed was inadequate capital; . . .

A     (d) Mr. Kinslow did not understand why, in the letter referred to in the previous sub-paragraph, you have omitted to state that the company's trading was conducted from Midhurst and that Mr. Hay was the managing director, the names of the auditors were D. H. Ortman & Co., and that the last date on which the auditors prepared accounts was January 1965; (e) finally, Mr. Kinslow complained that the letter referred to did not state that the accounts to June 30, 1965, had not been audited as late as December 30, 1965. We do not feel that the above five points, which we have reproduced at Mr. Kinslow's formal request, have any bearing on the subject-matter of our investigation, and we so informed Mr. Kinslow. We did, however, offer the observation that so far as we could see, your letter of December 30, 1965 "—that was the liquidator's initial report—

C     "was a fair assessment of the state of affairs as you found them."

    In regard to point (a) Mr. Bruce is adamant that Mr. Kinslow confined himself to saying merely that the meeting of December 9 was convened by short notice. Mr. Kinslow, Mr. Bailey and Mr. McGonigal go further, and say that Mr. Kinslow positively asserted that Mr. Tickler's appointment as liquidator was therefore invalid. The meeting of March 22, 1966,

D was the first occasion on which the short notice of the meeting was openly raised. It was also the first occasion on which the possible invalidity of Mr. Tickler's status as liquidator was openly raised, if in fact it was so raised at all. It was also the last occasion on which either point was openly raised until Mr. Kinslow and Mr. Bailey swore their affidavits in these proceedings in December 1969.

    Neither Mr. McGonigal, Mr. Kinslow nor Mr. Bailey possess any notes

E of what transpired at the meeting of March 22, although Mr. McGonigal recalled in the witness-box that he thought he had at one time possessed such notes. None of them even wrote to Mr. Bruce or Mr. Tickler to put on record that objection was taken to the validity of Mr. Tickler's appointment. Mr. McGonigal said that he did not feel that he was under any duty at all to write formally to Mr. Tickler warning him that he had no status as a liquidator, notwithstanding that his continued assumption of

F an office which he did not truly hold might involve him in some personal liability. On July 2, 1966, Messrs. Donald Bruce & Co. presented a preliminary report of their investigation into the company's affairs.

    The end of the first year of the liquidation was now approaching, and therefore the need to convene a general meeting of the company and a meeting of creditors in accordance with the statute. The following inter-

G change of letters took place between Mr. McGonigal and Mr. Kinslow on behalf of the fertilizer company. A letter dated October 5, 1966, from Mr. Kinslow:

    " . . . we understand from the Companies Act that if the company has not been wound up 12 months after the liquidation proceedings start, then it would be necessary to call a company meeting to inform the shareholders as to what is going on. In actual fact, it is of very little

H interest to us whether this meeting is held or not, but we presume that Cork, Gully will go through the formalities of calling it. If this is so, it is not our intention to send along any company representative, but we should like you to attend by proxy just to ensure that our interests are observed."

    The next letter was dated December 30, 1966, from Mr. McGonigal to Mr. Kinslow:

" I enclose a copy of a notice I have received from the liquidator of the   A
above company in case you have not yourself received one. You will
see that Mr. Tickler is investigating a possible fraudulent preference.
I presume that you have heard nothing about this although I seem to
remember there was some talk at the creditors' meeting about a
possible preference of Baileys Fertilizers."

On January 2, 1967, from Mr. Kinslow to Mr. McGonigal:          B

" Thank you for your letter of December 30, 1966. You will be
arranging for us, as a company, to be represented at the company
meeting. As far as I am personally concerned I do not wish to be
represented as you know I reserve the right to upset the proceedings
at a later date if I think it necessary, on the grounds that I was given
inadequate notice of the meeting at which the liquidation was agreed."   C

On January 17, 1967, the creditors' meeting was held. The fertilizer
company could not attend that meeting because they were not creditors.
It so happened that Messrs. Coward, Chance & Co. were creditors for £5
or £10. Mr. McGonigal attended that meeting, ostensibly as Messrs.
Coward, Chance's representative, but actually on behalf of the fertilizer
company, which paid him for that purpose. There is no evidence as to   D
who attended the shareholders' meeting if there were one. On September
1, 1967, Messrs. Donald Bruce & Co. presented their second report on the
affairs of the company. On March 26, 1968, Messrs. Cork, Gully & Co.
submitted a long questionnaire to Mr. Kinslow. The questionnaire was
answered through Messrs. Coward, Chance & Co. on June 28, 1968, no
objection being taken to the status of Mr. Tickler. There was some further
correspondence. Finally on August 25, 1969, the present summons was   E
issued claiming that certain payments made between July and September
1965 by the company were a fraudulent preference of the fertilizer com-
pany. As I have indicated, the preliminary answer of the fertilizer company
is that the company is not, and never has been, in liquidation.

This highly equivocal attitude of the fertilizer company, of Mr. Kinslow
and Mr. Bailey as its responsible officers, can be illustrated, if not explained,   F
by certain extracts from the correspondence and evidence. On March 7,
1966, Mr. Kinslow wrote on behalf of the fertilizer company to Messrs.
Coward, Chance & Co. in these terms:

" I am prepared to co-operate in any investigation of the affairs of
Bailey, Hay including any interview.. However, it must be established,
once and for all, whether the company is in liquidation. As you know   G
I maintain that I received inadequate notice of the ' so-called ' company
meeting on December 9, 1965, at which it was ' resolved ' to place
the company in voluntary liquidation. Thus whomsoever carries out
any investigation must be validly appointed to carry out the type of
investigation proposed."

On March 15, Mr. McGonigal replied to that letter:          H

" Thank you for your letter of March 7 upon which we have spoken
on the telephone. I confirm that I will arrange a meeting between
yourself, Mr. K. J. Bailey and Mr. Bruce at 12 noon on Tuesday
March 22 at which I shall be present.
" I think that you are right to co-operate with Mr. Bruce notwith-
standing that he has been appointed by a liquidator the validity of
whose appointment you dispute. I understand that you wish to

A    reserve the possibility of upsetting the appointment of Mr. Tickler as liquidator if at some point you consider that he has not adequately investigated the affairs of the company so that a new investigation can take place. However, I think that it is best to co-operate to the full in Mr. Tickler's investigation in the interest both of yourself and the creditors even if this co-operation involves some recognition of Mr. Tickler's appointment."

B

In evidence Mr. Kinslow said under cross-examination: " I did not see that any harm could come to the fertilizer company if the company went into liquidation." Mr. Bailey said: " I was content to let matters rest. I did not object and do not object to Mr. Tickler carrying on. I was happy to let things drift along until these proceedings started." Mr. McGonigal told me in a carefully considered answer in reference to the attitude of mind C    of his clients and himself in advance of the meeting of March 22: " We would tell Mr. Bruce that we did not recognise Mr. Tickler's appointment. We would co-operate in the investigation. If we did not like the way things were going, then we would upset the liquidation."

One might ask why Mr. Kinslow and Mr. Bailey were seeking to preserve the position in this curious way. I think that the situation was this D    and I so find. Mr. Kinslow and Mr. Bailey as officers of the fertilizer company had no objection whatever to the company being liquidated, although they personally regretted that their names were associated with a bankruptcy. They were, however, very dissatisfied with the state of the company's affairs, as indeed were the creditors, as appears from Mr. Tickler's report of December 30, 1965. Mr. Kinslow and Mr. Bailey had misgivings in the first instance as to whether Mr. Tickler would really cause a full and E    thorough investigation to be made into the company's affairs, misgivings which Mr. McGonigal told me, and I think told his clients, he did not really share. Mr. Kinslow and Mr. Bailey reserved mentally the right to object to his appointment in case they wanted to challenge the way in which he was conducting the investigations and get somebody to replace him. I say " mentally " because the only time that the reservation, as it F    were, surfaced into public view was at the meeting of March 22, 1966.

In the end it seems to me Mr. Kinslow and Mr. Bailey were perfectly content with Mr. Tickler as liquidator, but now the point has been resuscitated for a wholly different purpose, namely, as a defence to a claim of fraudulent preference. Mr. Millett quite frankly admits that the defence is a technical one and is being raised on his own advice and not at the instigation of his clients. The matter comes before me by way of a pre- G    liminary point directed to be tried separately from the main issue of fraudulent preference. The question defined in the order [of Mr. Registrar Berkeley] of February 27, 1970, is simply whether the company is or is not in voluntary liquidation. There is no halfway house. Either the company must be treated as having gone into voluntary liquidation on December 9, 1965, or the company must be treated as not yet in liquidation and all the H    transactions which have taken place over the last five-and-a-quarter years are liable to be re-examined by somebody on that basis.

