1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3    IN RE:                      .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
4    FTX TRADING LTD.,           .
     et al.,                     .  (Jointly Administered)
5                                .
                                 .  Courtroom No. 5
6                                .  824 Market Street
              Debtors.          .  Wilmington, Delaware 19801
7                                .
                                 .  Tuesday, December 12, 2023
8    . . . . . . . . . . . . . .  10:01 a.m.

9                        TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Emergent
     Fidelity Technologies:   John C. Goodchild III, Esquire
13                            MORGAN, LEWIS & BOCKIUS, LLP
                              1701 Market Street
14                            Philadelphia, Pennsylvania 19103

15
     For the U.S. Trustee:    Linda Richenderfer, Esquire
16                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
17                            J. Caleb Boggs Federal Building
                              844 King Street
18                            Suite 2207, Lockbox 35
                              Wilmington, Delaware 19801
19

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

1 | INDEX

2 | MOTIONS:                                                                PAGE

3 | Agenda
Item 1:    Emergent Debtor's Second Motion for Entry of        4
4 |            an Order Extending the Exclusivity Periods
            During Which Only the Emergent Debtor May File
5 |            a Chapter 11 Plan and Solicit Acceptances
            Thereof
6 |            [D.I. 4056, filed on November 20, 2023]

7 |            Court's Ruling:                                     4

8 | Agenda
Item 2:    Emergent Debtor's Motion for Entry of an Order       4
9 |            Approving Post-petition Financing and Granting
            Related Relief
10 |           [D.I. 3024, filed on October 6, 2023]

11 |           Court's Ruling:                                    --

12 | Agenda
Item 3:    Emergent Debtor's Motion for an Order                4
13 |           Authorizing Antiguan Professionals to be
            Retained and Compensated under the Supervision
14 |           of the Antiguan Court
            [D.I. 4098, filed on November 22, 2023]

15 |           Court's Ruling:                                    --

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2

WITNESSES CALLED
3  BY THE MOVANT:                                    PAGE

4        ANGELA BARKHOUSE

5        Direct examination by Mr. Goodchild          17

6        Cross-examination by Ms. Richenderfer        48

7

8

9

10

11                           EXHIBITS

12  DECLARATIONS:                                     PAGE

13  1) Declaration of Angela Barkhouse and attached    16
       exhibits, Docket 3024-2
14
    2) Declaration of Angela Barkhouse and attached    16
15     exhibits, Docket 3

16

17  Transcriptionists' Certificate                    88

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 10:01 a.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Good morning, everyone.

4              Thank you, please be seated.

5              Whenever you're ready.

6              MR. GOODCHILD:  Good morning, Your Honor.  John

7    Goodchild, Morgan Lewis Bockius, here on behalf of the

8    Emergent Debtor.

9              Your Honor, we had three motions on for today, one

10   of which was the exclusivity motion, was, I think -- I

11   believe we submitted a certificate of no objection to that.

12             I was not sure whether Your Honor desired a

13   presentation on the extension of exclusivity, but --

14             THE COURT:  I think I've seen that, but if you

15   have a COC, I'll take a look at it and we'll get that entered

16   for you.

17             MR. GOODCHILD:  The two other motions are

18   contested, that is the motion for post-petition financing,

19   which is Docket 3024 and the motion for a protocol around

20   payment of offshore firms, and that's Docket 4098.  These

21   motions fit together because they relate to the interplay

22   between this Court and this proceeding versus the Antiguan

23   proceeding for the Emergent Debtor.

24             Your Honor, we have discussed with the United

25   States Trustee, which is the sole objector -- BlockFi's

1    questions have been resolved; FTX's questions have been

2    resolved -- we are in a situation in which the only objecting

3    party is the United States Trustee.

4         We have conferred with the United States Trustee

5    and have agreed that with the Court's permission, we'll make

6    a single record to support both of the motions.

7         THE COURT:  Yeah, that's fine.  They're really

8    interrelated, so...

9         MR. GOODCHILD:  They are interrelated; yes, Your

10   Honor.

11        To do that, Your Honor, we have in the courtroom

12   Ms. Angela Barkhouse, who is one of the Antiguan appointed

13   liquidators of the Emergent Debtor.  So, Ms. Barkhouse, could

14   you stand just to let the Court -- that, I believe, will be

15   the only live witness, Your Honor.

16        And in discussion with the U.S. Trustee, we've

17   decided with the Court's permission, we'll do very short

18   openings, move to the presentation of Ms. Barkhouse's

19   testimony, and then, obviously, if Your Honor desires

20   argument after that, we can go that way.

21        THE COURT:  Okay.

22        MR. GOODCHILD:  Is that all right with Your Honor?

23        THE COURT:  That's fine, thank you.

24        MR. GOODCHILD:  All right.

25        Well, with respect to the evidence, we have --

1          THE COURT:  Before we go any further, did you sign

2  in?  I see no one from your side of the table.

3          MR. GOODCHILD:  Your Honor, I think I did not.

4          May I approach, Your Honor?

5          THE COURT:  Approach, yes.

6          UNIDENTIFIED MALE SPEAKER:  I signed us in, Your

7  Honor.

8          THE COURT:  I don't -- it doesn't show up.

9          Is there another sheet somewhere?

10          MS. RICHENDERFER:  Your Honor, may I approach?

11          THE COURT:  Yes, thank you.

12          Okay.  Go ahead.

13          MR. GOODCHILD:  Your Honor, from my perspective,

14  the evidence in support of both motions will consist of two

15  declarations from Ms. Barkhouse.  One is Docket Entry 3024-2,

16  which was submitted was submitted along with the post-

17  petition financing motion.  And then we are also relying upon

18  the first day declaration, which is Docket Entry 3 in the

19  Emergent case.

20          And, Your Honor, will recall that after the

21  beginning of the Emergent case, Your Honor entered a limited

22  joint administration that changed all the Emergent filings so

23  that they on the FTX Trading docket.  The original first day

24  declaration is on a separate Emergent docket and it's Docket

25  Entry 3.

1        There were several exhibits attached to those

2   declarations that we are submitting be part of the record:

3   the liquidation order, which is an Antiguan court order, a

4   liquidation order dated July 14, 2023, which is Exhibit 1 to

5   the Barkhouse declaration at 3024; the summary of litigation

6   conducted by Samuel Bankman-Fried in Antigua, which is

7   Exhibit 2 to the Barkhouse declaration; the transcript of

8   proceedings, which is the record of a judgment of the

9   Antiguan Court, dated December 28, 2022, so about a year ago,

10  that's Exhibit 3 to the Barkhouse declaration; the joint

11  provisional liquidation order, which is the order that

12  preceded the liquidation order at Exhibit A(1).  The joint

13  provisional liquidation order is dated December 5, 2022;

14  that's Exhibit B to the Barkhouse declaration.  As I said,

15  the first day declaration of Angela Barkhouse, Docket 3 on

16  the Emergent Docket, and then, of course, Your Honor, Ms.

17  Barkhouse's testimony.

18        Your Honor, that record, once completed, we

19  believe it will show that the post-petition financing is a

20  sound exercise of the liquidator's business judgment and that

21  a reasonable businessperson would make a similar decision

22  under the circumstances.

23        We believe the evidence will show the debtor here

24  faces unusual financing constraints given the seizure of the

25  assets.  And recall, Your Honor, the assets of the Emergent

1  Debtor have been seized by the Department of Justice by order

2  from January of 2023.

3           The evidence will show the liquidators have tested

4  the lending market extensively and that no one secured

5  lending is available, and that the only financing available

6  is at high rates, if at all.  And you will see in the U.S.

7  Trustee's objection, Your Honor, that one of the U.S.

8  Trustee's objection is to the terms, the rates associated

9  with this loan.

10          THE COURT:  Well, there are high rates and there

11  are outrageous rates.

12          MR. GOODCHILD:  Yes, Your Honor.

13          I understand that that is an issue, Your Honor.

14  It is also true, Your Honor, that we are talking about a

15  $300,000 advance.  The size of the advance will be a part of

16  the evidentiary presentation.

17          The evidence will show the DIP is necessary to

18  keep critical offshore professionals working.  And we're

19  really only talking about King's Counsel, and that person is

20  an independent contractor.  And Your Honor is probably

21  familiar with how King's Counsel or Queen's Counsel before

22  the unfortunate passing of Queen Elizabeth, how those folks

23  are compensated.  They're not like large law firms and there

24  was a need created by the use of King's Counsel and the need

25  for King's Counsel.

1            And at the end, we'll show that the pricing and

2   the size are appropriate to the facts and circumstances and

3   that it is imperative to prevent Sam Bankman-Fried from

4   regaining control of the company, which is the result if the

5   Antiguan litigation cannot be continued.

6            As I said, neither of the debtors' creditors, FTX,

7   nor BlockFi, objects.  We agreed to changes in the proposed

8   order after discussions with both, FTX and BlockFi.  The

9   changes clarified the DIP lien, if Your Honor grants, will be

10  subordinate to any pre-existing interest.  There's no priming

11  lien component.  There's no roll-up.  There's no need to show

12  adequate protection.

13           With respect to the offshore professionals, the

14  evidence will show the liquidators and the Antiguan

15  professionals are already operating under the oversight of

16  the Antiguan Court; these are all Court-appointed firms.

17           The approval includes any approval of any payment,

18  so no matter what happens with Your Honor in this proceeding,

19  there is an Antiguan proceeding for the approval of any

20  payment to any of these firms.

21           THE COURT:  But this isn't a 15; it's an 11.

22           MR. GOODCHILD:  That is correct, Your Honor; you

23  are right.

24           The evidence will show that none of the Antiguan

25  professionals have any role in the Chapter 11 case.

1        The liquidators, Ms. Barkhouse and Ms. Shukla,

2   who's not in the courtroom, they do have a role, but they act

3   as officers of the Antiguan Court and in furtherance of the

4   duties imposed by that Court.

5        And, Your Honor, I grant it is an 11; I

6   understand.

7        At the end, we'll ask Your Honor to grant that

8   motion because it will avoid costly duplication of effort.

9   It will subject the professionals' activity to the scrutiny

10  of the Court, best able to evaluate their activities;

11  meaning, the activities in the Antiguan litigation.  It's

12  consistent with precedent from other cross-border cases.

13       And it is our view that neither the liquidators,

14  nor the Antiguan firms, the offshore firms, qualify within

15  the definition of "professional persons" under 227 and the

16  line of cases followed in this circuit with respect to that.

17       Does Your Honor have any questions?

18       THE COURT:  No, thank you.

19       MS. RICHENDERFER:  Good morning, Your Honor.

20  Linda Richenderfer from the Office of the United States

21  Trustee.

22       As you may have guessed, I have been chosen to try

23  to fill the very big shoes of Juliet Sarkessian upon her

24  retirement.  So this is my first time appearing in front of

25  you in the FTX matters, but you'll be seeing me for days to

1   comes for different aspects of these cases.

2        (Laughter)

3            MS. RICHENDERFER:  Your Honor, to be clear, the

4   U.S. Trustee agrees with the goal of the joint liquidators,

5   which is to keep the assets under control and to not allow

6   them to become subject to the control of Samuel Bankman-Fried

7   or the other 10 percent shareholder of Emergent.

8            Now, we have to look at a couple of facts here.

9   One point is that the assets are right now under the control,

10  quite frankly, of the U.S. Department of Justice.  They were

11  seized in January and the shares were liquidated in

12  September.  No one is touching those assets until they go

13  through the Department of Justice.

14           And in light of the fact that Mr. Bankman-Fried

15  was found guilty and that the 10 percent shareholder of

16  Emergent pled guilty, I don't think that those assets are

17  leaving the control of the Department of Justice anytime

18  soon.

19           The joint liquidators' goal, they made the

20  decision that to reach that goal, they needed to file this

21  Chapter 11 case and when they filed the case, they gained the

22  protection of the automatic stay, sort of a belt-and-

23  suspenders, I guess, if you will; again, making it clear that

24  actions to touch the assets had to go through this Court.

25           And in order to make use of the protections set

1  forth in the Bankruptcy Code, a debtor must, as the *quid pro*

2  *quo*, also then comply with bankruptcy statutes and rules and

3  relevant case law.

