```
1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3   IN RE:                       .  Chapter 11
                                  .  Case No. 22-11068 (JTD)
4   FTX TRADING LTD. et al.,      .
                                  .  (Jointly Administered)
5           Debtors.             .
                                  .
6   . . . . . . . . . . . . . .   .
                                  .
7   FTX TRADING LTD., MACLAURIN  .  Adversary Proceeding
    INVESTMENTS LTD., f/k/a/      .  No. 23-50492 (JTD)
8   ALAMEDA VENTURES LTD., and    .
    WEST REALM SHIRES SERVICES,   .
9   INC.,                        .
                                  .
10          Plaintiffs,          .
                                  .
11     -against-                 .
                                  .
12  LAYERZERO LABS LTD., ARI      .
    LITAN, and SKIP & GOOSE       .  Courtroom No. 5
13  LLC,                         .  824 Market Street
                                  .  Wilmington, Delaware 19801
14          Defendants.          .
                                  .  Wednesday, December 13, 2023
15  . . . . . . . . . . . . . .   .  1:05 p.m.

16

17                      TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE JOHN T. DORSEY
18                UNITED STATES BANKRUPTCY JUDGE

19

20  Audio Operator:           Sharon A. Page, ECRO

21  Transcription Company:    Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

1   <u>APPEARANCES</u>:

2   For the Debtors and
    Debtors-in-Possession:   Adam G. Landis, Esquire
3                            LANDIS RATH & COBB, LLP
                             919 Market Street
4                            Suite 1800
                             Wilmington, Delaware 19801
5
                             -and-
6
                             James L. Bromley, Esquire
7                            SULLIVAN & CROMWELL, LLP
                             125 Broad Street
8                            New York, New York 10004

9   For the United States
    Internal Revenue
10  Service:                 Elisabeth M. Bruce, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
11                             TAX DIVISION
                             950 Pennsylvania Avenue NW
12                           Washington, DC 20530

13  For the Official
    Committee of
14  Unsecured Creditors:     Kenneth Pasquale, Esquire
                             PAUL HASTINGS, LLP
15                           200 Park Avenue
                             New York, New York 10166
16

17

18

19

20

21

22

23

24

25

1                                INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 14:   Motion of Debtors for Entry of an Order        5
4             Establishing a Schedule and Procedures for
              Estimating Claims Filed by the United States
5             Department of the Treasury – Internal Revenue
              Service
6             [D.I. 4204, filed on November 29, 2023]

7             Court's Ruling:                                55

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2   WITNESSES CALLED
    BY DEBTORS:                                        PAGE
3

4        THOMAS M. SHEA

5        Direct examination by declaration            --

6        Cross-examination by Ms. Bruce               35

7        Redirect examination by Mr. Bromley          55

8

9                             EXHIBITS

10  EXHIBITS:                                          PAGE

11  1 - Information document request                   45

12  2 - Tax Return Excerpts                            45

13

14  DECLARATIONS:                                      PAGE

15  1) Declaration of Thomas M. Shea                   24

16  2) Declaration of Edgar W. Mosley II               24

17

18  Transcriptionists' Certificate                     61

19

20

21

22

23

24

25

1        (Proceedings commenced at 1:02 p.m.)

2            THE COURT:  Good afternoon, everyone.  Thank you.

3            Please be seated.

4            Mr. Landis.

5            MR. LANDIS:  Good afternoon, Your Honor.  May it

6    please the Court, Adam Landis from Landis Rath & Cobb on

7    behalf of FTX Trading Ltd., and its affiliated debtors.

8            Your Honor, we filed our agenda at Docket 4601 on

9    December 11th.  Although there is a number of items on the

10   agenda, Items 1 through 5 have been adjourned.  Items 6

11   through 13 and 15 have been resolved with orders entered or

12   orders pending.  We are grateful to Your Honor for entering

13   those orders.

14           That leaves us with one matter going forward

15   today, Agenda Item No. 14, which is the debtors' motion to

16   establish the schedule and procedures for the estimation of

17   the Department of Treasury – IRS claims.  In connection with

18   that matter Mr. Bromley will make the presentation on behalf

19   of the debtors.

20           THE COURT:  Okay.  Thank you.

21           MR. BROMLEY:  Good afternoon, Your Honor.  James

22   Bromley of Sullivan & Cromwell on behalf of the FTX debtors.

23   Nice to be before you again.

24           Your Honor, this is an important issue that we are

25   bringing before you today.  We have a dispute.  We have a

1  dispute with the Internal Revenue Service that is potentially

2  the most material dispute that the debtors have.  We have the

3  Internal Revenue Service having filed against the FTX

4  debtors' claims in the amount of $24 billion.  The filing of

5  those claims, Your Honor, creates an obstacle, a potentially

6  insurmountable obstacle, with respect to the resolution of

7  these cases.

8           And if I can start with a little bit of background

9  to lead you to where we are today, I think that might be

10 helpful.

11           THE COURT:  Okay.

12           MR. BROMLEY:  Your Honor may recall that these

13 cases filed very abruptly on November 11th, 2022.  What we

14 found, when these cases filed, was quite remarkable.  A lot

15 has been written and spoken about the circumstances of the

16 filing and the condition of the books and records of the

17 debtors at the time of the filing.

18           One of the things that hasn't been focused on as

19 much though is that when these cases filed we, effectively,

20 had a financial services firm that had a community of

21 customers all around the world that found all of their

22 deposits, their claims, their accounts frozen.  In a bank

23 insolvency or broker/deal insolvency, even an insurance

24 company insolvency which will be dealt with in State Court,

25 there are very specific provisions in the laws that deal with

1  customer and depositor claims.

2        Indeed, in most financial services insolvencies

3  customers have their claims addressed immediately and don't

4  find themselves subject to reconciliation in a Court

5  proceeding.  I am handling the Chapter 11 proceedings for

6  Silicon Valley Bank Financial Group, the holding company for

7  Silicon Valley Bank. All of the customers were taken care of

8  by the FDIC and through the sale of SVB to First Citizens

9  Bank.  So, all those customers of the bank, and that was the

10  case in Washington Mutual and Lehman Brothers; those

11  customers were all taken care of.

12        So, why is it different here?  Well, this was a --

13  this is a new type of company. It's a new world.  The crypto

14  customers, the depositors, who have filed, in these cases,

15  claims amounting to $16 billion have been held in limbo.

16  There is no institutional or statutory regime that allows

17  them to be paid out early.  There is no statutory regime that

18  provides them with particular protections.

19        What we have is a system that we have been using

20  through the Chapter 11 process to come to a resolution as

21  quickly as humanly possible to be able to compensate and

22  repay the victims of the fraud that occurred here.  We have

23  been trying to do this at lightning speed.  One year ago

24  today, John Ray, the CEO of these FTX entities, was sitting

25  in front of the house financial services committee testifying

1  on Capitol Hill. One year ago yesterday Sam Bankman-Fried was

2  arrested in the Bahamas subject to extradition to the United

3  States.

4         Just one year ago today we were standing in front

5  of and sitting in Congress with Mr. Ray testifying.  Yet,

6  just one year later Mr. Bankman-Fried has been convicted

7  after a long trial.  The Federal Government, through the

8  efficient offices of the Southern District of New York, were

9  able to put together a massive case, investigate and

10 prosecute not only Mr. Bankman-Fried, but obtain guilty pleas

11 from several other of the leaders of the organizations.

12        We are on the precipice of filing a plan of

13 reorganization, disclosure statement, and a motion for the

14 approval of solicitation procedures.  A set of three

15 extraordinarily complex documents that are the result of an

16 enormous amount of work that has been put in by the debtors,

17 by the creditors committee, by the ad hoc committee, and by

18 the joint provisional liquidators where we are coming to the

19 Court, literally this weekend, with papers that represent an

20 enormous amount of consensual work and a process that will be

21 able to be implemented in the new year that will lead to the

22 delivery of recoveries to the victims of Mr. Bankman-Fried's

23 crimes.

24        There is, however, an enormous obstacle to that

25 and it is the claim that has been filed or the claims that

1    have been filed by the Internal Revenue Service.  It is

2    impossible, Your Honor, to really disconnect the two.  In

3    order for us, as the debtors, together with our creditor

4    constituencies and working hand and glove, and Your Honor

5    knows that wasn't easy, with the now joint official

6    liquidators of the Bahamas entity we are in a position to

7    implement a comprehensive plan of reorganization that will

8    provide for distributions to victims.

