**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11
PLAN OF REORGANIZATION OF FTX TRADING LTD. AND ITS
AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION**

SULLIVAN & CROMWELL LLP
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

*Counsel for the Debtors and Debtors-in-Possession*

Dated: December 16, 2023
      Wilmington, Delaware

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

THE BOARD OF DIRECTORS OF THE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN AND THE TRANSACTIONS CONTEMPLATED AND DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN.  NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED OR POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES.

IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE CHAPTER 11 PLAN AND/OR THE CHAPTER 11 PLAN DOES NOT BECOME EFFECTIVE, NO PORTION OF THE CHAPTER 11 PLAN, INCLUDING ANY SETTLEMENTS, WILL BECOME EFFECTIVE.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO; STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN; EVENTS IN THESE CHAPTER 11 CASES AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE SUCH SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY BY SUCH DOCUMENTS AND STATUTORY PROVISIONS TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRETY OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.

FACTUAL INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS BASED ON CURRENTLY AVAILABLE INFORMATION AND BOOKS AND RECORDS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

NO PERSON SHOULD RELY ON ANY INFORMATION OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL, STATE OR FOREIGN SECURITIES LAWS OR OTHER SIMILAR LAWS.

## **TABLE OF CONTENTS**

1. EXECUTIVE SUMMARY ...............................................................................................1

   A. Purpose of This Disclosure Statement ..................................................................1
   B. Recovery Analysis and Treatment of Claims and Interests ...................................1
   C. Substantive Consolidation of Certain Debtors.......................................................8
   D. Voting on the Plan ................................................................................................9
   E. Confirmation of the Plan .....................................................................................11

2. BACKGROUND ........................................................................................................12

   A. The Silos ............................................................................................................12
   B. Factors Leading to the Commencement of the Debtors' Chapter 11 Cases ..........15

3. SIGNIFICANT EVENTS AND BUSINESS INITIATIVES IN THESE
   CHAPTER 11 CASES ................................................................................................19

   A. Overview of Chapter 11 .......................................................................................19
   B. Commencement of these Chapter 11 Cases...........................................................19
   C. These Chapter 11 Cases .......................................................................................20
   D. Sale Processes .....................................................................................................26
   E. Consensual Turnovers ..........................................................................................29
   F. Litigation.............................................................................................................30
   G. Investigative Efforts ............................................................................................33
   H. Other Recovery Efforts ........................................................................................33
   I. Estate Assets .......................................................................................................35
   J. Other Bankruptcies ..............................................................................................36
   K. Foreign Debtors ...................................................................................................42
   L. Interim Reports of John J. Ray III .......................................................................43
   M. Customer Redaction.............................................................................................45
   N. The Draft Plan, Creditor Meetings and the Settlement and Plan Support
      Agreement............................................................................................................46
   O. U.S. Trustee's Request to Appoint Examiner........................................................47
   P. Estimation for IRS Claims ...................................................................................48
   Q. Estimation Motion ...............................................................................................49

4. SUMMARY OF THE PLAN........................................................................................50

   A. Considerations Regarding the Chapter 11 Plan .....................................................50
   B. Rationale Underlying Plan Treatment of Claims....................................................50
   C. Classification, Treatment and Voting of Claims and Interests ...............................53
   D. Implementation of the Plan...................................................................................75
   E. Provisions Governing Distributions......................................................................79
   F. Record Date and Delivery of Distributions ...........................................................80
   G. Settlement, Release, Injunction and Related Plan Provisions.................................85
   H. The Customer Preference Settlement.....................................................................89

5.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ................94

      A.    The Confirmation Hearing ........................................................................94
      B.    Confirmation Standards ...........................................................................94
      C.    Best Interests Test ....................................................................................96
      D.    Financial Feasibility .................................................................................98
      E.    Acceptance by Impaired Classes ..............................................................99
      F.    Confirmation Without Acceptance by All Impaired Classes...............................99

6.    VOTING PROCEDURES ..................................................................................101

      A.    Parties-in-Interest Entitled to Vote .......................................................102
      B.    Amounts for Voting Purposes.................................................................102
      C.    Customer Preference Settlement.............................................................105
      D.    Convenience Claim Election....................................................................107
      E.    Voluntary Releases Under the Plan ........................................................107
      F.    Classes Under the Plan ...........................................................................108
      G.    Solicitation Packages for Voting Classes ...............................................108
      H.    Solicitation Packages for Non-Voting Classes .......................................109
      I.    Voting Procedures...................................................................................109

7.    ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING ...................111

      A.    Risks Related to the Debtors and These Chapter 11 Cases .................111
      B.    Risks Related to the Plan ........................................................................111
      C.    Additional Risks.......................................................................................115

8.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
      OF THE PLAN .................................................................................................119

      A.    U.S. Federal Income Tax Consequences to the Debtors......................120
      B.    U.S. Federal Income Tax Consequences to U.S. Holders ...................122
      C.    U.S. Federal Income Tax Treatment of the Wind Down Entities and the
            U.S. Holders of Customer Entitlement Claims .....................................122
      D.    General Tax Reporting by the Wind Down Entities to U.S. Holders of
            Customer Entitlement Claims .................................................................123
      E.    Withholding on Distributions and Information Reporting....................124

9.    ALTERNATIVE TO CONFIRMATION OF THE PLAN ...........................................126

10.   DEBTORS' RECOMMENDATION....................................................................127

**Appendices**

Appendix A:  Chapter 11 Plan

Appendix B:  Solicitation Procedures Order

Appendix C:  Liquidation Analysis

Appendix D:  Digital Assets Conversion Table

# 1.    EXECUTIVE SUMMARY

On November 11 and November 14, 2022 (as applicable, the "Petition Date"), FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Simultaneous with the filing of this Disclosure Statement (as defined below), the Debtors are filing the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement, and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan"),[2] a copy of which is attached hereto as Appendix A.

The Plan and this Disclosure Statement are the result of extensive discussions and negotiations among the Debtors, the Official Committee (as defined below), the Ad Hoc Committee (as defined below), the Class Action Claimants (as defined below) and other stakeholders.  The Plan is a direct product of the Settlement and Plan Support Agreement among the Debtors, the Ad Hoc Committee, the Class Action Claimants and the Official Committee.  The Plan and this Disclosure Statement reflect many compromises to create the best, most equitable and economical outcome for all creditors and stakeholders in these Chapter 11 Cases.

## A.    Purpose of This Disclosure Statement

The Debtors submit this *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (as may be further amended, supplemented or modified from time to time and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code for the purpose of soliciting votes on the proposed Plan.  The purpose of this Disclosure Statement is to provide the Holders of Claims who are entitled, and will be solicited, to vote on the Plan with adequate information to make an informed judgment about the Plan.  Pursuant to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a bankruptcy court-approved written disclosure statement has been provided to each creditor or interest holder entitled to vote on the plan.

## B.    Recovery Analysis and Treatment of Claims and Interests

The Plan organizes the Debtors' creditor and equity constituencies into groups called Classes.  For each Class, the Plan describes (a) the underlying Claim or Interest; (b) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than full value on account of its Allowed Claim or Allowed Interest or that the rights of Holders under

---

[2]    Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

law will be altered in some way; and (c) the form of any recovery that Holders will receive on account of their respective Allowed Claims or Allowed Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify administrative claims as defined in section 503 of the Bankruptcy Code ("Administrative Claims") or 503(b)(9) Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Tax Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3 | Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 5A | Dotcom Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5B | U.S. Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5C | NFT Customer Entitlement Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7A | Dotcom Convenience Claims | Impaired | Entitled to Vote |
| 7B | U.S. Convenience Claims | Impaired | Entitled to Vote |
| 7C | General Convenience Claims | Impaired | Entitled to Vote |
| 8A | PropCo Ordinary Course Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 8B | PropCo DM Claim | Impaired | Entitled to Vote |
| 8C | PropCo General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Cancelled Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 10 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 11 | Subordinated Claims | Impaired | Entitled to Vote |
| 12 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 13 | FTT Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 14 | Preferred Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 15 | Section 510(b) Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 16 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |

| 17 | *De Minimis* Claims | Impaired | Not Entitled to Vote, Deemed to Reject |

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, see Section 4 below—Summary of the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO MATERIAL CHANGE.**

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES[3]**

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 1 Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. | $ [•] | [•]% |
| Class 2 Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court. | $ [•] | [•]% |
| Class 3 Secured Claims | Except to the extent that a Holder of an Allowed Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Claim, each Holder of an Allowed Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator:  (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Secured Claim or (iii) treatment of such Allowed Secured Claim in any other manner that renders the Claim Unimpaired. | $ [•] | [•]% |

---

[3]    Figures are as of [•], 2023 and are subject to material change.

[4]    Estimated aggregate amount of claims currently asserted against or scheduled by the Debtors, incorporating provisions of the Plan and excluding duplicative claims.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 4 Separate Subsidiary Claims | Except to the extent that a Holder of an Allowed Separate Subsidiary Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Separate Subsidiary Claim, each Holder of an Allowed Separate Subsidiary Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Allowed Separate Subsidiary Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court. | $ [•] | [•]% |
| Class 5A Dotcom Customer Entitlement Claims | Except to the extent that a Holder of an Allowed Dotcom Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Dotcom Customer Entitlement Claims, each Holder of an Allowed Dotcom Customer Entitlement Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the Dotcom Customer Priority Assets available to pay Dotcom Customer Entitlement Claims in accordance with the waterfall priority set forth in section 4.2.1 of the Plan. | $ [•] | [•]% |
| Class 5B U.S. Customer Entitlement Claims | Except to the extent that a Holder of an Allowed U.S. Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed U.S. Customer Entitlement Claims, each Holder of an Allowed U.S. Customer Entitlement Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the U.S. Customer Priority Assets available to pay U.S. Customer Entitlement Claims in accordance with the waterfall priority set forth in section 4.2.2 of the Plan. | $ [•] | [•]% |
| Class 5C NFT Customer Entitlement Claims | Except to the extent that a Holder of an Allowed NFT Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed NFT Customer Entitlement Claim, each Holder of an Allowed NFT Customer Entitlement Claim shall receive the Available NFT associated with such Allowed NFT Customer Entitlement Claim. | $ [•] | [•]% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 6 General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool available to pay General Unsecured Claims in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $ [•] | [•]% |
| Class 7A Dotcom Convenience Claims | On the later of the Initial Distribution Date or as soon as reasonably practicable after a Dotcom Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Dotcom Convenience Claim, each Holder of an Allowed Dotcom Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such Allowed Dotcom Convenience Claim. | $ [•] | [•]% |
| Class 7B U.S. Convenience Claims | On the later of the Initial Distribution Date or as soon as reasonably practicable after a U.S. Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed U.S. Convenience Claim, each Holder of an Allowed U.S. Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such Allowed U.S. Convenience Claim. | $ [•] | [•]% |
| Class 7C General Convenience Claims | On the later of the Initial Distribution Date or as soon as reasonably practicable after a General Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Convenience Claim, each Holder of an Allowed General Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such Allowed General Convenience Claim. | $ [•] | [•]% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 8A PropCo Ordinary Course Claims | [Except to the extent that a Holder of an Allowed PropCo Ordinary Course Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo Ordinary Course Claim, each Holder of an Allowed PropCo Ordinary Course Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Allowed PropCo Ordinary Course Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court.][5] | $ [•] | [•]% |
| Class 8B Propco DM Claim | [Except to the extent that a Holder of an Allowed PropCo DM Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo DM Claim, each Holder of an Allowed PropCo DM Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the proceeds from the sale, disposition or other monetization of property of FTX Bahamas PropCo available to pay PropCo DM Claims in accordance with the waterfall priority set forth in section 4.2.4 of the Plan.][6] | $ [•] | [•]% |
| Class 8C PropCo General Unsecured Claims | [Except to the extent that a Holder of an Allowed PropCo General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo General Unsecured Claim, each Holder of an Allowed PropCo General Unsecured Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the proceeds from the sale, disposition or other monetization of property of FTX Bahamas PropCo available to pay PropCo General Unsecured Claims in accordance with the waterfall priority set forth in section 4.2.4 of the Plan.][7] | $ [•] | [•]% |

---

[5]   **Note to Draft**: Classification and treatment of claims against FTX Bahamas PropCo subject to ongoing discussions with the Bahamas JOLs (as defined below).

[6]   **Note to Draft**: Classification and treatment of claims against FTX Bahamas PropCo subject to ongoing discussions with the Bahamas JOLs.

[7]   **Note to Draft**: Classification and treatment of claims against FTX Bahamas PropCo subject to ongoing discussions with the Bahamas JOLs.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 9 Cancelled Intercompany Claims | All Cancelled Intercompany Claims shall be cancelled, released or otherwise settled in full, and the Holders of Cancelled Intercompany Claims shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Claims under the Plan. | $ [•] | [•]% |
| Class 10 Intercompany Interests | No Holder of an Intercompany Interest shall receive any Distributions on account of its Intercompany Interest.  On and after the Effective Date, all Intercompany Interests shall, at the option of the Debtors, either be reinstated, set off, settled, addressed, distributed, contributed, merged or cancelled. | $ [•] | [•]% |
| Class 11 Subordinated Claims | Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Claim, each Holder of an Allowed Subordinated Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $ [•] | [•]% |
| Class 12 Equitably Subordinated Claims | Except to the extent that a Holder of an Allowed Equitably Subordinated Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Equitably Subordinated Claim, each Holder of an Allowed Equitably Subordinated Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $ [•] | [•]% |
| Class 13 FTT Interests | Except to the extent that a Holder of an Allowed FTT Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed FTT Interest, each Holder of an Allowed FTT Interest shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $ [•] | [•]% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[4] | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 14 Preferred Equity Interests | Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interests shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $ [•] | [•]% |
| Class 15 Section 510(b) Claims | Except to the extent that a Holder of an Allowed Section 510(b) Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Section 510(b) Claim, each Holder of an Allowed Section 510(b) Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $ [•] | [•]% |
| Class 16 Other Equity Interests | Except to the extent that a Holder of an Allowed Other Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Equity Interest, each Holder of an Allowed Other Equity Interest shall receive its share equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $ [•] | [•]% |
| Class 17 *De Minimis* Claims | No Holder of a *De Minimis* Claim shall receive any Distributions on account of its *De Minimis* Claim.  On and after the Effective Date, all *De Minimis* Claims shall be cancelled and shall be of no further force and effect, whether surrendered for cancelation or otherwise. | $ [•] | [•]% |

### C.    Substantive Consolidation of Certain Debtors

Pursuant to sections 105, 363, 365 and 1123 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and as an integral part of the Global Settlement (as defined below) pursuant to the Plan, the Plan shall be deemed a motion by the Debtors seeking the approval, effective as of the Effective Date, of the substantive consolidation of the Estates of the Consolidated Debtors into a single Entity formed as a Delaware trust (the "Consolidated Wind Down Trust") for the purposes of effectuating and implementing the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such substantive consolidation of the Estates of the Consolidated Debtors, as well as findings by the Bankruptcy Court that such substantive consolidation is fair, equitable,

reasonable and in the best interests of the Debtors, their Estates and the Holders of Claims and Interests.

Except as otherwise provided in the Plan and subject in all respects to the classification and treatment of Claims and Interests set forth in the Plan, as a result of the substantive consolidation of the Estates of the Consolidated Debtors:  (a) all property of the Consolidated Debtors shall vest in, and constitute the property of, the Consolidated Wind Down Trust, free and clear of any and all Liens, charges or other encumbrances or interests pursuant to section 5.9 of the Plan; (b) all guarantees of any Consolidated Debtor of the payment, performance or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Wind Down Trust; (d) all Cancelled Intercompany Claims shall be deemed cancelled; and (e) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Consolidated Wind Down Trust.

Except as otherwise provided in the Plan, the substantive consolidation shall not: (i) affect the separate legal existence of the Consolidated Debtors for purposes other than implementation of the Plan pursuant to its terms; (ii) constitute or give rise to any defense, counterclaim or right of netting or setoff with respect to any Cause of Action vesting in the Consolidated Wind Down Trust that could not have been asserted against the Consolidated Debtors; or (iii) constitute the transfer or assignment of, or give rise to any right under, any executory contract, insurance contract or other contract to which a Consolidated Debtor is party, except to the extent required by section 365 of the Bankruptcy Code in connection with the assumption of such contract by the applicable Debtors.

As explained in Section 2.A below, the Debtors consist of FTX Trading and 95 affiliates.  Holders of Allowed Claims against or Allowed Interests in each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Allowed Interests in the applicable Class.

**D.    Voting on the Plan**

1. *Parties-in-Interest Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan

proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, refer to Section 4 below—Summary of the Plan.

Classes 1, 2, 3, 4 and 8A are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan, and are therefore not entitled to vote on the Plan.

Classes 5A, 5B, 5C, 6, 7A, 7B, 7C, 8B, 8C and 11 are Impaired under, and entitled to vote to accept or reject, the Plan.

Classes 9, 10, 12, 13, 14, 15, 16 and 17 are Impaired and not entitled to any recovery under the Plan, and are therefore not entitled to vote on the Plan.

Generally, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each impaired class entitled to vote accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the Plan.  Holders of claims who fail to vote are deemed neither to accept nor to reject the Plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

However, even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan; provided that the Plan has been accepted by at least one Impaired Class of creditors.  In such circumstances, the Plan can be confirmed by a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  For a more detailed description of the requirements for confirmation of a plan without the approval of every Impaired Class, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

2.   *Submitting a Ballot*

Classes 5A, 5B, 5C, 6, 7A, 7B, 7C, 8B, 8C and 11 are entitled to vote to accept or reject the Plan.  If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot(s). Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot(s) and return the Ballot(s) to Kroll Restructuring Administration LLC (the "Notice and Claims Agent").  For further information, refer to Section 6 below—Voting Procedures, and the Solicitation Procedures Order (as defined below) attached hereto as Appendix B.

Ballots cast by Holders in Classes entitled to vote must be received by the Notice and Claims Agent by [•] **(ET)** on **[•], 2024** (the "<u>Voting Deadline</u>").  For further information, refer to Section 6 below—Voting Procedures.

Ballots received after the Voting Deadline will not be counted, except in the Debtors' discretion.

The method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Plan or Solicitation Procedures Order, delivery of a Ballot will be deemed made only when the Ballot is actually received by the Notice and Claims Agent.  Sufficient time should be allowed to ensure timely delivery.

Delivery of a Ballot to the Notice and Claims Agent by facsimile, e-mail or any means not specifically described herein will not be accepted.  No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent) and, if so sent, will not be counted.

3.  *Recommendation*

**The Debtors recommend that all Holders of Claims entitled to vote on the Plan vote to accept it.**

E.    **Confirmation of the Plan**

1.  *Plan Objection Deadline*

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before **4:00 p.m. (ET) on [•], 2024**.

Unless objections to Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court.  For further information, refer to Section 5 below—Statutory Requirements for Confirmation of the Plan.

2.  *Confirmation Hearing*

The Bankruptcy Court has scheduled the hearing to consider confirmation of the Plan (the "<u>Confirmation Hearing</u>") for **[•], 2024 at [•] [a/p].m. (ET)**.  The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtors without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

2.   **B**ACKGROUND

    **A.**    **The Silos**

        The FTX Group (as defined below) operated two centralized digital asset exchanges:  FTX.com (the "FTX.com Exchange") in non-U.S. jurisdictions and its U.S. counterpart, FTX.US (the "FTX.US Exchange").  The FTX Exchanges were among the world's largest digital asset exchanges, where millions of customers bought, sold and traded certain digital assets.  Since their founding between 2019 to early 2020, the FTX Exchanges gained international prominence for their popularity among users, their high-profile acquisitions and celebrity endorsements, and the public image of Samuel Bankman-Fried, their co-founder and CEO, who was a vocal public figure in the cryptocurrency industry.  In addition, the FTX Group owned, invested in or operated a number of different businesses, ranging from drone manufacturing to video game development.  The FTX Group also operated a "crypto hedge fund", Alameda Research LLC ("Alameda Research"), which engaged in various trading activities and was used to make investments on behalf of the FTX Group in a wide array of businesses, ranging from digital asset startups to artificial intelligence.

        The Debtors operated their businesses through approximately 100 entities incorporated around the world (collectively, including non-Debtor affiliates, the "FTX Group").  For convenience, postpetition management has separated these businesses and corresponding entities into four broad categories, or "Silos."  These silos are: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries, which includes the businesses known as "FTX.US," "LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among other businesses (the "WRS Silo"); (b) a group composed of Debtor Alameda Research and its Debtor subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Paper Bird Inc., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) a group composed of Debtor FTX Trading and its Debtor and non-Debtor subsidiaries, including the exchanges doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions (the "Dotcom Silo").  Prior to the Petition Date, each of these Silos were controlled by the FTX Group's co-founder and chief executive officers, Bankman-Fried.  Minority equity interests in the Silos were held by Zixiao "Gary" Wang and Nishad Singh, the co-founders of the business along with Bankman-Fried.  The WRS Silo and Dotcom Silo also have third-party equity investors, including investment funds, endowments, sovereign wealth funds and family offices.

        The corporate structure chart below provides a general overview of the relationship between and among the Debtors, organized by Silo, as well as certain non-Debtor affiliates.

## ORGANIZATIONAL CHART (12/5/23)



\* Percentages directly held by each of Sam Bankman-Fried, Gary Wang and Nishad Singh in individual entities varies.

\*\* Indicates non-operational subsidiary entity.

\*\*\* 99% held by FTX Trading Ltd.

\*\*\*\* 80% held by FTX Trading Ltd.

1. *WRS Silo*

The WRS Silo contained, among other businesses, the FTX.US Exchange. Founded in January 2020 by Bankman-Fried, Wang and Singh, the FTX.US Exchange was incorporated in Delaware and intended to be available to both U.S. and non-U.S. users. The FTX.US Exchange allowed customers to, among other things, spot trade in certain digital assets. By November 2022, the FTX.US Exchange had over one million registered users, becoming one of the largest centralized digital asset exchanges available in the United States. FTX.US Exchange's spot exchange is registered with the United States Department of the Treasury (via the Financial Crimes Enforcement Network) as a money services business and held a series of state money transmission licenses in the United States. The WRS Silo also contained Embed Financial Technologies Inc. ("Embed"), which operated a clearing and custody platform that provided registered investment advisors, broker-dealers and other financial institutions with application program interfaces and brokerage services, as well as LedgerX LLC ("LedgerX"), a digital currency futures and options exchange and clearinghouse regulated by the Commodity Futures Trading Commission.

2. *Alameda Silo*

The Alameda Silo contained, among other businesses, Alameda Research, a "crypto hedge fund" that traded and speculated in certain digital assets and related loans and securities for the account of its owners, Bankman-Fried (90%) and Wang (10%). Beginning in October 2021, Caroline Ellison acted as co-CEO (and later CEO) of Alameda Research. Alameda Research, through its affiliates, operated quantitative trading funds, whose strategies included, among other things, arbitrage, market making and yield farming. The Alameda Silo also offered over-the-counter trading services, and made and managed other debt and equity investments. Entities in the Alameda Silo ranged from funds in the Cayman Islands to market making operations in Turkey. The other Debtors in the Alameda Silo are organized in Delaware, Korea, Japan, the British Virgin Islands, Antigua, Hong Kong, Singapore, the Seychelles, the Cayman Islands, the Bahamas, Australia, Panama and Nigeria.

3. *Ventures Silo*

The entities within the Ventures Silo invested in over 400 projects, with billions of dollars in funded assets. The investments made by entities in the Ventures Silo are wide ranging in several different industries, and are composed of equity investments, limited partnerships and funds, token investments and loans.

4. *Dotcom Silo*

The Dotcom Silo contained, among other businesses, the FTX.com Exchange. Founded in 2019 by Bankman-Fried and Wang, the FTX.com Exchange was a centralized digital asset trading platform and exchange organized in Antigua and intended to be unavailable to U.S. users. The FTX.com Exchange allowed non-U.S. customers to, among other things, buy and sell certain spot digital assets, trade digital asset-based derivatives and tokenized stocks, participate in peer-to-peer margin borrowing and lending and stake certain digital assets. The FTX.com Exchange was operated by Bankman-Fried, Wang and Singh. Wang and Singh had both worked

at Alameda Research and joined the FTX.com Exchange soon after it was launched.  In September 2021, the international exchange relocated its headquarters from Hong Kong to the Bahamas where it sought compliance under the emerging Digital Assets and Registered Exchanges (DARE) Act established in 2020.  By November 2022, the FTX.com Exchange had more than seven million registered users, making it one of the largest centralized digital asset exchanges in the world.

The Dotcom Silo also includes other centralized digital asset exchanges that operated around the world, such as FTX Japan K.K. ("FTX Japan"), Quoine Pte Ltd and Digital Assets DA AG ("FTX Europe").

**B.      Factors Leading to the Commencement of the Debtors' Chapter 11 Cases**

### 1.  *The Control Failures at the FTX Exchanges*

As detailed in the First Day Declarations[8] and the Debtors' *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges Cases* [D.I. 1242] (the "First Ray Report"), prepetition, the FTX Group lacked appropriate management, governance and organizational structure.  Control of the FTX Group was concentrated in Bankman-Fried, Singh and Wang.  With a few limited exceptions, the FTX Group lacked independent or experienced finance, accounting, human resources, informational security, and cybersecurity personnel or leadership.  There was also no internal audit function, and almost non-existent board oversight.  Despite its size and importance, the FTX Group had little to no capacity, expertise, or commitment to identifying, verifying, reporting or processing its financial business.  For almost all of the Debtors, as of the Petition Date, financial statements were either non-existent, limited, or completely unreliable.

The FTX Group also did not observe traditional formalities with respect to intercompany transactions.  Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation.  Alameda Research regularly provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda Research, for various other Debtors, or for non-Debtor FTX Digital Markets Ltd. ("FTX DM") and for venture investments or acquisitions whether for Alameda Research, various other Debtors or affiliates.

Furthermore, there were serious deficiencies in the FTX Group's controls related to digital asset management, information security and cybersecurity.  While the FTX Group retained software developers, there was no dedicated personnel in cybersecurity or leadership in information security.  The FTX Group did not implement fundamental, widely accepted security controls to protect its significant digital assets, nor did it employ fundamental controls with respect to cloud and infrastructure security.  As a result of these control failures, the FTX Group exposed digital assets under its control to a grave risk of loss, misuse, and compromise, and

---

[8]    The "First Day Declarations" refer to the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident.

        2.   *The Commingling and Misuse of Customer Deposits at the FTX.Com Exchange and Corporate Funds*

        As detailed in Debtors' *Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704] (the "Second Ray Report"), Bankman-Fried, Singh, Wang and others at their direction, commingled and misused FTX.com Exchange customer deposits.  At the direction of Bankman-Fried, Singh and Wang, the FTX Group funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research and other affiliates.  At the same time, the FTX Group used its bank accounts for purposes not disclosed to the banks that hosted them, commingling and misusing vast sums of customer and corporate funds in the process.  This misuse continued for several years.  Based on the Debtors' analysis, as of the Petition Date, approximately $[•] billion in customer-deposited assets was misappropriated from the FTX.com Exchange, the vast majority of which was in the form of cash and stablecoins.  To facilitate this extensive scheme, Bankman-Fried, Singh and Wang, with the assistance of internal staff and other insiders, lied to banks and auditors, executed false documents, and moved the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to The Bahamas, in a continual effort to avoid detection of their wrongdoing.

