**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | Hearing Date:  January 25, 2024 at 10:00 a.m. (ET) |
| | Objection Deadline:  January 18, 2023 at 4:00 p.m. (ET) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING
AND APPROVING (A) ENTRY INTO, AND PERFORMANCE UNDER, THE
SHARE PURCHASE AGREEMENT AND (B) THE PURCHASE AND SALE OF
CERTAIN SHARES FREE AND CLEAR OF LIENS, CLAIMS AND
ENCUMBRANCES AND (II) DISMISSING THE CHAPTER 11 CASES OF
CERTAIN DEBTORS EFFECTIVE UPON THE EARLIER OF THE CLOSING
OR THE TERMINATION OF THE SHARE PURCHASE AGREEMENT**

FTX Trading Ltd. ("FTX Trading"), FTX Europe AG ("FTX Europe") and their

affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this

motion (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit

A (the "Order"), pursuant to sections 105(a), 305(a), 349, 363 and 1112(b) of title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 1017, 2002 and

6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 1017-2,

2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing and approving

(i) entry into, and performance under, the Share Purchase Agreement, dated as of January 4,

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288
and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of
the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A
complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at
https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd
is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

2024 (the "Share Purchase Agreement") between Debtor FTX Europe, a Swiss stock corporation ("Seller"), and Debtor FTX Trading, a company organized under the laws of Antigua and Barbuda ("Purchaser"), a copy of which is attached as Exhibit B to this Motion, and the ancillary documents thereto, including the release agreement to be entered into at the Closing (as defined below) attached as Exhibit D to the Share Purchase Agreement and (ii) the sale by Seller, and purchase by Purchaser, (the "Sale Transaction") of the shares (the "Shares") in Debtor FTX EU Ltd, f.k.a. K-DNA Financial Services Ltd, a Cyprus limited company ("FTX Cyprus"), and Debtor FTX Switzerland GmbH, a Swiss limited liability company ("FTX Switzerland," together with FTX Cyprus, the "Subject Companies" and each a "Subject Company"), free and clear of all Liens (as defined in the Share Purchase Agreement); and (b) dismissing the Chapter 11 Cases (as defined below) (the "Dismissal") of Seller and Seller's other subsidiaries FTX Certificates GmbH, FTX Crypto Services Ltd, FTX Structured Products AG and FTX Trading GmbH (collectively with Seller, the "Remaining FTX Europe Group Entities") effective upon the earlier of the consummation of the Sale Transaction (the "Closing") or the termination of the Share Purchase Agreement in accordance with its terms (the "Termination").  In support of this Motion, the Debtors submit the declarations of Tanja Luginbühl attached hereto as Exhibit C (the "Luginbühl Declaration") and Stylianos A. Triantafyllides attached hereto as Exhibit D (the "Triantafyllides Declaration"), which are each incorporated herein by reference, and other evidence to be presented at the hearing on the Motion.  In further support of this Motion, the Debtors respectfully state as follows:

## Background

      1.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code.

The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Joint administration of the Debtors' cases (the "<u>Chapter 11 Cases</u>") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") appointed an Official Committee of Unsecured Creditors (the "<u>Committee</u>") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

3.      Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

<u>**Facts Specific to Relief Requested**</u>

**I.      Overview of the FTX Europe Group**

A.      <u>The FTX Europe Group</u>

4.      The Subject Companies are Debtors, wholly-owned subsidiaries of Debtor Seller, and form part of a group of companies consisting of Seller and its subsidiaries (collectively, the "<u>FTX Europe Group</u>").  Seller is a wholly-owned subsidiary of Purchaser and is the European holding company of the FTX Europe Group.  Seller served as the FTX Europe Group's administrative hub, IT development provider and financing entity.

5.      FTX Cyprus was the only subsidiary of the FTX Europe Group with customer-facing commercial activities.  FTX Switzerland was designated to act as a liquidity provider to FTX Cyprus and as an intermediary between FTX Cyprus and the FTX.com

platform.  As of November 30, 2023,[2] the book value of Seller's interest in FTX Cyprus is $9.8 million, and the book value of Seller's interest in FTX Switzerland is $417,000.

6.      The FTX Europe Group also includes certain other Debtors, which never had, or no longer have, any substantive operations or direct role in the operation of the Business (as defined below).  These include:

> (i) FTX Certificates GmbH, an entity formed under the laws of Switzerland, which was established to enable the FTX Europe Group to offer exchange traded products, but never commenced substantive operations;

> (ii) FTX Crypto Services Ltd, an entity formed under the laws of Cyprus, which was established to enable the FTX Europe Group to provide spot trading services, but never commenced substantive operations;

> (iii) FTX Structured Products AG, an entity formed under the laws of Liechtenstein, which was established to enable the FTX Europe Group to offer exchange traded products, but never commenced substantive operations; and

> (iv) FTX Trading GmbH, an entity formed under the laws of Germany, which was established to provide administrative support services to the other entities of the FTX Europe Group.  FTX Trading GmbH no longer has any substantive operations, and all of its employees were either terminated or transferred to FTX Cyprus.

B.  Prepetition Business

7.      Prior to the Petition Date, the FTX Europe Group operated a business (the "Business"), primarily through FTX Cyprus, pursuant to which customers in Europe were able to engage in certain digital asset transactions through the FTX.com platform operated by the Debtors.  The Business historically operated as part of the wider FTX group.  FTX Cyprus had approximately 116,000 customers, approximately 41,000 of which had net positive balances as of the Petition Date.

---

[2]   Based on the local (unaudited) management accounts of the Seller as of November 30, 2023.

8.      FTX Cyprus is subject to the regulatory supervision of the Cyprus Securities and Exchange Commission ("CySEC") and holds a license (currently suspended) (the "License") to operate as a Cypriot Investment Firm.  *See* Triantafyllides Decl. ¶ 5.  The License permits FTX Cyprus to undertake certain brokerage, custodianship and lending services to clients across Europe pursuant to the Cyprus Investment Services and Activities and Regulated Markets Law of 2017.  *Id.*

9.      On the Petition Date, FTX Cyprus ceased operations and CySEC issued an order suspending the License (the "Suspension") and ordering FTX Cyprus to take certain actions, including corrective measures to bring itself into compliance with certain of its authorization conditions.  In order to comply with the Suspension order FTX Cyprus has to comply with Cyprus law requiring the safekeeping of fiat currency balances belonging to its customers (the "Customer Cash") and return such Customer Cash to its customers.  *See* Triantafyllides Decl. ¶ 6.  These customer fiat currency balances are required to be held in segregated client bank accounts pursuant to Cyprus law.  *Id.*

10.     During the process of reconciling customer entitlements to the Customer Cash, the Debtors and their advisors learned that FTX Cyprus does not hold sufficient funds to meet all such entitlements and is therefore not able to comply with the suspension order.  The Debtors, based on currently available information, calculate that the shortfall in customer funds (the "Shortfall") is approximately €7.1 million.  This Shortfall may increase as a result of known and unknown contingent claims, and could be subject to dispute by FTX Cyprus customers or other third parties.  At the Debtors' request, CySEC has agreed several times to further extend the Suspension, which is currently set to expire on March 31, 2024.  *See* Triantafyllides Decl. ¶ 7.

