## EXHIBIT B

**Share Purchase Agreement**

EXECUTION VERSION

**SHARE PURCHASE AGREEMENT**

**by and between**

**FTX EUROPE AG**

**and**

**FTX TRADING LTD**

**Dated as of January 4, 2024**

# TABLE OF CONTENTS

## ARTICLE 1
## PURCHASE AND SALE OF SHARES

1.1    Purchase and Sale of Shares ...................................................................................4
1.2    Closing ...................................................................................................................4
1.3    Deliveries at Closing..............................................................................................4
1.4    Withholding ...........................................................................................................5

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

2.1    Representations and Warranties of Seller...............................................................5
2.2    Representations and Warranties of Purchaser.........................................................6

## ARTICLE 3
## COVENANTS

3.1    Interim Operations .................................................................................................8
3.2    Tax Matters ............................................................................................................8
3.3    Cyprus Regulatory Matters.....................................................................................9
3.4    Books and Records; Information .............................................................................9
3.5    Certain Intellectual Property Matters....................................................................10

## ARTICLE 4
## BANKRUPTCY AND MORATORIUM MATTERS AND CONDITIONS TO EFFECTIVENESS

4.1    U.S. Bankruptcy Court Filings..............................................................................10
4.2    Swiss Court Filings ..............................................................................................11
4.3    Conditions to Effectiveness. ................................................................................11

## ARTICLE 5
## CONDITIONS TO CLOSING

5.1    Mutual Conditions ...............................................................................................11
5.2    Conditions to the Obligation of Purchaser............................................................12
5.3    Conditions to the Obligation of Seller ..................................................................12

## ARTICLE 6
## TERMINATION

6.1    Grounds for Termination ......................................................................................12
6.2    Effect of Termination............................................................................................13

**ARTICLE 7**
**OTHER MATTERS**

| | | |
|---|---|---|
| 7.1 | Waiver, Amendment | 13 |
| 7.2 | Remedies | 14 |
| 7.3 | No Survival of Representations and Warranties or Covenants | 14 |
| 7.4 | Expenses | 14 |
| 7.5 | Notices | 14 |
| 7.6 | Specific Performance | 15 |
| 7.7 | Fiduciary Obligations | 16 |
| 7.8 | Entire Understanding; No Third-Party Beneficiaries | 16 |
| 7.9 | Assignment | 16 |
| 7.10 | Counterparts | 16 |
| 7.11 | Severability | 16 |
| 7.12 | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial | 16 |
| 7.13 | Damages | 17 |
| 7.14 | Interpretation | 17 |

EXHIBIT A – DEFINITIONS ... A-1

EXHIBIT B – FORM OF CYPRUS TRANSFER DOCUMENTS ... B-1

EXHIBIT C – FORM OF QUOTA ASSIGNMENT AGREEMENT ... C-1

EXHIBIT D – FORM OF RELEASE AGREEMENT ... D-1

SCHEDULE A – INTERCOMPANY PAYMENTS ... SC A-1

SCHEDULE B – PURCHASE PRICE ALLOCATION ... SC B-1

This SHARE PURCHASE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "<u>Agreement</u>"), dated as of January 4, 2024, is made by and between FTX Europe AG, a Swiss stock corporation ("<u>Seller</u>"), and FTX Trading Ltd, an Antigua company limited by shares ("<u>Purchaser</u>"). The signatories to this Agreement are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>".

## Recitals

WHEREAS, on November 11, 2022 (the "<u>Petition Date</u>") and November 14, 2022, Purchaser, Seller and certain of their Affiliates (collectively, the "<u>Debtors</u>") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases (the "<u>Chapter 11 Cases</u>") are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "<u>Bankruptcy Proceeding</u>");

WHEREAS, on April 11, 2023, Seller entered into moratorium proceedings under the Laws of Switzerland (the "<u>Swiss Moratorium Proceeding</u>") before the Composition Court of the District Court Höfe in Wollerau, Schwyz, Switzerland (the "<u>Swiss Court</u>");

WHEREAS, Seller (A) holds (i) two hundred fifty-eight thousand eight hundred eleven (258,811) shares of FTX EU Ltd. (formerly known as K-DNA Financial Services Ltd), a Cyprus limited company ("<u>FTX Cyprus</u>"), constituting one hundred percent (100%) of the issued and outstanding share capital of FTX Cyprus (the "<u>FTX Cyprus Shares</u>"), and (ii) two hundred (200) quotas of FTX Switzerland GmbH, a Swiss limited liability company ("<u>FTX Switzerland</u>" and, together with FTX Cyprus, the "<u>Subject Companies</u>" and each a "<u>Subject Company</u>"), constituting one hundred percent (100%) of the issued and outstanding quota capital of FTX Switzerland (the "<u>FTX Switzerland Shares</u>" and, together with the FTX Cyprus Shares, the "<u>Shares</u>"), and (B) desires to sell, assign and transfer to Purchaser the Shares for an aggregate base purchase price of six million Dollars ($6,000,000) (the "<u>Purchase Price</u>"), and in consideration of the other transactions and payments made pursuant to the Transaction Documents, all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the respective boards of directors of the Parties have determined it is advisable and in the best interests of Seller's and Purchaser's estates and the beneficiaries of such estates to consummate the Transactions and have approved this Agreement;

WHEREAS, the Parties intend to seek one or more Orders of the Bankruptcy Court (i) approving this Agreement and authorizing the Parties to consummate the Transactions and (ii) dismissing the Chapter 11 Cases of Seller and its subsidiaries, other than the Subject Companies, prior to or upon the Closing (such Order or Orders, the "<u>U.S. Court Order</u>");

WHEREAS, Seller intends to seek the entry of an Order of the Swiss Court approving this Agreement and authorizing Seller to consummate the Transactions (the "<u>Swiss Court Approval</u>");

WHEREAS, Purchaser intends to submit all applications, filing, notices or reports, and obtain any consents, clearances, registrations, approvals, permits, waivers and authorizations or

3

other approvals (including the expiration of any waiting period) that may be required by the Cyprus Securities and Exchange Commission ("CySEC") to permit the transfer of the FTX Cyprus Shares at the Closing (the "CySEC Transfer Authorization"); and

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF SHARES

1.1    Purchase and Sale of Shares. Upon the terms and subject to the conditions set forth in this Agreement, the U.S. Court Order and the Swiss Court Approval, Seller agrees to sell, assign, convey, transfer and deliver to Purchaser, and Purchaser agrees to purchase and acquire from Seller, at the Closing, all of Seller's right, title and interest in, to and under the Shares in consideration for the Purchase Price payable by Purchaser, which purchase shall be free and clear of any Liens other than restrictions on transfer arising solely under the applicable Laws of Switzerland or Cyprus or the U.S. federal and state securities Laws ("Permitted Liens").

1.2    Closing. The closing of the Transactions (the "Closing") will take place at 10:00 a.m., Central European Time, at the offices of Lenz & Staehelin, Brandschenkestrasse 24, CH-8027 Zurich, Switzerland, or remotely via electronic exchange of documents and signatures on the third (3rd) Business Day following the satisfaction or waiver of the conditions to closing specified in Article 5 (other than such conditions which by their nature may only be satisfied on the date of the Closing), or at such other time as Purchaser and Seller shall agree in writing (the date at which the Closing actually occurs being referred to as the "Closing Date").

