# EXHIBIT B

**Global Settlement Agreement**

EXECUTION VERSION

## GLOBAL SETTLEMENT AGREEMENT

This GLOBAL SETTLEMENT AGREEMENT (including all exhibits, annexes, and schedules attached hereto in accordance with <u>Section 10.03</u> hereof, this "<u>Agreement</u>") is made and entered into as of December 19, 2023 (the "<u>Execution Date</u>"), by and among FTX Trading Ltd. ("<u>FTX Trading</u>") and its affiliated debtors and debtors-in-possession (including, for the avoidance of doubt, FTX Property Holdings Ltd. ("<u>PropCo</u>") (collectively, the "<u>Debtors</u>") and FTX Digital Markets Ltd. ("<u>FTX DM</u>") acting by the JOLs (as defined below) as agents and without personal liability.  The Debtors and FTX DM are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## RECITALS

**WHEREAS**, on November 10, 2022, (a) the Securities Commission of The Bahamas (the "<u>SCB</u>") filed a petition for the winding up of FTX DM with the Supreme Court of The Bahamas (the "<u>Bahamas Court</u>") and (b) the Bahamas Court ordered a provisional liquidation proceeding for FTX DM (the "<u>Provisional Liquidation</u>");

**WHEREAS**, on November 11 and November 14, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), commencing the chapter 11 cases that are being jointly administered under the caption *In re FTX Trading Ltd.*, *et al.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2023) (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

**WHEREAS**, on November 15, 2022, FTX DM filed a petition for recognition of the Provisional Liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York and on November 28, 2022, the Bankruptcy Court entered an agreed order to transfer venue to the Bankruptcy Court under the caption *In re: FTX Digital Markets LTD., Debtor in a Foreign Proceeding*, Case No. 22-11217 (JTD) (the "<u>Chapter 15 Case</u>");

**WHEREAS**, between November and December 2022, FTX DM and the Debtors had various disputes that ultimately were sought to be resolved with a settlement and cooperation agreement (the "<u>Cooperation Agreement</u>") that was executed on January 6, 2023;

**WHEREAS**, on February 14, 2023, the Bahamas Court granted an order recognizing Mr. Kurt Knipp to act in The Bahamas on behalf of or in the name of Debtors Alameda Research LLC, Alameda Research Ltd., Clifton Bay Investments LLC, FTX Trading Ltd., Maclaurin Investments Ltd., West Realm Shires Inc. and West Realm Shires Services Inc.;

**WHEREAS**, on February 15, 2023, the Bankruptcy Court entered an order recognizing the Provisional Liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code;

**WHEREAS**, on March 19, 2023, the Debtors commenced an adversary proceeding against FTX DM and the JOLs in *Alameda Research LLC, et al.* v. *FTX Digital Markets Ltd., et al.*, Adv. Pro. No. 23-50145 (JTD) [D.I. 1119] (the "<u>Adversary Proceeding</u>");

**WHEREAS**, FTX DM and the JOLs disputed the Debtors' allegations and asserted counterclaims against the Debtors in the Adversary Proceeding;

**WHEREAS**, on March 29, 2023, FTX DM filed a motion in the Chapter 11 Cases seeking an order from the Bankruptcy Court clarifying that the automatic stay does not apply or, in the alternative, for relief from the automatic stay to file an application in the Provisional Liquidation to resolve certain novel and complex legal issues regarding FTX DM's relationship to the FTX.com Exchange (as defined below) and its customers (the "Lift Stay Motion");

**WHEREAS**, on June 20, 2023, the Bankruptcy Court entered an order denying the Lift Stay Motion and ordered the parties to mediate;

**WHEREAS**, on November 10, 2023, the Bahamas Court granted an order that, among other things, (a) appointed the JOLs as joint official liquidators of FTX DM and (b) determined that FTX DM be wound up in accordance with the Bahamas Companies Act;

**WHEREAS**, the Debtors and FTX DM commenced mediation and have sought consensual extensions of the time to respond to claims and counterclaims asserted in the Adversary Proceeding;

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations over a period of many months regarding the terms of a global settlement to resolve all disputes between the Parties and the mutual support to their respective insolvency proceedings;

**WHEREAS**, the Debtors have provided the JOLs access to certain pre- and post-filing books, records, and analyses of the Debtors regarding the accounts of FTX DM and the Debtors;

**WHEREAS**, the JOLs have reviewed such books, records, and analyses and have concluded that FTX.com Exchange (as defined below) records are so commingled (both as between Dotcom Customers' funds and as between FTX DM and the Debtors) that neither the accounts of FTX DM and the Debtors nor those of individual Dotcom Customers can be recreated, and that tracing of assets and funds is not feasible;

**WHEREAS**, each Party has an interest in avoiding the uncertainty, delay, cost and expense that is associated with litigation of the disputes between the Parties, including the novel legal, factual and equitable issues raised in connection with the Adversary Proceeding, the Lift Stay Motion, the Cooperation Agreement, the DM Liquidation and the Chapter 11 Cases, generally;

**WHEREAS**, without any admission by either Party, each Party desires to settle all disputes between them, including the Adversary Proceeding, and to express to the other Party its support and commitment with respect to the other Party's insolvency and any related or ancillary proceedings; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the global settlement governed by this Agreement (the "<u>Global Settlement</u>") on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

### Article I.        Definitions and Interpretation

Section 1.01    <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>Acceptable DM Liquidation</u>" means a liquidation of FTX DM proposed by the JOLs that is consistent with this Agreement.

"<u>Acceptable Plan</u>" means a Chapter 11 Plan proposed by the Debtors that (a) is consistent with this Agreement, including the provisions with respect to FTX DM and PropCo, and incorporates the releases set forth in <u>Article IX</u>; (b) taken as a whole, treats holders of FTX.com Customer Entitlement Claims not materially less favorably than as contemplated by the Plan Term Sheet, (c) includes post-Plan Effective Date governance that is reasonably acceptable to FTX DM, and (d) is otherwise reasonably acceptable to FTX DM.

"<u>Administrative Expenses</u>" means reasonable past documented, and reasonable estimates of future fees, costs, charges, liabilities and other expenses incurred or to be incurred in the course of the DM Liquidation or the Chapter 11 Cases (as the case may be), including such sums incurred in pursuing DM-Controlled Recovery Actions or Debtors-Controlled Recovery Actions (as the case may be) and, in the case of the DM Liquidation, all expenses listed in O.20 r.1(1) of the Bahamas Companies Liquidation Rules 2012 and s.204 of the Bahamas Companies Act and, in the case of the Chapter 11 Debtors, any costs or expenses of administration of Chapter 11 Cases of a kind specified under section 503 of the Bankruptcy Code.

"<u>Admitted</u>" means, with respect to any Claim in the DM Liquidation, that such Claim has been admitted as a proof in the DM Liquidation pursuant to section 235 of the Bahamas Companies Act.

"<u>Advance DM Loan</u>" means a loan made by FTX Trading to FTX DM under the Loan Agreement, dated as of the date hereof, between FTX Trading, as lender, and FTX DM, a borrower.

"<u>Adversary Proceeding</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Adversary Proceeding Parties</u>" has the meaning set forth in <u>Section 7.01</u>.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control" (including, with correlative

meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Agreement Effective Period" means the period from the Initial Settlement Effective Date to the Termination Date.

"Allowed" has the meaning set forth in the Chapter 11 Plan.

"Applicable Petition Date" means (a) with respect to the Debtors, November 11, 2022 and (b) with respect to FTX DM, November 10, 2022.

"Bahamas Approval Orders" has the meaning set forth in Section 4.01(a).

"Bahamas Bar Date" has the meaning set forth in Section 5.01.

"Bahamas Code" means the Bahamas Companies Act, Companies Liquidation Rules, 2012 and Insolvency Practitioners' Rules, 2012.

"Bahamas Companies Act" means The Bahamas' Companies Act (as amended by *inter alia* the Companies (Winding Up Amendment) Act, 2011).

"Bahamas Court" has the meaning set forth in the recitals to this Agreement.

"Bahamas Customer" means a Dotcom Customer that has made a valid Opt-In Election.

"Bahamas Properties" has the meaning set forth in Section 2.04(a).

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Business Day" means any day other than a Saturday, Sunday, public holiday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York or in Nassau, The Bahamas.

"Cause of Action" means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, right of subordination, netting, recoupment and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"Chapter 11 Approval Orders" has the meaning set forth in Section 3.01(a).

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Chapter 11 Plan" means a joint plan of reorganization (including any supplement thereto and all exhibits, annexes, and schedules attached thereto) proposed by the Debtors in the Chapter 11 Cases pursuant to section 1121(a) of the Bankruptcy Code.

"Chapter 11 Schedules" means the schedules of assets and liabilities filed by the Debtors in the Chapter 11 Cases, each as may be amended, supplemented or modified from time to time.

"Chapter 15 Case" has the meaning set forth in the recitals.

"Claim" with respect to any Debtor, has the meaning ascribed to it in section 101(5) of the Bankruptcy Code, and with respect to FTX DM, has the meaning ascribed to it in section 235 of the Bahamas Companies Act.

"Class 5A Cumulative Distribution Percentage" means, on any distribution date, the amount expressed as the cumulative percentage determined by the Debtors to be distributable on Allowed Trading Customer Entitlement Claims as of such distribution date, taking into account distributable cash and appropriate reserves.

