# EXHIBIT C

## Mendelsohn Declaration

4884-1843-6503 v.2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |

**DECLARATION OF BRUCE MENDELSOHN IN SUPPORT OF
MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING SALE OF NOTE ISSUED BY HELIX NANOTECHNOLOGIES INC.
FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES;
(II) AUTHORIZING AND APPROVING ENTRY INTO, AND PERFORMANCE
UNDER, THE PURCHASE AND SALE AGREEMENT;
AND (III) GRANTING RELATED RELIEF**

I, Bruce Mendelsohn, hereby declare as follows:

1. I am a Partner in the Advisory Group at Perella Weinberg Partners L.P. ("PWP"), a financial advisory firm that maintains an office at 767 5th Avenue, New York, New York 10153, and the Debtors' investment banker. PWP is a full-service investment banking firm providing strategic and financial advisory services, including with respect to mergers and acquisitions, capital raising and restructuring transactions across a broad range of industries. PWP and its professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in Chapter 11 proceedings.

2. I have been employed as a Partner of PWP since January 2016. I received a Bachelor of Arts degree in 1984 from Emory University and a Master of Business

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd. is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Administration in 1989 from the Wharton School at the University of Pennsylvania.

3. Prior to joining Perella Weinberg Partners, I was a Partner at Goldman Sachs where I worked from May 1998 to June 2015 and most recently served as Head of the Americas Restructuring Group and part of the U.S. Leveraged Finance team. I was named a Partner at Goldman Sachs in 2010. From 2006 to 2008, I served as Chief Underwriting Officer for North America, where I was a member of Goldman Sachs' Firmwide Capital Committee and its Special Situations Specialty Lending Investment Committee. I served as Global Head of the Special Assets and Bank Debt Portfolio groups from 2000 to 2008, and started at Goldman Sachs in the Securities Division where I spent two years working on the distressed bond and bank loan proprietary trading desks. Prior to Goldman Sachs, I worked for UBS and MJ Whitman in restructuring and distressed securities, and began my career in finance at Lehman Brothers.

4. In addition to working with the Debtors in the above-captioned cases (the "Chapter 11 Cases"), my experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations across a broad range of industries, including the chapter 11 cases of: American Tire Distributors, Bonanza Creek, Breitburn Energy, Bristow Group, California Resources Corporation, Chesapeake Energy, Cineworld Group, Crossmark Holdings, Eco-Bat Technologies, Fieldwood Energy, Garret Motion, iHeart Communications, LATAM Airlines, Memorial Production Partners, Pacific Drilling, Sanchez Energy Corporation, Seadrill, Sears, Video Equipment Rental Corporation, Windstream, and 21st Century Oncology, among others. In addition, while at Goldman Sachs, I was involved in the following bankruptcy cases: Bridge Information Systems, Brothers Gourmet Coffees, Calpine, CRC Communications, Focal Communications, General Growth Properties, Lehman Brothers, Network Plus, Nextel International, Orchard Supply, Qwest Communications and 360 Networks.

5. I submit this declaration (this "Declaration") in support of the *Motion of Debtors For Entry of an Order (i) Authorizing and Approving Sale of Note Issued by Helix Nanotechnologies Inc. Free and Clear of all Liens, Claims, Interests and Encumbrances; (ii) Authorizing and Approving Entry Into, and Performance Under, The Purchase and Sale Agreement; and (iii) Granting Related Relief* (the "Motion"). [2]

6. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge, information and belief, or my opinion based upon experience, knowledge and information concerning FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"); (ii) information learned from my review of relevant documents; and/or (iii) information supplied by members of the Debtors' management, employees of PWP working directly with me or under my supervision, direction or control, and/or from the Debtors' other professionals and advisors.

7. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being compensated for this testimony other than through payments to be received by PWP as a professional the Debtors have retained; none of those payments are specifically payable on account of this testimony. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

A. **A Sound Business Justification Exists for the Sale.**

8. I believe that Seller's entry into the Agreement represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, creditors and other parties-in-interest.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

### B. The Sale Will Produce the Highest and Best Offer.

9. PWP was engaged by the Debtors effective November 16, 2022 to provide financial advisory, restructuring, financing and sale services to the Debtors during these Chapter 11 Cases. PWP has assisted the Debtors in their exploration and evaluation of strategic alternatives to maximize the value of, and monetize, their diverse, global assets. This has included a review of documents regarding the Debtors' businesses and investments, discussions with management of the Debtors, discussions with businesses in which the Debtors have made investments, and coordinating and initiating discussions with potential purchasers.

10. Following a strategic review, the Debtors decided to monetize the Note through a private sale process in consideration of, among other things, the existence of an offer for the Note from Purchasers at an attractive value, which value is a significant portion of the value that the Debtors paid for such Note. In evaluating this sale, the Debtors considered the value of the Note, the ability for the Debtors to be able to monetize or otherwise get repaid on the Note, and the offer from Purchaser. PWP designed a process to maximize the value received for the Note, taking into account the Debtors' business judgment that a consensual sale process would maximize potential value. The terms of the Agreement direct the Subject Company to work cooperate with the Debtors to accommodate a market check for the Note following execution of the Agreement, including by lifting certain transfer restrictions under the terms of the Note that might otherwise limit a potential sale of the Note to a third party and certain "go-shop" provisions, which will allow the Debtors to market the Note to potential alternative purchasers. This will allow the Seller to confirm prior to the Sale Hearing that there are no competing offers that would provide additional value and, in the event there are competing offers, gives Debtors greater freedom to complete a sale of the Note to a third party than would otherwise be available under the terms of the Agreement.

