[Date: 03/01/2024]

RECEIVED

2024 JAN -5  AM 11: 32

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

The Honorable Judge John Dorsey

824 N. Market Street, Courtroom 5, 5th Floor

Wilmington, DE 19801

United States

(302) 533 - 3169.

**RE: Objection to motion of Debtors Estimate Claims based on digital assets, Case No. 22-11068
(JTD), Hearing Date: January 25,2024 at 10am (EST)**

**Dear Judge Dorsey,**

I am writing to express a formal objection to the debtor's request for an order to estimate claims,
including Customer Entitlement claims, based on the figures in the digital assets conversions table.
My concerns lie in the methodologies applied, as well as the equitable treatment of assets that were
under custodianship, not property of the debtor. This letter aims to succinctly outline the issues
inherent in the current proposal.

I represent Nugenesis Ou and Nugenesis PTY LTD, along with all its congregates and affiliated users
and holders adversely impacted by this matter. Our collective claim exceeds $64,400,000,
comprising various cryptocurrencies, primarily Nucoin. It is noteworthy that the debtor has
proposed to liquidate Nucoin at a valuation of zero, a point of significant contention.

**My standing**

Before proceeding, allow me to introduce myself. I am Hussein Faraj, a core founder of NuGenesis
Networks, Nugenesis Media Hubs, Nucoin, Metalabs Global, and several other blockchain and AI
initiatives. My expertise in the digital asset domain is rooted in over a decade of leading one of the
most extensive Research and Development branches in this field. This includes extensive field
training, mentoring over 100 trainees in blockchain architecture and tokenomics, and co-designing
an Artificial Intelligence system capable of predicting BTC and ETH market prices with 98% accuracy
within a four-hour window. My proficiency in evaluating cryptocurrency assets and understanding
market dynamics is globally recognized and highly esteemed.

Notably, I recently participated in the Celsius case, presented before the honorable Judge Glen. My
testimony, drawing from my in-depth knowledge of valuing assets in the digital space, was
acknowledged as expert evidence.

1

Upon thorough review of the debtor's submission, I must express significant concerns regarding the methodologies employed in asset valuation. The methodologies outlined fail to meet any recognized standards within the digital asset space. Specifically, if the debtor intended to use a 'fair value assessment', the indicated prices fall notably short of what would be considered fair appraisals by any accepted industry standard. The approach appears to be arbitrary and lacks recognizable methodology.

Furthermore, the debtor's request omits several critical aspects, which I will elucidate in subsequent parts of this submission.

In the context of FTX and its associated entities, there are distinct categories of assets that, by any standard valuation methodology, should not be uniformly appraised. This principle aligns with the findings in the Celsius case adjudicated by the Honorable Judge Glenn.

**Our assets were held in custody**

The primary distinction lies between custodianship and non-custodianship accounts. Under the Terms of Service (ToS), specifically Clause 8.2.6 of FTX, the treatment of crypto assets held in custody is clearly defined:

A) The title to digital assets remains at all times with the user, with no transfer of ownership to FTX Trading.

B) Digital assets in a user's account are not considered property of, nor are they subject to be loaned to, FTX Trading. FTX Trading explicitly does not treat or regard the digital assets in a user's account as belonging to FTX Trading.

This differentiation is crucial in assessing the valuation and treatment of these assets within the FTX framework.

The distinction regarding custody is paramount and must be treated separately from other forms of assets held by FTX. This includes digital assets that were loaned but not executed, where ownership unequivocally remained with the lender. Under no fair value assessment methodology can it be deemed acceptable to liquidate such assets, penalizing users who never consented to the use of their assets by FTX or any of its associated entities. The unilateral action of liquidating these assets without user approval contravenes basic principles of asset custody and ownership rights.

2

**Dislocated market approach is perverted**

This situation further raises the issue of dislocated market analysis, a factor prominently considered in the Celsius case when valuing the Cel token. The Honorable Judge Glenn accepted the argument that the token's market value at the petition date was not a true representation of its worth due to market manipulation. However, the circumstances surrounding FTX and its associated companies are markedly different. The alleged illegal activities by FTX, involving the use of assets not owned by them to suppress or manipulate the value of certain cryptocurrencies, led to a dislocated market. This artificial suppression suggests that the true value of these affected assets would have been significantly higher had these incidents or market manipulations not occurred.

As established by Judge Glenn in the Celsius bankruptcy matter, market data influenced by such abnormal factors should not be used for asset valuation. Consequently, if a fair value assessment were to be applied, the value of these digital assets would be considerably higher than their values on the petition date.

**The petition date open market price is preferred**

Should the court elect to adhere to the petition date values as the appropriate methodology for this case, foregoing a fair value assessment, then it logically follows that any subsequent actions such as discounting or liquidating any token or coin based on alternate methodologies would be untenable. The selective application of different valuation methodologies, as and when convenient, undermines the integrity of the valuation process. Digital asset valuations must adhere consistently to their designated methodologies, ensuring fairness and uniformity in their application.

In my professional opinion, accounts held in custody should be given precedence over any claims against the debtor. Consequently, it is my recommendation that the court should not endorse the Debtor's Motion to estimate the claims as currently proposed. This stance is informed by the principles of asset ownership and custodial responsibilities, which are fundamental to the integrity of digital asset management and the equitable treatment of all parties involved.

**Our active role in exposing through investigation, The FTX Alameda Fraud**

NuGenesis, through its investigative branch, Inside Crypto, played a pivotal role in exposing the alleged criminal activities of Sam Bankman-Fried (SBF) and his associates related to FTX. Our team conducted extensive internal investigations, leveraging insider information and monitoring FTX network activities for approximately six months prior to its collapse. Our efforts led to the discovery and tracing of numerous asset movements and investments made by the group of companies.

Immediately following the collapse of FTX, NuGenesis disseminated this critical data, providing guidance on understanding the FTX debacle. We compiled substantial evidence, including video admissions, to further this cause. Despite several offers, which we perceived as bribes to cease our investigations, we remained steadfast, believing in the exposure of what we suspected to be a $26 billion fraud.

Our extensive research yielded a comprehensive list of investments and financial maneuvers made by the involved parties. Contrary to the debtor's claim of necessitating currency devaluation for distribution purposes, our findings, largely verified for accuracy, suggest otherwise. We propose that if the debtor were to focus on existing assets, including potential clawbacks including Binance clawback, in which the repayment made to Binance was through customer funds, they would likely realize a surplus. Thus, the rush to devalue cryptocurrencies appears unjustified at this stage. Attached is a spreadsheet detailing our findings, supporting our position against the proposed devaluation.

Regarding Nucoin, it's important to clarify its status and handling by the debtor. Nucoin was held by the debtor under a market maker agreement, wherein ownership of the asset remained with NuGenesis Network and its users until the contract's execution and full payment for the assets were made.

**Valuation based on cost of investment and build**

Beyond the issue of damages, the rights of NuGenesis users and network in valuing Nucoin (NUC) must be recognized. The debtor's motion to liquidate NUC at zero value is fundamentally flawed. NuGenesis, as one of the pioneers in the blockchain space, has never conducted an ICO, IEO, or any form of presale that could categorize NuGenesis Network as a speculative security. Over a decade was invested in developing and launching our comprehensive technology, which played a critical role in exposing the alleged crimes of FTX and its affiliates.

The liquidity held by the debtor represents over $30 million in labor and financial investment. With more than 450 user miner accounts and over 7500 basic user accounts, the asset was loaned to Alameda Research and held on Liquid Japan. Nucoin, as a service coin, grants users explicit rights to all technologies under the NuGenesis Networks, including but not limited to major crypto news platforms, Blockchain-as-a-Service platforms, and various services like NFTCity, which are accessible to coin holders.

Therefore, the proposed liquidation of NUC at zero value by the debtor not only undermines the inherent value of these extensive investments and technologies but also disregards the rightful claims of NuGenesis users and the network.

4

In addressing the matter of value assessment before the court today, I wish to succinctly highlight a critical point regarding the proposed devaluation of Nucoin (NUC) to zero by the debtor, which, in my view, lacks any justifiable basis.

NuGenesis has always upheld principles of transparency and organic growth in the digital asset market. We neither engaged in nor authorized market manipulation, wash trading, or any practices to artificially inflate trade volumes. Our commitment to open, fair, and natural market evolution is fundamental. Consequently, Nucoin was never a property of the Debtor or any affiliated companies; it was provided on a loan basis, with the understanding of full payment in accordance with our market maker agreement.

Repeated demands for the return of these assets were made by NuGenesis, but these requests were not fulfilled. The sale of Nuc on Liquid by Alameda Research, which benefited from these transactions, should not result in penalizing users who chose NUC as their preferred digital asset. These users, including over 450 miners, who contributed to minting NUC, provided the liquidity for the loan to Alameda Research. Approving the Debtor's request would unjustly penalize these individuals and undermine their contributions and investments in NUC. It would also penalise over 7570 users.

Therefore, I urge the court to consider the implications of approving the debtor's request on the NuGenesis community and reject any motion to devalue Nucoin to zero.

**The market making agreement that took custody of our assets**

Regarding the contractual basis of our relationship with Alameda Research, I would like to draw the court's attention to key provisions within the agreement, specifically documented in the DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D.

