**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. 5202, 5208 & 5204 |

**OPPOSITION OF BOBA FOUNDATION TO MOTION OF DEBTORS TO ESTIMATE**
**CLAIMS BASED ON DIGITAL ASSETS AND REQUEST FOR CONTINUED HEARING**

Boba Foundation ("Boba Foundation"), by and through its undersigned attorneys,
submits this opposition and request for a further continued hearing (the "Opposition") to the
*Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. No. 5202] (the "Estimation
Motion"). In support of this Opposition, Boba Foundation relies on the Declaration of Gene
Shook (the "Shook Decl.") and the Declaration of Tobia S. Keller (the "Keller Decl.") filed
contemporaneously herewith, and respectfully states as follows:

**I.    Introduction and Summary of Argument**

1.    Boba Foundation deposited certain BOBA tokens with FTX Trading Ltd. under
what was a clear custodial arrangement. Boba Foundation diligently engaged with Debtors to
recover its BOBA, to no avail. Rather, on Monday, January 8, it was electronically served with

---

[1]    The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the
large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the
last four digits of their federal tax identification numbers is not provided herein. A complete list
of such information may be obtained on the website of the Debtors' claims and noticing agent at
https://restructuring.ra.kroll.com/ftx.  The principal place of business of Debtor Emergent
Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St.
John's, Antigua and Barbuda.

the Estimation Motion. Its primary position is simple:  The Estimation Motion should be denied

unless and until Debtors, through an adversary proceeding, establish that they have a property

right in the BOBA that they hold in custody *and* that they have a right to sell Boba Foundation's

tokens. (They do not.)

2.      Boba Foundation's secondary position is equally simple:  Its claim, to the extent

that its right to recover its BOBA can be described as a claim, is not contingent, is fully

liquidated, and is so small relative to Debtors assets that the status of its claim could not possibly

effect, much less delay, these cases or confirmation of Debtors' plan. Indeed, Boba Foundation's

tokens represent less than 1 percent of the face value of customer claims and of Debtors'

holdings.  Treatment of BOBA is functionally irrelevant and does not justify the extreme

prejudice to Boba Foundation that the actions contemplated in the Estimation Motion would

impose.

3.      At a minimum, Boba Foundation should be permitted the opportunity to litigate

the extent of its and Debtors' interest in the BOBA tokens, and time to consider and respond to

the very heavy evidentiary burden that arises from the need to respond to the Estimation Motion

and its supporting expert declarations.

## II.   <u>Background</u>

### A.    **The Boba Foundation and BOBA Tokens**

4.      Boba Foundation supports its native Boba Network, which is a layer 2 protocol—

a scaling solution built on top of layer 1 blockchain protocols, such as the Ethereum blockchain.

Shook Decl., ¶ 2. The Boba Network is currently deployed on two of the largest blockchains, the

Ethereum and BNB blockchains, among others. *Id*. Through Boba Network's technology

solutions, users can move transaction computation "off the main blockchain," while still

maintaining the same level of security of the underlying blockchain. *Id*. By moving transaction

computation off chain, data can be processed more efficiently, increasing the overall transaction throughput and preventing network congestion. *Id*. Users also benefit by reducing high fees paid for transactions on the underlying blockchain. *Id*. As the first cross-chain platform—the first scaling solution to be deployed on multiple blockchains—Boba Foundation aims to make the Boba Network the universal scaling platform for all blockchains. *Id*.

5.      Boba Foundation launched a native network utility and governance token called BOBA for Boba Network. *Id*. ¶ 3.

6.      BOBA can be used in a variety of ways, including for payment of network fees. *Id*. But one of most important uses of BOBA is for voting on proposals for governance of the Boba Network.

7.      The Boba Network is a decentralized autonomous organization, or DAO, which is a type of decentralized, digital management structure. *Id*. ¶ 4. A DAO exists as a set of smart contracts on the blockchain, with no physical address or officials with formal authority. *Id*. ¶ 5. The members of the ecosystem govern the network by making proposals for the future direction of the network, new features, enhanced tools, changes to protocols, and the like. *Id*. BOBA holders receive rights to participate in the Boba DAO, where they can vote on such proposals. One staked BOBA token is equivalent to one vote. *Id*. ¶ 6.

