**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br>(Jointly Administered)<br><br>**Hearing Date: January 25, 2024 at 10:00 a.m. (ET)**<br>**Obj. Deadline: January 11, 2024 at 4:00 p.m. (ET)** |

**PRELIMINARY OBJECTION OF FONDATION SERENDIPITY, FONDATION
ELEMENTS, SERENDIPITY NETWORK LTD
AND LIQUIDITY NETWORK LTD TO THE FTX DEBTORS' MOTION
TO ESTIMATE CLAIMS BASED ON DIGITAL ASSETS**

Fondation Serendipity, Fondation Elements, Serendipity Network Ltd. and Liquidity Network Ltd (collectively, the "**Foundations**"), by and through their undersigned counsel, hereby submit this preliminary objection (the "**Preliminary Objection**") to the *Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. No. 5202] (the "**Estimation Motion**")[1] filed by the debtors and debtors-in-possession (collectively, the "**FTX Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). In support of their Preliminary Objection, the Foundations respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The Estimation Motion, which was filed between Christmas and New Year's Day on two weeks' notice, purports to delete billions of dollars of token value that was ascertainable in the market or otherwise recorded on the FTX Debtors' books and records as of the Petition Date. Though couched as an Estimation Motion, it is, in reality, a claim disallowance motion that flips the ordinary claims process afforded under sections 502(a) and 502(b) of the Bankruptcy Code on

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Estimation Motion.

its head, leaving countless customers without recourse and without ever having had their day court. While the desire to confirm a fair chapter 11 plan in an expedient way is a goal shared by the FTX Debtors and their customers and creditors, alike, expediency cannot justify the degree to which the Estimation Motion compromises the most-affected customers' due process, voting and economic rights.

2. The Estimation Motion should be denied because the FTX Debtors cannot meet their burden that the liquidation of claims would *unjustifiably* delay these Chapter 11 Cases. As other cryptocurrency exchange bankruptcies have demonstrated, bankruptcy cases can proceed expeditiously to plan confirmation in the traditional way: by valuing claims as asserted by customers in the first instance, maintaining appropriate reserves, and proceeding to liquidate claims through the objection process. A different tact is not required in these Chapter 11 Cases.

3. Moreover, painting with a broad brush, the FTX Debtors seek leave to estimate claims that are neither unliquidated nor contingent (putting aside strenuous assertions to the contrary) and, therefore, are not subject to estimation. The Foundations timely filed customer claims for Digital Assets in a liquidated amount based on their market price as of the Petition Date computed using readily observable sources. Under section 502(a) of the Bankruptcy Code, these claims are deemed allowed unless objected to by the FTX Debtors. The Foundations are assuredly not the only customers who submitted proofs of claims in this way. At a minimum, the Estimation Motion should be denied with respect to the Foundations' customer claims.

4. The FTX Debtors seek to short-cut what they pose to be *the central issue* in this case – valuing digital assets as of the Petition Date – but this Court should not let them. Customers should be afforded appropriate due process and sufficient time to digest the bespoke valuation methodology proposed by the FTX Debtors in the Estimation Motion, which their experts have

undoubtedly been preparing for months, given its pervasive impact on the voting, plan confirmation and distributions rights of all customers in these Chapter 11 Cases. While the Foundations were able to stipulate an alternative schedule within which to litigate matters related to the valuation of MAPS, OXY and/or SRM tokens, representing just a few of the scores of tokens in the crosshairs of the Estimation Motion, if the Estimation Motion is granted, countless other customers whose claims may be adversely and unfairly compromised by the Estimation Motion simply may not have the resources or sufficiently concentrated exposure to obtain similar accommodations. This is, of course, exactly what the FTX Debtors intended. Their gambit to curtail customers' due process rights should be seen for what it is and denied.

