# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered)<br><br>Hearing Date: January 25, 2024, at 10:00 a.m. (ET)<br>Obj. Deadline: January 11, 2024, at 4:00 p.m. (ET)<br><br>Re: D.I. No. 5202 |

## PRELIMINARY OBJECTION OF MAPS VAULT LIMITED TO MOTION OF DEBTORS TO ESTIMATE CLAIMS BASED ON DIGITAL ASSETS

Maps Vault Limited ("Maps Vault"), through its undersigned counsel, DLA Piper LLP (US), hereby submits this preliminary objection (this "Preliminary Objection") to the *Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 5202] (the "Estimation Motion"),[1] filed by the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). In support of this Preliminary Objection, Maps Vault respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Estimation Motion is, according to the Debtors, "an important building block in constructing the Plan and ensuring a fair and value maximizing resolution of these Chapter 11 Cases for stakeholders." (Estimation Motion ¶ 4.) The Digital Assets Conversion Table, of which the Motion seeks approval and which the Debtors and their experts apparently spent months compiling, is intended to "provide the basis by which creditors can understand the value of their Claims" and "provide material information to creditors upon which they may evaluate the Plan." (*Id.* ¶ 3.) Maps Vault concurs in the Debtors' view that these are "important" objectives insofar

---

[1] Capitalized terms not defined herein have the meanings set forth in the Estimation Motion.

as they relate to the Debtors' more than one million creditors, and more important still as to that subset of creditors who, like Maps Vault, will be left with materially reduced or effectively disallowed claims if the Debtors' "estimation" conclusions are left unchallenged.

2. Such important consequences notwithstanding, the Debtors seek to compel adjudication of the Estimation Motion and approval of the Digital Assets Conversion Table in just a few short weeks, under the streamlined, plainly inapplicable estimation standard set forth in section 502(c) of the Bankruptcy Code. The Estimation Motion was filed by the Debtors late on December 27, 2023, very obviously in the holiday week between Christmas and New Years. The Estimation Motion was accompanied by two expert reports, which together run more than 100 pages, and which, in turn, are predicated on many more thousands of pages of data sources, authorities, and analyses. Any credible response will require many hours of expert analysis, discovery as to the documents and information underlying the Debtors' and their experts' conclusions, the drafting of a rebuttal report and, prior to any hearing, depositions of the experts on both sides. The Debtors initially proposed to accomplish all of the foregoing in little more than three weeks, and with potentially numerous objecting parties, with objections due by January 11, 2024, and a hearing set to go forward on January 25, 2024.

3. The Debtors have now agreed to permit litigation as to any MAPS, OXY and SRM token-related claims to proceed on a more reasonable schedule. However, such a schedule would not have needed to be negotiated if the Debtors had proceeded, as they should have, under the more appropriate claim objection and allowance procedure contemplated by section 502(a) and (b) of the Bankruptcy Code. For avoidance of doubt, the Maps Claims are neither unliquidated nor contingent, and thus section 502(c) is inappropriate.

4.  While the Maps Claims (as defined below) may be objectively significant in amount, they constitute a relatively small portion of the billions of dollars of total asserted unsecured claims in these cases. What's more, the fact that they may be *disputed* claims is not itself a basis or justification to estimate them—instead, the Debtors can and should establish reserves for the fully asserted amounts of the Maps Claims under their proposed liquidating plan, such that the parties can move forward with litigation on the merits of the claims on a reasonable and proper timeline. Such a small reserve (in the approximate amount of $525,313,728) (i) is not a large amount relative to the overall size of the customer claims pool; (ii) would impose no cognizable harm or prejudice on the Debtors while an appropriate claim allowance process goes forward; and (iii) would preserve both parties' due process rights with respect to the adjudication of the Maps Claims.

