# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | ) Case No. 22-11068 (JTD) |
| Debtors. | ) (Jointly Administered) |
| | ) Re: Docket No. 5202 |

## LIMITED OBJECTION OF TMSI SEZC LTD. TO MOTION OF DEBTORS TO ESTIMATE CLAIMS BASED ON DIGITAL ASSETS

TMSI SEZC Ltd. ("TMSI"), through its undersigned counsel, files this limited objection (this "Objection") to the *Motion of Debtors to Estimate Claims Based on Digital Assets* [Docket No. 5202] (the "Motion").[2] In support of this Objection, TMSI states as follows:

### Preliminary Statement[3]

1. TMSI holds a Customer Entitlement Claim consisting of, among other Digital Assets, SRM. The Debtors reflect, in their Digital Assets Conversion Table, the Petition Date price of $0.37 for SRM, but then propose applying a 58.3% "asset liquidation discount" to lower that price to $0.1551467.[4] This reduction in price significantly and unfairly lowers the value of TMSI's Claim.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[3] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms in the Objection.

[4] All references to "$" in this motion refer to U.S. Dollars.

2.      The Howell Report specifies approximately $509 million face value of Customer Entitlement Claims based on SRM holdings (which includes TMSI's SRM holdings) and approximately $3.7 billion in face value of the Debtors' holdings of SRM. That indicates that the Debtors held an excess of SRM relative to the SRM held (and claimed) by Customers on the Petition Date. In calculating the asset liquidation discount for SRM, the Howell Report uses the full $3.7 billion in face value of the Debtors' holdings of SRM. However, only the $509 million in Customer Entitlement Claims should be used for calculating the asset liquidation discount, if any, for SRM.

3.      The Debtors' SRM holdings, like other Digital Assets owned directly by the Debtors, will be liquidated by the Debtors for the benefit of all Customers and other stakeholders. But any excess over the Customer Entitlement Claims relative to SRM was, at the Petition Date, a proprietary asset of the Debtors' estate, not a claim and no Customer Entitlement Claim corresponds to those SRM, and, accordingly, they should not be included when valuing Customer Entitlement Claims based on SRM holdings. The Debtors' own SRM would not have been sold on the Petition Date, and the purpose of valuing Claims is to determine what a claimant holding SRM would have received on the Petition Date.

4.      The Debtors and their expert concede SRM is unique and should be assessed differently to other Digital Assets. The Howell Report spends considerable time discussing the unique circumstances surrounding SRM and what makes SRM different from other Digital Assets. SRM was a liquid Digital Asset trading on some of the biggest Digital Asset exchanges, including Binance and Kraken.[5] SRM prices and trading volumes represented and continue to represent real and active markets. Arguably no asset liquidation discount would be appropriate because holders

---

[5] This is in contrast to certain other Digital Assets, such as MAPS and OXY, which traded only on FTX.com.

of SRM could have sold their SRM on the Petition Date for $0.37 on the open market. SRM holders would have received at or near the Petition Date price of $0.37 per SRM but for the filing of the Chapter 11 Cases. Even assuming the application of the KO model would be appropriate for SRM, limiting the model input to only the $509 million Customer Entitlement Claims makes more sense. To the extent the Debtors' hypothetical liquidation of their proprietary SRM would decrease the price of SRM, that impacts distributions made on account of Claims but does not impact the notional amount of Claims. Claims should be valued based on what the price of SRM was on the Petition Date, not based on what would happen if the Debtors sold off the entirety of the Debtors own SRM holdings, together with Customer's SRM holdings, at some future time.

5.  The asset liquidation discount also excessively punishes holders of Claims in SRM for what the open market already had priced in. The price of SRM was approximately $0.73 when CoinDesk published its article on Alameda's balance sheet.[6] That price decreased to approximately $0.37 by the Petition Date because the market anticipated the liquidation of the Debtors' proprietary SRM holdings.[7] That difference in price represents the true asset liquidation discount. Discounting that by an additional 58.3% artificially suppresses the value of Claims denominated in SRM even further, punishing customers and other stakeholders.

6.  In addition, the process of dollarizing Digital Assets and estimating Customer Entitlement Claims are among the most critical issues in the Chapter 11 Cases and involve complex mathematical formulas and analytics. The timing of the filing of the Motion, during a time of holidays and vacations, is unfortunate. The Court should permit TMSI more time to understand

---

[6] *See* https://coinmarketcap.com/currencies/serum/.

[7] *Id.*

the Debtors' analysis and for the parties to debate matters constructively before ruling on this important matter.

**Factual Background**

7.  On December 27, 2023, the Debtors filed the Motion seeking entry of an order estimating the value of Claims in respect of Digital Assets, including Customer Entitlement Claims, based on the amounts set forth in the Digital Assets Conversion Table. The Digital Assets Conversion Table is the result of a process undertaken by the Debtors and their experts to "analyze and determine the value of each of the Digital Assets on which Claims are based, as well as those Claims, as of the Petition Date." Motion ¶ 3. The Debtors intend to use the Digital Asset Conversion Table to calculate the value of Claims in connection with distributions under a chapter 11 plan of reorganization. *Id.* ¶ 12.

