

FILED

2024 JAN 12 PM 3: 03

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket 5202** |

### OBJECTION OF SIMON CARTER TO
### (I) THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION AND
### (II) MOTION OF THE DEBTORS TO ESTIMATE CLAIMS BASED ON DIGITAL ASSETS

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................................................... 4

INTRODUCTION..................................................................................................................................... 11

BACKGROUND ....................................................................................................................................... 30

   1.   CRYPTOCURRENCY ........................................................................................................................ 30

        A) Coins and Tokens ............................................................................................................. 30

        B) Non-Custodial Wallets and Custodial Wallets ................................................................. 32

        C) Public and Private Keys ..................................................................................................... 33

        D) On-Chain and Off-Chain Transactions ............................................................................. 35

        E) Cryptocurrency is fungible................................................................................................ 37

   2.   THE FTX.COM PLATFORM ............................................................................................................. 38

        A) Deposits .......................................................................................................................... 40

        B) Withdrawals .................................................................................................................... 41

        C) Accounts......................................................................................................................... 42

DISCUSSION .......................................................................................................................................... 43

   1.   CORE EVIDENCE: TERMS OF SERVICE ............................................................................................. 45

   2.   EXTRINSIC EVIDENCE .................................................................................................................. 47

   3.   DIGITAL ASSETS......................................................................................................................... 57

   4.   OMNIBUS POOLS........................................................................................................................ 60

   5.   FRAUD AND MISAPPROPRIATION ................................................................................................... 64

   6.   PRIVATE EXCHANGE LEDGER ........................................................................................................ 66

   7.   FTX JAPAN................................................................................................................................ 71

   8.   SECURITIES AND COMMODITIES .................................................................................................... 73

   9.   SUMMARY................................................................................................................................. 75

**TERMS OF SERVICE** ........................................................................................................................ **79**

    1.    USER-TO-USER TRADING PLATFORM ................................................................................................. 82

    2.    DIGITAL ASSETS .................................................................................................................... 85

    3.    FIDUCIARY RELATIONSHIP ......................................................................................................... 92

    4.    UNCLAIMED OR ABANDONED PROPERTY ........................................................................................ 95

    5.    *BONA FIDE* PURCHASER .......................................................................................................... 98

    6.    NO RISK BANKRUPTCY CLAUSE ................................................................................................... 99

    7.    COLLATERAL ....................................................................................................................... 100

    8.    MARGIN TRADING ................................................................................................................ 101

**STAKED ASSETS** ........................................................................................................................... **103**

**PROPERTY** ................................................................................................................................. **109**

    1.    ACADEMIC ANALYSIS ............................................................................................................ 110

    2.    LEGAL ANALYSIS ................................................................................................................. 111

            *England and Wales* ...................................................................................................... *111*

            *Singapore* .................................................................................................................. *113*

            *Hong Kong* ................................................................................................................ *114*

            *New Zealand* .............................................................................................................. *114*

            *United States* .............................................................................................................. *114*

**TRUST** ..................................................................................................................................... **119**

**RELATED CASES** .......................................................................................................................... **126**

    CIVIL CASES ...................................................................................................................... 126

    CRIMINAL CASE .................................................................................................................. 129

**SUMMARY** ................................................................................................................................ **133**

COMES NOW, Mr. Simon Carter, a customer who holds an account on FTX.com, represented *pro se*, individually and on behalf of all other FTX.com customers similarly situated (collectively, the **"Affected Customers"**), respectfully raises the following OBJECTION to the third presentation of the proposed '*Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates*' (Dkt. 4861) (the **"Plan"**) submitted by the above-captioned debtors and debtors-in-possession (collectively, the **"Debtors"**); and intertwined OBJECTION to the Debtors' proposed '*Motion to Estimate Claims Based on Digital Assets*' (Dkt. 5202) (the **"Motion"**).

The United States Bankruptcy Court for the District of Delaware (the **"Court"**) has jurisdiction over this matter pursuant to 28 U.S.C. §1334 and is able to provide opinion pursuant to §157(b)(1), such that the Objection issue goes to matter of core proceedings §157(b)(2)(A) "matters concerning the administration of the estate"; §157(b)(2)(B) "exemptions from property of the estate" and "estimation of interests for the purposes of confirming a plan under chapter 11"; and, §157(b)(2)(O) "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship".

The statutory base for the Objection is §105(a), §541, and §1109(b) of title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the **"Bankruptcy Code"**).

In support thereof, it is respectfully represented as follows:

## **PRELIMINARY STATEMENT**

The Debtors have not prioritized doing the right thing for their customers.  They have not

respected the terms of service (the "**Terms of Service**" or "**ToS**")[2] which govern the contractual relationship between the Debtors and their customers, and sadly, this Objection to the Motion and Plan is a necessary response to the failure of the Debtors to act with great probity in a *core issue* affecting the root and branch of the proceedings. The Terms of Service for the FTX International platform (FTX.com) (the "**Platform**") are unambiguous which provide for Affected Customers that "**Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.**" and "**None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.**" (Exhibit A, §8.2.6). Supporting the Terms of Service is robust extrinsic evidence. Section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case" (H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367-368 (1977)). See *also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less").

Accordingly, the Debtors have no legal, equitable or beneficial interest in the Digital Assets[3] held in Affected Customer accounts on November 11, 2022 at 15:00:00 UTC (the "**Petition Date**"). The *core issue* is found at the heart of the filed Motion which seeks entry of and Order "estimating Claims based on Digital Assets and fiat currency by approving the Digital Assets Conversion Table to

---

[2] All references to "Terms of Service" or "ToS" are to the latest version dated from May 13, 2022, a copy of which is attached as **Exhibit A**. In addition, as explained in this submission, the May 13, 2022 version of the Terms of Service are considered the current version for all customers using the FTX.com International Platform at the Petition Date.

[3] "**Digital Assets**" in the context of the Terms of Service stated to mean BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform. The scope of definition includes stablecoins such as USDT and USDC but excludes 'E-Money' issued by the Platform to represent fiat currency deposits.

value such Claims, including Customer Entitlement Claims, for purposes of any plan in these Chapter 11 Cases" (Motion at §4) and respectfully is a matter which must be brought to conclusion by this Court.

The Objection is considered valid under the Bankruptcy Code §105(a) "power of the court", §541 "property of the estate", and §1109(b) such that any "party in interest" may "raise and may appear and be heard on any issue in a case under this chapter". This Court has the necessary authority to provide opinion on the matter. *See In re Fisher*, 67 B.R. 666, 668 (Bankr. D. Colo. 1986) ("The determination of what constitutes property of the bankruptcy estate is inherently an issue to be determined by the bankruptcy court."). See *In Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135, 83 S. Ct. 232, 234, 9 L. Ed. 2d 190 (1962) ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.").

This Objection provides a detailed account of the matters that circle over the *core issue* of the Debtors' bankruptcy estate (the "**Estate**") which is enlarged with property that is not the rightful property of the Debtors under Section 541 of the Bankruptcy Code. The Estate is wrongly expanded to include custodial Digital Assets held in trust for the benefit of Affected Customers (the "**Custodial Property**") – some Digital Assets having since been converted post-petition into fiat currency (the "**Converted Property**"). These assets cannot reasonably be considered available to the Estate for distribution under the Plan and consequently cannot reasonably be subject to the valuations or "used for purposes of any plan" as proposed by the Motion which, of significance, seeks endorsement to value Digital Assets in adverse fiat currency for the purpose of settling unsecured creditor claims with the Estate. This Objection disputes the Motion is valid since the Digital Assets are not property of the

[6]

Estate.  At bottom, the Debtors have no sound interest in the Custodial and Converted Property which belongs to Affected Customers and not to the Estate.

Additionally entwined are custodial Digital Assets which the Debtors *represented* to hold in trust for the benefit of Affected Customers, but which assets were unlawfully embezzled across the Debtors' structure of companies (the "**Stolen Property**").  Invariably, each Digital Asset (aside from Non-Fungible Tokens) held in a customer account on the Platform consist of a crypto-*token* married to an equivalent underlying crypto-*coin*.  The Stolen Property was a compendium of cash deposits and a fungible bulk of underlying cryptocurrencies coins held – or represented to be held – by the Platform acting as the custodial intermediary for the benefit of Affected Customers.  The Terms of Service provide that customers retain ultimate property interest to their Digital Assets (both crypto-token and crypto-coin) which may be withdrawn at any time.  While the fraud unlawfully misappropriated the underlying crypto-coins it is common ground that the crypto-tokens survived and sustain the entitlement to the underlying native cryptocurrency coins.  E.g. A customer with 3 bitcoin tokens held in their customer account continues to benefit from a beneficial entitlement to 3 native bitcoin coins as such time the customer chooses to withdraw their property from the Platform.  At bottom, the Debtors are obligated to return the stolen fungible crypto-coins to the custodial wallets to allow Affected Customers to withdraw their Digital Assets if they choose, and in this regard the ultimate interest in the Stolen Property belongs to Affected Customers and not to the Estate.

There is common ground amongst the Custodial Property, Converted Property and Stolen Property (collectively, "**Customer Property**") such that these Digital Assets *should* all be found in custodial wallets containing the underlying fungible bulk of cryptocurrency coins, though *but-for* the fraud the Stolen Property is missing from the omnibus pools, and *but-for* the sell-off the Converted

[7]

Property is residing in a Debtor controlled bank account. However, property interest in the Digital Assets is not defined by the fraud. The extent of Affected Customers property interests is authoritatively defined by the Digital Assets held in customer accounts on the Petition Date. You do not lose property interest in your vehicle merely because it is stolen – and Affected Customers do not lose property interest in their Digital Assets as result of adverse events.

The Objection hereafter soundly establishes that Digital Assets deposited, stored, acquired, received, transferred, converted, held – or otherwise were *represented* to be held by the Debtors – in trust in custodial accounts on the Platform are the property of Affected Customers and those Digital Assets and Digital Asset entitlements (including Converted Property and Stolen Property) are not property of the Estate to be distributed by any Plan or given an adverse valuation in an alternative fungible fiat currency for the purposes of advancing a Plan which is fundamentally misshaped contrary to §541 of the Bankruptcy Code.

It is right and proper for the Debtors to treat Affected Customers' property interests with the highest superpriority and to reunite Affected Customers with their lawful property. Such action falls within the Debtors *ordinary course of business operations* – to reconcile the underlying fungible bulk of Digital Asset coins held in custodial wallets against the aggregated Digital Asset tokens and entitlements held in customer accounts – causing the Debtors to transfer, convert, or otherwise acquire cryptocurrencies as necessary to maintain the marriage between Digital Asset tokens and coins and ensure sufficient liquidity in the omnibus pools to process withdrawals of customer property. This *ordinary business operation* was a core function of the Platform in its day-to-day role as custodial intermediary. This reconciliation can be re-run to the extent Digital Assets are available or could be made available using new liquidity gained from recovered assets or from less liquid assets now

converted to liquid assets while in the protection of bankruptcy. A shortfall in recovered crypto-assets to meet customer entitlements in full should trigger an alternative Plan that embodies a scheme for full restitution to the extent of the *in specie* debt as part of the title 11 reorganization including via potential use of recovery tokens in the rebooted exchange (noting here these title 11 restructuring proceedings are not intended to result in total liquidation or termination of the exchange). Simply, Affected Customers consider their Digital Assets are more valuable rather than a substitute cash settlement and are entitled to request their Digital Assets are returned.

While dealing with the matter with the highest superpriority is unlikely to be popular amongst all interested parties and creditors, this is a fair and reasonable course of action in the context which is soundly supported by unambiguous contractual Terms of Service upon which Affected Customers relied to do business with the Platform and under which they entrusted their hard-earned Digital Assets. As custodial intermediary, the Debtors were providing Affected Customers with the contractual equivalent of a safety deposit box for their Digital Assets rather than an interest earning checking account and it is right and proper that Customer Property – which was plainly not owned by FTX and to which the Estate holds no sound legal, equitable, or beneficial interest – should be returned in full.

At this point I should pause to underline that during these proceedings the Debtors' have invariably highlighted the difficulty of tracing commingled fiat currency and cryptocurrency across their structure of companies. It is wholly unreasonable for the Debtors in bankruptcy to invent self-constrained hard-edged boundaries to their liability post-petition by imposing artificially constructed business silos for the convenience of administration that go to ring fence assets where such boundaries offered no practical limit to the flow of misappropriated customer assets or act to contain the extent of

the fraud pre-petition. Consequently, the Debtors must look to the *whole* structure of their businesses which invariably received embezzled customer assets to discharge their great liability to Affected Customers which should not reasonably exclude any assets-in-possession to facilitate full restitution. The Debtors stole property from Affected Customers and their obligation is to leave no stone unturned in pursuit of returning that property back to customers.

Significantly, it is impossible for any assessment of the *core issue* to overlook the fraud perpetrated on Customer Property which unlawful course of events are now certified in related criminal and civil actions. The adverse legal proceedings have established beyond reasonable doubt that **Customer Property *was* misappropriated,** and I call upon this Court to align with the progress of determinations granted in the civil and criminal courts and to uphold their sound judgments rather than allow the Debtors to continue a play out a plainly false narrative that wrongly engorges the Estate.

The Debtors are entirely wrong-footed not have brought this core gating issue before the Court. By their own yardstick the Debtors have exercised poor judgment *inter alia* by: (A) ignoring their own dictate that establishing title to customer property was a *central legal issue* to be resolved by this Court; (B) prematurely preparing three plans of reorganization in the shadow of multiple adversary proceedings and fraud without certainty of property interest; (C) applying an acutely unreasonable interpretation of Customer Property contrary to unambiguous Terms of Service and robust extrinsic evidence; (D) misrepresenting the character of Customer Property so as to further an unsound scheme that continues to misappropriate Customer Property commingling it with Estate property and proposing wholesale distribution to all creditors (as well as to create sufficient liquidity to pay their own considerable expenses and costs); and (E) as consequence of their actions have

[10]

advanced a false prospectus wasting time and millions of dollars in unnecessary and avoidable legal fees – paid from bank balances enriched by further misappropriation of Customer Property.

The following is submitted with sharp focus to resolve the *core issue* determining the extent of the Estate as a core proceeding which has direct impact relevant to the proposed Plan including distribution of customer property by the Estate and interlinked Motion to value Digital Assets in the furtherance of the Plan. The Court has jurisdiction under §105(a) to deal with the *core issue* head on including, *sua sponte*, in order to resolve the central gating issue hanging uncomfortably over proceedings.

