trade, transfer, deposit, or withdraw THEIR digital assets (with named exceptions[33]) and would direct FTX as custodial intermediary to effect their instructions. In the general and practical sense, this was the customer exercising full control over their assets. For *contract provisions*, the Terms were clear that Digital Assets meant the crypto-tokens or pegged token entitlements. And the Terms were crystal clear about WHO owned the Digital Assets in customer Accounts ("Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading" and "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading"). For *business intention*, the extrinsic evidence points to FTX compliance policy married with *inter alia*, helpful clarifying published public policies and principles, public representations, advertisements, social media posts, criminal and civil cases, and BANKMAN-FRIED's own words and testimony to U.S. Congress which in concert confirm no doubt FTX.com represented to act as custodial intermediary of customer owned Digital Assets it held in trust on behalf of Affected Customers.

As custodial intermediary, FTX was responsible for safeguarding and ministering the digital assets on behalf of the Affected Customers, and in this role, FTX necessarily required access to private keys to fulfil a practical function – not just to process customer withdrawals but also to reconcile the pegged coins held in custody in the omnibus pools against token balances held in customer Accounts maintained on the Exchange Ledger. This was not possession with any intent to own the assets. (Noting the Bankruptcy Code does not expand the Debtors' interests in bankruptcy).

---

[33] With exception of very specific circumstances such as where a margin trading position in debt was closed according to separate agreed terms, but even in that instance FTX as intermediary was applying the rules of the system on behalf of the counterparty as directed by the terms so was not exercising free control but rather effecting a standing order, and not to overlook that the beneficiary of the repaid debt was another customer and not FTX.

Accordingly, the Debtors have been looking down the wrong end of the telescope to consider crypto-tokens or token entitlements held in custody in omnibus pools belong to the Estate and are not identifiable to customers, if for no other reason than the intrinsic relationship that was created in the Exchange Ledger binding the tokens and pegged coins. The rules of the game were provided by the Terms of Service and quite likely constituted a primary reason why many customers entrusted their hard-earned personal property on FTX.com rather than any other crypto exchange. But further, that extrinsic evidence removes all doubt over the corporate intentions that Digital Assets (1) belonged to customers and not FTX, (2) were held in custody, (3) were in trust on behalf of customers, and (4) protected from third-party creditors. An analogy of the present situation might be drawn to a thief who contests the victim's ownership rights merely on the basis he subsequently lost the stolen item. Or contests ownership rights because he can no longer distinguish the misappropriated item amongst a hoard of other stolen items. But more than that, before stealing the item, the thief wrote the victim a note; "*This item is yours. It does not belong to me. I will not borrow it or take it.*"

The opinion sought from this Court is materially divorced from the fraud and is not controlled by the remaining Customer Pegged Assets. It is a question of legal analysis concerning the custodial intermediary agreement related to the ultimate legal and beneficial title of the Digital Assets which is held by Affected Customers in their Accounts.

The plain facts are:

(1) FTX.com was a user-to-user cryptocurrency exchange.

(2) The Digital Assets owned by customers and deposited or acquired by customers on the exchange were crypto-tokens and crypto-token entitlements to underlying crypto-coins held in custodial wallets.

[77]

(3) The May 2022 Terms of Service were unambiguous regarding ownership of these Digital Assets held in customer Accounts providing that "at all times" title remained with the customer – and for the avoidance of any doubt, in separate clause FTX.com expressly disclaimed any interest in the same intangible property.

(4) FTX compliance policy (submitted to the regulator) confirmed, in crystal clear language, that Digital Assets belonged to customers; were held in custody; and were held in trust; and, protected from third-party creditors.

(5) Concurrently, and throughout, FTX represented most of the foregoing publicly via publications, mainstream media, social media, marketing and advertising campaigns targeted at retail and institutional investors, and via testimony and public policy presented to U.S. Congress.

(6) The Affected Customers' crypto-tokens remain held in their locked customer Accounts which are positively identifiable on the Exchange Ledger. (Underlying assets have been raided by the Debtors though could be replaced, 1 BTC = 1 BTC).

(7) In the November 2022 run on the exchange the Debtors faced low levels of liquidity in the omnibus pools which forced a stop on processing withdrawal instructions breaching control provisions in the Terms.

The crypto-tokens remain identifiable in Affected Customer Accounts while the underlying crypto-coins remaining after the fraud have been seized into the Estate. Since the Petition Date, the Debtors have recovered liquid, semi-liquid, and illiquid assets such that, in principle, the Debtors could refill the omnibus pools with replacement crypto-coins to re-open withdrawals *in specie* and return Affected Customers' property. (Noting the fungibility of cryptocurrencies). To minster the pools would not be unusual task given that FTX frequently reconciled custodial assets in the omnibus pools against the aggregated crypto-token balances held in customer Accounts which from time-to-time will have required FTX to acquire coins to top-up a shortfall or rebalance pools. In the event insufficient liquidity exists in the Estate for full recovery of Affected Customers property then there are practical options, though it would be premature to discuss such restitution plans in detail. However, in the first instance, there is no obstacle in principle to prohibit the Debtors from replenishing the diminished

omnibus pools with digital assets as necessary to facilitate re-opening withdrawals for Affected Customers to the extent liquidity is available.

Lastly, this core issue has impact upon the Debtors present course of action, by Order granted from this Court, to sell-off digital assets held in blockchain wallets. In that regard it is for the Court to decide whether it may be necessary to interfere or practical to issue a temporary injunction to suspend the sell-off pending opinion in this matter since the relief requested obliges the Debtors to return assets *in specie* (requiring the Debtors to reacquire crypto-assets they currently hold-in-possession and are preparing to convert to USD or to reacquire cryptocurrencies using the proceeds from the sale of assets).

## TERMS OF SERVICE

From incorporation through to Petition Date there were, to the best of my knowledge, four versions of the Terms of Service governing use of the Platform which I have attached as **Exhibit A**; and **Exhibits J1-J3**. Three earlier versions of the ToS; March 2021 (Ex.J-1), December 2021 (Ex.J-2), through to February 2022 (Ex.J-3) were similarly constructed with updates aligned to changes in the services available on the Platform including allowing fiat currency deposits and changes to the governing law that reflected the relocation of operations (together the **"Superseded ToS"**). For the reasons stated below I will not dwell on each of the overtaken documents since around two-months later, the last version of the Terms dated May 13, 2022 was published which contained substantive changes to structure and provision, especially with regard the specified services and the treatment of customers' Digital Assets (the **"May ToS"**). The May ToS reflected the plan to on-board new customers, and migrate all existing customers, to FTX Digital which licensed and regulated digital asset business had become the principal operator of the Platform and trading services.

[79]

Collectively, all FTX.com Terms of Service provided amendment clauses and the means for customers to accept amendments to the Terms such that:

(a)     FTX could unilaterally update the Terms of Service;

(b)     any subsequent versions would apply over prior versions;

(c)     the customers' continued use of the Platform was deemed acceptance of the updated Terms of Service; and

(d)     the customers' sole and exclusive remedy if they did not agree with the amendments was to close their account on the Platform.

The Superseded Terms expressly provided these amendments and acceptance clauses as follows:

> "We may amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised agreement and shall apply on a going-forward basis with respect to transactions initiated after the posting date. In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that we shall not be liable to you or any third party as a result of any losses suffered by any modification or amendment of these Terms."

(Emphasis added)

The Superseded ToS included further provision with express agreement to the Terms merely by customers using the services:

> "You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with and be legally bound by these Terms and all applicable laws and regulations (including without limitation those stated in this Section 1, where applicable), and failure to do so may result in the suspension of your ability to use the Services or the closure of your Account. For the avoidance of doubt, continued use of your Account, and the receipt of all trading fee discounts and rebates, is conditioned on your continued compliance at all times with these Terms and all applicable laws and regulations." (Emphasis added)

[80]

The May ToS were updated for a fourth time to include an English governing law clause and reflected a pronounced revision to the layout of the sections, clauses, and format albeit carried over much of the core language and words used in the earlier versions. The new Section 22 provided for 'Updates to the Terms', quoted here as:

> "22.1    We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes."

> "22.2    If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms."

(Emphasis added)

The May ToS re-written preliminary introduction section further provided:

> "By registering for a Platform account ("Account") or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

> Section 21 (Right to change, suspend or discontinue Services) and Section 22 (Updates to Terms) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms."

(Emphasis added)

A customer was deemed to have accepted the updated May ToS by continued use of the Platform, so it is reasonably considered the updated Terms were accepted by all customers actively

using the Platform in the lead up to and as-at the Petition Date. For this reason, I do not intend to dwell further on provisions in the Superseded ToS, save to recognize the possibility that a subset of customers might exist who did not access the Platform after May 13, 2022 and whom remain bound by the provisions in the earlier versions of the ToS. I have no means to identify whether such a population exists or whether it is just hypothetical reasoning. However, if any such customers do exist, they are not considered to be 'similarly situated' thus would not belong in the congregation of Affected Customers but rather belong to a separate group of affected customers with dormant accounts or **'Dormant Customers'**. Respectfully, the Debtors are administrative keyholders to the Platform with visibility of usage logs and could conjure a list of such dormant customers (here noting reference to the ToS 'Unclaimed and Abandoned Property' provisions which would have necessitated tracking customer access and use of the Platform).

### 1. User-to-User Trading Platform

The next order of business is to underline the business relationship set out in the preliminary section of the Terms. (ToS, p.1):

> "FTX Trading's relationship with you under the Terms is as <u>a trading platform provider</u> <u>only</u>. FTX Trading <u>does not act as principal or counterparty with respect to trades entered</u> <u>into on the Platform</u>."

(Emphasis added)

This set the backdrop that FTX was contained to "provider" to mean the management and administration of the Platform and related services, to act as intermediary for Platform transactions, and custodian of digital assets. By not acting as "principal or counterparty" to any trading it set a baseline that FTX was not offering its own assets and would not trade directly in any of the Platform services offered to customers. Two exceptions were noted in the Terms. The *first* that FTX would act

[82]

as counterparty but-only when collecting trading fees from users, which fees were usually taken during

a transfer, and the *second* introduced that FTX affiliates may also be users of the Platform services.

