12.3.1   as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2   as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3   where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4   If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5   Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6   Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7   You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8   We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1   your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2   to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3   you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9   Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10   Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

## 13.   RESTRICTED ACTIVITIES

In connection with your use of the Services, you agree that you will not:

13.1.1   violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2   provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3   infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4   engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

13.1.5    distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6    use a web crawler or similar technique to access our Services or to extract data;

13.1.7    reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8    perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9    take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10    transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11    otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12    transfer any rights granted to you under the Terms;

13.1.13    engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14    engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15    assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

14.    **ELECTRONIC TRADING TERMS**

14.1    FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2    A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3    In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4    We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5    FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6    Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7    The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

## 15.    STAKING

15.1    When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2    The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

## 16.    MARGIN TRADING

16.1    This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3    When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4    Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5    The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

17.    **FORKS AND DISTRIBUTIONS**

17.1    As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2    FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3    If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4    The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5   In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18.   ATTACKS ON BLOCKCHAIN NETWORKS

18.1   FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2   Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19.   SITE; THIRD PARTY CONTENT

19.1   FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2   The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3   We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20.   AVAILABILITY

20.1   We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

20.2    You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3    FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

## 21.    RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES

21.1    We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2    If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

## 22.    UPDATES TO THE TERMS

22.1    We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2    If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

## 23.    FEES

23.1    In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2    On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3    You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

24.     **TAXES**

24.1    You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2    FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25.     **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1    **License**

25.1.1    FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2    Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3    "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2    **API use**

25.2.1    Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2    FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3    FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3    **Third Party Applications**

25.3.1    We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2    If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3    You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4    In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

26.    **PRIVACY POLICY**

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

27.    **CONFIDENTIALITY**

27.1    You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2    You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3    The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1    in the public domain through no breach of the Terms;

27.3.2    known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3    required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4    If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5    Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6    Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7    The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8    The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9    The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

28.    **COOKIES**

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

29.    **INDEMNIFICATION; RELEASE**

29.1    You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2    You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3    You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

30.    **LIMITATION OF LIABILITY; NO WARRANTY**

30.1    NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

30.1.1   FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2   FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3   TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2    SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1   INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2   INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3    YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4    YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1   THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2   THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3   THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

30.5     SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER
         INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS
         AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY
         USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES
         OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS,
         INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET
         ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR
         CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY
         ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING,
         BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR
         ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.    **COUNTRY-SPECIFIC ADDENDA**

       If you are a resident of Australia, Japan, or South Africa, additional terms and conditions
       will apply to your use of the Services as set forth in the Schedules attached hereto.

32.    **COMMUNICATIONS IN ENGLISH**

       The Terms are provided to you and concluded in English. We will communicate with you in
       English for all matters related to your use of our Services unless we elect, in our sole
       discretion, to provide support for other languages.

33.    **FEEDBACK**

       You acknowledge and agree that any materials, including without limitation questions,
       comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative
       materials or other information or commentary you provide to us or one of our social media
       accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you,
       whether by email, posting to the Site or social channels, or otherwise, are non-confidential
       and will become the sole property of FTX Trading. FTX Trading will own exclusive rights,
       including all intellectual property rights, in and to such Feedback, and will be entitled to the
       unrestricted use and dissemination of such Feedback for any purpose, commercial or
       otherwise, without acknowledgment or compensation to you.

34.    **QUESTIONS AND CONTACT INFORMATION**

34.1   We often post notices and relevant Services information in our Telegram channel and on
       our Twitter account, so we advise You to check those channels before contacting support.

       Telegram: https://t.me/FTX_Official

       Twitter: https://twitter.com/FTX_Official

       WeChat: ftexchange

       Blog: https://blog.ftx.com/

34.2   To contact us, please visit one of the links or channels above. For support with your
       Account, you may submit a support ticket at https://ftx.com/support. For legal and media
       inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide
       all relevant information, including your Account username and transaction IDs of any
       related deposits. Although we make no representations or provide no warranties as to the
       speed of response, we will endeavour to get back to you as soon as possible.

35.    **PROMOTIONS**

       FTX Trading does not, as a general rule, participate in promotions without an official
       pronouncement, either on the Site or elsewhere. You shall obtain prior written approval
       prior to releasing any statements, written media releases, public announcements and
       public disclosures, including promotional or marketing materials, relating to the Platform.

36.    **FORCE MAJEURE AND RELIEF EVENTS**

36.1    FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1    any Force Majeure Event; or

36.1.2    any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37.    **ASSIGNMENT AND SUBCONTRACTING**

37.1    You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2    FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38.    **GENERAL**

38.1    **Entire agreement**

38.1.1    You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2    You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3    You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2    **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3    **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4    **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

assigns.

38.5 **Variation and waiver**

38.5.1 Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2 No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

38.6 **No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

38.7 **Set off**

38.7.1 Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2 FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

38.8 **Equitable remedies**

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

38.9 **Third party rights**

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1 the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2 no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

38.10 **Electronic signature**

The Terms may be entered into by electronic means.

38.11 **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12 **Arbitration**

38.12.1 Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2 This arbitration agreement shall be governed by English law.

38.12.3 The seat of the arbitration shall be Singapore.

38.12.4 The language of the arbitration shall be English.

38.12.5 The number of arbitrators shall be one.

38.12.6 Each party agrees that:

(A) any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B) combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7 This agreement to arbitrate shall:

(A) be binding upon the parties, their successors and assigns;

(B) survive the termination of these Terms.

