## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 5378** |

## JOINT OBJECTION OF DR. MARCEL LÖTSCHER AND MARTHA LAMBRIANOU TO THE FTX EUROPE SALE MOTION

Dr. Marcel Lötscher and Martha Lambrianou (the "**European Creditors**"), by and though their counsel, hereby file this joint objection (the "**Objection**") to the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving (A) Entry into, and Performance Under, the Share Purchase Agreement and (B) the Purchase and Sale of Certain Shares Free and Clear of Liens, Claims and Encumbrances and (II) Dismissing the Chapter 11 Cases of Certain Debtors Effective Upon the Earlier of the Closing or the Termination of the Share Purchase Agreement* (the "**FTX Europe Sale Motion**") [D.I. 5378].[2]   In support hereof, the European Creditors submit the *Declaration of Patrik Odermatt* (the "**Odermatt Declaration**"), attached hereto as **Exhibit 1**, and, respectfully, state as follows:

## PRELIMINARY STATEMENT

1.     The Sale Transaction is not only fundamentally flawed, but clearly unfair to the creditors of FTX Europe AG ("**FTX Europe**") and FTX EU Ltd. ("**FTX EU**").   The Debtors

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in the above-captioned jointly-administered chapter 11 cases, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the FTX Europe Sale Motion.

through their counsel, Sullivan & Cromwell LLP ("**Debtors' Counsel**"), seek the approval of what can only be described as a collusive, private, insider sale transaction that would render FTX Europe a shell, stripped of control of one of the most valuable assets in these cases—the License held by FTX EU to engage in brokerage, custodianship and lending services across Europe.  The FTX Europe Sale Motion is completely devoid of any explanation as to how the proposed transaction— which would result in the release of well over $100 million in claims held by FTX Europe against FTX Trading, while preserving Alameda Research Ltd.'s ("**Alameda**") claim against FTX Europe—benefits any creditors of the Seller FTX Europe or FTX EU.  Rather, it appears that the only beneficiaries of this proposed transaction are Alameda (which was at the center of the FTX fraud) and FTX Trading, as well as the Debtors' professionals, who will maintain control over the License while at the same time protect their stated desire to surcharge the FTX Europe and FTX EU assets for a portion of their astronomical fees in these cases.  The Debtors have not established any benchmark for whether the proposed purchase price is market or not.  The sale process initially began at the end of 2022—the absolute bottom of the crypto market.  The Debtors rely entirely on a secret process to establish the market for the License.

2.        The Sale Transaction is a veiled attempt to avoid scrutiny of the issue presented in the pending Motions to Dismiss[3]—the Court's lack of subject matter jurisdiction over FTX Trading's, FTX Europe's and FTX EU's (collectively, the "**Dismissal Debtors**") bankruptcy cases.  Confronted with the Motions to Dismiss, the Debtors totally ignore the Court-approved marketing and sale procedures to pursue a closed-door, insider Sale Transaction, which the Debtors

---

[3] See *Motion of Patrick Gruhn, Robin Matzke, and Lorem Ipsum US to Dismiss Bankruptcy Case of FTX Trading Ltd.* (the "**Motion to Dismiss FTX Trading**") [D.I. 3400]; *Motion of Dr. Marcel Lötscher to Dismiss Bankruptcy Case of FTX Europe AG* (the "**Motion to Dismiss FTX Europe**") [D.I. 4037]; and *Motion of Martha Lambrianou to Dismiss Bankruptcy Case of FTX EU Ltd.* (the "**Motion to Dismiss FTX EU**") [D.I. 5529] (collectively, the "**Motions to Dismiss**").

mistakenly argue "moots" the FTX Europe Motion to Dismiss. The Court's lack of subject matter jurisdiction over the Dismissal Debtors' bankruptcy cases cannot be cured, waived or mooted, but, rather, demands that the FTX Europe Sale Motion be denied.

3.      Should the Court determine that it has subject matter jurisdiction over the Dismissal Debtors' bankruptcy cases, however, the Court must still deny the evidence-free[4] FTX Europe Sale Motion. The FTX Europe Sale Motion proposes a transaction that only serves to disadvantage the FTX Europe Group entities, which each have independent creditor bodies whose interests must be considered in evaluating the Sale Transaction, not FTX Trading's creditors. This Objection brings to light the Debtors' failure to act in good faith in pursuit of a fair price for the Shares. The Sale Transaction is the result of the Debtors' opportunistic efforts to deprive FTX Europe and FTX EU of control over its License, and is a direct response to the refusals of those entities' boards of directors to ratify the unauthorized filing of the chapter 11 cases. The Debtors have indeed misled the Court and creditors by conveniently omitting facts from the FTX Europe Sale Motion; principally, that the Sale Transaction is not the highest and best offer available for the Shares because it does not contain—in contrast to the Bidder 1 offer—a backstop guaranty for the payment of European customer claims. *See Bidder 1's Obj. to Mot. of Debtors for Entry of an Order (I) Authorizing and Approving (A) Entry Into, and Performance Under, The Share Purchase Agreement and (B) the Purchase and Sale of Certain Shares Free and Clear of Liens, Claims and Encumbrances and (II) Dismissing the Chapter 11 Cases of Certain Debtors Effective Upon the*

