## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 5202, 5203, 5204** |

### DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION OF DEBTORS TO ESTIMATE CLAIMS BASED ON DIGITAL ASSETS

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

REPLY ....................................................................................................................................4

I. Claims Must be Valued as of the Petition Date .................................................................4

    A. Section 502(b) of the Bankruptcy Code Requires Claims be Valued as of the Petition Date............................................................................................ 4

    B. No Party has Demonstrated that Section 502(b) Does Not Govern, or Provided any Legal Basis to Value Claims as of Another Date. ........................... 6

II. Estimation is Necessary and Appropriate ..........................................................................8

    A. Liquidation of Claims Would Unduly Delay These Chapter 11 Cases. ................. 8

    B. Claims Based on Digital Assets are Unliquidated. ................................................ 11

III. The Debtors' Methodology for Valuing the Digital Assets is Appropriate......................14

    A. It is Appropriate to Include the Debtors' Holdings when Determining the Value of Digital Assets. ..................................................................................... 14

    B. The Fundamental Value of FTT is $0 for Claims on Account of FTT................ 16

    C. Futures Prices Should Be Determined Based on the Petition Time Price. .......... 18

    D. Coin Metrics' Baseline Pricing is Objective and Reliable................................... 21

    E. Coin Metrics' Selection of Exchanges in its Data Set is Reliable. ...................... 22

    F. Tokenized Stock Prices Are Specific to the Debtors' Exchanges. ....................... 24

    G. Nugenesis's Additional Objections Should be Rejected. .................................... 25

IV. Arguments That Digital Assets Constitute Customer Property Are Preserved and Not Addressed by the Motion .......................................................................................27

V. The Motion Satisfied Procedural Requirements ..............................................................28

VI. Other Objections are Moot or Fail. .................................................................................29

CONCLUSION........................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re BlockFi Inc.*,
  Case No. 22-19361 (Bankr. D.N.J. Aug. 8, 2023) ....................................................5

*In re Celsius Network LLC*,
  2023 Bankr. LEXIS 2720 (Bankr. S.D.N.Y. Nov. 9, 2023) ......................................17, 18, 25

*In re Celsius Network LLC*,
  Case No. 22-10964 (Bankr. S.D.N.Y. Sept. 27, 2023) ..............................................5

*In re Energy Future Holdings Corp.*,
  531 B.R. 499 (Bankr. D. Del. 2015) ........................................................................12

*In re G-I Holdings, Inc.*,
  323 B.R. 583 (Bankr. D.N.J. 2005) ........................................................................8

*In re Glob. Power Equip. Grp. Inc.*,
  2008 WL 435197 (Bankr. D. Del. Feb. 14, 2008) ..................................................5, 7

*In re Innovasystems, Inc.*,
  2014 WL 7235527 (Bankr. D.N.J. Dec. 18, 2014) ..................................................8

*In re Loya*,
  123 B.R. 338 (9th Cir. BAP 1991) ..........................................................................12

*Mazzeo* v. *United States*,
  131 F.3d 295 (2d Cir. 1997) ....................................................................................12

*Matter of Pearson*,
  773 F.2d 751 (6th Cir.1985) ....................................................................................12

*In re RCS Capital Development, LLC*,
  2013 WL 3618550 (9th Cir. July 16, 2013) ............................................................5

*In re RNI Wind Down Corp.*,
  369 B.R. 174 (Bankr. D. Del. 2007) ........................................................................10

*In re Voyager Digital Holdings*,
  Case No. 22-10943 (Bankr. S.D.N.Y. Mar. 5, 2023) ..............................................5

*In re Wenberg*,
  94 B.R. 631 (9th Cir. BAP 1988) ............................................................................12

**Statutes**

11 U.S.C. § 502(b) ..................................................................................4, 5, 6, 7, 26, 28

11 U.S.C. § 502(c) ..................................................................................8, 10, 28

11 U.S.C. § 502(h) ..................................................................................30

11 U.S.C. § 1125 ..................................................................................9

**Other Authorities**

Del. Bankr. L.R. 9006-1(c)(ii) ..................................................................................29

*FTX Token Whitepaper*, WHITEPAPER.IO, https://whitepaper.io/document/502/ftx-
token-whitepaper ..................................................................................16

*2023*, KAIKO, https://www.kaiko.com/products/rates-and-indices/exchange-
ranking ..................................................................................23

*November 2023*, CCDATA, https://ccdata.io/research/exchange-benchmark-
rankings ..................................................................................23

*Top Crypto Exchanges*, CER, https://cer.live/ ..................................................................................23

*Top Cryptocurrency Spot Exchanges*, COINMARKETCAP,
https://coinmarketcap.com/rankings/exchanges/ ..................................................................................23

*Trust Score*, COINGECKO, https://www.coingecko.com/en/exchanges ..................................................................................23

"What Are Futures?," *FTX.com* (via Wayback Machine), available at
https://web.*archive*.org/web/20210320175303/https://help.ftx.com/hc/en-
us/articles/360024780791-What-Are-Futures ..................................................................................20

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession
(collectively, the "Debtors") hereby submit this reply (the "Reply") in support of the *Motion of
Debtors to Estimate Claims Based on Digital Assets* [D.I. 5202] (the "Motion")[2] and in response
to the objections to the Motion (the "Objections"), which are set forth in Appendix 1 attached
hereto.  In further support of the Motion, the Debtors also submit the *Declaration of Edgar W.
Mosley II in Support of Motion of Debtors to Estimate Claims Based on Digital Assets* (the
"Mosley Declaration"), attached hereto as Exhibit C, and the *Supplemental Declaration of
Sabrina T. Howell in Support of Motion of Debtors to Estimate Claims Based on Digital Assets*
(the "Howell Supplemental Declaration"), attached hereto as Exhibit D.

## PRELIMINARY STATEMENT

1.      The Debtors have worked tirelessly since the Petition Date to secure,
preserve, and maximize the value of their assets for the benefit of customers and other
creditors—the victims of Sam Bankman-Fried's fraud and the stunning collapse of the FTX
group.  These ongoing efforts have been extremely successful, with the Debtors having to date
recovered billions of dollars of assets for distribution through their Plan, and more is expected.
The Debtors' path to a confirmed Plan is clear and emergence from chapter 11 is within view.
But significant challenges remain in order to return that value to customers and other creditors.

2.      One of those challenges is addressed through this Motion:  there are
millions of unliquidated Claims based on Digital Assets in these Chapter 11 Cases that need to
be valued for multiple purposes, including Plan solicitation and voting, setting appropriate
reserves, and making distributions.  As is apparent from the spectrum of arguments advanced in

---

[2]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion or
the relevant objection, as applicable.

the Objections to the Motion, holders of these Claims have vastly different views on how to value them.  This confirms the need for a centralized approach to permit continued progress in these Chapter 11 Cases and to establish fair valuations that are compliant with applicable law.

3.     As has been clear from day one, due to the fraud committed by Mr. Bankman-Fried and other insiders, the Debtors did not have sufficient Digital Assets on the Petition Date to consider making in-kind distributions to creditors.  The majority of the value of Claims based on Digital Assets and/or fiat against the Debtors—nearly 60%—are on account of U.S. Dollar-denominated fiat and stablecoins pegged to the price of the U.S. dollar.  But *approximately 79%* of all scheduled Claims based on Digital Assets and fiat by volume of Claims include other assets that are not readily converted to U.S. dollars.

4.     Therefore, in order to treat all Claims based on Digital Assets equitably in the Plan, it is necessary to also dollarize the values of Claims based on Digital Assets other than fiat and stablecoins.  This is also how financial markets have been treating Claims based on Digital Assets throughout these Chapter 11 Cases through the dozens of Claims transfers occurring each day through U.S. Dollar transactions.

