# EXHIBIT D

**Howell Supplemental Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF SABRINA T. HOWELL IN SUPPORT OF MOTION TO ESTIMATE CLAIMS BASED ON DIGITAL ASSETS**

I, Sabrina T. Howell, hereby declare as follows:

1. I am an Associate Professor of Finance at the New York University Stern School of Business ("NYU Stern"). I currently serve as a Research Associate at the National Bureau of Economic Research and a Research Fellow at the Institute for Private Capital. My research and teaching focus on entrepreneurial finance, fintech, private equity, innovation, and China. My research has been published in *The Journal of Finance, The Quarterly Journal of Economics*, *The Review of Financial Studies*, *The Journal of Financial Economics, Management Science*, the *American Economic Review*, and the *Review of Finance*. My paper entitled "Initial coin offerings: Financing growth with cryptocurrency token sales," published in 2020 in *The Review of Financial Studies*, has been cited 684 times as of this writing, making it to my knowledge the most highly cited article in financial economics about initial coin offerings.

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

2. I received my B.A. in Economics and East Asian Studies from Yale University in 2008, my M.A. in Economics from Harvard University in 2012, and my Ph.D. in Political Economy and Government, Economics Track from Harvard University in 2015. From 2008 to 2009, I was a consultant at Charles River Associates, an international economic consulting firm.

3. I joined the faculty of NYU Stern in 2015 as an Assistant Professor and was promoted to Associate Professor with tenure in 2022. I have served as an Associate Editor for *Management Science* (2020-2022), *Review of Financial Studies* (2022-present), and *The Review of Corporate Finance Studies* (2022-present).

4. On December 27, 2023, I submitted a declaration and accompanying expert report (the "Report") [D.I. 5203] in support of the *Motion Of Debtors To Estimate Claims Based On Digital Assets* (the "Motion") [D.I. 5202]. [2]

5. I submit this declaration in further support of the Motion and in support of *Debtors' Reply in Support of Motion of Debtors To Estimate Claims Based on Digital Assets* (the "Reply"). I am authorized to submit this Declaration on behalf of the Debtors.

**I.    Futures Prices**

6. As detailed in my report, my view is that treating future positions as though they had been closed out by the holder at the Petition Time is most consistent with the way the futures contracts operated and with the Exchanges having closed and undergoing a bankruptcy process.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion or the Reply, as applicable.

7. I understand that certain objectors contend that futures should be settled at the underlying spot price rather than closed out as of the Petition Time, leaving each customer's Petition Time P&L unchanged. I do not believe this is appropriate.

8. I understand that the objectors equate the Debtors' bankruptcy filing with an accelerated settlement and delisting event. However, these events are not the same in my view. First, delisting usually occurs when the underlying asset ceases to exist or be traded.[3] For example, the delisting of LUNA-PERP on the Debtors' exchanges followed the collapse of the Terra-Luna ecosystem that was accompanied by suspension of LUNA trading.[4] This is not what occurred with respect to the Debtors on the Petition Date. Instead, the exchange itself ceased operations.

9. Furthermore, delisting is usually a process undertaken by an exchange with ongoing operations. Delisting events are often announced in advance, allowing prices to adjust in response. This is different from the closing out of futures positions, which is how a customer with a futures position would normally exit his or her position. I believe that valuing Claims based on futures positions by effectively closing out these positions is more appropriate than a delisting analogy in light of the goal of winding down the Exchanges' contracts. This amount is determined by reference to the P&Ls.

10. I also understand that certain objectors assert that the futures prices at the Petition Time were dislocated from broad market prices and thus the Petition Time P&L should not be used to price those assets. However, futures and other derivatives at issue were FTX-

---

[3] *See Delisting Futures Contracts*, BINANCE, (Oct. 1, 2020), https://www.binance.com/en/support/faq/delisting-of-futures-contracts-dd60dfbf654d4055aa6b217ea6d5ddba ("Delisting is the removal of a listed asset from an exchange. The delisting can be voluntary or involuntary and usually happens when a project ceases operations, does not meet listing requirements, undergoes a hard fork, or splits or reverse split occasions with new coins.").

