Case 22-11068-JTD    Doc 6796    Filed 01/30/24    Page 1 of 13





Unit F Bourne End Business Park  
Cores End Road  
Bourne End SL8 5AS  
United Kingdom  

+44 (0)1628 824 900  
postbox@modulesolutions.com  
www.modulesolutions.com  

Honourable Judge John Dorsey  
United States Bankruptcy Court  
District of Delaware  
824 N Market St  
5th Floor, Courtroom 5  
Wilmington, DE 19801  
302-533-3169  

January 29th, 2024

Re:  FTX TRADING LTD Chapter 11  
 22-11068-JTD  
 Objection to Motion of Debtors to Estimate Claims Based on Digital Assets (Dkt. 5202) (the "Motion")

Dear Honourable Judge John Dorsey,

This letter is respectfully provided in addition to the *Objection of Simon Carter to (I) the Debtors' Joint Chapter 11 Plan of Reorganization and (II) Motion of the Debtors to Estimate Claims Based on Digital Assets* (Dkt. 5690) and in response to the Debtors updated motion *Omnibus Reply in Support of Motion of Debtors to Estimate Claims Based on Digital Assets* (Dkt. 6728).

My earlier filing expressly dealt with the core gating issue that Digital Assets are the property of customers and as such are rightly represented unliquidated by the quantity and type of Digital Assets held in their customer account. Simply, 1 bitcoin equals 1 bitcoin. However, this update does not seek to replay those arguments but rather, and notwithstanding the core gating issue, to cast spotlight on other matters related to the updated Motion and the *Declaration of Sabrina T. Howell in Support of the Motion of Debtors to Estimate Claims Based on Digital Assets* (the "Howell

Module is the trading name of Module Solutions Ltd. Registered in England & Wales, Registration No. 4648599. VAT GB 813 1612 69

Declaration") and annexed report (the "Howell Report") to which the instant Motion of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") rely.

1. **The Howell Report is posited on a false prejudgment.**

The Howell Report stated in 'Background and Assignment" section that "The imbalance between the composition in customer claims based on fiat and digital asset holdings and that reflected on the balance sheets of the Debtors means that <u>the Debtors are unable to return all</u> fiat and <u>digital assets to their customers in kind</u>." (Emphasis added). Howell Report at ¶ 3. But this is somewhat misleading as Dr Howell went on to demonstrate in her analysis.

It was striking to discover that the Howell Report exposes the Debtors hold Digital Assets in possession with a combined face value of $8,782 million while, by contrast, the aggregate value of all Digital Asset customer claims amount to $7,039 million. All based on Petition Date market prices. Howell Report at Figure 1, *et al*. This calculates a $1,743 million surplus in Digital Assets held-in-possession by the Debtors over and above Digital Assets forming part of Customer Entitlement Claims.

The above math necessarily excludes "Fiat Currency" which is not a Digital Asset[1] by character or definition. Moreover, Fiat Currency, or electric money ("**E-Money**") as it was named on the exchange, was governed by separate Terms of Service on FTX.com and demands different contractual consideration. *See* FTX.com Terms of Service §§ 8.2-8.3. Noting the Terms of Service provides that *Digital Assets* are <u>purchased</u> using *E-Money*. Thus, there are sufficient grounds to distinguish Digital Assets and Fiat Currency as separate asset classes in Customer Entitlement Claims. Just as there are grounds to deal with FTX.com customer claims separately from FTX.us customer claims due to contractual differences, and bankruptcy courts have

---

[1] The Motion defines "Digital Assets" at footnote 3 to exclude non-fungible tokens which is built on the definition in the proposed *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. And its Debtor Affiliates* (Dkt. 4861) which defines "Digital Assets" as "a DLT Digital Asset or a Pre-Launch Cryptocurrency" where DLT Digital Asset means "any digital representation of value or units that is issued or transferrable using distributed ledger or blockchain technology, including Stablecoins, cryptocurrency and NFTs." A fuller definition of Digital Assets was provided in the FTX.com Terms of Service to mean "BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform".

generally been supportive upholding contractual provisions for different categories of customer assets. See *Re Celsius Network LLC*, No. 22-10694 (Bankr. S.D.N.Y) noting the treatment of customer assets in 'Custody' accounts were dealt with entirely differently to assets in 'Earn' accounts because of different underlying contractual terms.

