# EXHIBIT B

**Agreement**

EXECUTION VERSION

**PURCHASE AND SALE AGREEMENT**

**by and between**

**WEST REALM SHIRES INC.**

and

**AMALGAMATED TOKEN SERVICES INC.**

**Dated as of February 6, 2024**

This PURCHASE AND SALE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "<u>Agreement</u>"), dated as of February 6, 2024 (the "<u>Execution Date</u>"), is made by and between West Realm Shires Inc., a Delaware corporation ("<u>Seller</u>") and Amalgamated Token Services Inc., a Delaware corporation ("<u>Purchaser</u>"). The signatories to this Agreement are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>".

**Recitals**

WHEREAS, on November 11, 2022 and November 14, 2022, Seller and certain of its Affiliates (collectively, the "<u>Debtors</u>") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "<u>Bankruptcy Code</u>") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "<u>Bankruptcy Proceeding</u>");

WHEREAS, (i) Seller owns all of the outstanding equity interests in Digital Custody Inc., a Delaware corporation (the "<u>Company</u>" and such interests, the "<u>Interests</u>") and (ii) the Company owns 100% of the equity interests (the "<u>Trust Company Interests</u>") in FTX Vault Trust Company, a South Dakota non-depository public trust company (the "<u>Trust Company</u>");

WHEREAS, Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller all of the Interests pursuant to section 363 of the Bankruptcy Code, upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors or other applicable governing body of Seller has determined that it is advisable and in the best interests of Seller's estate and the beneficiaries of such estate to consummate the Transactions pursuant to the Sale Order and has approved this Agreement;

WHEREAS, Seller intends to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Seller to consummate the Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, Purchaser and Seller desire to make certain representations, warranties, covenants and agreements in connection with the Transactions and also prescribe various conditions to the Transactions; and

WHEREAS, the Parties acknowledge and agree that the Transactions are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of Seller or its Affiliates and Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the purchase by Purchaser.

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF INTERESTS

1.1     Purchase and Sale of Interests. Pursuant to sections 105 and 363 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller agrees to sell, assign, convey, transfer and deliver to Purchaser, and Purchaser agrees to purchase and accept from Seller, all of Seller's right, title and interest in, to and under the Interests, free and clear of any Liens (other than any Permitted Encumbrances), for an amount in cash equal to $500,000, *plus* the Acquired Cash Amount set forth in Section 1.4, which shall be payable without any withholding or deduction (the "Purchase Price").

1.2     Closing. The closing of the Transactions (the "Closing") will take place at 9:00 a.m., Eastern Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures on the day that is the second (2nd) Business Day following the date on which all of the conditions to closing specified in Article 6 are satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or, to the extent permitted by applicable Law, waiver of those conditions), or at such other time as Purchaser and Seller may agree in writing (the "Closing Date").

1.3     Deliveries at the Closing.  At the Closing, upon satisfaction or waiver of the conditions set forth in Article 6 hereof:

(a)     Seller shall deliver, or cause to be delivered, to Purchaser the certificate or certificates representing all of the Interests, or replacements therefor, in each case, duly endorsed in blank by the record holder thereof or accompanied by duly executed stock power(s) endorsed in blank by the record holder thereof;

(b)     Seller shall deliver to Purchaser a duly and properly completed IRS Form W-9;

(c)     Seller shall deliver to Purchaser, or cause Purchaser to take possession of the Books and Records; provided that the delivery obligations of Seller hereunder shall be deemed satisfied if such Books and Records remain in the possession of the Company or the Trust Company;

(d)     Purchaser shall pay the Purchase Price to Seller in accordance with Section 1.1 by wire transfer of immediately available funds pursuant to the instructions delivered by Seller to Purchaser prior to the Closing Date; and

(e)     each of Seller and Purchaser shall deliver to the other Party such other documents and instruments required to be delivered pursuant to the terms of this Agreement necessary to effectuate the purchase and sale of the Interests.

1.4     Closing Statement. No later than two (2) Business Days prior to the Closing Date, Seller shall prepare and deliver to Purchaser a statement (the "Closing Statement"), together with supporting documentation used by Seller in calculating the amounts set forth therein, setting

forth a good faith estimate of the Cash of the Company and the Trust Company (the "<u>Acquired Cash Amount</u>") as of Closing.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the corresponding sections or subsections of the disclosure schedule delivered by Seller to Purchaser concurrently with the execution and delivery of this Agreement (the "<u>Seller Disclosure Schedule</u>"), Seller hereby represents and warrants to Purchaser as follows:

2.1     <u>Organization, Qualification and Corporate Power</u>.

(a)     Seller is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.  Seller has all requisite corporate or similar power and authority to own, pledge or dispose of, either directly or indirectly, the Interests and the Trust Company Interests and to carry on its business as presently conducted.

(b)     Each of the Company and the Trust Company is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Each of the Company and the Trust Company has all requisite corporate power and authority to carry on its business as presently conducted and to own and use the properties owned and used by it.

2.2     <u>Capitalization</u>.

(a)     The authorized capital stock of the Company consists of 10,000,000 shares of common stock, of which 1,000,000 shares were issued and outstanding as of the close of business on the last Business Day preceding the Execution Date. All of the outstanding shares of common stock of the Company have been duly authorized and are validly issued in compliance with applicable Law and the certificate of incorporation, by-laws or comparable governing documents of the Company, and are fully paid and nonassessable.

(b)     Seller is the sole record and beneficial owner of all of the Interests, which collectively constitute 100% of the outstanding shares of common stock of the Company. Seller has good and valid title to the Interests free and clear of all Liens (other than Permitted Encumbrances). There are no preemptive or other outstanding rights, options, warrants, agreements, arrangements or commitments of any character under which Seller or the Company is or may become obligated to sell, or giving any Person a right to acquire, or in any way dispose of, any shares or any securities of the Company, including the Interests, and/or of the Trust Company or any securities or obligations exercisable or exchangeable for, or convertible into, the shares or any securities of the Company or the Trust Company, as applicable, and no securities or obligations evidencing such rights are authorized, issued or outstanding. Except for this Agreement and the certificate of incorporation, by-laws or comparable governing documents of the Company and the Trust Company, neither the shares nor any securities issued by the Company or the Trust Company are subject to any voting trust agreements, proxies, or other

Contracts with respect to the voting, purchase, repurchase, dividend rights, disposition or transfer.

(c)     One hundred percent of the outstanding capital stock of the Trust Company is solely owned by the Company.  Other than the Trust Company, the Company has no other Subsidiaries and does not own, directly or indirectly, securities issued by any other Person. Each of the outstanding shares of capital stock or other securities of the Trust Company is duly authorized, validly issued, fully paid and nonassessable and owned by the Company, free and clear of any Liens (other than any Permitted Encumbrances).

2.3     <u>Authorization</u>. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, Seller has the requisite corporate power and corporate authority to enter into, execute and deliver this Agreement and to perform all of the obligations to be performed by it hereunder. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, this Agreement, when executed, will be duly authorized, executed and delivered by Seller, and, when executed, will constitute a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

2.4     <u>Non-Contravention</u>. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, neither the execution and delivery of this Agreement, nor the performance by Seller of its obligations hereunder or thereunder, nor consummation of the Transactions by Seller, will (a) conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Interests or the Trust Company Interests owned by Seller under the terms or provisions of (i) its organizational documents or (ii) any contract that is material to the value of the Interests or the Trust Company Interests, (b) require on the part of Seller or the Company or Trust Company any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Entity, including regulations or guidance issued by the South Dakota Division of Banking with respect to a change in control of a South Dakota trust company and any notice or filing requirements arising in connection with such a change in control (except for any filing required to be made by Purchaser or its Affiliates with respect to the Trust Company Change in Control), or (c) violate any Law or Order applicable to the Company, Trust Company, or any of their properties or assets, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.5     <u>Broker's Fee; No Public Offering.</u> No Person acting on behalf of Seller or under the authority of Seller shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions, other than the financial advisors retained by Seller in the Bankruptcy Proceeding.

2.6     <u>Litigation</u>.  There are no Actions pending or, to the knowledge of Seller, threatened, that (a) relate to the ownership of the Interests or the Trust Company Interests, (b) challenge the validity or enforceability of Seller's obligations under this Agreement or any other document related to the Transactions or (c) would reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

4

2.7     Employee Benefits.

(a)     Section 2.7(a) of the Seller Disclosure Schedule sets forth an accurate and complete list of each Benefit Plan and separately identifies each Benefit Plan that is provided by a professional employer organization ("PEO").  With respect to each Benefit Plan, the Company or the Trust Company has made available (or, with respect to each Benefit Plan that is provided by a PEO, to the extent in Seller's possession after reasonable request to the PEO) accurate and complete copies of the Benefit Plan document, including any amendments thereto, or a written description of such Benefit Plan if not set forth in a written document.  Each Benefit Plan is in material compliance with its terms and applicable Laws, including, without limitation, ERISA and the Code.

(b)     Neither the Company nor the Trust Company has contributed (or had any obligation of any sort) in the last six (6) years to a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA.  Neither the Company nor the Trust Company has maintained, established, participated in or contributed to, or is or has been obligated to contribute to, or has otherwise incurred any obligation or liability (including any contingent liability) under, any "multiemployer plan" within the meaning of Section 3(37) of ERISA in the last six (6) years.

(c)     Neither the execution and delivery of this Agreement nor the consummation of the Transactions could, either alone or in combination with another event, entitle any employee of the Company or the Trust Company to severance pay or any material increase in severance pay or accelerate the time of payment or vesting, or materially increase the amount of compensation due to any such employee.

2.8     Labor Matters.

(a)     Neither the Company nor the Trust Company is a party to or bound by any collective bargaining agreement or other agreement with a labor union or like organization, and to the knowledge of Seller, there are no activities or proceedings by any individual or group of individuals, including representatives of any labor organizations or labor unions, to organize any employees of the Company or the Trust Company.

(b)     There is no, and within the past three (3) years has not been any, strike, lockout, slowdown, work stoppage, unfair labor practice or other material labor dispute, or material arbitration or grievance pending or, to the knowledge of Seller, threatened that may interfere with the respective business activities of the Company or the Trust Company, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.9     Compliance with Laws; Permits.  To the knowledge of Seller, and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) each of the Company and the Trust Company is in compliance with all Laws applicable thereto, and (b) each of the Company and the Trust Company has obtained and is in compliance with all Permits issued or granted by a Governmental Entity necessary to conduct its respective business as presently conducted.

