# Selected docket entries for case 23−2297

Generated: 02/12/2024 15:13:18

| Filed | Document Description | Page | Docket Text |
|-------|---------------------|------|-------------|
| 01/19/2024 | 66 Opinion Filed | 2 | PRECEDENTIAL OPINION. Coram: RESTREPO, BIBAS and SCIRICA, Circuit Judges. Total Pages: 16. Judge: RESTREPO Authoring. (SB) |
| 01/19/2024 | 67 | | JUDGMENT, Reversed and Remanded. Costs shall not be taxed. (SB) |
| | 67 Judgment Entered | 18 | |
| | 67 Notice of Judgment | 20 | |
| 02/12/2024 | 69 | | MANDATE ISSUED. (SB) |
| | 69 Mandate Issued | 25 | |
| | 69 Opinion | 27 | |
| | 69 Mandate Letter | 43 | |

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2297
_____

In re:  FTX TRADING LTD., et al.,
                                    Debtors


ANDREW R. VARA, US Trustee for Region 3,
                                    Appellant
_____


On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Case No. 22-11068)
Bankruptcy Judge: Honorable John T. Dorsey
_____


Argued: November 8, 2023
_____


Before: RESTREPO, BIBAS and SCIRICA, *Circuit Judges*.


(Filed: January 19, 2024)

Anna O. Mohan
Brian J. Springer [ARGUED]
United States Department of Justice
Civil Division, Appellate Staff
Room 7533
950 Pennsylvania Avenue NW
Washington, DC 20530
*Counsel for Plaintiff-Appellant*

Jonathan C. Lipson [ARGUED]
Temple University
Beasley School of Law
1719 North Broad Street

Philadelphia, PA 19122
*Counsel for Amicus Appellant*

Irv Ackelsberg
John J. Grogan
David A. Nagdeman
Langer Grogan & Diver
1717 Arch Street
Suite 4020, The Bell Atlantic Tower
Philadelphia, PA 19103
*Counsel for Amicus Appellant*

James L. Bromley [ARGUED]
Brian D. Glueckstein
Sullivan & Cromwell
125 Broad Street
New York, NY 10004
*Counsel for Debtor-Appellee*

Adam G. Landis
Matthew R. Pierce
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19801
*Counsel for Debtor-Appellee*

Kristopher M. Hansen
Kenneth Pasquale [ARGUED]
Isaac S. Sasson
John F. Iaffaldano
Paul Hastings
200 Park Avenue
New York, NY 10166
*Counsel for Defendant-Appellee*

Matthew B. Lunn
Robert F. Poppiti, Jr.
Young Conaway Stargatt & Taylor
1000 N. King Street
Rodney Square
Wilmington, DE 19801
*Counsel for Defendant-Appellee*

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*.

Sometimes highly complex cases give rise to straightforward issues on appeal. Such is the case here. Multi-billion-dollar company FTX Trading Ltd. ("FTX") filed for bankruptcy after a sudden and unprecedented collapse that sent shockwaves through the cryptocurrency industry. The issue before us is whether 11 U.S.C. § 1104(c)(2) mandates the Bankruptcy Court to grant the U.S. Trustee's motion to appoint an examiner to investigate FTX's management. We hold that it does, given both the statute's plain text and Congress's expressed intent in enacting this portion of the Bankruptcy Code. Accordingly, we will reverse the Bankruptcy Court's denial of the U.S. Trustee's motion, and remand for the appointment of an examiner consistent with this opinion.

## I. Factual and Procedural History

Over the course of eight days in November 2022, the cryptocurrency company FTX suffered a catastrophic decline in value. The primary owner of FTX, Samuel Bankman-Fried, also owned most of Alameda Research, a cryptocurrency hedge fund. In early November, industry reports claimed that Alameda Research was financially compromised, and questions regarding a conflict of interest between the two allegedly independent companies began to arise. What followed were discoveries of multiple corporate failures, including FTX's use of software to conceal the funneling of FTX customer funds into Alameda Research to bolster its balance sheet. These discoveries caused FTX, a company that had been valued at $32 billion earlier in 2022, to face a sudden and severe liquidity crisis as customers withdrew billions of dollars over the course of a few days. Since the collapse,

criminal investigations into FTX have unearthed evidence of widespread fraud and the embezzlement of customers' funds.[1]

Immediately following the crash, on November 11, 2022, Mr. Bankman-Fried appointed John J. Ray, III to replace him as CEO of FTX and its numerous affiliates ("FTX Group"). Over the next three days, Mr. Ray filed multiple voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. Mr. Ray, an experienced bankruptcy practitioner who claims to have supervised the restructuring of "several of the largest corporate failures in history," stated in his first report as debtor in possession that he had never before "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information." JA 52. He deemed the situation at FTX Group "unprecedented," citing, *inter alia*, the compromised integrity of the companies' operating systems, the "faulty regulatory oversight" of FTX's operations abroad, and the "concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals." JA 52.

Mr. Ray further reported that many of the companies in FTX Group lacked "appropriate corporate governance," operating without a functioning board of directors and failing to produce audited financial statements. JA 59. He maintained that FTX Group "did not maintain centralized control of its cash" and kept no accurate list of its bank accounts or the accounts' signatories. JA 60. FTX Group companies were historically unable to produce accurate financial statements or a "reliable cash forecast." JA 60–62. As a result of these "cash management failures," Mr. Ray was unable to determine how much cash the companies had when the bankruptcy petitions were filed. JA 61. He also found that FTX Group had "billions in investments" in non-cryptocurrency assets, but these investments could not be completely accounted for due to the

---

[1] On November 2, 2023, Samuel Bankman-Fried was convicted of seven wire fraud, conspiracy, and money laundering charges. His sentencing is scheduled for March 2024. Other former FTX executives pled guilty to similar charges.

companies' failure to "keep complete books and records." JA 66.

In addition, Mr. Ray described how FTX Group failed to implement a corporate system to regulate cash disbursements. Employees would simply submit "payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis."[2] JA 64. Mr. Ray discovered that corporate funds were used to purchase homes and other personal items for employees in the Bahamas, where FTX was headquartered. For some real estate purchases, there was no documentation categorizing the transactions as corporate loans and the properties were recorded in the Bahamas under the names of the FTX employees or advisors.

