# **<u>Exhibit A</u>**

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          22 CR 673 (LAK)

5    SAMUEL BANKMAN-FRIED,

6                  Defendant.              Trial
     ------------------------------x
7
                                           New York, N.Y.
8                                          October 18, 2023
                                           9:30 a.m.
9

10   Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                           District Judge
13
                          APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIELLE R. SASSOON
          NICOLAS ROOS
17        DANIELLE KUDLA
          SAMUEL RAYMOND
18        THANE REHN
          Assistant United States Attorneys
19
     COHEN & GRESSER, LLP
20        Attorneys for Defendant
     BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
          SRI K. KUEHNLENZ
22        DAVID F. LISNER

23   Also Present:
     Luke Booth, FBI
24   Kristin Allain, FBI
     Arjun Ahuja, USAO Paralegal Specialist
25   Grant Bianco, USAO Paralegal Specialist
```

1              (Trial resumed; jury not present)

2              THE COURT:  Anybody have any objection to my bringing

3     the jury more or less up to date on the schedule, with all

4     sorts of appropriate caveats?

5              MS. SASSOON:  No objection.

6              THE COURT:  What we are looking at is the conclusion

7     of evidence sometime in the week of October 30 or maybe

8     November 6, right?

9              Of course we have the issue of whether there is a

10    rebuttal case, a defense case.  We have all those issues.  But

11    I think they have a right to know how long they are going to be

12    here, to the extent we can tell them.

13             Let's get the witness on the stand and bring up the

14    jury.

15             MR. RAYMOND:  Thank you, your Honor.  The government

16    calls Eliora Katz.

17             (Jury present)

18             THE COURT:  Good morning, everybody.  Folks can be

19    seated.

20             The defendant and the jury all are present, as they

21    have been throughout.

22             I wanted to say a couple of things to the jury before

23    we get started this morning.

24             First of all, I know I speak for everybody in saying

25    how much we appreciate the fact that you are here every day on

1   time.  You get back from lunch on time.  That makes this all

2   move.  And everybody is very well aware of how much of your

3   time this is taking and are very appreciative of your service.

4        The second thing I wanted to do is update you as best

5   I can, which is kind of uncertain, about what the schedule is

6   looking like, without in any way committing.  There are

7   contingencies about what will happen in the rest of the trial,

8   as there are in any trial.

9        We currently think that the chance that the taking of

10  evidence, which doesn't include your deliberations or my giving

11  you my instructions and so on, could conclude as early as the

12  week of October 30.  It could also go into the week of November

13  6.  If it does, it probably will conclude that week.  If there

14  are significant changes, I'll try to keep you posted, but I

15  don't have all the information at the moment.

16       Mr. Raymond, I think it would be useful formally to

17  call your witness.

18       MR. RAYMOND:  Thank you, your Honor.  The government

19  calls Eliora Katz.

20       THE COURT:  Swear the witness, please, if we have not

21  done that already.

22       Have we sworn the witness.

23       MR. RAYMOND:  I don't believe so, your Honor.

24  ELIORA MICHAELA KATZ,

25     called as a witness by the government,

1     having been duly sworn, testified as follows:

2          THE COURT:  Thank you.  You may proceed, Mr. Raymond.

3          MR. RAYMOND:  Thank you, your Honor.

4  DIRECT EXAMINATION

5  BY MR. RAYMOND:

6  Q.  Ms. Katz, where did you work a year ago?

7  A.  FTX US.

8  Q.  When did you start working there?

9  A.  April 2022.

10  Q.  Ms. Katz can you speak a little further into the mic.  I

11  couldn't quite catch that.

12  A.  April 2022.

13  Q.  Where was your office?

14  A.  In Washington, D.C.

15  Q.  What was your title?

16  A.  Director of government relations and policy.

17  Q.  What were your responsibilities as the director of

18  government relations and policy?

19  A.  Advocating for regulatory clarity in the digital asset

20  markets.

21  Q.  What does it mean to advocate for regulatory clarity?  What

22  were your day-to-day responsibilities?

23  A.  Speaking with people in Washington about the importance of

24  federal oversight over crypto spot markets.

25  Q.  When you say speaking to people in Washington, what types

1   of people were you speaking to?

2   A.  Staffers on the hill.

3   Q.  When you say the hill, what does that refer to?

4   A.  Congress.

5   Q.  Who did you report to?

6   A.  Mark Wetjen.

7   Q.  Ms. Katz, did you ever meet Sam Bankman-Fried?

8   A.  Yes.

9   Q.  Did you ever meet him in Washington, D.C.?

10  A.  Yes.

11  Q.  Based on your job responsibilities, were you aware of the

12  purposes of his trips to D.C.?

13  A.  The purposes that I was, you know, involved with, I guess,

14  yes.

15  Q.  What were the purposes of his trips, if any?

16  A.  What I saw of -- engaging with policy makers about digital

17  asset regulation.

18  Q.  How did you know that was the purpose of some of his trip

19  to D.C.?

20  A.  Because I participated in some of those meetings.

21  Q.  So that's meetings with Mr. Bankman-Fried and some of the

22  policy makers you were describing?

23  A.  Correct.

24  Q.  As far as you know, did Sam Bankman-Fried ever make any

25  public statements while in D.C. related to FTX?

1    A.  Yes.

2    Q.  What were those?

3    A.  He testified before Congress in May, I believe, of 2022.

4    Q.  How do you know that he testified before Congress in May

5    2022?

6    A.  Because I was present in the room.

7           MR. RAYMOND:  Your Honor, the government offers

8    Government Exhibit 833, pursuant to stipulation Government

9    Exhibit 2001.

10          THE COURT:  Received.

11          (Government Exhibit 833 received in evidence)

12          MR. RAYMOND:  Your Honor, may we publish?

13          THE COURT:  Yes.

14          MR. RAYMOND:  Thank you.

15   Q.  Ms. Katz, can you read out the date of this tweet.

16   A.  November 28, 2021.

17   Q.  Was that November 28?

18   A.  I'm sorry.  November 8, 2021.

19   Q.  In this first tweet there is a reference to

20   blog.FTX.com/policy.

21          Do you see that?

22   A.  Yes.

23   Q.  Do you recognize that link?

24   A.  Yes.

25   Q.  What was it or is it?

1   A.  FTX's blog in which they would post kind of think pieces

2   related to digital asset policy.

3   Q.  Did you ever review the materials posted to that site?

4   A.  I had read some of them, the material, yes.

5   Q.  And why did you review those?

6   A.  To understand how FTX was thinking about policy.

7          MR. RAYMOND:  Your Honor, the government will now read

8   the first sentence of paragraph 8 of Government Exhibit 2000,

9   which is a stipulation between the parties.  Samuel

10  Bankman-Fried testified before the United States House of

11  Representatives Financial Services Committee on December 8,

12  2021.

13         Your Honor, the government now offers --

14         THE COURT:  Before you go on, I am going to give an

15  instruction.

16         Members of the jury, we talked about stipulations

17  three weeks ago.  You must accept as a fact what Mr. Raymond

18  just read as having been stipulated.

19         Let's go on, Mr. Raymond.

20         MR. RAYMOND:  Thank you, your Honor.

21         Your Honor the government now offers Government

22  Exhibits 913-1 and 913-2, pursuant to stipulation GX-2000,

23  which are, according to the stipulation, true and correct

24  copies of excerpts of video of his testimony that day.

25         THE COURT:  They are received.

```
 1              (Government Exhibits 913-1 and 913-2 received in
 2    evidence)
 3              MR. RAYMOND:  Your Honor, may we publish Government
 4    Exhibit 913-1?
 5              THE COURT:  Yes.
 6              MR. RAYMOND:  Thank you.
 7              Mr. Bianco, can you play that video.
 8              (Video played)
 9    Q.  Ms. Katz, did you recognize anyone in that video?
10    A.  Yes.
11    Q.  Who did you recognize?
12    A.  I recognized Sam, as well as my former supervisor at FTX,
13    Mark Wetjen.
14    Q.  Where was Mr. Wetjen sitting in that clip?
15    A.  Behind Sam.
16              MR. RAYMOND:  Mr. Bianco, could you now play
17    Government Exhibit 913-2 for the jury.
18              (Video played)
19              MR. RAYMOND:  Your Honor, the government next offers
20    Government Exhibit 913-T, pursuant to GX-2000, which is a true
21    and correct transcript of the excerpts of this testimony.
22              THE COURT:  It's received.
23              (Government Exhibit 913-T received in evidence)
24              MR. RAYMOND:  Your Honor, can we publish?
25              THE COURT:  Yes.
```

1              MR. RAYMOND:  Mr. Bianco, can you publish it.

2              Could you go to the next page.  Could you just

3      highlight the bottom, the lines here.

4              Could you take that down, Mr. Bianco.

5              Your Honor, the government next offers --

6              THE COURT:  Mr. Raymond, did you expect anybody to

7      look at it or read it?

8              MR. RAYMOND:  Not for that piece, your Honor, but for

9      the next piece I will.  Thank you.

10             THE COURT:  It's your case.

11             MR. RAYMOND:  Thank you.

12             Your Honor, the government next offers Government

13     Exhibit 913-A, pursuant to GX-2000, which is true and correct

14     excerpts of Mr. Bankman-Fried's submissions to the financial

15     services committee before his testimony.

16             Sorry, your Honor.  Is the exhibit received?

17             THE COURT:  Yes.

18             (Government Exhibit 913-A received in evidence)

19             MR. RAYMOND:  Thank you.

20             Mr. Bianco, could you publish it.

21             Mr. Bianco, could you highlight the top portion.

22     Q.  Ms. Katz, can you just read what exactly this is.

23     A.  It appears to be Sam Bankman-Fried's testimony before the

24     House Financial Services Committee in December of 2021, and

25     this was obviously before -- long before I joined FTX.

1   Q.   What does it list Mr. Bankman-Fried's role as?

2            MR. COHEN:   Objection.

3            THE COURT:   Sustained.

4            MR. RAYMOND:   That's fine, your Honor.

5            Mr. Bianco, could you get out of this and go to the

6   page 2.   Could you just highlight this portion.

7            MR. COHEN:   Same objection, your Honor.

8            THE COURT:   I have not heard a question.

9            MR. RAYMOND:   Your Honor, we can pull this down.   We

10  don't need to go further on this document.

11  Q.   Ms. Katz, can you read this portion of the document.

12           MR. COHEN:   Objection.

13           THE COURT:   Overruled.

14           MR. RAYMOND:   Thank you.

15  A.   FTX has designed and offered a platform with a market

16  structure that is risk reducing.   To be sure, there are

17  irresponsible actors in the digital asset industry and those

18  actors attract the headlines, but FTX is not one of them and in

19  fact has built a resilient risk-reducing platform as a

20  competitive advantage.

21  Q.   Thank you.

22           MR. RAYMOND:   Mr. Bianco, can you go to page 3 of the

23  document.   Can you highlight the bottom.

24  Q.   Ms. Katz, could you read this portion.

25  A.   BTC and ETH, two tokens expressly addressed by the CFTC to

1        be commodities subject to its jurisdiction.

2              MR. RAYMOND:  Mr. Bianco, can you go to the next page.

3        The page after that, please.  Could you go to the following

4        page after this.  Could you highlight the top portion, Mr.

5        Bianco.

6        Q.  Ms. Katz, do you recognize this document?

7        A.  Yes.

8        Q.  What is it?

9        A.  It was a piece that was on the FTX blog which was also

10       posted on the FTX blog long before I joined FTX and which I had

11       nothing -- I did not draft or write.

12       Q.  Were you aware of this document?

13       A.  Yes.

14       Q.  And had you seen this document when you were working at

15       FTX?

16       A.  Yes.

17              MR. RAYMOND:  Mr. Bianco, you can take this document

18       down.

19              Your Honor, the government next offers Government

20       Exhibit 836, pursuant to stipulation GX-2001.

21              THE COURT:  Received.

22              (Government Exhibit 836 received in evidence)

23              MR. RAYMOND:  May we publish it?

24              THE COURT:  Yes, sir.

25       Q.  Ms. Katz, could you just read the date of these tweets.

1   A.  December 8, 2021, December 8, 2021.

2   Q.  Could you just read the first under number 1.  Can you read

3   the tweet.

4   A.  A huge thanks to Maxine Waters, Patrick McHenry, and the

5   whole House Financial Services Committee for having us today to

6   talk about the future of digital assets.

7          MR. RAYMOND:  Mr. Bianco, can you get out of this

8   tweet.

9   A.  Again, this tweet tweeted before I joined the company.

10         MR. RAYMOND:  Your Honor, the government next offers

11  GX-763, pursuant to GX-2001.

12         THE COURT:  Received.

13         (Government Exhibit 763 received in evidence)

14         MR. RAYMOND:  Can we publish to the jury?

15         THE COURT:  Yes.

16         MR. RAYMOND:  Thank you.

17         Mr. Bianco, can you publish.

18  Q.  Ms. Katz, can you just read out the date first.

19  A.  February 6, 2022.

20  Q.  Could you read the tweet.

21  A.  I'm honored and excited to be testifying before the senate

22  AG committee on digital assets Wednesday, along with CFTC

23  Behnam.

24         Also before I joined the company.

25         MR. RAYMOND:  Your Honor, the government will now read

1    the first sentence of paragraph 9 of GX-2000, which is the

2    stipulation between the parties:

3          Samuel Bankman-Fried testified before the United

4    States Senate Committee on Agriculture Nutrition and Forestry

5    on February 9, 2022.

6          Your Honor, the government next offers GX-764,

7    pursuant to stipulation GX-2001.

8          THE COURT:  Received.

9          (Government Exhibit 764 received in evidence)

10          MR. RAYMOND:  May we publish?

11          THE COURT:  Yes.

12          MR. RAYMOND:  Thank you.

13          Mr. Bianco, can you publish 764.

14   Q.  Ms. Katz, could you just read out the date of this tweet

15   first.

16   A.  February 9, 2022.

17   Q.  And the embedded tweet from SBF underscore FTX, can you

18   just read that?

19   A.  I'll be testifying before the senate AG committee today.

20   Starts in 45 minutes.  My panel probably starts an hour after

21   that or so.

22   Q.  Can you read the FTX underscore official tweet on top of

23   that.

24   A.  To download Sam's testimony, please go to FTX US.  If you

25   would like to view all of our policy briefs, please see

```
 1    ftxpolicy.com.

 2              Also tweeted before I joined.

 3    Q.  Ms. Katz, ftxpolicy.com, that's a different URL than the

 4    one we looked at before, correct?

 5    A.  I believe so.

 6    Q.  Did you ever look at what was on ftxpolicy.com?

 7    A.  I believe so.

 8    Q.  And what was that?

 9    A.  A blog where FTX would post Sam's testimonies and other

10    thought pieces related to digital assets.

11              MR. RAYMOND:  Your Honor, the government now offers

12    GX-914-1, which consists of, according to the stipulation, a

13    true and correct video of excerpts of his testimony on February

14    9, 2022.

15              THE COURT:  Received.

16              (Government Exhibits 914-1 received in evidence)

17              MR. RAYMOND:  Your Honor, can we play it for the jury?

18              THE COURT:  Yes.

19              MR. RAYMOND:  Thank you.

20              Mr. Bianco, can you pull it up.

21              (Video played)

22              MR. RAYMOND:  Your Honor, the government next offers

23    GX-914-T, which, pursuant to GX-2000, is a true and correct

24    transcript of excerpts of Mr. Bankman-Fried's testimony before

25    the senate.
```

 1              THE COURT:  Received.

 2              (Government Exhibit 914-T received in evidence)

 3              MR. RAYMOND:  Your Honor, may we publish?

 4              THE COURT:  Yes.

 5              MR. RAYMOND:  Thank you.

 6              Mr. Bianco, can you go to the next page, and the page

 7    after that.  Could you just highlight Mr. Bankman-Fried's

 8    statement below.

 9    Q.  Ms. Katz, is that a transcript of the video we just saw?

10    A.  I believe so.

11              THE COURT:  You played the video.

12              MR. RAYMOND:  Yes.  Thank you, your Honor.

13              THE COURT:  I don't think we have to go through the

14    transcripts of the video.  You can put them in.

15              MR. RAYMOND:  Thank you, your Honor.  Will do.

16              Your Honor, the government next offers GX-914-A,

17    which, according to the stipulation, is a true and correct copy

18    of excerpts of Mr. Bankman-Fried's submissions to the senate

19    committee.

20              THE COURT:  Received.

21              (Government Exhibit received 914-A in evidence)

22              MR. RAYMOND:  May we publish?

23              THE COURT:  Yes.

24              MR. RAYMOND:  Mr. Bianco, can you first highlight at

25    the very top the testimony of Sam Bankman-Fried, cofounder.

1    Q.  Ms. Katz, do you recognize this document?

2    A.  Yes.

3    Q.  What is it?

4    A.  Sam Bankman-Fried's testimony before the senate agriculture

5    committee on February 9, 2022.

6            Also before I joined FTX.

7    Q.  What is Mr. Bankman-Fried's role listed as in this

8    document?

9    A.  Cofounder and CEO of FTX.

10            MR. RAYMOND:  Mr. Bianco, could you go down to page 2

11   of this document, and could you highlight this portion.

12   Q.  Ms. Katz, could you just read the first sentence of the

13   highlighted portion.

14   A.  FTX released this week FTX's key principles for ensuring

15   investor protections on digital asset platforms (investor

16   protection key principles) where we identified the most

17   important components of an investor-protection regime (which

18   the CEA and CFTC rules also reflect) and how FTX offers those

19   protections today with the direct membership model.

20   Q.  Ms. Katz, as part of your responsibilities at FTX US, were

21   you aware of FTX's key principles?

22   A.  Yes.

23   Q.  Had you reviewed a document by that title?

24   A.  That document was published before I joined FTX, but I had

25   seen it on the blog.

1    Q.  And could you just read the components listed below.

2            MR. COHEN:  Objection.

3            THE COURT:  Sustained.

4            Let's move it along.

5            MR. RAYMOND:  Thank you, your Honor.

6            Mr. Bianco, could you go to page 5 of the document.

7    Could you pull up the top.

8    Q.  Ms. Katz, is this the key principles document you were

9    talking about a moment ago?

10   A.  I believe so.

11           MR. RAYMOND:  Mr. Bianco, can you highlight on the

12   next page of the document the introduction, just the first

13   sentence:  FTX strongly believes ensuring investor protections

14   is critical to the successful operations of digital asset

15   platformings, including our own, as well as to ensuring

16   positive user experience for our customers.

17   Q.  Ms. Katz, when you were working at FTX, did you have any

18   reason to believe this statement was false?

19   A.  No.

20           MR. RAYMOND:  Mr. Bianco, can you go to the next page

21   of this document.  Under the -- the page after this.  At the

22   very top, maintaining adequate resources.

23   Q.  Is maintaining adequate resources to return a customer's

24   assets, a hallmark of the --

25           MR. COHEN:  Objection.

 1          THE COURT:  What is the objection?

 2          MR. COHEN:  The document speaks for itself.  We have

 3   gone over this.

 4          THE COURT:  I'll allow him to draw attention to it in

 5   this way.

 6          MR. RAYMOND:  Thank you, your Honor.

 7          A hallmark of the investor protection regimes for

 8   markets globally and in the U.S. are requirements to ensure the

 9   intermediary holding a customer's assets has adequate liquid

10   resources available at all times to ensure the customer can

11   redeem her assets when she chooses.

12   Q.  Ms. Katz, when you were working at FTX, did you have any

13   reason to believe that this statement was false?

14   A.  No.  I was not involved with the inner workings of these

15   issues and had no familiarity with them, so no.

16          MR. RAYMOND:  Mr. Bianco, can you highlight the bottom

17   part of this page:  FTX's policies and procedures.  It should

18   go over to the next page as well.  FTX has policies and

19   procedures for its platforms today that reflect this basic

20   principle by maintaining liquid assets for customer

21   withdrawals, including a sufficient balance of digital assets

22   funded by the company for its non-U.S. platform.

23   Q.  Ms. Katz, did you have any reason to believe that this

24   statement was false when you were working at FTX?

25   A.  No.

1           MR. RAYMOND:  And, finally, Mr. Bianco, could you go

2    to page 10 of this document.  I think it's the next page.

3           Do you see the line additionally as a general

4    principle, Mr. Bianco, in the middle of the page?  Can you just

5    highlight the middle of the page.  Thank you.

6           Additionally, as a general principle, FTX segregates

7    customer assets from its own assets across our platforms.

8    Q.  Ms. Katz, when you were working at FTX, did you have any

9    reason to believe this statement was false?

10   A.  No.  These were issues that I had no visibility or I didn't

11   pay attention to and had nothing to do with what I was doing

12   there.

13   Q.  Ms. Katz, did you draft this document?

14   A.  No.

15          MR. RAYMOND:  Mr. Bianco, you can pull this document

16   down and can you pull up GX-873, which is in evidence.  Could

17   you go to page 8.

18   Q.  Ms. Katz, can you read out the date of this tweet.

19   A.  Yes.  February 9, 2022.

20   Q.  Can you also read out the time.

21   A.  7:40 p.m.

22          MR. RAYMOND:  Your Honor, the government next offers

23   GX-839, pursuant to stipulation GX-2001.

24          THE COURT:  Received.

25          (Government Exhibit 839 received in evidence)

1             MR. RAYMOND:  May we publish?

2             THE COURT:  Yes.

3             MR. RAYMOND:  Thank you.

4  Q.  Ms. Katz, can you read the date and time of this tweet as

5  well.

6  A.  7:29 p.m., February 22, 2022.

7             Again, before I joined the company.

8             MR. RAYMOND:  Your Honor, the government now offers

9  GX-844, pursuant to stipulation GX-2001.

10            THE COURT:  Sorry.  I couldn't quite make out what

11 number.

12            MR. RAYMOND:  844, your Honor.

13            THE COURT:  Received.

14            (Government Exhibit 844 received in evidence)

15            MR. RAYMOND:  May we publish it?

16            THE COURT:  Yes, sir.

17            MR. RAYMOND:  Thank you.

18 Q.  Ms. Katz, could you read this tweet and the date.

19 A.  Yes.  I'm honored to be testifying before the house

20 agriculture committee tomorrow at 10 a.m.  10:42 p.m., May 11,

21 2022.

22 Q.  Ms. Katz, were you working at FTX in May 2022?

23 A.  Yes.

24 Q.  Did Mr. Bankman-Fried in fact testify before the house

25 agriculture committee on that day?

```
 1   A.  I believe so.

 2   Q.  Did you attend the hearing?

 3   A.  Yes.

 4           MR. RAYMOND:  Your Honor, the government now offers

 5   GX-845, pursuant to stipulation GX-2001.

 6           THE COURT:  Received.

 7           (Government Exhibit 845 received in evidence)

 8           MR. RAYMOND:  May we publish it?

 9           THE COURT:  You may.

10   Q.  Ms. Katz, can you read the date of this tweet.

11   A.  May 11, 2022.

12   Q.  Can you read just the top number 3 tweet and then letter C

13   below that.

14   A.  We think that by granting federal oversight of digital

15   asset markets, it would, C, protect customers.

16   Q.  Thank you.

17           MR. RAYMOND:  Your Honor, the government next offers

18   GX-916-T, which, pursuant to stipulation GX-2000, is a document

19   submitted by Samuel Bankman-Fried to the United States House

20   Committee on Agriculture for a hearing held on June 23, 2022.

21           THE COURT:  Received.

22           (Government Exhibit 916-T received in evidence)

23   Q.  Ms. Katz, were you working at FTX US in June 2022?

24   A.  Yes.

25   Q.  Were you aware of a submission made to Congress around June
```

1    23, 2022?

2    A.  Yes.

3    Q.  Did you participate in preparing materials submitted to

4    Congress?

5    A.  I can't recall exactly.  I believe this is the compilation

6    of things that were posted on the FTX blog which were all

7    drafted before I joined the company, so I had nothing to do

8    with writing the content, but I might have helped submit it to

9    Congress.

10   Q.  I think you mentioned the word compilation.  Were you

11   involved in compiling the documents from the FTX blog?

12   A.  I can't recall exactly, but that might have been something

13   that my boss at the time, Mark Wetjen, asked me to do, but I

14   can't recall exactly.

15              MR. RAYMOND:  Your Honor, may we publish?

16              THE COURT:  Yes.

17              MR. RAYMOND:  Mr. Bianco, can you go to page 3 of this

18   document.  Can you pull up just the top.

19   Q.  Ms. Katz, do you recognize this document?

20   A.  Yes.  Something from an FTX blog post published before I

21   joined the company.

22   Q.  And is this the company principles document that you

23   mentioned before?

24   A.  I believe so.

25              MR. RAYMOND:  Mr. Bianco, could you just return to the

1      first page of this document.

2      Q.  Ms. Katz, can you just refresh, what is the date of this

3      hearing?

4      A.  June 23, 2022.

5              MR. RAYMOND:  Your Honor, the government now offers

6      GX-870, pursuant to stipulation GX-2001.

7              THE COURT:  Received.

8              (Government Exhibit 870 received in evidence)

9              THE COURT:  How much more of this, Mr. Raymond?

10             MR. RAYMOND:  One more after this, your Honor.

11             May we publish it?

12             THE COURT:  Yes.

13     Q.  Ms. Katz, can you read the date first.

14     A.  August 3, 2022.

15     Q.  Could you just read the first tweet.

16     A.  I'm really excited to see Senators Stabenow and John

17     Boozman introduce strong bill to bring customer protection and

18     federal oversight to crypto.

19     Q.  Ms. Katz, were you aware of the legislation proposed around

20     this time related to the cryptocurrency industry?

21     A.  Yes.

22     Q.  Is your awareness part of your duties working for FTX US?

23     A.  Yes.

24             MR. RAYMOND:  Your Honor, the last one now.  The

25     government offers GX-856, pursuant to GX-2001.

 1                THE COURT:  Received.

 2                (Government Exhibit 856 received in evidence)

 3   Q.  Ms. Katz, first, can you read the date on these tweets.

 4   A.  October 19, 2022.

 5   Q.  For the second tweet can you just read 2A.

 6   A.  At a high level, we need regulatory oversight and customer

 7   protection.

 8   Q.  Ms. Katz, during your testimony you've seen certain tweets

 9   and public statements by Mr. Bankman-Fried.  Did you believe

10   those statements about how FTX worked when you worked at FTX

11   US?

12   A.  Yes.

13                MR. RAYMOND:  No further questions, your Honor.

14                THE COURT:  Thank you.  Is there any cross?

15                MR. COHEN:  Yes, your Honor.

16   CROSS-EXAMINATION

17   BY MR. COHEN:

18   Q.  Just a few questions, Ms. Katz.

19                Just so the record is clear, when did you actually

20   work at FTX?

21   A.  From April 2022 through November 2022.

22   Q.  So about six, seven months?

23   A.  Correct.

24   Q.  And I think you mentioned a fellow named Mark Wetjen, is

25   that right?

1   A.   Yes, sir.

2   Q.   He was your boss?

3   A.   Yes.

4   Q.   Do you know his background?

5   A.   Somewhat, yes.

6   Q.   Do you know if he had ever worked for CFTC?

7   A.   He did, yes.

8   Q.   And what did he do there?

9   A.   I believe he was a commissioner.

10  Q.   He was one of the commissioners of the CFTC?

11  A.   To my knowledge, yes.

12       MR. COHEN:   Now, if we could call up just very quickly

13  GX-844.

14  Q.   Do you recall Mr. Raymond just showed this document to you?

15  A.   Yes.

16  Q.   And it references testimony before the House Committee on

17  Agriculture.  You see tractors and apples and so forth.

18       You see that, ma'am?

19  A.   Yes.

20  Q.   Do you know -- let me back up.

21       The House Committee on Agriculture had supervision

22  over the CFTC, isn't that correct?

23  A.   Yes.

24       MR. COHEN:   We can take that down.

25  Q.   Now, you mentioned that during the time you were at FTX

1    there had been some written testimony submitted to Congress.

2              Do you recall that testimony, ma'am?

3    A.  Yes.

4    Q.  If I understand correctly, that was something that you did

5    not work on?

6    A.  Correct.

7    Q.  That was worked on by Mr. Wetjen and Mr. Bankman-Fried?

8    A.  Correct.

9              MR. COHEN:  I have nothing further.  Thank you.

10             THE COURT:  Thank you.

11             Anything else, Mr. Raymond?

12             MR. RAYMOND:  No.  Thank you, your Honor.

13             THE COURT:  Ms. Katz, thank you.  You are excused.

14             (Witness excused)

15             THE COURT:  Next witness.

16             MR. ROOS:  Yes, your Honor.  The government calls

17   Peter Easton.

18   PETER DOUGLAS EASTON,

19       called as a witness by the government,

20       having been duly sworn, testified as follows:

21             THE COURT:  Mr. Roos, you may proceed.

22             MR. ROOS:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MR. ROOS:

25   Q.  Good morning.

```
 1    A.  Good morning.

 2    Q.  Where do you work?

 3    A.  I work at the University of Notre Dame.

 4    Q.  What's your title or role at University of Notre Dame?

 5    A.  I'm a professor of accounting.

 6    Q.  What areas of accounting do you focus on?

 7    A.  I cover accounting largely at the border of finance and

 8    accounting, valuation, financial statement analysis, those

 9    kinds of things.

10    Q.  Let me ask you a little bit about your background.  Where

11    did you do your schooling?

12    A.  I did undergraduate schooling and some postgraduate

13    schooling in Australia, then in the late '70s moved to

14    University of California Berkeley, where I completed the Ph.D.

15    in finance and accounting.

16    Q.  What did you do after getting your Ph.D.?

17    A.  My first appointment was at the University of Chicago.  I

18    continued to work at the University of Chicago until 2008 on

19    and off.  I also went back to Australia for five years, at Ohio

20    State for eight years, and I've been 20 years at the University

21    of Notre Dame.

22    Q.  Since becoming a professor at the University of Notre Dame,

23    what roles have you had?

