

Unit F Bourne End Business Park
Cores End Road
Bourne End SL8 5AS
United Kingdom

+44 (0)1628 824 900
postbox@modulesolutions.com
www.modulesolutions.com

Honourable Judge John Dorsey
United States Bankruptcy Court
District of Delaware
824 N Market St
5th Floor, Courtroom 5
Wilmington, DE 19801
302-533-3169

February 15th, 2024

Re: FTX TRADING LTD Chapter 11 22-11068-JTD

**(1) Objection** to Motion of Debtors for Entry of an Order Authorizing and Approving (I) Procedures for Sale of Debtors' Equity Interests in Anthropic, PBC; (II) Sale(s) of Such Equity Interests in Accordance with such Procedures Free and Clear of any Liens, Claims, Interests and Encumbrances; and (III) Redaction and Filing Under Seal of Certain Confidential Commercial Information in the Sale Procedures (Dkt. 6950 (sealed) & 6952 (redacted)) (the "**Anthropic Motion**"); and

**(2) Objection** to Motion of Debtors for Entry of an Order (I) Authorizing and Approving Sale of Interests in Digital Custody Inc. Free and Clear of All Liens, Claims, Interests and Encumbrances; (II) Authorizing and Approving Entry Into, and Performance Under, the Purchase and Sale Agreement; (III) Authorizing Debtors to File Certain Schedules to the Purchase and Sale Agreement Under Seal; and (IV) Granting Related Relief (related document(s)7248) (Dkt. 7248 (sealed) & 7249 (redacted) (the "**DCI Motion**"); and

**(3) Other business.**

Dear Honourable Judge John Dorsey,

This letter is respectfully provided in objection to the above Motions.

The first order of business, and getting straight to the heart of the matter, is that **the Anthropic Shares are not free and clear of claims or interests** due to the fact that $500 million of funds used to acquire the Anthropic Shares in October 2021 are directly traceable back to FTX

customer property, and as such FTX customers have a proprietary interest in this investment.

The legitimate interest in the Anthropic Shares[1] has been established by examination of bank accounts, ledgers and related accounting records for Alameda Research, LLC, ("**Alameda**") and FTX Trading Ltd and its affiliate companies ("**FTX**") in the period January 1, 2021 through to November 11, 2022. The methodology applied a flow-of-funds analysis starting at the transfer to acquire the investment and thereafter tracing the money transfers back through intracompany accounts to the initial transfer out of an account holding FTX customer property. For the reasons set forth hereafter, the Anthropic Motion should be denied pursuant to §363(e) and §363(f) of title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "**Bankruptcy Code**").

There is no doubt that the $500 million used to purchase Anthropic Shares comprised the transfer of a large sum. Given the investment was made from commingled customer funds, and due to the fungible nature of fiat currency held in a bank account, the claim to proprietary interest is not asserted to trace back to a single individual customer but rather to FTX customers generally. Therefore – it is posited that an *in rem* claim to the Anthropic Shares, or the proceeds of sale of the Anthropic Shares, should fairly and equitably be secured for the benefit of FTX customers alone rather than allocated to the General Pool for general waterfall distribution in the Debtors' plan of reorganization to non-customer creditors. To the extent of this property interest, FTX customers are secured creditors.

The next item is objection to the DCI Motion which seeks to sell 100% of the equity interest held in Digital Custody Inc. at an unreasonable knock-down price.

Later in this letter, I venture to other business to comment on the Debtors' recent announcement regarding the non-sale or non-restart of the FTX.com exchange.

Lastly, the final item in this letter flags the haste in which the Debtors have been selling certain Digital Assets granted by the *Order authorizing and approving (i) guidelines for the sale or transfer of certain Digital Assets, (ii) the sale or transfer of such Digital Assets in accordance with such guidelines free and clear of any liens, claims, interests and encumbrances, (iii) the Debtors' entry into, and performance under, postpetition hedging arrangements, including granting liens and superpriority administrative expense claims in connection therewith and (iv) the Debtors to stake certain digital assets* (the "**Asset Sale Order**"). Order signed September 13, 2023. (Dkt. 2505).

[1] Capitalized terms as defined in the Motions unless indicated otherwise.

I will deal with each in turn:

1. **Objection to Anthropic Motion**

In background, and before jumping in to lay out the burden of proof on the issue pursuant to §363(p)(2) of the Bankruptcy Code, it is perhaps necessary to consider the relevant landscape to this objection. There can be no quarrel that the Debtors have exclusive control of and access to their internal systems, databases, financial accounts, ledgers, and other related records (collectively, the "**Data Sources**") and without permissive access to these Data Sources it would be impossible to establish the necessary burden of proof to trace customer property.

