**Exhibit C**

**United States v. Samuel Bankman-Fried, S6 22 Cr. 673 (LAK)**

ECF 370

Peter Easton Testimony

EXTRACT OF TRANSCRIPT of Proceedings as to Samuel Bankman-Fried re: Trial held on
10/18/2023 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Khristine Sellin,
(212) 805-0300, (McGuirk, Kelly) (Entered: 12/12/2023)

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4          v.                 22 CR 673 (LAK)

5    SAMUEL BANKMAN-FRIED,

6            Defendant.       Trial
     ------------------------------x
7

                              New York, N.Y.
8                              October 18, 2023
                             9:30 a.m.
9

10    Before:

11

                     HON. LEWIS A. KAPLAN,
12

                           District Judge
13

                 APPEARANCES
14

   DAMIAN WILLIAMS
15        United States Attorney for the
       Southern District of New York
16    BY:  DANIELLE R. SASSOON
       NICOLAS ROOS
17        DANIELLE KUDLA
       SAMUEL RAYMOND
18        THANE REHN
       Assistant United States Attorneys
19

   COHEN & GRESSER, LLP
20        Attorneys for Defendant
   BY:  MARK S. COHEN
21        CHRISTIAN R. EVERDELL
       SRI K. KUEHNLENZ
22        DAVID F. LISNER

23    Also Present:
   Luke Booth, FBI
24    Kristin Allain, FBI
   Arjun Ahuja, USAO Paralegal Specialist
25    Grant Bianco, USAO Paralegal Specialist

1    there had been some written testimony submitted to Congress.

2            Do you recall that testimony, ma'am?

3    A.   Yes.

4    Q.   If I understand correctly, that was something that you did

5    not work on?

6    A.   Correct.

7    Q.   That was worked on by Mr. Wetjen and Mr. Bankman-Fried?

8    A.   Correct.

9            MR. COHEN:  I have nothing further.  Thank you.

10           THE COURT:  Thank you.

11           Anything else, Mr. Raymond?

12           MR. RAYMOND:  No.  Thank you, your Honor.

13           THE COURT:  Ms. Katz, thank you.  You are excused.

14           (Witness excused)

15           THE COURT:  Next witness.

16           MR. ROOS:  Yes, your Honor.  The government calls

17   Peter Easton.

18   PETER DOUGLAS EASTON,

19        called as a witness by the government,

20        having been duly sworn, testified as follows:

21           THE COURT:  Mr. Roos, you may proceed.

22           MR. ROOS:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MR. ROOS:

25   Q.   Good morning.

1    A.    Good morning.

2    Q.    Where do you work?

3    A.    I work at the University of Notre Dame.

4    Q.    What's your title or role at University of Notre Dame?

5    A.    I'm a professor of accounting.

6    Q.    What areas of accounting do you focus on?

7    A.    I cover accounting largely at the border of finance and

8    accounting, valuation, financial statement analysis, those

9    kinds of things.

10   Q.    Let me ask you a little bit about your background.  Where

11   did you do your schooling?

12   A.    I did undergraduate schooling and some postgraduate

13   schooling in Australia, then in the late '70s moved to

14   University of California Berkeley, where I completed the Ph.D.

15   in finance and accounting.

16   Q.    What did you do after getting your Ph.D.?

17   A.    My first appointment was at the University of Chicago.  I

18   continued to work at the University of Chicago until 2008 on

19   and off.  I also went back to Australia for five years, at Ohio

20   State for eight years, and I've been 20 years at the University

21   of Notre Dame.

22   Q.    Since becoming a professor at the University of Notre Dame,

23   what roles have you had?

24   A.    I've been director of a center for education and accounting

25   and research and accounting.  I have taught accounting classes,

1    again on the border of finance and accounting.

2    Q.  Are you a tenured professor?

3    A.  Yes, I am.

4    Q.  What are some of the requirements for becoming a tenured

5    professor?

6    A.  The requirements are teaching, of course, but also

7    publication in the very top academic journals.

8    Q.  What do you teach?

9    A.  I teach essentially penetrating financial statements,

10   understanding the financial statements and understanding their

11   implications for security valuations or asset valuation of

12   various kinds.

13   Q.  You mentioned, in addition to teaching, doing research.

14   What are your areas of research?

15   A.  My areas of research for the entire 40 years of my research

16   career have been based on penetrating the details of financial

17   statements and understanding the implications of those

18   financial statements for securities markets, securities prices,

19   asset valuations in general.

20   Q.  From your research have you published any books or

21   articles?

22   A.  Yes.  I published five books.  I have published 50 articles

23   in the top journals.

24   Q.  What types of books have you published?

25   A.  My books are all on financial statement analysis,

1    penetrating the financial statements, and the implications for

2    valuation.

3    Q.  Are they textbooks?

4    A.  They are all textbooks, yes.

5    Q.  I assumed not fictional books about penetrating, correct?

6    A.  Right.

7    Q.  Have you worked on any academic journals?

8    A.  Yes.  I've been editor on all of the top four journals in

9    the United States, on the top journal in Canada, top journal in

10   Europe, and the top journal in the Asia Pacific area.

11   Q.  When you say top journals, you're referring to accounting

12   journals?

13   A.  I am, yes.

14   Q.  Have you ever worked on any litigation or court cases?

15   A.  Yes, I have.

16   Q.  At a high level, what kind of litigation?

17   A.  This has, again, been penetrating the financial statements,

18   understanding issues in the accounting statements, things that

19   may have been omitted or incorrectly stated, and the

20   implications of that for valuation; generally, not always.

21   Q.  Have you ever worked on any cases involving financial or

22   accounting fraud?

23   A.  Yes, I have.

24   Q.  What cases?

25   A.  I have worked on three cases.  These were cases in the

1    early 2000s:  Enron, WorldCom, and Parmalat.

2    Q.  Now, have you ever worked on any cases or matters related

3    to cryptocurrency?

4    A.  Yes, I have.

5    Q.  What have you worked on?

6    A.  I worked on the *SEC v. Ripple* case.

7            MR. ROOS:  At this time, your Honor, the government

8    would move to qualify --

9            THE COURT:  Not necessary.  Received.

10           MR. ROOS:  Thank you, your Honor.

11           May we inquire on that basis?

12           THE COURT:  Yes, of course.

13   Q.  Professor Easton, I would like to ask you a few preliminary

14   questions about your involvement in this case before we get to

15   the substance.

16           To your knowledge, have you ever met any of the

17   witnesses in the case?

18   A.  No, I have not.

19   Q.  And have you ever met the defendant, Samuel Bankman-Fried?

20   A.  No, I have not.

21   Q.  Do you have any personal knowledge of the facts of the case

22   other than what you have learned over the course of your work

23   on the case?

24   A.  No, I do not.

25   Q.  Is there anyone who has assisted you in the work you've

1    done on this matter?

2    A.   Yes.

3    Q.   Who is that?

4    A.   I've been assisted by a team from a litigation consulting

5    firm called Brattle.

6    Q.   What kind of work did Brattle do to assist you?

7    A.   Brattle did a lot of the investigation of the details of

8    the data, programming, penetrating details, helping me to

9    aggregate data together.

10   Q.   When you do academic research, is it typical for you to be

11   assisted by others?

12   A.   Absolutely.

13   Q.   Whose direction did the individuals at Brattle work under?

14   A.   Under mine.

15   Q.   And were you compensated for your work on this case?

16   A.   Yes, I was.

17   Q.   Approximately how much have you billed on this case to

18   date?

19   A.   I'm not sure, but in excess of 100,000.

20   Q.   One hundred hours or dollars?  What did you say?

21   A.   In excess of $100,000.

22   Q.   Got it.

23           Will you bill for your time at this trial?

24   A.   Yes, I will.

25   Q.   And have you been paid yet for your work?

1    A.  Yes, I have.

2    Q.  You said you work with Brattle.  Are you compensated for

3    the work that Brattle does in the case?

4    A.  No, I'm not.

5    Q.  Is your pay dependent in any way on the opinions you give

6    in the courtroom today?

7    A.  No, it is not.

8    Q.  Is your pay in any way dependent on the outcome of this

9    case?

10   A.  No, it is not.

11   Q.  In the binder in front of you there are a set of exhibits

12   for your review.  Professor Easton, if you would just flip

13   through those and see if you're familiar with them.

14        For the record, the binder contains Government

15   Exhibits 1001 to 1005, 1010, 1011, 1013, 1014, 1017 and its

16   subparts, 1018, 1023-1033, 1035, 1039, 1040, 1041, 1044, 1045,

17   1050, 1051, and 3000 through 3016.

18        THE COURT:  Mr. Roos, can you repeat those backwards.

19        MR. ROOS:  Those are actually my lotto numbers also.

20        THE COURT:  Good luck.

21   Q.  Professor Easton, are you familiar with those exhibits that

22   are marked for identification?

23   A.  Yes, I am.

24   Q.  And, generally speaking, what is in the binder before you?

25   A.  What is in the binder is a series of exhibits and backup

1    prepared by me and my team.

2    Q.   Do they include tables and charts?

3    A.   Yes, they do.

4    Q.   Do those charts and tables summarize voluminous quantities

5    of data that you have looked at?

6    A.   Yes, they do.

7              MR. ROOS:  So at this time the government offers

8    Exhibits 1001 to 1005, 1010, 1011, 1013 --

9              THE COURT:  A little slower.

10             MR. ROOS:  Should I restart?

11             THE COURT:  I'm with you as far as 1010.

12             MR. ROOS:  1010, 1011, 1013, 1014, 1017, including its

13   subparts, 1018, 1023 to 1033, 1035, 1039 through 1041, 1044,

14   1045, 1050, and 1051.  The government also offers, pursuant to

15   stipulation S-2003, Government Exhibits 30, 56, 89, 188, 201,

16   213, 308, 310, 314, 317, 327, 344, 506.  The government offers,

17   pursuant to stipulation S-2002, Government Exhibit 1735.  And,

18   finally, the government offers as demonstrative aids Exhibits

19   3000 to 3016.

20             MR. LISNER:  No objections beyond the one we resolved

21   yesterday for numbers 1017 through 1051.

22             THE COURT:  They are all received.

23             (Government Exhibits 1001 to 1005, 1010, 1011, 1013,

24   1014, 1017, including its subparts, 1018, 1023-1033, 1035,

25   1039-1041, 1044, 1045, 1050, 1051, 30, 56, 89, 188, 201, 213,

308, 310, 314, 317, 327, 344, 506, 1735, 3000-3016 received in

evidence)

      THE COURT:  Members of the jury, Exhibits 3000 through

3016 are what we call demonstratives.  They are exhibits

designed to illustrate for you other materials so that you can

understand the testimony, but they are not themselves evidence.

You won't have them in the jury room unless the parties agree

otherwise.

      Let's go.

      MR. ROOS:  Thank you.

Q.  Professor Easton, have you worked on financial analysis in

preparation for your testimony here today?

A.  Yes, I have.

Q.  What, at a very high level, was the topic of your analysis?

A.  The topic of analysis was to understand the sources and

uses of fiat and cryptocurrency by Alameda and FTX.

Q.  Before we talk about those findings further, I want to

discuss what went into your financial analysis and the

materials you considered.  OK?

A.  Yes.

Q.  Let's start with the materials.  Why don't you just list

them for us.  What types of records or data or information did

you consider?

A.  There was a large amount of materials, but the easiest box

to put them in is bank statements.  The FTX database was a

 1  massive source of data, the Blockchain, and third-party bank

 2  statements.

 3  Q.  Why don't we break that down a little bit.

 4        MR. ROOS:  Can we please publish Government Exhibit

 5  3000.

 6  Q.  Professor Easton, can you explain to the jury what we are

 7  looking at on page 1 of Government Exhibit 3000.

 8  A.  Yes.  These are bank statements of Alameda.  On the left

 9  you will see a statement of deposits.  Excuse me.  Of

10  withdrawals.  So you will see these are withdrawals in late

11  September.  You will see the amount in the second column.  Then

12  you will see the identity of the individual who withdrew the

13  amount.

14        On the right-hand side you will see a similar

15  statement from the Silvergate and Alameda account, but in this

16  case it is deposits.

17  Q.  At a high level, what did you and your team do with bank

18  statements like this?

19  A.  These statements were extraordinarily important in

20  identifying when customer money was put into an Alameda account

21  and when it was withdrawn from an Alameda account.

22  Q.  Did you process or code the data in any way?

23  A.  Yes.  Me and my team did.  We identified individual

24  customers.  This was a very time-consuming task because

25  individual customers could be labeled in very many ways.  Peter

1    Easton, for example, could be P. Easton or Mr. Easton or Peter

2    Easton, so we set up a matching database so that we could tag

3    each customer and identify them very carefully in the flows

4    through the accounts.

5         MR. ROOS:  Can we please go to page 2.

6    Q.   Professor Easton what does this show?

7    A.   This is a snapshot of the FTX database.  This is a gigantic

8    database.  You will see on the left-hand side tables.  We only

9    go from A to B in the tables.  Tables go way down, of course.

10   We access particular tables here.  So this is all withdrawals,

11   all the deposits, pricing data, all kinds of data that were

12   required for the analysis.

13        MR. ROOS:  Can we go to page 3.

14   Q.   You mentioned cryptocurrency Blockchain records.  Can you

15   explain what we are looking at?

16   A.   Here we are looking at a Blockchain record.  The top is the

17   unique identifier, 66 letters and digits.  This uniquely

18   identifies a particular transaction.  We can see the initiator

19   of that transaction also with a hashtag, and we can see the

20   contract itself.  What is this contract?  This is for the

21   transfer of -- you will see at the bottom, toward the bottom

22   that this is the transfer of 4400 ether, near enough, and those

23   are valued at $6.5 million.

24   Q.   And the transaction hash --

25        THE COURT:  Just a minute.

1          Professor, you used the word hashtag.  Would you tell

2     the jury what that is, please.

3          THE WITNESS:  These hashtags are unique identifiers on

4     the Blockchain.  You will see, I believe, that in the

5     transaction there are 66 alphanumeric identifiers.  Because

6     there are so many combinations of these numbers and alphabetic

7     codes, you can see this will surely be unique.  So later, if we

8     want to search for a particular transaction, we can uniquely

9     identify on the Blockchain every transaction that has ever

10    occurred.

11         THE COURT:  Thank you.

12         Go ahead.

13         MR. ROOS:  One moment, your Honor.  Maybe there is a

14    juror having an issue with one of the monitors.

15         THE COURT:  Are we having a problem with the monitor?

16         JUROR:  Yes.

17         THE COURT:  If you can get that one fixed, maybe you

18    can work on my PC.

19         We all set or not yet?

20         We are ready to go.

21         MR. ROOS:  Thank you.

22         Let's go to page 4.

23    Q.  Professor Easton, can you describe what we are looking at

24    on page 4 of this exhibit.

25    A.  So I have also examined bank statements from third-party

1    lenders.  In this case this is the beginning of a very long

2    bank statement from Genesis, one of the lenders, and it just,

3    in this particular snapshot, shows an invoice to Alameda

4    Research for the interest that's accrued for the month of

5    August 2022.  In the left-hand column you will see the

6    currencies:  BNB, Bitcoin, Ether, Link, etc.  In the middle

7    column you will see the accrued interest on the cryptocurrency.

8    And in the right hand column you will see the accrued interest.

9    3.6 million on the U.S. dollar.

10   Q.  How were documents like these statements from

11   cryptocurrency lenders like Genesis incorporated into your

12   overall analysis?

13   A.  Again, for these, it was largely understanding the source

14   of funds to Alameda and FTX.

15           MR. ROOS:  We can take the exhibit down.

16   Q.  Once you had all of this data, what types of analyses did

17   you do?

