**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FTX TRADING LTD., *et al.*,[1] | ) Case No. 22-11068 (JTD) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Re: Docket Nos. 5202 and 5626** |
| | ) |

**SUPPLEMENTAL OBJECTION OF TMSI SEZC LTD. TO
MOTION OF DEBTORS TO ESTIMATE CLAIMS BASED ON DIGITAL ASSETS**

TMSI SEZC Ltd. ("TMSI"), through its undersigned counsel, files this supplemental objection (this "Supplemental Objection") to the *Motion of Debtors to Estimate Claims Based on Digital Assets* [Docket No. 5202] (the "Motion") and *Limited Objection of TMSI SEZC Ltd. to Motion of Debtors to Estimate Claims Based on Digital Assets* [Docket No. 5626] (the "Initial Objection", and together with the Supplemental Objection, the "Objection").[2]  In support of this Supplemental Objection, TMSI states as follows:

**Preliminary Statement[3]**

1.     The Debtors propose to reduce significantly the face value of TMSI's Customer Entitlement Claim by cutting the $0.37 Petition Date price of SRM price by 58.3% to $0.1551467. This significant asset liquidation discount is the result of an incorrect application of legal principles and a flawed methodology.  Moreover, the Debtors' expert witness is not qualified to opine on two

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

[3]    Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms in further sections of the Supplemental Objection.

key issues: (1) whether the Debtors' holdings of SRM should be included as an input to the KO Model; and (2) the proper pricing methodology where there is an active futures market in addition to a spot market.

2.      Section 502(c) is intended to be used for estimating claims for purposes of voting on a plan of reorganization, but the Debtors inappropriately apply it to fix the value of Customer Entitlement Claims.  In doing so, the Debtors estimate the wrong thing.  Instead of estimating the value of customers' claims, the Debtors estimate the Petition Date price of customers' claims following a hypothetical sale of all the Debtors' holdings.  Case law is clear that claims are to be estimated as if the Chapter 11 Cases never happened. What hypothetically would happen if the Debtors' holdings were liquidated is legally irrelevant.  Accordingly, the Debtors' expert Professor Sabrina Howell's valuation of TMSI's SRM Customer Entitlement Claim by estimating the impact to the Petition Date price if the Debtors sold all $3.7 billion of their SRM holdings is improper to consider and irrelevant as a matter of law.  Instead, the Petition Date price of TMSI's SRM holdings should be discounted, if at all, only to reflect the sale of the $509 million of SRM that customers claimed—which, as the case law requires, provides an estimate of what customers would have recovered if the Chapter 11 Cases never happened.

3.      In attempt to justify using the Debtors' holdings as the amount to be sold, Howell argues that using only customers' SRM would result in a shortfall where non-SRM customers would see their recoveries diminish and that, in her view, would be bad.  According to Howell, using the Debtors' holdings as the amount to be sold is "reasonable" because SRM was associated with FTX and Sam Bankman-Fried ("SBF").  But Howell's personal opinion on how the Bankruptcy Code should be applied to meet her subjective views on which creditors should bear what risks (i) is not an input to the KO Model, (ii) is contrary to the Bankruptcy Code's estimation

2

principles and priority scheme for similarly situated creditors, (iii) double counts a risk already incorporated into the Petition Date SRM price, and (iv) is not a proper topic of expert testimony.

4.      A key input to Howell's methodology is the average daily trading volume over the Estimation Period.   In calculating that input, Howell committed a further fundamental methodological flaw by excluding the volume of the SRM perpetual futures markets from the analysis.  During the Estimation Period and through the Petition Date, SRM had an active perpetual futures market with daily volumes exceeding those in the spot market.  The liquidity available in the SRM futures market is highly relevant to assessing the price impact of sales in the SRM spot market.  Howell simply ignored that liquidity, and, as both she and the Debtors' counsel conceded during her deposition, she has no expertise with the futures liquidation strategies that make the inclusion of that liquidity critical. With those concessions, the Debtors do not have a competent expert witness to opine on the relevance of liquidity in the perpetual futures market, leaving TMSI's expert Ioannis Gkatzimas' uncontroverted opinion regarding the interplay between the spot and futures markets unrebutted.

5.      Howell nonetheless makes a conclusory determination, couched as an expert opinion, that such markets are irrelevant because SRM spot holdings cannot literally be sold on the perpetual futures market.  But Howell misses the point because a market participant would have used the perpetual futures market to limit the price impact of unwinding a spot position and, further, the existence of those markets is relevant to the price impact of selling positions on the spot market because spot and futures markets function as a unified liquidity pool.

