# Exhibit F

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
IN RE:                   )
                         )
                         )  Case No.
FTX TRADING LTD., et al. )
                         )  22-11068 (JTD)
       Debtors.          )
```

EXAMINATION OF

FOTIOS KONSTANTINIDIS

_____

TAKEN ON

TUESDAY, FEBRUARY 27, 2024

CERTIFIED STENOGRAPHER:
 JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
 CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
 CCR-WA (No. 21007264), CSR-CA (No. 14420),
 REALTIME SYSTEMS ADMINISTRATOR
 JOB NO.:  1105009



```
 1
 2
 3              EXAMINATION of
 4   FOTIOS KONSTANTINIDIS, taken before
 5   JESSICA R. WAACK, Registered Professional
 6   Reporter, Registered Merit Reporter,
 7   Certified Realtime Reporter, Registered
 8   Diplomate Reporter, California Certified
 9   Realtime Reporter, New Jersey Certified Court
10   Reporter (License No. 30XI008238700); Texas
11   Certified Shorthand Reporter (License No.
12   11958); Washington State Certified Court
13   Reporter (License No. 21007264); California
14   Certified Shorthand Reporter (License No.
15   14420); New York Association Certified
16   Reporter, New York Realtime Court Reporter
17   and Notary Public of Washington, D.C. and the
18   States of New York, Pennsylvania, Delaware,
19   Maryland and Virginia, at Sullivan &
20   Cromwell, LLP, 125 Broad Street, New York,
21   New York, on Tuesday, February 27, 2024,
22   commencing at 9:06 a.m. and concluding at
23   12:13 p.m.
24
25
```

```
 1            A P P E A R A N C E S
 2
 3   ON BEHALF OF THE DEBTORS AND DEBTORS IN
 4   POSSESSION:
 5      SULLIVAN & CROMWELL LLP
 6      BY:  BRIAN D. GLUECKSTEIN, ESQ.
 7      BY:  JULIE KAPOOR, ESQ.
 8      125 Broad Street
 9      New York, New York  10004-2498
10      PHONE:  212-558-1635
11      EMAIL:  Gluecksteinb@sullivan.com
12
13   ON BEHALF OF FOUNDATION ELEMENTS,
14   FOUNDATION SERENDIPITY, SERENDIPITY
15   NETWORK LTD. AND LIQUIDITY NETWORK LTD.:
16      REED SMITH LLP
17      BY:  BRIAN M. ROSTOCKI, ESQ.
18      BY:  AARON JAVIAN, ESQ.
19      1201 Market Street, Suite 1500
20      Wilmington, Delaware  19801
21      PHONE:  302-778-7561
22      EMAIL:  Brostocki@reedsmith.com
23
24
25
```

```
 1            A P P E A R A N C E S
 2
 3   ON BEHALF OF MAPS VAULT LTD.:
 4      DLA PIPER
 5      BY:  JEFFREY TOROSIAN, ESQ.
 6      444 West Lake Street, Suite 900
 7      Chicago, Illinois  60606
 8      PHONE:  312-368-4045
 9      EMAIL:  Jeffrey.torosian@dlapiper.com
10
11   REMOTELY ON BEHALF OF THE OFFICIAL
12   COMMITTEE OF UNSECURED CREDITORS:
13      PAUL HASTINGS LLP
14      BY:  KEN PASQUALE, ESQ.
15      BY:  LEONIE KOCH, ESQ.
16      200 Park Avenue
17      New York, New York  10166
18      PHONE:  212-318-6463
19      EMAIL:  Kenpasquale@paulhastings.com
20
21
22
23
24
25
```

```
 1            A L S O   P R E S E N T
 2            (appearing remotely)
 3
 4   VIRGINIA CALLAHAN, DLA Piper
 5   BEN CHAPPLE, Reed Smith
 6   DASHA ANOSOVA, Analysis Group
 7   JOHN MIRAGLIA, Reed Smith
 8   ISAAC FOOTE, Sullivan & Cromwell
 9   CHING WATSON, FTI
10   JOH MIRAGLIA, Reed Smith
11   KURT WYNNE, Reed Smith
12   DENNIS O'DONNELL, DLA Piper
13
14            --o0o--
15
16
17
18
19
20
21
22
23
24
25
```



Page 6

1        INDEX TO EXAMINATION
2     WITNESS:  FOTIOS KONSTANTINIDIS
3
4        EXAMINATION          PAGE
5     BY MR. GLUECKSTEIN          9
6
7        INDEXED PAGES
8              PAGE
9     FOTIOS KONSTANTINIDIS, sworn       8
10    REPORTER CERTIFICATE        130
11    INSTRUCTIONS TO WITNESS      131
12    DECLARATION UNDER PENALTY OF PERJURY   132
13    ERRATA SHEET            133
14
15       INFORMATION REQUESTED
16           None
17
18    WITNESS INSTRUCTED NOT TO ANSWER
19           None
20
21
22
23
24
25

Page 7

1        INDEX TO EXHIBITS
2     WITNESS:  FOTIOS KONSTANTINIDIS
3      Tuesday, February 27, 2024
4     MARKED     DESCRIPTION     PAGE
5     Exhibit 1  Maps Vault's expert disclosure
6           of Mr. Konstantinidis      12
7     Exhibit 2  Expert report of
8           Mr. Konstantinidis dated
9           January 26, 2024       13
10    Exhibit 3  Motion of debtors to estimate
11          claims based on digital assets  49
12    Exhibit 4  2023 Oxford publication    65
13
14    ** All exhibits were attached to the
15        original transcript **
16
17           --o0o--
18
19
20
21
22
23
24
25

Page 8

1          F. KONSTANTINIDIS - 02/27/2024
2              ******
3          PROCEEDINGS
4      February 27, 2024, 9:06 a.m.
5          New York, New York
6              ******
7      FOTIOS KONSTANTINIDIS, sworn
8   on oath and/or affirmed, called as a
9   witness herein, was examined and testified
10          as follows:
11              *****
12      MR. TOROSIAN:  Brian, before you
13   begin, so when we -- this can be on the
14   record.  When we object, since he's
15   both of our experts, we assume an
16   objection for one is an objection for
17   both --
18      MR. GLUECKSTEIN:  Yes.
19      MR. TOROSIAN:  -- and we don't
20   have to speak over the record.
21      MR. GLUECKSTEIN:  That's fine.
22      MR. TOROSIAN:  The only exception
23   might be privilege, since we have
24   separate privileges, but I'm probably
25   going to take the lead on objections

Page 9

1          F. KONSTANTINIDIS - 02/27/2024
2   and he doesn't need to say join, join,
3   join.
4      MR. GLUECKSTEIN:  Yeah, that's
5   fine.
6          EXAMINATION
7   BY MR. GLUECKSTEIN:
8      Q.  Good morning --
9      A.  Good morning.
10     Q.  -- Mr. Konstantinidis.  My name
11   is Brian Glueckstein.  I am an attorney at
12   Sullivan & Cromwell.  I represent the FTX
13   debtors.
14      Mr. Konstantinidis, as you know,
15   you are under oath this morning testifying
16   despite the judge not being in the room.
17      Do you understand that?
18     A.  Yes.
19     Q.  Just a couple of rules just to
20   make sure that we get a clean record for
21   today.  Please allow me to finish my
22   answer -- my question before you give your
23   answer, and I'll allow you to do the same
24   so that the court reporter can record a
25   transcript accurately.



Page 10

F. KONSTANTINIDIS - 02/27/2024
1      F. KONSTANTINIDIS - 02/27/2024
2         Is that okay?
3      A.  Yes.
4      Q.  If you don't understand any of my
5   questions, please be sure to ask me to
6   clarify or restate the question so that I
7   am sure that if you answer the question,
8   you understood the question.
9         Does that make sense?
10     A.  Yes.
11     Q.  If your attorneys, counsel ask --
12  interpose an objection, you will still need
13  to give me an answer to that question
14  unless they instruct you not to answer.
15        Do you understand that?
16     A.  Yes.
17     Q.  If you need a break at any time
18  this morning, just let us know.  Happy to
19  take a break.  I'll just ask that you
20  answer if there's a pending question before
21  a break.
22     A.  Yes.
23     Q.  Is there any reason that you're
24  aware of where you're not capable of giving
25  complete and accurate testimony this

Page 11

1      F. KONSTANTINIDIS - 02/27/2024
2   morning?
3      A.  No.
4      Q.  Sir, have you been deposed
5   before?
6      A.  No.
7      Q.  Have you testified in court?
8      A.  No.
9      Q.  To prepare for today's
10  deposition, what did you do to prepare for
11  this morning?
12     A.  I read my original report.  I
13  also read the report from both the opposing
14  experts, Professor Howell and Mr. Lu.  Both
15  the original reports and the rebuttal
16  reports as well as some reference papers
17  that they used for the reports.
18     Q.  Did you review any other
19  materials before -- to prepare for this
20  morning?
21     A.  Like I said, I reviewed the
22  reports, the rebuttals, some references.  I
23  don't quite remember which ones, but what I
24  thought was the most important for the
25  reports.

Page 12

1      F. KONSTANTINIDIS - 02/27/2024
2      Q.  Did you speak with anybody in
3   anticipation for preparing for this
4   morning?
5      A.  I spoke to the lawyers from
6   DLA Piper and Reed Smith.
7      Q.  Did you speak to both of them at
8   the same time?
9      A.  No.
10     Q.  You had separate meetings?
11     A.  Separate meetings.
12     Q.  How long were those meetings?
13     A.  I had a meeting with DLA Piper
14  for one hour last Thursday, a second
15  meeting on Friday for two hours, and a
16  meeting with Reed Smith for about 20
17  minutes on Saturday morning.
18     Q.  During the course of those
19  meetings, did you review any documents?
20     A.  No.
21        MR. GLUECKSTEIN:  Let's mark the
22  first two exhibits.  These are his
23  reports.
24        (Whereupon, Exhibit 1, is marked
25        for identification.)

Page 13

1      F. KONSTANTINIDIS - 02/27/2024
2        (Whereupon, Exhibit 2, is marked
3        for identification.)
4   BY MR. GLUECKSTEIN:
5      Q.  Mr. Konstantinidis, could you
6   take a look at what's been marked first as
7   Exhibit 1.
8      A.  Yes.
9      Q.  Are you familiar with this
10  document?
11     A.  Yes.
12     Q.  What is this document?
13     A.  This is my expert report on
14  behalf of the clients of DLA Piper.
15     Q.  Okay.  And Exhibit 2, do you
16  recognize that exhibit?
17     A.  Yes.
18     Q.  And what is that exhibit?
19     A.  This is my report with
20  correspondence to the Foundation Elements
21  and Foundation Serendipity.  These are the
22  Reed Smith clients.
23     Q.  Do these reports together contain
24  a complete statement of the opinions that
25  you currently intend to provide in this



F. KONSTANTINIDIS - 02/27/2024

1
2  matter?
3      A.   By saying "complete," what do you
4  mean?
5      Q.   Are you offering opinions on any
6  subjects that are outside Exhibits -- the
7  scope of Exhibits 1 and 2?
8      A.   These are my reports, but based
9  on the -- on your questions, I will clarify
10 my opinions --
11     Q.   Okay.
12     A.   -- or provide additional
13 insights.
14     Q.   And with respect to the -- are
15 you -- you're intending to testify at the
16 hearing on March 20 before the Court?
17     A.   Yes.
18     Q.   Are you intending to provide
19 testimony and offer opinions on any
20 subjects that are not contained in
21 Exhibits 1 and 2?
22     A.   I will be testifying based on my
23 opinions; however, based on the questions,
24 I may expand on my opinions.
25     Q.   Have any of your opinions changed

F. KONSTANTINIDIS - 02/27/2024

1
2  in any way since you completed and executed
3  your reports reflected in Exhibits 1 and 2?
4      A.   No, they haven't.
5      Q.   Is there anything in those
6  reports that you would like to amend or
7  clarify with respect to the testimony
8  that -- or not testimony, with respect to
9  the opinions that are contained in those
10 reports?
11     A.   No, I don't.
12     Q.   Mr. Konstantinidis, you're not
13 offering an opinion on any alternative ways
14 that the debtors could try to realize value
15 from Maps, Oxy or Serum, are you?
16     A.   The scope of my opinions were to
17 value the portfolios of the four entities.
18 It wasn't in scope to determine how the
19 liquidation of the debtors' side will take
20 place.
21     Q.   So you're not offering an opinion
22 on how the debtors would liquidate those
23 assets?
24     A.   I'm not offering an opinion on
25 how the liquidation will be implemented.

F. KONSTANTINIDIS - 02/27/2024

1
2      Q.   And you're not offering an
3  opinion on any alternatives to a
4  liquidation?
5      A.   My opinions are strictly on
6  valuing the portfolios as of the petition
7  date and time.
8      Q.   Similarly, Mr. Konstantinidis,
9  you're not offering any opinion with
10 respect to trading strategies or other ways
11 the debtors might monetize their token
12 portfolio, correct?
13     A.   Correct.  That's out of the scope
14 of my opinions.
15     Q.   And you're not suggesting that
16 the debtors should hedge or short or do
17 anything else with respect to their tokens
18 with respect to monetization of those
19 tokens, correct?
20     A.   Correct.
21     Q.   Are you familiar with the concept
22 of burning tokens?
23     A.   Yes.
24     Q.   What is the concept of burning
25 tokens?

F. KONSTANTINIDIS - 02/27/2024

1
2      A.   Well, in many cases, either
3  individuals or entities, they will decide
4  to burn tokens, basically throw them away
5  from the wallet ID so -- for different
6  strategies.
7      Q.   You're not offering an opinion
8  that the debtors should be burning Maps,
9  Oxy or Serum tokens in this case, are you?
10     A.   Again, solely my opinions was to
11 value the portfolios.
12     Q.   So you're not offering an opinion
13 with respect to whether it makes sense for
14 the debtors to burn tokens in this matter,
15 are you?
16     A.   I'm not offering any opinions
17 about potential strategies from the
18 debtors.
19     Q.   Did you have -- in completing the
20 analysis and opinions reflected in your
21 reports, did you have assistance from
22 anyone in completing that work?
23     A.   Yes, I did.
24     Q.   Who assisted you?
25     A.   I had two members of my team that



Page 18

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2  assisted me in the data analysis and also
 3  another person that assisted me with a
 4  blockers discount model with a model that I
 5  use for valuation.
 6        Q.  Are these other employees at
 7  Stout?
 8        A.  There are other -- in general?
 9        Q.  No.  Are the -- are the
10  individuals who assisted you other
11  employees of Stout?
12        A.  Yes.
13        Q.  What was their role in the
14  analysis compared to yours?
15        A.  The role of one of them was to
16  analyze the data we received.  The role of
17  the second was to mine the blockchain so we
18  can get cryptocurrency data.  The third one
19  was to run the Stout valuation model under
20  my guidance.
21        Q.  If you could look at Exhibit B to
22  what is Exhibit 1 of your report, your
23  report that you filed on behalf of the DLA
24  clients.
25        A.  Uh-huh.
```

