<pre>
 1                      NITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,    .
                                  .  (Jointly Administered)
 5            Debtors.            .
     . . . . . . . . . . . . . .  .
 6                                .
     ALAMEDA RESEARCH LTD., AND   .
 7   CLIFTON BAY INVESTMENTS LLC  .
     F/K/A ALAMEDA RESEARCH       .
 8   VENTURES LLC,                .
                                  .
 9          Plaintiffs,           .
                                  .
10     - against -                .  Adv. Pro. No. 23-50411 (JTD)
                                  .
11   MICHAEL KIVES, BRYAN BAUM,   .
     K5 GLOBAL HOLDINGS LLC, K5   .
12   GLOBAL TECHNOLOGY LLC, MBK   .
     CAPITAL LP SERIES T, K5      .
13   GROWTH CO-INVEST I GP LLC,   .
     K5 GLOBAL GROWTH FUND I GP   .
14   LLC, K5 GLOBAL VENTURES LLC, .
     MOUNT OLYMPUS CAPITAL LP,    .
15   MOUNT OLYMPUS CAPITAL LLC,   .
     K5 GLOBAL GROWTH FUND II LP, .
16   K5 GLOBAL GROWTH FUND II GP  .
     LLC, K5X FUND I LP, K5X      .
17   FUND I LLC, AND SGN ALBANY   .
     LLC,                         .
18                                .
            Defendants.           .
19   . . . . . . . . . . . . . .  .
                                  .
20   SUNIL KAVURI, AHMED ABD-EL-  .  Adv. Pro. No. 24-50012 (JTD)
     RAZEK NOIA CAPITAL SARL AND  .
21   PAT RABITTE,                 .
                                  .
22          Plaintiffs,           .
                                  .
23      v.                        .  Courtroom No. 5
                                  .  824 North Market Street
24   FTX TRADING, LTD, et al.,    .  Wilmington, Delaware 19801
                                  .
25          Defendants.           .  Wednesday, March 20, 2024
     . . . . . . . . . . . . . .  .  10:00 a.m.
</pre>

```
 1                    TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JOHN T. DORSEY
 2               UNITED STATES BANKRUPTCY JUDGE

 3   APPEARANCES:

 4   For the Debtors:          Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
 5                             919 Market Street
                               Suite 1800
 6                             Wilmington, Delaware 19801

 7                             Brian Glueckstein, Esquire
                               SULLIVAN & CROMWELL LLP
 8                             125 Broad Street
                               New York, New York 10004
 9
     For the U.S. Trustee:     Benjamin Hackman, Esquire
10                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
11                             Lockbox 35
                               Wilmington, Delaware 19801
12
     For TMSI SECZ Ltd.:       Elliot Bacon, Esquire
13                             Peter Siddiqui, Esquire
                               KATTEN MUCHIN ROSENMANN LLP
14                             525 West Monroe Street
                               Chicago, Illinois 60661
15
     For FTX Co-MDL:           Colin Robinson, Esquire
16                             PACHULSKI STANG ZIEHL & JONES LLP
                               919 North Market Street
17                             17th Floor
                               Wilmington, Delaware 19801
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Jermaine Cooper, ECRO

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1 | APPEARANCES (CONTINUED):

2 | For OXY and MAPS
Foundations:                Kurt Gwynne, Esquire
3 |                          Benjamin Chapple, Esquire
                            REED SMITH LLP
4 |                          1201 Market Street, Suite 1500
                            Wilmington, Delaware 19801
5 |
For the K5 Defendants:      James Brandt, Esquire
6 |                          LATHAM & WATKINS LLP
                            1271 Avenue of the Americas
7 |                          New York, New York 10020

8 | For MAPS Vault:            Aaron Applebaum, Esquire
                            DLA PIPER LLP (US)
9 |                          1201 North Market Street, Suite 2100
                            Wilmington, Delaware 19801
10 |
                            Jeffrey Torosian, Esquire
11 |                         Joseph Roselius, Esquire
                            DLA PIPER LLP (US)
12 |                         444 West Lake Street, Suite 900
                            Chicago, Illinois 60606
13 |
For the Committee:          Kenneth Pasquale, Esquire
14 |                         PAUL HASTINGS LLP
                            200 Park Avenue
15 |                         New York, New York 10166

16 | For Certain Former
Customers of FTX:           David Adler, Esquire
17 |                         MCCARTER & ENGLISH LLP
                            Worldwide Plaza
18 |                         825 Eighth Avenue, 31st Floor
                            New York, New York 10019
19 |
                            Shannon Humiston, Esquire
20 |                         MCCARTER & ENGLISH LLP
                            Renaissance Centre
21 |                         405 North King Street, 8th Floor
                            Wilmington, Delaware 19801
22 |
For FTX Digital
23 | Assets:                  Brett Bakemayer, Esquire
                            WHITE & CASE LLP
24 |                         1221 6th Avenue
                            New York, New York 10020
25 |

1                              INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 18: Motion of Debtors to Estimate Claims          5
4           Based on Digital Assets [D.I. 5202,
            Filed on 12/27/23]
5
   Agenda
6  Item 19: (I) Application of United States Trustee
            For an Order Approving Appointment of
7           Robert J. Clearly, Esquire, as Examiner;
            (II) Motion for Entry of an Order (A)
8           Establishing the Scope, Cost, Degree,
            And Duration of the Initial Phase of the
9           Examination and (B) Granting Related
            Relief; and (III) Motion to File Certain
10          Information Regarding Potential Parties
            In Interest Under Seal [D.I. 8048, Filed
11          2/27/24]

12          Court's Ruling:  Hearing Continued

13
   WITNESSES CALLED
14 BY THE DEBTORS:                                        PAGE

15     KEVIN LU
       Direct examination by Mr. Glueckstein             21
16     Cross-examination by Mr. Applebaum                40
       Cross-examination by Mr. Chapple                  62
17     Redirect examination by Mr. Glueckstein           84

18     SABRINA HOWELL
       Direct examination by Mr. Glueckstein             91
19     Cross-examination by Mr. Roselius                134
       Cross-examination by Mr. Gwynne                  178
20

21 EXHIBITS:                                             PAGE

22 FTX Exhibits 1, 3, 6, 9 - Howell Opinions            133

23

24

25

1        (Proceedings commenced at 10:02 a.m.)

2            THE COURT:  Thank you, everyone.  Please be

3  seated.  Mr. Landis?

4            MR. LANDIS:  Good morning, Your Honor.  And may it

5  please the Court, Adam Landis from Landis, Rath & Cobb, here

6  on behalf of FTX Trading Limited and its affiliated debtors.

7            Your Honor, we filed a second amended agenda

8  reflecting three matters going forward today.  Number 18 is

9  the digital assets estimation motion.  Number 19 is the U.S.

10  Trustee's application for an order approving the appointment

11  of examiner.  Number 21 is a status conference in the Kives

12  adversary proceeding.

13            Your Honor, for efficiency, we thought that we

14  would take the matters out of order.  If it is acceptable to

15  the Court, we'd start with Number 19, the U.S. Trustee's

16  application, do the status conference next, and then go into

17  the litigation on the digital assets estimation motion.

18            THE COURT:  Yep, that's fine.  Thank you.

19            MR. LANDIS:  Okay, great, Your Honor.  The idea

20  here is that hopefully some of the folks in the courtroom

21  will be able to leave after their matters are concluded.

22            And with that, I think I'll hand the podium over

23  to the United States Trustee in connection with its

24  application.

25            THE COURT:  Okay.  Thank you.  Mr. Hackman?

1      MR. HACKMAN:  Good morning, Your Honor.  May I

2 please the Court, Ben Hackman for the U.S. Trustee.  Thank

3 you for your time hearing us this morning.

4      We are here on the U.S. Trustee's application to

5 approve Robert J. Cleary's appointment as examiner in these

6 cases and to establish the scope, cost, degree, and duration

7 of the examination.  As between the debtors, the official

8 committee, the ad hoc committee, the Securities and Exchange

9 Commission, Mr. Cleary, and the U.S. Trustee, we are here on

10 an uncontested basis.

11      Mr. Cleary is of counsel at Patterson Belnap Webb

12 & Tyler in New York.  He and his counsel, Daniel Lowenthal,

13 also at Patterson Belnap, are here in the courtroom today.

14      The U.S. Trustee appointed Mr. Cleary as examiner,

15 subject to Court approval on February 27.  The notice of

16 appointment is Docket Item 8047.  The U.S. Trustee's

17 application to approve that appointment and to establish the

18 scope, cost, degree, and duration of the examination is

19 Docket Item 8048.  An unredacted copy of Mr. Cleary's

20 verified statement was filed under seal at Docket Item 8049.

21      As an initial matter, I would move for admission

22 of Mr. Cleary's verified statement, which is attached to the

23 U.S. Trustee's application at Docket Item 8048, Exhibit A.

24 Mr. Cleary is present in the courtroom today.

25      THE COURT:  Okay.  Is there any objection?  It's

1   admitted without objection.

2          MR. HACKMAN:  After the U.S. Trustee filed his

3   papers, the parties had discussions about the form of order

4   establishing scope, cost, degree, and duration.  Those

5   discussions resulted in an agreed form of order that we filed

6   under certification of counsel on Friday at Docket Item 9547.

7          The certification of counsel includes a clean and

8   accumulative redline of the form of order compared to the

9   order we had filed originally.  That form was agreed to

10  between the debtors, Mr. Cleary, and the U.S. Trustee.

11         The official and ad hoc committees have advised

12  that they have no comments about that revised form of order,

13  and counsel to the SEC advised that she did not object to its

14  entry.

15         Two responses were filed to the U.S. Trustee's

16  application.  First, a joinder and a separate response was

17  filed at Docket Item 9282 by plaintiffs, who recently brought

18  an adversary proceeding that seeks a legal determination

19  whether customer deposits constitute estate assets.

20         The joinder asks the Court to expand the scope of

21  investigation to cover that legal issue of whether customer

22  deposits constitute estate assets.  The debtors filed a

23  response to that joinder at Docket Item 9581.

24         Second, a reservation of rights was filed at

25  Docket Item 9363 by plaintiffs in multidistrict litigation in

1    Florida.  That reservation of rights wanted to see what the

2    revised form of order said.  The U.S. Trustee respectfully

3    submits that the Court should approve the appointment of Mr.

4    Cleary as examiner in these cases.

5        We submit that Mr. Cleary is a disinterested

6    person as defined in the Bankruptcy Code, and that he has

7    superlative credentials for this appointment.  No one, to our

8    knowledge, has opposed Mr. Cleary's appointment.  The formal

9    approval order was submitted with our application, and we

10   would respectfully ask Your Honor to enter it.

11       As to scope, cost, degree, and duration, the U.S.

12   Trustee submits that the revised form of scope order filed

13   under certification of counsel should be approved.  We

14   believe that form of order accords with the Third Circuit's

15   opinion and with Your Honor's comments at the January 24th

16   status conference.

17       The form of order incorporates comments from Mr.

18   Cleary and the debtors.  It is the product of extensive and

19   thoughtful input from the debtors, Mr. Cleary, and the U.S.

20   Trustee, and we thank the debtors and Mr. Cleary for engaging

21   in that process.

22       I wanted to point out three things about the

23   formal order.  First, in Paragraph 2, the examiner would have

24   60 days to file his report.  That is longer than the 30 to 45

25   days that Your Honor indicated at the January 24th status

1  conference.

2          But we submit that additional time is -- that

3  additional time is modest and appropriate given the size of

4  these cases.  We understand that that 60-day time frame is

5  significant to Mr. Cleary.

6          Second, in Paragraph 4, the fees for performing

7  the examination would not exceed $1.6 million without

8  prejudice to the rights of the examiner to seek an increase

9  of the budget for cost shown on notice.  We submit that

10 figure is consistent with Your Honor's comment that costs

11 should be in the low seven figures.

12         And third, in Paragraph 13, this paragraph would

13 authorize an unredacted version of Mr. Cleary's verified

14 statement to be filed under seal.  We believe that relief is

15 consistent with prior sealing orders Your Honor has entered.

16 I believe the most recent one is at Docket Item 7315.

17         We also believe the redactions are consistent with

18 the redactions the state professionals have made in their

19 retention applications.  Bottom line, we view those

20 redactions as maintaining the status quo on sealing.

21         As to the plaintiff's joinder, the U.S. Trustee

22 believes that the form of order submitted under certification

23 of counsel substantially hues to the guidance Your Honor gave

24 at the January 24th status conference.  We ensured the

25 material terms of that order, including the examiner's

1  budget, have been crafted by the parties based on the Court's

2  direction, and we submit that it is appropriate.

3          We view scope, cost, degree, and duration as

4  fitting together.  And in the event that the Court were to

5  expand the scope to cover what plaintiffs are asking for, we

6  would note other factors, such as cost and determination may

7  need to be revisited at the appropriate time.

8          Unless Your Honor has any questions, that's all I

9  have.

10          THE COURT:  No questions.  Thank you.

11          MR. HACKMAN:  Thank you, Your Honor.

12          THE COURT:  Anyone else wish to be heard in

13  support of the motion?

14          MR. LANDIS:  Good morning again, Your Honor, Adam

15  Landis from Landis, Rath & Cobb, on behalf of the debtors.

16  I'm just going to make a few brief comments, Your Honor, with

17  respect to the form of order.

18          Mr. Hackman remarked that the comments and

19  negotiations were extensive and thoughtful.  I think that's

20  an apt description.

21          As you can tell from the black line that the U.S.

22  Trustee submitted with the proposal, there were numerous

23  issues that needed to be discussed, revised, and worked

24  through, and I want to thank the U.S. Trustee's office and

25  counsel to the proposed examiner for doing that on such an

1  efficient basis.  We worked very hard to get here.

2          Your Honor, I do want to note for the record that

3  counsel to the MDL co-lead plaintiffs has confirmed to me

4  that their reservation of rights now is moot, that they're

5  satisfied with the form of order.  So we're pleased about

6  that.  So at least some party was appreciative of the efforts

7  that we went through to get to a form of order everyone

8  hopefully could agree to.

9          Your Honor, I know that I don't often like having

10 my own language quoted back to me.  And I don't mean --

11         THE COURT:  I get that all the time.

12         MR. LANDIS:  I don't mean to offend the Court by

13 doing it here, but I will note at the January 24th status

14 conference, Your Honor gave some thoughts on the scope of the

15 examination.

16         And to quote that, again, just so it's fresh in

17 everybody's mind, Your Honor stated that "My view is the

18 examiner should review the investigations that have already

19 been concluded or that are currently underway by the debtors,

20 the committee, any third parties, including the SEC, the DOJ,

21 the Southern District of New York, the CFTC, anybody else

22 who's investigated these debtors and provide a report that

23 outlines those investigations and what their findings were

24 and make recommendations for additional investigations, if

25 any, that the examiner believes would be necessary or helpful

1  to the Court or the estate."

2  Your Honor, we took those words seriously and did

3  our best to incorporate them faithfully into the proposed

4  form of scope order.

5  They are in there, and I'm tempted to reserve

6  comments for response to what the Kavuri objectors have to

7  say.  And in fact, I think I will do that with Your Honor's

8  indulgence.  Rather than front run our response to their

9  objection, I think we ought to hear their objection and then

10  let me say a few words after that.

11  THE COURT:  All right, thank you.  Anyone else in

12  support?

13  MR. ROBINSON:  Your Honor, Colin Robinson,

14  Pachulski Stang Ziehl & Jones, on behalf of the FTX co-MDL,

15  lead counsel with Moskowitz Boies Schiller firms.  Mr. Landis

16  confirmed what I was going to get up and say, which was, we

17  appreciated the opportunity to look at the revised order.  It

18  resolved our issues, and we have no issue with each entry

19  today.  Thank you.

20  THE COURT:  Thank you.

21  Ms. BAKEMEYER:  Good morning, Your Honor.  Brett

22  Bakemeyer of White & Case, on behalf of the joint official

23  liquidators of FTX Digital markets.  I rise just to say that

24  the JOLS are not taking any position with respect to the

25  examiner for the simple reason that the parties have

1  addressed all of the concerns and the markup of the proposed

2  form of order.

3          However, it is important that the Bahamas process

4  is not delayed by any report issued by the U.S. debtor's

5  process and the U.S. debtor's process, the 60-day proposed

6  deadline in the order is satisfactory to us at this moment.

7          So to that end, the JOLS are poised to respond

8  promptly to appropriate inquiries from the examiner to ensure

9  that the process continues to be expedited and meets that 60-

10  day deadline.  Unless Your Honor has any questions, I'll cede

11  the podium.

12          THE COURT:  Thank you.  Anyone else in support?

13  Anyone want to object?

14          MS. HUMISTEN:  Good morning, Your Honor.  Shannon

15  Humisten of McCarter & English, on behalf of certain former

16  customers of ftx.com.  With me in the courtroom today is my

17  co-counsel, David Adler, and with the Court's permission, I'd

18  like to cede the argument to Mr. Adler.

19          THE COURT:  Okay.  Thank you, Mr. Adler.

20          MR. ADLER:  Good morning, Your Honor.  David Adler

21  from McCarter & English, on behalf of the Kavori plaintiffs.

22          We filed a response with respect to the scope of

23  the examination or the scope of the investigation by the

24  examiner.  And we did outline what we think are certain

25  fundamental issues in the case that the examiner should

1  examine and be part of his investigation.

2             I've heard that the debtors have done their

3  investigation, the committee has done an investigation.  But

4  the benefit of having an examiner do this report is that

5  there will be a public report on file for everyone to see.

6  And at this point, there are many customers, who don't know

7  exactly the story with respect to FTX, are in the dark.

8             And I think it would help the plan process to get

9  the answers to the questions that I raised in the response,

10 namely, whether the assets deposited or held by the ftx.com

11 platform are property of the debtors estate, and assuming

12 that they are, the manner in which a debtor converted and

13 used such assets.

14            And Number 3, whether the debtors are stockbroker

15 or commodity broker, as those terms are defined in Title 11.

16 We think these are fundamental questions, Your Honor.  We

17 think that answering these questions now can streamline the

18 plan process as it moves forward, and it may also serve as a

19 platform for parties to coalesce around the plan of

20 reorganization for this company.

21            We're not seeking to delay it.  We think that the

22 examiner can do this investigation in 60 days, and we think

23 that these fundamental issues should be resolved by a

24 disinterested, neutral third party who only reports to the

25 Court.

1      THE COURT:  Isn't that me?  Am I not the

2  disinterested third party who's going to decide those issues?

3      MR. ADLER:  You are, Your Honor, but I think that

4  as part of this process, obviously, issues are presented to

5  you, and you have to decide them.  But there's not something

6  out there that sort of tells the whole story about FTX.

7      THE COURT:  Well, you filed a lawsuit, right?

8      MR. ADLER:  Yes.

9      THE COURT:  To address these issues.

10      MR. ADLER:  Yes, I did.

11      THE COURT:  And there's going to be discovery.

12  There's going to be a hearing, going to be a trial --

13      MR. ADLER:  Yes.

14      THE COURT:  -- and I'll decide the issues.  It's

15  not an examiner's job.  This is a core issue in this case.

16      MR. ADLER:  Okay.

17      THE COURT:  Are these assets assets of the debtor,

18  or are they assets of the depositors?  And whether or not the

19  debtor is a stockholder -- stockbroker or commodities broker.

20      Those are issues that I need to decide, and it's

21  not appropriate for the examiner, have an examiner look at

22  those issues.  This is now part of an adversary proceeding

23  that I need to decide.

24      MR. ADLER:  Your Honor, I can hear the message.

25  With that, I will conclude.  But I do think that there is a

1  benefit for a report to be issued by a third party --

2           THE COURT:  Okay.  Thank you.

3           MR. ADLER:  -- and I'll leave it at that.

4           THE COURT:  All right, thank you.  I know, Mr.

5  Landis, you wanted to speak, but I think I've issued my

6  ruling is that --

7           MR. LANDIS:  Your Honor, I was -- I was only --

8           THE COURT:  -- the objection is overruled, so you

9  don't have --

10          MR. LANDIS:  Thank you, Your Honor, I was only

11 going to rise to say that it seems like my job is done here

12 and the preparation I did was good for me, but not necessary

13 for you.  Thank you, Your Honor.

14          THE COURT:  All right.  Thank you.  All right with

15 that, then, I'm satisfied that the requested order is

16 appropriate.  The one thing I want to -- I don't need to add

17 it to the order, but the one thing I want to do is have a

18 status conference in approximately 30 days, just to see where

19 the examiner is in the process.

20          So Mr. Clearly, if you don't mind coming back in

21 30 days or so.  And we can do that virtually, so you don't

22 need to come to court for that because it'll be a status

23 conference, and we'll do that virtually, but contact chambers

24 and we'll come up with a date for that status conference.

25          MR. HACKMAN:  Thank you.  Your Honor, I rise just

1  to advise that we have uploaded the forms of order for Your

2  Honor's consideration.  I would ask if Mr. Cleary and his

3  proposed counsel would have Your Honor's permission to be

4  excused for the remainder of the hearing.

5           THE COURT:  Certainly, yes.  Thank you very much

6  for coming.  Appreciate it.

7           MR. HACKMAN:  Thank you, Your Honor.

8           THE COURT:  All right.  And we'll get those orders

9  entered as soon as possible.

10          MR. LANDIS:  Your Honor.  Next, we intended to

11 move to the status conference on the CODS adversary

12 proceeding.

13          MR. BRANT:  Good morning, Your Honor.  James

14 Brandt of Latham and Watkins, on behalf of the defendants.  I

15 think we have an agreement with the plaintiffs on the issue

16 of the status conference, and the agreement is as follows.

17          We're going to adjourn the deadline for

18 substantial completion of document production from April 1st

19 to April 15th, with all parties reserving rights as to

20 whether document production is actually substantially

21 completed.

22          We are going to adjourn all of the deadlines in

23 the case sine de.  We are going to spend the time between now

24 and April 15 discussing an agreeable mediator.  I believe

25 given conversations before the hearing today, we will be able

1  to agree on a mediator, and upon the substantial completion

2  of the document production, we're going to set a mediator

3  date as reasonably promptly as possible, given the schedule

4  of the agreed mediator.

5  MR. DUNNE:  Your Honor, Christopher Dunne from

6  Sullivan and Cromwell.  Mr. Brandt does have that right,

7  although it was nice to come down here and meet Your Honor.

8  THE COURT:  Okay.  All right.  Thank you very

9  much, Mr. Brandt.  Then, we're going to set a further status

10  conference, or are we just going to wait and see how things

11  play out until April 15th?

12  MR. BRANT:  I think we should wait to see what

13  happens with the mediator because who knows what direction it

14  will go in.  And that'll probably inform when it's right to

15  have a next status conference, if one's necessary at all.

16  THE COURT:  Okay, that sounds good to me.  Thank

17  you.

18  MALE VOICE:  Agree.

19  THE COURT:  All right.  Thank you.

20  MR. PASQUALE:  Ken Pasquale from Paul Hastings for

21  the Committee.  Given the amount at issue in the litigation,

22  we would ask to be involved in that mediation.

23  THE COURT:  Certainly, yes.

24  MALE VOICE:  Of course.

25  MR. PASQUALE:  Thank you.

1          MR. DUNNE:  Thank you so much, Your Honor.

2          THE COURT:  Thank you.

3          MR. DUNNE:  And pleasure to meet you.

4          THE COURT:  Thank you.  Now the main event.

5          MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

6  Glueckstein, Sullivan and Cromwell, for the debtors.

7          Your Honor, we are here this morning, the third

8  item going forward on the agenda, Item 18, is the further

9  hearing on the debtor's motion to estimate claims based on

10  digital assets.

11          We're here with respect this morning to four

12  digital assets that were not valued by the process at the

13  January 31st hearing on the debtors motion, MAPS, Oxy, Serum,

14  and Boba.  From the debtor's perspective, Your Honor, we

15  intend to be very efficient with the Court's time and to move

16  swiftly through the evidence and argument today.

17          Two housekeeping issues at the outset, from our

18  perspective, as set forth in the pretrial order that Your

19  Honor entered yesterday, one of the objectors, TMSI, believes

20  there should be opening arguments prior to the presentation

21  of evidence in addition to closings.

22          The other parties have agreed to proceed

23  immediately to evidence, followed by closing arguments.  But

24  of course, if there are going to be opening arguments by one

25  party, everybody's reserved to make one.

1           The second issue, Your Honor, is certain of the

2   objectors have made motions in limine to exclude portions of

3   the debtor's expert testimony.  We understand there may also

4   be challenge to both of our experts testifying at all.

5           So on both of these issues, Your Honor, we'll take

6   guidance as to how the Court would like to proceed this

7   morning, whether we want to have openings, and how you would

8   like to address the threshold motions.

9           THE COURT:  Well, I have spent a lot of time

10  reading all of the papers, so I don't think I need opening

11  statements.  So we can skip right to the evidence.  On the

12  motions in limine, we'll deal with them as each of the

13  experts comes up to testify.  So I'll allow for a voir dire

14  and a challenge to the ability of that expert to testify, and

15  we'll go from there okay.

16          MR. GLUECKSTEIN:  Thank you, Honor.  So with that,

17  then, the debtor's two experts, two witnesses that we'd be

18  presenting this morning who have filed reports and

19  declarations, which would be the foundation for the evidence.

20  We do have some limited direct as well as the voir dire

21  process Your Honor just referred to.

22          So if it pleases the Court, we'd get right to it

23  and call our first witness on behalf of the debtors, who is

24  Kevin Lu?

25          THE COURT:  Okay.  Mr. Lu, please take the stand

1   and remain standing for the oath.

2            THE CLERK:  Please raise your right hand.  Please

3   state your full name and spell your last name for the court

4   record, please.

5            THE WITNESS:  Kevin Lu, L-U.

6            THE CLERK:  Do you affirm that you tell the truth,

7   the whole truth, and nothing but the truth to the best of

8   your knowledge and abilities?

9            THE WITNESS:  Yes, I do.

10           THE CLERK:  You may be seated.  Your Honor.

11           THE COURT:  Mr. Glueckstein.

12                     DIRECT EXAMINATION

13  BY MR. GLUECKSTEIN:

14       Q.   Good morning, Mr. Lu.

15       A.   Good morning.

16           THE COURT:  So just to be clear, Mr. Glueckstein,

17  the way we should proceed is the way you would traditionally

18  proceed with an expert witness is establish his credentials

19  to testify as an expert.  We'll allow voir dire, and then

20  we'll hear the motions in limine.

21           MR. GLUECKSTEIN:  That's exactly what I intend to

22  do.

23  BY MR. GLUECKSTEIN:

24       Q.   Mr. Lu, can you please describe for the Court

25  where you are currently employed?

1       A.    Coin Metrics.

2       Q.    And what is your role there?

3       A.    I'm a director of data science and product.

4       Q.    What formal educational degrees do you hold?

5       A.    I hold a bachelor's in business administration and

6   a bachelor's in economics with distinction.

7       Q.    And where did you earn those degrees?

8       A.    At the University of California at Berkeley.

9       Q.    Mr. Lu, did you have professional experience in

10  data sciences prior to joining Coin Metrics?

11      A.    Yes.  My professional experience consists of about

12  15 years of experience.  And at all the companies I worked at

13  prior to Coin Metrics, they involved applications of data

14  science to financial data.

15      Q.    And you worked for a period of time at NERA

16  Economic Consulting, correct?

17      A.    That's right.  That was the first company that I

18  worked for.  My role there involved analyzing financial data

19  in connection with securities litigation.

20      Q.    You then worked for a period of time at Edgeworth

21  Economics, correct?

22      A.    Yes.  Edgeworth Economics is also a consulting

23  firm that provides expert testimony and consulting services

24  to government organizations.  In this role, I also analyze

25  financial data in connection with a variety of litigation.

1          Q.   Following that position, you worked as a data

2    analyst at Bridgewater Associates, correct?

3          A.   That's right.  Bridgewater Associates --

4          Q.   What did you do there?

5          A.   -- is a global macro hedge fund.  I believe it's

6    the largest hedge fund ranked by asset center management and

7    one of the best performing hedge funds of all time.  My role

8    there was to maintain the firm's datasets in connection with

9    their trading systems.

10         Q.   So your final position prior to joining Coin

11   Metrics was at The Element Group, correct?

12         A.   Yes.  The Element Group is a financial services

13   firm engaged in the digital assets industry, and my title

14   there was director of quantitative analysis.  My

15   responsibilities included developing the firm's trading

16   infrastructure and developing trading strategies for digital

17   assets.

18         Q.   When did you join Coin Metrics?

19         A.   I joined Coin Metrics five years ago, I believe in

20   2019.

21         Q.   Can you just briefly explain what Coin Metrics

22   does?

23         A.   Sure.  Coin Metrics is one of the earliest

24   providers of data for the digital assets industry.  We have a

25   wide range of commercial data products, including market

1  data, which refers to data collected from exchanges and other

2  trading venues, network data, which refers to data collected

3  from the blockchain that digital assets are based on.  We

4  also have several indexes and some data sets related to

5  network risk.

6          Q.   What do you do in your role at Coin Metrics?

7          A.   As the director of data science, I have a wide

8  range of responsibilities, and I'm responsible for a number

9  of our commercial data products.  I lead a team of software

10  engineers, and data scientists, and designers, and other

11  folks to evolve and maintain the commercial data products

12  under my supervision.  Ultimately, I'm responsible for and

13  held accountable to the success of these products.

14          Q.   And do those products include the Coin Metrics

15  prices?

16          A.   Yes.  One of the products under my responsibility

17  are the Coin Metrics prices.  This is a commercial data

18  product that consists of prices for a large number of digital

19  assets, and they're used for a variety of use cases, such as

20  research and back testing, financial and accounting --

21  financial and accounting purposes, reporting purposes, being

22  published on chain through blockchain oracles, or being used

23  to settle financial contracts or as a benchmark to financial

24  contracts.

25          Q.   Do you continue to work on the Coin Metrics

1  prices?

2      A.   Yes.  My involvement the Coin Metrics prices

3  continues to this day.  I still have an active involvement in

4  it, and I continue to regularly talk with our customers and

5  our internal teams to evolve and maintain the product.

6      Q.   Mr. Lu, you testified in this matter in support of

7  the debtor's motion at the January 31st hearing, correct?

8      A.   That's right.

9      Q.   And are the opinions that you would intend to

10  offer today based on the same methodologies as those

11  presented to the Court at the January hearing?

12      A.   Yes, it is.

13          MR. GLUECKSTEIN:  Your Honor, we, at this time,

14  would tender Mr. Lu as an expert in calculating the prices of

15  digital assets, and specifically to provide the opinions with

16  respect to the prices set forth in his declaration and volume

17  report.

18          THE COURT:  Anyone wish to voir dire?

19          MR. APPLEBAUM:  Thank you, Honor.  Aaron Applebaum

20  from DLA Piper on behalf of MAPS Vault.

21  VOIR DIRE

22  BY MR. APPLEBAUM:

23      Q.   Mr. Lu, good morning.  It's nice to see you again.

24      A.   Good morning.

25      Q.   Mr. Lu, you testified that you have a college

1  degree in business administration and economics; is that

2  right?

3       A.   That's right.

4       Q.   You don't hold any advanced degrees, though, is

5  that correct?

6       A.   That's right.

7       Q.   And you've never taken any academic coursework in

8  cryptocurrency; is that right?

9       A.   That's right.  As I mentioned in my deposition,

10 when I was an undergrad, digital assets weren't invented yet,

11 so it would not be possible to have academic study in the

12 topic.

13      Q.   But since graduating and since the advent of

14 cryptocurrency, you've still not taken any academic courses

15 in that subject; is that right?

16      A.   I have not.

17      Q.   And since graduating from college in 2006, you've

18 never taken any courses in asset valuation, statistics, or

19 data science, is that right?

20      A.   I have not.  Although, I have passed the chartered

21 financial analyst Level 2 exam, which includes topics on

22 asset valuation.

23      Q.   And outside of articles that may have been posted

24 on the Coin Metrics website, you've never published any

25 academic articles; is that right?

1        A.    That's right.

2        Q.    You've never published any articles that have been

3    peer reviewed; is that correct?

