<pre>
 1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,     .
                                   .  (Jointly Administered)
 5          Debtors.               .
     . . . . . . . . . . . . . .   .
 6                                 .
     ALAMEDA RESEARCH LTD., AND    .
 7   CLIFTON BAY INVESTMENTS LLC   .
     F/K/A ALAMEDA RESEARCH        .
 8   VENTURES LLC,                 .
                                   .
 9          Plaintiffs,            .
                                   .
10      - against -                .  Adv. Pro. No. 23-50411 (JTD)
                                   .
11   MICHAEL KIVES, BRYAN BAUM,    .
     K5 GLOBAL HOLDINGS LLC, K5    .
12   GLOBAL TECHNOLOGY LLC, MBK    .
     CAPITAL LP SERIES T, K5       .
13   GROWTH CO-INVEST I GP LLC,    .
     K5 GLOBAL GROWTH FUND I GP    .
14   LLC, K5 GLOBAL VENTURES LLC,  .
     MOUNT OLYMPUS CAPITAL LP,     .
15   MOUNT OLYMPUS CAPITAL LLC,    .
     K5 GLOBAL GROWTH FUND II LP,  .
16   K5 GLOBAL GROWTH FUND II GP   .
     LLC, K5X FUND I LP, K5X       .
17   FUND I LLC, AND SGN ALBANY    .
     LLC,                          .
18                                 .
            Defendants.            .
19   . . . . . . . . . . . . . .   .
                                   .
20   SUNIL KAVURI, AHMED ABD-EL-   .  Adv. Pro. No. 24-50012 (JTD)
     RAZEK NOIA CAPITAL SARL AND   .
21   PAT RABITTE,                  .
                                   .
22          Plaintiffs,            .
                                   .
23      v.                         .  Courtroom No. 5
                                   .  824 North Market Street
24   FTX TRADING, LTD, et al.,     .  Wilmington, Delaware 19801
                                   .
25          Defendants.            .  Monday, March 25, 2024
     . . . . . . . . . . . . . . . .  9:30 a.m.
</pre>

```
 1                        TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
 2                  UNITED STATES BANKRUPTCY JUDGE

 3   APPEARANCES:

 4   For the Debtors:         Adam Landis, Esquire
                              LANDIS RATH & COBB LLP
 5                            919 Market Street
                              Suite 1800
 6                            Wilmington, Delaware 19801

 7                            Brian Glueckstein, Esquire
                              SULLIVAN & CROMWELL LLP
 8                            125 Broad Street
                              New York, New York 10004
 9
     For TMSI SECZ Ltd.:      Elliot Bacon, Esquire
10                            KATTEN MUCHIN ROSENMANN LLP
                              525 West Monroe Street
11                            Chicago, Illinois 60661

12   For OXY and MAPS
     Foundations:             Kurt Gwynne, Esquire
13                            Brian Rostocki, Esquire
                              REED SMITH LLP
14                            1201 Market Street, Suite 1500
                              Wilmington, Delaware 19801
15
     For MAPS Vault:          Jeffrey Torosian, Esquire
16                            DLA PIPER LLP (US)
                              444 West Lake Street, Suite 900
17                            Chicago, Illinois 60606

18

19

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1                               INDEX

2   MOTIONS:                                                    PAGE

3   Agenda
    Item 18: Motion of Debtors to Estimate Claims              5
4            Based on Digital Assets [D.I. 5202,
             Filed on 12/27/23]
5
    Agenda
6   Item 19: (I) Application of United States Trustee
             For an Order Approving Appointment of
7            Robert J. Clearly, Esquire, as Examiner;
             (II) Motion for Entry of an Order (A)
8            Establishing the Scope, Cost, Degree,
             And Duration of the Initial Phase of the
9            Examination and (B) Granting Related
             Relief; and (III) Motion to File Certain
10           Information Regarding Potential Parties
             In Interest Under Seal [D.I. 8048, Filed
11           2/27/24]

12

    WITNESSES CALLED
13  BY THE DEBTORS:                                            PAGE

14      SABRINA HOWELL
        Cross-examination by Mr. Bacon                         4
15      Redirect examination by Mr. Glueckstein                44

16  WITNESSES CALLED
    BY MAPS VAULT:                                             PAGE
17
        FOTIOS KONSTANTINIDIS
18      Direct examination by Mr. Torosian                     65
        Cross-examination by Mr. Rostocki                      117
19      Cross-examination by Mr. Glueckstein                   161

20
    WITNESSES CALLED
21  BY TMSI:

22      IOANNIS GKATZIMAS
        Direct examination by Mr. Bacon                        196
23      Cross-examination by Glueckstein                       215
        Redirect examination by Mr. Bacon                      226

24

25

1          (Proceedings commenced at 9:33 a.m.)

2               THE COURT:  Did we miss anything on the record?

3               THE COURT REPORTER:  Just your good morning.  That

4    was it.

5               THE COURT:  Well, I asked if there was any

6    housekeeping, there was no housekeeping.  We called Professor

7    Howell back to the stand and I reminded her that she was

8    still under oath.  So, we can go ahead and get started.

9               MR. BACON:  Thank you, Your Honor.  Elliott Bacon

10   on behalf of TMSI.

11                    CROSS-EXAMINATION (RESUMES)

12   BY MR. BACON:

13   Q     Good morning, Professor Howell.

14   A     Good morning.

15   Q     Good to see you again.

16         Between the conclusion of the hearing on Wednesday and

17   today, have you spent any time talking to counsel for the

18   debtors?

19   A     I have.

20   Q     And about how much time did you spend?

21   A     About two hours.

22   Q     And did you review any materials that you had not

23   previously reviewed during that time?

24   A     I read the papers that I had cited in the last hearing

25   which I had only looked at in a very cursory way before the

1   previous hearing.

2   Q     But other than those, no additional material, right?

3   A     I reviewed the slide deck that was provided last night

4   from, I believe, the MAPS team.  I have reviewed some prices

5   online.  Some materials about perpetual futures trading just,

6   you know, as background material.

7   Q     What prices online did you review?

8   A     I looked online at the prices for Serum, MAPS and Oxy.

9   Q     For a spot -- is that spot prices or for perpetual

10  futures prices?

11  A     Spot prices.

12  Q     Okay.  And what background materials did you also

13  review relating to perpetual futures?

14  A     I reviewed a memo about the way that trades are

15  executed as a limit order book, much the way spot trades are

16  executed in perpetual futures markets.  So, sort of the

17  mechanics of how you open or close a short position or a long

18  position.  That memo was provided to me by the team at

19  Analysis Group which is working under my direction.

20  Q     Okay.  And what is the name of that memo?

21  A     I don't recall what the title was.

22  Q     And the information containing that was related to the

23  manner at which you execute on perpetual futures markets?

24  A     Correct.

25  Q     Okay.  And that was information that you did not review

1  prior to your initial opinion?

2  A    That's right.  Though it doesn't affect my rebuttal

3  opinion about perpetual futures.

4  Q    But new materials, correct?

5  A    Yes.

6  Q    Okay.  And are you relying on that memo in any way

7  today?

8  A    I don't think so.  It depends on if you ask me about

9  the mechanics of perpetual futures trading.  I might make use

10 of it.

11       MR. BACON:  We'll find out.  Your Honor, we'd ask

12 that that document be produced.

13       THE COURT:  Can we have a copy?

14       MR. BACON:  We'll get a copy, Your Honor.

15       THE COURT:  Okay.

16 BY MR. BACON:

17 Q    So, I'd like to start just by walking through your

18 methodologies since it's been some time since we all gathered

19 here.  Your assignment was to value customers digital asset

20 claims by estimating the effects of liquidating the debtors

21 holdings of each digital asset claim by customers as of the

22 petition day, correct?

23 A    I was asked to assess the likely impact on prices from

24 liquidating the debtors holdings in order to estimate a

25 reasonable market price for assets subject to customer claims

1  and use that to assign a value to customer claims.

2  Q    And with respect to calculating the asset liquidation

3  discount of digital assets, you did so through the

4  application of a KO model, right?

5  A    Yes.

6  Q    And the inputs to that model are petition time price,

7  volatility, liquidation amount, and the average daily trading

8  volume, correct?

9  A    Correct.

10 Q    And for average daily trading volume used in estimation

11 period, correct?

12 A    Yes.

13 Q    And that estimation period was from November 2nd, 2021

14 through November 1st, 2022.  Is that right?

15 A    Yes.

16 Q    And so, you did not incorporate volume after November

17 1st, 2022 into your application of the KO model, correct?

18 A    I do in sensitivity tests in my rebuttal report but not

19 in the main report.

20 Q    My question is about the application of the KO model.

21 There's no volume date in there after November 1st, 2022.

22 A    No, I used the KO model in my rebuttal report to

23 calculate the same discounts using different time periods.

24 So, I have used them in the KO model.

25 Q    That's not in your rebuttal report to Mr. Gkatzimas,

1  correct?  That's your other rebuttal report?

2  A    Yes.

3  Q    Okay.  So, in your original opinion then with respect

4  to your application, the KO model, you did not use volume

5  data after November 1st?

6  A    That's correct.

7  Q    Okay.  And with that application in your original

8  report, post-petition events are not incorporated into your

9  application of the KO model, correct?

10  A    Correct.

11  Q    And on Wednesday, you testified that when the asset

12  liquidation discount from the KO model was above 100 percent,

13  you reduced it to 100 percent in your report, right?

14  A    Yes.

15  Q    And other than that adjustment to the asset liquidation

16  discount, in your original report, you didn't make any other

17  adjustments to the outputs of the KO model, right?

18  A    I only apply the discounts from the KO model when they

19  are more than 10 percent.

20  Q    Okay.  So, other than the 10 percent and the 100

21  percent, there's no other modifications to the output to the

22  KO model?

23  A    Yes.

24  Q    And so, again, one of the four inputs is the amount to

25  be liquidated, right -- or amount to be sold?

1    A      Yes.

2    Q      And your assignment was to use the debtors holdings as

3    the amount to be liquidated, correct?

4    A      Yes.

5    Q      And that was based on an instruction from counsel,

6    correct?

7    A      Yes.

8    Q      And your application of the KO model resulted in an

9    asset liquidation discount based on the estimated price

10   impact of selling those debtors holdings, correct?  When

11   they're also claimed by customers, right?  There's an overlap

12   between -- I'll rephrase so it's a clear question.  In your

13   application, the KO model results in an asset liquidation

14   discount based on the estimated price impact of selling the

15   debtors holdings of each digital asset also claimed by

16   customers, correct?

17   A      Yes.  Since the purpose is to value customer claims.

18   Q      And if a customer claims the digital asset but the

19   debtors do not hold that digital asset, no asset liquidation

20   discount is applied, correct?

21   A      That would be true.  I believe there were, at most, a

22   few assets in that category.

23   Q      There's a few assets that the customers claim then but

24   the debtors do not hold them?

25   A      I'm not sure about the exact number or if there are

1  any, but it would be de minimis.

2  Q      Okay.  In your report you say that 577 out of the 1,321

3  digital assets claimed by customers were held by debtors,

4  correct?

5  A      Yes.

6  Q      Okay.  And that leaves another 744 digital assets, if

7  my math is right.

8  A      The overwhelming majority of those are what we term, or

9  I term, FIAT (phonetic) denominated contracts like futures

10 contracts between the customer and FTX which there's no sense

11 in which FTX can hold them so they are not -- they are in

12 that group for example.

13 Q      But none of those received an asset liquidation

14 discount, correct?

15 A      That's right.

16 Q      And some of those are what you referred to as regular

17 tokens, right?

18 A      They may be.  I would need to go back to our analysis

19 materials.

20 Q      And so, if customers claimed a digital asset that the

21 debtors held, an asset liquidation discount would be

22 calculated just based on the debtors holdings, right?

23 A      Yes.

24 Q      And that's true regardless of the size of the customers

25 claim?

1  A    Yes.

2  Q    And that's true regardless of the ratio between the

3  customers claims and the debtors holdings?

4  A    Yes.

5  Q    And likewise, if the debtors holdings of the digital

6  assets exceeded the customer claims for that digital asset,

7  then the debtors holdings were used as the liquidation

8  amount, right?

9  A    Yes.

10  Q    And the opposite is true as well, right, that if the

11  customer claims were below the debtors holdings, the debtors

12  holdings, again, were used?

13  A    Yes.

14  Q    And in your rebuttal report to Mr. Gkatzimas you state

15  that using the debtors holdings as opposed to the customer

16  claims is an input to the KO model as appropriate because to

17  do otherwise there would be a short fall in the asset sale

18  proceeds that would have to be borne by other creditors,

19  right?

20  A    Yes.

21  Q    And those other creditors might be those holding more

22  liquid assets according to your report, right?

23  A    Yes.

24  Q    And one of the four inputs to your application of the

25  KO model is the average daily trading volume, right?

1   A      Yes.

2   Q      And digital assets with higher average daily trading

3   volumes are more liquid than assets with lower daily trading

4   volumes, right?

5   A      Yes.

6   Q      An average daily trading volume provides a measure of

7   liquidity of a financial product, right?

8   A      Not on its own.  It's one input.

9   Q      What do you mean?

10  A      The liquidity is described by, you know, at a minimum

11  volume and volatility for the asset.  And then once you are

12  looking to take a position – so in this case, to liquidate

13  the debtors holdings - what matters is the relative average

14  daily trading volume compared to the position you're taking –

15  -

16  Q      That's with respect to -- I'm sorry.

17              THE COURT:  Let's not talk over each other,

18  please.

19              THE WITNESS:  No, it's okay.  And then volatility

20  is also an input.

21  BY MR. BACON:

22  Q      This is your time with respect to your application of

23  the KO model, right?

24  A      You know, every liquidity -- illiquidity index or price

25  impact model I've seen includes both volume and volatility.

1  Q     Okay.  So, volume and volatility are measures of
2  liquidity?
3  A     They can be combined into a measure of illiquidity.
4  They, on their own, neither number is a measure of liquidity.
5  Q     But those two together are a measure of liquidity?  The
6  volume and trading volume.
7  A     Yes.
8  Q     And then you also note in your rebuttal report to Mr.
9  Gkatzimas that another explanation for using the debtors
10 holdings for SRM as an input to the KO model is that prior to
11 the petition date, SRM holders were exposed to an FTX
12 specific risk, right?
13 A     Yes.
14 Q     And that's the risk that FTX or Alameda could've
15 liquidated their SRM holdings at any time, right?
16 A     That's one of the risks.
17 Q     And this was based on publicly available information,
18 right, this risk?
19 A     Yes.
20 Q     And that was known at petition time too, correct?
21 A     The full extent of the Alameda balance sheet, I don't
22 know that it was known at petition time.  I think it was
23 known that Sam Bankman-Fried had founded Serum and was
24 closely -- and controlled it and was closely involved with
25 it.  I don't know that the full balance sheet was known.

1   Q      But with respect to the debtors holdings in SRM, that

2   was known as the date of the CoinDesk article, right?

3   A      I think it was known that they held a great deal of it.

4   Sitting here now, I'm not entirely -- I believe -- I'm not

5   entirely sure whether it was known exactly how much they

6   held.

7   Q      Do you recall whether that was in one of the assets

8   that was discussed in that article?

9   A      In the CoinDesk article?  You know, I don't remember.

10  I don't recall it being discussed but I would have to look at

11  it to be sure.

12  Q      Okay.  And do you know if that was one of the assets

13  that was discussed on the ledger sheet that came out before

14  the petition date?

15  A      I'm not sure.  I would have to go look again to be

16  certain.

17  Q      And the price of the Serum token declined in the months

18  leading up to the petition date, right?

19  A      Yes.  I believe it declined from around $5 to $10 in

20  the year before to about 70, 80 cents in September before the

21  CoinDesk article.  So, there's a big decline in that period,

22  you know, before the CoinDesk article about Alameda's balance

23  sheet and then it declined to 37 cents.  So, by about half

24  between the CoinDesk article and the petition date.  And then

25  it continued to fall, and a year later was about 6 cents

1 which I think is where it is about now.

2 Q    Okay.  I think I got this from what you just said, but

3 so the price declined leading up to the CoinDesk article and

4 then also declined between the CoinDesk article and the

5 petition date, is that right?

6 A    Mm-hmm.

7         THE COURT:  Is that a, yes?

8         THE WITNESS:  Sorry.  Yes.

9         THE COURT:  Thank you.  You need to say yes or no.

10 BY MR. BACON:

11 Q    And so, this FTX specific risk that you discussed was

12 at least, to some extent, incorporated into the petition time

13 price of SRM, right?

14 A    I expect as I mentioned in the deposition that the

15 decline in the days leading up to the petition date, in part,

16 reflected the collapse of FTX given the tight reliance of the

17 Serum project on FTX.  But it's hard to say particularly

18 given that crypto currency markets overall were being roiled

19 during that period.  You know, Bitcoin also declining what

20 exactly the price was reflecting.  I think there was

21 generally a lot of uncertainty during that period.

22 Q    And you did know events study to determine the effect

23 of the price decline, right?

24 A    Can you clarify, a what kind of a study?

25 Q    An events study?

1    A      Of what?

2    Q      Are you familiar with the phrase event study?

3    A      Yes.  I use them in my research, but I'm not sure event

4    study of what on what --

5    Q      To determine how certain price impacts contributed to

6    the decline between November 2nd and the petition date.

7    A      So, that's not how we usually use events study in

8    economics.  We think about it as using some sort of exogenous

9    event to look for discontinuity.  But in this case, it's

10   untestable what the price decline reflected exactly in terms

11   of the beliefs of knowledge and constraints on trading of the

12   various market participants.

13   Q      Are you familiar with events studies that look at the

14   release of news and determine what the impact of the price

15   is?

16   A      I mean, I can see a time series of the Serum price

17   around say the event of the CoinDesk article and see it

18   declining afterward.  So, in that case, I have absolutely

19   seen that time series.

20   Q      My question, I think, was more basic.  Are you aware of

21   events study that look at the release of publicly available

22   information and the impact of that information on the price's

23   securities?

24   A      So, yes.  I use event studies in my research.  I think

25   the, you know, one challenge is that when you're going to do

1 an events study is to try to get a causal effect which I

2 think is what you're getting at.  So, you're saying, you need

3 that event to be exogenous or independent of the assets.

4     So, I think if we're saying the, you know, as overall

5 during this period, prices are declining it's very hard

6 because the CoinDesk article is not exogenous to the price

7 evolution of Serum.  I wouldn't want to assert that the

8 decline we see following the CoinDesk article is entirely

9 attributed to the CoinDesk article.  I don't have a valid

10 counter factual for what it would have done in the absence of

11 the article since it was generally on a decline which we call

12 pre-trends.  It's like a problem in event studies.

13     If things aren't flat before, it's called a pre-trend

14 and we worry that, you know, in the absence of the event, we

15 don't know what would've happened.  You might think it might

16 continue on the decline.  But I haven't -- I certainly have

17 not done an analysis to try to tease out the impact of the

18 CoinDesk article on the Serum price but I think it would be

19 essentially impossible to get a causal effect is what I'm

20 trying to get at.

21 Q     How is that different than analysis that's done in a

22 traditional securities fraud case with an event study?

23 A     I'm not sure what you're referring to.  I'd have to

24 review it.

25 Q     And in your rebuttal report to Mr. Gkatzimas you note

1  that the fundamental value of the SRM token is likely

2  negligible as of the petition time, correct?

3  A      Yes because the Serum project was defunct right around

4  the petition date.

5  Q      Did you do any quantitative analysis in the fundamental

6  value of the SRM token?

7  A      No.

8  Q      And that is not an input into your application of the

9  KO model, correct?

10 A      Correct.

11 Q      Average daily trading volume is one of the inputs,

12 right?  I think we established that.

13 A      Yes.

14 Q      All right.  And, again, just to remind everyone the

15 estimation period is November 2nd, 2021 through November 1st,

16 2022, right?

17 A      Yes.

18 Q      All right.  And in calculating the average daily

19 trading volume, input for the KO model, to determine your SRM

20 liquidation discount, you looked at spot volume over the

21 estimation period, right?

22 A      Yes.

23 Q      And you did not make any adjustment to that volume

24 based on events that occurred after November 1st, 2022,

25 right?

1   A      Right.

2   Q      And SRM perpetual futures markets had trading volume

3   throughout the estimation period, correct?

4   A      Yes.

5   Q      And perpetual futures markets for digital assets were

6   widely used, correct?

7   A      I'm not sure how you define "widely."  They existed.

8   There was volume in perpetual futures markets.

9   Q      And they were in fact the dominant derivative, right?

10  A      The dominant derivative within crypto?

11  Q      Yes.

12  A      Probably.

13  Q      Probably?

14  A      I don't know for sure.

15  Q      Okay.  Do you have your report still in front of you?

16  A      Yes.  Give me one moment.

17  Q      I can give you a new one if it's -- no one cleaned up

18  the mess in the intro.

19          MR. BACON:  Your Honor, this is FTX-1.

20          THE COURT:  Thank you.

21          THE WITNESS:  Yes.

22  BY MR. BACON:

23  Q      Okay.  And if you go to Paragraph 31 of that report,

24  which I believe it's on page 16 of the actual report.  I

25  think it's labeled 19 of 129 of the document, and directing

1  your attention to the third sentence there which states:

2       "While never meaningfully taken in conventional

3  markets, perpetual futures were adopted to cryptocurrency

4  markets where they became the dominant derivative and were

5  among the most actively traded products on the exchanges."

6       Is that statement correct that they were the dominant

7  derivative?

8  A    Yes.  I think so.

9  Q    Any reason to doubt what you previously wrote?

10 A    No.  I think sitting here today I did not recall that

11 citation (indiscernible), but I now do and I read the paper.

12 I think it's a good paper.  And I agree with it if it's in

13 there.

14 Q    And your asset liquidation discount is based on the

15 2016 KO article, correct?

16 A    Yes.

17 Q    And that article is a theoretical and variance

18 framework which is calibrated based on historical stock

19 exchange data, right?

20 A    Yes.

21 Q    And then KO applied that framework in a 2023 article,

22 correct?

23 A    Yes.

24 Q    And in that 2023 article, they continue to use average

25 daily trading volumes inputs, right?

1  A      Yes.

2  Q      And when available in that article, they use both spot

3  and futures markets as their liquidity, right, as their

4  volume?

5  A      They only use futures volume when the crash that

6  they're studying was caused by trading in futures markets.

7  So, in that paper they study eight crashes and some of them

8  they use futures volume as well as spot volume, and some of

9  them they only use spot volume; and the ones where they also

10 use futures volume are ones like George Soros's trade, I

11 forget which year it was, but he was trading in futures

12 markets that caused the crash.  He was trading futures

13 contracts.  There was a crash.  And so, they study futures

14 volume.  They actually, in for all eight in the appendix,

15 provide results only using spot volume because they note that

16 it's not obvious that you'd want to use both in any case.

17 Q      Was it eight or five?

18 A      I apologize if I misremembered.  We can turn to it and

19 check.

20 Q      Sure.  Let's take a look.

21 A      Okay.

22 Q      I don't know if you've got it already up there.  I

23 think it's FTX (indiscernible), I think.

24 A      Okay.

25          MR. BACON:  I can give you a clean one if that's

1  easier?

2         THE COURT:  Which document are we looking at?

3         MR. BACON:  I think it is FTX --

4         MR. GLUECKSTEIN:  It's FTX 16, Your Honor.

5         MR. BACON:  16, it should be in your binder so

6  that I can give you -- this might be easier.

7         THE WITNESS:  I don't have it.

8         MR. BACON:  May I approach, Your Honor?

9         THE COURT:  Yes.

10        THE WITNESS:  I apologize if I got the number

11 wrong, but I believe we could go through them and see that I

12 am correct about their use of futures volume.

13 BY MR. BACON:

14 Q    I'll try to do this in the most efficient way I think I

15 can.  So, if we start at page 2177 of the document --

16 A    Yes.  You're right.  It's five.  I apologize for my

17 mistake.

18 Q    No apologies necessary.  So, 3.1 talks about the stock

19 market crash of October 1929, correct?

20 A    Mm-hmm.

21 Q    And were there futures in financial products in October

22 of 1929?

23 A    I'm not sure.

24 Q    Okay.  And if we turn to page 2178, we have a market

25 crash in Section 3.2 in October 1987, correct?

1  A      Yes.

2  Q      Okay.  And with respect to that market crash and

3  analyzing it, KO used both spot and futures volumes, correct?

4  A      Yes.  And my understanding is that this in part

5  reflects -- this reflects the sentence -- or my point was

6  based on the sentence over four days, October 15, 16, 19, and

7  20, 1987 (indiscernible) sold S&P futures contracts

8  representing 10.4 billion in index futures and 3.27 billion

9  in NYSE stocks.  And so, that's what they are studying the

10 impact of those sales.

11 Q      And on that page the authors write "We consider the

12 entire stock market to be one market," correct?

13 A      Correct.

14 Q      And they write that "We estimate daily volume as the

15 sum of average daily volume in the futures market and the

16 NYSE for the previous month," correct?

17 A      Yes.

18 Q      Okay.  And the next crash is on the following page 2180

19 which is Section 3.3 trades of George Soros on October 22,

20 1987, right?

21 A      Yes.

22 Q      And the authors do not use spot and futures markets

23 combined for that, right?

24 A      That's correct.

25 Q      Okay.  And they provide an explanation as to why they

1  do that, correct?

2  A     Yes because the markets were not well integrated.

3  Q     That's right.  On Page 2081, the authors write:

4       "Since Soros's sales started just before the opening of

5  the New York Stock Exchange trading the arbitrage mechanism,

6  which connects stock and futures markets, did not have time to

7  work.   Indeed, futures contracts traded at levels about 20

8  percent cheaper than stocks.  We thus consider only S&P 500

9  futures markets in this example, not combining it with the

10 market for New York Stock Exchange stocks."

11      Did I read that correctly?

12 A     Yes.  I think this highlights how these markets are not

13 always well integrated even in the stock markets.

14 Q     Right because futures and spot markets open at

15 different times of the day, right?

16 A     And there's also quite a bit of debate about whether

17 they do operate as a single market.

18 Q     There's debate about whether the S&P 500 market

19 operates as a arbitrage mechanism with the traditional stock

20 market?

21 A     I think this debate is well described in the

22 (indiscernible) et al 2023 paper that Mr. Gkatzimas cites in

23 his report which includes a long literature discussion about

24 the theoretical and empirical literature on either side of

25 the issue, both for and against about whether how the

1  presence of a derivative market effects the spot market and

2  the degree to which this arbitrage, you know, acts to truly

3  eliminate, you know, any price differentials.

4      And the reason for the potential lack of market

5  completeness, as we actually see in this example with Soros

6  of, you know, there being a failure of integration, is a

7  combination of the information of market participants, the

8  transaction costs, regulatory and institutional constraints

9  on trading like short selling constraints, and all of these

10 things, you know, can potentially lead these markets not to

11 be well integrated.  And I think -- I don't want to

12 necessarily go too far down this road right here unless you

13 want to hear, but I think there's actually reason to think

14 that they are much magnified in the crypto setting.

15 Q    Right.  This is an example about the S&P 500, right?

16 A    Mm-hmm.

17 Q    Okay.  And you're aware that there are S&P 500 ETFs,

18 right?

19 A    Sure.

20 Q    Yes or no.

21 A    Sorry.  Here it says he sold a large -- George Soros

22 lost 60 million in minutes by selling a large number of S&P

23 futures contracts.

24 Q    Yes.  Sorry my question is not -- the answer to my

25 question is not in the article.  My question is are you aware

1  that there are S&P 500 ETFs?

2  A     Yes.

3  Q     Okay.  And the S&P 500 ETFs are correlated with the

4  spot price of S&P 500 stocks, right?

5  A     Yes.  But are you talking about futures contracts?

6  Q     I'm taking about S&P 500 ETFs.

7  A     Oh, yes.

8  Q     Okay.  And are you aware that there's a market for S&P

9  500 futures as well, right?

10  A     Yes.

11  Q     And those futures prices are correlated to the ETFs,

12  right?

13  A     I imagine so.

14  Q     Okay.  And here, the reason that the authors state that

15  futures were not used, and I'll read it again, is "Since

16  Soros's sales started just before the opening of the New York

17  Stock Exchange trading, the arbitrage mechanism which

18  connects stocks and futures did not have time to work",

19  right?  Did I read that correctly?

20  A     Yes.

21  Q     Okay.  And so, the next crash in on page 2182, right?

22  And its Section 3.4 liquidation of a name that I'm going to

23  mispronounce, Cordial's Roag trades (phonetic) in January of

24  2008?

25  A     Yes.

1  Q      Okay.  And the authors use spot and futures markets

2  together in that example, correct?

3  A      (No verbal response).

4  Q      And I can speed up your review a little bit if you

5  check towards the bottom of page 2183, the second to last

6  full paragraph.

7  A      Yes.  Since Cordial had established long positions in

8  equity index futures contracts, I believe thus he was trading

9  in futures.

10 Q      Okay.  And if we turn to page 2185, we have the flash

11 crash of May 6th, 2010, correct?

12 A      Correct.

13 Q      And again, there is both spot and futures volumes

14 measured collectively, correct?

15 A      I only see here that they only used the futures

16 contracts.  Am I missing something?

17 Q      Can you turn to page 2186?  Do you see the table that's

18 in 2186?

19 A      Yes.

20 Q      Do you see row -- column 1 of that table?

21 A      Yes.

22 Q      Do you see the first row is S&P futures volume,

23 correct?

24 A      Right.

25 Q      And the second row is stock market volume, right?

1  A      Yes.  But I'm not sure they used that --

2  Q      And the first number is 132 --

3            THE COURT:  Wait.  She was talking.

4            THE WITNESS:  Okay.  Yeah, they don't mention it

5  in the text.  But I think they do.

6            MR. BACON:  Okay.

7            THE WITNESS:  It looks like from the equation that

8  they used both.

9  BY MR. BACON:

10  Q      Right.  The futures volume reflected in the chart is

11  132 billion, right?

12  A      Yes.

13  Q      And the stock market volume is 161 billion, right?

14  A      Yes.  They note that -- this is what -- they note

15  appendix C provides estimate under the alternative

16  assumptions of (indiscernible) and volatility in less

17  integrated markets which I think means -- I believe if I

18  recall from having read it earlier, that that's where they

19  separate it.

20  Q      Okay.  But in this equation, that's presented in the

21  body of the article, they combine both, correct?

22  A      Yes.

23  Q      132 plus 161?

24  A      (No verbal response).

25  Q      To make it easier, if you look at the body 2185, the

1  last full paragraph there where it begins "We examine."  And

2  there they discuss adding the 132 from the futures with the

3  161 from spot, correct?

4  A     Yes.

5  Q     Okay.  And we can put that away.

6        And so, SRM perpetual futures volume is not included in

7  your average daily trading volume for the KO model, right?

8  A     Yes.  And it's also not included in KO 2016 that was

9  the basis --

10 Q     Sure.  My question is about your application to the KO

11 model.

12 A     Yes.

13 Q     Okay.  And in your original report, in offering that

14 opinion, did you calculate the average daily trading volume

15 of SRM perpetual futures markets over the estimation period?

16 A     No.

17 Q     And your asset liquidation discount for the SRM tokens

18 is about 58 percent, right?

19 A     Yes.

20 Q     All right.  In your rebuttal report you do state that

21 approximately 99 percent of the volume in SRM perpetual

22 futures markets d-listed about five days after the petition

23 date, right?

24 A     By five days after the petition date.

25 Q     And post-petition volume is not a component of your

1  application of the KO model, correct?

2  A     Correct.

3  Q     And you did not perform any analysis in your original -

4  - in adopting your 58 percent asset liquidation discount of

5  whether SRM spot prices and SRM perpetual future prices were

6  aligned, correct, during the estimation period?  I can do it

7  again.

8  A     No.  Did I study whether perpetual futures and spot are

9  aligned?

10 Q     During the estimation period.

11 A     No.

12 Q     But you are aware that perpetual futures contracts

13 include a funding rate mechanism, right?

14 A     Yes.

15 Q     And to keep prices from deviating too much from the

16 spot price, perpetual futures use a funding rate mechanism in

17 which the two parties in the contract make periodic payments

18 depending on whose bet is paid off, correct?

19 A     Yes.  And the major dislocations in those funding rates

20 in the days before the petition date on all five exchanges

21 that Mr. Gkatzimas uses are one reason it has been reasonable

22 to expect the delisting's to occur subsequently even before

23 the petition date.

24 Q     Okay.  Let me ask this in two parts then.  Is the

25 statement I just read correct?

1   A      How the funding rate mechanism works, yes.

2   Q      Okay.  And then you said that you did not do any

3   analysis of how the prices were aligned during the estimation

4   period, correct?

