<pre>
1                UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
2

3   IN RE:                       .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
4   FTX TRADING LTD., et al.,    .
                                 .  (Jointly Administered)
5           Debtors.             .
    . . . . . . . . . . . . . .  .
6                                .
    ALAMEDA RESEARCH LTD., AND   .
7   CLIFTON BAY INVESTMENTS LLC  .
    F/K/A ALAMEDA RESEARCH       .
8   VENTURES LLC,                .
                                 .
9           Plaintiffs,          .
                                 .
10    - against -                .  Adv. Pro. No. 23-50411 (JTD)
                                 .
11  MICHAEL KIVES, BRYAN BAUM,   .
    K5 GLOBAL HOLDINGS LLC, K5   .
12  GLOBAL TECHNOLOGY LLC, MBK   .
    CAPITAL LP SERIES T, K5      .
13  GROWTH CO-INVEST I GP LLC,   .
    K5 GLOBAL GROWTH FUND I GP   .
14  LLC, K5 GLOBAL VENTURES LLC,.
    MOUNT OLYMPUS CAPITAL LP,    .
15  MOUNT OLYMPUS CAPITAL LLC,   .
    K5 GLOBAL GROWTH FUND II LP,.
16  K5 GLOBAL GROWTH FUND II GP  .
    LLC, K5X FUND I LP, K5X      .
17  FUND I LLC, AND SGN ALBANY   .
    LLC,                         .
18                               .
            Defendants.          .
19  . . . . . . . . . . . . . .  .
                                 .
20  SUNIL KAVURI, AHMED ABD-EL-  .  Adv. Pro. No. 24-50012 (JTD)
    RAZEK NOIA CAPITAL SARL AND  .
21  PAT RABITTE,                 .
                                 .
22          Plaintiffs,          .
                                 .
23     v.                        .  Courtroom No. 5
                                 .  824 North Market Street
24  FTX TRADING, LTD, et al.,    .  Wilmington, Delaware 19801
                                 .
25          Defendants.          .  Tuesday, March 26, 2024
    . . . . . . . . . . . . . .  .  10:00 a.m.
</pre>

<pre>
                    TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE JOHN T. DORSEY
             UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            Brian Glueckstein, Esquire
                            SULLIVAN & CROMWELL LLP
                            125 Broad Street
                            New York, New York 10004

For OXY and MAPS
Foundations:                Kurt Gwynne, Esquire
                            REED SMITH LLP
                            1201 Market Street, Suite 1500
                            Wilmington, Delaware 19801

For MAPS Vault:             Jeffrey Torosian, Esquire
                            DLA PIPER LLP (US)
                            444 West Lake Street, Suite 900
                            Chicago, Illinois 60606

For the Committee:          Isaac Sasson, Esquire
                            PAUL HASTINGS LLP
                            200 Park Avenue
                            New York, New York 10166

For BOBO Foundation:        William Firth, III, Esquire
                            PASHMAN STEIN WALDER HAYDEN
                            Court Plaza South, East Wing
                            21 Main Street, Suite 200
                            Hackensack, New Jersey 07601



(APPEARANCES CONTINUED)

Audio Operator:             Jermaine Cooper, ECRO

Transcription Company:      Reliable
                            The Nemours Building
                            1007 N. Orange Street, Suite 110
                            Wilmington, Delaware 19801
                            Telephone: (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
</pre>

APPEARANCES (CONTINUED):

For TMSI:                    Peter Siddiqui, Esquire
                             KATTEN MUCHIN ROSENMAN LLP
                             525 West Monroe Street
                             Chicago, Illinois 60661

1                          <u>INDEX</u>

2    <u>MOTIONS</u>:                                          <u>PAGE</u>

3    Agenda
     Item 18:  Motion of Debtors to Estimate Claims        5
4              Based on Digital Assets [D.I. 5202,
               Filed on 12/27/23]
5
               Court's Ruling:                             115
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 10:00 a.m.)

2        (Call to order of the Court)

3            THE COURT:  Good morning, everyone.  Thank you.

4   Please be seated.

5            Mr. Glueckstein.

6            MR. GLUECKSTEIN:  Good morning, Your Honor.  For

7   the record, Brian Glueckstein, Sullivan & Cromwell, for the

8   debtors.

9            Your Honor, we are here this morning addressing

10  the one remaining piece of the debtors' motion to estimate

11  claims based on digital assets by valuing the four digital

12  assets left open in the Court's prior order and the digital

13  asset conversion table, MAPS, Oxy, Serum, and BOBA.

14           The debtors need to determine the petition date

15  price for the four remaining spot tokens to complete the

16  digital asset conversion table and permit the estimation of

17  every one of the approximately 75,000 creditor claims based

18  on one or more of these four tokens.  This, along with the

19  price of the remaining digital assets previously established,

20  will allow the debtors to estimate the claims of millions of

21  creditors based on one or more of the 1,321 unique digital

22  assets.

23           In turn, the debtors will then be able to provide

24  adequate information in our soon-to-be-filed disclosure

25  statement about claims recovery, set reserves, and ultimately

1 make distributions to creditors following confirmation of our

2 plan.

3         Armed with orders entered by this Court, the

4 debtors have been strategically monetizing their remaining

5 digital assets to maximize the value of those assets and the

6 cash available to make distributions on allowed claims.  As

7 the Court knows, the plan is premised in providing U.S.

8 Dollar recoveries to creditors; and it is, therefore,

9 necessary for claims based on digital assets to be converted

10 to U.S. Dollars to be addressed alongside fiat and stable

11 coin claims.

12         After a full-day evidentiary hearing on January

13 31st, the Court determined that it was appropriate to

14 estimate the millions of unliquidated creditor claims based

15 on digital assets.  At that hearing, the Court received

16 testimony and written opinions from the debtors' experts at -

17 - that testified at this hearing, Kevin Lu and Sabrina

18 Howell, credited that evidence and concluded the debtors'

19 method for estimating those claims, based on digital assets,

20 was fair and reasonable.

21         While these objectors' rights were reserved, there

22 is nothing in that order that says the Court or the debtors

23 are somehow required to forget the progress that has already

24 been made in support of the plan process or pretend that it

25 has not happened.

1          The Third Circuit has made clear in Bittner v.

2  Borne Chemical and its progeny that the Bankruptcy Court

3  should use whatever method is best suited to the

4  circumstances of the case in estimating claims pursuant to

5  Section 502(c) of the Bankruptcy Code.  Bittner itself was a

6  case where the claim was estimated at zero value.  And the

7  Third Circuit noted, quote, that:

8          "-- where there is sufficient evidence on which to

9  base a reasonable estimate of the claim, the bankruptcy judge

10  should determine the value."

11          This Court has broad discretion to estimate claims

12  as long as the approach to doing so is reasonable.  The

13  unique facts of this case, most notably for purposes of this

14  motion, that the debtors have millions of claims based on

15  digital assets that are all unliquidated and not readily

16  converted to U.S. Dollars.  The question of how to determine

17  the petition time prices for these four tokens boils down to

18  whether the debtors' estimation methodology should apply

19  equally to these tokens or if there's some reason to treat

20  them differently.

21          The extensive evidence now before the Court

22  confirms that the debtors' approach remains reasonable and is

23  fair to all creditors.  The result of that process, including

24  as to the tokens at issue today, is supported by both the

25  debtors and the Official Committee of Unsecured Creditors.

1          Importantly, each of the objectors and their

2    experts agree that it is appropriate to discount the petition

3    time prices for each of MAPS, Oxy, and Serum by some amount.

4    The dispute is how much of a discount should be applied.

5          The objectors go to great lengths to attack the

6    debtors' experts and their conclusions in an attempt to force

7    a different result and line their pockets with value for

8    claims that, in the case of MAPS and Oxy tokens, have no

9    value.  These objectors should not be permitted to siphon off

10   value at the expense of other creditors.  Their flawed

11   attacks and alternatives provide no basis for the Court to

12   deviate from the debtors' estimation methods.

13         THE COURT:  Well, let me ask you a question about

14   that because I'm struggling with Professor Howell's testimony

15   because she says, on the one hand, using the KO method, the

16   MAPS and Oxy tokens are worth zero as of the petition date;

17   yet, she concedes that the KO method requires an orderly

18   liquidation over time.

19         MR. GLUECKSTEIN:  Uh-huh.

20         THE COURT:  She concedes that, when you start that

21   process, those tokens are going to sell for something, but

22   she doesn't know how much.  She also concedes that it's going

23   to continue to sell for something over some period of time,

24   but she doesn't know how long.  That seems to indicate to me

25   that there is some value, not zero value, to those tokens.

1       MR. GLUECKSTEIN:  Your Honor, there's been no

2  suggestion and there's been no evidence in the record and the

3  objectors offered zero evidence to suggest that there's any

4  meaningful value to receive from the sale of these tokens.

5       THE COURT:  Well, it's your --

6       MR. GLUECKSTEIN:  The testimony --

7       THE COURT:  It's your burden.  You're the ones who

8  brought this motion.  It's your burden of proof.

9       MR. GLUECKSTEIN:  That's correct, Your Honor.

10      But the question here is whether this methodology

11  is an appropriate methodology.  What Professor Howell

12  testified, in response to the questions on this topic and in

13  response to Your Honor's question, of the record at this

14  hearing, is that she could not say that the first token,

15  which is worth a few cents, that the market would immediately

16  crash to zero.  What she said was that the -- we would need

17  to look at how efficient the market is to determine exactly

18  how quickly the market would go to zero.  But she testified

19  and it's her testimony that she made clear that she expects

20  that to happen, quote, "very quickly," once the debtors start

21  selling their tokens.

22      THE COURT:  That's not what she said when I asked

23  her the question.  She said she didn't know how long it would

24  take.

25      MR. GLUECKSTEIN:  The -- there's -- I can -- we

1  can find the citation from her testimony on -- what was it --

2  last Wednesday.  She said "very quickly," she expected that

3  to happen "very quickly."  We'll get the citation for that,

4  Your Honor.

5         THE COURT:  But that doesn't tell me anything.

6  "Very quickly"?  How is "very quickly"?  Is that a few days,

7  a few months, a few years?  I don't know.

8         MR. GLUECKSTEIN:  But --

9         THE COURT:  She couldn't tell me how long it was

10  going to take.

11         MR. GLUECKSTEIN:  But the question, Your Honor,

12  is:  Is there going to be -- the question here is:  Is there

13  any value to the tokens for purposes of valuing these claims,

14  of which there are tens of thousands of claims?  And so, at

15  the end of the day, the question of so whether the debtors

16  might be able to realize some nominal amount from selling

17  some tokens into the market in that hypothetical scenario

18  does not suggest that there's value to these claims.

19         In fact, when she applies the methodology, the

20  discount that we're talking about here is, as the objectors

21  have pointed out, well over a hundred percent.  So the

22  question here is, at the end of the day, whether or not

23  there's any reason to deviate from that methodology and

24  assume that there is going to be some value received that

25  would otherwise be distributable on account of their tokens.

1        And the fact that Professor Howell was unable to

2   say it's going to happen after exactly X number of tokens at,

3   you know, a couple of cents a piece, does not indicate at all

4   that there is any value here that's going to be realized by

5   the estate.

6        THE COURT:  Well, she also didn't tell you how

7   many tokens would be -- and I'm -- she -- I can't imagine

8   it's going to be we're going to sell one token.  I mean, it's

9   going to be something over time.  The debtors are going to

10  sell these tokens, right?

11       MR. GLUECKSTEIN:  The debtors will certainly

12  attempt to monetize these tokens.  But I think what we've

13  heard in this courtroom over the last couple of weeks is that

14  it's going to be incredibly difficult, if not impossible, to

15  do so.  That's the whole problem here.

16       THE COURT:  Then if they're work nothing, why

17  don't you just give them back?

18       MR. GLUECKSTEIN:  They don't want them.

19       UNIDENTIFIED:  I'm going to object, Your Honor.

20  He's getting into 408 communications now.  That is

21  inappropriate.  This is not based on evidence.

22       THE COURT:  All right.  Yeah, let's not get into

23  any discussions that you've have.

24       MR. GLUECKSTEIN:  I think -- let me phrase it

25  differently, Your Honor.

1          Your Honor's question.  If we believe that an

2   asset has zero value and they believe that it has material

3   value, you would think, at some point during these

4   proceeding, the question would have been posed to Your Honor

5   as to whether they could get these tokens back.  It has not

6   happened.  There -- counsel is correct.  There's nothing in

7   the record that suggests that there's any discussion either

8   way, or interest on their side of those tokens.

9          THE COURT:  Well, can't I order that anyway?

10          MR. GLUECKSTEIN:  You could, you absolutely could,

11   Your Honor.

12          THE COURT:  And what's the debtors' position if I

13   were to do that?

14          MR. GLUECKSTEIN:  If the Court were to order that,

15   with respect to these particular tokens -- we certainly have

16   these particular tokens.  If the Court were to order,

17   particularly -- and I think there's -- there might be some

18   difference here between MAPS, Oxy, and Serum, where we are

19   attributing value to those tokens.  So Serum, you know, there

20   are obviously -- that's -- we are attributing some value to

21   those tokens and claims to those tokens.

22          THE COURT:  Only Serum, right?

23          MR. GLUECKSTEIN:  With respect to Serum.  So I'm

24   differentiating Serum.

25          But with respect to MAPS, the MAPS and Oxy tokens,

1  which the debtors' position is there is no value to be

2  realized from these tokens, if Your Honor were to order us to

3  return those tokens to these creditors, we would obviously

4  comply with the Court's order.

5           THE COURT:  Okay.

6           MR. GLUECKSTEIN:  You know, that would need to be

7  in full and -- in full satisfaction of those claims.  But if

8  the issue here is that the objectors believe that these

9  tokens have value and the debtors don't, that absolutely

10 could be a solution, Your Honor.

11          THE COURT:  All right.  Go ahead.

12          MR. GLUECKSTEIN:  Your Honor, with respect to --

13 just to continue.  With respect to the debtors' estimation

14 methodology, Mr. Lu, the Coin Metrics Director of Data

15 Science, explained how he used his extensive experience in

16 developing and maintaining the Coin Metrics prices to

17 calculate the baseline prices for each of MAPS, Oxy, Serum,

18 and BOBA tokens, in the same manner that he had for every

19 other token that he priced.  He did this through a rigorous

20 process of selecting a high quality constituent market and

21 then calculate the prices as of the petition date, which is

22 detailed in his reports and testimony before the Court.

23          The MAPS and Oxy objectors are quick to criticize

24 aspects of Mr. Lu's pricing analysis, but offer no evidence

25 of their own.  In fact, the record is clear that Mr.

1   Konstantinidis did no analysis to calculate his petition date

2   prices, but rather took unverified and unreliable Coin Market

3   kept data and applied a twenty-four-hour calculation period,

4   for which he cites no basis in his reports for choosing.

5          Professor Howell took Mr. Lu's prices and used

6   them as one of her key inputs in considering whether an asset

7   liquidation discount for each and every token that she

8   evaluated is appropriate.

9          Unlike most of the debtors' other digital assets,

10  each of the tokens at issue today and their associated

11  projects have close ties to Mr. Samuel Bankman-Fried and the

12  FTX Group prior to the petition date.  Unlike tokens widely

13  traded in the markets, MAPS, Oxy, and Serum were tokens that

14  were held almost exclusively on the FTX Exchange, promoted by

15  FTX, and in the case of Serum, created by FTX.  As Professor

16  Howell explains, this led to the debtors holding more than 95

17  percent of the maximum supply of each of MAPS, Oxy, and Serum

18  tokens and comprised approximately half of the face value of

19  the debtors' remaining digital assets as of the petition

20  date.

21          The petition prime price calculated by Mr. Lu

22  reflects a market price when less than one percent of MAPS

23  and Oxy and three percent of Serum was freely traded.  As a

24  result, the debtors held amounts of these digital assets far

25  exceeding what the market could absorb and representing

1  hundreds and, in some cases, thousands of times the daily

2  trading volumes at the precise time the petition date, where

3  the estates needed to liquidate all of their assets to

4  satisfy customers and other creditor claims.

5          The petition date price of these assets cannot be

6  viewed in a vacuum, where we ignore other FTX-related trading

7  activity that's happening at the same time.  To do so would

8  require us to suspend reality and to attribute value to

9  claims based on digital assets, assuming a market for those

10  assets that never has and never will exist.

11          If the debtors ignore the market impact from their

12  liquidations, the result, as Professor Howell explains in her

13  supplemental declaration, in FTX Exhibit 3, and in her

14  reports, it would be a shortfall attributable to those

15  specific and identifiable types of tokens that would have to

16  be borne by other creditors who held fiat, stable coin, and

17  more liquid cryptocurrencies and who did not assume the risk

18  as holders of MAPS, Oxy, and Serum did, that the debtors

19  might choose or be compelled to liquidate their massive

20  holdings in that token.

21          After careful consideration of different potential

22  models, Professor Howell applied the KO model.  As she

23  testified, she determined it to be based upon rigorous

24  economic theory, and is applicable, in her view, to digital

25  assets and markets.

