### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., et al.,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered)<br><br>**Hearing Date: [ ], 2024 at 1:00 p.m. (ET)**<br>**Objection Deadline: April 30, 2024**<br><br>**Re: Docket No. 11626** |

### OBJECTION TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING ENTRY INTO, AND PERFORMANCE UNDER, THE COLLATERAL CLAIM SETTLEMENT AGREEMENT, THE INTER-DEBTOR RESTRUCTURING AGREEMENT, AND THE RESTRUCTURING PAYMENT AGREEMENT AND (II) GRANTING RELATED RELIEF

Daniel Friedberg ("Friedberg"), by and through his undersigned counsel, files this Objection to *Motion of Debtors for Entry of an Order (i) Authorizing and Approving Entry Into, and Performance Under, the Collateral Claim Settlement Agreement, the Inter-Debtor Restructuring Agreement, and the Restructuring Payment Agreement and (ii) Granting Related Relief* (Docket No. 11626) ("Restructuring Motion") and respectfully requests the entry of an order denying said motion. In further support of this objection, Friedberg respectfully states as follows:

### PRELIMINARY STATEMENTS

1. The Restructuring Motion does not provide adequate justification for its financial

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of Debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua, and Barbuda.

terms.  Therefore, further discovery of the Debtors is required to determine whether the financial terms are reasonable, and to investigate further matters relevant to this objection. This objection then remains subject to potential amendment after further discovery is completed.

2.      The Restructuring Motion was made to fulfill the terms of a sale motion [D.I. 8202] that was approved by order of this Court [D.I. 9585] (the "FTX Europe Sale"). In the approval proceedings, the FTX Europe Sale was inaccurately characterized to the Court as value-accruing. However, the unexpected terms of the Restructuring Motion that were required by the FTX Europe Sale eviscerate the value of the FTX Europe Sale. Therefore, the Court and interested parties did not receive sufficient information from the Debtor regarding the FTX Europe Sale prior to its approval.

3.      The Restructuring Motion grants a $50,000,000 unsecured claim to Binance. Particular scrutiny and discovery is warranted before the Debtors are permitted to provide any compensation to Binance as: (i) Binance and its founder have been operating as an organized criminal organization within the United States according to the U.S. Department of Justice, the SEC, and other agencies; and (ii) the Debtors likely have significant claims against Binance that have not yet been brought, and (iii) it is premature for the Debtors to provide any unsecured claim to Binance and to waive its set-off rights until those claims are determined, assessed and brought.

4.      Given Binance's infamy and the size of Debtors' potential claim against it, the Restructuring Motion is not approvable on its face. Friedberg also objects to the Restructuring Motion as unreasonable because: (i) the Restructuring Motion accepts a $65 million claim of Binance against the Debtor when the maximum value of such claim is based on its value as of the Petition Date and is, on information and belief, less than $30 million; (ii) the Debtors inaccurately characterized the FTX Europe Sale to the Court as value-accruing when it in fact represents a

significant net loss to the estates based on the Restructuring Motion's own terms; (iii) the FTX Europe Sale lacked an open and competitive bidding process; (iv) the December 2022 Court-filed financial statements of FTX Europe included an unexplained "Other Expense" loss of over $100 million which occurred after the filing of this bankruptcy during the automatic stay; (v) the FTX Europe Sale and the Restructuring Motion do not comply with the mandatory Swiss rules governing asset liquidations, thereby raising issues to its fitness and enforceability; and (vi) approval of the Restructuring Motion could raise significant cross-border comity and conflict of law concerns because Switzerland, where FTX Europe is headquartered and based, is not a party to an international agreement requiring it to recognize this Court's decisions, an issue that the Restructuring Motion fails to address.

## JURISDICTION AND VENUE

5.      The Debtors assert that the Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and that venue is proper under 28 U.S.C. § 1408.

6.      But given that the bankruptcy petition of FTX Europe AG was apparently filed without the requisite corporate authority, the Court lacks jurisdiction under Article III of the U.S. Constitution to adjudicate the Restructuring Motion.  In addition, the Court's inability to grant effective relief as explained herein raises additional subject matter jurisdictional issues. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) (inability to grant effective relief deprives the Court of jurisdiction); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).

## FACTS

7.   FTX Europe AG is a corporation formed and registered in Switzerland[2].

---

[2] *See* FTX Europe's corporate charter, Art.1, a copy of which is included in the appendix filed with the Motion to Dismiss [D.I. 4037] as Tab 1.

8.      On November 17, 2023, Dr. Marcel Lötscher ("Lötscher"),  filed the *Motion of Dr. Marcel Lötscher to Dismiss Bankruptcy Case of FTX Europe AG* [Docket No. 4037] ("Motion to Dismiss).

9.      The Debtors filed a *Motion of Debtors for Entry of an Order (I) Authorizing and Approving (A) Entry into, and Performance Under, the Share Purchase Agreement and (B) the Purchase and Sale of Certain Shares Free and Clear of Liens, Claims and Encumbrances and (II) Dismissing the Chapter 11 Cases of Certain Debtors Effective Upon the Earlier of the Closing or the Termination of the Share Purchase Agreement* (the "FTX Europe  Sale  Motion") [D.I.  5378].  Dr. Lötscher, and Martha Lambrianou filed a joint objection to the FTX Europe Sale Motion (the "Sale Objection") [D.I. 5957].

