## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD., ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., WEST REALM SHIRES SERVICES, INC., and NORTH DIMENSION INC., | |
| Plaintiffs, | Adv. Pro. No. 24-_____(JTD) |
| - against - | |
| CENTER FOR APPLIED RATIONALITY, LIGHTCONE INFRASTRUCTURE, INC., LIGHTCONE ROSE GARDEN LLC and FTX FOUNDATION, | |
| Defendants. | |

### COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 105, 544, 548, AND 550 AND DEL. CODE ANN. TIT. 6, §§ 1304, AND FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502

Plaintiffs FTX Trading Ltd. ("FTX"), Alameda Research Ltd. ("Alameda"), West

Realm Shires, Inc. ("WRS"), West Realm Shires Services, Inc. ("WRSS") and North Dimension

Inc. ("North Dimension" and together with FTX, Alameda, WRS and WRSS, the "Plaintiffs")

through their undersigned counsel, for their Complaint against the Center for Applied Rationality

("CFAR"), Lightcone Infrastructure, Inc. ("Lightcone"), Lightcone Rose Garden LLC

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

("Lightcone RG", together with CFAR and Lightcone, the "CFAR Defendants") and FTX

Foundation (together with the CFAR Defendants, the "Defendants"), allege the following based

upon personal knowledge and upon their investigation to date as to themselves and their own

acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 548, and

550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and

Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2)

and 1305, to avoid and recover from the CFAR Defendants, or from any other person or entity

for whose benefit the transfers were made, all transfers of property of Plaintiffs to the CFAR

Defendants made between March 2022 and August 2022, prior to commencement of the

above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11

Case"), by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"

and each a "Debtor").

2.      Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to

disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and

until Defendants have relinquished to Plaintiffs all property that they received in transfers that

are determined by the Court to be avoidable and/or recoverable.

3.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the

Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court")

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been

appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to

operate their businesses and manage their properties as debtors-in-possession pursuant to

Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11

Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128].

Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to

prosecute, this adversary proceeding.

4.      Prior to the filing of the Chapter 11 Cases, Alameda was a cryptocurrency trading

firm owned by Sam Bankman-Fried ("Bankman-Fried") and Zixiao "Gary" Wang ("Wang").

FTX was a digital asset exchange founded by Bankman-Fried, Wang, and Nishad Singh

("Singh").

5.      FTX Foundation was the philanthropic arm of the FTX Group[2] of companies.  Its

funding was provided by Alameda and other Debtor entities.  Together, FTX Foundation

directed not less than $4,904,999.61 of commingled funds from Alameda and FTX accounts to

make donations to the CFAR Defendants.

6.      Plaintiffs have determined, based on their analysis and investigation to date, that

the following transfers to the CFAR Defendants are avoidable under the Bankruptcy Code and

Title 6 of the Delaware Code:

| Date | Amount of Transfer | Transferor |
|---|---|---|
| March 3, 2022 | $2,000,000.00 | FTX Trading Ltd. |
| July 8, 2022 | $370,000.00 | FTX Foundation |
| July 13, 2022 | $500,000.00 | FTX Foundation |
| Aug. 18, 2022 | $500,000.00 | FTX Foundation |
| Sept. 20, 2022 | $34,999.61 | FTX Foundation |
| Oct. 3, 2022 | $160,000.00 | FTX Foundation |

---

[2]     The "FTX Group" is comprised of four silos. These silos include: (a) a group composed of Debtor West Realm
Shires, Inc., Debtor West Realm Shires Services, Inc., and their Debtor and non-Debtor subsidiaries; (b) a group
composed of Plaintiff Alameda Research Ltd., Alameda Research LLC, and their Debtor subsidiaries; (c) a
group composed of Debtors Clifton Bay Investments LLC, Clifton Bay Investments Ltd., Island Bay Ventures
Inc. and FTX Ventures Ltd.; and (d) a group composed of Debtor and Plaintiff FTX Trading Ltd. and its Debtor
and non-Debtor subsidiaries.

| Date | Amount of Transfer | Transferor |
|---|---|---|
| Oct. 3, 2022 | $150,000.00 | FTX Foundation |
| Oct. 3, 2022 | $160,000.00 | FTX Foundation |
| Oct. 3, 2022 | $150,000.00 | FTX Foundation |
| Oct. 3, 2022 | $160,000.00 | FTX Foundation |
| Oct. 3, 2022 | $160,000.00 | FTX Foundation |
| Oct. 3, 2022 | $150,000.00 | FTX Foundation |
| Oct. 3, 2022 | $100,000.00 | FTX Foundation |
| Oct. 3, 2022 | $160,000.00 | FTX Foundation |
| Oct. 3, 2022 | $150,000.00 | FTX Foundation |

