**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | : | |
|---|---|---|
| | : | |
| *In re* | : | Chapter 11 |
| | : | |
| FTX TRADING LTD., *et al.*,[1] | : | Case No. 22-bk-11068 (JTD) |
| | : | (Jointly Administered) |
|     Debtors. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**REPORT OF ROBERT J. CLEARY, EXAMINER**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these bankruptcy cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## TABLE OF CONTENTS

Defined Terms ............................................................................................................. viii

Executive Summary ...................................................................................................... 1

Part 1: Background and Methodology ........................................................................ 5

   I.    The Examiner's Appointment and Assigned Duties ....................................... 5

   II.   The Examiner's Methodology ......................................................................... 7

Part 2: Employment of S&C ..................................................................................... 12

   I.    Overview ....................................................................................................... 12

   II.   Rules Governing the Retention of Professionals ......................................... 13

      a.   Section 327 of the Bankruptcy Code ..................................................... 13

      b.   Bankruptcy Rule 2014 ............................................................................ 14

      c.   Application of the Law ............................................................................ 15

         1.   Actual Conflicts ................................................................................. 15

         2.   Potential Conflicts ............................................................................. 17

            (i)    Professional's Prepetition Work for a Debtor ............................ 17

            (ii)   Professional's Relationship with a Debtor's Principals ............. 19

            (iii)  Professional's Simultaneous Representation of Multiple Debtors ................. 22

      d.   The Role of Conflicts Counsel ............................................................... 24

   III.  The Court's Ruling on the Debtors' Application to Employ S&C ........................... 25

      a.   Summary of the Record .......................................................................... 25

      b.   The Court Hearing .................................................................................. 32

      c.   Analysis of Court's Ruling ..................................................................... 33

   IV.  Analysis of Other Investigations ................................................................. 35

      a.   Quinn Emanuel Investigation ................................................................. 36

      b.   Additional Materials Regarding S&C ..................................................... 38

   V.   Conflicts That S&C Allegedly Did Not Adequately Disclose To the Court ............ 41

      a.   Representation of Bankman-Fried in Connection with His Purchase of Robinhood Stock ............................................................................................................ 41

      b.   LedgerX Transaction .............................................................................. 45

      c.   BlockFi .................................................................................................... 49

      d.   Events Leading Up to the Bankruptcy Filings ....................................... 50

      e.   Representations to Regulatory Authorities ............................................. 54

      f.   Representations to Voyager Digital's Counsel ...................................... 56

   VI.  Recommendations for Additional Investigations ....................................... 58

**Part 3: Fraud by Current and Former Employees of the Debtors**.......................................... **60**

**I.    Overview of Investigative Work** ................................................................. **60**

**II.   Identification of Former and Current Employees of the FTX Group** ..................... **63**

**III.  Investigations into Former Employees** ......................................................... **64**

    a.    Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, and Gary Wang ................. 64

        1.    USAO-SDNY ................................................................................. 64

        2.    SEC .............................................................................................. 66

        3.    CFTC ........................................................................................... 66

        4.    Debtors' Investigation ..................................................................... 67

    b.    Ryan Salame ............................................................................................ 68

        1.    USAO-SDNY ................................................................................. 68

        2.    Debtors' Investigation ..................................................................... 69

    c.    Other FTX Group Employees ..................................................................... 70

    d.    FTX Group In-house Legal and Compliance Employees ................................. 73

        1.    Daniel Friedberg ............................................................................ 74

        2.    Can Sun ....................................................................................... 76

        3.    Ryne Miller ................................................................................... 77

    e.    FTX Group Whistleblowers ........................................................................ 78

    f.    Other Payments to FTX Group Employees .................................................... 83

**IV.   Current Employees** ............................................................................... **83**

**V.    Conclusion** .......................................................................................... **84**

**Part 4: Manipulation of FTT and Other Tokens** .................................................. **85**

**I.    Cryptocurrency Tokens Associated with the Debtors** ....................................... **85**

    a.    FTT Token ............................................................................................. 86

    b.    Other Tokens Associated with the Debtors ................................................... 89

    c.    Role of FTT in the FTX Group's Collapse ................................................... 92

**II.   Summary of Investigations into the Use and Manipulation of FTT** ....................... **94**

    a.    Investigative Work ................................................................................... 94

        1.    Government Investigations and Actions ............................................... 94

            (i)    USAO-SDNY ........................................................................ 94

            (ii)    SEC ................................................................................... 95

            (iii)    CFTC ................................................................................. 96

        2.    The Debtors' Investigations ............................................................. 97

    b.    Investigative Findings .............................................................................. 98

1.  Creation of FTT and its Relation to Alameda's Value ................................ 99
2.  Instances of FTT Manipulation .................................................................... 100
3.  Individuals Involved in Manipulation ......................................................... 102
4.  Use of FTT to Inflate Alameda's Value ...................................................... 103
5.  The Buy and Burn Program .......................................................................... 104

**III.  Summary of Investigations into Other FTX-Affiliated Tokens ................................ 106**

a.  Investigative Work .............................................................................................. 106

1.  Government Investigations and Actions ...................................................... 106
2.  The Debtors' Investigations .......................................................................... 107

b.  Investigative Findings ........................................................................................ 108

1.  Alameda's Holdings of Illiquid Other FTX-Affiliated Tokens on Its Balance Sheet 108
2.  Potential Manipulation of Other FTX-Affiliated Tokens ........................... 109
3.  Debtors' Control of Serum ............................................................................ 110
4.  The Debtors' Involvement with MAPS and OXY ...................................... 111

**IV.  Conclusion .............................................................................................................. 112**

**Part 5:  Misconduct by Professionals Engaged by the FTX Group ...................................... 114**

**I.  Law Firms ................................................................................................................ 116**

a.  Tier One Law Firms ........................................................................................... 117
b.  Tier Two Law Firms ........................................................................................... 117
c.  Tier Three Law Firms ......................................................................................... 118
d.  Witnesses Interviewed in Connection with Law Firm Investigations ......................... 118
e.  Summary of Notable Findings Concerning Law Firms ...................................... 118

1.  Law Firm-1 .................................................................................................... 119
2.  Law Firm-2 .................................................................................................... 121
3.  Law Firm-3 .................................................................................................... 122
4.  Law Firm-4 .................................................................................................... 123
5.  Law Firm-5 .................................................................................................... 124
6.  Paul Hastings ................................................................................................. 125
7.  Anderson Mōri & Tomotsune ....................................................................... 126
8.  Law Firm-6 .................................................................................................... 126
9.  Law Firm-7 .................................................................................................... 127
10.  Skadden Arps Slate Meagher & Flom LLP ................................................. 128
11.  Simmons & Simmons ................................................................................... 128

12. Willkie Farr & Gallagher LLP ................................................................. 128

13. Orrick, Herrington & Sutcliffe LLP ........................................................ 129

14. Holland & Knight LLP ........................................................................... 130

15. Silver Miller Law ................................................................................... 130

16. Pavel Pogodin/Consensus Law ............................................................. 131

17. Law Firm-8 ............................................................................................ 131

18. Bracewell .............................................................................................. 132

19. Morrison & Foerster .............................................................................. 132

20. Hogan Lovells International LLP ........................................................... 133

21. Bahamian Counsel ................................................................................ 134

**II. Auditors ..................................................................................................... 134**

a. Auditor-1 ............................................................................................... 135

b. Auditor-2 ............................................................................................... 137

c. Moore Stephens CPA Limited ............................................................... 137

**III. Accountants ............................................................................................... 138**

a. Robert Lee & Associates ....................................................................... 139

b. Silicon Valley Accountants .................................................................... 141

c. Rivers & Moorehead .............................................................................. 142

d. PricewaterhouseCoopers Entities .......................................................... 142

e. MicroLedgers and Mazars LLP ............................................................. 142

**IV. Valuation Firms ......................................................................................... 143**

a. Redwood Valuation Partners .................................................................. 143

b. Teknos Associates LLP .......................................................................... 144

c. BDO USA LLP ...................................................................................... 144

**V. Regulatory, Licensing and Compliance Consultants ................................. 145**

a. MR Holdings & Varin Strategies ........................................................... 146

b. XReg Consulting Ltd. ............................................................................. 146

c. ProCo Global (d/b/a Chartwell Compliance) ......................................... 147

**VI. Government and Community Relations Consultants .................................. 147**

a. Barbara Miller (d/b/a BGM Consultants) & Alpen Sheth (d/b/a Canopy Labs LLC) 147

b. Consultant-1 ........................................................................................... 148

**VII. Lobbyists .................................................................................................... 149**

a. ADAM and Michelle Bond ..................................................................... 150

b. Rich Feuer Anderson .............................................................................. 151

iv

**VIII.    Other Professional Vendors** ................................................................. **151**

    a.    Taxbit, M Group, and Inca Digital ............................................... 151

    b.    Vendors-1, -2, and -3 ................................................................. 152

    c.    Vendor-4 .................................................................................... 152

**IX.   Financial Institutions** ....................................................................... **153**

    a.    Silvergate Bank ......................................................................... 154

    b.    Prime Trust LLC ........................................................................ 154

    c.    Signature Bank ........................................................................... 155

    d.    Evolve Bank & Trust and Wise ................................................. 155

    e.    Deltec Bank & Trust Co. Ltd. and Deltec International Group ... 156

**X.    Further Investigations** ........................................................................ **156**

**Part 6: Other Investigations** ...................................................................... **158**

**I.    Acquisitions** ....................................................................................... **158**

    a.    Embed ........................................................................................ 159

    b.    FTX Europe/Digital Assets AG ................................................. 160

    c.    FTX Japan/Liquid ...................................................................... 161

    d.    Genesis Block ............................................................................ 161

**II.    Bankman-Fried Family Members** ...................................................... **162**

**III.   Charitable Contributions** .................................................................. **165**

**IV.   FTX Tokens/Investments at Third-Party Exchanges** ......................... **168**

    a.    Exchanges For Which Recovery Is Complete or Near Complete ........................... 171

        1.    Coinbase ............................................................................ 171

        2.    OKCoin .............................................................................. 172

    b.    Exchanges At Which Debtor Accounts Were Seized by USAO-SDNY ................ 172

    c.    Exchanges For Which Recovery Efforts Remain In Process .......................... 173

        1.    Crypto.com ........................................................................ 173

        2.    MEXC ................................................................................ 174

        3.    Poloniex ............................................................................. 174

        4.    Upbit .................................................................................. 174

    d.    Exchanges Over Which the Debtors Exert No Control .............................. 174

        1.    GATE.io ............................................................................. 175

        2.    KuCoin ............................................................................... 175

**V.    FTX.US** .............................................................................................. **176**

    a.    Investigative Steps ..................................................................... 177

b.      S&C's Findings Regarding the FTX.US "Hole" and Bankman-Fried's Statements.. 178

c.      Recommendations for Further Investigation ................................................. 181

**VI. Miscellaneous Investigations** ................................................................ **183**

a.      FTX Group Properties .................................................................................. 184

b.      Other Investigated Preference Actions ........................................................ 184

c.      NFT Withdrawals ........................................................................................ 185

**VII. Payments to Foreign Officials** ............................................................ **185**

a.      Payments to and Contacts with Bahamian Government Officials ............... 186

1.      Transfer of Assets to the Securities Commission of the Bahamas ....................... 186

2.      Other Payments to and Connections with Bahamian Government Officials .......... 188

b.      Payments to Chinese Government Officials ................................................. 189

**VIII.        Political Contributions** ............................................................ **190**

a.      Government Investigations .......................................................................... 190

b.      Debtors' Investigation ................................................................................ 191

**IX. Venture Book** ........................................................................................ **192**

a.      Investigative Steps ..................................................................................... 193

1.      Quinn Emanuel Venture Book Investigations ................................................... 193

2.      S&C Venture Book Investigations ................................................................. 194

b.      Summary of Findings .................................................................................. 195

c.      Avoidance Actions ...................................................................................... 195

1.      Background ................................................................................................. 195

2.      Actual and Intended Avoidance Actions .......................................................... 196

(i)      K5 Global ................................................................................................ 196

(ii)     Latona .................................................................................................... 197

(iii)    Modulo ................................................................................................... 198

(iv)     Farmington State Bank/Moonstone Bank .................................................. 199

(v)      Deck Technologies ................................................................................... 199

3.      Other Efforts to Monetize Venture Investments .............................................. 200

4.      Venture Book Investments of Concern ........................................................... 202

(i)      Venture Investment-1 ............................................................................... 202

(ii)     Venture Investment-2 ............................................................................... 203

(iii)    Venture Investment-3 ............................................................................... 203

d.      Further Venture Book-Related Efforts ......................................................... 204

**Part 7: Related Adversary Proceedings** ...................................................... **205**

**Part 8: Estimated Duration and Proposed Budget for Recommended Investigations....... 209**

## DEFINED TERMS

| | |
|---|---|
| ADAM | Association of Digital Asset Markets |
| Additional S&C Materials | Materials and allegations put forward by former employees, third-party observers, and other parties in interest concerning S&C's conflicts of interest, including the Friedberg Declaration; *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S. D. Fla.) (KMM), Dkt. No. 1; Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5; and *Vara v. FTX Trading (In re FTX Trading)*, No. 23-2297 (3d Cir.), Dkt. No. 27 |
| Alameda | Alameda Research LLC and other entities in the "Alameda Silo," as set forth in the Ray First Day Declaration |
| Alameda Ventures | Clifton Bay Investments LLC, f/k/a Alameda Research Ventures LLC, and related entities. |
| AlixPartners | AlixPartners, LLP |
| Alvarez & Marsal | Alvarez & Marsal Holdings, LLC, an investigatory firm retained by S&C |
| AMT | Anderson Mōri & Tomotsune |
| bankruptcy cases | The jointly administered chapter 11 proceedings of FTX Trading, and certain of its affiliates captioned *In re FTX Trading Ltd*., No. 22-bk-11068 (Bankr. D. Del) (JTD) |
| Bankruptcy Court | The United States Bankruptcy Court for the District of Delaware |
| Bankruptcy Code | Title 11 of the United States Code |
| Bankruptcy Rule(s) | Federal Rules of Bankruptcy Procedure |
| BDO | BDO USA LLP |
| Binance | Binance Holdings Ltd. and its affiliates |
| BlockFi | BlockFi International Ltd and BlockFi, Inc. |
| BlockFi SEC Settlement | Public settlement reached between BlockFi and the SEC |
| Bracewell | Bracewell LLP |
| Brian Simms | Brian Simms KC, Bahamas counsel to FTX Group and JPL |
| CEO | Chief Executive Officer |
| CFTC | Commodity Futures Trading Commission |

| | |
|---|---|
| Clement T. Maynard & Co | Bahamas counsel to FTX Group |
| Coinbase | A cryptocurrency exchange at which the FTX Group maintained accounts |
| Consensus Law | A law firm operated by Pavel Pogodin that was retained by FTX Group after it represented a whistleblower |
| Consultants | Sports, media, and corporate partnership consultants engaged by the FTX Group |
| Cottonwood Grove | Cottonwood Grove Limited |
| CRO | Chief Restructuring Officer |
| Crypto.com | A cryptocurrency exchange at which the Debtors maintained accounts |
| CZ | Changpeng Zhao, the founder of cryptocurrency exchange Binance |
| DAAG | Digital Assets DA AG, renamed FTX Europe after its acquisition by the FTX Group |
| Debtors | FTX Trading, Ltd. and its affiliated entities that are debtors in the Chapter 11 bankruptcy cases |
| Deck | Deck Technologies, a political data analytics company |
| Deltec | Deltec International Group |
| Deltec Bank | Deltec Bank & Trust Co. Ltd. |
| Dietderich Declaration | *Declaration of Andrew G. Dietderich In Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 270-3 |
| Dkt. No. | Citations to "Dkt. No." without a case name or number refer to docket entries in *In re FTX Trading Ltd.*, No. 22-bk-11068 (Bankr. D. Del) (JTD) |
| DOJ | U.S. Department of Justice |
| Embed | A securities clearing and custody business acquired by the FTX Group |
| Emergent | Emergent Fidelity Technologies Ltd. |
| Evolve Bank | Evolve Bank & Trust, a bank where Wise held an FBO account |
| Examination | The Examiner's methods and procedures underlying this Report |
| FBO | For Benefit Of |

ix

| | |
|---|---|
| FCA | U.K. Financial Conduct Authority |
| FDM | FTX Digital Markets Ltd. |
| FEC | Federal Election Commission |
| Fenwick | Fenwick & West, LLP |
| FinCEN | Financial Crimes Enforcement Network |
| First Ray Report | The First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges, Dkt. No. 1242-1 |
| Friedberg Declaration | *Declaration of Daniel Friedberg In Support of Amended Objection of Warren Winter to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 530 |
| FTI | FTI Consulting, Inc. |
| FTT | The exchange token for FTX.com |
| FTX Foundation | A non-profit that made charitable contributions with funds from FTX Group, later known as FTX Philanthropy |
| FTX Group | FTX Trading Ltd., West Realm Shires Services Inc., d/b/a FTX.US, Alameda Research LLC, and their directly and indirectly owned subsidiaries and affiliates |
| FTX Philanthropy | A non-profit that made charitable contributions with funds from FTX Group, previously known as FTX Foundation |
| FTX Trading | FTX Trading Ltd. |
| FTX Ventures | FTX Ventures, Ltd. |
| FTX.com | A cryptocurrency exchange operated by FTX Trading |
| FTX.US | An exchange for spot trading of cryptocurrency and other digital assets in the United States operated by the FTX Group, and controlled by WRS |
| GAAS | Generally Accepted Auditing Standards |
| GAP | Guarding Against Pandemics, a political action committee |
| Gate.io | A cryptocurrency exchange at which Debtors maintained accounts |
| Genesis Block | Genesis Block Ltd., a cryptocurrency trading firm |
| HiveEx | Hive Empire Trading Pty Ltd. |
| Hogan | Hogan Lovells International LLP |

x

| | |
|---|---|
| Holland & Knight | Holland & Knight LLP |
| Inca | Inca Digital, Inc. |
| JOLs | Joint Official Liquidators of FTX Digital Markets Ltd. appointed in the Bahamas |
| JPLs | Joint Provisional Liquidators of FTX Digital Markets Ltd. appointed in the Bahamas |
| K5 | K5 Global and related entities |
| KuCoin | A cryptocurrency exchange at which Debtors maintained accounts |
| Landis | Landis Rath & Cobb LLP |
| Latona | Latona Biosciences Group |
| LayerZero | LayerZero Labs Ltd. |
| LedgerX | LedgerX LLC |
| Lennox Patton | Bahamas counsel to the FTX Group |
| LHI | Ledger Holdings, Inc., a holding company for LedgerX |
| Liquid | A Japanese cryptocurrency exchange operated as FTX Japan after its acquisition by the FTX Group |
| LPTCC | Limited Purpose Trust Company Charter |
| M 7 Holdings | M 7 Holdings, LLC |
| M Group | M Group Strategic Communications, a public relations firm |
| MAPS | The token for Maps.me |
| Mazars | Mazars LLP |
| MEXC | A cryptocurrency exchange at which Debtors maintained accounts |
| MIAX | Miami International Holdings, Inc. |
| MicroLedgers | MicroLedgers Co. Ltd. |
| Barbara Miller | Barbara Miller d/b/a BGM Consultants |
| Mirana | Mirana Corp., the investment arm of Bybit, a cryptocurrency exchange |
| Modulo | Modulo Capital |
| MoFo | Morrison & Foerster LLP |
| Moonstone Bank | Farmington State Bank d/b/a Moonstone Bank |
| Moore Stephens | Moore Stephens CPA Limited |

| | |
|---|---|
| MR Holdings and Varin Strategies | MR Holdings, Varin Strategies (d/b/a Compliers Consulting) |
| MTG | Mind the Gap, a political action committee |
| Nardello | Nardello & Co., an investigative firm retained by S&C |
| NFT | A non-fungible token, a type of cryptocurrency token designed to be uniquely identifiable |
| North Dimension | North Dimension Inc. and related entities |
| Norton Hall | Norton Hall Ltd. |
| OKCoin | A cryptocurrency exchange at which Debtors maintained accounts, sometimes referred to as OKX |
| Omnibus Authority | Document appointing John J. Ray III as CEO of the FTX Group |
| Orrick | Orrick Herrington & Sutcliffe LLP |
| Other FTX-Affiliated Tokens | SRM, OXY, and MAPS |
| OXY | The token for the Oxygen Protocol |
| Paul Hastings | Paul Hastings LLP, counsel to the Unsecured Creditors' Committee |
| Petition Date | The dates that the bankruptcy cases were commenced, November 11 and 14, 2022 |
| Poloniex | A cryptocurrency exchange at which the Debtors maintained accounts |
| Prime Trust | Prime Trust LLC |
| ProCo | ProCo Global (d/b/a Chartwell Compliance) |
| Professionals | A group of 195 law firms, auditors, accountants, financial consultants, and other professionals engaged by the FTX Group between 2017 and 2022 |
| PwC AG | PricewaterhouseCoopers AG |
| PwC LLP | Pricewaterhouse Coopers LLP |
| Pyth Network | Pyth Network, a pricing data aggregator, and associated entities including Pyth Data Association, the minter of the PYTH token |
| Quinn Emanuel | Quinn Emanuel Urquhart & Sullivan, LLP, conflicts counsel to the Debtors |
| R&M | Rivers & Moorehead |
| Ray Employment Declaration | *Declaration of John J. Ray III in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan* |

| | |
|---|---|
| | *& Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 270-2 |
| Ray First Day Declaration | Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, Dkt. No. 24 |
| Redwood | Redwood Valuation Partners |
| RFA | Rich Feuer Anderson |
| RLA | Robert Lee & Associates |
| Robinhood | Robinhood Markets, Inc. |
| Robinhood Shares | Approximately $500 million worth of shares of Robinhood acquired by Bankman-Fried |
| Robinhood Transaction | Acquisition of Robinhood Shares by Bankman-Fried |
| S&C Employment Application | *Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 270 |
| SBF Criminal Case, Dkt. No. | Citations to "SBF Criminal Case, Dkt. No." refer to docket entries in *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y.) (LAK) |
| SCB | Securities Commission of the Bahamas |
| Scope Order | *Order (I)(A) Establishing the Scope, Cost, Degree, and Duration of the Examination and (B) Granting Related Relief; and (II) Permitting the Filing of Certain Information Regarding Potential Parties in Interest Under Seal*, Dkt. No. 9883 |
| SEC | U.S. Securities and Exchange Commission |
| Second Ray Report | The Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com, Dkt. No. 1704-1 |
| Sheth | Alpen Sheth d/b/a Canopy Labs LLC |
| Signature | Signature Bank |
| Silver Miller | Silver Miller Law |
| Silvergate | Silvergate Bank |
| Simmons & Simmons | Simmons & Simmons JWS Pte. Ltd |
| Skadden | Skadden Arps Slate Meagher & Flom LLP |
| SRM | The exchange token for the Serum exchange |

| | |
|---|---|
| Supplemental Dietderich Declaration | *Supplemental Declaration of Andrew G. Dietderich in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 510 |
| Supplemental Ray Employment Declaration | *Supplemental Declaration of John J. Ray III in Support of Debtors' Applications for Orders Authorizing the Retention and Employment of Sullivan & Cromwell LLP, Alix Partners LLP and Quinn Emanuel Urquhart & Sullivan, LLP*, Dkt. No. 511 |
| TaxBit | TaxBit Inc., a tax and accounting firm |
| Teknos | Teknos Associates LLP |
| TigerWit | TigerWit Holdings Ltd./ TigerWit Limited (UK) |
| Unsecured Creditors' Committee | The official committee of unsecured creditors in the Debtors' bankruptcy cases |
| Upbit | A cryptocurrency exchange at which Debtors maintained accounts |
| U.S. Trustee Objection | *Objection of the United States Trustee to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 496 |
| USAO-SDNY | The United States Attorney's Office for the Southern District of New York |
| Venture Book | A fund created by FTX Group to invest in companies and tokens |
| Voyager Digital | Voyager Digital Holdings, Inc., and its debtor affiliates |
| Willkie | Willkie Farr & Gallagher LLP |
| Winter Objection | Collectively: (i) *Objection to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 369; and (ii) *Amended Objection to Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-in-Possession* Nunc Pro Tunc *to the Petition Date*, Dkt. No. 459 |
| Wise | A payment processor used by non-Debtor FTX Philanthropy |
| WRS | West Realm Shires Inc. |
| WRSS | West Realm Shires Services Inc. |
| XReg | XReg Consulting Ltd. |

## EXECUTIVE SUMMARY

This is the Report of Examiner Robert J. Cleary in the Chapter 11 bankruptcy cases of FTX Trading, Ltd. ("FTX Trading") and certain of its affiliates (collectively, the "FTX Group" or the "Debtors"),[2] No. 22-bk-11068 (Bankr. D. Del) (JTD).

Part One of the Report sets out the history of the bankruptcy cases, the background of the Examiner's appointment, and the scope of the Examiner's duties.  Pursuant to the Bankruptcy Court's order of March 20, 2024, the Examiner was tasked with compiling and summarizing the completed and ongoing investigations, and the findings thereof, into the FTX Group by the Debtors' counsel, by the Unsecured Creditors' Committee, and by any third parties (including government agencies), and making recommendations for additional investigations.  The Examiner was further instructed to address three specific issues: (1) whether the Bankruptcy Court correctly ruled on the Debtors' application to employ Sullivan & Cromwell LLP[3] as counsel despite alleged conflicts of interest; (2) whether existing and ongoing investigations adequately addressed fraud by the former and current employees of the Debtors; and (3) whether the investigations have adequately addressed the Debtors' use of its cryptocurrency token FTT to inflate the value of FTX Group entities.  Part One concludes with a discussion of the methodology the Examiner has used to accomplish these assigned tasks.

Part Two addresses the Debtors' engagement of S&C.  It sets out the legal framework governing the retention of professionals in bankruptcy cases—with particular attention to how that framework has been applied by the United States Court of Appeals for the Third Circuit— and analyzes the Bankruptcy Court's ruling on the Debtors' application to engage S&C.  It also

---

[2] This Report generally refers to these entities as the "FTX Group" when describing prepetition conduct or events, and as the "Debtors" when describing postpetition conduct or events.

[3] This Report will refer to Sullivan & Cromwell LLP as "S&C."

describes an investigation into S&C's prepetition representation of the FTX Group conducted by the Debtors' conflicts counsel, Quinn Emanuel Urquhart & Sullivan, LLP,[4] as well as allegations made by interested parties regarding S&C's conduct.  Ultimately, Part Two concludes that the Examiner did not identify any error in the Bankruptcy Court's decision authorizing the Debtors to retain S&C.  However, the Examiner recommends two additional investigations into S&C-related issues: an investigation into S&C's representation of Samuel Bankman-Fried ("Bankman-Fried")[5] in connection with his purchase of shares of Robinhood Markets, Inc., and an inquiry into the postpetition sale of LedgerX that specifically addresses any potential claims the Debtors may have against non-released shareholders in the LedgerX parent company, LHI.

Part Three assesses the adequacy of investigations into prepetition fraud by prepetition employees of the FTX Group, and whether any employees involved in that fraud remain employed by the Debtors.  This Part describes the extensive investigative work by the Debtors' counsel and government agencies.  Part Three then surveys the results of investigations by government agencies and the Debtors' counsel into fraudulent conduct, including any perpetrated by Bankman-Fried, the co-founder of FTX.com and Alameda and the former CEO of FTX.com; by FTX Group executives Bankman-Fried, Caroline Ellison, Nishad Singh, Zixiao ("Gary") Wang, and Ryan Salame; by the FTX Group's in-house legal and compliance teams; and by other FTX Group employees.  It also addresses several instances in which current or former FTX Group employees made whistleblower complaints, circumstances in which the FTX Group sought to resolve those whistleblower complaints by making payments, and other instances when the FTX Group made payments to departing employees that were not clearly tied to known

---

[4] This Report will refer to Quinn Emanuel Urquhart & Sullivan, LLP as "Quinn Emanuel."

[5] This Report refers to Samuel Bankman-Fried as "Bankman-Fried."  When other individuals with the surnames "Bankman-Fried," "Bankman," or "Fried" are referenced, the Report uses their first and last names.

whistleblower complaints.  The Examiner concludes that no further investigation is warranted by him, as the ongoing and completed investigations have established the facts surrounding fraud by former employees of the FTX Group and demonstrated with sufficient confidence that current employees of the Debtors were not likely complicit in the prepetition fraud.

Part Four evaluates the adequacy of investigations into whether FTX Group entities manipulated cryptocurrency tokens or used cryptocurrency tokens they controlled to inappropriately inflate the value of FTX Group entities.  This Part reviews investigations into the use of four cryptocurrency tokens that may have been employed for these purposes: FTT, SRM, MAPS, and OXY.  It summarizes the investigations into instances of manipulation that have been conducted by the Debtors' counsel and governmental units.  Ultimately, the Examiner concludes that these investigations have been sufficient to identify the significant instances of manipulation and the individuals who were principally involved, and that additional investigation into this subject by him is not necessary.

Part Five addresses investigations into prepetition conduct by professional service firms engaged by the FTX Group, including law firms, accounting firms, auditing firms, valuation firms, and other consultants.  It summarizes completed and ongoing investigations conducted by the Debtors' counsel into potential misconduct by these professional services firms.  The Examiner concludes that these investigations have been thorough and complete, such that there are no areas in which further investigation by the Examiner would be productive.

Part Six addresses other investigations into the prepetition conduct of the FTX Group and affiliated individuals and how those investigations have led, or could lead, to recovery of assets for the Debtors' estates.  Investigations addressed in this section include inquiries into (1) corporate acquisitions by the FTX Group, (2) Bankman-Fried's family members, (3) charitable

and political contributions by the FTX Group and affiliated individuals, (4) cryptocurrency tokens that the FTX Group held at third-party exchanges, (5) the collapse of FTX.US, (6) miscellaneous investigations, (7) political contributions by the FTX Group and affiliated individuals, (8) payments to foreign officials, and (9) the FTX Group's Venture Book.  The Examiner concludes that the completed and ongoing investigations into these issues have largely been sufficient to establish the facts concerning the FTX Group's conduct and to identify potential areas for asset recovery.  However, he recommends one additional project to be undertaken by him: an investigation into potential misconduct at FTX.US.

Part Seven summarizes other adversary proceedings brought by the Debtors that are not addressed in other Parts.

Finally, Part Eight outlines the expected duration and proposed budget for the Examiner's recommended investigations.

## PART 1: BACKGROUND AND METHODOLOGY

Part One of this Report sets out the relevant history of these bankruptcy cases, the scope of the Examiner's investigation, and the Examiner's methodology.

### I.      The Examiner's Appointment and Assigned Duties

On November 11, 2022, many FTX Group entities filed for Chapter 11 bankruptcy in the United States District Court for the District of Delaware (the "Bankruptcy Court"), and West Realm Shires Inc. ("WRS") followed on November 14 (together, the "Petition Date").  On December 1, 2022, the United States Trustee for Region 3 (the "U.S. Trustee") moved for appointment of an examiner pursuant to section 1104(c) of title 11 of the United States Code (the "Bankruptcy Code").[6]  The Debtors,[7] the Official Committee of Unsecured Creditors ("Unsecured Creditors' Committee"),[8] and the Bahamas-based Joint Provisional Liquidators ("JPLs") of FTX Digital Markets Ltd.[9] ("FDM") opposed the U.S. Trustee's motion.  The

---

[6] *In re FTX Trading Ltd.*, No. 22-bk-11068 (Bankr. D. Del) (JTD), Dkt. No. 176.  Further citations in this Report to a docket number, without an accompanying case name or number, are to docket entries in *In re FTX Trading Ltd.*, No. 22-bk-11068 (Bankr. D. Del) (JTD).

[7] Dkt. No. 573.

[8] Dkt. No. 571.

[9] Dkt. No. 572.  In Bahamian insolvency law, provisional liquidators are appointed by the court to act as agents of a company placed into provisional liquidation before a winding up order has been entered.  Provisional liquidators are empowered to take various actions to maintain the value of the company.  Once a winding up order has been entered, the official liquidators conduct the winding up of a company, including collecting, realizing, and distributing assets.

On November 10, 2023, the SCB "presented a winding up petition against [FDM] and suspended its license to operate" as a digital asset business in the Bahamas.  *See Third Interim Report and Accounts of the Joint Provisional Liquidators to the Supreme Court of the Commonwealth of the Bahamas*, Joint Provisional Liquidators of FTX Digit. Mkts., at 4 (Nov. 9, 2023), https://www.pwc.com/bs/en/services/business-restructuring-ftx-digital-markets/assets/third-update-from-the-jpls-10-nov-2023.pdf, *archived at* https://perma.cc/4N9U-3ZBJ.  The Supreme Court of the Bahamas subsequently ordered FDM be placed into provisional liquidation and appointed Brian Simms KC of Lennox Paton, Kevin Cambridge of PricewaterhouseCoopers Advisory (The Bahamas) Limited, and Peter Graves of PricewaterhouseCoopers Limited as the JPLs.  *See id.*  About a year later, pursuant to the Supreme Court of the Bahamas' November 10, 2023 order, the Bahamian court ordered FDM be wound up, and the JPLs were appointed as Joint Official Liquidators ("JOLs").  *See FTX Digital Markets Ltd. (In Official Liquidation)*, PWC, https://www.pwc.com/bs/en/services/business-restructuring-ftx-digital-markets.html, *archived at* https://perma.cc/98G4-EQHF.

Bankruptcy Court held a hearing on the U.S. Trustee's motion on February 6, 2023,[10] and subsequently denied the motion for appointment of an examiner.[11]

The U.S. Trustee appealed the Bankruptcy Court's order to the United States Court of Appeals for the Third Circuit,[12] which reversed.[13]  The Third Circuit explained that section 1104(c) instructs that a bankruptcy court "'shall' appoint an examiner if the terms of the statute have been met," which is an "obligatory command to appoint an examiner."[14]  The Third Circuit remanded the case to the Bankruptcy Court "with instructions to order the appointment of an examiner[]."[15]

On remand, the Bankruptcy Court held a hearing,[16] and subsequently directed the U.S. Trustee to appoint an examiner.[17]  The U.S. Trustee appointed Robert J. Cleary as the Examiner,[18] and in an order dated March 20, 2024, the Bankruptcy Court approved that appointment.[19]

On March 20, 2024, the Bankruptcy Court also issued an order concerning the scope of the Examiner's investigation (the "Scope Order").[20]  The Scope Order instructed the Examiner to issue a report that:

---

[10] Dkt. No. 622.

[11] Dkt. No. 746.

[12] Before appealing the Bankruptcy Court's order, the U.S. Trustee successfully moved in the United States District Court for the District of Delaware for an order certifying a direct appeal to the Third Circuit.  *Vara v. FTX Trading Ltd. (In re FTX Trading Ltd.)*, No. 22-bk-11068 (JTD), 2023 WL 3721527 (D. Del. May 30, 2023).

[13] *In re FTX Trading Ltd.*, 91 F.4th 148 (3d Cir. 2024).

[14] *Id*. at 153.

[15] *Id*. at 157.

[16] Dkt. No. 6366.

[17] Dkt. No. 7909.

[18] Dkt. No. 8048.

[19] Dkt. No. 9882.

[20] Dkt. No. 9883 (the "Scope Order").

(i) summarizes the investigations of the Debtors conducted by the Debtors, the [Unsecured Creditors'] Committee, and any third parties (including any governmental units, to the extent such information is made available to the Examiner) which are pending or have concluded (the 'Investigations'), (ii) summarizes the findings or status of such Investigations, and (iii) makes recommendations for additional investigations.[21]

The Bankruptcy Court also directed the Examiner to undertake the following tasks, which the Third Circuit expressly enumerated in its opinion:

> a.      An examination of the Court's ruling on the Debtors' application to employ Sullivan & Cromwell (respectively, "S&C" and the "Employment Application"), including whether there are potential conflicts of interest involving S&C which were not adequately addressed by the Court's hearing and ruling on the Employment Application;[22]
>
> b.      An examination of whether the Investigations adequately addressed fraud by the Debtors' employees and whether employees involved in such fraud are still working for the Debtors;[23] and
>
> c.      An examination of whether the Investigations adequately addressed the Debtors' use of its cryptocurrency, FTT, to inflate the value of FTX and Alameda Research.[24]

In accordance with the Bankruptcy Court's instructions, this Report addresses each of these topics.

## II.    The Examiner's Methodology

The Scope Order tasked the Examiner with assessing and summarizing the completed and ongoing investigations undertaken by counsel for the Debtors and counsel for the Unsecured

---

[21] *Id.* at ¶ 2.

[22] *Id.* at ¶ 3(a); *see also In re FTX*, 91 F.4th at 157 ("This requirement of disinterest is particularly salient here, where issues of potential conflicts of interest arising from debtor's counsel serving as pre-petition advisors to FTX have been raised repeatedly.").

[23] Scope Order at ¶ 3(b); *see also In re FTX*, 91 F.4th at 157 ("Moreover, the U.S. Trustee raised the concern that, given the reports of widespread fraud, officers or employees who may have engaged in wrongdoing could remain at FTX Group.").

[24] Scope Order at ¶ 3(c); *see also In re FTX*, 91 F.4th at 157 ("[A]n investigation into FTX Group's use of its own cryptocurrency tokens, FTTs, to inflate the value of FTX and Alameda Research could bring this practice under further scrutiny, thereby alerting potential investors to undisclosed credit risks in other cryptocurrency companies.").

Creditors' Committee, as well as their findings.  The Examiner requested initial briefings from the Debtors' primary counsel, S&C, and its conflicts counsel, Quinn Emanuel, as well as from Paul Hastings LLP,[25] counsel for the Unsecured Creditors' Committee.  All three law firms provided timely, complete, and very helpful cooperation, beginning with comprehensive briefings.  The law firms produced relevant investigative documentation, including memoranda of investigations and interviews, reports of financial data analyses, and other documents. Members of the Examiner's team reviewed and analyzed these investigative documents.  When the Examiner's team had follow-up questions, members of the team requested additional information and investigative documents from the three law firms and discussed issues of interest with them.  The law firms supplied virtually all of the information requested.  In a few limited instances, the law firms declined to produce requested materials to the Examiner. Whenever a law firm withheld requested materials, it provided a reasonable justification for doing so, and there was no negative impact on the Examiner's work.  In total, the Examiner's team (1) reviewed hundreds of investigative documents and reports prepared by or at the direction of the three law firms, and (2) had dozens of discussions with attorneys at these firms who participated in the investigations.

The Scope Order also instructed the Examiner to summarize investigations conducted by third parties, including governmental units, as well as their findings.  In accordance with this instruction, members of the Examiner's team conferred with representatives of each of the many government agencies that have investigated the Debtors, including the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), the U.S. Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), the

---

[25] This Report will refer to Paul Hastings LLP as "Paul Hastings."

United States Department of Justice ("DOJ"), a committee of the United States House of

Representatives, state securities regulators, and a money transmitter regulator.  Each

governmental unit reported on the status of its respective investigations, to the extent that doing

so was possible without compromising non-public investigations.  Members of the Examiner's

team also undertook a comprehensive review of (1) civil complaints against the FTX Group and

associated individuals, (2) criminal information and indictments filed against individuals

affiliated with the FTX Group, and (3) the transcripts of Bankman-Fried's criminal trial and

sentencing, and related filings.[26]  Finally, the Examiner's team reviewed testimony and other

materials from Congressional hearings into the collapse of the FTX Group.

The Examiner also gathered information from sources other than the Debtors, the

Unsecured Creditors' Committee, and the government.  Members of the Examiner's team

received information from counsel for certain senior FTX Group executives (Caroline Ellison,

Gary Wang, and Nishad Singh) via attorney proffers.  Members of the Examiner's team also

spoke with John Ray, current Chief Executive Officer ("CEO") of the Debtors, and Adam

Moskowitz and David Boies, counsel for the plaintiff class in an ongoing multidistrict litigation

against the Debtors and affiliated individuals and entities.[27]  The Examiner reviewed unsolicited

written materials provided by Bankman-Fried.  The team conferred with Bahamas counsel for

the JOLs.  Finally, the Examiner received and considered unsolicited information from several

individuals and law firms.  In some instances, the Examiner's team followed up with additional

---

[26] A review of the USAO-SDNY investigations and prosecutions involving senior FTX Group executives, as well as the SEC and CFTC complaints, is addressed throughout this Report.  The Examiner also understands that certain state securities regulators, including the Wisconsin Department of Financial Institutions, Division of Securities, have filed proofs of claim outlining an investigation into FTX.US "for offering and selling unregistered securities in the form of its Earn program."  *See* Claim No. 72749, *In re West Realm Shires Inc.*, No. 22-bk-11183 (Bankr. D. Del.) (JTD).

[27] *In re: FTX Cryptocurrency Exchange Collapse Litigation*, No. 23-md-03076 (S.D. Fla) (KMM).  Moskowitz is also lead counsel in a separate lawsuit against S&C stemming from the collapse of the FTX Group.

questions, but only did so when the providers of unsolicited information identified themselves. The Examiner did not communicate with individuals who did not reveal their identities, nor did he respond to every named individual or entity who provided unsolicited information.

As noted above, the Examiner was guided by the Scope Order, which framed the Examiner's task as summarizing and assessing investigations completed by others rather than conducting a *de novo* investigation into issues concerning the collapse of the FTX Group. Many percipient witnesses were previously interviewed by the Debtors' counsel and/or the government. Because of the limited scope of the Examiner's assigned tasks, the Examiner generally did not interview percipient witnesses. Similarly, the Examiner did not review primary source documents that were already reviewed by the Debtors' counsel and/or the government, except in some limited circumstances or to the extent that these documents were excerpted or quoted in investigative work product prepared by others.

Bankruptcy examiners are appointed to conduct "an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor."[28]  However, examiners do not have free rein to investigate any matter of potential private or public interest related to a debtor. Rather, "[t]he Examiner performs his duties at the request of the Court,"[29] and the Court "direct[s] the examiner's investigation."[30]  Accordingly, the Examiner did not investigate every matter related to the Debtors that has attracted public or press attention. Nor did he investigate every known

---

[28] 11 U.S.C. § 1104(c).

[29] *In re New Century TRS Holdings, Inc.*, 407 B.R. 558, 566 (Bankr. D. Del. 2009).

[30] *In re FTX*, 91 F.4th at 156 (quoting 5 William L. Norton III, *Norton Bankruptcy Law and Practice* § 99:25 (3d ed. 2023)).

complaint regarding the prepetition conduct of the FTX Group or the postpetition course of these bankruptcy cases.  Instead, the Examiner investigated only the matters assigned to him by the Scope Order.  This Report should not be interpreted as a comment on any issues beyond the Examiner's remit.

Throughout the Report, names of certain individuals and entities are anonymized.[31]

---

[31] Dkt. No. 15271, at 2.

## PART 2:  EMPLOYMENT OF S&C

### I.    Overview

As set forth in the Scope Order, the Examiner was tasked with reporting on "the Court's ruling on the Debtors' application to employ [S&C], including whether there are potential conflicts of interest involving S&C which were not adequately addressed by the Court's hearing and ruling on the Employment Application."[32]  The Examiner has reviewed in detail the record before the Court regarding S&C's employment and considered whether facts outside the record should have been brought to the Court's attention.

The second section of this Part reviews the bankruptcy conflict rules that govern a court's consideration of a professional's retention application.  The following section describes (1) the record that was before the Court on the S&C Employment Application (as defined below), and (2) the hearing held by the Court, and then analyzes the Court's ruling.  The fourth and fifth sections discuss investigations and other assessments of S&C's alleged conflicts by other law firms, academics, and other parties in interest.  Finally, the sixth section makes recommendations for further investigative work related to S&C's retention as the Debtors' primary counsel in these bankruptcy cases.

In sum, the Examiner has concluded that, in light of the record before the Court, there was no error in the Court's decision concerning the Debtors' retention of S&C.  However, after a review of investigations and other analyses of S&C, the Examiner has found that there were some additional facts relevant to S&C's conflicts or disinterestedness that were not before the Court when it ruled on the S&C Employment Application.  None of the additional facts reviewed to date suggests that S&C was in fact conflicted from representing the Debtors, or that the

---

[32] Scope Order at ¶ 3(a).

Court's decision was compromised by the lack of such information.  However, the Examiner sets forth below two recommendations for limited further investigation concerning facts that were not before the Court.  These recommendations are in the public interest as they are made with the goal of ensuring that material questions that have been raised by observers of these cases are fully and completely vetted and answered.

## II.    Rules Governing the Retention of Professionals

### a.    *Section 327 of the Bankruptcy Code*

Bankruptcy Code section 327(a) provides that, with court approval, a debtor may employ attorneys that "do not hold or represent an interest adverse to the estate, and that are disinterested persons."[33]  The term "disinterested person" is defined as:

> [A] person that (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.[34]

Therefore, both the first and second prong of section 327(a) prohibit a debtor's lawyer from holding an interest adverse to the bankruptcy estate.  The Third Circuit has observed that, while the two prongs of section 327(a) are "formally distinct," they "effectively collapse into a single test."[35]  But because the Bankruptcy Code does not define the term "adverse interest," the language is left open to interpretation by the courts.

The Bankruptcy Code does include other guidance on the application of section 327(a).  Under section 1107(b), a professional is not automatically disqualified under section 327 solely

---

[33] 11 U.S.C. § 327(a).

[34] 11 U.S.C. § 101(14).

[35] *In re Boy Scouts of Am.*, 35 F.4th 149, 157 (3d Cir. 2022) (citing *In re BH & P, Inc.*, 949 F.2d 1300, 1314 (3d Cir. 1991)).

because that professional represented the debtor on prior occasions.  Similarly, under section 327(c), a professional is not disqualified solely because of that professional's employment by, or representation of, a creditor.

      *b.*     *Bankruptcy Rule 2014*

Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") enforces the provisions of section 327(a) by requiring disclosure of a professional's relationships with parties in interest.  Bankruptcy Rule 2014 requires that an application to retain a professional under section 327 be accompanied by a "verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."[36]

Courts have held that "Bankruptcy Rule 2014 requires that the attorney seeking employment disclose to the Court all connections with parties in interest in the case, rather than furnishing only those which appear to implicate 'disinterestedness' or 'adverse interest' concerns under section 327(a)."[37]  The Third Circuit has further emphasized that the obligation to disclose possible conflicts of interest "belongs to the party who seeks employment by the estate" because it is not the bankruptcy court's obligation "to search the record for possible conflicts of interest," and that "negligence does not excuse the failure to disclose a possible conflict of interest[]."[38] But a bankruptcy court's "discretion in determining whether to disqualify counsel for inadequate

---

[36] Fed. R. Bankr. P. 2014(a).

[37] *In re eToys, Inc.*, 331 B.R. 176, 190 (Bankr. D. Del. 2005) (emphasis in original); *see also In re Blue Ridge Limousine & Tour Serv., Inc.*, No. 12-bk-17551 (BFK), 2014 WL 4101595 (Bankr. E.D. Va. Aug. 20, 2014); *In re Harris Agency, LLC*, 451 B.R. 378 (Bankr. E.D. Pa.), *aff'd sub nom. Paul J. Winterhalter, P.C. v. Off. of the U.S. Tr. (In re The Harris Agency, LLC)*, 462 B.R. 514 (E.D. Pa. 2011).

[38] *In re BH & P, Inc.*, 949 F.2d at 1317-18 (alterations and internal citations omitted).

disclosure is broad" and "[a] [B]ankruptcy [C]ourt may excuse the original failure to disclose because complete disclosure is for the Court's benefit so that it can scrutinize any adverse interests of the attorney."[39]

      *c.*    *Application of the Law*

In the Third Circuit, conflicts under section 327 fall into three categories: "(1) actual conflicts of interest, (2) potential conflicts of interest, and (3) appearances of conflict."[40]  Actual conflicts of interest result in per se disqualification of professionals, potential conflicts of interest are left to the bankruptcy court's discretion to determine if they are disqualifying, and appearances of conflicts alone cannot lead to disqualification.[41]  Because only actual or potential conflicts of interest can be disqualifying, this section of the Report focuses on the case law regarding those types of conflicts.

      1.    Actual Conflicts

The term "actual conflict of interest" is not defined in the Bankruptcy Code; however, the Third Circuit has stated that "[p]ragmatically, a conflict is actual when the specific facts before the bankruptcy court suggest that it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest."[42]  The Third Circuit has observed that the determination of a "conflict as 'potential' or 'actual' . . . [is] committed to the bankruptcy court's sound exercise of discretion."[43]  Indeed, courts in the Third

---

[39] *Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP (In re Northwestern Corp.)*, 346 B.R. 84, 89 (D. Del. 2006) (quoting *First Interstate Bank of Nev., N.A. v. CIC Inv. Corp. (In re CIC Inv. Corp.)*, 175 B.R. 52, 54 (B.A.P. 9th Cir. 1994)).

[40] *In re Boy Scouts of Am.*, 35 F.4th at 157 (citing *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 476 (3d Cir. 1998)).

[41] *Id.* at 157-58.

[42] *Id.* (internal quotations omitted) (quoting *In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir. 2002)).

[43] *In re Marvel Ent. Grp., Inc.*, 140 F.3d at 476.

Circuit "have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists in light of the particular facts of each case."[44]

That said, the Third Circuit has also stated that while "a bankruptcy court enjoys considerable discretion in evaluating whether professionals suffer from conflicts . . . [it] does not enjoy the discretion to bypass the requirements of the Bankruptcy Code."[45]  Accordingly, courts rigorously adhere to the statutory requirement that a disinterested person cannot be an officer within two years before the petition date,[46] and courts strictly prohibit a creditor from serving as a debtor's professional.[47]

In addition, the Third Circuit has held that, while prior representation of a debtor does not by itself merit disqualification, receipt of a preferential transfer under section 547(b) of the Bankruptcy Code constitutes an actual conflict of interest requiring disqualification of the professional.[48]  This is due to the fact that "receipt of a preference creates a conflict with unpaid creditors because a payment by an insolvent debtor to one creditor is necessarily paid at the

---

[44] *In re BH & P, Inc.*, 949 F.2d at 1315 (quoting *In re Star Broad., Inc.*, 81 B.R. 835, 844 (Bankr. D.N.J. 1988)).

[45] *In re Pillowtex, Inc.*, 304 F.3d at 253 n.5, 254 (citing *U.S. Tr. v. Price Waterhouse*, 19 F.3d 138 (3d Cir.1994) for the proposition that "based on the language of the Code, a bankruptcy court that approves the retention of a prepetition creditor of the estate necessarily abuses its discretion"—as under section 101(14), a "disinterested person" must be a person who "is not a creditor").

[46] *In re Essential Therapeutics, Inc.*, 295 B.R. 203, 211 (Bankr. D. Del. 2003) (holding that an individual who served as secretary for the debtors was not disinterested even though he only performed ministerial tasks because the proposed representation was contrary to the clear and unambiguous language of the statute).

[47] *See Price Waterhouse*, 19 F.3d at 142 (finding that an accounting firm that was also one of the twenty largest creditors of the estate was not disinterested even though the accounting firm promised not to participate in the case or vote its claim in the plan process).

[48] *In re First Jersey Secs., Inc.*, 180 F.3d 504, 509 (3d Cir.1999).

expense of another creditor."[49]  At the time of retention, then, courts will determine if a

prepetition payment is preferential.[50]

### 2.    Potential Conflicts

When a professional has a potential conflict of interest, a bankruptcy court has wide

discretion to approve or reject the professional's retention based on the court's assessment of the

totality of the circumstances in light of the specific facts of the case.[51]  Most courts look to the

materiality of the potentially disqualifying facts and balance them against the potential

advantages to the estate of having the professional in question represent the debtor.[52]

### (i)    Professional's Prepetition Work for a Debtor

As noted above, "[p]rior representation of the debtor does not, by itself, merit

disqualification" of a professional under section 327.[53]  But such prior representation does

constitute a potential conflict of interest.  Accordingly, courts will evaluate the nature of the

prior representation to determine if a disqualifying conflict exists under section 327.[54]

Most courts have held that customary prepetition bankruptcy services—i.e.,

preliminary work performed to prepare a bankruptcy filing—do not, standing alone, require

---

[49] *In re Fleming Cos., Inc.*, 305 B.R. 389, 393 (Bankr. D. Del. 2004) (citing *In re Pillowtex, Inc.*, 304 F.3d at 252).

[50] *In re Pillowtex, Inc.*, 304 F.3d at 248 (finding that, even though counsel agreed to (1) return any preference payments it might have received, and (2) waive any claim resulting from the preference payments, the firm could not continue with its representation until the court determined whether a preference existed).

[51] *In re Marvel Ent. Grp., Inc.*, 140 F.3d at 477; *see also In re BH & P, Inc.*, 949 F.2d at 1315 ("[C]ourts have generally declined to formulate bright-line rules concerning the criteria for disqualification but have favored instead an approach which gives the bankruptcy court discretion to evaluate each case on its facts, taking all circumstances into account.").

[52] *In re Boy Scouts of Am.*, 35 F.4th at 161 ("Because Sidley's representation of BSA did not prejudice Century but disqualifying it would have been a significant detriment to BSA, it was well within the Court's discretion to determine that the drastic remedy of disqualification was unnecessary").

[53] *In re Fleming Cos., Inc.*, 305 B.R. at 393 (noting that "neither of the parties involved in the prior transaction ha[d] complained about [counsel's] representation," the objecting creditor was "not a creditor of either party at the time the transaction took place," and that counsel had "disclosed its involvement in the transaction to the satisfaction of the United States Trustee").

[54] *Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 464 (5th Cir. 2012).

disqualification under section 327(a).[55]  Relatedly, a firm's receipt of a retainer prepetition

does not automatically disqualify it under section 327, despite its status as a creditor.[56]  Circuit

courts have highlighted that "[a]ll professionals become 'creditors' when they perform services

for which the estate must pay.  When the services are performed, the professional is not

thereupon disqualified as not disinterested."[57]  Ultimately, whether a professional who has

received a retainer is disinterested will depend on the totality of the circumstances.[58]

     Courts have determined that a disqualifying potential conflict does exist if the debtor's

attorney is required to review her own legal work during the bankruptcy case.  For example,

where an attorney provided prepetition advice on transactions that would be scrutinized

postpetition, the attorney could be disqualified from serving as the debtors' counsel because

as "a participant in those decisions, it was impossible for [counsel] to review those decisions

with disinterestedness."[59]

---

[55] *See In re Hall*, 520 B.R. 116, 121 (Bankr. D. Kan. 2014) (citing *In re Watson*, 94 B.R. 111, 114 (Bankr. S.D. Ohio 1988), *reconsideration denied*, 102 B.R. 112 (Bankr. S.D. Ohio 1989)); *In re Creative Rest. Mgmt., Inc.*, 139 B.R. 902, 918 (Bankr. W.D. Mo. 1992) ("Each case in which counsel performed pre-bankruptcy services must be evaluated based on the facts presented.  Where, as here, the services were overwhelmingly related to a bankruptcy which was being contemplated throughout the period, no such basis for removal exists").

[56] *Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.)*, 339 B.R. 730, 739 (B.A.P. 9th Cir. 2006) ("The professional's status as a secured creditor by virtue of the retainer does not disqualify the professional from being retained by the estate as required by section 327 of the Code.") (quoting 3 Collier on Bankruptcy ¶ 328.02[4] (15th ed. 2005)).

[57] *Id.* at 739 n.10; *In re Martin*, 817 F.2d 175, 180 (1st Cir.1987) (noting that, despite section 327's apparent bar against the employment of any attorney who is a creditor, any attorney who provides legal services to a debtor "becomes a creditor of the estate just as soon as any compensable time is spent on account.  Thus, to interpret the law in such an inelastic way would virtually eliminate any possibility of legal assistance for a debtor in possession").

[58] *See In re Insilco Techs., Inc.*, 291 B.R. 628, 634 (Bankr. D. Del. 2003) (listing factors to be considered, including whether "terms of an engagement agreement reflect normal business terms . . . whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms-length negotiation[] [and] . . .whether the retention, as proposed, is in the best interests of the estate . . .").

[59] *DeAngelis v. Geisenberger (In re Ressler Hardwoods & Flooring, Inc.)*, No. 1:08-bk-01878MDF, 2010 WL 2342497, at *7 (Bankr. M.D. Pa. June 8, 2010); *aff'd sub nom. Geisenberger v. DeAngelis*, No. 1:10-CV-01660, 2011 WL 4458779 (M.D. Pa. Sept. 23, 2011); *see also In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840 (Bankr. S.D. Ill. 1993) (holding that while representation of the debtor prepetition is not, in itself, a basis for disqualification, and even simultaneous representation of the debtor and its controlling shareholder may be permissible, counsel for the debtor was involved in a prepetition stock redemption transaction that would need to be scrutinized postpetition

In contrast, courts have held that disqualification is not necessary if there is no evidence that counsel's prepetition work for the debtor was improper or would influence counsel's postpetition representation of the debtor.[60]  For example, in one Delaware case, the court determined that disqualification of a debtor's proposed counsel under section 327 was not warranted, despite counsel's representation of the debtor and its subsidiary in a prepetition transaction.  This was because (1) neither of the parties in the transaction had complained about the representation, (2) the complaining creditor was not a creditor of either party at the time of the transaction, and (3) the debtor's counsel had disclosed its involvement in the transaction to the satisfaction of the U.S. Trustee.[61]

Courts also look to other factors to evaluate the significance of a professional's prepetition work.  These factors include the revenue earned by the professional from the prior representation and whether it was a material percentage of the firm's overall revenue,[62] whether the party was a significant client of the firm, whether the prior representation would influence the firm to not engage in its best representation of the debtor, and whether the firm had adequately and sufficiently disclosed the relationship.[63]

(ii)      Professional's Relationship with a Debtor's Principals

---

and that counsel, who played an instrumental role in that transaction, might have difficulty conducting the necessary review).

[60] *See, e.g.*, *In re Am. Int'l Refinery, Inc.*, 676 F.3d at 465 (noting that there was "no evidence in the record indicating that A&R's advice on the treatment of these claims was clouded"); *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 420, 433 (Bankr. N.D. Ill. 2015).

[61] *In re Northwestern Corp.*, 346 B.R. at 88.

[62] *See In re Filenes Basement, Inc.*, 239 B.R. 850, 853 (Bankr. D. Mass. 1999) ("The billings to any one client or the aggregate group is not material to the Firm;s revenues.  Individually, no client represented more than 1% of the Firm's total billings, and the aggregate group represented less than 1.1% of the total billings, of the Firm for calendar year 1998."); *In re Rockaway Bedding, Inc.*, No. 04-bk-14898, 2007 WL 1461319, at *3 (Bankr. D.N.J. May 14, 2007) ("PNC Bank represented less than 1% of Duane Morris LLP's 2006 annual gross revenue.").

[63] *See Kennedy v. Skadden, Arps, Slate, Meagher & Flom LLP (In re Radnor Holdings Corp.)*, 528 B.R. 245 (D. Del. 2014), *aff'd sub. nom. In re Radnor Holdings Corp.*, 629 F. App'x 277 (3d Cir. 2015).

In some circumstances, a professional's representation of other parties closely related to the debtor, such as the debtor's directors, officers, or principal stakeholders, may give rise to a disqualifying conflict.[64] These types of representations "are not a disqualifying conflict per se" but they may become disqualifying "when adverse interests either exist *or are likely* to develop."[65]

In one Third Circuit case, a debtor's law firm simultaneously represented the debtor and the debtor's sole shareholder, president, and CEO, who had personally guaranteed the debtor's secured debts. The Third Circuit ruled that there was no significant risk of an adverse interest developing because the debtor's assets far exceeded the value of secured claims, such that it was substantially certain that all secured claims would be satisfied and the CEO would likely never be called upon to satisfy her guarantees.[66] Therefore, the court determined that despite there being a potential conflict, the possibility that this conflict would become an actual conflict was remote.[67] Similarly, in a bankruptcy case in the Southern District of New York, the debtor's proposed counsel had represented a corporate director prepetition. Proposed counsel was allowed to represent the debtor in the bankruptcy case because the prior representation had

---

[64] *See Rome v. Braunstein*, 19 F.3d 54 (1st Cir. 1994) (denying fee application of debtor's counsel that previously represented both sole shareholder, president of the debtor and certain of his other family members); *In re EZ links Golf, LLC*, 317 B.R. 858 (Bankr. D. Colo. 2004) (denying retention of debtor's proposed counsel because it had close ties and consequential relationships with parties that were inseparable with the debtor).

[65] *In re Jade Mgmt. Services*, 386 F. App'x 145, 149 (3d Cir. 2010) (emphasis in original) (quoting *In re Plaza Hotel Corp.*, 111 B.R. 882, 890 (Bankr. E.D. Cal. 1990); *see also In re Angelika Films 57th Inc.*, 227 B.R. 29, 40 (Bankr. S.D.N.Y. 1998), *aff'd sub nom. Tenzer Greenblatt LLP v. Silverman (In re Angelika Films 57th, Inc.)*, 246 B.R. 176 (S.D.N.Y. 2000).

[66] *In re Jade Mgmt Servs.*, 386 F. App'x at 149; *but see Parker v. Frazier (In re Freedom Solar Ctr., Inc.)*, 776 F.2d 14 (1st Cir. 1985) (reversing lower court's order permitting attorney to continue to represent debtor, debtor's sole shareholder, and a new corporation organized by shareholder where shareholder might be liable for preferential transfers); *In re Grabill Corp.*, 113 B.R. 966, 969 (Bankr. N.D. Ill. 1990), *aff'd sub nom. Grabill Corp. v. Pelliccioni*, 135 B.R. 835 (N.D. Ill. 1991), *aff'd sub nom. In re Grabill Corp.*, 983 F.2d 773 (7th Cir. 1993) ("Representation of more than one person or entity in a matter which ends up in bankruptcy court is fraught with ethical quagmires . . . temporary alliances forged between parties on a matter one day, frequently dissolve shortly thereafter when battle is joined on another matter arising in that same case.").

[67] *In re Jade Mgmt. Servs.*, 386 F. App'x at 149.

terminated before the petition date, and there were no allegations that the prepetition work substantially related to any claims asserted in the bankruptcy cases.[68]  Therefore, the bankruptcy court held that the debtor's proposed counsel was not disqualified under section 327(a).

In contrast to the cases cited above, courts have disqualified counsel based on longstanding relationships and close connections between a debtor's counsel and its principals, when counsel acted in the principals' interests to the detriment of the debtor.[69]

When a professional does not represent an insider, yet has a relationship with an insider, courts evaluate the materiality of the relationship to determine whether a conflict exists.  In one case, the court stated that a firm's former attorney being an insider of the debtor "alone might not cause [us] to find material adversity" requiring disqualification of the firm.[70]  Moreover, courts have acknowledged that the specialized nature of bankruptcy practice means that relationships between professionals and others involved in a bankruptcy case are "inevitable."[71]  And, therefore, even close familial relationships may not require disqualification.  One court examining a familial relationship between debtor's counsel and the debtor explained that the question presented by such a relationship is whether "counsel, as the debtors' nephew, possess[es] an interest such as would color the requisite independent and impartial judgment

---

[68] *In re Level 8 Apparel LLC*, No. 16-bk-13164 (JLG), 2023 WL 2940489, at *16 (Bankr. S.D.N.Y. Apr. 13, 2023).

[69] *In re Rusty Jones, Inc.*, 134 B.R. 321, 344 (Bankr. N.D. Ill. 1991) (finding a conflict of interest under section 327 when a partner at debtor's counsel had significant personal and business relationships with indirect controlling owners of the debtors, leading counsel to act on several occasions to further the goals of these owners to the detriment of the debtor's estate).

[70] *Petralex Stainless, Ltd. v. Bishop Tube Div. of Christiana Metals (In re Petralex Stainless, Ltd.)*, 78 B.R. 738, 746 (Bankr. E.D. Pa. 1987).

[71] *In re eToys, Inc.*, 331 B.R. at 195 (determining that the relationship between counsel for the unsecured creditors' committee and the individual hired to coordinate debtor's liquidation, which extended over many years and involved several bankruptcy cases was "not unusual" and "[i]n fact, given the specialized nature of the bankruptcy practice, it is inevitable.").

required to handle the case."[72]  That court determined that the relationship "does not outweigh the value afforded by his experience and familiarity with the affairs of the debtors."[73]

Courts have held, however, that professionals will not be found to be disinterested due to close relationships with insiders of the debtor if it is not clear whether the professional will be acting in the best interest of the bankruptcy estate.  In a case in which a debtor's counsel had many important and consequential connections with parties who were integral to and somewhat inseparable from the debtor, the court determined that the interrelationship of the parties meant that there were far too many areas where questions could arise as to whether debtor's counsel's action or inaction on behalf of the debtor was driven by what was in the best interest of the estate and its creditors or by what would be in the best interest of the individuals.[74]

(iii)    Professional's Simultaneous Representation of Multiple Debtors

The majority of courts, including the Third Circuit, have held that the representation of multiple related debtors does not alone create a *per se* conflict of interest warranting disqualification under section 327.[75]  The Second Circuit has explained that "[i]nterdebtor issues arise in most large multidebtor bankruptcy cases.  [Therefore,] [r]equiring appointment of independent professionals to represent each individual debtor in all such cases, regardless of the factual circumstances, would burden estates with unjustified and insurmountable costs."[76]

---

[72] *In re Covey*, 57 B.R. 665, 667 (Bankr. D.S.D. 1986).

[73] *Id.*

[74] *In re EZ Links Golf, LLC*, 317 B.R. at 864.

[75] *See In re BH & P, Inc.*, 949 F.2d at 1314 (holding that "the existence of interdebtor claims is . . . no longer an automatic ground for disqualification of counsel . . ."); *In re Adelphia Commc'ns Corp.*, 342 B.R. 122, 128 (S.D.N.Y. 2006) ("[P]resence of intercompany claims between debtors represented by the same counsel does not automatically warrant the disqualification of that counsel") (quoting *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 672-73 (Bankr. S.D.N.Y. 2006)); *In re Int'l Oil Co.*, 427 F.2d 186, 187 (2d Cir. 1970) (the existence of intercompany claims was not enough "to saddle these estates with the expense of separate trustees and trustees' attorneys").

[76] *In re Adelphia*, 342 B.R. at 128.

Instead, courts have determined that only the presence of an "actual" conflict, as opposed to a "potential" conflict, will prevent simultaneous representation of debtors.[77]

As with the analysis of all conflicts under section 327, a determination as to whether a single professional's representation of multiple debtors rises from a potential conflict to a disqualifying actual conflict is highly fact-specific.  The Third Circuit has held that factors to be considered "include, but are not limited to, the nature of the disclosure of conflict made at the time of appointment, whether the interests of the related estates are parallel or conflicting, and the nature of the interdebtor claims made."[78]  However, in addition to these factors, the Circuit has reiterated the general rule that bankruptcy "[c]ourts have been accorded considerable latitude in using their judgment and discretion in determining whether an actual conflict exists."[79]

When multiple debtors have intercompany claims against one another, many courts take a wait-and-see approach before deciding whether additional professionals are necessary.[80] Counsel will not necessarily be disqualified at the outset of a case due to the possibility that a conflict might arise.  Should conflicts surface, then conflicts counsel can be retained.[81]

---

[77] *In re Glob. Marine, Inc.*, 108 B.R. 998, 1004 (Bankr. S.D. Tex. 1987) ("[T]here is a fundamental distinction between the 'potentially' conflicting interests that may arise in every instance of joint representation and an 'actual conflict of interest' as envisioned by § 327(c).").

[78] *In re BH & P Inc.*, 949 F.2d at 1316.

[79] *Id.* at 1315; *see In re Glob. Marine, Inc.*, 108 B.R. at 1004 (finding no actual conflict of interest that would require disqualification of bankruptcy counsel that represented multiple corporate debtor affiliates with a complex web of intercompany debts, who used each other's assets, and guaranteed each other's debts to third parties); *but see Quarles & Brady LLP v. Maxfield (In re Jennings)*, 199 F. App'x 845, 849 (11th Cir. 2006) (holding that an actual conflict arose where "one debtor depleted its assets despite another debtor's secured claim against those assets" forcing counsel "to advance two diametrically opposed goals" that "created an actual dispute") (internal quotation marks omitted).

[80] *In re Adelphia*, 342 B.R. at 128.

[81] *In re Wheatfield Bus. Park LLC*, 286 B.R. 412, 423 (Bankr. C.D. Cal. 2002) ("[I]f a potential conflict of interest arises because of a transaction between two affiliated business entities that are both debtors in bankruptcy cases, the appointment of special counsel to deal with that transaction may be sufficient to permit a single attorney or law firm to represent the related entities as their general bankruptcy counsel.")

23

d.      The Role of Conflicts Counsel

When a debtor's primary counsel cannot handle a matter in a bankruptcy case due to a conflict of interest, courts will often allow the debtor to retain another law firm as conflicts counsel.[82]  In certain circumstances, courts have held that a potential conflict can be avoided by the retention of conflicts counsel when a case begins.[83]  In other instances, courts will wait to see how the case plays out before requiring the retention of conflicts counsel.[84]

The retention of conflicts counsel, however, is not a cure-all for every situation.  Courts have held that conflicts counsel will not provide a solution to conflicts arising when the party with whom the professional has a relationship has a significant and pervasive role in the case.[85]  Situations in which courts have held the appointment of conflicts counsel to be insufficient include those in which the professional has a conflict of interest with the debtor's largest creditor who was central to the reorganization,[86] or when the professional has a conflict with a debtor's major competitor with multiple claims, including more than half the total unsecured claims against the debtor.[87]  Therefore, if the retention of conflicts counsel cannot ensure that a lawyer or law firm will provide the debtor with undivided loyalty, then that lawyer or law firm must be disqualified.

---

[82] *See, e.g.*, *In re Enron Corp.*, No. 01-bk-16034(AJG), 2002 WL 32034346, at *11 (Bankr. S.D.N.Y. May 23, 2002), *aff'd sub. nom. Exco Res., Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, No. 02-cv-5638(BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (describing conflicts counsel as an "acceptable procedure[] to address conflict of interest issues . . . in numerous large bankruptcy cases.").

[83] *See, e.g.*, *In re J&M Dev. of Cass Cnty., Inc.*, No. 04-br-41065-JWV, 2004 WL 1146451, at *3 (Bankr. W.D. Mo. May 19, 2004) (citing *In re BH & P, Inc.*, 103 B.R. 556 (Bankr. D.N.J. 1989)), *remanded*, 119 B.R. 35 (D.N.J. 1990), *aff'd*, 949 F.2d 1300 (3d Cir. 1991)).

[84] *See, e.g.*, *Hassett v. McColley (In re O.P.M. Leasing Servs., Inc.)*, 16 B.R. 932, 939 (Bankr. S.D.N.Y.1982) (citing *Dresner, Gomberg & Co., Inc. v. Kilsheimer (In re G.E.C. Secs., Inc.)*, 331 F.2d 655, 656 (2d Cir. 1964) and *Katz v. Kilshemer*, 327 F.2d 633, 636 (2d. Cir. 1964)).

[85] *See, e.g.*, *In re Amdura Corp.*, 121 B.R. 862 (Bankr. D. Colo. 1990).

[86] *In re Project Orange Assocs., LLC*, 431 B.R. 363, 375.

[87] *In re WM Distribution, Inc.*, 571 B.R. 866 (Bankr. D.N.M. 2017).

**III.    The Court's Ruling on the Debtors' Application to Employ S&C**

    *a.    Summary of the Record*

On December 21, 2022, the Debtors filed an application to retain S&C as counsel (the "S&C Employment Application").[88]  Objections to the S&C Employment Application were due on January 4, 2023.  The hearing was initially scheduled for January 11, 2023, and then later adjourned to January 20, 2023.  Attached as exhibits to the S&C Employment Application were declarations from CEO John Ray (the "Ray Employment Declaration") and S&C partner Andrew G. Dietderich (the "Dietderich Declaration").  The Ray Employment Declaration discusses the Debtors' decision to select S&C as counsel, as well as S&C's rate structure and cost supervision.  The Dieterich Declaration contains, among other things, a short statement that "S&C was engaged by the Debtors for a limited number of matters prior to the Petition Date, chiefly with respect to acquisition transactions and specific regulatory inquiries related to certain U.S. business lines."[89]  For this work, S&C was paid $8,564,487 in total.[90]  The S&C Employment Application and related declarations provide few specifics on the nature of S&C's prior work for the Debtors.

On January 4, 2023, one of the Debtors' customers and creditors filed an objection to the S&C Employment Application.[91]  The objection was amended on January 10, 2023 (together, the "Winter Objection").[92]  The Winter Objection asserts that S&C had an actual conflict of interest arising from:  (1) S&C's relationship with Ryne Miller, described as General Counsel to

---

[88] Dkt. No. 270.

[89] Dkt. No. 270-3 at ¶ 16.

[90] *Id.*

[91] Dkt. No. 369.

[92] Dkt. No. 459.

FTX.US,[93] and Tim Wilson, described as General Counsel to FTX Ventures, Ltd. ("FTX

Ventures"), both of whom were former S&C attorneys and, Winter argues, worked with S&C to

mount an extreme pressure campaign so that Bankman-Fried would place the FTX Group into

bankruptcy; (2) S&C's prepetition representations, which would allegedly need to be

investigated and were not sufficiently disclosed; (3) S&C's preference exposure; and (4) S&C's

representation of potential targets of investigations and litigation to be brought by the estates.

One other creditor joined the Winter Objection.[94]

On January 13, 2023 (after an extension of the objection deadline), the U.S. Trustee filed

an objection to the S&C Employment Application (the "U.S. Trustee Objection").[95]  The U.S.

Trustee Objection raises two concerns.  First, the U.S. Trustee asserts that S&C's disclosures

were "wholly insufficient to evaluate whether S&C satisfies the Bankruptcy Code's conflict-free

and disinterestedness standards."[96]  Second, the U.S. Trustee argues that the scope of S&C's

retention should not include an investigation of the Debtors' downfall given S&C's close

connection to "an insider" of the Debtors (likely a reference to Miller) and because such an

investigation would be more appropriately tasked to an examiner.[97]

On January 17, 2023, Dietderich filed a supplemental declaration containing more robust

disclosures than the initial Dietderich Declaration (the "Supplemental Dietderich Declaration").[98]

The Supplemental Dietderich Declaration discusses how S&C was retained by the FTX Group

---

[93] The Examiner has seen references to both West Realm Shires Inc. and its subsidiary West Realm Shires Services Inc. as doing business as FTX.US.

[94] Dkt. No. 502.

[95] Dkt. No. 496.

[96] *Id.* at 2.

[97] *Id.*

[98] Dkt. No. 510.

and describes the days leading up to the Petition Date.  Dietderich explicitly denies pressuring

Bankman-Fried to commence the bankruptcy cases, as alleged in the Winter Objection.

Dietderich also discusses the negotiation and execution of the document appointing Ray as CEO

(the "Omnibus Authority").  Dietderich explains that Ray was one of several candidates

identified by S&C for the position of Chief Restructuring Officer ("CRO"), but the Supplemental

Dietderich Declaration does not explain why Ray was appointed CEO instead.

According to Dietderich, in the days leading up to the Petition Date, Dietderich and other

S&C attorneys were in contact with various members of the FTX Group leadership, including

Bankman-Fried (represented by his own counsel), Can Sun (General Counsel to FTX Trading

Ltd.), and Zach Dexter (CEO of LedgerX LLC ("LedgerX")).  At this time, Dietderich states that

S&C was also taking direction from Miller and Wilson who, as mentioned, were both senior

legal officers at the FTX Group and prior S&C attorneys.  Notably, in the lead up to the

bankruptcy filing, two FTX Group senior legal officers—Sun and Daniel Friedberg—resigned

from their positions.[99]

The Supplemental Dietderich Declaration explains S&C's relationship with both Miller

and Wilson, as well as two other former S&C associates with more junior roles at the FTX

Group.  Miller was an associate at S&C for several years before being elected to the partnership.

He was a partner of the firm from January 2019 to July 2021, when he left to join the FTX

Group.  Wilson was an associate at S&C from September 2019 to April 2021.  He did not leave

S&C to join the FTX Group.  Instead, he left S&C for another law firm that also did work for the

---

[99] *Id*. at ¶ 15.  With respect to Sun, Dietderich testifies that he was in contact with Sun during November 8, but that
Sun resigned later that same day.

FTX Group, Fenwick & West, LLP ("Fenwick").[100]  The Supplemental Dietderich Declaration does not disclose (and Dietderich may not know) when Wilson joined the FTX Group.

Regarding S&C's prepetition work, the Supplemental Dietderich Declaration contains disclosures, referred to as a *Pillowtex* analysis,[101] regarding the fees received by S&C from the FTX Group for the one-year period prior to the Petition Date.[102]  The purpose of this analysis is to determine whether S&C received a potentially avoidable transfer.  Beyond the preference disclosures, Dietderich also asserts that S&C did not classify the FTX Group as "regular clients," which is a designation the firm uses for clients with whom it has a standing relationship.[103]  In his declaration, Dietderich predicts that work for the FTX Group in 2022 would represent less than 1% of S&C's total revenues in 2022.[104]

As set forth in the Supplemental Dietderich Declaration, starting in July 2021, S&C opened 20 matters prepetition on behalf of the FTX Group.  The most significant representation of the FTX Group, based on the fees generated, was S&C's representation of West Realm Shires Services Inc. ("WRSS") in its bid for substantially all of the assets of Voyager Digital Holdings, Inc. and its debtor affiliates ("Voyager Digital").  S&C was paid approximately $3,128,000 for this work.[105]  S&C also received $1,513,000 for its representation of WRS in connection with its acquisition of LedgerX LLC.  S&C also represented WRS in its formal request to the CFTC to modify WRS' registration as a derivative clearing organization so it could offer margined products directly to participants.  S&C was paid approximately $662,000 for this

---

[100] *Id.* at ¶¶ 62-66.

[101] This analysis is so termed because it is based on the Third Circuit decision *In re Pillowtex, Inc.*, 304 F.3d at 251.

[102] Dkt. No. 510 at ¶ 59.

[103] *Id.* at ¶ 40.

[104] *Id.* at ¶ 44.

[105] *Id.* at ¶ 48.

representation.[106]  And S&C advised the FTX Group in connection with other investigations and inquiries from the CFTC.  One involved inquiries concerning third-party crypto businesses, for which S&C received approximately $220,000.[107]  There was one CFTC matter for which S&C received fees in excess of $1,000,000, which was in connection with the agency's investigation into the FTX Group's Know Your Customer policies and procedures, for which S&C received $1,405,000.[108]

The remaining matters disclosed in the Supplemental Dietderich Declaration were much smaller engagements.  However, two of these comparatively small engagements merit further comment here because they were representations of individuals from the FTX Group's leadership on a personal basis.  First, Dietderich discloses that S&C advised Bankman-Fried in his individual capacity in connection with Hart-Scott-Rodino Act compliance and public reporting obligations, "arising out of a position that had been established in the stock of Robinhood Markets, Inc."[109]  Second, S&C provided tax and estate planning advice to Nishad Singh.  The modest fees for both matters were paid for by Alameda Research LLC ("Alameda").[110]

The Supplemental Dietderich Declaration also discloses S&C's representation of certain parties included on the "interested parties list" that was provided to S&C by the Debtors for the purposes of preparing its disclosures pursuant to Bankruptcy Rule 2014.  For example, the Supplemental Dietderich Declaration discloses that S&C represented BlockFi International Ltd.

---

[106] *Id*. at ¶ 49.

[107] *Id.*

[108] *Id.* at ¶ 48.

[109] Dkt. No. 510 at ¶ 52.

[110] *Id.* at ¶ 51.  The work for Singh amounted to $22,000 in fees.  The work for Bankman-Fried amounted to $195,000 in fees.

and BlockFi, Inc. (collectively, "BlockFi") in a regulatory matter that resulted in a public settlement (the "BlockFi SEC Settlement").[111]  It notes that, at the time the declaration was filed, the matter was substantially complete, and that S&C did not expect any further work.[112]

On the same day that the Supplemental Dietderich Declaration was filed, two additional declarations were filed.  First, Ray filed a supplemental declaration (the "Supplemental Ray Employment Declaration").[113]  The Supplemental Ray Employment Declaration provides additional background on Ray's decisions to retain S&C as primary legal counsel and to engage Quinn Emanuel to, among other things, serve as counsel on matters for which S&C is conflicted. Ray also clarified that, although Miller was still employed at the Debtors, he had no day-to-day responsibilities.  Second, Alexa J. Kranzley, an S&C partner, filed a declaration attaching emails between S&C and the U.S. Trustee regarding S&C's Employment Application.[114]  Those emails, collectively, demonstrate that there were extensive communications between S&C and the U.S. Trustee regarding the additional disclosures in the Supplemental Dietderich Declaration.

On January 17, 2023, the Unsecured Creditors' Committee filed a statement saying that it did not share the U.S. Trustee's concerns regarding the retention of S&C, particularly given S&C's additional disclosures.  This statement also asserts that denial of the S&C Employment Application would cause "disruption and expense" that "would not be in the best interests of the estates."[115]

---

[111] *Id.* at ¶ 76.  BlockFi operates another crypto platform.

[112] *Id.*

[113] Dkt. No. 511.

[114] Dkt. No. 512.

[115] Dkt. No. 508 at ¶ 5.

On January 19, 2023, Dietderich filed a second supplemental declaration that contains minor additional disclosures as well as clarifications to the existing S&C disclosures.[116]

Also on January 19, 2023, Daniel Friedberg filed a declaration purportedly in support of the Winter Objection (the "Friedberg Declaration").[117]  Among other things, Friedberg asserts that S&C had breached ethical obligations and overbilled the FTX Group for certain prepetition work;[118] that S&C had a conflict concerning its prepetition representation of both the "Alameda Group"[119] and BlockFi;[120] that S&C mistakenly filed FTX.US[121] into Chapter 11 when "the group appears to have been solvent";[122] and that S&C erred in making the "unexplainable decision to leave open withdrawals at FTX.US for several days and not secure the crypto assets of the entities *after* filing bankruptcy."[123]

The filing of the Friedberg Declaration prompted the objectors to file an emergency motion asking the Court to adjourn the January 20 hearing on the S&C Employment Application.[124]  Characterizing the Friedberg Declaration as a "bombshell" and its allegations against S&C as "explosive," the objectors opined that "it is in the best interest of our clients and all stakeholders to have additional time to arrange testimony, secure a deposition and, otherwise,

---

[116] Dkt. No. 533.

[117] Dkt. No. 530.

[118] *Id.* at ¶¶ 48-55.

[119] This term is not defined in the declaration.

[120] *Id.* at ¶¶ 56-63.  The declaration also does not include a definition of BlockFi.

[121] Defined in the declaration as WRSS, but, as noted *supra* note 93, the Examiner has also seen references to WRSS' parent entity, WRS, doing business as FTX.US.

[122] *Id.* at ¶ 64.

[123] *Id.* at ¶ 66 (emphasis in original).

[124] Dkt. No. 535.

get to the bottom of this unexpected development."[125]  No other objections, statements, or declarations were filed in connection with the S&C Employment Application.

       *b.*     *The Court Hearing*

     At the January 20 hearing, the Court denied the objectors' emergency motion to adjourn the hearing and declined to consider the Friedberg Declaration.  The Court noted that Friedberg had filed neither a motion nor a joinder to a motion, and his declaration was not filed in support of anyone else's motion.  As a result, the Court held that the Friedberg Declaration was "not . . . appropriate—procedurally it's not appropriate."[126]  In addition, the Court concluded that the declaration was "full of hearsay, innuendo, speculation, rumors; certainly not something I would allow to be introduced into evidence in any event."[127]  The Court also noted that Friedberg was not present in the courtroom.  "He is simply trying to be a witness, I suppose, but witnesses are not allowed unless [they are] here live."[128]

     Also at the hearing, counsel for the U.S. Trustee informed the Court that the U.S. Trustee's objection to the S&C Employment Application was resolved as a result of S&C's extensive additional disclosures.[129]  An S&C partner, an attorney representing the Unsecured Creditors' Committee, and an attorney representing the objectors all addressed the Court on the merits of the S&C Employment Application.

     Based on this record, the Court ruled that, despite the prepetition work performed by S&C, there was no evidence of an actual conflict and no potential conflict that would require

---

[125] Transcript at 17:20, 18:12, 19:6-9, Dkt. No. 558.

[126] *Id*. at 24:1-5.

[127] *Id*. at 24:6-9.

[128] *Id*. at 25:1-3.

[129] *Id*. at 9:5-10:8.

disqualification.  The Court reached this conclusion because nothing in the extensive record before it indicated "any investigation would be required of those transactions with which [S&C] might have been involved" and, even if there were, the "[D]ebtors have retained conflict counsel."[130]  The Court also noted that Ray and four independent directors were appointed "who are all consummate professionals, who were not involved in the company's collapse, and there's no evidence that Miller or Wilson are involved in the management of the [D]ebtors at this time."[131]  Regarding the preference allegations, the Court ruled that "the payments made within the 90-day preference period constitute ordinary course payments" and therefore were not recoverable by the Debtors.[132]  Accordingly, the Court overruled the Winter Objection and granted the S&C Employment Application.  The Court's decision was not appealed by any party.

      *c.*     *Analysis of Court's Ruling*

As directed in the Scope Order, the Examiner reviewed the Court's ruling on the S&C Employment Application to determine whether there were any potential conflicts of interest involving S&C which were not adequately addressed.

At the time of the hearing on the S&C Employment Application, there were just two objections before the Court: The Winter Objection and a joinder to the Winter Objection.  In light of the Friedberg Declaration's procedural and evidentiary deficiencies, the Examiner does not believe that the Court erred by disregarding the Friedberg Declaration.[133]

With respect to each of the objectors' arguments, the Court had "considerable latitude in using [its] judgment and discretion in determining whether an actual conflict exists 'in light of

---

[130] Transcript at 48:18-25, Dkt. No. 558.

[131] *Id*. at 50:3-8.

[132] *Id*. at 51:2-6.

[133] Nonetheless, the allegations contained in the Friedberg Declaration are addressed *infra*, at Section IV.

the particular facts of each case.'"[134]   Likewise, the Court had "wide discretion . . . to approve or

disapprove" S&C's retention based on the existence of a potential conflict.[135]   Indeed, as noted

above, potential conflicts are not *per se* disqualifying.[136]   And any concerns about potential

conflicts can be alleviated through the employment of conflicts counsel.[137]

The Court addressed and responded to each of the objectors' arguments.  First, the

objectors argued that S&C's prepetition work for the Debtors gave rise to potential conflicts.

But, as discussed previously, if there is no evidence in the record that counsel's prepetition work

for a debtor related to or would influence counsel's representation of the debtor, then

disqualification for such work is not warranted.[138]   The Court found that there was nothing in the

record that would merit disqualification of S&C based on its prepetition work.[139]   After carefully

reviewing the record that was before the Court, the Examiner agrees with the Court's conclusion.

Second, the objectors cited S&C's relationship with Miller and Wilson.  To be sure, the

case law reveals that longstanding relationships with insiders can be disqualifying if it is unclear

whether the professional will act in the best interest of the estate or the insider.[140]   Here,

however, the Court concluded that "there's no evidence that Miller or Wilson are involved in the

management of the [D]ebtors at th[e] time [of the retention decision]" and that generally these

---

[134] *In re BH & P, Inc.*, 949 F.2d at 1315 (quoting *In re Star Broad., Inc.*, 81 B.R. at 844).

[135] *In re Marvel Ent. Grp., Inc.*, 140 F.3d at 477; *see also In re BH & P, Inc.*, 949 F.2d at 1315.

[136] *In re Boy Scouts of Am.*, 35 F.4th at 157 (citing *In re Marvel Ent. Grp., Inc.*, 140 F.3d at 476).

[137] *See, e.g.*, *In re J&M Dev. of Cass Cnty., Inc.*, 2004 WL 1146451, at *3 (citing *In re BH & P, Inc.*, 103 B.R. at 564); Transcript at 48:22-24, Dkt. No. 588.

[138] *See, e.g.*, *In re Am. Int'l Refinery, Inc.*, 676 F.3d at 465; *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. at 433.

[139] Transcript at 48:18-25, Dkt. No. 558.

[140] *In re Jade Mgmt. Servs.*, 386 F. App'x at 148; *see also In re Angelika Films 57th Inc.*, 227 B.R. at 40; *In re Rusty Jones, Inc.*, 134 B.R. at 344.

relationships posed no conflicts issues that would require disqualification.[141]  Again, the

Examiner has seen nothing in the record to question the Court's conclusion on this issue.

Finally, the Court addressed the objectors' arguments regarding S&C's receipt of a

prepetition retainer and other payments within the 90-day preference period.[142]  Receipt of a

retainer does not automatically prevent a finding of disinterestedness, as "[a]ll professionals

become 'creditors' when they perform services for which the estate must pay."[143]  In addition, as

noted above, the Court reviewed S&C's *Pillowtex* analysis and determined that the payments

S&C received were within the ordinary course—a dispositive fact that was unchallenged by the

objectors.[144]  Once again, having carefully reviewed the record that was before the Court on this

issue, the Examiner agrees that (1) the retainer paid to S&C prepetition, and (2) all other

payments S&C received during the 90-day preference period provided no basis to disqualify

S&C from representing the Debtors in these bankruptcy cases.

In light of the record before the Court, the Court's analysis of each of the objectors'

arguments, and the wide discretion afforded to the Court in determining whether disqualifying

conflicts exist, the Examiner has concluded that there was no error in the Court's decision

concerning the Debtors' retention of S&C.

## IV.    Analysis of Other Investigations

In accordance with the directive from the Court, the Examiner has also sought to identify

any facts relevant to S&C's alleged conflicts or disinterestedness that were not before the Court

---

[141] Transcript at 50:5-8, Dkt. No. 558.

[142] *Id*. at 50:19-21; 51:2-4.

[143] *In re Dick Cepek, Inc*., 339 B.R. at 739 n.10.

[144] Transcript at 50:24; 51:4, Dkt. No. 558.  Pursuant to section 547 of the Bankruptcy Code, transfers made in the ordinary course of business are non-avoidable.  *See* 11 U.S.C. §547(c)(2).

when it ruled on the S&C Employment Application.  This section summarizes other

investigations and discusses key findings regarding S&C's retention.

      *a.    Quinn Emanuel Investigation*

      Quinn Emanuel conducted an investigation into S&C's prepetition work.  Upon the

instruction of Ray, Quinn Emanuel's mandate was to investigate facts relating to whether, and to

what extent, attorneys at S&C may have advised on, possessed knowledge of, or been made

aware of critical facts concerning these categories of misconduct:[145]

> (a) the alleged commingling of FTX Trading Ltd. ([] "FTX.com") customer
> deposits/funds with the corporate assets of Alameda [] and other [entities in
> the FTX Group]; (b) the alleged misappropriation of FTX.com customer
> deposits/funds to pay for various unauthorized personal and corporate
> expenditures; (c) the allegedly false and misleading statements and
> representations made to FTX.com's customers, specific FTX.com
> investors, FTX.com's outside auditors, lenders and creditors of Alameda [],
> the investing public generally, and Silvergate Bank; (d) an alleged bribe of
> over $40 million paid to Chinese government officials to unfreeze
> approximately $1 billion in cryptocurrency held in various trading accounts
> associated with Alameda; (e) an alleged lack of internal controls at
> FTX.com and [WRSS], among other FTX entities; and (f) an alleged
> conflict of interest that S&C maintained in connection with a potential
> acquisition of BlockFi [by WRSS].[146]

      Quinn Emanuel conducted a thorough investigation.  It ran targeted searches over

approximately 320,000 documents, reviewed approximately 14,000 documents, and interviewed

seven S&C partners who provided prepetition legal services to the Debtors.[147]  When

determining which S&C attorneys' documents to review, Quinn Emanuel looked for lawyers

(1) with substantial prepetition documents, (2) who billed significant hours to the FTX Group

---

[145] Quinn Emanuel, *Report to CEO John Ray and the Independent Directors of the FTX Group Debtors Entities Regarding Sullivan & Cromwell LLP*, Feb. 2024 (the "Quinn Report on S&C"), at 1.

[146] *Id.* at 2.

[147] *Id*. at 4.

prepetition, or (3) who signed an engagement letter with the FTX Group.[148]  Eight attorneys were identified as meeting at least two of the three criteria.[149]  Quinn Emanuel chose not to interview one of these attorneys, though his emails were a part of the 14,000 documents reviewed.[150]

Significantly, however, Quinn Emanuel's investigative mandate had certain limitations. For instance, Quinn Emanuel was not asked to consider and, hence, did not investigate, the broader question of whether S&C had any conflicts of interest that might have disqualified it from serving as counsel under Bankruptcy Code section 327.  This is because S&C's retention had already been approved by the Bankruptcy Court.  As another limitation, Quinn Emanuel did not investigate S&C's representation of either Bankman-Fried or Singh as individuals because it was not charged with that responsibility.  As one final limitation, Quinn Emanuel did not interview individuals outside of S&C, such as Miller, in connection with its investigation into S&C.  Once again, this was because such interviews were beyond the scope of Quinn Emanuel's investigative mandate.

There were also constraints on Quinn Emanuel's ability to collect certain documents.  At times, some S&C attorneys used Signal[151] to communicate with the FTX Group's employees, and often those communications were auto-deleted after a specific period of time.  S&C produced various Signal communications, and the Examiner has reviewed all of those documents.[152]  However, because of the use of Signal auto-deletion features, it is likely—and

---

[148] S&C Investigation Annotated Steps.

[149] *Id*.

[150] *Id*.  Quinn Emanuel did not interview one S&C partner because his documents either were not relevant or entirely overlapped with other partners' emails.  As a result, Quinn Emanuel did not believe that this additional interview would have revealed further relevant information.

[151] Signal is an encrypted messaging system that employees of the FTX Group frequently used for both internal and external communications.  Among other features, Signal provided options for ephemeral messaging.

[152] S&C has represented that they produced all relevant Signal messages that they were able to retrieve.

indeed appears to be the case—that the production of these messages is not and potentially could never be complete.

Notwithstanding these impediments, Quinn Emanuel is comfortable with the scope of its review, including with respect to the Signal messages provided by S&C.  In particular, Quinn Emanuel noted that, in the Bankman-Fried criminal proceedings, no additional e-mail, Signal or other communications with S&C were proffered by the prosecution or the defense.

Through its investigation, Quinn Emanuel did not find any evidence that S&C advised on, had knowledge of, or ignored red flags relating to the six areas of FTX Group malfeasance identified by Quinn Emanuel.

After reviewing the Quinn Emanuel investigation, the Examiner is satisfied with the process and methodology that the firm used, as well as the overall thoroughness of its review. While the scope of the investigation was, out of necessity, not all-encompassing, the Examiner has found no evidence suggesting that he cannot rely on Quinn Emanuel's conclusions.

> b.    *Additional Materials Regarding S&C*

The Examiner also reviewed and analyzed materials and allegations put forward by former employees, third-party observers, and other parties in interest concerning S&C's alleged conflicts of interest (the "Additional S&C Materials").[153]

The Additional S&C Materials contain many factual allegations.  Some of them were before the Court when it ruled on the S&C Employment Application, such as S&C's relationship with Miller.  For the reasons discussed above, the Examiner has concluded that the Court did not

---

[153] These materials include: Dkt. No. 530; *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1; Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5; and *Vara v. FTX Trading (In re FTX Trading)*, No. 23-2297 (3d Cir.), Dkt. No. 27.

err in determining that the facts before it did not require the disqualification of S&C from serving as Debtors' counsel under the applicable rules.  Other allegations contained in the Additional S&C Materials appear to be conclusory, such as allegations regarding S&C's purported knowledge of unlawful conduct.  These statements are both generally unsupported by specific factual evidence and contradicted by Quinn Emanuel's findings in its investigation.

The Examiner also disagrees with certain other allegations and conclusions in the Additional S&C Materials.  For example, certain academics have argued that S&C's cooperation with prosecutors may have violated S&C's duties to the Debtors, wasted estate assets, or misled Bankman-Fried.[154]  Specifically, these scholars allege that, prior to the Petition Date, S&C violated its duty of confidentiality, candor, and loyalty to its client by disclosing to prosecutors, without proper authorization from the FTX Group, that a crime had occurred at the company.[155] But the Examiner has not seen any email or other document in which S&C expressly disclosed a crime to prosecutors or regulators prepetition.  The Examiner has seen communications disclosing to the government that FTX.US had discovered an anomaly on its balance sheet—that there were not enough assets to cover liabilities.[156]  Those disclosures do not conclude that the anomaly amounted to, or was the result of, a crime.[157]  Notably, these prepetition disclosures were made either by Miller himself or by S&C at the direction of Miller while he was still acting

---

[154] *See* Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, at 5, 6, 31, 42, 52, 53, https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5; *Vara v. FTX Trading (In re FTX Trading)*, No. 23-2297 (3d Cir.), Dkt. No. 27, at 32-35.

[155] *See* Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, at 5, 6, 31, 42, 52, 53. https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5; *Vara v. FTX Trading (In re FTX Trading)*, No. 23-2297 (3d Cir.), Dkt. No. 27, at 5.

[156] Further discussion of this anomaly, or "hole," is found *infra,* at Part 6, Section V.

[157] *See* emails from Ryne Miller to various regulators, Nov. 9, 2022, Quinn Emanuel Interview Documents, F10705-E035453307.

as General Counsel to FTX.US.[158]  Regarding their allegations about S&C's ethical duties, the academics appear to conflate the FTX Group and Bankman-Fried, whereas in fact there is a distinction between a corporate client and its principals.  At that time, S&C was representing the FTX Group, not Bankman-Fried.  Significantly, Bankman-Fried was then separately represented by sophisticated, experienced counsel.  Furthermore, the FTX Group's decision, in consultation with S&C, to make a swift and decisive self-disclosure concerning the balance sheet anomaly is consistent with the prudent and common strategy for companies to promptly self-disclose corporate misconduct, and may have helped preserve estate resources by enabling the company to earn cooperation credit.[159]  Lastly, the Examiner has confirmed that, since Ray's appointment, S&C's continued cooperation with prosecutors has been at Ray's direction.

Other factual assertions in the Additional S&C Materials are not relevant to the Examiner's conflicts analysis.  For example, some of those allegations criticize S&C's postpetition work, including the sales of certain cryptocurrency assets, and the decision to wind down certain operations rather than maintaining those businesses as going concerns.[160]  But these business decisions were made by Ray and the independent directors, not S&C.  And all asset sales were approved by the Court after notice to parties in interest—including the U.S. Trustee

---

[158] *See id.*  The Examiner has also seen a Signal message where Miller informed various FTX Group executives, including Bankman-Fried, that he was reporting the financial anomaly to regulators and Bankman-Fried did not protest the decision.  *See* Signal message from Ryne Miller to Gary Wang, Bankman-Fried, Joseph Bankman, Mark Wetjen, Zach Dexter, Nishad Singh, Nov. 9, 2022.  Instead, Bankman-Fried apologized to the other chat participants and directed them to continue to rely on Miller for information related to FTX.US.

[159] *See Memorandum from the Office of the Deputy Attorney General*, U.S. Dep't of Justice (Sept. 15, 2022) (requiring companies to produce "on a timely basis" facts and evidence about misconduct in order to receive full cooperation credit) (emphasis in original).  "Cooperation is a mitigating factor, by which a corporation—just like any other subject of a criminal investigation—can gain credit in a case that otherwise is appropriate for indictment and prosecution . . . Credit for cooperation takes many forms and is calculated differently based on the degree to which a corporation cooperates with the government's investigation and the commitment that the corporate demonstrates in doing so."  U.S. Dep't of Just., Just. Manual § 9-28.700 (2024).

[160] *See e.g.,* Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, at 54-57, 59, https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5.

and the Unsecured Creditors' Committee—and opportunity for hearings.  For at least some of the sales, no objections were filed.  The Examiner has seen no evidence that these postpetition business decisions were made by S&C.  Moreover, the Examiner has uncovered no proof suggesting that these core business decisions were unreasonable or that the Court's approval of these transactions was flawed in any respect.

The Additional S&C Materials also criticize the amount of fees that S&C has been paid as Debtors' counsel.  Even if that complaint were well grounded, it is irrelevant to this inquiry.  The fees that S&C has incurred postpetition are not germane to the section 327 analysis, and a detailed assessment of these fees is not within the scope of the Examiner's review.  Even so, the Examiner notes that S&C's fees are (1) publicly disclosed in monthly fee statements and quarterly fee applications that include detailed time records, and (2) subject to review by the Court, the U.S. Trustee, a court-appointed fee examiner, the Unsecured Creditors' Committee, and all other parties in interest.  Other than some minor adjustments requested by the fee examiner or the U.S. Trustee, no objections have been filed by any party in interest in response to S&C's monthly fee statements or quarterly fee applications, and the quarterly applications all have been approved by the Court on an interim basis.

Notwithstanding the above, the Examiner has identified several categories of allegations within the Additional S&C Materials that merit further discussion.

## V.    Conflicts That S&C Allegedly Did Not Adequately Disclose To the Court

### a.    *Representation of Bankman-Fried in Connection with His Purchase of Robinhood Stock*

The Supplemental Dietderich Declaration discloses one instance where S&C represented Bankman-Fried prepetition in his individual capacity.  In that declaration, Dietderich states that, "[u]nder the supervision of Dan Friedberg, the senior legal officer of the FTX [G]roup, and Ryne

Miller, General Counsel of FTX[.]US, S&C advised Mr. Sam Bankman-Fried in connection with Hart-Scott-Rodino compliance and public reporting obligations arising out of a position that had been established in the stock of Robinhood[.]"[161]  S&C received fees and expenses for this matter of approximately $195,000.  The payment was arranged and paid for by Alameda.[162]  The Supplemental Dietderich Declaration further states that, other than this representation and one other individual representation of Singh, S&C did not represent or perform services for any of the Debtors' current or former officers or directors, including Bankman-Fried.[163]

A letter from the USAO-SDNY to U.S. District Court Judge Lewis Kaplan revealed that, through an entity called Emergent Fidelity Technologies Ltd., ("Emergent"), a special purpose entity owned primarily by Bankman-Fried, Bankman-Fried acquired approximately $500 million worth of shares of Robinhood Markets, Inc. (the "Robinhood Shares") using misappropriated FTX Group customer funds.[164]  And because the prosecutors found no public connection between Emergent and the Debtors, they seized the Robinhood Shares after a showing of probable cause that they were the proceeds of wire fraud and property involved in money laundering.[165]

The Additional S&C Materials contain various allegations with respect to S&C's involvement in this acquisition of the Robinhood Shares (the "Robinhood Transaction"). Specifically, the materials assert that S&C acted as both personal counsel for Bankman-Fried and

---

[161] Dkt. No. 510 at ¶ 52.

[162] *Id.*

[163] *Id.* at ¶ 53.

[164] *United States v. Samuel Bankman-Fried* ("SBF Criminal Case"), No. 22-cr-00673 (S.D.N.Y.) (LAK), Dkt. No. 53; *see also* Robinhood Markets, Inc., (Form SC 13D) (May 12, 2022).

[165] SBF Criminal Case, Dkt. No. 53.

primary counsel for Emergent.[166]  In contrast to the statement in the Supplemental Dietderich

Declaration that S&C merely advised on "Hart-Scott-Rodino compliance and public reporting

obligations,"[167] the Additional S&C Materials claim that S&C provided expertise and advice to

both Bankman-Fried and Emergent regarding the structuring of the Robinhood Transaction

itself.[168]  Therefore, based on this work by S&C, the Additional S&C Materials allege that S&C

knew how the Robinhood Shares were purchased and with what funds—in other words, that

S&C was aware of the misappropriation of customer funds.[169]

The Examiner has seen no evidence that S&C acted as the primary counsel for Emergent

or that S&C's advice regarding the Robinhood Transaction involved the structuring of the

transaction itself.  However, there does not appear to have been any independent examination

into S&C's work on the Robinhood Transaction.  The Quinn Emanuel investigation did not

involve any review of S&C's representation of Bankman-Fried or Singh individually.  But

references to the Robinhood Transaction did arise during Quinn Emanuel's document review and

interviews.[170]  For instance, when he was interviewed by Quinn Emanuel, S&C Partner Mitch

Eitel, explained that he and S&C represented Bankman-Fried in his personal capacity by

advising on an SEC 13D filing and related Hart-Scott-Rodino compliance.[171] Quinn Emanuel

---

[166] *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1 at ¶ 176; Dkt. No. 530 at ¶ 16.

[167] Dkt. No. 510 at ¶ 52.

[168] *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1 at ¶ 198 ("This was, therefore, no simple transaction, and despite S&C's expertise and advice to Bankman-Fried on the transaction, the purchase was not arranged through sophisticated financial institutions but rather over the course of 29 separate trading days over a period of two months via Emergent.").

[169] *Id*. at ¶ 201 ("S&C represented at the same time both Emergent, the special purpose vehicle used to accomplish the share purchase (such that S&C knew how the shares were purchased and with what funds) and also Bankman-Fried who purchased the Robinhood shares.").

[170] This was confirmed to the Examiner during his meeting with Quinn Emanuel on April 1, 2024.

[171] Quinn Emanuel, *Memorandum re: Interview of Mitch Eitel*, July 28, 2023, at 3.

asked Eitel about an email chain in which Miller discussed various options for structuring a transaction to ensure that Alameda (which initially held some of the Robinhood Shares) would not be identified on the SEC 13D form.  Indeed, Miller explicitly told S&C that "[w]e have a desire not to identify Alameda."[172]  In his interview, Eitel explained to Quinn Emanuel that, in the private equity and hedge fund space, it is not unusual for companies to want to remain anonymous and, therefore, Miller's request did not seem aberrant.

Beyond this brief exchange in the Eitel interview, no investigation appears to have been done into the Robinhood Transaction and, in particular, there has been no larger review of S&C's role in the transaction.  As a result, there are no findings regarding the extent to which, if at all, S&C (1) advised on the transaction itself, (2) had access to and received inside information regarding the transaction (or the FTX Group more generally), or (3) simultaneously advised Emergent and Bankman-Fried.  While Quinn Emanuel did not otherwise find any evidence that S&C advised on, possessed knowledge of, or was made aware of facts relating to the FTX Group's misappropriation of customer funds, Quinn Emanuel's investigation did not include a full analysis of the Robinhood Transaction.

In fact, only S&C itself appears to have looked further into the Robinhood Transaction postpetition.  S&C conducted this inquiry as part of its efforts to recover the Robinhood Shares for the benefit of the bankruptcy estates, as the stock represented one of the estates' largest monetizable assets.

Given that no prior investigation has been conducted into the Robinhood Transaction, the Examiner recommends an investigation into the details of this transaction to confirm that there were no conflicts of interest on account of S&C's work (see *infra,* at Section VIII).

---

[172] Email from R. Miller to J. Hearn, Apr. 20, 2022, Quinn Emanuel Interview Documents, F10705-E016516334.

b.      *LedgerX Transaction*

Debtor Ledger Holdings, Inc. ("LHI") was a holding company for non-debtor LedgerX, which operated a CFTC-regulated Bitcoin options exchange and clearing house.[173]  In October 2021, WRS purchased LedgerX through the acquisition of LHI's shares for approximately $300 million.[174]  As noted above, the Supplemental Dietderich Declaration discloses that S&C represented WRS in this transaction.

In December 2022, the Debtors commenced a sale process for the LedgerX business.[175]  In January 2023, the Debtors received six non-binding indications of interest for the purchase of LHI's interests in LedgerX, or portions thereof, ranging from $500,000 to $90 million.[176]  In March 2023, two final bids were received.[177]  The Debtors received a $35 million bid from M 7 Holdings, LLC ("M 7 Holdings"), a wholly-owned subsidiary of Miami International Holdings, Inc. ("MIAX"), and a $14 million bid from another bidder.[178]  Notably, MIAX was a major shareholder of LHI up until the WRS acquisition.[179]  In addition, various directors and officers of MIAX also served on the board of LHI until the time of the WRS acquisition.[180]

In May 2023, LHI was sold to M 7 Holdings in a deal that provided approximately $50 million in proceeds to the Debtors.[181]  The sale agreement was (1) approved by the Debtors'

---

[173] Dkt. No. 233 at ¶ 3.

[174] *Id.*; Alexander Saeedy, *FTX Poised for $250 Million Loss on LedgerX Sale*, Wall St. J., (Apr. 25, 2023), https://www.wsj.com/articles/ftx-poised-for-250-million-loss-on-ledgerx-sale-d591e99f, *archived at* https://perma.cc/832F-96Q5.

[175] Dkt. No. 233.

[176] *See* Dkt. No. 1344 at ¶ 13; S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 104.

[177] *See* Dkt. No. 1344 at ¶ 14.

[178] *See id.* at ¶ 14; Dkt. No. 1342, at 2; S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 104.

[179] *See* Dkt. No. 1342, at 2.

[180] *See id.*

[181] *See* Dkt. No. 4862, at 26.

board, (2) subject to review and objection by parties in interest (with no objections received), and (3) approved by the Court.  In order to obtain Court approval, the Debtors presented evidence that the sale transaction was the "highest or otherwise best bid," and because no one objected to the proposed sale this evidence was uncontested.[182]  It is outside the scope of the Examiner's mandate to evaluate the appropriateness of this sale transaction.  However, the Debtors' inability to obtain a sale price anywhere near the price that WRS paid for the assets less than two years earlier suggests that WRS overpaid for LHI in October 2021.  As such, the prepetition transaction, which S&C advised on, could be the subject of an avoidance action.  In fact, S&C appears, at least preliminarily, to have concluded as much because, in April 2023, it drafted a clawback complaint against the former shareholders of LHI that sold their interests to WRS.

The Court specifically contemplated the possibility that one or more of the transactions that S&C advised the Debtors on prepetition could become the subject of a postpetition investigation.  The Court held that, if "any investigation would be required of those transactions with which Sullivan & Cromwell might have been involved . . . debtors have retained conflict counsel to conduct *any investigation* that might touch on those issues."[183]  Thus, the Court approved S&C's retention on the basis that, if a postpetition investigation were required into any transaction that S&C was involved in, conflicts counsel would be retained for that work.[184]  As a result, no later than when S&C determined that there might a potential clawback action, the investigation into WRS' prepetition purchase of LHI should have been handed over to Quinn Emanuel as conflicts counsel.  Quinn Emanuel attorneys have confirmed that they were not involved in any such investigation.

---

[182] Dkt. No. 1344 at ¶ 17.

[183] Transcript at 48:19-24, Dkt. No. 558 (emphasis added).

[184] *Id*. at 48:18-25.

That being said, while S&C failed to turn over the investigative work related to WRS' prepetition purchase of LHI to Quinn Emanuel, it is unclear whether that has had any impact whatsoever on the estates.  The May 2023 sale agreement between the Debtors, M 7 Holdings, and MIAX included the sale of the Debtors' claims against former shareholders of LHI associated with M 7 Holdings, including MIAX.[185]  Therefore, the sale agreement essentially released those former LHI shareholders and reduced the amount of funds that could be recovered in any clawback claim.[186]  Importantly, M 7 Holdings would not have agreed to purchase LedgerX absent the purchase of these claims.[187]  Therefore, while it appears that S&C should have handed over this work to Quinn Emanuel, many of the claims that might have been pursued in an avoidance action were released, and the sale of claims was ultimately beneficial for the estates because, as was noted in the sale hearing, without it, the Debtors could not have consummated this sale of LedgerX.

Regarding the releases, it has also been asserted that the LedgerX sale included a release of any legal malpractice claims that LedgerX may have had against S&C, which would include any claims derived from what S&C allegedly knew about the fraud at the FTX Group.[188]  The basis for this argument is that the sale released "directors, officers, employees, [and] agents" of

---

[185] *See* Dkt. No. 1342-1 § 5.3(a).  As noted above, all parties had notice and opportunity to object to these releases, but no objections were filed.  Notably, MIAX would not have entered into the purchase agreement absent the purchase of these claims.  *See* Dkt. No. 1344 at ¶ 26; Transcript at 7:16-22, Dkt. No. 1436.

[186]  Dkt. No. 1344 at ¶ 17 (describing the scope of the claims purchased and noting that it covers former shareholders that collectively received approximately 37% of the proceeds of WRS' acquisition).

[187] Transcript at 7:16-22, Dkt. No. 1436.

[188] Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, at 57, https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5.

LedgerX, and S&C could be considered an "agent" of LedgerX.[189]  However, it is not obvious that the term "agent" is meant to include a law firm or any other professional, because the rest of the phrase refers to directors, officers and employees.  Furthermore, S&C was not acting as LedgerX's counsel in either the prepetition or postpetition sale transaction.  Prepetition, S&C represented WRS.  Postpetition, S&C represents the Debtors, but LedgerX is not a Debtor, and the sale transaction was a sale of debtor LHI's equity interests rather than a sale of non-debtor LedgerX's assets.  Notably, in a meeting with the Examiner, S&C represented that it does not view itself as an "agent" that was released by this language.  The Examiner expects that S&C would stand by this stated position.

Nonetheless, as noted above, the Examiner believes that S&C should have turned over to Quinn Emanuel, as conflicts counsel, the postpetition investigation into WRS' prepetition acquisition of LedgerX.  Accordingly, the Examiner is recommending a further investigation. Specifically, the Examiner notes that not all claims against LHI's former shareholders were sold in the postpetition transaction.[190]  The Debtors did retain the right to pursue claims against other former shareholders (i.e., those that are not associated with M 7 Holdings), and any investigation into these claims should not be conducted by S&C.  Instead, the Examiner recommends he conduct an investigation into the potential claims against the non-released shareholders.  This investigation will determine if there are any claims, including any avoidance action claims,

---

[189] *Id.*; Dkt. No. 1433 at ¶ S (defining "Released Parties" to include "LedgerX's current directors, officers, employees, agents and the predecessors, successors and assigns of each of the foregoing (in each case, solely in their capacity as such)").

[190] *See* Dkt. No. 1343 at ¶ 8 ("[T]he substantial majority of the potential causes of [action] held by the Debtors in relation to the LedgerX Business, including in connection with the acquisition of Seller by West Realm Shires Inc., will be preserved by the Debtors."); Dkt. No. 1344 at ¶ 17 (describing the scope of the claims purchased and noting that it covers former shareholders that collectively received approximately 37% of the proceeds of WRS' acquisition).

against the non-released shareholders.  This investigation may also provide additional insight

into how the LedgerX transactions unfolded (*see infra,* at Section VI).

    *c.*    *BlockFi*

As noted above, the Supplemental Dietderich Declaration discloses that S&C represented

BlockFi in a regulatory matter, and that the representation resulted in the BlockFi SEC

Settlement.[191]  Although the Court was aware of this representation at the time of S&C's

retention, and the representation was by then substantially complete, questions have been raised

regarding this representation.[192]

For instance, the Friedberg Declaration, which the Court appropriately did not consider

when ruling on the S&C Employment Application, makes allegations regarding the BlockFi

representation.  Specifically, Friedberg contends that an entity in the "Alameda Group" loaned

$200 million to BlockFi with an option to purchase BlockFi.[193]  Friedberg also alleges that,

before the Petition Date, S&C provided "Alameda advice with respect to diligence on whether

the option should be exercised."[194]  In connection with this representation, Friedberg accused

S&C of failing to advise the Alameda Group that no exemption under the Securities Act of 1933

could apply to Alameda's exercise of the purchase option.[195]  Friedberg also claimed that, if

S&C had advised Alameda on this issue, then Alameda "would not have entered into the loan

agreement with BlockFi in the first place."[196]

---

[191] Dkt. No. 510 at ¶ 76.

[192] *See, e.g., Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1 at ¶¶ 11-16.

[193] Dkt. No. 530 at ¶ 57.

[194] *Id.* at ¶ 58

[195] *Id.* at ¶¶ 58-63.

[196] *Id.* at ¶ 63.

On its face, this argument is questionable because Friedberg never asserted that S&C advised Alameda on the underlying loan agreement, but rather only on the exercise of the purchase option.  And Friedberg's allegations appear to be factually incorrect in several respects.  Significantly, Quinn Emanuel's investigation confirmed that S&C did not represent either BlockFi or the FTX Group in connection with the loan agreement or the related purchase option.[197]  In connection with his investigation, the Examiner has seen an email communication regarding the loan agreement that shows that another sophisticated law firm—not S&C—was representing the FTX Group in connection with that transaction.[198]

However, S&C did discuss the BlockFi SEC Settlement and related regulatory issues with the FTX Group,[199] a fact that does not appear to have been before the Court when it ruled on the S&C Employment Application.  That said, because S&C had limited involvement in this transaction, and S&C was not acting as legal counsel to either party to the transaction, this fact likely would <u>not</u> have impacted the Court's ruling on S&C's disinterestedness.  Accordingly, the Examiner does not recommend further investigation regarding this representation.

        *d.*      *Events Leading Up to the Bankruptcy Filings*

S&C did a substantial amount of work for the Debtors leading up to the Petition Date. For the reasons discussed above, (*see supra*, at Section II(c)(2)(i)), the work S&C did to prepare the Debtors for bankruptcy did not create an actual conflict of interest so long as the work was

---

[197] Quinn Report on S&C, at 8.

[198] *See* email from Can Sun to various Blockfi email addresses, attorneys at Davis, Polk & Wardwell LLP, and lawyers at Latham & Watkins LLP, dated June 24, 2022, with the subject line "RE: BlockFI <> FTX – Loan Agreement."

[199] Quinn Report on S&C, at 8.

not improper, illegal, or negligent.[200]  However, some observers have alleged such impropriety

and argued that (1) S&C hand-picked Ray as CEO to lead the Debtors' restructuring efforts

because he is loyal to S&C, (2) S&C pressured Bankman-Fried to resign from his position at the

company, (3) S&C induced Bankman-Fried to resign by lying to him, (4) Miller inappropriately

pushed for the Debtors to file Chapter 11 in the United States so that S&C could act as counsel,

and (5) S&C erred in deciding to include FTX.US but to exclude LedgerX from the Chapter 11

filings.[201]  None of these allegations, to the extent they have any validity, were before the Court

when it ruled on the S&C Employment Application.

Regarding Ray's appointment, on November 11, 2022, Bankman-Fried signed the

Omnibus Authority pursuant to which Ray was appointed CEO.  S&C had recommended Ray,

someone who does have a professional relationship with an attorney at S&C.[202]  But that fact did

not create an actual conflict of interest.[203]  The Examiner has seen no evidence that the

relationship between Ray and that S&C attorney (1) reflects anything more than a history of

professional engagements, or (2) was not fully disclosed to the Court.  However, as noted above,

Ray was initially proposed to serve as the Debtors' CRO.  It is not clear why Ray was appointed

CEO instead of CRO as originally planned, and it is not apparent who made that decision or

why.  Ray confirmed that he was not involved in these negotiations or the decision to appoint

---

[200] *See In re Hall*, 520 B.R. at 121 (citing *In re Watson*, 94 B.R. at 114); *In re Creative Rest. Mgmt., Inc*., 139 B.R. at 918; *see also, e.g.*, *In re Am. Int'l Refinery, Inc.*, 676 F.3d at 465; *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. at 433.

[201] *Vara v. FTX Trading (In re FTX Trading)*, No. 23- 2297 (3d Cir.), Dkt. No. 27, at 28-29; Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5; *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S.D. Fla.) (KMM), Dkt. No. 1, at ¶ 32; Dkt. No. 530 at ¶¶ 33-37, 64.

[202] Dkt. No. 510 at ¶ 68.

[203] *In re eToys, Inc.*, 331 B.R. at 195.

him CEO instead of CRO.  When the Examiner asked S&C attorneys about this decision, the

S&C lawyers pointed to Bankman-Fried's inexperience with corporate restructurings, which is

the reason why CROs are usually appointed.  Nonetheless, as noted above, Bankman-Fried

signed the Omnibus Authority and, in consultation with his counsel, chose to appoint Ray CEO.

In addition, S&C was not representing Bankman-Fried in the days leading up to the

Petition Date.  Bankman-Fried had retained other sophisticated counsel to represent him in his

individual capacity.[204]  Bankman-Fried's personal attorneys were involved in the drafting of the

Omnibus Authority, were able to advise Bankman-Fried on the terms of the Omnibus Authority,

and could explain to him the consequences of signing it.  Although the Examiner has reviewed

emails between S&C and Bankman-Fried where Bankman-Fried's personal counsel was not

included, these appear to be typical communications between a lawyer and a corporate client's

principal where the lawyer provides advice to the corporate client.  In particular, these emails did

not relate to the Omnibus Authority and do not appear to have pressured Bankman-Fried in any

way to either resign from his position as CEO or commence the bankruptcy cases.[205]  The

Examiner has seen no evidence that S&C acted improperly in connection with Bankman-Fried's

execution of the Omnibus Authority.

To the extent S&C advised the Debtors to file for bankruptcy in the United States, this

advice appears sound.  The United States has a well-developed Bankruptcy Code and system.

---

[204] Dkt. No. 510 at ¶ 19; Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, at 29, 31, 32 (providing screenshots of emails that include Bankman-Fried's personal attorneys), https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5.

[205] *See, e.g.*, Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11* (Mar. 13, 2024). U of Penn, Inst. for Law & Econ Research Paper No. 24-08, at 29, 31, 32 (providing four screenshots of emails from S&C attorneys to Bankman-Fried), https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5.

For many reasons, corporations often prefer to file for bankruptcy relief in the United States.[206]
To cite just one example, the Bankruptcy Code places an automatic and immediate worldwide
moratorium on adverse creditor actions against debtors.[207]  Many jurisdictions, including the
Bahamas, do not offer debtors the same degree of protection.[208]  Of course, there are times when
filing for bankruptcy in the United States might not be feasible or advisable.  But the Examiner
has seen nothing to suggest that it would have been prudent for the Debtors to avoid filing these
bankruptcy cases in the United States.

Finally, S&C has been criticized for excluding LedgerX from the bankruptcy filing and
also for including LedgerX's parent company, FTX.US,[209] in the filing.[210]  More specifically,
S&C has been accused of (1) leaving LedgerX out of the bankruptcy filing in order to obtain a
larger retainer, and (2) including FTX.US in the filing for the same reason.[211]  In the first
instance, S&C did not make any final decisions as to which entities would file for bankruptcy.
While S&C provided advice, Ray and the directors made the final decision.  Nonetheless, in light
of these assertions, the Examiner has tried to reconstruct what was known when S&C was

---

[206] Steven Church & Jeremy Hill, *Bankruptcy-Friendly U.S. Extends Lead as Haven of Foreign Filers*, Bloomberg, (July 21, 2021), https://www.bloomberg.com/news/articles/2021-07-21/bankruptcy-friendly-u-s-extends-lead-as-haven-of-foreign-filers?embedded-checkout=true, *archived at* https://perma.cc/H8KG-SQEA (discussing major filings of foreign corporations and noting that it is commonly agreed that America has company-friendly bankruptcy rules).

[207] *See* 11 U.S.C. §362.

[208] *See* Companies (Winding Up Amendment) Act, § 192, 2011 (Act No. 53/2011) (Bah.), Official Gazette of the Bahamas, Section 192 (requiring parties to file a motion to stay proceedings).

[209] As noted elsewhere, the Examiner has seen both WRS and WRSS referred to as "FTX.US."

[210] Dkt. No. 530 at ¶¶ 33-37 (stating that Ryne Miller insisted on filing in the United States so that S&C could do the work but that FTX.US should not have been included in the bankruptcy filing).

[211] *Garrison v. Sullivan & Cromwell, LLP*, No. 24-cv-20630 (S. D. Fla.) (KMM), Dkt. No. 1 at ¶¶ 9, 33 (alleging that funds were moved to LedgerX in order to secure receipt of a retainer to S&C); Dkt. No. 530 at ¶ 36 (stating that FTX.US was included in the bankruptcy because it had the cash to pay S&C its retainer).

preparing the bankruptcy filings to determine if there was a sound basis for the advice to exclude LedgerX and to include FTX.US in the bankruptcy cases.

At the time of filing, Ray believed that LedgerX was solvent and a noteworthy exception to the Debtors' general lack of corporate controls.[212]  As for FTX.US, the Examiner has seen evidence that, before the Petition Date, the Debtors' employees could not produce a reliable account of FTX.US' assets or customer balances, that certain employees believed there was a significant "hole" in the FTX.US balance sheet, and that those financial discrepancies were reported to regulators.[213]  The Examiner has seen no evidence that calls into question the decision to leave LedgerX out of the bankruptcy filings but to include FTX.US.

> e.    *Representations to Regulatory Authorities*

The Supplemental Dietderich Declaration discloses that S&C had advised the Debtors prepetition on responses to certain information requests from U.S. regulatory authorities, including the CFTC.[214]  But the Additional S&C Materials contain allegations that S&C made misrepresentations in these submissions and, moreover, that in working on the responses S&C became aware of the fraud at the FTX Group.  For example, S&C advised LedgerX concerning a submission LedgerX made to the CFTC, stating that Alameda "has no . . . special or unique

---

[212] *See* The First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges ("First Ray Report"), Dkt. No. 1242-1, at 11 (noting that LedgerX was an isolated exception to the Debtors' overall lack of independent or experienced finance, accounting, human resources, information security or cybersecurity personnel or leadership); Dkt. No. 24 ("Ray First Day Declaration"), at ¶ 13 ("Based on the information that I have reviewed at this time, LedgerX is solvent.").

[213] S&C, *Memorandum re: Interview of Ryne Miller*, Nov. 17, 2022 ("Miller Interview Memo") (discussing realization that there might be a hole in the FTX.US balance sheet); S&C, *12.9.2022: Tim Wilson Interview Notes*, Dec. 9, 2022, at 12-13 (recounting conversation with Bankman-Fried regarding $45 million hole in FTX.US balance sheet identified by other employees); S&C, *12.8.2022 Adrienne During Interview Notes*, Dec. 8, 2022 (the "During Interview Notes"), at 7-8 (recounting discussion of a $40 million hole); emails from Ryne Miller to various regulators, Nov. 9, 2022, Quinn Emanuel Interview Documents, F10705-E035453307; *see also infra,* at Part 6, Section V.

[214] Dkt. No. 510 at ¶ 50.

access to the exchange, to exchange data, or to any other feature of the exchange."[215]  This

statement by LedgerX was ultimately determined to be false, and thus it has been alleged that

S&C's work in advising on this submission exposed it to the fraud at the FTX Group.[216]  Prior

investigations have concluded otherwise.

    As previously discussed, Quinn Emanuel thoroughly investigated S&C's prepetition

work to determine whether S&C either knew of or was willfully blind to the fraud at the FTX

Group.  This comprehensive investigation reviewed the legal advice and services S&C provided

in connection with information requests from regulatory authorities, including the CFTC.[217]  As

part of this investigation, Quinn Emanuel analyzed communications and documents where S&C

attorneys helped prepare responses to CFTC inquiries for the Debtors.[218]  Quinn Emanuel found

no evidence to suggest that S&C attorneys knew that any of the Debtors' submissions to

regulators contained false or misleading statements.  Beyond that, Quinn Emanuel found that

S&C was not made aware of any facts that would have revealed to it the fraud at the FTX Group.

Quinn Emanuel also asked S&C partners about their regulatory advice, and the latter confirmed

that (1) the work they performed did not entail verifying the factual accuracy of statements made

by the FTX Group; (2) at the time, they had no reason to question the veracity of the information

they received from the Debtors; and (3) they relied upon the accuracy of these representations in

rendering their legal advice.[219]  From the investigations and source documents reviewed, the

---

[215] Quinn Emanuel, *FTX Responses to Clearing Policy Questions*, Aug. 16, 2022, F10705-E016384266.

[216] *See e.g.,* Jonathan C. Lipson & David A. Skeel, *FTX'd: Conflicting Public and Private Interests in Chapter 11*
(Mar. 13, 2024), U of Penn, Inst. for Law & Econ Research Paper No. 24-08, at 27,
https://ssrn.com/abstract=4760736, *archived at* https://perma.cc/CGQ6-CUY5.

[217] Quinn Report on S&C, at 2-3.

[218] *Id*. at 3, 6.

[219] *Id*.

Examiner has seen no evidence to suggest that S&C knew about the fraud at the FTX Group prepetition or that S&C ignored red flags that would have required the firm to investigate statements made by the Debtors.

Because neither Quinn Emanuel nor the Examiner have found any evidence that S&C knew that the FTX Group's representations to authorities were false, the disclosures contained in the Supplemental Dietderich Declaration were sufficient for the Court to rule on S&C's disinterestedness.  This is so even though the Court may not have known that S&C helped prepare client statements to regulatory authorities that, unbeknownst to S&C, were false.[220] Accordingly, the Examiner is not recommending any further investigation into S&C's representation of the Debtors in connection with information requests from regulatory authorities.

f.    *Representations to Voyager Digital's Counsel*

It is undeniable that the Debtors' descent into bankruptcy happened rapidly.  As disclosed in the Supplemental Dietderich Declaration, in July 2022, S&C advised the Debtors on their contemplated purchase of the assets of Voyager Digital—a company operating a cryptocurrency trading platform—in connection with Voyager Digital's bankruptcy filing.  On September 26, 2022, Voyager Digital announced that WRS had won a hard-fought auction to purchase all of Voyager Digital's assets.[221]  An asset purchase agreement was executed the next day, and on

---

[220] ABA Model Rule of Professional Conduct 4.1 (truthfulness) provides that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person."  ABA Model R. Prof'l Conduct 4.1, https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct /rule_4_1_truthfulness_in_statements_to_others/, *archived at* https://perma.cc/MDW7-UGHP.  The Model Rules have been adopted by most states, including Delaware and New York.  *See* Del. Lawyers' R. Prof'l Conduct 4.1; N.Y. Lawyers' R. Prof'l Conduct 4.1 (emphasis added).  The commentary to Rule 4.1 notes that "[a] misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer *knows is false*."  *See* Comments to Del. Lawyers' R. Prof'l Conduct 4.1 (emphasis added).

[221] *See In re Voyager Digital Holdings, Inc.*, No. 22-bk-10943 (Bankr. S.D.N.Y.) (MEW), Dkt. No. 457.

56

October 20, 2022, the sale was approved by court order in Voyager Digital's bankruptcy case.[222] As the winning bidder, the FTX Group was considered financially sound at this time.

But less than two weeks later, on November 2, 2022, a Coindesk article revealed Alameda's significant holdings of FTT, the exchange token for the FTX exchange.[223]  On November 6, 2022, Changpeng Zhao ("CZ"), the founder of cryptocurrency exchange Binance Holdings Ltd. (together with its affiliates, "Binance"), announced that Binance would be liquidating its sizeable FTT holdings, which caused a rapid sell off of FTT.[224]  Early the next day, Bankman-Fried tweeted reassuringly that "FTX is fine," while Dietderich assured Voyager Digital's counsel via email that questions being raised about the FTX Group's liquidity was just "Binance silliness" because the FTX Group was "rock solid."[225]  However, later that same day, the FTX Group was trying to obtain emergency funding.

The email sent by Dietderich to Voyager Digital's counsel on the morning of November 7 has garnered a lot of public attention.  Significantly, however, Dietderich states in his Supplemental Declaration that he did not learn about the FTX Group's financial problems until

---

[222] *See id.* at 581.

[223] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Nov. 2, 2022), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/, *archived at* https://perma.cc/8AQ4-RMXJ.

[224] CZ BNB (@cz_binance), X (formerly Twitter) (Nov. 6, 2022), https://twitter.com/cz_binance/status/1589283421704290306?lang=en, *archived at* https://perma.cc/68PH-SE3P ("As part of Binance's exit from FTX equity last year, Binance received roughly $2.1 billion USD equivalent in cash (BUSD and FTT). Due to recent revelations that have come to light, we have decided to liquidate any remaining FTT on our books.").  Binance has since been sued for its part in the Debtors' collapse.  *See Lahav v. Binance Holdings Ltd*, No. 23-cv-05038 (N.D. Cal.) (TLT), Dkt. No. 1.

[225] *See* email from A. Dietderich to D. Azman, dated Nov. 7, 2022, Quinn Emanuel Interview Documents, F10705-E005618689; Jody Godoy, *'FTX is fine' - tweets Sam Bankman-Fried may regret on the stand*, Reuters (Oct. 26, 2023), https://www.reuters.com/world/us/ftx-is-fine-tweets-sam-bankman-fried-may-regret-stand-2023-10-26/, *archived at* https://perma.cc/PWR5-QN9N.

the morning of November 8—a day after sending his email to Voyager Digital's counsel.[226]  The Examiner has reviewed no evidence to the contrary.

When asked about his November 7 "rock solid" email in an interview conducted by Quinn Emanuel, Dietderich stated that, after the Voyager Digital auction closed, there was concern that Binance and CZ were putting out negative press statements in order to derail the FTX Group's purchase of Voyager Digital's assets.[227]  Dietderich's statement appears to be supported by the fact that (1) Binance was also a bidder in the Voyager Digital auction,[228] and (2) Binance and the FTX Group were not only competitors in the crypto market, but their respective founders had a well-documented, contentious relationship.[229]  For these reasons, the Examiner is not recommending that he conduct any further investigation into Dietderich's representations to Voyager Digital's counsel.

## VI.    Recommendations for Additional Investigations

In sum, following a detailed review of the Quinn Emanuel investigation and the Additional S&C Materials, the Examiner believes that further inquiry is warranted regarding two aspects of the allegations surrounding S&C's potential conflicts as Debtors' counsel.

The Examiner recommends that he be authorized to conduct an investigation into S&C's representation of Bankman-Fried in connection with his purchase of the Robinhood Shares.  The investigation would focus on (1) the contours of that representation, and (2) what, if anything, S&C knew or should have known about the FTX Group's fraud based on that representation.

---

[226] Dkt. No. 510 at ¶ 10.

[227] Quinn Emanuel, *Memorandum re: Interview of Andrew Dietderich*, July 27, 2023, at 5.

[228] *Id*.

[229] *See e.g.*, David Yaffe-Bellany, *How Sam Bankman-Fried's Crypto Empire Collapsed*, N.Y. Times (Nov. 14, 2022), https://www.nytimes.com/2022/11/14/technology/ftx-sam-bankman-fried-crypto-bankruptcy.html, *archived at* https://perma.cc/U5KV-YRCP (describing CZ as Bankman-Fried's "biggest rival").

Dietderich has stated that S&C's representation in connection with the Robinhood Transaction was limited to advising on Hart-Scott-Rodino compliance and public reporting obligations.[230] On the other hand, there are allegations in the Additional S&C Materials that S&C (1) advised on the structuring of the Robinhood Transaction itself; (2) had access to and received inside information regarding the transaction as a result of its representation; and (3) advised Emergent in connection with that transaction.  (*See supra*, at Section V(a)).  Further investigation into this transaction would be important to help determine whether there was a potentially disqualifying conflict that the Court should have been aware of when ruling on S&C's retention application.  In addition, the investigation would discern more generally if S&C advised on, possessed knowledge of, or had been made aware of critical facts relating to the FTX Group's misconduct as a consequence of this representation.  (*See infra*, at Part 8).

The Examiner also recommends that an investigation be conducted into the Debtors' potential claims against the former shareholders of LHI that sold their interests to WRS prepetition to the extent those claims were not released in the postpetition transaction.  This investigation would determine whether an avoidance action is warranted with respect to these shareholders, which would be beneficial for the estates.  Such an investigation would also be in the interest of the public and the Court as, in carrying out the investigation, the Examiner would gain additional insight into and report on how these transactions unfolded.  (*See supra*, at Section V(b); *see also infra*, at Part 8).

---

[230] Dkt. No. 510 at ¶ 52.

## PART 3:  FRAUD BY CURRENT AND FORMER EMPLOYEES OF THE DEBTORS

As described in the Second Ray Report, "from the inception of the FTX.com exchange, the FTX Group commingled customer deposits and corporate funds, and misused them with abandon."[231]  In its Scope Order, the Bankruptcy Court directed the Examiner to inquire into "whether the Investigations adequately addressed fraud by the Debtors' employees and whether employees involved in such fraud are still working for the Debtors."[232]  This portion of the Examiner's Report answers these questions.  For the reasons set forth below, the Examiner has determined that the completed and ongoing investigations by the Debtors, the Debtors' counsel, and government agencies into whether the Debtors' former and current employees were involved in fraud have been robust, thorough, and competently conducted.  The Examiner does not believe that any further investigation into current or former employees by the Examiner is warranted at this time.

### I.    Overview of Investigative Work

As discussed further below, several government agencies—including the USAO-SDNY—investigated the fraud perpetrated by individuals affiliated with the FTX Group.  These government investigations have principally focused on the fraudulent conduct of Bankman-Fried and other executives, including co-conspirators Ellison, Singh, and Wang, perpetrated on FTX Group customers, investors, and lenders.  Ellison served as co-CEO and then sole CEO of Alameda, Singh served as Head of Engineering at FTX.com, and Wang co-founded FTX.com and Alameda and served as Chief Technical Officer of FTX.com.  On November 2, 2023, following a month-long jury trial, Bankman-Fried was convicted of wire fraud and conspiracy to

---

[231] *See* The Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com ("Second Ray Report"), Dkt. No. 1704-1, at 5.

[232] *See* Scope Order at ¶ 3(b).

commit wire fraud on FTX.com's customers; wire fraud and conspiracy to commit wire fraud on Alameda's lenders; conspiracy to commit securities fraud; conspiracy to commit commodities fraud; and conspiracy to commit money laundering.[233]  Bankman-Fried was sentenced on March 28, 2024, to 25 years' imprisonment.[234]

Pursuant to cooperation agreements, Wang, Singh, and Ellison pleaded guilty to various crimes, including wire fraud and conspiracy to commit the same, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.[235]  Ellison and Singh also pleaded guilty to conspiracy to commit money laundering, and Singh pleaded guilty to conspiracy to make unlawful political contributions and to defraud the Federal Election Commission ("FEC").[236]  All three testified as cooperating witnesses at Bankman-Fried's trial.[237]  Another former senior FTX Group executive, Ryan Salame, separately pleaded guilty to conspiracy to make unlawful political contributions and to defraud the FEC, and conspiracy to operate an unlicensed money transmitting business.[238]  All four are awaiting sentencing.

Additionally, and as discussed further below, the Debtors' counsel extensively investigated the fraudulent activities of the FTX Group executives, particularly Bankman-Fried and his co-conspirators.  The Debtors' counsel also thoroughly investigated the possible involvement of other former and current employees in fraudulent conduct at the FTX Group.

---

[233] *See* Transcript at 3252:3-24, SBF Criminal Case, Dkt. No. 384; *see also* Press Release, U.S. Dep't of Just., *Statement of U.S. Attorney Damian Williams on the Conviction of Samuel Bankman-Fried*, U.S. Dep't of Just. (Nov. 2, 2023), https://www.justice.gov/usao-sdny/pr/statement-us-attorney-damian-williams-conviction-samuel-bankman-fried, *archived at* https://perma.cc/YL6Z-HEG3.

[234] *See* SBF Criminal Case, Dkt. No. 424.

[235] *See* SBF Criminal Case, Dkt. Nos. 6-9, 19, 21.

[236] *See* SBF Criminal Case, Dkt. Nos. 8-9, 19, 90-91, 102.

[237] *See* SBF Criminal Case, Dkt. Nos. 352, 356, 358, 360, 362, 366, 368.

[238] *See* SBF Criminal Case, Dkt. Nos. 262, 265, 283.

They were assisted in these efforts by several outside investigatory and advisory firms, including Nardello & Co. ("Nardello") and Alvarez & Marsal Holdings, LLC ("Alvarez & Marsal").

Investigative efforts included the following steps, among others.  The Debtors' counsel reviewed millions of pages of documents collected from the FTX Group.[239]  They comprehensively reviewed these documents to assess whether other FTX Group employees were involved in the core fraudulent conduct at the FTX Group.  The Debtors' counsel also conducted numerous interviews with FTX Group employees, including in-house legal and compliance employees and members of the FTX Group's senior management.[240]  With limited exceptions for limited purposes, the Debtors' counsel did not speak with Wang, Singh, or Ellison, all of whom were actively cooperating with the USAO-SDNY at the time of the investigation.  The Debtors' counsel likewise did not speak with Bankman-Fried, who was under indictment during their investigations.  In addition, the Debtors' counsel served Bankruptcy Rule 2004 requests on certain individuals.[241]

The Debtors, with assistance from S&C, responded to more than 400 requests for documents and information from the USAO-SDNY, and, on behalf of the Debtors, S&C produced almost 4.5 million pages of documents and the Amazon Web Services FTX Group database to the USAO-SDNY.[242]  The Debtors' counsel also responded to over 300 requests

---

[239] *See, e.g.*, S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 10.

[240] *See* S&C, *FTX Trading Ltd. / Chapter 11 Interview Memos & Notes*; Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 46.  The Debtors' counsel sought to interview other employees throughout their investigations, but some declined to cooperate and others were unavailable for interviews due to resource or other constraints.

[241] *See, e.g.*, S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 112, 192.

[242] *Id.* at 10.

from other federal government and law enforcement agencies, as well as over 100 requests from state and local government and law enforcement agencies.[243]

As noted, the Examiner believes that the investigations by the Debtors, the Debtors' counsel, and the government were comprehensive, thorough, and competently conducted.  The Debtors' and the Debtors' counsel's investigative work led to the prompt resolution of criminal charges against the FTX Group executives and the filing of numerous avoidance actions.

## II.      Identification of Former and Current Employees of the FTX Group

The Debtors' investigation into current and former FTX Group employees required, as a threshold matter, an effort to compile a comprehensive list of FTX Group employees before and after the Petition Date.  That is because, as described in the First Ray Report, the FTX Group lacked a current and complete list of employees at the time of the bankruptcy filing.[244]  Further complicating matters, FTX Group employees resigned informally, including orally and over Signal.[245]

To understand who had departed and who remained at the companies, the Debtors' legal and human resources employees attempted to create a list of employees and their roles and contact information.[246]  Additionally, the Debtors' human resources personnel emailed employees in the period immediately following the Petition Date to gather names, work statuses, locations, job titles, supervisor names, and other related information.[247]  The Debtors now maintain a list of current Debtor employees.[248]  S&C provided that list of employees to the

---

[243] *Id.* at 35.

[244] *See* First Ray Report, at 13.

[245] *See* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 5.

[246] *See id.*

[247] *See* Email from the Debtors verifying employment status, Dec. 1, 2022, F10705-E005808688.

[248] *See* Spreadsheet of the Debtors' employees, Mar. 1, 2024.

Examiner, as well as a list of FTX Group employees' statuses as of November 2022 generated by an attorney employed by FTX.US, a spreadsheet showing FTX.US employees as of November 13, 2022, and employee compensation information for 2021 and the first half of 2022.[249]

## III. Investigations into Former Employees

### a. *Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, and Gary Wang*

#### 1. USAO-SDNY

Soon after the collapse of the FTX Group and its related bankruptcy filing, the USAO-SDNY brought charges against the FTX Group's executives. Bankman-Fried was first indicted by the USAO-SDNY on December 9, 2022.[250] On December 19, 2022, Wang and Ellison pleaded guilty pursuant to cooperation agreements, and on February 28, 2023, Singh pleaded guilty pursuant to a cooperation agreement.[251] Each testified at the trial of Bankman-Fried in October and November 2023, at which Bankman-Fried was convicted of all counts.[252]

The trial against Bankman-Fried principally focused on his fraud on FTX.com's customers and investors and Alameda's lenders.[253] With regard to FTX.com customers, the evidence established that contrary to Bankman-Fried's and the FTX Group's public representations that customer funds would not and could not be used by FTX Group entities, Bankman-Fried and certain co-conspirators acting at his direction misappropriated massive amounts of FTX.com customer funds.[254] They accomplished this primarily by directing

---

[249] *See id.*; Spreadsheet of FTX Group employee status, Nov. 2022, F10705-E015112017; Spreadsheet of FTX.US employees, Nov. 13, 2022; Spreadsheet of FTX Group employee compensation information, 2021-2022, F10705-E000595511.

[250] *See* SBF Criminal Case, Dkt. No. 1.

[251] *See* SBF Criminal Case, Dkt. Nos. 19, 21, 102.

[252] *See* Transcript at 3252:3-24, SBF Criminal Case, Dkt. No. 384.

[253] *See* SBF Criminal Case, Dkt. No. 410, at 8-21.

[254] *See id.* at 8-9.

customers to deposit money into bank accounts controlled by Alameda, which Alameda then withdrew for its use, and by creating special privileges for Alameda in FTX.com's software, which allowed Alameda to maintain a negative balance, gave Alameda a $65 billion line of credit, and exempted Alameda from the automatic liquidation feature.[255]  Customer funds were used for, among other things, venture investments, stock repurchases, real estate, political and charitable donations, and loan repayments.[256]  With respect to the FTX Group's investors, the evidence proved that Bankman-Fried and certain co-conspirators acting at his direction defrauded them by, among other means, misrepresenting Alameda's privileges on FTX.com and misleading investors about an "insurance fund" for the FTX Group and about the FTX Group's revenue.[257]  Moreover, the evidence established that Bankman-Fried, along with certain co-conspirators acting at his behest, defrauded Alameda's lenders, including by sending them a false balance sheet for Alameda.[258]  The USAO-SDNY also presented evidence during trial regarding several schemes that were charged in superseding indictments against Bankman-Fried but which were ultimately severed from trial, including payments to Chinese government officials, unlawful political donations, and operation of an unlicensed money transmitting business.[259]

As noted above, Bankman-Fried was sentenced to 25 years' imprisonment.  The sentencing court found a loss to investors of $1.7 billion, a loss to Alameda's lenders of $1.3 billion, and a loss to FTX.com's customers of approximately $8 billion.[260]

---

[255] *See id.* at 10.

[256] *See id.* at 11-12, 98.

[257] *See id.* at 18-20.

[258] *See id.* at 20-21.

[259] *See* SBF Criminal Case, Dkt. No. 410, at 21-30.  The USAO-SDNY subsequently declined to proceed to a second trial on the severed counts, including the charged violation of the Foreign Corrupt Practices Act and the charge of conspiracy to operate an unlicensed money transmitting business.  *See* SBF Criminal Case, Dkt. No. 388.

[260] *See* Transcript at 6:3-8, SBF Criminal Case, Dkt. No. 426 ("Bankman-Fried Sentencing Transcript").

2.    SEC

Other federal government agencies brought parallel civil cases against the four FTX

Group executives as well.  The SEC filed civil actions against Bankman-Fried, Ellison, Wang,

and Singh for violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5

thereunder, 17 C.F.R. § 240.10b-5.[261]  In its complaint against Bankman-Fried, the SEC alleges

that he raised at least $1.8 billion from investors, including approximately $1.1 billion from

United States-based investors, while misleading investors about the FTX Group's misuse of

customer funds, Alameda's privileges on FTX.com, and FTX.com's exposure to Alameda and its

illiquid collateral.[262]  In its complaints against Ellison, Wang, and Singh, the SEC brings

allegations regarding their roles in the investor fraud scheme set forth in Bankman-Fried's

complaint.[263]  The SEC entered into consent judgments with Ellison, Wang, and Singh.[264]  The

SEC's case against Bankman-Fried was stayed pending resolution of the parallel criminal

proceedings.[265]

3.    CFTC

The CFTC also brought civil actions against Bankman-Fried, Ellison, Wang, and Singh

for violations of Section 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. § 9(1), and

---

[261] *See Sec. & Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.) (PKC), Dkt. No. 1; *Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.) (PKC), Dkt. No. 1; *Sec. & Exch. Comm'n v. Singh*, No. 23-cv-1691 (S.D.N.Y.) (PKC), Dkt. No. 1.

[262] *See Sec. & Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.) (PKC), Dkt. No. 1 at ¶¶ 27-29.

[263] *See Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.) (PKC), Dkt. No. 1; *Sec. & Exch. Comm'n v. Singh*, No. 23-cv-1691 (S.D.N.Y.) (PKC), Dkt. No. 1.

[264] *Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.) (PKC), Dkt. Nos. 15-16; *Sec. & Exch. Comm'n v. Singh*, No. 23-cv-1691 (S.D.N.Y.) (PKC), Dkt. No. 7.

[265] *See Sec. & Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.), Dkt. No. 16.

Regulation 180.1(a) thereunder, 17 C.F.R. § 180.1(a).[266]  As alleged in the CFTC's complaints, Bankman-Fried, Ellison, Wang, and Singh engaged in fraud in connection with the sale of commodities.[267]  The CFTC entered into consent judgments with Ellison, Wang, and Singh.[268] The CFTC's case against Bankman-Fried was stayed pending resolution of the parallel criminal proceedings.[269]

4. Debtors' Investigation

As noted above, the Debtors cooperated extensively with the USAO-SDNY in the government's investigation into FTX Group executives Bankman-Fried, Ellison, Singh, and Wang.  The Debtors, with assistance from their counsel and other professionals, also conducted their own investigations to further understand the fraudulent conduct of the executives at the FTX Group and to determine whether avoidance actions could be pursued.

The Debtors' investigation into the FTX Group executives spanned a wide array of misconduct at the FTX Group, including investigations into the core scheme of misappropriation of customer funds as well as other criminal activities.  Among other things, S&C investigated several schemes that were presented at Bankman-Fried's criminal trial, such as the use of the North Dimension entities; the backdated payment agent agreement between Alameda and FTX Trading generated to "expla[in] why Alameda held FTX cash for the benefit of [] FTX

---

[266] *See Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. Nos. 1, 13; *Commodity Futures Exch. Comm'n v. Singh*, No. 23-cv-1684 (S.D.N.Y.), Dkt. No. 1.

[267] *See Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. Nos. 1, 13; *Commodity Futures Exch. Comm'n v. Singh*, No. 23-cv-1684 (S.D.N.Y.), Dkt. No. 1.

[268] *See Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. Nos. 25-26; *Commodity Futures Exch. Comm'n v. Singh*, No. 23-cv-1684 (S.D.N.Y.), Dkt. No. 17.

[269] *See Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. No. 38.

customers";[270] bribes to Chinese government officials;[271] the FTX Group's operation of an unlicensed money transmitting business; and Alameda's fraudulent balance sheets.[272]

The Debtors have filed an avoidance action against Bankman-Fried, Ellison, Wang, and Singh, bringing 48 claims against the four former FTX Group executives, including for breach of fiduciary duty, fraudulent transfer, waste of corporate assets, and conversion.[273]  That case remains pending.[274]

     *b.*    *Ryan Salame*

     1.    USAO-SDNY

Ryan Salame was the CEO and Chairman of FDM and a close associate of the other FTX Group executives.  At trial, Ellison testified that Bankman-Fried "said that he really valued [Salame] for his loyalty."[275]

On September 7, 2023, Salame pleaded guilty to conspiracy to make unlawful political contributions and to defraud the FEC, and conspiracy to operate an unlicensed money transmitting business.[276]  Pursuant to his plea agreement, Salame is required to pay restitution to the Debtors of more than $5.59 million, which captures a $5 million withdrawal that Salame made from FTX.com in November 2022.[277]  The Debtors and Salame recently agreed that

---

[270] *See* Second Ray Report, at 24 (alterations and internal quotation marks omitted).

[271] As discussed further below, S&C investigated possible payments to current and former Bahamian government officials as well.

[272] *See* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 12-19.

[273] *See FTX Trading Ltd. v. Bankman-Fried*, No. 23-ap-50448 (Bankr. D. Del.) (JTD), Dkt. No. 1.

[274] *See FTX Trading Ltd. v. Bankman-Fried*, No. 23-ap-50448 (Bankr. D. Del.) (JTD).

[275] Transcript at 689:22-24, SBF Criminal Case, Dkt. No. 358.

[276] *See* SBF Criminal Case, Dkt. Nos. 262, 265, 283.

[277] *See* Salame Plea Transcript at 16:9-21, SBF Criminal Case, Dkt. No. 283; *see also* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 109.

Salame will satisfy that restitution by transferring his Bahamian apartment, which was appraised at $5.9 million, "to [FDM], acting by the JOLs, as nominee for the Debtors."[278]

## 2.    Debtors' Investigation

As with the other FTX Group executives, the Debtors investigated Salame's role at the FTX Group and his involvement in misconduct there.  Among other things, S&C reviewed Salame's relevant communications, as well as his transfer activity and trading on the FTX exchanges and assets he owned.[279]  Through its investigation, S&C found that, among other things, Salame assisted with the creation of the backdated payment agent agreement; made or directed other FTX Group employees to make misrepresentations to banks about the purpose of FTX Group bank accounts; misappropriated FTX Group assets to buy real estate, restaurants, and food service companies, and to make other purchases and investments, including a private jet; and withdrew millions of dollars from his FTX.com account shortly before FTX.com halted customer withdrawals.  The Debtors also identified millions of dollars of FTX Group-funded political contributions made by Salame.[280]

In addition, S&C investigated the circumstances surrounding two $50 million loans involving Salame, Alameda, and two other companies, Deltec International Group ("Deltec") and Norton Hall Ltd. ("Norton Hall").[281]  The investigation concluded that the loans were intended to ameliorate Deltec's capital issues while ensuring that Deltec would "owe" the FTX Group as a result, and the related promissory notes were structured to conceal Alameda's role in

---

[278] *See* Dkt. No. 13631 at ¶ 3.

[279] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 109.

[280] A more detailed account of the investigations into the FTX Group's political and charitable contributions is provided below.  *See infra*, at Part 6, Sections III and VII.

[281] *See* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 101.

the loans.[282]  The investigation further determined that Salame executed one note as a "director" of Norton Hall, despite not being a director of Norton Hall and despite Norton Hall's director being unaware of the note.[283]  Following the investigation, the Debtors reached a settlement regarding the loans, with Deltec agreeing to pay the value of the loan with interest and the remaining obligations extinguished.[284]

The Debtors continue to assess next steps with regard to Salame.

c.      *Other FTX Group Employees*

S&C also investigated whether other employees were involved in the core fraudulent conduct at the FTX Group and the misappropriation of customer assets.  In furtherance of that effort, S&C conducted an exhaustive review of communications and documents that included those collected from senior FTX Group executives to identify any lower-level employees who communicated with them and may have been involved in criminal conduct.  In addition, S&C conducted a preference review of exchange accounts, including accounts of current and former employees.  Moreover, and as described in further detail below, S&C reviewed whether employees who would be retained after the Petition Date may have been implicated in wrongdoing at the FTX Group.  Finally, in its work responding to government investigations and its own review of FTX Group materials, S&C identified certain employees for further investigation for a range of potential malfeasance.

As S&C represented to the Examiner and based on the record developed at Bankman-Fried's trial, the Examiner understands that the investigative work performed by the Debtors, their professionals, and various government agencies determined that the core fraudulent conduct

---

[282] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶ 149.

[283] *See* Dkt. No. 1195 at ¶¶ 5, 10.

[284] *See* Dkt. No. 1267 at ¶¶ 3-4.

at the FTX Group (namely, the commingling and misuse of customer funds) was limited to a small group of FTX Group executives.  However, S&C separately identified other employees involved in conduct that formed the basis for contemplated or filed adversary proceedings.

For example, S&C's investigation identified John Samuel Trabucco, the former co-CEO of Alameda, as a possible subject of interest.[285]  S&C reviewed Trabucco's communications and other documents and served Bankruptcy Rule 2004 requests on Trabucco.[286]  With the assistance of Nardello, Alvarez & Marsal, and AlixPartners, S&C also investigated Trabucco's assets, his activity on the FTX exchanges, and his transactions with the FTX Group.[287]  Based on those investigations, S&C and their professionals determined that the FTX Group spent over $15 million for real estate, a yacht, and a marina slip for Trabucco during the preference period and found that Trabucco made substantial withdrawals from the FTX.com exchange in September 2022.[288]  The Debtors are continuing to assess next steps with regard to Trabucco.

As another example, S&C identified one former FTX Group director as a possible subject of investigation due to high trading volume on his FTX.com account.[289]  S&C also investigated a former FTX Group employee who managed token investments for Alameda and, working with Alvarez & Marsal, uncovered certain sales related to those investments that were not properly documented.[290]  S&C also found that this employee made substantial withdrawals from his exchange account close to the Petition Date.[291]  And S&C also investigated a former FTX Group

---

[285] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 112.

[286] *Id.*

[287] *Id.*

[288] *Id.*; *see also* Nardello, *Report Prepared for Sullivan & Cromwell LLP re: John Samuel Trabucco*, Jan. 29, 2023, at 7-8.

[289] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 144.

[290] *Id.* at 141.

[291] *Id.* at 142.

employee who was the subject of media reports regarding his transfer of $600,000 of FTT to a

charity that he co-founded.[292]  Due to the need to prioritize other litigation and potential

challenges with any claims against these individuals, the Debtors have not yet elected to proceed

with actions against them.

In addition, S&C investigated withdrawals during the preference period by four former

FTX Group employees and their affiliates, which resulted in approximately $157 million of

transfers from FTX.com and FTX.US during the preference period.[293]  S&C, with the assistance

of Alvarez & Marsal and Nardello, reviewed relevant accounts and trading activity, as well as

communications related to these withdrawals.[294]  Based on that investigation, certain Debtor

entities filed an avoidance action against Matthew and Michael Burgess, Huy Xuan Nguyen, Jing

Yu Wong, and their affiliates.[295]  As alleged, the Debtors' investigation identified approximately

$73 million in withdrawals in November 2022, by an account registered to Michael Burgess, a

former Business Development Manager and Head of Partnerships at FTX.com and the brother of

Matthew Burgess, a former customer service employee for FTX.com and FTX.US.[296]  Matthew

Burgess was still employed by the FTX Group at the time of the withdrawals.[297]  As further

alleged, Matthew Burgess misled FTX Group employees about the ownership of Michael

---

[292] *Id.* at 137.

[293] *Id.* at 82-84; *see also FTX Trading Ltd. v. Burgess*, 22-ap-50585 (Bankr. D. Del.) (JTD), Dkt. No. 1 at ¶ 13.  The Debtors "selected August 31, 2023," for "indicative spot pricing of a present day judgment in th[e c]omplaint." *FTX Trading Ltd. v. Burgess*, 22-ap-50585 (Bankr. D. Del.) (JTD), Dkt. No. 1 at ¶ 13 n.3.

[294] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 82.

[295] *FTX Trading Ltd. v. Burgess*, 22-ap-50585 (Bankr. D. Del.) (JTD), Dkt. No. 1.

[296] *See id* at ¶¶ 14, 26, 29.  Both Michael and Matthew Burgess were formally employed by Salameda Ltd., a non-Debtor affiliate of the FTX Group.  *See id.* at ¶¶ 4, 26, 29.

[297] *See id.* at ¶ 11.

Burgess's account in an attempt to prioritize those withdrawals over other customers.[298]  In addition, the Debtors allege that the other named former employees, Nguyen and Wong, also withdrew funds from their FTX.com and FTX.US accounts during the preference period.[299]  That adversary proceeding was recently stayed pending its resolution.[300]

> d.   *FTX Group In-house Legal and Compliance Employees*

In addition to the above-mentioned investigative work into FTX Group employees, Quinn Emanuel specifically examined whether FTX Group in-house legal and compliance employees had knowledge of fraud or other misconduct at the FTX Group.[301]  In connection with that effort, Quinn Emanuel interviewed nine employees from the legal and compliance departments, the majority of whom were attorneys.[302]  Quinn Emanuel also reviewed FTX Group communications, including Signal messages where available, transaction records, legal documents, and accounting records, as well as other reports and materials produced by Alvarez & Marsal and Nardello.[303]  Lastly, Quinn Emanuel served Bankruptcy Rule 2004 requests on Daniel Friedberg and Can Sun, and received an attorney proffer from Sun.

Quinn Emanuel attempted to interview other in-house legal and compliance employees living outside of the United States, but those employees were unresponsive to those requests.[304]

---

[298] *See, e.g.*, *id.* at ¶¶ 11, 52; *see also* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 83.

[299] *See FTX Trading Ltd. v. Burgess*, 22-ap-50585 (Bankr. D. Del.) (JTD), Dkt. No. 1 at ¶¶ 11-14.  Like Matthew and Michael Burgess, Nguyen and Wong, although formally employed by Salameda Ltd., worked for other entities. *See id.* at ¶¶ 27-28.

[300] *See FTX Trading Ltd. v. Burgess*, 23-ap-50585 (Bankr. D. Del.) (JTD), Dkt. No. 45.

[301] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 45.

[302] *See id.* at 46.

[303] *Id.* at 45-46.

[304] *Id.* at 45.

Because of the difficulties in ensuring those individuals' compliance with the requests, Quinn

Emanuel did not further attempt to interview them.[305]

Based on its investigation, Quinn Emanuel concluded that the nine in-house legal and

compliance employees it interviewed were generally isolated from the scope of misconduct at

the FTX Group.[306]  Quinn Emanuel further investigated three senior in-house counsel at the FTX

Group:  Daniel Friedberg, former General Counsel of Alameda and former Chief Compliance

Officer of FTX.US;[307] Can Sun, former General Counsel of FTX Trading; and Ryne Miller,

former General Counsel of FTX.US.  Those three attorneys were interviewed by S&C in the

months immediately following the Petition Date.

### 1.    Daniel Friedberg

Friedberg previously served as a partner at Law Firm-1,[308] a law firm frequently used by

the FTX Group, where he worked with the FTX Group on "general corporate and tax matters."[309]

He joined the FTX Group in January 2020 as General Counsel of Alameda and Chief

Compliance Officer of FTX.US, and subsequently served in several other positions during his

time at the FTX Group.[310]

Following Quinn Emanuel's investigation into Friedberg, in June 2023, the Debtors filed

a complaint against him asserting claims of breach of fiduciary duties and legal malpractice,

---

[305] *Id.*

[306] *Id.* at 47.

[307] As described in the Debtors' amended complaint against him, Friedberg held numerous titles during his time at the FTX Group.  *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶ 31.

[308] *See infra*, at Part 5, Section I(e)(1).

[309] *See id.* at ¶ 29.

[310] *See id.* at ¶¶ 30-32.

among others, and seeking to recover transfers and damages.[311]  After discovering that Friedberg had deleted files from his work laptop, including the Signal application, S&C, with the assistance of FTI, recovered deleted Signal messages as well as other materials from the laptop.[312]  Based on information from those Signal messages, among other sources, the Debtors filed an amended complaint against Friedberg in January 2024.

The amended complaint alleges, among other things, that Friedberg assisted in diverting funds to FTX Group executives, including by assisting in the creation of North Dimension and its bank account, drafting the backdated payment agent agreement, and creating purported loans from the FTX Group to its executives; avoided regulatory requirements and misled regulatory bodies; misrepresented the nature of the Serum Foundation and SRM token; facilitated multi-million dollar payments to acquaintances, including millions of dollars spent on inadequate and often nonexistent marketing services; failed to implement required oversight and controls as Chief Compliance Officer and General Counsel, including by failing to maintain proper know-your-customer protocols; and received token, equity, and other compensation from the FTX Group in exchange for his loyalty.[313]  As further alleged in the amended complaint, Friedberg also facilitated the resolution of multiple whistleblower complaints asserting improprieties at the FTX Group, making payments of vast sums of money to the complainants without properly investigating the underlying conduct.[314]  *See infra*, at Part 3, Section III(e).  The Debtors' action against Friedberg remains pending.[315]

---

[311] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 1.

[312] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 29.

[313] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶¶ 41-158, 185-209.

[314] *See id.* at ¶¶ 159-84.

[315] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del) (JTD).

2.    Can Sun

Can Sun joined the FTX Group in August 2021 from Law Firm-1.  He served as General Counsel of FTX Trading.[316]  Sun was called as a witness by the government at Bankman-Fried's trial pursuant to a non-prosecution agreement.  At Bankman-Fried's trial, Sun testified that his responsibilities included "licensing[,] regulatory strategy, [and] internal corporate work."[317]

Quinn Emanuel investigated Sun's work for the FTX Group while at Law Firm-1 and while at the FTX Group.  Quinn Emanuel learned that, as part of Sun's work at Law Firm-1, he drafted and circulated intercompany agreements for the FTX Group, and continued that work after joining the FTX Group.[318]  Quinn Emanuel's investigation also found that, consistent with his testimony at trial, Sun was aware of company loans to FTX Group executives during his time at the FTX Group; Quinn Emanuel further determined that Sun intentionally structured some of these loans to avoid scrutiny regarding the relationship between WRS and Alameda.[319]  Quinn Emanuel also concluded that Sun, in coordination with Friedberg, worked to avoid CFTC scrutiny by concealing information about entities with an interest in FTX Trading.[320]  Quinn Emanuel's investigation also found that, again consistent with Sun's testimony at trial, Sun purchased a residence in the Bahamas with FTX Group-funded loans.[321]  And Quinn Emanuel

---

[316] *See* Transcript at 1896:14-1897:7, SBF Criminal Case, Dkt. No. 372.  Although Sun had formal employment contracts with Salameda Ltd. and FDM, he described his role at the FTX Group at Bankman-Fried's trial as "general counsel" to FTX and the "head[]" of "legal at FTX International."  *See id.* at 1897:6-10; *see also* Quinn Emanuel, *Memorandum re: FTX Investigations—Can Sun*, May 14, 2024 ("Quinn Sun Memo"), at 2-5.

[317] *See* Transcript at 1897:6-14, SBF Criminal Case, Dkt. No. 372.

[318] Quinn Sun Memo, at 6.

[319] *Id.* at 7-11; *see also* Transcript at 1946:14-1948:18, SBF Criminal Case, Dkt. No. 372.

[320] Quinn Sun Memo, at 16-19.

[321] *Id.* at 13-15; *see also* Transcript at 1953:24-1954:9, SBF Criminal Case, Dkt. No. 372.

investigated Sun's involvement in resolving whistleblower complaints at the FTX Group, but ultimately concluded that Friedberg took a more active role in negotiating those settlements.[322]

Also consistent with Sun's testimony at trial, Quinn Emanuel determined that while Sun was aware of the existence of the North Dimension entities, there was no evidence that he was aware of their use in unlawfully diverting customer funds.[323] And as Sun further testified at trial, he learned about Alameda's exemption from automatic liquidation in August or September of 2022, but he was unaware that the exemption enabled Alameda to withdraw customer funds from the exchange until Singh told him that on November 7, 2022.[324]

The Debtors continue to assess next steps with respect to Sun.

### 3.    Ryne Miller

Ryne Miller had been a partner at S&C prior to joining the FTX Group. His role as counsel to the FTX Group while at S&C is discussed above, *see supra*, at Part 2. Miller joined the FTX Group in August 2021 as the General Counsel of FTX.US, and he remained employed at FTX.US until March 2023.[325] Miller, unlike Friedberg or Sun, focused primarily on United States-based matters rather than both domestic and international issues.[326] His work included regulatory compliance, corporate acquisitions, lobbying, and employee-related actions.[327]

Quinn Emanuel identified several items of interest with respect to Miller's work at the FTX Group. First, Miller was involved in the resolution of several whistleblower claims

---

[322] *See* Quinn Emanuel, *Summary of Investigation of FTX Group Pre-Petition Professionals*, Mar. 29, 2024 ("Professionals Report"), at 53.

[323] *See* Quinn Sun Memo, at 11; *see also* Transcript at 1905:13-1906:3, SBF Criminal Case, Dkt. No. 372.

[324] *See* Transcript at 1923:6-11, 1964:8-21, SBF Criminal Case, Dkt. No. 372.

[325] Quinn Emanuel, *Memorandum re: FTX Investigations—Ryne Miller*, May 10, 2024 ("Quinn Miller Memo"), at 1-3.

[326] *Id.* at 3.

[327] *Id.* at 3-4.

explained in further detail below, including claims raised by Whistleblower-1, Whistleblower-3, and Whistleblower-5.[328]  Quinn Emanuel determined that Miller's involvement in resolving whistleblower claims was more limited than Friedberg's.[329]  Quinn Emanuel's investigation also found that Miller identified corporate governance concerns shortly after he joined the FTX Group.[330]  And while Miller learned about Alameda's exemption from automatic liquidation during the summer of 2022, Quinn Emanuel found no evidence that he was aware that Alameda was used as a vehicle to spend customer funds or that he believed that this could lead to the downfall of the FTX Group.[331]  Ultimately, Quinn Emanuel did not find any evidence that Miller knew of or participated in the fraud at the FTX Group and did not find any evidence that Miller knew about the commingling of customer and FTX Group assets.[332]

   e.      *FTX Group Whistleblowers*

As part of its review of the FTX Group's in-house compliance and legal employees, Quinn Emanuel investigated the FTX Group's resolution of several whistleblower complaints that alleged systemic misconduct at the FTX Group, primarily those brought by then-active or recently terminated employees.[333]  Because the FTX Group did not track whistleblower or employee complaints, in order to identify the universe of complaints to assess, Quinn Emanuel reviewed all severance agreements with FTX Group employees and the circumstances

---

[328] *Id.* at 4.

[329] *See* Professionals Report, at 53; *see also* Quinn Miller Memo, at 12.

[330] *See* Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 55; Quinn Miller Memo, at 9-10.

[331] *See* Quinn Miller Memo, at 8, 12.

[332] *See* Quinn Miller Memo, at 12.  Further discussion of Miller's identification of a shortfall at FTX.US may be found *infra*, in Part 6, Section V.

[333] Professionals Report, at 45-46.

surrounding those agreements.[334]  Quinn Emanuel ultimately identified settlement agreements totaling more than $25 million with seven whistleblowers who alleged various improprieties at the FTX Group, with most of that money going to five of those whistleblowers who raised allegations of systemic improprieties.[335]

To investigate these payments, Quinn Emanuel reviewed memoranda of interviews conducted by S&C and FTX Group documents related to the whistleblower complaints, issued Bankruptcy Rule 2004 requests to law firms that advised the FTX Group on these complaints, and interviewed several former in-house legal and compliance employees and two whistleblowers.[336]  Quinn Emanuel concluded that FTX Group counsel did not properly investigate the substance of these whistleblower complaints but rather settled them for considerable amounts, and that these resolutions were principally handled by Friedberg, with the assistance of Sun, Miller, and Joseph Bankman, Bankman-Fried's father and senior advisor to the FTX Group.[337]  A summary of significant whistleblower settlements investigated by Quinn Emanuel is provided below.

*First,* Whistleblower-1, a former FTX.US employee, alleged, among other things, market manipulation and insider trading.[338]  Quinn Emanuel determined that the FTX Group settled Whistleblower-1's claims—without investigating the merits—for $1.8 million, despite Whistleblower-1 having worked at FTX.US for less than two months at a salary of $200,000 per

---

[334] *Id.* at 46.

[335] *Id.* at 46.

[336] *Id.* at 47-48.

[337] *See id.* at 48-51; *see also* Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 57.

[338] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶ 172.

year.[339]  After resolving Whistleblower-1's claims, the FTX Group retained Whistleblower-1's

counsel to provide "general client counseling" at a rate of more than $200,000 per month for five

years.[340]  Until the Petition Date, that law firm produced only one three-page memorandum

pursuant to that retention agreement.[341]  The memorandum was drafted and signed by a non-

lawyer—again, consistent with the pattern Quinn Emanuel uncovered regarding the FTX

Group's retention and use of counsel.[342]  Friedberg's alleged involvement in Whistleblower-1's

claims is detailed in the pending action against him.[343]

*Second,* as reported in the Second Ray Report, Whistleblower-2, an attorney at Alameda,

raised concerns about regulatory and governance issues at Alameda and Alameda's handling of

customer funds without a money transmitting license.[344]  Quinn Emanuel's investigation into this

complaint determined that Whistleblower-2 was terminated by Friedberg after raising these

concerns, and received a $2 million settlement despite having worked at Alameda for less than

three months.[345]  Friedberg did not investigate or address the issues raised by Whistleblower-

2.[346]  Friedberg's alleged involvement in resolving Whistleblower-2's claims is detailed in the

pending action against him.[347]

---

[339] *See id.* at ¶¶ 174-76; *see also* Professionals Report, at 49-50.

[340] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at at ¶ 179.

[341] *See id.* at ¶ 180.

[342] *See id.*

[343] *See id.* at ¶¶ 172-80.

[344] *See* Second Ray Report, at 22-23.

[345] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶¶ 183; *see also* Professionals Report, at 49.

[346] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶ 184.

[347] *See id.* at ¶¶ 181-84.

*Third*, Whistleblower-3, a compliance employee at FTX.US, claimed that FTX.US lacked sufficient anti-money laundering controls and compliance measures.[348]  Whistleblower-3, who was hired to work on anti-money laundering compliance, was subsequently terminated three months after being hired.[349]  The FTX Group settled Whistleblower-3's claims without investigation, and Friedberg, Miller, and two other in-house attorneys negotiated a settlement payment that was approximately three times Whistleblower-3's annual salary.[350]

*Fourth,* Whistleblower-4, an executive at FTX.US, claimed that the FTX Group misled regulators and investors and lacked adequate corporate structure.[351]  Whistleblower-4 wrote a letter to Bankman-Fried, Singh, and Friedberg outlining those concerns.[352]  Shortly after, Friedberg told Whistleblower-4 that he should not have written the letter and, in particular, should not have suggested that the FTX Group may not satisfy investor expectations.  Friedberg further suggested that Whistleblower-4 apologize to Bankman-Fried.[353]  Whistleblower-4 resigned from FTX.US in September 2022, and agreed to a settlement worth more than $16 million.[354]  The FTX Group resolved Whistleblower-4's claims without investigation.[355]

*Fifth*, Whistleblower-5 alleged commingling of customer funds, inadequate corporate separation among FTX Group entities, market manipulation, and violation of CFTC

---

[348] Professionals Report, at 49; Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 63.

[349] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 63.

[350] *Id.*

[351] *Id.* at 65.

[352] *See id.*

[353] S&C, *Memorandum re: Interview of* Whistleblower-4, Dec. 22, 2022, at 10-11.

[354] Professionals Report, at 49.

[355] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 65.

regulations.[356]  Friedberg and Miller attempted to settle these claims prior to litigation; Quinn

Emanuel did not find any evidence that they otherwise attempted to investigate or remediate the

misconduct alleged by Whistleblower-5.[357]  After the bankruptcy filing, Whistleblower-5's

claims were resolved by settlement.[358]

*Sixth*, Whistleblower-6 alleged market manipulation and concealment of a relationship

with Alameda.[359]  He received a settlement offer of $200,000, although the claims were not

settled prior to the Petition Date.  As with the other whistleblower complaints, Quinn Emanuel

found no evidence that the FTX Group investigated Whistleblower-6's claims.[360]

*Finally,* in 2019, an outside attorney, Pavel Pogodin (now deceased),[361] filed a complaint

on behalf of Bitcoin Manipulation Abatement LLC against certain FTX Group entities and

several high-ranking employees, alleging money laundering, the operation of an unlicensed

money transmitting business, market manipulation, violations of the Commodity Exchange Act,

and other unlawful conduct.[362]  Friedberg, who was then serving as the FTX Group's outside

counsel at Law Firm-1, advised the FTX Group on the complaint.  Friedberg ultimately arranged

for the FTX Group to pay more than $3 million for two purposes: (1) to resolve those claims, and

(2) to retain Pogodin as an attorney for the FTX Group.[363]  However, in its investigation, Quinn

---

[356] Professionals Report, at 50.  S&C and Paul Hastings subsequently determined that Whistleblower-5 was terminated for cause for inappropriate conduct.  *See* S&C, Whistleblower-5 and Ledger X—FTX Debtors Mediation Statement, Feb. 15, 2023, at 5; Paul Hastings, *FTX—LedgerX Investigation Memorandum*, Nov. 13, 2023, at 2.

[357] Professionals Report, at 50-51.

[358] *Id*.

[359] Professionals Report, at 50.

[360] *See id.*

[361] Pogodin was identified in the Debtors' action against Friedberg.  *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶¶ 161-71.

[362] *See Bitcoin Manipulation Abatement LLC v. FTX Trading LTD*, No. 4:19-cv-7245 (N.D. Cal.), Dkt. No. 1.

[363] *See Alameda Research LLC v. Friedberg*, No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32 at ¶¶ 161-71.

Emanuel found no evidence that Pogodin provided any legal services to the FTX Group—a consistent pattern with the FTX Group's retention of counsel, as described in detail below.[364] *See infra*, at Part 5, Section I(e).  The Debtors' pending action against Friedberg alleges his relevant conduct in resolving Pogodin's claims.[365]

### f.    Other Payments to FTX Group Employees

Quinn Emanuel also reviewed payments to other employees who were terminated by the FTX Group but did not raise known whistleblower complaints.[366]  Quinn Emanuel found that about half of those terminations occurred during June and July of 2022, and about 73 percent of the termination agreements were for payments of less than $100,000.[367]  Quinn Emanuel focused in particular on six large employee payments ranging in size from $885,000 to nearly $12 million.[368]  Although Quinn Emanuel's investigation did not fully resolve the circumstances behind each of these large payments, it appears that those settlements did not involve similar allegations of impropriety as the whistleblower complaints described above.  The Examiner does not believe that additional investigation is warranted beyond Quinn Emanuel's work.

## IV.    Current Employees

After the Petition Date, the Debtors considered which of their remaining employees may be necessary to provide assistance to the Debtors moving forward.  As part of that review, the Debtors consulted with S&C to determine whether the identified employees engaged in misconduct at the FTX Group.  Based on that inquiry, and with the assistance of S&C, the

---

[364] *See id.* at ¶ 170.

[365] *See id.* at ¶¶ 161-71.

[366] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 68-69.

[367] *Id.* at 68.

[368] *Id.* at 69.

Debtors retained certain employees who were employed by the FTX Group prior to the Petition Date and who were deemed to have not engaged in any criminal activities.  Those employees then provided assistance in recovery efforts.

## V.    Conclusion

In sum, the Debtors and the Debtors' counsel, along with several government agencies, conducted a broad investigation into possible fraudulent conduct that took place at the FTX Group prior to the bankruptcy filing.  That investigation facilitated the resolution of criminal charges against top executives at the FTX Group, including Bankman-Fried, led to many avoidance actions, and prompted the voluntary resolution of other claims.  Based on his review of the investigations conducted to date, and given his understanding that the fraudulent activity at the FTX Group was largely perpetrated by a limited and tight-knit group of executives, the Examiner does not believe that any further investigation by him into former employees of FTX Group is warranted.

In addition, the Debtors and the Debtors' counsel have examined whether any employees who remained employed engaged in fraudulent conduct at the FTX Group.  Based on discussions with Debtors' counsel, the Examiner understands that the Debtors retained only those employees who they viewed as having no complicity.  The Examiner therefore believes that the ongoing and concluded investigations into fraud committed by the Debtors' employees, both current and former, have been adequate to address those issues.

## PART 4:  MANIPULATION OF FTT AND OTHER TOKENS

The Scope Order directs the Examiner to conduct "[a]n examination of whether the Investigations adequately addressed the Debtors' use of its cryptocurrency, FTT, to inflate the value of FTX and Alameda Research."[369]  This Part addresses the investigations into that issue. In addition, individuals associated with the FTX Group were involved in the development of at least three other cryptocurrency tokens also held by Alameda as of the Petition Date.  Given certain similarities to FTT and the potential that those other cryptocurrency tokens could have also been used to inflate the value of the FTX Group, this part of the Report also addresses investigations into those other tokens.  For the reasons explained below, the Examiner concludes that prior investigations adequately addressed whether the FTX Group used these cryptocurrency tokens to inflate its value, such that no further investigation is necessary.

Section I below provides background on each of the four tokens addressed in this Part, as context for the discussion that follows.  Sections II and III then summarize investigations conducted to date into allegations that individuals at or associated with the FTX Group manipulated one or more of these tokens, based on public reports as well as information made available to the Examiner through these bankruptcy cases.  Finally, Section IV explains the bases for the Examiner's conclusion that, at this time, further investigation into these issues by the Examiner is not warranted.

## I.    Cryptocurrency Tokens Associated with the Debtors

This section provides a brief overview of the four cryptocurrency tokens addressed in this Part:  FTT, SRM, OXY, and MAPS.  As detailed further below, while FTT has been the subject

---

[369] Scope Order at ¶ 3.

of extensive public discourse and investigation, the other three tokens discussed below have received relatively less attention but could present similar issues.

a.    *FTT Token*

Many cryptocurrency exchanges have native "exchange tokens" that offer benefits when used on the exchange.[370]  The FTT token was the exchange token of the FTX.com exchange. According to the FTX Token white paper,[371] FTT could "be used as collateral" on the trading platform, and customers who held a certain amount of FTT received discounts on trading fees as well as "rebates from all OTC trading on FTX."[372]  FTT was designed as a deflationary token, with FTX Trading committing to use a portion of its fee revenue to buy and burn FTT tokens "until at least half of all FTT is burned."[373]  Generally speaking, a "buy and burn" occurs when an entity associated with a token buys some of the tokens currently circulating in the market and permanently takes them out of circulation.[374]  Overall, this design of FTT incentivized users of the FTX.com exchange to buy and hold FTT, and purported to tie the value of the FTT token to

---

[370] *See* Robert Stevens, *What Is an Exchange Token?*, CoinDesk (Nov. 9, 2022), https://www.coindesk.com/learn/what-is-an-exchange-token/, *archived at* https://perma.cc/57D3-P4PC.

[371] "A cryptocurrency whitepaper is a comprehensive document outlining the technical and economic aspects of a specific cryptocurrency.  It is typically written by the cryptocurrency's development team or core members and serves as a guide for potential investors, miners and users."  CoinMarketCap, *Whitepaper*, https://coinmarketcap.com/academy/glossary/whitepaper, *archived at* https://perma.cc/2FJ3-YBBA.

[372] FTX Trading, *FTX Token Whitepaper*, 7, https://whitepaper.io/document/502/ftx-token-whitepaper, *archived at* https://perma.cc/3XJ9-K3JH.

[373] *Id.*

[374] *See* CoinMarketCap, *Burn/Burned*, https://coinmarketcap.com/academy/glossary/burned, *archived at* https://perma.cc/R3AP-R3R6.

the success of the FTX.com exchange.[375]  As described by FTX Trading at the time, "FTT is the token powering the FTX ecosystem."[376]

FTX Trading created the FTT token in or around May 2019.[377]  A few months later, following a period in which investors and FTX.com users were able to purchase FTT in advance of the listing, FTX Trading officially listed FTT on the FTX.com exchange.  According to FTX Trading, it issued a total of 350 million FTT tokens, of which 175 million were designated as "company tokens."  All FTT tokens, including the company tokens, were purportedly "locked" (i.e., unable to be sold)[378] as of the initial listing, but were meant to "unlock" over periods of time depending in part on how and when the FTT token at issue was acquired.[379]  According to the FTT white paper, FTX Trading used the sale of these tokens in part to generate capital for the development of the exchange.[380]  FTX Trading reported that, as of July 21, 2019, it had sold roughly 73 million FTT tokens prior to the listing, at prices between $0.10 and $0.80 per token.[381]  Once FTT was listed, the tokens sold prior to the listing would start to "unlock" and

---

[375] This design was not entirely novel, in that other "exchange tokens" available at the time also offered discounts to holders and touted a "buy and burn" program.  *See, e.g.*, Binance, *BNB (BNB)* (Sept. 3, 2020), https://www.binance.com/en/research/projects/bnb (discussing similar features of BNB), *archived at* https://perma.cc/L3CP-J73B.

[376] FTX Trading, *FTT Transparency Page*, (via the Wayback Machine), *archived at* https://web.archive.org/web/20200806161131/https://help.ftx.com/hc/en-us/articles/360029638552-FTT-Transparency-Page.

[377] *See, e.g.,* FTX *Token*, CoinDesk, https://www.coindesk.com/price/ftx-token/, *archived at* https://perma.cc/CJ28-ADBR.

[378] *See, e.g.*, CoinMarketCap, *Token Lockup*, https://coinmarketcap.com/academy/glossary/token-lockup, *archived at* https://perma.cc/CG62-U3UG.

[379] FTX Trading, *FTT Transparency Page*, *supra* note 376.

[380] FTX Trading, *FTX Token Whitepaper*, *supra* note 372, at 1 ("We want to scale up as quickly as possible and build a community of strong supporters, and so we are conducting a token raise for people who want to help grow FTX.").

[381] FTX Trading, *FTT Transparency Page*, *supra* note 372.

could be resold.[382]  FTX Trading planned to list FTT at an initial price of $1 per token.[383]  FTT experienced various price fluctuations after its initial listing; according to some public sources, FTT at one point traded as high as approximately $85 per token.[384]

FTX Trading also used FTT as payment and collateral in various business transactions. For example, Binance's initial investment into FTX Trading in late 2019 included both an equity stake in FTX Trading as well as "a long-term position in the FTX Token (FTT)."[385]  In 2021, when FTX Trading decided to buy out Binance's equity stake for a reported $2.3 billion, FTX Trading satisfied the buyout price in part with a transfer to Binance of additional FTT valued at nearly $555 million.[386]

As set forth below, subsequent investigations into the FTX Group have revealed instances in which individuals at the FTX Group engaged in efforts to artificially prop up the market price of FTT.  Moreover, Alameda held a significant portion of all outstanding FTT, which it included on its balance sheet and used as collateral for other obligations.  The revelation of this information in early November 2022 precipitated a series of events that contributed to the collapse of the FTX Group and the institution of these bankruptcy cases.

---

[382] *Id.*

[383] *Id.*

[384] *See, e.g.*, FTX Token overview page, CoinMarketCap, https://coinmarketcap.com/currencies/ftx-token/, *archived at* https://perma.cc/3L2D-FQZB (reflecting FTT price of $85.02 on September 9, 2021); *see also* FTX overview page, CoinGecko, https://www.coingecko.com/en/coins/ftx-token, *archived at* https://perma.cc/YJ49-985T (reflecting FTT price of $84.18 on September 9, 2021).  For the avoidance of doubt, this Report takes no position as to the actual value or trading price of FTT, or any other cryptocurrency, at any point in time.

[385] Binance, *Binance Announces Strategic Investment in Cryptocurrency Derivatives Exchange FTX*, Binance Blog (Dec. 20, 2019), https://www.binance.com/en/blog/all/binance-announces-strategic-investment-in-cryptocurrency-derivatives-exchange-ftx-414610870200725504, *archived at* https://perma.cc/5ES6-BP2Z.

[386] *See* GX-213 (July 15, 2021, Share Transfer Agreement), at 1, SBF Criminal Case.

      b.     *Other Tokens Associated with the Debtors*

While FTT garnered significant public attention in the wake of the FTX Group's collapse and bankruptcy, certain other cryptocurrency tokens also had a close connection to Bankman-Fried and the FTX Group. This Report addresses three such tokens: SRM, MAPS, and OXY. These tokens, along with FTT, at times have been referred to as "Sam Coins" given their close association with Bankman-Fried.[387]

SRM is the exchange token for the Serum exchange. According to the Serum Foundation's July 2020 white paper, the Serum exchange was built on the Solana blockchain and created with the goal of facilitating decentralized trading of cryptocurrencies at high speeds and low costs.[388] Contemporaneous reports disclosed that the Serum Foundation was initially created by FTX Trading and Alameda,[389] and that the Serum exchange was championed by Bankman-Fried.[390] However, the Serum Foundation's white paper represented that "[Project Serum] is permissionless—***we do not hold special power anymore***. It is up to you, the crypto community, to use it as you will."[391] The Serum white paper touted various benefits of SRM, including that holders of SRM would incur lower trading fees when trading on SRM's native exchange

---

[387] *See* Emily Flitter & David Yaffe-Bellany, *FTX Founder Gamed Markets, Crypto Rivals Say*, N.Y. Times (Jan. 18, 2023), https://www.nytimes.com/2023/01/18/business/ftx-sbf-crypto-markets.html, *archived at* https://perma.cc/C648-VDDU.

[388] Serum Foundation, *Serum—White Paper*, 3-4 (July 2020), https://whitepaper.io/document/626/serum-whitepaper, *archived at* https://perma.cc/GWZ4-EQTC.

[389] Solana Foundation, *FTX Chooses Solana for Serum: A High-Speed, Non-Custodial Decentralized Derivatives Exchange* (July 26, 2020), https://solana.com/news/ftx-chooses-solana-for-serum--a-high-speed--non-custodial-derivatives-exchange, *archived at* https://perma.cc/DRR4-262A.

[390] *See, e.g.*, Samuel Bankman-Fried (@SBF_FTX), X (formerly Twitter) (July 27, 2020, 4:08 AM), https://twitter.com/SBF_FTX/status/1287661223043928064, *archived at* https://perma.cc/NR6P-4XXU (Bankman-Fried tweet about Project Serum).

[391] Serum Foundation, *Serum—White Paper*, 11 (July 2020) (emphasis added), https://whitepaper.io/document/626/serum-whitepaper, *archived at* https://perma.cc/GWZ4-EQTC.

(Serum).[392]   The Serum white paper likewise claimed that net fees generated by the Serum

exchange would be used to buy and burn SRM tokens, thereby reducing overall supply.[393]   The

white paper stated that a total of 10 billion tokens would be minted (i.e., created) with a limited

percentage circulated at launch and periodic unlocking of tokens over time.[394]

MAPS is the token for Maps.me.  Maps.me began as an offline mapping application, but

relaunched in late-2020/early-2021 with new decentralized finance features built on Serum and

Solana.[395]   A January 2021 white paper for MAPS stated that MAPS "[t]oken holders will

benefit from 100% of net-revenues that Maps.me generates" and have the ability to vote on

governance issues.[396]   Similar to SRM, the MAPS white paper states that a total of 10 billion

tokens would be minted, with a limited supply circulated at launch and additional tokens

unlocked over a series of years.[397]   MAPS also claimed to use 100% of net revenue towards a

buy and burn program that would reduce supply and benefit holders.[398]   As with SRM, public

disclosures at the time revealed a certain degree of connection between Maps.me and individuals

associated with the FTX Group.  The Maps.me white paper listed Bankman-Fried and Ramnik

---

[392] *Id.* at 6.

[393] *Id.* at 6.

[394] *Id.* at 7.

[395] *See* Maps Token, *MAPS and Maps.me—FAQ*, Medium (Feb. 2, 2021), https://mapstoken.medium.com/maps-and-maps-me-faq-a204bfd976aa, *archived at* https://perma.cc/LCV2-Y6Q9 (Maps 2.0 launched in December 2020); *see also* Maps.me, *Maps – White Paper*, 3-5 (Jan. 2021), https://maps.me/token/MAPS.pdf, *archived at* https://perma.cc/GRM4-HKWH (January 2021 white paper states that the financial suite would be launched in the coming month).

[396] Maps.me, *Maps—White Paper*, 7-8 (Jan. 2021), https://maps.me/token/MAPS.pdf, *archived at* https://perma.cc/GRM4-HKWH.

[397] *Id*. at 11.

[398] Maps Token, *MAPS and Maps.me—FAQ*, Medium (Feb. 2, 2021), https://mapstoken.medium.com/maps-and-maps-me-faq-a204bfd976aa, *archived at* https://perma.cc/LCV2-Y6Q9.

Arora (at the time, Head of Product within the FTX Group) as advisors to the project,[399] and public reporting disclosed that Bankman-Fried led a $50 million round of funding for "Maps.me 2.0."[400]

Finally, OXY is the token for the Oxygen Protocol.  According to Oxygen's December 2020 white paper, Oxygen launched as a decentralized borrowing and lending protocol built on Serum and Solana, and was co-founded by the same individuals who co-founded MAPS.[401] Oxygen sought to leverage the user base of Maps.me by integrating into the platform.[402]  Oxygen claimed to offer OXY holders discounts on fees when using the Oxygen Protocol, participation in the governance model, and other benefits through a buy and burn program.[403]  The Oxygen white paper stated that a total of 10 billion OXY tokens would be minted, with a small percentage unlocked at launch and additional tokens unlocked over the course of several years.[404]

---

[399] Maps.me, *Maps—White Paper*, 9 (Jan. 2021), https://maps.me/token/MAPS.pdf, *archived at* https://perma.cc/GRM4-HKWH.

[400] Samuel Haig, *SBF leads $50M funding round to bring DeFi to Maps.me's 140M users*, Cointelegraph (Jan. 18, 2021), https://cointelegraph.com/news/sbf-leads-50m-funding-round-to-bring-defi-to-maps-me-s-140m-users, *archived at* https://perma.cc/5J8R-P4JC.

[401] Oxygen, *Oxygen: The Prime Brokerage Protocol White Paper*, 4-5, 8-10 (Dec. 2020), https://www.oxygen.org/Oxygen.pdf, *archived at* https://perma.cc/H894-8EJE (listing Alex Grebnev and Viktor Mangazeev as co-founders); *see also*, Maps.me, *Maps—White Paper*, 9 (Jan. 2021), https://maps.me/token/MAPS.pdf, *archived at* https://perma.cc/GRM4-HKWH (listing Alex Grebnev and Viktor Mangazeev as co-founders).

[402] Oxygen, *Oxygen: The Prime Brokerage Protocol White Paper*, 8-9 (Dec. 2020), https://www.oxygen.org/Oxygen.pdf, *archived at* https://perma.cc/H894-8EJE.

[403] Oxygen, *Oxygen: The Prime Brokerage Protocol White Paper*, 9 (Dec. 2020), https://www.oxygen.org/Oxygen.pdf, *archived at* https://perma.cc/H894-8EJE; *see also* Oxygen, *Token*, https://www.oxygen.org/token.html, *archived at* https://perma.cc/HU53-NG37.

[404] Oxygen, *Oxygen: The Prime Brokerage Protocol White Paper*, 11 (Dec. 2020), https://www.oxygen.org/Oxygen.pdf, *archived at* https://perma.cc/H894-8EJE.

Bankman-Fried was listed as an advisor to the Oxygen Protocol,[405] and Alameda led a $40

million round of funding into Oxygen.[406]

     *c.*     *Role of FTT in the FTX Group's Collapse*

On November 2, 2022, CoinDesk published an article on a leaked Alameda balance

sheet.[407]  CoinDesk reported that Alameda's balance sheet listed $14.6 billion in assets, with

"unlocked FTT" as the biggest asset at $3.66 billion, and "FTT collateral" as the third largest

asset at $2.16 billion.[408]  The CoinDesk article observed that, according to FTX.com's website at

the time, "[t]here [were] about 197 million FTT tokens worth $5.1 billion in circulation."[409]

According to the CoinDesk article, Alameda's balance sheet also included a generic line item for

"$3.37 billion of 'crypto held.'"  Separately, it listed "large amounts of the Solana blockchain's

native token [SOL]" and holdings of other tokens including SRM, MAPS, and OXY.[410]

Prior to this leak, the crypto industry was already experiencing a downturn, with

cryptocurrency values declining and multiple firms shuttering in the summer of 2022.[411]

Although the price of FTT reportedly had reached a high of approximately $85 in early

---

[405] *Id*. at 10.

[406] Andrew Thurman, *Alameda Research doubles down on Maps.me, invests $40 million in Oxygen*, Cointelegraph (Feb. 24, 2021), https://cointelegraph.com/news/alameda-research-doubles-down-on-maps-me-invests-40-million-in-oxygen, *archived at* https://perma.cc/Q6YT-5NW9.

[407] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Nov. 2, 2022), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/, *archived at* https://perma.cc/8AQ4-RMXJ.  This CoinDesk article, and its role in the collapse of the FTX Group, is also discussed *supra*, at Part 2, Section V(f).

[408] *Id.*  The numbers reported by CoinDesk generally correspond with those in a balance sheet that the USAO-SDNY introduced during Bankman-Fried's trial, which purported to reflect Alameda's holdings as of June 30, 2022.  GX-419 (Consolidated Balance Sheet 2022 Q2), SBF Criminal Case.

[409] Ian Allison, *Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, CoinDesk (Nov. 2, 2022), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/, *archived at* https://perma.cc/8AQ4-RMXJ.

[410] *Id*.

[411] *See, e.g.*, David Gura, *Crypto Billionaire says Fed is driving current downturn*, NPR (June 19, 2022), https://www.npr.org/2022/06/19/1105853170/crypto-billionaire-says-fed-is-driving-current-downturn, *archived at* https://perma.cc/GM2L-MWQ7.

September 2021, it had fallen to approximately $25 in the days before the CoinDesk report, according to public sources.[412]

On November 6, Changpeng Zhao ("CZ"), then-CEO of Binance, tweeted that "[d]ue to recent revelations that have came [*sic*] to light, we have decided to liquidate any remaining FTT on our books,"[413] and that "[d]ue to market conditions and limited liquidity, we expect this will take a few months to complete."[414]  Caroline Ellison responded with a tweet in which Alameda offered to "happily buy it all from you today at $22!"[415]  While public reporting indicates that the price of FTT briefly held around $22 following that tweet, it continued to fall—losing 44% of its value between November 1 and 7.[416]  In the face of this downward spiral, investors tried to withdraw significant assets from FTX.com, with reports quoting claims from Bankman-Fried that $6 billion was withdrawn from the exchange in 72 hours prior to the morning of November

---

[412] *See, e.g., FTX Token overview page*, CoinMarketCap, https://coinmarketcap.com/currencies/ftx-token/, *archived at* https://perma.cc/3L2D-FQZB; *see also FTX overview page*, CoinGecko, https://www.coingecko.com/en/coins/ftx-token, *archived at* https://perma.cc/YJ49-985T.  Once again, in conveying this information, this Report takes no position as to the actual value or trading price of FTT or any other cryptocurrency at any point in time.

[413] Changpeng Zhao (@cz_binance), X (formerly Twitter) (Nov. 6, 2022, 10:47 AM), https://twitter.com/cz_binance/status/1589283421704290306?lang=en, *archived at* https://perma.cc/68PH-SE3P.

[414] Changpeng Zhao (@cz_binance), X (formerly Twitter) (Nov. 6, 2022, 10:47 AM), https://twitter.com/cz_binance/status/1589283426028642305, *archived at* https://perma.cc/8SGA-WEP3.

[415] Caroline Ellison (@carolinecapital), X (formerly Twitter) (Nov. 6, 2022, 11:03 AM), https://twitter.com/carolinecapital/status/1589287457975304193, *archived at* https://perma.cc/69UE-69GR ("@cz_binance if you're looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!").

[416] *See* Tracey Wang & Oliver Knight*, Binance to Sell Reset of FTX Holdings as Alameda CEO Defends Firm's Finance Condition*, CoinDesk (Nov. 6, 2022), https://www.coindesk.com/business/2022/11/06/binance-sells-holdings-of-ftx-token-as-alameda-ceo-defends-firms-financial-condition/, *archived at* https://perma.cc/8NR6-WUU9 (original article published at 11:55 AM EST); *see also* Sam Reynolds, *FTX Token Plummets on Withdrawal Concerns as Contagion Hits Broader Crypto Markets*, CoinDesk (Nov. 7, 2022), https://www.coindesk.com/markets/2022/11/08/ftt-plummets-as-market-fears-possible-alameda-contagion/, *archived at* https://perma.cc/8XRE-N27Z (original article published at 10:28 PM EST).

8.[417]  FTX.com halted crypto withdrawals that afternoon,[418] at which point FTT had fallen to approximately $4.[419]  Three days later, on November 11, the Debtors commenced their bankruptcy cases.

## II.     Summary of Investigations into the Use and Manipulation of FTT

As detailed below, there have been multiple investigations into facts surrounding the FTX Group's use and manipulation of FTT to inflate the value of the FTX Group, including Alameda.  This Examination included a review of both public and nonpublic information concerning these investigations.  The public information included complaints and indictments by government authorities, as well as transcripts and exhibits from the Bankman-Fried trial in October 2023 and sentencing in March 2024.  The nonpublic information included materials created by and for counsel for the Debtors, including memoranda and other documents concerning investigations into aspects of the FTX Group's alleged use and manipulation of FTT. The Examiner's team also spoke to representatives from certain government agencies.

### a.     *Investigative Work*

#### 1.     Government Investigations and Actions

##### (i)     USAO-SDNY

The USAO-SDNY investigated allegations that the FTX Group used and manipulated FTT to inflate its value.  Prosecutors presented evidence of that manipulation during the

---

[417] Tom Willison & Angus Berwick, *Crypto exchange FTX saw $6 bln in withdrawals in 72 hours*, Reuters (Nov. 8, 2022), https://www.reuters.com/business/finance/crypto-exchange-ftx-saw-6-bln-withdrawals-72-hours-ceo-message-staff-2022-11-08/, *archived at* https://perma.cc/3KH9-S5YN.

[418] Tracy Wang, *FTX Exchange Halts All Crypto Withdrawals*, CoinDesk (Nov. 8, 2022), https://www.coindesk.com/business/2022/11/08/ftx-exchange-halts-all-crypto-withdrawals/, *archived at* https://perma.cc/2GLC-Z9R4 (original article published at 4:51 PM EST).

[419] Krisztian Sandor, *FTX Token Falls 80% Despite Binance Bailout as Alameda Contagion Spreads to Bitcoin*, CoinDesk (Nov. 8, 2022), https://www.coindesk.com/markets/2022/11/08/ftx-token-falls-80-despite-binance-bailout-as-alameda-contagion-spreads-to-bitcoin/, *archived at* https://perma.cc/25WW-L693 (original article published at 4:14 PM EST).

Bankman-Fried trial.[420]  This evidence addressed the creation of FTT and its use to inflate the value of Alameda, as well as at least three specific instances where senior executives at the FTX Group manipulated the value of FTT.  Each of these instances of manipulation is discussed in further detail in Section II(b)(2) below.

(ii)    SEC

As noted above, in December of 2022, the SEC filed two cases—one against Bankman-Fried, and the other against Ellison and Wang—that in part allege misuse and manipulation of FTT.  Both complaints conclude that this conduct "violat[es] the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934."[421]  Ellison and Wang entered into consent judgments with the SEC shortly after the complaints were filed.[422]  The case against Bankman-Fried was stayed pending his criminal prosecution.[423]

The SEC complaint against Ellison and Wang alleges widespread manipulation to artificially inflate the price of FTT.  According to the SEC, this was done to increase the value of Alameda's FTT holdings, with those holdings then used as collateral to support loans of customer assets made to Alameda by FTX Trading, as well as loans made to Alameda by third parties.[424]  The SEC complaint further alleges that Alameda inflated the price of FTT by "programm[ing] [] automated trading tools (or 'bots') to conduct trades and execute transactions

---

[420] *See supra*, at Part 3, Section III(a)(1) for additional information concerning the Bankman-Fried trial.

[421] *SEC Charges Caroline Ellison and Gary Wang with Defrauding Investors in Crypto Asset Trading Platform FTX*, Sec. & Exch. Comm'n (Dec. 21, 2022), https://www.sec.gov/news/press-release/2022-234, *archived at* https://perma.cc/8VRS-Y3DF; *see also SEC Charges Samuel Bankman-Fried with Defrauding Investors in Crypto Asset Trading Platform FTX*, Sec. & Exch. Comm'n (Dec. 13, 2022), https://www.sec.gov/news/press-release/2022-219, *archived at* https://perma.cc/BNH8-DZ45 ("The SEC's complaint charges Bankman-Fried with violating the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934").

[422] *Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.) (PKC), Dkt. Nos. 15-16 (Ellison and Wang consent judgments).

[423] *Sec. & Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.) (PKC), Dkt. No. 16.

[424] *Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.) (PKC), Dkt. No. 1 at ¶¶ 92-94.

to purchase FTT at specific prices" and "adjust[ing] trading parameters of its trading bots in order to support the price of FTT."[425]  The SEC complaint also discusses instances in which Bankman-Fried and Ellison sought to artificially prop up the price of FTT in response to external events, which generally correspond to the three examples of manipulation addressed during the criminal trial of Bankman-Fried.[426]

(iii)    CFTC

The CFTC filed a complaint on December 13, 2022, alleging certain violations of law related to the use of FTT by the FTX Group and associated individuals.  This complaint named Bankman-Fried, FTX Trading, and Alameda, and an amended complaint filed on December 21, 2022, added claims against Ellison and Wang.[427]  The amended complaint charges all defendants except for Wang with "fraud and material misrepresentations in connection with the sale of digital asset commodities," and charges Wang with "fraud in connection with the sale of digital asset commodities."[428]

The amended complaint alleges that the creation and use of FTT contributed to the defendants' artificial inflation of Alameda's balance sheet and other frauds.  According to the CFTC, Alameda's holdings comprised "a significant portion of all FTT in circulation."[429]  The CFTC further asserts that, although FTT was relatively illiquid and traded at volumes far below

---

[425] *Id.* at ¶ 92.

[426] *Id.* at ¶¶ 93, 106.

[427] *Commodity Futures Trading Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.) (PKC), Dkt. Nos. 1, 13 (original and amended complaints).

[428] *CFTC Charges Alameda CEO and Alameda and FTX Co-Founder with Fraud in Action Against Sam Bankman-Fried and his Companies* , Commodity Futures Trading Comm'n (Dec. 21, 2022), https://www.cftc.gov/PressRoom/PressReleases/8644-22, *archived at* https://perma.cc/D377-5KF6; *see also Commodity Futures Trading Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.) (PKC), Dkt. No. 13 at ¶¶ 121-137.

[429] *Commodity Futures Trading Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.) (PKC),  Dkt. No. 13 at ¶ 70.

Alameda's FTT holdings, Alameda allegedly valued its FTT holdings on its balance sheet at the illiquid market prices, and then used those assets to support a number of large loans.[430]  The CFTC also alleges that the buy and burn program of FTT contributed to this inflation in that it was "intended to raise the value of the FTT tokens that remained in circulation, and thereby [raise] the value of the FTT that Alameda held."[431]

As was the case for the SEC action, Ellison and Wang both entered into consent judgments with the CFTC shortly after it filed its amended complaint, and the case was otherwise stayed pending the resolution of the criminal case against Bankman-Fried.[432]

## 2.    The Debtors' Investigations

Information and materials shared with the Examiner revealed that the Debtors and their counsel conducted investigatory work that touched on the use and manipulation of FTT by the FTX Group.  Although the Debtors did not undertake a dedicated investigation with the specific purpose of identifying every possible instance of potential FTT manipulation, or all individuals who may have been involved therein, issues related to FTT emerged through investigations into other subjects.

For example, an investigation by Quinn Emanuel into Law Firm-1,[433] a law firm used by the FTX Group prior to the Petition Date, adduced facts related to the original creation of FTT and its use by FTX Group.

S&C also investigated matters related to the buy and burn program of FTT.  For example, S&C analyzed an agreement between FTX Trading and the Debtor entity Cottonwood Grove

---

[430] *Id.* at ¶¶ 70-72.

[431] *Id.* at ¶ 69.

[432] *Commodity Futures Trading Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.) (PKC), Dkt. Nos. 25-26 (Wang and Ellison consent judgments).

[433] *See infra*, at Part 5, Section I(e)(1).

Limited ("Cottonwood Grove"), which purportedly was used by FTX Trading to carry out the FTT buy and burn program.[434]  S&C also investigated FTX Trading's actual implementation of the buy and burn program for FTT, including to determine whether that activity involved any impropriety.

In addition, S&C interviewed and directed investigations into several former employees. Some of those interviews and investigations touched on conduct related to FTT, although FTT itself was not the focus of such inquiries.  Through its broader investigation, S&C also reviewed preserved email and Slack communications[435] involving senior executives of the FTX Group that occurred in the two calendar years prior to the Petition Date.

Finally, although separate from the issue of prepetition manipulation, the Debtors also investigated an allegation of unauthorized "minting" of FTT tokens that took place after the Petition Date.[436]  S&C determined that what occurred was not actually a "minting" of new FTT tokens, but rather the release of 195 million non-trading FTT tokens from an account that had held those tokens since the original minting of FTT in 2019.  Those 195 million FTT tokens have since been returned to the Debtors.

  b. *Investigative Findings*

As set forth above, both the Debtors and multiple government authorities have, to various degrees, conducted investigations into the use and manipulation of FTT by the FTX Group prior to the Petition Date.  This section summarizes the collective findings of these investigations with regards to the original creation of FTT; instances of FTT manipulation; those individuals

---

[434] S&C, *Cottonwood Agreement Summary*, June 20, 2023 ("Cottonwood Agreement Summary").

[435] As discussed *supra*, at Part 3, employees of the FTX Group frequently communicated through self-deleting Signal messages such that many communications were no longer available.

[436] In his November 17, 2022, declaration, Ray reported the unauthorized "dilutive 'minting' of approximately $300 million in FTT tokens" after the Petition Date.  *See* Ray First Day Declaration at ¶ 66.

involved in the manipulation; the use of FTT to inflate Alameda's value; and potential issues related to the FTT buy and burn program.

### 1.    Creation of FTT and its Relation to Alameda's Value

Prior investigations have addressed how Alameda obtained a significant amount of FTT, potentially at little or no cost,[437] and then used those FTT holdings as collateral in order to obtain loans other FTX Group entities as well as from third parties.  At the trial of Bankman-Fried, Ellison testified that "for a lot of 2018, [Alameda] had a lot of trouble getting loans"; however, "[i]t started to improve in the beginning of 2019, but the situation definitely got better towards the end of 2019 when we—after we created FTT."[438]  Ellison also testified that "shortly after [the FTT tokens] were listed, [Bankman-Fried] said that we should start putting them on our balance sheet and that they would be able to get us more loans from third-party lenders."[439]

Investigative materials provided by the Debtors reveal contemporaneous communications in which Bankman-Fried and others discussed the association between the market value of FTT and the claimed value of Alameda.  One Nardello memorandum shared with the Examiner recounts a document circulated by Bankman-Fried on July 22, 2019, a week before the initial listing of FTT, in which Bankman-Fried wrote that "the difference between a $1.5 resting price and a $2.5 resting price is a *$200m swing* in Alameda's [Net Asset Value]."[440]

Bankman-Fried and others also acknowledged the centrality of FTT to Alameda's value and ability to remain in business.  In a document dated September 5, 2019, Bankman-Fried

---

[437] *Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.), Dkt. No. 1 at ¶ 91; Transcript at 672:13-20, SBF Criminal Case, Dkt. No. 358 (Ellison testifying that Alameda received 60-70% of the initial distribution of FTT for free).

[438] Transcript at 670:22-671:4, SBF Criminal Case, Dkt. No. 358.

[439] *Id.* at 674:8-11.

[440] Nardello, *Memorandum re: FTX/Alameda Research Links to Binance and affiliated entities*, Apr. 19, 2023 ("Binance Memo"), at 7 (quoting F10705-E000282184) (emphasis in original).

acknowledged that Alameda's "NAV is currently extremely dependent on exactly how you count FTT; if FTT counts for anything it's totally fine, but if it doesn't then we aren't able to support our current borrows/etc."[441]  Around that same time, another senior executive of Alameda, Trabucco, warned of an "exodus" if employees were to understand Alameda's net asset value without FTT, and yet another senior executive, Singh, expressed concern that Alameda had a "negative-without-FTT NAV."[442]

### 2.    Instances of FTT Manipulation

Prior investigations have also revealed how senior FTX Group executives engaged in various acts intended to artificially inflate the value of FTT—and thus the value of Alameda. This included purchasing FTT at specific prices—even losing money on individual trades—in order to inflate or defend the value of FTT.  The SEC has alleged that Alameda executed these trades at least in part through programmed bots.[443]

While the Examiner understands that certain investigations remain ongoing, these investigations have revealed at least three specific instances in which senior executives of the FTX Group sought to manipulate the price of FTT.

One such instance of manipulation involved an effort to keep the price of FTT above one dollar after it was first listed in 2019—at which point some of the pre-listing sales of FTT started to "unlock" and could be resold.  Ellison testified that Bankman-Fried "thought 1 dollar was a psychologically important price, and if it went below a dollar, then people might lose confidence in it, so that [Alameda] should try to buy it if it started going below a dollar."[444]  Investigations

---

[441] *Id.* at 9 (quoting F10705-E000273170).

[442] *Id.* at 10 (quoting F10705-E000273198); *id.* at 11 (quoting F10705-E001025865).

[443] *Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.) (PKC), Dkt. No. 1 at ¶ 92.

[444] Transcript at 672:25-673:5, SBF Criminal Case, Dkt. No. 358.

conducted by S&C likewise identified contemporaneous communications in which Trabucco expressed concerns regarding the price of FTT in 2019, and the potential consequences of a decline in price.[445]

A second example of manipulation occurred in or around July 2021, when Binance began to sell some of its significant FTT holdings.  Ellison testified that she was instructed by Bankman-Fried to defend the price of FTT by "buying once the price had gone down a bit," due to the downward pressure created by Binance "selling some of their stake in FTT."[446]  Ellison understood that Bankman-Fried wanted her to defend the price of FTT to avoid unnerving the market or "put[ting] any of our loans in danger by having the price go down too much"—even if this resulted in Alameda losing money on the individual trades.[447]

Finally, Ellison testified concerning an effort to prop up the value of FTT on November 6, 2022, after Binance's then-CEO announced an intention to sell all remaining FTT holdings.  In response, and in an effort to counteract a reduction in FTT's price and dispel concerns over Alameda's liquidity, Ellison tweeted an offer to buy Binance's holdings for $22 per token.[448] Ellison testified that, while this tweet did stabilize FTT's price around $22 for some time, it continued to decline and she and Bankman-Fried stopped defending FTT at $22 in the face of "a lot of selling."[449]

---

[445] Binance Memo, at 10 (quoting F10705-E000273198).

[446] Transcript at 674:18-23, SBF Criminal Case, Dkt. No. 358; *see also Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.) (PKC), Dkt. No. 1 at ¶ 93 ("In another instance in 2021, the price of FTT was again facing downward pressure from external events, this time related to substantial sales of FTT by a third party. Bankman-Fried again instructed Ellison to have Alameda purchase FTT on trading platforms to support the price.").

[447] Transcript at 676:23-677:2, SBF Criminal Case, Dkt. No. 358.

[448] Transcript at 905:18-22, 906:12-17, SBF Criminal Case, Dkt. No. 360.

[449] *Id*. at 907:10-25.

Additionally, Ellison testified that, in general, Bankman-Fried "gave us a lot of instructions about FTT" and that "at various points he instructed us to buy if there was a large amount of selling or if the price was going down too much."[450]

### 3. Individuals Involved in Manipulation

The investigations into FTT manipulation have principally centered on conduct by Ellison, under the direction of Bankman-Fried, to manipulate the price of FTT for the benefit of Alameda. At the Bankman-Fried trial, Ellison testified that such information was closely held among select individuals and not widely shared.[451]

On the other hand, testimony and exhibits introduced at the trial suggest that others at the FTX Group may have had occasion to detect efforts to manipulate FTT. For example, Ellison testified concerning an instance in which trades undertaken with the purpose of supporting the price of FTT, as opposed to maximizing value, were questioned by another Alameda trader.[452] Ellison also testified that the plan to publicly tweet the $22 offer for FTT in November 2022 was discussed in a group chat that included not only herself and Bankman-Fried but also other individuals associated with Alameda.[453] Moreover, the SEC complaint alleges that the manipulation was carried out in part through bots that were programmed to trade at certain prices. But the SEC complaint does not identify those involved in the programming. However, while the above individuals and others may have questioned certain trading activity of Alameda and even had reason to suspect ulterior motives, this alone does not indicate actual knowledge as to the manipulative intent of such transactions, nor knowing participation in such conduct.

---

[450] Transcript at 674:12-17, SBF Criminal Case, Dkt. No. 358.

[451] *Id.* at 674:24-675:7.

[452] *Id.* at 676:4-22.

[453] Transcript at 904:22-906:17, SBF Criminal Case, Dkt. No. 360.

Based on materials reviewed in this Examination and discussions with counsel for the Debtors, it does not appear that the Debtors conducted an investigation with the specific objective of identifying all employees or agents of the FTX Group who had actual knowledge of or contributed to the manipulation of FTT. However, as set forth above, S&C reviewed numerous communications of the FTX Group's senior executives, including Bankman-Fried and Ellison, and investigated other subjects that likely would have identified any others centrally involved in FTT manipulation. Based on information provided by S&C, that work did not reveal any such other individuals.

### 4.    Use of FTT to Inflate Alameda's Value

Apart from the attempts to manipulate the market price of FTT discussed above, prior investigations have concluded that Alameda's valuation of its FTT holdings using open market prices was itself unreasonable given the relatively illiquid market for FTT and the fact that FTT made up a significant portion of Alameda's balance sheet.

Based on these investigations, Alameda executives understood that if Alameda had sought to liquidate its outsized holdings, it could not have obtained the same prices reflected in the market for much smaller transactions. Ellison testified at Bankman-Fried's trial that she initially did not put Alameda's FTT holdings on Alameda's balance sheet, since it would have been "somewhat misleading because we wouldn't have been able to sell all the FTT for that much and it was much larger than the rest of the items on our balance sheet at the time."[454] She similarly testified that, given that Alameda owned most of the FTT in circulation, "if Alameda

---

[454] Transcript at 678:20-679:3, SBF Criminal Case, Dkt. No. 358.

had actually tried to sell the FTT that we owned, it would have ended up kind of making up way less than" the mark-to-market value reflected on the balance sheet.[455]

Wang similarly testified that if Alameda had sold all of its FTT in 2019 or 2020, "it would cause the price of FTT to drop by large amounts."[456]  That was "[b]ecause there is not enough people who would want to buy all of the FTT that is being sold all at once at the price it was currently trading at."[457]

In addition, prior investigations suggest that certain agents of the FTX Group may also have been aware of these risks.  For example, in its investigation of Law Firm-1, Quinn Emanuel identified a December 2019 communication from Bankman-Fried to members of that firm in which Bankman-Fried acknowledged that "Alameda holds lots of FTT, which has a high market value but that market value could not be realized without crashing the market."[458]  Quinn Emanuel concluded that the firm would have understood at the time that the FTX Group's holdings in FTT were illiquid and thus posed a significant risk to the FTX Group's solvency.[459]

### 5.    The Buy and Burn Program

Bankman-Fried testified at trial that the buy and burn program was a key feature of FTT and functioned "similar to a share buyback.  So if, for instance, FTX had $3 million of revenue in a week, it would take 1 million of those dollars and use that to buy FTT tokens in the market, effectively giving value to FTT token holders."[460]  While this program was touted as providing

---

[455] *Id*. at 679:4-12.

[456] Transcript at 378:9-14, SBF Criminal Case, Dkt. No. 352.

[457] *Id.* at 378:15-19.

[458] Document produced by Law Firm-1 to Quinn Emanuel.

[459] Quinn Emanuel's investigation has not, however, identified any evidence that this firm was aware of the efforts by the FTX Group to manipulate the market price of FTT.

[460] Transcript at 2374:5-15, SBF Criminal Case, Dkt. No. 376.

value to ordinary holders of FTT, the CFTC has alleged that this program existed to inflate the value of the FTT that remained in circulation—the vast majority of which was held by Alameda.[461]  Through post-Petition Date investigations, S&C similarly concluded that the program created upward pricing pressure on FTT.[462]  S&C determined that the FTX Group spent approximately $462 million of its approximately $1.5 billion in gross revenue on this FTT buy and burn program in order to purchase FTT from existing token holders, including Alameda.[463]

S&C has also investigated certain aspects of FTT's buy and burn program.  FTX Trading had represented that the FTT buy and burn program was conducted by Cottonwood Grove, a wholly owned subsidiary of Alameda, through the terms of a licensing agreement with FTX Trading.[464]  Pursuant to this agreement, dated April 15, 2019, Cottonwood Grove was to receive certain licensing fees from FTX Trading that it could use to repurchase tokens for burning. Bankman-Fried served as the signatory for both Cottonwood Grove and FTX Trading on this agreement.[465]  However, through its investigation, S&C concluded that the Cottonwood-FTX agreement was "likely illegitimate" and "likely an attempt to shield revenues from tax authorities."[466]  Among other things, forensic experts retained by S&C did not identify any payments between FTX Trading and Cottonwood, which one would have expected to see if there was a legitimate licensing agreement between the companies.[467]

---

[461] *Commodity Futures Trading Comm'n v. Bankman-Fried*, No. 1:22-cv-10503 (S.D.N.Y.) (PKC), Dkt. No. 13 at ¶¶ 69-70.

[462] S&C, *Review of Post-Petition Investigations for Examiner,* Mar. 15, 2024, at 175.

[463] *Id.*

[464] Cottonwood Agreement Summary, at 1,3.

[465] Software License, Tokenization, and Co-Marketing Agreement, at 11, F10705-E000004616.

[466] Cottonwood Agreement Summary, at 5, 10.

[467] *Id*. at 6-8.

S&C also conducted an investigation into the actual mechanics of the FTT buy and burn program. S&C, with assistance from Alvarez & Marsal, determined that the buy and burn program was conducted through an FTX Trading account that bought FTT on the open market. A detailed review of data for the buy and burn transactions conducted by Alvarez & Marsal did not reveal any improper preferential trading, non-market price trading, or other potential manipulation conducted through this program.

## III.    Summary of Investigations into Other FTX-Affiliated Tokens

Compared to FTT, there has been more limited investigation into three other cryptocurrency tokens associated with the FTX Group: SRM, OXY, and MAPS (the "Other FTX-Affiliated Tokens"). As discussed in Section I(b) above, each of these tokens was in part created by, or otherwise associated with, Bankman-Fried. In addition, based on public reporting and exhibits introduced during the trial of Bankman-Fried, Alameda listed holdings of each of these tokens on its balance sheet.

Given this context, this Examination also considered prior investigatory work concerning these tokens, and whether the FTX Group may have also manipulated one or more of these tokens or otherwise used holdings of such tokens to inflate its value.

As set forth below, although the Other FTX-Affiliated Tokens do not appear to have been the principal focus of any investigation to date, certain information regarding these tokens has emerged from investigations into other subjects.

### a.    Investigative Work

#### 1.    Government Investigations and Actions

The complaints filed by the SEC and testimony elicited during the Bankman-Fried criminal trial focused principally on FTT as the subject of token manipulation. However, the complaints also allude to potential misconduct related to Other FTX-Affiliated Tokens.

The SEC complaints allege that "Bankman-Fried . . . misrepresented the risk profile of investing in FTX . . . by failing to disclose FTX's exposure to Alameda and, relatedly, that the collateral Alameda deposited on FTX consisted largely of illiquid, FTX-affiliated tokens, including FTT."[468]

During the Bankman-Fried trial, Ellison testified that Alameda had large holdings of SRM, MAPS, and OXY, and that these illiquid coins, along with FTT, were placed on Alameda's balance sheet.[469]  Ellison also testified that Alameda had programmed models to support not only the price of FTT, but also SRM.[470]  This testimony is detailed further in the following section.

2.    The Debtors' Investigations

The Debtors do not appear to have conducted a dedicated investigation with the specific purpose of identifying manipulation of the Other FTX-Affiliated Tokens.  However, these tokens are briefly addressed in certain materials shared with the Examiner.

Specifically, Quinn Emanuel's investigation into Law Firm-1 also addressed certain issues concerning the creation and control of SRM by the FTX Group.  The findings of this investigation are detailed below.  In addition, in the Motion of Debtors to Estimate Claims Based on Digital Assets, the Debtors asserted that "Alameda's balance sheet holdings of MAPS, OXY and SRM played a large role in Mr. Bankman-Fried's fraud."[471]  Additionally, an expert proffered by the Debtors in support of that motion opined that the SRM, MAPS, and OXY tokens appeared "consistent with [a] strategy" to "artificially inflate the trading price of the

---

[468] *Sec. & Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y.), Dkt. No. 1 at ¶ 29; *see also Sec. & Exch. Comm'n v. Ellison*, No. 22-cv-10794 (S.D.N.Y.), Dkt. No. 1 at ¶ 33 (substantially similar language).

[469] Transcript at 681:17-683:7, SBF Criminal Case, Dkt. No. 358.

[470] *Id*. at 719:22-720:16.

[471] Dkt. No. 9566 at ¶ 4.

token" through a restriction of free-float.[472]  The Examiner understands that S&C has also investigated certain matters related to MAPS and OXY.

   b.    *Investigative Findings*

As set forth above, there has been relatively limited investigation concerning SRM, MAPS, and OXY.  This section summarizes the current findings of these investigations based on information reviewed in this Examination.

   1.    Alameda's Holdings of Illiquid Other FTX-Affiliated Tokens on Its Balance Sheet

At the trial of Bankman-Fried, Ellison testified that, as with FTT, the overall liquidity of these coins "was not very high."[473]  Nevertheless, Alameda ultimately included each of these coins on its balance sheet.

At trial, the government introduced a consolidated balance sheet for Alameda for Q2 of 2022 that attributed roughly $1 billion of Alameda's $14.6 billion in total reported assets to holdings of SRM, MAPS, and OXY.[474]  This included line items for $182 million in unlocked SRM, $160 million in unlocked MAPS, and $37 million in unlocked OXY, as well as entries for roughly $300 million in locked SRM, $347 million in locked MAPS, and $38 million in locked OXY.[475]  By comparison, the same balance sheet reported over $5.8 billion in FTT assets (between "Unlocked FTT" and "FTT collateral").[476]

As with FTT, Ellison testified that if Alameda attempted to sell all of its holdings in the Other FTX-Affiliated Tokens, "we would end up getting a lot less" than the value on the balance

---

[472] Dkt. No. 9566-2 at ¶ 10.

[473] Transcript at 682:6-17, SBF Criminal Case, Dkt. No. 358.

[474] GX-419 (Consolidated Balance Sheet 2022 Q2), SBF Criminal Case; *see also* Transcript at 811:2-14, SBF Criminal Case, Dkt. No. 360 (USAO-SDNY introducing balance sheets that Ellison prepared, including GX-419).

[475] GX-419 (Consolidated Balance Sheet 2022 Q2), SBF Criminal Case.

[476] *Id*.

sheet.[477]  Wang similarly testified that SRM and FTT were cryptocurrencies "that were illiquid" and so Alameda "wouldn't be able to get the full value."[478]  This is notable since, based on information provided by S&C, Alameda may have used its SRM holdings to collateralize certain loan obligations—although to a much lesser degree than with FTT.

2.    Potential Manipulation of Other FTX-Affiliated Tokens

At the Bankman-Fried trial, Ellison testified that the low liquidity of a given token made it easier to move the price of that token through trades.  She gave the following example:

> So liquidity is a measure of how much market trading activity there is in something and how easy it is to buy and sell it without moving the price too much.  So for some of these coins, like MAPS, if you tried to buy a little bit of MAPS, the price would go up a lot, and, conversely, if you tried to sell it, the price would go down a lot.[479]

Similarly, in postpetition litigation over the value of SRM, MAPS, and OXY, an expert retained by the Debtors opined that market prices for the tokens were based on amounts of tokens available for trading (free float), which were "*less than three percent* of the tokens' maximum supply."[480]  The Debtors' expert observed that others, including Bankman-Fried, had acknowledged that restricting the free float of tokens could allow for the creators of those tokens to inflate the market values; they could then use those inflated market values to inflate the values of the tokens on their balance sheets.[481]  The Debtors' expert opined that "[t]he at-issue tokens appear to be consistent with this strategy."[482]  However, the Debtors' expert did not investigate these tokens to determine if manipulation had actually occurred.

---

[477] Transcript at 683:3-7, SBF Criminal Case, Dkt. No. 358.

[478] *Id*. at 526:12-19.

[479] *Id*. at 682:10-17.

[480] Dkt. No. 9566-2 at ¶ 10 (emphasis in original).

[481] *Id*. at ¶ 10.

[482] Dkt. No. 9566-2 at ¶ 10.

At trial, Ellison testified that Alameda had trading models that "were generally set up to buy FTT and Serum as they went down," in order to "support them, provide liquidity"—and that this was done in part to keep the price up.[483]  Based on information provided in this Examination, it does not appear that the Debtors specifically investigated these models.

### 3.    Debtors' Control of Serum

At the time SRM was launched, FTX Trading and Alameda disclosed that they had created the Serum Foundation, which built the Serum protocol.[484]  The Serum white paper represented, however, that "[w]hile we have built the Serum protocol, it is permissionless—*we do not hold special power anymore*.  It is up to you, the crypto community, to use it as you will."[485]  Contrary to such representations, Quinn Emanuel determined that the FTX Group in fact maintained the ability to exercise at least a certain degree of control over Serum.

Quinn Emanuel's investigations further found that, at the instruction of the FTX Group's employees, Law Firm-1 created the Serum Foundation with systems that would allow certain employees of the FTX Group to continue to exercise control over the Serum Foundation and the SRM token.  Quinn Emanuel also found that individuals associated with the FTX Group used Law Firm-1 to create an entity called the Incentive Ecosystem Foundation in order to provide incentives for the SRM ecosystem and bolster SRM's market price, while concealing that entity's connection to the FTX Group.[486]  In addition, Quinn Emanuel found that, unbeknownst

---

[483] Transcript at 719:20-720:16, SBF Criminal Case, Dkt. No. 358.

[484] Anatoly Yakovenko, *FTX Chooses Solana for Serum: A High-Speed, Non-Custodial Decentralized Derivatives Exchange*, Medium (July 27, 2020), https://medium.com/solana-labs/ftx-chooses-solana-for-serum-a-high-speed-non-custodial-decentralized-derivatives-exchange-c346a27c1f2b, *archived at* https://perma.cc/672K-GZJU.

[485] Serum Foundation, *Serum—White Paper*, 11 (July 2020) (emphasis added), https://whitepaper.io/document/626/serum-whitepaper, *archived at* https://perma.cc/GWZ4-EQTC.

[486] *See* Andrew Thurman, *Solana DeFi Major Serum's 'Incentive Ecosystem Foundation' Is Raising $100M*, CoinDesk (Jan. 7, 2022), https://www.coindesk.com/business/2022/01/07/solana-defi-major-serums-incentive-ecosystem-foundation-is-raising-100m/, *archived at* https://perma.cc/7XS8-AS8A (article quotes an "pseudonymous Serum core contributor JHL" who framed the foundation as a part of Serum separating itself from the FTX Group).

to the public, the FTX Group and certain affiliated individuals could control the burn of SRM tokens during a transition period.  However, Quinn Emanuel has not identified any evidence that Law Firm-1 was aware of any actual manipulation of the buy and burn program.

S&C directed an investigation into Solana, the blockchain platform used for Serum. Although this investigation identified a "significant level of collaboration between the FTX and Solana teams,"[487] the investigation did not find that Solana was aware of any improper control or manipulation by the FTX Group in connection with the Serum Foundation or the SRM token.

4.    The Debtors' Involvement with MAPS and OXY

As discussed above, contemporaneous public reports disclosed that Bankman-Fried and/or Alameda had invested in MAPS and OXY, and that Bankman-Fried served as an advisor to both MAPS and OXY.  Investigatory work by the Debtors during the bankruptcy cases has revealed additional connections.

First, in a filing in the bankruptcy cases, the Debtors reported that Friedberg—the former General Counsel of Alameda—"commissioned the White Paper for Maps and drafted significant portions of it in October 2020."[488]

Second, S&C requested that Nardello investigate certain matters concerning MAPS Vault, an entity owned by Alexander Grebnev and Victor Mangazeev.[489]  Grebnev and Mangazeev are listed as the co-founders of MAPS and OXY in the respective white papers.[490] The January 31, 2024 Nardello investigation memorandum does not address any potential

---

[487] Nardello, *Memorandum re: Solana*, Sept. 19, 2023, at 18.

[488] Dkt. No. 9566 at ¶ 25.

[489] Nardello, *Memorandum re: Potential Claimant—MAPS Vault Limited*, Jan. 31, 2024 ("MAPS Vault Memo"), at 2.

[490] *See* Maps.me, *Maps—White Paper*, 9 (Jan. 2021), https://maps.me/token/MAPS.pdf, *archived at* https://perma.cc/GRM4-HKWH; Oxygen, *Oxygen: The Prime Brokerage Protocol White Paper*, 9-10 (Dec. 2020), https://www.oxygen.org/Oxygen.pdf, *archived at* https://perma.cc/H894-8EJE.

manipulation of MAPS or OXY.  However, the investigation found that companies associated with both MAPS and OXY had signed agreements with Cottonwood Grove—a subsidiary of Alameda.[491]

## IV.    Conclusion

As set forth above, the Bankruptcy Court charged the Examiner with determining "whether the Investigations adequately addressed the Debtors' use of its cryptocurrency, FTT, to inflate the value of FTX and Alameda Research."[492]  This Examination also considered the same question with respect to the Other FTX-Affiliated Tokens, three other cryptocurrency tokens closely associated with the FTX Group.

Based on the information and materials reviewed in the course of this Examination, and given the objectives of the bankruptcy process and this Examination, the Examiner concludes that prior investigations have adequately addressed whether the FTX Group used these cryptocurrency tokens to inflate its value.

To be sure, the investigations to date may not have identified every instance in which FTT or other cryptocurrency tokens may have been manipulated by the FTX Group or otherwise used to inflate the value of the FTX Group, including Alameda, prior to the Petition Date.  In particular, the investigations into the Other FTX-Affiliated Tokens have been relatively limited to date, despite indications that those tokens had the potential to be manipulated in a similar manner as FTT.  On the other hand, the Other FTX-Affiliated Tokens were less prominent and comprised a significantly smaller portion of Alameda's balance sheet.  Moreover, the Examiner

---

[491] MAPS Vault Memo, at 5 (finding that Cottonwood Grove signed a $15 million revolving loan agreement with MAPS Vault, and that Cottonwood Grove signed an agreement with Oxygen to coordinate any private sales of tokens over $1 million).

[492] Scope Order at ¶ 3.

understands that certain investigations related to the Other FTX-Affiliated Tokens remain ongoing.

Overall, the Examiner concludes that further investigation into these subjects is unlikely to confer significant additional benefit on the estates or the public at this juncture.  As set forth above, questions concerning token manipulation and inflation of assets by the FTX Group have been investigated by multiple government agencies, as well as multiple professionals retained by the Debtors.  The findings across these investigations are largely consistent and have already identified several methods of manipulation as well as the individuals primarily involved in such conduct.  Although further investigation by the Examiner into token manipulation might reveal additional instances of manipulation or other individuals who facilitated such conduct, such an investigation would require significant time and resources that is likely to outweigh any marginal benefit conferred on the estates or the public.

## PART 5:  MISCONDUCT BY PROFESSIONALS ENGAGED BY THE FTX GROUP

In addition to reporting on the three enumerated issues in the Scope Order, the Examiner was charged with "summariz[ing] the investigations of the Debtors" and "mak[ing] recommendations for additional investigations."[493]  Pursuant to that obligation, this Part examines and summarizes investigations into professional service firms used by the FTX Group.  A summary of investigations into other issues involving the FTX Group—beyond the three issues enumerated in the Scope Order and the FTX Group's professional service firms—follows in Part Six.

After the FTX Group filed its Chapter 11 petitions, Quinn Emanuel was retained as conflicts counsel and directed to undertake a comprehensive investigation of any professionals the FTX Group engaged prior to the Petition Date.  In total, Quinn Emanuel identified 195 different law firms, auditors, accountants, financial consultants, and other professionals engaged by the FTX Group between 2017 and 2022 (collectively, "Professionals").[494]  The vast majority of Professionals investigated were law firms.[495]  Quinn Emanuel, with Alvarez & Marsal and S&C, used the FTX Group's books and records to identify these firms by locating engagement letters, payments for "Legal Services" or "Professional Services" as reflected in the general ledgers, bank statements, and FTX Exchanges.[496]  Additionally, as Quinn Emanuel's parallel investigations into the FTX Group's venture investments and the FTX leadership progressed, it identified several other entities the FTX Group had engaged.[497]

---

[493] Scope Order at ¶ 2.

[494] Professionals Report, at 1.

[495] *Id.* at 5.

[496] *Id.* at 6-7.

[497] *Id.* at 3, 7.

For the purposes of determining the type of investigation to be undertaken, Quinn Emanuel assigned each Professional to a group depending on the nature and extent of the professional services provided, as well Quinn Emanuel's determination of the total fees paid to the Professional based on its analysis of the FTX Group's books and records.[498]  Each engagement was first reviewed to determine whether it potentially related to, or touched on, the subject of FTX leadership misconduct, including: (1) the treatment of FTX.com customer deposits and funds; (2) the use of the FTX exchanges' customer funds; (3) the sources of assets available to Alameda and other FTX Group entities; (4) the use of FTX Group assets to make venture investments; (5) statements and representations to the FTX exchanges' customers, Alameda's lenders and creditors, regulators, and the investing public generally; (6) interactions with foreign government officials in connection with regulations, licensure, and the disposition of FTX Group cryptocurrency; and (7) legal and internal controls within the FTX Group (collectively, the "Investigative Topics").[499]

Section I discusses the law firms that provided prepetition legal services to the FTX Group; Section II discusses the FTX Group's auditors; Section III discusses the FTX Group's accountants; Section IV discusses the FTX Group's valuation firms; Section V discusses the consultants that provided the FTX Group regulatory, compliance, and licensing services; Section VI discusses the FTX Group's government and community relations consultants; Section VII discusses the FTX Group's lobbyists; Section VIII discusses other professional vendors hired by

---

[498] *Id.* at 6-7; *see also id.* at Appendix A.

[499] Quinn Emanuel developed these investigative topics after reviewing several publicly filed documents—including the Fifth Superseding Indictment returned on March 27, 2023 against Bankman-Fried; the proceedings leading up to and including the criminal trial of Bankman-Fried; and the findings presented in the First and Second Interim Reports regarding FTX Group's control failures—as well as the Debtors' investigations into FTX leadership, investment and venture acquisitions, and the facts developed through the Debtors' prosecution of civil actions. *Id.* at 4-5.

the FTX Group; and Section IX discusses the FTX Group's banks and financial institutions.

Finally, Section X explains the bases for the Examiner's conclusion that, at this time, none of

these prepetition professionals warrant further investigation by him.

## I.    Law Firms

Quinn Emanuel identified 145 law firms that provided prepetition legal services to the

FTX Group.[500]  Quinn Emanuel categorized each firm into one of three tiers based on criteria

reflected below:

| Table 1 | | Tier One | Tier Two | Tier Three |
|---|---|---|---|---|
| **Primary Criteria** | | Services significantly intersected with the Investigative Topics **OR** fees over $1 million | > $100k Fees **AND** intersection between services and Investigative Topics | < $100k Fees **AND** no apparent intersection between services and Investigative Topics |
| **Depth of Investigation** | | • Scope of engagement<br>• Invoices<br>• Review internal documents<br>• Rule 2004 Requests<br>• Investigatory memoranda | • Scope of engagement<br>• Invoices<br>• Review relevant internal documents | • Scope of engagement<br>• Invoices |

Initially, Tier One comprised 29 law firms, Tier Two comprised 17 firms, and Tier Three

included 99 firms.[501]  Twenty-three of the Tier Two and Tier Three law firms were later

reclassified to Tier One after Quinn Emanuel determined that the scope of these engagements

potentially intersected with certain Investigative Topics.[502]

---

[500] *Id.* at 7; *see also id.* at Appendix B.

[501] *Id.* at 9.

[502] *See id.* at Appendix B; *see also id*. at 13.

a.    *Tier One Law Firms*

The law firms subject to Tier One investigation received more than $1 million in fees or provided services that touched on the Investigative Topics.  Tier One was subject to the most rigorous investigation.  The process included Bankruptcy Rule 2004 requests, a review of the FTX Group's internal documents, and preparation of investigatory memoranda.[503]  In response to its Bankruptcy Rule 2004 requests, Quinn Emanuel received and reviewed approximately 222,500 documents.  Simultaneously, Quinn Emanuel reviewed approximately 226,000 documents in the FTX Group's possession that were specifically tied to known Professionals' names and email addresses.[504]  The investigation concluded that the Tier One law firms were paid approximately $54.7 million in fees.

b.    *Tier Two Law Firms*

Seventeen law firms were initially categorized as Tier Two (i.e., the firm was paid more than $100,000 and had some engagements related to the Investigative Topics).[505]  Quinn Emanuel analyzed their: (1) scope of engagement; (2) invoices; and (3) other relevant documents and communications maintained by the FTX Group.[506]  In the course of the Tier Two investigation, Quinn Emanuel escalated 10 firms to Tier One investigatory scrutiny.[507]  For the remaining seven law firms, Quinn Emanuel found that they provided general corporate, general

---

[503] Professionals Report, at 3, 9.

[504] *Id.* at 11.

[505] *Id.* at 12-13.

[506] *Id.* at 13.

[507] *Id.*; *see also id.* at Appendix B.

employment, or immigration services not relevant to the Investigative Topics.[508]  Accordingly, Quinn Emanuel determined that these seven law firms did not warrant further scrutiny.[509]

### c.      Tier Three Law Firms

The remaining 99 law firms, all of whom invoiced the FTX Group less than $100,000, were investigated as Tier Three firms.[510]  Quinn Emanuel reviewed these firms' invoices and engagement letters to assess whether any warranted further investigation.[511]  Ultimately, Quinn Emanuel concluded that 13 of these firms should be escalated to Tier One scrutiny, as the firms provided legal services significantly related to the Investigative Topics.[512]  The remaining 86 Tier Three firms were not subject to further investigation.[513]

### d.      Witnesses Interviewed in Connection with Law Firm Investigations

In addition to reviewing documents, Quinn Emanuel and S&C interviewed former FTX Group in-house attorneys and compliance officers.[514]  These individuals were interviewed to provide additional background on the prepetition law firms and their work for the FTX Group, as well as to provide more detail on issues such as whistleblower complaints and how they were addressed.

### e.      Summary of Notable Findings Concerning Law Firms[515]

This Section discusses Quinn Emanuel's investigation into certain Tier One law firms, the law firms subject to the most rigorous investigation.  In general, Quinn Emanuel determined

---

[508] *Id*. at 13.

[509] *Id*.

[510] *Id.*

[511] *Id.*

[512] *Id*. at Appendix B.

[513] *Id.* at 13.

[514] *Id.* at 14.

[515] An analysis of notable findings concerning S&C is included in Part 2, *supra*.

that the FTX Group selected law firms in a disorganized and haphazard manner.  Only Law

Firm-1 was entrusted with a bird's-eye view.  Otherwise, law firms were generally given discrete

tasks on an ad hoc basis and work was often duplicated among law firms.  As a result, at times,

law firms received fees without providing meaningful services.  However, Quinn Emanuel's

investigation also determined that most law firms' work did not intersect with misconduct at the

FTX Group.

### 1.    Law Firm-1

Quinn Emanuel's investigation established that Law Firm-1 was perhaps the law firm

most intertwined with the FTX leadership and, unlike other Professionals, had unique access to a

vast range of matters and information on behalf of the FTX Group.  As of February 2024, Quinn

Emanuel reviewed approximately 68,000 documents through strategic searches of the FTX

Group's internal database and documents produced by non-law firm third parties (together, the

"Database").[516]  Quinn Emanuel also obtained more than 183,136 documents from Law Firm-1

through its Bankruptcy Rule 2004 requests.[517]  Notably, however, Law Firm-1 frequently used

ephemeral messaging platforms such as Signal[518] to communicate with individuals at the FTX

Group and, to date, has only produced 144 individual or group chats between Law Firm-1 and

FTX Group employees.[519]  Only 18 of those chats still contained messages; the remainder only

showed that a group message had once existed, but did not contain any content.  As of May

2024, Law Firm-1's production and Quinn Emanuel's investigation remain ongoing.[520]

---

[516] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 12.

[517] Professionals Report, at 19.

[518] Ephemeral messaging applications are programs that allow messages to be automatically deleted at some point following receipt of a message.  *See supra* note 151.

[519] Professionals Report, at 21.

[520] *Id*. at 19 n.32.

Joseph Bankman selected Law Firm-1 as Alameda's outside counsel in October 2017.[521] Law Firm-1 then served as the FTX Group's primary U.S. outside counsel and advised the company on issues of employment, tax, lending agreements, acquisitions, regulatory matters, government investigations, compliance and risk mitigation, equity incentives, partnership agreements, trademark enforcement, intercompany services agreements, purchase agreements, and financing.[522]   Between 2018 and 2022, Law Firm-1 received more than $22 million in legal fees from the FTX Group.[523]

In 2018, while Friedberg was a partner at Law Firm-1, Joseph Bankman encouraged Bankman-Fried to employ Friedberg in a central role at Alameda.[524]   Friedberg and Can Sun left Law Firm-1 to join the FTX Group, in January 2020 and August 2021, respectively.[525]   Friedberg served as both the Chief Compliance Officer for FTX.US and General Counsel of Alameda, and Sun was the General Counsel for FTX Trading.[526]   However, the relationship between Law Firm-1 and the FTX Group went beyond Friedberg and Sun.   Joseph Bankman maintained unusually close personal relationships with various other Law Firm-1 lawyers, which sometimes translated into subsidizing perks for certain Law Firm-1 attorneys, such as paying for travel and admittance to sporting events.[527]

Quinn Emanuel found that Law Firm-1 was involved in an expansive range of matters, including those that closely intersected with core aspects of the FTX Group's improper

---

[521] *Id.* at 18-19.

[522] *Id.* at 19.

[523] *Id.* at 19; *see also id.* at Appendix A.

[524] *Id*. at 19.

[525] *Id*. at 19-20.

[526] *Id*. at 20.

[527] *Id.*

operations and management.  For example, Law Firm-1 attorneys were directly involved in the

following:

- The FTX Group's issuance of "founder loans," which were used to move at least $2 billion in cash and assets among FTX Group entities, as well as directly into the personal accounts of FTX Group leadership;

- Friedberg's creation of a backdated payment agent agreement between FTX Trading and Alameda;

- FTX Group leadership's efforts to obfuscate from government regulators and investors the close relationship between FTX Trading and Alameda;

- FTX Group leadership's efforts to use unconventional settlements to silence credible whistleblowers; and

- FTX Group's efforts to downplay its involvement with, and control over, the Serum Foundation.[528]

Given Law Firm-1's role and retention concerning several matters related to the

misconduct of the FTX Group leadership, Quinn Emanuel continues to assess these facts and

evaluate what additional steps it might advise the Debtors to take.[529]

2.    Law Firm-2

Quinn Emanuel reviewed all 15,742 documents produced by Law Firm-2 in response to

Bankruptcy Rule 2004 requests and approximately 15,950 of the FTX Group's own documents

relating to Law Firm-2 identified using various search terms.[530]

Quinn Emanuel's review revealed that Ryne Miller selected Law Firm-2 as counsel for

the FTX Group in December 2021.[531]  Law Firm-2 was then formally engaged by the FTX

---

[528] *Id.* at 21.

[529] *Id.* at 21-22.

[530] *Id.* at 29.

[531] *Id.*

Group and worked continuously on FTX Group matters, primarily on issues related to the FTX Group's venture investments, until November 2022.[532]

Many of the venture investments on which Law Firm-2 advised the FTX Group or a counterparty failed, came under regulatory scrutiny, or both.[533]  The FTX Group's in-house counsel typically instructed Law Firm-2 to perform little to no diligence on pending venture investments, and Law Firm-2 complied with this client directive.[534]  Law Firm-2 itself internally flagged the FTX Group's "light" approach to due diligence on several occasions.[535]

Additionally, Quinn Emanuel's investigation raised questions about the extent to which Law Firm-2 consistently conveyed the full extent of legal risks to the FTX Group, in particular regarding the risks of performing minimal or no diligence prior to executing transactions.  The investigation also identified transactions where Law Firm-2 represented a counterparty to the FTX Group during the same period of time that Law Firm-2 represented FTX Group entities in separate transactions.[536]  Many of these transactions did not include conflicts waivers.[537]

3.    Law Firm-3

Quinn Emanuel reviewed approximately 2,755 documents produced by Law Firm-3 in response to FTX Group's Bankruptcy Rule 2004 requests, and 5,845 documents maintained by the FTX Group.[538]  Quinn Emanuel concluded that FTX Trading engaged Law Firm-3 from November 2021 until November 2022 for services related to its venture investments.  However,

---

[532] *Id.*

[533] *Id.* at 30.

[534] *Id.* at 33.

[535] Quinn Emanuel, *Memorandum re: FTX Investigations Review of Law Firm-2*, Apr. 29, 2024, ("Law Firm-2 Report"), at 11.

[536] Law Firm-2 Report, at 35.

[537] *See id.* at 36-37.

[538] Professionals Report, at 33-34.

Law Firm-3 also provided services to other FTX Group entities, including Alameda Ventures, FTX Ventures, Alameda Research Ltd., and Alameda Research Ventures LLC.[539]  As he did with Law Firm-2, FTX Group's in-house counsel routinely instructed Law Firm-3 to perform little to no due diligence on multiple investments and Law Firm-3 complied with these directives.[540]

        4.     Law Firm-4

Quinn Emanuel sent Rule 2004 requests to Law Firm-4, a Swiss law firm.[541]  However, Law Firm-4 refused to produce documents without the approval of FTX Europe AG's sole remaining board member, Dr. Marcel Lötscher, who did not grant his approval.[542]  Accordingly, Quinn Emanuel's investigation of Law Firm-4 was limited to an analysis of approximately 1,770 documents from the Database.[543]  The review revealed that from October 2021 through November 2022, Law Firm-4 provided services to various FTX Group entities, including FTX Trading, FTX Europe AG, and Alameda Ventures.  This work was done in support of the FTX Group's strategy to enter the European cryptocurrency market by acquiring or investing in European entities, including Digital Assets DA AG ("DAAG").[544]  Additionally, Law Firm-4 provided tax, regulatory, and general corporate advice in connection with the FTX Group's European expansion.[545]  Consistent with their instructions to Law Firm-2 and Law Firm-3, the

---

[539] *Id.* at 34.

[540] *Id.*

[541] *Id.* at 35.

[542] *Id.*  Dr. Lötscher moved to dismiss FTX Europe AG's Chapter 11 filing on November 17, 2023, arguing that the filing was not authorized under Swiss law.  *See* Dkt. No. 4037. That motion was withdrawn on April 3, 2024. Dkt. No. 11028.

[543] Professionals Report, at 35.

[544] *Id.*  The DAAG acquisition is discussed in greater detail in Part 6 *infra*.

[545] *Id.*

FTX Group's in-house counsel repeatedly instructed Law Firm-4 to provide minimal or no due diligence on potential acquisitions and Law Firm-4 complied with these instructions.[546]

     5.     Law Firm-5

Quinn Emanuel served Bankruptcy Rule 2004 requests on Law Firm-5, an Australian law firm, but the firm refused to produce documents.[547]  Accordingly, Quinn Emanuel's investigation drew on a review of over 10,000 documents from the Database.[548]  Quinn Emanuel concluded that Law Firm-5 provided services to the FTX Group in Australia from March 2020 to November 2022.[549]  The majority of this work related to the FTX Group's acquisition of fintech businesses Hive Empire Trading Pty Ltd. ("HiveEx"), IFS Markets Pty Ltd., and TigerWit Holdings Ltd. (together with TigerWit Limited (UK), "TigerWit").[550]  The FTX Group used HiveEx and IFS Markets Pty Ltd. to form the basis of FTX Australia.[551]

Eventually, Law Firm-5's role grew to include negotiating settlements to avoid negative publicity for the FTX Group.[552]  For example, in July 2021, Law Firm-5 arranged for the incorporation of a Cayman Islands company, 707,016 Ltd., to pay off the creditors of Alex Saunders, an Australian crypto-influencer.[553]  Saunders was alleged to have used borrowed funds to trade on FTX.com, but lost the funds that he traded.[554]  To mitigate any reputational harm and

---

[546] Professionals Report, at 35.

[547] *Id.* at 36.

[548] *Id.*

[549] *Id.* at 36-37.

[550] *Id.* at 37.

[551] *Id.*

[552] *Id.*

[553] *Id.*

[554] *Id.*

avoid potential litigation, FTX Trading loaned Saunders $13.2 million through 707,016 Ltd. to enable Saunders to pay off his debts.[555]  Saunders has not repaid this loan.[556]

A partner at Law Firm-5, who was the FTX Group's primary contact at the firm, personally received at least $727,402 in "finder's fees" for certain acquisitions that he suggested.[557]  Law Firm-5 notified Quinn Emanuel in December 2023 that it holds AUD $578,836.82 in trust for FTX Trading, and that it has claims in the amount of AUD $252,787.54 (excluding interest) for unpaid fees.[558]

### 6. Paul Hastings

FTX.US engaged Paul Hastings in May 2022 to provide regulatory advice on certain compliance matters.[559]  Paul Hastings invoiced FTX.US $49,628, but received just $17,678 for its services.[560]  Despite the receipt of comparatively modest fees from the FTX Group, Quinn Emanuel subjected Paul Hastings to a more fulsome review due to its role in the bankruptcy cases as counsel to the Unsecured Creditors' Committee.  Quinn Emanuel did not serve Bankruptcy Rule 2004 requests on Paul Hastings.[561]  Quinn Emanuel's investigation did not uncover any evidence that Paul Hastings engaged in any misconduct or knew of any improprieties by the FTX leadership.[562]

---

[555] Id.

[556] Id.

[557] Quinn Emanuel, *FTX Investigative Review: Law Firm-5*, May 12, 2024, at 1.

[558] Id.

[559] Professionals Report, at 40.

[560] Id.

[561] Id. at Appendix B.

[562] Id. at 40-41.

7.    Anderson Mōri & Tomotsune

Anderson Mōri & Tomotsune ("AMT") advised Alameda Research K.K. in connection with the FTX Group's expansion into Japan and Japanese operations.  This included providing sporadic regulatory and corporate advice.[563]  Quinn Emanuel did not serve Bankruptcy Rule 2004 requests on AMT.[564]  AMT was paid approximately $1 million in legal fees over the course of its representation.[565] Quinn Emanuel did not identify evidence that AMT engaged in any wrongdoing or had knowledge of the FTX insiders' misconduct.[566]

8.    Law Firm-6

Quinn Emanuel served Bankruptcy Rule 2004 requests on Law Firm-6, and Law Firm-6 produced 3,599 documents in response.[567]  Alameda and Alameda Research Ltd. retained Law Firm-6 in connection with responses to SEC and CFTC document requests related to the entities' relationship with Tether/Bitfinex.[568]  Through its investigation, Quinn Emanuel found that Friedberg engaged Law Firm-6 because Law Firm-1—which would have been his first choice— was conflicted.  Law Firm-1 represented FTX.US before the SEC regarding the Tether/Bitfinex matter.[569]  Quinn Emanuel discovered that, in responding to the SEC, Law Firm-6 did not produce a document that, according to a Law Firm-6 attorney's notes, raises "[w]orry about market manipulation issues."[570]  Quinn Emanuel did not locate this document in either the

---

[563] *Id.* at 42.

[564] *Id*. at Appendix B.

[565] *Id*. at 42.

[566] Quinn Emanuel, *Memorandum re: FTX Investigations Review of Anderson, Mori & Tomotsune*, Mar. 14, 2024, at 13.

[567] Professionals Report, at Appendix B.

[568] *Id.* at 42-43.

[569] *Id*. at 42.

[570] *Id.* at 43.

documents produced by Law Firm-6 or in the FTX Group's own records.[571]  Relatedly, some

Law Firm-6 attorneys used Signal to communicate with the FTX Group's in-house counsel,

which, due to the ability for the messages to auto-delete, also raised questions as to whether all

communications were retained.[572]

        9.     Law Firm-7

       Quinn Emanuel did not issue Bankruptcy Rule 2004 requests to Law Firm-7.[573]  Law

Firm-7 was engaged by FTX.US to assist with its application to the New York State Department

of Financial Services for a Limited Purpose Trust Company Charter ("LPTCC"), a necessary

license to engage in a virtual currency business in New York.[574]  Quinn Emanuel located

documents in which Law Firm-7 voiced its concerns that, in preparing the LPTCC application,

FTX.US marked its policies concerning risk assessments and other internal controls as "final"

without sufficient review.[575]  Nonetheless, at the FTX Group's direction, Law Firm-7 filed the

LPTCC application on March 18, 2022.[576]  No license was granted as of the Petition Date.[577]

Law Firm-7 also provided employment advice to Alameda regarding candidate employees'

noncompete agreements with their prior employers.  Quinn Emanuel did not identify any issues

with this engagement.[578]  Quinn Emanuel determined that Law Firm-7 did not appear to have

engaged in any actionable misconduct.  While Law Firm-7 may have had some knowledge of

---

[571] *Id.*

[572] *Id.*

[573] *Id.* at Appendix B.

[574] *Id*. at 43-44.

[575] *Id*. at 44.

[576] *Id*.

[577] *Id*.

[578] Quinn Emanuel, *Memorandum of FTX Investigations Review of Law Firm-6*, Nov. 21, 2023, at 1.

FTX.US's deficiencies in policy formation and implementation, the firm attempted to improve those policies.[579]

### 10.    Skadden Arps Slate Meagher & Flom LLP

Quinn Emanuel served a Bankruptcy Rule 2004 request, and Skadden Arps Slate Meagher & Flom LLP ("Skadden") produced 874 documents in response.[580]  Skadden advised FTX.US concerning its political donations and lobbying activities.[581]  Quinn Emanuel found that, shortly before the Petition Date, Skadden raised numerous concerns regarding undisclosed political contributions by FTX.US.[582]  Skadden was paid $370,931 for its legal services.[583]

### 11.    Simmons & Simmons

FTX Trading retained Simmons & Simmons JWS Pte. Ltd ("Simmons & Simmons"), which produced over 100 memoranda on whether certain tokens available on the FTX exchange qualified as regulated assets under Singaporean law.[584]  Quinn Emanuel has not located a formal engagement letter with Simmons & Simmons, and it has not served Simmons & Simmons with a Bankruptcy Rule 2004 request.[585]  Simmons & Simmons received $544,364 in legal fees.[586]

### 12.    Willkie Farr & Gallagher LLP

Quinn Emanuel served Bankruptcy Rule 2004 requests on Willkie Farr & Gallagher LLP ("Willkie"), which produced 1,277 documents in response.[587]  FTX.US retained Willkie to

---

[579] *Id*. at 8.

[580] Professionals Report, at Appendix B.

[581] *Id*. at 44.

[582] *Id*.

[583] *Id*.

[584] *Id*. at Appendix B.

[585] *Id*. at 45, Appendix B.

[586] *Id*. at 44, Appendix A.

[587] *Id*. at Appendix B.

advise on legal and regulatory options available to allow LedgerX to operate a derivatives exchange without collateral requirements on retail customers' derivatives, and on registration requirements for certain licenses.[588]  Eventually, Willkie assisted FTX.US with its lobbying efforts to change the relevant regulations, as the only available options to obtain such licenses risked opening up Alameda's trading activity to regulators.[589]  Willkie received $293,632 for its legal services.[590]  Quinn Emanuel did not uncover any evidence suggesting that Willkie knew of any misconduct by the FTX leadership.

13.    Orrick, Herrington & Sutcliffe LLP

Quinn Emanuel served Bankruptcy Rule 2004 requests on Orrick Herrington & Sutcliffe LLP ("Orrick"), which produced 219 documents in response.[591]  FTX Trading retained Orrick in connection with Whistleblower-5's allegations, described *supra*, at Part 3, Section III(e).[592] Specifically, Orrick's role was limited to drafting Whistleblower-5's separation agreement, preparing talking points, and conducting legal research.  Quinn Emanuel concluded that Orrick's role in this matter was limited, and did not find any evidence suggesting that Orrick knew of any misconduct by the FTX leadership outside the context of Whistleblower-5's allegations.  Orrick was not asked to investigate those allegations.[593]  Orrick received $20,762 in legal fees.[594]

---

[588] *Id.* at 45.

[589] *Id.*

[590] *Id.*

[591] *Id.* at Appendix B.

[592] *Id.* at 52, 55 & n.158.

[593] *Id.* at 52.

[594] *Id.*

### 14.     Holland & Knight LLP

Quinn Emanuel served Bankruptcy Rule 2004 requests on Holland & Knight LLP ("Holland & Knight"), which provided 10,136 documents in response.[595]  Holland & Knight advised FTX Trading on a whistleblower's allegations, and various immigration matters.[596] Quinn Emanuel concluded that Holland & Knight's role in advising on the whistleblower's allegations was primarily limited to drafting a settlement agreement.  Quinn Emanuel did not find any evidence suggesting that Holland & Knight knew of any misconduct by the FTX leadership outside the context of the whistleblower's allegations.  Holland & Knight was not asked to investigate those allegations.[597]  Holland & Knight received $64,998 in legal fees.[598]

### 15.     Silver Miller Law

Quinn Emanuel served Bankruptcy Rule 2004 requests on Silver Miller Law ("Silver Miller"), which provided 272 documents in response.[599]  The FTX Group retained Silver Miller to provide legal advice concerning a wide array of regulatory matters, and a whistleblower's allegations.[600]  Quinn Emanuel concluded that Silver Miller's role in advising on the whistleblower's allegations was limited, and Quinn Emanuel did not find any evidence suggesting that Silver Miller knew of any misconduct by the FTX leadership outside the context of the whistleblower's allegations.  Silver Miller was not asked to investigate those allegations.[601]  Silver Miller received $760,000 in legal fees.[602]

---

[595] *Id.* at Appendix B.

[596] *Id.* at 52.

[597] *Id.*

[598] *Id.*

[599] *Id.* at Appendix B.

[600] *Id.* at 52.

[601] *Id.*

[602] *Id.*; *see also id.* at Appendix A.

16.     Pavel Pogodin/Consensus Law

Quinn Emanuel did not receive a response to their Bankruptcy Rule 2004 requests to Pavel Pogodin or his law firms.[603]  As noted above, *supra*, at Part 3, Section III(e), Pogodin held himself out as an attorney specializing in legal issues related to cryptocurrency.[604]  His law firm, Consensus Law, was retained by the FTX Group after Pogodin represented an entity that had filed a whistleblower lawsuit against the FTX Group and the FTX leadership.[605]  Pogodin received "loans" totaling $1 million as part of a settlement with the FTX Group for dropping these whistleblower claims.  He also entered into two engagements with the FTX Group.  The first totaled $1.4 million and Pogodin received $1.9 million for the second.[606]  However, Quinn Emanuel found no evidence that Pogodin ever provided any legal services to the FTX Group.[607]

17.     Law Firm-8

Quinn Emanuel issued Bankruptcy Rule 2004 requests to Law Firm-8, which produced 66 documents in response.[608]  The FTX Group retained Law Firm-8 after that firm represented Whistleblower-1.[609]  As noted above, *see supra*, at Part 3, Section III(e), Quinn Emanuel found that after the FTX Group settled Whistleblower-1's claims, within months, Friedberg retained Law Firm-8 to provide "general client counselling," and paid the firm $200,000 per month for

---

[603] Pogodin operated five law firms.  Professionals Report, at Appendix B.

[604] Quinn Emanuel, *Memorandum re: FTX Investigations Review of Pogodin Report*, May 13, 2024 ("Pogodin Report"), at 1, 2.

[605] Professionals Report, at 53.

[606] Pogodin Report, at 1-2.

[607] Professionals Report at 48-49, 53.

[608] *Id.* at Appendix B.

[609] *Id.* at 48, 53.

five years.[610]  During the following six months until the Petition Date, the only work-product

Law Firm-8 produced was a single, three-page memorandum prepared by a non-lawyer.[611]

### 18.     Bracewell

Quinn Emanuel served Bankruptcy Rule 2004 requests on Bracewell LLP ("Bracewell")

and received 1,342 documents from the firm.[612]  LHI engaged Bracewell in June 2021 to provide

regulatory advice and subpoena-response support.[613]  In addition, Bracewell advised LHI in two

employment-related disputes: for former LedgerX board member Andrew Baine, and for former

LHI employee Jennifer Liu.[614]  Bracewell was paid $172,158 for its services.[615]  Quinn

Emanuel's investigation did not turn up any evidence that Bracewell engaged in any misconduct

or knew of any misconduct by the FTX Group leadership.[616]

### 19.     Morrison & Foerster

Quinn Emanuel served Bankruptcy Rule 2004 requests on Morrison & Foerster LLP

("MoFo") and received 2,029 documents from the firm.[617]  Quinn Emanuel's investigation of

MoFo also comprised a review of approximately 4,500 documents from the Database.[618]

Starting in January 2018, Alameda, FTX.US, and FTX Trading engaged MoFo through its

offices in Japan, the United States, and the UK.[619]  MoFo Japan advised Alameda on banking

---

[610] *Id.* at 50.

[611] *Id.* at 53.

[612] *Id.* at Appendix B.

[613] Quinn Emanuel, *Memorandum re: FTX Investigations Review of Bracewell LLP*, Feb. 28, 2024, at 1, 2.

[614] *Id.* at 1.

[615] *Id.* at 2.

[616] *Id.* at 4.

[617] Professionals Report, at Appendix B.

[618] Quinn Emanuel, *Memorandum re: FTX Investigations Review of Morrison & Foerster LLP*, Mar. 14, 2024, at 2.

[619] *Id*. at 1.

and regulatory issues relating to its trading activities in Japan; MoFo US assisted FTX.US in setting up its consumer lending arm and in exercising FTX.US's share purchase option to acquire Digital Custody Inc.; MoFo UK provided advice in connection with FTX Trading's proposed acquisition of TigerWit Limited (UK).[620]  MoFo was paid approximately $1.281 million for its services, but in total invoiced approximately $1.673 million.[621]  Quinn Emanuel's investigation did not reveal any evidence that MoFo engaged in any misconduct or knew of any misconduct by the FTX leadership.

20.    Hogan Lovells International LLP

Quinn Emanuel reviewed approximately 2,482 documents produced by Hogan Lovells International LLP ("Hogan") in response to the FTX Group's Bankruptcy Rule 2004 requests, and 1,741 documents maintained by the FTX Group.[622]  Through the review, Quinn Emanuel concluded that FTX Trading engaged Hogan from February 2022 until November 2022 for services related to its subsidiary FTX Europe, specifically: acquiring certain UK companies, preparing change-in-control filings with the U.K. Financial Conduct Authority ("FCA"), and addressing an FCA warning notice.[623]  Hogan also provided services to FTX Ventures from March to June 2022 in connection with an investment in JustWontDie Ltd.[624]  For its services, Hogan received approximately $1,005,475 from FTX Europe and $121,876 from FTX

---

[620] *Id.*

[621] *Id.* at 2-3.

[622] Hogan Lovells Memo, at 2.

[623] *Id.* at 1.

[624] *Id.*

Ventures.[625]  Quinn Emanuel's investigation found no evidence that Hogan was engaged in any wrongdoing or knew about any misconduct by FTX Group executives.[626]

### 21.    Bahamian Counsel

As reflected in Table 2, the FTX Group retained several Bahamian law firms, including Clement T. Maynard & Co, Brian Simms, and Lennox Patton.[627]  Generally, these law firms were engaged in 2021 when the FTX Group formed FDM and began moving several employees and executives to the Bahamas.[628]  Quinn Emanuel's investigation of these Bahamian law firms was complicated by the litigation among the Debtors, FDM, and the JOLs appointed by the Bahamas.[629]  This litigation was ultimately resolved through a settlement agreement.[630]  As part of that agreement, the JOLs are primarily responsible for investigating and pursuing any claims as to Bahamian professionals, as well as maximizing the value of the Debtors' real estate and other assets in the Bahamas.[631]  The JOLs' investigation remains ongoing at this time.[632]

## II.    Auditors

Quinn Emanuel identified the FTX Group's auditors through an examination of the general ledgers of the FTX Group entities, other sources of payment information, and engagement letters.[633]  While no FTX Group entity was audited before 2019, three audit firms were engaged after 2019 to provide opinions on WRS and FTX.US, FTX Trading, and

---

[625] *Id.*

[626] *Id.*

[627] Professionals Report, at 15.

[628] *Id.*

[629] *Id.* at 17-18.

[630] *Id.* at 18.

[631] *Id.*

[632] *Id.*

[633] *Id.* at 61.

Cottonwood Grove.[634]  These firms were Auditor-1, Auditor-2, and Moore Stephens CPA

Limited ("Moore Stephens").[635]  In February 2023, Quinn Emanuel and the Unsecured Creditors'

Committee sent Bankruptcy Rule 2004 requests to each audit firm.  Quinn Emanuel reviewed

25,000 documents and 10,000 documents Auditor-1 and Auditor-2 produced in response to the

Bankruptcy Rule 2004 requests, respectively.[636]  Moore Stephens did not respond to the

discovery requests.[637]

     Quinn Emanuel utilized Alvarez & Marsal to analyze Auditor-1's and Auditor-2's audit

papers and the extent of their adherence to Generally Accepted Auditing Standards ("GAAS").[638]

Quinn Emanuel's own investigation focused on the relationship between the audits and the

Investigative Topics.

     *a.*     *Auditor-1*

     FTX.US retained Auditor-1 to audit its balance sheet for fiscal years ending December

31, 2020 and December 31, 2021, in support of FTX.US's application for a Money Transmitter

License.  Auditor-1 provided FTX.US and WRS clean audit opinions for these fiscal years.[639]

Quinn Emanuel's and Alvarez & Marsal's investigation, however, revealed numerous instances

where Auditor-1 failed to follow GAAS with respect to these FTX entities.[640]  For example, in its

audit for 2021, Auditor-1 identified custodial funds due to customers as a class of transactions

---

[634] *Id.* at 60-61.

[635] *Id.* at 61.

[636] *Id.*

[637] *Id.*

[638] *Id.* at 61-62.

[639] *Id.* at 63-65.

[640] *Id.*

with a high risk of material misstatement.[641]  While Auditor-1 planned four substantive audits to substantiate management's assertions concerning the over $200 million due to customers as reported on FTX.US's balance sheet, Auditor-1 completed only one such audit.  Quinn Emanuel and Alvarez & Marsal also found deficiencies in Auditor-1's audit of the movement of custodial funds, as well as its treatment of related-party receivables.[642]  For example, Auditor-1 investigated certain related-party transactions by simply asking Bankman-Fried to confirm the receivable, without seeking any records proving FTX.US's relationship with the related party or that the related party had sufficient funds to repay the receivable.[643]  Quinn Emanuel determined that these issues stemmed, at least in part, from a lack of auditor independence, as many Auditor-1 employees had a close relationship with FTX Group employees, including Friedberg.[644]

FTX.US ultimately terminated Auditor-1 in September 2022 after Auditor-1 submitted drafts of its 2021 WRS and FTX.US Communication of Material Weakness, Significant Deficiencies, and Other Findings and Observations letters.  Those drafts identified the entities' lack of internal controls as "Material Weaknesses" and "Significant Deficiencies."[645]  In total, Auditor-1 received approximately $470,000 for its services.[646]  Quinn Emanuel has concluded WRS and FTX.US may have claims against Auditor-1 for professional negligence and breach of fiduciary duty.[647]  Quinn Emanuel continues to assess these facts and consider any additional steps it might advise the FTX Group to take.

---

[641] *Id.* at 63.

[642] *Id.* at 63-65.

[643] *Id.* at 64-65.

[644] *Id.* at 65.

[645] *Id.* at 65-66.

[646] *Id.* at 63.

[647] *Id.*

b.    *Auditor-2*

FTX Trading retained Auditor-2 in early 2021 when FTX Trading considered undertaking an Initial Public Offering, which required the preparation of audited financial statements.[648]  Auditor-2 audited FTX Trading's financial statements for the fiscal years ending December 31, 2019, 2020, and 2021.[649]  Quinn Emanuel and Alvarez & Marsal's investigation indicates that Auditor-2's audit procedures did not conform to GAAS.[650]  Similar to Auditor-1, Auditor-2 did not perform any investigation around related-party receivables beyond merely seeking Bankman-Fried's confirmation of a related-party receivable of $1.2 billion owed by Alameda.[651]  And while Auditor-2 identified segregation of customer assets as a significant fraud risk, the investigations found that Auditor-2 failed to investigate many unusual transactions that would have revealed FTX Trading's failure to segregate customer funds.[652]

 Quinn Emanuel concluded FTX Trading may have claims against Auditor-2 for professional negligence and breach of fiduciary duty.[653]  Quinn Emanuel continues to assess these facts and consider any additional steps it might advise the FTX Group to take.

c.    *Moore Stephens CPA Limited*

Moore Stephens was engaged to audit the financial statements of Cottonwood Grove, a Hong Kong entity.[654]  Because Moore Stephens did not respond to Quinn Emanuel and the Unsecured Creditors' Committee's joint Bankruptcy Rule 2004 request, Quinn Emanuel

---

[648] *Id.*

[649] *Id.*

[650] *Id.* at 68-70.

[651] *Id.* at 68.

[652] *Id.* 69-70.

[653] *Id.* at 70.

[654] *Id*. at 71.

conducted a targeted investigation of the FTX Group's internal records related to Moore Stephens.[655]  Quinn Emanuel determined that Moore Stephens' work was limited, and that its work did not raise any investigative concerns.[656]  Because of the limited nature of Moore Stephens' work, Quinn Emanuel did not investigate it further.[657]

## III.    Accountants

Quinn Emanuel identified accountants who provided their services to the FTX Group by (1) searching for engagement letters within the FTX Group's internal files, (2) reviewing the FTX Group's books and records, (3) investigating other Professionals, and (4) reviewing information provided by Alvarez & Marsal.[658]  Quinn Emanuel divided accounting professionals into two investigative tiers: (1) accountants that provided extensive services to the FTX Group and received more than $100,000 in fees, or provided services that addressed Investigative Topics; and (2) accountants that provided only limited services to the FTX Group or received fees of less than $100,000.[659]  Five accounting firms were placed in the first tier:  Robert Lee & Associates ("RLA"), Silicon Valley Accountants ("SVA"), Rivers & Moorehead ("R&M"), Pricewaterhouse Coopers LLP ("PwC LLP"), and PricewaterhouseCoopers AG ("PwC AG").[660] Two accounting firms were placed in the second tier: MicroLedgers Co. Ltd. ("MicroLedgers") and Mazars LLP ("Mazars").

---

[655] *Id.*

[656] *Id.*

[657] *Id.*

[658] Professionals Report, at 72-73.

[659] *Id.* at 73.

[660] *Id.*

Quinn Emanuel and the Unsecured Creditors' Committee served joint Bankruptcy Rule 2004 requests on each of the firms in the first tier.[661]  RLA, R&M, and PwC LLP voluntarily complied with the requests.[662]  PwC AG refused to produce any documents.[663]  SVA initially did not satisfactorily comply with the requests, but Quinn Emanuel and the Unsecured Creditors' Committee jointly compelled production by issuing a subpoena under Bankruptcy Rule 2004.[664]

RLA produced approximately 47,000 documents, R&M produced approximately 38,000 documents, SVA produced approximately 20,000 documents, and PwC LLP produced a small number of documents.[665]  Quinn Emanuel reviewed these documents, as well as the FTX Group's internal documents, and consulted with Alvarez & Marsal.[666]  Quinn Emanuel additionally interviewed Robert Lee, RLA's founder, as its investigation revealed that RLA was the FTX Group's primary accountant.[667]

     a.     *Robert Lee & Associates*

Alameda retained RLA in February 2018 after Bankman-Fried approached Lee.[668]  RLA's services, which included bookkeeping, expanded through the next four years.[669]  Though initially retained by Alameda, by 2021, RLA billed several FTX Group entities.[670]  Quinn

---

[661] *Id.*

[662] *Id.*

[663] S&C attempted to obtain documents from PwC AG in connection with the DAAG-related litigation, but the litigation was ultimately settled.  *Id.* at 74 n.229.

[664] *Id.* at 73.

[665] *Id.*

[666] *Id.*

[667] *Id.*

[668] *Id.*

[669] *Id.* at 74-76.

[670] Professionals Report, at 74.

Emanuel identified 38 FTX-Group affiliated entities that RLA serviced.[671]  While some of these entities were shells, several were key entities, including Alameda, Alameda Research Ventures, FTX Trading, WRS, FTX.US, and Paper Bird.[672]  RLA used QuickBooks for these entities' day-to-day bookkeeping.[673]  However, QuickBooks software is designed for small businesses and is not robust enough to track the billions of dollars of fiat and cryptocurrency that the FTX Group handled.[674]

Quinn Emanuel's investigation found that RLA worked closely with the FTX Group.  For example, RLA was given access to internal Slack channels and participated in frequent meetings with the FTX Group's accounting staff.[675]  RLA accountant Caroline Papadopoulos eventually became Controller of FTX.US in November 2021.[676]  RLA's work primarily involved routine accounting and tax services based only on information provided by the FTX Group.[677]  Additionally, RLA prepared personal tax returns for at least 33 FTX Group employees, including senior FTX Group executives Bankman-Fried, Wang, Ellison, and Singh.[678]  In total, RLA was paid $4.58 million for its services.[679]

Quinn Emanuel did not discover any evidence that RLA had involvement in or knew of any misconduct or mishandling of customer funds, or that RLA rendered negligent advice.

---

[671] *Id.* at 75.

[672] *Id.*

[673] *Id.*

[674] *Id.*

[675] *Id.*

[676] *Id.*

[677] *Id.* at 76.

[678] *Id.* at 75-76.

[679] *Id.* at 75, Appendix A.

b.    *Silicon Valley Accountants*

SVA was initially retained by RLA to provide bookkeeping and document preparation services and to respond to auditor requests during FTX Trading's 2020 audit.[680]  FTX Trading, FTX.US, and Alameda then engaged SVA directly to provide accounting services.[681]  Quinn Emanuel discovered that SVA's founder and CEO, Gabriel Zubizarreta, maintained a close relationship with Bankman-Fried, Salame, Wang, Jen Chan (Chief Financial Officer, FTX Group), and Caroline Papadopoulos.  Zubizarreta provided extensive advice on various accounting issues and often engaged with both Auditor-2 and R&M to discuss FTX Trading's balance sheets.[682]  Zubizarreta maintained a FTX.US account, and invested in both FTX Trading and WRS through stock purchases.[683]  In one instance, an FTX.US exchange account deposited $100,000 into Zubizarreta's FTX.US account.[684]  Jayesh Peswani, FTX.US's Controller at the time, confirmed the payment was from FTX.US to express its appreciation to Zubizarreta for his services.[685]  This payment was the only one identified by Quinn Emanuel, as it does not appear SVA ever submitted invoices to the FTX Group for payment.[686]  Though Quinn Emanuel noted that these interactions raised questions as to Zubizarreta's and SVA's independence and objectivity, Quinn Emanuel did not identify any documentary evidence that Zubizaretta or SVA participated in or were aware of any misconduct.[687]

---

[680] *Id.* at 76.

[681] *Id.* at 76-77.

[682] *Id.* at 77.

[683] *Id.* at 77-78.

[684] *Id.* at 77.

[685] *Id.* at 77-78.

[686] *Id.* at 77, Appendix A.

[687] Professionals Report, at 78-79.

      *c.      Rivers & Moorehead*

FTX Trading engaged R&M in February 2021 to assist with an acquisition of Blockfolio. Rivers & Moorehead generally performed services on an *ad hoc* basis when the FTX Group required reporting in connection with audit and financial statements.  In total, R&M was paid $187,000 for its services.  Quinn Emanuel did not discover evidence that R&M participated in or was aware of any misconduct.

      *d.      PricewaterhouseCoopers Entities*

The FTX Group engaged multiple entities within the PwC network to provide accounting services at different times.  For example, PwC AG was engaged to provide accounting and tax advice to FTX Europe AG and PwC LLP supported a contemplated acquisition of BTC Africa SA.  In total, PwC entities received approximately $1.3 million for their services, with each individual PwC entity receiving a fraction of the total.  Quinn Emanuel did not find any evidence that any PwC entity participated in or was aware of any misconduct, and given the small amount of fees paid to the individual PwC entities, Quinn Emanuel concluded further investigation would not benefit the estates.[688]

      *e.      MicroLedgers and Mazars LLP*

The two accounting firms in the second tier of investigative depth, MicroLedgers and Mazars, were not issued Bankruptcy Rule 2004 requests.  However, Quinn Emanuel investigated the scope of their engagements and the services they performed through a review of the FTX Group's internal documents.  Quinn Emanuel additionally consulted with Alvarez & Marsal, and concluded that neither firm participated in or was aware of any misconduct.[689]

---

[688] *Id.* at 81-82.

[689] *Id.* at 82.

## IV.    Valuation Firms

Quinn Emanuel identified the FTX Group's valuation firms through a variety of means: (1) its concurrent investigations of other Professionals retained by the FTX Group,[690] (2) its review of payment records and other internal documents,[691] and (3) its review of the relevant engagement letters.  Through this methodology, Quinn Emanuel determined that two of the FTX Group's valuation firms did work that appears to have intersected with Investigative Topics: Teknos Associates LLP ("Teknos") and Redwood Valuation Partners ("Redwood").[692] Accordingly, Quinn Emanuel and the Unsecured Creditors' Committee jointly served Bankruptcy Rule 2004 requests on these firms, and Quinn Emanuel further reviewed the FTX Group's internal documents.[693]

S&C identified a third valuation firm, BDO USA LLP ("BDO"), which it investigated in connection with the FTX Europe adversary action.[694]

### a.    Redwood Valuation Partners

Redwood was engaged from 2020 to 2022 to, among other things, provide WRS and FTX Trading an estimate of the fair market value of those entities' common stock for the purpose of providing stock options to employees.[695]  The FTX Group paid Redwood $66,000 for this work.[696]  Redwood's valuations relied on documents provided by the FTX Group, though the

---

[690] *Id.* at 83.

[691] *Id.*

[692] *Id.*

[693] *Id.* at 83-84.

[694] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 121-23.  The FTX Europe adversary action is discussed in greater detail below, in Part 6, Section I(b).

[695] Professionals Report, at 84.

[696] *Id.*

FTX Group often failed to share necessary information for Redwood to provide a valuation.[697] Nonetheless, Quinn Emanuel determined that Redwood followed accepted valuation procedures in conducting both valuations.[698]

      *b.*      *Teknos Associates LLP*

      Teknos was engaged in September 2022 to perform 30 valuations, including of FTX Trading common share equity, Paper Bird warrants and common share equity, and WRS class A common share equity.[699]  However, prior to the Petition Date, Teknos did not send any valuations to the FTX Group.[700]  Through its Bankruptcy Rule 2004 requests, Quinn Emanuel received copies of 18 of Teknos' evaluations.  Quinn Emanuel ultimately found no documentary evidence that Teknos' valuations were improper or unduly influenced.[701]  Quinn Emanuel demanded that Teknos return $60,000 to the estates for Teknos' uncompleted work, but Teknos has refused.[702]

      *c.*      *BDO USA LLP*

      S&C served a third-party subpoena on BDO, which produced its work file for its report on DAAG.[703]  S&C additionally reviewed the FTX Group's internal records, including communications and documents shared with BDO.[704]  S&C found that BDO was retained in early 2022 to perform purchase price allocations for WRS' acquisition of Ledger Holding Inc.

---

[697] *Id.* at 84-85.

[698] *Id.* at 85.

[699] *Id.*

[700] *Id.*

[701] *Id.* at 85-86.

[702] *Id.* at 85 & n.274.

[703] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 122.

[704] *Id.*

(LedgerX's parent company) and FTX Trading's purchase of DAAG.[705]  S&C's investigation indicates that BDO valued the intangible assets of Ledger Holdings and DAAG at approximately $206 million and $237 million, respectively, based on the value of the operating licenses held by each entity.[706]  However, this valuation was likely based on projections provided by FTX Group employees.[707]

## V.    Regulatory, Licensing and Compliance Consultants

Quinn Emanuel identified four consultants that provided the FTX Group regulatory, compliance, and licensing services: MR Holdings, Varin Strategies (d/b/a Compliers Consulting), XReg Consulting Ltd. ("XReg"), and ProCo Global (d/b/a Chartwell Compliance), ("ProCo").[708]  Through its investigations into other Professionals, in-house professionals, and the FTX leadership, Quinn Emanuel determined that each of these consulting firms was involved in identifying acquisition targets, preparing license applications, and internal compliance matters.[709]  Thus, Quinn Emanuel subjected all four to investigation, though Bankruptcy Rule 2004 requests were only issued to XReg.[710]  XReg did not respond to the requests, however, and Quinn Emanuel did not take further steps to seek these documents as XReg is a Gibraltar entity.[711]  Quinn Emanuel additionally reviewed approximately 13,000 internal FTX Group documents related to these consultants.[712]

---

[705] Professionals Report, at 84.

[706] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 122.

[707] Professionals Report, at 84.

[708] *Id*. at 101.

[709] *Id.* at 101-02.

[710] *Id.* at 102.

[711] *Id.* at 102 n.337.

[712] *Id.* at 102.

a.    *MR Holdings & Varin Strategies*

Friedberg contacted David Martin, a member of MR Holdings and Varin Strategies, to identify potential broker-dealer acquisitions.[713]  Martin assisted with the acquisition of RJL Capital Group ("RJL") by coordinating the deal between the FTX Group and the seller, drafting the purchase agreement, and submitting RJL's application to FINRA to approve its change in ownership.[714]  However, after the deal closed, Martin discovered that Alameda's bank account initiated the payment of the purchase price rather than Bankman-Fried's personal account as originally contemplated.[715]  The transaction was unwound and re-executed, and the FINRA application was withdrawn and resubmitted, presumably to avoid regulatory scrutiny.[716]  In total, the firms collectively received $97,715 for their services.[717]

b.    *XReg Consulting Ltd.*

After the FTX Group and the FTX leadership sought to leave Hong Kong in late 2020, FTX retained XReg to provide FTX Trading options for relocation, with one of the criteria being whether a jurisdiction offered lax regulation of cryptocurrency.[718]  XReg additionally assisted on the acquisition of required business licenses in Gibraltar, Cyprus, the United Kingdom, Singapore, and the Bahamas, among other countries.[719]  XReg also drafted FTX Trading's anti-money laundering policies.[720]  In total, it received approximately $4 million for its services,

---

[713] *Id.* at 102.

[714] *Id.*

[715] *Id.* at 102 & n.339.

[716] *Id.*

[717] *Id.* at 102.

[718] *Id.* at 103.

[719] *Id.*

[720] *Id.*

including a $2.75 million bonus upon the completion of FTX Trading's business license applications in Singapore and the Bahamas.[721]

      c.      *ProCo Global (d/b/a Chartwell Compliance)*

FTX.US retained ProCo from June 2021 to November 2022 to assist FTX.US with obtaining and maintaining its money transmitter licenses in 53 U.S. states and territories, as well as preparing applications under the Multistate Money Services Businesses Licensing Agreement Program.[722]  ProCo provided additional consulting services on FTX.US's anti-money laundering services.[723]  It received approximately $603,434 for its services.[724]

## VI.    Government and Community Relations Consultants

Through its investigation into the FTX leadership and law firms, Quinn Emanuel learned that the FTX Group hired three government and community relations consultants to assist with grassroots advocacy and fostering local goodwill.[725]  Barbara Miller (Bankman-Fried's aunt) and Alpen Sheth (a consultant doing business as Canopy Labs LLC) were both retained in the South Florida region, while Consultant-1 was engaged in the Bahamas.[726]  Quinn Emanuel reviewed the FTX Group's internal documents to investigate these individuals.[727]

      a.      *Barbara Miller (d/b/a BGM Consultants) & Alpen Sheth (d/b/a Canopy Labs LLC)*

Shortly after FTX.US obtained the naming rights to the Miami Heat arena in early 2021, Joseph Bankman retained Barbara Miller and Sheth to establish relationships with community

---

[721] *Id.* at 103-04.

[722] *Id.* at 104.

[723] *Id.*

[724] *Id.*

[725] *Id.* at 96.

[726] *Id.* at 97, 99.

[727] *Id.* at 96.

figures in South Florida.[728]  These relationships ultimately led to a failed initiative by FTX.US and the FTX Foundation to donate $500 per month for a year into 100 participants' crypto wallets.[729]  FTX.US falsely represented that the accounts would be FDIC insured.[730]  Barbara Miller additionally organized a $2.3 million event at the FTX Arena that was attended by only 1,200 people.[731]  Joseph Bankman instructed Barbara Miller to spend "whatever it [took]" on the event.[732]

Quinn Emanuel's investigation found that Barbara Miller received payments of $140,000 from the FTX Group over a nine-month period. However, Quinn Emanuel has not identified any colorable claims against Barbara Miller that would meaningfully benefit the estates.[733]

    b.    *Consultant-1*

Quinn Emanuel served Bankruptcy Rule 2004 requests on Consultant-1's firm, but it did not respond to these requests.[734]  After the FTX Group moved its operations to the Bahamas, it retained Consultant-1 in May 2021 to facilitate its move.[735]  Consultant-1 was engaged specifically due to his connections with the Bahamian government.[736]  In September 2021, he was hired by FDM as its Vice President of Communications and Corporate Social Responsibility.[737]  Consultant-1 was successful in facilitating relationships between the FTX

---

[728] *Id.* at 97.

[729] *Id.* at 97-98.

[730] *Id.* at 98.

[731] *Id.* at 99.

[732] *Id.*

[733] *Id.*

[734] *Id.* at 89-90.

[735] *Id.* at 99-100.

[736] *Id.*

[737] *Id.* at 100.

leadership and the Bahamian government, and assisted with several property acquisitions in the Bahamas.[738]  As a consultant, Consultant-1 received twice the fees contemplated in his retention agreement.[739]  Though Quinn Emanuel has identified potential claims against Consultant-1, such claims would be brought by the Bahamian JOLs pursuant to the settlement agreement with FDM.[740]

## VII.   Lobbyists

Quinn Emanuel identified the FTX Group's lobbyists through reviewing engagement letters and general ledgers, which were cross-referenced against invoices, bank records, and other internal documents and communications.[741]  It additionally identified lobbyists through its investigation of the FTX Group's in-house counsel, as well its investigation of Bankman-Fried's parents.[742]  Quinn Emanuel calculated the fees each lobbyist received through its work with Alvarez & Marsal.[743]

In total, Quinn Emanuel identified 15 lobbyists and lobbying firms the FTX Group engaged: Cojo Strategies, LLC; Conaway Graves Group, LLC; Empire Consulting; Geoffrey Manne and International Center for Law & Economics; Hinman Straub Advisors LLC; John J. Donohue III; Kensington Strategies; Kevin S. Haeberle; Kimball Stroud and Associates; Law Offices of John J. Faso, P.C.; Message Global, LLC; Michelle Bond (d/b/a ADAM); Patomak Global Partners, LLC; Rich Feuer Anderson; and T Cap Solutions, LLC.[744]  Quinn Emanuel did

---

[738] *Id.*

[739] *Id.* at 101.

[740] *Id.*

[741] *Id.* at 90.

[742] *Id.*

[743] *Id.*

[744] *Id.* at 90-91.

not uncover any evidence that these firms engaged in misconduct or were aware of malfeasance by the FTX Group and its executives, though some were aware of the FTX Group's concealment of its relationship with Alameda.[745]  The facts relating to two of the lobbyists warrant some brief comments.

a.    *ADAM and Michelle Bond*

Michelle Bond, the CEO of the Association of Digital Asset Markets ("ADAM"), was Ryan Salame's girlfriend during the relevant time period.[746]  In October 2021, Ryne Miller directed a $1 million donation from FTX.US to ADAM to ensure it was at FTX.US's "full disposal" for contacts, scheduling, review of drafts, ideas, and other matters.[747]  Quinn Emanuel found that Bond worked closely with Miller, Friedberg, Joseph Bankman, and Law Firm-1 to obscure the FTX Group's lobbying efforts, leverage Bond's connections to lobby for favorable crypto regulations, and connect FTX leadership to government officials.[748]  In total, WRS, FDM, and FTX Trading paid $1.4 million in dues and donations to ADAM.[749]  Bond additionally received a $400,000 bonus from FDM pursuant to a consulting agreement.[750]  Finally, Quinn Emanuel's investigation revealed that Salame on multiple occasions directed wire transfers from FTX-related entities to Bond's personal bank account, totaling approximately $1 million.[751]

---

[745] *Id.* at 91.

[746] *Id.*

[747] *Id.* at 91-92.

[748] *Id.* at 94.

[749] *Id.*

[750] *Id.* at 94 n.295.

[751] *Id.*

b.      *Rich Feuer Anderson*

Rich Feuer Anderson ("RFA") was FTX.US's primary lobbyist in connection with

FTX.US Derivatives' application to the CFTC to amend its order of registration as a derivatives

clearing organization.[752]  Quinn Emanuel served a Bankruptcy Rule 2004 request on RFA, which

produced over 7,000 documents in response.[753]  In its review, Quinn Emanuel located several

handwritten notes by some RFA employees indicating concerns about FTX.US's business

practices.  But Quinn Emanuel ultimately concluded that RFA did not participate in any

wrongdoing, and was not aware of the commingling and misuse of customer funds.[754]

## VIII.   Other Professional Vendors

a.      *Taxbit, M Group, and Inca Digital*

Quinn Emanuel investigated TaxBit Inc. ("TaxBit"), a tax and accounting firm, M Group

Strategic Communications ("M Group"), a public relations firm, and Inca Digital, Inc. ("Inca").

TaxBit received $1.2 million from FTX.US for its services, and also received a $2 million

investment by Alameda Research Ventures in its Series B offering.[755]  M Group received

$3,066,867 in fees,[756] and Inca Digital received $2,400,000 in fees.[757]  Quinn Emanuel's review

of the available documents relating to each of these vendor's work did not support conducting

any further investigation into the vendors, as there was no evidence of wrongdoing or vendor

knowledge of misconduct by the FTX leadership.[758]

---

[752] *Id.* at 95.

[753] *Id.* at 90.

[754] *Id.* at 95-96.

[755] Quinn Emanuel, *Memorandum of FTX Investigative Review of TaxBit Inc.*, Nov. 21, 2023 ("TaxBit Memo"), at 1.

[756] Quinn Emanuel, *Memorandum re: FTX Investigative Review of M Group Strategic Communications*, Nov. 11, 2023 ("M Group Memo"), at 1.

[757] Quinn Emanuel, *Memorandum re: FTX Investigations Review of Inca Digital, Inc.*, May 13, 2024, at 2.

[758] TaxBit Memo, at 1; M Group Memo, at 1.

b.    *Vendors-1, -2, and -3*

Quinn Emanuel investigated Vendors-1, -2, and -3 (together "the Consultants"), which were three sports, media, and corporate partnership consultants engaged by the FTX Group. The Consultants helped negotiate many of the FTX Group's most visible marketing partnerships.[759] Nine of these partnerships are currently the subject of consolidated class action lawsuits involving claims of civil conspiracy and violations of the Florida Securities and Investor Protection Act and the Florida Deceptive and Unfair Practices Act.[760]

Quinn Emanuel did not find any completed work as specified in the three production agreements with Vendor-1.[761] In April 2022, WRSS terminated its contracts with the Consultants and agreed to pay them $12 million each over three years to accelerate commissions owed to them.[762] Alameda agreed to make these payments on FTX.US's behalf. By the Petition Date, the Consultants were paid a total of $21.3 million.[763] Quinn Emanuel has recommended that the Debtors conduct further investigation and expert analysis regarding these three vendors.[764]

c.    *Vendor-4*

Quinn Emanuel reviewed over 12,000 internal documents related to Vendor-4 and his related entities, in addition to examining numerous service deliverables and their statements of

---

[759] Quinn Emanuel, *Memorandum re: FTX Investigations of Vendors-2, and -3*, May 5, 2024 ("The Consultants Report"), at 1.

[760] *In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 23-md-03076 (S.D. Fla., June 5, 2023); *Edwin Garrison v. Samuel Bankman-Fried,* No. 22-cv-23753 (S.D. Fla., Dec 16, 2022); *Podalsky v. Bankman-Fried*, No. 22-cv-23983 (S.D. Fla., Dec. 7, 2022); *Norris v. Brady*, No. 23-cv-20439 (S.D. Fla., Feb. 3, 2023); *Garrison v. Major League Baseball*, No. 23-cv-24479 (S.D. Fla., Nov. 27, 2023).

[761] Quinn Emanuel, *Memorandum re: FTX Investigations Review of Vendor-1*, Mar. 7, 2024, at 1.

[762] The Consultants Report, at 1.

[763] *Id.*

[764] TaxBit Memo, at 1; M Group Memo, at 1.

work.[765]  Alvarez & Marsal additionally performed a transaction analysis for FTX Group

transfers to Vendor-4 and his related entities.[766]  Quinn Emanuel concluded that Vendor-4

coordinated extensively with Friedberg to execute multiple media and marketing agreements that

involved duplicative services with significantly inflated fees.[767]  Vendor-4's entities received

over $34 million from the FTX Group, yet provided minimal-to-no services for these fees.[768]

Quinn Emanuel is continuing to assess these facts and any additional steps it might advise the

FTX Group to take with respect to Vendor-4.

## IX.    **Financial Institutions**

Quinn Emanuel identified the FTX Group's banks and financial institutions through a

review of its financial records.[769]  Quinn Emanuel selected Silvergate Bank ("Silvergate"), Prime

Trust LLC ("Prime Trust"), and Signature Bank ("Signature") for investigation based on an

analysis of the FTX Group's accounts conducted by Alvarez & Marsal.[770]  Additionally,

Farmington State Bank d/b/a Moonstone Bank ("Moonstone Bank") was investigated by S&C

after S&C was informed by the General Counsel of Moonstone Bank that it held $50 million in

an account in the name of FDM.[771]  S&C further investigated Evolve Bank & Trust ("Evolve

Bank") after identifying two bank accounts in the name of FTX Philanthropy, each of which held

$10 million. [772] Summaries of these investigations are below.

---

[765] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 35.

[766] *Id.*

[767] *Id.* at 36.

[768] *Id.*

[769] *Id.* at 39.

[770] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 169.

[771] An analysis of notable findings concerning Moonstone Bank is included *infra*, at Part 6, Section IX(c)(2)(iv).

[772] *Id.* at 169.

a.     *Silvergate Bank*

Quinn Emanuel investigated Silvergate, as it was the bank where the FTX Group maintained accounts that received customer deposits.[773]  Quinn Emanuel and the Unsecured Creditors' Committee served joint Bankruptcy Rule 2004 requests on Silvergate, which produced approximately 35,000 documents.[774]  Quinn Emanuel found that the FTX Group had 30 open accounts at Silvergate, 16 of which held commingled customer and FTX Group funds.[775]  Funds were often moved from "for the benefit of" or "FBO" accounts into operating accounts.[776]  While the movement of funds from FBO accounts to an operational account could signal the misuse of customer funds, Quinn Emanuel did not find any Silvergate policy or procedure in place to detect such transfers.[777]  Moreover, the FTX Group failed to properly designate all FBO accounts, which would impair Silvergate's ability to detect any wrongdoing.[778]

b.     *Prime Trust LLC*

Quinn Emanuel selected Prime Trust for investigation, as it was primarily associated with accounts that funded FTX Trading operations and property purchases, and it received funds from commingled accounts.[779]  Quinn Emanuel and the Unsecured Creditors' Committee served joint Bankruptcy Rule 2004 Requests on Prime Trust, which produced approximately 342,000 documents.[780]  Quinn Emanuel identified 23 total accounts, three of which held commingled

---

[773] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 39.

[774] *Id.*

[775] *Id.* at 40.

[776] *Id.*

[777] *Id.* at 41.

[778] *Id.*

[779] *Id.* at 39.

[780] *Id.*

funds.[781]  Prime Trust filed for bankruptcy in August 2023, and a plan of reorganization was

confirmed in December 2023.[782]

       *c.*     *Signature Bank*

      Quinn Emanuel selected Signature for investigation, as it was a bank where the FTX

Group maintained accounts that funded FTX Trading operations and property purchases and

received funds from commingled accounts.[783]  Quinn Emanuel and the Unsecured Creditors'

Committee served joint Bankruptcy Rule 2004 requests on Signature.  Signature has produced

approximately 125,000 documents, and its production remains ongoing.[784]  Thus far, Quinn

Emanuel has identified 30 total accounts, six of which held commingled funds.[785]  However, no

account was identified as an FBO account, though Quinn Emanuel's review remains ongoing.[786]

Signature is currently in FDIC receivership, making any recovery unlikely should Quinn

Emanuel discover identified FBO accounts.[787]

       *d.*     *Evolve Bank & Trust and Wise*

      Evolve Bank held an FBO account for Wise, a payment processor used by non-Debtor

FTX Philanthropy.[788]  S&C, in its investigation with AlixPartners, located an aggregate $10

million in accounts held by FTX Philanthropy at Evolve Bank (as well as Signature) that were

entirely funded through transfers from FTX Group entities WRSS, North Dimension, and FTX

---

[781] *Id.* at 42.

[782] *Id.*

[783] *Id.* at 39.

[784] *Id.*

[785] *Id.* at 43.

[786] *Id.*

[787] *Id.*

[788] S&C, *Review of Post-Petition Investigations for Examiner,* Mar. 15, 2024, at 171.

Trading.[789]  S&C, with the assistance of Jen Chan, recovered the $10 million held in these accounts on April 14, 2023.[790]

     *e.*     *Deltec Bank & Trust Co. Ltd. and Deltec International Group*

Deltec Bank & Trust Co. Ltd. ("Deltec Bank") and Deltec International Group ("Deltec") were both directed by Jean Chalopin, who also served as a director of Moonstone Bank.[791] Deltec Bank (as well as Chalopin and Moonstone Bank) is a defendant in a class-action MDL currently pending in the Southern District of Florida.[792]  The relevant complaint alleges that the FTX Group held at least 17 accounts at Deltec Bank, and that had Deltec followed Bahamian law, then Deltec Bank would have detected the unusual transactions between Alameda and other FTX Group entities and thus been obligated to investigate such transactions.[793]  However, according to Quinn Emanuel's investigation, Deltec Bank did not conduct any such inquiries.[794]

     In addition, Deltec received a $50 million loan from Norton Hall, of which Ryan Salame was purportedly a director.[795]  The transaction is discussed *supra*, at Part 3, Section III(b).

## X.     Further Investigations

     At this time, the Examiner does not recommend that he undertake any independent investigation of the Professionals.  It appears that Quinn Emanuel (and S&C)[796] applied an effective methodology to rigorously investigate the Professionals that received substantial fees or other payments from the FTX Group, and those Professionals that performed work that had a

---

[789] *Id.* at 169.

[790] *Id.* at 170-71.

[791] *In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 23-md-03076 (S.D. Fla.); Dkt. No. 155 at ¶ 298.

[792] *See generally id.*

[793] *Id.* at ¶¶ 300-04.

[794] *Id.* at ¶ 302.

[795] Dkt. No. 1195 at ¶¶ 3-5.

[796] S&C conducted investigations in connection with potential avoidance or adversary actions.

significant nexus to the Investigative Topics. Where Quinn Emanuel found evidence that a Professional engaged in, or was aware of, any of the FTX leadership's misconduct, rendered negligent advice, or received excessive or otherwise questionable fees, Quinn Emanuel continues to assess these facts and is advising the FTX Group on what, if any, additional steps to take.

Limited investigations were conducted of certain Professionals that received smaller fees and did not appear to perform work that intersected with the Investigative Topics. Though further investigation of these entities would be possible, the Examiner does not believe such investigation would be an efficient use of the estates' resources given the challenges of likely recoveries, and in many cases, the comparatively low dollar amounts at issue.

The Examiner also considered the following additional circumstances in determining that a further investigation into certain Professionals was not warranted: (i) if the Professional had filed for bankruptcy or liquidation; (ii) applicable standards that may limit liability for Professionals (in particular banks); and, (iii) if the Professional was located internationally, meaning that the cost of retaining foreign counsel and litigating potential claims (and, if successful, the costs of collection) could likely outweigh any potential recoveries for the estates.

# PART 6: OTHER INVESTIGATIONS

Pursuant to the Bankruptcy Court's instruction that the Examiner "summariz[e] the investigations of the Debtors" and "mak[e] recommendations for additional investigations," [797] this Part summarizes other ongoing and completed investigations into the FTX Group's activities which have not been addressed in earlier Parts of the Report, and assesses whether any additional investigations are necessary.

The Examiner largely found that the Debtors' counsel and the relevant government agencies have undertaken thoughtful, comprehensive investigations to establish the full scope of the FTX Group's activities. These investigations have led to extensive and cost-effective recovery of assets for the estates. However, the Examiner recommends one additional investigation into FTX.US: a matter of significant public interest that has not yet been thoroughly explored by the investigations to date.

## I.      Acquisitions

S&C undertook several investigations into potential claims arising out of corporate acquisitions by the FTX Group. Some of these investigations resulted in litigation. These investigations are described below.

Quinn Emanuel's investigation into the circumstances surrounding the FTX Group's acquisition of LedgerX and the estates' sale of LedgerX is discussed above in Part 2, Section V(b) and will not be repeated here.

---

[797] Scope Order, at ¶ 2.

a.    *Embed*

Embed was a small securities clearing and custody business.[798]  S&C's investigation revealed that the FTX Group entered into an agreement for clearing services in January 2022 and began using Embed's services in April 2022.[799]  Shortly after the FTX Group began using Embed's clearing services, Debtor entity WRS acquired Embed for nearly $300 million, using funds from Alameda.[800]  WRS conducted minimal due diligence before the acquisition and paid an inflated price to acquire Embed.[801]

After the Petition Date, the Debtors unsuccessfully sought to sell Embed.  The highest bid was from Embed's founder, who offered a bid of $1 million, and even the highest non-binding expression of interest was only $78 million, well below the price that WRS had paid.[802]

On behalf of the Debtors, S&C filed an avoidance action against a lengthy list of individuals and entities that received transfers as a result of the Embed acquisition.[803]  S&C filed a separate avoidance action on behalf of the Debtors against FTX executives Bankman-Fried, Nishad Singh, and Gary Wang, who had received equity interests in Embed as part of the transaction.[804]  The lawsuits allege fraudulent transfer and preference claims.[805]  The Embed

---

[798] *Alameda Research Ltd. v. Giles*, No. 23-ap-50380 (Bankr. D. Del) (JTD), Dkt. No. 1 at ¶ 3.

[799] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 51.

[800] *Alameda Research Ltd. v. Giles,* No. 23-ap-50380 (Bankr. D. Del) (JTD), Dkt. No. 1 at ¶¶ 38, 45.

[801] *Id*. at ¶¶ 39-48.

[802] *Id*. at ¶¶ 58-62.

[803] *Id*. at Ex. A.

[804] *Alameda Research Ltd. v. Bankman-Fried*, No. 23-ap-50381 (Bankr. D. Del) (JTD), Dkt. No. 1.

[805] *Alameda Research Ltd. v. Giles,* No. 23-ap-50380 (Bankr. D. Del) (JTD), Dkt. No. 1 at ¶¶ 69-106; *Alameda Research Ltd. v. Bankman-Fried*, No. 23-ap-50381 (Bankr. D. Del) (JTD), Dkt. No. 1, at ¶¶ 68-126.

litigation is ongoing, but S&C has settled with some of the defendants and has resolved the separate case against the FTX Group executive defendants.[806]

> b.      *FTX Europe/Digital Assets AG*

S&C's investigation revealed that the FTX Group purchased DAAG, a small Swiss financial technology company, for $376 million in three tranches of stock purchases between October 2020 and November 2021.[807]  At the time of the acquisition, DAAG did not "have any active business." [808]  The FTX Group did not conduct a proper due diligence process and significantly overpaid for this company.[809]  The investigation further determined that, despite the high purchase price, the acquisition did not include the rights to key pieces of intellectual property, which were retained by another entity owned by one of DAAG's founders.[810]  After the acquisition, the FTX Group renamed DAAG as "FTX Europe."[811]

The Debtors attempted to sell FTX Europe after the Petition Date, but concluded that a sale would not be possible because the company had no meaningful saleable assets and did not control key intellectual property.[812]  Because the Debtors were unable to monetize FTX Europe, S&C, on behalf of the Debtors, brought an avoidance action against the founders of the company.  The avoidance action alleged fraudulent transfer and preferences claims, as well as

---

[806] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 57.

[807] *Alameda Research Ltd. v. Lorem Ipsum UG*, No. 23-ap-50437 (Bankr. D. Del) (JTD), Dkt. No. 1 at ¶¶ 49-77.

[808] *Id*. at ¶¶ 76-77 (citation omitted).

[809] *Id*.

[810] *Id*. at ¶¶ 78-84.

[811] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 63.

[812] *Alameda Research Ltd. v. Lorem Ipsum UG*, No. 23-ap-50437 (Bankr. D. Del) (JTD), Dkt. No. 1 at ¶ 104.

breach of fiduciary duty claims under the law of Antigua.[813]  The Debtors have successfully settled this adversary proceeding.[814]

    *c.*    *FTX Japan/Liquid*

S&C's investigation also found that the FTX Group acquired Liquid, a Japanese cryptocurrency exchange, in April 2022 for approximately $185 million.[815]  The acquisition came after the FTX Group had extended Liquid an emergency loan of $120 million prompted by the fact that Liquid had been victimized by a hack.[816]  Liquid subsequently operated as FTX Japan.

S&C investigated potential claims arising out of the FTX Japan acquisition and decided against pursuing litigation.  S&C concluded that the Debtors had received substantial value from the FTX Japan acquisition, as the company was a successful cryptocurrency exchange that had a difficult-to-obtain Japanese license.[817]

    *d.*    *Genesis Block*

S&C investigated the FTX Group's relationship to Genesis Block Ltd. ("Genesis Block"), an over-the-counter cryptocurrency trading firm that also operated cryptocurrency ATMs.[818]  S&C's investigation found that the FTX Group structured a series of transactions whereby the FTX Group acquired nearly the entire economic stake in Genesis Block, but almost all of the shares of Genesis Block were transferred to an entity controlled by Genesis Block's co-

---

[813] *Id.* at ¶¶ 107-140.

[814] Dkt. No. 9587.

[815] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 129.

[816] *Id.* at 128.

[817] *Id.* at 131.

[818] *Id.* at 114.

founder and CEO.[819]  S&C found that, after the transactions were completed, Genesis Block

became a *de facto* subsidiary of the FTX Group and the FTX Group maintained control of

Genesis Block.[820]  S&C also identified and investigated a relationship between Genesis Block

and the so-called "Korean friend" account on FTX.com.[821]  At Bankman-Fried's trial, Singh

testified that Bankman-Fried directed him to move about $8 billion of Alameda's liabilities to

that account in August 2022.[822]  And Wang testified that in November 2022, Bankman-Fried

identified "the special Korean accounts" as the home of Alameda's liabilities to FTX.com.[823]

The Debtors continue to assess next steps with respect to Genesis Block and its affiliated

entities and individuals.

## II.    Bankman-Fried Family Members

Quinn Emanuel thoroughly investigated four of Bankman-Fried's family members and in

particular, whether they had knowledge of or involvement in the misconduct at the FTX Group:

Joseph Bankman, Barbara Fried, Gabe Bankman-Fried, and Barbara Miller.[824]

Joseph Bankman, Bankman-Fried's father, is a tenured Stanford Law School professor

who served as an officer, director, manager and/or *pro bono* counsel to a number of FTX Group

entities.[825]  Barbara Fried, Bankman-Fried's mother, is a Professor Emerita of Stanford Law

School.  She served as a member of the Board of Advisors of Stanford University's Ethics

---

[819] *Id*. at 114-15; *see also* Nardello, *Report Prepared for Sullivan & Cromwell LLP re: Genesis Block Limited*, Mar. 22, 2023 ("Genesis Block Memo"), at 5.

[820] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 116.

[821] *Id*.; Genesis Block Memo, at 30.

[822] *See* Transcript at 1380:3-1382:21, SBF Criminal Case, Dkt. No. 366.

[823] *See* Transcript at 453:5-457:10, SBF Criminal Case, Dkt. No. 352.

[824] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 71.

[825] *Alameda Research LLC v. Bankman*, No. 23-ap-50584 (Bankr. D. Del.) (JTD), Dkt. No. 26 at ¶ 3.

Center, and was a primary advisor to Bankman-Fried and other senior FTX Group executives regarding political contributions.[826]  Gabe Bankman-Fried, Bankman-Fried's younger brother, was the Executive Director of Guarding Against Pandemics ("GAP"), a political action committee.[827]  Barbara Miller, Bankman-Fried's aunt, served as a consultant to FTX.US.[828] Barbara Miller's involvement is discussed in Part 5, Section VI.a.

In the course of this investigation, Quinn Emanuel, assisted by Nardello and Alvarez & Marsal, reviewed documents collected from the Debtors and related entities such as GAP, as well as through Rule 2004 requests, and reviewed publicly available information including media reports and IRS filings.[829]  In addition, Alvarez & Marsal performed tracing analyses.[830]  Quinn Emanuel also considered relevant witness testimony adduced at the criminal trial of Bankman-Fried and information obtained from witness interviews.[831]

Among other things, Quinn Emanuel's investigation identified payments from or traceable to the FTX Group that were made to certain of these family members.  Quinn Emanuel's investigation identified two transfers to Gabe Bankman-Fried that were traceable to FTX Group assets: a "gift" of $2 million;[832] and a payment of $200,000, in connection with a December 2021 consulting agreement pursuant to which Gabe Bankman-Fried was to advise Singh on Singh's personal philanthropic donations.[833]  Quinn Emanuel also found that Bankman-

---

[826] *Id*. at ¶¶ 86-87.

[827] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 147.

[828] *Alameda Research LLC v. Bankman*, No. 23-ap-50584 (Bankr. D. Del.) (JTD), Dkt. 26 at ¶ 80.

[829] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 71-72.

[830] *Id*.  Tracing analysis involves using forensic accounting methods to track transfers of cash and assets.

[831] *Id*. at 72.

[832] *Id*. at 73.

[833] *Id*.

Fried made significant donations to GAP, and that while Gabe Bankman-Fried likely knew these were funded through FTX Group, there was no evidence that Gabe Bankman-Fried knew the donations were made up of customer funds.[834]  Quinn Emanuel continues to assess next steps with regard to Gabe Bankman-Fried.

Quinn Emanuel also thoroughly investigated the roles, involvement, and knowledge of Joseph Bankman and Barbara Fried regarding wrongdoing at the FTX Group, and the extent to which they benefitted from the improper conduct.  Following its investigation, the Debtors filed an avoidance action against Joseph Bankman and Barbara Fried.[835]

The complaint alleges, among other things, that Joseph Bankman "had broad authority to make decisions for" many FTX Group entities.[836]  The complaint further alleges that, rather than "insist on and implement controls and raise alarms about the misconduct" within the FTX Group entities, Joseph Bankman "instead, stayed silent and in at least one instance, helped hush a complainant whose allegations threatened to expose the fraud."[837]  Joseph Bankman is alleged to have not only "failed to investigate" whistleblower allegations that the FTX Group "had engaged in cryptocurrency price manipulation[,] money laundering, and operat[ing] an unlicensed money transmitter business,"[838] but also to have "applauded others for squashing [the] whistleblower complaint"[839] through, among other things, recommending an investigation into the whistleblower's attorney's disciplinary history.[840]  The Debtors also allege that Barbara Fried

---

[834] *Id.* at 73.

[835] *Alameda Research LLC v. Bankman*, No. 23-ap-50584 (Bankr. D. Del.) (JTD), Dkt. No. 26.

[836] *Id.* at ¶ 4.

[837] *Id.* at ¶ 7.

[838] *Id.* at ¶ 81.

[839] *Id.*

[840] *Id.* at ¶ 82.

"used her access and influence to benefit her own organization," the political action committee Mind the Gap ("MTG"), with "Bankman-Fried and Singh contribut[ing] tens of millions of dollars to MTG or MTG-supported causes."[841]  The complaint further alleges that, "[a]s a result of her concern about public scrutiny [of political donations], [Barbara] Fried on multiple occasions suggested, and even encouraged, Bankman-Fried and Singh to falsify disclosure records and misrepresent the sources of . . . particular contribution[s]," and that Barbara Fried knew Singh's contributions were unlawful.[842]

The Debtors also allege that Joseph Bankman and Barbara Fried "wielded their influence and status as Bankman-Fried's parents to enrich themselves at the expense of" the Debtors,[843] including obtaining a payment of $10 million in funds originating from Alameda, and purchasing a Bahamas property worth $16.4 million obtained with funds originating from FTX Trading,[844] both of which the Debtors seek to recover.  This action remains pending.

## III.    Charitable Contributions

As described in the Second Ray Report, the FTX Group channeled funds to non-profit entities and other "purportedly altruistic endeavors."[845]  These donations were made by, among other entities, the FTX Foundation (later known as FTX Philanthropy), which was led by Nicholas Beckstead at the time of the FTX Group's collapse.[846]  The Second Ray Report explains that the FTX Group "committed publicly to contribute at least 1% of FTX's revenue

---

[841] *Id.* at ¶ 89.

[842] *Id*. at ¶ 130.

[843] *Id.* at ¶ 91.

[844] *Id*. at ¶ 73.

[845] *See* Second Ray Report, at 28-29.

[846] *See* Second Ray Report, at 28; *see also* S&C, *Memorandum re: Interview of Nicholas Beckstead*, Feb. 27, 2024, at 2-4, 7.

from fees to the FTX Foundation."[847]  But, as that Report also notes, "FTX Foundation grants

were" instead "funded via transfers from a variety of bank accounts," including several that

"contained commingled customer and corporate funds."[848]  At Bankman-Fried's criminal trial,

the USAO-SDNY introduced evidence on the flow of funds from customer deposits to these

FTX Group donations.[849]

As part of its investigative work into the FTX Group's donations, S&C and Landis Rath

& Cobb LLP ("Landis") contacted over 300 non-profit entities that together received over $200

million in purported charitable donations from the FTX Group in an effort to recover the FTX

Group's donations.[850]  S&C's work included extensive negotiations with these recipients, in part

to establish that the funds at issue came from the FTX Group.[851]  For entities that were less

cooperative, S&C made Bankruptcy Rule 2004 requests and, for one organization, served a

motion to compel Bankruptcy Rule 2004 discovery.[852]  S&C also worked with Nardello to

investigate certain non-profits that received FTX Group-funded donations.[853]

Based on facts developed in their investigations, the Debtors filed adversary proceedings

related to certain charitable contributions.  For example, certain Debtors filed an avoidance

action against Bankman-Fried, Beckstead, the FTX Foundation, former FTX Foundation

employee Ross Rheingans-Yoo, and various other entities.[854]  Based on the Debtors'

---

[847] *See* Second Ray Report, at 25-26 (citation and internal quotation marks omitted).

[848] *See id.* at 26.

[849] *See, e.g.*, Transcript at 1750:13-1751:2, SBF Criminal Case, Dkt. No. 370.

[850] *See id.* at 152.; *see also, e.g.*, Dkt. No. 3329.

[851] *See id.*

[852] *See id.* at 152.; *see also e.g.*, Dkt. No. 3329.

[853] *See, e.g.*, Nardello, *Memorandum re: Center for Applied Rationality*, Aug. 25, 2023; Nardello, *Memorandum re: The Centre for Effective Altruism and Effective Ventures*, Aug. 17, 2023.

[854] *Alameda Research Ltd. v. Platform Life Sciences, Inc.*, No. 23-ap-50444 (Bankr. D. Del.) (JTD), Dkt. No. 1.

investigations, the amended complaint alleges that the FTX Foundation and Latona Biosciences

Group ("Latona"), a "sham non-profit company organized in the Bahamas," "took over $71

million of commingled funds from Alameda and FTX accounts to make investments in and

donations to life sciences companies for Bankman-Fried's personal aggrandizement."[855]  It

further alleges that "although Latona purported to be a non-profit corporation, Bankman-Fried,

Rheingans-Yoo, and Beckstead wanted to participate in and profit from any upside in these

investments," and therefore "intentionally obscured Latona's role in making these investments

and avoided any discussion of the equity stakes that Latona had received in connection with

these investments."[856]  The Debtors recently reached a resolution of this adversary proceeding,

settling the entire matter with the exception of the Debtors' claims against Bankman-Fried.[857]

Issues related to Latona are also addressed later in this Part, in the discussion of the Venture

Book.  *See infra*, at Part 5, Section IX(c)(2)(ii).

The Debtors' pending avoidance action against Bankman-Fried's parents, Joseph

Bankman and Barbara Fried, also includes allegations regarding charitable donations made by

Joseph Bankman.[858]  As relevant here, the Debtors allege that Joseph Bankman, a Senior Advisor

to the FTX Foundation and a Stanford Law School professor, "had considerable leeway in

directing charitable donations" and authorized "various FTX Group and affiliated entities"—not

just the FTX Foundation—to make those donations.[859]  The Debtors further assert that "[s]ome

---

[855] *See Alameda Research Ltd. v. Platform Life Sciences, Inc.*, No. 23-ap-50444 (Bankr. D. Del.) (JTD), Dkt. No. 73 at ¶ 5.

[856] *Id.* at ¶ 48.

[857] *See Alameda Research Ltd. v. Platform Life Sciences, Inc.*, No. 23-ap-50444 (Bankr. D. Del.) (JTD), Dkt. No. 102.

[858] *Alameda Research LLC v. Bankman*, No. 23-ap-50584 (Bankr. D. Del.) (JTD), Dkt. No. 1.

[859] *See Alameda Research LLC v. Bankman*, No. 23-ap-50584 (Bankr. D. Del.) (JTD), Dkt. No. 26 at ¶¶ 42, 78-79.

of Bankman's work at the FTX Group resulted in a flagrant waste of FTX Group funds."[860]  And

the Debtors allege that Joseph Bankman directed "donations of more than $5.5 million" to

Stanford University in an attempt to "curry favor with and enrich his employer at the FTX

Group's expense."[861]  This matter remains pending.[862]  Further discussion of the avoidance

action against Joseph Bankman and Barbara Fried may be found *supra*, at Part 6, Section II.

S&C provided to the Examiner a list of over 1,200 charitable donations made by the FTX

Group.[863]  S&C initially prioritized recovery of the largest charitable donations, before turning to

the next-largest group of donations and, finally, working with Landis to recover funds from

recipients of smaller donations.  S&C concluded that, for recipients of the smallest value

donations, any potential recoveries would likely be outweighed by the costs of further action.

Without engaging in litigation, the Debtors have collected about $70 million from over

50 non-profits that received FTX Group-funded donations.[864]  The Debtors continue to assess

possible steps to recover charitable contributions.

## IV.   FTX Tokens/Investments at Third-Party Exchanges

The FTX Group maintained accounts at cryptocurrency exchanges in multiple

jurisdictions.[865]  By January 27, 2023, the Debtors, in conjunction with S&C and Alvarez &

Marsal, identified cryptocurrency assets belonging to the Debtors, but outside of the Debtors'

custody, valued at approximately $3.5 billion as of the Petition Date.[866]  Of this total, more than

---

[860] *Id.* at ¶ 80.

[861] *Id.* at ¶ 115.

[862] *See Alameda Research LLC v. Bankman*, No. 23-ap-50584 (Bankr. D. Del.) (JTD).

[863] *See* Spreadsheet of Charitable Contribution Transfers.

[864] *See* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 151.

[865] *Id*. at 168.

[866] S&C, *UCC Professionals Meeting*, Jan. 27, 2023, at 14.

$1.76 billion worth of cryptocurrency was held in hot wallets,[867] including in hot wallet accounts at third-party exchanges.[868]  The Debtors faced several challenges in recovering cryptocurrency assets from third-party exchanges.  These difficulties included insufficient documentation, a dearth of knowledgeable personnel, and difficulties obtaining access to accounts at third-party exchanges because the exchanges authorized only a limited number of users to access the accounts.[869]

In November 2022, during her interview with S&C, Caroline Ellison provided information regarding the Debtors' third-party exchange accounts and estimates of the value of the contents.[870]  According to Ellison, several third-party exchanges locked access to the accounts or otherwise precluded the Debtors from accessing the assets in the days following the Petition Date.[871]  S&C and Alvarez & Marsal contacted third-party exchanges to request that each exchange freeze the Debtor accounts and enter into discussions for transfer of control of the accounts to the Debtors.[872]

S&C and Alvarez & Marsal identified additional accounts at third-party exchanges that belonged to the Debtors by: (1) investigating more than 2,000 potential accounts or log-in credentials; and (2) pursuing on-chain tracing efforts to locate undisclosed token holdings at

---

[867] A "hot wallet" is a means of storing cryptocurrency on a device that is connected to the Internet.  *See* First Ray Report, at 23.

[868] S&C, *UCC Professionals Meeting*, Jan. 27, 2023, at 14.

[869] *Id*. at 15.

[870] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[871] *Id.*

[872] S&C, *UCC Professionals Meeting*, Jan. 27, 2023, at 17.

exchanges and at other locations.[873]  S&C worked to regain control of these accounts with the goals of: (1) recovering the assets; and (2) transferring all tokens to cold storage.[874]

As of January 27, 2023, S&C and Alvarez & Marsal had identified accounts at 23 exchanges.  Four exchanges granted the Debtors access to the accounts or had granted access pending verification.[875]  Thirteen other exchanges agreed to freeze accounts and were considered to be cooperating, including having requested legal process to turn over control.[876]  The remaining six exchanges had not responded as of January 27, 2023, and/orthe Debtors were in discussions with SDNY-USAO regarding pursuit or forfeiture.[877]

As of March 15, 2024, the Debtors reached agreements or had near-complete agreements with nine exchanges, including one newly identified account, to grant the Debtors access to the accounts.[878]  The value of the tokens in these resolved accounts was estimated to be approximately $290 million, as of the Petition Date.  Two accounts, created by Debtors at Binance and Binance US, were seized by the USAO-SDNY.  Those seized accounts held assets estimated to be worth approximately $230 million as of the Petition Date.[879]

Eleven exchanges have not yet agreed to resolutions allowing the transfer of control of the frozen accounts to the Debtors, but are part of ongoing efforts by the Debtors to secure

---

[873] *Id*.

[874] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168. "Cold storage," or a "cold wallet" is a means of storing cryptocurrency on a secure device that is not connected to the Internet.  *See* First Ray Report, at 23.

[875] S&C, *UCC Professionals Meeting*, Jan. 27, 2023, at 17.  The four exchanges are: (1) Bitfinex; (2) Deribit; (3) LMAX; and (4) Kraken.

[876] *Id.*  The 13 exchanges are: (1) Ascendex; (2) Bitbank; (3) Bitflyer; (4) Bitmex; (5) Bitstamp; (6) Bybit; (7) Coinbase; (8) Crypto.com; (9) Gate.io; (10) Gemini; (11) Paxos; (12) Polonex; and (13) Upbit.

[877] *Id*.  The six exchanges are: (1) Binance and Binance US; (2) BTCTurk; (3) Huboi; (4) KuCoin; (5) MEXC; and (6) OKCoin.

[878] *Id*.  The nine exchanges are: (1) Liquid (not listed among the January 23, 2023 exchanges); (2) Bitstamp; (3) Bitfinex; (4) Coinbase; (5) Deribit; (6) Gemini; (7) Kraken; (8) LMAX; and (9) OKCoin.

[879] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

recovery of the assets.  The aggregate value of the assets in these accounts is estimated to be approximately $245 million as of the Petition Date.[880]  S&C believes that four exchanges are currently beyond the reach of the Debtors' recovery efforts.[881]  S&C estimates that the aggregate Petition Date value of Debtor assets held in accounts at these four exchanges is approximately $130 million.[882]

   a.    *Exchanges For Which Recovery Is Complete or Near Complete*

As of March 15, 2024, S&C considered asset recovery to be essentially complete from the following nine exchanges: (1) Liquid; (2) Bitfinex;[883] (3) Bitstamp; (4) Coinbase; (5) Deribit[884]; (6) Gemini; (7) Kraken; (8) LMAX; and (9) OKCoin.[885]  The investigations conducted by S&C and Paul Hastings provided additional detail on two of these accounts:

   1.    Coinbase

This account was determined to represent the greatest value of non-FTT Debtor assets held at a third-party exchange, consisting primarily of SOL tokens estimated to be worth $105 million as of January 30, 2024.  However, at that time, this account was jointly controlled by BlockFi and the Debtors.[886]  Although the extent to which this joint control was resolved in favor of the Debtors was not detailed in S&C's March 15, 2024 report, the Debtors' recovery of assets held at Coinbase is considered complete or near complete.

---

[880] *Id*.

[881] *Id*.

[882] *Id*.

[883] Bitfinex was identified as a holder of FTT.  Paul Hastings, *FTT Claims and Holders Summary*, July 10, 2023, at Tab "On-Chain Holders (FTI)."

[884] The Debtors' Deribit account was identified as the source of a payment to Genesis to pay down a loan of 10.6 BTC ($248,000) on July 19, 2022.  However, documentation of the underlying loan has not been identified. Paul Hastings, *FTX Unsecured Creditors' Committee—FTI Analysis*, Mar. 1, 2023 ("Document Review"), at Row 4.

[885] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[886] Paul Hastings, *Presentation to the Official Committee of Unsecured Creditors of FTX Trading Ltd., et al.*, Jan. 30, 2024, at 10.

2.    OKCoin

As determined through an investigation conducted by Nardello on behalf of S&C, OKCoin (sometimes referred to as OKX) is a global cryptocurrency exchange with offices in the United States, Malta, Hong Kong, Singapore, and Japan.[887] Nardello's investigation did not, however, reveal the nature or value of Debtor assets held at OKCoin.  Nevertheless, S&C reports asset recovery from OKCoin to be complete or near complete.[888]

b.    *Exchanges At Which Debtor Accounts Were Seized by USAO-SDNY*

As of January 27, 2023, S&C reported that the Debtors were aware that the USAO-SDNY was seeking forfeiture of the Debtors' accounts held at two related entities: (1) Binance;[889] and (2) Binance US.[890]  By March 15, 2024, the Debtors' crypto-assets in those accounts had, in fact, been seized by the USAO-SDNY.[891]

As part of its investigation into Binance on behalf of S&C, Nardello reviewed an August 2022 study of stablecoins titled "Stablecoin Cyclones: Mint & Burn Patterns."  Among other things, the study discussed unexpected aspects of TrueUSD, a U.S. dollar fiat-backed stablecoin. The study found that "FTX and Binance share a redemption address. . . . [E]ither TrueUSD made a mistake and sent the same address to these two rival exchanges or they are coordinating TrueUSD on some level."[892]

---

[887] Nardello, *Memorandum re: OKCoin*, Dec. 2, 2022, at 1.

[888] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[889] Binance was also identified as a holder of FTT.  Paul Hastings, *FTT Claims and Holders Summary*, July 10, 2023, at Tab "On-Chain Holders (FTI)."

[890] S&C, *UCC Professionals Meeting*, Jan. 27, 2023, at 17.

[891] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[892] Nardello, *Report Prepared for Sullivan & Cromwell LLP re:Binance Supplemental Research*, Nov. 18, 2023, at 11.

Miller recounted to S&C that, after the Petition Date, he learned of approximately $1 million in cryptocurrency that the Debtors maintained at Binance. Miller stated that he secured these crypto-assets by putting them on a physical metal ledger.[893]

### c.    Exchanges For Which Recovery Efforts Remain In Process

The Debtors are continuing recovery efforts with respect to 11 other third-party exchanges:[894] (1) AscendEX; (2) Bitbank; (3) Bitexen; (4) bitFlyer; (5) BitMEX; (6) Bybit;[895] (7) Crypto.com; (8) MEXC; (9) Paxos; (10) Poloniex; and (11) Upbit. These accounts represent assets estimated at $245 million as of the Petition Date.[896] The Debtors' investigation of these exchanges uncovered additional detail related to four of them:

### 1.    Crypto.com

According to an investigation conducted by Nardello, Crypto.com is a cryptocurrency exchange operated by Foris DAX MT, a Malta corporation registered to operate in Hong Kong.[897] Foris DAX MT held accounts at FTX.com beginning at least as early as 2019.[898] The Nardello investigation report into Crypto.com did not discuss accounts held by the Debtors at Crypto.com or its parent. However, the report did include evidence that Crypto.com or its parent had more than $33 million in assets on deposit with the Debtors as of October 2022.[899] S&C investigated Crypto.com and identified accounts held by the Debtors at Crypto.com.[900] It

---

[893] Miller Interview Memo, at 11.

[894] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[895] Bybit was identified as a holder of FTT. Paul Hastings, *FTT Claims and Holders Summary*, July 10, 2023, at Tab "On-Chain Holders (FTI)."

[896] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[897] Nardello, *Memorandum re: Foris Dax*, Sept. 12, 2023, at 2.

[898] *Id.* at 9.

[899] *Id.* at 10.

[900] S&C, *UCC Professionals Meeting*, Jan. 27, 2023, at 17.

reported that Crypto.com had frozen these accounts at the Debtors' request, and that the Debtors were in the process of securing control over these assets as of May 2024.[901]

### 2.    MEXC

Nardello identified documents indicating that Alameda had opened accounts on the MEXC platform and held various cryptocurrency tokens in those accounts.[902]  MEXC was also identified as a holder of FTT.[903]

### 3.    Poloniex

Poloniex is a cryptocurrency exchange that, as of October 2019, was acquired by Sun Yuchen, a high-profile individual in the cryptocurrency industry who also goes by Justin Sun.[904]

### 4.    Upbit

The investigation by Paul Hastings into preferential transfers involving Alameda identified email exchanges and KYC documentation that indicate "Alameda had direct access" to an account on Upbit.[905]  It further identified a letter from Ray to Upbit's General Counsel stating that the Debtors have an account at Upbit, identified by account ID, and requesting that the funds in the account be transferred to the bankruptcy estate.[906]

### d.    *Exchanges Over Which the Debtors Exert No Control*

There are four third-party exchanges where S&C identified accounts held by the Debtors, but the accounts are outside the control of the Debtors.  These exchanges are: (1) BTCTurk;

---

[901] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[902] Nardello, *Memorandum re: MEXC*, Apr. 20, 2023, at 3.

[903] Paul Hastings, *FTT Claims and Holders Summary*, July 10, 2023, at Tab "On-Chain Holders (FTI)."

[904] Nardello, *Memorandum re: Orange Anthem*, July 6, 2023, at 1,6.

[905] Paul Hastings, *FTX UCC - Summary of Alameda Privileges/Preferential Treatment*, June 7, 2023, at Tab "Detailed Analysis".

[906] *Id.*

(2) GATE.io; (3) Huboi; and (4) KuCoin.[907]  The Debtors' accounts at these exchanges are estimated to hold assets valued at $130 million as of the Petition Date.[908]  Of these, S&C's investigation and reporting offered additional notable information on two of them:

1.    GATE.io[909]

In January 2023, S&C determined that GATE.io was willing to cooperate with the Debtors by freezing the Debtors' accounts to preserve value and transferring control of those assets to the Debtors.[910]  S&C indicated that GATE.io had, as of January 27, 2023, frozen the account(s) related to the Debtors' holdings.[911]  However, along with 12 other third-party exchanges, GATE.io requested legal process prior to granting the Debtors access or control to the frozen assets.[912]  Then, in contrast to the 12 cooperating exchanges, GATE.io stopped cooperating with the Debtors.[913]

2.    KuCoin[914]

Nardello identified documents indicating that Alameda listed assets equivalent to $115 million in a KuCoin account, with $80 million of that characterized as "currently available" as of November 7, 2022.[915]

---

[907] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[908] *Id*.

[909] GATE.io was identified as holding positions in the FTT token.  Paul Hastings, *FTT Claims and Holders Summary*, July 10, 2023, at Tab "On-Chain Holders (FTI)."

[910] S&C, *UCC Professionals Meeting*, Jan. 27, 2023, at 17.

[911] *Id.*

[912] *Id.*

[913] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[914] KuCoin was also identified as a holder of FTT.  Paul Hastings, *FTT Claims and Holders Summary*, July 10, 2023, at Tab "On-Chain Holders (FTI)."

[915] Nardello, *Memorandum re: KuCoin,* Apr. 20, 2023, at 20.

KuCoin has been the target of many regulatory actions, including one by the New York State Attorney General alleging improper securities trading.[916]  Although the Debtors have identified assets in a KuCoin account, those assets are assessed by S&C to be outside the control of the Debtors and not subject to advancing recovery efforts.[917]

## V.    FTX.US

Beginning in 2020, the FTX Group created and maintained FTX.US, an exchange for spot trading of cryptocurrency and other digital assets in the United States.[918]  FTX.US was needed because FTX.com, the FTX Group's primary exchange, was not available to users in the United States.[919]  FTX.US was a subsidiary of Debtor entity WRS, which also controlled several other businesses related to cryptocurrency trading that served U.S. customers.[920]

On November 8, 2022, after FTX.com paused customer withdrawals, Bankman-Fried tweeted that "FTX.us . . . [is] not currently impacted by this," and on November 10, he claimed that FTX.US was "100% liquid" and "[e]very user could fully withdraw" funds.[921]  However, on November 9, representatives of FTX.US informed U.S. regulators and the U.S. House of Representatives that "FTX US  . . . customer assets actually held are not immediately reconcilable with the customer assets reported."[922]  FTX.US subsequently filed for Chapter 11

---

[916] *Id*. at 9.

[917] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 168.

[918] First Ray Report, at 4.

[919] Ray First Day Declaration, at ¶ 33.

[920] Examples of other WRS businesses in this category included LedgerX LLC, a CFTC-licensed cryptocurrency futures and derivatives market, and FTX Capital Markets LLC, an SEC-registered broker-dealer.  *See id*. at ¶¶ 12-21.

[921] Letter from Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, U.S. House of Representatives, to Sam Bankman Fried and John Ray (Nov. 18, 2022), at 3, https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/2022-11-18.RK%20to%20Bankman-Fried%20and%20Ray-FTX%20re%20FTX%20Crypto.pdf, *archived at* https://perma.cc/88G8-GEL8.

[922] *Id*.

along with the other FTX Group entities.  On January 17, 2023, Bankman-Fried contended that

FTX.US should not have filed for bankruptcy, as FTX.US "was and is solvent, likely with

hundreds of millions of dollars in excess of customer balances."[923]

      S&C has undertaken a number of investigations into issues presented by the collapse of

FTX.US.  These investigations included whether FTX.US was insolvent when the bankruptcy

was filed, as well as an inquiry into Bankman-Fried's various public statements that espoused the

opposite position, i.e., that FTX.US was, and remained, solvent.  The investigations by S&C

confirmed that FTX.US was in fact insolvent on the Petition Date, with a multimillion dollar

"hole" in FTX.US's balance sheet,[924] and that Bankman-Fried's statements to the contrary were

false.  In this section, the Examiner summarizes the investigative steps taken and the findings of

these investigations, and recommends that he conduct a further investigation into issues

surrounding the "hole" in FTX.US's balance sheet and its causes, and the potential commingling

and misuse of customer funds involving FTX.US.

      a.    *Investigative Steps*

      Immediately after the Petition Date, S&C began investigating the collapse of the FTX

Group, including issues related to FTX.US.[925]  Relevant here, the initial investigation into

FTX.US involved the review of documents collected from Debtor entities and interviews of

---

[923] *See* Samuel Bankman-Fried, *FTX US Balance Update 2023-01-17*, Substack (Jan. 18, 2023), https://sambf.substack.com/p/ftx-us-balance-update-2023-01-17, *archived at* https://perma.cc/M585-CCVT; *see also* Samuel Bankman-Fried (@SBF_FTX), X (formerly Twitter) (Jan. 17, 2023, 7:31 pm), https://twitter.com/SBF_FTX/status/1615507065337958401, *archived at* https://perma.cc/R3E9-N3ND ("FTX US is solvent, as it always as [sic] been.").

[924] FTX Group executives used the term "hole" to refer to a shortfall in available assets at FTX.US relative to FTX.US's liabilities to customers and others.  The CFTC later adopted this terminology in its complaint against FTX Group executives stemming from the collapse of FTX.US.  *See Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. No. 1 at ¶¶ 95-98.

[925] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 26.

several FTX.US executives.[926]  S&C identified evidence that, in the leadup to the Petition Date, FTX executives had discussed a $46 million "hole" in customer assets at FTX.US.[927]

After Bankman-Fried claimed on January 17, 2023 that FTX.US was, and had always been, solvent, S&C further investigated the "hole" and the veracity of Bankman-Fried's statements about FTX.US's solvency.[928]  S&C reviewed additional documents and communications located on devices obtained from the Debtors and conducted a forensic accounting of FTX.US's assets and liabilities in conjunction with AlixPartners and Alvarez & Marsal.[929]

b.    *S&C's Findings Regarding the FTX.US "Hole" and Bankman-Fried's Statements*

Based on its investigation into FTX.US, S&C found the following: when concerns about FTX.com liquidity issues developed in early November 2022, certain FTX Group executives—including Bankman-Fried, Ellison, Singh, FTX.US CEO Zach Dexter, and FTX.US General Counsel Ryne Miller—discussed issues related to FTX.US.[930]  After pointed questions from Dexter and Miller, Bankman-Fried and Wang provided spreadsheets ostensibly reflecting the bank balances of WRS (FTX.US's parent company) and the aggregated customer balances at FTX.US.

Dexter analyzed these spreadsheets and informed the group that the FTX.US bank balances spreadsheet totaled $138.5 million and that the "Wallet Balances" spreadsheet—the customer balances—totaled $184.7 million, leaving a hole (or shortfall) of approximately $46

---

[926] *See, e.g.*, Miller Interview Memo; S&C, *Memorandum re: Interview of Marissa MacDonald*, Dec. 7, 2022 ("MacDonald Interview Memo"); During Interview Notes.

[927] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 26.

[928] *Id.*

[929] *Id.*

[930] S&C, *Talking Points for SDNY Re: FTX.US Shortfall*, Apr. 4, 2023 ("USAO-SDNY Talking Points"), at 2 (quoting FTX_000022866).

million at FTX.US.[931]  Dexter pressured other FTX Group executives to address the hole by transferring funds from FTX.US operating cash accounts to bank accounts that held FTX.US customer funds.  Eventually, Bankman-Fried claimed to have resolved the hole by "transferr[ing] 46m from info@alameda-research.com to expenses@ftx.us."[932]

But as S&C's investigation determined and the CFTC later alleged, the transfer that Bankman-Fried described was not what Dexter had prudently recommended: it was not a transfer from an FTX.US operating cash account to increase the amount of cash available for customer withdrawals in FTX.US's bank accounts.[933]  Instead, as the CFTC alleges, in an effort to cover the hole at FTX.US, Bankman-Fried made a transfer from Alameda's FTX.US account to another account at FTX.US that could be used to satisfy customer withdrawal demands.[934]  In other words, Bankman-Fried used Alameda funds to shore up FTX.US's balance sheet by reducing FTX.US's nominal liability to Alameda, while not, in reality, adding any additional assets to FTX.US's balance sheet.[935]  Dexter reported this transfer to the CFTC soon after it was made, and the CFTC incorporated allegations about the transfer into its case against Bankman-Fried.[936]

As S&C's investigation found, the FTX Group executives soon realized that the calculations of FTX.US's financial position were flawed.[937]  Dexter identified these errors to a

---

[931] *Id*. (citing FTX_001567895).

[932] *Id*. at 3 (quoting FTX_000022974).

[933] *Id.*; *Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. No. 1, at ¶¶ 97-98.

[934] USAO-SDNY Talking Points, at 3; *Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. No. 1 at ¶¶ 97-98.

[935] *Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. No. 1 at ¶ 95 ("Bankman-Fried quickly indicated he would fill the hole at FTX US from liquidation of Alameda assets.").

[936] USAO-SDNY Talking Points, at 3; *Commodity Futures Exch. Comm'n v. Bankman-Fried*, No. 22-cv-10503 (S.D.N.Y.), Dkt. No. 1 at ¶ 98.

[937] USAO-SDNY Talking Points, at 3-4 (citing FTX_000287058).

smaller group of FTX.US executives, excluding Bankman-Fried and other key members of FTX Group leadership.  Dexter explained that the calculations had involved several bank balances and customer wallet balances, each from a different point in time, and that in the financial documentation provided, "operational cash [was] clearly being counted towards 'backing' cash, which is clearly not how this is supposed to work."[938]  Caroline Papadopoulos, FTX.US's controller, pointed out that the calculation was off for another reason: it "includ[ed] [WRS] cash [which] should be considered independent of FTX US."[939]  She characterized the ostensible reconciliation as "nonsense."[940]  In the wake of this discovery, FTX.US filed for bankruptcy with the other FTX Group entities.

In light of these findings, S&C concluded that Bankman-Fried was incorrect when he claimed FTX.US was solvent on the Petition Date.  Bankman-Fried's argument for FTX.US's solvency relied on similar errors to those made during the attempted reconciliation of the balance sheet: it counted cash held by FTX.US affiliates WRS and LedgerX as cash that could be used to pay out FTX.US customers.[941]  Additionally, Bankman-Fried claimed that FTX.US had $485 million in crypto-assets available to satisfy customer withdrawals.  But this was also false; these tokens had declined significantly in value by the Petition Date.[942]  Finally, S&C concluded that even if FTX.US had been solvent, it was appropriate to file it into bankruptcy.  Given the extensive evidence of asset commingling across entities in the FTX Group—including the commingling of FTX.US and Alameda assets undertaken in an effort to cover the hole at

---

[938] *Id.* (citing FTX_000287196).

[939] *Id.*

[940] *Id.*

[941] *Id.* at 5 (citing FTX_000287196).

[942] *Id.* at 5-6.

FTX.US—FTX.US would have been vulnerable to litigation by creditors of other FTX entities if it had not been included in the bankruptcy filings.[943]

   c.    *Recommendations for Further Investigation*

S&C's investigation confirmed the hole at FTX.US.  In conjunction with Alvarez & Marsal, S&C has continued to investigate the size of the hole as of the Petition Date and refine its estimate.  The most recent calculation—as of May 7, 2024—estimates that the hole was approximately $141 million, far greater than FTX.US's leadership and the senior FTX Group executives had understood.[944]  However, S&C acknowledged it has not focused on whether there was a hole before November 2022, or how large such a hole may have been.[945]

There is reason to believe that FTX.US may have experienced balance sheet shortfalls far earlier than the Petition Date.  S&C found that senior FTX Group executives frequently ordered the transfer of assets (both cryptocurrency and fiat currency) between FTX.US and other entities in the FTX Group, such as Alameda and FTX.com.[946]  During S&C's interviews with FTX.US executives, witnesses discussed the movement of funds between FTX.US and other FTX Group entities.  For example, a senior executive in FTX.US compliance described a conversation with an employee with FTX.US's settlements team that occurred around the time of the discovery of the hole.  As the compliance executive reported, when the topic of the hole came up, the settlements employee mentioned "normally . . . go[ing] to Alameda and switch[ing] [a stablecoin] into fiat from [Alameda]."[947]  S&C noted that FTX.US made at least some transfers

---

[943] *Id*. at 3-4.

[944] Dkt. No. 14301-1, at 29.

[945] USAO-SDNY Talking Points, at 6.

[946] *Id*.

[947] During Interview Notes, at 8.

to and from other FTX Group entities to resolve imbalances in stablecoin reserves, and that at

least certain of those transfers involved a swap of one asset held at FTX.US for another asset of

equal value held at another FTX Group entity.  But it is not clear whether all the transfers took

that form, or whether some were transfers undertaken at the direction of FTX Group executives

to address balance sheet holes at FTX.US.  Another FTX.US executive who served in a senior

role in the compliance department described a conversation in which she was told that FTX

executive Jayesh Peswani would do "top-side entries on the books" at FTX.US,[948] suggesting to

her that "someone can move something around" among FTX Group entities.

These findings suggest that FTX.US may have experienced "holes," or shortfalls of

available assets relative to liabilities on occasions before November 2022 and that these holes, as

well as the November 2022 hole, may have been resolved by FTX employees transferring, or

ordering the transfer of, assets from other FTX Group entities to FTX.US.  It does not appear,

however, that the Debtors have fully investigated the cause of the November 2022 hole at

FTX.US, or the existence or causes of holes that may have existed at other times.  Nor have they

determined (1) whether the balance sheet holes were the result of commingling of customer or

corporate assets; (2) their frequency and size; or (3) how they were covered, and who was

involved in covering them.  In discussions with the Examiner, S&C explained it would be

difficult to conclusively determine the causes of the holes at FTX.US because of the poor state of

the FTX Group's record-keeping and the fact that—as the FTX Group's executives found when

they attempted to assess the size of the FTX.US hole in the days before the Petition Date—it is

difficult to determine the state of FTX.US's balance sheet at any given time.  This is due to the

high volatility of many crypto-assets and constant fluctuations in fiat and cryptocurrency account

---

[948] MacDonald Interview Memo, at 19.

balances.  Nevertheless, S&C acknowledged it has not investigated in full certain potential causes of the hole or holes at FTX.US.

The Examiner recommends that he be authorized to conduct an investigation into these issues.  Further investigation of the existence, cause, and resolution of "holes," or balance sheet shortfalls, at FTX.US may identify additional misconduct or misuse of customer assets.  Additionally, further investigation and reporting on FTX.US's insolvency could promote public confidence in the bankruptcy process by refuting Bankman-Fried's false claims that FTX.US was solvent as of the Petition Date.  The Examiner notes that further inquiry into potential misuse of customer assets at FTX.US is unlikely to be accretive to the estates given the prior investigations into the FTX Group's misuse of customer assets.  However, the Scope Order recognizes that additional investigations may be warranted if those "additional investigations would be in the public interest." [949]  Given the significant public interest in issues related to FTX.US—an FTX Group entity that served customers in the United States, was publicly advertised to US customers as a "US based and regulated" exchange that made "[c]rypto investing . . . simple,"[950] and has been the subject of extensive public debate—it is the Examiner's view that further inquiry by him into FTX.US is warranted.

## VI.    Miscellaneous Investigations

The Debtors' counsel investigated a handful of other issues not readily assigned to one of the other categories of inquiries discussed in this Report, but where the Debtors' counsel saw a possibility of locating value for the estates.  These miscellaneous investigations are discussed here.

---

[949] The Examiner may recommend additional investigations if they "would be in the public interest."  *See* Scope Order at ¶ 2.

[950] FTX.US, https://ftx.us (Feb. 10, 2022), *archived at* https://web.archive.org/web/20220210160911/https://ftx.us/.

a.     *FTX Group Properties*

S&C investigated properties owned by the FTX Group in the Bahamas.[951]  Alvarez &

Marsal, along with counsel in the Bahamas, reviewed the Bahamas Land and Property Registry

to identify properties owned by the FTX Group and affiliated employees and individuals.[952]

S&C reviewed relevant records and communications related to each property and identified who

lived in the residential properties.[953]

As a result of its investigation, S&C concluded that, although FDM wired funds to

purchase the residences, it funded those purchases through transfers from FTX Group bank

accounts.[954]  In total, S&C identified 35 commercial and residential properties purchased with

more than $231 million of Debtor funds.[955]  Those properties are the subject of separate actions

seeking to recover the value of the properties.[956]

b.     *Other Investigated Preference Actions*

S&C has investigated certain entities for potential preference actions as part of its review

of top FTX.com and FTX.US customers.  For example, S&C identified two Alameda lenders and

found that one lender received loan repayments from Alameda on the days immediately

preceding the bankruptcy filing.[957]  S&C also identified and investigated one firm that was

---

[951] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 182.

[952] *Id.*

[953] *Id.*

[954] *Id.*

[955] *Id.* at 183.

[956] *See FTX Trading Ltd. v. Bankman-Fried*, No. 23-ap-50448 (Bankr. D. Del.) (JTD); *Alameda Research LLC v. Bankman*, No. 23-ap-50584 (Bankr. D. Del.) (JTD).

[957] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 138-40.

founded by a since-departed Alameda executive.[958]  The Debtors have not yet elected to pursue claims against those individuals and entities, but continue to assess possible next steps.

        *c.*     *NFT Withdrawals*

        S&C has also investigated certain non-fungible token ("NFT") transactions that occurred immediately before and on the Petition Date.[959]  By analyzing withdrawal and trading data from that period, S&C found that those NFT transactions were part of a scheme whereby FTX.com users, who could not withdraw funds from the exchange after FTX.com froze withdrawals, paid inflated prices for NFTs sold by Bahamian individuals.  Those Bahamian individuals, who could withdraw funds from the exchange after FTX.com lifted the withdrawal freeze for Bahamian users on November 10, 2022, would in turn withdraw the proceeds from the sales of NFTs from FTX.com.[960]  This investigation also identified two former employees of the FTX Group who withdrew funds in a similar way, but those employees voluntarily agreed to return those funds to the Debtors.[961]  The Debtors continue to assess next steps with respect to the individuals involved in these transactions.

## VII.    Payments to Foreign Officials

        The USAO-SDNY and the Debtors' counsel have conducted extensive investigations into transfers from the FTX Group to various foreign government officials, including the transfer of assets to the Securities Commission of the Bahamas ("SCB") and substantial payments to Chinese government officials.  A summary of those investigations is set forth below.

---

[958] *Id.* at 143.

[959] *Id.* at 134.

[960] *Id.*

[961] *Id.* at 135.

a.    *Payments to and Contacts with Bahamian Government Officials*

1.    Transfer of Assets to the Securities Commission of the Bahamas

Immediately after the Petition Date, S&C learned that previously unreleased FTT tokens had been transferred to the custody of the Bahamian government.[962]  That same week, S&C began investigating the circumstances of these transfers.

S&C corresponded with counsel for Bankman-Fried, Wang, and the JPLs, as well as with FTX Group employees and the USAO-SDNY.  In an emergency motion filed by the Debtors in these bankruptcy cases, the Debtors accused the SCB of violating the automatic stay by directing the transfer of the Debtors' digital assets out of their bankruptcy estates and to the Bahamian government.[963]  The JPLs subsequently filed an emergency motion for relief from the automatic stay and to compel the turnover of certain electronic records controlled by the Debtors.[964]  In opposing this emergency motion, the Debtors provided this Court with a copy of an affidavit from the Executive Director of the SCB, which attached a postpetition, November 12, 2022 *ex parte* order from the Supreme Court of the Bahamas authorizing "all of the digital assets on the FTX.com platform within the possession, custody and/or under the control of [FDM]" be transferred to the SCB.[965]  The JPLs and the Debtors subsequently entered into an agreement regarding mutual cooperation that consensually resolved the issues raised by the JPLs' emergency motion.[966]

---

[962] *See, e.g.*, Dkt. No. 335 at ¶¶ 33-34.

[963] Dkt. No. 22 at ¶ 7; *see also* 11 U.S.C. § 362.

[964] *See* Dkt. No. 197.

[965] *See* Dkt. No. 336-2, at 20, 388-90.

[966] *See* Dkt. No. 402.

During the criminal trial of Bankman-Fried, the USAO-SDNY presented evidence regarding the post-filing transfer of assets to the SCB.[967]  The USAO-SDNY relied on this evidence in support of a fraud enhancement at sentencing, to establish that Bankman-Fried's offense involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding."[968]  In support of its argument that the enhancement for fraud during a bankruptcy proceeding applied, the USAO-SDNY relied on Wang's trial testimony that Bankman-Fried told him that "ideally [we] should transfer [customer assets] to the Bahamas liquidators or the Bahamas regulators" because "they seemed friendly and seemed willing to let [Bankman-Fried] stay in control of the company."[969]  The USAO-SDNY also cited evidence that, while Bankman-Fried and Wang were working to transfer the assets to the Bahamian authorities, Bankman-Fried instructed Wang to continue the transfers despite warnings from Miller that there was "a significant question of who owns the assets," and that Bankman-Fried "cannot transfer any funds that are the subject of the bankruptcy estate."[970]  The defense, on the other hand, contended that the enhancement did not apply because Bankman-Fried transferred those assets to "compl[y] with an order of a foreign government with physical jurisdiction over him."[971]  When Bankman-Fried was sentenced, the sentencing court agreed with the USAO-SDNY and applied the two-level sentencing enhancement.[972]

---

[967] *See* Transcript at 464:22-471:8, SBF Criminal Case, Dkt. No. 352.

[968] SBF Criminal Case, Dkt. No. 410, at 57-59 (citing U.S.S.G. § 2B1.1(b)(9)(B)).

[969] *See id.* at 57-58 (second alteration in original) (quoting Transcript at 465:20-466:1, SBF Criminal Case, Dkt. No. 352).

[970] *See id.* at 58-59; *see also* Transcript at 467:22-470:21, SBF Criminal Case, Dkt. No. 352.

[971] *See* SBF Criminal Case, Dkt. No. 414, at 6.

[972] *See* Bankman-Fried Sentencing Transcript at 7:22-8:3, SBF Criminal Case, Dkt. No. 426.

2.      Other Payments to and Connections with Bahamian Government Officials

S&C, with assistance from Nardello, also investigated other connections between the FTX Group and current or former Bahamian government officials, including payments made and other benefits conferred in an apparent effort to secure influence in the Bahamas.  As described in the Second Ray Report, those payments included a $1 million "bonus" paid to a former Bahamian government official, who was acting as an attorney for FDM.[973]  S&C determined that this "bonus" was offered to the former government official to secure her assistance in obtaining a necessary license for FDM under the Bahamas' Digital Assets and Registered Exchanges Act.[974] In its investigation, S&C developed evidence that, when asked whether these payments could possibly constitute bribes, the FTX Group employee who offered the "bonus" dismissed those concerns based on his view that the recipient of those payments was no longer a government official.[975]  The former Bahamian government official secured the license for FDM within six weeks.[976]

S&C and Nardello also found that the FTX Group made several donations to entities affiliated with Bahamian government officials and their families.[977]  For example, the FTX Group sent $500,000 as a purported donation to an entity owned by relatives of a high-ranking Bahamian government official.[978]  In addition, the FTX Group donated $175,000 to other entities

---

[973] *See* Second Ray Report, at 16.

[974] *See* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 49; *see also* Second Ray Report, at 16.

[975] S&C, *Memorandum re: Interview of Can Sun*, Jan. 11, 2023 ("Sun Interview Memo"), at 13.

[976] *See* Second Ray Report, at 16.

[977] *See* S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 49.

[978] *See* Nardello, *Memorandum re: Issues Concerning Bahamian Insolvency Proceedings Involving FTX*, May 13, 2023, at 31.

affiliated with family members of high-ranking Bahamian government officials.[979]  Finally, S&C and Nardello's investigation identified other contacts between the FTX Group and Bahamian government officials.

      *b.*     *Payments to Chinese Government Officials*

      S&C—in conjunction with Alvarez & Marsal, AlixPartners, Nardello, and TRM Labs—also investigated the circumstances surrounding payments to Chinese government officials in 2021 to unlock Alameda accounts in China.[980]  Those accounts, which contained around $1 billion, were frozen by the Chinese government as part of its investigation into money laundering involving an Alameda counterparty.[981]  The USAO-SDNY brought a superseding indictment against Bankman-Fried charging him with violating the Foreign Corrupt Practices Act in connection with these payments to Chinese government officials, alleging that they totaled "at least approximately $40 million."[982]  At the criminal trial of Bankman-Fried, Ellison testified that these payments were in the "ballpark" of $100 million, and that she understood them to be "a large bribe to Chinese government officials to get some of our exchange accounts unlocked."[983]  S&C's investigation further found that these payments to Chinese government officials totaled approximately $161 million.[984]

---

[979] *See id.*

[980] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 15.

[981] *See* Transcript at 827:14-828:14, SBF Criminal Case, Dkt. No. 360.

[982] *See* SBF Criminal Case, Dkt. No. 115 at ¶¶ 102-05.  That charge, along with several others, was severed from the counts that proceeded to trial, and following Bankman-Fried's trial, the USAO-SDNY declined to pursue a second trial on the remaining counts.  *See* SBF Criminal Case, Dkt. No. 388.

[983] *See* Transcript at 827:9-12, 832:16-24, SBF Criminal Case, Dkt. No. 360.

[984] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 15.

## VIII.   Political Contributions

As has been widely reported in the press,[985] the FTX Group; affiliated individuals including Bankman-Fried, Nishad Singh, and Ryan Salame; and affiliated non-profit organizations and political action committees made extensive political contributions.[986] Donations were directed to politicians of both major American political parties, as well as to political action committees, national, state, and local political parties, and party-aligned groups.[987]   As explained below, multiple investigations have determined that many of these donations were made in violation of law.

### a.     Government Investigations

As part of its criminal case, the USAO-SDNY charged Bankman-Fried with violating federal election laws by using "straw donors" and corporate funds to make tens of millions of dollars of political contributions in excess of statutory limits.[988]   Among those used as  "straw donors" were two executives of the FTX Group, Singh and Salame.[989]   However, due to legal

---

[985] *See, e.g.*, Brian Schwartz, *How former crypto king Sam Bankman-Fried and friends quietly donated to political groups and relatives*, CNBC (Dec. 19, 2022), https://www.cnbc.com/2022/12/19/how-ftx-founder-sbf-and-friends-quietly-donated-to-political-groups-and-relatives.html, *archived at*  https://perma.cc/UA4A-XTPF; Kenneth P. Vogel & Ken Bensinger, *U.S. Scrutinizes Political Donations by Sam Bankman-Fried and Allies*, N.Y. Times, Dec. 17, 2022, https://www.nytimes.com/2022/12/17/us/politics/sam-bankman-fried-political-donations-doj.html, *archived at* https://perma.cc/UD66-NNJE.

[986] Second Ray Report, at 27; SBF Criminal Case, Dkt. No. 410, at 22; *see also* Brian Schwartz, *How former crypto king Sam Bankman-Fried and friends quietly donated to political groups and relatives*, CNBC (Dec. 19, 2022), https://www.cnbc.com/2022/12/19/how-ftx-founder-sbf-and-friends-quietly-donated-to-political-groups-and-relatives.html, *archived at*  https://perma.cc/UA4A-XTPF.

[987] *See* SBF Criminal Case, Dkt. No. 410, at 21-22; *see also* Kenneth P. Vogel & Ken Bensinger, *U.S. Scrutinizes Political Donations by Sam Bankman-Fried and Allies*, N.Y. Times, Dec. 17, 2022, https://www.nytimes.com/2022/12/17/us/politics/sam-bankman-fried-political-donations-doj.html, *archived at* https://perma.cc/UD66-NNJE.

[988] SBF Criminal Case, Dkt. No. 80 at ¶¶ 41, 91-96.

[989] *Id*. at ¶¶ 32-43 (describing a straw donor scheme undertaken with two unnamed executives of the FTX Group); SBF Criminal Case, Dkt. No. 410 (sentencing submission listing Salame and Singh as the unnamed executives).

challenges relating to Bankman-Fried's extradition from the Bahamas, the USAO-SDNY ultimately chose to not try Bankman-Fried on these campaign finance charges.[990]

  b.    *Debtors' Investigation*

S&C undertook an extensive investigation into the Debtors' political contributions. This investigation involved a review of the Debtors' internal documents referencing political contributions and cross-referencing identified donations to federal and state campaign finance filings.[991]  S&C also worked with AlixPartners to trace transfers from the Debtors' bank accounts to political candidates.[992]  Nardello investigated and summarized public records regarding the Debtors' political donations.[993]  And S&C inquired into these issues during certain witness interviews.[994]  Separately, on behalf of the Unsecured Creditors' Committee, Paul Hastings and FTI Consulting also undertook an investigation into the political contributions.

These investigations identified over 1,000 political contributions totaling over $200 million.[995]  They also determined that many of these donations were made using purported "loans" from Debtor entities that were, in fact, transfers from customer or corporate funds to Debtor insiders.[996]  In order to recover these funds for the bankruptcy estates, the Debtors requested that the identified recipients of the political contributions voluntarily return the funds

---

[990] *See* SBF Criminal Case, Dkt. No. 410, at 18 ("[T]he government of The Bahamas informed the United States after the extradition that Bankman-Fried had not been extradited on the campaign finance count, . . . For that reason alone, the Government was unable to proceed to trial on [that charge]").

[991] S&C, *Review of Post-Petition Investigations for Examiner,* Mar. 15, 2024, at 147.

[992] *Id*.

[993] *See, e.g.*, Nardello, *Memorandum re: Political Entity Contact Information*, Aug. 25, 2023; Nardello, *Report Prepared for Sullivan & Cromwell LLP re: Gabriel Bankman-Fried*, May 17, 2023; Nardello, *Report Prepared for Sullivan & Cromwell LLP re: Alan Joseph Bankman*, May 15, 2023; Nardello, *Report Prepared for Sullivan & Cromwell LLP re: Nishad Thirumale Singh*, Jan. 29, 2023.

[994] *See, e.g.*, S&C, *Memorandum re: Interview of Mark Wetjen,* Jan. 11, 2023; Sun Interview Memo.

[995] *See* Political Contribution Spreadsheet; Political Donation Review Spreadsheet (identifying approximately $200 million in political donations).

[996] *See, e.g.*, SBF Criminal Case, Dkt. No. 410, at 23; Second Ray Report, at 27-28.

in lieu of being subjected to an avoidance action.[997]  In response, many of the recipients "have either returned the funds to the Debtors or turned them to [sic] over to the U.S. Department of Justice."[998]

S&C and the USAO-SDNY continue to investigate issues related to political donations by the Debtors and their affiliates.

## IX.    Venture Book

The FTX Group created a fund, referred to as the "Venture Book," that would allow rapid deployment of capital to invest in companies and tokens.  The idea behind the Venture Book was to permit the FTX Group to "move fast," with no "external 'stakeholders' or 'committees.'"[999] The Venture Book's stated core mission was to "advance global blockchain and web3 adoption, with a broad investment mandate across social, gaming, fintech, software, and healthcare."[1000] Investigations have revealed that the FTX Group, through the Venture Book, invested nearly $6 billion, including customer assets, in over 500 individuals and entities between May 2020 and October 2022.[1001]

---

[997] *FTX Debtors Send Messages to Recipients of Avoidable Donations*, PR Newswire (Feb. 5, 2023), https://www.prnewswire.com/news-releases/ftx-debtors-send-messages-to-recipients-of-avoidable-donations-301738948.html, *archived at* https://perma.cc/RCY8-82U7.

[998] Second Ray Report, at 28.

[999] FTX Ventures, https://ventures.ftx.com (Aug. 11, 2022), *archived at* https://web.archive.org/web/20220811091647/https://ventures.ftx.com/.

[1000] *FTX launches $2 billion Ventures fund, hires former Lightspeed Partner Amy Wu*, PR Newswire (Jan. 14, 2022), https://www.prnewswire.com/news-releases/ftx-launches-2-billion-ventures-fund-hires-former-lightspeed-partner-amy-wu-301461078.html, *archived at* https://perma.cc/5SVR-DFBY.

[1001] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 77; S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 185.

*a.     Investigative Steps*

After the Petition Date, S&C and Quinn Emanuel investigated the Venture Book and evaluated potential litigation and monetization options.[1002]  In January 2023, S&C and Quinn Emanuel divided up the then-known Venture Book investments.  S&C retained those it had already begun to investigate and those with close ties to issues that were being addressed in other bankruptcy-related cases; Quinn Emanuel assumed responsibility for investigating the rest.[1003]

1.     Quinn Emanuel Venture Book Investigations

With Alvarez & Marsal, Quinn Emanuel compiled information concerning over 500 Venture Book investments, including the nature of the investments, the investment size, the funding dates and sources, and any future payments due.[1004]  Quinn Emanuel appropriately prioritized its inquiries based on the size of the investment.  For 30 large investments, which Quinn Emanuel defined as investments of $11 million or more, and which comprised 90% of the Venture Book's value, Quinn Emanuel undertook the most comprehensive investigations.[1005] This included a review of the Debtors' documents and data related to each investment, a review of publicly available information, and work with outside consultants to value the investments.

---

[1002] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 79.

[1003] S&C and Quinn Emanuel provided inconsistent lists of Venture Book investments over time.  The discrepancy arises primarily from differing ways of categorizing instances in which the Debtors made multiple types of investments (e.g. equity and token) in the same entity, and when the Debtors made investments in multiple legal entities associated with the same venture.  Additionally, given the poor state of the Debtors' record-keeping, S&C and Quinn Emanuel discovered previously unknown venture investments during their ongoing investigations.  The Examiner is satisfied that Quinn Emanuel and S&C have done a fulsome investigation to identify all of the Debtors' venture investments.

[1004] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 80.

[1005] *Id.* at 81-85.

Quinn Emanuel prepared memoranda summarizing its investigative findings, including its recommendation for additional steps when appropriate.[1006]

For 39 medium-sized investments, defined as investments of $5 million to $11.5 million, that made up 4.7% of the Venture Book's value, Quinn Emanuel conducted more targeted investigations. These involved a more circumscribed review of the Debtors' documents and public documents as compared to the reviews conducted for the large investments. Quinn Emanuel recommended further investigation and analysis with respect to seven of the investments that fell within the $5 million to $11 million range.[1007]

Finally, Quinn Emanuel worked with Alvarez & Marsal to summarize basic information regarding the remaining, smaller Venture Book investments, i.e., those under $5 million. Quinn Emanuel did not investigate each of these investments, reasoning that the cost of such investigations relative to their limited value would not be accretive to the bankruptcy estates. These investments totaled approximately $286 million, making up approximately 4.8% of the Venture Book's total value.[1008]

### 2.    S&C Venture Book Investigations

In conjunction with Nardello, S&C undertook similar investigations into its assigned Venture Book entities. S&C's investigations involved a review of the Debtors' documents and data related to each investment. The firm also had Nardello prepare investigative memoranda regarding many of the entities assigned to S&C, using publicly available documents and the Debtors' internal documents. S&C then evaluated the merits of pursuing litigation.

---

[1006] *Id*. at 85.

[1007] *Id*. at 86; Quinn Emanuel, *Memorandum re: Analysis of Venture Book Investments Between $5 Million and $11.5 Million*, Apr. 15, 2024, at 1.

[1008] Quinn Emanuel, *QE Assigned Investments Under $5 Million*.

b.        *Summary of Findings*

The investigations into the Venture Book concluded that the FTX Group's venture investment process was haphazard, with an emphasis on speed over reasoned decision-making. Various FTX Group entities made Venture Book investments, with seemingly little regard for corporate formalities.  For instance, some Venture Book investments were made by entities affiliated with Alameda, while others were made by entities affiliated with FTX Trading. [1009] Moreover, the FTX Group did not appear to have or follow any investment guidelines.[1010] Investments were made in amounts varying from under $1,000 to over $1 billion.  They were made in a variety of modalities, including personal loans to startup founders; purchases of cryptocurrency tokens; and equity investments in publicly traded companies, among others. Investments were paid for in cash, cryptocurrency, and FTX shares.[1011]  Investments were often spontaneous or executed very quickly, with limited due diligence prior to investing, and were often based on unsupported valuations.[1012]  Finally, a troubling number of Venture Book investments involved entities with ties to FTX Group senior executives.[1013]

c.        *Avoidance Actions*

1.        Background

As of the date of this Report, the Debtors have brought only a few avoidance actions against Venture Book entities.  The Debtors largely have held off on pursuing litigation concerning the Venture Book because they have been working to monetize these investments

---

[1009] Quinn Emanuel, *Presentation Regarding FTX Professionals, Legal Insiders, and Venture Investments to Chapter 11 Examiner Robert J. Cleary, Esq.*, Mar. 22, 2024, at 77.

[1010] *Id*. at 78.

[1011] *Id*.

[1012] *Id*.

[1013] *Id*.

without the expense and burden of litigation, and in many cases these efforts have been successful.  For some large and medium-sized Venture Book investments, the Debtors have decided not to institute avoidance actions yet, for tactical and strategic reasons that appear prudent to the Examiner.  Quinn Emanuel concluded that avoidance actions against the entities involved in the small and medium-sized Venture Book investments would not be accretive to the estates, as the cost of litigation would likely outweigh the potential returns.

The Debtors have, however, pursued avoidance actions against a handful of Venture Book entities investigated by S&C and have conducted additional investigations into certain Venture Book investments of concern.  These avoidance actions and investigations are described below.  The Debtors continue to investigate issues related to the Venture Book and to evaluate options to secure recoveries from these investments.

2.      Actual and Intended Avoidance Actions

In instances where it concluded that doing so would be accretive to the estates, S&C has pursued, or prepared to pursue, a handful of avoidance actions against Venture Book entities it investigated.  S&C settled some of the potential avoidance actions on the eve of litigation or decided not to pursue them due to intervening events; other avoidance actions have also been resolved, while still others remain ongoing.  The facts underlying the more significant of these actual and intended avoidance actions, as found by S&C, are described below, along with a brief description of their status.

(i)      K5 Global

At the direction of Bankman-Fried, Alameda and Alameda Research Ventures invested $700 million in K5 Global and related entities (collectively, "K5").[1014]  K5 was a business

---

[1014] Dkt. No. 1679 at ¶¶ 7-8.

controlled by a celebrity talent agent that operated several investment funds.[1015]  The FTX Group

hastily invested in K5 after Bankman-Fried attended a dinner party with celebrities at the home

of K5's co-owner; the FTX Group conducted little to no due diligence before making the

investment.[1016]  And although the K5 investment was made using funds from Alameda and

Alameda Research Ventures, the investment was held by two newly formed shell corporations,

SGN Albany LLC and Mount Olympus Capital LP, that were controlled by senior FTX

executives, including Bankman-Fried.[1017]

On June 22, 2023, S&C brought an avoidance action against K5, SGN Albany, Mount

Olympus Capital, and individuals associated with K5, alleging fraudulent transfer, preferential

transfer, property recovery claims, and tort and contract claims under the laws of Delaware and

the British Virgin Islands.[1018]  After SGN Albany failed to appear in the action, the bankruptcy

estates successfully moved for a default judgment against it, giving the estates ownership of

SGN Albany's interest in K5.[1019]  The proceeding remains ongoing as to other defendants.

(ii)     Latona

Bankman-Fried created Latona as a vehicle to undertake investments in life sciences

companies.[1020]  Latona was portrayed as part of the FTX Foundation's philanthropic efforts

focused on pandemic preparedness.  But in reality, it was an investment vehicle controlled by

Bankman-Fried and other senior FTX Group executives.[1021]  FTX Group entities FTX Trading

---

[1015] *Id*. at ¶ 1.

[1016] *Id*. at ¶¶ 1-5.

[1017] *Id*. at ¶¶ 28-35.

[1018] *Id*. at ¶¶ 101-169.

[1019] *Alameda Research Ltd. v. Kives*, No. 23-ap-50411 (Bankr. D. Del.) (JTD), Dkt. No. 48.

[1020] *Alameda Research Ltd. v. Platform Life Sciences Inc.*, No. 23-ap-50444 (Bankr. D. Del.) (JTD), Dkt. No. 1, at ¶ 5.

[1021] *Id*. at ¶¶ 46-48.

and Alameda transferred over $71 million to Latona.[1022]  That money was used to invest in life sciences companies at excessive valuations, and with little to no due diligence.[1023]

S&C brought an avoidance action against Latona, the companies in which it invested, and its insiders (including Bankman-Fried).[1024]  The complaint alleged fraudulent transfer, property recovery claims, and contract and tort claims under the laws of Antigua and Barbuda and the British Virgin Islands.[1025]  The estates have reached settlement agreements with all of the defendants except for Bankman-Fried.[1026]

(iii)    Modulo

Modulo Capital ("Modulo") was an investment fund that received an investment of nearly $500 million from Alameda and was also a significant creditor of the FTX Group.[1027]  An investigation by Nardello and S&C revealed that the operators of Modulo maintained close ties to senior FTX Group executives, and that, in internal emails, Bankman-Fried described Modulo as a *de facto* arm of Alameda.[1028]  In light of this information, S&C prepared to litigate an avoidance action against Modulo.  However, the Debtors negotiated a settlement agreement in which Modulo transferred over $400 million in cash to the estates and released over $50 million in claims against certain Debtors.[1029]

---

[1022] *Id*. at ¶ 12.

[1023] *Id*. at ¶¶ 51-54.

[1024] *Id*. at ¶¶ 1-2.

[1025] *Id*. at ¶¶ 114-175.

[1026] *Alameda Research Ltd. v. Platform Life Sciences Inc.*, No. 23-ap-50444 (Bankr. D. Del.) (JTD), Dkt. Nos. 89, 97, 102.

[1027] S&C Venture Book Spreadsheet.

[1028] Nardello, *Memorandum re: Modulo Capital—Ownership, Control and Principals*, Jan. 19, 2023, at 7-9.

[1029] Dkt. No. 1244.

(iv)     Farmington State Bank/Moonstone Bank

In early 2022, the Debtors had discussions with Farmington State Bank (then d/b/a Moonstone Bank) regarding the development of a cryptocurrency staking program.[1030]  Although Moonstone Bank was a small regional bank with only a few million dollars in assets, Debtor entity Alameda Research Ventures invested $11.5 million in Moonstone Bank's holding company, FBH Corporation.[1031]  The discussions around the staking program did not prove fruitful, but FTX Group entity FTX Trading nonetheless deposited $50 million in a Moonstone Bank account.[1032]  The USAO-SDNY seized the $50 million deposit in January 2023.[1033]

S&C considered a potential avoidance action against Moonstone Bank to recover the $11.5 million investment by Alameda Research Ventures.[1034]  However, while S&C was evaluating litigation, the Federal Reserve Board and Washington Department of Financial Institutions announced an enforcement action against Moonstone Bank and, as a consequence, the bank wound down its operations.[1035]  Accordingly, S&C determined that litigation was unlikely to be accretive to the estates.[1036]

(v)     Deck Technologies

Bankman-Fried personally acquired political data analytics company Deck Technologies ("Deck") in August 2022, using an ostensible $5 million loan from FTX Group entity Alameda and $1.5 million in personal funds.[1037]  S&C investigated this acquisition and determined that at

---

[1030] S&C, *Review of Post-Petition Investigations for Examiner*, at 106.

[1031] *Id*.

[1032] *Id*.

[1033] *Id*. at 107.

[1034] *Id*.

[1035] *Id*. at 108.

[1036] *Id*.

[1037] *Id.* at 124-125; Nardello, *Memorandum re: Deck Technologies, Inc. and Max Wood*, May 2, 2023, at 3.

the time of the acquisition, Deck had significant debt, lacked funds to make payroll, and did not expect to reach profitability until 2025.[1038]  Bankman-Fried nonetheless agreed to Deck's proposed purchase price without negotiation.[1039]

Given the circumstances surrounding the Deck acquisition, S&C evaluated fraudulent transfer claims against Deck.[1040]  While S&C concluded that such claims were plausible, it ultimately decided not to pursue them because the cost of any litigation would outweigh any potential recovery.[1041]  Instead, the Debtors attempted to sell Deck.[1042]  When those efforts failed, the Debtors placed Deck in a wind-down process.[1043]

### 3.    Other Efforts to Monetize Venture Investments

As discussed above, the Debtors have made significant efforts to monetize the FTX Group's venture investments and secure a recovery for the estates without litigation.  These efforts are ongoing.  Because this monetization project involves sensitive negotiations with potential buyers, this Report does not address the status of monetization efforts in detail.  However, one example of a successful monetization that came before this Bankruptcy Court is discussed here.

In its investigation, S&C found that the Debtors held a large stake in the Pyth Network, a "public blockchain-based software system that aggregates pricing data for various financial assets[] . . . in order to provide a real-time public blockchain[-]based feed of prices for such

---

[1038] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 125.

[1039] *Id*.

[1040] *Id*. at 126.

[1041] *Id*.

[1042] *Id*.

[1043] *Id*.

assets," which would be used by "[m]arket data providers and consumers."[1044]  Debtors Cottonwood Grove, Alameda, and other affiliated entities held approximately 1.12 billion of the original PYTH tokens, the "native cryptographic token of the Pyth Protocol," and nearly all of the 10 billion original PYTH tokens were held in a blockchain wallet address on FTX.com on the Petition Date.[1045]  Because almost all of the original PYTH tokens were "inaccessible" due to the filing of the bankruptcy cases, Pyth Data Association contended that "there [was] a substantial risk that without relief from the automatic stay, participants in the Pyth Network and Pyth Protocol[] . . . w[ould] start abandoning the Pyth project."[1046]

S&C consulted with the Pyth Data Association, and the parties ultimately agreed that the latter could seek relief from the automatic stay in order to mint new PYTH tokens, which "would have the same technical characteristics and potential uses" as the original PYTH tokens held by the Debtors.[1047]  As part of that agreement, Debtors Cottonwood Grove and Alameda would receive "an amount of New PYTH equal to the amount of Original PYTH that they and their affiliates owned as of the Petition Date."[1048]  The Bankruptcy Court approved Pyth Data Association's motion for relief from the automatic stay,[1049] and the Pyth Network subsequently launched along with the newly minted PYTH tokens.[1050]  The Debtors then sold an initial tranche of the newly minted PYTH tokens for the benefit of the estates.

---

[1044] Dkt. No. 1632 at ¶ 2.

[1045] *Id.* at ¶¶ 4-5.

[1046] *Id.* at ¶ 33.

[1047] *Id.* at ¶¶ 8-9.

[1048] *Id.* at ¶ 9.

[1049] Dkt. No. 1693.

[1050] S&C, *Review of Post-Petition Investigations for Examiner*, Mar. 15, 2024, at 167.

### 4. Venture Book Investments of Concern

Quinn Emanuel has identified several additional Venture Book investments of concern. The Debtors are evaluating their options with respect to these investments. Three examples are described below.

#### (i) Venture Investment-1

Debtor entity Alameda Ventures made several equity investments in Venture Investment-1, a Bitcoin mining company that is incorporated in Cyprus and operates Bitcoin mining facilities in Kazakhstan, the United States, and elsewhere.[1051] Between August 2021 and April 2022, the Debtors purchased four separate tranches of shares in Venture Investment-1, with a total purchase price of over $1 billion.[1052] Bankman-Fried personally executed three of the four share purchase agreements on behalf of Alameda Ventures.[1053] There is evidence that some of the purchases were made using FTX Group customer funds.[1054]

The investigation into Venture Investment-1 uncovered problematic facts. At the time of the investment, the company's financial statements raised red flags, both among other potential investors and internally at the FTX Group.[1055] Individuals associated with Venture Investment-1, including a board member, were aware of potential inaccuracies in the company's financial statements and valuation materials provided to potential investors.[1056] There was also evidence that co-founders of Venture Investment-1 had been involved in criminal conduct in

---

[1051] Quinn Emanuel, *Memorandum re: FTX Venture Book Review of Venture Investment-1*, Jul. 12, 2023, at 7.

[1052] *Id*. at 2-3.

[1053] *Id*. at 3-4.

[1054] *Id*. at 11.

[1055] *Id*. at 10, 18-20.

[1056] *Id*. at 12-13.

Kazakhstan.[1057]  And while the FTX Group's due diligence process identified many of these issues,[1058] the FTX Group nevertheless chose to invest.[1059]

(ii)    Venture Investment-2

Debtors Alameda and Alameda Research Ventures made three loans totaling $43 million in support of Venture Investment-2, three cryptocurrency-related ventures associated with a single individual.[1060]  Bankman-Fried personally authorized these loans, which were disbursed between March 2021 and April 2022.[1061]

Quinn Emanuel's investigation revealed that several "badges of fraud" were present at the time of the investments:  (1) the individual who controlled all three entities involved in Venture Investment-2 had a close relationship with several senior FTX Group executives, including a possible romantic relationship with a senior executive; (2) the investments were concealed from the public; (3) the loan agreements with Venture Investment-2 may not have been for reasonably equivalent value, as they contemplated several questionable, non-monetary "alternatives to repayment"; and (4) the FTX Group may have been insolvent at the time of the transfers.[1062]

(iii)    Venture Investment-3

Quinn Emanuel identified a $10 million "membership interest" that Debtor entity Alameda Research Ventures purchased in Venture Investment-3 in June 2022.[1063]  Venture

---

[1057] *Id*. at 7-8.

[1058] *Id*. at 14-16.

[1059] *Id*. at 16.

[1060] Quinn Emanuel, *Memorandum re: FTX Venture Book Review of Venture Investment-2*, Apr. 3, 2023, at 4.

[1061] *Id*. at 1-4.

[1062] *Id*. at 12-14.

[1063] Quinn Emanuel, *Memorandum of FTX Venture Book Review of Venture Investment-3*, July 12, 2023, at 1-2.

Investment-3 was founded by an individual who was formerly associated with several FTX Group entities.[1064]  There is no evidence the FTX Group conducted any due diligence before making this investment, and there is no evidence supporting the valuation at which the FTX Group invested.[1065]  More fundamentally, there is no evidence Venture Investment-3 conducted any business when the investment was made.[1066]  Therefore, it is likely the Debtors would be able to prove that the FTX Group did not receive reasonably equivalent value in exchange for the $10 million investment.[1067]

### d.    Further Venture Book-Related Efforts

The Debtors' counsel undertook significant efforts to investigate and recover funds associated with the large venture investments that make up the vast majority of the Venture Book.

To date, however, for the reasons outlined above, similar investigative efforts have not been undertaken with respect to the Venture Book's small and medium-sized investments.  As noted above, Quinn Emanuel has not pursued detailed investigations into individual small and medium-sized investments because it has concluded that doing so would not be cost-effective. The Examiner agrees with Quinn Emanuel's assessment.  Given the high cost of investigation and the limited potential return, it would not be accretive to the estates for the Debtors' counsel or the Examiner to investigate the circumstances surrounding each of the hundreds of small and medium-sized Venture Book investments.  The Debtors continue to evaluate accretive and cost-effective strategies for asset recovery from small and medium-sized Venture Book investments.

---

[1064] *Id*. at 2.

[1065] *Id*. at 5.

[1066] *Id*. at 1-2.

[1067] *Id*. at 5.

## PART 7: RELATED ADVERSARY PROCEEDINGS

This Part sets forth information regarding certain adversary proceedings that have been brought by the Debtors in an effort to recover assets for the estates, and are not discussed elsewhere in this Report.[1068]

*Alameda Research Ltd. v. Voyager Digital, LLC*, No. 23-ap-50084 (Bankr. D. Del.) (JTD):  This avoidance action seeks to recover alleged preferential transfers based on the Debtors' transactions with Voyager Digital after Voyager Digital filed for Chapter 11 protection in the Southern District of New York on July 5, 2022.[1069]  Voyager Digital was a "feeder fund," a type of investment fund that pools funds for investment into another fund, which for Voyager Digital was Alameda.  The complaint alleges that, between August and October 2022, at the request of Voyager Digital, Alameda and FTX Trading repaid certain loans that Voyager Digital made to Alameda, with accrued interest, with various cryptocurrencies (including repayment of certain loans prior to maturity).[1070]  The complaint asserts that the combined value of the transfers made by both Alameda and FTX Trading to Voyager Digital amounted to more than $453.1 million, with more than 98 percent of the total traceable to Alameda.[1071]  This action was resolved[1072] by a settlement in which the Debtors agreed to release Voyager Digital and related entities from three claims of Alameda Ventures and one claim of Alameda Research Ventures[1073] in exchange for Voyager Digital releasing the Debtors from 100 claims of Voyager Digital.[1074]

---

[1068] The information in this Part is current as of the date of this report.

[1069] *Alameda Research Ltd. v. Voyager Digital, LLC*, No. 23-ap-50084 (Bankr. D. Del.) (JTD), Dkt. No. 8 at ¶¶ 3-5.

[1070] *Id*. at ¶¶ 24-28.

[1071] *Alameda Research Ltd. v. Voyager Digital, LLC*, No. 23-ap-50084 (Bankr. D. Del.) (JTD), Dkt. Nos. 8-1, 8-2.

[1072] *Alameda Research Ltd. v. Voyager Digital, LLC*, No. 23-ap-50084 (Bankr. D. Del.) (JTD), Dkt. No. 23.

[1073] Dkt. No. 13123-1.

[1074] Dkt. No. 13123-2.

*Alameda Research LLC v. FTX Digital Markets Ltd.*, No. 23-ap-50145 (Bankr. D. Del.) (JTD):  The Debtors allege that the Bahamian JPLs erroneously claim that FDM, a Bahamian entity, "is the constructive owner of FTX.com's property, including fiat and cryptocurrency, intellectual property, and customer relationships, as a matter of non-bankruptcy law."[1075]  This action seeks declaratory relief that FDM has no ownership interest in the Debtors' assets— including its cryptocurrency, fiat currency, intellectual property, and customer information or relationships—and that any assets held by FDM are held for the Debtors or represent avoidable fraudulent transfers.[1076]

*FTX Trading Ltd. v. Mirana Corp.*, No. 23-ap-50759 (Bankr. D. Del.) (JTD):  This action is brought to avoid and recover transfers made to Mirana Corp., the investment arm of Bybit, the operator of one of the world's largest cryptocurrency exchanges.[1077]  The complaint asserts that between September 2021 and the Petition Date, Mirana's account balance on FTX.com grew from $40 million to as much as $500 million, and was valued at "several [hundred] million dollars" in the period preceding FTX Group's collapse.[1078]  The complaint alleges that based on its large account value and high levels of trading activity, Mirana was granted "VIP status" by the FTX.com exchange.[1079]

According to the complaint, Mirana became aware of the financial distress at FTX.com in November 2022, and then "sought to leverage its VIP status on FTX.com to ensure that it

---

[1075] *Alameda Research LLC v. FTX Digital Markets Ltd.*, No. 23-ap-50145 (Bankr. D. Del.) (JTD), Dkt. No. 18 at ¶ 3.

[1076] *Id.* at ¶¶ 66-130.

[1077] *FTX Trading Ltd. v. Mirana Corp.*, No. 23-ap-50759 (Bankr. D. Del.) (JTD), Dkt. No. 1 at ¶¶ 1-4.

[1078] *Id.* at ¶ 46.

[1079] *Id.* at ¶¶ 47, 50.

received priority treatment over other customers."[1080]  The complaint claims that, on November 7-8, 2022, just prior to withdrawals being halted, Mirana was able to withdraw more than $327 million in assets.  The complaint further alleges that the aggregate value of all assets withdrawn by Mirana- and Bybit-affiliated entities and individuals was $953.2 million.[1081]

This action also alleges postpetition misconduct by Mirana and its related entities, claiming that Mirana and Bybit violated the automatic stay based on Bybit's: (1) refusal to transfer estate assets held in Bybit accounts; and (2) efforts to devalue token holdings of the estates that were part of a token swap agreement whereby Alameda received 100 million BIT tokens in exchange for approximately 3.4 million FTT tokens.[1082]

*FTX Trading Ltd. v. LayerZero Labs Ltd.*, No. 23-ap-50492 (Bankr. D. Del.) (JTD):  This is an action to avoid and recover fraudulent and preferential transfers made to LayerZero Labs Ltd. ("LayerZero") by Alameda Ventures.[1083]  The complaint alleges that Alameda Ventures used funds misappropriated from the Debtors to enter into a series of financing arrangements with LayerZero, including: (1) equity investments in LayerZero of $70 million; (2) the purchase of STG tokens for $25 million; and (3) a loan agreement pursuant to which Alameda borrowed $45 million from LayerZero.[1084]  The Debtors further allege that as the Debtors faced financial crisis, LayerZero leveraged its position to extract an agreement that: (1) required Alameda Ventures to relinquish its equity stake in LayerZero and warrants it held for LayerZero (ZRO)

---

[1080] *Id*. at ¶ 50.

[1081] *Id*. at ¶¶ 52, 57 (assets valued as of November 10, 2023).

[1082] *Id*. at ¶¶ 117-121.

[1083] *FTX Trading Ltd. v. LayerZero Labs Ltd*., No. 23-ap-50492 (Bankr. D. Del.) (JTD), Dkt. No. 1 at ¶ 1.

[1084] *Id*. at ¶¶ 3-4.

and Stargate (STG) tokens[1085] in exchange for forgiveness of Alameda Ventures' loan, and (2) allowed LayerZero to purchase Alameda Ventures' 100 million STG tokens for $10 million.[1086]

---

[1085] The LayerZero token, ZRO, is a token minted by LayerZero, a protocol for applications to operate across blockchains.  The Stargate token, STG, is a token minted by Stargate Finance, a protocol for asset transfer that employs LayerZero technology.

[1086] *Id*. at ¶¶ 6-9.

**PART 8: ESTIMATED DURATION AND PROPOSED BUDGET FOR RECOMMENDED INVESTIGATIONS**

As explained above, pursuant to the Scope Order, at ¶ 2, the Examiner recommends that he be authorized to undertake additional investigations of the following issues:

1. S&C's representation of Bankman-Fried in connection with his purchase of the Robinhood Shares. This inquiry would focus on (1) the scope and contours of that representation and (2) based on that representation, what, if anything, S&C knew or should have known about the FTX Group's fraud. *See supra*, at Part 2, Section VI.

2. Potential claims against the former shareholders of LHI that sold their interests to WRS, to the extent these claims were not released in the postpetition transaction. This inquiry would (1) determine whether an avoidance action is warranted with respect to these unreleased shareholders, and (2) enable the Examiner to report on the underlying details of the prepetition sale of LHI to WRS. *See supra*, at Part 2, Section VI.

3. The "holes" or balance sheet shortfalls at FTX.US. This inquiry would center on (1) the reasons these holes arose at FTX.US, (2) whether the balance sheet holes were the result of commingling of customer or corporate assets, (3) the frequency and magnitude of the holes, and (4) how they were resolved and by whom. *See supra*, at Part 6, Section V(c).

The Examiner estimates that the additional investigative work related to these issues would take approximately ten weeks. It is estimated that the cost of this work, along with a Report to the Court summarizing the same, would not exceed $2,400,000.

The Examiner hereby respectfully requests that the Court authorize him to conduct the three investigations summarized above.

Dated: May 20, 2024

Respectfully submitted,

By: _____/s/ Robert J. Cleary_____

Robert J. Cleary
*Chapter 11 Examiner*

**ASHBY & GEDDES, P.A.**

Michael D. DeBaecke (Bar No. 3186)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Tel: (302) 654-1888
Email: mdebaecke@ashbygeddes.com

*-and-*

**PATTERSON BELKNAP WEBB & TYLER LLP**

Daniel A. Lowenthal (admitted *pro hac vice*)
Kimberly A. Black (admitted *pro hac vice*)
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
Email: dalowenthal@pbwt.com
Email: kblack@pbwt.com

*Counsel to Robert J. Cleary in his capacity as Chapter 11 Examiner appointed in the Chapter 11 Cases*

210