## Exhibit 3

**Executed Purchase and Sale Agreement**

EXECUTION VERSION
CONFIDENTIAL

**PURCHASE AND SALE AGREEMENT**

**by and among**

**CLIFTON BAY INVESTMENTS LLC**

**and**

**THE PURCHASERS LISTED ON SCHEDULE A**

**Dated as of May 31, 2024**

This PURCHASE AND SALE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "Agreement"), dated as of May 31, 2024, is made by and between Clifton Bay Investments LLC (formerly known as Alameda Research Ventures LLC), a Delaware limited liability company ("Seller"), and the purchasers listed on Schedule A (each a "Purchaser" and together, "Purchasers"). The signatories to this Agreement are collectively referred to as the "Parties" and individually as a "Party".

## Recitals

WHEREAS, on November 11, 2022 and November 14, 2022, Seller and certain of its Affiliates (collectively, the "Debtors") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "Bankruptcy Code") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "Bankruptcy Proceeding");

WHEREAS, on February 29, 2024, the Bankruptcy Court entered the Sale Procedures Order authorizing and approving, among other things, (a) the Sale Procedures (as defined in the Sale Procedures Order) for the sale or transfer of all or a portion of the Interests and (b) the sale(s) of the Interests in accordance with the Sale Procedures free and clear of any liens, claims, interests and encumbrances (other than Permitted Encumbrances);

WHEREAS, Seller holds the interests set forth on Schedule A (the "Interests") in or with the entity set forth on Schedule B (the "Subject Company") and desires to sell, assign and transfer to each Purchaser such amount of Interests as is set forth opposite such Purchaser's name on Schedule A pursuant to section 363 of the Bankruptcy Code, in accordance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors or other applicable governing body of Seller has determined that it is advisable and in the best interests of Seller's estate and the beneficiaries of such estate to consummate the Transactions pursuant to the Sale Procedures and Sale Order and has approved this Agreement;

WHEREAS, Seller intends to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Seller to consummate the Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, each Purchaser desires to purchase the Interests set forth opposite such Purchaser's name on Schedule A pursuant to section 363 of the Bankruptcy Code; and

WHEREAS, the Parties acknowledge and agree that the Transactions are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of Seller or its Affiliates and Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the purchases by Purchasers.

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF INTERESTS

1.1     <u>Purchase and Sale of Interests</u>. Pursuant to sections 105 and 363 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement, at the applicable Closing, Seller agrees to sell, assign, convey, transfer and deliver to each Purchaser, and each such Purchaser agrees to purchase and accept from Seller, all of Seller's right, title and interest in, to and under the Interests set forth opposite such Purchaser's name on <u>Schedule A</u>, as may be updated from time to time prior to the applicable Closing, for an amount in cash calculated pursuant to <u>Section 1.2</u>, which purchase shall be free and clear of any Liens other than Permitted Encumbrances.

1.2     <u>Purchase Price</u>. The aggregate purchase price for each Purchaser's respective Interests shall be an amount in cash equal to the number of such Interests set forth on <u>Schedule A</u>, as may be updated from time to time prior to the applicable Closing pursuant to this Agreement, multiplied by the applicable Per Share Price set forth on <u>Schedule A</u> (each such aggregate purchase price, an "<u>Aggregate Purchase Price</u>"), which shall be payable without any withholding or deduction.

1.3     <u>Liabilities</u>. From and after the applicable Closing Date, and upon the terms and subject to the conditions set forth in this Agreement and the Transfer Documents, any liabilities for Taxes, fees or other governmental charges attributable to the Interests or the ownership of such Interests by the applicable Purchaser shall be the responsibility of such Purchaser.

1.4     <u>Closing</u>. The closing of the Transactions in respect of a Purchaser (each such Closing, a "<u>Closing</u>") will take place at 9:00 a.m., Eastern Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures on the second (2nd) Business Day following the date on which all of the conditions to closing specified in <u>Article 5</u> are satisfied or waived in respect of such Purchaser, or at such other time as such Purchaser and Seller shall agree in writing (each, a "<u>Closing Date</u>").

1.5     <u>Deliveries at Closing</u>. At each Closing, upon satisfaction or waiver of the conditions set forth in <u>Article 5</u> hereof:

(a)     the applicable Purchaser shall pay its respective Aggregate Purchase Price to Seller in accordance with <u>Section 1.2</u> by wire transfer of immediately available funds pursuant to the instructions delivered by Seller to such Purchaser prior to the applicable Closing Date;

(b)     the applicable Purchaser shall deliver to Seller a counterpart to the Transfer Documents, duly executed by such Purchaser or its applicable Affiliates party thereto;

2

(c)      Seller shall deliver to the applicable Purchaser a counterpart to the Transfer Documents, duly executed by Seller or its applicable Affiliates party thereto; and

(d)      Seller shall deliver to the applicable Purchaser, and such Purchaser shall deliver to Seller, each of the other documents and instruments required to be delivered pursuant to the terms of this Agreement or any Transfer Documents.

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1      <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants to each Purchaser that:

(a)      <u>Authorization</u>. Seller is an entity duly organized and validly existing in good standing under the laws of Delaware. Subject to compliance with the Sale Procedures, entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents to which Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder. Subject to compliance with the Sale Procedures, entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, this Agreement and the Transfer Documents to which it is a party have been or, when executed, will be duly authorized, executed and delivered by it, and constitute or, when executed, will constitute a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

(b)      <u>Title to Interests</u>. Seller owns all right, title and interest in and to the Interests, free and clear of all Liens other than Permitted Encumbrances and Liens created by or through a Purchaser or any of its Affiliates.

