## <u>EXHIBIT B</u>

**Draft Complaint**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CELSIUS NETWORK LLC, *et al.*, | § | Case No. 22-10964 (MG) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | | |
| MOHSIN Y. MEGHJI, AS LITIGATION | § | |
| ADMINISTRATOR FOR THE POST- | § | |
| EFFECTIVE DATE DEBTORS, | § | Adv. Proc. No. ___-_____ |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | |
| QUOINE PTE LTD.; FTX TRADING LTD.; *et al.* | § | |
| | § | |
| Defendants. | § | |

## **COMPLAINT**

Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated

debtors ("**Plaintiff**" or the "**Litigation Administrator**"), through his undersigned counsel, files

this complaint (the "**Complaint**") to avoid and recover transfers made by the above-captioned

---

[1]    The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Celsius debtors (collectively, the "**Debtors**," and together with their non-Debtor affiliates "**Celsius**" or the "**Company**") to or for the benefit of the Defendants (the "**Defendants**"), and alleges the following facts and claims based upon information and belief based on reasonable due diligence in the circumstances of the Debtors' bankruptcy cases, Plaintiff's ongoing investigation, and the documents and information currently available to Plaintiff as to all other matters:

<u>**PRELIMINARY STATEMENT**</u>

1.      Prior to the Company filing for chapter 11 protection on July 13, 2022 (the "**Petition Date**"), Celsius customers were led to believe that Celsius was a legitimate cryptocurrency enterprise.  Despite the Company's public messaging, on the inside Celsius was a fraudulent mess, the extent of which has come to light through investigative fallout in the Celsius bankruptcy itself.  Far from being safer than a bank, Celsius repeatedly failed to responsibly hold or invest the assets transferred to its platform by its account holders.  Losing billions of dollars because of risky investments and grave mismanagement, the Company managed to keep up its appearances until the cryptocurrency crashes of 2022, insisting on its legitimacy as a business right up to the very last.  As a result of Celsius's staggering and widespread fraud, many of the Company's customers lost their life savings and faced financial ruin.  Assets, related to customers who trusted the lies propagated by Celsius's management and did not withdraw those assets from the Company's platform before the Company implemented a freeze, were trapped on the platform.

2.      Defendants in this action are a competitor cryptocurrency exchange and platform, operated by and through a conglomerate of subsidiaries known collectively as "**FTX**".  Some of Celsius's customers, during a run on the so-called Celsius crypto bank in the summer of 2022, withdrew assets from accounts with the Company (the "**Customer Transfers**") and transferred those assets to the Defendants' platform (the "**FTX Transfers**").  As a result, this set of Celsius

customers (collectively, the "**Initial Transferees**")[2] fared far better than other Celsius customers who believed the Company's assurances and did not withdraw assets from Celsius.  Notably, of the customers whose preference exposure was not released under the confirmed plan of reorganization, 80% removed more than 90% of their account balances before the freeze.

3.      The Bankruptcy Code provides a mechanism to correct the resulting inequity among Celsius customers and recover such transfers for the benefit of all creditors.  The Litigation Administrator, with his obligation to all creditors of the Estates, seeks to put as many Celsius customers as possible on equal footing.  To do so, the Litigation Administrator brings this preference avoidance and recovery action against the Defendants as the subsequent recipients of the assets transferred away from Celsius by the Initial Transferees.

4.      One of the Defendants, Quoine Pte Ltd. ("**Quoine**"), is an FTX Debtor (defined below) and was a customer of the Company that withdrew assets off the Celsius platform prior to the Company's bankruptcy (the "**Quoine Transfers**").[3]  Of Celsius account holders, less than 2% were involved in transfers of assets off the Company's platform in the same way as Quoine, and of that population, the Litigation Administrator is not pursuing any account holders with less than $100,000 of preference exposure.  As a result of the Quoine Transfers and the FTX Transfers, the other Defendants hereto are the immediate or mediate (hereinafter, "subsequent") transferees of a significant number of avoidable Customer Transfers.  As a practical matter, it is the Defendants

---

[2]      For the purposes of this proposed Complaint, information pertaining to the Customer Transfers and FTX Transfers can be found attached to the *Declaration of Kenneth Ehrler in Support of the Celsius Litigation Administrator's Motion for Relief from the Automatic Stay*, filed concurrently, as Exhibit C (the "**Subsequent Transfers Schedule**").  For ease of reference, the Subsequent Transfers Schedule will also be referred to as "**Exhibit C**" in this proposed Complaint.  The Subsequent Transfers Schedule provides the identities of the Initial Transferees *i.e.* customers who transferred their assets from the Celsius platform to FTX identified by Plaintiff to date.

[3]      For the purposes of this proposed Complaint, information pertaining to the Quoine Transfers can be found attached to the *Declaration of Kenneth Ehrler in Support of the Celsius Litigation Administrator's Motion for Relief from the Automatic Stay*, filed concurrently, as Exhibit D (the "**Quoine Transfers Schedule**").  For ease of reference, the Quoine Transfers Schedule will also be referred to as "**Exhibit D**" in this proposed Complaint.

who currently hold the assets subject to recovery.  Because of FTX's own freeze on asset withdrawals and the FTX subsequent bankruptcy, the assets that should be earmarked for the Celsius estates remain with the Defendants.  Thus, and in order to save judicial and estate resources, the Litigation Administrator is seeking to recover those assets subject to avoidable transfers from the Defendants, as subsequent transferees.  Through these targeted efforts, such recoveries will be distributed more equitably and evenly to all account holders.