It is not, in my view, possible, as I think Mr. Millett at one time tended to suggest, for me to dismiss the present summons on the footing that the company is not in liquidation, but for all other purposes to proceed on the basis that the company is in liquidation. This would, in my view, be a quite inconsistent pair of positions for any court to take up. Put briefly, and at the risk of not doing full justice to Mr. Millett's able submissions,

Brightman J.       In re Bailey, Hay & Co. Ltd. (Ch.D.)       **[1971]**

his argument is that (1) the company did not validly resolve to go into    A
liquidation on December 9, 1965, and (2) the fertilizer company is not pre-
cluded by its conduct or by laches from maintaining that defence. He
submits that the mere attendance of Mr. Kinslow and Mr. Bailey and Mr.
McGonigal at the meeting of December 9, 1965, did not validate the pro-
ceedings purported to be transacted thereat. Nor, he submits, did their
abstention from voting against the resolution amount to its acceptance.
He says that the fertilizer company did not waive the defect inherent in    B
the notice of the meeting of December 9, 1965. Mr. Kinslow and Mr.
Bailey were at that period unaware of their right to object to the length of
notice. Therefore, Mr. Millett submits, there could be no waiver. They
acquiesced, he says, in nothing. There has been no laches because, until
this summons was issued, the fertilizer company was not called upon to
adopt either one attitude or another. The allegation that the company is    C
not in liquidation is merely a defence and no-one is under any duty to
defend himself until he is attacked.

I appreciate the force of what Mr. Millett submits, but I think it is
important to bear in mind the broad picture of this case. In 1965 the
fertilizer company is a shareholder in the company. The company is
hopelessly insolvent. The shareholder receives a 14-day notice of a
meeting at which voluntary liquidation is proposed. The shareholder is    D
advised by a qualified solicitor and is represented by him at the meeting.
No-one realises at the meeting that it has been convened at short notice.
The shareholder suffers the resolution to be passed and sees the company
ostensibly placed in liquidation. Within the next fortnight the shareholder
realises that the notice was short by one day but does not openly dis-
close this fact until a further three months have elapsed. The share-    E
holder deals with the liquidator as liquidator in a dispute over a lorry
and reserves the right to prove in the liquidation. The shareholder even
attends the statutory creditors' meeting under borrowed colours. The
shareholder raises no effective objection to the liquidation until three-and-
a-half years after it began. The shareholder qua former creditor is then
called upon to discharge an obligation, or alleged obligation, arising as a
result of the liquidation of the company. Then for the first time it    F
seeks in this court a declaration that the company has never been in
liquidation at all. For my part I should be slow to accede to such a
claim made in such circumstances unless I were compelled to do so by
authority.

It is established law that a company is bound in a matter, intra vires
the company, by the unanimous agreement of all its corporators. I refer    G
to *In re Express Engineering Works Ltd.* [1920] 1 Ch. 466 and *Parker and
Cooper Ltd.* v. *Reading* [1926] Ch. 975. I quote two brief passages
from the latter case. At p. 982 Astbury J. says: " . . . where a transaction
is intra vires the company and honest the sanction of all the members of
the company, however expressed, is sufficient to validate it, . . ." At
p. 983: ". . . the company was bound in a matter intra vires by the
unanimous agreement of its members."    H

I consider that on the particular facts of this case all the corporators
ought to be treated as having assented on December 9, 1965, to the com-
pany being wound up on that day. In my judgment, the case falls within
the principle of the decisions in the two cases I have mentioned. Admittedly
three of the five corporators did not vote in favour of the resolution,
but they undoubtedly suffered it to be passed with knowledge of their
power to stop it. The true quality of the acts of such corporators on

A December 9 is not to be judged exclusively by reference to what they did or did not do on that day, but is also to be judged in the light of what they did and did not do thereafter.

What these corporators did and did not do after December 9, 1965 down to December 10, 1969, when they swore their affidavits disclosing this defence, points, in my view, to one conclusion only. The conclusion is that they outwardly accepted the resolution to wind up as decisively B as if they had positively voted in favour of it. If corporators attend a meeting without protest, stand by without protest while their fellow-members purport to pass a resolution, permit all persons concerned to act for years on the basis that that resolution was duly passed and rule their own conduct on the basis that the resolution is an established fact, I think it is idle for them to contend that they did not assent to the C purported resolution.

In the circumstances I have set out I see no injustice in treating them as having agreed to the liquidation. I observe that in a paragraph from a letter written by Mr. Kinslow on January 2, 1967, which I have already read, Mr. Kinslow himself apparently saw nothing strange in the remark that " I was given inadequate notice of the meeting at which the liquidation was *agreed.*" It seems to me that that was a very appropriate D observation.

Secondly, the fertilizer company is, in my view, barred by laches from now disputing that the company is in liquidation. The fertilizer company is setting up a positive case against the liquidator, a case which inevitably involves a claim that the liquidator has no status whatever and is wrongly in possession of the company's assets. In my judgment, the E equitable doctrine of laches is applicable to that situation just as if the fertilizer company were seeking a remedy against the liquidator.

It will be sufficient for present purposes to cite a passage from the speech of Lord Blackburn in *Erlanger* v. *New Sombrero Phosphate Co.* (1878) 3 App. Cas. 1218, 1279:

F "In *Lindsay Petroleum Co.* v. *Hurd* (1874) L.R. 5 P.C. 221, 239, it is said: ' The doctrine of laches in courts of equity is not an arbitrary or a technical doctrine. Where it would be *practically unjust* to give a remedy, either because the party has, by his conduct done that which might fairly be regarded as equivalent to a waiver of it, or where, by his conduct and neglect he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were after-G wards to be asserted, in either of these cases lapse of time and delay are most material. But in every case if an argument against relief, which otherwise would be just, is founded upon mere delay, that delay of course not amounting to a bar by any statute of limitations, the validity of that defence must be tried upon principles substantially equitable. Two circumstances always important in such cases are the length of the delay and the nature of the acts done during the H interval, which might affect either party and cause a balance of justice or injustice in taking the one course or the other, so far as relates to the remedy.' I have looked in vain for any authority which gives a more distinct and definite rule than this; and I think, from the nature of the inquiry, it must always be a question of more or less, depending on the degree of diligence which might reasonably be required, and the degree of change which has occurred, whether the balance of justice or injustice is in favour of granting the remedy

Brightman J.        In re Bailey, Hay & Co. Ltd. (Ch.D.)        [1971]

or withholding it. The determination of such a question must largely  **A**
depend on the turn of mind of those who have to decide, and must
therefore be subject to uncertainty; but that, I think, is inherent in
the nature of the inquiry."

There is no period of limitation which applies to proceedings to declare
invalid a purported resolution to wind up. Mr. Millett concedes, and in
my view rightly concedes, that there must be some limit of time which  **B**
would bar those proceedings; in other words, that the doctrine of laches
is relevant in such a case. It does seem to me that after this period of
time it would be " *practically unjust* " to the creditors of the company and
to Mr. Tickler to accede to the sort of relief which is sought here, assuming
that I am wrong in the conclusion which I earlier expressed that the three
corporators have in truth assented to the resolution. Additionally, there-
fore, to the first ground of my decision, I find also that the declaration  **C**
sought by the fertilizer company is in any event barred by their laches.

I have purposely left to the conclusion of my judgment one dispute of
fact which I think is really the only disputed fact in the case: that is to
say, whether at the meeting of March 22, 1966, Mr. Kinslow asserted that
the appointment of Mr. Tickler as liquidator was invalid so that he had
no status. I do not think that the point is very material because nothing  **D**
was ever done about it by Mr. Kinslow or Mr. Bailey, or the fertilizer
company, and as Mr. Heyman observed, there is no such thing as a
" without prejudice " liquidation. But in case the matter goes further,
I think I ought to record my own view that it is unproven that any such
assertion was made by Mr. Kinslow.