4         And that brings us first to the DIP.  Your Honor

5  already made a remark about the interest rate.  I can't

6  conceive of a case where it ever hit triple digits, the

7  percentage, for the interest rate.  And the fact that it's

8  for a small amount of money, Your Honor, almost makes it

9  worse, because we're talking about a DIP lender who was the

10 prepetition lender and already has approximately $11 million

11 on the line here, and not quite clear what the interest rate

12 is for that $11 million.

13        As you saw in our objection, we tried to work out

14 the interest rate by backing into what the numbers were that

15 would be due on certain dates.  We weren't successful with

16 that.

17        So, we go from those interest rates that, clearly,

18 I don't believe in any way could be over 50 percent -- they

19 probably weren't over 30 percent -- and we go, all of a

20 sudden, to, okay, $300,000 more, but we want 150 percent

21 interest or 200 percent or 250 percent interest.

22        I would also submit, Your Honor, that the current

23 record, which may be expanded upon before Your Honor today,

24 does not explain to us what was done to shop this loan.  All

25 we have is a blanket statement.  We don't know what was done.

1        We do know, though, as noted in our objection, to

2   the professionals motion, I'll call it, that the lender, not

3   only loaned money prepetition, but now wants to loan

4   $300,000.  They are also now out there buying FTX claims and

5   FTX is one of the creditors of Emergent.  So we have a

6   situation where we have a prepetition lender and we have

7   somebody who is a creditor of Emergent saying, to give you

8   $300,000 to protect this estate, I want 200 percent interest

9   or 150 percent interest.

10       And the due dates, just are way too soon, because

11   there was no other source of funding for this estate, other

12   than the funds that are in the hands of the U.S. Department

13   of Justice and there is no indication that that money is

14   going to be released to Emergent, even partially, in time to

15   make those payments.  So we really are setting ourselves up

16   for a situation where we are going to be looking at the

17   higher interest rates, plus the default rate of 5 percent,

18   which is almost negligible in the grand scheme of things.

19       The other concern, Your Honor, is that this is the

20   foot in the door and we may see the debtor come back.  We

21   don't want to see this DIP loan expanded upon in the future

22   because we will tell you, and it will come out during the

23   evidence, that the professionals in Antigua are owed far more

24   than $300,000.  They are owed at least $3 million.

25       When I asked the witness different questions about

1 the MORs to try to figure out exactly how much they're all

2 owed, but it's at least $3 million. So it's unclear why this

3 $300,000 payment is no necessary at this point.

4          The motion did mention the appeal, though the

5 appeal was already argued at the end of October, and we'll

6 have to hear from Ms. Barkhouse as to what the current status

7 is. But it's my understanding it was argued at the end of

8 October, as was stated in the DIP motion.

9          Moving on to the professional motion, as Your

10 Honor also noted, this is a Chapter 11; it's not a

11 Chapter 15. And every single one of the debtors' MORs, it

12 represented that it was going to work on a cross-border

13 insolvency protocol and, in fact, there were efforts made

14 during the summertime. And there is a draft that's pretty

15 much complete, but the debtors never moved forward with that.

16          And it's one thing to say, Okay, this is the give

17 and take that's going to be in this cross-border insolvency

18 protocol that's going to be abided by both courts, and it's

19 another thing to come to this Court and say, Okay, we are

20 giving Your Honor what we see in the cross-border cases. But

21 they're doing it out of context; they lifted one paragraph

22 out of the protocol. I think it's almost word-for-word from

23 the one in Nortel. They left one paragraph out about the

24 Antiguan Court overseeing the fees and the engagements in

25 this case -- I'm sorry, in the Antiguan Court proceedings.

1          The other way in which these things are often

2    handled is Rule 327(e).  I've been involved in many cases

3    where the debtor had to initiate foreign proceedings, didn't

4    have a 15, but needed representation, and came to the Court

5    with 327(e) motions for retention of professionals in the

6    foreign jurisdiction.

7          Neither of those processes have been followed

8    here; instead, Your Honor is being asked to approve $300,000.

9    There's no budget.  We're told the money is going to go

10   straight to these professionals.  And we're not going to have

11   any insight -- there's no transparency into how that money is

12   being spent.

13         So Your Honor is approving funds, they'll flow

14   right out the door and this Court won't have oversight as to

15   how they are processed, who gets them, and where they go, and

16   that is part of the concern that we have, Your Honor.

17         To be clear, again, the U.S. Trustee does not in

18   any way question the goals of the joint liquidators.  We

19   don't question the notion that they need counsel and

20   professionals to represent them in those proceedings.

21         What we do is we question the process by which

22   they are trying to gain approval of the further loans and

23   gain this Court's comfort order, basically, to say that the

24   Antiguan Court -- whatever that process is, and we'll

25   question Ms. Barkhouse about that -- whatever that process

1 is, is sufficient and that Your Honor doesn't need to worry

2 about where money that is becoming a debt of this estate,

3 this Court has no control over where it goes.  No oversight

4 into where it goes.

5          Unless Your Honor has any questions, we can jump

6 into, I guess, the evidentiary portion.

7          THE COURT:  Okay.  Thank you.

8          No questions at this time.

9          MS. RICHENDERFER:  Thank you, Your Honor.

10          MR. GOODCHILD:  May I proceed, Your Honor?

11          THE COURT:  Yes, go ahead.

12          MR. GOODCHILD:  Before we call Ms. Barkhouse, I'd

13 like to move for the admission of the documentary exhibits

14 that I mentioned.

15          THE COURT:  Is there any objection?

16          MS. RICHENDERFER:  No, Your Honor.

17          THE COURT:  They're admitted, without objection.

18      (Barkhouse Declaration and attached exhibits, Docket

19 3024-2, received in evidence)

20      (Barkhouse Declaration and attached exhibits, Docket 3,

21 received in evidence)

22          MR. GOODCHILD:  The movant calls Angela Barkhouse.

23          THE COURT:  Ms. Barkhouse, please come forward.

24          Take the stand and remain standing for the oath.

25          THE CLERK:  Please raise your right hand.

1          Please state your full name and spell your last
2   name for the court record, please.
3          THE WITNESS:  Angela Jessica Barkhouse, B-a-r-k-h-
4   o-u-s-e.
5       ANGELA BARKHOUSE, MOVANT'S WITNESS, AFFIRMED
6          THE WITNESS:  I do.
7          THE CLERK:  You may be seated.
8          Your Honor?
9          THE COURT:  Thank you.
10                    DIRECT EXAMINATION
11  BY MR. GOODCHILD:
12  Q    Good morning, Ms. Barkhouse.
13  A    Good morning.
14  Q    Could you introduce yourself to the Court and let the
15  Court know who you are and what you do, please.
16  A    Absolutely.  I am an insolvency --
17          THE COURT:  Can you move the microphone closer to
18  you, please.
19          THE WITNESS:  Yes, sorry.
20          I am an insolvency practitioner and asset-recovery
21  expert.  I deal with the investigation and recovery of
22  financial losses, normally where there has been financial
23  crime or misconduct or malfeasance.
24          Some of my cases that I can highlight, the
25  investigation of the former President of the Republic of

1  Maldives for embezzlement of funds.  I've also, as an expert,

2  for the United Nations Development Program, investigated

3  corruption and closure of cases for the Truth and

4  Reconciliation Commission for Tunisia after Ben Ali.  And

5  also, I'm currently investigating and recovering losses for

6  the 1MDB, 1 Malaysia financial scandal, which is $7.65

7  billion in loss.

8          Most of my cases involve elements of cross-

9  border --

10          THE COURT:  Let's wait until we have another

11  question.

12          THE WITNESS:  Oh, sure.

13          THE COURT:  You're going beyond the scope of the

14  question.

15          THE WITNESS:  Sorry.

16          MR. GOODCHILD:  Thank you, Your Honor.

17  BY MR. GOODCHILD:

18  Q    Ms. Barkhouse, as you mentioned, you are an expert in

19  asset recovery and fraud.

20          Could you give the Court a sense of whether you

21  received any designations, you have any training or

22  experience in that region.

23  A    Sure.  So I am a qualified accountant, so I'm a fellow

24  of the Association of Certified Chartered Accountants in the

25  U.K.  I have degree in applied accounting.  I also have a

1  masters in criminal justice policy.  I'm a certified fraud

2  examiner from the ACFE in the United States.  And I am

3  qualified to act as the insolvency practitioner in the Cayman

4  Islands, the BVI.  I'm appointed in Antigua, DIFC, and in

5  Samoa.

6  Q     All right.  When did you first become a licensed

7  insolvency practitioner in any jurisdiction?

8  A     In the British Virgin Islands in 2017 is when I first

9  took on -- I was appointed, personally, to look over cases in

10 insolvency.

11 Q     In this case, in the Emergent case, you and Ms. Shukla

12 are appointed as joint liquidators, right?

13 A     Yes.

14 Q     What was the process by which you and Ms. Shukla were

15 appointed by the Antiguan Court?

16 A     So the petitioning creditor, who in this case, was Ben

17 Shimon, had sought the protection of the Antiguan Court to

18 have a receivership placed over the assets of Emergent and of

19 Sam Bankman-Fried.

20       The petitioning creditor is able to put forward and

21 nominate individuals and he asked for us to be put forth

22 based on our expertise and our experience in cross-border

23 asset recovery.  That petition was put forward to the Court

24 and that was granted by the Court.

25 Q     Okay.  And when were you appointed as provisional

1  liquidator of Emergent?

2  A     Provisional liquidator of Emergent, I was appointed on

3  the 5th of December, 2022.

4  Q     Just for context, as of December 5, 2022, had

5  Emergent's assets been seized by the Department of Justice?

6  A      No, in fact, at the time of the receivership order,

7  which was on the 18th of November, FTX was falling over and

8  there was Ben Shimon who had understood that they had funds

9  that had gone into Emergent, had information that Sam

10 Bankman-Fried was trying to sell the Robin Hood assets at a

11 significant discount, and he was extremely worried that these

12 assets were going to be dissipated and liquidated without any

13 control; that's why he petitioned the Antiguan Court to take

14 control over those assets.

15      When we, then, tried to seek information from Sam

16 Bankman-Fried himself, which he didn't respond to, we then

17 petitioned for the winding-up of Emergent and that happened

18 on the 5th of December.

19 Q     Has the Antiguan Court entered a winding-up order for

20 Emergent?

21 A     Yes, on the 23rd of March.

22 Q     Of this year?

23 A     Of this year.

24 Q     In the Emergent case, could you give the Court a sense

25 of what your duties are as a Court-appointed liquidator.

1   A      As a Court-appointed liquidator, it was our duty to

2   investigate what happened that led to the insolvency or to

3   the financial distress of the company and particularly where

4   there are allegations of financial wrongdoing, we are asked

5   to find out providence of funds and the destination of funds

6   thereon.  We are also expected to preserve those assets for

7   the benefit of creditors, whoever they may be.

8   Q      Now, you mentioned that part of those duties was a kind

9   of investigation into the events leading up to the

10  liquidation and sources and uses of funds.

11         Did I hear you right?

12  A      Yes.

13  Q      All right.  Did you do that in this case?

14  A      We did.

15         And more specifically so, after the stipulation

16  agreement was entered into, we were able, then, to obtain

17  production from FTX and BlockFi and that allowed us to

18  identify the providence of funds into Emergent, which was not

19  as Sam Bankman-Fried had said.  His affidavit was as a result

20  of promissory notes; in fact, that was very inaccurate.

21  Q      Now, you had mentioned the stipulation.  I want to make

22  sure we clarify.  I believe the Court is going to remember

23  this stipulation, but what stipulation are you talking about?

24  A      So the stipulation agreement that the parties, BlockFi

25  and FTX and Emergent, would not enter into a litigation to

1  determine the ownership of the assets of Emergent, which, at

2  no point, have we tried to do.

3  Q     And you referred to a production of documents or

4  information related to that stipulation.

5       How does that stipulation relate to your ability to get

6  information?

7  A     It allowed us to obtain information from FTX, because

8  we had been seeking for some time, to obtain information from

9  them and we were unable to do so directly.

10 Q     Okay.  And did you receive information from FTX?

11 A     We did.  We received it over a period of time, probably

12 around six months, in total, over three different tranches.