9           It's important, in our view, because when you are

10   looking at typical Chapter 11 proceedings, large liquidations

11   that take place over a period of years, whether it was Lehman

12   Brothers, or Residential Capital, or Nortel, proceedings that

13   were largely about institutional claims.  There wasn't a

14   universe of victims of customers that literally were

15   depending on the recoveries to come out the door and into

16   their pockets so that they can restart their economic lives

17   which have been held simply frozen since the first week of

18   November in 2022.

19          The team of professionals that has been running

20   this exercise has received an enormous amount of criticism in

21   the press, in Congress, in papers that have been filed by

22   different parts of the United States Government for the

23   amount of money and the time that has been spent on trying to

24   bring all of this information together.

25          One of the things that we needed to do was to

1  create the financial system to understand the information

2  that had been left by Mr. Bankman-Fried and his cohorts and

3  to be able to implement a plan of reorganization and a path

4  forward.  Its cost a lot of money, there is no doubt, but it

5  has worked.  So, while the Internal Revenue Service, in their

6  papers, says Mr. Ray said that a year ago he has never seen

7  anything as bad as this and he has seen some bad things.  He

8  has said this is a dumpster fire. It's a crime scene.  These

9  are comments that were made a year ago.

10          In the time since then enormous efforts have been

11  made, substantial reports have been filed about malfeasance

12  that has taken place, enormous claims have been brought and

13  many successfully resolved in terms of bringing cash into

14  these estates.  The billions of dollars that have been

15  recovered in the one-year period is really unprecedented.

16          One of the things that the debtors have done over

17  that period of time is work with the most sophisticated

18  financial advisors in the world.  There aren't many cases

19  that you can say we have hired both AlixPartners and

20  Alvarez & Marsal.  But not only have we hired both of them,

21  we also have Ernst & Young who have worked tirelessly with

22  respect to tax returns.

23          The issues that we are facing today, Your Honor,

24  and the relief that we are seeking isn't something that we

25  just stumbled upon in the last couple of months.  From the

1  very early stages of these cases it was Mr. Ray's instruction

2  that we needed to be on top of getting a handle on the taxes,

3  filing tax returns, and making sure that those tax returns

4  were credible, bullet proof and able to be defended because

5  we expected that the internal revenue service would want to

6  take a look at it.

7        It's also important, Your Honor, to understand the

8  nature of these cases, these entities.  The vast majority of

9  the business that was conducted by the FTX.com exchange, as

10  Your Honor will recall from many hearings, but in particular

11  the first day hearing when we had the structures put up on

12  the wall, took place outside of the United States.  The

13  FTX.com exchange was an international exchange.  You couldn't

14  operate on the FTX.com exchange if you were an American

15  citizen.

16        One of the things that the company did do

17  correctly, generally, was KYC because if you were an American

18  citizen or sitting in the United States you couldn't operate

19  on the FTX.com exchange.  There was the FTXUS.com exchange.

20  That was for American citizens.

21        The vast majority of the activity that took place

22  with these debtors only took place in the last three years.

23  That is important to keep in mind because when you look at

24  Mr. Mosley's declaration, and we will talk about that a

25  little bit more, he makes it clear that FTX Trading Ltd., the

1  Antiguan entity that operated the international exchange, is

2  really the only entity in the entire group that actually

3  earned any revenue taxable income, but it's an Antiguan

4  entity not subject to tax in the United States.  And even

5  taking that into account, it had one year where it earned

6  taxable revenue in Antigua over $300 million.

7           The tax returns that we have filed for the US

8  taxpayers make it clear that there was never any taxable

9  income in the United States.  Instead, there were $11 billion

10 of losses.  $11 billion of losses because, as we know, as

11 Mr. Bankman-Fried and his cohorts stole money from clients

12 and used it to make investments they were also using it to

13 trade and they were doing a terrible job at it, and they were

14 losing lots of money on the trades. The losses on those

15 trades generated the $11 billion of losses that are

16 represented in the tax returns that have been filed and

17 prepared by Ernst & Young.

18          What we are talking about, Your Honor, is the need

19 at this point in time to recognize that if we are going to

20 need to sit down and litigate to a point of certainty,

21 counting the sands in the Sahara Desert and boiling the ocean

22 like the IRS would suggest, the only result that we are going

23 to end up with is being able to say that instead of an $11

24 billion loss there is a $10 and a half billion loss or maybe

25 it's a $13 billion loss.  There is simply no credible set of

1  facts or circumstances that the IRS has put forth that could

2  in a million years, and I use that excessive phrase carefully

3  here, that could ever generate taxable income that would

4  justify a $24 billion claim.

5          If we have a $24 billion claim in these cases all

6  of the work that has been done to put together the plan of

7  reorganization, put together the disclosure statement,

8  structure the compensation of the tens of thousands, the

9  millions of victims here, all of that is going to have to be

10 put on a shelf until we deal with the issues that have been

11 raised by the sheer magnitude of the IRS.  That is why we are

12 here today, Your Honor.

13         So, what about the IRS claim? I think what we need

14 to do is start with just Form 410, it's a proof of claim.

15 What has the IRS done?  The IRS, like every other creditor,

16 must submit a proof of claim. We can't lose sight of the fact

17 of the title of that document. It is an official form.  At

18 the top it says proof of claim. It doesn't take a lawyer to

19 understand that when you submit the claim you must supply

20 proof.  The Internal Revenue Service has not done that.

21 There is not a single bit of proof attached to any of the

22 claims that they have filed. There are line items with

23 numbers and every one of those numbers has a footnote that

24 says estimated, subject to review; every single one.

25         I understand that the United States Government,

1   and in particular the IRS, is given the benefit of the doubt

2   in many circumstances in terms of the timing with which they

3   file pleadings and the amount of work that is put into them.

4   I understand that they are overworked and underpaid.  But the

5   Internal Revenue Service is an enormous institution and it is

6   part of the Department of Treasury.

7          What we are talking about here is not particularly

8   complicated things. The bankruptcy system is put in place to

9   compel creditors to actually come to the Court with proof.

10  The bankruptcy system provides government claimants with more

11  time than regular claimants.  What we have here is a case

12  that was filed in November of 2022.  The Internal Revenue

13  Service has been in contact with the debtors, their

14  professionals, and Ernst & Young through the course of 2023.

15         As the declaration of Mr. Shea from Ernst & Young

16  makes clear, thousands of information discovery requests have

17  been submitted by the IRS, and responded to, and processed by

18  Ernst & Young on behalf of the debtors, thousands.  We have

19  had extensive correspondence with the Department of Justice

20  on behalf of the Internal Revenue Service.  We have

21  continually asked for a credible, not just credible, any

22  explanation of why the claims, the numbers that are submitted

23  with the claims, are -- how there is any support for those.

24  We have been --

25         THE COURT:  I'm sorry. If you are on Zoom leave

1  Your camera off, please.  If you turn Your camera on I am

2  going to remove you from the Zoom call.  It's becoming very

3  distracting.

4          I'm sorry, Mr. Bromley.  Go ahead.

5          MR. BROMLEY:  So, Your Honor, this has been an

6  ongoing exercise, right.  So we are not here looking, as the

7  Internal Revenue Service intimates in their objection, for

8  some extraordinary relief that is outrageous in light of all

9  of the unanswered discovery requests that have been

10 outstanding from the Internal Revenue Service.  We have been

11 engaged in a constant dialogue.  Now notwithstanding that

12 dialog we have not gotten any answers.

13         The way the system is supposed to work is that

14 creditors are supposed to file a claim.  When I am

15 representing a creditor, and indeed I just worked last week

16 on a proof of claim submitted by my own firm in a bankruptcy

17 in the District of New Jersey where we have a claim because

18 we had represented the company and hadn't been paid. I am

19 focused on making sure that I am complying with the basic

20 instructions that are encompassed by the title of the

21 document which is proof of claim.  I am providing the

22 information, the retention agreement, the document, the time

23 records, the invoices that we submitted that support our

24 proof of claim.

25         Now, is it different with respect to the Internal

1  Revenue Service, and, Your Honor, I submit that it's not.  We

2  are all taxpayers here in the United States, right.  We file

3  tax returns and until the tax return is objected to by the

4  taxing authority that is the evidence of, prima facie

5  evidence, of the amount of tax that is owed. It is incumbent

6  on the taxing authority to tell the taxpayer what is wrong

7  with the tax return, if anything.

8         This is a circumstance, Your Honor, where we are

9  have submitted all of the tax returns for '20, '21, '22.  The

10 Internal Revenue Service, that is what they do, they review

11 tax returns and they decide whether or not there is anything

12 to challenge.