        In part due to this misconduct, the FTX.com Exchange suffered serious liquidity challenges.  As of March 2022, internal documents suggest that the FTX.com Exchange had a cash deficit of over $[•] billion.  Shortly after the Petition Date, the FTX.com Exchange owed customers a shortfall amount approximately $[•] billion.  This deficit is in the form of fiat currency and digital assets that had been misappropriated.

        A diagram highlighting the intermingling of primary deposit accounts for U.S. dollars only is displayed below.  A full accounting of the billions of digital asset transactions is likely impossible.



**Primary Deposit Accounts: Sources and Uses of Funds**
USD Transfers, April 2019 through Petition Date

### 3. _An Acute Liquidity Crisis_

In part due to the circumstances described above, the FTX Group suffered from an acute liquidity crisis beginning in early November 2022. On November 2, 2022, the cryptocurrency news site CoinDesk published an article that revealed that Alameda Research held a significant position in FTT, the FTX Group's native token, estimated at a value of approximately $4 billion, which represented almost one third of Alameda Research's total aggregate assets. The publication prompted questions about the FTX Group's undisclosed leverage and liquidity. After the article was published, the CEO of Binance, the largest centralized digital asset exchange, announced that it planned to sell its FTT holdings. The publicly announced sale of such a large amount of FTT—which is correlated with the value of the FTX Exchanges as a whole—in such a short period of time, led to a severe "run" on the FTX Exchanges as customers pulled funds off the exchanges. On November 8, 2022, Binance announced that it had entered into a non-binding letter of intent to acquire the FTX.com Exchange but subsequently terminated the potential transaction on November 9, 2022. Between November 2, 2022 and the Petition Date, customers attempted withdrawals of several billions of dollars and many withdrawals were not fulfilled.

4. *Foreign Liquidation Proceedings*

On November 10, 2022, the Securities Commission of The Bahamas (the "SCB") took action to freeze assets of non-Debtor FTX DM.  In addition, in the early hours of November 11, 2022, the directors of non-Debtors FTX Express Pty Ltd and FTX Australia Pty Ltd., Australian subsidiaries in the Dotcom Silo, appointed voluntary administrators for a restructuring process under Australian law.

5. *Omnibus Corporate Authority*

At approximately 4:30 a.m. ET on Friday, November 11, 2022, after consultation with his attorneys, Bankman-Fried agreed to resign, resulting in the appointment of John J. Ray III as the Debtors' Chief Executive Officer.  Mr. Ray was delegated by Bankman-Fried all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.

3.    <u>SIGNIFICANT EVENTS AND BUSINESS INITIATIVES IN THESE CHAPTER 11 CASES</u>

The following is a general summary of significant events in these Chapter 11 Cases, including a discussion of the Debtors' claims process, asset recovery initiatives and litigation efforts since the commencement of these Chapter 11 Cases.

A.    **Overview of Chapter 11**

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization and orderly liquidation.  Chapter 11 helps a company to maximize recovery to all stakeholders.  Chapter 11 promotes equality of treatment for similarly situated creditors and interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate comprising all property and all other legal and equitable interests of the debtor as of the date of the debtor's petition for chapter 11 protection.  Chapter 11 allows the debtor to continue all business operations and remain in possession of all property of the estate as a "debtor-in-possession."

The United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") monitors the progress of a chapter 11 case and supervises its administration.  In particular, the U.S. Trustee is responsible for monitoring the debtor-in-possession's operation of the business and the submission of operating reports and fees.

A chapter 11 case often culminates in the consummation of a chapter 11 plan. The plan includes a classification of claims against and interests in the debtor and specifies how each class will be treated.  Among other things, the plan must be confirmed by the Bankruptcy Court before it is implemented.

B.    **Commencement of these Chapter 11 Cases**

On Friday, November 11, 2022, Bankman-Fried agreed to resign, resulting in the appointment of John J. Ray III as the FTX Group's CEO.  At that time, Mr. Ray was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.

Mr. Ray's first official act was to commence these Chapter 11 Cases.  As part of his leadership, Mr. Ray instituted five core objectives for these Chapter 11 Cases (collectively, the "<u>Core Objectives</u>"):

- **Implementation of Controls**: the implementation of accounting, audit, cash management, cybersecurity, human resources, risk management, data protection and other systems that did not exist, or did not exist to an appropriate degree, prior to Mr. Ray's appointment;

- **Asset Protection & Recovery**: locating and securing property of the estate, a substantial portion of which was suspected of being missing or stolen;

- **Transparency and Investigation**: the pending, comprehensive, transparent and deliberate investigation into claims against Bankman-Fried, the other co-founders of the Debtors and third parties, in coordination with regulatory stakeholders in the United States and around the world;

- **Efficiency and Coordination**: cooperation and coordination with insolvency proceedings of subsidiary companies in other jurisdictions; and

- **Maximization of Value**: the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and digital and physical property.

### C.    These Chapter 11 Cases

On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court, commencing these Chapter 11 Cases.

On February 13, 2023, at each of these Debtor's respective request, the Bankruptcy Court dismissed the cases of Debtors SNG Investments Yatirim Ve Danismanlik Anonim Sirketi (Case No. 22-11093) and FTX Turkey Teknoloji Ve Ticaret Anonim Sirketi (Case No. 22-11170) [D.I. 711].  On August 18, 2023, the Bankruptcy Court dismissed the case of FTX Exchange FZE (Case No. 22-11100) [D.I. 2207].  On November 13, 2023, the Bankruptcy Court dismissed the cases of Liquid Financial USA, Inc., LiquidEX, LLC, Zubr Exchange Limited and DAAG Trading, DMCC [D.I. 3375].

#### 1.    *First Day Relief*

Shortly after the Petition Date, the Debtors filed numerous motions seeking relief to stabilize the Debtors and to facilitate the consolidated administration of these Chapter 11 Cases (the "First Day Motions").  On November 22, 2022 and November 23, 2023, the Bankruptcy Court entered orders approving the First Day Motions (the "First Day Orders"), with certain approvals on an interim basis.

Among other things, the First Day Orders allowed the Debtors to administer these Chapter 11 Cases in a streamlined and consolidated manner and to continue certain activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval.  In particular, the First Day Orders authorized the Debtors to:

- jointly administer these Chapter 11 Cases for procedural purposes;

- serve certain documents on parties-in-interest via email and to redact certain customer information from publicly filed documents;

- file a consolidated list of the Debtors' top 50 creditors in lieu of each Debtor filing a list of its 20 largest unsecured creditors;

- extend the time to prepare and file schedules of assets and liabilities and statements of financial affairs;

- establish notice and objection procedures for transfers of certain equity securities in the Debtors and claims of worthless stock deductions;

- pay prepetition claims of certain vendors and lienholders; and

- pay prepetition compensation and reimbursable expenses, pay and honor benefits and other programs and continue workforce obligations.

As part of the First Day Motions, the Debtors filed a motion for authorization to implement a cash management system, maintain and open bank accounts and retain business forms (the "Cash Management Motion") [D.I.47]. As detailed in the Cash Management Motion, as of the Petition Date, the postpetition Debtors and management did not yet know the total amount of cash because of historical cash management failures and deficiencies in documentation controls. Accordingly, to ensure that the Debtors could navigate the chapter 11 process in an orderly and efficient manner, the Debtors requested approval of a new postpetition payment system. The Bankruptcy Court approved the Cash Management Motion on an interim basis on November 23, 2022 [D.I. 143] and on a final basis on January 12, 2023 [D.I. 488]. The postpetition cash management system permits the Debtors to, among other things, make deposits, transfers and advances among the Debtors, to and from non-Debtors and between new bank accounts established as a cash pooling system.

The remainder of the First Day Motions approved on an interim basis were subsequently approved on a final basis by the Bankruptcy Court on January 9, 2023.

In addition, the commencement of these Chapter 11 Cases triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtors and the commencement or continuation of prepetition litigation against the Debtors. Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

1. _Retention of Debtor Professionals_

On November 17, 2022 and December 21, 2022, the Debtors filed applications to retain their restructuring professionals. These included applications to retain (a) Owl Hill Advisory, LLC as chief executive officer [D.I. 269]; (b) Sullivan & Cromwell LLP as counsel to the Debtors [D.I. 270]; (c) Landis Rath & Cobb LLP as co-counsel to the Debtors [D.I. 272]; (d) Alvarez & Marsal North America, LLC as financial advisor [D.I. 273]; (e) Perella Weinberg

Partners LP as investment banker [D.I. 275]; (f) RLKS Executive Solutions LLC as certain chief officers [D.I. 276]; (g) AlixPartners, LLP as forensic investigation consultants [D.I. 277]; (h) Kroll Restructuring Administration LLC as administrative advisor [D.I. 279]; (i) Quinn Emanuel Urquhart & Sullivan, LLP as special counsel [D.I. 280]; (j) certain ordinary course professionals [D.I. 282] and (k) Ernst & Young LLP as tax services provider [D.I. 284]. Each of the retention applications was approved [D.I. 132, 428, 437, 505, 534, 544, 546, 548, 553, 615].

On November 19, 2022, the Debtors also filed a motion to establish procedures for the compensation and reimbursement of expenses of the Debtors' and the Official Committee's professionals on a monthly basis [D.I. 286] (the "Interim Compensation Procedures Motion"). An order approving the Interim Compensation Procedures Motion was entered on January 9, 2023 [D.I. 435].

### 2. *The Official Committee*

On December 15, 2022, the U.S. Trustee appointed an official committee of unsecured creditors (the "Official Committee") [D.I. 231]. The Official Committee currently consists of the following: (a) Coincident Capital International, Ltd.; (b) Larry Qian; (c) Octopus Information Ltd.; (d) Pulsar Global Ltd.; (e) Wincent Investment Fund PCC Ltd.; (f) Wintermute Asia Pte. Ltd.; (g) Zachary Bruch. Two initial members, Acaena Amoros Romero and GGC International Ltd. have since resigned [D.I. 2212, n.5; 3685]. The Official Committee retained Paul Hastings LLP as lead counsel [D.I. 635], Young Conaway Stargatt & Taylor, LLP as co-counsel [D.I. 657], FTI Consulting, Inc. as financial advisor [D.I. 730] and Jefferies LLC as investment banker [D.I. 729].

### 3. *The Ad Hoc Group of Non-U.S. Customers of FTX.com*

The Ad Hoc Committee of Non-U.S. Customers of FTX.com (the "Ad Hoc Committee") is a creditors' committee representing a diverse group of international FTX.com Exchange customers. The Ad Hoc Committee retained Eversheds Sutherland (US) LLP ("Eversheds") as lead counsel and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") as co-counsel. Members of the executive committee of the Ad Hoc Committee (the "AHC Executive Committee"), Eversheds and Morris Nichols retained Rothschild & Co US Inc. as financial advisor and investment banker to the AHC Executive Committee, Eversheds and Morris Nichols.

On December 28, 2022, the Ad Hoc Committee commenced an adversary proceeding (the "AHC Adversary Proceeding") against the Debtors. *See Ad Hoc Committee of Non-US Customers of FTX.com* v. *FTX Trading, Ltd., et al.*, Adv. Pro. No. 22-50514 (JTD) [D.I. 328]. The AHC Adversary Proceeding alleges, among other things, that non-U.S. customers of the FTX.com Exchange retained a property interest in certain fiat currency and digital assets held by the Debtors. On August 21, 2023, the adversary proceeding was stayed pending discussions between the Debtors and the Ad Hoc Committee. As detailed in Section N below, on October 16, 2023, the Ad Hoc Committee entered into the PSA, which, among other things, settles the AHC Adversary Proceeding subject to effectiveness of the Plan.

On August 23, 2023, the Debtors filed a motion seeking authorization to reimburse the fees and expenses of the Ad Hoc Committee's professionals on a monthly basis [D.I. 2238]. On October 25, 2023, the Debtors filed an amended reimbursement motion reflecting the updated terms of reimbursement in accordance with the PSA [D.I. 3373]. Among other things, the Ad Hoc Committee professionals agree to comply with the interim compensation procedures approved by the Court. An order approving the amended reimbursement agreement motion was entered on November 15, 2023 [D.I. 3928].

### 4.   *The Class Action Claimants*

On December 27, 2022, certain claimants (the "Class Action Claimants") commenced an adversary proceeding (the "Class Action Adversary Proceeding") against the Debtors. *See Onusz, et al.* v. *West Realm Shires Inc., et al.*, Adv. Pro. No. 22-50513 (JTD) [D.I. 321]. The Class Action Adversary Proceeding alleges, among other things, that U.S. customers of the FTX Exchanges had, as of the Petition Date, a property interest in certain fiat currency and digital assets that the Debtors assert to be property of their Estates. As detailed in Section N below, on October 16, 2023, the Class Action Claimants entered into the PSA, which, among other things, settles the Class Action Adversary Proceeding subject to effectiveness of the Plan.

### 5.   *Fee Examiner*

On March 8, 2023, the Court appointed Katherine Stadler as the fee examiner (the "Fee Examiner") for these Chapter 11 Cases [D.I. 834]. On April 12, 2023, the Court approved the Fee Examiner's motion to retain Godfrey & Kahn, S.C. as counsel to the Fee Examiner [D.I. 1268]. The Fee Examiner subsequently published its first report on professionals' interim fee applications on June 20, 2023 [D.I. 1663], its second report on September 5, 2023 [D.I. 2427] and its third report on December 5, 2023 [D.I. 4495].

### 6.   *341 Meeting and Schedules and SOFA*

On December 20, 2022, the U.S. Trustee conducted an initial meeting of creditors pursuant to section 341 of the Bankruptcy Code.

On March 14 and March 15, 2023, the Debtors filed their schedules of assets and liabilities and statements of financial affairs with the Bankruptcy Court [D.I. 865-954, 956-63, 966-1083]. On June 27, 2023, the Debtors filed amended schedules of assets and liabilities of certain Debtors [D.I. 1729-66]. On July 31, 2023, the Debtors filed unredacted versions of schedules and statements for certain Debtors [D.I. 1985-95, 1997-2031, 2033-42, 2045-97]. On August 31, 2023, the Debtors filed further amended schedules of assets and liabilities of certain Debtors [D.I. 2285-2408].

### 7.   *Bar Date, KYC and Claims Process*

The FTX Group had over 10 million customer accounts, approximately 1.8 million of which had net positive balances as of the Petition Date. The FTX Group also had creditors who were non-customers, including vendors, service providers, government entities and celebrities who endorsed or advertised the FTX Group in exchange for a fee. In order to streamline the claims process for holders of non-customer claims and Customer Entitlement

Claims, the Debtors established two separate bar dates. On May 19, 2023, the Bankruptcy Court entered an order setting June 30, 2023 as the bar date for non-customer proofs of claims and proofs of interest and September 29, 2023 as the governmental bar date [D.I. 1519]. On June 28, 2023, the Bankruptcy Court entered an order setting September 29, 2023 as the bar date for customer proofs of claims [D.I. 1793] (the "Customer Bar Date Order").

To facilitate the submission process of potentially millions of Customer Entitlement Claims, the Debtors developed an online claims portal for the submission and processing of Customer Entitlement Claims. Holders of Customer Entitlement Claims could access the FTX customer claims portal at https://claims.ftx.com ("FTX Customer Portal") with their existing credentials in order to, among other things, submit their proof of claim, perform Know Your Customer ("KYC") procedures, access customer support personnel, view historical transactions, and view balances as of the Petition Date.

As part of the Customer Entitlement Claims process, the Debtors requested all claimants to submit KYC information of the original holders of Customer Entitlement Claims as of the Petition Date. The Debtors requested KYC information from both individual and institutional customers. The KYC procedures were implemented for anti-money laundering ("AML") controls that the FTX Group lacked prepetition. These AML controls are necessary for the Debtors to mitigate the risk that the Customer Entitlement Claims process could be used to facilitate money laundering, fund terrorism or result in violations of economic sanctions. The AML controls are also necessary to generally limit regulatory risks and to help ensure a legitimate claims trading market.

As set forth in the Customer Bar Date Order, in the event that a holder of a Customer Entitlement Claim did not initiate the requested KYC process by September 29, 2023, such claim is treated as "unverified." With respect to all unverified Customer Entitlement Claims, the Debtors reserved the right, in their sole discretion after consultation with the Committee, either to (i) allow such claims without the requested KYC information or (ii) object to the allowance of such Customer Entitlement Claims' proofs of claim and scheduled claims on an omnibus basis, on notice to all such holders, including, among other bases, of insufficient documentation, and repeat the request such holders submit the requested KYC information at a later date. In the event of such objection, such holders of Customer Entitlement Claims have the additional opportunity to submit the requested KYC information to the Debtors to resolve the objection on such claim relating to the requested KYC information.

The Plan provides that any Customer Entitlement Claim will be an "Unverified Customer Entitlement Claim" if either (i) the Holder of such Customer Entitlement Claim has failed to submit the KYC information of the original holder by a date determined by the Debtors or order of the Court or (ii) the original customer of such Customer Entitlement Claim has failed to submit the KYC information by a date determined by the Debtors or order of the Court. Any Unverified Customer Entitlement Claim will not be an Allowed Customer Entitlement Claim.

Additionally, in connection with Distributions under the Plan, holders of Claims are required to comply with certain Pre-Distribution Requirements, including, among other things, submission of KYC information of the then-current Holder receiving the Distribution. In the event a holder of a Claim, including a Customer Entitlement Claim, fails to submit and

satisfactorily complete the Pre-Distribution Requirements, including, among other things, requested KYC information, thirty days before any applicable Distribution Date, such Distribution will be forfeited.

8. *Stay Relief*

During these Chapter 11 Cases, certain parties filed motions seeking relief from the automatic stay, including:

- On November 22, 2022, Miami-Dade County, a political subdivision of the State of Florida, filed a motion seeking relief from the automatic stay to terminate an agreement with a Debtor (the "Naming Rights Agreement") [D.I. 135]. On December 30, 2022, the Debtors filed an omnibus motion seeking the rejection of, among other things, the Naming Rights Agreement [D.I. 333]. On January 11, 2023, the Bankruptcy Court entered an agreed order authorizing the Debtors' rejection of the Naming Rights Agreement [D.I. 470].

- On December 15, 2022, North America League of Legends Championship Series, LLC ("Riot") filed a motion (i) compelling the rejection of an agreement with a Debtor (the "Strategic Sponsorship Agreement") or, in the alternative, (ii) seeking relief from the automatic stay for cause under section 362(d)(1) of the Bankruptcy Code to permit Riot to terminate the Strategic Sponsorship Agreement [D.I. 243]. On January 11, 2023, the Bankruptcy Court entered an agreed order authorizing the Debtors' rejection of the Strategic Sponsorship Agreement [D.I. 480].

- On March 15, 2023, Bankman-Fried filed a motion seeking relief from the automatic stay or, to the extent it does apply, lifting and modifying the automatic stay to the extent necessary to permit the advancement and/or reimbursement of defense, settlement and other costs covered by certain insurance policies [D.I. 964]. On March 29, 2023, the Official Committee filed an objection in response to Bankman-Fried's motion [D.I. 1183] and the Debtors filed a response explaining that the Debtors are contractually bound not to oppose efforts to seek relief from the automatic stay with respect to such insurance policies [D.I. 1184]. On April 7, 2023, Bankman-Fried filed a reply in further support of his motion [D.I. 1239]. On April 17, 2023, after a hearing on the motion, the Bankruptcy Court entered an order denying the motion without prejudice [D.I. 1299].

- On June 14, 2023, Pyth Data Association filed a motion seeking relief from the automatic stay to take certain actions with respect to the Pyth protocol [D.I. 1632]. On June 23, 2023, the Bankruptcy Court entered an agreed order reflecting the parties' consensual resolution of the motion [D.I. 1693].

- On September 21, 2023, Island Air Capital and its beneficial owner, Paul F. Aranha, filed a motion seeking relief from the automatic stay to take certain actions regarding the use, maintenance and possible sale of certain aircraft [D.I. 2659]. The Debtors objected [D.I. 3002] and were joined by the Official Committee [D.I. 3017]. As of the date of this Disclosure Statement, this motion remains pending while the parties continue discussions.

**D.    Sale Processes**

1.    *Embed, LedgerX, FTX Japan and FTX Europe*

On December 15, 2022, the Debtors filed a motion seeking approval of bid procedures (the "Bid Procedures") for sales processes for several businesses [D.I. 233]. Specifically, at that time, the Debtors contemplated selling the following businesses: (1) non-Debtor Embed; (2) LedgerX; (3) FTX Japan and (4) FTX Europe. On January 12, 2023, the Bankruptcy Court granted the Debtors' motion, approving the Bid Procedures, the form and manner of notices for the sale of these businesses and assumption and assignment procedures, as well as scheduling auctions and sale hearings for these processes [D.I. 487].

In accordance with the Bid Procedures, the Debtors commenced sale processes for these four business. With respect to LedgerX, the Debtors received multiple qualified bids and ultimately selected M 7 Holdings, LLC as the successful bidder. On April 25, 2023, pursuant to the Bid Procedures, the Debtors filed a notice of this successful bid and a form of sale order for the sale of LedgerX to M 7 Holdings, LLC [D.I. 1342]. On May 4, 2023, the Bankruptcy Court entered an order approving the sale of LedgerX for an aggregate purchase price of $48.8 million [D.I. 1433].

With respect to the other three businesses, the Debtors' strategic decisions have evolved based on a number of different factors.

With respect to Embed, the Debtors determined that liquidation was in the best interest of the Estates. The Debtors received twelve non-binding initial indications of interest, including an indication of interest from Michael Giles, the founder of Embed, to purchase Embed with an average value of approximately $35 million. Of the twelve potential bidders, and after conducting more comprehensive due diligence, only Giles and another bidder submitted a final bid, with Mr. Giles' $1 million as the higher bid price. Based on the terms of the final bids received, the Debtors decided to formalize a wind down plan for the liquidation of Embed beginning in May 2023. As part of this orderly liquidation, ten individuals (nine former Embed employees and one former Embed consultant) entered into short-term retention agreements through September 30, 2023 that included provisions settling their prior retention and other bonus obligations owed by Embed and Debtor West Realm Shires Services Inc. ("WRSS"). Embed's other 19 employees were terminated at that time and their claims for prior retention and other bonus payments remain outstanding. As of October 1, 2023, Embed has closed out of its customer relationships and has reduced its headcount to four employees. The Debtors currently anticipate that all Embed wind down activities, including remaining regulatory and administrative matters, will be concluded by December 31, 2023.

The Debtors have considered multiple options related to FTX Japan, including seeking to restart operations, the possibility of including the digital asset exchange of FTX Japan in a potential restart/reboot of the FTX international exchanges or a possible sale to interested investors. As part of these efforts and to retain the necessary personnel as part of these efforts, on April 26, 2023, the Debtors filed a motion seeking approval of FTX Japan's key employee incentive plan (the "Japan KEIP") [D.I. 1359]. The Japan KEIP provided for certain incentive payments to encourage staff with requisite skills and knowledge to continue working at FTX Japan through a restart and sale or reorganization. On June 8, 2023, the Bankruptcy Court entered an agreed order approving the Japan KEIP [D.I. 1589]. As of November 30, 2023, neither incentive program criteria have been met, and no awards have been granted on account of the Japan KEIP.

### 2. *De Minimis Sales*

Prior to the Petition Date, the Debtors regularly entered into and exited relatively small investments across a variety of asset categories, including, among other investments, coins, tokens and token platforms and interests in privately held companies. The Debtors also routinely acquired controlling or 100% interests in early-stage private companies with relatively small enterprise values. A number of these assets were held purely for investment purposes and, as a result, were meant to be monetized over time rather than integrated in the Debtors' core cryptocurrency exchange businesses.

On January 18, 2023, the Debtors filed a motion seeking approval of procedures for the sale or transfer of certain assets that were of relatively *de minimis* value compared to the Debtors' total asset base (the "De Minimis Assets") free and clear of liens, claims, interests and encumbrances [D.I. 525]. On February 13, 2023, the Bankruptcy Court entered an order approving the motion [D.I. 702] (the "De Minimis Assets Sale Order"). Since the entry of the De Minimis Assets Sale Order, the Debtors have filed monthly status reports describing the De Minimis Assets sold each month [D.I. 1254, 1473, 1608, 1859, 2441, 3035 and 3717] and proceeds to date are approximately $17.6 million in the aggregate.

### 3. *Private Sales*

Prior to the Petition Date, the Debtors routinely entered into and exited investments across a variety of asset categories, including interests in privately held companies (including in the form of preferred stock, common stock, warrants and notes), debt and equity securities in publicly traded companies, investments in certain digital assets, venture capital or other investment funds, and investments in coins, tokens and token platforms. A number of these assets were held for purposes of investment and, as a result, were meant to be monetized over time rather than integrated into the Debtors' core digital asset exchange businesses. As part of the effort to maximize the value of the Estates, the Debtors considered various strategic dispositions with respect to these assets:

- On March 8, 2023, the Debtors filed a motion seeking approval of the sale of Debtor Clifton Bay Investments LLC's limited partnership interests in Sequoia Capital Fund, L.P. ("Sequoia") to Al Nawwar Investments RSC Limited ("Nawwar") for approximately $45 million [D.I. 839]. The

Debtors acquired the interests in Sequoia on March 11, 2022 with an aggregate capital commitment of approximately $100,000,000, of which Debtor Clifton Bay Investments LLC contributed approximately $50,000,000.  After evaluating all bids submitted, the Debtors and Nawwar entered into that certain Purchase and Sale Agreement, dated as of March 8, 2023.  On March 28, 2023, the Bankruptcy Court approved the sale [D.I. 1174].

- On March 22, 2023, the Debtors filed a motion seeking approval of the sale of the Debtors' interests in Mysten Labs, Inc. ("Mysten") and Sui Token Warrants to Mysten for approximately $96.3 million [D.I. 1140]. The Debtors' interests consisted of 567,045 shares of Series B Preferred Stock in Mysten Labs, Inc. (the "Preferred Stock") and SUI Token Warrants to purchase 367,751,203 SUI Tokens.  The SUI Tokens were subject to a one to four year rolling lockup period with a one-year cliff following public launch of the SUI Tokens.  This lockup restricted the ability to sell or trade the SUI Tokens in the open market for an extended timeframe.  Of the approximately $96.3 million sale price, $95,237,684.19 will be allocated to the Preferred Stock and $1,012,315.81 will be allocated to the SUI Token Warrants.  On April 12, 2023, the Bankruptcy Court approved the sale [D.I. 1266].

- On June 8, 2023, the Debtors filed a motion seeking approval of the sale of Debtor Maclaurin Investments Ltd.'s interests in SCHF Cayman, L.P. ("SCHF Cayman") to Liberty Mutual Investment Holdings LLC ("Liberty Mutual") for approximately $19.6 million [D.I. 1596, 1789].  The Debtors acquired the interests in SCHF Cayman on July 1, 2022, with an aggregate capital commitment of $100,000,000, only $25,000,000 of which was funded as of the Petition Date.  After evaluating all bids submitted, the Debtors and Liberty Mutual entered into that certain Purchase and Sale Agreement, dated as of June 8, 2023.  SCHF Cayman is designed as an evergreen fund and therefore had no guaranteed exit timing or imminent monetization opportunity for the Debtors.  On June 28, 2023, the Bankruptcy Court approved the sale [D.I. 1792].