C. Intercompany Payments

11.     As outlined in the table below, certain of the Remaining FTX Europe

Group Entities, on the one hand, and the Subject Companies, Purchaser, Debtor West Realm

Shires Inc. ("WRS") and Debtor Alameda Research Ltd. ("Alameda Research"), on the other

hand, are party to various intercompany claims as of the date hereof (the "Intercompany

Claims").

| Debtor Obligor | Amount | Debtor Obligee | Treatment Upon Closing |
|---|---|---|---|
| *Major Claims* | | | |
| FTX Europe AG | $60,150,000 | Alameda Research Ltd. | Outstanding |
| FTX Trading Ltd. | $102,483,387 | FTX Europe AG | Outstanding |
| *Expense Claims* | | | |
| FTX Europe Group | Professional Fees | Global Allocation | Outstanding |
| FTX Switzerland GmbH | $495,458 | FTX Europe AG | Paid by Purchaser |
| FTX Europe AG | $245,805 | West Realm Shires, Inc. | Outstanding |
| FTX Europe AG | $3,078,612 | FTX Trading Ltd. | Outstanding |
| FTX Trading GmbH | $154,440 | West Realm Shires, Inc. | Released |
| FTX Trading GmbH | $374,975 | FTX Trading Ltd. | Released |
| FTX Structured Products AG | $1,123 | West Realm Shires, Inc. | Outstanding |
| FTX Switzerland GmbH | $1,000 | West Realm Shires, Inc. | Outstanding |
| FTX Crypto Services Ltd | $15,452 | FTX Trading Ltd. | Outstanding |
| FTX Crypto Services Ltd | $7,804 | West Realm Shires, Inc. | Outstanding |
| FTX Certificates GmbH | $1,000 | West Realm Shires, Inc. | Outstanding |
| *Other Claims* | | | |
| FTX EU Ltd | $1,168,801 | FTX Trading Ltd. | Outstanding |
| FTX Switzerland GmbH | $102,310 | FTX Trading Ltd. | Outstanding |
| FTX EU Ltd | $94,541 | West Realm Shires, Inc. | Outstanding |
| *Support Payments* | | | |
| FTX EU Ltd | $2,962,980 | FTX Europe AG | Paid by Purchaser |

12.     The largest of these Intercompany Claims relate to certain transactions

entered into by the FTX Europe Group prior to its acquisition by Purchaser, including (i) a claim

of approximately $60.2 million held by Alameda Research against Seller in respect of certain

crypto asset transfers made by Alameda Research to Seller to collateralize trading of crypto

derivative products facilitated by Seller and (ii) a claim of approximately $102.5 million held by

Seller against Purchaser in respect of certain crypto assets transferred from Seller to Purchaser (collectively, the "Major Claims").

13.    In addition, the Intercompany Claims include claims in respect of operating costs and expenses incurred by parent companies on behalf of their subsidiaries, or loans made by parent companies to their subsidiaries to cover operating costs and expenses, including (i) post-petition fees and expenses of counsel and professional advisors to the Debtors incurred by Purchaser on behalf of the FTX Europe Group in connection with the Chapter 11 Cases, in an amount to be determined based on a global allocation among the Debtors at the time of the confirmation of a plan of reorganization; (ii) $495,458 owed by FTX Switzerland to Seller in respect of certain pre and post-petition intercompany loans and operating expenses paid by Seller on behalf of FTX Switzerland; (iii) $245,805 owed by Seller to WRS in respect of post-petition payroll and other charges paid by WRS on behalf of Seller; (iv) $3,078,612 owed by Seller to Purchaser in respect of certain pre and post-petition intercompany loans and operating expenses paid by Purchaser on behalf of Seller; (v) $154,440 owed by FTX Trading GmbH to WRS in respect of certain post-petition payroll and operating expenses paid by WRS on behalf of FTX Trading GmbH; (vi) $374,975 owed by FTX Trading GmbH to Purchaser in respect of certain post-petition intercompany loans for payroll and operating expenses; (vii) $1,123 owed by FTX Structured Products AG to WRS in respect of U.S. Trustee fees; (viii) $1,000 owed by FTX Switzerland to WRS in respect of U.S. Trustee fees; (ix) $15,452 owed by FTX Crypto Services Ltd to Purchaser in respect of post-petition payroll and operating expenses paid by Purchaser on behalf of FTX Crypto Services Ltd; (x) $7,804 owed by FTX Crypto Services Ltd to WRS in respect of post-petition payroll and other charges paid by WRS on behalf of FTX Crypto Services Ltd; and (xi) $1,000 owed by FTX Certificates GmbH to WRS in respect of

U.S. Trustee fees (the "Expense Claims").[3]  In addition, Seller incurred $2,962,980 of pre-and post-petition operational expenses (including payroll expenses) and invoices to IT service providers on behalf of FTX Cyprus, which was booked as a contribution by Seller to FTX Cyprus (the "Support Payments").

14.    Pursuant to the Sale Transaction, (i) Purchaser will make payments to Seller in respect of the Support Payments and the $495,458 Expense Claims that are held by Seller against the Subject Companies, and (ii) WRS and Purchaser will release their claims against FTX Trading GmbH.  The Major Claims and the remainder of the Expense Claims will not be repaid in connection with the Sale Transaction and will remain outstanding following the Closing.

D.    The Swiss Moratorium Proceeding

15.    According to the Debtors' currently available books and records, as of November 30, 2023, Seller is balance sheet insolvent with a negative equity position of approximately $105 million.[4]  Due to Seller's financial condition, Seller's board of directors, pursuant to its duties under Swiss law, filed a request with the District Court of Höfe, Switzerland (the "Swiss Court") to open provisional moratorium proceedings (the "Provisional Moratorium") with respect to Seller on April 4, 2023.  *See* Luginbühl Decl. ¶ 4.  The Swiss

---

[3]    The Subject Companies, on the one hand, and Purchaser and WRS, on the other hand, are also party to certain intercompany claims relating to post-petition fees and expenses including (i) $1,168,801 owed by FTX Cyprus to Purchaser in respect of post-petition expenses paid by FTX Trading on behalf of FTX Cyprus; (ii) $102,310 owed by FTX Switzerland to Purchaser in respect of certain post-petition intercompany loans provided to FTX Switzerland to cover its operating costs; and (iii) $94,541 owed to WRS in respect of certain post-petition expenses and costs in respect of FTX Cyprus paid by WRS on behalf of FTX Cyprus.  These are not included in the Major Claims or the Expenses Claims as they are claims among entities that will remain Debtors following the Dismissal.

[4]    Based on the local (unaudited) management accounts of the Seller as of November 30, 2023.  Excluding receivables against FTX Trading Ltd. in the amount of $102.5m that have been fully impaired in accordance with Swiss accounting principles.

Court granted this request on April 11, 2023, which was subsequently extended to December 11, 2023.  On November 24, 2023, the Swiss Court granted a definitive moratorium until June 11, 2024 (the "Definitive Moratorium" and, together with the Provisional Moratorium, the "Moratorium").  *Id.*

16.     Pursuant to the Moratorium, Seller operates under the supervision of a court-appointed administrator, Holenstein Brusa AG (the "Swiss Administrator"), while Seller seeks to either restructure its debt or enter into a composition agreement with its creditors.  During the Moratorium, Seller may also enter into a transaction with the goal of maximizing the value of its assets for its creditors as required under Swiss law.  *See* Luginbühl Decl. ¶ 5.  The Debtors understand that following the Closing, the Swiss Administrator is required to consider, pursuant to its duties under Swiss law, whether to initiate Swiss bankruptcy liquidation proceedings in relation to Seller.  *See* Luginbühl Decl. ¶ 6.