1.3    Deliveries at Closing. At the Closing, upon satisfaction or waiver of the conditions set forth in Article 5 hereof:

(a)    Purchaser shall pay to Seller the Purchase Price, plus Swiss transfer stamp Taxes, if any;

(b)    Purchaser shall pay to Seller, in respect of payments made by Seller on behalf of the Subject Companies, the respective amounts specified on Schedule A hereto by wire transfer of immediately available funds pursuant to the instructions delivered by Seller to Purchaser prior to the Closing Date;

(c)    each of Seller and Purchaser shall deliver to the other Party (and to FTX Cyprus, as applicable) the documentation required to effect the transfer of the FTX Cyprus Shares, in the form specified in Exhibit B;

(d)    each of Seller and Purchaser shall deliver to the other Party the documentation required to effect the transfer of the FTX Switzerland Shares, in the form specified in Exhibit C;

(e)    each of Seller and Purchaser shall deliver to the other Party a counterpart to the release agreement, in the form specified in Exhibit D (the "Release Agreement"); and

(f)     each of Seller and Purchaser shall deliver to the other Party each of the other documents and instruments required to be delivered pursuant to the terms of this Agreement and shall take all other actions necessary under applicable Law to effect the transfer of the Shares.

1.4     <u>Withholding</u>.  Purchaser will be entitled to deduct and withhold any such amounts required to be deducted and withheld pursuant to any provision of any applicable Law, and such withheld amounts will be treated for all purposes of this Agreement as having been paid to Seller. The Parties shall use commercially reasonable efforts to mitigate or eliminate any such withholding or deduction.

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1     <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants to Purchaser that:

(a)     <u>Authorization</u>. Seller is an entity duly organized and validly existing under the laws of Switzerland. Subject to entry of the U.S. Court Order, the Swiss Court Approval, the CySEC Transfer Authorization and any other Order entered by the Swiss Court and/or the Bankruptcy Court applicable to the Transactions, Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Transaction Documents to which Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder. Subject to entry of the U.S. Court Order, the Swiss Court Approval and any other Order entered by the Swiss Court and/or the Bankruptcy Court applicable to the Transactions, this Agreement and the Transaction Documents to which it is a party have been or, when executed, will be duly authorized, executed and delivered by it, and constitute or, when executed, will constitute a valid and binding obligation of Seller, enforceable against it in accordance with its terms, subject to limitations on enforceability of covenants and undertakings pursuant to applicable bankruptcy Laws.

(b)     <u>Title to Shares</u>. Seller owns all right, title and interest in and to the Shares, free and clear of all Liens other than Permitted Liens.

(c)     <u>No Conflicts</u>. Subject to entry of the U.S. Court Order, the Swiss Court Approval, the CySEC Transfer Authorization and any other Order entered by the Swiss Court and/or the Bankruptcy Court applicable to the Transactions the execution and delivery of this Agreement and the Transaction Documents to which Seller is a party and the performance or consummation of the Transactions by Seller do not conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Shares owned by Seller under the terms or provisions of (i) Seller's organizational documents, or (ii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to materially hinder, delay or impair consummation of the Transactions by Seller.

5

(d)      Broker's Fee; No Public Offering. No Person acting on behalf of Seller or under the authority of Seller is entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions.

(e)      No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Section 2.1, neither Seller nor any other Person (other than Purchaser) has made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Shares, Seller, the Subject Companies or any of their respective Affiliates, businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of Seller's or its Affiliates' respective representatives and any statutory warranty is, to the extent permitted under applicable law, excluded.

(f)      Remedies for misrepresentation and breach of warranties; No Survival. The rights and remedies of Purchaser in case of a misrepresentation or breach of warranty are limited to the rights and remedies explicitly set out in this Agreement and any statutory rights and remedies are excluded. In accordance with Section 7.3 below, the representations and warranties of Seller shall not survive the Closing, and any recourse of Purchaser against Seller based on misrepresentation or breach of warranty after Closing shall be excluded.

2.2      Representations and Warranties of Purchaser. Purchaser hereby represents and warrants to Seller that:

(a)      Authorization. Purchaser is an entity duly organized and validly existing under the laws of its jurisdiction of organization. Subject to entry of the U.S. Court Order, the CySEC Transfer Authorization and any other Order entered by the Bankruptcy Court applicable to the Transactions, Purchaser has the requisite power and authority to enter into, execute and deliver this Agreement and the Transaction Documents and to perform all of the obligations to be performed by it hereunder and thereunder. Subject to entry of the U.S. Court Order, the CySEC Transfer Authorization and any other Order entered by the Bankruptcy Court applicable to the Transactions, this Agreement and the Transaction Documents to which Purchaser is a party have been or, when executed, will be duly authorized, executed and delivered by Purchaser, and constitute or when executed, will constitute a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other Laws of general application affecting enforcement of creditors' rights generally.

(b)      No Conflicts. Subject to entry of the U.S. Court Order, the execution and delivery of this Agreement and the Transaction Documents to which Purchaser is a party and the performance or consummation of the Transactions by Purchaser do not (i) conflict with or result in a breach or violation of the terms or provisions of its organizational documents, (ii) result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which Purchaser is a party or by which Purchaser is bound, or (iii) conflict with or result in a breach or violation of the terms or provisions of any statute or any order, rule or regulation of any court or governmental agency or

body having jurisdiction over Purchaser or its property, except, in each case, to the extent such conflicts, violations, defaults or accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transaction Documents. The execution and delivery by Purchaser of this Agreement and the Transaction Documents to which it is a party and the performance by Purchaser of its obligations hereunder and thereunder will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, order, writ, decree, permit or license, or any consent or approval of any other party to Purchaser's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon Purchaser, except for the U.S. Court Order, the CySEC Transfer Authorization and any other Order entered by the Bankruptcy Court applicable to the Transactions.

(c)    Sufficiency of Funds. Purchaser has, and will have as of the date hereof and as of the Closing, sufficient cash on hand to make the payments set forth in Section 1.3(a) and Section 1.3(b) and otherwise perform its obligations hereunder. Purchaser has not incurred, and prior to the Closing will not have incurred, any obligation, commitment, restriction or liability that would impair or adversely affect such resources.

(d)    Broker's Fee. No Person acting on behalf of Purchaser or under the authority of Purchaser is entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions.

(e)    No Other Representations or Warranties.

(i)    Except for the representations and warranties expressly contained in this Section 2.2, Purchaser has not made any other express or implied representation or warranty with respect to, or otherwise in connection with the Transactions and/or the Seller, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of Purchaser's or its Affiliates' respective representatives.

(ii)    Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.1, (A) neither Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided or made available to Purchaser in connection with the Transactions, and Purchaser has not relied on any representation or warranty other than those expressly set forth in Section 2.1, (B) Purchaser has not executed or authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to Purchaser or any of its Affiliates, or any of its or their respective representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Subject Companies, or their business, assets or liabilities, or any part thereof, and (C) the Shares, the Subject Companies and the business, assets and liabilities of the Subject Companies are being transferred "as is", "where is" and "with all faults". Purchaser acknowledges and agrees that, except for the

7

representations and warranties expressly set forth in <u>Section 2.1</u>, Seller, on behalf of itself and its subsidiaries and Affiliates, (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities, conditions (financial or otherwise) and prospects of the Subject Companies or with respect to the Shares (including any express or implied warranty of merchantability or fitness for a particular purpose), and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or its or their respective representatives (including any opinion, information, projection or advice that may have been or may be provided to Purchaser by any representative of Seller or any of its Affiliates). Purchaser acknowledges and agrees that Seller has not made any representations or warranties to Purchaser regarding the probable success or profitability of the Subject Companies.