"Commenced KYC" means, for any Dotcom Customer who has made a valid Opt-In Election, that such Dotcom Customer shall have provided the information that is required by the KYC Procedures for the assessment of eligibility for Allowance or Admission, as applicable, of a FTX.com Customer Entitlement Claim and to receive distributions on account of such FTX.com Customer Entitlement Claim.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming an Acceptable Plan in a form reasonably acceptable to FTX DM with respect to provisions that relate to FTX DM, PropCo, the JOLs, or this Agreement.

"Control Person" means any of (a) Samuel Bankman-Fried, Zixiao "Gary" Wang, Nishad Singh, Caroline Ellison, and (b) any Person with a familial relationship with any of the foregoing individuals.

"Controlling Party" means (a) with respect to a Debtors-Controlled Recovery Action, the Debtors and (b) with respect to a DM-Controlled Recovery Action, FTX DM, or the JOLs.

"Cooperation Agreement" has the meaning set forth in the recitals to this Agreement.

"Debtors" has the meaning set forth in the preamble to this Agreement.

"Debtors-Controlled Recovery Action" means any Recovery Action that is not a DM-Controlled Recovery Action; *provided* that Debtors-Controlled Recovery Actions shall not include any Recovery Action against any Released Party.

"*De Minimis* Claim" means any Claim classified and treated as a *De Minimis* Claim in the Acceptable Plan.

"Digital Asset" means a DLT Digital Asset or a Pre-Launch Cryptocurrency.

"Disputed Digital Assets" means any Digital Asset agreed between the Parties by agreement between counsel to each Party conveyed in writing (including electronic mail) between such counsel.

"DLT Digital Asset" means any digital representation of value or units that is issued or transferable using distributed ledger or blockchain technology, including stablecoins, cryptocurrency and non-fungible tokens.

"DM-Controlled Recovery Action" means a Recovery Action that:  (a) the Debtors and FTX DM have agreed in writing shall constitute a DM-Controlled Recovery Action; (b) arises out of or relates to an avoidable or potentially avoidable withdrawal from the FTX.com Exchange by any Dotcom Customer (other than an Excluded Party) who is a Specified Jurisdiction Resident or a Bahamas Customer; (c) arises out of or relates to an avoidable or a potentially avoidable transfer made directly by FTX DM or PropCo to any Person other than a Dotcom Customer who is (i) not a Bahamas Customer or (ii) an Excluded Party; or (d) is a potential defense to a DM Customer Entitlement Claim; *provided* that a Recovery Action shall constitute a DM-Controlled Recovery Action for purposes of this clause (d) solely to the extent such Dotcom Customer Recovery Action is asserted by FTX DM as a defense to a DM Customer Entitlement Claim; *provided* further that DM-Controlled Recovery Actions shall not include any Recovery Action against any Released Party.

"DM Customer Entitlement Claim" means a FTX.com Customer Entitlement Claim in the DM Liquidation as a result of an Opt-In Election; *provided* that no Claim held by an Excluded Party shall constitute a DM Customer Entitlement Claim.

"DM Customer Reference Amount" means, on any distribution date, the amount expressed in U.S. Dollars that is necessary for all Eligible DM Customer Entitlement Claims receiving distributions on such distribution date to have received, on or prior to such distribution date, aggregate distributions expressed as a percentage of the face amount of such Eligible DM Customer Entitlement Claims equal to the Class 5A Cumulative Distribution Percentage.

"DM Distributable Cash" means, on any distribution date, the amount expressed in U.S. Dollars of cash and cash equivalents in the FTX DM estate after paying Administrative Expenses and establishing appropriate reserves for Administrative Expenses, excluding any cash balance in the DM Non-Customer Account that FTX DM determines to be required to satisfy in full all Admitted DM Non-Customer Claims pursuant to Section 5.03(b).

"DM Excess Claim" means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, rule or regulation, common law or otherwise) of a Dotcom Customer arising out of or related to accounts or positions on the FTX.com Exchange, other than a DM Customer Entitlement Claim.

"DM Liquidation" means FTX DM's liquidation or winding up proceeding in The Bahamas.

"DM Non-Customer Account" means a segregated account to be opened in the name of FTX DM and funded pursuant to Section 5.03(c).

"DM Non-Customer Claim" means any Claim (including any trade or other general unsecured claim or governmental claim) filed against FTX DM that is not a DM Customer Entitlement Claim or a DM Excess Claim.

"DM Non-Customer Claims Pool" means all property in the DM Non-Customer Account.

"DOJ" means the U.S. Department of Justice.

"DOJ Seized Funds" means any funds that may be received from the DOJ relating to amounts seized from the bank accounts in the name of FTX DM at Farmington State Bank (d/b/a Moonstone Bank) and Silvergate Bank specified in Exhibit A hereto.

"Dotcom Convenience Claim" means any Claim classified and treated as Dotcom Convenience Claim in the Acceptable Plan.

"Dotcom Customer" means any customer of record on the FTX.com Exchange at any time.

"Dotcom Customer Pool" has the meaning set forth in the Plan Term Sheet.

"Dotcom Customer Preference Action" has the meaning set forth in Section 5.05(a).

"Dotcom Customer Preference Offer" has the meaning set forth in Section 5.05(a).

"Dotcom Customer Recovery Action" means any Recovery Action arising out of or related to a transfer by FTX DM or any Debtor to any Person in such Person's capacity as a Dotcom Customer.

"Eligible DM Customer Entitlement Claim" means, as of any distribution date, any DM Customer Entitlement Claim (or portion thereof) that:  (a) is the subject of a valid Opt-In Election on or prior to the Bahamas Bar Date; (b) is held by a Dotcom Customer that has Commenced KYC by the KYC Cut-off Date and has satisfied the KYC Procedures in respect of itself and the Original Customer of such Customer Entitlement Claim by the applicable distribution date; and (c) either (i) has been Admitted against FTX DM in an amount not greater than the Guideline Amount; (ii) has been determined in a Joint Claims Hearing to be a Claim that would have been Allowed as a FTX.com Customer Entitlement Claim; or (iii) has been approved by the Debtors as an Eligible DM Customer Entitlement Claim, whether pursuant to Section 5.03(d)(iv) or otherwise.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Excluded Party" means any (a) Control Person, Insider or Affiliate of a Control Person or Insider; (b) holder or subsequent transferee of such holder of a Claim against any Debtor other than a FTX.com Customer Entitlement Claim; or (c) Person or any initial or subsequent transferee of such Person against whom the Debtors determine they have any Cause of Action (other than for withdrawals of cash or Digital Assets from the FTX.com Exchange) that are identified on a schedule to be provided by the Debtors to FTX DM in accordance with Section 5.02(b).

"Excluded Preference Claim" has the meaning set forth in the Plan Term Sheet.

"Execution Date" has the meaning set forth in the preamble to this Agreement.

"Existing Confidentiality Arrangements" means the Confidentiality Arrangements between the Parties dated as of January 30, 2023, as amended, supplemented and modified from time to time.

"Fenwick Retainer Receivable" means the receivable held by FTX DM against Fenwick & West LLP in respect of a retainer in the amount of $3.5 million.

"Final Settlement Effective Date" means the Plan Effective Date.

"FTX DM" has the meaning set forth in the preamble to this Agreement.

"FTX Trading" has the meaning set forth in the preamble to this Agreement.

"FTX.com Customer Entitlement Claim" means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, the Bahamas Code, federal or state law, rule or regulation, common law or otherwise) held by any Person against any of the Debtors or FTX DM that compensates such Person for the value of cash or Digital Assets credited to an FTX.com Exchange account in the name of such Person in accordance with the calculation procedures set forth in Section 5.03(d)(ii). For the avoidance of doubt, any Claim for the appreciation in the value of a Digital Asset after the Applicable Petition Date is not a FTX.com Customer Entitlement Claim and, if against FTX DM, shall constitute a DM Excess Claim.

"FTX.com Exchange" means the FTX.com trading platform.

"FTX.com Exchange Assets Buyer" means any entity that acquires assets from the Debtors pursuant to the FTX.com Exchange Asset Sale Transaction.

"FTX.com Exchange Asset Sale Transaction" means any transaction or series of transactions approved by the Bankruptcy Court involving the sale, disposition or other monetization of property of the Debtors associated with the FTX.com Exchange (whether alone or together with any other assets of the Debtors) or any other transaction that would permit the

Debtors, a successor thereof, or an acquirer of any assets associated with the FTX.com Exchange to operate an offshore platform not available to U.S. investors.

"FTX.com Exchange Intellectual Property" means the following, as used in, related to or associated with the FTX.com Exchange, all intellectual property and other similar proprietary rights arising in any jurisdiction of the world, whether registered or unregistered, including in and to any of the following:  (a) Trademarks; (b) patents and patent applications, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, re-examinations, extensions and reissues; (c) trade secrets, know-how, customer lists and other proprietary rights in confidential information; (d) published and unpublished works of authorship, whether copyrightable or not, including data and databases, web code, copyrights, applications and registrations therefor, and renewals, extensions, restorations and reversions thereof; and (e) Internet domain names, social media identifiers and URLs.  Without limiting the foregoing, FTX.com Exchange Intellectual Property includes the "FTX" Trademark and any derivatives or variations thereof, including any Internet domain names, social media identifiers and URLs that incorporate any of the foregoing.