11. The Debtors expect to continue marketing the Note over the course of the coming weeks to confirm that no higher and better offer exists. As a result, the Debtors believe the Agreement facilitates the Debtors obtaining both the certainty of a transaction and maximum value for the Debtors' estates.

12. After extensive arms'-length negotiations, Seller and Purchasers entered into that certain Purchase and Sale Agreement, dated as of January 4, 2024 (the "Agreement"), whereby Purchasers agreed to purchase the Note for the sum of (i) an upfront purchase price equal to $5,000,000 (the "Upfront Purchase Price") and (ii) either (x) a deferred payment amount equal to $3,000,000 or (y) the return of the Note in part to Seller in a principal amount equal to 37.5% of the original principal amount of the Note, plus 37.5% of any interest that accrued pursuant to the terms set forth in the Note (the "Deferred Consideration", together with the Upfront Purchase Price, the "Purchase Price").

13. Based on my experience, involvement in the process and review of available alternatives, it is my opinion that there is no better or higher offer currently available for the Note, and that the Agreement facilitates the Debtors seeking a higher or better offer, or confirming that none exists prior to consummation of the Agreement. I believe that all interested persons and entities have been or will be afforded a full, fair and reasonable opportunity to (i) make a higher or better offer to purchase the Note, and (ii) object or be heard with respect to the Sale Motion.

C. **The Sale Will Produce a Fair and Reasonable Price for the Note.**

14. I believe that the Purchase Price for the Note contemplated by the Agreement is fair and reasonable. The Debtors, with the assistance of PWP, ensured that sale of the Note would reflect its fair market value by marketing the Note and conducting arm's-length negotiations.

15. The Upfront Purchase Price is equal to 50% of the original principal amount of the Note, and the Purchase Price (including the Deferred Consideration) is equal to either 80% or greater than 87.5% of the outstanding principal amount of the Note.

16. Pursuant to the Agreement, the Purchase Price is subject to higher or better offers from any third party in the form of an "Alternative Transaction", and a "fiduciary out" which provides that the Agreement can be terminated by the boards of directors (or similar governing bodies) of Seller if it is determined to be inconsistent with the fiduciary duties of the boards of directors (or similar governing bodies). If an Alternative Transaction is received by the Debtors, Seller has the right, but not the obligation, to terminate the Agreement upon entering into a definitive agreement with respect to such Alternative Transaction.

17. I believe that a longer process or the implementation of formal bidding procedures for the sale of the Note would not have resulted in a higher or better value to the estate. A private sale enabled the Debtors to avoid the additional costs, expenses, time and risks associated with a formal bidding and sale process. In addition, selling the Note now will ensure that the Debtors receive value for the Note and will protect the Debtors against any near term change in circumstances of the Purchaser. I believe that selling the Note in a private sale is the most efficient and cost-effective means of minimizing costs to the estate while maximizing the value for the benefit of the estate.

18. In my role as the Debtors' financial advisor, I reviewed the Agreement and based on my experience, believe the Agreement is the result of extensive, arm's-length and good-faith negotiations between the parties, and that such negotiations were free of any collusion.

### D. The Sale of the Note Should be Made Free and Clear of Any Liens, Including Successor Liability.

19. No Purchaser is a successor to or substantial continuation of the Debtors or their estates and there is no continuity of enterprise between any Purchaser and the Debtors as a result of any action taken in connection with the Sale Transaction. It is my understanding that no Purchaser is holding itself out to the public as a continuation of the Debtors based on the Sale Transaction or the Agreement. The Sale Transaction does not amount to a consolidation, succession, merger, or de facto merger of any Purchaser and the Debtors and/or the Debtors' estates.

20. Moreover, I believe that not transferring the Note free and clear of all Liens (other than Permitted Encumbrances) would adversely affect the Debtors' efforts to maximize the value of the Note. I believe that no Purchaser would have entered into the Agreement and would not consummate the transactions contemplated thereby if the sale of the Note was not free and clear of all Liens (other than Permitted Encumbrances), or if such Purchaser would, or in the future could, be liable for any such interests.

### E. The Mutual Release Should be Approved.

21. It is my belief that the mutual release of all claims, causes of actions (including all avoidance actions), liens, rights and remedies entered into by Seller and Purchasers in respect of the acquisition or ownership of the Note should be approved. It is my belief that the inclusion of the mutual release among Seller and Purchasers pursuant to section 7.4 of the Agreement is a necessary and integral part of each Purchaser's consummation of the Sale Transaction and the scope of such mutual release is appropriately tailored under the facts and circumstances. The mutual release is: (a) in exchange for the good and valuable consideration provided by Seller and each Purchaser; (b) a good faith settlement and compromise of the claims,

causes of action, Liens, rights and remedies released by such releases; (c) in the best interests of the Debtors and all holders of claims and interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their estates asserting any claim or cause of action (including all avoidance actions) released pursuant to such release.

22. Accordingly, for the foregoing reasons, I believe that the Agreement represents the highest and best offer for the Note and that the sale of the Note to Purchasers pursuant to the Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 4, 2024.

*/s/ Bruce Mendelsohn*
Bruce Mendelsohn
Partner
Perella Weinberg Partners L.P.