Section 3 of the agreement, titled "LOAN," outlines the terms under which NuGenesis PTY ltd provided loans to Alameda Research Limited. It specifies the procedure for loan provision, interest accrual, repayment, and conditions under which the loan may be terminated. Of particular relevance is Section 3(f), which details events of default, including the failure of the Market Maker to return loaned assets and any material default in the performance of any agreement provisions.

Crucially, under Section 3(F)(iii), in the event of bankruptcy or similar proceedings, the obligations towards NuGenesis regarding the loan remain intact and enforceable. This means that despite the bankruptcy proceedings involving Alameda Research, the loaned assets are still legally owned by and payable to NuGenesis.

5

Further, Section 4 of the agreement builds upon these terms, providing additional stipulations regarding the handling of these loaned assets.

In light of these contractual provisions, NuGenesis asserts its legal rights to the loaned assets and accrued interests, as per the agreement's terms, notwithstanding the bankruptcy proceedings of Alameda Research. This contractual obligation must be duly considered in any valuation or liquidation proposals presented to the court.

The terms outlined in Section 4, titled "OPTION," of the agreement between NuGenesis and Alameda Research are of significant relevance. This section delineates the Market Maker's options upon the Maturity Date of the loan. Specifically, it allows the Market Maker to either repay the loan as per Section 3(d) or to purchase the loaned tokens, either partially or in full, from NuGenesis at a pre-determined price. It is crucial to note that the Market Maker is obligated to make payment in USDC within 24 hours of exercising this option.

Moreover, the execution of this option entails the transfer of all rights, title, and interest in the purchased tokens from NuGenesis to the Market Maker. NuGenesis, as the customer, has confirmed its lawful ownership of these tokens, ensuring that they are free from any security interests, liens, or other encumbrances. However, it is important to highlight that this option is contingent upon the agreement not being terminated by NuGenesis pursuant to Section 5(a) and remaining in effect for a minimum of twelve months from its inception or the provision of the applicable loan.

In the context of the ongoing matter, it is pertinent to stress that the debtor's claim over the asset is conditional upon the full payment of the asset. Until such payment is made, the asset remains the property of NuGenesis. NuGenesis had made multiple requests for the return of its assets prior to the petition date, which Alameda Research failed to fulfill.

Furthermore, the agreement includes specific terms regarding indemnification, as detailed in Section 9, which should be carefully considered in the context of this case.

In light of these contractual provisions, it is evident that NuGenesis retains significant rights and claims over the assets in question, and these must be duly recognized and considered in any decision-making process by the court.

Section 9 of our agreement, titled "INDEMNIFICATION," warrants particular attention in this context. This clause stipulates that the customer (NuGenesis) will indemnify the market maker, except in cases where liability, loss, or damage results from the market maker's gross negligence, willful misconduct, or fraud.

In the current situation, NuGenesis asserts that gross negligence and fraudulent activities were conducted by the market maker, Alameda Research. We have substantial evidence supporting these allegations, which includes admissions of such misconduct by the market maker. Consequently, based on the provisions of Section 9, Alameda Research cannot claim indemnification under this agreement.

This situation underscores the legal responsibility of Alameda Research for its actions and its non-exemption from liability due to its admitted gross negligence and fraudulent conduct. Therefore, any claims by Alameda Research for indemnification in this regard should be considered invalid and inapplicable, as per the contractual terms agreed upon by both parties.

Schedule B of the market making agreement, dated January 6, 2022, between Alameda Research ("Borrower") and NuGenesis Pty Ltd ("Lender"), is pivotal in this discussion. This schedule, which forms part of the overarching Market Making Agreement, details the specific terms of the token loan and option agreement regarding Nucoin (NUC). As per the agreement, the total liability under this arrangement amounts to $64,400,000 USD for 200 million NUC tokens, with varying option prices ranging from $0.01 to $1.00 per token.

The failure of Alameda Research to return the loaned liquidity has rendered the planned payments for exchange listings and trades untenable. The subsequent market actions by Alameda Research, including the dumping of Nucoin and the alleged fraud and negligence by Alameda Research and Liquid Japan, have severely impacted the NuGenesis network and its stakeholders.

Approving the debtor's request to liquidate Nucoin's value would not only undermine NuGenesis's financial stability but also unjustly penalize its vast user base and the over 7500 individuals who contributed to the growth of the network. NuGenesis, was on the cusp of becoming one of the top 10 platforms by 2024, has developed groundbreaking technologies and was in the process of establishing the world's largest digital asset-based city in Farley, NSW, Australia. The repercussions of the FTX collapse and related actions have already forced NuGenesis to shut down its global operations, halt its projects, and abandon years of development work.

**The plea to this court**

Therefore, I respectfully urge Your Honor to consider the severe consequences of liquidating Nucoin's value on NuGenesis and its community. The approval of the debtor's request to liquidate NUC would be detrimental, not only to our company but also to the hundreds of people who have invested their time and resources in our network.

In conclusion, we respectfully request the Honorable Judge John Dorsey to consider the broader implications of liquidating Nucoin (NUC) held both by customers on the platforms and owed to

NuGenesis Network. Liquidating these assets without a substantiated basis would not only be unjust but could potentially lead to the collapse of the entire NuGenesis Network.

While NuGenesis is actively pursuing separate legal action against the debtor for alleged fraud, this does not diminish the debtor's financial obligations to NuGenesis Network. For the court's reference, a copy of the Market Making (MM) agreement will be attached to this submission.

In summary, On a broader assessment, The approval of the debtor's motion would have far-reaching and detrimental effects on millions of retail customers, many of whom have already endured significant hardship and stress due to the actions of FTX and its associated entities. The presence of the ADHOC committee, although well-intentioned, does not fully represent the interests of customer claimants holding specific digital assets. This situation presents a dilemma where the interests of investors and customers may diverge significantly.

We urge the court to weigh these considerations carefully, recognizing the profound impact this ruling will have on countless individuals. The decision should reflect not only the appropriate legal and valuation methodologies but also the principles of equity and justice. Accepting the debtor's motion without thorough consideration of these factors would set a precedent of arbitrary valuation, devoid of solid grounding in either principle or practice.

Furthermore, we highlight that there are still substantial assets within the broad investment portfolio of FTX and its associated companies. To precipitously devalue user assets before exploring all other avenues of redress would be an injustice.

As an expert in the field and a party directly affected by the actions of the debtor, I bring to the court's attention the failure to apply appropriate valuation methodologies, the oversight of custodial and loan agreements, and the neglect of fair value principles, including those concerning dislocated markets.

This ruling bears the weight of determining the futures of millions. It is therefore imperative that the court addresses the core legal questions and methodologies with the utmost care and consideration.

In conclusion, this submission has emphasized the vital importance of safeguarding not only the interests of NuGenesis Network but also those of the broader community of digital asset holders impacted by the debtor's proposed actions. Our arguments against the liquidation of Nucoin highlight a commitment to fairness, transparency, and the rightful recognition of custody and loan agreements. The decision the court faces extends beyond the confines of a single entity; it is a decision that will resonate across the entire digital asset community, affecting the lives and investments of millions. Therefore, we respectfully urge the Honorable Judge to consider the wider implications of this case and to deny the debtor's motion for liquidation. Such a decision would not

only serve the interests of justice for NuGenesis but also set a precedent that upholds the integrity and stability of the digital asset market as a whole.

Respectfully,

[Hussein Faraj, NuGenesis

3/01/ 2024.
admin @advagroup .com. au

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

## MARKET MAKING AGREEMENT

**THIS AGREEMENT** (this "*Agreement*") is made effective as of January 5, 2022 (the "*Effective Date*") by and between Alameda Research Limited, a company limited by shares with a registered address at Tortola Pier Park, Building 1 Second Floor, Wickhams Cay I, Road Town, Tortola, British Virgin Islands ("*Market Maker*") and NuGenesis Pty Ltd, a company with a registered address at 632 Forest Road Bexley, New South Wales, Australia (the "*Customer*"). Market Maker and Customer may be referred to herein as a "*Party*", and together, the "*Parties*".

WHEREAS, Market Maker is a specialist (including its affiliates) in providing liquidity in markets for tokens across different exchanges;

WHEREAS, Customer has issued or intends to issue a token to operationalize its protocol and seeks to improve liquidity (the "*Tokens*"); and

WHEREAS, the Customer wishes to engage the services of Market Maker on the terms and for the consideration as set forth below (the "*Services*").

NOW, THEREFORE, in consideration of the promises and the mutual covenants, terms and conditions hereinafter set forth, and for other good and valuable consideration, receipt of which is specifically acknowledged, the parties hereto hereby agree as follows:

### Section 1. MARKET MAKER SERVICES

**(a) Market Operations & Trading.** Market Maker will quote the Tokens on each Applicable Exchange and stated market, to be amended from time to time, with a bid/offer spread of no more than **100** basis points, at least **90%** of the time. In terms of market depth, **min($20k, 200k tokens)** should be within 2% of the best bid/offer.

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

Market Maker's quoting performance shall be measured each calendar week. If Market Maker fails to meet these quoting requirements for two consecutive calendar weeks, then Customer shall have the remedies set forth in Section 5(c) below, as well as any other available remedies at equity or at law. Such efforts will include the use of Market Maker's proprietary trading bot in accordance with a strategy crafted by Market Maker to add liquidity to any applicable markets. Market Maker will have sole discretion to craft such strategy and operate its trading bot in accordance with what Market Maker deems to be the most effective and efficient way to increase liquidity and to balance the order book. As such the liquidity provided by Market Maker may not be symmetric and there will be occasions in which Market Maker will place more bids than offers and vice versa.