8.      Boba Network launched on the Ethereum blockchain in September 2021. *Id*. ¶ 7. It launched as the first ever layer 2 protocol on the BNB, Avalanche, Moonbeam, and Fantom blockchains in the second half of 2022. *Id*. ¶ 8. It is in a key growth phase that is critical to the development of the network and to widespread adoption by both developers and crypto holders. *Id*. ¶ 9.

### B.      BOBA Tokens Held on FTX.com

9.      Boba Foundation minted 500 million BOBA, of which approximately 300 million are in circulation. *Id*. ¶ 10. Of that 300 million, roughly 144 million are held in FTX.com custodial accounts. *Id*. Accordingly, nearly half the BOBA market is frozen in FTX accounts as a result of Debtors' bankruptcies. *Id*.

10.      The commencement of these cases, and the Debtor's inability or refusal to release Boba Foundation's BOBA holdings (hereafter, the "Tokens") from its custody, has fundamentally impacted the ability of Boba Foundation and other Boba Network participants to engage with and continue to develop the ecosystem. *Id*. ¶ 11.

11.      FTX.com holds the Tokens for Boba Foundation as a custodian/in trust, not as a beneficial owner, and Boba Foundation's right to freely transfer tokens to and from the account maintained by FTX.com is at the core of its contractual relations. FTX.com does not have, and cannot claim, any right to Boba Foundation's tokens.

12.      Notwithstanding numerous inquiries of FTX.com's counsel about Boba Foundation's desire to recover its tokens, FTX.com has been unwilling to engage with Boba Foundation regarding the recovery of its Tokens. Keller Decl. ¶¶ 4–9.

13.      Because Debtors have refused to release the BOBA held in FTX.com custodial accounts to their rightful owners, those BOBA owners cannot stake their tokens to vote on governance proposals put forward in the Boba DAO. Shook Decl., ¶ 12. And they effectively cannot put forward new governance proposals because they cannot generate support for those proposals, given that nearly half of the BOBA in circulation is inaccessible to its owners. *Id*. ¶ 13.

4

### C.    Debtors' Valuation of BOBA

14.    The face value of customer claims for BOBA, valued in U.S. dollars (USD), is $30.21 million, while the face value of Debtors' BOBA holdings is $32.83 million. *Declaration of Sabrina T. Howell in Support of the Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. No. 5203], *Annex 1, Expert Report of Sabrina T. Howell* [D.I. No. 5203-1] ("Howell Rep.") at 42 (Fig. 13). Thus, Debtors' holdings of BOBA exceed all BOBA held by Boba Foundation and other BOBA owners, meaning that Debtors should have sufficient tokens to return the BOBA to its owners.

15.    But the Plan does not provide for the *return* of Tokens to the Boba Foundation or BOBA to its holders. Rather, in the case of the Boba Foundation, the Plan proposes to provide Boba Foundation with a Dotcom Customer Entitlement Claim that will be paid from Dotcom Customer Priority Assets. *See* Plan at 4.3.5.

16.    Rather than fix the Boba Foundation's claim at the market price, by the Estimation Motion, Debtors propose to pay holders of BOBA only after discounting the market price by 25.0 percent—one of the top five highest discounts Dr. Howell applied to any cryptocurrency. *See* Howell Rep. at 42 (Fig. 13). In addition, for "locked" tokens being held subject to vesting or other release conditions, Dr. Howell proposes a discount to market of 48.38 percent. *Id*. at 94 of 129 (Ex. 4A).

17.    Dr. Howell treats the $30.3 million of BOBA holdings in a manner similar to her treatment of SRM, MAPS, and OXY, even though the Boba Foundation is informed and believes that Debtors or their affiliates controlled the $451.78 million in holdings of SRM, $305.64 million in holdings of MAPs, and $160.25 million in holdings of OXY.[2]

---

[2] *See, e.g.*, https://www.coindesk.com/consensus-magazine/2023/11/07/sam-bankman-frieds-wildest-craziest-dumbest-trades/ [last visited on January 7, 2024] (these coins described as "Sam

### D.    Boba's Attempts to Recover the Tokens

18.    On September 27, 2023, Boba Foundation filed a customer claim in the FTX Trading Ltd. bankruptcy, Case No. 22-11068. Keller Decl. ¶ 3. Debtor's schedules indicate that Boba Foundation's account, Customer Code 01442154, holds 13,209,445 BOBA, $184.03, and 0.00000001 USDT (Tether).