5.  In addition to being procedurally deficient, the Estimation Motion should be denied because it is legally defective. Rather than seeking to estimate claims as of the Petition Date from the perspective of creditors, the FTX Debtors instructed their expert to discount token values based on the value that could be realized *by the FTX Debtors'* in conducting an orderly liquidation of *their own holdings of such tokens* (the "**Asst Liquidation Discount**"). This position makes no sense. If the value that the FTX Debtors could realize from selling digital assets bore any relationship to the value at which customer claims should be allowed, then every customer with a claim for a Digital Asset that the FTX Debtors did not actually have on the Petition Date – and, according to the Estimation Motion, there were 744 such tokens -- should be valued at zero. Such an approach cannot be, and is not, the law. Nor can the Asset Liquidation Discount, which purports to reduce and extinguish claims because the FTX Debtors have too many (rather than too few) Digital Assets, be the law. Accordingly, the Estimation Motion's application of the Asset Liquidation Discount should be rejected *ab initio* as a matter of law.

3

## FACTUAL BACKGROUND

6. Fondation Serendipity ("**Serendipity Foundation**") is organized as a private foundation under Swiss law. Its principal mission is to supervise the issuance and deployment of MAPS tokens, including community tokens, for the benefit of the Maps.me ecosystem.[2]

7. Serendipity Network Ltd ("**SNL**" and, together with Serendipity Foundation, the "**Maps.me Foundation**") is Serendipity Foundation's wholly-owned subsidiary. SNL was formed for the primary purpose of issuing MAPS tokens.

8. Fondation Elements ("**Elements Foundation**") is organized as a private foundation under Swiss law. Like Serendipity Foundation with respect to the Maps.me ecosystem, Elements Foundation's principal mission is to supervise the issuance and deployment of OXY tokens, including community tokens, for the benefit of the Oxygen.org ecosystem.[3]

9. Liquidity Network Ltd ("**LNL**" and, together with Elements Foundation, the "**Oxygen.org Foundation**") is Elements Foundation's wholly-owned subsidiary. LNL was formed for the primary purpose of issuing OXY tokens.[4]

10. Serendipity Foundation serves as custodian for 2 billion MAPS tokens issued for their eventual deployment into the Maps.me ecosystem to support its development. Additionally, in view of the critical role to be played by the Maps.me ecosystem in seeding the development of the Oxygen.org ecosystem, Serendipity Foundation also holds 1 billion OXY tokens. Serendipity

---

[2] Maps.me is a mobile maps and navigation services application. Tens of millions of people use Maps.me to navigate across 195 countries. Maps.me adopted MAPS tokens as its ecosystem token.
[3] Oxygen.org is a decentralized finance ecosystem offering a prime brokerage service protocol and a non-custodial mobile wallet. Its on-chain prime brokerage is built on the Serum ecosystem, running on Solana's scalable block-chain and seeded by millions of users of Maps.me. Oxygen.org adopted OXY tokens as its ecosystem token.
[4] Neither Elements Foundation nor Serendipity Foundation has ultimate beneficial owners. The Foundations' organizational structure is commonly used in decentralized finance projects featuring digital assets.

Foundation has maintained an account with the FTX Debtors in which, as of the Petition Date, it held its allocation of MAPS and OXY tokens.[5]

11.    Elements Foundation serves as custodian for 2 billion OXY tokens issued for their eventual deployment into the Oxygen.org ecosystem to support its development. Elements Foundation has maintained an account with the FTX Debtors in which, as of the Petition Date, it held its allocation of OXY Tokens.

12.    On June 30, 2023, and September 28, 2023, the Foundations filed proofs of claim asserting customer claims against the FTX Debtors. Serendipity Foundation filed a customer claim for 2 billion MAPS tokens and 1 billion OXY tokens as of the Petition Date. Serendipity Foundation liquidated its claim by multiplying the number of MAPS tokens by $0.1072, which was the price per token of MAPS, and by multiplying the number of OXY tokens by $0.03232, which was the price per token of OXY, in each case as sourced from CoinMarketCap on the Petition Date, for an aggregate liquidated claim amount of $246,720,000.[6]

13.    Elements Foundation filed a customer claim for 2 billion OXY tokens as of the Petition Date. Elements Foundation liquidated its claim by multiplying the number of OXY tokens by $0.03232, as sourced from CoinMarketCap on the Petition Date, for an aggregate liquidated claim amount of $64,640,000 as of the Petition Date.[7]