5.  In any event, the Estimation Motion must be denied because the Debtors cannot carry their burden under section 502(c) of the Bankruptcy Code to show that estimation of the Maps Claims is required to avoid "undue delay" as to claims that are purportedly "unliquidated" or "contingent." *See In re Dow Corning Corp.*, 211 B.R. 545, 573 (Bankr. E.D. Mich. 1997) ("[T]he party moving for estimation must show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process."); *In re LightSquared Inc.*, 2014 WL 5488413, at *5 (Bankr. S.D.N.Y. Oct. 30, 2014) (denying estimation when "[the movant] has failed to demonstrate undue delay . . . as it is required to show pursuant to section 502(c)"). As a threshold matter, the Debtors cannot carry their burden as to susceptibility to estimation because the Maps Claims are, in fact, liquidated. If the Debtors seek to dispute the Maps Claims, which are presumed *prima facie* valid under Bankruptcy Rule 3001(f), they should object to them under

section 502(b)—not seek an end-run around the claims allowance process by seeking to estimate an already-liquidated claim under the guise of section 502(c).

6. Nor do the Estimation Motion's conclusory allegations of "undue delay" suffice to satisfy the second prong of the section 502(c) standard. Any adjudication of the Maps Claims—by claim objection under section 502(a) or estimation under section 502(c)—will be complex and will require many weeks to resolve the numerous issues in dispute implicated by the Debtors' anticipated objections. Such issues include those already set forth in the Estimation Motion as to the valuation of the MAPS, OXY and SRM tokens generally, but relevant issues may also encompass matters that touch upon the overall relationship between the Debtors and Maps Vault. Such an estimation proceeding would require multiple experts and extensive evidence with respect to valuation and such other relationship issues. A section 502(c) estimation proceeding of such wide-ranging scope is neither appropriate nor practical.

7. The Estimation Motion, as presented, is a thinly veiled attempt to disallow, in their entirety, the Maps Claims without basic due process protections and should be denied. Maps Vault reserves the right to supplement this Preliminary Objection after discovery and before any hearing with respect to whether estimation is warranted under section 502(c) or, if applicable, any estimation proceeding on the merits of the claims.

## FACTUAL BACKGROUND

8. On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

A. **Claims Process and Chapter 11 Plan**

9. On May 19, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1519], setting the non-customer bar date to file proofs of claim against any of the Debtors as June 30, 2023, and the governmental bar date as September 29, 2023.

10. On June 28, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Customer Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim and (C) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1793] (the "Customer Bar Date Order"), setting the deadline for customers to file proofs of claim on account of Customer Claims as September 29, 2023.

11. As set forth in the *Notice of Deadlines Requiring Filing of Customer Proofs of Claim on or Before September 29, 2023 and Customer Proofs of Claim Affected by the Amendment of or Supplement to the Debtors' Schedules of Assets and Liabilities* [D.I. 1870] (the "Customer Bar Date Notice"), each customer proof of claim based on cryptocurrencies or digital assets was required to set forth, among other information, (i) the number of units or quantity of each cryptocurrency or digital asset and (ii) the program (*i.e.* Earn, Lend or Stake), if any, applicable to each cryptocurrency or digital asset.

12. The proof of claim form permitted holders of Customer Claims to file Claims denominated in Digital Asset quantities and without dollarized values. However, it did not preclude holders of Customer Claims from asserting, in a supplement or otherwise, liquidated claims with specific dollar valuations for any of the cryptocurrencies or digital assets. Thus, upon information and belief, many Claims based on Digital Assets, including the Maps Claims, have been asserted

5

in proofs of claim with dollarized values, which "constitute prima facie evidence of the validity *and amount* of the claim." Fed. R. Bankr. P. 3001(f) (emphasis added).

14. On December 16, 2023, the Debtors filed (i) the Plan, (ii) the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession* [D.I. 4862] (the "Disclosure Statement"), and (iii) the *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Packages; (III) Approving the Forms of Ballots; (IV) Establishing Voting, Solicitation and Tabulation Procedures; and (V) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 4863] (the "Solicitation Procedures Motion").

14. The Debtors have stated that they intend to soon file a further amended Plan and Disclosure Statement to incorporate their recently announced settlement with the Joint Official Liquidators of FTX Digital Markets Ltd. [D.I. 4904] and certain other changes, including the Digital Assets Conversion Table requested by the Estimation Motion.

15. According to the Debtors, the Digital Assets Conversion Table is integral to advancing the Plan confirmation process. The proposed Solicitation Procedures Order requires that, for the purposes of the Solicitation and Voting Procedures, to the extent all or part of any Claim includes Digital Assets, such Digital Assets should be valued and converted to U.S. dollar amounts using the Digital Assets amounts set forth on the Debtors' Schedules or in a timely filed proof of claim as converted by the valuations to be set forth in an order by the Court. (*See* Solicitation Procedures Motion, ¶ 56.) A U.S. dollar value for Claims based on Digital Assets is also required for determining projected recovery ranges for such Claims in the Disclosure Statement. (Disclosure Statement, § 1.B.)