8.  TMSI holds a Customer Entitlement Claim (the "TMSI Customer Claim"). The TMSI Customer Claim is comprised of Digital Assets, including, among others, Serum tokens ("SRM"), SRM_LOCKED, and SRM_CUSTOM.[8]

9.  As more fully set forth in the *Expert Report of Sabrina T. Howell* (the "Howell Report") attached as Annex 1 to the *Declaration of Sabrina T. Howell in Support of the Motion of Debtors to Estimate Claims Based on Digital Assets*, the Debtors' experts used certain information and mathematical approaches, including the Kyle and Obizhaeva (2016, hereafter "KO") model, to determine the value of Digital Assets as of the Petition Date for Claim valuation purposes.[9] *See* Howell Report ¶¶ 18 *et seq.* The KO model, which was built using data from the NASDAQ and

---

[8] SRM is the "utility token of the Serum ecosystem." Serum Foundation, *Serum – White Paper* p. 5 (July 2020), available at https://assets.website-files.com/61382d4555f82a75dc677b6f/61384a6d5c937269dbed185c_serum_white_paper.88d98f84.pdf.

[9] Kyle, Albert S. and Anna A. Obizhaeva, "Market Microstructure Invariance: Empirical Hypotheses, "Econometrica, Vol. 84, No. 4, 2016, pp. 1345-1404 ("KO Paper").

NYSE from the early 2000s, uses certain inputs to produce an expected discounting of an asset based on, among other things, the average daily trading volume of an asset and the amount to be liquidated. *Id.* ¶¶ 24 *et seq.*

10. Prof. Howell relies on the KO model in determining that certain Digital Assets, including SRM, warrant an asset liquidation discount. *Id.* ¶ 64 ("[a]verage daily volume in normal times is often used as a benchmark to gauge the size of the transaction the market can absorb. If the position being liquidated is large relative to the typical daily trading volume, liquidation can be costly.").

11. The Howell Report relies on, among other things, average daily trading volume and the size of the position being liquidated in positing that SRM warrants a 58.3% asset liquidation discount. For SRM, with a Petition Date price of $0.37, the face value of Customer Entitlement Claims is $509.64 million and the face value of the Debtors' underlying holdings are $3.703 billion, meaning that the amount to be liquidated according to Prof. Howell would be significant (approximately $3.7 billion worth) relative to the average daily trading volume of SRM during the Estimation Period. The price of SRM in the Digital Assets Conversion Table is a mere $0.1551467 after application of the 58.3% asset liquidation discount.[10]

## **Argument**

12. TMSI objects to the 58.3% asset liquidation discount applied to its SRM and any other SRM-denominated Digital Asset. The Motion should be denied as to SRM pricing based on two grounds, both of which result in adjustments to the inputs to the KO model or not using the KO model at all.

---

[10] Prof. Howell further discounts SRM_LOCKED and SRM_CUSTOM by a DLOM (as defined in the Howell Report) to reflect the "locked" nature of the underlying SRM. TMSI is not objecting to the DLOM applicable to its SRM_LOCKED or SRM_CUSTOM.

13. First, the entirety of the Debtors' holdings of SRM should not be included in the amount of SRM to be liquidated as an input to the KO model. Prof. Howell, in calculating the asset liquidation discount for SRM, includes the approximately $3.7 billion in face value of the Debtors' underlying holdings of SRM, as opposed to just the amount attributable to Customer Entitlement Claims. This overstates the amount of SRM that would ordinarily be sold in a liquidation, resulting in a flawed result. In order to estimate Customer Entitlement Claims holding SRM, any model should include only Customer SRM—i.e., the $509 million in Customer Entitlement Claims—which would result in a substantially lower asset liquidation discount.

14. The purpose of estimating Claims is to determine what a claimant is owed as of the Petition Date. Here, the starting point is straightforward: Customers holding SRM as of the Petition Date in accounts at FTX.com were owed a dollar figure equal to the number of SRM held multiplied by the Petition Date price. Any discount, to the extent a discount is appropriate, would be tied to the liquidation of that Customer SRM only, and not the Debtors' own SRM holdings. Liquidating the Debtors' own SRM holdings, on the other hand, speaks to recovery on, and the ultimate distribution in respect of, Customer Entitlement Claims and other Claims, not the value of those Claims at the Petition Date. Customer Entitlement Claims should be viewed and valued independent of the Debtors' assets ultimately available to satisfy those Claims.