## **INTRODUCTION**

I, Simon Carter, am a software engineer and systems architect with a British honors degree in Computing Systems, broadly equivalent of a US master's degree, and have over thirty years' experience in software and systems development. English is my first language. Since 2003 I have served as a founding Director of Module Solutions Limited, a private firm in the UK providing business-to-business data systems, and customer of FTX. My professional experience means I understand system architectures, and my responsibilities include oversight of design, development, testing, maintenance, and revision of complex data centric systems, and reading and writing technical documents, such that in the context of understanding FTX.com's Terms of Service, I consider that I am able ascertain the plain and ordinary meaning of the words used. I previously wrote to the Court in September 2023 to generally question the ownership status of digital assets held by customers on FTX.com (Dkt. 2493) which was reasonably applied in objection to the Debtors' motion to sell-off

[11]

digital assets held-in-possession[4] (the "**Asset Sale Motion**"). Thereafter I submitted a *pro se* 'Motion for Opinion' (Dkt. 3890) which this Court rejected as an invalid submission as a core proceeding under 28 U.S. Code §157.

I attach a bundle of related documents to which I refer as Exhibits (**Exhibit X** or **Ex.X**) and make references to page numbers in the bundle as **(Exhibit/page)** otherwise section and page references are to the cited resource e.g. (**§X** or **p.Y/pp.Y-Z**). For the sake of brevity, I omit facts and matters which are already familiar to the Court unless it is relevant to refer in support of this Objection. All references made to 'customers' or 'Affected Customers' means users with an active account on the FTX International platform and who had Digital Assets[5] in their FTX.com account on the Petition Date.

I remain convinced that it is absolutely necessary for the core ownership issue to be determined by this Court standing on the shoulders of a reasonable assessment that: (A) the basis of facts are sound; (B) the property interest matter is fundamentally important to these proceedings; (C) the Terms of Service were meant to be understood by an average reader such that it should not require a legion of lawyers to derive the correct interpretation written within the four corners of the document; and (D) related civil and criminal proceedings have established property *was* misappropriated from

---

[4] Debtors' Motion for entry of an Order authorizing and approving (i) guidelines for the sale or transfer of certain Digital Assets, (ii) the sale or transfer of such Digital Assets in accordance with such guidelines free and clear of any liens, claims, interests and encumbrances, (iii) the Debtors' entry into, and performance under, postpetition hedging arrangements, including granting liens and superpriority administrative expense claims in connection therewith and (iv) the Debtors to stake certain digital assets. Filed on August 23, 2023. (Dkt. 2239)

[5] "**Digital Assets**" in the context of the Terms of Service stated to mean BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform. The scope of definition includes stablecoins such as USDT and USDC but excludes 'E-Money' issued by the Platform to represent fiat currency deposits.

customers and not from the Estate.  Additionally, I consider that (E) not respecting the unambiguous Terms of Service will harm consumer confidence at large where similar clear contractual governance applies and in particular (F) would be inconsistent with the United States Bankruptcy Court in the District of New Jersey in the matter of BlockFi Inc. which delivered an Order[6] that "[t]he digital assets held in the Custodial Omnibus Wallets as of the Platform Pause Time Stamp are not property of the Debtors' estate".  The Order based on comparable terms of service ("**The title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi.**").  Similarly in United States Bankruptcy Court in the Southern District of New York in the matter of Celsius[7] the bankruptcy court found "that digital assets in the Custody Wallets and Ineligible Withhold Assets … are not property of the Debtors' estates under section 541 of the Bankruptcy Code".  Also based on comparable terms of service ("**Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius**") whereat customers' crypto-assets were excluded from the debtors' estates to be returned *in specie*.

The first order of business is to take a brief look-back at why, after more than a year, this core issue remains an outstanding matter in these bankruptcy proceedings. On January 11, 2023, at the first hearing in this bankruptcy case, counsel for the Debtors rightly reported "We also have begun to engage on the **central legal issues** in the case. These include the nature of customer entitlements, are they property or claims, ..." (emphasis added) which task was fundamental to establish the extent of

---

[6] In *Re BlockFi Inc., et al,*. No. 22-19361 (Bankr. N.J.); Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (a) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief. (Dkt. 121), and related Order (Dkt. 923).

[7] *Re Celsius Network LLC,* No. 22-10694 (Bankr. S.D.N.Y); Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief. (Dkt. 670), and related Order (Dkt. 1767).

[13]

the Estate pursuant to the Bankruptcy Code, §541(a)(1). (The Estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case"). And also §541(d) such that if the Debtors are considered to hold bare legal title to underlying Digital Assets in order to perform custodial administration, without any equitable or beneficial interest to the property it holds in trust for customers it is only those bare legal rights which pass to the Estate. In other words, the "rights a debtor has in property at the commencement of the case continue in bankruptcy – no more, no less." *Welborn v. Ruegsegger (In re Welborn)*, 75 B.R. 243, 244 (Bankr. D. Mont. 1987) (quoting *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984).

Two-months later, in March 2023, and with the ownership issue still unresolved, the Joint Provisional Liquidators (the "**JPLs**") of FTX Digital Markets Ltd, as they were at that time, provided notice to the Debtors about their draft '*Application for Directions*' in the Supreme Court of The Bahamas, which Application included matter #4: "*In what capacity does FTX DM hold any digital assets and/or fiat*". A full and true copy of the draft Application and email exchange are provided at **Exhibit I**. On March 11, 2023, in their written response, the Debtors stated about the "**very central topics**" that "the **FTX Debtors believe** that all of the matters mentioned in the two-page "**Application**" … **must be addressed in front of Judge Dorsey**" and "[t]hese matters concern **what is and is not property of the chapter 11 estates**". (Emphasis added).

However, six-months later, at the September 13, 2023 Omnibus Hearing in the agenda item related to the Asset Sale Motion, counsel for the Debtors confirmed the ownership matter, as-at that time, "**has not been resolved**" (*Sept 13, 2023 Hr'g Tr. at* 16:06, Dkt.2503) despite having already submitted a first reading of their proposed plan of reorganization[8], and shortly afterwards a second

---

[8] Draft Joint Plan of Reorganization filed on July 31, 2023 (Dkt. 2100)

reading of the proposed plan[9]. It was a remarkable confession in the context of the Asset Sale Motion since the *very central topic* impacts upon customers' cryptocurrency entitlement claims and property interests to the assets-in-possession and the assets available to the estate for distribution under the proposed plan. In oral arguments, the Debtors skillfully danced around the ownership matter, though it was striking the Debtors comments went only insofar as to describe the post-fraud outcome and without any justification to the Court for wrongly labelling all assets as property of the Estate. See *Hr'g Tr. at* 11:55. (Customers *"had an account to which some cryptocurrency ... related"* and *"the underlying facts are ... the assets that are available to the debtors as property of the estate do not match what's on the screens of the accounts."*).

Furthermore, the Debtors had from time-to-time variously remarked about the commingling of assets and lack of accounting and controls at FTX to be an issue generally, yet in the specific matter of property interest discussed at the Hearing the Debtors were surprisingly cognizant representing that customer assets related to the Platform were clearly identifiable and distinguishable from any other commingled pool or assets-in-possession. See *Hr'g Tr. at* 13:01. (*"There are assets that are associated with the exchanges – we call the dot com customer pool and the US pool, but they don't necessarily match customer entitlements. And there is of course most of our assets which are not in those pools but in various other debtors around our structure that also don't match individual customer entitlements."*). Here, the Debtors skated over core truths that misappropriated customer assets were as a matter of fact used for a variety of purposes directly and indirectly across the Debtors structure of companies – including loan repayments, personal enrichment, and investments. The scope of fraud was so widespread that there is no good intelligence for tracing how ALL misappropriated

---

[9] Draft Plan of Reorganization filed on October 16, 2023 (Dkt. 3291 Ex.1)

customer assets were dispersed after being collated as fungible (fiat and crypto) currency in bank accounts and wallets, such that, for example, investments made within the venture silo – cannot with any degree of certainty – be assured not to have been funded in full or in part from embezzled customer assets taken from the dot com silo.

Thus, for the Debtors argument to focus on the *residual assets* as were available in the "dot com customer pool" in the wake of the fraud is an artificial construct distracting from the central matter of the ultimate (legal, equitable, beneficial) property interest in the crypto-assets deposited, transferred, or acquired and held in customer accounts – irrespective of when or where the underlying assets were misappropriated by the Debtors. The Debtors are plainly looking down the wrong end of the telescope such that by their logic – if Andy parks his vehicle in Billy's garage from where it is later stolen, then the Debtors would have it that Andy should lose his lawful property interest in his vehicle. Adding that it was Billy who stole the vehicle.

Notwithstanding, the Court was perceptive to ask the relevant question at the September Hearing (*Hr'g Tr. at* 17:25):

Judge Dorsey:     But a customer could say, "I know I have 3 bitcoin on the exchange. I might not know which particular bitcoin it is, but there is 3 bitcoin on the exchange that belongs to me". That's their argument. "And I want it back. I want the bitcoin back – I don't want the cash. I want the bitcoin back because I think that is more valuable to me". How do I deal with that?

Mr. Dietderich, Sullivan & Cromwell. Debtors' Counsel:
              Well - I think that again I would say that the burden of proof is on the customer to prove an interest in the property and there has been neither a specific allegation nor – nor an assertion in the interest in the property.

[16]

To say the Debtors' answer comes up short is something of an understatement. Relevant analysis is provided later (see 'Private Exchange Ledger' section), and I will not dwell for long here – save to highlight the reply given was a clear signal of the Debtors lack of probity and gaslighting in this matter. The Debtors told a story which obfuscated information. *Firstly*, the Debtors adopted an acute position temporarily blind to the Digital Asset balances shown in customer accounts. The Debtors failed to acknowledge the Digital Asset tokens held in a customer account defined a beneficial property interest to an equivalent amount of underlying Digital Asset coins held in the custodial wallets. Not the other way around. Earlier, the Debtors had generally recognized there are "customer entitlements" to underlying assets (*Hr'g Tr. at* 13:01) – which entitlement was plainly identified by the Digital Assets held in customer accounts and frankly should have been the beginning and end of the "proof".

*Secondly*, The Debtors' invented test – for a customer to prove interest in specific fungible property – was both unreasonable and unnecessary given the fungible characteristic of the asset. Consider, a bank does not require a customer to prove an interest in a particular fungible dollar bill before it will process a withdrawal, but that is precisely the absurdity of the test being advanced by the Debtors. Notwithstanding, the Debtors later and somewhat casually recognized cryptocurrencies held in the shared pools were fungible. See *Hr'g Tr. at* 15:10. (*"We are only selling these assets that are at most – a kind of a fungible bulk."*). The 'fungible' character carrying the definition of an interchangeable unit without distinguishing feature that could be replaced by another identical unit of equal value and type. In the context, it was adequate proof for a customer to show their entitlement to 3 bitcoin from within the fungible pool of bitcoins rather than precisely identify a particular fungible bitcoin which is by nature without distinguishing feature. Related, and additionally, the essential

ingredient for the Debtors to operate their centralized cryptocurrency exchange was reliance on the characteristic that cryptocurrency coins are fungible. Simply, the Platform would have had to be an entirely different business but-for this fungibility of the underlying asset, and for the Debtors to be take a contrary view in the matter is beyond belief.

*Thirdly*, the Debtors' test was an impossibly high bar unsupported by the Platform. No information was disclosed, or ledger published, or account given, which may have informed a customer of the identity of a particular underlying fungible asset that belonged to them (not that this was even feasible given architecture of the exchange and the fungible character of cryptocurrency coins) and similarly no information was disclosed about the specific wallet address containing the underlying fungible asset. The only means available for either the Debtors or a customer to determine property interest in the underlying fungible bulk is by examining the Digital Asset entitlements held in the customer's account. Consequently, the Debtors test was knowingly disingenuous.

The Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee") commented on the matter at the Hearing, stating for the record, *"We don't necessarily agree with everything the Debtor's said about the traceability of property interests"* (*Hr'g Tr. at* 20:52). Alas, no more was forthcoming since at that date the Debtors and Ad Hoc Committee were quietly aligned on a trajectory to support the proposed plan of reorganization[10]. The Asset Sale Motion was granted, though not because customer property interests were disqualified – no customer could possibly

---

[10] At the September 13, 2023 Hearing the Debtors had completed, or were finalising, private closed doors negotiations to reach a settlement in the matter of the Ad Hoc Committee's adversary proceeding with terms agreeable to the Ad Hoc Committee's constituents including reimbursement of Ad Hoc Committee legal fees and ongoing monthly fees and unfettered public support for the Plan of Reorganization, such that there was no room for adopting a contrary position in open Court. The *'Settlement and Plan Support Agreement'* was later filed with the Court on October 16, 2023 (Dkt. 3291).

[18]

overcome the high bar setup by the Debtors – and not because the Debtors had validated a superior title claim to the assets. Nevertheless, and despite progress in the sell-off of crypto-assets, this submission advocates using the liquidity derived and now held in fungible assets (fiat currency) from the Converted Property to replenish the underlying fungible cryptocurrency coins in custodial wallets. It is already mentioned that such reconciliation forms part of the *ordinary course of business operations* of the Platform to marry the aggregated Digital Asset balances held in customer accounts with the underlying cryptocurrency coins before reopening withdrawals for Affected Customers to the extent that is possible.

Three months following the September 13, 2023 Omnibus Hearing, and passing the Petition Date anniversary, the Debtors demonstrated no particular appetite for transparently resolving the *very central topic* in this Court as they had represented generally and more specifically to the JPLs. Consequently, any grounds which the Debtors rely upon in support of their alleged claim to Customer Property remains wholly assumed and unvalidated by this Court. On December 16, 2023, the Debtors filed the third proposed Joint Chapter 11 Plan of Reorganization (Dkt. 4861) which Plan continues to assert Customer Property falls in the Estate and the assets distributed by the Estate to all creditors while characterizing Affected Customers as general Class 5A unsecured creditors.

As an Affected Customer I have held expectation that this *central legal issue* would have been resolved by the Debtors with the highest probity in a timely fashion – *as per* examples set in the BlockFi and Celsius bankruptcies by the respective debtors (see 'Property' below) which resolutions did not mandate extensive or burdensome litigation to understand the clear an unambiguous intent of their related terms of service. And certainly, I had expectation the matter would have been put to bed before any reasonable plan was put before this Court, though to my great surprise and frustration, and

[19]

to the best of my knowledge, it is a matter which has been kicked into the long grass with no signs of being dealt with before committing to a plan, and until the question is addressed the cart remains firmly planted before the horse. The premature draft plans of reorganization are based on a landscape which, even according to the Debtors, has not resolved the necessary and fundamental legal analysis which risks incorrectly treating customer property as part of the Estate. This Court has the necessary authority to provide opinion on the matter. Bankruptcy Code §105(a). Also *See In re Fisher*, 67 B.R. 666, 668 (Bankr. D. Colo. 1986) ("The determination of what constitutes property of the bankruptcy estate is inherently an issue to be determined by the bankruptcy court."). See *In Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135, 83 S. Ct. 232, 234, 9 L. Ed. 2d 190 (1962) ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.").