The Definitions in the Terms assist to provide context where 'Exchange' was stated to mean

"the <u>trading platform operated by FTX Trading or its Affiliates</u> through which the Services may be

offered <u>to Users to transact in Digital Assets with other Users</u>" (emphasis added). And the 'Service

Schedule' expressly noted the user-to-user relationship extracted with emphasis in the following table:

| Specified Service | Description |
|---|---|
| Spot Market | "The Spot Market is a trading platform through which you can spot trade certain Digital Assets <u>with other Users</u> in exchange for fiat currency (depending on your location) or Digital Assets." |
| Spot Margin Trading | "Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and <u>borrowing</u> the required Digital Assets <u>from other Users</u>. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform. You may also <u>lend</u> your Digital Assets <u>to other Users</u> who need them to spot trade. Digital Asset borrowers pay a lending fee to Digital Asset lenders." |
| OTC / Off-exchange Portal (OEP Portal) | "The OEP Portal enables you to connect <u>with other Users</u> to request quotes for spot Digital Assets. In response to a request for a quote, <u>other Users</u> will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the <u>other User</u>. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and <u>you will trade directly with the other User</u>. The Service Provider will carry out post-trade clearing and settlement of the trade <u>between you and the other User</u>." |

[83]

| Specified Service | Description |
|---|---|
| Futures Market | "The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage." |
| Volatility Market (Options Contacts) | "The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage." |
| Volatility Market (MOVE Volatility Contracts) | "The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage." |
| Leveraged Tokens Spot Market | "The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users." |
| Volatility Market (BVOL/iBVOL Tokens) | "The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage." |
| NFT Market | The NFT Market is a trading platform on which you can trade non-fungible tokens ("**NFT**") with other Users for fiat currency or Digital Assets and offer to sell them by auction. |

(Emphasis added; underline)

Furthermore, the basis of the user-to-user exchange and services were referenced throughout the Terms, *inter alia*, ('Margin Trading', §2.4.1) "When you lend Assets to other Users ..."; ('Order Book and Convert', §7.1) "… Orders may be placed by Users to be matched with the Orders of other Users"; ('Digital Assets', §8.2.3) "The Platform enables you to … send Digital Assets to and receive Digital Assets from other Users of the Services…"; ('ELECTRONIC TRADING TERMS', §14.6) "Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users"; ('MARGIN TRADING', §16.2) "If, after your positions

[84]

and Assets are liquidated, your Account still contains insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed."; (at §16.3) "When you lend Assets to other Users…"; (at §16.4) "… your Account balance may be subject to clawback due to losses suffered by other Users."

Consequently, there was no foundation or occasion when FTX might itself acquire ownership of Digital Assets held in customer Accounts and rather inferred any relationship between FTX and customer's Digital Assets would merely be in the shoes of providing the Platform services which, as already mentioned, included processing customer withdrawal instructions, and reconciling aggregated Digital Asset balances in the omnibus pools. Thus, there are no good grounds, in principle, to underwrite any of the Digital Assets held by customers should presumptively be property of the Estate.

## 2. Digital Assets

I will now turn and deal with Section 8 in the May 2022 Terms with regard to 'ACCOUNT FUNDING' and 'Digital Assets'. The first provision for a customer to use the Platform was raised in subsection 'Funding - General' which at §8.1.1 required customers to fund their FTX.com accounts either first buying Digital Assets or transferring their own existing Digital Assets to the exchange, and/or transferring fiat currency which would be converted to 'E-Money' that could be used to acquire Digital Assets on the Platform.

"8.1.1    In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account."

(Emphasis added)

[85]

The clause did not stipulate Digital Assets had to be bought from a specific user or place, though the Platform did offer to convert fiat currency to cryptocurrency, but in the context, *procurement* of a Digital Asset would transfer of property ownership to the customer so who the asset was purchased from was perhaps a moot issue. The meat of the provisions for 'Digital Assets' were contained in Section §8.2 of the Terms which began by expanding on the provision for funding customer accounts:

> "8.2.1    The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a "USD Stablecoin"). You may deposit <u>Digital Assets that you already own into your Account</u> by generating an address within <u>your Account</u> and sending <u>your Digital Assets</u> to such address, after which they should appear in <u>your Account balance</u> (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance)."

(Emphasis added)

The words "Digital Assets that you already **own**", "**your** Account", "**your** Digital Assets", and "**your** Account balance" are carefully chosen. Ownership in the context can only refer to personal property to which customers already hold good title, and the words altogether establish a complete transfer such that *your property* will be placed in *your account*. The provision does not cast any uncertainty over what is being transferred, who owns it, or where it is going. Nor was there any suspicion the act of depositing cryptocurrency would interrupt existing ownership. For instance, as already discussed, the transaction was not suggested to result in a faux, representative, or equivalent digital asset with a different store of value credited to the customer's account, or that the FTX would acquire title or other beneficial interest to the underlying asset as result of the deposit.

The next provision asserted a similar outcome resulting from the *purchase* of Digital Assets. The standard meaning of 'purchase' plainly applying to the acquisition of property or assets by various

[86]

methods and resulting in the transfer of property or assets from one party to another through agreement:

> "8.2.2   You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase."

Although the provision does not expressly refer where the purchased Digital Assets would be placed, in the context of the general provisions of the Terms, it was reasonable assumed, and demonstrated, that any purchased assets would be transferred into the customer's Account.

Next, the Terms then conveyed the extent of control available to a customer using the Platform services including to exchange Digital Assets for another type, transfer Digital Assets to other Platform users, or withdraw Digital Assets to third parties outside the Platform. Reasonably, such transactions were each characteristic of a transfer of ownership which could only be executed if the customer held title to the assets.

> "8.2.3   The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion)."

Further clarification was provided in regard to transfers at §8.2.8 - §8.2.10 (not repeated here) under the umbrella of provisions concerning *risks* and *responsibilities* to ensure Digital Assets were sent to the correct on-chain address for the particular crypto-asset, with purpose intended to disclaim the Platform against rejected or failed transfers due to technical or other issues. As already mentioned, such transfers could only reasonable be supported by the Platform if the customer owned the Digital Assets.

[87]

The next provision at §8.2.4 related to *selling* Digital Assets for fiat currency. Although the provision omits to specify that customers could only sell Digital Assets they own (save for the overarching provision at §8.2.11 discussed later) it was somewhat implied since a customer would only have had control over the Digital Assets held in their Account, and which the preceding provisions established was necessarily funded by assets owned by the customer either via deposit, purchase, or transfer.

> "8.2.4   You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions."

Notably, this provision did provide consent for FTX to debit the customer's account balance to facilitate the sell instruction ("you authorise us to debit your account"). This *debit clause* suggested the Terms were sufficiently careful to highlight impact on customer assets in their Account – even though in the circumstances of selling assets the customer could not reasonably have expected not to have had their account balance reduced. This provision is material to establish that an act impacting upon the customer Account would, on the balance of probability, have been carefully written into the relevant section of the Terms in plain language equal to the words used here. Moreover, a transfer of assets or ownership to FTX whether explicitly stated or implied would have been extraordinary against the backdrop of the user-to-user exchange and should have been well noted.

The provision at §8.2.5 has no particular merit in the instant matter save to highlight the words used again refer to "your Digital Assets" in "your Account" underlining the relationship between the customer and their cryptocurrency.

And then comes §8.2.6 which has been much referenced already. The plain and ordinary meaning of the words speak for themselves and do not require much narrative:

[88]

8.2.6    All Digital Assets are held in your Account on the following basis:

    (A)    Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

    (B)    None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

    (C)    You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

It is relevant to the matter to underline the words used **"title"**, **"owner"**, **"belonging"**, **"your Digital Assets"**, and not **"the property of"** provide, in the context, compelling and unambiguous intention over the certainty of the Affected Customers interest in the property.

The sub-clause at (A) that stated **"you shall bear all risk of loss"** was sandwiched before the sub-clause relating to the inherent volatility of crypto-assets and in the context of the written sentences was read to mean **"risk of loss"** as a result from the customer using the Platform services, rather than from, for example, bearing all risks due to the misappropriation of assets by the Debtors, or bankruptcy as result of fraud, which, in the event, is provided under 'LIMITATION OF LIABILITY; NO WARRANTY' at §30.1 which stated:

    "30.1    NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

        30.1.2    FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

        30.1.3    TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS."

[89]

Further, the "risk of loss" clause is consistent with other similar references in the Terms intended to highlight the risk of trading cryptocurrencies, such as at §2.7.4 which stated:

"2.7.4    Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services."

Returning to 'Digital Assets', the overarching provision at §8.2.11 adequately required the customer to warrant the Digital Assets they used on the Platform were their property (or in the alternative, were authorized to use the property as in the case of institutional customers).

"8.2.11    You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person."

(Emphasis added)

Based on the foregoing it would have been difficult to disagree with the provisions that the customer was anything other than the owner of the Digital Assets in their account. The alternative reading of this clause forbids FTX should hold any claim to the property, such as: '*FTX represents and warrants to you that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund customer accounts) are not owned by FTX*'.

Elsewhere, the words used in other provisions in the Terms reinforce customers' Digital Asset ownership. For example, specific provisions in the 'STAKING' section included (at §15.1) "When you hold Digital Assets on the Platform …" and "[i]f you stake your Digital Assets, …". (emphasis added). The words '*you* hold' has a quite different meaning to '*we* hold' which might have been the case had FTX considered it held legal interest, and for similar reasons, "*your* Digital Assets"

[90]

is quite different to "*our* Digital Assets". And in a further example at 'ORDER BOOK AND CONVERT' section (at §7.10) "You hereby authorize FTX Trading to credit or debit … your Assets from your Account" (emphasis added) for alike reasons.

No explicit clause exists in any of the provisions within the 'Digital Assets' section, or elsewhere in the Terms for that matter, that provided for Digital Assets held in customer Accounts to be usurped by the Platform provider or have ownership transferred to FTX by any other means. Indeed, it would have been extraordinary if such provisions were to have existed in the face of the preliminary declaration in the Terms that "FTX Trading does not act as principal or counterparty" leaving little contractual opportunity to assume asset ownership. A single reference was made to circumstances when FTX might have to "seize" assets as intermediary but only in the limited context of settling "your debt to other Users". If a particular Service had created a scenario where the Platform should legitimately acquire property rights to customers' Digital Assets – temporarily or permanently – it would seem reasonable to have expected a specific clause in the related provisions and section of the Terms in light of the carefully chosen words employed in other provisions (*see* §8.2.4), but even then such a contractual change to ownership would sit in tension with §8.2.11.

In sum, the plain and ordinary meaning of the Terms established:

(1) Users traded with other users, and not FTX; and

(2) Customers were "at all times" owners of the Digital Assets in their Accounts; and

(3) FTX expressly rejected property interest to Digital Assets held in customer Accounts; and

(4) None of the Digital Assets in customer Accounts "shall or maybe" loaned to FTX such that FTX were proscribed from using customers' Digital Assets for their own benefit; and

(5) Customers retained full control of the Digital Assets held in their account; and

[91]

(6) Situations which affected customer accounts were stipulated in the context (i.e. FTX may debit account balance when customer converting Digital Assts to fiat currency, or FTX may seize assets to pay a debt from margin trading to another user).

## 3. Fiduciary Relationship

There are four main occasions in the Terms where express or implied reference was made to a financial or fiduciary relationship. At §2.1 entitled 'No advice and no reliance' two provisions highlighted the need for customers to do their own research to inform their own decision-taking:

> "2.1.1    FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and <u>FTX Trading does not provide any other financial</u>, investment, taxation or legal <u>advice in connection with the Services</u>. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. <u>You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets</u>. FTX Trading will not be liable for any loss suffered by you or any third party."

> "2.1.3    FTX Trading is not your broker, intermediary, agent, or advisor and has <u>no fiduciary relationship</u> or obligation to you <u>in connection with</u> any <u>trades</u> or other <u>decisions</u> or <u>activities</u> effected by you using the Services."

(Emphasis added)

The scope of this fiduciary relationship was written in the context of the surrounding 'no advice and no reliance' provisions, and thus is read to be limited insofar as to disown a relationship in connection with *giving advice* or *market commentary* that may be provided to customers by the Platform and used for decision-taking (the bad advice disclaimer). It would not be reasonable to extract the words at §2.1.3 in isolation of the clause so as to reinvent the meaning as an intention to sever all fiducial relationship given the responsibilities enshrined in delivering the exchange services

[92]

required, at the bare minimum, FTX to act on behalf of customers by holding and safeguarding digital assets held in customer Accounts on the Platform.