38.12.8 Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13 **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

**SCHEDULE 1**

**DEFINITIONS AND INTERPRETATION**

1.    **DEFINITIONS**

1.1    As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)     acts of God, flood, drought, earthquake or other natural disaster;

(ii)    epidemic or pandemic;

(iii)   terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)    nuclear, chemical or biological contamination or sonic boom;

(v)     any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)    collapse of buildings, fire, explosion or accident; and

(vii)   any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2.    **INTERPRETATION**

2.1    **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1    a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2    a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3    the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4    a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5    a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2    **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

29

2.3     **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1     a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2     a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3     a reference to an individual includes that individual's estate and personal representatives.

2.4     **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5     **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6     **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1     the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2     general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7     **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8     **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

**SCHEDULE 2**

**SERVICE SCHEDULE**

| Specified Service | Spot Market |
| --- | --- |
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion. The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 3**

**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | **Spot Margin Trading** |
| **Specified Service description** | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform. |
| | You may also lend your Digital Assets to other Users who need them to spot trade. |
| | Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement. |
| | The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk. |
| | The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins. |
| | The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion. |
| | Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |

| **Risk disclosures** | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms. |
|---|---|
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

**SCHEDULE 4**

**SERVICE SCHEDULE**

| | |
|---|---|
| **Specified Service** | OTC / Off-exchange Portal (OEP Portal) |
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 5**
**SERVICE SCHEDULE**

| Specified Service | Futures Market |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after. |
| | Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24. |
| | You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins. |
| | **IMPORTANT:** Section 16 of the General Terms applies to this service. |
| | Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors. |
| | In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

35

| | |
|---|---|
| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 6**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (Options Contacts) |
| --- | --- |
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date. |
| | If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies. |
| | You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date. |
| | The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money". |
| | The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration. |
| | Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |
| | If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
|---|---|
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 7**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (MOVE Volatility Contracts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. |
| | MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. |
| | 1.   Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. |
| | 2.   Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. |
| | 3.   Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. |
| | You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

|  | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
|  | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
|  | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

SCHEDULE 8

SERVICE SCHEDULE

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

| | |
|---|---|
| | ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM. |
| | By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account. |
| | If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specific Service. |
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to: |
| | • **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors. |
| | • **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying. |
| | • **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token. |
| | • **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets. |

## SCHEDULE 9
## SERVICE SCHEDULE

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| Specified Service description | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. |

In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of:

- Tomorrow's MOVE Volatility contract
- Next weeks' MOVE contract, and the two weeks after that
- Next Quarter's MOVE contract, and the quarter after that

and

- -1x BTC-PERP (Short)

IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long).

BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk.

YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION

| | |
|---|---|
| | REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.<br><br>BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors.<br><br>By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account.<br><br>If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.<br><br>• **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.<br><br>• **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

|  | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |
|---|---|

## SCHEDULE 10
### SERVICE SCHEDULE

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider. |
| | Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index. |
| | Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. |
| | You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins. |
| | You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform. |
| | You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins. |
| | Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable). |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 11**

**SERVICE SCHEDULE**

| Specified Service | NFT Market |
| --- | --- |
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion.<br><br>Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens.<br><br>NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all.<br><br>NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it.<br><br>While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion.<br><br>You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so.<br><br>There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value.<br><br>NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

|  | PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING. |
|---|---|

**SCHEDULE 12**

**SERVICE SCHEDULE**

| Specified Service | NFT Listing |
|---|---|
| Specified Service description | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| Service Provider | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| Specified Service specific terms (in addition to the General Terms) and risk disclosures | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. |
| | If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail. |
| | Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise. |
| | **Intellectual property** |
| | You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content. |
| | By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates. |
| | You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork. |
| | **Prohibited activities** |
| | You will not: |

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

**SCHEDULE 13**
**SERVICE SCHEDULE**
**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**
**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

---

**1.   FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES**

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a)   your deposit of fiat currency to Digital Assets; and

b)   your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

---

**2.   FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA**

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or financial products.

---

**3.    STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

**4.    YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the *Corporations Act 2001* (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

**5.    DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the *Privacy Act 1988* (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

## SCHEDULE 14
## SERVICE SCHEDULE
## TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

## SCHEDULE 15
### SERVICE SCHEDULE
### TERMS APPLICABLE TO JAPAN USERS ONLY
#### (Updated September 19, 2022)

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are *non-recourse* with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

**別紙 15**

**サービスに関する別紙**

**日本のユーザーにのみ適用される規約**

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

---

FTX トレーディングは、P2P 貸借暗号資産の貸人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸人となることはありません。

当社のユーザーのみが、借受人又は貸人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

**貸出し**

お客様が P2P 貸借暗号資産取引の貸出人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て**責任財産限定型**消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

**借受け**

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**責任財産は**本借受人の口座において本借受人が保有する資産**に限定されます**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出を含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限する当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