---

[4] The FTX Europe Sale Motion is not supported by the declaration of a competent witness attesting to, *inter alia*, the supposed arms-length negotiation of its terms, the fairness of the price, the bidding process and decision to opt for private insider sale, and the alleged business reasons for a sale outside of a Chapter 11 plan. See, e.g., *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). The declarations of two foreign lawyers attached to the motion do not address these matters. Nor do they address the threshold issue of the validity of the petitions filed by the Dismissal Debtors and the Court's subject matter jurisdiction.

*Earlier of the Closing or the Termination of the Share Purchase Agreement* (the "**Bidder 1 Objection**") [D.I. 5954, at ¶¶ 1, 4-5].  Moreover, the Debtors do not establish that the sale process bears any equivalency to an auction; to the contrary, the process laid out in the FTX Europe Sale Motion belies any hallmarks of fairness or transparency.  The Debtors simply announce that they reached terms with Bidder 1, and then upped the cash consideration by a mere $100,000.  Left unsaid is that Bidder 1 was not given any opportunity to match or exceed that amount.  As such, the process set forth by the Debtors is clearly flawed and insufficient.

4.      The Court must deny the FTX Europe Sale Motion and foreclose the Debtors' misguided attempt to chill bidding on the FTX Europe Group assets, including the Shares, and to privately transfer control and value of the License to upstream creditors, and to the detriment of FTX Europe and FTX EU creditors (including tens of thousands of customers).  In the alternative, based on the competing offers and interest for the Shares, the Court should require the Debtors to conduct a public auction, consistent with the Bid Procedures Order, as originally proposed by the Debtors and approved by the Court.[5]

## OBJECTION

### I.    The Court Lacks Jurisdiction Over the Dismissal Debtors' Bankruptcy Cases and the Independent Director Lacks Authority to Approve the Sale Transaction

5.      As an initial threshold issue, it is respectfully submitted that the Court lacks subject matter jurisdiction over the Dismissal Debtors' bankruptcy cases, and therefore, cannot authorize and approve the Sale Transaction or make a "good faith" finding under section 363(m) of the Bankruptcy Code.  As set forth in the Motions to Dismiss, which are each incorporated herein by reference (including responsive pleadings), the Dismissal Debtors, upon the advice of Debtors'

---

[5] *See Order (A) Approving Bid Procedures, Stalking Horse Procedures and the Form and Manner of Notices for the Sale of Certain Businesses, (B) Approving Assumption and Assignment Procedures and (C) Scheduling Auctions(s) and Sale Hearing(s)* (the "**Bid Procedures Order**") [D.I. 487].

Counsel, filed unauthorized chapter 11 petitions.  There is not a single "arguable basis" for the Court's exercise of subject matter jurisdiction over the Dismissal Debtors' unauthorized bankruptcy cases.  *See Price v. Gurney*, 324 U.S. 100, 107 (1947); *Campbell v. Motors Liquidation Co.*, 428 B.R. 43, 59 n.23 (S.D.N.Y. 2010) (quoting *United Student Aid Funds v. Espinosa*, 559 U.S. 260 (2010)).  It logically follows that, because the FTX Europe Sale Motion seeks approval from the Court of the sale of assets that are "not even colorably within its jurisdiction," the Court can neither approve the Sale Transaction nor make a good faith finding under section 363(m) of the Bankruptcy Code.  *See Campbell*, 428 B.R. at 55-56 (quoting *Pittsburgh Food & Bev. v. Ranallo*, 112 F.3d 645, 650 (3d Cir. 1997)).

6.      Relatedly, the Omnibus Authority (as defined in the Motion to Dismiss FTX Trading) could not and did not appoint John J. Ray, III ("**Ray**") the Chief Executive Officer of FTX Trading.  [Motion to Dismiss FTX Trading, at 15-18].[6]  As such, Ray lacked the requisite authority to act on behalf of FTX Trading, as the sole shareholder of FTX Europe, to now appoint Arturo Giovanoli (the "**Independent Director**") to the board of FTX Europe.  It follows that the Independent Director cannot approve the Sale Transaction on behalf of FTX Europe because he was not legally appointed as a director of FTX Europe.  The FTX Europe Sale Motion relies on the Court's non-existent subject matter jurisdiction and the Independent Director's illusory authority to approve the Sale Transaction.  Consequently, the FTX Europe Sale Motion must be denied in its entirety.

## II.    <u>The Debtors Fail the Entire Fairness Test, Prohibiting this Court's Approval of the Sale Transaction</u>

7.      Assuming, *arguendo*, that the Court finds it has subject matter jurisdiction, the Sale

---

[6] Nor did the Omnibus Authority validly appoint Ray as the Chief Executive Officer of FTX Europe or FTX EU.  [*See* Motion to Dismiss FTX Europe and Motion to dismiss FTX EU].