5.     To accomplish this, the Debtors, based on the work of Coin Metrics and Professor Howell, seek to estimate these Claims based on the values set forth in the Digital Assets Conversion Table.  For the vast majority of Digital Assets, the Digital Assets Conversion Table sets forth the Petition Time price of the Digital Asset based on the widely relied-upon Coin Metrics pricing as described in the Lu Declaration.  The Debtors believe that Petition Time pricing for Digital Assets is both required under the Bankruptcy Code and also the most equitable manner in which to value Claims based on Digital Assets.  As addressed in more detail below, objectors proposed multiple different methodologies for valuing certain Digital Assets

with the only unifying feature being that each objector is advocating for their own interests and the methodology that provides them with the highest individual Claim amount.  In contrast, the Debtors are a fiduciary for the estates as a whole.  They must advocate for a methodology that both complies with the requirements of the Bankruptcy Code and treats creditors the *most* fairly.  The Petition Time values reflected in the Digital Assets Conversion Table achieve these objectives.

6.      As described in the Howell Declaration, for a select few Digital Assets, the Digital Assets Conversion Table necessarily includes certain discounts to account for other variables.  Notably, out of the over 1,300 Digital Assets on the Digital Assets Conversion Table, the Debtors have proposed adjustments to Petition Time market pricing for fewer than 200 Digital Assets.

7.      The Debtors filed this Motion to provide notice to parties-in-interest and a transparent process to establish the Digital Assets Conversion Table in advance of the Plan confirmation process.  Importantly, this permits the Court to consider and establish the valuation of Claims based on Digital Assets prior to finalizing the Disclosure Statement and commencement of solicitation and voting on the Plan.

8.      The Objections reveal some confusion about what the Debtors are requesting and, importantly, *not* requesting through the Motion and Order.  The Digital Assets Conversion Table sets forth the estimated values of Claims based on Digital Assets for purposes of solicitation, voting, and distributions due to the millions of unliquidated customer Claims.  Under the circumstances, this is necessary to provide creditors adequate information and a recovery analysis in connection with the Disclosure Statement, and to permit creditors to make an informed vote on the Plan.  The Order and Digital Assets Conversion Table ***do not*** preclude

creditors from arguing in the future, including in connection with Plan confirmation, that they hold property rights in any Digital Assets.  To the extent this Court later determines any creditor has a property interest in specific property, the Digital Assets Conversion Table would not be applicable.[3]

9.     Finally, certain of the Objections seek to contest the valuation of individual Digital Assets for which further discovery and briefing is necessary prior to the adjudication by the Court.  As a result, the Debtors have agreed to defer a determination on the value of three spot tokens subject to objections:  MAPS, OXY, and SRM, which will be considered at a further evidentiary hearing on an agreed schedule in March 2024.  A revised proposed Order is attached hereto as <u>Exhibit A</u>.  A copy of the revised proposed Order compared against the proposed Order filed with the Motion is attached hereto as <u>Exhibit B</u>.

10.     The Debtors submit that estimation is appropriate with respect to Claims based on Digital Assets, and that the estimated values provided in the Digital Assets Conversion Table are fair and appropriate for Claims based on Digital Assets.  The Debtors respectfully request that the Court overrule the Objections and grant the Motion.

## **<u>REPLY</u>**

**I.    Claims Must be Valued as of the Petition Date**

**A.    Section 502(b) of the Bankruptcy Code Requires Claims be Valued as of the Petition Date.**

11.     Section 502(b) of Bankruptcy Code governs the valuation of claims and provides black letter law that "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of petition."  11

---

[3]    The revised proposed Order includes this and other clarifications as to its scope and the applicability of the Digital Assets Conversion Table.

U.S.C. § 502(b); *see also In re Glob. Power Equip. Grp. Inc.*, 2008 WL 435197, at \*5 (Bankr. D. Del. Feb. 14, 2008) (noting that it is "502(b)'s unambiguous design" to "[]freez[e] the value of a claim").

12.     This is why, in accordance with section 502(b), Claims based on Digital Assets have been valued as of the applicable petition date in other cryptocurrency bankruptcy cases. *See, e.g., In re BlockFi Inc.*, Case No. 22-19361 (Bankr. D.N.J. Aug. 8, 2023), D.I. 1309 ("As is required by section 502(b) of the Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the Digital Assets (based in United States dollars pursuant to Digital Assets Conversion Table) held by the Account Holder at the Debtors as of the Petition Date at 11:59 p.m. UTC."); *In re Voyager Digital Holdings*, Case No. 22-10943 (Bankr. S.D.N.Y. Mar. 5, 2023), D.I. 1138 ("Account Holder Claims shall be valued in U.S. dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code."); *In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. Sept. 27, 2023), D.I. 3577 ("Unless otherwise expressly provided herein, the value of a Claim denominated in Cryptocurrency shall be calculated by converting the value of the Claim into Cash as of the Petition Date…").

13.     On this issue, Digital Assets can be analogized to foreign currency, which is valued using the currency exchange rate as of the applicable petition date.  This "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars.  The amount of the claim will not change, even . . . if the applicable currency rises or falls in relation to dollars."  *In re Glob. Power Equip. Grp., Inc.*, 2008 WL 435197, at \*5; *see also In re RCS Capital Development, LLC*, 2013 WL 3618550, at \*13 (9th Cir. July 16, 2013) (concluding "that the bankruptcy court erred in calculating the exchange rate [for purposes of claim allowance] by using the breach date rather than the petition date as

mandated by § 502(b)").  Accordingly, the Debtors must value Claims, including those based on Digital Assets, as of the Petition Date.

> **B.    No Party has Demonstrated that Section 502(b) Does Not Govern, or Provided any Legal Basis to Value Claims as of Another Date.**

14.    Numerous *pro se* objectors take issue with the Debtors' use of Petition Time pricing, rather than either (i) current market pricing or (ii) in-kind distributions.  However, no objector has demonstrated that section 502(b) of the Bankruptcy Code does not require Petition Time pricing, or provided any other *legal* basis to value Claims as of any date other than the Petition Date.[4]  Rather, these objectors argue that valuing Claims based on the Petition Time value of Digital Assets is "unfair" and "inequitable."  The Debtors respectfully disagree with these arguments: not only is Petition Time pricing required by the Bankruptcy Code, it is the only fair method to value these Claims.

15.    The Debtors understand the concerns expressed by customers regarding the increase in value of certain Digital Assets since the Petition Date.  But the market price of many Digital Assets (and the corresponding Claims) have also *decreased* in value since the Petition Date.  Because Digital Assets are extremely volatile assets, fixing Claims values as of the Petition Time protects everyone and is equitable.

16.    A number of objectors—who believe their Claims based on Digital Assets have increased in value since the Petition Date—argued for an alternative to Petition Time but do not explain why doing so complies with the Bankruptcy Code.  For example, one form of objection filed by dozens of *pro se* claimants asserts that valuation as of the Petition Date "fails to consider the volatile nature of cryptocurrency markets, where the value of assets can fluctuate

---

[4]    Arguments regarding whether Digital Assets constitute customer property are addressed separately below.

widely in a short period." This is wrong: valuation of assets as of the Petition Date is how a debtor *acknowledges* a volatile market. Indeed, a primary purpose of section 502(b) is to "freeze" claims that may later fluctuate postpetition. *See In re Glob. Power Equip. Grp., Inc.*, 2008 WL 435197, at *5 (noting that valuation as of the petition date "prevents the value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars").