[4] "FTX will delist LUNA-PERP," *FTX Crypto Derivatives Exchange*, May 13, 2022, available at https://web.archive.org/web/20220513181050/http:/help.ftx.com/hc/en-us/articles/6258482308372; https://thecryptobasic.com/2022/05/13/cryptocom-is-reversing-all-terra-luna-trades-initiated-at-an-incorrect-price-since-may-12th/.

specific financial contracts whose payoffs were inherently tied to the market dynamics of the Debtors' exchanges. In fact, the Debtors' website specifically highlighted that "futures listed on FTX differ from other major cryptocurrency futures."[5] It is therefore my view that customers with futures positions on the Debtors' exchanges were exposed to the risks of the FTX futures market, including the impact of any potential futures pricing anomalies. Additionally, repricing supposedly "mispriced" perpetual futures contracts could also unfairly benefit the creditors who would have received potentially large payments through the futures "funding rate" system as a result of the same "mispricing" prior to the Petition Time.

## II.     Using the Debtors' Holdings to Determine the Value of Digital Assets

11.     I believe that it is appropriate to consider the effect of an orderly liquidation of the Debtors' holdings of Digital Assets to determine an accurate Petition Time value of such Digital Assets. To do otherwise would assume that the Debtors either (i) do not liquidate their holdings of Digital Assets outside of those claimed by customers and other creditors or (ii) liquidate their holdings of Digital Assets claimed by customers and other creditors first to satisfy those Claims, then liquidate their other holdings.

12.     I understand that the Debtors have filed a Plan that requires liquidation of all of their assets, digital or otherwise, to satisfy Claims. I also understand that the Debtors must sell all of the Digital Assets they hold, regardless of whether they are the basis of a Claim, to create U.S. dollars to distribute on account of Allowed Claims. These sales by the Debtors would necessarily affect the price of Digital Assets claimed by customers because a customer could not sell their Digital Assets at the Petition Time without having the sale price affected by the Debtors'

---

[5] "What Are Futures?," *FTX.com* (via Wayback Machine), available at https://web.archive.org/web/20210320175303/https://help.ftx.com/hc/en-us/articles/360024780791-What-Are-Futures.

sales at the same time. Furthermore, each Digital Asset has a market with a finite amount of liquidity, or ability to absorb sales. With a sufficiently large quantity for sale, demand becomes exhausted and further sales are impossible (i.e., the price becomes zero). It is my view that the values of Digital Assets at the Petition Time should not be determined in a vacuum, as if there were no other FTX-related trading activity happening at that time.

13. Additionally, if the Debtors were to ignore the market impact from liquidating their Digital Assets holdings, or assume that the Digital Assets that are the basis of Claims could be liquidated first, the result would be a shortfall in asset sale proceeds that would have to be borne by other creditors. In fact, some of the creditors who would bear the brunt of this shortfall would be those who holding Claims to *more liquid* Digital Assets such as Bitcoin that the Debtors did not hold in sufficient quantities, while the creditors who would benefit would be those holding the more illiquid assets.

14. It is my view that Claims based on Digital Assets have different degrees of FTX-specific risk. When purchasing particular Digital Assets that FTX/Alameda was known to hold in large quantities relative to daily trading volumes, a trader assumed the risk that FTX/Alameda might at any time liquidate its holdings and crash the price. For example, a customer who purchased Digital Assets such as Bitcoin assumed the risk of the Exchanges functioning, but not the risk of the Debtors selling Bitcoin into the market because Bitcoin is so liquid and widely held. In contrast, when purchasing a Digital Asset such as MEDIA or STG where the Debtors were large holders relative to the circulating supply or regular trading volume in the markets, the customer took an additional risk that the Debtors might choose or be compelled to liquidate the token. It is my view that it is reasonable for the risk of being able to liquidate a Digital Asset in the market to be borne by the holders of such Claims, and not by other customers

or creditors who did not assume such risk. This risk is incorporated into the liquidation discounts that I calculate in my report, because they are increasing in the quantity the Debtors must sell relative to daily trading volume.

15. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: January 28, 2024

*/s/ Sabrina T. Howell*
Sabrina T. Howell
Stern School of Business, New York University
Associate Professor