Notably, the Howell Report excludes ascribing value to any non-Digital Assets held-in-possession by the Debtors which were funded or enriched by misappropriated customer property. Nor does the Report clarify whether the Digital Assets held-in-possession are limited to a particular silo, though as generally discussed in my filed Objection (Dkt. 5690), there were no hard-edged boundaries applied to the misappropriation of customer property across the Debtors' structure of companies so there should be no boundaries introduced in bankruptcy to hinder recovery of stolen property, and in the case of the fraud, any fraudulent internal transfers fall within section 548 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") and can be reversed across silos for transactions made two years preceding the Petition Date.

In sum, the total value of Digital Assets held-in-possession by the Debtors identifies sufficient headroom to return the unliquidated amount and type crypto-assets to customers. This situation would have been plain in the Howell Report but-for the commingling of Digital Assets and Fiat Currency in the analysis. While a breakdown of holdings and claims is not provided in particular detail it may be assumed that some administrative function is needed to reconcile the Digital Assets held-in-possession against aggregated Digital Asset tokens held in customer accounts (representing the Customer Entitlement Claims) to the underlying Digital Asset coins. Such reconciliation is not extraordinary in the context which fell within the normal course of business operations of the cryptocurrency exchange. In other words, this reconciliation would have been a commonplace task for the Debtors pre-petition.

2. **Digital Assets are commodities.**

The Motion posits that unliquidated Digital Assets must be liquidated "for the purposes of any plan", including "voting and distribution purposes". Motion at ¶ 3. While the need to apportion an estimated valuation for voting purposes is accepted to allow a plan to progress,

[3]

applying the same estimated Petition Date valuation to Digital Assets for distribution purposes without being contingent on a further revaluation before distribution is wrong-footed. There is nothing in 11 U.S.C. § 502(c) to suggest the "estimated" claim value should stand free from further review or reviews. Indeed, the plain and ordinary meaning does not suggest an estimated valuation is in any way final which provides room for further revision of any estimated valuation before actual distribution.

Cryptocurrencies are, at root, "commodities" as defined by the U.S. Commodity Exchange Act (the "**CEA**"), which definition has been invariably upheld by the Commodity Futures Trading Commission (the "**CFTC**") for nearly a decade[2] and is a definition which equally applies in bankruptcy. 11 U.S.C. § 761(a).

Further, and additionally, in *CFTC vs Samuel Bankman-Fried, FTX Trading Ltd d/b/a FTX.com, Alameda Research LLC, Caroline Ellison, and Zixiao "Gary" Wang*, 22-CV-10503-PKC (S.D.N.Y 2022) (the "**CFTC Complaint**"), the CFTC secured judgments against Ellison[3] and Wang[4] for "violation of … federal commodities laws" being contrary to the CEA, 7 U.S.C. ch.1 which regulations expressly apply to commodity exchanges. The amended CFTC Complaint (ECF No. 13) provides clarification at ¶ 23. ("A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Digital assets include virtual currencies,

---

[2] In 2015, the CFTC defined Bitcoin and other virtual currencies as commodities under the CEA in its enforcement action, *In the Matter of: Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*, CFTC Docket No. 15-29. 2015 WL 5535736 (Sept. 17, 2015). The CFTC applied the broad definition of a commodity as set out in the CEA and found that the scope of that definition included Bitcoin. "The definition of a "commodity" is broad […] Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities." Ensuing, the CFTC undertook enforcement action in various fraud cases including in *CFTC v. My Big Coin Pay, Inc.*, No. 18-CV-10077-RWZ (D. Mass. Sept. 26, 2018) holding that the CEA defines "commodity" generally and categorically, "not by type, grade, quality, brand, producer, manufacturer, or form". Here finding that the virtual currency "My Big Coin", which had not performed futures trading, was a commodity because of the existence of futures trading in other virtual currencies. The court considered case law related to the treatment of natural gas as analogous to virtual currency reasoning that, as with natural gas, there is futures trading in virtual currencies (like Bitcoin) and consequently the court held that virtual currencies are commodities under the CEA. In other words, all cryptocurrencies are commodities because futures contracts trade on the broad category of virtual currency. The court reaffirming earlier decisions that Bitcoin and other cryptocurrencies are "commodities". See also *CFTC v. Dillion Michael Dean and The Entrepreneurs Headquarters Limited*, No. 18-CV-00345, (E.D.N.Y July 9, 2018); *CFTC v. Patrick K. McDonnell and CabbageTech,6 Corp. d/b/a Coin Drop Markets*, No. 18-CV-00361, (E.D.N.Y August 28, 2018).
[3] *CFTC vs Samuel Bankman-Fried, FTX Trading Ltd d/b/a FTX.com, Alameda Research LLC, Caroline Ellison and Zixiao "Gary" Wang*, 22-CV-10503-PKC (S.D.N.Y 2022) ECF No. 26.
[4] *Id.*, ECF No. 25.