2.10     Real Property.  The Company and the Trust Company do not own any real property. Section 2.11 of the Seller Disclosure Schedule sets forth a correct and complete list of

all real property leased or subleased to the Company or the Trust Company (collectively, the "Leased Real Property") and a list of all leases (the "Leases") entered into by the Company or the Trust Company with respect to the Leased Real Property. The Company and the Trust Company, as applicable, (a) have a valid leasehold interest in all Leased Real Property, free and clear of all Liens (other than Permitted Liens), (b) there exists no default or event of default (as applicable) under the Leases, and (c) there are no written or oral subleases, concessions, licenses, occupancy agreements or other Contracts or arrangements granting to any Person other than the Company or the Trust Company the right to use or occupy the Leased Real Property.

2.11    Intellectual Property.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    Since August 12, 2022, neither the Company nor the Trust Company has entered into any Contract concerning the licensing of any Intellectual Property Rights material to or necessary for the conduct of their respective businesses, other than non-exclusive licenses for the use of Software or Software services on standardized terms that are generally commercially available.

(b)    Since August 12, 2022, (i) neither the Company nor the Trust Company has, to the knowledge of Seller, directly or indirectly infringed, misappropriated or otherwise violated the Intellectual Property Rights of any Person, and (ii) neither the Company nor the Trust Company has received any written claim, notice, invitation to license or similar communication alleging any of the foregoing.

2.12    No Other Representations or Warranties.  Except for the representations and warranties contained in this Article 2, neither Seller, the Company nor the Trust Company has made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Interests, the Trust Company Interests, Seller, the Company, the Trust Company or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, the Company, the Trust Company, any Affiliate of Seller, the Company, or the Trust Company or any of Seller's, the Company's, the Trust Company's or its or their Affiliates' respective representatives.

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

3.1    Organization and Corporate Power. Purchaser is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.  Purchaser is duly qualified to conduct business under the Laws of each jurisdiction in which the nature of its business or the ownership or leasing of its properties requires such qualification.  Purchaser has all requisite corporate or similar power and authority to carry on its business as presently conducted and to own and use the properties owned and used by it.

6

3.2    Authorization. Purchaser has the requisite corporate power and corporate authority to enter into, execute and deliver this Agreement and to perform all of the obligations to be performed by it hereunder. This Agreement, when executed, will be duly authorized, executed and delivered by Purchaser, and, when executed, will constitute a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other Laws of general application affecting enforcement of creditors' rights generally.

3.3    Non-Contravention. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, neither the execution and delivery of this Agreement, nor the performance by Purchaser of its obligations hereunder or thereunder, nor consummation of the Transactions by Purchaser, will (a) conflict with or result in a breach or violation of the terms or provisions of its organizational documents, (b) result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which Purchaser is a party or by which Purchaser is bound, (c) require on the part of Purchaser any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Entity, including regulations or guidance issued by the South Dakota Division of Banking with respect to a change in control of a South Dakota trust company and any notice or filing requirements arising in connection with such a change in control (except for any filing required to be made by Purchaser or its Affiliates with respect to the Trust Company Change in Control) or (d) violate any Law or Order applicable to the Company, Trust Company, or any of their properties or assets, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to materially hinder, delay or impair the performance of its obligations under this Agreement.

3.4    Litigation.  There are no Actions pending or, to the knowledge of Purchaser, threatened against Purchaser or its Affiliates that (a) challenge the validity or enforceability of Purchaser's obligations under this Agreement or any other document related to the Transactions or (b) would reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions. Neither Purchaser nor any of its Affiliates is a party to or subject to the provisions of any Order that would, to the Knowledge of Purchaser, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

3.5    Available Funds; Solvency.  Purchaser has obtained sufficient third-party debt or equity financing for Purchaser to deliver the Purchase Price (assuming the Acquired Cash Amount is no greater than $2,800,000) in full and to consummate the Transactions, and Purchaser has furnished to Seller written evidence thereof.  Purchaser has no reason to believe that Purchaser will not be able to pay the Purchase Price in full and consummate the Transactions.  Upon the consummation of the Transactions: (a) Purchaser will not be insolvent as defined in section 101 of the Bankruptcy Code; (b) Purchaser will not be left with unreasonably small capital; (c) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; and (d) the capital of Purchaser will not be impaired.

3.6    Independent Appraisal.

(a)      Purchaser acknowledges that Seller, the Company or the Trust Company may be in possession of material, nonpublic information relating to the Company or the Trust Company. Purchaser further acknowledges and agrees that Seller, the Company, and the Trust Company have no obligation to disclose to Purchaser any such material, nonpublic information except as may be required for a representation and warranty of Seller hereunder to be accurate and correct. Purchaser further acknowledges that (i) it is not relying on there having been disclosed any such material or potentially material information which is not disclosed, and (ii) any such information may be materially adverse to Purchaser's interests. Purchaser further acknowledges that it is prepared to purchase the Interests from Seller on the foregoing basis and hereby waives any right to rescind or invalidate the purchase of the Interests from Seller or to seek any damages or other remuneration from Seller based on the possession of any such material, nonpublic information by Seller.

(b)      Purchaser acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the Interests, and that it is responsible for making its own evaluation of any information about the Interests, the Company, the Trust Company or Seller that it may receive either directly from the Company, the Trust Company or Seller, and that none of the Company, the Trust Company, Seller or any Affiliate, partner, employee, officer or director thereof (i) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement or (ii) shall be under any obligation to provide access to or advise Purchaser or any other Person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the Interests, the Company, the Trust Company or Seller (or any assumptions upon which such information is based) supplied by it or by any Person or be otherwise liable to the Company, the Trust Company or Seller or any other Person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

3.7      <u>Accredited Investor; Qualified Purchaser</u>. Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933, as amended and a "qualified purchaser" within the meaning of Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended, and the rules promulgated thereunder.

3.8      <u>No Resale</u>. Purchaser's purchase of the Interests is for its own account for investment and not with a view to the distribution or resale thereof, except in compliance with the Securities Act of 1933, as amended, and applicable state securities laws.

3.9      <u>Broker's Fee</u>. No Person acting on behalf of Purchaser or under the authority of Purchaser shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions.

3.10     <u>No Other Representations or Warranties</u>.

(a) Except for the representations and warranties contained in this <u>Article 3</u>, Purchaser has not made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Interests, the Company, the Trust Company, Purchaser or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of Purchaser's or its Affiliates' respective representatives.

(b) Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Article 2</u>, (A) none of Seller, the Company, the Trust Company or any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to Purchaser in connection with the Transactions and Purchaser has not relied on any representation or warranty other than those expressly set forth in <u>Article 2</u>, (B) Purchaser has not executed or authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to Purchaser or any of its Affiliates, or any of its or their respective representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Company or the Trust Company, or its assets or liabilities or any part thereof, other than any such representation or warranty expressly set forth in this Agreement; and (C) the Interests are being transferred "as is", "where is" and "with all faults". Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Article 2</u>, Seller, on behalf of itself and its subsidiaries and Affiliates, including the Company and the Trust Company, (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities, conditions (financial or otherwise) and prospects of the Company or the Trust Company or with respect to the Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or its or their respective representatives (including any opinion, information, projection or advice that may have been or may be provided to Purchaser by any representative of Seller or any of its Affiliates). Purchaser acknowledges and agrees that Seller has not made any representations or warranties to Purchaser regarding the probable success or profitability of the Company and the Trust Company.

(c) Purchaser acknowledges and agrees that the enforceability of this Agreement against Seller is subject to entry of the Sale Order and any other Order entered into by the Bankruptcy Court applicable to the Transactions.

## ARTICLE 4

## COVENANTS

4.1 <u>Interim Operations of the Company</u>. Seller shall, and shall cause the Company to, use its commercially reasonable efforts to conduct the business of the Company and the Trust

Company in the ordinary course in all material respects consistent with past practice. Seller shall not, and shall cause the Company or the Trust Company not to, incur any Indebtedness.

    4.2    <u>Tax Matters</u>.

    (a)    Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding with respect to Taxes from Pre-Closing Periods with respect to the Company and the Trust Company. Seller and Purchaser will consult and cooperate on a reasonable basis in preparing and timely filing Tax Returns with respect to Pre-Closing Periods with respect to the Company and the Trust Company for any Tax Return reasonably expected to impact Seller. For the avoidance of doubt, any Tax Return of the Company and the Trust Company filed after the Closing Date for a Pre-Closing Period that is not expected to have an effect on Seller shall be prepared by Purchaser and Purchaser shall control any audit of the Company and Trust Company for a Pre-Closing Period conducted after the Closing Date if such audit is not expected to have an adverse impact on Seller. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to transfer to Purchaser any books, records or information to the extent they relate to Tax Returns or related records or workpapers concerning Seller or a Seller Tax Group, provided that, to the extent such Tax Returns, records or workpapers would otherwise be required to be provided hereunder, and to the extent commercially reasonable, Seller shall use commercially reasonable efforts to provide portions of such Tax Returns, records or workpapers, or redacted versions thereof, to the extent relating solely to the Company or the Trust Company. For the avoidance of doubt, this Section 4.2 will not require the Company or the Trust Company to take any actions that would reasonably be expected to prevent or delay the consummation of the Transactions.

    (b)    Purchaser hereby agrees, from and after the Closing, to pay all transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges (all including penalties, interest and other charges with respect thereto, collectively "<u>Transfer Taxes</u>") incurred in connection with the Transactions. Such Transfer Taxes shall be paid by the party responsible under applicable Law to pay such Transfer Taxes (with Purchaser advancing Seller its share of such tax at least three (3) days before the tax payment due date).

    (c)    Any payment by Purchaser, the Company or the Trust Company under this <u>Section 4.2</u> will be an adjustment to the consideration paid under this Agreement.

    (d)    If Purchaser reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to Seller hereunder under applicable Law, Purchaser shall notify Seller as promptly as practicable after becoming aware of such requirement to withhold and deduct, and in any case, at least ten (10) Business Days before any such payment subject to withholding and the Parties shall use reasonable best efforts to mitigate or eliminate any such withholding or deduction.

    (e)    From and after the Closing Date, Purchaser shall not, and shall cause the Company and the Trust Company not to, except as otherwise required by applicable Law, without the prior written consent of Seller (not to be unreasonably withheld, conditioned, or delayed), (i) amend or otherwise modify a Tax Return of the Company or the Trust Company for

a Pre-Closing Period and (ii) make any Tax election with respect to the Company or the Trust Company (including an election under Section 336 or 338 of the Code or any similar provision of foreign, state or local Law) that relates to, or is retroactive to, a Pre-Closing Period, in each case, to the extent such action could reasonably be expected to have an adverse impact on Seller.