Regarding the companies' cryptocurrency assets, Mr. Ray declared FTX Group engaged in "[u]nacceptable management practices" including, *inter alia*, "the use of an unsecured group email account" to access "critically sensitive data" and "the use of software to conceal the misuse of customer funds." JA 64–65. Mr. Ray claimed to identify $372 million of unauthorized cryptocurrency transfers initiated on FTX's petition date, and the subsequent unauthorized "minting" of $300 million in FTX's cryptocurrency tokens, FTTs. *Id.* The disordered state of FTX Group at the time it filed for bankruptcy, exacerbated by the failure of FTX founders to identify sources of supposed additional assets, meant that Mr. Ray and his team of professionals "located and secured only a fraction of the digital assets." *Id.*

Within weeks of the filing of the bankruptcy petitions, the United States Trustee moved for the appointment of an examiner pursuant to 11 U.S.C. § 1104(c). In so doing, the U.S. Trustee posited that a public report of the examiner's findings could reveal the "wider implications" that FTX's unprecedented collapse had for the cryptocurrency industry. JA 97. The U.S. Trustee also claimed an examiner could "allow for a faster and more cost-effective resolution" of the

---

[2] Mr. Ray revealed that there was no comprehensive list of FTX Group employees and only incomplete human resource records of the terms and conditions of employment.

bankruptcy proceedings because Mr. Ray could concentrate on his "primary duty of stabilizing the debtors' businesses" while the examiner investigated FTX's compromised pre-petition management, which was purportedly responsible for misappropriating $10 billion in customers' assets. *Id.*

Of greater significance for the purposes of this appeal, the U.S. Trustee argued that the Code mandates the Bankruptcy Court to grant their motion and order the appointment of an examiner. Section 1104(c) provides that, in instances like this where no trustee has been appointed, then:

> [O]n request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall* order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> > (1)  such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
> >
> > (2)  the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added). The U.S. Trustee argued that, because they made the request and FTX Group's unsecured debts "substantially exceed" $5 million, appointment of an examiner was mandatory under the plain language of subsection (c)(2).[3] JA 98.

---

[3] In addition, the U.S. Trustee advanced the argument that the appointment of an examiner would also be proper under subsection 1104(c)(1), claiming that an investigation would be "in the best interests of the Debtors' estates, their creditors, and

6

The Committee for Unsecured Creditors ("Creditors' Committee"), the Joint Provisional Liquidators of FTX Digital Markets Ltd., and the Debtors filed their objections to the U.S. Trustee's motion. At a hearing before the Bankruptcy Court, the U.S. Trustee reiterated their position that the appointment of an examiner in this instance is mandatory, and argued this interpretation is supported by legislative history that conveys Congress's intent to guarantee an independent investigation into any large-scale bankruptcy. The opposing parties argued the phrase "as is appropriate" in Section 1104(c) renders the appointment of an examiner subject to the Bankruptcy Court's discretion. JA 299, 307. They claimed such an appointment here would be highly inappropriate, given that an investigation would create an unjustifiable cost for creditors, interfere with their efforts to stabilize FTX Group, duplicate their findings of management wrongdoing, and pose a security risk to cryptocurrency codes.

The Bankruptcy Court agreed with those who opposed the motion and ruled the appointment of an examiner was discretionary under the Code. JA 17–18. The Court acknowledged FTX Group's unsecured debt far exceeded $5 million but found the phrase "as is appropriate" in Section 1104(c) allowed it to deny the U.S. Trustee's motion to appoint an examiner, despite the statutory requirements having been met. The Court supported its conclusion by citing Bankruptcy Court decisions and congressional records from the year before the revised Code was enacted.

## II.    Jurisdiction and Standard of Review

The U.S. Trustee appealed the Bankruptcy Court's decision to the District Court and moved to certify the order for direct appeal pursuant to 28 U.S.C. § 158(d)(2).[4] The District

---

equity security holders" given the grounds to suspect "actual fraud, dishonesty, or criminal conduct in the management of the Debtors." JA 100 ¶ 35.

[4] The U.S. Trustee first moved for certification in Bankruptcy Court, and then renewed the motion when jurisdiction transferred to the District Court pursuant to Fed. R. Bankr. P. 8006(b).

Court granted the certification motion, and this Court authorized the direct appeal. We have jurisdiction over Chapter 11 cases under 28 U.S.C. § 158(d)(2)(A). This Court reviews questions of law decided by the Bankruptcy Court *de novo*. *In re Trump Ent. Resorts*, 810 F.3d 161, 166–67 (3d Cir. 2016).

## III. Discussion

The issue before us is one of statutory interpretation: whether the plain text of Section 1104(c)(2) requires a bankruptcy court to appoint an examiner, if requested by the U.S. Trustee or a party in interest, and if "the debtor's total fixed, liquidated, unsecured debt" exceeds $5 million. We hold that it does. The Bankruptcy Court erred in denying the U.S. Trustee's motion to appoint an examiner to investigate FTX Group.

"Our interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'" *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). In interpreting a statute, we are required "to give effect to Congress's intent." *In re Trump*, 810 F.3d at 167. We presume that intent is expressed through the ordinary meaning of the statute's language. *Id.* If the meaning of the text is clear, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce [the statute] according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted). We therefore start by examining the plain text of Section 1104(c).

Congress made plain its intention to mandate the appointment of an examiner by using the word "shall," as in the Bankruptcy Court "shall" appoint an examiner if the terms of the statute have been met. 11 U.S.C. § 1104(c). The meaning of the word "shall" is not ambiguous. It is a "word of command," *Black's Law Dictionary* (5th ed. 1979), that "normally creates an obligation impervious to judicial discretion," *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). We have held that "shall" in a statute is interpreted as "must," which means "shall" signals

when a court must follow a statute's directive regardless of whether it agrees with the result. *Scott v. Vantage Corp.*, 64 F.4th 462, 477 (3d Cir. 2023). To interpret "shall" as anything but an obligatory command to appoint an examiner, when the conditions of subsection 1104(c)(2) have been met, would require us "to abandon plain meanings altogether." *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369, 397 n.17 (3d Cir. 2013) (citations omitted). Instead, the language of subsection 1104(c)(2) requires us to command the Bankruptcy Court to grant the U.S. Trustee's request for an examiner in this instance. *See Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'").

Despite the mandatory language, the Bankruptcy Court found that the phrase "as is appropriate" controls the appointment of an examiner under Section 1104(c). Following this interpretation, the text "the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate" means the Bankruptcy Court appoints an examiner only if it decides an investigation would suit the circumstances. 11 U.S.C. § 1104(c). According to this reading, context gives "shall" the meaning of "may." We disagree. Under the last-antecedent rule of statutory construction, "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding and not to others more remote." *Stepnowski v. Comm'r*, 456 F.3d 320, 324 (3d Cir. 2006) (quoting *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003)). Applying the rule, the phrase "as is appropriate" modifies the words that immediately precede it— which are "to conduct such an examination of the debtor," not "shall order the appointment of an examiner." 11 U.S.C. § 1104(c).

Although instructive, the last-antecedent rule is not absolute and we therefore look to other indicia to discern the phrase's meaning. *Viera v. Life. Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir. 2011) (citing *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 365 (3d Cir. 2004)). We need not look far. As the U.S. Trustee argued below, Section 1104(c) states "as is appropriate," not "*if* appropriate." JA 288 (emphasis added). While "if appropriate" indicates the Bankruptcy Court

has a choice, the phrase "as is appropriate" indicates it is permitted to determine what is pertinent given the specific circumstances of each case. This interpretation—that "as is appropriate" refers to the nature of the investigation, not the appointment of the examiner—is further bolstered by the context. Immediately after the phrase "as is appropriate," the statute provides the word "including" and a list of topics that merit investigation: "allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor." 11 U.S.C. § 1104(c).