24    A.  I've been director of a center for education and accounting

25    and research and accounting.  I have taught accounting classes,
```

1  again on the border of finance and accounting.

2  Q.  Are you a tenured professor?

3  A.  Yes, I am.

4  Q.  What are some of the requirements for becoming a tenured

5  professor?

6  A.  The requirements are teaching, of course, but also

7  publication in the very top academic journals.

8  Q.  What do you teach?

9  A.  I teach essentially penetrating financial statements,

10  understanding the financial statements and understanding their

11  implications for security valuations or asset valuation of

12  various kinds.

13  Q.  You mentioned, in addition to teaching, doing research.

14  What are your areas of research?

15  A.  My areas of research for the entire 40 years of my research

16  career have been based on penetrating the details of financial

17  statements and understanding the implications of those

18  financial statements for securities markets, securities prices,

19  asset valuations in general.

20  Q.  From your research have you published any books or

21  articles?

22  A.  Yes.  I published five books.  I have published 50 articles

23  in the top journals.

24  Q.  What types of books have you published?

25  A.  My books are all on financial statement analysis,

1    penetrating the financial statements, and the implications for

2    valuation.

3    Q.   Are they textbooks?

4    A.   They are all textbooks, yes.

5    Q.   I assumed not fictional books about penetrating, correct?

6    A.   Right.

7    Q.   Have you worked on any academic journals?

8    A.   Yes.  I've been editor on all of the top four journals in

9    the United States, on the top journal in Canada, top journal in

10   Europe, and the top journal in the Asia Pacific area.

11   Q.   When you say top journals, you're referring to accounting

12   journals?

13   A.   I am, yes.

14   Q.   Have you ever worked on any litigation or court cases?

15   A.   Yes, I have.

16   Q.   At a high level, what kind of litigation?

17   A.   This has, again, been penetrating the financial statements,

18   understanding issues in the accounting statements, things that

19   may have been omitted or incorrectly stated, and the

20   implications of that for valuation; generally, not always.

21   Q.   Have you ever worked on any cases involving financial or

22   accounting fraud?

23   A.   Yes, I have.

24   Q.   What cases?

25   A.   I have worked on three cases.  These were cases in the

1  early 2000s:  Enron, WorldCom, and Parmalat.

2  Q.  Now, have you ever worked on any cases or matters related

3  to cryptocurrency?

4  A.  Yes, I have.

5  Q.  What have you worked on?

6  A.  I worked on the *SEC v. Ripple* case.

7         MR. ROOS:  At this time, your Honor, the government

8  would move to qualify --

9         THE COURT:  Not necessary.  Received.

10         MR. ROOS:  Thank you, your Honor.

11         May we inquire on that basis?

12         THE COURT:  Yes, of course.

13  Q.  Professor Easton, I would like to ask you a few preliminary

14  questions about your involvement in this case before we get to

15  the substance.

16         To your knowledge, have you ever met any of the

17  witnesses in the case?

18  A.  No, I have not.

19  Q.  And have you ever met the defendant, Samuel Bankman-Fried?

20  A.  No, I have not.

21  Q.  Do you have any personal knowledge of the facts of the case

22  other than what you have learned over the course of your work

23  on the case?

24  A.  No, I do not.

25  Q.  Is there anyone who has assisted you in the work you've

1    done on this matter?

2    A.  Yes.

3    Q.  Who is that?

4    A.  I've been assisted by a team from a litigation consulting

5    firm called Brattle.

6    Q.  What kind of work did Brattle do to assist you?

7    A.  Brattle did a lot of the investigation of the details of

8    the data, programming, penetrating details, helping me to

9    aggregate data together.

10   Q.  When you do academic research, is it typical for you to be

11   assisted by others?

12   A.  Absolutely.

13   Q.  Whose direction did the individuals at Brattle work under?

14   A.  Under mine.

15   Q.  And were you compensated for your work on this case?

16   A.  Yes, I was.

17   Q.  Approximately how much have you billed on this case to

18   date?

19   A.  I'm not sure, but in excess of 100,000.

20   Q.  One hundred hours or dollars?  What did you say?

21   A.  In excess of $100,000.

22   Q.  Got it.

23        Will you bill for your time at this trial?

24   A.  Yes, I will.

25   Q.  And have you been paid yet for your work?

1   A.  Yes, I have.

2   Q.  You said you work with Brattle.  Are you compensated for

3   the work that Brattle does in the case?

4   A.  No, I'm not.

5   Q.  Is your pay dependent in any way on the opinions you give

6   in the courtroom today?

7   A.  No, it is not.

8   Q.  Is your pay in any way dependent on the outcome of this

9   case?

10  A.  No, it is not.

11  Q.  In the binder in front of you there are a set of exhibits

12  for your review.  Professor Easton, if you would just flip

13  through those and see if you're familiar with them.

14        For the record, the binder contains Government

15  Exhibits 1001 to 1005, 1010, 1011, 1013, 1014, 1017 and its

16  subparts, 1018, 1023-1033, 1035, 1039, 1040, 1041, 1044, 1045,

17  1050, 1051, and 3000 through 3016.

18        THE COURT:  Mr. Roos, can you repeat those backwards.

19        MR. ROOS:  Those are actually my lotto numbers also.

20        THE COURT:  Good luck.

21  Q.  Professor Easton, are you familiar with those exhibits that

22  are marked for identification?

23  A.  Yes, I am.

24  Q.  And, generally speaking, what is in the binder before you?

25  A.  What is in the binder is a series of exhibits and backup

1  prepared by me and my team.

2  Q.  Do they include tables and charts?

3  A.  Yes, they do.

4  Q.  Do those charts and tables summarize voluminous quantities

5  of data that you have looked at?

6  A.  Yes, they do.

7          MR. ROOS:  So at this time the government offers

8  Exhibits 1001 to 1005, 1010, 1011, 1013 --

9          THE COURT:  A little slower.

10          MR. ROOS:  Should I restart?

11          THE COURT:  I'm with you as far as 1010.

12          MR. ROOS:  1010, 1011, 1013, 1014, 1017, including its

13  subparts, 1018, 1023 to 1033, 1035, 1039 through 1041, 1044,

14  1045, 1050, and 1051.  The government also offers, pursuant to

15  stipulation S-2003, Government Exhibits 30, 56, 89, 188, 201,

16  213, 308, 310, 314, 317, 327, 344, 506.  The government offers,

17  pursuant to stipulation S-2002, Government Exhibit 1735.  And,

18  finally, the government offers as demonstrative aids Exhibits

19  3000 to 3016.

20          MR. LISNER:  No objections beyond the one we resolved

21  yesterday for numbers 1017 through 1051.

22          THE COURT:  They are all received.

23          (Government Exhibits 1001 to 1005, 1010, 1011, 1013,

24  1014, 1017, including its subparts, 1018, 1023-1033, 1035,

25  1039-1041, 1044, 1045, 1050, 1051, 30, 56, 89, 188, 201, 213,

1   308, 310, 314, 317, 327, 344, 506, 1735, 3000-3016 received in

2   evidence)

3          THE COURT:  Members of the jury, Exhibits 3000 through

4   3016 are what we call demonstratives.  They are exhibits

5   designed to illustrate for you other materials so that you can

6   understand the testimony, but they are not themselves evidence.

7   You won't have them in the jury room unless the parties agree

8   otherwise.

9          Let's go.

10          MR. ROOS:  Thank you.

11  Q.  Professor Easton, have you worked on financial analysis in

12  preparation for your testimony here today?

13  A.  Yes, I have.

14  Q.  What, at a very high level, was the topic of your analysis?

15  A.  The topic of analysis was to understand the sources and

16  uses of fiat and cryptocurrency by Alameda and FTX.

17  Q.  Before we talk about those findings further, I want to

18  discuss what went into your financial analysis and the

19  materials you considered.  OK?

20  A.  Yes.

21  Q.  Let's start with the materials.  Why don't you just list

22  them for us.  What types of records or data or information did

23  you consider?

24  A.  There was a large amount of materials, but the easiest box

25  to put them in is bank statements.  The FTX database was a

1    massive source of data, the Blockchain, and third-party bank

2    statements.

3    Q.  Why don't we break that down a little bit.

4           MR. ROOS:  Can we please publish Government Exhibit

5    3000.

6    Q.  Professor Easton, can you explain to the jury what we are

7    looking at on page 1 of Government Exhibit 3000.

8    A.  Yes.  These are bank statements of Alameda.  On the left

9    you will see a statement of deposits.  Excuse me.  Of

10   withdrawals.  So you will see these are withdrawals in late

11   September.  You will see the amount in the second column.  Then

12   you will see the identity of the individual who withdrew the

13   amount.

14          On the right-hand side you will see a similar

15   statement from the Silvergate and Alameda account, but in this

16   case it is deposits.

17   Q.  At a high level, what did you and your team do with bank

18   statements like this?

19   A.  These statements were extraordinarily important in

20   identifying when customer money was put into an Alameda account

21   and when it was withdrawn from an Alameda account.

22   Q.  Did you process or code the data in any way?

23   A.  Yes.  Me and my team did.  We identified individual

24   customers.  This was a very time-consuming task because

25   individual customers could be labeled in very many ways.  Peter

1   Easton, for example, could be P. Easton or Mr. Easton or Peter

2   Easton, so we set up a matching database so that we could tag

3   each customer and identify them very carefully in the flows

4   through the accounts.

5          MR. ROOS:  Can we please go to page 2.

6   Q.  Professor Easton what does this show?

7   A.  This is a snapshot of the FTX database.  This is a gigantic

8   database.  You will see on the left-hand side tables.  We only

9   go from A to B in the tables.  Tables go way down, of course.

10  We access particular tables here.  So this is all withdrawals,

11  all the deposits, pricing data, all kinds of data that were

12  required for the analysis.

13         MR. ROOS:  Can we go to page 3.

14  Q.  You mentioned cryptocurrency Blockchain records.  Can you

15  explain what we are looking at?

16  A.  Here we are looking at a Blockchain record.  The top is the

17  unique identifier, 66 letters and digits.  This uniquely

18  identifies a particular transaction.  We can see the initiator

19  of that transaction also with a hashtag, and we can see the

20  contract itself.  What is this contract?  This is for the

21  transfer of -- you will see at the bottom, toward the bottom

22  that this is the transfer of 4400 ether, near enough, and those

23  are valued at $6.5 million.

24  Q.  And the transaction hash --

25         THE COURT:  Just a minute.

1           Professor, you used the word hashtag.  Would you tell

2    the jury what that is, please.

3           THE WITNESS:  These hashtags are unique identifiers on

4    the Blockchain.  You will see, I believe, that in the

5    transaction there are 66 alphanumeric identifiers.  Because

6    there are so many combinations of these numbers and alphabetic

7    codes, you can see this will surely be unique.  So later, if we

8    want to search for a particular transaction, we can uniquely

9    identify on the Blockchain every transaction that has ever

10   occurred.

11          THE COURT:  Thank you.

12          Go ahead.

13          MR. ROOS:  One moment, your Honor.  Maybe there is a

14   juror having an issue with one of the monitors.

15          THE COURT:  Are we having a problem with the monitor?

16          JUROR:  Yes.

17          THE COURT:  If you can get that one fixed, maybe you

18   can work on my PC.

19          We all set or not yet?

20          We are ready to go.

21          MR. ROOS:  Thank you.

22          Let's go to page 4.

23   Q.  Professor Easton, can you describe what we are looking at

24   on page 4 of this exhibit.

25   A.  So I have also examined bank statements from third-party

1  lenders.  In this case this is the beginning of a very long

2  bank statement from Genesis, one of the lenders, and it just,

3  in this particular snapshot, shows an invoice to Alameda

4  Research for the interest that's accrued for the month of

5  August 2022.  In the left-hand column you will see the

6  currencies:  BNB, Bitcoin, Ether, Link, etc.  In the middle

7  column you will see the accrued interest on the cryptocurrency.

8  And in the right hand column you will see the accrued interest.

9  3.6 million on the U.S. dollar.

10  Q.  How were documents like these statements from

11  cryptocurrency lenders like Genesis incorporated into your

12  overall analysis?

13  A.  Again, for these, it was largely understanding the source

14  of funds to Alameda and FTX.

15          MR. ROOS:  We can take the exhibit down.

16  Q.  Once you had all of this data, what types of analyses did

17  you do?

18  A.  Then I did both high-level analyses and analyses

19  penetrating individual transactions.

20  Q.  Have you reached any conclusions from those analyses?

21  A.  Yes, I have, some at a very high level and others at a very

22  transactional level.

23  Q.  Starting at the high level --

24          MR. ROOS:  Let's publish Government Exhibit 3001.

25  Q.  What are these?

1    A.   These are the 30,000-feet, high-level conclusions.

2           First of all, the amount of customer fiat deposits --

3    and all analysis are broken into fiat versus crypto -- the

4    amount of customer deposits held in Alameda Research and

5    FTX.com accounts was way less than was owed to customers on

6    FTX.  And then the question, of course, is what happened to

7    that money.  Well, Alameda Research used it for their own

8    expenditures.

9           Similarly, the amount of FTX hot and cold crypto

10   wallets was far less -- the amount owed in those wallets was

11   far less than the amount that was owed to FTX customers, and,

12   again, Alameda Research used customer crypto funds to pay for

13   the expenditures.

14          Also Alameda Research had the opportunity to borrow

15   against FTX, and there was not sufficient borrowing to cover

16   those expenditures.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. ROOS:

2   Q.  And you're referring to through the spot margin program?

3   A.  Through the spot margin program, yes, exactly.

4   Q.  All right.  We're going to go through these conclusions, so

5   why don't we take this down.

6          You mentioned some findings relating to fiat and some

7   findings related to cryptocurrency, and before we go through

8   the findings, I just want to talk about the differences there.

9          MR. ROOS:  Why don't we publish Government

10  Exhibit 3002.

11  Q.  And starting on page 1, Professor Easton, can you explain

12  to the jury what you mean by fiat currency.

13  A.  So by fiat currency, I mean the currency that we are all

14  used to using.  US currency is the fiat currency for the United

15  States.  We have a hundred dollar bill.  The pound, of course,

16  is the fiat currency for the UK.  The euro is the fiat currency

17  for Europe.  The yen is the fiat currency for Japan.  These are

18  currencies we're used to seeing, and throughout my testimony, I

19  will use color codes to remind us of what we're talking about.

20  Fiat will always be shown as a green identity.

21          MR. ROOS:  And let's go to page 2.

22  Q.  What information has been added to the screen?

23  A.  The other side of the screen points out that we've got this

24  alternative cryptocurrency.  Cryptocurrency is recorded by

25  unique hashtag, and you'll see an example in the bottom

1   right-hand corner of this exhibit.  Transactions are recorded

2   on the blockchain.  Every time we have sufficient transactions

3   built up, a new block is created.  The blocks are connected and

4   will never disappear.  So the blockchain exists forever.  An

5   example of three cryptocurrencies that will come up in the

6   testimony, Bitcoin, Ether, and USDT.  USDT is somewhat

7   different to the others inasmuch as it is a stablecoin, meaning

8   that it is tethered to, tied to, the US dollar.  One stablecoin

9   is essentially equal to one US dollar.

10  Q.  All right.  With that background, I want to talk about your

11  first two conclusions that we looked at, okay?

12  A.  Yes.

13          MR. ROOS:  We can take this down.

14  Q.  Now you mentioned just now fiat currency and fiat deposits,

15  but what is a fiat deposit?  What did you mean by that?

16  A.  A fiat deposit is just like you or I would take money from

17  our wallet, our back-pocket wallet, and deposit at a bank.

18          MR. ROOS:  Let's bring up Government Exhibit 3003.

19  Q.  Professor Easton, what does this show?

20  A.  So if we look at the top part of this diagram, it shows a

21  simple operation of a customer—you or I—putting a hundred

22  dollars into a bank account.  The bank accounts in question

23  here are Alameda, North Dimension, and FTX.  The lower part

24  shows the accounting, how the accounting would occur.  The

25  accounting is a classic double-entry bookkeeping accounting

1   method, which has been around for centuries, and essentially

2   all the double-entry means is that we record the fact that

3   we've got $100 of customer deposits in the green on the

4   right-hand at the bottom, but we will record a corresponding

5   liability.  We've got that customer account of a hundred

6   dollars in green, but we owe the customer a hundred dollars, so

7   we've got a liability building up of a hundred dollars per

8   unit.

9   Q.  And so just focusing here on the bottom section, for this,

10  you see the account—the box that says fiat@ftx.com Bookkeeping

11  Account?

12  A.  Yes.

13  Q.  How is that part of the double-entry bookkeeping accounting

14  system you described?

15  A.  So this is the second entry or the negative entry to

16  balance the positive entry.  We could use the term debits and

17  credits, but they are unnecessarily confusing.

18  Q.  So let's say a customer deposits a hundred dollars into one

19  of these Alameda or North Dimension or FTX bank accounts.  How

20  is that recorded in the FTX database bookkeeping account?

21  A.  It should be recorded as a corresponding liability.  In

22  this case we've got a hundred dollars deposited, and there will

23  be a corresponding amount owing against that deposit, a

24  liability.

25  Q.  And how is it documented within the accounting system in

1   terms of the customer account, so this last box here on the

2   right?

3   A.   It's an increase in the customer account.  So we increase

4   by a hundred dollars a customer account, we increase the

5   negative amount in the liability.

6   Q.   So how does this process work for fiat withdrawals?

7           MR. ROOS:  Let's go to the second page.

8   A.   So for fiat withdrawals, as you would expect, it's just the

9   opposite.  So the transaction between you and——the customer and

10  the bank is at the top.  At the bottom of this diagram is now

11  we've taken a hundred dollars out of the customer account and

12  in turn, in the fiat@ftx bookkeeping account, we no longer have

13  that liability.  We've paid the cash back to the customer.

14  Q.   And so just to be clear about the terms we're using, when

15  Alameda or FTX received a fiat deposit, would that result in a

16  positive or negative entry in that fiat@ftx bookkeeping

17  account?

18  A.   When they received a deposit, it would result in a negative

19  entry in the fiat account.

20          THE COURT:  And again, just for clarification, you

21  have the legend on the lower left side of the chart which reads

22  Exchange Ledger Activity.  "Exchange" refers to what exactly?

23          THE WITNESS:  FTX exchange.

24          THE COURT:  And "ledger" in this context means what?

25          THE WITNESS:  This means the general ledger at FTX.

1          THE COURT:  In other words, a bookkeeping record.

2          THE WITNESS:  Exactly.

3          THE COURT:  And in this case it's an electronic

4    record.

5          THE WITNESS: Yes, it is.

6          THE COURT:  All right.  Let's go.  Go ahead.

7          MR. ROOS:  Thank you.

8    BY MR. ROOS:

9    Q.  And you used the term "fiat liability."  So the balance of

10   this account, I think you said, gets more negative with more

11   deposits.  What about the liability——when you refer to

12   liability, what are you referring to?

13   A.  Well, the——the balance gets less negative——more negative,

14   meaning that the liability increases.

15   Q.  All right.  And so we're on withdrawals.  And let me ask

16   you:  Did the balance of the fiat@ftx account change over time?

17   A.  Yes, it did.

18   Q.  How so?

19   A.  I traced the month-by-month balance in that fiat account at

20   the time and it increased.

21   Q.  So let's take a look.

22         MR. ROOS:  Can we please publish Government

23   Exhibit 1003.

24         THE COURT:  Yes.

25   Q.  Professor Easton, what does Government Exhibit 1003 show?

1  A.  So just to orient us on the——the graph here, the *x* or

2  horizontal axis denotes months, going from the beginning of

3  January 2021 through November 11, 2022.  You'll see the

4  vertical axis, the *y* axis, is importantly billions of dollars.

5  What I plot here is the monthly month-end balance in the fiat

6  liability——in other words, the increase in the liability over

7  time.  And you will see that it increases steadily to a peak of

8  11.3 billion in June of 2022.

9  Q.  And what was the largest point of fiat liability?

10 A.  What was the largest point?

11 Q.  Yes.

12 A.  11.3 billion.

13 Q.  And so how would that be expressed in the fiat@ftx.com

14 account?

15 A.  That would be expressed as a negative amount, a liability.

16        MR. ROOS:  All right.  Let's take a look at Government

17 Exhibit 1004.

18 Q.  And Professor Easton, can you explain what this exhibit

19 shows.

20 A.  Yes.  Well, first of all, we have the liability that we

21 just had on the previous account——previous exhibit; we've

22 repeated it here.  So the liability, the amount that should

23 have been deposited to bank accounts, was 11.3 billion.  The

24 amount that was actually in those accounts is the greenish-blue

25 line.  You can see it's quite low, reaches around about

2 billion, 2.3 billion, at the time of the peak liability.

Q.  And so just so we're sure we understand, the black line,

how, if at all, does that compare to the black line on the last

exhibit?

A.  It's exactly the same line.

Q.  And the green line represents what?

A.  The green line represents the actual bank balance of

customer accounts, the amount of customer money that was really

there, whereas the black line represents the amount that should

have been there.

Q.  And then the white boxes here represent what?

A.  The——the discrepancy, the difference between what was there

and what should have been there at these two different points

in time.  One point in time is the end of June 2022, the other

at the end of October 2022.

Q.  All right.  So let's go back to the diagram we were looking

at previously about fiat deposits, but use these June balance

numbers.

        MR. ROOS:  Could we bring up Government Exhibit 3004.

Q.  What does this show, Professor Easton?

A.  So now we're going back to——you'll see the accounting at

the bottom of this slide.  The accounting requires that every

dollar a customer deposits has a corresponding amount in the

fiat liability.  So the fiat liability should have been 11——is

11.3 billion.  Yet if we look at what was actually in these

1  customer accounts to cover the fiat liability, it was just

2  2.3 billion, the amount at the top of this slide.

3          MR. ROOS:  We can take this down.

4  Q.  So let's talk about what happened with the money.  And

5  first, have you analyzed the movement of money between or among

6  accounts?

7  A.  Yes, I have.

8          MR. ROOS:  Can we publish Government Exhibit 1050.

9  Q.  And let's walk through this exhibit.

10          Professor Easton, can you explain what we're looking

11  at on the screen right now on the first page.

12  A.  Well, to help understand how all of these accounts were

13  commingled——mixed together, in other words——I've separated the

14  accounts out into four blocks:  One, the accounts Alameda and

15  FTX that were accepting customer deposits, I'll analyze those

16  in the green box; to the left-hand side, in blue, Alameda

17  Research bank accounts; and to the right are FTX bank accounts,

18  not accepting customer funds——they're all in the green; and in

19  the bottom right-hand corner you'll see another account, which

20  is uniquely a Sam Bankman-Fried entity.  This is the yellow

21  box.

22  Q.  And what significance, if any, do the colors have on these

23  boxes?

24  A.  The color green represents customer accounts; the color

25  blue will always represent Alameda accounts, Alameda Research

1   accounts; black will always represent FTX bank accounts; and

2   yellow will always represent Paper Bird-SBF.

3   Q.  And just to be clear about the blue, those are Alameda

4   Research accounts that do not receive customer funds.

5   A.  That is correct.

6   Q.  Now let's go to page 2.

7         And what information has been added to the exhibit?

8   A.  So they were in fact 47 accounts that accepted customer

9   funds that I could have put in this box.  Of course it would

10   have been unreadable, so what I've done is I've separated out

11   the 11 biggest.  We can all see of course there's 12, but

12   there's a 12th, which is the customer withdrawals and deposits.

13   Q.  Okay.  Let's look at page 3.

14         And what information has been added to the exhibit

15   now?

16   A.  Similarly, I've identified the main accounts in—the ones

17   with the largest amount of funds in Alameda Research, in FTX on

18   the right-hand side, and SBF on the bottom right-hand corner.

19   Q.  Now you mentioned receiving fiat deposits.  I think earlier

20   in your testimony you also mentioned stablecoins.  To what

21   extent do the accounts in green also receive stablecoin

22   conversions?

23   A.  They do also receive stablecoin conversions.

24   Q.  Now let's go to the next page.

25         And can you explain what additional information has

been added to the exhibit.

A.   So now what all of these arrows indicate is movement among

the accounts that hold customer deposits.  It doesn't describe

all of the movements; it describes the biggest movements.  A

thick line means a lot of movement, a thin line means much less

movement.

        MR. ROOS:  Could we please go to the next page.

Q.  What additional information has now been added to the

exhibit?

A.  It's important to notice that all of these lines on this

exhibit, they still remain green; in other words, this is

move——movement of customer funds.  So this is now movement of

customer funds out of these customer bank accounts to Alameda

on the left-hand side, on your left-hand side of this chart,

and FTX on the right-hand side of this chart.

        MR. ROOS:  Could we please go to the next page,

page 6.

Q.  What additional information has been added now?

A.  Now we see that there's movement in both directions, from

Alameda Research to customer accounts, FTX bank to customer

accounts——in other words, movement in both directions——but also

movement from FTX accounts and customer accounts to Paper Bird,

SBF's entity on the bottom right-hand corner.

        MR. ROOS:  Could we go to page 7.

Q.  I see a purple box has been added to the screen.  What does

1   that represent?

2   A.  Well, there's another important actor in this——this whole

3   sequence, and this is third-party investors who put money into

4   FTX, so their funds also were part of the mix.

5           MR. ROOS:  And let's go to the last page, page 8.

6   Q.  And what information is added now?

7   A.  So this——these purple lines now show the flow of investor

8   funds, and you'll see that there's a flow of investor funds to

9   SBF bank accounts, there's a flow to Paper Bird, the SBF

10  entity, and there's a flow to North Dimension, which is the

11  Alameda bank account accepting customer funds.

12  Q.  Focusing on those purple lines and the flow of them, have

13  you been able to determine which investors' funds were

14  transferred to the North Dimension Alameda accounts?

15  A.  Yes, I have.

16          MR. ROOS:  Could we please bring up Government

17  Exhibit 1023.

18  A.  This is the list of investors.

19  Q.  Okay.  And the list of investors that were——that make up

20  those purple lines on the last slide?

21  A.  Exactly.

22  Q.  Okay.  And what do——just so we understand, do you see where

23  it says Settled Date of Sources of Funds, and then next to it,

24  it says Source of Loaned Funds?  What does Source of Loaned

25  Funds refer to?

1    A.   The source of loaned funds refers to the entity that put

2    the money in, that made the investment in FTX, the date of that

3    investment is on the left-hand side.

4         MR. ROOS:   All right.   We can take this down.

5    Q.   So now let's talk about what happened to the customer funds

6    that moved through these accounts.   And was any of the customer

7    money spent?

8    A.   Oh, yes.

9         MR. ROOS:   Could we publish Government Exhibit 1044.

10   Q.   And focusing on page 1, Professor Easton, can you explain

11   what this shows.

12   A.   Yes.   So this—this just is a schema that points out that

13   customer funds were used in various ways, and four ways that I

14   analyzed were: investment in businesses and financial

15   funds—I'll show some examples; political contributions;

16   charitable foundations; and in the purchase of real estate.

17        MR. ROOS:   So let's go to page 2 of this exhibit.

18   Q.   And focusing on investments in business and financial

19   funds, what are you referring to?

20   A.   Here, it is investments by Alameda entities in businesses

21   and other financial activities.

22   Q.   Now the top of your exhibit here says Uses of Customer

23   Funds.   Have you been able to trace customer funds from

24   customer bank accounts to investments in businesses and

25   financial funds?

1    A.  Yes, I have.

2    Q.  Okay.  Let's look at some examples.

3         MR. ROOS:  Could we please bring up Government

4    Exhibit 1033.

5    Q.  Professor Easton, what does this exhibit show?

6    A.  So this—again, the color coding is helpful, I hope.  So on

7    the left-hand side we have customer funds, which are in turn

8    transferred through a bank that handles customer deposits to

9    the right-hand side, where we have a purchase, in this case

10   it's of Modulo Capital, which was a startup hedge fund in the

11   Bahamas.

12   Q.  And I want to talk to you a little bit, before we go deeper

13   into the actual tracing here, about the process of tracing, now

14   that you've used the term.  What are you referring to?

15   A.  So here, if we go from right to left—it's unusual, but we

16   always go from right to left.  So the investment is in Modulo

17   Capital.  I then can identify a transaction where the transfer

18   occurred from the bank to Modulo Capital.  Going back further

19   to the left, I can see—if you look at the top line on

20   the—June 27th, there was a transfer to Modulo; on the same day

21   there was a transfer of customer funds to Alameda Research,

22   traced in turn to the purchase of Modulo Capital.

23   Q.  So let's focus on the process of tracing.

24        MR. ROOS:  Could we go to page 2.

25   Q.  So just focusing on this first transaction, I want to talk

1    about what went into the tracing.

2              MR. ROOS:  Why don't we go to page 3.

3    Q.  And can you walk us through the process of using the

4    records and data in order to trace out this transaction.

5    A.  Yes.  So a summary of the record is in the spreadsheet, a

6    snapshot out of the spreadsheet that shows the tracing that we

7    actually did.  So if you look at the first line of this——maybe

8    this first line could be highlighted?

9    Q.  Yes.  Next——I think the next page.

10   A.  Okay.  Next page, please?

11             Okay.  So here we see a handshake that connects the

12   bank to Modulo Capital.  Since there's never been a transaction

13   between these two before, this 1 dollar is sent to ensure the

14   integrity of the transaction, which later will be $50 million.

15   So it's the first step.  So it goes from the green, Alameda

16   Research bank, to the orange.  This is the external entity in

17   which there's an investment.

18             If we go to the next, we'll see then there's a

19   transfer of customer funds via an intermediary, Circle Internet

20   Financial, to Alameda.  So now it's in the bank.

21             And then next we see the transfer from the bank to

22   Modulo Capital.

23             All of these transfers are identified in the record,

24   so we can go back and see every one of those transactions.

25             MR. ROOS:  Let's go to the next page.

1   Q.   Beyond the tracing in the bank records, have you utilized

2   any other information?

3   A.   Where possible, we used other information, and this is an

4   example.  This is an example of a Slack message, an internal

5   email, if you like, between Sam Bankman-Fried——from Sam

6   Bankman-Fried, and it says this $50 million which we've just

7   traced is for Modulo Capital LP, *we should send it via the*

8   *Signet account*, which is the Signet account labeled above,

9   9485, and then we see Jen says paid.

10          MR. ROOS:  Now let's go back to the tracing slide.

11  Let's go to page 8.  And I want to focus on the bottom sequence

12  as an example.  And focusing on that bottom sequence.  Let's go

13  to the next page.

14  Q.   Can you walk us through this sequence.

15  A.   Yes.  So now this also involves Modulo Capital, and of

16  course the handshake doesn't have to occur anymore because

17  we've already established connection.  So we'll see——if we go

18  to next, we'll see a transfer of a hundred million dollars

19  on——late on the 25th of September.

20          Then we see——if we go to the next, we'll see a further

21  transfer of what totals $192 million.  So we know that in the

22  immediate vicinity of this transfer, large chunks of money

23  totaling 292 million have been transferred from customer funds

24  to the bank account holding the customer funds and in turn to

25  Modulo Capital for the investment.

1          MR. ROOS:  Okay.  Can we go to the next.

2    Q.  Is that what that shows?

3    A.  I'm sorry.  Yes, it does.

4    Q.  All right.

5          MR. ROOS:  And then let's go back to——let's go one

6    more page in.

7    A.  So this then summarized, we've got a total of $292 million.

8    We don't know exactly what customer this $292 million comes

9    from, but we know it is only customer funds, it's not any other

10   source of funds, and so $292 million of customer funds was used

11   to purchase Modulo Capital.

12         MR. ROOS:  If we could please go to page 14, the next

13   page.

14   Q.  And what additional information has been added?

15   A.  So now again we have internal email messages.  First of

16   all, *we're putting an additional 250 million into Modulo.*

17   *Would you be able to send over the funds to the same Signet*

18   *address.  It would be great if this done tonight, and ideally,*

19   *250 million tonight.*  Indeed, that's in——on September 26th at

20   5 p.m.——5 a.m.  The money was transferred on the 26th, that

21   same day.

22   Q.  All right.

23         MR. ROOS:  Let's go back to the first page of this

24   Exhibit 1033, page 1.

25   Q.  And so now, now that we've gone through the exercise of

tracing, what is your conclusion, expressed on Government

Exhibit 1033?

A.   Okay.  So we——we've looked in detail at the tracing of the

top transfer and the bottom transfer on this page.  We did

similar analysis for the other two.  So overall we can conclude

that all of the purchase of Modulo Capital was made using

customer funds.

         MR. ROOS:  Okay.  We can take this exhibit down.

         Let's put up Government Exhibit 1027A, please.

Q.   And Professor Easton, what does Government Exhibit 1027A

show?

A.   So this is a similar demonstration.  Now a payment to

Genesis Digital Assets, which was a crypto miner.  It's a

little more complicated because we get a flow through many

Alameda accounts accepting customer deposits, and you'll see on

the left-hand side we've got a flow into North Dimension at the

top of this slide, mostly of customer funds, 145 million, but

some other inflows, not identified as customer funds.

         Similarly, at the bottom left-hand corner, you'll see

flows into Alameda Research of 539 million customer funds, and

other inflows during this period of time of 24.9 million.  So

some of the 100 million that eventually went to Genesis Digital

may have come from customer funds, but you can see that the

total of 32.6 million, the other inflows on the top and the

24.9 million, the other inflows at the bottom, does not sum to

1    100.  And therefore, some must have come out of the customer

2    funds.  And given this disproportionate amount of funds that

3    came from customers versus other inflows, it's likely that more

4    than the 50-odd million came from customer funds.

5              MR. ROOS:  Let's put up Government Exhibit 1027B,

6    please.

7    Q.  Professor Easton, what does this exhibit show?

8    A.  So again, if we focus on the right-hand side where we've

9    got the expenditure of customer——of funds, on the left-hand

10   side we have the source of those funds.  Again, it gets a

11   little more complicated because we've got more bank accounts

12   that——through which the money is traced, but ultimately we'll

13   see that there is customer funds totaling 1.1 million plus

14   another .6 million, 1.7 million.  And other inflows, just the

15   sum of 9.4 million and 48 million.  All of this has to fund

16   550.9 million.  So a large amount of this 550 million must have

17   come from customer funds.

18   Q.  And I just noticed on this exhibit, it says 550.9.  Is that

19   dollars or million?

20   A.  That is million.

21   Q.  And how are you able to conclude that it was customer funds

22   and not these other inflows that funded this payment to Genesis

23   Digital?

24   A.  I can conclude that the majority of the payment was

25   customer funds because the total other funds is 9.4 plus

1   48 million, you have 57 million, and the total payment was

2   550 million, so it must have come—large portion must have come

3   from customer funds.

4            MR. ROOS:  We can take this down.

5            Could we please publish Government Exhibit 3005.

6   Q.  And Professor Easton, directing your attention to the top,

7   have you performed any analysis relating to an investment in

8   Skybridge Capital in September 2022?

9   A.  Yes.

10  Q.  Can you explain what types of materials you've reviewed

11  that are on the screen.

12  A.  So in this case there's a subscription agreement from

13  Alameda, signed by Sam Bankman-Fried, an agreement to subscribe

14  to buy, if you like, shares in Skybridge Capital, which is a

15  venture capital fund in New York, run by Scaramucci.  It's the

16  purchase of 30 percent ownership in Skybridge.

17  Q.  And have you done any type of financial analysis or tracing

18  relating to this investment in Skybridge Capital?

19  A.  Yes, I have.

20           MR. ROOS:  Could we please bring up Government

21  Exhibit 1028.

22  Q.  Professor Easton, what does this show?

23  A.  Again, we got similar flows—customers on the top left-hand

24  corner to Skybridge Capital on the bottom right.  But

25  importantly, we have an addition here.  We've now got blue,

1    Alameda Research.  This is separate entity Alameda Research,

2    except that, like the entire flow, you'll see it says

3    45 million on September 7th from Alameda Research, and that

4    amount was in turn used on the next day to invest in Skybridge

5    Capital.

6    Q.  Now what's your conclusion about the source of funds for

7    the Skybridge investment?

8    A.  So at most——again, if we look from the left-hand side where

9    we've got 18 million in other inflows, 438 in customer funds,

10   the 45 million may have been funded by 18 million of other

11   inflows.

12           MR. LISNER:  Objection, your Honor.

13           THE COURT:  Sorry.  What's the objection?

14           MR. LISNER:  Speculation, to the witness's conclusion

15   using the words "may," "may have."

16           MR. ROOS:  I think he's appropriately saying that it

17   could but it's not all of it.

18           THE COURT:  Overruled.

19   BY MR. ROOS:

20   Q.  Go ahead, Professor.

21   A.  So you can see that other inflows are 18 million, so I

22   think I really mean that 18 million may have come——of the

23   45 million may have come from other inflows, but it also could

24   have come from customer funds.  But at least 45 minus 18 must

25   have come from customer funds.

1     MR. ROOS:  We can take that down.

2     Could we please publish Government Exhibit 3006.

3  Q.  Professor Easton, have you done any analysis relating to an

4  investment in Dave Inc. in March 2022?

5  A.  Yes.  So this was a purchase of a 100 million stake in Dave

6  Inc.  This again was a Alameda venture, signed by

7  Bankman-Fried, and I traced this.

8  Q.  Okay.  So let's look at the tracing.

9     MR. ROOS:  Can we please bring up Government

10 Exhibit 1029.

11 Q.  Can you describe what your tracing shows.

12 A.  So again, the pattern is the same as before.  However,

13 notice now that we have this entity called Paper Bird.  Paper

14 Bird is an entirely owned Bankman-Fried entity, and you'll see,

15 if we go from the bank accounts, Alameda Research, the transfer

16 among two of them, Alameda Research 9485 and Alameda Research

17 4061, these are customer depositories.  Out of that customer

18 depository, 105 million was transferred on the——March 22nd to

19 Paper Bird, an entity outside of Alameda and FTX, and then on

20 the next day was used by Paper Bird to purchase the investment

21 in Dave.

22 Q.  Were you able to conclude the source of the funds used for

23 the Dave Inc. investment?

24 A.  Yes.  So if we trace all the way back to customers on the

25 top left-hand corner, we can say——see that we can identify

1    113.8 million of customer funds, but at the same time

2    2.4 million of other inflows that may not have been customer

3    funds.  2.4 million is a small part of 100 million, and

4    therefore the majority of this payment for Paper Bird——by Paper

5    Bird for Dave must have come from customer funds.

6           THE COURT:  Professor, the figure you used in relation

7    to the phrase "customer funds" was 113.8, not 130, yes?

8           THE WITNESS:  That is correct.  I apologize.

9           MR. ROOS:  Thank you.  And Judge, I don't know if——I

10   see you're standing, but if you want to take a break right now,

11   I'm about to move to the next exhibit.

12          THE COURT:  No, I just stand once in a while because I

13   sit so long.

14          We can take our morning break, 15 minutes.

15          THE DEPUTY CLERK:  All rise.

16          (Recess)

17          (In open court; jury present)

18          THE COURT:  Please be seated.

19          The defendant and the jurors are all present, as they

20   have been throughout.

21          You may continue, Mr. Roos.

22          MR. ROOS:  Thank you.

23          Why don't we put up Government Exhibit 3007.

24   BY MR. ROOS:

25   Q.  Professor Easton, have you reviewed an investment in K5

1   Global Holdings?

2   A.  Yes, I have.

3   Q.  And just starting with the materials on the screen, what do

4   these relate to?

5   A.  This is an agreement between SBF——Sam Bankman-Fried——and K5

6   Global, which is a venture capital firm, to obtain a general

7   partnership with K5.

8   Q.  And then I want to focus on the payment confirmation we

9   have on the right side.

10          What's the date on this and what's the wire transfer

11  amount?

12  A.  The date is April 14, 2022, and the wire transfer amount is

13  $300 million.

14  Q.  Okay.  And then just the date on the Summary of Terms?

15  A.  6th of March 2022.

16  Q.  Have you conducted any form of financial analysis relating

17  to the investment in K5 Global Holdings?

18  A.  Yes, I have.

19          MR. ROOS:  Let's put up Government Exhibit 1030,

20  please.

21  Q.  Professor Easton, what does this show?

22  A.  So again, the flow is——is similar to the flows we've had

23  before.  On the bottom right-hand side is the entity K5 in

24  which Sam Bankman-Fried, through Alameda Research Ventures,

25  invested $300 million.  I traced it back through several bank

1  accounts, including Alameda Research 4016 and 9485, back to

2  customer deposits of 765 million from customers and 127 million

3  other.

4  Q.  And what was your conclusion about what funds were used to

5  fund the K5 Global Holdings?

6  A.  So given that there was only 127 million to cover a

7  possible 300 million, some of the investment in K5 Global must

8  have come from customer funds.

9       MR. ROOS:  We can take this down.

10       Could we please publish Government Exhibit 3008.

11  Q.  Now have you looked into an investment in Anthropic PBC?

12  A.  Yes, I have.

13  Q.  And could you describe what materials are on this exhibit.

14  A.  So this is—first of all, in the middle, the big block is

15  what was the investment in.  It was an investment in a

16  fundraising effort by Anthropic, which is an AI company.  The

17  Slack message indicates we have to wire—Sam Bankman-Fried

18  suggests, *we have to wire 500 million to Anthropic.  This*

19  *should come from an Alameda Research Ventures bank account.*

20  Q.  And have you conducted any form of financial analysis

21  relating to the source of funds used to make this investment?

22  A.  Yes, I have.

23       MR. ROOS:  All right.  Why don't we publish Government

24  Exhibit 1041.

25  Q.  Professor Easton, what does this show?

1    A.  So again, similar to the analyses before, we have a

2    transfer of customer funds through a series of Alameda Research

3    customer depository accounts, through to an Alameda Research

4    external account——in other words, this is an account that does

5    not hold customer funds——of 500 million, and in turn, the

6    bottom right-hand corner, a payment for the investment in

7    Anthropic.

8    Q.  And how does the amount of the investment in Anthropic

9    relate to the amount we saw on that Slack message on the last

10   exhibit?

11   A.  It is that amount.

12           MR. ROOS:  We can take this down.

13           Could we please publish Government Exhibit 1032.

14   Q.  Professor Easton, starting on page 1 of this exhibit, can

15   you explain what the exhibit shows.

16   A.  Yes.  So this is a summary of a purchase by Alameda

17   Research of Robinhood shares——here, a brokerage account called

18   ED&F Man.  Importantly, this exhibit shows that customer funds

19   primarily were used to fund a transfer of 292 million out of

20   customer funds——of customer funds out of customer depositories

21   to Alameda Research to an account that already had 196 million

22   worth of Robinhood shares.  In turn, Alameda Research purchased

23   another 292 million of Robinhood shares.

24   Q.  And by "Robinhood shares," what are you referring to?

25   A.  These are shares in a trading firm called Robinhood.

1  Q.  When you say "shares," are they like shares of stock?

2  A.  Yes.

3  Q.  Okay.  Let's look at what happens next.

4         MR. ROOS:  Could we go to page 2 of this exhibit.

5  Q.  And some additional information has been added to the

6  exhibit.  What does it depict?

7  A.  So in the first flow, the flow that we saw before we added

8  this piece, I was trying to summarize essentially what

9  happened.  But in addition, Alameda Research——there was a

10  transfer out of Alameda Research of 491 million to Sam

11  Bankman-Fried and 54.6 million to Gary Wang.  This amount was

12  exactly equal to the amount that was used to purchase Robinhood

13  shares.

14         MR. ROOS:  So let's go to the next page.

15  Q.  And what information is now added to the exhibit?

16  A.  So this 468——400——$546 million——I apologize——is——this

17  $546 million was then transferred to an entity wholly owned by

18  Gary Wang and Sam Bankman-Fried called Emergent Fidelity

19  Technologies.  This is the yellow box, identified yellow

20  because now it's a Bankman-Fried entity.

21         MR. ROOS:  And let's go to the next page.

22  Q.  And what does this new information on the exhibit depict?

23  A.  Recall that the 546.1 million which went to Gary and Sam

24  Bankman-Fried goes to Emergent Technologies but then was

25  transferred back to Alameda Research, so there's a round-trip

1    transaction, if you like, that makes Alameda Research whole.

2    Q.  And what then happened, if anything, in response to this

3    $546.1 million transfer?  And could we go to the next page.

4    A.  So in turn, Robinhood shares were transferred to this

5    brokerage fund in the name of Bankman-Fried and Wang.

6            MR. ROOS:  And let's go to the last page.

7    Q.  So what does this last page now depict?

8    A.  So the end result of all of those transactions, which I've

9    tried to summarize as clearly as possible——I hope it is

10   clear——is that customer funds ultimately went through Alameda

11   Research and did this big round-trip transaction so that they

12   ended up in an account owned by Wang and Bankman-Fried, which

13   then in turn purchased Robinhood shares.

14   Q.  And so just to be clear, we've looked at straight green

15   lines previously.  What do the sort of dashes indicate here?

16   Was this actually the flow of funds?

17   A.  No.  The dashes are there to indicate all of this——these

18   transactions that occurred in the background.

19           MR. ROOS:  Okay.  We can take this exhibit down.

20           Let's put back up Government Exhibit 1044.  And if we

21   go to page 3.

22   Q.  Professor Easton, we've talked about a bunch of instances

23   of payments or investments in businesses.  Have you done any

24   analysis relating to payments for political contributions?

25   A.  Yes, I have.