During this Chapter 11 bankruptcy proceeding the Debtors' have variously asserted, including by their related actions, argument at hearings, and motions to this Court, that it has not been possible to trace fiat currency or cryptocurrency across their structure of companies back to customers from their own analysis of the Data Sources.

I will dwell momentarily to remind the Court of the absurd test set out by the Debtors around the time of the Asset Sale Order that was employed as a means to trace customer ownership of fungible cryptocurrency held in omnibus wallets: The conditions laid out by the Debtors set an impossibly high bar which demanded customers should identify, or be identifiable from, anonymous coins within the fungible mass of digital assets, rather than, more logically from the token entitlements held in customer accounts that identified customers' proprietary interest in the underlying coins – and as was recorded in the Debtors' exchange ledger[2]. *See* further discussion Dkt. 5690 pp.66-71. Here, there is no doubt the Debtors were looking down the wrong end of the telescope. Their flawed approach had the same prospect of success as finding a $1 dollar bill on the sidewalk and expecting the bill itself to reveal the owner. Or a bank customer having to confirm the serial number of the next bill in the ATM before processing the withdrawal.

Notwithstanding, the latest filed plan of reorganization categorized FTX customers as unsecured creditors and allocated distributions from either the 'Dotcom Silo' for FTX.com customers or 'WRS Silo' for FTX.us customers. Each silo having an associated pool of assets from which the liquidated proceeds of sale would be distributed in the proposed waterfall. Related, the plan proposed a hard-edged boundary to exclude other assets-in-possession allocated to the 'Alameda

[2] Concurrently, the Debtors had applied the token balances held in customer accounts to form the basis for Customer Entitlement Claims yet overlooked and divorced these same balances when tracing fungible digital assets.

Silo'[3] and 'Ventures Silo'[4] that would deny both classes of customer priority access to distributions from the associated proceeds of sale. *See* Dkt. 115 Exhibit 1. In sum, the Debtors divorced investment assets held in other silos from FTX customers (albeit the recovered or liquidated assets would provide some proportionate recovery to customers via the General Pool further down the waterfall). This proposed plan is striking given the extent of fraud and scale of the misappropriation of customer property, including the well-documented "lending" of customer property by FTX to Alameda and the use of that customer property across the Debtors' structure of companies. It is also a prominent position to have taken without a sound foundation or having obtained any burden of proof to conclusively confine customer claims to each customer silo – by admission the Debtors have not been able to trace customer property. Of course, if the Debtors could trace customer property to investments, cryptocurrencies, or other recoverable assets then FTX customers would reasonably benefit from a secured claim to the asset or the associated proceeds of sale.

**A. The funds used to purchase the Anthropic Shares have been traced to customer property and as such FTX customers have equity claim and proprietary interest in the investment.**

This objection to the Anthropic Motion and asserted proprietary claim by tracing FTX customers funds to the purchase of Anthropic Shares is not the result of my own analysis of the Data Sources. Not unsurprising since the Debtors hold the Data Sources under lock and key. The proof of evidence to which I will refer and the basis of this objection echoes the work of an eminent expert in the field of forensic accounting who was granted access to the Debtors' Data Sources – and which work has been reported in public records.

It can be of no great surprise to learn that the heavy lifting in the matter was robustly dealt with by expert analysis in *United States v. Sam Bankman-Fried*[5] (the "**Criminal Case**"). That examination of the Data Sources was able to trace the $500 million transferred to purchase the Anthropic Shares back to transfers out of accounts containing customer property. On October 8, 2023, in a Letter Motion to the court, *id.* ECF 315, attached as **Exhibit A**, the U.S. Government, the plaintiff in the Criminal Case, sought to preclude defendant Sam Bankman-Fried ("**Bankman-Fried**") introducing the valuation of Anthropic Shares into evidence. The Government noted:

---

[3] Alameda Silo indicated to hold digital assets, treasuries, crypto ETFs, venture investments including in Genesis Digital Assets, Modulo Capital.

[4] Ventures Silo indicated to hold venture investments including in Anthropic, K5, Dave Inc.

[5] *United States v. SAM BANKMAN-FRIED*, 1:22-cr-00673, (S.D.N.Y. Dec 12, 2023)

> "By way of background, the defendant invested approximately $500 million in Anthropic, a startup artificial intelligence company, in April 2022. The Government expects to introduce evidence that the defendant funded this investment with FTX customer deposits. In the past few weeks, Anthropic has announced that it is attempting to raise additional funds from investors, including Amazon and Google, at a valuation between $20 billion and $30 billion."