18   A.  Then I did both high-level analyses and analyses

19   penetrating individual transactions.

20   Q.  Have you reached any conclusions from those analyses?

21   A.  Yes, I have, some at a very high level and others at a very

22   transactional level.

23   Q.  Starting at the high level --

24           MR. ROOS:  Let's publish Government Exhibit 3001.

25   Q.  What are these?

1  A.   These are the 30,000-feet, high-level conclusions.

2           First of all, the amount of customer fiat deposits --

3  and all analysis are broken into fiat versus crypto -- the

4  amount of customer deposits held in Alameda Research and

5  FTX.com accounts was way less than was owed to customers on

6  FTX.  And then the question, of course, is what happened to

7  that money.  Well, Alameda Research used it for their own

8  expenditures.

9           Similarly, the amount of FTX hot and cold crypto

10 wallets was far less -- the amount owed in those wallets was

11 far less than the amount that was owed to FTX customers, and,

12 again, Alameda Research used customer crypto funds to pay for

13 the expenditures.

14          Also Alameda Research had the opportunity to borrow

15 against FTX, and there was not sufficient borrowing to cover

16 those expenditures.

17               (Continued on next page)

18

19

20

21

22

23

24

25

```
 1    BY MR. ROOS:
 2    Q.   And you're referring to through the spot margin program?
 3    A.   Through the spot margin program, yes, exactly.
 4    Q.   All right.  We're going to go through these conclusions, so
 5    why don't we take this down.
 6              You mentioned some findings relating to fiat and some
 7    findings related to cryptocurrency, and before we go through
 8    the findings, I just want to talk about the differences there.
 9              MR. ROOS:  Why don't we publish Government
10    Exhibit 3002.
11    Q.   And starting on page 1, Professor Easton, can you explain
12    to the jury what you mean by fiat currency.
13    A.   So by fiat currency, I mean the currency that we are all
14    used to using.  US currency is the fiat currency for the United
15    States.  We have a hundred dollar bill.  The pound, of course,
16    is the fiat currency for the UK.  The euro is the fiat currency
17    for Europe.  The yen is the fiat currency for Japan.  These are
18    currencies we're used to seeing, and throughout my testimony, I
19    will use color codes to remind us of what we're talking about.
20    Fiat will always be shown as a green identity.
21              MR. ROOS:  And let's go to page 2.
22    Q.   What information has been added to the screen?
23    A.   The other side of the screen points out that we've got this
24    alternative cryptocurrency.  Cryptocurrency is recorded by
25    unique hashtag, and you'll see an example in the bottom
```

1  right-hand corner of this exhibit.  Transactions are recorded

2  on the blockchain.  Every time we have sufficient transactions

3  built up, a new block is created.  The blocks are connected and

4  will never disappear.  So the blockchain exists forever.  An

5  example of three cryptocurrencies that will come up in the

6  testimony, Bitcoin, Ether, and USDT.  USDT is somewhat

7  different to the others inasmuch as it is a stablecoin, meaning

8  that it is tethered to, tied to, the US dollar.  One stablecoin

9  is essentially equal to one US dollar.

10  Q.  All right.  With that background, I want to talk about your

11  first two conclusions that we looked at, okay?

12  A.  Yes.

13        MR. ROOS:  We can take this down.

14  Q.  Now you mentioned just now fiat currency and fiat deposits,

15  but what is a fiat deposit?  What did you mean by that?

16  A.  A fiat deposit is just like you or I would take money from

17  our wallet, our back-pocket wallet, and deposit at a bank.

18        MR. ROOS:  Let's bring up Government Exhibit 3003.

19  Q.  Professor Easton, what does this show?

20  A.  So if we look at the top part of this diagram, it shows a

21  simple operation of a customer—you or I—putting a hundred

22  dollars into a bank account.  The bank accounts in question

23  here are Alameda, North Dimension, and FTX.  The lower part

24  shows the accounting, how the accounting would occur.  The

25  accounting is a classic double-entry bookkeeping accounting

1    method, which has been around for centuries, and essentially

2    all the double-entry means is that we record the fact that

3    we've got $100 of customer deposits in the green on the

4    right-hand at the bottom, but we will record a corresponding

5    liability.  We've got that customer account of a hundred

6    dollars in green, but we owe the customer a hundred dollars, so

7    we've got a liability building up of a hundred dollars per

8    unit.

9    Q.  And so just focusing here on the bottom section, for this,

10   you see the account—the box that says fiat@ftx.com Bookkeeping

11   Account?

12   A.  Yes.

13   Q.  How is that part of the double-entry bookkeeping accounting

14   system you described?

15   A.  So this is the second entry or the negative entry to

16   balance the positive entry.  We could use the term debits and

17   credits, but they are unnecessarily confusing.

18   Q.  So let's say a customer deposits a hundred dollars into one

19   of these Alameda or North Dimension or FTX bank accounts.  How

20   is that recorded in the FTX database bookkeeping account?

21   A.  It should be recorded as a corresponding liability.  In

22   this case we've got a hundred dollars deposited, and there will

23   be a corresponding amount owing against that deposit, a

24   liability.

25   Q.  And how is it documented within the accounting system in

```
 1  terms of the customer account, so this last box here on the
 2  right?
 3  A.   It's an increase in the customer account.  So we increase
 4  by a hundred dollars a customer account, we increase the
 5  negative amount in the liability.
 6  Q.   So how does this process work for fiat withdrawals?
 7         MR. ROOS:  Let's go to the second page.
 8  A.   So for fiat withdrawals, as you would expect, it's just the
 9  opposite.  So the transaction between you and—the customer and
10  the bank is at the top.  At the bottom of this diagram is now
11  we've taken a hundred dollars out of the customer account and
12  in turn, in the fiat@ftx bookkeeping account, we no longer have
13  that liability.  We've paid the cash back to the customer.
14  Q.   And so just to be clear about the terms we're using, when
15  Alameda or FTX received a fiat deposit, would that result in a
16  positive or negative entry in that fiat@ftx bookkeeping
17  account?
18  A.   When they received a deposit, it would result in a negative
19  entry in the fiat account.
20         THE COURT:  And again, just for clarification, you
21  have the legend on the lower left side of the chart which reads
22  Exchange Ledger Activity.  "Exchange" refers to what exactly?
23         THE WITNESS:  FTX exchange.
24         THE COURT:  And "ledger" in this context means what?
25         THE WITNESS:  This means the general ledger at FTX.
```

1         THE COURT:  In other words, a bookkeeping record.

2         THE WITNESS:  Exactly.

3         THE COURT:  And in this case it's an electronic

4    record.

5         THE WITNESS:  Yes, it is.

6         THE COURT:  All right.  Let's go.  Go ahead.

7         MR. ROOS:  Thank you.

8    BY MR. ROOS:

9    Q.  And you used the term "fiat liability."  So the balance of

10   this account, I think you said, gets more negative with more

11   deposits.  What about the liability—when you refer to

12   liability, what are you referring to?

13   A.  Well, the—the balance gets less negative—more negative,

14   meaning that the liability increases.

15   Q.  All right.  And so we're on withdrawals.  And let me ask

16   you:  Did the balance of the fiat@ftx account change over time?

17   A.  Yes, it did.

18   Q.  How so?

19   A.  I traced the month-by-month balance in that fiat account at

20   the time and it increased.

21   Q.  So let's take a look.

22         MR. ROOS:  Can we please publish Government

23   Exhibit 1003.

24         THE COURT:  Yes.

25   Q.  Professor Easton, what does Government Exhibit 1003 show?

1    A.   So just to orient us on the—the graph here, the $x$ or

2    horizontal axis denotes months, going from the beginning of

3    January 2021 through November 11, 2022.  You'll see the

4    vertical axis, the $y$ axis, is importantly billions of dollars.

5    What I plot here is the monthly month-end balance in the fiat

6    liability—in other words, the increase in the liability over

7    time.  And you will see that it increases steadily to a peak of

8    11.3 billion in June of 2022.

9    Q.   And what was the largest point of fiat liability?

10   A.   What was the largest point?

11   Q.   Yes.

12   A.   11.3 billion.

13   Q.   And so how would that be expressed in the fiat@ftx.com

14   account?

15   A.   That would be expressed as a negative amount, a liability.

16          MR. ROOS:  All right.  Let's take a look at Government

17   Exhibit 1004.

18   Q.   And Professor Easton, can you explain what this exhibit

19   shows.

20   A.   Yes.  Well, first of all, we have the liability that we

21   just had on the previous account—previous exhibit; we've

22   repeated it here.  So the liability, the amount that should

23   have been deposited to bank accounts, was 11.3 billion.  The

24   amount that was actually in those accounts is the greenish-blue

25   line.  You can see it's quite low, reaches around about

1    2 billion, 2.3 billion, at the time of the peak liability.

2    Q.   And so just so we're sure we understand, the black line,

3    how, if at all, does that compare to the black line on the last

4    exhibit?

5    A.   It's exactly the same line.

6    Q.   And the green line represents what?

7    A.   The green line represents the actual bank balance of

8    customer accounts, the amount of customer money that was really

9    there, whereas the black line represents the amount that should

10   have been there.

11   Q.   And then the white boxes here represent what?

12   A.   The—the discrepancy, the difference between what was there

13   and what should have been there at these two different points

14   in time.   One point in time is the end of June 2022, the other

15   at the end of October 2022.

16   Q.   All right.   So let's go back to the diagram we were looking

17   at previously about fiat deposits, but use these June balance

18   numbers.

19         MR. ROOS:   Could we bring up Government Exhibit 3004.

20   Q.   What does this show, Professor Easton?

21   A.   So now we're going back to—you'll see the accounting at

22   the bottom of this slide.   The accounting requires that every

23   dollar a customer deposits has a corresponding amount in the

24   fiat liability.   So the fiat liability should have been 11—is

25   11.3 billion.   Yet if we look at what was actually in these

1    customer accounts to cover the fiat liability, it was just

2    2.3 billion, the amount at the top of this slide.

3              MR. ROOS:  We can take this down.

4    Q.  So let's talk about what happened with the money.  And

5    first, have you analyzed the movement of money between or among

6    accounts?

7    A.  Yes, I have.

8              MR. ROOS:  Can we publish Government Exhibit 1050.

9    Q.  And let's walk through this exhibit.

10             Professor Easton, can you explain what we're looking

11   at on the screen right now on the first page.

12   A.  Well, to help understand how all of these accounts were

13   commingled—mixed together, in other words—I've separated the

14   accounts out into four blocks:  One, the accounts Alameda and

15   FTX that were accepting customer deposits, I'll analyze those

16   in the green box; to the left-hand side, in blue, Alameda

17   Research bank accounts; and to the right are FTX bank accounts,

18   not accepting customer funds—they're all in the green; and in

19   the bottom right-hand corner you'll see another account, which

20   is uniquely a Sam Bankman-Fried entity.  This is the yellow

21   box.

22   Q.  And what significance, if any, do the colors have on these

23   boxes?

24   A.  The color green represents customer accounts; the color

25   blue will always represent Alameda accounts, Alameda Research

1    accounts; black will always represent FTX bank accounts; and

2    yellow will always represent Paper Bird-SBF.

3    Q.  And just to be clear about the blue, those are Alameda

4    Research accounts that do not receive customer funds.

5    A.  That is correct.

6    Q.  Now let's go to page 2.

7        And what information has been added to the exhibit?

8    A.  So they were in fact 47 accounts that accepted customer

9    funds that I could have put in this box.  Of course it would

10   have been unreadable, so what I've done is I've separated out

11   the 11 biggest.  We can all see of course there's 12, but

12   there's a 12th, which is the customer withdrawals and deposits.

13   Q.  Okay.  Let's look at page 3.

14       And what information has been added to the exhibit

15   now?

16   A.  Similarly, I've identified the main accounts in—the ones

17   with the largest amount of funds in Alameda Research, in FTX on

18   the right-hand side, and SBF on the bottom right-hand corner.

19   Q.  Now you mentioned receiving fiat deposits.  I think earlier

20   in your testimony you also mentioned stablecoins.  To what

21   extent do the accounts in green also receive stablecoin

22   conversions?

23   A.  They do also receive stablecoin conversions.

24   Q.  Now let's go to the next page.

25       And can you explain what additional information has

1    been added to the exhibit.

2    A.   So now what all of these arrows indicate is movement among

3    the accounts that hold customer deposits.  It doesn't describe

4    all of the movements; it describes the biggest movements.  A

5    thick line means a lot of movement, a thin line means much less

6    movement.

7         MR. ROOS:  Could we please go to the next page.

8    Q.   What additional information has now been added to the

9    exhibit?

10   A.   It's important to notice that all of these lines on this

11   exhibit, they still remain green; in other words, this is

12   move—movement of customer funds.  So this is now movement of

13   customer funds out of these customer bank accounts to Alameda

14   on the left-hand side, on your left-hand side of this chart,

15   and FTX on the right-hand side of this chart.

16        MR. ROOS:  Could we please go to the next page,

17   page 6.

18   Q.   What additional information has been added now?

19   A.   Now we see that there's movement in both directions, from

20   Alameda Research to customer accounts, FTX bank to customer

21   accounts—in other words, movement in both directions—but also

22   movement from FTX accounts and customer accounts to Paper Bird,

23   SBF's entity on the bottom right-hand corner.

24        MR. ROOS:  Could we go to page 7.

25   Q.   I see a purple box has been added to the screen.  What does

1  that represent?

2  A.  Well, there's another important actor in this—this whole

3  sequence, and this is third-party investors who put money into

4  FTX, so their funds also were part of the mix.

5          MR. ROOS:  And let's go to the last page, page 8.

6  Q.  And what information is added now?

7  A.  So this—these purple lines now show the flow of investor

8  funds, and you'll see that there's a flow of investor funds to

9  SBF bank accounts, there's a flow to Paper Bird, the SBF

10  entity, and there's a flow to North Dimension, which is the

11  Alameda bank account accepting customer funds.

12  Q.  Focusing on those purple lines and the flow of them, have

13  you been able to determine which investors' funds were

14  transferred to the North Dimension Alameda accounts?

15  A.  Yes, I have.

16          MR. ROOS:  Could we please bring up Government

17  Exhibit 1023.

18  A.  This is the list of investors.

19  Q.  Okay.  And the list of investors that were—that make up

20  those purple lines on the last slide?

21  A.  Exactly.

22  Q.  Okay.  And what do—just so we understand, do you see where

23  it says Settled Date of Sources of Funds, and then next to it,

24  it says Source of Loaned Funds?  What does Source of Loaned

25  Funds refer to?

1  A.   The source of loaned funds refers to the entity that put

2  the money in, that made the investment in FTX, the date of that

3  investment is on the left-hand side.

4        MR. ROOS:   All right.   We can take this down.

5  Q.   So now let's talk about what happened to the customer funds

6  that moved through these accounts.   And was any of the customer

7  money spent?

8  A.   Oh, yes.

9        MR. ROOS:   Could we publish Government Exhibit 1044.

10 Q.   And focusing on page 1, Professor Easton, can you explain

11 what this shows.

12 A.   Yes.   So this—this just is a schema that points out that

13 customer funds were used in various ways, and four ways that I

14 analyzed were: investment in businesses and financial

15 funds—I'll show some examples; political contributions;

16 charitable foundations; and in the purchase of real estate.

17       MR. ROOS:   So let's go to page 2 of this exhibit.

18 Q.   And focusing on investments in business and financial

19 funds, what are you referring to?

20 A.   Here, it is investments by Alameda entities in businesses

21 and other financial activities.

22 Q.   Now the top of your exhibit here says Uses of Customer

23 Funds.   Have you been able to trace customer funds from

24 customer bank accounts to investments in businesses and

25 financial funds?