6.      Howell's lack of understanding of the perpetual futures market and its impact on spot prices, in addition to her lack of relevant experience and academic training, renders her unqualified under Federal Rule of Evidence 702. Further, her methodology (to the extent she

3

employed one) used to decide to exclude perpetual futures markets volume as part of an input to the KO Model is unreliable and not helpful to the trier of fact as required by Federal Rule of Evidence 702.

7.      Correcting Howell's incorrect application of legal principles and flawed methodology by adjusting her inputs to the KO Model to (1) use only customers' claims in SRM as the liquidation amount and (2) include perpetual futures in the average daily trading volume significantly lowers the ALD for SRM.  By correcting the liquidation amount, with no other modification, the ALD decreases from 53.75% to 19.99%.  By correcting the average daily trading volume, with no other modification, the ALD decreases from 53.75% to 33.51%.  Making both corrections to the KO Model decreases the ALD from 53.75% to approximately 12.47%.[4]

## **Factual Background[5]**

8.      On January 28, 2024, the Debtors filed the *Debtors' Omnibus Reply in Support of Motion of Debtors to Estimate Claims Based on Digital Assets* [Docket No.  6728], which included as Exhibit D the *Supplemental Declaration of Sabrina T. Howell in Support of Motion of Debtors to Estimate Claims Based on Digital Assets* (the "Supplemental Howell Declaration", and together with the Initial Howell Declaration, the "Howell Declarations").

9.      On February 16, 2024, TMSI delivered to the Debtors the *Declaration of Ioannis Gkatzimas on Behalf of TMSI SEZC Ltd.* (the "Gkatzimas Report", a copy of which is attached hereto as **Exhibit A**).  The Gkatzimas Report details the findings of Ioannis Gkatzimas in response

---

[4]    Gkatzimas' calculations are not based on the same CoinMetrics data used by Howell, but are based on data from CoinAPI, "another leading crypto data provider, and data provided by TMSI." Gkatzimas Report ¶ 28.  The key difference in the data used by Howell and Gkatzimas is that Gkatzimas begins with an average daily spot trading volume of 30 million, while Howell begins with 25.2 million SRM. Gkatzimas Report ¶ 28 n.24.  Gkatzimas' calculations begin with an ADL of 53.75%, while Howell's begins with 58.3%.  Howell, in her Rebuttal Report, did not take any issue or make any comment with respect to the data set Gkatzimas used.

[5]    This Supplemental Objection respectfully incorporates by reference the factual background set forth in paragraphs 7–11 of the Initial Objection.

to the Howell Declaration.   Gkatzimas reviewed Howell's methodology and calculations to estimate the price of SRM as of the Petition Date.   Gkatzimas calculated that the proper asset liquidation discount (the "ALD") for SRM, using the KO Model, is 12.47%.   Gkatzimas Report ¶ 9(a).

10.     The KO Model, which Howell uses to calculate the ALD for SRM, has four main inputs: (1) average daily trading volume; (2) amount to be liquidated; (3) volatility of the asset; and (4) Petition Date price. *Id.* ¶ 19.   Gkatzimas' calculations are the result of correcting the values for two of these inputs: the amount of SRM to be sold and the average daily trading volume.   The face value of amount of SRM to be sold is corrected from $3.7 billion to $509 million.   *Id.* ¶ 9(a). The average daily trading volume in SRM is corrected to include the perpetual futures markets. *Id.* ¶ 19(b).

11.     Howell uses only the spot market and omits the perpetual futures markets when calculating average daily trading volume.   "The perpetual futures markets for many crypto assets, including SRM, were relatively active (and in fact had a higher average daily trading volume than SRM spot markets) during the Estimation Period, and therefore serve as an important avenue of liquidity for market participants.   By ignoring volume from the perpetual futures markets, the Howell Declaration underestimates the trading activity in the SRM tokens, and as a result, overestimates the asset liquidation discount." *Id.* ¶¶ 9(b), 14.

12.     As a result of this key flaw, the "Howell Declaration accounts for less than half of the SRM [trading volume] that was accessible to market participants during the estimation period." *Id.* ¶ 21.   Including the volume from perpetual futures markets would add 47,533,298 SRM of daily trading volume (more than the average daily trading volume for spot markets of 30,187,655

SRM) over the Estimation Period. *Id.* ¶ 12.  The failure to account for perpetual futures markets volume "substantially overestimates" the ALD. *Id.* ¶ 25.