Page 19

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2        Q.  Exhibit B there is a copy of your
 3  CV; is that correct?
 4        A.  Exhibit B or Exhibit 1?
 5        Q.  Exhibit B to that document, sir.
 6        A.  Oh, okay.  Okay.
 7        Q.  Is that a copy of your CV?
 8        A.  Yes.
 9        Q.  Is that CV still accurate as we
10  sit here today?
11        A.  Yes.
12        Q.  Mr. Konstantinidis, I understand
13  from your CV that you obtained an
14  undergraduate degree in physics in Greece;
15  is that correct?
16        A.  That's correct.
17        Q.  Then you attended UCLA for
18  graduate school; is that right?
19        A.  Yes.
20        Q.  What degrees did you obtain in
21  connection with your graduate studies?
22        A.  I obtained a master's in space
23  physics and a master's in computer science.
24        Q.  Do you hold any degrees in
25  finance?
```

Page 20

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2        A.  No.
 3        Q.  Do you hold any degrees in
 4  economics?
 5        A.  No.
 6        Q.  Do you hold any professional
 7  certifications or licenses in either
 8  finance or economics?
 9        A.  No.
10        Q.  Do you hold any degrees in
11  valuation?
12        A.  What do you mean "degrees in
13  valuation"?
14        Q.  Do you have any -- either
15  educational degrees or professional
16  certifications in valuation.
17        A.  As far as I know, there's no
18  degree in valuation.  So you mean
19  certification or...
20        Q.  Any -- whether it be
21  certification, licensing, professional --
22        A.  No.
23        Q.  Based on your CV, sir, I
24  understand you've been with Stout since
25  August of 2019; is that correct?
```

Page 21

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2        A.  Yes.
 3        Q.  Okay.  And prior to your role
 4  joining Stout, did you do any work
 5  performing asset valuation?
 6        A.  No.
 7        Q.  Prior to joining Stout, in your
 8  experience, did you have any experience
 9  with application of asset discounts?
10        A.  No.
11        Q.  Prior to your joining Stout in
12  2019, did you have any professional
13  experience with respect to digital assets?
14        A.  Yes.
15        Q.  Can you explain for me that
16  experience prior to joining Stout?
17        A.  Yes.  That experience was with
18  Visa, obviously the biggest payment
19  network, between 2015 and 2017.  There were
20  multiple prototypes on the blockchain
21  network.  And products I built with startup
22  at Visa was investing -- investing in
23  chain.com.
24            At McKinsey, there were clients
25  that I was working for that they had
```



6 (Pages 18 to 21)

Page 22

1          F. KONSTANTINIDIS - 02/27/2024
2    blockchain.
3          And in my most recent employ just
4    before Stout, I worked on the blockchain
5    for specific use cases for the fintech
6    industry.
7          Q.   And what do you mean by that,
8    when you say work on the blockchain?  What
9    were you actually doing?
10         A.   I was actually using blockchain
11   to identify customers.  So I knew the
12   intricacies of the blockchain and how it
13   works, which is the main platform for
14   digital assets.
15         Q.   And was either of those -- either
16   of those experiences -- neither of those
17   experiences involved valuation of digital
18   assets, correct?
19         A.   Correct.
20         Q.   Okay.  Turning to your time at
21   Stout.
22         On the first page of your CV, you
23   list under the heading of Stout you're the
24   global practice lead offering five service
25   lines there --

Page 23

1          F. KONSTANTINIDIS - 02/27/2024
2          A.   Uh-huh.
3          Q.   -- do you see that?
4          A.   Yep.  Yes.
5          Q.   Do any of these service lines
6    that you are the practice lead for focus on
7    asset valuation?
8          A.   Yes.  The second one, the data
9    analyticals and business intelligence.
10   This is on our website, the one we have --
11   the one we list the digital assets
12   subpractice line, if you will.
13         Q.   And what is the -- you know, what
14   is the scope of the work that you do at
15   Stout or have done at Stout in the area of
16   valuation that falls under that business
17   line?
18         A.   I valued cryptocurrencies and
19   NFTs, non-fungible tokens.
20         Q.   Okay.  With respect to valuation
21   of cryptocurrencies, can you elaborate on
22   your experience there?
23         A.   Yes.  Purely for cryptocurrencies
24   in the last two years, I had about eight
25   valuation projects.  Six of them were

Page 24

1          F. KONSTANTINIDIS - 02/27/2024
2    primarily for tax purposes, and two of them
3    were for financial reporting from companies
4    that they invest.
5          And one of them actually was the
6    Celsius bankruptcy where I valued close to
7    130 cryptocurrencies.
8          Q.   And was the valuation you did in
9    Celsius, does that fall within your
10   category of tax purposes or financial
11   purposes?
12         A.   That one was primarily for
13   financial reporting.  That was the
14   instructions.
15         Q.   And you did not -- did you submit
16   a report in the Celsius bankruptcy?
17         A.   There was the report that was
18   submitted by Alvarez & Marsal on our
19   behalf, but my analysis was part of the
20   report.
21         Q.   And you did not testify in the
22   Celsius bankruptcy?
23         A.   There was one of my colleagues
24   that testified.
25         Q.   Okay.  But you did not?

Page 25

1          F. KONSTANTINIDIS - 02/27/2024
2          A.   I did not.
3          Q.   Does any of your work at Stout as
4    the global digital practice lead, do you
5    have experience, specific experience with
6    respect to determining asset discounts
7    prior to this matter?
8          A.   Yes.
9          Q.   Can you explain your experience
10   in that area?
11         A.   Those projects that I mentioned
12   before with cryptocurrencies for IRS
13   purposes --
14         Q.   Uh-huh.
15         A.   -- and even for financial
16   reporting, they had discounts in them that
17   I had to calculate.
18         Q.   Okay.  So when you say
19   "discount," when you say that you
20   calculated discounts for IRS purposes --
21         A.   Uh-huh.
22         Q.   -- can you walk me through what
23   that type of assignment would be, what you
24   would actually do?
25         A.   Yes.  An individual or an entity



```
 1         F. KONSTANTINIDIS - 02/27/2024
 2   that holds certain cryptocurrency tokens
 3   that would, like Stout, which I
 4   represented, to value their portfolio for
 5   tax purposes for IRS.
 6        Q.  Okay.  When you say for -- the
 7   engagements you had for -- when you say for
 8   financial reporting purposes, that would
 9   have been reporting purposes that the
10   company could report to whom?  To
11   regulators?
12        A.  Either regulators, the.  SEC or
13   even for themselves internally; they want
14   to know how much their assets are valued
15   at.
16        Q.  Okay.  So how, in the course of
17   those analyses, does -- were you asked to
18   conduct asset discounts as part of that
19   analysis?  How does that play into the
20   analysis?
21        A.  What do you mean how?  Can you
22   rephrase?
23        Q.  Well, you testified a minute ago
24   that part of the work you did on these
25   valuation, crypto valuation projects for
```

```
 1         F. KONSTANTINIDIS - 02/27/2024
 2   tax or financial purposes included
 3   calculating discounts --
 4        A.  Uh-huh.
 5        Q.  -- of cryptocurrencies?
 6        How did that -- you know, what
 7   type of discounts were you calculating in
 8   those projects?
 9        MR. ROSTOCKI:  Objection.  Form.
10        THE WITNESS:  Do you want to talk
11     about the discounts on the -- for IRS
12     purposes or financial reporting?
13   BY MR. GLUECKSTEIN:
14        Q.  Let's start with IRS purposes.
15        What type of discounts were you
16   calculating?  How was that done?
17        A.  For IRS purposes, I use the exact
18   same model that I used here, the blockers
19   discount.  And it was primarily based on
20   volume, that clients hold certain number of
21   cryptocurrency tokens and they want to
22   understand for IRS purposes what is the
23   actual value of that portfolio.
24        So the blockers discount is the
25   same model that I used in this engagement,
```

```
 1         F. KONSTANTINIDIS - 02/27/2024
 2   and that's the one that I used on those IRS
 3   projects as well.
 4        Q.  Okay.  And did you do any -- was
 5   your -- the analysis that you would have
 6   done for your engagements, valuation for
 7   financial reporting purposes, would you
 8   have conducted a different type of
 9   analysis?
10        A.  Yes.  Financial reporting has
11   certain account liquidation that they don't
12   care about the blocks, so meaning the
13   volume.
14        So in this case the discounts
15   come from the fact of staked, which are
16   like locked tokens, staked Ether, for
17   example, staked Bitcoin.  They can be
18   staked in a third-party platform.  They can
19   be staked in the defi protocols.
20        There are different approaches.
21   But there is definitely a different
22   discount than the one applied for IRS
23   purposes.
24        Q.  Prior to this engagement, how
25   many times have you been engaged as an
```

```
 1         F. KONSTANTINIDIS - 02/27/2024
 2   expert witness?
 3        A.  You mean prior to this
 4   engagement?
 5        Q.  Prior to this engagement,
 6   correct.
 7        A.  In a court hearing or in general?
 8        Q.  You were retained -- well, you
 9   testified that you have not testified --
10        A.  Correct.
11        Q.  -- in court, right?
12        Have you submitted expert reports
13   to a court prior to this proceeding?
14        A.  Not to a court.
15        Q.  Have you submitted an expert
16   report to another judicial body such as an
17   arbitration?
18        MR. TOROSIAN:  Object to form.
19        THE WITNESS:  Yes.
20   BY MR. GLUECKSTEIN:
21        Q.  What context have you submitted
22   expert reports in arbitration?
23        A.  Can you rephrase what you mean by
24   "what context"?
25        Q.  Well, what have you -- you've
```



Page 30

```
1        F. KONSTANTINIDIS - 02/27/2024
2   submitted expert reports in arbitration
3   proceedings?
4        A.  Yes.
5        Q.  How many times?
6        A.  Just once.
7        Q.  What was the subject matter of
8   that expert report?
9        A.  Primarily sampling theory,
10  confidence intervals.  That was the
11  primary -- that was -- I was an expert for
12  confidence interval and sampling theory.
13       Q.  Did you testify in that case?
14       A.  I'm not sure if legal it's called
15  testimony, but, yes, I was -- I was there
16  in arbitration hearing in person with the
17  other expert.
18       Q.  And you were examined in front of
19  the arbitration panel?
20       A.  Correct.
21       Q.  And did that engagement have
22  anything to do with digital assets?
23       A.  No.
24       Q.  Do you recall when that -- when
25  that was?
```

Page 31

```
1        F. KONSTANTINIDIS - 02/27/2024
2        A.  Maybe a year and a half ago.  I
3   mean, I don't exactly remember, but...
4        Q.  How are you engaged in this
5   matter?
6        A.  A colleague of mine from Stout
7   told me about DLA Piper's sort of, like,
8   need for an expert to analyze and study the
9   opposing experts' report and value the
10  assets.
11       And then he put me in contact
12  with DLA Piper, and that's how I was
13  engaged.
14       Q.  And how did you become -- were
15  you separately engaged by Reed Smith on
16  behalf of those clients?
17       MR. ROSTOCKI:  Object to form.
18       THE WITNESS:  Again, through the
19       same colleague of mine, I was
20       separately engaged also with Reed
21       Smith.
22  BY MR. GLUECKSTEIN:
23       Q.  And so the engagements were --
24  each came to you through your colleague at
25  Stout?
```

Page 32

```
1        F. KONSTANTINIDIS - 02/27/2024
2        A.  Correct.
3        Q.  What was the scope of the
4   assignment that was given to you by
5   DLA Piper on behalf of its clients?
6        A.  It was to read, study and analyze
7   the opposing experts' reports and also
8   provide value for the portfolios.
9        Q.  When you say "provide value for
10  the portfolios," what are you referring to?
11       A.  I'm referring to valuing the
12  portfolios.
13       Q.  Portfolios of what?
14       A.  Of the two entities that I
15  represent.
16       Q.  With respect to -- a portfolio of
17  what?  Of their cryptocurrency holdings?
18       A.  Yes.  Of the digital assets.
19       Q.  Was that limited in some way to
20  specific digital assets?
21       A.  Well, in this case one of them
22  had Maps and Serum, and the other had Oxy
23  and Serum.
24       Q.  So you were -- you undertook to
25  value the holdings of the DLA clients in
```

Page 33

```
1        F. KONSTANTINIDIS - 02/27/2024
2   Maps, Oxy and Serum?
3        A.  Yes.
4        Q.  What was the scope of your
5   assignment in this matter by the -- when
6   you were retained by the Reed Smith
7   clients?
8        A.  It was, again, to study and
9   analyze the opposing experts' reports and
10  provide value for the portfolios of their
11  clients -- or their digital assets that
12  they hold.
13       Q.  Is it your understanding there's
14  any difference in scope of your assignment
15  between those two engagements?
16       A.  Well, primarily on the Reed Smith
17  it was mostly focused on the -- on the
18  valuation part.  That's evident in my
19  report.
20       And on the DLA Piper side, it was
21  also a little bit more on the studying and
22  analyzing the opposing experts' reports.
23       Q.  Were there any opinions in this
24  matter that either clients asked you to
25  give that you declined to provide?
```



```
 1          F. KONSTANTINIDIS - 02/27/2024
 2      A.  No.
 3      Q.  Had you worked with DLA Piper on
 4  any other engagements prior to this one?
 5      A.  No.
 6      Q.  Do I understand correctly from
 7  your report that you're being paid hourly
 8  for your services in connection with this
 9  litigation?
10      A.  Yes.
11      Q.  Are you receiving any additional
12  compensation or incentives beyond your
13  hourly rate?
14      A.  No.
15      Q.  Mr. Konstantinidis, have you done
16  any prior work with CoinMarketCap?
17      A.  Yes.
18      Q.  When have you worked with
19  CoinMarketCap?
20      A.  In all of this engagements I
21  described before, CoinMarketCap is the main
22  data aggregator that I'm using along with
23  the other two that I put in my report, Coin
24  Paprika and CoinGecko.
25      Q.  So in your work, you generally
```

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2  rely on data from CoinMarketCap; is that
 3  right?
 4      A.  It's one of the sources.
 5      Q.  Have you done any work with
 6  CoinMarketCap directly as a client?
 7      A.  No.
 8      Q.  How many -- approximately how
 9  many hours have you spent on this
10  engagement between the clients?
11      A.  That's an approximation, because
12  there's no way for me to remember.  But I
13  would say approximately 80 hours.
14      Q.  Do you have any sense of how many
15  hours the others on your team spent on this
16  engagement?
17      A.  Less than that definitely.
18      Q.  What is your understanding,
19  Mr. Konstantinidis, of what -- what the Oxy
20  token is?
21      A.  My understanding is that it is a
22  utility and governance token that it's --
23  it's used for specific fintech use cases
24  like borrowing.  And it's a native token
25  for the Oxygen protocol.
```