4        A.    That's correct.

5        Q.    And before this case, you've never given expert

6    testimony to any court; is that right?

7        A.    Yes, that's right.

8        Q.    And you don't hold any certifications or

9    professional licenses, do you?

10        A.    No, I don't.

11        Q.    And you're not a member of any professional or

12    industry organizations relating to cryptocurrency, asset

13    valuation, data science, or statistics; is that correct?

14        A.    That's correct.

15        Q.    I believe you testified that Coin Metrics was

16    retained by the debtors here to determine the price of the

17    digital assets that were listed on the FTX exchange; is that

18    right?

19        A.    Yes, that's right.

20        Q.    And that determination of prices, that requires

21    statistical analysis; do you agree with that?

22        A.    Yes, I would agree with that.

23        Q.    And is that because these various types of digital

24    assets are traded on multiple markets and on multiple

25    exchanges?

1          A.   That's right.

2          Q.   And so to determine the price, you have to take

3    all of this data from these markets and exchanges and then

4    use statistics to determine what the price is at any given

5    point in time; is that right?

6          A.   That's correct.

7          Q.   And do you agree that that's a fairly complicated

8    statistical analysis that has to be carried out?

9          A.   The physical methods are relatively simple in

10   nature.  I wouldn't characterize them as complex.

11         Q.   You have to do a weighted average; is that right?

12         A.   My methodology involves weighted median.

13         Q.   And to accomplish that weighted median, you have

14   to take price information from multiple markets and multiple

15   exchanges and consider what the volume is on those exchanges

16   and then perform those calculations; is that right?

17         A.   That's correct.

18         Q.   And you don't hold yourself out to be an expert in

19   statistics; is that correct?

20         A.    I took courses in undergrad on statistics.  I've

21   studied data science on a professional level and have

22   experience as a data scientist.  I feel like I have good

23   grounding in statistics.

24         Q.   You worked as part of a team on the Coin Metrics -

25   - with Coin Metrics on this project; is that right?

1      A.   Yes, that's right.

2      Q.   And the team members that work with you, none of

3 them have published in any academic journals with respect to

4 statistics either, have they?

5      A.   I don't believe regarding statistics.

6      Q.   And none of them have advanced degrees in

7 statistics, to your knowledge.

8      A.   One individual that worked on the matter, Uriel

9 Moron, he has a PhD in physics.

10      Q.   In physics.  But he does not have an advanced

11 degree in statistics; is that right?

12      A.   That's right.

13      Q.   As part of your declaration, you make a point

14 about Coin Metrics having received about $50 million of

15 venture capital investment; is that right?

16      A.   That's right.

17      Q.   But you don't disclose in your declaration who

18 those venture capital investors are; is that correct?

19      A.   I did not disclose in my declaration.  That's

20 right.

21      Q.   It's possible that those investors could be

22 invested on some of the exchanges that you're analyzing as

23 part of your methodology; is that right?

24      A.   It's possible, but I have no knowledge of the

25 investment portfolios of Coin Metrics' investors.

1     Q.   And those investors could also be customers on the

2   FTX exchange; is that right?

3     A.   Again, it's possible, but I have no way of knowing

4   if they're customers or not.

5     Q.   And it's possible that employees of Coin Metrics,

6   officers, directors, and other employees, could be investors

7   on some of these exchanges that you're analyzing as part of

8   this methodology; is that right?

9     A.   It's also possible.  But again, I really have no

10  detailed knowledge of the behavior of my colleagues or the

11  directors and officers at Coin Metrics.

12    Q.   And Coin Metrics has a conflicts of interest

13  policy?

14    A.   Yes, it does.

15    Q.   But that conflict of interest policy does not

16  require employees of Coin Metrics to disclose any of their

17  investments on exchanges or anything along those lines; is

18  that right?

19    A.   When you refer to investments on exchanges, do you

20  mean investments in the exchanges or investments of digital

21  assets held on those exchanges?

22    Q.   I mean investments in the exchanges themselves.

23    A.   To the best of my knowledge, the conflicts of

24  interest policy does not require to disclose that fact.

25    Q.   And in fact, it doesn't require them to disclose

1  any investments at all; is that right?

2       A.   I'm not familiar with the exact details of the

3  conflicts of interest policy.  As part of my compliance with

4  the conflicts of interest policy, I have had to disclose

5  which digital assets I hold if it exceeds a certain

6  threshold.

7       Q.   You're personally invested in one of the exchanges

8  that is being reviewed through your methodology; is that

9  right?

10      A.   That's right.

11      Q.   And that wasn't disclosed either in your

12  declaration, was it?

13      A.   It was not, but I testified to it at my

14  deposition.

15      Q.   Now, part of your methodology is to select which

16  exchanges you're going to pull data from in order to

17  determine prices; is that right?

18      A.   That's right.

19      Q.   And you select those based on which exchanges Coin

20  Metrics believes are trustworthy or not trustworthy; is that

21  accurate?

22      A.   It's accurate.  It's based on a framework called

23  the trusted exchange framework that was developed by Coin

24  Metrics.  There are also other rules described in my

25  methodology that play a role in determining which constituent

1  markets or exchanges that I ultimately select.

2      Q.   And the reason you select some exchanges but not

3  others is because you believe that there are examples or

4  instances of wash trading or other kinds of fake trading that

5  exists on certain exchanges but are less prevalent on others;

6  is that right?

7      A.   It's not exclusively.  There's digital assets can

8  trade on a large number of exchanges in the markets, and

9  these exchanges can vary in quality.  One way that they can

10 vary in quality is the degree to which they have watch

11 trading or non-economic trading on the exchange.  But there

12 are other factors that I considered, as well.

13         THE COURT:  Mr. Applebaum, this is supposed to be

14 voir dire, which is he qualified to testify as an expert

15 witness.

16         MR. APPLEBAUM:  Yes, Your Honor.

17         THE COURT:  You're getting into his methodology,

18 which you'll be able to do on cross examination once he

19 testifies on direct about his methodology, but it has nothing

20 to do with qualifications at this point.

21         MR. APPLEBAUM:  Understood, Your Honor.  The point

22 that I was making was that I believe his methodology is also

23 unsound for purposes of qualification.  But I'm happy to stop

24 there.

25         Your Honor, MAPS Vault does object to Mr. Lu being

1  qualified as an expert.  Certainly have no doubt that Mr. Lu

2  is intelligent and good at his job.  He simply lacks the

3  credentials and qualifications that are necessary to be

4  qualified as an expert witness.

5          The methodology relied on requires complex

6  statistical analysis, creating formulas to calculate these

7  weighted median averages of prices of digital assets.  He's

8  not a statistician.  He has no particular training in

9  statistics other than taking some classes in college on that.

10          The methodology relies on his ability to determine

11 which exchanges are trustworthy.  He doesn't have any

12 particular training or credentials to exercise that judgment.

13 His basis for doing so is non-academic.  It's not peer

14 reviewed.

15          Mr. Lu comes from the private sector.  There's

16 risk of it being influenced by external, undisclosed economic

17 interests, which casts doubt on the reliability of the expert

18 testimony.

19          In sum, Your Honor, the testimony is simply not

20 based on sufficient facts or data, is not the product of

21 reliable principles or methods, which is shown most clearly

22 by the fact that so many markets are being excluded.  For

23 these reasons, Your Honor, we do ask that Mr. Lu not be

24 qualified as an expert witness in this case.

25          THE COURT:  All right.  Well, just to be clear, at

1   this point, all I'm going to be ruling on is whether he's

2   qualified as an expert witness.  The questions about whether

3   his methodology is appropriate or not, you can argue that's a

4   Daubert objection.

5           But given that there's no jury here, in a Daubert

6   hearing, I'd have to hear all the testimony anyway.  So I've

7   always taken the position with expert witnesses that I'll

8   hear the testimony and then decide whether or not I'm going

9   to accept their opinion or not.

10          MR. APPLEBAUM:  Understood, Your Honor.

11          THE COURT:  And I think that's an appropriate way

12  to do it, absent a jury trial.

13          MR. APPLEBAUM:  Understood, Your Honor.  Thank

14  you, Your Honor.

15          THE COURT:  Let me hear from anybody else who

16  wants to object to Mr. Lu as qualified to testify as an

17  expert.  Okay.  Mr. Glueckstein?  No?  A late riser.

18          MR. CHAPPLE:  Your Honor, this is Ben Chapple on

19  behalf of Reed Smith.  We join in the objection that DLA

20  Piper just raised.  Thank you.

21          THE COURT:  All right.  Thank you.

22          MR. GLUECKSTEIN:  With respect to the

23  qualification objection, Brian Glueckstein for the debtors,

24  we submit that Mr. Lu is more than qualified.  Third Circuit

25  has made clear that the standard for qualification should be

1  liberally interpreted, and they quoted broad range of skills,

2  knowledge and training will suffice for the two qualifying

3  expert.  It's the Panetta case, 520F 3d 237 that we cite in

4  our papers.

5          Certainly, Mr. Lu here is on the narrow question

6  of determining the prices the debtors are to rely on for

7  purposes of setting petition time pricing, those prices need

8  to be set.  Mr. Lu works in this field full time.  He has

9  worked at Coin Metrics specifically for five years.  This is

10 a new industry; that is a long time.  This is what he does

11 full time, all the time.

12         The questions around Mr. Lu in his direct was

13 clear about his experience professionally.  That goes back 15

14 years, all in the area of data sciences, all at top level

15 firms where he worked in this area.  So he has both a

16 foundational academic background as well as more than

17 sufficient professional experience to opine on the issues

18 that he is offering.

19         And as Your Honor alluded to, of course, it'll be

20 Your Honor's decision as the fact finder here to credit his

21 testimony as you see sufficient.

22         THE COURT:  Okay.  Thank you, Mr. Glueckstein.

23 All right.  I find that the witness is qualified, based on

24 his education, training, and experience in the field, to

25 opine on calculating the prices of digital assets.  And I

1   will allow him, or I will recognize him as an expert in that

2   field.  And then, we will deal with the issues of what, if

3   any, weight I should give to his testimony after we get

4   through the full examination across.

5           MR. GLUECKSTEIN:  Thank you.  At the outset, and

6   as we intend to do, the parties have submitted the reports,

7   including Mr. Lu's report.  We'll address those in a moment,

8   but we do want to supplement with some limited direct.  So if

9   I may proceed, if it pleases the Court, with some further

10  direct examination of Mr. Lu.

11          THE COURT:  Yes.

12          MR. GLUECKSTEIN:  May I approach, Your Honor, the

13  witness with a binder of exhibits?

14          THE COURT:  Yes.

15          MR. GLUECKSTEIN:  Does Your Honor need them or do

16  you have them electronically?

17          THE COURT:  I have them on the screen.

18  DIRECT EXAMINATION (CONT.)

19  BY MR. GLUECKSTEIN:

20      Q.  Mr. Lu, what were you asked to do when you were

21  retained by the debtors in these cases?

22      A.  My assignment was to calculate the prices of

23  certain digital assets held by the FTX exchanges.  I was also

24  asked to calculate a confidence interval reflecting the

25  uncertainty in the determination of my prices.  And I was

1  also asked to write a declaration containing my

2  qualifications, the methodology I used, and the final output

3  from this analysis.

4       Q.   Mr. Lu, can you please turn to Exhibit F-2 in your

5  binder there.  What is that document?

6       A.   This document is the declaration that I wrote as

7  part of my assignment and that was filed on my behalf.

8       Q.   Is this declaration marked as FTX 2 an accurate

9  reflection of the pricing opinions that you provided to the

10 debtors in this case?

11      A.   Yes, it is.

12      Q.   Mr. Lu, can you provide for the Court a summary

13 overview of what you did to provide the pricing that set

14 forth in detail in your declaration?

15      A.   Sure.  At a high level, there are two facets to my

16 methodology.  The first facet is the selection of high

17 quality constituent markets that are used in the price

18 calculation, and the second facet is the application of

19 statistical methods or techniques to aggregate the input data

20 from these constituent markets to calculate the final price.

21      Q.   And can you elaborate just a bit on the first

22 facet of your methodology on how you determine the

23 constituent market?

24      A.   Sure.  I selected a set of high quality

25 constituent markets for each of the digital assets that I

1  calculated prices for.  This is necessary because generally,

2  digital assets can trade on many different exchanges and be

3  traded on many different markets, and there's a wide range of

4  quality amongst these exchanges and markets.

5       Of note, it's suspected that certain exchanges can

6  manipulate their trading activity to inflate the reported

7  trading volume in order to attract users or increase their

8  rankings on certain websites.

9       To deal with this issue, I relied upon the trusted

10  exchange framework developed by Coin Metrics, which grades

11  exchanges along several dimensions, one of which is data

12  quality, which examines whether or not an exchange has

13  economic trading, meaning arm's length transactions between a

14  willing buyer and willing seller, or has patterns that are

15  indicative of wash trading or fake volume.

16       There are other indicators of quality, as well, that

17  the framework considers, such as the degree that an exchange

18  complies with regulatory policies and rules, the stability of

19  their infrastructure, how transparent they are with respect

20  to their data or their financial reporting or their holdings.

21       And all these considerations are used in how I select

22  the set of high quality constituent markets in order to

23  calculate to reliable price.

24       Q.   Once you have that set of high, reliable

25  constituent markets, what do you do then to calculate price?

1        A.   The second facet of my methodology is to aggregate

2   the input data from these constituent markets.   I will

3   extract the most recent trade immediately prior to the

4   petition time and apply a weighted median to these trades.

5   And that is how I calculate the final price in this analysis.

6        Q.   Did your analysis submitted in this matter include

7   the MAPS, Oxy, Serum, and Boba tokens?

8        A.   Yes, it does.

9        Q.   So you provided a price based on that methodology

10   for each of those tokens that are at issue today?

11        A.   That's correct.

12        Q.   Mr. Lu, are you familiar with the report that was

13   done in this matter by Mr. Constantinidis on behalf of the

14   MAPS and Oxy objectors?

15        A.   Yes, I have reviewed that report.

16        Q.   Did you prepare a written rebuttal report?

17        A.   Yes, I provided a response to this report of Mr.

18   Constantinidis.

19        Q.   Sir, could you please turn to Exhibit FTX-7 in the

20   binder that's in front of you?   What is that document?

21        A.   This is the document that I prepared in response

22   to a review of the expert report of Mr. Constantinidis, and

23   it was filed on my behalf.

24        Q.   Are you aware that Mr. Constantinidis critiques

25   certain of your opinions in his report?

1     A.   Yes, I am.

2     Q.   Did any of his critiques change your conclusions

3 with respect to your analysis and opinions?

4     A.   No.  I carefully reviewed all the assertions in

5 the excerpt report of Mr. Constantinidis, and none of his

6 critiques, including ones regarding my selection of the

7 calculation window or the methods by which I selected the

8 constituent markets, would cause me to change my opinions or

9 cause me to change the analysis that I performed.

10     Q.   In your opinion -- I'm sorry.  Is it your opinion

11 that the petition time price you provided to the debtors for

12 each of MAPS, Oxy, Serum, and Boba is a high quality and

13 reliable price?

14     A.   Yes, that is my opinion.

15          MR. GLUECKSTEIN:  Your Honor, at this time, I'd

16 like to move into evidence Exhibits FTX-2 and FTX-7, which

17 are the written reports of Mr. Lu.

18          THE COURT:  Is there any objections?  They're

19 admitted without objection.

20          MR. GLUECKSTEIN:  Your Honor, we would tender at

21 this time, Mr. Lu, for cross examination, reserving the right

22 to redirect.

23          THE COURT:  Okay, thank you.  Cross?

24                    CROSS-EXAMINATION

25 BY MR. APPLEBAUM:

1          Q.    Morning again.  Aaron Applebaum, DLA Piper, on

2    behalf of MAPS Vault.  Mr. Lu, you were just testifying about

3    the digital assets being traded on multiple constituent

4    markets and multiple constituent exchanges or multiple

5    exchanges; is that right?

6          A.    That's right.

7          Q.    And I want to make sure that we're talking about

8    the same terms and we understand what those mean.  So am I

9    correct that a constituent market is a specific marketplace

10   on an exchange where you can trade or sell one type of

11   digital asset for either another type of digital asset or for

12   a fiat currency?

13         A.    That's correct.

14         Q.    So for Bitcoin, there could be a market where

15   Bitcoin is exchanged for U.S. dollars; is that right?

16         A.    Yes.

17         Q.    And there could be another market where Bitcoin is

18   exchanged for Ethereum tokens; is that right?

19         A.    Yes.

20         Q.    And yet another where Bitcoin is exchanged for

21   MAPS tokens, right?

22         A.    That's right.

23         Q.    And so if you're trying to determine the price of

24   Bitcoin in U.S. dollars, you have to consider that these

25   markets may not all be equal at any given point in time, is

1  that right?

2      A.   I don't understand the term equal.  Could you

3  please --

4      Q.   Sure.

5      A.   -- explain more?

6      Q.   So Bitcoin could be selling for $20 on a Bitcoin

7  U.S. dollar market, but it could be selling for the

8  equivalent of $21 on the Bitcoin Ethereum market, once you

9  calculate the value of Ethereum at that point in time?

10     A.   That's right, yes.

11     Q.   And each of these individual pairings, those are

12 all what we call a constituent market; is that right?

13     A.   Just to clarify, my term, constituent market,

14 refers to the markets that I selected in the calculation of

15 the price.  I think what you were describing was just a

16 market in general.

17     Q.   Understood.  So those are each a market, and then,

18 an exchange at its most simple level is a collection of those

19 markets; is that right?

20     A.   Yes.

21     Q.   And so you could have the same type of markets on

22 multiple exchanges, right?  You could have a Bitcoin U.S.

23 dollar market on the FTX exchange, and you can have a Bitcoin

24 U.S. dollar market on the MEXC exchange; is that correct?

25     A.   That's right.

1      Q.   And even though they're the same market, they

2  could have different prices on different exchanges at the

3  same period of time; is that right?

4      A.   Yes.

5      Q.   And you have to take all of that data from all of

6  these markets and all of these exchanges and aggregate it and

7  then apply statistical analysis to it in order to determine

8  the price at any point in time; is that right?

9      A.   Yes, that's right.

10     Q.   And I think you said before that that's a weighted

11  median average; is that correct?

12     A.   Yes.  I use a weighted median technique to

13  calculate the final price.

14     Q.   And is it a weighted median technique because

15  these different exchanges have different volumes on them, and

16  so we give more weight to the exchanges that have higher

17  volume?

18     A.   The weights that I used in the weighted median

19  technique consist of 50 percent from -- 50 percent of the

20  weight is derived from the market's trading volume, and 50

21  percent of the weight is derived from the market's inverse

22  price variance.

23     Q.   And what do you mean by inverse price variance?

24     A.   I calculate the variance of the price for that

25  constituent market over a certain window, and I take the

1  inverse of it, which is, in other words, one over the price

2  variance.

3      Q.   Would the most precise way to calculate price be

4  to pull the data from every market where an asset is sold and

5  then aggregate that data and calculate the price based on

6  that formula?

7      A.   No.  I strongly disagree with that assertion

8  because, as I mentioned, there's a wide range of quality

9  among exchanges and markets that trade a given digital asset.

10 And my methodology is designed to select the highest quality

11 constituent markets so that the price that I calculate is the

12 most reliable.

13     Q.   So your methodology excludes markets that you

14 believe are not as reliable; is that right?

15     A.   That's right.

16     Q.   And that methodology you've stated is generally

17 identical to what's used by Coin Metrics in a product called

18 the Coin Metrics Prices?

19     A.   It's very similar, yes.

20     Q.   But the Coin Metrics Prices does look at all of

21 the candidate markets from all exchanges in order to

22 calculate prices; isn't that right?

23     A.   The Coin Metrics Prices will consider all

24 exchanges as a candidate exchange, but it will still use the

25 same methodology that I used in this assignment to select the

1  constituent markets.  So it does not include all markets that

2  a given digital asset will trade on.

3        Q.    We started to discuss a few moments ago, but the

4  reason, or one of the reasons, that you believe that some of

5  these markets are less reliable or less trustworthy than

6  others relates back to a 2019 article that was published by

7  Bitwise.  Are you familiar with that article?

8        A.    Yes.

9        Q.    And that article wasn't published in any academic

10  journals, and it wasn't peer reviewed; is that right?

11        A.    Not to my knowledge.

12        Q.    And according to that article, Bitwise analyzed

13  certain exchanges and determined that there were indications

14  of wash trading taking place on those exchanges; is that

15  right?

16        A.    Yes.

17        Q.    Now, Bitwise only looked at Bitcoin markets on

18  those exchanges; is that right?

19        A.    Yes, I believe that's true.

20        Q.    Bitwise didn't look at any markets dealing with

21  MAPS, Oxy, or Serum tokens; is that right?

22        A.    No, they did not.

23        Q.    And no one at Coin Metrics independently analyzed

24  the data that Bitwise looked at to verify Bitwise's

25  conclusions and analysis; is that right?

1        A.    That's right.  But as I mentioned in my

2   deposition, we have used the same techniques that Bitwise

3   used in their analysis and applied it to a different sample

4   of data and have found that those techniques are effective.

5        Q.    And those techniques are effective to identify

6   indications of wash trading; is that right?

7        A.    That's right.

8        Q.    And wash trading, that's a practice that

9   artificially inflates the volume of transactions on a market

10  within an exchange?

11       A.    Wash trading refers to self-trading, generally.

12  And if there's a large amount of wash trading, it would lead

13  to inflated trading volume.

14       Q.    Now, Bitwise's determination or conclusion that

15  there's this evidence of wash trading that's based on

16  statistical inference; is that right?

17       A.    I think that's fair to say.

18       Q.    Bitwise is inferring the existence of wash trading

19  based on certain patterns that they see in the data from

20  those markets?

21       A.    Yes, that's right.

22       Q.    Bitwise didn't have firsthand evidence of wash

23  trading.  They're not able to point to a specific trade or a

24  specific market participant and say, that was a wash trade or

25  that was an economically arm's length transaction?

1      A.   Yes.  Their methodology was not designed to

2  determine whether an individual trade was non-economic in

3  nature.  They were looking at a sample of data and looking at

4  the distribution of that entire sample.

5      Q.   So Coin Metrics' solution to this problem of

6  unreliable data from some of these exchanges was to create

7  what it calls the trusted exchange framework; is that right?

8      A.   It was created for other reasons, as well.  But

9  one of the reasons was to determine whether or not an

10  exchange is likely to engage in wash trading or non-economic

11  trading.

12      Q.   And you used the trusted exchange framework in

13  your analysis and your completion of the assignment in this

14  case; is that right?

15      A.   Yes.

16      Q.   And you looked at the trusted exchange framework,

17  and you said, I'm only going to look at markets within

18  exchanges that the framework identified as the most

19  trustworthy, the most reliable?

20      A.   Yes.  If, for a given digital asset, if it is

21  traded on one or more of the trusted exchanges, my

22  methodology prefers to use those exchanges.  And if not,

23  then, it will consider the low-rated exchanges as identified

24  in the trusted exchange framework.

25      Q.   So if it's traded on just one trusted exchange,

1  you purposefully ignored entire segments of the marketplace

2  that where trading was done on the not so trusted exchanges;

3  is that right?

4       A.   Yes.  Because my methodology prefers to select

5  markets from trusted exchanges because prior analysis

6  indicates that those exchanges are more reliable than the low

7  rated exchanges.

8       Q.   Now, the trusted exchange framework, that's a

9  commercial product developed and marketed by Coin Metrics?

10      A.   Yes.

11      Q.   So Coin Metrics' purpose in that framework is to

12  make money.  It's to sell it to its customers; is that right?

13      A.   We don't monetize, directly, the Trusted Exchange

14  Framework.  The results from the Trusted Exchange Framework

15  are used in other data sets and commercial products that we

16  offer.  So we don't sell the results of this or try to

17  monetize it directly.

18      Q.   But Coin Metrics isn't a governmental regulator.

19  It's not an academic institution.  It's a private commercial

20  company; is that right?

21      A.   Yes.

22      Q.   Coin Metrics isn't subject to any prescribed

23  standards or processes.  And how it developed or used that

24  framework; is that right?

25      A.   That's right.

1      Q.    Now, for this assignment, you used the current

2  version of the framework, which is version 2.1; is that

3  right?

4      A.    Yes.

5      Q.    And that version was created in October of 2023?

6      A.    Yes.

7      Q.    And there was a version 2.0 before that; is that

8  right?

9      A.    Yes.

10      Q.    And the version before 2.0 was version 1.0,

11  correct?

12      A.    That's right.

13      Q.    And it was version 1.0 that was in effect on

14  November 11, 2022, which was the petition date for the FTX

15  debtors; is that right?

16      A.    That would be the version immediately prior to the

17  petition time.  I don't really understand what you mean by,

18  in effect.

19      Q.    The version of the framework that existed on

20  November 11, 2022, was version 1.0 of the Trusted Exchange

21  Framework.

22      A.    That's right.

23      Q.    And the version of the framework that you used

24  when you performed your analysis in December of 2023, when

25  you prepared your declaration that was just presented to the

1   Court, that was using statistics and data from these

2   exchanges as of the end of the third quarter of 2023; is that

3   right?

4        A.   Yes.  The sample that we used in version 2.1

5   ranged from 2022 Q2 to 2023 Q2, which encompasses the

6   petition time.

7        Q.   But version 2.1 is determining which exchanges are

8   trustworthy as of September 30, 2023, correct?

9        A.   Yes.  But as I mentioned, it uses a sample of data

10  that encompasses the petition time.

11       Q.   But the version that you use, version 2.1, that

12  didn't exist on November 11th, 2022, correct?

13       A.   It did not exist.

14       Q.   And the data that it relies on didn't exist in

15  November of 2022; is that right?

16       A.   Some of the data existed because the sample period

17  was from 2022 Q2 to 2023 Q2.  So the data from 2022 Q2 to the

18  petition time existed as of the petition time.

19       Q.   So some of the data in version 2.1 goes back to

20  2022, but it also includes data up through September 30th of

21  2023 that did not exist as of the petition date?

22       A.   That's right.

23       Q.   Now, the framework assesses exchanges based on

24  five categories; is that right?

25       A.   I believe so.

1          Q.    Those are data quality, transparency, resilience

2    and security, regulatory compliance, and API quality; is that

3    right?

4          A.    That sounds right.

5          Q.    And the framework assigns each exchange a grade in

6    each of those categories, correct?

7          A.    Yes.

8          Q.    And then, typically in commercial practice, the

9    framework then somehow aggregates those grades and provides

10   each exchange with an overall grade or score; is that right?

11         A.    Yes.

12         Q.    But for this assignment, you didn't look at the

13   overall grade.  You only looked at the grade for one

14   category, data quality; is that right?

15         A.    That's not correct.

16         Q.    How is that not correct?

17         A.    In the selection of candidate exchanges, we relied

18   on the data quality score.  In the step where I select

19   constituent markets, I rank them using a number of factors,

20   one of which is the overall score of the Trusted Exchange

21   Framework.  So we are using -- I am using both the data

22   quality score and the overall score in my methodology.

23         Q.    But you only use the overall score after you've

24   already eliminated exchanges from consideration based solely

25   on the data quality score; is that right?

1          A.    That's right.

2          Q.    So if an exchange gets eliminated based on data

3    quality score, it doesn't matter what the overall grade was,

4    it never gets to that step of the process, correct?

5          A.    That's right.

6          Q.    In order to calculate the grade that's given to

7    each exchange, Coin Metrics only analyzes a small sample of

8    data from each exchange; is that right?

9          A.    Yes.

10         Q.    And that sample is only taken from certain select

11   markets within the exchange, correct?

12         A.    That's correct.

13         Q.    Coin Metrics does not analyze the data from every

14   market within an exchange.

15         A.    That's correct.

16         Q.    But the grade that is given to the exchange is

17   applied to the exchange as a whole based solely on the

18   certain markets that were actually tested; is that correct?

19         A.    That's correct.

20         Q.    And it's possible, right, that some constituent

21   markets within that exchange are of higher quality than other

22   markets within the same exchange, correct?

23         A.    It's possible.

24         Q.    Now, the result of using the Trusted Exchange

25   Framework in this case was that certain exchanges on which

1  MAPS, Oxy, and Serum tokens were traded were excluded

2  entirely; is that right?

3       A.    Sorry, can you please repeat the question?

4       Q.    Sure.    The result of using the Trusted Exchange

5  Framework here is that certain exchanges on which MAPS, Oxy

6  and Serum tokens were traded were excluded entirely.

7       A.    That's correct.    Because the results from the

8  Trusted Exchange Framework indicate that there are -- there

9  could be suspected wash trading or non-economic trading on

10 certain exchanges, and thus would be less reliable for the

11 purposes of calculating the price.

12      Q.    And the exchanges that were excluded by the

13 Trusted Exchange Framework include the LBank and the MEXC

14 exchanges?

15      A.    Yes.

16      Q.    And you also didn't consider the FTX exchange; is

17 that right?    For purposes of calculating price.

18      A.    I did consider the FTX exchange.    As I described

19 in my declaration, I institute a hierarchy of exchanges where

20 I first prefer to select exchanges that are considered

21 trusted by the Trusted Exchange Framework, first, if they

22 exist for -- if those exchanges listed that particular

23 digital asset, and if they did not list that particular

24 asset, then I would rely on the low rated exchanges.    And if

25 the low rated exchanges did not list that particular digital

 1  asset, then I would rely on the FTX exchanges.

 2       Q.   So for MAPS, Oxy, and Serum tokens, you didn't

 3  look at the FTX exchange because there was at least one

 4  exchange that fell within your definition of a trusted

 5  exchange; is that right?

 6       A.   That's right.

 7       Q.   Now, when Coin Metrics tested these exchanges,

 8  including LBank and MEXC, and excluded them, it did so based

 9  on the analysis it did of those certain markets within those

10  exchanges, correct?

11       A.   That's right.

12       Q.   But Coin Metrics did not analyze any markets

13  dealing with MAPS, Oxy, or Serum tokens on any of those

14  exchanges; is that right?

15       A.   They were not included in the sample we used in

16  the analysis.

17       Q.   So the result is that you excluded significant

18  amounts of trading data relating to MAPS, Oxy, and Serum

19  tokens without ever sampling the markets on which those

20  tokens were traded; is that right?

21       A.   That's correct.  But it's not an unreasonable

22  assumption that if we detect wash trading in a major market,

23  like their Bitcoin tether market, that there could be wash

24  trading in other markets where the barrier to wash trading is

25  lower, and the incentives may be stronger.

1      Q.   But you don't have any evidence or any statistical

2  analysis of any markets dealing with MAPS, Oxy, or Serum

3  tokens reflecting an indication of wash trading on those

4  markets; is that right?

5      A.   I have not done that analysis.  There may be wash

6  trading or there may not.

7      Q.   But you've not done the analysis.  That's

8  accurate, right?

9      A.   I have not analyzed those particular -- I have not

10  analyzed markets for those particular digital assets.

11      Q.   And you don't have any knowledge of any direct

12  evidence of wash trading for any of those tokens, either

13  MAPS, Oxy, or Serum tokens on any of those markets on any of

14  those exchanges; is that right?

15      A.   That's right.  As I said, I haven't done the

16  analysis.  And there may be wash trading, or there may not be

17  wash trading.

18      Q.   But you haven't personally examined any markets

19  dealing with MAPS, Oxy, or Serum tokens, so you don't know

20  whether there was wash trading or not for those markets.

21      A.   That's correct.

22      Q.   Now, the actual calculation of price, once we've

23  gotten past the selection of markets, you're then calculating

24  the price using that volume weighted median average; is that

25  right?

1        A.    That's right.  It's a weighted median.

2        Q.    And for this assignment, to assess that weighted

3   median, you used a 60-minute interval; is that right?