5   A      For the original report, no.

6   Q      Did you ever do an analysis of how the two markets were

7   aligned during the estimation period?  And that's November

8   2nd, 2021 through November 1st, 2022.

9   A      I, you know, in preparing the rebuttal, I've seen

10  graphs of the time series of the funding rate and the

11  alignment on those five exchanges in the period proceeding

12  the petition date and it may overlap with the estimation

13  period --

14  Q      And the petition date is November 11 -- I'm sorry.

15  A      -- which reveal those dislocations.

16          THE COURT:  Please wait till she finishes the

17  questions so we're not talking over each other.

18          MR. BACON:  Yes.  Sorry, Your Honor.

19          THE WITNESS:  Go ahead.

20  BY MR. BACON:

21  Q      Did you look at the one-year estimation period, did you

22  perform an analysis of how the perpetual futures market and

23  the spot markets were aligned during that period?

24  A      No.

25  Q      In your rebuttal report, you note that there are

1  certain risks with trading perpetual futures, right?

2  A     Yes.

3  Q     Did you do you any quantitative assessment of those

4  risks?

5  A     No.

6  Q     Okay.  And you didn't do any analysis linked to

7  strategies designed to mitigate those risks, right?

8  A     No.

9  Q     One of the risks you note is that your required to post

10 collateral for perpetual futures positions, right?

11 A     Yes.

12 Q     And you are aware that you can trade perpetual futures

13 on leverage as well, right?

14 A     Yes.

15 Q     And you didn't perform any analysis of the cost of

16 posting collateral in the SRM perpetual futures markets,

17 right?

18 A     You mean the amount of collateral that would be

19 required or the cost of that capital?

20 Q     The cost of doing so, yeah.

21 A     No.

22 Q     And another risk is that there's counterparty risks

23 because an exchange in which you are trading perpetual

24 futures could go bankrupt, right?

25 A     Yes.

1   Q      And that's a risk for spot holdings on an exchange too,

2   right?

3   A      On any exchange, yes, if you're holding assets on an

4   exchange.

5   Q      We're here, aren't we?

6   A      Yes.

7   Q      And in your rebuttal report --

8   A      Sorry, just to be clear, the reason that that risk is

9   more relevant in the case of futures trading is that the

10  collateral has to be maintained indefinitely on the exchange

11  for as long as the position is opened whereas in liquidating

12  or selling, one would, you know, put assets on an exchange to

13  be sold and then sell it.  And once you've sold them, you're

14  no longer dependent on the viability of the exchange.

15  Q      Right.  But if you're tokens were still at the

16  exchange, you might lose the value of those tokens, right?

17  A      Yes.  But presumably, one would be putting the tokens

18  on the exchange to be sold when one would want to sell them.

19  Q      Are you aware that TMSI has a claim for Serum spot

20  tokens?

21  A      Yes.

22  Q      And those were held at the exchange at the time of the

23  bankruptcy, right?

24  A      Yes.

25  Q      And you're aware that --

1   A      They took --

2   Q      I'm sorry.

3   A      Yes.  That was the risk.  I think that's where the

4   risk, the you know, exchange specific risk comes in that they

5   chose to hold all of these tokens at FTX as opposed to in

6   cold storage or somewhere else and they were exposed to the

7   risk that something would happen to the exchange.

8   Q      Right.  And those are spot tokens, right?

9   A      Yes.

10  Q      And in your rebuttal report to Mr. Gkatzimas you state

11  that perpetual futures volume is not relevant to your

12  application, the KO model, because perpetual futures cannot

13  be used for liquidating digital assets, correct?

14  A      Among other reasons, yes.

15  Q      Okay.  Let's focus on that one, okay.  And your

16  statement there is based on the fact that perpetual futures

17  do not result in the delivery of the underlying asset, right,

18  a perpetual future in SRM doesn't result in the delivery of

19  an SRM when you sell the contract, right?

20  A      Correct.

21  Q      It's either FIAT or Stablecoin typically.  Is that

22  right?

23  A      When you close out your positions?

24  Q      Yes.  What perpetual future contract their settlement.

25  A      Yes.

1 Q    Okay.  And so, a person liquidating a spot position
2 could hedge that position by shortening the perpetual futures
3 markets, right?
4 A    They could.
5 Q    And the way a hedge of that type would work is that the
6 price went down in the spot position, there would be games
7 offset in the perpetual futures addition, right?
8 A    There could be.
9 Q    Assuming the funding rate mechanism is working, right?
10 A    Again, it depends on how well integrated the markets
11 are, which I haven't seen evidence about.
12 Q    Because you didn't do any analysis of how those markets
13 were integrated between the estimation period, correct?
14 A    My understanding was that was not needed for the
15 rebuttal opinion.
16 Q    Okay.  And you didn't do it, correct?
17 A    Correct.
18 Q    Okay.  And so, similarly how spot goes down, your gain
19 should be offset in the futures position, if the spot went
20 up, you would lose money in the futures position, right?
21 A    That's true if the markets are perfectly integrated.
22 Q    Do they need to be perfectly integrated?
23 A    No.
24 Q    Okay.  And you can later unwind that hedge position,
25 right?

1  A      Yes.

2  Q      Okay.  And that's how you would get net proceeds out of

3  that process, right?

4  A      My -- once I understood that the way that TMSI intended

5  to use futures volume was through this hedging strategy as

6  opposed to somehow selling Serum into futures markets which

7  is what the original motion and the original Gkatzimas report

8  sort of implied.  So, once I knew about this hedging

9  strategy, I disagree with the presumption that it would have

10 no transaction costs.  If the markets are perfectly

11 integrated as to (indiscernible) and Mr. Gkatzimas are

12 assuming, then the key reason that I believe this would not

13 work well is because you would have the same transaction cost

14 that is price impact from your trades in the futures as in

15 the spot.  So, even though they're right that the round-trip

16 price impact might cancel out, it does not mean that trading

17 is costless for the market participant taking it on.

18        Do I believe that by this strategy is saying in

19 addition to selling the Serum volumes on the spot, we're

20 going to do triple that volume of trading in the futures

21 markets and if the markets are integrated, as they're

22 assuming, those trades have the same price impact.  And we

23 have to account for that in calculating the transaction cost

24 from this whole strategy, which Mr. Gkatzimas fails to do.

25        So, I think it's -- the problem is not that you can't,

1  in theory, hedge in futures markets, it's that there's going

2  to be price impact from selling -- from taking these huge

3  positions just the same way as in the spot market.

4  Q    Okay.  And I believe you just said that those markets

5  have to be perfectly integrated, but I believe a few minutes

6  ago you said they did not have to be perfectly integrated,

7  correct?

8  A    Well, no.  I'm saying assuming that they're perfect --

9  like the price would be exactly symmetric would be the same

10  in both markets if they're perfectly integrated.  If they're

11  not perfectly integrated, it would be, you know, something

12  slightly different.

13  Q    And your statement that if they're perfectly integrated

14  that the price impact would be the same is regardless of the

15  ratio between the spot -- the volume and the spot and the

16  futures markets?

17  A    Well, if you're going to fully hedge the Serum volume

18  you're trying to sell in the spot, you got to open a short

19  position with the same quantity of volume.  So, you could

20  hedge some smaller volume than you're selling in the spot,

21  but then you wouldn't be fully hedged.

22  Q    Yes.  So, my question was different.  My question is

23  about the -- you're aware that there's average daily trading

24  volume in the spot market and in the perpetual futures

25  markets, correct?

1  A      That's right.

2  Q      Okay.  And you're aware that you can have differences

3  in the average daily trading volume in one market and the

4  other market, right?

5  A      Correct.

6  Q      And you would expect different price impact in those

7  markets depending on how much is traded in those markets,

8  right?

9  A      Only if they're not well integrated.  And I just -- I'm

10 not saying they are or they aren't.  I haven't seen evidence

11 one way or the other.  But I'm saying if we take the

12 assumptions that are in the TMSI motion and Gkatzimas report,

13 not really Gkatzimas, the TMSI motion is given and we suppose

14 that they're perfectly integrated, then actually the price

15 impact is the same from selling it to one or the other.

16 Q      If I have a futures market that has a billion dollars'

17 worth of average daily trading volume and I sell a thousand

18 dollars' worth of -- short a thousand dollars' worth of the

19 perpetual spots, okay?  And on the other hand, I have a spot

20 market that has $1,000 worth of average daily trading volume

21 and I sell that same $1,000 there, would you expect the price

22 impact in each of those markets to be the same?

23 A      If they were a single liquidity pool and they were

24 perfectly integrated as is supposed in the motion, then yes.

25 And I think that example highlights the fact that you sort of

1  -- if that's implausible then I don't -- then I suggest

2  they're not perfectly integrated.

3  Q    I just want to make sure I've got my answer to my

4  hypothetical right.  If I sold a thousand dollars' worth in a

5  market that traded a billion dollars a day and I sold a

6  thousand dollars' worth in a market that traded at a thousand

7  dollars a day, you would expect the same price impact in each

8  of those markets?

9  A    Only if they were a single perfectly integrated

10  liquidity pool which I, again, have not done an analysis here

11  but my personal -- my prior is that they are not.  But I'm

12  saying that the hedging strategy that is being proposed in

13  the TMSI motion presumes that they are, that arbitrageurs,

14  you know, are coming in and eliminating any price

15  differentials so that the price impact from selling in one

16  market would be the same as the price impact of selling in

17  the other market.  And that's why the hedge would work.

18  Q    And so, assuming that the markets are perfectly

19  integrated, which I know you said they don't have to actually

20  be perfectly integrated --

21  A    Yeah, I'm not saying they are.  I'm saying suppose they

22  are.

23  Q    Let's assume they're perfectly integrated.  The price

24  impact from selling a thousand dollars in a billion-dollar

25  day market is the same as selling a thousand dollars in a

1  thousand-dollar day market?

2  A     If they are all one market which is -- for example, in

3  those KO -- you know, examples we were looking at, they were

4  treating it as one single liquidity pool just summing them up

5  in the formulas.  They were just saying we're going to take -

6  - in those cases where they treat it as a single liquidity

7  pool, a single market, they just sum up the volume in both

8  markets and call it one market.  So, the price impact is the

9  same in either market.

10  Q     And one of the things that you looked at between

11  Wednesday's hearing and today was an article about execution

12  in the perpetual futures market, right?

13  A     Yes.

14  Q     Okay.  And you are aware that perpetual futures markets

15  have order books, correct?

16  A     Yes.

17  Q     And spot markets have order books, correct?

18  A     Yes.

19  Q     Okay.  And if I had a billion dollar a day market and the

20  top of book price was a million dollars, if I sold the $1

21  thousand into that market there would be no price impact, right?

22  A     I don't want to, you know, talk about a hypothetical

23  about a market I don't understand or I don't know what the

24  volume or volatility is.

25  Q     Are there any assumptions you need to answer my

1  question?

2  A    Yes.  If we're assuming that this is the whole market and

3  you give me inputs of the amount we're selling and daily trading

4  volume and volatility, we can calculate a, you know, whether

5  it would be a price impact.  But I'm not going to speculate

6  based on just like a couple of numbers.

7  Q    Is there any market in the world that is a billion-dollar

8  market that the (indiscernible) book has a million dollars at

9  the best price, if I sell a thousand dollars into it.  I'm going

10 to move the market price.

11 A    I just don't want to -- I'm not going to engage in

12 these sorts of hypothetical examples.  I'm not sure --

13 Q    You're not sure whether there's a market in the world

14 like that?

15 A    No.  I don't want to speculate without -- about

16 specific numbers without knowing what we're talking about.

17 Q    I don't think this requires speculation, but if that's

18 your answer that you don't want to speculate, I'll move on.

19 A    Thank you.

20      MR. BACON:  I don't have any further questions,

21 Your Honor.

22      THE COURT:  Okay.  Thank you. I think that was the

23 last of the crosses, right?  So, we're going to --

24      THE WITNESS:  Your Honor, may I request a five-

25 minute break to use the restroom?

1        THE COURT:  Sure.  Absolutely.  We'll take a five-

2   minute recess.

3        (Recess taken at 10:24 a.m.)

4        (Proceedings resumed at 10:29 a.m.)

5           THE COURTROOM DEPUTY:  All rise.

6           THE COURT:  Thank you.  Please be seated.

7           Ready for redirect?

8           MR. GLUECKSTEIN:  Yes, Your Honor.  Before I do, I

9   just want to address two issues if I may.  I just want to --

10  sorry, for the record, Your Honor, Brian Glueckstein,

11  Sullivan & Cromwell, for the debtors.

12          Before we proceed with redirect, I just want to be

13  sure that cross-examination is complete.  First, there was a

14  question raised by Mr. Bacon, I think there might have been a

15  little bit of talking past each other between Professor

16  Howell and Mr. Bacon.  The only memo that we believe she was

17  referring to, when she was asked if she reviewed anything

18  else, was an internal memo provided by her team, some of the

19  futures trading issues that she said she did not rely on.

20  So, we don't believe it would be appropriate to produce that

21  memo, but we are happy to provide it to Your Honor if Your

22  Honor would like to review it.  And we don't see it as the

23  basis for examination.

24          The other issue that was left open, I think was

25  left open, on Wednesday was there was a reservation by the

1   other objectors to potentially seek to examine Professor

2   Howell on the articles that she cited in response to a

3   question that she was posed on cross-examination.

4          So, I just want to make sure we could tie off

5   those two issues before -- and we are certain that cross-

6   examination is complete before proceeding to redirect.

7          THE COURT:  Let me hear from the other side.

8          MR. TOROSIAN:  Good morning, Your Honor.  Jeff

9   Torosian from DLA Piper on behalf of MAPS Vault.

10          We decline to engage in any more cross on those

11   issues.  So, our cross is complete.

12          I do want to highlight, though, just so we are

13   clear on setting the table for the rest of the hearing.  We

14   assume this is a one and done testifying situation and that

15   there will not be a rebuttal case with the same rebuttal

16   witness going through expert reports.  But I just wanted to

17   put that out there because that is our assumption, but I want

18   counsel for the debtors to confirm that.

19          MR. GLUECKSTEIN:  Your Honor, that was our

20   assumption as well.  It still is.  There is an issue.  If it

21   appears that there might be an issue we will have to see how

22   Mr. Konstantinidis proceeds.  We were provided demonstrative

23   exhibits last evening that contain analysis that is new that

24   Mr. Konstantinidis has not put forward in his reports.  So,

25   to the extent that that material is presented I think we have

1  no choice but to reserve the right to recall Dr. Howell on

2  that issue.

3          MR. TOROSIAN:  Again, Jeff Torosian for MAPS

4  Vault.

5          If that is the issue -- if that becomes the case

6  and they want to call a rebuttal case on narrow issues if

7  they think the opinions are new, we can have that dispute

8  then, but whatever rebuttal case they come up with should be

9  contained to those issues.

10         THE COURT:  All right.  Well, my view on experts

11  is any new opinions are not allowed. I mean you had the

12  opportunity to present your expert through an expert report

13  and if you did not do so he cannot testify on this matter.

14         MR. TOROSIAN:  I agree and I don't think there are

15  any new opinions.

16         MR. BACON:  Your Honor, on the first point we take

17  counsel's representation of now questions about the document.

18         THE COURT:  All right.  Thank you.

19         MR. GLUECKSTEIN:  Thank you, Your Honor.  We will

20  proceed then with redirect.

21                     REDIRECT EXAMINATION

22  BY MR. GLUECKSTEIN:

23  Q    Good morning, again, Professor Howell.

24  A    Good morning.

25  Q    Professor Howell, could you please explain again for

1   the Court what it is that the KO model is used for in your

2   analysis?

3   A     Yes.  The ultimate goal is to value customer claims.

4   To do so we need a market price in US dollars, given the

5   constraints that I understand of this bankruptcy process.

6   The face value of the debtors' holdings, using petition date

7   prices, is misleading because its based on circulating tokens

8   that represent just one to two percent of total token supply.

9   And the debtors will be selling 95 to 99 percent of total

10  token supply.

11        So, to bridge that gap I used the KO model to deliver a

12  reasonable estimate of the market price for these tokens

13  after an orderly liquidation process.  So, the KO model is

14  not, you know, a valuation model, its estimating the likely

15  price at which these holdings could be sold.  And that gives

16  us a set of market prices which I then used to value customer

17  claims.

18  Q     Professor Howell, why are you comfortable with the

19  concept of transaction costs discussed in the KO model is

20  equivalent to what you term an "asset liquidation discount?"

21  A     I used the word "discount" essentially for parsimony

22  here.  I viewed it as synonymous with the transaction cost

23  that is described in the KO model and other models of price

24  impact.  So, I see it as the same thing in this context.  In

25  a different context discount could mean something else, but I

1  believe it is fairly clear in the report how I mean it.

2      A number of questions you were asked on cross-

3  examination assume that your methodology assumes the debtors

4  would "flood the market" with MAPS and Oxy tokens.  Do you

5  recall those questions?

6  A      I do.

7  Q      Is flooding the market the premise of the KO model?

8  A      Quite the reverse. The KO model assumes that positions

9  are taken in a gradual manner. It's a slow trading model.

10  They don't deliver a time to liquidation as part of the

11  output. Instead, the theory is, essentially, based on the

12  assumption that there is an equilibrium natural speed of

13  trading that balances a desire for fast execution with a

14  desire to minimize transaction costs.

15      So, in fact, its -- one of the reasons the KO model is

16  relatively conservative is because it assumes a very gradual,

17  gradual sales over, you know, certainly in the case of the at

18  issue tokens a very long period of time.

19  Q      Does your model assume the debtors sell all of their

20  holdings in MAPS, Oxy, or Serum in one day?

21  A      No.  That would be absurd.  Again, it's a slow trading

22  model that assumes a gradual liquidation.  You know, for

23  example, KO mentioned that the portfolio transition date that

24  they are using in their paper, which is where asset managers

25  are, you know, buying and selling positions of certain

1  amounts of stock that even those bets or position changes

2  would take a few days to a few weeks in how they, you know,

3  were executed according to the natural speed of trading.  And

4  those positions, relative to trading volume of those stocks,

5  were miniscule compared to the quantities we are considering

6  here.

7        So, I think, you know, it would -- it is totally absurd

8  to think that it would -- that they would all be sold in a

9  day.  If anything, this is a very slow trading model that

10 would take a very long time. And I think the fact that we use

11 both Mr. Konstantinidis and myself use daily measures of

12 volume and volatility that is just what the inputs to the

13 formula are.  Its an expected normal days volume and

14 volatility. It doesn't imply either in his model or in mine

15 that everything would be sold in one day.

16 Q    Do you recall being asked a number of questions on

17 cross-examination regarding your application of the KO model

18 resulting in discounts for MAPS and Oxy tokens exceeding 100

19 percent?

20 A    Yes.

21 Q    In your view is there a flaw in the KO model that it

22 can produce discounts of more than 100 percent?

23 A    No.

24 Q    Why not?

25 A    The -- what the KO model is doing, as other models of

1  illiquidity or price impact, is its just reflecting how hard

2  it is to sell a certain amount of an asset into a given

3  market.  And these models -- when it's very hard, and they're

4  super liquid they deliver transaction costs that are more

5  then 100 percent.  This is true for the rule of thumb square-

6  root model that is very widely used among traders in academic

7  studies. To my knowledge, it has never been criticized for

8  delivering discounts -- sorry, delivering transaction costs,

9  or discounts, or whatever we wish to call them of more than

10  100 percent.

11       As I mentioned last week, intuitively, we can imagine

12  that the cost of selling something can be larger than the

13  value of that item.  So, I think both in practice and in

14  theory this is not -- this is just not a problem.

15  Q     Just to be clear, is the KO model a type of model that

16  what you were referring to as a price impact model?

17  A     Yes.

18  Q     You were asked to read from certain academic papers in

19  your testimony last week that criticized discounts in excess

20  of 100 percent.  Do you recall that?

21  A     Yes.

22  Q     In one of those papers that you were asked to read from

23  was a paper by Finnerty in 2002.  Do you recall that paper?

24  A     Yes.

25  Q     Is the model discussed in that paper a price impact

1  model?

2  A      No. It's a discount for lack of marketability.

3  Q      You were also asked to read from a paper that was

4  authored by Ghaidarov.  Do you recall that paper?

5  A      Yes.

6  Q      Did that paper discuss a price impact model?

7  A      No.

8  Q      What type of model is addressed in that paper?

9  A      Also, a discount for lack of marketability or a DLOM

10 model.

11 Q      You were asked to read an excerpt from a paper written

12 by Mr. Abbott.  Does that paper discuss a price impact model?

13 A      No.  Also, a DLOM model.

14 Q      And I believe the final paper you were asked to read

15 from was a paper authored by Stockdale published in 2008.  Do

16 you recall that paper?

17 A      Yes.

18 Q      Does that paper discuss a price impact model?

19 A      No.  Its also a DLOM model.

20 Q      In your opinion, are the criticisms of a DLOM model

21 with results that exceed 100 percent justified?

22 A      I think they can be. The idea of a discount for lack of

23 marketability is really about a decision of whether to sell

24 something that you have the right to sell. Its kind of a

25 stopping problem.  And these authors are positing that, you

1  know, it would be both impractical and sort of counter

2  intuitive for those discounts to go over 100 percent because,

3  you know, if I tell you I am going to give you a -- if I said

4  here's an IOU for a share of stock in 10 years, you know, I

5  shouldn't make you worse off by the fact that its in 10

6  years.

7      So, the lack -- the -- you can always abandon the

8  option to sell something.  So, the idea behind those

9  critiques is that, you know, it shouldn't make you worse off.

10 But I really don't think it -- whether those critiques are

11 valid just really doesn't have any bearing on whether it is a

12 signal of some problem that the KO model delivers discounts

13 of more than 100 percent.  They are just completely different

14 models.  They are based on different theories.  One is -- the

15 DLOMs are based on put options, valuing a put option, valuing

16 the right to sell something; they are just completely

17 different. So, I think its sort of apples and oranges.

18 Q    Professor Howell, you were asked a number of questions

19 regarding your selection of exchanges for your trading volume

20 data input.  Do you recall that testimony?

21 A    Yes.

22 Q    Why did you determine that the LBank exchange data

23 would be excluded from your data?

24 A    At the outset of estimation, for all the tokens that we

25 considered, myself and the team from Analysis Group,

1  identified the full set of exchanges to use and we decided to

2  employ the Coin Metrics universe.  We then identified

3  anomalous trading activity that did not seem plausible on

4  three exchanges.  The team at Analysis Group quarried Kevin

5  Lu who said, yes, these are very low trust exchanges, I

6  suggest you exclude them and they were excluded from the

7  whole -- from the universe of exchanges for all of the

8  tokens.

9      I am emphasizing that because it seemed a bit

10  suggestive that, oh, perhaps we were, you know, cherry-

11  picking exchanges like for MAPS or for Oxy.  That is not the

12  case. We considered the same set of exchanges as the starting

13  point for all of the tokens and excluded LBank, ZB, and

14  LocalBitcoins because of their implausible trading activity

15  that you can easily see in the data and because of Mr. Lu's

16  opinion confirming that.  So that is why we ended up not

17  using them for MAPS.  But it certainly wasn't a MAPS specific

18  decision.

19  Q    Do you recall being showed a list of exchange rankings

20  from Coin Metrics -- CoinMarketCap's website.

21  A    Yes.

22  Q    Did you use CoinMarketCap data in your analysis?

23  A    No.

24  Q    Do you view CoinMarketCap's exchange rankings as

25  relevant at all your conclusions?

1  A      No.

2  Q      Do you still have the binder of FTX exhibits in front

3  of you, Professor Howell?

4  A      Yes.

5  Q      Could you turn to FTX-6 which is your rebuttal report?

6  A      Yes.

7  Q      If you could turn to figure 3 on page 22, please.  Are

8  you there?

9  A      Yes.

10  Q      We looked at this briefly in your direct, but can you

11  please explain for the Court what is depicted in this chart?

12  A      Yes.  Here the far-left column has the discounts from

13  my original report using the Coin Metrics data I just

14  described, you know, which is the universe of Coin Metrics

15  less those three exchanges.  Then in the second column and in

16  the remaining columns are using sources of data that Mr.

17  Konstantinidis suggested.  The second one is CoinMarketCap.

18  That includes those three exchanges I just mentioned, LBank,

19  ZB, and LocalBitcoins.  Here, we see that the discounts for

20  MAPS and Oxy are remaining at 100 percent. The discount for

21  Serum goes down somewhat, still in the same ballpark.

22  Q      Just to be clear, if you do your analysis, you include

23  the trading volumes from the excluded exchanges, does the

24  discount for MAPS or Oxy change at all?

25  A      No.

1  Q      Professor Howell, do you recall being asked some

2  questions about your estimation period for determining the

3  representative liquidity of the market going forward?

4  A      Yes.

5  Q      There has been a lot of discussion and some even this

6  morning about the estimation period.  What does the

7  estimation period represent?

8  A      This is used to develop two inputs to the KO model,

9  average daily trading volume and volatility. The goal here is

10 to try to identify a reasonable estimate of volume and

11 volatility as we would expect them to look in the orderly

12 liquidation commencing on the petition date.  So, using

13 prepetition data information, but the goal is to project

14 forward to this orderly liquidation that we are imagining

15 would happen starting on the petition date.

16      So, I decided to use in my main analysis this one-year

17 period because in the period following the CoinDesk article

18 there was, sort of, unprecedented uncertainty in the markets

19 and I did not expect that uncertainty to remain going forward

20 from, you know, following the petition date.

21      Second, I needed a long enough period of time to

22 capture, you know, sort of what the average trading day might

23 look like and ensure that the results wouldn't be biased by

24 something particular that might happen on a given day.  And I

25 chose a year period which seemed to balance that need to kind

1  of capture the market cycles without wanting to go too far

2  back and end up with, you know, sale information about all of

3  the digital assets I was considering.

4  Q    Again, the estimation period that you used covered

5  which one year period?

6  A    November 2nd, 2021 to November 1st, 2022.

7  Q    And can you please just summarize why you believe that

8  estimation is appropriate particularly the exclusion of the

9  period after November 2nd, 2022?

10  A    The period following November 2nd, the CoinDesk article

11  was characterized by a large degree of uncertainty,

12  volatility, selling pressure in these markets due to the

13  collapse of FTX.  Overall, you know, this was just -- this

14  was a period where I wouldn't -- where it was what we would

15  call a major news day. I wouldn't expect those that period to

16  continue in the future, but it turns out that the results are

17  actually quite similar, incorporating that period in various

18  ways Mr. Konstantinidis suggested.

19  Q    And in connection with your rebuttal analysis did you,

20  in fact, conduct an analysis of how your asset liquidation

21  discount would be impacted if you used data up until the

22  petition date?

23  A    I did.

24  Q    And can you turn to page 16 of your rebuttal report,

25  FTX-6 in figure 1 that is on that page?

1  A       Yes.

2  Q       And can you please explain what is reflected in figure

3  1 of Exhibit FTX-6?

4  A       So here the first row is the main estimates from my

5  original report and Mr. Konstantinidis suggests two

6  alternatives.  One is to end on the petition date that is in

7  the second row.  Here, the discount for MAPS and Oxy remains

8  at 100 percent and the Serum discount, in fact, increases to

9  63 percent.  The third row takes only a six-month period

10 ending on the petition date, which Mr. Konstantinidis also

11 suggested, and here, again, the discount for MAPS and Oxy are

12 both 100 percent and the Serum discount increases slightly to

13 64 percent.

14 Q       So based on your analysis, if you include the data up

15 until the petition date, is there any change at all with

16 respect to the asset liquidation discount for MAPS or Oxy

17 tokens?

18 A       No.

19 Q       And with respect to Serum tokens the discount actually

20 increased, is that right?

21 A       That is correct, reflecting high volatility.

22 Q       Professor Howell, you were asked some questions this

23 morning about perpetual futures markets and you were shown,

24 and you walked through in some detail, the 2023 KO paper.  Do

25 you recall that?

1   A      Yes.

2   Q      Does any of the studies in KO 2023 change your views to

3   the appropriateness of using -- or not using futures volumes

4   when calculating your volumes for Serum tokens here?

5   A      They do not.

6   Q      And can you elaborate on why that is?

7   A      So, the -- as I understand it, the TMSI motion proposes

8   two ways that futures volumes could be useful to a

9   liquidation of the Serum tokens. One is that the mere

10  presence of the derivative market, which would have softened

11  the impact of selling into the futures market -- sorry, it

12  would soften the impact of selling into the spot market.

13  That is because arbitrageurs would be buying and selling

14  across the spot in the futures market when price

15  differentials emerge, for example, if you sell into the spot.

16       If that is occurring, which I haven't seen strong

17  evidence for or against, then its already included in the

18  volumes I used because that arbitrage activity would have

19  occurred in the yearlong estimation period in which I take

20  spot value.  So, as Mr. Bacon described, perpetual futures

21  markets were active during that period.  And if arbitrageurs

22  are going -- you know, are buying in futures, and selling in

23  spot, and buying in spot to sell in futures in order to

24  arbitrage out price differentials they are creating volume in

25  the spot market, they have to.  The only way that you

1   arbitrage those price differentials and soften the price

2   impact, as I just described, is by buying and selling in

3   spot.  So that volume is there, its there in my volume that I

4   am currently using in the formula.

5       The second strategy is this hedging approach where you

6   would be selling Serum into spot and then separately taking

7   on these transactions, new trades in the futures market where

8   you would open a short position, then you would sell into the

9   spot market and then you would close out the short position

10  which is the same as taking the long position.

11      They fail to account for the fact that those trades,

12  those very large trades, in the futures markets would have

13  price impact.  That price impact would at least double, if

14  not triple, the total transaction costs that you are overall

15  engaged in.  So, if your trades have no price impact at all

16  you are selling, you know, one share of apple today you can

17  hedge in futures markets and, you know, you might not have

18  any price impact on the price when you are taking your

19  futures positions, but that is not true here because you

20  would be hedging a huge quantity to match the huge quantity

21  of Serum that you are selling and that would have exactly the

22  same price impact that the spot trades would have.

23      So, I disagree with the assumption in the TMSI motion

24  that the spot trades would have price impact but the price

25  impact of the futures trades wouldn't have any impact.  And I

1    can go through -- I have -- if it would be helpful, I have

2    like a toy example where I a can kind of go through how that

3    -- why it is that I think the transaction cost would double

4    from that strategy, but I'm not sure if you want to take the

5    Court's time.

6    Q    If you think it would be helpful just to summarize very

7    quickly.

8    A    So, suppose you have an asset and the price is $100,

9    and you are wanting to sell one unit of it in spot markets

10   and you also want to go through this hedging strategy.  Let's

11   suppose that the price impact of selling one unit is $1.  So,

12   if you sell one unit in the spot market the price goes down

13   to $99, that is the actual price you get.  So, the

14   transaction cost is $1 basically and your proceeds are $99.

15        Now as we were discussing -- as I was discussing with

16   Mr. Bacon earlier, if these markets -- let's suppose that

17   these markets are completely integrated, its one unified

18   liquidity pool, that means that the price impact from opening

19   a sure position of one unit is also $1 just like selling

20   Serum in the spot is $1. Similarly, long position goes up,

21   the price will go up by $1.  So, if this is totally one

22   liquidity pool the symmetric price impacts are the same in

23   both markets.

24        So, now we go to execute our strategy, and we open a

25   sure position, and the price opens at $99 because there's a

1   price impact of $1 from opening that sure position of $1.

2   Then we sell our Serum into the spot market and we push it

3   down again to $98.  So, our proceeds from selling the Serum

4   are $98 and the price previously started on $100.  Then we

5   close out the futures or equivalently take a long position

6   and in doing that we push the price up to $99.  So, the

7   futures trade nets zero, they cancel each other out, we make

8   nothing, we lose nothing on our futures trading, but our

9   proceeds from selling that one unit of Serum are $98.  So,

10  the transaction cost is $2.

11      In contrast, had we not hedged and we just sold our one

12  Serum we would have gotten $99.  We would have just pushed it

13  down once. Instead, at the point of which we liquidated the

14  Serum, we pushed it down twice.  So, that is the intuition

15  for doubling the transaction cost so that, therefore, Mr.

16  Gkatzimas's 33 percent or whatever would become 67 percent

17  which is more then the 58 percent I calculated.

18      You could actually go through that -- that is the order

19  where I said short, sell spot, close out short. That is the

20  order in the TMSI report.  You can actually -- I can go

21  through a similar logic for other orders of operations and

22  the same thing holds true that the transaction cost is either

23  $2 or potentially $3 if you do it all simultaneously and

24  there is no time for arbitrage to work.