1          She determined that the transaction costs theory

2     set forth in KO was the most appropriate model available when

3     considering the impact of an orderly liquidation of the

4     debtors' assets on token value and applied it to determine

5     and discount as necessary to the adjusted petition time price

6     for spot tokens.  The 100 percent plus discount for MAPS and

7     Oxy reflect the extraordinary circumstances and extreme

8     liquidity of these tokens, not some flaw in the model.

9          While Mr. Konstantinidis holds his analysis out as

10    a valuation of claims, the record is clear that he did the

11    exact same thing as Dr. Howell, in terms of the steps that he

12    applied.  Both started with a petition time price.  Both

13    calculated a needed downward adjustment of that price to a

14    discount.  And once the adjusted petition time price is

15    determined, they then use it to calculate the value of claims

16    based on that asset.  Professor Howell testified at length as

17    to why she believed the transaction cost theory set forth in

18    the KO model is most appropriate and synonymous with a

19    discount in this context.

20         Mr. Konstantinidis' testimony that Professor

21    Howell and KO contemplate a sale of all tokens on a single

22    day is, frankly, absurd.  It contrasts everything Professor

23    Howell has said and what is actually written in the 2016 KO

24    paper.  It also contradicts the criticism of the KO slow

25    trading model that's set forth in his written report.

1          Professor Howell, applying KO, contemplates an

2   orderly liquidation of the token positions over time and her

3   discounts reflect that assumption.  Importantly, Professor

4   Howell explained that, when her estimation period is

5   explained to -- is applied to seven other models, the

6   liquidation discounts for MAPS and Oxy produced by all of

7   them is 100 percent, and for Serum, most are also 100

8   percent, far exceeding Professor Howell's calculation of 58

9   percent.  Those results are consistent with Professor

10  Howell's testimony that the KO model actually produces

11  conservative results, which the debtors view as appropriate

12  when estimating creditor claims.

13          As Professor Howell explained in her testimony and

14  in her reports, her inputs and assumptions are reasonable and

15  reliable.  She uses a conservative and long estimation period

16  in order to reduce estimation errors.  The evidence shows she

17  used reliable data for volume and petition time prices that

18  she received from Coin Metrics.

19          Professor Howell also explained why even DLOM

20  models can result in 100 percent discounts and, in fact, do.

21  For example, for MAPS and Oxy, when the Ghaidarov Model is

22  applied with corrected inputs, as shown as Exhibits 9 and 10

23  to the Howell rebuttal report.  Yet, for completeness,

24  Professor Howell evaluated the impact with respect to the

25  asset liquidation discount, using what is likely inflated

 1  data from three data aggregaters suggested by Mr.

 2  Konstantinidis.  And the discount for MAPS and Oxy tokens

 3  remained at 100 percent, while Serum discounts book-ended her

 4  58 percent discount, as summarized in Figure 3 of her

 5  rebuttal report, which is Exhibit FTX-6.

 6          Professor Howell explained how she also evaluated

 7  different estimation periods that extended until the petition

 8  date.  Again, the discount for MAPS and Oxy tokens remained

 9  at 100 percent, while the discount for Serum actually

10  increased, as set forth in Figure 1 of her rebuttal report.

11          As we discussed, Your Honor, it's the debtors'

12  position that, if there's any suggestion that we could

13  realize meaningful value from the sale of MAPS and Oxy tokens

14  is unsupported by the record.

15          Professor Howell's incremental discount for locked

16  tokens after the adjusted token price cannot seriously be

17  disputed and, in fact, is not disputed by TMSI.  There is no

18  debate that claims based on tokens subject to a vesting

19  schedule, from the customers' perspective, have less present

20  value than those freely tradable by that customer on the

21  petition date.

22          When looked at in totality, the methodologies set

23  forth by the debtors' experts, Mr. Lu and Professor Howell,

24  remains reasonable and fair to all creditors in these cases

25  and should be applied to these tokens alongside the others.

1          Mr. Gkatzimas, offering testimony only with

2     respect to the liquidation discount for Serum, accepts and,

3     in fact, applied the entirety of Professor Howell's

4     methodology.  He offers no opinions with respect to the

5     liquidation discount for Oxy or MAPS, which his clients also

6     hold.  Mr. Gkatzimas himself provides alternative

7     calculations for scenarios both where the aggregate customer

8     claims and the debtors' holdings are considered.  He nowhere

9     suggests that an individual creditor discount is

10    appropriately applied.  He applies the KO model and does not

11    dispute the DLOM as applied to Serum tokens.  The only

12    opinion he offers is that Professor Howell failed to include

13    the perpetual futures market in her trading volume input to

14    the KO model.

15          TMSI, of course, is looking to increase the

16    trading volume in an attempt to lower the resulting discount

17    output.  In her rebuttal report and testimony before the

18    Court at this hearing, Professor Howell explained why she

19    considered, but determined including such volumes was

20    inappropriately.  Most fundamentally, as Mr. Gkatzimas

21    concedes, perpetual futures cannot be used for liquidating

22    Serum tokens.  At most, the perpetual futures market could be

23    used to hedge exposure at significant transaction expense and

24    risk to the estate.

25          Regardless, the Serum spot token itself would

1   still have to be liquidated.  And there is, thus, no basis to

2   include futures volumes in the application of a KO model.  To

3   consider doing so, there would, among other things, need to

4   be evidence of an integrated market during the estimation

5   period.  Mr. Gkatzimas provides no such evidence in his

6   report.  And while he tried to offer high-level and

7   conclusory testimony to that effect at the hearing, it was

8   both insufficient and untimely.

9         We submit the Court should neither consider this

10  testimony as it considers a new opinion -- as it constitutes

11  a new opinion that was not previously disclosed on this

12  topic.  Moreover, Professor Howell explained why, in her

13  opinion, including perpetual futures volumes would increase

14  transaction costs and need to be included in a KO model

15  analysis.

16        Mr. Konstantinidis goes in a completely opposite

17  direction.  He does not include perpetual futures volumes in

18  his analysis for Serum, or MAPS or Oxy for that matter, but

19  does a different exercise altogether that is both not

20  responsive to the core estimation question and unreliable.

21  Mr. Konstantinidis has no relevant experience and has sourced

22  his methodology and opinions from work from the specialized

23  world of tax accounting.

24        Mr. Konstantinidis attempted to value his clients'

25  claims in isolation, not taking into account the other

1  creditors with claims based on the same digital assets or the

2  debtors' massive holdings of the at-issue tokens.  The Court

3  was clear at the January 31st hearing that it would be

4  estimating claims and not adjudicating MAPS and Oxy's

5  individual claims.  Yet, that seems to be what they're

6  seeking to do.

7           Mr. Konstantinidis does not offer a discount

8  applicable to the petition date token price applicable to all

9  creditors asserting claims based on these digital assets, as

10 contemplated by the motion and the digital asset conversion

11 table.  In fact, he offers different discounts for each of

12 his own clients based on each client's individual holdings.

13 The result of this approach, if adopted, would be for the

14 debtors to need to calculate individual discounts and then

15 individual token prices for each and every creditor.  As he

16 suggests doing with his flawed methodology, his analysis is

17 focused on increasing trading volumes and the amount of

18 tokens that could be sold into the market.

19          Professor Howell explained why Mr. Konstantinidis'

20 assumption that each and every creditor could sell ten

21 percent of the average trading volume of MAPS, Oxy, and Serum

22 into the market every day in perpetuity, without any price

23 impact, is both absurd and unsupportable.

24          Mr. Konstantinidis admitted that his methodology

25 permits the assumption that every single creditor could sell

1  up to ten percent of the average trading volume into the

2  market at the same time without any adverse price impact

3  because the model only looks at holdings from an individual

4  perspective.  He provides no citations or other support in

5  his report for this assumption.

6          Mr. Konstantinidis, likewise, goes on to use

7  unreliable and untested trading data that is likely inflated,

8  due to washed trading or fake volumes.  His volume growth

9  projections of 850 percent in the first year are facially

10 unsupportable.  He assumes this massive trading growth in the

11 first year, despite the close ties of Serum, MAPS, and Oxy to

12 FTX and the fact that these Chapter 11 proceedings have

13 already led to the Serum and Oxy projects becoming defunct.

14 He bases this assumption supposed -- on supposed trading

15 activity from 20 cryptocurrencies that fail to meet even his

16 own selection criteria, since two are, in fact, old stable

17 coins and held by FTX, as noted in Figure 3 of Professor

18 Howell's initial report.

19         In the end, Your Honor, the conflicting

20 alternative discounts offered by the objectors are

21 incompatible with one another, do not provide a value

22 generally applicable to each of MAPS, Oxy, Serum, and BOBA,

23 and do nothing but try to justify receiving value from the

24 debtors at the expense of other creditors.  As the debtors'

25 experts established, the methodology the debtors used and

1  approved by the Court for all the other tokens is applicable

2  to these tokens, as well.

3          The debtors' objective throughout this process has

4  been to estimate the most fair and reasonable valuation of

5  claims based on digital assets, and that includes with

6  respect to these tokens, Your Honor.  The Court should credit

7  the testimony and opinions of the debtors' experts and

8  overrule the remaining objections.  Thank you.

9          THE COURT:  Well, let me ask you another question.

10  One of the -- the difficulty with valuing crypto assets,

11  unlike other assets, is they have no inherent value; it's

12  just a bunch of zeros and ones in a software package.  So I

13  can't look, like I would with a corporation, and say well, it

14  trades on the stock exchange for five dollars a share, but I

15  have to look at the underlying assets and liabilities of the

16  company, including tangible assets, intangible assets, and

17  come up with a valuation.

18          Here, this -- the only value is derived from the

19  trades themselves.  And as far as I can tell,

20  cryptocurrencies trade on sentiment and nothing else.

21  Someone likes it, so they're going to buy it; or they don't

22  like it anymore, so they're going to sell it.

23          And in valuing assets, every judge always wants to

24  look to what is the price you can get in the marketplace.

25  So, aside from returning the tokens to the objectors here, is

1  it possible for the debtors to start a process of liquidating

2  and see what happens, start selling the tokens and see what

3  happens to the price?

4  MR. GLUECKSTEIN:  Is it possible?  I mean, I

5  suppose -- yes.  Is it possible?  We obviously have the

6  ability, with Your Honor's orders, to start, you know, to

7  liquidate cryptocurrencies.  We have done that with other

8  tokens, as is clear from the evidence before the Court.  We

9  have not done that with respect to the tokens at issue, we're

10 talking about today.  Whether that could be achieved in any

11 volume I guess is to be seen.  But certainly, if the Court

12 were to direct us to do that, we could go into the market and

13 see what could be done.

14 I think the -- I agree with Your Honor that this

15 question of inherent value, this is not like valuing assets

16 in the way that was discussed at times during the hearing,

17 which is why the entirety of the process that we have focused

18 on and the methodology that the experts the debtors have

19 brought forward have been focused on is to look at what is

20 the market price and what adjustments need to be made to that

21 market price to have a market price that we then use to value

22 the claim.

23 And there is no dispute -- despite all the

24 disputes you heard here from the differing experts, as I

25 said, there's no dispute that the petition date market price

1   that was listed on various exchanges or that was calculated

2   by Mr. Lu reflects what these tokens could be sold for in the

3   market.  There's no dispute about that.  So the question is -

4   - everybody is in agreement that some amount less than that

5   petition date price could be realized in the market as of the

6   petition date.

7        Now what could be realized today -- the price of

8   these tokens has continued to decrease, as I understand it --

9   is uncertain at best.  And you know, the only way we would

10  know, just like any of the tokens that we have priced through

11  this estimation process, there's going to ultimately be some

12  answer, to the extent they could be sold at all.  But for

13  purposes of the estimation process, the debtors continue to

14  believe that this is not -- what we are doing here is

15  determining an adjusted petition date price that reflects the

16  realities of the market on the petition date and we think the

17  way we propose to do that is the best method to do it.

18        But I agree with Your Honor that trying to look at

19  this as a pure valuation of cryptocurrency exercise is a

20  challenge, it's not how we looked it, and agree with Your

21  Honor's observations.

22        THE COURT:  Okay.  Thank you.

23        MR. GLUECKSTEIN:  Thank you.

24        MR. SASSON:  Good morning, Your Honor.  Isaac

25  Sasson from Paul Hastings for the Official Committee of

1  Unsecured Creditors.

2         Your Honor, as Mr. Pasquale mentioned to the Court

3  when we first addressed this motion in January, the committee

4  considers its role here as ensuring that the process by which

5  petition date values are applied to digital assets is fair

6  and reasonable to all creditors, regardless of any particular

7  creditor's holdings or claims.

8         The committee worked closely with the debtors

9  prior to the filing of this motion and, as Mr. Glueckstein

10  noted, fully supports the motion and the underlying

11  methodologies applied by the debtors' experts.

12         The objecting parties today advocate for

13  valuations of their digital assets in a manner different than

14  applied to every other digital asset by this Court last

15  month.  Why they reserved the right to challenge the debtors'

16  methodology, the objecting parties' valuation approach must

17  still make sense, apply well accepted methodologies, and be

18  fair in application to all creditors that hold MAPS, Oxy, and

19  Serum tokens, not merely those of the objectors, and indeed

20  must be fair to all creditors, as unjust recoveries to some

21  dilutes recoveries to all.

22         This is where the objectors fail.  To reiterate

23  Mr. Glueckstein's point, perhaps the most striking aspect of

24  that failure is Mr. Konstantinidis' opinion that the

25  valuation of MAPS, Oxy, and Serum tokens will be different

1   for each and every creditor who holds those digital assets

2   based on the holdings of each creditor and independent from

3   the holdings of each other and from the debtors.  This is not

4   only contrary to the purpose of the estimation proceeding,

5   which is to set uniform value for each token, but would also

6   be completely unreasonable and impractical in its

7   application.

8         The objectors' position, if adopted, would also

9   result in an unreasonably high value for the MAPS, Oxy, and

10  Serum tokens that ignores the circumstances and

11  characteristics of each of those tokens.

12        Your Honor, in response to your question to Mr.

13  Glueckstein about market sentiment, try as they did to

14  deflect from the facts, as explained in the record, each of

15  MAPS, Oxy, and Serum tokens, they're known as "Sam Coins" for

16  the very reason that they were closely affiliated with FTX

17  and Mr. Sam Bankman-Fried.  These coins are not like the

18  other digital assets held by FTX, except for FTT, which

19  Professor Howell properly valued at zero.

20        These three tokens, plus FTT, are digital assets

21  that Alameda used, held, was complicit in the fraud, and they

22  used to --

23        MR. TOROSIAN:  Objection, Your Honor.  None of

24  this is in the evidence.  The only evidence about Sam Coins

25  was that Professor Howell reviewed some articles in the

1  press.  There is no evidence about what counsel is talking

2  about right now.

3            THE COURT:  All right.

4            MR. SASSON:  Your Honor, it's in the rebuttal --

5            MR. GWYNNE:  Your Honor, for the record, Kurt

6  Gwynne from Reed Smith on behalf of the MAPS and Oxy

7  Foundations.

8            I join in that objection and ask that Your Honor

9  not permit argument where there's no evidence to support it.

10           THE COURT:  What evidence do I have?

11           MR. SASSON:  Your Honor, it's in the rebuttal

12 report of Professor Howell that was admitted into evidence, I

13 think yesterday or on Wednesday, I forget exactly when, but

14 we can --

15           THE COURT:  Well, I mean, she can rely on that to

16 formulate her opinion, but it doesn't mean it's admitted for

17 the truth of the matter asserted in that report.

18           MR. SASSON:  Understood, Your Honor.  But it goes

19 to the general methodology of why it went to less than a

20 hundred -- why the liquidation discounts were so stark here

21 because these were held widely by FTX and the market

22 sentiment and market understood that, but --

23           THE COURT:  Well, yeah, I understand what her

24 opinion is.  But you're going beyond that and saying that

25 there are -- that the market actually does view these as Sam

1  Coins and, therefore, not marketable.  And I -- you know, she

2  assumed that for her -- she assumed that for her analysis,

3  but it's not a factual issue that's been presented to me as a

4  fact in evidence.  So limit your discussion to what her

5  opinions are.

6          MR. SASSON:  So -- understood, Your Honor.  I will

7  adjust -- so the one last piece on the three tokens as it

8  relates to market sentiment, generally, and as part of the

9  opinions was the debtors held over 95 percent of each of the

10 outstanding MAPS, Oxy, and Serum tokens.  And that is part

11 and parcel of why the asset liquidation discount ended up

12 where it is.  The values -- and given that, the value of

13 these at-issue tokens are fairly, reasonably, and logically

14 impaired by their connections to FTX, primarily the inclusion

15 of how much value FTX -- how many of these tokens FTX held.

16          The objectors necessarily took on the risk that

17 FTX -- of FTX controlling virtually all of these freely

18 tradable tokens, making them different to the other creditors

19 who held digital assets on the exchange.  If the values of

20 these tokens were set at unreasonably high values proposed by

21 the objectors, the costs would come out of the pockets of the

22 other creditors, which is unfair and inequitable to them.

23          And Your Honor, I just wanted to address the one

24 question you had to Mr. Glueckstein about returning -- giving

25 these tokens back to the creditors.  Your Honor, to the

1    extent MAPS and Oxy have zero value -- and the committee

2    clearly believes they does -- they do -- the committee agrees

3    that those token -- that giving those tokens to the MAPS and

4    -- to the creditors who hold MAPS and Oxy claims would be an

5    elegant solution to that -- this dispute.