10.      The Debtors subsequently filed a motion [  ] to resolve the Sale Objection and Motion to Dismiss.

11.      FTX Europe is governed by the Swiss Code of Obligations and the Swiss Civil Code, not U.S. law.  FTX  Europe  is  organized  under  the  Swiss  Code  of  Obligations ("CO").  To establish the law of Switzerland in support of this objection, and in particular Swiss law under the CO, Friedberg relies upon the Motion to Dismiss and the *Declaration of Patrik Odermatt* ("Odermatt Dec.") filed in support of the Motion to Dismiss[3].

12.      As set forth in the Motion to Dismiss, the bankruptcy filing of FTX Europe with this Court was without the requisite corporate authority.  Therefore, it is a nullity, and this Court does not have the Article III authority to adjudicate the Restructuring Motion.

---

[3] The Odermatt Dec. with exhibits thereto is included in the appendix to the Motion to Dismiss [D.I. 4037] at Tab 2.

13.     FTX Europe has only the barest, insubstantial connections with the United States.  FTX Europe has operations, assets, employees, creditors, and customers outside the United States.  For purposes of this Court's jurisdiction, the Debtors' lack of connections with the United States has severe disqualifying consequences.

14.      The Debtors released a press release on April 12, 2023 announcing that the Board of Directors of debtor FTX Europe AG, the holding company of the FTX European business, filed a petition for a Swiss moratorium proceeding (the "Swiss Restructuring Proceeding") under Swiss law and petition was duly granted, and that the Swiss Restructuring Proceeding commenced on April 11, 2023.  The press release also noted:

15.     [T]he Moratorium process will facilitate the exploration of strategic alternatives, including the previously disclosed potential sale of its business pursuant to **U.S. Bankruptcy Court-approved bidding procedures**. Importantly, the previously announced process for confirming customer balances in preparation for allowing the withdrawal of funds from FTX EU Ltd. is unchanged by the Moratorium.  In its order granting the Moratorium, the Swiss Court appointed an administrator for FTX Europe AG. (emphasis added)

16.     Rather than obtain approval of bidding procedures by the Court as announced by the Debtors and proceed with a public bidding and sale process to maximize the value of FTX Europe, the FTX Europe Sale was instead consummated without any bidding process at all,

17.     There is only one sentence mentioning the Administrator's approval of the transactions in the Restructuring Motion.  There is no evidence of approval under Swiss law of the transactions contemplated by the Restructuring Motion.

18.     Switzerland has not adopted the UNCITRAL Model Law on Cross Border Insolvency and the UNCITRAL Model Law on Recognition and Enforcement of Insolvency-

Related Judgments.   Swiss law is staunchly territorial, as opposed to universalist,[4] in regard to

insolvency matters.[5] Simply put, Swiss law dictates that the bankruptcy proceeding of a Swiss

corporation should proceed in Switzerland under Swiss law. "Where a foreign Debtor is

undergoing restructuring or insolvency proceedings outside of Switzerland, a foreign insolvency

official would not be authorized to take possession of, or otherwise seek enforcement in, any

Swiss assets of the Debtor."[6]  "The [Swiss] stay in principle extends to all civil law proceedings

irrespective of the (Swiss or foreign) venue." *Id*. While the Swiss bankruptcy authorities have no

meaningful way of enforcing the stay abroad, they may refuse to admit claims against the

insolvent Debtor resulting from such foreign proceedings to the schedule of claims." *Id*. "Swiss

companies are sometimes included in US Chapter 11 proceedings in the context of a world-wide

---

[4] "Traditionally, territorialism allows the bankruptcy court of a particular jurisdiction to apply its laws, for the benefit of its jurisdictional creditors, whereas universalism requires all involved jurisdictions to relinquish their sovereignty and apply the law of a foreign jurisdiction." Edward S. Adams and Jason K. Fincke, Coordinating *Cross-Border Bankruptcy: How*

*Territorialism Saves Universalism, 15 COLUM. J. EUR. L. 43 (2009), available at https://scholarship.law.umn.edu/faculty_articles/828.*

[5] UNCITRAL Model Law on Recognition and Enforcement of Insolvency-Related Judgments (2018) (available at http://www.uncitral.org/pdf/english/texts/insolven/Interim_MLIJ.pdf) and UNCITRAL Model Law on Cross-Border Insolvency (1997) (available at http://www.uncitral.org/pdf/english/texts/insolven/1997-Model-Law-Insol-2013-Guide-Enactment-e.pdf).

The CBI Model Law has been adopted by 44 countries. (available at http://www.uncitral.org/uncitral/en/uncitral_texts/insolvency/1997Model_status.html).

See also, Recognition and Enforcement of Insolvency-Related Judgments: Draft Guide to Enactment of the Model Law, A/CN.9/WG.V.WP.157 (available at https://documents-ddsny.un.org/doc/UNDOC/LTD/V18/009/44/PDF/V1800944.pdf?OpenElement).

[6] See Lenz & Staehelin, *Switzerland: Restructuring & Insolvency* https://www.legal500.com/guides/chapter/switzerland-restructuring-insolvency/

restructuring of the group, although such proceedings *are not recognized in Switzerland*." *Id*

(emphasis added).