7.      During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiffs intend to avoid and recover all such transfers made, or obligations incurred, to or for the benefit of Defendants or any other transferee and accordingly reserve the right to amend this Complaint.  In particular, and without intending to create any limitation, Plaintiffs reserve the right to amend this Complaint to include: (i) further information regarding relevant transfers or obligations; (ii) information regarding additional transfers made or obligations incurred; (iii) additional plaintiffs; (iv) modifications of and/or revisions to the Defendants' names; (v) additional defendants; and (vi) additional causes of action that may become known at any time during this adversary proceeding, through formal discovery or otherwise.

## THE PARTIES

8.      Alameda is a British Virgin Islands company limited by shares.  It is a wholly-owned subsidiary of Debtor Alameda Research LLC, a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Wang.

9.      FTX is a corporation registered in Antigua and Barbuda.  Its principal place of business was in Nassau, Bahamas.  FTX and its subsidiaries and affiliate entities collectively did business as FTX.com and operated a digital asset trading exchange.  FTX is 80% owned by Paper Bird Inc., a Delaware corporation that is wholly owned by Bankman-Fried.

10.      Plaintiff WRS is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.

11.      Plaintiff WRSS, doing business as FTX.US, is a Delaware corporation and a wholly owned subsidiary of Plaintiff WRS.

12.      Plaintiff North Dimension is a wholly owned subsidiary of Debtor Alameda Research LLC.

13.      FTX Foundation is a non-profit, non-stock corporation incorporated in Delaware. Its sole member was Bankman-Fried, and its directors included Bankman-Fried, Singh, Wang, Caroline Ellison (together, the "Insiders"), and the Chief Executive Officer of FTX Foundation.

14.      CFAR is a California non-profit corporation with its principal place of business at 270 Telegraph Avenue, Berkeley, California, 94705.

15.      Lightcone is a Delaware non-profit corporation with its principal place of business at 270 Telegraph Avenue, Berkeley, California, 94705.  Upon information and belief, Lightcone is owned and/or controlled by CFAR and/or persons affiliated with CFAR.

16.      Lightcone RG is a California limited liability company with its principal place of business as 2740 Telegraph Avenue, Berkeley, California, 94705.  Upon information and belief, Lightcone RG is owned and/or controlled by CFAR and/or persons affiliated with CFAR.

## JURISDICTION AND VENUE

17.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

18.     This adversary proceeding arises from and relates to the Chapter 11 Cases filed with this Court on the Petition Date.

19.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

20.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

21.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

22.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

23.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

I.    **The Insiders' Scheme to Defraud the FTX Group's Customers, Creditors, and Shareholders.**

24.    Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of the Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

25.    The Insiders used their control over the FTX Group's systems to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things, luxury homes, political and "charitable" contributions, and various investments that would inure to the benefit of the Insiders rather than the corporate entities that had paid for them.

26.    The Insiders funded much of this spending through Alameda, which, at the Insiders' direction, unlawfully diverted assets belonging to FTX.com, the principal international cryptocurrency exchange operated by the FTX Group, to the Insiders' pet projects.  In doing so, the Insiders defrauded FTX.com's customers, creditors, and shareholders, and violated their fiduciary duties and numerous laws.

27.    Prior to their resignations or terminations amidst FTX's collapse, the Insiders held virtually all of the top executive positions at the FTX Group.  Bankman-Fried was the CEO of

FTX until the Petition Date, was the sole director of Alameda until September 6, 2022, and was previously the CEO and sole director of West Realm Shires, Inc. ("WRS").  Wang served as the Chief Technology Officer at both FTX and WRS.  Singh served as the Director of Engineering at both FTX and WRS as well as serving as Chief Security Officer at WRS.  Ellison was the co-CEO of Alameda LLC from August 2021 until September 2022, when she was named the sole CEO.  Ellison was also a director of Alameda from September 6, 2022 until the Petition Date.