(c)      <u>No Conflicts</u>. Subject to compliance with the Sale Procedures, entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, the execution and delivery of this Agreement and the Transfer Documents to which Seller is a party and the performance or consummation of the Transactions by Seller do not conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Interests owned by Seller under the terms or provisions of (i) its organizational documents, (ii) any contract that is material to the value of the Interests, or (iii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)      <u>Certain Conduct</u>. Seller has not (i) sold, assigned, transferred, delivered or otherwise disposed of all or any portion of the Interests held by Seller, (ii) converted, exchanged or redeemed all or any portion of the Interests, or (iii) agreed to do any of the foregoing.

(e)      <u>Broker's Fee; No Public Offering</u>. No Person acting on behalf of Seller or under the authority of Seller shall be entitled to any broker's, finder's, or similar fee or

3

commission in connection with the Transactions, other than the financial advisors retained by Seller in the Bankruptcy Proceeding.

(f)        No Other Representations or Warranties. Except for the representations and warranties contained in this Section 2.1, neither Seller nor any other Person (other than Purchasers) has made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Interests, Seller, the Subject Company, Purchasers or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of Seller's or its Affiliates' respective representatives or the Subject Company.

2.2        Representations and Warranties of Purchasers. Each Purchaser hereby represents and warrants to Seller that:

(a)        Authorization. Such Purchaser is an entity duly organized or formed and validly existing in good standing under the laws of its jurisdiction of organization. Such Purchaser has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents and to perform all of the obligations to be performed by it hereunder and thereunder. This Agreement and the Transfer Documents to which such Purchaser is a party have been or, when executed, will be duly authorized, executed and delivered by such Purchaser, and constitute or when executed, will constitute a valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other Laws of general application affecting enforcement of creditors' rights generally.

(b)        No Conflicts. The execution and delivery of this Agreement and the Transfer Documents to which such Purchaser is a party and the performance or consummation of the Transactions by such Purchaser do not (i) conflict with or result in a breach or violation of the terms or provisions of its organizational documents, (ii) result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which such Purchaser is a party or by which such Purchaser is bound or (iii) conflict with or result in a breach or violation of the terms or provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Purchaser or its property, except, in each case, to the extent that such conflicts, violations, defaults or accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Documents. The execution and delivery by such Purchaser of this Agreement and the Transfer Documents to which it is a party and the performance by such Purchaser of its obligations hereunder and thereunder and the consummation of the Transactions contemplated hereby and thereby will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, order, writ, decree, permit or license, or any consent or approval of any other party to such Purchaser's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon such Purchaser, except for the Sale Order.

(c)        Independent Appraisal.

4

(i)      Such Purchaser acknowledges that Seller may be in possession of material, nonpublic information relating to the Subject Company. Such Purchaser further acknowledges and agrees that Seller has no obligation to disclose to such Purchaser any such material, nonpublic information except as may be required for a representation and warranty of Seller hereunder to be accurate and correct. Such Purchaser further acknowledges that (A) it is not relying on there having been disclosed any such material or potentially material information which is not disclosed, and (B) any such information may be materially adverse to such Purchaser's interests. Such Purchaser further acknowledges that it is prepared to purchase the applicable Interests from Seller on the foregoing basis and hereby waives any right to rescind or invalidate the purchase of the applicable Interests from Seller or to seek any damages or other remuneration from Seller based on the possession of any such material, nonpublic information by Seller.

(ii)      Such Purchaser acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the applicable Interests, and that it is responsible for making its own evaluation of any information about the applicable Interests, the Subject Company or Seller that it may receive either directly from the Subject Company or Seller, and that none of the Subject Company, Seller or any Affiliate, partner, employee, officer or director thereof (A) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement or (B) shall be under any obligation to provide access to or advise such Purchaser or any other Person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the applicable Interests, the Subject Company or Seller (or any assumptions upon which such information is based) supplied by it or by any Person or be otherwise liable to the Subject Company or Seller or any other Person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

(d)      Accredited Investor; Qualified Purchaser. Such Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933, as amended and a "qualified purchaser" within the meaning of Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended, and the rules promulgated thereunder.

(e)      No Resale. Such Purchaser's purchase of the applicable Interests is for its own account for investment and not with a view to the distribution or resale thereof, except in compliance with the Securities Act of 1933, as amended, and applicable state securities laws.

(f)      Broker's Fee. No Person acting on behalf of such Purchaser or under the authority of such Purchaser shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions.

(g)    Bidder Questionnaire. Such Purchaser has completed the bidder questionnaire (as set forth in the Sale Procedures) and the responses provided therein are true and correct in all respects.

(h)    No Other Representations or Warranties.

(i)    Except for the representations and warranties contained in this Section 2.2, such Purchaser has not made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Interests, the Subject Company, any Purchaser, Seller or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and such Purchaser disclaims any other representations or warranties, whether made by such Purchaser, any Affiliate of such Purchaser or any of such Purchaser's or its Affiliates' respective representatives.

(ii)    Such Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.1, (A) neither Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to such Purchaser in connection with the Transactions and such Purchaser has not relied on any representation or warranty other than those expressly set forth in Section 2.1, (B) such Purchaser has not executed or authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to such Purchaser or any of its Affiliates, or any of its or their respective representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Subject Company, or its assets or liabilities, including the Operative Documents, or any part thereof; and (C) the Interests are being transferred "as is", "where is" and "with all faults". Such Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.1, Seller, on behalf of itself and its subsidiaries and Affiliates (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities, conditions (financial or otherwise) and prospects of the Subject Company or with respect to the Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to such Purchaser or its Affiliates or its or their respective representatives (including any opinion, information, projection or advice that may have been or may be provided to such Purchaser by any representative of Seller or any of its Affiliates). Such Purchaser acknowledges and agrees that Seller has not made any representations or warranties to such Purchaser regarding the probable success or profitability of the Subject Company.