5.      To that end, and through this Complaint, Plaintiff seeks to avoid and recover the preferential transfers that Defendants either: (i) received as initial transferees during the 90 days immediately preceding the Debtors' commencement of the Chapter 11 Cases (the "**Preference Period**"), or (ii) received as subsequent transferees of assets transferred to Celsius customers during the Preference Period.

## <u>NATURE OF THE ACTION</u>

6.      Plaintiff brings this adversary proceeding (the "**Adversary Proceeding**") pursuant to sections 547, 550 and 502 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") to avoid and recover from Defendants, or from any other person or entity to or for whose benefit the transfers were made, transfers of property of the Debtors during the Preference Period in the Celsius bankruptcy cases (collectively, the "**Chapter 11 Cases**").

7.      Plaintiff seeks entry of a judgment against Defendants: (i) avoiding, pursuant to section 547(b) of the Bankruptcy Code, preferential transfers to and/or for the benefit of Initial Transferees and/or Defendants, (ii) pursuant to section 550(a) of the Bankruptcy Code, directing Defendants to pay to Plaintiff an amount to be determined at trial that is not less than the amount of the Avoidable Transfers (defined below), plus interest and costs; and (iii) pending such

payment, disallowing any claim of Defendants against the Debtors pursuant to section 502 of the Bankruptcy Code.

8.      Through its ongoing investigation, Plaintiff has determined, based on currently available information, that the Quoine Transfers set forth on **Exhibit D** (in the aggregate amount withdrawn, net of new value, of no less than approximately $67,038,496)[4] were made by the Debtors during the Preference Period to or for the benefit of the Initial Transferees and/or Defendants, are avoidable under section 547 of the Bankruptcy Code, and are recoverable under section 550 of the Bankruptcy Code.

9.      Through its ongoing investigation, Plaintiff has determined, based on currently available information, that the FTX Transfers set forth on **Exhibit C** (in the aggregate amount withdrawn, net of new value, of no less than approximately $377,419,348) were made by Initial Transferees during the Preference Period to or for the benefit of Initial Transferees and are recoverable against the Defendants as subsequent transfers under section 550 of the Bankruptcy Code.

10.      During the course of this Adversary Proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers made to other initial transferees or Defendants during the Preference Period that are avoidable under section 547 of the Bankruptcy Code. Plaintiff intends to avoid and/or recover all such transfers made to or for the benefit of Defendants or any other transferee as a subsequent transferee during the Preference Period.[5] Plaintiff reserves

---

[4]    For ease of reference, and to provide a sense of the dollar value for the preference actions, with the exception of CEL Token where the Plan value was used to calculate its value, the Celsius Litigation Administrator has provided the market value of the various assets as of May 7, 2024. All values herein from the Subsequent Transfer Schedule and the Quoine Schedule are calculated in the same fashion. In doing so, Plaintiff does not waive, and expressly reserves, any and all arguments with respect to the proper valuation date of the preference actions or the form of recovery on any judgments.

[5]    Plaintiff recognizes and asserts that, under section 550(a) of the Bankruptcy Code, for preference recovery claims against subsequent transferees, the date of the transfer to the subsequent transferee need not have occurred during the Preference Period. However, as a factual matter in this case, as discussed *infra*, all transfers from Celsius's

the right to amend this Complaint to include, without limitation: (i) further information regarding the Avoidable Transfers; (ii) additional transfers made during the Preference Period or, in the case of subsequent transfers, at any time; (iii) modifications of and/or revisions to Defendants' names; (iv) additional Defendants; (v) additional Initial Transferees; and (vi) additional causes of action, if applicable (collectively, the "**Amendments**"), that may become known at any time during this Adversary Proceeding, through formal discovery or otherwise, and intend for any such Amendments to relate back to this Complaint.

11.     To the extent that any Defendants have filed a proof of claim in the Chapter 11 Cases or have otherwise requested payment from the Debtors' estates (collectively, the "**Claims**"), this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff's right to object to such Claims for any reason including, but not limited to, Section 502 of the Bankruptcy Code, and such rights are expressly reserved.

## **THE PARTIES**

12.     The Litigation Administrator brings this action pursuant to the *Findings of Fact, Conclusions of Law, and Order Signed on November 9, 2023 Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3972][6] (the "**Confirmation Order**"), *the Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289] (the "**Plan**"), the *Litigation Administrator Agreement* [Docket No. 4297] (the "**Litigation Administrator Agreement**"), and Section 1123 of the Bankruptcy Code.  The Debtors are:

---

platform were frozen as of the Pause (defined *infra*), one month before the Petition Date.  As such, all Avoidable Transfers from Celsius's platform to FTX's platform were necessarily effectuated during the Preference Period. Plaintiff reserves the right to pursue through this adversary proceeding any subsequent transfers discovered that occurred outside of the Preference Period.

[6]     "Docket No." refers to the docket of *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. July 13, 2022).

Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network, Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd; GK8 UK Limited; and GK8 USA LLC.

13.     Defendants are all of the debtors (the "**FTX Debtors**") under the jointly-administered chapter 11 cases of *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Nov. 11, 2022) (the "**FTX Bankruptcy**").[7]

14.     Defendant Quoine Pte. Ltd. (d.b.a. Liquid) is a private limited company organized under the laws of Singapore.  Quoine is a debtor in the FTX Bankruptcy.