I reach this finding for these reasons. I have seen in the witness-box
all persons who attended that meeting. I have heard what they have  **E**
said and I am certain that all did their best to recall the truth. However,
Mr. Bruce took a most careful note of the five points made by Mr. Kinslow
that Mr. Kinslow wanted passed on to Mr. Tickler. It was said in evidence
that the points were produced by Mr. Kinslow deliberately and in a
manner which enabled them to be recorded. Indeed it is very noticeable
from the rough notes made by Mr. Bruce how the nature of his notes  **F**
changed when he comes to the five points. The five points are recorded
carefully and fairly fully with no attempt at the sort of verbal shorthand
which appears earlier in these notes. I do not believe that Mr. Bruce
would have failed to record the express challenge to the status of the
liquidator had it, in fact, been made. Nor is there any trace of that
challenge among the contemporaneous writings which refer to this meeting.
Without in any way casting imputations on the honesty and truthfulness of  **G**
Mr. Kinslow, Mr. Bailey and Mr. McGonigal, I prefer the evidence on this
point of Mr. Bruce to the evidence of those speaking to the contrary effect
because it seems to me more likely. In the result, I shall declare that the
company is in voluntary liquidation.

*Declaration that company in liqui-*  **H**
*        dation.*
*Costs reserved to the hearing of the*
*        summons.*

Solicitors: *Tarlo, Lyons & Aukin; Coward, Chance & Co.*

T. C. C. B.

**<u>EXHIBIT AA</u>**

Chancery Division

# *In re* The Sherlock Holmes International Society Ltd

## Aidiniantz *v* The Sherlock Holmes International Society Ltd and others

### [2016] EWHC 1392 (Ch)

| | |
|---|---|
| 2016 May 9, 10; June 15 | Mark Anderson QC sitting as a deputy High Court judge |

*Agency — Authority — Breach of warranty of authority — Company retaining solicitors to resist winding up petition — Sole director's appointment expiring during course of proceedings but director continuing to give solicitors instructions on company's behalf — Petitioner contending that solicitors liable for breach of warranty of authority — Whether solicitors having ostensible authority — Whether solicitors continuing to warrant authority once director's appointment questioned by petitioner*

The company appealed from an order winding it up. Before the appeal came on for hearing, the petitioner raised an issue as to the sole director's status and issued an application for a declaration as to the validity of his appointment. The court held that the director's appointment had expired by the time of the hearing at which the winding up order had been made. In consequence there had been no director in office to give instructions to the company's solicitors to continue to resist the petition. Having failed to recover his costs from the company, the petitioner sought to recover them from the company's solicitors on the ground that they had acted without the company's authority and were therefore liable for breach of warranty of authority.

On the application for costs—

*Held*, refusing the application, that the solicitors had been properly retained by the company and had had continuing ostensible authority to act for it until the petitioner questioned the "director's" status; that the litigation thereafter had been about the very issue alleged to have been warranted; that a solicitor did not warrant the correctness of its client's case and the petitioner could not claim to have relied on any such warranty when litigating to achieve a declaration to the opposite effect; and that, accordingly, the petitioner could not recover his costs from the solicitors (paras 28–30, 32, 40–47, 67).

## APPLICATION for costs

The company, The Sherlock Holmes International Society Ltd, was wound up on the petition of John Aidiniantz. Having failed to recover his costs from the company, the petitioner sought to recover them from the company's solicitors, Pinder Reaux and Associates Ltd, on the ground that they had acted without the company's authority and were therefore liable for breach of warranty of authority. Alternatively, the petitioner sought an order that his costs be paid by Jennifer Decoteau and Stephen Riley, who had acted as two of the company's directors.

The facts are stated in the judgment.

*Hugh Sims QC* and *Christopher Brockman* (instructed by *Gordon Dadds LLP*) for the petitioner.
*Niamh O'Reilly* (instructed by *RPC LLP*) the solicitors.

The court took time for consideration.

15 June 2016. **MARK ANDERSON QC** handed down the following judgment.

**1** The facts and the history of the litigation, and the identity of the participants, are dealt with in the principal judgment [2016] EWHC 1076 (Ch). I now have to deal with costs, including an application by Mr Aidiniantz that Messrs Pinder Reaux and Associates, who purported to act for the Company on the instructions of Ms Decoteau and Mr Riley, should be added as a party and ordered to pay Mr Aidiniantz's costs.

1

© 2016. The Incorporated Council of Law Reporting for England & Wales

**2** I will use the same abbreviations, names and defined phrases as I used in the principal judgment without explaining them again here, but I will provide a brief synopsis of the litigation.

**3** On 1 July 2014 Mr Aidiniantz presented a petition to wind up the Company on the insolvency ground. The persons in de facto control of the Company included Mr Riley and Ms Decoteau. In early July 2014 Ms Decoteau retained Pinder Reaux on behalf of the Company to resist the petition on the ground that the Company has a counterclaim against Mr Aidiniantz for some £1·8m. In October 2014 Pinder Reaux were instructed to bring proceedings to enforce it and a claim form was served. The proceedings were stayed when the winding up order was made.

**4** In about July 2014 Ms Decoteau appointed Mr Riley as a director and then resigned, leaving *him* as the sole director. However she continued to involve herself in the affairs of the Company, which by this time were confined to resisting the petition and pursuing the October 2014 claim.

**5** Mr Riley's appointment as a director automatically expired on 31 December 2014 and the Company was left without a director, but no one noticed that that had occurred. Mr Riley and Ms Decoteau continued to give instructions to Pinder Reaux and the petition took its course to a hearing before Registrar Derrett in January 2015. In a judgment handed down in March she ordered that the Company be wound up. On instructions from Mr Riley and Ms Decoteau, Pinder Reaux launched an appeal for which Henderson J granted permission. The appeal was listed for 3 November 2015 before me.

**6** On 16 October 2015 Gordon Dadds LLP, Mr Aidiniantz's solicitors, wrote to Pinder Reaux to question Mr Riley's status as a director on the ground that his original appointment had been invalid. On 27 October Gordon Dadds issued an application for a declaration on the same ground. The result was that the appeal did not proceed on 3 November but directions were given for a trial of the issue which had been raised. At that hearing, the expiry of Mr Riley's appointment on 31 December 2014 was raised for the first time in the alternative to the contention that it had never been valid at all. It is that alternative ground of objection which has succeeded.

**7** The matter came on for hearing on 11 January 2016. In the principal judgment, circulated in draft in early February, I declared that Mr Riley's appointment had indeed expired on the date alleged, but rejected the argument that it had never been valid at all.

**8** In light of my conclusion Pinder Reaux ceased to act for the Company. At the hearing which gives rise to this judgment the Company was unrepresented. Pinder Reaux were represented by Ms Niamh O'Reilly on instructions from RPC LLP and Mr Aidiniantz by Mr Hugh Sims QC and Mr Christopher Brockman on instructions from Gordon Dadds. Ms Decoteau and Mr Riley appeared before me without legal representation and Ms Decoteau spoke for both of them.

**9** Mr Aidiniantz claims his costs from Pinder Reaux. He applies in the alternative for an order that his costs be paid by Ms Decoteau and Mr Riley, who have already been added as defendants for that purpose. At the hearing Ms Decoteau submitted that there should be no order as to costs. She subsequently made written submissions which I agreed to consider, arguing that Mr Aidiniantz or Pinder Reaux should meet the costs which have been paid to Pinder Reaux.

*Mr Aidiniantz's application against Pinder Reaux*

**10** The ground for the application against Pinder Reaux is that they purported to act for the Company in bringing the appeal from 1 January 2015 onwards, without any authority to do so. It is a claim for breach of warranty of authority. No application has been made against Pinder Reaux for a wasted costs order under section 51(6) of the Senior Courts Act 1981. Mr Yapp's witness statement in response to Pinder Reaux's evidence indicated that Mr Aidiniantz was seeking such an order, but at the hearing Mr Sims recognised the difficulty of making an application only in a witness statement in response, and did not press for a wasted costs order to be made at this hearing.

**Submissions**

**11** Mr Sims argued that Pinder Reaux warranted that they had authority to act on behalf of the Company, that warranty was breached, and the breach caused Mr Aidiniantz to lose all the costs he incurred from 1 January 2015 onwards. Mr Sims says that Pinder Reaux are strictly liable for those costs on a solicitor/own client basis. They amount to some £275,000, although that includes some costs incurred in the October 2014 action.

**12** In response, Ms O'Reilly relies on ostensible authority. The evidence of Mr John Spyrou of Pinder Reaux is that his firm was first retained on 1 July 2014 by Ms Decoteau who was then a director. At some point, also in 2014, she appointed Mr Riley in her place. So Pinder Reaux were properly instructed by the Company in 2014. Ms O'Reilly argues that Mr Aidiniantz was entitled to assume that Mr Riley's authority continued until he learned otherwise: *Benjamin*

2

*Scarf v Alfred George Jardine* (1882) 7 App Cas 345. Pinder Reaux therefore had the Company's ostensible authority to bring the appeal. There was therefore no breach of warranty.