13 Q     And have you analyzed that evidence?

14 A     We have.

15      On each production stage, we had to ask for more

16 information because the production wasn't necessarily

17 complete, and that allowed us to get to the point where we

18 are at today, where we have identified where the providence

19 of funds came from, and that, in fact, there may be even more

20 creditors than we currently know of.

21 Q     You had mentioned the involvement of Sam Bankman-Fried

22 and how the result of his investigation differs from some

23 things that Sam Bankman-Fried has said.

24      Could you explain what Sam Bankman-Fried has been

25 doing, if anything, while you have been doing what you need

1  to do as Emergent's liquidator.

2  A      From the very outset, we have dealt with no less than

3  15 applications by Sam Bankman-Fried in Antigua to stay,

4  strike out, or to appear against the decisions to appoint us

5  as receivers or liquidators.  He's agitated the Antiguan

6  Court to get us to -- to get the Court to turn over the

7  company back to Sam Bankman-Fried and the Court has agreed

8  with us that it must remain within independent control.

9  Q      But the applications in question, did you hire counsel

10 to represent you in connection with those applications?

11 A      We had no choice to; you need to have counsel to

12 advocate in the courts in Antigua.  There are only two King's

13 Counsel that are admitted in Antigua and we had one of those,

14 very luckily, who has been extremely valuable to us.

15 Q      Why was it necessary to hire King's Counsel in order to

16 do that litigation in Antigua?

17 A      Quite frankly, in Antigua, everybody was taken up

18 already.  You had Sam Bankman-Fried with his lawyers.  You

19 had the DOJ with their lawyers, BlockFi.  You had FTX

20 Digital.  You had FTX.  The remaining legal counsel was very

21 limited and we were extremely lucky to have found David

22 Joseph.

23 Q      You were in the courtroom during the opening

24 statements, right?

25 A      (Inaudible.)

1  Q      Now, Counsel for the U.S. Trustee asked some questions,

2  or raised some questions regarding the total amount of fees

3  that are owed to the non-U.S. law firms and to your firm

4  Quantuma.

5       Do you recall that she said something like that?

6  A      Yes, I do.

7  Q      All right.  Just so we can jump to that for a second,

8  could you give the Court a sense of the different

9  professional firms that we're talking about here, not Morgan

10 Lewis, which is the U.S. counsel, but the different

11 professional firms and how much each of those professional

12 firms is owed currently.

13 A      Is that including prepetition or just post-petition?

14 Q      Well, perhaps, I should ask you a different question.

15      With respect to any of these professionals firms, are

16 there unpaid amounts that relate to periods of time before

17 this bankruptcy petition was filed?

18 A      No.

19      So all of the individuals were paid by the funding

20 agreement prior to the Chapter 11, because we did not want to

21 end up in an unsecured creditor basis for these individuals,

22 who have served a very good purpose and had preserved those

23 assets, prior to the DOJ seizing the assets on the 6th of

24 January, which I would remind you is at least six or seven

25 weeks after Sam Bankman-Fried had tried to sell those assets.

1    And so, we had to engage with foreign counsel, Antiguan

2   counsel, to support the liquidators in defending against

3   SBF's actions against us.

4   Q    All right.  So let's take those firms in order.

5        MR. GOODCHILD:  By my count, there are four, Your

6   Honor, listed in the motion and in the affidavits that have

7   already been admitted.

8   BY MR. GOODCHILD:

9   Q    Let's take the law firm Forbes Hare --

10  A    Yes.

11  Q    -- who are they and what do they do?

12  A    So, they are an offshore law firm that operate in

13  multiple jurisdictions, such as the Cayman Islands and in the

14  BVI.  They were supporting us in the drafting of the

15  applications in response to SBF, and also in response to

16  BlockFi, actually, and were supporting us with submissions to

17  the Court in defense of those actions and also in support of

18  the winding-up of the company in Antigua, following the

19  (indiscernible) order.

20  Q    Approximately how much is Forbes Hare owed for its work

21  since the Emergent Chapter 11 has been filed?

22  A    Since the Emergent Chapter 11, they are owed $1.013

23  million.

24  Q    Lake and Kentish, who are they and what do they do?

25  A    So, they are Antiguan local counsel.  So they are

1  experts in local Antiguan incorporation law and they were

2  enabling us to navigate the International Business

3  Corporations Act in relation to the winding-up of the debt of

4  the company.

5  Q    How much is Lake and Kentish owed since the Emergent

6  Chapter 11 was filed?

7  A    $62,000.

8  Q    Essex Court Chambers.

9       That's David Joseph, right?

10 A    Yes, and his junior counsel, Alex Weatherford

11 (phonetic).

12 Q    What is the relationship between those individuals, the

13 King's Counsel and the junior on the one hand and Essex Court

14 on the other hand.

15      Could you explain to the Court?

16 A    So, Essex Court is a set of chambers, which a number of

17 individual practitioners, who are barristers, will form part

18 of that court.  They have a junior -- they have a clerk,

19 which takes instructions for them, normally from solicitors,

20 and clients to enable them to appear in front of the Court.

21      So in certain jurisdictions, the solicitors or the

22 local counsel cannot appear in front of the judge; it has to

23 be a counsel of sorts.

24 Q    Is Essex Court a law firm?

25 A    No, it's a set of chambers in which is just purely

1   barristers.

2   Q     Mr. Joseph, is Mr. Joseph his own law firm?  I'm trying

3   to get to the -- what is the economic unit?

4   A     He is a sole practitioner.

5         So he -- the chambers can be useful for moxing

6   (phonetic) for being able to rely on other duty of counsel or

7   senior counsel.  But he is very much a sole practitioner.  So

8   he takes his own cases and he can decide whether to take

9   those cases or not; he doesn't have to.  And then, he can

10  take his cases, which we instructed him to do so, and he took

11  on this case and he agreed to work with us on it.

12  Q     Okay.  Now how does the junior get paid?

13  A     The same way as King's Counsel.  So he's also a sole

14  practitioner.  He's ultimately, I suppose, if you're looking

15  at ambition and progress, he would like to become King's

16  Counsel himself one day.

17  Q     Okay.  Now, in our papers we referred to an amount due

18  to the Essex Court Chambers.

19        And by doing that, do you mean to say that's the amount

20  owed to David Joseph, plus the amount owed the junior?

21  A     Yes.

22  Q     Okay.  Looking at that total, Essex Court, the two

23  individual practitioners, what is the amount that is unpaid

24  since the Emergent Chapter 11 was paid?

25  A     $1.18 million.

1  Q      You had described the role of King's Counsel in the

2  Antiguan litigation and --

3              THE COURT:  Can I ask a clarifying question first?

4              When you talk about the amounts owed, $1.18

5  million, is that in pounds or in dollars?

6              THE WITNESS:  That's in dollars.

7              THE COURT:  Okay.  Thank you.

8  BY MR. GOODCHILD:

9  Q      Going back to Essex Court and King's Counsel, can you

10  explain to the Court why it is that the Essex Court lawyers

11  are owed a little over a million dollars and the Antiguan

12  local counsel are owed about $65,000.

13  A      Because we only used the local Antiguan counsel for

14  navigating local law.

15         So what King's Counsel are doing is they are presenting

16  to the Court, the merits of the case, the merits of why the

17  company should be wound up, or why that Sam Bankman-Fried's

18  efforts to overturn those orders should be made.  But local

19  counsel only deal with the specifics of procedure, local

20  procedure in the court and local law.

21  Q      So I want to go back just a little bit, before we go to

22  Quantuma, which is the last firm, I want to go back to

23  something that came up right at the beginning of the hearing.

24  And, obviously, the assets of Emergent have been seized by

25  the Department of Justice, right?

1  A      Yes.

2  Q      All right.  And that seizure took place in January of

3  2023, right?

4  A      Yes.

5  Q      Okay.  It might be natural for anyone to ask, including

6  the United States Trustee, why it is so important for you and

7  these offshore professionals to fight so hard against the

8  litigation that Sam Bankman-Fried has been prosecuting; in

9  other words, why does it matter now that the assets have been

10 seized?

11 A      I think you have to take that in two parts, which is up

12 until the Chapter 11 petition and thereafter, Sam Bankman-

13 Fried fought very hard, even after the DOJ had seized those

14 assets, because once you end up into a position where if we

15 were just dealing with Antigua and he was trying to get those

16 orders overturned, he would then remain in control of those

17 companies and those assets.

18        There is an argument as to what he may have been wanted

19 to do with those, whether it was used for plea bargaining,

20 whether it was fees for other means.  But post the petition,

21 it was more about still returning over the company, but to

22 him, even though, as I said, the DOJ had seized those, we

23 spoke to the DOJ about this in the call that we had with them

24 and we said, Well, why would he want to do this, because they

25 were already seized?

1      But there is clearly a personal element to this, a

2   personal benefit to him to be able to regain control of that

3   company.  And you can speculate on that, but my personal

4   belief is it allows him to position himself in a better

5   opportunity.

6      Also, remember, at that time, he had not been

7   charged -- he had been charged, but he hadn't been convicted.

8   Q    And now, of course, Sam Bankman-Fried has been

9   convicted.  The assets are still seized.

10      Do you have a view as to how the Emergent case

11   resolves, *vis-a-vis*, the seized assets?

12   A    I would like to think that we could have engagement

13   with the DOJ and with the creditors as to exactly how the

14   providence of funds came into Emergent and who the creditors

15   are, and where the proportion of distribution of assets

16   should be made.

17   Q    Have you had, you or your professionals, have had any

18   conversation with the DOJ about resolving the matter in that

19   way?

20   A    We have tried and, understandably, the DOJ said that

21   they were dealing with the criminal proceedings, and that

22   they would not be able to deal with us until after the trial

23   had taken place and concluded.

24   Q    Okay.  Do you have an understanding of when the DOJ has

25   said that it is going to engage with respect to resolving

1  things with Emergent?

2  A    They have said that they will not be able to engage

3  with us until after the sentencing of Sam Bankman-Fried,

4  which is around the end of March of next year.

5  Q    Have they offered an explanation why?

6  A    I believe it's because the second trial is due in March

7  and they want to wait for the conclusion of that, also.

8  Q    Have you had any conversations with representatives of

9  FTX regarding how to resolve the relationship between

10  Emergent and FTX?

11  A    I have tried.  To say I have tried is an

12  understatement.

13       We have believed that there could be -- certainly, in

14  relation to the funding -- I'm going to step away from

15  this -- but certainly in relation to the funding, we felt

16  that we would be able to come out of that funding agreement

17  much, much, much sooner if FTX could engage with us as to how

18  we could deal with any further funding of the actions against

19  SBF, but we could not get any engagement from them on that

20  front.

21  Q    What about BlockFi, have you had any conversation with

22  BlockFi?

23  A    We have not had engagement with BlockFi.  They are

24  looking to engage with us now.  At the beginning they were

25  extremely hostile towards us, but that was during the

1  Antiguan proceedings where they were trying to prevent us

2  from coming into a Chapter 11 process.

3  Q     Let me go back to the professionals.  There is one

4  entity that we hadn't talked about and that's Quantuma.  That

5  is your firm.

6  A     Yes.

7  Q     What role is Quantuma, the firm, playing in these

8  proceedings?

9  A     So, as independent fiduciaries who are appointed by the

10  Court.  We take our appointments personally in our own name,

11  but we have, as do any other firms, as does A&M who acts with

12  FTX, as does EY who acts with BlockFi, as do Peter Bucy

13  (phonetic) who acts with FTX Digital.

14      We are all under the umbrella of bigger companies that

15  enable us to use their infrastructure such as data security,

16  IT, insurances, (indiscernible), etc., etc.  So, even though

17  we take our appointments in our own name it is actually the

18  firm that supports the infrastructure around that.

19  Q     All right. And with respect to infrastructure does

20  Emergent have any employees, any infrastructure of its own?

21  A     No. It has absolutely none.  Certainly none that we

22  have identified. It was just a shell company.

23  Q     So, Quantuma is providing all of that support to you

24  that you might otherwise, in a different case, get from the

25  employees of the debtor company?

1  A     Yes.  So, if we were looking to seek information, we

2  have to obtain that information ourselves.  There is

3  certainly -- we were able to obtain information from anyone

4  independently that was willing to do so.