13        I understand that in large corporate situations

14 the strategy and the policy might be, well, we are going to

15 take our time.  We are going to conduct an audit.  We are

16 going to look at this information, we are going to ask for

17 things.  Well, in many respects that process has taken place.

18 We have thousands of information requests that have been

19 responded to. There are a few that are outstanding and they

20 will be satisfied by January 15th.  Just so Your Honor can

21 get a sense of what is outstanding, the outstanding requests

22 relate to issues like travel and food reimbursement expenses.

23        So, Your Honor, the type of information that is

24 being sought and remains outstanding is things like did they

25 really have Tabbouleh Hummus for dinner and charge for a

1   steak dinner.  It's that type of backup that is the subject

2   of the requests that are outstanding. We will have that

3   information for them no later than January 15th.

4         Now, the IRS has submitted, in connection with

5   this after we filed our motion, a list of discovery requests.

6   Those discovery requests given the impression that there is

7   another enormous world of information.  Well, let's look at

8   that because it relates to two different worlds.

9         The first world is we filed tax returns. The way

10  the proof of claim process works is that if you think our tax

11  returns are wrong tell us why you think they're wrong and

12  file some proof.  The proofs of claim that have been filed in

13  these cases have no words, they have numbers, other than

14  estimates. We are looking at it.  It doesn't say what we are

15  looking at or why we are looking at it, why we think it could

16  be this, or why we think it could be that.

17        Your Honor, one of the proofs of claim that was

18  filed by the IRS is with respect to Alameda Research LLC.

19  It's really interesting to look at because if you look at the

20  tax that is alleged with respect to the year 2022 it simply

21  takes the number from 2021 and then multiplies it by $1.5 to

22  the penny.  When you look at the numbers for 2023, the claim

23  that is alleged, they simply take the number from 2022 and

24  they multiply that by 1.5 to the penny. This doesn't show the

25  type of work or thoughtfulness that allows the debtors to

1  have any basis to object.  We don't know what the claim is

2  other than the dollar amount.

3  So, Your Honor, when we are sitting here today

4  we're looking at that from the perspective of all of the

5  momentum that is moving forward to bring these cases to

6  conclusion, to be able to distribute dollars and cents to

7  victims, individuals, many of whom are on our line now and

8  have been on line for so many hearings throughout the course

9  of this case.  The only way that we are going to be able to

10  implement the plan of reorganization and to start putting

11  money into the hands of these individuals is if we deal with

12  the IRS claim.

13  How big is the IRS claim in respect of our claims

14  pool?  It's over 50 percent of the claims pool.  When you

15  take our creditor claim -- I'm sorry, customer claims and our

16  non-customer claims and you add them together and divide it

17  by two it's the Internal Revenue Service with zero support,

18  without a word that tells us why anything that they have --

19  any number that they have alleged has a basis in fact.  All

20  of our proofs that we have submitted to the internal revenue

21  service says that we have $11 billion of losses.  So, what

22  the Internal Revenue Service has to do is zero out every one

23  of those $11 billion of losses and on top of that prove up

24  $24 billion of cash obligations.

25  Now, in their objection the Internal Revenue

1  Service largely says, look, we need more information and it

2  could be zero, it could be $24 billion, it could be some

3  other number.  We don't have the ability within the system to

4  accommodate that kind of approach.  It's not justified by the

5  law and the facts here compel a substantially different

6  answer.

7          So, what we are looking at, Your Honor, is we are

8  looking for an estimation schedule.  We believe that these

9  claims are rife, perfect for estimation. They are

10 unliquidated.  Quite incredibly, the Internal Revenue Service

11 in the first sentence of their objection says that these

12 claims are liquidated because we have the information

13 somewhere in the debtors' records that would allow them to

14 calculate the number with specificity.  They completely

15 ignore the fact that we have filed tax returns which say we

16 have $11 billion of losses. We have already given them the

17 information.

18         The way this tennis game is played we hit the ball

19 over the net to them by filing a tax return, they hit the

20 ball over the net back to us by saying we have looked at Your

21 tax return and we disagree with it for these reasons. Then we

22 look at that and we hit the ball back over and say these

23 reasons don't count for these reasons and so on.  We have

24 filed the tax returns. It is now their time to tell us what

25 is wrong with them.  The idea that they don't have sufficient

1  information and they haven't had sufficient time is simply

2  not credible.

3         Now, Your Honor, what are we looking for?  Well,

4  we are looking for something that is a timeline that is set

5  forth in our motion.  We believe that by mid-January they

6  should be able to tell us, with specificity, we should be

7  able to have a process that leads us to an estimation hearing

8  in mid to late February.  We believe that that is appropriate

9  under the circumstances and we completely dispute any

10  allegation that the IRS has made that there is information

11  that they need in order to take the first step.  It is simply

12  not the case.

13         The way this works is we file tax returns, they

14  object to those tax returns by telling us what is wrong and

15  then we respond to those objections.  We cannot bear a double

16  burden of both filing tax returns and then looking at these

17  completely naked proofs of claim which have infinity numbers

18  attached to it and then somehow try to credibly object to

19  things that we don't even know are being alleged. Now, I

20  understand that these are big cases and complicated cases and

21  I understand that the Internal Revenue Service is a large

22  organization.  We happening to be dealing be the regional

23  office in Nebraska for some reason.  I don't know why, and

24  I'm not criticizing it, but that's who we're dealing with.

25         This is such an enormous number.  It is such an

1  obstacle to the implementation of a plan of reorganization

2  and the delivery of recovery to the victims that we need the

3  attention of more than just the office in Nebraska.  We have

4  made inquiries of the Internal Revenue Service about their

5  willingness to resolve these issues in different ways.  The

6  Internal Revenue Service would agree that they would

7  subordinate their claim to the creditor claims, the other

8  creditor claims, that we could have a conversation about that

9  and we've been willing to do it.  They have been unwilling to

10 have that conversation.

11        We'd be willing to have a conversation with the

12 Internal Revenue Service about trying to deal with something

13 that is more rationale than a $24 billion claim.  I will note

14 that it started out as a $44 billion claim and is now down

15 to 24.  That's progress, but it's still a number that's a

16 complete obstacle to moving forward with the plans of

17 reorganization.

18        So, what we need the Internal Revenue Service to

19 do is to fit in to the system that everyone else has to

20 comply with.  If we were dealing with commercial creditors

21 who were filing unsupported, unsubstantiated claims of this

22 magnitude, we would be compelled to not only move to dismiss,

23 but also to seek sanctions.  Because the obstacles that are

24 being created by filing unsubstantiated, unsupported

25 outlandish claims is that we are going to create additional

1 administrative expense to fight them.  That's all this is.

2          We're not asking for any of that with respect to

3 the Internal Revenue Service.  We understand their role,

4 their obligations.  But that doesn't mean that they have to

5 play by the rules.  They have to play by the rules.  They

6 have to realize that this is a case that everything that they

7 think and breathe has an impact on tens of thousands,

8 millions of creditor claims and they have to stop acting as

9 if what they do has no impact on anyone else.

10          Right now, the single largest obstacle to moving

11 forward with distributions to creditors is the Internal

12 Revenue Service and so we need a process, here in this court,

13 Your Honor, with due respect, that forces them to actually

14 engage.  And the way to force them to engage is to put them

15 on a tight leash and a short schedule that forces the issue

16 to be addressed.  Perhaps the way that gets addressed is once

17 that schedule gets set, we could have discussions in

18 Washington to see if there's a way to settle this.

19          But without that sort of schedule and without that

20 sort of compulsion, we're simply going to be stuck in

21 Nebraska and we can't afford to be stuck in Nebraska anymore,

22 Your Honor.  Our creditors can't.  The victims of Sam

23 Bankman-Fried's fraud cannot for the record to be stuck in

24 Nebraska.

25          So, Your Honor, that's where we are from the

1  debtors' perspective.  We have submitted two declarations in

2  support of the motion:  one of Mr. Edgar Mosley, who you have

3  seen before in court and who has testified -- he's sitting

4  here and is ready to testify if there are any concerns, so

5  we'd like to move Mr. Mosley's declaration into evidence.

6  Also in court is Mr. Thomas Shea of Ernst & Young.  He's not

7  been before you, Your Honor, but he is similarly here and

8  ready to be questioned if there are any concerns, but we

9  would like to move his declaration into evidence, as well.

10           And as you see, the declarations are each for very

11  limited evidentiary purposes, but consistent with our

12  obligations to the Court, we have them here and they're ready

13  to testify, if necessary.