- On August 2, 2023, the Debtors filed a motion seeking an order authorizing the Debtors to enter into a settlement and share exchange agreement, pursuant to which, among other things, (i) the Debtors would transfer all shares of common stock of IEX Group, Inc. ("IEX"), other than 578,600 shares of IEX common stock (the "Retained Shares") which the Debtors would retain and have the ability to monetize; (ii) IEX would transfer to the Debtors all of the common shares of FTX Trading and all of the shares of class A common stock of WRS that it had received in a prior transaction with the Debtors; (iii) IEX and the Debtors would release any claims or causes of action against each other arising out of the prior transaction and (iv) IEX would waive all transfer restrictions related to the Retained Shares and cooperate with the Debtors in the monetization of the

Retained Shares. [D.I. 2110].  On August 18, 2023, the Bankruptcy Court approved the motion [D.I. 2204].

### 4. *Monetization of Digital Assets*

On September 13, 2023, the Debtors received Bankruptcy Court approval to sell, hedge and stake certain digital assets in accordance with certain investment guidelines [D.I. 2505] (the "Coin Monetization Order").  Contemporaneously with the entry of the Coin Monetization Order, the Bankruptcy Court authorized the Debtors' entry into, and performance of its obligations under, that certain Investment Services Agreement, dated August 23, 2023 (the "IMA"), between the Debtors and Galaxy Digital Capital Management LP ("Galaxy") [D.I. 2504].  The IMA appointed Galaxy as an investment manager for the Debtors, and authorized Galaxy to sell, hedge and stake the Debtors' digital assets on behalf of the Debtors pursuant to the investment guidelines in the Coin Monetization Order.

The Debtors are in the process of monetizing their digital assets in preparation for dollarized distributions to creditors after the effective date of the Plan.  Through December 8, 2023, the Debtors have sold certain of their digital assets for $1.8 billion pursuant to the Coin Monetization Order.

While the Debtors were in the process of conducting digital asset sales, the Debtors, in consultation with the Official Committee and the Ad Hoc Committee, determined to conduct Bitcoin derivative trading in order to hedge against the Debtors' exposure to Bitcoin and to generate yield on their digital assets portfolio.  To date, the Debtors have executed options trading documentation with several counterparties and have begun executing hedging transactions with such counterparties.

### 5. *Sale of Grayscale and Bitwise Trust Units*

The Debtors hold units (the "Trust Assets") in five statutory trusts managed by Grayscale Investments, LLC (the "Grayscale Trusts") and one statutory trust managed by Bitwise Investment Advisors, LLC (the "Bitwise Trust" in a brokerage account at ED&F Man Capital Markets, Inc. (n/k/a Marex Capital Markets Inc.) and in a brokerage account at Deltec Bank and Trust Limited.  The Grayscale Trusts and Bitwise Trust allow investors to gain exposure to digital assets without owning the digital assets themselves.

On November 3, 2023, the Debtors entered into that certain Second Amended and Restated Investment Services Agreement (the "Second A&R IMA"), to permit Galaxy to sell the Grayscale Trust Assets on behalf of the Debtors.  The Debtors concurrently filed a motion seeking authorization for the Debtors to sell the Trust Assets pursuant to certain procedures described in the Second A&R IMA.  The motion was approved on November 29, 2023.

### E. **Consensual Turnovers**

Since the Petition Date, the Debtors have engaged in an extensive effort to investigate and identify property of the estate that is in the possession or control of third parties.  Certain of those third parties consented to the turnover of such property conditioned upon an

order of the Bankruptcy Court.  Accordingly, the Debtors filed the following consensual turnover motions:

- On January 25, 2023, the Debtors filed a motion seeking the turnover of approximately $347.7 million of assets held in brokerage accounts at Interactive Brokers LLC [D.I. 582].  On February 3, 2023, the motion was granted by the Bankruptcy Court [D.I. 616].

- On March 29, 2023, the Debtors filed a motion seeking the turnover of approximately $165 million of assets held in accounts by Aux Cayes FinTech Co. Ltd. and Okcoin USA, Inc. [D.I. 1189].  On April 10, 2023, the motion was granted by the Bankruptcy Court [D.I. 1245].

- On March 29, 2023, the Debtors filed a motion seeking the turnover of approximately $53 million of assets held by Deltec International Group [D.I. 1195].  On April 12, 2023, the motion was granted by the Bankruptcy Court [D.I. 1267].

- On August 2, 2023, the Debtors filed a motion authorizing the turnover of approximately $14.3 million of assets held by Stripe, Inc. and approximately $1 million of assets held by BiLira Teknoloji Anonim Şiirketi [D.I. 2107].  On August 18, 2023, the motion was granted by the Bankruptcy Court [D.I. 2203].

### F.    Litigation

As part of the ongoing investigation and asset recovery initiatives, the Debtors have initiated numerous legal actions against various parties, including former Insiders, former business partners of the Debtors and other parties.  These include:

1. Three actions against Bankman-Fried and other former Insiders to claw back funds wrongfully paid:

   i.   An adversary action against Bankman-Fried, Wang, Singh and Ellison [D.I. 1886].  The complaint alleges breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, waste of corporate assets, aiding and abetting waste of corporate assets, and conversion, among other claims.  The Debtors are further seeking to avoid significant fraudulent transfers that were made for the benefit of the defendants.  The defendants' motions to dismiss were due November 30, 2023.

   ii.  An adversary action against FTX Group in-house counsel and Chief Compliance Office Daniel Friedberg [D.I. 1679].  The complaint details Friedberg's facilitation of the routing of customer funds to former Insiders, failure to implement necessary internal controls, and silencing of whistleblowers who threatened to expose

the FTX Group's wrongdoing.  The Debtors' claims against Friedberg include breaches of his fiduciary duties and aiding and abetting breaches by Bankman-Fried, Ellison, Wang, and other executives, legal malpractice, and corporate waste.  The Debtors seek to recover various transfers to Friedberg, including payment of an approximately $3 million bonus.  Friedberg filed his answer, partial motion to dismiss, and counterclaims in the adversary proceeding on October 23, 2023, asserting a right to indemnification and moving to dismiss portions of the Debtors' fraudulent transfer claims relating to Serum tokens and the Debtor's cause of action for disallowance of Friedberg's claims pursuant to section 502(d) of the Bankruptcy Code.  A schedule for further briefing has not yet been set.

iii.    An adversary action against Bankman-Fried's parents, Allan Joseph Bankman and Barbara Fried, detailing Bankman and Fried's exploitation of their access and influence within the FTX Group to enrich themselves and their chosen causes by millions of dollars [D.I. 2642].  Among the transfers the Debtors seek to avoid is a $10 million gift and purchase of a $16.4 million luxury property in The Bahamas, both of which originated from Debtor funds and were transferred to Bankman and Fried for their personal benefit.  The complaint also alleges that Bankman breached his fiduciary duties to Alameda Research, Alameda Research Ltd., WRSS, and FTX Trading as a de facto officer, director, and/or manager of those entities, and that Fried aided and abetted former Insiders' breaches of fiduciary duties by providing advice to evade political contribution disclosure rules.  The parties have entered into a stipulation extending the briefing schedule to early 2024.

2.   An adversary action against Michael Giles, the founder and CEO of Embed, and various other former Embed equity holders, to claw back approximately $236.8 million [D.I. 1503].  Briefing on the defendants' motions to dismiss completed on October 20, 2023 and defendants' request for oral argument is pending before the Bankruptcy Court.  Discovery is ongoing.

3.   An adversary action against (i) various owners and affiliates of K5 Global Holdings LLC, a venture capital company (the "K5 Defendants"), and (ii) SGN Albany Capital LLC ("SGN Albany"), an entity majority-owned by Bankman-Fried, Wang, and Singh, to claw back $700 million [D.I. 1679].  On September 26, 2023, the Bankruptcy Court granted plaintiffs' motion for default judgment against SGN Albany.  On August 17, 2023, the K5 Defendants filed a motion to withdraw the reference, and briefing on that motion was completed on October 13, 2023.  On September 11, 2023, the K5 Defendants filed a motion to stay the adversary proceeding and a motion to dismiss the complaint.  Briefing on the motion to stay was

completed on October 2, 2023 and briefing on the motion to dismiss was completed on December 11, 2023.  Discovery is ongoing.

4.   An adversary action against various former insiders of FTX Europe to recover $323.5 million in connection with the Debtors' prepetition acquisition of FTX Europe [D.I. 1866].  Discovery began in September and the parties have exchanged requests for production and plaintiffs have also served subpoenas on a number of third parties.  The parties are currently in the midst of briefing on defendants' motions to dismiss, which were filed on October 25 and October 27.  Briefing is set to be completed in early January 2024.

5.   An adversary action against Platform Life Sciences Inc., Latona Biosciences Group, Ross Rheingans-Yoo, Bankman-Fried, Nicholas Beckstead, and various small lifesciences defendants, for approximately $70 million in fraudulent transfers [D.I. 1881].  On September 15, 2023, Platform Life Sciences Inc. moved to dismiss the complaint for lack of personal jurisdiction [Adv. D.I. 35].  Plaintiffs filed an opposition to Platform Life Sciences Inc.'s motion to dismiss on September 29, 2023 [Adv. D.I. 41]; Platform Life Sciences, Inc. filed a reply on October 6, 2023 [Adv. D.I. 45].  Oral argument on Platform Life Sciences Inc.'s motion was held on November 15, 2023 [Adv. D.I. 71]; a ruling on Platform Life Sciences Inc.'s motion is pending.  Pursuant to a Stipulation and Order entered on November 1, 2023, the adversary proceeding was stayed as to the small lifesciences defendants and Beckstead, and the small lifesciences defendants agreed to facilitate the transfers to the Debtors of all rights and interests that Latona has in the small lifesciences defendants if Latona consents to it or the court orders it [Adv. D.I. 62, 64].

6.   An adversary action against LayerZero Labs, Ltd. ("LayerZero"), Ari Litan, and Skip & Goose LLC to recover assets transferred to LayerZero through fire sale transactions negotiated on the eve of the commencement of these Chapter 11 Cases, as well as to recover approximately $44 million in preferential transfers to the defendants.  Defendants' answer is scheduled to be filed on December 22, 2023.

7.   An adversary action against former FTX Group employees Michael Burgess, Huy Xuan "Kevin" Nguyen, Jing Yu "Darren" Wong, and Matthew Burgess, as well as certain related entities and individuals, to recover as fraudulent and/or preferential transfers approximately $157 million removed from the FTX Exchanges in the lead-up to the petition date [D.I. 2654].  On November 20, 2023, the defendants filed their motion to dismiss.  Motion to dismiss briefing is scheduled to be completed February 20, 2024.  Discovery is scheduled to begin December 15, 2023.

8. An adversary action against Bybit Fintech Ltd., Mirana Corp., Time Research Ltd., and other affiliated persons seeking to recover fraudulent and preferential transfers of withdrawals valued at approximately $950 million.  The Debtors are further seeking turnover of Debtor property, and damages from violations of the automatic stay caused by Bybit Fintech Ltd.'s depriving the Debtors of their assets, and otherwise taking steps to devalue Debtor property [D.I. 3722].

Also, on March 22, 2023, the Debtors filed a motion seeking an order authorizing the Debtors to enter into a settlement agreement for approximately $460 million with Modulo Capital, Inc. and various affiliates (the "Modulo Parties") in connection with various claims the Debtors believed they had against the Modulo Parties, including fraudulent transfer and/or preferential transfer claims [D.I. 1133].  The settlement agreement required the Modulo Parties to pay approximately $406 million in cash to the Debtors, and release claims, valued at approximately $56 million, to assets held on the FTX.com Exchange [D.I. 1133].  On April 10, 2023, the Bankruptcy Court approved the motion [D.I. 1244].  In early May 2023, Modulo transferred approximately $406 million in cash to the Debtors.

## G.    Investigative Efforts

Since the commencement of these Chapter 11 Cases, the Debtors have provided substantial cooperation in investigations by various governmental authorities around the world.  From the filing of these Chapter 11 Cases through the completion of Bankman-Fried's criminal trial, the Debtors have responded to near-daily requests from domestic and international authorities, and have provided authorities with more than 4.3 terabytes of data, including more than 1.4 million documents.

In particular, the Debtors have cooperated with the U.S. Department of Justice (the "DOJ") on its ongoing criminal investigations, which have—to date—resulted in four Insiders pleading guilty and Bankman-Fried being convicted on seven counts following a jury trial.  The Debtors also have been cooperating with the DOJ and other governmental authorities in connection with investigations into other potential criminal activity and misconduct.

The Debtors also have engaged extensively with the DOJ and other authorities to coordinate asset recovery and asset forfeiture efforts in order to maximize recoveries for creditors and victims.

## H.    Other Recovery Efforts

### 1.   *Donation and Political Contribution Recoveries*

After extensive analysis of bank records and various internal records, the Debtors identified 123 high-value prepetition transfers to different non-profit entities or projects totaling approximately $168.1 million.  This set of transfers consists primarily of transfers above $250,000 and ranges up to $16,647,353.  The Debtors have coordinated closely with the DOJ and other authorities with respect to these transfers, and the Debtors have contacted each of the recipients of these larger dollar transfers to seek the return of these funds to the extent Debtors are the appropriate party to seek their return.  To date, the Debtors have resolved, closed or

received settlement proposals from 45 entities. Examples of resolutions completed to date include: (i) Effective Ventures Foundation USA, Inc. for $22.54 million; (ii) Stanford University for $5.7 million; (iii) Center for AI Safety for $5.2 million; (iv) Effective Ventures Foundation UK for $4.2 million; (v) The Working Policy Project for $3.5 million; and (iv) the Metropolitan Museum of Art for $550,000. The Debtors also are reviewing potential lower-value prepetition transfers to approximately 403 non-profit entities or projects, consisting primarily of transfers of up to $250,000.

The Debtors have also identified approximately $195 million in prepetition transfers to political entities across approximately 1,072 different contributions. This includes transfers as large as $10 million, but the vast majority—900—are transfers of under $100,000, including hundreds of transfers of a few thousand dollars each. The Debtors have coordinated closely with the DOJ and other authorities with respect to these transfers, and have agreed that the DOJ is the appropriate party to seek the return of the majority of these transfers. To date, the Debtors have recovered approximately $500,000 from the recipients for which the Debtors are the appropriate party to seek the return of funds, which does not include amounts recovered by the DOJ.

## 2. *Settlement Procedures Motion*

On September 11, 2023, the Bankruptcy Court entered the *Order Authorizing and Approving Procedures for Settling Certain Existing and Future Litigation Claims and Causes of Action* [D.I. 2487], which streamlines the process for approving small dollar settlements. Under the order, and with certain exclusions, claims with an estimated value of $3 million or less may be settled without a filing under Bankruptcy Rule 9019(a) by providing notice to representatives of the Official Committee, the Ad Hoc Committee, and the U.S. Trustee, and providing a five-day period for objection. Where the estimated claim value is greater than $3 million and less than or equal to $15 million, and the settled value is $7 million or less, claims may be settled by filing a notice with the Bankruptcy Court and allowing a five-day period for objection. The order also requires a monthly filing identifying the settling parties and settlement amounts for the prior month.

## 3. *Other Recovery Efforts*

The Debtors have coordinated closely with the DOJ in connection with the seizure and forfeiture of Bombardier Global and Embraer Legacy airplanes, which were purchased and improved with approximately $35 million of estate funds. The Debtors continue to coordinate with the DOJ to work toward a consensual resolution of claims related to these airplanes.

On September 7, 2023, former Debtor Insider Ryan Salame pleaded guilty to conspiracy to defraud the United States and willfully violate the Federal Election Campaign Act and conspiracy to operate an unlicensed money transmitting business. Plea Tr. 24:10-25, Sept. 7, 2023, *United States* v. *Salame*, 22-cr-00673 (S.D.N.Y. 2023). As a condition of his plea agreement, Salame agreed to pay restitution to the Debtors in the amount of $5,593,177.91. The restitution amount is to be paid according to a plan established by the Bankruptcy Court.

In coordination with DOJ, the Debtors have helped secure more than half a billion dollars of assets held on more than a dozen third-party platforms around the world, including significant amount of Debtor assets held in accounts nominally registered in the name of non-Debtor entities or individuals. The Debtors continue to work with third-party exchanges to secure additional Debtor assets held on those platforms.

### I.    Estate Assets

The Debtors have made significant progress in their asset recovery efforts and advancements in their financial accounting systems. Below is a high-level overview of the Debtors' assets in each Silo as of the date of this Disclosure Statement. A significant portion of the referenced stablecoin holdings have been converted to cash, and certain below referenced digital assets have been monetized in accordance with the Coin Monetization Order.

#### 1.    *WRS Silo*

WRS Silo cash includes operating cash allocated to the WRS Silo as of the Petition Date, plus cash secured and marshalled by the Debtors postpetition and proceeds from the sale of LedgerX. WRS also holds two funded equity investments in IEX Group, Inc. and Bitnomial, Inc. The WRS Silo also has certain remaining digital assets holdings, including among others, Bitcoin; Ether; Wrapped Ether; DAI and USDC.

#### 2.    *Alameda Silo*

Alameda Silo cash includes operating cash allocated to the Alameda Silo as of the Petition Date, plus cash secured and marshalled by the Debtors postpetition and proceeds from the monetization of certain venture investments such as Modulo Capital Alpha Fund LP and SCHF Cayman, L.P. The Alameda Silo holds approximately 100 equity investments, including approximately ten direct fund investments, approximately 130 token investments and approximately five loan investments. In total, the Alameda Silo funded over $2.6 billion for all venture asset positions. Postpetition, the Debtors have exited approximately fifteen positions via sales, settlements and other dispositions, yielding proceeds of over $400 million. The top six venture holdings by the Alameda Silo by funded value (excluding monetized investments) include: Genesis Digital Assets Limited; Voyager Digital Ltd.; SOL Tokens; Toss; HOLE Tokens; and MATIC Tokens.

The Alameda Silo also holds brokerage investments in several marketable equity securities and digital asset-based trusts, including, among others, the Grayscale Investments. The Alameda Silo also has certain digital asset holdings including among others, Solana; Bitcoin; Aptos; Tether and Ether.

#### 3.    *Ventures Silo*

Ventures Silo cash includes operating cash as of the Petition Date, plus cash secured and marshalled by the Debtors postpetition and proceeds from the monetization of certain venture investments including Mysten and Sequoia. The Ventures Silo holds approximately 130 equity investments, approximately 30 direct fund investments, approximately 40 token investments and approximately five loan investments. The Ventures Silo funded over

$1.7 billion for all venture positions. Postpetition, the Debtors have exited over twenty positions via various transactions, yielding approximate proceeds of approximately $150 million. The top five venture holdings by the Ventures Silo include: Anthropic; Dave Inc.; Aptos; Chipper Cash; TripleDot and Near.

                 4.     *Dotcom Silo*

        Dotcom Silo cash includes operating cash allocated to the Dotcom Silo as of the Petition Date, plus cash secured and marshalled by the Debtors postpetition. The Dotcom Silo also held two de minimis funded token investments as of the Petition Date, one of which has been monetized. The Dotcom Silo also holds one funded token investment, Aptos. The Dotcom Silo holds various digital asset holdings, including among others, Toncoin, Bitcoin, Ether and Tether Gold.

    **J.**    **Other Bankruptcies**

               1.     *Voyager*

        On July 5, 2022, Voyager Digital Holdings, Inc. and certain of its affiliates (collectively, the "Voyager Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Voyager Chapter 11 Cases"). The Voyager Debtors operated a cryptocurrency trading platform.

        Before July 2022, various Debtors and the Voyager Debtors were involved in various financial engagements. On June 21, 2022, Debtor Maclaurin Investments Ltd. (formerly known as Alameda Ventures, Ltd. as lender, Voyager Digital Holdings, Inc. as borrower, and Voyager Digital, Ltd. ("Voyager TopCo"), as guarantor, entered into an agreement to establish a loan facility (the "Voyager Loan Facility"). At that time, Alameda Ventures, Ltd. and Debtor Alameda Research Ventures LLC were also the beneficial owners of several million shares of common stock of Voyager TopCo. Plus, Voyager TopCo and HTC Trading Inc., a non-Debtor affiliate of the Voyager Debtors, were parties to a loan agreement pursuant to which a series of loans in cryptocurrency and cash were made to Debtor Alameda Research Ltd. (one of Alameda Research's subsidiaries in the Alameda Silo) (the "Voyager MLA Loans").

        After the Voyager Chapter 11 Cases were commenced, but before the Petition Date, Debtor West Realm Shires Inc. ("FTX US") submitted the winning bid in the Voyager Debtors' auction of their businesses, a central component of their reorganization million proceedings. On September 27, 2022, Voyager TopCo and FTX US entered into an asset purchase agreement, whereby FTX US would acquire a substantial amount of the Voyager Debtors' assets. The bankruptcy court overseeing the Voyager Chapter 11 Cases approved the Voyager Debtors' entry into the asset purchase agreement (the "Voyager APA") on October 20, 2022, with the transaction contemplated to close pursuant to the Voyager Debtors' to be filed chapter 11 plan of reorganization. As discussed below, the Voyager APA was terminated pursuant to stipulation between the parties before the transaction closed.

        In addition, various other Debtors also timely filed proofs of claim in the Voyager Chapter 11 Cases. On October 3, 2022, Alameda Ventures, Ltd. filed proofs of claim against the Voyager Debtors, asserting certain claims for $75 million that were outstanding under the

Voyager Loan Facility, plus certain additional claims for related damages. Alameda Research Ventures LLC also filed a proof of claim for damages arising from the purchase of its shares of Voyager TopCo common stock.

After the Petition Date, the Debtors and the Voyager Debtors have engaged in extensive negotiations and formal proceedings to resolve their outstanding business matters.

First, after the Petition Date, the Debtors and the Voyager Debtors agreed to terminate the Voyager APA. A stipulation terminating that agreement was approved by the Bankruptcy Court on January 9, 2023 [D.I. 423] and by the bankruptcy court in the Voyager Chapter 11 Cases on January 10, 2023.

Second, on January 30, 2023, Alameda Research Ltd. filed a complaint in the Bankruptcy Court against Voyager Digital, LLC and HTC Trading Inc. (collectively, the "Voyager Preference Defendants") seeking to avoid repayments by Alameda Research Ltd. under the Voyager MLA Loans in September and October 2022 and related amounts as preferences under sections 547 and 550 of the Bankruptcy Code. An amended complaint was filed on March 2, 2023 adding FTX Trading as a plaintiff and asserting additional preference claims arising from withdrawals by the Voyager Debtors from the FTX Exchanges (collectively with the Voyager MLA Loan repayments, the "Voyager Preference Claims"). The FTX Debtors have asserted that, because the Voyager Preference Claims arose after the Voyager Chapter 11 Cases commenced, they are recoverable by Alameda Research Ltd. on an administrative priority basis pursuant to sections 503 and 507 of the Bankruptcy Code.

Third, in connection with the Voyager Debtors' plan confirmation process, Alameda Research Ltd. and the Voyager Preference Defendants entered into a stipulation pursuant to which, among other things, (i) the Voyager Debtors agreed to reserve $445 million with respect to the Voyager Preference Claims; (ii) the Voyager Preference Claims would be litigated in the Bankruptcy Court; (iii) the Debtors would waive any claims arising from the Voyager Loan Facility and (iv) the parties would submit to non-binding mediation in an effort to resolve all outstanding claims and disputes. The stipulation was approved by the Bankruptcy Court on March 8, 2023 [D.I. 833] and by the bankruptcy court for the Voyager Chapter 11 Cases on April 6, 2023. The Parties commenced mediation regarding these disputes in September 2023, and mediation is ongoing.

Finally, in these Chapter 11 Cases, the Voyager Debtors filed proofs of claim asserting claims related to the Voyager MLA Loans and the Voyager APA. As of the date of filing the Disclosure Statement, the Voyager Debtors and the Debtors have not reached a consensual resolution for these proofs of claim, so the Debtors intend to reconcile them as part of their general claims reconciliation process.

## 2. *Genesis Global Holdco, LLC*

On January 19, 2023, Genesis Global Holdco, LLC and its affiliates (collectively, the "Genesis Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Genesis Chapter 11 Cases"). Prior to January 2023, the Genesis Debtors offered a range of different digital asset services, including trading, lending and borrowing.

Prior to the Petition Date, various Debtors and the Genesis Debtors were engaged in certain business and financial arrangements, including various lending relationships.

After the Genesis Chapter 11 Cases were commenced, the Debtors took several actions to protect their interests. First, on May 3, 2023, the Debtors sought relief from the automatic stay in the Genesis Chapter 11 Cases to bring avoidance actions against the Genesis Debtors in relation to certain loan repayments, pledges of collateral, and withdrawals from the FTX Exchanges in the 90-day period prior to the Petition Date. The Debtors also later filed certain proofs of claim on the Genesis Debtors' claims register in connection with those same claims (the "Genesis Preference Claims"). In the aggregate, the Debtors asserted claims against the Genesis Debtors in a gross amount exceeding $3 billion. In response to the Debtors' stay relief motion, on June 1, 2023, the Genesis Debtors filed a motion in their own chapter 11 cases to establish procedures for the estimation of the Genesis Preference Claims. The Genesis Debtors and the Debtors subsequently engaged in litigation regarding the Genesis Debtors' estimation motion and the Debtors' stay relief motion.

In these Chapter 11 Cases, the Genesis Debtors also sought to protect their alleged prepetition interests. On or about June 30, 2023, certain Genesis Debtors filed proofs of claims asserting various claims against the Debtors that exceeded $320 million. In addition, non-Debtor affiliate GGC International Ltd. ("GGCI") filed a general unsecured claim against various Debtors for $213 million.

Beginning in early July 2023, the Debtors, GGCI and the Genesis Debtors engaged in settlement discussions to resolve the parties' various, interrelated disputes. The parties ultimately reached a consensual resolution of the parties' claims and disputes (the "Genesis Settlement Agreement"). The Genesis Settlement Agreement provided for, among other things, the withdrawal and expungement of all Genesis Debtors' and GGCI's claims against the Debtors and an allowed general unsecured claim by Alameda Research against the Genesis Debtors in the amount of $175 million. The Genesis Settlement Agreement was approved by the Bankruptcy Court on September 6, 2023 [D.I. 2433] and the bankruptcy court in the Genesis Chapter 11 Cases on October 6, 2023.

### 3. *Emergent Fidelity Technologies Ltd.*

Emergent Fidelity Technologies Ltd. ("Emergent") is a company formed under the laws of Antigua and Barbuda that was closely held by Bankman-Fried. Despite its affiliation with Bankman-Fried and the Debtors, Emergent was not part of these Chapter 11 Cases as of the Petition Date. Bankman-Fried and Wang had formed Emergent to hold certain investments in Robinhood Markets, Inc. ("Robinhood"), a brokerage and cash management application platform. According to Emergent's governance documents, Bankman-Fried is Emergent's only director; Bankman-Fried and Wang owned 90% and 10% of Emergent, respectively. To capitalize Emergent, Bankman-Fried and Wang had borrowed approximately $540 million from Debtor Alameda Research.