## II.     Marketing and Sale Process

17.     The Debtors' retained investment banker, Perella Weinberg Partners LP ("PWP"), at the request of the Debtors, commenced a marketing process to explore potential transactions for the sales of various Debtors, including the FTX Europe Group, in November 2022.  During this process, PWP reached out to over 200 parties, and the Debtors entered into non-disclosure agreements with over 80 potential purchasers.  After the commencement of the sale process, it became apparent to the Debtors and their advisors that Seller was balance sheet insolvent and would need to enter into a local moratorium process.  Accordingly, the Debtors ceased expending resources on any active marketing activities for the FTX Europe Group pending further developments.

18.     Between June 2023 and August 2023, following termination of the marketing activities, the Debtors' advisors received unsolicited indications of interest in FTX

Europe Group entities from six parties.  Of these six parties, two signed NDAs and engaged further in discussions with the Debtors regarding a potential transaction.  One of these two parties ("<u>Bidder 1</u>") contacted management of Seller in June 2023 to express interest in purchasing FTX Cyprus and potentially other subsidiaries of Seller.  The other party reached out to management of Seller on August 11, 2023 to express interest in a transaction involving the FTX Europe Group.

19.     Following receipt of these expressions of interest, the Debtors recommenced the marketing process for the Subject Companies.  PWP reviewed the list of parties who had previously signed non-disclosure agreements, and, based on those parties' prior interest, determined that 14 of these parties may be interested.  PWP contacted these 14 parties, of which three were not responsive to PWP's inquiry, and PWP, on behalf of the Debtors, sent the other 11 parties informational materials and a summary of proposed terms of a sale.  None of these 11 parties ultimately submitted an offer for the Subject Companies.

20.     Based on the Debtors' business judgment, the Debtors determined that the transaction with Bidder 1 was the highest and best and pursued negotiations with Bidder 1, exchanging draft transaction documents from October through December 2023.  Throughout this negotiation process, the Swiss Administrator reviewed and commented on draft documentation and was invited to attend all business-level discussions.  Counsel to Bidder 1 and Seller exchanged substantially final forms of transaction documentation on December 14, 2023.

21.     The transaction negotiated with Bidder 1 contemplated, among other things, (i) the purchase and sale of the shares of FTX Cyprus for $5,000,000 and the shares of FTX Switzerland for $900,000; (ii) payment by Bidder 1 of $750,000 to the Debtors for certain costs and expenses, including a contribution to FTX Cyprus in the amount of $500,000 for

ongoing working capital; and (iii) satisfaction by the Debtors of certain intercompany claims

held by certain Debtors against the Subject Companies in an aggregate amount of $4,711,094.

Additionally, the transaction with Bidder 1 also contemplated entry into a release agreement

pursuant to which (i) the Subject Companies would release certain Debtors from all claims with

respect to matters that have existed or occurred at any time prior to and including the date of the

release agreement and (ii) the Debtors would release Bidder 1 and the Subject Companies from

all claims with respect to matters that have existed or occurred at any time prior to and including

the date of the release agreement (with the exception of an intercompany receivable owed to

FTX Switzerland).  The closing of the transaction with Bidder 1 was subject to certain closing

conditions, including (i) the dismissal of the Chapter 11 Cases of Seller and the Subject

Companies; (ii) obtaining approval from the Swiss court supervising the Moratorium; (iii) receipt

of approval from CySEC with respect to the transfer of the shares in FTX Cyprus; and (iv) other

customary closing conditions.

22.     While the Debtors were discussing a potential transaction involving the

Subject Companies with Bidder 1, in connection with the Debtors' other ongoing explorations of

potential transactions, the Debtors learned of potential interest from other third parties in the

FTX Europe Group, including FTX Cyprus and the License.  The Debtors and their advisors

informed the Swiss Administrator regarding these potential indications of interest and discussion

between the Debtors, their advisors and the Swiss Administrator regarding the implementation of

the Sale Transaction commenced.

23.     Discussions with the Swiss Administrator to pursue the Sale Transaction

instead of the potential alternative transaction with Bidder 1 continued.  The Debtors determined

that FTX Trading purchasing the shares of FTX Cyprus and FTX Switzerland from FTX Europe

was the best path forward to ensure the Debtors maintain control over both entities. This will allow the Debtors to retain the License and exclusive use of the FTX Cyprus European customer list and to potentially explore in an orderly manner any disposition or transaction involving the License or customer list on a global or stand-alone basis. Additionally, since FTX Trading is purchasing the equity of the Subject Companies, the Debtors will retain the ability to pursue and control any litigation claims held by the Subject Companies, including any relating to the customer Shortfall. Finally, since FTX Cyprus is a customer-facing Debtor with tens of thousands of customers with net positive balances as of the Petition Date, retaining the entity will allow the Debtors to continue to engage with the relevant regulators on the process for the return of the Customer Cash and any other distributions to customers.

24.     Accordingly, the Debtors' counsel, Sullivan & Cromwell LLP, engaged closely with the Swiss Administrator and the independent director of Seller to negotiate and finalize the terms of the Sale Transaction. The Swiss Administrator reviewed and commented on draft documentation and was invited to attend all business-level discussions. The Share Purchase Agreement and the Sale Transaction have been duly approved by the board of Seller and the Swiss Administrator (*see* Luginbühl Decl. ¶ 7) and by the board of Purchaser.

## III.    The Sale Transaction

25.     On January 4, 2024, Seller and Purchaser executed the Share Purchase Agreement, which contains the following material terms:[5]

| Seller | FTX Europe AG |
|---|---|
| Purchaser | FTX Trading Ltd. |
| Acquisition of Shares | At Closing, Seller will sell to Purchaser, and Purchaser will purchase from Seller, the Shares, comprising: (i) 100% of the |

---

[5]   Capitalized terms used in this Section III but not otherwise defined herein are to be given the meanings ascribed to them in the Share Purchase Agreement. To the extent that there are inconsistencies between any summary description of the Share Purchase Agreement contained herein and the terms of the Share Purchase Agreement, the terms of the Share Purchase Agreement shall govern.

| | |
|---|---|
| | share capital of FTX Cyprus and (ii) 100% of the quota capital of FTX Switzerland. |
| **Purchase Price** | The consideration payable to Seller includes (i) cash equal to $5,100,000 for the shares of FTX Cyprus and $900,000 for the shares of FTX Switzerland and (ii) the release of claims of the Debtors against FTX Trading GmbH, including $154,440 owed by FTX Trading GmbH to WRS and $374,975 owed by FTX Trading GmbH to Purchaser. |
| **Intellectual Property** | Neither Seller nor any of the Subject Companies own or hold any interest in Intellectual Property related to the conduct of any of the business of Purchaser or its Affiliates.<br><br>Seller, on behalf of itself and its successors and assigns, will release the Released Purchaser Parties from any and all Liabilities based on infringement, misappropriation or other violation of any Intellectual Property and waives the benefit of or reliance upon any Law that would provide, in sum or substance, that the foregoing release does not extend to Liabilities that, as of the date hereof, Seller, and its subsidiaries and their respective successors and assigns do not know exist, or do not expect to exist, in their favor.<br><br>Seller agrees, on behalf of itself and its successors and assigns, not to initiate or prosecute any Actions against the Released Purchaser Parties based on, related to or arising out of any such Liabilities. |
| **Closing Conditions** | Closing conditions include: (i) obtaining the Swiss Court Approval, (ii) the entry of the Sale Order (iii) the CySEC Transfer Authorization being completed, and (iv) there being no Final Order making the Transactions illegal or otherwise prohibiting the Transactions.<br><br>The obligation of each of Seller and Purchaser to effect the Closing is subject to customary conditions regarding the accuracy of the representations and warranties and the performance of material obligations under the Share Purchase Agreement. |
| **Termination Date** | The Share Purchase Agreement may be terminated: (i) upon the mutual agreement of Seller and Purchaser; (ii) by either Seller or Purchaser if the Closing has not occurred by February 29, 2024 or if a Governmental Entity issues an order prohibiting the Transactions; (iii) by either party if the other party is in material breach of the Share Purchase Agreement; or (iv) by Seller if its board of directors determines that proceeding with the Transactions or failing to terminate the Share Purchase Agreement could be inconsistent with the board's fiduciary duties. |