(f)    <u>Remedies for Misrepresentation and Breach of Warranties; No Survival</u>. The rights and remedies of Seller in case of a misrepresentation or breach of warranty are limited to the rights and remedies explicitly set out in this Agreement and any statutory rights and remedies are excluded. In accordance with <u>Section 7.3</u> below, the representations and warranties of Purchaser shall not survive the Closing, and any recourse of Seller against Purchaser based on misrepresentation or breach of warranty after the Closing shall be excluded.

## ARTICLE 3

## COVENANTS

3.1    <u>Interim Operations</u>. Seller shall not take any action as shareholder of the Subject Companies to cause the Subject Companies to undertake any activities or to take any actions except as may be necessary or advisable to comply with the Customer Claim Requirements or applicable Law.

3.2    <u>Tax Matters</u>.

(a)    <u>Tax Returns</u>. The Parties agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Subject Companies as is reasonably necessary for determining any liability for Taxes, the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit and the prosecution or defense of any claim, suit or proceeding relating to any Tax.

(b)    <u>Cooperation</u>. Seller and Purchaser shall cooperate with each other (and cause the Subject Companies to cooperate) in good faith in connection with Taxes with respect to the Subject Companies, including (i) in the conduct of any audit, litigation, adjustment or other proceeding with respect to Tax periods (or portions thereof) prior to the Closing Date, (ii) with respect to the Tax treatment of the Transaction, (iii) using commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity as may be necessary to mitigate, reduce or eliminate any Tax (including withholding or deduction in respect of Taxes) that could be imposed with respect to the Transactions, and (iv) using commercially reasonable

efforts to cause the transactions contemplated by this Agreement to be structured in a Tax-efficient manner, including in making any elections under Treasury Regulations Section 301.7701-3 for U.S. federal income tax purposes as determined by the Parties cooperating in good faith to be the most Tax-efficient.

(c)     Transfer Tax. All Transfer Taxes (other than Transfer Taxes specified in Section 1.3(a)), if any, incurred in connection with the consummation of the Transactions shall be borne and paid by the Party legally liable under applicable Law.

(d)     Purchase Price Allocation. The Parties have allocated the Purchase Price between the Subject Companies in the respective amounts specified on 7.14(c)EXHIBIT DSCHEDULE B hereto. For the avoidance of doubt, the Purchase Price allocation for U.S. income tax purposes shall follow the provisions under this Section 3.2(d) of this Agreement. The Parties shall cooperate to prepare a schedule allocating the purchase price (as determined for U.S. federal income tax purposes) among the assets of the Subject Companies in a manner consistent with Section 1060 of the Code (the "Allocation Statement") within a reasonable period after the Closing Date. Each Party agrees that it will (i) be bound by the Allocation Statement, (ii) report for Tax purposes the Transactions in a manner consistent with the Allocation Statement (including, without limitation, the filing of IRS Form 8594 and any similar or corresponding form for state or local Tax purposes, in each case, to the extent applicable), and (iii) not take a position for Tax purposes inconsistent with the Allocation Statement on any Tax Return or in any proceeding before any taxing authority except with the prior written consent of the other Party. To the extent the purchase price is adjusted, the Parties agree to revise and amend the Allocation Statement and IRS Form 8594 (and any similar or corresponding form for state or local Tax purposes) in the same manner and according to the same procedure.

3.3     Cyprus Regulatory Matters. Purchaser acknowledges and agrees that, (i) Purchaser shall bear the sole responsibility for obtaining the CySEC Transfer Authorization, and (ii) the Transactions shall not be conditioned on, and none of Seller nor any of its Affiliates shall have any responsibility or obligation with respect to, the granting or reinstatement by CySEC of any license or authorization required to allow FTX Cyprus to undertake regulated activities or operations.

3.4     Books and Records; Information. After the Closing Date, Purchaser shall, until the later of (x) the end date of the statutory record-keeping period under applicable Law and (y) the sixth (6th) anniversary of the Closing Date, preserve, maintain and retain all books, records, other documents and electronically stored information of and relating to the Subject Companies and their business, in existence on the Closing Date (collectively, the "Books and Records") and, subject to compliance with applicable Law, make the same available for inspection and copying by Seller, any of Seller's successors or assigns or any trustee in bankruptcy and, in each case, any of their respective representatives upon reasonable notice and during normal business hours, for any reasonable business purpose or compliance with any obligation under any applicable Law, including for the purposes of (a) the preparation or amendment of tax returns, financial or court filings or reports of Seller and the Debtors, (b) responding to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Entities, (c) prosecuting and defending any Action or for other like purposes, including claims in connection with this Agreement or the Transactions and including claims, objections and resolutions in the Swiss

Moratorium Proceeding or Swiss bankruptcy proceedings or the Bankruptcy Proceeding, and (d) as is necessary to administer, or to satisfy their obligations in connection with, the Swiss Moratorium Proceeding or Swiss bankruptcy proceedings or the Bankruptcy Proceeding. In addition, Seller shall be permitted to retain a copy of the Books and Records for the foregoing purposes, it being understood, for the avoidance of doubt, Seller and its Affiliates shall have no obligation to do so.

     3.5    <u>Certain Intellectual Property Matters</u>.

     (a)    Seller and Purchaser acknowledge and agree that neither Seller nor any of the Subject Companies own or otherwise hold any right, title or interest in or to any Intellectual Property used in, held for use in, necessary for or related to the conduct of any of the businesses of Purchaser or any of its Affiliates, as conducted at any time prior to the date hereof or as currently conducted.

     (b)    Seller, on behalf of itself and its successors and assigns, hereby fully and irrevocably (i) releases, acquits and discharges the Released Purchaser Parties from any and all Liabilities based on, related to or arising out of any purported direct or indirect (including induced or contributory) infringement, misappropriation or other violation of any Intellectual Property, and (ii) waives any benefits of, or reliance on, any applicable Laws that would provide, in sum or substance, that the foregoing release, acquittal or discharge does not extend to Liabilities in relation to Intellectual Property that, as of the date hereof, Seller and its subsidiaries, do not know to exist, or do not expect to exist, in their favor.

     (c)    Seller, on behalf of itself and its successors and assigns, hereby agrees not to institute or prosecute any Actions against the Released Purchaser Parties based on, related to or arising out of any Liabilities in relation to Intellectual Property contemplated in <u>Section 3.5(b)</u>.

     (d)    Seller shall take all actions reasonably necessary to cause its subsidiaries to (i) effectuate the release, acquittal, discharge and waiver set forth in <u>Section 3.5(b)</u> and (ii) comply with <u>Section 3.5(c)</u>, including by causing such parties to take any necessary corporate action.

# ARTICLE 4

## BANKRUPTCY AND MORATORIUM MATTERS AND CONDITIONS TO

## EFFECTIVENESS

     4.1    <u>U.S. Bankruptcy Court Filings</u>.

     (a)    As promptly as reasonably practicable following the date hereof, Purchaser and Seller shall file with the Bankruptcy Court one or more motions seeking entry of the U.S. Court Order.

(b)      Each Party shall keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received from the Bankruptcy Court or any other Person with respect to the Transactions. The Parties shall consult with each other regarding pleadings and declarations that either of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the entry of the U.S. Court Order.

4.2      <u>Swiss Court Filings</u>.

(a)      As promptly as reasonably practicable following the date hereof, Seller shall (i) file with the Swiss Court a request seeking approval of the sale of the Shares to Purchaser as per art. 298 para. 2 of the Swiss Debt Enforcement and Bankruptcy Act (DEBA), and (ii) use commercially reasonable efforts to obtain Swiss Court Approval.