"Global Settlement" has the meaning set forth in the recitals to this Agreement.

"Guideline Amount" means, for any DM Customer Entitlement Claim, (a) the USD Equivalent of the cash and Digital Assets set forth in the Chapter 11 Schedules calculated as of the Chapter 11 Petition Date (without any adjustment for subsequent changes in value of any Digital Assets) *minus* (b) for any Dotcom Customer with Net Preference Exposure greater than $250,000, 15% of any Net Preference Exposure attributable to the holder of such FTX DM Customer Entitlement Claim on the books and records of the Debtors.

"Ineligible DM Customer Entitlement Claim" means any DM Customer Entitlement Claim (or portion thereof) that is not an Eligible DM Customer Entitlement Claim.

"Initial Settlement Effective Date" means the first date on which all Bahamas Approval Orders, Chapter 11 Approval Orders have been entered.

"Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code and includes any non-statutory insiders of the Debtors and affiliates of the Debtors.

"JIN Guidelines" mean the Guidelines for Communication and Cooperation between Courts in Cross-Border Insolvency Matters issued by the Judicial Insolvency Network in October 2016 as reflected in Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware 9029-2.

"Joint Claims Hearing" means a hearing jointly conducted by the Bankruptcy Court and the Bahamas Court in accordance with the JIN Guidelines to determine whether a DM Customer Entitlement Claim (or portion thereof) constitutes an Eligible DM Customer Entitlement Claim.

"JOLs" means, at any time, Brian C. Simms KC, Kevin G. Cambridge and Peter Greaves in their capacity as joint and several official liquidators of FTX DM (and in their capacity as joint and several provisional liquidators, where applicable) together with any

additional or successor Person or Persons who take or hold office as joint official liquidators of FTX DM.

"KYC Cut-off Date" means the date that is the later of (a) ninety (90) days after the Opt-In Deadline and (b) thirty (30) days after the Plan Effective Date or such other date as may be ordered by the Bankruptcy Court.

"KYC Procedures" has the meaning set forth in Section 5.08(a).

"Law" means any federal, state, local, Bahamas or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court and the Bahamas Court).

"Lift Stay Motion" has the meaning set forth in the recitals to this Agreement.

"Net Preference Exposure" has the meaning set forth in the Plan Term Sheet.

"Non-Controlling Party" means (a) with respect to a Debtors-Controlled Recovery Action, FTX DM and the JOLs; and (b) with respect to a DM-Controlled Recovery Action, the Debtors.

"Opt-In Deadline" means the Bahamas Bar Date.

"Opt-In Election" has the meaning set forth in Section 5.02(a).

"Original Customer" means, with respect to a DM Customer Entitlement Claim, the Holder of such FTX.com Customer Entitlement Claim as of November 10, 2022.

"Party" has the meaning set forth in the preamble to this Agreement.

"Person" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

"Plan Effective Date" means the date on which the last condition to the effectiveness of an Acceptable Plan has been satisfied or waived in accordance with the terms thereof and such Acceptable Plan becomes effective.

"Plan Term Sheet" means the term sheet attached to the Plan Support Agreement filed by the Debtors in the Chapter 11 Cases on October 16, 2023 [D.I. 3291].

"Pre-Launch Cryptocurrency" means an asset that would have been a DLT Digital Asset but for the fact that such asset has not been issued and is not transferable using distributed ledger or blockchain technology as of November 11, 2022.

"PropCo" has the meaning set forth in the preamble to this Agreement.

"PropCo Ordinary Course Claim" means any prepetition Claim against PropCo arising in the ordinary course in respect of the ownership, use, sale or transfer of the Bahamas Properties.

"Properties Exclusive Sales Agency Agreement" means the Properties Exclusive Sales Agency Agreement, dated as of the date hereof, between FTX Trading, PropCo and FTX DM.

"Properties Sales Procedures" has the meaning set forth in Section 2.04(a).

"Provisional Liquidation" has the meaning set forth in the recitals to this Agreement.

"Recovery Action" means any actual or potential Cause of Action (a) arising out of or relating to a transfer of property or the incurrence of an obligation or any distribution or other transaction made by or on behalf of the Debtors or FTX DM, or their estates or creditors, under (i) sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) or other applicable sections of the Bankruptcy Code, (ii) sections 228, 229, 230, 236, 241, 242, 243, and 244 of the Bahamas Code or (iii) similar or related local, state, federal, or foreign statutes and common law, including preferential and fraudulent transfer laws or (b) that may be asserted by any of the Debtors or FTX DM against an officer, director, fiduciary, insurer, or any other Person or Entity; *provided* that no Cause of Action shall constitute a Recovery Action to the extent such Cause of Action is (A) asserted by a Debtor against FTX DM, (B) asserted by FTX DM against a Debtor or (C) asserted by any Debtor or FTX DM against a governmental authority with respect to Taxes.

"Released Parties" has the meaning set forth in Section 9.01.

"Releasing Parties" has the meaning set forth in Section 9.01.

"SCB" has the meaning set forth in the recitals to this Agreement.

"Specified Jurisdiction Resident" means any Person that is listed in the customer records of the FTX.com Exchange as a resident in any jurisdiction listed in Exhibit B hereto.

"Stipulated Debtors Property" means any interest in property of the Debtors or FTX DM (including the Disputed Digital Assets) other than Stipulated DM Property.

"Stipulated DM Property" means the assets, interests, rights or property, as the case may be, listed in Exhibit C hereto.

"Stipulated PropCo Claim" has the meaning set forth in Section 2.04(b).

"Taxes" means (a) any and all federal, state, Bahamian, local or foreign contributions, taxes, fees, imposts, duties and similar governmental charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any governmental unit, including any taxes on income, profits or gross receipts, ad valorem, value added, capital gains, sales, excise, use, real property, withholding,

estimated, social security, housing fund, retirement fund, profit sharing, customs, import duties and fees and any other governmental contributions, and (b) any transferee or successor liability in respect of any items described in clause (a) above.

"Termination Date" means the date on which termination of this Agreement as to a Party is effective in accordance with Article VIII.

"Trademarks" means any trademarks, service marks, logos, symbols, trade names, and other indicia of origin, applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby.

"Trading Customer Entitlement Claim" means any FTX.com Customer Entitlement Claim that is not (a) a DM Customer Entitlement Claim, (b) a Dotcom Convenience Claim, or (c) a *De Minimis* Claim.

"USD Equivalent" of any cash or Digital Assets means the value in U.S. Dollars determined by order of the Bankruptcy Court to be applicable to such cash or Digital Assets for purposes of the allowance of Claims in the Chapter 11 Cases.

Section 1.02    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    any capitalized terms in this Agreement that are defined with reference to another agreement are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)    if any payment, distribution, act or deadline under this Agreement is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date;

(f)    unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(g)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(h)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(i)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(j)    the use of "include" or "including" is without limitation, whether stated or not;

(k)    all references to "$" and "dollars" will be deemed to refer to United States currency unless otherwise specifically provided; and

(l)    the word "or" shall not be exclusive.

## Article II.    Disputed Property

Section 2.01    <u>Allocation of Disputed Property</u>.  The Parties agree that, on the Final Settlement Effective Date, (a) all right, title and interest of the Parties in the Stipulated DM Property shall vest with the estate of FTX DM free and clear of all Claims and interests of the Debtors and (b) all right, title and interest of the Parties in the Stipulated Debtors Property shall vest with the estate of the Debtors free and clear of all Claims and interests of FTX DM.  Each Party shall take such commercially reasonable actions as may be reasonably requested by the other Party to give effect to this <u>Section 2.01</u>.  Except as otherwise provided in this Agreement, each Party shall be responsible for all Taxes and out-of-pocket costs and expenses incurred on or after the Final Settlement Effective Date with respect to the property allocated to it hereby.

Section 2.02    <u>Conduct of Litigation Involving Third Parties</u>.

(a)    <u>DM-Controlled Recovery Actions</u>.  As between the Parties, FTX DM shall have the right to manage and control the prosecution of the DM-Controlled Recovery Actions, including any decision to investigate, assert, resolve or settle such DM-Controlled Recovery Actions in whole or in part; *provided* that FTX DM shall consult with the Debtors prior to the settlement of any material DM-Controlled Recovery Action.

(b)    <u>Debtors-Controlled Recovery Actions</u>.  As between the Parties, the Debtors shall have the right to manage and control the prosecution of any Debtors-Controlled Recovery Actions, including any decision to investigate, assert, prosecute, resolve or settle such Debtors-Controlled Recovery Actions in whole or in part; *provided* that the Debtors shall consult with FTX DM prior to the settlement of any material Debtors-Controlled Recovery Action.