**(b) Commencement.** Market Maker shall provide the services set forth in this Section 1 upon the date that is the later of: (i) the date that is five days from the Effective Date; (ii) the date following the day of receipt of the applicable Loan as set forth in Section 3 below; and (iii) the date on which the Tokens are listed for trading on an Applicable Exchange.

**Section 2. [RESERVED]**

[Reserved for input from counterparty, if any]

**Section 3. LOAN**

**(a) Loan.** Subject to the terms and conditions set forth herein, Customer shall provide one or more Loan(s) to Market Maker of the Tokens (the "*Loaned Assets*") pursuant to and with additional terms as set forth in a Term Sheet in substantially the same form as attached hereto as Exhibit A ("*Term Sheet*").

**(b) Interest.** The Loan(s) shall bear an interest rate as set forth in the applicable Term Sheet, accrued and payable on the date set forth in the applicable Term Sheet (the "*Maturity Date*").

**(c) Loan Procedure.** A Loan will commence upon the date funds are received by Market Maker, and in no case later than the date that is the later of: (i) the date that is 5 business days from the

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

Effective Date; and (ii) the date on which the Tokens are listed for trading on any Applicable Exchange.

**(d) Loan Repayment Procedure.** Unless otherwise specified in Section 4 below, upon the Maturity Date Market Maker shall repay the entirety of the applicable Loan and all accrued and unpaid interest to Customer by 11pm HKT, directly to a wallet address or bank account, as applicable, designated by Customer.

**(e) Termination of Loan.**

The applicable Loan will terminate upon the earlier of:

> (i)      the Maturity Date;

> (ii)     the exercise of the Option as set forth in Section 4; or

> (iii)    the occurrence of an Event of Default as defined in Section 3(f) if Customer elects to terminate a Loan.

In the event of a termination of any Loan, any Loaned Assets shall be redelivered immediately and any accrued and unpaid interest as well as any fees owed shall be payable immediately to Customer.

**(f) Event of Default.** The following shall be events of default and cause a Loan and all accrued and unpaid interest to be immediately due and payable.

> (i)      the failure of Market Maker to return any and all Loaned Assets upon termination of any Loan; *provided*, *however*, that Market Maker shall have one (1) business day to cure such default;

(ii)    a material default by Market Maker in the performance of any other provision of this Agreement, including without limitation a failure by Market Maker to abide by its obligations in Section 1 of this Agreement and Market Maker's failure to cure such material default within five (5) business days;

(iii)    any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings.

## Section 4. OPTION

Upon the Maturity Date, Market Maker will have the option to either repay the applicable Loan as per Section 3(d) or purchase the applicable loaned Tokens, in whole or in part, from Customer at the price set forth in the applicable schedule. If Market Maker chooses to execute the Option, it will make payment in USDC within 24 hours of such exercise. If Market Maker exercises the Option, Market Maker shall assume all of the rights, title, and interest in and attached to such Tokens purchased from Customer. Customer confirms that it is the lawful owner of such Tokens with good, legal, and marketable title thereto, and Customer has the absolute right to sell, assign, convey, transfer and deliver such Tokens. Such Tokens are free and clear of any and all security interests, liens, pledges, claims (whether pending, prospective or cognizable), charges, escrows, encumbrances or similar rights. For the avoidance of doubt, unless this Agreement is voluntarily terminated by Customer pursuant to Section [5(a)], if this Agreement is terminated prior to twelve (12) months from the date hereof, or the provision of the applicable Loan, the applicable Option will terminate and no longer be exercisable.

The Option may also be exercised prior to the Maturity Date, at the Market Maker's discretion.

## Section 5. TERM, TERMINATION & REMEDIES

**(a) Term & Voluntary Termination.** This Agreement will commence on the Effective Date and terminate twelve (12) months thereafter (the "**Term**"). Either Party may terminate this Agreement

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

upon thirty (30) days written notice to the other Party, however, if the Agreement is terminated by Customer, unless there is an Event of Default or a termination of a Loan pursuant to Section [5(c)], such Loan and applicable Option shall continue until the Maturity Date or otherwise pursuant to the terms herein. If the agreement is voluntarily terminated by Market Maker, the applicable Option will terminate and no longer be exercisable, and the Loan shall be due on the earlier of: the Maturity date, or 30 days after the notice of termination.

**(b) Termination.**

    (i)      Customer may terminate this Agreement for cause and without providing any prior notice upon the following:

        a.  Market Maker materially breaches any of the terms herein, following the receipt of notice and a two-week cure period.

        b.  Market Maker materially breaches Section 6 hereof.

    (ii)     Market Maker may terminate this Agreement for cause and without providing notice upon any of the following:

        a.  Customer fails to extend a loan in a timely manner for the tokens specified in the appropriate schedule.

        b.  Customer materially breaches Section 6 hereof.

**(c) Certain Remedies.** Upon the failure of Market Maker to meet its quote obligations as set forth herein for two consecutive calendar weeks, Customer may take any or all of the following actions)

terminate the applicable Loan early by providing notice to Market Maker no later than seven (7) days after Market Maker's failure to perform. Upon receipt of such an early termination notification, Market Maker shall have until the end of the second business day after the notification to repay such Loan and any accrued and unpaid interest;

      (i)        not honor the full option quantity, prorated for the period in which such obligations were not met; and

      (ii)      terminate this Agreement upon written notice.

The remedies listed herein are not exclusive and do not preempt the use of any other remedy available at equity or at law, unless otherwise waived herein.

### Section 6. CONFIDENTIALITY

**a) Use of Confidential Information.** The Parties may, from time to time, disclose Confidential Information to one another. Accordingly, each Party agrees as the recipient (the "*Receiving Party*") to keep strictly confidential all Confidential Information provided by the other party (the "*Disclosing Party*"), whether or not such information was specifically labeled or stated to be confidential, secret or otherwise similarly designated. The Receiving Party further agrees to use the Confidential Information of the Disclosing Party solely for the purposes of fulfilling its obligations under this Agreement. The Receiving Party may not use for its own benefit or otherwise disclose any of the Confidential Information of the Disclosing Party or for any other purpose.

**(b) Definition of Confidential Information.** "*Confidential Information*" means, subject to Section 6(a), information in any form, oral, graphic, written, electronic, machine-readable or hard copy consisting of (i) any non-public information provided by the Disclosing Party, including but not limited to, all of its inventions, designs, data, source and object code, program interfaces, know-how, trade secrets, techniques, ideas, discoveries, marketing and business plans, pricing, profit margins, and/or similar information or (ii) any information which the Disclosing Party identifies as confidential information or the Receiving Party should understand from the context of the disclosure, to be confidential information. Confidential Information also includes this Agreement and the fact of its existence.

**(c) Scope.** The obligations of this Section 6, including the restrictions on disclosure and use, shall not apply with respect to any Confidential Information received by Customer to the extent Customer determines in good faith that it is necessary or advisable to disclose such Confidential Information pursuant to a governmental or regulatory process.

**(d) Time Limitations.** The provisions of this Section 6 will remain in force and effect for one year after the termination of this Agreement; *provided* that the protections of subsection (a) above shall apply to any Confidential Information that constitutes a trade secret of one of the Parties for so long as such Confidential Information remains a trade secret.

### Section 7. REPRESENTATIONS AND WARRANTIES

#### a) Mutual Representations & Warranties

Each Party represents, warrants and covenants to the other Party that:

     (i)     it has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder, including all required licenses and approvals as may be necessary;

     (ii)     it has duly executed and delivered this Agreement; and

     (iii)     this Agreement constitutes a valid and legally binding obligation of such Party, enforceable in accordance with its terms.

#### (b) Market Maker Representations and Warranties

Market Maker represents, warrants and covenants to Customer that:

(i)     Market Maker will perform all its activities in a workmanlike manner and will use commercially reasonable efforts to provide the Services and Market Maker will comply with laws applicable to its business conduct; however, Market Maker provides no warranty as to the ultimate performance of the price of the Tokens and makes no representation that the Tokens will or will not achieve certain volume targets, nor does Market Maker make any promise or guarantee that it can get or keep the Tokens listed on any exchange or platform.

(ii)    Market Maker will not engage in any actions taken by a market participant or a person acting in concert with a market participant which are intended to (A) deceive or mislead other market participants; (B) artificially control or manipulate the price or trading volume of the Tokens or trading assets; (C) aid, abet, enable, finance, support, or endorse any of foregoing activity (such activity, "**Market Manipulation**"). Market Manipulation specifically includes, without limitation, front running, wash trading, spoofing, layering, churning and quote stuffing, but does not include customary market-making activities.

(iii)    Market Maker will comply, and Market Maker's affiliates and any persons acting on Market Maker's or Market Maker's affiliates' behalf will comply, at all times with all laws, statutes and regulations relating to anti-money laundering, countering the financing of terrorism, sanctions, anti-bribery and anti-corruption under all laws applicable to it or them (as the case may be).

**(c) Customer Representations and Warranties**. Customer represents and warrants that it has used its best efforts to conduct a legal analysis of the Tokens and that it has determined and that the Tokens do not constitute securities and in all respects the Tokens are being purchased for their utility on the applicable network protocol.