19.    On July 6, 2023, counsel for Boba Foundation contacted counsel for the Ad Hoc Committee at Morris, Nichols, Arsht & Tunnell LLP and Eversheds Sutherland regarding recovery of the Tokens. *Id.* ¶ 4. On July 10, 2023, I spoke with counsel about Boba Foundation's interests and the role of the Ad Hoc Committee. *Id.*

20.    On August 4, 2023, counsel for Boba Foundation spoke with counsel at Landis Rath & Cobb, LLP, local counsel for Debtors, to request recovery of the Tokens. He offered to make an inquiry with Debtors about Boba Foundation's desire to recover the Tokens. *Id.* ¶ 5.

21.    On August 17, 2023, Boba Foundation's counsel contacted counsel at Landis Rath to follow up. He responded but did not have any update. *Id.* ¶ 6.

22.    Boba Foundation's counsel again followed up on December 5, 2023, at which point Landis Rath made an introduction to Debtors' counsel Sullivan & Cromwell. *Id.* ¶ 7.

23.    On December 7, 2023, Boba Foundation's counsel spoke by telephone with counsel at Morris Nichols, who recommended a call with Sullivan & Cromwell. *Id.* ¶ 8.

24.    On December 8, 2023, Boba Foundation's counsel spoke with counsel at Sullivan & Cromwell and requested that the tokens be returned in exchange for a waiver of Boba Foundation's claim. *Id.* ¶ 9. Debtors' counsel indicated that there was no practical path for

---

Coins" because of Sam Bankman-Fried's trading firm's "sizable ownership and direct control over the supply.")

returning the tokens in kind at that time. *Id.* Debtors' counsel also noted that Debtors would be filing an amended plan later that month. *Id.*

25.     The Estimation Motion had been alluded to in previous filings, but Debtors had not indicated that they would be applying asset liquidation discounts. They certainly had not indicated that they intended to discount BOBA holdings by 25 to 48 percent.

26.     On January 8, 2024—three days ago—Boba Foundation's counsel was first served by electronic mail with the Estimation Motion and supporting papers. *Id.* ¶ 10.

**III.    Argument**

     **A.    The Estimation Motion should not be heard until Debtors establish rights in BOBA pursuant to a duly filed adversary proceeding.**

27.     The Estimation Motion presumes without discussion that, rather than remaining property of Boba Foundation, the Tokens will be the subject of Customer Entitlement Claims. *See* Estimation Motion at ¶18; *see generally Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 4861] (the "Plan"). For the reasons set forth in the *Opening Brief in Support of the Ad Hoc Committee of Non-US Customers of FTX.com's Motion for Partial Summary Judgment* in Adversary Proceeding No. 22-50514 [A.D.I. 11] ("Ad Hoc Comm. Mot."), which arguments are incorporated as if set forth herein, Debtors have no interest in the Tokens and should not be permitted to sell them.

28.     Boba Foundation intends to vigorously defend its position that the Tokens were held in a custodial account for the benefit of Boba Foundation and that none of Debtors have anything other than a mere possessory interest in the Tokens. Boba Foundation denies that Debtors have the right to sell its Tokens, all of which were and remain in Debtors' possession.

29.     Notwithstanding the foregoing, neither the Estimation Motion nor the Plan address whether Debtors have *any* interest in the Tokens. Selling the Tokens, which are Digital

Assets within the meaning of the Plan, requires this Court's determination that Debtors have that power and authority. *See* § 363(b)[3] (authorizing sale only of "property of the estate"); § 363(f) (identifying circumstances under which the property of the estate may be sold free and clear of another party's interest). To the extent that Debtors assert that Boba Foundation does not have an interest in the Tokens, or that Debtors share an interest in the Tokens notwithstanding Boba Foundation's assertion to the contrary, Debtors must commence an adversary proceeding to (a) determine the "extent of . . . [an] interest in property" (Fed. R. Bankr. P. 7001(2), (b) obtain approval to sell the alleged "interest of the estate and of a co-owner" of the Tokens (Fed. R. Bankr. P. 7001(3)), or (c) obtain a declaration regarding the foregoing (Fed. R. Bankr. P. 7001(9)).