---

[5] Although Serendipity Foundation has held 2 billion MAPS tokens and 1 billion OXY tokens since the initial issuance and minting of such tokens, to date, the Schedules and Statements filed by the FTX Debtors do not reflect Serendipity Foundation's MAPS tokens. The position set forth in the FTX Debtors' Schedules and Statements omitting MAPS tokens from Serendipity Foundation's account is plainly erroneous and should be corrected. Serendipity Foundation reserves all right with respect to this error.
[6] 471,232,877 MAPS tokens were unlocked and 1,528,767,123 MAPS tokens were locked as of the Petition Date. 179,389,312.97709919 OXY tokens were unlocked and 820,610,687.02290081 OXY tokens were locked as of the Petition Date.
[7] 358,778,625.95419838 Oxy tokens were unlocked and 1,641,221,374.04580162 OXY tokens were locked as of the Petition Date.

14. On November 2, 2023, the Oxygen.org Foundation transferred its claims against the FTX Debtors to Lavanda Sands, L.L.C. ("**LSL**"). LSL supports this Preliminary Objection.

15. On December 16, 2023, the Debtors filed (i) the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 4861], (ii) the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession* [D.I. 4862] (the "**Disclosure Statement**"), and (iii) the *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Packages; (III) Approving the Forms of Ballots; (IV) Establishing Voting, Solicitation and Tabulation Procedures; and (V) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 4863] (the "**Solicitation Procedures Motion**").

16. On December 27, 2023, the FTX Debtors filed the Estimation Motion requesting the entry of an order pursuant to sections 105(a) and 502(c) of the Bankruptcy Code estimating the value of MAPS and OXY tokens at $0.00 as of the Petition Date and, accordingly, the value of the Foundations' customer claims at $0.00 for voting, plan confirmation and distribution purposes.

17. The FTX Debtors have stated that they intend to soon file a further amended Plan and Disclosure Statement to incorporate their recently announced settlement with the Joint Official Liquidators of FTX Digital Markets Ltd. [D.I. 4904] and certain other changes, including the Digital Assets Conversion Table requested by the Estimation Motion

18. According to the FTX Debtors, the Digital Assets Conversion Table is integral to advancing the Plan confirmation process. The proposed Solicitation Procedures Order requires that, for the purposes of the Solicitation and Voting Procedures, to the extent all or part of any Claim includes Digital Assets, such Digital Assets should be valued and converted to U.S. dollar

amounts using the Digital Assets amounts set forth on the FTX Debtors' Schedules or in a timely filed proof of claim as converted by the valuations to be set forth in an order by the Court. (*See* Solicitation Procedures Motion, ¶ 56.) A U.S. dollar value for Claims based on Digital Assets is also required for determining projected recovery ranges for such Claims in the Disclosure Statement. (Disclosure Statement, § 1.B.)

## OBJECTION

I. **The FTX Debtors Have Note Carried Their Burden Under Section 502(c) of the Bankruptcy Code**

   A. **Liquidating Claims in the Ordinary Way would not Unduly Delay the Administration of These Chapter 11 Cases**

19. The Estimation Motion should be denied because the FTX Debtors have failed to carry their burden that the estimation of all Digital Assets Claims in the manner proposed is necessary to avoid undue delay in the administration of these Chapter 11 Cases. Contrary to the FTX Debtors' conclusory assertion that all "[c]laims based on Digital Assets are unliquidated," and, therefore, subject to estimation, courts uniformly recognize that the decision to estimate claims under 502(c)(1) "is within [the court's] sound discretion and not the obligation of [the court]," absent a showing of "undue delay." *In re RNI Wind Down Corp.*, 369 B.R. 174, 192 (Bankr. D. Del. 2007). This is because "[b]ankruptcy law's general rule is to liquidate, not estimate." *In re Dow Corning*, 211 B.R. 545 at 560 – 61 (Bankr. E.D. Mich. 1997).