6

B.  **Maps Vault and Oxygen Vault Claims**

   *1.   Maps Vault Claims*

   16.    Maps Vault was organized in the British Virgin Islands on September 30, 2020. Maps Vault was formed to purchase, hold, and, from time to time, sell MAPS tokens, which had been issued to support MAPS.me—a mobile maps and navigation services application used by more than 100 million people to navigate across 195 countries. Maps.me adopted MAPS tokens as its ecosystem token.

   17.    The MAPS token was designed to afford MAPS token-holders economic rights commensurate with the number of tokens they hold. Approximately 10 billion MAPS tokens were issued in furtherance of the Maps.me ecosystem.

   18.    In accordance with the Maps White Paper, 10 billion MAPS tokens were allocated for distribution to various parties and stakeholder groups, including 20% to the Serum Community Fund, 20% to the MAPS Community Fund, 10% for private sale and for MAPS token's initial exchange offering and initial liquidity, and the remaining 50% earmarked for liquidity and token growth, ecosystem partners, project builders, technology and product, and ecosystem growth and marketing uses.

   19.    Of all issued MAPS tokens, 90%—including all tokens issued for private sale, liquidity and token growth, ecosystem partners, project builders, and technology and product tokens—were issued subject to a seven (7) year lock-up period, pursuant to which such tokens began unlocking linearly over six (6) years commencing in December 2021 (one year after the date of their issuance). The lock-up period was intended to align team members, partners, and investors in committing to the long-term success of the Maps.me ecosystem.

20. On or about October 10, 2020, Maps Vault acquired 4,000,000,000 MAPS tokens from Serendipity Network Ltd, as issuer (the "Issuer"), pursuant to an agreement for purchase of MAPS tokens. On or about the same date, (i) the Debtors, through Cotton Grove Limited, acquired 4,000,000,000 MAPS tokens from the Issuer pursuant to an agreement for purchase of MAPS tokens; and (ii) the Issuer issued 2,000,000,000 MAPS tokens to itself, subject to the Issuer's strict obligation to have any disposition approved by, or made within the scope of any disposition rules adopted by, Foundation Serendipity on behalf of the Maps.me token community. At their peak, all issued and outstanding MAPS tokens were worth approximately $18 billion, based on their publicly reported trading price.

21. In the period between September 30, 2020, and the Petition Date, Maps Vault also acquired (i) a quantity of SRM tokens; and (ii) a *de minimis* quantity of TRX tokens. Serum (SRM) is the native utility and governance token of Serum, a decentralized exchange based on the Solana blockchain. Tronix (TRX) is the native cryptocurrency of TRON, a decentralized digital platform for both content creators and consumers, and TRX's primary purpose is to allow users to interact with decentralized applications built on the TRON platform.

22. In late 2020, Maps Vault opened a cryptocurrency account at FTX. To the best of Maps Vault's information and belief, Maps Vault's cryptocurrency accounts at FTX were subject to the terms of use applicable to all FTX users.

23. As of the Petition Date—as reflected in the Proofs of Claim filed by Maps Vault on June 29 and September 28, 2023 (Confirmation IDs: 3265-69-BGTHN-761175203, 3265-69-DOCRM-460337416, 3265-69-CDWPN-672893003, 3265-70-JLAYG-671353347) (the "Maps Vault Proofs of Claim," and the underlying claims, the "Maps Vault Claims")—the following tokens in the following quantities were credited to Maps Vault's FTX account:

- o  MAPS [919,803,630.62041176]

- o  MAPS_LOCKED [3,001,863,000.37958824]

- o  SRM [25,930.09973614]

- o  SRM_LOCKED [2,951,713.52285749]

- o  TRX [.000001]

- o  USD [0.01]

Accordingly, in the aggregate, not less than 3,921,666,631 MAPS tokens and 2,977,643.62259363 SRM Tokens were credited to Maps Vault's FTX account as of the Petition Date.