15. Potentially, the inclusion of all of the Debtors' holdings of SRM into the KO model as amounts to be liquidated was unintentional and a mistake. Prof. Howell states that she "us[ed] the KO model to estimate asset liquidation discounts for digital assets in the Debtors' holdings *that are also the basis for customer claims*." Howell Report ¶ 71 (emphasis added). This would be the $509 million of the face value of Customer Claims. *Id.* ¶ 71, Figure 13. But the KO input

was the $3.7 billion figure, representing the Debtors' total SRM holdings. *See Id.* Ex. 3, ECF 5203-1 p. 92, row 62.

16. Second, using an unadjusted KO model is not appropriate. The paper in which the KO model was designed was based exclusively on NADSAQ and NYSE buying and selling data from the early 2000s. Digital Assets did not exist at the time the KO model was developed. While the authors note that they expect the *functional form* of the model to be reliable in other asset markets, they concede that they "do not expect invariance to hold perfectly across different markets and different time periods. Differences in trading institutions across markets might make the volume multiplier and the volatility multiplier vary across markets." KO Paper at 1404.

17. The authors of the KO Paper also state that the predictions of the KO model "may hold most closely when tick size is small, market makers are competitive, and transaction fees and tax are minimal." *Id.* at 1348. Prof. Howell states that "[c]ertain features of crypto currency markets, such as small tick sizes, competitive market-makers, low transaction fees, and minimal taxes, imply that the KO model may in fact be more applicable to cryptocurrency markets." Howell Report ¶ 69.

18. Here, application of the KO model to Digital Asset markets is inappropriate for two principal reasons. First, while the *functional form* of the KO model may be a useful guide at a very high level the model's coefficients of factors to be applied are unreliable with respect to Digital Assets markets. The coefficients dictate the ultimate output of the KO model. If NYSE and NASDAQ contained different and statistically inconsistent coefficient values from one another, it follows that Digital Assets markets would too. Further, the KO model was developed using buying and selling data, while Prof. Howell's analysis relates only to selling.

19. Digital Assets markets contain characteristics different from the markets used to develop the KO model. Transaction fees in Digital Assets markets are significantly larger than U.S. equity markets. High transaction fees result directly in lower overall trading volume for the same amount of real dollar volume and price volatility. Using volume data from low transaction fee U.S. equity markets (where volume is high in part as a result of low transaction fees) would dramatically overestimate the market impact of a large position liquidation in the relatively higher transaction fee (and therefore lower volume) crypto markets.

20. Even assuming the KO model is applicable to Digital Asset markets, Prof. Howell, when applying the KO model, unfairly excludes volume in trading of SRM perpetual futures positions. That volume would add at least 44 million SRM worth of average daily trading volume to SRM, which volume would further decrease the asset liquidation discount. A hypothetical seller of SRM could use perpetual futures markets to liquidate SRM, so that volume should be fairly counted as part of a KO model calculation.

21. Using the correct SRM inputs to the KO model significantly lowers the asset liquidation discount. *Declaration of Jeff Bezaire in Support of Limited Objection of TMSI SEZC Ltd. to Motion of Debtors to Estimate Claims Based on Digital Assets* (the "Bezaire Declaration", attached as Exhibit 1 hereto) ¶ 9. By changing $3.7 billion to $509 million (i.e., the SRM in the Debtors' possession attributable to Customer accounts), the asset liquidation discount would be approximately 21.6%. *Id.* In addition, adjusting the average daily trading volume to include perpetual futures volumes (i.e., another approximately 44 million SRM), would result in a final asset liquidation discount of approximately 35.5%. *Id.* Combining both of the foregoing adjustments would reduce the asset liquidation discount to approximately 13.2%. *Id.*

22. Finally, as noted, SRM had at the Petition Date an active and definable market. SRM was listed on multiple exchanges and could have been bought or sold at then then-market price by TMSI or any Customer. In that way, SRM is similar to other Digital Assets priced by the Debtors at their face value without any discount. As a result of that active and definable market, the asset liquidation discount reflects a double, downward hit holders of Claims in SRM for what the free market had already priced in. The price of SRM was approximately $0.73 when CoinDesk published its article on Alameda's balance sheet.[11] That price decreased to approximately $0.37 by the Petition Date.[12] That difference in price represents the true asset liquidation discount. Discounting that by an additional 58.3%--derived from an in apposite model being used improperly—artificially suppresses the value of Claims in SRM and needlessly punishes customers and other stakeholders.

---

[11] *See* https://coinmarketcap.com/currencies/serum/.

[12] *Id.*

**Conclusion**

WHEREFORE, TMSI respectfully requests the Court deny the Motion as to the price and asset liquidation discount of SRM and grant such other relief as the Court finds just and appropriate.

Dated: January 11, 2024                   **SAUL EWING LLP**

By:     */s/ Mark Minuti*
Mark Minuti (DE Bar No. 659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-6813
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Peter A. Siddiqui (admitted *pro hac vice*)
Ethan D. Trotz (admitted *pro hac vice*)
525 W. Monroe Street
Chicago, Illinois 60661
Telephone: (312) 902-5200
peter.siddiqui@katten.com
ethan.trotz@katten.com

*Attorneys for TMSI SEZC Ltd.*