For the avoidance of doubt, this submission focuses on the property of the Estate and respectfully petitions the Court to take action or provide opinion or other determination over my property rights, and the property rights of similarly situated Affected Customers, to their Digital Assets which were:

(1)   Held in customer accounts on the Petition Date (these crypto-asset balances being known to the Debtors and communicated to customers via e-mail during March 2023 and thereafter published on the customer claims portal); and

(2)   Deposited into customer accounts post-petition (as may exist for whatever reason); and

(3)   Settled from open trading positions closed with effect on the Petition Date – rather than, it is assumed, to allow such trading positions to remain open post-petition and divorced

from customers' control breaching the Terms of Service. *See* Exhibit A, §8.2.6(C). ("You control the Digital Assets held in your Account").

Further, the Court is invited to provide separate commentary over the property rights to Digital Assets held in customer accounts and 'staked' for reward on the Platform (the "**Staked Assets**"). Not because these Digital Assets are considered different, but because such assets perhaps carry a stigma by association with other cryptocurrency exchanges in bankruptcy which had provided separate 'custodial accounts' and 'earn accounts' where assets put to use for reward might not belong to customers. But this interpretation mistakes other forms of 'earn accounts' operated under different terms allowing another party to use, hypothecate and rehypothecate the assets as they see fit to derive a profit. But that is not the case here as the Staked Assets always remained in customer accounts subject to the same Terms of Service as other Digital Assets held in customer accounts where title to the assets always remained with the customer. *See* Exhibit A, §8.2.6 ("All Digital Assets are held in your Account on the following basis (A) Title to your Digital Assets shall <u>at all times</u> remain with you and shall not transfer to FTX Trading."). (Emphasis added). Nevertheless, to allow sharp focus on the subject, the question of ownership of Staked Assets is separated, though for the avoidance of doubt, these assets are considered to belong to Affected Customers.

Further, the submission explicitly excludes customer property related to the following asset classes (the "**Excluded Assets**"):

- Fiat currency or 'E-Money' (the Platform's fiat currency equivalent) held in FTX.com customer accounts (the "**Cash Assets**"); and

- Fiat currency or 'E-Money' or Digital Assets held by customers on any of the Debtor's other platforms (FTX.us, *et al*).

[21]

The Excluded Assets are considered sufficiently distinguishable such that this submission does not advance any merits or prejudice any other judgment or opinion this Court may be required to deliver on those asset classes which were subject to alternative provisions in the Terms of Service. Indeed, separating Digital Assets held in customer accounts on FTX.com from the Excluded Assets should expedite matters.

The property ownership question requires standard legal analysis in order to determine Affected Customers rights to the Digital Assets held in their respective FTX.com customer accounts (**"Accounts"**) and determine whether those rights are personal or proprietary. If personal rights in the full sense, then the Digital Assets should be fully returned to Affected Customers *in specie*. If proprietary rights, then it is a matter of further analysis to determine the legal, equitable and beneficial interest and whether to return the digital assets in-kind.

The practical consequences may well be considered undesirable (removing property which has been wrongly assumed into the Estate and adopted into the proposed Plan for distribution) ranking Affected Customers above other interested parties, though there was nothing equitable about the events which resulted in FTX misappropriating Affected Customers' assets. The Debtors acknowledged their great responsibility in objection to the Motion of the JPLs for Determination that the U.S. Debtors' Automatic Stay Does Not Apply. *See* Dkt. 1409, §4. ("Moreover, the Debtors separately are responsible to customers for economic losses on a litany of fraud and other non-contractual claims.").

Notwithstanding Affected Customer property is *not* considered part of the Estate, while commenting on equitable matters, it is relevant to briefly detour into the third proposed Plan (Dkt. 4861) filed on December 16, 2023 which bakes-in inequality within its proposed framework for

[22]

distribution that would deliver *limited economic loss* to customers with Cash Assets and stablecoins which asset values have remained broadly unchanged in USD value since the Petition Date and were by and large unaffected by the market crash artificially caused by FTX. The Plan proposes to deliver either *zero economic loss*, or *limited loss*, to a very large population of preferential customers[11] lucky enough to have withdrawn their assets in the days before the collapse **(the "Preference Customers")** and who transferred considerable value from the exchange[12]. It will also deliver *zero economic loss* to a significant population of other customer withdrawals completed before the nine-day window but within the allowable 90-day bankruptcy preference period and now excluded by the Plan (the **"Excluded Preference Customers")**. By contrast, Affected Customers *un*lucky enough not to have had their withdrawal instructions processed in the immediate days prior to collapse have found their Digital Assets locked in the Platform when the USD equivalent value had plummeted as consequence of the FTX collapse. By the terms proposed in the Plan, the Preference Customers and Excluded Preference Customers will retain their property *in specie*, which for the avoidance of doubt is as it should be as customer property does not belong to the Estate, though results in inequitable treatment of Affected Customers for whom the Debtors did not process withdrawals[13], though perhaps could do now following recovery of liquid, less liquid, and illiquid assets while under the protection of bankruptcy. Had sufficient liquidity been available in November 2022 there is no doubt Affected

---

[11] The Joint Plan of Reorganization filed on December 16, 2023 (Dkt. 4861) proposes no preferential claw-back for customers whose nett withdrawals amounted to less than $250,000 in the nine day period immediately before the Petition Date and 15% reduction in their claim or 15% cash payment for any nett withdrawal amount above $250,000 threshold.

[12] The Preference Customers include several VIP customers for whom FTX prioritised withdrawal instructions elevating their transfers in the queue above non-VIP customers.

[13] On November 10, 2022, whilst withdrawals were locked for all FTX.com customers, Sam Bankman-Fried re-opened withdrawals for Bahamian national customers of FTX.com to allow them to transfer "their assets, making them fully whole" in preference to processing withdrawals for any other customer waiting for their withdrawal instruction to be processed. The assets used to process these preferences were taken from generally available omnibus pools.

Customer withdrawals would have been processed upon customers' controlling instructions and *but-for* the fraud would have been economically whole.

Further, and additionally, the Debtors' updated proposed Plan and related Motion to monetize crypto-assets with Petition Date valuations renders a synthetically low assessment of economic value for all virtual currencies while simultaneously benefitting from the reversal in the market conditions since the breakdown instigated by FTX collapse. This is a double-whammy for Affected Customers holding digital assets. For example, the Motion asserts to use a low USD equivalent value of Bitcoin (BTC) at $16,781 per BTC on the Petition Date (although the market price was around $17,500) and now (at the time of writing) has passed $45,000 – more than two and a half times the USD equivalent valuation. IF the recovery rate for unsecured customer creditor is around $0.85c on the dollar, as has been speculated (loosely based on the 15% 'haircut' offered to Preference Customers with nett withdrawals over $250,000), then it follows Accounts with Cash Assets or stablecoins, and the Preference Customers and Excluded Preference Customers, will each have yielded the greatest recovery in present-day asset valuations at $0.85c. However, by comparison, the real terms equivalent recovery rate for an Affected Customer holding BTC locked on the exchange will be less than half that of the other asset classes at around $0.32c with most other Digital Assets being similarly situated to bitcoin. Notably, Solana (SOL), for example, is valued by the Motion at $16.24 on the Petition Date (below the day's trading price) and is now valued at over $95 – nearly six times the Petition Date valuation which, for comparison, would yield an equivalent recovery rate of around $0.15c on the dollar. Plainly, Affected Customers could not re-purchase the same quantity of Digital Assets with a USD equivalent disbursement based on the Motion's undervalued Petition Date prices. There is, therefore, a great divide in the economic value of restitution that is proposed to customers depending on their class of asset. In such circumstances, and in the event this Court determines customer property

remains in the Estate, an equitable remedy to provide adequate protection against the diminution in value of Digital Assets would be for the Plan to return Digital Assets *in specie* reflecting the *same* terms offered to Preference Customers. Without a change of direction, the proposed Plan is not equitable as all customers would not be similarly situated and unlikely to be supported by customers holding Digital Assets. However, such hypothesis on the proposed Plan has strayed from the purpose of this submission and is perhaps irrelevant since the asserted lawful position is considered that **Affected Customers' Digital Assets do not form part of the Estate** which therefore demands superpriority repayment *in specie*.

The custodial intermediary arrangement provided by the Terms of Service, in which FTX ascribed itself as holder of customer owned assets, is subject to legal interpretation which methodology provides a clear objective approach for interpreting contracts. *First*, determine whether the contract is ambiguous. *Next*, if at all unclear, **consider extrinsic evidence to determine the parties' intent** to ascertain the proper interpretation of the contract. *Finally*, if, and only if, the extrinsic evidence does not provide the answer then the rule of *contra proferentem* may be invoked providing that an ambiguous contract term should be construed against the drafter. In the instant matter the plain, ordinary, and common meaning of the unambiguous language used in the Term of Service, and supported by extrinsic evidence, supports an arrangement in which FTX was holding customer property in trust with certainty of intention, object, and subject matter sufficient to confirm Affected Customers retain ultimate (legal, equitable and beneficial) title to their Digital Assets held in their Accounts which, respectfully, should prove determinative. E.g. *Knight v Knight (1840) 3 Beav 148*. (Holding that for a trust to be properly constituted, it must consist of a minimum set of requirements: certainty of intention, certainty of subject matter and certainty of object.); *Hunter v Moss* [1994] 1

WLR 452 (Established that property rights exist in a part of a specified quantity or bulk of fungible assets).

On December 27, 2022, Austin Onusz, Cedric Kees van Putten, Nicholas J. Marshall and Hamad Dar began an adversary proceeding in *Onusz, et al. v. West Realm Shires Inc., et al.,* No. 22-50513 (Bankr. D. Del.) (Dkt. 321) (the **"Class Action"**) against the Debtors alleging customers of FTX.com and FTX.us held property interests in fiat currency and digital assets on the respective exchange platforms, and further alleged breach of contract, breach of fiduciary duties, negligence, conversion, and alleged aiding and abetting against particular named insiders. While aspects of common ground exist with regard to some of the principles surrounding Digital Assets, the Class Action has a distinctly broader focus. To deal with *FTX.com* and *FTX.us* and *money* and *property* and *related civil matters* in concert at a jury trial, as the Class Action prescribes, would undoubtedly result in protracted legal arguments and delay. Further, the scope of the proposed Class Action is somewhat overtaken by progress in the parallel criminal and civil cases.

On December 29, 2022, the Ad Hoc Committee began an adversary proceeding in *Ad Hoc Committee of Non-US Customers of FTX.com v. FTX Trading, Ltd., et al.,* No. 22-50514 (Bankr. D. Del.) (Dkt. 328) against the Debtors alleging customers of FTX.com held property interest in fiat currency and digital assets. Although there are elements of common ground found in that adversary proceeding, this Objection is not considered to trespass over all the same ground being that the Ad Hoc Committee casts a wider net including fiat currency and E-Money held in customer accounts which asset classes were affected by separate provisions in the Terms of Service, and imperfectly deals with the matter of digital assets. To deal with both *money* and *property* in concert, as the Ad-Hoc Committee does, would undoubtedly result in protracted legal arguments. Further, the Ad Hoc

[26]

Committee represents the interests of non-US clients holding Cash Assets, highly exposed Excluded Preference Customers, and claims purchasers which constituency is not representative of the thousands of other Affected Customers generally.

On October 16, 2023, the Class Action and Ad Hoc Committee plaintiffs signed the '*Settlement and Plan Support Agreement*' (the **"Plan Support Agreement"**) with the Debtors in support of the second Draft Plan which settlement terms require unfettered cooperation and positive public affirmations from both plaintiffs. *See* Dkt. 3291. The full and true extent of the negotiations behind this agreement remain sealed though it is broadly believed to involve amendments favorable to the plaintiffs, such as curtailing the 90-day preference period for Excluded Preference Customers and improved terms for Preference Customers, and in return the Debtors avoid having to deal with the uncomfortable question of ownership of Digital Assets in open Court, as well as agree to support a motion to reimburse the Ad Hoc Committee legal fees further diminishing the assets held in the Estate. Nevertheless, both the Class Action plaintiffs and Ad Hoc Committee respective adversary proceedings remain alive.

*        *        *

In addition to dealing with the contract provisions in the Terms of Service, a priority order of business is to grapple with the technical specificity surrounding "Digital Assets" held in FTX.com customer Accounts as inked in the Terms of Service. I have observed parties misconstrue a true and factual understanding by substituting the term **"Digital Assets"** to mean only the crypto-assets held in the omnibus pools and in the same breath referring to a popularly plowed defense which considers ownership is defined by the control of private keys required to authorize a transaction. This misreading is forgivable since it applies a commonplace supposition about cryptocurrencies that perhaps reflects

[27]

a natural assumption about how the exchange was imagined to work. For example, when Anna deposited some of her bitcoins on the Platform, she could see a corresponding amount of BTC show up in her Account balance. When she then traded her BTC with Bill, another FTX.com customer using the Platform services, for his ether (ETH) she saw her Account balance was updated to show the corresponding amount of ETH she had acquired. And when she withdrew the ETH to her cold wallet the same amount of ETH was transferred off the Platform. For all intents and purposes Anna considered she was in control of blockchain assets throughout. This is a general held assumption about how a cryptocurrency exchange operates and one that exchanges are seemingly happy to represent to customers. But that is not the whole truth and is not supported in law.

The nitty gritty detail of the situation means it is necessary to grapple with the concept of **'coins' and 'tokens' to appreciate how FTX dealt with Digital Assets** deposited and held in customer Accounts and how these assets related to the omnibus pools and customer-to-customer trading on the platform. This topic is expanded in 'Discussion', though, in abstract, may be considered in terms of a customer taking their goods (i.e. crypto-coins) to a parcel delivery company (FTX.com) who provided a box (token) into which the goods (coins) were placed ready for transit. Together the box and goods became a parcel (digital asset) belonging to the customer which held a value equivalent to the goods inside it. The parcel was entrusted to the company (i.e. deposited) to be processed through its delivery network (customer accounts and exchange services) before being delivered to the destination (withdrawal) where the goods were removed from the box.

This analogy might be loosely taken one step forward by exposing the **delivery company's** service contract which stated, "*At all times the box and its contents belong to you. We do not own the box or its contents. We will not use the box or its contents, and we will not treat the box or its contents*

[28]

*as property belonging to us*". Mindful, the company managers nevertheless took goods from the boxes and gave the misappropriated property to their friends (fraud) which crime was unearthed and the company collapsed.  Fast forward, the administrators arrive and seize everything.  They open the undelivered parcels and claim the goods (i.e. crypto-coins) as their own for the reason they have control of the box cutter (private keys) and all they now see are piles of unidentified goods (coins) whilst ignoring the parcels (digital assets) were clearly listed on a manifest (customer accounts), and with an eye closed to the primary operations of the former business that safeguarded and delivered parcels placed in its custody.