In the section 'Digital Asset transfers and volatility', the provisions tread a similar path restraining the fiduciary relationship to disclaim against *risk* related to the *volatility* of cryptocurrencies which provisions were set out in the adjoining clauses. The interpretation of the "fiduciary duty" at §2.2.2 was limited to warrant against the risks of using the Platform to trade in volatile crypto-assets and expressly that it should not be taken to mean FTX approves of a particular digital asset merely by making it available on the Platform:

> "2.2.2   Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services."

(Emphasis added)

The words in the provision are carefully applied and are not considered to trespass over the duties in providing the Platform or services. Altogether, these three foregoing provisions limit fiduciary duty with respect to transacting in digital assets on the Platform, via the API, or in connection with any other services offered on the FTX website or mobile application.

The boilerplate 'no partnership or agency' provision at §38.6 is a general clause commonly found in contracts:

[93]

"38.6    **No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person."

Interpreting the 'catch-all' clause is subject to other express, or implied, provisions in the Terms. To that extent, in the context of **"provider"** of the cryptocurrency exchange, the custodial intermediary was in the business of receiving deposits, holding digital assets on behalf of customers, delivering trading services, and processing withdrawals such that there is, at minimum, some necessary element of fiduciary relationship surrounding the handling and storage of associated digital assets. It is considered, in light of the words amply used elsewhere, HAD the intention of the boilerplate clause been to disclaim all custodial responsibility then (i) the Terms would have included specific disclaimer written in the relevant context and with good specificity given the sparkling clarity provided for customer title to their Digital Assets which in the context established a trust arrangement (*see* §8.2), and (ii) FTX would have avoided making public declarations which would otherwise adversely influenced the plain interpretation of terms.

With regard to the interpretation of the terms, the extrinsic evidence already discussed, includes proclaiming public statements made by FTX and BANKMAN-FRIED, by definition an affiliate, including stating to U.S. Congress that customers' Digital Assets "were held in custody by FTX", and the Safeguarding Policy noting the assets were "in trust", such that these bear weight over the interpretation of the clause and consideration that the intention of the 'no partnership no agency' provision was NOT to waive all 'fiduciary relationship' with regard to the custody of assets.

[94]

Notwithstanding, at bottom, the ambiguity of the interpretation is subject to the rule of *contra proferentem* to be construed against the drafter.

## 4. Unclaimed or Abandoned Property

Section 9 was entitled 'UNCLAIMED OR ABANDONED PROPERTY'. In the legal sense, unclaimed property is defined as personal property left by an owner for a specified period of time whereas abandoned property is personal property to which the owner has intentionally relinquished all rights to the property. Both cases provide for 'property' that is 'owned' by someone.

Reading the Section 9 provisions carefully, clause §9.1 begins "If FTX Trading is holding Assets in your Account ("Unclaimed or Abandoned Property"), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, …". Here, the parenthetically defined shorthand reference "Unclaimed or Abandoned Property" is used. While there are no particular rules for the use of shorthand references, they are generally expected to relate to the words immediately coming before the parenthetical shorthand. Syntactically, it is a proxy. In this instance the subject of the written words was plainly "Assets in your Account", but the shorthand reference not only used the same number of words but also conjured a different sub-class of asset unrelated to the written text which was confusing. The shorthand reference used *might* be relevant later in the provision but not here and consequently the drafter introduced unnecessary ambiguity when reading this clause. To undo confusion, the parenthetical shorthand reference can be omitted to make the provision more readable and to comfortably understand the intended meaning, as follows:

> 9.1   If FTX Trading is holding **Assets in your Account**, and we are unable to contact
> you and have no record of your use of the Services for a prolonged period of time or

[95]

your Account has been closed, Applicable Laws may require us to report such **Assets in your Account** as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such **Assets in your Account** to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such **Assets in your Account**, as permitted by Applicable Laws.

9.2    If FTX Trading is holding **Assets in your Account**, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such **Assets in your Account** as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the **Assets in your Account**. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the **Assets in your Account** on your behalf and shall, on demand, repay to you the **Assets in your Account** subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the **Assets in your Account**. If no such demand is made by you, the Trustee may pay the **Assets in your Account** into court in the applicable jurisdiction in accordance with Applicable Laws.

This exercise has not rewritten the provision – rather normalized the text by reverting the ambiguous shorthand reference. Nevertheless, the ordinary and natural meaning of the words still retain some potential ambiguity especially in "… you acknowledge and agree that your Account may be transferred to FTX Trading … as Trustee of the Assets in your Account". The plain reading of the words provides for a "transfer" of "your Account". But "as Trustee…" might be read either with conjunction, pronoun or preposition.

The *first* interpretation construed to mean – 'you agree that FTX Trading takes *control* of your Account … *because FTX Trading is* Trustee of the Assets in your Account'. (Noting here that the 'Digital Asset' provisions in the Terms established a trust was formed for the intermediated custodial holding of a customer owned assets). (Also noting the start of clause §9.2 begins "If FTX

[96]

Trading is <u>holding</u> Assets in your Account ..." (emphasis added) which act of 'holding' could only come about through custody). The *second* interpretation construed to mean – 'you agree that FTX Trading takes *control* of your Account ... *who is the* Trustee of the Assets in your Account'. Reasonably, this is taken to have the same meaning as the first interpretation. The *third* interpretation is construed to mean – 'you agree that FTX Trading takes *control* of your Account ... *being the* Trustee of the Assets in your Account'.

Practically there may be no difference between all three since each result in a custodial holding of the unclaimed assets in trust. But it is the implied pre-existing trust status of the assets in the account which stands out, and underlined in the following sentence "FTX Trading, as Trustee, will hold the Assets in your Account on your behalf...". Also noting that for all interpretations FTX confirms its fiduciary role includes holding "the Assets in your Account" in trust.

Further, and additionally, the provision adds light on the ownership issue. The trustee-beneficiary relationship confirms in principle that, as custodial intermediary, FTX was not the beneficial owner of the property and had no proprietary interest in the property. (Noting the for the benefit of construct that "FTX Trading, as Trustee, will hold the Assets in your Account on your behalf..."). This is compelling in favor of Affected Customer property interest in their Digital Assets, since were FTX intended to have held any legitimate claim for legal or proprietary interest in the assets then it would be anything other than trustee – or if it were trustee and co-beneficiary then it reasonable would have been stated – i.e. perhaps by holding rights to assets as a co-owner in an equitable tenancy in common arrangement, but it did not.

[97]

Further, and additionally, the formation of a trust arrangement accepts that, as far as the Terms are concerned, the "three certainties" for establishing a trust could be met for the crypto-tokens and crypto-token entitlements held in customer Accounts. *See* 'Trust' below.

## 5. *Bona fide* purchaser

Customers added crypto-tokens to their Account balance by several means, some already mentioned. Crypto-coins transferred by the customer to their own Account on the exchange, or transferred by others for the customer's benefit, inherently carried a beneficial interest. For digital assets acquired within the Platform the ToS provide some helpful language.

The 'Fiat Currency' section at §8.3.5 describes provision for the purchase of Digital Assets using E-Money held in a customer Account:

> "8.3.5    You may <u>purchase Digital Assets</u> by using E-Money credited to your Account (depending on your location). To carry out a <u>Digital Asset purchase</u> using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete <u>your purchase</u>. Although we will attempt to <u>deliver Digital Assets to you</u> as promptly as possible, E-Money may be debited from your Account before <u>Digital Assets are delivered to your Account</u>."

(Emphasis added)

Similarly, the 'Digital Assets' provisions already discussed included clause at §8.2.2 which noted similar language, "You may <u>purchase Digital Assets</u> in exchange for certain supported fiat currencies" and "to complete <u>your purchase</u>". Emphasis added. Here, "your purchase" plainly conveying who would gain the property interest in the acquired Digital Assets.

[98]

And in the Schedule 1 'DEFINITIONS', the term "Order" is given to mean "each instruction placed by you on the Order Book to <u>purchase</u> or sell a specified quantity of a Digital Asset at a specific price in the Digital Asset in which trading is denominated on the Order Book; …". Emphasis added.

In these circumstances, the action of using E-Money, or fiat currency payment from a bank account, to provide a valuable consideration to buy Digital Assets constituted the customer was the purchaser of crypto-tokens subsequently delivered to the customer's Account, such that the customer had acted as a *bona fide* purchaser and the legal and beneficial proprietary rights to the crypto-tokens and crypto-token entitlements were also transferred to the customer.

## 6. No risk bankruptcy clause

The Terms did not explicitly include a bankruptcy clause which might define risk to customers or provide particular provisions which bound customer owned assets held in custody by FTX to the Debtors or their Estate. Indeed, the 'no partnership or agency' clause might well be considered to confirm customers do not share any of the rights, responsibilities, or liabilities that might come with a formal partnership arrangement in bankruptcy, and similarly the Debtors are not entitled to make binding decisions on behalf of customers or their assets.

Overarching, the 'limitation of liability' provisions already mentioned at §30.1 disclaim any express, or implied, customer liability which might arise from the obligations of bankruptcy due to "fraud or fraudulent misrepresentation" and the criminal convictions now associated with the matter have material bearing.

[99]

## 7. Collateral

For other Services offered by the Platform, for instance 'MARGIN TRADING', the Terms used plain language to set out the risks involved to customers including at §16.2 for the intermediary to "seize ... Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users ...":

"16.2    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. ... If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, <u>we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users</u>, in which case, you may sustain a total loss of all Assets in your Account. ... If, after your positions and Assets are liquidated, your Account still contains insufficient Assets to <u>settle your debts to other Users</u>, you will be responsible for any additional Assets owed. ..."

"16.3    When <u>you lend Assets to other Users</u>, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default."

(Emphasis added)

The mechanics for posting collateral related to margin trading positions was chiefly ministered by FTX using available assets held in the customer Account which became 'locked' when utilized in a collateral giving situation:

8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

For obvious reasons the Platform prioritized less volatile E-Money in customer Accounts for collateral which was supported by the Terms, "any available assets". However, when collateral was locked in the customer's Account it remained the property of the customer in line with the Terms. (*see* §8.2.6, Noting that all digital assets held in a customer's Account were on the basis that title always remained with the customer and did not transfer to FTX).

The 'Debit Account Balance' provision validates:

10.3    If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

10.3.1    you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

Here, the conditions authorize FTX to recover debt by liquidating assets held in a customer's Account and the clause was necessary because the Terms provide assets held in the customer's Account belonged to the customer. IF the customer had yielded ownership when posting collateral for a margin position then, in the shoes of the intermediary, FTX could have seized assets held in possession without demand to clear a debit balance, but even in this situation the ultimate beneficiary of recovered assets was another customer and not FTX.

## 8.  Margin Trading

Following, and related to the foregoing, the Spot Margin Trading service provided that Digital Assets would be borrowed *from other customers*, and that customers could chose to lend tokens *to other customers*. FTX only ministered the service and applied its risk engine to liquidate adverse positions limiting customer losses whilst margin trading. Any crypto-asset posted as collateral did not leave the customer's Account and title to the digital asset was not transferred. The same was true

[101]

when lending assets to other customers: The borrower did not acquire title and the lender's asset balance was not diminished, albeit the lent part was locked and could not be withdrawn, sold, used as collateral, staked or otherwise used during the lending period which operated on an hour-by-hour commitment and could be terminated on demand.