---

**SCHEDULE 16**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO UK USERS ONLY**

**(Updated September 29, 2022)**

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

**EXHIBIT B**

FTX DIGITAL MARKETS
**APPLICATION FOR REGISTRATION
AS DIGITAL ASSET BUSINESS**

**Digital Assets and Registered Exchanges Act 2020**

Application for Registration as Digital Asset Business (Part A - Form 1)

| Item | Questions | | Responses |
|---|---|---|---|
| 1 | Name of Applicant | | FTX Digital Markets Limited |
| 2 | Type of Registration Application - *Indicate the digital asset business for which registration is sought:* <br><br> A payment service provider utilising digital assets ☐ <br> Provision of an exchange between digital assets and fiat currencies ☒ <br> Provision of an exchange between one or more forms of digital assets ☒ <br> Providing the transfer of digital assets ☐ <br> Provision of financial services related to an issuer's offer or sale of a digital asset ☐ <br> Other ☐ | | |
| 3 | **Full Business Contact Details of Applicant** <br> State the applicant's principal business address, including website, and provide email address, telephone numbers and fax numbers. If the Applicant operates more than one address in The Bahamas, provide details for each office. | | Registered Address: G.K. Symonette Building, Shirley Street, Nassau, New Providence, PO Box N-7525 <br><br> Business Address: Building 27 of the Veridian Corporate Center, West Bay Street, Nassau, New Providence <br> Website: https://ftx.com <br> Email: rsalame@alamedaresearch.com |
| 4 | **Full Details on Founders, Beneficial Owner, Significant Interests Holder, Directors, and Officers** <br> Provide completed Form 2 for each founder, beneficial owner or security holder[1], director, and officer of the Applicant. <br> If the digital tokens of the Applicant are traded on another digital token exchange in any jurisdiction, provide full details of listing. <br> Provide a list of all affiliates of the Applicant and indicate nature of relationship, businesses the affiliate is in, where incorporated, etc. | | Please see attached Form 2 for the following individuals: <br> • Samuel Bankman-Fried as Beneficial Owner, Director and Chairman. <br> • Daniel Friedberg as Secretary. <br> • Ryan Salame as Director, CEO and President. |
| 5 | **Full Details on Persons to be Carrying on Digital Asset Business on Behalf of Applicant** <br> Provide completed Form 3 for each person who is to carry on digital asset business on behalf of the Applicant, including Founder, Chief Executive Officer Compliance Officer. | | Please see attached Form 3 for the following individuals: <br> • Ryan Salame as Chief Executive Officer. <br> • Aramintha Jessica Ferguson-Murray as Compliance and Money Laundering Reporting Officer. |
| 6 | **Discipline History** <br> State whether the applicant or any founder, director, officer or significant interest holder of the applicant has ever been: <br> (a) disciplined by any stock exchange, digital token exchange, regulatory authority or professional association in any jurisdiction or been denied admission, registration or renewal or had its membership or registration revoked; <br> (b) declared bankrupt, been convicted of a crime or been sued under any commercial law, securities law, companies law or law concerning fraud; <br> (c) involved with an application for regulatory approval in any jurisdiction where that application has been refused or withdrawn; <br> (d) dismissed from any office or employment or barred from entry to any profession or occupation; or <br> (e) compulsorily wound up or made any compromise or arrangement with its creditors or ceased trading in circumstances where its creditors did not receive or have not yet received full settlement of their claims. <br> If so, please provide full details. | | We can confirm that the applicant, "FTX Digital Markets Limited", its founder, directors and officers have never been disciplined by any stock exchange, digital token exchange, regulatory authority or professional association in any jurisdiction or been denied admission, registration or renewal or had its membership or registration revoked; have never declared bankrupt, been convicted of a crime or been sued under any commercial law, securities law, companies law or law concerning fraud; have not been involved with an application for regulatory approval in any jurisdiction where that application has been refused or withdrawn; have never dismissed from any office or employment or barred from entry to any profession or occupation; nor have they compulsorily wound up or made any compromise or arrangement with its creditors or ceased trading in circumstances where its creditors did not receive or have not yet received full settlement of their claims. |
| 7 | **Operational Capabilities** <br> Provide a detailed description of the applicant's operational capabilities, including the physical premises, cybersecurity protocols, data management systems, data protection systems, risk management systems, banking, digital clearing and digital custody arrangements, communication capabilities, as applicable. <br><br> Provide names and addresses of principal bankers, digital custodians, digital asset service providers and other service and technical providers, as applicable. | | Please refer to the business plan and relevant policy documents for detailed descriptions of operational capabilities, including the physical premises, cybersecurity protocols, data management systems, data protection systems, risk management systems, banking, digital clearing and digital custody arrangements, and communication capabilities, as applicable. <br><br> We should note that the company does not currently have banking relationships although we are seeking to open one bank account with Fidelity Bank (Bahamas) Ltd in the short term and seeking further banking partners both within and outside the Bahamas in the medium term. The FTX group has banking capabilities and we will seek to obtain similar accounts for FTX Digital Markets Limited |

**Digital Assets and Registered Exchanges Act 2020**

Application for Registration as Digital Asset Business (Part A - Form 1)