Transaction is prohibited under the Bankruptcy Code and fails the "entire fairness" test. When insiders are on both sides of a transaction, as is the case here, a proposed sale is not entitled to the deferential business judgment rule. Instead, a court is "required to give heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." *In re Flour City Bagels, LLC*, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016); *see also In re Rickel & Assocs., Inc.*, 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002). A court's enhanced scrutiny is even more critical when "the sale will benefit an insider that controls the debtor[.]" *Flour City*, 557 B.R. at 78 (citing *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009)). FTX Trading is not merely an insider of FTX Europe, FTX Trading is FTX Europe's sole shareholder and—if done in accordance with requirements of the entities' organizational documents and applicable law—has the power to control FTX Europe. The Court's utmost scrutiny of the Sale Transaction is required.

8.      The "entire fairness" test examines "whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (citing *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997)). The "fair dealing" and "fair price" components of the entire fairness test must be analyzed in tandem. *Bayou Steel BD, L.L.C. v. Black Diamond Cap. Mgmt. L.L.C.*, 651 B.R. 179 (Bankr. D. Del. 2023). "'Fair dealing' involves elements such as (a) when the transaction was timed, (b) how it was initiated, (c) how it was structured, (d) how it was negotiated, (e) how it was disclosed to the directors, and (f) how the approvals of the directors and the stockholders were obtained." *Halperin v. Moreno*, 594 B.R. 239, 297 (Bankr. D. Del. 2018). "'Fair price' includes such considerations as "economic and financial considerations . . ., including all relevant factors: assets, market value,

earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.*; *see Bayou Steel*, 651 B.R. at 187.

9.      When an insider transaction is challenged, "the burden is on the insider" to prove both elements of the entire fairness test. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998). The Debtors readily concede that the Sale Transaction is an insider sale subject to the "entire fairness" test. [FTX Europe Sale Motion, at 15, 18-20]. The Debtors, however, woefully fail to satisfy their burden of establishing the inherent fairness of the Sale Transaction.

### A.      The Sale Transaction Bespeaks Collusion Between the Debtors, Ray, Debtors' Counsel and the Independent Director

10.      The FTX Europe Sale Motion is plagued with collusive conduct between the fiduciaries purporting to act in the best interest of the non-consolidated Debtors. "[W]ith respect to fair dealing," the FTX Europe Sale Motion provides one (1) conclusive statement: "the Sale Transaction was negotiated at arm's-length between Purchaser, on the one hand, represented by the Debtors and the Debtors' advisors, and Seller, on the other hand, represented by Seller's independent director and with the cooperation and input of the Swiss Administrator." [*Id.*]. The Debtors' shortfall is exacerbated by their failure to expressly disclose the following facts, which, by definition, conflict with their alleged "arm's-length" negotiations.

- FTX Europe and the Independent Director were not and are not represented by independent professionals in connection with the Sale Transaction. Indeed, when independent professionals were requested to evaluate and advise as to FTX Europe's interests, such request was denied. Rather, Debtors' Counsel and the Debtors' other professionals are on both sides of the Sale Transaction, representing FTX Trading, as Purchaser, and FTX Europe, as Seller.[7]

---

[7] FTX Europe, as Seller, was also presumably represented by Debtors' Counsel in its negotiations with Bidder 1. Under the circumstances, and considering the contested Expense Claims described below, it appears that Debtors' Counsel holds an interest adverse to the FTX Europe Group entities and is not disinterested, as required under *B H &*

- The Swiss Administrator is not a truly independent third-party neutral. Rather, the Swiss Administrator was also installed by Debtors' Counsel, over the objection of FTX Europe's former sole director, Jürg Bavaud.

- Ray, acting under the deficient Omnibus Authority on behalf of FTX Trading, as the sole shareholder of FTX Europe, appointed FTX Europe's sole Independent Director, not only after the unauthorized commencement of FTX Trading's and FTX Europe's bankruptcy cases, but **did so only after it became clear that FTX Europe's existing director, Jürg Bavaud, was unlikely to approve the proposed Sale Transaction**.

- The improperly-appointed Independent Director approved the Sale Transaction almost immediately upon his appointment by FTX Trading—without the time necessary to properly review and evaluate not only the Sale Transaction, but also the alternatives, including the Bidder 1 offer.

These material and omitted facts demonstrate that the Debtors fail to satisfy any element of "fair dealing" in how the insider transaction was negotiated, structured, and approved.