17. The same form objection notes that the objectors "appreciate the methodology applied to value assets like FTT, SRM, MAPS, and OXY" but are "concerned that other assets such as BTC, ETH, and SOL have experienced significant increases in value since the [P]etition [D]ate," which appreciation is not reflected in the prices set forth in the Digital Assets Conversion Table. Therefore, according to the objectors, there is "disparity in how different assets are treated." This is not the case. Petition Date valuation for all Digital Assets *eliminates* disparity in treatment. To treat some Digital Assets differently than other Digital Assets based on whether they appreciated or depreciated in value since the Petition Date is inherently disparate treatment, impermissible under the Bankruptcy Code, and inequitable for creditors.

18. Other Objections reinforce the need for one uniform, objective date. For example, one objector submits that Digital Assets should be valued as of the date the Debtors sold those Digital Assets. (*See* D.I. 5532.) Another suggests the Debtors "select a date to dollarize assets in between March 20th and October 20th 2023," which "represents the average timeframe between FTX bankruptcy date, and today[']s timeframe." (D.I. 5662.) This objector also proposes selecting 9:00 am ET on the Petition Date, rather than the Petition Time (10:00 am ET), "since there is a 5% difference between the proposed timeframe." (*Id.*) Yet another

objector proposes that, if not current market prices, "the bankruptcy process should at minimum endeavor to offer customers the 1-year average price preceding the petition date (i.e. 11 November 2021 to 11 November 2022)." (D.I. 5785.) And still another seeks either a "rolling valuation window based on market prices within a defined timeframe," "an independent pricing mechanism" or "an auction for customer claims [that] would allow open market competition to determine their true value." (D.I. 5953.)

19.    There is no basis to do any of these things. The law is clear: Claims are, and should be, valued as of the Petition Date.

## II.    Estimation is Necessary and Appropriate

20.    Section 502(c) of the Bankruptcy Code provides that "there *shall* be estimated . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). Though the Court has broad discretion to choose whatever method it deems best-suited to the particular circumstances to estimate claims, *In re Innovasystems, Inc.*, 2014 WL 7235527, at *7 (Bankr. D.N.J. Dec. 18, 2014), because "[s]ection 502(c) . . . is drafted in mandatory terms," the Court *must* estimate claims if it determines that liquidating the contingent or unliquidated claims "would unduly delay the bankruptcy case," *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005).

### A.    Liquidation of Claims Would Unduly Delay These Chapter 11 Cases.

21.    Liquidation of Claims based on Digital Assets would unduly delay these Chapter 11 Cases. The Debtors have over *2 million* scheduled Claims and over 87,000 filed Claims that include at least a single Digital Asset (excluding NFTs) and/or fiat currency. (Mosley Decl. ¶ 6.) These Claims are scheduled and filed almost exclusively in *quantities* of Digital Assets only, and do not contain any U.S. Dollar value. (*Id.*)

22.     Further, while almost 60% of the *value* of scheduled Claims based on assets set forth in the Digital Assets Conversion Table is on account of fiat or stablecoins, approximately 79% of all scheduled Claims that are based on assets set forth on the Digital Assets Conversion Table include assets that are *not* fiat or stablecoins, and thus are not readily converted to U.S. Dollar values.  (*Id.* ¶ 7.)  Thus, to liquidate every one of these Claims would take years, because it would subject the Debtors to the cost and burden of an individual claims adjudication process with every holder of a Claim based on Digital Assets.  (*Id.*)  If only a portion of these Claims are contested, the Debtors and the Court will be inundated with the burden of costly and time consuming litigation to value Claims based on Digital Assets.  (*Id.*)  The absence of a streamlined, uniform process would be administratively prohibitive and could also result in different values for the same Digital Assets applied to different Claims.  (*Id.*)

23.     The Debtors are at the precipice of commencing the Plan confirmation process and proceeding towards returning value to customers and other creditors.  The Disclosure Statement must contain "adequate information" pursuant to section 1125 of the Bankruptcy Code to permit creditors to make an informed decision when voting on the Plan.  This requires concrete information on projected recoveries, which is not possible for Claims based on Digital Assets until values have been assigned to those Digital Assets.  (*Id.* ¶ 8.)  The Debtors have determined that it is therefore important to have the dollarized value of Claims based on Digital Assets determined prior to solicitation and voting on the Plan.  (*Id.*)  To the extent the Debtors were required to individually liquidate all such Claims, solicitation, voting, and the entire chapter 11 plan process would be unduly and unjustifiably delayed.  (*Id.*)  Accordingly, the Debtors submit that these values must be established *now*, and the only way to do so without significant delay of these Chapter 11 Cases is through estimation of those Claims.

*See, e.g.*, *In re RNI Wind Down Corp.*, 369 B.R. 174, 191 (Bankr. D. Del. 2007) (the purpose of section 502(c) is to prevent the debtor's estate from "being held hostage by the fixing or liquidation of an unliquidated or contingent claim").

24.     Fondation Serendipity, Fondation Elements, Serendipity Network Ltd. and Liquidity Network Ltd. (D.I. 5617) (collectively, "Oxy")[5] disagree with the Debtors' contention that Digital Assets must be valued prior to solicitation.  (Oxy Obj. ¶ 25 ("fully and finally fixing the value of Digital Assets is not strictly required for the [] Debtors to have the information that they need to proceed with Plan confirmation").)  Instead, Oxy wants the Debtors to value Claims based on Digital Assets on an "as asserted" basis through the traditional claims objection process.  (*Id.*)  This ignores reality.  Not only is it untenable given the number of Claims based on Digital Assets that have been scheduled or filed, but the vast majority of these Claims are, at least in part, currently set forth in quantities rather than U.S. Dollar amounts.  There is therefore no "as asserted" basis on which to proceed.  Moreover, whether it is "strictly necessary" is irrelevant—the Debtors have determined that it is better for all stakeholders for the recovery analysis in the Disclosure Statement to be reliable, meaningful, and based on actual values that have been approved by the Court rather than the Debtors' unilateral predictions.[6]

25.     Conclusory arguments by Boba Foundation (D.I. 5601), Maps Vault Limited (D.I. 5620) ("Maps"), Oxy, and Three Arrows Capital, Ltd. (D.I. 5615)[7] that estimation

---

[5]     Lavanda Sands, L.L.C. joins Oxy's objection.  (*See* D.I. 5624.)  Responses to arguments raised by Oxy in its objection are also in response to Lavanda Sands, L.L.C.

[6]     Oxy's proposal that the Debtors proceed with estimation now solely with respect to Digital Assets that have market pricing at the Petition Time that does not require further adjustment is equally misplaced.  (Oxy Obj. ¶ 25.)  First, other Objections take issue with certain of those prices.  Second, this approach would defer many of the more complex valuation issues until Plan confirmation, which is exactly what the Debtors seek to avoid.

[7]     Avalanche (BVI), Inc. joins the objection of Three Arrows Capital, Ltd.  (*See* D.I. 5686.)  Responses to arguments raised by Three Arrows Capital, Ltd. in its objection are also in response to Avalanche (BVI), Inc.

is not necessary are unpersuasive and refuted by the evidence presented in the Mosley

Declaration.  (Boba Foundation Obj. ¶¶ 39-47; Maps Obj. ¶¶ 35-38; Oxy Obj. ¶¶ 19-25; Three

Arrows Capital Ltd. Obj. ¶ 13.)  Boba Foundation's, Maps' and Oxy's arguments that the

Debtors have not established that liquidation would result in undue delay with respect to their

Claims specifically (Boba Foundation Obj. ¶¶ 42-47; Maps Obj. ¶ 38; Oxy Obj. ¶¶ 26-30) reveal

the exact problem with which the Debtors are faced:  there are *millions* of creditors with Claims

based on Digital Assets who could all say they want the Debtors to litigate valuation of their

individual Claims in the context of a contested Claims objection.  That is impractical.