such as bitcoin (BTC), ether (ETH) and tether (USDT), which are digital representations of value that function as mediums of exchange, units of account and/or stores of value. <u>Digital assets such as including bitcoin (BTC), ether (ETH), tether (USDT) and others are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).</u>") Emphasis added. FTX was, in principle, a commodity exchange and acted as broker between customers. *Id.* ECF 13 ¶ 36. ("FTX offered trading in a large variety of digital assets, including digital asset commodities such as bitcoin, ether, tether and others. FTX operated primarily as a derivatives exchange and offered trading in various types of options, futures, swaps, "perpetual futures" and other digital asset commodity derivative products.")

The CFTC Complaint against the Debtors for violating commodities laws and contravening the CEA and 7 U.S.C. ch.1 is presently stayed subject to progress in the superior criminal court for related offenses against former FTX executive Bankman-Fried[5], Ellison[6], and Wang[7] including conspiracy to commit commodities fraud in violation of 7 U.S.C. §§ 9(1) and 13(a)(5) where guilty pleas and a jury verdict have now been secured against all defendants. The criminal case, *United States v. Bankman-Fried*, 22-CR-673 (S.D.N.Y.), established "a portion of the customer deposits that were fraudulently misappropriated by the defendant were commodities, namely cryptocurrencies like bitcoin", *Id.* ECF 149, at pp. 17-21, relying on *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 227 (E.D.N.Y. Mar. 6, 2018). Both the civil and criminal cases are dealt with in more detail in my filed Objection (Dkt. 5690, pp. 126-133).

Consequently, there are very solid grounds that cryptocurrencies must be dealt with as commodities within the Bankruptcy Code, and it follows that FTX treated as a commodity exchange thus, the commodity broker liquidation subchapter of the Bankruptcy Code applies.

The custodial depositary relationship between FTX and its customers was what Congress had in mind when enacting the commodity broker liquidation subchapter with emphasis on commodities markets and the need for stability and customer confidence. See *In re Co Petro*

---

[5] United States v. Bankman-Fried, 22-CR-673 (S.D.N.Y.)
[6] United States v. Caroline Ellison, 22-CR-673 (S.D.N.Y.) ECF No. 8
[7] United States v. Zixaio (Gary) Wang, 22-CR-673 (S.D.N.Y.) ECF No. 6

*Marketing Group, Inc.*, 680 F.2d 566 (9th Cir. 1982) at 571-72. (Noting that Congress defined a "deposit relationship" in which "the customer is not so much dealing *with* the broker or dealer as *through* him. Thus, consideration of the broker or dealer's creditworthiness do [sic] not enter into the customer's decisions." citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 265, *reprinted in* U.S. Code Cong. Admin.News 5963, 6223. (Emphasis in original), and also "Thus in the normal commodity broker-customer relationship, the customer expects that the success of his investment will depend solely on the vicissitudes of the particular commodity market, and not on the general financial health of the broker. *See Brodt v. Bache Co.*, 595 F.2d 459, 461-62 (9th Cir. 1978)."). Here reflecting the peer-to-peer trading provided on the FTX exchange and prevailing Terms of Service. Also, the authorities inherently established within the CFTC Complaint and criminal case validating FTX was acting as broker providing access for its customers to a commodities market.

Notwithstanding Digital Assets are not the rightful property of the bankruptcy estate contrary to § 541 of the Bankruptcy Code and in absence of this court providing opinion on the core gating issue, in the prevailing period § 766 of the Bankruptcy Code is valid. There are two limbs which are considered apply:

i) **Customer property should be returned in kind, <u>in full</u>.**

The Bankruptcy Code contains an expansive definition of "customer property", § 761(10), validating identifiable Digital Assets held in customer accounts fall under the definition. The regulations allow the return of customer property promptly and in priority to all other claims. See *In re Bucyrus Grain Co., Inc.*, 127 B.R. 45, 49 (D. Kan. 1988). ("[C]ommodity customers are granted the highest priority against the bankrupt broker's estate.").