      4.3    <u>Regulatory Filings/Approvals</u>.

      (a)    <u>Exchanging Information</u>. Seller, on the one hand, and Purchaser on the other hand, shall each, upon request by the other, furnish the other with all information concerning itself, its subsidiaries, directors, officers, equityholders, other interestholders and, to the extent necessary, its Affiliates, and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of the Parties or any of their respective subsidiaries or, to the extent necessary, Affiliates, to any Governmental Entity in connection with the Transactions.

      (b)    <u>Initial Submissions</u>. Each of Seller and Purchaser shall prepare and file as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity in order to consummate the Transactions.  Whether or not the Transactions are consummated, Purchaser shall be responsible for all fees and payments to any Governmental Entity (including filing fees) incurred in order to obtain any consent, clearance, registration, approval, permit or authorization or any expiration or termination of a waiting period pursuant to this <u>Section 4.3</u>.

      (c)    <u>Subsequent Submissions</u>. The Parties shall, or shall cause their respective subsidiaries and Affiliates to, promptly provide all documents requested by any Governmental Entity to the extent reasonably necessary or advisable to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from such Governmental Entity in order to consummate the Transactions.

      (d)    <u>Conduct of Interactions with Governmental Entities</u>. Subject to applicable Laws relating to the exchange of information, the Parties shall, to the extent practicable, each consult with the other on and consider in good faith the views of the other in connection with, all the information relating to Purchaser, Seller, the Company or the Trust Company, as the case may be, and any of their respective subsidiaries, that appears in any filing made with, or written materials submitted to, any Governmental Entity in connection with the Transactions. In exercising the foregoing rights, the Parties shall act reasonably and as promptly as practicable.

      (e)    <u>Best Efforts</u>.

      (i)    Notwithstanding anything in this Agreement to the contrary, Purchaser shall and shall cause its Affiliates to, at Purchaser's sole cost, take or cause to be taken, any and all actions and do, or cause to be done, any and all things necessary, proper or advisable to avoid, eliminate and resolve each and every impediment and obtain all consents required to permit the satisfaction of the conditions in Article 6, as promptly as reasonably practicable, including in order to obtain approval of the Trust Company Change in Control,

11

including by offering and causing its Affiliates to fund or commit to the Trust Company such minimum capital amounts as may be required by Law or by any Governmental Entity of competent jurisdiction.

(ii)    Without limiting the generality of the foregoing, the Parties agree to take or cause to be taken, at Purchaser's sole cost, the following actions:

(1)    the prompt use of their respective commercially reasonable efforts to avoid the entry of any permanent, preliminary or temporary injunction or other decree, decision, determination or judgment that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Transactions; and

(2)    the prompt use of their respective commercially reasonable efforts to take, in the event that any Order is entered or issued, or becomes reasonably foreseeable to be entered or issued, in any regulatory proceeding or inquiry of any kind that would make consummation of the Transactions in accordance with the terms of this Agreement unlawful or that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Transactions, any and all steps (including the appeal thereof, the posting of a bond or, in the case of Purchaser, the taking of the steps contemplated by Section 4.3(e)(i)) necessary to resist, vacate, modify, reverse, suspend, prevent, eliminate or remove such actual, anticipated or threatened Order so as to permit such consummation on a schedule as close as possible to that contemplated by this Agreement.

4.4    <u>Confidentiality</u>. Each of Seller and Purchaser acknowledges that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which terms are incorporated herein by reference, and agrees to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full except that (i) the term of the Confidentiality Agreement shall be extended to December 31, 2024, and (ii) Seller shall be permitted to disclose the terms of this Agreement. For the avoidance of doubt, Seller is expressly permitted to disclose this Agreement and any exhibits and schedules thereto with the Bankruptcy Court as necessary or advisable in connection with the Transactions. From and after the Closing, Seller shall treat all Confidential Information as confidential and not disclose such Confidential Information except as permitted by this Agreement. Notwithstanding anything to the contrary in any other agreement among any of the Parties, Seller and Purchaser are both expressly permitted to (a) disclose or use Confidential Information (i) to or with any court or similar body in connection with any judicial or legal process or administrative proceeding with respect to the Interests, the Company or the Trust Company or (ii) as reasonably necessary in connection with the Bankruptcy Proceeding, including to the extent reasonably necessary in connection with the sale of the Interests by Seller as part of the Bankruptcy Proceeding and (b) disclose this Agreement, any transfer documents contemplated by this Agreement and, in each case, any exhibits and schedules thereto to the Bankruptcy Court or to the South Dakota Division of Banking as necessary or advisable in connection with the Transactions.

4.5    <u>Maintenance of Books and Records</u>. After the Closing Date, Purchaser shall, until the sixth (6th) anniversary of the Closing Date, preserve, maintain and retain all books, records, other documents and electronically stored information of and relating to the Company and the

Trust Company and its or their business, in existence and provided or delivered to Purchaser (or in the possession of the Company or the Trust Company) on the Closing Date (collectively, the "<u>Books and Records</u>") and, subject to compliance with applicable Law, make the same available for inspection and copying by Seller, any of Seller's successors or assigns or any trustee in bankruptcy and, in each case, any of their respective representatives upon reasonable notice and during normal business hours, for any reasonable business purpose or compliance with any obligation under any applicable Law, including for the purposes of (a) the preparation or amendment of tax returns, financial or court filings or reports of Seller and the Debtors, (b) responding to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Entities, (c) prosecuting and defending any Action or for other like purposes, including claims, objections and resolutions in the Bankruptcy Proceeding and (d) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Proceeding. In addition, Seller shall be permitted to retain a copy of the Books and Records for the foregoing purposes.

       4.6    <u>Employee Benefits</u>.

       (a)    Purchaser agrees that the employees of the Company or the Trust Company at the Closing who continue to remain employed with the Company or the Trust Company (the "<u>Continuing Employees</u>") shall, during the period commencing on the Closing Date and ending on the first anniversary of the Closing, be provided with (i) base salary or base wage that is no less favorable than the base salary or base wage provided by the Company or the Trust Company to each such Continuing Employee immediately prior to the Closing, (ii) target annual cash bonus opportunities that are no less favorable than the target annual cash bonus opportunities provided by the Company or the Trust Company to each such Continuing Employee immediately prior to the Closing and (iii) pension and welfare benefits (including perquisites) that are no less favorable in the aggregate than those provided by the Company or the Trust Company to each such Continuing Employee immediately prior to the Closing.

       (b)    Purchaser shall (i) cause any pre-existing conditions or limitations and eligibility waiting periods under any group health plans of the Purchaser or its Affiliates to be waived with respect to the Continuing Employees and their eligible dependents, (ii) give each Continuing Employee credit for the plan year in which the Closing occurs towards applicable deductibles and annual out-of-pocket limits for medical expenses incurred prior to the Closing for which payment has been made and (iii) give each Continuing Employee service credit for such Continuing Employee's employment with the Company or the Trust Company for purposes of vesting, benefit accrual and eligibility to participate under each applicable benefit plan of Purchaser, as if such service had been performed with Purchaser, except for benefit accrual under defined benefit pension plans, for purposes of qualifying for subsidized early retirement benefits or to the extent it would result in a duplication of benefits.

       (c)    Prior to the Closing, if requested by Purchaser in writing, to the extent permitted by applicable Law and the terms of the applicable plan or arrangement, the Trust Company shall cause the Trust Company's participation in a 401(k) plan of a PEO (the "<u>401(k) Plan</u>") to be terminated effective immediately prior to the Closing.  In the event that Purchaser requests that the Trust Company's participation in the 401(k) Plan be terminated, the Trust

Company shall provide Purchaser with evidence that such participation has been terminated not later than the day immediately preceding the Closing Date.

(d)    On or prior to the Closing, Seller shall cause the Company to take the actions set forth on Section 4.6(d) of the Seller Disclosure Schedule.

(e)    Nothing contained in this Agreement is intended to (i) be treated as an amendment of any particular Benefit Plan, (ii) prevent Purchaser or any of its Affiliates from amending or terminating any of their benefit plans or, after the Closing, any Benefit Plan in accordance with their terms, (iii) prevent Purchaser, the Company, the Trust Company or any of their Affiliates, after the Closing, from terminating the employment of any Continuing Employee, subject to following adequate procedures under applicable Law and compliance with this Section 4.6, or (iv) create any third-party beneficiary rights in any employee of the Company or the Trust Company, any beneficiary or dependent thereof, or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Continuing Employee by Purchaser, the Company or any of their Affiliates or under any benefit plan which Purchaser, the Company, the Trust Company or any of their Affiliates may maintain.

4.7    Dividend.   Prior to the Closing, Seller shall use commercially reasonable efforts to make a withdrawal of any excess cash of the Company and the Trust Company, other than Restricted Cash.  Such withdrawal may take the form of a dividend, interim dividend, share buyback, distribution of reserves, payback of intercompany funds, or any other mechanism permissible under applicable Law.

4.8    Intercompany Obligation.   Purchaser and Seller agree that, on or prior to the Closing Date (but in any event prior to Closing), any intercompany account, note or loan payable recorded on the books of the Company or the Trust Company, on the one hand, to Seller or any of its Affiliates (excluding the Company and the Trust Company), on the other hand, shall be fully settled or otherwise cancelled, and that the Company shall thereafter have no liability therefor.

## ARTICLE 5

## BANKRUPTCY MATTERS

5.1    Bankruptcy Court Filings.

(a)    As promptly as possible, Seller or its applicable Debtor Affiliates shall (i) file with the Bankruptcy Court one or more motions, along with the proposed Sale Order, (A) seeking approval of the sale of the Interests to Purchaser and (B) fixing the time, date and location of the hearing to approve the consummation of the Transactions (the "Sale Hearing"); (ii) notify, as required by the Bankruptcy Code and the Bankruptcy Rules, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court, and such additional parties as such Purchaser may reasonably request; and (iii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Order.

(b)     Each Party shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received from the Bankruptcy Court or any other Person with respect to the Transactions.

(c)     The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.  Seller shall promptly provide Purchaser and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the Sale Order, or related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser and its outside legal counsel.  Seller shall not seek any modification to the Sale Order with respect to the Transactions by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Proceeding has been appealed, in each case, without the prior written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed).