Under the Bankruptcy Court's interpretation, the appointment of an examiner under either subsection of Section 1104(c) would be subject to a court's discretion and a judge would have the final say as to whether an investigation was warranted. But this interpretation runs counter to the statute's plain language and established canons of construction. Whereas subsection 1104(c)(1) permits a court to consider "the interests of creditors, any equity security holders, and other interests of the estate," subsection (c)(2) allows for no such consideration. We agree with the Sixth Circuit's conclusion that "[t]he contrast" between the two subsections "could not be more striking." *In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990). There is no weighing of interests in subsection 1104(c)(2); the court is only permitted to determine whether the unsecured debt minimum of $5 million has been met. *Id.* If we ignore the differences between the plain text of the two subsections, then subsection (c)(2) becomes discretionary and indistinguishable from subsection (c)(1). Such a reading would defy the "usual rules of statutory interpretation" by assuming that "Congress adopt[ed] two separate clauses in the same law to perform the same work." *United States v. Taylor*, 596 U.S. 845, 857 (2022). We make no such assumption here.

In addition to contravening rules of statutory construction, reading subsection (c)(2) as discretionary would require disregarding direct evidence of Congress's intent.[5] In

---

[5] The Bankruptcy Code was enacted after a "compromise bill" passed both houses of Congress in October 1978. *See* Leonard L. Gumport, *The Bankruptcy Examiner*, 20 Cal. Bankr. J. 71, 91 (1992). When proposing the bill to Congress, the sponsors

obtaining passage of the Bankruptcy Code, the Senate floor manager explained the "business reorganization chapter" ensures "special protection for the large cases having great public interest." 124 CONG. REC. 33990 (1978). Such protection comes from a provision guaranteeing an "automatically appointed" examiner in large cases, a measure designed to "preserve[] and enhance[]" debtors' and creditors' interests, "as well as the public interest." *Id.* The Code's sponsors agreed that, in cases where the "fixed, liquidated, unsecured debt" reached $5 million, the appointment of an examiner is required "to [ensure] that adequate investigation of the debtor is conducted to determine fraud or wrongdoing on the part of present management." 124 CONG. REC. 32403 (1978). To guarantee that "the examiner's report will be expeditious and fair," the sponsors forbade the examiner from acting as or representing a trustee in the bankruptcy and required that the investigation remain separate from the reorganization process.[6] *Id.* at 32406. In enacting Chapter 11, the sponsors adopted a revised approach where the needs of

_____

of that legislation, Representative Edwards and Senator DeConcini, made "nearly identical statements . . . to their respective chambers." *Id.* at 91–92. These statements are "persuasive evidence" of the legislation's intent. *See Begier v. IRS*, 496 U.S. 53, 64 n.5 (1990) ("Because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we have treated their floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent.").

[6] The Bankruptcy Code "prohibits an examiner from serving as a trustee or as counsel for the trustee in order to ensure that examiners may not profit from the results of their work." *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 430 (6th Cir. 2004). Such independence distinguishes examiners from other participants in the Chapter 11 bankruptcies who may investigate wrongdoing but who also seek to benefit financially from the reorganization plan. *See, e.g.*, 11 U.S.C. § 1102(b)(1) (members of the creditors' committee "shall ordinarily" consist of either the seven largest creditors or those who organized before the filing of the petition).

security holders are balanced against "equally important public needs relating to the economy, such as employment and production, and other factors such as the public health and safety of the people or protection of the national interest." *Id.*; *see also Young v. United States*, 535 U.S. 43, 53 (2002) ("[T]he Bankruptcy Code *incorporates* traditional equitable principles."). Because subsection 1104(c)(2) was enacted to protect the public interest in larger bankruptcy cases, a "refusal to give effect to the mandatory language" regarding the appointment of an examiner would result in a failure "to give effect to the legislative intention." 7 Collier on Bankruptcy ¶ 1104.03[2][b] (16th ed. 2023).

Despite this clear intention to protect the public interest, Congress tempered the mandatory nature of subsection 1104(c)(2) by making both the request for an examiner and the scope of the investigation subject to acts of discretion. First, an examiner is not automatically appointed in cases where $5 million of unsecured debt exists. Rather, the U.S. Trustee or a party in interest must deem one necessary and motion the court. 11 U.S.C. § 1109(b). While the Debtors argue granting discretion to every party in interest is illogical and encourages abuse, they provide no evidence to support either position. That a party in interest may abuse its discretion by requesting an examiner is not grounds for deeming Congress's grant of such discretion absurd.[7]

---

[7] At argument, the government stated that during the fiscal year of 2022, the U.S. Trustee filed fewer than ten motions to appoint examiners. Transcript of Oral Argument at 6:20–23, FTX Trading Ltd. (Nov. 8, 2023) (No. 23-2297). He further noted that there has been no evidence of a "fallout" from the Sixth Circuit's decision in *In re Revco D.S., Inc.*, 898 F.3d at 501, which held the appointment of an examiner is mandatory under subsection 1104(c)(2) in 1990, over thirty years ago. *Id.* at 6:16–18; *see also* George M. Treister & Richard B. Levin, *Fundamentals of Bankruptcy Law* 369–71 (7th ed. 2010) ("Requests for an examiner are infrequent, in both large and small Chapter 11 cases."). In any case, courts must "give effect to [a] plain command, even if doing that will reverse the longstanding practice under the statute." *Lexecon Inc.*, 523 U.S. at 35 (citations omitted).

Second, while a bankruptcy court must appoint an examiner if the statutory requirements are met, the phrase "as is appropriate" in Section 1104(c) means the court "retains broad discretion to direct the examiner's investigation," including its scope, degree, duration, and cost. 5 Norton Bankr. L. & Prac. § 99:25 (3d ed. 2023); *see also* 11 U.S.C. § 330(a)(3). By setting the investigation's parameters, the bankruptcy court can ensure that the examiner is not duplicating the other parties' efforts and the investigation is not unnecessarily disrupting the reorganization process. Moreover, to the extent the mandatory nature of subsection 1104(c)(2) encourages parties in interest to invoke an investigation to tactically delay proceedings, the bankruptcy court has the discretion to continue with the confirmation process without receiving the examiner's findings or public report. 7 Collier on Bankruptcy ¶ 1104.03[2][b] (16th ed. 2023).

In this instance, the Bankruptcy Court denied the motion for an examiner in part because it deemed Mr. Ray to be "completely independent" from FTX's founding members and that any remaining prior officers "have been stripped of any decision making authority." JA 9–10. On appeal, the debtors in possession and the Creditors' Committee argue an investigation would be duplicative and wasteful given their ongoing efforts to uncover all pre-petition mismanagement. Neither position is relevant, given our holding that the appointment of the examiner is mandatory under the Code. But nor is either position persuasive, given that Congress has guaranteed that an investigation under subsection 1104(c)(2) would differ from those conducted by the Appellees in several significant ways. [8]

---

[8] The duties of an examiner are set forth in 11 U.S.C. § 1106(a)(3) and (4), which provide that an examiner shall, "except to the extent that the court orders otherwise," investigate "the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;" and then "file a statement of any investigation," which must include any fact "pertaining to fraud, dishonesty,

First, an examiner must be "disinterested" as defined by 11 U.S.C. § 101(14), which means a "creditor, an equity security holder, or an insider," or anyone with "an interest materially adverse to the interest of the estate" cannot be appointed to conduct a Section 1104(c) investigation.[9] *See* 11 U.S.C. § 1104(d). The Code also forbids a debtor in possession, the quintessential "insider," from performing the duties of an examiner and investigating itself. *See* 11 U.S.C. § 1107(a) (stating a debtor in possession "shall have all the rights . . . and powers" and "perform all the functions and duties" of a trustee, except the duties granted to trustees and examiners in subsections 1106(a)(2) through (4)). An examiner "is first and foremost disinterested and nonadversarial" and "answers solely to the Court." *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 432 (6th Cir. 2004) (quoting *In re Baldwin United Corp.*, 46 B.R. 314, 316 (S.D. Ohio 1985)). This requirement of disinterest is particularly salient here, where issues of potential conflicts of interest arising from debtor's counsel serving as pre-petition advisors to FTX have been raised repeatedly. Moreover, the U.S. Trustee raised the concern that, given the reports of widespread fraud, officers or employees who may have engaged in wrongdoing could remain at FTX Group. JA 100 ¶ 35. In enacting subsection 1104(c)(2), Congress made certain that neither the Bankruptcy Court nor the Appellees could deem these issues unworthy of an outside investigation in this particular bankruptcy, which certainly qualifies as a

---

incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."