```
 1              MR. ROOS:  Why don't we bring up Government Exhibit

 2    3009.

 3    Q.  Now, Professor Easton, have you done any analysis relating

 4    to a political donation by Ryan Salame?

 5    A.  Yes, I have.

 6    Q.  I want to first direct your attention to the message on the

 7    left-hand side of the screen.  Do you see where it says:  The

 8    GMI PAC needs some more funding in order to support Senator

 9    Boozman in his primary.  Spoke to Sam yesterday.  Ryan, do you

10    have any appetite for giving more to GMI.

11              You see that message?

12    A.  I do see it.

13    Q.  You see below it, it says 500,000 to 1 million?

14    A.  Yes, I do.

15              MR. LISNER:  Objection, your Honor.  Can we ask for a

16    sidebar, please?

17              THE COURT:  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25
```

```
1              (At sidebar)

2              THE COURT:  Mr. Lisner.

3              MR. LISNER:  I think Mr. Cohen is going to cover this

4    one.

5              MR. COHEN:  Your Honor, we have no objection to the

6    tracing analysis that the witness is putting forward.  But at

7    least from the -- she is getting the exhibit -- from the

8    exhibit there is also commentary about the nature of the

9    political spending, the reasons for it.  We would ask for a

10   limiting instruction with respect to that.

11             THE COURT:  What limiting instruction are you asking

12   for?

13             MR. COHEN:  Along the same lines you gave yesterday

14   about, the defendant has not been charged in this case with

15   political and campaign contribution violations.  This is -- as

16   I understand it, this is a flow-of-funds analysis that we are

17   hearing and not commentary on the validity or invalidity of the

18   contributions themselves.

19             MR. ROOS:  There is a real difference here, which is

20   that yesterday the limiting instruction came after the witness

21   said he conspired with the defendant in committing a violation

22   of the campaign finance laws, and your Honor appropriately gave

23   an instruction right before he said we conspired with.

24             Here, as Ms. Sassoon has argued previously in sidebar

25   and as we briefed, its spending on donations is direct evidence
```

1    of the use of customer funds, so it's direct evidence of the

2    wire fraud, it's direct evidence of the money laundering.

3         The reason I'm calling the witness' attention to these

4    particular messages is, the next thing I am going to ask him is

5    whether he did any tracing of $500,000 to a million dollars to

6    the GMI PAC.

7         MR. COHEN:  Can I just see it?

8         MR. ROOS:  I will note, this exhibit is in evidence,

9    also, this and the underlying exhibit.

10         MR. COHEN:  The first section in yellow is the point

11   we are making.  This is Mr. Wetjen commenting on needs more

12   support in the primary.  I don't think this witness is

13   qualified to talk about the nature of the donations.  I

14   understand he's an accountant --

15         THE COURT:  He's not talking about the nature of the

16   donations.

17         MR. ROOS:  I will definitely not ask whether his views

18   on Boozman or the nature of the donations or anything.  I am

19   just going to ask him, did he trace this money.

20         MR. COHEN:  With that limitation, that's fine.

21         (Continued on next page)

22

23

24

25

1               (In open court)

2               THE COURT:  Let's proceed.  Restate your question.

3               MR. ROOS:  Thank you, your Honor.

4    Q.  Just to pick up where we are, Professor Easton, the first

5    highlighted message about GMI PAC, the second highlighted

6    message about an amount, 500K to a million, and then a blue

7    message that says:  @Samuel Bankman-Fried, I can wrap more

8    funds through my name.

9               Have you done any sort of analysis of the movement of

10   funds relating to a payment for the GMI PAC in an amount of

11   500,000 to $1 million?

12   A.  Yes, I have.

13              MR. ROOS:  Let's bring up an exhibit.  Can we please

14   publish Government Exhibit 1039.

15   Q.  Professor Easton, what does this exhibit show?

16   A.  Again, starting from the right, moving to the left, we see

17   the transfer of the half a million dollars on June 3 from Ryan

18   Salame's personal account to the GMI PAC.  On the day -- a few

19   days before, on the 25th of May, there was a transfer of 5.5

20   million into Ryan Salame's account.  We can trace that 5.5

21   million to either 11 million in customer funds or .2 million in

22   other inflows.

23              The bottom line of all of this is that we have got

24   other inflows of .2 million funding, .5 million contribution to

25   the GMI PAC, and, therefore, at least three-fifths of that

Case 1:22-cr-00673-LAK   Document 370   Filed 12/12/23   Page 71 of 215 1747

1    contribution must have come from customer funds.

2           MR. ROOS:  We can take this down.

3           Can we publish Government Exhibit 3010?

4           THE COURT:  Yes.

5    Q.  Professor Easton, have you done any analysis relating to a

6    political contribution by Nishad Singh?

7    A.  Yes, I have.

8    Q.  Directing your attention to the email excerpts we have up

9    on the screen, do you see, first, the highlighted portion that

10   says:  Your $1 million pledge to our operating expenses.  This

11   is in the top email from Barbara Fried to Sam at Alameda

12   Research and Nishad Singh.

13          Do you see the part where it says:  Your $1 million

14   pledge to our operating expenses?

15   A.  Yes, I do.

16   Q.  It says:  Since this is going to our 527 and hence is

17   disclosed, I'm assuming that Nishad would be the better person

18   to have his name on it.

19          You see then the bottom email of a day later, April

20   22, 2021, from Nishad Singh:  Sounds good.  I am happy to

21   pledge the 1 million for MTG operating, agreed on optics.

22   A.  Yes.

23   Q.  Have you analyzed a political donation of an amount of 1

24   million by Nishad Singh?

25   A.  Yes, I have.

1          MR. ROOS:  Can we please bring up Government Exhibit

2     1031.

3     Q.  Professor Easton, can you explain what this exhibit shows.

4     A.  Similar to the previous exhibit, if we look to the

5     right-hand side, we will see the transfer of the $1 million

6     from Nishad Singh's personal bank account to mind the gap.

7     That $1 million on the same day came from an Alameda Research

8     bank account; in fact, transferred across two or at least two.

9     This is something of a simplification of the transfers among

10    the green Alameda Research accounts.  The same day 1 point

11    million came -- was transferred among Alameda accounts.

12         We then traced that back.  And this is a case where

13    it's very difficult, it was impossible to in fact trace the

14    million directly to some customer funds.  But what we know is,

15    in the immediate vicinity of that transfer of a million, there

16    was 1.5 billion of customer funds that were transferred into

17    Alameda Research, 4456, and roughly half a billion of other

18    inflows.

19         So this is a case where we cannot directly trace the

20    money to customer funds, but it seems likely -- I'm purely

21    looking at the numbers here -- it seems likely, given that we

22    have got roughly two billion of customer funds and half a

23    billion of other inflows, that it may have come from customer

24    funds.

25         MR. ROOS:  We can take that down and put up Government

Exhibit 1044, page 4.

Q.  Professor Easton, have you done any analysis concerning the

use of customer funds for charitable foundations?

A.  Yes, I have.

Q.  I'm sorry?

A.  Yes, I have.

          MR. ROOS:  Can we take this down and publish

Government Exhibit 3011.

Q.  Now, do you recognize this as a Slack message between or

among Delaney Ornelas, Fab, Jen, Lynn, Ryan Salame, and Sam

Bankman-Fried?

A.  Yes, I do.

Q.  Can you just read the highlighted portions of the message.

A.  From Delaney:  Did we request another wire be sent out to

Guarding Against Pandemics from Alameda.  There is the 20

million wire that was sent out from Alameda Silvergate

operating account last week on 10/01.  Yeah.  I got the message

from Ryan Salame and, finally, from Ryan Salame, yes.  It's a

donation.

Q.  Are you familiar with Guarding Against Pandemics?

A.  Yes, I am.

Q.  What is it?

A.  It's a charitable fund essentially guarding against

pandemics.

Q.  Have you done any financial tracing relating to just

 1    payment?

 2    A.  Yes, I have.

 3         MR. ROOS:  Let's bring up Government Exhibit 1035.

 4    Q.  Can you explain what Government Exhibit 1035 shows.

 5    A.  Yes.  Again, moving from the right to the left, the 20

 6    million donation that we have just identified in the Slack

 7    messages went from Alameda Research 6056 on the 1st of October

 8    2021.  On that same day there was a transfer from another

 9    Alameda account to Silvergate, 6056.  The amount going into the

10    Alameda Research 4456 account in the immediate vicinity all

11    came from customer funds.  Therefore, the $20 million wire to

12    Guarding Against Pandemics must have come from customer funds.

13         MR. ROOS:  Now, why don't we put up Government Exhibit

14    1040, please.

15    Q.  What does Government Exhibit 1040 depict?

16    A.  This is a similar flow from customer funds to FTX

17    foundation, which was a charitable foundation set up by FTX.

18    Q.  Can you describe what your analysis shows.

19    A.  The analysis shows that, on the 5th of October, starting

20    from the right to the left, there was five wires totaling $20

21    million from North Dimension to the FTX foundation.  That same

22    day, there was a transfer from an Alameda account to another

23    Alameda account, both depositories of customer funds.  And on

24    the day before, the customer funds going into Alameda Research

25    totaled 25 million, all customer funds, no other deposits.  In

1    other words, the 20 million donation to FTX foundation must

2    have come from customer funds.

3            MR. ROOS:  Let's bring back Government Exhibit 1044

4    and go to page 5.

5    Q.  Focus on the last category now, have you done any analysis

6    relating to use of customer funds to purchase properties?

7    A.  Yes, I have.

8            MR. ROOS:  Please publish Government Exhibit 3012.

9    Q.  Professor Easton, what does this show?

10   A.  This is a list of real estate purchased in the Bahamas.

11   Q.  What exhibit is this information drawn from?

12   A.  This exhibit is drawn from a spreadsheet that is in fact

13   Government Exhibit 3 that indicates all of the purchases.  It's

14   a much more detailed spreadsheet than this summary.

15   Q.  Where are these properties located?

16   A.  In the Bahamas.

17   Q.  Have you done any analysis relating to payments for these

18   properties?

19   A.  Yes, I have.

20           MR. ROOS:  Can we please bring up Government Exhibit

21   1026.

22   Q.  Professor Easton, what does this show?

23   A.  So this shows a purchase of a number of pieces of real

24   estate in the Bahamas, again going to the right-hand side of

25   this chart, for a total of 96.5 million between December 29 and

March 16, 2022.  The payment for those Bahamian properties go

from FTX digital markets.  A fund, black, owned by FTX does not

hold, should not hold customer funds.

      On the 29th of December there is a transfer from

another FTX account to FTX digital markets.  Now, tracing back

to the customers, the customer funds were traced from an FTX

depository trading account 9964 on the 12th of December -- 24th

of December, on that same day, a transfer from another Alameda

account, and, in turn, in the preceding days, all of the funds

were coming from customers into Alameda 9485.  Therefore, the

hundred million -- excuse me -- the 96.5 ultimately paid for

the properties must have come from customer funds.

      MR. ROOS:  Why don't we put up next to Government

Exhibit 1026 Government Exhibit 3012 and go to page 2.

Q.  Focusing on the Bahamas real estate properties in the

orange box, were you able to determine some of the properties

that were paid for using those customer funds?

A.  Yes.  Some, but not all.  There is -- the total on the

right-hand side is less than 96.5.

Q.  Just to be clear, what is depicted on page 2 of Government

Exhibit 3012?

A.  This is a subset of the properties that were purchased with

the $96.5 million.

Q.  And then what was the purchase price of the second

property?

1    A.   $30 million.

2    Q.   That was for the Orchid penthouse?

3    A.   Yes, it is.

4    Q.   Now, did you do any other tracing of payments for

5    properties?

6    A.   Yes, I did.

7          MR. ROOS:   Why don't we take these two down and put up

8    Government Exhibit 1025.

9    Q.   Professor Easton, how, if at all, is this exhibit different

10   from the last one we were looking at?

11   A.   Now you will notice another purple color hits the diagram,

12   and this is now investor funds.   This is investor funds put

13   into FTX, in turn transferred within FTX to FTX digital

14   markets, and then used to purchase Bahamian properties.   In

15   other words, in this case we have got to invest the funds, to

16   which I can trace the purchase of 70.5 million in property in

17   the Bahamas.

18   Q.   Have you been able to determine some of the properties that

19   were paid for by the investor funds?

20   A.   Yes, I have.

21          MR. ROOS:   Why don't we put up next to this Government

22   Exhibit 3012, page 3.

23   Q.   What does page 3 of Government Exhibit 3012 show?

24   A.   It shows some of the properties that were included in the

25   purchase of 79.5 million in real estate in the Bahamas.

```
 1              MR. ROOS:  Just focusing on this last property here,
 2    can we go to page 4.
 3    Q.  What information has been added to the exhibit?
 4    A.  This is in fact the deed of ownership of the property at
 5    Old Fort Bay Real Estate.
 6    Q.  What's the price and who are the owners?
 7    A.  The price was 1.64 million -- 16.4 million, plus value
 8    added tax of 1.64 million.
 9    Q.  Who was it deeded to?
10    A.  The deed is to Alan Joseph Bankman and Barbara Helen Fried.
11              MR. ROOS:  We can take those two down.
12              Let put back up Government Exhibit 1004.
13    Q.  Professor Easton, directing your attention to this period
14    in June of 2022, what was the difference between the amount of
15    fiat and the amount reflected in FTX's database?
16    A.  $9 billion.
17    Q.  Have you analyzed what that $9 billion was spent on?
18    A.  Yes, I have.
19              MR. ROOS:  We can take this down and can we please put
20    up Government Exhibit 1045.
21    Q.  Starting on page 1 of Government Exhibit 1045, can you show
22    what -- can you explain what this represents.
23    A.  This is a whole pie of the amount of money that should be
24    available to cover customer funds, $11.3 billion.
25    Q.  This is as of that June date?
```

1    A.  This is as of June 30, 2022.

2            MR. ROOS:  Let's go to page 2.

3    Q.  What information has been added to the exhibit?

4    A.  This is the slice of the pie that still exists in Alameda

5    bank accounts.  This is the amount that is in fact present to

6    cover the funds, the 11.6 billion.  The whole chart should be

7    green, but it's not.

8            MR. ROOS:  Let's put them side by side, Government

9    Exhibit 1004 and Government Exhibit 1045, page 2.

10   Q.  How, if at all, do the colors on Government Exhibit 1004

11   relate to the colors on Government Exhibit 1045?

12   A.  So the black piece of the pie, so to speak, represents the

13   black line or the total liability for customer funds.  The

14   green slice out of the pie represents the green line.  And this

15   pie is a diagram as at June 30, the time when the peak

16   liability, 11.3, exists and the associated customer deposits,

17   2.3.

18   Q.  Have you been able to fill in the rest of the pie?

19   A.  Much of it, yes.

20           MR. ROOS:  Let's go back to just looking at Government

21   Exhibit 1045 and go to page 3.

22   Q.  Professor Easton, what does this show?

23   A.  So this shows the pieces of this pie that had been used for

24   various purposes.  I will point out just some of them.  But

25   some of these things are familiar.