The U.S. Government cited Anthropic's fund-raising action which at the time estimated the original $500 million equity acquired in Anthropic (representing a 7.84% stake, Anthropic Motion at ¶ 4) to be valued somewhere between $1.568 billion and $2.352 billion.

Later, on October 18, 2023, at the related trial held in the U.S. District Court Southern District of New York, the U.S. Government's expert witness, Professor Peter D. Easton ("**Easton**")[6], who is a qualified expert witness within the field in the Delaware Chancery Court, testified to the flow-of-funds used in various business and financial transactions across the Debtors' structure of companies. The testimony compliant with Rules 702-705 of the Federal Rules of Evidence. From his analysis of the Data Sources, Easton was able to trace the sources of fiat and cryptocurrency variously used by Alameda and FTX back to customer funds. His testimony is recorded in official court transcript, *id.* ECF 370 pp.26-133 ("**Easton Testimony**"), which is attached hereto as **Exhibit C**. An extract from the Easton Testimony relevant to the purchase of Anthropic Shares, at pp.63-64, is provided below picking up direct questioning by counsel for U.S. Government:

```
     MR. ROOS: We can take this down.
Could we please publish Government Exhibit 3008.
Q. Now have you looked into an investment in Anthropic PBC?
A. Yes, I have.
Q. And could you describe what materials are on this exhibit.
A. So this is—first of all, in the middle, the big block is
   what was the investment in. It was an investment in a
   fundraising effort by Anthropic, which is an AI company. The
   Slack message indicates we have to wire—Sam Bankman-Fried
   suggests, we have to wire 500 million to Anthropic. This
   should come from an Alameda Research Ventures bank account.
Q. And have you conducted any form of financial analysis
   relating to the source of funds used to make this investment?
```

[6] Professor Easton has been the Notre Dame Alumni Professor of Accountancy and Director of the Center for Accounting Research and Education at the Mendoza College of Business in the University of Notre Dame for over 20 years. *See* Expert Disclosure of Professor Peter D Easton, August 16, 2023. *United States v. BANKMAN-FRIED*, 1:22-cr-00673, (S.D.N.Y. Dec 12, 2023). ECF 236-9. Attached as **Exhibit B**.

A. Yes, I have.
MR. ROOS: All right. Why don't we publish Government Exhibit 1041.
Q. Professor Easton, what does this show?
A. So again, similar to the analyses before, we have a transfer of customer funds through a series of Alameda Research customer depository accounts, through to an Alameda Research external account—in other words, this is an account that does not hold customer funds—of 500 million, and in turn, the bottom right-hand corner, a payment for the investment in Anthropic.
Q. And how does the amount of the investment in Anthropic relate to the amount we saw on that Slack message on the last exhibit?
A. It is that amount.

In his testimony, Easton confirmed that the flow of $500 million used for the Anthropic investment was traced through a series of Debtor company transfers back to a $500 million transfer of funds from FTX customer deposit accounts. Easton's analysis had reasonably applied the Last In, First Out (LIFO) model in the tracing analysis. Objectively, the LIFO method of tracing is considered appropriate in the circumstances where a specific amount – i.e. $500 million – could be traced as a fungible quantity in a flow-of-funds analysis from first transfer to output within a relevant timeframe – here the determining period falls after the Slack message and the purchase of the Anthropic Shares. This approach concurs with regulations which require "a method of tracing", U.C.C. § 9-315(b)(2). Also noting, that when tracing other investments, political donations, contributions to charitable foundations, and the purchase of real estate, Easton was fair in his analysis to acknowledge occasions when an account forming part of a chain of transfers already held a credit balance.

It is respectfully highlighted to this Court, that in addition to the Anthropic investment, the Easton Testimony revealed FTX customer property could be traced to investments *inter alia* in Genesis Digital Assets ($700 million), K5 Global Holdings ($300 million), Dave Inc. ($100 million), Skybridge Capital ($45 million), Modulo Capital ($450 million), Paper Bird ($430 million), *supra.* p.80, the tracing of customer property for the purchase of Anthropic Shares ($500 million), *supra.* 63-64, and Robinhood shares ($546 million), *supra.* pp.64-66; for political donations, *supra.* pp.66-72; donations to charitable foundations including Guarding Against Pandemics (GAP) ($20 million), a political lobbying organization, and FTX Foundation ($20 million), *supra.* pp.73-75; and certain real estate in the Bahamas ($96 million), *supra.* pp.75-77. The traceable customer property mentioned in the Easton Testimony amounts to around $3 billion – yet Professor Easton notes further tracing to other ventures of "another $1.4 billion", to

"brokerage and outflows, almost a billion, $970.7 million", other real estate, and "other expenses, $305 million" which were not mentioned in detail during his testimony.