1  A.  Yes, I have.

2  Q.  Okay.  Let's look at some examples.

3       MR. ROOS:  Could we please bring up Government

4  Exhibit 1033.

5  Q.  Professor Easton, what does this exhibit show?

6  A.  So this—again, the color coding is helpful, I hope.  So on

7  the left-hand side we have customer funds, which are in turn

8  transferred through a bank that handles customer deposits to

9  the right-hand side, where we have a purchase, in this case

10  it's of Modulo Capital, which was a startup hedge fund in the

11  Bahamas.

12  Q.  And I want to talk to you a little bit, before we go deeper

13  into the actual tracing here, about the process of tracing, now

14  that you've used the term.  What are you referring to?

15  A.  So here, if we go from right to left—it's unusual, but we

16  always go from right to left.  So the investment is in Modulo

17  Capital.  I then can identify a transaction where the transfer

18  occurred from the bank to Modulo Capital.  Going back further

19  to the left, I can see—if you look at the top line on

20  the—June 27th, there was a transfer to Modulo; on the same day

21  there was a transfer of customer funds to Alameda Research,

22  traced in turn to the purchase of Modulo Capital.

23  Q.  So let's focus on the process of tracing.

24       MR. ROOS:  Could we go to page 2.

25  Q.  So just focusing on this first transaction, I want to talk

1  about what went into the tracing.

2        MR. ROOS: Why don't we go to page 3.

3  Q.  And can you walk us through the process of using the

4  records and data in order to trace out this transaction.

5  A.  Yes.  So a summary of the record is in the spreadsheet, a

6  snapshot out of the spreadsheet that shows the tracing that we

7  actually did.  So if you look at the first line of this—maybe

8  this first line could be highlighted?

9  Q.  Yes.  Next—I think the next page.

10  A.  Okay.  Next page, please?

11        Okay.  So here we see a handshake that connects the

12  bank to Modulo Capital.  Since there's never been a transaction

13  between these two before, this 1 dollar is sent to ensure the

14  integrity of the transaction, which later will be $50 million.

15  So it's the first step.  So it goes from the green, Alameda

16  Research bank, to the orange.  This is the external entity in

17  which there's an investment.

18        If we go to the next, we'll see then there's a

19  transfer of customer funds via an intermediary, Circle Internet

20  Financial, to Alameda.  So now it's in the bank.

21        And then next we see the transfer from the bank to

22  Modulo Capital.

23        All of these transfers are identified in the record,

24  so we can go back and see every one of those transactions.

25        MR. ROOS: Let's go to the next page.

1  Q.  Beyond the tracing in the bank records, have you utilized

2  any other information?

3  A.  Where possible, we used other information, and this is an

4  example.  This is an example of a Slack message, an internal

5  email, if you like, between Sam Bankman-Fried—from Sam

6  Bankman-Fried, and it says this $50 million which we've just

7  traced is for Modulo Capital LP, *we should send it via the*

8  *Signet account*, which is the Signet account labeled above,

9  9485, and then we see Jen says paid.

10       MR. ROOS:  Now let's go back to the tracing slide.

11  Let's go to page 8.  And I want to focus on the bottom sequence

12  as an example.  And focusing on that bottom sequence.  Let's go

13  to the next page.

14  Q.  Can you walk us through this sequence.

15  A.  Yes.  So now this also involves Modulo Capital, and of

16  course the handshake doesn't have to occur anymore because

17  we've already established connection.  So we'll see—if we go

18  to next, we'll see a transfer of a hundred million dollars

19  on—late on the 25th of September.

20       Then we see—if we go to the next, we'll see a further

21  transfer of what totals $192 million.  So we know that in the

22  immediate vicinity of this transfer, large chunks of money

23  totaling 292 million have been transferred from customer funds

24  to the bank account holding the customer funds and in turn to

25  Modulo Capital for the investment.

1           MR. ROOS:  Okay.  Can we go to the next.

2    Q.   Is that what that shows?

3    A.   I'm sorry.  Yes, it does.

4    Q.   All right.

5           MR. ROOS:  And then let's go back to—let's go one

6    more page in.

7    A.   So this then summarized, we've got a total of $292 million.

8    We don't know exactly what customer this $292 million comes

9    from, but we know it is only customer funds, it's not any other

10   source of funds, and so $292 million of customer funds was used

11   to purchase Modulo Capital.

12          MR. ROOS:  If we could please go to page 14, the next

13   page.

14   Q.   And what additional information has been added?

15   A.   So now again we have internal email messages.  First of

16   all, *we're putting an additional 250 million into Modulo.*

17   *Would you be able to send over the funds to the same Signet*

18   *address.  It would be great if this done tonight, and ideally,*

19   *250 million tonight.*  Indeed, that's in—on September 26th at

20   5 p.m.—5 a.m.  The money was transferred on the 26th, that

21   same day.

22   Q.   All right.

23          MR. ROOS:  Let's go back to the first page of this

24   Exhibit 1033, page 1.

25   Q.   And so now, now that we've gone through the exercise of

1 tracing, what is your conclusion, expressed on Government

2 Exhibit 1033?

3 A.   Okay.  So we—we've looked in detail at the tracing of the

4 top transfer and the bottom transfer on this page.  We did

5 similar analysis for the other two.  So overall we can conclude

6 that all of the purchase of Modulo Capital was made using

7 customer funds.

8          MR. ROOS:  Okay.  We can take this exhibit down.

9          Let's put up Government Exhibit 1027A, please.

10 Q.   And Professor Easton, what does Government Exhibit 1027A

11 show?

12 A.   So this is a similar demonstration.  Now a payment to

13 Genesis Digital Assets, which was a crypto miner.  It's a

14 little more complicated because we get a flow through many

15 Alameda accounts accepting customer deposits, and you'll see on

16 the left-hand side we've got a flow into North Dimension at the

17 top of this slide, mostly of customer funds, 145 million, but

18 some other inflows, not identified as customer funds.

19          Similarly, at the bottom left-hand corner, you'll see

20 flows into Alameda Research of 539 million customer funds, and

21 other inflows during this period of time of 24.9 million.  So

22 some of the 100 million that eventually went to Genesis Digital

23 may have come from customer funds, but you can see that the

24 total of 32.6 million, the other inflows on the top and the

25 24.9 million, the other inflows at the bottom, does not sum to

1    100.  And therefore, some must have come out of the customer

2    funds.  And given this disproportionate amount of funds that

3    came from customers versus other inflows, it's likely that more

4    than the 50-odd million came from customer funds.

5            MR. ROOS:  Let's put up Government Exhibit 1027B,

6    please.

7    Q.  Professor Easton, what does this exhibit show?

8    A.  So again, if we focus on the right-hand side where we've

9    got the expenditure of customer—of funds, on the left-hand

10   side we have the source of those funds.  Again, it gets a

11   little more complicated because we've got more bank accounts

12   that—through which the money is traced, but ultimately we'll

13   see that there is customer funds totaling 1.1 million plus

14   another .6 million, 1.7 million.  And other inflows, just the

15   sum of 9.4 million and 48 million.  All of this has to fund

16   550.9 million.  So a large amount of this 550 million must have

17   come from customer funds.

18   Q.  And I just noticed on this exhibit, it says 550.9.  Is that

19   dollars or million?

20   A.  That is million.

21   Q.  And how are you able to conclude that it was customer funds

22   and not these other inflows that funded this payment to Genesis

23   Digital?

24   A.  I can conclude that the majority of the payment was

25   customer funds because the total other funds is 9.4 plus

 1    48 million, you have 57 million, and the total payment was

 2    550 million, so it must have come—large portion must have come

 3    from customer funds.

 4              MR. ROOS:  We can take this down.

 5              Could we please publish Government Exhibit 3005.

 6    Q.  And Professor Easton, directing your attention to the top,

 7    have you performed any analysis relating to an investment in

 8    Skybridge Capital in September 2022?

 9    A.  Yes.

10    Q.  Can you explain what types of materials you've reviewed

11    that are on the screen.

12    A.  So in this case there's a subscription agreement from

13    Alameda, signed by Sam Bankman-Fried, an agreement to subscribe

14    to buy, if you like, shares in Skybridge Capital, which is a

15    venture capital fund in New York, run by Scaramucci.  It's the

16    purchase of 30 percent ownership in Skybridge.

17    Q.  And have you done any type of financial analysis or tracing

18    relating to this investment in Skybridge Capital?

19    A.  Yes, I have.

20              MR. ROOS:  Could we please bring up Government

21    Exhibit 1028.

22    Q.  Professor Easton, what does this show?

23    A.  Again, we got similar flows—customers on the top left-hand

24    corner to Skybridge Capital on the bottom right.  But

25    importantly, we have an addition here.  We've now got blue,

1   Alameda Research.  This is separate entity Alameda Research,

2   except that, like the entire flow, you'll see it says

3   45 million on September 7th from Alameda Research, and that

4   amount was in turn used on the next day to invest in Skybridge

5   Capital.

6   Q.  Now what's your conclusion about the source of funds for

7   the Skybridge investment?

8   A.  So at most—again, if we look from the left-hand side where

9   we've got 18 million in other inflows, 438 in customer funds,

10  the 45 million may have been funded by 18 million of other

11  inflows.

12          MR. LISNER:  Objection, your Honor.

13          THE COURT:  Sorry.  What's the objection?

14          MR. LISNER:  Speculation, to the witness's conclusion

15  using the words "may," "may have."

16          MR. ROOS:  I think he's appropriately saying that it

17  could but it's not all of it.

18          THE COURT:  Overruled.

19  BY MR. ROOS:

20  Q.  Go ahead, Professor.

21  A.  So you can see that other inflows are 18 million, so I

22  think I really mean that 18 million may have come—of the

23  45 million may have come from other inflows, but it also could

24  have come from customer funds.  But at least 45 minus 18 must

25  have come from customer funds.

1        MR. ROOS:  We can take that down.

2        Could we please publish Government Exhibit 3006.

3  Q.  Professor Easton, have you done any analysis relating to an

4  investment in Dave Inc. in March 2022?

5  A.  Yes.  So this was a purchase of a 100 million stake in Dave

6  Inc.  This again was a Alameda venture, signed by

7  Bankman-Fried, and I traced this.

8  Q.  Okay.  So let's look at the tracing.

9        MR. ROOS:  Can we please bring up Government

10 Exhibit 1029.

11 Q.  Can you describe what your tracing shows.

12 A.  So again, the pattern is the same as before.  However,

13 notice now that we have this entity called Paper Bird.  Paper

14 Bird is an entirely owned Bankman-Fried entity, and you'll see,

15 if we go from the bank accounts, Alameda Research, the transfer

16 among two of them, Alameda Research 9485 and Alameda Research

17 4061, these are customer depositories.  Out of that customer

18 depository, 105 million was transferred on the—March 22nd to

19 Paper Bird, an entity outside of Alameda and FTX, and then on

20 the next day was used by Paper Bird to purchase the investment

21 in Dave.

22 Q.  Were you able to conclude the source of the funds used for

23 the Dave Inc. investment?

24 A.  Yes.  So if we trace all the way back to customers on the

25 top left-hand corner, we can say—see that we can identify

1   113.8 million of customer funds, but at the same time

2   2.4 million of other inflows that may not have been customer

3   funds.  2.4 million is a small part of 100 million, and

4   therefore the majority of this payment for Paper Bird—by Paper

5   Bird for Dave must have come from customer funds.

6           THE COURT:  Professor, the figure you used in relation

7   to the phrase "customer funds" was 113.8, not 130, yes?

8           THE WITNESS:  That is correct.  I apologize.

9           MR. ROOS:  Thank you.  And Judge, I don't know if—I

10  see you're standing, but if you want to take a break right now,

11  I'm about to move to the next exhibit.

12          THE COURT:  No, I just stand once in a while because I

13  sit so long.

14          We can take our morning break, 15 minutes.

15          THE DEPUTY CLERK:  All rise.

16          (Recess)

17          (In open court; jury present)

18          THE COURT:  Please be seated.

19          The defendant and the jurors are all present, as they

20  have been throughout.

21          You may continue, Mr. Roos.

22          MR. ROOS:  Thank you.

23          Why don't we put up Government Exhibit 3007.

24  BY MR. ROOS:

25  Q.  Professor Easton, have you reviewed an investment in K5

1   Global Holdings?

2   A.  Yes, I have.

3   Q.  And just starting with the materials on the screen, what do

4   these relate to?

5   A.  This is an agreement between SBF—Sam Bankman-Fried—and K5

6   Global, which is a venture capital firm, to obtain a general

7   partnership with K5.

8   Q.  And then I want to focus on the payment confirmation we

9   have on the right side.

10          What's the date on this and what's the wire transfer

11  amount?

12  A.  The date is April 14, 2022, and the wire transfer amount is

13  $300 million.

14  Q.  Okay.  And then just the date on the Summary of Terms?

15  A.  6th of March 2022.

16  Q.  Have you conducted any form of financial analysis relating

17  to the investment in K5 Global Holdings?

18  A.  Yes, I have.

19          MR. ROOS:  Let's put up Government Exhibit 1030,

20  please.

21  Q.  Professor Easton, what does this show?

22  A.  So again, the flow is—is similar to the flows we've had

23  before.  On the bottom right-hand side is the entity K5 in

24  which Sam Bankman-Fried, through Alameda Research Ventures,

25  invested $300 million.  I traced it back through several bank

1   accounts, including Alameda Research 4016 and 9485, back to

2   customer deposits of 765 million from customers and 127 million

3   other.

4   Q.  And what was your conclusion about what funds were used to

5   fund the K5 Global Holdings?

6   A.  So given that there was only 127 million to cover a

7   possible 300 million, some of the investment in K5 Global must

8   have come from customer funds.

9           MR. ROOS:  We can take this down.

10          Could we please publish Government Exhibit 3008.

11  Q.  Now have you looked into an investment in Anthropic PBC?

12  A.  Yes, I have.

13  Q.  And could you describe what materials are on this exhibit.

14  A.  So this is—first of all, in the middle, the big block is

15  what was the investment in.  It was an investment in a

16  fundraising effort by Anthropic, which is an AI company.  The

17  Slack message indicates we have to wire—Sam Bankman-Fried

18  suggests, *we have to wire 500 million to Anthropic.  This*

19  *should come from an Alameda Research Ventures bank account.*

20  Q.  And have you conducted any form of financial analysis

21  relating to the source of funds used to make this investment?

22  A.  Yes, I have.

23          MR. ROOS:  All right.  Why don't we publish Government

24  Exhibit 1041.

25  Q.  Professor Easton, what does this show?

```
 1   A.  So again, similar to the analyses before, we have a
 2   transfer of customer funds through a series of Alameda Research
 3   customer depository accounts, through to an Alameda Research
 4   external account——in other words, this is an account that does
 5   not hold customer funds——of 500 million, and in turn, the
 6   bottom right-hand corner, a payment for the investment in
 7   Anthropic.
 8   Q.  And how does the amount of the investment in Anthropic
 9   relate to the amount we saw on that Slack message on the last
10   exhibit?
11   A.  It is that amount.
12           MR. ROOS:  We can take this down.
13           Could we please publish Government Exhibit 1032.
14   Q.  Professor Easton, starting on page 1 of this exhibit, can
15   you explain what the exhibit shows.
16   A.  Yes.  So this is a summary of a purchase by Alameda
17   Research of Robinhood shares——here, a brokerage account called
18   ED&F Man.  Importantly, this exhibit shows that customer funds
19   primarily were used to fund a transfer of 292 million out of
20   customer funds——of customer funds out of customer depositories
21   to Alameda Research to an account that already had 196 million
22   worth of Robinhood shares.  In turn, Alameda Research purchased
23   another 292 million of Robinhood shares.
24   Q.  And by "Robinhood shares," what are you referring to?
25   A.  These are shares in a trading firm called Robinhood.
```

1  Q.  When you say "shares," are they like shares of stock?

2  A.  Yes.

3  Q.  Okay.  Let's look at what happens next.

4        MR. ROOS:  Could we go to page 2 of this exhibit.

5  Q.  And some additional information has been added to the

6  exhibit.  What does it depict?