13.     On February 22, 2024, the Debtors delivered to TMSI the *Rebuttal Expert Report of Sabrina T. Howell in Response to Ioannis Gkatzimas* (the "<u>Howell Rebuttal Report</u>", a copy of which is attached hereto as **<u>Exhibit B</u>**).  The Howell Rebuttal Report makes several arguments in opposition to the finding in the Gkatzimas Report that the perpetual futures market should be taken into account when determining the average daily trading input for the KO Model. However, Howell is not qualified under Federal Rule of Evidence 702 to opine on perpetual futures markets and her premise in attempting to refute Gkatzimas' points—that one cannot literally sell spot SRM using perpetual futures markets—misunderstands the Objection and how spot and futures markets interact.

<u>**Argument**</u>

**I.      The Debtors' Application of Section 502(c) of the Bankruptcy Code is Inappropriate.**

14.     Section 502(c)(1) of the Bankruptcy Code provides that "[t]here shall be estimated for purpose of allowance under this section any contingent or unliquidated claim, the fixing or liquidation of which . . . would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). "The purpose of section 502(c) is to prevent the administration of the debtor's estate from being held hostage by the fixing or liquidation of an unliquidated or contingent claim.  It is not a mechanism for reducing the amount of a debtor's liability." *In re RNI Wind Down Corp.*, 369 B.R. 174, 191 (Bankr. D. Del. 2007); *see also Owens Corning v. Credit Suisse First Bos.*, 322 B.R. 719 722 (D. Del. 2005) ("We are not, at this time, deciding how much each claimant will actually be entitled to receive, but the total amount which the claimants, as a group, could legitimately have claimed as compensation, as of the petition date.").

15.     Here, the Debtors' application of estimation goes far beyond its intended scope. The Debtors propose not just to estimate but also to fix the value of Customer Entitlement Claims.

16.     Further, when estimation is employed, values are to be estimated "on the basis of what would have been a fair resolution of the claims in the absence of bankruptcy." *Owens Corning*, 322 B.R. at 722.  Contrary to the law, Howell's approach estimates the impact of the Chapter 11 Cases on Customer Entitlement Claims by estimating what the impact of selling all of the Debtors' $3.7 billion of SRM would be on the Petition Time price of the tokens claimed by customers.  That approach does not estimate the value of Customer Entitlement Claims; instead, that essentially answers the question of what the estimated proceeds would be if the Debtors sold all of the SRM on their books.[6]  To answer the question for which estimation is intended, the $3.7 billion of SRM used by Howell as the liquidation amount in the KO model must be substituted with the $509 million that customers claim in SRM.

17.     Attempting to apply Howell's methodology reveals its flaws.  For instance, under Howell's methodology, assuming all else being equal, if customers claimed $1 billion of SRM, the ALD applied to those claims would differ depending on whether the Debtors' held $100 billion, $1 billion in SRM, or $0 in SRM, as Howell's analysis depends only on what the Debtors hold, not what customers claim. Howell Dep. 106:15-107:20.  Under Howell's application of the KO Model, if customers claim $1 billion of SRM and the Debtors hold $100 billion of SRM, an ALD from selling $100 billion SRM would be applied to customers' SRM claims.  If, however, customers claim $500 billion SRM and the Debtors hold $0 SRM, then *no* ALD is applied to the

---

[6]     Although estimation was approved earlier in these Chapter 11 Cases with respect to other Digital Assets, the circumstances surrounding SRM are unique in a way that magnifies the impact of the legal and methodological flaws of Howell's approach.  Unlike other Digital Assets, the Debtors owned a meaningful amount of SRM. Including those amounts prejudices customers like TMSI to a larger extent than the holders of other Digital Assets because it increases the amount to be sold from a face value of $509 million to $3.7 billion (an approximate 726% increase).

7

customers' claims despite the impossibility of selling $500 billion of SRM while suffering zero price impact. That result is illogical and seemingly capricious.