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2      Q.  What is the understanding -- what
 3  understanding do you have of what the
 4  Oxygen protocol is?
 5      A.  It provides the -- if you hold
 6  the network, that it has governance rules
 7  into it where the token lives.  It is
 8  pretty standard in cryptocurrencies that
 9  they have their own network where they
10  reside.
11      Q.  Are you aware of the current
12  status of the Oxygen protocol ecosystem?
13      A.  I wouldn't know the most recent
14  ones, because I didn't check it recently.
15  But it's still active, and it looks like it
16  still has a website and the native token is
17  still trading.
18      Q.  Beyond the native token still
19  trading, and the fact that they have a
20  website, do you have any information one
21  way or the other as to what the Oxygen
22  protocol ecosystem is currently doing, if
23  anything?
24      A.  I think I list that also in my
25  report about its objective.
```

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2      Q.  I'm sorry.  Where are you
 3  looking?
 4      A.  I'm looking at page 8.
 5      Q.  You're looking at paragraph 18 of
 6  your report --
 7      A.  Paragraph -- yes.
 8          MR. TOROSIAN:  Of Exhibit 1, just
 9  for clarification.
10          THE WITNESS:  Of Exhibit 1.
11  BY MR. GLUECKSTEIN:
12      Q.  In determination of -- you're
13  citing to what the -- what you state is the
14  main objective of the Oxygen protocol as
15  stated there in paragraph 18?
16      A.  That this is -- yeah, this is my
17  understanding of the Oxygen protocol, what
18  I have in my report.
19      Q.  And there's nothing in your
20  report about what the current status of the
21  Oxygen protocol ecosystem is today,
22  correct?
23      A.  No.  Because the scope was to
24  value everything as of the petition date.
25  Everything that happened after is
```



Page 38

1           F. KONSTANTINIDIS - 02/27/2024
2    irrelevant.
3         Q.   Did you -- did you assess what
4    the state of the Oxygen protocol ecosystem
5    was on the petition date?
6         A.   Yes.
7         Q.   What did you conclude?
8         A.   I conclude for the petition date
9    and time, it was still existent.  And the
10   Oxy token was still penetrating.
11        Q.   What is your understanding of
12   what -- I'm sorry -- I'm sorry.  Strike
13   that.
14             You described Oxy as a utility
15   token, correct?
16        A.   Correct.
17        Q.   What is your understanding of
18   what that means?
19        A.   It means that a cryptocurrency
20   doesn't have only -- only inherent value
21   based on supply and demand, but it also
22   serves certain purposes for the holders of
23   that token.
24        Q.   And so how is Oxy a utility token
25   in this case?

Page 39

1           F. KONSTANTINIDIS - 02/27/2024
2         A.   Well, in this case, just like I
3    state in my report, it gives certain
4    rewards, if you will, to the holders of the
5    token in trading, as in term liquidity,
6    as a passive yield.  It provides some kind
7    of an interest.
8             This is common to
9    cryptocurrencies to provide those rewards
10   for their holders.  And that's how they
11   become utility token.
12        Q.   And for those utility tokens
13   to -- for the holders of those utility
14   tokens to realize those benefits, the
15   Oxygen protocol would need to be
16   functioning, correct?
17             MR. ROSTOCKI:  Objection to form.
18             THE WITNESS:  Yes.  Unless there
19        is another venue where you can use that
20        token.  That's -- in many cases, tokens
21        are native to a protocol like this one,
22        but they can also be residing and
23        existing in other networks or they can
24        be used as well for certain rewards.
25   ///

Page 40

1           F. KONSTANTINIDIS - 02/27/2024
2    BY MR. GLUECKSTEIN:
3         Q.   Are you aware of the Oxy token
4    being used in any other networks or
5    protocols?
6         A.   I believe there was, based on the
7    news I checked, I believe there was some
8    kind of a relationship with a Maps token
9    that they were thinking of combining or
10   residing on the same networks.
11             But I'm not 100 percent sure
12   about other networks that was potentially
13   used.
14        Q.   And you're not aware of whether,
15   in fact, any combination of Maps and Oxy
16   ever happened?
17        A.   I'm not aware of that.
18        Q.   Do you agree that the Oxygen
19   protocol ecosystem was closely tied to FTX?
20             MR. ROSTOCKI:  Objection to form.
21             THE WITNESS:  What do you mean by
22        "closely tied"?
23   BY MR. GLUECKSTEIN:
24        Q.   Well, however you interpret it.
25   I mean -- let me restate it.

Page 41

1           F. KONSTANTINIDIS - 02/27/2024
2             Do you agree that the Oxygen
3    protocol ecosystem was developed closely
4    with FTX?
5             MR. TOROSIAN:  Objection to form.
6             THE WITNESS:  No, I don't know
7        that.
8    BY MR. GLUECKSTEIN:
9         Q.   You don't know that or you
10   disagree?
11        A.   I don't know that.  Not I
12   disagree; I do not know that.
13        Q.   Okay.  Are you familiar with the
14   concept that the fundamental value of a
15   token?
16        A.   I'm not aware of what that means,
17   the fundamental value.
18        Q.   You're not aware?
19        A.   I'm not aware of what exactly it
20   means, yes --
21        Q.   So you --
22        A.   -- valuation theory --
23        Q.   I'm sorry.
24             You don't have a view then on
25   what the -- on whether the Oxy token have

MAGNA
LEGAL SERVICES

Page 42

1          F. KONSTANTINIDIS - 02/27/2024
2    any fundamental value?
3              MR. TOROSIAN:  Object to form.
4              THE WITNESS:  Unless you define
5         what is fundamental value, it's not a
6         term that's used in traditional
7         valuation theory when you say
8         fundamental value of a cryptocurrency.
9    BY MR. GLUECKSTEIN:
10        Q.  Okay.  What is the Serum token?
11        A.  The Serum token, like I explain
12   in paragraph 19, was the most mature of the
13   three tokens.  That was a year before Maps
14   and Oxy.  And it was trading in more crypto
15   exchanges and it was both a governance and
16   a utility token.
17        Q.  And what's your understanding of
18   what a governance token is?
19        A.  The governance token means that
20   it's open to the holders that they decide
21   how to evolve.  And also the holders can
22   determine what is the future state and the
23   future strategy of that token, in what kind
24   of rewards, what kind of relationships,
25   what kind of contracts will take place.

Page 43

1          F. KONSTANTINIDIS - 02/27/2024
2        Q.  And similar to Oxy, to the extent
3    that Serum is a utility token of the Serum
4    exchange, its value would be derived from
5    its role on the Serum exchange itself,
6    correct?
7        A.  Yes.  But the Serum token had
8    more venues where it was trading and was
9    more mature than the other two tokens.
10       Q.  What do you mean by it had more
11   venues that it was trading?
12       A.  More cryptocurrency exchanges.
13       Q.  It was listed on more exchanges?
14       A.  Correct.
15       Q.  You were refer to -- you were
16   just referring to paragraph 19 of your
17   report, which is Exhibit 1, correct?  You
18   have that in front of you?
19       A.  Yes.
20             MR. TOROSIAN:  I think it was 18,
21        but -- I thought he was referring to --
22             (Simultaneous unreportable
23             crosstalk occurs among parties.)
24             THE WITNESS:  19.  19 for Serum.
25             MR. TOROSIAN:  I apologize.

Page 44

1          F. KONSTANTINIDIS - 02/27/2024
2    BY MR. GLUECKSTEIN:
3        Q.  You say towards the bottom of
4    that paragraph, "Serum was launched by the
5    Serum Foundation, a nonprofit organization
6    established by Alameda Research and FTX."
7             Do you see that?
8        A.  Yes.
9        Q.  So it is, in fact, your
10   understanding that Serum was -- the Serum
11   Foundation was established by Alameda and
12   FTX, correct?
13       A.  Yes.
14       Q.  Would you agree with me then that
15   the Serum exchange was closely tied to FTX
16   and Sam Bankman-Fried?
17             MR. TOROSIAN:  Object to form.
18             THE WITNESS:  I don't know about
19        Sam Bankman-Fried, but definitely with
20        FTX, because that's how it was created.
21   BY MR. GLUECKSTEIN:
22       Q.  And are you aware of Sam
23   Bankman-Fried's role as the founder and CEO
24   of FTX and Alameda?
25       A.  Are you asking me if the -- if he

Page 45

1          F. KONSTANTINIDIS - 02/27/2024
2    was the CEO of FTX?
3        Q.  What is your understanding of Sam
4    Bankman-Fried's role at FTX and Alameda?
5        A.  My understanding is that he was
6    the CEO of the company of FTX.
7        Q.  And do you have any understanding
8    one way or the other as to his involvement
9    in the Serum project?
10       A.  That one I don't know what kind
11   of involvement he had.
12       Q.  Have you ever heard the term "Sam
13   coins" used?
14       A.  I didn't know it before, but it
15   was in Professor Howell's rebuttal.
16       Q.  Prior to seeing that term in
17   Professor Howell's report, you had not
18   heard the term "Sam coins" used?
19       A.  I had not heard of it, no.
20       Q.  You testified a few moments ago
21   you're not familiar with and don't use the
22   term "fundamental value of tokens,"
23   correct?
24             MR. ROSTOCKI:  Objection to the
25        form.

MAGNA
LEGAL SERVICES

Page 46

1         F. KONSTANTINIDIS - 02/27/2024
2         THE WITNESS:  Yes.  So for my
3    engagements for cryptocurrency, the
4    scope is to value the tokens.  So I'm
5    not sure what the fundamental value
6    means in that context.
7    BY MR. GLUECKSTEIN:
8         Q.   When you say "value the tokens,"
9    how do you define -- when you say "value
10   the tokens," what do you mean?
11        A.   I mean what do they value for a
12   willing seller and a willing buyer.
13        Q.   As far as the price that you
14   could trade the token?
15        A.   Not necessarily trade, because it
16   may not be traded.  But the price that
17   someone is willing to pay to buy the token.
18        Q.   In your mind, is there any value
19   in a token that goes beyond the price that
20   a buyer and a seller would be willing to
21   pay and receive?
22        MR. TOROSIAN:  Object to form.
23        THE WITNESS:  What do you mean?
24   Can you give me an example?
25   ///

Page 47

1         F. KONSTANTINIDIS - 02/27/2024
2    BY MR. GLUECKSTEIN:
3         Q.   Is there any value beyond the
4    price -- let me strike that.
5         Your valuation of tokens is
6    establishing the price that a buyer and
7    seller would agree on for purposes of that
8    token, correct?
9         A.   Yes.  Or for IRS purposes,
10   what -- what are they valuing those tokens.
11        Q.   And you're not offering any other
12   valuation opinions with respect to the
13   tokens other than that price, as you define
14   it?
15        MR. TOROSIAN:  Object to form.
16        THE WITNESS:  What would be
17   another opinion?  I'm --
18   BY MR. GLUECKSTEIN:
19        Q.   I'm just asking.
20        A.   No, I understand.  But I'm giving
21   the value of the token.
22        Q.   Okay.  Mr. Konstantinidis, you --
23   your reports, you -- and you agree with the
24   debtors here that discounts to the petition
25   date spot pricing for Maps, Oxy and Serum

Page 48

1         F. KONSTANTINIDIS - 02/27/2024
2    need to be made, correct?
3         A.   Yes.
4         Q.   So you're not suggesting that
5    there's any basis to value any of Maps, Oxy
6    or Serum at the spot price on the petition
7    date, right?
8         A.   Correct.
9         Q.   So the claims that were submitted
10   by your clients in the debtors' bankruptcy
11   cases with amounts based on petition date
12   spot pricing are incorrect or
13   unsupportable, correct?
14        MR. ROSTOCKI:  Objection to form.
15        MR. TOROSIAN:  Object to form.
16        THE WITNESS:  I haven't read that
17   document.  But due to the volume of the
18   trading volume, you cannot use the spot
19   price as of the petition date for the
20   whole block.
21   BY MR. GLUECKSTEIN:
22        Q.   Sir, have you reviewed the motion
23   that was filed by the debtors to estimate
24   claims based on digital assets that we're
25   here talking about today?

Page 49

1         F. KONSTANTINIDIS - 02/27/2024
2         A.   Which motion are you referring
3    to?
4         Q.   Well, let's take a look at it.
5         (Whereupon, Exhibit 3, is marked
6         for identification.)
7    BY MR. GLUECKSTEIN:
8         Q.   Sir, you have in front of you
9    what is titled "Motion of Debtors to
10   Estimate Claims Based on Digital Assets."
11        Do you see that?
12        A.   Yes.
13        Q.   Have you ever reviewed this
14   document before?
15        A.   I may have looked at it, but I
16   don't remember the details.
17        Q.   Do you have an understanding of
18   what the debtors seek to do in this motion
19   for which you were retained to provide your
20   valuation?
21        MR. ROSTOCKI:  Objection to form.
22        THE WITNESS:  Not exactly,
23   because that was out of scope -- out of
24   the scope of what I did.
25   ///

1          F. KONSTANTINIDIS - 02/27/2024
2    BY MR. GLUECKSTEIN:
3          Q.  So you looked -- you just looked
4    at -- as you described it, you provided
5    critiques of the debtors' experts, and you
6    valued the tokens?
7              MR. ROSTOCKI:  Objection to form.
8              THE WITNESS:  That was the scope,
9          yes.
10   BY MR. GLUECKSTEIN:
11         Q.  Okay.  All right.  So you
12   didn't -- you didn't do anything else with
13   respect to consider what the debtors were
14   asking the Court to do in connection with
15   the opinion you were providing, correct?
16         A.  Yes.  I'm a valuation expert, so
17   I valued the portfolios.
18         Q.  You've described a few times as
19   you valued your clients' portfolio of Maps,
20   Oxy and Serum tokens, correct?
21             MR. ROSTOCKI:  Objection to form.
22             THE WITNESS:  Yeah.
23   BY MR. GLUECKSTEIN:
24         Q.  You did not value Maps, Oxy or
25   Serum with respect to any other customers

1          F. KONSTANTINIDIS - 02/27/2024
2    of FTX, correct?
3          A.  Correct.
4          Q.  And you're not anywhere offering
5    an opinion on the value of Maps, Oxy or
6    Serum as of the petition date that would be
7    applicable to other customers of FTX,
8    correct?
9          A.  Correct.
10         Q.  And your opinion, as reflected in
11   Exhibit 1, is that discounts to petition
12   date prices should be made for each of your
13   clients on a per-entity basis, correct?
14         A.  Yes.
15         Q.  All right.  And you say that
16   in -- if you look at paragraph 49 of your
17   report.
18         A.  Uh-huh.
19         Q.  In paragraph 49 you say, "The
20   result of this analysis as of the date of
21   this report and based on the foregoing
22   valuation methodology is that the
23   appropriate discounts on a per-entity basis
24   as of the petition date," and it goes on to
25   list price -- discounts there, correct?