4        A.    That's correct.

5        Q.    And that means you looked at the volume of trading

6   on those select markets that you chose to look at just in the

7   60-minute period leading up to the time that the petition was

8   filed; is that right?

9        A.    That's correct.

10       Q.    But you're aware that Professor Howell used a

11  different window to assess trading volume in her analysis; is

12  that right?

13       A.    I'm aware of that.

14       Q.    She used a much longer window going back an entire

15  year, correct?

16       A.    I believe that's correct.

17       Q.    And you didn't test any other time windows for

18  your analysis to see how it would affect price, is that

19  correct?

20       A.    I did test other time windows.

21       Q.    Did you test the time window that Professor Howell

22  used?

23       A.    No, I didn't.  But as I mentioned in my response,

24  during the development of the Coin Metrics prices, we did

25  perform a sensitivity analysis consisting of many assets and

1  many different time windows.  And we determined that the 60-

2  minute time window striked the right balance between

3  timeliness and robustness and manipulation resistance.  I

4  might add that the 60-minute window seems to be adopted

5  widely within the industry.  I cited six different

6  methodologies that also adopt the 60-minute calculation

7  window.

8       Q.   But your sensitivity analysis did not include the

9  same time window that Professor Howell used for her analysis,

10 correct?

11      A.   No.  The other analysis that I performed, which

12 considered a different calculation window, was in response to

13 Mr. Constantinidis's critique that a longer time window would

14 be more appropriate.  I believe he used an example where he

15 used a 12-hour calculation window.  And in my response, I

16 performed an analysis where we changed the calculation window

17 from 60 minutes to 12 hours, and the results on the final

18 prices were immaterial at less than 1 percent.

19      Q.   And your view is that the industry accepted

20 standard is a 60-minute window?

21      A.   Based on my review of other methodologies posted

22 publicly by reputable data providers, I have found that many

23 of them have selected a 60-minute calculation window.

24      Q.   Are you familiar with any that used a one-year

25 window like Professor Howell did?

1       A.    My review of the methodologies were limited to

2  data providers that were calculating price.  I did not review

3  methodologies in connection with Dr. Howell's assignment.

4       Q.    I understand you didn't review specifically for

5  this assignment, but you've been qualified as an expert.  I'm

6  just asking if you're aware of any industry standards, any

7  published articles, anything in the industry that says that a

8  one year time period like that used by Professor Howell is

9  the appropriate time period to use.

10      A.    For the purposes of calculating price, I have not

11 seen a calculation window of one year.

12      Q.    Part of your testimony was that you calculated a

13 confidence interval to show that your prices are reliable.

14 Is that right?

15      A.    That's right.

16      Q.    Now, in statistics, a confidence interval is an

17 indicator of the level of uncertainty when you're

18 extrapolating conclusions from a small sample onto a larger

19 population.  Is that right?

20      A.    That's right.

21      Q.    So the normal example is if you take a survey of

22 100 registered voters and you're going to extrapolate that

23 to, say, the voting population is predicted to vote a certain

24 way, and there's a margin of error of plus or minus so many

25 percent.  That's a typical use of a confidence interval; is

1  that right?

2       A.    I would say that's a fair statement.

3       Q.    And part of the calculation of the confidence

4  interval in that situation is you're looking at the size of

5  the sample that was used, and you look at the size of the

6  population as a whole, and that gets factored into how close

7  or not close the confidence interval would be.  Is that

8  right?

9       A.    I believe if you're referring to the traditional

10 statistics definition of confidence intervals, it will only

11 consider the size of the sample.  It will not consider the

12 size of the population.

13      Q.    But your confidence interval here doesn't fit the

14 traditional statistics definition of confidence interval.  Is

15 that right?

16      A.    I calculated a value that represents the

17 uncertainty and determination of my price, and I labeled it

18 as confidence interval just as a term that could be widely

19 understood.  The techniques I used here are different from

20 the traditional statistics definition of confidence interval,

21 which you're asking about.

22      Q.    And here, the confidence interval that you

23 calculated is only demonstrating the reliability of price

24 within those certain exchanges and certain constituent

25 markets that you actually looked at for the purpose of

1  calculating price.  Is that right?

2      A.   That's right.  The confidence interval I

3  calculated was reflecting the uncertainty of my price, and my

4  price only used the constituent markets that I selected.

5      Q.   So the confidence interval that you calculated

6  doesn't take into account that your price may be more

7  significantly different than the price that existed on the

8  MEXC or the LBank or even the FTX exchanges that you did not

9  consider; is that right?

10     A.   It does not.  But such a calculation -- such a

11 confidence interval would be inconsistent with my assignment.

12 My understanding of my assignment was to calculate the

13 uncertainty of my price, not the price that includes

14 exchanges and markets that I feel like would be less

15 reliable.

16     Q.   And you don't think that your price, the

17 uncertainty of your price, is affected by the fact that there

18 are entire markets and entire exchanges not being considered?

19     A.   It's not affected because I did not use those

20 other exchanges in the calculation of my price.

21     Q.   So at the end of the day, you calculated price for

22 each of these MAPS, Oxy, and Serum tokens as of the petition

23 time, which was 10:00 a.m. on November 11, 2022, right?

24     A.   That's right.

25     Q.   And you did that by looking at only markets on

1  certain exchanges that were identified as trustworthy by the

2  Trusted Exchange Framework, correct?

3       A.    Sorry, can you please repeat the question?

4       Q.    Sure.  You calculated the price by looking only at

5  markets on the exchanges that were identified as trustworthy.

6       A.    For a given digital asset if they traded on one or

7  more of the exchanges that are considered trusted, then yes.

8       Q.    And that's what happened with MAPS, Oxy, and

9  Serum.  There was one exchange that satisfied the criteria of

10  the framework.  So all other exchanges which were less

11  trustworthy were not considered.

12       A.    There was one or more trusted exchange for those

13  digital assets.  That's correct.  And I believe for some of

14  the digital assets in this matter, there were more than one

15  trusted exchange.

16       Q.    And just to be clear, the exchanges that were

17  excluded was based solely on an analysis of data from markets

18  that did not include any markets on which MAPS, Oxy, or Serum

19  were traded.  Is that correct?

20       A.    That's correct.  We had to take a sample of data

21  to perform analysis.  It would be extremely burdensome or

22  almost impossible to consider the entire universe of markets

23  on all exchanges.

24       Q.    But you didn't include any markets?  Not all of

25  them.  You didn't analyze a single market on which one of

1   those three tokens were traded; is that right?

2        A.   They were not included in the sample of data.

3             MR. APPLEBAUM:  No further questions.

4             THE COURT:  Thank you.  Anyone else wish to

5   cross??

6             MR. CHAPPLE:  May it please the Court?  Ben

7   Chapple, Reed Smith, on behalf of the MAPS and Oxy

8   foundations.

9                      CROSS-EXAMINATION

10  BY MR. CHAPPLE:

11       Q.   Hello again, Mr. Lu.  Nice to see you today.

12       A.   Hi.  Same, as well, to you.

13       Q.   Thank you.  So I'll do my best, as I did during

14  the deposition, to not rehash ground that Mr. Applebaum

15  covered today.  There may be a little bit of overlap, though,

16  so just as a sort of a threshold matter, just want to be

17  clear.  The term trusted exchange, that's just a term that

18  Coin Metrics has derived, correct?

19       A.   That's a term specific to Coin Metrics.  That's

20  right.

21       Q.   And you're familiar with the LBank exchange,

22  correct, Mr. Lu?

23       A.   Yes.

24       Q.   And to be clear, you never advised Professor

25  Howell not to use LBank prior to her issuance of her opening

1 report in this case, correct?

2     A.   I did not directly advise Dr. Howell not to use

3 LBank.  I believe there was a question from Alvarez & Marsal

4 on this topic where I shared my thoughts on LBank and other

5 exchanges.

6     Q.   And when that question was asked to you from

7 Alvarez & Marsal, did you understand the purpose of the

8 question?

9     A.   No.  Alvarez & Marsal provided me with a chart

10 that graphed volume, and there were certain outliers on the

11 chart.  And they asked me if I could provide more explanation

12 on why we're observing these outliers.  I responded that

13 based on Coin Metrics' five years of maintaining a 24/7 data

14 feed with these exchanges, we've observed clearly earnest

15 data on numerous occasions from LBank and ZB.com.

16     Q.   But to be clear, none of those instances involve

17 MAPS, Oxy, or Serum, correct?

18     A.   To the best of my knowledge, they don't.  Although

19 we have not -- we have also not looked as to whether or not

20 that earnest data is present in those assets.  They may exist

21 or they may not.

22     Q.   So you chose not to undertake that analysis

23 despite it being relevant to this proceeding today?

24     A.   When the question was posed to me, I believe this

25 was in November 2022, I had no way of knowing that there

1  would be additional discussion on this matter and that there

2  would be a particular focus on these tokens.  So I did not

3  look into that question.

4       Q.   And you were, of course, aware that there was a

5  specific proceeding, including depositions and supplemental

6  expert reports that were exchanged in connection with that

7  very issue, correct?

8       A.   That's right.

9       Q.   So, turning back to LBank, during your deposition,

10 you testified you believed LBank ranks dead last in the Coin

11 Metrics Trusted Exchange Framework.  Isn't that right?

12      A.   That's right.

13      Q.   But you've also acknowledged during your

14 deposition that LBank received a grade of C in the data

15 quality category under the Trusted Exchange Framework,

16 correct?

17      A.   Yes.

18      Q.   And in fact, another exchange you identified in

19 your opening declaration, Upbit, scored lower than LBank in

20 the data quality category; isn't that right?

21      A.   I would need to consult the table to answer that

22 question.  I don't know.

23      Q.   Certainly.  Do you have the binder in front of you

24 still where you can turn to FTX-2, please?  And please, I'll

25 direct you to page 37.

1       A.    Yes, I see that Upbit was ranked lower than LBank

2   in the data quality category.

3       Q.    Are you aware that under CoinMarketCap rating of

4   top cryptocurrency spot exchanges, LBank is ranked number 21

5   of over 200 spot exchanges?

6       A.    I'm not aware of that.

7       Q.    Do you have any reason to disagree with that?

8       A.    I have no way of knowing how CoinMarketCap ranks

9   their exchanges, so I can't opine on whether or not that's

10  appropriate or not appropriate.

11      Q.    Do you have Oxy Exhibit 57 before you?

12      A.    I have a binder with exhibits with the prefix FTX.

13  If there are certain you can direct me to.

14      Q.    Bear with me.  I'll get a binder for you.  One

15  moment, please.  And again, that's Oxy 57.

16           MR. GLUECKSTEIN:  Counsel, can we get copies?

17  Despite -- Your Honor, despite everybody exchanging exhibits,

18  we did not get exhibits from this objector last night.  So we

19  don't have this document.

20           MR. CHAPPLE:  Just for the record, Your Honor,

21  they were sent at 6:07 p.m. last night.  I'm not sure -- no

22  one followed up from debtors counsel.  So it's the first I'm

23  hearing of it from them.  I apologize that they weren't

24  received.  I can confirm that they were sent at 6:07 p.m.

25  yesterday evening.

1          MR. GLUECKSTEIN:  Well, they were not received, so

2   we would appreciate getting a copy of.

3          MR. CHAPPLE:  Certainly.

4          MR. GLUECKSTEIN:  This exhibit is being --

5          MR. CHAPPLE:  Grab a copy of that right now, Your

6   Honor.

7          THE COURT:  All right.  Did the pretrial order

8   include a date when the exchange of exhibits was supposed to

9   occur?

10          MR. CHAPPLE:  Your Honor, the pretrial order did

11   not have a specific provision.  I believe all the parties

12   were guided by your chamber's procedures that specified as

13   soon as practical and no later than two hours before

14   yesterday.  I believe DLA Piper's client exchanged their

15   exhibits around 1:00 or 2:00 p.m.  As I just stated on the

16   record, 6:07 p.m. is when my co-counsel sent that on behalf

17   of my clients.  And I believe shortly thereafter, debtors

18   counsel circulated theirs.

19          THE COURT:  Okay.

20          MR. CHAPPLE:  And to be clear, we, of course,

21   provided a copy to your courtroom deputy who confirmed

22   receipt shortly after we transmitted it, again, right around

23   6:07 p.m.  I'm not sure what happened.

24   BY MR. CHAPPLE:

25      Q.   Mr. Lu, have you been able to orient yourself and

1   identify Oxy Exhibit 57?

2       A.   Yes, I have it in front of me.

3       Q.   Fantastic.  And how have you since been able to

4   confirm that CoinMarketCap's rating of over 200 spot

5   exchanges ranks LBank as 21, correct?

6       A.   Yes.  I see that.

7       Q.   In your declaration, you indicate that the

8   methodology you use to calculate the prices is identical to

9   the methodology used to calculate Coin Metrics' reference

10  rate.  One of the prices contained within Coin Metrics'

11  prices, correct?

12      A.   That's right.

13      Q.   And one of the other prices contained within Coin

14  Metrics, prices is the principal market rate; isn't that

15  right?

16      A.   Yes.  Principal market price.

17      Q.   Thank you.  Thank you.  You testified during your

18  deposition that the principal market price is calculated

19  based on the venue in which the most trading volume has

20  occurred for a given asset, correct?

21      A.   That's right.

22      Q.   You also testified that Coin Metrics' principal

23  market prices are typically used for valuing assets for

24  accounting purposes and that they conform to generally

25  accepted accounting principles, correct?

1      A.    That's correct.

2      Q.    Isn't it true that Coin Metrics customers prefer

3 using principal market prices because they conform to GAAP?

4      A.    I can't really speak to the preferences of our

5 customers directly, but this data product was designed so

6 that our users could use it in compliance with fair value

7 accounting principles.

8      Q.    Mr. Lu, I'm going to hand you a copy of your

9 deposition because you provided a different answer when you

10 were deposed.  Bear with me one moment.

11           MR. CHAPPLE:  Your Honor, may I approach to hand

12 you a copy?

13           THE COURT:  I have it.  Thank you.

14           MR. CHAPPLE:  Excellent.

15 BY MR. CHAPPLE:

16      Q.    So, if you could please turn to page 48 of your

17 deposition, and I will direct you to line 22.

18      A.    Yes, I see it.

19      Q.    Can you please read line 19 to line 24?

20      A.    So the Coin Metrics reference rates does not

21 conform to GAAP principles.  I don't know whether or not they

22 do, because I'm not an accountant, but I know that some of

23 our users have preferred using the principal market prices

24 for that purpose.

25      Q.    So you, in fact, do know that some customers have

1  preferred using the principal market prices because they

2  conform to GAAP principles, correct?

3       A.    I can make some reasonable inferences just from my

4  discussions with them, but I'm not in the mind of my users.

5       Q.    During your deposition, you testified you did not

6  identify the principal market for either Oxy or MAPS when

7  computing the price for either token; isn't that right?

8       A.    I did not calculate the principal market price for

9  those assets.

10      Q.    So, with respect to your calculation for the price

11 of Oxy and MAPS, any trading data from LBank would have been

12 excluded, regardless of whether LBank was the principal

13 market for either token, correct?

14      A.    That's correct.  LBank was not selected as a

15 constituent exchange in the calculation of my price.

16      Q.    You talked with Mr. Applebaum before I took the

17 podium regarding the 60-minute trading window that you use,

18 correct?

19      A.    Yes.

20      Q.    And to be clear, that 60-minute trading window was

21 from 9:00 a.m. Eastern Time to 10:00 a.m. Eastern time on the

22 petition date, correct?

23      A.    Yes.

24      Q.    You agree with me, though, that the highest

25 activity for cryptocurrency trading occurs between 9:00 a.m.

1  and 4:00 p.m. Correct?

2       A.    That's correct.  But I don't see the relevance of

3  it in the calculation of my price.

4       Q.    Cryptocurrency trades 24/7 across the world,

5  correct?

6       A.    That's right.

7       Q.    So the seven-hour peak in trading activity really

8  depends on the geographic location, correct?

9       A.    It depends on the geographic location of the

10  trader that we're, I guess, in question.

11      Q.    Because there's different time zones across the

12  globe, right?

13      A.    Yes.

14      Q.    So, turning to the confidence interval, during

15  your deposition, you were asked about the purpose of your

16  calculation of the confidence interval, and you testified

17  that you did not know why the debtors requested you to

18  calculate that, correct?

19      A.    That's right.

20      Q.    And you do not use the confidence interval in

21  determining the price of Oxy or MAPS tokens, correct?

22      A.    That's correct.

23      Q.    In your response to Mr. Constantinidis's report,

24  you indicate that the standard statistical methods for

25  calculating confidence intervals are not appropriate because

1  they fail to incorporate staleness of data, correct?

2       A.    That's right.

3       Q.    So you'd agree with me, then, that relying on

4  older stale data can lead to misleading results, right?

5       A.    I wouldn't say misleading.  If there may be

6  situations where the only available data may be stale and in

7  which case, that would still be the most appropriate data to

8  use.  The only available data to use.

9       Q.    If there is more recent data, would you agree with

10 me that it would be appropriate to use more recent data as

11 opposed to more stale data?

12      A.    I'd have to consider the totality of the

13 situation.  I'd have to examine whether or not that more

14 recent data came from an exchange that is of high quality and

15 that has trading that is economic in nature.  As an example.

16 There may be other factors that I may consider before making

17 a determination.

18      Q.    Another point of disagreement between you and Mr.

19 Constantinidis relates to the reliability of trading data

20 reported to CoinMarketCap; isn't that right?

21      A.    Yes.

22      Q.    And CoinMarketCap, like Coin Metrics, is a data

23 aggregator, right?

24      A.    There really is no consensus on these terms, I

25 think.  But CoinMarketCap provides data and Coin Metrics also

1  provides data.

2      Q.    And you indicate that CoinMarketCap is not a

3  reliable source of trading volume data because you believe,

4  based on certain studies identified in your response, that

5  CoinMarketCap volume numbers include a large portion of fake

6  volume in wash trading, right?

7      A.    That's correct.

8      Q.    And just to be clear, you testified that you've

9  never personally conducted any analysis of the reliability of

10  the trading volume reported on CoinMarketCap.  Isn't that

11  right?

12      A.    The Trusted Exchange Framework that produced by

13  Coin Metrics includes in its sample exchanges that are also

14  included in CoinMarketCap's reported trading volume.  And we

15  have found that certain exchanges that are in both Coin

16  Metrics and CoinMarketCap's data sets have signs of non-

17  economic trading.

18      Q.    You still have your deposition transcript in front

19  of you?

20      A.    Yes, I do.

21      Q.    Please turn to page 146.  Let me know when you're

22  on that page.

23      A.    I am on that page.

24      Q.    Please read lines 12 to lines 15.  Actually,

25  strike that.  Please read lines 12 to line 18.

1        A.    I'm sorry, on what page?

2        Q.    Certainly.  Page 146.

3        A.    Have you performed any independent analysis of the

4   reliability of the trading volume reported by CoinMarketCap?

5   I personally haven't.  Has anyone done so at your direction?

6   No.

7        Q.    During your deposition, you also acknowledged that

8   you weren't aware of any data from any exchange that would

9   indicate that there was wash trading with respect to MAPS or

10  Oxy tokens.  Isn't that right?

11       A.    That's correct.  There may be wash trading or

12  there may not.

13       Q.    So when you were previously being examined by Mr.

14  Applebaum, you referenced an analysis that Coin Metrics

15  purportedly did that was similar to the analysis that was

16  undertaken in Bitwise.  Do you recall that testimony?

17       A.    Yes, I recall that.

18       Q.    And did the analysis that Coin Metrics did that

19  was similar to the analysis that Bitwise employed, did it

20  involve any analysis of Oxy, MAPS, or Serum token?

21       A.    No.  The sample of data that we used didn't

22  include those assets.  As I mentioned before, it was

23  necessary to take a sample because an exhaustive analysis of

24  all the data would be almost impossible to accomplish.

25       Q.    In footnote 8 of your response, you discussed some

1  of the changes that CoinMarketCap has made following the

2  publication of the 2019 Bitwise article, correct?

3      A.   Yes.

4      Q.   You noted that after the publication of the 2019

5  Bitwise article, CoinMarketCap began excluding a particular

6  exchange from reported volume calculations.  If the exchange

7  has zero fees, provides incentives to users to trade, or if

8  price outliers are detected.  Isn't that right?

9      A.   That's right.

10      Q.   And in the same footnote, you also note that after

11  the publication of the 2019 Bitwise article, CoinMarketCap

12  has released additional metrics to provide users with a

13  greater level of transparency regarding which exchanges are

14  likely to have non-economic or fake volumes, correct?

15      A.   That's correct.

16      Q.   And during your deposition, although you weren't

17  aware of the exact date, you testified that these changes

18  were implemented months after the publication of the 2019

19  Bitwise article, right?

20      A.   That's correct.

21      Q.   With respect to the impact of changes that

22  CoinMarketCap made, you conceded that removing an exchange

23  without wash trading would reduce the percentage of wash

24  trading in other fake volume.  Strike that.

25      With respect to the impact of the changes that

1  CoinMarketCap made, you conceded during your deposition that

2  removing an exchange without trading fees would reduce the

3  percentage of wash trading and other fake volume, correct?

4       A.    Yes.  It would reduce the amount of fake volume.

5       Q.    You also conceded during your deposition that

6  removing an exchange that provides incentives to users to

7  trade would reduce the percentage of wash trading and other

8  fake volume; isn't that right?

9       A.    Yes.

10      Q.    You testified previously that you did not know for

11 certain whether CoinMarketCap had also threatened to remove

12 exchanges that didn't provide certain mandatory trading data,

13 correct?

14      A.    I'm not aware of what they did related to that.

15      Q.    But you do recall, and you testified during your

16 deposition that you recall after the 2019 Bitwise article,

17 you recall reading a heading -- strike that.  I'll move on.

18      You agree that you had not performed any analysis to

19 determine whether any of the exchanges implemented by

20 CoinMarketCap after the 2019 Bitwise article improved the

21 reliability of CoinMarketCap's reported trading volume,

22 correct?

23      A.    I have not done that study.

24      Q.    But you're relying on "other independent

25 researchers" that you believe have conducted a further

1  analysis.  Isn't that right?

2       A.   Yes.  As I mentioned in response, there are other

3  academic papers published in peer reviewed journals that have

4  studied the same problem using data sets that are -- data

5  sets that encompass a period of time after the 2019 Bitwise

6  study, and they have come to the same conclusions.

7       Q.   And did you cite those articles in your response?

8       A.   Yes.

9       Q.   Specifically are in the footnote 7 of your

10 response?

11      A.   That's right.

12      Q.   So the first article referenced in footnote 7 is

13 Crypto Wash Trading by Cong et al, correct?

14      A.   That's right.

15      Q.   To be clear, the Cong article didn't contain any

16 analysis as to whether there was wash trading with respect to

17 MAPS or Oxy tokens, correct?

18      A.   That's right.

19      Q.   And the Cong article only analyzed data from 2019,

20 correct?

21      A.   I can't recall.  I need to look at the articles.

22      Q.   It's Exhibit Oxy-30.  I'll probably have to get

23 you another binder.  One moment, please.  And once you have

24 Oxy-30 up, please turn to page 7, and I can direct you to the

25 specific paragraph.

1      A.    Yes, I have in front of me.

2      Q.    All right, please.  Do you see the heading that

3  says two, data and summary statistics?

4      A.    Yes, I see it.

5      Q.    All right.  About halfway down that paragraph,

6  there's a sentence that begins, it's just after footnote 7,

7  our data covers the period from 00:00 July 9, 2019, to 23:59,

8  November 3, 2019.  Do you see that?

9      A.    Yes.

10     Q.    So you agree with me that the data that was

11 considered in the Cong article was from 2019, correct?

12     A.    Yes, I agree with that.

13     Q.    Which is essentially the same period as the

14 Bitwise article, correct?

15     A.    I believe it's a similar time period.

16     Q.    And turning back to footnote 7 of your report, the

17 second article is titled Wash Trading at Cryptocurrency

18 Exchanges.  And that's by Le Pennec, et al, correct?

19     A.    I believe so.

20     Q.    And just like the Cong article, the Le Pennec

21 article did not contain any analysis as to whether there was

22 wash trading with respect to MAPS or Oxy tokens, correct?

23     A.    I don't believe so.

24     Q.    And just like the Cong article, the data from the

25 Le Pennec article, like Bitwise, was also from 2019; isn't

1  that right?

2      A.    I don't know if that -- I'd have to look at the

3  article.

4      Q.    Have you reviewed the article previously?

5      A.    A long time ago.  I have reviewed it, but I can't

6  recall as I sit here today.

7      Q.    Does it refresh your recollection if I tell you

8  that it states we collected daily data for each of the

9  exchanges for the period July 23rd to November 10th, 2019?

10      A.    It doesn't refresh my recollection, but I believe

11  you when you say that.

12      Q.    Looking back at footnote 7 of your report, there's

13  a third article.  It's titled Direct Evidence Of Bitcoin Wash

14  Trading.  And that article is by Arash Aloosh, correct?

15      A.    I believe so.

16      Q.    And as the name of the article suggests, it

17  focuses on Bitcoin, correct?

18      A.    I believe so.

19      Q.    The article does not involve or analyze Oxy or

20  MAPS tokens?  Correct?

21      A.    Not to my knowledge.

22      Q.    And despite the fact that this article was

23  published in August of 2023, isn't it true that the article

24  examines trading data from June 2011 until May 2013?

25      A.    I believe that's correct.

1      Q.    And to be clear, that's stale information,

2  correct?

3      A.    It is a long time ago, yes.

4      Q.    And you testified earlier that it's not

5  appropriate in many instances to rely on stale information.

6  Correct?

7      A.    I testified that it would depend on the situation

8  and that if the still information was the only available

9  information, it might be correct to rely on that.

10     Q.    There's a fourth article referenced in footnote 7

11  of your response.  It's titled Do Cryptocurrency Exchanges

12  Fake Trading Volume?  An Empirical Analysis Of Wash Trading

13  Based On Data Mining.  And that's by Chen et al, correct?

14     A.    I believe so.

15     Q.    Are you aware of the fact that this article cited

16  in your report refers to CoinMarketCap as "one of the most

17  influential portal websites with comprehensive and true data

18  of the cryptocurrency market"?

19     A.    I'm not aware of that statement.

20     Q.    In your response, you stated that serious

21  practitioners within the industry understand that data

22  aggregators such as CoinMarketCap, CoinGecko and Coinpaprika

23  are not reliable sources for trading volume data, correct?

24     A.    That's right.

25     Q.    Isn't it true that Professor Howell has described

1  CoinMarketCap as "the most comprehensive and credible source

2  of trading data for digital assets"?

3       A.   I'm not aware of that statement.

4       Q.   Let's look at FTX-12.  I believe that's in the

5  binder the debtor's counsel handed you.  And once you have

6  that exhibit in front of you, please let me know.

7       A.   My binder only goes to FTX-9.

8       Q.   One moment, please.  I'm sure the debtor's counsel

9  has another binder handy.

10           MR. CHAPPLE:  Your Honor, do you already have a

11  copy?

12           THE COURT:  I have it.  Thank you.

13           THE WITNESS:  Thank you.

14           THE COURT:  So, you know, we're going to go until

15  noon, and then I'm going to take lunch break.  Come back at 1

16  o'clock.  The rate we're going, I don't think we're going to

17  finish today.

18           MR. CHAPPLE:  Appreciate the heads-up.  Thank you

19  very much, Your Honor.

20  BY MR. CHAPPLE:

21       Q.   So, Mr. Lu, please turn to the page -- it's got a

22  lot of numbers on it.  The bottom right hand corner, it says

23  FTX-DA-EST -- there's a bunch of zeros.  And then it says

24  6280.  It's also separately paginated as 3933, just a few

25  pages into the document.  Do you have that before you?

1      A.   Yes, I see it.

2      Q.   All right, you see the heading that says 1.2

3  market overview?

4      A.   Yes, I see it.

5      Q.   Great.  So at the very bottom of that paragraph,

6  the final sentence that appears on that page that carries

7  over onto the other, please read it for me.  It begins, we

8  merged the ICOs.

9      A.   We merged the ICOs from token data with daily

10  trading data from CoinMarketCap, which is the most

11  comprehensive and credible source of trading data for digital

12  assets.  Would you like me to continue?

13      Q.   No.  You've done an excellent job.  Thank you.

14  During your deposition, you testified you were not aware of

15  any court or tribunal commenting on the reliability or

16  accuracy of either CoinMarketCap or Coin Metrics, correct?

17      A.   I haven't looked into it, so I'm not aware.

18      Q.   So you're not aware that the Delaware Superior

19  Court in Diamond Fortress Technologies Inc. versus EverID

20  Inc. described CoinMarketCap as "a reliable valuation tool"

21  for determining the US Dollar value of cryptocurrency tokens?

22      A.   I'm not aware of that, but it seems to me my

23  interpretation of that sentiment is that they are opining on

24  CoinMarketCap's price, not the reported trading volume.

25      Q.   So you're also unaware of the fact the Federal

 1  District Court for the Southern District of New York in CFTC

 2  versus Reynolds described CoinMarketCap as a reliable

 3  valuation tool?

 4       A.   Again, if they mentioned valuation, my

 5  interpretation of that is price, not volume.  But I am not

 6  aware of that.

 7       Q.   During your deposition, you testified you believe

 8  that Coin Metrics relies upon circulating supply figures from

 9  CoinMarketCap in connection with indexes for certain assets

10  not covered by Coin Metrics, correct?

11       A.   That's correct.

12       Q.   But you were unaware of any other current or

13  historical instances where Coin Metrics relied on pricing or

14  volume data from CoinMarketCap; isn't that right?

15       A.   In our commercial data products, yes.

16       Q.   Isn't it true that Coin Metrics previously used

17  CoinMarketCap as its primary source for pricing information?

18       A.   That's not correct.

19       Q.   In the binder with the Oxy exhibits, could you

20  please turn to Oxy-38?

21       A.   Yes, I see this.

22       Q.   So if you please turn to page 2 of 3, let me know

23  when you see the heading little more than halfway down the

24  page.  It's in bold, it says price.

25       A.   I see it.

1        Q.    Great.  So can you please read that for me?

2        A.    Price is price.  Not much to say about that one.

3   We get it from CoinMarketCap, with all the caveats that

4   entails.  Be advised, it's the opening price.  But I'd like

5   to provide a little bit more context on my answer.  This

6   article was published in 2018.  This is before I joined,

7   before the company received venture funding and was

8   officially a company.  I was not aware of this.  I'm not

9   aware of this document.

10       Q.    But you don't question its authenticity, correct?

11       A.    It looks like it's printed from our website, so I

12  don't question the authenticity.

13       Q.    This is a website you're familiar with, correct?

14       A.    Yes.  It looks like it's from Coin Metrics'

15  website.

16            MR. CHAPPLE:  Your Honor, I don't believe I have

17  any other questions.  It may be an appropriate time to take

18  lunch, if that is okay with you.

19            THE COURT:  All right.  So are you done your cross

20  examining?

21            MR. CHAPPLE:  I am done cross examining.

22            THE COURT:  Is anyone else going to cross, Mr. Lu?

23  No?  So we're going to go right to redirect when we get back

24  from lunch.  As I said, at the rate we're going, it doesn't

25  seem like we're going to finish today.  Do you, anybody in

1  the room think otherwise, that we might be able to get -- Mr.

2  Glueckstein?

3          MR. GLUECKSTEIN:  No, Your Honor.  I mean, we were

4  optimistic, but I agree, unless the pace picks up here, it's

5  not going to happen.

6          THE COURT:  Okay.  Problem is, I am in Washington,

7  DC tomorrow and Friday, so if we continue, it's going to be

8  Monday when we come back, just so everybody's aware of that.

9  So for now, we'll recess until 1 o'clock, and we'll come

10  back, and we'll pick up from there.