25      So, this is why I think the transaction cost from this

1  strategy, if applied correctly, would, in fact, be twice as

2  high as what is in my report.

3  Q    Professor Howell, ultimately do you believe that it was

4  appropriate to include futures trading volumes in your volume

5  input into your KO analysis?

6  A    I don't believe it would be appropriate.

7           MR. GLUECKSTEIN:  No further questions, Your

8  Honor.

9           THE COURT:  Thank you.

10           Professor Howell, I have a question for you.

11           THE WITNESS:  Yes.

12           THE COURT:  I want to make sure that I understand

13  how this process works.  So, the KO model, you said, assumes

14  an orderly liquidation over a long period?

15           THE WITNESS:  It assumes a gradual -- it assumes

16  that trading occurs at an equilibrium natural speed that

17  tries to trade off these, you know, opposing pressures of

18  wanting fast execution. You know, you want to execute as

19  quickly as possible against the transaction costs.  They

20  don't provide a time period, but I think you are right that

21  for the at issue tokens it would almost certainly be a long

22  period, long in the sense of many years, and the reason I

23  believe that is because they say, first, that those -- I

24  mentioned those, you know, actual asset manager portfolio

25  transition trades they are using which were tiny fractions of

1  overall volume for those stacks would take days to weeks. And

2  then I think they also mentioned in one of the papers that

3  they sort of imagined the natural speed being maybe one

4  percent of total volume a day for certain assets.  We have so

5  much more than that, I imagine many years.

6        THE COURT:  Hold on one second.  So, if the debtor

7  began an orderly liquidation process as of the petition date,

8  let's say, is it your testimony based on the liquidation

9  analysis that it would be 100 percent for two of the tokens

10 that if the debtors sold any of those tokens on the petition

11 date the price, they would receive was zero?

12        THE WITNESS:  I don't know how fast the price

13 would go to zero once they started selling, but I think once

14 the market knew the liquidation was happening, I suspect it

15 would be quite quick in practice.  So, the KO model doesn't

16 deliver an estimated time and its assuming that it is

17 happening gradually.

18        The reason the 100 percent discount makes sense

19 and the reason any of the half dozen, you know, price impact

20 models I considered all deliver 100 percent is that in

21 practice you can't sell, you know, this many tokens, this

22 extreme amount of tokens into such a small relative market.

23 And so, I think it would be --

24        THE COURT:  My point is that at the beginning --

25        THE WITNESS:  -- it would happen quickly.

1          THE COURT:  -- of this process the debtors are

2   going to get something for these tokens.  They are not going

3   to get zero, right?

4          THE WITNESS:  That's right.  I think --

5          THE COURT:  And we don't know how long a period of

6   time it would be before it hit zero.

7          THE WITNESS:  Yeah, that is true.

8          THE COURT:  Okay.  That is all I need.  Thank you.

9          Does that prompt any redirect?

10          MR. GLUECKSTEIN:  No.  I think we're -- no further

11   questions, Your Honor.  Thank you.

12          THE COURT:  Thank you, Professor Howell.  You may

13   step down.

14      (Witness excused)

15          THE COURT:  Do the debtors have any other

16   evidence?

17          MR. GLUECKSTEIN:  No, Your Honor.  We enter our

18   exhibits as we go.  So, that concludes our case in chief.

19          THE COURT:  Did we introduce -- have the parties

20   agreed that all the exhibits that have been submitted are

21   admissible?  Do we have any objections to any of the

22   exhibits?

23          MR. GLUECKSTEIN:  No, Your Honor.  I think what we

24   have -- certainly from our perspective we have admitted the

25   reports of the experts as we went.  Many of the articles that

1 are listed on the exhibit list are --

2          THE COURT:  I need to know exactly so we have a

3 record of which exhibits are being admitted into evidence.

4          MR. GLUECKSTEIN:  Yeah, I think the issue, Your

5 Honor, just to be clear from the debtors' perspective, we

6 believe that everything that is on the exhibit list of the

7 parties can be in the record of the hearing.  But all of

8 these articles that the experts are referring to and

9 testifying about, and even that they relied on, are

10 appropriate evidence for purposes of the hearing but the

11 articles themselves are not being admitted for the truth of

12 the matter asserted.

13          So, I think that all of those exhibits are subject

14 to FRE 803(18) which says that experts can testify about

15 articles they relied on or be shown articles and read those

16 articles into the record.  So, we are fine with them being

17 part of the record, we just want to be clear that the various

18 articles cited by all the parties we don't think are coming

19 in for the truth of the matter asserted.

20          THE COURT:  So, are any of those articles actually

21 listed as the pre-marked exhibits for the case?

22          MR. GLUECKSTEIN:  Yeah, I think they all are.

23          THE COURT:  Okay.  So, I need to know specifically

24 which exhibits are being introduced into evidence and which

25 are only being used for purposes of the expert's testimony.

1  I mean we can do that later.  We don't have to do it right

2  this minute but the parties should meet and confer at the

3  next break.

4          MR. GLUECKSTEIN:  We can do that.  To be clear,

5  the debtors' position is that none of the articles are coming

6  in for the truth of the matter asserted.  They are coming in

7  as articles that the experts relied on.

8          THE COURT:  I understand that.  I am just trying

9  to -- so, if we get an appeal to the District Court, the

10 District Court knows Exhibit 1 was admitted into evidence for

11 all purposes, Exhibit 2 was, Exhibit 5 was not, it was not

12 admitted for the truth of the matter. I need to know that for

13 the record.

14         MR. GLUECKSTEIN:  That is fine, Your Honor. I am

15 happy to go through that with respect to the debtors'

16 exhibits, but maybe we should confer with counsel at the next

17 break to make sure we are on the same page.

18         THE COURT:  All right.  Objectors want to call

19 their first witness.

20         MR. TOROSIAN:  Good morning, Your Honor. Jeff

21 Torosian of DLA Piper for MAPS Vault Ltd.

22         Just to address that we intend to move for the

23 admission of our exhibits as we go but we are happy to confer

24 with counsel as we wrap this hearing up and decide what is in

25 and what is out.  So, we can give you a list.

1          THE COURT:  Okay.

2          MR. TOROSIAN:  We would like to call as our first

3  witness Fotios Konstantinidis.

4          THE COURT:  Mr. Konstantinidis, please come

5  forward, take the stand, and remain standing for the oath.

6          THE CLERK:  Please state your full name and spell

7  your last name for the Court record please.

8          MR. KONSTANTINIDIS:  Fortios Konstantinidis, K-O-

9  N-S-T-A-N-T-I-N-I-D-I-S.

10       FOTIOS KONSTANTINIDIS, OBJECTOR WITNESS, SWORN

11         THE CLERK:  Your Honor.

12                    DIRECT EXAMINATION

13 BY MR. TOROSIAN:

14 Q    Mr. Konstantinidis, can you tell the Court where you

15 are currently employed?

16 A    I am employed at Stout.

17 Q    What is Stout?

18 A    Stout is a valuation services, accounting services, and

19 investment banking services in the middle market.

20 Q    What services does Stout provide?

21 A    It started about 30 years ago as a valuation services

22 company.

23 Q    What are valuations services?

24 A    We value businesses, we value securities, and we also

25 value digital assets.

1  Q      How long have you worked at Stout?

2  A      A little bit over four and a half years.

3  Q      What is your title?

4  A      I am a managing director of digital and data analytics.

5  Q      Do you lead any groups at Stout?

6  A      Yes.  This is my group and it has five service lines.

7  Q      What is your group?

8  A      So, my group at digital and data analytics one of the

9  service lines is the blockchain and digital asset valuation.

10 Q      What is digital and data analytics practice at Stout?

11 A      Overall, it's the umbrella where my team analyzes large

12 amounts of data whether for insides for corporates or whether

13 for value digital assets.

14 Q      What is the focus of your work in particular?

15 A      My work is focused on the data analysis and also

16 providing reports for valuing cryptocurrencies and digital

17 assets.

18 Q      What are digital assets?

19 A      Digital assets are assets that you find in digital and

20 non-physical form primarily binary data or software code.

21 Q      And is cryptocurrency a type of digital asset?

22 A      Yes.  It's a special type that it resides on the

23 blockchain.

24 Q      What is an NFT?

25 A      NFT is a non-fungible token.

1   Q     Is it a type of digital asset?

2   A     It's another type of digital asset and non-fungible

3   means two of them are not the same. They are all different.

4   Q     What formal educational degrees do you hold?

5   A     I have a Bachelor of Science in physics from the

6   University of Thessaloniki in Greece, a Master of Science in

7   space physics from University of California, Los Angeles, and

8   a Master of Science in computer science from University of

9   California, Los Angeles.

10  Q     Do any of your -- does any of your -- did any of your

11  education relate to digital assets?

12  A     Yes.  Computer science is definitely related to digital

13  assets.  All the concepts around the blockchain come from

14  computer networks, databases, cryptography.  These are

15  courses that in grad school I taught as well.  So, its highly

16  related to the environment where digital assets reside.

17  Q     Have you, in your career, taken any courses in

18  valuation?

19  A     I haven't taken any formal courses in school; however,

20  I took enterprise courses.  Stout being a valuation firm,

21  when you enter the company, you do have to take certain

22  courses in valuation theory.

23  Q     Before joining Stout four years ago did you work

24  anywhere else?

25  A     I worked in the payments industry and the consulting

1  industry.

2  Q     Can you briefly describe for the Court your prior work

3  experience?

4  A     Yes. I worked in the payments industry at Vista

5  (phonetic), the biggest payments network, and in the credit

6  union space.  In both cases I delivered products and

7  prototypes around the blockchain about cross-border payments

8  or identifying customers using the blockchain. I also worked

9  in the consulting space at McKinsey & Company that I advised

10 clients on the use of blockchain especially on the Fintech or

11 the financial market.

12 Q     So, is it fair to say that some of those work

13 experiences involve digital assets?

14 A     Yes.

15 Q     Have you published any articles or given any speeches

16 on digital assets in your career?

17 A     I published three articles in the last three years in

18 Bloomberg, Bloomberg Law and Bloomberg Tax, focused on

19 valuing NFTs and cryptocurrency assets.  I also gave two

20 presentations in the last year, one last year and one this

21 year, at the Practising Law Institute: it's a non-profit for

22 legal professionals around valuation methodologies for

23 cryptocurrencies and NFTs.

24 Q     Do you have any experience in the valuation of digital

25 assets?

1  A      Yes, I do.

2  Q      Can you please describe for the Court that experience?

3  A      Yes.  I have 10 cryptocurrency projects where I value

4  digital assets. Two of them were NFTs for specific funds,

5  eight of them were valuing digital assets, six of them were

6  for IRS/tax purposes, two of them were for financial

7  purposes.  One of the valuation projects for financial

8  purposes was the Celsius bankruptcy.  So, in the Celsius

9  bankruptcy I valued over 130 cryptocurrencies, some of them

10 were liquid, some of them were semi-liquid, some of them were

11 highly liquid; so, several valuation methodologies were

12 employed by me in order to provide that valuation for

13 Celsius.

14        MR. TOROSIAN:  Your Honor, I move for the

15 qualification of Fotios Konstantinidis as an expert in the

16 valuation of digital assets and tender him for *voir dire* if

17 there is any objection.

18        THE COURT:  Any *voir dire*?

19        MR. GLUECKSTEIN:  Your Honor, I will ask questions

20 with respect to Mr. Konstantinidis's qualifications that go

21 towards the weight of the evidence. In light of Your Honor's

22 comments we are not going to -- we do have concerns about the

23 opinions he is offering, but we are not going to challenge

24 his testimony before Your Honor and allow Your Honor to make

25 the decision on weighing the testimony.

1    THE COURT:  Okay.  I will recognize him as an

2  expert in valuation of digital assets and we will determine

3  later on the weight, if any, to be given to his testimony.

4    MR. TOROSIAN:  Thank you, Your Honor.

5  BY MR. TOROSIAN:

6  Q    Mr. Konstantinidis, were you retained as an expert

7  witness in this case?

8  A    Yes.

9  Q    By whom?

10  A    By DLA Piper on behalf of the MAPS Vault entities.

11  Q    And were you retained by anyone else?

12  A    I was also retained by Reed Smith.

13  Q    Okay.  And on behalf of --

14  A    On behalf of the Serendipity Foundation entities.

15  Q    Okay.  With respect to the DLA Piper MAPS Vault

16  engagement, when were you engaged?

17  A    I believe it was the second week of January.

18  Q    With respect to that engagement, the DLA Piper MAPS

19  Vault engagement, what were you asked to do when you were

20  retained?

21  A    I was asked to value the tokens that were held by the

22  entities. I was also asked to review the opinions submitted

23  by the debtors and also submit an expert opinion.

24  Q    Approximately how many tokens of the MAPS, Oxy, and

25  Serum did you value?

1   A    For the MAPS Vault Ltd. entities it was about 4 billion

2   tokens for MAPS, I believe 3 billion tokens of Oxy, and about

3   10 million of Serum; and all of them were (indiscernible) of

4   75 percent locked, 25 percent unlocked.

5   Q    What valuation date did you use?

6   A    The valuation date was the petition date of November

7   11th, 2022 at 10 a.m. Eastern.

8   Q    And why do you use that date?

9   A    Well, that was the date that was given to me by DLA

10  Piper.

11  Q    Were all of the tokens that you valued here saleable as

12  of the petition date?

13  A    No, they were not.

14  Q    Why not?

15  A    Like I said before, a percentage of them were unlocked

16  so they weren't sellable or marketable.

17  Q    What does locked mean?

18  A    Locked in this case means that there is a legal

19  agreement which was part of the purchase agreements regarding

20  certain amounts of tokens that cannot be sold right away.

21  You have to wait for a certain period of time, what's called

22  a vesting period.

23  Q    And what is that schedule of time for the tokens that

24  were locked on the petition date to become unlocked?

25  A    For MAPS it was 5.1 years I believe, for Oxy it was

1  4.1, and for Serum it was 4.8 I think.

2  Q      What did you do to perform your valuation?

3  A      Well, I mean the first thing I did, obviously, I need

4  my valuation date which I had.  The second thing is what is

5  my holdings, which I know.  The third is I need to calculate

6  my average daily trading volume and the prices as of the

7  petition date which is my valuation date.

8  Q      And what do you do with that information?

9  A      So, that information helps you to understand which

10 valuation methodology to employ.  In this case I realized

11 that the holdings are more then the daily trading volume.  So

12 that means that the market won't be able to absorb those

13 tokens sold on the specific petition date.

14 Q      So, what did that cause you to have to do?

15 A      So, in this case, and this is where my experience from

16 the IRS projects come, valuing cryptocurrencies. In this case

17 they go to method and valuation theories blockage discount.

18 So, you realize you cannot sell everything at once.  So,

19 obviously, there is going to be a discount.  You need to

20 decrease your price in order for a willing buyer to buy your

21 assets.  The blockage discount is my established valuation

22 methodology going forward.

23 Q      What is the blockage discount method?

24 A      The blockage discount method is a method that was

25 invented in the 80's.  It was sort of an agreement between

1   the tax court and the valuation practitioners that realized

2   for large holdings it doesn't make any sense to sell

3   everything on the valuation date.  You need to follow a

4   phased liquidation approach, what we call in valuation theory

5   a dribble-out method.  So, everything is sold gradually for

6   the certain period of time and then you go back on the

7   petition date and apply the discount.

8   Q     Is the blockage method well known in the valuation

9   industry?

10  A     It's very well established.

11  Q     Is it generally accepted in the valuation community?

12  A     It's very well accepted in the valuation community.

13  Q     Ms. Cohen, could you pull-up slide 1 of our

14  demonstrative?

15        So, Mr. Konstantinidis, what did you do to perform your

16  blockage method of valuation to the MAPS Vault tokens here?

17  A     So, this graph shows, sort of, like the sequential

18  steps I followed to value the at issue tokens.  So, first,

19  like I said before, I calculated the average (indiscernible)

20  trading volume and the prices.  And how did I do that?  My

21  source was CoinMarketCap and I went 24 hours prior to the

22  petition date.

23  Q     Why did you use CoinMarketCap for that analysis?

24  A     So, CoinMarketCap is the oldest and the most well-

25  established and mature data provider in the cryptocurrency

1  space. I used it in all my prior engagements, I used it in

2  Celsius, also the creditors and the debtors used it in

3  Celsius.  So, it's a well-known data provider. Its sort of

4  like the Bloomberg for cryptocurrency data.

5  Q     You said you used 24 hours prior to the petition date

6  to calculate this average daily trading value and prices.

7  Why did you pick 24 hours?

8  A     Yes, I did.  The reason for that -- there are two

9  reasons.  One is I wanted to be as close as I can within

10 reason to the petition date. Secondly, cryptocurrencies are

11 traded globally, different time zones. It's well established

12 that the highest trading activity takes place between 9 a.m.

13 to 4 p.m. local time.  So, by having a 24-hour window I

14 ensure I take into account all the different exchanges

15 globally of MAPS, Oxy, and Serum.

16 Q     What did you do next?

17 A     So, next this is the realization that the token

18 holdings are higher then the daily trading volumes.  So, they

19 cannot be absorbed in the market in a day.  So naturally

20 there is going to be a discount.  So, my next step would be

21 finding that discount, how do I quantify that.

22 Q     And what did you do next?

23 A     So, the next is a dribble-out valuation. This is

24 exactly the method that assumes that the certain number of

25 tokens will be sold daily until after all of them or maybe a

1  percentage of them be sold.  This is the method that is

2  widely accepted by valuation professionals and also accepted

3  by the tax court.

4  Q    How did you perform that dribble-out analysis?

5  A    So the key input for the analysis is you need to assume

6  what is the percentage of tokens that can be sold daily.

7  Now, based on my professional judgment and based on a

8  reasonable assumption in the valuation community, 10 percent

9  of the daily trading volume is a reasonable amount to sell

10 without impacting price.

11      Now, we know price will be impacted.  That is why there

12 is the discount, right.  So, that doesn't mean the price

13 won't be impacted. It will be impacted and that is why I am

14 applying a discount but I do need an assumption to do the

15 phased liquidation for valuation purposes.

16 Q    What did you do next?

17 A    Well, the second point that discount comes in is there

18 is also a vesting scheduling meaning you cannot sell the

19 locked tokens right away. You do need to wait.  However, the

20 uniqueness of that vesting schedule for those locked tokens

21 is they are not locked tokens for the full five years, they

22 are getting unlocked daily.  That means they become

23 marketable, so you can sell them on the market.  So, your

24 block of a 10 percent is a mix of the unlocked tokens and

25 then the locked tokens that become unlocked that day.

1  Q     So you mentioned now twice 10 percent.  What exactly is

2  the 10 percent and how did you determine that?

3  A     So, the 10 percent is a reasonable assumption of the

4  block. You need to define your block in a dribble-out.  How

5  much are you going to sell daily.  So, based on the once used

6  by practitioners on the dribble-out methodology is a

7  reasonable assumption to say, listen, I am not going to go

8  over 10 percent for valuation purposes and I want to see how

9  long it will take in order to find my input that I will

10 quantify my discount.

11 Q     So, how did you come up with 10 percent?

12 A     So, this is coming from professional experience by

13 doing it in all of my other projects for value

14 cryptocurrencies when I employ dribble-out method.  I have

15 also seen reports from competitors that they are using a 10

16 percent assumption.  So, this is a very reasonable assumption

17 that does take place in real world blockage discount

18 methodology.

19 Q     What could possibly happen if your model assumed more

20 than 10 percent?

21 A     Well, if the model assumed 10 percent, I mean it's a

22 different assumption.  Obviously, in this case you will have

23 a lower discount, but I wanted to be conservative.

24 Q     Does selling more then 10 percent impact price?

25 A     It will impact the price because that is my assumption.

1  Everything over 10 percent will impact the price.

2  Q    Conversely, what is your assumption if you sold less

3  than 10 percent of the average daily trading value?

4  A    I mean if you sold less then 10 percent, lets say you

5  make an assumption 5 percent, its going to be a slower

6  liquidation phase.

7  Q    Would selling less then 10 percent effect price?

8  A    It wouldn't affect the price based on my assumptions.

9  Q    What did you do next?

10  A    So, next is I need to understand what is the volume

11  profile, does it increase, decrease, while that liquidation

12  process takes place.  For cryptocurrencies, especially for

13  smaller ones like MAPS and Oxy, you would expect on average

14  for the volume to grow.  I mean its not realistic to assume

15  stagnant volume.  So, for that reason I didn't want to come

16  up with any number out of thin air. I just selected 20 other

17  cryptocurrencies, I found the average growth for them, I

18  averaged it out and for every year of their existence I found

19  out what is the average growth and that is what I applied on

20  my volume, on my phase liquidation approach.

21  Q    How did you select the 20 other cryptocurrencies that

22  you said you used to determine the changes, possible future

23  changes in volume?

24  A    So, the first thing I wanted to ensure is that they are

25  existent for five years because that is my longest vesting

1  schedule for MAPS.  So, that will be there for five years.  I

2  chose to select the model Ethereum.  It's the most stable and

3  the oldest blockchain started in 2015.  So that ensures that

4  I have older cryptocurrencies.  I didn't select the

5  Stablecoins because on average, Stablecoins provide high

6  volume growth and I didn't want to bias my data.

7       Then in between I made sure that those 20 are the ones

8  that have the highest market cap. So, they are relatively

9  successful cryptocurrencies. If I had to map them to a

10  traditional market, I would say I selected them 20

11  (indiscernible) stocks and the growth and that is how I

12  applied that volume profile for MAPS, Oxy, and Serum.

13  Q    So now you have your 10 percent assumption and your

14  volume profile and how that is going to change over time.

15  What did you do next?

16  A    So next is what we actually need. One of the main input

17  parameters to calculate the discount because the discount

18  will exist, obviously, because of the volume of the holdings.

19  So, we need what is called, in the dribble-out method, the

20  average holding time of the block.  Some blocks, close to the

21  petition date, will be sold right away.  Some blocks, closer

22  to the end of the liquidation phase, will be sold after.  So,

23  what is the average holding time of a block which I need for

24  quantifying my discount.

25  Q    What do you do with that average holding time once you

1  have that determined?

2  A    Once you have it, it is the input parameter to your

3  discount formulas that will give you the actual discount.

4  Q    So, what did you do next?

5  A    So next is the step where I need to quantify the

6  discount.  Now what other input parameters for my discount

7  formulas is the average holding time of a block, it's the

8  price of the token as of the petition date, and it's a price

9  volatility. The price volatility is a market way to say how

10  prices fluctuate.  So, I also need to put the price

11  fluctuation but all discount equations and formula need the

12  annual because they see the discount as a long-term process.

13  And I also need the annualized price volatility.

14  Q    What models did you use once you had all these inputs?

15  A    I used two models; I used Chaffee and I used Finnerty.

16  Q    What are Chaffee and what is Finnerty?

17  A    So, Chaffee is the first model that came as discount

18  model traditionally. I think it came somewhere in the

19  beginning of the 90's and then Finnerty came later.  These

20  are the two most well-established and popular discount

21  models.  And they measure marketability as an umbrella,

22  marketability due to restrictions, due to control rights, due

23  to volume; all they need is those input parameters and they

24  have also been tested against real world data.

25  Q    What did you do once you had the results of those two

1  separate models?  What did you do with those figures?

2  A    I calculated the average of the two and that was my

3  actual discount.

4  Q    Why did you take an average of those two models?

5  A    Well, all of the discount models has pros and cons.

6  And you need to know them in order to apply them correctly.

7  So, the Chaffee model is one that based on comparing it with

8  real world data, actual discounts that they took place you

9  find that it always overstates discounts for high volatility

10 periods.  For Finnerty we know for a fact that it understates

11 discounts.  So, I don't want to take one or the other because

12 it will bias my data.  I don't want to understate my discount

13 and I don't want to overstate it.  So, I am taking the

14 average of the two.

15 Q    Ms. Cohen, can you turn to slide 2 of the

16 demonstrative.

17       Mr. Konstantinidis, what does slide 2 show?

18 A    So, this shows visually what I provided to the opposing

19 experts about the liquidation phase.  So, I show exactly --

20 on the actual Excel file I show exactly how many tokens are

21 sold daily.  Here, obviously, for planning reasons, I put

22 them on a monthly basis and it clearly shows how liquidation

23 takes place.

24       By the way, for all my projects for IRS this is needed

25 for audit purposes.  They do need to see that liquidation

1 phased process how many tokens are sold.

2 Q    So, is this for all four holdings of tokens for MAPS

3 Vault?

4 A    I think for purposes of that visual I chose Oxy because

5 it had the shorter period, 4.1 years vesting, so I can fit

6 inside the slide.  So, it's only for Oxy.

7 Q    Okay.  This demonstrative is only for Oxy?

8 A    Its only for Oxy.  Obviously, there is the same one for

9 MAPS and two for Serum for the 20.

10 Q    Okay.  So, you did the same thing for each --

11 A    I did the same thing for all the other tokens.

12 Q    Okay.  What does this show in terms of the locked

13 tokens and volume, and the unlocked tokens and volume?

14 A    So, it's pretty clear.  You have two reasons for lack

15 of marketability.  One of the reasons is the locking.

16 Seventy-five percent of your tokens are locked so you can't

17 sell them right away, you need to wait daily for a fixed

18 amount to get unlocked.  I think for MAPS it was 1.6 million,

19 I forget, or around that neighborhood.  The second reason for

20 the discount is the volume.  So, obviously you can't sell

21 more then 10 percent a day because you affect the price.

22       So, in the beginning, whatever that color is light

23 gray, you see that you sell many tokens.  So, in the

24 beginning you sell -- in the first couple of years you sell a

25 mix of locked and unlocked, but because your unlocked tokens

1   are 25 percent of your portfolio at some point you are done

2   selling.  So, now you sold all of your unlocked tokens.

3        So, now you have only your locked tokens and you go way

4   less, that is why you see those blue lines.  You go way less

5   than the 10 percent because now you are bound not by volume

6   anymore, you are bound by locking.  So, you wait till the end

7   of the vesting period, 4.1 years in December of '26 that you

8   know you liquidated everything.

9   Q    And that unlocking schedule, do tokens become unlocked

10  on a daily basis?

11  Q    Yes.

12  Q    And using this analysis what did this allow you to --

13  what input did this get you for your model?

14  A    So, you see that big vertical line?  At the end of the

15  day all you have to calculate is that average holding period

16  and you have to think qualitatively the blocks that will be

17  sold close to the petition date, the discount will be pretty

18  low because they are so close. The blocks will be sold at

19  close to the end your liquidation period. They have a high

20  discount because, obviously, you held them more.  So, that is

21  your average holding period of a block, but you need to put

22  it as input to your discount formula.

23  Q    Did you have an understanding of how much of the total

24  supply of MAPS, Oxy, and Serum tokens were held by the MAPS

25  Vault and Oxygen Vault, my client at the time of the

1  petition?

2  A    Yes.

3  Q    And what was that?

4  A    I believe, like I said before, the 4 billion MAPS

5  tokens the debtor holds 10 billion as a custodian, I guess,

6  so it's like 40 percent, the Oxy is 30 percent, and Serum I

7  think its less then 1 percent, maybe .4.  I forget the exact

8  percentage.

9  Q    Did your valuation analysis for MAPS Vault consider

10 other parties holdings of the rest of the supply of those

11 tokens?

12 A    No, I didn't.

13 Q    Why not?

14 A    Well, I mean its best practice in valuation methodology

15 that you give me the holdings and I value those holdings. I

16 don't take into account other investors. I don't take into

17 account the total supply.  I just value those holdings.

18 Q    So, with all of these inputs did you form an opinion on

19 how much of the value of MAPS Vaults holdings of MAPS, Oxy,

20 and Serum tokens should be discounted?

21 A    Yes.

22 Q    With those discounts in mind, did you form an opinion

23 of what the value of the MAPS Vault at issue tokens would be?

24 A    Yes.

25 Q    Did you prepare a report detailing those opinions?

1    A      Yes, I did.

2    Q      Okay.  If I could direct your attention to FTX Exhibit

3    4.  It should be the binder right in front of you.  Is that

4    the FTX exhibits?

5    A      Debtors' exhibit binder?

6    Q      Yeah, that's debtors exhibits.  That's the one.

7    A      Oh, that's the one.  Okay.

8    Q      Exhibit 4.

9           And, Your Honor, just for clarity in the record FTX

10   Exhibit 4 is also the same as MAPS Exhibit 1, but we will use

11   the debtors' exhibit just to reduce paper.

12              THE COURT:  Okay.  Thank you.

13   BY MR. TOROSIAN:

14   Q      Can you tell me what that is?

15   A      Yes.  That is the report I submitted on behalf of the

16   MAPS Vault entities.

17   Q      Who prepared that report?

18   A      I did.

19   Q      Did you sign it?

20   A      Yes.

21   Q      When?

22   A      January 26th, 2024.

23   Q      Are the statements and opinions detailed in this report

24   the same as when you issued it?

25   A      Yes.

1    MR. TOROSIAN:  Your Honor, I would move for the

2  admission of FTX-4 which is also the same as MAPS Exhibit 1

3  into evidence.

4          THE COURT:  Any objection?

5          MR. GLUECKSTEIN:  No objection.

6          THE COURT:  Its admitted without objection.

7       (FTX-4 received into evidence)

8          MR. TOROSIAN:  Thank you.

9  BY MR. TOROSIAN:

10 Q    Mr. Konstantinidis, directing your attention to pages

11 22 through 24 of your report, Exhibit 4 --

12 A    Yes.

13 Q    -- what is listed there starting in Paragraph 48?

14 A    So, Paragraph 48 has the results of the analysis as the

15 holdings of the MAPS Vault Ltd. and the Oxy Vault Ltd.

16 entities.

17 Q    I am directing your attention to Paragraph 49 on page

18 23 of your report.            What is your opinion regarding

19 the precise discounts applied to each of the At-Issue Tokens?

20 A    So paragraph 49 shows the discounts for the holdings,

21 so for March, the discount was 45.41 percent, going to second

22 decimal.  Serum was 45.99 percent.  And the Oxygen Vault

23 Ltd., the holdings was for Oxy, 36.86 percent, and for Serum,

24 45.94 percent.

25 Q    Now, are the two Serum discounts listed at paragraph 49

1  of your report identical?

2  A    They're slightly different on the second decimal.

3  Q    And why's that?

4  A    Because the two entities hold different amounts of

5  Serum and also different makes of locked and unlocked tokens.

6  Q    Referring to paragraph 50 on page 23 of your report,

7  what is your opinion -- well, what is listed there?

8  A    So, this is are where I dollarize the amount.  So,

9  obviously, after you have the discounts, what you do is you

10  calculate the number of tokens liquidated by the spot price

11  as of the petition date, multiply it by one, minus the

12  discount, which was the amount that you left after the

13  discount is out.

14  Q    And what is your opinion, as listed in paragraph 50 of

15  the value of all the At-Issue Tokens for Maps Vault Ltd., the

16  dollarized amount for Maps is $229,309,262.  For Serum, the

17  dollarized amount, the value is $653,435.  For Oxy, the value

18  is $60,212,010.  And for Serum, the value is $1,608,463?

19  How did you run those calculations?

20  A    So the calculations, after you have the amount of

21  tokens liquidated are fairly straightforward.  You just

22  multiply these are the numbers of tokens that were

23  liquidated, multiply by the spot price, and then one, minus

24  the discount.  One minus the discount, because the amount

25  that's discounted is taken out and then you do need to do the

1  one minus that.

2  Q    Okay.

3        MR. TOROSIAN:  Ms. Callahan, could you turn to

4  slide 3, please.

5  BY MR. TOROSIAN:

6  Q    Mr. Konstantinidis, what is slide 3 of the

7  demonstrative showing?

8  A    So this is a view where I put together in two columns,

9  all the input variables, try to, you know, simplify the

10  process in one slide.  I pretty much went through most of it.

11  I think you can see that CoinMarketCap data was the data

12  source for the both prices in volume and then best practices

13  indicate that they should have the same window.  That's why

14  you see the same window being 24 hours.

15      The entities that held the tokens was Maps Vault.  The

16  liquidation amount, again, the amount of tokens you can sell

17  daily without impacting price is 10 percent.

18      You do see the volume profile for the four years after

19  the petition date that I used.  You do see year one, an 857

20  percent increase; year two, 21 percent; year three, 4 and a

21  half percent; and year four, 7 percent.

22      You can see the average holding time of a block for the

23  three tokens and Maps is the highest ones.  The discount

24  models are Chaffee (phonetic) and Finity (phonetic) and you

25  will see the actual discount for the three tokens.