6              Unless Your Honor has further quest -- any further

7    questions, the committee will otherwise rest on its papers.

8              THE COURT:  Okay.  Thank you.

9              MR. SASSON:  Thank you, Your Honor.

10             MR. TOROSIAN:  Good morning, Your Honor.  Jeff

11   Torosian of DLA Piper on behalf of Maps Vault.

12             Your Honor, I will endeavor to answer the two

13   questions you had through my presentation, but if I don't,

14   I'll definitely address them at the end.

15             Your Honor, as --

16             THE COURT:  Well, I'd like you to address that one

17   question I have of --

18             MR. TOROSIAN:  Sure.

19             THE COURT:  -- why don't I just order the debtors

20   to return your tokens.

21             MR. TOROSIAN:  Well, the difficulty here is we're

22   estimating claims based on the petition date.  That was 18

23   months ago.  And we've -- both sides have had experts to say

24   what those claims were on 11/11/22.

25             I don't know what the value is today.  I know it's

1  positive value, I know it's trading for positive value, I

2  know it's worth something.  But our claim, at face value on

3  11/11/22, is over $500 million.  We've discounted it based on

4  a valuation that we think is appropriate, which I can go

5  through, to 291.8 million.

6        I don't know what the value is today.  I don't

7  know who owns these platforms today, Maps Vault, Oxygen

8  Vault, I don't know their status today.  I believe they're

9  operational, but I don't know for certain.  And I don't know

10 if the value matches what the petition date value is.  Nobody

11 has done that analysis.

12       So, while, if someone is going to give my client

13 something, we're happy to take it if there's no liabilities

14 associated with it, our claim is still -- it has to be like

15 all claims here.  We all have to be treated the same.  Our

16 claim is based on a petition date value pursuant to the law.

17 So we're -- they're hap -- we're happy to take whatever

18 someone is giving us, but our claim is our claim and we think

19 it should be adjudicated as of 11/11/22, not today.

20       THE COURT:  Well, so I return the coins, order the

21 coins be returned and you liquidate them, and then we

22 determine what the value of your proof of claim is

23 afterwards.

24       MR. TOROSIAN:  We can do that.  But the

25 liquidation schedule is -- you know, there would be three and

1   a half more years left in it, or I guess potentially, with

2   the locking schedule and all of that, which claims they're

3   giving us.  Are they giving us all claims or just the ones

4   that pertain to our claim?

5          THE COURT:  Well, I guess that begs another

6   question.  Why should I put the burden on the debtors and the

7   reorganized -- well, it won't be a reorganized debtor, but

8   whatever trust gets set up afterwards, to spend another three

9   and a half to -- I took from the testimony it could be up to

10  five years to liquidate these coins, and the expense of

11  having to do that.

12         MR. TOROSIAN:  Yeah.  And I think this goes --

13  I'll go through this in my argument.  But you know, we keep

14  talking, the debtor keeps talking about its liquidation of

15  its holdings.  We're not here on a liquidation motion; we're

16  here on an estimation of claims.  And that estimation of

17  claims is done as of 11/11/22.

18         They have a separate liquidation motion and they

19  have separate requirements that they have to follow to

20  actually liquidate all assets and, you know, collect through

21  all recoveries and distribute it to creditors.  That's for a

22  different day and that's a different motion.

23         This motion is to estimate our claim, which was

24  filed as a proof of claim, as exhibits before Your Honor, as

25  of 11/11/22.  We'll take face value of that, it's over a

 1  five-hundred-million-dollar face value.  But we think we have

 2  to value it, we think it's appropriate to value it as of

 3  11/11/22, and that valuation is $291.8 million.

 4         Now they're not giving anyone else in the

 5  estimation motion their tokens.  Everyone else has tokens

 6  that they've made over 1,300 other creditors, other

 7  claimants, they've estimated their claims as of 11/11/22.

 8  They're not arguing to return them their tokens.  I don't

 9  know what those token values are either, I don't think any of

10  those other claimants do.  I don't think most of those

11  claimants know how they got valued in the first place.

12         But we should be entitled to the same relief the

13  debtor is seeking against us that they sought against the

14  other creditors.  And we don't think giving us tokens, which

15  I don't know what the value is today -- I think it's worth

16  something, I don't know -- is appropriate.

17         THE COURT:  Well, that's the rub here.  If you

18  don't know the value of them, how am I --

19         MR. TOROSIAN:  I don't --

20         THE COURT:  -- supposed to --

21         MR. TOROSIAN:  I don't know --

22         THE COURT:  -- figure it out?

23         MR. TOROSIAN:  -- it today.  I don't know it

24  today.

25         THE COURT:  Okay.

1          MR. TOROSIAN:  I know the value as of the germane

2     issue before the Court, which is 11/11/22, it's 18 months

3     ago, so I know that value, so ...

4          Your Honor, as made clear, obviously, in the

5     pretrial submissions here, which is the motion, response, and

6     reply, this is a battle of the experts.  Ours is an expert in

7     valuation of digital assets.  Theirs, they have one expert in

8     calculating price, and they have another expert, which was

9     really a discount expert.

10          Ours has done this numerous times, including in

11    the Celsius bankruptcy, and leads a group that does this at

12    Stout.  Theirs never did it before, never performed a

13    valuation of digital assets before.  Brilliant, dynamic,

14    highly educated, highly published, erudite, impressive, et

15    cetera, et cetera, but she's never published on this before,

16    she's never spoken on this before, she's never took a class

17    on it, she never went to a conference on it before, she never

18    did it before.

19          Both sides' experts were told to do vastly

20    different things.  Ours valued Maps Vault's claims based on

21    Maps Vault's holdings of three tokens.  We provided a claim -

22    - a path for our claim estimation.  The Oxy objectors

23    provided a path for their claim estimation.  All other

24    claimants of our tokens, of these at-issue tokens, will have

25    to live with the debtors' estimate of zero value since they

1   don't provide an alternative way to estimate their claim and

2   we have no way of doing that for them, since we don't know

3   their holdings and we don't know their unlocking schedule.

4          Whether or not the Court agrees with me on our

5   approach, that we should value these two claims and give the

6   third party zero, or the debtors', either way, all third-

7   party claimants, all other claimants other than Maps and Oxy

8   will get zero, either way.

9          They, the debtors, on the other hand, provided a

10  path for valuing the total sale of the full supply of tokens,

11  one line in an order that they claim fits all in size, zero.

12  Theirs came up with a value for the entire supply of these

13  tokens for the entire market, including all of the debtors'

14  substantial holdings, owned holdings in these tokens, which

15  makes little sense.

16         Remember, debtors own, not hold as custodian, they

17  own 40 percent of all MAPS tokens and 30 -- over 30 percent

18  of all Oxy tokens.

19         If I could have Mr. Applebaum put on the screen

20  Oxy Exhibit 4, which was admitted into evidence.

21         These were the debtors' answers to interrogatories

22  where the debtor listed all of the debtors' owned holdings of

23  the MAPS tokens and Oxy tokens.  And as you can see, it's in

24  the billions of tokens.  If you do the math on these, you're

25  over -- you're at approximately 4 billion MAPS tokens, which

1  is about 40 percent of the 10 billion total.  And I think

2  it's over 30 percent of the Oxy tokens.

3          Interestingly enough, the Apple calculator that I

4  was using the other day to add these up doesn't even go up to

5  the billions; it only goes up to the hundred millions.

6  Apparently, the Apple calculator truncates the numbers.  So I

7  have --

8          THE COURT:  You have to turn it sideways.

9          MR. TOROSIAN:  Yeah.  Yeah, you have to --

10          THE COURT:  And then it will get you --

11          MR. TOROSIAN:  Fair enough.  That's -- see, now

12  you're -- I need you over here.  That's why Mr. Applebaum is

13  using the computer and I'm not.

14          But this shows you that the debtors actually own a

15  lot of these tokens.  And the real problem here is the

16  debtors told their expert to do the wrong thing.  This is

17  where most of the experts' disputes come from, and it's the

18  reason Professor Howell used a discount model that's not used

19  for valuation purposes.

20          The debtors didn't tell Professor Howell to value

21  our claim individually, no.  The debtors didn't tell

22  Professor Howell to value our claim together with the Oxy

23  objectors' claim, no.  The debtors didn't tell Professor

24  Howell to value all claimants' claims, Maps Vault, Oxy, all

25  other third parties, no.

1          Instead, the debtors told Professor Howell that

2   she had to value the entire supply of these tokens, including

3   the substantial amounts owned by the debtors themselves, even

4   though they're not claimants against themselves.  And she had

5   to assume that all of that supply would be immediately dumped

6   on the market as of the valuation.  That's made clear

7   throughout these proceedings.

8          If you can pull up Howell -- Professor Howell's

9   report, which is in evidence.  I believe it's FTX-1, if I'm

10  not mistaken.

11         Paragraph 4 of Professor Howell's report makes

12  this absolutely clear right from the get-go.  It says, quote:

13         "I was asked by Sullivan & Cromwell LLP to assist

14  with determining the value of creditor claims associated with

15  digital assets by evaluating the likely effect of liquidating

16  the debtors' holdings of each digital asset claimed by

17  creditors (in USD equivalent) as of the petition [day].  This

18  includes determining the discount at which the debtors would

19  have been able to sell their holdings, including derivative

20  contracts created by FTX but excluding NFTs, in an orderly

21  liquidation commencing at the petition time."

22         Professor Howell said the same thing on direct.

23         If you could pull up the trial testimony, Page

24  113, Line 4 of the first day of trial.

25         "Question" -- and remember, this is direct from

1   Sullivan & Cromwell:

2            "Question:  And what were you asked to do when you

3   were retained by the debtors?

4            "Answer:  So I was asked to assist the debtors in

5   determining the value of customer claims."

6            So far, so good.  That's the whole point here.

7   But then she goes on:

8            "And I understand, as part of the bankruptcy

9   process, the debtors have to sell all of their holdings of

10  digital assets.  So I considered the various categories of

11  assets to which the customers have claims and I assessed

12  whether it was appropriate to assign any discounts that would

13  result from the liquidation process."

14           What is she talking about?

15           On cross by Mr. Roselius, Professor Howell made

16  clear that she knew the debtors couldn't make a claim against

17  themselves on their own holdings, but that the immediate

18  liquidation of all tokens owned and held by the debtors was

19  an assumption she was told by the debtors to make in her

20  valuation of customer claims.

21           If we could pull up Page 137, Line 23 of the first

22  day of trial testimony.  And if you'll indulge me, Your

23  Honor, I will read through this:

24           "Question:  Now you are not testifying that the

25  debtors have to liquidate all of their holdings to value our

1  claims, correct?  They wouldn't have to liquidate all of

2  their holdings.

3          "Answer:  It's beyond the scope of my work to

4  opine on what they have to or don't have to do.

5          "Question:  But you're saying that you considered

6  that the debtors would liquidate all of their holdings?

7          "Answer:  Yes.

8          "Because you were told that that is a requirement,

9  that they do so.

10          "Answer:  So I was told to consider the likely

11  impact on prices of the debtor selling all of their holdings

12  of digital assets.  And it's my understanding that the

13  bankruptcy proceedings are requiring the debtors to sell all

14  of their holdings of digital assets, regardless of whether

15  they are the basis of customer claims."

16          Regardless whether they're the basis of customer

17  claims?

18          "But I'm not a lawyer. I can't speak beyond that

19  information that I received."

20          I'll skip the next question.  It goes on:

21          "Question:  Yes.  The debtors have to liquidate,

22  they have to sell all their assets.  That's your assumption

23  regarding -- regardless of the effect that it has on value of

24  digital assets?

25          "Answer:  That's correct.

1          "Question:  And regardless of the effect that it

2   has on the value of customer claims?

3          "Answer:  Correct.  I was asked to determine the

4   value of customer claims, you know, as a result of that

5   liquidation process.

6          "Question:  And your understanding is that the

7   Court instructed the debtors that they had to sell all of the

8   tokens immediately or essentially as soon as they could?

9          "Answer:  I was asked to consider to consider an

10  orderly liquidation commencing on the petition date, and

11  that's exactly what the KO model is designed to do."

12         Your Honor, I want to read that sentence again

13  because I think that that's the key here:

14         "I was asked to consider to consider an orderly

15  liquidation commencing on the petition date, and that's

16  exactly what the KO model is designed to do."

17         What is she talking about?

18         The debtors' assumption makes no sense, as the

19  debtors didn't liquidate any tokens on the petition date.

20  They haven't liquidated any tokens in the 18 months since.

21  Debtors can still liquidate, any way they wish to maximize

22  value to their recoveries.  Of course, they can't go back in

23  time and dump all of their assets on the petition date, and

24  they haven't done that since.

25         In fact, the debtors' liquidation efforts have --

1   must be done in accordance with the Court's digital asset

2   sale order, which was Docket Entry 2505, which guides the

3   debtors to sell their assets slowly because even the debtors

4   know they have to maximize their recovery.

5          In the debtors' own words from that motion for a

6   digital sale assets order, which is 2239, quote:

7          "If the debtors attempted to sell large digital

8   asset positions directly on the exchange, the debtors' risk

9   'flooding the market' and depressing the value of such

10  digital assets."

11         Debtors' future liquidation of its holdings that

12  it owns is entirely beside the point.  We're here on claim

13  estimation based on claimants' holdings and how much they're

14  valued at as of the petition date, not debtors' holdings.

15         Professor Howell's errors were many, but the

16  principal error here lies at Sullivan & Cromwell's feet for

17  giving Professor Howell the wrong assignment.

18         From there, it gets worse as both sides' experts

19  used different methodology with different inputs and came to

20  vastly different conclusions.  Our expert's conclusion was

21  that Maps Vault's claims should be valued at 291.8 million.

22  Theirs was that our claim and all other claims on these

23  tokens, all of them, should be valued at zero.

24         Before I go into the differences in all these

25  inputs, we have to check the smell test.  And I think Your

1   Honor already sniffed this out.  Our expert says a thing,

2   three types of tokens, were worth something on the petition

3   date and came up with an amount.  Their expert valued or

4   discounted the same thing, three types of tokens, which were

5   trading at the time of the petition with positive value,

6   which had no liabilities or debts associated with them, and

7   they concluded they were less than worthless.  They then

8   rounded -- I'm sorry -- truncated less than worthless to just

9   worthless, since even they knew less than worthless makes

10  even less sense.  That doesn't pass the smell test.  A thing

11  with positive trading value and no associated liabilities

12  cannot possibly be worth zero.

13          Professor Howell admits this.  On your

14  questioning, which you referenced again, she admitted that

15  the debtors could sell positive tokens for positive value.

16  In questioning from Mr. Roselius -- this is Page 178, Line 3

17  -- she even said it could go up to $100 million of value that

18  could be sold before it dropping to zero.

19          Let's dig into how we got there, how they got

20  there and how their conclusion got to be so low.  Of course,

21  there's no dispute here on what tokens are at issue.  There's

22  no dispute here on the date of valuation.  And the analysis

23  is conceptually simple:  Date of valuation, type and amount

24  of what's to be valued times price.

25          The difficulty here is threefold:

1           One, figuring out what the price is, is a little

2   more difficult in cryptocurrencies because you have to look

3   at different exchanges and calculate price.

4           Number two, some of these tokens were locked, some

5   of them were unlocked as of the petition date and subject to

6   unlocking schedules, which are different for each claimant.

7           And three, the fact that more tokens -- there are

8   more tokens to be valued than the average daily trading

9   volume.

10          So the valuation experts need to account for that.

11  In other words, form an opinion on price and account for how

12  much a willing buyer would pay for these tokens on the

13  petition date, knowing they're not fully liquid on that date.

14  Both sides' experts disagree on the inputs, how to find them,

15  and how to determination valuation on inputs.

16          Start with price.  Mr. Konstantinidis looked at

17  more exchanges and determined price in a twenty-four-hour

18  window leading up to the petition.  Counsel said he had no

19  basis to do that.  He absolutely had a basis to do that.  He

20  said these exchanges trade worldwide, 24/7, and you have to

21  take a twenty-four-hour period to capture it.

22          Mr. Lu didn't do that, though.  He excluded some

23  exchanges arbitrarily, we think arbitrarily, and limited his

24  review to a one-hour window, which excludes a heck of a lot

25  of trading all over the world.  Neither of Mr. Lu's decisions

1  was judgmentally sound.

2          On volume, again, Mr. Konstantinidis looked at

3  more exchanges and the same twenty-four-hour window that he

4  looked at for price to determine baseline value.  Given that

5  baseline and the amount of tokens at issue, Mr.

6  Konstantinidis knew he needed to consider a dribble-out

7  liquidation analysis.  And for that liquidation analysis, he

8  needed to know what the expected volumes would be going

9  forward after the petition date.  That's for purposes of

10  running his blockage discount or dribble-out method.

11          In doing that, he, of course, knew that volumes

12  don't stay identically the same over time, and so you have to

13  analyze how you think they're going to change.  And he looked

14  at 20 other cryptocurrencies over a five-year period,

15  averaged the results, and came out with a volume profile

16  going forward.