19.      Significantly, Swiss law does not allow for the recognition of any foreign

proceeding except when several stringent requirements are met:

> As a consequence of the principle of territoriality, insolvency proceedings in relation to a Debtor having its registered seat outside of Switzerland have no effect (in particular with regard to Swiss-located assets of such Debtor) unless they have been recognized in Switzerland. Foreign insolvency proceedings can be recognized in Switzerland if the following requirements are fulfilled: (i) the insolvency decree must have been rendered in the **state of the Debtor's domicile or where the Debtor has its COMI outside of Switzerland**; (ii) **the petition for recognition was made by the insolvency administrator, by the Debtor itself or by a creditor**; (iii) **the insolvency decree must be enforceable in the state where it was rendered**; and (iv) **the foreign insolvency proceedings must not violate Swiss public policy and the fundamental principles of Swiss procedural law**.

> *Id*. (emphasis added)

20.      Even without the benefit of any discovery, compelling reasons exist to deny the

Restructuring Motion.  It is clear that the Restructuring Motion is not authorized.  It is also likely

unenforceable under Swiss law because FTX Europe is not domiciled in the U.S. and it does not

have a center of main interest or COMI in the U.S. Furthermore, there has been no petition or

even discussion of a petition for recognition in Switzerland in the Restructuring Motion.  The

lack of a presence in the U.S. raises considerable questions over the lack of subject matter

jurisdiction in the Bankruptcy Court (thus being unenforceable even in the U.S.).  The lack of

transparency into the Swiss proceeding and the obstacles under Swiss law to enforcement of this

settlement on third parties in Switzerland will likely lead to inconsistent orders in both

jurisdictions

## **ARGUMENT**

**I.**      **The Court Lacks Subject Matter Jurisdiction over FTX Europe and Swiss Law Prohibits Recognition of Foreign Orders Outside of Very Limited Circumstances**

7

21.    Friedberg adopts the arguments set forth in the Sale Objection and the Motion to Dismiss as if stated in full herein.  The FTX Europe Creditors persuasively demonstrated that the filing of the bankruptcy petition by FTX Europe was without corporate authority.  The FTX Europe Creditors further argued in the Sale Objection [D.I. 5957] that:

> There is not a single "arguable basis" for the Court's exercise of subject matter jurisdiction over the Dismissal Debtors' unauthorized bankruptcy cases.  *See Price v. Gurney*, 324 U.S. 100, 107 (1947); *Campbell v. Motors Liquidation Co*., 428 B.R. 43, 59 n.23 (S.D.N.Y. 2010) (quoting *United Student Aid Funds v. Espinosa*, 559 U.S. 260 (2010)).  It logically follows that, because the FTX Europe Sale Motion seeks approval from the Court of the sale of assets that are "not even colorably within its jurisdiction," the Court can neither approve the Sale Transaction nor make a good faith finding under section 363(m) of the Bankruptcy Code.  *See Campbell*, 428 B.R. at 55-56 (quoting *Pittsburgh Food & Bev. v. Ranallo*, 112 F.3d 645, 650 (3d Cir. 1997)).

> Sale Objection, paragraph 5.

22.    Because the FTX Europe bankruptcy filing was made without the necessary corporate authority, this Court has no subject-matter jurisdiction over the Restructuring Motion. *In re Whittaker, Clark & Daniels, Inc.*, No. 23-13575 (MBK), 2023 Banker. LEXIS 1600, at \*6 (Bankr. D.N.J. June 20, 2023) (if a bankruptcy filing is submitted without corporate authority, "then this Court lacks subject matter jurisdiction over the case").  Moreover, subject matter jurisdiction in federal bankruptcy court cannot be manufactured by private agreement.  *In re RNI Wind Down Corp.*, Nos. 06-10110(CSS), 936, 1305, 1343, 2007 Bankr. LEXIS 982, at \*33-34 (Bankr. D. Del. Mar. 29, 2007).  Therefore, the apparent willingness of the parties to the agreements that are the subject the Restructuring Motion to submit to the jurisdiction of this Court does not cure the lack of subject matter jurisdiction.  The lack of subject matter jurisdiction is the end of the inquiry and requires denial of the Restructuring Motion in its entirety.

23.     Putting aside the critical issue of the lack of subject matter jurisdiction, the Restructuring Motion should not be approved for the additional reason that the European debtors lack a meaningful connection to the United States.  The practical result of approval of the Restructuring Motion under these circumstances could be the entry of competing dispositions by this Court and the Swiss Court, which would trigger serious comity concerns.

24.     *First*, the Debtors' lack of connections with the United States deprives the Court of its ability to exercise the requisite *in rem* bankruptcy jurisdiction.  This fatal jurisdictional defect alone should result in denial of the Restructuring Motion.  *Second*, the Debtors' lack of connections with the United States means that Swiss law would not recognize the Chapter 11 Cases as foreign main proceedings, and is possibly restricted from doing so under these circumstances.  The Restructuring Motion is silent as to a recognition proceeding in Switzerland.  Without a recognition proceeding, there is no practical mechanism for the enforcement in Switzerland of the Bankruptcy Code or any Bankruptcy Court order against the FTX Europe's creditors. This means that Swiss creditors could and most likely would proceed in Switzerland without regard to the proposed settlement. This will likely lead to inconsistent orders in the Swiss insolvency system ***over the same assets*** that contradict the terms of the settlement that this Court is being asked to approve.

25.     The Debtors' lack of connections with the United States means that any Chapter 11 relief the Debtors obtain would be essentially advisory rather than enforceable, which is something that the federal courts cannot do.  *Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  For example, even if the Restructuring Motion is approved, creditors of FTX Europe with no connections to the United States, which are the majority of the creditors of FTX Europe, are free to disregard this Court's order in their own country. They will have a robust basis under

Swiss law for their refusal to honor the decision of this Court.  As discussed, Swiss law does not allow for recognition of a foreign order outside of recognition proceedings and Swiss law only allows recognition if the entity is domiciled in the U.S. or has a COMI in the United States, neither of which applies to FTX Europe.  Because Chapter 11 relief would be both ineffectual and costly, denial of the Restructuring Motion is warranted.