28.     The Insiders' conduct has been the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission, the Commodity Futures Trading Commission, and a host of state and international regulators.  All of the Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that underlie this action.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud; Ellison also pleaded guilty to conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On February 28, 2023, Singh pleaded guilty to the same felonies as Ellison as well as conspiracy to make unlawful political contributions and defraud the Federal Election Commission.  *See* Min. Entry, Feb. 28, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On November 2, 2023 a jury convicted Bankman-Fried on seven (7) counts of fraud.  *See* Min. Entry, Nov. 2, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2023).  He was sentenced on March 28, 2024 to serve 25 years imprisonment.  At all times prior to the Petition Date, the Insiders collectively held majority stakes in FTX, Alameda, and WRS and exercised control over the actions of those entities.

29.     In connection with his plea, Wang admitted that in 2019 he made "certain changes to the [FTX.com] code" to give Alameda "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies.  Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.  Using these "special privileges," the Insiders frequently caused Alameda to spend large amounts of Debtors' funds for their own personal benefit.

30.     Before his conviction, Bankman-Fried repeatedly, and publicly, stated that Alameda operated as "a wholly separate entity" from FTX.com.  *Annie Massa et al., Sam Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It Collapsed.  Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022, 5:58 AM), https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison was quoted as saying that "[w]e keep them [FTX and Alameda] quite separate in terms of day-to-day operations."  *Id.* In reality, however, the Insiders routinely, and secretly, used Alameda to loot "several billion dollars" from FTX.com using the "special privileges," thereby defrauding FTX.com's creditors.  Plea Tr. 28:23-29:1, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102;  Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

31.     Bankman-Fried also conspired with Ellison and others to divert funds to Alameda that were intended to be deposited at FTX.com before they reached the exchange, so that the Insiders could use those funds to benefit themselves.  Beginning in 2019 and continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank accounts controlled by Alameda, and then North Dimension, without disclosing to the banks that held those accounts

or to FTX.com customers the nature of the arrangement between FTX.com, Alameda, and North

Dimension.  *See* Superseding Indictment ¶ 18, *United States* v. *Bankman-Fried*, 22-cr-00673

(S.D.N.Y. 2022), ECF No. 115.

32.      In April 2021, Bankman-Fried ink-signed a sham "Payment Agent Agreement,"

that was falsely backdated by nearly two years.  An outside law firm was asked to prepare the

intercompany agreement for the sole purpose of providing it to an external auditor that had been

retained to prepare an audited financial statement of FTX in connection with a contemplated

initial public offering of the company.  FTX's Chief Compliance Officer directed that the

agreement state that "FTX gets first dibs on Alameda's cash," an apparent attempt to paper over

the fact that there were no existing limitations on Alameda's ability to spend FTX exchange

customers' cash for its own purposes.  The draft agreement the law firm subsequently provided

stated that Alameda provided "cash management" services for FTX, and that assets of FTX held

by Alameda pursuant to the agreement would be deemed a loan to Alameda.  Beginning in

March 2021, the same FTX Chief Compliance Officer prepared another version of the sham

agreement that did not reflect any loan to Alameda, which stated that Alameda provided mere

"payment services" pursuant to which it would "complete payments . . . as directed by FTX from

time to time," and receive assets from FTX "to be held and/or transferred . . . as quickly as

commercially possible."  In reality, Alameda never transferred and had no intention of

transferring customer deposits to FTX at all.

33.      In the days leading up to the Petition Date, Bankman-Fried supplied potential

investors with a purported Alameda balance sheet that included a liability of $8 billion in a

"Hidden, poorly internally labled [sic] 'fiat@' account."  *See* Superseding Indictment ¶ 56,

*United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.  However,

Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted into Alameda's bank accounts that had not been maintained for the benefit of customers or repaid to FTX[.]" *Id.* ¶ 57. The Insiders used these funds "to make investments in the name of Bankman-Fried and his associates, rather than in the name of Alameda." *Id.* ¶ 26.

34.     The Insiders were aware at all relevant times of the "special privileges on the FTX platform" that allowed Alameda to "borrow" billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to Defendants. Ellison admitted that from 2019 through 2022 she was aware of this arrangement, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral, . . . pay interest[,] . . . [or] being subject to margin calls or FTX.com's liquidation protocols." Plea Tr. 27:11-15, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 19. Ellison also "understood that FTX would need to use customer funds" to make many of its investments, *id.* at 28:2-4, 22-24, and admitted that many investments "were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds." *Id.* at 28:24-29:1.