(iii)    Such Purchaser acknowledges and agrees that the enforceability of this Agreement against Seller is subject to compliance with the Sale Procedures and entry

of the Sale Order and any other Order entered into by the Bankruptcy Court applicable to the Transactions.

## ARTICLE 3

## COVENANTS

3.1     <u>Tax Matters</u>. Seller and each Purchaser shall (i) cooperate with each other in good faith in connection with Taxes with respect to the Subject Company or the Interests and with respect to the Tax treatment of the Transactions and (ii) use commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity as may be necessary to mitigate, reduce or eliminate any Tax (including withholding or deduction in respect of Taxes) that could be imposed with respect to the Transactions. All Transfer Taxes, if any, incurred in connection with the consummation of the Transactions shall be borne by the applicable Purchaser(s). If any Purchaser reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to Seller hereunder under applicable Law, such Purchaser shall notify Seller at least ten (10) Business Days before any such payment subject to withholding.

3.2     <u>Confidentiality</u>. Seller and each Purchaser (a) acknowledge that, with respect to the Confidentiality Agreement with such Purchaser, (i) such agreement remains in full force and effect in accordance with its terms, (ii) such agreement shall not terminate due to this Agreement, and (iii) the terms of such agreement are incorporated herein by reference, and (b) agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full except that Seller shall be permitted to disclose the terms of this Agreement. For the avoidance of doubt, Seller is expressly permitted to disclose this Agreement, any Transfer Documents and, in each case, any exhibits and schedules thereto with the Bankruptcy Court as necessary or advisable in connection with the Transactions.

3.3     <u>Agreement to Be Bound</u>.  Each Purchaser agrees to accept and be bound by the terms and conditions of all the Operative Documents and the obligations and limitations of Seller under all of the Operative Documents as though such Purchaser was an original party thereto. Each Purchaser agrees to execute such additional documents as may be necessary to become a party to one or more of the Operative Documents, as may be requested by the Subject Company.

## ARTICLE 4

## BANKRUPTCY MATTERS

4.1     <u>Bankruptcy Court Filings</u>.

(a)     Seller or its applicable Debtor Affiliates shall (i) file with the Bankruptcy Court a written notice including the Sale Disclosures (as defined in the Sale Procedures Order), no later than two (2) Business Days after entering into this Agreement, pursuant to the Sale Procedures (the "<u>Sale Notice</u>") and (ii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Order.

7

(b)    Each Purchaser shall (i) appear in the Bankruptcy Court or furnish any affidavits, declarations or other documents or information for filing with the Bankruptcy Court, in each case, if reasonably requested by Seller or required by the Bankruptcy Court in connection with the Transactions and (ii) keep Seller reasonably apprised of the status of material matters related to this Agreement, including, promptly furnishing Seller with copies of notices or other communications received from the Bankruptcy Court or any Person with respect to the Transactions.

(c)    The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, the Sale Order.  Seller shall promptly provide each Purchaser and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the Sale Order, or related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to such Purchaser and its outside legal counsel. Seller shall not seek any modification to the Sale Order with respect to the Transactions by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Proceeding has been appealed that is materially adverse to the Purchasers, in each case, without the prior written consent of Purchasers (not to be unreasonably withheld, conditioned or delayed).

(d)    If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), Seller agrees to, and agrees to cause its Debtor Affiliates to, use their commercially reasonable efforts, to defend against such appeal, petition or motion, and each Purchaser agrees to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

4.2    <u>Alternative Transaction</u>.

(a)    Consummation of the Transactions are subject to approval by the Bankruptcy Court and the consideration by the Debtor Affiliates and the Bankruptcy Court of higher or better competing bids. From and after the date hereof until the date on which the Sale Order is entered (the "<u>Sale Process Date</u>"), Seller and the Debtor Affiliates shall be permitted to cause their respective representatives and Debtor Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchasers and their Affiliates, agents and representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers to purchase all or any part of the Subject Company and/or its assets (whether in combination with other assets of Seller and the Debtor Affiliates or otherwise) and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, any Order entered into by the Bankruptcy Court applicable to the Transactions or other applicable Law, including supplying information relating to the Subject Company and the assets of the Subject Company to prospective purchasers.

(b)    Seller shall have the right, at any time before the Sale Process Date, to sell Shares to one or more additional purchasers (each such Purchaser, an "<u>Additional Purchaser</u>") on the terms set forth herein (each such sale, an "<u>Additional Sale</u>"); <u>provided</u> that where the per