15.     Defendant FTX Trading is a corporation organized under the laws of Antigua and Barbuda.  No trustee has been appointed for FTX Trading in the FTX Bankruptcy and FTX Trading continues to operate its business and manage its properties as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## JURISDICTION AND VENUE

16.     The United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and Amended Standing Order of Reference, No. M-431, of the United States District Court for the Southern District of New York, dated January 31, 2012.

17.     The Adversary Proceeding is commenced pursuant to Sections 502, 547 and 550 of the Bankruptcy Code, and Bankruptcy Rules 3007, 6009 and 7001 (the "**Bankruptcy Rules**").

18.     The Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157 that this

---

[7]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in FTX Bankruptcy, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Court has jurisdiction to hear and to determine and to enter a final order and judgment.  In the event that this Court or any other court finds any part of the Adversary Proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to the Chapter 11 Cases and will have a material impact on the administration of the Debtors' estates (the "**Estates**").

19.     Plaintiff consents to entry of final orders and judgments by this Court in this Adversary Proceeding pursuant to Bankruptcy Rule 7008.  Plaintiff also consents to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

20.     This Court has personal jurisdiction over Defendants, in as much as Defendants have maintained minimum contacts with the United States in connection with the claims asserted in this Complaint.  This Court also has jurisdiction over Defendants pursuant to Bankruptcy Rules 7004 (d) and (f) and New York Civil Practice Law & Rules § 302 (McKinney 2008) because Defendants purposefully availed themselves of the laws of the United States and the State of New York by, among other things, doing business or transacting business in the United States and in the State of New York which gives rise and/or relates to the claims at issue in this Adversary Proceeding. Further, this Court also has jurisdiction over Defendants by virtue of their having entered into agreements with the Debtors and/or Plaintiff that selected New York law as the governing law for various contracts and matters and designated New York as the forum state for dispute resolution with respect to the transactions at issue in this Adversary Proceeding.  Defendants also filed one or more proofs of claim in these Chapter 11 Cases and therefore are subject to the Court's jurisdiction.

21.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because this Adversary Proceeding arises in and is related to the Debtors' bankruptcy case pending in this Court.

## FACTUAL BACKGROUND

**A.      The Celsius Business Model and its Programs**

22.      Celsius was founded in 2017.  The business idea was described in a whitepaper, which Celsius used to solicit capital through the public initial coin offering of its CEL token. Celsius planned to offer two primary products.  Of relevance for the purposes of this Complaint, customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest. Celsius said it would lend those cryptocurrency assets to hedge funds, family offices, and crypto funds to generate yield.  Celsius account holders could elect to receive weekly rewards payments (or interest) in the deposited cryptocurrency (*i.e.*, in-kind) or in CEL token, which had higher return interest rates.  In short, customers would deposit digital assets onto the Celsius platform.  Celsius would lend the coins to third parties to earn yield.

23.      Earn was an investment program offered to Celsius account holders who held their assets on Celsius's cryptocurrency platform (the "**Earn Program**").  Under the Earn Program, participants ("**Earn Users**") could place digital assets in accounts with Celsius ("**Earn Accounts**") in return for rewards.  The relationship between Earn Users and Celsius was governed by the Celsius's "**Terms of Use**," which is attached hereto as **Exhibit** [●].[8]

24.      The Terms of Use provided that when account holders transferred assets to Celsius, they transferred ownership of those assets to the Debtors.  The Terms of Use provided that customers who transferred assets to the Company as part of the Earn Program "grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn

---

[8]      For the purposes of this proposed Complaint, Exhibit [●] (the Terms of Use) is *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018*, Docket No. 393 Exhibit A-8.

Service."[9]  The Company was thus, among other things, granted the right "to pledge, re pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership," and "to use or invest such Digital Assets in [its] full discretion."[10]  In other words, the Terms of Use unambiguously transferred title and ownership of Digital Assets deposited into Earn Accounts from users to the Company, as recognized by this Court.[11]

25.     Customers who agreed to the Terms of Use entered into a contractual arrangement with Celsius Network Ltd ("**CNL**"), a UK entity.  However, in August 2021, the Terms of Use were updated such that the counterparty for all customers became Celsius Network LLC ("**LLC**"), a Delaware entity, and were governed by New York law.  All customers were required to accept these updates to the Terms of Use through a "push" notification to continue to access Celsius's platform.  This was done, in part, to reflect the change in legal entity where the vast majority of Debtors' cryptocurrency was held, moving those cryptocurrencies from CNL in the UK to LLC in the United States.  Previously, CNL received all transfers from retail and institutional customers for the Earn Program.  After these changes, LLC remained the counterparty on the Terms of Use and a holder of assets until the Debtors' bankruptcy filings.  Further, all "user facing" activities, including all withdrawal requests related to the Earn Program, were housed in the workspace hosted by LLC for customer accounts.

26.     The Terms of Use provided that customers could withdraw assets corresponding to

---

[9]   Terms of Use Version 8 § 4(D).

[10]  *Id.* § 13.