**13** Alternatively Ms O'Reilly relies on section 161 of the Companies Act 2006 which provides that the acts of a person acting as a director are valid notwithstanding that it is afterwards discovered that he had ceased to hold office. She says that section 161 continued to apply even after 16 October 2015, when Gordon Dadds' letter raised the issue of Mr Riley's appointment. She says that it was not discovered that Mr Riley's appointment had terminated until I circulated my draft judgment.

**14** Next Ms O'Reilly contends that even if Pinder Reaux were in breach of a warranty of authority, that breach caused no loss. The warranty, if true, would have enabled Mr Aidiniantz to obtain an order for costs against the Company. The basis of this petition is that the Company is insolvent. Therefore the order for costs would have been worthless. Damages for breach of warranty should not put the claimant into a better position than he would have enjoyed if the warranty had been true. She invokes *McGregor on Damages* 19th ed (2014), para 34–022:

> "the important qualification on the entitlement of a contracting party to claim reliance expenditure, which is that he cannot do so in order to escape from a bad bargain; he cannot put himself in a better position than if the contract had been properly performed".

It follows, she says, that where the party for whom the solicitor purports to act would not have been able to meet an order for costs, the solicitor *is* not liable. That was the view expressed by Colman J in *Skylight Maritime SA v Ascot Underwriting Ltd* [2005] EWHC 15 (Comm); [2005] PNLR 25.

**15** Finally Ms O'Reilly argued that even if she is wrong about everything else, the litigation initiated by the application notice of 27 October 2015 was about the very issue alleged to have been warranted. Solicitors do not warrant the correctness of their client's case and Mr Aidiniantz could not claim to have relied on any such warranty when litigating to achieve a declaration to the opposite effect.

**16** Mr Sims responded that ostensible authority can never defeat a claim for breach of warranty of authority because the warranty is that the agent is actually authorised, not ostensibly so. He points out that ostensible authority has not been argued as a defence to such a claim in any reported case about unauthorised litigation, let alone successfully so. He says that the leading case of *Yonge v Toynbee* [1910] 1 KB 215 would have been decided differently if ostensible authority provided a defence.

**17** Mr Sims argued that section 161 only deals with procedural or similar slips in a person's appointment and has no application where the appointment was never made or never renewed at all: *Morris v Kanssen* [1946] AC 459; and further that Pinder Reaux were on notice of the expiry of Mr Riley's office and that a person with notice can derive no protection from section 161 or ostensible authority.

**18** As to the issue whether a breach of warranty caused his client loss, Mr Sims argued that the measure of damages is the amount of costs expended in dealing with the unauthorised proceedings, notwithstanding that the Company in respect of which the warranty was given is insolvent. He says that the comments of Colman J in *Skylight Maritime* to contrary effect were obiter and wrong. Partly in reliance on the decision of Judge Seymour QC in *Stevenson v Singh* [2012] EWHC 2880 (QB) at [78FF], Mr Sims argued that the nature of the remedy depends on the nature of the warranty; and that where the warranty was that impliedly given by a solicitor who conducts litigation, the measure of damages must be the amount of costs thrown away in resisting the proceedings. He points out that in *Yonge v Toynbee*, Buckley LJ said that the damages would be "the amount of the plaintiffs costs thrown away in the action". In *FernÉe v Gorlitz* [1915] 1 Ch 177, Eve J explicitly found that the loss to be compensated was the costs thrown away in resisting the proceedings. In *Stevenson*, Judge Seymour QC at para 79 took *FernÉe* as establishing "that, in a case in which a solicitor has acted in breach of his warranty of authority in commencing an action the measure of damages is the actual costs to which the opposite party was put in consequence in having to resist the action". That was also the order made by Steyn J in *Babury Ltd v London Industrial plc* (1989) 139 NLJ 1596 where the solicitor had purported to act for a company which had been dissolved.

**19** As regards the position after 16 October 2015, Mr Sims says that Pinder Reaux continued to warrant that they acted for the Company and anyway the costs of inquiring into whether the warranty was breached were caused by the breach.

© 2016. The Incorporated Council of Law Reporting for England & Wales

*The jurisdiction*

**20** In *Yonge v Toynbee* the Court of Appeal identified the conceptual basis of the liability as compensation for breach of an implied warranty given by the solicitor that he was authorised to act by his client. The rationale of the inferred warranty in the context of litigation is that the solicitor is uniquely placed to verify that the person giving him instructions is authorised to do so. Swinfen Eady J said, at p 234:

> "The manner in which business is ordinarily conducted requires that each party should be able to rely upon the solicitor of the other party having obtained a proper authority before assuming to act. It is always open to a solicitor to communicate as best he can with his own client, and obtain from time to time such authority and instructions as may be necessary. But the solicitor on the other side does not communicate with his opponent's client, and, speaking generally, it is not proper for him to do so … It is in my opinion essential to the proper conduct of legal business that a solicitor should be held to warrant the authority which he claims of representing the client; if it were not so, no one would be safe in assuming that his opponent's solicitor was duly authorised in what he said or did, and it would be impossible to conduct legal business upon the footing now existing; and, whatever the legal liability may be, the court, in exercising the authority which it possesses over its own officers, ought to proceed upon the footing that a solicitor assuming to act, in an action, for one of the parties to the action warrants his authority."

**21** A further aspect of the rationale is that:

> "Making the solicitor liable in such circumstances avoids the injustice which would otherwise be caused by the fact that the person for whom the unauthorised solicitor was purporting to act could not himself be made responsible for the opposing party's costs"

(*SEB Trygg Liv Holding AB v Manches* [2005] EWCA Civ 1237; [2006] 1 WLR 2276, 2298).

**22** Although the conceptual basis of the jurisdiction is contractual, the court is of course not actually dealing with *a* breach of contract. As Waller LJ explained in *Nelson v Nelson* [1997] 1 WLR 233 at 239H, the court is exercising its authority over solicitors as its officers, but is doing so on the footing that the solicitor warrants his authority. A solicitor who breaches the warranty is amenable to the supervisory jurisdiction of the court and may in the court's discretion be ordered summarily to pay the other party's costs.

**23** As to discretion, Waller LJ said, at p 241:

> "I should finally make clear two things. First, because even in the want of authority case the court is exercising its inherent jurisdiction, it must be right to say that the court ultimately has a discretion. But, second, it is of such importance that solicitors do not commence proceedings without authority leaving the opposing party without even a person or entity against whom an order for costs can be obtained, that it is difficult to contemplate circumstances where, if the lack of authority leads to that result, the discretion would be exercised in favour of the solicitors. The warranty by analogy, however, is not a warranty of solvency or that the costs will be recovered; it is that the plaintiff exists and has authorised the proceedings and no more."

**24** Although the remedy is discretionary, "It has never been considered to be a bar to the exercise of this jurisdiction that the solicitor acted bona fide and in reasonable reliance upon instructions" (per Steyn J in *Babury Ltd v London Industrial plc* (1989) 139 NLJ 1596). In that sense, liability is strict.

**25** However the jurisdiction is only to be exercised in clear cases where there are no issues unsuitable for summary disposal. In *Babury* Steyn J went on to say:

> "It might, for example, sometimes in less than clear cut cases be right to leave the aggrieved party to his remedy in an action in damages for breach of warranty of authority against the solicitor. Having made clear that there is no inflexible rule, it is nevertheless right in my view to emphasise that a solicitor who clearly acted without authority, causing by his representation of authority the opposing party to incur wasted

4

© 2016. The Incorporated Council of Law Reporting for England & Wales

costs, must usually expect to be ordered to pay the costs in the exercise of the court's summary jurisdiction."

**26** In *Skylight Maritime* Colman J said at para 13:

"The result of the authorities and the demands of the twin objectives of making solicitors accountable for their unauthorised conduct of litigation and yet of protecting them against untested allegations of want of authority is that, whereas in clear cases of breach of warranty of authority and consequent recoverable loss, the court can summarily determine the solicitors' liability for damages, in cases where there are real issues as to the facts or law, the courts should not do so but should leave the opposite party to start proceedings by issuing a claim for breach of warranty of authority."

*What warranty was given in this case and for what period?*
**27** It is common ground that Pinder Reaux gave a warranty in instituting the appeal and in conducting it until Mr Riley's status was first brought into question on 16 October 2015. Ms O'Reilly did not submit that the warranty was satisfied on the basis that Pinder Reaux did have a client who had authorised the appeal, namely Mr Riley. She accepted that the warranty was that the Company had authorised the appeal. The issue is whether the warranty continued after 16 October 2015.