5  Q     Going back to Quantuma, how much is Quantuma owed for

6  work it has performed since the Emergent Chapter 11 began?

7  A     So, we are owed, since the Chapter 11 -- just in the

8  Antiguan proceedings or including the Chapter 11 --

9  Q     I want to make sure the Court is informed totally. So,

10 if you have a breakdown then that will do.

11 A     I can split that out.  So, in the Chapter 11

12 proceedings, which has included engaging with the DOJ in

13 relation to the acquisition of the shares, engaging in the

14 stipulation agreement, etc., etc., we are owed $457,000. In

15 relation to the Antiguan proceedings itself $94,000.

16 Q     I'm doing the math in my head which is always

17 unreliable especially as it relates to me. That sounds like

18 we have got a total unpaid amount in the $2.6, $2.7 million

19 range. Does that sound right?

20 A     Yes.  In relation to the Antiguan proceedings $2.2

21 million only.

22 Q     I said my math is unreliable.

23       Let's talk about the funding a little bit.  If we have

24 a $2.2 million unpaid amount in relation to the Antiguan

25 proceedings why is the post-petition funding that you are

1  seeking approval for only $300,000 US?

2  A    There is a recognition that the prepetition funding

3  agreement, the rights within that, not (indiscernible), but

4  if we were to proceed in Antigua and defend against Sam

5  Bankman-Fried we have to pay those sole practitioners with

6  (indiscernible) and that was for the Court of Appeals

7  hearing.  That was $300,000 US.  It was imperative that we

8  did that.

9  Q    Why was that appeal so important?

10  A    Because if we did not appear in the Court of Appeals

11  hearing then by default Sam Bankman-Fried and his lawyers

12  would have won a summary judgment to have overturned all of

13  the liquidation and, therefore, all of the actions prior to

14  that.

15  Q    You mean everything that you had done?

16  A    Everything that we had done.

17  Q    Would that have put Sam Bankman-Fried in control of

18  Emergent in general?

19  A    Yes. He would be the -- well, we stand in the shoes of

20  the company, so we are the corporate record holder for

21  Emergent.  So, we stand or sit at the table with the DOJ, and

22  FTX, and BlockFi, and any other creditors that may now come

23  forward.  We provide that independent non-hostile view of

24  where the distribution should go.  If Sam Bankman-Fried was

25  to take control of that company he would have a very

1  different viewpoint to how I would.

2  Q     Meaning what as it relates to the DOJ and the

3  discussions to come?

4  A     Well, I think in relation to -- I think it's more

5  important in relation to the creditors themselves because Sam

6  Bankman-Fried in relation to the DOJ he could negotiate with

7  the DOJ. They could forfeit these assets.  They could go into

8  victim funds and they could be distributed however the DOJ

9  sees fit; however, there was going to be extended litigation

10 between BlockFi, and FTX, and Sam Bankman-Fried, I believe,

11 in relation to exactly who the creditors are of that.

12       As we know, the pledge agreement took place between

13 BlockFi and Emergent, purportedly.  It would have knocked out

14 FTX as creditors of those assets.  Equally if BlockFi -- if

15 the pledge was considered invalid through the avoidance

16 procedures, then FTX creditors would be considered to be

17 beneficiaries of those assets.

18       There is also the view here that, again, coming back to

19 the providence and decimation of funds, we have identified

20 that there are funds that are self-made within Emergent that

21 created its own profit.  We also identified that there may

22 have been FTX Digital funds that went into there.  We have

23 identified that they could be a creditor with Voyager.  If

24 FTX has avoidance with Voyager and it goes the other way,

25 Voyager could then become a creditor and then you end up with

1   a whole mess of trying to work out exactly who should benefit

2   from those assets.

3   Q    When you explained all of that do you attach

4   significance to all of those findings as it relates to what

5   might happen in the future with respect to Emergent and FTX

6   and the discussions relating to how to resolve everything

7   here?

8        MS. RICHENDERFER:  Your Honor, I've allowed a lot

9   of testimony, but this goes far beyond, I think, the subject

10  matter of the DIP and the professionals. I am struggling to

11  see the relevance of this and an awful lot of it has been

12  hearsay, of course, also.  I haven't stood up to interject,

13  but if we are going to hear an awful lot about what might

14  happen in the future, I just question the (indiscernible).

15        THE COURT:  It's also speculative.

16        MR. GOODCHILD:  I believe that the person who

17  decided to engage counsel to expend the funds and to take the

18  actions that are being criticized in the objection should

19  have the opportunity to explain why she has done what she's

20  done.

21        THE COURT:  I will allow it to that extent.

22  BY MR. GOODCHILD:

23  Q    Looking at -- let me go back to the question that I

24  asked.  The explanation you gave with respect to the findings

25  that derived from your investigation once you got information

1  from FTX, do you attach significance to those as it relates

2  to the need to continue to fight with Sam Bankman-Fried over

3  control of the company?

4  A    Absolutely. I think it's critical to have an

5  independent Court appointed fiduciary to be the record holder

6  and to stand in the shoes of the company when they are

7  dealing with third parties and the DOJ.

8  Q    Going back to the unpaid amounts, is there any funding

9  available to Emergent during its Chapter 11 period other than

10 the post-petition financing that we are seeking approval of?

11 A    We had sought to obtain funding from other parties.  We

12 entered into a process of due diligence and entered into

13 NDA's with other parties.  They did their due diligence and

14 looked at what they would offer.  Quite frankly, one of them

15 was even higher.  The other withdrew from the diligence

16 process a few weeks in.

17 Q    Let me back up a step. You said you went out and

18 consulted with other potential lenders.  Approximately how

19 many other potential lenders did you approach about the

20 possibility of providing funding during the pendency of the

21 Emergent Chapter 11?

22 A    We spoke to four funders, including Fulcrum itself, and

23 entered into NDA's with two.

24 Q    The -- how did you select the four potential funders

25 other than Fulcrum in order to know whom to approach?

1  A     One was through recommendation.  The other is through a

2  well-known international litigation funder who has done a lot

3  of litigation funding in the US and globally. The third is

4  someone that I have worked with on multiple other cases

5  previously and I approached them directly.

6  Q     Is it -- I understand that we have -- that you entered

7  into two non-disclosure agreements.  So, we can't disclose

8  the names of two of the potential funders.  Can you give the

9  Court a sense of the types of institutions that you

10 approached?

11 A     So, these are institutions that have been funding

12 litigation and particular situations for very many years.

13 They are very well known in the market.  They are not new

14 entrance into the market.  They have something like -- one of

15 them has $1.8 billion into asset management in terms of asset

16 cases, contingent asset cases.  The other, I think, is even

17 higher than that.  Fulcrum itself, obviously, has interest in

18 other cases to.

19 Q     When you thought about what institutions to approach

20 did you consider that there are different parts of the

21 lending market.  You have asset-based lenders, you have

22 traditional debtor-in-possession lenders, and you have other

23 kinds of lenders.  Did you select a particular facet in the

24 marketplace that you thought was appropriate for this case?

25 A     We did. We looked to debtor-in-possession financing

1 through specific -- well, through a specific firm.  Another

2 one was, as I said, more institutionally based, but under

3 asset management.  Their investment is based off lawyers.

4 So, they have all this experience previously, so they know

5 exactly what they are looking into and what they are prepared

6 to invest (indiscernible).

7 Q    Did you get any feedback from any of those potential

8 lenders that you approached regarding their willingness to

9 lend to Emergent at all?

10 A    The big issue, quite frankly, is the fact that the DOJ

11 has seized the assets.  There is no much less certainty as to

12 whether or not there would be any return for them; hence why

13 the pricing was so high and we could not find any better

14 deal.

15 Q    Did you ask those market participants about whether

16 they would lend to Emergent on an unsecured basis?

17 A    They would not do that.

18 Q    In the end none of the potential funding sources was

19 willing to fund, is that right?

20 A    None of them were viable.  This was prior to -- just to

21 give some clarification, this was prior to the Court of

22 Appeals hearing where we had actually sought to get Fulcrum

23 paid out and to find a better deal in terms of pricing. Then

24 the Court of Appeals hearing was coming up. Then that is why

25 this DIP motion is in relation to the $300,000.  But, as I

1  said, we had tried to sort financing prior to this motion.

2  Q     Looking at the professionals that we touched on Forbes

3  Hare, Lake Kentish, Essex Court.  Let's stay with the law

4  firms for a moment, those three law firms. Have any of those

5  law firms performed any services related to the

6  administration of this Chapter 11?

7  A     No, absolutely not.

8  Q     And with respect to Quantuma, I think you explained

9  that some of the services at Quantuma had related to the

10 administration of the case at some point?

11 A     Yes.

12 Q     I want to go back to the size of the proposed financing

13 just for a moment.  I had asked you earlier about why

14 $300,000. I want to come back to that question a little bit.

15 Now that the appeal has been argued why is it important for

16 Emergent to obtain this amount of post-petition financing

17 when there is no much more that is unpaid through all the

18 professionals including Morgan Lewis, which we haven't even

19 talked about?

20 A     I think it's critical because, as we have noted

21 earlier, they are sole practitioners.  They don't have --

22 they are not paid a salary.  They do not have the comfort of

23 huge institutions to be able to back them.  They have the

24 ability to take other cases, quite frankly.  We needed them.

25 They have performed some work for us, but this $300,000 was

1  significant because of the Court of Appeals hearing. As I

2  said, it would have unwound everything afterwards.

3  We still don't have judgment. It still could be that we

4  need them.  It would be very, very bad faith not to be able

5  to provide them with, at least, a quarter of what they have

6  dealt with so far in order to get to this position.

7  Q    Do you have an understanding of why the lawyers from

8  Essex Court went forward and continued to argue the appeal

9  notwithstanding the fact that they didn't receive the amount

10 of money in post-petition financing that we are talking about

11 today?

12 A    Because we all feel very, very strongly that is a point

13 of principal.  We are very, very certain that, as was the

14 Judge at the time, these companies should not be handed into

15 the reigns of any of the interested or hostile creditors or

16 to Sam Bankman-Fried himself.

17 Q    When it came to this particular proposed financing, the

18 roughly $300,000 US, why did you select Fulcrum to provide

19 that money?

20 A    Because, as I said earlier, we had looked at trying to

21 obtain financing from other institutions in the market who

22 were not willing to engage with us in substance again.  And,

23 quite frankly, because this is $300,000 and we could have

24 expended a lot of time and energy in dealing with new

25 financing options where they would have to enter into the due

1  diligence process, we would have to enter into NDA's.  That

2  would cost more than $300,000 itself, I think.

3  Q    Did you attempt to negotiate with Fulcrum regarding the

4  terms under which they would lend the $300,000?

5  A    Yes.

6  Q    Tell the Court about how those negotiations went?

7  A    Well they were very concerned because of the situation

8  that they had been put in, in relation to their prepetition

9  financing.  They absolutely understood the necessity of being

10 able to enter into the Court of Appeals and to be able to

11 defend against those actions. So, also, as a point of

12 principal they agree that it was necessary and so they would

13 fund that extra amount, but they were not willing to fund us

14 any further at that point in relation to any of the fees.

15 Q    Do you have an understanding of whether Fulcrum is --

16 would be willing to extend any more credit beyond the

17 $300,000 that we are talking about today?

18 A    I don't think that that would be a possibility, no.

19 Q    Did you attempt to negotiate with Fulcrum regarding the

20 amount of the interest rate in this $300,000 advance?

21 A    Yes.  And on this occasion, it was not agreed; however,

22 we have discussed whether there is a way to negotiate the

23 prepetition financing going forward.

24 Q    And what is the status of those discussions?

25 A    We are still in discussions at the moment.

1   Q      This facility, the $300,000 facility under

2   consideration today, it has a maturity in it of just about

3   four months, the end of April I think.

4   A      Yes.

5   Q      Was there conversation with Fulcrum regarding the

6   selection of maturity date?

7   A      We did.  At the time it was based around the DOJ

8   correspondence with us that stated that we would be in a

9   position to engage with them after Sam Bankman-Fried's

10  sentencing which was at the end of March.  So, we gave the

11  additional month so that we could have some time to deal with

12  the DOJ.