14           And with that, Your Honor, I would take any

15  questions the Court may have and if not, I would cede the

16  podium to my counsel -- co-counsel from the Creditors

17  Committee.

18           THE COURT:  Okay.  Let me see if anybody has an

19  objection to the introduction of the declarations?

20           MS. BRUCE:  Yeah, we do object to the declarations

21  being entered into evidence, Your Honor.  We'd ask for, at

22  least, for an opportunity to cross them.

23           THE COURT:  I'm sorry?

24           MS. BRUCE:  We'd at least ask for an opportunity

25  to cross the witness.

1          THE COURT:  Oh, you'll have the opportunity to

2   cross if you want, yeah.

3          MS. BRUCE:  Okay.

4          THE COURT:  But, I mean, I can take the

5   declarations as a proffer and then I can open it up to you to

6   cross-examine the witnesses if you'd like?

7          MS. BRUCE:  Okay.  That's acceptable, Your Honor.

8          THE COURT:  Okay.  So the declarations are

9   admitted.

10       (Mosley Declaration received in evidence)

11       (Shea Declaration received in evidence)

12         THE COURT:  And let's go -- we'll finish up with

13  openings here.  I'll hear from the Committee and then I'll

14  hear from the Government and we'll go from there.

15         MR. BROMLEY:  Thank you, Your Honor.

16         MR. PASQUALE:  Good afternoon, Your Honor.  Ken

17  Pasquale from Paul Hastings for the Official Creditors

18  Committee.

19         Your Honor, I'll be very brief.  We find a

20  joinder.  I couldn't agree more with what Mr. Bromley

21  represented, with respect to getting distributions to

22  creditors.  Your Honor, you've heard me at the last number of

23  hearings saying the Committee's primary responsibility, given

24  the status of the case these days, is to expedite

25  confirmation and expedite that distribution process.

1          The IRS claim is, as Mr. Bromley explained, an

2    impediment to the timeline that's been set that, again, the

3    Committee is looking to move even faster than has been set

4    forth.  I don't want to belabor the record in that regard,

5    especially with respect to an opening, Your Honor, but I will

6    mention, and Mr. Bromley quickly mentioned this as well, in

7    the plan support agreement, in the term sheet attached --

8    it's that the Docket 3291 -- the proposed plan, as you'll see

9    this weekend when the plan is filed, does provide for a

10   subordination of government claims, such as the Internal

11   Revenue Service claim.

12          There's not a mention in the IRS' opposition to

13   this motion about that issue, which is, needless to say,

14   significant in the context of the plan that will be

15   prosecuted.  So I think that is a telling omission in the

16   IRS' papers.

17          But for here, I'll just ask the Court if there are

18   any questions and reserve.

19          THE COURT:  No questions at this time, thank you.

20          MR. PASQUALE:  Thank you, Your Honor.

21          MS. BRUCE:  Good afternoon, Your Honor.  Elisabeth

22   Bruce on behalf of the Department of Justice and the IRS.

23          What the debtors are asking here today is

24   essentially to circumvent the bankruptcy process and the Code

25   and what it sets out in terms of what's required to challenge

1  a proof of claim.  They would like to invent additional

2  requirements that the IRS has when it filed its proof of

3  claim, additional things it should have submitted.  It's --

4  those things are made up.  Those things are not actual

5  requirements.

6         What the Code sets forth is what we put in our

7  brief, that when the IRS files its proof of claim, it's

8  presumptively correct and the burden is on the debtors to

9  challenge that presumption.

10        It's also very clear in case law that a tax return

11  alone is not enough to challenge an assessment by the IRS.  A

12  tax return is nothing but a shell; it's a piece of piece of

13  paper with numbers on it and the debtors have the burden to

14  provide support for that tax return.  That is what they would

15  use to challenge the IRS' numbers.  They don't pass that and

16  that's why they're here today on their motion.

17        Now, that being said with their burden, I do think

18  it would be helpful to explain to Your Honor how the IRS came

19  up with their numbers, so I would like to just explain that

20  quickly.

21        THE COURT:  Okay.  Do you have a witness to

22  support this?

23        MS. BRUCE:  We did not bring an IRS witness here

24  today, Your Honor.  I'm happy to explain it to you myself or

25  if we could, at a later date, bring in an IRS witness, but

1  given the short deadline with their motion...

2            THE COURT:  Mr. Bromley?

3            MR. BROMLEY:  Your Honor, we object to any

4  explanation of what the IRS did or didn't consider, unless

5  there's a witness available to be cross-examined.

6            THE COURT:  That's right.

7            I've got to have it evidence.  I can't -- you

8  can't testify.

9            MS. BRUCE:  Okay.  Understood, Your Honor.

10            So the debtors have not provided the support or

11  substantiation to change the IRS' claim.  They have claimed

12  that E&Y has been working on this and that they have provided

13  thousands of responses to the IRS.  Those expenses have

14  included such things as saying, We don't have support.  So

15  they said, We've responded, but they have not provided

16  support.

17            The debtors are trying to distance themselves from

18  all of their prior filings in this case, from John Ray's

19  reports and saying, Oh, it was a year ago that they said

20  there were no books and records, that there were no corporate

21  controls.  And they're now asking us to somehow believe that

22  John Ray's group has completely reorganized the company, such

23  that even prior information is now reliable.

24            We noted in our brief, even E&Y doesn't believe

25  the prior year's tax returns.  They noted in there when they

1  filed their 2022, that, essentially, they couldn't have

2  signed 2022 tax returns if they were relying on the prior

3  year's tax returns at all.  So, E&Y wants to stay an arm's-

4  length away from these prior returns, but wants the IRS to

5  accept them as face value and just take the numbers as they

6  are with no substantiation behind them whatsoever.

7          I think it's also very telling in Mr. Shea's

8  declaration that the responses they list, not one of them

9  include anything for the 2022 tax returns.  Now, the IRS has

10 not issued official IDRs for those, but they have been in

11 contact with E&Y.

12         I personally spoke with Mr. Shea and asked him to

13 provide support for that, given the emphasis from both, the

14 debtors and us, on speed and to prioritizing -- to prioritize

15 providing that information.  The IRS has not received any

16 support whatsoever for those 2022 tax returns, which EY filed

17 in August.  They knew very well in August that the IRS was

18 auditing them and that information would be necessary.  It

19 has not yet been provided.

20         The timeline that the debtors are suggesting here,

21 first of all, estimation, we don't believe is even

22 appropriate in this case, Your Honor.  Estimation hearings

23 are appropriate when the claim is difficult to quantify.

24 When you're dealing with something like emotional distress,

25 that it's like, how can anybody even assign a value to that.

 1  We're dealing with numbers here.  We're dealing with taxes.

 2  We're dealing with income taxes, employment taxes; these are

 3  numbers that can be calculated.  We don't have to ask

 4  somebody to assign a value to them.  They can be calculated.

 5         The problem is that the debtors don't have the

 6  support they need.  That's a different problem.  That doesn't

 7  mean estimation is appropriate here.

 8         Even if Your Honor finds that estimation is

 9  appropriate, the deadlines that they're proposing is somewhat

10  preposterous.  EY filed these returns in August and has yet

11  to provide the support.  It's taken them months to work on

12  it, but the debtors think they can give us 21 days to do all

13  of our discovery, review all of that support, conduct

14  depositions, do a 30(b)(6) of EY; all of that, they think we

15  only need 20 days for.

16         There's no reason for this emergency.  It's

17  completely fabricated by the debtors.  If they wanted to deal

18  with the IRS claim, they could have done it when the IRS

19  filed any time April.

20         If they wanted to present Your Honor with nothing

21  more than tax returns with no support, they had those tax

22  returns in August.  Why didn't they file something in August?

23         The claims bar deadline was at the end of

24  September.  If they wanted to wait until then, they could

25  have filed something in September.

1        Now they choose to file this motion a week before

2   their proposed plan and their own self-imposed deadlines and

3   say that because of that, because of the plan support

4   agreement, which we weren't a party to, which they did not

5   bring us in on, because of all of that, they need this

6   impossibly rushed and truncated schedule that deprives us of

7   the opportunity to actually litigate this claim.

8        If Your Honor wants to move this along, we'd

9   suggest that you give the debtors a deadline and say, You

10  know what, in 21 days, EY needs to provide the rest of what

11  is owed to the IRS.

12       And what's owed, Your Honor, all the support for

13  2022, all the support.  They filed those returns.

14       Some partner must have been looking at support

15  when they signed his name on that return.  Where is that

16  support?  We have not been provided it.  They should give

17  that to us.