Shortly after the Petition Date, on November 17, 2022, a third-party creditor of Emergent filed a petition with the Antiguan court seeking to impose a receivership over Emergent's shares. The next day, the Antiguan court granted the receivership request,

appointing Angela Barkhouse and Toni Shukla of Quantuma (Cayman) Limited and Quantuma (BVI) Limited, respectively, as joint provisional liquidators. The Emergent joint provisional liquidators are tasked with overseeing the liquidation of Emergent in the Antiguan court proceedings.

Emergent's close affiliation with Bankman-Fried, coupled with its initial capital injection from Alameda Research, have led to its assets being subject to numerous competing claims. Emergent held its assets in a U.S. financial institution, Marex Capital Markets, Inc. in New York. On or around January 6, 2023, U.S. federal prosecutors seized Emergent's assets—approximately 55 million shares in Robinhood and $20.7 million in cash—in connection with the criminal prosecution of Bankman-Fried. These assets are still subject to other alleged claims and security interests, including those asserted by one or more of the Debtors, Bankman-Fried, and certain chapter 11 debtors in the bankruptcy case of another cryptocurrency company, BlockFi Inc. (described in more detail below).

On February 3, 2023, Emergent filed a petition for relief under chapter 11 of the Bankruptcy Code, under the direction of its joint provisional liquidators. In the accompanying first day declaration, Barkhouse asserted that Emergent required the protection of the Bankruptcy Court and the powers accorded to a debtor under the Bankruptcy Code because of the numerous competing parties claiming to be Emergent's creditors, the location of Emergent's assets in the United States, and the risk that certain parties may not comply with orders issued by the Antiguan court. The Bankruptcy Court granted interim and final approval for the joint administration of Emergent and the Debtors on April 10, 2023 and May 10, 2023, respectively.

4. *BlockFi Inc.*

Shortly after the Petition Date, on November 28, 2022, BlockFi Lending LLC ("BlockFi Lending"), BlockFi International LLC ("BlockFi International") and BlockFi, Inc. ("BlockFi", and together with BlockFi Lending and BlockFi International, the "BlockFi Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "BlockFi Chapter 11 Cases"). The BlockFi Debtors operated a financial services platform where retail clients could earn, borrow, trade and store certain digital assets.

Before the Petition Date, certain Debtors had business relationships with the BlockFi Debtors. In June 2022, following the BlockFi Debtors' experiencing a liquidity crisis, Debtor FTX US agreed to provide a revolving credit facility in an amount up to $400 million (the "BlockFi Rescue Facility"). As part of that transaction, FTX US also received an option to buy certain BlockFi Debtors' equity. From July through October 2022, the BlockFi Debtors drew $275 million from the BlockFi Rescue Facility.

Alameda Research also periodically borrowed cryptocurrency and cash from BlockFi Lending and BlockFi International pursuant to several loan agreements (the "BlockFi Loan Agreements"). During the 90 days prior to the Petition Date, certain BlockFi Debtors received repayments under the BlockFi Loan Agreements in an aggregate amount of approximately $132 million. Finally, the BlockFi Debtors also maintained several accounts on the FTX Exchanges.

In the days leading up to the Petition Date, reacting to speculation regarding Alameda Research's stability, the BlockFi Debtors took a series of actions. First, BlockFi Lending and BlockFi International modified the BlockFi Loan Agreements to increase the required collateralization levels, which Alameda Research satisfied. Certain BlockFi Debtors also withdrew certain assets from the FTX Exchanges with an aggregate value of approximately $3.6 billion. On November 8, 2022, BlockFi attempted to withdraw an additional $181 million in digital assets from the FTX Exchanges, which was not honored. BlockFi also requested an additional $125 million in capital pursuant to the terms of the BlockFi Rescue Facility, which the FTX Group did not fund.

On November 9, 2022—two days before the Petition Date—Alameda Research and BlockFi entered into a forbearance agreement, and BlockFi, BlockFi Lending and BlockFi International each entered into separate pledge agreements with Alameda Research and Emergent. Pursuant to the terms of the pledge agreement with Emergent, Emergent purportedly granted BlockFi a security interest in all of Emergent's rights, titles and interests in its Robinhood investment to secure the obligations of Emergent, Alameda Research, and their affiliates to the BlockFi Debtors and their affiliates. Likewise, under its pledge agreement with the BlockFi Debtors, Alameda Research purportedly granted BlockFi a security interest in all of its rights, titles and interests in, among other things, its shares of the Grayscale Trusts and the Bitwise Trust to secure the obligations of Alameda Research and its affiliates. On November 10, 2022, BlockFi alleged that Alameda Research had breached the terms of its forbearance agreement with BlockFi and informed Emergent of its election to accelerate Emergent's obligations under its respective pledge agreement.

On November 14, 2022, the BlockFi Debtors attempted to foreclose on the Robinhood shares, but Emergent did not complete the transfer. On November 28, 2022, the BlockFi Debtors commenced the BlockFi Chapter 11 Cases. That same day, BlockFi Inc. commenced an adversary proceeding against Emergent in connection with its alleged rights to the Robinhood shares and certain proceeds thereof.

On January 6 and January 11, 2023, the United States government filed notices in the BlockFi Chapter 11 Cases and these Chapter 11 Cases [D.I. 477] that, as described above, the DOJ had seized Emergent's assets, including proceeds from the Debtors' sale of the Robinhood shares, in connection with criminal proceedings against Bankman-Fried. On April 21, 2023, the Debtors and the BlockFi Debtors reached an agreement pursuant to which any and all claims related to the Robinhood assets would be litigated in connection with civil or criminal forfeiture proceedings before Judge Kaplan of the United States District Court for the Southern District of New York.

On March 31, 2023, the Debtors filed proofs of claim against the BlockFi Debtors' asserting that the loan repayments, collateral pledges and FTX Exchange withdrawals constitute avoidable preferences under sections 547 and 550 of the Bankruptcy Code (collectively, the "Debtors' BlockFi Claims"). On June 29, 2023, the BlockFi Debtors filed certain proofs of claim asserting claims related to certain assets purportedly held on the FTX Exchanges and for amounts outstanding under the BlockFi Loan Agreements, and in unliquidated amounts related to the pledge agreement with Emergent (the "BlockFi Affirmative Claims").

On August 11, 2023, the BlockFi Debtors filed a motion to estimate the Debtors' BlockFi Claims, and on August 21, 2023, the BlockFi Debtors filed an objection to the Debtors' BlockFi Claims. On September 13, 2023, the Debtors objected to the BlockFi estimation motion in the BlockFi Chapter 11 Cases and filed a reservation of rights with respect to the BlockFi Debtors' objection to the Debtors' BlockFi Claims.

On or about September 25, 2023, the Debtors and the BlockFi Debtors entered into a stipulation (the "BlockFi Claims Stipulation") pursuant to which, among other things, (i) the Debtors received an allowed claim for $275 million arising out of the BlockFi Rescue Facility; (ii) the BlockFi Debtors agreed to lift the automatic stay to allow the litigation of the Debtors' BlockFi Claims in the Bankruptcy Court and (iii) the Debtors' BlockFi Claims would otherwise be withdrawn from the BlockFi Chapter 11 Cases for the purposes of affirmative distributions from the BlockFi Chapter 11 Cases and such claims would be litigated in the Bankruptcy Court, including as defenses to or for the purpose of setoff against the BlockFi Affirmative Claims. The court overseeing the BlockFi Chapter 11 Cases and the Bankruptcy Court approved the BlockFi Claims Stipulation on October 3, 2023 and October 19, 2023 [D.I. 3314], respectively. The BlockFi Claims Stipulation contemplates mediation between the Debtors and the BlockFi Debtors with respect to the various disputes between the parties, which is expected to commence in January 2024. Since the entry into the BlockFi Claims Stipulation, the parties have been engaged in ongoing discussions with respect to such disputes. The BlockFi Claims Stipulation did not resolve the parties' competing rights to Emergent's interests in Robinhood. As of the date of filing the Disclosure Statement, litigation regarding Emergent's assets, including the Robinhood shares, remains ongoing.

5. *Three Arrows Capital*

On June 27, 2022, Three Arrows Capital, Ltd. (the "Three Arrows") commenced a liquidation proceeding before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) in the British Virgin Islands (the "3AC BVI Proceeding"), and that court issued an order appointing Russell Crumpler and Christopher Farmer as joint liquidators of Three Arrows. On July 1, 2022, Three Arrows commenced a chapter 15 case, and on July 28, 2022, the 3AC BVI Proceeding was granted recognition by the United States Bankruptcy Court for the Southern District of New York.

On or around July 30, 2023, Three Arrows filed certain proofs of claim against the Debtors asserting various claims arising from a purported transfer of assets from Three Arrow's FTX.com Exchange customer account to the FTX Debtors while Three Arrows was insolvent. On September 29, 2023, Three Arrows filed a motion to lift the automatic stay against the Debtors to pursue the claims asserted in their proof of claim, including preference claims, in the 3AC BVI Proceeding (or alternatively, Three Arrow's chapter 15 proceeding), as well as a motion for coordination between the Bankruptcy Court and the bankruptcy courts overseeing the chapter 11 proceedings of Genesis, BlockFi and Celsius Network with respect to Three Arrows's preference claims against each such debtor. On October 10, 2023, Three Arrows withdrew both motions.

As of the date of filing the Disclosure Statement, Three Arrows and the Debtors have not pursued a consensual resolution for these proofs of claim, so the Debtors intend to reconcile them as part of their general claims reconciliation process.

## K.      Foreign Debtors

During the course of these Chapter 11 Cases, certain Debtor and related non-Debtor affiliates have been subject to parallel liquidation proceedings in their respective jurisdictions.

### 1.    *Australia*

On November 11, 2022, prior to the commencement of these Chapter 11 Cases, the directors of non-Debtors FTX Express Pty Ltd and FTX Australia Pty Ltd., both Australian entities, appointed Messrs. Scott Langdon, John Mouawad, and Rahul Goyal of KordaMentha Restructuring as voluntary administrators.

### 2.    *The Bahamas*

Non-Debtor FTX DM is an International Business Company incorporated in the Commonwealth of The Bahamas on July 22, 2021.  FTX DM is a wholly owned subsidiary of Debtor FTX Trading.  On September 20, 2021, the SCB approved FTX DM's registration to operate as a Digital Asset Service Provider under the Digital Assets and Registered Exchanges Act, 2020 of The Bahamas.

On November 10, 2022, after it became clear that the FTX Group was facing a severe liquidity crisis, the SCB filed a petition for provisional liquidation of FTX DM with the Bahamas Court (the "Provisional Liquidation").  On the same day, The Bahamas Court granted the petition and appointed Brian C. Simms KC as provisional liquidator of FTX DM.  On November 14, 2022, the Bahamas Court appointed Messrs. Kevin G. Cambridge and Peter Greaves of PricewaterhouseCoopers as additional joint provisional liquidators to serve alongside Simms.  On November 10, 2023, the Bahamas Court ordered that FTX DM be wound up and appointed Simms, Cambridge and Greaves as official liquidators (the "Bahamas JOLs").

On November 15, 2022, FTX DM filed a petition for recognition of the Provisional Liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, captioned *In re FTX Digital Markets Ltd. (in Provisional Liquidation)*, No. 22-BK-11516 (MEW) [D.I. 1] (the "Chapter 15 Case").  On November 28, 2022, the Bankruptcy Court entered an agreed order to transfer venue to the Bankruptcy Court [D.I. 131].

Between November and December 2022, FTX DM and the Debtors had various disputes that ultimately were resolved pursuant to that certain settlement and cooperation agreement, dated January 6, 2023 (the "Cooperation Agreement").  On February 9, 2023, the Bankruptcy Court approved the Cooperation Agreement [D.I. 683].

On February 15, 2023, the Bankruptcy Court in the Chapter 15 Case entered an order recognizing the Provisional Liquidation as a foreign main proceeding under chapter 15 of

the Bankruptcy Code [D.I. 129].  On February 23, 2023, the Bahamas Court entered an order recognizing Kurt Knipp to act in The Bahamas on behalf of or in the name of Debtors Alameda Research, Alameda Research Ltd., Clifton Bay Investments LLC, FTX Trading, Maclaurin Investments Ltd., FTX US and WRSS.

On March 19, 2023, the Debtors commenced an adversary proceeding against FTX DM and the Bahamas JOLs [D.I. 1119].  The Debtors sought a declaratory judgment from the Bankruptcy Court that (i) FTX DM has no ownership interest in the Debtors' cryptocurrency, fiat currency, intellectual property or customer information; (ii) in the alternative, any transfers to or through FTX DM were fraudulent and avoidable and (iii) that the Debtors are entitled to avoid any fraudulent transfers and recover the avoidable transfers from the Defendants plus accrued interests and costs.  On consent of the Debtors and FTX DM, the Official Committee intervened as a plaintiff in the adversary proceeding by order dated June 23, 2023. [D.I. 21].

On March 29, 2023, FTX DM filed a motion in these Chapter 11 Cases seeking an order from the Bankruptcy Court clarifying that the automatic stay does not apply or, in the alternative, for relief from the automatic stay to file an application in the Provisional Liquidation to resolve certain novel and complex legal issues regarding FTX DM's relationship to the FTX.com Exchange and its customers [D.I. 1192].

The Debtors and FTX DM commenced mediation regarding all of their related issues, including among other things the Debtors' adversary proceeding and FTX DM's automatic stay relief motion, and have sought consensual extensions of the time to respond to claims and counterclaims asserted in the adversary proceeding.  The parties have engaged in ongoing good faith, arm's-length negotiations over a period of many months regarding the terms of (i) a global settlement to resolve all disputes between them and (ii) support for the other party's insolvency proceeding.

**L.      Interim Reports of John J. Ray III**

In the interest of furthering the Core Objectives, the Debtors prepared and filed two interim reports.

1.  *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges*

On April 9, 2023, the Debtors filed the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges Cases*.  The First Ray Report detailed the lack of management, governance, accounting, and security controls at the prepetition FTX Group, and the consequences of those control failures.  Management and control of the FTX Group was largely consolidated with Bankman-Fried, Singh, and Wang, who lacked the experience and ability necessary to adequately oversee the growing companies.  Among them, Bankman-Fried was viewed as having the final voice in all major decisions.  Key roles, such as a CFO, Chief Risk Officer, or Chief of Information Security, were missing at some or all critical entities.  Moreover, board oversight was virtually non-existent.  The First Ray Report explained that efforts to resolve these deficiencies and clarify corporate responsibilities were unwelcome and prompted retaliation.  For example, the president of the FTX.US Exchange

resigned after extensive disagreement with Bankman-Fried and Singh regarding the absence of appropriate reporting lines, formal management structure and key hires. Likewise, less than three months after being hired, a lawyer that expressed similar concerns about Alameda Research was summarily terminated.

The First Ray Report also described the significant lack of appropriate accounting and financial records, associated controls and staff, despite the FTX Group's expansive global operations and control of tens of billions of dollars. For instance, the FTX Group failed to hire professionals that could assist in accounting for assets and liabilities, hedge risk, and prepare financial reports. Indeed, fifty-six entities within the FTX Group never produced financial statements of any kind. Many of the other prepetition FTX Group utilized QuickBooks as their accounting system, and relied on a disorganized set of spreadsheets and shared drives to manage their assets and liabilities. Moreover, corporate structure and form was frequently disregarded, and assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. As a result of these inadequacies, for almost all of the Debtors, as of the Petition Date, financial statements were either non-existent, limited, or completely unreliable.

The First Ray Report also explained that, despite the FTX Group's public statements regarding the importance of safeguarding digital assets, the FTX Group had extensive deficiencies in its controls with respect to digital asset management, cybersecurity and information security generally. Especially with respect to its digital assets custody, the FTX Group did not implement industry-standard security controls. Instead, the FTX Group maintained virtually all of its digital assets in "hot wallets," which left them susceptible to compromise. These deficiencies, among other things, contributed to a November 2022 breach that drained approximately $432 million worth of assets on the date of the bankruptcy petition.

The First Ray Report also documented the favorable privileges Alameda Research was granted on the FTX.com Exchange. These privileges included the exemption from auto-liquidation and the ability to "borrow" an unlimited amount of digital assets even when Alameda Research's account balance on the exchange was below zero or net-negative. Together, these privileges gave Alameda Research the unique ability to trade and withdraw virtually unlimited assets, regardless of the size of its account balance and without risk to its positions being liquidated. The First Ray Report also explained how those privileges allowed the FTX Group to misappropriate customer funds, ultimately contributing to the FTX Group's collapse.

2. *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com*

On June 26, 2023, the Debtors filed the Second Ray Report. Building on the findings of the First Ray Report, the Second Ray Report detailed the rampant commingling and misuse of customer assets at the FTX.com Exchange. The Second Ray Report explained that the FTX Group represented publicly that, as is common in many industries, it separated customer and corporate funds. Indeed, the FTX Group even published a document touting the importance of this and other controls to prevent the misuse of customer assets, in its *FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*. Bankman-Fried repeatedly cited this publication in public statements and in testimony to the United States Congress.

However, despite these representations, the FTX Group regularly misappropriated customer assets, at the express direction of Bankman-Fried and others.  The Second Ray Report explained that, in part to avoid banks' restrictions related to digital assets, the FTX Group regularly funneled customer deposits and withdrawals of fiat currency through bank accounts of Alameda Research and its affiliates, misrepresenting the purpose of those funds to its banking partners.  At the same time, at the direction of Bankman-Fried and others, the FTX Group used those accounts for other purposes, commingling large sums of customer and corporate funds in the process.  The Second Ray Report provides a detailed overview of the process by which customers deposited assets on the FTX.com Exchange, which were principally on-ramped through bank accounts in the name of Alameda Research and its "subsidiary" North Dimension, before transitioning later to accounts nominally held by FTX DM.  As one former employee characterized it, the FTX Group made no meaningful distinction between funds of customers and funds of Alameda Research.  Those funds were then dispersed throughout the FTX Group and commingled with corporate assets.

Former FTX Group personnel attempted to justify the misuse of customer deposits by manufacturing a sham and doctored payment agreement which falsely claimed Alameda Research provided cash management services to the FTX.com Exchange.  As the Second Ray Report details, this scheme was led in part by Friedberg.  In addition to the sham agreement, that same senior attorney also took other actions to facilitate and cover up the FTX Group's commingling of customer and corporate funds, such as instructing employees to make false statements to banks.

As evidenced by correspondence and other records described in the Second Ray Report, this senior attorney, Bankman-Fried and others knew that the sham agreement and misrepresentations to banking partners were false.  Ultimately, as the Second Ray Report details, misappropriated and commingled customer deposits were used in part for speculative trading, venture investments, and the purchase of luxury properties, as well as for political and other donations designed to enhance their power and influence.  At the time of the Second Ray Report's publication, the Debtors' efforts to trace assets and maximize recoveries for stakeholders were ongoing.

### M.    Customer Redaction

On November 19, 2022, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* [D.I. 45] (the "Original Redaction Motion").  Among other things, the Original Redaction Motion requested authority for the Debtors to redact (a) the names and all associated identifying information of the Debtors' customers pursuant to section 107(b)(1) of the Bankruptcy Code and (b) the addresses and email addresses of individual creditors or equity holders of the Debtors pursuant to section 107(c) of the Bankruptcy Code.  On November 23, 2022, the Bankruptcy Court granted the Original Redaction Motion on an interim basis [D.I. 157].  Prior to the final hearing on the Original Redaction Motion, the Debtors modified the relief requested in the Original Redaction Motion to seek authority to redact confidential information pursuant to section 107(b) of the Bankruptcy

Code only for a limited period, subject to extension, and deferred their request to redact customer names pursuant to section 107(c).  On January 11, the Bankruptcy Court granted the Original Redaction Motion on a final basis [D.I. 545], except that the Bankruptcy Court authorized the Debtors to redact customer names pursuant to section 107(b) of the Bankruptcy Code for an initial period of only 90 days, subject to extension.

On April 20, 2023, the Debtors and the Official Committee filed the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals* [D.I. 1324] (the "First Extension Motion").  The First Extension Motion requested, among other things, authority to redact (a) the names, addresses and email addresses of the Debtors' customers for an additional 90 days pursuant to section 107(b) of the Bankruptcy Code and (b) the names, addresses and email addresses of the Debtors' customers who are natural persons on a permanent basis pursuant to section 107(c).  On June 15, 2023, the Bankruptcy Court entered the *Order Authorizing Movants to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals* [D.I. 1643] (the "First Extension Order").  The First Extension Order authorized the Debtors and the Official Committee to permanently redact the names of all customers who are natural persons from filings with the Bankruptcy Court in which disclosure would indicate such person's status as a customer, pursuant to section 107(c) of the Bankruptcy Code.  The First Extension Order also authorized the Debtors and the Official Committee to redact the names, addresses and email addresses of all the Debtors' customers for an additional 90 days (such date, the "Extended Redaction Deadline") pursuant to section 107(b).

On June 23, 2023, Bloomberg L.P, Dow Jones & Company, Inc., The New York Times Company and the Financial Times Ltd. filed a notice of appeal regarding the First Extension Order.  The appeal is fully briefed and currently pending before the United States District Court for the District of Delaware.

On September 13, 2023, the Debtors and the Official Committee filed the *Second Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers* [D.I. 2508] (the "Second Extension Motion").  On October 24, 2023, the Bankruptcy Court entered an order granting the Second Extension Motion [D.I. 3353] and further extending the Extended Redaction Deadline for an additional 90 days.

**N.     The Draft Plan, Creditor Meetings and the Settlement and Plan Support Agreement**

On July 31, 2023, the Debtors filed the *Draft Joint Plan of Reorganization* [D.I. 2100] (the "Draft Plan").  The Draft Plan contemplated a proposed global settlement and good-faith compromise of a large and complicated collection of claims, causes of actions and disputes involving the Debtors, including both claims against the Debtors and intercompany claims by various Debtors against other Debtors.  The Draft Plan was filed at a relatively early stage—before the expiration of the Customer Bar Date, the completion of pending investigations, the preparation of a disclosure statement, and meeting with key creditor constituents to discuss the

-46-

structure and terms of the Draft Plan—in order to facilitate creditor feedback and the consensual resolution of certain open issues in the Draft Plan and accompanying term sheet.

On August 18, 2023, the Official Committee filed the *Emergency Motion of the Official Committee of Unsecured Creditors for Entry of an Order Compelling Mediation of Chapter 11 Plan and Other Case Issues* [D.I. 2212].  Before the Bankruptcy Court heard the merits of the Official Committee's mediation motion, the Debtors and the Official Committee agreed on a schedule for meetings to discuss the draft plan and the related open issues and, if necessary, mediation.

On September 11 and 12, 2023, the Debtors arranged meetings with key creditor constituents in order to provide an update on the Debtors' progress in these Chapter 11 Cases and to achieve consensus among key creditor constituents with respect to the open items identified in the Draft Plan and term sheet.  Members of the Ad Hoc Committee, the Official Committee and the Class Action Claimants attended as well as their respective advisors.  The Debtors discussed, among other topics, coin monetization, the FTX Customer Portal, plan structure and estate assets, priority issues, venture investments, tax concerns and preliminary recovery analyses at the meetings.  The Debtors achieved agreement in principle on several open issues and agreed to reconvene following month to attempt to close out the remaining open items in the Draft Plan and accompanying term sheet.

On October 11 and 12, 2023, the Debtors met with members of the Ad Hoc Committee, the Official Committee and the Class Action Claimants, as well as representatives of the Bahamas JOLs and their respective advisors.  The Debtors discussed, among other things, claims reconciliation processes in the U.S. and the Bahamas, KYC policies, the customer shortfall priority percentage, the sale of the FTX Exchange, the monetization of digital asset, financial and venture investments, the customer preference settlement policy and post-effective governance.  The Debtors achieved broad consensus on many of the remaining open items in the Draft Plan and accompanying term sheet.

Following the September and October meetings, on October 16, 2023, the Debtors, the Ad Hoc Committee, the Class Action Claimants and the Official Committee executed that certain Settlement and Plan Support Agreement (the "PSA") [D.I. 3291], which, among other things, settles the AHC Adversary Proceeding and Class Action Adversary Proceeding subject to effectiveness of the Plan, establishes a preference policy to be implemented in the Plan and settles the treatment of the FTX Exchange's customer shortfall claim in the Plan.  Details of the settlement, including the customer preference settlement policy, are reflected in the Plan and are summarized in Section 4 of this Disclosure Statement.

O.    **U.S. Trustee's Request to Appoint Examiner**

On December 1, 2022, the U.S. Trustee moved to appoint an examiner in the Debtors' cases [D.I. 176], joined by a handful of state financial regulation agencies [D.I. 263, 600].  The U.S. Trustee argued that section 1104(c) of the Bankruptcy Code required the Bankruptcy Court to appoint an examiner because the Debtors' liquidated, unsecured debts exceed $5,000,000.  The U.S. Trustee also argued that the appointment of an examiner would be beneficial to the interests of creditors and the Debtors' Estates.  The Debtors, the Official

Committee and Bahamas JOLs opposed the motion, arguing that the statute did not mandate the appointment of an examiner and that the appointment of an examiner would injure the interests of creditors and the Estates. After a hearing, the Bankruptcy Court denied the U.S. Trustee's motion on February 15, 2023. The U.S. Trustee appealed to the U.S. Court of Appeals for the Third Circuit using the direct certification mechanism from Bankruptcy Rule 8006(f). *See Vara* v. *FTX Trading Ltd*, No. 23-2297 (3d Cir. 2023).

On appeal, the U.S. Trustee's sole argument is that section 1104(c) of the Bankruptcy Code mandates the requirement of an examiner when the debt threshold is satisfied [Appeal D.I. 23]. It does not contest the Bankruptcy Court's factual findings that the appointment of an examiner would be enormously costly to the Estates and injure the interests of creditors and the Debtors' Estates. The Debtors and the Official Committee argue that the U.S. Trustee continues to misread the text of the statute and that mandatory appointment of an examiner is not required by the section 1104 of the Bankruptcy Code [Appeal D.I. 44]. Oral argument was held on November 8, 2023. The Debtors estimate that the U.S. Court of Appeals for the Third Circuit will decide the appeal within the next three months.

### P. Estimation for IRS Claims

On April 27 and 28, 2023, the Internal Revenue Service (the "IRS") filed proofs of claim in the Debtors' cases totaling approximately $43.8 billion. On September 21, the IRS withdrew some of its claims and amended others. Its updated proofs of claim total approximately $43.3 billion. On November 2, 2023, the IRS further amended certain of its claims to reduce the amount claimed for the 2022 and 2023 tax years. The further amended proofs of claim reduced the total to approximately $24 billion. All of the IRS's proofs of claim note that the claims reflect "estimated tax liability" because the IRS's examination of the Debtors' tax returns is still "pending." Based on the Debtors' calculations, the Debtors submit that substantially all of the tax liability is excessive and cannot be substantiated.

The Debtors believe that the IRS's claims jeopardize plan confirmation. The IRS has not issued deficiency notices, attempted to substantiate its proofs of claim, or clarified when it plans to complete its examination. The Debtors understand that the IRS plans to examine their tax returns at its ordinary pace—potentially over the course of years. Given the magnitude of the IRS claims, plan confirmation would be delayed until the IRS concludes its examination. Moreover, the IRS has not at this time agreed to subordinate its claims.