| Intercompany Payments | At Closing, in addition to the Purchase Price, Purchaser will pay: (i) $2,962,980 in respect of pre and post-petition invoices paid by Seller on behalf of FTX Cyprus to certain IT service providers of FTX Cyprus and other operating costs of FTX Cyprus and (ii) $495,458 owed by FTX Switzerland to Seller in respect of certain pre and post-petition intercompany loans and operating expenses paid by Seller on behalf of FTX Switzerland. |
|---|---|
| Releases | At Closing, the Seller, the Remaining FTX Europe Group Entities, the Purchaser and WRS will enter into the Release Agreement pursuant to which: |
| | (i) each of Purchaser and WRS will release the Remaining FTX Europe Group Entities from all claims with respect to matters that have existed or occurred at any time prior to and including the date of the Release Agreement other than (A) the Major Claim held by Alameda Research against Seller and (B) postpetition fees and expenses of counsel and professional advisors to the Debtors incurred by Purchaser on behalf of the FTX Europe Group in connection with the Chapter 11 Cases; (C) WRS's claim of $245,805 against Seller in respect of post-petition operating expenses paid by WRS on behalf of Seller; (D) Purchaser's claim of $3,078,612 against Seller in respect of certain pre and post-petition intercompany loans and operating expenses paid by Purchaser on behalf of Seller; (E) WRS's claim of $1,123 against FTX Structured Products AG in respect of U.S. Trustee fees; (F) WRS's claim of $1,000 against FTX Switzerland in respect of U.S. Trustee fees; (G) Purchaser's claim of $15,452 against FTX Crypto Services Ltd in respect of post-petition payroll and operating expenses paid by Purchaser on behalf of FTX Crypto Services Ltd; (H) WRS's claim of $7,804 against FTX Crypto Services Ltd in respect of post-petition payroll and other charges paid by WRS on behalf of FTX Crypto Services Ltd and (I) WRS's claim of $1,000 against FTX Certificates GmbH in respect of U.S. Trustee fees; and (ii) each of the Remaining FTX Europe Group Entities will release the other Debtors from all claims with respect to matters that have existed or occurred at any time prior to and including the date of the Release Agreement, other than the Major Claim held by Seller against Purchaser; provided that the Major Claim held by Seller against Purchaser will not be excluded from the foregoing release |

|  | by the Remaining FTX Europe Group Entities unless a proof of claim with respect to such Major Claim is submitted in accordance with the *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793] within 45 days of the Closing. |
|---|---|
| **Governing Law** | The Share Purchase Agreement and the Release Agreement will be governed by the laws of the State of Delaware. |

26.     In addition to the material terms of the Share Purchase Agreement described above, in accordance with Local Rule 6004-1(b)(iv), the Debtors note the following with respect to the Sale Transaction:

| **Sale to an Insider** | Purchaser is an insider of Seller within the meaning set forth in section 101(31)(B)(iii) of the Bankruptcy Code.  *See* Local Rule 6004-1(b)(iv)(A). |
|---|---|
| **Agreements with Management** | None.  *See* Local Rule 6004-1(b)(iv)(B). |
| **Releases** | As described above, "Releases."  *See* Local Rule 6004-1(b)(iv)(C). |
| **Private Sale/No Competitive Bidding** | No auction will be conducted.  *See* Local Rule 6004-1(b)(iv)(D). |
| **Closing and Other Deadlines** | As described above, "Termination Date."  *See* Local Rule 6004-1(b)(iv)(E). |
| **Good Faith Deposit** | None.  *See* Local Rule 6004-1(b)(iv)(F). |
| **Interim Arrangements with Purchaser** | Not applicable.  *See* Local Rule 6004-1(b)(iv)(G). |
| **Use of Proceeds** | None.  *See* Local Rule 6004-1(b)(iv)(H). |
| **Tax Exemption** | Not applicable.  *See* Local Rule 6004-1(b)(iv)(I). |
| **Record Retention** | Not applicable.  The Debtors are not selling substantially all of their assets under the Agreement.  *See* Local Rule 6004-1(b)(iv)(J). |
| **Sale of Avoidance Actions** | None.  *See* Local Rule 6004-1(b)(iv)(K). |
| **Requested Findings as to Successor Liability** | None.  *See* Local Rule 6004-1(b)(iv)(L). |
| **Sale Free and Clear of Unexpired Leases** | Not applicable.  *See* Local Rule 6004-1(b)(iv)(M). |
| **Credit Bid** | Not applicable.  *See* Local Rule 6004-1(b)(iv)(N). |

| Relief from Bankruptcy Rule 6004(h) | The Debtors request a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).  *See* Local Rule 6004-1(b)(iv)(O). |
|---|---|

## Jurisdiction

27.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 305(a), 349, 363 and 1112(b) of the Bankruptcy Code, Bankruptcy Rules 1017, 2002 and 6004 and Local Rules 1017-2, 2002-1 and 6004-1.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

28.     By this Motion, the Debtors seek entry of the Order, substantially in the form attached hereto as Exhibit A, (a) authorizing and approving (i) entry into, and performance under, the Share Purchase Agreement and the ancillary documents thereto, (ii) the sale by Seller, and purchase by Purchaser, of the Shares in Subject Companies, free and clear of all Liens; and (b) dismissing the Chapter 11 Cases of the Remaining FTX Group Entities effective upon the earlier of the Closing or the Termination.

**Basis for Relief**

**I.    The Court Should Approve the Entry into the Share Purchase Agreement and the Sale Transaction Under Section 363(b) of the Bankruptcy Code.**

29.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 does not provide a standard establishing when it is appropriate for bankruptcy courts to authorize the sale of a debtor's assets or purchase of assets using estate funds, courts in this district have held that such a sale or purchase may be authorized under section 363 if the court finds a "sound business purpose."  *See Dai-Ichi Kangyo Bank, Ltd.* v. *Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)) (citations omitted); *Culp* v. *Stanziale (In re Culp)*, 550 B.R. 683, 697 (D. Del. 2015), *appeal dismissed*, 681 Fed. Appx. 140 (3d Cir. 2017).

A.    A Sound Business Purpose Exists for the Entry into the Sale Purchase Agreement and the Sale Transaction

30.    A sound business purpose for the sale of a debtor's assets or use of estate funds to purchase assets outside the ordinary course of business exists where such sale or purchase is necessary to maximize and preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g.*, *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to protect and maximize the value of the estate's assets); *In re Lionel Corp.*, 722 F.2d at 1071; *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997).