(b)      Each Party shall keep the other Party reasonably apprised of the status of material matters related to the Swiss Court filings, including, upon reasonable request, promptly furnishing the other Party with copies of notices or other communications received from the Swiss Court with respect to the Transactions.

(c)      The Parties shall consult with each other regarding pleadings either of them intends to file with the Swiss Court in connection with, or which might reasonably affect the Swiss Court Approval.

(d)      If any Order of the Swiss Court relating to this Agreement shall be appealed by any Person, Seller agrees to use its commercially reasonable efforts to defend against such appeal, petition or motion, and Purchaser agrees to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

4.3      <u>Conditions to Effectiveness</u>. The Parties acknowledge and agree the enforceability of this Agreement is subject to entry of the U.S. Court Order, the Swiss Court Approval, the CySEC Transfer Authorization and any other Order entered by the Swiss Court applicable to the Transactions.

**ARTICLE 5**

**CONDITIONS TO CLOSING**

5.1      <u>Mutual Conditions</u>. The respective obligations of each of Seller and Purchaser to effect the Closing are subject to the satisfaction or waiver (where legally permitted) by both Parties of the following conditions on or prior to the Closing Date:

(a)      The Swiss Court Approval shall have been completed;

(b)      The Bankruptcy Court shall have entered the U.S. Court Order;

(c)      The CySEC Transfer Authorization shall have been obtained; and

11

(d)      No court, arbitrator, mediator or other Governmental Entity of competent jurisdiction shall have enacted, enforced, entered, issued or promulgated any Final Order in effect and that has the effect of making the Transactions illegal or otherwise prohibiting consummation of the Transactions.

5.2      <u>Conditions to the Obligation of Purchaser</u>. The obligation of Purchaser to effect the Closing is subject to the satisfaction or waiver by Purchaser of the following additional conditions on or prior to the Closing Date:

(a)      The representations and warranties of Seller contained in this Agreement shall be true and correct on the date of this Agreement and as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and

(b)      Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date.

5.3      <u>Conditions to the Obligation of Seller</u>. The obligation of Seller to effect the Closing is subject to the satisfaction or waiver by Seller of the following additional conditions on or prior to the Closing Date:

(a)      The representations and warranties of Purchaser contained in this Agreement shall be true and correct on the date of this Agreement and as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and

(b)      Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date.

## ARTICLE 6

## TERMINATION

6.1      <u>Grounds for Termination</u>. This Agreement may be terminated at any time:

(a)      by mutual agreement of Seller and Purchaser;

(b)      by either Seller or Purchaser if the Closing has not occurred by February 29, 2024 (the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 6.1(b)</u> shall not be available to a Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the Closing to have occurred on or prior to the Termination Date;

(c)      by either Seller or Purchaser, if any court, arbitrator, mediator or other Governmental Entity of competent jurisdiction shall have enacted, enforced, entered, issued or promulgated any Final Order in effect and has the effect of making the Transactions illegal or

otherwise prohibiting consummation of the Transactions (it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal in accordance with the Parties' respective obligations under this Agreement unless and until this Agreement is terminated pursuant to this <u>Section 6.1</u>);

(d)      by Seller if Purchaser shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.3</u>, and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) Business Days after written notice thereof is given by Seller to Purchaser, and (B) the Termination Date; <u>provided</u>, that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 6.1(d)</u> if Seller is then in material breach of any of its representations, warranties, covenants or other agreements hereunder, and such material breach would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.2</u>;

(e)      by Purchaser if Seller shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or to be true (i) would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.2</u>, and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) Business Days after written notice thereof is given by Purchaser to Seller and (B) the Termination Date; <u>provided</u>, that Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 6.1(e)</u> if Purchaser is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.3</u>;

(f)      by Seller, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement could be inconsistent with its or such Person's or body's fiduciary duties.

6.2      <u>Effect of Termination</u>. If this Agreement is terminated in accordance with <u>Section 6.1</u>, then no Party shall have any liability or further obligation to any other Party pursuant to this Agreement; <u>provided</u>, <u>however</u>, that no such termination shall relieve a Party of any liability or damages to the other Party resulting from any knowing and intentional material breach of this Agreement, or if committed with gross negligence, as determined by applicable laws.

# ARTICLE 7

## OTHER MATTERS

7.1      <u>Waiver, Amendment</u>. Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party that would have benefited from the provision had it not been waived.

7.2    <u>Remedies</u>. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by a Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.3    <u>No Survival of Representations and Warranties or Covenants</u>. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms. Following the Closing, in no event shall Seller or Purchaser have any recourse against the other or the Purchaser Parties or Seller Parties, respectively, with respect to any representation, warranty, covenant or agreement made by Seller or Purchaser, as applicable, in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the Closing Date.

7.4    <u>Expenses</u>. Except as otherwise provided in this Agreement or the Transaction Documents, each of Purchaser and Seller shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Transaction Documents and the Transactions.

7.5    <u>Notices</u>. All notices, requests and other communications under this Agreement to a Party will be in writing, in each case to such Party at its address (or number) set forth below or such other address (or number) as the Party may specify by notice to the other Party.

If to Seller:

> FTX Europe AG
> Churerstrasse 135
> 8808 Pfäffikon SZ
> Switzerland
> Attention: Arturo Giovanoli
> Email: agiovanoli@matrixs.com
>
> Holenstein Brusa Ltd
> Utoquai 29 / 31
> 8008 Zurich
> Switzerland
> Attention:  Thomas Zemp
>                      Dusan Knezevic
> Telephone: +41 44 257 20 00
> Email:       zemp@hol-law.ch
>                     knezevic@hol-law.ch

If to Purchaser:

> FTX Trading Ltd
> c/o Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004
> United States
> Attention: John J. Ray III

*With a copy (which shall not constitute notice) to*:

> Sullivan & Cromwell LLP
> 1 New Fetter Lane
> London EC4A 1AN
> United Kingdom
> Attention:  Andrew G. Dietderich
>                    Evan S. Simpson
>                    Alexa J. Kranzley
>                    Oderisio de Vito Piscicelli
> Telephone: +1 212 558 3830
>                    +44 20 7959 8426
>                    +1 212 558 7893
>                    +44 20 7959 8589
> Email:        simpsone@sullcrom.com
>                    devitopiscicellio@sullcrom.com

7.6    Specific Performance.

(a)    Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement. Accordingly, each Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including the specific performance of such covenants, promises or agreements (including to cause Purchaser to consummate the Transactions and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 7.6 will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    Each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the

15

respective covenants and obligations of Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 7.6</u>.

7.7    <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require either of the Parties or any of their respective directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, until the Closing has occurred, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

7.8    <u>Entire Understanding; No Third-Party Beneficiaries</u>. This Agreement and the Transaction Documents together set forth the entire understanding of the Parties relating to the subject matter of this Agreement and will supersede all contemporaneous understandings and prior agreements, written or oral, among the Parties with respect to the subject matter of this Agreement. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities.

7.9    <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by a Party (whether by operation of law or otherwise) without the prior written consent of the other Party, and any purported assignment in violation of this <u>Section 7.9</u> will be void, except for the following assignments, which shall not require any consent and will not be void: (a) assignment by Seller to an Affiliate of Seller (<u>provided</u>, that Seller remains liable jointly and severally with its assignee Affiliate for any assigned obligations to Purchaser), and (b) assignment by Seller to a succeeding entity following its emergence from the Bankruptcy Proceeding. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by each Party to this Agreement and its successors and permitted assigns.