(c)    <u>Cooperation in Respect of Recovery Actions</u>.  The Parties shall cooperate and use commercially reasonable efforts to maximize recoveries from all Recovery Actions. Upon request by the Controlling Party, subject to the Bankruptcy Court or Bahamas Court

approval, if required, the Non-Controlling Party shall take such actions, or refrain from taking such actions, with respect to a Recovery Action as may be requested by the Controlling Party, in the reasonable discretion of the Controlling Party, from time to time.  Subject to the Bankruptcy Court or Bahamas Court approval, if required, the Non-Controlling Party shall cooperate with the Controlling Party in connection with the investigation, assertion, prosecution, resolution and settlement of any Recovery Action, including (i) making available to the Controlling Party and its advisors relevant records and information (subject in all respects to the terms of the Existing Confidentiality Arrangements and Section 2.03 hereof) and (ii) participating in litigation as a plaintiff, co-plaintiff or other appropriate party, in each case as may be reasonably necessary for the Controlling Party to investigate, assert, prosecute, resolve or settle such Recovery Action; *provided* that the Controlling Party shall be responsible for any and all adverse costs ordered and shall indemnify the Non-Controlling Party (including, with respect to FTX DM, the JOLs, and with respect to the Debtors, the Debtors' directors and officers) for such costs.  The Non-Controlling Party shall not object to, delay, impede, or take any other action to interfere with any Recovery Action controlled by the Controlling Party.  Except as provided in this Section 2.02(c), the Parties shall each bear their own costs and expenses in connection with any Recovery Actions, whether or not the Controlling or the Non-Controlling Party.

Section 2.03    Information Sharing.  Subject in all respects to the terms of the Existing Confidentiality Arrangements, the Parties agree to share information in their possession concerning the matters contemplated by this Agreement, including, in respect of:  (a) any Stipulated DM Property or Stipulated Debtors Property; (b) any Recovery Action; (c) the negotiation, solicitation, confirmation, approval or consummation of an Acceptable Plan and an Acceptable DM Liquidation and all material developments in matters relating thereto; (d) FTX.com Customer Entitlement Claims, and distributions relating thereto; (e) Opt-In Elections and the exercise thereof; (f) Administrative Expenses; and (g) any other information that is reasonably requested by the other Party for the administration of their Estate; *provided* that nothing in this Agreement shall oblige a Party to share privileged materials with the other Party or share any information in violation of applicable Law or any confidentiality arrangement binding such Party at the time of such request.

Section 2.04    PropCo.

(a)    Bahamas Properties Sales Process.  Each Party agrees to the joint process set forth in the Properties Exclusive Sales Agency Agreement for the prompt cash sale of real estate owned by PropCo in The Bahamas (the "Bahamas Properties") free and clear of all Claims and interests of creditors of the Parties' estates (the "Properties Sales Procedures").

(b)    Allowance of PropCo Claim.  The Parties stipulate that, effective as of the Final Settlement Effective Date, a Claim of FTX DM against PropCo (the "Stipulated PropCo Claim") shall be stipulated and Allowed as an unsecured, unsubordinated, prepetition Claim in the amount of $256,291,221.47; *provided* that the Stipulated PropCo Claim shall be subordinated to the PropCo Ordinary Course Claims.  In no event shall FTX DM assert the Stipulated PropCo Claim against any other Debtor.

(c)    Objection to Claims Against PropCo.  The Debtors shall, in consultation with FTX DM, object to and contest any and all Claims asserted in the Chapter 11 Cases against

PropCo (other than the Stipulated PropCo Claim, any PropCo Ordinary Course Claim, or any Claim for an Administrative Expense of PropCo), and shall not settle such Claim without the prior written consent of FTX DM or make any distribution to the holder of such Claim without the prior written consent of FTX DM or order of the Bankruptcy Court.  The Debtors shall use reasonable commercial efforts to file objections to Claims against PropCo in accordance with this Section 2.04(c) before the Plan Effective Date.  In the event that the aggregate amount of Allowed Claims and Claims for Administrative Expenses of PropCo that are senior to or *pari passu* with the Stipulated PropCo Claim exceeds $50 million, then the amount of cash to be transferred by the Debtors to DM in accordance with Exhibit C hereto shall be increased by an amount equal to (i) the amount that would have been distributed to FTX DM from the PropCo estate had the aggregate amount of Allowed Claims and Claims for Administrative Expenses of PropCo that are senior to or *pari passu* with the Stipulated PropCo Claim been $50 million *minus* (ii) the amount actually distributed to FTX DM from the PropCo estate.

(d)    Distributions of Proceeds on and after the Final Settlement Effective Date.  PropCo shall be treated separately under the Chapter 11 Plan and not substantively consolidated with any other Debtor.  FTX DM agrees that it shall not sell, transfer or assign any interest, directly or indirectly, in the Stipulated PropCo Claim without the prior written consent of the Debtors (and any purported assignment without consent shall be null and void).  FTX DM agrees that it shall apply all net proceeds received on the Stipulated PropCo Claim in accordance with the terms and conditions of this Agreement.

Section 2.05    Monetization and Transfer of Assets.

(a)    Prompt Transfer of Digital Assets held by the SCB.  FTX DM shall use commercially reasonable efforts to obtain the return of the Digital Assets held by the SCB.  Upon such return, FTX DM shall transfer all such Digital Assets to the Debtors.

(b)    Realization of Assets.  Each Party shall cooperate and use commercially reasonable efforts to assist (including by providing any consents or authorizations) the other Party in the prompt realization of assets allocated to the other Party under Section 2.01, including, with respect to the transfer of the Disputed Digital Assets, the release of the DOJ Seized Funds to FTX DM's estate, and in monetizing the Bahamas Properties.

(c)    Application of Funds at FTX DM.  FTX DM shall apply cash and other property it controls solely to pay (subject to approval by the Bahamas Court) or reserve for Administrative Expenses of FTX DM, in each case, after ten (10) days advance notice to the Debtors; *provided* that, after the Final Settlement Effective Date, FTX DM may also apply Stipulated DM Property to pay or reserve for Administrative Expenses or make distributions in the DM Liquidation in accordance with this Agreement and applicable Law.  FTX DM shall provide such historical financial information and projections to the Debtors as the Debtors may reasonably request from time to time.

Section 2.06    FTX.com Exchange Asset Sale Transaction.

(a)    The Debtors shall consult with FTX DM in respect to any FTX.com Exchange Asset Sale Transaction.

(b)    In the event of an FTX.com Exchange Asset Sale Transaction within two (2) years from the Execution Date, at the request of FTX Trading (on behalf of the Debtors) and subject to receipt of any necessary governmental or regulatory approvals, FTX DM shall, effective immediately upon closing of any FTX.com Exchange Asset Sale Transaction, transfer, assign, convey, and deliver to, at FTX Trading's election, either (i) the FTX.com Exchange Assets Buyer or (ii) FTX Trading (for immediate transfer, assignment, conveyance and delivery by FTX Trading to the FTX.com Exchange Assets Buyer), in each case, for no additional consideration, all of FTX DM's right, title and interest in and to any FTX.com Exchange Intellectual Property, free and clear of all claims and interests of FTX DM for application pursuant to an Acceptable Plan.  To the extent required under applicable Law, FTX DM shall file applications to obtain orders from the Bahamas Court, in form and substance reasonably satisfactory to the Debtors, authorizing such transfer, assignment, conveyance and delivery. Upon and following the foregoing assignment, FTX DM shall not use or otherwise exploit any FTX.com Exchange Intellectual Property.  For the avoidance of doubt, no licenses or registrations held by FTX DM under the Digital Assets and Registered Exchanges Act enacted by the Parliament of The Bahamas shall be transferred, assigned, conveyed or delivered pursuant to this Section 2.06(b).  Any Taxes, out-of-pocket costs and expenses incurred by FTX DM in respect of this Section 2.06(b) shall be borne by the Debtors.

(c)    FTX DM shall not transfer, assign, convey, sell, dispose of, lease, license, mortgage, pledge, encumber, or divest any licenses or registrations held by FTX DM under the Digital Assets and Registered Exchanges Act enacted by the Parliament of The Bahamas.  FTX DM shall not consent to and shall object to any such transfer, assignment, conveyance, sale, disposition, lease, license, mortgage, pledge, encumbrance, or divestiture.

## Article III.    The Chapter 11 Plan

Section 3.01    Debtors' Commitments.  During the Agreement Effective Period, the Debtors shall use commercially reasonable efforts to:

(a)    provide access to the pre- and post-filing books and records of the Debtors as reasonably requested by the JOLs in connection with the Bahamas Approval Orders and any related submissions to the Bahamas Court, subject to any applicable privileges;

(b)    by no later than January 10, 2024, file with the Bankruptcy Court motions seeking orders, each in form and substance reasonably satisfactory to FTX DM, approving (i) this Agreement; (ii) the Properties Exclusive Sales Agency Agreement and the Properties Sales Procedures; and (iii) the Advance DM Loan (the "Chapter 11 Approval Orders"); *provided* that the Debtors agree to file the motion seeking an order from the Bankruptcy Court approving the Properties Exclusive Sales Agency Agreement and the Properties Sales Procedures as soon as practicable;

(c)    pursue solicitation, confirmation, approval, and consummation of an Acceptable Plan;

(d)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay solicitation, confirmation, approval, or consummation of an Acceptable Plan, support and take all steps reasonably necessary and desirable to address any such impediment;

(e)      obtain any and all required governmental, regulatory and third-party approvals for the implementation or consummation of an Acceptable Plan;

(f)      timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order for relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of an Acceptable Plan;

(g)      give FTX DM prior notice of any motion or other pleading concerning this Agreement or any of the matters contemplated hereby that is filed on behalf of the Debtors with any court in the United States;

(h)      establish appropriate reserves to make payments to FTX DM that are required under this Agreement; and

(i)      not file any motion or pleading (or support any motion or pleading filed by any other Person) with the Bankruptcy Court that, in whole or in part, is materially inconsistent with this Agreement or an Acceptable Plan.