### Section 8. LIMITATION ON LIABILITY

Customer agrees and acknowledges that Market Maker is not responsible for the ultimate performance of the Tokens on the market. Customer agrees to hold Market Maker harmless for any price fluctuations or price depreciation of the Tokens during the Term of this Agreement, other than such fluctuations or depreciation caused by the gross negligence, willful misconduct or fraud of Market Maker. Customer also agrees to hold Market Maker harmless in the event that the

Tokens are delisted from any exchange or platform, other than due to the gross negligence, willful misconduct or fraud of Market Maker.

While Market Maker will use commercially reasonable efforts to vet any such online trading platform for adequate security, Customer agrees to hold Market Maker harmless in the event such trading platform experiences a loss of funds that is outside of Market Maker's control (including but not limited to a hacking incident or security breach) for any damage in excess of the outstanding amount of the applicable Loan and any accrued and unpaid interest. In the event any sum of Customer's funds are lost due to an insolvency issue at any such online trading platform, which insolvency issue occurred through no fault of Market Maker, which shall be deemed to occur wherein such online trading platform will not return funds within thirty (30) days of a request made in writing by Market Maker, Market Maker will have the right to transfer to Customer any claim or portion of a claim it has against such trading platform as such claim relates to Customer's funds. Market Maker will execute any required paperwork to facilitate such transfer; after such transfer Market Maker will cooperate fully with Customer to sign any additional documents or provide any requested information to facilitate Customer's claim.

## Section 9. INDEMNIFICATION

Except to the extent that any liability, loss, penalty or damage is caused by gross negligence, willful misconduct or fraud on the part of Market Maker, Customer will defend, indemnify and hold harmless Market Maker and its affiliates (and each of their employees, shareholders, directors and representatives) for any penalty, claim or loss to the extent any such penalty, loss or claim that arises based on a final determination of a court of competent jurisdiction finding the Tokens to be a financial instrument that required registration, including but not limited to a security, in an applicable jurisdiction, or otherwise that the Tokens or the activities of Customer are unlawful under applicable law.

## Section 10. ARBITRATION

Any dispute, controversy or claim arising out of or relating to this contract, or the breach termination or invalidity thereof, shall be settled by arbitration administered by Judicial Arbitration and Mediation Services, Inc. under its commercial arbitration rules. the number of arbitrators shall be one. The place of arbitration shall be New South Wales, Australia. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. This Section 10 is subject to Section 17 below.

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

## Section 11. GOVERNING LAW

This Agreement will be governed by and construed and interpreted in accordance with the laws of New South Wales, Australia, without giving effect to choice of law provisions. Each party waives any right it may have to assert the doctrine of *forum non conveniens*, to assert that it is not subject to the jurisdiction of such arbitration or courts or to object to venue to the extent any proceeding is brought in accordance herewith.

## Section 12. ENTIRE AGREEMENT

This Agreement supersedes and cancels any and all prior agreements between the parties hereto, express or implied, relating to the subject matter hereof, with the exception of any agreement signed contemporaneous hereto. This Agreement, including all schedules and attachments hereto, sets forth the entire agreement between the parties. It may not be changed, altered, modified or amended except in a writing signed by both parties.

## Section 13. NON-WAIVER

The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances will not be construed as a waiver or relinquishment of such provision or right.

## Section 14. ASSIGNMENT/NON-ASSIGNMENT

Neither Party will assign this Agreement, in whole or in part, without the prior written consent of the other Party. This Agreement will inure to the benefit of, and be binding upon the Parties hereto, together with their respective legal representatives, successors, and assigns, as permitted herein.

## Section 15. SEVERABILITY

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

If any paragraph, term or provision of this Agreement will be held or determined to be unenforceable, the balance of this Agreement will nevertheless continue in full force and effect unaffected by such holding or determination to the fullest extent permitted by law as though such paragraph, term or provision had been written in such a manner and to such an extent as to be enforceable under the circumstances.

### Section 16. NOTICE

All notices hereunder will be in writing. Notices may be delivered by email to Market Maker at info@alameda-research.com, and to Customer at admi@advagroup.com.au. Either party may designate a new address, for purposes of this Agreement, by notice to the other party in accordance with this paragraph.

### Section 17. CAPTIONS & HEADINGS

The section captions and headings are merely for ease of reference and will not to be read into the meaning of the covenants hereunder. This Agreement is the product of arm's length negotiation between the Parties and as such may not be resolved against the drafter.

### Section 17. ATTORNEY'S FEES

If any litigation or arbitration is necessary to enforce the terms of this Agreement, the prevailing party will be entitled to have their attorney fees paid by the other party.

### Section 18. SIGNATURES & COUNTERPARTS

PDF email and electronic signatures to this Agreement will be deemed as originals. This Agreement may be executed in counterparts, which when taken together will be deemed a single complete, fully executed document.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have set their signatures hereto as of the Effective Date.

**Alameda Research**

By: _____Caroline Ellison_____

Name: _____Caroline Ellison_____

Title: _____Co-CEO_____

**NuGenesis Pty Ltd**

By: _____Hussein Faraj_____

Name: _____Hussein Faraj_____

Title: _____CEO, Director_____

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

**SCHEDULE A**

**Applicable Exchanges**

- Binance, Kucoin, Okex, Coinbase

  - /USD, /USDT pairs

- Liquid

  - /USD, /USDT, /BTC pairs

**SCHEDULE B**

**Token loan and option**

This schedule dated January 6, 2022 between Alameda Research ("Borrower") and NuGenesis Pty Ltd ("Lender") incorporates all of the terms of the Market Making Agreement between Lender and Borrower. By signing this Term Sheet, you agree to the following specific terms:

Borrowed asset: NUC

Amount of borrowed asset: 200m tokens

Borrow fee: 0% per annum

Maturity date: January 6, 2023

Option prices:

- $0.01 for 40m tokens
- $0.10 for 40m tokens
- $0.20 for 40m tokens
- $0.30 for 40m tokens
- $1.00 for 40m tokens

NuGenesis Pty Ltd

Alameda Research

By: *Hussein Faraj*
A5149B5DBC1845C...

By: *Caroline Ellison*
198B1A7CC5A74E7...

Name: Hussein Faraj

Name: Caroline Ellison

Title: CEO, Director

Title: Co-CEO

DocuSign Envelope ID: 2727E065-904F-4E10-BF02-B56ED782F68D

P+2e

| Announced Date | Organization Name | Lead Investor | Funding Round | Money Raised |
|---|---|---|---|---|
| Nov 25, 2022 | | No | | 27,800,000 |
| Nov 14, 2022 | Lemon Cash | Yes | Series A - Lemon Cash | 5,000,000 |
| Nov 4, 2022 | Joepegs | Yes | Seed Round - Joepegs | — |
| Oct 27, 2022 | Lens Protocol | — | Seed Round - Lens Protocol | 3,000,000 |
| Oct 25, 2022 | Martian | — | Pre Seed Round - Martian | 1,700,000 |
| Oct 24, 2022 | Paragraph | — | Venture Round - Paragraph | 1,700,000 |
| Oct 18, 2022 | Paragraph | — | Pre Seed Round - Paragraph | 55,000,000 |
| Oct 3, 2022 | Celestia | — | Series A - Celestia | 14,000,000 |
| Sep 28, 2022 | Exponential DeFi | Yes | Seed Round - Exponential DeFi | 20,000,000 |
| Sep 27, 2022 | Coral | Yes | Venture Round - Coral | 11,000,000 |
| Sep 21, 2022 | Tactic | — | Venture Round - Tactic | 2,000,000 |
| Sep 21, 2022 | Sintra | — | Seed Round - Sintra | 35,000,000 |
| Sep 13, 2022 | Messari | — | Series B - Messari | 54,000,000 |
| Sep 9, 2022 | Doodles | Yes | Series A - Doodles | — |

1

| | | | | |
|---|---|---|---|---|
| Sep 8, 2022 | SkyBridge Capital | Yes | Venture Round - SkyBridge Capital | 5,000,000 |
| Sep 8, 2022 | VerifyVASP | Yes | Series A - VerifyVASP | 300,000,000 |
| Sep 6, 2022 | Mysten Labs | — | Series B - Mysten Labs | 7,000,000 |
| Aug 30, 2022 | Dust Labs | Yes | Seed Round - Dust Labs | 40,000,000 |
| Aug 29, 2022 | Xterio | — | Series A - Xterio | 5,000,000 |
| Aug 9, 2022 | DoraHacks | — | Series B - DoraHacks | 5,800,000 |
| Jul 7, 2022 | Luxon | — | Seed Round - Luxon | 50,000,000 |
| Jun 29, 2022 | Hidden Road | — | Series A - Hidden Road | 13,600,000 |
| Jun 8, 2022 | Soba | — | Seed Round - Soba | 2,500,000 |
| Jun 8, 2022 | Samudai | — | Pre Seed Round - Samudai | 60,000,000 |
| Jun 7, 2022 | Delphia | Yes | Series A - Delphia | 9,600,000 |
| Jun 7, 2022 | Vyre Network | Yes | Series A - Vyre Network | 6,500,000 |
| Jun 7, 2022 | Chillchat | — | Seed Round - Chillchat | 32,000,000 |
| May 23, 2022 | Euler | Yes | Venture Round - Euler | 5,000,000 |

| Date | Company | | Round | | Amount |
|------|---------|---|-------|---|--------|
| May 18, 2022 | Doppel | Yes | Seed Round - Doppel | | 20,000,000 |
| May 16, 2022 | DoraHacks | — | Series B - DoraHacks | | 24,000,000 |
| May 13, 2022 | Metatheory | Yes | Series A - Metatheory | | 1,000,000 |
| May 4, 2022 | Edge Tradeworks | — | Venture Round - Edge Tradeworks | | — |
| Apr 26, 2022 | One UPI Payments | — | Pre Seed Round - One UPI Payments | | 23,000,000 |
| Apr 26, 2022 | Cogni | — | Series A - Cogni | | 5,800,000 |
| Apr 21, 2022 | GamerGains Lab | Yes | Seed Round - GamerGains Lab | | 9,000,000 |
| Apr 7, 2022 | Bastion | — | Series A - Bastion | | 3,500,000 |
| Apr 7, 2022 | Taki | — | Seed Round - Taki | | 350,000,000 |
| Apr 6, 2022 | NEAR Protocol | — | Private Equity Round - NEAR Protocol | | 350,000,000 |
| Apr 6, 2022 | NEAR | — | Venture Round - NEAR | | 3,800,000 |
| Mar 30, 2022 | Bridge Network | Yes | Seed Round - Bridge Network | | 135,000,000 |
| Mar 22, 2022 | LayerZero Labs | — | Series A - LayerZero Labs | | 450,000,000 |
| Mar 21, 2022 | Yuga Labs | Yes | Seed Round - Yuga Labs | | 100,000,000 |