30.    Debtors in other bankruptcies have tried, as Debtors' do here, to sell assets in which the estate's interest was disputed; the courts have wisely rejected these attempts. *In re Eastman Kodak Co.*, No. 12-10202, 2012 Bankr. LEXIS 2746, at *4–7 (Bankr. S.D.N.Y. June 15, 2012); *see also id.* at *10, n.6 (citing *In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261, 2008 Bankr. LEXIS 2120, 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) ("It is worth noting . . . that in *Whitehall*, the debtors . . . had not made even a *prima facie* showing that the property to be sold was property of the estate").

31.    The Estimation Motion presents a narrow but complex valuation question (from the standpoint of data and analytics) that will take time to evaluate and substantively oppose. *See* Section D below. But Boba Foundation should not be required to muster the resources necessary

---

[3]    All statutory references are to the Bankruptcy Code, 11 U.S.C. sections 101 *et seq.*, unless otherwise indicated.

to address the Estimation Motion until after Debtors have brought and prevailed in an adversary proceeding that concludes that Debtors have more than a possessory interest in the Tokens.

### B.    Estimation of the Tokens' value is not mandatory, and estimation on these facts is unnecessary and inappropriate.

32.    Estimation pursuant to section 502(c) is mandatory *only* if this Court "determines that liquidating the contingent or unliquidated claim 'would unduly delay the bankruptcy case.'" Estimation Motion ¶ 16, citation omitted. Here, Boba Foundation's claim is neither contingent nor unliquidated. And even if liquidation of Boba Foundation's claim were necessary, that process would have no impact on the administration of these cases or on Plan confirmation.

### 1.    Boba Foundation's claim is neither contingent nor unliquidated.

33.    The Estimation Motion does not assert that Boba Foundation's claims are contingent. Rather, it is premised on customers' current, matured interests in specific tokens. *See generally* Estimation Motion ¶ 9 (describing customer claims).

34.    The Estimation Motion asserts that claims relating to the Tokens are unliquidated because "the amount owed has not been determined." Estimation Motion ¶ 17. Here, however, Debtors and Boba Foundation know *exactly* the number of Tokens that FTX Trading Ltd. is holding in custody for Boba Foundation. The only question is the conversion rate.

35.    Curiously, Debtors themselves identify several crypto cases in which customer claims were treated as liquidated claims based entirely on trading prices as of the debtor's petition date. Estimation Motion ¶ 26; *see In re BlockFi Inc.*, Case No. 22-19361 (Bankr. D.N.J. Aug. 8, 2023), D.I. 1443 (Digital Assets Conversion Table based on "USD Price as of 11/28/22"); *In re Voyager Digital Holdings*, Case No. 22-10943 (Bankr. S.D.N.Y. Mar. 5, 2023), D.I. 1138 ("Account Holder Claims shall be valued in U.S. dollars as of the Petition Date"); *In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. Sept. 27, 2023), D.I. 1420 ("Petition

Date USD Coin Prices as of 8:10 PM ET on 7/13/2022"). There is no apparent reason to treat

claims relating to the Tokens differently here.

36.     More generally, the question of whether a claim is liquidated is not a new one.

One court collected cases in 1990, noting that:

> The majority of courts that have considered this issue have held that
> a debt is liquidated if the amount due can be determined with
> sufficient precision and that debts of a contractual nature, even
> though disputed, are liquidated. Several of these courts quote the
> following passage from C.T. McCormick, Damages, § 54 p. 213
> (1935) to support this conclusion:
>
> A claim is liquidated if the evidence furnishes data which, if
> believed makes it possible to compute the amount with exactness,
> without reliance upon opinion or discretion. Examples are claims
> upon promises to pay a fixed sum, claims for money had and
> received, claims for money paid out, and claims for goods or
> services to be paid for at an agreed rate. If the claim is one of the
> kinds mentioned above, it is still liquidated; by what seems the
> preferable view, even though it is disputed in whole or in part.

*In re Pennypacker*, 115 B.R. 504 (Bankr. E.D. Pa. 1990) (citations omitted).