20. In addition, "[b]ecause estimation is a second-best method, [the scope of estimation] should be confined to the extent necessary to accomplish the overarching goal of avoiding undue delay and not expanded beyond that point." *In re North American Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C. D. Cal 2016). Therefore, "the party moving for estimation must

7

show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process." *In re Dow Corning*, 211 B.R. at 573 (Bankr. E.D. Mich. 1997).

21. Importantly, courts have held that "undue delay" must rise to a level more than ordinary delay; instead, it must be "unjustifiable" delay. *Id*. at 563; *In re Teigen*, 228 B.R. 720, 723 (Bankr. D.S.D. 1998); *see also In re A&B Assocs., L.P.*, 2019 WL 1470892, at *36 (Bankr. S.D. Ga. Mar 29, 2019) (stating that "undue delay is an "excessive or unwarranted slowing of the administration of a debtor's case." quoting *In re John Q. Hammons Fall 2006, LLC*, 2017 Bankr. LEXIS 3550, at *4 (Bankr. D. Kan. Oct. 13, 2017). Courts do not simply rubber stamp requests for estimation procedures, but conduct a factual inquiry into the purported delay identified by the movant and the movant's motivation for estimating, and in a number of circumstances have found that estimation under 502(c) of the Bankruptcy Code is not warranted. *See, e.g.*, *In re Dow Corning*, 211 B.R. at 562-74; *In re Lightsquared Inc.*, 2014 WL 5488413, at *5-6 (Bankr. S.D.N.Y. Oct. 30, 2014).

22. Courts generally find undue delay and estimate claims when the debtor's plan has been confirmed, all conditions to distributions have been satisfied and estimation will allow immediate distributions to creditors to flow. *Cf. In re Club Ventures Inv. LLC*, 2012 WL 6139082 (Bankr. S.D.N.Y. Dec 11, 2012) (estimating claims when money was ready to be distributed to creditors but for claims requiring a reserve of 80% of the money in Debtor's escrow); *In re Enron Corp.*, 2006 WL 544463 (Bankr. S.D.N.Y. Jan. 17, 2006) (estimating claim at $0 so that periodic distributions required by confirmed plan could continue and when it was clear that claim had no merit because it was already dismissed in district court and had a low probability of success on appeal); *In re AMR Corp.*, 2021 WL 2954824 (Bankr. S.D.N.Y. July 14, 2021) (granting estimation when Court had already disallowed the claims multiple times, the bankruptcy case had

8

been ongoing for ten years, the plan had been confirmed almost eight years before, and the unliquidated claim caused an interruption in distributions), *with In re Apex Oil Co.*, 107 B.R. 189 (Bankr. E.D. Miss. 1989) (denying estimation when there was no showing of undue delay and debtor's plan was not yet confirmed); *In re RNI Wind Down Corp.*, 369 B.R. at 191 (denying estimation because debtor did not show undue delay and stating that absent a finding of undue delay, the court is not obligated to estimate a claim).

23. Moreover, prior to plan confirmation, courts typically only find undue delay when the process for liquidating claims must be conducted in a different forum and the timeline required by such forum to liquidate claims is untenable; *see, e.g., In re: Lane*, 68 B.R. 609, 611 (Bankr. D. Hawaii 1986) (granting estimation prior to confirmation when it would take state courts an indeterminate amount of time to liquidate a claim); *and In re Interco, Inc.*. 137 B.R. 993, 998 (Bankr. E.D. Mo. 1992) (granting estimation motion pre-confirmation where liquidating a claim through arbitration would scuttle the momentum the debtors were building towards reorganization); or where claim estimation would preclude one or more affected claimants from being entitled to distributions. *See, e.g., In re Innovasystem, Inc.*, 2014 Bankr. LEXIS 5103\*. (Bankr. D.N.J. Dec. 18, 2014) (granting estimation motion pre-confirmation where estimation was limited to voting purposes, rather than distributions).