24. On the Petition Date, the price of MAPS tokens was $0.1072 per token, as sourced from CoinMarketCap (coinmarketcap.com/currencies/maps), and the price of SRM tokens was $0.4179 per token, as sourced from CoinMarketCap (coinmarketcap.com/currencies/serum).

25. Thus, the value in USD of MAPS tokens and SRM tokens held by Maps Vault as of the Petition Date was $420,402,662.84 and $1,244,357.27, respectively, for a total of $421,647,020.11.

### 2. *OXY Claims*

26. In late 2020, Oxygen Vault Limited ("Oxygen Vault") opened a cryptocurrency account at FTX. To the best of Maps Vault's information and belief, Oxygen Vault's cryptocurrency accounts at FTX were subject to the terms of use applicable to all FTX users.

27. As of the Petition Date—as reflected in the Proofs of Claim filed by Oxygen Vault on June 29 and September 28, 2023 (Confirmation IDs: 3265-70-CYMNS-491255818, 3265-69-DIEVK-216452732, 3265-69-BHERU-708814938, and 3265-69-FMNIJ-161916036)—

(the "Oxygen Proofs of Claim," and the underlying claims, the "Oxygen Vault Claims," and together with the Maps Vault Claims, the "Maps Claims"), the following tokens in the following quantities were credited to Oxygen Vault's FTX account:

- OXY [974,492,842.61176861]
- OXY_LOCKED [2,138,332,564.38823139]
- SRM [100,473.81295225]
- SRM_LOCKED [7,222,309.39995117]
- USD [0.01]

Accordingly, in the aggregate, not less than 3,112,825,407 OXY tokens and 7,322,783.20118364 SRM Tokens were credited to Oxygen Vault's FTX account as of the Petition Date.

28. On the Petition Date, the price of OXY tokens was $0.03232 per token, as sourced from CoinMarketCap (coinmarketcap.com/currencies/oxygen), and the price of Serum tokens was $0.4179 per token, as sourced from CoinMarketCap (coinmarketcap.com/currencies/serum). The value in USD of OXY tokens and SRM tokens held by Oxygen Vault as of the Petition Date was $100,606,517.15 and $3,060,191.09, respectively, for a total of $103,666,708.24.

29. By Claim Assignment Agreement, dated November 2, 2023, Oxygen Vault assigned to Maps Vault all the Oxygen Proofs of Claim.

30. The Estimation Motion, invoking a number of bases for such value reductions (or "discounts"), estimates the value of (i) the MAPS tokens at $0.00; (ii) the Oxy tokens at $0.00; and (iii) the SRM Tokens at $0.1551467.

**ARGUMENT**

I. **THE DEBTORS HAVE NOT CARRIED THEIR BURDEN UNDER SECTION 502(c) OF THE BANKRUPTCY CODE**

31. The Estimation Motion should be denied because the Debtors have failed and are unable to carry their burden under section 502(c) of the Bankruptcy Code to show that estimation of all of the Maps Claims is necessary to avoid undue delay in the administration of their Chapter 11 Cases. Indeed, the Debtors cannot even satisfy the threshold criterion of establishing that the Maps Claims are unliquidated.

32. Contrary to the Debtors' conclusory assertion that all "Claims based on Digital Assets are unliquidated," and, "therefore, subject to estimation,"[10] the Maps Claims were fully liquidated when filed and the amounts stated in the Maps and Oxygen Proofs of Claims must be deemed *prima facie* valid under Bankruptcy Rule 3001(f). Fed. R. Bankr. P. 3001(f).

33. Moreover, courts uniformly recognize that a decision to estimate claims under section 502(c)(1) "is within [the court's] sound discretion and not the obligation of [the court]," absent a showing of "undue delay." *In re RNI Wind Down Corp.*, 369 B.R. 174, 192 (Bankr. D. Del. 2007). This is because "[b]ankruptcy law's general rule is to liquidate, not estimate." *Dow Corning*, 211 B.R. at 560–61.

34. In addition, "[b]ecause estimation is a second-best method, [the scope of estimation] should be confined to the extent necessary to accomplish the overarching goal of avoiding undue delay . . . and not expanded beyond that point." *North American Health Care*, 544 B.R. at 689. Therefore, "the party moving for estimation must show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process." *Dow Corning*, 211 B.R. at 573.