  The Debtors and other interested parties have variously represented that to deal with the matter of digital asset ownership is a highly complex undertaking that might take a significant period of time and require great legal efforts to unravel.  But I dispute this as it is really a quite straight-forward matter.  It can be resolved within the four corners of the Terms of Service which unambiguously formed the boundaries governing the agreement between FTX and Affected Customers and is supported by much extrinsic evidence.  The Debtors are anticipated to defend the extent of the Estate, though the truth is they have no skin in the game since customer assets do not form part of the Estate.  They might provide legal analysis that will re-imagine the Terms to assert the Estate's claim, but such obscure analysis in bankruptcy must be considered superfluous in the shadow of the simple language and clear expectation laid out by the Terms of Service.  The question is not as much about entitlement to property when in bankruptcy, but whether Debtors had that same right to the Digital Assets before the Petition Date.  The Term of Service certainly do not support that. Moreover, if this core issue is considered so complex that it requires the combined efforts of many talented legal minds and a long period of time to unravel, how does that reflect on the ability of a reasonable person to ascertain and decipher such an alternative complex legal meaning that might be

[29]

buried within the provisions beyond the ordinary and natural meaning of the written words to which customers had agreed, and which unambiguous language assured the customer they retained title to their property. If the Debtor's intention is to now create such great ambiguity in the provisions where none existed before, then the rule of *contra proferentem* must apply.


## **BACKGROUND**

### **1. Cryptocurrency**

Generally, *cryptocurrency* is characterized as digital currency based on a blockchain technology providing a decentralized digital store of value independent of any central bank or other singular authority.

I shall not dwell on this topic, recite the history of cryptocurrencies, or the mechanics of blockchain technology more than necessary as much of that ground as is relevant has already been covered with this Court save to underline a few key points:

#### **A) Coins and Tokens**

With reference to the earlier example, the Digital Assets controlled by Anna on the Platform were not merely crypto-*coins* held in a blockchain wallet but more precisely were crypto-*tokens* held in her Account. It might seem pedantic but there is a difference: a crypto 'coin' exists on a native blockchain whereas a crypto 'token' exists on top of a blockchain encapsulating it for operation. Crypto-coins include BTC, ETH or XRP and are also referred to as native, layer-1 projects, or 'on-

chain' crypto-assets. Crypto-tokens like USDC[14], FTX Token (FTT), Polygon (MATIC), Arbitrum (ARM), or the asset tokens held in customer accounts on a crypto exchange, can be referred to as non-native, Layer-2 projects, or 'off-chain' crypto assets. Together 'coins' and 'tokens' are both *cryptocurrency* being a class of digital assets that rely on the underlying use of blockchain technology.

It might assist to visualize the crypto-tokens held on FTX.com as a *blockchain-pegged crypto token* since it derived its value from an underlying asset stored in a custodial wallet on the native blockchain. The crypto-token granted an *entitlement* to the pegged asset. I will refer to the underlying crypto-coins as '**Customer Pegged Assets**' which portrays the intended relationship between the customers' crypto-tokens and crypto-token entitlements held over the crypto-coins, and collectively as 'Digital Assets' representing the asset balances in customers' Accounts to remain consistent with the Terms of Service. The tokens 'encapsulated' the coins to create the totality of the *Digital Asset* owned by the customer – from the earlier parcel delivery company analogy, the token is the box and the goods inside are the coins that altogether form the parcel.

In some respects, the Digital Assets share characteristics with pegged stablecoins which are themselves asset based crypto-tokens having a store of value pegged to a stable asset such as fiat currency, except in the case of FTX.com, the crypto-tokens on the exchange were pegged to a particular crypto-coin and so were married to a store of value that was subject to fluctuations in the prevailing market exchange rate. Thus, the BTC held in Anna's account was a BTC token having the same store of value as native BTC owing to it being backed by an equivalent amount of BTC coin on the Bitcoin blockchain held in the custodial wallet. These were cryptocurrencies in the full sense.

---

[14] USD Coin (USDC) is a cryptocurrency stablecoin pegged to the U.S. Dollar and backed by Circles' reserves such that each USDC has an equivalent USD asset, 1:1. Although classed as a stablecoin it is technically a tokenized dollar and not a coin.

### B) Non-Custodial Wallets and Custodial Wallets

Is it useful, as I see it, to briefly set out what is meant by a custodial wallet. To do so it is necessary to first consider that a *cryptocurrency wallet* is a piece of software or hardware designed to manage and facilitate cryptocurrency transactions. A wallet generally stores the public and private keys necessary for each cryptocurrency holding but does not in itself 'contain' the cryptocurrency rather it provides a means to connect to and interact with a particular blockchain network that contains blocks of transactions including those related to the public keys linked to the wallet.

A *non-custodial wallet* supports the transfer of a cryptocurrency to another blockchain address and generally not much else, though some providers are increasingly offering additional related services such as staking services and debit cards linked to cryptocurrency holdings. The user is considered to have sole control of the private key and therefore a non-custodial wallet is generally regarded to be secure as the user is not reliant on a third party's security measures. For most non-custodial wallets, users will never actually see the private key which is managed by the wallet to confirm a transaction – it is a common misconception that the 24-word seed phrase generally issued for recovery is the private key, but in fact this is only used by the wallet provider to mathematically derive the secure alphanumeric private key. A forgotten wallet password, or lost recovery phrase, or failure/collapse of the wallet service could result in permanent loss and inability to access the cryptocurrency held in the wallet. Holding cryptocurrency in a cold wallet, that is a wallet stored off-line typically using a physical storage medium like a USB-drive, is akin to putting money under a mattress, and the loss of the recovery phrase or device, such as in a house fire, could result in total loss of the cryptocurrency.

[32]

For a *custodial wallet*, a third party such as a cryptocurrency exchange is responsible for safeguarding and managing the keys on behalf of the user which is seen by some as a benefit having less user responsibility in the safekeeping of keys. These wallets are usually linked to additional services (buying or selling cryptocurrencies or exchanging to/from fiat currency) and typically provide easy-to-use interfaces for users. The user is issued a public key for making cryptocurrency deposits and the user controls when to transfer their cryptocurrency holdings – and much like many non-custodial software wallets the user does not get 'hands-on' managing the private key to confirm a transaction which is instead managed by the custodian on their behalf. The wallet provider will have security measures to protect access which are generally on par with non-custodial software wallets, however a lost password may not necessarily result in the permanent loss of cryptocurrency held in the wallet.

FTX variably represented customer Accounts as 'wallets' in the Terms of Service. *See* Exhibit A, §7.2. ("[T]he price of a given Digital Asset as quoted on your "Wallet" page on the Site"). And in public forums. *See* Testimony of Sam Bankman-Fried to Congress, Exhibits D & E. (Noting the written testimony generally, and specifically when describing FTX.com, stated "The core product also consists of … a custody service and wallet for users"). To avoid confusion, throughout I refer to 'Account' to mean 'customer account', and 'wallet' to mean the native blockchain 'custodial wallet'.

### C) Public and Private Keys

The *public key* is the public address on the blockchain, much like a postal address, and the *private key* is used to facilitate and confirm the transfer of the cryptocurrency, much like a front door key provides entry to the house. These keys are typically 25-36 alphanumeric characters in length. Users are familiar with the public key which is often copied-and-pasted as part of a cryptocurrency

[33]

transfer to specify the destination wallet address, although conversely users are generally divorced from the highly regarded private key which is commonly managed by custodial or non-custodial wallet providers or services.

Popular opinion suggests holding the private key alone is absolute proof of ownership fueled in no small part by the "not your keys, not your crypto" cultural meme commonly plowed on social media. (Observing such social advice is generally buyer-beware since many 'professional' social media contributors have a good eye on their popularity rankings and related income streams rather and possibly not on the subject matter). But this meme is often a too narrow definition that skates over material factors including individual circumstances, contract provisions, custodial arrangements, and property ownership. For instance, if a hacker gained adverse possession and control of a private key, it does not follow that the hacker has become the rightful owner to the related crypto-asset. If digital assets held in custody are misappropriated by fraud the owner's legal or beneficial title is not seized by the bad faith custodian. In the tangible world, the finder of a misplaced car key does not gain ownership of the vehicle merely by being in possession of the lost keys, and a friend who holds your front door key in trust has no expectation of gaining title to your house. And a bank employee does not become the legal owner of the contents of the bank vault merely because they have the combination code to the safe anymore than a bank robber becomes the rightful owner of a swag bag full of dollar bills merely by recent adverse possession.

If we were truly to only to consider the hierarchy of control as a mechanism to determine ownership, then the functional control layer residing below the issuing instruction for a blockchain transfer falls on the validator who controls authorizing the transaction on the public ledger and as far as I am aware no one is asserting that miners or validators have a superior property interest in the

[34]

crypto-asset. Thus, both the validator and the private key are a necessary component of blockchain technology required to authorize a transaction on the public ledger of a blockchain network, but merely having access to the key or control to validate the transaction does not provide certainty of ownership.

There is a population of crypto cases (examples provided in 'Property' and 'Trust' sections below) where possession of private keys has been a useful indicator to the courts to help resolve contested ownership of intangible property in lieu of additional robust material. However, in the instant case, FTX.com was a regulated cryptocurrency exchange that was populated by non-anonymous customers. It was bound by Terms of Service governing its intermediary function to hold assets in custody that provided agreement, *inter alia*, that ultimate (legal and beneficial) title to the intangible property "at all times" belonged to customers. The Digital Assets owned by Affected Customers were plainly identifiable in Accounts such that the value and role of private keys establishing ownership is less weighty.

Common-sense dictates that if the private key was the *only* legal indicator of ownership then there should reasonably be no reasonable prospect of a market at all for off-chain projects like centralized cryptocurrency exchanges or on-chain custodial wallets or any other crypto based project which risked entrusting cryptocurrency to a third party – consequently, analysis of related material facts including custodial arrangements, trusts, and contracts assist determining legal ownership rather than assume ownership is a judgment merely by possession of the alphanumeric keys required for custodial function.

### D) On-Chain and Off-Chain Transactions

An *on-chain* transaction refers to a transfer of cryptocurrency made on the public ledger of a particular native blockchain network that has been verified to the blockchain by its validators. Such

[35]

transactions occur on blockchain networks like Bitcoin, Ethereum, and XRP Ledger (XRP).  The transaction is publicly viewable and at a minimum will reveal the transferer and transferee public addresses and the amount of cryptocurrency transferred.

The alternative *off-chain* transaction occurs outside of the native blockchain network.   These transactions are not recorded on the underlying blockchain but facilitated in secondary layers which provide a solution to issues of scalability and are now a crucial part of the crypto universe.  Examples of off-chain cryptocurrencies include MATIC and ARM which are blockchains built on top of the Ethereum network, and FTX's FTT which uses Ethereum and Solana blockchains.  Other examples of off-chain applications include services provided by third-party interlocutors, such as, a centralized cryptocurrency exchange like FTX.com.  These applications and their associated off-chain assets and transactions are popular due to scalability, speed of transaction, greater anonymity and, in the case of crypto exchanges, cost efficiency having zero/low-cost transactions fees making it the preferred solution allowing the exchange to charge platform transaction fees to their customers.  In a centralized cryptocurrency exchange, a private ledger performs an administration function comparable to the public ledger for the blockchain and records the cryptocurrency transactions performed *off-chain* within the exchange, and to the rules of the system usually defined in terms of use.  In order to maintain an appropriate store of value in the off-chain digital assets, an exchange will typically administer a pool of equivalent on-chain assets equal to the amount of off-chain crypto-assets held by its customers.

Cryptocurrencies are fungible representations of value stored in lines of computer code and there is no particular limitation which mandates a cryptocurrency is only considered a digital asset when it exists on a native blockchain network.  In this regard, there is no distinction in the legal sense

[36]

between on-chain and off-chain digital assets which share characteristics including that both are considered to be 'property' which can be owned, traded, transferred, and held in trust.

### E) Cryptocurrency is fungible

A cryptocurrency coin does not carry a permanent unique identifier akin to the serial number which features on a dollar bill. When acquiring cryptocurrency, each transaction is sequentially stored (in 'block' forming a 'chain' of transactions) on the native blockchain with key parameters about the transferor and transferee addresses (i.e. the wallet the coins were transferred from and the wallet to which they are now attached), the amount of cryptocurrency being transferred, and digital signatures. In that regard, for example, one bitcoin held at an address on the Bitcoin blockchain is identifiable but only insofar as it is a number forming part, or all, of the coins in a particular transaction and the bitcoin in and of itself is no more unique than the digit '1' written here.

When cryptocurrency is transferred from a transferor to a transferee, the transfer brings into existence a *new* cryptocurrency asset on the blockchain containing new digital signature parameters (public and private keys). The *old* cryptocurrency asset persists on the blockchain but ceases to have any value or function and is marked as being spent or cancelled. This means it would be impossible to ever 'receive' back the *exact* same cryptocurrency asset.

Thus, fundamentally cryptocurrency is interchangeable on a one-to-one basis where each unit is equal in value and can be replaced by another unit of the same kind. In this regard, cryptocurrencies share the value characteristic of fiat currency being that 1 BTC = 1 BTC just as \$1 = \$1. (Albeit \$1 is technically less fungible in that it carries a unique serial number). Cryptocurrencies are truly fungible property.

[37]

## 2.  The FTX.com Platform

FTX.com was a centralized cryptocurrency exchange ("**CEX**") and custodial intermediary with services for its customers to deposit, transfer, hold, receive, trade, or acquire Digital Assets. The custodial holding arrangements – which did not result in the loss of the owner's property rights – were provided via the use of ledgered accounts and custodial wallets that contained assets belonging to customers. At all times customers retained ultimate (legal or beneficial) title to the crypto-tokens and crypto-token entitlements held on their behalf. These tokens and related entitlements do not form part of the Estate.

FTX.com was a customer-to-customer trading platform that used intermediary services delivered by FTX and its affiliates. The Platform offered cash and spot markets supporting various digital asset commodities (such as BTC, ETH, USDC, XRP, and other cryptocurrencies as were available from time-to-time) which could be traded anonymously from one customer to another. It also offered a digital asset derivatives market with complex services such as futures and margin trading between customers. The exchange could receive cash deposits and deposits of customer owned Digital Assets transferred from supported blockchain networks and could transfer withdrawn crypto-assets back to native blockchains. FTX.com operated the exchange *off-chain* which Sam Bankman-Fried ("**BANKMAN-FRIED**") noted in a roundabout way to Congress[15]. *See* Ex.G, p.3 (last paragraph) and duplicated in Ex.H, p.4 (continued paragraph)  ("Separate from deposits and withdrawals, transactions and transfers on the FTX exchanges themselves ... do not require public blockchain activity").