In either the borrower or lender scenario, or collateral giver or taker scenario, the counterparty was always another customer, so FTX, who was neither agent nor counterparty but the intermediary holding the assets, was not a named player on the field of potential beneficial ownership and has no good grounds to claim proprietary interest in Affected Customers' crypto-tokens lent or posted for margin positions. Alameda, as *market maker*, may well have been counterparty to some trading but that does not grant the Debtors overarching rights to seize ALL property interest into the Estate including every digital asset held on the Platform. At best it might qualify *some* property interest where Alameda was a collateral taker, but only in circumstances where an open margin trading position had fallen into a negative balance requiring the use of some or all of the collateral. (Based on understanding that open trades were closed with effect of the Petition Date). Of course, the opposite would be true for any open margin trading positions which held a positive balance then the collateral would have been unlocked from the customer Account at settlement and no ownership rights lost, plus any positive balance settled in favor of the customer. There is also a potential legal question of forfeiture by Alameda as an insider heavily implicated in the fraud. Nevertheless, in these circumstances the Terms lack specific provision to support a scenario where the Debtors might reasonably claim beneficial property interest, and were there any, the provisions ought to have been unambiguously written. (Rule of *contra proferentem*).

[102]

## STAKED ASSETS

The first order of business is to determine whether Digital Assets held in customer Accounts and enrolled for staking were effectively unenrolled on the Petition Date, or by virtue that FTX had misappropriated the underlying staked assets, or that the Debtors have since seized the related assets. This might overtake any further discussion since if the digital assets were not staked then they would simply be held in the customer Account and no further analysis is required. To this end, for the same reasons that open trading positions closed effective of the Petition Date, then staking will also have ceased (if for no other reason than the underline assets on the blockchain had been disturbed).

We do not need to go further, though I will proceed on the worst-case such that there is value in examining the Terms, although before diving into the related Terms, it assists to briefly recap what is meant by 'staking' to set out the background knowledge expected, by the Platform at least, to have been known to the customer:

In the world of decentralized cryptocurrency there is no central authority on-hand to authorize cryptocurrency transfers on a blockchain network. Instead, the blockchain relies on a distributed network of participants to validate transactions and add them to the blockchain. Some blockchains, such as BTC, validate transactions via a proof-of-work algorithm which requires a complex mathematical problem to be solved by participants ("miners") in order to validate and add the new transaction to the blockchain. Typically, these are slow, expensive, and environmentally inefficient as it requires a certain amount of computing power to produce the necessary *proof of work*, and many validators will race to be the first to solve the problem, validate the transaction, and gain a reward from the blockchain in the form of the cryptocurrency.

[103]

To solve the adverse problems associated with proof-of-work validation, other blockchains invented proof-of-stake consensus algorithms which enable existing holders of the cryptocurrency a chance to perform the validation for reward without the computational overhead. No work is necessary just proof the participant holds a *stake* in the blockchain network for a randomized chance to be chosen to validate transactions and earn reward. Here, it assists to have the largest amount of staked cryptocurrency.

Proof-of-stake blockchains are not all alike, though typically the mechanics require the crypto coin(s) to be designated available for validation with the cryptocurrency delegated such that the staked asset remains in the participants wallet. Technically there is a slight risk of losing some of the locked asset but only by the adverse actions of the participant acting dishonestly or maliciously validating transactions.

On the Platform, the effect of staking was to 'lock' the corresponding Digital Asset in the customer account preventing secondary use or trading risk while the Platform delegated the corresponding Customer Pegged Asset in the custodial wallet as a validator to earn reward from the blockchain. The Terms included general provision to allow the customer assets to be locked in such a way at §8.1.3 for participation in a range of Platform services, which stated:

"8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates."

However, while the provision related to locking Digital Assets for the purpose of "collateral" for "Services or part thereof offered through the Platform" it did not dedicate any further words to hypothecate, rehypothecate, or otherwise transfer ownership. And made no express provision for staking assets. Critically, the Digital Asset remained in a customer's Account throughout, and the

[104]

customer continued to hold ultimate title and control over their assets (Ex.A, §8.2.6), including determining when to 'unstake' a staked asset. The Platform was not a "broker" rather ministered the service.

The Terms included the section 'STAKING' with specific provisions at §15.1, "… [i]f you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf". On first impression, the words might be considered to raise some ambiguity over how "facilitate" and "on your behalf" might be construed.

There is no express indication here that the service would interrupt the customer's title or otherwise trespass over property rights. Consequently, a deeper dive into all the related provisions in Terms is required. Staking is first referred in section 'Digital Asset Distributions not supported' of the Terms which stated:

"2.11    Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking."

Ostensibly, the plain reading of "may in its sole discretion" provided FTX with determinative authority to "stake these Digital Assets" and not pass rewards on to the customer. On first reading, and in isolation, it seems something of a tyrannical provision however, when read in concert with the specific 'Staking' clause and related digital asset 'Distributions' provision, it is apparent the words at

§2.11 have a less aggressive intention requiring a controlling action by the customer (not overlooking the control clause at §8.2.6(C)).

The references made to "stake these Digital Assets" and "your Digital Assets" reflects the Digital Assets held in a customer Accounts were be interpreted inseparably from the Customer Pegged Assets held in custodial wallets, since necessarily it was the crypto-coins that had to be staked with the particular blockchain for reward and not the tokens shown in the Account. And it was not the case that the Platform provided some custom staking service of its own design since no corresponding service was listed in the Service Schedule.

In the 'STAKING' section of the Terms at §15, the provisions stated:

"15.1    When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES."

"15.2    The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions."

Later, in the 'Forks and Distributions' section at §17.4 the provisions of the Terms stated:

[106]

"The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as ... the provision of rewards or other similar payment for participation in a Digital Asset's protocol ("Staking Rewards")" and "FTX Trading may, in its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support."

When read in concert, the provisions allow customers to stake their digital asset for reward (staking clause), and in such circumstances FTX may in its sole discretion stake these digital assets (not supported clause, and distributions clause) on behalf of the customer (staking clause) such that there is no particular right for the customer to demand digital assets which have *potential* for proof-of-stake to actually be staked or reward given (all three clauses). Here, FTX is simply acting as administrator of the customers' crypto-coins upon instruction to enroll to the staking service (and unenroll from it) rather than acting as a broker or providing some other agent service. This is how I interpreted the clauses since, at the time of reading, FTX did not appear particularly tyrannical. Further, the tax clause at §15.2 conveys responsibility upon the customer for resolving their own tax affairs for any gains as result of choosing to earn staking rewards. And additionally, overlaid are the 'Digital Assets' provisions which proscribed FTX from using assets in customer accounts for their own benefit. (*Id.,* §8.2.6(B)) ("None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading") (emphasis added). Nonetheless, none of the related staking terms expressly or otherwise pretend to violate the baseline provisions that absolute title to customer's Digital Assets always remained with the customer, which was reasonably be required if the intent was to override the explicit provisions to customers' personal property.

I later reference the bankruptcy in *Re Celsius Network LLC, No. 22-10694 (Bankr. S.D.N.Y)* though it seems relevant to briefly mention it here. In *Celsius* the Bankruptcy Court gave Opinion that digital assets in 'Earn Accounts' were presumptively the property of the bankruptcy estate but-only

[107]

because the express Terms allowed it. *See Id.*, 'Memorandum Opinion and Order Regarding Ownership of Earn Account Assets', Dkt. 1822, p.10. (Referencing the Earn Accounts Terms of Use stated, "[Y]ou grant Celsius … all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion."). Notably, no such grant existed in the FTX.com Terms of Service.

Moreover, in *Celsius* the Court "found that digital assets in the Custody Wallets and Ineligible Withhold Assets … are not property of the Debtors' estates" (*Id.*, 'Order Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts', Dkt. 1767, p.2) and ordered "customers to withdraw digital assets held by the debtors on behalf of customers – other than any current or former employee or insiders or … affiliate". The Order was substantially based on the prevailing Terms of Use. *See Id.*, Dkt. 393, p.533. ("Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius") which words bear remarkable similarity to FTX.com.

[108]

## PROPERTY

*In Celsius*[34] provides some other parallels with the instant matter including in the matter of determining whether cryptocurrency is 'property'. The debtors motion in that bankruptcy asserted customer owned digital assets in custodial wallets do not constitute property of the estate. *See Id.*, 'Motion Seeking Entry of an Order Authorizing the Debtors to Reopen Withdrawal for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts', Dkt. 670. I revisit *Celsius* later, though for now repeat a relevant section from the motion which provides good introduction to the matter of *property* in bankruptcy:

> "Section 541 of the Bankruptcy Code generally provides that all property in which a debtor has a legal or equitable interest, including any interest in property that a debtor acquires postpetition, becomes property of the estate upon the commencement of a chapter 11 case. 11 U.S.C. §541(a)(1), (a)(7). Importantly, section 541 of the Bankruptcy Code does not by itself create new legal or equitable interests in property; instead, "[p]roperty interests are created and defined by state law." *Butner v. United States, 440 U.S. 48, 54-55 (1979)* (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"). Indeed, Congress was clear that section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367-68 (1977); see also *Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir. 1984)* (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less"). Thus, if a debtor holds no legal or equitable interest in property as of the commencement of the case, such property does not become property of the debtor's estate under section 541 and the debtor is prohibited from distributing such property to its creditors. *See Pearlman v. Reliance Ins. Co., 371 U.S. 132, 135-36 (1962)* ("The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.")."

---

[34] *Re Celsius Network LLC, No 22-10694 (Bankr. S.D.N.Y)*

There has been growth in the population of cases appearing before the courts involving digital assets where the courts have had to deal with the question of whether cryptocurrencies are 'property' in the legal sense, such that it is now generally accepted under English law that cryptocurrencies are a form of property which can be the subject of a trust agreement – notwithstanding its entirely fungible character and non-identifiable status.

The following, split broadly to academic and legal analysis, sets out the stall in support that cryptocurrency is identifiable as 'property' in common law jurisdictions:

## 1.  Academic Analysis

In November 2019, the UK Jurisdiction Taskforce, a body established by the UK Government, the Judiciary and the Law Society, published the benchmark academic analysis, '*Legal statement on the status of crypto-assets and smart contracts*'[35] (the "**Legal Statement**") which grappled with the question of cryptocurrency and property.  The *Legal Statement* considered the importance of property in bankruptcy (*Legal Statement*, §36):

> "Proprietary rights are of particular importance in an insolvency, where they generally have priority over claims by creditors, and when someone seeks to recover something that has been lost, stolen or unlawfully taken. They are also relevant to the questions of whether there can be a security interest in a crypto-asset and whether a crypto-asset can be held on trust."

The *Legal Statement* recognized (*Id.*, §41) the inherent nature of cryptocurrency may "create some practical obstacles to legal intervention but that does not mean that crypto assets are outside the law."  Determining ownership of cryptocurrency is not narrowly limited to the holder of the private

---

[35] In December 2021, the UK Jurisdictional Task Force published '*Legal statement on crypto-assets and smart contracts*'. < https://lawtechuk.io/our-reports/ >

key rather the matter of ownership depends on circumstances and on the rules of the relevant system.