| | | The operational capabilities will be described in the following policies |
|---|---|---|
| 8 | **Policies and Procedures** Provide a summary of the applicant's written supervisory, internal controls and risk management policies and procedures, including digital token management, cybersecurity operations, operational controls, AML/CFT policies and controls, reporting policies, code of conduct, etc. as applicable. Attach a complete copy of these policies and procedures. | Please find attached a copy of the following policies: • AML/CFT/CPF Policy. • Data Protection Policy. • Cybersecurity Policy. • Safeguarding of Assets & Digital Token Management Policy. • Corporate Governance Policy (which includes the operational controls, reporting lines and code of conduct policy). |
| 9 | **Financial Statements** If the Applicant has any significant interests holders that are companies, the Applicant must also submit for each such security holder – (a) audited financial statements for the two financial years immediately prior to the date of the application or, if shorter, since the date of establishment; (b) the auditor's report accompanying the audited financial statements; and (c) the most recent interim financial statements signed by the Chief Executive Officer (or equivalent), and the Financial Controller (or equivalent) to be true and complete. | Please find attached the Audited Financial Statements for FTX Trading Limited, a significant interest holder of FTX Digital Markets Limited. |
| 10 | **Other Regulatory Approvals** If the applicant is registered, licensed or authorized by any other regulatory authority in The Bahamas or elsewhere, provide details of that status, including name of authority, type of registration, license or authorization, date of approval, registration number, etc. | We can confirm that the applicant, "FTX Digital Markets Limited", has never received any other regulatory approvals. |
| 11 | **Business Plan** Provide a copy of the applicant's detailed and up to date business plan, inclusive of financial and operational projections, staffing requirements, a description of products and/or services offered, target market, and technological requirements, etc. | Please find attached a copy of FTX Digital Markets Limited Business Plan with this application form. |
| 12 | **Contact Person at Applicant** Give the name, business telephone number, and email address of a senior official of the Applicant who is knowledgeable about the application and who may be contacted to discuss it. | Name: Ryan Salame (CEO and President) Telephone Number: +1 413 446-8023 Email Address: rsalame@alameda-research.com |
| 13 | Date the Application | |

| | | | |
|---|---|---|---|
| 14 | **Certification and Signature** Include the signature of two senior officers certifying the following statement – "We, the undersigned, hereby affirm that to the best of our information, knowledge and belief that a. the Applicant is currently in compliance with all the applicable provisions of the Act; and b. the contents of this form and any attachments provided with this form are true, correct and not misleading." | **Full Name:** | Ryan David Salame |
| | | **Title:** | CEO |
| | | **Signature:** | |
| | | **Full Name:** | Samuel Bankman-Fried |
| | | **Title:** | Chairman |
| | | **Signature:** | |
| | **WARNING: Intentional misstatement or failure to disclose information may constitute an offence.** | | |

Required attachments:

**Digital Assets and Registered Exchanges Act 2020**

Application for Registration as Digital Asset Business (Part A – Form 1)

1. Copy of the applicant's written supervisory, internal controls and risk management policies and procedures.
2. A copy applicant's detailed and up to date business plan, inclusive of financial and operational projections, staffing requirements, a description of products and/or services offered, target market, and technological requirements, etc.
3. Copies of required financial statements.
4. Evidence that the company has adequate insurance and regulatory capital.
5. An organizational chart for the firm together with job descriptions for each position. (Include total number of employees in the company).
6. Evidence of the applicant's good standing in accordance with section 277 of the Companies Act (Ch. 308).
7. A certified copy of the applicant's Memorandum and Articles of association, or equivalent incorporation documents.
8. A schedule of proposed fees for services rendered by the business.
9. Evidence of the applicant's registration with any other regulatory authority, if applicable
10. Completed Form 2 of the First Schedule in respect of each founder, beneficial owner, significant interest holder, director and officer of the applicant digital asset business.

[1] Note that where the Applicant is a publicly traded entity in The Bahamas or elsewhere, Form 2s are only required to be provided for significant interests holders of the Applicant.

F10705-E000004902

**EXHIBIT C**

FTX DIGITAL MARKETS
**CUSTOMER MIGRATION PLAN**

# FTX DIGITAL MARKETS LIMITED

# CUSTOMER MIGRATION PLAN

## Document History

| Date | Version | Description |
|------|---------|-------------|
| August 2021 | v1.0 | N/A. |
| | | |

## Confidentiality

All information contained in this document shall be kept in confidence. No part of this document is to be altered or copied without the written agreement of FDM Digital Markets Limited (**FDM**). None of this information shall be divulged to persons other than to authorised employees and contractors of FDM on a need to know basis. The release of this document to other parties must be authorised by FDM, and only once an NDA has been signed with that party.

## Review & Approvals

This document requires review and approval as it may be released to third parties as part of FDM's planning and decision management process. The following representatives of FDM have approved this document:

| Name | Title | Date Approved |
|------|-------|---------------|
| Ryan Salame | CEO | 24 August 2021 |
| | | |

## TABLE OF CONTENTS

**INTRODUCTION**     **4**

OBJECTIVE     **4**

**APPORTIONMENT OF RESPONSIBILITIES**     **4**

FDM'S RESPONSIBILITIES     **4**
SENIOR MANAGEMENT RESPONSIBILITIES     **4**

**TERMS OF SERVICE**     **4**

**GAP ANALYSIS**     **5**

RISK ASSESSMENT     **5**

**MIGRATION PLAN**     **5**

## INTRODUCTION

This policy outlines FDM's approach to the migration of customers from FTX Trading Limited (**FTX**). In developing this policy, FDM has considered the operational, technical and regulatory aspects of its approach to the migration.

## OBJECTIVE

This policy's objectives are to:

- Present FDM's plan to migrate customers to its business from FTX.

## APPORTIONMENT OF RESPONSIBILITIES

FDM clearly defines the roles and responsibilities of all individuals with oversight of, and/or involvement in, the migration of customers.

## FDM'S RESPONSIBILITIES

FDM is ultimately responsible for the onboarding of customers according to the firm's AML/CFT Policy.

FDM's key roles and responsibilities in relation to the migration of customers are outlined below:

- Appropriately communicating the new terms of service to its customers.
- Ensuring customers are risk assessed and onboarded according to the AML/CFT Policy.
- Ensuring any gaps in the due diligence requirements are filled.