11.    The lack of independence between FTX Trading and FTX Europe, the recent firing of Mr. Bavaud (which timing coincidentally coincided with the Motion to Dismiss FTX Europe), and the immediate approval of the Sale Transaction by the newly appointed "Independent Director," are indicative of an unfair, results-driven sale process. Courts consider various factors when determining whether insider "transactions were not conducted at arm's length," including: (1) attempts to influence decisions; (2) selection of new management; (3) special access to personnel; (4) whether the insider was the sole source of financial support; and (5) managerial control, including personnel decisions and decisions as to which creditors should be paid. *See generally In re Broadstripe, LLC*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (discussing insider status) (citing *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d. Cir. 2009)). **All of those factors are present here**. Considering some of the sworn statements submitted in these bankruptcy cases that

_____

*P, Inc.*, 949 F.2d 1300 (3d Cir. 1991). Debtors' Counsel cannot unbiasedly represent two masters; someone has to independently represent the interests of FTX Europe and FTX EU—including the duties owed to their respective creditors. The Court should authorize the FTX Europe Group entities to retain independent professionals to review and consider the Sale Transaction.

challenge the integrity of the estate fiduciaries involved in the Sale Transaction, there is a strong possibility that the alliances between the Debtors, Ray, Debtors' Counsel, the Swiss Administrator and the new Independent Director resulted in the Sale Transaction due to undisclosed motives and inappropriate influences.[8]  The (undisclosed) relationships between the parties negotiating the Sale Transaction bespeaks collusion—the antithesis of "fair dealing."[9]   The FTX Europe Group's creditors are entitled to absolute transparency before the Court can even consider the terms of the proposed sale.

12.    As noted throughout this Objection, the facts evidence all of the *Broadstripe* factors.  The Debtors have repeatedly made improper attempts to bully and influence the European Creditors' decision-making and independent fiduciary duties under Swiss and Cyprus law— including by denying FTX Europe and FTX EU access to their own independent counsel.  See Lambrianou Decl. [D.I. 5529-2]; *Motion of Dr. Marcel Lötscher to Dismiss Bankruptcy Case of FTX Europe AG* [D.I. 4037].   When necessary, the Debtors have removed those fiduciaries, including Mr. Bavaud, and replaced them with new management who will do their bidding, unquestioned.   The Debtors have also denied the creditors in these cases access to pertinent financial information—including the Bidder 1 offer—and precluded potential bidders from meeting with FTX Europe or FTX EU personnel necessary to complete adequate due diligence. These acts have all been taken while the FTX Europe and FTX EU assets have been frozen or

---

[8] See *Declaration of Daniel Friedberg in Support of Amended Objection of Warren Winter to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLC as Counsel to the Debtors and Debtors-In-Possession Nunc Pro Tunc to the Petition Date* [D.I. 530] and *Declaration of Martha Lambrianou in Support of Motion of Martha Lambrianou to Dismiss Bankruptcy case of FTX EU Ltd.* ("**Lambrianou Decl.**") [D.I. 5529-2].

[9] The Debtors try to describe the dealings as open and arms-length, stating that while they were discussing the potential transaction with Bidder 1, they learned of potential interest from "other third parties," which resulted in the proposed Sale Transaction. [FTX Europe Sale Motion, at 11]. **But, the "third party" was one of the Debtors, the Purchaser FTX Trading.**

otherwise controlled by the Debtors' and their professionals.  See, e.g., Lambrianou Decl. [D.I. 5529-2].  And, finally, by this proposed Sale Transaction, the Debtors are attempting to prefer certain creditors and debtors over others—in effect prematurely (and unilaterally) treating the chapter 11 estates as substantively consolidated.

**B.  A Private Sale is Inappropriate Given the Substantial Interest from Third Parties**

13.     Further clouding the integrity of the Sale Transaction is the Debtors' conveniently timed switch from a public sale process (with a number of interested third parties) to a private, insider sale.  Simply put, the process described by the Debtors is insufficient. The Debtors say they reached agreement with Bidder 1, but then decided to retain the asset for themselves.  They **do not** say that they ever gave Bidder 1 the opportunity to meet or exceed the insider offer.

14.     The European Creditors do not disagree that "Bankruptcy Rule 6004(f)(i) permits a debtor to conduct private sales or sales without an auction…**when a good business reason exists**."  [FTX Europe Sale Motion, at 24] (emphasis added).  Here, however, good business reason clearly does not exist because—corporate authority and jurisdictional hurdles aside—the proposed Sale Transaction is not even currently the highest and best offer on the table.  The terms of the Bidder 1 offer are, upon information and belief, superior to the FTX Trading offer because Bidder 1 would include the functional equivalent an unconditional guaranty of payment of all European customer claims.  [*See* Bidder 1 Objection, D.I. 5954, at ¶¶ 1, 4-5; *cf.* FTX Europe Sale Motion, at ¶¶ 9-10].  That alone makes it a better offer, as currently formulated, and undercuts the Court's ability to approve the Sale Transaction.  Moreover, the Debtors' failure to address that fact in the FTX Europe Sale Motion ought to give the Court pause and highlights the need for close scrutiny.  Further, the FTX Europe Sale Motion relies on four (4) unpublished sale orders in support of the private Sale Transaction, none of which contemplated a private, insider sale while third parties

stood ready to engage in a transaction.  [*See* FTX Europe Sale Motion, at 24-25].