26.     Finally, Maps also argues that liquidation of individual claims would not

result in more delay than this estimation proceeding due to the time necessary to litigate the

valuation of MAPS and OXY.  (Maps Obj. ¶ 38.)  Not so.  Maps' arguments actually

demonstrate why estimation is necessary.  *First*, the agreed-upon litigation schedule to estimate

the value of those Digital Assets is more expedited and condensed than a typical contested matter

with respect to a Claim objection.  It will also determine the valuation for *all* holders of Claims

based on those specific Digital Assets.  Second, Maps is merely *one of millions* of creditors who

could similarly seek a contested matter to litigate valuation on a Claim-by-Claim basis.  This

process is far more efficient and manageable than litigating individual Claim objections.

**B.      Claims Based on Digital Assets are Unliquidated.**

27.     Claims based on Digital Assets are unliquidated and subject to estimation.

An "unliquidated" claim is a "claim in which the amount owed has not yet been determined."  *In*

*re Energy Future Holdings Corp.*, 531 B.R. 499, 515 n.70 (Bankr. D. Del. 2015).  For purposes

of determining whether a claim is "liquidated" in analogous contexts, courts have looked to

whether the claim's value has been determined or the relative "ease" with which that value can

be determined.  *See Mazzeo* v. *United States*, 131 F.3d 295, 304 (2d Cir. 1997).  "[A] disputed

debt which is capable of ready determination is liquidated." *In re Loya*, 123 B.R. 338, 340–41 (9th Cir. BAP 1991). "The definition of 'ready determination' turns on the distinction between a simple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability." *In re Wenberg*, 94 B.R. 631, 634 (9th Cir. BAP 1988); *Matter of Pearson*, 773 F.2d 751, 756 (6th Cir.1985) ("[T]he fact that evidence must be taken to determine the amount of the claim indicates that, until then, the claim was unliquidated.").

28.     Establishing fair valuations for novel digital assets trading around the world in notoriously opaque markets is far from simple or readily determinable. Ascribing values to the Digital Assets on which Claims are based required a complex, fact-intensive analysis that required months of work by the Debtors and their professionals. Approval of those values will require multiple hearings with testimony from both fact and expert witnesses. The process involved in obtaining approval of the Digital Assets Conversion Table cannot be determined with "ease" and thus the Claims based on Digital Assets are indeed unliquidated.

29.     Certain objectors take the position that their specific Claims are not unliquidated and therefore cannot be estimated. Boba Foundation, for example, asserts that its Claims are not unliquidated because the *number* of Digital Assets that form the basis for Boba Foundation's claim is not disputed. (Boba Foundation Obj. ¶ 34.) According to Boba Foundation, "[t]he only question is the conversion rate." (*Id.*) However, it is the conversion rate that is crucial (and complicated), and what renders Boba Foundation's Claims unliquidated.

30.     Maps and Oxy also assert that their Claims are not unliquidated because they filed proofs of claim with U.S. Dollar amounts, and as such, the Debtors merely *dispute*

those Claims, which alone does not render them contingent or unliquidated.[8]  (Maps Obj. ¶¶ 40-41; Oxy Obj. ¶¶ 27, 29.)  But merely asserting a self-identified conversion rate for Digital Assets does not exempt Maps and Oxy from this estimation process.

31.     The Customer Bar Date Notice approved by this Court explicitly stated that "the Debtors are only requesting all holders of Customer Claims to assert their quantities of cryptocurrency, digital assets and other assets **and not to include any conversions or valuations.  The Debtors will seek to establish valuations at a later date, and all parties' rights are reserved.**"  (Customer Bar Date Notice n.3.)  Selecting a (self-serving) value for the relevant Digital Assets and plugging it into their proofs of claim notwithstanding explicit instructions in the Customer Bar Date Notice to the contrary did not liquidate their Claims.  It is indeed telling that the very objectors who argue that their Claims are not liquidated are the same parties who have retained experts and are engaging in weeks of discovery with respect to the value of those Claims.

32.     Boba Foundation also asserts that the Debtors should treat Claims based on Digital Assets as liquidated by "just look[ing] at the trading price on the Debtors' petition date."  (*See* Boba Foundation Obj ¶¶ 35-37; *see also* Oxy Obj. ¶ 25 n.8.)  But this ignores the circumstances of these Debtors and, as explained below (*see supra* Section III), that additional considerations must be taken into account to arrive at a fair valuation.  Accordingly, Claims based on Digital Assets are unliquidated.

---

[8]     Maps' and Oxy's arguments regarding whether their Claims are contingent are irrelevant.  (*See* Maps Obj. ¶¶ 40, 42; Oxy Obj. ¶¶ 28-29.)  The Debtors do not assert that Maps' or Oxy's Claims are contingent, nor do they need to under section 503(c).

### III.     The Debtors' Methodology for Valuing the Digital Assets is Appropriate

#### A.     It is Appropriate to Include the Debtors' Holdings when Determining the Value of Digital Assets.

33.     The effect of an orderly liquidation of the Debtors' holdings of Digital Assets is necessary to determine the accurate Petition Time value of Digital Assets.  To do otherwise would assume that the Debtors either (i) do not liquidate their holdings of Digital Assets outside of those claimed by customers and other creditors or (ii) liquidate their holdings of Digital Assets claimed by customers and other creditors first to satisfy those Claims, and then liquidate their other holdings.  (Howell Suppl. Decl. ¶ 11.)  Neither of these assumptions is realistic, and the objectors who take issue with it miss the mark.  (*See* Boba Foundation Obj. ¶ 37; Oxy Obj. ¶¶ 34-41.)

34.     The Debtors have filed a Plan that requires liquidation of all of their assets, digital or otherwise, to satisfy Claims.  This was known on the Petition Date, and it was revealed early on in these Chapter 11 Cases that the Debtors lacked the Digital Assets necessary to consider in-kind distributions.  (*See* Howell Rep. ¶ 3.)   Therefore, the Debtors *must* sell all of the Digital Assets they hold, regardless of whether they are the basis of a Claim, to create U.S. dollars to distribute on account of Allowed Claims.  These sales necessarily would affect the price of those Digital Assets because a customer could not sell their Digital Assets at the Petition Time without having the sale price affected by the Debtors' sales of Digital Assets at the same time.  (Howell Suppl. Decl. ¶ 12.)  Furthermore, each Digital Asset has a market with a finite amount of liquidity, or ability to absorb sales.  (*Id.*)  With a sufficiently large quantity for sale, demand becomes exhausted and further sales are impossible.  (*Id.*)  The values of Digital Assets at the Petition Time thus cannot be determined in a vacuum as if there was no other FTX-related trading activity happening at that time.  (*Id.*)

35.     This methodology is also the fairest for all creditors.  Were the Debtors to ignore the market impact from liquidating their Digital Assets holdings, or assume that the Digital Assets that are the basis of Claims could be liquidated first, the result would be a shortfall in asset sale proceeds that would have to be borne by other creditors.  (*Id.* ¶ 13.)  The creditors who would bear the brunt of this shortfall (*i.e.*, higher discounts) would be those holding *more liquid* assets that the Debtors did not hold in sufficient quantities, while the creditors who would benefit would be those holding the more illiquid assets.  (*Id.*)  Because the Debtors *must* liquidate their holdings, a liquidation discount is unavoidable.  Forcing all creditors to share ratably in a loss due to the sale of particular and identifiable Digital Assets would be unfair and inequitable.