Section 766(c) provides that the Debtors "<u>shall return promptly to a customer any specifically identifiable</u> security, <u>property</u>, or <u>commodity contract to which such customer is entitled</u>". Emphasis added. The entitlement being defined by each customers' *net equity claim* to property held by the Debtors for their benefit. See Terms of Service § 8.2.6.

[6]

For the purposes of § 766, customers' "net equity claims" primarily comprise the unliquidated balance of Digital Assets held in customer accounts: The crypto-tokens and token entitlements to underlying crypto-coins are, at bottom, commodity contracts that are a swap, as defined under section 1a(47) of the CEA, having a commodity interest in a native cryptocurrency. E.g. bitcoin (BTC), ether (ETH), or tether (USDT). Customer property is identifiable in the Debtors' records and exchange ledger by the quantity and type of Digital Assets forming part or all of the Customer Entitlement Claim (which echoes the Digital Asset balances found in customer accounts on the Petition Date).

It is already explained pursuant to the Howell Report that the aggregated value of Digital Assets held-in-possession by the Debtors exceeds the total value of all Digital Asset customer claims. As such, under the protection of bankruptcy the Debtors have recovered adequate Digital Assets to provide liquidity to enable physically delivery of Digital Assets to customers by re-opening withdrawals with priority as allowable via an Order of Relief *and* before a plan of reorganization.

ii)   **Customer property is returned in kind, <u>in part</u> (or the Debtors do not have sufficient Digital Assets to return *any* property in kind).**

If the Debtors contest the validity of the Howell Report such that they do not consider the bankruptcy estate holds-in-possession Digital Assets of the amounts reported, then it reasonably calls to question the robustness of the data employed in the Report.

Nevertheless, such matters are divorced from statute and regulations supporting the return of customer property. The Bankruptcy Code allows a pro rata distribution of identifiable customer property to customers. § 766(h). ("[T]he trustee shall distribute customer property ratably to customers on the basis and to the extent of such customers' allowed net equity claims, and in priority to all other claims" and such distribution shall be in the form of cash, or the return or transfer of property or commodity contracts). In the context of customers' Digital Assets, the application of customer property need not be traceable or contained to specifically identifiable property held-in-possession where fungible property is concerned and thus, are not subject to the treatment outlined in 11 U.S.C. § 766(c). See *Bucyrus* at 51-52. ("Under sections 761(10) and

[7]

766(h), a customer need not specifically identify property to recover from a customer account. *See* S.Rep. No. 95-989, 95th Cong., 2d Sess. 106, *reprinted in* 1978 U.S. Code Cong. Admin.News 5787, 5892; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 393, 1978 U.S. Code Cong. Admin.News 5963, 6349.")

Congress' focus to protect commodity customers have enacted regulations, *see* 7 U.S.C. § 24, that have resulted in a detailed set of procedures when applying the Bankruptcy Code. *See* 17 C.F.R. § 190.01-190.10. These federal regulations, *inter alia*, define "net equity" as the unliquidated balance held in the customer account, *id.* § 190.08(b)(1)(i)(A), married as necessary with the realizable market value of customer property determined "as of the close of the market on the last preceding market day", *id.* § 190.08(b)(1)(i)(C). The market date pricing is a first-step valuation applied *in concert with* provisions for subsequent revaluations "to <u>correct misestimates or errors including, without limitation, corrections for ongoing events such as the liquidation of unliquidated claims or specifically identifiable property at a value different from the estimated value previously used in computing net equity</u>", *id.* § 190.08(b)(4)-(5). Emphasis added. And per § 766(j)(2), "if a customer is not paid the full amount of such customer's allowed net equity claim from customer property, the unpaid portion of such claim is a claim entitled to distribution under section 726 of this title".