(d)     If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), Seller agrees to, and agrees to cause its Debtor Affiliates to, use their commercially reasonable efforts, to defend against such appeal, petition or motion, and Purchaser agrees to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

5.2     Non-Solicitation; Alternative Transaction.

(a)     Consummation of the Transactions are subject to approval by the Bankruptcy Court and the consideration by the Debtor Affiliates and the Bankruptcy Court of higher or better competing bids.  From and after the date hereof until three (3) days before the Sale Hearing, as such date may be modified or extended (the "Sale Process Date"), Seller and its Debtor Affiliates shall be permitted to cause their respective representatives and Debtor Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers to purchase all or any part of the Company, the Trust Company and/or its or their assets (whether in combination with other assets of Seller and the Debtor Affiliates or otherwise) and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, any Order entered into by the Bankruptcy Court applicable to the Transactions or other applicable Law, including supplying information relating to the Company or the Trust Company and the assets of the Company or the Trust Company to prospective purchasers.

(b)     From and after the Sale Process Date, other than as set forth herein, Seller and its representatives shall not (i) solicit, initiate, knowingly facilitate or knowingly encourage the submission of, or any inquiries with respect to, any Alternative Transaction by a third party;

(ii) participate in any discussions or negotiations with a third party regarding, or furnish to any third party any information or data with respect to, or otherwise cooperate in any way with respect to, a proposed Alternative Transaction; or (iii) enter into any letter of intent, memorandum of understanding, acquisition agreement or other agreement, arrangement or understanding that contemplates an Alternative Transaction; <u>provided</u>, that Seller may, in connection with any bona fide proposal related to an Alternative Transaction received by Seller without any violation of clause (i) above, furnish information and data to a third party and take any other action referred to in clause (ii) above, if: (A) Seller determines in good faith that such proposal constitutes a higher or otherwise better offer for the Interests; and (B) Seller gives Purchaser prompt written notice of Seller's intention to furnish information or data to or to engage in negotiations or discussions with the third party submitting such proposal.

5.3     <u>Sale Order</u>.

(a)     Subject to <u>Section 5.2</u> and <u>Section 8.7</u>, each of Seller and Purchaser shall take all actions as may be reasonably necessary to cause the Sale Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" buyer under section 363(m) of the Bankruptcy Code.

(b)     The Sale Order shall, among other things, (i) approve, pursuant to sections 105 and 363 of the Bankruptcy Code, (A) the execution, delivery and performance by Seller of this Agreement, (B) the sale of the Interests to Purchaser on the terms set forth herein and free and clear of all Liens (other than Permitted Encumbrances), and (C) the performance by Seller of its obligations under this Agreement, (ii) find that (A) Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and (B) Purchaser is not a successor to Seller and (iii) grant Purchaser the protections of section 363(m) of the Bankruptcy Code.

## ARTICLE 6

## CONDITIONS TO CLOSING

6.1     <u>Mutual Conditions</u>. The respective obligations of each of Seller and Purchaser to effect the Closing are subject to the satisfaction or waiver by the other Party of the following conditions on or prior to the Closing Date:

(a)     The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and not subject to a stay.

(b)     No court, arbitrator, mediator or other Governmental Entity of competent jurisdiction shall have enacted, enforced, entered, issued or promulgated any Order or Law (whether temporary, preliminary or permanent) that is in effect and has the effect of making the Transactions illegal or otherwise prohibiting consummation of the Transactions.

(c)     The South Dakota Division of Banking shall have given notice in writing approving the Trust Company Change in Control.

6.2     <u>Conditions to the Obligation of Purchaser</u>. The obligation of Purchaser to effect the Closing is subject to the satisfaction or waiver by Purchaser of the following additional conditions on or prior to the Closing Date:

(a)     The representations and warranties of Seller contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect", contained therein) as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(b)     Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date.

6.3     <u>Conditions to the Obligation of Seller</u>. The obligation of Seller to effect the Closing is subject to the satisfaction or waiver by Seller of the following additional conditions on or prior to the Closing Date:

(a)     The representations and warranties of Purchaser, the Company and the Trust Company contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect", contained therein) as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and

(b)     Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date.

## ARTICLE 7

## TERMINATION

7.1     <u>Grounds for Termination</u>. This Agreement may be terminated at any time:

(a)     by mutual agreement of Seller and Purchaser;

(b)     by either Seller or Purchaser if the Closing has not occurred by September 1, 2024 (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate this Agreement pursuant to this <u>Section 7.1(b)</u> shall not be available to a Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the Closing to have occurred on or prior to the Termination Date;

(c)    by either Seller or Purchaser, if there is in effect a Final Order of a Governmental Entity of competent jurisdiction, enjoining or otherwise prohibiting the consummation of the transactions contemplated in this Agreement (it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal in accordance with their respective obligations under this Agreement unless and until this Agreement is terminated pursuant to this Section 7.1);

(d)    by Seller if Purchaser shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in Section 6.1 or Section 6.3 and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Seller to Purchaser and (B) the Termination Date; provided, that Seller shall not have the right to terminate this Agreement pursuant to this Section 7.1(d) if Seller is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in Section 6.1 or Section 6.2;

(e)    by Purchaser if Seller shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in Section 6.1 or Section 6.2, and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Purchaser to Seller and (B) the Termination Date; provided, that Purchaser shall not have the right to terminate this Agreement pursuant to this Section 7.1(e) if Purchaser is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in Section 6.1 or Section 6.3;

(f)    by Seller if (A) all of the conditions set forth in Section 6.1 (*Mutual Conditions*) and Section 6.2 (*Conditions to Obligations of Purchaser*) have been satisfied or waived (other than those that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing), (B) Seller has irrevocably confirmed by written notice to Purchaser that (1) all conditions set forth in Section 6.3 (*Conditions to Obligation of Seller*) have been satisfied (other than those that, by their nature, are to be satisfied at Closing) or that it would be willing to waive any unsatisfied conditions in Section 6.3 (*Conditions to Obligation of Seller*) if the Closing were to occur, and (2) it is ready, willing and able to consummate the Closing and (C) Purchaser fails to consummate the Closing within two (2) Business Days following the date the Closing should have occurred pursuant to Section 1.2; provided, however, that any purported termination by Purchaser pursuant to Section 7.1(b) (*Termination Date*) shall be deemed to be a termination by Seller pursuant to this Section 7.1(f) if Seller is entitled to terminate this Agreement pursuant to Section 7.1(f) at the time of such termination; or

(g)    by Seller, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the transactions contemplated in the Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

       7.2       <u>Effect of Termination; Reverse Termination Fee</u>.

       (a)       In the event of termination of this Agreement pursuant to <u>Section 7.1</u>, this Agreement shall become void and of no effect; <u>provided</u>, that the provisions set forth in this <u>Section 7.2</u>, <u>Article 8</u> and in the Confidentiality Agreement shall survive the termination of this Agreement; <u>provided</u>, further, that the term of the Confidentiality Agreement shall be extended to December 31, 2024; <u>provided</u>, <u>further</u>, that nothing in this <u>Section 7.2</u> shall be deemed to release any Party from liability for any material breach of this Agreement prior to termination (which, for the avoidance of doubt, will be deemed to include any failure by either Party to consummate the Closing if and when it is obligated to do so hereunder).

       (b)       If this Agreement is terminated:

       (i)       pursuant to Section 7.1(b) (*Termination Date*), and at the time of such termination, all of the conditions set forth in Article 6 (*Conditions to Closing*), other than those in Section 6.1(c) (*South Dakota Approval*) or Section 6.1(b) (*Orders*), in each case, have been satisfied or waived (other than those that, by their nature, are to be satisfied at the Closing, but which conditions remain capable of being satisfied);

       (ii)       pursuant to Section 7.1(c) (*Legal Restraint*) and no willful and material breach by Seller of its obligations hereunder has contributed materially to the entry or occurrence of such Order;

       (iii)       by Seller pursuant to Section 7.1(d) (*Purchaser Breach*); or

       (iv)       pursuant to Section 7.1(f) (*Purchaser Failure to Close*);

then Purchaser will promptly pay Seller a fee equal to $50,000 (the "<u>Reverse Termination Fee</u>") in cash, no later than two (2) Business Days after the date of receipt of the applicable termination notice.

       (c)       Each of the Parties acknowledges and agrees that the agreements contained in this <u>Section 7.2(b)</u> are an integral part of the Transactions and that, without these agreements, the other Party would not enter into this Agreement.  Each of the Parties further acknowledges that payment by Purchaser of the Reverse Termination Fee is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Seller, together with any additional damages to which Seller may be entitled hereunder, in the circumstances in which the Reverse Termination Fee may be payable by Purchaser for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision; <u>provided</u> that, for the avoidance of doubt, this <u>Section 7.2(b)(i)</u> shall not limit the rights of Seller to pursue a grant of specific performance or other equitable relief pursuant to <u>Section 8.7</u> prior to the termination of this Agreement.

       (d)       All amounts due hereunder will be payable by wire transfer in immediately available funds to such account as Seller may designate in writing to Purchaser.  If Purchaser fails to promptly make any payment required in accordance with <u>Section 7.2(b)</u>,

Purchaser will pay interest on the amount of the payment at the prime rate of Bank of America (or its successors or assigns) in effect on the date the payment was payable in accordance with such sections.

<h1 align="center">ARTICLE 8</h1>

<h1 align="center">OTHER MATTERS</h1>

8.1    <u>Waiver, Amendment</u>. Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party that would have benefited by the provision had it not been waived.

8.2    <u>Remedies</u>. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by a Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

8.3    <u>No Survival of Representations and Warranties or Covenants</u>. No representations, warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms. Following the Closing Date, in no event shall Seller or Purchaser have any recourse against the other or the Purchaser Parties or Seller Parties, respectively with respect to any representation, warranty, covenant or agreement made by Seller or Purchaser, as applicable, in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the Closing Date.

8.4    <u>Release</u>. From and after the Closing, upon the terms and subject to the conditions set forth herein, Purchaser shall be deemed to have waived, discharged, settled, compromised and released any and all claims, causes of actions, liens, rights and remedies it has, had or may have against the Seller Parties, as of the Closing in respect of the acquisition or ownership of the Interests, including with respect to the terms of the certificate of incorporation, by-laws or comparable governing documents of the Seller Parties, and any alleged breach thereof, whether known or unknown, liquidated or unliquidated, contingent or non-contingent, except as set forth in this Agreement and to enforce the obligations set forth herein to effectuate the terms of this Agreement; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall be construed as a release, waiver, compromise, or settlement of any other claims Purchaser may have against any Debtor Affiliates or their estates arising prior to the Bankruptcy Proceeding.

8.5    <u>Expenses</u>. Except as otherwise provided in this Agreement or any transfer documents contemplated by this Agreement, each of Purchaser and Seller shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement and the Transactions;

provided, however, that Seller shall pay and reimburse Purchaser 50% of the legal fees and expense incurred for the engagement of Davenport, Evans, Hurwitz & Smith, LLP in connection with the Transactions, whether such fees were for the benefit of Purchaser or Seller.