[9] Under the Bankruptcy Code, a "disinterested person" is defined as a person that "is not a creditor, an equity security holder, or an insider;" "is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor;" and "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(A)–(C).

"large case[] having great public interest." 124 CONG. REC. 33990 (1978).

Second, an examiner appointed under subsection 1104(c)(2) must make their findings public, an obligation neither a creditor committee nor a debtor in possession shares.[10]  *Compare* 11 U.S.C. § 1103(c)(2) *and* 11 U.S.C. § 1107(a), *with* § 1106(a)(4), (b).  Requiring a public report furthers Congress's intent to protect the public's interest as well as those creditors and debtors directly impacted by the bankruptcy.  Such protection seems particularly appropriate here.  The collapse of FTX caused catastrophic losses for its worldwide investors but also raised implications for the evolving and volatile cryptocurrency industry.  For example, an investigation into FTX Group's use of its own cryptocurrency tokens, FTTs, to inflate the value of FTX and Alameda Research could bring this practice under further scrutiny, thereby alerting potential investors to undisclosed credit risks in other cryptocurrency companies.  In addition to providing much-needed elucidation, the investigation and examiner's report ensure that the Bankruptcy Court will have the opportunity to consider the greater public interest when approving the FTX Group's reorganization plan.[11]

_____

[10] The public report requirement is set forth in 11 U.S.C § 1106 (a)(4)(A) and § 107(a).  Section 1106(a) sets forth the duties of an examiner.  Subsection 1106(a)(4) directs an examiner to "file a statement of any investigation" which includes "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate." 11 U.S.C. § 1106(a)(4)(A).  Such a statement is deemed public under 11 U.S.C. § 107(a).

[11] At argument, counsel for the unsecured Creditors' Committee posited that examiners in large-scale bankruptcies are not appointed as a matter of course and cited three examples: *In re Genesis Global Holdco, LLC*., No. 1:23-bk-10063, ECF 1 *et seq*. (Bankr. S.D.N.Y. Jan. 19, 2023), *In re Voyager Digital Holdings, Inc*., No. 1:22-bk-10943, ECF 1 *et seq*. (Bankr. S.D.N.Y. July 5, 2022), *In re JCK Legacy Co*.,

## IV.    Conclusion

For the foregoing reasons, we reverse the decision of the Bankruptcy Court and remand with instructions to order the appointment of an examiner under 11 U.S.C. § 1104(c)(2).

---

No. 1:20-bk-10418, ECF 1 *et seq.* (Bankr. S.D.N.Y. Feb. 13, 2020).  In searching the above-cited docket entries, it appears no motion requesting the appointment of an examiner pursuant to 11 U.S.C. § 1104(c)(2) was ever made.  Transcript of Oral Argument 31:21–32:1, FTX Trading Ltd. (Nov. 8, 2023) (No. 23-2297).

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2297
_____

In re:  FTX TRADING LTD., et al.,
Debtors

ANDREW R. VARA, US Trustee for Region 3,
Appellant
_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Case No. 22-11068)
Bankruptcy Judge: Honorable John T. Dorsey
_____

Argued: November 8, 2023
_____

Before: RESTREPO, BIBAS and SCIRICA, *Circuit Judges*.


_____

JUDGMENT
_____


This cause came to be considered on the record from the United States Bankruptcy Court for the District of Delaware and was argued on November 8, 2023.

On consideration whereof, it is now hereby ORDERED and ADJUDGED by this Court that the order entered by the Bankruptcy Court on February 21, 2023 denying the motion for the appointment of an examiner is hereby REVERSED and the claim is REMANDED to the Bankruptcy Court for further proceedings.

All of the above in accordance with the Opinion of this Court. Costs shall not be taxed.

ATTEST:

s/Patricia S. Dodszuweit
Clerk

Dated: January 19, 2024

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Cᴏᴜʀᴛ ᴏғ Aᴘᴘᴇᴀʟs
FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA  19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE

215-597-2995

January 19, 2024

Irv Ackelsberg, Esq.
Langer Grogan & Diver
1717 Arch Street
Suite 4020, The Bell Atlantic Tower
Philadelphia, PA 19103

James L. Bromley, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

Roma N. Desai, Esq.
Office of Attorney General of Texas
Office of Special Litigation
P.O. Box 12548
Austin, TX 78711

Brian D. Glueckstein, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

John J. Grogan, Esq.
Langer Grogan & Diver
1717 Arch Street
Suite 4020, The Bell Atlantic Tower
Philadelphia, PA 19103

Kevin Gross, Esq.
Rosenthal Monhait & Goddess
919 N Market Street
Suite 1401
Wilmington, DE 19801

Kristopher M. Hansen, Esq.
Paul Hastings

200 Park Avenue
30th Floor
New York, NY 10166

John Iaffaldano, Esq.
Paul Hastings
200 Park Avenue
30th Floor
New York, NY 10166

Adam G. Landis, Esq.
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19801

Jonathan C. Lipson, Esq.
Temple University
Beasley School of Law
1719 N Broad Street
Philadelphia, PA 19122

Matthew B. Lunn, Esq.
Young Conaway Stargatt & Taylor
1000 N King Street
Rodney Square
Wilmington, DE 19801

Layla D. Milligan, Esq.
Office of Attorney General of Texas
Office of Special Litigation
P.O. Box 12548
Austin, TX 78711

Anna O. Mohan, Esq.
United States Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue NW
Room 7533
Washington, DC 20530

Michael D. Morris, Esq.
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707

David A. Nagdeman, Esq.
Langer Grogan & Diver
1717 Arch Street
Suite 4020, The Bell Atlantic Tower
Philadelphia, PA 19103

Kenneth Pasquale, Esq.
Paul Hastings
200 Park Avenue
30th Floor
New York, NY 10166

Matthew R. Pierce, Esq.
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19801

Robert F. Poppiti Jr., Esq.
Young Conaway Stargatt & Taylor
1000 N King Street
Rodney Square
Wilmington, DE 19801

Jennifer Rood, Esq.
89 Main Street
Third Floor
Montpelier, VT 05620

Abigail R. Ryan, Esq.
Office of Attorney General of Texas
Office of Special Litigation
P.O. Box 12548
Austin, TX 78711

Isaac Sasson, Esq.
Paul Hastings
200 Park Avenue
30th Floor
New York, NY 10166

Brian J. Springer, Esq.
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

RE: In re: FTX Trading, Ltd., et al
Case Number: 23-2297
District Court Case Number: 22-11068
District Court Case Number: 1-23-cv-00241

<u>ENTRY OF JUDGMENT</u>

Today, **January 19, 2024** the Court entered its judgment in the above-captioned matter pursuant to Fed. R. App. P. 36.