```
 1            Genesis, we traced 50 and 650 million largely back to
 2   customers.  Similarly, the investment in K5 we have talked
 3   about.  Similarly, the investment in Anthropic, the investment
 4   in Dave, the investment in Modulo.  The Modulo analysis was for
 5   a related time period, so there's only 50 of the 450 taken out
 6   of this pie.  Other ventures we haven't traced I did trace,
 7   another 1.4 billion.  Paper Bird we have seen, 430 million.
 8   Then we have another big chunk, brokerage and outflows, almost
 9   a billion, 970.7 million.  We have real estate, some of which
10   we have analyzed.  We have other expenses, 305 million.  And we
11   have got the two charitable donations that I've indicated.
12   Q.  Just a few follow-up questions on this.
13            The outflows to insiders, what's that a reference to?
14   A.  The outflows to insiders are the payments to, how can I
15   say, the inner circle of FTX and Alameda.
16   Q.  Now, the expenses category, it's not something we have
17   traced in the past slides you've gone through.  Give us an
18   example what type of thing falls into that category.
19   A.  This is going to be payment for equipment, rent on
20   property, payment of salaries, those kinds of things.
21   Q.  And then you have this large other category.  Just give us
22   an example or two of things that would fall within the other
23   category.
24   A.  I really haven't analyzed that.  There was a limit to the
25   resources we have to analyze this material, but a lot of this
```

```
 1        was in fact investing -- investment in crypto.

 2               MR. ROOS:  We can take this down.

 3               Let's change topics.

 4   Q.   At the beginning of your testimony this morning you had a

 5   few conclusions relating to fiat deposits and then I think two

 6   relating to cryptocurrency.

 7               Do you remember that?

 8   A.   Yes, I do.

 9               MR. ROOS:  Let's turn to the cryptocurrency

10   conclusions.  Let's put up Government Exhibit 3013.

11   Q.   Professor Easton, I just want to start first by talking

12   about the process.

13               Can you explain what Government Exhibit 3013 shows.

14   A.   So you know how this describes a deposit in fact occurs in

15   practice, a crypto deposit occurs.  So I may have -- it would

16   be great if I did, but I may have a 100 Bitcoins in my own

17   personal wallet, and I might put those -- would put those in

18   FTX.  I might choose to put it in FTX.  It would go into an FTX

19   crypto wallet with my name on it, but then it is transferred to

20   a sweep wallet within FTX that includes my deposit and everyone

21   else's.

22   Q.   I'm sorry.  You said sweep wallet?

23   A.   Sweep, yes.

24   Q.   Just to be clear, is a sweep wallet one of these online

25   wallets?
```

1   A.  Yes, it is.

2   Q.  How about the process for withdrawals.

3       MR. ROOS:  Can we go to page 2.

4   Q.  Can you explain this.

5   A.  Then the withdrawal bypasses the individual account.  It

6   has already been mingled into this sweep wallet.  I would

7   withdraw my 100 Bitcoins back out.  It gets transferred from

8   the sweep wallet back to my personal wallet.

9   Q.  Earlier in your testimony you described analysis comparing

10  the balances within FTX's ledger or database to the amount of

11  fiat deposits in bank accounts.  Have you done a similar

12  exercise comparing the database to what was in these crypto

13  wallets?

14  A.  Yes, I have.

15      MR. ROOS:  Why don't we bring up Government Exhibit

16  1051.

17      MR. LISNER:  Hold on.  Objection, your Honor.  This

18  relates to the exhibit that we talked about yesterday.  I

19  believe your Honor reserved at the time.

20      THE COURT:  Overruled.

21  Q.  Professor Easton, why don't you orient us.  What are we

22  looking at here?

23  A.  So this is similar to the chart that I put up for fiat

24  currency, but now we are looking at crypto.  We have got much

25  finer data which we can get off the Blockchain.  So you will

1   see the black line.  The black line represents the customer

2   deposits of crypto on the FTX exchange.  So this is the amount

3   of crypto that should have been held in FTX.com in order to

4   cover yours and my deposits.

5        The orange line or yellow line, however it is

6   appearing, represents the actual balances that were in the FTX

7   crypto wallets.  In short, you can see that there is a huge

8   deficiency.  There is a big difference.  There is much less

9   money in the crypto wallets than there should have been.

10  Q.  Just to be clear, what is the yellow -- what sort of

11  balances does the yellow line represent?

12  A.  This is the balance of -- in fact, this whole diagram

13  reflects just -- the nine biggest cryptocurrencies are the ones

14  that we investigated.  It shows the amount of those nine

15  currencies that were in fact held on the Blockchain.

16  Q.  If you included more currencies, like every currency, would

17  that change the size of the difference over time?

18  A.  It could.  It can only increase the difference.  Inasmuch

19  as if there is another cryptocurrency, which we didn't analyze,

20  the best-case scenario would be that the black line and the

21  orange line coincide.

22  Q.  Just to then focus on an example of the difference, you

23  have got a marker here for October 31, 2022.  What was the

24  difference between the amount listed on FTX.com's customer

25  balances and what was actually in the crypto wallets?

1   A.   The difference was $11.3 billion.

2   Q.   What was the difference, as opposed to the top?

3   A.   I'm sorry.  The amount that should have been in the wallets

4   was 11.4 billion.  The amount that was in the wallets was 1.1.,

5   so there is a difference of 10.3 billion.

6   Q.   Let me ask you, have you analyzed accounts within the FTX

7   database -- sorry.  Withdrawn.

8         Let me start by just asking you about the difference

9   and what caused it.  OK?

10  A.   OK.

11  Q.   Have you done any analysis relating to accounts with a

12  feature called allow negative?

13  A.   Yes, I have.

14        MR. ROOS:  Why don't we take down this exhibit and why

15  don't we look at Government Exhibit 3014.

16  Q.   Professor Easton, can you explain what Government Exhibit

17  3014 shows.

18  A.   Yes.  First of all, this comes out of the big FTX database.

19  And what it represents, going from left to right, the blocks

20  that I have highlighted, ID number is an Alameda account, which

21  was a much-used Alameda account.  You can see that it's indeed

22  identified as an Alameda account under user name

23  info@AlamedaResearch.com.

24        If we go to the next -- fifth column, you will see

25  borrowed.  This says that there was a borrowing limit on this

 1    account of a bit more than $65 billion.  The check in the next

 2    chart says that account 9 is permitted to withdraw, become

 3    negative.

 4    Q.  Have you done any analysis relating to the number of

 5    accounts that had this allow-negative box checked?

 6    A.  Yes, I have.

 7         MR. ROOS:  Can we please bring up Government Exhibit

 8    1001.

 9    Q.  Professor Eaton, what does Government Exhibit 1001 depict?

10    A.  This shows the accounts that were permitted to go into the

11    red, so to speak, go to negative.  You will see account 9, the

12    account that I have just referred to, and a whole bunch of

13    other Alameda Research accounts.  You will also note that no

14    other customer accounts outside of Alameda were permitted to go

15    negative.

16    Q.  Now, have you reviewed the balances of these allow negative

17    accounts over time?

18    A.  Yes, I have.

19    Q.  The Alameda ones?

20    A.  Yes, I have.

21    Q.  And before I ask you about those balances over time, I just

22    want to ask you a few questions about how you got the balance

23    data.  OK.

24         MR. ROOS:  Why don't we publish Government Exhibit

25    3015.

 1    Q.   Professor Easton, what does this exhibit show?

 2    A.   This is, again, from the FTX database.   In this particular

 3    case you will see, on the 2nd of November 2022, going from left

 4    to right, account ID 9 and a balance which is not particularly

 5    readable.   But if we go to the right-hand side, where we will

 6    see a lot of detailed data, you will see that it might be

 7    useful -- can we expand the green section.

 8              MR. ROOS:   Can we zoom in on the four red boxes in the

 9    green section.

10    A.   You will see dollars, U.S. dollars, are coded 1.   You will

11    see that there is a negative balance of 67 million, almost 68

12    million U.S. dollars in this account.   It is allowed to go

13    negative and it has gone negative to the tune of 67 million.

14    Q.   Let me just add some little commas there and ask you what

15    the number is again.

16    A.   Have I missed a comma?   I'm sorry.   676 million, not 67

17    million.

18    Q.   What do the three others show?

19    A.   Then the code for Bitcoin is 43, so there is 69,111

20    Bitcoins borrowed by Alameda.   This is a negative to the tune

21    of 65,000 Bitcoins.   Tether, the stablecoin, is coded 44, and

22    again, you see a large negative number, 157 million.   Finally,

23    45 is Ether, and you will see 605,000 Ethers negative.

24    Q.   Have you used data like this to determine balances over

25    time?

1    A.  Yes, I have.

2    Q.  When you did that analysis, which currencies did you focus

3    on?

4    A.  I focused on these four:  Dollars, Bitcoin, Tether, and

5    Ether.

6    Q.  Why did you focus on those currencies?

7    A.  Because they are the most used.

8    Q.  Were you able to ascertain Alameda's balances in those

9    currencies over time?

10   A.  Yes, I was.

11         MR. ROOS:  Would you please publish Government Exhibit

12   1002.

13   Q.  Professor Easton, what does Government Exhibit 1002 show?

14   A.  Again, let me just orient the graph.  So the X axis is the

15   same going from January '21 through November 11, 2022.  The

16   vertical axis is still in billions of dollars, but notice it's

17   going more negative as we go -- less negative as we go up the

18   chart.  So the X axis is in fact at the top of the chart,

19   indicating that at all times over this period the balance in

20   these allow negative accounts was indeed negative going up to

21   around about 12 billion at the end of the period.

22   Q.  When you say going up, you mean going up to a negative

23   number?

24   A.  Exactly.  Increasing to a more negative number of 12

25   billion.

1    Q.  Have you analyzed the spending out of these allow negative

2    accounts?

3    A.  Yes, I have.

4           MR. ROOS:  You can take this down, and can we please

5    publish Government Exhibit 3016.

6    Q.  Professor Easton, at the top of the screen it says:

7    Buyback of FTX stock from Binance.

8           Have you analyzed a transaction relating to a buyback

9    of FTX's stock from Binance?

10   A.  Yes, I have.

11   Q.  Can you describe the materials on the screen that you have

12   reviewed.

13   A.  The material on the left-hand side shows that share

14   transfer agreement of the repurchase of Binance stock back to

15   FTX.  On the right-hand side you will see the purchase amount

16   and you will see -- again, I have to get the commas right.  So

17   we have 1 billion BNB, we have 500 million BUSD, which is the

18   Bitcoin stablecoin, and in fact you will see also some FTT

19   indicated on the bottom of the left-hand side.

20   Q.  Who is the email from?

21   A.  The email is from Samuel Bankman-Fried.

22   Q.  Have you analyzed the source of funds used to buy back

23   FTX's stock from Binance?

24   A.  Yes, I have.

25          MR. ROOS:  Can we please bring up Government Exhibit

1  1024.

2  Q.  Professor Easton, can you describe what Exhibit 1024 shows.

3  A.  Yes.  This shows that of the 2.2 billion that are buyout --

4  buyback of Binance stock, 1.2 billion, or a little more than

5  half of that 2.2 billion, came from customer funds on the FTX

6  exchange.

7  Q.  Professor Easton, we looked at some of these tracing slides

8  previously for bank accounts, and they had green colors on

9  them.

10         How if at all, are these slides different?

11 A.  The big difference is, now we are tracing cryptocurrency,

12 not fiat.

13         THE COURT:  Excuse me.  So the customer funds

14 indicated on this chart reflect customer deposits not of fiat

15 but of Bitcoin and other cryptocurrencies, is that correct?

16         THE WITNESS:  Yes, that's correct.

17         THE COURT:  Thank you.

18         MR. ROOS:  Thank you, your Honor.

19 Q.  Professor Easton, I want to draw your attention to some

20 information on this chart.

21         MR. ROOS:  Can we go to page 2.

22 Q.  Now, the red box that's appeared, focusing on the source of

23 the customer funds, what was that?

24 A.  The account was account number 9, the account we have seen

25 a few times already.

1   Q.  That was the account with the allow negative?

2   A.  That's right.

3   Q.  And what was the balance in that account on the day of the

4   Binance buyout?

5   A.  On the day of the first part of that buyout, it was

6   negative 1.8 billion, meaning that a payment out of that

7   account must have made it more negative.

8          THE WITNESS:  Your Honor, I felt as if I should

9   elaborate on my answer.

10          THE COURT:  Go ahead.

11          THE WITNESS:  So the tracing is for every type of

12   cryptocurrency that was used to pay, so the tracing is at each

13   individual crypto level.

14          THE COURT:  Thank you.

15   Q.  Professor Easton, you're referring to Judge Kaplan's

16   question about -- focusing on Bitcoin, you're elaborating that

17   it's for all the cryptocurrencies.

18   A.  Yes.  Individually considered.

19   Q.  In addition to the spending on the Binance buyout, have you

20   analyzed any other spending using cryptocurrency?

21   A.  Yes, I have.

22   Q.  Just give us a category.  What type of spending?

23   A.  Spending to pay off third-party lenders.

24   Q.  So to repay loans?

25   A.  To repay loans, yes.

```
 1   Q.  Before we talk about that, let's talk about -- sorry.

 2   Whose lenders?

 3   A.  Lenders to FTX.

 4   Q.  To FTX?

 5   A.  To Alameda.  I beg your pardon.

 6   Q.  So let's talk about just the borrowing and lending before

 7   we talk about the use of funds.

 8           MR. ROOS:  Can we please publish Government Exhibit

 9   1013.

10   Q.  Focusing on the first page of 1013, what does this exhibit

11   show?

12   A.  So Alameda also borrowed funds from other -- from

13   third-party lenders outside of the firm.

14   Q.  Like the Genesis you showed us in the beginning?

15   A.  For example.

16   Q.  What does this diagram or chart show?

17   A.  This is, again, a daily chart.  The Y axis is, again,

18   billions.  You can see the amount borrowed increased over time

19   through the end of November 2021 to a max of 15.4 billion and

20   then declined over time.

21           MR. ROOS:  Let's go to page 2 to add a marker.

22   Q.  Do you see that this marker that was added on May 12, 2022,

23   it says Terra Luna (Luna collapse)?

24   A.  Yes.

25   Q.  What happened to cryptocurrency prices after that Terra
```

1    Luna collapse on May 12?

2    A.   Terra Luna -- the Terra Luna collapse introduced a lot of

3    uncertainty to the market and crypto prices collapsed.

4    Q.   Have you analyzed what happened with loans after this

5    period?

6    A.   Yes, I have.

7            MR. ROOS:   Let's go to the next page.

8    Q.   What additional information has been added to the exhibit?

9    A.   This is simply saying that, in the month of May 2022, there

10   were a total of three payments of $1.3 billion to third-party

11   lenders.

12   Q.   So Alameda repaid $1.3 billion in May.  What about in June?

13           MR. ROOS:   Can we go to the next page.

14   A.   So in June, a further 2.9 billion.

15   Q.   What about July.

16           MR. ROOS:   Can we go to the next page.

17   A.   July, almost three-quarters of a billion repayments.

18   Q.   During this period, have you been able to determine whether

19   any new loans were made to Alameda?

20   A.   Yes, I have.

21           MR. ROOS:   Why don't we go to the next page.

22   A.   New loans were 1.7 billion during this period.

23   Q.   And over what period were those new loans extended?

24   A.   From the beginning of May through the end of FTX, 1111.

25   Q.   We have added one more marker here at the end, and what

```
 1    does that refer to?

 2    A.  So this just points out that at the end of FTX, or at least

 3    on 1111, the loans still unrepaid were $1.3 billion.

 4          MR. ROOS:  Just to zoom in on this, can we look at

 5    Government Exhibit 1014.

 6    Q.  Professor Easton, what does this show?

 7    A.  This is the zoom in, so it shows the repayments in May, it

 8    shows the repayments in June, the repayments in July, and --

 9    excuse me -- in July, and, finally, an amount outstanding of

10    1.3 billion.  And during this time period we had new loans of

11    1.7 billion.

12    Q.  Focusing on this period that we zoomed in on that's in

13    gray, does the red line continue to show the total amount of

14    loans during those periods?

15    A.  Yes, it does.

16    Q.  Now, have you analyzed the source of funds used to repay

17    these third-party lenders at Alameda?

18    A.  Yes, I have.

19          MR. ROOS:  Let's bring up Government Exhibit 1017A.

20    Q.  Professor Easton, what does Government Exhibit 1017A show?

21    A.  This shows that of the repayment to the crypto lender

22    Genesis of 3.5 billion, 1.7 of that came out of customer crypto

23    funds on the FTX exchange.

24    Q.  Which account was used to make that payment?

25    A.  Again, it was account 9, which had a negative balance of
```

1    7.2 billion at the time that the first payment was made.

2            MR. ROOS:  Can we please put up Government Exhibit

3    1017B.

4    Q.  Professor Easton, what does Government Exhibit 1017B show?

5    A.  This is a similar exhibit.  It shows a payment to BlockFi,

6    the third-party lender.  The entire one point million payment

7    came out of customer funds.

8    Q.  Just focusing again on the account and the balance, what

9    was that?

10   A.  It came out of account number 9, which had a negative

11   balance at the time that the billion was paid.  In other words,

12   the negative balance went to 2 billion from 1 billion negative.

13   Q.  Professor Easton, have you done a similar type of tracing

14   and analysis for other lenders?

15   A.  Yes, I have, many of them.

16   Q.  Many of them.  OK.

17           To keep us moving, what I am going to do is, we will

18   just put up the exhibit, we will ask you to name the lender and

19   then describe what the source of funds were rather than walk

20   you through the whole thing.  OK?

21   A.  OK.

22           MR. ROOS:  Do why don't we put up Government Exhibit

23   1017C.

24   A.  This describes the lender Voyager.  You can see that the

25   majority of the funds to pay Voyager came from customers.

 1              MR. ROOS:  Can we put up 1016D.

 2   A.  Similarly to Celsius, roughly four-fifths of the payment

 3   came from customer funds.

 4              MR. ROOS:  How about 1017E.

 5   A.  This is repayment to Abra all from customer funds.

 6              MR. ROOS:  1017F, please.

 7   A.  To Maple, all from customer funds.

 8              MR. ROOS:  We will add another to this slide, 1017H.

 9   A.  To Anchorage, all from customer funds.

10              MR. ROOS:  Can we please add 1017J.

11   A.  To Nexo, all from customer funds.

12              MR. ROOS:  Can we please put up 1017G.

13   A.  Payment to TrueFi was roughly two-thirds from customer

14   funds.

15              MR. ROOS:  Can we please publish 1017I.

16   A.  Payment to Ledn.  Roughly, again, two-thirds from customer

17   funds.

18              MR. ROOS:  Finally, 1017K.

19   A.  Payment to BitGo, only about a fifth from customer funds,

20   but still some customer funds.

21   Q.  For each of these repayments, which Alameda account did the

22   funds come out of?

23   A.  Every one of them came out of account 9.

24   Q.  When those repayments began, was the account positive or

25   negative?

1   A.  It was negative.

2        MR. ROOS:  Let's put up Government Exhibit 1018.

3   Q.  Professor Easton, what does Government Exhibit 1018 show?

4   A.  So this pie chart again is -- demonstrates the entire

5   analyses of all of the repayments to third-party lenders.  And

6   to summarize 68 percent of the payments to third-party lenders,

7   repayments to third-party lenders came from customer funds.

8   Only 32 percent came from other funds.

9   Q.  What was the amount of customer funds that made up that 68

10  percent?

11  A.  $4.5 billion.

12        MR. ROOS:  Let's put back up Government Exhibit 1002,

13  please, which was Alameda's negative accounts.  Can we zoom in

14  on this period of May 2022 to the end of the calendar.

15  Q.  Professor Easton, can you describe what happened to

16  Alameda's balances in its allow-negative accounts over the

17  period it was repaying those letters?

18  A.  It started at roughly 6-- 6 billion negative, increased a

19  little bit, in other words, became slightly less negative, but

20  then you can see continued to become quite negative, to the

21  tune of eventually something like 12 billion negative.

22        MR. ROOS:  If we can zoom out.

23  Q.  Professor Easton, you've been focusing on these accounts

24  with this allow-negative feature enabled.  Have you also done

25  analysis of all of the Alameda accounts?

1    A.  Yes, I have.

2          MR. ROOS:  Let's put up first Government Exhibit 1005.

3    Q.  What does this show?

4    A.  This is all accounts now, not just those that were allow

5    negative that did go negative.  There were some that did not

6    have allow negative and, obviously, therefore, they didn't go

7    negative.  So you will see that this chart, which is almost

8    always in the red, so to speak, that's very negative.  It's

9    slightly less negative than the previous chart.

10   Q.  Just to call out a few points in time in 2022, first, what

11   was the balance on May 12, 2022 across all the accounts?

12   A.  A negative $12.6 billion.

13   Q.  What about on June 14, 2022?

14   A.  Still very negative, $10.9 billion.

15   Q.  What about on November 1, 2022?

16   A.  Negative $9.2 billion.

17   Q.  Just to be clear, this includes all of Alameda's accounts

18   on FTX?

19   A.  This is all of Alameda bank accounts, yes, on FTX.

20   Q.  And all currencies?

21   A.  Yes.

22   Q.  Let me ask you, have you analyzed whether Alameda's

23   negative balance here can be explained through borrowing in the

24   spot-margin program?

25   A.  Yes, I can.

 1              MR. ROOS:  Let's put up Government Exhibit, for

 2   starters, 1011.

 3   Q.  Professor Easton, can you explain what this chart shows.

 4   A.  First of all, the red line is the same red line as we were

 5   seeing before, so this is a negative balance.  I chose to put

 6   it as a positive chart because we are going to compare it -- I

 7   am going to compare it to the actual borrowing.

 8              So the Alameda balance reached the peak that we have

 9   seen before of 12.6 billion.  The actual Alameda borrowing on

10   this spot-margin program was far less than the amount needed to

11   cover this negative balance.  So you can see from the bluish

12   line, bluish green line, that the amount was way, way less than

13   the amount that would have had to be borrowed to cover this

14   negative balance.  For example, on May 12, the deficiency or

15   the deficit, the negative amount, the difference between what

16   we would have needed and what we did have is 10.8 billion.

17   Q.  What's your conclusion as to whether Alameda's negative

18   balance can be explained by its own borrowing in the

19   spot-margin program?

20   A.  It cannot be explained.

21   Q.  Let's say Alameda borrowed every dollar in every crypto

22   available in the spot-margin program.

23              Could that explain its negative balance?

24   A.  No, it could not.

25              MR. ROOS:  Let's look at another exhibit, Government

Exhibit 1010.

Q.  Professor Easton, can you explain what Government Exhibit
1010 shows.

A.  The difference between this chart and the one we have just
seen is that the bluish green line shows the total borrowing on
the spot margin.  Clearly, it's not enough to cover the Alameda
negative amount.

Q.  What's your conclusion as to whether Alameda's negative
balance on FTX can be explained by all the borrowing through
the spot margin?

A.  It cannot be.

Q.  What's your conclusion as to the source of the money that
was used when Alameda incurred a negative balance?

A.  It must have been customer funds.

        MR. ROOS:  No further questions.

        THE COURT:  Thank you.  Why don't we take our lunch
break a little early and come back at 1:45.

        (Luncheon recess)

```
 1                      AFTERNOON SESSION

 2                          1:49 p.m.

 3           (In open court; jury not present)

 4           MS. SASSOON:  Your Honor?

 5           THE COURT:  Yes.

 6           MS. SASSOON:  Two very quick things.  For a later

 7   witness this afternoon, the defense has a few objections to

 8   exhibits that perhaps we could take up at the beginning or end

 9   of the afternoon break.

10           THE COURT:  Okay.

11           MS. SASSOON:  And second, in an absent-minded moment,

12   I walked into the wrong room, which was the jurors' room.  I

13   walked right out but not before they all laughed at me.  And I

14   told the defense, but I also wanted to put it on the record.

15           THE COURT:  Mr. Cohen, do you want me to do anything

16   else about this?

17           MR. COHEN:  No.  We just asked that it be put on the

18   record, your Honor.

19           THE COURT:  Okay.  That's fine.

20           And before we call the jury, I just want to put on the

21   record, with respect to the objection to Exhibit 1051 this

22   morning, it was overruled because I regard the disclosure as

23   having been adequate and in any case find no substantial

24   prejudice to the defense.