Further, and additionally, Professor Easton's flow-of-funds analysis determined customer property could also be traced in the buyback of Binance stock (amounting to $1.2 billion), *supra.* pp.88-90; and, repayment of loans to Genesis, Voyager, Celsius, Abra, Maple, Anchorage, Nexo, TrueFi, Ledn, BitGo altogether misappropriating customer property amounting to $4.5 billion, *supra.* pp.93-96.

At this point it is perhaps appropriate to detour briefly and cast a spotlight over the performance of the Debtors in this matter. *Firstly*, it is conspicuous that within these bankruptcy proceedings the Debtors have failed to trace customer property per Easton despite their unreserved access and control of the Data Sources. The Debtors have an army of very well compensated lawyers billing more than $1 million per day and with no reasonable financial limitation preventing them from engaging experts like Professor Easton pursuant to §327 of the Bankruptcy Code to undertake expert tracing analysis. And on that note, the funds involved in the venture investments were prominent – $50 million; $100 million; $500 million. These amounts are, for instance, in no way comparable to tracing a taxi fare or other small value denomination transaction. They were major transactions which begs the rhetorical question – could the Debtors reasonably overlook the flow of $500 million from one account to another? Transfers of $500 million between accounts that coincide within a relevant period of the investment in Anthropic would perhaps be a difficult series of transactions to overlook.

*Secondly*, and perhaps of greater concern, having provided Easton with access to the Data Sources, and with full knowledge of the outcome of his work tracing customer property in the Criminal Case, the Debtors have subsequently done – – nothing. The Debtors have seemingly turned a blind-eye to the matter as evidenced *inter alia* by the instant Anthropic Motion. This absence of honest recognition inevitably challenges their integrity since in addition to the Anthropic investment Easton exposed other traceable assets – also known to the Debtors – in which the latest plan of reorganization (submitted post Criminal Case) similarly divorces traceable assets from customers. Upon the circumstances of this case, there is little room for colorful explanation why the Debtors have exhibited questionable integrity and have not been acting in the best interests of their customers, even though they are obliged by the ties of natural justice and equity to return customer property.

In the context it seems reasonable to question: *If the Debtors' performance has been sub-standard tracing the Anthropic investment – where traceable information is transparent and available in the public domain – then what is the prospect there has been other adverse decision-taking in private?*

This question perhaps piggybacks on the uncomfortable circumstances in which Sullivan & Cromwell were already inside the chicken coup before the FTX collapse only to emerge as Debtor's counsel in bankruptcy which inevitably raises concern over conflicts of interest and prior knowledge. I consider the Debtors are playing fast and loose with certain matters which demonstrates a lack of probity and is an issue I welcome should be inked into the Examiner's scope of work due to the potential repercussion that adverse decision-taking could have on customers who have already been defrauded once by the Debtors.

In a similar vein, it is also noticeable that the Official Committee of Unsecured Creditors (the "**UCC**"), and the Ad Hoc Committee of Non-US Customers (the "**Ad-Hoc**")[7], who are similarly well-represented and compensated in these proceedings, have equally remained silent on the tracing matter despite, like the Debtors, also having full knowledge to the extent of traceable customer property confirmed in the Criminal Case. Pursuant to §1103 of the Bankruptcy Code, either the UCC or Ad-Hoc may have employed Professor Easton or another expert to provide testimony to this Court. The UCC and Ad-Hoc should be held to the same standard as the Debtors and it follows their inaction in the matter falls short of representing the best interests of FTX customers – acting in concert with the Debtors to overlook material equitable issues affecting customers' property rights.

Given both the UCC and Ad-Hoc stand on platforms which purport to represent customers, if neither come forward in response to the Anthropic Motion to flag the Anthropic Shares are traceable customer property it can only speak volumes to this Court as to their integrity in these proceedings and should rightly draw speculation about whose interests they truly serve. Of course, against the backdrop of the Plan Support Agreement ("**PSA**"), it is not expected that the UCC or Ad-Hoc will adopt any contrary position to the Debtors thereby demonstrating their ineffectiveness to represent the wider population of customers at large in contemporaneous issues.