7  A.  So in the first flow, the flow that we saw before we added

8  this piece, I was trying to summarize essentially what

9  happened.  But in addition, Alameda Research—there was a

10  transfer out of Alameda Research of 491 million to Sam

11  Bankman-Fried and 54.6 million to Gary Wang.  This amount was

12  exactly equal to the amount that was used to purchase Robinhood

13  shares.

14        MR. ROOS:  So let's go to the next page.

15  Q.  And what information is now added to the exhibit?

16  A.  So this 468—400—$546 million—I apologize—is—this

17  $546 million was then transferred to an entity wholly owned by

18  Gary Wang and Sam Bankman-Fried called Emergent Fidelity

19  Technologies.  This is the yellow box, identified yellow

20  because now it's a Bankman-Fried entity.

21        MR. ROOS:  And let's go to the next page.

22  Q.  And what does this new information on the exhibit depict?

23  A.  Recall that the 546.1 million which went to Gary and Sam

24  Bankman-Fried goes to Emergent Technologies but then was

25  transferred back to Alameda Research, so there's a round-trip

1    transaction, if you like, that makes Alameda Research whole.

2    Q.  And what then happened, if anything, in response to this

3    $546.1 million transfer?  And could we go to the next page.

4    A.  So in turn, Robinhood shares were transferred to this

5    brokerage fund in the name of Bankman-Fried and Wang.

6            MR. ROOS:  And let's go to the last page.

7    Q.  So what does this last page now depict?

8    A.  So the end result of all of those transactions, which I've

9    tried to summarize as clearly as possible—I hope it is

10   clear—is that customer funds ultimately went through Alameda

11   Research and did this big round-trip transaction so that they

12   ended up in an account owned by Wang and Bankman-Fried, which

13   then in turn purchased Robinhood shares.

14   Q.  And so just to be clear, we've looked at straight green

15   lines previously.  What do the sort of dashes indicate here?

16   Was this actually the flow of funds?

17   A.  No.  The dashes are there to indicate all of this—these

18   transactions that occurred in the background.

19           MR. ROOS:  Okay.  We can take this exhibit down.

20           Let's put back up Government Exhibit 1044.  And if we

21   go to page 3.

22   Q.  Professor Easton, we've talked about a bunch of instances

23   of payments or investments in businesses.  Have you done any

24   analysis relating to payments for political contributions?

25   A.  Yes, I have.

1          MR. ROOS:  Why don't we bring up Government Exhibit

2     3009.

3     Q.  Now, Professor Easton, have you done any analysis relating

4     to a political donation by Ryan Salame?

5     A.  Yes, I have.

6     Q.  I want to first direct your attention to the message on the

7     left-hand side of the screen.  Do you see where it says:  The

8     GMI PAC needs some more funding in order to support Senator

9     Boozman in his primary.  Spoke to Sam yesterday.  Ryan, do you

10    have any appetite for giving more to GMI.

11          You see that message?

12    A.  I do see it.

13    Q.  You see below it, it says 500,000 to 1 million?

14    A.  Yes, I do.

15          MR. LISNER:  Objection, your Honor.  Can we ask for a

16    sidebar, please?

17          THE COURT:  Yes.

18          (Continued on next page)

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Mr. Lisner.

3          MR. LISNER:  I think Mr. Cohen is going to cover this

4    one.

5          MR. COHEN:  Your Honor, we have no objection to the

6    tracing analysis that the witness is putting forward.  But at

7    least from the -- she is getting the exhibit -- from the

8    exhibit there is also commentary about the nature of the

9    political spending, the reasons for it.  We would ask for a

10   limiting instruction with respect to that.

11         THE COURT:  What limiting instruction are you asking

12   for?

13         MR. COHEN:  Along the same lines you gave yesterday

14   about, the defendant has not been charged in this case with

15   political and campaign contribution violations.  This is -- as

16   I understand it, this is a flow-of-funds analysis that we are

17   hearing and not commentary on the validity or invalidity of the

18   contributions themselves.

19         MR. ROOS:  There is a real difference here, which is

20   that yesterday the limiting instruction came after the witness

21   said he conspired with the defendant in committing a violation

22   of the campaign finance laws, and your Honor appropriately gave

23   an instruction right before he said we conspired with.

24         Here, as Ms. Sassoon has argued previously in sidebar

25   and as we briefed, its spending on donations is direct evidence

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   of the use of customer funds, so it's direct evidence of the

2   wire fraud, it's direct evidence of the money laundering.

3          The reason I'm calling the witness' attention to these

4   particular messages is, the next thing I am going to ask him is

5   whether he did any tracing of $500,000 to a million dollars to

6   the GMI PAC.

7          MR. COHEN:  Can I just see it?

8          MR. ROOS:  I will note, this exhibit is in evidence,

9   also, this and the underlying exhibit.

10         MR. COHEN:  The first section in yellow is the point

11  we are making.  This is Mr. Wetjen commenting on needs more

12  support in the primary.  I don't think this witness is

13  qualified to talk about the nature of the donations.  I

14  understand he's an accountant --

15         THE COURT:  He's not talking about the nature of the

16  donations.

17         MR. ROOS:  I will definitely not ask whether his views

18  on Boozman or the nature of the donations or anything.  I am

19  just going to ask him, did he trace this money.

20         MR. COHEN:  With that limitation, that's fine.

21         (Continued on next page)

22

23

24

25

1        (In open court)

2        THE COURT:  Let's proceed.  Restate your question.

3        MR. ROOS:  Thank you, your Honor.

4    Q.  Just to pick up where we are, Professor Easton, the first

5    highlighted message about GMI PAC, the second highlighted

6    message about an amount, 500K to a million, and then a blue

7    message that says:  @Samuel Bankman-Fried, I can wrap more

8    funds through my name.

9        Have you done any sort of analysis of the movement of

10   funds relating to a payment for the GMI PAC in an amount of

11   500,000 to $1 million?

12   A.  Yes, I have.

13       MR. ROOS:  Let's bring up an exhibit.  Can we please

14   publish Government Exhibit 1039.

15   Q.  Professor Easton, what does this exhibit show?

16   A.  Again, starting from the right, moving to the left, we see

17   the transfer of the half a million dollars on June 3 from Ryan

18   Salame's personal account to the GMI PAC.  On the day -- a few

19   days before, on the 25th of May, there was a transfer of 5.5

20   million into Ryan Salame's account.  We can trace that 5.5

21   million to either 11 million in customer funds or .2 million in

22   other inflows.

23       The bottom line of all of this is that we have got

24   other inflows of .2 million funding, .5 million contribution to

25   the GMI PAC, and, therefore, at least three-fifths of that

1    contribution must have come from customer funds.

2            MR. ROOS:  We can take this down.

3            Can we publish Government Exhibit 3010?

4            THE COURT:  Yes.

5    Q.  Professor Easton, have you done any analysis relating to a

6    political contribution by Nishad Singh?

7    A.  Yes, I have.

8    Q.  Directing your attention to the email excerpts we have up

9    on the screen, do you see, first, the highlighted portion that

10   says:  Your $1 million pledge to our operating expenses.  This

11   is in the top email from Barbara Fried to Sam at Alameda

12   Research and Nishad Singh.

13           Do you see the part where it says:  Your $1 million

14   pledge to our operating expenses?

15   A.  Yes, I do.

16   Q.  It says:  Since this is going to our 527 and hence is

17   disclosed, I'm assuming that Nishad would be the better person

18   to have his name on it.

19           You see then the bottom email of a day later, April

20   22, 2021, from Nishad Singh:  Sounds good.  I am happy to

21   pledge the 1 million for MTG operating, agreed on optics.

22   A.  Yes.

23   Q.  Have you analyzed a political donation of an amount of 1

24   million by Nishad Singh?

25   A.  Yes, I have.

1   MR. ROOS: Can we please bring up Government Exhibit

2   1031.

3   Q. Professor Easton, can you explain what this exhibit shows.

4   A. Similar to the previous exhibit, if we look to the

5   right-hand side, we will see the transfer of the $1 million

6   from Nishad Singh's personal bank account to mind the gap.

7   That $1 million on the same day came from an Alameda Research

8   bank account; in fact, transferred across two or at least two.

9   This is something of a simplification of the transfers among

10  the green Alameda Research accounts. The same day 1 point

11  million came -- was transferred among Alameda accounts.

12          We then traced that back. And this is a case where

13  it's very difficult, it was impossible to in fact trace the

14  million directly to some customer funds. But what we know is,

15  in the immediate vicinity of that transfer of a million, there

16  was 1.5 billion of customer funds that were transferred into

17  Alameda Research, 4456, and roughly half a billion of other

18  inflows.

19          So this is a case where we cannot directly trace the

20  money to customer funds, but it seems likely -- I'm purely

21  looking at the numbers here -- it seems likely, given that we

22  have got roughly two billion of customer funds and half a

23  billion of other inflows, that it may have come from customer

24  funds.

25          MR. ROOS: We can take that down and put up Government

1  Exhibit 1044, page 4.

2  Q.  Professor Easton, have you done any analysis concerning the

3  use of customer funds for charitable foundations?

4  A.  Yes, I have.

5  Q.  I'm sorry?

6  A.  Yes, I have.

7          MR. ROOS:  Can we take this down and publish

8  Government Exhibit 3011.

9  Q.  Now, do you recognize this as a Slack message between or

10  among Delaney Ornelas, Fab, Jen, Lynn, Ryan Salame, and Sam

11  Bankman-Fried?

12  A.  Yes, I do.

13  Q.  Can you just read the highlighted portions of the message.

14  A.  From Delaney:  Did we request another wire be sent out to

15  Guarding Against Pandemics from Alameda.  There is the 20

16  million wire that was sent out from Alameda Silvergate

17  operating account last week on 10/01.  Yeah.  I got the message

18  from Ryan Salame and, finally, from Ryan Salame, yes.  It's a

19  donation.

20  Q.  Are you familiar with Guarding Against Pandemics?

21  A.  Yes, I am.

22  Q.  What is it?

23  A.  It's a charitable fund essentially guarding against

24  pandemics.

25  Q.  Have you done any financial tracing relating to just

1  payment?

2  A.  Yes, I have.

3  MR. ROOS:  Let's bring up Government Exhibit 1035.

4  Q.  Can you explain what Government Exhibit 1035 shows.

5  A.  Yes.  Again, moving from the right to the left, the 20

6  million donation that we have just identified in the Slack

7  messages went from Alameda Research 6056 on the 1st of October

8  2021.  On that same day there was a transfer from another

9  Alameda account to Silvergate, 6056.  The amount going into the

10  Alameda Research 4456 account in the immediate vicinity all

11  came from customer funds.  Therefore, the $20 million wire to

12  Guarding Against Pandemics must have come from customer funds.

13  MR. ROOS:  Now, why don't we put up Government Exhibit

14  1040, please.

15  Q.  What does Government Exhibit 1040 depict?

16  A.  This is a similar flow from customer funds to FTX

17  foundation, which was a charitable foundation set up by FTX.

18  Q.  Can you describe what your analysis shows.

19  A.  The analysis shows that, on the 5th of October, starting

20  from the right to the left, there was five wires totaling $20

21  million from North Dimension to the FTX foundation.  That same

22  day, there was a transfer from an Alameda account to another

23  Alameda account, both depositories of customer funds.  And on

24  the day before, the customer funds going into Alameda Research

25  totaled 25 million, all customer funds, no other deposits.  In

1   other words, the 20 million donation to FTX foundation must

2   have come from customer funds.

3           MR. ROOS:  Let's bring back Government Exhibit 1044

4   and go to page 5.

5   Q.  Focus on the last category now, have you done any analysis

6   relating to use of customer funds to purchase properties?

7   A.  Yes, I have.

8           MR. ROOS:  Please publish Government Exhibit 3012.

9   Q.  Professor Easton, what does this show?

10  A.  This is a list of real estate purchased in the Bahamas.

11  Q.  What exhibit is this information drawn from?

12  A.  This exhibit is drawn from a spreadsheet that is in fact

13  Government Exhibit 3 that indicates all of the purchases.  It's

14  a much more detailed spreadsheet than this summary.

15  Q.  Where are these properties located?

16  A.  In the Bahamas.

17  Q.  Have you done any analysis relating to payments for these

18  properties?

19  A.  Yes, I have.

20          MR. ROOS:  Can we please bring up Government Exhibit

21  1026.

22  Q.  Professor Easton, what does this show?

23  A.  So this shows a purchase of a number of pieces of real

24  estate in the Bahamas, again going to the right-hand side of

25  this chart, for a total of 96.5 million between December 29 and

1    March 16, 2022.  The payment for those Bahamian properties go

2    from FTX digital markets.  A fund, black, owned by FTX does not

3    hold, should not hold customer funds.

4            On the 29th of December there is a transfer from

5    another FTX account to FTX digital markets.  Now, tracing back

6    to the customers, the customer funds were traced from an FTX

7    depository trading account 9964 on the 12th of December -- 24th

8    of December, on that same day, a transfer from another Alameda

9    account, and, in turn, in the preceding days, all of the funds

10   were coming from customers into Alameda 9485.  Therefore, the

11   hundred million -- excuse me -- the 96.5 ultimately paid for

12   the properties must have come from customer funds.

13           MR. ROOS:  Why don't we put up next to Government

14   Exhibit 1026 Government Exhibit 3012 and go to page 2.

15   Q.  Focusing on the Bahamas real estate properties in the

16   orange box, were you able to determine some of the properties

17   that were paid for using those customer funds?

18   A.  Yes.  Some, but not all.  There is -- the total on the

19   right-hand side is less than 96.5.

20   Q.  Just to be clear, what is depicted on page 2 of Government

21   Exhibit 3012?

22   A.  This is a subset of the properties that were purchased with

23   the $96.5 million.

24   Q.  And then what was the purchase price of the second

25   property?

1    A.  $30 million.

2    Q.  That was for the Orchid penthouse?

3    A.  Yes, it is.

4    Q.  Now, did you do any other tracing of payments for

5    properties?

6    A.  Yes, I did.

7         MR. ROOS:  Why don't we take these two down and put up

8    Government Exhibit 1025.

9    Q.  Professor Easton, how, if at all, is this exhibit different

10   from the last one we were looking at?

11   A.  Now you will notice another purple color hits the diagram,

12   and this is now investor funds.  This is investor funds put

13   into FTX, in turn transferred within FTX to FTX digital

14   markets, and then used to purchase Bahamian properties.  In

15   other words, in this case we have got to invest the funds, to

16   which I can trace the purchase of 70.5 million in property in

17   the Bahamas.

18   Q.  Have you been able to determine some of the properties that

19   were paid for by the investor funds?

20   A.  Yes, I have.

21        MR. ROOS:  Why don't we put up next to this Government

22   Exhibit 3012, page 3.

23   Q.  What does page 3 of Government Exhibit 3012 show?

24   A.  It shows some of the properties that were included in the

25   purchase of 79.5 million in real estate in the Bahamas.

1       MR. ROOS:  Just focusing on this last property here,

2   can we go to page 4.