18.    In answering the wrong question and improperly applying section 502(c) of the Bankruptcy Code, Howell also causes the Debtors to corrupt the dollarization effort. According to Howell, her assignment was to "assist with determining the value of creditor claims associated with digital assets by evaluating the likely effect of liquidating the Debtors' holdings of each digital asset claimed by creditors (in USD equivalent) as of the Petition Time." Howell Initial Report ¶ 4. By speculating on a post-petition liquidation of the Debtors' SRM holdings (whether attributable to a customer or not), Howell fails to answer the question of what Customer Entitlement Claims were worth as of the Petition Date, which is exactly what the dollarization effort is supposed to accomplish.

19.    Howell defends this contrary-to-law approach by injecting her subjective views on which customers should bear the risk of any shortfall. She writes, "if the Debtors were to ignore the market impact from liquidating their digital asset holdings, or assume that the Digital Assets that are the basis of claims could be liquidated first, the result would be a shortfall in asset sale proceeds that would have to be borne by other creditors." Howell Rebuttal Report ¶ 18. Howell opined further on this point during her deposition:

> If the customer claims amounts that the debtor held in sufficient quantities were liquidated first to satisfy those claims, there would be a large shortfall in liquidation proceeds to satisfy the remaining customer claims to assets that the debtor was not holding in sufficient quantities, and those remaining claims are to assets that are, in general, more liquid than [SRM] and less tied to FTX. And so those creditors who would be harmed by this strategy would be those holding more liquid tokens that were less tied to FTX, while the creditors who would benefit would be those holding the less liquid tokens that were dependent on FTX. And it is my view that the creditors who assumed these FTX-specific risks should bear the

> burden of those liquidation costs and not the creditors who are holding more liquid and widely-held assets.

Howell Dep. 108:22-109:15. Howell's belief as to the priority among similarly situated creditors is (i) not an expert opinion, (ii) contrary to the Bankruptcy Code's priority and estimation principles, and (iii) ultimately exposes an improper purpose: i.e., a results-driven attempt to have the Debtors' hypothetical recoveries match the value of Customer Entitlement Claims. Accordingly, Howell's opinion does not carry any weight and should be ignored.

20.     Even if Howell's subjective view were somehow relevant, during her deposition, Howell acknowledged that the "FTX-specific risk" she thinks certain customers assumed and therefore should bear any shortfall was already incorporated into the Petition Date price of SRM. The potential involvement of FTX, Alameda, and SBF in SRM was publicly available and widely known for many months prior to the Petition Date.  Howell conceded during her deposition that such risk "was certainly to some degree incorporated" in the price of SRM and "a negative view of the future of Serum was reflected in the large decline in the token's price in the weeks and months leading up to the [Petition Date]." *Id.* 104:14-17, 112:8-9.  Accordingly, Howell double counts whatever the FTX-specific risk was since, by Howell's own admission, that risk was already incorporated into the Petition Date price of SRM.

## II.     Howell is Not a Qualified Expert in Futures Markets and Her Methodology is Unreliable.

21.     The inclusion of expert testimony is subject to Federal Rule of Evidence 702, which imposes three substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit.  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  The party offering the expert bears the burden of showing that each standard of admissibility is met.  *360Heros, Inc. v. GoPro, Inc.*, 569 F. Supp. 3d 198, 202 (D. Del. 2021).

22.     An expert is "qualified" if they "possess specialized expertise." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.2d 396, 404 (3d Cir. 2003).   "Rule 702 mandates that the relevant expert testimony must be supported by appropriate validation—i.e., good grounds, based on what is known." *360Heros, Inc.*, 569 F. Supp. at 201 (internal citation omitted).   "Such testimony should amount to 'more than subjective belief or unsupported speculation[]' and a court's focus in examining this factor must be on 'principles and methodology' rather than on the expert's conclusions." *Id*. at 201 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 595 (1993)).

23.     The portions of Howell's Rebuttal Report and her testimony regarding perpetual futures markets should be stricken and excluded because she is not qualified to offer her opinion that the volume in the SRM perpetual futures markets is irrelevant to the price impact of selling spot SRM positions.   Howell is not an expert on perpetual futures trading strategies and market impacts, as conceded by both Howell and the Debtors' counsel. When Howell was questioned on these topics, Debtors' counsel stated that Howell is "not here to testify as a trader." Howell Dep. 143:6-7.  Howell likewise conceded that "[f]utures trading strategies as a general matter are beyond the scope of my analysis for this matter." *Id.* 143:10-12.  Howell cannot put forth the opinions contained in her Rebuttal Report relating to perpetual futures.