1          F. KONSTANTINIDIS - 02/27/2024
2          A.  Yes.
3          Q.  And so consistent with that view
4    in paragraph 49 of your report, you apply a
5    different discount to the Serum held by
6    Maps Vault Ltd. than to the tokens held by
7    Oxygen Vault Ltd., correct?
8          A.  Correct.
9          Q.  And this is because under your
10   methodology, you calculate the asset -- you
11   calculate the discount based on the
12   holdings of Serum for each of those clients
13   individually, correct?
14         A.  Yes.
15         Q.  And so the result of applying
16   different discounts is that there would be
17   a different token value on the petition
18   date for each of your clients, correct?
19             MR. ROSTOCKI:  Objection to form.
20             THE WITNESS:  Yes.  But this is
21         normal for those valuations when in the
22         previous projects you asked me, a
23         client comes and they want me to value
24         the portfolio, I don't know what other
25         clients are holding for the same

1          F. KONSTANTINIDIS - 02/27/2024
2         assets.  So you treat the portfolio
3         isolated to everything else.
4    BY MR. GLUECKSTEIN:
5          Q.  I understand.  I'm just trying to
6    understand what you did.
7          A.  Uh-huh.
8          Q.  So what you did, you calculated a
9    discount based on the holdings of each
10   individual client, and that gets you to
11   potentially, as we see here, different
12   discounts for different clients, correct?
13         A.  Yes.
14         Q.  And so under your methodology, if
15   the debtors needed to calculate a discount
16   and a price for each of its customers, it
17   would need to do an individual analysis, as
18   you did here for each of your clients,
19   correct?
20         A.  Not for all the tokens.
21         Q.  But for these tokens.  I'm
22   talking about for these tokens.
23         A.  Yes.
24         Q.  Nowhere -- sir, nowhere in your
25   analysis reflected in Exhibit 1 or

MAGNA ●▷
LEGAL SERVICES

1        F. KONSTANTINIDIS - 02/27/2024
2    Exhibit 2 are you accounting for the
3    debtors' other holdings of Maps, Oxy or
4    Serum other than the claims of your
5    clients, correct?
6        A.   Yes.
7        Q.   Are you aware, sir, that more
8    than 95 percent of the maximum supply of
9    each of these tokens were in the possession
10   of FTX and Alameda on the petition date?
11       A.   This is a number that I believe
12   it was in Professor Howell's report.  I
13   just didn't see the data verified that.
14   But I wouldn't say yes or no just because I
15   didn't see proof of that.
16       Q.   So you don't know one way or the
17   other?
18       A.   I don't know for sure.
19       Q.   Does that sound plausible to you?
20       A.   I mean, if you had me to guess,
21   it would sound plausible.
22       Q.   In your view, though, those
23   holdings are not relevant to your analysis
24   in calculating the discount with respect to
25   the claims of your clients, right?

1        F. KONSTANTINIDIS - 02/27/2024
2        A.   But from that 95 percent, these
3    are gonna be the holdings --
4        Q.   Uh-huh.
5        A.   -- of the clients, because FTX
6    would be serving as a custodian, correct?
7        Q.   Are you suggesting that your
8    clients hold all of that 95 percent or have
9    claims to that 95 percent?
10       A.   I haven't seen any data about how
11   the tokens break down between my clients
12   and the remaining tokens that FTX holds.
13       What I'm suspecting is if you're
14   saying that FTX held 95 percent, some of
15   the holdings would belong to those entities
16   that I valued their tokens.
17       Q.   Do you have any sense of the
18   magnitude as to your clients' holdings as
19   compared to other holdings of FTX in Maps,
20   Oxy and Serum?
21           MR. TOROSIAN:  Object to form.
22           THE WITNESS:  Do you mean
23       separately or together all the
24       plaintiffs combined?
25   ///

1        F. KONSTANTINIDIS - 02/27/2024
2    BY MR. GLUECKSTEIN:
3        Q.   Plaintiffs meaning your clients.
4        A.   Yeah, meaning the four entities.
5        Q.   Yeah.  So we can put them --
6    either way is fine.  If you can put them
7    together, do you have a sense on a combined
8    basis the percentage of tokens that your
9    clients hold compared to the debtors?
10           MR. TOROSIAN:  Object to form.
11           MR. ROSTOCKI:  Object to form.
12           THE WITNESS:  It would be -- my
13       guess would be that the percentage
14       would be high for Maps and Oxy, but not
15       necessarily for Serum.
16   BY MR. GLUECKSTEIN:
17       Q.   And you say high for Maps and
18   Oxy.
19       So of the 95 percent of the
20   maximum supply held by the debtors, you're
21   suggesting that there would be a high
22   percentage of that that was held by your
23   clients?
24           MR. TOROSIAN:  Object to form.
25           THE WITNESS:  I haven't seen the

1        F. KONSTANTINIDIS - 02/27/2024
2    data, but that's what I'm guessing.
3    BY MR. GLUECKSTEIN:
4        Q.   And whatever the percentage is
5    beyond your client's share of that
6    95 percent, you did not take that into
7    account in calculating your discounts,
8    correct?
9        A.   Correct.
10       Q.   In your analysis, what, if
11   anything, do you assume will happen to the
12   debtors' remaining holdings of Maps and Oxy
13   beyond the tokens that are claimed by your
14   clients?
15       A.   What do you mean what will
16   happen?
17       Q.   What will the debtors do with
18   those tokens?
19           MR. TOROSIAN:  Object to form.
20           THE WITNESS:  That was outside
21       the scope.  What I did was value the
22       tokens.
23   BY MR. GLUECKSTEIN:
24       Q.   And so you didn't take into
25   account, though, whether the debtors needed

1        F. KONSTANTINIDIS - 02/27/2024
2   to sell their tokens at the time your
3   client was selling its tokens, correct?
4        A.  Correct.  Per your -- one of the
5   first questions you asked, for me
6   determining the way that the liquidation
7   will take place is outside the scope of
8   what I provided.
9        Q.  But from a valuation perspective,
10  you don't think it's relevant that the
11  debtors will be selling a significant
12  number of tokens at the same time that your
13  clients are selling tokens; is that right?
14       MR. TOROSIAN:  Object to form.
15       THE WITNESS:  It's not relevant.
16  For example, in the Celsius bankruptcy,
17  they did a different way or at least on
18  the plans was a different structure of
19  liquidation to protect the smaller
20  creditors.
21       Based on your plan, if you sell
22  everything they have, as an investor
23  that holds a thousand tokens, an
24  investor that holds a million tokens
25  would have the same discount, so it's

1        F. KONSTANTINIDIS - 02/27/2024
2   not fair.
3   BY MR. GLUECKSTEIN:
4        Q.  Okay.  So aside from fairness,
5   would -- from an economic perspective, from
6   your methodology you're saying that if the
7   debtors sold its tokens, it has no effect
8   on the discount that you're -- that would
9   be appropriate to apply to your clients'
10  tokens?
11       MR. TOROSIAN:  Object to form.
12       MR. ROSTOCKI:  Object to form.
13       THE WITNESS:  It does not have an
14  effect, because I would need to know
15  the specifics of the liquidation, which
16  markets, potentially the decentralized
17  exchanges.  Based on my knowledge as of
18  right now, it wouldn't have an effect.
19  BY MR. GLUECKSTEIN:
20       Q.  And did you do anything to obtain
21  an understanding of what the debtors intend
22  to do with those tokens as far as a
23  liquidation strategy?
24       A.  Why would that -- that wouldn't
25  affect my valuation.  That's completely

1        F. KONSTANTINIDIS - 02/27/2024
2   irrelevant, how the debtors will decide how
3   to do the liquidation.
4        Q.  So if the debtors were to sell a
5   billion Maps tokens on the same day as your
6   clients, that has no impact on your
7   discount analysis?
8        MR. TOROSIAN:  Object to form.
9        THE WITNESS:  But this is outside
10  the scope of what I did.  Because the
11  debtors can also hold some of the
12  tokens.  They can have a completely
13  different strategy.  I think you asked
14  me about strategies before, and that
15  was outside the scope of what I did.
16  BY MR. GLUECKSTEIN:
17       Q.  Okay.  Again, sir, I'm just
18  trying to understand.
19       So if you're -- so your testimony
20  is that your methodology is unaffected by
21  whether your clients are the only seller in
22  the market or whether the debtors are
23  selling a billion tokens at the same time?
24       MR. TOROSIAN:  Object to form.
25       MR. ROSTOCKI:  Object to form.

1        F. KONSTANTINIDIS - 02/27/2024
2        THE WITNESS:  My opinion is that
3   I valued the tokens as of the petition
4   date and time, as an individual
5   portfolio, which is the standard
6   methodology especially for IRS
7   purposes, without taking account of
8   anything else that I do not control.
9   BY MR. GLUECKSTEIN:
10       Q.  Okay.  When you say standard
11  methodology, are you talking in the context
12  of an IRS valuation?
13       A.  An IRS valuation or any
14  valuation, when I have a project that
15  somebody gives me a portfolio of digital
16  assets, that's what I value.
17       Q.  You spoke a moment ago, you used
18  the term it would not -- you used the term
19  "fair."
20       If the debtors Maps and Oxy is
21  liquidated at a greater discount than you
22  calculate for your clients, how do you
23  understand customer claims based on those
24  tokens that would be paid?
25       A.  What do you mean if a debtors had

1        F. KONSTANTINIDIS - 02/27/2024
2    a higher discount from what I had
3    individually for tokens or per portfolio?
4        Q.  So you have valued the portfolio,
5    as you put it, of your clients' tokens,
6    correct?
7        A.  Uh-huh.  Correct.
8        Q.  If the debtors liquidate the
9    entirety of their Maps and Oxy holdings and
10   have to do so at a larger discount than you
11   are opining, in your view, who should bear
12   the cost of that shortfall?
13       MR. ROSTOCKI:  Objection to form.
14       MR. TOROSIAN:  Object to form.
15       THE WITNESS:  There is no way to
16   know if the discount would be more or
17   less.  I actually provided data from
18   cryptocurrencies when large holdings
19   are sold into the market, and sometimes
20   the price can go up.
21       So that is something that in real
22   life may not happen this way.  It's a
23   hypothetical.  And these are
24   cryptocurrencies.
25   ///

1        F. KONSTANTINIDIS - 02/27/2024
2    BY MR. GLUECKSTEIN:
3        Q.  I think you agree with me, sir,
4    that a large block of tokens cannot be
5    liquidated as quickly as a few tokens,
6    correct?
7        A.  Yes.
8        Q.  If you could look at Exhibit --
9    look back again at Exhibit 1, which is your
10   report.  Paragraph 41, sir, which is on
11   page 21.
12       A.  Uh-huh.
13       Q.  I'm sorry.  42.
14       A.  Yeah.
15       Q.  What are you describing in
16   paragraph 42 of your report?
17       A.  I'm basically describing the
18   widely accepted assumption that I have that
19   selling a block up to 10 percent of daily
20   trading volume, one, would not affect the
21   price.
22       Q.  So it is your opinion that
23   selling up to 10 percent of daily trading
24   volume of Maps, Oxy and Serum could be done
25   each day without any affect on market

1        F. KONSTANTINIDIS - 02/27/2024
2    price?
3        A.  Yes.  And this is not only my
4    opinion.  This is a well-established
5    percentage that's used in -- for tax
6    purposes for large estates, not only by
7    Stout, but by other reputable valuation
8    firms.
9        And it has also been listed in
10   the KO 2023 paper that does say that it's a
11   reasonable assumption for individual stocks
12   between 5 percent and 10 percent of daily
13   trading volume without changing the price.
14       Q.  Okay.  So you're familiar --
15   you're familiar with the 2023 KO paper?
16       A.  Yes.
17       Q.  Are you aware that in that paper,
18   the authors state that even in highly
19   liquidity markets, and even if quantities
20   are traded -- quantities traded are
21   restricted to 5 to 10 percent of daily
22   volume, execution of large bets may lead to
23   significant price changes?
24       A.  I don't remember the context, but
25   they talk about large bets, which is

1        F. KONSTANTINIDIS - 02/27/2024
2    different than transactions or blocks.
3        Q.  Okay.  Well, let's take a look at
4    that.
5        (Whereupon, Exhibit 4, is marked
6    for identification.)
7    BY MR. GLUECKSTEIN:
8        Q.  So you refer to this -- is this
9    the article that you were referring to in
10   answer to your prior question about the --
11   your 10 percent being accepted by Kyle and
12   Obizhaeva?
13       A.  Yes.  It's one of my reference,
14   but the most important is that this is an
15   established percentage in the -- for the
16   IRS purposes that we're using for
17   valuation.  That was my first reference.
18       Q.  Right.  Can you -- so let's --
19   let's go there first.
20       So can you explain what you mean
21   by an established -- an established
22   valuation for IRS purposes?
23       A.  What I mean is that the
24   assumption that the 10 percent wouldn't
25   depress price for a long periods of times

MAGNA ▶
LEGAL SERVICES

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2  is used by Stout and other valuation firms
 3  based on individual traders, with market
 4  makers, with investment bankers.
 5        And in Stout, our practice has
 6  about 200 valuation reports to IRS on a --
 7  on an annual basis.  And that's one of the
 8  assumptions we used.
 9        And the tax court never contested
10  or audited that assumption, so it's a
11  well-established assumption among valuation
12  practitioners.
13        Q.  And, in your opinion, that
14  10 percent applies across the board to all
15  cryptocurrencies?
16        A.  Applies across the board to
17  assets also, to all assets.
18        Q.  All assets?
19        A.  All assets that we use.
20        Q.  It includes -- so any market for
21  any asset, you could sell 10 percent into
22  the market without any price affect?
23        A.  Well, it depends.  It depends on
24  the market.  It depends on many
25  characteristics.  But it's a very
```

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2  reasonable assumption for -- for most
 3  markets.
 4        I don't want to be absolute, but
 5  definitely like I said before for
 6  cryptocurrency markets, we used it, and
 7  there was no contention or any issues with
 8  the assumptions.  It's not the first time
 9  that I used that assumption.
10        Q.  And that -- and you're saying
11  there was no issue with using that
12  assumption in submissions to the Internal
13  Revenue Service?
14        A.  Correct.
15        Q.  Have you used that 10 percent
16  assumption outside of the context of
17  submissions to the IRS?
18        A.  Well for financial reporting,
19  like I said before, the volume is not
20  something you take into account.  So
21  primarily you're using it for tax purposes.
22        Q.  All right.  So the document
23  that's -- that was marked as Exhibit 4,
24  this is the 2023 K&O paper that you said
25  you were familiar with, sir?
```