11          Mr. Lu, you're still under oath, and because you

12  have not completed your examination yet, you are not allowed

13  to speak to anybody during the break about your testimony.

14          THE WITNESS:  Sure, I understand.

15          THE COURT:  All right.  Thank you very much.

16  We're recessed till 1 o'clock.

17              (Off the record at 11:58 a.m.)

18              (On the record at 1:02 p.m.)

19          THE COURT:  Mr. Lu, if you can come forward and

20  take the stand again, please.  Just a reminder, Mr. Lu, you

21  are still under oath.

22          THE WITNESS:  Yes.

23                    REDIRECT EXAMINATION

24  BY MR. GLUECKSTEIN:

25      Q.  Good afternoon, Mr. Lu.

1        A.    Good afternoon.

2        Q.    For the record, Brian Glueckstein for the debtors.

3   Mr. Lu, is it your view that wash trading is still an issue

4   in the cryptocurrency industry today?

5        A.    Yes.  Based on my review of the literature, the

6   analysis that we performed in the Trusted Exchange Framework,

7   and discussions that I've had with industry participants,

8   it's still my view that wash trading occurs in the

9   cryptocurrency industry today.

10        Q.    Have you seen any literature suggesting that the

11   issue of wash trading or fake volume has been resolved?

12        A.    No, I haven't.

13        Q.    Do you have any reason to believe that the MAPS,

14   Oxy, and Serum tokens are exempt from the issues of wash

15   trading and fake volumes?

16        A.    No, I don't.  And my general opinion is that wash

17   trading is more likely in assets that are in the longer tail.

18        Q.    Can you elaborate what you mean by that?

19        A.    By longer tail of assets, I mean assets that are

20   smaller in market cap, not the major assets like Bitcoin and

21   Ethereum.

22        Q.    Mr. Lu, you were asked some questions that related

23   to a footnote in your rebuttal report.  Do you still have the

24   binder of documents in front of you?

25        A.    Yes, I do.

1        Q.    If you could turn to your rebuttal report, which

2   is Exhibit FTX-7, if you could turn to page 5 of that report.

3        A.    I have it in front of me.

4        Q.    Do you see footnote 8 there?

5        A.    Yes, I do.

6        Q.    You were asked some questions about changes that

7   CoinMarketCap has made to its data set in connection with

8   what you said in footnote 8.  Do you recall those questions?

9        A.    Yes, I do.

10        Q.    Okay.  There's more to the footnote in footnote 8

11   that you talked about in connection with your opinion of

12   those CoinMarketCap adjustments, correct?

13        A.    That's correct.

14        Q.    What do you say ,if you could read starting with

15   the middle of that paragraph, starting "however"?

16        A.    However, this represents the most cursory attempt

17   at addressing the fake volume problem.  These exclusion rules

18   will only remove the most blatant and egregious instances of

19   wash trading.  Exchanges that wish to inflate their reported

20   trading activity will usually attempt to obfuscate their

21   methods.  CoinMarketCap still makes no attempt at excluding

22   such exchanges from its reported volume figures, and in fact,

23   will still include exchanges where its own confidence in the

24   legitimacy of reported volume is low to moderate.

25        Q.    Does that remain your view as you sit here

1  testifying today?

2       A.   Yes, I believe that's still the way that

3  CoinMarketCap operates today.

4       Q.   Mr. Lu, in calculating the prices, the petition

5  time prices in this matter, why does Coin Metrics analyze

6  samples of exchange data?

7       A.   The total data that Coin Metrics has in our data

8  sets is extremely large, many, many terabytes of data, and to

9  do an exhaustive analysis of all the data in our data sets

10  would be almost impossible.  Therefore, we sampled -- we took

11  a representative and random sample of major markets from

12  exchanges and used this in our analysis for the Trusted

13  Exchange Framework.

14       Q.   Are you confident that those samples are reliable

15  across markets?

16       A.   Yes, it's a random and randomized sample of the

17  major markets that represent typical activity that's

18  occurring on those exchanges.

19       Q.   You applied the same methodology.  I'm sorry, did

20  you apply the same methodology that is set forth in your

21  reports across all the tokens that you valued with respect to

22  this assignment?

23       A.   Yes, I consistently applied the same methodology

24  to all of the assets that I was asked to price in this

25  assignment.

1    Q.    And do you recall how many assets you looked at?

2    A.    I think it was 426 or so.

3    Q.    Do you view it as important to have had a single

4  methodology in calculating prices across a set of digital

5  assets?

6    A.    I believe so.  By applying a consistent

7  methodology, I didn't make any exceptions or introduce any

8  bias on any one asset or another.

9    Q.    Was the confidence interval that you provided as

10  part of this assignment used in determining the actual

11  petition time price list?

12    A.    No, it was not.

13    Q.    You were asked some questions about your use of

14  the 60-minute calculation window this morning.  Do you recall

15  those?

16    A.    Yes, I do.

17    Q.    You used that calculation window for purposes of

18  calculating the petition time prices, correct?

19    A.    That's correct.

20    Q.    In your view, could it be appropriate to use a

21  different period of time for calculating something other than

22  prices?

23    A.    If the purpose of analysis is for something that's

24  not calculating prices, it could be reasonable to choose

25  another calculation window.

1     Q.   And you're not offering an opinion on that?

2     A.   I'm not offering an opinion.

3     Q.   You were asked a couple of questions --

4          THE COURT:  Hold on one second, please.

5  I'm sorry.

6          MR. GLUECKSTEIN:  I'm sorry, Your Honor.

7          THE COURT:  Got a little frog in my throat.  Go

8  ahead, sorry.

9  BY MR. GLUECKSTEIN:

10     Q.   Mr. Lu, you were asked some questions regarding

11  Exhibit FTX-12, which was a paper written by Professor

12  Howell.  You still have that in front of you?

13     A.   Yes, I have it in front of me.

14     Q.   Have you reviewed this paper before being shown it

15  this morning?

16     A.   I have not.  It's my first time seeing it.

17     Q.   Are you aware of the date of the -- is there an

18  indication on that document the date of the paper, Professor

19  Howell's paper?

20     A.   I see on the first page received June 22nd, 2018,

21  editorial decision September 7th, 2019.

22     Q.   Do you have any insights one way or the other as

23  to why Professor Howell made the statement that was read to

24  you regarding CoinMarketCap data?

25     A.   I haven't reviewed this paper, so I can't tell why

1  she made that statement.

2          MR. GLUECKSTEIN:  Thank you.  No further

3  questions, Your Honor.

4          THE COURT:  Thank you.  Thank you, Mr. Lu.  You

5  may step down.

6          MR. GLUECKSTEIN:  Your Honor, the debtors would

7  next call  Professor Sabrina Howell to the stand.

8          THE COURT:  Professor Howell, please come forward.

9  Take the stand and remain standing for the oath.

10          MR. ROSELIUS:  Your Honor, Joe Roselius on behalf

11  of MAPS Vault Limited.

12          THE COURT:  You might want to get to a microphone.

13  I don't know if we're picking you up over here.

14          MR. ROSELIUS:  Just wondering if this would be an

15  appropriate time to address our motion in limine before

16  Professor Howell starts to testify, or if you want to wait

17  until we get to her rebuttal.

18          THE COURT:  I think we're going to do the same we

19  did with Mr. Lu.  We'll do the qualification.  I'll allow

20  voir dire.  You can challenge on qualifications, and then

21  once we get past that, I'll hear the testimony.  You can

22  raise any -- do your cross, and at the end, I'll make a

23  decision on whether and to what extent I should give credence

24  to the professor's testimony.

25          MR. ROSELIUS:  Okay, so we're not going to do the

1  motion in limine before she testifies?

2          THE COURT:  No motion in -- as I said before, the

3  motion in limine is really a Daubert motion, which I have to

4  hear the testimony anyway.  So I'm going to hear the

5  testimony, and then I'll decide at the end whether or not the

6  testimony would be excluded.

7          MR. ROSELIUS:  Understood, Your Honor.

8          THE CLERK:  Please raise your hand.  Please state

9  your full name and spell your last name for the court record,

10 please.

11         THE WITNESS:  Sabrina Howell.  H-O-W-E-L-L.

12         THE CLERK:  Do you affirm that you tell the truth,

13 the whole truth, and nothing but the truth to the best of

14 your knowledge and abilities?

15         THE WITNESS:  I do.

16         THE CLERK:  You may be seated.

17         Your Honor?

18                     DIRECT EXAMINATION

19 BY MR. GLUECKSTEIN:

20      Q.   Good afternoon, Professor Howell.

21      A.   Good afternoon.

22      Q.   Could you please describe to the Court where

23 you're currently employed?

24      A.   At the NYU Stern School of Business.

25      Q.   What is the focus of your work?  I'm sorry.  What

1   is your position at the NYU Stern School of Business?

2        A.   I'm a full professor of finance.

3        Q.   And what is the focus of your work as a professor

4   at the Stern School?

5        A.   My research and teaching focus on entrepreneurial

6   finance and fintech, among other topics.

7        Q.   What courses do you teach as part of your work at

8   the Stern School?

9        A.   I created and teach a course on entrepreneurial

10  finance with a focus on fintech.  And in that course, I have

11  developed lectures on Bitcoin and blockchain, on blockchain

12  and capital markets, on non-fungible tokens, and on initial

13  coin offerings, which I have taught in various years.

14       Especially relevant to today's matter, I taught an

15  executive MBA course to a team from Liquidnet, which is a

16  capital markets liquidity services provider, about blockchain

17  in capital markets, where topics like best execution and

18  decentralized exchanges came up.

19       On the research side, I have authored a paper that was

20  actually just being discussed about initial coin offerings,

21  which is also very relevant to this matter.

22       Q.   Can you explain why, in your opinion, that paper,

23  your ICO paper, is relevant to this matter?

24       A.   In the ICO paper, I gather and aggregate price

25  data for a large number of tokens.  I study token listings on

1  exchanges, the market capitalization of tokens, token vesting

2  and lockup schedules, and finally distinguish between types

3  of tokens and define types of tokens, including what a

4  utility token is, which is how I categorize the three at

5  issue tokens today.

6        Q.   Has your ICO paper been published in a peer-

7  reviewed publication?

8        A.   Yes, it's published in the Review of Financial

9  Studies, which is a top finance journal, and it has been

10  cited about 700 times, which, to my knowledge, makes it the

11  most highly cited paper on this topic in finance or

12  economics.

13        Q.   Professor, what formal educational degrees do you

14  hold?

15        A.   I have a BA from Yale University in economics and

16  East Asian studies and a PhD from Harvard University in the

17  Economics track of the Political Economy and Government

18  program.

19        Q.   Are you involved with any professional

20  organizations?

21        A.   I'm a research associate at the National Bureau

22  for Economic Research and a research fellow at the Institute

23  for Private Capital, among others.

24        Q.   Did you have any professional experience in the

25  areas of economics and finance prior to your appointment to

1   your position at NYU?

2        A.   I worked in 2008 and 2009 at Charles River

3   Associates, an economic consulting firm.

4        Q.   Have you done any work prior to this engagement as

5   an expert witness?

6        A.   I served as an expert in a case assessing the

7   liquidity of the market for employee stock options at a

8   private firm.

9        Q.   Professor Howell, do you have an understanding of

10  futures markets and how they work?

11       A.   I do, both from the general course of being a

12  finance professor and also because I solo authored a paper

13  published in the Journal of Corporate Finance on corporate

14  risk management.

15       And in that paper, I estimate the implied cost of

16  capital for firms hedging a volatile asset, in this case oil,

17  using futures in financial markets.  I estimate specifically

18  the cost of capital required for a margin account, and I

19  discuss in the paper the challenges to hedging in futures

20  markets, not only the requirement to post collateral, but

21  also information frictions, transaction costs, and basis

22  risk.

23       Q.   Professor Howell, you testified in this matter in

24  support of the debtor's motion to estimate claims at the

25  January 31st hearing before this court, correct?

1          A.    That's right.

2          Q.    And are the opinions that you intend to offer

3    today with respect to MAPS, Oxy, Serum, and BOBA tokens based

4    on the same methodologies presented to the Court at that

5    hearing?

6          A.    Yes.

7                MR. GLUECKSTEIN:  Your Honor, at this point, we

8    would tender Dr. Howell as an expert in digital asset

9    valuation specifically to provide the opinions with respect

10   to the discounts set forth in her reports and her

11   (inaudible).

12               THE COURT:  Voir dire?

13               MR. ROSELIUS:  Thank you, Your Honor.  Joe

14   Roselius from DLA Piper on behalf of MAPS Vault Limited.

15   VOIR DIRE

16   BY MR. ROSELIUS:

17         Q.    Good afternoon, Professor Howell.

18         A.    Good afternoon.

19         Q.    Good to see you again.

20         A.    Good afternoon.

21         Q.    You've not taken any courses on asset valuation;

22   is that correct?

23         A.    Correct.

24         Q.    You've not taken any courses in asset valuation

25   beyond some basic valuation during your master's or PhD

1  coursework; is that right?

2      A.   That's right.

3      Q.   You've not taken any courses on cryptocurrency

4  valuation, correct?

5      A.   No.  I created one of the first.

6      Q.   A course on fintech, but nothing to do with

7  cryptocurrency valuation; is that correct?

8      A.   No, the course is not specifically about

9  cryptocurrency valuation in totality.

10          MR. ROSELIUS:  Your Honor, may I approach?

11          THE COURT:  Yes.  What are you handing up?

12          MR. ROSELIUS:  Our exhibits.  MAPS.

13          THE COURT:  Okay.

14          THE WITNESS:  Thank you.

15  BY MR. ROSELIUS:

16      Q.   You have no work experience with cryptocurrency

17  valuation; is that correct?

18      A.   You mean outside of my work as a professor?

19      Q.   Yeah.  Outside of academia?

20      A.   No.

21      Q.   You have no experience with asset liquidation.

22      A.   Correct.

23      Q.   Your classes that you teach do not address

24  liquidating holdings of digital assets.

25      A.   I've discussed selling digital assets.  I haven't,

1  in my course, covered a liquidation of the type that the

2  debtor is undertaking.

3       Q.   And your classes don't address the price impact of

4  liquidating digital assets, correct?

5       A.   That's correct.

6       Q.   I want to direct your attention to MAPS-15 in the

7  binder I handed you.  Let me know when you're there.

8       A.   I am.

9       Q.   That's a true and accurate copy of the syllabus in

10 the class you created from 2016; is that correct?

11      A.   Yes.  This is before I started teaching the

12 fintech class.

13      Q.   That's not from the class?  From your class?

14      A.   So I've actually developed two different courses

15 at Stern.  One is called Topics in Entrepreneurial Finance,

16 which is just an entrepreneurial finance course.  And that's

17 the syllabus you have here.  And I've taught that in a number

18 of years, different years since I've been at Stern.

19      And then the course I was discussing earlier is called

20 Applications in Entrepreneurial Finance: Fintech.  And that

21 course has some entrepreneurial finance content, some fintech

22 content.  And it was that when I was talking about the

23 lectures on blockchain and capital markets and Bitcoin and

24 initial coin offerings and nonfungible tokens, I was

25 referring to that course and to the specific years when I

1  taught those lectures, as I taught different lectures in

2  different years, but not this course.

3       Q.   This is a syllabus from your course, though,

4  right?  From one of your courses.

5       A.   But not from my fintech course.

6       Q.   This course does not address asset valuation,

7  correct?

8       A.   I do teach valuation in entrepreneurial finance.

9  You can see it here in lectures two and four.  I have two

10 lectures on methods of valuation.

11      Q.   Of company valuation, correct?

12      A.   That's right.

13      Q.   Not asset valuation.

14      A.   I mean, the workhorse model of valuation in

15 finance, the discounted cash flow method is applied to any

16 asset or company.  We don't distinguish.

17      Q.   You didn't apply any discounted cash flow

18 valuation to MAPS and Oxy in this case, did you?

19      A.   No.

20      Q.   So it really has nothing to do with your opinions

21 as they relate to MAPS and Oxy?

22      A.   Well, I didn't conduct a fundamental valuation of

23 MAPS and Oxy.  I only assessed the fundamental value of FTT.

24 For MAPS and Oxy, I assessed the likely price at which the

25 debtor could sell its holdings, which is a different

1   question.

2        Q.   So you didn't do a discounted cash flow analysis

3   of MAPS or Oxy?

4        A.   No.

5        Q.   Or Serum?

6        A.   No.

7        Q.   So let's go to MAPS-16 in your binder.  Is this a

8   true and accurate copy of the 2023 syllabus for your

9   Applications in Entrepreneurial Finance:  Fintech class?

10       A.   Yes.

11       Q.   That does not address valuation of cryptocurrency,

12  correct?

13       A.   Correct.

14       Q.   And it doesn't address asset valuation of the type

15  that you applied to MAPS and Oxy in this case at all,

16  correct?

17       A.   That's correct.

18       Q.   So let's look at FTX-12.  Is the binder of the FTX

19  exhibits still in front of you?

20       A.   I think I have FTX-12 as my paper, right?

21       Q.   Yeah.

22       A.   Okay.

23            MR. ROSELIUS:  Exhibit, Your Honor.

24            THE COURT:  Thank you.  My allergies are killing

25  me today.

 1  BY MR. ROSELIUS:

 2        Q.    That's the ICO paper that's been discussed a few

 3  minutes ago.

 4        A.    Yes.

 5        Q.    Your ICO paper doesn't provide a model for

 6  calculating the value of a token like MAPS or Oxy, correct?

 7        A.    Correct.

 8        Q.    Doesn't provide a model for calculating the value

 9  of customer claims like the ones that are at issue in this

10  case?

11        A.    No.

12        Q.    And in fact, you didn't rely on the ICO paper in

13  calculating the discounts in this case.  Is that correct?

14        A.    I relied on my knowledge of cryptocurrency and

15  cryptocurrency markets, which comes from the expertise I

16  gathered in working on this paper.

17        Q.    But you did not rely on this paper, correct?

18        A.    On specific calculations or estimates?  No.

19        Q.    And in fact, you've written no papers that are

20  relevant to your opinions about the discounts to MAPS, Oxy,

21  or Serum?

22        A.    Not directly, no.

23        Q.    The only research interests that you have

24  currently regarding cryptocurrency has to do with the

25  valuation of airdropped tokens; is that correct?

1        A.    I've also conducted some research on non-fungible

2   tokens, but currently, yes, that would be the only one.

3        Q.    You're not using the KO Model as part of that

4   research?

5        A.    No.

6        Q.    Because in an airdrop, you essentially give away

7   the tokens for free.

8        A.    That's right.

9             THE COURT:  Are we getting into methodology, or

10  are we talking about her qualifications?

11            MR. ROSELIUS:  Your Honor, just to show that the

12  ICO paper and her research interests are not actually

13  relevant to her expertise or opinions in this case, but I'm

14  happy to move it along.

15            THE COURT:  Yeah, let's move along.  I think we're

16  getting beyond just her qualifications as an expert.

17            MR. ROSELIUS:  In fact, Your Honor, I think I'll

18  stop there.

19            THE COURT:  Want to be heard on your -- oh, we

20  have more cross, or more voir dire.

21            MR. BACON:  Good afternoon, Your Honor.  Elliot

22  Bacon on behalf of TMSI.

23  VOIR DIRE

24  BY MR. BACON:

25        Q.    Good to see you again, Professor Howell.  Let me

1  just level set for a second so we understand the opinions

2  you're offering in this case.  Are you offering an opinion on

3  the asset liquidation discount as calculated through your

4  application of the KO Model?  That's right?

5        A.    Yes.

6              THE COURT:  Does this go to qualifications?

7              MR. BACON:  Yeah, I just want to set forth -- I

8  get there in two seconds.

9  BY MR. BACON:

10       Q.    You are not offering opinion regarding perpetual

11  futures trading strategies, right?

12       A.    As part of my rebuttal to Mr. Gkatzimas's report,

13  I do discuss perpetual futures, and I believe that is

14  relevant for today's hearing.

15       Q.    Are you offering opinion regarding how perpetual

16  future trading strategies work?

17       A.    I'm prepared to comment on the trading strategy

18  proposed in particular, and the only place it's proposed

19  explicitly is that TMSI motion.  I believe.  And I believe

20  I'm prepared to discuss that if need be.

21       Q.    And is that part of your opinion in this case,

22  though?

23       A.    I'm a little bit fuzzy as a non-lawyer on what an

24  opinion versus a non-opinion is.  My estimated discounts, the

25  asset liquidation discounts and discounts for lack of

1  marketability where appropriate, resulting in the assigned

2  values to customer claims, does not involve futures markets

3  in any way.

4       So that, like my original report, it pertains to

5  futures only in actually those customer claims that were in

6  the form of futures.  But I don't discuss sort of futures

7  trading strategies in general or use them in the ALD or DLOM

8  calculations.  Sorry if that was a bit long.  I'm not sure

9  what you're getting.

10      Q.   In the ICO paper that you referenced earlier, does

11 that relate to liquidating financial assets?

12      A.   No.

13      Q.   And the Journal of Corporate Finance paper that

14 you referenced in connection with your futures experience,

15 does that relate to the liquidating of financial assets?

16      A.   Not directly.

17      Q.   Does any of your academic experience relate to the

18 manner in which derivatives markets can be used to unwind

19 positions and financial assets?

20      A.   No.

21      Q.   And likewise, is it right that you've not

22 published any articles relating to the manner in which

23 derivatives markets can be used to unwind petitions and

24 financial assets?

25      A.   No, although I think my paper on corporate risk

1  management is specifically about and estimates how companies

2  use futures markets to hedge, which implies opening and

3  closing futures positions, which is sort of where the latter

4  would be unwinding the futures positions.  But no, I don't

5  have research specifically on unwinding.

6          THE COURT:  Mr. Bacon, I apologize, I need to take

7  a short, just takes five minutes.

8              (Off the record at 1:29 p.m.)

9              (On the record at 1:32 p.m.)

10          THE BAILIFF:  All rise.

11          THE COURT:  You can be seated.  Sorry for the

12  interruption.  Go ahead, Mr. Bacon.

13          MR. BACON:  Thank you, Your Honor.

14  BY MR. BACON:

15      Q.   And outside the article that you just referenced,

16  none of your research relates to the manner in which

17  derivatives markets can be used to unwind positions in

18  financial assets, correct?

19      A.   Correct.

20      Q.   And other than the opinion that you've set forth

21  in this case, none of your professional work relates to the

22  manner in which derivatives markets can be used to unwind

23  liquidate spot positions and financial assets?

24      A.   Yes.

25      Q.   Okay.  And have you ever personally performed the

1  liquidation of financial assets?

2      A.    No.

3          MR. BACON:  Your Honor, we object to Professor

4  Howell being qualified as an expert to offer the opinions set

5  forth in her rebuttal report to Mr. Gkatzimas.  If you'd like

6  to hear that argument now, as was done with professor -- with

7  Mr. Lu, we're happy to do it now.  Or if you want us to hold

8  off on that.

9          THE COURT:  Yeah, this is the time to do it.  If

10  you want to make an argument on her qualification.

11          MR. GLUECKSTEIN:  Just on qualification.  Yes,

12  Your Honor.  Professor Howell's statements regarding future

13  markets should be excluded.  Professor Howell is not

14  qualified to opine the relevance of futures markets,

15  generally, and perpetual futures markets, specifically,

16  especially with respect to liquidating spot positions.

17          The debtors contend that Professor Howell does not

18  need to be an expert in perpetual futures strategies to opine

19  on whether it's appropriate to include perpetual futures

20  volume in her application of the KO Model.  That's simply

21  incorrect.

22          To offer an expert opinion on how perpetual

23  futures should be used in connection with the KO Model, an

24  expert needs to understand how related sources of liquidity

25  interact with one another, how those liquidating positions

1  access all sorts of liquidity to do so, the trading

2  strategies used, the mechanics of those trading strategies,

3  the implications of those trading strategies, and the

4  economic attributes of those trading strategies, and lastly,

5  the manner in which prices in the spot and futures markets

6  relate to those trading strategies.

7            A qualified expert would understand those things.

8  Professor Howell has no expertise relating to any of those

9  things.  Without that understanding, Professor Howell cannot

10 say one way or the other whether the existence of perpetual

11 futures markets impact the price impact of selling a spot

12 position.

13            In their response to our motion in limine, the

14 debtors say that Professor Howell is not an expert on

15 perpetual futures markets or on futures trading strategies.

16 But they nonetheless suggest that that doesn't matter for her

17 to give an opinion on how futures trading volume is relevant

18 to her application of the KO Model in liquidating spot

19 positions.

20            Your Honor, I cannot find the logic in that

21 argument.  That admission of her lack of expertise and the

22 answers that Professor Howell has given on voir dire render

23 her statements regarding the use of perpetual future markets

24 to liquidate spot positions simply those of a layperson.

25 Professor Howell lacks the relevant practical and academic

1   experience in that area.  And the debtors can see that in

2   their motion in limine.

3         Her lack of specialized expertise and knowledge

4   exposed this inability and why futures markets are so

5   critical to liquidating a crypto spot position.  The paper

6   that Professor Howell referenced relates to her futures

7   experience, relates to the manner in which Kansas and Iowa is

8   used to manage risk and highway procurement contracts that

9   has nothing to do with liquidating sophisticated financial

10  assets using spot and derivatives markets.

11        And the remainder of the opinions set forth in

12  Professor Howell's rebuttal regard what similarly situated

13  customers should bear the risk of a shortfall of liquidating

14  the debtor's assets.  That is simply not an expert opinion,

15  especially for someone who's not an expert in bankruptcy

16  laws.  And for these reasons, we object to Professor Howell's

17  admission to being qualified to offer the opinion she does in

18  her rebuttal to Mr. Gkatzimas's report.

19        THE COURT:  Okay.  Thank you.

20        MR. GWYNNE:  Good afternoon, Your Honor.  Kurt

21  Gwynne from Reed Smith on behalf of Foundation Serendipity

22  Foundation Elements, Serendipity Network, and Liquidity

23  Network being referred to as the MAPS and Oxy foundations.

24        I just wanted to rise, Your Honor, to tell the

25  Court that we support the motion that DLA filed on behalf of

1   MAPS Vault.  Although I did not have questions for the

2   witness, I just wanted that to be on the record, Your Honor.

3            THE COURT:  Okay, thank you.

4            MR. ROSELIUS:  Your Honor.  Again, Joe Roselius

5   from DLA Piper, on behalf of MAPS Vault.  With respect to

6   Professor Howell's qualifications, she has essentially no

7   experience in asset valuation or cryptocurrency asset

8   valuation.  Yet she's being offered as an asset valuation

9   expert.  And even though she is being offered as an expert in

10  asset valuation, she's relying entirely on someone else to do

11  the prices.  And so for those reasons, we think that it's

12  inappropriate to qualify her as an expert.  But I also

13  briefly want to address, Your Honor, our motion in limine,

14  because that is a different issue.

15           Our motion in limine addresses a specific portion

16  of Professor Howell's rebuttal report, which has to do with

17  the fundamental value of MAPS and Oxy.  And Professor Howell

18  just testified that she's not offering an opinion as to the

19  fundamental value of MAPS and oxy.

20           And so, you know, I'm happy to talk more about the

21  motion in limine, but I did want to address it before we get

22  into any of those opinions, because it's a different issue

23  from the sort of Daubert issues and issues about her

24  qualifications to testify.

25           THE COURT:  Okay, thank you.

1    MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian

2  Glueckstein for the debtors.  So to take these kind of, in

3  turn, Professor Howell has made clear in her testimony and in

4  her written credentials in her report that she possesses the

5  skills necessary to conduct the work that she did here.  The

6  fact that she has not calculated valuation of digital assets

7  in the exact manner that she is offering here, in our view,

8  is not relevant.

9    The standard, as we discussed this morning, with

10  respect to qualification under Daubert, is liberal.  The

11  Third Circuit has said, amongst other things, similarly,

12  other statements, other similar statements, that a broad

13  range of knowledge, skills, and training is sufficient to

14  qualify somebody as an expert.

15    Professor Howell has testified about the work that

16  she did in creating a fintech course that addresses the types

17  of digital asset and the types of issues that are presented

18  by FTX.  In this case, she testified about her experience,

19  research experience in this new industry, her ICO paper being

20  the most widely cited paper on issues that are relevant to

21  her analysis.

22    No, it is not a paper that is doing exactly what

23  she is doing here.  The question, though, with respect to

24  qualification, is whether or not she possesses the skills and

25  the understanding to make the reasoned decisions and to

1   conduct the analysis in which she's being offered for.

2         TMSI goes further in their motion.  They're

3   seeking to disqualify her on the grounds that she's not a

4   futures expert, and Mr. Bacon misrepresents what we said in

5   our motion.  We didn't make any concession she's not an

6   expert.  What we said, and I think that Professor Howell's

7   testimony is clear that she believes she has the skills and

8   she described her knowledge of futures and where that has

9   intersected with her professional experience.

10        The issue of futures is -- isolated in this

11   context for today's hearing -- is in the isolated question

12   that TMSI is arguing that Professor Howell excluded certain

13   data from her calculations that they believe should be

14   included.  They go to the volumes of the -- trading volumes

15   of Serum.

16        What we said in our response is that we're not

17   specifically offering Professor Howell as an expert in

18   futures trading strategies because we don't believe that's

19   necessary.  What she certainly needs to do is be able to

20   respond, as she just testified that she's prepared to do to

21   the rebuttal -- in rebuttal to the arguments that are being

22   put forward by Mr. Gkatzimas, and she is more than qualified

23   to do that.

24        Courts in this circuit have made clear that

25   rebuttal evidence is admissible where it will help explain,

1  repel, counteract, or disprove evidence of the adverse party.

2  So she was very clear just now on the voir dire that she's

3  not offering futures trading strategies.  What she is doing

4  is rebutting Mr. Gkatzimas's opinion that she made a mistake

5  in excluding certain data from her calculations.  And we

6  submit she's more than qualified to do that.

7        Finally, Your Honor, on this question of

8  fundamental value that's the subject of the MAPS Vault

9  motion, those opinions arise, again, in the context of

10  Professor Howell's rebuttal to Mr. Constantinidis.  Mr.

11  Constantinidis is the first person to put at issue the nature

12  of tokens of MAPS, Oxy, and Serum.

13        He addresses them in paragraphs 17, 18, and 19 of

14  his affirmative expert report.  And in suggest -- based on

15  the opinions that he's offering, Professor Howell responds

16  with opinions with respect to the nature of these tokens and

17  why the nature of these tokens help explain the discount

18  rates that she calculated.

19        But at the end of the day, she's calculating

20  discount rates based on her methodology and her formulation.

21  Again, discussion of those issues are relevant to the matters

22  before the Court today.  But they are rebuttal testimony in

23  which there is liberal authority for the Court to take in in

24  terms of the scope of her testimony today.

25        So for all those reasons, Your Honor, we do

1  believe Dr. Howell should be qualified on the issue that she

2  is presenting evidence on.  And we don't believe there's any

3  merit to either of the motions in limine with respect to the

4  scope of the testimony that she's prepared to offer to the

5  Court this afternoon.

6           THE COURT:  Thank you, Mr. Glueckstein.  All

7  right, I'm going to overrule the objections.  I think

8  Professor Howell does possess the required skill, knowledge,

9  and experience to be able to opine on the issues which she's

10  been asked to opine on.  That leaves open the question of

11  whether or not what weight or whether I should consider

12  Professor Howell's testimony at all at the end of the day,

13  after I've heard all of the direct and cross-examination, and

14  I will take that issue under advisement at this point.  And

15  probably at the end of the day, I'll take that under

16  advisement and I'll rule later on.  And that includes Mr. Lu

17  as well.  That's still an open issue.  Okay.