1      And lastly, the value of the holdings that I think I

2  just read to you before.

3  Q      You said you were engaged by the foundations, which

4  we're calling the "Oxy Objectors" today.

5      Does your report that we've just admitted into

6  evidence, FTX Exhibit 4, include your opinions for those

7  other clients?

8  A      No, it doesn't.

9  Q      And for your report, which is FTX Exhibit 4, did you

10 consider any of the holdings of any other client?

11 A      No, I did not.

12 Q      Okay.  And, again, why not?

13 A      Well, again, the task at hand is to value those

14 holdings and that's what I do, normally, in all of my

15 valuation projects.  I don't go and try to understand other

16 investors and what they hold.  I just value the At-Issue

17 Tokens.

18 Q      In your professional opinion, would it be appropriate

19 to consider other holdings when you're valuing the holdings

20 in front of you?

21 A      I mean, it's not appropriate, because this is best

22 practices and you do the same on the foundation if it's at a

23 discount cash flow.  They give your company the value.  I'm

24 not taking into account other companies of the same space

25 that they sell the same product; you just value those exact

1   holdings.

2   Q    In your professional opinion, would it be appropriate

3   to consider any tokens that are owned -- not held -- owned by

4   the debtors in performing your valuation of the holdings

5   owned by Maps Vault?

6   A    No, I don't think so.

7   Q    And why not?

8   A    They -- my task as a valuation expert is to value the

9   holdings.  They're not correlated with holdings that other

10  investors may hold, may possess.

11  Q    Now, you mentioned your engagement also included a

12  review and analysis of Mr. Lu's and Professor Howell's

13  reports and opinions; is that right?

14  A    Yes.

15  Q    Okay.  Regarding Mr. Lu, did you agree with Mr. Lu's

16  opinions and methodologies?

17  A    No.

18        MR. TOROSIAN:  Ms. Callahan, could you turn to the

19  next slide, please.  This is Slide 4.

20  BY MR. TOROSIAN:

21  Q    What is your opinion of what Mr. Lu did wrong?

22  A    I think here I summarized my three criticisms regarding

23  Mr. Lu's expert report, the first one being the short window,

24  used to calculate prices; the second being certain reliable

25  crypto exchanges were excluded; and third, the use of the

1  (indiscernible).

2  Q     Okay.  Regarding the time period, which is listed as

3  number one on this demonstrative, what time period did Mr. Lu

4  use to collect the price data?

5  A     So Mr. Lu used the one hour prior to the petition date.

6  Q     And please remind the Court which interval you used?

7  A     I used the 24-hour interval.

8  Q     And why do you think that 24 hours is the right

9  interval and 60 minutes is the wrong interval?

10 A     Because you want to take into account all the exchanges

11 where this cryptocurrency is traded and some of them will

12 be -- will have very low volume -- will be closed if you take

13 just the one-hour interval.  By doing the 24-hour, you take

14 into account, globally, all the trade exchanges.

15 Q     Did you test other intervals, other than the 24-hour

16 interval that you used?

17 A     I did test the one-hour, Mr. Lu's interval.

18 Q     And what did you find when you did that?

19 A     Well, I found that the valuation goes lower of the

20 holdings.

21 Q     And the second point here, regarding Mr. Lu's

22 collection of the pricing data, why, in your professional

23 opinion, do you believe that was done improperly?

24 A     Because based on his methodology, when you exclude

25 reliable exchanges, the price will change.

1       So, I know for a fact a reliable exchange such as LBank

2 was excluded.

3 Q     Do you believe LBank should have been included in the

4 exchanges that Mr. Lu considered?

5 A     Yes, and LBank is one of the reliable exchanges for

6 Maps.

7 Q     Why do you think LBank should have been included?

8 A     Well, for two reasons.  Both Coin Metrics has the

9 number 30 and Number 29 has another one, B-Books that

10 Professor Howell did use for volume calculation.  And there's

11 no difference between in the attributes for ranking between

12 the two crypto exchanges, especially on the data quality.

13      There's also one minor grade change when B-Books has, I

14 believe, C-minus for API quality and the grade for LBank is

15 D; that's the only difference.

16      And in Coin Metrics, it's far higher than at least

17 three of the cryptocurrency exchanges that were used for

18 Serum.  I believe it's Number 21 or Number 23 in the Coin

19 Metrics -- sorry -- CoinMarketCap rankings.

20 Q     And how does Mr. Lu's method of collecting the purchase

21 price data affect the overall valuation?

22 A     If you don't -- if you exclude crypto exchanges, then

23 you get different price, and in most of the cases, Mr. Lu was

24 getting lower prices.

25 Q     Regarding the third point here, your criticism of

1  Mr. Lu's use of the confidence interval, what is a confidence

2  interval?

3  A     Confidence interval, if I can say it in plain English,

4  is the margin of error.  In surveys, in polls, you take a

5  poll, you go to 100 people and you say, How many apples do

6  you eat in a day?  And they're saying two.

7        Obviously, when you're trying to extrapolate from the

8  hundred people to a million people, there's going to be a

9  margin of error.  And then you say two apples, plus or minus

10 half an apple; that's a confidence interval.

11 Q     What, in your professional opinion, did Mr. Lu do wrong

12 in his calculation and application of the confidence

13 interval?

14 A     There's no sample.  If there's no sample, there's no

15 confidence interval.  He just calculates prices.

16 Q     Did you calculate a confidence interval?

17 A     No, you can't; there's no sampling.

18 Q     Thank you.

19       Regarding Professor Howell's opinions, do you agree

20 with her opinions and methodologies?

21 A     No, I don't.

22            MR. TOROSIAN:  Okay.  Ms. Callahan, can you turn

23 to the next slide, Slide 5 of the demonstrative.

24 BY MR. TOROSIAN:

25 Q     What is your opinion of what Professor Howell did

1  wrong?

2  A    I think I have here the six major criticisms I put in

3  my expert report.  The first one is regarding the estimation

4  period, the time interval that's 10 days and a year prior to

5  the petition date to calculate daily trading volume.  The

6  second one is the calculating deflated volume, lower than

7  actual volume, by not including reliable cryptocurrency

8  exchanges.  The third one is the nature of the method being

9  used that sells everything in a day and kills the market.

10  The fourth one is byproduct of the same method that discounts

11  go significantly higher than 100 percent.  The fifth one is

12  you penalize your lock token twice, so you have two

13  discounts, instead of one.  And the last one being using your

14  data holdings to value your tokens, instead of the actual

15  claimant's holdings.

16  Q    Regarding the first point, that Professor Howell picked

17  to analyze trading volume, wrong period, why in your

18  professional opinion, do you believe that was done

19  improperly?

20  A    Well, your petition date is November 11, 2022.  It's

21  not November 2nd, 2022.  It's another day.  So you cannot

22  exclude your actual petition date.  I mean, (indiscernible)

23  did the exact same thing and, in general, I go 24 hours

24  closing to my valuation date, which is, in this case, my

25  petition date.

1   Q      And what period did Professor Howell use?

2   A      She used the November 22nd, 2021, to November 1st,

3   2022, period, starting on November 2nd, 2022, due to a

4   CoinDesk article that the assumptions may have affected the

5   price or the volume.

6   Q      So she excluded the 10 days leading up to the petition?

7   A      Correct.

8   Q      So that's one reason you think her use of that interval

9   for volume data was incorrect?

10  A      Yeah, when I saw the volume data for Maps and Oxy, I

11  didn't see any unusual volume activity or any trend

12  underneath for that period of time, except from a spike, I

13  think, on November 10, early November 10.  But there was

14  nothing that would show me that the volume or the price was

15  affected by the article.

16       On top of it, the other problem with that choice is you

17  get the best of both worlds.  You go way back from your

18  petition date, so volume is low, and then price, you go close

19  to the petition date, so price is low.  So now, both volume

20  and price is low, which, in normal trading circumstances, is

21  an impossible situation.  When volume goes up, price will go

22  down and vice-versa.

23  Q      So, the price that Professor Howell used for

24  calculations was determined by Mr. Lu, right?

25  A      Yes.

1  Q     And what period did Mr. Lu use for replies?

2  A     So Mr. Lu is using the one hour prior to the petition

3  date.

4  Q     Not the same period used by Professor Howell?

5  A     Not the same period.

6  Q     And was it appropriate for Professor Howell to consider

7  the time interval for her volume calculations, including over

8  a year before the petition date?

9  A     Well, then the data becomes stale.  I mean, you

10 don't -- you go a year back, you don't know the causal

11 relationships and what caused the low or high volume during

12 that period and you're basically having a different valuation

13 date when you do that.

14 Q     So is that inappropriate or appropriate to go back that

15 far?

16 A     It's inappropriate.

17 Q     Okay.  And how did Professor Howell's picking of this

18 period, which was different than Mr. Lu's pricing period,

19 affect the overall valuation?

20 A     The discount gets much higher, because the average

21 daily trading volume is much lower than what it should have

22 been.

23        MR. TOROSIAN:  If we could turn -- we'll come back

24 to Slide 5, but if we can turn to Slide 6 of the

25 demonstrative.

1  BY MR. TOROSIAN:

2  Q     What does Slide 6 show?

3  A     So that shows the volumes that I chose.  I selected in

4  blue in the circles from Maps Vault and Serum, which are the

5  volumes from CoinMarketCap as of the 24 hours before the

6  petition date.  In the light color, you can see the volumes

7  as calculated based on the interested party estimation period

8  that Professor Howell is using.

9  Q     What do you conclude by looking at this Slide 6?

10 A     Well, I believe one of the criticisms is I'm using

11 inflated volumes being done closer to the petition date and

12 that clearly shows that for Maps, I am only about 200,000

13 tokens more.  On Oxy I'm actually 700,000 tokens less.  So I

14 didn't do anything deliberately and I certainly didn't take

15 inflated volume.  I took volume as of the petition date.

16 Q     Going back to Slide 5 on reason two of your criticisms

17 of Professor Howell's report and the exchanges that she

18 picked to analyze trading, why in your professional opinion

19 do you believe that was not improperly?

20 A     Well, because certain reliable exchanges were not taken

21 into account.  So, for example, for Maps, LBank is a fourth

22 cryptocurrency exchange that should have been taken.

23 Professor Howell took Gate.io, FTX, and I believe the third

24 one was MEXC, but not LBank.  So the volume that she

25 calculates is lower than it should have been.

1  Q     So Mr. Lu excluded LBank for prices and Professor

2  Howell excluded LBank for volume?

3  A     Correct.

4  Q     Okay.  And how did Professor Howell's exclusion of

5  LBank for volume affect your overall valuation?

6  A     Well, the discount becomes much higher, because if you

7  include LBank and run the calculations that are in my report,

8  the volume for Maps for 510,000, half a million, goes up to

9  1.7.  So it more than triples if you take that cryptocurrency

10 exchange into account.

11 Q     On your reason three of Slide 5, how does Professor

12 Howell's assumption that all tokens are -- the entire supply

13 of tokens are released on the market on the valuation date

14 affect your overall valuation?

15 A     I mean, in any case, it would kill the market.  If you

16 sell a large amount of holdings, whether they're shares of

17 cryptocurrency tokens in a day, they're going to be

18 worthless.  That's why the (indiscernible) discount came from

19 the Tax Court for cases like that.  When people would say my

20 holdings are worth zero because everything is sold on the

21 valuation date, the Tax Court came back on the

22 (indiscernible) and said, you know, hold on, that doesn't

23 make any sense.  That's how the dribble-out methodology came

24 into play.

25 Q     Why, in your professional opinion, do you believe it's

1  wrong to consider all of the holdings being released in one

2  day?

3  A     I mean, you don't have to be a valuation expert to

4  understand that if you sell a large quarter of shares or

5  securities in a day, you would either kill the market or you

6  will get a much higher discount than what you should have.

7  Q     On reason four listed on Slide 5, what exactly -- what

8  was the model used by Professor Howell for her discount?

9  A     Professor Howell used the (indiscernible) KO model.

10 Q     And what's wrong with the use of -- well, strike that.

11       What is the KO model?

12 A     So the KO model is a model that tries in understand

13 illiquidity in the market and it comes up with a transaction

14 cost formula.  So it clearly says that we calculate

15 transaction costs.  The word discount or valuation is nowhere

16 to be found in that paper.  So they clearly understand the

17 illiquidity of markets, transaction costs.

18       And as a use case for them, in 2023, they're using the

19 same formula to understand market crashes, not to value

20 assets.

21 Q     What's wrong with Professor Howell's use of the KO

22 model?

23 A     This model is not used for what it's supposed to be

24 used.  Again, that model tries to understand when I sell a

25 large number of shares on a day, what happens to the market?

1       What are the transaction costs which is broken down

2   into bid-ask spread and the price impact.  That's what it

3   does.

4       That's why the use case is, okay, let's try to

5   understand and predict market crashes.  That model should not

6   be used for valuing assets and calculating discounts.

7   Q    Have you ever used the KO model for any of your other

8   valuations of cryptocurrency?

9   A    No.

10  Q    Have you ever heard of anyone using the KO model to

11  value cryptocurrency?

12  A    No.

13  Q    You mentioned transaction costs a couple of times.

14      What is a transaction cost?

15  A    So in finance theory, there are two different kinds of

16  costs you incur when you sell an asset.  There are the direct

17  costs, what you pay for broker fees, legal fees, marketing

18  fees to sell your assets, and there are indirect costs, after

19  your sale, how the market absorbs it.  And the transaction

20  costs for KO, other researchers do it differently.  They

21  break it down into the bid-ask spread and the market -- the

22  price impact.

23      Now, for Maps and Oxy, the price impact is the value of

24  the transaction cost; it's 99.9 percent of it.  The bid-ask

25  spread is very slow.  So you can use, for those practices,

1 interchangeably, price impact and transaction costs for Maps

2 and Oxy.

3          MR. TOROSIAN:  Ms. Callahan, can you turn to

4 Slide 7 of the demonstrative.

5 BY MR. TOROSIAN:

6 Q     Mr. Konstantinidis, what does Slide 7 show?

7 A     I think this breaks down in a little bit more detail

8 what the KO model does and what my criticisms lie, with

9 respect to not being a valuation model.

10 Q     Can you take the Court through the next slide?

11 A     Of course, yes.

12          So I think at the top, you see sort of like a high-

13 level view of the equation that the KO model, I believe it's

14 equation number 38 on the paper, close to the end of it, and

15 that's what's being used by Professor Howell.  So you see

16 there is a component with a bid-ask spread, the difference

17 between, obviously, what is seller is asking and what a buyer

18 is bidding.  And there's one coefficient you can call it

19 multiplier that is used in this case and there's a second

20 component where the price impact comes into play.

21          Price impact means I sell everything in a day, let's

22 see how the market reacts.  And there's a second coefficient

23 multiplier.

24          Now, let's start from the beginning.  The author says

25 these are transaction costs.  To transaction costs are market

1  specific.  Transaction costs describe a market.  They don't

2  describe an asset.

3       Valuational discount is asset-specific.  And what that

4  means is plain English, transaction costs will be different

5  in New York in the New York Stock Exchange, will be different

6  in NASDAQ, will be different in cryptocurrency exchanges like

7  Coinbase, Kraken, Binance.  Every market will have its own

8  transaction costs.

9       Valuation is asset-specific.  I sell Maps on Gate.io.

10  I'll get the same discount if I sell it to Kraken or Coinbase

11  exchanges.  So that's a major different.  And that makes us

12  understand why there are two pairs of coefficients or

13  multipliers in the equation.

14       The researcher Professor Howell and Professor

15  (indiscernible) might have one pair of coefficients for the

16  New York Stock Exchange and one pair of coefficients for

17  NASDAQ.  Why?  You never have that for discounts.  Discounts

18  are coefficient independent, because the transaction costs

19  are different for different markets and Professor Howell

20  takes the average of the two.  So she calculates the KO value

21  for NASDAQ.  She calculates the KO value for NYEC and then

22  she takes the average of the two.

23       Now, for Serum, the additional problem, without going

24  into a lot of detail, are the constituent markets, which

25  Mr. Lu talked about.  So in every cryptocurrency exchange,

1  every cryptocurrency trades in other cryptocurrencies.  It's

2  like fee occurrences.  For example, you can sell dollars into

3  Swiss francs or euros.  By the same exactly, you can sell

4  Maps into Ether, one cryptocurrency, or you can sell Maps

5  into Tether, USDT, a stablecoin.

6        So there are two constituent markets for Maps for a

7  cryptocurrency exchange.  Every constituent market as a

8  different bid-ask spread and a different price impact, just

9  like when you sell dollars to Swiss francs or euros, will

10  have two different pairs of price impact and bid-ask spread.

11        So for Serum, that has 18 cryptocurrency exchange

12  markets and in every market, Serum trades with three other

13  cryptocurrencies.  You will need to calculate 54 sets of

14  coefficients.  So the model is not even applied correctly.

15  Every cryptocurrency might be able to have its own

16  coefficients to calculate transaction costs.

17        Thirdly, like I said before, when I ran the

18  calculation, price impact is 99.9 percent of the transaction

19  costs for Maps and Oxy, so it still adds this component.  And

20  this is what comes into play that everything is sold in a

21  day, what does a month tell us about it?

22        Well, in the formula, unlike all the discount formulas,

23  including Chaffee (phonetic), Finity (phonetic),

24  (indiscernible), Longstaff (phonetic), the fixed model, all

25  the discount models, they use annual volatility.  So they try

1  to understand price fluctuation for the long term, annually,

2  because of the discount.

3       KO model doesn't accept annual.  It accepts daily.

4  Why?  Because it's trying to understand the price fluctuation

5  for the day that you sell those assets.  That's why it kills

6  the market.  So the math tells us that.  It's not my opinion.

7  You use the daily volatility.

8       As an example, number-wise, is the annual volatility

9  for Maps is 120 percent.  The daily volatility is .05

10  percent.  The .05 percent is the number that goes into KO,

11  not the 120 percent.  The 120 percent goes into all the

12  discount models that I know of and they exist.

13       Point Number 5, it cannot be over -- discounts

14  valuation theory does not contradict common sense.  Discounts

15  cannot be over 100 percent.  They can also be negative --

16  they cannot be negative.  So for the reason that KO values

17  are over 100 percent, it's obvious it's not a discount, so

18  you cannot call it a discount.

19       The other point is, in the past, there have been

20  precedents that researchers like Longstaff, Abrams, they came

21  up with transaction costs.  Other practitioners saw that and

22  they either abandoned their models or they fixed them.

23  Nobody used them as discount models.

24       Now, in finance theory, there may be a breach or there

25  may be not, depending on the market between transaction costs

1  and discounts.  They may be correlated or they may be not,

2  but it's open research.  That's not something set that you

3  can find the recipe between the two.  As long as I have

4  transaction costs, I can multiply by two and find the square

5  root and, boom, that's my discount.  That's not as easy.

6  People spend a lot of time and research on that.

7        And the last one is the KO model.  I've checked all the

8  valuation resources.  You have (indiscernible) reports in the

9  past.  I've never seen it.  It's never used by the valuation

10 community to value assets, so I'm not aware of it.

11 Q    How did Professor Howell's use of the KO model affect

12 her overall valuation?

13 A    Well, I mean, the KO model gives values 500 percent,

14 450 percent for Maps, 300 percent for Oxy, so it's way over

15 100 percent and, obviously, that makes the holdings

16 worthless.

17 Q    You heard -- you were sitting in the courtroom, you

18 heard on direct Professor Howell said she considered other

19 models, several other models, as well?

20 A    Correct.

21 Q    Did you analyze Professor Howell's consideration of

22 those other models?

23 A    Yes, I did.

24        MR. TOROSIAN:  If you could, Ms. Callahan, turn to

25 Slide 8.

1  BY MR. TOROSIAN:

2  Q     What does this slide show?

3  A     This shows the alternative models that Professor Howell

4  has used.  There, the transaction costs, I believe most of

5  them talk about price impact, but like I said for Maps and

6  Oxy, they're interchangeably used because most of the value

7  from the transaction costs comes from the price impact.

8  Q     So these percentages that are listed here, what are

9  these percentages?

10 A     These percentages is the price impact of selling 10

11 billion tokens on the petition date.  And, I mean, I agree

12 with Professor Howell, it makes sense that it goes over 100

13 percent.  It's the price impact.  So, yeah, obviously, if I

14 sell 10 billion tokens on November 11, 2022, yeah, the price

15 impact will be 72,819 percent or 38,000 percent or 11,000

16 percent.  These are the transaction costs.

17       Obviously, qualitatively, those tell me that that one

18 sale doesn't make any sense to take place because the

19 transaction costs are significantly higher than the value of

20 my assets.

21 Q     Do you form any conclusions when you see figures such

22 as this, like the Maps, KO linear model returning a discount

23 of 27,886 percent?

24 A     I mean, the first thing that comes to mind, obviously,

25 these are not discounts.  But I want to understand what they

1  are; that's the second step in my thinking.

2  Q     Are they valuation models?

3  A     No.

4  Q     What did you use instead of the KO model?

5  A     I used the two most well-established and popular

6  discount models, Chaffee and Finity.

7  Q     And what did you do with the results, again?

8  A     Again, I calculated the average, knowing that one of

9  them overstates discount and the other understates discount.

10            MR. TOROSIAN:  I'd like to go back to Slide 5,

11  briefly, Ms. Callahan.

12  BY MR. TOROSIAN:

13  Q     And, again, this is the slide with your criticisms of

14  Professor Howell's opinions.  Number 5 on this list, what are

15  the two discounts that you believe Professor Howell applied

16  together?

17  A     She's applying -- so Professor Howell is applying the

18  KO model and she's also applying the discount for lack of

19  marketability based on numerical simulations.

20  Q     What is what she calls an "asset liquidation discount"?

21  A     That's not a term that exists in valuation theory.

22  Q     Have you ever heard it before?

23  A     No.

24  Q     You ever heard of any valuation professional using that

25  term before?

1    A       No.

2    Q       Do you believe that's a term that's widely recognized

3    in the valuation community?

4    A       No, I don't know what it means, exactly.

5            Valuation theory, the big umbrella is the marketability

6    and we're going to be using it loosely here, but it has a

7    straight definition in the international glossary of business

8    valuation terms that all the bodies of appraisals and

9    business valuation experts are using.  And marketability

10   means the conversion of property into cash quickly at a

11   minimal cost.  That's what it means.  So it's a big umbrella.

12           You can have marketability due to volume, which is lack

13   of liquidity; due to restrictions, like shares are not

14   registered with the SEC, so they're liquid unregistered

15   shares.  You can have due to control rights.  You can have

16   different ways, but marketability is a big umbrella.

17           So all these models, they calculate lack of

18   marketability, which can be due to many reasons.

19   Q       And what happens when you apply both of those

20   discounts, the DLAM and the ALD, we'll call it?

21   A       I mean, you penalize, especially, the locked tokens

22   twice.  So, you have them one for liquidating them and then

23   one for getting unlocked; although, they do get unlocked and

24   they become marketable daily.

25   Q       And how does Professor Howell's use of both of those

1  discounts affect her overall valuation?

2  A    I mean, obviously, using the KO for Maps and Oxy,

3  you're at 400 percent already, so it doesn't make a

4  difference.  But for Serum, you multiply the 58 percent by

5  whatever the DLAM is and then it lowers the valuation.

6  Q    On the same slide, reason six, regarding Professor

7  Howell's assumption that her discount analysis needed to

8  consider the liquidation of not just the Maps Vault holdings,

9  but all the debtors' -- debtor-owned tokens, as well, why is

10 that wrong again?

11 A    Well, the task at hand is to value the tokens that are

12 held by the Maps entities.  It doesn't make any sense to

13 liquidate the total supply of those tokens.  It's not best

14 practice from a valuation standpoint.

15         MR. TOROSIAN:  Ms. Callahan, can you turn to

16 Slide 9, please.

17 BY MR. TOROSIAN:

18 Q    Mr. Konstantinidis, what does Slide 9 show?

19 A    This shows different scenarios based on the blockage

20 discount model that I used.  The left-most column is exactly

21 what's laid out in my report.  The scenario starting at

22 column -- at the second column, all the way to the last one,

23 there are different scenarios based on the criticism or, in

24 some cases, based on my deposition.

25 Q    So, looking --

1        MR. GLUECKSTEIN:  And, Your Honor, I'm sorry, I'm

2   going to object to this, the testimony on alternative

3   scenarios one, two, three.  The first we ever saw of it was

4   in this slide, which was given to us last night.  It does not

5   appear anywhere in Mr. Konstantinidis' report.

6        MR. TOROSIAN:  Your Honor, he asked questions

7   about this alternate analysis based on -- at the

8   deposition -- based on his review of the rebuttal reports of

9   the other experts.  For instance, in alternate scenario two,

10  150 percent, which is the only item in that scenario that

11  changed versus scenario one, which is his report.  So

12  scenario one is his report.  That's unassailable.  Scenario

13  two shows 150 percent.

14       Mr. Glueckstein asked specifically about that in

15  his deposition and what would the analysis -- how would the

16  analysis change during that deposition.

17       The other two scenarios, alternate scenario one

18  and three, again, scenario one is exactly as his report,

19  except for using Mr. Lu's prices, and scenario three is

20  exactly as his report, except you throw the numbers into the

21  KO model.

22       THE COURT:  Mr. Glueckstein?

23       MR. GLUECKSTEIN:  Your Honor, surely questions

24  were asked about, in the context of 150 percent.  You can ask

25  him again, but these scenarios, in particular, are new

1  calculations with new valuations that he's presenting and,

2  frankly, alternative scenario three, the only explanation we

3  have for what it is, is counsel's representation right now.

4         So we don't see -- this appears to us to be

5  offering new opinions with new alternatives that are

6  different from what he is offering the Court.

7         THE COURT:  All right.  Well, it's hard for me to

8  make that determination sitting here without reviewing the

9  deposition transcripts and the reports, so I'm going to allow

10 it, but during the break, Mr. Glueckstein, you can certainly

11 confer with Professor Howell to come up with any cross-

12 examine you might want to do with the witness.

13        Are there any additional documents that relate to

14 these that were not previously produced?

15        MR. TOROSIAN:  No, Your Honor.

16        THE COURT:  Okay.  So, we'll handle it that way

17 and then, as I said, after the hearing, I'll have to review

18 the transcript of the deposition and see whether or not it's

19 something that should have been admitted at all and I'll make

20 that determination then.

21        MR. TOROSIAN:  Thank you, Your Honor.

22 BY MR. TOROSIAN:

23 Q    So, Mr. Konstantinidis, looking at this exhibit, what

24 does the blue, the lighter blue mean?

25 A    So, the lighter blue means the input I used on my

1  report.

2  Q    Okay.  And so for your stout -- for the first column,

3  stout valuation, what is that column showing?

4  A    So the first one shows exactly the input variables and

5  the results that I acquired and I submitted in my expert

6  report.

7  Q    Okay.  And that column is consistent entirely with your

8  opinions that we went through already that has a total value

9  of $291.8 million?

10  A    Yes.

11  Q    And those are all the inputs you used, as we've already

12  talked about?

13  A    Correct.

14  Q    Okay.  And I want to just key in the volume profile

15  line there that has four figures in that volume profile.

16      What do those represent?

17  A    So, these represent the average volume growth from the

18  20 cryptocurrencies and how that growth evolved year over

19  year under year one of existence, year two, year three, and

20  year four of existence.  And that's what I used for my face-

21  liquidation process for the blockage discount.

22         MR. TOROSIAN:  And Ms. Callahan, can you turn back

23  to Slide 3, and we'll come back to this slide.

24  BY MR. TOROSIAN:

25  Q    Slide 3, this is the summary of your analysis that we

1  already talked about, but are the same figures listed in the

2  volume profile here as they are in the same column for your

3  report in Slide 9?

4  A    Yes, these are the same numbers.

5  Q    Going back to Slide 9, what is the next column show,

6  which is alternate scenario one?

7  A    So the alternate scenario one uses everything that I

8  use in my report, with the difference of replacing the prices

9  I calculated with Mr. Lu's prices.

10 Q    Okay.  And as we established before, you don't think

11 Mr. Lu's prices are right?

12 A    Correct.

13 Q    So this isn't your opinion that you're promoting for

14 the Court to accept as far as the valuation?

15 A    No, it wasn't part of my opinion.

16 Q    And what was the value of the holdings, if you just

17 make that one change and consider Mr. Lu's prices, what are

18 the value of the holdings that you were valuing for the

19 purposes of my clients?

20 A    So the holdings go lower, especially for Maps and

21 Serum.  Mr. Lu's prices are maybe 10 to 15 percent lower from

22 my prices.  That's why you see the total value going down to

23 275 million, rounding them, rounding the amount.

24 Q    Okay.  And what is shown in alternate scenario two?

25 A    So alternate scenario two is something that I was asked

1    in my deposition about the median, instead of the average.

2    And the difference between the three statistics is the

3    average is a representative number of the 20

4    cryptocurrencies.  The median will exclude some values that

5    they may be outliers that may be considered to be extreme.

6         So in this case, I was asked and I think my guess

7    was 150.  The actual number is 165 percent, but I still went

8    with what I said in my deposition of 150 percent volume

9    growth on year one.

10   Q    All right.  So let's understand that a little bit.

11        So in alternate scenario two, the only thing that's

12   changed is year one of the volume profile is 150 percent

13   there versus the first column, which is year one, is 857

14   percent?

15   A    Correct.

16   Q    Okay.  And just remind the Court how you calculated the

17   857 percent?

18   A    Yeah, so the 857 percent, let's pick one cryptocurrency

19   that started, let's say, in 2016.  You find its volume.  You

20   find what was the volume in 2017 and then you calculate the

21   volume growth and you do that for 20 cryptocurrencies.  You

22   align them to make sure they all have a year one, year two,

23   year three, year four, and you find the average growth per

24   year.  And that's what you apply in the liquidation phase.

25   Q    Okay.  And did you take those same figures before doing

1  the median or mean average or median --

2  A     Yeah, everything else remained the same, per the

3  question in my deposition for year one, because I think my

4  understanding is that there's a perception that it's a high

5  growth, although, there have been 20 other tokens in the same

6  period that they went way over that.  But I still went

7  with 150 percent and as you can see --

8  Q     Well, let me ask you another question.

9        So you mentioned 165 percent.  What was 165 percent?

10  A    That's the actual median, when --

11  Q    Of what?

12  A    Of the 20 cryptocurrencies, the volume growth for year

13  one.

14  Q    Okay.  And I think you said that you believed you

15  thought that figure, you were estimating at your deposition,

16  was 157 -- 150 percent?

17  A    Well, I prefer to be conservative and be more favorable

18  on the other side, rather than favor my side, so I gave a

19  lower number, which obviously provides a lower valuation.

20  Q    Okay.  And what is the valuation in alternate scenario

21  two?

22  A    So that valuation was 250.6 million.

23  Q    Okay.  And what is alternate scenario three showing?

24  A    So three shows -- follows the exact methodology that

25  Professor Howell is following, and instead of using the

1  debtor holdings, I'm using the Maps Vault entity holdings.

2  Q    Okay.  So the blue in scenario three is all the inputs

3  are based on your opinions, but you're using the KO model to

4  actually run the discount?

5  A    Yeah, I using both discounts; I'm using the KO model

6  and I'm using, also, the Monte Carlo simulations.

7  Q    And that's what Professor Howell did?

8  A    Yes.

9  Q    Okay.  And what conclusions do you draw from looking at

10  your alternate scenario three?

11  A    So as you can see, Maps is at 149 percent, so all the

12  Maps tokens are worthless.  KO in this case, goes lower than

13  100 percent, at 93 percent, so the Oxy tokens do have some

14  value in this scenario and the total is 7 and a half million.

15  Serum has some value, as well.

16  Q    What conclusions do you draw regarding the KO model

17  when you look at alternate scenario three?

18  A    Well, based on my professional judgment, it just shows

19  how inappropriate the KO model is in this case.  You see how

20  worthless the Maps tokens become, whether in my approach, you

21  think everything is gradual.  You know how much you sell.

22       Everything is transparent.  You know how much -- how

23  many tokens you can sell a day without impacting price.  I

24  showed you the liquidation phase, the schedule, what's been

25  sold.

1          So my conclusion is that it's completely inappropriate

2   for this task.

3               MR. TOROSIAN:  I have no further questions, Your

4   Honor.

5               THE COURT:  Okay.  Thank you.

6               MR. TOROSIAN:  Thank you.

7               THE COURT:  Mr. Glueckstein, I'll give you the

8   option of --

9               MR. GLUECKSTEIN:  Your Honor, I believe there's

10  probably more direct.