17          Remember -- and I don't want this to be loss --

18  nobody is liquidating anything.  Mr. Konstantinidis is not

19  liquidating anything.  He's doing a liquidation analysis, so

20  that he can come up with an input, the average holding

21  period, and use that input for his formulas, Chaffe and

22  Finnerty, and then come up with a discount to apply as of

23  valuation date.  That's classic valuation analysis.

24          That discount, Chaffe and Finnerty, also accounts

25  for price volatility during that time.  Counsel doesn't

1  understand the difference between the ten percent and the

2  price volatility.  It's a different concept.  The discount

3  method, Chaffe and Finnerty, accounts for price volatility

4  during the liquidation process.  But again, no liquidation is

5  happening.  It's a construct for a model to come up with a

6  discount.

7         Professor Howell also tried to figure out baseline

8  volume, but looked at a more limited set of exchanges to do

9  so, and also looked to a different period, which bizarrely

10 excludes the ten days leading up to the petition date, but

11 then, for some reason, goes as far back as over a year before

12 the petition date.  She looked at a different period for

13 volume than Mr. Lu did for price.  No reason.  She then

14 didn't consider any increase in that volume over time and

15 just figured that all tokens -- ours, Oxy objectors, third

16 parties, the tokens owned by the debtors themselves -- would

17 be somehow dumped on the market on the petition time.  That

18 is not, Judge, mentally sound.  Those are the input disputes.

19        But then the experts used different methodologies

20 and plugged these inputs into different formulas to value the

21 large volume of tokens as of the petition date.

22        Mr. Konstantinidis applied a blockage discount, a

23 widely recognized and used discount model in the valuation

24 community for assets such as these, and came out with a value

25 of 291.8 million, something much less than face value of all

1  tokens as of the petition date, but certainly more than zero.

2          Professor Howell ran a liquidation schedule that

3  included the directive from the debtors that she needed to

4  immediately liquidate all the tokens she was valuing, but

5  also all of the debtors' tokens, as well.  That's illogical

6  and not an accepted practice in valuation at all.  When

7  valuing a thing, say a commercial office building in midtown

8  Manhattan, you don't consider what if, when your willing

9  buyer is considering whether to buy your building, all of the

10 other buildings in midtown Manhattan suddenly are for sale at

11 the same time.

12         Let me use an even more similar analogy.  If you

13 were valuing three shares of Apple stock -- Professor Howell

14 mentioned Apple in one of her questionings --  the valuation

15 is relatively simple.  Three shares is certainly less than

16 the seventy million shares traded every day.  So you take

17 three times the share price of Apple, which is about one

18 seventy-two, and the result of that calculation is your

19 valuation, that's it.

20         Now, even for that calculation with

21 cryptocurrency, Professor Howell couldn't do that because she

22 can't figure out what the price is.  She has to rely on

23 professor -- Mr. Lu to do that.  She couldn't even do that

24 simple valuation calculation for cryptocurrency because she's

25 not qualified to get price.  Apparently, she has to go to Mr.

1  Lu for that.

2          But let's say in this analogy you were valuing 100

3  million shares of Apple.  Now it gets a little more

4  interesting.  Now you need to discount it a bit to reflect

5  the fact that 100 million is more than 10 percent of the

6  average daily trading volume.  You know daily trading volume

7  of Apple is 70 million shares a day.  You know you can sell

8  it to 7 million shares, which is 10 percent of 70 million,

9  per day.  And you have to do a liquidation analysis, the

10 dribble-out method Mr. Konstantinidis discussed, to apply

11 your blockage discount and come with a value for those Apple

12 shares.

13         Here's what you don't do.  You don't take the

14 entire amount of outstanding shares of Apple, which is 16

15 billion shares, assume that they all need to liquidated

16 exactly at the same time you're valuing your 100 million

17 shares, and then figure out how long it would take to

18 liquidate the whole thing, all 16 billion.  It would

19 obviously crash the market, which is what Professor Howell

20 said.

21         Let's make it even more interesting.  Let's say

22 you're only hitting the market with Apple's treasury stock.

23 Of the 16 billion, let's say Apple's treasury stock is 40

24 percent of that 16 billion.  That's 40 percent of MAPS, 30

25 percent of Oxy.  That's 6.2 billion shares of Apple hitting

1  the market when you're valuing your measly 100 million

2  shares.  Again, it would crash the market.  That's total

3  nonsense, Your Honor, 100 million public company shares of a

4  quality company like Apple.

5           And forget about what the fundamental value of

6  Apple is.  I don't know what the book value of Apple is.  All

7  I'm dealing with is price, just like here.  It doesn't matter

8  what the fundamental value is of these tokens.  All we're

9  dealing with is price in this hearing.

10          By that estimation, by that analogy, and by

11  Professor Howell's directive that she include all this

12  treasury stock, 3 shares of Apple is worth more than 100

13  million shares of Apple.  We've never heard of a valuation of

14  a thing that ever considered something like that.  It's

15  because Professor Howell assumed all of the shares

16  outstanding, even the 40 percent that the debtor owns of

17  MAPS, 30 percent of Oxy, would have to be liquidated at the

18  same time as the valuation date.

19          Professor Howell was told to do that for some

20  reason.  She was told to liquidate all shares, rather than

21  value creditor claims based on shares owned by them, not the

22  debtors.  Then Professor Howell discounted all tokens' value

23  as of the petition date due to that large volume.  But she

24  didn't apply the widely recognized blockage method.  Instead,

25  she looked to the KO model.

1              And let's talk about that, a model never used or

2    even mentioned for use in a valuation of this sort.  Instead,

3    it's used to predict market crashes.  That is the definition

4    of a "novel method," pursuant to Daubert, and cannot be

5    allowed.  Novelty for KO for valuation is obvious.  Why is it

6    obvious?  People have been valuing large blocks of shares for

7    decades.  The KO model comes from some obscure research paper

8    in an academic journal in 2016.  There's been no testimony

9    that the valuation departments of the big four accounting

10   firms were on fire after this paper came out and said now we

11   have a new way of valuing assets, forget this blockage

12   method, this is new and great and exciting.  Nobody did that.

13             There's been no testimony that it's been ever used

14   before.  And in fact, Mr. Konstantinidis said he's never

15   heard of it being used before, never used it before, never

16   heard anyone use it before, it's never been used.  There's no

17   case, there's no citation, there's nothing.  That is a novel

18   method for valuation that cannot be allowed by this Court

19   under Daubert.

20             THE COURT:  So, should I ignore Mr. Gkatzimas's

21   testimony?

22             MR. TOROSIAN:  Mr. Gkatzimas did not apply a KO

23   method.

24             THE COURT:  He said he did?

25             MR. TOROSIAN:  No, he didn't, Your Honor.  He

1   showed in the last alternate analysis, in that last slide of

2   the demonstrative, just how absurd the KO model is.  That

3   exhibit he said, who he concluded after looking at that,

4   after adding all of his inputs and throwing it in the KO

5   model, that reinforced his opinion of how absurd the KO model

6   is and how inappropriate it is for this purpose, for valuing

7   assets.  That was certainly not his opinion.  As I made clear

8   at the end of that testimony, his opinion is the first

9   column.  291.8 million, no KO model, the KO model is

10  inappropriate for this purpose.

11          The inappropriateness of this model is evidenced

12  by returning values of less then zero which Professor Howell

13  then truncated to zero.  How can a discount result in a value

14  less then zero. Its illogical, it makes no sense.  And as Mr.

15  Konstantinidis said, models are rejected on that basis alone.

16  Same is true of all other models that Professor Howell looked

17  to in the demonstrative.  Remember, she truncated all of

18  those models and said, oh, they all show 100 percent

19  discount.  Again, illogical.

20          We showed you the actual math for those.  All

21  those models come up with values of vastly over 100 percent;

22  28,000 percent, 38,000 percent, 73,000 percent.  What are we

23  talking about.  Those are not valuation models.  As Mr.

24  Konstantinidis said, those are also models like the KO model

25  for predicting market crashes.  If you take a ton of stock,

1  16 billion apple shares, every outstanding share of apple and

2  throw it on the market will that crash the market. Yes, it

3  will.  Thank you, Mr. K.  Thank you, Mr. O.  That is not a

4  valuation model.

5          The inappropriateness of the KO model is further

6  evidenced by the fact that no matter what the inputs are here

7  it will return a value of less then zero.  Again, even if you

8  did sell all the midtown Manhattan office buildings with no

9  debt, no liabilities at the same time it would be worth more

10  then something.

11          Professor Howell's use of the KO model is

12  reminiscent of an episode of the office.  When Michael Scott

13  is driving the car with Dwight Schrute and they're following

14  Garman, and Garman tells them to make a right turn, and

15  Dwight says, Michael, we can't go down that road we're going

16  to drive right into a lake.  Professor Howell does the same

17  thing.  She says, look, I threw these numbers in a model and

18  the model came out with zero. Its illogical, it makes no

19  sense.  You cannot accept it, Your Honor.

20          We ask you estimate Maps Vaults claim of 291

21  million pursuant to Paragraph 50 of Mr. Konstantinidis's

22  report.  Thank you, Your Honor.

23          THE COURT:  Thank you.

24

25

1            MR. GWYNNE:  Good morning, Your Honor.  Kurt

2   Gwynne from Reed Smith on behalf of the Maps and Oxy

3   Foundations.

4            First, to answer some of the questions from our

5   perspective that Your Honor had raised, with respect to

6   giving back the tokens, one of the problems with just doing

7   that now is that the value of the tokens has declined over

8   the last 16 or 18 months.  The spot prices on the petition

9   date for Maps was .1071257.  That is now .03674.  So, it

10  declined from .10, almost .11, to .03.  The Oxy tokens spot

11  price on the petition date was .0306372. Today, this morning,

12  that spot price is .01548.  So, that has decreased from .03

13  to .015.

14           As the debtor argued with respect to other

15  creditors who raised the issue about taking into

16  consideration post-petition things and for the individual

17  creditors who were asking to have their claims valued now

18  when the value of their tokens or coins increased the debtor

19  said, no, the relevant date is the petition date.  Well, that

20  holds true also with respect to these tokens as well, Your

21  Honor.

22           THE COURT:  Well, it is the petition date, but I

23  could order the return of the tokens and your claim then is

24  the difference between the value they are now versus the

25  value they were on the petition date.

1          MR. GWYNNE:  I understand that, Your Honor, and it

2    may be that Your Honor can do that. I am not necessarily

3    going to agree here and now because also, as counsel said for

4    Maps Vault, it depends on the treatment in the plan whether

5    we're being treated the same as other creditors, if they're

6    getting all cash as opposed to, for example, getting their

7    tokens back.

8          I hear what Your Honor is saying and it would be a

9    measure of damages to say you get your tokens back and then

10   the difference in price which means we are doing the same

11   hearing again except we're doing it at that point about the

12   difference in price. The other issue, of course, with that

13   too is the time to sell the tokens and really knowing what

14   that delta is. It doesn't happen overnight. It likely would

15   take the three and a half to four years to liquidate the

16   tokens.

17         With respect to Mr. Gkatzimas's testimony and you

18   asked if you should ignore his testimony because he applied

19   the KO model. I think he very clearly just said he took it

20   for granted because that is what Professor Howell had used. I

21   don't read his testimony in any way shape or form as vouching

22   for that methodology.  I think, if anything, the opposite.

23         Having said that, Your Honor, I probably should

24   have said for the record I'm here on behalf of Foundation

25   Serendipity, Foundation Elements, Serendipity Network Ltd.,

1  and Liquidity Network Ltd., which we collectively refer to as

2  the Foundations or the Maps and Oxy Foundations.

3       During this hearing, Your Honor, you have heard a

4  contrast, a clear contrast, between the debtors' witnesses

5  and in particular certainly Professor Howell and the

6  claimants' witness, Mr. Konstantinidis.  Mr. Konstantinidis,

7  the head of AI and digital transformation at Stout is a

8  valuation expert who has experience with valuation. He makes

9  a living valuing assets and determining discounts.  He valued

10  hundreds of assets in the Celsius bankruptcy case.  And to

11  determine the discounts in this case, he applied established

12  discount models, not transaction cost models but established

13  discount models. His approach is informed by real world

14  assumptions backed by an analysis of the industry.

15       On the other hand, Your Honor, Professor Howell's

16  analysis is that she adopted a transaction cost model that

17  had never been used for purposes of valuing any asset or ever

18  determining a discount.  She chose that model despite a lack

19  of any academic or other support for using the model in that

20  way and despite the outlandish discounts that resulted;

21  38,000 percent discounts, 50,000 percent discounts, 75,000

22  percent discounts.  That in and of itself, Your Honor, should

23  have been evidence enough for Professor Howell that the model

24  was not appropriately being used.

25

1          Its novel and unprecedented to use that model the

2     way she did and the outputs show that.  Professor Howell

3     calls the output of the model instead of transaction costs,

4     which is what the model is designed to discover, she refers

5     to the output as an asset liquidation discount.  That is an

6     unknown term in finance or valuation literature. It is the

7     unicorn of valuation and finance because that term does not

8     exist.

9          Professor Howell expressly acknowledged that she

10    made that term up.  The debtor made Professor Howell's job

11    even harder though and her analysis even less useful by

12    giving her instructions that were defective and that were

13    contrary to the relevant facts, that were contrary to the

14    sale order that Your Honor had entered, that were contrary to

15    applicable law including the Bittner case, and that were

16    contrary to the debtors' fiduciary duties.

17         One thing is clear and undeniable and that is that

18    these tokens on the petition date were traded by market

19    participants on a number of cryptocurrency exchanges and they

20    were trading for a positive observable price.  Professor

21    Howell's creation of this concept of an asset liquidation

22    discount cannot eliminate that value.

23         Your Honor, Professor Howell, as evidenced during

24    her testimony on March 20th, 2024, on page 225, lines 13 to

25    18, said that the debtor -- according to this testimony, Your

1   Honor, she says -- she acknowledges that if you have some

2   tokens they have value, but if you have too many then all of

3   a sudden they have no value.  That makes no sense, Your

4   Honor.

5           In essence, what the debtor is saying if our

6   clients have $200 million worth of tokens and the debtor has

7   $1.4 billion you add the two together and you get zero.  I

8   mean that makes no sense from any type of mathematical

9   analysis.  There is no scientific basis for it.  There is no

10  academic basis for it.  If you have 200 million of something

11  and you add 1.4 billion to it, maybe that 1.4 billion has to

12  be discounted because of the inability of the market to

13  absorb it all, but if you were  holding $200 million in value

14  at that point when you received the additional 1.4 billion

15  they can't add up to zero.  And that is, in essence, what

16  Professor Howell would have this Court believe and that in

17  and of itself should be evidence of the flawed nature of her

18  methodology and the misuse of the KO model.  No matter what

19  ivory tower you're in, Your Honor, the math doesn't work.

20          Now, turning to Mr. Konstantinidis's estimation of

21  the value of the claims, he looked at them from the customer

22  perspective, which is what we should be doing here.  As

23  counsel for Maps Vault indicated, this is not a liquidation

24  hearing, this isn't a case where Your Honor is doing a

25

1   547(b)(5) analysis of a hypothetical Chapter 7 liquidation or

2   anything like that. We are valuing the creditors' claims.

3          Mr. Konstantinidis used an average of the Finnerty

4   and Chaffe models and those models account for both of the

5   relevant discounts in this case.  One is the blockage or

6   liquidity discount arising from the quantities of tokens as

7   compared to the daily, average daily trading volumes and also

8   the non-marketability discount attributable to the fact that

9   some tokens were locked and had to be sold over time.

10          The spot price and trading volumes for his

11   analysis Mr. Konstantinidis obtained from CoinMarketCap in

12   the 24 hours prior to the petition date. I mentioned earlier

13   what the spot prices were for Maps and Oxy tokens and the

14   average daily trading volumes were over 2,062,000 units for

15   Maps and over 3,085,000 units for Oxy.  Mr. Konstantinidis

16   used that data from CoinMarketCap to determine the volatility

17   of Maps and Oxy tokens, using an annualized nine-month

18   average.  Courts, by the way, including the Superior Court in

19   Delaware, as indicated in our objection, have found

20   CoinMarketCap to be credible and reliable as a source for

21   both pricing and volume information.

22          Indeed, I point out Professor Howell used

23   CoinMarketCap data to value 44 tokens in this case.  Mr.

24   Konstantinidis then selected a database of 20 comparable

25   cryptocurrencies for purposes of determining a future volume

1   trend for the at issue tokens. That is important, Your Honor,

2   because in this case the free float as Professor Howell

3   testified, was approximately 1 percent of the amount of

4   tokens that had been minted.

5         The -- when you have such a small free float you

6   have to account for the possible likelihood that trading

7   volume is going to increase as more tokens become unlocked

8   over time.  Mr. Konstantinidis looked at 20 comparable tokens

9   over a similar time period to look at what happened with the

10  trading volume of those tokens as additional tokens were

11  unlocked and that is how he came up with the increase in

12  trading volume.  Professor Howell did not such an analysis.

13  Of course, she did no such analysis because it didn't help

14  her get to valuing our claims at zero so she just assumed

15  that the trading volume would never increase despite the fact

16  that only 1 percent of the coins were in free float.

17        Now the debtor takes issue with Mr. Konstantinidis

18  first year of increase in volume saying that its 850 percent,

19  but one of the things to remember, Your Honor, is that it's

20  easy if I have a dollar and I give you two dollars.  Well,

21  that is 100 percent but its not a large amount. The same is

22  true with the trade volume here, it wasn't a large amount.