26.     Debtors' invocation of U.S. bankruptcy law is especially inappropriate here. Fully effective relief is available in Switzerland without the disqualifying limitations that would apply to this Court's adjudication of the Restructuring Motion.  Switzerland has a highly respected legal system and a robust reorganization law readily available to FTX Europe.  The Debtors have been silent as to why they are proceeding in this Court in defiance of Swiss law.  Given the jurisdictional and comity concerns outlined herein, this Court should reject the Restructuring Motion and defer to Swiss law and Swiss jurisdiction, and allow for the Swiss Restructuring Proceeding to proceed. There is an established process under Swiss law that is most likely going to maximize value to creditors.  There is no reason to avoid that process.

27.     Bankruptcy jurisdiction is fundamentally *in rem*.  *See, e.g.*, *Tenn.Student Assistance Corp. v. Hood,* 541 U.S. 440, 447-48 (2004) (explaining that bankruptcy jurisdiction is fundamentally *in rem*, not *in personam*).  In particular, property of the estate is comprised of what is subject to the custody of the bankruptcy court.  *See* 28 U.S.C. § 1334(e) (vesting the district courts with "exclusive jurisdiction" over property of the estate), *id.* § 157(a) (delegating bankruptcy jurisdiction to the bankruptcy courts); *Hood,* 541 U.S. at 447-48; *Straton v. New*, 283 U.S. 318, 321 (1931) (the jurisdiction of the bankruptcy court "is so far *in rem* that the estate is regarded as in custodia legis from the filing of the petition"); *Gross v. Irving Tr. Co.*, 289 U.S. 342, 344-45 (1933); *U.S. Fid. & Guar. Co. v. Bray*, 225 U.S. 205, 217 (1912); *Acme Harvester Co. v.*

*Beekman Lumber Co.*, 222 U.S. 300, 306-07 (1911); *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 192 (1902); *Shawhan v. Wherritt*, 48 U.S. 627, 643 (1849).

28.     When Congress vested the bankruptcy courts with *in rem* jurisdictional authority, (see 28 U.S.C. § 1334(e)), it was assumed that it did so by adopting the established understanding of how *in rem* jurisdiction functions. *E.g., Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) ("when a statutory term is obviously transplanted from another legal source, it brings the old soil with it" and "as part of the old soil they bring with them, the bankruptcy statutes incorporate the traditional standards") (citations and quotation marks omitted); *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986).  By its nature, *in rem* jurisdiction requires that the Court be able to reach the assets in question. *See, e.g., The Ann*, 13 U.S. 289, 291 (1815) ("In [o]rder to institute and perfect proceedings in rem, it is necessary that the thing should be actually or constructively within the reach of the Court"); *see also United States v. Mack*, 295 U.S. 480, 484 (1935) ("One of the essentials of jurisdiction *in rem* is that the thing shall be 'actually or constructively within the reach of the Court.'") (quoting *The Ann*); *The Resolute*, 168 U.S. 437, 439 (1897); *United States v. The Little Charles*, 26 F. Cas. 979, 982 (C.C.D. Va. 1818) (Marshall, C.J.).

29.     As a consequence, if a federal court cannot as a practical matter exercise control over any of the Debtor's property (*e.g.*, because it is not within the Court's effectual reach), *in rem* jurisdiction does not exist. *E.g.*, *United States v. Mack*, 295 U.S. at 484; *The Ann*, 13 U.S. at 291. Because the FTX Europe has essentially no property in the United States, the major premise of the Court's *in rem* bankruptcy jurisdiction is lacking and the Restructuring Motion should be rejected.

30.     Comity further supports rejection of the Restructuring Motion.  Section 305 of the Bankruptcy Code permits abstention when a foreign debtor that has no meaningful ties to the United States files for bankruptcy protection here.  *See, e.g., In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 724-25 (Bankr. S.D. Fla. 1993) (deferring to foreign court because foreign creditors of the foreign debtor were not subject to American jurisdiction).

31.     "American  Courts  have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities." *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985).  Comity is a relevant consideration even when no foreign insolvency proceeding is pending.  *See In re Spanish Cay Co.*, 161 B.R. at 724-25 (granting § 305(a) dismissal under principles of comity even where Debtor had yet to commence a foreign insolvency proceeding). Certainly, if the *Spanish Cay* court found that dismissal was warranted when no foreign proceeding is pending, when a Swiss proceeding is pending in a strictly territorial insolvency country, this Court should allow the Swiss Restructuring Proceedings to be completed.  It is particularly egregious that the Debtors have proceeded without any discussion or legal support regarding how this settlement will be recognized or how third party Swiss creditors will be heard, or bound by the Restructuring Motion.

32.     In deciding whether to continue proceedings under a Chapter 11 case under § 305(a), Courts generally consider the following factors "to gauge the overall best interests" of the Debtor and creditors: (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of

assets; (5) whether the Debtor and creditors are able to work out a less expensive out-of-court
arrangement which better serves all interests in the case; (6) whether a non-federal insolvency
has proceeded so far in those proceedings that it would be costly and time consuming to start
afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction
has been sought. *In re Northshore Mainland Servs., Inc.,* 537 B.R. 192, 203-04 (Bankr. D. Del.
2015). "[T]he exact factors to be considered and the weight to be given each of them is highly
sensitive to the facts of each individual case." *In re Mazzocone*, 200 B.R. 568, 575 (E.D. Pa.
1996)..