35.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." *See* Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

36.     Testimony from the FTX Insiders during Bankman-Fried's criminal trial further clarified the relationship between Alameda and FTX, and the scheme pursuant to which the FTX Insiders misappropriated customer funds. For example, Singh testified he and Wang implemented the "allow negative feature" which granted Alameda the ability to "go negative

without any balance" such that Alameda was not "bounded by its collateral limit." Trial Tr. 1362:25–1363:10, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). When Singh confronted Bankman-Fried about the growing hole caused by Alameda's exchange privileges, Bankman-Fried responded that the "main plan remains, making FTX successful and growing it." *Id.* 1411:3–1412:10. FTX.com's former General Counsel also testified that Bankman-Fried told Singh that the hole "is what it is and there is nothing we can do about it. The only thing we can do is grow the company and fill the hole." *Id.* 1964:12-1965:5.

37.    Ellison testified that Bankman-Fried's strategy was for Alameda to borrow "as much money as [it] could get from whatever sources [it] could find at whatever terms [it] could get" and to "make a lot of investments, potentially in the billions of dollars of venture investments in . . . relatively early-stage companies." *Id.* 693:4–17. Ellison also explained that she "learned that FTX had loaned money that it had raised from investors totaling $1.6 billion to Alameda," which "had been concealed from FTX's auditors." *Id.* 937:12–14. Ellison testified that when an Alameda lender called an open term loan, Bankman-Fried directed her to "prepare alternative ways of presenting the information" and "come up with ways to conceal things in [their] balance sheet that [they] both thought looked bad." *Id.* 786:13–25.

## II.    FTX Foundation and Its Transfers to CFAR and Lightcone.

### A.    FTX Foundation

38.    FTX Foundation was funded primarily by assets belonging to Alameda and other Debtor entities in the FTX Group. When Bankman-Fried set up FTX Foundation in February 2021, he announced that FTX Group would contribute at least 1% of its fees to the foundation. But FTX Foundation's primary source of funds was Alameda monies that had been commingled with FTX customer deposits, contrary to FTX's public representations that it maintained strict separation of customer and corporate funds. FTX Foundation claimed on its website that it

"works to save lives, prevent suffering and help build a flourishing future."  In reality, very few of FTX Foundation's donations directly benefitted the needy.  Its largest donations went to associates of FTX Insiders in the "effective altruism" movement, which claims to use "evidence and reason to figure out how to benefit others as much as possible," according to one effective altruism website.  Another significant portion of FTX Foundation's giving went toward think tanks or groups researching artificial intelligence or advocating public policy positions.

39.     FTX Foundation donations of $2 million or more required approval by Bankman-Fried.  Its donations burnished Bankman-Fried's public image as a do-gooder even as he orchestrated one of the largest fraudulent schemes in U.S. history.  FTX Foundation ceased operations when FTX collapsed in November 2022.

### B.     Connections Between CFAR and Lightcone

40.     CFAR was founded in 2012 as a 501(c)(3) non-profit organization.  Its purported mission is to promote the concept of applied rationality which, according to CFAR's website, is the "domain of understanding how human cognition already works, in practice, such that we can then start the process of making useful changes, such that we will be better positioned to solve the problems that really matter."  In tax filings, CFAR further described its mission as "perform literature reviews in psychology, cognitive science, and related fields, develop tools based on these reviews that help individuals and groups in a practical way with clear thinking and decision-making and teach these tools to individuals and groups that show promise in using these tools to philanthropic ends."

41.     According to its website, CFAR reviews individual case studies, advances in cognitive science research, and data from participants in its workshops to "build[] a robust set of tools for truth-seeking, introspection, self-improvement, and navigating intellectual disagreement . . . ."  CFAR's workshops, which are four-and-half-day off-site retreats in which

participants receive instruction in applied rationality, cost $3,900.  The price includes room and

board, a 200-page handbook, and "four free follow-up coaching calls with a CFAR staff

member."  CFAR also runs "coaching and mentorship programs for [its] alumni network,

helping individuals improve themselves and find their way toward fulfilling, high-impact work."

CFAR further puts on regular small events for the rationality and "effective altruist"

communities at its offices in Berkeley, California.

42.     Lightcone was formed in 2017 by Oliver Habryka—a former intern at CFAR.  A

June 30, 2023 blog post by Habryka claims that Lightcone is a "fiscally sponsored project" of

CFAR.  Lightcone's website represents that Lightcone is a "project by the Center for Applied

Rationality."  According to Lightcone's statement of information filed in California on April 14,

2023, Habryka is the only listed officer for the corporation.