8

share price of the Shares to be purchased in an Additional Sale exceeds the Per Share Price of any of the Interests to be purchased by any of the existing Purchasers pursuant to this Agreement, (A) Seller may elect to allocate Shares to any such Additional Purchaser by reducing the Interests allocated to the Purchasers hereunder and (B) any such reduction pursuant to this Section 4.2(b) shall first reduce pro rata the Interests sharing the lowest Per Share Price, and then pro rata for the Interests sharing the next lowest Per Share Price, and so on, as applicable, until such time as the lowest Per Share Price of the remaining Interests is greater than the per share price of the Shares in the Additional Sale, whereupon the Additional Purchaser shall not be allocated any such remaining Interests; provided, however, that Seller will provide prior written notice to any Purchaser whose number of Interests will be reduced pursuant to this Section 4.2(b), and such existing Purchaser may elect to increase the Per Share Price for such Purchaser's Interests at any time prior to the joinder of the Additional Purchaser to this Agreement.  Each Additional Purchaser shall execute a joinder to this Agreement and the related Transfer Documents in the form set forth on Schedule B hereto, and upon delivery of such joinder agreement, (x) Seller shall update Schedule A to include such Additional Purchaser and the number of Shares such Additional Purchaser is purchasing, and any related reduction in the Interests to be purchased by the existing Purchasers pursuant to the preceding sentence, and (y) such Additional Purchaser shall be considered a "Purchaser" and the Shares to be purchased by such Additional Purchaser shall be considered "Interests" for all purposes under this Agreement and the other agreements contemplated hereby.

4.3     Sale Order.

(a)     Subject to Section 4.2 and Section 7.9, Seller and each Purchaser shall take all actions as may be reasonably necessary to cause the Sale Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Each Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by such Purchaser under this Agreement and, if applicable, demonstrating that such Purchaser is a "good faith" buyer under section 363(m) of the Bankruptcy Code.

(b)     The Sale Order shall, among other things, (i) approve, pursuant to sections 105 and 363 of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Interests to Purchasers on the terms set forth herein and free and clear of all Liens (other than Permitted Encumbrances), and (C) the performance by Seller of its obligations under this Agreement and (ii) find that each Purchaser is not a successor to Seller.  If requested by any Purchaser, and subject to delivery by such Purchaser of any applicable affidavits requested by Seller or set forth in the Sale Procedures in connection therewith, the Sale Order shall also include a finding that such Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant such Purchaser the protections related thereto.

9

## ARTICLE 5

## CONDITIONS TO CLOSING

5.1    <u>Mutual Conditions</u>. The respective obligations of Seller and each Purchaser to effect the applicable Closing are subject to the satisfaction or waiver by the other Party of the following conditions on or prior to the applicable Closing Date:

(a)    The Sale Notice shall have been filed in accordance with the terms of the Sale Procedures; and

(b)    The Bankruptcy Court shall have entered the Sale Order.

5.2    <u>Conditions to the Obligation of Purchasers</u>. The obligation of each Purchaser to effect the applicable Closing is subject to the satisfaction or waiver by such Purchaser of the following additional conditions on or prior to the applicable Closing Date:

(a)    The representations and warranties of Seller contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect", contained therein) as of the applicable Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(b)    Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the applicable Closing Date.

5.3    <u>Conditions to the Obligation of Seller</u>. The obligation of Seller to each Purchaser to effect the applicable Closing is subject to the satisfaction or waiver by Seller of the following additional conditions on or prior to the applicable Closing Date:

(a)    The representations and warranties of such Purchaser contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect", contained therein) as of the applicable Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and

(b)    Such Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the applicable Closing Date.

## ARTICLE 6

## TERMINATION

6.1     <u>Grounds for Termination</u>. This Agreement may be terminated in its entirety at any time:

(a)     by mutual agreement of Seller, on the one hand, and Purchasers, on the other hand;

(b)     by Seller, on the one hand, or Purchasers, on the other hand, if there is in effect a Final Order of a Governmental Entity of competent jurisdiction, enjoining or otherwise prohibiting the consummation of the Transactions (it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal in accordance with their respective obligations under this Agreement unless and until this Agreement is terminated pursuant to this <u>Section 6.1</u>);

(c)     automatically, if Seller enters into one or more definitive agreements (other than this Agreement) with respect to an Alternative Transaction that results in the sale of all of the Interests; or

(d)     by Seller, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement could be inconsistent with its or such Person's or body's fiduciary duties.

6.2     <u>Termination of an Individual Purchaser</u>. This Agreement may be terminated with respect to the acquisition of the applicable Interests by any individual Purchaser (the "<u>Terminated Purchaser</u>"): (a) by mutual agreement of Seller, on the one hand, and such Purchaser, on the other hand; (b) by either Seller or such Purchaser if the applicable Closing has not occurred by within one hundred and twenty (120) days following the date hereof (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate such acquisition pursuant to this <u>Section 6.2(b)</u> shall not be available to a Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the applicable Closing to have occurred on or prior to the Termination Date; (c) by Seller with respect to any Purchaser, where the number of Interests to be sold to such Purchaser is reduced to zero pursuant to <u>Section 4.2(b)</u>; or (d) by Seller if such Purchaser shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.3</u> and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Seller to such Purchaser and (B) the Termination Date; <u>provided</u>, that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 6.2</u> if Seller is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.2</u>.  Upon such termination, Seller shall update <u>Schedule A</u> accordingly to reflect such termination.

11

6.3     Effect of Termination. If this Agreement is terminated as permitted by Section 6.1 or Section 6.2:

(a)     no Party shall have any liability or further obligation to any other Party pursuant to this Agreement (or, with respect to Section 6.2, Seller and the Terminated Purchaser shall have no liability or further obligation to the other Party pursuant to this Agreement); provided, however, that (i) the agreements of Seller and the applicable Purchaser set forth in Section 3.2 (*Confidentiality*) and Section 7.6 (*Expenses*) shall survive such termination and (ii) no such termination shall relieve a Party of any liability or damages to any other Party resulting from any knowing and intentional material breach of this Agreement;

(b)     the applicable Purchaser shall return to Seller all documents, work papers and other material of Seller relating to the Transactions, whether obtained before or after the execution hereof or certify that such documents have been destroyed; and

(c)     the provisions of the Confidentiality Agreements will continue in full force and effect.