[11]  During the Celsius Bankruptcy, the NY Bankruptcy Court addressed whether deposits in "Earn" accounts constituted assets of the Celsius Estates.  On January 4, 2023, following a multi-day hearing and extensive briefing from the parties in interest, the NY Bankruptcy Court issued a ruling (the "**Earn Ruling**") determining that when assets were deposited in "Earn" accounts, "the cryptocurrency assets became Celsius's property."  *In re Celsius Network LLC*, 647 B.R. 631, 637 (Bankr. S.D.N.Y. 2023).

the balances in their Earn or Custody Accounts at will, or transfer them between accounts at Celsius as needed.[12] However, that was not how Celsius actually operated. In March 2022, Celsius acknowledged internally that it was not producing enough revenue to cover liabilities or additional operating expenses. Celsius was insolvent by nearly $800 million by its own account. Accordingly, Celsius was unable to fulfil the promises set forth in the Terms of Use and return assets to customers when requested. Rather, the assets that customers withdrew depleted a pool of assets that was already insufficient for Celsius to honor customers' withdrawal requests.

27. Celsius's model was therefore always a complete fraud, with the Company promising it could pay its customers back when it inherently and knowingly could not. This reality contrasted heavily with the misrepresentations propagated by the Company's leadership. The public was misled consistently as to the risk of Celsius's investments, regulatory compliance, the strength of its financials, and non-existent insurance, among other material facts. Each lie was intended to convince more retail investors to transfer their assets to Celsius. Celsius was never a legitimate enterprise, with such misrepresentations and accompanying mismanagement extending through its entire downfall.

### B.    Celsius Faces Heavy Losses and Regulatory Scrutiny Leading to the Pause

28. Beginning in 2021 through the Petition Date, Celsius faced increasing regulatory pressure from the United Kingdom and United States governments. For example, on May 14, 2021, the Texas State Securities Board notified Celsius that it may have offered securities in Texas in violation of Texas securities law and issued a notice of hearing on September 17, 2021.[13] The

---

[12]   Terms of Use Version 8 § 4(B), 11.

[13]   Notice of Hearing, *Tex. State Sec. Bd. v. Celsius Network, Inc. et al*, SOAH Docket No. 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 (Tex. St. Sec. Bd. Sept. 17, 2021), https://www.ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL_Celsius_NOH_js_signed.pdf.

Alabama Securities Commission issued an order to show cause on September 16, 2021.[14] Thereafter, a cease and desist order was entered against Celsius in Kentucky on September 23, 2021.[15] On September 17, 2021, the New Jersey Bureau of Securities found that Celsius was offering unregistered securities in violation of New Jersey law and ordered Celsius to cease and desist from offering Earn Accounts to unaccredited investors in the United States (the "**New Jersey Order**").[16] Around the same time, several other state regulatory agencies, including those in Vermont, California, and New York, took action against Celsius.

29.     In mid-2021, Celsius was forced by regulators in the U.K. to "migrate" its retail business from CNL (a U.K. entity) to LLC (a Delaware entity). More specifically, Celsius "migrated" all customer assets and obligations arising from transactions on the Celsius Platform from CNL to LLC (the "**Migration**"). In response to adverse regulatory action in the U.K., Celsius announced on June 23, 2021, that it was "migrating [its] main business activity and headquarters from the United Kingdom to the United States and where applicable, to several other jurisdictions."

30.     On April 15, 2022, the New Jersey Order became effective, forcing Celsius to publicly admit to the regulatory issues that had been plaguing it for over a year. In a dramatic and public move, Celsius was forced to close its Earn Program to unaccredited investors. In an attempt to keep customers on the platform, Celsius launched its "Custody" product for customers in certain U.S. states (the "**Custody Program**"). The Custody Program provided accounts ("**Custody Accounts**") that were unlike the Earn equivalent in that the Terms of use provided that customers

---

[14]   Order to Show Cause, *In the Matter of Celsius Network, LLC*, Admin. Ord. SC-2021-0012 (Al. Sec. Comm'n Sept. 16, 2021), https://asc.alabama.gov/wp-content/uploads/2023/11/SC-2021-0012.pdf.

[15]   Emergency Order to Cease and Desist, *Dep't of Fin. Inst. v. Celsius Network LLC*, No 2021-AH-00024 (Ky. Fin. Inst. Sept. 21, 2021), https://kfi.ky.gov/Documents/Celsius%20Network%20LLC%202021AH00024.pdf.

[16]   State of New Jersey Bureau of Securities, *Summary Cease and Desist Order in the Matter of Celsius Network, LLC* (Sept. 17, 2021), https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf.

retained title to the assets but could not generate rewards.[17]  Funds that were already held in Celsius's Earn Accounts were allowed to remain in those Earn Accounts regardless of accreditation status, however, on and after April 15, 2022, only international-based users and U.S. accredited users could transfers funds to Earn Accounts.  The Custody Program was created 89 days before the Petition Date.  Any transfers of assets from Earn Accounts to Custody Accounts and the accompanying transfer of title from Celsius to customers ("**Earn to Custody Title Transfers**"), therefore, also occurred during the Preference Period.

31.    While Celsius was already insolvent at least as of March 2022, the situation at the company was about to become even more untenable.  On May 7, 2022, what started as an increasing migration of assets off Celsius's platform turned into an explosion.  The cryptocurrency token, TerraUSD ("**UST**"), suffered a significant loss of value that sent shockwaves through the entire cryptocurrency market.  The UST token was a stablecoin whose value was pegged to USD through an algorithm and use of another cryptocurrency called "Luna."  The UST coin value "de-pegged" and plummeted.  Celsius had approximately $940 million deployed on the Terra Chain.  It was able to escape the crash with an approximately $30 million loss.  Celsius also had lent $41 million to Three Arrows Capital, which entered liquidation as a result of Terra Luna.