**28** The application for a declaration made on 27 October raised a new issue and initiated a new phase in the litigation. Although raised within an appeal to which the Company was a party, and in which Pinder Reaux were on the record as acting for it, in resisting the application Pinder Reaux were advancing Mr Riley's claim to be a director. Pinder Reaux and counsel chose to express their position as acting for the Company because that was consistent with the case which they were instructed to advance, but it was obvious to all that that begged the very question in dispute. It was merely incidental to Mr Riley's position to assert that the Company shared it. Applying ordinary objective principles, a reasonable person in the position of Mr Aidiniantz would not have concluded that in making (and causing counsel to make) submissions to that effect, Pinder Reaux were warranting that Mr Riley was still a director. Legal representatives do not warrant the arguments they make on behalf of their clients. See for example— *SEB Trygg Liv Holding AB v Manches* at para 66:

"it is important to bear in mind that generally a solicitor conducting proceedings does not warrant what he says or does on behalf of his client. Thus he does not warrant that his client, the named party to the proceedings, has title to sue, is solvent, has a good cause of action or defence or has any other attribute asserted on his behalf."

and *Nelson v Nelson* [1997] 1 WLR 233 per Peter Gibson LJ at p 237:

"He does not warrant that the client has a good cause of action or that the client is solvent."

**29** Moreover the rationale of inferring a warranty of authority, identified in para 20 above, does not arise where the very issue in the litigation is the authority alleged to have been warranted. It is not the case that Mr Aidiniantz was unable to make his own inquiries about Mr Riley's status as a director. After 16 October he was exactly as well placed as Pinder Reaux to inquire whether or not Mr Riley's appointment had expired. A person equally well placed as the agent to know whether the agent's authority has come to an end does not have the benefit of an implied warranty of authority: *Smout v Ilbery* 152 ER 357; (1842) 10 M & W 1 as explained in *Yonge v Toynbee* by Buckley LJ at pp 227–228. And in *Babury Ltd v London Industrial plc*, Steyn J observed that the general rule (that a warranty is given) "may sometimes have to yield to special circumstances, for example in a case where the opposing party's solicitor is informed that there was a doubt about the solicitor's authority …".

**30** Pinder Reaux did not need to inform Mr Aidiniantz that there was a doubt about their authority. He knew that he could not, in the words of Buckley LJ, safely assume it. In asserting that they did have authority, Pinder Reaux were advancing Mr Riley's case, not warranting it. A solicitor does not warrant his authority where that issue is known to be controversial and the parties are engaged in litigation to find the answer.

**31** Neither is the further aspect of the rationale (mentioned in para 21 above) present in this case. Mr Aidiniantz never expected to be awarded his costs against the Company. He knew all

5

along that his only chance of recovering costs was against Mr Riley and Ms Decoteau. He still has that chance.

32 I therefore conclude that Pinder Reaux ceased to give any warranty as to their authority after Mr Aidiniantz's assertion that Mr Riley was not a director of the Company on 16 October 2015. However they did give the warranty mentioned in para 27 above for the period before that assertion.

### Was the warranty breached?

#### The "better position" controversy

33 Although the issue summarised in paras 14 and 18 above was argued in the context of causation and quantification of loss, for reasons I will explain the question whether a claimant can recover damages providing a better outcome than if the warranty had been true is relevant to the defences based on ostensible authority and section 161. I will therefore address that issue before dealing with those defences.

34 In *Skylight Maritime* Colman J set out his analysis at paras 15–20:

> "15. The question that then arises is what is the appropriate measure of loss?
>
> "16. It is important not to lose sight of the fact that the relevant breach of warranty is the non-existence of the authority that was warranted. Therefore, the opposite party or promisee has lost the benefit of the position he would have been in had the warranty been true. In other words, the court is concerned to quantify what benefit has been lost by reason of the fact that the supposed client is not after all a party to the proceedings. In the ordinary case, the promisee will have lost the ability to recover from that client the costs of the proceedings in the event of a costs order in the promisee's favour. This is usually quantified as the amount of costs thrown away by the promisee in relation to the proceedings from the first participant in them of the solicitor until the promisee is apprised of the solicitor's lack of authority.
>
> "17. In *Firbank's Executors v Humphreys* (1886) 18 QBD 54, Lord Esher MR stated at p 60: 'The damages under the general rule are arrived at by considering the difference in the position he [the person acting in reliance on the warranty] would have been in had the representation been true and the position he is actually in consequence of its being untrue.'
>
> "18. In *In re National Coffee Palace Company* (1883) 24 Ch D 367 there are observations by Brett MR at p 372 and by Bowen LJ at p 375 to the effect that if the supposed principal is insolvent the promisee will not be entitled to recover substantial damages from the warrantor of authority because he would not have been able to recover from the suppose principal if the warranty had been true.
>
> "19. In *Habton Farms v Nimmo* [2004] QB 1 Clarke LJ in the Court of Appeal, with whom Auld LJ agreed, approved the following passage in *McGregor on Damages* 16th ed in relation to breach of warranty of an agent's authority to contract on behalf of an apparent party to the contract at page 18: '1311. Given an enforceable contract had the agent had authority and given a solvent principal, the damages will be based on the measure of damages that the plaintiff could have recovered in an action for breach of contract against the principal had the principal been bound, and this will generally give him damages for the loss of his bargain. The particular measure falls to be judged in accordance with the particular type of contract that the defendant had warranted his authority to negotiate, and illustrations in the cases range over a variety of contract types.'
>
> "20. Accordingly, a claim for breach of warranty of authority cannot be deployed to put the promisee in a better position than if the warranty had been true. Thus, if a supposed client is insolvent, substantial damages for breach of a solicitor's warranty of authority will not normally be recoverable because the promisee would not have been able to recover costs against the client even if the solicitor had authority to act."

35 I do not accept Mr Sims' argument that Colman J's analysis was obiter. He decided that he could not exercise the court's summary jurisdiction because there were factual complications, one of which was whether the purported principal was solvent or not at the relevant time: see para 60 of the judgment. I should follow that decision and will do so.

36 I will however briefly address Mr Sims' submissions as to why the decision was wrong, not least because the contractual nature of the liability raises issues which did not arise in

6

Skylight, namely the availability of ostensible authority and section 161 of the Companies Act 2006 as defences to a claim for breach of warranty of authority.

**37** The Court of Appeal observed in *SEB Trygg Liv Holding AB v Manches* at 2298 that "Although this contractual theory presents some conceptual problems in the case of a solicitor conducting litigation, this is nevertheless the established basis for the liability". I accept that this does not mean that the court acts on a legal fiction that there is a contract. I accept also that the nature of the warranty must inform the remedy for its breach, as submitted by Mr Sims in reliance on the words of Judge Seymour QC in *Stevenson v Singh* [2012] EWHC 2880 (QB). However neither of these points leads to the conclusion, and there is nothing in Judge Seymour QC's judgment to suggest, that costs may be quantified on the footing of damages for breach of warranty whilst ignoring some of the contractual principles altogether. The warranty given by solicitors in litigation has never been treated as conceptually different from the warranty given in non-contentious business nor from the warranty given by other types of agent in non-legal business. Although the nature of the warranty will determine the remedy, it would be surprising if that meant that established contractual principles were disregarded.

**38** In my judgment none of the cases relied on by Mr Sims *(Yonge v Toynbee, FernÉe v Gorlitz* and *Babury v London Industrial plc)* is authority for the proposition that damages for breach of warranty of authority may put the claimant into a better position than if the warranty had been true. In *Babury* the supposed principal did not exist. In *Yonge* and in *FernÉe* the clients were under a disability and therefore not able to give instructions. In all three cases the warranty could never have been true and so there was no possibility that damages assessed as wasted expenditure would put the plaintiffs into a better position than they would have enjoyed if the warranty had been true.

**39** For these reasons, although I accept that the usual measure of damages in the litigation cases will be the costs that have been wasted, that will not be so if that would put the claimant into a better position than if the warranty had been true.

*Ostensible authority*

**40** Pinder Reaux were properly retained by Ms Decoteau on behalf of the Company in 2014 and notice of the termination of their retainer was not given to Mr Aidiniantz. He would therefore have been entitled to insist that the Company was bound by the actions which Pinder Reaux had taken on its behalf: *Scarf v Jardine* (1882) 7 App Cas 345. Pinder Reaux were ostensibly authorised to act for the Company. Mr Sims did not submit that his own client had notice that they were not authorised.

**41** The same conclusion arises from the rule in *Royal British Bank v Turquand* (1856) 6 E&B 327, which was summarised by Lord Simmonds in *Morris v Kanssen* [1946] AC 459, para 474:

> "Persons contracting with a company and dealing in good faith may assume that acts within its constitution and powers have been properly and duly performed and are not bound to inquire whether acts of internal management have been regular."