13  Q      Most of this conversation so far has been about

14  activity in Antigua and yet here we are before a United

15  States Court.  Why was it important to you to file a motion

16  before Judge Dorsey to seek approval of this financing?

17  A      We wanted complete transparency.  We wanted the

18  approval and protection of the US Court to be able to do

19  that.  We fully understand why we filed the Chapter 11

20  petition which was to obtain the protection of the US

21  Bankruptcy Court particularly against hostile creditors.

22  That is what we were seeking here today, full transparency

23  and your assistance.

24  Q      Coming back to Fulcrum just for a moment, have you

25  conducted personal conversation with Fulcrum around this

1  particular advance?

2  A     Yes.

3  Q     And did you -- in the course of those conversations,

4  did you reach any view regarding why Fulcrum was willing to

5  extend this advance?

6  A     As touched upon earlier, it was really a point of

7  principal. I think they really understood that our hands

8  would be tied if we did not enter into the Court of Appeals

9  hearings.  It was very much a me seeking their assistance and

10 they were willing to provide it, but there was some serious

11 discussions about whether they should.  Thankfully they did.

12 Q     There was some concern raised here regarding whether

13 Fulcrum is proceeding in good faith given the terms of the

14 loan, the short maturity and the high interest rate.  Have

15 you reached a view regarding whether Fulcrum is proceeding in

16 good faith?

17 A     I do believe they are proceeding in good faith.

18 Q     Why do you believe that?

19 A     I think that they are -- as I said, there is a point of

20 integrity and principal in relation to the basis of these

21 proceedings and why we need counsel.  I also believe that we

22 do feel that we will be able to engage with creditors and DOJ

23 in due course as to the distribution of those assets.  I do

24 feel that Fulcrum are willing to negotiate on their pricing

25 as a result of that.

1          MR. GOODCHILD:  A moment, Your Honor.

2          THE COURT:  Okay.

3     (Pause)

4  BY MR. GOODCHILD:

5  Q     Ms. Barkhouse, we talked earlier about the appointment

6  you received from an Antiguan Court.  The law firms, were the

7  law firms appointed by the Court directly in Antigua?

8  A     No.

9  Q     Were they appointed by you?

10 A     They were appointed by us, yes.

11 Q     When it comes time for the Antiguan counsel to be paid

12 is there a process in Antigua regarding the approval of the

13 expenditure to make the payments?

14 A     Yes.

15 Q     Can you tell the Court what that entails?

16 A     Absolutely.  The Antiguan Court is part of the Eastern

17 Caribbean Courts and all of those Courts, as most

18 jurisdictions do, when you are an independent fiduciary and

19 practitioner appointed by the Court in a situation such like

20 this you are required to provide your application for fees to

21 the Court for the Court to approve.  So, needless to say it

22 is highly examined.  We run through all of the fees to make

23 sure that they are of value and that they are accurate.  We

24 then submit the fee application to the Antiguan Court and the

25 Judge will review that fee application and determine

1  (indiscernible) himself whether they are reasonable and

2  whether they have been occurred in the due course of the

3  liquidation itself.

4  Q    So, I want to break down those steps just for a moment.

5  The bills of the law firms, do they go to you in the first

6  instance?

7  A    They come to us in the first instance and we also

8  supply that as part of our fee application to the Court as

9  supporting evidence of what has been dealt with within the

10 liquidation.

11 Q    When you received the bills from the law firms do you

12 review them for reasonableness?

13 A    Absolutely.

14 Q    Why do you do that?

15 A    Because of principal, because of integrity.  I have

16 absolutely cut fees down before for other law firms. I will

17 not entertain any excessive billing.  I have credibility and

18 reputation to uphold, so I put that in front of the Court.

19 Q    Then when it comes time for the application to be made

20 to the Antiguan Court is the applicant there or is each of

21 the firms an applicant separately?

22 A    We are the applicant.

23 Q    What do you have to show to the Antiguan Court in order

24 to obtain the approval?

25 A    Where the assets -- sorry, where the fees are being

1  paid out the assets of the company the Court wants to see

2  that those fees are being paid in a proper manner and of the

3  right reasons.  So, we have to show exactly what we have

4  done.  We have categories and subcategories of workstreams.

5  So, we will look at administration and planning, we will look

6  at strategy, we look at dealing with legal investigations,

7  there will be subcodes if there are specific proceedings in

8  place, for example, the Antiguan Court proceedings.  We have

9  a subcode for the 456 proceeding, which is the receivership.

10 Then the 480 which is the liquidation and also for the

11 Chapter 11 workstream.  So, we have a complete set of data

12 which we then collect and set out to the Court, and they are

13 able to review that in full.

14 Q    And you referred to categories and collating.  Do you

15 exhibit the actual bills from the law firms to the Court?

16 A    Yes.

17 Q    Is there an additional analysis that you perform that

18 then is also provided to the Court or is it just the

19 provision of the bills to the Court?

20 A    We will submit to the Court that we believe the fees

21 are properly incurred.

22            MR. GOODCHILD:  Thank you. I have nothing further.

23 I pass the witness.

24            THE COURT:  Cross-examination.

25            Just so the parties are aware, I have to attend to

1  something at 11:30 that is probably going to take about an

2  hour. Then I have a two o'clock hearing.  So, the plan is

3  going to be we will break just before 11:30, we will come

4  back at one, we will go from one till two, and then if we

5  need to we will go -- the two o'clock hearing I am hoping

6  won't last very long and then we will pick up after that

7  hearing.

8                      CROSS-EXAMINATION

9  BY MS. RICHENDERFER:

10 Q    Ms. Barkhouse, as we have met before, my name is Linda

11 Richenderfer. I am an attorney from the Office of the United

12 States Trustee.

13      I do have some questions for you.  I am going to go a

14 little out of order first because I want to -- I have some

15 follow-up questions to things as you were testifying about

16 them.  Then I will turn to some of the other documents

17 connected with this case.

18      You were just going through the process of how the

19 joint liquidators submit this application to the Antiguan

20 Court, and what you do in looking at the fees, and then how

21 you pass on the information.  Have you filed any of these

22 applications yet with the Antiguan Court?

23 A    No, we haven't.  Not yet.

24 Q    And why is that that you haven't filed any yet?

25 A    We are not due to.  We have had significant dealings

1  with, obviously, SBF and various different applications in

2  place at the moment.  We do have a hearing for directions

3  very shortly that we are hoping will come out of the Court of

4  Appeals judgment.  Then at that point we would be looking to

5  submit a fee application even when we are able to determine

6  that we are able to get our fees paid out of the assets of

7  the company.  That will be decided upon by the DOJ and/or

8  perhaps FTX and other creditors.

9  Q    So, if I follow that correctly, let me know if I don't

10 have this right, you are not going to file an application

11 regarding fees you get things worked out with the DOJ and

12 there are assets that come back to Emergent?

13 A    Yes.  Unfortunately, sometimes in these situations

14 there's obviously practitioners don't get paid and, you know,

15 its vastly unfair when they are dealing with principals of

16 legal justice, but unfortunately that is the way it goes. The

17 issue is that you cannot pay assets out of a company that has

18 been seized by the DOJ.  That is why we are here to ask for

19 the DIP motion financing so that we can actually obtain some

20 funds so that we can proceed with the Court of Appeals

21 judgment post thereafter.

22 Q    In some of the -- not in some of them. I should say in

23 all of them, in all of the monthly operating reports that

24 have been filed for this debtor there is a reference to a

25 retainer being held by professionals in connection with the

1  Antiguan matter.  Where did those funds come from?

2  A    They came from the prepetition financing.

3  Q    And I believe it's around $890,000.

4  A    No. It's about a million.

5  Q    About a million?

6  A    Yes.

7  Q    Okay.  And I am not including in that the retainer that

8  was initially held by Morgan Lewis.

9  A    Right.  Okay.  Yes, you are right.  So, it's about

10 $700,000.

11 Q    I'm sorry, could you repeat that again.

12 A    So, there was the retainers held we had -- so, we had a

13 proposed retainer of $1.5 for Forbes Hare which is held in

14 trust, then we have $1 million of retainers paid -- sorry,

15 $700,000 not including Morgan Lewis.

16 Q    What was the first retainer you were talking about or

17 the first money you said was held in trust?

18 A    So, for the Forbes Hare fees that were billed or rather

19 raised for us we -- they sought a -- we sought to have their

20 fees reduced which, as I was saying, I will look at fees and

21 I will decide whether or not they are reasonable or whether

22 they deal with other things.  So, they put forward a $1.6

23 bill, we proposed $1.5, and so actually the retainers that

24 are held in total are $700,000.

25 Q    Okay.  That relates to you getting a reduction of their

1  bill before any applications are filed with the Antiguan

2  Courts, correct?

3  A     Absolutely, yes.

4  Q     The amounts that you gave us when you were being

5  questioned by counsel, as to what is owed to the four

6  Antiguan professionals, I will call them, those were just for

7  amounts that were accrued after the filing of the US Chapter

8  11 petition, correct?

9  A     Yes.  So, because of the fact that we were filing into

10 the US Bankruptcy Court there are, of course, expected

11 administrative costs to be dealt with within the bankruptcy.

12 So, we had sought small retainers for that point in time to

13 be able to deal with the US Court bankruptcy.  What we were

14 not expecting was to have so many actions against us by SBF.

15 Q     So, how much, if anything, is still owed to these

16 professionals with respect to work that they performed prior

17 to the filing of the US Bankruptcy Court -- of the US

18 bankruptcy case, excuse me.

19 A     So, they were paid for all of the work they had done

20 prior to the Chapter 11 petition.

21 Q     Okay.

22 A     So, the retainers were for everything post the Chapter

23 11 petition to deal with just pure administrative costs of

24 dealing with the bankruptcy and dealing with persons such as

25 yourself.

1  Q      So, I thought though that you had said that you had not

2  yet made any applications to the Antiguan Court regarding

3  payment of the professionals.

4  A      No, I haven't.

5  Q      Are you agreeing with what I just said that you haven't

6  made any applications?

7  A      So, we make an application for funding in relation to

8  the fees that had been incurred.  We haven't made an

9  application to the Court for fees to be paid in the sense

10 that after the assets of the company.  Remember, the fees are

11 being paid by a funder, not by the assets of the company.

12 So, we sought an application for the Court to approve a

13 funder to pay for the fees for those individuals.  We haven't

14 gone back to the Court and asked for a fee to be paid out of

15 the assets of the company.

16      That is why the funder is in a position of risk because

17 ultimately if the Court decides no then the funder has lost

18 out their investment or their capital.  Although, the lawyers

19 or the individuals up to that point would have been paid, but

20 they may well be negotiations after that.  We would still

21 have to go to the Court and have our fees approved.

22 Q      So, the fees that were paid prior to the filing of the

23 Chapter 11 petition have not yet been reviewed by the

24 Antiguan Court?

25 A      No. Not by the Antiguan Court, no.

1  Q     What was the total of what was paid?

2  A     So, $3.4 million -- so $4.2 million was paid, but that

3  included the retainers.

4  Q     Okay.  And I saw information in connection with your

5  DIP motion that the prepetition debt owed to Fulcrum is at

6  $11 million. Do I have that correct?

7  A     So, what we have currently is interest currently due of

8  $8 million, yes.  So, as I had discussed, we absolutely were

9  convinced, obviously as it appears incorrectly, that we were

10 going to be negotiating with FTX to pay out Fulcrum very soon

11 after so the interest wouldn't have accrued in the way that

12 it had.  We also thought that we would be able to deal with

13 the DOJ and perhaps deal with a release of some of those

14 company assets to deal with the prepetition financing and the

15 cost incurred already.  We hadn't been able to do that and so

16 unfortunately the interest has accrued, yes.

17 Q     So, let me ask this question differently then.  How

18 much in principal did the joint liquidators borrower prior to

19 the petition date?

20 A     So, $4.2 million was the principal.

21 Q     And on top of that, as of today, $8 million of interest

22 has accrued on top of the $4.2 million in principal?

23 A     Yes.

24 Q     And what is the interest rate on the prepetition debt?

25 A     Its 2.5 times.

1  Q      So, 250 percent?

2  A      Yes.

3  Q      And did you do any shopping before you entered into

4  that credit agreement?