18       What else should they give us?  EY has told the

19  IRS that they will not support the prior year's tax returns.

20  So they have three options.  They can tell the IRS, We don't

21  support for them, so do what you will with them or they can

22  amend them or they can say, You know what?  Those returns are

23  good.  We'll sign them.  We'll support them.  Do one of those

24  things and then tell the IRS:  We're done.

25       So if they had spent this enormous amount of work

1  that they say they have -- and I'm not disparaging EY, I know

2  that it's an unprecedented situation with the company -- but

3  they need to give the IRS a finite universe of information.

4  The reason it's taken so long is because the IRS makes a

5  request, they give them a lot of time.  They come back, they

6  say, Oh, well, we only gave you what you asked for.  You

7  haven't asked for 2022 support yet, because the returns

8  haven't technically been processed, all of those

9  technicalities.

10       Let's do away with the technicalities.  Let's tell

11  the debtors, You know what?  You're touting your returns so

12  highly, give the IRS all the support for them and tell them

13  when you're done.  Tell them when you've given them

14  everything you've got.  And then from that date, from the

15  date they tell us they're done, give us at least three, four

16  months to review it and then we'll come and we'll have a

17  hearing on it.

18       But to come up and say, you know, it's on the IRS

19  to come and put forward all of their information when EY has

20  not provided all the support for it.  It is just flipping

21  everything on its head, Your Honor.  It's misrepresenting who

22  has the burden here.  It's misrepresenting who has the

23  ability to provide the information.

24       This is a one-way street.  It's always that case.

25  When a tax return is filed, the taxpayer has all the

1  information.  It's on them to provide that information to the

2  IRS.  It's not on the IRS to make up a number.  So --

3           THE COURT:  But isn't that what you did?  Where

4  did the $24 billion come from?

5           MS. BRUCE:  Well, it started with the tax returns

6  filed by the debtors and they've made adjustments based on

7  the lack of information that they've received.

8           So that's what I was going to attempt --

9  basically, Your Honor, it's based on what they found in the

10 pleadings, which relates to misappropriation of income and

11 underreported income and --

12          THE COURT:  But how do you know that?  How do you

13 know it's underreported?

14          MS. BRUCE:  It was in the filings, Your Honor, the

15 fact that they had no books and records.  The company was

16 rife with fraud.  They were stealing money, so they were

17 taking cash from customers, reporting it as deposits, and

18 using it to run the business.

19          THE COURT:  So you're assuming --

20          MS. BRUCE:  That's deposits, not income.

21          THE COURT:  -- you're just making assumptions?

22          MS. BRUCE:  Well, those were facts that were filed

23 with this Court, Your Honor.

24          THE COURT:  What facts?

25          MS. BRUCE:  In John Ray's report.

1     THE COURT:  All they're saying is there was fraud

2 in the company and somehow that turns into a $24 billion tax

3 claim.

4     MS. BRUCE:  It's the application of those facts to

5 their tax returns, to the ones that they had that were filed,

6 and then they did have to make estimates for later years.  At

7 the time, they didn't have any tax returns for 2022 --

8     THE COURT:  All right.

9     MS. BRUCE:  -- in April.

10     So, essentially, Your Honor, EY doesn't trust the

11 returns.  Everyone has said the company doesn't have books

12 and records, that it was a fraud.  But the debtors think that

13 the IRS should be forced to accept nothing but a single page

14 of a tax return and say, This is gospel.  But when you ask --

15 when the IRS asks for support, we don't have it, but you

16 should just take this as gospel.

17     When they know that the IRS is going to be

18 auditing those returns and they have months to provide that

19 support, they don't do it, but we're just supposed to take

20 that tax return in and accept it.  I think that expectation

21 of the IRS is preposterous and they're expecting treatment

22 that no other taxpayer would get.

23     And they know that.  They put in their pleadings,

24 they complain that they're being treated like every other

25 taxpayer; that's their complaint in their pleading.

1          We're treating them like every other taxpayer; we

2     are expecting them to substantiate their tax returns.  So if

3     that's their biggest complaint, then that is what the IRS has

4     done.  The IRS does expect them to substantiate.

5          THE COURT:  Okay.

6          MS. BRUCE:  So we would ask that you deny their

7     motion, Your Honor.  To the extent you find an estimation

8     hearing is appropriate, we would ask that you would approve a

9     schedule, similar to what we propose, where you give them a

10    deadline to provide us information and then provide us a

11    reasonable amount of time to review it and to prepare for a

12    hearing.

13         THE COURT:  All right.  Thank you.

14         MS. BRUCE:  Thank you.

15         THE COURT:  Do you want to cross the witnesses?

16         MS. BRUCE:  Mr. Shea, we would like to cross, yes.

17         THE COURT:  Okay.  Mr. Shea, do you want to step

18    forward, please.

19         Can you please come forward, take the stand, and

20    remain standing for the oath.

21         THE CLERK:  Please raise your right hand.

22         Please state your full name and spell your last

23    name for the record, please.

24         MR. SHEA:  Thomas Michael Shea, S-h-e-a.

25         THOMAS MICHAEL SHEA, DEBTORS' WITNESS, AFFIRMED

1          THE WITNESS:  Yes.

2          THE CLERK:  You may be seated.

3          Your Honor?

4          THE COURT:  Okay.  Go ahead.

5                    CROSS-EXAMINATION

6   BY MS. BRUCE:

7   Q     Good afternoon, Mr. Shea.

8   A     Good afternoon.

9   Q     What is your current place of employment?

10  A     Ernst & Young, LLP.

11  Q     And what's your role there?

12  A     I am a principal in our tax practice.

13  Q     Mr. Shea, do you recall having a phone conversation

14  with me and David Harrington from Sullivan & Cromwell in

15  October?

16          MR. BROMLEY:  Objection, Your Honor.

17          Mr. Shea's declaration is the direct testimony.

18  Anything that's outside of the four corners of the

19  declaration are outside the scope of cross.

20          THE COURT:  Can you -- I don't know if we're

21  picking you up on that one.

22          MR. BROMLEY:  I'm sorry, Your Honor.

23          James Bromley of Sullivan & Cromwell.

24          The appropriate subject for cross-examination is

25  the declaration, which forms his direct testimony, so we'd

1  ask that the IRS focus on the declaration.  The idea that

2  she's going to ask questions about a conversation that she

3  had with Mr. Shea is certainly not within the four corners of

4  the declaration.

5           MS. BRUCE:  Your Honor, it does go to how E&Y has

6  been responding to the IRS, what they've been aware of, and

7  what responses they have provided.

8           THE COURT:  But you're going to --

9           MR. BROMLEY:  Objection for lack of foundation,

10  Your Honor.

11           THE COURT:  But you're going to ask him questions

12  about a conversation he had with you?

13           MS. BRUCE:  Yes, Your Honor.

14           I would like to know whether -- it goes to whether

15  he was aware of information that the IRS needed.

16           THE COURT:  Then, doesn't that make you a witness?

17           Because if you're going to ask him that question,

18  I'm going to let him cross-examine you, which means you can't

19  argue this case.

20           MS. BRUCE:  Okay.  Then I can you the question,

21  Your Honor.

22           THE COURT:  Okay.

23  BY MS. BRUCE:

24  Q    Mr. Shea, do you have your declaration available?

25  A    I do over in my seat.

1  Q     Okay.

2              MS. BRUCE:  If we could get you a copy of it?

3              MR. BROMLEY:  Your Honor, may I approach?

4              THE COURT:  Yes.

5  BY MS. BRUCE:

6  Q     If you could look at paragraph 6 of your declaration,

7  Mr. Shea, in this paragraph, you summarize the requests that

8  E&Y has received from the IRS; is that correct?

9  A     Yes.

10 Q     In the table that you list here, are any of these

11 requests related to the 2022 year for income tax?

12 A     No.

13 Q     Has E&Y provided any support to the IRS for the 2022

14 tax years?

15 A     No.

16 Q     Have -- has the IRS asked you for support for the 2022?

17 A     Not through an additional IDR.

18 Q     Have they asked you informally?

19 A     Yes.

20 Q     Have you been working with them to provide that support

21 for 2022?

22 A     Yes.

23 Q     How long have you been working with them to provide

24 that support?

25 A     Specifically, over the last few weeks.

1   Q      When do you anticipate being able to provide them that

2   support?

3   A      Friday, December 15th.

4   Q      And what support is it that you will be providing on

5   that date?

6   A      It will be document requests that are similar to what

7   we have provided for the previous taxable periods.

8   Q      Will it include support for the losses claimed on the

9   turns?

10  A      Yes.

11  Q      Will it include support for the expenses claimed on the

12  tax returns?