To prevent the IRS claims from frustrating plan confirmation, the Debtors filed the *Motion of Debtors for Entry of an Order Establishing a Schedule and Procedures for Estimating Claims Filed by the United States Department of the Treasury – Internal Revenue Service* [D.I. 4204] to establish a schedule and procedures to estimate the claims under section 502(c) of the Bankruptcy Code. The Debtors requested an estimation schedule of approximately three months. During that time, the Debtors and the IRS will complete fact and expert discovery and estimation briefing in anticipation of an evidentiary hearing before the Bankruptcy Court, which the Debtors have proposed to occur at the end of February 2024. The Bankruptcy Court will thereafter estimate the IRS's claims for all purposes, including plan confirmation. The IRS has opposed the Debtors' motion to establish such estimation procedures

[D.I. 4509].  The Official Committee filed a statement in support of the Debtors' motion [D.I. 4554].

The Court granted the Debtors' motion to estimate and set the evidentiary hearing for early to middle of March 2024.

**Q.    Estimation Motion**

The FTX Group had over 1.8 million customer accounts with positive balances as of the Petition Date.  On June 28, 2023, the Bankruptcy Court established September 29, 2023 as the bar date for Customer Entitlement Claims.  In connection therewith, holders of Customer Entitlement Claims submitted proofs of claim setting forth, among other information, the number of units or quantity of each digital asset, fiat currency and/or derivative position held in their account(s) as of the Petition Date.

Because the Plan provides that the Debtors will make certain distributions to holders of Customer Entitlement Claims in cash, rather than in kind, it is necessary for the Debtors to estimate the value of digital assets, fiat currencies and derivative positions held by customers as of the Petition Date and asserted in such proofs of claim.  Accordingly, the Debtors will file a motion to estimate Customer Claims.

4.    S<small>UMMARY OF THE</small> P<small>LAN</small>

This section provides a summary of the structure and means for implementation of the Plan.  The Plan is annexed hereto as <u>Exhibit 1</u> and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

A.    **Considerations Regarding the Chapter 11 Plan**

The terms of the Plan are the result of extended analyses by the Debtors and their advisors as well as numerous meetings and intensive negotiations with multiple interested parties, including the Official Committee, the Ad Hoc Committee and the Class Action Plaintiffs.  The Debtors have sought to avoid, wherever possible, protracted litigation on issues relating to the Plan, such as the customer priority, customer preferences, substantive consolidation and waterfalls in order to mitigate the cost and delay of these Chapter 11 Cases.

Accordingly, the Plan includes a settlement and compromise on such issues and others that will provide holders of claims recoveries that reflect the relative risks and benefits of their claims taking into account the costs and likelihood of prosecution to final judgment.  Although litigation regarding the Plan could produce different absolute or relative recoveries from those proposed by the Plan, such litigation would not be finally resolved for many years, delaying and potentially materially eroding the value of ultimate distributions to all creditors.

B.    **Rationale Underlying Plan Treatment of Claims**

1.    *Substantive Consolidation of the Debtors*

As part of the Global Settlement (as defined below), the Plan consolidates all Debtors other than the Separate Subsidiaries into a single entity of pooled assets and liabilities.  Separate subsidiaries are entities that are expected to be fully solvent and historically maintained corporate separateness.  This is referred to as substantive consolidation.  The consequence of substantive consolidation is that claims of creditors against previously separate debtors become claims against the consolidated entity of pooled assets.

In *In re Owens Corning*, the Third Circuit established that a proponent of substantive consolidation is required to show that (i) prepetition the debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.  *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005).

Based on the facts of these Chapter 11 Cases, the Debtors determined that substantive consolidation is warranted under both prongs of Owens Corning.  The FTX Group often operated under the same name (FTX) and was tightly controlled by Bankman-Fried.  The FTX Debtors also did not observe any discernable corporate formalities with respect to intercompany transactions.  Further, the FTX Group, which consisted of more than one hundred entities, relied on a hodgepodge of Google documents, Slack communications, shared drives,

Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities. Intercompany transactions were not properly documented and assets were extensively commingled. Copies of key documentation are incomplete, inaccurate, contradictory, or missing entirely. Since the commencement of these Chapter 11 Cases, the Debtors have spent considerable time and effort attempting to understand the most basic of facts, such as the number of employees the Debtors have, where the Debtors' assets are, and how money flowed between entities. Attempts have been made to identify intercompany transactions and the inability to do so comprehensively—let alone to analyze and settle all intercompany litigation claims—is supported by the record of the work so far.

Despite the morass of intermingled entities, there are certain limited entities that have historically been separate entities and operated independently. These entities will remain separate and their creditors will be unimpaired on account of their Allowed Claims.

## 2. *Waterfall Analysis and the Customer Shortfall Claim*

As part of the Global Settlement, the Debtors have established three primary sources of recovery: (1) the Dotcom Customer Priority Assets, (2) the U.S. Customer Priority Assets and (3) the General Pool. As more fully described in the Plan, the Dotcom Customer Priority Assets and the U.S. Customer Priority Assets generally consist of the assets that were attributable to the FTX.com Exchange and the FTX.US Exchange, respectively, as of the Petition Date. The General Pool contains other assets, including but not limited to, the FTX Group's investments and the Alameda U.S. Customer Claim. Holders of Class 5A and Class 5B claims each will receive the priority assets attributable to their respective FTX Exchange, and each FTX Exchange will retain a "shortfall claim" against the General Pool for the benefit of the Holders of Class 5A and Class 5B claims.

The Plan sets forth waterfalls that govern the application of proceeds from each of the Dotcom Customer Priority Assets, the U.S. Customer Priority Assets and the General Pool. Under the General Pool waterfall, the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim retain a priority over Allowed Class 6 General Unsecured Claims. Specifically, after proceeds in the General Pool are applied to pay Administrative Claims, Other Priority Claims and Priority Tax Claims and General Convenience Claims, 66% of the amounts next available for distribution from the General Pool will be applied to pay the Dotcom Intercompany Shortfall Claim and the U.S. Shortfall Claim on a pro rata basis. Then, the remaining shortfall claims will rank equally with Class 6 claims with respect to the remaining 34% of proceeds.

The primary legal basis for a substantial priority for holders of Class 5 claims is a potential right of the FTX Exchanges, on their own behalf or on behalf of customers, to impose a constructive trust on assets of the Alameda Silo, as well as other Debtors, under Delaware law.

Under Delaware law, a constructive trust is a flexible equitable remedy designed to prevent a defendant from benefitting as a result of its wrongful conduct. Where a person holds property in circumstances in which in equity and good conscience it should be held or enjoyed by another, he will be compelled to hold the property in trust for that other. A breach of trust by a trustee is a violation of a correlative right of the beneficiary, and gives rise to liability on the

part of the trustee and a correlative cause of action on the part of the beneficiary for any loss to the trust estate. The fiduciary duties a trustee traditionally owes at common law include the duty of loyalty and the rule against self-dealing. *See McMahon* v. *New Castle Associates,* 532 A.2d 601, 608 (Del. Ch. 1987).

### 3. *Constructive Trust Remedy Against Assets of the Alameda Silo*

The Debtors' investigations indicate that, at the direction of Bankman-Fried and others, the FTX Group (i) funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research and its affiliates and (ii) used those accounts for many other purposes, commingling and misusing vast sums of customer and corporate funds in the process. Over $[•] billion of assets deposited in the FTX.com Exchange were misappropriated from the exchange in favor of Alameda Research. Alameda Research was in a position of trust with FTX Trading (among other reasons because both entities were under the control of Bankman-Fried), and Alameda Research, at the direction of Bankman-Fried, abused such trust when it misappropriated at least $[•] billion of FTX Trading assets. FTX Trading could have a meritorious argument that Alameda Research was unjustly enriched by abusing its position of trust with FTX Trading based on the following, among others: (i) Alameda Research was permitted to take assets deposited by customers on the FTX.com Exchange without any limit; (ii) to cover up the shortfall in excess of $[•] billion created by the misappropriation of funds by Alameda Research, Bankman-Fried, Wang and Singh created a sham customer account (known as the "Korean friend account") on the FTX.com Exchange reflecting an $8.8 billion payable from Alameda Research to FTX Trading; (iii) from the inception of FTX Trading, Bankman-Fried, Wang and Singh had customers send their funds intended for the FTX.com Exchange to Alameda Research's bank accounts due to FTX Trading's inability to open bank accounts in the United States and (iv) the FTX Group funneled money from these Alameda Research accounts through other FTX Group accounts and ultimately used the funds for a variety of illicit purposes, including to finance political contributions, venture investments and purchases of luxury real estate properties for senior FTX Group employees and others in the Bahamas.

### 4. *Constructive Trust Remedy Against Assets Outside of the Alameda Silo*

FTX Trading also has a basis to seek to extend the constructive trust over the assets of entities outside of the Alameda Silo through equitable tracing. Equitable tracing rules allow a court imposing a constructive trust to find that the trust attaches to commingled pools of assets and remains in effect even as new assets are added and removed to a commingled pool. Here, given the FTX Group's lack of books and records and extensive misappropriation of assets across all Debtors, assets may have been transferred to entities even outside the Alameda Silo. Accordingly, a court could expand a constructive trust to encompass assets of other Debtors. However, given the strength of the arguments in favor of substantive consolidation, equitable tracing rules may not be necessary to effectuate the relative priorities of the shortfall claims against the General Pool.

### 5. *The Global Settlement*

Purported customer property interests and entitlements in the Debtors' digital assets and fiat currency is a central and highly controversial issue in these Chapter 11 Cases.

With respect to the FTX.com Exchange, the AHC Adversary Proceeding alleges, among other things, that an express trust under English law should be imposed in favor of customers of the FTX.com Exchange based upon the FTX.com Exchange terms of service. The Debtors have argued, among other things, that the FTX.com Exchange terms of service are ambiguous with respect to whether a trust relationship exists and that application of English law does not warrant imposition of an express trust.

With respect to the FTX U.S. Exchange, U.S. customers may argue, among other things, that WRSS held digital assets and fiat in a "bailment for keeping" capacity based on the language of the FTX U.S. user agreement. If a bailment for keeping is established, WRSS would hold mere possessory interest in, but not legal title to, the digital assets and fiat associated with the FTX.US Exchange and, as a result, such assets and fiat would not constitute property of the Debtors. On the other hand, the Debtors may argue, among other things, that the FTX U.S. user agreement is ambiguous and does not establish a bailment for keeping relationship.

In addition, customers of both the FTX U.S. Exchange and the FTX.com Exchange may assert an unjust enrichment claim and argue that a constructive trust should be imposed for their benefit. However, a customer constructive trust action that seeks a priority over other customers will be difficult for any group of customers to prove. The Debtors submit that, as an equitable remedy, a constructive trust should not be imposed where it would lead to disproportionate recoveries for similarly situated creditors. Furthermore, funneling all assets to customers ignores the fact that many general unsecured claimants were victims of Alameda Research's fraudulent conduct as well.

Litigation over these issues with the Ad Hoc Committee or the Class Action Claimants would be time consuming and costly. To consensually resolve these issues and avoid the unnecessary time and costs, the Debtors established priority claims and shortfall amounts for the benefit of customers against the General Pool. The Debtors negotiated the priority claims and the shortfall amounts with key constituents at an early stage in these Chapter 11 Cases. The result of these extensive negotiations led to the establishment of the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim and their relative priorities, as reflected in the terms of the PSA and the Plan, and as described in section 4(c) of this Disclosure Statement. The Debtors, the Official Committee, the Ad Hoc Committee and the Class Action Claimants believe that the Plan provides holders of claims with recoveries that reflect the relative risks and benefits of their claims, and takes into account the costs and likelihood of prosecution to final judgment.

## C.    Classification, Treatment and Voting of Claims and Interests

### 1.    *Classification of Claims and Interests*

All Claims and Interests except for Administrative Claims and 503(b)(9) Claims are classified in the Classes set forth in Article 4 of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent

that such Claim or Interest is Allowed as a Claim or Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

2. *Summary of Claims Classification and Treatment*

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Tax Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3 | Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 5A | Dotcom Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5B | U.S. Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5C | NFT Customer Entitlement Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7A | Dotcom Convenience Claims | Impaired | Entitled to Vote |
| 7B | U.S. Convenience Claims | Impaired | Entitled to Vote |
| 7C | General Convenience Claims | Impaired | Entitled to Vote |
| 8A | PropCo Ordinary Course Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 8B | PropCo DM Claim | Impaired | Entitled to Vote |
| 8C | PropCo General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Cancelled Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 10 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 11 | Subordinated Claims | Impaired | Entitled to Vote |
| 12 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 13 | FTT Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 14 | Preferred Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 15 | Section 510(b) Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 16 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 17 | *De Minimis* Claims | Impaired | Not Entitled to Vote, Deemed to Reject |

3.   *Distributions Waterfalls*

    a.   <u>Dotcom Customer Waterfall</u>

Proceeds from the Dotcom Customer Priority Assets shall be applied in the following manner:

    (i)   *first*, to pay Case Expenses allocated to the Dotcom Customer Priority Assets pursuant to section 3.6 of the Plan;

    (ii)   *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims allocated to the Dotcom Customer Priority Assets;

    (iii)   *third*, to pay and perform obligations owed to FTX DM under the FTX DM Global Settlement Agreement;

    (iv)   *fourth*, to pay Allowed Dotcom Convenience Claims;

    (v)   *fifth*, to pay Allowed Dotcom Customer Entitlement Claims; and

    (vi)   *sixth*, to transfer remaining proceeds to the General Pool.

This concept is illustrated below.



b.    U.S. Customer Waterfall

Proceeds from the U.S. Customer Priority Assets shall be applied in the following manner:

(i)    *first*, to pay Case Expenses allocated to the U.S. Customer Priority Assets pursuant to section 3.6 of the Plan;

(ii)    *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims allocated to the U.S. Customer Priority Assets;

(iii)    *third*, to pay Allowed U.S. Convenience Claims;

(iv)    *fourth*, to pay Allowed U.S. Customer Entitlement Claims; and

(v)    *fifth*, to transfer remaining proceeds to the General Pool.

This concept is illustrated below.



c.   General Pool Waterfall

Proceeds in the General Pool shall be applied in the following manner:

(i)   *first*, to pay Allowed Administrative Claims allocated to the General Pool pursuant to section 3.6 of the Plan;

(ii)   *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims, other than Allowed Priority Tax Claims and Allowed Other Priority Claims (i) allocated to the Dotcom Customer Priority Assets or U.S. Customer Priority Assets; (ii) against FTX Bahamas PropCo or (iii) against any Separate Subsidiary;

(iii)   *third*, to pay Allowed General Convenience Claims;

(iv)   *fourth*, with respect to 66 percent of the amount next available for Distribution from the General Pool, to pay on a Pro Rata basis the Allowed Dotcom Intercompany Shortfall Claim and the Allowed U.S. Intercompany Shortfall Claim;

(v)   *fifth*, with respect to the remaining amount available for Distribution from the General Pool, to pay on a Pro Rata basis Allowed General Unsecured Claims, any unpaid balance of the Allowed Dotcom Intercompany Shortfall Claim and any unpaid balance of the Allowed U.S. Intercompany Shortfall Claim;

(vi)   *sixth*, to pay Separate Subsidiary Intercompany Claims;

(vii)   *seventh*, to pay Allowed Subordinated Claims;

(viii)   *eighth*, to pay Allowed Equitably Subordinated Claims;

(ix)   *ninth*, to pay Allowed FTT Interests;

(x)   *tenth*, to pay Preferred Equity Interests;

(xi)   *eleventh*, to pay Allowed Section 510(b) Claims; and

(xii)   *twelfth*, to pay Other Equity Interests;

This concept is illustrated below.



General Pool
Fiat and Digital Assets not held by the Dotcom or US Pools
Excess Distributable Value from the Separate Subsidiaries
Excess Distributable Value from Non-Debtor Subsidiaries
Customer Preference Action recoveries
Alameda US Customer Claim
Proceeds from sale of FTX.com Exchange
100% of Remaining Dotcom Residual Interest
100% of Remaining US Residual Interest
All Other Property not held by the Dotcom or US Pools
1 Allowed Administrative Claims allocated to the General Pool
2 Allocated & allowed Priority Tax & Other Priority Claims
3 Pay allowed General Convenience Claims
4 66% of Remaining Proceeds, US / Dotcom Intercompany Shortfall
5 Allowed General Unsecured Claims and Remaining US / Dotcom Shortfall Claims
6 Separate Subsidiary Intercompany Claims
7 Pay Allowed Subordinated Claims
8 Pay Allowed Equitably Subordinated Claims
9 Pay Allowed FTT Interests
10 Pay Preferred Equity Interests
11 Pay Allowed Section 510(b) Claims
12 Pay to pay Other Equity Interests.
Proceeds Waterfall
Legend
Flow Diagram:
Proceeds
Distributions
Proceeds from General Pool
Asset of General Pool
Creditor Pools:
US Pool
Dotcom Pool
General Pool

d.    [FTX Bahamas PropCo Waterfall

Proceeds from the sale, disposition or other monetization of property of FTX Bahamas PropCo shall be applied in the following manner:

(i)    *first*, to pay Case Expenses allocated to FTX Bahamas PropCo pursuant to section 3.6 of the Plan;

(ii)    *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims against FTX Bahamas PropCo;

(iii)    *third*, to pay Allowed PropCo Ordinary Course Claims;

(iv)    *fourth*, to pay the PropCo DM Claim;

(v)    *fifth*, to pay Allowed PropCo General Unsecured Claims; and

(vi)    *sixth*, to transfer remaining proceeds to the Dotcom Customer Priority Assets.

This concept is illustrated below.][9]

---

[9]    **Note to Draft**:  Classification and treatment of claims against FTX Bahamas PropCo subject to ongoing discussions with Bahamas JOLs.





e.    Separate Subsidiaries Waterfall

Proceeds from the sale, disposition or other monetization of property of each Separate Subsidiary shall be applied in the following manner:

(i)    *first*, to pay Case Expenses allocated to such Separate Subsidiary pursuant to section 3.6 of the Plan;

(ii)    *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims against such Separate Subsidiary;

(iii)    *third*, to pay Allowed Separate Subsidiary Claims against such Separate Subsidiary;

(iv)    *fourth*, to pay Allowed Separate Subsidiary Subordinated Intercompany Claims; and

(v)    *fifth*, to transfer remaining proceeds to the General Pool.

This concept is illustrated below.



The waterfall concepts discussed in this section are illustrated together in the following figure.



4. _Treatment_ of _Claims and Interests_

a.      Class 1 – Priority Tax Claims

(i)      _Classification_:  Class 1 consists of all Allowed Priority Tax Claims.

(ii)      _Treatment_:  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

(iii)      _Voting_:  Claims in Class 1 are Unimpaired.  Each Holder of a Priority Tax _Claim_ is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Priority Tax Claim is entitled to vote to accept or reject the Plan.

b.      Class 2 – Other Priority Claims

(i)      _Classification_:  Class 2 consists of all Other Priority Claims.

(ii)      _Treatment_:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)      _Voting_:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

c.      Class 3 – Secured Claims

(i)      _Classification_:  Class 3 consists of Secured Claims.

(ii)      _Treatment_:  Except to the extent that a Holder of an Allowed Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Claim, each Holder of an Allowed Secured Claim shall receive one of the following

treatments, in the sole discretion of the Plan Administrator: (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Secured Claim or (iii) treatment of such Allowed Secured Claim in any other manner that renders the Claim Unimpaired.

(iii)    *Voting*: Claims in Class 3 are Unimpaired.  Each Holder of a Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Secured Claim is entitled to vote to accept or reject the Plan.

d.    Class 4 – Separate Subsidiary Claims

(i)    *Classification*:  Class 4 consists of all Separate Subsidiary Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Separate Subsidiary Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Separate Subsidiary Claim, each Holder of an Allowed Separate Subsidiary Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Allowed Separate Subsidiary Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)    *Voting*: Claims in Class 4 are Unimpaired.  Each Holder of a Separate Subsidiary Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Separate Subsidiary Claim is entitled to vote to accept or reject the Plan.

e.    Class 5A – Dotcom Customer Entitlement Claims

(i)    *Classification*:  Class 5A consists of all Dotcom Customer Entitlement Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Dotcom Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Dotcom Customer Entitlement Claims, each Holder of an Allowed Dotcom Customer Entitlement Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the Dotcom Customer Priority Assets available to pay Dotcom

Customer Entitlement Claims in accordance with the waterfall priority set forth in section 4.2.1 of the Plan.

(iii)   *Voting*:  Claims in Class 5A are Impaired.  Each Holder of a Dotcom Customer Entitlement Claims is entitled to vote to accept or reject the Plan.

f.      Class 5B – U.S. Customer Entitlement Claims

(i)    *Classification*:  Class 5B consists of all U.S. Customer Entitlement Claims.

(ii)   *Treatment*:  Except to the extent that a Holder of an Allowed U.S. Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed U.S. Customer Entitlement Claims, each Holder of an Allowed U.S. Customer Entitlement Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the U.S. Customer Priority Assets available to pay U.S. Customer Entitlement Claims in accordance with the waterfall priority set forth in section 4.2.2 of the Plan.

(iii)   *Voting*:  Claims in Class 5B are Impaired.  Each Holder of a U.S. Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

g.      Class 5C – NFT Customer Entitlement Claims

(i)    *Classification*:  Class 5C consists of all NFT Customer Entitlement Claims.

(ii)   *Treatment*:  Except to the extent that a Holder of an Allowed NFT Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed NFT Customer Entitlement Claim, each Holder of an Allowed NFT Customer Entitlement Claim shall receive the Available NFT

-68-

associated with such Allowed NFT Customer Entitlement Claim.

(iii) *Voting*:  Claims in Class 5C are Impaired.  Each Holder of an NFT Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

h. <u>Class 6 – General Unsecured Claims</u>

(i) *Classification*:  Class 6 consists of all General Unsecured Claims.

(ii) *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool available to pay General Unsecured Claims in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii) *Voting*:  Claims in Class 6 are Impaired.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

i. <u>Class 7A – Dotcom Convenience Claims</u>

(i) *Classification*:  Class 7A consists of all Dotcom Convenience Claims.

(ii) *Treatment*:  On the later of the Initial Distribution Date or as soon as reasonably practicable after a Dotcom Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Dotcom Convenience Claim, each Holder of an Allowed Dotcom Convenience Claim shall receive payment in

Cash in an amount equal to [•] percent of such Allowed Dotcom Convenience Claim.

(iii)   *Voting*:  Claims in Class 7A are Impaired.  Each Holder of a Dotcom Convenience Claim is entitled to vote to accept or reject the Plan.

j.      Class 7B – U.S. Convenience Claims

(i)     *Classification*:  Class 7B consists of all U.S. Convenience Claims.

(ii)    *Treatment*:  On the later of the Initial Distribution Date or as soon as reasonably practicable after a U.S. Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed U.S. Convenience Claim, each Holder of an Allowed U.S. Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such Allowed U.S. Convenience Claim.

(iii)   *Voting*:  Claims in Class 7B are Impaired.  Each Holder of a U.S. Convenience Claim is entitled to vote to accept or reject the Plan.

k.      Class 7C – General Convenience Claims

(i)     *Classification*:  Class 7C consists of all General Convenience Claims.

(ii)    *Treatment*:  On the later of the Initial Distribution Date or as soon as reasonably practicable after a General Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Convenience Claim, each Holder of an Allowed General Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such Allowed General Convenience Claim.

(iii)   *Voting*:  Claims in Class 7C are Impaired.  Each Holder of a General Convenience Claim is entitled to vote to accept or reject the Plan.

l.   [Class 8A – PropCo Ordinary Course Claims

(i)   *Classification*:  Class 8A consists of all Allowed PropCo Ordinary Course Claims.

(ii)   *Treatment*:  Except to the extent that a Holder of an Allowed PropCo Ordinary Course Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo Ordinary Course Claim, each Holder of an Allowed PropCo Ordinary Course Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Allowed PropCo Ordinary Course Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)   *Voting*:  Claims in Class 8A are Unimpaired.  Each Holder of a PropCo Ordinary Course Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a PropCo Ordinary Course Claim is entitled to vote to accept or reject the Plan.

m.   Class 8B – PropCo DM Claim

(i)   *Classification*:  Class 8B consists of the Allowed PropCo DM Claim.

(ii)   *Treatment*:  Except to the extent that a Holder of an Allowed PropCo DM Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo DM Claim, each Holder of an Allowed PropCo DM Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the proceeds from the sale, disposition or other monetization of property of FTX Bahamas PropCo available to pay PropCo DM Claims in accordance with the waterfall priority set forth in section 4.2.4 of the Plan.

(iii)   *Voting*:  Claims in Class 8B are Impaired.  Each Holder of a PropCo General Unsecured Claim is entitled to vote to accept or reject the Plan.

n.       Class 8C – PropCo General Unsecured Claims

(i)      *Classification*:  Class 8C consists of all Allowed PropCo General Unsecured Claims.

(ii)     *Treatment*:  Except to the extent that a Holder of an Allowed PropCo General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo General Unsecured Claim, each Holder of an Allowed PropCo General Unsecured Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the proceeds from the sale, disposition or other monetization of property of FTX Bahamas PropCo available to pay PropCo General Unsecured Claims in accordance with the waterfall priority set forth in section 4.2.4 of the Plan.

(iii)    *Voting*:  Claims in Class 8C are Impaired.  Each Holder of an PropCo General Unsecured Claim is entitled to vote to accept or reject the Plan.][10]

o.       Class 9 – Cancelled Intercompany Claims

(i)      *Classification*:  Class 9 consists of all Cancelled Intercompany Claims.

(ii)     *Treatment:*  All Cancelled Intercompany Claims shall be cancelled, released or otherwise settled in full, and the Holders of Cancelled Intercompany Claims shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Claims under the Plan.

(iii)    *Voting*:  Claims in Class 9 are Impaired.  Each Holder of a Cancelled Intercompany Claim is conclusively deemed to have rejected the Plan.  No Holder of a Cancelled Intercompany Claim is entitled to vote to accept or reject the Plan.

p.       Class 10 – Intercompany Interests

(i)      *Classification*:  Class 10 consists of all Intercompany Interests.

(i)      *Treatment*:  No Holder of an Intercompany Interest shall receive any Distributions on account of its Intercompany Interest.  On and after the Effective Date, all Intercompany

---

[10] **Note to Draft**: Classification and treatment of claims against FTX Bahamas PropCo subject to ongoing discussions with the Bahamas JOLs.

Interests shall at the option of the Debtors, either be reinstated, set off, settled, addressed, distributed contributed, merged, or cancelled.

(ii)     *Voting*:  Claims in Class 10 are Impaired.  Each Holder of an Intercompany Interest is conclusively deemed to have rejected the Plan.  No Holder of an Intercompany Interest is entitled to vote to accept or reject the Plan.

q.     <u>Class 11 – Subordinated Claims</u>

(i)     *Classification*:  Class 11 consists of all Subordinated Claims.

(ii)     *Treatment*:  Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Claim, each Holder of an Allowed Subordinated Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii)     *Voting*:  Claims in Class 11 are Impaired.  Each Holder of a Subordinated Claim is entitled to vote to accept or reject the Plan.

r.     <u>Class 12 – Equitably Subordinated Claims</u>

(i)     *Classification*:  Class 12 consists of all Equitably Subordinated Claims.