31.    The Debtors believe that it is advantageous to the Debtors' estates for FTX Trading to purchase the Shares of FTX Cyprus and FTX Switzerland from FTX Europe in order to maintain direct control over both entities.  Under the current corporate structure, these Subject

Companies are wholly owned subsidiaries of FTX Europe.  Since FTX Europe is currently in

Moratorium, any actions with respect to the Subject Companies would require approval of the

Swiss Administrator and potentially the Swiss Court.  Moreover, in light of FTX Europe's

current financial condition, there is a risk that the Swiss Administrator will resolve, pursuant to

its duties under Swiss law, to initiate Swiss bankruptcy liquidation proceedings.

32.     Authorizing Seller to sell, and Purchaser to purchase, the Shares now

solves these issues.  The Debtors will be able to retain the License, exclusive use of the FTX

Cyprus European customer list and control of any litigation claims held by the Subject

Companies against any parties, including any actions relating to the customer Shortfall.

Additionally, the closing of the Sale Transaction and receipt of proceeds of the Sale Transaction

will allow an immediate wind down of Seller and its remaining subsidiaries for the benefit of

local creditors.  Accordingly, the Debtors submit that the entry into, and performance under the

Share Purchase Agreement, and the Sale Transaction represents a sound exercise of the Debtors'

business judgment and should be approved pursuant to section 363(b) of the Bankruptcy Code.

B.    The Sale Transaction Satisfies the Entire Fairness Standard

33.     When reviewing a transaction between an insider of a debtor and the

debtor, courts have generally supplanted the "business judgment rule" with the "entire fairness"

standard.  In applying the entire fairness standard, courts examine the integrity and entire fairness

of the transaction at issue, typically examining whether the process and price of a proposed

transaction not only appear fair but are fair and whether fiduciary duties were properly taken into

consideration.  *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (noting

that parties are required to exercise "due care" when entering into an interested transaction.);

*Citicorp Venture Capital, Ltd.* v. *Comm. of Creditors Holdings Unsecured Claims (In re*

*Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to

rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein.") (citation omitted), *aff'd*, 160 F.3d 982 (3rd Cir. 1998).

34.     The inquiry typically focuses on two aspects, "fair dealing" and "fair price," both of which must be examined together in resolving the ultimate question of entire fairness. *Bayou Steel BD, L.L.C.* v. *Black Diamond Cap. Mgmt. L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*, 651 B.R. 179 (Bankr. D. Del. 2023). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* at 187. Fair price "relates to the economic and financial considerations" in evaluating the proposed transaction. *Id.*

35.     With respect to fair dealing, the Sale Transaction was negotiated at arm's'-length between Purchaser, on the one hand, represented by the Debtors and the Debtors' advisors, and Seller, on the other hand, represented by Seller's independent director and with the cooperation and input of the Swiss Administrator. From Purchaser's perspective, moving the Subject Companies out of the current corporate structure and having Purchaser directly own both would allow Purchaser to retain the License, exclusive use of the FTX Cyprus European customer list, and of the Subject Companies' litigation claims while also minimizing the risk of any potential interference from Swiss bankruptcy proceedings. From Seller's perspective, an injection of cash from the proceeds of the sale would allow for a prompt wind-down of Seller and its subsidiaries for the benefit of its local creditors. Seller is also receiving a greater amount of consideration than was offered by Bidder 1. In addition, regulatory approval in connection

with a transaction with Bidder 1 may be less certain than regulatory approval in connection with

an internal reorganization.

36.     With respect to fair price, the Debtors, with the cooperation and input of

the Swiss Administrator, ran a robust marketing process to sell the Subject Companies and

negotiated the terms of an alternative transaction at arms-length with Bidder 1, amounting to

effectively a market test.  Negotiations with Bidder 1 set a fair price for the Shares, consisting of

cash consideration of $5,900,000 and cash payments in respect of certain intercompany claims

against the Subject Companies.  Ultimately, for the reasons described above, the Debtors

determined not to move forward with Bidder 1, and instead to pursue the Sale Transaction.

Seller and Purchaser have agreed to a higher amount of consideration in respect of the Sale

Transaction:  (i) $6,000,000 of cash consideration, (ii) releases of $529,415 in total claims held

by the Purchaser—a $374,975 claim by Purchaser against FTX Trading GmbH and a $154,440

claim by WRS against FTX Trading GmbH, (iii) cash payments in the amount of $3,458,438 in

respect of intercompany claims held by Seller against FTX Cyprus ($2,962,980) and FTX

Switzerland ($495,458), and (iv) the Releases.  No other parties identified in the marketing effort

made offers of comparable value to the Seller.  Accordingly, the Debtors submit that the Sale

Transaction satisfies the entire fairness standard.

C.   Adequate and Reasonable Notice of the Sale Was Provided to Interested Parties

37.     Notice of this Motion will be provided to the following parties:  (i) the

U.S. Trustee; (ii) counsel to the Committee; (iii) any known affected creditor(s) asserting a lien,

claim or encumbrance against, or interest in, the relevant Shares; (iv) any party that has

expressed an interest in purchasing the Subject Companies during the last six months; (v) all

known creditors of the Remaining FTX Europe Group Entities; (vi) any interested or affected

governmental or regulatory entity, including the Internal Revenue Service, the Securities and

Exchange Commission and the United States Department of Justice; and (vii) any other party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that all parties with an interest in the Sale Transaction have been given adequate notice and that no other or further notice need be provided.

D. <u>The Parties Have Acted in Good Faith and Purchaser Should Be Entitled to the Good Faith Protections of Section 363(m) of the Bankruptcy Code</u>

38.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that authorization of the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

39.     Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp.* v. *Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)); *see also United States* v. *Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings").

40.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 147. To constitute lack of good faith, a purchaser's

conduct in connection with a sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (citations omitted).  Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *See id.*; *see also Pursuit Capital Mgmt. Fund I, L.P.* v. *Burtch (In re Pursuit Capital Mgmt., LLC)*, 874 F.3d 124, 135 (3d Cir. 2017).

41.    As described above, the Purchaser and Seller engaged in arm's-length negotiations.  With respect to fair dealing, the Sale Transaction was negotiated at arm's'-length between Purchaser, on the one hand, represented by the Debtors and the Debtors' advisors, and Seller, on the other hand, represented by Seller's independent director and with the cooperation and input of the Swiss Administrator.  Purchaser is paying a fair price for the Shares and has a sound justification for entering into the Sale Transaction.  Accordingly, the Debtors request the finding that Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

## II.    The Sale Should Be Free and Clear of All Liens, Claims and Encumbrances Under Section 363(f) of the Bankruptcy Code.

42.    Although the Debtors are currently unaware of any Liens, out of an abundance of caution the Debtors request authorization to sell the Shares free and clear of all Liens, other than Permitted Liens (as defined in the Share Purchase Agreement), in accordance with section 363(f) of the Bankruptcy Code, with any such Liens attaching to the proceeds of the sale of the Shares.

43.    The sale of estate property free and clear of any interest is governed by section 363(f) of the Bankruptcy Code, which provides:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if—
>
> (1)    applicable nonbankruptcy law permits sale of such property
>        free and clear of such interest;
> (2)    such entity consents;
> (3)    such interest is a lien and the price at which such property is
>        to be sold is greater than the aggregate value of all liens on
>        such property;
> (4)    such interest is in bona fide dispute; or
> (5)    such entity could be compelled, in a legal or equitable
>        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

44.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive:

approval of a proposed sale of assets free and clear of interests requires only that one of the five

requirements be satisfied with respect to each such interest. *See In re Kellstrom Indus., Inc.*,

282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the

conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the

sale free and clear of all liens.") (citation omitted).