7.10    <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

7.11    <u>Severability</u>. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

7.12    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

16

(a)     This Agreement will be governed by, and construed in accordance with, the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law, provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such Laws.

(b)     Without limiting a Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Shares, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 7.5</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Proceeding has been closed pursuant to Section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) such court does not have subject matter jurisdiction over such Action, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each Party consents to process being served by the other Party in any Action by delivery of a copy thereof in accordance with the provisions of <u>Section 7.5</u>; <u>provided</u>, <u>however</u>, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)     Each Party waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

7.13    <u>Damages.</u>

Neither Party shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

7.14    <u>Interpretation</u>. (a) As used in this Agreement, references to:

(i)     the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)     the Preamble, Recitals, Sections or Exhibits refer to the Preamble, a Recital or a Section of, or an Exhibit to this Agreement unless otherwise indicated;

(iii)      this Agreement refers to this Agreement and the Exhibits to it; and

(iv)      all references to "Dollars", "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified.

(b)      Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(c)      The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**FTX EUROPE AG**

By:

     Name:    Arturo Giovanoli
     Title:     Sole Member of the Board

**APPROVAL OF SWISS ADMINISTRATOR TO SELLER TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD** *(not its own name, but solely as Swiss Court, appointed Administrator and subject to the Swiss Court Approval)*

By:

     Name:    Dusan Knezevic

By:

     Name:    Thomas P. Zemp

**PURCHASER:**

**FTX TRADING LTD**

By:

     Name:    John J. Ray III
     Title:     Chief Executive Officer

[*Signature Page to Share Purchase Agreement*]

IN WITNESS WHEREOF, the Parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**FTX EUROPE AG**

By:  _____
       Name:    Arturo Giovanoli
       Title:     Sole Member of the Board

**APPROVAL OF SWISS ADMINISTRATOR TO SELLER TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD** *(not its own name, but solely as Swiss Court, appointed Administrator and subject to the Swiss Court Approval)*

By:  _____
       Name:   Dusan Knezevic

By:  _____
       Name:   Thomas P. Zemp

**PURCHASER:**

**FTX TRADING LTD**

By:  _____
       Name:    John J. Ray III
       Title:     Chief Executive Officer

*[Signature Page to Share Purchase Agreement]*

IN WITNESS WHEREOF, the Parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**FTX EUROPE AG**

By: _____
        Name:    Arturo Giovanoli
        Title:      Sole Member of the Board

**APPROVAL OF SWISS ADMINISTRATOR TO SELLER TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD** *(not its own name, but solely as Swiss Court, appointed Administrator and subject to the Swiss Court Approval)*

By: _____
        Name:    Dusan Knezevic

By: _____
        Name:    Thomas P. Zemp

**PURCHASER:**

**FTX TRADING LTD**

By: _____
        Name:    John J. Ray III
        Title:      Chief Executive Officer

*[Signature Page to Share Purchase Agreement]*

EXHIBIT A – DEFINITIONS

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Action" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such Person.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2(d).

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Books and Records" has the meaning set forth in Section 3.4.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York or Zurich, Switzerland are authorized or required by statute to close.

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Closing" has the meaning set forth in Section 1.2.

"Closing Date" has the meaning set forth in Section 1.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Conditions to Closing" has the meaning set forth in Article 5.

"Customer Claim Requirements" means any requirement imposed by CySEC or applicable Law for FTX Cyprus to satisfy any right to payment of a customer of FTX Cyprus in respect of such customer's trading activity through the deposit of funds with FTX Cyprus as of the Petition Date, and any Order of CySEC in connection therewith.

"CySEC" has the meaning set forth in the Recitals.

"CySEC Transfer Authorization" has the meaning set forth in the Recitals.

"Debtors" has the meaning set forth in the Recitals.

"Final Order" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or to make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"FTX Cyprus" has the meaning set forth in the Recitals.

"FTX Cyprus Shares" has the meaning set forth in the Recitals.

"FTX Switzerland" has the meaning set forth in the Recitals.

"FTX Switzerland Shares" has the meaning set forth in the Recitals.

"Governmental Entity" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement, shall include the U.S. Securities and Exchange Commission and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors, Purchaser or the Subject Company.

"Intellectual Property" means all rights anywhere in the world in or to: (a) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for the foregoing and all goodwill associated therewith and symbolized thereby, including all renewals of same (collectively, the "Trademarks"), (b) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues, (c) trade secrets and other confidential or proprietary information or know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists, (d) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of information, mask rights and computer software), copyrights therein, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof, (e) data and databases, and (f) any other intellectual property or proprietary rights.

"Law" or "Laws" means any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"Liabilities" means any claims, obligations, rights, suits, damages, causes of actions, remedies and liabilities, of any kind, nature or description.

"Lien" means any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation, usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude, restrictive covenant or condition, encroachment, claim, interest, restriction or any other encumbrance of any kind.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbitrator, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceeding.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Permitted Liens" means restrictions on transfer arising solely under applicable Laws of Switzerland or Cyprus or under the U.S. federal and state securities Laws.

"Person" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Petition Date" has the meaning given in the Recitals.

"Purchase Price" has the meaning set forth in the Recitals.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Parties" means, collectively, (i) Purchaser, (ii) each of the current or former Affiliates of Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Release Agreement" has the meaning set forth in Section 1.3(e).

"Released Purchaser Parties" means, collectively, (i) the Purchaser Parties and (ii) their respective customers, users, licensees, distributors, resellers, suppliers, manufacturers and service providers.

"Seller" has the meaning set forth in the Preamble.

"Seller Parties" means, collectively, (i) Seller, (ii) each of the current or former Affiliates of Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Shares" has the meaning set forth in the Recitals.

"Subject Companies" has the meaning set forth in the Recitals.

"Swiss Administrator" means the administrator of Seller in the Swiss Moratorium Proceeding.

"Swiss Court" has the meaning set forth in the Recitals.

"Swiss Court Approval" has the meaning set forth in the Recitals.

"Swiss Moratorium Proceeding" has the meaning set forth in the Recitals.

"Taxes" means any tax or similar duty, fee, charge or assessment thereof imposed by a Governmental Entity, in each case in the nature of a tax, including any interest, penalties and additions imposed with respect to such amount.

"Tax Return" means any returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns, and any amendments thereto) or any other document supplied or required to be supplied, filed or maintained with respect to any Taxes.

"Termination Date" has the meaning set forth in Section 6.1(b).

"Trademarks" has the meaning set forth in the definition of "Intellectual Property".

"Transaction Documents" means this Agreement and each of the documents delivered to effect the Closing pursuant to Section 1.3(c) to Section 1.3(d).

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges including any interest, penalties and additions imposed with respect to such amount.

"U.S. Court Order" has the meaning set forth in the Recitals.

*[Remainder of page intentionally left blank]*

EXHIBIT B – FORM OF CYPRUS TRANSFER DOCUMENTS

## <u>INSTRUMENT OF TRANSFER</u>

WE   **FTX EUROPE AG**
of    […]

(hereinafter called the "**Transferor**")

in exchange of good and valuable consideration received by me/us by

Name   **FTX TRADING LTD.**
Of    […]

(hereinafter called the "**Transferee(s)**")

do hereby transfer to the said Transferee(s) the share(s) shown in the schedule hereto held by us/me in the undertaking called

<b>FTX EU LTD</b>

to hold unto the said Transferee(s) his/their executors, administrators and assigns.