Section 3.02      FTX DM's Commitments.  During the Agreement Effective Period, FTX DM shall use commercially reasonable efforts to:

(a)      provide access to the pre- and post-filing books and records of FTX DM as reasonably requested by the Debtors in connection with the Chapter 11 Approval Orders, the Chapter 11 Plan, and any related submissions to the Bankruptcy Court, subject to any applicable privileges;

(b)      support solicitation, confirmation, approval, and consummation of an Acceptable Plan, including by voting the Stipulated PropCo Claim to accept an Acceptable Plan;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay solicitation, confirmation, approval, or consummation of an Acceptable Plan, support the Debtors in all reasonably necessary and desirable steps to address any such impediment;

(d)      not object to, delay, impede, or take any other action to interfere with (i) solicitation, confirmation, approval, and consummation of an Acceptable Plan or (ii) any motion, application or other pleading or document filed by the Debtors in the Bankruptcy Court that is not inconsistent with this Agreement;

(e)      not take or agree to take any action to support or facilitate in any manner any chapter 11 plan other than an Acceptable Plan; and

(f)    not file any motion or pleading (or support any motion or pleading filed by any other Person) with the Bankruptcy Court that, in whole or in part, is materially inconsistent with this Agreement or an Acceptable Plan.

### Article IV.    The DM Liquidation

Section 4.01    <u>FTX DM's Commitments</u>.  During the Agreement Effective Period, FTX DM shall use commercially reasonable efforts to:

(a)    by no later than January 10, 2024, (x) file applications to obtain orders from the Bahamas Court, each in form and substance reasonably satisfactory to the Debtors sanctioning (i) this Agreement; (ii) the Properties Exclusive Sales Agency Agreement and the PropCo Sale Procedures; and (iii) the Advance DM Loan and (y) file a motion to approve this Agreement in the Bankruptcy Court with respect to the Chapter 15 Case (the "<u>Bahamas Approval Orders</u>"); *provided* that FTX DM agrees to file the application seeking an order from the Bahamas Court sanctioning the Properties Exclusive Sales Agency Agreement and the Properties Sales Procedures as soon as practicable;

(b)    promptly conduct an Acceptable DM Liquidation;

(c)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay an Acceptable DM Liquidation, support and take all steps reasonably necessary and desirable to address any such impediment;

(d)    obtain any and all required governmental, regulatory and third-party approvals for the implementation or consummation of this Agreement;

(e)    timely file a formal objection to any pleading filed with the Bahamas Court by any Person seeking the entry of an order for relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of an Acceptable DM Liquidation;

(f)    give the Debtors prior notice of any report, motion, application, summons, petition or other pleading concerning this Agreement or any of the matters contemplated hereby that is filed on behalf of FTX DM with any court in The Bahamas;

(g)    facilitate the Debtors' appearance, attendance and participation in any and all proceedings before any court in The Bahamas that concerns this Agreement or any of the matters contemplated hereby; and

(h)    not file any motion, application, summons, petition, or pleading (or support any motion, application, summons, petition, or pleading filed by any other Person) with the Bahamas Court that, in whole or in part, is materially inconsistent with this Agreement or an Acceptable DM Liquidation.

Section 4.02    <u>Debtors' Commitments</u>.  During the Agreement Effective Period, the Debtors shall use commercially reasonably efforts to:

(a)     support FTX DM's efforts in obtaining the Bahamas Approval Orders;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the Global Settlement, to support and take all steps reasonably necessary and desirable to address any such impediment;

(c)     not object to, delay, impede, or take any other action to interfere with (i) the Acceptable DM Liquidation or (ii) any motion, application or other pleading or document filed by FTX DM in the Bahamas Court that is not inconsistent with this Agreement;

(d)     not take or agree to take any action to support or facilitate in any manner a liquidation other than an Acceptable DM Liquidation; and

(e)     not file any motion or pleading (or support any motion, application, summons, petition, or pleading filed by any other Person) with the Bahamas Court that, in whole or in part, is materially inconsistent with this Agreement.

**Article V.     Claims, Distributions and Inter-Estate Funding**

Section 5.01    <u>The Bahamas Bar Date</u>.  FTX DM shall establish May 15, 2024, or such other date as the Parties may reasonably agree, as a bar date for Claims against FTX DM (the "<u>Bahamas Bar Date</u>").  Except as required under applicable Law, FTX DM shall not seek to move or alter the Bahamas Bar Date without the prior written consent of the Debtors, not to be unreasonably withheld.

Section 5.02    <u>Responsibility for FTX.com Customer Entitlement Claims</u>.

(a)     <u>Opt-In Election</u>.  In connection with the solicitation of an Acceptable Plan, the Parties shall provide each Dotcom Customer, other than Excluded Parties or the Dotcom Customer specified in the last sentence of <u>Section 5.03(d)(v)</u>, the right to irrevocably elect by the Opt-In Deadline to have all (but not less than all) FTX.com Customer Entitlement Claims set forth in a Ballot in the Chapter 11 Cases or in a proof of debt in the DM Liquidation, as applicable, withdrawn with prejudice from the Chapter 11 Cases and administered, reconciled, valued, settled, adjudicated, resolved and satisfied in the DM Liquidation.  Each Dotcom Customer may exercise the Opt-In Election either by election on its ballot in the Chapter 11 Cases or by executing and filing a proof of debt in the DM Liquidation containing a waiver of any such Dotcom Customer's Entitlement Claim against the Chapter 11 Debtors (an "<u>Opt-In Election</u>").  The applicable portions of such ballots, proof of debt and the related disclosures made by the Parties about the Opt-In Election shall be in form and substance reasonably satisfactory to each Party.

(b)     <u>Excluded Parties</u>.  Excluded Parties shall not be eligible to exercise the Opt-In Election.  The Debtors shall provide FTX DM with an initial list of Excluded Parties by no later than the mailing of ballots for the Chapter 11 Plan.  The Debtors may supplement or modify such list from time to time up to the thirtieth (30th) day following the Bahamas Bar Date, at which time the list of Excluded Parties shall be final and binding on both Parties.

(c)    Allocation of Responsibility for FTX.com Customer Entitlement Claims. All FTX.com Customer Entitlement Claims whose holders have validly exercised the Opt-In Election prior to the Opt-In Deadline shall be administered, reconciled, valued, settled, adjudicated, resolved and satisfied in the DM Liquidation and disallowed in full in the Chapter 11 Cases.  All other FTX.com Customer Entitlement Claims shall be administered, reconciled, valued, settled, adjudicated, resolved and satisfied in the Chapter 11 Cases and shall be disallowed in full in the DM Liquidation.

Section 5.03    Classification and Treatment in the DM Liquidation.

(a)    Classification.  Each Claim Admitted in the DM Liquidation shall be classified in accordance with this Agreement as either (i) a DM Non-Customer Claim, (ii) a DM Customer Entitlement Claim, (iii) a DM Excess Claim or (iv) a Claim for Administrative Expense.

(b)    Treatment of DM Non-Customer Claims.  Each holder of an Admitted DM Non-Customer Claim shall receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Admitted DM Non-Customer Claim, payment in cash according to the Laws governing the DM Liquidation in an amount equal to such holder's pro rata share of the DM Non-Customer Claims Pool; *provided* that any such holder shall not be entitled to receive a distribution in an amount greater than the total amount of its Admitted Claim.  There shall be no other recovery for holders of DM Non-Customer Claims.

(c)    DM Non-Customer Account.  The DM Non-Customer Account shall receive no funding by FTX DM at any time other than funding upon the Final Settlement Effective Date in an amount equal to $15 million.  The DM Non-Customer Account shall be the sole source of payment for DM Non-Customer Claims.

(d)    Treatment of DM Customer Entitlement Claims.

(i)    Subject to Section 5.03(d)(iv), each holder of an Admitted DM Customer Entitlement Claim shall receive, in full and final satisfaction, settlement, release and discharge of and in exchange for its Admitted DM Customer Entitlement Claim, distributions from FTX DM as set forth in this Section 5.03(d)(i).  FTX DM shall make distributions on Eligible DM Customer Entitlement Claims and Ineligible DM Customer Entitlement Claims on the same distribution dates and on a ratable basis.  Subject to there being sufficient DM Distributable Cash, the aggregate amount distributed, whether in cash or in kind, on all DM Customer Entitlement Claims (including both Eligible DM Customer Entitlement Claims and Ineligible Customer Entitlement Claims) on any distribution date shall equal the DM Customer Reference Amount for such distribution date.

(ii)    Subject to Bahamas Court approval if necessary, FTX DM shall calculate the amount of a DM Customer Entitlement Claim to be equal to the fair market value of cash or Digital Assets on account at the FTX.com Exchange as of November 11, 2022; *provided* that Claims relating to the FTT token shall be valued at zero and treated as DM Excess Claims.  FTX DM shall set the value of a Digital Asset at the U.S. Dollar

equivalent of the fair market value of such Digital Asset.  FTX DM shall use commercially reasonable efforts to determine the fair market value of Digital Assets in a manner that is consistent with the valuation methodologies and processes adopted by the Debtors in consultation with FTX DM in the Chapter 11 Cases (as specified in the Plan Term Sheet).

(iii)    The Debtors shall, at the request of FTX DM, take all commercially reasonable actions as may be reasonably appropriate or necessary to request that the Bankruptcy Court conduct one or more Joint Claims Hearings with the Bahamas Court.