3

| Mar 18, 2022 | Dave | Yes | Post-IPO Equity - Dave | 25,000,000 |
|---|---|---|---|---|
| Mar 17, 2022 | C2x | Yes | Funding Round - C2x | 92,000,000 |
| Feb 21, 2022 | Mina | — | Initial Coin Offering - Mina | 1,900,000 |
| Feb 19, 2022 | Chilichat | — | Seed Round - Chilichat | 200,000,000 |
| Aug 31, 2021 | Helium | Yes | Series D - Helium | 2,000,000 |
| | Coinfeeds | | Seed Round - Coinfeeds | |
| | | | | 2,568,200,000 |

| pledge | yearly | total investment over term | one off payment | FTX aestimated spending | amount |
|---|---|---|---|---|---|
| Housing in Bahamas | | | | 500,000,000 | funding held | 2,568,2... |
| Housing in dubai - unverified | | | | 25,000,000 | direct spending | 10,887,9... |
| Miami heat | 7,100,000 | 135,000,000 | 7,100,000 | Total | 13,456,1... |
| Esports | | | | 3,200,000 | FTX and Alameda | amounts |
| TSM | 21,000,000 | 210,000,000 | 21,000,000 | FTX | 13,456,1... |
| Collegue sports | 1,750,000 | 17,500,000 | 1,750,000 | Alameda | 13,109,5... |
| Sports influences - unverified | | | $50,000,000 | total estimated spenditure | 26,565,6... |
| Political donations | | | 70,289,840 | | |
| Other politcal donations unverified | | | 86,449,200 | | |
| Robinhood | | | 648,000,000 | | |
| sequoia capital | | | 200,000,000 | | |
| Sequoia heritage | | | 100,000,000 | | |
| Other investments | | | 500,000,000 | | |
| k5 global | | | 300,000,000 | | |
| Altimeter Capital unverified | | | 250,000,000.00 | | |

| | | | |
|---|---|---|---|
| Multicoin Capital unverified | | | 250,000,000 |
| Binance stake payout | | | 2,100,000,000 |
| Paid Influences unverified | | | 23,500,000 |
| Fuinding Rounds 112 rounds | | | 3,700,000,000 |
| Limit Break | | | 200,000,000 |
| Meow | | | 22,000,000 |
| Emperic Network | | | 7,000,000 |
| SecureSave | | | 11,000,000 |
| kwil | | | 9,600,000 |
| Swim | | | 4,000,000 |
| PlayUp | | | 48,000,000 |
| Web3Auth | | | 13,000,000 |
| Memento | | | 4,000,000 |
| BetDex | | | 21,000,000 |
| faraway | | | 21,000,000 |
| Mythetical Games | | | 150,000,000 |
| Sky Mavis | | | 152,000,000 |
| Genesis Digital Assets | | | 431,000,000 |
| Liquid Global | | | 120,000,000 |
| circle | | | 440,000,000 |
| Soldius Labs | | | 20,000,000 |
| protego trust bank | | | 70,000,000 |
| On finance | | | 1,000,000 |
| 1inch | | | 2,800,000 |
| Wages - estimate | | | 18,250,000 |
| operational Costs | | | 36,000,000 |
| Serum - unverified | | | 250,000,000 |
| | Total | | 10,887,939,040 |

5

Alameda

| Announced Date | Organization Name | Lead Investor | Funding Round | Money Raised |
|---|---|---|---|---|
| Nov 8, 2022 | Fordefi | — | Seed Round - Fordefi | 18,000,0 |
| Sep 22, 2022 | 3Commas | Yes | Series B - 3Commas | 37,000,0 |
| Sep 7, 2022 | Fuel Labs | — | Venture Round - Fuel Labs | 80,000,0 |
| Jul 27, 2022 | Trustless Media | Yes | Seed Round - Trustless Media | 3,300,0 |
| Jul 25, 2022 | Cardinal | — | Seed Round - Cardinal | 4,400,0 |
| Jul 17, 2022 | Empiric Network | — | Seed Round - Empiric Network | 7,000,0 |
| Jul 14, 2022 | ZKX | — | Seed Round - ZKX | 4,500,0 |
| Jun 24, 2022 | ChangeUp | Yes | Series A - ChangeUp | 4,100,0 |
| Jun 17, 2022 | Voyager | Yes | Post-IPO Debt - Voyager | 200,000,0 |
| Jun 16, 2022 | Earth From Another Sun | — | Seed Round - Earth From Another Sun | 4,500,0 |
| Jun 9, 2022 | Orderly Network | — | Seed Round - Orderly Network | 20,000,0 |
| May 30, 2022 | Merge | — | Seed Round - Merge | 9,500,0 |
| May 18, 2022 | Pine Protocol | — | Seed Round - Pine Protocol | 1,500,0 |
| May 18, 2022 | Questbook | — | Series A - Questbook | 8,300,0 |
| May 16, 2022 | Voyager | Yes | Post-IPO Equity - Voyager | 60,000,0 |
| May 10, 2022 | Jambo | — | Series A - Jambo | 30,000,0 |
| Apr 14, 2022 | Elumia | Yes | Seed Round - Elumia | — |
| Apr 7, 2022 | The Kingdom | — | Seed Round - The Kingdom | 3,600,0 |
| Mar 29, 2022 | zkLend | — | Seed Round - zkLend | 5,000,0 |
| Mar 25, 2022 | | — | | |

1

| Mar 15, 2022 | Float Capital | Yes | Seed Round - Float Capital | 1,600,0 |
| Mar 13, 2022 | Eizper Chain | Yes | Seed Round - Eizper Chain | 4,000,0 |
| Mar 10, 2022 | Delysium | — | Venture Round - Delysium | 4,000,0 |
| Mar 9, 2022 | Mirror World | — | Seed Round - Mirror World | 4,000,0 |
| Mar 8, 2022 | Swim | — | Seed Round - Swim | 4,300,0 |
| Mar 8, 2022 | Cega | — | Seed Round - Cega | 4,300,0 |
| Mar 7, 2022 | Cega Finance | Yes | Seed Round - Cega Finance | 11,500,0 |
| Mar 7, 2022 | Moonstone Bank | — | Venture Round - Moonstone Bank | 200,000,0 |
| Mar 1, 2022 | Immutable Systems | — | Series C - Immutable Systems | 32,900,0 |
| Feb 28, 2022 | Subspace Labs | — | Funding Round - Subspace Labs | 50,000,0 |
| Feb 28, 2022 | VALR | — | Series B - VALR | |
| Feb 22, 2022 | GamesPad | — | Corporate Round - GamesPad | — |
| Feb 21, 2022 | Zebec | — | Series A - Zebec | 28,000,0 |
| Feb 17, 2022 | Jambo | — | Seed Round - Jambo | 7,500,0 |
| Feb 11, 2022 | Ref Finance | — | Initial Coin Offering - Ref Finance | 4,800,0 |
| Feb 11, 2022 | PORTALS | — | Seed Round - PORTALS | 5,000,0 |
| Feb 7, 2022 | Salad Ventures | — | Initial Coin Offering - Salad Ventures | 13,500,0 |
| Feb 4, 2022 | Polygon | — | Venture Round - Polygon | 450,000,0 |
| Feb 1, 2022 | Sidus Heroes | — | Seed Round - Sidus Heroes | — |
| | | | | 6,500,0 |