37.     Here, the facts suggest the same conclusion that the *BlockFi, Voyager*, and *Celsius*

courts reached:  It is possible to compute the amount with exactness and without reliance on

opinion or discretion—just look at the trading price on Debtors' petition date. The Estimation

Motion does not provide any rationale for why the market price should be adjusted for a

hypothetical sale of *all* the BOBA in Debtors' custody, nor is one apparent. The Boba Foundation

has never given any indication it had a desire or need to sell the Tokens. In fact, selling the

BOBA holdings will do significant harm to the Boba Network by driving down the price of the

token and upending the governance structure.

38.     Thus, because Boba Foundation's claims are neither contingent nor unliquidated,

estimation is not authorized by section 503(c).

**2.      Valuing the Tokens is immaterial to the plan and will not unduly delay the bankruptcy case or consideration of the plan.**

39.      Even assuming that Boba Foundation's claims were unliquidated, the need to liquidate a claim alone does not warrant estimation even if estimation could be accomplished more quickly. *See In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997) ("From the plain language of § 502(c), it is clear that estimation does not become mandatory merely because liquidation may take longer and thereby delay administration of the case. Liquidation of a claim, in fact, will almost always be more time consuming than estimation.").

40.      The precedent cited in the Estimation Motion illustrates circumstances in which estimation has been found to be mandatory. In *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005), the court found estimation of asbestos claims mandatory in a case with "more than 150,000 asbestos claims pending against [the Debtor], with the prospect of several hundred thousand more asbestos-related personal injury claims being filed in the future. In *In re Lane*, an individual's case that had been pending for four years had been held up by an unliquidated claim in which the claimant sought $5 million and, on these facts, the Court held, "No plan of reorganization can be confirmed so long as this claim remains unliquidated and not estimated." 68 B.R. 609, 611 (Bankr. D. Haw. 1986)

41.      By contrast, this Court and others have found that "[a]bsent a finding of undue delay, 'it is within this Court's sound discretion and not the obligation of this Court to estimate a claim.'" *In re RNI Wind Down Corp.*, 369 B.R. 174, 191 (Bankr. Del. 2007) citing *In re Apex Oil Co.*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989).

42.      As set forth below, determination of the value of the Tokens makes no material difference in Debtors' attempts to confirm their Plan, as the Token claims are neither so large nor so voluminous as to affect case administration or plan confirmation.

43.     The Estimation Motion argues that claims involving Digital Assets (as defined

therein) are unliquidated and must be valued. In doing so, it makes no distinction among various

tokens. But the Howell Report does. The Howell Report shows that, of $3.8 billion of "Other

Digital Assets," approximately 70%, or $2.6 billion, is accounted for in Bitcoin and Ethereum

claims. Howell Rep. at 33 (Fig. 11). Of the remaining $1.16 billion in claims on tokens included

among Other Digital Assets, over 95% ($1.12 billion) involve just three tokens: SRM, MAPS,

and OXY. *Id.* at 33 (Fig. 11) and 42 (Fig. 13).

44.     Boba Foundation is informed and believes that SRM, MAPS, and OXY were part

of FTX-backed decentralized finance brokerage networks known as Serum, Maps.me and

Oxygen, and that these coins were referred to as "Sam's Coins" for FTX's founder, Sam

Bankman-Fried.[4]

45.     In contrast, BOBA are not "Sam's Coins." Rather, holders of BOBA, like Boba

Foundation, entered into custodial agreements with FTX Trading Ltd., and (to Boba

Foundation's knowledge) were not held, traded, or otherwise used in material amounts by

Debtors. They bear little similarity to SRM, MAPS, and OXY, and Boba had no intention of

liquidating its Tokens on any timetable, much less the timetable discussed in the Howell Report.[5]

46.     Moreover, Debtors' expert report states that the face value of the BOBA tokens

are, in the aggregate, $30.2 million. Howell Rep at 42 (Fig. 13). The total of all Other Digital

---

[4]   *See* Crypto.news, "Maps.me and Oxygen have tokens locked up in FTX", November 16, 2022
("These two initiatives are part of the 'Sam's coins' group, including SRM, MAPS, OXY, and
FIDA").  Downloaded at https://crypto.news/maps-me-and-oxygen-have-tokens-locked-up-in-
ftx/ on January 7, 2024.