24. Here, none of the factors that typically give courts comfort to grant estimation motions when asked to do so are present. The FTX Debtors seek to estimate claims before plan confirmation, when distributions are not imminent, with respect to claims that are not subject to the procedural delays attendant to having to liquidate claims in another forum and with respect to claims that each raise matters of first impression that have not previously been determined by this or any other court. On top of that, the FTX Debtors are seeking claims to be estimated for all

purposes, not just, for example, for voting and plan confirmation purposes. The absence in these Chapter 11 Cases of factors that typically give courts comfort when asked to estimate claims should give this Court considerable pause.

25. The FTX Debtors argue that estimating the value of all Digital Asset claims for all purposes is necessary for plan voting and solicitation purposes and to enable them to provide adequate disclosure regarding claim values and distribution ranges. (Estimation Motion ¶ 20.) But, fully and finally fixing the value of Digital Assets is not strictly required for the FTX Debtors to have the information that they need to proceed with Plan confirmation. Between the FTX Debtors' books and records, the Statements and Schedules of Assets and Liabilities and the proofs of claim that have now been filed, the FTX Debtors have all the information necessary to value customer claims for Digital Assets on an "as asserted" basis. This will be a greater amount than the amount that the FTX Debtors seek to elicit from the Estimation Motion, but, with tools at their disposal in a traditional claim objections process, the FTX Debtors are more than capable of progressing expeditiously towards plan confirmation, while saving claim estimation for more targeted matters that are truly an impediment.[8] Alternatively, the FTX Debtors could pursue claim estimation, now, solely with respect to Digital Assets that have market pricing of the Petition Date that their claims valuation methodology largely reaffirms, rather than eliminates. Accordingly, while liquidating claims will take longer to fix the value of customer claims than the Estimation Motion, this additional delay is justifiable, and not undue.

---

[8] It is instructive that other bankrupt, cryptocurrency exchanges have managed to proceed to plan confirmation without seeking to estimate claims on the scale proposed by the FTX Debtors. *Cf.* Order Pursuant to Bankruptcy Rule 1009 Directing the Debtors to Amend Their Schedules in Certain Circumstances [D.I. 1387], *In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. Nov. 11, 2022) (directing the Celsius debtors to amend their schedules to include a non-binding digital assets conversion table).

**B.    The Estimation Motion Should be Denied with Respect to the Foundations Because Their Digital Asset Claims are neither Contingent nor Unliquidated**

26.    The Foundations' claims are neither unliquidated nor contingent and are not properly subject to estimation under 502(c). Accordingly, at a minimum, the Estimation Motion should be denied with respect to the Foundations claims.

27.    A claim is "unliquidated" under the Bankruptcy Code "if the amount of the claim has been ascertained or can be readily ascertained." *See In re Knight,* 55 F.3d 231, 236 (7th Cir. 1995). There are numerous sources of pricing information, such as CoinMarketCap, that are regularly used by market participants, including the FTX Debtors, to calculate the market value of a Digital Asset as of a particular time.[9] The Foundations liquidated the value of MAPS and OXY tokens in their proofs of claim in accordance with their readily ascertainable value from a reputable, third-party pricing source. Accordingly, the Foundations' claims are presumptively liquidated under the Bankruptcy Code. *See* Bankruptcy Rule 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim.").

28.    A claim is "contingent" under the Bankruptcy Code where it "has not yet accrued and . . . is dependent upon some future event that may never happen.'" *In re GCO Servs., LLC*, 324 B.R. 459, 466 (Bankr. S.D.N.Y. 2005) (quoting *In the Matter of Provincetown-Boston Airlines*, Inc., 72 B.R. 307, 310 (Bankr. M.D. Fla. 1987)). A guaranty claim, in which the primary obligation has not come due, and may never come due, is the classic example of a contingent claim. The Foundations' claims include claims for MAPS and OXY tokens that were "locked" as of the

---

[9] The FTX Debtors, for example, have used CoinMarketCap pricing to convert quantities of various digital assets into its US Dollar value in presentations they have made to the Court and to creditors. *See, e.g.*, Preliminary Analysis of Shortfalls at FTX.COM and FTX.US: Materials for Official Committee and other Stakeholders, dated March 2, 2023, at 6.