11

35. Importantly, courts have held that "undue delay" must rise to a level more than ordinary delay; instead, it must be "unjustifiable" delay. *Id.* at 563; *In re Teigen*, 228 B.R. 720, 723 (Bankr. D.S.D. 1998); *see also In re A&B Assocs.*, L.P., 2019 WL 1470892, at *36 (Bankr. S.D. Ga. Mar. 29, 2019) (stating that "undue delay" is an "excessive or unwarranted slowing of the administration of a debtor's case"). Indeed, courts do not simply rubber stamp requests for estimation procedures, but they rather conduct a factual inquiry into the purported delay identified by the movant and the movant's motivation for estimating, and in a number of circumstances have found that estimation under section 502(c) of the Bankruptcy Code is not warranted. *See, e.g.*, *Dow Corning*, 211 B.R. at 562–74; *LightSquared*, 2014 WL 5488413, at *5–6.

36. Here, the Debtors have not proffered a sufficient basis to carry their burden under section 502(c) of the Bankruptcy Code. The Debtors merely assert that litigation over "Claims based on Digital Assets," including the Maps Claims, will take significant time. But that is precisely the type of argument that courts have repeatedly rejected as a basis for estimation. *See, e.g.*, *Dow Corning*, 211 B.R. at 560–61 ("From the plain language of 502(c), it is clear that estimation does not become mandatory merely because liquidation may take longer and thereby delay the administration of the case. Liquidation of a claim, in fact, will almost always be more time consuming than estimation."); *Teigen*, 228 B.R. at 723 ("Although liquidation of a claim may take longer, the delay is only undue if it is unjustifiable.").

37. As to Maps Vault, as opposed to the great mass of customers holding more readily valued tokens, the Debtors have introduced no facts or evidence with respect to the timing, amount and nature of distributions to creditors in the event their liquidating plan is confirmed, and the size of any reserves that the Debtors would need to establish as to the Maps Claims under the liquidating plan. Such facts go directly to the heart of the key question—whether allowance of the Maps Claims

under section 502(a) would result in an "undue delay" that would be obviated by estimation under section 502(c).[2] Without demonstrating with particularity the need to estimate the Maps Claims in order to avoid a demonstrable delay as to distributions, the Debtors cannot carry their burden under section 502(c).

38. Moreover, as described above, given the large number of complex issues likely to be raised by any adjudication of the Maps Claims (even for estimation purposes), many involving expert testimony as to cryptocurrency valuation, market conditions and other variables, any estimation proceeding would have to be extraordinarily lengthy and complicated if it is to provide the "realistic assessment" of the Maps Claims required even under the section 502(c) standard. *Enron*, 2006 WL 544463, at *3; *Dow Corning*, 211 B.R. at 563 ("[R]egardless of the estimation method selected, for the process to have any semblance of fairness it will necessarily involve hearings that would be quite lengthy and protracted."). As a result, the Debtors cannot show that any cognizably "undue" delay would result from the liquidation of the Maps Claims under section 502(a), as compared to the estimation of the claims under section 502(c).

---

[2] Courts generally find undue delay and estimate claims when the debtor's plan has been confirmed, all conditions to distributions have been satisfied and estimation will allow immediate distributions to creditors to flow. *Compare In re Club Ventures Inv. LLC*, 2012 WL 6139082 (Bankr. S.D.N.Y. 2012) (estimating claims when money was ready to be distributed to creditors but for claims requiring a reserve of 80% of the money in debtor's escrow); *In re Enron Corp.*, 2006 WL 544463 (Bankr. S.D.N.Y. 2006) (estimating claim at $0 so that periodic distributions required by confirmed plan could continue and when it was clear that claim had no merit because it was already dismissed in district court and had a low probability of success on appeal); *In re AMR Corp.*, 2021 WL 2954824 (Bankr. S.D.N.Y. 2021) (granting estimation when Court had already disallowed the claims multiple times, the bankruptcy case had been ongoing for ten years, the plan had been confirmed almost eight years before, and the unliquidated claim caused an interruption in distributions), *with In re Apex Oil Co.*, 107 B.R. 189 (Bankr. E.D. Miss. 1989) (denying estimation when there was no showing of undue delay and debtor's plan was not yet confirmed); *In re RNI Wind Down Corp.*, 369 B.R. 174 (Bankr. D. Del. 2007) (denying estimation because debtor did not show undue delay and stating that absent a finding of undue delay, the Court is not obligated to estimate a claim).