---

[15] Written testimony given by Sam Bankman-Fried on "Digital Assets and the Future of Finance" Hearing before the U.S. House of Representatives Committee on Financial Services on December 8, 2021, a copy is provided as **Exhibit G**; and written testimony on "Examining Digital Assets - Risks, Regulation, and Innovation" Hearing before the U.S. Senate Committee on Agriculture, Nutrition and Forestry on February 9, 2022, a copy is provided as **Exhibit H**.

Furthermore, FTX.com required all customers to undergo regulatory Know Your Customer ("**KYC**") checks before granting access to, or use of, the Platform so unlike layer-1 blockchain networks, FTX.com was a *non-anonymous system* – FTX knew its customers and could identify *their* Accounts and *their* Digital Assets.

FTX.com was a custodial intermediary which held assets in custody on behalf of its customers. *See* 'Discussion' below. Each platform Account provided a view of the crypto-tokens identifiable to, and in the control of, the customer. The underlying crypto-token entitlements reflected by the Customer Pegged Assets were held on the behalf of customers in one or more custodial wallets which formed part of an omnibus pool of commingled assets for all customers. For the reasons already stated, the fungible nature of crypto-assets meant there was no expectation for a customer to receive back the *exact* cryptocurrency deposited or transferred[16] but rather to receive back the correct *amount* of crypto-coins from the pools. Here, the extent of the customer's entitlement to crypto-coins held in commingled pools was defined by the number of related crypto-tokens that were displayed in the balance of the customer's Account. And much like fungible fiat currency withdrawn from an ATM where $1 = $1, the Customer Pegged Assets were similarly interchangeable, 1 BTC = 1 BTC.

I shall not dwell here longer than necessary as the background of FTX.com is well known, although it assists to lift the hood slightly on some mechanics of the Platform. To the best of my understanding, I will deal with relevant matters starting with a cryptocurrency deposit:

---

[16] Refers to the characteristic that cryptocurrency generally have no physical identification other than a record of transaction on the blockchain that contains information about the transferor, transferee, and the amount of the cryptocurrency transferred. During transfer, a new record is created on the blockchain, and previous transactions related to the balance are treated as spent or cancelled. It is therefore impossible to 'get back' the exact same crypto.

**A) Deposits**

The customer (or another transferor) would initiate the transfer of a Digital Asset *they own*, or in the case of transfer from a third-party, a Digital Asset the customer was intended to own, from a 'place' *inter alia*, a non-custodial wallet, a custodial wallet, cryptocurrency exchange, or an over-the-counter or on-ramp service provider (using fiat currency to first acquire the Digital Asset on-chain). Common to each transfer would be specificity in the amount of the cryptocurrency being transferred. FTX issued the customer a deposit address[17] married to the customer for the purpose of transferring the cryptocurrency.   On occasion, the Platform required the customer's account number or similar identification embedded in the 'Destination Tag' or 'Memo' a string data field within the transaction record, where the deposit address was a commingled wallet to allow the Platform to correctly credit the deposit to the customer.   The customer (or transferor) would variously authenticate the transfer at the other 'place' and the transfer would then be validated on the blockchain which, depending on the cryptocurrency, might take seconds to several hours, and the associated transaction fees would be paid. Once validation was complete and fees paid, the cryptocurrency transaction would be 'received'[18] at the deposit address.

Upon receipt, the Platform credited the corresponding amount of crypto-tokens to the asset balance in the customer's Account.   When the customer logged into their Account, they saw their Digital Asset balance which reflected the crypto-tokens rather than a live feed of the underlying coins deposited into custody at the deposit address or held in custody in the related omnibus pool (if it had

---

[17] The deposit address was a unique public address on the blockchain generated by the Platform for the particular digital asset being transferred.

[18] Although described as 'received' there is no tangible delivery of any object or thing, rather a new entry is made on the public ledger or blockchain containing the customer's deposit address.

[40]

been a live view of the underlying assets then the fraud would have been exposed sooner). At this point the deposited crypto coin was divorced from the customer, but only insofar as there was no permanent link forged between the *exact* token showing in the Account and the *exact* coin transferred to the deposit address for the reasons already explained. If the cryptocurrency was anything other than Bitcoin, it is my understanding the deposit address balance was periodically swept into one or more custodial wallets in the omnibus pools. For Bitcoin, however, due to the high transaction costs, the balance would generally remain at the deposit address and all such deposit addresses were treated by FTX.com as part of the BTC omnibus pool.

### B) Withdrawals

Withdrawals from the Platform largely operated in reverse: The customer, having control of their Digital Assets held in their Account, could issue a withdrawal instruction to the intermediary at any time and specify a blockchain address to receive the transfer. Additional *control* features were optionally available to assist *authenticating* a withdrawal including (i) a separate password to validate; and/or (ii) an access control list to only accept withdrawal instructions from certain network IP addresses; and/or (iii) limiting the withdrawal to specific transferee blockchain addresses.

Once instructed, the Platform would debit the crypto-tokens from the Account balance and fulfil the transfer using the customer's entitlement to crypto-coins held in the omnibus pool, transferring the crypto-assets to the transferee. It is uncertain but assumed that most withdrawals were likely ministered by automated system routine. Transactions could be processed within a few minutes, subject to blockchain validation. From the customers perspective, it really made no difference which custodial wallet – hot or cold – the digital asset was transferred from during the withdrawal. Reiterating that 1 ETH = 1 ETH; 1 USDC = 1 USDC; 1 XRP = 1 XRP, *etc.*

[41]

The Platform would periodically run functions to reconcile the aggregated crypto-token balances held in Accounts with the crypto-coins held in omnibus pools to ensure adequate liquidity was available to process withdrawals.

### C) Accounts

The Platform provided customers secure access to their Accounts via a username, password, and mandatory two-factor authentication (an additional layer of security usually requiring either a security token or a biometric factor, such as a fingerprint) as well as additional transactional security options already mentioned above including a second password for authorization. The security was equal to, or better than, that of most non-custodial hot wallets and provided a gatekeeping role sufficient to safeguard customer Accounts.

The Account (a.k.a. occasionally, "Wallet" or "wallet for users") would show customers their Digital Assets held in custody and provided a launchpad to access related platform services provided by FTX, as already outlined. Thus, in a practical and general sense, the Accounts gave customers positive control over their assets to use, dispose, or transfer, and the access arrangements provided negative control to exclude others from using their Account. Ask Anna about her holdings on FTX and she would say she holds "*10 ETH*". Anna could exclusively decide when and how to trade, and how much ETH to transfer, exchange, or withdraw and in that regard could exercise full control over the Digital Assets held in her Account. The Debtors role as custodial intermediary was subordinated to the safekeeping of customer assets and, as directed from time to time, to effect Anna's instructions as necessary.

During its period of operation, FTX managed $billions in deposits and withdrawals for customers and there was no outside suspicion of the adverse fraud since revealed. In fact, FTX claimed

to be the safest cryptocurrency exchange on the planet through its various representations and endorsements. Certainly, there was no express expectation or intention that Anna was agreeing to yield control or title and ownership of her ETH to the Debtors by merely depositing her owned crypto-assets on the Platform. Quite the contrary. *See* Terms of Service, Ex.A, §8.2.6. (Noting the clear intentions that title to the crypto-asset property "at all times" remained with the customer).

## DISCUSSION

On April 2, 2019, FTX Trading Ltd ("**FTX Trading**") was incorporated in Antigua and Barbuda. The company was based in Hong Kong and provided the first releases of the FTX International trading platform for international and non-U.S. customers. This platform was limited in support of cryptocurrencies and did not accept fiat currency deposits.

On July 22, 2021, FTX Digital Markets Ltd ('In Provisional Liquidation') ("**FTX Digital**") (a.k.a. FDM) was incorporated in the Commonwealth of The Bahamas. FTX Digital was a wholly-owned subsidiary of FTX Trading and the company's incorporation reflected a strategic move of the FTX group to The Bahamas in light of the emerging regulatory framework to bring the Platform to an appropriately regulated jurisdiction. FTX Digital was duly registered and regulated[19] by the Securities Commission of The Bahamas (the "**SCB**") under the Digital Assets and Registered Exchanges Act, 2020 (as amended) ("**DARE Act**"). The company's Application for Registration, provided as **Exhibit B**, stated its purpose was "provision of an exchange between digital assets and fiat currency; and, provision of an exchange between one or more forms of digital assets" (Ex.B. #2). More generally,

---

[19] FTX Digital was granted licence and registration under the DARE Act on September 10, 2021.

FTX Digital advertised[20] to provide "users regulated access to FTX's industry-leading derivatives, options, volatility products, and other FTX products and services".

**FTX International** comprised FTX Trading and its subsidiaries, including FTX Digital, that were collectively doing business as "**FTX**" and "**FTX.com**" and operated, maintained and administered the FTX International exchange which functioned as a digital asset trading platform on the basis to provide a cryptocurrency exchange for customers outside of the United States (and certain other jurisdictions) to deposit, store, acquire, convert, transfer, or otherwise transact their own Digital Assets with other customers.

Operating in The Bahamas enabled FTX.com to represent itself within a regulated framework as a trusted intermediary providing the Platform and related services, though at bottom, it was FTX Digital that was doing all the heavy lifting as no other entity in the FTX International group of companies was licensed or regulated as a digital asset business to operate on this soil. In line with this strategy, FTX intended to on-board all new international customers to FTX Digital and migrate all existing international customers to FTX Digital as was detailed in related policies and procedures, including the company's '*Customer Migration Plan*' dated August 24, 2021, which is provided as **Exhibit C**. This had the single objective "to migrate customers to its business from [FTX Trading]" which included "communicating the new terms of service to its customers" (Ex.C, p.4). A similar intention was also noted in FTX Digital's '*AML/CFT Risk Assessment*' provided as **Exhibit D** (p.3):

> "Following registration, **FTX will migrate customers** (other than those from certain jurisdictions) **to FDM**. Some services and products offered on FTX's platform will remain with FTX or other FTX Group companies, FTX's Terms of Service, and web and

---

[20] FTX Digital's LinkedIn profile, 'About us' section. < https://bs.linkedin.com/company/ftx-digital-markets >

device applications, will be modified to clearly identify the company through which a user is transacting, ensuring full transparency and disclosure to customers".

(Emphasis added)

## 1.  Core Evidence: Terms of Service

FTX.com's last updated Terms of Service in May 2022 provided the Digital Assets held in customer Accounts were entrusted on the basis that "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading" (Ex.A, §8.2.6(A)), and "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading" (*Id.*, §8.2.6(B)) (emphasis added).  The Terms DID NOT provide an everlasting permissive clause for FTX to hypothecate, rehypothecate, lend, borrow, or otherwise take or use the Digital Assets for *any purpose*, though if a contrary clause is considered to exist then it must be considered in the context of the Terms that (A) the clear overriding intention for ownership of Digital Assets held in Accounts is set out in the 'Digital Asset' provisions; (B) a clause having significant effect upon customer ownership would reasonably have been written by the drafter in equally plain English alongside the other relevant 'Digital Asset' provisions; (C) a contrary clause must be read in the context in which it is written i.e. the 'Margin Trading' provision (*Id.*, §16.2) provides FTX ministerial control to seize and/or liquidate Digital Assets but only insofar as it would relate to a particular margin trading position and a particular debt position BUT the specific clause does not provide an overarching license to take customer assets at will if there was no margin position, or if a margin position was not in default – and moreover, the beneficial owner of any Digital Asset seized or liquidated to discharge and settle a margin trading debt would be another customer and not FTX who was neither agent nor counterparty; and (D) a contrary

clause bearing ambiguity that cannot be ratified by the plain words in the Terms or by extrinsic evidence is subject to the rule of *contra proferentem*.

Further, and additionally, the Terms DID NOT expressly provide for customer owned assets to be subjected to, or in any way party to, the risk of the Debtors becoming insolvent or entering bankruptcy, noting here that section §541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case" (H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367-368 (1977)). See *also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less").

In English common law, under which the Terms were governed, the courts use an objective approach to ascertain the intention of provisions in a contract by examining how the ordinary and natural meaning of the words used would be understood by a reasonable person having all the background knowledge. *See Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, §14; *Lukoil Asia Pacific Pte Ltd v Ocean Tankers (Pte) Ltd* [2018] EWHC 163 (Comm), [2018] 2 All ER (Comm) 108, §8; *et al.* (Holding that the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties at the time of the contract, would have understood the parties to have meant). Where terms are ambiguous the objective approach further considers the overall purpose of the provisions, and, where required, a business common-sense interpretation.

The objective approach in English law is sufficiently comparable to contract interpretation applied by this Bankruptcy Court, to the extent relevant to the matter. When applying either approach there can be no quarrel that zero ambiguity exists in the 'Digital Asset' provisions of the Terms which

[46]

clearly ascribed title to Digital Assets shall **"at all times"** remain with the customer, and was supplemented with a plainly written supplementary disclaimer which unmistakably rejected any property interest by the Debtors in the same assets such that the plain, ordinary, and natural meaning of the combined words used at §8.2.6 were explicit and unambiguous. At bottom, based solely on the provisions of the Terms, there are adequate grounds to establish the Digital Assets held in Affected Customers' Accounts were the intangible personal property of customers and no good grounds exist to consider the Debtors' Estate holds any interest in the same Digital Assets. These provisions, amongst others, establish a trust arrangement was created. The 'Terms of Service' and 'Trust' are analyzed later in detail.

## 2. Extrinsic Evidence

FTX Digital was regulated by the SCB under the provisions of the DARE Act which was necessary for FTX.com to operate the exchange on Bahamian soil. The Application for Registration was co-signed by BANKMAN-FRIED and Ryan David Salame (**"SALAME"**) attesting to "compliance with all applicable provisions of the Act" as evidenced in the submission of various "true, correct and not misleading" policies and procedures. The Application for Registration Part 1 Form which relates to the First Schedule of the DARE Act is provided as **Exhibit B**. The resulting Register of Digital Asset Businesses as published by the SCB from time to time showing the registration information is provided as **Exhibit E**. Included amongst the evidence submitted to the SCB was the '*Safeguarding of Assets & Digital Token Management Policy*' (the **"Safeguarding Policy"**)[21] dated to August 16, 2021, and provided as **Exhibit F**, which compliance policy stated customer assets were "appropriately safeguarded"; "segregated" from its own assets; "clearly designated and easily

---

[21] The 'Safeguarding of Assets & Digital Token Management Policy' August 16, 2021 attached as **Exhibit F**

identifiable"; that "customer funds do not represent property of [FTX Digital]" and are "protected from third-party creditors"; "have systems of control in place that are proportionate to … **the assets in custody** and the risks involved … including the management of digital tokens in its custody"; and "**customer assets are held in trust**". The Policy provided written certainty that Digital Assets belonged to customers which it considered were "in custody" and "held in trust" and were "protected from … creditors".