The *Legal Statement* provided examples (*Id.*, §43) of particular relevance to the instant matter:

"(a) a person may hold the key on behalf of another, e.g. an employer or client, or as a custodian or intermediary, in which case ownership would be determined by established rules of agency or trust;"

"(f) in non-anonymous systems where crypto-asset owners are identified in the transaction ledger, the status of the record (e.g. whether it treated as definitive or merely evidential) is likely to depend on what the participants have agreed as to its effect."

In sum, the *Legal Statement* considered (*Id.*, §57), "crypto-assets possess all the characteristics of property set out in the authorities" and the subsequent discussion (*Id.*, §§71-85) concluded crypto-assets have all of the indicia of property, such that crypto-assets could therefore to be treated, in principle, as property.

## 2. Legal Analysis

### England and Wales

An authoritative description of the characteristics of *property* were stated by Lord Wilberforce in *National Provincial Bank v Ainsworth* [1965] AC 1175, as follows:

"Before a right or an interest can be admitted into the category of property, or of a right affecting property, it must be definable, identifiable by third parties, capable in its nature of assumption by third parties, and have some degree of permanence or stability."

The four requirements in *Ainsworth* have been variously tested in regard to cryptocurrency and found it is *definable* being that it can be isolated from other assets of the same type and uniquely allocated to a public key address on the blockchain, or in the case of off-chain digital assets uniquely allocated to a customer Accounts on the Exchange Ledger; it is both *identifiable by third parties* and *capable of assumption by third parties* due the use of a private key to confirm a transaction for

[111]

blockchain assets or by control wielded through the customer Account for intra-platform trading with other customers, and the desirability of the cryptocurrency by others; and, *stability and permanence* come from the nature of the blockchain network which provides a public record, and for FTX.com comes from the Exchange Ledger and store of value maintained in on-chain pegged assets.

In *Yanner v Eaton* [1999] HCA 53, the Court considered at §17 that strictly in law, "… 'property' does not refer to a thing; it is a description of a legal relationship with a thing. It refers to a degree of power that is recognized in law as power permissibly exercised over the thing." The Judge here affirming the law should not overlook the legal relationship or ability to control property, which applied in the instant matter factors the Terms provide a customer holds title to their Digital Assets and always retains an ability to exercise control over Digital Assets held in their Account, and the role of the custodial intermediary to effect those instructions.

In *Elena Vorotyntseva v Money-4 limited and others [2018] EWHC 2596 (Ch)*, the High Court issued a proprietary injunction preventing the removal of specific ETH and BTC holdings. In coming to his decision, Birss J observed that there had been no suggestion that cryptocurrencies could not be a form of 'property'.

In *AA v Persons Unknown* [2019] EWHC 3556 (Comm) the matter related to the hacking of an insurance company and subsequent ransom payment. In the High Court, Bryan J considered the question whether Bitcoin is 'property' capable of being subject of a proprietary injunction. The Judge adopted the reasons identified in §§71-84 of the *Legal Statement* and held that Bitcoin meets the criteria set out in *Ainsworth* as being definable, identifiable by third parties, capable in their nature of assumption by third parties, and having some degree of permanence and held that cryptocurrencies are 'property'.

[112]

The courts have also granted proprietary injunctions in *Ion Science Limited & another v Persons Unknown* (21 December 2020, Butcher J) (Finding that "cryptoassets such as bitcoin are property within the common law definition of that term."); *Toma v Murray* [2020] EWHC 2295 (Ch); *Zi Wang v Graham Darby* [2021] EWHC 3054 (Comm) (Holding that "it is common ground that fungible and non-identifiable digital assets such as Tezos constitute property that is capable of being bought and sold as well as held on trust as a matter of English law."); *Sally Jayne Danisz v Persons Unknown* [2022] EWHC 280 (QB) and *Lavinia Deborah Osbourne v Persons Unknown* [2022] EWHC 1021 (Comm) without suggesting cryptocurrencies are not a form of 'property'.

**Singapore**

In *Quoine Pte Ltd v B2C2 Ltd* [2019] SGHC(I) 03 (14 March 2019); *Quoine Pte Ltd v B2C2 Ltd* [2020] SGCA(I) 02 (24 February 2020) it was accepted at first instance by Thorley IJ (there being no argument to the contrary) that Bitcoins could be the subject of a trust, and hence were property. He observed that "cryptocurrencies have the fundamental characteristic of intangible property as being an identifiable thing of value" and that they met all of the requirements in *National Provincial Bank*. The subsequent Appeal did not reject the matter of trust.

In *ByBit Fintech Ltd v Ho Kai Xin and others* [2023] SGHC 199 the High Court dealt with the issue of what type of property crypto-assets are and considered factors including that the assets are transferred for value and will appear on companies' balance sheets. While not tangible assets that can be physically held they "do manifest themselves in the physical world" and can be defined and identified by modern humans, such that they can be traded and valued as holdings. The Court determined that crypto-assets are "things in action" capable of being held on trust.

### Hong Kong

The courts have granted proprietary injunctions in *Nico Constantijn Antonius Samara v Stive Jean-Paul Dan* [2021] HKCFI 107841; *Yan Yu Ying v Leung Wing Hei* [2021] HKCFI 3160; and *Huobi Asia Limited & Anor v Chen Boliang & Anor* [2020] HKCFI 2750 without any party suggesting cryptocurrencies are not, and cannot be, considered property.

### New Zealand

In *Ruscoe v Cryptopia Ltd (in Liquidation)* [2020] NZHC 728, the New Zealand High Court held that cryptocurrencies, as digital assets, are a form of property that are capable of being held on trust. The *Cryptopia* case bears striking similarity to FTX as a cryptocurrency exchange in bankruptcy which included adverse matters and warrants close examination. Like FTX, Cryptopia exchange provided intermediary custodial exchange services holding customers digital assets in omnibus pools managed via a ledger and the platform allowed customers to trade with each other. Its terms did not assert Cryptopia held ownership to the custodial assets but rather considered title of crypto-assets remained with the seller until it was transferred to a buyer.

### United States

In *Re Celsius Network LLC,* No. 22-10694 (Bankr. S.D.N.Y) the Bankruptcy Court upheld digital assets held in 'Custody Wallets' and 'Withhold Wallets' on behalf of customers are not property of the debtor's estates under the Bankruptcy Code. *See Id.,* 'Order Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts', Docket 1767 (the **"Withdrawal Order"**). This followed the debtor's motion (*Id.*, Dkt. 670) and hearing on December 7, 2022 advocating support for customer ownership of their

[114]

own assets. The Judge accepted the basis for relief that withdrawable assets are property of the customers (*Withdrawal Order*, §27):

> "Absent a contrary legal or regulatory framework (such as the recording system governing the transfers of real property), courts look to the intent of the parties as evidenced in a written agreement. *See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010)* (holding that, as a general matter with respect to contracts, the intent of the parties controls); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985)* (same); *The Elgee Cotton Cases, 89 U.S. 180, 186 (1874)* (applying intent of parties doctrine to question of transfer of title). Here, the parties entered into a contractual arrangement governed by clear terms of use and under which the parties have a consistent course of dealing, so those terms govern the parties' relative rights. Under New York law, which governs the Latest Terms of Use, contracts are interpreted and enforced in accordance with their plain meaning and clear and unambiguous terms.[36] The ultimate objective in interpreting an agreement is to determine "the intention of the parties as derived from the language employed."[37] Here, the ownership and title to the Custody Assets should be determined by the parties' respective contractual rights, as articulated in the Latest Terms of Use, which are clear and provide ample evidence that the parties' intent was that the title and ownership of Custody Assets remain with the customers, and that title and ownership of assets in the Earn Program and the Borrow Program are held by the Debtors."

In Celsius the latest and relevant Terms of Use expressly provided that property title and ownership of Custody Assets remain with the customer at all times. The relevant section of the Terms of Use repeated here bear striking similarity with the provisions in the FTX.com 'Digital Asset' Terms:

> "**Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius**. Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you, except as required by valid court order, competent regulatory agency, government agency or applicable law. As title owner of assets, you bear all risk of loss. Celsius shall have no liability for any Digital Asset price fluctuations or any or all loss of Digital Assets. Notwithstanding the foregoing, Celsius may suspend

---

[36] *See, e.g., In re Condado Plaza Acquisition LLC,* 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020); *see* Latest Terms of Use, at §33 (providing that New York law governs).

[37] *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 825 (Bankr. S.D.N.Y. 2010) (quoting *Tom Doherty Assocs. Inc. v. Saban Entm't Inc.*, 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994)).

[115]

your access to Services, including the Custody Service and your access to a Custody Wallet, in the event of market disruptions or periods of volatility. Celsius or a Third Party Custodian controls the private keys to the Blockchain addresses of all Custody Wallets. Celsius will use reasonable care and commercially reasonable efforts in connection with the Custody Service to store and secure Eligible Digital Assets in a Custody Wallet. You understand that your use of the Custody Service, whether provided by Celsius or a Third Party Custodian, does not create a fiduciary relationship between you and Celsius or any Third Party Custodian. Neither Celsius nor any Third Party Custodian has any fiduciary duty to you. Celsius has no duty to inquire into, supervise, or determine the suitability of any transaction you initiate involving Eligible Digital Assets in a Custody Wallet. Eligible Digital Assets in a Custody Wallet may be comingled with the Eligible Digital Assets of other Users, and Celsius is under no obligation to return the actual Eligible Digital Assets initially transferred by you to a Custody Wallet, but will return Eligible Digital Assets of the identical type reflected in your Celsius Account at the time you request such a return".

(emphasis added)

The unambiguous intent was for customers to retain title to digital assets held by Celsius through its custodial service. Just like at FTX.com. All such user assets were commingled and under the Celsius Terms of Use customers were entitled to the return of the same type of digital asset being that the comingling would not return their specific digital assets (which aligns with the principals of transactions on the blockchain that create new crypto-assets for each transfer leaving old transfers obsolete).

The *Celsius* case also delivered an alternative judgment for customers' digital assets deposited to 'Earn Accounts' where the asset was used as collateral or to earn rewards. Again, the Terms of Use were unambiguous and provided property title and ownership of those assets were transferred to the Celsius for performance of the reward program, and thereafter the debtor's estate:

"In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service ... and the use of our Services, **you grant Celsius ... all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or**

[116]

**otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.** You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise rights of ownership;

2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

3. **In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws."**

(emphasis added)

The court provided Opinion (*Id.*, 'Memorandum Opinion and Order Regarding Ownership of Earn Account Assets', Docket 1822) which certified assets in Earn Accounts were presumptively the property of the estate. The Judge dealt with the legal standing to find the Terms of Use unambiguously transferred "all right and title" to those assets "including ownership rights" deposited into Earn Accounts from the customers to the debtors.

In *BlockFi Inc., et al,*. No. 22-19361 (Bankr. N.J.) the Bankruptcy Court reached a similar conclusion to *Celsius* custody accounts finding with the debtors in support of the applicable terms of service that customers' digital assets held in custodial wallets belonged to customers. The terms for custody accounts provided that "title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi.". Just like at FTX.com. Here, like *Celsius*, it was the debtors demonstrating great probity who claimed they "have no legal or equitable interest in cryptocurrency that was present in the Wallet Accounts as of Platform Pause, and clients should be

[117]

able to withdraw such assets from the platform if they choose.". *See BlockFi*, Withdrawal motion Dkt. 121; Hearing Audio Dkt. 848, and related transcript Dkt. 853.