## SENIOR MANAGEMENT RESPONSIBILITIES

The CEO is the primary person responsible for the migration of customers from FTX to FDM. To do so, the CEO will appoint a person(s) with sufficient seniority, skills, and experience to oversee the process of migration. The Compliance Officer and MLRO will play a key part in the migration of customers from FTX to FDM, particularly regarding customers who are considered high risk and/or a PEP.

FDM will engage with FTX senior management in order to have a clear understanding of the transition objectives and milestones from the parent.

The CEO and CO will engage with FTX customer support and marketing in order to ensure both FTX and FDM are aligned on the transition, from messaging to the operational execution. The ultimate objective is a smooth transition from a user experience perspective. Front end and back end systems should also reflect a shift of activity to FDM as smoothly as possible, subject to regulatory considerations.

## TERMS OF SERVICE

Customers who will be migrated from FTX to FDM will be required to accept new terms of service and the sharing of information from FTX to FDM prior to onboarding. As the migration commences, customers will be notified of the change and will be given a period of 90 days to raise any queries, comments, or concerns to the centralised customer support team, before accepting the new terms of service and sharing of information or withdrawing their funds. If customers do not actively accept the new terms of service or the sharing of

information within 90 days and do not remove all of their funds, they will be assumed to have accepted the new terms of service and be migrated.

## GAP ANALYSIS

FDM will conduct a gap analysis to identify any differences between the due diligence conducted on customers by FTX and the requirements of FDM. During the migration process, customers will be required to provide any additional due diligence information that FDM would need to obtain in order to comply with the requirements of its AML/CFT Policy. Customers who are unable to provide the required information during their respective migration window, will have their FDM account restricted, unless mitigating circumstances apply.

## RISK ASSESSMENT

Customers who migrate to FDM will be risk assessed according to its AML/CFT Policy, following the risk assessment, the customer will be assigned their relevant risk score. As part of the risk assessment, customers will be screened for any PEP and/or sanctions matches. If any matches are discovered, the relevant actions will be taken according to the AML/CFT Policy.

## MIGRATION PLAN

The FDM migration hierarchy is based on customers trading volume, followed by customer type (i.e. institutional or retail). In order to ensure a smooth and well-managed transition, the migration is expected to be completed by 2023.

High volume users represent a small number of customers which provide a high amount of volume and hence revenue to FDM, as such they will be prioritised and migrated first. The other institutional customers will follow, also representing a small number of higher volume customers.

Once institutional customers have been migrated, FDM will focus on migrating individuals. Low risk individuals will be migrated first as there will be less friction in terms of due diligence requirements, and it is believed most of these customers will not require further due diligence other than that which is shared from FTX to FDM. Medium and high risk individual customers will be the last to be migrated. These customers may require further due diligence documents and reviews by the CO/MLRO.

Please see the table below for the expected time frame for the migration of customers. FDM will provide quarterly updates to the Securities Commission of the Bahamas (**SCB**) with the actual number of customers that have been successfully migrated.

| Customer Type | Number of Clients to be Migrated (expected) | Migration Commencement Date | Expected Migration Completion Date | Actual Customers Migrated to Date |
|---|---|---|---|---|
| High volume (institutional) | Fee VIP & Tier 6 | Q4 21 | Q1 22 | |
| Other Institutional | Fee Tiers 2-5 | Q1 22 | Q2 22 | |
| Individual low risk | All Fee Tiers | Q2 22 | Q3 22 | |
| Individual medium risk | All Fee Tiers | Q3 22 | Q4 22 | |
| Individual high risk | All Fee Tiers | Q4 22 | Q1 23 | |

**EXHIBIT D**

FTX DIGITAL MARKETS
**AML/CFT RISK ASSESSMENT**
(EXTRACT)





FTX Digital Markets Ltd – AML/CFT Risk Assessment

August 2021

## Contents

| | |
|---|---|
| INTRODUCTION | 3 |
| METHODOLOGY | 3 |
| MONEY LAUNDERING AND TERRORIST FINANCING RISKS COMMONLY ASSOCIATED WITH VIRTUAL ASSETS | 5 |
| GUIDANCE BY THE FINANCIAL ACTION TASK FORCE | 6 |
| Red flag indicators related to transactions | 7 |
| Red flag indicators related to transaction patterns | 7 |
| Red flag indicators related to anonymity | 7 |
| Red flag indicators about senders or recipients | 8 |
| Red flag indicators in the source of funds or wealth | 8 |
| Red flag indicators related to geographical risks | 8 |
| THE BAHAMA'S NATIONAL RISK ASSESSMENT 2015/2016 | 9 |
| Money laundering threat | 9 |
| RISK ASSESSMENT | 10 |
| Products and services | 10 |
| Customers | 11 |
| Geographic exposure | 14 |
| Transactions | 16 |
| Distribution channels | 19 |
| Operational risks | 19 |

## Introduction

FTX Digital Markets Ltd (**FDM**) is an International Business Company incorporated in The Bahamas that intends to operate a digital platform for users to trade digital assets and digital asset futures and options.

FDM is a wholly-owned subsidiary of FTX Trading Ltd (**FTX**), a company incorporated in Antigua and Barbuda. The FTX group is considered to be one of the world's leading digital asset exchanges, regularly ranking in the top 5 globally by volume traded.