15.    The FTX Europe Sale Motion describes a robust and successful marketing and sale process for the FTX Europe Group's assets, which resulted in "substantially final forms of transaction documentation [with Bidder 1] on December 14, 2023" and interest from other third parties.  [FTX Europe Sale Motion, at 9-12].  Despite Bidder 1's active offer and interest from additional third parties, the Debtors acknowledge that they unilaterally changed course in pursuit of the Sale Transaction "to retain the License and exclusive use of the FTX Cyprus European customer list and to potentially explore in an orderly manner any disposition or transaction involving the License or customer list on a global or stand-alone basis."  [*Id.*].  The Debtors' proclaimed exercise of business judgment (much less entire fairness) is, at best, unsound.  At worst, the proffered reason for the Sale Transaction—to "maintain direct control over both entities" (the Subject Companies)—smacks of insider self-dealing on its face.  The Debtors, with zero transparency, actually elected to halt efforts to market and sell the FTX Europe Group's assets in accordance with the Bid Procedures Order to actively interested third parties in order to retain control over the License—at the expense of certain creditors to whom Debtors' Counsel also owe duties—for the supposed reason that the Debtors might "potentially explore" another transaction involving the FTX Europe Group's assets at a later date.  Respectfully, this is pure sophistry, and is intended to hide the real justification for the pivot to the private Sale Transaction: a desperate attempt to defang Dr. Lötscher's meritorious motion to dismiss the FTX Europe chapter 11 case and avoid scrutiny for the improper filing—and subsequent actions—of Debtors and Debtors' Counsel. [10]  [*See* D.I. 5428].

---

[10] It also appears that the Debtors may be attempting to make it easier to eventually transfer the value of the License from the FTX Europe Group "silo" to a substantively consolidated estate under the opaque and confusing terms of the

16. The Debtors' decision to forego its public marketing and sale process for the FTX Europe Group's assets and engage in the private Sale Transaction, on the heels of the Motions to Dismiss, is indeed very troubling. As expected, the FTX Europe Sale Motion details the Debtors' efforts to publicly market and sell the FTX Europe Group's assets and sets forth specific dates for certain milestones, such as the exchange of substantially final forms of transaction documents with Bidder 1 on December 14, 2023, only three (3) weeks prior to the FTX Europe Sale Motion. [*See* FTX Europe Sale Motion, at 10-11]. However, noticeably absent from the FTX Europe Sale Motion are specific dates for when the Debtors began considering the Sale Transaction. The Debtors ambiguously maintain that:

> while discussing a potential transaction involving the Subject Companies with Bidder 1, in connection with the Debtors' other ongoing explorations of potential transactions, the Debtors learned of potential interest from other third parties in the FTX Europe Group, including FTX Cyprus and the License. The Debtors and their advisors informed the Swiss Administrator regarding these potential indications of interest and discussion between the Debtors, their advisors and the Swiss Administrator regarding the implementation of the Sale Transaction commenced.

[FTX Europe Sale Motion, at 11].

17. The Debtor's vagueness is not surprising at all because the Sale Transaction is nothing other than an admitted attempt to "moot" the Motion to Dismiss FTX Europe. [*See* D.I. 5428]. Simply stated, the Debtors seek to rush a sale of the Shares from FTX Europe to FTX Trading and then quietly dismiss FTX Europe's bankruptcy case. However, the Debtors "already expended significant resources and time marketing the assets of the Businesses of the FTX Europe Group," which has produced concrete interest from third parties, including the documentation of a transaction with Bidder 1. Contrary to the Debtors' assertion that "any further marketing or

---

proposed Plan. See *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession* (the "**Disclosure Statement**") [D.I. 4862]; *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "**Plan**") [D.I. 4861].

auction process would not yield a higher or better offer for the Shares," Bidder 1's offer was inadequately summarized in the FTX Europe Sale Motion and is a higher and better offer than the Sale Transaction, due to the fact that Bidder 1, if it is the successful purchaser, has committed to its ability to cover all customer claims upon reactivation of the License—meaning that there will be no Shortfall. [*See* Bidder 1 Objection, D.I. 5954, at ¶¶ 1, 4-5]. Due to the competing offers from Bidder 1 and FTX Trading (and potentially others), a private sale of the Shares is inappropriate. The Court should require the Debtors to comply with the paragraph 7 of the Bid Procedures Order and conduct a public auction.