36.     This is particularly true here, where the Digital Assets subject to the largest liquidation discount adjustments were known to be held in substantial quantities by the Debtors.  Claims based on Digital Assets have different degrees of FTX-specific risk.  (*Id*. ¶ 14.) When purchasing particular Digital Assets that the Debtors were known to hold in large quantities relative to daily trading volumes, a trader assumed the risk that the Debtors might at any time liquidate its holdings and crash the price.  (*Id.*)  For example, a customer who purchased Digital Assets such as Bitcoin assumed the risk of the Debtors' exchanges functioning, but not risk of the Debtors selling Bitcoin into the market because Bitcoin is so liquid and widely held.  (*Id.*)  In contrast, when purchasing an illiquid Digital Asset where the Debtors were large holders relative to the circulating supply or regular trading volume in the markets, the customer took an additional risk that the Debtors might choose or be compelled to liquidate the token.  (*Id.*)  The risk of being able to liquidate a Digital Asset in the market is one

that should be borne by the holders of such Claims, and not by other customers or creditors who did not assume that risk.  (*Id.*)[9]

37.     Finally, it is important to emphasize that the asset liquidation discount affects very few Digital Assets: it is only applied where appropriate to 71 Digital Assets out of the over 1,300 set forth on the Digital Assets Conversion Table.  (*See* Howell Rep. ¶ 13.)

**B.     The Fundamental Value of FTT is $0 for Claims on Account of FTT.**

38.     As explained by Professor Howell, FTT has no value in the Digital Assets Conversion Table because FTT has no utility outside of an operating FTX.com exchange and therefore no fundamental value.  (Howell Rep. ¶¶ 43-45.)  Every feature of FTT was dependent upon the continued operation of the FTX.com exchange.  Generally, FTT had the following features (among others):[10]

- **Token Burn**.  One third of all fees generated by the FTX.com exchange were to be used to repurchase FTT, simulating a stock repurchase/dividend.  The repurchased FTT would be "burned," i.e., eliminated from circulation.

- **Voting Rights**.  Customers with a requisite number of FTT had the right to vote on new digital asset listings and other features.

- **Crypto Back Rewards**.  Customers received a discount on transaction fees if FTT was held by the customer.  The discount increased commensurate with the number of FTT held.

- **Airdrops**.  Free tokens were distributed to customers via a lottery; the probability of winning was increased in proportion to the number of FTT held.

- **Investment Rights**.  Customers received early access to initial coin offerings hosted on FTX.com exchange.

---

[9]     Oxy's argument that valuation of customer claims is determined by reference to the Stockbroker Liquidation Provisions (Oxy Obj. ¶¶ 38-41) is also meritless.  This is a Chapter 11 case; not a stockbroker liquidation.

[10]    *FTX Token Whitepaper*, WHITEPAPER.IO, https://whitepaper.io/document/502/ftx-token-whitepaper (last visited January 27, 2024).

39.     Without an operating FTX.com exchange, these sources of FTT's value are eliminated; no one else can perform them.  The Plan does not provide for an operating FTX.com exchange, or *any* exchange that utilizes FTT, following these Chapter 11 Cases.  In addition, holders of FTT did not have a fixed maturity date or schedule of payments, or the right to demand repayment, and had no liquidation preference, security interest, or other legitimate expectation of recovery in a true insolvency and liquidation of the Debtors.

40.     Accordingly, Professor Howell concluded that "there is neither a current nor future source of value for FTT, and therefore . . . FTT has zero fundamental value." (Howell Rep. ¶¶ 15, 85-87.)  The Debtors' proposal is consistent with Judge Glenn's findings with respect to a similar valuation question in the Celsius bankruptcy case.  In that case, Judge Glenn approved a settlement valuing Celsius' native utility token at a small amount ($0.25) despite his reservations that even this amount was excessive.  *See In re Celsius Network LLC*, 2023 Bankr. LEXIS 2720, at *21-22 (Bankr. S.D.N.Y. Nov. 9, 2023) ("No objecting party presented evidence that any source of speculative value, alone or in conjunction, could even approach, much less exceed, $0.25. . . . If the Celsius platform could not operate in the future, as in fact is the case, the CEL Token as a utility token on that platform would have no value.").

41.     Certain *pro se* objectors assert that FTT should not be valued at $0 because (i) there is an active market in FTT that assigns some positive value to FTT (*see* D.I. 5427, 5436, 5488), (ii) FTT is no different from other Digital Assets and should be assigned its Petition Time price (*see* D.I. 5436, 5488) and (iii) FTT has been assigned positive value in certain other cryptocurrency exchange bankruptcies (*see* D.I. 5488).  These Objections fail.  As noted by Professor Howell, market prices for FTT were unreliable and likely distorted in the period leading up to the Petition Date "due to the concealed fraud at FTX. . . ."  (Howell Rep.

¶ 87.)  Further, any current market price for FTT is merely speculative.  FTT is a utility token with no value outside of an operating exchange, which does not currently exist and which is not going to exist in the future.  (*Id.* ¶¶ 43-45); *cf. In re Celsius Network LLC*, 2023 Bankr. LEXIS 2720, at *19-20 (finding that when the crypto exchange sponsoring a crypto utility token suspends operations the value of the crypto utility token is purely speculative).  Moreover, it is not the current market price that matters for purposes of estimating Claims on account of FTT, but the Petition Time value.  As explained in the Howell Report, the fundamental value of FTT at the Petition Time is zero.  (*See* Howell Rep. ¶ 86.)

42.     In any event, the relief requested with respect to FTT presumes, as the current Plan does, that there is no FTX exchange utilizing FTT following emergence, and the revised proposed Order reserves all parties' rights in the event that were to unexpectedly change, as well as with respect to classification of FTT in the Plan.

**C.     Futures Prices Should Be Determined Based on the Petition Time Price.**

43.     Professor Howell's approach treats Claims based on futures positions as though the futures positions had been closed out by the customer at the Petition Time.  (Howell Rep. ¶¶ 32-33.)  This is most consistent with the way the futures contracts operated and with the Debtors having ceased operations and filed for bankruptcy.

44.     As explained in the Howell Report, "[f]utures contracts represent opposing bets by two parties about the future price of an asset, where one party takes the long position (a bet that the price will increase) and one takes a short position (a bet that the price will decline)." (Howell Rep. ¶ 30.)  The futures contracts, as agreed to between the customers and the Debtors, did not result in the actual exchange of an asset; rather, they resulted in fiat-denominated profit-and-losses (P&L) for the bet's "winners" and "losers" of whether the price of the futures contract will increase or decrease.  (*Id.*)  A conventional futures contract has a fixed maturity date, so the

futures price must converge to the spot price at the expiration date.  (*Id.* ¶ 31.)  A perpetual futures contract, to the contrary, has no fixed maturity date.  (*Id.*)  Perpetual futures use a funding mechanism in which the two parties in the contract make periodic payments depending on whether the futures price is above or below the price of the underlying reference asset.  (*Id.*)

45.     To trade futures, a customer must post collateral in a margin account.  (*Id.* ¶ 30.)  As the price of the futures contract moves up or down, the customer's P&L changes.  (*Id.*)  Every day, the Debtors calculated the P&L in a "mark-to-market" exercise.  (*Id.*)  The Debtors calculated the P&L in its "mark-to-market" exercise every 30 seconds.  (*Id.* ¶ 32.)  For perpetual futures, the Debtors recalculated the funding rate every hour, 24 hours a day.  (*Id.* ¶ 31.)  Therefore, if the price of a perpetual futures contract deviated from the underlying reference asset for twenty-four hours, funding payments were made to re-calibrate any mispricing.  Due to the high-frequency updating and the nature of futures contracts, Professor Howell determined that the P&Ls for each customer closely reflect futures prices at any snapshot in time.  (*Id.* ¶ 32.)  Accordingly, Professor Howell valued futures at the value of their fiat-denominated account, which held the P&L for futures.  (*Id.* ¶ 33.)