Thus, the Motion is somewhat out of step to estimate "distributions" for commodities at Petition Date given the regulations for commodities markets prescribe a precise methodology. Simply, the first-step estimation to value unliquidated Digital Assets should use the current market pricing – albeit this remains a proxy value subject to further revaluation close to the date of distribution. The regulations do not support net equity value for commodities claims should be married to Petition Date market prices. Consequently, the Motion should be updated to apply a valuation of Digital Assets at the prevailing market pricing "as of the close of the market on the last preceding market day" with commitment to apply "corrections for … the liquidation of unliquidated claims or specifically identifiable property at a value different from the estimated value previously used in computing net equity". As a worked example, if Amy has a claim of 10 COIN and the Debtors are able to make an initial *in specie* distribution of 4 COIN then her net equity claim is reduced to 6 COIN. If a COIN is valued at $1 the liquidated claim for

[8]

distribution under § 726 is valued at $6 at this first instance distribution, but if on the day before the next distribution the market value of COIN is $0.50c the claim may be revalued to $3.

3. **Estimating a valuation of Digital Assets for distribution as-is proposed in the Motion conflicts with the proposed valuation for Customer Preference Settlements.**

Notwithstanding Digital Assets are not the rightful property of the bankruptcy estate such that there is no preference liability associated with the withdrawal of customers' own Digital Assets, and not overlooking matters raised in the foregoing paragraphs:

The proposed *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd and its Debtor Affiliates* (Dkt. 4861) (the "**Plan**") specifies a Customer Preference Action should apply to any customer who withdrew their Digital Assets during the Customer Preference Settlement Look Back Period. In this period most transfers were performed by customers withdrawing cryptocurrencies from their accounts after news broke about the fraud at FTX, albeit many customers, me included, found their withdrawal instructions went unfulfilled as FTX scrambled to provide liquidity into the omnibus pools of Digital Assets.

The Plan proposes any customer who successfully transferred assets during the Look Back Period should adhere to a financial settlement determined by the Customer Preference Settlement Amount which is calculated from the Net Preference Exposure related to each customer's individual transfers and the total amount withdrawn. Here, the Debtors propose all pre-petition transfers of Digital Assets would be valued "based on prices as of the applicable transfer", Plan § 2.1.113. The proposed approach is entirely consistent with the valuation of net equity claims for customer property pursuant to § 761(17) of the Bankruptcy Code already discussed – using the market value on the date of transfer.

The impacts of the FTX collapse on the crypto markets resulted in a significant decline in the value of cryptocurrencies. While neither the Motion nor Howell Report proffer any valuation table for preference transfers leaving a question mark over settlement values, Figure 1 shows the general decline in market prices after news broke around November 8, 2022. Here, certain

cryptocurrency values on November 2 were 30% - 40% higher than at Petition Date, and have risen further since.

This Motion's proposed use of Petition Date prices for estimating Customer Entitlement Claims for distribution purposes under § 726 is a striking contrast to the approach the Debtors propose should apply for preference settlements (which, as explained, would be married to actual valuations *on the date of transfer*). The contrasting approach demonstrates the Plan can accommodate relevant market pricing for Digital Assets at the date of transfer within the four corners of the document.



*Figure 1: Market Price Response to Collapse of FTX (credit: CFTC v. FTX Trading Ltd. et al,. 22-CV-10503-PKC (S.D.N.Y 2022))*

Further, and additionally, it is perhaps worth pausing to reflect on the terms of the proposed Customer Preference Action which would allow any customer who withdrew their Digital Assets between 10-days and 90-days before the Petition Date (as allowable look back period in the Bankruptcy Code) to keep 100% of their withdrawn assets free from any avoiding action. Conversely any customer who withdrew assets in the 9-day Customer Preference Settlement Look Back Period would become liable for the preference settlement, but only if their aggregated

withdrawals in the period exceeded $250,000. So, a customer who withdrew $10 million at 11:59 p.m. ET on November 1, 2022 would keep all their withdrawn property, but a customer who made the same withdrawal two-minutes later at 12:01 a.m. ET on November 2, 2022 would be liable to pay a $1.5 million settlement. Or, if two customers withdrew the exact same amount on different days within the Look Back Period, one could fall foul of the settlement and the other not merely because of a change in market pricing at the time of transfer elevating their claim above the $250,000 threshold.

4. **Estimating value of unliquidated Digital Assets using Petition Date pricing is unreasonable.**

Notwithstanding Digital Assets are not the rightful property of the estate, or the preceding paragraphs:

The proposed Customer Preference Settlement rightly asserts the applicable time to value withdrawn Digital Assets is at the *date of transfer*. Section 766 of the Bankruptcy Code advocates a similar approach to determine the value of returned property which seems a logical and reasonable course of action based on accurate market pricing. It would not make logical sense to apply Petition Date pricing to a completed transfer.