8.6    Notices. All notices, requests and other communications under this Agreement to a Party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such Party at its address (or number) set forth below or such other address (or number) as the Party may specify by notice to the other Party.

If to Seller:

West Realm Shires Inc.
2600 South Shore Blvd, Suite 300
League City, TX 77573
Attention: Kathryn Schultea
Email: kathyschultea@ftx.com

*With a copy (which shall not constitute notice) to*:

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Attention:  Alexa J. Kranzley
                   Mimi Wu
Telephone:(212) 558-3275
                   (310) 712-6698
Email:     kranzleya@sullcrom.com
               wum@sullcrom.com

If to Purchaser:

Amalgamated Token Services, Inc.
900 Kearny Street, Suite 500,
San Francisco, CA 94133
Attention: Legal
Email: legal@coinlist.co

*With a copy (which shall not constitute notice) to*:

Haynes and Boone LLP
30 Rockefeller Plaza
New York, NY 10112
Attention: Matthew Frankle

Telephone: 212.918.8950
Email: matthew.frankle@haynesboone.com

8.7    Specific Performance.

(a)    Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement. Accordingly, each Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including specific performance of such covenants, promises or agreements (including to cause Purchaser to consummate the Transactions and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 8.7 will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    Each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of  Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this Section 8.7.

8.10    Fiduciary Obligations.  Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.

8.11    Entire Understanding; No Third-Party Beneficiaries. This Agreement and the Confidentiality Agreement together set forth the entire understanding of the Parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the Parties with respect to the subject matter of this Agreement. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities.

8.12    Assignment. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by a Party (whether by operation of law or otherwise) without the prior written consent of the other Party, and any purported assignment in violation of this Section 8.12 will be void, except for the following assignments which shall not require any consent and will not be void: (a) assignment to an Affiliate of either Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party)

and (b) assignment by Seller to a succeeding entity following its emergence from the Bankruptcy Proceeding. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by each Party to this Agreement and its successors and permitted assigns.

8.13    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

8.14    <u>Severability</u>. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

8.15    <u>No Presumption</u>. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

8.16    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such Laws.

(b)    Without limiting a Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Interests, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 8.6</u>; provided, <u>however</u>, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the

event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each Party consents to process being served by the other Party in any Action by delivery of a copy thereof in accordance with the provisions of <u>Section 8.6</u>; <u>provided</u>, <u>however</u>, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)     Each Party waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

8.17     <u>Interpretation</u>.

(a)     As used in this Agreement, references to:

(i)     the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)     the Preamble, Recitals, Sections or Exhibits refer to the Preamble, a Recital or a Section of, or an Exhibit to this Agreement unless otherwise indicated;

(iii)     this Agreement refers to this Agreement and the Exhibits to it; and

(iv)     all references to "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified.

(b)     Wherever this Agreement requires a Party to take an action, the requirement constitutes an undertaking by the Party to cause its subsidiaries, and to use its commercially reasonable efforts to cause its other Affiliates, to take appropriate action in connection therewith.

(c)     Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(d)     The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**WEST REALM SHIRES INC**.

By:    _____

        Name:    John J. Ray III
        Title:    Authorized Signatory

**PURCHASER**:

**AMALGAMATED TOKEN SERVICES INC.**

By:    _____

        Name:
        Title:

*[Signature Page to Purchase and Sale Agreement]*

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**WEST REALM SHIRES INC**.

By:    _____

Name:    John J. Ray III
Title:    Authorized Signatory

**PURCHASER**:

**AMALGAMATED TOKEN SERVICES INC.**

DocuSigned by:

By:    *Raghav Gulati*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
0B5F790DA54D477

Name: Raghav Gulati
Title: Chief Executive Officer

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"401(k) Plan" has the meaning set forth in Section 4.6(c).

"Acquired Cash Amount" has the meaning set forth in Section 1.4.

"Action" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such Person.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means the sale, transfer or other disposition of the Interests in a transaction with a purchaser or transferee other than Purchaser and/or its Affiliates.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

"Benefit Plan" means any benefit or compensation plan, program, policy, practice, agreement, contract, arrangement or other obligation, whether or not in writing and whether or not funded, in each case, that is sponsored or maintained by, or required to be contributed to by the Company or the Trust Company or otherwise for the benefit of employees (and beneficiaries) of the Company or the Trust Company.  Benefit Plans include, but are not limited to, "employee benefit plans" within the meaning of Section 3(3) of ERISA, employment, non-compete and/or non-solicit, consulting, retirement, severance, termination or change in control agreements, deferred compensation, equity-based, incentive, bonus, supplemental retirement, profit sharing, insurance, medical, welfare, fringe or other benefits or remuneration of any kind.

"Books and Records" has the meaning set forth in Section 4.5.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York are authorized or required by statute to close.

"Cash" of the Company and the Trust Company as of any date means cash, checks, money orders, marketable securities, short-term instruments and other cash equivalents (including, for the avoidance of doubt, Restricted Cash), funds in time and demand deposits or similar accounts, cash security deposits and other cash collateral posted with vendors, landlords and other parties; provided that Cash shall (without duplication) (x) be increased by checks, drafts and other similar instruments in transit that have been received by, but not deposited into the bank accounts of, the Company or the Trust Company and (y) be reduced by the aggregate amount of all checks, drafts and other similar instruments issued and outstanding but uncleared as of such time.

"Closing" has the meaning set forth in Section 1.2.

"Closing Date" has the meaning set forth in Section 1.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Recitals.

"Confidential Information" means any information related to the Company, the Trust Company and Purchaser, any of their respective stakeholders or any of their contractual or commercial counterparties that is furnished by or on behalf of the Company, the Trust Company or Purchaser or their respective representatives to Seller or its representatives and that is non-public, confidential and/or proprietary in nature; *provided* that "Confidential Information" does not include any information that (a) was or becomes available to Seller or any of its representatives on a non-confidential basis before disclosure to Seller by the Company, the Trust Company or Purchaser or its representatives or which Seller otherwise had the right to obtain from the Company, the Trust Company or Purchaser or its representatives without obligations of confidentiality, (b) is or has become generally available to or known by the public other than as a result of its disclosure by Seller or its representatives in breach of this Agreement or any other obligation of confidentiality to the Company, the Trust Company or Purchaser, as applicable, (c) becomes available to Seller or its representatives on a non-confidential basis from a source other than the Company, the Trust Company or Purchaser, as applicable, or its representatives who, to Seller's knowledge, is not bound by a confidentiality agreement with the Company, the Trust Company or Purchaser, as applicable, (d) was independently developed by Seller or its representatives without use of the Confidential Information, (e) was or is obtained from the Company, the Trust Company or Purchaser, as applicable or any other Person by Seller or any of its representatives through a discovery process in any judicial or legal process or administrative proceeding or (f) has been approved for release on a non-confidential basis by written authorization by the Company, the Trust Company or Purchaser, as applicable.

"Confidentiality Agreement" means that certain confidentiality agreement entered into between Purchaser and/or any of its Affiliates and the Debtors, dated November 16, 2022.

"Continuing Employees" has the meaning set forth in Section 4.8.

"Contract" means any agreement, undertaking, lease, license, contract, note, mortgage, indenture, arrangement or other obligation.

A-2

"Debtor Affiliates" means the Debtors and their respective wholly owned subsidiaries.

"Debtors" has the meaning set forth in the Recitals.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Execution Date" has the meaning set forth in the Preamble.

"Final Order" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"Governmental Entity" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the U.S. Securities and Exchange Commission and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors, Purchaser, the Company or the Trust Company.

"Intellectual Property Rights" means all rights anywhere in the world in or to: (a) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, logos, symbols, trade dress, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of the same; (b) patents, patent applications, registrations and invention disclosures, including divisionals, revisions, supplementary protection certificates, continuations, continuations-in-part, renewals, extensions, substitutes, re-issues and re-examinations; (c) confidential or proprietary trade secrets, inventions, discoveries, ideas, improvements, information, know-how, data and databases, including processes, schematics, business methods, formulae, drawings, specifications, prototypes, models, designs, customer lists and supplier lists; (d) published and unpublished works of authorship, whether copyrightable or not (including all rights in Software, website and mobile content, data, databases and other compilations of information), copyrights therein and thereto, and registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof; (e) Internet domain names and URLs; and (f) any other intellectual property, industrial or proprietary rights.

"Interests" has the meaning set forth in the Recitals.

"Law" or "Laws" means any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"<u>Lien</u>" means any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation, usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude, restrictive covenant or condition, encroachment, claim, interest, restriction or any other encumbrance of any kind.

"<u>Lease</u>" has the meaning set forth in <u>Section 2.10</u>.

"<u>Leased Real Property</u>" has the meaning set forth in <u>Section 2.10</u>.

"<u>Material Adverse Effect</u>" means any change, development, circumstance, fact or effect that, individually or taken together with any other changes, developments, circumstances, facts or effects is, or would reasonably be expected to be, materially adverse to the financial condition, assets, liabilities, business operations or results of operations of the Company and the Trust Company, taken as a whole; <u>provided</u>, <u>however</u>, that none of the following, either alone or in combination, shall be deemed to constitute a Material Adverse Effect that is occurring, has occurred or would reasonably be expected to occur: (a) changes, developments, circumstances or facts in or with respect to the economy, credit, capital, securities, digital asset or financial markets or political, regulatory or business conditions in the geographic markets in which the Company and/or the Trust Company has operations or its products or services are sold, (b) changes, developments, circumstances, facts or effects generally affecting the industries, markets or geographical areas in which the Company or the Trust Company operates, (c) any change in the price or relative value of any digital currency or cryptocurrency, or any other blockchain-based tokens or assets, (d) any change in existence or legality of any digital currency or cryptocurrency, or any other blockchain-based token or asset, or any halt or suspension in trading of any such digital currency or cryptocurrency on any exchange, (e) changes, events and occurrences in the industries in which the Company or the Trust Company operates generally, (f) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, any change, development or effect resulting from acts of war (whether or not declared), sabotage, terrorism, military actions or the escalation of any of the foregoing, whether perpetrated or encouraged by a state or non-state actor or actors (other than cyberattacks), any weather or natural disaster, or any outbreak of illness or other public health event (or any measures taken in response thereto) or any other *force majeure* event (except to the extent causing any damage or destruction to or rendering unusable any material facility or property of the Company and/or the Trust Company), whether or not caused by any Person (other than the Company or the Trust Company or any of its or their Affiliates or representatives), (g) changes in law, generally accepted accounting principles or official interpretations of the foregoing, (h) compliance with this Agreement, including any effect on Seller resulting from failure to take any action to which Purchaser refused consent under this Agreement, (i) the Transactions or any announcement hereof or the identity of Purchaser, (j) the pendency of the Bankruptcy Proceeding and any action approved by, or motion made before, the Bankruptcy Court, or (k) matters known to or reasonably foreseeable by Purchaser, taking into account the financial condition, business and operations of Seller, the fact that Seller is involved in the Bankruptcy Proceeding and the circumstances giving rise to such Bankruptcy Proceeding; <u>it</u> being <u>understood</u> that the failure of the Company or the Trust Company to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbitrator, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceeding.