If you wish to seek review of the Court's decision, you may file a petition for rehearing. The procedures for filing a petition for rehearing are set forth in Fed. R. App. P. 35 and 40, 3rd Cir. LAR 35 and 40, and summarized below.

<u>Time for Filing</u>:
14 days after entry of judgment.
45 days after entry of judgment in a civil case if the United States is a party.

<u>Form Limits</u>:
3900 words if produced by a computer, with a certificate of compliance pursuant to Fed. R. App. P. 32(g).
15 pages if hand or type written.

<u>Attachments</u>:
A copy of the panel's opinion and judgment only.
Certificate of service.
Certificate of compliance if petition is produced by a computer.
No other attachments are permitted without first obtaining leave from the Court.

Unless the petition specifies that the petition seeks only panel rehearing, the petition will be construed as requesting both panel and en banc rehearing. Pursuant to Fed. R. App. P. 35(b)(3), if separate petitions for panel rehearing and rehearing en banc are submitted, they will be treated as a single document and will be subject to the form limits as set forth in Fed. R. App. P. 35(b)(2). If only panel rehearing is sought, the Court's rules do not provide for the subsequent filing of a petition for rehearing en banc in the event that the petition seeking only panel rehearing is denied.

A party who is entitled to costs pursuant to Fed.R.App.P. 39 must file an itemized and verified bill of costs within 14 days from the entry of judgment. The bill of costs must be submitted on the proper form which is available on the court's website.

A mandate will be issued at the appropriate time in accordance with the Fed. R. App. P. 41.

Please consult the Rules of the Supreme Court of the United States regarding the timing and requirements for filing a petition for writ of certiorari.

Very truly yours,

Patricia S. Dodszuweit, Clerk


 By: Stephanie
Case Manager
Direct Dial 267-299-4926

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2297
_____

In re:  FTX TRADING LTD., et al.,
Debtors


ANDREW R. VARA, US Trustee for Region 3,
Appellant
_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Case No. 22-11068)
Bankruptcy Judge: Honorable John T. Dorsey
_____

Argued: November 8, 2023
_____

Before: RESTREPO, BIBAS and SCIRICA, *Circuit Judges*.


_____

JUDGMENT
_____


This cause came to be considered on the record from the United States Bankruptcy Court for the District of Delaware and was argued on November 8, 2023.

On consideration whereof, it is now hereby ORDERED and ADJUDGED by this Court that the order entered by the Bankruptcy Court on February 21, 2023 denying the motion for the appointment of an examiner is hereby REVERSED and the claim is REMANDED to the Bankruptcy Court for further proceedings.

All of the above in accordance with the Opinion of this Court. Costs shall not be taxed.

ATTEST:

s/Patricia S. Dodszuweit
Clerk

Dated: January 19, 2024

Certified as a true copy and issued in lieu
of a formal mandate on ___February 12, 2024___

Teste: *Patricia A Dodszuweit*
Clerk, U.S. Court of Appeals for the Third Circuit

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2297
_____

In re:  FTX TRADING LTD., et al.,
Debtors

ANDREW R. VARA, US Trustee for Region 3,
Appellant
_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Case No. 22-11068)
Bankruptcy Judge: Honorable John T. Dorsey
_____

Argued: November 8, 2023
_____

Before: RESTREPO, BIBAS and SCIRICA, *Circuit Judges*.

(Filed: January 19, 2024)

Anna O. Mohan
Brian J. Springer [ARGUED]
United States Department of Justice
Civil Division, Appellate Staff
Room 7533
950 Pennsylvania Avenue NW
Washington, DC 20530
*Counsel for Plaintiff-Appellant*

Jonathan C. Lipson [ARGUED]
Temple University
Beasley School of Law
1719 North Broad Street

Philadelphia, PA 19122
*Counsel for Amicus Appellant*

Irv Ackelsberg
John J. Grogan
David A. Nagdeman
Langer Grogan & Diver
1717 Arch Street
Suite 4020, The Bell Atlantic Tower
Philadelphia, PA 19103
*Counsel for Amicus Appellant*

James L. Bromley [ARGUED]
Brian D. Glueckstein
Sullivan & Cromwell
125 Broad Street
New York, NY 10004
*Counsel for Debtor-Appellee*

Adam G. Landis
Matthew R. Pierce
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19801
*Counsel for Debtor-Appellee*

Kristopher M. Hansen
Kenneth Pasquale [ARGUED]
Isaac S. Sasson
John F. Iaffaldano
Paul Hastings
200 Park Avenue
New York, NY 10166
*Counsel for Defendant-Appellee*

Matthew B. Lunn
Robert F. Poppiti, Jr.
Young Conaway Stargatt & Taylor
1000 N. King Street
Rodney Square
Wilmington, DE 19801
*Counsel for Defendant-Appellee*

———————————

OPINION OF THE COURT

———————————

RESTREPO, *Circuit Judge*.

Sometimes highly complex cases give rise to straightforward issues on appeal. Such is the case here. Multibillion-dollar company FTX Trading Ltd. ("FTX") filed for bankruptcy after a sudden and unprecedented collapse that sent shockwaves through the cryptocurrency industry. The issue before us is whether 11 U.S.C. § 1104(c)(2) mandates the Bankruptcy Court to grant the U.S. Trustee's motion to appoint an examiner to investigate FTX's management. We hold that it does, given both the statute's plain text and Congress's expressed intent in enacting this portion of the Bankruptcy Code. Accordingly, we will reverse the Bankruptcy Court's denial of the U.S. Trustee's motion, and remand for the appointment of an examiner consistent with this opinion.

## I.    Factual and Procedural History

Over the course of eight days in November 2022, the cryptocurrency company FTX suffered a catastrophic decline in value. The primary owner of FTX, Samuel Bankman-Fried, also owned most of Alameda Research, a cryptocurrency hedge fund. In early November, industry reports claimed that Alameda Research was financially compromised, and questions regarding a conflict of interest between the two allegedly independent companies began to arise. What followed were discoveries of multiple corporate failures, including FTX's use of software to conceal the funneling of FTX customer funds into Alameda Research to bolster its balance sheet. These discoveries caused FTX, a company that had been valued at $32 billion earlier in 2022, to face a sudden and severe liquidity crisis as customers withdrew billions of dollars over the course of a few days. Since the collapse,

criminal investigations into FTX have unearthed evidence of widespread fraud and the embezzlement of customers' funds.[1]

Immediately following the crash, on November 11, 2022, Mr. Bankman-Fried appointed John J. Ray, III to replace him as CEO of FTX and its numerous affiliates ("FTX Group"). Over the next three days, Mr. Ray filed multiple voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. Mr. Ray, an experienced bankruptcy practitioner who claims to have supervised the restructuring of "several of the largest corporate failures in history," stated in his first report as debtor in possession that he had never before "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information." JA 52. He deemed the situation at FTX Group "unprecedented," citing, *inter alia*, the compromised integrity of the companies' operating systems, the "faulty regulatory oversight" of FTX's operations abroad, and the "concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals." JA 52.