25           All right.  Let's get the jury.
```

 1              (Jury present)

 2              THE COURT:  Be seated, please.

 3              The record will reflect that the defendant and the

 4    jurors all are present.

 5              Professor Easton, you're still under oath.

 6              You may cross-examine, Mr. Lisner.

 7    CROSS EXAMINATION

 8    BY MR. LISNER:

 9    Q.  Good afternoon, Professor Easton.

10    A.  Good afternoon.

11    Q.  I want to go through some of the things you testified

12    earlier this morning about.

13              Do you recall testifying about a number of

14    acquisitions from your analysis FTX or Alameda relied on

15    customer funds to pay for?

16    A.  I do.

17    Q.  And your analysis was based on reviewing the accounts from

18    which the entity receiving the funds received them, correct?

19    A.  That is correct.

20    Q.  And that in turn brought you to an Alameda account, and I

21    believe your opinion was that customer money was going into the

22    account, and then you followed that through to the investment,

23    which would cause you to conclude customer funds were used.

24    A.  Several Alameda accounts, yes.

25              MR. LISNER:  Can we bring up GX 1033, Brian.  This is

Case 1:22-cr-00673-LAK   Document 370   Filed 12/12/23   Page 102 of 215   1778

1    in evidence.  It's one of Professor Easton's demonstratives.

2    Q.  And this is the Modulo demonstrative, correct?

3    A.  Yes, it is.

4    Q.  And here what you're indicating, if I have this right, all

5    the green boxes down the middle indicate that——or on the left,

6    sorry, those green boxes indicate that 100 percent of the funds

7    came from customer assets, true?

8    A.  True.

9         MR. LISNER:  Can we jump to the second to last page,

10   Brian.

11   Q.  Okay.  And here, I'm looking at the green I guess in the

12   one, two, three——in the fifth column.  These are the customers

13   Circle Internet Financial and TrueCoin, right?

14   A.  No, they're not the customers.  What they are is an

15   intermediary that transfers customer stablecoins into dollars.

16   Q.  I believe you testified earlier that all the funds came

17   from customer assets.  Where on this——in this analysis are the

18   customers?

19   A.  The customers' funds are transferred——and I traced this——to

20   Circle Internet, and there at Circle Internet were changed from

21   a stablecoin to dollars, but it was customer funds that are in

22   the background of this transaction, and I traced them back to

23   the original bank statements.

24   Q.  And how did you trace those, sir?

25   A.  Through the FTX database and bank statements.

 1            MR. LISNER:  If we could jump to GX 1030, Brian.

 2   That's the flow chart with respect to K5.

 3            Now how do I delete the——there we go.

 4   Q.  Okay.  And here you're showing that customer funds flowing

 5   in were at 765 million and other inflows approximately

 6   127 million, correct?

 7   A.  Correct.

 8   Q.  And what I want to do is go to your spreadsheet backup on

 9   this to trace that through.

10   A.  Okay.

11            MR. LISNER:  Brian, are you able to bring up——this is

12   a spreadsheet for GX 1030.  It's No. 3574.

13            MR. ROOS:  Objection.  So the document he's pulling up

14   is not in evidence, and I'm not sure there is——what the

15   question is that precedes going to the 35——looking to a

16   document not in evidence.

17            THE COURT:  Well, it can be shown to the witness——

18            MR. LISNER:  Just for the witness.

19            THE COURT:  ——and we'll see where it goes from there.

20   But I don't know whose Exhibit 3574 it's supposed to be.

21            MR. LISNER:  Yes.  Can you pull up only for the

22   witness, Brian, spreadsheet 3574-431.

23            THE COURT:  Is that defendant's exhibit or government

24   exhibit?

25            MR. LISNER:  It's neither.  It's 3500 material.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1            THE COURT:  All of which are GX exhibits, right?  Or

 2   am I missing something?

 3            MR. LISNER:  We can identify it as GX.

 4            THE COURT:  No, I need to know what it is.  That's not

 5   a hard question, is it?

 6            MR. ROOS:  It's 3500 material produced by the

 7   government.  It's neither marked as a defense nor as a

 8   government exhibit.

 9            THE COURT:  All right.  So let's mark it as a defense

10   exhibit now.

11            MR. LISNER:  We'll mark it as DX 3574-431.

12            THE COURT:  Okay.

13            MR. LISNER:  All right.  Can you bring that up just

14   for the witness and myself.

15   BY MR. LISNER:

16   Q.  Now this is the backup for your chart at GX 1030, the

17   investment in K5?

18   A.  Yes.

19   Q.  Got it.  And same issue here.  In green, there are a number

20   of sources of customer——of claimed customers in green that are

21   stablecoin issuers, true?

22            MR. ROOS:  Objection.

23            THE COURT:  Sustained as to form.

24            MR. LISNER:  Okay.  We can move on.

25            You can take that off the screen, Brian.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1              Okay.  Let's move to GX 1018.

 2   Q.  I want to ask you some questions about your analysis of

 3   repayments by Alameda made to Genesis——well, made to

 4   third-party lenders.

 5              Does this chart reflect your conclusions about the

 6   amount of customer funds versus other assets that were repaid

 7   to third-party lenders in the period May through November?

 8   A.  Yes, it does.

 9   Q.  Okay.  And one of those lenders was Genesis?

10   A.  Yes.

11              MR. LISNER:  Okay.  Can we pull up just quickly,

12   Brian, GX 1017A.

13   Q.  Okay.  And that's your analysis from this morning about

14   repayments to Genesis?

15   A.  It's the summary, yes.

16   Q.  Okay.  And these payments, do they reflect only principal

17   repayments or do these payments include any collateral

18   repayments as well?

19   A.  They reflect crypto-by-crypto payments for loans from

20   Genesis.

21   Q.  Okay.  So there wouldn't be any collateral postings based

22   on this payment.

23   A.  I don't understand the question.  Sorry.

24   Q.  The 3.5 billion that was paid to Genesis, is your testimony

25   that this entire amount was made of principal repayment?

1    A.  I'm not certain of that.

2    Q.  You're not certain of that?

3    A.  It is payment of an amount owing to the third party,

4    Genesis.  Whether it's payment of owed interest as well as

5    principal, I'm not sure as I sit here now.

6    Q.  Okay.  Well, let's see if we can show you some things to

7    refresh your recollection.  Is that fair?

8    A.  Yeah.

9          MR. LISNER:  Brian, for the witness only, could we

10   please bring up——this is in the backup to GX 1017 and 18.

11   There's a spreadsheet labeled 3574-424D.

12         THE COURT:  Which will be marked Defendant's

13   Exhibit 3574-424D.

14         MR. LISNER:  Yes.  Thank you, your Honor.

15         And can you go to the bottom, the tab for returned

16   loans.  And you see column E, there's a return date?  If you

17   could sort by return date.  Just sort the oldest to newest, and

18   then let's jump to May 11th.

19   BY MR. LISNER:

20   Q.  Okay.  What I want to do is point out three transactions

21   here.  And for May 11th, there is a 90,000 Ethereum payment

22   made on May 11th.  Do you see that?

23         MR. ROOS:  Objection.

24         THE COURT:  What is the objection?

25         MR. ROOS:  I believe up here it says he was trying to

1    refresh his recollection, so the form of the question.

2            THE COURT:  Certainly.  Sustained.

3    Q.  Do you recall, Professor Easton, specific payments made by

4    Alameda to Genesis on or about May 11th, 12th, and 13th?

5    A.  I recall seeing this document at some point, and yes, I can

6    see those two payments.

7    Q.  Okay.  And does it refresh your recollection whether a

8    90,000 Ethereum payment was made on May 11th?

9    A.  That's what it says here, yes.

10   Q.  155,000——

11           MR. ROOS:  Objection to form.

12           THE COURT:  Yes.  The answer is stricken.  The

13   question is:  Does it refresh your recollection?  The answer is

14   not, I'm reading this document back to you.  That's

15   inappropriate.  And let's not do that.

16           MR. LISNER:  Understood, your Honor.

17   BY MR. LISNER:

18   Q.  Okay.  Can I ask you to keep in mind, Professor Easton, the

19   payments made on May 11th, May 12th, and May 13th in Ethereum.

20           THE COURT:  He's been asked to have that in mind.  Do

21   you have another question?

22           MR. LISNER:  I do.  I'm going to go between

23   spreadsheets that were used.

24           THE COURT:  Ask your questions, please.

25           MR. LISNER:  Understood.

1         Okay.  Can we go—you could take this down, Brian.

2    Can you please bring up GX 1235.

3         My understanding is this is in evidence as a

4    third-party business record under the government's stipulation.

5         THE COURT:  If it's in evidence, it's in evidence.

6    Does everybody agree that it's in evidence?

7         MR. ROOS:  I'm not—it's not in evidence.

8         THE COURT:  That confirms what I see.

9         MR. LISNER:  Okay.  Can you bring up, just for the

10   witness, Brian, GX 1235.

11   BY MR. LISNER:

12   Q.  Do you recognize this document as Genesis's loan

13   repayments?

14   A.  Yes, I do.

15        MR. LISNER:  Okay.  And Brian, same thing.  If you'd

16   sort the return dates and jump to May 11th, May 12th, May 13th,

17   2022.

18        Okay.  Leave that place, and if you could just take

19   that down, Brian.

20   Q.  I'm going to ask you a question without the need for that.

21   Do you recall if those loan payments we discussed a minute ago

22   were repaid for principal repayments?

23   A.  I don't recall seeing that on the document that I just

24   looked at.

25        THE COURT:  The question is whether, in your memory,

1  you remember that or you don't remember that.  He's not asking

2  you what you may have read on the screen.

3        THE WITNESS:  I apologize.

4  A.  No, I don't recall.

5  Q.  Okay.  Would it refresh your recollection to look at

6  Genesis's loan repayment summary?

7  A.  It may.

8        MR. LISNER:  Brian, could you please bring up 1235 to

9  the same place we were, GX 1235.

10  Q.  Does this refresh your recollection whether those Ethereum

11  payments we discussed were repaid as loan principal?

12  A.  No, it does not.

13        MR. LISNER:  Okay.  You could take that down.

14  Q.  And do you recall whether those loan repayments——let me

15  rephrase.

16        Do you recall whether those payments we discussed were

17  paid to Genesis as collateral for borrowings by Alameda?

18  A.  No.

19  Q.  Okay.  Would it refresh your recollection to look at a

20  collateral summary produced by Genesis?

21  A.  Possibly.

22        MR. LISNER:  Brian, could you please bring up GX 1238.

23        Okay.  Can you scroll down to rows 185 through 187.

24  Q.  Does this refresh your recollection whether the payments we

25  discussed were collateral postings on Genesis by Alameda?

1    A.  No, it does not.

2    Q.  Does not.

3            MR. LISNER:  Okay.  You can take that down.

4    Q.  All right.  Let's switch topics.

5            You testified on direct that Alameda used customer

6    funds to repay third-party lenders between May and July 2022,

7    correct?

8    A.  Correct.

9    Q.  And just kind of rounding out the numbers, I believe you

10   testified in May it was approximately 1.3 billion.  Sound

11   right?

12   A.  Sounds right.

13   Q.  2.9 billion in June?

14   A.  Sounds right.

15   Q.  And approximately 750 million in July.

16   A.  Yes.

17   Q.  Okay.  And I think you testified on direct that if a

18   payment was made, you would expect the account balance,

19   Alameda's account balance to become more negative.

20   A.  Correct.

21           MR. LISNER:  Okay.  Can we bring up GX 1002, which is

22   in evidence.

23   Q.  So focusing here on the period we just talked about, May

24   through approximately July——let me rephrase.

25           In your direct, Mr. Roos asked you to look at the

1    downward-trending line from about May until the end of the

2    year, May 2022 to I guess November 2022.  Do you recall that?

3    A.  I do.

4    Q.  Okay.  But if we focus on the period only between

5    approximately May——and I'll do my best to draw a line——and what

6    appears to be approximately June, July, the line is sloping

7    upwards, correct?

8    A.  That was my testimony, yes.

9    Q.  And during this period, approximately, we just talked——we

10   just mentioned——rephrase.

11        During this period, approximately 5 billion in loans

12   were repaid?

13   A.  Yes.

14   Q.  And if there was a payment, you testified you'd expect the

15   numbers to get more negative, but here it's doing the opposite,

16   true?

17   A.  Yes.

18        MR. LISNER:  Okay.  You could take that down, Brian.

19   And if you could put up GX 1005, which is also in evidence.

20   Q.  Same question.  If I focus on the period between——I'll do

21   my best to draw the line——May 2022 through approximately

22   June-July, the line is sloping upwards as well, correct?

23   A.  Yes.

24   Q.  And if there were payments remade from the Alameda account,

25   you'd expect that to go down, true?

1   A.  No.  Incorrect.

2   Q.  Incorrect.  Why is that incorrect?

3   A.  The payment in and of itself would make the line go down,

4   but other things are happening during this time period.

5   Q.  Okay.  What else is happening?

6   A.  Changes in the——

7          MR. LISNER:  You could take this down, Brian.

8   A.  There were new loans for that time period, for example.

9   Q.  There were new loans?  Do you know when those were taken

10  out?

11  A.  Not specifically as I sit here now, no.

12  Q.  So new loans from third-party lenders.  So you're meaning

13  that more funds would flow into Alameda and it would go up

14  instead of down.

15  A.  Right.

16  Q.  Right.  You didn't testify to any of that in your direct,

17  did you?

18          MR. ROOS:  Objection.  Misstates——

19          THE COURT:  Sustained.

20  Q.  Okay.  A clarification on 1002 versus 1005.  2?

21          MR. LISNER:  Can you bring up, Brian, side by side,

22  1002 and 1005.

23  Q.  Now you testified on direct that these were different, and

24  if I recall correct, 1002 is a limited set of accounts for a

25  limited set of currencies, correct?

1  A.  Correct.

2  Q.  And the limited accounts were Alameda's "Allow Negative"

3  accounts, true?

4  A.  Correct.

5  Q.  And for currencies, the US dollar, USDT, which is a

6  stablecoin, Bitcoin, and Ethereum, correct?

7  A.  Correct.

8  Q.  And then 1005 was meant to reflect all Alameda balances in

9  all currencies.

10  A.  Correct.

11  Q.  Does that include fiat as well?

12  A.  Yes.

13  Q.  Okay.  So if we look at the period that is approximately

14  April 2nd—April 1st, April 2nd, 2022—again, I'll do my best

15  to draw it—but on 1002, in April 2022, it looks like it's

16  about here—that appears to be approximately 7½ billion?  I'll

17  try to draw the line.  Forgive the shaky finger.  Does that

18  appear to be approximately negative 7½ billion?

19  A.  Yes.

20  Q.  Okay.  And if we compare that with the line on GX 1005,

21  same date, April 1, 2022, it's zero, correct?

22  A.  Right.

23  Q.  So your summaries of the Alameda account balance on the

24  same day is different by $7 billion depending on the variables

25  you chose to include.

1   A.  Yes.

2   Q.  Let's talk about some of those variables.

3        MR. LISNER:  Brian, you could take those down.

4   Q.  For the specific accounts, how did you select the "Allow

5   Negative" accounts?

6   A.  All of those that were allowed to turn negative.

7   Q.  And how did you identify them as associated with Alameda?

8   A.  I——I knew which accounts were Alameda and which accounts

9   were not.

10  Q.  Are there any accounts——

11       MR. LISNER:  Well, let's bring up 1001.  I think

12  that's the account listings.

13  Q.  Is it your understanding that all of these accounts are

14  associated with the Alameda Research user name——user ID?

15  A.  Yes.

16  Q.  Okay.  And if there are accounts here that weren't

17  associated with the Alameda account ID, they shouldn't have

18  been included, true?

19  A.  True.

20       MR. LISNER:  Okay.  I'll ask this to set up the next

21  question, your Honor.

22  Q.  Do you recall whether any accounts are included on this

23  1001 exhibit in the Alameda account column that are not

24  associated with the Alameda user ID?

25  A.  I do not recall such an account.

1           MR. LISNER:  Okay.  Can we pull up for the witness

2    only GX 1702.

3    Q.  Does this appear to be the list of accounts, list of

4    Alameda accounts that you used as a basis to select the

5    accounts in 1001?

6    A.  I believe so, yes.

7           MR. LISNER:  Okay.  Brian, if I could ask you, in

8    column——well, first, in the first row, if you could put the

9    filters on, and then I'll ask you to show only "Allow Negative"

10   where it's true in column J.

11          Your Honor, request to publish this to the jury as

12   something that Professor Easton relied on, not for its truth

13   but for material Professor Easton relied on.

14          THE COURT:  I don't understand.

15          MR. ROOS:  Me neither.

16          MR. LISNER:  I think we're entitled to ask Professor

17   Easton about the bases for his conclusions.

18          THE COURT:  I don't understand the question.

19          MR. LISNER:  Well, I didn't ask——I don't have a

20   pending question to the witness.  The question to your Honor

21   was whether we could publish this to the jury.

22          THE COURT:  I don't even know if it's in evidence.

23          MR. ROOS:  It's not.

24          THE COURT:  I believe it is not.

25          MR. LISNER:  It's not.  So the request is——

 1              THE COURT:  Therefore, you're not going to show it to

 2     the jury.

 3              MR. LISNER:  Understood, your Honor.

 4     BY MR. LISNER:

 5     Q.  Okay.  Column J, we've sorted this so it only shows "Allow

 6     Negative" accounts.

 7              MR. ROOS:  Objection to asking a witness about a

 8     document that's not in evidence.

 9              THE COURT:  Sustained.

10     Q.  Does this refresh your recollection to the accounts that

11     are included in your Exhibit 1001?

12              MR. ROOS:  Objection.

13              THE COURT:  Sustained.  There's been no failure of

14     recollection.

15              MR. LISNER:  Okay.  You could take that down.

16              THE COURT:  The only thing we know about this document

17     up to now is that it appears to be a list of accounts that he

18     used in listing accounts on 1001.  That is 100 percent——unless

19     I'm missing something——of the information known about this

20     exhibit, apart from the fact that it's not in evidence.

21              MR. LISNER:  Yes, your Honor.

22              THE COURT:  So if you want it in evidence, you have to

23     have a foundation.  If you want to read it to the jury or show

24     it to the jury, you've got to get it into evidence.

25              MR. LISNER:  Okay.  Let's put that back up, Brian.

1    BY MR. LISNER:

2    Q.  Can you tell us what this document is, Professor Easton.

3    A.  This is a document from which I originally determined the

4    accounts with the "Allow Negative" flag.

5    Q.  Does this appear to be a document maintained in the

6    ordinary course by FTX?

7              MR. ROOS:  Objection, foundation.

8              THE COURT:  Sustained.

9              MR. LISNER:  All right.  We'll move on.  We'll move

10   on.

11             Sticking with loan repayments, Brian, if you could

12   please bring up 1017J, GX 1017J, which is in evidence.

13   BY MR. LISNER:

14   Q.  I think you testified earlier that the 1017 series reflects

15   the loan repayments made by Alameda from its account 9 to

16   third-party lenders; is that right?

17   A.  That is correct.

18   Q.  Okay.  And looking at this one, J, you testified that at

19   the bottom came from account 9 and then there was the

20   balance——I'll circle here——in account 9 on the day before the

21   transfer was made, or right before the transfer was made.

22   A.  The first transfer, yes.

23   Q.  Okay.  So then after the transfer was made this number

24   should become more negative, true?

25   A.  Immediately, at that instant, yes.

1  Q.  Okay.  So here we're looking at May 1 in GX 1017J, and it

2  reflects account 9 had a balance of 7.3 billion, correct?

3  A.  Correct.

4  Q.  Okay.  And I'm going to go through these quickly just to

5  get through the numbers.

6         MR. LISNER:  Could we get to 1017C, Brian.

7  Q.  This is eight days later, on May 9th.  And there's an

8  account balance of minus 6.42 billion, correct?

9  A.  Correct.

10 Q.  And that's approximately 900 million less negative than

11 May 1st.

12 A.  Yup.

13 Q.  And during that period significant loan repayments were

14 made out of the account?

15 A.  Yes.

16 Q.  Okay.  And then we could skip a few days just to cut to the

17 chase.

18         MR. LISNER:  If we could pull up 1017G.

19 Q.  And this reflects that on June 17th, minus 5 billion or

20 500 million remains in the account, correct?

21 A.  Correct.

22 Q.  That's almost a $7 billion increase in the balance of

23 account No. 9 when you testified significant loan payments were

24 made.

25 A.  This is balance in crypto.  Crypto balances can fluctuate

1     all the time.

2              MR. LISNER:  Could I have my question read back,

3     please.

4              THE COURT:  Yes.

5              (Record read)

6     Q.  Can you answer that yes or no, sir?

7     A.  Yes.

8     Q.  Thank you.

9              MR. LISNER:  Okay.  You can take that down.

10    Q.  Let's switch gears to fiat.

11             MR. LISNER:  If you could bring up GX 1004, Brian.

12    Q.  Okay.  And I think you testified——correct me if I'm

13    wrong——on direct that here what we have on the top is the fiat@

14    balance in the black line——I'm sure everyone here has heard

15    more about the fiat@ account than they'd like to——and then the

16    bottom, the bank balance such that the difference represents

17    the gap of what Alameda would have spent.

18    A.  Correct.

19    Q.  Okay.  So the bigger the gap means there's more spending by

20    Alameda, and the smaller gap means that there would be less.

21    A.  Correct.

22    Q.  One clarifying question:  How was it that this line is

23    negative in the beginning period, in January 2021?  It appears

24    that it's only a little bit, but the fiat line is below zero.

25    A.  This was associated with, as best I understand it, where

1    there were deposits of crypto and of fiat, and the exchange

2    between crypto and fiat result in a slight positive difference.

3    Q.  Got it.  Got it.  Okay.  So same concept that we discussed

4    earlier.  If I look at the period between May, which is where

5    your maximum point is, 11.3 billion, thereafter, in May, June,

6    and July, it looks like the gap either remains the same or

7    decreases, correct?

8    A.  Correct.

9    Q.  And that's the period when 5 billion in loans was paid.

10   A.  Correct.

11   Q.  Okay.  Now at the bottom here——let me clear this line——the

12   green line in the legend indicates that this is the balance in

13   Alameda, North Dimension, and FTX bank accounts.  Is it your

14   understanding that FTX, over different periods of time, relied

15   on different accounts?

16   A.  Yes.

17   Q.  And is it fair to say that the amount of fiat kept in the

18   FTX account should not appear as a liability for Alameda?

19   A.  I don't know what FTX account you're referring to, sir.

20   Q.  The one reflected on your graph here.  So FTX bank

21   accounts.

22   A.  Would you repeat the question, please.

23   Q.  Is it fair to say that fiat customer deposits received in

24   FTX bank accounts should not be treated as a liability of

25   Alameda's?

1    A.   I'm not sure I understand the question, but if fiat

2    deposits have been included in an FTX bank account that

3    includes customer deposits, they should be included as a

4    liability.

5    Q.   For FTX.

6    A.   For FTX.

7    Q.   Not Alameda.

8    A.   Not Alameda.

9         MR. LISNER:   Okay.  If you could take that down.

10        Brian, if you could put up GX 1005.

11   Q.   This we talked about briefly earlier.  This reflects all of

12   Alameda's balances across all currencies, including fiat@

13   liability, true?

14   A.   Correct.

15   Q.   And is it your understanding that this graph includes the

16   fiat line that we just looked at across all bank accounts?

17   A.   Yes.

18   Q.   Okay.  But if that includes an FTX liability and not an

19   Alameda liability, fair to say the FTX portion should not be

20   included in this 1005?

21   A.   This is the balance in the accounts that accepted customer

22   deposits.

23   Q.   So this includes the full fiat@ subaccount entry.

24   A.   Yes, it does.

25   Q.   Okay.  Does the subaccount entry for fiat@ include customer

1    deposits regardless if they were made in an Alameda account, a

2    North Dimension account, and an FTX account?

3    A.  Yes.

4    Q.  Okay.  Should the portion in the FTX account be included in

5    the fiat@ liability attributed to Alameda?

6    A.  No.

7    Q.  Okay.  Did you exclude that in this graph?

8    A.  No, I did not.

9    Q.  Okay.  You're, by the way, not offering any opinion on what

10   information or aspects of the fiat account that

11   Mr. Bankman-Fried did or did not see over the years.

12            MR. ROOS:  Objection.

13            THE COURT:  Sustained.

14            MR. LISNER:  Okay.  Let's take that down, Brian.

15   Q.  Let's stick with the fiat for a moment.

16            MR. LISNER:  If you could pull up GX 3003.

17   Q.  This was your demonstrative about the basic mechanics of

18   how customers would deposit fiat onto FTX, correct?

19   A.  Correct.

20   Q.  Okay.  And here you list the numbers.  I know they're for

21   illustrative purposes, but it's listed in USD, so the customer

22   account in FTX here has a positive 100 US dollars, correct?

23   A.  Correct.

24   Q.  Okay.  Do you have an understanding that credits on FTX,

25   credits on a customer account on FTX don't reflect actual cash

1   or legal tender?

2            MR. ROOS:  Objection.

3            THE COURT:  Sustained.

4   Q.  Is it your understanding that the $100 entry there reflects

5   legal tender?

6            MR. ROOS:  Objection.

7            THE COURT:  Sustained.

8            MR. LISNER:  Okay.  Can we bring up, only for the

9   witness, Brian, DX 1022.

10           Okay.  These are the May 2022——

11           MR. ROOS:  Objection.  Could we have a sidebar?

12           THE COURT:  Yes.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1800

1          (At the sidebar)

2          MR. ROOS:  The objection is that the document he was

3   about to announce the name of is the FTX terms of service.

4   It's not a basis for his opinion.  It's not in evidence.  I

5   can't imagine how this witness can lay a foundation for it,

6   particularly given——I'm not saying it won't come in ever, but

7   there are hearsay questions about the circumstances in which it

8   can be offered——is it for its truth, is it for the effect on

9   the listener——and ultimately if it is shown to him, it's a

10  legal document, and we all know the expert witness is the last

11  person who should be opining on legal obligations, given his

12  role in the case.

13         MR. LISNER:  Your Honor, I don't think the foundation

14  objection is an issue because there's a stipulation on

15  authenticity as to this document.  This is a document that the

16  expert reviewed, and we think it's admissible as a nonhearsay

17  document.  It's a contract.  It's a verbal act.  It's in the

18  materials he relied on.  I want to ask him about how——

19         THE COURT:  How do you know it's in the materials he

20  relied on?

21         MR. LISNER:  The government produced 3500 material

22  that the expert relied on, and this is one of them.

23         THE COURT:  Relied on or saw?

24         MR. LISNER:  So I could ask.  I don't know.  We have

25  not had access to the witness before.

```
 1              MR. ROOS:  I guess if he wants to show it without

 2    saying what the document is and ask him if it's something he

 3    relied on in reaching his opinion, then if the answer is yes,

 4    he can ask another question; if the answer is no, that's the

 5    end of it.

 6              THE COURT:  You can do that much anyway.

 7              (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (In open court)

2           MR. LISNER:  Okay.  Thank you, your Honor.

3           Could you bring up for the witness only, Brian,

4    DX 1022.

5    BY MR. LISNER:

6    Q.  Just yes or no, two questions:  Did you——do you recognize

7    this document?

8    A.  No.

9           MR. LISNER:  Okay.  You can take that down, Brian.

10   Q.  Do you agree with the statement that the net asset

11   valuation model is commonly applied when valuing privately held

12   companies?

13   A.  Yes.

14   Q.  And your presentation this morning relied exclusively on

15   Alameda balances held on the FTX platform, true?

16          MR. ROOS:  Objection.  Misstates testimony.

17          THE COURT:  Well, he can say.

18          MR. LISNER:  It's a question.

19   A.  Yes.

20   Q.  Okay.  Do you understand that Alameda traded on multiple

21   exchanges in addition to FTX?

22   A.  Yes.

23   Q.  Held assets on those exchanges?

24   A.  Excuse me?

25   Q.  That it held assets on those exchanges?

1    A.  Yes.

2    Q.  And Alameda held significant assets in venture capital?

3    A.  Yes.

4    Q.  And Alameda was required to post collateral for the loans

5    it received?

6            MR. ROOS:  Objection, foundation.

7            THE COURT:  Sustained.

8    Q.  You didn't perform a net asset value analysis in this case,

9    did you?

10   A.  No, I did not.

11           MR. LISNER:  Okay.  If we could bring up GX 1039,

12   which is in evidence.

13   Q.  I believe you testified earlier this morning that this

14   reflects a flow of funds in connection with the donation made

15   by Ryan Salame, true?

16   A.  True.

17   Q.  Now if you look in the upper left here, there's two sources

18   of funds, customer funds from customer bank accounts and other

19   inflows, and there's a date window for each of them, May 23rd

20   to May 25th.  How did you pick what window to use for your

21   analysis?

22   A.  So I went back in time, recognizing that the data is daily

23   data, not time-stamped data, until I found sufficient funds to

24   cover 5.5 million in this example.

25           MR. LISNER:  Okay.  And if you bring up—take that

1    down and bring up GX 1041.

2    Q.  Which is another example of your flow chart analysis.  Here

3    there is only one date window here.  Why are there different

4    windows across different analyses?

5    A.  Because in this example, unlike a previous example where I

6    had to go back two days to find sufficient funds, I found

7    sufficient funds to cover 540 in just one day.

8    Q.  Would your conclusion about which assets were used be

9    affected if you used longer or shorter date windows?

10   A.  Absolutely not, and I've checked that out.

11   Q.  Okay.  You didn't present any of that analysis today?

12   A.  No.

13   Q.  You understand that FTX had significant positive revenues,

14   true?

15          MR. ROOS:  Objection, foundation.

16          MR. LISNER:  I'll rephrase.  I'll rephrase.  Sorry.

17   Q.  Do you have an understanding of whether FTX generated

18   positive revenue?

19   A.  I haven't analyzed the generation of revenue by FTX.

20   Q.  In the documents you reviewed, have you seen any evidence

21   that FTX generated positive revenue?

22          MR. ROOS:  Objection.

23          THE COURT:  Ground?

24          MR. ROOS:  He just said he didn't know, he didn't

25   under——he didn't analyze this at all.

1        THE COURT:  I'll allow the question.

2   A.  Would you repeat the question, please.

3   Q.  Have you seen evidence in your work on this case of FTX

4   generating positive revenue?

5   A.  No.

6        MR. LISNER:  Just one moment, your Honor.

7   Q.  Switching topics, approximately how many people at the

8   Brattle Group assisted you in your analysis?

9   A.  Ten to twelve.

10  Q.  And you testified how much you billed on this matter.  Do

11  you know how much the Brattle Group earned——billed in this

12  matter?

13  A.  No.

14  Q.  Did you originate this matter for the Brattle Group?

15  A.  No.

16  Q.  Do you receive any compensation from the Brattle Group

17  other than your hourly rate for this matter?

18  A.  No.

19        MR. LISNER:  Just one moment.

20        No further questions, your Honor.

21        THE COURT:  Thank you.

22        Any redirect?

23        MR. ROOS:  Just briefly.

24        Please put up Government Exhibit 1017A.

25

```
 1   REDIRECT EXAMINATION

 2   BY MR. ROOS:

 3   Q.  Professor Easton, you were asked some questions about

 4   whether this was loan principal or loan interest.  Regardless

 5   of whether it was loan principal or loan interest, what did you

 6   determine was the source of the funds that paid Genesis?

 7             MR. LISNER:  Objection.  Mischaracterizes the

 8   question.

 9             THE COURT:  I didn't hear him characterizing it.

10             Well, no, sustained.  Rephrase it.

11   Q.  Do you recall being asked about repayment of loan

12   principal, just yes or no?

13   A.  Yes, I do.

14   Q.  Do you remember being asked questions about repayment of

15   loan interest?

16   A.  Yes.

17   Q.  Irrespective of whether loan interest or loan principal was

18   repaid, what was the source of the funds?

19   A.  The source of funds for either payment was either customer

20   flows or other inflows.  That was my focus.

21   Q.  Now I want to just ask you—you were shown several—several

22   points in times and several negative balances.  Do you remember

23   that?

24   A.  I do.

25   Q.  And I think you testified about the balances, the negative
```

 1  balance account going up and down over time; is that right?

 2  A.  Yes.

 3  Q.  And at some points I think Mr. Lisner asked you about where

 4  the number wasn't as negative; is that right?

 5  A.  That is correct.

 6  Q.  Okay.  Now throughout all those instances Mr. Lisner asked

 7  you about, was the number still negative?

 8  A.  Yes, it was.

 9  Q.  And what are some of the reasons why the balance can change

10  besides the repayment of loans?

11  A.  Well, in crypto it's very obvious that cryptocurrencies

12  fluctuate a great deal up and down.

13  Q.  And besides the cryptocurrency fluctuations, were there

14  other inflows and outflows of these accounts at the times

15  looked at?

16  A.  Yes.  In the last few months there was 1.7 billion of

17  inflows.

18          MR. ROOS:  No further questions.

19          THE COURT:  Thank you.

20          Any recross?

21          MR. LISNER:  Briefly.

22          If you could bring up 1017 again, Brian.

23          1017B.  That one's fine.  A is fine.

24  RECROSS EXAMINATION

25  BY MR. LISNER:

1    Q.  You were just asked about this.  I want to understand your

2    methodology on this.  If Alameda deposited——let me set up a

3    hypothetical.

4         If Alameda set up——deposited one Bitcoin before this

5    payment was made and then immediately transferred it to Genesis

6    from its account, so it took a off-chain Bitcoin, took a

7    Bitcoin off the platform, put it into account No. 9, and then

8    used account No. 9 to pay Genesis, how would that Bitcoin be

9    reflected in your analysis as coming from a customer fund or an

10   other inflow?

11        MR. ROOS:  Objection, to the form and the scope.

12        THE COURT:  I'll allow it.

13   A.  So I think the easiest way or most straightforward way to

14   answer your question is to say what I would have done if the

15   one Bitcoin resulted in a positive balance in Alameda account

16   9.  The payment would be seen as an other flow.  If the balance

17   was negative, that would mean it would be dipping into customer

18   funds.

19   Q.  Just let me make sure I understand the test.  The test is

20   if when the payments were made the full amount came from a

21   negative balance; is that right?

22   A.  I'm not sure what the question is.  I'm sorry.

23   Q.  I'm trying to make sure I understand the test you applied

24   for determining whether customer funds were used to pay a

25   third-party lender.  And you said——correct me if I'm wrong——if

 1  the account balance is negative, then the payment would be

 2  considered using customer funds.

 3  A.  If the account balance of the particular cryptocurrency was

 4  negative and that particular cryptocurrency was used to pay the

 5  loan, it would be considered dipping into customer funds.

 6  Where else could it have come from?

 7  Q.  Okay.  So then using my example, if the account is negative

 8  15, Bitcoin——are you with me?——and then Alameda deposits one

 9  Bitcoin from off the platform, so now it's negative 14, and

10  then it pays 10 to somebody, all use of customer funds?

11  A.  It's paid out of the 14, which is what's left.  It's

12  customer funds.

13  Q.  And there's no distinction in your analysis between deposit

14  of Bitcoin put on and the negative Bitcoins that are there.

15  A.  It must have come out of customer funds because the balance

16  is negative.  It would be dipping further into customer funds.

17          MR. LISNER:  No further questions.

18          THE COURT:  Thank you.

19          MR. ROOS:  Thank you, your Honor.

20          THE COURT:  Thank you, Professor Easton.  You're

21  excused.