The validity of the work by Easton tracing the Anthropic Shares investment was sound and provided the basis for the jury in the Criminal Case to unanimously find Bankman-Fried guilty of the indictments for fraud related crimes and the misappropriation of customer property. **The instant Anthropic Motion should be denied because a robust burden of proof has established that the $500 million in funds used to acquire the Anthroptic Shares can be traced back to FTX customer funds and customers therefore have a proprietary interest in the Anthropic investment.**

[7] The Ad Hoc Committee of Non-US Customers filings pursuant to Bankruptcy Rule 2019 are demonstrative that their constituents are not representative of the largest cohort of customers, by number and account size.

Respectfully, with an ambition of delivering natural justice and equitable remedies, the Court might use the powers available pursuant §105(a) of the Bankruptcy Code to compel the Debtors subject to §327(a), or the UCC subject to §1103, or on its own validation pursuant to Rule 706 of the Federal Rule of Evidence as a court-appointed expert, to call upon Professor Easton via the Brattle Group to provide his expert knowledge and robust analysis to this Court as to the extent of each traceable investment, political donation, charitable contribution, and purchase of real estate property which he was able to successfully track back to customer property, including if required, to validate tracing the Anthropic Shares reported herein.

**B. Insiders attest to the use of customer property to make investments.**

In addition to the Easton Testimony, it is relevant to consider the landscape surrounding the fraud and misappropriation of customer property. Caroline Ellison ("**Ellison**"), a co-conspirator of Sam Bankman-Fried and former co-CEO and CEO of Alameda, pled guilty on December 19, 2022, in the U.S. District Court Southern District of New York to criminal charges, including to commit commodities fraud and wire fraud against FTX customers. Ellison's explained her wrongdoing to Judge Abrams, with the following extract copied from Ellison's Plea transcript, pp.28-29:

> "I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds."

Noting in the above extract that there were no provisions within Terms of Service that governed the contractual relationship with its customers to gave FTX any freedoms to borrow (or lend) customer property. FTX was not a counterparty (aside from collecting fees), and any trade, or trading event, or lending, or borrowing, was undertaken at a customer-to-customer level.

In the Criminal Case, Ellison provided testimony on October 11, 2023. Her testimony was recorded in the official court transcript, *id.* ECF 360 ("**Ellison Testimony**"). An extract from the Ellison Testimony provides a first-hand account as to the use of customer property to fund Alameda investments, in this following example, for part of the investment in Modulo Capital, *supra.* p.139, which asset the Debtors have allocated to the Alameda Silo. Picking up direct questioning of Ellison by counsel for the U.S. Government:

> MS. SASSOON: And if we could go to the next page.
> Q. Can you read the defendant's message on June 24, 2022.

A. Yeah. It says, "*$50 million for Modulo Capital LP. We should send via Signet,*" and then gives an address.
Q. What does it mean to send $50 million by Signet?
A. Signet is a banking system that a lot of companies and crypto use, so that meant send $50 million from our bank account to their bank account.
Q. And what had happened shortly before the defendant directed a $50 million payment to Modulo?
A. This is around a week after Alameda had used billions of dollars of FTX customer funds to repay our loans.
Q. And in your view, did Alameda have liquid funds at this time to make these sorts of investments?
A. No. All of our liquid funds were coming from money we had borrowed from FTX.
Q. And so where did you understand the money for this $50 million to Modulo was coming from?
A. It was coming from Alameda, and that was ultimately coming from FTX customers.

Later Ellison was questioned about other investments. The follow extract is also from Ellison Testimony, *supra.* pp.141-142 – here, the U.S. Government counsel continuing her direct questioning of Ellison:

MS. SASSOON: And Mr. Bianco, if you could expand column C.
Q. What is this tab?
A. This is a tab with the—each individual loan that was made.
Q. And just taking an example, can you read the entries in row 1. What is this?
A. You mean in spreadsheet row 2 or—
Q. Yes.
A. The lending entity is Alameda Research, LLC, and it was being lent to Alameda Research Investments, Ltd. The amount was $100 million. The date was September 20, 2022. And the notes say that the invest—the loan was for an investment into Modulo.
Q. Let's look at row 40. And what does row 40 show about how much money was loaned to Ryan Salame?
A. It shows that it was around $35 million.
Q. Directing your attention to rows 41 to 55, who is the recipient of the loans listed here?
A. Sam was.