3   Q.  What information has been added to the exhibit?

4   A.  This is in fact the deed of ownership of the property at

5   Old Fort Bay Real Estate.

6   Q.  What's the price and who are the owners?

7   A.  The price was 1.64 million -- 16.4 million, plus value

8   added tax of 1.64 million.

9   Q.  Who was it deeded to?

10  A.  The deed is to Alan Joseph Bankman and Barbara Helen Fried.

11      MR. ROOS:  We can take those two down.

12      Let put back up Government Exhibit 1004.

13  Q.  Professor Easton, directing your attention to this period

14  in June of 2022, what was the difference between the amount of

15  fiat and the amount reflected in FTX's database?

16  A.  $9 billion.

17  Q.  Have you analyzed what that $9 billion was spent on?

18  A.  Yes, I have.

19      MR. ROOS:  We can take this down and can we please put

20  up Government Exhibit 1045.

21  Q.  Starting on page 1 of Government Exhibit 1045, can you show

22  what -- can you explain what this represents.

23  A.  This is a whole pie of the amount of money that should be

24  available to cover customer funds, $11.3 billion.

25  Q.  This is as of that June date?

1    A.   This is as of June 30, 2022.

2             MR. ROOS:   Let's go to page 2.

3    Q.   What information has been added to the exhibit?

4    A.   This is the slice of the pie that still exists in Alameda

5    bank accounts.  This is the amount that is in fact present to

6    cover the funds, the 11.6 billion.  The whole chart should be

7    green, but it's not.

8             MR. ROOS:   Let's put them side by side, Government

9    Exhibit 1004 and Government Exhibit 1045, page 2.

10   Q.   How, if at all, do the colors on Government Exhibit 1004

11   relate to the colors on Government Exhibit 1045?

12   A.   So the black piece of the pie, so to speak, represents the

13   black line or the total liability for customer funds.  The

14   green slice out of the pie represents the green line.  And this

15   pie is a diagram as at June 30, the time when the peak

16   liability, 11.3, exists and the associated customer deposits,

17   2.3.

18   Q.   Have you been able to fill in the rest of the pie?

19   A.   Much of it, yes.

20            MR. ROOS:   Let's go back to just looking at Government

21   Exhibit 1045 and go to page 3.

22   Q.   Professor Easton, what does this show?

23   A.   So this shows the pieces of this pie that had been used for

24   various purposes.  I will point out just some of them.  But

25   some of these things are familiar.

1          Genesis, we traced 50 and 650 million largely back to

2    customers.  Similarly, the investment in K5 we have talked

3    about.  Similarly, the investment in Anthropic, the investment

4    in Dave, the investment in Modulo.  The Modulo analysis was for

5    a related time period, so there's only 50 of the 450 taken out

6    of this pie.  Other ventures we haven't traced I did trace,

7    another 1.4 billion.  Paper Bird we have seen, 430 million.

8    Then we have another big chunk, brokerage and outflows, almost

9    a billion, 970.7 million.  We have real estate, some of which

10   we have analyzed.  We have other expenses, 305 million.  And we

11   have got the two charitable donations that I've indicated.

12   Q.  Just a few follow-up questions on this.

13          The outflows to insiders, what's that a reference to?

14   A.  The outflows to insiders are the payments to, how can I

15   say, the inner circle of FTX and Alameda.

16   Q.  Now, the expenses category, it's not something we have

17   traced in the past slides you've gone through.  Give us an

18   example what type of thing falls into that category.

19   A.  This is going to be payment for equipment, rent on

20   property, payment of salaries, those kinds of things.

21   Q.  And then you have this large other category.  Just give us

22   an example or two of things that would fall within the other

23   category.

24   A.  I really haven't analyzed that.  There was a limit to the

25   resources we have to analyze this material, but a lot of this

1    was in fact investing -- investment in crypto.

2            MR. ROOS:  We can take this down.

3            Let's change topics.

4    Q.  At the beginning of your testimony this morning you had a

5    few conclusions relating to fiat deposits and then I think two

6    relating to cryptocurrency.

7            Do you remember that?

8    A.  Yes, I do.

9            MR. ROOS:  Let's turn to the cryptocurrency

10   conclusions.  Let's put up Government Exhibit 3013.

11   Q.  Professor Easton, I just want to start first by talking

12   about the process.

13           Can you explain what Government Exhibit 3013 shows.

14   A.  So you know how this describes a deposit in fact occurs in

15   practice, a crypto deposit occurs.  So I may have -- it would

16   be great if I did, but I may have a 100 Bitcoins in my own

17   personal wallet, and I might put those -- would put those in

18   FTX.  I might choose to put it in FTX.  It would go into an FTX

19   crypto wallet with my name on it, but then it is transferred to

20   a sweep wallet within FTX that includes my deposit and everyone

21   else's.

22   Q.  I'm sorry.  You said sweep wallet?

23   A.  Sweep, yes.

24   Q.  Just to be clear, is a sweep wallet one of these online

25   wallets?

```
 1   A.  Yes, it is.

 2   Q.  How about the process for withdrawals.

 3           MR. ROOS:  Can we go to page 2.

 4   Q.  Can you explain this.

 5   A.  Then the withdrawal bypasses the individual account.  It

 6   has already been mingled into this sweep wallet.  I would

 7   withdraw my 100 Bitcoins back out.  It gets transferred from

 8   the sweep wallet back to my personal wallet.

 9   Q.  Earlier in your testimony you described analysis comparing

10   the balances within FTX's ledger or database to the amount of

11   fiat deposits in bank accounts.  Have you done a similar

12   exercise comparing the database to what was in these crypto

13   wallets?

14   A.  Yes, I have.

15           MR. ROOS:  Why don't we bring up Government Exhibit

16   1051.

17           MR. LISNER:  Hold on.  Objection, your Honor.  This

18   relates to the exhibit that we talked about yesterday.  I

19   believe your Honor reserved at the time.

20           THE COURT:  Overruled.

21   Q.  Professor Easton, why don't you orient us.  What are we

22   looking at here?

23   A.  So this is similar to the chart that I put up for fiat

24   currency, but now we are looking at crypto.  We have got much

25   finer data which we can get off the Blockchain.  So you will
```

1    see the black line.  The black line represents the customer

2    deposits of crypto on the FTX exchange.  So this is the amount

3    of crypto that should have been held in FTX.com in order to

4    cover yours and my deposits.

5          The orange line or yellow line, however it is

6    appearing, represents the actual balances that were in the FTX

7    crypto wallets.  In short, you can see that there is a huge

8    deficiency.  There is a big difference.  There is much less

9    money in the crypto wallets than there should have been.

10   Q.  Just to be clear, what is the yellow -- what sort of

11   balances does the yellow line represent?

12   A.  This is the balance of -- in fact, this whole diagram

13   reflects just -- the nine biggest cryptocurrencies are the ones

14   that we investigated.  It shows the amount of those nine

15   currencies that were in fact held on the Blockchain.

16   Q.  If you included more currencies, like every currency, would

17   that change the size of the difference over time?

18   A.  It could.  It can only increase the difference.  Inasmuch

19   as if there is another cryptocurrency, which we didn't analyze,

20   the best-case scenario would be that the black line and the

21   orange line coincide.

22   Q.  Just to then focus on an example of the difference, you

23   have got a marker here for October 31, 2022.  What was the

24   difference between the amount listed on FTX.com's customer

25   balances and what was actually in the crypto wallets?

1    A.   The difference was $11.3 billion.

2    Q.   What was the difference, as opposed to the top?

3    A.   I'm sorry.  The amount that should have been in the wallets

4    was 11.4 billion.  The amount that was in the wallets was 1.1.,

5    so there is a difference of 10.3 billion.

6    Q.   Let me ask you, have you analyzed accounts within the FTX

7    database -- sorry.  Withdrawn.

8         Let me start by just asking you about the difference

9    and what caused it.  OK?

10   A.   OK.

11   Q.   Have you done any analysis relating to accounts with a

12   feature called allow negative?

13   A.   Yes, I have.

14        MR. ROOS:  Why don't we take down this exhibit and why

15   don't we look at Government Exhibit 3014.

16   Q.   Professor Easton, can you explain what Government Exhibit

17   3014 shows.

18   A.   Yes.  First of all, this comes out of the big FTX database.

19   And what it represents, going from left to right, the blocks

20   that I have highlighted, ID number is an Alameda account, which

21   was a much-used Alameda account.  You can see that it's indeed

22   identified as an Alameda account under user name

23   info@AlamedaResearch.com.

24        If we go to the next -- fifth column, you will see

25   borrowed.  This says that there was a borrowing limit on this

1   account of a bit more than $65 billion.  The check in the next

2   chart says that account 9 is permitted to withdraw, become

3   negative.

4   Q.  Have you done any analysis relating to the number of

5   accounts that had this allow-negative box checked?

6   A.  Yes, I have.

7        MR. ROOS:  Can we please bring up Government Exhibit

8   1001.

9   Q.  Professor Eaton, what does Government Exhibit 1001 depict?

10  A.  This shows the accounts that were permitted to go into the

11  red, so to speak, go to negative.  You will see account 9, the

12  account that I have just referred to, and a whole bunch of

13  other Alameda Research accounts.  You will also note that no

14  other customer accounts outside of Alameda were permitted to go

15  negative.

16  Q.  Now, have you reviewed the balances of these allow negative

17  accounts over time?

18  A.  Yes, I have.

19  Q.  The Alameda ones?

20  A.  Yes, I have.

21  Q.  And before I ask you about those balances over time, I just

22  want to ask you a few questions about how you got the balance

23  data.  OK.

24        MR. ROOS:  Why don't we publish Government Exhibit

25  3015.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.   Professor Easton, what does this exhibit show?

2   A.   This is, again, from the FTX database.  In this particular

3   case you will see, on the 2nd of November 2022, going from left

4   to right, account ID 9 and a balance which is not particularly

5   readable.  But if we go to the right-hand side, where we will

6   see a lot of detailed data, you will see that it might be

7   useful -- can we expand the green section.

8             MR. ROOS:  Can we zoom in on the four red boxes in the

9   green section.

10  A.   You will see dollars, U.S. dollars, are coded 1.  You will

11  see that there is a negative balance of 67 million, almost 68

12  million U.S. dollars in this account.  It is allowed to go

13  negative and it has gone negative to the tune of 67 million.

14  Q.   Let me just add some little commas there and ask you what

15  the number is again.

16  A.   Have I missed a comma?  I'm sorry.  676 million, not 67

17  million.

18  Q.   What do the three others show?

19  A.   Then the code for Bitcoin is 43, so there is 69,111

20  Bitcoins borrowed by Alameda.  This is a negative to the tune

21  of 65,000 Bitcoins.  Tether, the stablecoin, is coded 44, and

22  again, you see a large negative number, 157 million.  Finally,

23  45 is Ether, and you will see 605,000 Ethers negative.

24  Q.   Have you used data like this to determine balances over

25  time?

1   A.   Yes, I have.

2   Q.   When you did that analysis, which currencies did you focus

3   on?

4   A.   I focused on these four:  Dollars, Bitcoin, Tether, and

5   Ether.

6   Q.   Why did you focus on those currencies?

7   A.   Because they are the most used.

8   Q.   Were you able to ascertain Alameda's balances in those

9   currencies over time?

10  A.   Yes, I was.

11          MR. ROOS:  Would you please publish Government Exhibit

12  1002.

13  Q.   Professor Easton, what does Government Exhibit 1002 show?

14  A.   Again, let me just orient the graph.  So the X axis is the

15  same going from January '21 through November 11, 2022.  The

16  vertical axis is still in billions of dollars, but notice it's

17  going more negative as we go -- less negative as we go up the

18  chart.  So the X axis is in fact at the top of the chart,

19  indicating that at all times over this period the balance in

20  these allow negative accounts was indeed negative going up to

21  around about 12 billion at the end of the period.

22  Q.   When you say going up, you mean going up to a negative

23  number?

24  A.   Exactly.  Increasing to a more negative number of 12

25  billion.

1    Q.  Have you analyzed the spending out of these allow negative

2    accounts?

3    A.  Yes, I have.

4            MR. ROOS:  You can take this down, and can we please

5    publish Government Exhibit 3016.

6    Q.  Professor Easton, at the top of the screen it says:

7    Buyback of FTX stock from Binance.

8            Have you analyzed a transaction relating to a buyback

9    of FTX's stock from Binance?

10   A.  Yes, I have.

11   Q.  Can you describe the materials on the screen that you have

12   reviewed.

13   A.  The material on the left-hand side shows that share

14   transfer agreement of the repurchase of Binance stock back to

15   FTX.  On the right-hand side you will see the purchase amount

16   and you will see -- again, I have to get the commas right.  So

17   we have 1 billion BNB, we have 500 million BUSD, which is the

18   Bitcoin stablecoin, and in fact you will see also some FTT

19   indicated on the bottom of the left-hand side.

20   Q.  Who is the email from?

21   A.  The email is from Samuel Bankman-Fried.

22   Q.  Have you analyzed the source of funds used to buy back

23   FTX's stock from Binance?

24   A.  Yes, I have.

25           MR. ROOS:  Can we please bring up Government Exhibit

1    1024.

2    Q.  Professor Easton, can you describe what Exhibit 1024 shows.

3    A.  Yes.  This shows that of the 2.2 billion that are buyout --

4    buyback of Binance stock, 1.2 billion, or a little more than

5    half of that 2.2 billion, came from customer funds on the FTX

6    exchange.

7    Q.  Professor Easton, we looked at some of these tracing slides

8    previously for bank accounts, and they had green colors on

9    them.

10          How if at all, are these slides different?

11   A.  The big difference is, now we are tracing cryptocurrency,

12   not fiat.

13          THE COURT:  Excuse me.  So the customer funds

14   indicated on this chart reflect customer deposits not of fiat

15   but of Bitcoin and other cryptocurrencies, is that correct?

16          THE WITNESS:  Yes, that's correct.

17          THE COURT:  Thank you.

18          MR. ROOS:  Thank you, your Honor.

19   Q.  Professor Easton, I want to draw your attention to some

20   information on this chart.

21          MR. ROOS:  Can we go to page 2.

22   Q.  Now, the red box that's appeared, focusing on the source of

23   the customer funds, what was that?

24   A.  The account was account number 9, the account we have seen

25   a few times already.

1   Q.   That was the account with the allow negative?

2   A.   That's right.

3   Q.   And what was the balance in that account on the day of the

4   Binance buyout?

5   A.   On the day of the first part of that buyout, it was

6   negative 1.8 billion, meaning that a payment out of that

7   account must have made it more negative.

8          THE WITNESS:  Your Honor, I felt as if I should

9   elaborate on my answer.

10         THE COURT:  Go ahead.

11         THE WITNESS:  So the tracing is for every type of

12  cryptocurrency that was used to pay, so the tracing is at each

13  individual crypto level.

14         THE COURT:  Thank you.

15  Q.   Professor Easton, you're referring to Judge Kaplan's

16  question about -- focusing on Bitcoin, you're elaborating that

17  it's for all the cryptocurrencies.

18  A.   Yes.  Individually considered.

19  Q.   In addition to the spending on the Binance buyout, have you

20  analyzed any other spending using cryptocurrency?

21  A.   Yes, I have.

22  Q.   Just give us a category.  What type of spending?

23  A.   Spending to pay off third-party lenders.

24  Q.   So to repay loans?

25  A.   To repay loans, yes.

1  Q.  Before we talk about that, let's talk about -- sorry.

2  Whose lenders?

3  A.  Lenders to FTX.

4  Q.  To FTX?

5  A.  To Alameda.  I beg your pardon.

6  Q.  So let's talk about just the borrowing and lending before

7  we talk about the use of funds.

8         MR. ROOS:  Can we please publish Government Exhibit

9  1013.