24.     Howell also is unqualified as she lacks specialized expertise and is nothing more than a layperson with respect to futures markets, let alone perpetual futures, and cryptocurrency in general.  *See* Howell Initial Report App'x A.

25.     Howell (i) does not have substantial experience (academic or professional) in perpetual futures markets; (ii) does not have any employment experience or academic training in the cryptocurrency industry; (iii) does not teach any classes focused primarily on cryptocurrency;

10

(iv) does not have any licenses, degrees, or certifications in cryptocurrency; (v) is not a member of any professional or industry organization related to cryptocurrency; (vi) does not have any honors, grants, or fellowships in cryptocurrency or futures markets, and (vii) has never previously served as an expert in any matter related to cryptocurrency. *See* Howell Dep. 15:14-19, 25:6-26:12; Howell Initial Report App'x A. During her deposition, the only course relating to cryptocurrencies Howell could reference was "a class session about valuing and understanding non-fungible tokens," which are outside the scope of her ALD exercise. Howell Dep. 11:7-8; Howell Initial Report ¶ 4 (excluding NFTs).

26.    The one item in Howell's experience focused on cryptocurrency is a published paper which involved initial coin offerings and had nothing to do with futures markets or liquidating positions. In that paper, the word "futures" appears only three times, in the last paragraph of the paper, stating that "Filecoin futures have traded on Gate.io and Lbank since December 13, 2017, and the futures prices provide an estimate of the value of the underlying FIL tokens. While the FIL futures traded as high as $27.66 each in the crypto bull market of late 2017, prices have retreated to a recent level around $6.00."[7] Howell does not mention perpetual futures markets a single time in that paper.

27.    The only paper Howell cited during her deposition about futures is one in which, according to Howell, she "stud[ies] how firms hedge oil risk using futures markets." Howell Dep. 20:22-23.[8] However, that paper has nothing to do with unwinding large spot positions in a hypothetical liquidation. Instead, that paper involves comparing the methods Kansas and Iowa

---

[7]    Howell, Sabrina T., Marina Niessner, and David Yermack, *Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales*, THE REVIEW OF FIN. STUDIES, Vol. 33, No. 9, 2020 ("Howell et al. (2020)"), pp. 3925-3974, at p. 3926.

[8]    Sabrina T. Howell, *Firm T\ype Variation in the Cost of Risk Management*, J. OF CORP. FIN. 64 (June 2020).

use to manage risks in highway paving contracts. Sabrina T. Howell, *Firm Type Variation in the Cost of Risk Management*, J. OF CORP. FIN. 64 (June 2020), at 31–32.

28.     Even if Howell were qualified to offer an expert opinion on perpetual futures markets, her methodology (to the extent there was one) for excluding volume from perpetual futures markets in unreliable and her opinion is not helpful to the trier of fact as required by Federal Rule of Evidence 702.  Her methodology and grounds for excluding perpetual futures markets volume is not based in a reasoned, analytical approach, but rather are conclusory statements, speculation, and a misapprehension regarding the dynamics between spot and futures markets. Howell simply concluded that because "[p]erpetual futures do not transfer the underlying digital asset . . . perpetual futures cannot be used an instrument for liquidating the Debtors' holdings." Howell Rebuttal Report ¶ 8.

29.     Further, Howell did not conduct any quantitative analysis regarding the risks of using a perpetual futures market strategy that she identified in the Howell Rebuttal Report, or any cost-benefit analysis of whether the benefits might outweigh those risks.  Howell Dep. 120:8-121:12.  Howell simply identified risks (many of which were not even unique to perpetual futures) and moved on without any analysis.  Such a methodology is not sound and leads to an unreliable conclusion that amounts to nothing more than an ungrounded, speculative opinion.

III.     **Howell Incorrectly Applied the KO Model By Excluding Perpetual Futures Markets Volume.**

30.     There were active perpetual futures markets for SRM during the Estimation Period and as of the Petition Date, which represented an "important avenue of liquidity for market participants trading in crypto assets such as SRM." Gkatzimas Report ¶ 14.  Spot and their related futures markets act as a single liquidity pool such that the price impact of selling a spot position can be assessed only across the liquidity available in both markets. *Id.* ¶ 24.  This is true regardless

12

of whether a market participant trades in the perpetual futures markets: it is the existence of a functioning perpetual futures market and the liquidity it offers that affects the price in the spot market.