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2        A.  Yes.
 3        Q.  You've reviewed this previously?
 4        A.  Yes.
 5        Q.  Okay.  If you turn to page 2192,
 6  which is part of the conclusions section,
 7  which starts on page 2191.
 8        A.  Uh-huh.
 9        Q.  On the top of page 2192 --
10        A.  Uh-huh.
11        Q.  -- has the language I referred to
12  as part of their conclusions that, quote,
13  "Even in a highly liquid markets and even
14  if quantities traded or restricted to 5 or
15  10 percent of daily volume, execution of
16  large bets may lead to significant price
17  changes," end quote.
18        Do you see that?
19        A.  Yes.
20        Q.  Do you disagree with that
21  conclusion?
22        A.  Well, they say "may lead."
23        Q.  Uh-huh.
24        A.  And also they provide tables.  In
25  this paper they try to -- and the other
```

```
 1        F. KONSTANTINIDIS - 02/27/2024
 2  thing is they talk about bets, large bets,
 3  which may combine more than one
 4  transactions.  In most cases they do.
 5        And, secondly, in the tables
 6  where they understand the six market
 7  crashes, they do admit that their
 8  predictions are not accurate per the
 9  declines that happen in market crashes.
10        Thirdly, they're understanding
11  how certain large bets may create market
12  crashes or not.  That was the purpose of
13  the paper --
14        Q.  Uh-huh.
15        A.  -- which is completely different
16  from what I'm doing.
17        And they also at the end of that
18  paper on page 20 -- 2001 [sic], they talk
19  about their inability to identify the crash
20  based on the Soros trades and flash cross
21  trades that they did not, as they expected,
22  created market crashes.
23        So it's not an absolute, their
24  statement, because there's the other
25  statement somewhere else on the paper about
```

Page 70

```
1           F. KONSTANTINIDIS - 02/27/2024
2    the 5 to 10 percent that I'm trying to find
3    that -- for individual stocks, that it
4    doesn't affect the market price.
5        Q.  But you would agree --
6           MR. TOROSIAN:  Take your time.
7           THE WITNESS:  Yeah.
8    BY MR. GLUECKSTEIN:
9        Q.  -- sir, that it is possible that
10   even if quantities traded are restricted to
11   5 or 10 percent of daily volumes, there
12   could be an affect on price change?
13          MR. TOROSIAN:  Object to form.
14          THE WITNESS:  No.  I disagree.
15   This is an assumption I use and other
16   competitors of us are using in the
17   valuation reports, so this is a valid
18   assumption.
19   BY MR. GLUECKSTEIN:
20       Q.  Okay.  So you disagree with this
21   conclusion, which is one of multiple
22   conclusions, but then you disagree with
23   this conclusion that's set forth in the
24   2023 K&O report?
25          MR. ROSTOCKI:  Objection to form.
```

Page 71

```
1           F. KONSTANTINIDIS - 02/27/2024
2           MR. TOROSIAN:  Objection to form.
3           THE WITNESS:  I disagree, because
4    in this paper they're not valuing
5    assets, and they're trying to
6    understand market crashes.  So it's a
7    completely different scope of what I
8    did.
9    BY MR. GLUECKSTEIN:
10       Q.  In terms of the purpose of the
11   report is different, in your view?
12       A.  But also the analysis they
13   provide.  They also do not see
14   transactions.  They see bets.
15       Q.  Okay.  And how do you see that as
16   transaction versus bets leading to a
17   different outcome?
18       A.  Well, because bets are
19   constructed differently.  There may be a
20   number of transactions altogether combined
21   that it has a completely different modeling
22   that they're trying to put into the market
23   to understand pricing impact.
24       Q.  You said that the 10 percent is a
25   reasonable assumption.  Did you perform any
```

Page 72

```
1           F. KONSTANTINIDIS - 02/27/2024
2    analysis to support that assumption for
3    purposes of this opinion?
4        A.  I think I provided some
5    cryptocurrency data that they show large
6    trades, and we also -- I also did the
7    analysis for the traditional stock market
8    for the second -- secondary offerings.
9           But this is, again, an
10   established percentage that practitioners
11   are using.  This is based on real-world
12   data and interviews and decades of
13   experience.
14       Q.  Do you cite anywhere in your
15   report any other practitioners or citations
16   in the literature that agree that the
17   10 percent is a reasonable assumption
18   across the board?
19       A.  I don't have any citations of the
20   report.
21       Q.  In your view, with respect to the
22   market for Maps, Oxy and Serum, could there
23   be some price impact above zero at the
24   10 percent trading level?
25       A.  No.
```

Page 73

```
1           F. KONSTANTINIDIS - 02/27/2024
2        Q.  What level of volume increase
3    would you expect a result -- to result in a
4    nonzero price impact for Maps?
5        A.  Well, my assumption is
6    10 percent.  So anything over 10 percent
7    will potentially have a price impact.
8        Q.  So at 10.1 percent we might see a
9    price impact?
10       A.  Yeah, I would say, on average,
11   based on my assumption everything over
12   10 percent, although it's still
13   conservative, may potentially have a price
14   impact.
15       Q.  And because you're using the
16   10 percent as a fixed assumption, that
17   would be the same for Oxy and Serum as
18   well?
19       A.  Yes.
20       Q.  Your blockage discount method
21   assumes there will be block trading every
22   single day in Maps and Oxy for four to five
23   years depending on the token, correct?
24       A.  Yes.
25       Q.  And do you account for
```



1          F. KONSTANTINIDIS - 02/27/2024
2    anywhere -- do you account anywhere for
3    market expectations of these ongoing block
4    trading day after day?
5          MR. ROSTOCKI:  Objection to form.
6          THE WITNESS:  No.
7    BY MR. GLUECKSTEIN:
8       Q.  Do you think that the market at
9    some point would recognize that there was
10   block trading happening at this volume
11   every day and adjust over time?
12      A.  The cryptocurrency market is
13   difficult to understand.  So by selling,
14   you create liquidity.  So also the price
15   can go up.  There are other factors outside
16   of what you control.
17          So you don't really know if it
18   will go up or down.  But, again, this is an
19   assumption that has been used and approved.
20   And I'm following just a well-known path
21   for valuation practitioners.
22      Q.  Okay.  And when you say that this
23   10 percent is well established by valuation
24   practitioners, what is the basis for that
25   statement other than your experience with

1          F. KONSTANTINIDIS - 02/27/2024
2    the IRS?
3          MR. TOROSIAN:  Object to form.
4          THE WITNESS:  It is other
5    competitors of Stout's are using it.
6    Some of the reports are public, and
7    they were made in the U.S. tax court
8    about the 10 percent.
9    BY MR. GLUECKSTEIN:
10      Q.  Do you cite any of those in your
11   opinion?
12      A.  I don't cite them, no.
13      Q.  The 10 percent assumption applies
14   to each of your clients individually,
15   correct?
16      A.  Correct.
17      Q.  Okay.  So it's a 10 percent -- is
18   it a 10 percent increase in the overall
19   market for Maps, or is it that your -- each
20   of your clients could sell 10 percent per
21   day?
22          MR. TOROSIAN:  Object to form.
23          THE WITNESS:  It's each client.
24   BY MR. GLUECKSTEIN:
25      Q.  Each of the clients?

1          F. KONSTANTINIDIS - 02/27/2024
2       A.  (No audible response.)
3       Q.  So each of the clients could sell
4    10 percent into the market each day and not
5    have any -- your assumption is not have any
6    effect on price, correct?
7       A.  Correct.
8       Q.  So your three clients would be
9    selling 10 percent each, 30 percent of
10   their holdings each day, correct?
11          MR. TOROSIAN:  Object to form.
12          THE WITNESS:  For which you're
13   talking?
14   BY MR. GLUECKSTEIN:
15      Q.  Let's -- for Maps.
16      A.  So what is the percentage you
17   said?
18      Q.  Well, you're saying each client
19   who holds a token could sell 10 percent
20   into the market each day without any effect
21   on price, correct?
22          MR. TOROSIAN:  Object to form.
23          THE WITNESS:  Yes.
24   BY MR. GLUECKSTEIN:
25      Q.  And if you had 50 clients, they

1          F. KONSTANTINIDIS - 02/27/2024
2    could each sell 10 percent under your
3    methodology, correct?
4       A.  Correct.  But, again, you see the
5    portfolio's isolated, and that's what you
6    do for normal projects.  There's no way to
7    investigate if somebody comes and have
8    large amounts of cryptocurrency, what
9    others are holding.
10          So that's the methodology.  This
11   is a special case that I happen to be the
12   valuation expert for those entities.  But
13   in most of the cases, I do not know what
14   others are holding.  And every portfolio is
15   treated differently.
16          MR. GLUECKSTEIN:  Why don't we
17   take a 5-minute break.
18          MR. TOROSIAN:  Yeah, sure.
19          THE STENOGRAPHER:  Off the
20   record.
21          (Whereupon, a recess was taken at
22   10:21 a.m.)
23          MR. GLUECKSTEIN:  Back on the
24   record.
25   ///

MAGNA
LEGAL SERVICES

Page 78

```
1           F. KONSTANTINIDIS - 02/27/2024
2   BY MR. GLUECKSTEIN:
3       Q.  Now, Mr. Konstantinidis, can you
4   go back to Exhibit 1, which is your report.
5   We were looking earlier at paragraph 49.
6           We discussed -- you set out in 49
7   a discount rate for the tokens held by each
8   of the DLA clients there, correct?
9       A.  Yes.
10      Q.  And in paragraph 50, then you
11  calculate a value of those tokens based on
12  the adjusted discounted price, correct?
13      A.  Yes.
14      Q.  Okay.  And you testified this
15  morning that you evaluated -- you valued
16  each of the clients' portfolios of tokens
17  as they used it, correct?  That's the term
18  you used?
19      A.  Yes.  That's the term I used,
20  meaning things they had.
21      Q.  So did you calculate that -- in
22  this report here, did you calculate -- do
23  you consider the Maps Vault Ltd. holdings
24  to be one portfolio and Oxygen Vault Ltd. a
25  second portfolio?
```

Page 79

```
1           F. KONSTANTINIDIS - 02/27/2024
2       A.  Yes.
3       Q.  And then, so, similarly in the
4   report in Exhibit Number 2 with respect to
5   other clients, paragraph 24, the holdings
6   of Foundation Elements would be a third
7   portfolio?
8       A.  Yes.
9       Q.  And then Foundation Serendipity a
10  fourth portfolio, correct?
11      A.  Yes.
12      Q.  So for purposes of your opinions
13  here, you valued, in your parlance, four
14  portfolios of tokens; is that correct?
15      A.  Yes.
16      Q.  Did you value any other
17  portfolios of tokens?
18      A.  No.
19      Q.  Sorry to jump back, sir, but if
20  you could go back to Exhibit 1, which is
21  your report on behalf of the DLA clients.
22          Do you have that, sir?
23      A.  Uh-huh.
24      Q.  If you could look at paragraph 33
25  of your report.
```

Page 80

```
1           F. KONSTANTINIDIS - 02/27/2024
2       A.  Uh-huh.
3       Q.  You state in the middle of
4   paragraph 33, quote, "Large amounts of
5   Maps, Oxy and Serum can be absorbed into
6   the cryptocurrency market, and there is no
7   reason to require a slow trading strategy,"
8   end quote.
9           Do you see that in the middle --
10      A.  Yes.
11      Q.  Yeah.  What do you mean by "large
12  amounts" there in paragraph 33?
13      A.  I mean more than 10, 15 percent
14  of daily trading volume.
15      Q.  And when you say "can be absorbed
16  into the cryptocurrency market," do you
17  mean can be absorbed without a price
18  impact?
19      A.  No.  I mean they can be sold.
20  They can be absorbed.  They will not crash
21  the market.
22      Q.  They will not crash the market.
23          So it's your opinion that large
24  amounts, 10 to 15 percent, in your words,
25  of these at-issue tokens can be absorbed
```

Page 81

```
1           F. KONSTANTINIDIS - 02/27/2024
2   into the market where there are buyers for
3   those tokens?
4       A.  My apologies.  Let me -- more
5   than 10 percent.
6       Q.  More than --
7       A.  Because obviously my opinion is
8   up to 10 percent it won't depress the
9   value.
10          So here I show six transactions
11  that they are over 10 percent that the
12  market can absorb without crashing.
13      Q.  Okay.  So we'll get to the six in
14  a moment.
15          But your statement specifically
16  about Maps, Oxy and Serum, so it's your
17  testimony that in excess of 10 percent can
18  be absorbed into the market on a daily
19  basis without crashing the market?
20      A.  I'm not making the claim about
21  daily basis.  The data show individual
22  large tokens sold in the market.
23      Q.  So it's just your general view
24  that large amounts in excess of 10 percent
25  of these three tokens can be absorbed into
```



Page 82

```
1         F. KONSTANTINIDIS - 02/27/2024
2    the market, meaning if you sold them, there
3    would be a buyer?
4         A.  Yes.  But it's not only my view.
5    I provided the data to support.
6         Q.  And so the support for that
7    statement are the examples that you list
8    below in A through F?
9         A.  Yes.  These are some examples.
10   But, in general, based on my professional
11   judgment, that has happened in the past
12   with other crypto tokens.
13        Q.  Okay.  And you cite six examples
14   in your report.
15           Do you provide any other -- do
16   you provide any other evidence of that view
17   other than these six examples in
18   paragraph 33?
19        A.  I haven't provided any other
20   examples, but also I'm relying on my
21   experience with a cryptocurrency market
22   where I have seen large trades do take
23   place without destroying the market.
24        Q.  Okay.  If you could turn to
25   paragraph -- I'm sorry.  Before we do that.
```

Page 83

```
1         F. KONSTANTINIDIS - 02/27/2024
2           So the six tokens that are listed
3    in paragraph 33, how did you identify those
4    tokens?
5         A.  I did not identify the tokens.  I
6    was looking for large transactions.  This
7    is a random sample.  I didn't pick them.
8         Q.  This is a random sample of large
9    transactions.
10          So there are others that you
11   reviewed, other large transactions that you
12   reviewed?
13        A.  These are the ones that I found
14   readily, because it's not -- it's time
15   consuming to mine the blockchain.
16        Q.  For these six examples that you
17   list in paragraph 33, did you track what
18   happened to the price over a longer period
19   of time following these block trades?
20        A.  Over a long period of time
21   meaning?
22        Q.  Well, you present here in
23   paragraph 33, and you state the volume of
24   the trade and then you say what happened to
25   the price on the following day --
```

Page 84