18           MR. GLUECKSTEIN:  Thank you, Honor.

19  DIRECT EXAMINATION (CONT.)

20  BY MR. GLUECKSTEIN:

21      Q.  Proceeding then, Dr. Howell, can you please

22  summarize for the Court why you believe the breadth of

23  experience that you possess qualifies you to offer the

24  opinions that you are offering today?

25      A.  I believe that my research and teaching in

1  cryptocurrency markets, in corporate risk management, and in

2  finance more generally make me well qualified to offer advice

3  on the matters at hand.

4       Q.    And what were you asked to do when you were

5  retained by the debtors in these cases?

6       A.    So I was asked to assist the debtors in

7  determining the value of customer claims.  And I understand

8  as part of the bankruptcy process, the debtors have to sell

9  all of their holdings of digital assets.  So I considered the

10  various categories of assets to which customers have claims,

11  and I assessed whether it was appropriate to assign any

12  discounts that would result from the liquidation process.

13       Q.    What are the types of discounts that you

14  considered in your analysis?

15       A.    I considered three types of discounts.  The first

16  is the likely price at which the debtors would be able to

17  sell all their holdings in an orderly liquidation commencing

18  on the petition date.

19       I estimate a discount reflecting illiquidity in these

20  markets relative to the size of the debtor holdings that

21  exceed 10 percent for 71 of the 1321 digital assets to which

22  customers had claims.  And I apply those discounts, which I

23  call an asset liquidation discount.  It's equivalently can

24  think of as a transaction cost to customer claims as needed.

25       So then, with those prices in hand, I turn to the

1  second type of discount, which addresses the fact that for a

2  subset of tokens claimed by customers, the tokens weren't in

3  the customers' accounts at the petition date, but instead

4  were to be distributed in the future according to

5  predetermined vesting schedules.

6        So this is just the same way that employee stock

7  options at a conventional company might vest over time.  And

8  to account for the non-marketability of those claims, I

9  assign a discount for lack of marketability, or DLOM, using

10  those predetermined vesting schedules.

11        And then finally, I was asked to opine on the

12  fundamental value of the FTT token, given that the token

13  wouldn't be used in any possible restart of an FTX exchange.

14  And I determined that that fundamental value was zero, and

15  therefore assigned a zero value to claims based on that

16  token, as well as other equity, or equity like claims in the

17  form of digital assets.

18        Q.    Did your analysis of the debtor's digital assets

19  with respect to potential discounts to petition day pricing

20  include MAPS, Oxy, Serum, and BOBA token?

21        A.    Yes.

22        Q.    And Professor Howell, did you prepare some

23  demonstrative exhibits for discussion this afternoon?

24        A.    I did.

25        Q.    We're going to put those up on the screen here for

1   ease of the Court, Your Honor.  I'm sorry, Professor Howell,

2   if we could look at demonstrative 2 that you prepared here.

3   Could you please provide the Court a summary overview of your

4   opinions with respect to the ad issue tokens today?

5       A.   Sure.  So on this slide, I have four key takeaways

6   for today's hearing.  The first is that it's well established

7   that if you sell a large quantity of an asset, it may impact

8   the price of that asset, and given the requirement to sell

9   all of the debtor's holdings, I continue to believe that it's

10  appropriate to use the quantity of the debtor's holdings in

11  estimating an asset liquidation discount.

12      I chose a model from a paper by Kyle and Obizhaeva to

13  calculate that discount, and the estimates that come out of

14  it are 100 percent discount for MAPS and Oxy, 58 percent for

15  Serum, and 25 percent for BOBA.

16      The second takeaway is that the quote/unquote lock

17  tokens, which, to be clear, are those tokens subject to these

18  vesting schedules, they're not locked from the debtor's

19  perspective.  The debtor controls these tokens, but they are

20  non-marketable from the customer's perspective, and it's

21  reasonable, and I think very standard, that a non-marketable

22  asset is worth less than the equivalent marketable asset.  So

23  I continue to think it's important to apply that DLOM I

24  discussed earlier to those locked tokens.

25      And then finally, the last two bullets here are

1  addressing the opinions of the objectors' experts, which I

2  think at a high level are basically trying to create more

3  volume as inputs into my ALD formula in order to lead to

4  lower discounts.

5      And want to highlight two things here.  One is that

6  using Mr. Constantinidis's own methodology, which differs

7  quite substantially from mine, but if I correct his sort of

8  implausible assumptions about future trading volume, I

9  actually get, again with his methodology, similar discounts

10  to my own AlD estimates.

11      And then finally, concerning the report by Mr.

12  Gkatzimas and the motion from TMSI, after a very close look,

13  I do not believe that perpetual futures markets would be

14  useful for liquidating the debtor's Serum holdings, and in

15  fact, to the contrary, would create more risk and more

16  transaction costs for the debtors.

17      Q.    Professor Howell, did you reach these conclusions

18  based on the same analysis you used to calculate potential

19  discounts for the debtor's other digital assets?

20      A.    Regarding the first two bullets here.  Yes, so

21  what's nice about the method I use is that it's applied

22  systematically to all of the tokens in the same way.

23      Q.    Are there any characteristics, specifically with

24  respect to MAPS, Oxy, and Serum, that help explain the

25  discount rates that you've calculated for these tokens?

1          A.    Yeah, so these tokens are extreme cases, and the

2    formula, therefore, delivers, especially in the case of MAPS

3    and Oxy, the extreme result of 100 percent discount.  So, as

4    we can see in these pie charts here, the debtors are holding

5    more than 95 percent of total token supply, and only about 1

6    to 3 percent of that total token supply is freely trading in

7    markets.

8          So these large sort of face values of debtor holdings,

9    like 3.7 billion for Serum, come from prices that are driven

10   by markets with only a very tiny fraction of tokens being

11   traded as the debtors are holding.  So you have this sort of

12   immense amount of illiquidity in which a huge amount of

13   tokens are being hypothetically sold into a tiny market as

14   part of this liquidation process.

15         And so you put in extreme inputs, and we sort of get

16   extreme outputs.  And it's important to stress that it is not

17   an accident that the debtors were holding such a large share

18   of these tokens.  That didn't just happen.  And this is, I

19   think, where some of the sort of controversy about

20   fundamental value is coming in.

21         Because I do mention in my rebuttal report that the

22   reason the debtors holding so much of these tokens is because

23   of their close tie between these projects and FTX and Mr. Sam

24   Bankman-Fried.  That, for example, in the case of MAPS, Sam

25   Bankman-Fried was an advisor.  Alameda invested $50 million.

1  FTX hosted their initial coin offering.  The general counsel,

2  a senior executive at FTX, wrote large portions of the MAPS

3  white paper.

4       We can go through a sort of a similar discussion for

5  Oxy and Serum, where Serum was the creation of Sam Bankman-

6  Fried and FTX, and he completely controlled that project.  So

7  these at-issue tokens are closely tied to FTX and Alameda.

8  That, I think, partly explains why they were holding so much

9  of them.  I hope that provides some useful context.

10      Q.    Professor Howell, you referenced the Kyle and

11  Obizhaeva model that you used to calculate your asset

12  liquidation discount.  That is the model you use, correct?

13      A.    Yeah.

14      Q.    And what is the KO Model?

15      A.    Yeah.  Happy to talk about this, I think.  Should

16  we go to the next slide?  I think.  There we go.  Perfect.

17  So, Kyle and Obizhaeva 2016 is a research paper published in

18  Econometrica, which is the most highly regarded journal in

19  Economics for new methods.

20      And what they do is they develop what they term a

21  universal formula for market impact from selling or

22  potentially buying a large position, which is potentially

23  implemented across many trades.  And that's actually a very

24  nice analogy to what the debtor is doing as part of this

25  liquidation process in exiting these positions.

1    Kyle and Obizhaeva, who I'll call KO, develop

2  invariance principles for market microstructure that they can

3  use to translate observable trading volume into unobservable

4  order imbalances, and thus transaction costs, which is what

5  we're after.

6    And then they can use those principles to develop a

7  formula which is essentially a refinement of the rule of

8  thumb square root model that allows us to estimate the

9  expected price impact and bid ask spread, which together form

10  a transaction cost, and I'll call an asset liquidation

11  discount for exiting a position for liquidating holdings.

12    Q.   First of all, why do you believe the KO Model is

13  an appropriate model to use to calculate your asset

14  liquidation discount for cryptocurrency tokens?

15    A.   So after considering a number of alternatives, I

16  determined that the KO Model was both the most economically

17  rigorous and was most likely applicable to cryptocurrency

18  markets.  So first, it has been used in, and is intended for

19  a diverse array of markets and asset types.  It's been used

20  to calculate price impact for corporate bonds, for US

21  Treasuries, for stock markets 100 years ago.  And it's also

22  been used by at least four research papers that I know of in

23  cryptocurrency markets specifically.  So I think it was the

24  most appropriate option that I had available to me for this

25  exercise.

1          Q.    How do you apply the KO Model?

2          A.    The KO Model requires four inputs which are listed

3    on this slide.  The first is the amount that you're selling,

4    which here is the debtor's holdings.

5          The second is the volatility of prices or returns,

6    which you want to reflect sort of what you think is going to

7    be an average trading day over the period of liquidation.

8          Third, you need the price, and I was assigned to use

9    the petition time price.

10         And then finally you need the daily trading volume,

11   which like volatility, you want to reflect sort of what you

12   think daily trading volume will look like on a typical day

13   during the liquidation procedure.  You put these into the

14   formula and you get out an asset liquidation discount.

15         Q.    And when you did this with respect to the at-issue

16   tokens today, what did you get with respect to MAPS?

17         A.    So for MAPS, the debtor's holdings is about 10

18   billion units.  And I want to highlight, as it says on the

19   bottom of this slide, that that number of units is almost

20   20,000 times the average daily trading volume of MAPS.

21         And just to put that into perspective, what that means

22   is that if the debtors could sell 100 percent of daily

23   trading volume every day, which is completely implausible, it

24   would still take 54 years to liquidate their holdings.  So it

25   is no surprise that the resulting discount is 100 percent.

1    Q.    And what did you determine when you applied the KO

2 Model to Oxy?

3    A.    For Oxy, also about 10 billion units of holdings,

4 which amounts to around 6000 times average daily trading

5 volume, also yields a discount of 100 percent.

6    And one thing I want to highlight here is that that

7 discount gets applied to all of the customer claims to Oxy.

8 So one benefit of this approach is that we need not estimate

9 different discounts for different customers.  But once I have

10 this one asset liquidation discount that gets applied to all

11 of the customer claims.

12    Q.    When you actually apply the model to MAPS and Oxy,

13 do you actually get an output that exceeds 100 percent?

14    A.    Yes.

15    Q.    And do you view that -- how did you determine 100

16 percent from that output?

17    A.    I truncate outputs that exceed 100 percent at 100

18 percent because I don't want to assign customers to have to

19 pay the debtors.  But it's not wrong that the formula

20 produces estimates of over 100 percent.  So in these cases,

21 it is simply reflecting the extreme illiquidity of these

22 tokens.

23    Now, I point out only 12 of the more than 400 assets

24 that I put through this formula yielded discounts of more

25 than 100 percent, despite the fact that relative to

1  conventional assets, in conventional markets, many of the

2  debtor's assets are quite illiquid.

3      Now, I think the objectors have suggested in the

4  deposition that it might somehow be a problem of the model

5  that it yields more than 100 percent discounts.  But I really

6  don't think that's true.  And I think the fact that, for

7  example, certain discounts for lack of marketability, which

8  is a totally different types of discount, are supposed to

9  asymptote to 100 percent, is not actually really relevant for

10 whether a price impact measure could potentially yield a

11 result of more than 100 percent.

12     And intuitively, we can think about the fact that a

13 transaction cost can, in fact, be higher than the item's

14 worth.  It can cost more to sell an item than that item is

15 worth.  So I think we can kind of think about that as

16 explaining why the discounts could be more than 100 percent.

17     Q.    Professor Howell, what did you get when you ran

18 the KO Model with respect to Serum?

19 A     Yeah, for Serum the market is somewhat larger, but the

20 debtors, you know, are holding almost 400 times average daily

21 trading volume and I estimate a discount from the KO formula

22 of 58 percent.

23 Q     And finally, with respect to BOBA, what did you

24 determine when you applied your asset liquidation discount?

25 A     Here, the estimated discount was 25 percent.

1  Q    As part of your work, did you calculate how applying

2  other models would impact asset liquidation as counted for

3  the at issue tokens that we're talking about today?

4  A    I did.  I considered a number of other models before

5  choosing the KO model.  These included the Amihud (2002)

6  liquidity measure, the rule of thumb square-root measure,

7  some that are actually not on this slide like the Corwin and

8  Schultz measure, and ultimately decided that the KO model was

9  both, you know, most applicable to cryptocurrencies and also

10 the most conservative as the other models generally produced

11 higher discounts.

12      And we can see here from the figures from my rebuttal

13 report to Mr. Konstantinidis that, you know, the particular

14 choice of KO is not what's driving the 100 percent discount

15 as seven other possible models also deliver 100 percent

16 discount for MAPS and OXY.  And the third row here highlights

17 how the KO model is relatively conservative and that most of

18 those models actually also produce 100 percent discount for

19 Serum.

20 Q    Professor Howell, do you still have the FTX exhibit

21 there in front of you.  Is there a binder marked FTX debtor

22 exhibits?

23 A    Yes.  Debtors exhibit binder.  Yes.

24 Q    Did you prepare a declaration and report detailing your

25 opinions and findings that you've been detailing?

1    A      I did.

2    Q      Could you turn to the exhibit marked FTX-1?

3    A      Yes.

4    Q      Is the document marked FTX-1 a copy of your declaration

5    with annex initial report?

6    A      It is.

7    Q      Did you prepare this report based on your analysis?

8    A      Yes.

9    Q      Did you also prepare a supplemental declaration in

10   support of the motion that was filed with the Court?

11   A      Yes.

12   Q      Could you turn to the exhibit marked FTX-3?

13   A      Yes.

14   Q      And do you recognize that as a copy of your

15   supplemental declaration that was submitted to the Court?

16   A      I do.

17   Q      Professor Howell, are you familiar with the report that

18   was submitted in this matter by Mr. Konstantinidis on behalf

19   of the MAPS and OXY objectors?

20   A      Yes.  I am.

21   Q      And are you aware that Mr. Konstantinidis's report

22   include critiques of your opinions?

23   A      Yes.  I am.

24   Q      Do any of critiques change your conclusions?

25

1  A     They do not.  I have reviewed all of his critiques and

2  I find them to be unfounded.

3  Q     Did you, in fact, prepare a written rebuttal report to

4  Mr. Konstantinidis?

5  A     I did.

6  Q     And could you please turn to FTX-6 in your binder?

7  A     Yes.

8  Q     Is this FTX-6, a copy of your rebuttal report with

9  respect to Mr. Konstantinidis's opinions?

10  A     It is.

11  Q     And did you prepare this report based on your analysis?

12  A     I did.

13  Q     And you just testified that you're aware and have

14  reviewed Mr. Konstantinidis's report in this matter, correct?

15  A     Yes.

16  Q     Do you agree with Mr. Konstantinidis's analysis and

17  conclusions?

18  A     Mr. Konstantinidis uses a different approach than I do

19  to valuing each customers claim.  And you can see here the

20  claims that he -- excuse me, the discounts that he arrives at

21  for the different customers on behalf of whom he's filing his

22  report and for each token.  And I just want to point out that

23  unlike the discounts I calculate, these discounts cannot be

24  used to value all customer claims but rather are on a

25

1   customer-by-customer basis.  If you can turn to the next

2   slide --

3   Q    I'm sorry.  If you could then just summarize your views

4   with respect to Mr. Konstantinidis's methodology.

5   A    So, I think there are three important problems with Mr.

6   Konstantinidis's approach:

7        The first is grossly inflated trading volumes.  Both

8   initial volume as well subsequent growth.

9        The second is the assumption that each customer can

10  sell 10 percent of trading volume everyday for years on end

11  with no price impact.  And he does this separately for each

12  customer.  And so, what that means is that, in the case of

13  OXY, 30 percent of daily trading volume is getting sold every

14  day with no impact on the price.  And in the case of MAPS

15  it's 20 percent.  And I believe that this just defies

16  commonsense in addition to basic finance.

17       When I take his methodology with other assumptions that

18  I find problematic, but I just correct the volume inputs to

19  be plausible, I arrive at discounts that are quite similar to

20  the ALD's that I calculate in my method.  And furthermore,

21  you know, note that that liquidation he proposes with

22  corrected volumes would take many decades to happen which

23  seems a sort of undue delay in the extreme.

24  Q    Can you describe what you're conveying in Slide 14 of

25  your demonstrative?

1  A     So, these graphs illustrate the implausible growth that

2  Mr. Konstantinidis assumes.  So, he proposes that the trading

3  volumes for MAPS and OXY are going to increase by 850 percent

4  after the petition date relative to prepetition date annual

5  trading volumes despite the fact that in the case, you know,

6  that there was much concern about whether these projects

7  would continue and in the case of OXY, the underlying project

8  is actually defunct, you know, as of shortly after the

9  petition date.  So, it's really hard to imagine how investor

10 interests could increase this much.  And certainly, is

11 totally at odds with the reality of ex-post trading volume.

12      And then for Serum, he assumes a 20 percent growth rate

13 which I also think is unreasonable particularly because he's

14 basing it, as you can see in this graph, on a spike that

15 occurred at the petition date reflecting the high degree of

16 uncertainty and trading activity that occurred on that day

17 which would not reasonably be expected to continue afterward.

18 Q     Professor Howell, is it your understand that Mr.

19 Konstantinidis used volume data from CoinMarketCap which we

20 heard some about this morning?

21 A     Yes.  I believe he did.

22 Q     Could you turn back to, in the exhibit binder, your

23 rebuttal report which is FTX Exhibit 6?

24 A     Yes.

25

1  Q     And if you could look at page 22 of your report,

2  there's a figure there, Figure 3.

3  A     Yes.

4  Q     Can you explain for the Court what you're conveying in

5  Figure 3 of your rebuttal report?

6  A     Yes.  So, Mr. Konstantinidis suggests that, you know,

7  it would be better to use data from the data aggregators

8  CoinMarketCap, CoinGecko, or Coinpaprika instead of Coin

9  Metrics.  And for the at issue tokens, this is really like a

10 non-issue.  So, I don't really understand why so much is

11 being made about it because the discounts remain at 100

12 percent for MAPS and OXY using data from CoinMarketCap and

13 are slightly lower but still in the same range for Serum.

14      So, I think even though CoinMarketCap uses volumes from

15 exchanges that CoinMarketCap admits has low trusts in the

16 senses that they are dominated by illegitimate trading that

17 couldn't absorb the liquidation of, you know, these assets in

18 a sale.  Nonetheless, the discounts are actually quite, you

19 know, quite similar.

20 Q     Professor Howell, do you have -- we talked -- you spoke

21 a little bit earlier about your paper initial coin offerings

22 finance growth with cryptocurrency token sales.

23 A     Yes.

24 Q     Do you have a copy of that?  It's FTX Exhibit 12 there.

25 A     Yes.

1  Q     There was a question asked of Mr. Lu this morning with

2  respect to your citation to CoinMarketCap data in this

3  report.  Can you explain to the Court your view on why you

4  used CoinMarketCap data in this paper?

5  A     Yes.  So, I did the date gathering for this project in

6  2017 when Coin Metrics did not yet exist.  And cryptocurrency

7  markets and their data providers were, at that time, much

8  less mature.  And CoinMarketCap, which had been around since

9  2013, was really the only game in town.  And so, that was the

10  first reason why we used CoinMarketCap.

11        Second --

12  Q     Were there additional reasons?

13  A     Yes.  There are actually two other reasons that I think

14  are relevant here.

15        So, the second reason is that, at that time, in part

16  because cryptocurrency markets were immature, I actually

17  didn't know that wash trading was such a big problem.  The

18  research papers, the academic papers that have been cited

19  today hadn't yet been written.  And so, I didn't even know

20  that it could be a problem at that time on coin market cap.

21        Third, I think the objective of the analysis is

22  actually the most important thing to consider here.  When I

23  was writing this paper, I wanted to be as comprehensive as

24  possible and that's why I describe CoinMarketCap actually in

25  the text as is the most comprehensive because I specifically

1  wanted to include the frauds and scams that existed in the

2  ICO market in order to connect them with outcomes for those

3  projects in the markets; whereas for this analysis for the

4  FTX matter, I wanted to be inclusive -- you know, air on the

5  side of being inclusive, but it was important to exclude

6  volume that is, you know, clearly illegitimate because it

7  wouldn't be able to absorb liquidation of the debtors

8  holdings.

9       So, actually the goals of the analysis are quite

10  different and so I think it's appropriate to use Coin Metrics

11  for gathering data on volume for this analysis because that

12  universe is designed to be at least mostly organic volume

13  rather than this illegitimate wash trading that seems to

14  dominate some of the other exchanges.

15  Q    Professor Howell, are you also familiar with the report

16  done in this matter by Mr. Gkatzimas on behalf of TMSI?

17  A    I am.

18  Q    And did you, in fact, prepare a rebuttal written report

19  to his opinion as well?

20  A    I did.

21  Q    Could you please turn to Exhibit FTX-9 in your binder?

22  A    Yes.

23  Q    Is the exhibit marked as FTX-9, a copy of your rebuttal

24  report with respect to Mr. Gkatzimas's opinion?

25  A    It is.

1  Q     And did you prepare this report based on your analysis?

2  A     I did.

3  Q     Did you agree with Mr. Gkatzimas's conclusions in his

4  report?

5  A     So, I don't.

6  Q     Can you please summarize why that is.

7  A     Yes.  So, I think a little bit of, kind of, background,

8  I think, is helpful here of how the arguments have kind of

9  evolved.  So, in the original TMSI motion and Mr. Gkatzimas's

10 report, it is heavily implied that it's possible to sell

11 Serum tokens directly into perpetual futures markets.  In my

12 rebuttal to Mr. Gkatzimas, I explained that this is not

13 possible.  Then in the follow up -- I'm not sure what's it's

14 called exactly, the TSMI motion and Mr. Gkatzimas's

15 deposition, they proposed two ways that futures markets could

16 be useful for liquidation.

17      The first is that the existence of this derivative

18 market would sort of soften the price impact of just selling

19 into the spot market which is what, you know, I'm proposing

20 doing in the asset liquidation discount.  That point does not

21 involve, you know, engaging in futures markets in the

22 liquidation.

23      The second proposal they have is a hedging strategy

24 where whomever is doing the liquidating would take a short

25 position in the futures markets in order to try to profit

1   from price declines in the spot market as a result of the

2   liquidation.  And then, you'd subsequently close out your

3   futures contracts.

4        I don't think either of these strategies have the

5   potential to reduce the transfer cost of liquidation for

6   different reasons.  And so, I don't think perpetual futures

7   markets can be used to liquidate the debtors holdings and I

8   think that the particular calculation that Mr. Gkatzimas does

9   in his report misapplies KO, that's the, you know, the Kyle

10  and Obizhaeva model, by failing to account for transaction

11  costs from hedging in futures markets.

12       So, selling and, you know, taking a huge position in a

13  futures market will impact the price just like selling in the

14  spot will.  And those price impacts are not considered by Mr.

15  Gkatzimas.  And in my view, they would actually, essentially,

16  double or potentially triple the transaction cost from the

17  whole exercise.

18       Third, engaging in perpetual futures markets, so, you

19  know, opening these derivative positions would expose the

20  debtors to counter party risks.  For example, FTX.com

21  accounted for 20 percent of Serum perpetual futures before

22  the petition -- volume before the petition date.  And so, you

23  know, the debtors would be taking on that risk that like FTX,

24  you know, an exchange might go under and those positions

25  would be at risk.

1      And then finally, this strategy is not feasible in

2   practice because all of the Serum perpetual futures market

3   volume disappeared within 5 days of the petition date.  All

4   of those contracts were d-listed.  And you could've expected

5   that on the petition date because we see large dislocations

6   in the funding rates that are supposed to be aligning the

7   futures price with the reference price in these futures

8   contracts in the five markets that Mr. Gkatzimas uses for his

9   date.  So, it would've been reasonable to expect these d-

10  listings.  And, in fact, they occurred so the strategy would

11  not in fact be possible.

12           MR. GLUEKCSTEIN:  Your Honor, at this time, I'd

13  like to move into evidence Professor Howell's opinions which

14  are marked as Exhibits FTX-1, FTX-3, FTX-6, and FTX-9.

15           THE COURT:  Any objection?

16       (No verbal response)

17           THE COURT:  They're admitted without objection.

18       (FTX-1, FTX-3, FTX-6, and FTX-9 received into evidence)

19           UNIDENTIFIED SPEAKER:  Yes, Your Honor.  Just

20  subject to our (indiscernible).

21           THE COURT:  Yes.

22           MR. GLUEKCSTEIN:  Thank you, Your Honor.  At this

23  time then I will pass the witness for cross-examination.

24           THE COURT:  Thank you.

25                         CROSS-EXAMINATION

1  BY MR. ROSELIUS:

2  Q     Hello again, Professor Howell.

3  A     Hello.

4  Q     You call your -- you say, KO model an asset liquidation

5  discount, right?

6  A     Correct.

7  Q     You came up with that term?

8  A     Yes.

9  Q     That's not a standard term in the valuation industry,

10  is it?

11  A     I could equivalently call it a transaction cost or an

12  implementation shortfall.  Either way, it's simply the unit

13  impact on price from selling the position.  So, Kyle and

14  Obizhaeva call it a transaction cost or implementation

15  shortfall.  I just shorten that to a discount and we are

16  liquidating assets.  So, I call it an asset liquidation

17  discount.  But as I said in my deposition, this is just

18  purely semantics.

19  Q     So, it's not a standard term in the valuation industry

20  then?

21  A     Discounts are often used in many contexts in finance.

22  Q     So, the term "asset liquidation discount" is not a

23  standard term in the valuation industry, correct?

24  A     To be honest, I don't know.  I don't think it's

25  especially relevant.

1  Q     And that term is not in any of the articles that you

2  relied on or considered, correct?

3  A     Correct.

4  Q     You did consider a paper by Abbott, correct?

5  A     I don't recall sitting here.  I read many papers as

6  part of this work.  So, if you could please show it to me, I

7  may be able to recall if I have read it or not.

8  Q     It's been marked as MAPS-12 in your binder.  In the

9  black binder.

10 A     I have a lot of black binders.

11 Q     I think it's the one with no cover sheet.

12 A     12?

13 Q     Yes ma'am.  You referred to transaction costs as a

14 discount, right?

15 A     Yes.  I am discounting -- yes, it's a discount to the

16 price that comes from the price -- the impact on,

17 importantly, the prevailing market price from selling the

18 asset.  It seems important because -- I don't know.  Anyway,

19 sorry.  Go ahead.

20 Q     You shortened the term "transaction cost" to discount.

21 That's your testimony?

22 A     Yes.  I guess so.  I mean, I guess they're equivalent

23 in my context.  But I want to emphasize that this count is --

24 I think the meaning would depend on, you know, the context.

25

1  So, I don't want to say that discount would be equivalent to

2  a transaction cost in any context.

3  Q    MAPS-12 is a paper by Ashok Abbott entitled "Discount

4  for Lack of Liquidity Understanding and Interpreting Options

5  Models," and it's in the Business Valuation Review, right?

6  A    I see that.

7  Q    And you relied on that.  It's in Exhibit B to your

8  original report, correct?

9  A    Correct.

10 Q    And the very first sentence after the introduction,

11 Professor Abbott says:

12     "Traditionally, business valuation practitioners have

13 used discount for lack of market ability (DLOM) as a generic

14 term to indicate impairment and value due to lack of

15 marketability and liquidity."

16     Did I read that correctly?

17 A    Yes.

18 Q    Now, you did not learn the KO paper as part of your

19 education, correct?

20 A    Correct.

21 Q    And when I say the KO paper, I'm referring to Kyle and

22 Obizhaeva (2016).  The paper that you relied on to calculate

23 that asset liquidation discount.

24 A    Yes.

25

1  Q      You didn't ever use in your work experience -- your

2  non-academic work experience.

3  A      Correct.

4  Q      You don't use it as part of your FinTech class.

5  A      Correct.

6  Q      You've never cited it in any of your other work?

7  A      Correct.

8  Q      You don't use it in your current research?

9  A      Correct.

10 Q      And before this assignment, you had never used a KO

11 model at all, correct?

12 A      Correct.

13 Q      I want to talk about the assumptions that you made as

14 part of your analysis.  You were directed --

15 A      Are we done with Abbott?

16 Q      You can put the paper to the side if you'd like.

17 A      Okay.

18 Q      Just to keep your desk clear I suppose.  Now, as part

19 of your analysis you were directed to make certain

20 assumptions, correct?

21 A      Yes.  As described in the assignment paragraph of my

22 original report.

23 Q      Now, you are not testifying that the debtors have to

24 liquidate all of their holdings to value our claims, correct?

25 They wouldn't have to liquidate all of their holdings.

1  A     It's beyond the scope of my work toopine on what they

2  have to or don't have to do.

3  Q     But you're saying that you considered that the debtors

4  would liquidate all of their holdings --

5  A     Yes.

6  Q     -- because you were told that is a requirement that

7  they do so.

8  A     So, I was told to consider the likely impact on prices

9  of the debtors selling all of their holdings of digital

10  assets.  And it is my understanding that the bankruptcy

11  proceedings are requiring the debtors to sell all of their

12  holdings of digital assets regardless of whether they are the

13  basis of customer claims.  But, as I'm not a lawyer, I kind

14  of can't speak beyond that information that I received.

15  Q     And regardless of any impact that would have on the

16  value of the tokens or the price, the value of the claims?

17  A     I'm sorry.  Can you clarify?

18  Q     Yes.  The debtors have to liquidate.  They have to sell

19  all of their assets, that's your assumption, regardless of

20  the effect that has on the value of the digital assets.

21  A     That's correct.

22  Q     And regardless of the effect it has on the value of the

23  customer claims?

24

25

1  A     Correct.  Well, I was asked to help determine the value

2  of the customer claims, you know, as a result of that

3  liquidation process.

4  Q     And your understanding is that the Court instructed the

5  debtors that they had to sell all of the tokens immediately.

6  Or essentially, as soon as they could.

7  A     I was asked to consider an orderly liquidation

8  commencing on the petition date and that's exactly what the

9  KO model is designed to do.

10  Q     You did not -- and it's your understanding that the

11  debtors could not burn digital assets?

12  A     I was not given information on that one way or the

13  other.

14  Q     And burning means to destroy the tokens.  For example,

15  delete the keys associated with the wallet or account.

16  A     Right.  I know what burning means.  I presume, based on

17  my assignment, indicating that the debtors would be selling

18  all of their holdings of digital assets that wouldn't include

19  burning.  But I -- you know, at least within the scope of my

20  assignment.

21  Q     You didn't consider whether the debtors could burn some

22  of the tokens to increase their value?

23  A     No.  I did not.

24  Q     And you assumed that the debtors would have to sell all

25  of their holdings, not just the customer holdings, right?

1  A      That's true.  Though, I might add here that, if I may,

2  that the -- using my method, the holdings of MAPS and OXY

3  would have to be no more than 3 percent or 11 percent of

4  total supply to get the discounts below 100 percent.

5  Q      Well, we'll come back to that.  You didn't consider

6  whether the debtors could retain their holdings and sell only

7  the creditors holdings, correct?

8  A      I did not.

9  Q      You didn't consider whether the debtors could choose to

10  sell something less than all of their holdings as part of

11  your analysis?

12  A      I did not.

13  Q      You relied on the petition time prices developed by Mr.

14  Lu, correct?

15  A      I did.

16  Q      And to determine the trading volume, you relied on data

17  from the exchanges identified by Mr. Lu, correct?

18  A      Yes.  Sorry, there were some assets that were not

19  covered.  And for those, I used other sources.