11              MR. ROSTOCKI:  Yes, Your Honor, Brian Rostocki for

12  the Foundations.  I have a quick direct of

13  Mr. Konstantinidis.

14              If I could have a minute just to get some

15  documents, please?

16              THE COURT:  Sure.  Just to let you know, I'm going

17  to break at 12:30, so...

18              MR. ROSTOCKI:  Your Honor, I don't think I'll be

19  less than 15 minutes.  I'm not sure if you wanted to break

20  now or I can just go and see how far I can get.

21              THE COURT:  Just go and see how far you can get.

22              MR. ROSTOCKI:  No problem.

23              THE COURT:  We need to move this along.

24                          CROSS-EXAMINATION

25  BY MR. ROSTOCKI:

1  Q      Good afternoon, Mr. Konstantinidis.

2  A      Good afternoon.

3  Q      Again, my name for the record is Brian Rostocki and I

4  represent the Oxy and Maps Foundations, which sometimes I'll

5  refer to as "the Foundations."  I'll also refer to

6  Mr. Torosian's clients sometimes as "Vault"; is that okay

7  with you?

8  A      Yes.

9  Q      Okay.  And you were retained by Reed Smith in this

10 case; is that correct?

11 A      Yes.

12 Q      And you were retained by Reed Smith on behalf of the

13 Foundations?

14 A      Yes.

15 Q      What were you asked to do when you were retained on

16 behalf of the Foundations in this case?

17 A      I was asked to review and analyze the expert opinions

18 that were submitted by the debtors.  I was also asked to

19 value the assets that the Foundation entities hold and to

20 provide an expert report.

21 Q      And do you have a binder for the Oxy Exhibits in front

22 of you?  It's Oxy Exhibit 1.  If you don't, I have one for

23 you.

24 A      Yes.

25 Q      And do you have Oxy Exhibit 1 in front of you?

1    A       Yes.

2    Q       And what is this document?

3    A       It's my expert report that I submitted.

4    Q       And is this report an accurate reflection of your

5    opinions and findings?

6    A       Yes.

7    Q       And can you turn to page 10 of that report?

8    A       Yes.

9    Q       Is that your signature?

10   A       Yes.

11   Q       And are the opinions and findings in Oxy 1 the same

12   today as the date that you issued this report?

13   A       Yes.

14   Q       And in rendering the valuation set forth in your

15   reports for Vault and the Foundations, did you apply the same

16   valuation methodologies in both reports?

17   A       Yes.

18   Q       And are these the same valuation methods that you just

19   discussed with Mr. Torosian?

20   A       Yes, they are.

21   Q       And do the same critiques that you discussed with

22   Mr. Torosian of Mr. Lu and Professor Howell apply equally

23   with respect to the Foundations?

24   A       Yes.

25   Q       Okay.  Did you review the opening and rebuttal reports

1  from Professor Howell and Mr. Lu?

2  A     Yes.

3  Q     Okay.  And did Professor Howell and Mr. Lu's rebuttal

4  reports cause you to change any of your findings or opinions?

5  A     No.

6  Q     Were there certain steps that you followed to value the

7  Foundations' Maps and Oxy tokens as of the petition date?

8  A     Yes.

9  Q     And are these the same steps that were on the

10  demonstrative that you discussed with Mr. Torosian?

11  A     Yes.

12  Q     Okay.  I just want to briefly talk about some, and

13  drill down on some aspects of certain of those steps.

14        Is it fair to say that you first determined the daily

15  trading volume for Maps and Oxy tokens?

16  A     Yes, like I showed.

17  Q     And you obtained the detail trading volume from

18  CoinMarketCap; is that correct?

19  A     Correct.

20  Q     Okay.  Have you used CoinMarketCap previously in

21  connection with your work in the cryptocurrency space?

22  A     Yes.

23  Q     Okay.  And in what context have you used CoinMarketCap?

24  A     Well, I used it in the Celsius bankruptcy.  I use it in

25  all of my engagements for valuing assets for tax purposes,

1  financial reporting.  It's one of the major go-to providers
2  for me for cryptocurrency data.
3  Q    And are you aware of Mr. Lu's critiques of your use of
4  CoinMarketCap and volume data?
5  A    Yes.
6  Q    Did one of Mr. Lu's critiques relate to potential wash
7  trading within the volume of figures reported by
8  CoinMarketCap?
9  A    Yes.
10  Q    Can you briefly explain what is wash trading?
11  A    Well, wash trading is sort of like a high-level term
12  that certain bad actors, if you will, they're trying to
13  create, artificially create volume and interest in a specific
14  token.  From a lower-level standpoint, they open different
15  cryptocurrency wallets and they exchange volume among
16  themselves.  They buy and sell themselves, and that's how
17  they create artificial volume.
18  Q    And did CoinMarketCap undertake efforts to address wash
19  trading issues?
20  A    Yes, they did.
21  Q    And what is your understanding of those efforts
22  undertaken by CoinMarketCap?
23  A    I believe Mr. Lu quoted some of them in a footnote, but
24  there have been other ones, as well, to mitigate the issue.
25  Q    And what are some of those efforts, if you could

1  describe them for the record?

2  A    Yeah, one of the first, sort of like methods that they

3  took into play after the 2019, I believe, article, about wash

4  trading Bit Asset Management (phonetic), they started ranking

5  the cryptocurrency exchanges.  It's not regulated.  So any

6  cryptocurrency exchange, they can give you any volume they

7  want, so there's no way to check, so they tried to -- they

8  put into play, machine learning, AI, as well, to understand

9  what's fake, what's not, the best of their ability,

10  obviously.  They also created what's called a liquidity

11  score, so they created certain attributes for the

12  cryptocurrency exchanges.  And I think the most important

13  step they took is that they have a certain data alliance.  So

14  they have a data alliance regarding transparency and

15  accountability.

16       So all the cryptocurrency exchanges that they report

17  volume and pricing data to CoinMarketCap, they need to abide

18  by certain requirements; otherwise, the data won't be

19  accepted.

20  Q    And what is a confidence indicator?

21  A    So a confidence indicator is a number that provides

22  sort of like how reliable is a cryptocurrency market.

23  Q    And how does CoinMarketCap use a confidence indicator?

24  A    So they use it in the context of ranking, and,

25  obviously, there different rankings.  Coin Metrics has their

1  own way, but CoinMarketCap does have a reliable way, which,

2  again I used in the <u>Celsius</u> bankruptcy to understand.

3  I certainly don't want to take volume from cryptocurrency

4  exchanges that they're not reliable.

5  Q    Do you have another Oxy binder in front of you, I

6  believe it's Volume 2?  I'm going to direct your attention to

7  some documents?

8  A    It doesn't have any labels.

9  Q    I'm going to go through a series of documents here,

10  starting with Oxy 48.  Can you turn to that, please.

11  A    Yes.

12  Q    Are you familiar with Oxy 48?

13  A    Yes.

14  Q    Can you turn to Oxy 49, please.

15  A    Yes.

16  Q    And are you familiar with Oxy 49?

17  A    Yes.

18  Q    Let's go to Oxy 50.

19  A    Yes.

20  Q    And are you familiar with Oxy 50?

21  A    Yes.

22  Q    And next, Oxy 51.

23  A    Yes.

24  Q    Are you familiar with Oxy 51?

25  A    Yes.

1    Q      And are you familiar with Oxy 53?

2    A      Yes, I am.

3    Q      And what are these documents?

4    A      Most of the documents are taken from the official

5    CoinMarketCap website that they leased, the different

6    measures they take in order to address fake volume.

7    Q      And so, do these documents show and reflect the efforts

8    that CoinMarketCap has undertaken to address wash trading?

9    A      Correct.

10   Q      Did you personally obtain copies of these documents?

11   A      Yes.

12   Q      And how did you do that?

13   A      I just went to the official website from CoinMarketCap

14   and I checked their documentation.

15   Q      And are you familiar with CoinMarketCap's logo?

16   A      Yes.

17   Q      Is that on the top of the left-hand page of some of

18   these documents?

19   A      Yeah, it's the blue C, like, yeah, letter.

20   Q      And when you made a decision to rely on CoinMarketCap

21   data, were you aware of these efforts by CoinMarketCap to

22   address wash trading?

23   A      Yes.

24   Q      You had a discussion with Mr. Torosian about LBank.

25   Can you describe for me what is LBank?

1  A      So, LBank is a cryptocurrency exchange, where in this

2  case, Maps had significant trading volume.

3  Q      Okay.  And was trading data from LBank included in

4  Professor Howell's analysis?

5  A      No, it wasn't.

6  Q      And do you, in your professional opinion, do you agree

7  with the exclusion of trading data from LBank in Professor

8  Howell's analysis?

9  A      No, I don't.

10        And it's not my opinion; it's based on the rankings

11  from both, CoinMarketCap and Coin Metrics.

12  Q      And what was the impact of LBank being excluded from

13  Professor Howell's analysis?

14  A      Yeah, I think, like I said before, it triples the

15  volume from 510,000 average daily trading volume, it goes up

16  to 1.7 and it's been listed in my report.

17  Q      And you mentioned some of the rankings for

18  cryptocurrency exchanges.  Can you give some examples of the

19  categories of these rankings?

20  A      Yes, there are attributes such as data quality, data

21  transparency, API, the application program interface, how you

22  pull your data API quality, the revenue, the liquidity score

23  of the cryptocurrency exchange.  So there are different

24  attributes, obviously, from different data providers, so

25  that's why Coin Metrics has different attributes than

1  CoinMarketCap.

2  Q    And can you turn to Oxy 57 for me.  It's in Volume 2.

3  A    Okay.  Yes.

4  Q    And what is this document?

5  A    These are the CoinMarketCap rankings.

6  Q    And did you personally pull this document?

7  A    Yes.

8  Q    And where did you pull this document from?

9  A    This is from the CoinMarketCap official website.

10 Q    So you went to the CoinMarketCap website and downloaded

11 it directly from that site?

12 A    Correct.

13       And mind you, these changes; they're dynamic.  It

14 doesn't mean -- one week may have different rankings than the

15 following week.

16 Q    And on Oxy 57, where is LBank ranked?

17 A    So LBank is ranked 21.

18 Q    And how, generally, does LBank compare to some of the

19 other exchanges Professor Howell relied on in her report?

20 A    Well, if I turn to the pages, let me find -- for

21 example CX.io, that's used for volume for Serum is Number 75.

22 HitBTC is another one, 101, that's used for Serum.  Far lower

23 than LBank.  I'm just trying to find others, as well.

24 Poloniex, it's used by Professor Howell for calculating

25 volume for Serum.  It's Number 82.

1    Q      Okay.  And can you -- do you have the debtors' binder

2    in front of you, the FTX binder?

3    A      Yes.

4    Q      Can you turn to FTX 2, please, and I want to focus on

5    Appendix B to Mr. Lu's declaration, and the exact page at the

6    top of the document is 37 out of 54.

7    A      Okay.  I'm there.

8    Q      And do you recognize this document?

9    A      Yeah, this is the coin transfer change framework.

10   Q      Okay.  And what is your understanding of the ranking

11   feel here for data quality?

12   A      So for data quality, LBank has C, and it looks it looks

13   like there are a bunch of other cryptocurrency exchanges that

14   they're -- that they have the same grade.

15   Q      And how, generally, does LBank compare to some of the

16   other exchanges that Professor Howell relied on in her

17   report?

18   A      I mean, like I said before, and this, I think, shows it

19   graphically, that LBank is exactly the same like the one

20   before it, the line before B-Books.  You see, every grade is

21   the same, except for API quality, which, in plain English, it

22   means how easily you extract data.

23          I mean, obviously, for our case here, what difference

24   does it make if you care about a reliable market, but you do

25   see it's only a flip of a C- to a D.  B-Books is used for

1 call calculating volume for Serum, but LBank is excluded when

2 call calculating volume for Maps.

3            MR. ROSTOCKI:  I know we're at 12:30.  I didn't

4 know if you want me to continue or I can (indiscernible) time

5 to break.

6            THE COURT:  Why don't we take our break for lunch.

7 We'll come back at 1:30.

8            For planning purposes, I have a hard stop today

9 at 4:30.  Do we think we're going to finish today?

10            MR. ROSTOCKI:  I will do my best to go through my

11 outline some more to make it as efficient as possible.

12            MR. GLUECKSTEIN:  I certainly they we should be

13 able to finish, Your Honor, but I can't speak for the

14 objectors.

15            THE COURT:  Okay.  How much time -- think about --

16 one of the things I'm thinking about is post-trial

17 submissions, because this is a very complex expert

18 calculation here that I think I could use some help with some

19 post-trial submissions.

20            Do the parties want post-trial submissions?  Do

21 closings?  I'm just trying to plan here how to approach this

22 at the end of the evidentiary presentation.

23            MR. TOROSIAN:  Your Honor, Jeff Torosian for Maps

24 Vault.  We're happy to do post-trial submissions if Your

25 Honor would like.  We do very much want to do closings, as

1  well, though.

2          THE COURT:  All right.

3          MR. TOROSIAN:  So, if we could do closings, I'm

4  happy to do post-trial submissions on top of that, but I

5  don't want to -- I think it's important that we summarize the

6  evidence before you today.

7          THE COURT:  All right.

8          MR. ROSTOCKI:  Foundations agree.

9          UNIDENTIFIED SPEAKER:  Same with TMSA (phonetic),

10  Your Honor.

11          MR. GLUECKSTEIN:  Your Honor, we'll take guidance

12  from the Court.  If Your Honor would like post-trial

13  submissions, we're happy to provide one.  I do think the

14  parties were planning on making a closing submission at the

15  end of the hearing.

16          THE COURT:  And how long do you think closings are

17  going to take?

18          MR. TOROSIAN:  I haven't heard the other parties,

19  but, Your Honor, mine is about 20, 25 minutes.

20          MR. GLUECKSTEIN:  I think we're approximating

21  about 30 to 45 minutes for ours.

22          THE COURT:  We're not finishing today.  I can tell

23  you we're not finishing today.

24          I do have tomorrow open.  Alternatively, what we

25  could do is do the post-trial submissions and then do closing

1   arguments, but that will give me the benefit of having to

2   read the post-trial submissions and then having better-formed

3   questions to ask the parties.

4          UNIDENTIFIED SPEAKER:  I'm happy to come back

5   tomorrow, Your Honor.  I'd very much like to do the closings

6   before the post-trial submissions.  I think the post-trial

7   submissions are probably going to look a lot like the

8   pretrial submissions, but I think closings will summarize the

9   evidence before the parties put that together.

10          So I'm happy to come back tomorrow and do it if we

11  get there.  I'm happy to be quicker today, too.

12      (Laughter)

13          THE COURT:  Promises.  Promises.

14          MR. GLUECKSTEIN:  Your Honor, we're at the Court's

15  pleasure.  I think to the extent that Your Honor would like

16  post-trial submissions, I do think it would be helpful to put

17  some parameters around that.  Obviously, there's very

18  extensive pretrial submissions, so I want to avoid -- I do

19  understand counsel's comment and I don't necessarily disagree

20  with it.  I don't want the parties to give you kind of a re-

21  hash of long and voluminous briefing.

22          THE COURT:  Nor do I.

23          MR. GLUECKSTEIN:  So if that's helpful to Your

24  Honor, we're happy to provide it.  As far as the timing of

25  the closings, we are fine to do it at the close of evidence,

1  whether that be today or tomorrow.  We're happy to come back

2  and do that.  Whatever is going to be more helpful to the

3  Court.

4          THE COURT:  All right.  Well, let's see where we

5  are at the close of evidence.  If we -- I don't want to have

6  a disjointed closing.  So, if we get to the end of the day

7  and we only have an hour left, it doesn't sound like --

8  there's no way we're going to finish closings, then we'll

9  come back on Tuesday.

10         Is everybody available on Tuesday to come back?

11         MR. TOROSIAN:  Yes, Your Honor.

12         MR. GLUECKSTEIN:  Yes, Your Honor.

13         UNIDENTIFIED SPEAKER:  Someone from the Committee

14 will be here.

15         THE COURT:  I'm sorry?

16         UNIDENTIFIED SPEAKER:  Someone from the Committee

17 will be here.

18         THE COURT:  Okay.

19         UNIDENTIFIED SPEAKER:  That's fine, Your Honor.

20         THE COURT:  All right.  So, it sounds like

21 everybody can do Tuesday.  So, let's go ahead and take our

22 lunch break.

23         Mr. Konstantinidis, during the break, you're not

24 allowed to talk to anybody about your testimony.

25         So, with that, we will come back at 1:30.  Thank

1  you.

2        (Recess taken at 12:35 p.m.)

3        (Proceedings resumed at 1:32 p.m.)

4            COURT CLERK:  All rise.  Please be seated.

5            THE COURT:  Ready to continue?

6            MR. ROSTOCKI:  May I approach the witness, Your

7  Honor, with a copy of the demonstrative that was shown

8  earlier today?

9            THE COURT:  Sure.

10            MR. ROSTOCKI:  Would you like a copy?

11            THE COURT:  If it's not going to be brought up on

12  the screen, I will need a copy.

13            MR. ROSTOCKI:  Sure.

14            THE COURT:  Thank you.

15            MR. ROSTOCKI:  We'll bring it up to Your Honor.

16  Sorry.

17  BY MR. ROSTOCKI:

18       Q.    Mr. Konstantinidis, on page -- the first page of

19  this demonstrative, under No. 4 there, it also mentions a

20  vesting schedule for MAPS and OXY tokens.  Do you see that?

21       A.    Yes.

22       Q.    And did your analysis take into account the

23  vesting schedule for MAPS and OXY?

24       A.    Yes.

25       Q.    And why did you want to understand the vesting

1 | schedule in valuing the MAPS and OXY tokens?

2 |     A.   Because a percentage of them, they're locked, so I

3 | want to understand when they become unlocked.

4 |     Q.   And is a vesting schedule something an expert in

5 | the field would reasonably rely on when valuing

6 | cryptocurrency?

7 |     A.   Yes, because these are restricted or locked

8 | tokens.

9 |     Q.   And did you take into account the vesting schedule

10 | in connection with your blockage model?

11 |     A.   Yes.

12 |     Q.   And how did you do so?

13 |     A.   Well, the average time of a block being held takes

14 | into account both a volume restriction and the locking

15 | restriction, just like I showed in the visual of the

16 | liquidation process.

17 |     Q.   And who were the issuers of the MAPS and OXY

18 | tokens?

19 |     A.   I believe the entities are like MAPS Vault

20 | Limited, and I think the Serendipity Foundation.

21 |     Q.   And in your experience, does transferring holdings

22 | to a cold storage wallet eliminate a token's vesting

23 | schedule?

24 |     A.   No, that's just moving tokens from one wallet to

25 | another.

1    Q.    And in your experience, does transferring holdings

2  to a cold storage wallet mean the person who controls the

3  wallet can sell the tokens regardless of the vesting

4  schedule?

5    A.    No, they cannot do that.

6    Q.    And did you hear Professor Howell's testimony that

7  the MAPS and OXY tokens were never locked from the debtor's

8  perspective --

9    A.    Yes.

10    Q.    -- or in the sense that the word locked is used in

11  the crypto economy?

12    A.    Yes.

13    Q.    And do you agree with Professor Howell's testimony

14  in that respect?

15    A.    Not in this case.

16    Q.    Why not?

17    A.    Well, in this case, the locking mechanism is due

18  to the legal agreement between the issuer and the purchaser.

19  So there's nothing in technology that doesn't allow you to

20  sell the tokens.  It's a legal restriction.

21    Q.    And in your experience, can a custodian of digital

22  assets or an exchange unilaterally unlock tokens?

23    A.    No, they cannot do that.  I mean, I'll give you an

24  example.  For the Celsius bankruptcy fire blocks was a major

25  custodian.  The custodian cannot make any changes on the

1  legal restrictions of the tokens held because they don't

2  belong to them.

3        Q.   Did you also hear Professor Howell's testimony

4  that the MAPS and OXY tokens should be viewed like employee

5  options, and if an employee leaves the company before the

6  option vests, the company can reallocate those options?

7        A.   Yes.

8        Q.   Do you agree with this analogy from Professor

9  Howell?

10        A.   I mean, there are some similarities when it comes

11  down to a vesting schedule from a restricted stock unit

12  perspective.  But where I disagree is the issuer for

13  restricted stock unit is the company where an employee works.

14  The issuer of these tokens is not the debtor.  It's the MAPS

15  Foundation and the Serendipity Foundation.  So only the

16  issuers can make changes to those restrictions.

17        Q.   And did you ultimately reach a conclusion as to

18  the vesting schedule for the Foundation's MAPS and OXY

19  tokens?

20        A.   Yes.

21        Q.   And what conclusion did you reach?

22        A.   I believe the MAPS tokens held the vesting

23  schedule was 5.1 years, and the OXY was 4.1.

24        Q.   And turning back to this demonstrative on the

25  first page under 5, I believe you discussed that you made

1  certain assumptions regarding the daily volume growth for

2  MAPS and OXY following the petition date.  Is that right?

3       A.   Correct.

4       Q.   Was this assumption for the Foundations also the

5  same analysis that you discussed with Mr. Torosian with

6  respect to his vault claims?

7       A.   Yes, this was the same volume profile.

8       Q.   Can you turn to OXY-1 in your binder, and we

9  direct your attention to paragraph 21?

10           THE COURT:  Sorry, which document are we looking

11  at?

12           THE WITNESS:  OXY-1.

13           MR. ROSTOCKI:  OXY one.

14  BY MR. ROSTOCKI:

15       A.   And which it should be?

16       Q.   Volume one under the OXY binder.

17       A.   Okay.

18       Q.   It's your report.

19       A.   Okay.

20       Q.   For the Foundations.  And turn your attention to

21  paragraph 21.

22       A.   Okay.

23       Q.   Can you elaborate for me on why you analyzed

24  volume trends of 20 cryptocurrencies that are available in

25  the Ethereum blockchain, were active for five years, were not

1  stable coins, and have average trading volume between $1 and

2  $30 million.

3       A.   Yes, I think, like I answered before, based on my

4  professional adjustment, I felt like the number 20, 20

5  cryptocurrencies is a sufficiently large number for

6  cryptocurrencies.

7       Secondly, because my vesting schedule for MAPS is 5.1

8  years, I want to make sure they were existent for five years.

9  And the oldest cryptocurrency reside in the Ethereum

10 blockchain.  It's the oldest and most stable blockchain, came

11 into existence in 2015.

12      Additionally, I did not want them to be stable coins

13 because they have a different nature.  They pegged to a fiat

14 currency, let's say, to the dollar, and on average, they have

15 high volume and high volume growth, so I didn't want to bias

16 my average.

17      And lastly, I chose the daily trading volume to be,

18 what, 1 to 30 million at the end of those five years.

19 Because my belief was that MAPS and OXY will be relatively

20 successful cryptocurrencies, and they'll follow those 20

21 cryptocurrency volume growth.  I would think of them as, like

22 I said before, midcap stocks so they're not necessarily too

23 small.  But I think it was a reasonable assumption.

24      Q.   And I believe you testified to Mr. Torosian that

25 you applied an average of the daily volume growth for MAPS

1  and OXY following the petition date as opposed to a median.

2  Is that right?

3       A.   Yes.

4       Q.   And why did you use an average opposed to a median

5  for daily volume growth of the MAPS and OXY tokens following

6  the petition date?

7       A.   Because the average takes into account all 20

8  tokens, median will exclude some of them believing that

9  they're outliers.  Now, in statistics, there is not a set

10  definition of an outlier.  Normally, you're saying three

11  standard deviations from the mean, and even some of the

12  cryptocurrencies that didn't meet that criterion.  So in my

13  professional adjustment, I prefer the average over the

14  median.

15       Q.   Now, going down later on the diagram, did you also

16  quantify the discount that was to be applied for the

17  Foundations tokens?

18       A.   Yes.

19       Q.   And how did you quantify that discount for the

20  Foundations?

21       A.   So the discount calculation was the same with

22  MAPS.  And it is.  It was the average between two discount

23  models because one of them always understates, and the other

24  one overstates discounts.

25       Q.   And were those the Finnerty and Chafe (phonetic)

1  models that you discussed with Mr. Torosian?

2       A.    Yes.

3       Q.    Did you rely on the Finnerty and Chafe models in

4  quantifying the discounts for the Foundations, OXY, and MAPS

5  tokens for the same reasons you discussed earlier with Mr.

6  Torosian with respect to the Vault?

7       A.    Yes.

8       Q.    And can we go back to your report, OXY-1, at

9  paragraph 24?  Based on the inputs that you testified today

10  and also set forth in your report, what discount did you use

11  for the Foundations, OXY, and MAPS tokens?

12       A.    So, for the Foundation Elements entity, the

13  discount for OXY tokens was 36.4 percent.  For the

14  Foundations Serendipity holdings, the discount for OXY tokens

15  was 35.8 percent.  And for MAPS, the discount was 43.2

16  percent.

17       Q.    Okay.  And what was your final step in valuing the

18  Foundations tokens?

19       A.    The final step is multiplying the number of tokens

20  that were liquidated in the phase liquidation approach by the

21  spot price, by the price as of the petition date, and then

22  multiply that by one minus the discount, which is the amount

23  that was realized.

24       Q.    And this price as of the petition date, is that

25  the 24-hour price that you got from CoinMarketCap that you

1   discussed with Mr. Torosian?

2        A.    Yes.

3        Q.    And if you can turn to paragraph 25 of your report

4   at OXY-1, in your expert opinion, what is the petition date

5   value for the Foundations, MAPS, and OXY tokens based on the

6   application of the discount and pricing data you just

7   mentioned?

8        A.    So, the value for the OXY tokens that Foundation

9   Elements hold is 38,960,743.  And the Foundation Serendipity

10  holdings, the value of OXY is 19,659,096.  And for MAPS, the

11  value is 121,633,079.

12       Q.    I want to cover some of the alternative

13  calculations you went over with Mr. Torosian but now for the

14  Foundations.  If you can turn to the last page of that

15  demonstrative, please.  Let me ask you this.  Could the

16  Foundations and its tokens be plugged into these alternates?

17       A.    Yes.

18       Q.    And with respect to alternate scenario one, what

19  would be the valuations of the Foundations tokens under

20  alternate scenario one?

21       A.    It will be lower -- the total value from my report

22  for the Foundation holdings, the total is 180,000,000.  I

23  believe under scenario one, when I run the calculation

24  replacing my prices with Mr. Lu's prices, the total valuation

25  comes to be 174,000,000, I believe.

1        Q.    And that's the sum of the valuation of the

2    Foundations, MAPS and OXY tokens?

3        A.    Yes.  All the Foundation tokens?  Yes.

4        Q.    And under alternate scenario two that you

5    discussed with Mr. Torosian, what would be the value of the

6    Foundations tokens under that scenario?

7        A.    So, in the scenario where everything else is the

8    same and the only difference is the volume growth is 150

9    percent, I believe that lowers the value of the total

10   Foundation Elements to about 162,000,000, I believe.

11       Q.    And that figure that you just provided for under

12   alternate scenario two for the Foundations, is that the sum

13   of the Foundations, MAPS, and OXY tokens?

14       A.    Yes.  These are all the tokens they hold.

15       Q.    But the valuations you are endorsing to the Court

16   for the Foundations, MAPS, and OXY tokens are set forth in

17   paragraph 25 of your report; is that right?

18       A.    Correct.

19       Q.    Are you aware that there are other holders of MAPS

20   and OXY tokens outside of the debtor's Vault and the

21   Foundations?

22       A.    I believe so.

23       Q.    And how would you describe these other customers'

24   claims in terms of size compared to the Foundations and Vault

25   claims?

1      A.    I don't know their holdings, but the size of the

2  Foundation is significant compared to everybody else.

3      Q.    And would it be easy to apply your methodology to

4  these other customers, assuming they had a locking schedule

5  similar to the Foundations and substantially lower volumes

6  such that it wouldn't take nearly as long to liquidate their

7  tokens?

8      A.    Yeah, it's pretty straightforward.

9      Q.    And when you say it's pretty straightforward, how

10 long would you think it would take you to do that analysis?

11     A.    It wouldn't take more than a day.

12     Q.    Just want to touch briefly on a few of your

13 critiques of Professor Howell's analysis in her report.  Have

14 you heard of the concept of burning tokens?

15     A.    I've heard of it.

16     Q.    And can you briefly explain your understanding of

17 burning tokens?

18     A.    It's reducing the total supply of tokens by

19 sending them to an imaginary wallet address, just getting rid

20 of tokens in plain English.

21     Q.    And why would someone burn tokens?

22     A.    Well, generally they burn tokens to limit the

23 supply.  That means you have less supply, more demand, so the

24 price will go up.

25     Q.    And does the Oo model account for whether some

1  MAPS or OXY tokens could be burned by the debtors to increase

2  the value for all MAPS and OXY tokens?

3         A.    I don't think so.

4         Q.    Does the KO model offer any guidance on when or

5  how tokens would be liquidated by the debtor?

6         A.    No, just like I think I explained, the KO model

7  understands price impact and transaction cost.  So everything

8  is sold in a day.

9         Q.    And have you ever heard of the concept of a bet?

10        A.    Yes, that's the basic concept that the KO model is

11  founded on.

12        Q.    And what bet does the KO model rely on here?

13        A.    So in this case, there is a single bet, meaning

14  the debtors say sell everything at once in one day.

15        Q.    Is a bet generally hard to quantify.

16        A.    Based on the KO offers, a bet is impossible to

17  observe because it's a statistically independent decision an

18  investor makes.  What that means in plain English?  It means

19  that I make a decision to sell ten Bitcoins.  Now, those ten

20  Bitcoins on the cryptocurrency exchange, they can be spread

21  out in ten different transactions of one Bitcoin each.  When

22  I consume the data, I see ten different transactions.  So I'm

23  not in the mind of the investor to understand did they want

24  to have one trade that was split into ten or they wanted ten

25  different trades?  That's why in the KO model they're using

1  portfolio transition orders.  What that means, I'm an

2  investor, I'm calling my broker and I say sell 1000 shares.

3  So that's the bet.  But in real life, when I observe the data

4  from cryptocurrency or traditional markets, there is no way

5  for me to know what assembles a bet, which is different than

6  a transaction which is an observable measure.

7        Q.    Now what if there was a different bet such that

8  the debtors had to maximize the value of their portfolios of

9  digital assets and they could do so by selling tokens,

10  holding tokens, burning tokens or a combination of these

11  strategies.  Would the KO model be appropriate to estimate

12  transaction costs to that bet?

13        A.    I don't think so.

14        Q.    And if the starting point of the bet is more

15  complicated than a pure liquidation of holdings, what happens

16  to the relevance of the KO model?

17        A.    Well, again, the KO model is used, and that's why

18  it was invented based on the authors to understand and

19  calculate transaction cost, which is the cost associated with

20  a trade.  And one use case that the same authors are using

21  their model is to understand market crashes.

22        Q.    And in Professor Howell's application of the KO

23  model, does she treat a transaction cost as the same thing as

24  a discount?

25        A.    Professor Howell is using the term asset

1  liquidation discount, ALD.

2      Q.   And are you aware of any finance, economics, or

3  valuation article that treats a cost as the same thing as a

4  discount?

5      A.   No.

6      Q.   And is the KO model a transaction cost model in

7  your opinion?

8      A.   Well, it's not my opinion.  The author says so.

9      Q.   And can you please turn to OXY-41, volume two?

10 This is Dr. Abbott's 2009 article titled Discount for Lack of

11 Liquidity: Understanding and Interpreting Option Models.  And

12 it's from the Business Valuation Review.

13     A.   Yes.  Okay, I have it.

14     Q.   Are you familiar with this publication by Dr.

15 Abbott?

16     A.   Yes.

17     Q.   And is this publication considered a reliable

18 source for when an expert is determining a discount?

19     A.   Yeah.  Business Valuation Resources, BVR, is the

20 top publication for valuation experts.

21     Q.   Let's see what Dr. Abbott says about the effect of

22 treating a cost as a discount.  If you can turn to page 145

23 of the article in the third paragraph on the right side of

24 the page that begins with the sentence beginning with

25 neglecting to convert.  Can you read that sentence for me?

1          A.    Neglecting to convert the option premium to the

2     applicable discount creates the illusion that the estimated

3     discounts are greater than 100 percent.    An impossible

4     solution.

5          Q.    And in your opinion, did Professor Howell neglect

6     in her analysis to convert the transaction cost into a

7     discount?

8          THE COURT:    Yes.    But again, like I said before, if

9     they can be converted, that's not always a sure thing.    That

10    bridge depends on the market.