23  So, an 857 percent increase as tokens became unlocked in the

24  future is not a large number.  Certainly, by the way, it's

25  interesting that the debtors concern about an 850 percent

1   increase in trading but isn't concerned about a 75,000

2   percent supposed discount rate.

3           Mr. Konstantinidis approach is consistent with the

4   fact that we are supposed to be ascribing value to these

5   tokens as though no bankruptcy had occurred.  That is what

6   the case law says as indicated in our objection, including

7   cases from the Delaware Bankruptcy Court.  Taking into

8   account the fact that some tokens were locked and some were

9   unlocked Mr. Konstantinidis applied a market recognized

10  assumption that 10 percent of daily trading volume of a

11  particular asset can be sold on a daily basis without

12  significant adverse effect on the price of the asset.

13          Now debtors' counsel said that Mr. Konstantinidis

14  assumed there would be absolutely no effect on the trading

15  price, but that is not true and Mr. Konstantinidis, on the

16  stand, expressly said that is the reason he has a discount

17  because he understands there is some impact as a result of

18  the trading.  But applying the blockage or dribble-out method

19  to calculate the discount based on lack of marketability over

20  the time period during which the tokens would be sold Mr.

21  Konstantinidis used the average, as I mentioned earlier, of

22  two discount models; not transaction cost models, but two

23  discount models, the Finnerty model which is generally said

24  to underestimate discounts at high volatility and the Chaffe

25  model which is said to overestimate discounts and high

1  volatility. So, he took the average of the two which

2  neutralizes any bias form either of those discount

3  methodologies.

4       Mr. Konstantinidis analysis calculates the value

5  of the Foundation Elements claims at $38,960,743 which is a

6  36.4 percent discount as to the petition date spot price for

7  Maps tokens.  And with respect to the Foundation

8  Serendipity's claim, he values it at $121,633,079 which is a

9  43.2 percent discount to the petition date spot price for

10 Maps.  And $19,659,096 which is a 35.8 percent discount from

11 the petition date spot price for Oxy.

12      Now Professor Howell criticizes Mr. Konstantinidis

13 analysis because in her view it does not apply to Maps and

14 Oxy token holders that did not object to the estimation

15 motion.  In other words, that it was Mr. Konstantinidis or

16 our clients' jobs to figure out the estimation for everybody

17 including people that did not object.  Well, we don't believe

18 we have that burden, Your Honor.  Mr. Konstantinidis clearly

19 said on the stand that it would be easy to apply his model to

20 third parties that did not object.

21      I also would point out that tokens held by --

22 there is a reason that the non-objectors aren't here today,

23 Your Honor, and that is because the amount of tokens that

24 they hold is so small and inconsequential that they didn't

25

1   think it was worth objecting to what the debtor was trying to

2   do in this case.

3           Professor Howell makes some other criticism of Mr.

4   Konstantinidis methodology, but I will discuss them within

5   the context of her analysis which I will turn to next.

6   Professor Howell is, as has been acknowledged, you know, very

7   well educated and impressively so but she is a novice when it

8   comes to valuation, valuing creditors claims and determining

9   discounts.  Unlike Mr. Konstantinidis, she has never valued a

10  digital asset.  Unlike Mr. Konstantinidis, she has never

11  calculated a discount.  Curiously, she never even cited, let

12  alone employed, the KO model which she is using in this case.

13          Professor Howell's testimony should be given no

14  weight, Your Honor, for two reasons.  First, the fix was in

15  from the time her assignment was given to her. Her assignment

16  was riddled with instructions and assumptions that were

17  defective and intended to reduce the value of the Maps and

18  Oxy tokens.  Second, her novel unprecedented and unorthodox

19  methodology is as misguided as the assignment that she was

20  given.

21          Starting with the assignment, the creditors claim

22  is to be valued at the petition time in the absence of a

23  bankruptcy proceeding, but also in accordance with contract

24  law.  Debtors' counsel told Your Honor that you have

25  significant flexibility to determine the procedure for

1  valuing -- for estimating a claim and that is certainly true

2  under the Third Circuit's decision in <u>Bittner</u>, but the Third

3  Circuit also says clearly in that case that the claim

4  estimation must be in accordance with applicable contract

5  law.

6          The debtors, however, gave Professor Howell

7  instructions that were contrary to both of those principles.

8  In fact, the debtors instructions to Professor Howell are

9  really nothing short of outrageous.  I mean, first, the

10 debtor instructed the Professor Howell to assume that the

11 debtor would sell all of its tokens commencing on the

12 petition date to pay the creditors' claims; however, in

13 interrogatory number one the debtor admits that it hasn't

14 sold a single Maps or Oxy token to date.

15         There is no legitimate basis for telling Professor

16 Howell to assume that the debtor did something that the

17 debtor, in fact, did not do.  Again, this is not a

18 liquidation, its not supposed to be a process designed to

19 come up with assumptions that will minimize the creditors

20 claims.  There is no basis whatsoever in any estimation case

21 that says you should assume the debtor did something that it

22 did not on the petition date and hasn't done for almost 18

23 months thereafter.

24         This is also not a for sale of the creditors'

25 claims or tokens and that is important, Your Honor, because

1   the debtor says and Professor Howell says, well, Mr.

2   Konstantinidis says that you have two or three creditors and

3   they're each going to be able to sell 10 percent in the

4   market, and because they are each selling 10 percent in one

5   case you have 20 percent being sold every day, I think it was

6   Oxy, and then in Maps you have 30 percent of market trading

7   volume being sold every day.  That is a flawed analysis, Your

8   Honor.

9           No one is forced to sell anything. This is just a

10  hypothetical process of the Court can value a creditors claim

11  by the sale price for that claim, but the creditors aren't

12  forced to sell, you know, their claims or their tokens.  So,

13  the assumption that everything has to be sold, whether it's

14  the debtors assets or other creditors in the valuing of any

15  individual creditors claim is a faulty assumption.

16          The debtors instructions to Professor Howell are

17  also defective because on August 23rd, 2023 the debtor, by

18  and through its advisors, Alvarez & Marsal, Sullivan &

19  Cromwell, and Perella Weinberg, filed a case update that said

20  they were considering restarting of the FTX exchange in the

21  second quarter of 2023, at least five months after the

22  petition date.  Now Professor Howell summarily dismissed any

23  connection between restarting the FTX exchange and the sale

24  of tokens, but there is a connection.  As Mr. Lu testified:

25

1          "When an exchange has tokens on it that are

2    traded, the more trading there is the more that attracts

3    other traders and also increases the rankings of the

4    exchange."

5          So, if the debtor was going to restart its FTX

6    exchange it would make sense for the debtor to continue

7    trading Maps and Oxy tokens on the FTX exchange just like it

8    did prepetition. So, there is a connection.

9          In addition, Your Honor, having the FTX exchange

10   would have given the debtor flexibility to decide whether it

11   wanted to sell all of its Maps and Oxy tokens now over the

12   next three or four years or to hold them.  So, asking or

13   instructing Professor Howell to assume that everything was

14   being sold on the petition date is contrary to not just the

15   facts, its contrary to the law and its contrary to what was

16   being considered at the time of the petition.  The defective

17   instruction, of course, did have one purpose and that purpose

18   was to reduce the value of the creditors claims.  But there

19   is other instructions that also had the same purpose.

20         Second, the debtor instructed Professor Howell to

21   assume that the debtor could start selling all tokens,

22   including locked tokens, on the petition date.  Professor

23   Howell claimed for the first time, by the way, in Court that

24   the Maps and Oxy tokens were -- that the debtor controlled

25   them and could consider them to be unlocked from the

1  beginning because they were sent to a cold storage wallet at

2  FTX.  And that, according to her, was evidence that the

3  debtor controlled the tokens and could sell them all. That is

4  nonsensical, Your Honor.  That expresses a fundamental

5  misunderstanding of the cryptocurrency market.

6        Maps and Oxy Foundations, not FTX, minted the

7  tokens at issue.  FTX had no right or ability to unlock any

8  Maps or Oxy tokens.  Mr. Konstantinidis, who actually looked

9  at the contract between the debtors affiliates and the Maps

10  and Oxy Foundations, specifically testified that there were

11  prohibitions in there of, you know, trying to change that the

12  debtor could not change the vesting schedule, that the

13  vesting schedule bound the debtor.

14        A cold storage wallet is just simply an offline

15  security measure. It doesn't authorize the transferee or

16  empower the transferee to set aside vesting schedules and

17  there is no basis for that.  Instructing Professor Howell to

18  treat all the tokens as unlocked that is contrary to the

19  Bittner case because that is giving instructions not in

20  accordance with contract law, but in derogation of contract

21  law.

22        Third, the debtors instructed Professor Howell

23  from the creditors perspective to consider the tokens locked.

24  Obviously, the two  instructions together treat the tokens as

25  unlocked, the same tokens as unlocked from the debtors'

1  perspective but locked from the creditors' perspective, was

2  intended to just further whipsaw the creditors and enable

3  Professor Howell to have a bigger discount by considering all

4  the volumes being sold and yet still having an additional

5  discount because it couldn't be sold from the creditors

6  perspective.

7          You would see if you were doing an analysis, you

8  either are selling it or you are not.  And if supposedly the

9  debtor could sell at all then there wouldn't be any reason to

10  put a second discount on the creditors' claims for lack of

11  marketability, but of course doing both of those things was

12  designed to further discount the creditors' claims. It's

13  basically heads the debtor wins, tails the creditors lose.

14          If the debtor had actually sold tokens in breach

15  of the vesting periods the creditors would have had claims

16  against the debtor for breach of contract.  So, frankly,

17  whatever benefit the debtor thinks its getting from trying to

18  sell things that are subject to a vesting schedule creditors

19  would just end up having a different kind of claim against

20  the debtor for that breach.

21          Fourth, and perhaps most troubling, the fact that

22  the debtors instructions to Professor Howell were contrary to

23  an order of this Court, the debtors representations to this

24  Court and the debtors fiduciary duty.  In Paragraph 8 of

25  Docket Item 2505, that is Your Honor's order approving

 1  guidelines for the debtors sale of digital assets, the order

 2  provided that nothing in the order alters the debtors'

 3  contractual obligations to comply with contractual lockup

 4  provisions.

 5        So, having -- this order was filed on September

 6  2023. This was around the same time the debtor is working

 7  with Professor Howell.  So, they are telling Your Honor that

 8  we're not saying that we are authorized to do anything

 9  contrary to our contractual lockup, yet they are telling

10  Professor Howell to assume that they don't apply to it.

11        The debtors instructions are also contrary to

12  Paragraph 21 of the related motion where the debtor said that

13  it would not sell its assets in a way that would either, you

14  know, crash the market or flood the market.  Now the debtor

15  and Professor Howell try to argue, well, we are not flooding

16  the market, you know, we are selling everything in an orderly

17  fashion; yet, Professor Howell has used the term "crash the

18  market" because of the volume of tokens that the debtor is

19  selling.

20        Perhaps one of the most troubling parts is the

21  instruction being inconsistent with the debtors fiduciary

22  duty.  The debtor has a fiduciary duty to maximize the value

23  of this assets for the benefit of its estate and its

24  creditors. How could the debtor possibly sell its assets in a

25  way that would render them valueless.  How does it make any

1  sense for the debtor to take all its tokens and say, you know

2  what, we are not going to burn some tokens, which is a way to

3  reduce the supply and then sell the balance because they will

4  have more value or find some way to maximize the value of the

5  tokens.

6       When asked if she considered whether there were

7  ways to maximize value of the debtors assets, which would

8  maximize the value of the creditors' claims, Professor Howell

9  just simply said that is outside the scope of her engagement.

10 Anything, of course, that would improve the value of the

11 assets from the creditors perspective she considered to be

12 outside the scope of her assignment.

13      Taking her cue from the debtors, you know, she

14 pitched in with her own inconsistent decisions designed to

15 reduce the value of the at issue tokens.  For example, she

16 excluded the increase in Maps and Oxy trading volume between

17 November 2nd and November 11th; however, she still took from

18 Mr. Lu the petition time pricing.  And she acknowledged that

19 the pricing of the Maps and Oxy tokens went down from

20 November 2nd to November 11th.  So, she finds a way to accept

21 the decline in price over that period while simultaneously

22 rejecting the increase in volume during that period.  Again,

23 inconsistent. The only thing consistent about that is its

24 consistent with an intention to devalue the creditors'

25 claims.

1          Notably, Professor Howell says, well, I am not

2    taking that traffic from November 2nd to November 11th

3    because there was an article in CoinDesk regarding Alameda's

4    balance sheet and I think there was some, you know, abnormal

5    trading activity after that.  Yet, she took, you know, during

6    the rest of the year backwards acknowledged there were other

7    events that were newsworthy and those newsworthy events led

8    to trading, but she didn't exclude that trading.  So,

9    obviously, it was designed to try to decrease the value or

10   the amount of Maps and Oxy tokens that were traded, reduce

11   that daily average just like her exclusion of LBank which I

12   will get too.

13          Another assumption she made intended to depress

14   the value of the Maps and Oxy tokens was the fact that

15   trading volume would remain flat.  She testified she had no

16   scientific or other basis for that.  She acknowledged she did

17   no study to determine if any potential purchasers would be

18   interested in additional Maps or Oxy Tokens and unlike Mr.

19   Konstantinidis, she didn't look at any comparable tokens to

20   determine what happens as additional supply becomes

21   available.  So, the fix was in. It was really a fait

22   accompli.  Every one of these assumptions on the screen,

23   whether it was an instruction from debtors' counsel or an

24   assumption that Professor Howell made, every single one of

25

1  them was designed to depress the value of the Maps and Oxy

2  tokens.

3         There are so many fundamental problems with the

4  assignment she was given that her mission was so

5  fundamentally flawed that her analysis should also be given

6  no weight.  Her analysis has its own debilitating errors.  It

7  never cited to the CO model before, doesn't use it in her

8  research, never used it before this assignment, but chose it

9  to be a discount model.

10         And no matter how hard she tries to hammer it into

11  being a discount model, it's not one.  She can change what

12  she calls it, you know, from -- now, instead of calling it a

13  transaction cost model, now, all of a sudden in the last 24

14  hours or so, she's parental rights to refer to it as a price

15  impact model or trying to give it some definition that would

16  somehow make her choice of that model appropriate, but it

17  wasn't.

18         The KO model is not and was never intended to be a

19  discount.  It's authors, not only in the 2016 paper when they

20  came up with the KO model, but in their two later papers,

21  2020 and 2023, never referred to it as a discount model.  In

22  fact, none of those three articles ever uses the word

23  "discount" a single time.

24         It's a transaction cost model and Professor Howell

25  testified that the purpose of the KO model is not to value an

1  asset, and that's really what we're trying to do here, is to

2  value or estimate the value of the creditor's claims.  The KO

3  model has never been applied by anyone as a discount model

4  before Professor Howell tried to smash it into being one.

5  The authors, Kyle and (indiscernible) never described it as

6  such.  As Mr. Konstantinidis testified, there's no basis in

7  finance or valuation theory to use the KO model to determine

8  the discount.

9          Now Professor Abbott's articles, which I think is

10  Oxy Exhibit 41, Professor Abbott's article establishes the

11  problem with incorrectly presenting a cost of liquidity from

12  a transaction cost model as a discount.  And the theoretical

13  problem with using a cost model to determine a discount is

14  that you end up with discounts that are theoretically

15  problematic and well in excess of 100 percent.  That's

16  exactly what happened here.  Gatorov Stockdale (phonetic)

17  also share the same view.  The discount for lack of

18  marketability will never exceed 100 percent in Gatorov's

19  example or Gatorov's article, which was acknowledged in the

20  testimony on page 166.

21          So, now caught in the crosshair of her peers and

22  their articles, Professor Howell now trying to find another

23  way out in her continuing efforts to defend the indefensible,

24  which is her choice of the KO model.  Now, she says, well,

25  these articles, they just refer to a discount for lack of

1  marketability, or the DLOM, that they don't apply to her

2  asset liquidation discount.

3          Well, first of all, these articles are -- are

4  never going to use the word "asset liquidation discount,"

5  because it's made up.  The phrase doesn't exist in the

6  literature.  It's the unicorn of Professor Howell's creation.

7  But the way Professor Howell describes her asset liquidation

8  discount, it is a discount for lack of marketability.

9          Professor Howell admits that the KR model measures

10 liquidity.  Liquidity is the ease by which an asset can be

11 converted into cash.  So lack of liquidity is lack of

12 marketability and that's important to understand, that lack

13 of liquidity is lack of marketability.  Now, if you look at

14 the title of Professor Abbott's article, it specifically

15 says, "Discount for lack of liquidity" at the top.

16         So while Professor Howell acknowledges that the KO

17 model measures liquidity, she tries to say it's not -- you

18 know, her use of it is not a DLOM.  That it's some new term

19 called "ALD."  But the asset liquidation discount, as she

20 uses it is a discount for lack of liquidity and is well

21 within the scope of what these articles are talking about

22 when they say that a discount should never exceed 100

23 percent.