33.     All but one these factors here point to this Court deferring to Swiss law and Swiss
court (with the remaining factor being neutral).  First, as already discussed, decisions of this Court
are not likely to be enforced or honored by the competent authorities in Switzerland or by the
Debtors' creditors.  The Debtors fail to explain they could gain recognition of this Court's orders
in Switzerland. As a result, there is no efficiency or economy to continue a proceeding in this
country that will not be enforced.  Second, there is no and can be no serious argument that
Switzerland, one of the richest and most sophisticated countries in the world with a developed
legal system, cannot be the suitable forum for the bankruptcy case for one of its own corporations.
Third, given the well-developed law in Switzerland, Debtors cannot demonstrate that proceeding
in this Court is necessary to achieve a just result.  Indeed, given this Court's inability to grant
effectual relief, a proceeding in Switzerland is a much more viable and just alternative.  This is not
even a close question. There is currently no information to evaluate the fifth factor. The sixth factor
also warrants deferring to the ongoing proceedings in Switzerland as the administration there has
been active for almost a year.  Finally, the seventh factor supports a finding of a lack of jurisdiction
because it appears that the Debtors filed for approval of the Restructuring Motion in the United

States in an effort to use the more deferential standard of approval for a sale transaction under the
Bankruptcy Code and to avoid the fair and open bidding process generally required in the Swiss
Restructuring Proceedings.

## II.      The Settlement's Lack of Transparency and Several Critical Flaws in the Economics of the Deal Render it Unreasonable and Not in the Best Interest of the Estate

34.      To approve a settlement under Bankruptcy Rule 9019(a), the Court must find that
it is "fair, reasonable and in the best interest of the estate." *In re Louise's, Inc.*, 211 B.R. 798, 801
(D. Del. 1997).  This standard has been further described as follows:

> In undertaking an examination of the settlement, we emphasize that
> this responsibility of the bankruptcy judge … is not to decide the
> numerous questions of law and fact raised … but rather to canvas the
> issues and see whether the settlement "fall[s] below the lowest
> point in the range of reasonableness.

*Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1982) *cert. denied* 464 U.S.
822 (1983).  The United States Supreme Court has found that in determining the fairness of a
compromise, a judge should:

> Form an educated estimate of the complexity, expense and likely
> duration of such litigation, the possible difficulties of collecting on
> any judgment which might be obtained, and all other factors rolled
> into a full and fair assessment of the wisdom of the proposed
> compromise. Basic to this process in every instance, of course, is the
> need to compare the terms of the compromise with the likely rewards
> of litigation.

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 419,
424-25 (1968).

35.      The Third Circuit in *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996), applied
*TMT Trailer* in the context of a settlement pursuant to Bankruptcy Rule 9019(a), and enumerated

the following factors to guide a Court in its determination of the reasonableness of a settlement: (i) the probability of successful litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending to it; and (iv) the paramount interest of creditors appearing. *See also*, *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006). These factors do not permit approval of the Restructuring Motion

36.     The litigation brought by the Debtors is a self-made emergency because they initiated litigation into the U.S. Bankruptcy Court against several foreign creditors when the Swiss insolvency proceeding should have been the forum for their resolution. The idea that it is too complicated to assess whether to move forward in the Swiss proceedings is again, a complexity of their own making. Friedberg's preliminary investigation firmly indicates that the settlement documents contemplated by the Restructuring Motion likely cannot be enforced in Switzerland as there are serious obstacles to the enforcement or recognition of a U.S. order or proceeding. Furthermore, the settlement itself is riddled with serious flaws, from settling with a criminal enterprise, mixing the litigation with Binance into this deal will undoubtedly raise eyebrows in the Swiss legal system where creditors were defrauded, and assets have been undervalued due to the accelerated and closed process employed in the marketing of the assets. This settlement will likely result in chaos when inconsistent orders are entered regarding the same assets in Switzerland. There appears to be no part of this Restructuring Motion that is in the best interests of creditors.[7]

37.     Set forth below are specific reasons why the Restructuring Motion is not approvable as a matter of bankruptcy law.

---

[7] The Debtors do not attempt to show that the collection factor favor approval of the Restructuring Motion.

### A.  BINANCE IS A CRIMINAL ENTERPRISE

38.     Granting a free and clear $50 million claim to Binance is inconsistent with the estate's fiduciary duties because Binance is a worldwide criminal enterprise.

39.     Indeed, Binance and its founder committed many criminal violations on a multi-national scale.

40.     For example, on November 21, 2023, the U.S. Department of Justice announced a $4 billion fine against Binance, and a guilty plea by its founder for willful money laundering activities and willful violations of US sanctions[8].

41.     The Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) and the U.S. Commodity Futures Trading Commission (CFTC) also found willful criminal violations by Binance and its founder in connection with the November 21, 2023, DOJ guilty plea.

42.     On November 21, 2023, the U.S. Department of Treasury entered into a Settlement Agreement[9] stating that Binance engaged in repeated willful prohibited transactions with sanctioned jurisdictions including Iran, Syria, North Korea, Crimea, Cuba, and sanctioned individuals.

---

[8] "Binance and CEO Plead Guilty to Federal Charges in $4B Resolution", DOJ Press Release at https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

[9] Settlement Agreement, Department of Treasury at https://ofac.treasury.gov/media/932356/download?inline.