43.     Lightcone shares the same registered agent address—2740 Telegraph Avenue,

Berkeley, California 94705—as CFAR. This address is the location of the Rose Garden Inn, a

hotel purchased by Lightcone RG in the fall of 2022, in part using funds received from FTX

Foundation.

### C.     CFAR & Lightcone Acquisition of Rose Garden Inn

44.     Throughout 2022, FTX Foundation and CFAR were in discussions to purchase

the Rose Garden Inn in Berkeley, California as a retreat center for the Effective Altruist

community.  Upon information and belief, FTX Foundation declined to purchase the Rose

Garden Inn and CFAR began investigating acquiring the hotel itself in or about February 2022.

45.     On March 2, 2022, CFAR submitted a funding request to FTX Foundation

"requesting $2,000,000 be given to the Center for Applied Rationality as an exclusive grant for

its project, the Lightcone Infrastructure Team."  On March 2, 2022, FTX Foundation caused

$2,000,000.00 to be wired to CFAR from an FTX bank account.

46.     Between March 2022 and October 2022, FTX, Alameda and FTX Foundation made 14 additional transfers to CFAR in the aggregate amount of $2,904,999.61.

47.     On July 13, 2022, and August 18, 2022, FTX Foundation caused payments of $500,000 each to be wired from an account held by North Dimension to a title company as an initial deposit for Lightcone RG's acquisition of the Rose Garden Inn.  Lightcone RG closed on the purchase of the hotel on or about November 4, 2022.  Although these transfers were intended as a loan to be re-paid once the financing for the Rose Garden Inn closed, the Debtors records do not indicate that CFAR or Lightcone ever repaid this $1 million "loan."

48.     The property is subject to a deed of trust and assignment of rents in favor of Slimrock Investments Pte. Ltd., which provided Lightcone with a $20 million loan for the purchase and renovation of the property.  According to Habryka, the "total price for the property was $16.5MM, the total loan was for $20MM, including $3.5MM for repairs and renovation."  Habryka has publicly stated that "Slimrock Investments Pte. Ltd. is an investment company that Jaan Tallinn [an Estonian billionaire computer programmer and investor] owns. He gave us the loan to buy the property, and he facilitated it via this company."

49.     On October 3, 2022, FTX Foundation approved a grant of $1,500,000 to Lightcone, stipulating that the funds "must be spent for charitable purposes to support the project 'General Support for Lightcone.'"  The grant was paid in a series of 10 transfers made on October 3, 2022 from an account held by FTX Foundation.  Upon information and belief, a material portion of the transfers was used by CFAR to fund Lightcone and the acquisition and renovation of the Rose Garden Inn.

50.     Transfers from FTX Foundation to CFAR were funded by wallet deposits made by Alameda Research into the FTX.us exchange account of FTX Foundation, which then initiated withdrawals that were fulfilled as fiat transfers from a WRSS bank account.

### D.     Defendants' Failure to Respond to Debtors' Outreach

51.     The Debtors and their advisors have been working since the Petition Date to recover and protect estate assets, investigate potential claims, and maximize value for all stakeholders.  As part of this effort, Debtors emailed CFAR on June 27, July 10, July 18, and August 30 of 2023, in order to discuss the transfers and a potential resolution of Debtors' claims.  CFAR ignored all of these communications.  On August 31, 2023, Debtors delivered a letter to CFAR's place of business requesting to meet and confer regarding discovery to be taken under Rule 2004 of the Federal Rules of Bankruptcy Procedure.  CFAR ignored that letter, too.  It was only after Debtors filed a motion for Rule 2004 discovery on October 20, 2023, that CFAR engaged, through counsel, with Debtors.

### III.     The Transfers to CFAR Involved Multiple Badges of Fraud Evincing Actual Intent to Hinder, Delay, or Defraud Creditors.

52.     As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the transfers to the CFAR Defendants, including that:

    i.     Numerous material facts relating to those transfers were concealed;

    ii.     Bankman-Fried removed or concealed Plaintiffs' assets;

    iii.     The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

    iv.     Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made; and

    v.     The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

**CAUSES OF ACTION**

**COUNT ONE**
**FRAUDULENT TRANSFERS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(A)**
**(ALL DEFENDANTS)**

53.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

54.     Plaintiffs made the transfers set forth above at Paragraph 6 to Defendants.

55.     Each of the transfers to Defendants was a transfer of property of Plaintiffs.

56.     Each of these transfers was made with the intent to hinder, delay, or defraud present or future creditors, a fact known by FTX Foundation and CFAR Defendants.