# ARTICLE 7

# OTHER MATTERS

7.1     Action by Purchasers. Any action to be taken by Purchasers pursuant to this Agreement, including such actions set forth in Section 4.1(c) and Sections 6.1, shall be effective upon the consent of Purchasers acquiring at least 50% of the Interests set forth on Schedule A, as of such time.

7.2     Waiver, Amendment. Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party or Parties that would have benefited by the provision had it not been waived.

7.3     Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by a Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.4     No Survival of Representations and Warranties or Covenants. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the latest Closing Date with respect to Seller, and the applicable Closing Date with respect to each Purchaser, except for covenants and agreements that by their terms are to be satisfied after the applicable Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms. In no event shall Seller or any Purchaser have any recourse against the other or the Purchaser Parties or the Seller Parties following the applicable Closing Date, respectively with respect to any representation, warranty, covenant or agreement made by Seller or such Purchaser, as applicable,

in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the applicable Closing Date.

7.5     Release. From and after the Closing, upon the terms and subject to the conditions set forth herein, each Purchaser shall be deemed to have waived, discharged, settled, compromised and released any and all claims, causes of actions, liens, rights and remedies it has, had or may have against the Seller Parties as of the Closing in respect of the acquisition or ownership of the Interests, including with respect to the terms of the Operative Documents and any alleged breach thereof, whether known or unknown, liquidated or unliquidated, contingent or non-contingent, except as set forth in this Agreement and to enforce the obligations set forth herein to effectuate the terms of this Agreement; provided, however, that nothing in this Agreement shall be construed as a release, waiver, compromise, or settlement of any other claims Purchaser may have against any Debtor Affiliates or their estates arising prior to the Bankruptcy Proceeding.  Purchaser Parties expressly waive and relinquish any and all provisions, rights, and benefits conferred by California Civil Code § 1542 or any similar law of any state or territory of the United States or any principle of common law that is similar, comparable or equivalent to California Civil Code § 1542.

7.6     Expenses. Except as otherwise provided in this Agreement or the Transfer Documents, each Party shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Transfer Documents and the Transactions.

7.7     Notices. All notices, requests and other communications under this Agreement to a Party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such Party at its address (or number) set forth below or on Schedule A, as applicable, or such other address (or number) as the Party may specify by notice to each other Party.

If to Seller:

> Clifton Bay Investments LLC
> 2600 South Shore Blvd, Suite 300
> League City, TX 77573
> Attention: Kathryn Schultea
> Email: kathyschultea@ftx.com
>
> *With a copy (which shall not constitute notice) to*:
>
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004

Attention:  Audra D. Cohen
            Rita-Anne O'Neill
Telephone:  (212) 558-3275
            (310) 712-6698
Email:      cohena@sullcrom.com
            oneillr@sullcrom.com
            kranzleya@sullcrom.com
            wum@sullcrom.com

7.8    <u>Specific Performance</u>.

(a)    Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement. Accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including specific performance of such covenants, promises or agreements (including to cause any Purchaser to consummate the Transactions and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 7.8</u> will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    Each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by any Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of any Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 7.8</u>.

7.9    <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.  For the avoidance of doubt, until the last Closing has occurred, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

7.10    <u>Entire Understanding; No Third-Party Beneficiaries</u>. This Agreement, the Transfer Documents and the Confidentiality Agreements together set forth the entire understanding of the Parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the Parties with respect to the subject matter of this Agreement. In the event of any conflict between this Agreement and the Transfer Documents or the Operative Documents, the provisions of this Agreement shall prevail. No representation, warranty, inducement, promise, understanding or

14

condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities.

7.11    Assignment. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any purported assignment in violation of this Section 7.11 will be void, except for the following assignments which shall not require any consent and will not be void: (a) assignment to an Affiliate of any Party (provided that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties) and (b) assignment by Seller to a succeeding entity following its emergence from the Bankruptcy Proceeding. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by each Party to this Agreement and its successors and permitted assigns.

7.12    Counterparts. This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

7.13    Severability. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

7.14    No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

7.15    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such Laws.

(b)      Without limiting a Party's right to appeal any order of the Bankruptcy Court, as between the Parties to this Agreement (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Interests, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 7.7</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)      Each Party consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of <u>Section 7.7</u>; <u>provided</u>, <u>however</u>, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)      Each Party waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

7.16    <u>Damages</u>. No Party shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

7.17    <u>Interpretation</u>. (a) As used in this Agreement, references to:

(i)      the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)      the Preamble, Recitals, Sections or Exhibits refer to the Preamble, a Recital or a Section of, or an Exhibit to this Agreement unless otherwise indicated;

(iii)      this Agreement refers to this Agreement and the Exhibits to it; and

(iv)      all references to "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified.

(b)      Wherever this Agreement requires a Party to take an action, the requirement constitutes an undertaking by the Party to cause its subsidiaries, and to use its

16

commercially reasonable efforts to cause its other Affiliates, to take appropriate action in connection therewith.