32.    In the face of the Terra Luna crash, rumors swirled around Celsius and its stability.  Users withdrew over $1.4 billion worth of cryptocurrency assets from the Celsius platform the week after the Terra Luna event.  Seventy-five percent of all withdrawals that occurred during the Preference Period occurred after the event.

33.    Internally, Celsius faced a liquidity crisis.  It had billions of dollars invested in illiquid investments, including approximately $800 million in staked ETH (which was locked until

---

[17]    Celsius, *Custody FAQ*, https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ  (last visited June 3, 2024).

an uncertain date in the future) and approximately $600 million in its BTC mining operation, but insufficient assets to address customer withdrawal requests.  Celsius experienced an issue that has been faced by banks with on demand deposits for centuries.  Celsius also had more than one billion in loans that were collateralized by cryptocurrency that was dramatically decreasing in value and required additional collateral to avoid margin calls.  On May 16, 2022, Celsius's liquidity had dropped by 40% due to customer withdrawals and steep price declines in BTC and ETH.

34.    Over the course of May and June, crypto prices widely and continuously plummeted, and the instability in the crypto markets led to a run on the bank.  In May, BTC was down 15.7% month-over-month.[18]  June was even worse, as BTC was down 37.9%.[19]  Many customers began rapidly withdrawing all or some of their assets, demanding crypto that Celsius did not have the liquidity to provide *en masse*.  Many other players in the crypto markets were also collapsing under the same pressures, with crypto brokerage company Voyager Digital and crypto hedge fund Three Arrows Capital filing for chapter 11 bankruptcy on July 6, 2022, and July 1, 2022, respectively.[20]

35.    On June 12, 2022, in response to customer withdrawal demands and increasing volatility in the cryptocurrency markets, Celsius paused all withdrawals from its platform to prevent further erosion of value (the "**Pause**").  Hundreds of thousands of customers who still had assets on the platform were left without recourse, unable to withdraw or sell their coins.  A matter of minutes, in some cases, made the difference between being a customer who was able to escape with its assets and a customer who would have assets frozen indefinitely while the value continued

---

[18]    Statmuse, *what is the average price of bitcoin in May 2022*, https://www.statmuse.com/money/ask/what-is-the-average-price-of-bitcoin-in-may-2022 (last visited June 3, 2024).

[19]    Statmuse, *what is the average price of bitcoin in June 2022*, https://www.statmuse.com/money/ask/what-is-the-average-price-of-bitcoin-in-june-2022 (last visited June 3, 2024).

[20]    *See In re: Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y, Dec. 29, 2022); *In re: Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943, (Bankr. S.D.N.Y, filed July 5, 2022).

to plummet.

C.    **The Chapter 11 Cases**

36.    On July 13, 2022, (the "**Petition Date**"), the Debtors, other than GK8 Ltd, GK8 UK Limited, and GK8 USA LLC (collectively, the "**GK8 Debtors**"), filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code.  On December 7, 2022, the GK8 Debtors filed voluntary petitions in this Court under chapter 11 of the Bankruptcy Code. All of these Chapter 11 Cases were consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b).[21]

37.    On July 27, 2022, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to Section 1102 of the Bankruptcy Code.[22] On September 29, 2022, the Court entered an order directing the appointment of an examiner. Following the examiner's issuance of a final report of her examination, on April 4, 2023, the Court entered an order discharging the examiner.

38.    On November 9, 2023, the Court entered the Confirmation Order, pursuant to which the Bankruptcy Court approved and confirmed the Plan for all of the Debtors (as amended, supplemented, or modified from time to time).

39.    On January 31, 2024, the Plan became effective.[23]  As part of the Plan, the Litigation Administrator was appointed to prosecute, settle, or otherwise resolve any claims belonging to the Estates and to serve as the Estates' representative in certain litigation, including causes of action under chapter 5 of the Bankruptcy Code.[24]  The Litigation Administrator is charged to maximize distributions to the stakeholders, including victims of Celsius's collapse.

---

[21]    *See* Docket Nos. 53 and 1648.
[22]    *See* Docket No. 241.
[23]    *See* Docket No. 4298.
[24]    *See* Docket No. 3577, Art. IV.G.

D.      **The Avoidable Transfers**

1.      **Quoine Transfers**

40.     Quoine was a customer of Celsius that held an Earn Account.  The market turmoil that Celsius faced during the Preference Period led to unprecedented withdrawals from the Celsius platform, amounting to a classic "run on the bank."  Celsius's records show that Quoine contributed to this "run on the bank" by making significant withdrawals during this time (the "**Quoine Transfers**").  Unlike other customers, Quoine was able to withdraw the full amount of their assets before Celsius paused withdrawals and locked all assets on its platform, advantaging Quoine over other creditors.

41.     During the Preference Period, the Debtors transferred to Quoine, by virtue of Quoine withdrawing funds held in its Earn Account, an aggregate amount withdrawn, net of new value, totaling no less than approximately $67,038,496.  The dates and amounts of each such Quoine Transfer are set forth on **Exhibit D** along with the dates and amounts of any deposits made by Quoine during the Preference Period.

42.     In accordance with Section 547(b) of the Bankruptcy Code, Plaintiff has analyzed available information and seeks to avoid and recover all of the Quoine Transfers as preferential transfers.  Based in part on the Earn Ruling, which held that assets in "Earn" accounts were the property of Celsius, Quoine's transfers from Earn Accounts off the Celsius platform during the Preference Period qualify as avoidable transfers for which Quoine was the initial transferee.