**42** However Pinder Reaux gave a warranty that the Company had authorised the appeal. That was not the case. The warranty was untrue. So the question arises whether ostensible authority is enough to satisfy a solicitor's warranty of authority.

**43** In *Rainbow v Howkins* [1904] 2 KB 322, an auctioneer knocked a horse down to the plaintiff in error, at a price below a reserve of which the plaintiff was unaware. In so doing the auctioneer purported to make a contract of sale on the owner's behalf and warranted his authority to do so. The auctioneer noticed the error before a memorandum of sale had been made, so the sale was unenforceable. The auctioneer refused to proceed with the sale and the plaintiff sued him for breach of his warranty of authority, claiming the profit he would have made if the sale had gone ahead. He lost. The Divisional Court held that the auctioneer had ostensible authority to sell the horse to the plaintiff and therefore the plaintiff could have enforced the contract but for the want of a memorandum. "Here the answer to the plaintiff's claim on the ground of breach of warranty or misrepresentation of authority is that there was none. The defendant's principal was as much bound as if he had made the bargain himself." So although the auctioneer was not actually authorised to sell the horse to the plaintiff, his ostensible authority made good the warranty. The case was not decided on the basis of a breach which caused no loss. There was no breach.

**44** That case demonstrates no more than that ostensible authority provides a defence to a claim for breach of warranty of authority, if and to the extent that it puts the claimant into the same position as he would have enjoyed if there had been actual authority. In my judgment this

7

is but a reflection of the principle that a claim for breach of warranty cannot put the claimant into a better position than if the warranty had been true.

**45** If Mr Sims had been right that the measure of loss is always the amount of costs expended in the unauthorised litigation, even where the supposed principal is insolvent, then I would have accepted that ostensible authority could not provide a defence. It is the existence of the ostensible authority which causes the claimant to incur the costs, and it would be wrong if the same facts barred him from a remedy he would otherwise have. Ostensible authority is a doctrine intended to protect third parties against the want of authority of an apparent agent, not the other way round. However this consideration falls away if one accepts that damages cannot put the claimant into a better position than if the warranty had been true. Ostensible authority is invoked to prevent a claimant, whose only cause of action depends on X being untrue, from being put into a better position than if X were true.

**46** If ostensible authority does not have the effect of putting the claimant into the same position as actual authority would have done, then it does not provide a defence to a claim for breach of warranty of authority. *Yonge v Toynbee* is an example. The solicitors who acted for Mr Toynbee may well have had ostensible authority under the principles of *Scarf v Jardine,* but the steps taken in the litigation purportedly on behalf of Mr Toynbee could not have been validated by that ostensible authority because Mr Toynbee was under a disability. Similar considerations applied in *FernÉe v Gorlitz*. Such considerations do not apply here.

**47** For these reasons, I consider that Pinder Reaux's ostensible authority provides an answer to Mr Aidiniantz's claim for breach of warranty of authority, for the period during which the ostensible authority endured—until Mr Aidiniantz appreciated that he could no longer safely assume that they were acting for the Company which I take as 16 October 2015. I have already decided that after that period, no warranty was given.

**48** However a further consideration arises. If the warranty had been true, Mr Aidiniantz would have had no reason to cause his solicitors to write the letter of 16 October 2015, to issue his application dated 27 October, to cause the hearing of the appeal not to proceed on 3 November and to engage in the lengthy hearing before me in January I must consider whether the costs of that dispute were the result of Pinder Reaux's want of actual authority. If they were, then their ostensible authority was not as good for Mr Aidiniantz as actual authority and the defence of ostensible authority would not avail Pinder Reaux to the extent of those costs.

**49** In my judgment, the cost of litigating this issue were not caused by Pinder Reaux's lack of actual authority before the issue was raised. They were caused because Pinder Reaux's ostensible authority came to an end in controversial circumstances. Pinder Reaux did not warrant that their authority would continue for any particular period into the future; neither did they warrant that their authority would not expire in controversial circumstances which could give rise to expensive litigation to establish that expiry.

**50** In principle the costs of litigation to decide whether a warranty of authority was false may be recoverable as damages for its breach. Such was the outcome in *Collen v Wright* 120 ER 241; (1857) 8 El & Bl 647. However in that case the costs were incurred in an unsuccessful attempt to establish that the warranty was true. The reverse is the position here. Mr Aidiniantz preferred the warranty to be untrue and incurred costs in order to benefit from the better position into which he perceived its falsity would put him. Whether or not it was actually a better position, it was not forced upon him by the fact that Pinder Reaux had not had actual authority. In no sense were these costs a loss resulting from the fact that the authority, while it lasted, had been ostensible not actual.

**51** Moreover it was agreed for the purpose of these proceedings that Mr Aidiniantz was the sole living member of the Company. He could therefore have chosen to allow the appeal to proceed. If he had thought that the truth of the warranted position was preferable to its falsity, he would have done so. Even without the peculiar feature that he was the Company's only member, he did not need to deploy the point about Mr Riley's authority to bring the appeal to an end. He could have let matters take their course. His discovery of the defect in Mr Riley's appointment offered him the opportunity of being in a different position than if the warranty had been true, but did not compel him to be. He obviously calculated that his position would be better if the warranty was untrue than if it was true. That was his preferred outcome. If the fact that the authority was ostensible results in the claimant being in a *better* position than if it had been actual, for reasons already explored he cannot complain of breach of warranty of authority.

**52** I must not be taken as criticising Mr Aidiniantz for challenging Mr Riley's status instead of getting on with the appeal on its merits. His challenge was resisted and was successful. Many (perhaps most) in his position would have made the same choice. It may seem odd that his

8

© 2016. The Incorporated Council of Law Reporting for England & Wales

claim for costs is lost because it was open to him, but he chose not, to allow an unauthorised appeal to proceed against his interests. I think that the apparent oddity disappears when one comes back to the starting point, which is that a solicitor's warranty of authority imposes no-fault liability and is therefore narrowly confined to being that the solicitor has a client against whom an order for costs can be made. Only the risk of the solicitor having no client is allocated to the solicitor without proof of fault. The warranty offers protection on a no-fault basis, but offers no greater protection than that. I agree with Mr Sims that the nature of the warranty determines the remedy, but that is precisely why there is no remedy in this case. If the claimant wants greater protection or fuller redress than is offered by the narrow no-fault warranty of authority, he has to look to other means of redress and assume the burden of proving that the solicitor was guilty of improper, unreasonable or negligent behaviour, or of establishing some other grounds for making a costs order against him.

*Companies Act 2006, section 161*

53 I heard full argument about the defence based on section 161 and will deal with it in case I am wrong on other matters.

54 Section 143 of the Companies Act 1929 provided that "The acts of a director or manager shall be valid notwithstanding any defect that may afterwards be discovered in his appointment or qualification." In *Morris v Kanssen* [1946] AC 459, Lord Simonds, with whom the rest of the House agreed, said of section 143, at p 471:

> "There is, as it appears to me, a vital distinction between (a) an appointment in which there is a defect or, in other words, a defective appointment, and (b) no appointment at all. In the first case it is implied that some act is done which purports to be an appointment but is by reason of some defect inadequate for the purpose; in the second case there is not a defect, there is no act at all. The section does not say that the acts of a person acting as director shall be valid notwithstanding that it is afterwards discovered that he was not appointed a director. Even if it did, it might well be contended that at least a purported appointment was postulated. But it does not do so, and it would, I think, be doing violence to plain language to construe the section as covering a case in which there has been no genuine attempt to appoint at all. *These observations apply equally where the term of office of a director has expired, but he nevertheless continues to act as a director, and where the office has been from the outset usurped without the colour of authority*." (My emphasis.)

55 However section 161 of the Companies Act 2006 contained new provisions not found in its predecessors:

> "(1) The acts of a person acting as a director are valid notwithstanding that it is afterwards discovered— (a) that there was a defect in his appointment; (b) that he was disqualified from holding office; (c) that he had ceased to hold office; (d) that he was not entitled to vote on the matter in question."

56 In my judgment *Morris v Kansscn* dealt with the words now to be found in section 161(l)(a) (defect in appointment) and 161(l)(b) (want of qualification), but not with the new paragraph 161(l)(c). It is easy to understand why a failure to appoint or reappoint someone is not a defect in his appointment or reappointment, so section 161(a) would not apply. But the 2006 Act was intended to widen the circumstances in which section 161 was to operate by adding two new sub-paragraphs, (c) and (d), dealing with situations with which the section had not previously dealt, one being that the purported director had in fact ceased to hold office and had not been reappointed. *Gore Brown on Companies* at 13.25 supports this view.