5  A      Yes, we did.

6  Q      And how many firms did you speak to regarding that?

7  A      We spoke to three firms with (indiscernible)

8  discussions and one who was vaguely interested, but then was

9  required.

10  Q      Were those the same firms that you spoke to when you

11  needed the $300,000?

12  A      No, different firms.  One of them was the same

13  actually.

14  Q      Was there one in addition to Fulcrum that was the same?

15  A      Yes.

16  Q      You talk somewhat about your conversations with

17  Fulcrum.  Who do you deal with primarily at Fulcrum?

18  A      So, if I am allowed to say individual names I deal with

19  Stuart King, Daniel Shepherd, and Matthew Hamilton.

20              THE COURT:  I want to ask a clarifying question

21  here. I am confused about the amount that is owed to Fulcrum.

22  Its described as a prepetition amount.  Is that pre-Chapter

23  11 petition amount?

24              THE WITNESS:  Yes.

25              THE COURT:  So, you borrowed this money after they

1  filed for bankruptcy in Antigua or, whatever, liquidation?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  So, this is a post-petition

4  amount in Antigua for $4.2 million at an interest rate of 250

5  percent?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  Thank you.

8  BY MS. RICHENDERFER:

9  Q    What process, if any, did you have to go through in the

10  Antiguan proceedings in order to get approval to enter into

11  the prepetition credit agreement with Fulcrum?

12  A    Well, we sought an ex parte application to the Antiguan

13  Court. We set out who we had -- well, we set out the

14  situation in terms of why we were seeking this which it was

15  an pecuniary situation because the assets were in the US and

16  they were held elsewhere. We also explained the fact that the

17  negotiations were entered into and the number of firms had

18  entered into.  And we asked the Court whether it was

19  reasonable to be able to seek this funding to be able to

20  defend against the various applications that were against us

21  including, as I say, BlockFi and Sam Bankman-Fried at the

22  time.

23  Q    Okay. How detailed was your description in that

24  application to the Court regarding the terms of the funding?

25  A    It was detailed in that we appeared in the Court the

1  same way we do now and we set out exactly what -- we made

2  submissions to the Court, we supplied an affidavit for that,

3  as well as the application.  So, it was detailed, yes.

4  Q    I guess I am getting at did you set out in that

5  application the amount of funds that were being borrowed,

6  which was $4.2 million and the interest rate that was going

7  to --

8  A    Yes.

9  Q    Was that approved by the Antiguan Court?

10  A    Yes.

11  Q    Do you have an order that approves that?

12  A    Yes.

13  Q    I don't believe that has been attached to any of your

14  declarations, for instance, not to the DIP or the first day

15  declaration.  Was there a reason why it wasn't attached?

16  A    I can't answer that.  I can't speak to that.  At the

17  time it was an ex parte application because we had wanted to

18  protect the lender in terms of that.  It ended up in the

19  public domain anyway.  But, no, I can't speak to why it's not

20  there.

21  Q    The order that was obtained approving that was that

22  obtained prior to the Chapter 11 petition being filed?

23  A    Yes.

24  Q    Was that order obtained prior to the DOJ seizing the

25  assets?

1  A      No.  So, we had entered into a term sheet with the

2  funder prior to the assets being seized.  The funder had

3  committed to that point in time and we proceeded to obtain

4  the application or rather to seek the application and obtain

5  the order for funding.

6  Q      So, was the 250 percent interest rate applicable even

7  before the DOJ seized Emergent's assets?

8  A      We had looked at a range of interest rates, but I can

9  understand why Fulcrum was seeking for a 2.5 times their

10 capital investment on the basis of the DOJ seizing the

11 assets.

12              THE COURT:  I don't think that answered the

13 question.  The question is -- I want you to repeat the

14 question.

15              MS. RICHENDERFER:  Now I have to remember.

16              THE COURT:  The question was did the 250 interest

17 rate, was that agreed to with Fulcrum before the DOJ seized

18 the assets.

19              THE WITNESS:  It was in the initial term sheet.

20 It was because we had engaged with various other funders and

21 they were looking at 30 percent.

22              THE COURT:  So, the answer to the question is yes.

23              THE WITNESS:  Yes.

24              THE COURT:  Thank you.

25 BY MS. RICHENDERFER:

1  Q    Do you have any idea as to when the Antiguan Appellate
2  Court may rule?

3  A    I do not.

4  Q    Are you aware of any deadlines by which they must rule?

5  A    No.

6  Q    When is the last time you talked to anyone from the
7  U.S. Department of Justice about the seized assets?

8  A    I can't remember the exact date, but I am going to
9  suggest it was four weeks ago when we had a call with them.

10 Q    And was that when they advised you that they couldn't
11 talk to you until after Mr. Bankman-Fried was sentenced?

12 A    They set out to us what was going to be the next steps,
13 and they said that that was exactly the same conversation
14 that they had with FTX and BlockFi, and that they would not
15 be engaging with the distribution of those assets until after
16 the sentencing of Sam Bankman-Fried, yes.

17 Q    Now, you also mentioned that the Antiguan court had
18 entered a winding-up order on March 23rd, 2023.  What does
19 that order provide for?

20 A    So that meant that the company was in full liquidation
21 rather than provisional liquidation, so that meant that the
22 company was considered insolvent and that it was in the
23 interest of justice to ensure that that company was looked
24 after by liquidators rather than by other parties, other
25 interested parties, and so that order was then provided.

1  Q     Now, in order to be declared insolvent, I'm presuming

2  that the court looked into what the potential liabilities

3  were of Emergent?

4  A     Yes; we submitted those to them, yes.

5  Q     And what were the potential liabilities that were

6  submitted?

7  A     All of the assets that are held by the DOJ, they're all

8  up for -- there are multiple interested parties that believe

9  those assets are theirs.  In any event, they were received by

10 Emergent from other parties, and that Emergent had no other

11 purpose other than to hold those shares, there were no other

12 assets to speak of.  Those assets are seized and they will be

13 distributed accordingly.

14 Q     So, if I have this correct then, the information that

15 was provided to the Antiguan court was that the assets of

16 Emergent are equal to the liabilities of Emergent?

17 A     So the assets of --

18 Q     That was a yes-no question, I'm sorry.

19 A     Sorry, sorry.  Can you repeat the question?  The assets

20 of Emergent are equal to the liabilities.  I think --

21 Q     The information that you presented --

22 A     Yes.

23 Q     -- to the Antiguan court regarding insolvency of

24 Emergent, based on what you just said, did you present to the

25 court that the assets and the liabilities of Emergent are the

1  same?

2  A      In fact we presented that the liabilities were more

3  because, at the particular point in time, we had received

4  information from BlockFi as to what they believed their claim

5  was and it was in excess of the current value of the assets

6  at that point in time, because, remember, those are shares

7  and they were going up and down --

8  Q      Right.

9  A      -- in terms of value, so we had to present at that

10 point in time that BlockFi's interest in it was higher than

11 the value of the shares currently being held.

12 Q      Okay.  Are you familiar with something that we do in

13 Chapter 11 U.S. bankruptcy cases, which is get a bar date for

14 creditors to file claims?

15 A      Yes.

16 Q      It's my understanding that there's been no motion yet

17 made for a bar date in this case; is that correct?

18 A      No, I think we -- no, we haven't.

19 Q      Okay.  So, at this point in time, you do not know what

20 the potential amount of liabilities are with respect to the

21 Chapter 11 proceeding?

22 A      No; not in detail, no, but as I described earlier, in

23 fact our investigation showed --

24 Q      Okay --

25 A      -- there may be multiple creditors --

1  Q     -- it's going to be --

2  A     -- with multiple claims.

3  Q     -- a very long time in front of poor Judge Dorsey --

4          THE COURT:  Answer the question, please, that's

5  asked.

6          THE WITNESS:  No.

7  BY MS. RICHENDERFER:

8  Q     Now, you gave us a little bit of your background in

9  answers to questions from counsel.  Have you ever been

10 involved or seen a scenario before where a lender was

11 receiving 250 percent interest on a loan?

12 A     Not that degree, no, but I have seen very high

13 percentages before, yes, in high-value --

14 Q     Again --

15 A     -- yes.

16 Q     -- we're going to be here -- I'm going to ask follow-up

17 questions --

18 A     Okay.

19 Q     -- don't worry, your counsel has the right to ask you

20 questions.  So you haven't seen 250.  Have you ever seen

21 anything over 100 percent?

22 A     A hundred and thirty percent.

23 Q     Okay.  And did that also involve an insolvent entity?

24 A     Yes, but also some of the litigation funding agreements

25 -- and I need to explain this -- some of the litigation

1  funding agreements all have 130 percent, but they will also

2  have two times capital deployed.  So the additional 30

3  percent will be on recoveries, but you will have 2.5 times on

4  the capital deployed.  So there are various different ways of

5  dealing with litigation funding.

6  Q    Now, you said litigation funding, correct?

7  A    Yes.

8  Q    And you mentioned earlier that you had looked at

9  different type of funding that you could get for this entity.

10 Litigation funding is a different animal than a debtor-in-

11 possession loan; isn't it?

12 A    Yes, it is, but this funding was for the Antiguan --

13 Q    Again, it's --

14 A    -- litigation.

15 Q    -- yes/no, okay?

16          MS. RICHENDERFER:  Please --

17          THE WITNESS:  No.

18          MS. RICHENDERFER:  -- I ask the Court again.

19          THE COURT:  Please, you have to answer the

20 question you're asked.

21          THE WITNESS:  Okay.

22          THE COURT:  Your counsel will have the opportunity

23 to follow up --

24          THE WITNESS:  Okay.

25          THE COURT:  -- if he deems it necessary.

 1              THE WITNESS:  Apologies, Your Honor.

 2    BY MS. RICHENDERFER:

 3    Q      And we do not have litigation funding in this case, do

 4    we?

 5    A      We -- no.

 6    Q      So are you aware of any situations where the interest

 7    rate was over a hundred percent that didn't involve a

 8    litigation funding arrangement?

 9    A      No.

10    Q      How long have you been at --

11              THE COURT:  Ms. Richenderfer, is this a good

12    breaking point?

13              MS. RICHENDERFER:  Yes, it would be, Your Honor.

14              THE COURT:  Okay.  Why don't we take a recess then

15    and we'll reconvene at 1 o'clock.

16              Ms. Barkhouse, during the break, you are not

17    permitted to speak to anyone about your testimony, including

18    counsel.

19              And we will reconvene at 1:00 p.m.  Thank you.

20              MS. RICHENDERFER:  Okay.  Thank you, Your Honor.

21          (Recess taken at 11:26 a.m.)

22          (Proceedings resumed at 1:02 p.m.)

23              THE COURT:  Thank you.  Please be seated.

24              Ms. Richenderfer, whenever you are ready.

25              MS. RICHENDERFER:  Again, for the record, Linda

1  Richenderfer from the Office of the United States Trustee.

2  BY MS. RICHENDERFER:

3  Q    I have a few more follow-up questions and then I want

4  to ask about some documents real quickly.

5        So the prepetition loan of the 4.2 million, does that

6  have a lien on the assets that were seized by the U.S.

7  Government?

8  A    It has a lien on the assets of the company, but that

9  was -- but those have been -- now been seized, obviously.

10  Q    Okay.  And when the -- if the $300,000 DIP is approved,

11  who is that going to be paid out to?

12  A    That would be paid to King's Counsel David Joseph.

13  Q    Does the debtor have any assets that are located

14  outside of the United States?

15  A    No.

16  Q    Now, was the prepetition loan subject to New York law?

17  A    It was subject to -- the governing law was -- I'd have

18  to double check that, actually -- it was to New York law.

19  Q    And the proposed DIP term sheet is also subject to New

20  York law, correct?

21  A    It would be an extension of that, so, yes.

22  Q    Okay.  So it's an extension of the original?

23  A    Yes.

24  Q    Okay.

25  A    Sorry, my correction, England and Wales.  Sorry.

1  Q     So the original prepetition loan was subject to the law

2  of England --

3  A     England and Wales --

4  Q     -- and Wales?

5  A     -- yes.

6  Q     And the DIP loan, which is supposed to be an extension

7  of that, is subject to New York law?