13  A      Yes --

14  Q      Will --

15  A      -- to the extent there are expenses we can support,

16  yes.

17  Q      Are there expenses on the tax return that you are

18  unable to support?

19  A      I'm -- I don't remember.  I don't recall all the

20  details of that.

21  Q      So you're not sure if there are expenses there that

22  will be unsubstantiated?

23  A      I believe if there were expenses that were

24  unsubstantiated, we have already considered that in the filed

25  returns.

1   Q      Okay.  But it is true that, as of today, the IRS has

2   not received any support for the 2022 tax returns?

3   A      That is correct.

4   Q      In regards to the 2021 and 2020 tax returns, has E&Y

5   signed off on those returns in any way?

6   A      We have not been asked to sign off on the returns.  We

7   have assisted with the compilation of information to provide

8   to the IRS.

9   Q      Does E&Y believe that those returns are accurate?

10  A      We believe that there are, potentially, adjustments in

11  those returns.

12  Q      So you believe that the returns do need to be amended?

13  A      Amended or adjusted through the audit process, yes.

14  Q      Is there support that the IRS requested for those

15  returns that E&Y has been unable to provide?

16  A      Some questions we have been unable to provide support

17  for.

18  Q      What type of request?

19  A      I don't recall offhand.

20  Q      I have an example of one that I can provide you.

21          MS. BRUCE:  May I approach?

22          THE COURT:  Yes.

23          Do you have a copy for me?  Thank you.

24  BY MS. BRUCE:

25  Q      Mr. Shea, if you could take a moment and look at this

1  document and let me know if you recognize it.

2  A     I do, yes.

3        But I, admittedly, I -- you know, we have a team full

4  of professionals that are involved with compiling all of this

5  information.

6  Q     Is John Healy, who has signed this return, is he on

7  your team as E&Y?

8  A     Yes.

9  Q     And he's working on the FTX audit?

10  A     Yes.

11  Q     This, at the top here, it says, "FTX response to IRS

12  information document request."

13        So is it accurate to say that this document is a

14  response that your team at E&Y provided to the IRS?

15  A     Yes.

16  Q     Could you please turn to the third page of the document

17  I just provided you, and could you read the response under

18  number 16.  Could you read the title of number 16, what was

19  asked for, and then the response.

20  A     "See response 11.  Invoices for business expenses were

21  not stored in any centralized location and are unavailable."

22  Q     And the request, what number 16 was asking for, the

23  description of that, could you read that.

24  A     "Details and substantiation for all expenses."

25  Q     So, is it fair to say that the IRS requested

1  substantiation of all expenses and in response to that, your

2  team said that the expenses were not stored in a centralized

3  location and are unavailable.

4       Is that an accurate representation?

5  A    Yes.

6       And this is with respect to, specifically, the entity,

7  Alameda Research, LLC.

8  Q    And that's if you look in the upper left-hand corner of

9  this document, correct --

10 A    Yes.

11 Q    -- you see "Alameda Research"?

12 A    Yes.

13 Q    And the date on this response, what was the date?

14 A    November 30th, 2023.

15 Q    I don't know, do you have any idea when the debtors

16 filed their motion in this case that we're here on today?

17 A    I believe it was shortly after.

18 Q    Since November 30th, 2023, do you have any reason to

19 believe that this response has changed?

20 A    I do not.

21 Q    So as of today, if you were asked to substantiate the

22 expenses for Alameda Research LLC, E&Y's response would be

23 that they have no support; is that correct?

24 A    Yes.

25 Q    I also have excerpts of the 2022 tax return that E&Y

1  prepared.

2          MS. BRUCE:  If I could approach, Your Honor?

3      (No verbal response)

4          THE COURT:  Thank you.

5  BY MS. BRUCE:

6  Q     Mr. Shea, do you recognize this document?

7  A     Yes.

8  Q     What is it?

9  A     It is the 2022 tax return for Alameda Research LLC.

10 Q     And this tax return was prepared by your firm E&Y,

11 correct?

12 A     Correct.

13 Q     If you could flip to, I believe it's about eight pages

14 in, and on the lower right-hand corner of the document, it

15 says "statement 16."

16 A     Yes.

17 Q     Could you just take a moment to read this so I can ask

18 you a question about it.

19 A     Yes.

20 Q     This is a footnote that was included in the 2022 tax

21 return that your firm filed, correct?

22 A     Correct.

23 Q     Does this footnote say that none of the prior year net

24 operating losses were being utilized for 2022?

25 A     Correct.

1   Q      If the 2022 tax return had utilized the prior year net

2   operating losses, would you have signed the tax return?

3   A      I can't say we didn't deal with that situation.

4   Q      What was the purpose of including this footnote in the

5   tax return?

6   A      It was to alert of basically what I declared that we do

7   anticipate possible adjustments to prior year returns.

8   Q      If you could flip one more page over, Mr. Shea, this is

9   the beginning of several pages of support here.  Do you

10  recognize this --

11  A      Yes.

12  Q      -- schedule?  Is this a schedule that was included in

13  the 2022 tax return?

14  A      Yes.

15  Q      And is it the support for the capital loss that was

16  claimed on the 2022 tax return for Alameda?

17  A      It is a summary of the losses.

18  Q      On the right-hand column where the heading says

19  proceeds, slash, basis, right underneath that, could you read

20  me what it says right below that?

21  A      Further details available upon request.

22  Q      Has the IRS requested these details?

23  A      Yes.

24  Q      Have they been provided?

25  A      We have started previewing that information on some of

1   the weekly calls with them.  So we've gone through the format

2   to make sure that it's everything that they're looking for

3   and we're working with them on a way of transmitting that

4   data because it is rather substantial.

5   Q     But, I'm sorry, just to pinpoint your answer, that data

6   has not been provided to the IRS; correct?

7   A     It has not yet.

8   Q     Okay.

9             MS. BRUCE:  Your Honor, I'd like to move the

10  information document request in as Exhibit 1 and the excerpts

11  of the tax return in as Exhibit 2.

12            THE COURT:  Any objection?

13            MR. BROMLEY:  We would say the entire tax return

14  rather than excerpts of it.

15            THE COURT:  I'm sorry?

16            MR. BROMLEY:  Your Honor, the entire tax return

17  rather than excerpts.

18            THE COURT:  Do we have the entire tax return?

19            MR. BROMLEY:  Well, the entire document that has

20  been provided.

21            MS. BRUCE:  I didn't print out copies of the

22  entire tax return, Your Honor, I can --

23            MR. BROMLEY:  So these are just the --

24            MS. BRUCE:  -- provide it electronically.

25            MR. BROMLEY:  So these are the excerpts that

1  you're seeking, the ones that we have in our hands?

2          MS. BRUCE:  Those are just the excerpts that we're

3  seeking to introduce.

4          MR. BROMLEY:  So the question, the entire document

5  I have in my hand is what you're seeking to --

6          MS. BRUCE:  That's correct.

7          MR. BROMLEY:  -- move in?

8          MS. BRUCE:  Yes.

9          MR. BROMLEY:  Okay.  We don't have an objection to

10  that, Your Honor.

11          THE COURT:  Okay, they're both admitted without

12  objection.

13      (IRS Exhibits 1 and 2 received in evidence)

14          MS. BRUCE:  I have no further questions at this

15  time, Your Honor.

16          THE COURT:  Okay, thank you.

17          Redirect?

18          MR. BROMLEY:  Your Honor, I just have a few

19  questions.

20                    REDIRECT EXAMINATION

21  BY MR. BROMLEY:

22  Q    Mr. Shea, so the question that Counsel for the IRS

23  asked you about further details available upon request,

24  that's the information you're going to provide on Friday?

25  A    That's correct.

1  Q     That's two days from now, right?

2  A     Yes.

3  Q     And the information requests that are outstanding with

4  respect to the 2022 tax year, I think you mentioned that they

5  were not the subject of official IDRs?

6  A     That's correct.

7  Q     So, notwithstanding the lack of official IDRs, Ernst &

8  Young has been complying with informal requests to produce

9  materials, correct?

10 A     Correct.

11 Q     And that's going to be produced on Friday?

12 A     Yes.

13 Q     Now, Ernst & Young has reviewed the tax returns for

14 2020 and 2021, correct?

15 A     Correct.

16 Q     And the -- what is the dollar amount of the losses

17 relating to the tax years 2020, 2021, and 2022?