(ii)     *Treatment*:  Except to the extent that a Holder of an Allowed Equitably Subordinated Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Equitably Subordinated Claim, each Holder of an Allowed Equitably Subordinated Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii)     *Voting*:  Claims in Class 12 are Impaired.  Each Holder of an Equitably Subordinated Claim is conclusively deemed to have

rejected the Plan.  No Holder of an Equitably Subordinated Claim is entitled to vote to accept or reject the Plan.

s.    Class 13 – FTT Interests

(i)    *Classification*:  Class 13 consists of all FTT Interests.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed FTT Interests agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed FTT Interests, each Holder of an Allowed FTT Interest shall receive payment in Cash equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii)    *Voting*:  Claims in Class 13 are Impaired.  Each Holder of an FTT Interest is conclusively deemed to have rejected the Plan.  No Holder of an FTT Interest is entitled to vote to accept or reject the Plan.

t.    Class 14 – Preferred Equity Interests

(i)    *Classification*:  Class 14 consists of all Preferred Equity Interests.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interests shall receive payment in Cash equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii)    *Voting*:  Interests in Class 14 are Impaired.  Each Holder of a Preferred Equity Interest is conclusively deemed to have rejected the Plan.  No Holder of a Preferred Equity Interest is entitled to vote to accept or reject the Plan.

u.    Class 15 – Section 510(b) Claims

(i)    *Classification*:  Class 15 consists of all Section 510(b) Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Section 510(b) Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Section 510(b) Claim, each

Holder of an Allowed Section 510(b) Claim shall receive payment in Cash equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii) *Voting*: Claims in Class 15 are Impaired. Each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan. No Holder of a Section 510(b) Claim is entitled to vote to accept or reject the Plan.

v.      Class 16 – Other Equity Interests

(i) *Classification*: Class 16 consists of all Other Equity Interests.

(ii) *Treatment*: Except to the extent that a Holder of an Allowed Other Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Equity Interest, each Holder of an Allowed Other Equity Interest shall receive payment in Cash equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii) *Voting*: Interests in Class 16 are Impaired. Each Holder of a Other Equity Interests is conclusively deemed to have rejected the Plan. No Holder of an Other Equity Interest is entitled to vote to accept or reject the Plan.

w.      Class 17 – *De Minimis* Claims

(i) *Classification*: Class 17 consists of all *De Minimis* Claims.

(ii) *Treatment*: No Holder of a *De Minimis* Claim shall receive any Distributions on account of its *De Minimis* Claim. On and after the Effective Date, all *De Minimis* Claims shall be cancelled and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(iii) *Voting*: Claims in Class 17 are Impaired. Each Holder of a *De Minimis* Claim is conclusively deemed to have rejected the Plan. No Holder of a *De Minimis* Claim is entitled to vote to accept or reject the Plan.

**D.      Implementation of the Plan**

1. *Operations Between the Confirmation Date and Effective Date*

During the period from the Confirmation Date through and until the Effective

Date, the Debtors may continue to operate as debtors-in-possession, subject to all applicable orders of the Bankruptcy Court.

## 2. *Global Settlement of Claims and Interests*

In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action arising, by or among the Debtors, including without limitation:  (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) any basis for the contractual, structural and legal subordination rights  of any Claim or Interest or any Distribution to be made on account of any Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) transactions among the Debtors prior to and on the Effective Date; (f) the allocation of corporate and administrative expenses across each of the Debtors; (g) the effects and consequences of the Debtors' terms of service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (h) the Debtors' disregard for corporate separateness before the Petition Date; (i) any causes of action by a Debtor against other Debtors or the Insiders of other Debtors;  (j) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of these Chapter 11 Cases; and (k) all Causes of Action relating to any of the foregoing.

In connection with the implementation of the Global Settlement pursuant to the Plan:  (a) the value of Claims in respect of Digital Assets shall be calculated pursuant to section 4.4 of the Plan; (b) the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim shall be recognized for the benefit of Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims; (c) the Alameda U.S. Customer Claim shall be recognized as part of the General Pool; (d) Claims shall be classified and treated as set forth in Article 4, which entitles Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims to recover against the (i) Dotcom Customer Priority Assets and the U.S. Customer Priority Assets, respectively, and (ii) General Pool, in accordance with the waterfall priorities set forth in section 4.2 of the Plan; (e) the Consolidated Debtors shall be substantively consolidated as set forth in section 5.5 of the Plan; (f) Cancelled Intercompany Claims shall be cancelled; (g) Separate Subsidiary Intercompany Claims, Subordinated Claims, Equitably Subordinated Claims, FTT Interests, Preferred Equity Interests and Section 510(b) Claims shall be subordinated to Claims of other Holders; (h) Other Equity Interests shall be cancelled; (h) Distributions to customers and creditors shall be made in Cash (other than in Available NFTs) as set forth in articles 4 and 7 of the Plan and (i) all assets scheduled by the Debtors shall constitute property of the Debtors' Estates.

## 3. *Substantive Consolidation*

As discussed above in Section 1.C of this Disclosure Statement, pursuant to sections 105, 363, 365 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and as an

integral part of the Global Settlement pursuant to the Plan, the Plan shall be deemed a motion by the Debtors seeking the approval, effective as of the Effective Date, of the substantive consolidation of the Estates of the Consolidated Debtors into a single Entity formed as a Delaware trust for the purposes of effectuating and implementing the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such substantive consolidation of the Estates of the Consolidated Debtors, as well as findings by the Bankruptcy Court that such substantive consolidation is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and the Holders of Claims and Interests.

Except as otherwise provided in the Plan and subject in all respects to the classification and treatment of Claims and Interests set forth in the Plan, as a result of the substantive consolidation of the Estates of the Consolidated Debtors:  (a) all property of the Consolidated Debtors shall vest in, and constitute the property of, the Consolidated Wind Down Trust, free and clear of any and all Liens, charges or other encumbrances or interests pursuant to Section 5.9 of the Plan; (b) all guarantees of any Consolidated Debtor of the payment, performance or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Wind Down Trust; (d) all Cancelled Intercompany Claims shall be deemed cancelled; and (e) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Consolidated Wind Down Trust.

Except as otherwise provided in the Plan, the substantive consolidation shall not: (i) affect the separate legal existence of the Consolidated Debtors for purposes other than implementation of the Plan pursuant to its terms; (ii) constitute or give rise to any defense, counterclaim or right of netting or setoff with respect to any Cause of Action vesting in the Consolidated Wind Down Trust that could not have been asserted against the Consolidated Debtors; or (iii) constitute the transfer or assignment of, or give rise to any right under, any executory contract, insurance contract or other contract to which a Consolidated Debtor is party, except to the extent required by section 365 of the Bankruptcy Code in connection with the assumption of such contract by the applicable Debtors.

4.  *Wind Down Entities*

The purpose of the Wind Down Entities is to monetize the Plan Assets and pay Distributions as promptly as reasonably practicable.  The Wind Down Entities shall hold Plan Assets for sale; sell Plan Assets; administer, and close as necessary, these Chapter 11 Cases; administer, reconcile and settle claims; and liquidate the Debtors and their non-Debtor subsidiaries pursuant to the terms of the Plan Supplement.  The Plan Administrator shall be vested with all other powers and authority set forth in the Plan and the Plan Administration Agreement, shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections 704(a)(1), 704(a)(2) and 704(a)(5) of the Bankruptcy Code.

5. *Plan Funding Mechanism*

Distributions under the Plan shall be funded from (a) Cash on hand, (b) Available NFTs, (c) Wind Down Cash Proceeds, and (d) any other Plan Assets, except as expressly set forth herein.

6. *Plan Administrator*

The Plan Administrator shall administer the Wind Down Entities after the Effective Date in accordance with the Plan Administration Agreement.  The appointment of the Plan Administrator shall be approved in the Confirmation Order.  The powers and duties of the Plan Administrator shall be set forth in the Plan and the Plan Administration Agreement, and will include the power and authority to, among other things, establish, administer, adjust and maintain the Disputed Claims Reserve and the Wind Down Reserve.  The Plan Administrator shall be a fiduciary of the Wind Down Entities and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administration Agreement.

7. *Vesting of Assets*

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Plan Assets irrevocably shall be transferred to and automatically vested in the Wind Down Entities, for the benefit of Holders of Claims, free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code.  All property held for Distribution pursuant to the Plan shall be held in trust for the benefit of the Holders of Allowed Claims and Interests and to pay the expenses of the administration of the Wind Down Entities. Upon the vesting of the Plan Assets, the Debtors nor the Consolidated Debtors shall have any interest in or with respect to the Plan Assets and such assets shall not be deemed property of the Debtors or Wind Down Entities.

8. *Preservation of Causes of Action*

Except as otherwise provided in Article 10 of the Plan or the other provisions of the Plan, each Cause of Action of a Debtor shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the Wind Down Entities as of the Effective Date.  Any Cause of Action against any Customer of the FTX.com Exchange or any of such Customer's successors or assigns shall vest exclusively in the Wind Down Entities and constitute a Dotcom Customer Priority Asset, and any such Cause of Action against any customer of the FTX.US Exchange shall vest exclusively in the Wind Down Entities and constitute a U.S. Customer Priority Asset.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Plan Administrator expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of Confirmation, the Plan, the vesting of such Cause of Action in the Wind Down Entities, any order of the Bankruptcy Court or these Chapter 11 Cases.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Plan Administrator, as

applicable, will not pursue such Cause of Action.

### E.    Provisions Governing Distributions

1.    *Distributions Timing*

a.    <u>Initial Distribution Date</u>.  On the Initial Distribution Date, the Distribution Agent shall commence Distributions under the Plan on account of each Claim that is Allowed on or prior to the Effective Date.[11]

b.    <u>Subsequent Distribution Dates</u>.  The Plan Administrator shall identify, in his or her reasonable discretion and in accordance with the Plan Administration Agreement, periodic dates after the Initial Distribution Date to be Subsequent Distribution Dates for purposes of making additional Distributions under the Plan.  Each Subsequent Distribution Date shall be a Business Day.

c.    <u>Distributions to Holders of Claims Allowed After the Effective Date</u>.  The Distribution Agent shall make Distributions to Holders of Claims Allowed after the Effective Date in accordance with the applicable provision of Article 4 of the Plan on the first Subsequent Distribution Date after such Claim is Allowed.  Unless the Plan Administrator otherwise agrees, no partial Distribution shall be made with respect to such Claim until all disputes in connection with such Claim have been resolved by Final Order of the Bankruptcy Court.

2.    *Distributions to Holders of Customer Entitlement Claims*

a.    <u>Distributions of Dotcom Customer Entitlement Claims, U.S. Customer Entitlement Claims and Allocations of Wind Down Cash Proceeds</u>.  On any Distribution Date, the Plan Administrator may direct the Distribution Agent to Distribute to the Holders of Allowed Dotcom Customer Entitlement Claims or Allowed U.S. Customer Entitlement Claims the Wind Down Cash Proceeds that the Plan Administrator, in his or her reasonable discretion and in accordance with the Plan and the Plan Administration Agreement, determines are Wind Down Cash Proceeds that belong to the Dotcom Customer

---

[11]    **Note to Draft**:  Distributions dates shall be determined by the Plan Administrator in his or her reasonable discretion.  To determine the "Initial Distribution Date," the Plan Administrator shall consider, among many factors, the costs associated with making Distributions, the assets and liabilities of the Wind Down Entities, liquidity, projected revenues and cash flows, status likelihood of successful resolution of current and future litigation and tax considerations.  The Initial Distribution Date may not be the Effective Date.

Priority Assets or U.S. Customer Priority Assets, respectively, in each case, in accordance with section 4.3 of the Plan.

b.  <u>Final Distribution at Closing of these Chapter 11 Cases</u>.  On or prior to the closing of these Chapter 11 Cases, the Plan Administrator shall Distribute (such Distribution, the "<u>Final Distribution</u>") all remaining Wind Down Cash Proceeds in accordance with the waterfall priority set forth in section 4.2 of the Plan and the classification and treatment set forth in section 4.3 thereof.

## F.    Record Date and Delivery of Distributions

### 1.  *Record Date for Distributions*

In advance of each Distribution Date, the Plan Administrator shall establish a Distribution Record Date for purposes of determining the Holders of Allowed Claims entitled to receive a Distribution on such Distribution Date, which Distribution Record Date shall be no less than [•] and no more than [•] days prior to the corresponding Distribution Date.  On each Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on such Distribution Record Date.  If a Claim is transferred 20 or fewer days before the applicable Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### 2.  *Delivery of Distributions in General*

Except as otherwise provided in the Plan, the Distribution Agent, at the direction of the Plan Administrator, shall make all Distributions required under the Plan to Holders of Allowed Claims.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the applicable Distribution Record Date by the Distribution Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtors, the Plan Administrator or the Distribution Agent have been notified in writing of a change of address); (b) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent; (c) at the address set forth in any notice filed pursuant to Bankruptcy Rule 3001(e); or (d) at the address reflected in the Schedules if no Proof of Claim has been filed and the Notice and Claims Agent has not received a written notice of a change of address.  The Debtors, the Plan Administrator, the Distribution Agent, the Wind Down Entities and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or

distribution may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Allowed Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### 3. *Valuation of Claims*

Except as otherwise provided in the Plan, an order of the Bankruptcy Court or as agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, any Claim asserted in a currency other than U.S. Dollars, except Claims in respect of Digital Assets, shall be automatically deemed converted to the equivalent U.S. Dollars at the Exchange Rate.

The value of a Claim in respect of a Digital Asset shall be calculated by converting the value of such Digital Asset into Cash as of the Petition Date utilizing the conversion rates set forth in the Digital Assets Conversion Table attached to this Disclosure Statement as Appendix D and pursuant to Section 4.4 of the Plan.

### 4. *Distribution Agent*

The Plan Administrator shall have the authority, in its sole discretion, to enter into an agreement with a Distribution Agent to facilitate the Distributions required under the Plan. To the extent the Plan Administrator determines to utilize a Distribution Agent to facilitate the Distributions, such Distribution Agent would first be required to:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or Distributions required under the Plan; and (c) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the Distributions required under the Plan to be distributed by such Distribution Agent.

The Plan Administrator shall pay to the Distribution Agent all of its reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  The Distribution Agent shall submit detailed invoices to the Plan Administrator for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Plan Administrator shall pay those amounts that it, in its sole discretion, deems reasonable, and shall object to those fees and expenses, if any, that the Plan Administrator deems to be unreasonable.  In the event that the Plan Administrator objects to all or any portion of the amounts requested to be reimbursed in the Distribution Agent's invoice, the Plan Administrator and the Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Plan Administrator and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

### 5. *Fractional and De Minimis Distributions*

Notwithstanding anything herein to the contrary, the Plan Administrator and the Distribution Agent shall not be required to make Distributions in Cash or payments of less than $10.  Any Holder of an Allowed Claim on account of which the amount of Cash or other

property to be distributed is less than $10 shall be forever barred from asserting such Claim against the Debtors, the Estates, the Plan Administrator, the Wind Down Entities or any of their property.

6.   *Undeliverable Distributions*

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' or Notice and Claims Agent's records, no further Distribution to such Holder shall be made unless and until the Plan Administrator or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter. Undeliverable Distributions shall remain in the possession of the Plan Administrator or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the relevant Wind Down Entity or is cancelled pursuant to Section 7.7 of the Plan and shall not be supplemented with any interest, dividends or other accruals of any kind. Nothing contained herein shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim whose Distribution is declared an undeliverable or Unclaimed Distribution.

7.   *Reversion*

Any Distribution under the Plan, including Distributions made by the Plan Administrator or the Distribution Agent in accordance with Section 7.4 of the Plan, that is an Unclaimed Distribution for a period of six months thereafter, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the relevant Wind Down Entity as Plan Assets with respect to Unclaimed Distributions on account of Claims, *provided*, *however*, that the Plan Administrator and the Distribution Agent shall use commercially reasonable efforts to notify the Holder of such Unclaimed Distribution within three months of the applicable Distribution Date. Any Distribution that is not made pursuant to section 7.5 of the Plan shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the relevant Wind Down Entity as Plan Assets pursuant to section 7.7. of the Plan. Upon revesting pursuant to section 7.7 of the Plan, the Claim of any Holder or its successors and assigns with respect to such property shall be cancelled and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. If any Unclaimed Distribution revests in any Wind Down Entity as Plan Assets pursuant to section 7.7 of the Plan after the Final Distribution is made, the Plan Administrator shall not be required to make any subsequent Distributions to Holders of Allowed Claims or Interests under the Plan.

8.   *Surrender of Cancelled Instruments or Securities*

Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent. Subject to the foregoing sentence, regardless of any actual surrender of a Certificate, the deemed surrender shall have the same effect as if its Holder had actually surrendered such Certificate, and such Holder shall be deemed to have relinquished all rights, Claims and Interests with respect to such Certificate.

Notwithstanding the foregoing paragraph, section 7.8 of the Plan shall not apply to any Claims reinstated pursuant to the terms of the Plan.

### 9. *Setoffs*

Except as otherwise provided in the Plan, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or the Plan Administrator of any such Claims, rights and Causes of Action that such Debtor or the Plan Administrator may possess against such Holder. In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or the Plan Administrator, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases by the applicable Claims Bar Date preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

### 10. *No Interest on Claims*

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of any Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### 11. *No Payment over the Full Amount*

In no event shall a Holder of an Allowed Claim receive more than the full payment of such Allowed Claim. To the extent any Holder has received payment in full with respect to an Allowed Claim, such Allowed Claim shall be deemed satisfied and expunged from the claims registry without an objection to such Claim having been filed and without any further notice to or action, order or approval of the Bankruptcy Court. To the extent that a Holder of an Allowed Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, the Plan Administrator or the Distribution Agent on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Plan Administrator or the Distribution Agent, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay

or return such distribution shall result in the Holder owing the Plan Administrator annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

12.    *Anti-Double-Dip*

The Plan Administrator may require any Holder of any Claim to submit satisfactory evidence that such Holder has not requested or received compensation for the same losses underlying such Claim in connection with any return of customer property procedures or other judicial or administrative proceeding, including, without limitation, any proceedings with respect to:  [(a) FTX Australia; (b) FTX DM; (c) FTX Turkey; (d) SNG Investments; (e) FTX Europe AG; (f) FTX EU Ltd.; (g) Quoine PTE Ltd. or (h) FTX Japan].  The Plan Administrator may, and may direct the Distribution Agent to, withhold any Distributions on such Claim until such time as satisfactory evidence is obtained or appropriate arrangements are in place that ensure no Holder receives more than any other Holder under the Plan, taking into account potential recoveries of all Holders.

As a condition to receiving any Distribution under the Plan, the Plan Administrator may require Holders of Allowed Dotcom Customer Entitlement Claims, U.S. Customer Entitlement Claims, NFT Customer Entitlement Claims, General Unsecured Claims, Dotcom Convenience Claims, U.S. Convenience Claims or General Convenience Claims to irrevocably and unconditionally assign and transfer to the Plan Administrator all right, title and interest in any claim or Cause of Action for the same losses that has been or may be made or asserted in any return of customer property procedures or other judicial or administrative proceeding relating to any Debtor or any Affiliate of the Debtors, including, without limitation, [(a) FTX Australia; (b) FTX DM; (c) FTX Turkey; (d) SNG Investments; (e) FTX Europe AG; (f) FTX EU Ltd.; (g) Quoine PTE Ltd. or (h) FTX Japan].

13. *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, the Plan Administrator and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any tax law, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  For any claims for employee compensation, such tax withholding may include withholdings, regardless of whether the current Holder is or was an employee of the Debtors.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Plan Administrator and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms that are reasonable and appropriate.  For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable Holder.  The Plan Administrator reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes and then to

the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

### 14. *Tax Identification, KYC and OFAC Certifications*

Any Holder entitled to receive any Distribution under the Plan shall, upon request, deliver to the Distribution Agent or such other Entity designated by the Plan Administrator:  (a) a completed IRS Form W-9 or appropriate IRS Form W-8, as applicable; (b) a certification that the Holder is not a Person or Entity with whom it is illegal for a U.S. person to do business under Office of Foreign Assets Control sanctions regulations and/or the list of Specially Designated Nationals and Blocked Persons and (c) know your customer information of the Holder of such Claim, which (i) for individuals, may include, among other things, full name including any aliases, date of birth, address and proof of address, identification and identification-related documents, nationality, phone number, email address, occupation, bank account information or wallet address, social security number (for U.S. citizens) and facial liveness and (ii) for institutional Holders, may include, among other things, company name, registration information, tax identification number, principal business address and phone number, business email address, information on the nature of the business and principal business activity, entity size, source of wealth/source of funds, annual revenue/profit, authorized signer, identity of ultimate beneficial owners, identity of directors and/or members of management, bank account information or wallet address and, for any ultimate beneficial owners, directors or members of management, similar identification information and records as are collected for individual Holders who are natural Persons (collectively, the "Pre-Distribution Requirements").  If a request for Pre-Distribution Requirements has not been satisfied within 30 days thereafter, a second request shall be sent to such Holder.  If the Holder fails to comply with the Pre-Distribution Requirements before the date that is 60 days after a second request is made, such Holder shall be deemed to have forfeited its right to receive Distributions, and shall be forever barred and enjoined from asserting any right to Distributions made prior to the Plan Administrator receiving its executed Pre-Distribution Requirements.  Any Distributions that are forfeited pursuant to this provision shall revest in the Wind Down Entities as Plan Assets.

### G.    Settlement, Release, Injunction and Related Plan Provisions

#### 1. *Subordinated Claims*

The Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination rights, except to the extent the Debtors have otherwise agreed in writing with the Holder of the applicable Allowed Claim or Interest.

#### 2. *Discharge of Claims and Termination of Interests*

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Interests in, the Debtors, any property of the Estates, the Plan

Administrator or any property of the Wind Down Entities, including all Claims of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Interest based upon such Claim, debt, right, liability, obligation or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, liability, obligation or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim, liability, obligation or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

3. _Release of Liens_

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and cancelled, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Wind Down Entities and their successors and assigns.  Any Holder of such mortgage, deed of trust, Lien, pledge or other security interest (and the applicable agents for such holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence such release, including the execution, delivery and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

4. **_Debtors' Release_**

**Except as otherwise specifically provided in the Plan with respect to the Preserved Potential Claims, for good and valuable consideration, including the service of the Released Parties to facilitate the administration of these Chapter 11 Cases and the implementation of the orderly liquidation contemplated by the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Released Parties are hereby conclusively, absolutely, unconditionally, irrevocably and forever released, waived and discharged by the Debtors, the Plan Administrator and the Estates, including any successor to, or assignee of the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, breach of contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors,**

these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the release of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act; *provided* that the release under this paragraph shall not apply to any Excluded Party, nor to any Preserved Potential Claims to the extent such Preserved Potential Claims are brought by and for the benefit of the Wind Down Entities with the approval of the Plan Administrator, unless otherwise specifically provided in the Plan or the Plan Supplement.  Nothing in the Plan or Confirmation shall affect any releases previously granted or approved by the Bankruptcy Court.

5. *<u>Voluntary Release by Holders of Claims and Interests</u>*

For good and valuable consideration, including the service of the Released Parties to facilitate the administration of these Chapter 11 Cases, the implementation of the Plan, and the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, breach of contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement or the Disclosure Statement, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement,

event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act.  Nothing in this paragraph shall cause the release of (a) any Excluded Party nor (b) any Preserved Potential Claims that are otherwise transferred to, and may be prosecuted by, the Wind Down Entity pursuant to the terms of the Plan.

6. *__Scope of Releases__*

Each Person providing releases under the Plan, including the Debtors, the Plan Administrator, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

7. *__Exculpation__*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

As of the Effective Date, to the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in section 10.4 or Section 10.5 of the Plan, the Exculpated Parties shall neither have nor incur any liability to any Entity for any act or omission in connection with, related to, or arising out of these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) the administration and adjudication of Claims and Interests during these Chapter 11 Cases; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Plan, the Disclosure Statement, the Plan Supplement or any related contract, instrument, release or other agreement or document created or entered into in connection with these Chapter 11 Cases (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan, the trading or sale of  cryptocurrencies and tokens in connection with these Chapter 11 Cases, the offer and issuance of any securities under or in connection with the Plan and the distribution of property, Digital Assets, or tokens under the Plan); or (d) any other transaction, agreement, event, or other occurrence related to these Chapter 11 Cases taking place on or before the Effective Date, other than liability resulting from any act or omission that is determined by Final Order to have constituted

**gross negligence, willful misconduct, fraud or a criminal act. Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party. Nothing in the Plan or Confirmation shall affect any exculpation orders previously granted or approved by the Bankruptcy Court.**

8. *Injunction*

**Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, the satisfaction and release pursuant to Article 10 of the Plan shall also act as a permanent injunction against any Person who has held, holds or may hold Claims, Interests or Causes of Action from (a) commencing or continuing any action to collect, enforce, offset, recoup or recover with respect to any Claim, liability, obligation, debt, right, Interest or Cause of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Interests; and (d) asserting any right of setoff, subrogation or recoupment of any kind on account of or in connection with or with respect to any such Claim or Interest, notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise, against any Plan Asset, the Wind Down Entities, any Holder of a Claim or Interest or any initial or subsequent transferee. Notwithstanding anything to the contrary in the Plan, all Holders of Claims, Interests or Causes of Action are enjoined from interfering with the Distributions contemplated by the Plan and from asserting any Claim or Cause of Action expressly preserved and vested exclusively in the Wind Down Entities as of the Effective Date.**

9. *Limitations on Exculpations and Releases*

**Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post-Effective Date obligations or (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, including the Preserved Potential Claims.**

H.    The Customer Preference Settlement

The Customer Preference Settlement is a compromise between the Debtors and Qualifying Customer Preference Settlement Participants (defined below) that, if approved under the Plan, will be effectuated pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 as part of the Global Settlement. The Customer Preference Settlement is a settlement of Dotcom Customer Preference Actions and U.S. Customer Preference Actions

(each, a "Customer Preference Action") that are not Excluded Customer Preference Actions as designed by the Debtors under Section 5.3.3 of the Plan.

Pursuant to section 547 of the Bankruptcy Code, the Debtors may pursue Avoidance Actions Customers for withdrawals such customers made from the FTX Exchanges within 90 days of the Petition Date, which are referred to as "preferences." The Debtors may pursue Avoidance Actions by commencing adversary proceedings and filing a complaint against a Customer to seek the return of the preferential withdrawals. As defined under the Plan, under the Customer Preference Settlement, a Customer's "Net Preference Exposure" will instead be calculated as the amount expressed in U.S. Dollars equal to (a) the net aggregate market value of all withdrawals by such Customer from the applicable FTX Exchange during the period beginning at 12:01 a.m. (ET) on November 2, 2022, and ending at 10:00 a.m. (ET) on November 11, 2022 (the "Customer Preference Settlement Look Back Period") *less* (b) the net aggregate market value of all deposits by such Customer on the applicable FTX Exchange during the Customer Preference Settlement Look Back Period, in each case as determined by the Debtors based on prices as of the applicable transfer.

The Debtors' proposed Customer Preference Settlement Amount is equal to 15 percent of the Net Preference Exposure; *provided* that the Net Preference Exposure is equal to or greater than $250,000. If the Net Preference Exposure is below $250,000, then the Preference Settlement Amount shall be zero.