45.    Furthermore, section 105(a) of the Bankruptcy Code grants the Court

broad discretionary powers, providing that "[t]he Court may issue any order, process or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

11 U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section

363(f).  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325

(Bankr. D. Del. 2001), at *8 (highlighting bankruptcy courts' equitable authority to authorize

sale of estate assets free and clear).

46.    To the extent any valid Liens exist with respect to the Shares, the Debtors

submit that the Sale Transaction satisfies one or more of the requirements of section 363(f) of the

Bankruptcy Code.  First, absent any objection to the Sale Transaction, a holder of any liens,

claims, interests and encumbrances shall be deemed to have consented to the Sale Transaction, and the Shares may be sold free and clear of all liens, claims, interests and encumbrances.  *See, e.g.*, *Hargrave* v. *Twp. of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims, interests and encumbrances satisfies section 363(f)(2)) (citations omitted); *In re BSA*, 642 B.R. 504, 569 (Bankr. D. Del. 2022) (citing *In re Tabone, Inc.*, 175 B.R. at 858).  Further, the Debtor submits that any holder of liens, claims and encumbrances against or interests in the Shares could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of their interests.  *See, e.g.*, *In re Southland Royalty Co. LLC*, 623 B.R. 64, 98 (Bankr. D. Del. 2021).

47.     Furthermore, to the extent any valid Liens are in existence immediately prior to the Closing with respect to the Shares (other than Permitted Liens), such Liens will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party-in-interest.  The Debtors submit that holders of any Liens will be sufficiently protected by the availability of the proceeds of the sale to satisfy their claims and interests.  Accordingly, the Debtors submit that the sale of the Shares free and clear of Liens (other than Permitted Liens) is in the best interests of the Debtors' estates and stakeholders.

### III.    A Private Sale of the Shares Is Appropriate Under Bankruptcy Rule 6004.

48.     Bankruptcy Rule 6004(f)(1) permits a debtor to conduct private sales or sales without an auction and courts in this district have held that a debtor may conduct a private sale when a good business reason exists.  *See, e.g.*, *In re RTI Holding Company, LLC*, No. 20-12456 (JTD) (Feb. 1, 2021), D.I. 1006 (approving the private sale of real property for approximately $1.6 million); *In re PQ New York, Inc.*, No. 20-11266 (JTD) (June 29, 2020), D.I. 435 (approving the private sale of assets for approximately $3 million); *In re Nortel*

*Networks Inc.*, No. 09-10138 (KG) (Nov. 23, 2010), D.I. 4402 (approving the private sale of

limited partnership interests and limited liability corporation interests for approximately $22.8

million); *In re W.R. Grace & Co.*, No. 01−01139 (JKF) (Dec. 17, 2008), D.I. 20284 (authorizing

the private sale of limited partnership interests for approximately $8 million).

49.     The Debtors have already expended significant resources and time

marketing the assets and businesses of the FTX Europe Group and running a robust sale process

prior to agreeing to the Sale Transaction.  Accordingly, the Debtors submit that any further

marketing or auction process would not yield a higher or better offer for the Shares.  As such, the

Debtors submit that good business reason exists for conducting a private sale under the

circumstances and that the proposed Sale Transaction is justified by a sound business purpose.

**IV.    The Dismissal of the Chapter 11 Case of the Remaining FTX Europe Group Entities
Upon the Earlier of the Closing or the Termination Is Appropriate Under
Section 1112(b) of the Bankruptcy Code.**

50.     A dismissal of a chapter 11 case is governed by section 1112(b) of the

Bankruptcy Code, which permits a party-in-interest, after notice and hearing, to seek to dismiss a

chapter 11 case in the best interests of the creditors and the estate for cause.  *See* 11 U.S.C.

§ 1112(b).  "Section 1112(b) requires a two-step process in which the court first determines

whether there is 'cause' to convert or dismiss, and next chooses between conversion and

dismissal based on 'the best interest of creditors and the estate.'" *In re American Capital*

*Equipment, LLC*, 688 F.3d 145, 161 (3d Cir. 2012) (citing *In re SGL Carbon Corp.*, 200 F.3d

154, 159 n.8 (3d Cir. 1999)).

A.  Cause Exists to Dismiss the Remaining FTX Europe Group Entities' Chapter 11 Cases.

51.     Whether cause exists to dismiss a chapter 11 case is determined on a case-

by-case basis and is a decision within the sound discretion of the bankruptcy court.  *In re*

*American Capital Equipment*, 688 F.3d at 161; *In re Myers*, 491 F.3d 120, 127 (3d Cir. 2007);

*Sullivan Central Plaza I, Ltd.* v. *BancBoston Real Estate Capital Corp.* (*In re Sullivan Cent.*

*Plaza I, Ltd.*), 935 F.2d 723, 728 (5th Cir. 1991); *In re Albany Partners, Ltd.*, 749 F.2d 670, 674

(11th Cir. 1984); *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010)

("Bankruptcy judges have wide discretion to determine whether cause exists to dismiss . . . a

case under section 1112(b)."); *In re Gucci*, 174 B.R. 401, 410 (Bankr. S.D.N.Y. 1994) ("The

Bankruptcy Court has wide discretion to determine if cause exists, and how to ultimately dispose

of the case.").

52.     Courts have broad equitable discretion under section 1112(b) to dismiss a

chapter 11 case based on the particular facts and circumstances of the case.  *See C-TC 9th Ave.*

*P'ship* v. *Norton Co.* (*In re C-TC 9th Ave. P'ship*), 113 F.3d 1304, 1311 n.5 (2d Cir. 1997); *In re*

*MF Glob. Holdings Ltd.*, 465 B.R. 736, 742 (Bankr. S.D.N.Y. 2012); *Trident Assocs. Ltd. P'ship*

v. *Metro Life Ins. Co.* (*In re Trident Assocs. Ltd. P'ship*), 52 F.3d 127, 131 (6th Cir. 1995), *cert.*

*denied*, 516 U.S. 869 (1995); *In re Smith*, 77 B.R. 496, 499-500 (Bankr. E.D. Pa. 1987).

53.     Section 1112(b)(4) provides a list of certain circumstances that constitute

"cause," including "substantial or continuing loss to or diminution of the estate and the absence

of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4).  This is a two-part inquiry.

*See In re Orchard Hills Baptist Church Inc.*, 608 B.R. 309, 316 (Bankr. N.D. Ga. 2019); *In re*

*Motel Properties, Inc.*, 314 B.R. 889, 895 (Bankr. S.D. Ga. 2004); *In re Sakon*, 617 B.R. 7, 15

(Bankr Ct. Dec. CRR).

54.     *First*, courts determine whether there is a substantial or continuing loss to

or diminution of the estate.  This prong is generally satisfied if the debtor has a negative cash

flow after commencement of the Chapter 11 case.  *See In re Taub*, 427 B.R. 208, 231 (Bankr.