AND I/WE the said Transferee(s) do hereby agree to take the said share(s) in the aforementioned undertaking subject to the conditions aforesaid.

Date:

## <u>SCHEDULE</u>

No of share(s)      […]

Serial No of share(s), from   […] - […]

Nominal value of each share  […]

Share Certificate No.    […]

| **THE TRANSFEROR(S)** | **THE TRANSFEREE(S)** |
|---|---|
| _____ | _____ |
| Executed for and on behalf of: | Executed for and on behalf of: |
| **FTX EUROPE AG** | **FTX TRADING LTD** |
| Represented by: Arturo Giovanoli | Represented by: John J. Ray III |
| Title: Sole Board Member | Title: Chief Executive Officer |
| Witness to the signature of Transferor(s) | Witness to the signature of Transferee(s) |
| ........................................................ | ........................................................ |

**FTX EU LTD**
(the "**Company**")

**WRITTEN RESOLUTION OF THE SOLE DIRECTOR OF THE COMPANY DATED […]**

**A.    DECLARATION OF INTEREST OF THE DIRECTORS**

The sole Director, by her sole signature hereto, declares that pursuant to Section 191 of the Companies Law, Cap. 113 of the Laws of Cyprus, as amended and the articles of association of the Company, she has no direct or indirect interest whatsoever in the subject matter of the below resolutions.

**B.    WRITTEN RESOLUTIONS**

By a written resolution of the sole Director of the Company, it is hereby resolved as follows:-

(1)  To approve of the following transfer of shares:

(a)  […] fully paid shares serial no. […] – […]

from **FTX EUROPE AG** (the "**Transferor**")

to **FTX TRADING LTD.**
of [address] (the "**Transferee**")

(2)  That share certificate No. […] reflecting the above mentioned shares of the Company formerly held by the Transferor be and is hereby cancelled.

(3)  That share certificate No. […] in the name of the Transferee for […] shares of the Company numbered from […] to […] (both inclusive) be issued under the seal of the Company to be affixed in the presence of the sole Director and the secretary of the Company.

(4)  The board of directors of the Company hereby instructs the secretary of the Company to take all appropriate steps to implement the above resolutions and to effect the aforesaid transfer, including, *inter alia*, (i) to record the relevant entries into the register of members of the Company to give effect to the above resolutions, (ii) to cancel share certificate No. […], (iii) to issue the new relevant share certificate(s) No. […] in the name of the Transferee as described above, and (iv) to proceed with the necessary filings and notifications to the Registrar of Companies within the time prescribed by Cyprus Law.

………..…………………………………..
[MARTHA LAMBRIANOU]
Director of the Company

EXHIBIT C – FORM OF QUOTA ASSIGNMENT AGREEMENT

**STAMMANTEILE-ABTRETUNGSVERTRAG**

*QUOTA ASSIGNMENT AGREEMENT*

vom / *dated* ⬛⬛⬛⬛⬛⬛

zwischen / *between*

**FTX Europe AG**
Churerstrasse 135, 8808 Pfäffikon SZ, Switzerland

(die "<b>Verkäuferin</b>" / <i>the "Seller"</i>)

und / *and*

**FTX Trading Ltd**
[address], Antigua

(die "<b>Käuferin</b>" / <i>the "Purchaser"</i>;
(und zusammen mit der Verkäuferin, die "<b>Parteien</b>" / <i>and collectively with the Seller, the "Parties"</i>)

**betreffend Abtretung sämtlicher Stammanteile der FTX Switzerland GmbH**

***regarding the assignment of all quotas in FTX Switzerland LLC***

---

**VORBEMERKUNGEN / *RECITALS*:**

(A)     FTX Switzerland GmbH (die "**Gesellschaft**") ist eine Gesellschaft mit beschränkter Haftung nach Schweizer Recht mit Sitz in Freienbach. Die Gesellschaft ist unter der Firmennummer CHE-268.689.958 im Handelsregister des Kantons Schwyz eingetragen. Das Kapital der Gesellschaft beträgt CHF 20'000 eingeteilt in 200 Stammanteile mit einem Nennwert von je CHF 100 (die "**Stammanteile**").

*FTX Switzerland LLC (the "**Company**") is a Swiss limited liability company with registered office in Freienbach. The Company is registered under the Company number CHE-268.689.958 with the commercial register of the Canton of Schwyz. The quota capital of the Company amounts to CHF 20,000 and is divided into 200 quotas with the par value of CHF 100 each (the "**Quotas**").*

(B)     Die Verkäuferin ist Eigentümerin aller 200 Stammanteile der Gesellschaft.

*The Seller is the owner of all 200 quotas in the Company.*

Dies vorausgeschickt vereinbaren die Parteien Folgendes:

*Now, therefore, the Parties agree as follows:*

## ÜBERTRAGUNG DER STAMMANTEILE / *TRANSFER OF QUOTAS*

Die Verkäuferin hat sich gemäss Kaufvertrag vom 4 Januar 2024 zwischen den Parteien (der "**Kaufvertrag**") verpflichtet, an die Käuferin sämtliche Stammanteile an der Gesellschaft und alle damit zusammenhängenden Rechte und Pflichten an die Käuferin zu übertragen und tritt diese hiermit an die Käuferin ab. Die Käuferin nimmt hiermit die Abtretung aller Stammanteile der Gesellschaft mit allen damit zusammenhängenden Rechten und Pflichten an.

*Pursuant to the purchase agreement dated 4 January 2024 between the Parties (the "Purchase Agreement"), the Seller agreed to transfer to the Buyer all quotas of the Company and any ancillary rights and obligations thereto and hereby assigns all quotas to the Purchaser. The Purchaser herewith accepts the transfer of all quotas in the Company and any ancillary rights and obligations thereto.*

## GEGENLEISTUNG UND BEDINGUNGEN / *COMPENSATION AND CONDITIONS*

Die Gegenleistungen und die Zahlungsbedingungen sowie unter anderem die Gewährleistung und Zusicherungen wurden im Kaufvertrag geregelt.

*The consideration and the payment conditions as well as, among others, the representations and warranties are documented in the Purchase Agreement.*

## DIVIDENDENBERECHTIGUNG / *DIVIDEND RIGHTS*

Sämtliche bis zum heutigen Tag gegebenenfalls nicht ausgeschütteten Gewinne der Gesellschaft stehen der Käuferin zu.

*The Purchaser shall be entitled to any potential profits of the Company which have not been distributed as of the date hereof.*

## EINTRAGUNG INS ANTEILBUCH / *ENTRY IN THE QUOTA REGISTER*

Die Käuferin ist in das Anteilbuch der Gesellschaft einzutragen.

*The Purchaser shall be registered into the quota register of the Company.*

**STATUTARISCHE RECHTE UND PFLICHTEN /** *MEMBERS' RIGHTS AND OBLIGATIONS ACCORDING TO THE ARTICLES OF ASSOCIATION*

Die Statuten der Gesellschaft sehen weder Nachschuss- noch Nebenleistungspflichten der Gesellschafter vor.

Gemäss Art. 26 Abs. 2 der Statuten der Gesellschaft dürfen die Geschäftsführer sowie Dritte, die mit der Geschäftsführung befasst sind, Tätigkeiten ausüben, die gegen das gesetzliche Konkurrenzverbot verstossen, sofern alle Gesellschafter schriftlich zustimmen.

Über die vorgenannte Bestimmung hinaus enthalten die Statuten keine Vorkaufs-, Vorhand-, oder Kaufsrechte der Gesellschafter oder der Gesellschaft sowie keine Konventionalstrafen.