(iv)    FTX DM may request from time to time by notice to the Debtors that an otherwise Ineligible DM Customer Entitlement Claim be treated as an Eligible DM Customer Entitlement Claim in the event of bona fide discrepancies between mandatory allowance rules in the Chapter 11 Cases and the DM Liquidation.  The Debtors shall consent to such request so long as such treatment does not increase the total amount of all Eligible DM Customer Entitlement Claims (taken together with all other requests pursuant to this Section 5.03(d)(iv)) by more than $75 million.

(v)    In the event that the Debtors agree with the FTX.com Exchange Assets Buyer to offer holders of FTX.com Customer Entitlement Claims an opportunity to trade their claims or receive their distributions on a digital currency exchange operated by the FTX.com Exchange Assets Buyer, FTX DM shall, at the request of the Debtors and to the extent permitted under applicable Law, offer the same opportunity to holders of DM Customer Entitlement Claims on the same terms and conditions; *provided* that, notwithstanding anything to the contrary in this Agreement, to the extent that FTX DM is not permitted under applicable Law to offer such opportunity, all holders of FTX.com Customer Entitlement Claims that elect to trade their claims or receive their distributions on such digital currency exchange shall not be eligible to exercise the Opt-in Election.

(vi)    To the extent permitted by applicable Law, FTX DM shall treat as DM Excess Claims any DM Customer Entitlement Claim held by a Bahamas Customer that has not Commenced KYC by the KYC Cut-off Date.

(e)    Treatment of DM Excess Claims.  No holder of a DM Excess Claim shall receive any distributions on account of its DM Excess Claim.

(f)    Treatment of Administrative Expense Claims.  Each holder of an agreed Administrative Expense Claim against FTX DM shall receive cash in an amount equal to the full unpaid amount of such Admitted Administrative Expense Claim.

Section 5.04    Claim Objections.

(a)    The Parties shall use commercially reasonable efforts to consult and coordinate in connection with Claims objections in order to facilitate a consistent approach to the administration of the estates.

(b)     FTX DM shall reject and, if applicable, contest any DM Excess Claim or any Claim held by an Excluded Party in consultation with the Debtors, and shall not settle such Claim or make any distribution to the holder of such Claim.

(c)     FTX DM shall not Admit in the DM Liquidation any Ineligible DM Customer Entitlement Claim without reasonable advance notice to the Debtors and an adequate opportunity, if the Debtors so request, to be heard on the matter in the Bahamas Court.

Section 5.05    Settlement of Dotcom Customer Preference Actions.

(a)     The Debtors shall offer certain Dotcom Customers the opportunity to settle avoidance actions relating to withdrawals off the FTX.com Exchange (each, a "Dotcom Customer Preference Action") consistent with the terms set forth in the Plan Term Sheet.  The Debtors and FTX DM shall use commercially reasonable efforts to (i) make the same settlement offer to Dotcom Customers (the "Dotcom Customer Preference Offer") available in the Chapter 11 Cases in the DM Liquidation and (ii) to release the settled Recovery Actions belonging to the estates of the Debtors and FTX DM upon acceptance of the offer.  FTX DM shall not make a Dotcom Customer Preference Offer (x) on terms more favorable than those offered in the Chapter 11 Plan or (y) in respect of any preference claim identified by the Debtors as an Excluded Preference Claim in accordance with the Plan Term Sheet.

(b)     FTX DM shall not make any distribution on a DM Customer Entitlement Claim to a Dotcom Customer in respect of whom there is a Dotcom Customer Preference Action unless (i) the Dotcom Customer Preference Action has been settled on terms not more favorable to an eligible counterparty than as contemplated by the Dotcom Customer Preference Offer, (ii) the Debtors have consented or (iii) the distribution is required by Bahamas Law, in which case the applicable DM Customer Entitlement Claim (or such part of it as would have been subject to extinguishment or set-off by reason of a DM Customer Preference Action) shall be deemed an Ineligible DM Customer Claim.

(c)     The Debtors shall manage the assertion, adjudication and settlement of a Dotcom Customer Preference Action to the extent such Dotcom Customer Preference Action is not a defense to a DM Customer Entitlement Claim, except to the extent Recovery Actions against the applicable defendant have been allocated to FTX DM pursuant to Section 2.02(a).

Section 5.06    Inter-Estate Funding.

(a)     Debtor Funding Obligation.

(i)     The Debtors agree to provide FTX DM with the Advance DM Loan as soon as reasonably practicable following the Initial Settlement Effective Date, but no later than January 29, 2024.  The Debtors and FTX DM shall agree to the terms of the Advance DM Loan in advance of the time necessary for the Parties to seek approval or sanction, as applicable, of the Advance DM Loan in accordance with this Agreement. FTX DM shall apply the proceeds of the Allowed DM Loan solely to pay Administrative Expenses.

(ii)     To the extent that, on any distribution date, the DM Customer Reference Amount exceeds DM Distributable Cash, the Debtors shall advance, from funds allocated to the Dotcom Customer Pool, cash to FTX DM to pay distributions to holders of DM Customer Entitlement Claims; *provided* that the Debtors shall have no obligation to advance funds to FTX DM to finance distributions by FTX DM unless (A) FTX DM is in compliance with this Agreement in all material respects and (B) the Debtors shall have received reasonable assurance that such funds will not be used, directly or indirectly, to pay DM Non-Customer Claims or DM Excess Claims.

(b)     FTX DM Funding Obligation.  To the extent that, on any distribution date, the DM Distributable Cash exceeds the DM Customer Reference Amount, FTX DM shall pay such excess to the Debtors for application pursuant to the Chapter 11 Plan, so long as the Debtors are in compliance with this Agreement in all material respects.  In addition, to the extent that, on any distribution date or at any other time, the amount of DM Distributable Cash exceeds the amount necessary to pay all remaining DM Customer Entitlement Claims in accordance with this Agreement, FTX DM shall pay such excess to the Debtors for application pursuant to the Chapter 11 Plan.

(c)     Administrative Expenses.  To calculate the amounts due under Section 5.06(a) and Section 5.06(b) (as applicable), each Party shall take into account the actual and projected Administrative Expenses of the other estate; *provided* that each Party reserves the right to object to any Administrative Expenses incurred by the other Party's estate to the extent permitted under applicable Law before (i) the Bankruptcy Court, if for Administrative Expenses of the Debtors or (ii) the Bahamas Court, if for Administrative Expenses of FTX DM.  Each Party may make additional advances to the other Party to pay Administrative Expenses as the other Party may agree from time to time.

Section 5.07    Distributions.

(a)     The Debtors shall make distributions to holders of Trading Customer Entitlement Claims and other creditor Claims pursuant to the terms of the Acceptable Plan and in accordance with this Agreement.  FTX DM shall make distributions to holders of DM Customer Entitlement Claims and other creditor Claims in the DM Liquidation in accordance with this Agreement.  The Parties shall use commercially reasonable efforts to coordinate record dates and distributions, align procedures and policies, minimize confusion among Claims holders, and minimize administrative costs and expenses.

(b)     This Agreement is premised on a centralized distribution process in which each Allowed or Admitted holder of an FTX.com Customer Entitlement Claim receives that same recovery as another similarly-situated holder.  Therefore, the Chapter 11 Plan administrator or FTX DM may require any holder of a FTX.com Customer Entitlement Claim to submit satisfactory evidence that such holder has not requested or received compensation for the same losses underlying such claim in connection with the other estate's distributions, or any return of customer property procedures or other judicial or administrative proceeding (including any proceedings with respect to FTX Australia Pty Ltd., FTX Express Pty Ltd., FTX Turkey Teknoloji ve Ticaret Anonim Şirketi, FTX Europe AG, FTX EU Ltd., Quoine PTE Ltd. or FTX Japan K.K.), and may refrain from making distributions on such Claim until such time as

satisfactory evidence is obtained or appropriate arrangements are in place ensuring that no holder receives more than any other holder under the Plan after taking into account such other potential recoveries.

Section 5.08    Know-Your-Customer.

(a)    FTX DM shall adopt in the DM Liquidation the same know-your-customer procedures utilized by the Debtors from time to time in the Chapter 11 Cases (the "KYC Procedures"), which shall be developed in consultation with the JOLs.

(b)    Each Party agrees that it shall not (i) Allow or Admit any FTX.com Customer Entitlement Claim (including Eligible DM Customer Entitlement Claims and Ineligible DM Customer Entitlement Claims) unless the holder of such FTX.com Customer Entitlement Claim has Commenced KYC by the KYC Cut-off Date or (ii) pay any FTX.com Customer Entitlement Claim (including Eligible DM Customer Entitlement Claims and Ineligible DM Customer Entitlement Claims) unless and until the holder of such FTX.com Customer Entitlement Claim has satisfied the KYC Procedures in respect of itself and the Original Customer of such FTX.com Customer Entitlement Claim.

(c)    Each Party agrees to share information with the other Party concerning the KYC Procedures and any supplementary know-your-customer process from time to time to the full extent permitted under applicable Law.

(d)    In each of the Chapter 11 Cases and the DM Liquidation, except as required by applicable Law, no FTX.com Customer Entitlement Claim shall receive any distribution unless (i) the holder of such FTX.com Customer Entitlement Claims as of the KYC Cut-off Date shall have Commenced KYC by the KYC Cut-off Date and (ii) the holder of such FTX.com Customer Entitlement Claims as of the applicable distribution date shall have fully satisfied the then-applicable KYC Procedures.