2

| Date | Company | | | Round | Amount |
|---|---|---|---|---|---|
| Jan 30, 2022 | | Nestcoin | — | Pre Seed Round - Nestcoin | 10,000,0 |
| Jan 28, 2022 | | StarryNift | — | Seed Round - StarryNift | 22,000,0 |
| Jan 26, 2022 | | Astar Network | — | Venture Round - Astar Network | 8,000,0 |
| Jan 26, 2022 | | Dropp | — | Venture Round - Dropp | 10,000,0 |
| Jan 21, 2022 | | Galxe | — | Series A - Galxe | 5,500,0 |
| Jan 20, 2022 | | Heroes of Mavia | — | Seed Round - Heroes of Mavia | 5,000,0 |
| Jan 19, 2022 | | STEPN | — | Seed Round - STEPN | 4,000,0 |
| Jan 18, 2022 | | Ancient8 | — | Seed Round - Ancient8 | 46,000,0 |
| Jan 17, 2022 | | Metaplex Studios | — | Initial Coin Offering - Metaplex Studios | 8,000,0 |
| Jan 13, 2022 | | Burnt Finance | — | Series A - Burnt Finance | 150,000,0 |
| Jan 13, 2022 | | NEAR Protocol | — | Initial Coin Offering - NEAR Protocol | 150,000,0 |
| Jan 12, 2022 | | NEAR | — | Funding Round - NEAR | 125,000,0 |
| Jan 6, 2022 | | SEBA Bank | — | Series C - SEBA Bank | 210,000,0 |
| Jan 5, 2022 | | Dave | — | Post-IPO Equity - Dave | 5,000,0 |
| Jan 4, 2022 | | Exotic Markets | — | Initial Coin Offering - Exotic Markets | 2,500,0 |
| Dec 28, 2021 | | TDX Strategies | — | Series A - TDX Strategies | 70,000,0 |
| Dec 23, 2021 | | MetaMap | — | Series B - MetaMap | 1,500,0 |
| Dec 21, 2021 | | Cosmic Guild | — | Seed Round - Cosmic Guild | 30,000,0 |
| | | RNDR Token | — | Initial Coin Offering - RNDR Token | |

3

| Date | Company | | Approved | Round | | Amount |
|------|---------|-|----------|-------|-|--------|
| Dec 21, 2021 | | Solscan | — | | Seed Round - Solscan | 4,000,0 |
| Dec 16, 2021 | | Solcial | Yes | | Seed Round - Solcial | 2,900,0 |
| Dec 16, 2021 | | Stocktwits | Yes | | Series B - Stocktwits | 30,000,0 |
| Dec 15, 2021 | | Anchorage Digital | — | | Series D - Anchorage Digital | 350,000,0 |
| Dec 15, 2021 | | Stoke Space | — | | Series A - Stoke Space | 65,000,0 |
| Dec 10, 2021 | | Artemis | Yes | | Pre Seed Round - Artemis | 2,000,0 |
| Dec 10, 2021 | | Router Protocol | — | | Series A - Router Protocol | 4,100,0 |
| Dec 9, 2021 | | Rainmaker Games | — | | Seed Round - Rainmaker Games | 6,500,0 |
| Dec 8, 2021 | | Zeta Markets | — | | Seed Round - Zeta Markets | 8,500,0 |
| Dec 6, 2021 | | Pixelynx | — | | Seed Round - Pixelynx | 4,500,0 |
| Dec 5, 2021 | | Stacked | Yes | | Series A - Stacked | 35,000,0 |
| Dec 1, 2021 | | solice | — | | Seed Round - solice | 4,300,0 |
| Dec 1, 2021 | | 1inch | — | | Series B - 1inch | 175,000,0 |
| Nov 30, 2021 | | Hxro | — | | Initial Coin Offering - Hxro | 34,000,0 |
| Nov 30, 2021 | | Sidus Heroes | No | | Seed Round - Sidus Heroes | — |
| Nov 17, 2021 | | FairSide Network | — | | Seed Round - FairSide Network | 4,200,0 |
| Nov 16, 2021 | | PStake | — | | Seed Round - PStake | 10,000,0 |
| Nov 16, 2021 | | Fracture Labs | — | | Seed Round - Fracture Labs | 4,100,0 |
| Nov 16, 2021 | | Satori Research | Yes | | Series A - Satori Research | — |
| Nov 8, 2021 | | CoinMENA | — | | Seed Round - CoinMENA | 9,500,0 |
| Nov 3, 2021 | | | — | | | 8,500,0 |

4

| Date | Company | | Round | Amount |
|---|---|---|---|---|
| Nov 3, 2021 | Syndica | — | Seed Round - Syndica | 50,000,0 |
| Nov 2, 2021 | AscendEX | — | Series B - AscendEX | 7,500,0 |
| Nov 1, 2021 | Spruce | — | Seed Round - Spruce | — |
| Nov 1, 2021 | Mara | — | Seed Round - Mara | 1,900,0 |
| Oct 28, 2021 | Phantasia Sports | — | Seed Round - Phantasia Sports | 4,000,0 |
| Oct 28, 2021 | Hawku | — | Seed Round - Hawku | 12,000,0 |
| Oct 26, 2021 | Elementus | — | Series A - Elementus | 6,800,0 |
| Oct 26, 2021 | Sipher | — | Seed Round - Sipher | 3,800,0 |
| Oct 22, 2021 | Drift Protocol | — | Seed Round - Drift Protocol | 31,000,0 |
| Oct 21, 2021 | GreenPark Sports | — | Series B - GreenPark Sports | — |
| Oct 19, 2021 | MCDEX | Yes | Venture Round - MCDEX | 3,500,0 |
| Oct 18, 2021 | PsyOptions | — | Seed Round - PsyOptions | 8,300,0 |
| Oct 8, 2021 | Genopets | — | Seed Round - Genopets | 19,000,0 |
| Oct 6, 2021 | Chingari | — | Series A - Chingari | 30,000,0 |
| Oct 1, 2021 | BitOasis | — | Series B - BitOasis | 20,000,0 |
| Sep 30, 2021 | Nifty Island | — | Pre Seed Round - Nifty Island | 5,000,0 |
| Sep 29, 2021 | DoinGud | — | Seed Round - DoinGud | 6,000,0 |
| Sep 21, 2021 | XDEFI Wallet | Yes | Series A - XDEFI Wallet | 1,300,0 |
| Sep 14, 2021 | SundaeSwap Labs, Inc. | — | Seed Round - SundaeSwap Labs, Inc. | 82,000,0 |
| Sep 14, 2021 | Immutable Systems | — | Series B - Immutable Systems | 22,800,0 |

5

| Date | Company | | Yes/— | Round | | Amount |
|---|---|---|---|---|---|---|
| | | Firefly Exchange | | | Venture Round - Firefly Exchange | |
| Sep 13, 2021 | | Credora (formerly X-Margin) | — | | Series A - Credora (formerly X-Margin) | 8,000,0 |
| Sep 9, 2021 | | DeFi Land | Yes | | Series A - DeFi Land | 4,100,0 |
| Sep 8, 2021 | | Eden Network | — | | Seed Round - Eden Network | 17,400,0 |
| Sep 7, 2021 | | Zenlink | Yes | | Series A - Zenlink | — |
| Sep 2, 2021 | | UXD Protocol | — | | Seed Round - UXD Protocol | 3,000,0 |
| Sep 1, 2021 | | Slope Finance | — | | Seed Round - Slope Finance | 2,300,0 |
| Aug 31, 2021 | | Offchain Labs | — | | Series B - Offchain Labs | 100,000,0 |
| Aug 30, 2021 | | Parallel Finance | — | | Series A - Parallel Finance | 22,000,0 |
| Aug 18, 2021 | | MobileCoin | — | | Series B - MobileCoin | 66,000,0 |
| Aug 10, 2021 | | Liquality | — | | Seed Round - Liquality | 7,000,0 |
| Aug 10, 2021 | | Helium | — | | Initial Coin Offering - Helium | 111,000,0 |
| Aug 5, 2021 | | Roco Finance | — | | Funding Round - Roco Finance | 4,200,0 |
| Aug 5, 2021 | | Messari | — | | Series A - Messari | 21,000,0 |
| Aug 5, 2021 | | TrueFi | — | | Initial Coin Offering - TrueFi | 12,500,0 |
| Aug 4, 2021 | | Archblock | — | | Venture Round - Archblock | 12,500,0 |
| Jul 27, 2021 | | Hedgehog Markets | — | | Seed Round - Hedgehog Markets | 3,500,0 |
| Jul 16, 2021 | | Ratio | — | | Seed Round - Ratio | 2,300,0 |
| Jul 8, 2021 | | WonderFi | Yes | | Series A - WonderFi | 5,600,0 |
| Jul 6, 2021 | | | — | | | 3,400,0 |

| Date | Company | | Round | Amount |
|---|---|---|---|---|
| Jun 15, 2021 | Solrise Finance | — | Seed Round - Solrise Finance | 6,300,0 |
| Jun 14, 2021 | Umee | No | Seed Round - Umee | 2,500,0 |
| Jun 9, 2021 | Rangers Protocol | — | Private Equity Round - Rangers Protocol | 314,000,0 |
| Jun 6, 2021 | Solana | — | Initial Coin Offering - Solana | 2,400,0 |
| Jun 3, 2021 | Snickerdoodle Labs | Yes | Seed Round - Snickerdoodle Labs | 7,000,0 |
| Jun 1, 2021 | Impossible Finance | — | Seed Round - Impossible Finance | 5,000,0 |
| Jun 1, 2021 | Lithium Finance | — | Seed Round - Lithium Finance | 7,000,0 |
| May 28, 2021 | Composable Finance | — | Seed Round - Composable Finance | — |
| May 20, 2021 | Only1 | — | Seed Round - Only1 | 8,000,0 |
| May 12, 2021 | Cryptocurrencies.Ai | Yes | Venture Round - Cryptocurrencies.Ai | 10,300,0 |
| May 6, 2021 | Big Time Studios | — | Series A - Big Time Studios | 3,000,0 |
| May 5, 2021 | Burnt Finance | Yes | Seed Round - Burnt Finance | 22,000,0 |
| Apr 29, 2021 | Lido | — | Venture Round - Lido | 3,200,0 |
| Apr 16, 2021 | Hashflow | — | Seed Round - Hashflow | 8,000,0 |
| Apr 13, 2021 | portto / Blocto | No | Series A - portto / Blocto | 65,000,0 |
| Apr 13, 2021 | ConsenSys | — | Convertible Note - ConsenSys | 2,000,0 |
| Apr 7, 2021 | Step Finance | — | Initial Coin Offering - Step Finance | 3,000,0 |
| | ChainSwap | — | Venture Round - ChainSwap | |