[5]   Indeed, a manifest unfairness of the Estimation Motion is that Boba is being penalized for
using FTX primarily as a custodian, not a dynamic trading platform, because the Howell Report
discounts BOBA for its lack of trading activity. Because Boba is a long-term holder of BOBA,
not a trader, a valuation that presumes a trading discount fundamentally misunderstands the role
and use of BOBA.

Assets held by Debtors is $7.7 billion and the total of all assets held by Debtors is $9.5 billion. *Id*. at 8 (Fig. 1). Thus, claims relating to BOBA tokens in the aggregate constitute 0.39% and 0.33%, respectively, of Debtors' Other Digital Assets and total assets. Because the Estimation Motion seeks a discount of 25% of the value of BOBA tokens, the net impact to the estate would be 25% of the total value of BOBA claims, or 0.1% of Debtors' Other Digital Assets and 0.08% of all of Debtors' assets; similarly, because the Estimation Motion seeks a discount of 48.38% of the value of locked BOBA tokens, the net impact to the estate would be 48.38% of the total value of locked BOBA claims, or 0.19% of Debtors' Other Digital Assets and 0.16% of all of Debtors' assets.[6] The small size of Boba Foundation's Tokens relative to Other Digital Assets and total assets held by Debtors belies Debtors' assertion that valuing the Tokens would unduly delay their Chapter 11 Cases. Estimation Motion at 9.

47.     Accordingly, the value of the Tokens and whether BOBA is discounted will make no difference to recoveries in Debtors' cases, and the estimation of Boba Foundation's claims pursuant to the Estimation Motion is neither mandatory nor fair under the circumstances.

**3.     Estimation should be for purposes of solicitation and voting only.**

48.     The Estimation Motion is clear that Debtors seek to estimate "for Plan solicitation and voting purposes." Estimation Motion ¶ 20. But the Estimation Motion further seeks to estimate BOBA claims for distribution purposes, asserting without evidence that "liquidation of the Claims based on Digital Assets would unduly delay, and potentially preclude, distributions

---

[6]   The Howell Report does not identify how Debtors' assets would be distributed among the classes of creditors identified in the Plan, so the impact on Boba Foundation's class (Class 5A) would be larger than the infinitesimally small numbers set forth above. Boba Foundation does not believe that Debtors will be able to show that these amounts would be material under any circumstance but, as discussed above, Boba Foundation should be permitted discovery sufficient to challenge any such allegation.

under any plan in these Chapter 11 Cases." Estimation Motion ¶ 22. Why this is the case is not explained. While there are indeed many BOBA claims, it is common in mega-cases that claims must be, and are, resolved post-confirmation. (The Plan has typical provisions regarding the treatment of disputed claims. *See* Plan at Article 8.)

49.     Moreover, Debtors have proposed a "pot" plan funded with the proceeds of the Dotcom Customer Priority Assets. Plan at § 4.3.5. For the reasons set forth above, the outcome of disputes regarding BOBA claims will not materially impact recoveries to holders of Class 5A claims.

50.     In sum, the Court should not credit Debtors' summary allegation of "undue delay." Debtors submit no evidence or even meaningful argument as to why normal procedural rules should not apply to Boba Foundation and other holders of BOBA claims. Thus, even if the Court were otherwise inclined to grant the Estimation Motion for purposes of solicitation and voting purposes, it should not bind holders of BOBA for purposes of distribution under the Plan.

**C.     Boba Foundation should be permitted to review and challenge the Estimation Motion.**

51.     As discussed above, the Estimation Motion assumes without addressing a critical question that Boba Foundation is entitled to litigate:  Do Debtors have any interest in Boba Foundation's Tokens? The Estimation Motion should not be considered until that question is litigated and resolved.

52.     Instead, the Estimation Motion seeks summary adjudication of the value of customer claims based on digital assets. Assuming, *arguendo*, that the matter were ripe for resolution before Debtors' contested ownership interest is resolved, Boba is entitled to the protections afforded by Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Bankr. P.

7056, 9014. As discussed below, Boba is entitled to seek and obtain substantial discovery before the issues raised by the Estimation Motion can be resolved. *See* Fed. R. Civ. Proc. 56(d).