11

Petition Date.  Unlike a contingent guaranty claim, which requires the occurrence of an extrinsic event for it to become fixed, and no longer contingent, the predicates for "locked" MAPS and OXY tokens to become unlocked are intrinsic to the tokens, themselves, and do not rely on the occurrence of an external event that may never occur.  The tokens simply unlock with the passage of time.  Moreover, as the FTX Debtors acknowledge, the Foundations' Claims, as Customer Entitlement Claims,[10] arose from deposit of MAPS and OXY tokens on the FTX exchange, which could only have occurred prior to the Petition Date.  Thus, the FTX Debtors' obligations of repayment arose prior to the Petition Date and do not depend on the occurrence of any future event.  Accordingly, the Foundations' claims are not contingent as of the Petition Date.

29.     The FTX Debtors may well dispute the validity and amount of the Foundations claims, but it is black letter law that "[s]imply because a debt is disputed by the debtor does not render it 'contingent'." *In re Gordon*, 127 B.R. 574, 578 (Bankr. E.D. Pa. 1991); *see also In re Nicoles*, 184, B.R. 82, 89 (B.A.P. 9th Cir. 1995) ("Whatever the debtor believes, even a bona fide dispute over liability for a claim does not make the debt contingent."); *In re Mazzeo*, 131 F. 3d 295, 303 (2d Cir. 1997) ("We cannot view a debt as contingent merely because the debtor disputes the claim, for that would make the word 'contingent' in the definition of 'claim' redundant.")

30.     Moreover, the liquidation of the Foundations' claims in the ordinary way would not unduly delay these Chapter 11 Cases.  While the Foundations claims are significant in amount, they constitute a relatively small portion of the billions of dollars of total asserted customers claims in these Chapter 11 Cases. Accordingly, the FTX Debtors can and should establish reserves for

---

[10]  The Plan defines "Customer Entitlement Claims" as Claims that "compensate the Holder of such Claim for the value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange." (Plan §2.1.37.)

the fully asserted amounts of the Foundation claims so that the parties can move litigate the validity and amount of the claims on a reasonable timeline.

II. **The Claims Estimation Process Undertaken by the FTX Debtors Is Legally and Procedurally Deficient**

    A. **The Estimation Motion Should be Denied Because It Does Not Afford Due Process to Customers**

31. The Estimation Motion should be denied because the timeline afforded to customers to review and digest the technical methodology that its expert witness have applied to estimate the value of 1,321 unique Digital Assets is simply insufficient relative to the breadth to relief that the FTX Debtors seek to impose via claims estimation. The Estimation Motion was accompanied by two expert reports, which together run more than 100 pages, and which, in turn, are predicated on many more thousands of pages of data sources, authorities, and analyses.

32. Any credible response will require weeks of expert analysis, discovery as to the documents and information underlying the FTX Debtors' and their experts' conclusions, the drafting of a rebuttal report and, prior to any hearing, depositions of the experts on both sides. Yet the FTX Debtors initially proposed to accomplish all of the foregoing in little more than three weeks, and with potentially numerous objecting parties, with objections due by January 11, 2024, and a hearing set to go forward on January 25, 2024

33. The due process afforded to affected customers should be proportionate the degree of relief that the FTX Debtors are seeking. *See, e.g., In re: AMR Corp.*, at 16 -17 (weighing the fact that the claimant had "received his day in court as to his own claims" as being critical to giving the court comfort that estimating the claimant's claim was appropriate). Where the FTX Debtors, through the Estimation Motion, seek to estimate claims arising from certain Digital Assets at zero or to discount substantially observable market pricing as of the Petition Date, customers who filed

proofs of claims in respect of such tokens should, instead, be presumptively entitled to benefit from the traditional claims process. At a minimum, the Court should pause consideration of the Estimation Motion for sufficient time to enable customers to have a full and fair opportunity to assess the impact that it has on their claims and whether to object.