## II. MAPS CLAIMS ARE NOT CONTINGENT OR UNLIQUIDATED AND, THUS, ARE NOT SUBJECT TO ESTIMATION.

39. The Estimation Motion should be denied as to the Maps Claims for the additional reason that such claims are neither contingent nor unliquidated and therefore are not subject to estimation. The Debtors appear to argue[3] that the Maps Claims are rendered contingent and/or unliquidated because the Debtors have retained for themselves the exclusive right to fix the Petition Date value of all Tokens and, thus, intend to dispute the validity of any claim, such as the Maps Claims, that sets forth a "dollar value" premised on the holder's information about the Petition Date value of its claim. However, it is black letter law that "[s]imply because a debt is disputed by the debtor does not render it 'contingent.'" *In re Gordon*, 127 B.R. 574, 578 (Bankr. E.D. Pa. 1991); *see also In re Nicholes*, 184 B.R. 82, 89 (B.A.P. 9th Cir. 1995) ("Whatever the debtor believes, even a bona fide dispute over liability for a claim does not make the debt contingent."); *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997) ("We cannot view a debt as contingent merely because the debtor disputes the claim, for that would make the word 'contingent,' in the definition of 'claim,' redundant.").

40. Nor can the Maps Claims be properly deemed unliquidated, even if, as the Debtors contend, the Maps and Oxygen Proofs of Claim contained a "U.S. dollar value" that was only a "customer's estimate." (Motion ¶18.) Under the section 502(c) standard, "a claim is liquidated if the amount due can be determined with sufficient precision." *Bennett v. Bon Secours Mercy Health, Inc.*, 2022 WL 2828991, at *3 (E.D. Pa. July 20, 2022); *In re Stebbins,* No. 8-14-

---

[3] With respect to Customer Entitlement Claims specifically, as set forth above and by the Debtors' design, customers were only required to provide the number of units or quantity of each Digital Asset in respect of their Customer Entitlement Claim on their proofs of claim; customers were not required to set forth a U.S. dollar value. (Estimation Motion ¶ 9.) Accordingly, the Debtors unsupported position is that any U.S. dollar value set forth in a filed proof of claim for Claims on account of Digital Assets could only be such "customer's estimate" and that this renders the claim unliquidated. (*Id.* at 18.) The Debtors cite no law in support of this position.

14

73357-las, 2015 Bankr. LEXIS 551, at *1 (Bankr. E.D.N.Y. Feb. 24, 2015) ("A debt is 'liquidated' where the claim can be readily determined by reference to an agreement or simple mathematical computation."); *id*. at * 21 ("The existence of a dispute over the underlying amount of a debt does not automatically render the debt . . . unliquidated."). The Maps Claims were determined with "sufficient precision" by "simple mathematical computation."

41.  The claims presented by Maps Vault, as to its MAPS, OXY, and SRM tokens (as set forth in the respective Attachments to the applicable Proofs of Claim) set forth a *calculated* "dollar value" that was "sourced from CoinMarketCap," a widely recognized and generally accepted source for cryptocurrency trading prices. To be sure, the Debtors' own expert, Sabrina Howell (i) acknowledged that "[f]or coins and tokens for which Coin Metrics did not provide [her] with data, [she] obtain[ed] daily historical price and trading volume data from CoinMarketCap via their API"; and (ii) elsewhere cited to CoinMarketCap data, sources and publications 51 times in her Expert Report. (Declaration of Sabrina T. Howell in Support of the Motion of Debtors to Estimate Claims Based on Digital Assets [Docket No. 5203], Annex 1, App. C ¶ 13 and *passim*.) Multiplying the Petition Date prices obtained from this source by the number of tokens held by Maps Vault yielded a "US dollar value" claim that is far more than a "customer's estimate"—it is a liquidated claim that cannot properly be subject to estimation under section 502(c). It may be that many of the customer claims that are targeted by the Estimation Motion are unliquidated, if the claimants did not calculate and assert the value of their claim on their proof of claim form. But this is not true for Maps Vault, and there is no basis to apply an estimation procedure to Maps Vault where it stands in a markedly different posture from such other claimants.