The Safeguarding Policy was stated to have been built on "the best practice guidance issued for the virtual asset sector" and, although was not a public policy and therefore could not have formed part of the background knowledge which would reasonably have been available to all parties, would have been known at least to FTX and is reasonably presented now as extrinsic evidence of FTX's corporate intentions. The Policy's overarching objectives were stated (*Id.*, p.4):

- Emphasise our stringent commitment to safeguarding assets belonging to both FDM and its customers;

- Summarise the main procedures, systems, and controls FDM has implemented to appropriately segregate its own assets and its customers' assets;

- Summarise the main procedures FDM has implemented to reconcile its own assets and its customer's assets; and

- Explain how FDM will manage the digital tokens under its custody."

(Emphasis added)

Compliance with this policy was "mandatory". The policy section 'Apportionment of Responsibilities' (*Id.*, p.5) outlined key roles and responsibilities, which included:

(1) "Appropriately account for the difference between its own assets and its customers' assets";

[48]

(2) "All third-party providers will be aware that <u>customer assets do not represent assets of FDM</u>";

(3) "All third-party providers are aware that **customer assets are held in trust**";

(4) "FDM will have systems of control in place that are proportionate to its size, **the assets in custody** and the risks involved in its business, <u>including the management of digital tokens in its custody</u>"

(Emphasis added)

Responsibility for policy compliance fell to the Chief Operating Officer to ensure "customer assets were segregated for accounting, operational and storage purposes" and was required to maintain "regular reconciliation" of "customer assets". The Chief Financial Officer held responsibility for "protecting customer assets from third-party creditor claims", and the Compliance Officer held overarching role to ensure compliance with the Policy.

The policy section for 'Safeguarding and Segregation' (*Id.*, p.7) stated that *inter alia* the responsibility was "to ensure that customer assets are appropriately safeguarded and segregated" and "ensure that":

(1) "<u>Customer assets</u> (both fiat and virtual assets) <u>are segregated from its own assets</u>";

(2) "<u>Customer assets</u> (both fiat and virtual assets) <u>will be clearly designated and easily identifiable</u>";

(3) "All third-party providers are aware that <u>customer funds do not represent property of FDM and are therefore</u> **protected from third-party creditors**"; and

(4) "All third-party providers are aware that **customer assets are held in trust**".

(Emphasis added)

The policy section for 'Digital Token Management' (*Id.*, p.8) set out the compliance requirement for mitigating risk from exposure on hot wallets:

"FDM uses a best practice hot wallet and cold wallet standard solution for the custody of virtual assets. The firm aims to maintain sufficient virtual assets in the hot wallet to cover two days of trading activities, which means only a small proportion of assets held are exposed to the internet, the remaining assets are stored offline. The 2-day trading figure is continuously monitored and if the hot wallet exceeds this amount, it will overflow into the cold wallet. If the figure drops below the 2-day trading figure, the hot wallet will be topped up from the cold wallet."

When read in concert, the Safeguarding Policy provides critical insight as to how FTX treated, or at worst intended to treat, customers' Digital Assets. The plain and ordinary meaning of the language used in the policy document provides no room for doubt that, as-at August 2021, as a matter of policy, FTX considered that (1) Digital Assets belonged to customers; (2) customer assets were segregated; (3) customer balances and trading activity were maintained in good accounting records; (4) control systems were used to reconcile the underlying custodial wallets containing the crypto-token entitlements against Account balances (the blockchain-pegged tokens); (5) Digital Assets were held in custody; (6) Digital Assets were held in trust; and (7) customer assets do not represent property of FTX and were protected from third-party creditors.

The Safeguarding Policy perhaps formed the constituent basis for the unmistakable words that were later introduced into the 'Digital Asset' provisions of the May 2022 Terms. To put this Policy into some corporate context, the Terms of Service identified FTX Digital as the main Service Provider in the Service Schedules[22] delivering the Platform's core trading services. It is inconceivable that FTX or its executive were oblivious to the Safeguarding Policy, or other general statements made about customers' Digital Asset ownership given that, if for no other reason, BANKMAN-FRIED had certified the Policy was "true, correct, and not misleading". Or otherwise that BANKMAN-FRIED

---

[22] FTX Digital Markets was listed in the Terms of Service as delivering the Platform services for Spot Market; Spot Margin Trading; OTC / Off-exchange Portal; Futures Market; Volatility Market (Options Contracts); and Volatility Market (MOVE Volatility Contracts).

was co-founder and CEO of FTX Trading, and Chairman and Director at FTX Digital, and co-founder and CEO of Alameda Research LLC ("**Alameda**") registered in Delaware, the connected crypto asset hedge fund, which firms operated out of the same offices in the Bahamas where a loose and informal corporate structure meant that the same people held overlapping positions in various FTX enterprises and the executive lived and worked close together[23]. Others, like Zixiao "Gary" Wang ("**WANG**"), was co-founder and Chief Technical Officer of both FTX Trading and FTX Digital, and he held specific designated compliance responsibilities in the Safeguarding Policy. And Daniel Friedberg ("**FREIDBERG**"), was FTX's lawyer and chief regulatory officer and Secretary of FTX Digital, Chief Compliance Officer of FTX, and FTX US, and General Counsel of Alameda and FTX. *See* Dkt. 1727 in the matter of the Debtors' complaint against FRIEDBERG. Simply put, the Safeguarding Policy was not divorced from FTX group and can be relied upon to attest to the clear corporate intentions submitted to the regulator that were held over customer property.

Further, and additionally, FTX also published various policy papers including '*FTX's Key Principles for Market Regulation of Crypto-Trading Platforms*' (the "**Market Regulation Key Principles**")[24] published in December 2021, provided in **Exhibit G** (pp.17-26), which laid out principles adopted by FTX and intended to guide policy makers and regulators. This included to

---

[23] Such as Sam Bankman-Fried who was co-founder and CEO of FTX Trading, held the office of Chairman and Director at FTX Digital, and was co-founder and former CEO of Alameda Research; Zixiao "Gary" Wang was co-founder and Chief Technical Officer of FTX Trading, Chief Technical Officer of FTX Digital, and co-founder of Alameda Research; Nishad Singh was co-founder and Head of Engineering at FTX Trading, FTX Digital, and Alameda; Constance Wang was Chief Operating Officer at FTX Trading and FTX Digital, and later Co-CEO at FTX Digital; Ryan Salame was former co-CEO at Alameda Research and CEO of FTX Digital; Daniel Friedberg was FTX's lawyer and chief regulatory officer and Secretary of FTX Digital, Chief Compliance Officer of FTX, and FTX US, and General Counsel of Alameda and FTX.

[24] The document 'FTX's Key Principles for Market Regulation of Crypto-Trading Platforms' was published in December 2021 and provided as exhibit in written testimony by Sam Bankman-Fried to *inter alia*, U.S. House of Representatives Committee on Financial Services, and U.S. Senate Committee on Agriculture, Nutrition and Forestry. Formerly at https://www.ftxpolicy.com and provided in Ex.G, pp. 17-26, and in Ex.H, pp.19-28.

[51]

explain custody of assets safekept in a wallet on the customer's behalf by a platform operator or intermediary should be boosted with "appropriate safeguards ... disclosed in policies and procedures of the custodian" to third-party service providers because the platform operator "will be held responsible" for these functions (*Id.*, p.22, 'Custody of Crypto Assets'). The Safeguarding Policy slips into these shoes which compliance policies were focused on safeguarding custody of customer assets.

FTX also published the policy paper '*FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*' (the "**Investor Protection Key Principles**")[25] in December 2021, provided in **Exhibit H** (pp.29-38), which explained the protections FTX afforded to "customers' interests and their assets", specifically (*Id.*, p.30, last paragraph):

> "These include (1) maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request; (2) ensuring the environment where customer assets are custodied, including digital wallets, are kept secure; (3) ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets; (4) ensuring appropriate management of risks including market, credit/counterparty, and operational risks; and (5) avoiding or managing conflicts of interest."

On the matter of 'Maintaining Adequate Resources to Return a Customer's Assets' (*Id.*, p.31, last paragraph):

> "FTX has policies and procedures for its platforms today that reflect this basic principle by maintaining liquid assets for customers withdrawals, including a sufficient balance of digital assets funded by the company for its non-U.S. platform. The resources are funded to provide sufficient cover against user losses under certain events and extreme scenarios in order to, among other purposes, ensure a customer without losses can redeem its assets from the platform on demand."

---

[25] The document 'FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms' was published in December 2021 and provided as exhibit in written testimony by Sam Bankman-Fried to U.S. Senate Committee on Agriculture, Nutrition and Forestry. Formerly at https://www.ftxpolicy.com and provided in Ex.H, pp. 29-38.

(Emphasis added)

On the matter of 'Securing Environment Where Customer Assets Are Custodied' (*Id.*, p.33, second paragraph):

> "Some have suggested that allowing the platform operator to serve as the digital-asset custodian might present a conflict of interest for the platform operator, presenting more opportunities for misuse or misallocation of customer assets. It is far from clear to FTX that contracting with a third party for custody would in every instance lower the risks of misuse or misallocation of a customer asset, <u>particularly when the platform operator would presumably remain accountable and, indeed, liable in every case;</u> …"

(Emphasis added)

On the matter of 'Ensuring Appropriate Ledgering and Disclosures of Assets to Protect Against Misuse' (*Id.*, p.34, first paragraph):

> "Another key investor-protection principle is making sure there is adequate bookkeeping (and related records) to track the customer's assets, combined with appropriate disclosure and reporting. This is to ensure that whoever is in control of a customer's assets is not misallocating or misusing those assets, particularly in furtherance to their own purposes at the expense of the customer's best interests. The basic concept here is that <u>there should be controls in place to ensure the custodian has books and records that keep track of and identify which customer owns what,</u> and there is adequate regulatory and customer reporting, as well as independent auditing, to verify the same.
>
> In keeping with this principle, FTX provides a user experience that enables any user to <u>easily view account balances for all assets,</u> for all of its platforms, in real time. By logging in to the customer's account at FTX, <u>the customer can immediately view the types of assets **they own, held in custody by FTX**.</u> The assets are ledgered and easily identifiable to the user (but **held in an omnibus wallet in the case of the customer's tokens** in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and <u>FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX.</u> Additionally, <u>as a general principle FTX segregates customer assets from its own assets across our platforms.</u>"

(Emphasis added)

Particularly noting in the above that customers "own" the assets "held in custody" which they could "immediately view" and were "ledgered and easily identifiable to the user". This can only mean to reference the balances shown in Accounts that specifically reflected the crypto-*tokens* rather than the pegged *coins* held in the underlying omnibus pools. Indeed, the Investor Protection Key Principles clarified for "customer's tokens" that the crypto-token entitlements owned by customers were held in custody in omnibus wallets.

In concert, the unambiguous provisions of the contractual agreement are enhanced by extrinsic evidence contained in the principles policies. These are further supported by additional representations repeatedly made in public that customer owned assets were properly safeguarded, segregated, and custodied by FTX.com. This included *inter alia* testimony given by BANKMAN-FRIED to U.S. House of Representatives Committee on Financial Services on December 8, 2021 in which BANKMAN-FRIED stated in written testimony about FTX.com. *See* Ex.G, p.2. (second paragraph). ("The core product consists of ... a custody service and wallet for users ..." and "The exchange[s] also have integrated ... back-office systems to perform clearing and settlement of trades, which includes updating records of ownership of the digital assets ... and transferring value between users' accounts (settlement)").

And here, with reference to the aforementioned Safeguarding Policy, BANKMAN-FRIED specifically noted "The FTX team has grown to over 200 globally, the majority of whom are responsible for compliance and customer support" and the "primary international headquarters and base of operation is in the Bahamas, where the company is registered as a digital asset business under The Bahamas' Digital Assets and Registered Exchanges Act, 2020" (emphasis added) which testimony unmistakably demonstrates to the commingling of the enterprises and migration of

[54]

operations, noting that above all others, BANKMAN-FRIED should have been able to clearly articulate difference, but rather interchanges FTX Trading and FTX Digital such that for all practical and operational purposes they were considered inseparable entities. *See* Ex.G, p.1. (last paragraph).

The bulk of the written testimony was later re-delivered to U.S. Senate Committee on Agriculture, Nutrition and Forestry on February 9, 2022 in which BANKMAN-FRIED also included to submit a copy of the Market Regulation Key Principles, and additionally the Investor Protection Key Principles already referred. *See* Ex.H. (Noting the continued public representations that FTX safeguarded customer owned assets which were stated to be held in custody and stored in omnibus wallets, and interchangeably referenced FTX Trading and FTX Digital).

Much material was also posted to social media by BANKMAN-FRIED and others variously representing customer assets were safeguarded, custodied and belonging to customers, and the days before the collapse there was great emphasized that customer owned assets were safe, secure and token and token entitlements were held 1:1 to try and persuade against the customer run on the exchange. For the sake of brevity I shall not repeat it here as much of it has already been well reported in mainstream media. Save to note one example unearthed from two days before filing for bankruptcy, and while FTX.com had already suspended all withdrawals from the Platform (noting that FTX.US withdrawals were still being processed), BANKMAN-FRIED sent the following email on November 9, 2022 to Ryan Pinder K.C., Senator, Attorney General of the Commonwealth of The Bahamas:

6) We are deeply grateful for what The Bahamas has done for us, and deeply committed to it. We are also deeply sorry about this mess.

As part of this: we have segregated funds for all Bahamian customers on FTX. And **we would be more than happy to open up withdrawals for *all* Bahamian customers on FTX, so that they can, *tomorrow, fully* withdraw *all* of their assets, making them fully whole**. It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country, and could open it up immediately if you reply saying you want us to. If we don't hear back from you, we are going to go ahead and do it tomorrow.

—

Sam Bankman-Fried

Here, BANKMAN-FRIED, in a thinly veiled act presumed to gain lasting favor from the host nation, proposed to open withdrawals for Bahamian nationals, acknowledging this subset of customers could fully withdraw all of "their assets". In the event withdrawals were opened, but rather than coming from segregated pools the withdrawn assets were understood to have been taken from *any* remaining available pool.

Further, and additionally, it is impossible to disregard the high-profile criminal and civil cases which have progressed through other courts. Four insiders, Caroline Ellison (**"ELLISON"**), Nishad Singh (**"SINGH"**), WANG, and SALAME have variously plead guilty to criminal indictments and civil charges related to wire fraud in which they admit to defrauding FTX customers of their money and *property*. And BANKMAN-FRIED has been found guilty by unanimous jury of defrauding FTX customers of their money and *property*. The criminal conviction bears material weight since the burden of proof required in the criminal court is of a higher standard than is usually required in civil matters. It is therefore relevant to consider the United States Government[26]; the United States Commodity Futures Trading Commission (**the "CFTC"**)[27]; the United States Securities and Exchange

---

[26] *United States v. BANKMAN-FRIED, 22 Cr. 673 (S.D.N.Y.)*

[27] *Commodity Futures Trading Commission v. Bankman-Fried, 22 Civ. 10503, (S.D.N.Y.)*

[56]

Commission **(the "SEC")**[28]; Courts in the Southern District of New York, and insiders at FTX, have collectively found common ground in the fundamental matter to determine Customer Property was misappropriated and Digital Assets belonged to customers.