However, the *BlockFi* digital assets broadly remain identifiable in the custodial wallets, though as already mentioned, the legal analysis necessary determine who owns the asset does not turn on whether the asset remains wholly intact. (The court does not need to physically see the stolen vehicle to establish ownership from material evidence presented to it pertaining to the legal owner). In FTX, the crypto-tokens remain intact and identifiable albeit the underlying crypto-coins have largely been misappropriated by the Debtors and Estate, though for the reasons already discussed, the coins are fungible property which could be returned to the omnibus pools by the Debtors who hold the proceeds of sale from seized assets and other recovered investments and assets acquired using misappropriated customer property. Thus, especially due to the fraud, the question of property ownership and entitlements can legitimately be divorced from the separate matter of tracing fungible assets.

Last to mention that FTX differentiates itself from both *Celsius* and *BlockFi* in that the Platform only offered customers a single custodial Account on the exchange whereas *Celsius* and *BlockFi* variously offered separate 'accounts' for *custody* and *earning* reward with separate terms of service, and where the 'earn' terms allowed the company to use the assets as it saw fit. This was not the case at FTX.com which did not offer specific 'earn' accounts, although customers could gain reward from either delegating their assets for proof-of-stake validation or lending them to other customers but significantly was not dependent on the efforts of FTX to use, hypothecate or rehypothecate their assets to generate that reward. At FTX.com, customer assets always remained in their Account and the Terms stated property title at all times remained with the customer.

[118]

## TRUST

A trust can come into existence in any manner, by express arrangement, by contract, by a unilateral declaration, by operation of law and also by oral declaration. E.g. *Cahlan v. Bank of Lassen County*, 11 Cal. App. 533 [ 105 P. 765]. ("Any words which indicate with sufficient certainty an intention or purpose to create a trust will be effective in so doing, without the use of the words trust or trustee.").

To determine whether the Digital Assets were held in trust by FTX as trustee on behalf of the Affected Customers as beneficiaries, the key question under common law is whether the following "three certainties" were satisfied:

(1) *Certainty of intention*: Was there a clear substantive intention, based on an objective assessment of the express and implied provisions of the Terms of Service and related representations (the extrinsic evidence), that FTX as custodial intermediary held specified crypto-tokens or crypto token entitlements (the Customer Pegged Assets) on trust for its customers?

(2) *Certainty of objects*: Was there sufficient identification of the customers who were the beneficiaries of the trust?

(3) *Certainty of subject matter*: Was there sufficient identification of the crypto-tokens or crypto token entitlements constituting the things that were the subject matter of the trust?

The **certainty of intention** was chiefly established in the provisions for 'Digital Assets' set out in the Terms: (A) "**Title** to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the **owner** of Digital Assets in your Account, you shall bear all risk of

[119]

loss of such Digital Assets"; (B) "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as **belonging** to FTX Trading"; (C) "you may withdraw **your** Digital Assets"; and at §8.2.11 (D) "You hereby represent and warrant to us that any Digital Asset used by you in connection with the Services (including any Digital Assets used to fund your Account) are … **owned** by you"; and at §9.1 (E) "as **Trustee** of Assets in your Account" and "FTX Trading, as **Trustee**, will hold the Assets in your Account on your behalf…". These provisions, as far as can be seen, provide intention of a trust arrangement where the trustee holds property, which is agreed does not belong to the trustee, for the benefit and on behalf of the beneficiaries. The specific provisions and general terms do use the words "belonging", "own", "your", "trustee" and "title" which in the context compel a conclusion in favor of the recognition of the customers' beneficial and proprietary interest in the crypto-tokens or crypto-token entitlements. Moreover, extrinsic evidence included in the Safeguarding Policy which expressly labelled the customers digital assets as being "safeguarded", held "in custody", and "in trust" and FTX, BANKMAN-FRIED and other FTX executives invariably represented customer assets were "safeguarded" and held in "custody".

Further, and additionally, building upon the title provisions in the Terms, there was no intention that FTX should have free use of customers' digital assets which would be fatal to the creation of a trust. Here, the Terms providing (1) "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading" and (2) "[the customer] controls the Digital Assets held in [their] Account". And the Terms were void of any express provisions which would have bound customers' digital assets in bankruptcy. (Further noting the Safeguarding Policy expressly stated customer assets were "safeguarded", "held in trust", and "protected from third-party creditors").

[120]

Also, the related criminal and civil convictions for wire fraud found FTX executive guilty of misappropriating customers' property which highlights judgment by the US Government, SEC, CFTC, and Courts in S.D.N.Y. over the absence of any free use to customers' digital assets. (Noting that if FTX did have free use to customer property which allowed that property to be used for other purposes without permission then it would unlikely qualify as 'misappropriation' in the legal sense). Consequently, it weighs in favor for certainty of intention that there were no general provisions in the Terms which supported FTX, in the role of custodial holding intermediary and provider-only of the exchange and trustee of customer property, to have unfettered access and free use of crypto-tokens or crypto token entitlements belonging to the Affected Customers. See *Pearson & Ors. v Lehman Brothers Finance SA* & Ors [2010] EWHC 2914 (Ch) at §258. (It was noted free use was a "powerful contra-indication" to the recognition of a trustee/beneficiary relationship).

The **certainty of objects** was established for customers identified by KYC validation checks and by their Accounts which held interest in crypto-tokens and crypto-token entitlements that remain sufficiently identifiable on the Platform and in concert with the Exchange Ledger.

The **certainty of subject matter** to identify the crypto-tokens and crypto-token entitlements was adequately established in customer Accounts and the Exchange Ledger. Where fungible assets were held in custodial wallets commingled with other customer holdings the entitlement is identified by the associated crypto-token balance held in the customer Account.

It is necessary to pause and consider the relevance of the "allocation principle" of fungible property in which it might be considered that property rights cannot be acquired in fungibles forming

an unidentified part of a bulk until they have been separated by some suitable act of appropriation[38].
Identifying distinguishing characteristic between fungible things, to set one apart from another, is an
impossible task given, for cryptocurrencies at least, they are indistinguishable and completely
interchangeable.  Here, factually 1 BTC = 1 BTC.  Consequently the "allocation principle" is
unnecessary and inapplicable to achieve subject matter certainty.  In support there is the leading
decision of the Court of Appeal in *Hunter v Moss* [1994] 1 WLR 452 which established that property
rights can arise in an unidentified part of a specified quantity or bulk of assets that are intangible where
such assets are necessarily indistinguishable from each other.  Interpreting here that the complete
interchangeability of these types of assets renders the allocation principle a pointless exercise when
trying to achieve certainty of one particular coin from within an omnibus pool of identical and
interchangeable coins.  And, as regards the circumstances in which a trust will be found to exist, the
guiding principles were summarized in *Pearson v Lehman* by Briggs J at §225 in ten numbered legal
principles (i) to (x), wherein (iii) stated "A trust of part of a fungible mass without the appropriation
of any specific part of it for the beneficiary does not fail for uncertainty of subject matter, provided
the mass itself is sufficiently identified and provided also that the beneficiary's proportionate share of
it is not itself uncertain".  This collective reasoning was applied in *Ruscoe v Cryptopia Limited (in
liquidation)* already mentioned.

There is perhaps another legal interpretation which might apply in *Hunter v Moss*, albeit
seemingly unsupported by any related crypto cases, that perhaps characterizes customer interests in

---

[38] R Goode, "Ownership and Obligation in Commercial Transactions" (1987) 103 *Law Quarterly Review* 433, 436. See also V Dixon,
"The Legal Nature of Intermediated Securities: An Insurmountable Obstacle to Legal Certainty?" in L Gullifer, J Payne,
*Intermediation and Beyond* (2019) p 64. This principle applies both to legal and equitable property claims, to absolute transfers and
the grant of security interests: L Gullifer, *Goode and Gullifer on Legal Problems of Credit and Security* (7th ed 2022) para 6.19; M
Yates, G Montague, *The Law of Global Custody* (4th ed 2013) para 3.27.

the omnibus pools as rights of co-ownership in an equitable tenancy in common over the entire pool. This would convey customers co-ownership rights to a proportionate entitlement of the fungible assets held in the pool, though given the intention of FTX was to safeguard and maintain an equal relationship of custodied assets 1:1 between pegged coins and crypto-tokens held in Accounts (the omnibus pool reconciliation), the customer entitlement would, in principle, deliver the same amount of fungible assets in either scenario. Of course, *but-for* the misappropriation and fraud. And presently *but-for* the subsequent sell-off of retained digital assets by the Debtors which have drained the omnibus pools. Although, as mentioned, the combined proceeds from the crypto sell-off, recovery of liquid, less liquid, and illiquid assets, much of which was acquired with misappropriated customer property, could be used to replenish the omnibus pools with new fungible assets and any shortfall thereafter perhaps converted into transferrable equity in retained illiquid investments, such as Anthropic, or equity tokens in FTX with value transferred to a reborn FTX exchange.

Notwithstanding, the "three certainties" required by common law establish that a valid trust arrangement was created for customers (beneficiaries) and their Digital Assets were held in custody in their Accounts, and in the custodial wallets, by FTX (trustee) as the custodial holding intermediary. With specificity, an individual trust was created for the benefit of a holder of a particular type of crypto token with the result that the token holder was the sole beneficiary. Or in the alternative interpretation of *Hunter v Moss*, one trust was created for the benefit of all holders of a particular crypto token with the result that all token holders were co-beneficiaries of the same trust. The trust would have come into effect when Affected Customers agreed to the May 2022 Terms of Service (*see* 'Terms of Service' above). A trust would not have been created for any Dormant Customers, as they might exist, who did not agree to the updated Terms.

[123]

The creation of a trust is a matter which is not, in principle, usurped or broken merely because of the fraud. Affected Customers' Digital Assets remain identifiable by the crypto-tokens still held in customer Accounts. In *Pearson v Lehman* the legal principles at (iv) confirmed "A trust does not fail for want of certainty merely because its subject matter is as present uncertain, if the terms of the trust are sufficient to identify its subject matter in the future". (Holding that the crypto-tokens or crypto-token entitlements held in trust were misappropriated by FTX and presently are missing from the omnibus pools but could be returned by the Debtors' acquiring replacement fungible assets).

There is good case law from across the common law world which supports that crypto token intermediated holding arrangements can be structured as trusts.

*Ruscoe v Cryptopia Limited (in liquidation)* [2020] NZHC 728, already discussed, and having great similarity to FTX.com, the New Zealand High Court held that cryptocurrencies are a form of "property" for the purposes of company law, and that the terms of service similar to FTX.com. And in common with FTX.com's Terms of Service, there was no provision in Cryptopia's terms of trade that attempted to make customers subject to the risk of Cryptopia becoming insolvent and going into liquidation. The Judge was awake to the impact of a judgment that property belonged to customers would remove it from the estate and impact upon the consequential distribution to other creditors (*Id.*, §§50-60). Nevertheless, the Judge deliberated extensively on the matter of whether any or all of the digital assets held on the cryptocurrency exchange and in omnibus pools were on trust for customers. *See Id.*, §§134-187. ("[W]hether by way of express, implied, resulting, constructive, Quistclose trust or otherwise."). In conclusion, the Judge found "the various cryptocurrencies were at equity held on separate express trusts by Cryptopia for all of the accountholders" and consequently the assets did not form part of the bankruptcy estate.