FDM will operate a digital platform through which users can trade digital assets and digital asset futures and options with one another. FDM's services will include:

- An order book and order matching engine that enables users to:
    - o   spot trade digital assets with other users;
    - o   trade digital asset futures and options contracts with other users; and
    - o   lend digital assets to other users.
- An off-exchange portal that enables users to place orders for digital assets with other, large users.
- Post-trade clearing and settlement of trades undertaken on the platform.

FDM's platform will enable users to obtain quotes, place buy and sell market and limit orders, and offer to lend digital assets and digital asset futures and options. Transactions undertaken on the platform will be cleared and settled by FDM.

FDM is seeking to be registered as a digital asset business under The Bahamas' Digital Assets and Registered Exchanges Act, 2020 (**DARE**). Following registration, FTX will migrate customers (other than those from certain jurisdictions) to FDM. Some services and products offered on FTX's platform will remain with FTX or other FTX group companies. FTX's terms of service, and web and device applications, will be modified to clearly identify the company through which a user is transacting, ensuring full transparency and disclosure to customers.

This document sets out:

- the methodology used in carrying out FDM's business-level risk assessment;
- an overview of guidance issued by relevant authorities and standard-setting bodies such as the Financial Action Task Force (FATF) on general risks of ML and TF relating to VAs and virtual asset service providers (VASPs);
- an assessment of the risks associated with the products and services offered, the types of customers, geographical exposure, the types of transactions, and how customers are engaged;
- an overview of the measures taken to minimise the risk of FDM being exploited for ML, TF, and PF based on the current policies, controls and procedures;
- an inherent risk rating and residual risk rating taking into account the measures in place; and
- where necessary, recommended actions to reduce the residual risk rating further to bring the risk in line with FDM's risk appetite.

**EXHIBIT E**

SECURITIES COMMISSION OF THE BAHAMAS
**REGISTER OF DIGITAL ASSET BUSINESSES**

 

## REGISTER OF DIGITAL ASSET BUSINESSES

Registration information provided as at:  30 November 2021

Digital Asset Business:

### FTX DIGITAL MARKETS LTD.

| | |
|---|---|
| **Address** | Building 27<br>Veridian Corporate Centre<br>West Bay Street<br>P.O. Box N 7525<br>Nassau, The Bahamas |
| **Phone** | (242) 603-1336 |
| **Website** | www.ftx.com |
| **Principal** | Samuel Bankman-Fried |
| **Chairman** | Samuel Bankman-Fried |
| **Secretary** | Daniel Friedberg |
| **Directors / Members** | Ryan Salame, Samuel Bankman-Fried |
| **Chief Executive Officer** | Ryan Salame |
| **Compliance Officer** | Jessica Murray |
| **Money Laundering Reporting Officer** | Jessica Murray |
| **SCB Registration Details**<br>Pursuant to Section 6 of the Digital Assets and Registered Exchanges Act, 2021 | – Provision of an exchange between digital assets and fiat currency; and,<br>– Provision of an exchange between one or more forms of digital assets |
| **Registration Type** | Digital Asset Business |
| **Registration Conditions** | None |
| **Sanctions** | None |
| **Other Registrations/**<br>**Licenses held outside of The Bahamas** | (i)  License: Australian Financial Services License<br>Entity Name: IFS Markets Party Limited<br>Jurisdiction : Australia<br>(ii)  License: Digital Ledger Technology Provider<br>Entity Name: Zubr Exchange Limited<br>Jurisdiction: Gibraltar |

 

## REGISTER OF DIGITAL ASSET BUSINESSES

Registration information provided as at:  31 March 2022

Digital Asset Business:

| FTX DIGITAL MARKETS LTD. | |
|---|---|
| **Address** | Building 27<br>Veridian Corporate Centre<br>West Bay Street<br>P.O. Box N 7525<br>Nassau, The Bahamas |
| **Phone** | (242) 603-1336 |
| **Website** | www.ftx.com |
| **Principals** | Samuel Bankman-Fried |
| **Chairman** | Samuel Bankman-Fried |
| **Secretary** | Daniel Friedberg |
| **Directors/Members** | Ryan Salame, Samuel Bankman-Fried |
| **Chief Executive Officer** | Ryan Salame |
| **Compliance Officer** | Jessica Murray |
| **Money Laundering Reporting Officer** | Jessica Murray |
| **SCB Registration Details**<br>Pursuant to Section 6 of the Digital Assets and Registered Exchanges Act, 2021 | – Provision of an exchange between digital assets and fiat currency; and,<br>– Provision of an exchange between one or more forms of digital assets. |
| **Registration Type** | Digital Asset Business |
| **Registration Conditions** | None |
| **Sanctions** | None |
| **Other Registrations/**<br>**Licenses held outside of The Bahamas** | (i)  License: Australian Financial Services License<br>Entity Name: IFS Markets Party Limited<br>Jurisdiction : Australia<br>(ii) License: Digital Ledger Technology Provider<br>Entity Name: Zubr Exchange Limited<br>Jurisdiction: Gibraltar |

 

## REGISTER OF DIGITAL ASSET BUSINESSES

Registration information provided as at: 12 November 2022

Digital Asset Business:

## FTX DIGITAL MARKETS LTD.

| | |
|---|---|
| **Address** | Building 27<br>Veridian Corporate Centre<br>West Bay Street<br>P.O. Box N 7525<br>Nassau, Bahamas |
| **Phone** | (242) 603-1336 |
| **Website** | www.ftx.com |
| **Principals** | Samuel Bankman-Fried |
| **Chairman** | Ryan Salame |
| **Secretary** | Daniel Friedberg |
| **Directors/Members** | Ryan Salame, Samuel Bankman-Fried |
| **Chief Executive Officer** | Samuel Bankman-Fried |
| **Compliance Officer** | Vacant |
| **Money Laundering Reporting Officer** | Vacant |
| **SCB Registration Details**<br>Pursuant to Section 6 of the Digital Assets and Registered Exchanges Act, 2021 | – Provision of an exchange between digital assets and fiat currency; and,<br>– Provision of an exchange between one or more forms of digital assets. |
| **Registration Type** | Digital Asset Business |
| **Registration Conditions** | License Suspended |
| **Sanctions** | None |
| **Other Registrations/<br>Licenses held outside of The Bahamas** | (i)  License: Australian Financial Services License<br>Entity Name: IFS Markets Party Limited<br>Jurisdiction : Australia<br>(ii) License: Digital Ledger Technology Provider<br>Entity Name: Zubr Exchange Limited<br>Jurisdiction: Gibraltar |

**EXHIBIT F**

FTX DIGITAL MARKETS
**SAFEGUARDING OF ASSETS AND DIGITAL TOKEN
MANAGEMENT POLICY**

# FTX DIGITAL MARKETS LIMITED

# SAFEGUARDING OF ASSETS & DIGITAL TOKEN MANAGEMENT POLICY

**Document History**

| Date | Version | Description |
|---|---|---|
| August 2021 | v1.0 | N/A. |
| | | |

**Confidentiality**

All information contained in this document shall be kept in confidence. No part of this document is to be altered or copied without the written agreement of FTX Digital Markets Limited (**FDM**). None of this information shall be divulged to persons other than to authorised employees and contractors of FDM on a need to know basis. The release of this document to other parties must be authorised by FDM, and only once an NDA has been signed with that party.

**Review & Approvals**

This document requires review and approval as it may be released to third parties as part of FDM's planning and decision management process. The following representatives of FDM have approved this document:

| Name | Title | Date Approved |
|---|---|---|
| Ryan Salame | CEO | 16/08/2021 |
| | | |

## TABLE OF CONTENTS

INTRODUCTION — 4

OBJECTIVE — 4
SCOPE — 4
POLICY COMPLIANCE — 4

APPORTIONMENT OF RESPONSIBILITIES — 5

FDM'S RESPONSIBILITIES — 5
SENIOR MANAGEMENT RESPONSIBILITIES — 5

SYSTEMS OF CONTROL — 6

ACCOUNTING STANDARDS — 6
IT AND SOFTWARE — 6

SAFEGUARDING AND SEGREGATION — 7

RECONCILIATION — 7

VIRTUAL ASSET RECONCILIATION — 7
FIAT ASSET RECONCILIATION — 8

DIGITAL TOKEN MANAGEMENT — 8

PRIVATE KEY MANAGEMENT — 9

RECORD KEEPING — 9

## INTRODUCTION

This policy outlines FDM's approach to the safeguarding of assets. In developing this policy, FDM has considered the operational, technical, and organisational aspects of its approach to the safeguarding of assets. Furthermore, FDM has considered the best practice guidance issued for the virtual asset sector.

FDM fully acknowledges that its products and services are at risk from criminals and others seeking to steal and misappropriate assets belonging to FDM and its customers. FDM is committed to take appropriate measures to prevent potential loss of assets.

## OBJECTIVE

This policy's objective are to:

- Emphasise our stringent commitment to safeguarding assets belonging to both FDM and its customers;

- Summarise the main procedures, systems, and controls FDM has implemented to appropriately segregate its own assets and its customers' assets;

- Summarise the main procedures FDM has implemented to reconcile its own assets and its customers' assets; and

- Explain how FDM will manage the digital tokens under its custody.

## SCOPE

This policy, subject to any local or jurisdictional legal or regulatory requirements, applies to:

- FDM, its employees, consultants, contractors, temporary employees, or any person having access to FDM or customer assets;
- External third parties, through contract commitments; and
- All information systems owned by and/or managed by FDM including all computers, technical infrastructure, network devices, applications, and databases.

This policy defines the manual and electronic protection requirements for FDM and its customers' assets.

Where FDM authorises arrangements whereby a third party stores or transmits FDM or its customers' assets on its behalf, it is FDM's responsibility for the oversight of the third party's procedures and practices and ensuring that they meet the requirements of this policy and any applicable regulations.

## POLICY COMPLIANCE

Compliance with this policy is mandatory for all users that access (or have access to) FDM's or its customers' assets. Any internal or external business supporting processes or procedures that cannot comply with this policy or supporting policies and standards, must have an exception statement approved by the Compliance Officer (**CO**).

Users involved in the management of third-party suppliers and service providers are responsible for ensuring that all third-party contracts and agreements impose sufficient obligations on suppliers and service providers to support FDM's cybersecurity objectives as set by this policy.

Deliberate or persistent attempts to violate or actual violations of this policy will lead to disciplinary measures.

FDM is a company incorporated and registered in The Bahamas, as is therefore bound to comply with certain rules and regulations covering customer data.

## APPORTIONMENT OF RESPONSIBILITIES

FDM clearly defines the roles and responsibilities of all individuals with oversight of the company's safeguarding of assets strategy.

## FDM'S RESPONSIBILITIES

FDM is ultimately responsible for the safeguarding of its customers' assets.