### C. The Independent Director Insufficiently Considered the Sale Transaction

18. The FTX Europe Sale Motion equally fails to sufficiently detail the Independent Director's involvement (or lack thereof) in negotiating the Sale Transaction. The most glaring omissions are the date on which the Independent Director was (improperly) appointed and what occurred prior to his involvement. On or about December 20, 2023, the Independent Director was appointed and concurrently, Jürg Bavaud, FTX Europe's sole director at the time, was terminated. However, improprieties aside, the change in control had no legal effect until it was published by the Swiss Official Gazette of Commerce on January 5, 2024. [Odermatt Declaration, Ex. B].[11] The Debtors, suddenly and ironically, informed Mr. Bavaud that he was expelled from the board of directors of FTX Europe because of (a) the pending chapter 11 cases and the Swiss Moratorium proceeding, and (b) the resulting need for new operational management—notwithstanding that the chapter 11 cases had been pending for over a year, and the Swiss Moratorium for over eight (8) months. Although dismissed from the board of FTX Europe, Mr. Bavaud remains a contract

---

[11] A notice of the change in control was entered in Commercial Register of the Canton of Schwyz on January 2, 2024. [Odermatt Declaration, Ex. A].

employee of FTX Europe (reporting to the Independent Director) and a director of other FTX Europe Group entities. Almost immediately after his appointment on December 20, 2023, the Independent Director approved the Sale Transaction—without ever even speaking to Mr. Bavaud about the offer terms or the prior marketing process.

19.    As the sole board member, Mr. Bavaud was involved (or so he thought) in the Debtors' efforts to market and sell the FTX Europe Group's assets. In July 2023, Mr. Bavaud was informed by the Swiss Administrator that FTX Europe would be forced to liquidate if a substantial investment in FTX Europe or sale transaction involving FTX Europe was not consummated. Thereafter, fulfilling his fiduciary duties, Mr. Bavaud sought, but was unable to secure, additional investors for FTX Europe. Mr. Bavaud was then made aware of potential offers to buy FTX Europe, including Bidder 1's offer, which were pursued from approximately August 2023 until Mr. Bavaud was suddenly terminated as the sole board member on or about December 20, 2023. During sale negotiations with the interested buyers, Mr. Bavaud made it known to the Debtors' Counsel and other professionals that a proposed sale price for FTX Europe in the vicinity of $6,000,000 was too low. Mr. Bavaud was never made aware of a potential private insider sale to FTX Trading prior to his board termination and despite his legacy knowledge, the proposed transaction was not discussed with him after his board termination. The inescapable conclusion is that Mr. Bavaud—who had expressed his dissatisfaction with the proposed cash consideration in a prior third party offer that was substantially the same as the cash consideration in the FTX Trading offer now before the Court—was an inconvenient barrier to the Debtors' and Debtors' Counsel's undisclosed self-dealings, which have now culminated in the Sale Transaction under the

sham approval of the Independent Director and their hand-picked Swiss Administrator.[12]

20.     Within days of the Independent Director's timely appointment, he approved the Sale Transaction—an insufficient time for the Independent Director to comprehend the Debtors' businesses, review the Sale Transaction and conclude that the Sale Transaction was superior to Bidder 1's offer and in the best interest of the FTX Europe Group entities' creditors.[13]   It is indisputable that the Independent Director did not "act[] on an informed basis, in good faith and in the honest belief that" the Sale Transaction was in the "best interest" of FTX Europe.  *In re Bura Auto. Sys.*, 2007 Bankr. LEXIS 2764, at *260 (Bankr. D. Del. Aug. 15, 2007).  The Independent Director's failure to conduct due diligence and investigate the merits of the never before revealed Sale Transaction should again give the Court pause.

21.     By selectively disclosing facts that favor the Debtors and Debtors' Counsel, the Debtors have shown their hand—the Sale Transaction is not the result of disinterested and arm's-length negotiations.  The Debtors have failed miserably to carry their burden of proving that the interested parties have engaged in "fair dealing."  The Debtors have supplied no reason at all for the departure from the Court-sanctioned marketing and sale process, which the Debtors requested and obtained in the Bid Procedures Order.  Accordingly, the FTX Europe Sale Motion must be denied.  Alternatively, if the Court denies the Motions to Dismiss, the Court should at minimum require the Debtors to conduct a public auction for the FTX Europe Group's assets with FTX Europe and FTX EU having independent, unconflicted professionals representing its creditors'

---

[12] Indeed, it is unclear from the FTX Europe Sale Motion whether the Independent Director or the Swiss Administrator have even been provided with the complete terms of the Bidder 1 offer.

[13] The Independent Director should immediately terminate the Share Purchase Agreement as permitted "by Seller, if Seller or the board of directors (or similar governing body) of Seller determines that **proceeding with the Transactions or failing to terminate this Agreement could be inconsistent with its or such Person's or body's fiduciary duties**."  [Share Purchase Agreement, at 12] (emphasis added).

interests "to ensure the bankruptcy estate in fact obtains the highest and best value for its assets." *In re MTE Holdings LLC*, 2021 Bankr. LEXIS 2225, at *21 (Bankr. D. Del. Aug. 17, 2021) (expressing that private sales are generally disfavored in the bankruptcy context).