46.     Auros Tech Limited ("Auros"),[11] one *pro se* objector (D.I. 5903) and one *pro se* creditor who sent informal comments to the Debtors objected to this valuation methodology.  These objectors contend that futures should be settled at the underlying spot price rather than at each customer's P&L at the Petition Time.  These objections fail for multiple reasons.

---

[11]   Avalanche (BVI), Inc. joined Auros' objection (D.I. 5614).  Responses to Auros are also responses to Avalanche (BVI), Inc.

47.    *First*, the objectors equate the Debtors' bankruptcy filing with an accelerated settlement and de-listing event.  (*See* D.I. 5614-1 ¶¶ 20-22; D.I. 5903.)  During a settlement and de-listing event, the objectors assert, both the market generally and the Debtors historically have used the spot price as the reference price.  (D.I. 5614-1 ¶ 18; D.I. 5903.)  However, the Debtors' bankruptcy filing was *not* a de-listing event.  As explained by Professor Howell, de-listing usually occurs when the underlying asset ceases to exist or be traded.  (Howell Suppl. Decl. ¶ 8.)  De-listing is also usually a process undertaken by an exchange with ongoing operations.  (*Id.* ¶ 9.)  A de-listing event is often announced in advance, allowing prices to adjust in response.  (*Id.*)  This is opposed to the closing out of positions, which is how a customer would normally exit a futures position.  (*Id.*)  None of those facts are present here.  The Debtors did not de-list the futures or underlying tokens—the Debtors ceased operations.  Accordingly, valuing Claims based on futures positions by effectively closing out these positions is more appropriate than a de-listing analogy.  (*Id.*)  This amount is determined by reference to the P&Ls.

48.    *Second*, the objectors assert that the futures prices at the Petition Time were dislocated from broad market prices and thus the Petition Time P&L should not be used to price those assets.  (*See* D.I. 5614-1 ¶ 21; D.I. 5903.)  This argument, too, fails.  Unlike many spot tokens, futures and other derivatives at issue were FTX-specific financial contracts whose payoffs were inherently tied to the market dynamics of the Debtors' exchanges.  (Howell Suppl. Decl. ¶ 10.)  The Debtors' website specifically highlighted that "futures listed on FTX differ from other major cryptocurrency futures."[12]  Therefore, customers with futures positions on the

---

[12]  "What Are Futures?," *FTX.com* (via Wayback Machine), available at https://web.archive.org/web/20210320175303/https://help.ftx.com/hc/en-us/articles/360024780791-What-Are-Futures (last visited Jan. 27, 2024).

Debtors' exchanges were exposed to the risks of the Debtors' futures market specifically, including the impact of any potential futures pricing anomalies.

49.     *Third*, making *ex post* adjustments to futures prices would potentially be inconsistent with how the Debtors' exchanges operated, including their automatic liquidation protocols, and may even result in negative balances for some customers.  Repricing supposed "mispriced" perpetual futures contracts could also unfairly benefit the creditors who would have received potentially large payments through the futures "funding rate" system as a result of the same "mispricing" prior to the Petition Time.  (*Id.*)  All this exercise would serve to do is re-allocate value between customers, because futures contracts are bilateral between counterparties where one party's gain is another party's loss.  The Debtors seek the most fair and equitable valuation of Claims based on Digital Assets and to get that value in the hands of creditors.  The most sensible way to do that is, as Professor Howell does, to freeze the futures contracts and close them out on the Petition Date using each customer's P&L.

**D.     Coin Metrics' Baseline Pricing is Objective and Reliable.**

50.     As set forth in the Lu Declaration, there were "significant spreads between prices on FTX and prices on the trusted exchanges during the time window immediately preceding and at the Petition Time."  (Lu Decl. ¶ 41.)  As Mr. Lu explains, "[s]everal factors may have contributed to these divergences, such as market participants factoring in FTX's increasing insolvency risk as information about its financial instability spread, challenges in executing arbitrage efficiently, and the specific timing of FTX suspending withdrawals for certain spot assets."  (*Id.*)  Accordingly, the Debtors engaged Coin Metrics to provide objective Petition Time pricing for many of the Digital Assets, and they did so pursuant to a methodology explained in the Lu Declaration.

51.     A small number of *pro se* creditors object to Coin Metrics' pricing for certain Digital Assets, arguing that Digital Assets TRX, BTT, JST, SUN and HT were trading at significantly higher prices on the Debtors' exchanges just prior to the Petition Time due to a mistaken belief by customers that those Digital Assets would be redeemed at a 1:1 ratio.  (*See* D.I. 5522, 5418, 5663, 5673.)  The objectors therefore demand that the values in the Digital Assets Conversion Table for those Digital Assets be based on the Debtors' pricing rather than that of Coin Metrics.

52.     The purpose of the Digital Assets Conversion Table is to identify the fair market of the Digital Assets at the Petition Time, taking into account the Debtors' circumstances. As Mr. Lu explains and the *pro se* objectors implicitly acknowledge in their objections, the factors that drove up prices of certain Digital Assets on the Debtors' exchanges were inextricably linked to circumstances *internal* to the Debtors' exchanges and expressly *not* tied to any external market activity.  (*See, e.g.*, D.I. 5522 at 1 ("Only FTX's internal prices changed, independent of the prices of other exchanges . . . ."); D.I. 5663 at 3 (noting the relevant coins "were at least 5 to 20 times more premium within FTX").)  This is exactly why the Debtors have relied, where possible, on Coin Metrics' pricing for spot tokens rather than the Debtors' internal pricing.  To utilize the Debtors' internal pricing for these spot token prices would not reflect the accurate market value at the Petition Time.

**E.     Coin Metrics' Selection of Exchanges in its Data Set is Reliable.**

53.     A single objector questioned the appropriateness of the Debtors' reliance on Coin Metrics for the underlying spot token pricing, arguing that Coin Metrics data may be unreliable because (i) Coin Metrics used data from exchanges like Binance, "which have been implicated in wash trading and anti-money laundering (AML) violations" and (ii) other

exchanges such as Bitfinex reported "higher Bitcoin prices than those proposed" by the estate

pursuant to Coin Metrics' data.  (D.I. 5659 at 1.)

54.     These arguments are unpersuasive.  As set forth in the Lu Declaration, a

"methodology to calculate prices for digital assets must . . . identify and select high-quality

constituent exchanges and markets to be used as inputs in the price calculation."  (Lu. Decl.

¶ 29.)  Coin Metrics therefore developed the "Coin Metrics 'Trusted Exchange Framework'" to

evaluate the data quality of a given exchange.  (*Id.* ¶ 35-36.)  The Trusted Exchange Framework

provides a quantitative and rules-based approach to evaluate the quality of pricing information

from a given exchange along several criteria, including transparency, resilience and security,

data quality, regulatory compliance and API quality.  (*See id.* ¶¶ 34-40; *Id.*, App'x B.)

55.     Pursuant to the Trusted Exchange Framework, Coin Metrics identified

Binance as a trusted exchange.  This determination is generally consistent with several other

independent researchers that assess exchanges.  CoinMarketCap assigns Binance a score of 9.9

out of 10,[13] CoinGecko assigns Binance a score of 10 out of 10,[14] CCData assigns Binance a

final score of 75 out of 100 and a grade of A,[15] Kaiko assigns Binance a score of 84 out of 100

and a grade of A,[16] and CER assigns Binance a rating of AAA.[17]  Although the rating scales

differ across researchers, these results indicate that other researchers consider Binance as one of

the highest quality exchanges for pricing Digital Assets.