It follows the estimated value of unliquidated Customer Entitlement Claims should also be determined on a similarly fair equitable basis using relevant market pricing to set a clear tone that the estimated valuation is merely a placeholder subject to revaluation and should therefore avoid any material gap in the equitable value of customers' Digital Assets. E.g. The final liquidation value of unliquidated Customer Entitlement Claims should use up-to-date market pricing which logically and equitably follows § 766, to allow customers to re-acquire the same quantity of Digital Assets where the distribution is fulfilled in USD.

In distribution, and subject to revaluation, any shortfall in the contemporaneous value of customer property distributed should carry forward the relative unliquidated amount of the original claim to the next distribution and so forth until the full claim is recovered. Thus, to set a line in the sand for the purpose of estimating the liquidated value of Digital Assets for

distribution, there is greater sense in using current market pricing to maintain parity with a fair market value. To apply a knowingly low estimate as the Petition Date pricing would do, sets a low bar which is largely divorced from the present market cycle – especially if the Debtors anticipate first distribution soon in 2024. Using current market pricing echoes the guidelines prescribed by CFTC but this is not the approach outlined in the Debtors' Motion.

As a worked example, Amy holds a claim to 100 COIN and on first distribution these are worth $1 each. The estate transfers $70 to Amy (or preferably 70 COIN) equivalent to 70% of the original claim. Amy's outstanding claim is reduced to 30 COIN. At the next distribution COIN has a market price of $0.50c valuing Amy's outstanding claim at $15. The estate transfers $10 to Amy (or 20 COIN) representing a total disbursement of 90% of the original claim. At the next disbursement COIN is worth $2 valuing Amy's outstanding claim of 10 COIN at $20. And so on. In addition, Amy might agree to convert part, or all, of her outstanding claim of 30 COIN after the initial distribution into COIN-RECOVERY tokens in a rebooted FTX2.0 exchange if such recovery rights tokens were to be made available.

*   *   *

The Motion's estimated valuation of unliquidated Digital Assets pursuant to 11 U.S.C. § 502(c) is adequate for establishing a claim value for the purpose of voting to progress the plan.

However, for the purpose of estimating distribution, the Motion is not adequate as filed. The Motion should be amended to use present market pricing as of the date of the Motion to bear better relationship with present market conditions. The Motion and proposed Order should also be amended to clarify the revaluation methodology when liquidating Customer Entitlement Claims about the date of each distribution to derive a fair market price for Digital Assets. This would marry with the legislative history and the public policy considerations for commodities markets set out by Congress to provide stability and customer confidence and as is provided by the Bankruptcy Code and guidelines issued by the CFTC for dealing with commodities in bankruptcy.

However, if the Debtors' Motion is proposing the estimated liquidation price is transposed unchanged to a fixed and final value for distribution, then this is wholly unsupported by federal guidelines provided for commodities in bankruptcy and such notion should be rejected outright by this court.

I also rejected the Debtor's notion that establishing fair valuations for Digital Assets is "far from simple or readily determinable". By their account, it would be impossible for any cryptocurrency exchange to provide market related pricing without months of effort and analysis, but that was precisely the business of the Debtors pre-petition and was able to align with wider market rates in real-time, so to assert such a timely remedy is impossible is simply disingenuous. There can be no dispute that the amount and type of Digital Assets are known which were held in customer accounts and these form the Customer Entitlement Claims. The only ingredient necessary to determine an updated valuation is the equivalent fiat currency exchange rate – which can be determined from any single or cumulative number of reliable market sources. To assert otherwise, the Debtors would be adopting an unnecessary and unreasonable position.

However, the Howell Report certifies the amount of Digital Assets held-in-possession by the Debtors eclipse Customer Entitlement Claims to Digital Assets which affords the Debtors opportunity to reopen withdrawals for certain customers, subject to Debtors' reconciliation of the related omnibus pools, and this should be done promptly and with priority. Such timely action to complete full recovery of Digital Assets would represent a major milestone in these proceedings, overcome the core gating issue, and satisfy the majority of customer claims in this bankruptcy.

I urge the court to reject the Motion as filed on the basis of the preceding paragraphs.

Respectfully,

Simon Carter

Director