"Party" or "Parties" has the meaning set forth in the Preamble.

"PEO" has the meaning set forth in Section 2.7(a).

"Permit" means the Trust Company Charter and any other permits, licenses, franchises, variances, exemptions, orders and other authorizations, consents and approvals of Governmental Entities.

"Permitted Encumbrance" means a restriction on transfer arising solely under applicable federal and state securities Laws and any transfer restrictions set forth in the certificate of incorporation, by-laws or comparable governing documents of the Company or the Trust Company.

"Person" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Pre-Closing Period" means all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"Purchase Price" has the meaning set forth in Section 1.1.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Parties" means, collectively, (i) Purchaser, (ii) each of the current or former Affiliates of Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Restricted Cash" means cash or cash equivalents that (a) are required to be held as cash or cash equivalents by the Company or the Trust Company to satisfy any applicable regulatory or contractual requirements as of such date, (including amounts required to be held for potential margin calls or used as trading collateral) and (b) the Company or the Trust Company is otherwise restricted from dividending or distributing to its shareholders or other equity interest holders prior to Closing pursuant to applicable Law or Contract, including letters of credit, credit support arrangements, or because such dividend or distribution would be heavily taxed.

"Sale Hearing" has the meaning set forth in Section 5.1(a).

"Sale Order" means an order entered by the Bankruptcy Court or other court of competent jurisdiction that includes the provisions set forth in Exhibit B hereto, subject to

(a) immaterial modifications or clarifications or (b) such other changes to which Purchaser consents (such consent not to be unreasonably withheld, conditioned or delayed).

"Sale Process Date" has the meaning set forth in Section 5.2(a).

"Seller" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" has the meaning set forth in Article 2.

"Seller Parties" means, collectively, (i) Seller, (ii) each of the current or former Affiliates of Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Seller Tax Group" means any affiliated, consolidated, combined, unitary or similar group for Tax purposes which Seller or any of its Affiliates is a member, other than such group solely between or among the Company and the Trust Company.

"Software" means any and all computer programs, applications, middleware, firmware, microcode and other software, including operating systems, software implementations of algorithms, models and methodologies, and application programming interfaces, in each case, whether in source code, object code or other form or format, including libraries, subroutines and other components thereof, together with input and output formats, and all documentation relating to any of the foregoing.

"South Dakota Division of Banking" means the Division of Banking of the South Dakota Department of Labor and Regulation.

"Straddle Period" means each taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any other Person of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries.

"Tax" or "Taxes" means any tax or similar duty, fee, charge or assessment thereof imposed by a Governmental Entity, in each case in the nature of a tax, including any interest, penalties and additions imposed with respect to such amount.

"Tax Return" means any returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) or any other document required to be supplied to a Tax authority relating to Taxes.

"Termination Date" has the meaning set forth in Section 7.1(b).

"Transactions" means the transactions contemplated by this Agreement.

"Trust Company" has the meaning set forth in the Recitals.

"Trust Company Change in Control" means a change in control of the Trust Company requiring a submission of any notice or filing with the South Dakota Division of Banking that arises out of Purchaser's acquisition, directly or indirectly, of the Trust Company.

"Trust Company Charter" means the non-depository public trust company charter and certificate of authority issued to the Trust Company by the South Dakota Division of Banking on November 5, 2021, pursuant to the South Dakota Codified Laws § 51A-6A.

[Remainder of page intentionally left blank]

**EXHIBIT B**

**FORM OF SALE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | Ref. No. ____ |

**ORDER (I) AUTHORIZING AND APPROVING SALE OF INTERESTS IN DIGITAL
CUSTODY INC. FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES; (II) AUTHORIZING AND APPROVING ENTRY INTO, AND
PERFORMANCE UNDER, THE PURCHASE AND SALE AGREEMENT;
(III) AUTHORIZING DEBTORS TO FILE CERTAIN SCHEDULES TO THE
PURCHASE AND SALE AGREEMENT UNDER SEAL; AND (IV) GRANTING
RELATED RELIEF**

Upon the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors

and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Sale Order"),

pursuant to sections 105(a), 107(b), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002,

6004, 9007, 9008, 9014 and 9018 and Local Rules 2002-1, 6004-1, 9006-1 and 9018-1(b) among

other things, (a) authorizing and approving the sale (the "Sale Transaction") of all the equity

interests (the "Interests") held by the Debtor West Realm Shires Inc., a Delaware corporation

("Seller"), in Digital Custody Inc., a Delaware corporation (the "Subject Company"), free and

clear of all liens, claims, interests and encumbrances in accordance with the terms and conditions

set forth in the Agreement, (b) authorizing and approving Seller's entry into, and performance

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and
4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the
Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete
list of such information may be obtained on the website of the Debtors' claims and noticing agent at
https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd
is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]   Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

under, the Purchase and Sale Agreement, dated as of February 6, 2024, a copy of which is attached as Exhibit A to the Motion (the "Agreement"), between Seller and Amalgamated Token Services Inc., a Delaware corporation ("Purchaser"), (c) authorizing Debtors to file certain schedules to the Agreement under seal, and (d) granting related relief; and the Court having held a hearing to approve the Sale Transaction pursuant to the terms of the Agreement (the "Sale Hearing") to review and consider (i) the Motion with respect to the Sale Transaction and all relief related thereto, (ii) the Agreement, (iii) the Declaration of Steven P. Coverick in Support of the Sale Transaction, and (iv) any objections thereto that were not resolved prior to the start of the Sale Hearing; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and objections (if any) to the Motion, with respect to the sale of the Interests, having been withdrawn or overruled on the merits; and after due deliberation and good cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    Jurisdiction and Venue.  This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Interests to be sold, transferred or conveyed pursuant to the Agreement, pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This Court may issue a final order on the Motion consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* FED. R. BANKR. P. 7052.

B.      <u>Statutory and Rule Predicates</u>.  The statutory and other legal predicates for the relief requested in the Motion and for the approvals and authorization herein are sections 105(a), 107(b) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, 9008, 9014 and 9018 and Local Rules 2002-1, 6004-1, 9006-1 and 9018-1(b).

C.      <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rule 6004(h), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedures, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein and authorizes the closing of the Sale Transaction contemplated hereby without regard to any stay or delay in its implementation.

D.      <u>Sale Notice</u>.  As shown by the affidavits filed and submissions made to the Court, (a) the Debtors have provided due, good, proper, timely, reasonable, adequate, appropriate and sufficient notice of, and sufficient opportunity to object to, the Motion with respect to the Sale Transaction and the relief requested therein (including the Debtors' requested findings with respect to successor liability), the Sale Transaction, and the proposed entry of this Sale Order in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, (b) such notice was adequate and sufficient under the circumstances of these Chapter 11 Cases, and (c) no other or further notice is necessary or shall be required.

E.      <u>Opportunity to Object</u>.  A fair and reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to all interested parties.

F.      <u>No Collusion</u>.  The Agreement and the Sale Transaction were negotiated, proposed and entered into by Seller and Purchaser without collusion or fraud, in good faith and

from arm's-length bargaining positions, and are substantively and procedurally fair to all parties. Neither the Debtors nor Purchaser has engaged in any conduct that would cause or permit the Agreement or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtors nor Purchaser has violated section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders. The Sale Transaction may not be avoided, and no damages may be assessed against Purchaser or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

G.    <u>Good Faith of Purchaser</u>.  Purchaser is purchasing the Interests in good faith and for value, and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  Purchaser is therefore entitled to all of the protections afforded under section 363(m) and any other applicable or similar bankruptcy or non-bankruptcy law, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Interests; (b) Purchaser in no way induced or caused the filing of these Chapter 11 Cases by the Debtors; (c) all payments to be made, and all other material agreements or arrangements entered into or to be entered into, by Purchaser in connection with the Sale Transaction have been disclosed; (d) Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (e) the negotiation and execution of the Agreement were at arm's length and in good faith, and at all times each of the Purchaser and Seller were represented by competent counsel of their choosing; and (f) the Purchaser has not acted in a collusive manner

4

with any person.  Purchaser will be acting in good faith within the meaning of section 363(m) in closing the transactions contemplated by the Agreement.

H.    <u>Fair Price and Fair Dealing</u>.  The sale of the Interests achieved a fair price and employed a substantively and procedurally fair process that properly accounted for fiduciary duties and is in the best interests of the Debtors' estates.

I.    <u>Highest and Best Offer</u>.  The Debtors and their advisors, including, without limitation, Alvarez & Marsal North America, LLC, have appropriately marketed the Interests, and a reasonable opportunity has been given to any interested party to make a higher or better offer for the Interests.  No other person or entity or group of entities has offered to purchase the Interests for higher or otherwise better value to the Debtors' estates than Purchaser. The offer to purchase the Interests made by Purchaser, under the terms and conditions set forth in the Agreement: (a) was made in good faith; (b) is the highest or otherwise best offer obtained for the Interests and will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative; (c) is for fair, adequate and sufficient consideration that constitutes reasonably equivalent value for the Interests being conveyed to Purchaser; (d) is fair and reasonable; (e) is in the best interests of the Debtors' estates; and (f) would not have been made by Purchaser absent the protections afforded to Purchaser by this Sale Order.

J.    The Debtors' determination that the Sale Transaction, pursuant to the Agreement, provides the highest or otherwise best offer for the Interests, and their related decision to sell the Interests, constitute a reasonable exercise of the Debtors' business judgment. The facts and circumstances described in the Motion and the evidence adduced in connection with the Sale Hearing demonstrate the Debtors' business judgment to sell the Interests to Purchaser at this time, and the Debtors have articulated sound business reasons for

consummating the Sale Transaction and for selling the Interests outside of a chapter 11 plan. Moreover, the sale of the Interests outside of a chapter 11 plan pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor dictates the terms of any chapter 11 plan.  The Sale Transaction does not constitute a *sub rosa* chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver and consummate the Sale Transaction, subject to this Sale Order.