Mr. Ray further reported that many of the companies in FTX Group lacked "appropriate corporate governance," operating without a functioning board of directors and failing to produce audited financial statements. JA 59. He maintained that FTX Group "did not maintain centralized control of its cash" and kept no accurate list of its bank accounts or the accounts' signatories. JA 60. FTX Group companies were historically unable to produce accurate financial statements or a "reliable cash forecast." JA 60–62. As a result of these "cash management failures," Mr. Ray was unable to determine how much cash the companies had when the bankruptcy petitions were filed. JA 61. He also found that FTX Group had "billions in investments" in non-cryptocurrency assets, but these investments could not be completely accounted for due to the

---

[1] On November 2, 2023, Samuel Bankman-Fried was convicted of seven wire fraud, conspiracy, and money laundering charges. His sentencing is scheduled for March 2024. Other former FTX executives pled guilty to similar charges.

companies' failure to "keep complete books and records." JA 66.

In addition, Mr. Ray described how FTX Group failed to implement a corporate system to regulate cash disbursements. Employees would simply submit "payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis."[2] JA 64. Mr. Ray discovered that corporate funds were used to purchase homes and other personal items for employees in the Bahamas, where FTX was headquartered. For some real estate purchases, there was no documentation categorizing the transactions as corporate loans and the properties were recorded in the Bahamas under the names of the FTX employees or advisors.

Regarding the companies' cryptocurrency assets, Mr. Ray declared FTX Group engaged in "[u]nacceptable management practices" including, *inter alia*, "the use of an unsecured group email account" to access "critically sensitive data" and "the use of software to conceal the misuse of customer funds." JA 64–65. Mr. Ray claimed to identify $372 million of unauthorized cryptocurrency transfers initiated on FTX's petition date, and the subsequent unauthorized "minting" of $300 million in FTX's cryptocurrency tokens, FTTs. *Id.* The disordered state of FTX Group at the time it filed for bankruptcy, exacerbated by the failure of FTX founders to identify sources of supposed additional assets, meant that Mr. Ray and his team of professionals "located and secured only a fraction of the digital assets." *Id.*

Within weeks of the filing of the bankruptcy petitions, the United States Trustee moved for the appointment of an examiner pursuant to 11 U.S.C. § 1104(c). In so doing, the U.S. Trustee posited that a public report of the examiner's findings could reveal the "wider implications" that FTX's unprecedented collapse had for the cryptocurrency industry. JA 97. The U.S. Trustee also claimed an examiner could "allow for a faster and more cost-effective resolution" of the

---

[2] Mr. Ray revealed that there was no comprehensive list of FTX Group employees and only incomplete human resource records of the terms and conditions of employment.

bankruptcy proceedings because Mr. Ray could concentrate on his "primary duty of stabilizing the debtors' businesses" while the examiner investigated FTX's compromised pre-petition management, which was purportedly responsible for misappropriating $10 billion in customers' assets. *Id.*

Of greater significance for the purposes of this appeal, the U.S. Trustee argued that the Code mandates the Bankruptcy Court to grant their motion and order the appointment of an examiner. Section 1104(c) provides that, in instances like this where no trustee has been appointed, then:

> [O]n request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall* order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> > (1)   such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
> >
> > (2)   the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added). The U.S. Trustee argued that, because they made the request and FTX Group's unsecured debts "substantially exceed" $5 million, appointment of an examiner was mandatory under the plain language of subsection (c)(2).[3] JA 98.

---

[3] In addition, the U.S. Trustee advanced the argument that the appointment of an examiner would also be proper under subsection 1104(c)(1), claiming that an investigation would be "in the best interests of the Debtors' estates, their creditors, and

The Committee for Unsecured Creditors ("Creditors' Committee"), the Joint Provisional Liquidators of FTX Digital Markets Ltd., and the Debtors filed their objections to the U.S. Trustee's motion. At a hearing before the Bankruptcy Court, the U.S. Trustee reiterated their position that the appointment of an examiner in this instance is mandatory, and argued this interpretation is supported by legislative history that conveys Congress's intent to guarantee an independent investigation into any large-scale bankruptcy. The opposing parties argued the phrase "as is appropriate" in Section 1104(c) renders the appointment of an examiner subject to the Bankruptcy Court's discretion. JA 299, 307. They claimed such an appointment here would be highly inappropriate, given that an investigation would create an unjustifiable cost for creditors, interfere with their efforts to stabilize FTX Group, duplicate their findings of management wrongdoing, and pose a security risk to cryptocurrency codes.

The Bankruptcy Court agreed with those who opposed the motion and ruled the appointment of an examiner was discretionary under the Code. JA 17–18. The Court acknowledged FTX Group's unsecured debt far exceeded $5 million but found the phrase "as is appropriate" in Section 1104(c) allowed it to deny the U.S. Trustee's motion to appoint an examiner, despite the statutory requirements having been met. The Court supported its conclusion by citing Bankruptcy Court decisions and congressional records from the year before the revised Code was enacted.

## II. Jurisdiction and Standard of Review

The U.S. Trustee appealed the Bankruptcy Court's decision to the District Court and moved to certify the order for direct appeal pursuant to 28 U.S.C. § 158(d)(2).[4] The District

---

equity security holders" given the grounds to suspect "actual fraud, dishonesty, or criminal conduct in the management of the Debtors." JA 100 ¶ 35.

[4] The U.S. Trustee first moved for certification in Bankruptcy Court, and then renewed the motion when jurisdiction transferred to the District Court pursuant to Fed. R. Bankr. P. 8006(b).

Court granted the certification motion, and this Court authorized the direct appeal. We have jurisdiction over Chapter 11 cases under 28 U.S.C. § 158(d)(2)(A). This Court reviews questions of law decided by the Bankruptcy Court *de novo*. *In re Trump Ent. Resorts*, 810 F.3d 161, 166–67 (3d Cir. 2016).

## III. Discussion

The issue before us is one of statutory interpretation: whether the plain text of Section 1104(c)(2) requires a bankruptcy court to appoint an examiner, if requested by the U.S. Trustee or a party in interest, and if "the debtor's total fixed, liquidated, unsecured debt" exceeds $5 million. We hold that it does. The Bankruptcy Court erred in denying the U.S. Trustee's motion to appoint an examiner to investigate FTX Group.

"Our interpretation of the Bankruptcy Code starts 'where all such inquiries must begin: with the language of the statute itself.'" *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). In interpreting a statute, we are required "to give effect to Congress's intent." *In re Trump*, 810 F.3d at 167. We presume that intent is expressed through the ordinary meaning of the statute's language. *Id.* If the meaning of the text is clear, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce [the statute] according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted). We therefore start by examining the plain text of Section 1104(c).