22          (Witness excused)

23          THE WITNESS:  Thank you.

24          THE COURT:  Next witness.

25          MR. RAYMOND:  Your Honor, the government calls Cory

1    Gaddis.

2            THE COURT:  You may proceed, Mr. Raymond.

3            MR. RAYMOND:  Thank you, your Honor.

4     CORY GADDIS,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. RAYMOND:

9    Q.  Mr. Gaddis, where do you work?

10   A.  I work at Google.

11   Q.  What is your title at Google?

12   A.  I'm a records custodian.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  How long have you worked at Google?

2    A.  A little over three years now.

3    Q.  What are your responsibilities as a records custodian?

4    A.  I respond to legal processes from government agencies, such

5    as subpoenas, search warrants, and court orders.

6    Q.  You said you respond to legal process.  What do you do in

7    response to legal process?

8    A.  I take a search of a particular record that they are

9    looking for, make a copy of that, and return that to the

10   requesting government agency.

11   Q.  Have you ever testified in a court before?

12   A.  Yes.

13   Q.  As part of your duties, do you sometimes cross-check Google

14   systems to confirm that certain documents were in fact provided

15   by Google?

16   A.  Yes.

17   Q.  In your role as a custodian of records, have you become

18   familiar with records maintained by Google?

19   A.  Yes.

20   Q.  Did you learn what kind of services Google offers its

21   customers?

22   A.  Yes.

23   Q.  What are those?

24   A.  Internet services such as email, file sharing.

25   Q.  Are you familiar with the product called Google Workspace?

```
 1   A.  Yes.

 2   Q.  What is Google Workspace?

 3   A.  Google Workspace is a collection of products for our

 4   enterprise customers, such as Google Docs, Google Sheets.

 5   Q.  You mentioned Google Docs.  What is Google Docs?

 6   A.  It's a word-editing software similar to like Microsoft

 7   Word.

 8   Q.  Can users share documents in Google Docs with others?

 9   A.  Yes.

10   Q.  Can a user allow others to view a Google Doc?

11   A.  Yes.

12   Q.  Can a user allow others to edit a Google Doc?

13   A.  Yes.

14   Q.  You also mentioned Google Sheets.  What is Google Sheets?

15   A.  It's a data-entry software, such as like Microsoft Excel.

16   Q.  And can a user share a Google Sheet with another user?

17   A.  Yes.

18   Q.  Can a user allow others to view a Google Sheet?

19   A.  Yes.

20   Q.  Can a user allow others to edit a Google Sheet?

21   A.  Yes.

22   Q.  In the course of your duties as a records custodian, have

23   you learned the type of information Google stores about its

24   users?

25   A.  Yes.
```

```
 1  Q.  What are those types of information?

 2  A.  That would be like subscriber information, metadata, and

 3  user content.

 4  Q.  You mentioned metadata.  What is metadata?

 5  A.  Metadata would be like transactional information associated

 6  with a particular file.

 7  Q.  So what type of information is that?

 8  A.  That might be things such as who created the document,

 9  where it was uploaded from, where it was edited.

10  Q.  Does a user manually enter metadata or is it generated

11  automatically?

12  A.  It would be generated automatically.

13  Q.  Does Google then store the metadata?

14  A.  Yes.

15  Q.  Taking a Google Doc as an example, does Google generate

16  metadata when a Google Doc is first created?

17  A.  Yes.

18  Q.  What type of metadata does Google generate?

19  A.  That would be such as where it was created from, who

20  created it.

21  Q.  How frequently thereafter would the metadata on such a

22  Google document upload, update?

23  A.  At the time or shortly thereafter.

24  Q.  At the time or shortly thereafter what?

25  A.  That document was created or edited.
```

1    Q.   So each time it's edited, the metadata is expanded?

2            MR. EVERDELL:  Objection.

3            THE COURT:  Sustained.  Form.

4    Q.   How frequently does the metadata update?

5    A.   At the time of and shortly thereafter.

6    Q.   Does Google systems save new information each time a record

7    is accessed or changed?

8    A.   Yes.

9    Q.   In your role as a records custodian, do you know of whether

10   this process of saving information on an ongoing basis occurs

11   automatically, at or soon after the time the metadata is

12   changed?

13   A.   Yes.

14           MR. EVERDELL:  Objection.

15           THE COURT:  Overruled.

16   Q.   Does Google then store that metadata?

17   A.   Yes.

18   Q.   Does Google maintain that metadata in the course of its

19   regularly conducted activity?

20   A.   Yes.

21   Q.   Is that regularly conducted activity a regular practice of

22   Google's?

23   A.   Yes.

24   Q.   Under what circumstances does Google provide a customer's

25   Google Docs or sheets to a U.S. Government agency?

1    A.  Pursuant to a search warrant.

2    Q.  When Google produces a Google Doc in response to a search

3    warrant, what file format does the Google Doc come in?

4    A.  It would typically come in a doc format, such as like a

5    DOCX.

6    Q.  Do you understand, is that accessible through Microsoft

7    Word?

8    A.  Yes.

9    Q.  How about when Google produces a Google Sheet, what format

10    does that come in?

11    A.  That would come in an Excel format or a CSV file.

12    Q.  When Google produces documents in response to a search

13    warrant, does it also provide the metadata associated with

14    those documents?

15    A.  Yes.

16    Q.  When Google provides the metadata, what file format does

17    the metadata come in?

18    A.  Typically, comes in a JSON file.

19    Q.  What is a JSON file?

20    A.  It's an extension for a particular file type, typically

21    contains the metadata on there.

22    Q.  How is that information provided in response to legal

23    process?

24    A.  It's provided alongside the requested content that's being

25    sought.

1          MR. RAYMOND:  Your Honor, may I approach to give the

2    witness a thumb drive?

3          THE COURT:  Yes.

4    Q.  Mr. Gaddis, do you recognize that thumb drive?

5    A.  Yes.

6    Q.  How do you recognize it?

7    A.  I saw the files being added to that thumb drive.

8    Q.  Does it have your initials on it?

9    A.  Yes.

10   Q.  Did you have an opportunity to review the contents of the

11   thumb drive prior to it being shown to you in court today?

12   A.  Yes.

13   Q.  What is on the thumb drive?

14   A.  Records pursuant to a search warrant that we received.

15   Q.  Have you reviewed whether the documents on the thumb drive

16   have been marked with government exhibit numbers?

17   A.  Yes.

18   Q.  Have you reviewed whether those are Government Exhibit

19   numbers 5M, 5F, 18M, 18F, 19M, 19F, 28M, 28F, 42M, 42F, 44M,

20   44F, 50M, 50F, 325M, 325F, and 340M, 340F?

21         MR. EVERDELL:  Objection, your Honor.

22         THE COURT:  What is the objection?

23         MR. EVERDELL:  It's leading.

24         THE COURT:  Do you want him to remember the numbers

25   without being prompted?  Is that the point?

 1              MR. EVERDELL:  Your Honor, just simply lodging the

 2   objection.

 3              THE COURT:  I understand.  Overruled.

 4              MR. RAYMOND:  Thank you, your Honor.

 5   Q.  Mr. Gaddis, do you know whether the documents contained on

 6   this thumb drive were the ones that Google in fact maintained

 7   and produced to the government?

 8   A.  Yes.

 9   Q.  How do you know that?

10   A.  I ran a hash script on the original zip folders that these

11   filed were provided from.

12   Q.  Did you review whether the files actually uploaded to that

13   thumb drive came from the zip folder you mentioned?

14   A.  Yes.

15   Q.  And did they?

16   A.  Yes, they did.

17   Q.  And were the files on the thumb drive created -- was the

18   data of the thumb drive entered or transmitted by the user and

19   were those records kept in the course of Google's ordinary

20   course?

21              MR. EVERDELL:  Objection.  Form.

22              THE COURT:  Sustained.  Form.

23              MR. RAYMOND:  Your Honor, my colleague just passed me

24   a note.  I don't think the witness answered the question about

25   the list of government exhibits I asked him about.  Is it

```
 1        possible to have that question read back?  Without all the

 2        details, maybe.

 3                 THE COURT:  We will do it without commercials.

 4                 Would you read back the list of exhibits to the

 5        witness.

 6                 (Record read).

 7        A.  Yes.

 8        Q.  Mr. Gaddis, moving on to the files on the thumb drive, have

 9        you reviewed whether Google servers recorded information about

10        those documents at the time the documents were created?

11        A.  Yes.

12        Q.  And were they?

13        A.  Yes.

14        Q.  And is maintaining that data kept in the course of Google's

15        regularly conducted activity?

16        A.  Yes.

17        Q.  And was it made by regularly conducted activity as a

18        regular practice of Google's?

19        A.  Yes.

20                 MR. RAYMOND:  Your Honor the government offers -- I'm

21        happy to read them again, your Honor:  Government Exhibits 5M,

22        5F, 18M, 18F, 19M, 19F, 28M, 28F, 42M, 42F, 44M, 44F, 50M, 50F,

23        325M, 325F, 340M, 340F.

24                 THE COURT:  Any objection, Mr. Everdell?

25                 MR. EVERDELL:  No objection.
```

```
 1                THE COURT:  Received.

 2                (Government Exhibits 5M, 5F, 18M, 18F, 19M, 19F, 28M,

 3     28F, 42M, 42F, 44M, 44F, 50M, 50F, 325M, 325F, 340M, 340F

 4     received in evidence)

 5                MR. RAYMOND:  Thank you, your Honor.

 6                THE COURT:  Did you mean to offer the thumb drive too?

 7                MR. RAYMOND:  No, your Honor.

 8                THE COURT:  Good.

 9                MR. RAYMOND:  Mr. Bianco can you pull up Government

10     Exhibit 44M.

11     Q.  Mr. Gaddis, what is this document?

12     A.  This is a JSON file.

13     Q.  JSON file, what does that mean again?

14     A.  This is a file containing metadata for one of the files

15     that we have produced in response to that search warrant.

16                MR. RAYMOND:  Mr. Bianco, can you pull up Government

17     Exhibit 44F and put it next to 44M.

18     Q.  Mr. Gaddis, looking at 44M, do you see where it says email

19     address?

20     A.  Yes.

21     Q.  It says caroline@alameda-research.com?

22     A.  Yes.

23     Q.  Right above that it says:  Gaia ID.

24                What is that?

25     A.  Gaia ID is a unique identifier for a Google account.
```

1    Q.  You said it's unique.  Can a single person have multiple

2    Gaia IDs?

3    A.  Yes.

4    Q.  How could that happen?

5    A.  It could be through various emails.  So one email may have

6    one Gaia ID and then another email would have a completely

7    different one.

8    Q.  For example, if a person had multiple email accounts, would

9    they potentially have multiple Gaia IDs?

10   A.  Correct, yes.

11   Q.  Are Gaia IDs typically associated with email addresses?

12   A.  Typically, yes.

13         MR. RAYMOND:  Mr. Bianco, if you go to control F in

14   44M for the word Sam.  I think it's row 3043.

15   Q.  Mr. Gaddis, do you see it says:  Email address:

16   Sam@alameda research.com?

17   A.  Yes.

18   Q.  You see above there is a Gaia ID ending in 8013?

19   A.  Yes.

20         MR. RAYMOND:  Now, Mr. Bianco, can you scroll all the

21   way to the top and look for a Gaia ID ending in 8013, which is

22   in row 1636.  Scroll up a little.

23   Q.  Mr. Gaddis, is that the same Gaia ID?

24   A.  Yes.

25   Q.  A couple of rows above that, what does it say under time?

 1   A.  It says 2022 June 19 at 11:49:37 UTC.

 2   Q.  Mr. Gaddis, just to confirm, the information you have read

 3   in this exhibit was created at or near the time it was

 4   generated by Google systems.

 5   A.  Yes.

 6           MR. EVERDELL:  Sorry, your Honor.  Did the witness say

 7   11:49?

 8           Oh, yes.  Just translating UTC time.  I understand.

 9           MR. RAYMOND:  No further questions.

10           THE COURT:  Thank you.

11           Cross-examination.

12           MR. EVERDELL:  Just one moment, your Honor.

13           THE COURT:  Please proceed.

14           MR. EVERDELL:  Thank you, your Honor.

15   CROSS-EXAMINATION

16   BY MR. EVERDELL:

17   Q.  Good afternoon, Mr. Gaddis.

18           You were testifying about the JSON files that you were

19   given, correct?

20   A.  Yes.

21   Q.  And we were looking at one of the JSON files in particular

22   that pertained to -- I believe GX-44M was the JSON file, is

23   that right?

24   A.  Yes.

25   Q.  I think you were shown -- let me step back.

1           The metadata includes certain fields, is that right?

2    A.  Yes.

3    Q.  And those fields can have meaning, depending on what the

4    field is called, right?

5    A.  Yes.

6    Q.  There is a field that is called view, is that right?

7    A.  Yes.

8    Q.  What does the view field mean?

9    A.  I believe that means that it's viewed.

10   Q.  You believe it means it's viewed?

11   A.  Yes.  I'm not super familiar with all the intricacies in

12   all of the fields.

13   Q.  You are not familiar with what the fields mean?

14   A.  No, not all of the fields.

15   Q.  What is your responsibility at Google, Mr. Gaddis?

16   A.  I respond to legal process such as search warrants,

17   subpoenas, and court orders.

18   Q.  How much experience do you have with metadata on certain

19   files?

20   A.  Not particularly any good amount of experience with it.

21   Q.  So you are not someone sort of steeped in the tech of

22   metadata, so to speak?

23   A.  No, I'm not.

24           MR. EVERDELL:  Give me one moment.

25           No further questions, your Honor.

1          THE COURT:  Anything else for the witness,

2    Mr. Raymond?

3          MR. RAYMOND:  No.  Thank you very much.

4          THE COURT:  Mr. Gaddis, you're excused.

5          (Witness excused)

6          THE COURT:  It seems like a good time for a break.

7          Counsel, stay.

8          (Jury not present)

9          THE COURT:  May I know why we just did that?

10         MR. RAYMOND:  Your Honor, we had tried to reach a

11   stipulation.

12         THE COURT:  Mr. Everdell, why did we just do that?

13         MR. EVERDELL:  Your Honor, it's really the

14   government's case to put on.  I assumed that they were going to

15   introduce metadata that somehow showed something about how

16   maybe my client interacted with certain documents, but he

17   wasn't able --

18         THE COURT:  And the metadata came in and you wouldn't

19   stipulate to it.

20         MR. EVERDELL:  Your Honor, he wasn't able to explain

21   what the metadata meant.

22         THE COURT:  Yes, I understood that.  That only makes

23   it worse.

24         Where did he fly in from?

25         MR. RAYMOND:  Texas, your Honor.

1           THE COURT:  This is a joke.

2           MS. SASSOON:  Your Honor, the exhibits for the next

3    witness, do you want to take it up at the end of the break?

4           THE COURT:  No.  We will do it now.

5           We had a witness this morning, who knew absolutely

6    nothing and spent the time saying I had nothing to do with any

7    of that, read documents that are public records.  And this

8    afternoon we fly somebody in from Texas to put in documents

9    about what he knows nothing or next to nothing that are

10   obviously stipulatable.

11          We have 18 people devoting time here to this case and

12   it's really a crime, that part of it.  Obviously, it's a

13   serious case.  Obviously, there are all kinds of important

14   things to be determined.  But lawyers are supposed to do a

15   little better than this.  I am talking to both sides.

16          What are the evidence problems here?

17          MS. SASSOON:  Just to preview, we are going to be

18   calling a law enforcement witness and admitting certain Twitter

19   exhibits through that witness, and I do intend to have the

20   witness explain certain things about the tweets and to read

21   some tweets.  I don't intend to belabor the point.  We are

22   going to finish this witness and another by the end of the day.

23   We only have two more witnesses tomorrow, Can Sun and

24   Boroujerdi, and we expect to end well before the end of the day

25   tomorrow.

1          With respect to this witness, I handed you up several

2    exhibits that the defense is objecting to.  These are direct

3    messages between the defendant and another Twitter user

4    @KelseyTuoc.  I think the defense has some objections they

5    wanted to raise.

6          THE COURT:  Let's hear them.

7          MR. EVERDELL:  Yes, your Honor.  This is Government

8    Exhibits 803A through D.  We both object on both relevance and

9    403 grounds.

10          Your Honor, if you look at these statements, these are

11    all messages with this person Kelsey Tuoc with the defendant,

12    they are all from a date of November 16, 2022.  This is after

13    the alleged conspiracies charged in the indictment were over.

14          And so it appears that the relevance of these

15    documents, if any, are going to a state of mind at the time the

16    statements were made, but that isn't relevant or probative of

17    his guilt at the time that the conspiracy was going on.

18          In addition, your Honor, we think that the probative

19    value is substantially outweighed by the prejudicial effect

20    because these are communications he is making with someone who

21    he knew for a decade, who he considered a friend, and these are

22    just off-the-cuff musings about past events that we think were

23    devoid of context that could be substantially misconstrued by

24    the jury.  We think that the first is really simply the

25    defendant talking about how history may be written by the

1     winners, but it contains some inflammatory language that we

2     think is more prejudicial than probative.

3              THE COURT:  This is 803(a)?

4              MR. EVERDELL:  Yes, your Honor.

5              THE COURT:  What are you talking about here?

6              MR. EVERDELL:  This is part of the communication with

7     Kelsey Tuoc.  She is asking about some statements that

8     Mr. Bankman-Fried has made in the past about -- there is some

9     swear words in here, your Honor.  I will block them out.  It

10    said:  Doing something unethical, s-h-i-t, and what he said

11    about doing that sort of thing in the past, and it then moves

12    into a discussion with CZ, head of Binance.

13             THE COURT:  Speak a little more slowly.

14             MR. EVERDELL:  Yes, your Honor.

15       Then it moves into a discussion about CZ, the head of

16    Binance, who there has been testimony about.  He makes a

17    statement here a month ago:  CZ was a walking example of don't

18    do unethical s-h-i-t, or your money is worthless.

19             THE COURT:  I have heard it before.

20             MR. EVERDELL:  I'm happy to say it out here.

21    Unethical shit or your money with worthless.  Now he is the

22    hero.  Is it because he's virtuous or because he had a bigger

23    balance sheet.

24             THE COURT:  Slower.  I can't take it this fast.

25             MR. EVERDELL:  I will slow down.

1          THE COURT:  I listen to 33 RPM records, not 45.

2          MR. EVERDELL:  I'll slow it way down, your Honor.  My

3    apologies.

4          THE COURT:  Nobody listens to records.

5          MR. COHEN:  I may be the only one who remembers 33,

6    your Honor.

7          THE COURT:  You may remember 78s.  We both do.

8          MR. EVERDELL:  I hate to swear yet again, but I will

9    do it slower this time.

10         A month ago, CZ was a walking example of, quote, don't

11   do unethical shit, or your money is worthless.

12         THE COURT:  We are talking about the guy from Binance.

13         MR. EVERDELL:  That's correct, your Honor.

14         Now he's a hero.  Is it because he's virtuous or

15   because he had a bigger balance sheet, and so he won.

16         The discussion continues about this sort of thing.

17         This seems to be just a reflection, sort of musings on

18   nothing more than the concept of history being written by the

19   winners, let's call it, but it has enough inflammatory language

20   in here that I think it's prejudicial to the defendant to put

21   this in front of the jury when they are discussing topics like

22   unethical shit.

23         So I think that the topic of the conversation has very

24   little probative value, but the rhetoric and the language used

25   has prejudicial effect, and it's all after time period.

 1              THE COURT:  That's 803A, several exhibits.

 2              MR. EVERDELL:  Correct, 803A.

 3              THE COURT:  Next.

 4              MR. EVERDELL:  803B is, again, more sort of musings

 5    about the past and about just his sort of -- the issue here is

 6    that they are speaking in terms of -- Kelsey Tuoc says:  Did

 7    they feel, Gary and Nishad, ashamed and guilty because all the

 8    customer deposits are gone?

 9              We are using the word guilty.  It is not in the sense

10    of legal guilt.  It's in the sense, I guess, of some sort of

11    personal feelings of guilt.

12              Again, these are sort of just abstract musings after

13    the fact, your Honor, after the alleged conspiracy is over.

14    And because you have the word guilt, guilty in this tweet or in

15    this Signal, I guess, it's very prejudicial and it is again not

16    very probative of the defendant's state of mind.

17              THE COURT:  How does it stack up against the fact that

18    they both pleaded guilty to multiple felonies and that's before

19    the jury?

20              MR. EVERDELL:  Understood, your Honor.  This is, of

21    course, the defendant making a comment on these facts himself.

22              THE COURT:  What you just read to me I thought was

23    Kelsey Tuoc.  Is that wrong?

24              MR. EVERDELL:  If you follow the thread --

25              THE COURT:  At one point your client says that Nishad

1   is the same, then guilty.  That's really prejudicial in light

2   of the fact that Nishad just got off the stand and pled guilty

3   to six felonies or seven.

4          MR. EVERDELL:  Understood, your Honor.

5          THE COURT:  What about the next one?

6          MR. EVERDELL:  So this, your Honor, is a discussion

7   about interactions with regulators and regulations.  Kelsey

8   Tuoc says:  You said a lot of stuff about how you wanted to

9   make regulations, just good ones.  Was that pretty much just PR

10  too?  There is some statements at the beginning, and then at

11  the end it says:  Yeah, just PR.  I'll say another swear word,

12  because I'm sure you've heard it before, your Honor.  Fuck

13  regulators.

14         This, I think, again, is Mr. Bankman-Fried after the

15  fact expressing some frustration about regulators at the time.

16  I believe the government might want to use this to show that

17  his efforts at engaging with regulators prior to this was all a

18  sham, which it wasn't.

19         THE COURT:  Which might gain some support from his

20  saying, yeah, just PR in relation to his efforts with

21  regulators.

22         MR. EVERDELL:  Your Honor, it's being spoken at a time

23  after the conspiracy at a time when he may have developed some

24  frustration with what had happened before, but it doesn't

25  reflect his honest intent at the time when he was engaging with

1    the regulators.  This is an after-the-fact statement maybe

2    about his mental state on November 16, but it's not probative

3    of his mental state prior to November 16 and it could be taken

4    out of context, and the jury could use it inappropriately

5    against my client.

6            THE COURT:  Let me hear from the government, please.

7            MS. SASSOON:  Your Honor, these are admissions by the

8    party opponent.  And just to take one obvious example, courts

9    routinely admit postarrest statements which are after the fact

10   where a defendant is making admissions.

11           The fact here that, as defense counsel said, he's

12   talking to someone he trusted in what he thought was a private

13   context is highly probative that what he's saying here is

14   truthful.

15           The government has offered evidence of the defendant's

16   public representations.  This shows the falsity of many of

17   those representations.  The fact that it's prejudicial is

18   because it's inculpatory, but that does not make it unfairly

19   prejudicial.

20           And keep in mind too that although this is after the

21   collapse of FTX, contemporaneous with these messages, the

22   defendant is going out and making public statements saying, I

23   did nothing wrong, and here he is simultaneously in these

24   private communications showing a very different face in

25   private.  It's highly probative of his guilt and it's

1    admissible under the hearsay rules.

2              THE COURT:  What was the date of the bankruptcy?

3              MS. SASSOON:  The 11th.

4              THE COURT:  I'll let you know when I come back

5    downstairs.

6              We have one other one, don't we, 881?

7              MR. EVERDELL:  Very quickly, your Honor, and this is

8    related.

9              Government's 881 is the opening page of Kelsey Tuoc

10   and it's a hearsay document, your Honor.

11             MS. SASSOON:  Your Honor, we are seeking to admit this

12   for its effect on the listener.  The final exhibit relating to

13   Kelsey Tuoc is a message from the defendant saying:  I thought

14   that was all off the record, can you please take it down.  And

15   that's because Kelsey Piper, the journalist associated with

16   this account, published an article that quoted many of these

17   messages.

18             THE COURT:  I don't see that in the exhibit.

19             MS. SASSOON:  It says:  Kelsey Piper, senior writer at

20   Vox's Future Perfect.

21             The defendant was corresponding with this person on

22   Twitter and, therefore, would be aware that she was a writer at

23   Vox and it puts in context his statement to her saying, I

24   thought this was off the record.  You can't understand his

25   message without appreciating that he understood her to be a

1    reporter.

2          THE COURT:  Where do I find the statement, I thought

3    this was off the record?

4          MS. SASSOON:  I believe that's 803D.

5          Just one more comment on the messages about Nishad

6    being guilty.  Obviously, the message sent by Kelsey Tuoc in

7    the form of a question, the defendant adopts it when he writes

8    back:  Yeah.

9          THE COURT:  I'll let you know.

10          (Recess)

11          THE COURT:  I have reviewed 803A, B, C, D, and I think

12    there is a fourth, 881.

13          MR. EVERDELL:  Yes, your Honor.

14          THE COURT:  And the defense objections are overruled.

15          Let me say a minute about what happened a moment ago.

16          Ms. Katz was called by the government this morning.

17    It was perfectly obvious, and she made it clear in response to

18    almost every question, whether it was responsive or not, that

19    she knew nothing with anything that happened here, nothing

20    whatever, and she was called essentially as a manikin to read

21    to the jury documents in evidence and the transcripts of

22    videotapes in evidence, and that was a waste of her time, it

23    was a waste of the jury's time, and it was a waste of everybody

24    else's time.  I expect different behavior from counsel.

25          And then we are treated to this Mr. Gaddis being

1    hauled up here from Texas to authenticate metadata on, I

2    believe it was five documents, maybe it's seven or eight, as to

3    which there was no dispute at all to get them into evidence.

4           Now, the defense was supposed to have had all of the

5    government's exhibits a long time ago.

6           Did you have them, Mr. Everdell?

7           MR. EVERDELL:  Your Honor, this particular metadata we

8    only got very recently.

9           THE COURT:  When?

10          MR. EVERDELL:  It was produced a few days ago.

11          THE COURT:  But you had it, you knew what it was, and

12   I assume you were asked to stipulate to the admissibility of

13   the metadata.

14          MR. EVERDELL:  We were not, your Honor.

15          THE COURT:  You were not.

16          MR. EVERDELL:  No.

17          THE COURT:  Did you offer it?

18          MR. EVERDELL:  Your Honor, the issue of metadata was

19   being -- let me step back.

20          We have had discussions about metadata before.  I see

21   the government is shaking their head.  I want to be accurate

22   about this.  There were discussions about stipping to metadata

23   before.  We got new metadata.  We did not have discussions

24   about stipping to the new metadata.  I didn't know exactly what

25   the testimony was going to be because it wasn't clear from the

1    3500 material whether there were things that could be disputed.

2           THE COURT:  Did you ask?  Did you ask?  I expect

3    lawyers to talk to each other.  Frankly, earlier in this case

4    that was going fine, and I appreciate that, and I expressed

5    that thought earlier more than once.

6           But the idea of hauling this guy up here from Texas

7    and treating the jury to whether those exhibit numbers could be

8    read three times or four times, or whatever it was, was just

9    unreasonable.  Obviously, there is some fault on both sides,

10   now that I hear you, but these people are giving up weeks of

11   their lives, and I care about that, and in the abstract I'm

12   sure you all do too.  But it's a hard-fought case.  But you got

13   to get over that and that goes for both sides.

14          MR. EVERDELL:  Understood, your Honor.

15          THE COURT:  We are not going to do this again.

16          Let's get to the next witness.

17          MS. SASSOON:  The government calls Shamel Medrano.

18          (Jury present)

19          THE COURT:  Defendant and the jurors --

20   SHAMEL MEDRANO,

21       called as a witness by the government,

22       having been duly sworn, testified as follows:

23          THE COURT:  The defendant and the jurors all are

24   present, as they have been throughout.

25          Ms. Sassoon, you may proceed.

 1              MS. SASSOON:  Yes, your Honor.

 2              The government calls Shamel Medrano.

 3   DIRECT EXAMINATION

 4   BY MS. SASSOON:

 5   Q.  Mr. Medrano, where do you work?

 6   A.  I work for the U.S. Attorney's Office in the Southern

 7   District of New York.

 8   Q.  What is your title at the U.S. Attorney's Office?

 9   A.  I am an investigative analyst.

10   Q.  What are some of your job responsibilities as an

11   investigative analyst?

12   A.  I assist Assistant United States Attorneys and special

13   agents during the course of their investigations.

14   Q.  What type of things do you do to assist?

15   A.  I do social media analysis, I do forensic analysis for

16   phones, I review business records.  Varies on the nature of the

17   case.

18   Q.  Are you familiar with Twitter?

19   A.  Yes, I am.

20   Q.  And do any of your job responsibilities involve Twitter?

21   A.  Yes.

22   Q.  What is Twitter?

23   A.  Twitter is a social media platform.

24   Q.  And with respect to this case, have you reviewed certain

25   tweets provided to you by prosecutors in this case?

1   A.  Yes, I have.

2   Q.  What is a tweet?

3   A.  A tweet is basically a post on Twitter.  It's a way for a

4   user on Twitter to interact with other users.

5   Q.  And have you reviewed certain Twitter direct messages

6   provided to you by prosecutors in this case?

7   A.  Yes, I have.

8   Q.  What are Twitter direct messages?

9   A.  Direct messages are private messages between multiple

10   parties, one or more party.

11   Q.  And is that on Twitter?

12   A.  Yes, it is, it's on Twitter.

13   Q.  And apart from your review of certain tweets and direct

14   messages, did the prosecutors provide you any other documents?

15   A.  Yes.  They provided me, I believe, business records.

16   Q.  Apart from that, what role, if any, did you have in this

17   case?

18   A.  Initially, I loaded some Twitter search warrant returns

19   into one of our investigative databases, and I also created

20   some maps.  Other than that, nothing else.

21          MS. SASSOON:  At this time, pursuant to stipulation

22   2001 between the parties, the government offers Government

23   Exhibits 770, 783, 788, 794, 796, 803A through D, 823, 853,

24   861, 865, 870, and 881.

25          MR. EVERDELL:  Subject to your Honor's prior ruling.

1          THE COURT:  I am just trying to catch up with you.

2          MS. SASSOON:  I'll try not to read the list four more

3    times, your Honor.