Q. And looking at row 48 as an example, it says there was a loan of 20 million on October 1, 2021, that was used for GAP. What is GAP?
A. GAP stands for Guarding Against Pandemics. That was Sam's political lobbying organization.
Q. And what did you learn about how the money to GAP was spent?
A. I learned that it was spent on donations to congressional candidates and to political action committees.
Q. Overall, in the summer and fall of 2022, what did you understand about where the money was coming from to make additional venture investments?
A. I understood that it was coming from Alameda and that Alameda's money was coming from FTX customer funds.

The Ellison Testimony provided a personal account which left little doubt that Alameda had no meaningful liquidity of its own and was knowingly using FTX customer funds to make venture investments, political donations, and enrich certain FTX and Alameda insiders. Notably, the related transactions specifically mentioned in the above extract correspond to flows-of-funds which Professor Easton traced back to FTX customers.

Having taken one detour it is perhaps relevant to also recap on the unambiguous provisions of the Terms of Service which governed the contractual relationship between the Debtors and their customers. "**Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading**", and "**None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.**", Terms of Service § 8.2.6. The language used was plain to convey the Terms did not give any room to "lend" customer property to FTX, or for Alameda to "borrow" customer property from FTX, who was not a counterparty to any of the exchange services.

In the cryptocurrency exchanges, FTX was the custodial intermediary and provided custodial accounts and various related services for customer-to-customer trading. On this playing field Alameda may have been an exceptionally advantaged market-maker[8] and insider, though at bottom, was an FTX customer bearing similar rights as per any other customer. Alameda had no greater freedoms to acquire title or "borrow" other customers' property unless it was in

[8] Alameda was to the only FTX customer allowed to carry a negative margin trading position which avoided liquidation rules governing the contractual relationship for all other customers – a situation which *but-for* this advantage – ultimately led to the collapse. Yet the Debtors hold, contrary to natural justice, that all customers regardless of their holdings, trading, lending, or positions should be liable for Alameda's embezzlement of customers' fiat currency and digital assets.

connection with another customer loaning their Digital Assets or as result of being counterparty in a trading action. E.g. Alameda might gain title to liquidated collateral when acting as counterparty in a margin trade with another customer, or Alameda might borrow Digital Assets from a customer who had elected to lend some Digital Asset held in their account to other customers generally. But in such circumstances – e.g. under the Spot Margin Trading service – customers who lent their Digital Assets to other customers, including Alameda, always retained title to those Digital Assets[9]. Also noting here that the unit being "lent" was a particular Digital Asset token held in a customer account which, by definition and principle, was different to the fungible mass of customers' fiat currency and cryptocurrency deposits that were being "loaned" by FTX to Alameda. Plainly, the Debtors had no legal, equitable or beneficial interest to Digital Assets held in customers' accounts and had no freedoms to "borrow" customer property at scale. But then, these are among the issues which go to the embezzlement and fraud running at the heart of the collapse.

The Ellison Testimony corroborates Easton's expert analysis tracing misappropriated use of customer funds to make investments, political donations, charitable contributions, acquire real estate, and enrich senior FTX executives.

## 2. Objection to the DCI Motion

Digital Custody Inc. ("**DCI**") was acquired by the Debtors for an aggregate investment of $10 million to obtain a full equity interest in the company on August 6, 2022, just a few months before bankruptcy. The purchase of DCI was made during the same period in which FTX customer funds have been traced to much larger investments, and while I presently have no direct evidence to present to the Court, on the balance of probability there are good grounds to suspect the funds used to acquire DCI followed the same pattern of misappropriating customer property. Such tracing information likely exists in the body of work undertaken by Professor Easton, and is noted in the Easton Testimony within the umbrella of other traced venture investments amounting to "another $1.4 billion".

Respectfully, if this Court does not call upon Easton to provide court-appointed expert testimony on tracing FTX customer property to investments made by the Debtors, then with a reasonable threat to the proprietary interests in DCI, the Debtors should be compelled to take necessary action, including pursuant to §327(a) of the Bankruptcy Code, to call upon Easton to testify at

[9] Digital Assets that were lent to other Users were effectively locked, and could not be withdrawn/sold/used as collateral/staked/etc. However, they could be used as maintenance margin to prevent liquidations. Any lending could be terminated at any time and related Digital Assets were unlocked, typically within an hour. And as per Terms of Service §8.2.6, "at all times" title to Digital Assets remained with the customer.

the related hearing for the DCI Motion in order to validate to this Court that the funds used in the acquisition of DCI are not traceable to FTX customer funds, per DCI Agreement at ¶ 2.6. ("There are no Actions pending or, to the knowledge of Seller, threatened, that (a) relate to the ownership of the Interests or the Trust Company Interests, (b) challenge the validity or enforceability of Seller's obligations under this Agreement or any other document related to the Transactions or (c) would reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions."). *See* Dkt. 7249-3.