10 Q.  Focusing on the first page of 1013, what does this exhibit

11 show?

12 A.  So Alameda also borrowed funds from other -- from

13 third-party lenders outside of the firm.

14 Q.  Like the Genesis you showed us in the beginning?

15 A.  For example.

16 Q.  What does this diagram or chart show?

17 A.  This is, again, a daily chart.  The Y axis is, again,

18 billions.  You can see the amount borrowed increased over time

19 through the end of November 2021 to a max of 15.4 billion and

20 then declined over time.

21        MR. ROOS:  Let's go to page 2 to add a marker.

22 Q.  Do you see that this marker that was added on May 12, 2022,

23 it says Terra Luna (Luna collapse)?

24 A.  Yes.

25 Q.  What happened to cryptocurrency prices after that Terra

1    Luna collapse on May 12?

2    A.    Terra Luna -- the Terra Luna collapse introduced a lot of

3    uncertainty to the market and crypto prices collapsed.

4    Q.    Have you analyzed what happened with loans after this

5    period?

6    A.    Yes, I have.

7          MR. ROOS:  Let's go to the next page.

8    Q.    What additional information has been added to the exhibit?

9    A.    This is simply saying that, in the month of May 2022, there

10   were a total of three payments of $1.3 billion to third-party

11   lenders.

12   Q.    So Alameda repaid $1.3 billion in May.  What about in June?

13         MR. ROOS:  Can we go to the next page.

14   A.    So in June, a further 2.9 billion.

15   Q.    What about July.

16         MR. ROOS:  Can we go to the next page.

17   A.    July, almost three-quarters of a billion repayments.

18   Q.    During this period, have you been able to determine whether

19   any new loans were made to Alameda?

20   A.    Yes, I have.

21         MR. ROOS:  Why don't we go to the next page.

22   A.    New loans were 1.7 billion during this period.

23   Q.    And over what period were those new loans extended?

24   A.    From the beginning of May through the end of FTX, 1111.

25   Q.    We have added one more marker here at the end, and what

1   does that refer to?

2   A.  So this just points out that at the end of FTX, or at least

3   on 1111, the loans still unrepaid were $1.3 billion.

4       MR. ROOS:  Just to zoom in on this, can we look at

5   Government Exhibit 1014.

6   Q.  Professor Easton, what does this show?

7   A.  This is the zoom in, so it shows the repayments in May, it

8   shows the repayments in June, the repayments in July, and --

9   excuse me -- in July, and, finally, an amount outstanding of

10  1.3 billion.  And during this time period we had new loans of

11  1.7 billion.

12  Q.  Focusing on this period that we zoomed in on that's in

13  gray, does the red line continue to show the total amount of

14  loans during those periods?

15  A.  Yes, it does.

16  Q.  Now, have you analyzed the source of funds used to repay

17  these third-party lenders at Alameda?

18  A.  Yes, I have.

19      MR. ROOS:  Let's bring up Government Exhibit 1017A.

20  Q.  Professor Easton, what does Government Exhibit 1017A show?

21  A.  This shows that of the repayment to the crypto lender

22  Genesis of 3.5 billion, 1.7 of that came out of customer crypto

23  funds on the FTX exchange.

24  Q.  Which account was used to make that payment?

25  A.  Again, it was account 9, which had a negative balance of

 1   7.2 billion at the time that the first payment was made.

 2           MR. ROOS:  Can we please put up Government Exhibit

 3   1017B.

 4   Q.  Professor Easton, what does Government Exhibit 1017B show?

 5   A.  This is a similar exhibit.  It shows a payment to BlockFi,

 6   the third-party lender.  The entire one point million payment

 7   came out of customer funds.

 8   Q.  Just focusing again on the account and the balance, what

 9   was that?

10   A.  It came out of account number 9, which had a negative

11   balance at the time that the billion was paid.  In other words,

12   the negative balance went to 2 billion from 1 billion negative.

13   Q.  Professor Easton, have you done a similar type of tracing

14   and analysis for other lenders?

15   A.  Yes, I have, many of them.

16   Q.  Many of them.  OK.

17           To keep us moving, what I am going to do is, we will

18   just put up the exhibit, we will ask you to name the lender and

19   then describe what the source of funds were rather than walk

20   you through the whole thing.  OK?

21   A.  OK.

22           MR. ROOS:  Do why don't we put up Government Exhibit

23   1017C.

24   A.  This describes the lender Voyager.  You can see that the

25   majority of the funds to pay Voyager came from customers.

1          MR. ROOS:  Can we put up 1016D.

2   A.   Similarly to Celsius, roughly four-fifths of the payment

3   came from customer funds.

4          MR. ROOS:  How about 1017E.

5   A.   This is repayment to Abra all from customer funds.

6          MR. ROOS:  1017F, please.

7   A.   To Maple, all from customer funds.

8          MR. ROOS:  We will add another to this slide, 1017H.

9   A.   To Anchorage, all from customer funds.

10          MR. ROOS:  Can we please add 1017J.

11   A.   To Nexo, all from customer funds.

12          MR. ROOS:  Can we please put up 1017G.

13   A.   Payment to TrueFi was roughly two-thirds from customer

14   funds.

15          MR. ROOS:  Can we please publish 1017I.

16   A.   Payment to Ledn.  Roughly, again, two-thirds from customer

17   funds.

18          MR. ROOS:  Finally, 1017K.

19   A.   Payment to BitGo, only about a fifth from customer funds,

20   but still some customer funds.

21   Q.   For each of these repayments, which Alameda account did the

22   funds come out of?

23   A.   Every one of them came out of account 9.

24   Q.   When those repayments began, was the account positive or

25   negative?

1    A.   It was negative.

2         MR. ROOS:   Let's put up Government Exhibit 1018.

3    Q.   Professor Easton, what does Government Exhibit 1018 show?

4    A.   So this pie chart again is -- demonstrates the entire

5    analyses of all of the repayments to third-party lenders.  And

6    to summarize 68 percent of the payments to third-party lenders,

7    repayments to third-party lenders came from customer funds.

8    Only 32 percent came from other funds.

9    Q.   What was the amount of customer funds that made up that 68

10   percent?

11   A.   $4.5 billion.

12        MR. ROOS:   Let's put back up Government Exhibit 1002,

13   please, which was Alameda's negative accounts.  Can we zoom in

14   on this period of May 2022 to the end of the calendar.

15   Q.   Professor Easton, can you describe what happened to

16   Alameda's balances in its allow-negative accounts over the

17   period it was repaying those letters?

18   A.   It started at roughly 6-- 6 billion negative, increased a

19   little bit, in other words, became slightly less negative, but

20   then you can see continued to become quite negative, to the

21   tune of eventually something like 12 billion negative.

22        MR. ROOS:   If we can zoom out.

23   Q.   Professor Easton, you've been focusing on these accounts

24   with this allow-negative feature enabled.  Have you also done

25   analysis of all of the Alameda accounts?

1  A.  Yes, I have.

2         MR. ROOS:  Let's put up first Government Exhibit 1005.

3  Q.  What does this show?

4  A.  This is all accounts now, not just those that were allow

5  negative that did go negative.  There were some that did not

6  have allow negative and, obviously, therefore, they didn't go

7  negative.  So you will see that this chart, which is almost

8  always in the red, so to speak, that's very negative.  It's

9  slightly less negative than the previous chart.

10 Q.  Just to call out a few points in time in 2022, first, what

11 was the balance on May 12, 2022 across all the accounts?

12 A.  A negative $12.6 billion.

13 Q.  What about on June 14, 2022?

14 A.  Still very negative, $10.9 billion.

15 Q.  What about on November 1, 2022?

16 A.  Negative $9.2 billion.

17 Q.  Just to be clear, this includes all of Alameda's accounts

18 on FTX?

19 A.  This is all of Alameda bank accounts, yes, on FTX.

20 Q.  And all currencies?

21 A.  Yes.

22 Q.  Let me ask you, have you analyzed whether Alameda's

23 negative balance here can be explained through borrowing in the

24 spot-margin program?

25 A.  Yes, I can.

1    MR. ROOS:  Let's put up Government Exhibit, for

2    starters, 1011.

3    Q.  Professor Easton, can you explain what this chart shows.

4    A.  First of all, the red line is the same red line as we were

5    seeing before, so this is a negative balance.  I chose to put

6    it as a positive chart because we are going to compare it -- I

7    am going to compare it to the actual borrowing.

8        So the Alameda balance reached the peak that we have

9    seen before of 12.6 billion.  The actual Alameda borrowing on

10   this spot-margin program was far less than the amount needed to

11   cover this negative balance.  So you can see from the bluish

12   line, bluish green line, that the amount was way, way less than

13   the amount that would have had to be borrowed to cover this

14   negative balance.  For example, on May 12, the deficiency or

15   the deficit, the negative amount, the difference between what

16   we would have needed and what we did have is 10.8 billion.

17   Q.  What's your conclusion as to whether Alameda's negative

18   balance can be explained by its own borrowing in the

19   spot-margin program?

20   A.  It cannot be explained.

21   Q.  Let's say Alameda borrowed every dollar in every crypto

22   available in the spot-margin program.

23        Could that explain its negative balance?

24   A.  No, it could not.

25        MR. ROOS:  Let's look at another exhibit, Government

1    Exhibit 1010.

2    Q.  Professor Easton, can you explain what Government Exhibit

3    1010 shows.

4    A.  The difference between this chart and the one we have just

5    seen is that the bluish green line shows the total borrowing on

6    the spot margin.  Clearly, it's not enough to cover the Alameda

7    negative amount.

8    Q.  What's your conclusion as to whether Alameda's negative

9    balance on FTX can be explained by all the borrowing through

10   the spot margin?

11   A.  It cannot be.

12   Q.  What's your conclusion as to the source of the money that

13   was used when Alameda incurred a negative balance?

14   A.  It must have been customer funds.

15            MR. ROOS:  No further questions.

16            THE COURT:  Thank you.  Why don't we take our lunch

17   break a little early and come back at 1:45.

18            (Luncheon recess)

19

20

21

22

23

24

25

```
 1                       AFTERNOON SESSION

 2                          1:49 p.m.

 3            (In open court; jury not present)

 4            MS. SASSOON:  Your Honor?

 5            THE COURT:  Yes.

 6            MS. SASSOON:  Two very quick things.  For a later

 7   witness this afternoon, the defense has a few objections to

 8   exhibits that perhaps we could take up at the beginning or end

 9   of the afternoon break.

10            THE COURT:  Okay.

11            MS. SASSOON:  And second, in an absent-minded moment,

12   I walked into the wrong room, which was the jurors' room.  I

13   walked right out but not before they all laughed at me.  And I

14   told the defense, but I also wanted to put it on the record.

15            THE COURT:  Mr. Cohen, do you want me to do anything

16   else about this?

17            MR. COHEN:  No.  We just asked that it be put on the

18   record, your Honor.

19            THE COURT:  Okay.  That's fine.

20            And before we call the jury, I just want to put on the

21   record, with respect to the objection to Exhibit 1051 this

22   morning, it was overruled because I regard the disclosure as

23   having been adequate and in any case find no substantial

24   prejudice to the defense.

25            All right.  Let's get the jury.
```

1           (Jury present)

2           THE COURT:  Be seated, please.

3           The record will reflect that the defendant and the

4    jurors all are present.

5           Professor Easton, you're still under oath.

6           You may cross-examine, Mr. Lisner.

7    CROSS EXAMINATION

8    BY MR. LISNER:

9    Q.  Good afternoon, Professor Easton.

10   A.  Good afternoon.

11   Q.  I want to go through some of the things you testified

12   earlier this morning about.

13          Do you recall testifying about a number of

14   acquisitions from your analysis FTX or Alameda relied on

15   customer funds to pay for?

16   A.  I do.

17   Q.  And your analysis was based on reviewing the accounts from

18   which the entity receiving the funds received them, correct?

19   A.  That is correct.

20   Q.  And that in turn brought you to an Alameda account, and I

21   believe your opinion was that customer money was going into the

22   account, and then you followed that through to the investment,

23   which would cause you to conclude customer funds were used.

24   A.  Several Alameda accounts, yes.

25          MR. LISNER:  Can we bring up GX 1033, Brian.  This is

1    in evidence.  It's one of Professor Easton's demonstratives.

2    Q.   And this is the Modulo demonstrative, correct?

3    A.   Yes, it is.

4    Q.   And here what you're indicating, if I have this right, all

5    the green boxes down the middle indicate that—or on the left,

6    sorry, those green boxes indicate that 100 percent of the funds

7    came from customer assets, true?

8    A.   True.

9         MR. LISNER:  Can we jump to the second to last page,

10   Brian.

11   Q.   Okay.  And here, I'm looking at the green I guess in the

12   one, two, three—in the fifth column.  These are the customers

13   Circle Internet Financial and TrueCoin, right?

14   A.   No, they're not the customers.  What they are is an

15   intermediary that transfers customer stablecoins into dollars.

16   Q.   I believe you testified earlier that all the funds came

17   from customer assets.  Where on this—in this analysis are the

18   customers?

19   A.   The customers' funds are transferred—and I traced this—to

20   Circle Internet, and there at Circle Internet were changed from

21   a stablecoin to dollars, but it was customer funds that are in

22   the background of this transaction, and I traced them back to

23   the original bank statements.

24   Q.   And how did you trace those, sir?

25   A.   Through the FTX database and bank statements.

1             MR. LISNER:  If we could jump to GX 1030, Brian.

2    That's the flow chart with respect to K5.

3             Now how do I delete the—there we go.

4    Q.  Okay.  And here you're showing that customer funds flowing

5    in were at 765 million and other inflows approximately

6    127 million, correct?

7    A.  Correct.

8    Q.  And what I want to do is go to your spreadsheet backup on

9    this to trace that through.

10   A.  Okay.

11            MR. LISNER:  Brian, are you able to bring up—this is

12   a spreadsheet for GX 1030.  It's No. 3574.

13            MR. ROOS:  Objection.  So the document he's pulling up

14   is not in evidence, and I'm not sure there is—what the

15   question is that precedes going to the 35—looking to a

16   document not in evidence.

17            THE COURT:  Well, it can be shown to the witness—

18            MR. LISNER:  Just for the witness.

19            THE COURT:  —and we'll see where it goes from there.

20   But I don't know whose Exhibit 3574 it's supposed to be.

21            MR. LISNER:  Yes.  Can you pull up only for the

22   witness, Brian, spreadsheet 3574-431.

23            THE COURT:  Is that defendant's exhibit or government

24   exhibit?

25            MR. LISNER:  It's neither.  It's 3500 material.

 1              THE COURT:  All of which are GX exhibits, right?  Or

 2    am I missing something?

 3              MR. LISNER:  We can identify it as GX.

 4              THE COURT:  No, I need to know what it is.  That's not

 5    a hard question, is it?

 6              MR. ROOS:  It's 3500 material produced by the

 7    government.  It's neither marked as a defense nor as a

 8    government exhibit.

 9              THE COURT:  All right.  So let's mark it as a defense

10    exhibit now.

11              MR. LISNER:  We'll mark it as DX 3574-431.

12              THE COURT:  Okay.

13              MR. LISNER:  All right.  Can you bring that up just

14    for the witness and myself.

15    BY MR. LISNER:

16    Q.  Now this is the backup for your chart at GX 1030, the

17    investment in K5?

18    A.  Yes.

19    Q.  Got it.  And same issue here.  In green, there are a number

20    of sources of customer——of claimed customers in green that are

21    stablecoin issuers, true?