31.     In the context of the KO Model, taking just one simplified example illustrates the point.  If SRM tokens are assumed to be sold only in the spot market and the futures market is ignored, the only source of liquidity to absorb the sale would be volume in the spot market.  In this case, the estimated price impact will be inflated because it will incorrectly reflect just a portion of available volume in the market.  Since the price impact is isolated to just the spot market, a "spread" would open between the spot and futures markets. Market participants would be incentivized to trade on the price difference by buying in the spot market and selling in the futures market, arbitraging away the spread until the price of the two markets converge. The result is that the price impact from the original SRM spot sale is dispersed over both the spot and futures markets, making the liquidity available in the futures market relevant (and critical) to determining the price impact of sales in the spot market.

32.     Howell ignores this market reality and focuses on the Debtors' apparent inability to utilize a trading strategy involving perpetual futures markets.[9]  In doing so, she repeats the same error: in valuing Customer Entitlement Claims the question is not how the Debtors would sell their holdings, but for what customers (or hypothetical market participants) could sell their claims as if the Chapter 11 Cases never happened.

33.     But even setting aside that (i) Howell ignores that spot and futures markets act as a single liquidity pool and (ii) the Debtor is the wrong stand-in for the liquidating party, her argument

---

[9]     Howell ignores this market reality despite noting (i) in her deposition that further articles by Kyle and Obizhaeva do in fact include futures liquidity in calculating average daily trading volume, Howell Dep. 137:11-138:1; 141:9-15; and (ii) that perpetual futures "became the dominant derivative, and were among the most actively traded products on the Exchanges." Howell Initial Report ¶ 31.

that the Debtors cannot use perpetual futures markets to liquidate a spot SRM position is still wrong. Howell asserts that perpetual futures markets cannot be used for liquidating the Debtors' SRM holdings because "the underlying digital asset never changes hands as part of a perpetual futures contract." Howell Rebuttal Report ¶ 21. In reaching this conclusion, Howell misunderstands how perpetual futures markets operate, how a perpetual futures position can be used to hedge a spot position, and how that hedge can be unwound to sell a spot position.

34. Again, in a simple example, a market participant that held an SRM spot position, all else being equal, could hedge that position by shorting SRM perpetual futures. Doing so effectively locks in the value for the SRM spot position because increases in the value of a market participant's spot holdings will be offset by decreases in the value of the market participant's short futures position, and vice versa. As the hedge position is unwound, the SRM spot position is sold and the short SRM perpetual futures position is covered, and the market participant receives the cash proceeds equivalent to the hedged value of selling the SRM spot position at the hedged price point. The selling of SRM tokens will have offsetting price impact to the covering of the SRM perpetual futures position, and therefore, there will be minimal expectation of further price impact upon unwinding the hedge position.

35. Howell appears not to understand such a trading strategy because she fails to contemplate that the hedged position would be unwound to obtain proceeds and exit the spot SRM position. Once Howell's misapprehension is corrected, each of her critiques as to why the Debtors could not trade perpetual futures to unwind a spot position falls apart.

36. First, Howell states that because one cannot literally sell spot positions in the perpetual futures markets—meaning there is no physical delivery—a perpetual futures strategy would not generate any expected cash proceeds. This argument misses the point because TMSI is

14

not suggesting selling a spot position through the futures market. Rather, as routinely done, after the short perpetual futures position is put on to hedge the spot position, the hedge would be unwound by selling the spot position and buying perpetual futures contracts. And as Howell concedes, a "market participant could receive cash flows associated from increases or decreases in the price, depending on whether they take a long or short position in futures markets." Howell Dep. 133:19-22. On FTX, for example, those profits would have been calculated within the first 30 seconds of opening the hedge. *See* Debtors' Omnibus Reply in Support of Motion of Debtors to Estimate Claims Based on Digital Assets [Docket No. 6728] ¶ 45 (stating that FTX's trading rules calculated profit and loss changes of futures positions "every 30 seconds.").

37.     Second, Howell also incorrectly states that using a perpetual futures trading strategy would "leave the SRM on the Debtors' books." Howell Rebuttal Report ¶ 25. As demonstrated by the hedging example discussed above, any SRM left on the Debtors' books would remain only for the amount of time necessary to unwind the spot and futures positions.