```
1         F. KONSTANTINIDIS - 02/27/2024
2         A.  Uh-huh.
3         Q.  -- do you see that?
4         A.  Yes.
5         Q.  Did you -- did you track what
6    happened to the price of these six tokens
7    in the six months following the block
8    trade?
9         A.  No, I didn't.
10        Q.  Did you look at the effect of the
11   price of this -- of these tokens at any
12   point other than the one following day to
13   assess the impact of the block trade?
14        A.  Not that I recall.  We may -- I
15   may have done, you know, some review of the
16   data, but not that I recall.
17        Q.  All right.  If we could turn now
18   to paragraph 46 of Exhibit 1.
19           Can you explain to me what you're
20   presenting in paragraph 46 of Exhibit 1 of
21   your report?
22        A.  Yes.  For the blockers discount
23   method, I did not want to assume an
24   unrealistic assumption of constant value
25   going forward, so I -- what I did was I
```

Page 85

```
1         F. KONSTANTINIDIS - 02/27/2024
2    used a CoinMarketCap API, and I used the
3    criterion of the volume, the dollarized
4    volume in USD to be between 1 million and
5    30 million, which are relatively successful
6    tokens.
7           And I found the average volume
8    for the five years of their existence, and
9    I applied that volume profile to Maps, Oxy,
10   Serum.
11        Q.  Okay.  And how did you select
12   those 20 cryptocurrencies?
13        A.  The one selection was the daily
14   volume as of the day that I -- around the
15   API.  So as of, let's say mid-January, that
16   was their daily trading volume.
17           And then I sorted them based on
18   market cap.  And that's how I chose them.
19        Q.  And you said that the data that
20   you sourced for this information was from
21   CoinMarketCap?
22        A.  Correct.
23        Q.  Did you analyze whether any of
24   the 20 cryptocurrencies that are listed in
25   Footnote 67 --
```



1      F. KONSTANTINIDIS - 02/27/2024
2      A.   Uh-huh.
3      Q.   -- had any ties to FTX or
4   Alameda?
5      A.   No.  Because the whole point was
6   to understand cryptocurrencies outside the
7   holdings to understand their volume growth.
8      Q.   Did you analyze whether any of
9   the 20 tokens listed in Footnote 67 --
10     A.   Uh-huh.
11     Q.   -- experienced any market
12  distress the way that Maps, Oxy and Serum
13  did due to the collapse of FTX?
14     A.   You mean -- can you clarify?  You
15  mean before the petition date or after the
16  petition date.
17     Q.   Yeah.  Before petition date.  So
18  at the time that you were looking at --
19  well, let's -- let me step back on that.
20       So the volume trends that you're
21  presenting in paragraph 46, are those --
22  are those trends that occurred before or
23  after the petition date?
24     A.   There were some before and some
25  after.  The criterion was five years of

1      F. KONSTANTINIDIS - 02/27/2024
2   existence of those tokens.
3      Q.   So that could -- that could --
4   that could have spanned before or after the
5   petition date; it was five years of
6   existence from the time you did your
7   analysis?
8      A.   Correct.  This is why I don't
9   need to be having FTX holdings, because I
10  wanted to be independent of the bankruptcy.
11     Q.   But did you assess in any way
12  whether those crypto -- those 20
13  cryptocurrencies had their own significant
14  market-affecting events?
15       MR. ROSTOCKI:  Objection to form.
16       THE WITNESS:  Well, it's
17  difficult to understand cause or
18  relationship in the crypto market.
19  Obviously there were major events
20  before the FTX bankruptcy.
21       And it's difficult to demean or
22  take the mean out or count all the
23  events, because it's impossible to do
24  in contingencies.
25       So I did review their volume, and

1      F. KONSTANTINIDIS - 02/27/2024
2   based on my professional judgment, it
3   didn't seem like they -- they were
4   affected by major events.
5   BY MR. GLUECKSTEIN:
6      Q.   But you didn't do any analysis on
7   a token-by-token base into the qualitative
8   events that might have been at issue for
9   those tokens?
10       MR. TOROSIAN:  Object to form.
11       THE WITNESS:  No, I did go and
12  review the volume.  And before the FTX
13  event, there was the Celsius event.
14  Before that, there was the Luna event.
15       So there were a number of events,
16  obviously major articles.  I prefer to
17  get the data as is versus applying
18  subjective criteria to demean the
19  volume.  Unless there is something that
20  I definitely considered to be affecting
21  that.  But that wasn't the case.
22  BY MR. GLUECKSTEIN:
23     Q.   And then how did you -- how did
24  you apply the volume trends that you
25  learned from that analysis to Maps, Oxy and

1      F. KONSTANTINIDIS - 02/27/2024
2   Serum for purposes of your report here?
3      A.   So I aligned, since their --
4   since their existence, I aligned those five
5   years of existence for those tokens from
6   Maps, Oxy, Serum.  Calendar years.  So Maps
7   and Oxy had a prior year in existence, so I
8   started year two.
9       And for Serum was two years in
10  existence, so I start the volume profile at
11  profile -- at year three.
12     Q.   Did you use an average of the 20
13  cryptocurrencies in terms of the volume
14  numbers?
15     A.   Yes.
16     Q.   Did you calculate a median of
17  those numbers at any point in your
18  analysis?
19     A.   I had a median just to review, so
20  I did calculate a median as well.
21     Q.   And do you recall whether the
22  median was higher or lower than the
23  average?
24     A.   The median was lower.
25     Q.   Was it significantly lower?



1       F. KONSTANTINIDIS - 02/27/2024
2       A.  The median for the first year,
3   the average was 850 percent, and the median
4   was around 150 percent.
5       Q.  150 percent?
6       A.  Yes.
7       Q.  Nonetheless, you thought that the
8   average was the more appropriate number to
9   base the projected growth for purposes of
10  the three at-issue tokens here?
11      A.  I felt it was the average better
12  represents your data.  I did not feel that
13  I had bad data, meaning data that I had to
14  take out.
15          And the median does -- does not
16  take out, you know, certain tokens, and I
17  did want to include everything.  I mean,
18  which is the same thing, for example, that
19  in Professor Howell's report, she is
20  calculating average volume from different
21  cryptocurrency markets.  She does not
22  calculate the median.  She takes the
23  average.  For volume, the average is more
24  representative than the median.
25      Q.  And do you agree with

1       F. KONSTANTINIDIS - 02/27/2024
2   Professor Howell's calculation that the
3   trading volumes of both Maps and Oxy would
4   increase by over 850 percent and Serum by
5   more than 20 percent based on your
6   projections?
7       A.  Yes.
8       Q.  And you think that the 850 --
9   based on your analysis of these 20
10  cryptocurrency value trends, you believe
11  that the 850 percent is a reasonable
12  projection?
13          MR. ROSTOCKI:  Objection to form.
14          THE WITNESS:  Yes, I believe it's
15  a reasonable projection.  Because I
16  also reviewed other tokens to find out
17  is it a real number.  Did other tokens
18  have a similar growth between the
19  estimation period that Professor Howell
20  has before the year before the petition
21  date and one year after.
22          And it seems that over -- more
23  than 20 cryptocurrencies that did have
24  significant growths over 850 percent,
25  you know, in the 5,000 percent range

1       F. KONSTANTINIDIS - 02/27/2024
2   and even more.
3          So it did seem like this is --
4   this is reasonable.  This is a
5   reasonable growth rate.
6   BY MR. GLUECKSTEIN:
7       Q.  From the 20 cryptocurrencies on
8   which you base your value and projections,
9   are you aware of any examples in your data
10  in which -- in which significant large
11  trades, 10 percent per day or more, were
12  observed?
13      A.  No.  I haven't -- I haven't done
14  this analysis.
15      Q.  If the volume growth rates are
16  slower than you assume, the liquidation of
17  the three at-issue tokens would take
18  longer, correct?
19      A.  Yes.
20      Q.  Potentially much longer?
21      A.  Well, "much" depends on what is
22  the growth rate that you're assuming.
23      Q.  So if you had a -- you know, if
24  you had a significantly lower growth rate,
25  it could take decades to liquidate these

1       F. KONSTANTINIDIS - 02/27/2024
2   tokens at these volumes, correct?
3       A.  When you say "significantly
4   lower," what number range are you talking
5   about for the growth rate?
6       Q.  Let's say -- well, if you did the
7   calculation to see how long it would take
8   to liquidate these -- these tokens at the
9   median level of I think you said
10  150 percent?
11      A.  I did not do the calculation.
12      Q.  Do you have any sense as to at
13  150 percent growth rate, how long it would
14  take to liquidate these tokens versus your
15  850 percent projection?
16      A.  It's a guess, obviously.  So
17  right now for the 850 percent, it takes 4
18  to 5 years, 4.8 to 5.1 depending on the
19  token in the portfolio.
20          If you go from 850, you said what
21  is the range?  100 percent --
22      Q.  You said early --
23          (Simultaneous unreportable
24          crosstalk occurs among parties.)
25  ///

Page 94

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2        (Stenographer requests one
 3          speaker at a time.)
 4   BY MR. GLUECKSTEIN:
 5        Q.  If you used the 150 percent
 6   median calculation --
 7        A.  Uh-huh.
 8        Q.  -- do you have an estimate as to
 9   how long it would take to liquidate the
10   tokens?
11        A.  Well, I would need to run the
12   model again, but it's going to be more than
13   five years.
14        Q.  Significantly more?
15        A.  Well, maybe --
16        MR. TOROSIAN:  Object to form.
17        THE WITNESS:  I wouldn't know the
18        exact amount, but let's say somewhere
19        between 20, 30 years, somewhere along
20        those lines.
21   BY MR. GLUECKSTEIN:
22        Q.  If we could look at -- back to
23   Exhibit 1 of your report, paragraph 45.
24        A.  Uh-huh.
25        Q.  You state in paragraph 45 that
```

Page 95

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2   the prices -- quote, "The prices and daily
 3   trading volumes used for the three tokens
 4   as of the petition date and petition time
 5   with a 24-hour average is for the 24 hours
 6   prior to the petition date and time."
 7        Do you see that?
 8        A.  Yes.
 9        Q.  Why did you select 24 hours as
10   the window to average prices?
11        A.  Because I want to be as close as
12   to the petition date, which is my valuation
13   date.
14        Q.  Why 24 hours versus some other
15   time increment?
16        A.  Well, the 24 hours is an
17   established one.  This is what
18   CoinMarketCap, CoinGecko, other providers
19   are using for average volumes.  And also in
20   my Celsius engagement, that's the one that
21   I used.  And the Court accepted the 24-hour
22   average.
23        Q.  You used 24-hour averages not
24   only for volume here, you're saying also
25   for pricing, correct?
```

Page 96

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2        A.  Yes.
 3        Q.  And did you -- you didn't
 4   consider -- strike that.
 5        You believe that the 24-hour
 6   average is also appropriate for pricing,
 7   not only volume, correct?
 8        A.  Yes.  It has to be both, because
 9   they're highly correlated.  When one goes
10   up, the other goes down.  So you can't have
11   different intervals.
12        Q.  Did you -- other than relying on
13   your experience, did you do any sensitivity
14   or other analysis to determine the 24 hours
15   was the appropriate period?
16        MR. TOROSIAN:  Object to form.
17        THE WITNESS:  Sensitivity in what
18        way?
19   BY MR. GLUECKSTEIN:
20        Q.  Did you do any -- any analytical
21   calculations as to why 24 hours is
22   appropriate?  Did you look at any other
23   periods of time?
24        A.  I did look at Mr. Lu's 60-minute
25   interval for prices.  I did look into
```

Page 97

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2   Professor Howell's one year prior to the
 3   CoinDesk article.  So I did look in
 4   different intervals.
 5        Q.  And you did not make any
 6   adjustments or discounts to those numbers
 7   on the 24-hour average due to the unusual
 8   events surrounding the collapse of FTX,
 9   correct?
10        MR. ROSTOCKI:  Objection to form.
11        THE WITNESS:  What do you mean
12        "unusual events?"
13   BY MR. GLUECKSTEIN:
14        Q.  The fact that FTX was -- the
15   public information about what was happening
16   with FTX and the imminency of its
17   bankruptcy.
18        A.  I did see the window, the 24-hour
19   and the window for Maps and Oxy did not
20   take into account the spike, the increase
21   in volume and the highly decrease in price
22   that they did happen before that 24-hour
23   window.
24        Q.  I'm sorry.  Can you repeat that
25   answer?
```



Page 98

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2     A.  Yes.  There was -- so that --
 3          MR. TOROSIAN:  Hold on.  Do you
 4     want her to read it back, or do you
 5     want to ask a new question?
 6          MR. GLUECKSTEIN:  Fair.
 7          THE WITNESS:  Maybe read it back.
 8          MR. GLUECKSTEIN:  Let me see the
 9     answer.
10     BY MR. GLUECKSTEIN:
11     Q.  I'll ask a different question.
12          When you say the window from Maps
13     and Oxy did not take into account the
14     spike, what are you referring to?
15     A.  There was a large increase of
16     volume and a highly deflated price before
17     the 24-hour window for Maps and Oxy.  That
18     was not taken into account in my average.
19     Q.  Any trading activity within the
20     24 hours immediately prior to the petition
21     date is what would be included in your
22     average, correct?
23          MR. TOROSIAN:  Object to form.
24          THE WITNESS:  This is included,
25     yes.
```

Page 99

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2     BY MR. GLUECKSTEIN:
 3     Q.  Your opinion is that Professor
 4     Howell's reliance on Coin Metrics's data
 5     for her analysis was not appropriate?
 6     A.  Correct.
 7     Q.  Why not?
 8     A.  Well, for Coin Metrics, she
 9     ignored a highly rated crypto exchange that
10     would significantly increase the volume.
11     Q.  And what's that crypto exchange?
12     A.  LBank.
13     Q.  Okay.  Any other reason why Coin
14     Metrics's data, in your opinion, is not the
15     appropriate data set?
16     A.  I would not say the Coin Metrics
17     data.  I would say the choice of the
18     cryptocurrency exchanges used.  Certain
19     crypto exchanges were ignored without a
20     reason, because they're ranked pretty high
21     both in Coin Metrics and in CoinMarketCap.
22     Q.  Okay.  And you identified LBank
23     as that exchange.
24          Are there any others, in your
25     view, that were ignored by Professor
```

Page 100

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2     Howell?
 3     A.  None that I can think -- none
 4     that I can think of.
 5     Q.  And --
 6     A.  There may be others, but that's
 7     the one I identify.
 8     Q.  Okay.  And what is the basis for
 9     your statement that LBank is a highly
10     ranked crypto exchange?
11     A.  Two data points.  One, on the
12     Coin Metrics rankings, LBank exist under
13     Bibox.  B-i-b-o-x.  Bibox is Number 29, and
14     LBank is Number 30.
15          The only difference between the
16     two is the strengths of the grade.  The API
17     quality for Bibox is C minus, and the API
18     quality for LBank is D.  Bibox is used for
19     Serum volume, so there's only one minor
20     grade, but then LBank is not used for Maps.
21          Second data point is
22     CoinMarketCap.  In CoinMarketCap, which the
23     rankings are quoted by Professor Howell in
24     her rebuttal, so it's an established data
25     aggregator for cryptocurrency, LBank is
```