20  Q      But that doesn't relate to MAPS, or OXY, or Serum?

21  A      That's right.

22  Q      You never talked to Mr. Lu before giving your opinion,

23  correct?

24  A      Correct.

25  Q      You didn't text with him or email with him?

1  A      I did not.

2  Q      You only reviewed his declaration?

3  A      That's right.  I received some information from him via

4  my team at Analysis Group.

5  Q      You specifically relied on Mr. Lu's determination of

6  which exchanges are trusted, correct?

7  A      For the purposes of price and volatility I used the

8  trusted exchange framework.  For volume, I used the universe

9  of exchanges in Coin Metrics with a few exceptions for except

10 unreliable ones.

11 Q      And that was based on Mr. Lu, correct?

12 A      That's right.

13 Q      You also looked at CoinMarketCap's trustworthiness

14 scores?

15 A      I did.

16 Q      But you did not use the CoinMarketCap data?

17 A      I did in my rebuttal report, but not in my initial

18 report for the at issue tokens.

19 Q      You didn't do any independent analysis of the

20 trustworthiness of individual exchanges, correct?

21 A      I have looked at volume data from a number of exchanges

22 where there were questions about reliability, but I did not

23 do an exchange-by-exchange analysis of trustworthiness.

24 Q      And you have not seen any evidence of wash trading in

25 MAPS, correct?

1  A      I haven't seen any evidence one way or the other, you

2  know, besides the academic and industry reports describing

3  large volumes of wash trading across the industry.

4  Q      You have not seen any evidence of wash trading in MAPS,

5  correct?

6  A      Correct.

7  Q      You have not seen any evidence of wash trading in OXY?

8  A      Correct.

9  Q      You have not seen any evidence of wash trading in

10  Serum?

11  A      Correct.

12  Q      I want to talk a little bit about your discount for

13  lack of market ability.  So, a discount for lack of

14  marketability reflects the opportunity costs of holding a

15  nonmarketable asset?

16  A      That's right.

17  Q      Nonmarketable assets cannot be sold for a certain

18  period of time?

19  A      That's right.

20  Q      And nonmarketable assets are less valuable than

21  marketable assets unless equal.

22  A      That's right.

23  Q      You were directed by the debtors to assume that all of

24  the tokens, held by the debtors, were instantaneously

25  unlocked as of the petition date.  Is that correct?

1  A      I know that FTX and Sam Bankman-Fried controlled the

2  keys to all of the MAPS, OXY, and Serum tokens that they were

3  holding.  I have seen the transactions on the Solana

4  blockchain, which are publicly available, transferring those

5  holdings to FTX cold storage wallets in the days after the

6  petition date.  So, for better or worse, yes, all of the

7  tokens were unlocked from the debtors perspective.

8  Q      And the debtors could unlock the tokens at will.

9  That's your understanding?

10  A      They weren't locked in the sense that that word is used

11  in the crypto economy which occurs usually, you know, in some

12  cases bitcoin being, you know, a great example.  You have an

13  algorithm that no one person controls that is minting new

14  coins.  And so, those bitcoins that have not yet been minted

15  through the mining process are locked.  Those are locked up.

16  And I think there was, perhaps, some impression -- Sam

17  Bankman-Fried at times gave the impression that some of the

18  tokens in these projects, especially Serum, were sort of

19  locked in this algorithmic manner on a smart contract on a

20  blockchain that no individual controlled.  But that wasn't

21  true.  In fact, he did control them.

22        So, they're called -- in the customer claim schedule,

23  they're called locked.  But the way to think about them is as

24  vesting schedules just like an employee would have at a

25  conventional company where, you know, if the employee leaves

1  before her options vest, the company can reallocate them to,

2  you know, another employee.

3  Q    So, it's you're understanding the debtors could unlock

4  tokens at will, correct?

5  A    I feel it's not a yes or no answer because they weren't

6  locked.  I don't think that they were locked to begin with as

7  I understand.  So, you can't unlock something that's not

8  locked.

9         MR. ROSELIUS:  May I approach the witness, Your

10  Honor?

11         THE COURT:  Yes.  What are you handing out?

12         MR. ROSELIUS:  A copy of her deposition

13  transcript.

14  BY MR. ROSELIUS:

15  Q    Professor Howell, if you could turn to page 216.  You

16  recall giving a deposition in this matter, correct?

17  A    Yes.

18  Q    You were under an oath to tell the truth at that time.

19  Same oath you're under today.  And I asked you at the

20  beginning of your deposition to let me know if you didn't

21  understand any questions, I would rephrase them.  Do you

22  remember that?

23  A    Yes.

24  Q    I want to direct your attention to page 216.  I'm going

25  to start at line 22 and go to line 1 on page 217.

1      Question:

2      "How do you know the debtor could unlock tokens at

3 will?

4      Answer:

5      "My understanding is that all of the holdings that I am

6 considering in my analysis are unlocked from the debtors

7 perspective."

8       And then the next question:

9      "You said that the debtors could unlock them at will.

10 I'm asking what you base that on?"

11      Answer:

12      "I'm not saying they were ever locked from the debtors

13 perspective.  I have no information on that."

14      Did I read that correctly?

15 A    You did.

16          THE COURT:  How is that different from what she

17 just testified to?  She said from the debtors perspective

18 they were never locked.  And that's exactly what she said in

19 the deposition.  That wasn't proper use of the deposition.

20 Go ahead.

21 BY MR. ROSELIUS:

22 Q    So, all of the debtors tokens could be liquidated

23 immediately, correct?

24 A    I'm sorry, is this a quote?

25 Q    No.  I'm just asking a question.

1  A      Yes.

2  Q      So, let's talk about the application of the KO model to

3  crypto currency.  The purpose of the KO model is not to value

4  an asset, correct?

5  A      The purpose of the KO model is to calculate the

6  transaction costs from a decision to take a position in a

7  market of a certain size.

8  Q      So, the purpose is not to value an asset, correct?

9  A      They don't describe it that way.  I used the KO model

10  to help determine the value of customer claims.

11  Q      The purpose of the KO model is not to value an asset?

12  A      I guess it depends who was using it.  That's why I was

13  answering that way.  So, not necessarily.  You don't have to

14  use it to value an asset.

15  Q      So, turning to page 207 of your deposition starting at

16  line 19.  You were asked:

17         Question:

18         "Can an application of the KO model be used to

19  determine the discount that renders the token value list not

20  withstanding that the token can be sold for positive dollar

21  amounts?"

22         Answer:

23         "The purpose of the KO model is not to value an asset

24  but rather to asses the transaction costs from a given

25  decision to take a position."

1        Did I read that correctly?

2   A     Yes.

3   Q     And the KO model does not determine the value of a

4   crypto currency token, correct?

5   A     That's what I -- yes.  Correct.

6   Q     You don't know of any other paper that uses the KO

7   model to value assets, correct?

8   A     So, since the deposition, I've been able to think about

9   this a little bit which is why I, you know, kind of refined

10  my -- the way I think about your use of the word value.  And

11  I was also able to look at the literature which I hadn't

12  previously thought was necessary.  And actually, the KO model

13  has been used to calculate price impact in a similar way, you

14  know, as we're doing.  In particular, there's a 2016 paper by

15  authors from Columbia --

16            MR. ROSELIUS:  Objection. I'm just going to

17  object.  This wasn't disclosed at her deposition, it wasn't

18  disclosed in her report; its improper.

19            THE COURT:  Well, you asked the question and she's

20  answering it.  So, go ahead.

21            THE WITNESS:  Anyway, so there is a paper that

22  does use the KO model to calculate price impact in stock

23  markets.  I will just leave it there.

24  BY MR. ROSELIUS:

25  Q     Not in cryptocurrency, correct?

1  A      Actually, there are at least four research papers that
2  use the KO model in the context of digital assets. One is the
3  Brauneis et al 2021 paper which we talked about a lot at the
4  deposition.  And since the deposition I have found at least
5  three others.  You know, one of them applies the KO model to
6  almost 600 cryptocurrencies and I can actually talk about
7  each of those in turn if you would like.
8  Q      And none of those other papers were disclosed with your
9  initial report, correct?
10 A      They were not.
11 Q      You didn't rely on them to come up with your opinion,
12 correct?
13 A      No.
14 Q      You didn't consider them because you didn't know about
15 them, correct?
16 A      That is right. I think they've only offered additional
17 comfort that the KO model is appropriate to use in the
18 digital asset context.
19 Q      And the same is true of your rebuttal report. You
20 didn't consider them in your rebuttal report, correct?
21 A      Correct.
22 Q      Didn't know about them so you had never even heard of
23 them at that point, correct?
24 A      Correct.
25 Q      Couldn't have formed any part of any basis for your

1  opinion, correct?

2  A      Correct.

3  Q      You referred to the Brauneis paper which is in your

4  binder at FTX-15.

5  A      Sorry, that's not the blank one?

6  Q      Oh, excuse me.  This is in the FTX binder.

7  A      The FTX binder only goes to nine.

8              THE COURT:  There should be two binders up there.

9              UNIDENTIFIED SPEAKER:  Yeah, I think, Your Honor,

10  we're going to have to -- he is going to have to give her a

11  copy.  The article exhibits are not in the binder.

12             THE COURT:  Okay.

13  BY MR. ROSELIUS:

14  Q      Would you agree that the KO model is not the

15  universally best measure for determining liquidity on

16  cryptocurrency exchanges?

17  A      I haven't seen any evidence that it is not.

18  Q      I am going to direct your attention to the abstract of

19  the Brauneis paper.  The last sentence, Brauneis says:

20       "Overall, the results suggest there is not yet a

21  universally best measure, but there are reasonably good low

22  frequency measures."

23       Did I read that correctly?

24  A      Yes.

25  Q      And Brauneis also says, on page 3, the second to last

1  sentence before the heading data and methodology:

2      "Overall, our results suggest that the measure used

3  should depend on the question being asked as there is not

4  (yet) a universally best measure."

5      Did I read that correctly?

6  A    Yes.

7  Q    Kyle and Obizhaeva have never asserted that their model

8  applies to cryptocurrency, is that correct?

9  A    Correct.

10  Q    The market for MAPS, OXY, and Serum is highly volatile,

11  isn't that true?

12  A    Yes.

13  Q    And that is part of why you think a discount over 100

14  makes sense because of the high or extreme volatility and

15  large holdings relative to the daily trading volume, correct?

16  A    I think its overwhelmingly driven by the very large

17  holdings.

18  Q    But it's also because of the high volatility, correct?

19  A    No. I don't think that the estimate for the at issue

20  tokens is especially sensitive to their volatility.

21  Q    So, directing your attention to page 49 of your

22  deposition.  I will direct your attention to lines 11 through

23  24.  There is a question that got cut off a bit. It started

24  "The tokens don't" and your answer was:

25      "Its pretty standard in these models that with extreme

1   volatility with, you know, high volatility in these

2   extraordinarily large holdings, relative to daily trading

3   volume, that would not plausibly exist in the normal market

4   environment.  For example, in the case of MAPS where holdings

5   are almost 20,000 times daily trading volume it is natural

6   that the formula would produce a discount of over 100 percent

7   and we then truncated it 100 percent. It does not mean that

8   the formula is incorrect in any way, but it produces a

9   discount of over 100 percent."

10          Did I read that correctly?

11  A    Yes.

12          THE COURT:  Again, completely consistent with her

13  previous testimony.

14          MR. ROSELIUS:  Your Honor, she said that high

15  volatility didn't play into her reason why the model produced

16  a discount over 100 percent being correct.

17          THE COURT:  I recall she did, but we will go from

18  there.

19  BY MR. ROSELIUS:

20  Q    I want to direct your attention back to the Brauneis

21  paper which again is FTX-14.  You have that in front of you,

22  correct?  And directing your attention to page 11, the last

23  sentence before the subheading 3.5.  Brauneis says --

24          THE COURT:  Wait a minute, let me get there.

25          MR. ROSELIUS:  Apologies, Your Honor.

1          THE COURT:  Page 11 you said?

2          MR. ROSELIUS:  Yes, page 11. Its got Bates number

3   2532 on it if that is more helpful.

4          THE COURT:  Where on page 11 did you say?

5          MR. ROSELIUS:  The last sentence before subheading

6   3.5 mean absolute errors and route mean squared errors.

7          THE COURT:  Go ahead.

8   BY MR. ROSELIUS:

9   Q     Brauneis states:

10      "The Kyle and Obizhaeva (2016) estimator performs

11   rather well in the low volume periods, but it is unable to

12   track liquidity across high volatility periods."

13      Now you did not do any research or study to determine

14   what the coefficients of the KO model would be if you used

15   cryptocurrency data, is that correct?

16   A    I did some internal analysis to verify that the

17   invariance principle we could test without cryptocurrency

18   data generally held and it did, but beyond that there wasn't

19   a way to systematically test whether it held in

20   cryptocurrency markets given our data. In particular, to do

21   such an exercise you need high frequency order book data like

22   Brauneis is using here, you know, for the many different

23   exercises that they conduct including the particular samples

24   that you just mentioned.

25   Q     And you didn't think validating the KO model and

1 | cryptocurrency was important to include in your report, is

2 | that correct?

3 | A    No. I thought it was -- I thought my rationale for

4 | using it made itself evident that it was the best possible

5 | choice.

6 | Q    You didn't think validating the model on cryptocurrency

7 | was important to include in your report?

8 | A    The particular exercise that I just described, no.

9 | Q    And your internal test got noisy at the higher

10 | volatility, is that correct?

11 | A    No.  At the highest decile of that size the data were

12 | especially noisy.

13 | Q    And MAPS and OXY, the analysis you are conducting,

14 | would be at the highest decile of that size, correct?

15 | A    I don't know.

16 | Q    So, let's talk a little bit about why you truncated the

17 | results from the KO model.  And you did truncate them?  The

18 | KO model was producing outputs with discounts of well over

19 | 100 percent, correct?

20 | A    Correct, for only 12 of the more then 400 assets that

21 | went through the KO formula as part of my process.

22 | Q    Including MAPS and OXY, correct?

23 | A    Correct.

24 | Q    Now tokens like MAPS and OXY don't have associated

25 | liabilities, correct?

1  A      Not that I know of.

2  Q      And they can't have a negative value, correct?

3  A      That's right.

4  Q      The price doesn't go below zero.

5  A      That is correct.

6  Q      And one of the reasons why you truncated the discount

7  to 100 percent is because a discount of 200 percent, for

8  example, is not reasonable, correct?

9  A      No, not exactly. So, the KO formula doesn't output a

10 price.  So, you just said the price can't go below zero.  Wha

11 the KO formula is producing is a transaction cost, a cost of

12 selling the unit and specifically it's a sort of percent of

13 the price.  So, what its saying when the result is more then

14 a hundred percent is that there is an extreme situation of

15 illiquidity where, you know, the holdings are grossly

16 exceeding the regular volume of the market that you are

17 selling into.

18      It is, as I mentioned at the beginning, actually

19 possible for the cost of selling something to exceed its

20 value.  So, this isn't really about the price going negative.

21 Its really about taking this huge transaction cost and then

22 applying it as appropriate to customer claims.  As I've said

23 earlier, you know, I don't think it would be appropriate to,

24 you know, assign -- it wouldn't make sense to assign, of

25 course, you know, negative value to a customer claim as part

1  of that last step.

2  Q     A discount of 200 percent is not reasonable, correct?

3  A     Sorry, no, I disagree.

4  Q     Okay. If you have an asset that is worth $100 and there

5  is a 200 percent discount, how much is it worth?

6  A     So, again, I am estimating transaction costs from

7  trying to liquidate the holdings.  So, I am saying it's not

8  actually impossible that the cost of selling an asset worth

9  $100 could cost $200.  That is not theoretically impossible.

10 Q     A discount of 200 percent is not reasonable because

11 customer claims can't have negative value, correct?

12 A     That's right.  That is what I just said in that last

13 staff of applying discounts to the value of customer claims I

14 truncated 100 percent which is the same thing as saying I am

15 applying a floor to the value of a customer claim at zero.

16 That is what I was trying to get at there.

17 Q     Tokens can't have negative values, correct?

18 A     Correct.

19 Q     And your reports, they don't show the actual discounts

20 that were produced by the KO model, correct?

21 A     Not in cases where they are over 100 percent.

22 Q     And the demonstrative doesn't show the actual results

23 of the KO model, correct?

24 A     Not where they are over 100 percent.

25 Q     You manually adjusted the discount from what the KO

1 model returned to 100 percent?

2 A    That's right.

3 Q    You didn't mention any of this in your opening report,

4 correct?

5 A    In my -- in the filed report?

6 Q    Yeah.

7 A    I believe we did mention that the discounts were

8 truncated at 100 percent.

9 Q    You didn't how what the actual discounts were?

10 A    No.

11 Q    Now you testified a few minutes ago that for the

12 discount to be under 100 percent the debtors holdings would

13 have to be on the order of 3 to 11 percent of the total token

14 supply. Do I have that right?

15 A    That's right.  So, we did an exercise for MAPS and OXY

16 to just highlight, you know, how large the debtors and, in

17 fact, also these customers claims are, you know, relative to,

18 you know, regular trading volume.  So, in the analysis that I

19 did I think for -- I believe for OXY its 3 percent, for MAPS

20 its 11 percent.  You would have to be, sort of, below that in

21 what you were liquidating in order for the formula to produce

22 an estimate below 100 percent.

23 Q    The debtors aren't making claims against themselves,

24 right?

25 A    Sorry, I don't know what that means.

1  Q     The debtors aren't making claims against themselves,

2  right?  The customer is making claims against the debtors.

3  The debtors don't have a claim against themselves, right?

4  A     I guess so, yeah.

5  Q     Just so I have this straight, for MAPS its 11 percent

6  and for OXY its 3 percent or did I get that backwards?

7  A     Well this is just an illustrative of how -- the size of

8  the debtors holdings is so large this is just to illustrate

9  how much you would have to decrease them before you start to

10 get to a situation where the liquidity and the market can

11 absorb these quantities of sales.  So, it's just -- I don't

12 know that we need to make too much of it, but its just saying

13 here is the point at which, as a percent of total token

14 supply, the discount starts to go below zero -- sorry, below

15 100 percent.

16 Q     Right, below 100 percent.  Again, just so I have it

17 correct for MAPS it would have to be below 3 percent and for

18 OXY below 11 percent or did I get it backwards?

19 A     I believe that is right, but I would have to go back

20 and look at our analysis to be sure.  So, its sort of a minor

21 thing that we did.

22 Q     I guess the point is regardless of the exact number the

23 debtors total holdings would have to be lower then that 3 or

24 11 percent threshold for the discount to go below 100

25 percent.

1   A      That is right.

2   Q      Now the total discount for Serum is less than 100

3   percent, right?

4   A      That is right.

5   Q      The discount that you apply from the asset liquidation

6   discount that you apply is 58.32 percent?

7   A      Yes.

8   Q      So, that means that the debtors holdings are below the

9   percentage of the total supply at which the discount would

10  become more then 100 percent, correct?

11  A      Correct.

12  Q      The face value of the debtors holdings of Serum is

13  around $3.7 billion, is that correct?

14         (No verbal response)

15  Q      You applied a discount of 58.32 percent, correct?

16  A      Correct.

17  Q      So, based on the asset liquidation discount that

18  reduces the value of the debtors holdings to around $1.5

19  billion?  $3.7 billion times one minus 58 -- 1 minus .58.

20  A      That is not exactly the right way to think about it.

21  It's the impact on the price from an orderly liquidation

22  commencing at the petition date would have each -- each unit

23  would have an average discount of this 58 percent.

24  Q      So, they're still worth 42 percent give or take a

25  decimal here of their face value?

1  A      That's right.

2  Q      So, if an unaffiliated third party gave the debtors an

3  additional amount of Serum it would cause the total discount

4  to go over 100 percent, correct?  That is how this works,

5  right?

6  A      Well, the discount depends on the quantity that you are

7  liquidating.

8  Q      So, if the debtors were liquidating -- if a third-party

9  gave the debtors additional Serum tokens that would increase

10 the quantity that they are liquidating and it would cause the

11 discount to go up to or over 100 percent, correct?

12 A      It depends on how much, but yes.

13 Q      A sufficient amount.  There is some sufficient amount,

14 correct?

15 A      Yes.

16 Q      And the value of all those tokens would go to zero,

17 correct?

18 A      Correct.

19 Q      I know you mentioned that the issues between you and

20 Mr. Konstantinidis are non-issues. But suffice it to say, you

21 disagreed about the estimation period, correct?

22 A      Yes.

23 Q      You used an estimation period from November 1st, 2021

24 to November 1st, 2022, correct?

25 A      Correct.

1  Q      That resulted in a discount of over 100 percent for

2  MAPS and OXY, correct?

3  A      Correct.

4  Q      Mr. Konstantinidis criticized you for that, but even if

5  you use a one-year period ending on November 10th, 2022

6  instead the discount is still over 100 percent?

7  A      That's right.

8  Q      And he also, I think, criticized you for not using a

9  six-month period ending on November 10th.  And even if you

10 used that six-month period the discount still goes over 100

11 percent?

12 A      That is right.

13 Q      And when I say the discount goes over 100 percent, I

14 mean that is the result of the KO model, its over 100

15 percent?

16 A      That is right.

17 Q      None of these situations involve the discount going to

18 exactly 100.0000 as far as you can remember?

19 A      No.

20 Q      The same is true about the trading volume data.  Mr.

21 Konstantinidis criticized you for using different data then

22 what Mr. Lu used.  But even if you used data that Mr.

23 Konstantinidis used the KO model still results in an output

24 over 100 percent, correct?

25 A      Correct.

1  Q    Using the additional exchanges, different estimation

2  periods, different trading volumes the result is always well

3  over 100 percent, correct?

4  A    For those two tokens, yes.

5  Q    For MAPS and OXY.

6  A    Yeah.

7  Q    And when you ran the additional models in your rebuttal

8  report those also resulted in discounts or resulted in

9  outputs of well over 100 percent, is that correct, for MAPS

10 and OXY?

11 A    Yes.  This reflects holdings that are, you know, 20,000

12 times and 6,000 times daily trading value.  So, any

13 reasonable model and any reasonable inputs are going to

14 produce a discount of over 100 percent.

15           THE COURT:  How much longer do you have for cross?

16           MR. ROSELIUS:  I'm almost finished with this point

17 and then I have two more.

18           THE COURT:  I am just trying to figure out when is

19 a good time to take a break.  So, let's take a break now.  We

20 have been going for a couple of hours.  So, let's recess for

21 15 minutes.

22      (Recess taken at 3:03 p.m.)

23      (Proceedings resumed at 3:19 p.m.)

24           THE COURTROOM DEPUTY:  All rise.

25           THE COURT:  Thank you.  Please be seated.

1          Whenever you are ready.

2          MR. ROSELIUS:  Your Honor, before I resume, I

3  wanted to briefly address the issue of the three additional

4  articles that were not previously disclosed.  We have asked

5  the debtors for a copy so that we could review them and cross

6  Professor Howell on them.  They have been unable to provide

7  them to us.  So, I would just, again, ask that we have the

8  ability to -- that the debtors produce them so that we can

9  cross her on it and bring Professor Howell back if necessary.

10          THE COURT:  We're probably not going to finish

11  today.  Mr. Glueckstein.

12          MR. GLUECKSTEIN:  Your Honor, the articles were

13  discussed by the Professor Howell in response to a question

14  from counsel.  He then asked her questions specifically in

15  response to whether she was aware of articles containing such

16  subject matter.  Counsel then asked her whether she relied on

17  those articles at the time she prepared her opinion and she

18  said no.

19          So, from our perspective we can produce the

20  articles if that is helpful.  They are, I'm sure, publicly

21  available.  But this notion that we are somehow going to

22  recall her and bring her back for purposes of cross-

23  examination on those articles we would object.

24          THE COURT:  Mr. Gwynne, do you want to be heard?

25          MR. GWYNNE:  Kurt Gwynne for the record, Your

1  Honor, from Reed Smith.

2          We join in the request.  The witness was

3  testifying about the articles and saying they supported her

4  use of the KO model in this context.  So, we should have an

5  opportunity to review the articles and cross-examine the

6  witness to see if they do support her use of the KO model in

7  this context.  That is something that has been an issue from

8  the time we filed our objection, if not before.  We have had

9  discovery, we've asked for things that support the witness's

10  opinions.

11          If she is saying the use of this model is where

12  she gets her opinions from and these articles support using

13  this model, which we vehemently dispute, that we should have

14  the articles and an opportunity to cross.  We shouldn't be

15  sandbagged by the assertion that there is three articles out

16  there and not knowing what they say, exactly what the context

17  of them is, whether they even use the word "discount."

18          So, we should have the articles and the

19  opportunity to cross-examine the witness after we have had a

20  chance to review them.

21          THE COURT:  Well, this is what happens when you

22  have an expert who after his or her deposition does some

23  additional work and it results in some additional information

24  that might be relevant. I think it is relevant based on what

25  she testified.  So, I will order that the articles be

1  produced.  If you can't find them publicly while you are

2  sitting there, I'm sure you have associates back there who

3  are probably looking for them right now.

4        We will see where we get at the end of today but I

5  will leave the record open as to Professor Howell until after

6  you have received those articles and determine whether or not

7  you think its worth doing cross-examination.  I will make a

8  determination at that time. I would like a copy of the

9  articles myself and then I will decide whether or not it

10  would be appropriate to bring her back for further cross.

11        THE WITNESS:  Your Honor, if I may just clarify. I

12  think earlier I didn't actually mention the authors.  So, I

13  am not sure if the folks who are looking for them would know

14  which ones I am referring to because there are actually

15  multiple.  Can I just say them first.

16        MR. GLUECKSTEIN:  Your Honor, we will get copies

17  of the articles and provide them to the Court and to counsel.

18        THE COURT:  Yes.  Let your counsel take care of

19  it.

20        THE WITNESS:  Okay.

21        MR. ROSELIUS:  Thank you, Your Honor.  May I

22  proceed, Your Honor?

23        THE COURT:

24  BY MR. ROSELIUS:

25     Professor Howell, before the break we were discussing

1  the fact that models -- the KO model and the other models

2  that you applied resulted in discounts or produced results

3  that are greater then 100 percent.  Do you recall that?

4       Yes.

5       And that is accurate, correct?

6       That's right.

7       That they produced discounts over 100 percent.

8       That is right.

9       If you can turn to Exhibit MAPS 13 in the black binder

10  with no cover sheet.  This is a paper by Stillian Ghaidarov

11  analysis and critique of the average strike put option

12  marketability discount model from September 2009, correct?

13       Correct.

14  Q    You relied on the Ghaidarov paper in calculating your

15  discount for lack of marketability in this case, correct?

16  A    I did.

17  Q    And Ghaidarov criticizes the Longstaff model because it

18  results in discounts over 100 percent, correct, on the first

19  page?

20  A    Can you show me where?

21  Q    Yeah, if you go to the last sentence of the penultimate

22  paragraph it says: "Furthermore, the discounts predicted by

23  the model tend to be significant for volatilities over -- oh,

24  sorry, this is Finnerty.  Excuse me.

25  A    Right.

1        Let me start that differently.  The Finnerty model is

2   also a model that you considered in this case?

3        Yes.

4        And you rely on a later version of Finnerty, is that

5   correct?

6        That's right.  Finnerty (2012).

7        Not the 2002 model that is discussed in this paper.

8        Correct.

9   Q    If you look, where I was directing you before, it says:

10  "Furthermore, the discounts predicted by the model tend to be

11  significant for volatilities over 30 percent and longer

12  holding periods exceeding the reasonable boundary of 100

13  percent."

14       Did I read that correctly?

15  A    Yes.

16  Q    And if you go to the third page of Ghaidarov, below

17  equation number six, Ghaidarov states: "It follows from the

18  expression above that the size of the marketability discount

19  expressed as a percentage of the initial security price v (0)

20  will never exceed 100 percent."

21       Did I read that accurately?

22  A    Yes.

23  Q    I want to direct your attention back to the Abbott

24  paper which I believe is MAPS-12.

25  A    Okay.

1   Q      Abbott states, if you go to page 145 --

2   A      Yes.

3   Q      -- the second sentence there -- actually let me just

4   read the first and second sentences of that paragraph:

5          "Put option-based models are being increasingly

6   employed by practitioners to measure the price risk

7   associated with lack of liquidity.  Often, however, the value

8   of a put option premium estimating the cost of liquidity is

9   presented incorrectly as the discount for lack of liquidity."

10         Did I read that correctly?

11  A      Yes.

12  Q      Your position is that a discount and transaction costs

13  are the same thing?

14  A      I think its great that you brought this up because

15  these two papers are referring to discounts for lack of

16  marketability, which is where the value of an asset, as we

17  have discussed already, is lower because you cannot sell it

18  for some period of time. I use a DLOM for those cases where

19  certain tokens are subject to these vesting schedules.

20         It actually has nothing to do with, what I call, the

21  asset liquidation discount that makes use of the KO formula.

22  So, it's the KO formula which is not a discount for lack of

23  marketability.  That is a transaction cost or a price impact,

24  an impact on the prevailing market price from selling a

25  quantity.  Okay, that is the KO output.  That can produce

1  discounts of more then 100 percent and that is totally

2  standard and no one has ever critiqued price impact models

3  for producing discounts of more than 100 percent.

4      I point to the rule of thumb square-root model, which

5  is widely used by practitioners and academics.  I have many

6  cites of this in my report.  It also produces discounts of

7  more than 100 percent, never criticized for that.

8      These two papers are critiquing discounts for lack of

9  marketability for going over 100 percent, which I agree with.

10  And my DLOM's asymptote to 100 percent because as a

11  marketability period -- non-marketability period kind of goes

12  to infinity, the value can go to zero but it should not go

13  below zero.

14      Now I also would quibble with these particular

15  critiques, Ghaidarov is --

16          MR. ROSELIUS:  Your Honor, I would object.  This

17  is not at all responsive to my question which is did I read

18  that correctly.

19          THE COURT:  Yeah, let's just answer the question.

20  Your counsel will have the opportunity to follow up if they

21  want to.

22          MR. ROSELIUS:  I would also move to strike her

23  answer to the extent --

24          THE COURT:  Its stricken.

25  BY MR. ROSELIUS:

1  Q      Then if you could turn to -- oh, sorry, the same paper,

2  not the next line but the following line. It says:

3         "Neglecting to convert the option premium to the

4  applicable discount creates the illusion that the estimated

5  discounts are greater then 100 percent, an impossible

6  solution."

7         Did I read that correctly?

8  A      Yes.

9  Q      Finally, if you could turn to MAPS-10 this is a paper

10  entitled "A Test of DLOM Computational Models" by John J.

11  Stockdale from the Business Valuation Review in 2008,

12  correct?

13  A      Yes.

14  Q      And if you go to page 137 at the top of the righthand

15  column it says:

16         "Models providing results that equal or exceed 100

17  percent may have a theoretical problem because it seems

18  logical that a discount would not reduce a value to zero or

19  less."

20         Did I read that correctly?

21  A      Yes.

22  Q      Thank you.

23  A      Let's talk about fundamental value.  You are not

24  providing an opinion as to the fundamental value of MAPS, or

25  OXY, or Serum, correct?

1  Q    I opined on the fundamental value in my rebuttal to Mr.

2  Konstantinidis who talks about the nature of the tokens.

3  Q    You don't mention Mr. Konstantinidis or his report

4  anywhere in Section 3 of your rebuttal report, is that

5  correct?

6  A    I would have to look to recall.

7  Q    Do you have it in front of you?  I mean I am happy to

8  represent to you that you don't if you want to take it at my

9  word.

10  A    Okay.

11  Q    Is that fair that you don't mention Mr. Konstantinidis

12  at all in Section 3, the background, where you talked about

13  MAPS, or OXY, or Serum, correct?

14          MR. GLUECKSTEIN:  Your Honor, I think the witness

15  has been offered and should review the document.