11         Q.    And did her failure to do so create an illusion

12    regarding the amount of the discount for the MAPS and OXY

13    tokens?

14         A.    Yes.

15         Q.    And is this the type of illusion that Dr. Abbott

16    was talking about?

17         A.    Yes.    I mean, Dr. Abbott says -- Professor Abbott,

18    rather, says the obvious that you cannot have discounts over

19    100 percent.

20         Q.    And by failing to convert the transaction cost

21    into a discount, did Professor Howell's application of the KO

22    model result in discounts above 100 percent?

23         A.    Yeah, in some cases there were 500.    Depending on

24    the holdings that you plug in the formula, it can be 500

25    percent 350 percent.    Numbers way over 100 percent.

1      Q.    And let's see what Dr. Abbott says about discounts

2   above 100 percent.  Can you please read the next sentence in

3   the same paragraph of Dr. Abbott's article that begins with

4   Stockdale?

5      A.    Stockdale makes an important observation that

6   models providing results that equal or exceed 100 percent may

7   have a theoretical problem because it seems logical that the

8   discount would not reduce a value to zero or less.

9      Q.    And did you hear Professor Howell's testimony that

10  models providing discounts exceeding 100 percent do not have

11  theoretical problems but rather just demonstrate the extreme

12  lack of liquidity?

13     A.    Yes.

14     Q.    And do you agree with this testimony from

15  Professor Howell?

16     A.    I don't agree with the fact that the discount can

17  be over 100 percent.

18     Q.    And in your view, does a discount above 100

19  percent and in some cases significantly above 100 say

20  anything about the model that produced it?

21     A.    Well, that means that the model doesn't calculate

22  discounts and the model says itself, these are transaction

23  costs.

24     Q.    And do you recall Professor Howell's testimony

25  that she came up with the term asset liquidation discount or

1   ALD?

2        A.   Yes.

3        Q.   And did you also hear Professor Howell say that it

4   was great how Dr. Abbott's article is brought up on her cross

5   examination because that article only applies to discounts

6   for lack of marketability or DLOM models and not to her asset

7   liquidation discount?

8        A.   Yes.

9        Q.   But wouldn't it have been impossible for Dr.

10  Abbott to refer to an asset liquidation discount when

11  Professor Howell just came up with the term purposes of this

12  case?

13       A.   Yes.

14       Q.   And are you aware of any academic or professional

15  literature that specifically addresses an asset liquidation

16  discount?

17       A.   No, I don't.

18       Q.   And turning back to Dr. Abbott's article, can you

19  read the very first sentence of that article?

20       A.   Under introduction you mean?

21       Q.   Traditionally.  Traditionally.

22       A.   Traditionally, business valuation practitioners

23  have used discount for lack of marketability, DLOM, as a

24  generic term to indicate impairment in value due to lack of

25  marketability and liquidity.

1      Q.    And have other academics questioned the

2    theoretical underpinnings of a purported discount mantle for

3    which the output is a discount in excess of 100 percent?

4      A.    Yes.

5      Q.    Can you name a few?

6      A.    Yeah, there have been precedents.  Just like I

7    mentioned before, there is the Longstaff model in '95 that

8    was producing discount over 100 percent.  It was abandoned.

9    And Professor Longstaff, or finance at UCLA, he came up with

10   a different model corrected the previous one.  And as of the

11   early 2000s, that's the actual Longstaff model.  There has

12   also been the Finnerty model, the first one, that it was

13   creating numbers over 100 percent, and Gatoroff (phonetic)

14   criticized that.  And that model was never used.  The second

15   model by Finnerty came a few years after.

16     Q.    And do you remember the demonstrative exhibit that

17   Professor Howell used in her direct testimony to show that

18   several other models resulted in discounts even larger than

19   the discounts from the KO model as she employed it?

20     A.    Yes.

21     Q.    And did you hear Professor Howell's testimony that

22   all these models were transaction cost model, like the KO

23   model?

24     A.    Yes, this is correct.

25     Q.    And in your opinion, did Professor Howell conduct

1  any meaningful analysis to convert the transaction cost

2  output from any of those models to an actual discount?

3      A.   No, but like I said before, it's not trivial.

4  Researchers spend years, if there is that bridge, they may

5  find it, they may not.  Depends on the market.  So it's not

6  trivial to find a recipe to transform transactional costs

7  into a discount.  They may be related, but it's not easy to

8  find that relationship.

9      Q.   But she didn't try to bridge that gap at all?

10      A.   No, she didn't.

11      Q.   And did you hear Professor Howell testify that she

12  manually reduced or truncated, in her words, to 100 percent

13  the transaction costs resulting from her application of the

14  KO model?

15      A.   Yes.

16      Q.   And in your view, is it sound practice to simply

17  convert the output of a transaction cost model to a discount

18  model?

19      A.   I think it would have been better to just have the

20  actual number instead of truncating it.

21      Q.   And shifting gears a bit.  Did you hear Professor

22  Howell testify that she does not see a connection between the

23  restart of the FTX exchange and whether or not to sell the

24  debtor's MAPS and OXY tokens?

25      A.   Yes, I remember that.

1        Q.   And do you have any view as to whether there is a

2   connection between the restart of the FTX exchange and

3   whether or not to sell the debtors MAPS and OXY tokens?

4        A.   Well, that was outside the scope of what I did.

5   My project or my task was to value the tokens.

6        Q.   I'm just asking if you have an opinion after

7   listening to her testimony.

8        A.   I mean, generally speaking, what I know from

9   experience is that if a cryptocurrency exchange is

10  functional, they may not have a real reason to liquidate all

11  their tokens.  But again, it's not something that I

12  considered in my report.

13       Q.   Just a few more things, Mr. Konstantinidis.  Do

14  you have the debtor's binder in front of you?

15       A.   Yes.

16       Q.   If you don't mind turning to FTX-15.

17       A.   15?

18       Q.   15.

19       A.   It goes up to 9, I think.

20            MR. ROSTOCKI:  May I press, Your Honor?

21            THE COURT:  Yeah, there should be another binder

22  up there.

23            THE WITNESS:  Is there a second one?

24            ADMINISTRATIVE LAW JUDGE FOY:  Volume 2, I

25  believe.

1          MR. GLUECKSTEIN:  I'm not sure if that exhibits in

2    the binder he has, Your Honor, we can hand up a separate copy

3    if easier than more binders.

4          ADMINISTRATIVE LAW JUDGE FOY:  You have a separate

5    copy?

6          MR. GLUECKSTEIN:  Yes.

7          ADMINISTRATIVE LAW JUDGE FOY:  Rather than -- I

8    won't be able to see them pretty soon.

9          THE WITNESS:  They have too many binders.

10         MR. ROSTOCKI:  May I approach, Your Honor?

11         ADMINISTRATIVE LAW JUDGE FOY:  Yes.

12         THE WITNESS:  Thank you.

13   BY MR. ROSTOCKI:

14         Q.   Can you tell me what is FTX-15?

15         A.   This is a paper published at the Journal of

16   Banking and Finance from some researchers in some university

17   in Graz, Austria, I believe.

18         Q.   And who's the author of this article?

19         A.   Multiple authors.  Alexander Brunes (phonetic),

20   Roland Mestel (phonetic), Ryan Ryarden (phonetic), and Eric

21   Thiesen (phonetic).

22         Q.   And are you familiar with this document?

23         A.   I believe this document was referenced in the

24   rebuttal by Professor Howell.

25         Q.   And is this document a reliable treatise or

1    publication with respect to the subject that it addresses?

2         A.    I mean, I believe so.

3         Q.    And do you recall Professor Howell's testimony

4    regarding three new articles that she believed uses the KO

5    model in the context of digital assets?

6         A.    Yes, I did.

7         Q.    And I believe the first article was from

8    Scharnowskia, et al, titled Bitcoin Blackout, Proof of Work

9    and Centralization Mining, dated December 6th, 2021, and was

10   from the University of Mannheim in Germany.  Do you recall

11   that article?

12        A.    Yeah, I believe they trying to understand what

13   happens in the market when electricity goes down related to

14   Bitcoin mining.

15        Q.    And in the second article was from Yao et al,

16   titled Investor Intention and Cryptocurrency, Market

17   Liquidity, a Double-Edged Sword dated August 2nd, 2022.  And

18   it's from the Tanyin University of China.  Do you recall that

19   article?

20        A.    Yeah.  I believe they only use one formula from KO

21   to understand illiquidity.

22        Q.    And the third article was from Moallemi, et al,

23   titled Model for Q Position Valuation in a Limit Order Book

24   dated December 2016.  And was from the Columbia Business

25   School.

1      A.    Yeah.  And that was the most, in my professional

2  opinion, important coming from Columbia Business School, but

3  it didn't address cryptocurrency.

4      Q.    Okay.  And did you review each of these articles?

5      A.    I did browse over them, yes.

6      Q.    Okay.  And do any of these articles talk about

7  using the KO model to value an asset?

8      A.    No, they don't.

9      Q.    Do any of these articles talk about using the KO

10  model to calculate a discount?

11      A.    No, they don't.

12      Q.    And generally speaking, what do these articles

13  address?

14      A.    The first one, or rather the third one, the way

15  you quoted them is from the Columbia Business School.  What

16  they're doing is they're trying to understand order book and

17  illiquidity by using what they call the illiquidity index

18  from the KO model.  The other two come from university I've

19  never heard of.  One is from somewhere in China, and the

20  other is from Ankara, Turkey, I believe.  And they're

21  estimating illiquidity based on one formula from the KO

22  model.  Not the same one that's used by Professor Howell to

23  understand illiquidity of a cryptocurrency market.  I believe

24  even one of them uses CoinMarketCap data to do that.  But

25  they don't have anything to do with calculating discounts,

1 valuing, or even using the exact same formula that's used by

2 Professor Howell.

3      Q.   And was it the Yao article that collected data

4 from CoinMarketCap?

5      A.   Yeah, I don't remember, to be honest, which one,

6 but I remember one of them on those tables that there were 90

7 degrees turned, that they were using CoinMarketCap data.

8      Q.   Other than Professor Howell, has the KO model ever

9 been used as a discount?

10      A.   Not that I know.  But again, the authors

11 themselves never claim that.  They say we're calculating

12 transaction costs.

13      Q.   And in your opinion, is Professor Howell's use of

14 the KO transaction cost model unprecedented for use as a

15 discount to value cryptocurrency?

16      A.   Yeah, I don't think it should be used as a

17 discount.

18      MR. ROSTOCKI:  Your Honor, I'd like to now move

19 the mission of OXY-1, 2, and 38 into evidence.  I don't think

20 there was any objection to those exhibits on the PTO --

21      THE COURT:  1, 2, and what was the third one?

22      MR. ROSTOCKI:  1, 2, and 38.

23      ADMINISTRATIVE LAW JUDGE FOY:  Any objection?

24      MR. GLUECKSTEIN:  We do not.

25      THE COURT:  Okay.  Admitted without objection.

1          MR. ROSTOCKI:  Also, Your Honor, we'd like to move

2   the admission of OXY-4.  I believe there was an objection.

3   They're simply the debtor's interrogatory answers.

4          MR. GLUECKSTEIN:  Your Honor, this is an exhibit.

5   That's responses to their discovery requests.  Again, we

6   don't have an issue with it being in the record of the

7   hearing.  I'm not sure it's evidence.

8          THE COURT:  Well, they're interrogatory answers,

9   which are supposed to be filed under certification.  I don't

10  see a certification.  Were these ever certified?

11         MR. GLUECKSTEIN:  I believe, Your Honor, we

12  resolved the interrogatories at issue here by producing

13  documents.  If I recall.  I don't believe that there's

14  substantive responses to these interrogatories.

15         MR. ROSTOCKI:  Your Honor, they did have

16  substantive responses regarding the sale of MAPS, OXY, and

17  Serum that there was no sales post.

18         MR. GLUECKSTEIN:  That's fine, Your Honor.  We're

19  fine with the interrogatories going in there.

20         THE COURT:  All right.  Admitted without

21  objection.

22         MR. ROSTOCKI:  Next, I'd like to move the

23  admission of OXY-5 through 25, subject to the debtor's

24  objection that they're not being admitted for the truth of

25  the matter asserted.

1          MR. GLUECKSTEIN:  Yeah, these exhibits, Your

2   Honor, are record of the case.  And we're fine with them

3   being part of the record of the hearing as long as they're

4   not being admitted for the truth of the matter asserted.

5          THE COURT:  They're admitted for that limited

6   purpose.

7          MR. ROSTOCKI:  We're also moving the admission of

8   statements from FTX-15 and 41 that were read into the record

9   during the testimony of Professor Howell and Mr.

10  Konstantinidis.  Mr. Konstantinidis, who the Court qualified

11  as an expert in this matter, testified as to the reliability

12  of these materials.  Sorry, it was OXY-41 and FTX-15.  They

13  were the Brunes and Abbott articles.

14          MR. GLUECKSTEIN:  Your Honor, those articles in

15  the relevant sections, counsel did have the witness identify

16  and read what was appropriate.  Again, we think that any of

17  these articles can be record of the case, but are not

18  evidence.  Rule -- Federal Rule of Evidence 803.18

19  specifically provides that if the treatise is called to the

20  attention of the expert witness and the expert witness can

21  testify about it, it's admitted as read into evidence.  But

22  the exhibit itself is not admitted into evidence.  It shall

23  not be received as an exhibit.  So we think that the

24  testimony and the record of the hearing is sufficient to

25  address this matter.

1          MR. ROSTOCKI:  As I said, Your Honor, we were just

2     admitting the statements that were read into the record, not

3     the actual exhibit.

4          THE COURT:  Well, they were read in, so we don't

5     need the exhibits.  I'll sustain the objection on those.

6          MR. ROSTOCKI:  I'd also like to move the emission

7     of OXY-48 through 51, 53, and 57.  Those were the

8     CoinMarketCap materials.

9          THE COURT:  Say those numbers again.

10         MR. ROSTOCKI:  48, 49, 50, 51, 53, and 57.

11         MR. GLUECKSTEIN:  Your Honor, these exhibits were

12    -- the witness did identify these exhibits and testify that

13    he pulled them from the CoinMarketCap website.  So from that

14    perspective, we're fine with them being part of the record.

15    Counsel did ask questions suggesting that they were intending

16    to use them for the truth of the matter asserted.  There's no

17    witness here from CoinMarketCap to discuss what they did or

18    did not do with respect to any of the issues discussed in

19    those documents, and we don't think they should be admitted

20    for that purpose.

21         MR. ROSTOCKI:  Your Honor, the only objection on

22    the PTO was a Foundation objection.  Mr. Konstantinidis

23    testified how he pulled those documents.  The documents are

24    clear about the distinct references to CoinMarketCap.  It's a

25    low burden to meet authenticity.  It's not clear and

1   conclusive proof that the document is what it is.  It's just

2   a prima facie showing.  I think we've met that burden here.

3          MR. GLUECKSTEIN:  I agree with that, Your Honor.

4   But based on what was asked of the witness today, the

5   documents are now purporting to be used for evidence of what

6   CoinMarketCap did or didn't do with respect to the issue of

7   wash trading and freight volume.  And that's different than

8   simply putting the exhibit into the record.

9          So we do not believe that they have evidentiary

10  value.  They are statements that purport to be on the

11  CoinMarketCap website.  Based on the testimony today, we will

12  not continue our objection with respect to authenticity

13  grounds they will pull from that website.  But there's nobody

14  here from CoinMarketCap to talk about what they did or didn't

15  do with respect to their exchanges.

16         THE COURT:  These exhibits would be hearsay.  An

17  expert obviously can rely on hearsay for purposes of

18  establishing his opinion, but that doesn't mean that the

19  information they relied upon is necessarily admissible.  So

20  these are hearsay, and I will sustain the objection.

21         MR. ROSTOCKI:  Your Honor, I would just note that

22  there was no objection to hearsay from the debtors for any of

23  these documents under the pretrial order.  We would submit

24  that their hearsay objection is waived.  They only raised the

25  foundation objection in the pretrial order, and that should

1  be the only objection that should be addressed here today.

2          MR. GLUECKSTEIN:  Your Honor, we disagree.  This

3  exhibit list was put to us for purposes of use of these

4  exhibits at the hearing.  It is only at the point that it is

5  clear today that the witness is purporting to rely on the

6  authenticity of the -- not the authenticity, but the actual

7  content of these documents to support statements that are

8  clearly hearsay.  They could have brought a witness from

9  CoinMarketCap, or attempted to, and they haven't done that.

10         So again, the issue here is whether these

11 documents could be relied on by the expert, could be looked

12 at by the expert, could be discussed at the hearing.  But

13 what we have now hearing for the first time is these are

14 being admitted for the truth of the matter asserted as to

15 what CoinMarketCap actually did.  They are hearsay, and they

16 should not be permitted for that purpose.

17         THE COURT:  I agree.  The objection is still

18 sustained.

19         MR. ROSTOCKI:  Finally, Your Honor, we request

20 that the Court take judicial notice of three documents filed

21 in this case.  The first is docket number 2239, filed with

22 the Court on August 24, 2023.  This is the debtor's motion to

23 approve guidelines for the sale of digital assets and related

24 relief.  The reason why we want the Court to take judicial

25 notice can be found primarily in paragraph 21 of that motion,

1  where the debtors state that they would not flood the market

2  with large positions of digital assets and depress the value

3  of such digital assets.  And I have a copy if debtor wants to

4  see it.

5          MR. GLUECKSTEIN:  We have no objection, Your

6  Honor, to take judicial notice of docketed pleadings or

7  orders of this court.

8          THE COURT:  I'll take judicial notice of the

9  docket.

10         MR. ROSTOCKI:  And the second is the actual order

11  entering that motion on September 13th, 2023.  It's

12  Docket No. 2505.  And the third document is Docket No. 2244-

13  1.  That's a case update from debtor's counsel and advisors

14  that were filed on August 24th, 2023.  The document shows

15  that the debtors were still considering restarting the FTX

16  Exchange up until sometime in the second quarter of 2023.  We

17  could add an exhibit tag to each of these and hand up to the

18  Court during the break.  Or if Your Honor prefers, we can

19  lodge them onto the docket via letter if that's what Your

20  Honor would prefer.

21         THE COURT:  And there's still no objection, Mr.

22  Glueckstein?

23         MR. GLUECKSTEIN:  I'm not going to endorse

24  counsel's characterization of what those documents are, but I

25  don't have an objection to Your Honor taking judicial notice

1  of the order.

2          THE COURT:  All right, I'll take judicial of all

3  three of those documents.  I don't think there's any need to

4  submit them as actual exhibits with an exhibit mark since I'm

5  just taking judicial notice.

6          MR. ROSTOCKI:  Sure.  And then for record

7  purposes, the sequence of those exhibits would be 60, 61, and

8  62.

9          THE COURT:  Cross.

10          MR. GLUECKSTEIN:  Okay.  Thank you.

11  CROSS-EXAMINATION

12  BY MR. GLUECKSTEIN:

13      Q.   Good afternoon, Mr. Konstantinidis.

14      A.   Good afternoon.

15      Q.   Nice to see you again.

16      A.   Nice to see you again as well.

17      Q.   For the record, Brian Glueckstein, Sullivan &

18  Cromwell, for the debtors.  Mr. Konstantinidis, you don't

19  hold any degrees in finance, economics, or valuation,

20  correct?

21      A.   No, I don't.  But there's no degree in valuation.

22      Q.   You've been with your current employer, Stout,

23  since August of 2019, correct?

24      A.   Correct.

25      Q.   Prior to that role in 2019, you had not performed

1  any asset valuation work at your prior employment, correct?

2          A.    Correct.

3          Q.    And you had no experience with the application of

4  asset discounts when you joined Stout in 2019, correct?

5          A.    Correct.

6          Q.    And while you've been at Stout, you've only

7  performed valuations of cryptocurrencies for either tax

8  purposes or financial reporting purposes, correct?

9          A.    Yes.  Because these are the only two use cases for

10  valid cryptocurrencies, either for tax purpose or financial

11  reporting.

12          Q.    You have not valued cryptocurrency outside of the

13  context of your work for tax purposes or financial reporting,

14  correct?

15          A.    Correct.

16          Q.    You did not provide an expert report to the Court

17  in the Celsius bankruptcy, correct?

18          A.    Correct.  There was a colleague of mine that

19  provided that.

20          Q.    In fact, you've never submitted an expert report

21  in a court proceeding, correct?

22          A.    Well, just to be precise, on the Celsius

23  bankruptcy, I signed the valuation report, so my name was

24  there for the cryptocurrency valuation.

25          Q.    You did some analysis as part of a project that

1  was submitted by others at your firm, correct?

2       A.   So what happened on Celsius, to be precise, there

3  were two segments.  The bigger segment and the feeds are

4  publicly available.  And you see that I spent most of the

5  time on it.  So the major segment was valuing the 130 plus

6  cryptocurrencies, and there was a second segment valuing

7  alternative investments that another team at Stout did.  And

8  then a third person basically combined those two reports into

9  one, and he testified to court.

10            THE COURT:  Hold on just one second.  We lost our

11  video for the courtroom.  Okay, what about the people on

12  Zoom?  Okay, I'm sorry.  Go ahead, Mr. Glueckstein.

13  BY MR. GLUECKSTEIN:

14       Q.   You did not testify in the Celsius bankruptcy

15  case, correct?

16       A.   I did not due to logistics.  The person that

17  testifies was based in New York, and I'm based on the West

18  Coast.

19       Q.   You agree with the debtors that discounts to the

20  petition date spot pricing for MAPS tokens need to be made,

21  correct?

22       A.   Excuse me, what was the last one?

23       Q.   That discounts to the petition date spot price for

24  MAPS tokens needs to be made, correct?

25       A.   Yes.  Yes.

1    Q.    And you agree that there needs to be an

2    adjustment, a discount to the price of petition day pricing

3    for OXY tokens, correct?

4    A.    Correct.

5    Q.    And you agree with the debtors that discounts to

6    the petition day spot pricing for Serum tokens need to be

7    made, correct?

8    A.    Yes.

9    Q.    The scope of your opinion, as you articulated, was

10   to value the claims portfolio of each of your individual

11   clients, correct?

12   A.    Correct.

13   Q.    You're not offering an opinion on alternative ways

14   for the debtors to realize value from their token portfolio,

15   correct?

16   A.    When you say realize value, are you saying

17   executing the liquidation process, that's what you mean?

18   Q.    Did you do anything with their tokens, liquidation

19   or otherwise?

20   A.    The only thing I did is I valued the tokens.

21   Q.    You valued the tokens with respect to your

22   clients, correct?

23   A.    With respect to the holdings, correct.

24   Q.    You're not offering any opinion on alternatives to

25   how the debtors would go about liquidating their token

1  portfolio, correct?

2      A.    I'm not offering any opinions on the execution.

3  My opinions are strictly on the valuation side.

4      Q.    And so likewise, you're not offering any trading

5  strategies for the debtors in terms of how they should

6  monetize their token portfolio, correct?

7      A.    Correct.

8      Q.    And you're not suggesting that the debtors should

9  hedge or short token prices for their token portfolio,

10  correct?

11      A.    No, I'm certainly not an expert for that.

12      Q.    And you're not offering an opinion that the

13  debtors should burn tokens, correct?

14      A.    Correct.

15      Q.    You testified that you provided valuations for

16  each of your client's claimed holdings of MAPS, OXY, and

17  Serum, correct.

18      A.    Yes.

19      Q.    To value those claims, as you put it, you

20  calculated a price for each of MAPS, OXY, and Serum, correct?

21      A.    Correct.

22      Q.    And to do that, you calculated a discount to the

23  market price of each of those tokens, correct?

24      A.    Correct.

25      Q.    And then you applied that discounted price to the

1  number of tokens that was held by each of your clients by

2  multiplying it by their holdings in each token, correct?

3       A.   Correct.

4       Q.   You did not do any sort of discounted cash flow

5  analysis or other valuation, correct?

6       A.   No.  Because discounted cash flow is used when

7  revenue is generated, there may be tokens that -- sometimes

8  more two tokens, potentially -- they may generate revenue,

9  and that's a use case.  When you lock your tokens or stake,

10 you give it to a third party platform, like in a bank, and

11 they give you interest back, so they generate revenue.

12      Q.   So what you did was discount, was calculate a

13 discount to the market price of the token.  That was the

14 valuation you did, correct?

15      A.   Yes.

16      Q.   And under your methodology, the discounted value

17 of one MAPS, OXY, or Serum token is different depending on

18 which of your clients is claiming the token, correct?

19      A.   Not one token.  There's slightly variation because

20 it depends on how many tokens they hold and what mix of

21 locked and unlocked tokens they hold.

22      Q.   So based on the holdings of each individual

23 client, you get to a different discount for each of MAPS,

24 OXY, and Serum, correct?

25      A.   Correct.

1      Q.    And so it's correct that under your methodology,

2  it would be required that the debtors calculate a unique

3  discount and price for each and every creditor asserting a

4  claim based on MAPS, OXY, and Serum tokens, correct?

5      A.    Yes, you would have to do it for holdings,

6  although there may be a benchmark, meaning you could have a

7  minimum discount based on average holdings.

8      Q.    But that would be a decision that was made.

9      A.    That would be a decision to be made.

10      Q.    Under your methodology, you would need to

11  calculate a different discount for each creditor based on its

12  individual holdings, correct?

13      A.    Yes.  Correct.

14      Q.    If your assignment was to come up with a petition

15  date market price applicable to all customer claims, would

16  you have done a different analysis?

17      A.    Well, you can't do that because you have a

18  restriction by volume.  The point being, the reason for the

19  discount is dual.  Like I said before, it's the locking of

20  the tokens.  So there is a legal restriction, and then there

21  is a volume based on the holdings.  So in your analogy, if

22  somebody held ten MAPS tokens, I wouldn't discount them.  I

23  mean, the market can absorb them, so the price cannot be

24  universal.  It depends on the size of the holdings.

25      Q.    So your view is that you cannot have a universal

1  discounted price for MAPS tokens, correct?

2      A.   Well, you can have a benchmark, you can make a

3  decision on average, you can say -- you can have segments on

4  different creditors and say, what is the average holdings

5  that they have for MAPS and OXY and have a benchmark average

6  discount.  You can definitely do that.  So it's a decision

7  you can make.

8      But to me, it doesn't make sense to assign a discount

9  to a MAPS token because the creditors that have very few

10 tokens that the market can absorb, they won't have a

11 discount.  Now, the holdings of entities like MAPS and

12 Serendipity that have large holdings, they would have a

13 discount.

14     Q.   So your view again, sir, your view is that you

15 cannot have a single price, discounted price, for MAPS tokens

16 applied to all creditors, correct?

17     A.   Correct.

18     Q.   And so as a result, you're not offering an opinion

19 today on the value of MAPS, OXY, or Serum tokens as

20 applicable to any creditor other than your clients, correct?

21     A.   Correct.

22     Q.   You stated that you assumed -- strike that.

23     In connection with your methodology, you testified that

24 you took into account certain tokens were locked pursuant to

25 a vesting schedule, correct?

1      A.    Correct.

2      Q.    And you testified that that was because of some

3  legal restriction, corrected?

4      A.    Correct.

5      Q.    Are you offering a legal opinion as to whether the

6  debtors have the right to sell or transfer tokens?

7      A.    I'm not a lawyer, so by default I'm not offering a

8  legal opinion.  However, based on two data points, the white

9  papers from OXY-MAPS that they clearly say linearly unlocking

10  of locked tokens and purchase agreements that your side sent

11  to me during the discovery phase, those purchase agreements

12  clearly said those tokens are locked by the issuer and they

13  follow a linear schedule.

14      Q.    But you're looking at the locked token schedule

15  from the perspective of your clients, who is the creditor,

16  correct?

17      A.    Well, again, I'm not coming here as a lawyer, but

18  in the purchase agreement that's sent to me during the

19  discovery phase, there were names of other entities.

20      Q.    Are you offering an opinion with respect to those

21  documents?

22      A.    I don't, but these are the documents that they

23  sent to me.  And the purchase agreements clearly said that

24  there is a locking mechanism from the issuer.

25      Q.    So you simply assumed in calculating your discount

1   that certain portions of your client's holdings were, in

2   fact, locked tokens, correct?

3        A.   Yes.  Because this is what the white papers and

4   the agreement said.

5        Q.   You stated earlier that the debtors were a

6   custodian of the MAPS and OXY tokens.  Do you recall that?

7        A.   Yes.

8        Q.   You don't have any basis to know one way or the

9   other whether the debtors were merely a custodian of those

10  tokens, do you?

11       A.   Well, I don't have a stated fact somewhere.  But

12  knowing, for example, that MAPS is holding 4 billion tokens

13  and the FTX wallet has 10 billion token, I assume that FTX is

14  holding those tokens, those 4 billion tokens that belong to

15  MAPS.

16       Q.   You make the assumption that the debtors are

17  holding the tokens to which MAPS is claiming an interest in,

18  correct?

19       A.   Yes, but it's not an assumption.  It's common

20  sense.  So, FTX wallet has the total supply, 10 billion

21  tokens, 4 billion of them belong to MAPS.  That's what I have

22  in the holdings.  So the 4 billion of them, 40 percent, is

23  what FTX wallet holds.

24       Q.   You applied the blockage discount model, as you

25  termed it, correct?

1      A.   Yes.

2      Q.   And that model was developed in the context of IRS

3 claims, correct.

4      A.   Again, I'm not a lawyer.  I'm not sure I would say

5 claims.  I would say holdings.  When you value large estates,

6 that's the model you use.

7      Q.   And you, yourself, have not applied that model

8 outside the context of valuing IRS claims or for purposes of

9 financial reporting, correct?

10      A.   Well, no.  For financial reporting, which was

11 Celsius, there is a specific accounting codification, fair

12 value measurement.  It's called accounting standard

13 codification 820, that you get -- it says that you need spot

14 prices, not volume.  So, for financial purposes and reporting

15 to either the SEC of internal reporting for funds, volume is

16 not coming into play.  Volume comes into play only for IRS

17 purposes.

18      Q.   Okay.  So thank you for the correction.  So you've

19 only applied this model for purposes of IRS valuation,

20 correct?

21      A.   Correct.

22      Q.   Two of the factors influencing the size of the

23 blockage discount are the size of the block and the trading

24 volume of the asset, correct?

25      A.   Correct.

1          Q.   And you would agree that the debtor's holdings in
2    each of MAPS, OXY, and Serum, is large, correct?
3          A.   Yes.
4          Q.   And you use the Finnerty and Chafe models to
5    calculate the discounts in your report, correct?
6          A.   Yes.
7          Q.   Those are models that address discounts for lack
8    of marketability, correct?
9          A.   Correct.
10         Q.   The Finnerty and Chafe models are based on studies
11   of restricted shares of stock and not digital assets,
12   correct?
13         A.   Correct.
14         Q.   So, Mr. Konstantinidis, as part of your
15   methodology, you assumed there could be an increase in the
16   daily trading volume of 10 percent without any depression in
17   the market price, correct?
18         A.   Yes.
19         Q.   You made that assumption for each of MAPS, OXY,
20   and Serum tokens, correct?
21         A.   Yes.
22         Q.   So you assume that a single creditor can sell up
23   to 10 percent of the daily trading volume of each token on a
24   daily basis with no price impact, correct?
25         A.   No, I don't assume that -- there is going to be

1  price impact.  That's why I'm applying a discount.  It's just

2  an assumption I need for the phase liquidation approach.

3       Q.   But you're assuming that each creditor, you're

4  assuming that each creditor, each of your clients, can sell

5  up to 10 percent of the daily trading volume with no price

6  impact, correct?

7       A.   Correct.  But again, I want to clarify that I'm

8  considering broker's discount understands there's going to be

9  a discount, there's going to be price changes while I'm

10 waiting for the liquidations, and that's what the discount

11 captures, those price change while I'm waiting to sell my

12 assets.  So it's just an assumption for reasons of

13 liquidation for valuation purposes.

14      Q.   And you believe that that's a reasonable

15 assumption to make.  But you do not cite anything in your

16 report supporting that 10 percent number, correct?

17      A.   Correct.  I did not cite anything.

18      Q.   In your view, you assume that with respect to

19 MAPS, there would be zero price impact above zero at the 10

20 percent trading level, correct?

21      A.   Correct.

22      Q.   The same for OXY up to the 10 percent trading

23 level, correct?

24      A.   Yes.

25      Q.   And same for Serum up to the 10 percent trading

1  level, correct?

2       A.    Yes.

3       Q.    Your methodology assumes that there could not even

4  be a very small percentage impact on price from selling up to

5  10 percent of the asset into the market, correct?