24         In the very first sentence of this article,

25 Professor Abbott states that the DLOM is a generic term that

1  includes impairment of value, due to lack of marketability

2  and liquidity.  So despite her attempt to try to distinguish

3  her newly created ALD from the DLOM, her own definition of

4  DLOM plainly includes her asset liquidation discount.

5  Specifically, she said that a DLOM, or a discount for lack of

6  marketability, is, quote, where the value of an asset is

7  lower, because you cannot sell it for some period of time,

8  closed quote.

9          Well, that's exactly what her use of the KO model

10  is supposed to be showing, that you can't sell all of the

11  tokens for some time period, because in her view, there's not

12  enough demand to do that, certainly, all at once.

13          Other professors at the NYU Stern School of

14  Business understand that an illiquidity discount is a

15  discount for lack of marketability.  In fact on Footnote 96

16  on page 36 of Professor Howell's report, he colleague,

17  Professor Damodaran wrote an article entitled, "Marketability

18  and Value:  Measuring the Illiquidity Discount."  So,

19  obviously, marketability and the discount for market includes

20  an illiquidity discount.

21          And Professor Howell can try to, you know,

22  sidestep the criticism of her model exceeding 100 percent,

23  but that attempt doesn't survive scrutiny, either, because

24  the illiquidity discount is a discount for lack of

25  marketability.  And Professor Howell's use of the KO model is

1  the poster child for criticism by people like Professor

2  Abbott, because her use of the KO model doesn't just result

3  in the discount of 110 percent or 200 percent, but, it

4  results in the discounts in the tens of thousands of

5  percents, which makes no sense, theoretically.

6          But I would say, also, please do not let it be

7  lost on the Court that Professor Howell cannot, has not, and

8  won't be able to cite a single source in support of treating

9  the transaction cost model ass the equivalent of a discount

10  model.  Professor Abbott pointed out what happens when you

11  use the transaction cost model and try to transaction cost

12  model and try to pass it off as a discount, that you end up

13  with the exact same problems that we have here with Professor

14  Howell's model.

15          But also, pay particular attention, Your Honor, to

16  the fact that Professor Howell also fails to cite, can cite,

17  and won't be able to cite, a single academic authority in

18  support of her bald assertion that there's nothing wrong with

19  a model that results in discounts over 75,000 percent.

20  Where's the academic literature in support of that assertion?

21  There is none.

22          Professor Howell's methodology fails scrutiny

23  under Daubert.  In the 2017 Zoloft case, 858 F.3d 787, the

24  Third Circuit said that in determining the reliability of a

25  novel scientific methodology, courts consider multiple

1  factors, including the testability of the hypothesis, whether

2  it's been peer-reviewed or published, the error rate, whether

3  standards control the techniques and operation, and whether

4  such standards exist, and whether the methodology is

5  generally accepted.  Both the expert's methodology and the

6  expert's application of that methodology have to survive

7  scrutiny under Daubert.

8         Here, the Professor Howell's methodology does not.

9  You know, to the extent the hypothesis is tested, it fails.

10  Professor Howell said, "she guesses," -- and it's not my

11  word; that's her word on the transcript page 135, lines 20 to

12  22 -- she guesses that the transaction costs and discount are

13  equivalent in her analysis.  Although, she claims she did

14  some unspecified internal analysis regarding the KO model's

15  invariance principal "held" in the cryptocurrency market, she

16  said that beyond that, she acknowledged that there was not a

17  way to systematically test whether it held a cryptocurrency

18  markets, given our data.

19         And she noted that the little bit of internal

20  tests or analysis that she did was especially noisy at the

21  tenth decile of information.  She did not conduct any

22  investigation regarding whether the coefficients that are

23  part of the KO model, which were based on data from the New

24  York Stock Exchange and NASDAQ, she did no analysis to

25  determine whether those coefficients could apply in the

1  cryptocurrency market.  She attempts to validate her views of

2  the KO model by citing to seven or models that all result in

3  discounts over 100 percent.

4          That's just seven more instances of Professor

5  Howell making the exact same mistake, because those seven

6  models, they're also transaction cost models.  Not a single

7  one of them was a discount model.  So seven more examples,

8  all she provided was seven more examples of why her

9  methodology makes no sense, because those other seven

10  transaction cost models also resulted in discounts for Maps

11  and Oxy above 100 percent.

12          So Professor Howell's admittedly novel and

13  unprecedented application of the KO model to determine the

14  discount has not been peer-reviewed and it has not been

15  published.

16          The error rate for her methodology is 100 percent,

17  with respect to Maps and Oxy, because a model that results in

18  a discount above 100 percent is theoretically faulty.

19  Professor Abbott says that.  Gatorov says that.  Stockdale

20  says that.  And Mr. Konstantinidis also said that.

21          In every case, her model, with respect to Maps and

22  Oxy, results in discounts above 100 percent, therefore, her

23  error rate for her methodology is 100 percent.

24          She also manually truncated those eye-popping

25  discounts.  She just manually truncated them.  Well, there's

1   no scientific, academic, or other basis for that.  That's

2   just simply a "behind the scenes" attempt to legitimize what

3   is illegitimate.

4          And I'd note, Your Honor, that she didn't even --

5   in her report, she didn't disclose how high these discounts

6   were.  The outrageousness of them was only something we found

7   out when we took discovery.  Every discount for Maps and Oxy

8   greatly exceeded the theoretical maximum.

9          There's also no standards to control the operation

10  of her novel approach and that's why she had to manually lop

11  off tens of thousands of dollars or percents of discount to

12  get to zero.

13         Her methodology, also, Your Honor, cannot be said

14  to be generally accepted, as she is the only one in the

15  history of the KO model to ever use it as a discount and she

16  uses it to resolve a discount that she terms an "asset

17  liquidation discount," that is a term that she acknowledges

18  she made up.

19         So, for those reasons, her methodology doesn't

20  survive scrutiny under Daubert.

21         Professor Howell does not cite any treatise,

22  academic article, or other literature endorsing or even

23  reviewing the KO model as a discount, but she does admit that

24  Maps and Oxy tokens are highly volatile.  Well, one of the

25  articles that she relies upon, which, of course, doesn't use

1  the KO model as a discount model, but uses it for transaction

2  cost purposes, the Broneiss (phonetic), the Alexander

3  Broneiss article.  It specifically says that the KO model

4  does not work well with high volatilities; another reason she

5  shouldn't have used it, with respect to those tokens.

6           Now, you know, lacking any peer support for her

7  selection of her model, she still tried to ambush us in court

8  with these three other unspecified articles that she said

9  supported her use of the KO model in this case.  Well, one of

10 those articles she claimed supported her case didn't have

11 anything to do with cryptocurrency at all.  It doesn't

12 mention the cryptocurrency.  It didn't mention digital

13 assets.  It's entirely unrelated to the cryptocurrency

14 market.

15          The other articles used the KO model with respect

16 to transaction costs, not discounts.  One of them dealt with

17 transaction cost related to blackouts in Japan and the other

18 dealt with the double-edged sword of investor attention.  The

19 interesting thing about that article, of course, is that it

20 acknowledged the CoinMarketCap data.  It used CoinMarketCap

21 data, in particular, for trading volume.

22          But that study actually said that the

23 microstructure characteristics of the cryptocurrency market

24 behave differently than traditional assets like the stock

25 market.  That's important.  It's ironic that Professor Howell

1 would cite that article in support of her use of the KO

2 model, which is all about microstructure invariance, an

3 article that says the microstructure of the crypto market is

4 different.  If those are the best articles she could find to

5 support her (indiscernible) to the KO model, Your Honor, then

6 that, in and of itself, is damning.

7          The novel discount theory belies common sense, as

8 I said earlier.  If you have 200 million of something and you

9 get another 1.4 billion of it, it can't add up to zero.

10 Maybe it's not 1.6 billion, but it's sure got to be above 200

11 million.

12          The bizarreness of Professor Howell's methodology

13 is apparent from her own testimony.  She says that these

14 tokens should be valued at zero.  And as Your Honor quickly

15 picked up on during the testimony, she couldn't say that the

16 tokens were really worth zero.  She couldn't say how long it

17 would take to sell them.  She couldn't say when the discount

18 would go to zero.  But she did say that it was possible that

19 $100 million worth of Maps or Oxy tokens could be sold before

20 the price would go to zero.

21          So, as a minimum, Your Honor, the debtor should be

22 here saying, According to their own expert, the Maps and Oxy

23 tokens should be worth a minimum of 100 million.  The

24 question is whether her methodology is sufficient to reduce

25 them below that.

1          Now, her concession that there is positive value

2   for the Maps and Oxy tokens, and maybe even $100 million

3   worth of value for the Maps and Oxy tokens is important,

4   because that in and of itself, belies the results of her KO

5   model.  How can her KO model say that there's a $78,000

6   discount on Maps and Oxy tokens and I'm going to truncate

7   that to 100 percent and Maps and Oxy tokens are worth zero,

8   according to model, but yet testified that you maybe could

9   sell $100 million of them.  How does that make any sense

10  whatsoever, Your Honor?  I would submit that it doesn't.

11         Her methodology and the application of it is

12  unprecedented, unorthodox, unreviewed, unpublished, and

13  unreliable.  And in addition to those fundamental problems,

14  she made other bad choices that compounded her errors.  One

15  glaring error, which I really think shows the bias of

16  Professor Howell in performing her assignment was the

17  exclusion of the LBank trading volume data.

18         And that's important because two-thirds of the

19  average daily trading volume came from the LBank exchange.

20  So, by unfairly eliminating that one exchange, she was wiping

21  out two-thirds of the average daily trading volume.  It went

22  from, if you include the LBank volume as Mr. Konstantinidis

23  testified, the volume goes up from 510 units to 1.7 million

24  units.

25         Now, Professor Howell claimed that she was not

1  included the LBank trade data because it was, quote, clearly

2  illegitimate, closed quote.  The only thing that was clearly

3  illegitimate was her exclusion of the LBank data.  She

4  acknowledged she had absolutely no evidence whatsoever of any

5  wash trading regarding Maps or Oxy tokens and neither did

6  Mr. Lu, for that matter.  She did not -- she could have

7  gotten on the Solana blockchain, looked at the Maps or Oxy

8  transactions and determined if there was any evidence of wash

9  trading, but she didn't do that.  She didn't even do the

10  simple exercise of an exchange-by-exchange comparison of

11  ratings regarding the different exchanges.

12          And as we know, the coin market -- I'm sorry, the

13  Coin Metrics spot data volume grade for LBank was C.  Also

14  sharing that same grade was Poloniex, MEXC, and BitBox, all

15  of which exchanges were used by Professor Howell to determine

16  trade data.  Now, caught in that inconsistency on the stand,

17  Professor Howell tried to quickly point to the overall grade

18  of D and said, well, of course, by the way, what we were

19  looking at was trade volume data, but Professor Howell said,

20  well, what's important is you've got to look at that overall

21  grade of D.  That, however, does not explain her reasoning

22  because Poloniex and BitBox also had an overall grade of D

23  and their trade volume was used by Professor Howell.

24          But the bias is even more undeniable when you look

25  at the coin market spot [sic] exchange rankings.  Professor

1 Howell used trade volume from exchanges that were ranked

2 seventy-fifth, eighty-second, one oh one, and one sixty-

3 eight.  But she excluded the volume of LBank, which was

4 ranked twenty-one.

5           Now, Professor Howell, I think, would claim that

6 she didn't know that because she didn't look at this, but

7 part of the problem with her analysis is she was too quick to

8 accept instructions and make assumptions and decisions that

9 reduced the value of the creditors' claims.  The only basis

10 for excluding the LBank volume is that the decision was

11 designed to depress the value of the Maps and Oxy tokens.

12           Mr. Lu, as an employee of Coin Metrics, had some

13 adversity to using CoinMarketCap data.  As a result, for the

14 petition time pricing, he just used three exchanges for Maps

15 and actually -- I'm sorry, three exchanges for Oxy, and just

16 one exchange Gate.io for Maps.  He acknowledged, of course,

17 that it's better to have more than one data source.  He

18 avoids the principal markets for the tokens, also, on the

19 basis of a concern over wash trading.  But he did no more

20 than Professor Howell did to determine whether there was any

21 wash trading.

22           And his use of the term "confidence interval" in

23 his analysis is as fabricated as the term "asset liquidation

24 discount" in Professor Howell's testimony; although, I guess

25 his is a little different in that a confidence interval is a

1  term that's used, but in the way he used it, it's not, as Mr.

2  Konstantinidis testified.

3          So, Your Honor, we ask that you value the Maps and

4  Oxy Foundation claims as follows:  the Elements Oxy claim at

5  $38,960,743; the Serendipity Oxy claim at $19,659,096; and

6  the Serendipity Maps claim at $121,633,079.  And that's a

7  conservative value, especially with respect to unlocked

8  tokens.

9          As debtors' counsel has pointed out a few times,

10  including in his closing statement, that our expert is not

11  even saying to just take our unlocked tokens, multiply them

12  by the spot price on the petition date and that's the value.

13  There actually would be a really good argument for doing

14  that, Your Honor.  I mean, the Third Circuit in 2007 in the

15  VFB, LLC v Campbell Soup case, 482 F.3d 624, 633, held that,

16  quote:

17          "Absent some reason to distrust it, the market

18  price is a more reliable measure of the stock's value than

19  the subjective estimates of one or two expert witnesses."

20          So the same thing is probably true in this case,

21  Your Honor, but conservatively, our expert was not saying,

22  just take our unlocked tokens, multiply them by the spot

23  market price.  We're not asking you to do that here today; of

24  course, we would reserve our rights on that, depending on

25  what happens in the future.

1          But for all those reasons, Your Honor, we would

2   request that you accept Mr. Konstantinidis' valuation, reject

3   Professor Howell's report, because of both, the nature of her

4   time and her chosen model, the methodology, and the way that

5   she applies it.

6          That's all I have, Your Honor, unless you have any

7   questions.

8          THE COURT:  One question.  If I'm looking at the

9   value of locked tokens as of the petition date, did they have

10  any value as of the petition date if they were locked?  They

11  downtown be sold that day, so they had no market value that

12  day, so how do I -- how does your expert explain how to value

13  the locked tokens?

14         They're going to be unlocked over time, you said

15  over a five-year period, I believe.

16         MR. GWYNNE:  Correct.

17         THE COURT:  So, how does he take into account the

18  fact that there were, I think, most of these tokens were

19  locked?

20         MR. GWYNNE:  Well, Your Honor, he takes that into

21  consideration through the DLOM.  The DLOM, the discount for

22  lack of marketability has two elements.  One is a discount

23  for illiquidity.  That's the discount based on the fact that

24  there's more available than can be sold on one day.  And then

25  with respect to the fact that the tokens were locked, he

1   takes that into consideration through the discount for lack

2   of marketability.  There is a discount for that in his

3   analysis, but it doesn't mean it has no value, just because

4   you don't have it today and can't sell it today.

5           For example, if someone said they were going to

6   give you or give, you know, the Court $10 million five years

7   from now, but you couldn't touch it until then, that wouldn't

8   mean it has no value now.  You know, it may be locked up for

9   10 years in until it's vested and you have the right to the

10  $10 million.  And you couldn't transfer the actual $10

11  million today, but that asset, that right to something in the

12  future has value, positive value; it just has to be

13  discounted, based on the fact that it's not available today.

14          THE COURT:  But the difference is if it's $10

15  million, that has a set value.  It's backed by the U.S.

16  Government.  I know it's five million.  It's going to be five

17  million five years from now.

18          These tokens have no inherent value, so the value

19  as of the petition date for the locked tokens -- and I'm just

20  throwing this out as a hypothetical -- so let's say the value

21  for the locked tokens on the petition date was zero, because

22  they were locked; they couldn't be sold.  You can't sell them

23  until a year, two years, five years from now, and who knows

24  what the market price is going to be five years from now.

25          So, how do I take -- how does he take that into

1  account in his analysis of the market value of the value of

2  those locked tokens as of the petition date?

3         MR. GWYNNE:  Understood.

4         And, Your Honor, I think the answer to that -- I'm

5  going to check with him before I'm finished so I can come

6  back to you in a second, but I believe the answer to that is

7  volatility.  One of the things you have to consider besides,

8  you know, the fact that there's a time value of money that's

9  relevant, but you also have to consider in your model the

10  volatility of pricing.

11         And one of the reasons why the DLOM models are

12  more reliable than what Professor Howell did is because the

13  KO model uses volatility only on one day, whereas, the DLOM

14  models use volatility over a longer period.

15         May I have a minute, Your Honor?

16         THE COURT:  Sure.

17     (Pause)

18         MR. GWYNNE:  Kurt Gwynne, again, for the record,

19  Your Honor.

20         The only thing I would add to my answer, after

21  talking to Mr. Konstantinidis, is that you also have to

22  consider the average holding time period.  But it is the

23  volatility, time value of money, and the average holding

24  period.

25         And as counsel for Maps Vault pointed out, it's

1  somewhat similar to an option, right.  An option, you can

2  sell an option now, even though it can't be exercised.

3          THE COURT:  Well, these can't be sold at all,

4  right?

5          You're criticizing them for saying they can be

6  sold now, so they can't be sold now.

7      (Pause)

8          MR. GWYNNE:  Your Honor, I think it is like an

9  option contract.