43.    The Securities and Exchange Commission filed 13 charges against Binance and its founder[10]. SEC Chair Gary Genzler stated:  "Through thirteen charges, we allege that Zhao and Binance entities engaged in an extensive web of deception, conflicts of interest, lack of disclosure, and calculated evasion of the law." The SEC litigation is ongoing.

44.    On June 16, 2023, French prosecutors confirmed that Binance was under investigation for aggravated money-laundering[11].

45.    In March of 2023, the Nigerian government charged Binance and certain of its officers with tax evasion and money laundering and arrested its compliance officer[12].

46.    The founder of Binance, Chanpeng Zhao (a/k/a "CZ") was recently sentenced to 4 months in prison. The Department of Justice recommended that CZ serve three years in prison for money laundering violations, recognizing that "sentencing Zhao to twice the maximum 18 months recommended under federal guidelines would reflect the magnitude of his willful violations.[13]"

---

[10] "SEC Files 13 Charges Against Binance Entities and Founder Changpeng Zhao", SEC Press Release at https://www.sec.gov/news/press-release/2023-101.

[11] "France investigates Binance over money-laundering, canvassing breaches", Reuters, June 16, 2023 at https://www.reuters.com/technology/binance-under-investigation-france-illegal-canvassing-le-monde-2023-06-16/.

[12] "How a Crypto Compliance Officer Ended Up in a Nigerian Prison", NY Times, April 18, 2024 at https://www.nytimes.com/2024/04/18/technology/binance-crypto-compliance-officer-nigerian-prison.html.

[13] "US Seeks 3 Years Prison for Binance founder Zhao", Reuters, April 25, 2024 at https://www.reuters.com/legal/us-seeks-36-months-jail-binance-founder-zhao-2024-04-24.

47.    The Debtors agreed to cooperate with the Department of Justice.  However, the Restructuring Motion does not explain whether the large payment is acceptable to the Department of Justice.  Indeed, the Restructuring Motion does not disclose whether the Debtors consulted with appropriate government agencies.

48.    Heightened scrutiny is required to determine whether a windfall payment of $50,000,000 to an organization and founder accused and convicted of criminal wrongdoing, is consistent with the estate's fiduciary duties.

49.    This is particularly true since the proposed payment to this worldwide criminal enterprise greatly exceeds the value of any claim Binance has against FTX as of the Petition Date as described below.

### B.  FTX HAS POTENTIAL CLAIMS AGAINST BINANCE AND WAIVING SET-OFF RIGHTS IS PREMATURE

50.    On information and belief, Binance and/or affiliates of Binance engaged in the following adverse transactions with FTX prior to its bankruptcy which may give rise to claim(s) against Binance: (i) FTX's first preferred shareholder was Binance and its shares were repurchased by Alameda for approximately $2 billion using funds likely stolen from FTX customers by Samuel Bankman-Fried and the other perpetrators; (ii) on November 8, 2022, Binance signed a non-binding agreement with FTX to buy the business in exchange for assuming the customer liability; and (iii) on November 9, 2022, less than 24 hours later, Binance backed out of the non-binding agreement citing "corporate due diligence and news reports" even though the FTX due diligence materials had not yet been shared with Binance, resulting in the filing of the FTX bankruptcy.

51.     It is unknown whether the Debtor assessed a claw back lawsuit for the billions paid to Binance, or investigated a claim regarding whether the non-binding agreement was entered into by Binance in good faith, or whether other claims have yet been identified (together, the "Potential Binance Adverse Claims").

52.     It defies explanation why the Debtor would provide $50 million in an unsecured claim on one matter without first assessing and bringing the Potential Binance Adverse Claims.

53.     The Collateral Claim Settlement Agreement [D.I. 11626-3] not only broadly releases Binance from relevant claims, but also expressly forecloses the Debtors from set-off of the Potential Binance Adverse Claims against the $50 million in unsecured claims:

> [N]either FTX Europe, FTX Trading, any of their affiliated Debtors, nor any entities that are subject to the control of the Debtors shall seek in the Bankruptcy Proceedings (i) to avoid, subordinate, recharacterize, recover, attack, **offset,** counterclaim, or defend the [$50 million Binance unsecured] allowed Claim … under any provision of title 11 of the Bankruptcy Code ,,, other applicable law, or equity …

[D.I. 11626-3 at ¶4, p. 4] (**emphasis** added, bracketed language ("[]") above has been added to provide context).

54.     It is non-sensical to handsomely pay Binance for one claim and to waive set-off rights while the Potential Binance Adverse Claims loom.

55.     If the Debtors bring and win the Potential Binance Adverse Claims, collection of the judgment against a criminal enterprise like Binance could be very uncertain. Since offset is foreclosed under the proposed Restructuring Motion, there is the real possibility that Debtor will have to pay Binance $50 million for its unsecured claim while at the same time chase an uncollected larger judgment against Binance. It is unreasonable for the Restructuring Motion to allow this perverse outcome.

## C.  THE DEBTORS' ASSUMPTION THAT BINANCE HAS A VALID $65 MILLION CLAIM AGAINST FTX IS INACCURATE

56.    Debtors justify the $50 million settlement to Binance by citing $65 million of collateral originally paid by Binance a year and a half before the filing of the bankruptcy (Restructuring Motion ¶¶ 11-12).