57.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from the CFAR Defendants and/or FTX Foundation the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(B)**
**(AGAINST ALL DEFENDANTS)**

58.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

59.     Plaintiffs made the transfers set forth above at Paragraph 6 to Defendants.

60.     Each of the transfers to the Defendants was a transfer of property of Plaintiffs.

61.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers.

62.     The Plaintiffs:  (1) were insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) engaged or were about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transaction; or (4) intended to incur, or believed that they would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due; FTX Foundation and CFAR Defendants had knowledge of the abovementioned facts.

63.     Accordingly, each of these transfers incurred by Plaintiffs to the Defendants should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from the CFAR Defendants and FTX Foundation the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT THREE
### FRAUDULENT TRANSFERS PURSUANT TO
### DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)
### (AGAINST ALL DEFENDANTS)

64.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

65.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

66.     Plaintiffs made the transfers set forth above at Paragraph 6 to Defendants.

67.     Each of the transfers to the Defendants was a transfer of property of Plaintiffs.

68.     Each of these transfers to the Defendants was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims; FTX Foundation knew that the transfers to the CFAR Defendants were made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  Each of the transfers is avoidable by creditors who hold allowable unsecured claims.

69.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from the CFAR Defendants and FTX Foundation the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FOUR
## FRAUDULENT TRANSFERS PURSUANT TO
## DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)
## (AGAINST ALL DEFENDANTS)

70.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

71.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

72.     Plaintiffs made the transfers set forth above at Paragraph 6 to Defendants.

73.     Each of the transfers to the CFAR Defendants was a transfer of property of Plaintiffs.

74.     Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers.

75.     The  Plaintiffs:  (1) were insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due; FTX Foundation and CFAR Defendants had knowledge of the abovementioned facts.

76.     Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

77.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from the CFAR Defendants and FTX Foundation the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FIVE
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)
## (AGAINST THE CFAR DEFENDANTS)

78.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully set forth here.

79.     As alleged above, Plaintiffs are entitled to avoid each of the transfers to the CFAR

Defendants addressed herein under Sections 544 and 548 of the Bankruptcy Code.

80.     Because the CFAR Defendants are the initial transferees or the entities for whose

benefit such transfers were made, Plaintiffs may recover from the CFAR Defendants the full

value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and

costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT SIX
## UNJUST ENRICHMENT
## (AGAINST LIGHTCONE RG)

81.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully

set forth here.

82.     As a result of the transfers to CFAR and Lightcone, Lightcone RG was unjustly

enriched by the receipt of the funds used to purchase the Rose Garden Inn.

83.     Any and all benefits obtained by Lightcone RG as a consequence of the

abovementioned transfers to CFAR and Lightcone were funded by Plaintiffs. However, Plaintiffs

received no benefit in exchange for the transfers.

84.     Plaintiffs lack an adequate remedy at law against Lightcone RG for Lightcone

RG's unjust enrichment at Plaintiffs' expense.

85.     Plaintiffs seek to recover from Lightcone RG all payments Lightcone RG

received from CFAR and Lightcone made using money from Plaintiffs.

## COUNT SEVEN
## DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)
## (AGAINST ALL DEFENDANTS)

86.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 52 as if fully

set forth here.

87.     As alleged above, Defendants are transferees or beneficiaries of transfers avoidable under Sections 544 and 548 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

88.     By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent that the Court has determined Defendants are liable pursuant to Section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

89.     Enter an order that the transfers addressed herein are avoidable fraudulent transfers under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

90.     Award Plaintiffs under 11 U.S.C. § 550 no less than $4,904,999.61 (plus the value of any additional avoidable transfers that Plaintiff learns, through formal discovery or otherwise, were made to Defendants);

91.     Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by the CFAR Defendants and FTX Foundation in these Chapter 11 Cases unless and until such Defendants relinquish to Plaintiffs the amount ordered as an award for avoidable transfers;

92.     Award Plaintiffs its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

93.     Award Plaintiffs all other relief, at law or equity, to which it may be entitled.

Dated: May 13, 2024
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
　　　　cobb@lrclaw.com
　　　　mcguire@lrclaw.com
　　　　robertson@lrclaw.com

*Counsel for the Debtors*
*and Debtors-in-Possession*