(c)    Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(d)    The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

[Remainder of page intentionally left blank]

4882-2525-3982 v.8

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**CLIFTON BAY INVESTMENTS LLC**

By: _____
Name:   John J. Ray III
Title:   Authorized Signatory

**PURCHASER**:


**G SQUARED VI HOLDCO, LLC**

By:                                       
Name: Larry Aschebrook
Title: Authorized Representative

Address:      180 N. Stetson Avenue, Suite 5100
Chicago, IL 60601


Attention:    Jeffrey Barton
Email:        larry@gsquared.com /
jefff@gsquared.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
**Manius Invest Co Ltd**

By: _____

Name: Essa M A A H Ibrahim
Title: Director

Address:    Craigmuir Chambers, Road Town,
Tortola, VG 1110, British Virgin Islands

Attention:    Sandip Bhatt
Email:    dico.invest@damacgroup.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:

**Scenic Management LLC**

By: _Michael Sobel_

Michael Sobel
Managing Partner
Scenic Co-Invest Anthropic LLC

Address:

915 Battery Street
San Francisco, CA 94111

Attention: sobel@scenicadvisement.com

Email: sobel@scenicadvisement.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:

**Scenic Co-Invest Anthropic LLC**

By:   *Michael Sobel*

      Michael Sobel
      Managing Partner
      Scenic Co-Invest Anthropic LLC

Address:
      915 Battery Street
      San Francisco, CA 94111

Attention:  sobel@scenicadvisement.com

Email:  sobel@scenicadvisement.com

[*Signature Page to Anthropic Purchase and Sale Agreement*]

**PURCHASER**:

**Elysium VC (N) LLC**

**Elysium Management LLC, Managing Member**

By: _____

             Name:  Barry J. Cohen
             Title: President

Address:  445 Park Ave., 1401, New York, NY 10022




Attention:     Barry J. Cohen
Email:         bcohen@elysllc.com

**PURCHASER**:
Fund SCVC-PV-LXVI, a series of SCVC Advisors, LP

By: _____

Name: Amrit Saxena
Title: Managing Partner

Address: 84
Malta Drive,
San
Francisco,
CA 94131

Attention:
Amrit
Saxena
Email:
amrit@saxec
ap.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
Fund XLVIII, a series of SCVC Advisors, LP


By:

Name: Amrit Saxena
Title: Managing Partner

Address: 84
Malta Drive,
San
Francisco,
CA 94131



Attention:
Amrit
Saxena
Email:
amrit@saxec
ap.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:

**KOREA INVESTMENT PARTNERS CO., LTD.**
**KIP Re-Up II Fund**

By: _____

Name: Mahn Soon Hwang
Title: Chief Executive Officer

Address:    10F Asem Tower, 517 Yeongdong-daero, Gangnam-gu, Seoul 06164, Republic of Korea

Attention:

Email:    minq.kim@koreainvestment.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:  GA-IP Opportunities II, LLC

By:

Name:    Ish S. Dugal

Title:    General Partner

Address:

50 W. Broadway Suite 333, PMB 17942,
Salt Lake City, Utah 84101

Attention:    Ish Dugal and Patrick Flynn
Email:

Ish@goldenarccap.com, pflynn@ironpineventures.com

DocuSign Envelope ID: A37C8856-7423-4535-A79B-7797DB6B3357

**PURCHASER**:

By:  Lawrence Bancroft

DocuSigned by:
2192FAC5D64243F...

Name: Lawrence P. Bancroft
Title: Managing Member

Address:      601 Montgomery Street, Suite 1212
San Francisco, CA  94111

Attention:   Greenbook Ventures
Email:       lawrence@greenbookventures.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

DocuSign Envelope ID: 47813BA1-B499-48FG-BAA6-A30C2A66689C4

**PURCHASER**:

By: _____

Name:   Adam Crawley

Title:   Manager

Address:   1204 San Antonio St
Floor 2
Austin, Texas 78701

Attention:   Adam Crawley

Email:   adam@augment.market

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
**MW LSVC ANTHROPIC, LLC**

_____
By:  MWSI VC Manager, LLC, Manager

      By: Lorenzo Esparza, Manager

Address:  1999 Avenue of the Stars
          Suite 2500
          Los Angeles, CA 90067


Attention: Lorenzo Esparza
Email:       LEsparza@manhattanwest.com

[_Signature Page to Anthropic Purchase and Sale Agreement_]

**PURCHASER:**

TELESOFT – 2020, LP

By:

Name:  Arjun Gupta

Title:  Executive Manager of the General Partner

Address: 400 E Main Street, Suite 2

Aspen, CO 81611, USA

Attention: Arjun Gupta

Email: Arjun@telesoftvc.com

**PURCHASER:**

Telesoft Capital, LLC

By: _____

Name:  Arjun Gupta

Title:  Managing Member

Address: 400 E Main Street, Suite 2
          Aspen, CO 81611, USA


Attention: Arjun Gupta


Email: Arjun@telesoftvc.com

**PURCHASER:** A.G.P Alternative Investment Fund V series I

By: _Zachary Grodko_
Name: Zachary Grodko
Title: Manager

Address: 590 Madison Ave 28th FL
NY, NY, 10022

Attention: Zachary Grodko
Email: zgrodk@allianceag.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

PURCHASER: A.G.l Alternative Investment Fund IV-
series 4

By: _Zachary Grodko_

Name: Zachary Grodko
Title: Manager
Address: 590 madison Ave 2rn Fl
NY, NY 10022

Attention: Zachary Grodko
Email: zgrodko@allianceg.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
CONSTITUTIONAL AI GOVERNANCE FUND 2
LLC

By: LTA Advisors LLC, Its General Partner

By: *Ryan Logue*
           Name: Ryan Logue
           Title: Managing Member

Address: 2810 N Church St
         Wilmington, DE 19802

Attention: Ryan Logue
Email:   ryan@ltse.com

**PURCHASER**: CONSTITUTIONALAI FUND, A
SERIES OF ABUNDANCE MASTER FUND LLC

By: LTA Advisors LLC, Its Organizer

By:    *Ryan Logue*
       _____
       Name: Ryan Logue
       Title: Managing Member