43.     Plaintiff asserts that the Quoine Transfers are "transfers" within the meaning of Section 101(54), are avoidable as Quoine Transfers, and are recoverable under Bankruptcy Code Section 550(a) as set forth in **Exhibit D**.  Plaintiff reasonably believes all of the Quoine Transfers are avoidable after giving effect to Quoine's known or reasonably knowable affirmative defenses

under section 547(c) of the Bankruptcy Code.

44.     As discussed, *supra*, each such withdrawal during the Preference Period was made while Debtors were insolvent within the meaning of Sections 101(32) and 547(b)(3) of the Bankruptcy Code.  Notwithstanding the foregoing, Plaintiff is also entitled to the presumption of insolvency for each Quoine Transfer made during the Preference Period pursuant to Section 547(f) of the Bankruptcy Code.

45.     Each such Quoine Transfer was made on account of an antecedent debt owed by Debtors before such transfer was made.  Quoine had withdrawal rights to the assets reflected in the balances in its Earn Account, having deposited the assets with Celsius as part of the Earn Program and under the Terms of Use.  Under the Terms of Use, Celsius was obligated to transfer assets corresponding to the balances in Quoine's account upon request.

46.     Upon information and belief, each Quoine Transfer was made to or for the benefit of Quoine.

47.     Quoine was the initial transferee who received each Quoine Transfer upon withdrawing the assets from Celsius.

48.     The Quoine Transfers, therefore, are all avoidable as transfers to Quoine of Debtors' interests in property during the Preference Period.

49.     Upon information and belief, the Quoine Transfers enabled Quoine to receive more than Quoine would have received if the Chapter 11 Cases were cases under chapter 7 of the Bankruptcy Code, the transfers had not been made, and such Quoine received payment of such debt to the extent provided by the Bankruptcy Code.

**2.     FTX Transfers**

**a.     The Customer Transfers**

50.     During the Preference Period, there were significant avoidable transfers of the Debtors' assets made by the Debtors to the Initial Transferees. *First*, as discussed *supra*, anyone who voluntarily moved assets from Earn to Custody received an Earn to Custody Title Transfer of those assets. *Second*, like Quoine, in the face of market disruptions, the Initial Transferees made many withdrawals from Earn and Custody Accounts off the Celsius platform during the Preference Period.[25]   Together, withdrawals of assets subject to an Earn to Custody Title Transfer and withdrawals from all Earn Accounts and (and other transactions as set forth in the Celsius disclosure statement)[26] made by Initial Transferees constitute avoidable preferential transfers.  All such withdrawals resulted in assets moving through the customers' fingers prior to any subsequent further movement of said assets to any other party, including FTX.

51.     These withdrawals contributed to the "run on the bank" just as the Quoine Transfers did, with Initial Transferees escaping the Pause and the freezing of assets on the platform where other creditors were not able to do so.

52.     Through the withdrawals, the Debtors transferred to the Initial Transferees an aggregate amount withdrawn, net of new value, totaling no less than $516,653,547.[27]   The aggregate amount withdrawn, net of new value, representing the Initial Transferees' total preference exposure, listed by each Initial Transferee is set forth in **Exhibit C**.  As described *supra*, a transferee's net preference exposure is calculated based upon deposits and withdrawals on or off of Celsius's platform or transfers between customer accounts.  These transfers of assets are all avoidable.  This Court has acknowledged that Celsius's *prima facie* case for the avoidance of such

---

[25]   Those relevant to this Complaint are reflected as individual transfers made to Quoine in Exhibit D and as aggregate amounts of transfers during the Preference Period in Exhibit C.

[26]   *See e.g. In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. Jul. 13, 2022), D.I. 3332 at 76–81.

[27]   This amount is reflected in Exhibit C, as the total of values in the column titled "Transfer Amount."

transfers is undisputed.[28]

53.     Only a subset of the withdrawals is relevant for the purposes of this Complaint.  The transfers that are relevant for the purposes of recovery are those transfers to Initial Transferees alleged to have been subsequently transferred to FTX's platform by the customers (the "Customer Transfers" and, together with the Quoine Transfers, the "**Avoidable Transfers**").  Initially, Celsius customers with both "Earn" and "Custody" Accounts, among others, received transfers off the Celsius platform through withdrawals.  Some customers received an Earn to Custody Transfer, while others moved assets in Earn Accounts to Custody Accounts or off of the platform entirely from Earn Accounts.  In some instances, customers caused assets to be transferred from their "Earn" or "Custody" accounts directly to wallets associated with the FTX cryptocurrency exchange platform, and other assets were transferred after initially having Celsius transfer assets to other locations.  Transfers from an "Earn" account off the Celsius platform during the Preference Period and transfers from "Earn" to "Custody" accounts during the Preference Period constitute avoidable preferences.  The aggregate amount of Customer Transfers, i.e. customer withdrawals, net of new value, that were ultimately directed to FTX, totals no less than approximately $377,419,348.[29]  The aggregate amount of Customer Transfers, net of new value, listed by each Initial Transferee is set forth in **Exhibit C**.

54.     In accordance with Section 547(b) of the Bankruptcy Code, Plaintiff has analyzed available information and asserts that the Customer Transfers are "transfers" within the meaning of Section 101(54), are avoidable as Customer Transfers, and are recoverable under Bankruptcy Code Section 550(a) as set forth in **Exhibit C**.  Plaintiff reasonably believes that all of the

---

[28]   *See* Dec. 7, 2022 Hr'g Tr. 195:11–18, Docket No. 1684.