57 I do not think it helpful to ask if what has occurred is a "slip in the appointment" as Mr Sims suggested. That phrase was used in *Morris v Kansscn* to explain their Lordships' decision in that case, and should not be taken as a gloss to the words of section 143, and obviously not to the new words of section 161. I can see nothing in section 161(1)(c) to suggest that it only applies where the cessation of office was caused by some, but not other, circumstances, and there is no reason why it should not apply where a director has ceased to hold office upon expiry of his appointment. I therefore reject Mr Sims' submission on that point.

58 Mr Sims next says that the section does not apply because Pinder Reaux were on notice of the defect in Mr Riley's appointment. Ms O'Reilly retorts that Pinder Reaux's state of mind is irrelevant. She says that section 161 validates Mr Riley's instructions to Pinder Reaux in

9

favour of Mr Aidiniantz unless Mr Aidiniantz was himself on notice of the expiry of Mr Riley's appointment.

**59** It was decided by the Court of Appeal in *Kanssen v Rialto (West End) Ltd* [1944] Ch 346, which went to the House of Lords as *Morris v Kanssen*, that section 143 (and therefore section 161) does not validate acts in favour of a person who had notice of the defect. That issue did not arise on appeal, but Lord Simonds summarised the Court of Appeal's reasoning as being that a person who invokes section 143 "must be subject to the same obligation as if he was relying on the general law as stated in *Royal British Bank v Turquand*" 6 E & B 327. One aspect of that obligation is to make proper inquiry if put on notice of the true position. For that reason it was decided in *Morris* that the rule in *Turquand* does not apply to validate acts in favour of directors who participated in the impugned transaction, because directors have a duty to see that the affairs of the company are properly conducted. The modern expression of that duty is to be found in section 171 of the Companies Act 2006.

**60** The alignment of section 161 with the rule in *Turquand* on the issue of notice leads me to the conclusion that a sole director cannot invoke section 161 to validate a transaction which was invalid because of some defect caused by a breach of his duty to see that the affairs of the company are properly conducted. The Court of Appeal so held, not in relation to section 161 but in relation to (what is now) section 40 of the 2006 Act, in *Smith v Henniker-Major & Co* [2002] EWCA Civ 762; [2003] Ch 182; [2002] 3 WLR 1848 and I think that that reasoning applies in this case.

**61** It would therefore not be open to Mr Riley to rely on section 161 as validating this appeal, because he was in breach of section 171, and such validation cannot have been achieved merely because he appointed solicitors to act on his behalf. For that reason Ms O'Reilly is right that Pinder Reaux's state of mind does not come into the matter. In my judgment section 161 validates unauthorised actions in favour of those dealing with a company. It does not validate hostile actions which persons dealing with the company do not want to be validated, such as litigation against them. So the appeal was not actually validated by section 161 because Mr Aidiniantz chose not to invoke the protection which was offered.

**62** However the fact remains that he could have done so if he had wanted the warranted position. So for the same reasons as apply in the case of ostensible authority, I think that Pinder Reaux are entitled to rely on section 161 as providing a defence to the claim for breach of warranty of authority for the period before the expiry of Mr Riley's appointment was discovered, which was I assume shortly before 3 November 2015. I reject Ms O'Reilly's contention that the defect was not discovered until I circulated my draft judgment. Everyone had notice of the point by 3 November. Indeed by the time of the hearing in January no one was arguing that Mr Riley was in fact still a director. The only point taken was laches.

### Quantification of loss

**63** For reasons already explained, even if I had found Pinder Reaux in breach of the warranty mentioned in para 27 above, the costs incurred during the period of the warranty would not be recoverable because the warranty was that the Company had authorised the appeal, and the Company was never going to pay the costs anyway.

**64** If I had decided that the costs of litigating the issue were in principle caused by Pinder Reaux's lack of actual authority, that would not have caused me to award them pursuant to the summary jurisdiction. If the warranty had been true, the appeal would have proceeded. If it had succeeded, further expensive litigation would have been inevitable. The claim which had been instituted in October 2014 would have remained to be litigated and there would have been further litigation about who were the members of the Company and therefore who was entitled to appoint directors. Mr Riley's standing as a director would therefore have remained unresolved and the costs of resolving it would have been incurred sooner or later. A further winding up petition would have been likely at some point as well.

**65** All of that would only have occurred if the appeal had been allowed. For these reasons I could not have decided whether an award of the costs occasioned by the dispute about Mr Riley's appointment would have put Mr Aidiniantz into a better position than if the warranty had been true. This would not have been a case suitable for summary disposal.

**66** The same considerations would have applied if I had decided that damages could in principle be assessed on the reliance expenditure basis. That would have involved inquiry into what would have happened if Pinder Reaux had not given the warranty, which is tantamount to asking what would have happened if no solicitor had acted. Judging by what happened in this case after Pinder Reaux did cease to act, when Ms Decoteau continued to purport to represent the Company without their services (even after I had delivered a draft of my judgment and after

10

© 2016. The Incorporated Council of Law Reporting for England & Wales

it had been handed down), I could not have been satisfied that Mr Aidiniantz's costs were caused by Pinder Reaux's warranty even as reliance expenditure.

### Conclusion

67 I decline to exercise the court's supervisory jurisdiction over Pinder Reaux to make an order for costs against them. I do not consider that the basis of the liability is made out. If I am wrong about that, the quantification of the liability would not have been suitable for summary disposal.

68 I do not have to exercise a discretion in these circumstances but the contractual basis of assessment seems to me to give full effect to the merits in this case. The want of authority has not left Mr Aidiniantz without anyone from whom he can recover costs. He has been left with exactly the same persons as he believed all along he would have recourse against.

69 I will add Pinder Reaux as a party and dismiss Mr Aidiniantz's claim against them.

*Costs under section 51 Senior Courts Act 1981*

### The claim against Pinder Reaux by Ms Decoteau and Mr Riley

70 In the absence of an application for wasted costs, there is no jurisdiction pursuant to which I could order Pinder Reaux to reimburse the costs paid to them as suggested by Ms Decoteau in her written submission after the hearing. Ms Decoteau made very serious allegations about Pinder Reaux's conduct which she should not have made, because they were irrelevant to any issue before me. Pinder Reaux were unable to respond to them because they were bound to maintain the Company's privilege.

### The claim against Ms Decoteau and Mr Riley by Mr Aidiniantz

71 Mr Aidiniantz claims that his costs of the appeal, and in light of my decision in the main judgment his costs below after 31 December 2014, should be paid by Mr Riley and Ms Decoteau.

72 Mr Aidiniantz has made an application to Registrar Derrett that Ms Decoteau and Mr Riley pay his costs of the proceedings before her, and that application is still outstanding. An award of costs against a non-party involves exercising a wide discretion having regard to the matters set out in CPR r 44.2, about which I know very little as regards the proceedings before the Registrar. I am in no position to deal with that application and must leave that to the Registrar. This also makes it difficult for me to decide the application in respect of the costs of the appeal, at least before the application notice of 27 October 2015. The appeal was an extension of the opposition to the winding up petition. Therefore if Registrar Derrett decides that the costs before her should be borne to any extent by Ms Decoteau and/or Mr Riley, it seems likely (without deciding the matter) that a similar order would follow in respect of the costs of the appeal up to 27 October. For these reasons I think that the issue of those costs are best left to Registrar Derrett as well.

73 However different considerations apply in respect of the proceedings concerning the application made on 27 October 2015. As I have already indicated, the real respondents to that application were Ms Decoteau and Mr Riley. I include Ms Decoteau because she and Mr Riley have made common cause throughout this dispute. Both have given instructions to Pinder Reaux on behalf of the Company. Ms Decoteau was not a director at any material time except at the very outset of Pinder Reaux's retainer, but she entered that retainer on behalf of the Company. It was she who spoke for Mr Riley at the hearing before me and she has said nothing to me to suggest that she has not been actively involved in the litigation. Indeed she admits that she funded at least some of the sums paid to Pinder Reaux.

74 I was told at the hearing in January that Ms Decoteau intended to bring a claim that she was a member of the Company. She and Mr Riley were obviously very keen to retain control of the Company. They instructed Pinder Reaux to resist the application of 27 October 2015 for that reason. It was Mr Riley's and Ms Decoteau's own dispute. They controlled the litigation and they were the real parties. The matters discussed in para 28 above are also relevant here.