8  A     To -- no, an extension of this, it would still be

9  England and Wales.

10 Q     Okay.  If you turn to the DIP term sheet -- and we'll

11 get to that in a minute, but I do believe that there is a

12 provision in there that says that it's governed by New York

13 law --

14 A     Right.

15 Q     -- but we'll get to that in a minute.

16 A     It might -- to be fair, it may have changed because we

17 did discuss which jurisdiction it should be in --

18 Q     Okay.

19 A     -- but I'm looking at this document in front of me.  So

20 the definitive agreement may well be New York law.

21 Q     And what is the document you're looking at in front of

22 you?

23 A     The liquidation funding agreement.

24 Q     I'm sorry, what is it again?

25 A     The liquidation funding agreement.

1  Q      And is that the one that was entered into prepetition?

2  A      So this is the one that was -- this was executed by

3  myself and Tony on the 2nd of February.

4            MS. RICHENDERFER:  Your Honor, I guess I would

5  register an objection at this point in time of the -- it was

6  my understanding -- I guess it was my fault, I didn't

7  directly ask -- that the witness had in front of her the

8  exhibits that we were told were being --

9            THE WITNESS:  Yes.

10           MS. RICHENDERFER:  -- used by the debtor today,

11 and I don't believe that is attached to any of the exhibits.

12           THE COURT:  Is that one of the exhibits?

13           MR. VICHCLILE:  No, Your Honor.

14           THE COURT:  Then you need to give a copy to

15 Counsel so she can review what she's looking at.

16           MS. RICHENDERFER:  Right.  And is there anything

17 else that -- I guess I'm concerned that there may be other

18 things that are in the binder that the witness has been

19 making use of --

20           THE COURT:  Why don't we just turn over -- turn

21 over the whole binder to Counsel, so she can see what's in

22 there.

23           MS. RICHENDERFER:  Yeah, we were not given a copy

24 and I didn't ask for one because I thought it was just what

25 Counsel had identified would be used at today's hearing.  My

1  bad.

2          THE COURT:  Do you have a copy of the binder?

3          MR. VICHCLILE:  I do, Your Honor.  May I approach,

4  please?

5          THE COURT:  Yes.

6          MS. RICHENDERFER:  So --

7          THE COURT:  Do you want to take some time to

8  review it before we continue?

9          MS. RICHENDERFER:  Your Honor, I'll go through the

10  questions I have right now.  Is this the same binder that was

11  given to the Court?

12          THE COURT:  I don't have a binder.

13          MS. RICHENDERFER:  Oh, you don't have a binder.

14  So we were both working in the dark.

15          THE COURT:  Yes, apparently.

16          MS. RICHENDERFER:  I think it's important that the

17  Court have it all, so -- but I'll put that to the side right

18  now.  Okay.

19          Your Honor, if I may just have a second?

20          THE COURT:  Sure.

21      (Pause)

22  BY MS. RICHENDERFER:

23  Q    What are you and the other joint liquidator doing while

24  you wait for the appeals court to issue its ruling?

25  A    We are continuing to administer the bankruptcy, we are

1  seeking still to talk to BlockFi and FTX, and we finalized

2  our analysis of the production data that was given to us

3  recently.

4  Q     And that production data was from FTX; correct?

5  A     FTX and BlockFi, but FTX was the most -- of the most

6  use.

7  Q     And that data identified which of the FTX co-debtors

8  were the source of funds that flow through to Emergent;

9  correct?

10 A     I'm sorry, can you repeat the question?

11 Q     Let me ask it a different way.  The data that you've

12 referred to that you are analyzing --

13 A     Yes.

14 Q     -- is that data that reflects how funds found their way

15 into Emergent?

16 A     Yes.

17 Q     Are you aware that there are others who are also

18 conducting that same investigation in connection with the

19 U.S. Bankruptcy Court proceeding?

20 A     I have no insight into any of the trustees or any other

21 investigative firm's dealings with any data or what they may

22 have.  We only asked for that data from FTX in order to

23 define exactly where the funds came into Emergent, which is

24 our debtor, and that's what we asked for and that's what we

25 received and we analyzed.  We have a duty to make sure that

1  we understand the company.

2  Q    Now, you talked about exercising your business

3  judgment.  The original term sheet that you agreed to

4  included a release of Fulcrum that extended not only to the

5  DIP loan, but also to the prepetition loan; correct?

6  A    Yes, it did.

7  Q    That has since been, though, removed; correct?

8  A    The release?

9  Q    Yes, for the prepetition loan.

10  A    I'm sorry, I'm not quite sure I understand.

11  Q    We'll deal with that with the Court.  The have been

12  language changes agreed to with the order that should have

13  taken care of that issue.

14       In connection with exercise of your business judgment,

15  do you know what the usury laws are of New York?

16  A    The -- sorry, usury?

17  Q    Usury laws regarding the amount of interest that can be

18  charged per a loan?

19  A    So we were dealing with the Antiguan proceedings at the

20  time, it was prior to the Chapter 11 petition, so we were not

21  engaged in --

22  Q    That's not my question.  My question --

23  A    Okay, so --

24  Q    -- just asked you -- excuse me --

25  A    -- no, I don't --

1   Q      Okay.

2   A      -- but, as I would point out, we were dealing with

3   Antiguan law at the time.

4   Q      Okay, but in terms of the DIP loan -- okay, we'll get

5   to that in a minute then.

6          Let's do the following.  I'm going to ask you some

7   questions about the monthly operating reports that were

8   filed; I'm going to ask you about the July 31, August 31, and

9   October 31.

10               MS. RICHENDERFER:  And I have copies of all of

11  these for everyone.  Your Honor, may I approach?

12               THE COURT:  Yes.  Thank you.

13          (Pause)

14               THE COURT:  Thank you.

15               THE WITNESS:  Thank you.

16  BY MS. RICHENDERFER:

17  Q      If you could, please, first look at the monthly

18  operating report for the period ending July 31, 2023, it is

19  Docket Item 2202 filed with the Bankruptcy Court on August

20  18th, 2023.

21          I do note that this was signed by the other joint

22  liquidator.  Do you review these before they are filed?

23  A      Ms. Shukla reviews them, she's responsible for them,

24  but I don't review them in detail.  She and I have

25  discussions over them and she sends me --

1  Q      Okay.

2  A      -- her oversight.

3  Q      So, if you turn to -- well, first, if we could turn to

4  page 14 of 20, if you look at the top, there's a header that

5  goes across the page and it says page 14 of 20.

6  A      Yes.

7  Q      I'm looking at -- it says part 2, assets and

8  liabilities status, post-petition payables.  And if you could

9  look over in that section, I don't need you to read that out

10  loud, and it makes reference there to a cross-border

11  protocol.  And my question is whether or not the joint

12  liquidators plan to move forward with a cross-border

13  protocol?

14  A      We did submit this to the U.S. Trustee and it's been

15  with the U.S. Trustee for quite some time.  So we were

16  waiting for a response on that.

17  Q      So, if you got a response from the U.S. Trustee

18  tomorrow, you would agree to enter into that and we would try

19  to put forth a joint cross-border protocol that would cover

20  proceedings in both jurisdictions?

21  A      That was our intention to make sure that there was

22  transparency and cooperation between both jurisdictions.

23  Q      So, to your knowledge, the U.S. Trustee's Office has

24  not been told that the debtor will not enter into a cross-

25  border insolvency protocol?

1  A     Sorry, so the debtor has not been told --

2  Q     No, I'm sorry, the U.S. Trustee has not been told, to

3  your knowledge, that the debtor at this point in time is not

4  interested in entering into a cross-border protocol?

5  A     Absolutely not.  We've always been interested in a

6  cross-border protocol.

7  Q     Okay.  And your understanding was that you were waiting

8  for comments from the U.S. Trustee's Office.  What steps, to

9  your knowledge, were taken in order to get those comments

10  from the U.S. Trustee's Office?

11  A     We engaged with legal counsel to engage with

12  yourselves, the U.S. Trustee, to be able to move that

13  forward.

14  Q     Do you know when those discussions first started?

15  A     They were, I believe, in around June or July this year,

16  but I'm not -- that's from -- that may be wrong, completely

17  wrong.

18  Q     Okay.  Then if we could go to page 16 of 20.  Okay.

19       So this is a balance sheet as of July 31st?

20  A     Yes.

21  Q     Okay.  Under assets, we see the cash.  That was before

22  the shares were sold; correct?

23  A     Yes.

24  Q     And then funds retained or held by Morgan Lewis

25  Bockius.  And then it says, retained or held by other

1  professionals, $891,888.82.  So, which professionals hold

2  retainers that equal that amount?

3  A    So we have a retainer, we hold a retainer on trust for

4  Forbes (indiscernible) I'll just look at my sheet.  There is

5  a retainer that was held by Essex Court, a retainer for Lake

6  & Kentish, and a retainer for Mourant (ph).

7  Q    And to your knowledge, as of today, have any of those

8  professionals taken their retainer money into their own

9  accounts?

10 A    No.

11 Q    And if the DIP order is entered --

12        THE COURT:  I'm sorry, no, they haven't or, no,

13 you don't know?

14        THE WITNESS:  No, they haven't.  To my knowledge,

15 no, they haven't.

16 BY MS. RICHENDERFER:

17 Q    And, to your knowledge, if the DIP order is entered

18 today, do -- or -- excuse me.  Let me start over again.  My

19 mouth is very dry.

20      To your knowledge, if the DIP order is entered today,

21 will any of those professionals move funds from their

22 retainer accounts into their own accounts?

23 A    No, they wouldn't on the basis of the DIP motion today,

24 no.

25 Q    Okay.  And, to your knowledge, are any -- strike that.

1        When will they?

2   A    When it is approved.  So, for example, when Morgan

3   Lewis asked to apply theirs, they sought my approval, which I

4   gave, and no other professionals have asked for that

5   approval.

6   Q    So the professional that will be paid the $300,000,

7   aren't they holding -- how much are they holding in retainer?

8   A    They had 291,000 on retainer, but, to my knowledge,

9   they have not applied that.  That may be incorrect, but to my

10  knowledge, they have not.

11  Q    Okay.  So we're here for a DIP motion for $300,000 to

12  pay to one given professional and they're holding around

13  $291,000 as a retainer right now?

14  A    But these are two sole practitioners who have no

15  salaries and they are looking to --

16  Q    That was a yes-no question, ma'am.  I'm sorry.  We're

17  going to be here all day --

18  A    So --

19  Q    -- unfortunately.

20  A    -- there was a case of the 300,000 -- it may well be

21  that they have applied the 291,000 and are therefore seeking

22  the additional 300,000.

23  Q    Okay, so we'll get to that in a minute.  So you don't

24  know what they're doing with those funds?

25  A    What I don't know for certain is whether or not they

1  have applied those specific funds to fees already.  What we

2  have asked for is an additional 300,000 to see them through

3  the Court of Appeals hearing, which is in addition to the

4  fees already incurred.

5  Q    Okay.  So, if you could leave this one open, I'm just

6  going to ask you about one more line item.  Post-petition

7  accrued unpaid costs, 3.37 million -- I'm rounding -- and

8  does that relate to the prepetition loan from Fulcrum?

9  A    Sorry --

10 Q    It's under liabilities, post-petition --

11 A    Ah, sorry, sorry, I'm looking at the wrong --

12 Q    -- accrued unpaid costs.

13 A    Yes, at that point in time --

14 Q    Or is it the line up above that says post-petition

15 secured creditors are 4.1?

16 A    No, the post-petition accrued unpaid costs is in

17 relation to post-petition.

18 Q    Okay.  So what makes up the $3.3 million?

19 A    That would be the fees incurred to date.

20 Q    By your Antiguan professionals?

21 A    That would be including Morgan Lewis.

22 Q    And we have here, the second line under liabilities,

23 prepetition secured creditors, 4.1 million.

24 A    Yes.

25 Q    That's the Fulcrum prepetition loan, right?

1  A      Yes.

2  Q      Okay.  If you now could take a look at the report for

3  the period ending August 31st, 2023, which is Docket Item

4  2649, and I'm going to ask you to please turn to page 17 of

5  21, which is the balance sheet as of August 31, 2023.