18 A     In total, about $11 billion.

19 Q     And the question that was asked to you with respect to

20 the Alameda Research set of questions, do you recall that --

21 A     Yes.

22 Q     -- Mr. Healy's document?  Item 16, detail of the

23 substantiation for all expenses, do you see that?

24 A     Yes.

25 Q     Yeah.  How many -- with respect to the business

1  expenses for these debtors that relate for this debtor,

2  Alameda Research, has Ernst & Young calculated them in the

3  billions of dollars?

4  A      No.

5  Q      Can you give a ballpark of what the business expenses

6  are?

7  A      It's tough to estimate.  I mean, if we go off what's in

8  2021, I mean, there's about 34 million.

9  Q      About 34 million?

10  A      Yes.

11  Q      Not billion?

12  A      Right, in -- yes -- I'm sorry, in 2022, the return I'm

13  looking at.

14  Q      And the corporate tax rate that's applied to Alameda

15  Research, LLC?

16  A      Twenty one percent.

17  Q      Twenty one percent?  So if $34 million of business

18  expenses were reclassified as taxable income, you'd apply a

19  21-percent interest rate to that?  So 21 percent of $34

20  million is how many billions?

21  A      It's a couple million --

22  Q      A couple million?

23  A      -- about six, six and change.

24  Q      Thank you.

25         Now, there was a reference in the earlier testimony

1  about potential adjustments, do you anticipate that any

2  potential adjustments will have a material impact with

3  respect to creating incremental additional tax liabilities

4  for the debtors?

5  A     No.

6          MR. BROMLEY:  Thank you, Your Honor, I don't have

7  any further questions --

8          THE COURT:  Okay, thank you.

9          MR. BROMLEY:  -- for Mr. Shea.

10         THE COURT:  Thank you, Mr. Shea.  You may step

11  down.

12         THE WITNESS:  Thank you.

13         THE COURT:  Any other evidence?

14         MR. BROMLEY:  No further evidence from the

15  debtors, Your Honor.

16         MS. BRUCE:  Not from us, Your Honor.

17         THE COURT:  Okay.  The openings were kind of

18  argument, but does anybody want to make some final comments

19  before we finish up?

20         MR. BROMLEY:  Very briefly, Your Honor.  We think

21  that this is additional evidence of the compelling need to

22  move this exercise forward and with dispatch.

23         The Internal Revenue Service has it backward.

24  These have -- the idea that a taxpayer files a tax return and

25  the Internal Revenue Service has the ability to ask endless

1  questions about irrelevant issues while asserting claims that

2  are literally to infinity and beyond simply have no

3  credibility.

4          There are two processes that we're talking about

5  here, one is dealing with taxpayer process and the other is

6  talking about bankruptcy process.  The Bankruptcy Court is

7  the place where those two processes come together for a

8  practical solution.

9          Now, the Internal Revenue Service says that this

10 is a motion for estimation.  Well, Your Honor, we could have

11 simply filed a motion -- the equivalent of a motion to

12 dismiss.  Once a proof of claim is filed, yes, it is deemed

13 valid until objected to.  There is no basis for these claims,

14 zero.  The idea that -- we need to move the process forward.

15 So whether we refer to this as an estimation proceeding or a

16 motion to dismiss for failure to state a claim is kind of

17 irrelevant.  We need to have a process to come to a

18 conclusion.  That conclusion needs to be obtained quickly, so

19 that the victims of Sam Bankman-Fried's fraud can be

20 compensated and receive payment.

21         The Internal Revenue Service has decided, in its

22 wisdom, to simply put numbers which have no basis in fact and

23 those numbers are so large, so astonishingly large, that it

24 creates a complete obstacle to moving forward with a plan of

25 reorganization.  It can't happen, it can't be allowed.  We

1  can't have a situation where the Internal Revenue Service is

2  allowed in its own bureaucracy to hold up the movement

3  forward of these cases, and they need to be able to be

4  brought in front of this Court and have a credible, logical

5  objection to what the debtors have put forward.  The Internal

6  Revenue Service has none.  They've made some allegations

7  about misappropriation, this or that.

8           Your Honor, I don't know of any American taxpayer

9  that could owe $24 billion.  I don't know if you took Apple

10 and Tesla and Amazon all together if they were going to have

11 to pay that sort of amount of money for taxable profits

12 earned in the United States over the past four years.  I

13 doubt it.

14          And, you know, the questions that have been asked

15 is -- you know, go to completely irrelevant issues.  The

16 magnitude of their claim -- if they were sitting here today

17 and had a $5 million claim or a $10 million claim, we

18 wouldn't be asking for this kind of expedited treatment

19 because it's something that could be worked through and dealt

20 with in the process.

21          The sheer size of their claim is the reason why we

22 have to deal with it on an expeditious basis.  So the

23 rationale that they use to say that we shouldn't be moving

24 forward fast is exactly the reason why we have to.  And, you

25 know, it is disappointing that there is no explanation

1  whatsoever.  And even with Ernst & Young on the stand, the

2  only thing that we can point to is a failure to back up some

3  expenses that might add -- you know, yield to a 21-percent

4  tax on $34 million of expenses that can't be supported.  You

5  know, if that's what we need to do to deal with a claim of

6  that magnitude, sure, we can deal with that, but to sit here

7  and try to imagine how one would say $24 billion is the wrong

8  number, you know, is simply -- it's simply not anything that

9  we, the debtors and the creditor constituency, should have to

10 bear.  The Internal Revenue Service has to say why they think

11 the tax returns are wrong and why they think any dollar

12 amount of taxable income exists and taxes are owed on it.

13         We have filed tax returns which show $11 billion

14 worth of losses.  The Internal Revenue -- it's supported by

15 tax returns prepared by one of the leading tax preparers and

16 experts in crypto-tax in the world, and the fact that they

17 haven't signed on to two years of tax returns that were

18 prepared by other accountants is self-evident.  But have they

19 provided the backup and support?  Yes.  And did they feel

20 that there are adjustments?  Perhaps.  Will those adjustments

21 have any material impact on the tax profile of these debtors?

22 No.

23         The fact is, is that that's the evidence here

24 today, that will be the evidence in February.  And if the

25 Internal Revenue Service wants to put something else out

1  there that we can respond to, this is the time to do it, and

2  we believe the schedule that we have proposed is the

3  appropriate schedule under the circumstances.

4            Thank you, Your Honor.

5            THE COURT:  Thank you.

6            Mr. Pasquale?  Let me have Mr. Pasquale first.

7            MR. PASQUALE:  Thank you, Your Honor, Ken Pasquale

8  for the committee, very quickly.

9            Counsel mentioned in her opening that the way the

10 IRS views the schedule for litigation is it should be that

11 E&Y turns over some information on behalf of the debtors and

12 then, three to four months later, the IRS will get back to

13 us.  Well, Your Honor, by that stage in these cases, we

14 should be really at the finish line, not starting, and that's

15 just unacceptable.

16           The other comment I just wanted to respond to,

17 Your Honor, is this is not like any other situation that the

18 IRS deals with.  This is not just the IRS and the tax filer,

19 this is a bankruptcy debtor, and this is not a two-party

20 dispute, there are all of the creditors of these estates who

21 this issue, this is a gating item for their recoveries.  And

22 so, Your Honor, this is not the situation where the IRS can

23 treat this like any other situation.

24           And so we fully support the motion and ask the

25 Court to impose the schedule that's proposed by the debtors.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Ms. Bruce?

4          MS. BRUCE:  Yes, thank you, Your Honor.

5          The evidence today here has shown that there is

6    significant gaps and lack of support for what the debtors are

7    saying they've given the IRS.  Now, they say it's irrelevant,

8    but I don't think all the support for the 2022 tax returns is

9    irrelevant, I don't think the support for all the expenses

10   claimed on the 2021 and 2020 tax returns is irrelevant.  Any

11   other taxpayer would have to substantiate those returns, it

12   is very relevant.  And the fact that the debtors can't

13   provide it, it's just further evidence that they're here

14   trying to turn the tables and get away from the fact that the

15   burden is on them to support their tax returns.

16         The Bankruptcy Code follows the tax law and the

17   debtors are trying to get away from that.  The estimation

18   hearing they're asking for is the incorrect venue for that.

19   All that the estimation hearing would do is need to follow

20   the tax code.

21         Now, they've brought up other issues about there

22   being victims here, which we are aware of, about

23   subordination being possible, estimation is not the right

24   venue for that.  If they want to address those issues, they

25   could have asked for a mediation or some other avenue, or

1  productively engaged with us in negotiations rather than just

2  saying you guys are either at the bottom of our plan or we're

3  not going to talk further.  So that is not -- the fact that

4  there are victims here is not a reason to hold an estimation

5  hearing, Your Honor.