The following is an example calculation of the Net Preference Exposure and Customer Preference Settlement Amount:

| Transaction Date | Transaction | Withdrawal Amount | Deposit Amount | Effect on Net Preference Exposure |
|---|---|---|---|---|
| November 1, 2022 | Withdrawal | $100,000 | | Does not affect Net Preference Exposure because it occurred prior to the Customer Preference Settlement Look Back Period |
| November 2, 2022 | Deposit | | ($300,000) | Decreases Net Preference Exposure |
| November 8, 2022 | Withdrawal | $700,000 | | Increases Net Preference Exposure |
| Total | | $700,000 | ($300,000) | |
| Net Preference Exposure: $400,000 | | | | |
| Customer Preference Settlement Amount: $60,000 | | | | 15% of the Net Preference Exposure |

The Debtors' proposed Customer Preference Settlement shall be made available to certain Customers during the plan solicitation process in each such Customer's plan Ballot. In addition to all of the other relevant plan related elections, each such Ballot will identify (x) the scheduled amount of each Customer's Dotcom Customer Entitlement Claim (Class 5A) or U.S. Customer Entitlement Claim (Class 5B), (y) the amount of the Customer's Net Preference Exposure and (z) the Debtors' proposed Customer Preference Settlement Amount.

Any Customer who wishes to accept the Customer Preference Settlement must (i) opt-in to the Customer Preference Settlement; (ii) vote to accept the Plan; (iii) not opt out of the Releases and (iv) not object to confirmation of the Plan.

A Customer with a Net Preference Exposure equal to or greater than $250,000 who wishes to accept the Customer Preference Settlement must also pay to the Debtors the Customer Preference Settlement Amount, as follows: first, by reducing such Customer's scheduled amount, if applicable, to zero, and, second, by making a cash payment to the Debtors for the remaining amount of such Customer's Customer Preference Settlement Amount. Any such cash payments must be received by the Debtors by the Effective Date for the Customer Preference Settlement to be deemed accepted. Notwithstanding any reduction in a Customer's scheduled amount or payment made to the Debtors, a Customer's vote with respect to the Plan shall be in the full amount of such Customer's pre-settlement scheduled amount. The following are illustrative examples of various Customer Preference Settlement scenarios:

| Customer Preference Settlement Impact 9 day period from 12:01 AM ET on 11/2/2022 through 10:00 AM ET on 11/11/2022 | | | | | |
|---|---|---|---|---|---|
| | | Customer A | Customer B | Customer C | Customer D |
| **Preference Settlement Amount:** | | | | | |
| Gross Withdrawals | | $6,300,000 | $5,200,000 | $15,000,000 | $2,000,000 |
| Less: Gross Deposits | | ($5,000,000) | ($5,000,000) | ($5,000,000) | ($5,000,000) |
| **Net Preference Exposure** | *(A)* | **$1,300,000** | **$200,000** | **$10,000,000** | **NA** |
| Settlement Percentage | *(B)* | 15% | WAIVED | 15% | NA |
| **Customer Preference Settlement Amount** | *(C) = (A) x (B)* | **$195,000** | **WAIVED** | **$1,500,000** | **NA** |
| | | | | | |
| **Adjusted Scheduled Claim:** | | | | | |
| Scheduled Claim | *(D)* | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 |
| Customer Preference Settlement Amount | *(C)* | ($195,000) | WAIVED | ($1,500,000) | NA |
| **Adjusted Scheduled Claim** | *(E) = (D) + (C)* | **$1,005,000** | **$1,200,000** | **–** | **$1,200,000** |
| | | | | | |
| Cash Settlement (Net Negative) | *If (E) is zero, (F) = (C) - (D)* | – | – | $300,000 | – |
| | | | | | |
| ***Outcome*** | | *Claim of $1.0M* | *Claim of $1.2M; Preference exposure is waived as it is below $250K* | *No claim, Customer C pays Debtors $300K cash settlement* | *Claim of $1.2M* |

The Debtors reserve the right to exclude any preference action from the Customer Preference Settlement by identifying such action as an "Excluded Customer Preference Action" by written notice to the Customer whose Net Preference Exposure is affected prior to the Effective Date. The Debtors shall not identify any preference claim as an Excluded Customer Preference Action unless the Debtors have determined there is a reasonable basis to conclude that, among other things: (a) the preference was received by an insider of any Debtor; (b) the preference was received by a current or former employee of the Debtors or any current or former affiliate of the Debtors; (c) such Customer may have had actual or constructive knowledge of the commingling and misuse of customer deposits and corporate funds by the Debtors; (d) such Customer either (x) changed their KYC information to facilitate withdrawals or (y) received manual permission from the Debtors to facilitate withdrawals when withdrawals were otherwise halted; (e) any Debtor has a claim, defense or cause of action against the recipient of the preference (or a subsequent transferee of a claim against the Debtors) or any of its affiliates other than a claim arising under section 547 of the Bankruptcy Code as a result of customer withdrawals from the applicable FTX Exchange; or (f) the Customer Preference Settlement Amount for a Customer may not reflect the fair value of such Excluded Customer Preference

Action. Any Customer notified that their Customer Preference Settlement Amount is affected by an Excluded Customer Preference Action shall not be eligible for the Customer Preference Settlement (relative to such Excluded Customer Preference Action) unless such Customer and the Debtors separately agree to a modified settlement excluding or compromising the Excluded Customer Preference Action.

A "Qualifying Customer Preference Settlement Participant" means any Holder of a Customer Entitlement Claim that: (a) has agreed to accept the Customer Preference Settlement Offer by an irrevocable election made on a properly executed and delivered Ballot, (b) has voted the related Customer Entitlement Claims held by such Holder to accept the Plan, (c) has not opted out of granting the releases set forth therein and (d) if such Holder holds Customer Entitlement Claims in an amount that is less than its Customer Preference Settlement Amount, such Holder has made a Cash payment to the Debtors on or prior to the Effective Date in an amount equal to the Customer Preference Settlement Amount *minus* the amount of such Holder's related Customer Entitlement Claims. For each Qualifying Customer Preference Settlement Participant, the Customer Preference Settlement shall become effective on the Effective Date and the Customer Preference Settlement shall (i) release such Qualifying Customer Preference Settlement Participant from all claims and causes of action arising out of or relating to withdrawals from the applicable FTX Exchange related to such claim and (ii) cancel and extinguish all "replacement" claims that such Qualifying Customer Preference Settlement Participant may have against the Debtors for the repayment of any preferential transfers arising out of or relating to withdrawals from the applicable FTX Exchange related to such claim. For the avoidance of doubt, each Qualifying Customer Preference Settlement Participant must satisfy the conditions for acceptance of the Customer Preference Settlement with regard to each claim of such customer and any release and/or cancellation of replacement claims shall apply only with regard to those claims that have been validly settled.

Distributions will not be made on claims held by the recipient of a preference or other avoidable transfer until any related avoidance claim has been settled or resolved by the Bankruptcy Court. The Debtors and the Plan Administrator reserve the right to enforce preference and avoidance claims against subsequent transferees to the fullest extent permitted by law.

For the avoidance of doubt, Claims against non-Customers arising under section 547 of the Bankruptcy Code will be unaffected by the Customer Preference Settlement.

The Customer Preference Settlement avoids complex and expensive litigation with Customers who elect to participate. Certain Customers have asserted they hold defenses to Customer Preference Actions, including (a) the securities safe harbor in section 546(e) of the Bankruptcy Code, which provides that preferential transfers involving margin payments or settlement payments in connection with securities contracts may not be clawed back, and (b) the ordinary course defense in section 547(c)(2) of the Bankruptcy Code, which provides that preferential transfers may not be avoided if they are made in the ordinary course of business. While the Bankruptcy Court has not adjudicated these defenses in these Chapter 11 Cases, it is possible that Customers may prevail on these defenses and defeat any avoidance action asserted against them. However, it is also possible that those defenses and safe harbors will be found not

to apply.  The Customer Preference Settlement is a fair resolution of these issues and participation is voluntary.

## 5.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the process of confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

### A.   The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtors will seek confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON [•], 2024 AT [•] [A/P].M. (ET) BEFORE THE HONORABLE JOHN T. DORSEY, UNITED STATES BANKRUPTCY JUDGE.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (ET) ON [•], 2024, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.   Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtors believe that section 1129 has been satisfied because, among other things:

1)   the Plan complies with the applicable provisions of the Bankruptcy Code;

2)   the Debtors, as plan proponents, have complied with the applicable provisions of the Bankruptcy Code;

3)   the Plan has been proposed in good faith and not by any means forbidden by law;

4)   any payment made or promised under the Plan for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has

been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

5) with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (see Section 5.C below—Best Interests Test);

6) each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

7) except to the extent that the Holder of a particular General Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed General Administrative Claims will be paid in full in Cash on the Effective Date;

8) except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court;

9) on a substantively consolidated basis, at least one Class of Impaired Claims will vote in favor of the Plan, determined without including any vote in favor of the Plan by any insider holding a Claim;

10) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (see Section 5.D below— Financial Feasibility); and

11) all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

### C.   Best Interests Test

#### 1.   *Explanation of the Best Interests Test*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan on account of such Claim or Interest property of value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "Best Interests Test").

To determine the probable distribution to Holders of Claims and Interests in each Impaired Class if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.

The Debtors' chapter 7 liquidation value would consist primarily of the unencumbered and unrestricted cash held by the Debtors at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtors' remaining unencumbered assets and properties by a chapter 7 trustee and Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled.  The gross cash available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases.  Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee.  Additional Administrative Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of these Chapter 11 Cases.  Such Administrative Claims and any other Administrative Claims that might arise in a liquidation case or result from these Chapter 11 Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the Liquidation Proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a chapter 7 liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 Liquidation Distribution to Holders of Claims or Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

#### 2.   *Liquidation Analysis of the Debtors*

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors

prepared by the Debtors' management with the assistance of their restructuring advisors, attached to this Disclosure Statement as Appendix C (the "Liquidation Analysis").

As more fully described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors do not intend and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

3. *Application of the Best Interests Test to the Liquidation Analysis of the Debtors*

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Interests, the Debtors believe that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtors' proposed Plan satisfies the requirements of the Best Interests Test.  As the following table indicates, non-consenting members of each Impaired Class will receive more (or no less) under the Plan than they would through a liquidation of the Debtors in a hypothetical chapter 7 case.

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
|-------|-------------|--------------------|---|
| | | PLAN | LIQUIDATION |
| 1 | Priority Tax Claims | [•]% | [•]% |
| 2 | Other Priority Claims | [•]% | [•]% |
| 3 | Secured Claims | [•]% | [•]% |

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
| --- | --- | --- | --- |
| | | PLAN | LIQUIDATION |
| 4 | Separate Subsidiary Claims | [•]% | [•]% |
| 5A | Dotcom Customer Entitlement Claims | [•]% | [•]% |
| 5B | U.S. Customer Entitlement Claims | [•]% | [•]% |
| 5C | NFT Customer Entitlement Claims | [•]% | [•]% |
| 6 | General Unsecured Claims | [•]% | [•]% |
| 7A | Dotcom Convenience Claims | [•]% | [•]% |
| 7B | U.S. Convenience Claims | [•]% | [•]% |
| 7C | General Convenience Claims | [•]% | [•]% |
| 8A | PropCo Ordinary Course Claims | [•]% | [•]% |
| 8B | PropCo DM Claim | [•]% | [•]% |
| 8C | PropCo General Unsecured Claims | [•]% | [•]% |
| 9 | Cancelled Intercompany Claims | [•]% | [•]% |
| 10 | Intercompany Interests | [•]% | [•]% |
| 11 | Subordinated Claims | [•]% | [•]% |
| 12 | Equitably Subordinated Claims | [•]% | [•]% |
| 13 | FTT Interests | [•]% | [•]% |
| 14 | Preferred Equity Interests | [•]% | [•]% |
| 15 | Section 510(b) Claims | [•]% | [•]% |
| 16 | Other Equity Interests | [•]% | [•]% |
| 17 | *De Minimis* Claims | [•]% | [•]% |

Accordingly, the Debtors believe that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

### D.     Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

The ability to make the distributions described in the Plan does not depend on future earnings or operations of the Debtors, but only on the orderly wind down of the Debtors' remaining assets.  Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

### E.    Acceptance by Impaired Classes

Generally, section 1129 of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  In Delaware, the requirements of section 1129 apply on a per-Debtor basis.  However, the substantive consolidation provisions under the Plan merge all Debtors other than the Separate Subsidiaries into one Debtor for the purposes of section 1129 of the Bankruptcy Code.  Accordingly, each Impaired Class will be treated as if their claims were against a single Debtor.

Holders of claims against Debtors that are not substantively consolidated will be paid in full satisfaction of their claims and are unimpaired.  A class of claims that is unimpaired under the Plan is deemed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such class is not required.  Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance.  Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.

### F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors.  Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests on a substantively consolidated basis, that is Impaired under, and has not accepted, the Plan.  Pursuant to Section 11 of the Plan, the Debtors reserve the right to seek confirmation under section 1129(b) of the Bankruptcy Code, if necessary.

#### 1.    *Unfair Discrimination*

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank;

in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

2. *Fair and Equitable*

The "fair and equitable" test applies to Classes of different priority and status and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in such Class. The condition that the Plan be fair and equitable also includes the following requirements, as applicable:

a.    with respect to a non-accepting Class of General Unsecured Claims, that either: (i) the Plan provides that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Interest that is junior to the Claims or Interests of such Class receives or retains any property under the Plan on account of such junior Claim or Interest; and

b.    with respect to a non-accepting Class of Interests, no Class of Interests junior to the non-accepting Class receives a distribution under the Plan.

3. *Confirmation of the Plan Pursuant to Section 1129(b)*

The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class of Claims, and/or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code because there are no Classes of equal rank that are receiving different treatment under the Plan.

The Debtors submit that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 1, 2, 3, 4 and 8A are Unimpaired and therefore deemed to have accepted the Plan. Further, no Class will receive more than 100% of the Allowed amount of the Claims in such Class under the Plan. The Holders of Claims or Interests in Classes 5A, 5B, 5C, 6, 7A, 7B, 7C, 8B, 8C and 11 may not receive, and Holders of Claims or Interests in Classes 9, 10, 12, 13, 14, 15, 16 and 17 will not receive, a distribution equal to the Allowed amount of their Claims or Interests, but no Holders of Claims or Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors seek to cram down a rejecting Impaired Class.

## 6.    VOTING PROCEDURES

On [•] 2024, the Bankruptcy Court entered an order, among other things, approving the adequacy of this Disclosure Statement, establishing voting, solicitation and tabulation procedures in connection with Confirmation of the Plan, approving the form of the solicitation materials and documents included in the solicitation packages and various other notices, setting the voting record date, the Voting Deadline, the date of the Confirmation Hearing and other proposed confirmation timeline and establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan (the "Solicitation Procedures Order") [D.I. [•]].

The Solicitation Procedures Order, a copy of which is attached hereto as Appendix B, is hereby incorporated by reference as though fully set forth herein.  The Solicitation Procedures Order should be read in conjunction with this Section 6 of this Disclosure Statement.

If you have any questions about:  (a) the procedures for voting your Claim or with respect to materials that you have received or (b) the amount of your Claim or Interest, or wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, please contact:

> FTX Trading Ltd. Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11232

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that:  (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more of such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Interests, meaning that all such Holders will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all of the conditions mentioned above are met before it can confirm the Plan.  Thus, even if all Classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible and that the Plan is in the best interests of the Holders of Claims against and Interests in the Debtors.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO [•] 2024 AT [4:00] P. M. (ET) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTORS MAY REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

### A.      Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, refer to Section 4 above—Summary of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

### B.      Amounts for Voting Purposes

The amounts for each Claim established in this subsection shall be used for voting purposes only and does not constitute the allowed amount of any claim for any other purpose, including distributions under the Plan.  In tabulating votes, the amount of the claim associated with each holder's vote shall be determined as follows:

1.      *Scheduled Claims Not Superseded by a Filed Proof of Claim*

   a.      In the event a claim is not scheduled as contingent, unliquidated or disputed, the scheduled amount shall control for voting purposes.

b.   In the event a scheduled claim is scheduled as contingent, unliquidated or disputed, such claim shall be disallowed for voting purposes.

2.   *Scheduled Claims Superseded by a Timely Filed Proof of Claim*

a.   Subject to any Resolution Event (as defined below), in the event a claim is not scheduled as contingent, unliquidated or disputed and the holder of the claim timely filed a proof of claim (or an untimely proof of claim that has been allowed as timely by the Bankruptcy Court under applicable law on or before [•], 2024 (the "Voting Record Date"), the asserted amount in the proof of claim shall control for voting purposes; provided that if such proof of claim is filed as partially liquidated and partially unliquidated or contingent, such claim will count for voting purposes only in the liquidated amount; provided, further, that if such proof of claim is subject to a pending objection from the Debtors or any other party-in-interest by the Solicitation Mailing Deadline, the scheduled amount shall then control for voting purposes.

b.   Subject to any Resolution Event, in the event a scheduled claim is scheduled as contingent, unliquidated or disputed and the holder of the claim timely filed a proof of claim (or an untimely proof of claim that has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date), the asserted amount in the proof of claim shall control for voting purposes; *provided* that if such proof of claim is filed as partially liquidated and partially unliquidated or contingent, such claim shall count for voting purposes only in the liquidated amount; *provided*, *further*, that if (i) such proof of claim is wholly contingent, unliquidated, or disputed (based on the face of such proof of claim or as determined upon the reasonable review of the Debtors) or (ii) such proof of claim is subject to a pending objection from the Debtors or any other party-in-interest by the Solicitation Mailing Deadline, such claim shall count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 solely for the purposes of voting and satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; *provided, further*, that if the objection from the Debtors or any other party-in-interest is an objection to reduce the amount asserted in such proof of claim, such claim shall count for voting purposes only in the reduced amount.

3.    *A Filed Proof of Claim in Respect of an Unscheduled Claim*

    a.    Subject to any Resolution Event, in the event that a claim is not scheduled by the Debtors and the holder of the claim timely filed a proof of claim (or an untimely proof of claim that has been allowed as timely by the Bankruptcy Court under applicable law on or before Voting Record Date), the asserted amount in the proof of claim shall control for voting purposes; *provided* that if such proof of claim is filed as partially liquidated and partially unliquidated or contingent, such claim will count for voting purposes only in the liquidated amount; *provided*, *further*, that if (i) such proof of claim is wholly contingent, unliquidated, or disputed (based on the face of such proof of claim or as determined upon the reasonable review of the Debtors) or (ii) such proof of claim is subject to a pending objection from the Debtors or any other party-in-interest by the Solicitation Mailing Deadline, such claim shall count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 solely for the purposes of voting and satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; provided, further, that if the objection from the Debtors or any other party-in-interest is an objection to reduce the amount asserted in such proof of claim, such claim shall count for voting purposes only in the reduced amount.

4.    *Resolution Event*

    a.    Notwithstanding the foregoing, with respect to all claims in the Voting Classes, the Claim, the claim amount for voting purposes shall be the amount:  (i) settled and/or agreed upon by the Debtors and the applicable holder, as reflected in a document filed with the Bankruptcy Court; (ii) set forth in an order of the Bankruptcy Court; (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court and the applicable holder or (iv) set forth in e-mailed instructions from the Debtors' counsel to the Solicitation Agent with the applicable holder copied (clauses (i) through (iv), the "Resolution Events").

Notwithstanding anything to the contrary:

    b.    if a claim is scheduled as contingent, unliquidated, or disputed and a proof of claim was not (i) filed by the applicable bar date for filing proofs of claim established by the Bankruptcy Court or (ii) deemed timely filed by an order of the Bankruptcy Court

prior to Voting Record Date, such claim shall be disallowed for voting purposes;

c.     holders of proofs of claim filed for $0.00 or zero cryptocurrency or other digital assets, as applicable, are not entitled to vote;

d.     Claims that have been paid, scheduled to be paid in the ordinary course of business, or otherwise satisfied are disallowed for voting purposes;

e.     Claims that have been disallowed for voting or distribution purposes by an order of the Bankruptcy Court are disallowed for voting purposes;

f.     any creditor who has filed or purchased duplicate claims within the same class shall, to the extent possible, be provided with only one Solicitation Package (as defined below) and one Ballot for voting a single claim in such class, regardless of whether the Debtors have objected to such duplicate claims; and

g.     if a proof of claim is amended, the last filed claim shall be subject to these procedures and will supersede any earlier filed claim, and any earlier filed claim will be disallowed for voting purposes.

## C.    Customer Preference Settlement

1.    *Customer Preference Settlement*

a.     Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the mutual compromises described in Section 5.3 of the Plan and other benefits provided under the Plan, on the Effective Date, the Debtors shall be authorized to effectuate the Customer Preference Settlement with all Qualifying Customer Preference Settlement Participants.

2.    *Effect of Customer Preference Settlement*.

a.     Pursuant to, and as part of, the Customer Preference Settlement, on the Effective Date:  (a) all Customer Entitlement Claims, if any, held by a Qualifying Customer Preference Settlement Participant shall be reduced or fully extinguished, as applicable, by the Customer Preference Settlement Amount; and (b) all Customer Preference Actions against such Qualifying Customer Preference Settlement Participant that are

not Excluded Customer Preference Actions shall be forever released, waived and discharged.  No Preference Replacement Claims shall arise out of, or result from, any Customer Preference Settlement.

b.    Holders of Customer Entitlement Claims that elect to accept the Customer Preference Settlement may ultimately be subject to preference liability in amounts exceeding those that would have been applicable to such Holders had they chosen not to accept the Customer Preference Settlement.

3.    *Excluded Customer Preference Actions.*

a.    The Debtors shall have the right to exclude any Customer Preference Action from the Customer Preference Settlement by sending written notice to the Holder of the applicable Customer Entitlement Claim on or prior to Confirmation designating such Customer Preference Action as an Excluded Customer Preference Action.  The Debtors shall not designate a Customer Preference Action as an Excluded Customer Preference Action unless the Debtors have determined there is a reasonable basis to conclude that, among other things:  (a) the recipient of the applicable preferential payment or transfer (i) was an Insider of any Debtor, (ii) was a current or former employee of the Debtors or of any current or former Affiliate of the Debtors, (iii) may have had actual or constructive knowledge of the commingling and misuse of Customer deposits and corporate funds, or (iv) either (x) changed its KYC information to facilitate withdrawals from the applicable FTX Exchange or (y) received manual permission from the Debtors to facilitate withdrawals when withdrawals were otherwise halted from the FTX Exchange; (b) any Debtor has a Cause of Action or a defense against the recipient of the applicable preferential payment or transfer (or a subsequent transferee of the applicable Customer Entitlement Claim) or any of its Affiliates other than a claim arising under a Customer Preference Action; or (c) the Customer Preference Settlement Amount for the Holder of the applicable Customer Entitlement Claim may not reflect the fair value of such Excluded Customer Preference Action.  All rights and defenses shall be reserved with respect to any Excluded Customer Preference Action and the Customer Preference Settlement Offer shall not apply to any Excluded Customer Preference Action.  Any Holder of a Customer Entitlement Claim that receives notice from the Debtors that its Customer Preference Settlement Amount is affected by an Excluded Customer Preference Action shall not be eligible for the Customer Preference Settlement with respect to such

Excluded Customer Preference Action except as the Debtors may otherwise agree in writing.

4.  *Approval of Customer Preference Settlement.*

a.  The Plan shall be deemed a motion to approve the Customer Preference Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Customer Preference Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Bankruptcy Court that the Customer Preference Settlement is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests.

**D.    Convenience Claim Election**

Claim holders from Class 5A, Class 5B and Class 6 may irrevocably elect to have their respective Claims reduced to $10,000 and receive the treatment for Class 7A Dotcom Convenience Claims, Class 7B U.S. Convenience Claims or Class 7C General Convenience Claims, as applicable (this election, the "Convenience Claim Election").

Holders who make the Convenience Claim Election must vote to accept the Plan. Holders who make the Convenience Claim Election and otherwise indicate a vote to reject Plan will be deemed to have voted to accept the Plan. Holders who make the Convenience Claim Election may receive a distribution that is less than the distribution such Holders would have received had they chosen not to make the Convenience Claim Election.

**E.    Voluntary Releases Under the Plan**

The release and injunction language in section 10 of the Plan is described above in Section 4 of this Disclosure Statement.

**HOLDERS IN THE VOTING IMPAIRED CLASSES AND NON-VOTING IMPAIRED CLASSES WILL EITHER RECEIVE A BALLOT OR ELECTION FORM, IN EACH CASE, TO ALLOW SUCH HOLDER TO OPT OUT OF THE RELEASES CONTAINED IN SECTION 10.5 OF THE PLAN BY CLEARLY MARKING THE "OPT-OUT" BOX ON THE BALLOT OR ELECTION FORM PROVIDED TO SUCH HOLDER.  ASSUMING SUCH BALLOT OR ELECTION FORM, AS APPLICABLE, IS TIMELY RECEIVED AND IN PROPER FORM, APPLICABLE HOLDERS WHO CHECK THE "OPT-OUT" BOX ON THE BALLOT OR ELECTION FORM WILL NOT BE DEEMED RELEASING PARTIES FOR PURPOSES OF SECTION 10.5 OF THE PLAN.**

F.    **Classes Under the Plan**

1.    *Voting Impaired Classes*

Classes 5A, 5B, 5C, 6, 7A, 7B, 7C, 8B, 8C and 12 are Impaired under, and entitled to vote to accept or reject, the Plan.

2.    *Unimpaired Classes of Claims*

Classes 1, 2 and 3, 4 and 8A are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan, and are therefore not entitled to vote on the Plan.

3.    *Non-Voting Impaired Classes*

Classes 9, 10, 12, 13, 14, 15, 16 and 17 are Impaired and not entitled to any recovery under the Plan, and are therefore not entitled to vote on the Plan.

G.    **Solicitation Packages for Voting Classes**

As set forth in the Solicitation Procedures Order, the Debtors will distribute or cause to be distributed a solicitation package to each Holder of a Claim entitled to vote on the Plan (a "Solicitation Package"). The Solicitation Packages will contain:

(1)    the Cover Letter, which describes the contents of the Solicitation Package and recommends all Holders of Claims in the Voting Classes to vote to accept the Plan;

(2)    the Official Committee Letter, which recommends that all Holders of General Unsecured Claims and Customer Entitlement Claims vote to accept the Plan;

(3)    the Ad Hoc Committee Letter (which shall only be included in the Solicitation Package to be served on Holders of Class 5A Dotcom Customer Entitlement Claims and Class 7A Dotcom Convenience Claims);

(4)    the Solicitation and Voting Procedures;

(5)    the applicable form of Ballot;

(6)    this Disclosure Statement (and exhibits thereto, including the Plan);

(7)    the Solicitation Procedures Order (excluding exhibits);

(8)    the Confirmation Hearing Notice; and

(9)    any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Classes.

The Solicitation Package will be distributed via e-mail in electronic format to all Holders of Claims in the Voting Classes to the e-mail on file for such Holder, if any, and the e-mail address listed on the filed proof of claim, to the extent a proof of claim was filed and any e-mail address other than the e-mail address on file was used.  If the message to either e-mail address is returned as undeliverable, or if the Debtors are not in possession of an e-mail address for such Holders, the Solicitation Agent shall serve the Solicitation Package on such Holders in paper or electronic format (*i.e.*, USB flash drive format), via first-class mail to the extent a valid physical mailing address is known by the Debtors.  The Debtors and Solicitation Agent are not required to conduct any additional research for updated addresses or e-mail addresses based on undeliverable Solicitation Packages.