E.D.N.Y. 2010); *In re Miell*, 419 B.R. 357, 366 (Bankr. E.D. N.Y. 2010) (noting that negative

cash flow alone can be sufficient cause to dismiss or convert under § 1112(b)).  An inability to

pay ongoing expenses combined with the absence of reliable income has equally been found

sufficient to satisfy this test.  *See In re Taub*, 427 B.R. 208, 231 ("[a]nother indicator is the

debtor's inability to meet the basic operating expenses critical to the viability of its enterprise,

notwithstanding the protection of the automatic stay."); *In re Creech*, 538 B.R. 245, 249 (Bankr.

E.D.N.C. 2015) ("An inability to pay ongoing expenses, combined with an absence of reliable

income, can establish cause."); *In re Sakon*, 617 B.R. 7, 15 (Bankr. D. Conn. 2020) ("[c]ritically,

courts have held that post-petition negative cash flow and an inability to pay current expenses

evidence the continuing losses required under section 1112(b)(4)(A).").

55. *Second,* if this inquiry is satisfied, courts inquire whether there is an

absence of reasonable likelihood of rehabilitation.  The rehabilitation standard is a different and

more demanding standard than whether or not the debtor can be reorganized.  *See In re Andover*

*Covered Bridge*, LLC, 553 B.R. 162, 175 (Bankr. Ct. Dec. CRR) quoting *In re Brutsche*, 476

B.R. 298, 301 (Bankr. D.N.M. 2012) ("Rehabilitation is a different and . . . much more

demanding standard than reorganization.").  It requires a financially viable plan for continuing

operations.  *See In re Woodruff*, 580 B.R. 291, 298 (Bankr. M.D. Ga. 2018).  There is no

reasonable rehabilitation if the debtor will not generate cash flow meeting its current obligations.

*See In re Sillerman*, 605 B.R. 631, 656 (Bankr. S.D. N.Y. 2019).

56. Additionally, the list in Section 1112(b)(4) is *non-exhaustive*.  Other

circumstances may constitute sufficient "cause" as well.  *See* H.R. Rep. No. 595, 95th Cong., 1st.

Sess. 405–06 (1978) (noting that the list in section 1112(b)(4) "is not exhaustive"); *see also In re*

*SGL Carbon Corp.*, 200 F.3d at 160 (noting that "the legislative history and case law makes clear

that in dismissing a chapter 11 case, the court will be able to consider other factors . . . and to use

its equitable powers to reach an appropriate result in individual cases").  In fact, "[m]any of the grounds expressly identified in section 1112(b)(4) may not apply when a chapter 11 debtor seeks voluntary dismissal of its bankruptcy case." *In re Brewery Park Assocs., L.P.*, 2011 WL 1980289, at *16 (Bankr. E.D. Pa., Apr. 29, 2011).

57.    One factor not explicitly listed in section 1112(b) that courts have found constitutes cause for voluntary dismissal is the inability of a debtor "to effectuate a plan" or where there is not a "reasonable possibility of a successful reorganization within a reasonable period of time." *In re American Capital Equipment*, 688 F.3d at 162 n.10 (3d Cir. 2012) ("the 'inability to effectuate a plan' remains a viable basis for dismissal because the listed examples of cause [in section 1112(b)] are not exhaustive"); *see also Bronson* v. *Thompson (In re Bronson)*, 2013 WL 2350791, at *8 (B.A.P. 9th Cir. May 29, 2013) ("When it becomes apparent to the court that the debtor will not be able to confirm and effectuate a plan within the foreseeable future, the bankruptcy court should exercise its discretion under § 1112(b) to dismiss or convert."); *In re Ramreddy, Inc.*, 440 B.R. 103, 113 n.26 (Bankr. E.D. Pa. 2009) (citation omitted) (noting that "[c]ourts have held that the inability to propose a feasible reorganization or liquidation plan, by itself, provides 'cause' for dismissal or conversion of a chapter 11 case on request of an interested party").

58.    In addition, in the context of a motion to dismiss a case under section 1112(b), the Third Circuit has repeatedly noted that the Supreme Court "has identified two of the basic purposes of Chapter 11 as (1) 'preserving going concerns' and (2) 'maximizing property available to satisfy creditors.'" *In re Integrated Telecom Express, Inc.*, 384 F.3d at 119.  If neither of these purposes can be demonstrated, dismissal is proper. *Id.*

59.     The circumstances affecting the Remaining FTX Europe Group Entities constitute "cause" to dismiss their Chapter 11 Cases effective upon the earlier of the Closing or the Termination.  *First*, "cause" exists because these Debtors have no reasonable likelihood of rehabilitating their operations.  The Remaining FTX Europe Group Entities are not operational and are not currently engaged in any ongoing business.  The Debtors do not expect the Remaining FTX Europe Group Entities to reorganize in the future.  *Second*, "cause" exists because the Debtors continue to incur costs associated with keeping these Debtors in the Chapter 11 Cases with no associated benefit.  For the reasons above, the Debtors submit that sufficient cause exists for the dismissal of the Remaining FTX Europe Group Entities effective upon the earlier of the Closing or the Termination.

B.  <u>Dismissal of the Remaining FTX Europe Group Entities' Chapter 11 Cases Effective Upon the Earlier of the Closing or the Termination Is in the Best Interests of the Creditors and Estates.</u>

60.     Once cause is established, a court must examine whether dismissal or conversion of a case to chapter 7 is in the best interests of the creditors and the estate.  *In re American Capital Equipment*, 688 F.3d at 161.  While the Bankruptcy Code does not define the "best interests of the creditors and the estate," "[t]he cases are uniform in holding that the decision to dismiss or convert is within the bankruptcy court's discretion and is based on the facts.  It is a case-by-case decision."  *In re Calrissian LP*, 2018 WL 3854004, at *2 (Bankr. D. Del. 2018); *see also In re Hampton Hotel Inv'rs, L.P.*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001) (noting that "courts are required to consider and weigh the totality of facts and circumstances of the individual case when determining what is in the best interest of the creditors").

61.     Further, a dismissal of a debtor's chapter 11 case meets the "best interests of creditors" test where a debtor has nothing left to reorganize or the debtor's assets are fixed and

liquidated. *See In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).

62.     The Debtors submit that the Remaining FTX Europe Group Entities have nothing to reorganize.  The Remaining FTX Europe Group Entities had limited operations prepetition, have no current operations and no employees who could potentially restart operations.  The Debtors expect that a Swiss court proceeding is sufficient to adequately perform an orderly wind down of Seller in accordance with Swiss bankruptcy law.  After the Closing or Termination, having Seller continually be subject to both the Moratorium and the Chapter 11 Cases is a needless drain of Debtor resources.

63.     In addition, dismissal of the Remaining FTX Europe Group Entities' Chapter 11 Cases is warranted here because the alternative—conversion to chapter 7—would not serve the best interests of the Remaining FTX Europe Group Entities' estates and their creditors.  Conversion would not reduce fees, time, and other costs associated with the Remaining FTX Europe Group Entities' continuation in the Chapter 11 Cases.  Managing chapter 7 cases in these jurisdictions would only pose a burden to the estates.  Accordingly, the Debtors respectfully submit that voluntary dismissal of the Remaining FTX Europe Group Entities' Chapter 11 Cases effective upon the earlier of the Closing or the Termination is in the best interests of the Debtors' estates and their creditors.