*The articles of association of the Company do not provide for an obligation of the quotaholders to make additional contributions nor do the quotaholders have any other additional obligations.*

*According to art. 26 para. 2 of the articles of association of the Company, the managing directors and other persons engaged with the management of the company may perform activities that violate the statutory non-competition obligation, provided that all quotaholders agree in writing with such activities.*

*Beyond the aforementioned provision, the articles of association do not contain any first option, pre-emptive and purchase rights of the quotaholders or of the Company, nor do they provide for liquidated damages.*


**HANDELSREGISTERANMELDUNG /** *APPLICATION WITH THE COMMERCIAL REGISTER*

Die Geschäftsführung wird die Käuferin als neue Gesellschafterin im Handelsregister zur Eintragung anmelden.

*The managing directors shall register the Purchaser as new quotaholder with the commercial register.*


**VERSCHIEDENES /** *MISCELLANEOUS*

**Vertragsänderungen /** *Amendment*

Änderungen und Ergänzungen dieses Abtretungsvertrages bedürfen zu ihrer Rechtswirksamkeit der Schriftform und der Zustimmung sämtlicher Parteien.

*This Assignment Agreement may only be modified and completed by an instrument in writing executed by all Parties hereto.*

**Verzicht /** *Waiver*

Verzichtet eine Partei darauf, eine Bestimmung dieses Abtretungsvertrages oder ein Recht, das ihr aus diesem Abtretungsvertrag zusteht, im Einzelfall durchzusetzen, so kann dies nicht als genereller Verzicht auf derartige Bestimmungen oder Rechte betrachtet werden oder als Beeinträchtigung der Gültigkeit dieses Abtretungsvertrages. Ein Verzicht einer Partei ist nur wirksam, wenn dieser Verzicht schriftlich erfolgt und von der verzichtenden Partei gehörig unterzeichnet ist.

*A Party's failure to exercise any of the provisions of this Assignment Agreement or any rights with respect to this Assignment Agreement shall not operate as waiver of such provisions or rights, nor in any way affect the validity of this Assignment Agreement. A Party's waiver must be in writing and duly signed by the Party against whom the waiver is being enforced.*

**Salvatorische Klausel /** *Severability*

Sollten einzelne Bestimmungen dieses Abtretungsvertrages aus irgendeinem Grund ungültig oder nicht vollstreckbar sein oder werden, so sind sie, wenn möglich, durch eine gültige oder vollstreckbare Bestimmung zu ersetzen, deren Zweck im weitest möglichen Umfang dem ursprünglich verfolgten Zweck und der wirtschaftlichen Absicht der Parteien am nächsten kommt. Die Nichtigkeit oder Änderung jeglicher Bestimmung dieses Abtretungsvertrages berührt die Gültigkeit oder Vollstreckbarkeit jeglicher anderer Bestimmung dieses Abtretungsvertrages nicht.

*If any provision of this Assignment Agreement is held to be or becomes invalid or unenforceable for any reason, such provision shall, if possible, be adjusted by a valid or enforceable provision, in order to achieve a result, which corresponds to the fullest possible extent to the original intention and economical purpose of the Parties. The nullity or adjustment of any provision of this Assignment Agreement shall not affect the validity and enforceability of any other provision of this Assignment Agreement.*

**ANWENDBARES RECHT UND GERICHTSSTAND /** *APPLICABLE LAW AND JURSIDICTION*

Dieser Abtretungsvertrag untersteht materiellem Schweizer Recht unter Ausschluss der Normen des internationalen Privatrechts und des Übereinkommens der Vereinten Nationen vom 11. April 1980 über Verträge über den internationalen Warenkauf (Wiener Übereinkommen). Für alle Streitigkeiten aus oder im Zusammenhang mit diesem Abtretungsvertrag sind die ordentlichen Gerichte in Freienbach, Kanton Schwyz, ausschliesslich zuständig.

*This Assignment Agreement shall be subject to and governed by substantive Swiss law excluding the provisions of the private international law and the United Nations Convention on Contracts for the International Sale of Goods dated 11 April 1980 (CISG), Any disputes*

*arising out of or in connection with this Assignment Agreement shall be subject to the exclusive jurisdiction of the ordinary courts of Freienbach, Canton of Schwyz.*

**INTERPRETATION /** *INTERPRETATION*

Bei allfälligen Widersprüchen zwischen der deutschen und der englischen Fassung dieses Abtretungsvertrags geht die deutsche Fassung vor.

*In case of any inconsistencies between the German and the English version of this Assignment Agreement the German version shall prevail.*

(Unterschriftenseite folgt / *signature page follows*)

## UNTERSCHRIFTEN / *SIGNATURES*

**Die Verkäuferin /** *the Seller***:**

**FTX Europe AG**

_____

Arturo Giovanoli

**Die Käuferin /** *the Purchaser***:**

**FTX Trading Ltd**

_____

John J. Ray III

**Zustimmung der schweizerischen Sachwalterin der Verkäuferin zum Abschluss dieses Vertrages /** *Approval of Swiss Administrator to Seller to enter into this Agreement:*

**HOLENSTEIN BRUSA AG** *(*nicht im eigenen Namen, sondern als gerichtlich bestellte Sachwalterin und vorbehältlich der Genehmigung durch das schweizerische Gericht */ not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval)*

_____

Dusan Knezevic

_____

Thomas P. Zemp

EXHIBIT D – FORM OF RELEASE AGREEMENT

RELEASE AGREEMENT

This RELEASE AGREEMENT (this "<u>Agreement</u>") is made as of [•], 2024, by and among FTX Europe AG, a Swiss stock corporation ("<u>FTX Europe</u>"), FTX Trading Ltd., an Antigua company ("<u>FTX Trading</u>"), West Realm Shires Inc., a Delaware corporation ("<u>WRS</u>"), FTX Certificates GmbH, a Swiss limited liability company ("<u>FTX Certificates</u>"), FTX Crypto Services Ltd, a Cyprus limited company ("<u>FTX Crypto Services</u>"), FTX Structured Products AG, a Liechtenstein stock corporation ("<u>FTX Structured Products</u>") and FTX Trading GmbH, a German limited liability company ("<u>FTX Trading GmbH</u>").  Capitalized terms used, but not otherwise defined herein, have the meanings given to such terms in the Purchase Agreement (as defined below).

RECITALS

WHEREAS, FTX Europe and FTX Trading are parties to that certain Share Purchase Agreement, dated as of January 4, 2024 (the "<u>Purchase Agreement</u>");

WHEREAS, pursuant to the Purchase Agreement, at Closing, FTX Europe shall sell to FTX Trading the Shares, and, accordingly, after consummation of the sale, FTX Cyprus and FTX Switzerland shall no longer be direct or indirect subsidiaries of FTX Europe; and

WHEREAS, Section 1.3(e) of the Purchase Agreement provides that, at Closing, each of FTX Trading and FTX Europe shall deliver to the other party a counterpart to this Agreement.