## Article VI.    Representations and Warranties

The Debtors, and FTX DM severally, and not jointly, represent, warrant and covenant to the other Party that, as of the Execution Date:

(a)    To the extent applicable, it is validly existing under the Laws of the state of its organization, and this Agreement, upon approval of the Bankruptcy Court or the Bahamas Court, as applicable, is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Law relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement, the Bankruptcy Code, and the Bahamas Code, no consent or approval is required by any other Entity in order for it to effectuate the transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)    to the extent applicable, the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material

respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents; and

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the transactions contemplated by, and perform its respective obligations under, this Agreement.

## Article VII.    Stay and Resolution of Adversary Proceeding

Section 7.01    Stay of Adversary Proceeding.  Between the Execution Date and the dismissal of the Adversary Proceeding pursuant to Section 7.03, the Debtors, FTX DM and the JOLs (the "Adversary Proceeding Parties") shall procure that the Adversary Proceeding be voluntarily stayed and all actions held in abeyance pending the Bankruptcy Court's consideration of confirmation of the Chapter 11 Plan; *provided* that such stay may be terminated by either Party upon termination of this Agreement.

Section 7.02    Resolution of Adversary Proceeding.  In full and final settlement and satisfaction of the Adversary Proceeding, the Adversary Proceeding Parties agree to settle on the Final Settlement Effective Date (a) all Claims and Causes of Action between the Parties that are asserted or could have been asserted in the Adversary Proceeding and all pending litigation between the Parties on the terms set forth in this Agreement, (b) all intercompany Claims between the Parties, except as provided otherwise in this Agreement, and (c) any potential objection either Party may have to such settlement on such terms.

Section 7.03    Withdrawal with Prejudice.  No later than seven (7) days after the Final Settlement Effective Date, the Adversary Proceeding Parties shall withdraw with prejudice the Claims and counterclaims asserted in the Adversary Proceeding and seek to dismiss with prejudice any and all pending litigation between the Parties.

## Article VIII.   Termination

Section 8.01    Mutual Termination Events.  Either Party may terminate this Agreement upon prior written notice to the other Party in accordance with Section 10.12 upon the occurrence of any of the following events:

(a)     the breach in any material respect by the other Party of any of the covenants set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Global Settlement or the transactions contemplated by this Agreement, which breach remains uncured for thirty (30) Business Days after the terminating Party transmits a written notice in accordance with Section 10.12 detailing any such breach;

(b)     any representation or warranty in this Agreement made by the other Party shall have been untrue in any material respect when made or shall have become untrue in any material respect, and that would have, or could reasonably be expected to have, an adverse effect on the Global Settlement or the transactions contemplated by this Agreement, which remains uncured for thirty (30) Business Days after the terminating Party provides written notice of the

untrue nature of the representation or warranty in accordance with <u>Section 10.12</u> detailing any such untruthfulness;

(c)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order (without the prior written consent of FTX DM), (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code or (ii) terminating exclusivity under section 1121 of the Bankruptcy Code;

(d)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Global Settlement or the transactions contemplated by this Agreement and (ii) either (1) such ruling, judgment or order has been issued at the request of the non-terminating Party in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after the terminating Party transmits a written notice in accordance with <u>Section 10.12</u> hereof detailing any such issuance;

(e)     the Initial Settlement Effective Date has not occurred by January 29, 2024;

(f)     the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order reasonably acceptable to the Parties within ten (10) Business Days;

(g)     any of the Bahamas Approval Orders is reversed or vacated, and the Bahamas Court does not grant a revised Bahamas Approval Order or revised Bahamas Approval Orders (as the case may be) reasonably acceptable to the Parties within ten (10) Business Days;

(h)     any of the Chapter 11 Approval Orders is reversed or vacated, and the Bankruptcy Court does not enter a revised Chapter 11 Approval Order or revised Chapter 11 Approval Orders (as the case may be) reasonably acceptable to the Parties within ten (10) Business Days;

(i)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that an Acceptable DM Liquidation is stayed or enjoined; or

(j)     the Final Settlement Effective Date has not occurred by September 1, 2024.

Section 8.02    <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date, other than as provided by <u>Section 10.18</u>, this Agreement shall be of no further force and effect and each Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Nothing in this Agreement shall be construed as prohibiting either Party from contesting whether any such termination is in accordance with the terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.

Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against the other Party.  No purported termination of this Agreement shall be effective under this <u>Section 8.02</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Notwithstanding the foregoing or anything herein to the contrary, no Party may exercise any of its termination rights as set forth in <u>Section 8.01</u> if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement unless such failure to perform or comply arises as a result of the other Party's actions or inactions or would not otherwise give rise to a termination event in favor of the other Party.  Nothing herein, including termination of this Agreement, shall be construed as a release or waiver of any claims arising out of, resulting from or related to a breach of this Agreement by any Party.

## Article IX.    Releases

Section 9.01    <u>Mutual Releases</u>.  Subject to the occurrence of, and effective upon and after, the Final Settlement Effective Date, the Debtors, on the one hand, and FTX DM, on the other hand, on behalf of themselves, and each and all of their and their respective present and future officers, directors, agents, executors, administrators, provisional liquidators, liquidators, conservators, predecessors, successors and assigns, excluding any Excluded Party (all such releasing persons and entities collectively, the "<u>Releasing Parties</u>"), hereby fully, unconditionally and irrevocably release, relieve, waive, relinquish, remise, acquit and forever discharge each other and their respective present and future officers, directors, agents, executors, administrators, provisional liquidators, liquidators, conservators, predecessors, successors and assigns, excluding any Excluded Party (all such released persons and entities collectively, the "<u>Released Parties</u>") from, against, and in respect of any and all present and future Claims, cross-claims, counterclaims, third-party claims, demands, liabilities, obligations, debts, liens, damages, losses, costs, expenses, controversies, actions, rights, suits, assessments, penalties, charges, indemnities, guaranties, promises, commitments, or causes of action of whatsoever nature, whether based in contract, tort or otherwise, whether in law or equity and whether direct or indirect, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, that such Party may have or may have against any other Party since the beginning of time, under, arising out of or in connection with the Global Settlement or any other Claims that could be asserted, including any right to claim indemnification or an award of attorneys' fees or other costs and expenses incurred in, or in connection with the Global Settlement, in all cases other than as otherwise provided in this Agreement.

Section 9.02    <u>Exceptions to Mutual Releases</u>.  Notwithstanding any other provision of this Agreement, the Parties' respective releases do not affect their respective obligations under this Agreement, the Parties' respective rights to bring any Claims or other Causes of Action arising out of or in connection with a breach of this Agreement.

Section 9.03    <u>Incorporation</u>. FTX DM shall perform such acts as may be necessary to effectuate and give full force and effect of the releases set forth in this <u>Article IX</u> in The Bahamas.  The Debtors shall incorporate the releases set forth in this <u>Article IX</u> in the Acceptable Plan.

**Article X.    Miscellaneous**

Section 10.01  <u>Acknowledgements</u>.  Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

Section 10.02  <u>Amendment and Waivers</u>.  This Agreement may not be amended or modified, nor may any of its provisions be waived, except in writing signed by the Parties.

Section 10.03  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signature pages, and schedules attached to this Agreement is expressly incorporated into and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

Section 10.04  <u>Further Assurances</u>.  Subject to the other terms and conditions of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court or the Bahamas Court, from time to time, to effectuate the Global Settlement, the releases set forth in <u>Section 9.01</u> and any transaction contemplated by this Agreement, as applicable.

Section 10.05  <u>Complete Agreement</u>.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Existing Confidentiality Arrangement.  The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

Section 10.06  <u>Governing Law</u>.  This Agreement is to be governed by and construed in accordance with the laws of the State of New York without giving effect to its conflict of laws principles to the extent that the application of the laws of another jurisdiction would be required thereby.

Section 10.07  <u>Dispute Resolution</u>.  Each Party agrees that it shall not initiate any action or proceeding in any court or tribunal in respect of any claim arising out of or related to this Agreement without reasonable advance notice and consultation with the other Party.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in accordance with the cross-border dispute resolution protocol attached as <u>Exhibit D</u> hereto.

Section 10.08  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN

ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

Section 10.09    Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each Person executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

Section 10.10    Rules of Construction.  This Agreement is the product of negotiations among the Debtors and FTX DM, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Debtors and FTX DM were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

Section 10.11    Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable, inure for the benefit of the Released Parties in Section 9.01.  Other than with respect to Section 9.01, there are no third-party beneficiaries under this Agreement, and, except as set forth in this Agreement, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity.

Section 10.12    Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to the Debtors, to:

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attention:  Andrew G. Dietderich, James, L. Bromley, Brian D. Glueckstein and Alexa J. Kranzley
E-mail address:  dietdericha@sullcrom.com, bromleyj@sullcrom.com, gluecksteinb@sullcrom.com, and kranzleya@sullcrom.com

(b)    if to FTX DM, to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: J. Christopher Shore, Brian Pfeiffer, Jason Zakia and Brett Bakemeyer

E-mail address: cshore@whitecase.com, bpfeiffer@whitecase.com, jason.zakia@whitecase.com, and brett.bakemeyer@whitecase.com

Lennox Paton
3 Bayside Executive Park
West Bay Street & Blake Road
N-4875
Nassau, The Bahamas
Attention: Sophia Rolle-Kapousouzoglou, Marco Turnquest
E-mail address: srolle@lennoxpaton.com; mturnquest@lennoxpaton.com

Any notice given by delivery, mail, or courier shall be effective when received.