7

| Date | Company | | Lead | Round | Amount |
|---|---|---|---|---|---|
| Apr 6, 2021 | Coin98 | Yes | | Seed Round - Coin98 | 4,000,0 |
| Mar 29, 2021 | Liquity | — | | Series A - Liquity | 6,000,0 |
| Mar 29, 2021 | BiLira | — | | Seed Round - BiLira | 7,500,0 |
| Mar 24, 2021 | XDEFI Wallet | — | | Seed Round - XDEFI Wallet | 1,200,0 |
| Mar 24, 2021 | StarkWare Industries | No | | Series B - StarkWare Industries | 75,000,0 |
| Mar 17, 2021 | Anchor Protocol | — | | Venture Round - Anchor Protocol | 20,000,0 |
| Mar 15, 2021 | Efficient Frontier | — | | Seed Round - Efficient Frontier | 2,000,0 |
| Mar 15, 2021 | Volmex Finance | — | | Seed Round - Volmex Finance | — |
| Mar 13, 2021 | Firefly Exchange | — | | Seed Round - Firefly Exchange | 6,400,0 |
| Mar 12, 2021 | Reef Finance | Yes | | Initial Coin Offering - Reef Finance | 20,000,0 |
| Mar 10, 2021 | Sommelier | — | | Seed Round - Sommelier | 3,500,0 |
| Mar 9, 2021 | Automata Network | — | | Seed Round - Automata Network | 1,000,0 |
| Feb 24, 2021 | Oxygen.org | Yes | | Venture Round - Oxygen.org | 40,000,0 |
| Feb 23, 2021 | Convergence Finance | — | | Seed Round - Convergence Finance | 2,000,0 |
| Feb 10, 2021 | Balancer Labs | — | | Series A - Balancer Labs | 5,000,0 |
| Feb 2, 2021 | Manta Network | — | | Seed Round - Manta Network | 1,100,0 |
| Feb 1, 2021 | InsurAce Protocol | Yes | | Private Equity Round - InsurAce Protocol | 3,000,0 |
| Jan 31, 2021 | Armor | — | | Venture Round - Armor | — |

| Jan 19, 2021 | MAPS.ME | Yes | Venture Round - MAPS.ME | 50,000,0 |
| Jan 19, 2021 | Saddle Finance | — | Seed Round - Saddle Finance | 4,300,0 |
| Dec 21, 2020 | Maple Finance | — | Seed Round - Maple Finance | 1,300,0 |
| Nov 30, 2020 | Espresso Systems | — | Seed Round - Espresso Systems | 3,100,0 |
| Nov 17, 2020 | Mask Network | — | Venture Round - Mask Network | 2,000,0 |
| Nov 10, 2020 | Union Protocol Foundation | — | Seed Round - Union Protocol Foundation | 3,900,0 |
| Nov 4, 2020 | Razor Network | No | Seed Round - Razor Network | 3,700,0 |
| Nov 3, 2020 | MathWallet | Yes | Series A - MathWallet | 7,800,0 |
| Nov 3, 2020 | 3Commas | Yes | Series A - 3Commas | 3,000,0 |
| Oct 15, 2020 | Archax | — | Seed Round - Archax | 8,000,0 |
| Oct 15, 2020 | Horizon Finance | — | Seed Round - Horizon Finance | 1,300,0 |
| Oct 13, 2020 | Persistence One | — | Initial Coin Offering - Persistence One | 3,750,0 |
| Oct 13, 2020 | DODO Exchange | — | Venture Round - DODO Exchange | 5,000,0 |
| Oct 10, 2020 | Opium Team | — | Seed Round - Opium Team | 3,300,0 |
| Oct 7, 2020 | Covalent | — | Venture Round - Covalent | 3,100,0 |
| Oct 1, 2020 | Opium Protocol | — | Seed Round - Opium Protocol | 3,300,0 |
| Sep 23, 2020 | Dune Analytics | — | Seed Round - Dune Analytics | 2,000,0 |
| Sep 17, 2020 | ParaSwap | — | Seed Round - ParaSwap | 2,700,0 |
| Sep 9, 2020 | Linear Finance | — | Seed Round - Linear Finance | 1,800,0 |

9

| Date | | | | | | Amount |
|---|---|---|---|---|---|---|
| Aug 26, 2020 | Frontier | — | | Seed Round - Frontier | | 1,900,0 |
| Aug 25, 2020 | Oin Finance | — | | Initial Coin Offering - Oin Finance | | 1,000,0 |
| Aug 25, 2020 | Perpetual Protocol | — | | Seed Round - Perpetual Protocol | | 1,800,0 |
| Aug 23, 2020 | RAMP DEFI | — | | Seed Round - RAMP DEFI | | 1,000,0 |
| Aug 15, 2020 | Sifchain Finance | — | | Seed Round - Sifchain Finance | | 3,500,0 |
| Mar 3, 2020 | Folkvang | Yes | | Seed Round - Folkvang | — | |
| Aug 13, 2019 | Credora (formerly X-Margin) | — | | Seed Round - Credora (formerly X-Margin) | | 2,100,0 |
| Feb 11, 2019 | Archax | — | | Seed Round - Archax | | |
| | | | | Total | | 4,468,950,0 |

| Organization Name | Total Funding Amount | | Loans/spending | amount |
|---|---|---|---|---|
| | $18M | $18,000,000 | Loan PaperBird SBF | 2,300,0 |
| Fordefi | | | Loan SBF | 1,000,0 |
| Espresso Systems | $35.1M | $35,100,000 | Loan Singh | 543,0 |
| | | | Ryan Salame | 55,0 |
| ConsenSys | $726.7M | $726,700,000 | Investments | $9,110,5 |
| | | | Running costs | 6,0 |
| AscendEX | $50M | $50,000,000 | Staff and council guess | 45,0 |
| | | | Yuga Labs | 50,0 |
| Archax | $37.4M | $37,400,000 | Total | 13,109,5 |
| | | | **FTX and Alameda** | **amounts** |
| VALR | $54.9M | $54,900,000 | **FTX** | **13,456,1** |
| | | | **Alameda** | **13,109,5** |
| Ancient8 | $10M | $10,000,000 | **total estimated spenditure** | **26,565,6** |
| | | | **Undisclosed paymets or loans** | |
| Solana | $315.8M | $315,800,000 | Gary Wang | |
| | | | Caroline | |
| Galxe | $10M | $10,000,000 | Dan Friedberg | |
| | $36.5M | $36,500,000 | | |
| Stacked | | | | |

| | $40.2M | $40,200,000 |
| Oxygen.org | | |
| | $5.1M | $5,100,000 |
| Covalent | | |
| | $4.2M | $4,200,000 |
| FairSide Network | | |
| | $50M | $50,000,000 |
| MAPS.ME | | |
| | $6.5M | $6,500,000 |
| Nestcoin | | |
| | $5M | $5,000,000 |
| Lithium Finance | | |
| | $88.4M | $88,400,000 |
| Chingari | | |
| | $11.5M | $11,500,000 |
| Moonstone Bank | | |
| | $9.5M | $9,500,000 |
| CoinMENA | | |
| | $16.3M | $16,300,000 |
| Elementus | | |
| | $6.6M | $6,600,000 |
| Manta Network | | |
| | $27.5M | $27,500,000 |
| Sommelier | | |
| | $273M | $273,000,000 |
| StarkWare Industries | | |
| | $10.3M | $10,300,000 |
| Big Time Studios | | |
| | $4M | $4,000,000 |
| Mirror World | | |
| | $49.1M | $49,100,000 |
| WonderFi | | |
| | $41.5M | $41,500,000 |
| Spruce | | |
| | $4.2M | $4,200,000 |
| Roco Finance | | |
| | $1.9M | $1,900,000 |
| Frontier | | |
| | $3.3M | $3,300,000 |
| Opium Protocol | | |
| | $19.8M | $19,800,000 |

| | | |
|---|---|---|
| MathWallet | | |
| | $189.8M | $189,800,000 |
| 1inch | | |
| | $14M | $14,000,000 |
| Burnt Finance | | |
| | $1M | $1,000,000 |
| RAMP DEFI | | |
| | — | |
| Armor | | |
| | $246.9M | $246,900,000 |
| SEBA Bank | | |
| | $30M | $30,000,000 |
| RNDR Token | | |
| | $20M | $20,000,000 |
| Nifty Island | | |
| | $4M | $4,000,000 |
| Swim | | |
| | $2M | $2,000,000 |
| Efficient Frontier | | |
| | $81.5M | $81,500,000 |
| Fuel Labs | | |
| | — | $75,000,000 |
| Aptos | | |
| | $34.2M | $34,200,000 |
| Archblock | | |
| | $32.3M | $32,300,000 |
| Balancer Labs | | |
| | $37.5M | $37,500,000 |
| Firefly Exchange | | |
| | $7M | $7,000,000 |
| Liquality | | |
| | $86.5M | $86,500,000 |
| MetaMap | | |
| | $8M | $8,000,000 |
| Syndica | | |
| | $3.9M | $3,900,000 |
| Union Protocol Foundation | | |
| | $10M | $10,000,000 |
| StarryNift | | |
| | $3M | $3 |
| ChainSwap | | |