53.     The Third Circuit recognizes that courts are "obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery." *Dowling v. Philadelphia*, 855 F.2d 136, 139 (3d Cir. 1988). The party seeking further discovery under Rule 56(d) must "submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Dowling v. Philadelphia*, 855 F.2d 136, 140 (3d Cir. 1988). In the Third Circuit, "a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course" where these requirements are met. *Atl. Deli & Grocery v. United States*, No. 10-4363 (JBS/AMD), 2011 U.S. Dist. LEXIS 55395, at *8 (D.N.J. May 23, 2011); *see also Sames v. Gable*, 732 F.2d 49, 51 (3d Cir. 1984) (similar).

### 1.     Debtors' theory of ownership and valuation has significant implications for the treatment of the Tokens.

54.     Before Boba Foundation can formulate a discovery plan, it needs to understand the basis upon which Debtors assert rights to the Tokens. To date, Debtors have not disclosed, much less explained, the theory upon which their alleged interest in the Tokens is premised. Boba Foundation should be permitted to take discovery relating to that theory, as it raises questions that will have material implications for the treatment of its assets:

        a.      If premised on avoidance or recharacterization of Boba Foundation's interest in its Tokens, does Boba Foundation maintain a lien or other cognizable interest that would give it rights akin to those of lien holders, *e.g.*, to make a credit bid, make an election pursuant to section 1111(b), or enforce the absolute priority rule?

15

      b.      If premised on equitable theories, how do Debtors propose to protect the governance rights conferred upon holders of BOBA? Can BOBA holders enforce those rights, which may not be "claims" because the holders may be entitled to equitable remedies for which there is no right to payment? *See* § 101(5)(B).

Keller Decl. ¶ 11.

55.     Once the theory is explained, Boba Foundation is entitled to understand it and the factual allegations underlying it. As of the date of this Opposition, Boba Foundation has had no basis upon which to conduct discovery on this critical assumption. *Id*. ¶ 12.

      **2.**      **Boba Foundation should be permitted to fully and fairly litigate the issues raised in the Estimation Motion.**

56.     The sheer volume of analysis purportedly supporting the Estimation Motion makes clear that any person opposing it will need time to assess and evaluate the motion and its conclusions. Indeed, in support of their motion, Debtors filed:

      a.      The 52-page expert report of Dr. Howell, supported by more than 70 pages of Appendices. Howell Rep. and Appendices [D.I. No. 5203-1]. It contains a detailed analysis to value "creditor claims" based on digital assets. *Id*. at 1–2.[7]

      b.      The 21-page declaration of Kevin Lu, Director of Data Science & Product at Coin Metrics, supported by 32 pages of Appendices, explaining in detail the

---

[7]  As discussed above, Boba Foundation disagrees with Dr. Howell's central underlying assumptions, which include that: (a) the digital assets FTX held in trust for Boba Foundation and other customers constitute "creditor claims," (b) "[t]he imbalance between the composition in customer claims based on fiat and digital asset holdings and that reflected on the balance sheets of Debtors means that Debtors are unable to return all fiat and digital assets to their customers in kind," and (c) the fact that digital assets were commingled means that it will be necessary (1) to value those assets in USD as of the petition date and (2) "for the Debtors to liquidate their balance sheets in order to provide distributions in USD under any confirmed plan of reorganization." Howell Rep. at 2. The Court should afford Boba Foundation adequate time to develop its arguments in opposition to these assumptions. Keller Decl. ¶ 13.

methodology Debtors used to establish the prices in USD for each of the digital assets as of the petition date. *See Declaration of Kevin Lu in Support of Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. No. 5204] ("Lu Decl.")