      **B.**    **The Estimation Motion Should be Denied Because the Asset Liquidation Discount Improperly Purports to Value Tokens from the Perspective of the FTX Debtors Rather than from the Perspective of Customers and is Contrary to Law**[11]

      34.    It is axiomatic that, for valuation purposes, claims are valued from the perspective of the creditor, not the debtor. After all, it is the debtor, not the creditor, who filed for insolvency, and the creditor, not the debtor, who is harmed. Yet, astoundingly, the FTX Debtors take the position, without any support, that the fact that they may liquidate customer property on account of their insolvency, is a basis to discount the value of a customer's claim – i.e., its right to payment – against the estate.

      35.    The Bankruptcy Code is explicit when the manner of a debtor's liquidation of estate property is relevant to valuing a claim. For example, to determine the value of the secured portion of a creditor's claim, section 506(a) of the Bankruptcy Code provides that the value of the collateral securing such creditors claim "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." If the value of collateral is less than the amount of the creditor's claim, the creditor's secured claim equals the value of the collateral, and the balance of the claim is unsecured, it is not extinguished. Yet the Asset Liquidation Discount purports to *extinguish* claims based on the impact the size of the FTX Debtors' holdings of a Digital

---

[11] For the avoidance of doubt, the Foundations reserve the right to dispute the methodologies used by the FTX Debtors' experts, including the Asset Liquidation Discount, in all respects, if required, after having had the benefit of expert discovery.

Asset would have on the FTX Debtors ability to realize value in respect of such Digital Asset in a hypothetical orderly liquidation by the FTX Debtors of their holdings.

36.     Bankruptcy courts in estimation procedures are constrained to apply estimation procedures that comport with applicable law. *See In re Lane*, 68 B.R. at 612 (". . . where there is sufficient evidence on which to base a reasonable estimate of the claim, the bankruptcy judge should determine the value. In so doing, the court is bound by the legal rules which may govern the ultimate value of the claim."). Accordingly, the Estimation Motion should be denied as a matter of law insofar as the FTX Debtors purport to use the Asset Liquidation Discount to discount customers' claims to Digital Assets based on the aggregate proportion of the FTX Debtors' holding of such assets.[12]

37.    The Plan proposed by the FTX Debtors establishes a pool of customer and general estate property, affords customers with priority claims against the pool of customer property established under the Plan and, to the extent of any shortfall in customer property, against the general estate property pool *pari passu* with other unsecured creditors, provides for the dollarization of claims as of the Petition Date and the satisfaction of such claims in cash, rather than in kind.[13] (*See* Plan §§ 4.2, 4.3.5, 7.2).

38.    It is no coincidence that these fundamental elements of the Plan mimic the provisions of article III of subchapter 7 of the Bankruptcy Code (the "**Stockbroker Liquidation Provisions**") applicable to stockbroker liquidations. *See generally* Bankruptcy Code §§ 741 – 753. The method for valuing customer claims under the Stockbroker Liquidation Provisions is at

---

[12] The impact and application of the Asset Liquidation Discount is pervasive, affecting 71 digital assets representing *56 percent* of the face value of the FTX Debtors' holdings of such assets and *10 percent* of the face value of customer claims. (*See* Howell Decl. at ¶ 71 (emphasis added).)

[13] The FTX Debtors note that satisfaction of claims in cash, rather than in kind, is necessary because of the mismatch between customers claims for digital assets and the digital assets actually custodied by the FTX Debtors as of the Petition Date, and the extent of commingling that the FTX Debtors engaged in pre-bankruptcy. (*See* Howell Decl. at ¶ 3.)

least analogous to (if not determinative) of the methodology applicable in these Chapter 11 Cases in the Plan. Colliers' provides that a customer's "net equity" claim "is a dollar figure calculated by determining what would have been realized *by the customer* had the securities credited to the customer account been liquidated on the filing date. . . " COLLIER ON BANKRUPTCY at ¶ 746.06[1] (emphasis added).