42.  Finally, even if the Maps Claims, among others, must be "ascribed values in U.S. dollars" by future Court order, that circumstance alone does not make the claims themselves

15

contingent, because "the concept of contingency involves the nature or origin of liability." *Matter of Knight,* 55 F.3d 231, 236 (7th Cir. 1995). More precisely, "it relates to the time or circumstances under which the liability arises [and] [i]n this connection 'liability' *does not mean the same as judgment or remedy, but only a condition of being obligated to answer for a claim*." *Id.* (emphasis added). As the Debtors themselves acknowledge, the Maps Claims, as Customer Entitlement Claims,[4] arose from deposit of MAPS, OXY and SRM tokens on the FTX exchange, which could only have occurred prior to the Petition Date. Thus, the Debtors' obligations of repayment arose prior to the Petition Date and do not depend on the occurrence of any future event. Therefore, the Maps Claims are clearly not contingent or unliquidated.

### III.    RESERVATION OF RIGHTS WITH RESPECT TO ANY ESTIMATION PROCEEDING ORDERED BY THE COURT

43.    To the extent the Court determines that an estimation proceeding is warranted, Maps Vault reserves all rights to conduct discovery and object to scope of the relief, and any procedures or protocols proposed to the Court (which the Debtors have not proposed or sought approval for through the Estimation Motion). In this connection, Maps Vault has been in discussions with the Debtors and has agreed on the timetable as to the exchange of expert reports, fact and expert discovery, briefing and an evidentiary hearing set forth on Exhibit "A" hereto (the "<u>Agreed Estimation Schedule</u>"). The Agreed Estimation Schedule is consistent with the schedule recently approved by the Court as to the IRS Estimation Proceeding and is in line with estimation schedules implemented in similarly complex chapter 11 cases. *See* Order, *In re Enron*, No. 1-16034 (Bankr. S.D.N.Y. 2004), ECF No. 16,353 (estimation hearings on *all* unliquidated or

---

[4]    The Plan defines "Customer Entitlement Claims" as Claims that "compensate the Holder of such Claim for the value as of the Petition Date of Cash or Digital Assets held by such Person or Entity in an account on any FTX Exchange." (Plan §2.1.37.)

16

contingent claims order to occur within 4.5 months); *see also In re SC SJ Holdings LLC*, No. 21-10549, [date], [D.I. 284], (Bankr. D. Del. May 6, 2021) (setting hearing for approximately one month from approval of schedule); *In re Extraction Oil & Gas, Inc.*, No. 20-11548, [date], [D.I. 1193] (Bankr. D. Del. Nov. 30, 2020) (two months); *In re Sand Spring Capital III, LLC*, No. 11-13393 [date] [D.I. 707] (Bankr. D. Del. Feb. 27, 2013) (initially two months; as rescheduled, approximately five months).

44. Thus, if the Court is inclined to permit the Estimation Proceeding to go forward as to the Maps Claims, it should enter an Order establishing a reasonable schedule for adjudication of the Maps Claims, substantially in the form of the Agreed Estimation Schedule, that would put in place a reasonable set of procedures and a consensual timeline to estimate the Maps Claims in accordance with principles of due process and fairness.

45. Maps Vault expressly reserves all rights, claims, arguments, defenses, and remedies with respect to the Estimation Motion or any other issue in the Chapter 11 Cases, including as to the claims asserted in its non-customer proofs of claim, as well as the right to supplement, modify, and amend this Objection, and to raise additional Objections in writing or orally at the hearing on the Estimation Motion.

[*Remainder of page intentionally left blank*]

**CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, Maps Vault respectfully requests that the Court (a) deny the Estimation Motion; (b) in the alternative, enter an Order approving the Agreed Estimation Schedule; and (c) grant such other and further relief as is just and proper.

Dated: January 11, 2024
       Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ *Aaron S. Applebaum*
Aaron S. Applebaum, Esq. (DE #5587)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2462
Email: aaron.applebaum@us.dlapiper.com

- *and* -

Dennis C. O'Donnell (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: dennis.odonnell@us.dlapiper.com

*Counsel for Maps Vault Limited*