In sum, the language used in the Terms was crystal-clear and provided clear unambiguous provision that FTX customers held absolute title to the Digital Assets in their Accounts. Extrinsic evidence provides great support to confirm the corporate intentions beyond reasonable doubt that Digital Assets were the intangible personal property of customers, and the assets were in custody and held in trust. The legal question is not clouded by the fraud, which was unknown to customers when they opened Accounts and deposited their assets with FTX, and can be answered within the four corners of the Terms boosted as necessary with robust extrinsic evidence.

I might stop here, though it may assist the Court to also consider the following paragraphs and sections with discussion on related matters in support of determining the core issue and later to provide analysis on the 'Terms of Service', 'Property', 'Trust', and the 'Related Cases'.

## 3. Digital Assets

In the context of the Platform, the term 'Digital Assets' was employed to mean the various cryptocurrencies that were supported and made available on FTX.com. The included the commodity tokens held in customer Accounts that encapsulated the pegged native coins, and interchangeably used to mean *inter alia* native coins, stablecoins, tokens, asset tokens, or token entitlements. I shall not reiterate every example where the words 'Digital Assets' are written in the Terms to underline rather

---

[28] *Securities and Exchange Commission v. Bankman-Fried, 22 Civ. 10501, (S.D.N.Y.); Securities and Exchange Commission v. Caroline Ellison and Zixiao "Gary" Wang, 22 Civ. 10794, (S.D.N.Y.)*

draw upon a few examples which demonstrate scope, beginning with the definition provided in the Terms:

> **"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

References to "BTC" and "ETH" are each a particular crypto coin native to a different blockchain network, whereas "FTT" and references to "token" means a crypto asset token which sits on top of a native coin using the underlying blockchain network for a particular purpose. "Cryptocurrency" means both crypto-coins and crypto-tokens. It is clear the drafter was deliberate in their choice of words to convey a definition for "Digital Assets" that interchangeably used terminology for both tokens and coins which is not awkward or ambiguous since it dovetails with what was implemented on the Platform. What is striking from the definition is that the meaning does not hint Digital Assets were a 'representation', 'credit', 'voucher', or some other variety of valueless placeholder that was anything other than crypto-asset in the true sense having a digital store of value.

*Next*, three examples of provisions from the Terms. The *first* provides a customer could deposit existing owned cryptocurrency (coin) into their Account (token + pegged coin) by sending the crypto-asset to a blockchain address which would then be added to the Account balance:

(Example 1)

"8.2.1    The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a "USD Stablecoin"). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance ..."

The *second* and *third* examples are opposite bookends. One notifies that changes affecting the underlying native blockchain network (coin) could affect the "Digital Asset". The other notifies the 'Spot Margin Trading' service on the Platform would use the "Digital Assets" held in your Account (token + pegged coin) for collateral.

(Example 2)

"17.1    As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes ("Forks") can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. ..."

(Example 3)

SCHEDULE 3
SERVICE SCHEDULE

| Specified Service: | Spot Margin Trading |
|---|---|
| Specified Service description: | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders." |

In sum, the Terms did not distinguish crypto-coins from crypto-tokens. And they did not need to. Neither did the Terms expressly, or by other representation made by FTX at any time, suggest the Digital Asset held in a customer Account was a valueless credit divorced from the cryptocurrency proper. Instead, a "Digital Asset" was the crypto-asset, for example "BTC" or "ETH", since the token encapsulated the coin and there is no discernable reason why FTX would have wanted to provide

distinction between on-chain and off-chain assets since FTX represented the BTC held and traded on FTX.com was cryptocurrency indistinct from BTC on the native blockchain having the same store of value and market price.

### 4. Omnibus Pools

Using omnibus pools was advantageous to the performance of the Platform. Off-chain transactions on the Platform were fast, avoided on-chain fees (though allowed FTX.com to charge its own fees to generate revenue), and were anonymous to the public ledger. Trading blockchain-pegged tokens on the exchange was undertaken on a customer-to-customer basis and provided through services available to customers in their Account.

The use of omnibus pools enabled the Platform to maintain aggregate balances in the fewest wallets (being at least equivalent to the number of cryptocurrencies supported by the Platform, and with addition for a range of hot and cold wallets). In the alternative approach, whereby each customer had an individual blockchain wallet for each cryptocurrency, it would have required the Platform to administer in excess of ten million wallets (being the reported number of customer accounts by the Debtors at the March 12, 2023 hearing) assuming each customer only had one type of digital asset, but if each customer held on average five different cryptocurrencies the number of wallets would rise to 50,000,000 individual custodial wallets. Any err or misplaced key could prove fatal for a wallet, and the reconciliation and rebalancing of crypto-assets would incur considerable transaction fees rendering the exchange less attractive, less popular, less competitive, and ultimately less profitable. This is why it is typical for a crypto exchange to manage a customer's on-chain assets via a smaller portfolio of commingled custodial wallets controlled by a ledger.

The underlying crypto-coins held in custody in omnibus pools were allocated to customers *generally* with the express purpose to provide a store of value for the blockchain-pegged tokens held in Accounts and consequently liquidity for the withdrawal of those same tokens. The Digital Assets owned by Bill and held in his Account included 10 ETH which comprised 10 ETH tokens held in his Account backed by 10 ETH coins stored in the Ethereum omnibus pool. Bill had no visibility of the 10 ETH coins in the pool which were stored in custody – his only point of reference to his crypto-assets were the ETH tokens showing in his Account balance. When Bill sold his ETH to Anna there was no on-chain transfer of crypto-coins, rather the transaction was an off-chain and intra-platform 'swap' of the tokens and coins from Bill to Anna which transferred ownership and control of the ETH tokens and ETH coins to Anna. And the BTC which Anna paid to Bill, resulted in her BTC tokens and BTC coins stored in the Bitcoin omnibus pool being transferred to Bill. When Anna wanted to subsequently withdraw the ETH she applied control over the ETH tokens in her Account by issuing an instruction to the Platform which began the withdrawal processes transferring her 10 ETH tokens from her Account balance and transferring the corresponding ETH coins from the omnibus pool to her cold wallet address. The underlying crypto-coins and use of private keys to validate a transfer from a blockchain wallet were therefore not the beginning and end of the withdrawal process, but rather a designed link in a chain of processes initiated by the customer exercising control over the Digital Assets held in their Account. Moreover, in bankruptcy, these private keys are not property of the Estate pursuant to Section 541(b)(1) of the Bankruptcy Code. (Property of the bankruptcy estate excludes "any power that the debtor may exercise solely for the benefit of an entity other than the debtor;").

Further, as custodian of the Digital Assets, FTX held ministerial responsibility to the Customer Pegged Assets which included the day-to-day business operation to reconcile the crypto-

coins stored in the omnibus pools against the aggregated balance of crypto-tokens held in all customer Accounts. As per Investor Protection Key Principles. *See* Ex.H, p.34 (second paragraph). ("[T]he customer can immediately view the types of assets they own, held in custody by FTX", and "FTX has policies and procedures for its platforms today that reflect this basic principle by maintaining liquid assets for customers withdrawals", and "FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX"). As Per Safeguarding Policy. *See* Ex.F, 'Virtual Asset Reconciliation', p.7. ("[A]ny internally calculated balances are reconciled to the expected balance on the underlying blockchain" and "... a lower amount of virtual assets on the underlying distributed ledger when compared to internal records, may be covered by the firm until these are investigated and cleared.").

Consequently, the Debtors would variously reconcile asset balances in the omnibus pools such that it was not unreasonable to for the Debtors to transfer, convert or acquire cryptocurrency as necessary in performance of its intermediary and custodial duty to maintain the required balances in line with the demands of the ledger. The digital token management included balancing custodial assets between hot and cold wallets to mitigate against risk of attack on a vulnerable blockchain network – the omnibus pool therefore comprised several hot and cold wallets for the same cryptocurrency, as per Safeguarding Policy. *See* Ex.F, 'Digital Token Management', p.8) ("[The Debtors] use[s] a best practice hot wallet and cold wallet standard solution for the custody of virtual assets. The firm aims to maintain sufficient virtual assets in the hot wallet to cover two days of trading activities, ..."). In a practical sense, the custodial functions required the Debtors to apply private keys to the blockchain wallets to maintain an adequate amount of pegged crypto-coins to match customers aggregated crypto-token balances.

Fundamentally and necessarily, the crypto-tokens and underlying crypto-coins defined by the crypto-token entitlements were assets paired *by amount* and not by some uniquely identifiable feature linking a particular customer or particular token with a particular coin.  The identity of the depositor or transferor of a coin to an omnibus pool was, in principle, immaterial due to the fungible character of cryptocurrency and the inherent function of the blockchain network that will always create a new crypto-asset for each transfer.

Cryptocurrency is not the same thing as fiat currency in the legal sense, though the ministered omnibus pools might be compared by way of a banking analogy: A bank does not need to ensure a particular serial numbered dollar bill is isolated and safeguarded for a particular customer to withdraw it, rather the bank only needs to ensure a sufficient quantity of dollar bills are present in the vault to meet the aggregated balance held in all customer accounts thereby providing liquidity against customer withdraws.  This reflects the fungible nature of money – each dollar bill has the same $1 value and the same is true of the crypto-coins held in the omnibus pools.  Of course, banks don't hold assets 1:1 because they operate under different contractual terms which allow them to hypothecate, rehypothecate, and otherwise use customer deposits to earn income for the bank and, amongst other things, pay interest back to the customer – and to that end banks gain a property interest in customer's money.  In the United Kingdom, the Financial Services Compensation Scheme protects bank deposits to a maximum of £85,000 in the event a bank collapses, though any deposits above this threshold are at risk in bankruptcy and the customer would become an unsecured creditor with no guarantee to be fully compensated.  However, this was not the case at FTX.com since intangible digital assets are a different class of property to money in a legal sense, and at FTX, unlike at the bank, the specific and unambiguous contractual terms provided customers always retained ultimate (legal or beneficial) title to the Digital Assets in their Account.

[63]

Thus, the question of Digital Asset ownership is not defined by the Customer Pegged Assets remaining in the Debtors possession in the omnibus pools after the embezzlement, though obviously the retained and recovered crypto-coins are interlinked, but is rather a matter *controlled* by the crypto-tokens held in customer Accounts as provided by the Terms of Service. This is an important concept to carry in the legal analysis since it is essential to the understanding of precisely *what* is being owned – especially since coins and tokens are intangible cryptocurrencies that only exist as lines of computer code. Here, for the avoidance of any doubt, the Digital Assets owned by Affected Customers were the tokens and token entitlements to the underlying coins.

## 5. Fraud and Misappropriation

Turning to the adverse fraud issue briefly, contrary to statute laws, regulatory requirements, the Terms of Service and related Policies (including the Safeguarding Policy), documents, best practice guidance, statements made in public forums, and without consent of Affected Customers, the Debtors failed to maintain the necessary checks and balances and controls required to segregate and safeguard assets[29] and knowingly and purposefully took and used customers' property for their own use and benefit, and a substantial portion of which remains missing. Thus, during the run on FTX.com in November 2022, the Debtors held fewer crypto-coins in the omnibus pools than the aggregated crypto-tokens in customer Accounts and so were unable to service all instructions from customers wanting to withdraw their Digital Assets from the exchange. This situation resulted in the Debtors halting withdrawals and imprisoning what remained of Affected Customers' Digital Assets which course of action breached the Terms at §8.2.6(C) that provided, "You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including

---

[29] Except for FTX Japan customers where FTX segregated assets into customer pools.

[64]

the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party" (emphasis added).

On December 13, 2022, FTX CEO John J. Ray III stated to the U.S. House Financial Services Committee about events at FTX, "This is really old-fashioned embezzlement. This is just taking money from customers and using it for your own purpose", and it is difficult to disagree with the character of that observation. Key actors have since plead guilty, or been found guilty, to various federal and civil charges including wire fraud ("for obtaining money and *property*") by misappropriating customer assets. Against this background, it is not unreasonable to at least ask the question: *Should the Debtors benefit from an assumed superior title to all crypto-coins held-in-possession given the scale of misappropriation of customer assets?*

At its core, the alleged fraud is a simple matter of theft of personal property, and the courts commonly side with plaintiffs in cases where property has been stolen. In the crypto universe, hackers aim to gain possession of private keys to steal crypto-assets, but in the case of FTX, the fraud was perpetrated as 'an inside job' where the thieves already had custodial access of the wallets containing Customer Pegged Assets. Witness testimony by insiders in the related criminal case insinuated the extent of Alameda's trading losses eclipsed and consumed all profits from FTX.com, which perhaps raises the rhetorical question: *At the end, if FTX.com had underwritten Alameda's losses with all its own liquid assets before misappropriating customers' liquid assets, then what proportion of the commingled liquid assets-in-possession can the Debtors reasonably claim to belong to FTX.com with any certainty?* I would hazard a guess; not many.

In his Declaration in Support of Chapter 11 Petitions and First Day Pleadings, John J Ray III commented (Dkt. 24, §5), "Never in my career have I seen such a complete failure of corporate

[65]

controls and such a complete absence of trustworthy financial information as occurred here" which is a damning reflection on the former executive. But this was just a first assessment reflecting initial findings that cannot have intended to provide a root and branch critique of each control system at FTX (the Declaration was filed six days after the Petition Date). Nonetheless, in the context, the Court will rightly need to ask the question: ***How are customers' Digital Assets to be identified given corporate controls and procedures are revealed to have been insufficient?***

To answer that overarching question it is essential to understand that systems core to the running of the exchange were necessarily sound (for it they had not been then the Platform would have failed to operate long before), and with specificity, I refer to the inter-related systems powering the Platform's centralized private exchange ledger (the "**Exchange Ledger**") collectively comprising a database of necessary digital records for the purpose of operating the exchange which included to create, manage and administer Accounts, and to record and process cryptocurrency deposits, transfers, transactions, trading activity, withdrawals, and customers' Digital Asset balances. It is this system which the Debtors employed post-petition to power the customer claims portal and allowed them to understand the extent of the customer liability and which also underpins much of the related financial information presented to this Court. Whereas it might be the case that overarching corporate controls were substandard, the same accusation cannot reasonably be thrown at, or stick to, the Exchange Ledger which reliably and robustly dealt with the minutiae of the exchange's day-to-day operation.