[124]

In *Quoine Pte Ltd v B2C2 Ltd [2019]* SGHC(I) 03 (14 March 2019)*; Quoine Pte Ltd v B2C2 Ltd* [2020] SGCA(I) 02 (24 February 2020), already discussed, it was determined in the Singapore High Court that Bitcoins could be the subject of a trust, and hence were property. The Judge found that Quoine held the BTC on trust for B2C2 on the basis that the "three certainties" had been fulfilled, namely, certainty of subject matter, certainty of objects and certainty of intention to create a trust. First, the Judge held that there was certainty of subject matter because cryptocurrency should be treated as property that was capable of being held on trust, on the basis that it satisfied the definition of a property right in *National Provincial Bank v Ainsworth* [1965] 1 AC 1175 ("Ainsworth") at 1248, in that it was definable, identifiable by third parties, capable in its nature of assumption by third parties, and had some degree of permanence or stability. In any case, the Judge noted, Quoine did not dispute this (Judgment at [142]). Second, the Judge found that there was certainty of objects, given that the beneficiaries were identifiable from the individual accounts of the users of the Platform (Judgment at [143]). Third, the Judge found that there was certainty of intention, based on the fact that the users' assets were managed separately from Quoine's own assets, thereby indicating that Quoine intended to hold the assets of an individual user on trust for that user (Judgment at [145])

In *Zi Wang v Graham Darby* [2021] EWHC 3054 (Comm), already referred, it was determined the cryptocurrency, Tezos (XTZ), was personal property capable of being the subject of a trust notwithstanding it has an entirely fungible character and non-identifiable status – no single unit bears any unique serial number of means of identification.

[125]

## RELATED CASES

I am cautious about citing live court proceedings in lieu of final judgment or sentencing, though in the circumstances given the below related cases are part and parcel of the post-collapse FTX ecosystem it is relevant to be awake to progress in the criminal and civil fraud cases.

**Civil Cases**

In *Securities and Exchange Commission v. Bankman-Fried, 22 Civ. 10501, (S.D.N.Y.)* (the **"Civ.1 Case"**), filed on December 13, 2022, the SEC alleges wrong-doing against BANKMAN-FRIED as sole defendant in the matter.

In *Commodity Futures Trading Commission v. Bankman-Fried, 22 Civ. 10503, (S.D.N.Y.)* (the **"Civ.2 Case"**), also filed on December 13, 2022, the CFTC alleges wrong-doing by "Samuel Bankman-Fried, FTX Trading Ltd d/b/a FTX.com, and Alameda Research LLC", though the original complaint was later amended on December 21, 2022 naming two additional defendants, ELLISON and WANG, whom, on December 20, 2022, pled guilty to all charges and admitted the allegations in the CFTC complaint as true. Consent Orders of Judgment on Liability were issued by the Court (ECF Nos. 25, 26).

In *Securities and Exchange Commission v. Caroline ELLISON and Zixiao "Gary" WANG, 22 Civ. 10794, (S.D.N.Y.)* (the **"Civ.3 Case"**) filed on December 21, 2022, the SEC alleges the same wrong-doing against ELLISON and WANG as expressed in Civ.1 Case. (All the above civil cases collectively the **"Civil Cases"**). Both ELLISON and WANG pled guilty to the charges and admitted the allegations in the SEC complaint as true (ECF Nos. 15, 16).

[126]

The United States Government intervened such that the Civil Cases are presently stayed pending the outcome of the Criminal Case. The reason for the stay, in part, is explained that the cases overlap and "involve nearly identical facts" (Civ.2, Dkt. 33, at §B.1) including "the scheme to defraud FTX.com customers" and "misappropriating FTX.com customer funds".

The CFTC complaint (Civ.2, Dkt. 1) makes various references to "customer assets" which language provides explicit understanding that customer assets were held in "custody", "misappropriated", and belonged to FTX customers, including:

"5. … **FTX customers deposits, including fiat currency and digital assets** such as bitcoin (BTC), ether (ETH) and tether (USDT), each a commodity in interstate commerce, that **were intended to be** used for trading or **custodied on FTX**, were regularly accepted, held by and/or misappropriated by Alameda for its own use."

"8. … These **unauthorized uses of customer assets** were not disclosed to or known by FTX customers."

"9. Throughout the Relevant Period, Defendants, through a web of subsidiaries, affiliates and other related entities collectively constituting the FTX Enterprise, **misappropriated customer assets** for their own use and benefit."

"51. … Alameda accessed and **used FTX customer assets** for Alameda's own operations and activities, including to fund its trading, investment and borrowing/lending activities. **Alameda's use of FTX customer assets included** both customer fiat deposits that were sent to Alameda-owned bank accounts and **customer digital asset deposits and holdings** that Alameda accessed via the unbounded withdrawal capabilities of its FTX account."

"52. The **use of customer assets** by Alameda **was not authorized by FTX customers**, and **FTX customers were not made aware that their assets** were being used by Alameda. To the contrary, FTX's Terms of Service expressly prohibited such use of **customer assets**. Specifically, Section 8.2.6 of the FTX Trading Terms of Service …"

"55. Such statements about **the treatment and custody of customer assets** include misstatements that Bankman-Fried and others made and/or caused to be made to the U.S. Congress, the CFTC and/or other federal and state government agencies, investors and in public venues such as Twitter."

[127]

"57. Contrary to such representations and without disclosure to FTX customers, Alameda and FTX commingled assets and **freely used FTX customer assets <u>as if they were their own</u>**, including as capital to deploy in their own trading and investment activities. ..."

"66. Defendants were aware of and participated in facilitating the foregoing privileges afforded to Alameda, both with respect to Alameda's advantages in its activity on FTX and with respect to Alameda's ability to withdraw and **<u>misappropriate</u> FTX customer assets**."

"75. In approximately May and/or June 2022, Alameda was subject to a large number of such margin calls and loan recalls. It did not have sufficient liquid assets to service its loans. Instead, at the direction and/or under the supervision of Bankman-Fried and ELLISON, **Alameda greatly increased its usage of FTX customer assets** to meet its external debt obligations. Alameda was able to rely on its undisclosed ordinary-course access to FTX credit **and customer assets** to facilitate these large withdrawals, which were several billion dollars in notional value. Defendants were aware of and/or responsible for **this <u>misappropriation</u> of FTX customer assets**."

"94. Bankman-Fried, ELLISON and other key personnel of FTX and Alameda acknowledged internally that this shortfall was not merely a matter of having sufficient liquid assets on hand to cover customer withdrawals in the short term; rather, **FTX customer assets were irrevocably lost because Alameda had <u>misappropriated</u> them**."

"101. On information and belief, this and other tweets posted by Bankman-Fried on November 7-8, 2022 were intended to dissuade FTX customers from requesting to withdraw **their assets** from Defendants' exchanges."

"107. ... ELLISON acknowledged that earlier that year, she, Bankman-Fried and other individuals had **decided to use FTX customer assets to pay Alameda's debts**, and that WANG and another FTX executive were aware of this. ... ELLISON informed Alameda staff that FTX had "always allowed" Alameda to **<u>borrow customer assets</u>**, and did not require collateral for **those loans**. She also explained that Alameda could access **user assets** without requiring FTX's approval as the "structure" allowed Alameda to "go negative in coins.""

(Emphasis added)

The SEC's civil cases largely repeat the CFTC arguments made in each complaint (Civ.1 (BANKMAN-FRIED), Dkt. 1; Civ.3 (ELLISON/WANG), Dkt. 1) with various references to "customer assets", including:

"2. ... Customers around the world believed his lies, and sent billions of dollars to FTX, believing **their assets** were secure on the FTX trading platform. But Bankman-Fried and WANG improperly diverted **customer assets** to Alameda Research LLC and its subsidiaries ("Alameda"), the crypto asset hedge fund that they had founded and co-owned and that ELLISON ran. WANG created and participated in the creation of the software code that allowed Alameda to divert FTX customer funds. ELLISON, in turn, used the **misappropriated FTX customer funds** for Alameda's trading activity. And Bankman-Fried used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations."

"5. ... Despite the fact that Alameda had, by this point, already taken billions of dollars of FTX **customer assets**, it was unable to satisfy its loan obligations. Bankman-Fried, with Defendants' knowledge, directed FTX to divert billions more in **customer assets** to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. ELLISON then used FTX's **customer assets** to pay Alameda's debts."

"37. ... Bankman-Fried and WANG thus gave Alameda and ELLISON *carte blanche* to use FTX **customer assets** for Alameda's trading operations and for whatever other purposes Bankman-Fried and ELLISON saw fit. In essence, Bankman-Fried and WANG placed billions of dollars of FTX **customer funds** into Alameda."

(Emphasis added)

**Criminal Case**

In *United States v. BANKMAN-FRIED, 22 Cr. 673 (S.D.N.Y.)* (the "**Criminal Case**") the superseding indictment (Dkt. 115) charged BANKMAN-FRIED with thirteen counts of fraud related to his part in the operation of the FTX exchange and other cryptocurrency companies he founded and controlled. A further superseding indictment (Dkt. 202) reduced the count to seven counts.

The Cr. Case also included seven felony charges against ELLISON in *United States v. CAROLINE ELLISON, 22 Cr. 673 (S.D.N.Y.)* Dkt. 8 and in *United States v. ZIXIAO (GARY) WANG, 22 Cr. 673 (S.D.N.Y.)* Dkt. 6, four felony charges are asserted against WANG. On December 19, 2022, defendants ELLISON and WANG waived indictment, consented to the filing of a Superseding Information, and pleaded guilty to each of the respective counts with which they were charged,

[129]

including to commit wire fraud on FTX customers. The wire fraud charges are relevant since they determine wrong-doing "for obtaining money and *property*" by misappropriating customer assets.

The Government's Memorandum in Opposition provided submission regarding the ownership of customer assets (ECF 149, at pp. 17-21) when discussing the "in connection with" limb to alleged violations of the Commodities Exchange Act. For convenience, I have repeated them here as they are of particular interest to the instant matter:

> *"First*, as alleged, **a portion of the customer deposits that were fraudulently misappropriated by the defendant were commodities, namely cryptocurrencies like bitcoin**. *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 227 (E.D.N.Y. Mar. 6, 2018) (holding that CFTC properly alleged fraud related to misappropriation of victims' virtual currency, which the court classified as a commodity, and recognizing that the CFTC has anti-fraud authority under Section 6(c)(1) of the CEA and Rule 180.1 in connection with spot transactions "not directly involving future trades"). The defendant describes the object of the scheme as the misappropriation of "FTX customer *fiat* deposits for Alameda's use" (Dkt. 141 at 6) (emphasis added), but that ignores that **customers made cryptocurrency deposits meant to be credited to their FTX accounts that were misappropriated** as well (Indictment ¶¶ 21-24). The Government expects that the evidence at trial will show that at the defendant's direction, Alameda removed customer funds from the FTX platform in a variety of ways, including by accruing an undisclosed negative balance in bitcoin through Alameda's trading activity and transferring customers' bitcoin off the exchange to pay Alameda's expenses. Thus, as in *Zandford*, "the [commodities] transactions themselves," specifically FTX customers' transfers of **their crypto assets** to the platform, "'enabled [the defendant] to convert the proceeds . . . to his own use." (Dkt. 141 at 6 (quoting *Zandford*, 535 U.S. at 820))."