FDM's key roles and responsibilities in relation to safeguarding of assets are outlined below:

- Appropriately account for the difference between its own assets and its customers' assets;

- All third-party providers will be aware that customer assets do not represent assets of FDM;

- All third-party providers are aware that customer assets are held in trust;

- FDM will have systems of control in place that are proportionate to its size, the assets in custody and the risks involved in its business, including the management of digital tokens in its custody;

- Developing and implementing procedures appropriate to the nature, size, and complexity of FDM's business and the risks it may reasonably face; and

- Ensure that the policies, controls, and procedures are regularly reviewed and updated according to the latest technology available, and that these are approved by senior management.

## SENIOR MANAGEMENT RESPONSIBILITIES

The CEO is the primary person responsible for the secure storage and implementation of certain financial and treasury procedures in place to protect FDM and its customers' assets.

To do so, the CEO will appoint a person(s) with sufficient seniority, skills, and experience to oversee the relevant procedures below:

- **Chief Technology Officer or equivalent:**
  - combating attacks on and attempts to steal funds and damage the infrastructure put in place to secure storage;
  - ensure that cryptography algorithms and hardware meet relevant security standards;
  - developing and releasing software ensuring security including, but not limited to, cryptography algorithms and hardware; and
  - performing regular security testing (pen-testing).

- **Chief Operating Officer or equivalent;**
  - ensuring FDM and customer assets segregation for accounting, operational and storage purposes;
  - maintaining regular reconciliation of FDM and customer assets; and
  - auditing record keeping system.

- **Chief Financial Officer or equivalent;** and
    - o  managing FDM assets; and
    - o  protecting customer assets from third-party creditor claims.

- **Compliance Officer and/or MLRO.**
    - o  ensuring FDM, its employees, consultants, contractors, temporary employees, or any person having access to FDM, or customer assets complies with this policy.

## SYSTEMS OF CONTROL

FDM will ensure that it has in place systems of control to manage customer assets that are proportionate to its size, the assets in custody and the risks involved in its business.

## ACCOUNTING STANDARDS

As part of its business operations, FDM will maintain reliable accounting records or cause reliable accounting records to be kept in relation to all sums of money received and expended, inclusive of all customer trading activity, trading revenue, and other transactions relating to FDM operations, and FDM will document the reason for such receipt or expenditure.

FDM will ensure that:

- accounting records are maintained in relation to all sums of money received and expended and indicate the reason for the receipt and expenditure accounting records establish the authorisation of transactions relating to expenditure;
- accounting records are reliable, in that the records;
    - o  explain all transactions by providing a record of the transaction along with an adequate summary of its details;
    - o  enable the financial position of the company to be determining with reasonable accuracy;
    - o  enable the preparation of financial statements; and include documentation underlying the transaction.
    - o  reconcile to cash positions held within banks or to blockchain balances
- there is a written statement included in the accounting records that the records are prepared to the directors' or officers' best knowledge, information and belief;
- the accounting records show the assets and liabilities of the company;
- in the case of Segregated Accounts Company, the accounting records must be maintained in relation to each segregated account as well as the general account of the company;

## IT AND SOFTWARE

Systems of control relating to IT and software will be kept up to date and will meet the latest industry protocols and standards. The systems of control that will be implemented and kept up to date will include, but it not restricted to:

- Multi factor authentication;
- Pattern analysis on internet traffic to servers;
- IP and device checking;
- Looking for brute force attacks on account passwords; and
- Multi-level security checks of customers that request access to their accounts.

## SAFEGUARDING AND SEGREGATION

FDM has a responsibility to ensure that customer assets are appropriately safeguarded and segregated from its own funds. This includes customer assets that may be held by third party service providers. FDM will ensure that:

- Customer assets (both fiat and virtual assets) are segregated from its own assets;
- Customer assets (both fiat and virtual assets) will be clearly designated and easily identifiable;
- All third-party service providers are aware that customer funds do not represent property of FDM and are therefore protected from third-party creditors; and
- All third-party providers are aware that customer assets are held in trust.

Regarding customer fiat assets, FDM will maintain customer accounts with a regulated credit, e-money or payment institution that is acceptable to the Securities Commission of The Bahamas (**SCB**). Customer accounts will be designated as such, and the monies contained therein will be appropriately ring-fenced and protected from claims against FDM.

Customer monies will be appropriately ring-fenced to protect from:

- The unlikely event FDM becomes insolvent;
- The use of customer monies being used to benefit others; and
- FDM using customer monies to finance its own operations.

Written notice will be provided to the relevant regulated credit, e-money, or payment institution to clarify that the assets contained are held by us on trust for our customers and they are not entitled to combine the account any other account, or to exercise any right of set-off or counterclaim against the money in those accounts, in respect of any debt owed by us.

All customer accounts will be under the dual signatory of two directors or of one director, together with a senior member of the management team.

## RECONCILIATION

FDM will take all reasonable steps to ensure that any value is applied to the correct accounts in good time.

### VIRTUAL ASSET RECONCILIATION

FDM must take all reasonable steps to ensure that any value is applied to the correct wallets in good time.

FDM has implemented an automated process which identifies differences between expected customer balances and virtual assets on the relevant blockchains. These amounts are then investigated and reconciled.

When reconciling virtual asset movements, FDM will ensure that any internally calculated balances are reconciled to the expected balance on the underlying blockchain in question. Any differences will be investigated. Any unidentified differences leading to a lower amount of virtual asset balances on the underlying distributed ledger when compared to the internal records, may be covered by the firm until these are investigated and cleared.

The company will look to apply an automated process due to the frequent movement in customer funds.