### D.  The Debtors Have Failed to Present Any Evidence Supporting a "Fair Price"

22.     The entire fairness test's two prongs interact and "[j]ust as a strong record of fair dealing can influence the fair price inquiry, . . . process can infect price." *FrontFour Capital Grp. LLC v. Taube*, 2019 Del Ch. LEXIS 97, at *50 (Del. Ch. Mar. 11, 2019) (internal quotations omitted).  The process by which the Sale Transaction evolved is tainted, and the Sale Transaction's proposed price fares no better.  In fact, other than a misleading and incomplete summary of Bidder 1's offer, the FTX Europe Sale Motion is silent on how the Purchase Price (including other financial considerations) was attained.  The Debtors cannot satisfy their burden by simply stating "the Purchaser is paying a fair price for the Shares" and must support their conclusion with evidence.  [FTX Europe Sale Motion, at 22].

23.     Like the sale process, the Debtors fail to support the Sale Transaction with any evidence that substantiates their alleged "fair price."  The Debtors and Debtors' Counsel turn a blind eye to the fact that FTX Europe and the Independent Director have not obtained an independent valuation of the Shares.  Moreover, the FTX Europe Sale Motion is not supported by a declaration from the Independent Director, indicating that, after considering the financial impact of the Sale Transaction on the FTX Europe's creditors, the Independent Director determined that the Sale Transaction is in their best interest.  Again, the Debtors' total lack of support and disclosure concerning the sale price demonstrates that the Independent Director just accepted the Debtors' and Debtors' Counsel's representations.  The Independent Director has a fiduciary duty to do more, and the FTX Europe Group's creditors are entitled to more.

24.     The Debtors, rather than attaching the Bidder 1 offer, ask the Court and creditors to take on faith that its terms have been adequately and accurately described.  The European Creditors decline to take that leap—and, respectfully, the Court should not do so either.  Based on what is disclosed in the FTX Europe Sale Motion, however, the Debtors convolute the differences between the Sale Transaction and Bidder 1's offer.  In sum, the differences appear to be: (i) FTX Trading's $6,000,000 in cash consideration for the Shares, which is $100,000 more than Bidder 1's current offer; (ii) the Releases, specifically pertaining to the $102,483,387 claim held by FTX Europe against FTX Trading; (iii) the Debtors' preservation of the $60,150,000 asserted by Alameda against FTX Europe; and (iv) satisfaction and allocation of certain Expense Claims. [FTX Europe Sale Motion, at 14].  Ultimately, the Debtors are the only parties with complete knowledge of the negotiations and competing offers, including Bidder 1's offer—which they have improperly elected to summarize, rather than attaching the agreement for the Court and creditors to review independently.  This is wholly inappropriate and prejudicial.

25.     Nevertheless, even based on what has been disclosed, the deficiencies are glaring.  First, looking only at the cash consideration, FTX Trading's minimal added cash consideration is immaterial and simply an optic that does not support a higher and better offer.  This is especially true given that Bidder 1 was not given the opportunity to exceed the offer price.

26.     Second, the Debtors maintain that "Seller is balance sheet insolvent with a negative equity position of approximately $105 million."  [FTX Europe Sale Motion, at 8].  The Debtors then relegate to a footnote that such valuation excludes FTX Europe's $102,483,387 Major Claim against FTX Trading because the claim is "fully impaired in accordance with Swiss accounting principles."  [*Id*.].  The Debtors concurrently represent that the "Major Claims . . . will not be repaid in connection with the Sale Transaction and will remain outstanding following the Closing."

[*Id*.].  The Debtors authoritatively conclude FTX Europe is insolvent and the Major Claim is fully impaired and, simultaneously, misinform the Court and creditors regarding the treatment of the Major Claim.  Rather, "the Major Claim held by Seller against Purchaser will [be released] unless a proof of claim with respect to such Major Claim is submitted . . . within 45 days of the Closing." [*Id*. at 14-15; Release Agreement, Ex. B].  Conversely, under no circumstances will Alameda release its alleged $60,150,000 Major Claim against FTX Europe, which, upon information and belief, is grossly overstated so that the Debtors may maintain control over FTX Europe's Swiss Moratorium.  [*See id*. at 14-15; Release Agreement, Ex. B].  The treatment of FTX Europe's Major Claim is concerning because it is unsupported by reliable financial data and legal authority (that has been confirmed by the Independent Director and independent professionals) and further blurs the interested parties' proclaimed good faith and arm's length negations.  "What is clear is that a court can and should consider whether an insider is receiving a release when evaluating the "good faith" criterion."  *In re Exaeris Inc.*, 380 B.R. 741, 747 (Bankr. D. Del. 2008) (citing *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 703-04 (Bankr. E.D. Pa. 1989)).