---

[13] *Top Cryptocurrency Spot Exchanges*, COINMARKETCAP, https://coinmarketcap.com/rankings/exchanges/ (last visited Jan. 27, 2024).

[14] *Top Crypto Exchanges Ranked by Trust Score*, COINGECKO, https://www.coingecko.com/en/exchanges (last visited Jan. 27, 2024).

[15] *Centralised Exchange Spot Benchmark | November 2023*, CCDATA, https://ccdata.io/research/exchange-benchmark-rankings (last visited Jan. 27, 2024).

[16] *Kaiko Exchange Ranking - Q4 2023*, KAIKO, https://www.kaiko.com/products/rates-and-indices/exchange-ranking (last visited Jan. 27, 2024).

[17] *Top Crypto Exch*anges, CER, https://cer.live/ (last visited Jan. 27, 2024).

56.     Additionally, contrary to this creditor's assertion, Mr. Lu's analysis identified *both* Binance *and* Bitfinex as trusted exchanges for purposes of determining the baseline Petition Time pricing of the Digital Assets priced by Coin Metrics.  (*Id.* ¶ 39.)  With respect to Binance specifically, Coin Metrics' Trusted Exchange Framework shows that Binance's leading digit orders fit the expected distribution for Benford's Law, suggesting no market manipulation.  (*Id.*, App'x B at 16.)  Moreover, it is not the case that Binance was used to price *every* Digital Asset.  Rather, Binance and Bitfinex (among others) were identified as part of a pool of trusted exchanges considered from which a narrower set of constituent markets was selected to price each Digital Asset, where available.  (*Id.* ¶ 45.)  In selecting the trusted exchanges ultimately used to calculate each Digital Asset's price, where available, Coin Metrics considered the market's volume, the presence of price outliers, the relevant exchange's score in the Trusted Exchange Framework and the quote currency of the market (*i.e.*, U.S. Dollars).  (*Id.*)  Accordingly, selection of the trusted exchanges used to price any particular Digital Asset ensures that the ultimate price calculated reflects the true market value of the Digital Asset at the Petition Time.  This objection should be overruled.

### F.     Tokenized Stock Prices Are Specific to the Debtors' Exchanges.

57.     As explained by Professor Howell, tokenized stocks are derivatives that aim to mimic the price movements of publicly traded stocks.  (Howell Rep. ¶ 37.)  The tokenized stocks on the Debtors' exchanges were not otherwise tradeable outside of the Debtors' exchanges.  (*Id.* ¶ 38.)  Therefore, Professor Howell considered tokenized stocks to amount to a financial contract between a customer and the Debtors to track a stock price.  (*Id.*)  Accordingly, the price of the tokenized stocks on the Debtors' exchanges—rather than same tokenized stocks on other exchanges or the underlying stocks themselves—best reflect the Petition Time value of such tokenized stocks.  (*Id.*)

58.     Two *pro se* objectors take issue with this approach.  (*See* D.I. 5542, 5594.)
These objectors argue that the tokenized stocks should be valued at the price of the underlying
stock itself rather than the price of the tokenized stock on the Debtors' exchanges.  For the
reasons set forth in the Howell Report, this is not appropriate.  While tokenized stocks were
intended to track the underlying stock, they are not, in fact, the underlying stock; they are a
completely separate instrument.  The Debtors are pricing Claims based on the tokenized stocks
offered by the Debtors, not the underlying stock itself.

59.     The objectors also assert that tokenized stocks are separately situated from
other Digital Assets because there should have been a regulated broker-dealer holding the
underlying share.  (*See id.*)  As explained above and clarified in the revised proposed Order, all
parties' rights are reserved with respect to arguments regarding whether Digital Assets are
customer property, including whether customers have recourse to the underlying shares (which
are not held by the Debtors).  To the extent these objectors believe they have claims against the
other entities purportedly holding the underlying shares, those arguments are unaffected by and
beyond the scope of the Motion.

### G.     Nugenesis's Additional Objections Should be Rejected.

60.     Hussein Faraj filed an objection purportedly on behalf of "Nugenesis Ou
and Nugenesis PTY LTD, along with all its congregates and affiliate users and holders adversely
impacted by" the Motion.  (D.I. 5420.)  As an initial matter, while Mr. Faraj alleges that his
testimony "was acknowledged as expert evidence" in Celsius, his "expert" report submitted there
was excluded because it was "generated within 72 hours" and "written by artificial intelligence."
*See In re Celsius Network LLC*, 2023 Bankr. LEXIS 2720, at *12-15.  The Court also found that
it was "not based on sufficient facts or data," "contain[ed] almost no citations to facts or data
underlying the majority of the methods, facts, and opinions set forth therein," and that Mr. Faraj

"did not review the underlying source material for any sources cited, nor [did] he know what his team did (or did not do) to review and summarize those materials." *Id.* at *13-14. Additionally, the Court found that the report "was not the product of reliable or peer-reviewed principles and methods" because "Mr. Faraj used a 'fair value' method that he personally developed" that "is not widely accepted in valuing cryptocurrency [and] has not been peer tested." *Id.* at *15.[18]

61.    Informed by this history, Mr. Faraj's unsupported arguments that the Debtors' approach "fail[s] to meet any recognized standards within the digital asset space" and "appears to be arbitrary and lacks recognizable methodology" must be rejected. (D.I. 5420 at 2.) Specifically, Mr. Faraj and other *pro se* objectors argue that the "alleged illegal activities" of the Debtors caused a "dislocated market," which in turn caused "artificial suppression" suggesting that "the true value of these affected assets would have been significantly higher." (*Id.* at 3.) This argument has no merit. As discussed above, section 502(b) of the Bankruptcy Code requires that the Debtors value Claims on the Petition Date. The factors that caused the market pricing on the Petition Date are not relevant. The Debtors' objective is to establish fair and accurate pricing of Claims based on Digital Assets as of the Petition Time. Furthermore, the Debtors did not selectively apply methodologies but rather assessed *each* Digital Asset and, with the assistance of Coin Metrics, established a Petition Time price. Each Digital Asset was assessed to determine whether an adjustment to that price was necessary because of an applicable liquidation discount or discount for lack of marketability. (Howell Rep. ¶¶ 17-61.) The fact that the application of the methodology only *resulted* in those discounts being applied to a select number of tokens does not mean that the methodology was selectively *applied*.

---

[18]    The spreadsheet attached to the objection contains no description of its contents or underlying methodologies or sources. It does nothing to call into question the reliability of the Debtors' analysis.

62.     Finally, Mr. Faraj argues that Nucoin specifically is undervalued by the Digital Assets Conversion Table because the value set forth therein—$0—does not take into account the "labor and financial investment" put into Nucoin or the "rights to all technologies" granted to users.  (D.I. 5420 at 4-5.)  This argument is easily dismissed.  Mr. Faraj offers no basis as to why the investment into a specific Digital Asset would impact its ultimate value.  The values set forth in the Digital Assets Conversion Table represent Professor Howell's expert opinion of the Petition Time value of each Digital Asset had the Debtors liquidated their holdings starting at the Petition Time.  Mr. Faraj has offered nothing to legitimately question the value of Nucoin.[19]

## IV.   Arguments That Digital Assets Constitute Customer Property Are Preserved and Not Addressed by the Motion

63.     Numerous *pro se* objectors raised different versions of an objection that the Debtors have not established that the Digital Assets claimed by customers constitute estate property and/or asserting a property interest in certain of the Digital Assets.  Objectors Boba Foundation and Sunil Kavuri, Ahmed Abd-El-Razek Noia Capital SARL and Pat Rabitte (D.I. 5632) similarly argue that the Motion should be denied unless and until the Debtors establish a property right in the relevant Digital Asset.[20]  The FTX MDL Co-Lead Counsel's objection also requests that the Order not impact parties' rights with respect to this issue.  (*See* D.I. 5628.)