K.    <u>Fair Consideration</u>.  The consideration provided by Purchaser pursuant to the Agreement constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

L.    <u>No Successor or Other Derivative Liability</u>.  As a result of any action taken in connection with the Sale Transaction, the Agreement, or this Sale Order: (a) Purchaser is not a successor to or mere continuation of or substantial continuation of the Debtors or their estates and there is no continuity of enterprise between Purchaser and the Debtors; and (b) Purchaser shall not be deemed to be holding itself out to the public as a continuation of the Debtors based on the Sale Transaction.  Purchaser is not, and shall not be, considered a successor in interest to any of the Debtors or their estates, by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, succession, merger, or de facto merger of Purchaser and the Debtors and/or the Debtors' estates.  Purchaser would not have entered into the Agreement if the sale of the Interests were not made free and clear of any successor liability of Purchaser.

M.  <u>Corporate Power and Authority</u>.  As set forth in section 2.1(a) of the Agreement, Seller (a) has full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (b) has all corporate authority necessary to consummate the Sale Transaction, and (c) has taken all corporate action and formalities necessary to authorize and approve the Agreement and the consummation of the Sale Transaction.  Seller's sale of the Interests has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for Seller to consummate the Sale Transaction.

N.  The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor Purchaser are entering into the Sale Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

O.  <u>Title to Assets</u>.  The transfer of the Debtors' rights, titles and interests to the Interests to Purchaser will be, as of the Closing Date (as defined in the Agreement), a legal, valid and effective transfer of such rights, titles and interests in the Interests, which transfer vests or will vest Purchaser with all rights, titles and interests of the Debtors to the Interests free and clear of all Liens (as defined below and in the Agreement), other than Permitted Encumbrances (as defined in the Agreement).  The Agreement is a valid and binding contract between Seller and Purchaser and shall be enforceable according to its terms.

P.  <u>Satisfaction of Section 363(f) Standards</u>.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full, and upon entry of this Sale Order, the Debtors are authorized to transfer all of their rights, titles and interests in and to the Interests free

7

and clear of any interest in the property, other than Permitted Encumbrances.  The Debtors may sell the Interests free and clear of all liens (statutory or otherwise), charges, pledges, mortgages, leases, easements, hypothecations, usufructs, deeds of trust, security interests, options, rights of use, first offer or first refusal, servitudes, restrictive covenants or conditions, encroachments, claims, interests, restrictions, or any other encumbrances of any kind (collectively, "Liens") against the Debtors, their estates or the Interests because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each holder with a Lien on the Interests to be transferred pursuant to the Agreement: (a) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented; (b) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; or (c) otherwise falls within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  Holders of Liens against the Debtors, their estates or the Interests who did not object, or who withdrew their objections, to the Sale Transaction or the Motion, with respect to the sale of the Interests (except with respect to Permitted Encumbrances), are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All other holders of Liens are adequately protected by having their Liens, if any, in each instance against the Debtors, their estates or the Interests, attach to the net cash proceeds of the Sale Transaction ultimately attributable to the Interests in which such creditor alleges a Lien, in the same order of priority, with the same validity, force and effect that such Liens had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

Q.    Purchaser would not have entered into the Agreement and would not consummate the Sale Transaction if the sale of the Interests to Purchaser were not free and clear

8

of all Liens (other than Permitted Encumbrances), or if Purchaser or any of the Purchaser Parties

(as defined in the Agreement) would, or in the future could, be liable for any such Lien.  The

total consideration to be provided under the Agreement reflects Purchaser's reliance on this Sale

Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to,

interest in and possession of the Interests free and clear of all Liens (other than Permitted

Encumbrances).  Not transferring the Interests free and clear of all Liens (other than Permitted

Encumbrances) would adversely impact the Debtors' efforts maximize the value of the estates,

and the transfer of the Interests other than pursuant to a transfer that is free and clear of all Liens

(other than Permitted Encumbrances) would be of substantially less benefit to the Debtors'

estates.

      R.     <u>Waiver of Bankruptcy Rule 6004(h)</u>.  Good and sufficient reasons for

approval of the Agreement and the Sale Transaction have been articulated.  The Debtors have

demonstrated both (a) good, sufficient and sound business purposes and justifications and (b)

compelling circumstances for the Sale Transaction other than in the ordinary course of business,

pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in

that, among other things, the immediate consummation of the Sale Transaction is necessary and

appropriate to maximize the value of the Debtors' estates.  Accordingly, there is cause to waive

or lift the stay contemplated by Bankruptcy Rule 6004(h) with respect to the Sale Transaction.

To maximize the value of the Interests, it is essential that the Sale Transaction occur within the

time constraints set forth in the Agreement.  Time is of the essence in consummating the Sale

Transaction and the Debtors and Purchaser intend to close the Sale Transaction as soon as

practicable.  Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair

value of the Purchase Price under the Agreement, the proposed Sale Transaction should be approved.

   S. The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f) and 363(m), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

   T. <u>Personally Identifiable Information</u>.  The Sale Transaction does not involve the sale of any personally identifiable information.  Thus, the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

   U. <u>Sensitive Information Under Seal</u>.  A publicly viewable redacted version of Seller Disclosure Schedule to the Agreement has been filed in these Chapter 11 Cases at Docket No. [●].  The information contained in the redacted Schedule (the "<u>Confidential Information</u>") is highly sensitive.  The Confidential Information does not relate to the economic terms of the proposed Sale Transaction. Filing the Schedule to the Agreement under seal pursuant to sections 105(a) and 107(b) of the Bankruptcy Code is in the best interests of the Debtors, their estates, creditors and other parties in interest.

   V. <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and the evidence adduced in connection with the Sale Hearing establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their estates.

IT IS HEREBY ORDERED THAT:

**A.**     **General Provisions**

1.     The sale of the Interests and the other relief requested in the Motion is granted as set forth herein, and the Agreement and the provisions thereof and the Sale Transaction are approved in their entirety as set forth herein.

2.     All objections, responses, reservations of rights and requests for any continuances concerning the Motion are resolved in accordance with the terms of this Sale Order as set forth in the record of the Sale Hearing.  To the extent any such objections, responses, reservations of rights or requests for any continuances were not otherwise withdrawn, waived, settled, or resolved, such are hereby overruled and denied on the merits.  All interested parties that failed to timely object to the Motion, with respect to the Sale Transaction, are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

3.     Notice of the Motion, the Agreement, the sale of the Interests free and clear of all Liens, except Permitted Encumbrances, the Sale Transaction was fair, equitable, proper, and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, 9008, 9014 and 9018 the Local Rules 2002-1, 6004-1 and 9006-1.

**B.**     **Approval of the Agreement**

4.     The Agreement and all of the terms and conditions thereof, are hereby authorized and approved in all respects.  The failure to specifically include or make reference to any particular provision of the Agreement in this Sale Order shall not impair the effectiveness of such provision, it being the intent of this Court that the Agreement and the Sale Transaction are authorized and approved in their entirety.

11

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction to Purchaser in accordance with the terms and conditions of the Agreement, (b) close the Sale Transaction as contemplated in the Agreement and this Sale Order, and (c) execute and deliver, perform under, consummate and implement the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale Transaction.  Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order; provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

6.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors of and holders of equity interests in, the Debtors, any holders of Liens in, against or on all or any portion of the Interests (whether known or unknown), Purchaser and all successors and assigns of Purchaser, the Interests and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to Chapter 7 under the Bankruptcy Code of these Chapter 11 Cases.  This Sale Order and the Agreement shall inure to the benefit of the Debtors, their estates and creditors, Purchaser and the respective successors and assigns of each of the foregoing.

## C.      **Consummation of the Sale Transaction**

7.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer all of their rights, titles and interests to the Interests to

12

Purchaser on the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such rights, titles and interests in the Interests and shall vest Purchaser with all of the Debtors' rights, titles and interests in the Interests and, upon the Debtors' receipt of the Purchase Price, shall be free and clear of all liens, claims, interests and encumbrances, including but not limited to, successor or successor-in-interest liability or, any tax liens or mechanic's liens asserted against the Interests, except Permitted Encumbrances, with all Liens to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such Liens now have against the Interests, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.  The provisions of this Sale Order authorizing and approving the transfer of the Interests free and clear of all Liens (other than Permitted Encumbrances) shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

8.       A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record except Permitted Encumbrances.

9.       If any person or entity which has filed statements or other documents or agreements evidencing Liens in, against or on all or any portion of the Interests shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and any other documents necessary for the purpose of documenting the release of all Liens which the

person or entity has or may assert with respect to all or any portion of the Interests, the Debtors, Purchaser and each of their respective officers, employees and agents are hereby authorized and empowered to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Interests.

        10.     This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens existing as to the Interests prior to the Closing Date, except Permitted Encumbrances, shall have been unconditionally released, discharged and terminated from the Interests, and that the conveyances described herein have been effected.  This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

**D.**      <u>**Prohibition of Actions Against Purchaser**</u>

        11.     Except as expressly provided for in this Sale Order or the Agreement, Purchaser shall not have any liability or other obligation or responsibility of the Debtors arising under or related to the Interests prior to the Closing.  Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Agreement, Purchaser shall not be liable for any claims against the Debtors or any of its predecessors or affiliates, and

Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental (subject to paragraph 15 below), successor or transferee liability, securities law, tax law, labor law, de facto merger, mere continuation or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, environmental liabilities (subject to paragraph E.15 below), and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Interests prior to the Closing.  The Sale Transaction does not amount to a consolidation, merger or de facto merger of Purchaser, on the one hand, and the Debtors, the Debtors' affiliates and/or the Debtors' estates, on the other hand, and there is not substantial continuity between Purchaser, on the one hand, and the Debtors or their affiliates, on the other hand, and Purchaser is not a mere continuation of the Debtors or their estates, and Purchaser does not constitute a successor to the Debtors or their estates.  For purposes of paragraphs 11 to 14**Error! Reference source not found.** of this Sale Order, all references to Purchaser shall include the Purchaser Parties.

12.    Except as expressly otherwise set forth in the Agreement and this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants and other creditors, holding Liens against or in all or any portion of the Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors or the Interests prior to the Closing

Date or the transactions contemplated by the Agreement, including the transfer of the Interests to Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against Purchaser, its Affiliates, its successors or assigns, their property or the Interests, such persons' or entities' Liens with respect to the Interests, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Purchaser, its Affiliates, its successors, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Purchaser, its Affiliates, its successors, assets or properties; (c) creating, perfecting or enforcing any Liens against Purchaser, its Affiliates, its successors, assets or properties; (d) asserting any unexercised set-off or right of subrogation against any obligation due Purchaser, its Affiliates or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order, or the agreements or actions contemplated or taken in respect thereof or (f) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate the Subject Company, subject to paragraph 14 below.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens in or on the Interests (except Permitted Encumbrances), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

13.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere (a) with the ability of the Debtors and/or Seller to sell and transfer the Interests to Purchaser in accordance with the terms of the Agreement and this Sale Order, and (b) with the ability of Purchaser to acquire and take possession of the Interests in accordance with the terms of the Agreement and this Sale Order.