Congress made plain its intention to mandate the appointment of an examiner by using the word "shall," as in the Bankruptcy Court "shall" appoint an examiner if the terms of the statute have been met. 11 U.S.C. § 1104(c). The meaning of the word "shall" is not ambiguous. It is a "word of command," *Black's Law Dictionary* (5th ed. 1979), that "normally creates an obligation impervious to judicial discretion," *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). We have held that "shall" in a statute is interpreted as "must," which means "shall" signals

when a court must follow a statute's directive regardless of whether it agrees with the result. *Scott v. Vantage Corp.*, 64 F.4th 462, 477 (3d Cir. 2023). To interpret "shall" as anything but an obligatory command to appoint an examiner, when the conditions of subsection 1104(c)(2) have been met, would require us "to abandon plain meanings altogether." *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369, 397 n.17 (3d Cir. 2013) (citations omitted). Instead, the language of subsection 1104(c)(2) requires us to command the Bankruptcy Court to grant the U.S. Trustee's request for an examiner in this instance. *See Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'").

Despite the mandatory language, the Bankruptcy Court found that the phrase "as is appropriate" controls the appointment of an examiner under Section 1104(c). Following this interpretation, the text "the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate" means the Bankruptcy Court appoints an examiner only if it decides an investigation would suit the circumstances. 11 U.S.C. § 1104(c). According to this reading, context gives "shall" the meaning of "may." We disagree. Under the last-antecedent rule of statutory construction, "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding and not to others more remote." *Stepnowski v. Comm'r*, 456 F.3d 320, 324 (3d Cir. 2006) (quoting *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003)). Applying the rule, the phrase "as is appropriate" modifies the words that immediately precede it— which are "to conduct such an examination of the debtor," not "shall order the appointment of an examiner." 11 U.S.C. § 1104(c).

Although instructive, the last-antecedent rule is not absolute and we therefore look to other indicia to discern the phrase's meaning. *Viera v. Life. Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir. 2011) (citing *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 365 (3d Cir. 2004)). We need not look far. As the U.S. Trustee argued below, Section 1104(c) states "as is appropriate," not "*if* appropriate." JA 288 (emphasis added). While "if appropriate" indicates the Bankruptcy Court

has a choice, the phrase "as is appropriate" indicates it is permitted to determine what is pertinent given the specific circumstances of each case. This interpretation—that "as is appropriate" refers to the nature of the investigation, not the appointment of the examiner—is further bolstered by the context. Immediately after the phrase "as is appropriate," the statute provides the word "including" and a list of topics that merit investigation: "allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor." 11 U.S.C. § 1104(c).

Under the Bankruptcy Court's interpretation, the appointment of an examiner under either subsection of Section 1104(c) would be subject to a court's discretion and a judge would have the final say as to whether an investigation was warranted. But this interpretation runs counter to the statute's plain language and established canons of construction. Whereas subsection 1104(c)(1) permits a court to consider "the interests of creditors, any equity security holders, and other interests of the estate," subsection (c)(2) allows for no such consideration. We agree with the Sixth Circuit's conclusion that "[t]he contrast" between the two subsections "could not be more striking." *In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990). There is no weighing of interests in subsection 1104(c)(2); the court is only permitted to determine whether the unsecured debt minimum of $5 million has been met. *Id.* If we ignore the differences between the plain text of the two subsections, then subsection (c)(2) becomes discretionary and indistinguishable from subsection (c)(1). Such a reading would defy the "usual rules of statutory interpretation" by assuming that "Congress adopt[ed] two separate clauses in the same law to perform the same work." *United States v. Taylor*, 596 U.S. 845, 857 (2022). We make no such assumption here.

In addition to contravening rules of statutory construction, reading subsection (c)(2) as discretionary would require disregarding direct evidence of Congress's intent.[5] In

---

[5] The Bankruptcy Code was enacted after a "compromise bill" passed both houses of Congress in October 1978. *See* Leonard L. Gumport, *The Bankruptcy Examiner*, 20 Cal. Bankr. J. 71, 91 (1992). When proposing the bill to Congress, the sponsors

obtaining passage of the Bankruptcy Code, the Senate floor manager explained the "business reorganization chapter" ensures "special protection for the large cases having great public interest." 124 CONG. REC. 33990 (1978). Such protection comes from a provision guaranteeing an "automatically appointed" examiner in large cases, a measure designed to "preserve[] and enhance[]" debtors' and creditors' interests, "as well as the public interest." *Id.* The Code's sponsors agreed that, in cases where the "fixed, liquidated, unsecured debt" reached $5 million, the appointment of an examiner is required "to [ensure] that adequate investigation of the debtor is conducted to determine fraud or wrongdoing on the part of present management." 124 CONG. REC. 32403 (1978). To guarantee that "the examiner's report will be expeditious and fair," the sponsors forbade the examiner from acting as or representing a trustee in the bankruptcy and required that the investigation remain separate from the reorganization process.[6] *Id.* at 32406. In enacting Chapter 11, the sponsors adopted a revised approach where the needs of

---

of that legislation, Representative Edwards and Senator DeConcini, made "nearly identical statements . . . to their respective chambers." *Id.* at 91–92. These statements are "persuasive evidence" of the legislation's intent. *See Begier v. IRS*, 496 U.S. 53, 64 n.5 (1990) ("Because of the absence of a conference and the key roles played by Representative Edwards and his counterpart floor manager Senator DeConcini, we have treated their floor statements on the Bankruptcy Reform Act of 1978 as persuasive evidence of congressional intent.").

[6] The Bankruptcy Code "prohibits an examiner from serving as a trustee or as counsel for the trustee in order to ensure that examiners may not profit from the results of their work." *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 430 (6th Cir. 2004). Such independence distinguishes examiners from other participants in the Chapter 11 bankruptcies who may investigate wrongdoing but who also seek to benefit financially from the reorganization plan. *See, e.g.*, 11 U.S.C. § 1102(b)(1) (members of the creditors' committee "shall ordinarily" consist of either the seven largest creditors or those who organized before the filing of the petition).

security holders are balanced against "equally important public needs relating to the economy, such as employment and production, and other factors such as the public health and safety of the people or protection of the national interest." *Id.*; *see also Young v. United States*, 535 U.S. 43, 53 (2002) ("[T]he Bankruptcy Code *incorporates* traditional equitable principles."). Because subsection 1104(c)(2) was enacted to protect the public interest in larger bankruptcy cases, a "refusal to give effect to the mandatory language" regarding the appointment of an examiner would result in a failure "to give effect to the legislative intention." 7 Collier on Bankruptcy ¶ 1104.03[2][b] (16th ed. 2023).

Despite this clear intention to protect the public interest, Congress tempered the mandatory nature of subsection 1104(c)(2) by making both the request for an examiner and the scope of the investigation subject to acts of discretion. First, an examiner is not automatically appointed in cases where $5 million of unsecured debt exists. Rather, the U.S. Trustee or a party in interest must deem one necessary and motion the court. 11 U.S.C. § 1109(b). While the Debtors argue granting discretion to every party in interest is illogical and encourages abuse, they provide no evidence to support either position. That a party in interest may abuse its discretion by requesting an examiner is not grounds for deeming Congress's grant of such discretion absurd.[7]

---

[7] At argument, the government stated that during the fiscal year of 2022, the U.S. Trustee filed fewer than ten motions to appoint examiners. Transcript of Oral Argument at 6:20–23, FTX Trading Ltd. (Nov. 8, 2023) (No. 23-2297). He further noted that there has been no evidence of a "fallout" from the Sixth Circuit's decision in *In re Revco D.S., Inc.*, 898 F.3d at 501, which held the appointment of an examiner is mandatory under subsection 1104(c)(2) in 1990, over thirty years ago. *Id.* at 6:16–18; *see also* George M. Treister & Richard B. Levin, *Fundamentals of Bankruptcy Law* 369–71 (7th ed. 2010) ("Requests for an examiner are infrequent, in both large and small Chapter 11 cases."). In any case, courts must "give effect to [a] plain command, even if doing that will reverse the longstanding practice under the statute." *Lexecon Inc.*, 523 U.S. at 35 (citations omitted).