4          THE COURT:  We all appreciate that.

5          They are all received.

6          (Government Exhibits 770, 783, 788, 794, 796, 803A-D,

7    823, 853, 861, 865, 870, and 881 received in evidence)

8          MS. SASSOON:  Mr. Bianco can you publish Government

9    Exhibit 823.

10   Q.  Mr. Medrano, is this a tweet?

11   A.  Yes, it is.

12   Q.  And do you see at the top it says:  @FTX official has

13   closed 900M at a valuation of 18B?

14   A.  Yes.

15   Q.  Do you say how @FTX official is in blue, as are a number of

16   other names beneath it:  @Sequoia, @Paradigm, @Ribbit.

17          Do you see that?

18   A.  Yes.

19   Q.  What is the significance of the at names that are in blue?

20   A.  The at is a mention, sort of a tag, so it's notifying these

21   other users of this activity that is taking place on the

22   platform.

23   Q.  Were those other user names on Twitter?

24   A.  Correct, other user names on Twitter.

25   Q.  Do you see at the bottom where it says:  77 reposts, 70

```
 1    quotes, 906 likes, 32 bookmarks?

 2    A.  Yes.

 3    Q.  What is a repost?

 4    A.  A repost is when a Twitter user reposts an actual post that

 5    is in front of us, so 77 other Twitter users reposted this

 6    tweet.

 7    Q.  What are likes?

 8    A.  Likes are users who have liked a tweet or post.

 9         MS. SASSOON:  Mr. Bianco, if you could now publish

10    Government Exhibit 853.

11    Q.  Mr. Medrano, do you see where it says @SBF FTX at the

12    bottom.  FTX's venture investing is concentrated under FTX's

13    ventures.  That's different from Alameda's ventures.

14         What's the date of that tweet?

15    A.  August 25, 2022.

16         MS. SASSOON:  Mr. Bianco, if you could pull up

17    Government Exhibit 871, the third page.

18    Q.  Mr. Medrano, do you see where it says FTX ventures and @SBF

19    FTX are acquiring a stake in @Skybridge?

20    A.  Yes.

21    Q.  Who posted this tweet originally?

22    A.  @Scaramucci.

23    Q.  What is the user name associated with that account?

24    A.  Anthony Scaramucci.

25    Q.  You see above that there is a symbol and it says SBF
```

1    retweeted.  What does that mean?

2    A.  SBF -- this means that the SBF account retweeted this post,

3    so he took it, which was originally on Anthony Scaramucci's

4    account.  He reposted it on his account.

5    Q.  And when somebody retweets a tweet, where does it appear,

6    if anywhere?

7    A.  It appears on both now, the user who originally posted it

8    and whoever retweeted it or reposted it on their account.

9         MS. SASSOON:  Mr. Bianco, if you could pull up next to

10   this retweet Government Exhibit 201, which is already in

11   evidence.

12   Q.  I want to direct your attention to the top where it says:

13   The subscription agreement by and between Skybridge Capital and

14   Alameda Research Ventures LLC.

15        What's the date in that paragraph?

16   A.  It is September 7, 2022.

17        MS. SASSOON:  We can take that down.

18        At this time the government offers four exhibits,

19   pursuant to stipulation 2003, and that's Government Exhibit 80,

20   which is a document titled name change, Clifton Bay Investments

21   LLC, dated September 8, 2022; Government Exhibit 84, which is a

22   document titled written resolutions of the director's change of

23   company name, dated September 25, 2022; Government Exhibit 86

24   titled updated certificate of incorporation Clifton Bay

25   Investments, dated October 6, 2022; and Government Exhibit 192

```
 1   titled Alameda Research Investments LTD, dated September 12,

 2   2022.

 3            THE COURT:  They are received.

 4            (Government Exhibits 80, 84, 86, and 192 received in

 5   evidence)

 6            MS. SASSOON:  Your Honor, may I briefly publish each

 7   of them?

 8            THE COURT:  Yes.

 9            MS. SASSOON:  Mr. Bianco, if we can publish Government

10   Exhibit 80.

11            Mr. Bianco, can you just highlight where it says

12   Alameda Research Ventures LLC changing its name to Clifton Bay

13   Investments.

14   Q.  Mr. Medrano, what's the date on this document?

15   A.  September 8, 2022.

16            MS. SASSOON:  If we can now pull up Government Exhibit

17   84.

18            Mr. Bianco, can you highlight where it says resolved

19   that the name of the company be changed from Alameda Ventures

20   LTD to MacLaurin Investments.

21   Q.  Mr. Medrano, what's the date on this document?

22   A.  September 23, 2022.

23            MS. SASSOON:  Mr. Bianco can you zoom in on the

24   signature, Samuel Bankman-Fried.

25            We can take this down.
```

1           Mr. Bianco, if you can publish Government Exhibit 86.

2           Can you please highlight where it says Alameda

3  Research Ventures LTD has changed its name to Clifton Bay

4  Investments LTD.

5  Q.  Mr. Medrano, what's the date on this document?

6  A.  September 22, 2022.

7           MS. SASSOON:  Finally, if we could publish Government

8  Exhibit 192, Mr. Bianco.

9           Can you please highlight where it says the company

10  intended to change its name from Alameda Research Investments

11  LTD to Goodman Investments LTD.

12  Q.  What is the date on this document, Mr. Medrano?

13  A.  September 12, 2022.

14           MS. SASSOON:  Mr. Bianco, if you could zoom in on the

15  signature block of Sam Bankman-Fried.

16           We can take that down.

17           Mr. Bianco, can you now publish Government Exhibit

18  783.

19           If you could zoom in on the top messages.

20  Q.  What type of document are we looking at here, Mr. Medrano?

21  A.  These are Twitter direct messages.

22  Q.  And this particular Twitter direct message, who is it

23  between?

24  A.  This is between Cosmo and SBF.

25  Q.  What is the date of the messages by the defendant that says

 1    LOL and the messages following that?

 2    A.   May 20, 2021.

 3              MS. SASSOON:   You can take that down.

 4              Pursuant to Government Exhibit 2003, the government

 5    offers Government Exhibit 267, which the parties have

 6    stipulated is a document called Silvergate initial due

 7    diligence questionnaire for traders, which was an attachment to

 8    setting up new accounts for Silvergate under Alameda Research

 9    LLC.

10              THE COURT:   Received.

11              (Government Exhibit 267 received in evidence)

12              MS. SASSOON:   Mr. Bianco, can you publish this

13    document.

14    Q.   Mr. Medrano, can you please read the entity name at the top

15    of this initial due diligence questionnaire.

16    A.   North Dimensions Inc.

17    Q.   And in box number 1 that says description of business, what

18    boxes are checked?

19    A.   Proprietary trading firm and over-the-counter trading firm.

20              MS. SASSOON:   Let's go to the third page of this

21    initial due diligence questionnaire.

22    Q.   Who signed this, Mr. Medrano?

23    A.   Samuel Bankman-Fried.

24    Q.   What's the date of this questionnaire signed by Sam

25    Bankman-Fried?

1   A.  December 9, 2020.

2            MS. SASSOON:  We can take that down.

3            Mr. Bianco, can you please publish Government Exhibit

4   788.

5   Q.  What type of document is this, Mr. Medrano?

6   A.  This is a Twitter direct message.

7   Q.  And who is it between?

8   A.  Matty Sino and SBF.

9   Q.  Do you see at the top where SBF sent a message:  We bought

10  out Binance's stake in FTX.  What's the date of that message?

11  A.  July 19, 2021.

12           MS. SASSOON:  We can take that down.

13           Mr. Bianco, can you publish Government Exhibit 770.

14  Q.  Who posted this tweet, Mr. Medrano?

15  A.  The original tweet was posted by the FTX underscore

16  official account.

17  Q.  And then what about on top of that?  What is that?

18  A.  Shaq posted.

19  Q.  Who is Shaq?

20  A.  He's a former basketball player.

21           MS. SASSOON:  Mr. Bianco, can you show the witness

22  what's been marked as Government Exhibit 1476.

23  Q.  Do you recognize anyone in this photo?

24  A.  Yes.

25  Q.  Who?

```
 1   A.  Shaquille O'Neal.

 2   Q.  Anyone else?

 3   A.  Yes.  And Sam Bankman-Fried.

 4           MS. SASSOON:  The government offers Government Exhibit

 5   1476.

 6           MR. EVERDELL:  No objection.

 7           THE COURT:  Received.

 8           (Government Exhibit 1476 received in evidence)

 9           MS. SASSOON:  Mr. Bianco, you can now publish this to

10   the jury.

11   Q.  Mr. Medrano, can you point out the people you recognize in

12   this photo.

13   A.  In the center, the tallest man is Shaquille O'Neal, and to

14   the left of him is SBF.

15           MS. SASSOON:  We can take that down.

16           Mr. Bianco, can you please publish Government Exhibit

17   794.

18   Q.  What type of document is this, Mr. Medrano?

19   A.  It's a Twitter direct message.

20   Q.  And can you read at the top who these messages are between?

21   A.  It's Matt Ballensweig and SBF.

22   Q.  What's the date of the first message from Matt Ballensweig

23   saying what a good partner Alameda has been to Genesis?

24   A.  June 19, 2022.

25           MS. SASSOON:  We can zoom out.
```

1    Mr. Bianco can you zoom in where it says:  Hit me in

2  five with a phone number.

3  Q.  What's the date of that message from Matt Ballensweig, Mr.

4  Medrano?

5  A.  June 20, 2022.

6    MS. SASSOON:  We can take that down.

7    Mr. Bianco, if you can now publish Government Exhibit

8  870 and zoom in at the top, the first tweet.

9  Q.  Mr. Medrano, can you remind us what it means when there is

10  blue font where it says @Senator Stabenow and @John Boozman?

11  A.  It's a mention of these other Twitter accounts.

12  Q.  And beneath that is there something embedded in the tweet?

13  A.  Yes.  A web address, a link.

14  Q.  And what's the web address that's embedded in the tweet?

15  A.  Agriculture.senate.gov.

16    MS. SASSOON:  Mr. Bianco, you can zoom out and if you

17  can please publish next to this exhibit Government Exhibit 796.

18  Q.  What type of document is this, Mr. Medrano?

19  A.  This is a Twitter direct message.

20  Q.  Who is it between?

21  A.  Frank Chaparro and SBF.

22  Q.  Do you see where Frank Chaparro wrote:  What do you mean by

23  not pushing against the community strategy?  Like will you stop

24  lobbying for the Stabenow/Boozman bill if crypto Twitter tells

25  you to stop.

```
 1              What's the date of that message?
 2    A.  October 29, 2022.
 3              MS. SASSOON:  Mr. Bianco, can you zoom in on the
 4    responses from the defendant.
 5    Q.  What is the date of Sam Bankman-Fried's responses in this
 6    direct message?
 7    A.  October 29, 2022.
 8              MS. SASSOON:  We can take that down.
 9              Mr. Bianco, if you could now publish Government
10    Exhibit 863 and publish alongside it Government Exhibit 861.
11    Q.  Mr. Medrano, what are the dates of the defendant's tweets
12    on the left?
13    A.  November 6, 2022.
14              (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25
```

1   BY MS. SASSOON:

2   Q.  And I want to direct your attention to the exhibit on the

3   right, Government Exhibit 861.  What's the date of this tweet?

4   A.  November 6.

5   Q.  And who posted this tweet on the right?

6   A.  Based Carbon.

7   Q.  And do you see where it says "Replying to @SBF_FTX"?  What

8   does that mean?

9   A.  That account is replying to a tweet that was originally

10  posted on the SBF account.

11  Q.  And can you read that tweet.

12  A.  "Thanks Sam.  I just deposited more money in my FTX account

13  and updated my browser.  Ready to go."

14  Q.  And above that, do you see where it says SBF and Likes?

15  What is signified by that?

16  A.  In this one, it signifies that SBF liked this tweet.

17          MS. SASSOON:  And if we could take down 861 and put up

18  in its place on the right Government Exhibit 865.

19  Q.  Who posted this tweet originally?

20  A.  This treat was originally posted by Crypto_Bitlord7.

21  Q.  What's the date of this tweet?

22  A.  November 6.

23  Q.  And right beneath that, what is signified by replying to

24  @SBF_FTX?

25  A.  Signifies that Crypto_Bitlord is replying to a tweet that

```
 1    was originally on the SBF_FTX account.

 2    Q.  And can you read the first two lines beneath that.

 3    A.  Yes.  "Thank you for clearing this up Sam.  It sounds like

 4    our funds are safe?  But what exactly is CZ talking about!?"

 5    Q.  And what is signified at the top here where it says "SBF

 6    Likes"?

 7    A.  It's that SBF liked this tweet.

 8            MS. SASSOON:  Okay.  We can take that down.

 9            And Mr. Bianco, if you could publish Government

10    Exhibit 866.  And zoom in.

11    Q.  Mr. Medrano, it's a little faint, but what's the date on

12    this tweet?

13    A.  I believe November 7, 2022.

14            MS. SASSOON:  And now I'm going to read from a

15    stipulation between the parties, Government Exhibit 2001,

16    paragraph 4, which says that:

17            "The exhibits set forth in Attachment B of this

18    stipulation are for authentic copies of tweets and retweets

19    posted at the dates and times indicated on the exhibits but

20    which were later deleted at the dates and times listed in

21    Attachment B."

22            And Mr. Bianco, can you please pull up page 9 of

23    Government Exhibit 2001, the stipulation.

24    BY MS. SASSOON:

25    Q.  And Mr. Medrano, what does it say here under Attachment B,
```

1    in the parenthetical?

2    A.  Beneath it?

3    Q.  Yes.

4    A.  Oh, "Deleted Tweets."

5    Q.  And under Government Exhibit 866, what have the parties

6    stipulated was the date and time of deletion of Government

7    Exhibit 866?

8    A.  November 8, 2022, at 5:37 p.m.

9           MS. SASSOON:  We can take that down.

10          Mr. Bianco, can you please publish Government

11   Exhibit 803A.  And can you zoom in on the upper half of this

12   exchange.

13   Q.  So what are we looking at here, Mr. Medrano?

14   A.  Twitter direct messages.

15   Q.  And who are the participants in these direct messages?

16   A.  Kelsey Tuoc and SBF.

17   Q.  And at the top, where it says, "I was just relistening to

18   that conversation we had this summer about whether you should

19   do unethical shit for the greater good."  Who sent that

20   message?

21   A.  Kelsey Tuoc.

22   Q.  And what was the date of her message?

23   A.  November 16, 2022.

24   Q.  And where it says, "You were like nah, don't do unethical

25   shit, like if you're running Philip Morris no one's going to

1   want to work with you on philanthropy," who sent that message?

2   A.  Kelsey Tuoc.

3   Q.  And what was the response?

4   A.  "Heh."

5   Q.  Looking toward the bottom of what's been zoomed in here, do

6   you see where Kelsey Tuoc wrote, "I was trying to figure out

7   like if that was kind of the PR off-the-cuff answer."  What was

8   the date of that message?

9   A.  November 16, 2022.

10  Q.  And can you read the response from SBF.

11  A.  "Man all the dumb shit I said.  It's not true, not really."

12          MS. SASSOON:  And Mr. Bianco, if you could scroll

13  down.  Keep scrolling down.

14  Q.  And Mr. Medrano, can you please read the last two messages

15  here.

16  A.  "I feel bad for those who get fucked by it.  By this dumb

17  game we woke westerners play where we say all the right

18  shibboleths and so everyone likes us."

19          MS. SASSOON:  Okay.  We can take that down.

20          And Mr. Bianco, if you could publish Government

21  Exhibit 803B.

22  Q.  And what is this?

23  A.  Direct message on Twitter.

24  Q.  And so just to be clear, are these public?

25  A.  They are not.

1    Q.  And who is a party to seeing what's viewed in a direct

2    message?

3    A.  The parties that are in the direct message, so in this

4    scenario, it's Kelsey Tuoc and SBF.

5    Q.  And who wrote "Gary and Nishad are gone," on November 16,

6    2022?

7    A.  Kelsey Tuoc.

8    Q.  And what did the defendant respond?

9    A.  "Yeah, scared.  Or Gary is scared, Nishad is ashamed and

10   guilty."

11   Q.  And who wrote "ashamed and guilty because all the customer

12   deposits are gone"?

13   A.  Kelsey Tuoc.

14   Q.  And what did SBF respond?

15   A.  "Yea."

16   Q.  Who wrote, "people I've talked to have said Nishad was much

17   more into the ethics/not being sketchy stuff than you were"?

18   A.  Kelsey Tuoc.

19   Q.  And can you read SBF's response.

20   A.  "Yea.  It hit him hard.  I mean it hit all of us hard.  But

21   it hit him HARD."

22          MS. SASSOON:  And Mr. Bianco, you can take that down.

23          And can you please publish Government Exhibit 803C.

24   Q.  Mr. Medrano, are these also direct messages?

25   A.  Yes.

1   Q.  And who are the participants here?

2   A.  Kelsey Tuoc and SBF.

3   Q.  Who wrote, "you said a lot of stuff about how you wanted to

4   make regulations, just good ones, was that pretty much just PR

5   too??"

6   A.  Kelsey Tuoc.

7   Q.  And can you read the defendant's response on November 16,

8   2022.

9   A.  "There's no one really out there making sure good things

10  happen and bad things don't.  Usually there's only one

11  toggle—-do more or do less.  Yeah, just PR.  Fuck regulators."

12          MS. SASSOON:  Okay.  We can take that down.

13          And Mr. Bianco, can you publish Government

14  Exhibit 803D.

15  Q.  And who are the participants in these direct messages?

16  A.  Kelsey Tuoc and SBF.

17  Q.  And what's the date of the defendant's message saying

18  "didn't mean those to all be on the record.  Could you take it

19  down?"

20  A.  November 16, 2022.

21          MS. SASSOON:  And Mr. Bianco, can you pull up

22  alongside this Government Exhibit 881.

23  Q.  What are we looking at here, Mr. Medrano?

24  A.  Kelsey——the Kelsey Tuoc Twitter account.

25  Q.  And is this publicly visible to Twitter users?

1    A.  Yes, it is.

2    Q.  And underneath Kelsey Tuoc, can you read what it says in

3    the next line?

4    A.  "Senior writer at VOX's Future Perfect.

5    Kelsey.piper@vox.com.

6    Q.  What is VOX?

7    A.  I'm not sure.

8              MS. SASSOON:  No further questions.

9              THE COURT:  Thank you.

10             Cross-examination?

11             MR. EVERDELL:  Thank you, your Honor.

12             THE COURT:  Mr. Everdell.

13             MR. EVERDELL:  Just briefly, your Honor.

14   CROSS EXAMINATION

15   BY MR. EVERDELL:

16   Q.  Good afternoon, Mr. Medrano.

17   A.  Good afternoon.

18   Q.  Mr. Medrano, you said that you were an investigator; is

19   that right?

20   A.  Yes, I'm an investigative analyst.

21   Q.  Okay.  And you work at the U.S. Attorney's Office, correct?

22   A.  That is correct.

23   Q.  And so you work at the same office as the prosecutors.

24   A.  That is correct.

25   Q.  In your direct examination you were shown a number of

1    messages, correct?

2    A.  Yes, the prosecutors showed me the messages.

3    Q.  Right.  And they were messages between Mr. Bankman-Fried

4    and other people, right?

5    A.  Correct.

6    Q.  Okay.  And as you just said, the prosecutors gave you those

7    messages to review before your testimony; is that right?

8    A.  That is correct.

9    Q.  Okay.  You didn't select these messages yourself, correct?

10   A.  I did not.

11   Q.  Okay.  So you don't know, for example, if there are other

12   messages with the same people that my client may have had

13   besides the ones you reviewed.

14   A.  That is correct.

15   Q.  Okay.  Okay.  Now you looked at I think a few Twitter

16   direct messages; is that right?

17   A.  That is right.

18   Q.  And we saw those on the screen before, right?

19   A.  Right.

20   Q.  And they were with a number of different parties, right?

21   A.  Yes.

22   Q.  I think one was Cosmo, right?

23   A.  Yes.

24   Q.  Another was Matt Ballensweig?

25   A.  Yes.

1    Q.  And we just looked at some with Kelsey Tuoc, right?

2    A.  Yes.

3    Q.  Now, Mr. Medrano, you don't know these people yourself,

4    correct?

5    A.  I do not.

6    Q.  And you don't know yourself what the nature of

7    Mr. Bankman-Fried's relationship was with the people on the

8    messages, correct?

9    A.  I do not.

10   Q.  Okay.  You don't know whether he knew them well, for

11   example?

12   A.  I do not know.

13   Q.  Or whether they were total strangers to him, right?

14   A.  Correct.

15   Q.  Okay.  And you don't know, for example, the context that

16   the conversation in the messages was happening in, correct?

17   A.  Correct.

18   Q.  You don't know the events that may have happened before

19   that conversation took place?

20   A.  No.  I only know what I was seeing, correct.

21   Q.  You know what you saw.

22   A.  Correct.

23   Q.  Okay.  And you don't know from reading the messages

24   themselves what the tone of the conversation was.

25          MS. SASSOON:  Objection.

```
 1              THE COURT:  Sustained.

 2              MR. EVERDELL:  Okay.  One moment.

 3              Nothing further, your Honor.

 4              THE COURT:  Thank you.

 5              Anything else?

 6              MS. SASSOON:  No, your Honor.

 7              THE COURT:  You're excused, sir.  Thank you.

 8              (Witness excused)

 9              THE COURT:  Next witness?

10              MR. REHN:  The government calls Paige Owens.

11              (Witness sworn)

12              THE DEPUTY CLERK:  Please state your full name and

13   spell it.

14              THE WITNESS:  Paige Owens.  P-A-I-G-E, Owens,

15   O-W-E-N-S.

16              THE DEPUTY CLERK:  You may be seated.

17              THE COURT:  You may proceed, Mr. Rehn.

18    PAIGE OWENS,

19       called as a witness by the Government,

20       having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. REHN:

23   Q.  Good afternoon, Ms. Owens.

24   A.  Good afternoon.

25   Q.  Where do you work?
```

1  A.  I work at the FBI.

2  Q.  Is that the Federal Bureau of Investigation?

3  A.  Yes, it is.

4  Q.  What is your position at the FBI?

5  A.  My position is forensic accountant.

6  Q.  Do you work in any particular unit?

7  A.  Yes, I work in the public corruption unit.

8  Q.  And what are your job duties as a forensic accountant in

9  the public corruption unit at the FBI?

10  A.  Yup.  So my job duties include analyzing bank statements

11  for different investigations, including campaign finance, fraud

12  against the government, and corruption of public officials.

13  Q.  How long have you worked for the FBI?

14  A.  For two years.

15  Q.  Where did you work prior to that?

16  A.  I was an auditor at PricewaterhouseCoopers for five years.

17  Q.  What sort of work did you do there?

18  A.  There I analyzed financial statements for different private

19  equity funds.

20  Q.  Do you have any professional certifications?

21  A.  Yes.  I'm a certified public accountant.

22       MR. REHN:  Mr. Bianco, could you bring up Government

23  Exhibit 3000, page 1.  This is a demonstrative aid that was

24  admitted for demonstrative purposes earlier today.

25  Q.  Ms. Owens, were you asked by the government to review

1   certain bank statements in connection with this case?

2   A.  Yes.

3   Q.  And on the screen do you see there's some excerpts from

4   some bank statements from an Alameda Research market maker

5   account and also from a North Dimension account?

6   A.  Yes.

7   Q.  What are the last four digits of the Alameda Research

8   market maker account?

9   A.  The last four digits of Alameda Research ends in 4456.

10  Q.  And what are the last four digits of the North Dimension

11  bank account?

12  A.  8738.

13        MR. REHN:  At this time, pursuant to stipulation, I'm

14  just going to identify certain exhibits pursuant to stipulation

15  S2004.

16        Government Exhibit 1246 are authentic copies of

17  business records from Greylock Financial Credit Union, and

18  those relate to Ryan Salame.

19        Government Exhibits 1308, 1313, and 1312 are authentic

20  business records from Prime Trust, and those relate to Nishad

21  Singh, Samuel Bankman-Fried, and Alameda Research.

22        Government Exhibit 1320 contains true and correct

23  copies of authentic business records from Signature Bank, and

24  those relate in particular to Ryan Salame and Sam

25  Bankman-Fried.

1      And Government Exhibits 1336, 1337, and 1338 are

2  authentic copies of business records from Silvergate Bank, and

3  those relate to North Dimension and Alameda market maker bank

4  account, and FTX Digital Market bank account.

5      If we could bring that back up.

6  BY MR. REHN:

7  Q.  Now, Ms. Owens, did you review the bank statements that

8  I've just identified that were identified in stipulation S2004?

9  A.  Yes, I did.

10  Q.  And did that include the bank statements for the two

11  accounts that we see on the screen here?

12  A.  Yes.

13  Q.  And do these——approximately how many pages were there in

14  the bank statements that you reviewed?

15  A.  A couple thousand for each.

16      MR. REHN:  We can bring that down.

17  Q.  Ms. Owens, in front of you there should be a binder that

18  contains what's been marked for identification as Government

19  Exhibits 1088, 1089, and 1090.

20  A.  Yep.

21  Q.  What are those exhibits?

22  A.  These exhibits are charts that I produced in conjunction

23  with the government that details the flow of funds from various

24  business accounts to certain individuals and the eventual

25  political contributions made.

1    Q.  And is the information contained in Government

2    Exhibits 1088, 1089, and 1090 taken from the bank statements

3    that I just identified that you reviewed?

4    A.  Yes.

5    Q.  And have you reviewed all the information contained in

6    Government Exhibits 1088, 1089, and 1090?

7    A.  Yes.

8    Q.  And have you confirmed that this is a—that the information

9    contained within these exhibits is taken from the bank

10   statements that I listed previously?

11   A.  Yes.

12   Q.  And do these charts accurately convey information that was

13   in those bank statements?

14   A.  Yes.

15          MR. REHN:  Your Honor, the government offers Exhibits

16   1088, 1089, and 1090.

17          THE COURT:  Any objection?

18          MR. EVERDELL:  No objection, your Honor.

19          THE COURT:  They are received.

20          (Government's Exhibits 1088, 1089, and 1090 received

21   in evidence)

22          MR. REHN:  So if we could bring up Government

23   Exhibit 1089.

24   BY MR. REHN:

25   Q.  And before we get into the details, Ms. Owens, at a high

1    level, could you explain what is summarized on these charts.

2    A.  Yeah.  So reading from left to right, you'll see money

3    flowing from two business bank accounts——Alameda Research's

4    Prime Trust and Silvergate account; the flow of funds was then

5    sent to Sam Bankman-Fried's Prime Trust and Signature Bank

6    accounts, in orange; and then the ultimate place where the

7    funds were sent, which are political contributions, and those

8    are the boxes in green.

9    Q.  And so we're seeing a flow of funds from the accounts

10   listed on the left through the accounts in the middle to the

11   accounts on the right?

12   A.  Correct.

13   Q.  Is there a particular methodology you used for the flow of

14   funds that is listed on these charts?

15   A.  Yes, I used the LIFO method——last in, first out.

16   Q.  Can you explain how the last in, first out method works?

17   A.  Yes, so the last in, first out method works——the last

18   payment that was received into an account is then going to fund

19   the following outgoing flows until there's no more money left.

20   Q.  Did the government ask you to calculate the flow of funds

21   using the last in, first out method?

22   A.  Yes.

23   Q.  Is that a common method used for tracing the flow of funds

24   through bank accounts?

25   A.  Yes.

1    Q.  And does it require you to exercise any judgment or

2    discretion?

3    A.  No.

4    Q.  Okay.  So let's look here at Government Exhibit 1089.  And

5    if we could focus on the top part of the chart.  What do we see

6    on the top half of this chart?

7    A.  Yes, so the top half of the chart shows money moving from

8    Alameda Research's Prime Trust account.  There were seven wires

9    totaling $46 million sent from January 14, 2022, to April 14,

10   2022; the seven wires were then deposited into Samuel

11   Bankman-Fried's Prime Trust account, and then ultimately used

12   to fund political contributions.

13   Q.  So looking, for example, at the one in the middle, if you

14   could explain the flow of funds on April 4th.

15   A.  Yes.  So on April 4, 2022, there was a $6 million wire sent

16   from Alameda Research's Prime Trust account to Samuel

17   Bankman-Fried's Prime Trust account; on the same day,

18   $6 million was then wired from Samuel Bankman-Fried's Prime

19   Trust account to House Majority PAC.

20   Q.  So based on the bank records that you reviewed, what was

21   the source of funds that were used for the donation to the

22   House Majority PAC?

23   A.  Alameda Research's Prime Trust account.

24   Q.  Now let's go ahead and look at the bottom of this chart.

25          MR. REHN:  And if we could expand the bottom half.

1    Q.  What is shown here?

2    A.  Yes.  So what's shown here is four wires sent on August 15,

3    2022, and October 3, 2022, totaling $16 million, from Alameda

4    Research's Silvergate account to Samuel Bankman-Fried's

5    Signature Bank account, and then the ultimate political

6    contribution sent on August 16th and October 3rd of 2022.

7    Q.  And so focusing on the first one listed here, if you could

8    explain the flow of funds on August 15th and August 16th.

9    A.  Yep.  So on August 15, 2022, there were three wires which

10   totaled $10 million sent from Alameda Research's Silvergate

11   account to Samuel Bankman-Fried's Signature Bank account.  The

12   next day, on August 16, 2022, there was a $10 million wire sent

13   from Samuel Bankman-Fried's Signature Bank account to One

14   Nation.

15   Q.  So based on the bank records that you reviewed, what was a

16   source of funds that were used for this donation to One Nation?

17   A.  Alameda Research Silvergate account ending 4456.

18           MR. REHN:  Mr. Bianco, could I ask you to bring up

19   Government Exhibit 28, which is in evidence.

20           I'm sorry.  28.  I think it's a spreadsheet.  So it

21   may be—and on this first tab that says SBF—Mr. Bianco, could

22   I ask you to scroll to line 76.

23   Q.  Ms. Owens, could I ask you to read the type that is listed

24   here.