Notwithstanding, the last Monthly Operating Report related to DCI for the period ending December 2023 has been filed by the Debtors[10] (Dkt. 6034) and this plainly details the "Ending equity/net worth" of DCI to be $10,296,251 chiefly derived from "Total Assets" amounting to $10,300,466. It is therefore striking that the DCI Motion proposes to dispose of the full equity stake at a 95% discounted Purchase Price of $500,000 plus the Acquired Cash Amount (which is the cash balance remaining in the DCI business accounts and this amount is unconfirmed but expected to be less than $2.8 million).

Not just that, but the Agreement proposes to sell the equity interest to a Purchaser, Amalgamated Token Services, Inc.[11] d/b/a CoinList, with equity from a convertible note issued by an insider of the Debtors – the original CEO of DCI and member of the DCI board of directors – who was central to the original acquisition. Within the meaning of §101(31)(B)(iii) of the Bankruptcy Code, the insider is a "person in control" of DCI. The Debtors should be able to explain to this Court whether the convertible note provided by the insider to the Purchaser is as result of equity finance originating from DCI's own assets (in which case, at bottom, the Debtors are not just proposing to sell the equity investment in DCI but also to finance for the purchase). Agreement at ¶ 3.5. "Purchaser has obtained sufficient third-party debt or equity financing for Purchaser to deliver the Purchase Price (assuming the Acquired Cash Amount is no greater than $2,800,000) ...", noting here that the Purchaser's solvency and ability to complete the purchase is dependent on the cash balance available in DCI company accounts.

Further, not that it has material bearing, there is good reason to believe that Sullivan & Cromwell were counsel for the Debtors in the original DCI acquisition having been retained during the applicable period. This is not, for the sake of clarity, to suggest that counsel would have been aware that misappropriated FTX customer funds might have been used to acquire the DCI investment.

---

[10] Filing by Ms. Mary Cilia who is the Chief Financial Officer of the Debtors

[11] Amalgamated Token Services, Inc have some pre-existing relationship with the Debtors since at least March 27, 2019. Dkt. 2059.

The DCI Motion as proposed does not represent value to creditors and an Order granting the sale should not be provided on the terms suggested or before FTX customer interests have been reasonably rejected. Moreover, in the circumstance, liquidating the reported $10.3 million of assets might represent better value to creditors rather than selling for a fraction of the value at a knock-down price.

Further, and additionally, it would perhaps be premature to dispose of "a valuable franchise" which "has a license from the Division of Banking of the South Dakota Department of Labor and Regulation that allows it to provide custodial services", DCI Motion at ¶ 5, that might be considered a valuable asset in the sale or reboot of the FTX exchange. Noting here that the Debtors have not motioned to the Court they should not sell or reboot the exchange, and this Court has not granted such order since reasonably the chapter 11 proceedings for "reorganization" principally hinge on the survival of the core product comprising the cryptocurrency exchange. See *infra*.

3. **Debtors' announcement pertaining to no reboot or no sale of FTX.com.**

In other business, and following-on from above, I would like to comment on the concerning matter announced at the January 31st hearing that FTX.com would not be rebooted or sold to interested parties. I found this announcement somewhat perverse.

*Firstly*, FTX Trading Ltd filed under the protection of a Chapter 11 bankruptcy which provided a safe harbor for "reorganization" so that the Debtors could emerge to continue operating their business, and there can be no quarrel that the primary business of FTX Trading Ltd was the FTX.com cryptocurrency exchange. The Debtors have now filed several different plans of reorganization and will soon solicit votes on that basis, but at bottom this is no longer a *reorganization* but a total liquidation which does not, in my opinion, fairly represent a chapter 11 process or provide for a fair or equitable outcome for customers. Indeed, the way the Debtors are carrying on at present is akin to a fire sale liquidating assets-in-possession in short order potentially at compromised value[12] and trespassing over customers' property rights[13]. As to the latter, I'm grateful to other customer-creditors for their recent filing of an adversary complaint

---

[12] Speculation on social media suggests the Debtors' may have been selling certain digital assets at significant discounts below market rate which action, if true, is contrary to the interests of all creditors.