22              MR. ROOS:  Objection.

23              THE COURT:  Sustained as to form.

24              MR. LISNER:  Okay.  We can move on.

25              You can take that off the screen, Brian.

```
 1              Okay.  Let's move to GX 1018.
 2   Q.  I want to ask you some questions about your analysis of
 3   repayments by Alameda made to Genesis—well, made to
 4   third-party lenders.
 5              Does this chart reflect your conclusions about the
 6   amount of customer funds versus other assets that were repaid
 7   to third-party lenders in the period May through November?
 8   A.  Yes, it does.
 9   Q.  Okay.  And one of those lenders was Genesis?
10   A.  Yes.
11              MR. LISNER:  Okay.  Can we pull up just quickly,
12   Brian, GX 1017A.
13   Q.  Okay.  And that's your analysis from this morning about
14   repayments to Genesis?
15   A.  It's the summary, yes.
16   Q.  Okay.  And these payments, do they reflect only principal
17   repayments or do these payments include any collateral
18   repayments as well?
19   A.  They reflect crypto-by-crypto payments for loans from
20   Genesis.
21   Q.  Okay.  So there wouldn't be any collateral postings based
22   on this payment.
23   A.  I don't understand the question.  Sorry.
24   Q.  The 3.5 billion that was paid to Genesis, is your testimony
25   that this entire amount was made of principal repayment?
```

1    A.  I'm not certain of that.

2    Q.  You're not certain of that?

3    A.  It is payment of an amount owing to the third party,

4    Genesis.  Whether it's payment of owed interest as well as

5    principal, I'm not sure as I sit here now.

6    Q.  Okay.  Well, let's see if we can show you some things to

7    refresh your recollection.  Is that fair?

8    A.  Yeah.

9          MR. LISNER:  Brian, for the witness only, could we

10   please bring up—this is in the backup to GX 1017 and 18.

11   There's a spreadsheet labeled 3574-424D.

12          THE COURT:  Which will be marked Defendant's

13   Exhibit 3574-424D.

14          MR. LISNER:  Yes.  Thank you, your Honor.

15          And can you go to the bottom, the tab for returned

16   loans.  And you see column E, there's a return date?  If you

17   could sort by return date.  Just sort the oldest to newest, and

18   then let's jump to May 11th.

19   BY MR. LISNER:

20   Q.  Okay.  What I want to do is point out three transactions

21   here.  And for May 11th, there is a 90,000 Ethereum payment

22   made on May 11th.  Do you see that?

23          MR. ROOS:  Objection.

24          THE COURT:  What is the objection?

25          MR. ROOS:  I believe up here it says he was trying to

 1  refresh his recollection, so the form of the question.

 2          THE COURT:  Certainly.  Sustained.

 3  Q.  Do you recall, Professor Easton, specific payments made by

 4  Alameda to Genesis on or about May 11th, 12th, and 13th?

 5  A.  I recall seeing this document at some point, and yes, I can

 6  see those two payments.

 7  Q.  Okay.  And does it refresh your recollection whether a

 8  90,000 Ethereum payment was made on May 11th?

 9  A.  That's what it says here, yes.

10  Q.  155,000—

11          MR. ROOS:  Objection to form.

12          THE COURT:  Yes.  The answer is stricken.  The

13  question is:  Does it refresh your recollection?  The answer is

14  not, I'm reading this document back to you.  That's

15  inappropriate.  And let's not do that.

16          MR. LISNER:  Understood, your Honor.

17  BY MR. LISNER:

18  Q.  Okay.  Can I ask you to keep in mind, Professor Easton, the

19  payments made on May 11th, May 12th, and May 13th in Ethereum.

20          THE COURT:  He's been asked to have that in mind.  Do

21  you have another question?

22          MR. LISNER:  I do.  I'm going to go between

23  spreadsheets that were used.

24          THE COURT:  Ask your questions, please.

25          MR. LISNER:  Understood.

 1          Okay.  Can we go—you could take this down, Brian.

 2   Can you please bring up GX 1235.

 3          My understanding is this is in evidence as a

 4   third-party business record under the government's stipulation.

 5          THE COURT:  If it's in evidence, it's in evidence.

 6   Does everybody agree that it's in evidence?

 7          MR. ROOS:  I'm not—it's not in evidence.

 8          THE COURT:  That confirms what I see.

 9          MR. LISNER:  Okay.  Can you bring up, just for the

10   witness, Brian, GX 1235.

11   BY MR. LISNER:

12   Q.  Do you recognize this document as Genesis's loan

13   repayments?

14   A.  Yes, I do.

15          MR. LISNER:  Okay.  And Brian, same thing.  If you'd

16   sort the return dates and jump to May 11th, May 12th, May 13th,

17   2022.

18          Okay.  Leave that place, and if you could just take

19   that down, Brian.

20   Q.  I'm going to ask you a question without the need for that.

21   Do you recall if those loan payments we discussed a minute ago

22   were repaid for principal repayments?

23   A.  I don't recall seeing that on the document that I just

24   looked at.

25          THE COURT:  The question is whether, in your memory,

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1   you remember that or you don't remember that.  He's not asking

2   you what you may have read on the screen.

3              THE WITNESS:  I apologize.

4   A.  No, I don't recall.

5   Q.  Okay.  Would it refresh your recollection to look at

6   Genesis's loan repayment summary?

7   A.  It may.

8              MR. LISNER:  Brian, could you please bring up 1235 to

9   the same place we were, GX 1235.

10  Q.  Does this refresh your recollection whether those Ethereum

11  payments we discussed were repaid as loan principal?

12  A.  No, it does not.

13             MR. LISNER:  Okay.  You could take that down.

14  Q.  And do you recall whether those loan repayments—let me

15  rephrase.

16             Do you recall whether those payments we discussed were

17  paid to Genesis as collateral for borrowings by Alameda?

18  A.  No.

19  Q.  Okay.  Would it refresh your recollection to look at a

20  collateral summary produced by Genesis?

21  A.  Possibly.

22             MR. LISNER:  Brian, could you please bring up GX 1238.

23             Okay.  Can you scroll down to rows 185 through 187.

24  Q.  Does this refresh your recollection whether the payments we

25  discussed were collateral postings on Genesis by Alameda?

1   A.  No, it does not.

2   Q.  Does not.

3        MR. LISNER:  Okay.  You can take that down.

4   Q.  All right.  Let's switch topics.

5        You testified on direct that Alameda used customer

6   funds to repay third-party lenders between May and July 2022,

7   correct?

8   A.  Correct.

9   Q.  And just kind of rounding out the numbers, I believe you

10  testified in May it was approximately 1.3 billion.  Sound

11  right?

12  A.  Sounds right.

13  Q.  2.9 billion in June?

14  A.  Sounds right.

15  Q.  And approximately 750 million in July.

16  A.  Yes.

17  Q.  Okay.  And I think you testified on direct that if a

18  payment was made, you would expect the account balance,

19  Alameda's account balance to become more negative.

20  A.  Correct.

21        MR. LISNER:  Okay.  Can we bring up GX 1002, which is

22  in evidence.

23  Q.  So focusing here on the period we just talked about, May

24  through approximately July—let me rephrase.

25        In your direct, Mr. Roos asked you to look at the

1    downward-trending line from about May until the end of the

2    year, May 2022 to I guess November 2022.  Do you recall that?

3    A.  I do.

4    Q.  Okay.  But if we focus on the period only between

5    approximately May—and I'll do my best to draw a line—and what

6    appears to be approximately June, July, the line is sloping

7    upwards, correct?

8    A.  That was my testimony, yes.

9    Q.  And during this period, approximately, we just talked—we

10   just mentioned—rephrase.

11          During this period, approximately 5 billion in loans

12   were repaid?

13   A.  Yes.

14   Q.  And if there was a payment, you testified you'd expect the

15   numbers to get more negative, but here it's doing the opposite,

16   true?

17   A.  Yes.

18          MR. LISNER:  Okay.  You could take that down, Brian.

19   And if you could put up GX 1005, which is also in evidence.

20   Q.  Same question.  If I focus on the period between—I'll do

21   my best to draw the line—May 2022 through approximately

22   June-July, the line is sloping upwards as well, correct?

23   A.  Yes.

24   Q.  And if there were payments remade from the Alameda account,

25   you'd expect that to go down, true?

1   A.  No.  Incorrect.

2   Q.  Incorrect.  Why is that incorrect?

3   A.  The payment in and of itself would make the line go down,

4   but other things are happening during this time period.

5   Q.  Okay.  What else is happening?

6   A.  Changes in the—

7            MR. LISNER:  You could take this down, Brian.

8   A.  There were new loans for that time period, for example.

9   Q.  There were new loans?  Do you know when those were taken

10  out?

11  A.  Not specifically as I sit here now, no.

12  Q.  So new loans from third-party lenders.  So you're meaning

13  that more funds would flow into Alameda and it would go up

14  instead of down.

15  A.  Right.

16  Q.  Right.  You didn't testify to any of that in your direct,

17  did you?

18            MR. ROOS:  Objection.  Misstates—

19            THE COURT:  Sustained.

20  Q.  Okay.  A clarification on 1002 versus 1005.  2?

21            MR. LISNER:  Can you bring up, Brian, side by side,

22  1002 and 1005.

23  Q.  Now you testified on direct that these were different, and

24  if I recall correct, 1002 is a limited set of accounts for a

25  limited set of currencies, correct?

1  A.  Correct.

2  Q.  And the limited accounts were Alameda's "Allow Negative"

3  accounts, true?

4  A.  Correct.

5  Q.  And for currencies, the US dollar, USDT, which is a

6  stablecoin, Bitcoin, and Ethereum, correct?

7  A.  Correct.

8  Q.  And then 1005 was meant to reflect all Alameda balances in

9  all currencies.

10 A.  Correct.

11 Q.  Does that include fiat as well?

12 A.  Yes.

13 Q.  Okay.  So if we look at the period that is approximately

14 April 2nd—April 1st, April 2nd, 2022—again, I'll do my best

15 to draw it—but on 1002, in April 2022, it looks like it's

16 about here—that appears to be approximately 7½ billion?  I'll

17 try to draw the line.  Forgive the shaky finger.  Does that

18 appear to be approximately negative 7½ billion?

19 A.  Yes.

20 Q.  Okay.  And if we compare that with the line on GX 1005,

21 same date, April 1, 2022, it's zero, correct?

22 A.  Right.

23 Q.  So your summaries of the Alameda account balance on the

24 same day is different by $7 billion depending on the variables

25 you chose to include.

1   A.  Yes.

2   Q.  Let's talk about some of those variables.

3        MR. LISNER:  Brian, you could take those down.

4   Q.  For the specific accounts, how did you select the "Allow

5   Negative" accounts?

6   A.  All of those that were allowed to turn negative.

7   Q.  And how did you identify them as associated with Alameda?

8   A.  I—I knew which accounts were Alameda and which accounts

9   were not.

10  Q.  Are there any accounts—

11       MR. LISNER:  Well, let's bring up 1001.  I think

12  that's the account listings.

13  Q.  Is it your understanding that all of these accounts are

14  associated with the Alameda Research user name—user ID?

15  A.  Yes.

16  Q.  Okay.  And if there are accounts here that weren't

17  associated with the Alameda account ID, they shouldn't have

18  been included, true?

19  A.  True.

20       MR. LISNER:  Okay.  I'll ask this to set up the next

21  question, your Honor.

22  Q.  Do you recall whether any accounts are included on this

23  1001 exhibit in the Alameda account column that are not

24  associated with the Alameda user ID?

25  A.  I do not recall such an account.

1          MR. LISNER:  Okay.  Can we pull up for the witness

2    only GX 1702.

3    Q.  Does this appear to be the list of accounts, list of

4    Alameda accounts that you used as a basis to select the

5    accounts in 1001?

6    A.  I believe so, yes.

7          MR. LISNER:  Okay.  Brian, if I could ask you, in

8    column—well, first, in the first row, if you could put the

9    filters on, and then I'll ask you to show only "Allow Negative"

10   where it's true in column J.

11         Your Honor, request to publish this to the jury as

12   something that Professor Easton relied on, not for its truth

13   but for material Professor Easton relied on.

14         THE COURT:  I don't understand.

15         MR. ROOS:  Me neither.

16         MR. LISNER:  I think we're entitled to ask Professor

17   Easton about the bases for his conclusions.

18         THE COURT:  I don't understand the question.

19         MR. LISNER:  Well, I didn't ask—I don't have a

20   pending question to the witness.  The question to your Honor

21   was whether we could publish this to the jury.

22         THE COURT:  I don't even know if it's in evidence.

23         MR. ROOS:  It's not.

24         THE COURT:  I believe it is not.

25         MR. LISNER:  It's not.  So the request is—

1          THE COURT:  Therefore, you're not going to show it to

2   the jury.

3          MR. LISNER:  Understood, your Honor.

4   BY MR. LISNER:

5   Q.  Okay.  Column J, we've sorted this so it only shows "Allow

6   Negative" accounts.

7          MR. ROOS:  Objection to asking a witness about a

8   document that's not in evidence.

9          THE COURT:  Sustained.

10  Q.  Does this refresh your recollection to the accounts that

11  are included in your Exhibit 1001?

12         MR. ROOS:  Objection.

13         THE COURT:  Sustained.  There's been no failure of

14  recollection.

15         MR. LISNER:  Okay.  You could take that down.

16         THE COURT:  The only thing we know about this document

17  up to now is that it appears to be a list of accounts that he

18  used in listing accounts on 1001.  That is 100 percent—unless

19  I'm missing something—of the information known about this

20  exhibit, apart from the fact that it's not in evidence.

21         MR. LISNER:  Yes, your Honor.

22         THE COURT:  So if you want it in evidence, you have to

23  have a foundation.  If you want to read it to the jury or show

24  it to the jury, you've got to get it into evidence.

25         MR. LISNER:  Okay.  Let's put that back up, Brian.

1  BY MR. LISNER:

2  Q.  Can you tell us what this document is, Professor Easton.

3  A.  This is a document from which I originally determined the

4  accounts with the "Allow Negative" flag.

5  Q.  Does this appear to be a document maintained in the

6  ordinary course by FTX?

7          MR. ROOS:  Objection, foundation.

8          THE COURT:  Sustained.

9          MR. LISNER:  All right.  We'll move on.  We'll move

10  on.

11          Sticking with loan repayments, Brian, if you could

12  please bring up 1017J, GX 1017J, which is in evidence.

13  BY MR. LISNER:

14  Q.  I think you testified earlier that the 1017 series reflects

15  the loan repayments made by Alameda from its account 9 to

16  third-party lenders; is that right?

17  A.  That is correct.

18  Q.  Okay.  And looking at this one, J, you testified that at

19  the bottom came from account 9 and then there was the

20  balance—I'll circle here—in account 9 on the day before the

21  transfer was made, or right before the transfer was made.

22  A.  The first transfer, yes.

23  Q.  Okay.  So then after the transfer was made this number

24  should become more negative, true?

25  A.  Immediately, at that instant, yes.

1  Q.  Okay.  So here we're looking at May 1 in GX 1017J, and it

2  reflects account 9 had a balance of 7.3 billion, correct?

3  A.  Correct.

4  Q.  Okay.  And I'm going to go through these quickly just to

5  get through the numbers.

6          MR. LISNER:  Could we get to 1017C, Brian.

7  Q.  This is eight days later, on May 9th.  And there's an

8  account balance of minus 6.42 billion, correct?

9  A.  Correct.

10  Q.  And that's approximately 900 million less negative than

11  May 1st.

12  A.  Yup.

13  Q.  And during that period significant loan repayments were

14  made out of the account?

15  A.  Yes.

16  Q.  Okay.  And then we could skip a few days just to cut to the

17  chase.