38.     Third, and for the same reason, Howell is incorrect when she says that "perpetual futures positions [would] need to be open forever." *See* Howell Rebuttal Report ¶ 8. While a perpetual futures contract has no expiration or maturity date, perpetual futures positions can be closed by the market participant based on the exchange's trading rules.[10] And, as noted above, short perpetual futures positions that were put on would be closed as the hedge was unwound by selling spot holdings and acquiring a perpetual futures position in offsetting amounts.

---

[10]    For example, Kraken's trading rules state that users can "enter and exit positions at any time." What are perpetual futures contracts?, Kraken, https://www.kraken.com/learn/trading/perpetual-futures-contracts (last accessed March 8, 2024). The same is true for OKX. See How to trade perpetual futures on OKX, OKX, https://www.okx.com/learn/how-to-trade-perpetual-swaps-on-okx (Dec. 15, 2023) ("If you would like to offset or close an open position, you can do so by entering a price and an amount to close and clicking Close. You can also click MKT Close All to exit an entire position at the current market price.").

39.     Fourth, Howell notes that the Debtors would need to post collateral to open a perpetual futures position, *id.* ¶ 24, but fails to account for the fact that the Debtors (or any market participant) can use leverage to post a small amount of collateral while receiving an outsized hedging impact relative to the collateral posted.  Howell never analyzed whether the cost of having to post collateral is outweighed by the benefits of accessing the perpetual futures market.  Howell Dep. 120:8-121:12.

40.     Fifth, Howell's claim that the Debtors are not sophisticated enough to employ a strategy using perpetual futures markets (or are incapable of taking on any marginal risk), *see* Howell Rebuttal Report ¶ 25, is not only irrelevant but is flat wrong.  The Debtors retained Galaxy Digital Capital Management LP ("Galaxy") to act as "Investment Manager" to manage certain of the Debtors' Digital Assets.  *See Order Authorizing FTX Trading Ltd. to Enter Into, and Perform Its Obligations Under, the Second Amended and Restated Investment Services Agreement* [Docket No.  4138].  The Investment Services Agreement between the Debtors and Galaxy authorizes Galaxy to enter into transactions in the futures markets.  Galaxy has the authority to "buy, sell, swap, redeem, manage, stake, hold exchange, convert and otherwise trade in any and all financial instruments (including, without limitation, digital assets, swaps, options, futures contracts, commodities, and forward contracts and derivatives." *Debtors' Motion for an Order Authorizing FTX Trading Ltd. to Enter Into, and Perform its Obligations Under, the Investment Services Agreement* [Docket No.  2240] ¶ 6.  Any analysis of how the Debtors would perform an orderly liquidation must assume the Debtors would act as a rational economic actor, as is contemplated by the Debtors' retention of Galaxy and execution of the Investment Services Agreement.

41.     Howell's final justification for excluding perpetual futures volume—that an alleged 99% of perpetual futures volume was delisted five days *after the Petition Date*—is irrelevant and

16

contrary to Howell's own methodology.[11]  To determine the average daily trading volume as an input for the KO Model, Howell used a year-long Estimation Period that does not take post-petition events or volume into account.  The Bankruptcy Code requires the estimation or valuation of claims based on the circumstances as they existed on the Petition Date.  To hold otherwise would allow someone to use an inequitable "wait and see" approach to utilize whatever information best defends one's position based on an *ex-post* analysis.[12]

[remainder of page left intentionally blank]

---

[11]    Howell did not analyze or consider what the perpetual futures market volume was prior to the Petition Date. Howell Dep. 124:14-19.

[12]    Considering post-petition prices and activity would result in the undervaluation of tokens like BTC and ETH that have risen dramatically since the Petition Date, an outcome this Court already has rejected. *See* Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets [Docket No. 7090].

**Conclusion**

WHEREFORE, TMSI respectfully requests the Court deny the Motion as to the price and ALD of SRM and grant such other relief as the Court finds just and appropriate.

Dated: March 8, 2024

**SAUL EWING LLP**

By:  /s/ Monique B. DiSabatino
Mark Minuti (DE Bar No.  659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Fax: (302) 421-6813
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

**KATTEN MUCHIN ROSENMAN LLP**
Peter A. Siddiqui (admitted *pro hac vice*)
Elliott Bacon (admitted *pro hac vice*)
Ethan D. Trotz (admitted *pro hac vice*)
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
peter.siddiqui@katten.com
elliott.bacon@katten.com
ethan.trotz@katten.com

*Attorneys for TMSI SEZC Ltd.*