Page 101

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2     either Number 21 or Number 23.
 3          The rankings for another crypto
 4     exchange called Poloniex, P-o-l-o-n-i-e-x,
 5     is about 77, and it is used for Serum.  And
 6     there is a -- the Bibox, which is used in
 7     Serum, is Number 147 in CoinMarketCap
 8     ranks.
 9          So, as a result, LBank is a
10     significant and trusted exchange for both
11     Coin Metrics and CoinMarketCap.  And that
12     had been clearly ignored from Professor
13     Howell's calculation of volume.
14     Q.  Okay.  So your view is that
15     Professor Howell should have included the
16     LBank volumes in her analysis, correct?
17     A.  At least the LBank if she uses
18     Coin Metrics.  But also I used
19     CoinMarketCap volume.
20          So as a secondary check to verify
21     the volume, I would have used a second data
22     aggregator, CoinMarketCap in this case, to
23     understand what is the difference between
24     the two for the simple reason those tokens,
25     were traded in decentralized exchanges, and
```

MAGNA
LEGAL SERVICES

1          F. KONSTANTINIDIS - 02/27/2024
2    Coin Metrics does not take into account
3    decentralized exchanges.  CoinMarketCap
4    does.  So I considered its volume more
5    accurate.
6          Q.  Do you know whether Professor
7    Howell's conclusion with respect to the
8    discount applied to Maps and Oxy would
9    decrease if she had included the LBank
10   volumes?
11         A.  I believe she put the additional
12   volumes and the discount that the KO comes
13   up or the transaction cost, rather, is
14   significantly higher than 100 percent.
15         Q.  So had she included the LBank
16   exchange data, it's your understanding that
17   Professor Howell still would have
18   calculated a 100 percent discount with
19   respect to Maps and Oxy, correct?
20         A.  Well, this is because they --
21   it's not correct, because the KO model does
22   not calculate discounts.
23         Q.  Well, but -- I understand you
24   have -- we'll talk about the KO model.
25         But under her methodology, it's

1          F. KONSTANTINIDIS - 02/27/2024
2    your understanding that had she included
3    those volumes, she still would have
4    calculated a 100 percent discount, correct?
5          A.  To be more accurate would be over
6    100 percent.  So it's going to be more than
7    100 percent.
8          Q.  You refer to CoinMarketCap as a
9    data aggregator.  What is that, in your
10   view -- or your understanding of what a
11   data -- strike that.  Let me try that
12   again.
13         Can you explain your
14   understanding of what a data aggregator is?
15         A.  A data aggregator goes to
16   different exchanges where contingencies are
17   traded and they extract volume, they
18   extract prices or the metrics that they
19   need to provide to parties that they need
20   to use that data.
21         Q.  And you testified that you
22   believe that CoinMarketCap was the
23   appropriate data source for this analysis,
24   correct?
25         A.  Correct.

1          F. KONSTANTINIDIS - 02/27/2024
2          Q.  Do you believe that CoinMarketCap
3    should be used to calculate the analysis of
4    discounts for all of the debtors' digital
5    assets or just the three tokens that you
6    looked at?
7          A.  I haven't done the analysis to
8    understand if CoinMarketCap covers all of
9    the digital assets.  I know the analysis
10   for those three.
11         But based on Professor Howell's
12   analysis in the original report, she just
13   used CoinMarketCap for about 44 digital
14   assets.
15         Q.  Do you know whether data
16   aggregators do any analysis to determine
17   whether the trades they report on are
18   valid?
19         A.  Yes.
20         Q.  And what do they -- you know
21   whether they do or they don't?
22         A.  They do.
23         Q.  They do.
24         And what's your understanding of
25   what CoinMarketCap, in particular, does to

1          F. KONSTANTINIDIS - 02/27/2024
2    determine reliability?
3          A.  So CoinMarketCap has certain
4    measures about the liquidity score of a
5    crypto exchange.  They also used AI and
6    machine learning methods to understand fake
7    trading volumes or incorrect pricing.
8          They also have certain guidelines
9    for the trade exchanges that they report
10   data to them.  And in many cases they
11   either don't include it, but if they
12   include it, they put asterisks that it's
13   not reliable.
14         Q.  And outside of reviewing what
15   they make -- what CoinMarketCap makes
16   available, did you conduct any analysis of
17   your own to determine the reliability of
18   their data?
19         A.  No.  But how would I do that?
20         Q.  I'm just asking if you did.
21         A.  No, there's no way to do that.
22         Q.  Are you familiar with the 2019
23   paper that was authored by Bitwise Asset
24   Management revealing that 95 percent of
25   Bitcoin trading was fake volume or wash

MAGNA
LEGAL SERVICES

1          F. KONSTANTINIDIS - 02/27/2024
2    trading?
3          A.   Yes, I am.
4          Q.   What is your understanding of
5    what wash trading is?
6          A.   Wash trading is primarily when I
7    as an investor use the same wallet ID or
8    even multiple wallet IDs and I exchange
9    volume among myself or some other people I
10   know just to create inflated volume and
11   inflated supply.  So I will increase the
12   price of that token.
13         Q.   Do you have an understanding
14   what -- other than wash trading, what fake
15   volumes would refer to?
16         A.   That would also refer to certain
17   exchanges that for their own benefit and
18   market data, nobody can regulate them.  So
19   they can report any volume they want just
20   to create that vehicle that they -- they
21   have a lot of transactions in their
22   platform.
23         Q.   Do you have a view as to whether
24   a wash trading or fake volume is an issue
25   at the exchanges reported on by

1          F. KONSTANTINIDIS - 02/27/2024
2    CoinMarketCap?
3          A.   For which particular exchanges do
4    you mean?
5          Q.   For any of the exchanges that are
6    aggregated by CoinMarketCap that are in
7    your data.
8          A.   I -- my understanding is that
9    documentation -- and it's a fact that
10   CoinMarketCap takes all these measures I
11   talked about before to detect fake volume
12   or incorrect pricing.
13         And after it does that, then it
14   cleans out the data, and that's what it
15   reports.
16         Q.   Do you understand there to be
17   a -- do you understand there to be reports
18   that -- as recently as 2023 that wash
19   trading and spot trading markets on
20   unregulated exchanges remains a significant
21   problem?
22         A.   Yes.  For certain markets that
23   are unregulated, it's still a problem in
24   cryptocurrency.
25         Q.   And it's your view that those

1          F. KONSTANTINIDIS - 02/27/2024
2    problems are not pervasive in the
3    CoinMarketCap aggregated data?
4          A.   Correct.  Yes.
5          Q.   And the basis for that is what's
6    been reported by CoinMarketCap to the
7    public, correct?
8          A.   Yes.  My basis for that is the
9    documentation they provide about the
10   measures they take to protect whoever
11   consumes that data.
12         Q.   Did you exclude from any of your
13   data, volume data, lower scoring exchanges
14   that are reported by CoinMarketCap?
15         A.   No.  Because just like I believe
16   in the original report by Mr. Lu, the data
17   aggregators when you extract historical
18   data, they do not provide the different
19   cryptocurrencies that they correspond to.
20         Q.   So isn't it true that one of the
21   reasons that CoinMarketCap would reduce the
22   rating of an exchange is because of
23   concerns about their trading data?
24         A.   In many cases, CoinMarketCap
25   doesn't even include exchanges that they

1          F. KONSTANTINIDIS - 02/27/2024
2    have low ranking.  This is why I am relying
3    on their data.
4          Q.   But you would agree that there
5    are, within the exchange pool that
6    CoinMarketCap is reporting, there are
7    higher ranked exchanges and lower ranked
8    exchanges, correct?
9          A.   But in most of the cases, they're
10   the higher ranked exchanges that they
11   provide.  And based on the data I saw, for
12   example, comparing Professor Lu -- excuse
13   me, Professor Howell's volume with
14   CoinMarketCap, she uses the 510,000 as the
15   average volume for the estimation period.
16         If you add LBank to that, you
17   get -- you get up to 1.7 million.  And the
18   CoinMarketCap reported volume is 1.8.
19         So there's 100,000 difference
20   between the two, which I believe probably
21   comes from a decentralized exchange or
22   rating or any other reputable exchange that
23   would provide that extra volume.
24         So based on the data I saw, it
25   makes perfect sense that CoinMarketCap does

MAGNA
LEGAL SERVICES

1          F. KONSTANTINIDIS - 02/27/2024
2    use reputable exchanges for at least those
3    three tokens.
4          Q.   CoinMarketCap, you do --
5    paragraph -- if you could look at
6    paragraph 24 of your report, Exhibit 1.
7          You note there your view that the
8    Howell report, quote, "Completely ignores
9    trading volume that takes place in
10   decentralized exchanges," end quote.
11         Decentralized exchange data is
12   presented in the CoinMarketCap data that
13   you review, correct?
14         A.   They may or they may not.
15         Q.   So are you suggesting that there
16   was additional decentralized exchange data
17   that needs to be included beyond the
18   CoinMarketCap source that you relied on?
19         A.   No, I'm not suggesting anything,
20   because I used the CoinMarketCap data
21   volume.  But what I'm recommending is there
22   is probably extra volume coming from
23   decentralized exchanges.
24         Q.   And you haven't sought to
25   quantify that beyond what's already

1          F. KONSTANTINIDIS - 02/27/2024
2    reflected in the CoinMarketCap data that
3    you used, correct?
4          A.   Well, what I did is, because
5    those coins were trading in two
6    blockchains -- these are SPL.  This is
7    Solana tokens.  This is the primary chain
8    that they reside, but they also reside on
9    Ethereum, which much lower volume.
10         What I did was I did mine the
11   Solana blockchain, and I found the volume
12   that corresponds to the three tokens.  And
13   I provide that, but I didn't use it.  I
14   just used CoinMarketCap.
15         I am -- basically provided an
16   extra data point that clearly shows there
17   is volume, significant volume outside the
18   centralized exchanges.
19         Q.   And you use all of the data
20   that's reported by CoinMarketCap, you
21   didn't exclude any CoinMarketCap data,
22   correct?
23         A.   I used -- yes, I used everything
24   that CoinMarketCap reports.
25         Q.   Did you use any of the trading

1          F. KONSTANTINIDIS - 02/27/2024
2    volumes that were reflected in CoinGecko or
3    Coin Paprika?
4          A.   No, I did not.
5          Q.   You criticize Dr. Howell's use of
6    the KO model in her calculation of asset
7    liquidation discounts, correct?
8          A.   Correct.
9          Q.   And specifically, paragraph 31 of
10   your report, if you could take a look at
11   that.
12         You conclude in paragraph 31 that
13   the Howell report never confirms the main
14   KO model hypothesis is true by calculating
15   the two variances based on cryptocurrency
16   data.
17         Have you done any analysis that
18   leads you to conclude that the variance
19   hypothesis does not apply to cryptocurrency
20   data?
21         A.   No, I have not.  But when you use
22   a model, you have to first check if it
23   meets those requirements before you run it.
24         Q.   Is it your position that, in your
25   view, Professor Howell did not adequately

1          F. KONSTANTINIDIS - 02/27/2024
2    establish or that the KO model does not
3    apply to cryptocurrency?
4          A.   My opinion is that the KO model
5    is not a discount model, first of all.
6          And then, secondly, it cannot be
7    applying to anything outside of the data
8    that it was used for.
9          Q.   Can you elaborate on what you
10   mean by cannot be used -- cannot be applied
11   to anything outside of the data that it was
12   used for?
13         A.   Yes.  In the 2016 paper, it's
14   using portfolio transition orders.  This is
15   when an investor call a broker and they
16   move -- they make certain moves on the
17   market for them, buy or sell.
18         The KO model is based on the idea
19   of a bet, which is statistically
20   independent, two bets from each other,
21   which means that these are not
22   transactions.  You need to know the mind of
23   the investor.
24         In the cryptocurrency market,
25   when I have a transaction, it's spread out

MAGNA ▶
LEGAL SERVICES

F. KONSTANTINIDIS - 02/27/2024
1
2    into five or six or ten, so it's impossible
3    to know, oh, this transaction -- do this
4    transaction belong to one bet or these are
5    10 different bets.
6         So, first of all, this is not
7    practical to understand what a bet is, so
8    you cannot use it in the cryptocurrency
9    market.
10        The second point is unlike the
11    normal discount models, Finnerty, Chaffe,
12    Longstaff, Ghaidarov, we clearly say these
13    are discounts, and they checked against
14    benchmark data.  The KO model never makes a
15    case about being a discount model.
16        So for those reasons, it cannot
17    be applied outside the data set it was used
18    for.
19    Q.   You're not aware of any -- you're
20    not aware of any situation where the KO
21    model was applied to cryptocurrency?
22    A.   For which purposes?
23    Q.   For any purpose.  You said it
24    can't be used for cryptocurrency markets.
25        MR. TOROSIAN:  Objection to form.

F. KONSTANTINIDIS - 02/27/2024
1
2         THE WITNESS:  There is one paper
3    cited by Professor Howell that they
4    used not the KO 2016, but they used a
5    KO 2023 model.  So it's not the same
6    one to understand illiquidity and also
7    rank crypto exchanges.
8         So it was used based -- for on
9    transaction costs.  And the two
10    cryptocurrencies were Bitcoin and
11    Ether.
12        And the paper does conclude that
13    in highly volatility periods, the KO
14    estimator is not accurate.  And
15    obviously in the case of Maps, Oxy and
16    Serum, even for studying illiquidity,
17    the volatility is very high.
18    BY MR. GLUECKSTEIN:
19    Q.   So is it your view that the
20    model -- the KO model cannot be applied to
21    any cryptocurrency or simply, in your view,
22    it would not be appropriate for Maps, Oxy
23    and Serum given the volatility?
24    A.   Applied as what?  The model to be
25    applied as what exactly, to do what?

F. KONSTANTINIDIS - 02/27/2024
1
2    Q.   To aid in calculating the
3    discounts to value for purposes of valuing
4    claims.
5    A.   It cannot use as a discount model
6    not only for cryptocurrency, but any
7    market, because it doesn't claim it's a
8    discount model.
9    Q.   So you're saying it has to claim
10    it's a discount model in order to be
11    applicable?
12        MR. TOROSIAN:  Object to form.
13        MR. ROSTOCKI:  Objection to form.
14        THE WITNESS:  Yes.  Two things
15    have to happen.  The authors of the
16    paper, they have to say I'm calculating
17    discounts.
18        Secondly, the model has to be
19    tested against real-world data,
20    benchmark data just like all the other
21    discount models to understand if it
22    overstates and understates discount and
23    how accurate it is.
24    BY MR. GLUECKSTEIN:
25    Q.   So you've never taken a model and

F. KONSTANTINIDIS - 02/27/2024
1
2    applied it in a different context from the
3    context in which it was created?
4         MR. TOROSIAN:  Object to form.
5         THE WITNESS:  No.
6    BY MR. GLUECKSTEIN:
7    Q.   No, you've never done that?
8    A.   No.
9    Q.   And you don't think that could be
10    done?
11    A.   Of course not.
12    Q.   What was the scope of the
13    valuation -- cryptocurrency valuation
14    project that you undertook in Celsius?
15    A.   It was to value all the
16    cryptocurrency holds for financial
17    reporting purposes.
18    Q.   And in your portion of the report
19    that you worked on valuing the
20    cryptocurrency, did you apply a discount
21    model there?
22    A.   I applied discount on -- in one
23    of the -- not on the final valuation, but
24    on a previous one for staked Ether.
25    Q.   That was the only discount you

Page 118

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2   applied to that portfolio?
 3       A.   As far as I remember, that's what
 4   comes to mind.  But this was not the final
 5   valuation.  Because on the final valuation
 6   on those staked tokens were unstaked, so
 7   they were at market value at this point.
 8       Q.   Did the report that you submit --
 9   that you submitted there in the Celsius
10   case, did you rely on the Finnerty model?
11       A.   Yes, yes, for the --
12       Q.   For what?
13       A.   For the discount of the staked
14   tokens.
15       Q.   And you did not apply, in that
16   case, the Chaffe model, correct?
17       A.   No.  This was primarily for
18   financial reporting for staked tokens.
19       Q.   And so there you concluded that
20   the appropriate model to use was only the
21   Finnerty model for that purpose?
22       A.   The Finnerty model is more
23   accurate than the Chaffe.  The Chaffe
24   always overstate discounts.  So I use the
25   Finnerty model in this case.
```