16          THE COURT:  Yes.  Give her a chance to review the

17  document.

18  BY MR. ROSELIUS:

19  Q    I believe its FTX-6, Professor Howell.

20  A    Section 3?

21  Q    Yeah, Section 3 starting on page 5 going to page 6.

22  A    Right. So, this section is rebutting -- is part of my

23  rebuttal to Mr. Konstantinidis where he has opened with a

24  section about the tokens background, and their nature, and

25  their sources of value.  So, I rebut by adding context about

1  their nature and sources of value that I think he left out

2  and is important to know.

3  Q     You are not offering any opinion as to the specific

4  fundamental value of MAPS, or OXY, or Serum, correct?

5  A     No -- sorry, I am -- I do opine on the fundamental

6  value of Serum being likely negligible given that the project

7  is defunct.  I believe its also true of MAPS -- sorry, of OXY

8  where the underlying protocol is also defunct.  I am not sure

9  if I exactly say that here.

10  Q     But the --

11  A     Yes, I do in Paragraph 14.

12  Q     -- MAPS and OXY tokens are not valueless, correct?

13  A     Well, so as it says here, I opine that the fundamental

14  value of OXY derived from its utility value on the Oxygen

15  exchange and since the Oxygen exchange is defunct it's not

16  obvious to me how it could have fundamental value.  That is

17  separate from whether the token has a positive price in the

18  market.

19  Q     Do you have your deposition transcript in front of you?

20  A     Yes.

21  Q     Could you go to page 204?

22  A     204?

23  Q     Yeah.  Starting at line 11, are you there?

24  A     Yes.

25  Q     Question:

1    "Do you conclude that the MAPS and OXY tokens are

2  valueless?"

3         Answer:

4         "No."

5         Did I read that correctly?

6  A    Yes.

7  Q    You are not offering any opinion as to the discount

8  based on any alleged connection between the at issue tokens,

9  and FTX, or Mr. Bankman-Fried, is that correct?

10 A    My discounts only depend on those connections in so far

11 as they employ the debtors holdings as an important input. I

12 explain, in various places, that those holdings are so large

13 because of the connections. I offer that, you know, because

14 of the dependence of these projects on FTX and Mr. Sam

15 Bankman-Fried. So, I provide that as context, but the formula

16 is mechanically including just the number that is the debtors

17 holdings.

18 Q    So any alleged ties between FTX or Mr. Bankman-Fried

19 and the at issue tokens that is not part of your formal

20 analysis or liquidation or marketability discounts, correct?

21 A    Correct.

22 Q    You don't know if Sam Bankman-Fried or anyone else

23 associated with FTX had an ownership stake in the Maps.me

24 application, is that correct?

25 A    I have reason to believe that there was some ownership

1   stake because I know that Alameda made a $50 million

2   investment in Maps.me and in my experience teaching

3   entrepreneurial finance such an investment -- you know, what

4   I would call a corporate VC investment almost invariably

5   comes with an ownership stake, but I have not seen a record

6   of that transaction.

7   Q    So, you do not know if there was, in fact, any

8   ownership stake, correct?

9   A    I do not.

10  Q    Did you review any records from the debtors in

11  preparing your opinion about the connection with Mr. Bankman-

12  Fried?

13  A    No.

14  Q    The alleged connection of Mr. Bankman-Fried or FTX.

15  Other then his role as an advisor, neither Sam Bankman-Fried

16  nor others associated with FTX controlled the governance of

17  the Maps.me organization, is that correct?

18  A    I don't know that.

19  Q    You don't know if Mr. Bankman-Fried or anyone else

20  associated with FTX had an ownership stake in the Oxygen.org

21  application, is that correct?

22  A    Well, I have the same view based on my experience

23  teaching entrepreneurial finance that the $40 million

24  investment of Alameda in Oxygen would have, in the normal

25  course of business, come along with an ownership stake, but

1  the same applies where I haven't seen the record.

2  Q     So, you don't know?

3  A     That's right.

4  Q     You never saw the underlying agreements that you are

5  basing that on?  You just assumed they existed?

6  A     I read about these investments serving as an advisor,

7  posting the ICO and so forth in news articles.  So, that is

8  my source of information.

9  Q     And in your rebuttal report, in Section 3, where you

10  discuss this, you cite to some of the White papers, correct?

11  A     Yes.

12  Q     Blog posts, correct?

13  A     Yes.

14  Q     Newspaper articles?  Michael Lewis's book -- sorry,

15  newspaper articles?

16  A     Yes.

17  Q     Michael Lewis's book?

18  A     I don't recall citing Michael Lewis's book, but I may

19  have.

20  Q     It's not that important.

21  A     Okay.

22  Q     But you did not consider any debtor documents at all,

23  correct?

24  A     That's correct.

25  Q     No agreements, correct?

1    A      Correct.

2    Q      No emails?

3    A      Correct.

4    Q      No text messages?

5    A      Correct.

6    Q      And any connection between the at issue tokens, and

7    FTX, or Mr. Bankman-Fried is not part of your discounts,

8    correct?

9    A      Again, only through the massive holdings as I have said

10   already.

11   Q      And if you took Mr. Bankman-Fried entirely it would not

12   change your discounts at all, correct?

13   A      I kind of don't understand that proposition. I don't

14   think he would have -- I don't think any of us would be here

15   if we took Sam Bankman-Fried out of the equation.

16   Q      Fair enough, but his -- the connection between him and

17   any wrongdoing by him does not affect your discounts,

18   correct?

19   A      It's actually a reason.  I think its especially

20   appropriate to apply discounts based on liquidating the

21   debtors' holdings, that amount, to customer claims. I explain

22   that, that these -- that the customers holding these tokens

23   were actually taking additional risk that was FTX specific

24   relative to a customer who would say just holding BTC,

25   bitcoin, on the FTX exchange.

1    One of those risks, I described two risks -- one of
2    those FTX specific risks has to do with the dependance of
3    these projects on FTX and Mr. Sam Bankman-Fried that by
4    choosing to have these partnerships, and dependents, and hold
5    all of the tokens at FTX the customers were taking on a risk
6    that fraud or mismanagement would cause FTX and Sam Bankman-
7    Fried to stop supporting the projects.  That was a risk that
8    those customers took and the, you know, bad state of the
9    world has prevailed.  So, I point out that its reasonable for
10   the customers who assumed those risk to bear their costs in
11   this bad state of the world.
12   Q    So, if you took SBF out of the case entirely, assume
13   there is no criminal aspect to it how does that change the
14   asset -- that would not change the asset liquidation discount
15   at all, correct?
16   A    I guess so.
17   Q    Now you agree that some amount of MAPS and OXY can be
18   sold before the price goes to zero, correct?
19   A    That is true.
20   Q    OXY was trading at a positive price on the petition
21   date, correct?
22   A    That is true.
23   Q    MAPS was trading at a positive price on the petition
24   date?
25   A    That is true.

1  Q     And OXY is currently trading at a positive price, is

2  that correct?

3  A     Yes.

4  Q     And MAPS is currently trading at a positive price,

5  correct?

6  A     Yes.

7  Q     If you start to sell the debtors holdings of MAPS and

8  OXY the price does not go to zero immediately, right?

9  A     It depends.

10 Q     It doesn't go to zero on the first token, correct?

11 A     So, again, this depends on market participants beliefs

12 about the expected liquidation.  I think your intuition is

13 that one could sell today one unit of MAPS at a positive

14 price, that's right.

15 Q     And you cannot tell at what point the price goes to

16 zero, correct?

17 A     I think it depends on, sort of, market efficiency and

18 what we assume about the rationality of participants.  You

19 know, if the liquidation began and participants knew there

20 would be a complete liquidation and that the discount would

21 ultimately be 100 percent, I would expect that a participant

22 interested in buying, say, MAPS would realize that the debtor

23 is willing to sell at, sort of, any positive price and would

24 demand a lower price, and that that would very quickly

25 dissolve to zero.  You know, how quickly again depends on,

1  sort of, information, beliefs and other frictions in the

2  market.

3  Q    And you don't know if you could sell $100 million worth

4  of MAPS or OXY before the price would go to zero, correct?

5  A    I don't know.

6  Q    And tokens like MAPS and OXY can't have a negative

7  value, correct?

8  A    Correct.

9  Q    The price can never go below zero?

10 A    Correct.

11         MR. ROSELIUS:  No further questions at this time

12 subject to the issue with the other articles.

13         THE COURT:  Thank you.

14         MR. GWYNNE:  Kurt Gwynne for the record.

15         Excuse me, Your Honor, I just need to get some

16 exhibits together.

17      (Pause)

18         MR. GWYNNE:  Thank you, Your Honor.

19         THE COURT:  No problem.

20                   CROSS-EXAMINATION

21 BY MR. GWYNNE:

22 Q    Good afternoon, Ms. Howell -- Professor Howell.

23 A    Good afternoon.

24 Q    Prior to your engagement by FTX you never estimated an

25 asset liquidation discount, correct?

1  A      Correct.

2  Q      And to estimate the asset liquidation discount you

3  chose that 2016 KO transaction cost model, right?

4  A      I did.

5  Q      And in your academic research or other work you never

6  cited that article before, right, the KO paper?

7  A      That is right.

8  Q      The KO model actually determines transaction costs,

9  right?

10 A      Right.

11 Q      And the KO model is a liquidation proxy, a liquidity

12 proxy, right?

13 A      It is based on an estimate of the liquidity of the

14 market.

15 Q      It measures liquidity, right?

16 A      Yeah.

17 Q      And the authors, Kyle and Obizhaeva, they never used

18 the term "discount" anywhere in their 2016 paper, correct?

19 A      I believe so, yes.

20 Q      And, in fact, when they wrote a subsequent paper in,

21 what was it, 2023 talking about their model or 2020, do you

22 remember when that was?

23 A      They have both a 2020 and a 2023 paper on this topic.

24 Q      And in none of those papers did they describe the

25 transaction cost model as a discount model, right?

1  A     That is right.  And I am happy to call this an asset

2  liquidation transaction cost if that would make everybody

3  happy.

4  Q     Let's talk about volatility. On average, the MAPS and

5  OXY tokens are more volatile then securities that are traded

6  on the New York Stock Exchange, right?

7  A     I would have to look to be sure.  I don't know that

8  they are more volatile then every stock traded on the New

9  York Stock Exchange, certainly not in every period of time.

10 Q     Do you have your deposition transcript, Ms. Howell --

11 Professor Howell.

12 A     Yes.

13 Q     Can you please turn to page 156 and let me know when

14 you are there?

15 A     Yes.

16 Q     Do you see where I asked you a question on line 17 and

17 then you answered it on lines 20 and 21?  Can you please read

18 that question and answer aloud?

19 A     Question:

20        "How would you compare the volatility of MAPS tokens to

21 securities traded on the New York Stock Exchange?"

22        Answer:

23        "On average, MAPS volatility is higher then stocks

24 traded on the New York Stock Exchange."

25        Question:

1        "How much higher?"

2        Answer:

3        "It would depend on the stock and the particular period

4  --

5  Q    There's no question.  You finished reading, right?

6  Just through 21.

7  A    Oh, okay. Sorry.  Yes.

8  Q    And then with respect to the OXY tokens can you turn to

9  page 157 and do you see we are on line 15 where I asked you a

10 question and then you answered through lines 21?

11 A    Yes.

12 Q    Can you read that aloud, please?

13 A    Starting on line 15?

14 Q    Yes, please.

15 A    Question:

16       "Would your answers be the same for OXY with respect to

17 its volatility compared to the New York Stock Exchange and

18 NASDAQ traded securities?"

19       Answer:

20       "Yes, I thought that's what I just answered but, yes.

21 I think both MAPS and OXY have relatively volatile prices

22 compared to the average stock on the New York Stock Exchange

23 or NASDAQ."

24            MR. GLUECKSTEIN:  Your Honor, I object to this.

25 This is entirely consistent with the testimony that she just

1  gave.  Counsel left out average from his question and she

2  explained what she meant by it. There's no inconsistency

3  here.

4           MR. GWYNNE:  I did not leave out average. It was

5  the second word in my question, Your Honor.  It was on

6  average.  The witness's testimony was directly contrary to

7  what her testimony was in her deposition.

8           THE COURT:  I think it was pretty consistent, but

9  go ahead.

10 BY MR. GWYNNE:

11 Q    On average, Professor Howell, MAPS tokens are more

12 volatile then securities traded on NASDAQ, right?

13 A    You know, what I said was, you know, the truth, as I

14 understood it, at the deposition.  You know, I haven't done

15 the analysis to compare the volatility and I used -- you

16 know, in the deposition I used the words "relative and

17 average," you know, reflecting that I think in general these

18 digital assets, just based on my knowledge of cryptocurrency

19 markets overall tend to be relatively volatile compared to

20 conventional stock markets.  That is what I was trying to

21 express in the deposition.

22      I want to, sort of -- I would like to walk back a

23 little bit to the degree I implied that I knew what the

24 volatility of specifically MAPS and OXY is relative to some

25 period of time in the New York Stock Exchange because I don't

1  know that.

2          MR. GWYNNE:  Your Honor, object and move to

3  strike.  That wasn't responsive to my question.  My question

4  was just simply on average were MAPS tokens more volatile

5  then securities traded on NASDAQ.

6          THE COURT:  I think that is what she answered.

7          THE WITNESS:  I have to say sitting here today --

8          THE COURT:  Hold on, Professor.

9          THE WITNESS:  Sorry.

10          THE COURT:  I think she was explaining why she

11  answered the way she did. So, I think its consistent.  Go

12  ahead.

13  BY MR. GWYNNE:

14  Q    So, is it your testimony that you don't know whether

15  the MAPS tokens are more volatile then average securities

16  traded on NASDAQ?

17  A    Correct. I have not done that analysis.

18  Q    Okay.  Can you please turn to page 157 of your

19  transcript?  Do you see where I ask you a question on line 11

20  and then you answered it down through line 14?

21  A    Yes.

22  Q    Can you please read that question and answer into the

23  record?

24  A    Question:

25          "What about the volatility of the MAPS tokens during

1  that same time period as compared to the securities traded on

2  the NASDAQ?"

3      Answer:

4      "I believe it is more volatile on average."

5  Q    All right.  Now, during the one-year period prior to

6  November 11th, 2022 MAPS and OXY tokens were more volatile

7  then securities traded on NASDAQ, right?

8  A    I don't know that for sure. I have not compared them.

9  Q    Would you agree that MAPS and OXY tokens are highly

10 volatile?

11 A    I believe they are fairly volatile.  Again, the

12 volatility is actually not driving the estimated discounts

13 for the at issue tokens. It isn't something that I have

14 systematically looked at or produced analysis about. So, I

15 would want to do that before speaking affirmatively about it.

16 Q    Okay.  That wasn't my question.  My question was are

17 MAPS and OXY tokens highly volatile, yes or no?  You can give

18 an explanation, but can you answer yes or no?

19 A    I don't know. I don't know what the benchmark is

20 sitting here today.

21 Q    Okay. Please turn to page 66 of you deposition and let

22 me know when you are there?

23 A    Yes.

24 Q    Do you see on line 10 where I ask you a question and

25 then you answered through line 12?

1    A      Yes.

2    Q      Please read my question and your answer?

3    A      Question:

4           "So, you said that MAPS, and OXY, and Serum are

5    volatile?"

6           Answer:

7           "Yes."

8    Q      And the KO model, according to Alexander Brauneis is

9    unable to track liquidity across high volatility periods,

10   correct?

11   A      That is exactly why I choose a one-year period rather

12   than just the period before the petition date so as to not be

13   restricted to especially high volatility periods and to

14   capture, kind of, a range of scenarios.

15           MR. GWYNNE:  Your Honor, I object and move to

16   strike.  That wasn't an answer to my question.

17           THE COURT:  Any response?

18           MR. GLUECKSTEIN:  Your Honor, I think Professor

19   Howell is answering the question as she sees appropriate if

20   she doesn't view it as a yes or no question.

21           THE COURT:  Motion to strike is denied.  Keep

22   going.

23   BY MR. GWYNNE:

24   Q      Do you believe that -- do you agree with Alexander

25   Brauneis that the KO model is unable to track liquidity

1   across high volatility periods?

2   A    I agree that that is what they say in their paper.

3   Q    Now you having never estimated an asset liquidation

4   discount before and having never cited to the KO transaction

5   cost model before and notwithstanding that the authors never

6   used the term "discount" you chose their model, the KO

7   transaction cost model, to determine your asset liquidation

8   discount for the highly volatile MAPS and OXY tokens, right?

9   A    I did.

10  Q    Now in the KO model the bid/ask spread and the price

11  impact are the two elements that make up the transaction

12  costs that is the output of the KO model, right?

13  A    Yes.

14  Q    And the trading venues from which the KO model was

15  created were the New York Stock Exchange and NASDAQ, right?

16  A    That is how they calibrate certain coefficents.

17  Q    Those were the trading venues from which the data came

18  that was used to create the KO model, right?

19  A    Not to create it, which is why I didn't answer yes or

20  no.  To calibrate it.

21  Q    So, the KO model was calibrated using data from the New

22  York Stock Exchange and NASDAQ, right?

23  A    Yes.

24  Q    And the KO model has coefficients that are part of the

25  calculation to determine the ultimate transaction cost,

1  right?

2  A      Yes.

3  Q      And the coefficients were determined based on data from

4  those two vendues, NASDAQ and New York Stock Exchange, right?

5  A      Yes.

6  Q      And here the trading venues for MAPS and OXY are

7  cryptocurrency exchanges, not the stock markets, right?

8  A      That is right.

9  Q      And the price impact that is an important element of

10  the KO model, right?

11  A      It is.

12  Q      And is it true that the KO model has been found not to

13  provide valuable information on ranking price impacts across

14  trading venues?

15  A      I believe that one result of the Brauneis model is that

16  other liquidities perform better for ranking exchanges, but

17  that is not the exercise that I am doing.  So, I disregarded

18  it.

19  Q      Are you aware that Brauneis, in his 2021 article, said

20  that:

21        "The liquidity proxies thus do not provide valuable

22  information on the rankings of price impacts across different

23  trading venues."

24  A      Yes.

25  Q      And the liquidity proxies about which Brauneis was

1  talking about included Kyle and Obizhaeva model, right?

2  A    Correct.  But, again, I am not doing a ranking of

3  exchanges in my analysis.  I think the relevant sentence is

4  in their abstract where they write the Kyle and Obizhaeva

5  (2016) estimator and the Amihud (2002) illiquidity ratio

6  outperform when estimating liquidity levels.  So, that

7  overall conclusion was my main reason for citing this article

8  as one reason why the KO model was appropriate.

9  Q    Well, you chose to use the KO model in the 2022

10 cryptocurrency market even though the coefficients used in

11 the KO model were created using stock market data that is

12 over 20 years old, right?

13 A    I think it's a little bit less than 20 years, but yes.

14 Q    In the KO model the coefficient from the New York Stock

15 Exchange differed from the coefficient from NASDAQ, right?

16 A    Yes.

17 Q    And the reason they differed is because the underlying

18 data was different in the two trading venues, right?

19 A    That's right.

20 Q    And you don't know how the underlying data was

21 different because you didn't work with that data, right?

22 A    That's right.

23 Q    And you didn't conduct any independent test to

24 determine whether those New York Stock Exchange and NASDAQ

25 coefficients could be applied in the cryptocurrency market,

1  right?

2  A     I did not.  One test I did do along kind of in that

3  spirit was to assess the discounts using the rule of thumb

4  square root model, which has no coefficients, is not

5  calibrated using any data from, you know, public markets, and

6  that produced often similar, but usually somewhat larger

7  discounts than the Kyle and Obizhaeva model.  So I don't

8  believe that the discounts and certainly not for the case of

9  Maps, Oxy, and Serum, you know, are a function of the

10  calibration using stock market data.

11  Q     Well, at no point since Kyle and Obizhaeva created

12  their model in 2016, at no point have they said that the

13  model could be used specifically in the cryptocurrency

14  market, right?

15  A     Right.

16  Q     And you didn't do any research to determine what the

17  coefficients would be in the KO model if you actually used

18  data from the cryptocurrency market, right?

19  A     I did not.

20  Q     All right.  Let's talk about the asset liquidation

21  discounts that you generated using the KO transaction cost

22  model.  What's the highest discount before you manually

23  reduced it to a hundred percent, what's the highest discount

24  resulting from your application of the KO transaction cost

25  model?

1    A      I don't know off the top of my head.

2    Q      Was it over 78,000 percent?

3    A      I don't know.

4    Q      Was it over 75,000 percent?

5    A      I don't know.

6    Q      You didn't say what it was in your report; did you?

7    A      I did not.

8    Q      But in your backup data you know that it was tens of

9    thousand of percent, right?

10   A      In some cases, yes.

11   Q      But in your report you didn't say the discount

12   resulting from my use of this transaction cost model was

13   50,000 percent, all you said in your report was a hundred

14   percent discount, right?

15   A      That was the discount that I applied to the customer

16   claim for those -- for that token.

17   Q      And your scientific, economic, financial theory process

18   for doing that was simply to just cap everything at a hundred

19   percent manually, right?

20   A      That's right.

21   Q      And you believe that using a transaction cost model to

22   determine a discount, even if the discount comes up at 50,000

23   or 75,000 or 78,000, doesn't reflect a theoretical problem

24   with the model, right?

25   A      Exactly.

1  Q    Now, is the value of a put option, is that called a put

2  option premium?

3  A    I don't -- the price of a put option?

4  Q    Well, what does the put option premium mean to you?

5  A    The value of holding the derivative and, you know,

6  which is usually done using option pricing theory.

7  Q    And do you believe that the value of a put option,

8  which represents the right to sell an asset at a

9  predetermined price, can proxy for the value loss due to non-

10 marketability?

11 A    I do, and I think that's a standard way to calculate a

12 discount for lack of marketability as, you know, Mr.

13 Constantinides does in his report as well.

14 Q    And the value of a put option premium, which estimates

15 the cost of liquidity, is the discount for lack of liquidity,

16 right?

17 A    No.

18 Q    No?  Why is that wrong?

19 A    So the discount for lack of marketability is reflecting

20 the opportunity costs of not being able to sell the asset,

21 and I proxy for that cost following, you know, a well-

22 established literature using the value of a put option

23 because a put option represents the right to sell something.

24 And so the idea is that that right to sell something is being

25 forgone and so I price this put option in my discount for

1  lack of marketability.  My discount for lack of marketability

2  does not have anything to do with liquidity.

3  Q    So is it your testimony that your discount for lack of

4  liquidity is unrelated to the cost of liquidity?

5  A    I don't know what that means.

6  Q    Well, do you know what the cost of liquidity means?

7  A    It's not really a term I'm familiar with.  I think that

8  we can think about the transaction cost from, you know,

9  something like the Kyle and Obizhaeva model or any of the

10  other models I use to calculate price impact as being a cost

11  of illiquity in the market, yes.

12  Q    So you don't know what the cost of liquidity means as

13  used in the Abbott article; is that fair to say?

14  A    It's not what I use in my analysis.  I think it's used

15  -- I think it's used in that way by Mr. Constantinides in his

16  method, sort of this blockage or dribble-out method where he

17  accounts for the fact that you can only sell a certain amount

18  every day and that that is sort of costly, using a model of

19  the discount for lack of marketability, but it's not how I

20  use it.

21  Q    No, you use the term transaction cost and discount

22  interchangeably with respect to the KO model; is that

23  accurate?

24  A    Yes.

25  Q    And is it also accurate that at your deposition you

1  couldn't cite to any literature that treats those two terms

2  as synonymous?

3  A      That's right.

4  Q      All right.  Now let's talk about, remember the

5  demonstrative exhibit that you testified about on direct

6  examination and it was up on the screen for the Court.  In

7  there, you had other models that you said supported your

8  more-than-a-hundred-percent discount, right?

9  A      That's right.

10  Q      And that those models, the KO square root, KO linear

11  model, square root Khan, or COMVN and CONVV, they're all

12  variants of the KO model itself, right?

13  A      No.

14  Q      What's different about them than the KO model?

15  A      So it's all laid out in the appendix to my rebuttal,

16  which has the formula for all of those models.  The square

17  root rule of thumb model has been around for a long time,

18  long before KO, and that model is -- you know, is a very

19  simple one that doesn't -- that, you know, I call KO kind of

20  a refinement of it, but, yeah, it's certainly not coming from

21  KO.  And, similarly, the -- you know, the other models you

22  mentioned besides, I believe, KO linear are all from sources

23  that are independent of KO.

24        We were actually using the -- well, anyway, I won't go

25  on, but --

1  Q      Well, when you use the phrase then KO model, why are

2  you calling it the KO square root model?

3  A      Because KO present both a refinement of the rule of

4  thumb square root model that I've been discussing and that's

5  my baseline model for estimating the discounts.  And then

6  they also offer a second option, which is we call KO linear,

7  which doesn't make use of that square root, and that, as I

8  show, kind of produces similar or in some cases larger

9  discounts than the baseline model.

10  Q      And all of those models are transaction cost models,

11  right?

12  A      That's right.

13  Q      So, in support of your using the KO transaction cost

14  model to determine a discount, you rely upon other

15  transaction cost models, right?

16  A      Yes.

17  Q      And the same is true with the Amihud model, right,

18  that's also a transaction cost model?

19  A      It's a -- it's a measure of illiquidity that we use to

20  calculate a price impact.

21  Q      None of those models are called discount models,

22  they're called transaction cost models, correct?

23  A      That's right, or price impact or illiquidity models,

24  yeah.

25  Q      All right.  Let's talk about trading volume and the

1  trading volume that you used for what you term the asset

2  liquidation discount.  With respect to the Maps and Oxy

3  tokens, you did not include any trading on the LBank

4  Cryptocurrency Exchange, correct?

5  A    Correct.

6  Q    And you included that based -- you excluded that

7  trading volume based on your conclusion that LBank was

8  especially untrustworthy, right?

9  A    Yes, based both on information I received indirectly

10  from Mr. Lu and from viewing data on -- data about volume on

11  LBank.

12  Q    Did any of that data that you reviewed involved Maps or

13  Oxy tokens?

14  A    It was -- no, I believe it was overall value on the

15  exchange.

16  Q    One of the exchanges that you did use to determine the

17  trading volume data for Maps and Oxys was the MEXC exchange,

18  right?

19  A    I believe so.

20  Q    And when you decided to exclude the LBank trading

21  volume based on untrustworthiness of LBank's trading volume,

22  you did so without comparing Coin Metrics spot data quality

23  rankings for LBank and MEXC, right?

24  A    So I tried to be as inclusive as possible and not do an

25  exchange-by-exchange analysis of trustworthiness.  I took the

1  whole universe of Coin Metrics exchanges that goes beyond

2  their sort of most trusted exchanges that they use for price

3  data, took the whole universe.  I then excluded three

4  exchanges where I was informed by Kevin Lu that they were

5  untrustworthy and that was confirmed by looking at the data,

6  and in some cases where I also saw low trust scores on

7  CoinMarketCap, so I then excluded those three and used

8  everything else.

9  Q    Okay.  So --

10 A    So I didn't look at MEX -- so I say that to highlight

11 that I didn't look at MEXC in particular.

12 Q    Okay.  So all that and I guess is the answer yes that

13 you did -- you excluded the LBank trading volume without

14 comparing Coin Metrics spot data quality rankings for LBank

15 and MEXC?

16 A    Right.

17 Q    All right, let's do that now.  Can you turn to Debtors'

18 Exhibit 2, FTX-2?  And let me know when you're there.

19 A    I'm there.

20 Q    All right.  And then if you could turn to at the top,

21 it will say page 37 of 54, and there should be a heading

22 called "Overall Rankings."  You can let me know when you're

23 there.

24 A    Okay.

25 Q    Okay.  Do you see the first column where it talks about

1  spot data quality?

2  A     Yes.

3  Q     And there's a grade in there on their spot data quality

4  for MEXC, right?

5  A     Right.

6  Q     What is the grade for the MEXC exchange?

7  A     C.

8  Q     And what is the spot data quality score for the LBank

9  exchange that you excluded?

10 A     C.

11 Q     All right.  Well, let's look at some of the other

12 cryptocurrency exchanges that you used for determining trade

13 volumes of other tokens to see if you were consistent or

14 inconsistent in your exclusion of LBank.  When --

15 A     I'm sorry, can I just -- I feel like that's missing the

16 important column, which is the overall grade on the far left-

17 hand side.  Maybe this is for redirect, but --

18           MR. GWYNNE:  Well, yeah, Your Honor --

19           THE WITNESS:  Okay.

20           MR. GWYNNE:  -- that's nonresponsive.  I think,

21 again, Counsel can deal with that in redirect.  I'm asking --

22           THE COURT:  Well, if you're going to show an

23 exhibit, it's got to be the whole exhibit.  So --

24           MR. GWYNNE:  Well, yeah --

25           THE COURT:  -- if it's not the whole exhibit --

1    MR. GWYNNE:  -- okay, that's fine.

2  BY MR. GWYNNE:

3  Q    All right.  So, with respect to -- with respect to the

4  Serum tokens, you included trade volume for Poloniex, right?

5  A    Yes.

6  Q    And with respect to the Serum tokens you also included

7  trading volume on the BitBox exchange, right?

8  A    Yes.

9  Q    Okay.  What were the data quality spot scores for

10  Poloniex and BitBox?

11  A    C and C.

12  Q    And those are also the same as the score for LBank,

13  correct?

14  A    Yes.

15  Q    And you were I think going to say earlier that you

16  thought the ultimate grade at the far right was the important

17  column, right?

18  A    Yes.

19  Q    What's the ultimate grade for Poloniex, BitBox, and

20  LBank?

21  A    They're all D.

22  Q    And yet you used Poloniex and BitBox, correct?

23  A    That's right.

24  Q    Okay.

25  A    I didn't rely on the rankings in deciding which

1  exchanges to include.

2  Q    All right.  Can you please turn to Oxy, Exhibit 57, it

3  should be in Volume 2 of the Oxy exhibits.

4  A    Okay.

5  Q    Okay.  What's the title on this document?

6         THE COURT:  I'm sorry, which exhibit, Mr. Gwynne?

7         MR. GWYNNE:  Oh, 57, Oxy-57.

8         THE COURT:  Thank you.

9         THE WITNESS:  "Top cryptocurrency spot exchanges."

10  BY MR. GWYNNE:

11  Q    Okay.  And do you see a sentence underneath that begins

12  "CoinMarketCap ranks"?  Do you see the sentence right --

13  A    Yes.

14  Q    -- under the heading?  Can you read that sentence

15  aloud?

16  A    "CoinMarketCap ranks and scores exchanges based on

17  traffic, liquidity, trading volumes, and confidence in the

18  legitimacy of trading volumes reported."

19  Q    Okay.  Now, before we look at those rankings, I want

20  you to keep this document open, but if you could also look at

21  your rebuttal report, which is FTX Exhibit 4.

22       (Pause)

23  Q    And if you could please turn to page 19 of your -- I'm

24  sorry, it's Exhibit 6, my apologies, FTX Exhibit 6, your

25  rebuttal report?

1  A      Yes.

2  Q      And if you could please turn to page 19 of your report,

3  which should be at the top page 23 of 90.

4  A      Yes.

5  Q      And do you see the note near the top, Note 4, where it

6  lists the crypto exchanges that you used to generate the

7  volume of the Serum tokens?

8  A      Yes.

9  Q      Can you please read those aloud?

10  A      BBOX, Binance, Binance.dot U.S., Bitfinex, Bittrex,

11  Bybit, CEX.io, Crypto.com, FTX, Gate.io, HitBTC, KBE, Kraken,

12  KuCoin, MEXC, OKX, Poloniex, Upbit.  The Lu declaration only

13  includes 12 exchanges and then I list those.