6       A.    Correct.  That's my threshold on a daily basis.

7  But again, I don't want to dilute the message that of course

8  there's going to be price change.  That's why I'm applying a

9  discount that captures that price change.

10      Q.    I understand the result of your method is a

11  discount, but your methodology assumes that there is zero

12  percentage impact from selling up to 10 percent of the asset

13  into the market, correct?

14      A.    Yes.  As part of the phased liquidation approach.

15      Q.    And then once you reach 10.1 percent or something

16  higher, there would then be some price impact, correct?

17      A.    Yes.  But that's a hypothetical.  You never do

18  that, because in your valuation model, you restrict it up to

19  10 percent.

20      Q.    And your blockage model assumes that there will be

21  block trading every day in MAPS and OXY for four to five

22  years with no price impact depending on the token.  Correct?

23      A.    Again, there will be price impact.  The assumption

24  is primarily for liquidation purposes, and the price impact

25  is captured by the discount formula, which takes into account

1   the price volatility.

2       Q.   And the discount that you generated assumes that

3   there will be block trading in MAPS and OXY for four to five

4   years every single day at that level, correct?

5       A.   That's what it assumes.  Again, understanding that

6   there's going to be a price impact.  That's why I'm using a

7   discount model.

8       Q.   Your analysis does not account anywhere for the

9   market expectations of these ongoing block trades day after

10  day, correct?

11      A.   No, it captures that of the price fluctuations.

12  That's why I'm calculating volatility.

13      Q.   You're calculating volatility, but you are not

14  addressing the possibility that the market prices in the day

15  after day block trading, correct?

16      A.   No, that's priced in the volatility.  Volatility

17  captures price fluctuations throughout the liquidation

18  period.

19      Q.   Okay.  You determine the claim amount of each of

20  your clients independently of your other clients, correct?

21      A.   Correct.

22      Q.   And so you valued four different sets of client

23  holdings, correct?

24      A.   Correct.

25      Q.   And you assume, for purposes of your model, that

1   each of these clients sells up to 10 percent of the average

2   daily trading volume in each of the relevant tokens, correct?

3         A.   Correct.

4         Q.   If there were 50 other creditors whose positions

5   in massive tokens needed to be liquidated, your opinion is

6   that as long as each creditor individually sold less than 10

7   percent of the daily trading volume, it's an appropriate

8   assumption that there's no market price impact, correct?

9         A.   Yes.  And just to clarify, that's what I do on the

10  IRS holdings valuation, there's no way to know what other

11  investors hold.  You treat that portfolio or the number of

12  holdings isolated from anything else.

13        Q.   And you don't look to see whether any of those

14  other 50 creditors or 500 creditors' sales were happening at

15  the same time.  Correct?

16        A.   Yes.  The other thing I want to clarify is I think

17  we're combining an execution of the liquidation with my

18  liquidation, which is primarily for valuation purposes.  So

19  I'm using it for valuation purposes as a valuation expert.

20  I'm not a trading expert, so I have no idea how in real life

21  it'll happen.  Will they happen at the same time, some of

22  them will be liquidated in completely different decentralized

23  exchanges from the other creditors?  That's something outside

24  my purview and my scope.

25        Q.   The valuation -- to be clear, the valuation that

1  you're offering is a discount to the market price, correct?

2      A.    Correct.

3      Q.    So it's outside the scope of your analysis that

4  even if, in the aggregate, 500 percent of the daily trading

5  volume of a given token was being sold into the market,

6  whether or not that would have a price impact, correct?

7      A.    No, that would be a different engagement.  Then

8  you would have to tell me, this is the number of token.  This

9  is your portfolio X number, 10 billion tokens.  And you have

10 to value those tokens, explicitly.

11     Q.    But you would only look at it under your

12 methodology if it was within the portfolio of the client's

13 tokens that you're looking at.

14     A.    Correct.  However you define to me the holdings or

15 the portfolio, to say you're valuing that portfolio, that's

16 what I'm valuing.  I'm not looking at the total supply.  I'm

17 not looking at other investors.  That's the best practices in

18 valuation.

19     Q.    And again, you're using the term valuation, but

20 what you're doing is calculating a discount from the market

21 price of the token, correct?

22     A.    And that's valuation theory.  Coming up with a

23 discount.

24     Q.    Okay.  And so coming up with that discount, if

25 your assignment was to look at the totality of the debtor's

1  holdings, if that was your portfolio, then you would have to

2  look at your model across the entirety --

3        A.    Correct.

4        Q.    -- of the debtor's market.

5        A.    That's correct.

6        Q.    And if your assignment was to look at the totality

7  of the market as a whole, you would look at the totality of

8  the market, correct?

9        A.    Yeah.  If you tell me, give me the value of the

10 Apple total supply shares or Amazon.  I mean, I don't know

11 why, but yes, that's what I would do.

12       Q.    Mr. Konstantinidis, you use CoinMarketCap data for

13 your pricing volume assumptions, correct?

14       A.    Yes.

15       Q.    And you did not conduct any analysis to determine

16 the reliability of the data provided by CoinMarketCap,

17 correct?

18       A.    No, I'm relying on the data provider, so I didn't

19 do any independent analysis.

20       Q.    So you just took the data that they publicly make

21 available and you used it in your analysis, correct?

22       A.    Correct.

23       Q.    And you use all the data that's reported by

24 CoinMarketCap, correct?

25       A.    When you mean -- when you say all the data, what

1  do you mean?

2       Q.   All the data that was available to you when you

3  went to collect data from CoinMarketCap, you didn't exclude

4  any exchanges, correct?

5       A.   Correct.

6       Q.   You didn't undertake any analysis to evaluate the

7  volume generated from any of the exchanges that was reported

8  on CoinMarketCap, correct?

9       A.   Well, correct.  But with the clarification that

10 the opposing experts, like Coin Metrics, sent me data around

11 LBank and Gate.io.  So there were cases when I compared

12 CoinMarketCap volume with individual cryptocurrency

13 exchanges.  Also, in addition, in some cases, I did go to

14 individual cryptocurrency exchanges, which are easy to

15 extract their data, like Gate.io, to compare their volume and

16 prices, what CoinMarketCap offers to me.  So I did do some

17 independent analysis to understand and make sure to reconcile

18 the numbers.

19      Q.   You did analysis to reconcile the numbers or you

20 did analysis to look at the reliability of the data?

21      A.   Well, I would say both.  The reliability of the

22 data from the standpoint, obviously, Coin Metrics had their

23 own volume for Gate.io.  I also independently pulled that

24 data from Gate.io, and I checked those numbers.  Now, there

25 was obviously FTX.  There's no way to pull that data, but I

1  did do that analysis for certain cryptocurrency exchanges

2  that they allow me to pull the data on top of accepting

3  CoinMarketCap.

4      Q.   Was there anything that you were able to do in

5  your analysis to actually test the reliability of the data

6  that's on CoinMarketCap?

7      A.   Well, do you mind clarifying, when you say

8  reliability, what exactly do you mean?

9      Q.   Did you do anything to analyze the reliability of

10  the exchange data that you -- volume data that you were

11  relying on from CoinMarketCap?

12      A.   So one thing that I did that I think I explained

13  well with LBank is the fact that Professor Howell is using

14  three cryptocurrency exchanges -- Gate.io, FTX, and MEXC --

15  for MAPS, and it was 510,000.  From CoinMarketCap, the volume

16  I received was 1.8, and then when I factored in LBank on top

17  of Professor Howell's volume, the volume went to 1.7.

18      So the Coin Metrics side of things said 1.7 million for

19  MAPS; CoinMarketCap said 1.8.  So there was 100,000

20  difference, which I assume it's probably based on

21  decentralized exchanges.  So I did some analysis to

22  understand if the numbers I get from CoinMarketCap make

23  sense.

24      Q.   You didn't do any analysis to determine whether or

25  not any of the exchange data on CoinMarketCap was victim of

1   wash trading or fake volumes, correct?

2        A.   Correct.

3        Q.   And you testified that it's your opinion that

4   using the 24 hours prior to the petition date to determine

5   your baseline volume assumption for each of MAPS, OXY, and

6   Serum was appropriate, correct?

7        A.   Correct.

8        Q.   And that was also based on CoinMarketCap data,

9   correct?

10       A.   Correct.

11       Q.   And you performed no sensitivity or other analysis

12  that set forth in your report to determine the

13  appropriateness of this 24 hours window, correct?

14       A.   I mean, I believe I -- like I said before, I

15  believed I checked with Mr. Lu like one hour prior, and some

16  of those numbers were provided in my report, as well, about

17  different windows.

18       Q.   But you didn't provide any analysis as to why 24

19  hours is the appropriate time for that volume assumption,

20  correct?

21       A.   This was primarily based on my -- yes.  So this

22  was primarily based on my professional judgment.  What I've

23  used elsewhere, just like in the Celsius bankruptcy, has a

24  24-hour window for making sure that I take into account all

25  the cryptocurrency exchanges.

1        Q.    And you don't cite to anything in your report that

2   relies on 24 hours as being the appropriate time for

3   calculating volume assumptions, correct?

4        A.    Correct.

5        Q.    You assumed trading volumes for MAPS and OXY would

6   increase by over 850 percent in the year after the petition

7   day, correct?

8        A.    Yes.

9        Q.    And over 20 percent for Serum, correct?

10       A.    Yes.

11       Q.    And this growth rate is growth from your

12  assumptions based on CoinMarketCap data, correct?

13       A.    Yes.

14       Q.    And you testified about a set of 20 tokens that

15  you identified that make up that data set, correct?

16       A.    Yes.

17       Q.    And that growth increase is projected based on the

18  average volume trends for those 20 tokens that you selected,

19  correct?

20       A.    Yes.

21       Q.    And you did not perform any analysis as to whether

22  any of those tokens had ties to FTX, correct?

23       A.    I believe -- I mean, I did some analysis.  I

24  believe none of them did have ties with FTX.

25       Q.    There's no analysis -- I'm sorry, sir.

1       A.   Oh, I'm sorry.  I was saying that I did perform

2   analysis to understand.  I don't believe that any of them

3   were part of the FTX holdings.

4       Q.   But the question was slightly different.  Did you

5   do any analysis as to whether any of those 20 tokens that

6   were in your data set had ties to FTX?

7       A.   What do you mean by ties?  Like FTX held them or -

8   -

9       Q.   FTX held them.  FTX or Mr. Bankman-Fried were

10  involved in those projects?

11      A.   I didn't do any explicit analysis, but I think I

12  did make sure they are not part of the holdings.  They're not

13  part of FTX holdings, so they're independent from the

14  cryptocurrency tokens that FTX is holding.

15      Q.   You did not consider whether any of those tokens

16  in your data set are utility tokens with associated projects

17  that failed, correct?

18      A.   Well, I don't think they failed just because of

19  the volume growth.  I don't believe, at least till the date

20  that I received the volume, that there were failed tokens

21  because they were still existent.

22      Q.   So you assume they were still existing, but you

23  didn't conduct any analysis on that topic, correct?

24      A.   But when I pulled the data just before I submitted

25  my report, they were existent before January 26, 2024.

1      Q.   And it was alluded to on your direct testimony,

2  you did calculate a median growth rate for these tokens, as

3  well, those 20 tokens, correct?

4      A.   Correct.  And just to clarify on that, it came up

5  on the deposition, and I think I gave an answer, 150 percent.

6  And the actual one when I went back was 165 percent, the

7  median.

8      Q.   But you did not include the median in your final

9  analysis.  You used the average, correct?

10      A.   Correct.

11      Q.   Using your average growth rate, it would take

12  approximately five years to liquidate each of your clients'

13  claimed holdings of MAPS, OXY, Serum under your approach,

14  correct?

15      A.   Correct.

16      Q.   And if you instead use the median volume numbers,

17  it would take significantly longer, correct?

18      A.   Correct.  And let me clarify on that.  Again, I

19  provided a high estimate, and I want to be conservative on

20  the deposition.  I said between 20 and 30 years.  When I run

21  the number again for 150 percent growth for MAPS, I believe

22  it took close to 17 years.  I believe for OXY was close to

23  ten years.  And for Serum was pretty much the same amount.

24      Q.   Do you still have the slides in front of -- the

25  copy of the slides in front of you?

1        A.    Yes.

2        Q.    Your demonstratives?

3        A.    Yes.

4             MR. GLUECKSTEIN:  Do you still have a copy, Your

5    Honor?

6             THE COURT:  Yes.

7    BY MR. GLUECKSTEIN:

8        Q.    If you could look at slide 9, the last slide there

9    on your alternative scenarios.

10       A.    Yes.

11       Q.    And just so that we're clear for the record, the

12   alternative scenarios are scenarios that you came up with for

13   purposes of this hearing, but those are not presented in your

14   report, correct?

15       A.    Correct.

16       Q.    If we look at the volume profile row of these

17   scenarios.

18       A.    Yes.

19       Q.    So there was some testimony about this on your

20   direct.  In alternative scenario two, you changed the 857

21   percent first year numbers to 150 percent to reflect, as you

22   put it, a conservative view of the median number, correct?

23       A.    Yeah, this was my answer in my deposition, so I

24   went with this.

25       Q.    And for years two, three, and four, you left those

1  percentages the same as your average calculations, consistent

2  with your report.

3       A.   Correct.  Correct.

4       Q.   And are you aware -- Mr. Konstantinidis, you

5  reviewed Professor Howell's rebuttal report, correct?

6       A.   Yes.

7       Q.   Do you have the FTX binder still in front of you

8  or accessible, I should say.

9       A.   Give me a second.  Yes, one second.

10      Q.   Okay, if you would please turn to FTX Exhibit 6.

11      A.   Yes.

12      Q.   And if you could turn to the few pages from the

13  back in the exhibits.  Exhibit No. 7.  There's a chart there.

14      A.   One second.

15      Q.   The table.

16      A.   Do you mind telling me the page on the top maybe

17  easier for me.

18      Q.   Sorry.  It's 81 of 90 at the top.

19      A.   81.

20      Q.   Let me know when you're there, please.

21      A.   Yes, I'm 81 of 90.  Yes.

22      Q.   Okay.  Do you see in Exhibit 7, Dr. Howell

23  presents median numbers with respect to your data set of 20

24  cryptocurrencies that go out beyond the first year?

25      A.   Yes.

1   Q.   And do you see that in 2025, those numbers start

2   to go negative?

3   A.   Yes.

4   Q.   Do you disagree with her calculations of the

5   numbers that they set forth in Exhibit 7?

6   A.   No, I don't.

7   Q.   But you didn't include those in your alternative

8   scenario two, right?  You just kept your -- you changed year

9   one but you didn't change the out years of two, three and

10  four, correct?

11  A.   Correct.  I was going strictly by the question

12  posed to me on the deposition about the first year growth.

13  Q.   And under the numbers presented in Exhibit 7 in

14  Dr. Howell's rebuttal report, if the volume numbers in years

15  two, three, and four are lower and in fact go negative, would

16  that impact the output from your discount calculation?

17  A.   It'll impact it, but it's going to be like a

18  slight impact.  Let's not forget that I'm also using a lower

19  number for the first year growth.  So I'm 15 percent less.

20  Q.   But you didn't calculate that and present that

21  here in your schedule, correct?

22  A.   Correct.  I was going to be, again, very tied to

23  what I said on my deposition, and the question was the first

24  year growth, and I answered 150 percent.  So I strictly

25  followed that path.

1        Q.    Okay.  And just to be clear, in alternative

2   scenario three of slide nine of your demonstratives.

3        A.    Yes.

4        Q.    You're presenting numbers that you purport to be

5   put through the KO model to calculate a discount with respect

6   to, in this example, only your client MAPS Vault.

7        A.    Correct.

8        Q.    And so you would run this scenario for each of

9   your clients separately and get to a separate discount for

10  each of those other clients, correct?

11       A.    Correct.

12       Q.    And you did that including CoinMarketCap data with

13  respect to trading volumes as well, correct?

14       A.    Yes.

15       Q.    If we could look at slide five in your

16  demonstratives.

17       A.    Yes.

18       Q.    And item three there.

19       A.    Yes.

20       Q.    You have a bullet or an illustration that says

21  critique three is kills the market by selling all holdings in

22  one day to measure market impact.  Do you see that?

23       A.    Yes, I have a different slide from -- yes.  Yes.

24       Q.    The KO model does not contemplate selling all

25  holdings in one day does it?

1      A.    Yes, it does.

2      Q.    Do you have in front of you FTX Exhibit 13.

3      A.    Goes up to nine.

4            MR. GLUECKSTEIN:  I approach, Your Honor?

5            THE COURT:  Yes.

6            THE WITNESS:  Thank you.

7  BY MR. GLUECKSTEIN:

8      Q.    Are you familiar with the documents for this

9  marked as FTX-13?

10     A.    Yes.

11     Q.    And what is it?

12     A.    That's the KO 2016 paper.

13     Q.    As you're understanding that this is the paper on

14 which Dr. Howell relies on for her model?

15     A.    Yes.

16     Q.    If you turn to page 1361 of the article.

17     A.    Yes.

18     Q.    In the discussion section there, the paragraph

19 starting second, it says, invariance relationships are based

20 on implicit assumption that bets are executed and

21 endogenously determined natural speed that trades off of the

22 benefits of faster execution against higher transaction

23 costs.  Do you see that?

24     A.    Yes.

25     Q.    Do you disagree with that statement?

1       A.    Well, I don't disagree, but first of all, it talks

2  about bets, and secondly, talks about how the market reacts

3  after the trade takes place.  That's the speed.

4       Q.    Okay.  So it is your view that the KO model

5  contemplates that the debtors will sell all of their holdings

6  on a single day?

7       A.    It is not my view.  Even the formula takes into

8  account, like I presented in my demonstrative, the daily

9  volatility, not the annual, like discount models do.

10 Secondly, there is no definition or demonstrative of -- just

11 like I showed the liquidation, in the KO model, there is no

12 liquidation phase that shows me how long it will take to

13 saturate the market.

14      So for those reasons, it assumes the sale happens in

15 one bet, and then from then on, the market decides how long

16 it takes to sell those tokens.  So that's why it doesn't

17 provide you a formula to understand when the market gets

18 saturated.  And that's why those numbers is over 100 percent

19 showing to you that it does not make sense as a trader to

20 sell those tokens in a day.

21      Q.    Sir, there's nothing -- can you point to anything

22 in the KO paper, FTX Exhibit 13, that says that the

23 transaction will all take place in a single day?

24      A.    Well, if you go to page 1400 in equation 38 that's

25 used by Professor Howell, the volatility there, sigma, is the

1  daily volatility.  So it takes into account the fluctuation

2  of price for a day, not the long term volatility like

3  discount models do.

4      And in addition, it doesn't give you any liquidation

5  schedule.  It never tells you how many shares or tokens you

6  will sell until after you saturate the market.  They may not

7  say it explicitly, but it's clearly implied by the math

8  formulas.

9      Q.   Do you have your report still in front of you?

10     A.   Yes, my report is.

11     Q.   Which is -- sorry, FTX Exhibit 4.

12     A.   Yes.

13     Q.   If you can look at page -- sorry, paragraph 33 on

14  page 16 of your report.

15     A.   Yes.

16     MR. GLUECKSTEIN:  Okay.  In paragraph 33, one of your

17  critiques of Professor Howell, in the second sentence, you

18  state, however, the slow trading strategy, which is assumed

19  to be used by traders to minimize transaction costs, plays no

20  role in the cryptocurrency market.  You see that?

21     A.   Yes.

22     Q.   Is that still your opinion today?

23     A.   Yes.

24     Q.   And it's your understanding that the slow trading

25  strategy that you're referring to there is Dr. Howell's model

1  applying the KO model, correct?

2      A.   Yes.  And to clarify, the slow trading strategy

3  comes into play when you have several bets.  I believe

4  Professor Howell testified that she assumed it's a single

5  bet.

6      Q.   You believe Professor Howell testified it's a

7  single bet.

8      A.   Correct.

9      Q.   You go on to state, large amounts of MAPS, OXY,

10  and Serum can be absorbed into the cryptocurrency market, and

11  there's no reason to require a slow trading strategy,

12  correct?

13      A.   Yes.

14      Q.   And so that continues to be your belief that there

15  can be significant amounts of these tokens that can be

16  absorbed into the market, correct?

17      A.   Well, the significant is a little bit vague.

18  Here, I'm talking regarding just amounts under 100 percent.

19  I don't disagree with Professor Howell that the volume held

20  by the claimants is much higher than the daily trading

21  volume.

22      Q.   But again, you're not considering at all any of

23  those amounts held by the other claimants or by the debtors,

24  correct?

25      A.   Correct.

1       Q.    You were asked some questions around by your

2   counsel on certain articles, one of which was the Abbott

3   article, which is OXY-41.  Do you recall that, sir?

4       A.    I recall it, but let me get it from the binder.

5   My apologies for the delay.  Yes, I'm there.

6       Q.    The models that are discussed in the Abbott

7   article, as evidenced by the first sentence of that article,

8   are critiquing models around the discount for lack of

9   marketability or the DLOM, correct?

10      A.    Again, like I said before, marketability covers

11  all kinds of reasons for discounts.

12      Q.    Is there anything in the Abbott article that

13  addresses -- sorry.  Is there anything in the Abbott article

14  addressing price impact models?

15      A.    No, it's only discount models because that's how

16  you value assets.

17              MR. GLUECKSTEIN:  I have no further questions,

18  Your Honor.

19              THE COURT:  Okay.  Thank you.  Redirect?

20              MR. TOROSIAN:  Jeff Torosian for MAPS Vault.  Your

21  Honor, I have no redirect.  I will after this witness is done

22  still have my case in chief, and we'll want to admit some

23  exhibits and evidence, but we can do that after the witness

24  steps down.

25              THE COURT:  Okay.

1          MR. TOROSIAN:  I don't know if counsel --

2          THE COURT:  Other parties want to redirect?

3          MR. ROSTOCKI:  I just have one quick question,

4  Your Honor.

5  RECROSS-EXAMINATION

6  BY MR. ROSTOCKI:

7      Q.    Referring to the agreements related to the vesting

8  schedule, were those agreements between the issuer and the

9  debtors?

10     A.    Like I said, these agreements were sent to me in

11  the discovery phase.  I remember there was between issuer

12  Serendipity liquidity network, and again, I'm not a lawyer.

13  And the purchasers were -- I remember a name being Cottonwood

14  Grove, and there were some other names.  So it was a legal

15  agreement between liquidity or MAPS entities, and then a

16  purchaser.

17          MR. ROSTOCKI:  That's all, Your Honor.  Thank you.

18          THE COURT:  Thank you.  Anyone else?  All right,

19  thank you, Mr. Konstantinidis, you can step down.

20          MR. TOROSIAN:  Your Honor, Jeff Torosian for MAPS

21  Vault.  Before I rest our case, we'd like to move into

22  evidence.  MAPS 2 and 5, which are the two proofs of claim,

23  and MAPS 3 and 4, which are the two transfer of claim and

24  claim assignment documents.

25          MR. GLUECKSTEIN:  Again, Your Honor, same issue.

1   Fine with them being part of the record, but not for the

2   truth of the matter asserted.

3           THE COURT:  Okay, they're admitted then, for that

4   limited purpose, not for the truth of the matter asserted.

5           MR. TOROSIAN:  Thank you, Your Honor.  With that,

6   MAPS Vault rests.

7           THE COURT:  Thank you.  Any other witnesses?

8           MR. BACON:  Good afternoon, Your Honor.  Elliott

9   Bacon on behalf of TMSI, we'd like to call Mr. Gkatzimas to

10  the stand.

11          THE COURT:  Okay, Mr. Gkatzimas, please come

12  forward.  Take the stand and remain standing for the oath.

13          THE CLERK:  Please raise your right hand.  Please

14  state your full name and spell your last name for the Court

15  record, please.

16          THE WITNESS:  Ioannis Gkatzimas, last name

17  G-K-A-T-Z-I-M-A-S.

18          THE CLERK:  Do you affirm that you tell the truth,

19  the whole truth, and nothing but the truth to the best of

20  your knowledge and abilities?

21          THE WITNESS:  I do.

22          THE CLERK:  You may be seated.  Your Honor.

23          THE COURT:  Whenever you're ready, Mr. Bacon.

24  DIRECT EXAMINATION

25  BY MR. BACON:

1      Q.   Good afternoon, Mr. Gkatzimas.

2      A.   Good afternoon.

3      Q.   Could you please describe to the Court the

4  academic degrees that you hold?

5      A.   Yes, I guess going in reverse order.  I hold a

6  master's of science in financial mathematics from Stanford

7  University, a master's of financial engineering from UC

8  Berkeley Haas School of Business, an MBA in international

9  finance from St. John's, and I hold a bachelor's in

10  pharmaceutical sciences from Aristotle University of

11  Thessaloniki in Greece with a focus on biochemistry and

12  pharmaceutical chemistry.

13      Q.   And are there any certifications that you hold and

14  professional affiliations?

15      A.   Yes, I have been a member of the Chartered

16  Financial Analyst Society in San Francisco since 2010/'11, I

17  believe.  I hold the CFA designations.

18      Q.   And have you held on any employment positions

19  within the financial services industry?

20      A.   Yes, I started my career in banking.  I worked for

21  a few banks on asset management and online trading systems at

22  the beginning of my career.  I have transitioned into

23  consulting from 2006 until today.

24      Q.   And where are you currently employed?

25      A.   I am employed full time at the Brattle Group.  I'm

1  a principal in the San Francisco office of the Brattle Group.

2  There I'm ahead of our credit derivatives and structured

3  products practice, and I'm also the co leader of our

4  cryptocurrency and digital assets practice.

5       In addition to my employment at the Brattle Group, I

6  teach part time at the University of California Haas School

7  of Business, where I have taught courses in financial

8  engineering, design of complex securities like futures, and

9  also in investments.

10      Q.   And in those roles, do you have experience

11  relating to valuing financial assets?

12      A.   Yes, in many different contexts and in many

13  different types of assets, including crypto.

14      Q.   And in connection with valuing financial assets,

15  is that done in connection with the disposition or

16  liquidation of those assets?

17      A.   Yes, it often is.  I have a couple of cases, for

18  example, involving concentrated positions, in particular

19  cryptocurrency tokens or issues related to futures for

20  cryptocurrency tokens like perpetual futures.

21      Q.   And have you given any presentations or authored

22  any articles relating to digital assets?

23      A.   Yes, I have.  I have given two presentations, one

24  in an academic audience at the University of San Francisco on

25  blockchain and cryptocurrency tokens, and another one at

1  General Motors and industrial audience.  In terms of

2  applications of crypto, I have written two publications in

3  professional journals in professional magazines, one on

4  Bitcoin futures and the return to the US market, the

5  regulated futures, the CME, and the CBOE versions.  And also

6  I had an initial kind of educational article on ICO's initial

7  coin offerings and their characteristics.

8       Q.   And could you just give the Court an example of

9  some of the experience that -- some of the specific

10 experience that you have relating to valuing financial

11 assets?  An example?

12      A.   Yeah.  So it's a variety of experiences, starting

13 from market structure design, how basically tokens are

14 designed, their use cases, the marketplaces where they trade,

15 including the structure of the marketplaces, the fees, the

16 market participants who engage in trading the derivatives on

17 crypto assets, which is a more recent development, the use of

18 stable coins and cryptocurrencies in tandem for performing

19 arbitrage strategies across markets.  A variety of issues,

20 basically.

21           MR. BACON:  Your Honor, at this time, I offer the

22 witness as an expert in the valuation and liquidation of

23 digital assets.

24           THE COURT:  Any voir dire?

25           MR. GLUECKSTEIN:  Similarly, Your Honor will have

1  some questions, but we're not going to contest.  We'll allow

2  Your Honor to judge the usefulness of this witness'

3  testimony.

4           THE COURT:  As before, I will accept the witness

5  as an expert in the proffered field, and we'll reserve any

6  judgments about what, if any, weight to give to his opinions

7  after I hear all the testimony.

8  BY MR. BACON:

9      Q.   Mr. Gkatzimas, can you describe to the Court your

10 assignment in this matter?

11     A.   Yes, my assignment was to assess the calculations

12 performed by Professor Howell and her opening declaration

13 with respect to estimation of asset liquidation discount

14 within the context of the KO model that she selected for the

15 Serum token.

16     Q.   And what do you mean by within the context of the

17 KO model?

18     A.   That means I took the KO model, the selection of

19 the KO model by Professor Howell is given and I looked at the

20 implementation of that model in the particular case of Serum.

21     Q.   And was there any other components to your

22 assignments?

23     A.   That was the main component to look into the model

24 and come up with my opinions.  As part of my assignment, I

25 had to look at the markets where Serum were actively traded,

1  meaning both spot and perpetual futures during this period,

2  understand the components, the inputs, basically that go into

3  the model.  And I was also asked to calculate two alternative

4  outputs.  I understand the parties disagree as to whether

5  creditor holdings or debtor holdings should be included to

6  estimate a liquidation discount.  I presented the results

7  under both scenarios, but I did not have an opinion on that

8  matter.

9       Q.   And did you form any opinions relating to that

10  assignment?

11       A.   Yes, as I explained in my declaration, and I also

12  testified in my deposition, I found that Professor Howell

13  either omits or ignores the value of perpetual futures when

14  she estimates the asset liquidation discount for the Serum

15  token.  I incorporate this in my calculation, which I think

16  is the proper way to apply the model, and I come up with an

17  asset liquidation discount in the range of 33 percent versus

18  58 percent that has been posed by Professor Howell.

19       Q.   And the 30 or so percent asset liquidation

20  discount, that is using debtor's holdings.

21       A.   This one is using only the creditor's holdings.

22  This is -- sorry, using only creditor holdings.

23       Q.   The 3.7 billion Serum?

24       A.   I think it's a 3.7 billion Serum.  Sorry.  This is

25  including debtor's holdings.  I misspoke.  So the 33 percent

1   includes debtor holdings.  If I constrain the application of

2   the KO model to include only creditor holdings, my

3   (inaudible) is down is in the range of 13 percent.

4          Q.   The adjustment you make to include perpetual

5   futures, how many inputs does that affect in the KO model?

6          A.   With respect to futures?  Is primarily one input

7   is the volume that is basically traded, active market trading

8   activity in the perpetual futures.  For the Serum token and I

9   apply as, again, I took the KO model by Professor Howell as

10  given, I apply the same estimation period from the 2nd of

11  November of the year prior to the 1st of November of 2022.

12  That one-year period.  I calculated very similar

13  methodologies, maybe with a different data source.  The

14  average trading volume in both the spot market and the

15  futures market, and I add them together to come up with the

16  average daily volume that I use as my input.  I believe my

17  volume is in the range of 78 million units average, whereas

18  only the spot market is roughly around 30.  The rest is

19  explained by the futures market.

20         Q.   And why is it appropriate to use perpetual futures

21  markets in calculating the average daily trading volume for

22  an input into the KO model?

23         A.   So I would say intuitively, there are two main

24  reasons.  First is basically the theory or the finance

25  principle, that if you have an asset and you are a market

1   participant that tries to maximize proceeds from selling this

2   asset, you would access all possible sources of liquidity.

3        In this case, these sources of liquidity consist of

4   both the spot market and the futures market.  I believe I

5   heard Professor Howell testify last week that I created

6   volume, essentially, which I think it's a disingenuous

7   statement.  I actually accounted properly for the volume in

8   the marketplace for both spots and futures, which is driven

9   by market participants themselves.  I just include something

10  that she omitted.  I think it's volume for which market

11  participants that wanted to express a position, positive or

12  negative, in the Serum token would have taken advantage, and

13  indeed took advantage during the period.  We already know

14  that the volume in the futures market was much larger than

15  the volume in the spot market.

16       There is a second reason that came as part of this

17  testimony.  I heard -- I read Professor Howell's deposition.

18  I got basically aware of the 2023 KO model, and I heard some

19  testimony about that model.  In my opinion, the author's own

20  model actually uses a combination of the two markets as one,

21  because they're tightly integrated, and they can function as

22  one market.

23       Effectively, the idea here is when you have to sell

24  something, you will try to maximize the possible number of

25  buyers, because that will give you a better price.  That's

1  the intuition behind including both spot and futures.

2      Q.   Can you describe to me the hedging strategy that

3  you would use if you were accessing the perpetual futures

4  market to liquidate spot position?