10         What we're criticizing the debtor for is saying

11 that as to them, the tokens should be considered unlocked and

12 freely salable and as to us, they're considered locked and

13 subject to a discount.  We agree that they should be subject

14 to a discount if they're locked and held by us, but we

15 shouldn't be subject to an additional discount because the

16 debtor is treating them as unlocked.

17         THE COURT:  Well, what evidence do I have that I

18 can assume these are similar to an option, where you can sell

19 bundles of locked tokens to someone else?

20         MR. GWYNNE:  Well, I don't know, Your Honor, if

21 that's specifically in any of the expert reports, but you do

22 have evidence that the, you know, tokens can be sold and you

23 do have evidence of what the value is of locked tokens.  And

24 I think it's undisputed that locked tokens do have value;

25 it's just a matter of what that value is.

1          THE COURT:  Well, and that's what I'm struggling

2   with.  What is the value of the locked tokens versus the

3   value of the tokens that are currently unlocked?

4          And if I'm looking at the value of locked tokens

5   in the future when they become unlocked, am I still looking

6   at the value on the petition date or am I looking at the

7   value in the future, which would be contrary to what the Code

8   provides?

9          MR. GWYNNE:  Yeah, well, I was going to say it

10  depends on what you're doing and for what purpose.  But as

11  far as for purposes of estimating creditors' claims, it's the

12  value on the petition date that is relevant.  And that's what

13  the testimony is of Mr. Konstantinidis and what his report

14  is, is the petition date value of tokens, whether they're

15  locked on unlocked.  And like I said --

16          THE COURT:  Well, wouldn't there be a difference

17  in value between locked and unlocked?

18          MR. GWYNNE:  There is.  Absolutely, there is.

19          THE COURT:  And how does he account for that in

20  his report?

21          MR. GWYNNE:  He accounts for that with the DLOM,

22  the discount for lack of marketability, and he applies that

23  to the locked tokens.  So the locked tokens are discounted

24  higher than the unlocked tokens.

25          For example, there are some unlocked tokens on day

1  one, you know, the amount that can be sold on day one,

2  they're at the spot price, because they can be sold

3  unrestricted on that day one at 10 percent of daily trading

4  volume, right.  That's the spot price.

5           But then things that get sold later over time have

6  discounts and the tokens that are locked have a bigger

7  discount because, you know, for lack of marketability.

8           THE COURT:  Does he take into account those that

9  are going to be unlocked a week from now versus those that

10 are going to be unlocked five years from now?

11          MR. GWYNNE:  Yes.

12          THE COURT:  Okay.  And where do I see that in his

13 report?

14          MR. TOROSIAN:  Your Honor, Jeff Torosian for Maps

15 Vault.  Do you mind if I get in on this?  I know I'm in

16 counsel's cross, but you're asking --

17          THE COURT:  Well, no.  I think you've already

18 spoken.  I'm talking to Mr. Gwynne now.

19          MR. GWYNNE:  Your Honor, I think if you look at

20 Mr. Konstantinidis' reports, that is Maps Vault 1 on page 21,

21 paragraph 44, it talks about -- you asked about would you

22 have any evidence compared to a (indiscernible) auction where

23 he's talking about the Chaffee model there.  He mentions the

24 foot option and then it continues on to the next page.

25          THE COURT:  All right.  Well, I'll take a look at

1  it.  But I don't recall from the testimony that there was any

2  way to distinguish between tokens that were going to be

3  unlocked tomorrow versus tokens that are going to be unlocked

4  five years from now.

5          And by definition, to me, it sounds like those

6  would have to have a different value.

7          MR. GWYNNE:  They do.  They absolutely -- I agree

8  with you.  Mr. Konstantinidis agrees with you, and I think if

9  you look at his report, you will agree with that.

10         I don't think we take the position that a token

11  that's unlocked tomorrow has the same value as a token that's

12  unlocked five years from now.

13         One of the things Mr. Konstantinidis told me to

14  mention to you was that average holding period.  And that's

15  part of when you do the Chaffee and Finnerty it discount

16  models, that average holding period is taken into

17  consideration and that's exactly what Your Honor is talking

18  about.  You know, you're looking at the time period where

19  you're holding all of these locked tokens and then you have

20  an average holding period as part of the calculation.

21         THE COURT:  Okay.  I'll take a look.

22         MR. GWYNNE:  Anything further, Your Honor?

23         THE COURT:  No, that's it.  Thank you.

24         MR. GWYNNE:  Thank you for your time.

25         THE COURT:  How long do you think you'll be?

1       UNIDENTIFIED SPEAKER:  Twenty minutes or less,
2   Your Honor.
3       THE COURT:  And we're already coming up on
4   lunchtime here.
5       How much rebuttal, do you think you'll have (audio
6   interference)?
7       UNIDENTIFIED SPEAKER:  It's probably 15 minutes,
8   Your Honor --
9       (Hold music plays)
10      AUTOMATED VOICE:  Welcome to Zoom.  Please press
11  pound, then, enter your meeting ID followed by the pound sign
12  again.
13      THE COURT:  Well, we might have to take a recess.
14      (Laughter)
15      UNIDENTIFIED SPEAKER:  Probably 15 minutes or so,
16  Your Honor.
17      THE COURT:  All right.  Let's just take a short
18  lunch break, like 45 minutes, we'll come back and finish up.
19      So, come back at 1 o'clock.
20      COUNSEL:  Thank you, Your Honor.
21      THE COURT:  Thank you.
22      (Recess taken at 12:17 p.m.)
23      (Proceedings resumed at 1:00 p.m.)
24      THE COURT:  Thank you, everyone.  Please be
25  seated.

1          All right, ready when you are.

2          MR. SIDDIQUI:  Good afternoon, Your Honor, Peter

3  Siddiqui, Katten Muchin Rosenman, on behalf of TMSI SEZC Ltd.

4          Your Honor, TMSI's objections to the debtors'

5  proposed estimation are specific and narrow.  The debtors'

6  through their estimation motion have set the rules for this

7  exercise.  The debtors chose to estimate claims using the KO

8  model.  Now, we heard a lot about what the KO model is and

9  what it is not, but we think the key is that the KO model is

10  an objective mathematical formula that uses four inputs as of

11  a certain date to calculate the estimated price impact of

12  selling a spot position.

13          TMSI has accepted living by those rules and the

14  mathematical rigor of the KO model to determine the outcome

15  here as it relates to the SRM tokens, that's what we want.

16  Unfortunately, when we identified in our papers the mistakes

17  the debtors made in their application of the KO model,

18  instead of correcting those mistakes or engaging in any

19  discussions, the debtors attempt to justify those mistakes by

20  arguments that only make sense if they completely change the

21  rules.

22          The KO model has four inputs, as we know:  average

23  daily trading volume, amount to be liquidated, volatility,

24  and petition date price.  Our objection is based on the

25  mistakes the debtors made in two of those inputs, the amount

1  to be --

2          THE COURT:  Just to be clear, contrary to then

3  what other counsel told me, you are using the KO model, you

4  just disagree with the inputs used by the debtor in the KO

5  model?

6          MR. SIDDIQUI:  That's right, Your Honor.  They

7  told us how they're estimating it, we're happy to have our

8  Serum token claim estimated in such a manner; however, we

9  just want it to be done properly.

10          And our objection is based on two of the inputs

11  where we think the debtors made mistakes, the amount to be

12  liquidated and the amount of available volume to liquidate

13  that amount.  The amount to be liquidated should be the

14  customers' claims, not the debtors' holdings.  The point of

15  this exercise is to dollarize TMSI's claim.  Estimation is a

16  tool analyzing from the creditors' perspective what the

17  dollar amount of that claim should be.  The debtors' excuse

18  for not doing so is illogical and contrary to the rules they

19  establish.

20          The debtors' basis is -- and I'm paraphrasing only

21  slightly -- is because the debtors have to sell anything

22  anyway in order to substantially consummate a Chapter 11 plan

23  of liquidation that one day will be confirmed, but that's not

24  an argument -- well, of course, that's true and the debtors

25  will liquidate all of their assets, either whether they're

1    bitcoin or Ether avoidance actions or tangible assets, or so

2    on, and to create a pot from which all creditors, whether

3    they're Sullivan & Cromwell, the U.S. Trustee's Office, and,

4    hopefully, someday soon, the victims of the debtors' fraud,

5    that is creditors, customers, and depositors, but that's

6    irrelevant today.  That's an answer to a different question,

7    that answers the question how much creditors are going to

8    receive on account of their claims, and that number could be

9    zero, it could be a hundred percent plus post-petition

10   interest, or it could be some number in between, but that's

11   not relevant to today's exercise, Your Honor.  That question,

12   while important one day, is not important today.

13          The actual question is what should TMSI's claim

14   and others based on SRM tokens equal in United States

15   dollars, that's the question, and the only reasonable way to

16   answer that is to hypothesize how much the sale of the

17   customer's claimed holdings and SRM tokens would be, and that

18   necessarily requires the amount-to-be-liquidated input for

19   the KO model to be the customer's SRM.

20          Now, the debtors' argument is a common and losing

21   one in the case law.  What the debtors are saying is they

22   need to estimate claims here in USD by assessing what happens

23   if they disclosed all of their tokens, but that's wrong.

24   Judges, when confronted with this question, reject that

25   analysis.  The District Judge in Owens Corning v. CSFB, which

1  we cite in our papers, was confronted with estimating

2  asbestos claims, and he had to decide whether to determine

3  them how the tort system would determine it or determine what

4  the outcome would be in the bankruptcy case, and the Judge

5  quickly and clearly held it's the former.  Estimated claims

6  are to be apprised on the basis of what would have been a

7  fair resolution of the claims in the absence of the

8  bankruptcy.  In other words, the task is to determine what

9  the creditor's stake in the case is, and I'm quoting:  "We

10  are not at this time deciding how much each claimant will

11  actually be entitled to receive, but the total amount which

12  the claimants as a group could legitimately have claimed as

13  compensation as of the petition date."  That's at 322 B.R.

14  719, 722, (D. Del. 2005).

15         And, Your Honor, that same court in Federal Mogul

16  ruled the same way, noting that estimation proceedings are

17  not confirmation, but they are the estimation of liability.

18  What creditors get on account of their claims is not an

19  estimation, according to these authorities.

20         And what we learned from Professor Howell is that

21  the customers' holdings are 509 million U.S. dollars worth of

22  Serum token, and that's at Figure 13 of her opening report.

23         Now, as I said, Judge, we are willing to play by

24  the rules.  That's a lot of tokens and the debtors' chosen

25  tool, the KO model, tells us that selling lots of tokens may

1 negatively affect the price.  But we understand that a

2 discount should be applied under these rules, but the right

3 input of the KO model for the amount of liquidated tokens

4 should be the creditors' holdings, not the debtor, and using

5 the proper input the KO model generates an asset liquidation

6 discount of 20 percent.

7         The other arguments the debtors try to counter

8 this seemingly clear result also make little sense and also

9 answer the wrong question.  That argument is that holders of

10 SRM tokens, or creditors whose claims are based on SRM

11 tokens, deserve to recover less in this bankruptcy case

12 because their tokens were affiliated with FTX.  With respect,

13 Judge, that is a bad argument.  This is not an equitable

14 subordination hearing, this is not a confirmation hearing,

15 this isn't even a popularity contest or a beauty pageant;

16 this is an estimation hearing.

17         The debtor is the movant here, they set the rules.

18 If they wanted to base estimation on which customer deserves

19 to lose more money here, they picked the wrong tool.  And,

20 frankly, the argument in their papers, Judge, that customers

21 should not share ratably in the proceeds of the estate is

22 baffling and disappointing.  Ratable distribution of

23 similarly-situated creditors is of course one of the bedrock

24 principles of the system.

25         Using the estimation methodology they chose, their

1  argument not only is not very good, it's completely wrong.

2  The KO model has four inputs, none of those inputs is who

3  deserves to lose more money.  Professor Howell admitted as

4  much.  Neither the debtor nor Professor Howell's subjective

5  views about Serum tokens makes a hoot of difference in this

6  case, and that's especially true coming from Professor

7  Howell, who couches her viewpoint as a so-called expert.  Who

8  deserves to lose money is not an expert opinion at all and,

9  even if it were, an academic with no bankruptcy knowledge of

10  crypto trading experiencing certainly isn't capable of

11  providing it.  In fact, she says as much and makes clear

12  she's not opining on the fundamental value of Serum tokens

13  and, in that instance, TMSI completely agrees with it.  She

14  has no valid opinion on the matter and any freestyling

15  conclusion based on subjective views that are not grounded in

16  any reasoned or analytical approach should be disregarded,

17  and, most importantly, it violates the very model that her

18  whole report is based on.

19         So, accordingly, the debtors have no thoughtful

20  counter to using the customers' holdings and, because of

21  that, because that's obvious in this context and because

22  there's no dispute, the proper input to the KO model should

23  be the customers' holdings.

24         And here's an example of the unreasonableness of

25  the debtors' position.  Now, imagine a scenario where

1  customer claims assert $500 million worth of Serum tokens and

2  the debtors held zero.  Using the debtors' holdings as the KO

3  model input, there would be no asset liquidation discount.

4  But we agree that using the KO model selling $500 million

5  worth of Serum tokens likely would affect downward the price,

6  but refusing to apply the KO model faithfully and in the

7  logical way leads to this absurd result.

8           And actually there's another thing that we agree

9  with Professor Howell on and that's when she admits that the

10  attributes of SRM tokens that may make them riskier

11  investments than say bitcoin or Berkshire Hathaway stock or

12  U.S. Treasurys, that's all publicly available information,

13  especially among investors in digital assets.  Those

14  attributes and the riskiness/un-riskiness of SRM tokens must

15  factor into the ever-changing market price of SRM tokens,

16  which, as we learned, Your Honor, dropped during the days

17  leading to the bankruptcy filing.

18           So Professor Howell is correct when she concedes

19  that SRM's connection to FTX is already incorporated in the

20  petition-time price.

21           The second error the debtors make in the KO model

22  as it relates to the SRM tokens is with respect to the volume

23  input.  The debtors used only the spot volume in their

24  formula; that is wrong.  The proper volume to include is all

25  trading volume for SRM tokens, which includes spot and

1  futures trading volume.  The debtors have no valid basis for

2  excluding all volume from their math here.  As we've heard,

3  SRM was a widely-traded token during the debtors' estimation

4  period, and it had an active and liquid spot and futures

5  market.  In fact, the futures market was larger than the spot

6  market during the estimation period.  And the fact that there

7  was such a large futures market demonstrates that market

8  participants used all available liquidity sources when

9  trading in SRM tokens.

10         Given these active liquid markets and how

11 straightforward it is to compute these volume -- this volume

12 during the estimation period, that volume should be included

13 in the input of the KO model.  The debtors refuse to do so

14 and they have no good reason for their refusal.  Their stated

15 reason is that the debtors literally can't sell Serum tokens

16 on the futures market.  To that, Your Honor, I respectfully

17 ask, who cares?  We have to remember the rules.  We are

18 estimating customer claims under the KO model, the KO model

19 says input volume here, that's what we want.  That's what

20 TMSI asks to be done in this case, input volume data; not

21 half of it, not a third of it, but all of it.

22         And remember what we heard, Your Honor, that when

23 Kyle and Obizhaeva, the K and the O of the KO model model,

24 themselves applied their own model in subsequent papers.

25 They used all volume data available, including futures, and

1   that's obvious.  Futures represent active and liquid markets

2   where market participants trade every day.  The availability

3   of a futures market to market participants is a significant

4   point.  And we heard from Mr. Gkatzimas how futures markets

5   can be used as part of a trading strategy which demonstrates

6   how using futures markets represent legitimate volume.

7          Now, Mr. Gkatzimas did testify here and he did

8   note in his report at paragraph 15 and footnote 22 that the

9   spot market and the futures market were integrated during the

10  estimation period, and that the design of the perpetual

11  futures contracts themselves keeps the prices integrated.

12  And, in connection with his report, produced backup data to

13  the debtors that, when analyzed, he testified, creates a 99.9

14  percent co-relationship between the spot and the futures

15  market.  That's part of the record, this is not new, and it's

16  all consistent.

17         Now, Howell, on the other hand -- Professor

18  Howell, on the other hand, didn't know any of that and didn't

19  look any of it up, and can't and didn't controvert Mr.

20  Gkatzimas's testimony in that regard.  And that's because,

21  Your Honor, as we've heard already and I'll summarize,

22  Professor Howell is not a credible expert on the futures.

23  Our criticism of Professor Howell here is most striking in

24  respect to futures.  She's not a futures expert to any

25  extent, she lacks the necessary specialized expertise and is

1   nothing more than a layperson without any formal education or

2   training on the subject.  Her expertise, as it may be in

3   economics or initial coin offerings or NFTs are not

4   sufficient grounding for an expert on the opinion of futures

5   market.

6           And we set out our arguments in detail in

7   paragraphs 23 to 27 of our supplemental objection, many of

8   which were echoed by my colleagues here today, and we learned

9   throughout this evidentiary hearing that those shortcomings

10  are real.  She does not know what she's talking about when it

11  comes to futures.  But even if she did have the necessary

12  training and expertise and qualifications to testify about

13  futures, which she doesn't, but let's assume she did, her

14  methodology is not based on any reasoned or analytical

15  approach.  The only thing she says is perpetual futures can't

16  be used to convey title of an asset.  Again, that is not a

17  valid, reliable, analytical basis to exclude all volume

18  inputs from the KO model, especially when the authors

19  themselves do so.