57.    Debtors explained that the Restructuring Motion will save the Debtors approximately $15 million in reduced claims [D.I. 12744, ¶1]. This $15 million savings is apparently the difference between the unsecured $50 million claim granted to Binance by the Restructuring Motion and the $65 million in collateral originally paid by Binance.

58.    The Restructuring Motion describes Binance as paying $65 million in collateral but stops there in explaining the rationale for the $50 million claim granted to Binance. What the Restructuring Motion does not explain is that Binance contributed this $65 million in collateral back in April 2021 and then used the same to purchase shares of stock of public companies, believed to be Tesla, Apple, MicroStrategy, and Microsoft.

59.    As of the Petition Date, the value of these public companies had greatly decreased and the value of the Binance collateral was then believed to be only about $25-$30 million. Even now, due to the substantial drop in Tesla stock, the collateral's value still falls well short of $50 million. Therefore, since the FTX liquidator has set the market value as of the petition date to be the relevant date for claims, consistent with bankruptcy law, the maximum claim of Binance (without regard to other available defenses) would be $25-30 million.

60.    The Debtors did not disclose to the Court that the value of the publicly traded stock purchased by Binance with the $65 million substantially decreased as of the petition date.

Neither the Court nor any interested party can evaluate the fairness of granting a $50 million unsecured claim to Binance without being told the value of the Binance claim.

61.     In any event, without regard to potential defenses against Binance and without regard to the Potential Binance Adverse Claims, it is unreasonable to grant Binance an unsecured claim against Debtor which greatly exceeds the value of the Binance claim as of the petition date. Why should Binance be favored over all other unsecured creditors and be paid back its purchase price rather than its claim value as of the Petition Date?

62.     The Restructuring Motion does not evaluate or assess the $65 million claim of Binance, and no attorney opinion or attorney assessment has been presented explaining why Binance is owed $50 million by FTX. Without such information, it is impossible to evaluate the propriety of the Restructuring Motion.

63.     The Restructuring Motion therefore would provide a windfall payment to a criminal organization without adequate explanation.

### D.  THE FTX EUROPE SALE WAS INACCURATELY CHARACTERIZED BY FTX AS ACCRETIVE

64.     The FTX Europe Sale was approved by the Court on March 18, 2023 [D.I. 9585].

65.     However, this approval, along with the lack of creditor objections to the FTX Europe Sale, was based upon Debtors' inaccurate statements that the FTX Europe Sale was accretive and offering value to the estate, and the fact that Debtors deliberately did not disclose the required Binance settlement to the Court prior to approval of the FTX Europe Sale.

66.     The Debtors were aware of the proposed Binance settlement which was a condition of the FTX Europe Sale prior to the approval of the FTX Europe Sale, but did not notify the Court of these economic terms. In fact, time records of FTX Debtor's counsel show that Debtor counsel provided the terms of the FTX Europe Sale to Binance counsel prior to the Court's approval of the

FTX Europe Sale.

67.     The large settlement to Binance, which was required by the FTX Europe Sale but withheld from the Court until the filing of Restructuring Motion, eviscerates the value of the FTX Europe Sale. Assuming unsecured claims are paid-in-full as widely anticipated at this time, the cost to the estate of the FTX Europe Sale is as follows:

| | |
|---|---|
| Payment to FTX: | $32,700,000 |
| Proposed Payment from FTX to Binance: | ($50,000,000) |
| Proposed Payment from FTX to CME: | (<u>$1,000,000</u>) |
| Net Sales Transaction: | ($18,300,000) |

68.     Despite the net cost of the FTX Europe Sale transaction, Debtors obtained Court approval and avoided creditor objection by hiding the required Binance settlement at the time of approval of the transaction, and then burying it in the opaque Restructuring Motion.

69.     In the Restructuring Motion to convince the Court to approve the FTX Europe Sale [Case No. 22-11068; Adv. Pro., No. 23-50437; D.I. 87] the required settlement with Binance was not even mentioned, and instead the Debtor states [at ¶28]:

> Furthermore, in conjunction with the settlement, and subject to the approval of the Court, the Sale Transaction would result in the payment of $32.7 million to Debtor FTX Europe at a significantly higher price than the Debtors have otherwise been able to realize.

70.     Accordingly, Debtors chose not to bring to the Court's attention the Binance settlement prior to approval of the FTX Europe Sale, a settlement which was required of the FTX Europe Sale transaction and a settlement that was already being discussed by Debtors' counsel with Binance counsel, even though the size of the Binance settlement eviscerated all value of the FTX Europe Sale.

71.     Interested parties therefore lacked critical information about the FTX Europe Sale necessary for due process and were not able to object to the FTX Europe Sale because it was falsely

portrayed as value accreditive to the estate.

### E.  THE FTX EUROPE SALE LACKED AN OPEN AND TRANSPARENT BIDDING PROCESS

72.     The FTX Europe entities are a very valuable franchise. The FTX Europe entities were purchased by FTX for more than $300 million. These entities include a profitable Swiss investment bank. Additionally, the entities are extremely valuable to any cryptocurrency exchange that sells derivatives because FTX Europe generally has the necessary licenses for an entity to sell cryptocurrency derivatives throughout the European Union.