Address: 2810 N Church St
         Wilmington, DE 19802

Attention: Ryan Logue
Email:     ryan@ltse.com

**PURCHASER**:

Fund FG-BLU, a series of Forge Investments LLC

By:    Grant George

Name: Grant George
Title: Principal, Forge Global Advisors
LLC

Address:     4 Embarcadero Center, Floor 15
San Francisco, CA 94111


Attention:    Investment Team
Email:    fundadmin@forgeglobal.com

[*Signature Page to Anthropic Purchase and Sale Agreement*]

**PURCHASER**:

Fund FG-AGV, a series of Forge Investments LLC

By:  _Grant George_
     Name: Grant George
     Title: Principal, Forge Global Advisors
     LLC

Address:     4 Embarcadero Center, Floor 15
             San Francisco, CA 94111

Attention:   Investment Team
Email:       fundadmin@forgeglobal.com

[*Signature Page to Anthropic Purchase and Sale Agreement*]

**PURCHASER**: Gemini IDF 2, LLC

By: _____

Name: Michael Miller

Title: President

Address:

12021 Wilshire Blvd #509, Los Angeles, CA 90025

Attention: Michael Miller
Email: geminiidfllc@gmail.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Action" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"Additional Purchaser" has the meaning set forth in Section 4.2(b).

"Additional Sale" has the meaning set forth in Section 4.2(b).

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such Person.

"Aggregate Purchase Price" has the meaning set forth in Section 1.2.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means one or more sales, transfers or other dispositions of the Interests or other Shares in a transaction with a purchaser or transferee other than Purchasers and/or their respective Affiliates.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York are authorized or required by statute to close.

"Closing" has the meaning set forth in Section 1.4.

"Closing Date" has the meaning set forth in Section 1.4.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement between each Purchaser and FTX Trading Ltd., West Realm Shires Inc., Alameda Research LLC, Clifton Bay Investments LLC, Paper Bird Inc. and their respective subsidiaries.

"Debtor Affiliates" means the Debtors and their respective wholly owned subsidiaries.

"Debtors" has the meaning set forth in the Recitals.

"Final Order" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"Governmental Entity" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the U.S. Securities and Exchange Commission and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors, any Purchaser or the Subject Company.

"Interests" has the meaning set forth in the Recitals.

"Law" or "Laws" means any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"Lien" means any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation, usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude, restrictive covenant or condition, encroachment, claim, interest, restriction or any other encumbrance of any kind.

"Material Adverse Effect" means any change, development, circumstance, fact or effect that, individually or taken together with any other changes, developments, circumstances, facts or effects is, or would reasonably be expected to be, materially adverse to the financial condition, assets, liabilities, business operations or results of operations of the Subject Company; provided, however, that none of the following, either alone or in combination, shall be deemed to constitute a Material Adverse Effect that is occurring, has occurred or would reasonably be expected to occur: (a) changes, developments, circumstances or facts in or with respect to the economy, credit, capital, securities, digital asset or financial markets or political, regulatory or business conditions in the geographic markets in which the Subject Company has operations or its products or services are sold, (b) changes, developments, circumstances, facts or effects generally affecting the industries, markets or geographical areas in which the Subject Company operates, (c) any change in the price or relative value of any digital currency or cryptocurrency, or any other blockchain-based tokens or assets, (d) any change in existence or legality of any digital currency or cryptocurrency, or any other blockchain-based token or asset, or any halt or suspension in trading of any such digital currency or cryptocurrency on any exchange, (e) changes, events and occurrences in the industries in which the Subject Company operates

A-2

generally, (f) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, any change, development or effect resulting from acts of war (whether or not declared), sabotage, terrorism, military actions or the escalation of any of the foregoing, whether perpetrated or encouraged by a state or non-state actor or actors (other than cyberattacks), any weather or natural disaster, or any outbreak of illness or other public health event (or any measures taken in response thereto) or any other *force majeure* event (except to the extent causing any damage or destruction to or rendering unusable any material facility or property of the Subject Company), whether or not caused by any Person (other than the Subject Company or any of its Affiliates or representatives), (g) changes in law, generally accepted accounting principles or official interpretations of the foregoing, (h) compliance with this Agreement, including any effect on Seller resulting from failure to take any action to which any Purchaser refused consent under this Agreement, (i) the Transactions or any announcement hereof or the identity of any Purchaser, (j) the pendency of the Bankruptcy Proceeding and any action approved by, or motion made before, the Bankruptcy Court, or (k) matters known to or reasonably foreseeable by a Purchaser, taking into account the financial condition, business and operations of Seller, the fact that Seller is involved in the Bankruptcy Proceeding and the circumstances giving rise to such Bankruptcy Proceeding; it being understood that the failure of the Subject Company to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect.

"Operative Documents" means, with respect to the Subject Company, the documents and agreements set forth in Schedule B and any other shareholders agreements, management agreements, bylaws, side letters and other documents and agreements governing the rights and obligations of Seller as an investor in the Subject Company, in each case as amended and/or restated to date.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbitor, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceeding.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Per Share Price" means the per share price set forth opposite the applicable Purchaser's name on Schedule A.

"Permitted Encumbrance" means a restriction on transfer arising solely under applicable federal and state securities Laws and any transfer restrictions set forth in the Operative Documents or the legends on certificates of the Interests.

"Person" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Purchaser" or "Purchasers" has the meaning set forth in the Preamble.