[29]   This amount is reflected in Exhibit C, as the total of values in the column titled "FTX Attributable Avoidance Amount."

Customer Transfers are avoidable after giving effect to Initial Transferees' known or reasonably knowable affirmative defenses under section 547(c) of the Bankruptcy Code.

55.     As discussed, *supra*, each such withdrawal during the Preference Period was made while the Debtors were insolvent within the meaning of Sections 101(32) and 547(b)(3) of the Bankruptcy Code.  Notwithstanding the foregoing, Plaintiff is also entitled to the presumption of insolvency for each Customer Transfer made during the Preference Period pursuant to Section 547(f) of the Bankruptcy Code.

56.     Each such Customer Transfer was made on account of an antecedent debt owed by Debtors to the respective Initial Transferee before such transfer was made.  The Initial Transferees had withdrawal rights to assets as part of their use of Earn and Custody Accounts, having deposited those assets with Celsius under the Terms of Use.  Under the Terms of Use, Celsius was obligated to transfer assets corresponding to their account balances to Initial Transferees upon request.

57.     Upon information and belief, each such Customer Transfer was made to or for the benefit of the respective Initial Transferee.

58.     Upon information and belief, the respective Initial Transferee was the initial transferee who received each such Customer Transfer.

59.     The Customer Transfers, therefore, are all avoidable as transfers of an interest of Debtors in any property made by Debtors to Initial Transferees during the Preference Period.

60.     The Customer Transfers enabled each Initial Transferee to receive more than such person or entity would have received if the Chapter 11 Cases were cases under chapter 7 of the Bankruptcy Code, the transfers had not been made, and such Initial Transferee received payment of such debt to the extent provided by the Bankruptcy Code.

**b.     FTX Transfers as Subsequent Transfers**

61.     Within the Preference Period, certain Celsius customers, the Initial Transferees, participated in the Customer Transfers by taking control and custody over the assets withdrawn from the Celsius platform.  Subsequently, the Initial Transferees directed the further transfer of the assets that had been withdrawn from the Celsius platform to the FTX cryptocurrency exchange platform (the "**FTX Transfers**").  Given that there was turmoil in the industry generally, that FTX was receiving *en masse* transfers of assets from Celsius, and the position of FTX as a major player in cryptocurrency, upon information and belief, Defendants were on notice that Celsius was on a downward spiral towards bankruptcy.  Further, in May and June of 2022, Celsius engaged in discussions with FTX directly about a possible acquisition of Celsius by FTX.  In order to effectuate a potential deal, CNL entered into NDAs with three FTX entities: LedgerX LLC (on May 7, 2022), FTX Trading Ltd. (on June 4, 2022), and Alameda Ventures Ltd. (on June 12, 2022).  FTX was therefore particularly well-positioned to understand the dire straits Celsius found itself in, having negotiated with the Company directly about the state of its financials.  In fact, media reports indicated that FTX declined to pursue an acquisition of Celsius because of its financial condition, specifically a $2 billion hold in its balance sheet.

62.     The position of FTX itself in the latter half of 2022 further indicates FTX's awareness of the weakened prospects of cryptocurrency industry players, imploding mere months after Celsius's own collapse.  In November 2022 a "run on the bank" began on the FTX cryptocurrency exchange platform, resulting in bankruptcy for the Defendants.  As of FTX filing for chapter 11 protection on November 11, 2022, all withdrawals had been frozen, and the contents of all FTX accounts were within the dominion and control of Defendants.

63.     Upon information and belief, all FTX Transfers reflected in **<u>Exhibit C</u>** are mediate transfers of the avoidable Customer Transfers, with Defendants receiving assets that is property of

the Debtors' Estates.

64.     In accordance with Bankruptcy Code Section 550(a), Plaintiff has analyzed available information and hereby seeks to recover all of the FTX Transfers.  In connection with that, Plaintiff seeks to recover the FTX Transfers as mediate transfers subject to section 550(a) as set forth on **Exhibit C**.

65.     In receiving the assets from the Customer Transfers, Defendants received an aggregate amount of withdrawals, net of new value, totalling no less than a $377,419,348.[30]  The aggregate amounts of FTX Transfers listed by each Initial Transferee are set forth on **Exhibit C**.

## CLAIMS

## COUNT ONE
### (Avoidance of Preferential Transfers — 11 U.S.C § 547(b) — Quoine)

66.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

67.     During the Preference Period, the Debtors made the Quoine Transfers to, and/or for the benefit of, Quoine in the amounts set forth on **Exhibit D**, which is incorporated by reference herein.

68.     During the Preference Period, Quoine was a creditor of the Debtors within the meaning of Section 547(b)(1) of the Bankruptcy Code at the time of each Quoine Transfer by virtue of supplying goods, services and/or loans for which Debtors were obligated to pay.

69.     The Quoine Transfers were transfers of an interest of Debtors in property.

70.     According to the books and records of the Debtors, the Quoine Transfers were made

---

[30] This amount is reflected in Exhibit C, as the total of values in the column titled "FTX Attributable Avoidance Amount."  Because all Customer Transfers were ultimately transferred to Defendants through the FTX Transfers, the aggregate amounts are the same.

to, and/or for the benefit of Quoine because each Quoine Transfer either reduced or fully satisfied a debt or debts then owed by the Debtors to Quoine.

71. The Quoine Transfers were made for, or on account of, antecedent debts owed by the Debtors to Quoine with respect to which each such Quoine Transfer relates.