75 I conclude that this application was not resisted by the Company for its benefit. It was resisted by Mr Riley and Ms Decoteau for their own perceived benefit. I therefore conclude that this is a case which is outside the ordinary run of cases which parties defend for their own benefit and at their own expense. I direct that Ms Decoteau and Mr Riley should in principle pay any costs to which Mr Aidiniantz may be entitled in the exercise of my discretion on the footing that they were the true respondents to the application of 27 October 2015.

76 The relevant rule is therefore CPR r 44.2:

> "44.2.— *Court's discretion as to costs*

11

"(1) The court has discretion as to— (a) whether costs are payable by one party to another; (b) the amount of those costs; and (c) when they are to be paid.

"(2) If the court decides to make an order about costs— (a) the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party; but (b) the court may make a different order."

"(4) In deciding what order (if any) to make about costs, the court will have regard to all the circumstances, including— (a) the conduct of all the parties; (b) whether a party has succeeded on part of its case, even if that party has not been wholly successful; and (c) any admissible offer to settle made by a party which is drawn to the court's attention, and which is not an offer to which costs consequences under Part 36 apply.

"(5) The conduct of the parties includes— (a) conduct before, as well as during, the proceedings and in particular the extent to which the parties followed the Practice Direction—Pre-Action Conduct or any relevant pre-action protocol; (b) whether it was reasonable for a party to raise, pursue or contest a particular allegation or issue; (c) the manner in which a party has pursued or defended its case or a particular allegation or issue; and (d) whether a claimant who has succeeded in the claim, in whole or in part, exaggerated its claim.

"(6) The orders which the court may make under this rule include an order that a party must pay— (a) a proportion of another party's costs; (b) a stated amount in respect of another party's costs; (c) costs from or until a certain date only; (d) costs incurred before proceedings have begun; (e) costs relating to particular steps taken in the proceedings; (f) costs relating only to a distinct part of the proceedings; and (g) interest on costs from or until a certain date, including a date before judgment.

"(7) Before the court considers making an order under paragraph (6)(f), it will consider whether it is practicable to make an order under paragraph (6)(a) or (c) instead."

**77** I have first to decide whether to make a costs order at all. I think that I should. Costs have been incurred in litigating the issue of who was legitimately in control of the Company in which both sides had perceived personal interests. Mr Aidiniantz is the clear winner since, as a result of the application, he has succeeded in having the appeal dismissed and therefore in putting the Company under the control of a liquidator and out of the control of Mr Riley and Ms Decoteau. His success has not been complete because he achieved a decision that Mr Riley ceased to be a director on 31 December 2014, whereas he sought a decision that his original appointment was invalid. However he is the clear winner and has incurred costs in vindicating his position. I should make an order for costs and the starting point is that it should be in his favour.

**78** In the exercise of my discretion I think it right that Mr Aidiniantz should not recover all of his costs since 27 October. I do not think it helpful to count up the number of issues on which he succeeded or failed—that just leads to confusion as to what counts as an issue. In my judgment the really significant point is that Mr Aidiniantz's argument that Mr Riley was not qualified for appointment as a director—the membership requirement—occupied a very significant proportion of the time taken at the hearing and I have no doubt of both sides' time in preparing for it. It was that argument which required me to consider the history of the family's dealings back to 2012, in particular the earlier litigation and its fall-out. The hearing in January occupied four days. The article 32 point could have been resolved within a much shorter timescale.

**79** Another matter to be taken into account is the timing of the application on 27 October, less than a week before the hearing of the appeal was due to commence. I accept Mr Yapp's evidence that none of Mr Aidiniantz's legal team had thought of the membership requirement point until shortly before 16 October, but Mr Yapp's witness statement said nothing about Mr Aidiniantz's own awareness of the point and the contents of his 2013 Defence as related in para 23 of the principal judgment suggest that he was aware of it, at least then. However, although I think that the timing of the application limited the amount of progress we were able to make at the hearing on 3 November, so did the claim that Mr Riley was a member, supported by minutes of meetings which later turned out to have been fabricated. I take all these matters into account.

**80** A further matter to be taken into account is Mr Aidiniantz's conduct of the case on 11 January 2016 as recounted in paras 47 and 48 of the principal judgment, which I described as unfortunate. That conduct lengthened the hearing. I also, however, have regard to the (partially) counterbalancing matters mentioned in paras 50 and 51 of the judgment.

© 2016. The Incorporated Council of Law Reporting for England & Wales

81 I have to consider the conduct of the paying parties as well. The deployment of the false documents described in paras 39 and 40 of the judgment was conduct from which neither Mr Riley nor Ms Decoteau have distanced themselves, and in which Ms Decoteau was personally involved; and the impact of that conduct as described in paras 43 to 45 of the principal judgment was significant. Two interlocutory hearings were required and a great deal of Mr Aidiniantz's resources must have been devoted to the issue. I must take into account the seriousness of this conduct itself, as well as the serious impact it must have had on Mr Aidiniantz's costs, in deciding the extent to which his costs should be met by Ms Decoteau and Mr Riley.

82 Taking all these factors into account, I order that Ms Decoteau and Mr Riley be jointly and severally liable for 60% of Mr Aidiniantz's costs of and occasioned by his application dated 27 October 2015, to be assessed on the standard basis if not agreed. Obviously the conduct mentioned in the preceding paragraph would have merited an order for assessment on the indemnity basis, but I have taken that into account in deciding the overall percentage.

83 I have evidence that invoices rendered to Mr Aidiniantz since the date of the application total £274,374 but am told by Mr Brockman on instructions that only £216,734 can be unarguably attributed to the application. Sixty per cent of that figure is roughly £130,000. Under CPR r 44.2(8) where the court orders a party to pay costs subject to detailed assessment, it will order that party to pay a reasonable sum on account of costs unless there is good reason not to do so. Despite submissions made to me by e-mail by Ms Decoteau, I can see no good reason here so Ms Decoteau and Mr Riley must make an interim payment. I accept Ms Decoteau's submission, which is true in this case as in most others, that much of Mr Aidiniantz's claim for costs might be discounted on detailed assessment, so I order that £60,000 be paid on account of the costs order.

### The costs of the application against Pinder Reaux

84 The order made above does not apply to Pinder Reaux's or Mr Aidiniantz's costs of Mr Aidiniantz's application against Pinder Reaux. In that application Pinder Reaux were the successful party and Mr Aidiniantz the unsuccessful one, and I can see no reason for displacing the general rule. Mr Aidiniantz must pay Pinder Reaux's costs of that application on the standard basis. This order applies to the hearing of 9 and 10 May and Pinder Reaux's associated costs of preparing to deal with Mr Aidiniantz's application against them. However this order applies only to Pinder Reaux's costs of resisting Mr Aidiniantz's application. It does not apply to their costs of dealing with Ms Decoteau or Mr Riley generally (otherwise than at the May hearing), only to costs properly attributed to Mr Aidiniantz's application.

85 I am told that those costs amount to £26,000 and I order that Mr Aidiniantz pays half that amount on account.

86 I reject Mr Brockman's submission that Ms Decoteau and Mr Riley should pay some of those costs instead of Mr Aidiniantz. Although dealing with Ms Decoteau's contribution in preparing for the hearing would have been time-consuming for Pinder Reaux, it was Mr Aidiniantz who brought Pinder Reaux before the same court in the same hearing as Ms Decoteau and Mr Riley and I do not think that he can escape paying some of Pinder Reaux's costs just because they were increased by other parties whom he had also brought before the court.

87 The order mentioned in para 82 against Mr Riley and Ms Decoteau above does not extend to Mr Aidiniantz's costs of his application against Pinder Reaux nor to his costs of 9 and 10 May and subsequent costs in working out the order. Although he made a successful application for costs against Mr Riley and Ms Decoteau, the time taken in preparing to advance that application is likely to have been, and in advancing it at court was, insignificant compared with the time taken by his application against Pinder Reaux.

88 I have considered the lengthy submissions made by e-mail by Ms Decoteau and indeed the preceding paragraph reflects my agreement with them on the only aspect of the case about which the submissions were invited. The rest of her submissions (i) continued to make inappropriate allegations against Pinder Reaux despite her having seen a draft of this judgment including para 70. There is no application for wasted costs against Pinder Reaux. (ii) were largely based on the premise that my judgment above (which she had seen in draft) is wrong. I cannot take that possibility into account when deciding costs.

*Order accordingly.*

SARAH ADDENBROOKE, *Barrister*

© 2016. The Incorporated Council of Law Reporting for England & Wales