6  A      Yes.

7  Q      There is a new line item under liabilities, which is

8  called post-petition accrued unpaid funding costs; it's

9  approximately $7.74 million.  What does that relate to?

10  A      That would be the interest.

11  Q      The interest owed to --

12  A      Fulcrum.

13  Q      -- Fulcrum for the prepetition loan, right?

14  A      Yes.

15  Q      Okay.  And then looking up above, the second line item,

16  prepetition secured creditors, in July the amount was 4.1,

17  and in August the amount 4.5 million -- I'm rounding -- what

18  accounts for the difference?

19         (Pause)

20  A      If you don't mind, just a moment.

21  Q      Sure.

22         (Pause)

23  A      I'm sorry.  I don't seem to see a breakdown of that

24  within this document so that I can check for myself.

25  Q      Do you know why the interest owed on the prepetition

1  Fulcrum loan was reported in the monthly operating report for

2  August and we don't see it in the July report?

3       (Pause)

4  A    No, I'm not clear on that.  I would have to refresh my

5  memory and come back to you on that.

6  Q    Okay.  And then the last monthly operating report that

7  I gave you was the one for October, this is the last one

8  that's been filed by the debtor, the November is not due yet,

9  and I'm looking at Docket Item 4018.

10       (Pause)

11  Q    And if we could again go to the balance sheet, which is

12  on page 17 of 21, under assets, I see that there is now a

13  zero or line next to the retainer funds held by MLB, and I

14  believe that is described elsewhere, either in this report or

15  the prior one, that was based on their fee application being

16  approved by this Court.

17       So, if any of the retainer funds have been taken into

18  income by other professionals, would that also be reflected

19  in the monthly operating report?

20  A    It should be, yes.

21  Q    Okay.  And the amount that is listed under liabilities,

22  the prepetition secured creditors amount is the same and the

23  unpaid funding cost is the same; however, interest has

24  continued to accrue, correct --

25  A    Yes.

1    Q      -- on the prepetition?  Okay.

2           Is it compound interest?

3    A      Yes, I think.

4    Q      Math was not my strong suit, which is why I went to law

5    school.  With interest of 250 percent accruing and on

6    compound interest, in how many months does the loan double,

7    triple?

8    A      Can I -- sorry, just to correct, the way that the

9    litigation funding agreement was set out was that it was 250

10   percent up until a certain date, which was 180 days, and then

11   it would increase to a different amount after that.

12   Q      You said litigation funding agreement --

13   A      Again, yes, I know.

14   Q      -- the prepetition was an asset-based funding

15   agreement, right?

16   A      It was a financing agreement for the liquidation.

17   Q      For the liquidation?

18   A      Yes.

19   Q      And now we're talking about a financing agreement for

20   the debtor-in-possession to proceed with its bankruptcy

21   proceeding --

22   A      Yes.

23   Q      -- in the U.S., correct?

24   A      Yes.

25   Q      Okay.  So, in fact that is one of the things that my

1   co-counsel here has pointed out to me, there's several

2   documents here that were not -- let me see here -- there's --

3            THE COURT:  I have a question before we proceed:

4   What does the rate increase to after 180 days?

5            MS. RICHENDERFER:  Your Honor, it's in the folder,

6   I will tell you that, it's in the binder.

7            THE COURT:  If the witness knows.

8        (Pause)

9            THE COURT:  If you know where it is in the binder,

10  can you tell her where it is?

11  BY MS. RICHENDERFER:

12  Q    Yeah, I was going to suggest, if you turn to Document

13  Number 14, which says term sheet dated January 13th, 2023,

14  the second page tells you what the compensation is, and it

15  goes through the different rates and how they will increase

16  over time.

17       (Pause)

18  Q    Did you find that?

19  A    Yes.

20  Q    Oh, okay.  I didn't --

21  A    Sorry.

22  Q    -- realize that you had.  Okay.

23  A    Sorry, I thought you were talking to somebody else.

24  Q    So the Court -- you said that the 250,000 was for the

25  first 180 days and we're beyond that right now, right?

1  A      Yes, that's right.

2  Q      And what does it go to between 180 and 270 days?

3  A      So it would increase to -- sorry, I'm looking at the

4  wrong document.

5         (Pause)

6  A      Sorry, I'm slightly confused because the document I

7  have in front of me has got not the date signed on it, so I'm

8  wondering if it's the right one.

9  Q      Well, if you turn to the last page of the document

10 that's in here as Number 14, there are two signatures there

11 and --

12 A      So that's the term sheet?

13 Q      That's the term sheet, right.

14 A      Right.  Okay, sorry, not the litigation agreement, it's

15 the funding agreement.

16 Q      Well, let me ask you first --

17 A      So --

18 Q      -- is that your signature on the last page here of --

19 A      Yes, it is, it is.  Sorry, I was looking at the wrong

20 document.  Apologies.

21 Q      Okay, yes.  This is Number 14, right?

22 A      Yes.

23 Q      Okay.  And so, if turn to the second page --

24 A      Yes.

25 Q      -- it's the term sheet, what is the interest between

1  180 and 270 days?

2  A      Two hundred and seventy five percent.

3  Q      And then what does the interest go to between 270 and

4  360 days?

5  A      Three hundred percent.

6  Q      Okay.  So, February 2nd -- so we're ten months into

7  this, so we're just about at the end of the 300 percent;

8  correct?

9  A      Yes.

10 Q      And then what does the interest rate go to when it

11 exceeds 360 days?

12 A      Three hundred and twenty five percent capped.

13            MS. RICHENDERFER:  Your Honor, there are four

14 documents that are in this binder that were not introduced

15 into evidence by debtors' counsel and I would like time at

16 some point to review them, I might have a question or two.  I

17 don't want to take up the time right now, though, unless the

18 Court prefers it done that way.  And I also believe that they

19 are an important part of this record for this debtor-in-

20 possession funding that's before --

21            THE COURT:  Do you have any other questions other

22 than the documents, or are you done with your cross

23 otherwise?

24            MS. RICHENDERFER:  I do have some other questions.

25            THE COURT:  Okay.  Why don't we finish your cross

1   and I will allow you the ability to come back later.  Do you

2   have an objection to them doing redirect?

3           MS. RICHENDERFER:  No, Your Honor, I don't.

4           THE COURT:  Okay.  So we'll do, finish your cross,

5   redirect, and then you can come back with questions about the

6   documents that weren't previously provided.

7           MS. RICHENDERFER:  Because they're not long, but

8   they're substantial --

9           THE COURT:  Yes.

10          MS. RICHENDERFER:  -- in terms of going through

11  the terms.

12  BY MS. RICHENDERFER:

13  Q    Okay.  One of the things that I do believe you also

14  have in your binder up there, Ms. Barkhouse, is your first

15  day declaration, your declaration in support of debtors'

16  Chapter 11 petition.

17  A    Yes.

18  Q    Okay.  And that is -- that was filed in the Emergent

19  case, 23-10149, at Docket Item 3.  And I had a question --

20          (Pause)

21  Q    Attached to this declaration as Exhibit B is the JPL

22  order, it says.

23  A    I don't have that in my -- sorry -- tab 13?

24  Q    It is -- it looks like it wasn't put into your binder.

25          UNIDENTIFIED SPEAKER:  It's tab 12.

1      MS. RICHENDERFER:  Oh, tab 12?

2      THE WITNESS:  Sorry.  Okay.

3  BY MS. RICHENDERFER:

4  Q    Okay, I was looking at the first day declaration, which

5  isn't in here, but that's okay.  The order, I think, is the

6  same.

7      (Pause)

8  Q    Okay, it is the same document.  So attached to your

9  declaration in support of the DIP motion, which is found at

10  Docket Item 4098, Exhibit B thereto is the Antigua court's

11  joint provisional order, and I have a question there.

12      In paragraph 4 -- and, specifically, I'm going to ask

13  you about paragraph 4(d), so I'll give you a minute to

14  refresh your recollection.  Are you ready?

15  A    Yes.

16  Q    Okay.  So the court order states at 4(d), quote,

17  subject to the prior approval of the court, obtain funding on

18  commercial terms for the performance of their duties,

19  including in connection with any legal proceedings for which

20  funding is permitted under the applicable law, end quote.

21      Is this the provision under which the joint liquidators

22  entered into the prepetition funding agreement?

23  A    So what this does is it allows us to enter into

24  negotiations with relation to it, but we seek the sanction of

25  the court to execute.

1  Q     Okay.  So it was your business judgment that the

2  prepetition loan constituted commercial terms?

3  A     Yes.  And I just wanted to clarify a point --

4  Q     That was -- okay, if you want to clarify something, go

5  ahead, I'll let you.

6  A     I do need to clarify a point.  Earlier, when we were

7  talking about what the terms were prior to the DOJ seizing

8  the assets, I refreshed my memory and in fact we were talking

9  a hundred percent and 125 percent.  After the DOJ seized the

10 assets, the funder therefore increased their percentage

11 rates, and we felt that we had no option at that point to

12 continue on those terms.

13 Q     And what refreshed your recollection on that?

14 A     Just relooking at the documents at the back of this.

15 Q     You're going to have to walk through that again for me.

16 I know that the Judge looked like he was puzzled.  I'm not

17 understanding the point, if you could just --

18 A     So the question earlier is whether I had entered into

19 discussions with Fulcrum immediately on 250 percent, the

20 answer to that is actually no, that they were on lower terms,

21 but after the DOJ seized the assets and that made the risk to

22 the funder much higher, the pricing mechanism was altered to

23 reflect that.

24 Q     So the January 13th, 2023 term sheet does not reflect

25 the original terms under which Fulcrum was going to provide

1  the prepetition loan?

2  A    We had entered into negotiations with Fulcrum in late

3  December, we had sought funding because at that point the

4  funds were frozen, at our request and amongst others as well

5  with the brokerage, and we did not have funds to enter into

6  the various proceedings that were going on in Antigua.  So we

7  needed to seek funding at that particular point in time.

8  Q    Again, that wasn't my question.  My question, with all

9  due respect, was was there a term sheet, based on what you've

10  told us, a term sheet that had in it --

11  A    Not an executed one, no.

12        THE COURT:  Wait until she's done asking the

13  question, please.

14        THE WITNESS:  Sorry, apologies.

15  BY MS. RICHENDERFER:

16  Q    Was there a term sheet, even if it wasn't executed,

17  that contained in it interest rates that were lower than

18  those that we just went through that were part of the January

19  13th, 2023 term sheet?

20  A    Yes, so this was the document that you don't have in

21  your binder.  So there's --

22  Q    So you have other documents with you that aren't even

23  in this binder?

24  A    So the document that I have in front of me, which is at

25  tab 16, is a liquidation funding agreement.

1  Q     Okay.

2  A     I don't know if you have this.

3  Q     I didn't until two minutes ago.

4  A     Right.  So it is this document that, correction, was

5  executed, but not dated.

6  Q     Okay, I don't see signatures -- oh, I see signatures.

7  Okay.

8  A     Yes.

9  Q     So you're telling me the document that's in here at tab

10 16 has interest rates in it that are different than what is

11 in the term sheet at tab 14?

12 A     Yes, but those were -- yes, because it was such a fast-

13 moving thing.  So this was --

14 Q     Okay, I think --

15 A     -- this was prior --

16 Q     -- you've answered the question.

17 A     -- yes --

18        MS. RICHENDERFER:  I think, Your Honor, this is an

19 area that will be better and more easily addressed by myself

20 once I can review these documents.

21        THE COURT:  I'm getting to a point where I think I

22 need to adjourn this hearing so that you have time to review

23 these documents that were never produced.  The witness has

24 been reviewing them on the stand, I don't have them.  This is

25 unacceptable.

1          So I'm going to continue this hearing until

2   tomorrow morning at 10 o'clock.  We'll come back then and

3   we'll finish the cross-examination, we'll go from there.

4          MS. RICHENDERFER:  Okay.

5          THE COURT:  All right?  We're adjourned until

6   tomorrow morning at 10 o'clock.

7          MS. RICHENDERFER:  Thank you, Your Honor.

8       (Proceedings concluded at 1:34 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling_____              December 13, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams_____              December 13, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski_____               December 13, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25