6         And I think it's very clear that they have not

7  been able to support and meet their burden, and we would ask

8  that you deny their motion on that basis.  And in the event

9  you grant it, provide a reasonable schedule which at least

10 gives the IRS a finite universe of data, in other words,

11 gives the debtor a deadline to finish what they need to do,

12 provide the support -- they say adjustments need to be made,

13 make the adjustments, amend the returns, and then set

14 deadlines from that point.

15        And the IRS is not holding up distributions.  The

16 debtors make it sound like checks would be going out the door

17 tomorrow if it weren't for us; that's not the case.  This is

18 not an emergency situation.  There's an entire claims

19 resolution process that needs to be got through, checks are

20 not going to go out tomorrow if you make our claim zero, Your

21 Honor.  So we respectfully ask that you deny their motion.

22        THE COURT:  Okay, thank you.

23        All right, I'm going to take a short recess, and

24 then I'll come back and give you my ruling on this.  Let's

25 recess until 2:30 and we'll come back.

1        Thank you.

2        (Recess taken at 2:16 p.m.)

3        (Proceedings resumed at 2:33 p.m.)

4            THE COURT:  Thank you.  Please be seated.

5            All right.  There are three questions, actually,

6   before me today, first is whether or not the IRS's claim is

7   subject to estimation under 502(c); two, if it is, what

8   schedule should be imposed for that estimation; and, three,

9   who bears the initial burden of proof at any estimation

10  hearing that might be.

11           On the first question of whether or not estimation

12  is allowed of an IRS claim, I find that it is.  502(c) allows

13  for the estimation of any claim that is unliquidated or

14  contingent.  The IRS's proof of claim is based on estimates

15  only, it is not a solid number, and the testimony I heard

16  today was there's no real basis to make that determination at

17  this point in time.

18           A number of courts have held that in situations

19  where the IRS has filed just an estimate of taxes it is

20  subject to a determination through an estimation process.

21  For example, Revco, D.S., Inc., 131 B.R. 615, 621 (Bankr.

22  N.D. Ohio 1990), determined that debtors could challenge the

23  IRS's estimate of prepetition taxes through either 505 or

24  through 502(c).

25           Also, In re Matter of Carr, 134 B.R. 370 at 373

1  (Bankr. N.D. Nebraska 1991), came to the same conclusion.

2  And also In re Southern Commodity Corp., 62 B.R. 4 at 6

3  (Bankr. S.D. Florida 1986), same conclusion.

4          Therefore, I find that the IRS's claim, because it

5  is based only on estimates, it is subject to an estimation

6  process under Section 502(c).

7          The next question then is, what's the schedule

8  going to be.  The debtors have submitted their proposed

9  schedule, the IRS has requested an additional five to six

10 months -- or four to five months on top of that.

11         As the debtors point out, bankruptcy requires

12 that -- well, bankruptcy is a process that moves quickly and

13 it requires that a debtor -- the debtor here has already been

14 in bankruptcy for over a year and it's a complicated case,

15 obviously, there are complicated issues with trying to pull

16 together the information that was not available when the case

17 was first filed, and the debtors have been working diligently

18 trying to gather that information.  So, in that vein and with

19 a need to get this -- and mindful always of the fact that it

20 is the customers and the creditors here who need to get paid.

21 And I understand the IRS is a creditor as well, but because

22 of the size of the claim, $24 billion estimated, it has an

23 impact on the ability of the debtors to move forward with

24 this case.

25         Therefore, I'm going to modify it only by adding

1   two weeks to the proposed schedule, so all the dates should

2   be moved out two weeks, that's both to give the IRS a little

3   bit more time and to accommodate the Court on its calendar as

4   well.

5          I don't know when the debtors are planning on

6   setting a hearing on their confirmation, I don't know whether

7   there will be objections to confirmation, there may be, but I

8   have held hearings in late 2022, right around the time this

9   case was getting filed -- no, it was 2021 -- in Mallinckrodt,

10  one case I held -- ended up with six weeks of trial time for

11  confirmation and to hold in between, right in the middle of

12  that, a two-week trial on whether or not the debtors had a

13  post-petition claim against them for antitrust violations.

14  So it can be done, it's not unusual, it's not unheard of.

15         And as far as a date for the hearing, I'd ask the

16  parties to confer with chambers to get a date for the hearing

17  within that -- again, that two-week extension of time.

18         On the burden of proof issue, I'd like the benefit

19  of a little bit more briefing on that issue because it is an

20  important issue and one that I want to make sure I'm making

21  the right decision.  So I'm going to ask the parties to make

22  simultaneous filings, briefs, short briefs, no more than ten

23  pages, addressing the question of, as between the IRS and the

24  debtors, who has the initial burden of proof at the

25  estimation hearing.  And I'll let you meet and confer and

1  come up with a date, given the holiday season, so that

2  everybody can be accommodated as to when those will be

3  submitted.

4         And I want to make sure the parties understand and

5  keep in mind, estimation is not a determination of the

6  liquidated value of the claim, it can't be, and it's a

7  summary process.  It is not a full-blown evidentiary process

8  where parties can request all kinds of discovery and take all

9  kinds of depositions and bring in all kinds of expert

10  witnesses.  So I'd like to get some sense from the parties,

11  given that I've now ruled that it can be estimated, as to

12  what this process is going to look like, what do the parties

13  anticipate.

14         I saw something in the papers, both sides saying

15  we might not even need expert witnesses, it might be able to

16  be decided on a question of law; if there are facts, they're

17  easily determined.  You know, for example, I heard the

18  testimony today about the deductions for business expenses

19  and, you know, that there's at least some evidence at this

20  point that as for 2022 it might only be $34 million.  And if

21  that's true, given the $24 billion claim filed by the IRS, it

22  would seem that it would be easier to determine factually

23  that even if there's information missing, it's not going to

24  change the number because you're never going to get to a

25  point where the debtors are going to owe $24 billion in

1   taxes.  It might not get to a point where the debtors owe any

2   taxes, it might be they owe a little bit of taxes, it might

3   be they owe a few million dollars or tens of millions of

4   dollars.

5           I don't know at this point because I don't have

6   the benefit of the evidence, but it would seem the parties

7   could look at the evidence ahead of time and make that

8   determination without having to spend the time and effort to

9   come to a trial and spend a week or two going through tons of

10  tax information to determine the value of the claim.  It

11  might not be necessary to do that; if the missing information

12  doesn't rise to a level where the debtors actually owe taxes,

13  that's the end of the story.  So let's look at that as we're

14  going through the discovery process here and keep that in

15  mind.

16          I mean, the idea here in bankruptcy -- we're not

17  in Tax Court -- so in bankruptcy we're trying to get to

18  conclusions quickly and be as accurate as possible without

19  wasting a lot of time and resources of the estate or the

20  other party, the creditors.  So let's keep that in mind.

21          Now, give me some thoughts.  I'd like to -- when

22  is the next omnibus hearing in this case?

23          UNIDENTIFIED SPEAKER:  January 25th, I believe,

24  Your Honor.

25          THE COURT:  Okay, let's set up something before

1  that.  Contact chambers, see if we can get a date the second

2  week of January for a status conference to see where we are

3  on that issue, what this hearing is going to look like.

4  Hopefully, by then I will have the benefit of the briefing.

5  Maybe I don't, it depends -- the additional briefing, it's up

6  to you guys.  If I do have that briefing, we'll talk about

7  that at that status conference, but otherwise let's talk

8  about what this estimation hearing is going to look like when

9  we get there.

10             Any questions, comments, concerns?

11             MR. BROMLEY:  None from us, Your Honor.

12             THE COURT:  All right.  Anything else before we

13  adjourn?

14             MR. LANDIS:  That's it for the debtors, Your

15  Honor.

16             THE COURT:  Okay.  Anything?

17             MS. BRUCE:  Nothing from us, Your Honor.

18             THE COURT:  Okay, thank you.

19             Thank you all very much.  I appreciate the

20  presentations, it was very helpful for me, and I will see

21  everybody sometime in early January.  Have good holidays.

22  Thank you.

23             COUNSEL:  Thank you, Your Honor.

24         (Proceedings concluded at 2:42 p.m.)

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ William J. Garling                December 14, 2023

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                December 14, 2023

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17  /s/ Mary Zajaczkowski                 December 14, 2023

18  Mary Zajaczkowski, CET-531

19  Certified Court Transcriptionist

20  For Reliable

21

22

23

24

25