### H. Solicitation Packages for Non-Voting Classes

#### 1. *Unimpaired Classes of Claims Not Eligible to Vote*

Holders of Claims who are not entitled to vote because they are unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Unimpaired Interests and Claims* and the Confirmation Hearing notice in electronic format.

#### 2. *Classes Not Eligible to Vote*

Holders of Claims or Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Notice of (I) Non-Voting Status to Holders of Impaired Interests and Claims* and the Confirmation Hearing notice in electronic format.

### I. Voting Procedures

Ballots cast by Holders in Classes entitled to vote and Election Forms must be received by the Solicitation Agent by the Voting Deadline at the following address or, with respect to Ballots and Election Forms eligible to be cast electronically, through the electronic ballot ("E-Ballot") platform at the website below:

**If by First-Class Mail, Courier or Hand Delivery:**

FTX Trading Ltd. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**If Electronically by the E-Ballot Platform:**

Either (i) visit the Solicitation Agent's website at https://restructuring.ra.kroll.com/FTX/ and follow the instructions to submit your Ballot (ii) visit the FTX Customer Portal and clicking on the "Vote – Proceed to Kroll" link, and following the instructions set forth on the website to submit your Ballot or Election Form.

IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CALL THE SOLICITATION AGENT AT [phone number] (DOMESTIC TOLL-FREE) *OR* [phone number] (INTERNATIONAL), OR CONTACT THE SOLICITATION AGENT AT FTXINFO@RA.KROLL.COM.

Ballots received after the Voting Deadline will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected. The method of delivery of Ballots and Election Forms to be sent to the Solicitation Agent is at the election and risk of each Holder of a Claim or an Interest. Except as otherwise provided in the Plan, such delivery will be deemed made only when the Ballot or Election Form is actually received by the Solicitation Agent. Sufficient time should be allowed to ensure timely delivery. Ballots must be signed and legible, and must be clearly marked to either accept or reject the Plan (but not both). If a Ballot or Election Form is signed by a trustee, executor, administrator, guardian, attorney-in-fact or other person acting in a fiduciary or representative capacity, such person must indicate such capacity when signing the Ballot. Delivery of a Ballot or Election Form to the Solicitation Agent by facsimile, e-mail or any other means not specifically provided for herein will not be accepted; *provided* that, for the avoidance of doubt, a Ballot or Election Form may be submitted via the online E-Ballot portal. No Ballot or Election Form should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Solicitation Agent) and, if so sent, will not be counted.

Any voter that has delivered a valid Ballot may not change its vote, except in accordance with the Solicitation Procedures Order. In the case where more than one timely, properly completed Ballot voting the same Claim(s) or Interest(s) is received by the Solicitation Agent, only the last properly executed Ballot timely received shall be counted unless the Holder of the Claim or Interest receives Bankruptcy Court approval to have the Ballot that bears an earlier date counted.

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and the restrictions on modifications set forth in the Plan, the Debtors or the Plan Administrator, as applicable, may alter, amend or modify the Plan, without additional disclosure pursuant to section 1127(b) of the Bankruptcy Code. If the Debtors make changes in the terms of the Plan materially adverse to any Holder of Claims or Interests or if the Debtors waive a material condition to the effectiveness of the Plan described in Article 11 of the Plan, the Debtors will disseminate additional solicitation materials to such affected Class and will extend the solicitation period, in each case to the extent directed by the Bankruptcy Court. After the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of the Plan.

**7.    ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

**A.    Risks Related to the Debtors and These Chapter 11 Cases**

1.    *General*

It is impossible to predict with certainty the amount of time that it will take to wind down these Chapter 11 Cases or to assure parties in interest that the Plan will be confirmed. A delay in the bankruptcy proceedings to confirm the Plan will also involve additional expense.

2.    *The Debtors Will Be Subject to Risks and Uncertainties Associated with These Chapter 11 Cases*

For the remainder of these Chapter 11 Cases, the Debtors' ability to develop and execute a chapter 11 plan will be subject to the risks and uncertainties associated with chapter 11.  These risks include the following: (a) ability to develop, confirm and consummate the Plan; (b) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee or to convert these Chapter 11 Cases to chapter 7 proceedings; and (c) the actions and decisions of the Debtors' creditors and other third parties who have interests in these Chapter 11 Cases that may be inconsistent with the Debtors' objectives.  Because of the risks and uncertainties associated with these Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the remainder of these Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.    *Undue Delay in Confirmation May Result in Additional Costs*

If Confirmation and Consummation of the Plan do not occur expeditiously, these Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

**B.    Risks Related to the Plan**

1.    *Holders of Claims and Interests May Object to the Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify claims against, and interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may

place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims or Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

2.   *The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation*

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Package to all Holders of Claims as of the voting record date in the Classes entitled to vote.  Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtors cannot provide any assurances that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in protracted chapter 11 cases.

3.   *Certain Customers and Creditors May Bring Litigation Against the Debtors*

Certain of the Debtors' customers and creditors have and may continue to bring and prosecute litigation against the Debtors during these Chapter 11 Cases, the outcome of which is uncertain.  In general, litigation can be expensive and time consuming to bring or defend against.  Although the Debtors believe the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, customers, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final

resolution of such litigation.  The impact of any such litigation on the Debtors' Estates, however, could be material.

4.    _Outcome of Current and Future Litigation Brought by the Debtors Is Uncertain_

As discussed in Section 3F hereof, the Debtors are currently engaged in ongoing litigation.  Although the Debtors believe that they will succeed in the litigation, there is a risk that the Debtors may lose some or all of the issues, which, depending on the priority of the ultimate claims, could have substantial impact on the Debtors' Estates and distributable assets.

5.    _The Bankruptcy Court May Not Grant the Debtors' Request for Nonconsensual Confirmation_

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, the Bankruptcy Court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan.

6.    _The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis_

Conversion to chapter 7 liquidation would, in the Debtors' view, produce a less favorable outcome for Holders of Claims and Interests than would the Plan.  However, underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management and advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.  Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

7.    _Plan Releases, Injunctions and Exculpations May Not Be Approved_

There can be no assurance that the Plan releases, injunctions and exculpations, as provided in Article 10 of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

8. *The Plan May Not Be Confirmed*

The Debtors make no assurances that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests would receive with respect to their Allowed Claims or Allowed Interests in a subsequent plan of reorganization or liquidation.

9. *Conditions Precedent to the Plan Becoming Effective May Not Be Satisfied*

There can be no assurance as to such timing or as to the occurrence of the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions precedent to the effectiveness of the Plan will be met or that the other conditions to Consummation, if any, will be satisfied or sufficiently waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

10. *Continued Risk upon Confirmation and Potential Appeal of Confirmation*

Even if the Plan is consummated, there may be continued risks, including certain risks that are beyond the control of the Debtors, such as deterioration of general market conditions or other changes in economic conditions, changes in the digital asset industry, potential revaluing of assets due to other chapter 11 proceedings and increase in expenses. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals. Even if the Plan is confirmed, the Debtors will continue to face uncertainty. Specifically, it is possible that the Plan's confirmation is appealed and its implementation subsequently paused until further litigation takes place.

11. *The Value of Preference, Avoidance and Litigation Proceeds Is Uncertain, Which May Affect the Value That Can Be Distributed to Holders of Claims Entitled to Receive Litigation Proceeds*

Under the Plan, distributions to holders of Allowed Claims will be funded in part by the proceeds of preference and avoidance actions as well as other litigation claims. Pursuant to the Plan, Holders of Claims entitled to litigation proceeds will receive periodic distributions on account of recoveries from these causes of action. The Debtors do not offer any assurance that these actions and litigations will be successful. Accordingly, it is impossible to predict with certainty the size or timing of any resulting distributions.

12.    *The Amount and Timing of Available Distributions, if Any, May Vary*

While the Debtors have attempted to project what they believe are likely Distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that Holders will receive the Distributions described in the Plan. The projections will necessarily be affected by events with unknown or uncertain timing, including, among other things, recoveries generated in connection with the liquidation of all of the Debtors' remaining assets (including, without limitation, the recoveries, if any, on account of the Preserved Potential Claims and the proceeds from Avoidance Actions and litigation Claims, after the resolution of any pending appeals), the outcome of objections to Claims, and the cost and expenses of such actions and generally administration and winding down of the Wind Down Entities. Additionally, the timing of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on account of Allowed Claims.

**C.    Additional Risks**

1.    *Digital Assets May Be Subject to Loss, Damage, Theft, or Restriction on Access. Additionally, Incorrect or Fraudulent Digital Asset Transactions May Be Irreversible*

A substantial part of the Debtors' businesses—and the value they represent—involves the possession of or investment in digital assets. There is a risk that part or all of the digital assets could be lost, stolen or destroyed. Access to digital assets could be restricted by cybercrime, such as the theft of private keys. Given the highly publicized Chapter 11 Cases, the Debtors, or a party in custody of their digital assets, could be an appealing target to hackers or malware distributors seeking to destroy, damage, or steal digital assets. Hackers or malicious actors may attempt to steal the Debtors' digital assets, such as by an attack on the Debtors' networks' source code, third-party platforms, custodian's infrastructure and personnel, storage locations or software, general computer systems or networks. Access to the Debtors' digital assets could also be restricted by other human actions (such as a terrorist attack) or by natural events (such as an earthquake or flood). It is also possible that, through computer or human error, whether caused by the Debtors', their customers, its vendors, or otherwise, the Debtors' digital assets could be transferred in incorrect amounts or to unauthorized third parties or accounts.

In general, in the event of any such adverse event that effects the Debtors' control and/or possession of its customer digital assets, the Debtors may be unable to prevent loss, damage, or theft. Furthermore, digital asset transactions are irrevocable. Therefore, in any event described in this section, the Debtors may have extremely limited or no effective means of recovering any lost, stolen or destroyed digital assets. As a result, any of these events may also adversely affect the Debtors' operations and, consequently, the value of the Debtors.

2.      *The Debtors' Assets are Highly Correlated to the Volatility of the Digital Asset Markets*

A substantial portion of the Debtors' assets are correlated to the historically volatile digital asset market. Sudden downward movements in particular digital assets or the digital asset market as a whole are not uncommon. Such movements could result from a range of factors, including but not limited to general macroeconomic conditions or specific events. For example, during 2022, digital asset prices quickly deteriorated in response to certain events, including the Debtors' own bankruptcy filing. A sudden decline in the value of the Debtors' digital assets may adversely affect the fair market value of the Debtors' assets, which could result in lower recoveries for Holders of Claims.

3.      *Digital Assets Are Not Subject to FDIC or SIPC Protections*

Digital assets are not typically held by a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC") and, therefore, digital assets are not typically subject to the protections provided to depositors with FDIC or SIPC member institutions.

4.      *The Debtors May Be Required to Obtain, and to Comply with, Government Permits and Approvals*

In order to conduct their businesses lawfully, the Debtors may be required to obtain, and to comply with, any necessary conditions, numerous permits and licenses from international governmental agencies. The process of obtaining and renewing necessary permits and licenses can be lengthy and complex; they can also sometimes result in the establishment of conditions that make the project or activity for which the permit or license was sought unprofitable or otherwise unattractive. In addition, such permits or licenses may be subject to denial, revocation or modification under various circumstances. Failure to obtain or comply with the conditions of permits or licenses, or failure to comply with applicable laws or regulations, may result in the delay or temporary suspension of the Debtors' operations.

5.      *Claims Could Be More Than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of Distributions in one or more Classes to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the assumptions underlying the projected recoveries discussed in this Disclosure Statement, and the variation may be material.

6.      *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that

such financial information fairly reflects their financial condition, given the poor condition of the Debtors' prepetition recordkeeping, as described in sections 2.B.2 and 3.L.1, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement is accurate.

### 7.    *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 8.    *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, these Chapter 11 Cases, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 9.    *Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

This Disclosure Statement contains forward-looking statements. These forward-looking statements include factors that could cause actual results to differ materially, such as: those factors described in this Section 7 of this Disclosure Statement; the Debtors' ability to obtain Bankruptcy Court approval with respect to motions in these Chapter 11 Cases; the effects of the Bankruptcy Court rulings in these Chapter 11 Cases and the outcome of the cases in general; the length of time the Debtors will remain in these Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of their interests in these Chapter 11 Cases; risks associated with third-party motions in these Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the increased administrative and restructuring costs related to these Chapter 11 Cases; and the payments of Allowed Claims and the amount of expenses projected to recognize recoveries and reconcile such Claims.

### 10.    *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of Claims and Interests against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such Holder's Claims and Interests. Holders of Allowed Claims and Allowed Interests should carefully review Section 8 of this Disclosure Statement, entitled "Material United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Debtors. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

11.    _Governmental Laws, Regulations and Actions Could Adversely Affect the Debtors_

The Debtors are subject to various federal, state and local laws, orders and regulations.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtors' profitability and have a material adverse effect on their financial position, liquidity and cash flows.  Such laws and regulations may require more stringent and costly measures.

12.    _No Admission Is Made_

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

8.    **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Wind Down Entities, and certain Holders entitled to vote on the Plan.  The following summary does not address the U.S. federal income tax consequences to Holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or Holders who will not receive any Distribution and are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury's interpretive regulations (the "Treasury Regulations"), judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.  This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address the Foreign Account Tax Compliance Act, the alternative minimum tax, the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes.  Unless otherwise indicated, this discussion assumes that all Claims are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their respective forms.

As used herein, the term "U.S. Holder" means a beneficial owner of a Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. All Holders are urged to consult their tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

### A.    U.S. Federal Income Tax Consequences to the Debtors

Recoveries of Holders will be reduced to the extent that assets or amounts that would otherwise be transferred to the Wind Down Entities are payable instead to the IRS in respect of Debtor tax liabilities. Holders should consider the risks associated with the tax position of the Debtors, and the priority of any legitimate tax claims arising therefrom, in determining their likely recoveries under the Plan. Potential tax liabilities of the Debtors can be divided into two categories: Those arising in taxable periods preceding the bankruptcy petition ("Prepetition Tax Liabilities") and those arising in taxable periods following the bankruptcy petition ("Postpetition Tax Liabilities").

### 1.    *Prepetition Tax Liabilities*

As of the date of this disclosure, the IRS has filed and retained approximately $24 billion in proofs of claim for potential Prepetition Tax Liabilities. This amount exceeds the total amount of assets that are available for distribution. Such proofs of claim do not constitute assertions of tax liability by the IRS, but rather a mere "reservation of rights" with respect to potential tax liabilities. The Debtors have filed detailed tax returns for the relevant prepetition tax periods, and these returns show a tax loss of over $11 billion and no additional tax liability of the Debtors for prepetition periods. The most recently filed tax returns were prepared by Ernst & Young LLP, outside accountants to the Debtors, utilizing over 100 qualified professionals to deal with the unique circumstances of the Debtors. As of the date of this disclosure, the IRS has not proposed any actual adjustments to the tax liabilities shown on these returns, or offered any substantive rationale for retaining proofs of claim with respect to the prepetition periods. In light of these facts, the Debtors have filed a submission with the Bankruptcy Court, pursuant to the authority of section 502 of the Bankruptcy Code, to have these proofs of claim estimated by the Bankruptcy Court, so that the bankruptcy reorganization can proceed on a timely basis. Although the Debtors do not currently believe that they have significant additional tax liability with respect to prepetition periods, there can be no assurance of this and claimants should

therefore consider the risks associated with the IRS proofs of claim for prepetition tax periods when considering whether to approve the Plan.

The Plan also expressly subordinates the IRS's claim for prepetition periods to Claims of creditors in Classes 1-10. This subordination is proposed for agreement by the IRS or approval by the Bankruptcy Court in light of certain DOJ positions, the placement in the prepetition corporate structure of certain Debtors who are U.S. taxpayers, and legal and equitable considerations relating to the IRS's proofs of claim. The IRS may object to this subordination if no consensual understanding is reached with the IRS and there can be no assurances as to how the Bankruptcy Court would resolve such an objection.

## 2.    *Postpetition Tax Liabilities*

As discussed further below, the Debtors intend to take the position that vesting of assets in the Wind Down Entities on the Effective Date will constitute a transfer for tax purposes and be a taxable event. These assets include substantial amounts of crypto, various private investments and various business assets. The question of whether the transfer of these assets will give rise to meaningful U.S. tax liability will turn on a substantial number of legal and factual questions that are not clear at this time. With regard to any particular asset, these questions include (a) what legal entity is currently deemed to own the asset for U.S. tax purposes (which includes the fundamental question of whether the owner of the asset is an entity subject to U.S. tax), (b) what is the "basis" of the asset for U.S. tax purposes, (c) what is the character of the gain arising from the disposition and (d) to what extent are losses from other activities available to offset any such gains (which likewise turns partly on answers to the other three questions).

There is also likely to be a difference between the value of the assets deemed to be transferred by the Debtors to the Wind Down Entities and the liabilities of the Debtors to Holders that might be deemed to be relieved as a result of these transfers. The question of whether any such difference might be treated as income or gain that gives rise to U.S. tax liability might similarly turn on questions relating to (a) which legal entity was deemed to have such income gain (and whether it was an entity subject to U.S. tax), (b) what was the amount deemed initially received by such entity, (c) what is the value of the assets transferred, (d) what was the character of the resulting gain or loss, and (e) to what extent losses from other activities are available to offset such gains.

For a variety of reasons, the Debtors currently expect that any such income or gains may be partly or wholly offset by losses and that U.S. tax liability arising from these disposition will be limited. There can be no assurance in this regard, however, and the ongoing process of determining relevant questions, filing relevant tax returns, and discussing and resolving final tax liability conclusions with the IRS (or in the courts, if no agreement can be reached) could take a number of years. In light of this fact, claimants should be prepared for the possibility that some assets of the Debtors may need to remain with the Debtors, or be placed in a special liquidating trust (rather than transferred to the Wind Down Entities), to satisfy potential tax liabilities.

B.      **U.S. Federal Income Tax Consequences to U.S. Holders**

The Debtors intend to take the position that Consummation of the Plan constitutes an exchange of a prepetition Claim for a meaningfully different Claim against one or more Wind Down Entities and is a taxable event for U.S. tax purposes.  To the extent relevant for any reporting or other U.S. tax purposes, the Debtors also intend to take the position that no prior activity or decision of the Debtors (*e.g.*, the filing of chapter 11 petitions) caused U.S. Holders to have a taxable event for U.S. tax purposes with respect to their claims.  These conclusions are not clear under current law, however, and there can be no assurance that the IRS will agree with them.  U.S. Holders are urged to consult their own tax advisors regarding their validity.  The rest of this disclosure assumes their validity for purposes of reaching other conclusions.

Generally, a U.S. Holder will recognize gain or loss with respect to its Claim in an amount equal to the difference between (i) the fair market value of its Claim against the Wind Down Entities on the Effective Date and (ii) the adjusted tax basis of the prepetition Claim against one or more Debtors deemed exchanged therefor (other than the basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).

The character of gain or loss recognized by a U.S. Holder as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including (i) the tax status of the Holder; (ii) whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held and (iii) in the case of Claims that are debt instruments, whether the Claim was acquired at a market discount and whether and to what extent the Holder previously claimed a bad debt deduction.  This disclosure is providing no description, however, of the various tax rules that may be relevant to the holders of Claims that are debt instruments, and such holders are urged to consult their own tax advisors regarding the consequences of the exchange.

C.      **U.S. Federal Income Tax Treatment of the Wind Down Entities and the U.S. Holders of Customer Entitlement Claims**

1.      *Classification of the Wind Down Entities*

The Wind Down Entities are intended to qualify as "liquidating trusts" for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, the liquidating trust beneficiaries are deemed to own the assets of the trust, and all of the trust's income and loss is taxed directly to the liquidating trust beneficiaries).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Wind Down Entities will be structured to comply with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Plan Administrator and Holders of Claims) will be required to treat, for U.S. federal income tax purposes, the Wind Down Entities as a grantor trust of which the holders of Claims against the Wind Down Entities are the owners and grantors.  The Wind Down Entities are created for the primary purpose of liquidating the

assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind Down Entities.

The following discussion assumes that the Wind Down Entities will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Wind Down Entities may or may not obtain a ruling from the IRS, concerning the tax status of the Wind Down Entities as grantor trusts. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Wind Down Entities, the U.S. federal income tax consequences to the Wind Down Entities could vary from those discussed herein (including the potential for imposition of tax on the net income of the Wind Down Entities at the entity level, rather than at the level of the holders of Claims against the Wind Down Entities). If the Wind Down Entities were found to be carrying on a profit-making business, the U.S. federal income tax consequences to the Wind Down Entities, the U.S. Holders of Customer Entitlement Claims, and the Debtors could vary from those discussed herein.

### D.    General Tax Reporting by the Wind Down Entities to U.S. Holders of Customer Entitlement Claims

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Wind Down Entities and all Holders of Claims) will be required to treat the transfer of the assets to the Wind Down Entities in accordance with the terms of the Plan. Pursuant to the Plan, the U.S. Customer Priority Assets will be treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the recipients of U.S. Customer Entitlement Claims (with each beneficiary receiving an undivided interest such assets ) in exchange for their U.S. Customer Entitlement Claims, followed by the transfer by such holders of such assets (subject to any related liabilities) to the Wind Down Entities in exchange for their U.S. Customer Entitlement Claims.

Accordingly, for U.S. federal income tax purposes all parties shall treat the Wind Down Entities as a grantor trust of which the holders of the U.S. Customer Entitlement Claims are the owners and grantors of the U.S. Customer Priority Assets, and treat such holders as the direct owners of an undivided interest of the Wind Down Entities, and therefore in the U.S. Customer Priority Assets (such a holder, a "Beneficiary"). Such Beneficiary must report on its U.S. federal income tax return its pro rata allocable share of income, gain, loss, deduction and credit recognized or incurred by the Wind Down Estates. A Beneficiary must report on its U.S. federal income tax return the tax consequences of sale or other disposition (or deemed disposition) of any assets of the Wind Down Estates, including its share of any gain or loss measured by the difference between (i) its share of the amount of Cash and/or the fair market value of any property received by the Wind Down Estates in exchange for the assets of the Wind Down Estates so sold or otherwise disposed of and (ii) such Beneficiaries' adjusted tax basis in its pro rata share of such assets of the Wind Down Estates. As noted below, the Plan Administrators will annually provide each Beneficiary a separate statement with information and instructions needed to report such income, gain, loss, deduction and credit recognized or incurred by the Wind Down Estates on such Beneficiary's U.S. federal income tax return.

Taxable income, gain or loss thereafter allocated to Holders of U.S. Customer Entitlement Claims will be treated as income, gain or loss with respect to each such Holder's undivided interest in the U.S. Customer Priority Assets, and not as income or loss with respect to its prior Claim.  The character of any income and the character and ability to use any loss will depend on the particular situation of the Holder.  To the extent any Holder of Claims is (i) a U.S. Holder, and (ii) has or will receive a Distribution from the General Pool in accordance with the Plan, the U.S. federal income tax consequences for such U.S. Holder will be similar to those of a U.S. Holder of U.S. Customer Entitlement Claims.

The U.S. federal income tax obligations of a Beneficiary with respect to its claims against the Wind Down Entities are not dependent on the Wind Down Entities distributing any cash or other proceeds.  Thus, Beneficiaries may incur a U.S. federal income tax liability with respect to its allocable share of Wind Down Entity income even if the Wind Down Entities do not make a concurrent distributions to the Beneficiaries.  In general, a distribution of cash by the Wind Down Entities will not be separately taxable to Beneficiaries in the Wind Down Entities Trust, since Beneficiaries will already be regarded for U.S. federal income tax purposes as owning the underlying assets (and will have been taxed at the time the Cash was earned or received by the Wind Down Entities).  Beneficiaries are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment if the Plan Administrator has the power to make an election to create a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and allocates any amounts to such funds.

The Plan Administrator will comply with all applicable governmental withholding requirements (see below).  Thus, in the case of any Beneficiaries that are not U.S. Holders, the Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

The Plan Administrator will file with the IRS tax returns for the Wind Down Entities, including the Wind Down Trust, consistent with its classification as a grantor Trust pursuant to Treasury Regulation Section 1.671-4(a).  The Plan Administrator also will send annually to each Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the Wind Down Entities as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  Such information will be provided each [February] with respect to the preceding calendar year.

## E.    Withholding on Distributions and Information Reporting

All Distributions to Holders of Customer Entitlement Claims will be subject to any applicable U.S. tax withholding rules.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate (currently 24%).

Backup withholding generally applies if the Holder: (a) fails to furnish its social security number or other taxpayer identification number; (b) furnishes an incorrect taxpayer

identification number; (c) fails properly to report interest or dividends; or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8).

If the Debtors or the Plan Administrator, as applicable, cannot verify whether a Holder of a Customer Entitlement Claim is a U.S. resident subject to an exemption, (x) for Distributions made by the Wind Down Trust on account of an Allowed Claim against U.S. Debtor, the recipient of such Distribution shall be presumed to be a U.S. non-exempt resident and such Distribution will be subject to withholding, (y) for Distributions made by the Wind Down Trust on account of an Allowed Claim against a non-U.S. Debtor to a recipient in the U.S., such recipient shall be presumed to be a U.S. non-exempt resident and such Distribution will be subject to withholding and (z) for Distributions made by the Wind Down Trust on account of an Allowed Claim against a non-U.S. Debtor to a recipient outside the U.S., such recipient shall be presumed not to be a U.S. resident and, accordingly, such Distribution will not be subject to any backup withholding.

Backup withholding is not an additional tax, but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Customer Entitlement Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the distributions they ultimately receive on their Customer Entitlement Claims would be subject to these Treasury Regulations.

In addition, a holder of Claims or a Beneficiary that is a not a U.S. Holder may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders. Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Plan Administrator.

9.    **ALTERNATIVE TO CONFIRMATION OF THE PLAN**

   The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest recovery on those Claims and Interests and is therefore in the best interests of such Holders.  If the Plan is not confirmed, a likely alternative near-future outcome for the Debtors is the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

   If the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict with precision how the proceeds of the liquidation would be distributed among Holders of Allowed Claims against the Debtors.

   The Debtors believe, however, that creditors would receive less value in the event that the Debtors are liquidated under chapter 7.  In addition, the Debtors believe that, in a liquidation under chapter 7, the value of the Debtors' Estates will be substantially eroded before creditors receive any Distribution, as a result of additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees.  The assets available for Distribution to creditors will be reduced by such additional expenses and by Claims, some of which will be entitled to priority.

   The Liquidation Analysis, prepared by the Debtors with their restructuring advisors, is premised upon a hypothetical liquidation in a chapter 7 case.  In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate estimated realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation would be the wind down and sale of individual assets.

   Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for Distribution to creditors than that recoverable under the Plan.  Therefore, the Debtors submit that the projected recoveries available to Holders of Claims and Holders of Interests in a chapter 7 liquidation are likely to be lower than those available under the Plan.

10.    **DEBTORS' RECOMMENDATION**

      In the opinion of the Debtors, the Plan is preferable to the only other alternative described herein.  **Therefore, the Debtors recommend that all Holders of Claims entitled to vote on the Plan vote to accept it.**

Dated: December 16, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/DRAFT                             
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*

## Appendix A

### Chapter 11 Plan

## **Appendix B**

**Solicitation Procedures Order**

## **Appendix C**

**Liquidation Analysis**

## **Appendix D**

**Digital Assets Conversion Table**