**V.     Alternatively, the Court Should Dismiss the Remaining FTX Europe Group Entities' Chapter 11 Cases Upon the Earlier of the Closing or the Termination Pursuant to Section 305(a) of the Bankruptcy Code.**

64.     Section 305(a)(1) of the Bankruptcy Code provides that the "court . . . may dismiss a case under [chapter 11], at any time if: (1) the interests of the creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1).

65.     Courts look to the following *non-exhaustive* list of factors to gauge the best interests of the creditors and the debtor, including, among other things:  (a) economy and efficiency of administration; (b) whether federal proceedings are necessary to reach a just and equitable solution; (c) whether there is an alternative means of achieving an equitable distribution of assets; and (d) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves the interests in the case.  *In re Crown Village Farm, LLC*, 415 B.R. 86, 96 (Bankr. D. Del. 2009).

66.     In addition, courts have dismissed Chapter 11 cases under section 305(a) where (a) the case would not result in an economical and expeditious administration of the debtor's estate or (b) it is unlikely that the debtor could confirm a chapter 11 plan.  *See, e.g.*, *In re Xacur*, 219 B.R. 956, 969 (Bankr. S.D. Tex. 1998) (dismissing an involuntary chapter 11 case commenced against a Mexican debtor under section 305(a) where the chapter 11 proceeding would not "result in an economical and expeditious administration" of the debtor's estate because of "the doubtful enforceability of bankruptcy court orders"); *In re Monsour Medical Center, Inc.*, 154 B.R. at 207 (dismissing a debtor's chapter 11 case under section 305(a) where "it [was] highly unlikely that debtor will put together a confirmable plan of reorganization").

67.     Here, dismissal under section 305(a) is in the best interests of the creditors and the Debtors' estates.  Absent a dismissal, the Chapter 11 Cases of the Remaining FTX Europe Group Entities would continue to incur U.S. Trustee fees with no concurrent benefit realized by remaining in Chapter 11.  Additionally, the Debtors expect that an orderly wind down of the Remaining FTX Europe Group Entities may be achieved in accordance with Swiss bankruptcy law.

68.     Accordingly, dismissal of the Chapter 11 Cases of the Remaining FTX Europe Group Entities effective upon the earlier of the Closing or the Termination is in the best interests of both the creditors and the Debtors' estates, and the Court should dismiss the cases pursuant to section 305(a) of the Bankruptcy Code.

**VI.    Alternatively, the Court Should Dismiss the Chapter 11 Cases of the Remaining FTX Europe Group Entities, Effective Upon the Earlier of the Closing or the Termination Pursuant to Section 105(a) of the Bankruptcy Code.**

69.     Section 105(a) of the Bankruptcy Code provides the Court with supplemental authority to effectuate the overall policy objectives of the Bankruptcy Code in connection with a motion to dismiss a chapter 11 case. *See* 11 U.S.C. § 105(a) ("[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

70.     Here, given the circumstances discussed above, the Debtors' focus with respect to the Remaining FTX Europe Group Entities must be to minimize the further incurrence of administrative expenses. The voluntary dismissal of the Chapter 11 Cases of the Remaining FTX Europe Group Entities accomplishes this goal. Absent a dismissal, the Debtors would continue to incur substantial chapter 11 administrative expenses.

71.     Accordingly, the dismissal of the Chapter 11 Cases of the Remaining FTX Europe Group Entities is consistent with the policy objectives of the Bankruptcy Code and the Court should dismiss these cases.

**VII.    All Orders Should Remain in Effect for the Time Period Each FTX Europe Debtor Was Part of the Chapter 11 Cases.**

72.     The Debtors request that all stipulations, settlements, rulings, orders and judgments of the Court entered in these jointly administered Chapter 11 Cases remain in full force and effect and survive the dismissal of the Chapter 11 Cases of the Remaining FTX Europe

Group Entities solely with respect to the time period where each FTX Europe Debtor was part of the Chapter 11 Cases. Although section 349 of the Bankruptcy Code typically contemplates that dismissal will reinstate the prepetition state of affairs by revesting property in the debtor and vacating orders and judgments of the bankruptcy court, the Court may "for cause, orde[r] otherwise." 11 U.S.C. § 349(b). "[T]his provision appears to be designed to give courts the flexibility to 'make the appropriate order to protect rights acquired in reliance on the bankruptcy case.'" *Czyzewski* v. *Jevic Holding Corp.*, 137 S. Ct. 973, 984 (2017).

73.     The Debtors submit that cause exists to allow all stipulations, settlements, rulings, orders and judgments entered by the Court during the Chapter 11 Cases to be given continued effect for the period where the Remaining FTX Europe Group Entities were part of the Chapter 11 Cases, notwithstanding the requested dismissal. This relief is necessary to protect the Debtors and preserve the authority the Debtors had to act pursuant to the various orders entered by the Court, including, but not limited to, any orders authorizing the Remaining FTX Europe Group Entities to pay (a) prepetition wages, salaries and other compensation and benefits, and reimbursable expenses, to employees and (b) prepetition trade claims of foreign (non-U.S.) vendors. Unless the Court orders otherwise, section 349 of the Bankruptcy Code could unravel the effect and authorizations of the orders entered in the Chapter 11 Cases. By allowing the orders of this Court to remain in full force and effect and survive dismissal for the period of time when the Remaining FTX Europe Group Entities were part of the Chapter 11 Cases, the Court will preserve the Debtors' authority to act pursuant to such orders notwithstanding dismissal of the Chapter 11 Cases of the Remaining FTX Europe Group Entities.

74.     The Court has granted relief similar to the relief requested herein with respect to orders of the Court remaining in full force and effect and surviving dismissal of a

debtor's chapter 11 case. *See, e.g., In re VG Liquidation, Inc., et al.*, Case No. 18-11120 (JTD) (Bankr. D. Del. Aug. 19, 2019) [D.I. 1183, 1184] (authorizing all prior orders of the court to "remain in full force and effect, . . . be unaffected by the dismissal of the Chapter 11 Case, and [be] specifically preserved for purposes of finality of judgment and *res judicata*"); *In re BioAmber Inc.*, Case No. 18-11078 (LSS) (Bankr. D. Del. June 20, 2018) [D.I. 34] (same); *In re St Alexius Properties, LLC*, Case No. 18-12527 (CSS) (Bankr. D. Del. Feb. 4, 2019) [D.I. 5] (ordering that, notwithstanding section 349, all orders of the Court entered "on or before the Dismissal Date shall remain in full force and effect and shall survive the dismissal of the bankruptcy cases").

### Bankruptcy Rules 6004(a) and 6004(h)

75.     The Debtors request that the Court (a) find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the 14-day stay requirements under Bankruptcy Rule 6004(h).  In light of the importance of an efficient timeline for maximizing the value of the Shares, the proposed Sale Transaction should be consummated as soon as practicable to allow the Debtors to maximize value for their estates and stakeholders. Accordingly, the Debtors request that the Order be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rule 6004(h) be waived.

### Notice

76.     Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) any known affected creditor(s) asserting a lien, claim or encumbrance against, or interest in, the relevant Shares; (d) any party that has expressed an interest in purchasing the Shares during the last six months; (e) any interested or affected governmental or regulatory entity, including the Internal Revenue Service, the Securities and Exchange Commission and the United States Department of Justice; (f) all known creditors of

the Remaining FTX Europe Group Entities; and (g) any other party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that all parties with an interest in the Sale Transaction have been given adequate notice and that no other or further notice need be provided.

## **Conclusion**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A and (b) grant such other and further relief as is just and proper.

Dated: January 4, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*