NOW, THEREFORE the parties hereto agree as follows:

Section 1.    <u>Release by FTX Debtor Releasors</u>

Subject to the occurrence of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the date hereof, each of FTX Trading and WRS, on behalf of themselves and their respective successors and assigns (collectively, the "<u>FTX Debtor Releasors</u>"), to the fullest extent permitted by Law, hereby generally, irrevocably, forever, fully and unconditionally release, waive and discharge, each of FTX Europe and its subsidiaries FTX Certificates, FTX Crypto Services, FTX Structured Products and FTX Trading GmbH (collectively, the "<u>FTX Europe Entities</u>"), together with their respective successors and assigns (collectively the "<u>FTX Europe Releasees</u>") from and with respect to any and all claims, obligations, rights, suits, damages, causes of actions, remedies and liabilities, of any kind, nature or description ("<u>Claims</u>") other than the excluded Claims described on <u>Annex A</u> hereto (the "<u>FTX Debtor Release Excluded Claims</u>"), whether known or unknown, contingent or not contingent, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, perfected or unperfected, subordinated or unsubordinated, joint or several, vested or unvested, executory, determined determinable or otherwise, whether or not the same is required to be accrued on the financial statements of any Person and howsoever arising, whether

based on any Law or right of action, and whether arising under any contract, agreement, arrangement, commitment or undertaking or in tort, which the FTX Debtor Releasors, or any of them, ever had or now has or can have or shall or may hereafter have against the FTX Europe Releasees (the "FTX Debtor Released Matters"). The releases contemplated herein are intended to be as broad as permitted by Law and are intended to, and do, extinguish all Claims of any kind whatsoever other than FTX Debtor Release Excluded Claims, whether at Law or in equity or otherwise, that are based on or relate to facts, conditions, actions or omissions (known or unknown) with respect to the FTX Debtor Released Matters that have existed or occurred at any time prior to and including the date hereof.

        Section 2.        Release by FTX Europe Releasors.

        Subject to the occurrence of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the date hereof, the FTX Europe Entities and their respective successors and assigns (collectively, the "FTX Europe Releasors"), to the fullest extent permitted by Law, hereby generally, irrevocably, forever, fully and unconditionally release, waive and discharge, each of the FTX Trading, WRS and their respective wholly owned subsidiaries (but excluding the FTX Europe Entities), together with their respective officers, directors, employees, agents and representatives, and each such Person's respective successors and assigns successors and assigns (collectively the "FTX Debtor Releasees") from and with respect to any Claims other than the excluded Claims described on Annex B hereto (the "FTX Europe Release Excluded Claims"), whether known or unknown, contingent or not contingent, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, perfected or unperfected, subordinated or unsubordinated, joint or several, vested or unvested, executory, determined determinable or otherwise, whether or not the same is required to be accrued on the financial statements of any Person and howsoever arising, whether based on any Law or right of action, and whether arising under any contract, agreement, arrangement, commitment or undertaking or in tort, which the FTX Europe Releasors, or any of them, ever had or now has or can have or shall or may hereafter have against the FTX Debtor Releasees (the "FTX Europe Released Matters"). The releases contemplated herein are intended to be as broad as permitted by Law and are intended to, and do, extinguish all Claims of any kind whatsoever other than FTX Europe Release Excluded Claims, whether at Law or in equity or otherwise, that are based on or relate to facts, conditions, actions or omissions (known or unknown) with respect to the FTX Europe Released Matters that have existed or occurred at any time prior to and including the date hereof.

        Section 3.        California Civil Code Waiver.

        Each of the parties hereto hereby expressly waives to the fullest extent permitted by Law the provisions, rights and benefits of California Civil Code Section 1542 (or any similar Law), which provides:

        *A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and*

*that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.*

Section 4.    <u>Miscellaneous.</u>

(a)    This Agreement and the Purchase Agreement together set forth the entire understanding of the parties hereto relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the parties hereto with respect to the subject matter of this Agreement.    No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any party in entering into this Agreement.    Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the parties hereto or their respective successors, any rights, remedies, obligations or liabilities; <u>provided</u>, that Section 1 of this Agreement shall be enforceable by any FTX Europe Releasee and Section 2 of this Agreement shall be enforceable by any FTX Debtor Releasee.

(b)    The following sections of the Purchase Agreement are incorporated into this Agreement by reference herein *mutatis mutandis*: Section 7.1 (*Waiver, Amendment*); Section 7.6 (*Specific Performance*); Section 7.9 (*Assignment*); Section 7.10 (Counterparts); Section 7.11 (*Severability*); Section 7.12 (*Governing Law; Submission to Jurisdiction; Waiver of Jury Trial*); and Section 7.14 (*Interpretation*).

*[Signatures Appear on the Following Page]*

**FTX EUROPE AG**

By:

_____

Name:    Arturo Giovanoli
Title:    Sole board member

**FTX TRADING LTD.**

By:

_____

Name:
Title

**WEST REALM SHIRES INC.**

By:

_____

Name:
Title:

**FTX CERTIFICATES GMBH**

By:

_____

Name:    Jürg Bavaud
Title:    Sole managing officer

**FTX CRYPTO SERVICES LTD**

By:

_____

Name:
Title

*[Signature Page to the Release Agreement]*

**FTX STRUCTURED PRODUCTS AG**

By: _____

     Name:   Jürg Bavaud
     Title:    Sole board member

**FTX TRADING GMBH**

By: _____

     Name:
     Title:

[*Signature Page to the Release Agreement*]

**Annex A**
**FTX Debtor Release Excluded Claims**

A Claim of approximately $60,150,000 held by Alameda Research Ltd against Seller in respect of certain crypto asset transfers made by Alameda Research to Seller to collateralize trading of crypto derivative products facilitated by FTX Europe.

Claims in respect of fees and expenses of counsel and professional advisors to the Debtors incurred by FTX Trading on behalf of the FTX Europe Entities in connection with the Chapter 11 Cases.

WRS's Claim of $245,805 against FTX Europe in respect of post-petition operating expenses paid by WRS on behalf of FTX Europe.

FTX Trading's Claim of $3,078,612 against FTX Europe in respect of certain pre and post-petition intercompany loans and operating expenses paid by FTX Trading on behalf of FTX Europe.

WRS Inc. claim of $1,123 against FTX Structured Products in respect of post-petition charges (US trustee fees),

WRS Inc. claim of $1,000 against FTX Switzerland in respect of post-petition charges (US trustee fees).

FTX Trading Ltd. claim of $15,452 against FTX Crypto Services in respect of post-petition payroll and operating expenses paid by FTX Trading Ltd. on behalf of FTX Crypto Services.

WRS Inc. claim of $7,804 against FTX Crypto Services in respect of post-petition payroll and other charges paid by WRS Inc. on behalf of FTX Crypto Services.

WRS Inc. claim of $1,000 against FTX Certificates in respect of post-petition charges (US trustee fees).

*[Signature Page to the Release Agreement]*

**Annex B**
**FTX Europe Release Excluded Claims**

A Claim of $102,483,387 held by FTX Europe against FTX Trading in respect of certain crypto assets transferred from FTX Europe to FTX Trading; <u>provided</u> that such Claim will not be an FTX Europe Release Excluded Claim, and shall be released pursuant to Section 2 hereof, unless a proof of claim with respect to such Claim is submitted in accordance with the *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793] within forty five (45) days of the date of this Agreement.

*[Signature Page to the Release Agreement]*

SCHEDULE A – INTERCOMPANY PAYMENTS

In respect of amounts paid on behalf of FTX Cyprus:

| Payment to | Amount ($) |
|---|---|
| FTX Europe AG | 2,962,980 |

In respect of claims against FTX Switzerland:

| Payment to | Amount ($) |
|---|---|
| FTX Europe AG | 495,458 |

SCHEDULE B – PURCHASE PRICE ALLOCATION

| | |
|---|---|
| **FTX Cyprus Shares** | $5,100,000 |
| **FTX Switzerland Shares** | $900,000 |