Section 10.13  <u>Admissibility</u>.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

Section 10.14  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

Section 10.15  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

Section 10.16  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

Section 10.17  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to, as applicable, the Debtors and FTX DM, submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

Section 10.18  <u>Survival</u>.  Except as expressly provided herein, <u>Section 10.05</u> (*Complete Agreement*), <u>Section 10.06</u> (*Governing Law*), <u>Section 10.07</u> (*Dispute Resolution*), <u>Section 10.11</u> (*Successors and Assigns*), <u>Section 10.12</u> (*Notices*), <u>Section 10.13</u>

(*Admissibility/FRE 408*), and <u>Section 10.15</u> (*Severability and Construction*) shall survive any termination of this Agreement.

Section 10.19  <u>Effectiveness</u>.  This Agreement shall become effective on the Initial Settlement Effective Date and shall be effective during the Agreement Effective Period.

[*Signature pages follow.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the Execution Date.

**FTX TRADING LTD., FTX**
**PROPERTY HOLDINGS LTD.,**
**WEST REALM SHIRES INC.,**
**ALAMEDA RESEARCH LLC, and**
**CLIFTON BAY INVESTMENTS,**
**for themselves and on behalf**
**of their affiliated debtors and debtors-**
**in-possession**


By _____
     Name:   John J. Ray III
     Title:    Chief Executive Officer

**FTX Digital Markets Ltd. – In Liquidation**

By    _____
Name:   Brian Simms, KC
Title:     Joint Official Liquidator of FTX Digital Markets Ltd., acting as agent and without personal liability

By    _____
Name:   Kevin Cambridge
Title:     Joint Official Liquidator of FTX Digital Markets Ltd., acting as agent and without personal liability

By    _____
Name:   Peter Greaves
Title:     Joint Official Liquidator of FTX Digital Markets Ltd., acting as agent and without personal liability

*[Signature Page to Global Settlement Agreement]*

**Exhibit A**

**DOJ Seized Accounts**

| Bank | Last 4 Digits of Account Number |
|---|---|
| Farmington State Bank d/b/a Moonstone Bank | 2685 |
| Farmington State Bank d/b/a Moonstone Bank | 2825 |
| Silvergate Bank | 2549 |
| Silvergate Bank | 2556 |
| Silvergate Bank | 2564 |
| Silvergate Bank | 0036 |
| Silvergate Bank | 0037 |

## **Exhibit B**

### **List of Specified Jurisdictions**

| | | | |
|---|---|---|---|
| 1. | Antigua and Barbuda | 23. | Dominican Republic |
| 2. | The Bahamas | 24. | Haiti |
| 3. | Barbados | 25. | Martinique |
| 4. | BVI | | |
| 5. | Cayman Islands | | |
| 6. | Dominica | | |
| 7. | Gibraltar | | |
| 8. | Hong Kong | | |
| 9. | Jamaica | | |
| 10. | Saint Lucia | | |
| 11. | St. Kitts and Nevis | | |
| 12. | St. Vincent and the Grenadines | | |
| 13. | Trinidad and Tobago | | |
| 14. | United Kingdom | | |
| 15. | Isle of Man | | |
| 16. | Anguilla | | |
| 17. | Bermuda | | |
| 18. | Turks and Caicos Islands | | |
| 19. | Jersey | | |
| 20. | Guernsey | | |
| 21. | Aruba | | |
| 22. | Cuba | | |

**Exhibit C**

**Stipulated DM Property – Allocation Upon Final Settlement Effective Date**

1.  An amount in cash to be transferred by the Debtors to FTX DM equal to $78 million *minus*, in accordance with the terms of the Advance DM Loan, the amount equal to the outstanding principal amount of the Advance DM Loan and accrued interest thereon as of the Settlement Effective Date

2.  Any and all DOJ Seized Funds that may be released by the DOJ

3.  All proceeds from the Stipulated PropCo Claim

4.  All cash currently held by FTX DM

5.  All licenses and registrations held by FTX DM under the Digital Assets and Registered Exchanges Act enacted by the Parliament of The Bahamas

6.  All DM-Controlled Recovery Actions and all the proceeds thereof

7.  FTX DM's other Claims and Causes of Action against third parties arising out of non-Dotcom Customer relationships, other than any action against any Excluded Party

8.  All of FTX DM's rights under this Agreement, including the right to receive payments from the Debtors thereunder

9.  The real property commonly known as "Blue Water", Lot A, Old Fort Bay, Nassau, New Providence, The Bahamas.

10. All the proceeds of Claims against Sam Bankman-Fried, Gary Wang, Nishad Singh or any other Person agreed between the Parties by agreement between counsel to each Party conveyed in writing (including electronic mail) between such counsel that are related to the real properties located in The Bahamas that were purchased in such individual's name; *provided* that such Claims shall constitute Debtor-Controlled Recovery Actions.

11. All Claims against any Person agreed between the Parties by agreement between counsel to each Party conveyed in writing (including electronic mail) between such counsel.

12. Other miscellaneous assets that are not real estate assets that are physically located in The Bahamas and not in the name of a Debtor (or which the Debtors provide prior written consent to the transfer to FTX DM), except that the Digital Assets held by the SCB shall constitute Stipulated Debtors Property.

13. All proceeds from the Fenwick Retainer Receivable.

14.     All proceeds from accounts or assets (other than Digital Assets) in the name of
        FTX DM.

**Exhibit D**
**Dispute Resolution Protocol**

1.      <u>Definitions</u>.  Capitalized terms used but not defined herein have the meaning set forth in the Global Settlement Agreement, dated as of December 19, 2023 (the "<u>GSA</u>"), by and among the Debtors and FTX DM acting by the JOLs as agents and without personal liability.  The following terms shall have the following definitions:

"<u>Covered Agreement</u>" means the GSA, the Properties Exclusive Sales Agency Agreement, the Advance DM Loan, and any other agreements, consents, certificates, amendments, assignments, or instruments in connection therewith or that otherwise expressly incorporate the terms of this Protocol (as defined below).

"<u>JIN Guidelines</u>" mean the Guidelines for Communication and Cooperation between Courts in Cross-Border Insolvency Matters issued by the Judicial Insolvency Network in October 2016 as reflected in Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware 9029-2.

"<u>Plan Administrator</u>" means, (a) if prior to the Plan Effective Date, the Debtors' Chief Executive Officer and (b) if on or after the Plan Effective Date, the plan administrator appointed pursuant to the terms of the Chapter 11 Plan.

2.      <u>Exclusive Mechanism</u>.  The Parties shall resolve any dispute, controversy, issue, claim, breach, enforcement or disputed termination arising out of or relating to any Covered Agreement (each, a "<u>Dispute</u>") pursuant to the terms of this Dispute Resolution Protocol (the "<u>Protocol</u>").  The procedures set forth in this Protocol shall be the exclusive mechanism for resolving any Dispute that may arise from time to time between the Parties and no Party may initiate any action or proceeding in any court in respect of any Dispute without complying with this Protocol.

3.      <u>Negotiation and Consultation without Judicial Intervention</u>.  Either Party may give written notice to the other Party of the existence of a Dispute ("<u>Dispute Notice</u>").  Promptly following the delivery of a Dispute Notice, the Parties shall attempt in good faith to resolve any Dispute set forth in the Dispute Notice without judicial intervention by negotiation and consultation between themselves, including not fewer than one in person or virtual meeting between the Plan Administrator on behalf of the Debtors and the JOLs on behalf of FTX DM.

4.      <u>Concurrent Jurisdiction Procedure</u>.  In the event that such Dispute is not resolved by the Parties within twenty (20) days after the delivery of a Dispute Notice, either Party may give written notice to the other Party of its intent to seek judicial intervention to resolve the Dispute ("<u>Judicial Intervention Notice</u>").  Following the delivery of a Judicial Intervention Notice, the Parties shall negotiate in good faith a procedure to resolve the Dispute that involves the concurrent jurisdiction of the Bankruptcy Court and the Bahamas Court and is consistent with the JIN Guidelines and applicable Law ("<u>Concurrent Jurisdiction Procedure</u>").

5.     <u>Failure to Reach Agreement on Concurrent Jurisdiction Procedure</u>.  In the event that the Parties do not reach an agreement with respect to the terms of a Concurrent Jurisdiction Procedure within twenty (20) days after the delivery of a Judicial Intervention Notice, either Party may bring any action or proceeding in respect of any Dispute in the Bankruptcy Court or the Bahamas Court.

6.     <u>Interim Measures</u>.  Each Party shall take such actions as may be reasonably necessary to preserve the *status quo* with respect to the subject matter of any *bona fide* Dispute pending resolution and either Party may make an application to any court of competent jurisdiction seeking interim measures reasonably necessary to obtain court approval of such actions from time to time.  Any Party that seeks interim measures pursuant to this section shall give prompt written notice to the other Party attaching copies of the application seeking interim measures and any supporting documents filed with the applicable court.

7.     <u>Notices</u>.  All notices given pursuant to this Protocol shall comply with <u>Section 10.12</u> of the GSA.