| | | | |
|---|---|---|---|
| | $3.7M | | $3,700,000 |
| Opium Team | | | |
| | $3.8M | | $3,800,000 |
| Drift Protocol | | | |
| | $23M | | $23,000,000 |
| Mara | | | |
| | $2.5M | | $2,500,000 |
| Snickerdoodle Labs | | | |
| | $3.7M | | $3,700,000 |
| BiLira | | | |
| | $1.8M | | $1,800,000 |
| Linear Finance | | | |
| | $3M | | $3,000,000 |
| UXD Protocol | | | |
| | $53.5M | | $53,500,000 |
| GreenPark Sports | | | |
| | $1.5M | | $1,500,000 |
| Pine Protocol | | | |
| | $8M | | $8,000,000 |
| Cryptocurrencies.Ai | | | |
| | $1M | | $1,000,000 |
| Oin Finance | | | |
| | — | | |
| Sidus Heroes | | | |
| | $6.5M | | $6,500,000 |
| ChangeUp | | | |
| | $43.2M | | $43,200,000 |
| Stocktwits | | | |
| | $2.9M | | $2,900,000 |
| Solcial | | | |
| | $4.1M | | $4,100,000 |
| Rangers Protocol | | | |
| | $2.5M | | $2,500,000 |
| TDX Strategies | | | |
| | $1.3M | | $1,300,000 |
| Horizon Finance | | | |
| | $17.4M | | $17,400,000 |
| Eden Network | | | |
| | $2M | | $2,000,000 |
| Artemis | | | |
| | $29M | | $29,000,000 |

13

| | | |
|---|---|---|
| Parallel Finance | | |
| | $1.9M | $1,900,000 |
| Phantasia Sports | | |
| | $7M | $7,000,000 |
| Empiric Network | | |
| | $4.5M | $4,500,000 |
| Pixelynx | | |
| | $8.8M | $8,800,000 |
| portto / Blocto | | |
| | $10.3M | $10,300,000 |
| Slope Finance | | |
| | $8M | $8,000,000 |
| Dropp | | |
| | — | |
| Satori Research | | |
| | $12.2M | $12,200,000 |
| Credora (formerly X-Margin) | | |
| | $3M | $3,000,000 |
| Only1 | | |
| | $6.8M | $6,800,000 |
| Sipher | | |
| | $10.1M | $10,100,000 |
| Questbook | | |
| | $8.4M | $8,400,000 |
| Liquity | | |
| | $5M | $5,000,000 |
| zkLend | | |
| | $2M | $2,000,000 |
| Convergence Finance | | |
| | $3.4M | $3,400,000 |
| Solrise Finance | | |
| | $3.5M | $3,500,000 |
| PsyOptions | | |
| | $8M | $8,000,000 |
| Heroes of Mavia | | |
| | $8.5M | $8,500,000 |
| Zeta Markets | | |
| | $7.2M | $7,200,000 |
| XDEFI Wallet | | |
| | $3.7M | $3,700,000 |
| Persistence One | | |

14

| | | |
|---|---|---|
| | [$3.3M](#) | $3,300,000 |
| Trustless Media | | |
| | [$4.3M](#) | $4,300,000 |
| Fracture Labs | | |
| | [$4.3M](#) | $4,300,000 |
| Cega Finance | | |
| | [$39M](#) | $39,000,000 |
| Composable Finance | | |
| | [$24.4M](#) | $24,400,000 |
| Astar Network | | |
| | [$23.9M](#) | $23,900,000 |
| Reef Finance | | |
| | [$1M](#) | $1,000,000 |
| Automata Network | | |
| | [$3.5M](#) | $3,500,000 |
| Hedgehog Markets | | |
| | — | |
| Elumia | | |
| | [$79.4M](#) | $79,400,000 |
| Dune Analytics | | |
| | [$49M](#) | $49,000,000 |
| Hxro | | |
| | [$3.5M](#) | $3,500,000 |
| Sifchain Finance | | |
| | [$4.8M](#) | $4,800,000 |
| Ratio | | |
| | [$2.7M](#) | $2,700,000 |
| ParaSwap | | |
| | [$1.8M](#) | $1,800,000 |
| Perpetual Protocol | | |
| | [$4.3M](#) | $4,300,000 |
| Cega | | |
| | [$4M](#) | $4,000,000 |
| Hawku | | |
| | [$4M](#) | $4,000,000 |
| InsurAce Protocol | | |
| | [$4.1M](#) | $4,100,000 |
| DeFi Land | | |
| | [$3.7M](#) | $3,700,000 |
| Razor Network | | |
| | — | $67,500,000 |

15

| | | |
|---|---|---|
| Matic and hole | — | |
| Zenlink | $28.2M | $28,200,000 |
| Hashflow | $38.3M | $38,300,000 |
| Umee | $46M | $46,000,000 |
| Metaplex Studios | $9.5M | $9,500,000 |
| Merge | $15.5M | $15,500,000 |
| Salad Ventures | $4.6M | $4,600,000 |
| Router Protocol | $4.4M | $4,400,000 |
| Cardinal | $5M | $5,000,000 |
| DODO Exchange | $5M | $5,000,000 |
| DoinGud | $4M | $4,000,000 |
| Step Finance | $2M | $2,000,000 |
| Eizper Chain | $1.3M | $1,300,000 |
| SundaeSwap Labs, Inc. | $5M | $5,000,000 |
| Exotic Markets | — | |
| Genesis | | $1,000,000,000 |
| GamesPad | — | |
| Saddle Finance | $11.8M | $11,800,000 |
| MobileCoin | $107.4M | $107,400,000 |
| Earth From Another Sun | $4.5M | $4,500,000 |
| The Kingdom | $3.6M | $3,600,000 |

| | | |
|---|---|---|
| | $38M | $38,000,000 |
| Subspace Labs | | |
| Dave | $486.3M | $486,300,000 |
| Stoke Space | $75.2M | $75,200,000 |
| PStake | $10M | $10,000,000 |
| solice | $4.3M | $4,300,000 |
| BitOasis | $30M | $30,000,000 |
| Anchor Protocol | $20M | $20,000,000 |
| PORTALS | $5M | $5,000,000 |
| Solscan | $4M | $4,000,000 |
| Folkvang | — | |
| Helium | $364.8M | $346,800,000 |
| Immutable Systems | $279.8M | $279,800,000 |
| Ref Finance | $4.8M | $4,800,000 |
| ZKX | $4.5M | $4,500,000 |
| Impossible Finance | $7M | $7,000,000 |
| Genopets | $8.3M | $8,300,000 |
| Cosmic Guild | $1.5M | $1,500,000 |
| NEAR | $533.7M | $533,700,000 |
| Jambo | $37.5M | $37,500,000 |
| Lido | $167M | $167,000,000 |
| NEAR Protocol | $533.7M | $533,700,000 |

| | | | |
|---|---|---|---|
| | $487M | | $487,000,000 |
| Anchorage Digital | | | |
| | $40M | | $40,000,000 |
| 3Commas | | | |
| | $20M | | $20,000,000 |
| Orderly Network | | | |
| | $14M | | $14,000,000 |
| Delysium | | | |
| | $123.7M | | $123,700,000 |
| Offchain Labs | | | |
| | $12.5M | | $12,500,000 |
| TrueFi | | | |
| | $6.5M | | $6,500,000 |
| Rainmaker Games | | | |
| | $48.9M | | $48,900,000 |
| Mask Network | | | |
| | $5M | | $5,000,000 |
| STEPN | | | |
| | $42.5M | | $42,500,000 |
| Zebec | | | |
| | $2.7M | | $2,700,000 |
| Maple Finance | | | |
| | $16.5M | | $16,500,000 |
| Coin98 | | | |
| | $61M | | $61,000,000 |
| Messari | | | |
| | $451.5M | | $451,500,000 |
| Polygon | | | |
| | $360.1M | | $360,100,000 |
| Voyager | | | |
| | total | | $9,110,500,003 |


AUSTRALIA
POST

EXPRESS WORLDWIDE **DOX** *DHL*

From: NIKGEN SRS... ...... ...
94 RAILWAY RD
ROCKDALE 2216
2216 ROCKDALE
AUSTRALIA

Origin:
**SYD**

To: JUDGE JOHN DORSEY
COURTROOM 5, 5TH FLOOR 824 N. MARKET ST

Contact:
JUDGE JOHN DORSEY

DE DE
**19801 WILMINGTON**
**UNITED STATES OF AMERICA**

**CVG    US — PHL — NJS DENJ**

Day    Time

Ref Code 4519657914AU/2024010308105105999

Pce/Shpt Weight    Piece
**./0.5 KG**    1/1

Content Description
DOCUMENTATION

NJHC
EDD-1/8/2024
Unknown
4519657914
PCS:1l1


WAYBILL 45 1965 7914


(2L)US19801+42000000

Reference

Cour
Inter
ost

U.S.M.S.
X-RAY

Courier
International    **Z4**


(J) JD01 4600 0113 6534 8354


DHLPIECEID JD01460001136534835