57.     Boba Foundation must be permitted to review and respond to these materials, which present numerous questions and challenges. For instance:

a.     Dr. Howell focused much of her analysis on estimating an "Asset Liquidation Discount" to be applied to tokens for which the market is relatively illiquid. Howell Rep. at 36–42. To reach this discount amount, Dr. Howell used something she refers to as the Kyle and Obizhaeva model. Howell Rep. at 39–41, C-9–C-14, Ex. 3 (Asset Liquidation Discounts). Dr. Howell applied a further discount to tokens she deemed "Non-Marketable Digital Assets," referencing models of Finnerty (210) and Ghaidarov (2009). *Id*. at 34–35, C-14–C-17, Ex. 4A (Non-Marketable Assets – LOCKED Digital Assets). Boba Foundation is unable to evaluate this work without assistance and access to Dr. Howell's workpapers.

b.     For customer holdings of BOBA, Dr. Howell applied a 25 percent Asset Liquidation Discount. Howell Rep. at 42. She applied a further 31.1 percent discount for lack of marketability to customer holdings of BOBA_LOCKED. *Id*. at 47. Dr. Howell combines these discounts to reduce the locked holdings of Boba Foundation and similarly situated customers by 48.38 percent, the 14th highest discount applied to any of the 1,321 unique assets Dr. Howell evaluated. *Id*. at Ex. 4A, p. 1, and *id*. at 8. Again, Boba Foundation needs assistance and access to Dr. Howell's workpapers.

58.     Boba Foundation had no prior notice that Debtors planned to assert that all digital assets held in trust are estate property, that Debtors planned to liquidate all digital assets, or that

17

Debtors would apply a discount of 25 to almost 50 percent to the Tokens that FTX purportedly held as a custodian. *Id*. ¶ 14.

59.     In fact, Boba Foundation was diligent in its efforts to engage with Debtors about its claim and desire to recover its BOBA. As set forth more fully in the Keller Declaration, Boba Foundation attempted to engage with Debtors' counsel and the Ad Hoc Committee's counsel on several occasions regarding treatment of the Tokens. *Id*. ¶¶ 4–9 . Notwithstanding its outreach and efforts to recover the Tokens, it received no indication that the specific relief sought in the Estimation Motion was in the works. *Id*. ¶ 15.

60.     Boba Foundation believed that Debtors were open to considering its proposals. *Id*. ¶ 16. Indeed, Debtors' Term Sheet prepared in connection with the Settlement and Plan Support Agreement ("Term Sheet") indicated that "certain customers may receive non-cash distributions in the form of tokens or e-money . . . ." Term Sheet [D.I. No. 3291-1] at 15, n.4. Boba Foundation expected that it would be a candidate for an in-kind distribution, given the relative illiquidity of the market for BOBA and the harm that the Boba Network would suffer if Debtors were allowed to liquidate customers' holdings, which represent nearly half of the outstanding market for BOBA. Keller Decl. ¶ 17.

61.     While Boba Foundation was aware that Debtors' Plan proposed to give Debtors the authority to sell digital assets generally, it was never advised that Debtors' position would be that they would not return its BOBA in kind under the Plan. *Id*. ¶ 18. Moreover, Debtors' Notice of Proposed Settlement of Customer Property Disputes [D.I. No. 3291], filed in mid-October, made no mention of Dr. Howell's work or that she would be applying discounts of up to 100 percent against customers' digital assets held in trust.

62.     Counsel for Boba Foundation was first served with the Motion by electronic mail on January 8, 2024, three days before this Opposition was due. *Id*. ¶ 10.

63.     In light of the foregoing, it was reasonable that Boba did not anticipate or begin to prepare for litigation prior to the filing of the Estimation Motion.

## IV.   <u>Conclusion</u>

**WHEREFORE**, Boba Foundation respectfully requests that the Court deny the Estimation Motion pending resolution of ownership questions regarding the Tokens and afford Boba Foundation adequate time to commence and complete discovery on the matters raised therein.

Dated: January 11, 2024                    **PASHMAN STEIN WALDER HAYDEN, P.C**

By:  <u>*/s/ John W. Weiss*</u>
      John W. Weiss (Del. Bar 4160)
      1007 North Orange Street, 4th Floor #183
      Wilmington, DE 19801
      Telephone: (302) 592-6496
      Email: jweiss@pashmanstein.com

      -- and --

      **KELLER BENVENUTTI KIM LLP**
      Tobias S. Keller (Cal. Bar 151445) *pro hac vice application pending*
      Traci Shafroth (Cal. Bar 251673) *pro hac vice application pending*
      425 Market Street, 26th Floor
      San Francisco, California 94105
      Telephone: (415) 496-6723
      Email:  tkeller@kbkllp.com
                tshafroth@kbkllp.com

      *Attorneys for Boba Foundation*