39. Like the Plan, the Stockbroker Liquidation Provisions require customer claims to be valued as of the Petition Date and for the trustee to promptly liquidate customer property to pay such claims in cash. "[T]he fact that certain securities cannot be liquidated or that there has been market fluctuation between the filing date and the actual liquidation date is irrelevant in determining a customer's claim, but will certainly impact the size of the fund of customer property." COLLIER ON BANKRUPTCY at ¶ 748.02. Thus, the Stockbroker Liquidation Provisions socialize gains and losses in the value of the customer property to be shared ratably by all customers, with customer claims to be determined by reference to a hypothetical liquidation of property credited to its account as of the Petition Date.

40. But, the FTX Debtors ignored this aspect of the Stockbroker Liquidation Provisions. Instead, without any attribution or support, the FTX Debtors state "[t]o make Distributions in Cash to creditors, whether on the Petition or now, the Debtors would need to liquidate all Digital Assets. Thus, the Petition Date actual values of the Digital Assets, and therefore the Claims in respect of those assets, need to reflect this reality." Even though it has no basis in law, the FTX Debtors then instructed their expert to incorporate the hypothetical liquidation of Digital Assets *by the Debtors* into her analysis of the valuation to be ascribed to creditors for claims that should, instead, reflect the hypothetical liquidation by them of their claims. (*See Declaration of Sabrina T. Howell In Support of the Motion of Debtors to Estimate Claims*

*Based on Digital Assets* [D.I. 5203] (the "**Howell Declaration**") at ¶ 4) ("I was asked by Sullivan & Cromwell LLP ("Counsel") to assist with determining the value of creditor claims associated with digital assets by evaluating the likely effect of liquidating the Debtors' holdings of each digital asset claimed by creditors (in USD equivalents) as of the Petition Time. This includes determining the discount at which the Debtors would have been able to sell their holdings, including derivative contracts created by FTX but excluding NFTs, in an orderly liquidation commencing at the Petition Time.").[14]

41. Nowhere in the Howell Declaration is there any analysis of whether applying the Asset Liquidation Discount is proper or appropriate. It is not. While bankruptcy courts have discretion in determining the acceptable procedures to use to estimate claims, bankruptcy courts are bound to apply estimation procedures that comply with applicable law. *See, e.g., In re Lane*, 68 B.R. at 612. The application of the Asset Liquidation Discount does not comport with law or principles of claim valuation as of the Petition Date. Accordingly, the Estimation Motion should be denied.

## RESERVATION OF RIGHTS

42. This Foundations and the FTX Debtors have agreed that evidentiary matters with respect to the valuation of MAPS, OXY and SRM tokens will not be heard during the hearing on January 25, 2024. If the Court grants the Estimation Motion, the FTX Debtors and Foundations have also agreed a schedule permitting the parties to take expert and other discovery, prepare rebuttal and reply expert reports and file supplemental papers in respect of the impact of the Estimation Motion on MAPS, OXY and SRM tokens.

---

[14] Howell goes on to note that. "[f]or parsimony, I was instructed by FTX to only apply an asset liquidation discount to a digital asset's price if the calculated discount exceeds 10 percent." (*Id*. at ¶ 4, fn. 8.)

43.     The Foundations expressly reserve all rights, claims, arguments, defenses and remedies with respect to the Estimation Motion, including in respect of the valuation of MAPS, OXY and/or SRM tokens, or any other issue in these Chapter 11 Cases, as well as the right to supplement, modify, and amend this Preliminary Objection, and to raise additional objections in writing or orally at the hearing on the Estimation Motion.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Foundations respectfully request that the Court deny the Estimation Motion and grant such other and further relief as is just and proper.

Dated: January 11, 2024
Wilmington, Delaware

Respectfully submitted,

/s/ Kurt F. Gwynne
Kurt F. Gwynne, Esq.
1201 North Market Street
Suite 1500
Wilmington, DE 19801-1163
Telephone: (302) 778-7500
Facsimile: (302) 778-7575
E-mail: kgwynne@reedsmith.com

-and-

REED SMITH LLP
Aaron Javian, Esq. (admission *pro hac vice* pending)
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
E-mail: ajavian@reedsmith.com

*Counsel to the Foundations*