## 6. Private Exchange Ledger

The Safeguarding Policy required FTX to "maintain reliable accounting records or cause reliable accounting records to be kept in relation to ... all customer trading activity" (Ex.F, 'Accounting Standards', p.6) such that the Exchange Ledger provided an accurate record of the Digital Assets

owned by customers, and could distinguish them from assets owned by other customers in as much as it provided the control system to identify the crypto-tokens held in Accounts and identify the crypto coin balances apportioned to the customer within the omnibus pools.

The Exchange Ledger was integral to the performance of Accounts on the Platform and to related trading services and was inked into the Terms (Ex.A, §8.2.6) ("**Digital Assets** are held in **your Account** on the following basis"; "As the owner of <u>Digital Assets in your Account</u> …"; "…the fiat currency value of <u>Digital Assets held in your Account</u>"; "None of the <u>Digital Assets in your Account</u> are the property of, or shall or may be loaned to, [the Debtors]"; "[The Debtors] do[es] not represent or treat <u>Digital Assets held in User's Accounts</u> as belonging to [the Debtors]"; "You control the <u>Digital Assets held in your Account</u>") (emphasis added). There can be no doubt that the Exchange Ledger was the authoritative control system able to identify customers' Digital Assets balances held in their Accounts.

The Exchange Ledger also fulfilled a critical role in the custody of Digital Assets as it was the control system which FTX employed to reconcile the aggregated token balances held in Accounts against the Customer Pegged Assets held in the omnibus pools.

At the September 13, 2023 Omnibus Hearing, the Debtors expressed in oral arguments that "*none of the assets we have are attributed to customer names - it's all part of one big general blended pool*" and asserted the burden is on the customer to "*specify with particularity*" the crypto-coin they claim to own. There is no quarrel that the Platform *did* use omnibus pools to store Customer Pegged Assets and, when observing any particular pool, no single cryptocurrency token would seem tethered to a specific customer for the reasons already discussed in Background. However, when the Debtors' stated, "*If Sally had deposited 3 bitcoin we don't have an account that says '3 bitcoin for Sally'*"

[67]

(H'ring 00:16:30, Dkt.2503) but here they were precisely describing the role of the BTC-token held in the customer's Account which provided an entitlement to the fungible BTC-coin held in the omnibus pool. Consequently the Debtors oral argument lacked probity and was perhaps made with one eye closed since, when considering the custodial function of the exchange in the round, it is impossible to divorce the custodial wallets from the Exchange Ledger (required as a matter of policy[30]) which served as the authoritative system of control *inter alia* to:

- Maintain a record of customers' deposits, trading activity, and digital asset balances; and

- Provide an aggregate balance of crypto-assets for reconciliation and periodic rebalancing of each omnibus pool to ensure custodial wallets collectively held an amount of coin equal to the token balance of each type of cryptocurrency reflected in the Exchange Ledger.

At the Hearing the Debtors point of view played fast and loose with the facts. *Firstly*, it was disingenuous to divorce the pegged crypto-coins held in omnibus pools from the tokens held in Accounts – to consider the omnibus pools with such isolation from the encapsulating systems means being blind to the tokenization principles at the heart of the exchange's operation. It would be much like peering into a bank vault of gold bars and concluding they must belong to the bank merely because customer names were not engraved on them. *Secondly*, the omnibus pools were ministered by FTX as part of its custodial role and reconciliation was executed as part of the back-office operations. For a customer to know which particular wallet contained their allotment of coins would have required

---

[30] The Terms of Service detail the Service Schedules provided by FTX Digital who wrote the Safeguarding Policy which demanded explicit systems of control to "maintain accounting records" "of all customer trading activity" and enable reconciliation of "customer balances and virtual assets on the relevant blockchain".

[68]

FTX to inform customers about these allocations which it did not do – for example, "Dear Anna, we have today reconciled the coins in the ETH pool and your 10 ETH are now held at wallet address 'abc123…'". *Thirdly*, the pools were designed as a store of value for the asset tokens and thereby to provide liquidity for withdrawals which architecture boosted performance and profitability of the exchange. For the Debtors to mistake the fundamental system architecture of their business or imply that a customer should have a distinctly identifiable blockchain wallet or detailed knowledge of the underlying wallets and assets held in custody beyond that which was implemented into the Platform or was information generally available to the customer in their Account is a fundamental mischaracterization of how FTX.com operated. Here, the exchange is a dog, and the Debtors are asking customers to point at its wings. *Fourthly*, it is already mentioned on-chain transactions comprise limited data that lacks appropriate capacity to store personally identifiable information about a customer, or their allotment of the cryptocurrency held in the omnibus pool (which by nature of public ledgers would be publicly viewable data). It would have been possible for FTX to store 'system data' such as an account number in the wallet transactions (as indeed it did mandate for certain cryptocurrency deposits), but in principle, FTX cannot have desired such a solution since any spot trade on the Platform would have necessitated an update to the underlying wallets which would have demanded a new transaction and all that entailed – external fees, performance delays, *etc* – contrary to the architecture for the off-chain centralized crypto exchange. Moreover, to 'read' the system data would have required a control system such as the Exchange Ledger to provide interpretation and so practically, any data embedded in a transaction would not be understood in isolation. *Fifthly*, IF the omnibus pools acted as the ledger (which they did not) then customers would have been awake to unexpected changes in their Digital Asset balances as soon as crypto-coins were misappropriated from their respective blockchain wallets. *Sixthly*, the Debtors beseeching customers to identify coins with

specificity invents a new test which is plainly contrary to the normal course of operations of the exchange – not one of the many Excluded Preference Customers or Preference Customers or for that matter, any customer in the history of the exchange's operation, were required to overcome such a high bar before their withdrawal instructions were processed, and is plainly not a standard request that has been applied at any time.

Contrary to the Debtors belief, Customers should not need to be called upon to identify with specificity the *exact* crypto-coins that belonged to them or that survive in the raided omnibus pools, but rather Affected Customers should only need to point to and assert control over *their crypto-tokens held in their Account* as provided by the Terms with an instruction issued to the custodian to withdraw their Digital Assets. This course of action will inevitably result in the Debtors having to confirm insufficient amounts of underlying pegged assets exist to process the withdrawal whereat the shortfall can only reasonably be attributed to (i) mismanagement of omnibus pools; (ii) assets that were misappropriated in the fraud; or (iii) assets which the Debtors have since seized and/or sold. For these fundamental reasons it is simply not possible to overlook the role of the Exchange Ledger or divorce it from the ownership matter, and to exclude the Exchange Ledger from analysis is to omit the hand from the glove.

Lastly, and for reasons broadly mentioned, the legal analysis required to answer the ownership question does not turn on whether the fungible entitlements, which form a part of the whole digital asset[31], exist in omnibus pools. Common law does not generally require the court to physically see the asset before it can determine, based on the materiality and weight of evidence before it, who

---

[31] The digital asset comprises a crypto-token and crypto-token entitlement to a fungible crypto-coin held in a custodial wallet in an omnibus pool.

owns the property. Consider situations of theft where the physical property is stolen, or embezzlement of money from a company which might be demonstrated by a change in the numbers on a balance sheet. In the instant matter, the property in question is intangible lines of computer code which could not be presented before the court, and so in either the exists or does not exist scenario, the evidence before the court is largely the same.

### 7. FTX Japan

FTX Japan Holdings K.K, FTX Japan K.K, and FTX Japan Services K.K are each companies forming a subsidiary of FTX Trading and collectively the Debtors. Together these affiliates operated the FTX exchange platform in the Japanese territory ("**FTX Japan**"). The overarching mechanics of FTX.com and FTX Japan were for all intents and purposes comparable with regard to the exchange and digital assets: A private exchange ledger was employed as the authoritative record of control for digital assets held in customer accounts which crypto-tokens were similarly pegged to on-chain crypto-coins held in custody in omnibus pools. Both exchanges had Terms which recognized digital assets belonged to customers and both were awake to the need to safeguard and segregate digital assets in trust (*see* in the case of FTX.com, Safeguarding Policy). Both exchanges were regulated by applicable law – for FTX.com the Bahamian DARE Act, and for FTX Japan the Payment Services Act. Both regulators required the exchanges segregate customer crypto-assets from the exchange's own holdings. However, for FTX Japan, the regulator had interposed a third-party trustee for fiat deposits (not required for crypto) and applied controls over how cryptocurrencies were stored – i.e. requiring 95% of customers' digital assets stored in cold wallets and 5% in hot wallets where the latter had to be backed by an equivalent amount of the exchange's own assets held in reserve in a cold wallet.

Although the Japanese regulator was proactive, it did not trespass over the contractual matter of property ownership.

In February 2023, the Debtors re-opened parts of FTX Japan allowing customers to withdraw their digital assets, which action demonstrated the Debtors view as to their digital asset ownership. Conversely, at the April 12, 2023 Omnibus Hearing the Debtors considered FTX.com customers rights to their Digital Assets remained "unclear". Given the near identical similarities it is striking that the Debtors found sufficient distinction between the two platforms – particularly finding that blockchain-pegged tokens and underlying coins held in omnibus pools and controlled by a ledger for FTX Japan customer WERE customer property which could be returned *in specie* while at the same time seizing FTX.com customers' pegged coins control by the Exchange Ledger into the Estate implying these digital assets WERE NOT customer property.

Inevitably the question of asset ownership has a legal answer which is not determined merely by the existence of pegged coins stored in omnibus pools – whether it was segregated or not – yet that seems to be the approach taken by the Debtors in regard to FTX Japan.  It is common ground that crypto-coins were misappropriated from FTX.com customers but whether coins are present or not in custodial wallets does not, in principle, alter the legal analysis that ultimate title to the (missing) intangible personal property belonged to customers.  The Debtors alternative treatment for Japanese customers' digital assets should place the Debtors in an uncomfortable position as it would be untenable for the Debtors to recast customer property held by FTX.com differently merely because the Customer Pegged Assets had been misappropriated.

Furthermore, and with regard to the burden of proof which the Debtors placed on FTX.com customers in the September 13, 2023 Omnibus Hearing, the Debtors do not appear to have insisted

[72]

any FTX Japan customer met the same high bar to identify "with specificity" their digital assets held

in omnibus pools rather accepting that the private exchange ledger was sufficiently robust to provide

certainty over the identification and amount of crypto-tokens held in customer Accounts and also the

related allocation of crypto-coins for each customer in the omnibus pools.

## 8. Securities and Commodities

It may assist to pause briefly and consider in this context that the tokens offered on FTX.com

might appear like *security tokens* but they were not investment contracts and are rather characterized

as *virtual currency* or more precisely, *commodity tokens*. The SEC does not view cryptocurrencies

like BTC or ETH as *securities*, and with no great distinguishing characteristic from other native

blockchains has chosen to provide limited regulatory guidance over digital assets preferring it seems

to instead take a regulation-by-enforcement approach using the Howey Test (*SEC v. W. J. Howey*). In

such circumstances the District Court in the Southern District of New York has recently determined

XRP is not a security when sold in the secondary market. *See SEC v. Ripple Labs Inc.,* 20 Civ. 10832.

At FTX.com, when crypto-tokens were traded on the Platform's secondary spot market, they were

sales of assets whereat intangible personal property was exchanged between anonymous customers

with all obligations extinguished at the time of sale. There was no investment contract, and there was

no expectation of future profit or income from the blockchain developers, the Platform, or the seller

and consequently were not securities. In his oral testimony[32] to the U.S. House of Representatives

Committee on Financial Services on December 8, 2021, BANKMAN-FRIED stated "We do not list

---

[32] The oral testimony given at the December 8, 2021 hearing on '*Digital Assets and the Future of Finance*' before the
U.S. House of Representatives Committee on Financial Services. A copy of the transcript is available on the
Government website < https://www.govinfo.gov/content/pkg/CHRG-117hhrg46302/html/CHRG-117hhrg46302.htm >

[73]

securities on our platform as of now, although we would be excited to explore listing digital asset securities in the future, under the guidance of the SEC."

In contrast, the CFTC considers virtual currencies to be *commodities* as defined under the Commodity Exchange Act.  On June 7, 2022, even before the FTX collapse, U.S. Senators Kirsten Gillibrand (D-NY), member of the Senate Agriculture Committee, and Cynthia Lummis (R-WY), member of the Senate Banking Committee, introduced the bipartisan '*Responsible Financial Innovation Act'* (the "**RFIA**") (S.4356, 117th Cong., 2022) which was re-introduced on July 12, 2023 with modifications to reflect the changing cryptocurrency market (S.___, 118th Cong., 2023).  The RFIA aims to establish a comprehensive legal and regulatory framework for crypto markets under the umbrella of CFTC regulatory control which includes to provide additional legal clarity during bankruptcy by adding "registered crypto asset exchange" within the definition of 'Commodity Broker' at §101(6) of the Bankruptcy Code; and related changes, including to 'Definitions' at §761 and 'Customer Property' to include "digital assets" at §766 (Re-introduced bill, §408).

Similarly, on April 28, 2022, U.S. Senator Glenn Thompson (R-PA) along with Senators Ro Khanna (D-CA), Tom Emmer (R-MN) and Darren Soto (D-FL) announced the '*Digital Commodity Exchange Act*' (the "DCEA") which provides alternative proposals for lawmakers to improve regulatory control of the crypto space.  Like the RFIA, the DCEA also proposed to include digital assets within amendments to Commodity Broker in the Bankruptcy Code.

Similarly, on August 3, 2022, U.S. Senators Debbie Stabenow (D-MI), Chairwoman of the Senate Committee on Agriculture, Nutrition, and Forestry, and John Boozman (R-AR), Ranking Member, along with Senators Cory Booker (D-NJ) and John Thune (R-SD) working in bipartisan agreement announced the '*Digital Commodities Consumer Protection Act*' (the "DCCPA") to the U.S.

House of Representatives Committee on Agriculture as the latest effort to improve regulatory control of the crypto space.

The RFIA, DCEA, and DCCPA all demonstrate an appetite for greater control of digital asset regulation including via amendments that might sit easily within the Bankruptcy Code which presently omits explicit terms to accommodate digital assets leaving the Courts to apply a best interpretation. However, such changes have not yet been ratified by lawmakers and in the instant matter, the security or commodity status of Digital Assets is not considered a prevailing factor as-to determination of customer ownership of their personal property which falls outside the Estate.

## 9. Summary

The Digital Assets owned by customers were not a tangible thing that could be physically picked-up and possessed or laid into the palm of another person's hand. Rather these cryptocurrencies were computer code reflecting a digital store of value and despite having intangible character the courts have held that cryptocurrencies can be treated as personal property. *See* 'Property' below.

In terms of intangible personal property, there can be no quarrel that ownership and custodianship are distinctly different legal concepts. Legal possession of Digital Assets held in customer Accounts in custody by FTX.com is not limited to simple analysis of who had access to private keys to the custodial wallets. Other factors, such as ability to direct, exercise, or effect control over the assets, contract provisions, trust arrangements, and business intention come into play which set out the rules of the game. As for *control*, it was the Affected Customers who decided WHEN to

[75]