> *"Second*, even those customers who deposited fiat currency on the FTX exchange were induced to do so **for the purpose of trading commodities**, such as bitcoin, and crypto-based derivatives, such as swaps. (Indictment ¶¶ 10, 11, 21). As alleged, the defendant's false claims that FTX would facilitate commodities and swap transactions with an eye toward "consumer protection," "avoiding or managing conflicts of interest," and "segregat[ing] customer assets from its own" (Indictment ¶ 2), were central to his gaining access to the customer funds that he misappropriated and, by extension, to the success of the fraud. *See CFTC v. Royal Metals Grp., LLC*, No. 18 Civ. 8407 (JMF), 2019 WL 1996307, at *7 (S.D.N.Y. Jan. 25, 2019) (commodities fraud scheme where defendants "misappropriated their Clients' funds" intended for the purchase of precious metals); *see*

[130]

*also Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110-11 (2d Cir. 1986) (holding that broker's misrepresentations relating to the "degree of risk" of commodities investing were made "in connection with" commodity futures contracts, under an analogous section of the CEA, 7 U.S.C. § 6(b) and noting that the "legislative history of the CEA indicates a congressional awareness that fraudulent conduct can occur during the solicitation of commodities accounts"); *CFTC v. Vartuli*, 228 F.3d 94, 101-02 (2d Cir. 2000) (misrepresentations regarding the effectiveness of a computer program advertised to make investment recommendations were made "in connection with" commodities contracts under 7 U.S.C. § 6(b)); *see also In re J.P. Jeanneret Associates, Inc.*, 769 F. Supp. 2d 340, 363 (S.D.N.Y. 2011) (holding that SEC Rule 10b-5's "in connection with" requirement "can be satisfied in circumstances . . . where the plaintiffs part with money intending that it be invested in securities, only to have the person to whom that money is entrusted steal it") (citing cases)."

"The defendant and his co-conspirators offered customers a facility for the purpose of buying and selling commodities and derivatives, and—as alleged—made false representations about the risks associated with the exchange and the security of their funds to induce customers to part with their trading capital, to engage in commodities trading on the exchange, and not to withdraw their funds. (Indictment ¶¶ 2, 11, 21, 24, 34, 54). This case thus resembles *Royal Metals Grp.*, 2019 WL 1996307, at *2, in which Judge Furman entered a default judgment under Rule 180.1 against defendants who "misappropriated their Clients' funds" intended for the purchase of precious metals, including by falsely claiming that their business provided a "safe and secure online environment to make precious metal investments.""

"Nor did the defendant's fraudulent conduct cease at the solicitation stage. In order to ensure that customers would continue to trade crypto and swaps on his platform, and thus, unknowingly, provide the capital to fund Alameda's speculative investments and leveraged borrowing, the defendant continued his pattern of material omissions, lies and half truths, loudly and publicly extolling the safety of FTX and its separation from Alameda. *See United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006) (scheme to defraud extends to those who are misled in assessing whether to "hold or sell" their investments)."

"*Finally*, in many instances, the defendant accomplished **the misappropriation by using customer assets** to engage in commodities and swap transactions for the benefit of Alameda, rather than for the benefit of the customers **to whom those assets belonged**. (E.g., Indictment ¶¶ 10, 22) ..."

There is no doubt which side of the fence the Government takes in the matter of who owned

FTX customer assets. Notably, the Government highlights the purpose and intention of the FTX

exchange was for customers to deposit and trade in cryptocurrencies so the fact customer fiat deposits and cryptocurrency transfers were intercepted and used for other purposes, or that digital assets held in custodial wallets were raided, does not dimmish from the consideration that customers believed the crypto token balances shown in their Accounts and that these crypto-tokens and crypto-token entitlements belonged to the customer and could be withdrawn at any time (as was the case up until the collapse).

On June 27, 2023, Judge Kaplan delivered his Memorandum Opinion (Corrected) (Dkt. 170) which rejected all the defendant's motions to dismiss indictments. In terms of the indictments related to defrauding FTX customers the Judge considered "… the indictment sufficiently alleges a scheme to defraud, an object of which was obtaining customer funds, which plainly constitute both "money" and "property" within the meaning of Section 1343" and the defendant's claim customers suffered no economic loss "is wrong both factually and as a matter of law".

It is striking that the Court's legal analysis applied in the criminal and Civil Cases are unified adding to the consensus that customer funds, deposits, and digital assets held on the Platform are the customers' property. The contrary position would otherwise mean customer assets belonged to the Debtors and such analysis would significantly alter the landscape in all proceedings.

In Sum, in the legal sense, 'misappropriation' is the unauthorized or improper use of someone else's property or funds, usually for personal gain or advantage. Both the Civil Cases and Criminal Case describe the facts to include misappropriation of customer assets which language frames legal analysis and recognition by both CFTC and SEC that 'customer assets' were the 'property' of FTX customers. Moreover, the admission of guilt by ELLISON, WANG, SINGH and SALAME in the Civil Cases and ELLICON and WANG in the Criminal Case without seeking to dispute the property

[132]

status or that customer assets were not the lawful property of FTX customers (which issue held substantial weight in the complaint) underlines that the matter of property ownership was uncontested with all parties accepting the customer assets belong to the FTX customers. The guilty verdict delivered in the Criminal Case to BANKMAN-FRIED puts the matter beyond reasonable doubt given the necessarily high bar which is required in a jury trial to convict.

## SUMMARY

In summary, (1) The Terms of Service is plainly written and unambiguous for Digital Assets with ultimate (legal, equitable, and beneficial) title remaining with the customer. Terms of Service, **§8.2.6.** "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading". A basket of robust extrinsic evidence supports the Terms which clarifies via policy and public representations and intentions made by FTX over the custody of Digital Assets, and as customer property held in trust. Thus, the Digital Assets belonging to Affected Customers does not form part of the Estate. (2) There is perfect fungibility between digital assets – as with fiat currency – which ensures the *exact* digital asset *does not* need to be identified for the asset to be returned to the Affected Customer, 1 BTC = 1 BTC. The omnibus pools can be reconciled against crypto-tokens held in customer Accounts (just as when FTX was a going concern), and fungible crypto-coins underlying the crypto-token entitlements can be acquired by the Debtors if there is a shortfall to enable Affected Customers' property to be returned. Assets held-in-possession by the Debtors that were acquired through the fraudulent transfer of customer property should be used to repopulate the omnibus pools. In the event the Debtors cannot recover sufficient liquid assets to replenish adequate Digital Assets to return Customer Property *in specie* to Affected Customers then alternative discussions should be held with relevant stakeholders including carrying recovery over to a reborn FTX2.0 exchange.

[133]

I respectfully request that the Court pursuant to the Court's own equitable powers accept this submission to find and determine as follows:

(A) That FTX as custodial intermediary was holding Digital Assets belonging to Affected Customers in a trust arrangement and Customer Property is not property of the Estate.

(B) That FTX as custodial intermediary was holding Digital Assets belonging to Affected Customers enrolled in staking services in a trust arrangement and is Customer Property not property of the Estate.

(C) Rejects the Debtors proposed Joint Plan of Reorganization which wrongfully includes Customer Property in the Estate and proposes disbursement of Customer Property which is not property of the Estate.

(D) Rejects the Debtors proposed Motion to value Customer Property in fiat currency for the purpose of furthering the invalid Joint Plan of Reorganization which includes Customer Property in the Estate and proposes disbursement of Customer Property which is not property of the Estate.

(E) Provides any such other and further judgment as this Court deems appropriate and proper under the circumstances.

[134]

Dated: January 11, 2024
      Bourne End, United Kingdom

Simon Carter

_____

Unit F Bourne End Business Park
Cores End Road
Bourne End, Buckinghamshire. SL8 5AS
United Kingdom
Telephone: (01628) 824900
Email: simon.carter@modulesolutions.com

[135]

**EXHIBIT A**

FTX.COM
**TERMS OF SERVICE**
MAY 13, 2022

FILED

2024 JAN 12  PM 3: 04

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

**FTX TERMS OF SERVICE**

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)     the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)     the FTX Application Programming Interface (**"API"**); and

(C)     any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

(together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)     FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)     Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.      **STRUCTURE OF TERMS**

1.1     The Terms comprise:

1.1.1     the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2    the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our <u>Privacy Policy</u>, <u>Security Policy</u> and <u>Fee Schedule</u> (**"FTX Policies"**); and

1.1.3    the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2    To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, <u>Fee Schedule</u>, <u>Privacy Policy</u>, <u>Security Policy</u> and other FTX Policies.

1.3    **IMPORTANT:** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

2.    **RISK DISCLOSURES**

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1    **No advice and no reliance**

2.1.1    FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2    You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3    FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2    **Digital Asset transfers and volatility**

2.2.1    Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

2.3    **Supply and value of Digital Assets**

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

2.4    **Margin trading**

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below) (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

2.5    **Complex products**

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3    USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4    FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

## 2.6    Blacklisted addresses and forfeited Assets

2.6.1    FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2    In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

## 2.7    Software protocols and operational challenges

2.7.1    The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2    You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3    You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4    Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

2.7.5    Digital Assets depend on the availability and reliability of power, connectivity, and hardware.  Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

2.8    **Compliance**

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

2.9    **Legislative and regulatory changes**

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

2.10    **No deposit protection**

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

2.11    **Digital Asset Distributions not supported**

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

2.12    **Reliance on third parties**

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

3.    **APPLICABLE LAWS AND REGULATIONS**

3.1    **Compliance with Applicable Laws**

3.1.1    You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2    Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

3.2 **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3 **Export controls**

3.3.1 The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A) you are in a prohibited jurisdiction as set forth at Location Restrictions (**"Restricted Territories"**);

(B) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C) you intend to transact with any Restricted Territories or Restricted Persons;

(D) you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E) the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2 We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4. **ELIGIBILITY**

4.1 In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1 If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2 If you are registering to use the Services on behalf of a legal entity, then:

(A) you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B) the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C) the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3    You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4    You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5    You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6    You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2    If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

## 5.    REGISTRATION PROCESS; IDENTITY VERIFICATION

5.1    When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2    In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3    You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4    Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5    If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6    We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

6.      **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1     You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features **("User Credentials and Security Passwords")** made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2     You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3     You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4     FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5     In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.      **ORDER BOOK AND CONVERT**

7.1     FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2     The Convert function on the Platform also allows you to submit instructions ("**Convert Instructions**") to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3    The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4    We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5    You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6    You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7    Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8    Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9    Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10    You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

## 8.    ACCOUNT FUNDING

### 8.1    Funding - General

8.1.1    In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2    You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

8.2 **Digital Assets**

8.2.1 The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2 You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3 The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4 You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5 FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6 All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7 FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8 It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9     You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10    When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11    You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12    It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

## 8.3    Fiat currency

8.3.1    Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2    Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3    E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4    E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5    You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

## 9.    UNCLAIMED OR ABANDONED PROPERTY

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

10.    **DEBIT ACCOUNT BALANCE**

10.1    If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the Fee Schedule; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2    If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3    If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

    10.3.1    you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

    10.3.2    you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

    10.3.3    you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

11.    **THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT**

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

12.    **ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION**

12.1    FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

    12.1.1    refuse to let you open an Account, suspend your Account, or terminate your Account;

    12.1.2    decline to process any instruction or Order submitted by you; and/or

    12.1.3    limit, suspend or terminate your use of one or more, or part of, the Services.

12.2    Such actions will not relieve you from your obligations pursuant to the Terms.

12.3    Such actions may be taken as a result of a number of factors, including without limitation:

13