27.    Third, the Debtors press a "global allocation" of professional fees incurred in connection with the Chapter 11 Cases upon confirmation of a chapter 11 plan, and the Sale Transaction preserves a claim for "postpetition fees and expenses of counsel and professional advisors to the Debtors incurred by Purchaser on behalf of the FTX Europe Group in connection with the Chapter 11 Cases."  [FTX Europe Sale Motion, at 6-7, 14].  As established in the Motion to Dismiss FTX EU, and equally applicable to the other members of the FTX Europe Group, Debtors' Counsel and the Debtor's other professionals were not and are not properly retained in these chapter 11 cases.  [Motion to Dismiss FTX EU, at 66].  Therefore, there is no basis to assert a claim for such fees and expenses against the members of the FTX Europe Group or include these

baseless claims as financial consideration for the Sale Transaction.[14]

28.    Interestingly, prior to filing the FTX Europe Sale Motion, Debtors' Counsel represented to the Court in an adversary complaint that the License was worthless.[15]   Now the License, indirectly through the acquisition of the Shares, is the only asset of the entire FTX Europe Group that the Debtors are interested in preserving.   The European Creditors submit that the Debtors' reversal is based, in part, due to the true value of the License when it is reinstated by CySEC and utilized to re-engage in brokerage, custodianship and lending services across Europe.[16] The failure to take such increased value into consideration to determine the Purchase Price of the Shares further evidences the Debtors' attempt to retain value for FTX Trading's creditors to the detriment of the FTX Europe Group entities' creditors.

29.    The Independent Director should have one goal: obtain the highest and best offer for the Shares.   Although the Debtors maintain that the negotiations with Bidder 1 effectively amounted to a "market test," it did not and does not support their alleged "fair price."   A fair price can be "established by demonstrating that no better alternatives" are available.   *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020).   A "fair price" should be the result of negotiations that "incorporate the respective parties' risks and rewards, and more, importantly, thoroughly tested by the market."   *Id*. at 792.   The Debtors' motion provides no explanation for the abandonment of Bidder 1's current offer at the eleventh hour in exchange for the Sale

---

[14] Assuming proper authority was obtained from FTX Europe and other FTX Europe Group entities, Debtors' Counsel would be prohibited from seeking retroactive approval of its retention and fees.  See *In re Ark. Co.*, 798 F.2d 645 (1986).

[15] See D.I. 1866, ¶¶ 104-105, at 31-32.  Notably, there is no explanation how using $6 million in customer funds held by FTX Trading to fund the Purchase Price to acquire what has previously been described as worthless, is in the best interest of FTX Trading's creditors.

[16] It bears noting that obtaining the CySEC Transfer Authorization by the Termination Date of February 29, 2024, is nearly impossible because, on the advice the European Creditor's Cyprus counsel, CySEC review and approval will take months.

Transaction, without a public auction as mandated by the Court's Bid Procedures Order.  The FTX Europe Sale Motion glosses over Bidder 1's current offer that is itself, upon information and belief, higher and better than the Sale Transaction because it guarantees FTX EU's customer deposits. Even if the Bidder 1 offer is not currently higher and better, there is no indication that any effort was made by the Debtors to go back to Bidder 1 and request that it match or exceed the Sale Transaction.  Before any transaction is approved by the Court, the European Creditors, as the real parties in interest, should have full and transparent access to the terms of all offers so that the risks and rewards of each can be properly considered—as the Independent Director clearly did not do so—and to all negotiations to ensure that the Debtors made every effort to obtain the highest and best price before handing the asset over to themselves.    The Court—and the sanctity of the chapter 11 process generally—are entitled to the same transparency.  Depriving the real parties in interest of access to all relevant information concerning the terms of active offers, coupled with collusive dealings between the Debtors, Ray, Debtors' Counsel and the Independent Director, forbids a good faith finding under section 363(m) of the bankruptcy code.  *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143, 147 (3d Cir. 1986) ("[T]he misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or Trustee, or an attempt to take grossly unfair advantage of other bidders.").

## RESERVATION OF RIGHTS

30.    The European Creditors reserve their rights to raise further and other objections to the FTX Europe Sale Motion prior to or at the hearing thereon.

## CONCLUSION

WHEREFORE, the European Creditors respectfully request that the Court deny the FTX Europe Sale Motion, or alternatively, if the Court determines it has subject matter jurisdiction over the Dismissal Debtors' bankruptcy cases, order that the Debtors conduct a public auction for the Shares to maximize value for the creditors of FTX Europe AG and FTX EU Ltd.


Dated: January 18, 2024
Wilmington, Delaware

/s/ *Christopher Viceconte*
Christopher Viceconte (No. 5568)
**GIBBONS P.C.**
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801
Telephone: (302) 518-6300
E-mail: cviceconte@gibbonslaw.com

-and-

Robert K. Malone (admitted *pro hac vice*)
Brett S. Theisen (admitted *pro hac vice*)
Christopher P. Anton (*pro hac vice* forthcoming)
Kyle P. McEvilly (admitted *pro hac* vice)
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
        btheisen@gibbonslaw.com
        canton@gibbonslaw.com
        kmcevilly@gibbonslaw.com

*Counsel for Dr. Marcel Lötscher*
*and Martha Lambrianou*