---

[19]   Mr. Faraj's argument regarding whether the Digital Assets constitute customer property (D.I. 5420 at 2) is addressed *infra* Section IV.  His specific arguments regarding the ownership of Nucoin (*id.* at 5-7) are similarly not affected by the Order or Digital Assets Conversion Table.

[20]   While not relevant here, the Boba Foundation also objects to the Motion on the grounds that the Debtors must first obtain approval to sell the Digital Assets.  (*See* D.I. 5601 ¶ 29.)  The Debtors already have authority to sell Digital Assets pursuant to the *Order Authorizing and Approving (I) Guidelines for the Sale or Transfer of Certain Digital Assets, (II) the Sale or Transfer of Such Digital Assets in Accordance with Such Guidelines Free and Clear of any Liens, Claims, Interests and Encumbrance, (III) the Debtors' Entry into, and Performance Under, Postpetition Hedging Arrangements, Including Granting Liens and Superpriority Administrative Expense Claims in Connection Therewith and (IV) the Debtors to Stake Certain Digital Assets* [D.I. 2505].

64.     As clarified in the revised proposed Order, nothing in the Motion seeks to address or prejudice any party's rights with respect to whether any Digital Assets constitute customer property.  All parties' rights with respect to any such arguments are fully reserved and unaffected by the Motion and the proposed revised Order.  In accordance with sections 502(b) and 502(c) of the Bankruptcy Code, the Debtors are seeking approval of the Digital Assets Conversion Table to estimate Claims based on those Digital Assets as of the Petition Date.  To the extent that prior to or in connection with confirmation of the Plan there is a determination that certain Digital Assets claimed by customers are in fact their property and not property of the Debtors, the Digital Assets Conversion Table would not be applicable to those specific assets.

65.     Similarly, various objectors request that the Court deny the Motion because, rather than having their Claims dollarized as of the Petition Date, they want the Digital Assets returned in-kind.  As a practical matter, this is impossible for most Digital Assets.  As explained in the Motion and over the course of these Chapter 11 Cases, the imbalance between Claims based on Digital Assets and those reflected on the Debtors' balance sheets means that the Debtors are unable to make in-kind distributions.  (*See* Mot. n.4.)  Nor is there any legal right for that result.  But in any event, the issue of customer property rights in Digital Assets is not being addressed by the Motion, and neither the Order nor approval of the Digital Assets Conversion Table prejudices any party's rights, claims or defenses on this issue.

## V.      The Motion Satisfied Procedural Requirements

66.     Certain objectors argue that the Debtors provided inadequate notice of the Motion.  (*See* D.I. 5617, 5620, 5624, 5672.)[21]  Not so.  The Local Rules provide that where a

---

[21]     Boba Foundation notes that it only received electronic service of the Motion on January 8, 2024, but does not object on this basis.  (*See generally* D.I. 5601.)

motion is filed at least 21 days prior to the applicable hearing date, "the movant may establish

any objection deadline that is no earlier than fourteen (14) days after the date of service and no

later than seven (7) days before the hearing date."  Local Rule 9006-1(c)(ii).  Here, the Debtors

filed the Motion on December 27, 2023, nearly one month prior to the date of the hearing at

which the Motion was originally scheduled to be heard.  The Motion provided for an objection

deadline of January 11, which was 15 days after the date of filing.  The Motion was therefore

compliant with the Local Rules.

67.    The Debtors also undertook extraordinary efforts to provide notice of, and

an opportunity to object to, the Motion.  The Debtors served the Motion on more than two

million customers and other parties-in-interest who may be affected by the relief requested in the

Motion.  Additionally, the Debtors have accommodated every party that requested an extended

objection deadline, and considered and responded to untimely objections filed after the objection

deadline.

68.    Furthermore, the Debtors have agreed with certain objectors to defer the

request to establish the valuation of OXY, MAPS and SRM until discovery is conducted

pursuant to an agreed upon schedule with a subsequent evidentiary hearing to be scheduled in

March 2024.  As a result of this agreement, the pending objection of TMSI SEZC Ltd. (D.I.

5626) is adjourned and the parties' rights are fully reserved.

## VI.    Other Objections are Moot or Fail.

69.    Certain of the other Objections are mooted by the revised proposed Order,

or otherwise deficient and should be overruled.

- Avalanche (BVI), Inc. argues that the Order and Digital Assets Conversion Table should not apply to Claims arising from contracts rejected by the Debtors in accordance with the Bankruptcy Code. (*See* D.I. 5686.)  The Debtors added language to the revised proposed Order

making clear that Claims on account of validly executed contracts rejected by the Debtors in these Chapter 11 Cases are excluded from the requested Order and the Digital Assets Conversion Table, with all parties rights' as to the value of those Claims reserved.

- LayerZero Labs Ltd. objected to the Motion on the basis that the values established by the Digital Assets Conversion Table are unfair if applied to claims arising under section 502(h) of the Bankruptcy Code. (*See* D.I. 5616.)  The Debtors added language to the revised proposed Order making clear that Claims arising under section 502(h) of the Bankruptcy Code are excluded from the requested Order and the Digital Assets Conversion Table, with all parties' rights as to the value of those Claims reserved.

- The FTX MDL Co-Lead Counsel object to the value of FTT in the Digital Assets Conversion Table to the extent it requires a determination on the classification or valuation of FTT prior to confirmation.  (*See* D.I. 5628.)  The Digital Assets Conversion Table seeks to set a value for FTT of $0 for Clams on account of FTT for purposes of solicitation, voting and distribution.  To the extent the FTX MDL Co-Lead Counsel objects to this valuation, that objection is addressed above.  (*See supra* Section III.B.)  However, as set forth in the revised proposed Order, all parties' rights are reserved with respect to classification of FTT under the Plan and no relief with respect to classification of FTT is requested in the Motion or Order.

- Certain objectors argue that the Digital Assets Conversion Table should be used for more limited purposes and not for distribution.  (*See* D.I. 5601 (solicitation and voting only); 5615 (disclosure statement only).)  There is no basis to limit the relief in this way.  The Debtors have properly noticed the Motion and carried their evidentiary burden, and are seeking entry of an Order that approves the Digital Assets Conversion Table for distribution purposes as well.

- Certain *pro se* objectors argue that the Debtors should restart the exchanges and that customers and creditors should receive equity in the reorganized Debtors.  (*See, e.g.*, D.I. 5532, 5662.)  Another argues that the Debtors should not restart any exchange.  (*See* D.I. 5782.)  These are Plan confirmation arguments, if anything, and not relevant to the Motion.

- Certain objectors refer the Court to the Mt. Gox bankruptcy proceedings, arguing that "as the price [of Bitcoin] rose, subordinated creditors started delaying exit to try and pay creditors off in USD and opportunistically come after the creditors estate.  Each attempt led to years of delay and eventually creditors were entitled to the same recovery minus all the administrative costs due to long expensive delays significantly harming their recovery."  This is exactly what the Debtors here are seeking to avoid—prolonged litigation over the value of Claims based on Digital

Assets.  Estimation will allow the Debtors to proceed to confirmation and distributions in a timely manner without unnecessary delay.

## **CONCLUSION**

For the reasons stated above, the Court should overrule the Objections, grant the

Motion and enter the revised Order, attached hereto as Exhibit A.

Dated: January 28, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Matthew R. Pierce
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*