14.     Purchaser has given substantial consideration under the Agreement for the benefit of the Debtors and their estates.  The consideration given by Purchaser shall constitute valid and valuable consideration for the sale being free and clear of any potential liens, claims, interests, and encumbrances, including any Liens, as to the Interests pursuant to this Sale Order, except with respect to the Permitted Encumbrances, and free and clear of any potential claims of successor liability against the Purchaser.  The consideration provided by Purchaser for the Interests under the Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

**E.     Other Provisions**

15.     Nothing in this Sale Order or the Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order.  In addition, nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law, including the jurisdiction to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

16.     Further, nothing in this Sale Order or Agreement authorizes the transfer or assignment of any governmental license, permit, registration, authorization or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law as appropriate.

17.     Notwithstanding anything to the contrary in the Motion, this Sale Order, or any findings announced at the Sale Hearing, nothing in the Motion, this Sale Order, or announced at the Sale Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the

United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

18.     The consideration provided by Purchaser to the Debtors pursuant to the Agreement for the Interests constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

19.     The sale of the Interests does not include the sale of any causes of action held by any of the Debtors against any person or entity, including but not limited to causes of action against Samuel Bankman-Fried, Gary Wang, Nishad Singh, Caroline Ellison or any person known by the Debtors to have a familial relationship with any of the foregoing persons.

20.     The Sale Transaction is undertaken by Purchaser without collusion and in good faith, within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction unless such authorization and such Sale Transaction were duly stayed pending such appeal at the time of the Closing. Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy Code.  The Debtors and Purchaser will be acting in good faith if they proceed to consummate the Sale Transaction at any time after the entry of this Order.

21.     As a good faith purchaser of the Interests, Purchaser has not entered into an agreement with any other potential bidders, and has not colluded with any other bidders, potential bidders, or any other parties interested in the Interests, and therefore, neither the

Debtors nor any successor-in-interest to the Debtors' estates shall be entitled to bring an action against Purchaser, and the Sale Transactions may not be avoided pursuant to section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) in respect of the Agreement or Sale Transaction.

22.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent Chapter 7 case into which these Chapter 11 Cases may be converted or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Agreement or the terms of this Sale Order.  In the event there is a conflict between this Sale Order and the Agreement (or any ancillary agreements executed in connection therewith), this Sale Order shall control and govern.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.  To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall control.

23.    Pursuant to Bankruptcy Rules 7062, 9014, and 6004(h), this Sale Order shall be effective and enforceable immediately upon entry, the Debtors and Purchaser are authorized to close the Sale Transaction immediately upon entry of this Sale Order, and the 14-day stay provided in Bankruptcy Rule 6004(h) is hereby expressly waived and shall not apply.

24.    The failure specifically to include any particular provision of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the

Agreement (including all ancillary documents executed in connection therewith) and this Sale Order.

25.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, with prior written notice to the Committee, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or any of the Debtors' creditors.  If the Agreement is modified, the Debtors shall file the modified version with the Court.

26.     Pursuant to the terms of and subject to the conditions contained in the Agreement, following the Closing, Seller, its successors and assigns and any trustee in bankruptcy will have access to the books and records related to the Interests subject to the terms of, and for the specified purposes set forth in, and in accordance with, section [4.5] of the Agreement.

27.     This Court shall retain exclusive jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

28.     The Agreement shall be in full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

29.     No bulk sales law, bulk transfer law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes (as defined in the Agreement)) shall apply to the Debtors' conveyance of the Interests or this Sale Order.

30.     The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

31.     The Debtors are authorized to file the Confidential Information under seal. Absent further order of the Court, the Confidential Information shall remain under seal and not be made available to anyone except for the Court, the U.S. Trustee and counsel to the Committee.

32.     Purchaser is a party-in-interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order, the Sale Transaction and any issues related to or otherwise connected to the Agreement and the Sale Transaction.

33.     Nothing in this Sale Order shall affect the obligations, if any, of the Debtors, Purchaser, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

34.     Nothing in this Sale Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impairing or diminishing any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not the Interests.

35.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Dated: _____
   Wilmington, Delaware

        _____
        The Honorable John T. Dorsey
        United States Bankruptcy Judge

**SCHEDULES**

**to the**

**PURCHASE AND SALE AGREEMENT**

**by and between**

**WEST REALM SHIRES INC.**

**and**

**AMALGAMATED TOKEN SERVICES INC.**

**Dated as of February 6, 2024**

INTRODUCTION ..................................................................................................................1

Schedule 2.7 Employee Benefits ........................................................................................3

Schedule 2.11 Real Property................................................................................................6

Schedule 4.6 Employee Benefits ........................................................................................7

## INTRODUCTION

These Schedules (including the attachments hereto, as amended or restated from time to time, these "Schedules") constitute the Seller Disclosure Schedule referred to in that certain Purchase and Sale Agreement (the "Agreement"), dated as of February 6, 2024, by and between West Realm Shires Inc., a Delaware corporation ("Seller") and Amalgamated Token Services Inc., a Delaware corporation ("Purchaser"). Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Agreement. Schedule references correspond to sections of the Agreement unless otherwise specified.

These Schedules are qualified in their entirety by reference to the specific provisions of the Agreement and do not constitute, and shall not be construed as constituting, representations, warranties or covenants of Seller, except as and to the extent provided in the Agreement or expressly set forth in a particular Schedule. Each Schedule is intended only to qualify and limit the representations, warranties, covenants and agreements of Seller contained in the Agreement. The inclusion of any facts, items or information, including dollar amounts, in these Schedules shall not in and of itself be construed as an admission that such fact, item or information (or any non-disclosed fact, item or information of comparable or greater significance) is material to Seller, individually or taken as a whole, and any such disclosure, including dollar amounts, shall not be deemed an acknowledgment or representation that such facts, items or information are material or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Therefore, the inclusion of any item in these Schedules shall not be deemed to be an admission or evidence of materiality of such item.

No disclosure in these Schedules relating to any possible or alleged breach or violation of any Law, Contract or other obligation shall be construed as an admission of liability to any third party, or as an admission against any interest of Seller or its directors or officers. In disclosing the information in these Schedules, Seller expressly does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. References in these Schedules to any agreement include references to such agreement's exhibits, amendments and schedules. Where the terms of a Contract or other disclosure item have been referenced, summarized or described, such reference, summary or description does not purport to be a complete statement of the terms of such Contract or other disclosure item. Any reference in these Schedules to any Contract is to that Contract as modified, supplemented or amended on or prior to the date hereof.

Disclosure of any particular item in any section or subsection of these Schedules with respect to the representations and warranties set forth in Article II of the Agreement, notwithstanding the omission of appropriate cross-references, shall be deemed to be disclosed for all purposes of Article II of the Agreement as long as the relevance of such disclosure to the other sections or sub-sections of the Agreement is reasonably apparent on its face based on a plain reading of such disclosure. The introductory language and section headings within these Schedules are inserted for convenience of reference only and will not affect the meaning or interpretation of the Agreement or these Schedules.

The matters disclosed by Seller in these Schedules: (1) are Confidential Information (as defined in the Confidentiality Agreement); (2) are being disclosed in these Schedules in accordance with the terms and subject to the conditions of the Confidentiality Agreement in all

respects; and (3) shall be treated by Purchaser strictly in accordance with the terms of the Confidentiality Agreement.

Seller does not assume any responsibility to any Person that is not a party to the Agreement for the accuracy of any information contained in these Schedules.

**Schedule 2.7**
**Employee Benefits**

(a)

1.  Employment Contract, dated as of January 1, 2022, by and between Digital Custody Trust Company and ██████████████ (the "███████ Contract").

2.  Employment Contract, dated as of January 1, 2022, by and between Digital Custody Trust Company and ████████████████ (the "███████ Contract").

3.  The following Benefit Plans are provided by a PEO:

    a.  Medical:

        i.  UHC Standard SC

        ii.  UHC Hawaii PPO

        iii.  UHC Puerto Rico

        iv.  UHC Standard

        v.  UHC Standard NV

        vi.  UHC Basic NV

        vii.  UHC Basic SC

        viii.  UHC Basic

        ix.  UHC Enhanced

    b.  Dental:

        i.  Delta Dental Premium TX

        ii.  Delta Dental Premium MS

        iii.  Delta Dental Premium MT

        iv.  Delta Dental Premium

        v.  MetLife Premium MT

        vi.  Delta Dental Premium VA

        vii.  MetLife Premium TX

        viii.    MetLife Premium

        ix.    MetLife Premium LA

        x.    MetLife Premium MS

        xi.    Delta Dental Premium LA

c.  Vision:

        i.    VSP Vision Premium

        ii.    Aetna EyeMed Premium

d.  Other:

        i.    DP Medical

        ii.    DP Dental

        x.    DP Vision

        xi.    DP Accident

        xii.    Accident

        xiii.    Critical Illness

        xiv.    DP Critical Illness

        xv.    DP Hospital Indemnity

        xvi.    Supplemental Life Insurance

        xvii.    Basic Life AD&D

        xviii.    Dependent Life

        xix.    Supplemental AD&D

        xx.    Spouse/Partner Life Insurance

        xxi.    Short-Term Disability

        xxii.    Long-Term Disability

        xxiii.    401(k) Plan

        xxiv.    Roth IRA Plan

xxv.   Flex Spending Health – U.S.

xxvi.   Flex Spending Dep Day Care

xxvii.   Legal Services

xxviii.   Commuter Benefits

(c)

1. ███████ Contract.

2. ███████ Contract.

**Schedule 2.11**
**Real Property**

1. The Trust Company is party to that certain Lease Agreement, dated June 30, 2021, by and between Blackstreet Investments, LLC and the Company for the premises known as 122 S Phillips Avenue Suite 250, Sioux Falls SD 57104 (the "Lease"), which was assigned by the Company to the Trust Company pursuant to that certain Assignment and Assumption of Lease Agreement, dated January 11, 2023 by and between the Company, as the assignor, and the Trust Company, as the assignee, as amended by the First Lease Addendum, dated August 2, 2023, by and between Blackstreet Partners, LLC and the Trust Company extending the term of the Lease.

**Schedule 4.6**
**Employee Benefits**

(d)

1.