Second, while a bankruptcy court must appoint an examiner if the statutory requirements are met, the phrase "as is appropriate" in Section 1104(c) means the court "retains broad discretion to direct the examiner's investigation," including its scope, degree, duration, and cost. 5 Norton Bankr. L. & Prac. § 99:25 (3d ed. 2023); *see also* 11 U.S.C. § 330(a)(3). By setting the investigation's parameters, the bankruptcy court can ensure that the examiner is not duplicating the other parties' efforts and the investigation is not unnecessarily disrupting the reorganization process. Moreover, to the extent the mandatory nature of subsection 1104(c)(2) encourages parties in interest to invoke an investigation to tactically delay proceedings, the bankruptcy court has the discretion to continue with the confirmation process without receiving the examiner's findings or public report. 7 Collier on Bankruptcy ¶ 1104.03[2][b] (16th ed. 2023).

In this instance, the Bankruptcy Court denied the motion for an examiner in part because it deemed Mr. Ray to be "completely independent" from FTX's founding members and that any remaining prior officers "have been stripped of any decision making authority." JA 9–10. On appeal, the debtors in possession and the Creditors' Committee argue an investigation would be duplicative and wasteful given their ongoing efforts to uncover all pre-petition mismanagement. Neither position is relevant, given our holding that the appointment of the examiner is mandatory under the Code. But nor is either position persuasive, given that Congress has guaranteed that an investigation under subsection 1104(c)(2) would differ from those conducted by the Appellees in several significant ways. [8]

---

[8] The duties of an examiner are set forth in 11 U.S.C. § 1106(a)(3) and (4), which provide that an examiner shall, "except to the extent that the court orders otherwise," investigate "the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;" and then "file a statement of any investigation," which must include any fact "pertaining to fraud, dishonesty,

First, an examiner must be "disinterested" as defined by 11 U.S.C. § 101(14), which means a "creditor, an equity security holder, or an insider," or anyone with "an interest materially adverse to the interest of the estate" cannot be appointed to conduct a Section 1104(c) investigation.[9] *See* 11 U.S.C. § 1104(d). The Code also forbids a debtor in possession, the quintessential "insider," from performing the duties of an examiner and investigating itself. *See* 11 U.S.C. § 1107(a) (stating a debtor in possession "shall have all the rights . . . and powers" and "perform all the functions and duties" of a trustee, except the duties granted to trustees and examiners in subsections 1106(a)(2) through (4)). An examiner "is first and foremost disinterested and nonadversarial" and "answers solely to the Court." *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 432 (6th Cir. 2004) (quoting *In re Baldwin United Corp.*, 46 B.R. 314, 316 (S.D. Ohio 1985)). This requirement of disinterest is particularly salient here, where issues of potential conflicts of interest arising from debtor's counsel serving as pre-petition advisors to FTX have been raised repeatedly. Moreover, the U.S. Trustee raised the concern that, given the reports of widespread fraud, officers or employees who may have engaged in wrongdoing could remain at FTX Group. JA 100 ¶ 35. In enacting subsection 1104(c)(2), Congress made certain that neither the Bankruptcy Court nor the Appellees could deem these issues unworthy of an outside investigation in this particular bankruptcy, which certainly qualifies as a

---

incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."

[9] Under the Bankruptcy Code, a "disinterested person" is defined as a person that "is not a creditor, an equity security holder, or an insider;" "is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor;" and "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(A)–(C).

"large case[] having great public interest." 124 CONG. REC. 33990 (1978).

Second, an examiner appointed under subsection 1104(c)(2) must make their findings public, an obligation neither a creditor committee nor a debtor in possession shares.[10]  *Compare* 11 U.S.C. § 1103(c)(2) *and* 11 U.S.C. § 1107(a), *with* § 1106(a)(4), (b).  Requiring a public report furthers Congress's intent to protect the public's interest as well as those creditors and debtors directly impacted by the bankruptcy.  Such protection seems particularly appropriate here.  The collapse of FTX caused catastrophic losses for its worldwide investors but also raised implications for the evolving and volatile cryptocurrency industry.  For example, an investigation into FTX Group's use of its own cryptocurrency tokens, FTTs, to inflate the value of FTX and Alameda Research could bring this practice under further scrutiny, thereby alerting potential investors to undisclosed credit risks in other cryptocurrency companies.  In addition to providing much-needed elucidation, the investigation and examiner's report ensure that the Bankruptcy Court will have the opportunity to consider the greater public interest when approving the FTX Group's reorganization plan.[11]

---

[10] The public report requirement is set forth in 11 U.S.C § 1106 (a)(4)(A) and § 107(a).  Section 1106(a) sets forth the duties of an examiner.  Subsection 1106(a)(4) directs an examiner to "file a statement of any investigation" which includes "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate." 11 U.S.C. § 1106(a)(4)(A).  Such a statement is deemed public under 11 U.S.C. § 107(a).

[11]  At argument, counsel for the unsecured Creditors' Committee posited that examiners in large-scale bankruptcies are not appointed as a matter of course and cited three examples: *In re Genesis Global Holdco, LLC*., No. 1:23-bk-10063, ECF 1 *et seq*. (Bankr. S.D.N.Y. Jan. 19, 2023), *In re Voyager Digital Holdings, Inc*., No. 1:22-bk-10943, ECF 1 *et seq*. (Bankr. S.D.N.Y. July 5, 2022), *In re JCK Legacy Co*.,

## IV.   Conclusion

For the foregoing reasons, we reverse the decision of the Bankruptcy Court and remand with instructions to order the appointment of an examiner under 11 U.S.C. § 1104(c)(2).

_____

No. 1:20-bk-10418, ECF 1 *et seq.* (Bankr. S.D.N.Y. Feb. 13, 2020).  In searching the above-cited docket entries, it appears no motion requesting the appointment of an examiner pursuant to 11 U.S.C. § 1104(c)(2) was ever made.  Transcript of Oral Argument 31:21–32:1, FTX Trading Ltd. (Nov. 8, 2023) (No. 23-2297).

16

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**

U̲NITED S̲TATES C̲OURT OF A̲PPEALS
FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

February 12, 2024

Ms. Una M. O'Boyle
United States Bankruptcy Court for the District of Delaware
824 N Market Street
3rd Floor
Wilmington, DE 19801

RE: In re: FTX Trading, Ltd., et al
Case Number: 23-2297
District Court Case Number: 22-11068
District Court Case Number: 1-23-cv-00241

Dear District/Bankruptcy Clerk

Enclosed herewith is the certified judgment together with copy of the opinion in the above-captioned case(s). The certified judgment is issued in lieu of a formal mandate and is to be treated in all respects as a mandate.

Counsel are advised of the issuance of the mandate by copy of this letter. The certified judgment shows costs taxed, if any.

Very truly yours,

 s/Stephanie
Case Manager
Direct Dial 267-299-4026

cc: All Counsel of Record