25   A.  "Political Donation."

1    Q.  And what is the recipient here?

2    A.  House Majority PAC.

3    Q.  And what was the date?

4    A.  The date was April 4, 2022.

5    Q.  And the amount?

6    A.  $6 million.

7    Q.  And referring you back to Government Exhibit 1089, does

8    this match one of the payments you traced that we just looked

9    at?

10   A.  Yes.

11        MR. REHN:  All right.  Mr. Bianco, could you scroll

12   down to line 133.

13   Q.  And if I could ask you to read the type listed here.

14   A.  "Political Donation."

15   Q.  And who's the recipient?

16   A.  One Nation.

17   Q.  And is there something in parentheses there as well?

18   A.  "One Nation (McConnell)."

19   Q.  And what's the amount of this particular donation?

20   A.  $10 million.

21   Q.  And going back to Government Exhibit 1089, does this appear

22   to match one of the flow of funds that you traced?

23   A.  Yes, the amount matches, and the date is just off by one

24   day.

25        MR. REHN:  We can bring that down.

1    Q.  Ms. Owens, I'd now like to bring up Government

2    Exhibit 1090.

3           And can you explain what we see here on the first page

4    of 1090.

5    A.  Yes.  So in this chart, you see on the left the blue box

6    says FTX Digital Markets and Alameda Research sending wires to

7    Nishad Singh's Prime Trust account.  That account then sends

8    wires to various political entities in the green boxes on the

9    right.

10   Q.  Okay.  So let's focus in on the top one.

11          Could you explain what we see with respect to the

12   first donation that's listed here.

13   A.  Yes.  So on April 21, 2022, there was a $2.65 million wire

14   sent from FTX Digital Markets's Silvergate account to Nishad

15   Singh's Prime Trust account.  That then funded three donations,

16   which are shown on the right side.

17   Q.  So based on your tracing, what was a source of funds for

18   the July 7th wire to the LGBTQ Victory Fund Inc.?

19   A.  The wire that was received from FTX Digital Markets.

20   Q.  And what was the date of that donation?

21   A.  July 7, 2022.

22          MR. REHN:  Mr. Bianco, could I ask you to bring up

23   Government Exhibit 477 alongside Government Exhibit 1090.

24   Q.  Ms. Owens, do you see some messages here on the right-hand

25   side?

```
1    A.  Yes.

2    Q.  What is the date of these messages?

3    A.  July 5, 2022.

4    Q.  And could I ask you to read the third message down.

5    A.  "Anyway, what's up with the LGBT Victory Fund?"

6            MR. REHN:  And Mr. Bianco, could I ask you to go to

7    the next page.

8    Q.  And Ms. Owens, if I could ask you to read, sort of two

9    thirds of the way down, the message beginning "but in general."

10           THE COURT:  Didn't we do this with another witness?

11           MR. REHN:  Excuse me, your Honor?

12           THE COURT:  Didn't we do this with Mr. Singh on the

13   stand?

14           MR. REHN:  We looked at these messages but not in

15   connection with this summary chart, your Honor.

16           THE COURT:  Isn't it redundant?

17           MR. REHN:  We can take it down.

18           Mr. Bianco, could I please ask you to bring back up

19   Government Exhibit 1090.

20           And if we could now go to the second page of

21   Government Exhibit 1090.

22   BY MR. REHN:

23   Q.  Ms. Owens, could I ask you to explain what is summarized on

24   page 2 of Government Exhibit 1090.

25   A.  Yes.  So on September 30, 2022, Alameda Research's
```

1  Silvergate account sent two wires totaling a million dollars to

2  Nishad Singh's Prime Trust account ending 5753.  Between

3  October 4, 2022, and October 7th of 2022, 16 wires were then

4  sent to the following political entities listed on the right.

5  Q.  So with respect to the 16 donations that are listed on the

6  right, based on your tracing, what was the source of funds for

7  those donations?

8  A.  Alameda Research's Silvergate account.

9       MR. REHN:  Okay.  We can now turn to Government

10 Exhibit 1088.  Mr. Bianco, if you could bring that up.

11 Q.  And Ms. Owens, if you could just explain at a high level

12 what is depicted on Government Exhibit 1088.

13 A.  Yes.  So on 1088, you see money flowing from North

14 Dimension Inc.'s Silvergate account on the left.  At the top

15 you'll see that there was——

16      MR. REHN:  If we could expand the top, Mr. Bianco.

17 A.  ——12 wires sent to Ryan Salame's Signature Bank account

18 totaling $34.5 million, which were then used to fund the

19 following——the political donations that are on the right in

20 green.

21 Q.  And so based on the tracing method that you applied, were

22 the original wires from——

23      MR. REHN:  If you could bring that down so we can

24 identify the original source.  I mean, Government Exhibit 1090.

25 Or 1089.  Or, I'm sorry, 1088.  Excuse me.

1  Q.  So for all the political contributions listed on the

2  right-hand side, were you able to identify the source of funds

3  for those contributions?

4  A.  Yes.  The source was North Dimension Inc.'s Silvergate

5  account.

6          MR. REHN:  Okay.  And Mr. Bianco, could I ask you to

7  expand the bottom part of this exhibit.

8  Q.  Ms. Owens, do you see that there are also some wires listed

9  on the bottom here?  Could you explain what this shows.

10  A.  Yes.  So North Dimension's account sent seven wires between

11  April 22nd and May 23rd, 2022, totaling $12.6 million to Ryan

12  Salame's Greylock bank account, which were then used over a

13  period of time to fund the political donations in the green

14  boxes on the right.

15  Q.  And if I could ask you to read the two middle boxes on the

16  right.

17  A.  Yup.  So on April 22nd and May 12th of 2022, $700,000 was

18  donated to Results for North Carolina Incorporated; and on

19  April 25th, '22 and May 2nd, '22, $500,000 was given to

20  Defending Main Street Super PAC.

21  Q.  And what was the source of funds for these donations?

22  A.  The North Dimension bank account.

23          MR. REHN:  Mr. Bianco, could we please bring back up

24  Government Exhibit 28.

25          And if we could go to the tab that says RDS at the

bottom.

Q.  And Ms. Owens, could I ask you to read the line 2, what the

type of donation is there.

A.  Political.

Q.  And does the date match one of the transfers that you

traced on Government Exhibit 1088?

A.  Yes.

Q.  And if I could ask you to read line 3.  And identify the

type.

A.  Political.

Q.  And does the recipient and the date match one of the

transfers that you traced in Government Exhibit 1088?

A.  Yes.

          MR. REHN:  We can bring that down.

Q.  Ms. Owens, aside from your work in helping to prepare and

review the exhibits we've been looking at, have you had any

other involvement with this case?

A.  No.

          MR. REHN:  Nothing further, your Honor.

          THE COURT:  Thank you.

          Any cross?

          MR. EVERDELL:  Yes, your Honor.

CROSS EXAMINATION

BY MR. EVERDELL:

Q.  Good afternoon, Ms. Owens.

1   A.  Good afternoon.

2   Q.  Ms. Owens, you said you're an accountant with the FBI; is

3   that right?

4   A.  Yes.

5   Q.  And you were asked by the prosecutors in this case to

6   perform an analysis of various bank records, right?

7   A.  Yes.

8   Q.  In particular, you were asked to trace money flows from

9   different bank accounts belonging to Alameda Research and North

10  Dimension to bank accounts belonging to Mr. Bankman-Fried,

11  Nishad Singh, and Ryan Salame, right?

12  A.  Yes.

13  Q.  Okay.  And from those accounts, you were asked to trace the

14  outflows from the accounts belonging to the individuals to

15  various political organizations, right?

16  A.  Yes.

17  Q.  The prosecutors were the ones who gave you the dates of the

18  money transfers that they wanted you to look at, right?

19  A.  Yes.

20  Q.  And they specified which accounts you should look at.

21  A.  Yes.

22  Q.  And they told you the names of the political organizations

23  that they wanted you to look at as well, right?

24  A.  Yes.

25  Q.  Okay.  Ms. Owens, you testified that the accounting method

1  that you used to determine whether the transfers from the

2  Alameda accounts, whether those were the source of the

3  political donations at the end, was called LIFO; is that right?

4  A.  Yes.

5  Q.  And you said that stands for last in, first out; is that

6  right?

7  A.  Correct.

8  Q.  Okay.  And I think you said that method assumes that when a

9  bank account receives a deposit, then any distributions out of

10  that bank account after the deposits received come from that

11  last deposit, right?

12  A.  Correct.

13  Q.  Okay.  LIFO isn't the only method that you can use, right?

14  A.  Correct.

15  Q.  You can also use, for example, the FIFO method, correct?

16  A.  Correct.

17  Q.  FIFO stands for first in, first out, right?

18  A.  Correct.

19  Q.  And that's also a common method of accounting method to do

20  this sort of analysis, right?

21  A.  Yes.

22  Q.  And that method assumes that the outflows from the bank

23  account are the product of the earliest deposit, not the most

24  recent deposit, correct?

25  A.  Correct.

1   Q.  Okay.  So just to use a simple example, if I deposit a

2   thousand dollars into a bank account in January and another

3   thousand in February and another thousand in March, and then I

4   withdraw a thousand in April, then under the FIFO method, the

5   thousand that was withdrawn in April was the result of the

6   thousand that was deposited in January, right?

7   A.  Correct.

8   Q.  Okay.  Because that was the first deposit that came in,

9   right?

10  A.  Yes.

11  Q.  And under LIFO, on the other hand, the thousand withdrawn

12  in April would have been the result of the thousand that was

13  deposited in March, right?

14  A.  Correct.

15  Q.  Okay.  Because that was the last deposit that came in.

16  A.  Yes.

17  Q.  And if you use FIFO rather than LIFO, the results can

18  differ, can't they?

19  A.  Correct.

20  Q.  Okay.  And the reason why you have to adopt one of these

21  methods at all, right, is because money is fungible, correct?

22  A.  Yes.

23  Q.  Okay.  And fungible just means that any dollar is the same

24  as any other dollar, right?

25  A.  Correct.

```
 1   Q.  So if you're depositing money into an account that already

 2   has money in it, there's no way to distinguish one dollar from

 3   another, right?

 4   A.  Correct.

 5   Q.  So these methods you use are a way of sort of using a

 6   method that has parameters to try to trace funds, right?

 7   A.  Yes.

 8   Q.  Even though the money itself is fungible.

 9   A.  Correct.

10   Q.  Okay.  I want to just take a look at one of the donations

11   that you just were asked about, okay?

12   A.  Yes.

13         MR. EVERDELL:  Okay.  So if we can put up what's

14   already in evidence as Government Exhibit 1088.

15         I might have to ask the government's assistance on

16   this since we don't have it in our system yet.

17         THE COURT:  Sure.

18   Q.  Okay.  That's Government's 1088; is that right?  Do you

19   recognize that, Ms. Owens?

20   A.  Yes.

21   Q.  Okay.  And these you said are the deposits to the political

22   organizations that relate to Ryan Salame, right?

23   A.  Correct.

24         MR. EVERDELL:  Okay.  And if we could just blow up

25   down at the bottom, that bottom portion.  Thank you.  I
```

 1   appreciate the help.

 2   Q.  All right.  So those are wires that came from the North

 3   Dimension account, went into Ryan Salame's Greylock account,

 4   and then out to political organizations, right?

 5   A.  Correct.

 6   Q.  Okay.  And you said that there——it shows here that there

 7   are seven wires, right, going to the Greylock account between

 8   April 22nd and May 23rd of 2022, right?

 9   A.  Yes.

10   Q.  And then seven wires going out, April 22nd to May 25th,

11   right?

12   A.  Yes.

13   Q.  Okay.  And then you see one of those wires down at the

14   bottom is a $250,000 wire to VIEW PAC, right?

15   A.  Yes.

16   Q.  And that's on May 16th of 2022, right?

17   A.  Yes.

18           MR. EVERDELL:  Okay.  If we could now pull up what is

19   now in evidence as Government Exhibit 1246.  I believe it was

20   just received by stipulation.

21           MR. REHN:  Your Honor, we didn't actually offer the

22   underlying bank records so it's not in evidence.

23           THE COURT:  It is not in evidence, but——take it from

24   there.

25           MR. EVERDELL:  Sure.  Thank you, your Honor.

1    BY MR. EVERDELL:

2    Q.  All right.  Well, let me ask you this, Ms. Owens:  Do you

3    recall reviewing the Greylock records for Ryan Salame's

4    Greylock bank account?

5    A.  Yes.

6    Q.  Okay.  And did you review the records that relate to——that

7    are around that May time, May 2022 time period when that

8    donation to VIEW PAC was made, right?

9    A.  Yes.

10   Q.  Okay.  And do you recall looking at the deposits that came

11   in and the withdrawals that went out, right?

12   A.  Yes.

13   Q.  And do you recall seeing that there were deposits that came

14   in around that time from the North Dimension bank account,

15   right?

16   A.  Yes.

17   Q.  Okay.  Do you recall in particular a deposit was made on

18   May 13th from the North Dimension bank account of 3.25 million,

19   approximately?

20   A.  I believe so.

21   Q.  Okay.  But do you recall also a deposit that came in later

22   that same day from Heller & Robbins PC?

23   A.  I don't recall.

24   Q.  All right.  Let's see if I can refresh your recollection.

25          MR. EVERDELL:  If we can pull up Government

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    Exhibit 1246.  And if you could scroll down, first to page 14,

 2    of the pdf.  Well, first off, stay at this page.  Well, let's

 3    go down to——I take it back.  Let's go down to page 14 of the

 4    pdf, if we could.  Is that something you're able to do?

 5            Oh, sorry.  Right.  If you could go down to page 15.

 6            Okay.  And just look first down at the bottom of the

 7    page, on the May 13th.  If you could just highlight the last

 8    couple entries down there.

 9    BY MR. EVERDELL:

10    Q.  All right.  First take a look at that.  And then if you

11    could take a look at the page that follows up at the top.

12            MR. EVERDELL:  If we could go to the next page.

13            Thank you.

14    Q.  Okay.  Now why don't you take a look at that.

15    A.  Yep.

16    Q.  And does this refresh your recollection about whether a

17    wire came in from Heller & Robbins PC at the same——later that

18    same day, on May 13th, after the North Dimension wire?

19    A.  Yes.

20    Q.  Okay.  And then do you recall whether or not the outflow to

21    VIEW PAC was made after that wire from Heller & Robbins?

22    A.  I'd have to review it myself.

23            MR. EVERDELL:  Okay.  If we could just minimize the

24    bottom one and highlight a little bit more of that same page,

25    from the top.  No, sorry, go from the top.  Yup.  Yup.  That's

1    right.  Fine.  Right there.  Thanks.

2    Q.  Why don't you take a look at that blowout and see if that

3    refreshes your recollection.

4    A.  Yes.

5    Q.  Okay.  Does it refresh your recollection about a wire,

6    whether the Heller & Robbins wire came in before the wire going

7    out to VIEW PAC?

8    A.  Yes.

9    Q.  Okay.  So what is your recollection, having been refreshed?

10   A.  Looking at these statements, using the LIFO method, the

11   source of VIEW PAC was Heller & Robbins.

12   Q.  And not North Dimension, correct?

13   A.  Looking at these statements, yes.

14            MR. EVERDELL:  Okay.  Now we can put that down.

15   Q.  Ms. Owens, in each of the exhibits you talked about, your

16   analysis on the left side of the exhibit begins with the source

17   of funds, right?

18   A.  Yes.

19   Q.  And in each of your exhibits the funds originate at bank

20   accounts that either belong to Alameda Research or North

21   Dimension, Inc.; is that right?

22   A.  Yes.

23   Q.  Okay.  Now as part of your analysis, you did not analyze

24   where the money in those accounts came from, right?

25   A.  Correct.

 1   Q.  All right.  So you don't know whether those funds came from

 2   Alameda's trading profits, for example.

 3   A.  Correct.

 4   Q.  Your analysis simply shows that money flowed out of those

 5   Alameda and North Dimension accounts into other accounts on

 6   particular dates, correct?

 7   A.  Yes.

 8   Q.  And that's it.

 9   A.  Yes.

10          MR. EVERDELL:  One moment, your Honor.

11          Nothing further, your Honor.

12          THE COURT:  Thank you.

13          Anything else, Mr. Rehn?

14          MR. REHN:  Briefly, your Honor.

15          THE COURT:  Proceed.

16   REDIRECT EXAMINATION

17   BY MR. REHN:

18   Q.  Ms. Owens, do you recall you were asked some questions

19   about the difference between the first in, first out method and

20   the last in, first out method?

21   A.  Yes.

22          MR. REHN:  If we could bring up Government

23   Exhibit 1089.

24   Q.  And if we look at the wires here, what do you see?  Let's

25   focus first on the top half of this page.  Do the wires coming

1    from Alameda Research account into the Sam Bankman-Fried

2    account tend to line up in terms of date with the wires coming

3    out?

4              MR. EVERDELL:  Objection.

5              THE COURT:  Sustained as to form.

6    Q.  Let's focus on the March 11th wire, coming from Alameda

7    Research into the Samuel Bankman-Fried Prime Trust account.  Do

8    you see that?

9    A.  Yes.

10   Q.  When was the wire correlating to that amount that was sent

11   to Guarding Against Pandemics?

12             MR. EVERDELL:  Objection, form.

13             THE COURT:  Overruled.

14   A.  The wire from Sam Bankman-Fried's account to Guarding

15   Against Pandemics was sent on March 11, 2022.

16   Q.  And if we go to the next line, when was the wire that was

17   sent from Alameda Research to Prime Trust?

18   A.  March 11, 2022.

19   Q.  I'm sorry.  The next line down.

20   A.  Oh.  Oh, April 4, 2022.

21   Q.  And when was the wire sent to the House Majority PAC?

22   A.  April 4, 2022.

23   Q.  And if we can just do one more.  What about the next one?

24   A.  January 31, 2022.

25   Q.  And when was the wire sent out from that Prime Trust

 1   account?

 2   A.  January 31, 2022.

 3          MR. REHN:  We could bring that down.

 4   Q.  Do you recall being asked some questions about the chart

 5   you prepared for Ryan Salame's bank accounts?

 6   A.  Yes.

 7          MR. REHN:  Your Honor, the government would now offer

 8   Government Exhibit 505 pursuant to stipulation 2003.  This is a

 9   Slack chat between Ryan Salame and an individual identified as

10   Scott.

11          MR. EVERDELL:  It's beyond the scope.

12          THE COURT:  I don't know what it is yet.

13          I'm sorry.  Is there a part of this you want to invite

14   my attention to or not?

15          MR. REHN:  Yes, your Honor.  This is responsive to the

16   questioning about the Ryan Salame tracing that the witness did.

17          THE COURT:  Yes, I assume that's so, but is there a

18   part of it that you want me to look at?

19          MR. REHN:  On the second page, your Honor.  We're just

20   going to pull up the third message down.

21          THE COURT:  Show me the preceding chart, the chart

22   that contains the money moving through Salame.

23          MR. REHN:  Yes.  If we could go to Government

24   Exhibit 1088 for the judge.

25          THE COURT:  Larger, please.

 1              And the date we're looking at?

 2              MR. REHN:  So the dates range from May of 2022——or

 3    actually April of 2022 through I believe November of 2022.  And

 4    in the prior exhibit the dates are from I believe November of

 5    2021.

 6              THE COURT:  Back to the 505, please.

 7              And your objection, Mr. Everdell?

 8              MR. EVERDELL:  Your Honor, it's beyond the scope.  The

 9    message is from November of 2021.  The analysis is

10    from——sorry——April 2022.  This witness has only testified about

11    money flows.  This has nothing to do with the money flows or

12    the particular political organizations that the money

13    supposedly went to.  It's completely beyond the scope of her

14    testimony, and I'm fairly confident she's never seen this

15    communication before.  I think it's completely beyond the

16    scope.

17              MR. REHN:  Your Honor, the witness was asked about the

18    tracing through the Ryan Salame bank account, and the

19    cross-examination was clearly meant to suggest that the tracing

20    that the witness performed was inaccurate, and I think that

21    evidence of a statement of one of the defendant's agents is

22    responsive to that cross.

23              MR. EVERDELL:  Your Honor, this has nothing to do with

24    the accuracy of the defendant's analysis.  This is a statement

25    by Ryan Salame purportedly about political donation.  It has

1    nothing to do with her testimony about the money flows in

2    particular, coming from one bank account to another and donated

3    to a particular organization, none of which is mentioned

4    anywhere in this—

5            THE COURT:  This objection is sustained.

6            MR. REHN:  Thank you, your Honor.  Nothing further.

7            MR. EVERDELL:  No recross, your Honor.

8            THE COURT:  Then you are excused, Ms. Owens.

9            (Witness excused)

10           THE COURT:  Now, members of the jury, we're going to

11   have what I hope is a shorter day tomorrow because we're only

12   going to have, as I understand it—correct me if I'm wrong—two

13   witnesses tomorrow, and then we are off till next Thursday.

14   And on next Thursday we may also have a short day; is that

15   right?

16           MS. SASSOON:  Your Honor, it depends on some issues

17   we'd like to raise with you.

18           THE COURT:  I'll stop with tomorrow.  Tomorrow we're

19   going to have a short day.  And now I'll find out what the

20   issues are.  But I'll see you in the morning at 9:30.

21           THE DEPUTY CLERK:  All rise.

22           (Continued on next page)

23

24

25

1              (Jury not present)

2              THE COURT:  Be seated, folks.

3              Lest I forget it, when we're done, I would appreciate

4    the government taking back all the used witness binders and so

5    on which are beginning to threaten the stability of the bench

6    here.

7              Okay.  Now what do I need to know about?

8              MS. SASSOON:  The government expects to rest early in

9    the day of a week from tomorrow, but it's our position that the

10   defense should have to begin its case at that point.

11             THE COURT:  Should or should not?

12             MS. SASSOON:  Should, given that we're going to have

13   this long break between now and next week for them to prepare.

14   I don't think the witnesses we have on tap for that week

15   are—they're going to be short, but I also think that they're

16   not so material that it would affect, you know, the decision to

17   put on a defense case.

18             We'd also ask that the Court set a deadline for the

19   defense to notify us of its first witnesses in the defense case

20   prior to Thursday.

21             THE COURT:  Mr. Cohen?

22             MR. COHEN:  I'm not sure I follow.

23             THE COURT:  They would like you to plan on the

24   commencement of your case, if any, promptly after they rest a

25   week from tomorrow, I guess.  First point.

1          Second point, they would like you to be obliged to

2    identify, if you're putting in a case, who the witnesses will

3    be, at least the first few, if there are going to be more than

4    one, and the sequence by a date certain.

5          MR. COHEN:  Well, your Honor, we will be prepared to

6    go forward on the 26th if we do put on a case.

7          THE COURT:  Is that the right date?

8          MR. EVERDELL:  26th, your Honor, that's a Thursday.

9          THE COURT:  I think that's right.

10         MR. COHEN:  I'm looking at your Honor's calendar.

11         THE COURT:  Well, let's hope it's right.

12         MR. COHEN:  I carry this with me all the time.

13         THE COURT:  I'll treasure that thought.  Especially if

14   I can find my own calendar.

15         Thursday is the 26th.  Next Thursday.

16         Okay.  Now it would seem to me——well, Ms. Sassoon,

17   when do you want notice?

18         MS. SASSOON:  As it stands, rebuttal expert notice

19   would then be due that Monday, and we'd like notice of the

20   other witnesses by that Monday as well.

21         THE COURT:  Okay.  What do you say to that?

22         MR. COHEN:  Your Honor, for the last several weeks,

23   well, the entire trial, we've been getting notice from the

24   government on the Friday before the week of all the witnesses

25   for the week, without being told who will be called in what

1  order, so in keeping with the symmetry of that, I would propose

2  that we provide our notice on the 24th, which is two days

3  before, which is how we've been receiving notice throughout the

4  trial.

5        THE COURT:  Do you think you could negotiate a

6  reasonable compromise here, folks?

7        MR. COHEN:  We can certainly try.

8        THE COURT:  And if you can manage that, I'm going to

9  send you to the Middle East.

10        MR. COHEN:  That's above my pay rate, your Honor.

11        THE COURT:  What about that?

12        MR. COHEN:  Let us try.  If your Honor will permit us,

13  we'll try.

14        THE COURT:  You'll let me know in the morning.  But

15  the rebuttal expert notices are due October 23rd.

16        MR. ROOS:  And on that, your Honor, in case it's

17  helpful for the defense and the Court, your Honor's order on

18  the defense experts and the possibility of rebuttal experts

19  basically attached or keyed various potential defense experts

20  to various government experts or witnesses.  The government is

21  not calling the——

22        MR. RAYMOND:  Andria van der Merwe, the expert on

23  commodities.

24        MR. ROOS:  So the only one is the one who testified,

25  Easton.

1          THE COURT:  So can we rely at this point on what

2     constitutes the universe of potential defense expert notices?

3          MR. COHEN:  Your Honor, we're still working through

4     that, and we would——we can have a more concrete answer for your

5     Honor tomorrow.  We're certainly not going to rebut the expert

6     that they didn't call, but——

7          THE COURT:  That seems reasonable.

8          MR. COHEN:  As much as we'd like to hear about corn

9     and all the other things on their charts.  But there is one

10    issue that I do want to talk with my colleagues and my client

11    about tonight.

12         THE COURT:  Sure.  Okay.

13         All right.  Anything else tonight?

14         MS. SASSOON:  One issue, your Honor.  We're calling

15    tomorrow an attorney from FTX.  His name is Can Sun.

16         THE COURT:  And he's a former attorney from FTX,

17    right?

18         MS. SASSOON:  Yes.

19         THE COURT:  Yes.

20         MS. SASSOON:  I reached out to counsel over the lunch

21    break to ask that they flag if there are any issues they're

22    going to raise on cross-examination related to their potential

23    presence of counsel defense, and so hopefully we can work that

24    out tonight and raise any issues before the witness takes the

25    stand with your Honor.  And we also are anticipating at least

1    one lawyer from the FTX debtors to be here in court to protect

2    what hasn't been waived in terms of privilege.  I don't──our

3    direct is not going to touch on anything that they're asserting

4    privilege over, and I'm not aware of anything on

5    cross-examination at this point that's going to touch on the

6    privilege, but they will be here in the event that it's

7    necessary.

8                    THE COURT:  Okay.

9                    MR. COHEN:  We will talk to them tonight, your Honor.

10                   THE COURT:  Good.

11                   MR. COHEN:  A lot of it depends on what they're

12   planning to do in the direct, so maybe they can give us a hint.

13                   THE COURT:  Yes.  Well, I urge communication.  Thank

14   you, folks.

15                   THE DEPUTY CLERK:  All rise.

16                   (Adjourned to October 19, 2023, at 9:30 a.m.)

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                               Page

3    ELIORA MICHAELA KATZ

4    Direct By Mr. Raymond  . . . . . . . . . . .1680

5    Cross By Mr. Cohen . . . . . . . . . . . . .1700

6    PETER DOUGLAS EASTON

7    Direct By Mr. Roos . . . . . . . . . . . . .1702

8    Cross By Mr. Lisner  . . . . . . . . . . . .1777

9    Redirect By Mr. Roos . . . . . . . . . . . .1806

10   Recross By Mr. Lisner  . . . . . . . . . . .1807

11    CORY GADDIS

12   Direct By Mr. Raymond  . . . . . . . . . . .1810

13   Cross By Mr. Everdell  . . . . . . . . . . .1821

14   SHAMEL MEDRANO

15   Direct By Ms. Sassoon  . . . . . . . . . . .1835

16   Cross By Mr. Everdell  . . . . . . . . . . .1853

17    PAIGE OWENS

18   Direct By Mr. Rehn . . . . . . . . . . . . .1856

19   Cross By Mr. Everdell  . . . . . . . . . . .1869

20   Redirect By Mr. Rehn . . . . . . . . . . . .1878

21

22

23

24

25

```
 1                       GOVERNMENT EXHIBITS

 2    Exhibit No.                                    Received

 3     913-1 and 913-2  . . . . . . . . . . . .1684

 4     914-1  . . . . . . . . . . . . . . . . .1690

 5     914A . . . . . . . . . . . . . . . . . .1691

 6     1001 to 1005, 1010, 1011, 1013, . . . . . .1709

 7              1014, 1017, including its

 8              subparts, 1018, 1023-1033,

 9              1035, 1039-1041, 1044, 1045,

10              1050, 1051, 30, 56, 89, 188,

11              201, 213, 308, 310, 314, 317,

12              327, 344, 506, 1735, 3000-3016

13     5M, 5F, 18M, 18F, 19M, 19F, . . . . . . . .1819

14              28M, 28F, 42M, 42F, 44M, 44F,

15              50M, 50F, 325M, 325F, 340M,

16              340F

17     770, 783, 788, 794, 796,  . . . . . . . . .1837

18              803A-D, 823, 853, 861, 865,

19              870, and 881

20     80, 84, 86, and 192  . . . . . . . . . . .1840

21     1088, 1089, and 1090 . . . . . . . . . . .1860

22     267  . . . . . . . . . . . . . . . . . .1842

23     763  . . . . . . . . . . . . . . . . . .1688

24     764  . . . . . . . . . . . . . . . . . .1689

25     833  . . . . . . . . . . . . . . . . . .1682
```

836    . . . . . . . . . . . . . . . . .1687

839    . . . . . . . . . . . . . . . .1695

1                        GOVERNMENT EXHIBITS

2    Exhibit No.                              Received

3    844    . . . . . . . . . . . . . . . . .1696

4    845    . . . . . . . . . . . . . . . . .1697

5    856    . . . . . . . . . . . . . . . . .1700

6    870    . . . . . . . . . . . . . . . . .1699

7    913-T  . . . . . . . . . . . . . . . . .1684

8    913-A  . . . . . . . . . . . . . . . . .1685

9    914-T  . . . . . . . . . . . . . . . . .1691

10   916-T  . . . . . . . . . . . . . . . . .1697

11   1476   . . . . . . . . . . . . . . . . .1844