[13] The Debtors and John J. Ray III have variously stated FTX embezzled customer property and have been awake to core gating issue that determining property of the estate is a matter for determination by this Court but have avoided bringing the matter to this Court. Similarly, misappropriated customer property has bene traced by expert analysis across the Debtors' structure of companies which the Debtors have failed to acknowledge through declaration or action to this Court.

that seeks natural justice to uphold customers' property rights conveyed by the Terms of Service governing the contractual relationship.

*Secondly*, while I have not taken the time to sum all the exact fee submissions, it is sufficient to state the Debtors have incurred hundreds of millions of dollars in excessive[14] billable hours over the past fourteen months to only now reach a conclusion that FTX.com is not for sale and that an operational exchange will not emerge from bankruptcy. If the Debtors had not envisaged restarting or selling the FTX.com exchange, then that decision should have been made at the get-go saving hundreds of millions of dollars in legal fees and the chapter 11 bankruptcy converted to chapter 7.

*Thirdly*, there does not appear to have been a lack of interest from third parties to acquire and reboot the FTX.com exchange. There were at least nine different parties. *See* Coverick Declaration, Dkt. 7249-4 at ¶ 6. The interest was not surprising since the FTX.com product was, in principle, a market leading global exchange and *but-for* the criminal activity could likely have sustained a position amongst the leading cryptocurrency exchanges on the planet – had customer property been appropriately segregated and the market-maker kept in check. It was striking that following the no-sale announcement at the January hearing, social media was a-light with discussion with some interested parties coming forward to express their frustration at the lack of transparency and integrity exhibited by the Debtors in the matter. Plainly there were interested parties with bids on the table such that there could be some form of asset sale. In the circumstances, any reasonable commercial offer for the exchange would provide additional receipts and opportunity for better recovery for creditors. It is respectfully suggested that using the powers available to this court pursuant to §105(a) that the matter – for which no particular motion has been filed – should be separately reviewed by this Court to adjudicate the commercial viability of the Debtors' decision-taking in the matter.

4. **Asset Sale Order provides Weekly Limit for the sale of certain Digital Assets**

Lastly, having noticed the haste by which the Debtors are selling certain Digital Assets, I would like to flag to the Court as follows:

The Asset Sale Order allowed for the sale of certain Digital Assets subject to a Weekly Limit of $100 million providing that "the Debtors (i) may temporarily increase the Weekly Limit for a period of one Calendar Week at a time with the prior written approval of the Committee and the

[14] To the best of my knowledge, the $2,235 hourly rate charged in bankruptcy is not the same commercial rate which Sullivan & Cromwell were billing FTX and Alameda pre-petition and before the collapse while they were counsel retained and advising FTX and its affiliates during the fraudulent period.

Ad Hoc Committee without further order of the Court; provided that the Debtors will provide notice of such temporary increase to the U.S. Trustee; and (ii) may permanently increase the Weekly Limit to $200 million upon further order of the Court." Asset Sale Order at ¶ 2(A)(d).

Court dockets reveal no request for a permanent increase has been sought or approved by this Court, or if it has it has not been published or identified. Nevertheless, the table below illustrates the reported monthly and calculated average weekly sales per month (based on weeks in the month) for certain Digital Assets.

| *Month, Year* | | *Aggregate Sales* | *Weekly Average $MM* |
|---|---|---|---|
| *October 2023* | | $ 136,223,450 | $ 34,058,362 |
| *November 2023* | | $ 1,217,098,797 | $ 243,419,759 |
| *December 2023* | | $ 865,687,458 | $ 216,421,864 |
| *January 2024* | *Not yet reported* | | |
| ***TOTAL*** | | **$ 2,219, 019, 705** | **$ 170,693,823** |

The reported sales cover a 13-week period which ought to calculate to sales of certain Digital Assets amounting to $1.3 billion, yet from the table it can be seen the Debtors have sold around $1 billion more than the Court's threshold limit within the period. Plainly the Order allows for a "temporary increase" subject to certain stipulations but there is nothing temporary about the high volume of sales realized through November and December. I have contacted the U.S. Trustee for confirmation of the dates and amounts of any related temporary increase notices which the Debtors may have provided per conditions of the Asset Sale Order, though the U.S. Trustee have yet to reply.

While this matter may seem trivial it has bearing to the adversary proceeding and remedies for recovery of native cryptocurrencies. Respectfully, pursuant to §105(a) the Bankruptcy Code, the Court might consider validating that the spirit and letter of the Asset Sale Order has been complied with, including that the completed sales have achieved a fair market rate.

Respectfully,

Simon Carter
Director