18          MR. LISNER:  If we could pull up 1017G.

19  Q.  And this reflects that on June 17th, minus 5 billion or

20  500 million remains in the account, correct?

21  A.  Correct.

22  Q.  That's almost a $7 billion increase in the balance of

23  account No. 9 when you testified significant loan payments were

24  made.

25  A.  This is balance in crypto.  Crypto balances can fluctuate

1    all the time.

2         MR. LISNER:  Could I have my question read back,

3    please.

4         THE COURT:  Yes.

5         (Record read)

6    Q.  Can you answer that yes or no, sir?

7    A.  Yes.

8    Q.  Thank you.

9         MR. LISNER:  Okay.  You can take that down.

10   Q.  Let's switch gears to fiat.

11        MR. LISNER:  If you could bring up GX 1004, Brian.

12   Q.  Okay.  And I think you testified—correct me if I'm

13   wrong—on direct that here what we have on the top is the fiat@

14   balance in the black line—I'm sure everyone here has heard

15   more about the fiat@ account than they'd like to—and then the

16   bottom, the bank balance such that the difference represents

17   the gap of what Alameda would have spent.

18   A.  Correct.

19   Q.  Okay.  So the bigger the gap means there's more spending by

20   Alameda, and the smaller gap means that there would be less.

21   A.  Correct.

22   Q.  One clarifying question:  How was it that this line is

23   negative in the beginning period, in January 2021?  It appears

24   that it's only a little bit, but the fiat line is below zero.

25   A.  This was associated with, as best I understand it, where

1    there were deposits of crypto and of fiat, and the exchange

2    between crypto and fiat result in a slight positive difference.

3    Q.  Got it.  Got it.  Okay.  So same concept that we discussed

4    earlier.  If I look at the period between May, which is where

5    your maximum point is, 11.3 billion, thereafter, in May, June,

6    and July, it looks like the gap either remains the same or

7    decreases, correct?

8    A.  Correct.

9    Q.  And that's the period when 5 billion in loans was paid.

10   A.  Correct.

11   Q.  Okay.  Now at the bottom here—let me clear this line—the

12   green line in the legend indicates that this is the balance in

13   Alameda, North Dimension, and FTX bank accounts.  Is it your

14   understanding that FTX, over different periods of time, relied

15   on different accounts?

16   A.  Yes.

17   Q.  And is it fair to say that the amount of fiat kept in the

18   FTX account should not appear as a liability for Alameda?

19   A.  I don't know what FTX account you're referring to, sir.

20   Q.  The one reflected on your graph here.  So FTX bank

21   accounts.

22   A.  Would you repeat the question, please.

23   Q.  Is it fair to say that fiat customer deposits received in

24   FTX bank accounts should not be treated as a liability of

25   Alameda's?

1   A.  I'm not sure I understand the question, but if fiat

2   deposits have been included in an FTX bank account that

3   includes customer deposits, they should be included as a

4   liability.

5   Q.  For FTX.

6   A.  For FTX.

7   Q.  Not Alameda.

8   A.  Not Alameda.

9            MR. LISNER:  Okay.  If you could take that down.

10           Brian, if you could put up GX 1005.

11  Q.  This we talked about briefly earlier.  This reflects all of

12  Alameda's balances across all currencies, including fiat@

13  liability, true?

14  A.  Correct.

15  Q.  And is it your understanding that this graph includes the

16  fiat line that we just looked at across all bank accounts?

17  A.  Yes.

18  Q.  Okay.  But if that includes an FTX liability and not an

19  Alameda liability, fair to say the FTX portion should not be

20  included in this 1005?

21  A.  This is the balance in the accounts that accepted customer

22  deposits.

23  Q.  So this includes the full fiat@ subaccount entry.

24  A.  Yes, it does.

25  Q.  Okay.  Does the subaccount entry for fiat@ include customer

1  deposits regardless if they were made in an Alameda account, a

2  North Dimension account, and an FTX account?

3  A.  Yes.

4  Q.  Okay.  Should the portion in the FTX account be included in

5  the fiat@ liability attributed to Alameda?

6  A.  No.

7  Q.  Okay.  Did you exclude that in this graph?

8  A.  No, I did not.

9  Q.  Okay.  You're, by the way, not offering any opinion on what

10  information or aspects of the fiat account that

11  Mr. Bankman-Fried did or did not see over the years.

12          MR. ROOS:  Objection.

13          THE COURT:  Sustained.

14          MR. LISNER:  Okay.  Let's take that down, Brian.

15  Q.  Let's stick with the fiat for a moment.

16          MR. LISNER:  If you could pull up GX 3003.

17  Q.  This was your demonstrative about the basic mechanics of

18  how customers would deposit fiat onto FTX, correct?

19  A.  Correct.

20  Q.  Okay.  And here you list the numbers.  I know they're for

21  illustrative purposes, but it's listed in USD, so the customer

22  account in FTX here has a positive 100 US dollars, correct?

23  A.  Correct.

24  Q.  Okay.  Do you have an understanding that credits on FTX,

25  credits on a customer account on FTX don't reflect actual cash

 1    or legal tender?

 2              MR. ROOS:  Objection.

 3              THE COURT:  Sustained.

 4    Q.  Is it your understanding that the $100 entry there reflects

 5    legal tender?

 6              MR. ROOS:  Objection.

 7              THE COURT:  Sustained.

 8              MR. LISNER:  Okay.  Can we bring up, only for the

 9    witness, Brian, DX 1022.

10              Okay.  These are the May 2022—

11              MR. ROOS:  Objection.  Could we have a sidebar?

12              THE COURT:  Yes.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1             (At the sidebar)

 2             MR. ROOS:  The objection is that the document he was

 3    about to announce the name of is the FTX terms of service.

 4    It's not a basis for his opinion.  It's not in evidence.  I

 5    can't imagine how this witness can lay a foundation for it,

 6    particularly given——I'm not saying it won't come in ever, but

 7    there are hearsay questions about the circumstances in which it

 8    can be offered——is it for its truth, is it for the effect on

 9    the listener——and ultimately if it is shown to him, it's a

10    legal document, and we all know the expert witness is the last

11    person who should be opining on legal obligations, given his

12    role in the case.

13             MR. LISNER:  Your Honor, I don't think the foundation

14    objection is an issue because there's a stipulation on

15    authenticity as to this document.  This is a document that the

16    expert reviewed, and we think it's admissible as a nonhearsay

17    document.  It's a contract.  It's a verbal act.  It's in the

18    materials he relied on.  I want to ask him about how——

19             THE COURT:  How do you know it's in the materials he

20    relied on?

21             MR. LISNER:  The government produced 3500 material

22    that the expert relied on, and this is one of them.

23             THE COURT:  Relied on or saw?

24             MR. LISNER:  So I could ask.  I don't know.  We have

25    not had access to the witness before.
```

1        MR. ROOS:  I guess if he wants to show it without

2   saying what the document is and ask him if it's something he

3   relied on in reaching his opinion, then if the answer is yes,

4   he can ask another question; if the answer is no, that's the

5   end of it.

6        THE COURT:  You can do that much anyway.

7        (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              MR. LISNER:  Okay.  Thank you, your Honor.

 3              Could you bring up for the witness only, Brian,

 4    DX 1022.

 5    BY MR. LISNER:

 6    Q.  Just yes or no, two questions:  Did you—do you recognize

 7    this document?

 8    A.  No.

 9              MR. LISNER:  Okay.  You can take that down, Brian.

10    Q.  Do you agree with the statement that the net asset

11    valuation model is commonly applied when valuing privately held

12    companies?

13    A.  Yes.

14    Q.  And your presentation this morning relied exclusively on

15    Alameda balances held on the FTX platform, true?

16              MR. ROOS:  Objection.  Misstates testimony.

17              THE COURT:  Well, he can say.

18              MR. LISNER:  It's a question.

19    A.  Yes.

20    Q.  Okay.  Do you understand that Alameda traded on multiple

21    exchanges in addition to FTX?

22    A.  Yes.

23    Q.  Held assets on those exchanges?

24    A.  Excuse me?

25    Q.  That it held assets on those exchanges?
```

1  A.  Yes.

2  Q.  And Alameda held significant assets in venture capital?

3  A.  Yes.

4  Q.  And Alameda was required to post collateral for the loans

5  it received?

6         MR. ROOS:  Objection, foundation.

7         THE COURT:  Sustained.

8  Q.  You didn't perform a net asset value analysis in this case,

9  did you?

10  A.  No, I did not.

11         MR. LISNER:  Okay.  If we could bring up GX 1039,

12  which is in evidence.

13  Q.  I believe you testified earlier this morning that this

14  reflects a flow of funds in connection with the donation made

15  by Ryan Salame, true?

16  A.  True.

17  Q.  Now if you look in the upper left here, there's two sources

18  of funds, customer funds from customer bank accounts and other

19  inflows, and there's a date window for each of them, May 23rd

20  to May 25th.  How did you pick what window to use for your

21  analysis?

22  A.  So I went back in time, recognizing that the data is daily

23  data, not time-stamped data, until I found sufficient funds to

24  cover 5.5 million in this example.

25         MR. LISNER:  Okay.  And if you bring up—take that

1      down and bring up GX 1041.

2      Q.  Which is another example of your flow chart analysis.  Here

3      there is only one date window here.  Why are there different

4      windows across different analyses?

5      A.  Because in this example, unlike a previous example where I

6      had to go back two days to find sufficient funds, I found

7      sufficient funds to cover 540 in just one day.

8      Q.  Would your conclusion about which assets were used be

9      affected if you used longer or shorter date windows?

10     A.  Absolutely not, and I've checked that out.

11     Q.  Okay.  You didn't present any of that analysis today?

12     A.  No.

13     Q.  You understand that FTX had significant positive revenues,

14     true?

15            MR. ROOS:  Objection, foundation.

16            MR. LISNER:  I'll rephrase.  I'll rephrase.  Sorry.

17     Q.  Do you have an understanding of whether FTX generated

18     positive revenue?

19     A.  I haven't analyzed the generation of revenue by FTX.

20     Q.  In the documents you reviewed, have you seen any evidence

21     that FTX generated positive revenue?

22            MR. ROOS:  Objection.

23            THE COURT:  Ground?

24            MR. ROOS:  He just said he didn't know, he didn't

25     under—he didn't analyze this at all.

1        THE COURT:  I'll allow the question.

2   A.   Would you repeat the question, please.

3   Q.   Have you seen evidence in your work on this case of FTX

4   generating positive revenue?

5   A.   No.

6        MR. LISNER:  Just one moment, your Honor.

7   Q.   Switching topics, approximately how many people at the

8   Brattle Group assisted you in your analysis?

9   A.   Ten to twelve.

10  Q.   And you testified how much you billed on this matter.  Do

11  you know how much the Brattle Group earned—billed in this

12  matter?

13  A.   No.

14  Q.   Did you originate this matter for the Brattle Group?

15  A.   No.

16  Q.   Do you receive any compensation from the Brattle Group

17  other than your hourly rate for this matter?

18  A.   No.

19        MR. LISNER:  Just one moment.

20        No further questions, your Honor.

21        THE COURT:  Thank you.

22        Any redirect?

23        MR. ROOS:  Just briefly.

24        Please put up Government Exhibit 1017A.

25

1    REDIRECT EXAMINATION

2    BY MR. ROOS:

3    Q.  Professor Easton, you were asked some questions about

4    whether this was loan principal or loan interest.  Regardless

5    of whether it was loan principal or loan interest, what did you

6    determine was the source of the funds that paid Genesis?

7              MR. LISNER:  Objection.  Mischaracterizes the

8    question.

9              THE COURT:  I didn't hear him characterizing it.

10             Well, no, sustained.  Rephrase it.

11   Q.  Do you recall being asked about repayment of loan

12   principal, just yes or no?

13   A.  Yes, I do.

14   Q.  Do you remember being asked questions about repayment of

15   loan interest?

16   A.  Yes.

17   Q.  Irrespective of whether loan interest or loan principal was

18   repaid, what was the source of the funds?

19   A.  The source of funds for either payment was either customer

20   flows or other inflows.  That was my focus.

21   Q.  Now I want to just ask you—you were shown several—several

22   points in times and several negative balances.  Do you remember

23   that?

24   A.  I do.

25   Q.  And I think you testified about the balances, the negative

1    balance account going up and down over time; is that right?

2    A.  Yes.

3    Q.  And at some points I think Mr. Lisner asked you about where

4    the number wasn't as negative; is that right?

5    A.  That is correct.

6    Q.  Okay.  Now throughout all those instances Mr. Lisner asked

7    you about, was the number still negative?

8    A.  Yes, it was.

9    Q.  And what are some of the reasons why the balance can change

10   besides the repayment of loans?

11   A.  Well, in crypto it's very obvious that cryptocurrencies

12   fluctuate a great deal up and down.

13   Q.  And besides the cryptocurrency fluctuations, were there

14   other inflows and outflows of these accounts at the times

15   looked at?

16   A.  Yes.  In the last few months there was 1.7 billion of

17   inflows.

18              MR. ROOS:  No further questions.

19              THE COURT:  Thank you.

20              Any recross?

21              MR. LISNER:  Briefly.

22              If you could bring up 1017 again, Brian.

23              1017B.  That one's fine.  A is fine.

24   RECROSS EXAMINATION

25   BY MR. LISNER:

1    Q.  You were just asked about this.  I want to understand your

2    methodology on this.  If Alameda deposited—let me set up a

3    hypothetical.

4         If Alameda set up—deposited one Bitcoin before this

5    payment was made and then immediately transferred it to Genesis

6    from its account, so it took a off-chain Bitcoin, took a

7    Bitcoin off the platform, put it into account No. 9, and then

8    used account No. 9 to pay Genesis, how would that Bitcoin be

9    reflected in your analysis as coming from a customer fund or an

10   other inflow?

11        MR. ROOS:  Objection, to the form and the scope.

12        THE COURT:  I'll allow it.

13   A.  So I think the easiest way or most straightforward way to

14   answer your question is to say what I would have done if the

15   one Bitcoin resulted in a positive balance in Alameda account

16   9.  The payment would be seen as an other flow.  If the balance

17   was negative, that would mean it would be dipping into customer

18   funds.

19   Q.  Just let me make sure I understand the test.  The test is

20   if when the payments were made the full amount came from a

21   negative balance; is that right?

22   A.  I'm not sure what the question is.  I'm sorry.

23   Q.  I'm trying to make sure I understand the test you applied

24   for determining whether customer funds were used to pay a

25   third-party lender.  And you said—correct me if I'm wrong—if

1    the account balance is negative, then the payment would be

2    considered using customer funds.

3    A.   If the account balance of the particular cryptocurrency was

4    negative and that particular cryptocurrency was used to pay the

5    loan, it would be considered dipping into customer funds.

6    Where else could it have come from?

7    Q.   Okay.  So then using my example, if the account is negative

8    15, Bitcoin——are you with me?——and then Alameda deposits one

9    Bitcoin from off the platform, so now it's negative 14, and

10   then it pays 10 to somebody, all use of customer funds?

11   A.   It's paid out of the 14, which is what's left.  It's

12   customer funds.

13   Q.   And there's no distinction in your analysis between deposit

14   of Bitcoin put on and the negative Bitcoins that are there.

15   A.   It must have come out of customer funds because the balance

16   is negative.  It would be dipping further into customer funds.

17             MR. LISNER:  No further questions.

18             THE COURT:  Thank you.

19             MR. ROOS:  Thank you, your Honor.

20             THE COURT:  Thank you, Professor Easton.  You're

21   excused.

22             (Witness excused)

23             THE WITNESS:  Thank you.

24             THE COURT:  Next witness.

25             MR. RAYMOND:  Your Honor, the government calls Cory