Page 119

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2       Q.   Why do you say the Chaffe model
 3   always overstates the discount model?
 4       A.   Because all of the discount
 5   models are checked against really data from
 6   private placement of restricted stocks to
 7   understand if the equation gives you lower
 8   discounts than the real life or aggregate
 9   higher discounts.
10          So the Chaffe, when tested
11   against real-world data, it's been
12   established in the valuation community that
13   it does overstate discounts for high
14   volatilities, especially over 65 percent or
15   so.
16       Q.   The Finnerty model has a maximum
17   cap on the discount it can provide,
18   correct?
19       A.   Correct.  The closed form, yes.
20       Q.   And for purposes of your analysis
21   here, am I correct that you -- for purposes
22   of this case, am I correct that you decided
23   to employ not only the Finnerty model but
24   also the Chaffe model and take an average?
25       A.   Yes.  And the reason was because
```

Page 120

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2   we know that one overstates discount and
 3   the other understates it.  So it's an
 4   average of the two.
 5          MR. GLUECKSTEIN:  Why don't we
 6   take just a short break.
 7          THE STENOGRAPHER:  Off the
 8   record.
 9          (Whereupon, a recess was taken at
10   11:33 a.m.)
11          MR. GLUECKSTEIN:  Back on the
12   record.
13   BY MR. GLUECKSTEIN:
14       Q.   Mr. Konstantinidis, we were
15   talking before the break about how you used
16   the Finnerty and Chaffe models in your
17   analysis here.
18          Do you recall that?
19       A.   Yes.
20       Q.   Those models are based on studies
21   of restricted shares of stock and not
22   digital assets, correct?
23       A.   Correct.
24       Q.   We were talking earlier this
25   morning about the fact that you used the
```

Page 121

```
 1          F. KONSTANTINIDIS - 02/27/2024
 2   24-hour average.  You can look again at
 3   your report in paragraph 45, Exhibit 1.
 4       A.   Uh-huh.
 5       Q.   The 24-hour average for not only
 6   volumes but for price --
 7       A.   Uh-huh.
 8       Q.   -- do you recall that?
 9       A.   Yes.
10       Q.   Can you explain or elaborate
11   further on why your opinion, the average
12   price for the 24 hours prior to the
13   petition date provides an appropriate
14   petition date price?
15          MR. TOROSIAN:  Object to form.
16          THE WITNESS:  The reason for that
17   is because I wanted to use the same
18   time interval for volume and pricing.
19   They're highly correlated, obviously
20   when volume goes up, price goes down
21   and vice versa.  So it's standard
22   practice to just use the same time
23   window.
24          The other reason for the pricing
25   is the fact that cryptocurrencies trade
```

1          F. KONSTANTINIDIS - 02/27/2024
2    24/7.  And it's well known that the
3    high activity on those markets happens
4    between 9:00 a.m. and 4:00 p.m. local
5    time.
6          So you will lose -- if you go too
7    close, you may lose some of those
8    crypto exchanges.  And as a standard
9    practice, that's the average I'm using.
10   BY MR. GLUECKSTEIN:
11        Q.   When you say "standard practice,"
12   so you didn't select the 24 hours for this
13   case, in particular?
14        A.   I used the same one in Celsius
15   for spot prices.  I generally for -- when I
16   try to find pricing, I do go 24 hours.
17        Now, there may be other cases,
18   based on data or modeling or whatever else,
19   but that's a normal window I've been using.
20        Q.   Would there be circumstances
21   where 24 hours, in your opinion, would not
22   be the appropriate time period to use for
23   price?
24        A.   I mean, there may be.  I don't
25   want to exclude it completely.  There may

1          F. KONSTANTINIDIS - 02/27/2024
2    be.
3         Q.   You didn't do any analysis here,
4    though, to confirm that 24 hours was
5    appropriate on these facts other than it
6    being your standard practice, correct?
7         MR. TOROSIAN:  Object to form.
8         THE WITNESS:  I did look into,
9    like, Mr. Lu took the 60 minutes before
10   the petition date.  I did look on, you
11   know, an hour before, 48 hours.
12        I did -- I wanted to make sure
13   what I'm doing obviously doesn't
14   include high or low.  Like I said
15   before, it doesn't include for Maps and
16   Oxy the high spike I saw in the data at
17   some point.
18        But from a valuation standpoint,
19   I also want to do justice and want to
20   go as close as I can to my valuation
21   date, which in this case is my petition
22   date and time.
23   BY MR. GLUECKSTEIN:
24        Q.   We talked earlier this morning
25   about the following paragraph in your

1          F. KONSTANTINIDIS - 02/27/2024
2    report, paragraph 46, with respect to the
3    volume trends from the 20 cryptocurrencies.
4         A.   Uh-huh.
5         Q.   Do you recall that testimony?
6         A.   Yes.
7         Q.   Can you elaborate further as to
8    how you chose those 20 cryptocurrencies
9    that went into your analysis?
10        A.   Yes.  I used a CoinMarketCap API.
11   The criterion was 1 million to 30 million
12   current trading volume.  They're all in the
13   Ethereum blockchain, which was established
14   in 2015.
15        For that reason, I wanted to -- I
16   want to ensure the tokens I choose, they do
17   have a good period of time, because I know
18   for a fact that the vesting schedule and
19   liquidation is five years for my tokens at
20   hand to value.
21        And then I sorted them based on
22   market cap, and that's how I chose those
23   tokens.
24        And I also wanted to ensure that
25   one other criteria was that they're not

1          F. KONSTANTINIDIS - 02/27/2024
2    stable coins, fiat-backed stable coins.
3         Q.   Were there other tokens that you
4    identified that met your criteria, or was
5    20 the total universe that you identify?
6         A.   I felt like that for finding in
7    the average, the 20s is a reasonable number
8    to find the average volume for the volume
9    profile, but I did not look into less or
10   more tokens.
11        Q.   So you didn't identify additional
12   tokens that you excluded from your data set
13   of the 120?
14        A.   I don't recall excluding any --
15   any tokens, at least, to my knowledge.
16   Unless there may have been some issue with
17   the data that were retrieved, but I don't
18   recall excluding them.
19        Q.   And you say you wanted to not
20   include stable coins.  Why is that?
21        A.   Well, the reasoning for that is
22   for stable coins, generally speaking, they
23   may fluctuate too wildly or maybe they're
24   extra conservative, so it feels like
25   they're on the edges on an arch.

MAGNA
LEGAL SERVICES

1    F. KONSTANTINIDIS - 02/27/2024
2         And I wanted to make sure that I
3    don't have at least fiat-backed stable
4    coins in my data. So that's my reasoning
5    behind that.
6         Q. Do you have any understanding
7    where -- sorry.
8         Footnote 67 down at the bottom of
9    that page, you list -- these are the 20
10   cryptocurrencies that you selected,
11   correct?
12        A. Yes.
13        Q. Do you have any understanding
14   of what the token PAXG is that's listed
15   there?
16        A. That's a PAX token that I
17   believe it's gold pegged from the PAX
18   ecosystem.
19        Q. Is that token, in fact, a stable
20   coin?
21        A. The CoinMarketCap assigns it as a
22   non-stable coin on their API.
23        Additionally, the data that the
24   opposing expert sent to me, they also
25   verified the same thing that the API as

1    F. KONSTANTINIDIS - 02/27/2024
2    from CoinMarketCap assigned it as a
3    non-stable coin.
4         Q. So the basis on which you
5    determine that was a non-stable coin was
6    simply based on the API data that you
7    reviewed from --
8         MR. TOROSIAN: Object to form.
9         THE WITNESS: It was -- yes, it
10   was based on the CoinMarketCap API.
11   BY MR. GLUECKSTEIN:
12        Q. Just to confirm,
13   Mr. Konstantinidis, you never worked
14   professionally at any point as a trader,
15   whether it be a crypto trader or any other
16   type of trading of -- did you?
17        A. You mean professional trading
18   or --
19        Q. Professional, professional.
20        A. No, no.
21        MR. GLUECKSTEIN: I have no
22   further comment -- no further
23   questions.
24        I don't know whether the
25   committee does, so we should ask.

1    F. KONSTANTINIDIS - 02/27/2024
2         I don't know, anybody from the
3    UCC on?
4         MR. TOROSIAN: Ken, do you have
5    any questions for the committee?
6         MR. PASQUALE: No, no, I don't.
7    Thank you.
8         MR. TOROSIAN: Great. I have no
9    questions.
10        Reed Smith, do you have anything?
11        MR. ROSTOCKI: Nothing.
12        MR. TOROSIAN: Thank you. We'll
13   reserve signature.
14        THE STENOGRAPHER: Did you need a
15   rough draft?
16        MR. TOROSIAN: Yeah.
17        THE STENOGRAPHER: Do you need
18   the final expedited?
19        MR. TOROSIAN: Yes.
20        THE STENOGRAPHER: To what?
21        MR. TOROSIAN: Could you do by
22   the end of the week?
23        THE STENOGRAPHER: Yes.
24        What did you need?
25        MR. ROSTOCKI: If we can get a

1    F. KONSTANTINIDIS - 02/27/2024
2    rough as soon as possible and final end
3    of the week.
4         (Time noted: 12:13 p.m.)

Page 130

REPORTER CERTIFICATE

1
2      I, the undersigned, do hereby certify:
3      That FOTIOS KONSTANTINIDIS was by me duly
4  sworn in the within-entitled cause; that
5  said deposition was taken at the time and
6  place herein named; and that the deposition
7  is a true record of the witness's testimony
8  as reported by me, a disinterested person,
9  and thereafter was transcribed.
10     I further certify that I am not
11 interested in the outcome of the said
12 action, nor connected with, nor related to
13 any of the parties in said action, nor to
14 their respective counsel.
15     IN WITNESS WHEREOF, I have hereunto set
16 my hand this 1st day of March, 2024.
17
18
19
20     _____
21          JESSICA R. WAACK
          Registered Diplomate Reporter
22        Certified Realtime Reporter
     California Certified Realtime Reporter
23      New York Realtime Court Reporter
     New York Association Court Reporter
24     Notary Public, State of New York
     CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
25   CCR-WA (No. 21007264), CSR-CA (No. 14420)

Page 131

INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.
10     You are signing same subject to
11 the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14     It is imperative that you return
15 the original errata sheet to the deposing
16 attorney within thirty (30) days of
17 receipt of the deposition transcript by
18 you.  If you fail to do so, the deposition
19 transcript may be deemed to be accurate
20 and may be used in court.
21
22
23
24
25

Page 132

1  DECLARATION UNDER PENALTY OF PERJURY
2  IN RE:  FTX TRADING
3  Date of Deposition:  February 27, 2024
4
5
6      I, FOTIOS KONSTANTINIDIS, hereby
7  certify under penalty of perjury under the
8  laws of the State of _____ that
9  the foregoing is true and correct.
10
11     Executed this____ day of    , 2024,
12 at _____.
13
14
15     _____
16     FOTIOS KONSTANTINIDIS
17
18 SUBSCRIBED AND SWORN BEFORE ME
19 THIS __ DAY OF _____, 20
20 _____
21     NOTARY PUBLIC
22 MY COMMISSION EXPIRES:_____
23
24
25

Page 133

1          ERRATA SHEET
2  IN RE:  FTX TRADING
3  WITNESS:  FOTIOS KONSTANTINIDIS
4  Date of Deposition:  February 27, 2024
5
6  Reason Codes:1. Clarify the record
                2. Conform to the facts
7               3. Correct transcription errors
8
9  Page    Line    Reason
   Page    Line    Reason
10 Page         To
   Page    Line    Reason
11 Page         To
   Page    Line    Reason
12 From         To
   Page    Line    Reason
13 From         To
   Page    Line    Reason
14 From         To
   Page    Line    Reason
15 From         To
   Page    Line    Reason
16 From         To
   Page    Line    Reason
17 From         To
   Page    Line    Reason
18 From         To
   Page    Line    Reason
19 From         To
   Page    Line    Reason
20 From         To
   Page    Line    Reason
21 From         To
   Page    Line    Reason
22 From         To
   Page    Line    Reason
23 From         To
24
25     _____
        FOTIOS KONSTANTINIDIS

MAGNA
LEGAL SERVICES