14  Q      Yeah, I'm just interested in the ones you used to

15  determine trading volume to see if we're being consistent.

16         All right.  One of the exchanges you mentioned was

17  CEX.io.  Can you please turn to the 75th-ranked

18  cryptocurrency exchange and tell me what cryptocurrency

19  exchange is ranked 75th?

20  A      CEX --

21              THE COURT:  Where are we, Mr. Gwynne, which

22  exhibit?

23              MR. GWYNNE:  I'm sorry, I'm in Exhibit 57.

24  There's -- at the left-hand column, there's ranking numbers.

25              THE COURT:  Which page is it?

1      MR. GWYNNE:  And it's page 7 of 22 at the bottom.

2   Oxy Exhibit 57, page 7 of 22.

3           THE COURT:  Oxy 57.

4   BY MR. GWYNNE:

5   Q    Are you there, Ms. Howell?

6   A    Yes, I am.

7   Q    I'm just waiting for the Court.

8           THE COURT:  I'm there.  Go ahead.

9           MR. GWYNNE:  Okay.

10  BY MR. GWYNNE:

11  Q    What is the 75th-ranked cryptocurrency exchange?

12  A    CEX.io.

13  Q    And that's one of the ones that you used to determine

14  trade volume for Serum, right?

15  A    Yes.

16  Q    All right.  What's the 82nd-ranked cryptocurrency

17  exchange on the next page?

18  A    Poloniex.

19  Q    And that's also one that you used for trade volume for

20  Serum, right?

21  A    Yes.

22  Q    What's the 101st-ranked cryptocurrency credit

23  agreement?

24  A    HitBTC.

25  Q    And that's also one that you used for determining Serum

1  trade volume, right?

2  A    That's right.

3  Q    What's the 168th-ranked cryptocurrency exchange?

4  A    BBOX.

5  Q    And that too is one you used to determine trade volume

6  for Serum, right?

7  A    Yes.

8  Q    So you used --

9  A    I think this highlights --

10  Q    -- you used exchanges ranked between 75 and 168 in the

11  CoinMarketCap rankings, right?

12  A    That's right, and I think this highlights how -- that

13  this was a very inclusive and conservative approach --

14  Q    Well, let's --

15  A    -- given these --

16  Q    -- let's see how inclusive it was.  Turn to the 21st-

17  ranked cryptocurrency exchange and tell me which one was

18  ranked number 21.

19  A    LBank.

20  Q    And that's the exchange that was excluded from the Maps

21  and Oxy volume data, right?

22  A    That's right.  I didn't use CoinMarketCap ratings to

23  decide which exchanges to include; I used the Coin Metrics

24  universe.

25  Q    Well, actually, what you did is you just relied upon

1   Mr. Lu to tell you which ones to choose, right?

2   A     Well, he informed -- as I understand, he informed my

3   team that three of the exchanges in the universe were not

4   trustworthy and we should consider excluding them.  I then

5   saw data on volumes at those exchanges that suggested highly

6   anomalous market activity over this period, volumes, you

7   know, spiking to 10,000 times on one day.  And so I agreed

8   that these appeared to, you know, be anomalous and volumes

9   that could not reflect activity in the normal course of

10  business, and so I agreed with the decision to exclude them.

11  Q     Now, by excluding LBank, the 21st-rank exchange on

12  CoinMarketCap, you were excluding two thirds of the dialing

13  trading volume for Maps tokens, right?

14  A     I don't know.  I didn't conduct that analysis.

15  Q     All right.  Let's focus on the time period that you

16  chose to determine trading volume.  In your determination of

17  trading volume for Maps and Oxy tokens, you used the one-year

18  period from November 1, 2021 to November 1, 2022, right?

19  A     Yes.

20  Q     And that one-year period ended 11 days before the

21  bankruptcy petition was filed, right?

22  A     That's right.

23  Q     And by doing so you excluded the period from November

24  2nd to the petition date, and you did so because of a

25  November 2nd Coin Desk article regarding FTX potential

1  bankruptcy, right?

2  A    That article about the problems in the Alameda balance

3  sheet led to a period of very high uncertainty and unusual

4  trading activity, and since for the purposes of thinking

5  about an orderly liquidation commencing on the petition date,

6  I chose to exclude that period in order to try to get out

7  like what an average trading day would look like commencing

8  on the petition date.  Though, as your colleague already

9  noted, if I include those ten days, my estimates don't

10 change, they actually increase for Serum.

11 Q    Well, news events regarding the particular

12 cryptocurrency often affect trading volume, right?

13 A    Yes.

14 Q    In fact, it's normal for a market to react to news that

15 is relevant to a token, right?

16 A    And the period that I use of a whole year ending

17 November 2nd includes lots of news events, the Terra LUNA

18 collapse being one example.

19 Q    And you didn't exclude any spikes from any of those

20 other news events, right?

21 A    No, because averaging the whole year together provides,

22 you know, the estimate of what an average trading day might

23 look like following the petition date when I would also

24 expect news events to arise.

25 Q    Yeah, but you're averaging the whole year before the

1  petition date, but excluding the ten-day period where there

2  was one spike, which, if included, would have substantially

3  increased your daily trading activity, right?

4  A    So, again, including that period does not change my

5  estimates for the at-issue tokens.  So, no, I disagree.

6  Q    Are you saying excluding that period did not affect

7  your average daily trading volume?

8  A    I think it depends on the token.  So --

9  Q    The Maps token.

10 A    -- would some -- I'm not sure.

11 Q    Okay.  What about the Oxy token?

12 A    I don't recall the exact volumes from the different

13 periods.

14 Q    Okay.  So having used, you know, limited trade volume

15 data where LBank was excluded, you then projected for

16 purposes of your analysis that trading volume would be flat

17 through the whole KO asset -- in your words, asset liquidity

18 period, right?

19 A    Yes.

20 Q    And did you look at other --

21 A    Which given --

22 Q    -- mature tokens --

23 A    Go ahead.

24 Q    -- like Mr. Constantinides did to determine what

25 happens with the trading volume of those mature tokens when

1  additional tokens become unlocked?

2  A    I disagree with a lot, with essentially all of what Mr.

3  Constantinides did in that dimension in terms of choosing

4  these sort of supposed peer tokens, and then your point about

5  additional tokens becoming unlocked, I don't --

6             MR. GWYNNE:  Your Honor, objection --

7             THE WITNESS:  -- I don't understand.

8             MR. GWYNNE:  -- move to strike.  I just asked her

9  if she looked at other mature tokens to determine what

10  happens to trading volume when additional tokens are

11  released.  I didn't ask her if she agreed or disagreed with

12  anything --

13             THE WITNESS:  Okay.

14             MR. GWYNNE:  -- Mr. Constantinides said.

15             THE WITNESS:  That's fair.

16             THE COURT:  Just answer the question.

17             THE WITNESS:  Okay.  No, I did not look at that.

18  BY MR. GWYNNE:

19  Q    Thank you.  All right.  Now, free-float is a term that

20  refers to the amount of tokens that are actually available

21  for trading in the marketplace, right?

22  A    Yes.

23  Q    And in your analysis you're assuming that the trading

24  volume was less than three percent of the tokens being -- are

25  in the free-float, right?  Less than three percent of all

1  Maps tokens are currently in the free-float, right?

2  A      That is true.  I mean --

3  Q      And as additional tokens become unlocked and released,

4  you don't increase any of the daily trading volumes, right,

5  in your analysis?

6  A      I have no reason to believe that they would affect

7  market activity, which depends not on the number of tokens in

8  circulation, but rather participants interested in buying and

9  selling them.

10  Q      Did you conduct any study to determine whether there

11  were participants interested in buying additional tokens

12  should they be released?

13  A      No.

14  Q      Now, you agree that it certainly is a strategy for

15  increasing prices to sell individual assets by restricting

16  quantities traded to no more than five or ten percent of

17  daily volume, right?

18  A      I believe that was one of Mr. Sam Bankman-Fried's

19  strategies; that's the only place I've come across it in this

20  context.

21  Q      But you agree that that's a strategy to potentially

22  increase prices, right?

23  A      Yes.

24  Q      All right.  Now, you claim to have excluded the LBank

25  trading volume because of wash trading or fake volume, right?

1  A      That I presume is one reason why it was untrustworthy,

2  but I don't actually have data on wash trading specifically.

3  Q      In fact, not only do you not have any data, you don't

4  have any evidence whatsoever of any wash trading regarding

5  the Maps tokens, right?

6  A      I do not.

7  Q      And you don't have any evidence whatsoever of any

8  trading with respect -- of any wash trading with respect to

9  the Oxy tokens, right?

10  A      I do not.

11  Q      So, on direct examination, when you said you thought

12  it's important to exclude trading volume that is clearly

13  illegitimate, you excluded the LBank Maps tokens volume

14  without any evidence that it was part of any wash trading,

15  right?

16  A      My understanding is that wash trading was a major

17  reason that an exchange would be untrustworthy or, in how Mr.

18  Lu describes it, the degree to which the volume is organic

19  versus not organic, but, no, I didn't have specific data on

20  wash trading.

21  Q      And you didn't go into the Solana blockchain to look at

22  any Maps or Oxy transactions to see if they had any

23  indications of wash trading, right?

24  A      I did not.

25  Q      And in fact you point out that the debtor has, right,

1  99 or 98 and a half percent of the Maps and Oxy tokens,

2  right?

3  A     That's right, but, again, trading volume is about

4  people buying and selling.  So you could have a tiny number

5  of tokens, but if traders want to sell them in a frenzy, you

6  could have a lot of trading volume.

7  Q     That wasn't my question.  My question was just you say

8  that the debtor has 98 or 99 percent of the Maps and Oxy

9  tokens, right?

10 A     Right.

11 Q     Were you concerned that the debtor was doing wash

12 trading?

13 A     Before the -- to clarify, before the petition date?

14 Q     At any time.

15 A     I think it's very possible.  I don't know -- I don't

16 have any information, but -- before the petition date that

17 they were engaged in wash trading.

18 Q     Did you investigate any of the debtors' transactions to

19 see if they were doing wash trading since they were the ones

20 holding the majority of the tokens?

21 A     I have not, but it's a good place to look.

22 Q     Did you ask anybody who works for the debtors, counsel

23 or financial advisers, investment bankers, anybody, if they

24 investigated whether the debtor did any wash trading?

25 A     I did not.

1           (Pause)

2                THE WITNESS:  I'm sorry to interrupt the

3   proceedings, but I need to take a break to nurse and I'm

4   wondering how -- I'm wondering if we can take -- if we're

5   going to go a while longer, if we could take a half-hour

6   break for that purpose.

7                THE COURT:  Okay.

8                THE WITNESS:  If we're going to --

9                THE COURT:  If you need a half hour, then we'll

10  have to conclude the proceedings today because I need to stop

11  at 5:00.

12               THE WITNESS:  You're going to stop at 5:00?

13               THE COURT:  Yes.

14               THE WITNESS:  Okay, then we can go until 5:00.

15               THE COURT:  Okay.  Are you sure?  I don't want --

16               THE WITNESS:  Yes.

17               THE COURT:  -- to hold you up.

18               MR. GWYNNE:  Yeah, I'm fine to --

19               THE WITNESS:  No, we can go until 5:00.

20  BY MR. GWYNNE:

21  Q    Earlier, in the beginning of your direct examination

22  with counsel Maps Vault, you talked about locked tokens, I

23  want to make sure with locked and unlocked, I want to make

24  sure I understand what you said.  I believe you said

25  something like you saw emails or something where the codes or

1 the keys to unlocking tokens were given to the debtor, is

2 that -- was that accurate?

3 A    I saw publicly available records of transactions on the

4 Solana blockchain, which is a permission list public

5 blockchain, in which the 10 billion unit -- roughly -- units

6 of holdings were moved following the petition date to FTX

7 cold storage wallets for Maps, Oxy, and Serum, and that was

8 evidence to me that FTX controls all of those tokens, that

9 they have the ability to give them away, to sell them, to do

10 what they will with them.

11 Q    And you think -- that to you indicated the debtor had

12 control or the ability to unlock any of those tokens and

13 transfer them; is that correct?

14 A    As I mentioned earlier, I don't believe any were locked

15 to begin with, so they can't be -- I don't think that they

16 could be unlocked, but the debtor controlled them and could

17 sell them or otherwise dispose of them.

18 Q    Okay.  And when you say they weren't locked to begin

19 with, what do you mean they weren't locked to begin with?

20 Are you saying they were organically unlocked tokens, or just

21 that the debtor had the ability to treat them as being

22 unlocked?

23         THE COURT:  I think she covered this already in

24 her cross-examination.  She said locked was equivalent to

25 what happens with bitcoin where they are not yet available,

1  they have to be mined in order to be unlocked.  And,

2  therefore, I think her testimony is pretty clear on that

3  issue.

4  BY MR. GWYNNE:

5  Q     Is locking different than the vesting schedule?

6  A     Yes, I think -- and I think there is a bit of confusion

7  here because these customer accounts, like in the claims

8  schedule, are described as locked, but they're locked from

9  the customer perspective, and that's sort of the -- you know,

10 it's just the word that's sort of used here by FTX to

11 describe those customer accounts.  They were controlled by

12 FTX and the reason that they were locked from the customer

13 perspective is that they were subject to these predetermined

14 vesting schedules that were known to the customer and known

15 to FTX and that we have records of.

16 Q     Okay.  So you're saying the customers have to comply

17 with the vesting schedule, but the debtors do not; is that

18 right?

19 A     The vesting schedule refers to the contract between the

20 customer and FTX to distribute the tokens to the customer on

21 a predetermined schedule, like an employee who stays with a

22 company receiving stock options or restricted stock units on

23 perhaps a quarterly basis.

24 Q     All right.  You testified -- well, strike that.

25       When purchasers bought Maps or Oxy tokens, they were

1  assuming certain risks, right?

2  A    Yes.

3  Q    And, to assume a risk, you obviously have to know about

4  it, right?

5  A    No, I think you can be faced with a risk you don't know

6  about.

7  Q    I didn't say to be faced with.  I said, to assume a

8  risk, you have to know about it; is that right?

9  A    I guess so, yeah, yeah.

10  Q    One such risk that you say the purchasers assumed was

11  the risk that the debtor could liquidate all its holdings and

12  crash the market, right?

13  A    Yes.

14  Q    And it was known before the petition date that the

15  debtors had a high percentage of Maps tokens, right?

16  A    That's right.

17  Q    And it was known before the petition date to these

18  purchasers that the debtor had a high percentage of Oxy

19  tokens, right?

20  A    I can't say what every purchaser of these tokens knew,

21  and in fact I think there was a lot of obfuscation about

22  these projects and how they were run by Sam Bankman-Fried and

23  FTX.  So I don't want to speak to what purchasers did or did

24  not know.

25  Q    Okay.  Well, you say the purchasers assumed the risk

1   that the debtor would liquidate its holdings and crash the

2   market, right?

3   A      They did.

4   Q      And you agree that, to assume a risk, you have to know

5   about it, right?

6   A      I think holders of these tokens faced certain risks

7   that did not apply to other tokens and I think they faced

8   those risks regardless of whether they knew about them or

9   not, but since the information was to a large degree in the

10  public domain, certain the large holdings were, I think it's

11  reasonable for those investors to bear the cost of those

12  risks and that, essentially, they, you know, had a -- you

13  know --

14  Q      You --

15  A      -- basically, if they didn't know about it, that

16  reflects naivete and sort of they should have known about it.

17  Q      No, you said in your report that the purchasers, the

18  customers that bought Oxy and Maps tokens assumed the risk

19  that the debtor would sell all of its tokens and crash the

20  market, right?

21  A      Uh-huh.

22  Q      And I'm asking you if when you said that, when you said

23  that they assumed the risk, does that mean that they had to

24  know about it?

25  A      I guess no.  I think they -- sorry, I apologize for

1  being a bit unclear, but -- unclear here, I just haven't

2  thought about that choice of language as carefully.  But, no,

3  I think that they assumed the risk regardless of whether they

4  knew about it or not --

5  Q     Okay.  Can you turn to page 192 --

6  A     -- I guess.

7  Q     -- of your deposition transcript, please?  Let me know

8  when you're there.

9          THE COURT:  I'm sorry, which page, Mr. Gwynne?

10          MR. GWYNNE:  Page 192.

11          THE WITNESS:  Okay.

12  BY MR. GWYNNE:

13  Q     Do you see on line 20, I asked you a question, and you

14  answered it on line 23?

15  A     Yes.

16  Q     Can you read the question and your answer, please?

17  A     Question:  "And that when you say purchasers assumed

18  that risk, by definition, you're saying they had to know

19  about it, right?"

20          Answer:  "Right."

21  Q     So if the purchasers were assuming the risk the debtor

22  was going to crash the market and the purchasers had to know

23  about it to assume the risk, then shouldn't the petition date

24  price for Maps and Oxy tokens already reflect the potential

25  that the debtor could crash the market?

1   A     No, I think the price might reflect whatever belief

2   market participants had about the value of the token and

3   future market participants' interest in buying and selling

4   it.  So, you know, I think -- I would imagine, first and

5   foremost, the price of the token would reflect the future

6   utility value on these platforms, on MAPS.ME and Oxygen.  You

7   know, I would expect, if the market participants had placed a

8   hundred-percent probability on a liquidation by FTX that the

9   price would have gone to zero.  And so what it tells me that

10  there was a positive, albeit small price around the petition

11  date is that there was uncertainty about that liquidation,

12  that there was not a hundred-percent probability placed on

13  that liquidation.

14  Q     So it sounds like you are agreeing that the purchasers

15  did reflect the possibility of the debtor liquidating its

16  tokens in the purchase price on the petition date, just

17  hadn't fully accounted for it; is that right?

18  A     It's possible, yes.

19  Q     All right.  Let's talk about your assignment from

20  Sullivan & Cromwell and some of the related assumptions.

21        Your assignment was to determine whether any discounts

22  on the value of Maps and Oxy tokens were appropriate, taking

23  into consideration the occurrence of the bankruptcy case,

24  right?

25  A     No, I don't think that accurately states the

1  assignment.

2  Q    So you're not -- I thought in your testimony earlier

3  you said part of your assignment was that you thought the

4  Court instructed the debtor that it had to sell all of its

5  assets; is that right?

6  A    Can we read my assignment to clarify this point?

7  Q    No, I'm just asking you the question.

8  A    It's my understanding that the debtor would be

9  liquidating all of its holdings of digital assets and my

10 assignment was to assess the likely impact on the price from

11 that -- from an orderly liquidation process in which all of

12 the holdings are liquidated.

13 Q    And that was because you thought that that was what had

14 to happen in the bankruptcy case, right?

15 A    That was my assignment.

16 Q    Now, you believe that your analysis is supposed to take

17 into consideration the context of the bankruptcy case, right?

18 A    I was assigned to use petition date prices.  So I

19 believe that is a function of the bankruptcy proceedings.

20 And -- but, otherwise, I'm not sure -- I guess I'm not sure

21 exactly what you're getting at in terms of incorporating the

22 bankruptcy.

23 Q    In your analysis, you didn't -- well, strike that.

24 I'll move on.

25       Even though you calculated volume by excluding the time

1  period between November 2nd and the petition date to estimate

2  price, which also went down during that time period -- which

3  went down during that time period, you did accept Mr. Lu's

4  60-minute -- or 60-minute petition time pricing, right?

5  A      I did.

6  Q      So -- and with respect from November 2nd to November

7  11th, the trading volume went up, it spiked up, that's why

8  you excluded it, right?

9  A      I excluded it because of the overall uncertainty and

10 anomalous activity during that period.

11 Q      Was the anomalous activity a spike or was it something

12 else?

13 A      There was also higher volatility in that period.

14 Q      Okay, but higher volatility of what, price?

15 A      Yes.

16 Q      Okay, but you weren't making the price determination,

17 Mr. Lu did that, right?

18 A      Well, so I think it's important to note that the three

19 inputs that go into the KO formula from the market are the

20 price, and then the volatility and the volume.  And those can

21 be measured in different ways, that's totally fine.  For the

22 price, the best estimate of a price in a market is always the

23 latest price.  We don't want to have stale prices.  So,

24 looking forward to an orderly liquidation commencing on the

25 petition date, the correct price to use is the latest price

1  and that would be the price at petition time that Mr. Lu

2  calculates.

3      Now, volatility is also calculated using price data.

4  Volatility is based on returns from day to day, the changes

5  in the price from day to day, but for that input we actually

6  want to capture what we would expect volatility would be on a

7  regular trading day going forward from the petition date.

8  So, to calculate volatility, I use the price series from --

9  also from Coin Metrics, but for this one-year period to

10 capture, again, this average trading day.  And then,

11 similarly, I also do that for volume.

12 Q    What happened to the trading volume for Maps and Oxy

13 tokens between November 2nd and November 11th?

14 A    I'd have to look.  I suspect it was somewhat higher,

15 but it does not affect my estimates of the discount, they

16 remain at a hundred percent.

17 Q    I didn't ask you if it affected your discount yet,

18 we'll get to that.  I just asked you what happened with the

19 trading volume, did it increase or not between November 2nd

20 and the petition date?

21 A    I haven't seen that data, but I would expect that it

22 increased.

23 Q    Did you not refer to that in your deposition, a spiking

24 between November 2nd and the 11th?

25 A    I think we looked at the graphs and you can see on the

1  petition date there's a spike in volume, that's the initial

2  volume that Mr. Constantinides used, I think that's what we

3  were talking about, and I did call that a spike, yes.

4  Q    And you excluded that increase from that, quote,

5  "spike" when you were determining the trading volume for Maps

6  and Oxy tokens, right?

7  A    That's right.

8  Q    Okay.  So, between November 2nd and the petition date,

9  there was a spike in trading, an increase, right?

10 A    I think the spike we were referring to was the -- was

11 like on the petition date, which is what Mr. Constantinides

12 uses as his input for regular trading volume.  So not that

13 whole -- you're kind of saying that whole period and I'm not

14 sure that that's true.

15 Q    All right.  In that whole period, the volume increased,

16 but it may not have spiked; is that fair?

17 A    Yeah.

18 Q    Yet, you excluded that period from the trading volume,

19 right?

20 A    Yes.

21 Q    On the other hand, with respect to the price, from

22 November 2nd to the petition date the price went down, right?

23 A    Yes.

24 Q    But you nevertheless took the full discount of the

25 price all the way up to the petition date in calculating the

1  KO model, right?

2  A     So the KO model is based on prevailing market prices at

3  the time that you begin the liquidation process and I was

4  assigned to use petition date prices.  So that was -- that

5  was not a decision that I made.

6  Q     With respect to the tokens and the debtors' ability to

7  sell them, you're saying the tokens are unlocked from the

8  debtors' perspective, so the debtor can sell them all, crash

9  the market, and, from the creditors' perspective, the tokens

10  are considered to be locked and, therefore, there's also the

11  double whammy of a discount on the creditors' tokens; is that

12  right?

13  A     So a subset of the tokens that are subject to customer

14  claims also have these marketability restrictions and, yes, I

15  assign a discount for lack of marketability to that subset.

16  Q     Okay, let me ask you something.  You testified

17  consistently today for sure that you were instructed that the

18  debtor would sell all of its assets commencing on the

19  petition date, right?

20  A     In an orderly liquidation process, yes.

21  Q     Correct.  And are you aware that on the petition date

22  there was a possibility that FTX was going to restart its

23  exchange rather than sell all of its assets?

24  A     I was aware there was a possibility of an exchange

25  restart; I didn't know that there was a connection to selling

1  or not selling assets.

2  Q    And are you aware that the possibility that FTX was

3  going to restart its exchange existed until sometime in the

4  second quarter of 2023?

5  A    Yes.

6  Q    And if the debtor was going to be restarting the FTX

7  exchange, it would have a reason to keep many of the tokens,

8  the Maps and Oxy tokens that it possessed, correct?

9  A    My understanding was that the debtor was going to

10  liquidate its holdings in order to create U.S. dollars with

11  which to pay claims to customer and I don't know why that is

12  related to a restart of the FTX exchange.

13  Q    So you think, if the debtor was going to restart the

14  FTX exchange, it would still sell all of its tokens, which

15  you say are worthless if they sell them all at once, they

16  would do that anyway?

17  A    That goes beyond the scope of my work with this matter.

18  Q    So you didn't consider that possibility?

19  A    I did not.

20  Q    You say the debtors' tokens are worthless, yet you just

21  said you assumed they were going to sell them for creditors,

22  is that -- you say the debtors' tokens have no value because

23  they hold them all, right, and, according to your analysis,

24  if you start selling them, at some point it goes to zero?

25  A    I don't think that's a fair description of what I do.

1  Q     Did debtors' counsel tell you that they represented to

2  the Court in filings that they weren't going to flood the

3  market with their tokens?

4  A     No.

5  Q     Would that have been relevant to you in doing your

6  analysis?

7  A     I only focused on the implications of the assignment

8  for my analysis, not the many other dimensions of this

9  bankruptcy process.

10 Q     Understood, but I'm asking you the question whether

11 that would have changed your analysis if the debtor had told

12 you that they would not flood the market with their tokens?

13 A     As long as the assignment continued to say that the

14 debtor would be selling all of its holdings of digital

15 assets, I think that's what I would continue to assume,

16 unless, you know, they -- if they had changed the assignment

17 to say we will sell some other quantity, then I would have

18 used different inputs.

19 Q     So --

20 A     But I think -- but as we discussed at the beginning, I

21 think it's -- given the constraints of the situation and the

22 imbalance between the customer claims and the debtors'

23 holdings, as I said in my opening remarks with the slides, I

24 think it's appropriate to use the debtors' holdings to

25 determine the value of customer claims here.

1  Q    I understand; that's not my question.  So let's assume

2  the assignment, you weren't restricted by what the current

3  assignment is and the debtor changed it and said, we want to

4  sell our tokens in a way that maximizes the value, we're not

5  going to flood the market, would that change your analysis?

6  A    If I had a completely different assignment, I'm sure I

7  would have done a different analysis, potentially.  I can't

8  -- it's beyond the scope of my work to speak to this

9  hypothetical.

10 Q    I'm not asking you if you had a completely different

11 assignment, I said if that factor changed and the debtor said

12 I'm not going to flood the market with my tokens, I'm not

13 going to crash the market, in your terms, but I'm going to do

14 it in a way that maximizes the value, would that change your

15 --

16 A    So I think --

17 Q    -- discount analysis?

18 A    So I think actually the orderly liquidation assumed in

19 the KO model is to execute the liquidation of the position at

20 what KO term a natural speed of trading in which traders

21 trade off the benefits of faster execution with transaction

22 costs.  And so that actually, the -- so I think, you know,

23 the method I used is actually really the opposite of this

24 idea of crashing the market by dumping the tokens

25 immediately, it actually assumes a slow -- what's sometimes

1  called a slow trading strategy that reflects this natural

2  speed of trading to minimize transaction costs.  And so I

3  don't think this is about crashing the market.

4  Q    Did the debtor tell you that its goal was to maximize

5  value of its Maps and Oxy token holdings?

6  A    No.

7  Q    You testified earlier, do you remember we talked about

8  burning a token?

9  A    Yes.

10  Q    And is burning a token something someone can do to

11  increase the value of other tokens that they're holding?

12  A    I'm not sure.  I haven't seen evidence of that.

13  Q    Okay.  Well, if you're saying the problem here is

14  there's too many tokens, right, there's too many tokens for

15  the market and, therefore, even though, if you sold some,

16  they'd have some value, if you sell them all, they'd have

17  none, that's in essence your conclusion, right?

18  A    Yes.

19  Q    So wouldn't it be rational and reasonable to burn some

20  tokens so you could sell the remaining ones for a positive

21  value?

22  A    Again, that's beyond the scope of my work.  It would

23  depend on one's objective and one's regulatory and

24  institutional constraints, and so forth.

25  Q    Well, did you consider whether the debtor should burn

1  some tokens to reduce the discount on the creditors' claims?

2  A     I did not.

3          THE COURT:  Mr. Gwynne, are you almost done or do

4  you still have some to go?  I promised the witness we'd

5  finish at 5:00.

6          MR. GWYNNE:  No, understood.  Can I have a minute,

7  Your Honor?

8          THE COURT:  Yes.

9      (Pause)

10         MR. GWYNNE:  Thank you, Your Honor, and thank you,

11 Ms. Howell, that's all the questions I have.  I would like to

12 just, you know, for the record also make it clear that I'm

13 leaving open the possibility of having more questions after

14 we get these articles that we don't have, but I'm otherwise

15 done with my examination and would ask Your Honor, if we're

16 finishing now, to please admonish the witness not to talk to

17 Counsel about her testimony that she gave or may give before

18 she comes back.

19         THE COURT:  Well, let's think about that because

20 it's a long break, it's not just overnight.

21         Is anybody else going to cross-examine the

22 witness?

23         MR. SIDDIQUI:  Yes, Your Honor, TMSI will.

24         THE COURT:  Okay.  Mr. Glueckstein?

25         MR. GLUECKSTEIN:  Your Honor, I just want to note

1  for the record, so while Mr. Gwynne has been examining the

2  witness, the articles in question have been provided both to

3  the objectors and to chambers.  So, to the -- I understand

4  we're kind of up against a deadline here, but to the extent

5  that there's going to be anything left open, I guess we can

6  leave it open with respect to that issue, although Your Honor

7  did suggest that you would consider whether additional

8  questions are appropriate.

9          THE COURT:  Yes, I will, but I opened up Monday as

10  the date to come back.  I don't know if that fits everybody's

11  schedules, including the witness's, is that -- do we have an

12  issue with Monday continuing?

13          THE WITNESS:  I can continue on Monday.

14          MR. GLUECKSTEIN:  Yeah, that's fine for the

15  debtors, Your Honor, we would appreciate that.

16          THE COURT:  And how about the objectors?

17          MR. TOROSIAN:  Your Honor, Jeff Torosian from DLA

18  Piper for Maps Vault, Limited.  It's fine with me and it's

19  fine with our witness.  Mr. Roselius will be out of town on

20  that date, if he can be excused, but any remaining cross on

21  that issue can be handled by Mr. Gwynne.

22          THE COURT:  Okay, that's fine.

23          MR. SIDDIQUI:  And, Your Honor, for TMSI, we think

24  Monday will work for our witness and will be resolved by a

25  phone call to United Airlines, but pending anything

1  unforeseen, we --

2           THE COURT:  Okay.

3           MR. PASQUALE:  Your Honor, Ken Pasquale from Paul

4  Hastings.  I am not available, but we will be here and be

5  ready to proceed on Monday.

6           THE COURT:  Okay.  All right, so Monday it is and

7  we'll start -- let's start at 9:30 to give us a little extra

8  time.

9           On the issue of whether or not the witness can

10 talk to Counsel, ordinarily, if it's an overnight or a day or

11 so, I would say you cannot talk to Counsel, but we're going

12 to be having almost a five-day break, four full days at least

13 break, so I don't want to hamstring the debtors in being able

14 to re-prepare the witness after that long of a break.  So I

15 will allow the Debtors' Counsel to consult with the witness

16 and we'll pick it up on Monday morning.  Okay?

17          MR. GLUECKSTEIN:  Thank you, Your Honor.

18          THE COURT:  Anything else before we adjourn for

19 the day?

20          MR. GLUECKSTEIN:  Not from the debtors, Your

21 Honor.

22          THE COURT:  Okay.  Thank you all very much.  We're

23 adjourned until Monday morning at 9:30.

24          COUNSEL:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1          (Proceedings concluded at 5:01 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                March 21, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                March 21, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16   /s/ Coleen Rand                       March 21, 2024

17   Coleen Rand, CET-341

18   Certified Court Transcriptionist

19   For Reliable

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25