5      A.   Yeah, I'm happy to do so.  And that's another

6  point I wanted to clarify.  I heard Professor Howell testify

7  both last weekend and today that I had a change of opinions

8  over time.  This is absolutely not the case.  In my opening

9  report, I have explicit language that said, I consider a

10  trading strategy that could be undertaken by a sophisticated

11  market participant that would try to maximize proceeds for

12  the estate.  That's exactly what I did.

13      And the words I used was to either eliminate exposure

14  to future price risk of Serum, or to lock in the value as of

15  the petition date.  These two definitions I have in my report

16  are exactly the same.  The definition of hedging, which is a

17  term I used in my deposition.  So there's no inconsistency at

18  all between the two.

19      The strategy that I suggest as a potential trading

20  strategy involves, indeed, perpetual futures.  I never stated

21  in any of my reports or my deposition that you would actually

22  sell SRM tokens through the perpetual futures.  What I posed

23  was, you would sell some amount of futures in the spot market

24  today.  At the same time, you initiate a short position in

25  the futures market, which is cash settled, as we have seen on

1  the record, and then a short period thereafter, pretty

2  quickly, actually, you would sell the remaining position in

3  your spot market, and you would unwind your futures position,

4  meaning you'll buy back the futures, and effectively, you

5  have liquidated the whole estate.

6        In this trading strategy, what the person responsible

7  for this liquidation process accomplishes is to lock the

8  value of the tokens today, meaning the petition day, and

9  taking account of all of the possible market liquidity

10 possible (inaudible) venues that are available to you.

11       Q.   And when you complete that strategy, is there any

12 spot position left on the liquidator's books?

13       A.   No, there's no position left.  It will be a period

14 of time that you have both open, let's say the futures

15 position open and some spots still held in your portfolio.

16 But the market for Serum tokens, as we know, was very liquid.

17 And also the markets are very closely integrated, meaning the

18 price.  We had that term earlier.

19       Closely integrated means that the price, if Serum token

20 in the spot market and the applied price in the futures

21 market are very, very close to each other.  So there is a

22 mechanism that accomplishes that.  It's what is called the

23 funding mechanism.  And the collateral posting.  Collateral

24 posting really has to do with any futures contract, is not

25 unique to Serum.  All futures traded futures, regulated

1    futures, financial index futures, have a component of margin

2    requirements, which is collateral.

3         In addition to that, crypto futures include the

4    component of funding, which makes sure that a very small

5    deviation that can happen between futures and spot prices

6    stays minimal and actually is correcting itself,

7    autocorrecting over time.

8         Q.    When you completed the hedging strategy, would

9    there be any open perpetual futures positions?

10         A.    No, because at that time, you would close your

11    perpetual futures positions.  And at that time, also because

12    the mechanism of the market brings these two prices so close

13    together, you have exactly an offsetting effect.  So when you

14    close the futures positions, you're buying back, effectively,

15    the futures contracts, which will have an upward pressure in

16    the token at the same time you're selling the remaining

17    quantity in the spot market will have a downward pressure at

18    the token.  But because they're offsetting and they're very,

19    very highly correlated, they would basically almost wash out,

20    which I think is what we heard also from Professor Howell's

21    testimony.

22         Q.    And the person or entity liquidating those

23    positions would obtain proceeds based on the price at which

24    they hedge the positions?

25         A.    Yes, the effect of that is, and I'm not talking

1  even in a perfect world, because we heard about perfect

2  correlation, you don't have to have perfect correlation.

3  Financial futures, which are existing or commodity futures,

4  existed for a century and more, don't ever require perfect

5  correlation.  There's always something called basis risk,

6  which I think Professor Howell is aware of.  She testified as

7  well.  It's a difference between how the spot market can

8  deviate from the futures market.  That's common risk in

9  trading with futures.

10      But at the end of the day, in a first order

11  approximation, if you want, your economic proceeds from

12  unwinding the strategy would be exactly the same as if you

13  had basically captured the price of the Serum token as of the

14  petition date.

15      Q.    And do traders trade on basis risk?

16      A.    Yes, they take positions if the basis risk will

17  increase or would decrease over time.  But there is something

18  called convergence.  Basis risk can only live so much at

19  maturity.  All futures contracts tend to converge to their

20  spot market by definition.

21      In the case of perpetuals, as I explained, there is

22  this additional mechanism of funding rate that keeps these

23  markets very, very closely correlated.  Tied together.  I

24  have separately, I wanted to explore if that's the case with

25  our data, using Serum data.  So I looked at time series of

1   the prices, closing prices for the Serum token that I had in

2   my disposal from Coin API, and equivalent closing prices for

3   futures, perpetual futures of Serum, again, from Coin API,

4   and I did a symbol correlation analysis to see how closely

5   they are in terms of day to day movement and (inaudible).

6   Indeed, I get a very high correlation coefficient in excess

7   of 99.9 percent, which is consistent with both my

8   understanding of this market and the mechanism that is in

9   place here to enforce this close relationship.

10      Q.   And are you discussing the period during the

11  estimation period right now?

12      A.   I'm discussing during the period in the estimation

13  period.  I think even in the period that we heard today

14  Professor Howell testifying that it was five days right after

15  the Coin Desk article, but prior to the petition date, there

16  was some, maybe, I don't know the word exactly that she used,

17  but basically maybe some unrest in the funding rate.

18      The funding rate is not what you care about.  It's the

19  two prices to remain close, that's what you care about.  And

20  I had looked before at the prices all the way to the petition

21  date, and they still indeed stayed close together.  So

22  although the funding rate may have some ups and downs, that

23  doesn't affect the mechanism that kept these prices together

24  very closely together.

25      Q.   I think we heard testimony earlier today that if a

1  market participant were to deploy a hedging strategy like

2  this, that the price impact in the spot market might double

3  or even triple.  Is that correct?

4        A.    No, that's inaccurate.  I think I disagree with

5  that.  I think as we even discussed earlier, the KO authors

6  applied the model in the case of equity market crashes, where

7  they use, when available, futures and spot market volumes

8  together as a single unified market because they're highly

9  integrated.

10       In this case, we're even more integrated because of the

11 funding mechanism.  The exceptions in the paper that they did

12 not use together both markets, is when either there was one

13 market was not available.  For example, it was not trading

14 when the other one was trading only, or there was not futures

15 at all.  In the early 1929 crash, the financial market

16 futures had not even been introduced.  They were introduced

17 around the '70s.

18       Q.    Why wouldn't the price impact double or triple to

19 the spot market if you use a hedging strategy?

20       A.    Because you have a larger pool of buyers.  In my

21 mind, it's almost like common sense.  Like if you have two

22 buyers only in the one market, then you have another thing in

23 the other market, you have a bigger pool of people that are

24 willing to buy something from you, not necessarily the

25 physical security, even the payoff in terms of cash

1  settlement, but they're willing to basically bet against you.

2  And by having a larger pool of buyers, you have a larger

3  cushion to minimize price impact.  This is why the authors

4  themselves actually apply this in cases where the markets are

5  highly integrated, like the one here.

6      Q.   And this might sound like an odd question, but

7  bear with me for a moment.  Do market participants hedge spot

8  positions in futures?

9      A.   Yeah, a lot of the time.  It's common practice.

10      Q.   And would market participants do that, in your

11  opinion, if it would cause two to three times impact on spot

12  position prices?

13      A.   Sorry, can you repeat the question?

14      Q.   Sure.  Would market participants do that if it

15  caused a two to three times price decline on their spot

16  position?

17      A.   No, it would be logical.  They would go in the

18  risk in the hedging market just to basically ensure the price

19  that they're getting, not to get a worse execution,

20  effectively.

21      Q.   And even if a market participant sold a spot

22  position without accessing the perpetual futures markets, is

23  the liquidity available in the perpetual futures market

24  nonetheless relevant to assessing price impact in the spot

25  market?

1       A.   Yes, because it is a market where market

2   participants are actively exchanging the perspective about

3   the future price developments of the Serum token.  And even

4   if the particular market participant is not acting directly

5   on the futures market, somebody else will jump in and try to

6   arbitrage this market.  This is one of the assumptions that

7   the authors also cite in the other papers.

8        For example, we hear the hypothetical stylized example

9   by Professor Howell, that if you have a stock at 100 and then

10  you sell (inaudible) and it will go to 99.  And then you go

11  in the futures, you go to 98.  I think that's ill-conceived.

12  In reality, these markets are integrated, operate as one,

13  which means immediately it doesn't go in a linear fashion.

14  They will go at the same time.

15       When people try to sell in the spot market, the future

16  doesn't wait and say, oh, they went from 100 to 99.  Now I'll

17  start at 99 and I'll add another one.  Actually, the first

18  minute they will start arbitraging, some people will take the

19  opposite position.  And the first step and last step of this

20  approach is instead of going from 100 to 99, it will go maybe

21  to 99.5, 99.6, 99.4, somewhere in between.  The exact value

22  will depend on the relative size of the futures versus the

23  spot markets.

24       Q.   So you would expect some of the price impact from

25  selling on the spot market to be absorbed by the liquidity

1  available in the perpetual futures market?

2      A.   Yes, absolutely.  It's a big market.  And

3  actually, we know as a fact in this case that the futures

4  market, the perpetual futures, was deeper and more liquid.

5  Effectively, it was one and a half times the volume, in terms

6  of average trading volume of the spot market during the

7  period of estimation.

8      Q.   Mr. Gkatzimas, you might have anticipated some of

9  my questions earlier, but is combining spot and futures

10 market volume consistent with KO's application of the 2016

11 model in their 2023 article?

12     A.   Yes, it is absolutely consistent.  When they have

13 access to both markets, they use both markets, and they

14 explicitly state that they see these markets as integrated.

15 And arbitragers can actually make sure that the markets stay

16 together.  And that's why you should take advantage of all

17 the volume.

18      There's another paper by the same authors.  There are

19 only two papers that I'm aware of.  And I think also

20 Professor Howell had in her deposition testimony a paper that

21 they wrote the same principles applied in the fixed income

22 markets, which includes corporate bonds and treasury

23 securities.  That's not published paper.  I believe it's a

24 working paper, but still applies the same idea, the same

25 model, and in this case as well.

1        For the markets that have futures, which are basically

2   treasuries, the treasury futures market is one of the most

3   liquid markets in the world.  They do indeed aggregate both

4   spot and futures market as one.

5            THE COURT:  Ms. Bacon, I'm going to take a recess.

6   We've been going for almost two hours.

7            MR. BACON:  Yeah --

8            THE COURT:  I'm sorry.  Go ahead.

9            MR. BACON:  I think I have like two, three minutes

10  if you want to wait.

11           THE COURT:  Okay, go ahead and finish then.

12  BY MR. BACON:

13       Q.   And this application using futures, though, was

14  not used in the 2016 KO model, correct?

15       A.   That is correct.  There is a reason for that.

16  There is no single name equity futures contracts in the US.

17  There was an attempt to introduce them back in the early

18  2000s, but it never succeeded.  And basically there was no

19  liquidity.  It went away.

20       So at the time they did the paper, as we heard from

21  both Professor Howell and Mr. Konstantinidis earlier, there

22  was basically data involving portfolio transitions of single

23  equity stocks, meaning single equity names.  I have some IBM.

24  I swap it for some Apple stock, for example.  There is no

25  equivalent market in the futures that says, I want to buy a

1  futures on a share of Apple or futures on a share of IBM.

2       This is not the case with index, which is the other

3  paper, the 2023 paper.  It is not the same case with

4  treasuries, which is the working paper.  And it's definitely

5  not the case with crypto where futures actually had the

6  majority of the volume, as we saw in this case.

7       Q.   So the instances in which KO applied their

8  methodology to financial assets that had robust futures

9  market, they included both spot and futures volume?

10      A.   Correct.

11      Q.   And Mr. Gkatzimas, have you read Professor

12  Howell's rebuttal report that she wrote in response to your

13  report?

14      A.   Yes, I did.

15      Q.   And you've reread Professor Howell's deposition

16  transcript?

17      A.   I did.

18      Q.   And you've listened to Professor Howell gave

19  testimony last Wednesday and earlier today?

20      A.   Yes.

21      Q.   And did any of those things change any of your

22  opinions?

23      A.   No.

24           MR. BACON:  May I approach, Your Honor?

25           THE COURT:  Yes.

1          MR. BACON:  TMSI-1 of 1.  (Inaudible) copy.

2          THE COURT:  I have.

3   BY MR. BACON:

4      Q.   Mr. Gkatzimas, do you recognize the document I've

5   handed to you?

6      A.   Yes.  This appears to be my declaration filed on

7   this matter.

8      Q.   Okay.  And is this declaration dated February 16,

9   2024?

10     A.   Correct.

11     Q.   And that declaration has your signature on it?

12     A.   Yes, it does.

13     Q.   And is this declaration true and accurate?

14     A.   Sorry, what was the question?

15     Q.   Yeah.  Does this declaration true and accurate

16  when you signed it?

17     A.   Yes, it was.

18     Q.   And it remains so today?

19     A.   Yes.

20         MR. BACON:  Your Honor, I move to admit TMSI-1

21  into evidence in support of TMSI's objection, supplemental

22  objections to the debtors motion to estimate claims.

23         THE COURT:  Any objection?

24         MR. GLUECKSTEIN:  No objection, Your Honor.

25         THE COURT:  It's admitted without objection.

1          MR. BACON:  No further questions, Your Honor.

2          THE COURT:  Okay, well, let's go ahead and take a

3  recess.  We'll reconvene at -- let's make it 3:40.

4          (Off the record at 3:23 p.m.)

5          (On the record at 3:39 p.m.)

6          THE BAILIFF:  All rise.

7          THE COURT:  Thank you.  Please be seated.

8  Everybody's already standing.  Mr. Glueckstein, whenever

9  you're ready.

10          MR. GLUECKSTEIN:  Thank you, Your Honor.

11  CROSS-EXAMINATION

12  BY MR. GLUECKSTEIN:

13     Q.   Good afternoon, Mr. Gkatzimas.

14     A.   Good afternoon.

15     Q.   Nice to see you again.  Mr. Gkatzimas, your report

16  is focused only on the Serum token, correct?

17     A.   That is correct.

18     Q.   And you're not offering any opinions on Professor

19  Howell's discounts with respect to the MAPS or OXY tokens,

20  correct?

21     A.   I do not.  Correct.

22     Q.   Your report addresses only the asset liquidation

23  applicable to the Serum token, correct?

24     A.   That is correct.

25     Q.   You're not offering any opinion on Professor

1  Howell's proposed approach for determining the discount for

2  lack of marketability for locked tokens with respect to

3  Serum, correct?

4          A.    Correct.

5          Q.    You're not offering any opinion as to Mr. Lu's

6  petition time price for the Serum token, correct?

7          A.    No, I do not.

8          Q.    And you do not argue that the claims based on

9  Serum should be paid at the petition date price, correct?

10         A.    My assignment was to evaluate the KO model

11 implementation specifically for the Serum token, which was

12 selected by Professor Howell as part of my analysis.  There

13 are two numbers I present in my report, a 33 percent

14 liquidation discount or a 13 percent liquidation discount.

15 If you include only creditor holdings.  Both of them would

16 lead to a liquidation discount.  So in that sense, there is a

17 liquidation discount that comes out starting from the use of

18 the KO model as the appropriate model here, which I take for

19 granted.

20         Q.    And so therefore, you are not arguing that claims

21 based on CM should be paid at the spot petition price,

22 correct?

23         A.    Correct.  I understand there will be some

24 liquidation discount.

25         Q.    And understanding the scope of your assignment,

1  you are not critiquing Professor Howell's use of the KO model

2  to calculate that liquidation discount, correct?

3       A.   Yes, that was not my assignment.  It was to look

4  at the implementation of the KO model as it pertains to the

5  Serum token.

6       Q.   And you in fact, apply the KO model to calculate

7  your liquidation discount just as she does, correct?

8       A.   I followed the same steps because I want to stay

9  as close to the true model.  But I did use different inputs,

10  which I explained in my declaration.  I used Coin API for

11  prices, for estimating returns and volatility of returns.

12  And basically I had some comfort because when I got access to

13  the data used by Professor Howell, these were basically very

14  similar.  So the main difference at the end between me and

15  Professor Howell is the inclusion of the futures volume as

16  part of the volume input in the KO model.

17       Q.   And you're not offering any opinion on Professor

18  Howell's data source being Coin Metrics, correct?

19       A.   I do not offer an opinion on that.

20       Q.   You're not opining on an appropriate trading

21  strategy for these Chapter 11 debtors, are you?

22       A.   Can you clarify what you mean by that?

23       Q.   Are you offering an appropriate trading strategy

24  for these debtors with respect to their digital assets?

25       A.   I'm offering a trading strategy that would be

1   considered by sophisticated market participant who would be

2   responsible for liquidating the liquid token and maximize

3   proceeds for the estate.

4        Q.   Are you suggesting that there's a particular

5   liquidation strategy that these debtors should be employing?

6        A.   Going forward, no.  This was as of the petition

7   time, knowing the information that was preceding the petition

8   date and leading up to the petition time.

9        Q.   So you haven't developed and aren't offering any

10  trading strategy for the debtors to actually liquidate their

11  Serum tokens today, correct?

12       A.   This is not part of my assignment.

13       Q.   In perpetual futures contracts for Serum, there is

14  no settlement where the underlying Serum token is delivered

15  to the counterparty, correct?

16       A.   That is correct.

17       Q.   And so perpetual futures contract for Serum, the

18  token would never transfer over the course of that

19  contractual arrangement, correct?

20       A.   That is correct.  These are cash out futures,

21  which is a common property that most financial industry

22  futures also have.

23       Q.   The debtors could not use perpetual futures to

24  sell any Serum tokens, correct?

25       A.   No.  Correct.  I never claimed that.

1    Q.   And rather, the market participant purchasing a

2    perpetual future in Serum is hedging against a decrease in

3    the market price, correct?

4    A.   That could be one use.  Hedging or speculating.

5    The perpetual futures gives you the option basically another

6    tool to get an economic position, not by owning the outright

7    Serum token, but basically either benefit from appreciation

8    or be protected from depreciation.  So you don't necessarily

9    have to get the Serum token involved, but you do get the

10   economic output of the movements in Serum price.

11   Q.   But the reason why you're entering into that

12   contract is to hedge against a decrease in the market price

13   of the underlying token, correct?

14   A.   In my specific report, yes.  That's not the main

15   reason that you enter into perpetual futures in general, but

16   yes, the way that I discussed it was exactly to maintain the

17   price, lock in the price as of the petition date.

18   Q.   But that's the opinion you're offering with

19   respect to Serum tokens, in your opinion, in this case,

20   correct?

21   A.   Correct.

22   Q.   Is it fair to say that a proposed perpetual future

23   strategy for the market participant would require two steps?

24   A.   Yes.  Two steps.  An opening --

25   Q.   The first would be the debtors would need to open

1  the Serum perpetual futures contract?

2       A.   Correct.

3       Q.   And the second would be then the debtor would need

4  to close the perpetual futures position at some point and

5  sell the underlying Serum token into the spot market,

6  correct?

7       A.   Correct.

8       Q.   And in the series of transactions, the debtors

9  would still need to sell the Serum tokens on the spot market

10 even after hedging through the perpetual futures market,

11 correct?

12      A.   Eventually, yes.  All of that will be sold.

13      Q.   And there's some transaction cost to conducting

14 perpetual futures trades, correct?

15      A.   Correct.

16      Q.   It's correct that a perpetual futures contract is

17 a bespoke contract between an individual and the exchange,

18 correct.

19      A.   I don't know all of the exchanges it traded, but

20 generally, yes.  I mean, I don't know all the details.  They

21 were traded in several exchanges.

22      Q.   Perpetual futures would be traded for Serum.

23 Perpetual futures could be traded at different prices on

24 different exchanges, correct?

25      A.   Correct.  Same like spot would trade at different

1   prices at different exchanges.  There is no unified market in

2   crypto.  That's a property of the crypto markets.

3        Q.   And, in fact, you're aware that this court has

4   already priced futures with respect to FTX Exchange

5   contracts, correct?

6        A.   Well, I remember you asked me that question, my

7   deposition.  I think the Court priced futures is a little bit

8   a misnomer.  I understand that you mean valued the futures as

9   of their current market value as of a given point in time.

10  That's not the same as a futures price, just technically

11  speaking.  But I understand what you're saying now.

12       Q.   But that would need to be done.  That needed to be

13  done.  There needed to be a price set with respect to futures

14  on the FTX Exchange that would be different than on some

15  other exchange, correct?

16       A.   That would depend on how the contract was written

17  on a particular perpetual futures on a given exchange, what

18  they use as a reference, essentially, or point, what widths

19  of the spot markets in Serum.  I assume that they would use

20  the same exchange spot, but I don't know that for a fact.

21       Q.   And it wouldn't surprise you, though, if there was

22  different prices on different exchanges for perpetual future

23  in Serum, right?

24       A.   I would not be surprised.  There's some variation,

25  as I said, between even spot markets in Serum.  So it's just,

1  if the spot market that drives, effectively, the futures are

2  slightly different, then both of them will be slightly

3  different.  This is not unusual, by the way, for crypto

4  assets, as I testified earlier.

5       Q.   On the petition date, the perpetual futures

6  markets for Serum and the spot market for Serum were not

7  perfectly integrated, correct?

8       A.   I don't know what's the basis for that.  I haven't

9  seen evidence that we're not well integrated at least.

10       Q.   Have you conducted an analysis that's presented,

11  in your opinion, as to whether or not the Serum spot and

12  futures markets were integrated on the petition date?

13       A.   I looked at the data in the estimation period,

14  which is the same that Professor Howell used, and looks at

15  the time series for a year leading up to November 1st of

16  2022.  And in this period, I looked at the price series, both

17  at exchanges, but also on the weighted average basis.  This

18  is a type of closed end of day positions.  And I said

19  earlier, I testified that they were very highly correlated.

20  So that's evidence that they were moving very closely

21  together on a day by day basis over a period of a year.  And

22  that's at least one of the significant inputs when you think

23  about integration.

24       Q.   And again, you're offering that testimony with

25  respect to the estimation period, which is the same period

1  that Professor Howell used, correct?

2       A.   Correct.  I also looked at a few days later, as I

3  mentioned earlier, as part up to the -- basically, I looked

4  up to what is the petition date, which is the day that we

5  tried to value it, just to see how the markets behaved, and I

6  saw they still stayed close to each other.

7       Q.   Your opinion that you just offered on direct

8  testimony that you just summarized, again, with respect to

9  the integration during the estimation period of spot and

10  future markets with Serum, that's not presented in your

11 report, is it?

12      A.   In the estimation period?

13      Q.   Yes.

14      A.   I say the mechanism by which they are tied

15 together.  I did not explicitly say about the correlation,

16 but I testified that in my deposition.

17      Q.   But you did not provide any analysis in your

18 report with respect to the actual analytical correlation

19 analysis that you've just testified to?

20      A.   No, I did not include that in my report.  It was

21 satisfactory to me that this was a very strong relationship.

22           MR. GLUECKSTEIN:  Your Honor, I would note that I

23 think that on direct, the witness offered testimony on this

24 subject that is outside the scope of his report and should

25 not be part of the record.

1          THE COURT:  Okay.  You include that in your

2    closing, deal with it, then.

3    BY MR. GLUECKSTEIN:

4          Q.   Mr. Gkatzimas, you agree that the exchanges where

5    the debtors would need to place perpetual futures contracts

6    are generally unregulated exchanges, correct?

7          A.   Yes.

8          Q.   And you acknowledge that debtors would have been

9    required to post collateral to open a perpetual futures

10   position in Serum, correct?

11         A.   Correct.  I acknowledge the use of collateral and

12   potential other trading costs.  In my opening declaration, I

13   have special footnote and discussion about that which is not

14   unusual for any futures markets.

15         Q.   And if the debtors post collateral to enable

16   perpetual futures positions in Serum, the debtor's collateral

17   will be exposed to counterparty risk of that exchange,

18   correct?

19         A.   Correct.  Like any transaction you do with that

20   exchange.

21         Q.   You did not perform any analysis to identify if

22   there were any market participants on the petition date that

23   would have been interested in the long position in Serum

24   tokens, correct?

25         A.   Well, I looked at the market volume, which to me

1  it's a good proxy for available market participants to absorb

2  liquidity.  And the market volume was in excess of the spot

3  volume for a long period leading up to this date, the

4  petition date.

5      Q.   Again, you were looking in the estimation period,

6  the estimation period that Professor Howell used, correct?

7      A.   Yes.  And I looked even the days closer to the

8  petition date.  I have a chart in my report that even shows

9  the volumes there.

10     Q.   You agree, however, that the Serum token was

11 itself facing questions of survival on the petition date,

12 correct?

13     A.   Yes.  There were questions about what's going to

14 happen.  And this was something that the market was reacting

15 to.  This is well documented.

16     Q.   And you are aware that the market, perpetual

17 futures in Serum tokens collapsed within five days of the

18 petition date, correct?

19     A.   I have not looked at the data on that on my own.

20 But I take that this is the testimony of Professor Howell.  I

21 have no reason to doubt.

22     Q.   You didn't consider that, though, in connection

23 with your opinion?

24     A.   No, my opinion was focused as of the petition date

25 and using the same approach, which was the prior year

1  periods, to estimating what is called, I think Professor

2  Howell testified regular market conditions.  Looking forward

3  and the metrics of these markets for my analysis.

4         MR. GLUECKSTEIN:  Thank you, Your Honor.  No

5  further questions.

6         THE COURT:  Thank you.  Redirect?

7         MR. BACON:  Elliott Bacon on behalf of TMSI again.

8  REDIRECT EXAMINATION

9  BY MR. BACON:

10     Q.   Mr. Gkatzimas, even if a market participant didn't

11  hedge in the perpetual futures market, is the perpetual

12  futures market still relevant to assessing price impact in

13  the spot market?

14     A.   Yes, it is, because this provides the total pool

15  of liquidity that's available to someone who wants to take

16  any position, an economic exposure, basically, to Serum token

17  one way or the other.

18     Q.   And you were asked some questions about the

19  integration of the spot and futures market as of the position

20  date and thereafter.  Do you remember that?

21     A.   Yes.

22     Q.   And the estimation period that you used ends about

23  ten days or so before the petition date, is that --

24     A.   November 1st, 2022, correct.

25     Q.   Okay.  And what was Professor Howell's estimation

1    period?

2         A.    Exactly the same.

3         Q.    So did Professor Howell incorporate trading volume

4    after November 1st, 2022, into her application of the KO

5    model?

6         A.    Not to my knowledge.  I didn't see that.

7         Q.    And you did the same as her?

8         A.    Yes.

9         Q.    And you asked some questions about the fundamental

10   value of Serum.  Do you recall that?

11        A.    Today or --

12        Q.    Yes, today.  Moments ago and maybe I'm missing

13   words with fundamental value, but do you recall just now Mr.

14   Glueckstein asked you some questions about the survivability

15   of the Serum token as of petition date?

16        A.    I didn't think that is fundamental value.

17   Survivability is more the assessment of the news that were

18   coming out about the Serum token, which I acknowledge in

19   detail in my opinion, in my declaration.  So this is just

20   market news coming into the marketplace.

21        Q.    And is that market news incorporated by Professor

22   Howell to her application of the KO model?

23        A.    I am not sure how they would be.  Well, they would

24   be incorporated -- let me put it this way.  The price that is

25   used is of a petition date, and this news came out before the

1  petition date.  So to the extent that the market was active,

2  which it was in both spot and perpetual futures market, this

3  information was absorbed continuously until the price on the

4  petition date.

5       I did not see the next step, which I think Professor

6  Howell was asked this morning if she attempted to quantify

7  how much of the price movement following this news

8  information in the market was due, or basically could be

9  explained by the news that came out.  I didn't see that part.

10 But the petition price date included, just from the

11 perspective of market trading and incorporated new

12 information, what was happening between November 1st and

13 November 11th.

14      Q.   And are there any adjustments to the KO model

15 based on market news other than what you just mentioned?

16      A.   Well, the model uses input volatility, which

17 basically would capture somewhat the changes in price.

18 That's what volatility is.  It has volume that would

19 basically incorporate how many people are trading on that

20 particular token.  And it has the current price, which is a

21 direct proxy of the impact on the price from information

22 flow.  If I put it simple terms.

23      Q.   And post-petition value is not incorporated into

24 the application of the KO model, correct?

25      A.   No, it is not.  It's a slow trading model, as

1    Professor Howell testified, and looks at what would be

2    regular market conditions up to the day that you drew the

3    estimation.  And that's exactly how you use it.  You use the

4    prior period information and estimates.

5            MR. BACON:  Thank you.  No further questions, Your

6    Honor.

7            THE COURT:  Thank you.  Thank you, sir.  You may

8    step down.

9            THE WITNESS:  Thank you, Your Honor.

10           MR. GLUECKSTEIN:  Your Honor, as I understand it,

11   that completes the witness testimony, I did want to go back

12   to the debtor's exhibits, if I could, since Your Honor had a

13   question this morning.

14           Just to round out that Exhibits 1, 2, 3, 6, FTX-1,

15   FTX-2, FTX-3, FTX-6, FTX-7, and FTX-9 have already been

16   admitted during the course of the testimony.  We would ask

17   the Court take judicial notice of FTX-10, which is the order

18   that Your Honor, entered following the hearing on this motion

19   in January.

20           THE COURT:  Is there any objection?

21           MR. TOROSIAN:  Jeff Torosian from MAPS Vault.  No

22   objection, per se.  But just to be clear, that order has no

23   effect on this hearing pursuant to paragraph 9 of the order.

24   But other than that, it is your order and we're happy to have

25   you take judicial notice of it.

1          THE COURT:  I will take judicial for what is what.

2          MR. GLUECKSTEIN:  And I think, Your Honor, there

3   were portions of FTX-12, 13, and 15 that were discussed by

4   the witnesses, but consistent with FRE 803.18, I think the

5   record speaks for itself on those.  So I don't think there's

6   any other debtor exhibits to admit.

7          THE COURT:  Okay.

8          MR. GLUECKSTEIN:  Thank you, Honor.

9          THE COURT:  Any other evidence from the objectors?

10          MR. TOROSIAN:  Jeff Torosian for MAPS Vault, no,

11   Your Honor.  We rest.

12          THE COURT:  Okay, thank you.

13          MR. BACON:  And I just -- the point that Mr.

14   Glueckstein just made about those last few exhibits, I would

15   also state stands for FTX-16, which was discussed but not

16   admitted, which is the 2023 KO article.

17          THE COURT:  Mr. Glueckstein?

18          MR. GLUECKSTEIN:  Yeah, I agree with that, Your

19   Honor.

20          THE COURT:  Okay.

21          MR. GWYNNE:  No other evidence from the

22   Foundations, Your Honor.

23          THE COURT:  Okay, thank you.  All right, so the

24   evidence is closed.  Clearly we're not going to get through

25   closings and I want to give everybody the opportunity to do

1  that.  We can come back tomorrow.  I don't know if people are
2  planning on staying the night or coming back in the morning.
3          MR. TOROSIAN:  Jeff Torosian?  I'm staying the
4  night, Your Honor, so anytime is fine.
5          MR. GLUECKSTEIN:  Same, Your Honor.  Whenever Your
6  Honor can hear us on that, that's fine.  I did want to give
7  the Court an opportunity, though.  If the Court had further
8  views with respect to the idea of post-trial briefing or the
9  timing of closings or anything of the sort, we would be happy
10  to take guidance from now.
11          THE COURT:  Well, we'll go ahead and do the
12  closings, and then I'll see if I need post-trial briefing or
13  not.  We'll go from there.
14          MR. GLUECKSTEIN:  Okay, that's fine with us, Your
15  Honor.  What time then, would you like to --
16          THE COURT:  I didn't hear from all the parties
17  about availability for morning.
18          MALE VOICE:  Morning is best for us.
19          THE COURT:  Okay.  Mr. Bacon?
20          MR. BACON:  Mr. Bacon, he's going to be doing it,
21  Your Honor.
22          THE COURT:  He's doing it.
23          THE COURT:  Okay.
24          MR. GWYNNE:  Good afternoon, Your Honor.  Kurt
25  Gwynne from Reed Smith on behalf of the MAPS and OXY

1   Foundations, tomorrow is fine with us.

2              THE COURT:  Okay.  All right, let's do closings

3   then at 10:00 a.m. tomorrow.  And obviously we will get

4   through closings tomorrow.  No question.  Anything else

5   before we adjourn?

6              MR. GLUECKSTEIN:  No, Your Honor.

7              THE COURT:  Thank you all very much, and we're

8   adjourned.  I'll see everybody tomorrow morning.

9              (End of Proceedings.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                  March 26, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                  March 26, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                   March 26, 2024

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25