20          The debtors' other argument that estimation period

21  futures volume should be excluded from the KO model is

22  because post-petition SRM futures trading was not available.

23  That is also is irrelevant.

24          First, estimation requires the Court to estimate

25  the value of claims as if the Chapter 11 cases never

1  happened; second, we have to remember the rules.  The debtors

2  said let's estimate using the KO model, using data from the

3  estimation period, which is approximately the year before the

4  bankruptcy filing.  In other words, future events are not at

5  all relevant to this exercise.

6         The debtors pick the formula, the debtors pick the

7  time period, and they need to populate the formula with the

8  right data.  They should be stuck with the choice that they

9  made and, when you use the proper volume inputs, the asset

10  liquidation discount drops to 12.47 percent.  If we play by

11  the rules themselves, that they themselves established, the

12  KO model inputs should include the prepetition inputs for

13  volume and the customers' holdings.

14         Thank you, Your Honor.

15         THE COURT:  Thank you.

16         Rebuttal.

17         MR. GLUECKSTEIN:  Good afternoon, Your Honor,

18  Brian Glueckstein for the debtors.

19         There was a lot of ground covered in the arguments

20  from objectors, much of which is extensively briefed in our

21  papers and I'm not going to respond to every argument here,

22  but there are a few points that warrant a discussion.

23         First, Your Honor, the suggestion by counsel from

24  the podium that debtors have breached their fiduciary duties

25  in how they're seeking to estimate these claims is

1  outrageous.  There isn't a shred of evidence before the Court

2  to support anything that Mr. Gwynne had to say on the topic

3  of how we are liquidating our assets, how we are conducting

4  this case.  There is not a single contract in the evidentiary

5  record of this hearing with respect to any lockup agreements

6  or any other contractual obligations of the debtor to these

7  objectors.  Suffice to say, we have a difference of opinion,

8  but none of that is relevant to what is happening here.

9         What we are doing, what the Court has been asked

10  to do is estimate millions of creditor claims based on

11  digital assets.  As much as the objectors would like us to

12  simply value, conduct a valuation exercise to the cent of

13  their claim, that's not what is required.  As stated in our

14  papers and as I explained this morning, the estimation -- and

15  the Court considered this back in January -- the burden that

16  we carry, which Your Honor found we satisfied back in

17  January, was that estimation was necessary because the claims

18  were unliquidated and that litigating them to value would

19  unduly delay the estate.  That issue is not before the Court

20  today, it's done.

21         The question today is whether the proposed

22  methodology that the debtors have proposed to estimate claims

23  results in a reasonable estimate of that claim.  And our view

24  is that the evidence shows that Professor Howell's

25  methodology, building off of the pricing determined by Mr.

1  Lu, satisfies that burden.

2         There was a slide up here about how Professor

3  Howell didn't definitively say that $100 million of Maps and

4  Oxy tokens could be sold, and Your Honor asked some questions

5  around the positive value this morning.  And what wasn't

6  shown was what appeared directly before that Q&A in the

7  transcript from last Wednesday.  This is in the transcript of

8  the hearing from March 20th at page 177, starting at line 15,

9  where Professor Howell was asked, "You cannot tell at what

10 point the price goes to zero, correct?"

11        And her answer is, "I think it depends on sort of

12 market efficiency and what we assume about the rationality of

13 participants.  You know, if the liquidation began and

14 participants knew there would be a complete liquidation, and

15 that the discount would ultimately be 100 percent, I expect

16 that the participant interested in buying say Maps would

17 realize that the debtor is willing to sell at sort of any

18 positive price and would demand a lower price, and that would

19 very quickly dissolve to zero."

20        We submit, Your Honor, that the question of the

21 methodology as it applies to these tokens and whether it

22 determines a reasonable estimation of the claims is

23 satisfied.  Their suggestion that this has all been drummed

24 up by the debtor to somehow bias these objectors -- that word

25 was used -- this same methodology was applied across the

1   entire portfolio of the debtors' digital assets.  The

2   suggestion this was done or orchestrated in some way to

3   target them specifically is ridiculous, and the record of

4   this hearing proves otherwise.  There's no way that our

5   official creditors committee would sit by and allow us to

6   conduct such an exercise targeting a particular creditor.

7          Your Honor, these tokens that we've been talking

8   so much about, Maps, Oxy, and Serum, these are not mainstream

9   cryptocurrency tokens.  Counsel stood up and made an analogy

10  to the sale of shares of Apple stock.  These are not Apple

11  stock, these aren't even bitcoin; these are tokens that were

12  closely associated with the failed exchange of FTX, the

13  reason why we're all in this courtroom and have been here for

14  the last 18 months.

15         The debtors' position, as evidenced by the outputs

16  from this exercise with respect to the Maps and Oxy tokens is

17  that these claims are in fact worthless.  You get to that

18  result because when we make the appropriate adjustment to the

19  petition-time price it's a 100-percent discount.  And that

20  discount was calculated both under Professor Howell's

21  methodology and in numerous other ways, taking inputs that

22  the objectors would argue that we should use, and coming up

23  with the same output, it's 100 percent.

24         And Your Honor raised a very interesting issue

25  this morning, and Counsel has verified in the colloquy over

1 the course of the morning with Your Honor, the Maps and Oxy

2 objectors don't want these tokens.  Your Honor asked why

3 don't we just give them back to them.  And I said we would be

4 willing to obviously abide by an order from the Court and we

5 would be open to doing that in satisfaction of the claim, but

6 what we then heard when you posed that question to them was

7 something very different.  Well, maybe we could get the

8 tokens, but the tokens aren't really worth anything today,

9 and so we would like our claim as well and we would like to

10 maybe have a deficiency claim because what we really want is

11 money, what we want is money out of this estate that should

12 be going into the pocket of other creditors that they're not

13 entitled to.

14 　　　　　THE COURT:  Well, wouldn't I have to -- if I did

15 give the tokens back or ordered that they be given back, and

16 I would then have to know what the value of those tokens is

17 today, and they would have a deficiency claim, would they

18 not?

19 　　　　　MR. GLUECKSTEIN:  I think, Your Honor, they would.

20 If we strictly said we ordered -- if we ordered the tokens to

21 be provided, those tokens, we'd have to conduct, whether it's

22 us or them, somebody would have to conduct an exercise to

23 monetize those tokens or agree on a value of those tokens.

24 And so the question then of what is the petition-time claim

25 amount remains outstanding, so that doesn't seem to solve the

1 problem.

2        What Your Honor first posited of why don't they

3 get the tokens back, which of course is the arguments that

4 have been made in other contexts here and have happened in

5 other cryptocurrency cases where there are very different

6 facts where the debtor actually had large swaths of

7 cryptocurrency, that's not an option here, in a general

8 sense, is that the customers agreed to take those tokens in

9 satisfaction of the claim.

10        And so if we go back and we look at the proof of

11 claim that was filed, right, and these are in -- this is in

12 the record of the hearing, the proofs of claim list

13 quantities of cryptocurrencies, that's what the proof of

14 claim -- we had a discussion about this at the hearing in

15 January, that's what the proof of claim form provided for,

16 that's what these objectors said is I want X millions of

17 tokens.  But now they're saying I don't want those tokens in

18 full satisfaction of the claim, if the Court orders the

19 tokens, then I still want my deficiency claim because I

20 believe these tokens were worth more on the petition date.

21        So I think, from the perspective of the estimation

22 proceeding that we're now involved with, I don't think that

23 solves the problem.  If anything, if they're not willing to

24 take the tokens in satisfaction of the claim, then all we're

25 doing is creating an option for them where they can go and

1  try to realize some value, and then we're going to be back

2  here doing the exact same thing, as one of the objector's

3  counsel noted.

4           So I think, absent an agreement that the tokens

5  are in satisfaction of the claim, then I think we're somewhat

6  in the same place where there needs to be a determination by

7  estimation of what the actual creditors is worth because

8  otherwise we're dealing with that deficiency claim issue.

9           THE COURT:  Right.  Okay.

10          MR. GLUECKSTEIN:  The -- there were a number of

11 specific -- obviously, we went through a number of the

12 specific objections that they have to Professor Howell's

13 methodology and her results.  It's important to note, Your

14 Honor, this is detailed in her reports and in our papers, the

15 KO model and the application of the KO model here did not

16 result in these sorts of significant discounts to most of the

17 debtors' digital assets.  It's a function of the nature of

18 these assets and the circumstances that both the customers

19 and the debtors find themselves in with respect to the volume

20 of these tokens and their existing almost entirely on the FTX

21 exchange.

22          There's been a lot of discussion about whether or

23 not the debtors' holdings, the customers' holdings,

24 individual customers' holdings, should be used for purposes

25 of application of the KO model or a calculation of some other

1   discount that was done.  There was suggestion in the argument

2   that this whole basis of this was somehow, you know,

3   direction from counsel.  Professor Howell has submitted

4   testimony on this issue.  Her supplemental declaration that

5   was filed with the Court that's in evidence of this

6   proceeding at Exhibit FTX-3 details why herself, why she, as

7   the expert opining on the application of the KO model and the

8   variables that go into the KO model, why using the debtors'

9   holdings is appropriate on the facts of this case.

10          The Maps and Oxy objectors don't want to look at

11  the customer holdings in the aggregate; they want to value

12  their own claim.  We just heard Counsel for TMSI talk about

13  how the proper input should be the aggregate customer

14  holdings.

15          So, again, Your Honor, we have to step back.  What

16  we have here are different ideas, different methodologies,

17  different proposals from different parties, all of whom on

18  the creditors' side, understandably, are trying to get the

19  highest value that they can justify for their claim.  What

20  the debtors are doing here is trying to come up and present

21  to the Court a reasonable methodology that is generally

22  applicable across a wide universe of claims that have to be

23  valued.  And the way we did that, as has been discussed, as

24  Professor Howell outlined, was to take a price, was to apply

25  the KO model using reasonable inputs, to get the output of

1  that model, and then to use that to -- those prices, the

2  prices that are in that chart, in the digital asset

3  conversion chart that's attached to the order that Your Honor

4  entered from January that has a bunch of TBDs that need to be

5  determined based on the results of this hearing, so that we

6  can then proceed to estimate the value of each individual

7  creditor claim.  That is what will allow us to know what are

8  the claims based on digital assets worth that we owe.

9        That is different than treatment of the claim.  I

10 agree with Counsel to TMSI, we are not at the plan

11 confirmation hearing.  The question of how those claims are

12 going to be treated, how those claims are going to be

13 classified, how customers are going to be addressed for

14 purposes of distributions, is all going to play out over the

15 next few months in front of Your Honor.  The question for

16 today is what is the estimated value of the claims, and to do

17 that we have to have a petition-date value for each and every

18 cryptocurrency that we can utilize because everybody in this

19 courtroom, everyone in this courtroom agrees that the --

20 every piece of evidence that's before Your Honor, all of the

21 witnesses that testified at this hearing agree that the spot

22 price on the petition date is not the appropriate price.  So

23 we need another price.

24        And so what we have presented is what we believe

25 is a reasonable method to do that, it applies equally to

1  Maps, Oxy, and Serum tokens, there is no reason to treat

2  those tokens any differently, and we would ask, Your Honor,

3  again that the objections be overruled.

4          THE COURT:  All right.

5          MR. GLUECKSTEIN:  Thank you.

6          THE COURT:  Thank you.

7          All right, I know I had mentioned earlier that I

8  may ask for post-trial briefing -- yes?

9          MR. FIRTH:  Hi, Your Honor.  My name is William

10 Firth, I'm from Pashman Stein Walder & Hayden; I represent

11 the Boba Foundation.  I just have a brief statement for the

12 record for Your Honor.

13         The Boba Foundation is the owner of approximately

14 144 million tokens known as the Boba tokens, and they were

15 deposited with the debtors under a clear custodial

16 arrangement.  The face value of Boba holdings tokens is

17 approximately 33 million.  The debtors seek to discount the

18 market price of Boba tokens by 25 percent, and further

19 discount another 48 percent of those being locked tokens

20 subject to vesting for other release conditions.  It's a

21 discount, a total discount of around 40 percent of face

22 value.

23         Boba filed an objection to the estimation

24 procedures, objecting to the estimation of its claim and on

25 the ground that the Boba tokens are not property of the

1  debtors.  Boba Foundation has elected not to dispute the

2  proposed estimations of its claims and will abide by the

3  Court's ruling on estimation issues.  However, Boba

4  Foundation still maintains that the Boba tokens are its

5  properties and not property of any of the debtors.

6          The first estimation order made it abundantly

7  clear that nothing in the estimation motion or order

8  "constitutes a ruling or finding of fact regarding whether

9  any of the digital assets, including NFTs or fiat currency,

10 are property of the debtors' estates, and all parties' rights

11 in this regard are expressly reserved."  That's paragraph 4

12 of the first estimation order.

13         Quoting this very language in the first order, in

14 their supplemental response the debtors acknowledge that "The

15 issue of whether digital assets constitute customer property

16 are also not at issue with respect to the estimation motion."

17         Your Honor, Boba Foundation wants to be sure that

18 any final order that is entered with respect to the

19 estimation motion contains the exact same protective language

20 that was in paragraph 4 of the first estimation order to

21 ensure that property of the estate issues regarding digital

22 assets or any fiat currency, and the parties' rights on these

23 issues are expressly reserved.

24         In the alternative, Your Honor has posed the

25 question today, why should I not order return of the tokens?

1 Boba Foundation agrees to that relief, should the Court so

2 order.

3          That's all, Your Honor.  Thank you.

4          THE COURT:  I'll let Mr. Glueckstein response to

5 that.

6          MR. GLUECKSTEIN:  Yes, briefly, Your Honor.  From

7 our perspective, I didn't address it because there was

8 nothing live.  I think, as we just heard from Counsel and the

9 Boba objections, they had objected at the January hearing, we

10 put them on the alternative track to have the evidentiary

11 hearing, they chose not to participate in that.  We've now

12 heard that they have accepted -- for the first time that

13 they've accepted the valuation.  There's of course no

14 contrary evidence in the record with respect to Boba tokens.

15          The debtors' position, as just read by Counsel and

16 as reflected in the order, with respect to any arguments that

17 somebody has with respect to property interests are reserved,

18 that has not changed.  In fact, the proposed supplemental

19 order that we submitted with respect to this hearing

20 incorporates every provision of the original order, including

21 that language, other than the additions that are made here.

22 So there's no dispute on that topic.

23          THE COURT:  All right, thank you.

24          All right.  As I was saying, I had raised the

25 prospect of post-trial briefing.  I'll open it up to the

1  parties as to whether you want post-trial briefing to address

2  some of the questions that I raised during the hearing, but I

3  don't feel that I need it at this point, but I'll ask the

4  parties their positions on that.  Let's start with the

5  debtors.

6         MR. GLUECKSTEIN:  Your Honor, the debtors'

7  position, as it was yesterday, is that we were happy to

8  provide any briefing that would be helpful to the Court.  I

9  do think that the pretrial briefing, combined with what you

10  heard today, is comprehensive.  I'm not sure that from the

11  debtors' perspective we need briefing.  If others feel

12  differently, then obviously we will need to revise our

13  position.

14         THE COURT:  All right.

15         MR. TOROSIAN:  Jeff Torosian for Maps.  Your

16  Honor, we're happy to do whatever you think would help you

17  kind of collate all this information.  If we do have pretrial

18  briefs -- or post-trial briefs, I would just request that

19  they be short or a page limited since the response briefs are

20  quite long and involved.

21         THE COURT:  Okay.

22         MR. SIDDIQUI:  Your Honor, Peter Siddiqui on

23  behalf of TMSI.  We agree with Mr. Glueckstein.  If Your

24  Honor wants them, we'll prepare them, but if you don't want

25  them, we don't need to prepare them.

1              THE COURT:  Okay.

2              MR. SIDDIQUI:  Thank you.

3              MR. GWYNNE:  Kurt Gwynne on behalf of the Maps and

4    Oxy Foundations, Your Honor.  We'd be happy to brief the

5    issue of the valuation of the locked tokens, which we'll want

6    to make sure Your Honor -- we've all been here and spent a

7    lot of time with respect to this hearing and the briefing,

8    and we want to make sure that Your Honor has what you need

9    for purposes of dealing with that issue.  So, you know, you

10   mentioned that, we're happy to brief that.

11             THE COURT:  All right.  Well, at this time I'm

12   going to say I don't need any additional post-trial briefing.

13   I may, as I wade through all of this, ask some specific

14   questions and ask the parties to make very brief submissions,

15   but at this point I don't think I need anything in addition

16   right now.  Okay?

17             Anything else before we adjourn?

18             MR. GLUECKSTEIN:  Nothing else, Your Honor.  We

19   appreciate the Court's indulgence for this lengthy hearing.

20             THE COURT:  Okay.  All right, thank you all very

21   much.  We are adjourned.

22             COUNSEL:  Thank you, Your Honor.

23         (Proceedings concluded at 1:36 p.m.)

24

25

1                        CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                 March 27, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                 March 27, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                  March 26, 2024

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25