73.     Early on, the Debtors recognized the high value of FTX Europe. On November 19, 2022, Mr. John J. Ray commented on the high value of FTX Europe:

> FTX Trading Ltd. and about 100 affiliated companies are starting a strategic review of global assets as a part of the Chapter 11 bankruptcy process for the collapsed crypto exchange. "Based on our review over the past week, we are pleased to learn that many regulated or licensed subsidiaries of FTX, within and outside of the US, have solvent balance sheets, responsible management and valuable franchises," FTX Group's new Chief Executive Officer John J. Ray III said in a statement. Among those with the largest identified financial positions are FTX EU Ltd., at $49.4 million in total cash available…[14]

74.     It was not a surprise that there was great interest in acquiring FTX Europe from many parties. The Debtors themselves have confirmed that there were 40 potential parties at one point.  Docket No. 413 at 6.

75.     FTX now proposes to liquidate FTX Europe at a substantial loss. It seems obvious that the FTX estate would be much better off giving away FTX Europe and avoiding paying $50 million to Binance rather than executing the FTX Europe Sale Transaction and accompanying

---

[14] "FTX global assets review begins, new CEO 'pleased' some entities have 'solvent balance sheets'", Nov 19, 2022, Fortune, at https://fortune.com/2022/11/19/ftx-global-assets-review-begins-ceo-pleased-some-entities-have-solvent-balance-sheets/.

Restructuring Motion.

76.     In sum, the FTX Sale Transaction and the Restructuring Motion are a bizarre and unexplained transaction that cannot be sustained even under the deferential business judgment rule. The Court and interested parties must be given the opportunity to conduct an appropriate inquiry into the process to verify that FTX Europe could not be sold to a third party and that the FTX Sale Transaction and Restructuring Motion was a reasonable option for liquidating the entity.

77.     The sale process does not meet the test of transparency. To assess the FTX Sale Transaction and Restructuring Motion, interested parties need information on who was the investment bank, the bidding and evaluation process, and the features of bids received.

### F. THE FTX EUROPE FINANCIAL STATEMENTS PREPARED BY THE DEBTOR INCLUDE AN UNEXPLAINED $100+ MILLION LOSS OCCURING IN DECEMBER 2022 DURING THE AUTOMATIC STAY

78.     Based on the financial statements filed by FTX Europe with the Court, FTX Europe was profitable and solvent until an unexplained $102,298,900 loss that supposedly occurred in the month of December 2022 [D.I. 2858]. This loss occurred after the bankruptcy filing and presumably while FTX Europe was no longer doing business and subject to the automatic stay.

79.     The purported loss was booked as "Other Expenses" without a specific explanation in the accompanying notes.  Note 11(c) of this financial statement explains "Other Expenses" as follows:

> Other Income and Expense. Other income and expenses include indirect costs to maintain the Debtors' estate, including, but not limited to, employee compensation, bank fees and interest, other income, insurance, taxes, ordinary course professionals, and other general and administrative expenses.

80.     The Court and the interested parties need an explanation for this unexplained loss of over $100 million during the bankruptcy. This loss apparently is the only reason that FTX Europe is insolvent, according to the financial statements, and apparently the only reason that the

FTX creditors are now being asked to bear a $50 million unsecured claim which FTX Europe could easily have paid in the absence of this unexplained Other Expense.

## G. SWISS LEGAL COMPLIANCE IS UNCERTAIN

81.     Swiss law imposes rigorous standards upon the persons engaged in a liquidation of a Swiss company. The Debt Enforcement and Bankruptcy Act (Bundesgesetz über Schuldbetreibung und Konkurs) is the primary source of legislation governing insolvency proceedings in Switzerland. Further laws such as the Swiss Code of Obligation (Schweizerisches Obligationenrecht), the Banking Act (Bundesgesetz über die Banken und Sparkassen) and the Insurance Supervision Act (Bundesgesetz betreffend die Aufsicht über Versicherungsunternehmen) contain additional insolvency- and restructuring-related provisions.

82.     Significantly, the board of directors and all persons engaged in the management of the Debtor are liable to both shareholders and creditors for any losses or damage arising from an intentional or negligent breach of their duties under Swiss law.

83.     The Restructuring Motion does not explain whether the rigorous Swiss standards have been complied with, raising the specter that any settlement and the actions being approved by this Court might be unenforceable in Switzerland. Discovery is required to verify that Swiss laws were followed regarding the corporate actions of FTX Europe since the Chapter 11 proceedings were filed in Delaware, including but not limited to an examination of the board records and correspondence between the debtor and the FTX Europe Administrator.

## H. APPROVAL OF RESTRUCTURING MOTION RAISES CROSS-BORDER COMITY AND CONFLICT OF LAW CONCERNS

84.     Approval of the Restructuring Motion could raise significant cross-border comity and conflict of law concerns because Switzerland, where FTX Europe is headquartered and based,

is not a party to an international agreement requiring it to recognize this Court's decisions, an issue that the Restructuring Motion fails to address.

85.     Swiss counsel of Friedberg will review these issues during the discovery process to investigate whether the Court's approval of the Restructuring Motion creates a serious violation of the comity required between the U.S. and Swiss legal systems.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, Mr. Friedberg respectfully requests that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A, and (b) grant such other and further relief as is just and proper.

Dated: April 30, 2024
          Wilmington, DE

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: */s/Rafael X. Zahralddin*

Rafael Zahralddin (Delware Bar No. 4166)
500 Delaware Ave Suite 700
Wilmington, DE 19801
Telephone:   (302)-985-6000
Rafael.Zahralddin@lewisbrisbois.com
Minyao Wang (*Pro hac vice* pending)
77 Water Street, Suite 2100
New York, New York 10005
Telephone:  (212) 232-1300
Minyao.Wang@lewisbrisbois.com

*Counsel to Daniel Friedberg*