"Purchaser Parties" means, collectively, (i) each Purchaser, (ii) each of the current or former Affiliates of such Purchaser, and (iii) each of the current or former officers, directors,

employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Sale Disclosures" has the meaning set forth in the Sale Procedures Order.

"Sale Notice" has the meaning set forth in Section 4.1(a).

"Sale Order" means an order entered by the Bankruptcy Court or other court of competent jurisdiction substantially in the form attached as Exhibit 1 to the Sale Procedures Order, subject to (a) immaterial modifications or clarifications or (b) such other changes to which Purchasers consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case, solely to the extent permitted by or in compliance with the Sale Procedures.

"Sale Procedures" has the meaning set forth in the Sale Procedures Order.

"Sale Procedures Order" means the *Order Authorizing and Approving (I) Procedures for Sale of Debtors' Equity Interests in Anthropic, PBC; and (II) Sale(s) of Such Equity Interests in Accordance With Such Procedures Free and Clear of Any Liens, Claims, Interests and Encumbrances* [D.I. 8215].

"Sale Process Date" has the meaning set forth in Section 4.2(a).

"Seller" has the meaning set forth in the Preamble.

"Seller Parties" means, collectively, (i) Seller, (ii) each of the current or former Affiliates of Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Shares" means the Series B Preferred Stock of the Subject Company.

"Subject Company" has the meaning set forth in the Recitals.

"Subject Company Consent" means the consent of, and any other action as required under the terms of the Operative Documents by, the Subject Company to the sale, assignment and transfer of the Interests to Purchasers and any admission of Purchasers as shareholders of the Subject Company.

"Taxes" means any tax or similar duty, fee, charge or assessment thereof imposed by a Governmental Entity, in each case in the nature of a tax, including any interest, penalties and additions imposed with respect to such amount.

"Termination Date" has the meaning set forth in Section 6.2.

A-4

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Documents" means any assignment and assumption agreement and any other instruments of transfer to be executed by Seller and each Purchaser at the applicable Closing, the agreement among Seller, such Purchaser and the Subject Company which relates to the sale, assignment and transfer of the Interests to such Purchaser, the admission or joinder (in respect of the applicable Interests) of such Purchaser under the Operative Documents and the Subject Company Consent, in a form reasonably satisfactory to Seller and such Purchaser.

"Terminated Purchaser" has the meaning set forth in Section 6.2.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges including any interest, penalties and additions imposed with respect to such amount.

[Remainder of page intentionally left blank]

A-5

**SCHEDULE A**

| Name of Purchaser | Interests (Number of Shares) | Per Share Price |
|---|---|---|
| G Squared VI Holdco, LLC | 4,499,325 | $30.0045 |
| Fund FG-BLU, a Series of Forge Investments LLC | 2,266,141 | $30.0045 |
| Fund SCVC-PV-LXVI, a series of SCVC Advisors, LP (Quickscope Investments) | 1,666,416 | $30.0045 |
| Manius Invest Co Ltd (Damac Capital) | 1,666,416 | $30.0045 |
| Constitutional AI Fund, a Series of Abundance Master Fund LLC (Collab LTSE) | 1,067,760 | $30.0045 |
| Augment Collective, LLC Series Anthropic PBC 1 | 833,208 | $30.0045 |
| Gemini Ventures 1, LLC | 416,604 | $30.0045 |
| MW LSVC Anthropic, LLC (Manhattan West) | 386,000 | $30.0045 |
| Constitutional AI Governance Fund 2 LLC | 371,430 | $30.0045 |
| GA-IP Opportunities II, LLC | 333,284 | $30.0045 |
| Elysium VC(N) LLC | 333,283 | $30.0045 |
| KIP Re-Up II Fund (Korea Investment Partners Co., Ltd.) | 333,283 | $30.0045 |
| A.G.P Alternative Investment Fund V- Series 1 LLC (Headwall) | 283,058 | $30.0045 |
| Fund FG-AGV, a Series of Forge Investments LLC | 132,734 | $30.0045 |
| TeleSoft-2020, LP | 103,317 | $30.0045 |
| TeleSoft Capital, LLC | 103,317 | $30.0045 |
| Green Book Ventures Horizon III LLC | 93,952 | $30.0045 |
| Scenic Co-Invest Anthropic LLC | 73,322 | $30.0045 |
| Scenic Private Access Fund I, L.P. | 66,656 | $30.0045 |
| Fund XLVIII, a series of SCVC Advisors, LP (Quickscope Investments) | 23,822 | $30.0045 |
| A.G.P Alternative Investment Fund IV- Series 4 LLC | 20,021 | $30.0045 |

A-1

**SCHEDULE B**

| Subject Company | Anthropic, PBC |
|---|---|
| **Operative Documents** | M-SAFE Purchase Agreement, dated October 5, 2021 as amended by that certain Amendment to M-SAFE Purchase Agreement dated March 4, 2022 and that certain Amendment No. 2 to M-SAFE Purchase Agreement dated date as of April 27, 2022. |
| | M-SAFE, dated October 5, 2021. |
| | Amended and Restated Certificate of Incorporation of Anthropic, PBC, dated January 29, 2024. |
| | Amended and Restated Bylaws of Anthropic, PBC, effective March 30, 2023. |
| | Amended and Restated Investors' Rights Agreement, dated January 30, 2024. |
| | Amended and Restated Right of First Refusal and Co-Sale Agreement, dated January 30, 2024. |
| | Amended and Restated Voting Agreement, dated January 30, 2024. |

B-1