72. The Quoine Transfers were made while the Debtors were insolvent within the meaning of Sections 101(34) and 547(b)(3) of the Bankruptcy Code. Plaintiff is entitled to the presumption of insolvency for each Quoine Transfer made during the Preference Period pursuant to Section 547(f) of the Bankruptcy Code.

73. Under the Debtors' Plan and current projected distributions pursuant to the Plan, general unsecured creditors of the Debtors will receive less than full value on account of their allowed claims against the Estates.

74. The Quoine Transfers were made on or within ninety (90) days prior to the Petition Date.

75. Upon information and belief, the Quoine Transfers enabled Quoine to receive more than it would receive if (a) the Debtors' Chapter 11 Cases were a case under chapter 7 of the Bankruptcy Code, (b) the Quoine Transfers had not been made, and (c) Quoine received payment of such debt(s) to the extent provided by the provisions of the Bankruptcy Code.

76. As of the date hereof, Quoine has not repaid all or any part of the value of the Quoine Transfers or returned the Quoine Transfers.

77. Quoine was either the initial transferee of the Quoine Transfers, the entity for whose benefit the Quoine Transfers were made, or was the immediate or mediate transferee of the initial transferee receiving the Quoine Transfers.

78. By reason of the foregoing, each Quoine Transfer should be avoided and set aside

as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, subject to any mitigation on account of new value that Quoine may demonstrate under applicable burdens of proof.

## COUNT TWO
### (Recovery of Transfers — 11 U.S.C § 550 — Quoine)

79.    Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

80.    Plaintiff is entitled to avoid the Quoine Transfers pursuant to Section 547(b) of the Bankruptcy Code.

81.    Quoine was the initial transferee of the Quoine Transfers, the immediate or mediate transferees of such initial transferee, or the person(s) for whose benefit the Transfers were made.

82.    Pursuant to Section 550(a) of the Bankruptcy Code, after accounting for any new value that Quoine may demonstrate under applicable burdens of proof, Plaintiff is entitled to recover from Quoine the property transferred in the Quoine Transfers, or the value of such transferred property, plus interest thereon to the date of payment and the costs of this action.

## COUNT THREE
### (Recovery of Transfers — 11 U.S.C § 550 — All Defendants)

83.    Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

84.    The Customer Transfers are avoidable under Section 547(b) of the Bankruptcy Code.

85.    Each of the FTX Transfers is recoverable from Defendants under Section 550(a) of the Bankruptcy Code.  Defendants are each an immediate or mediate transferee of each of the FTX Transfers from the Initial Transferees.  Upon information and belief, Defendants were on at least

inquiry notice of the FTX Transfers could or would become avoidable as a result of Debtors' potential bankruptcy.

86.     Pursuant to Section 550(a) of the Bankruptcy Code, after accounting for any new value that Defendants may demonstrate under applicable burdens of proof, Plaintiff is entitled to recover from Defendants the property transferred in the FTX Transfers, or the value of such transferred property, plus interest thereon to the date of payment and the costs of this action.

## COUNT FOUR
### (Disallowance of Defendants' Claims — 11 U.S.C. § 502(d) — All Defendants)

87.     Plaintiff repeats, reiterates and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

88.     As alleged above, Defendants are the initial, immediate and/or mediate transferees of transfers avoidable under Section 547 of the Bankruptcy Code and the persons from whom property is recoverable under Section 550 of the Bankruptcy Code.

89.     As of the date hereof, the Defendants have not repaid all or a part of the value of the Avoidable Transfers or returned the Avoidable Transfers.

90.     By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or may in the future be asserted in the Chapter 11 Cases should be disallowed unless and until Defendants relinquish to Plaintiff the property transferred or have paid to Plaintiff the value of such transferred property, for which and to the extent that the Court has determined Defendants are liable pursuant to section 550 of the Bankruptcy Code.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the

Defendants as follows:

(a)    Pursuant to Section 547(b) of the Bankruptcy Code, avoiding each of the Avoidable Transfers;

(b)    Pursuant to Section 550(a) of the Bankruptcy Code, directing Defendants to relinquish to Plaintiff the property transferred in the Avoidable Transfers;

(c)    In the alternative to the relief set forth in (b) above, directing Defendants to pay to Plaintiff an amount to be determined at trial that is not less than the full amount of the Avoidable Transfers, plus interest and costs, in each case subject to mitigation based on new value contributed during the Preference Period;

(d)    Disallowing any claim of Defendants pursuant to Section 502(d) of the Bankruptcy Code;

(e)    Awarding pre-judgment interest at the maximum legal rate from the date of Plaintiff's first demand to Defendants to return all Avoidable Transfers to and including the date of judgment with respect to this Complaint (the "**Judgment**") herein;

(f)    Awarding post-judgment interest at the maximum legal rate from the date of the Judgment until the date the Judgment is satisfied in full;

(g)    Awarding Plaintiff the costs of suit incurred herein, including, without limitation, attorneys' fees, costs, and other expenses incurred in this action, to the fullest extent allowed by applicable law;

(h)    Requiring Defendants to pay forthwith the amount of the Judgment; and

(i)    Ordering such other and further relief as the Court may deem just and proper.

*[Remainder of page intentionally left blank.]*

Dated: July [●], 2024
        New York, New York

                        *DRAFT*

                        *Counsel to Mohsin Y. Meghji, as
                        Litigation Administrator for Celsius
                        Network LLC, et al.*