## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Case No. 22-11068 (JTD) |
| FTX TRADING LTD., *et al.*, | Chapter 11 |
| Debtors | (Jointly Administered) |
| | **Related Docket Nos. 4863 and 15521** |

## FTX MDL PLAINTIFFS' OBJECTION TO
## DISCLOSURE STATEMENT

The Moskowitz Law Firm, PLLC and Boies Schiller Flexner LLP, solely in their capacity as co-lead counsel for, and on behalf of, thousands of plaintiffs (the "**MDL Plaintiffs**") in the multi-district litigation matter captioned *In re FTX Cryptocurrency Exchange Collapse Litigation*, Case No. 23-md-03076, pending in the U.S. District Court for the Southern District of Florida (the "**MDL**"), object to the Debtors' proposed *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-In-Possession* [Docket No. 15521] (the "**Disclosure Statement**").[1] The MDL Plaintiffs state:

### PRELIMINARY STATEMENT

1.     The Court should not approve the Disclosure Statement because: (a) the Disclosure Statement fails to provide adequate information as required in Bankruptcy Code § 1125 regarding several critical matters; (b) the Plan is facially unconfirmable as drafted such that approving the Disclosure Statement to solicit votes on a patently unconfirmable Plan would be futile; and (c) soliciting votes on a Plan centrally premised on (i) a forced settlement of a central issue in these cases—whether customer cryptocurrency held by the Debtors constitutes property of the Estates—and (ii) agreements with federal governmental entities that have not

---

[1]     A capitalized term used but not defined in this objection is defined in the Disclosure Statement.

been, and may never be, struck is at best premature and, worse, misleading to creditors entitled to vote on the Plan.

2.      Infirmities in the Disclosure Statement and the Plan must be addressed now, before creditors are solicited to vote on the Plan. The Plan violates Bankruptcy Code § 1123(a)(4) of the  by permitting unequal treatment among creditors in the same class and does not appear to have been proposed in good faith—as required in Bankruptcy Code § 1129(a)(3)—because, among other things, the Plan proposes to completely exclude all creditors from representation on the Wind Down Board of the Consolidated Wind Down Trust, to say nothing of depriving the principal beneficiaries of the Consolidated Wind Down Trust of any ability to participate in the choice of Plan Administrator.

3.      Perhaps the Debtors believe that disenfranchising creditors in this way is justified because of a fiction the Debtors maintain throughout the Plan and Disclosure Statement: that customer deposit claims are being paid in full with interest (that is, an "estimated recovery" of "129% - 143%" for both Class 5A and 5B). Assuming that fiction to be true, the Debtors evidently believe that customer creditors do not face a substantial enough risk in the operation of the Consolidated Wind Down Trust to warrant any representation on the Wind Down Board or any say in who their trustee will be.

4.      But by breathlessly touting what they claim to be a full recovery with interest for customer creditors, Debtors ignore that offering customers 129% recovery of the value of their cryptocurrency accounts *as of the Petition Date* is decidedly **not** the same as a full economic recovery. This is because cryptocurrencies have materially appreciated across the board since the Petition Date. For example, Bitcoin's market price at the Petition Date was approximately $17,000. It's now $70,000—more than three times the value at the Petition Date. Because the

Plan makes no provision for returning customers' cryptocurrency to them, the Plan proposes to deprive customers of all the appreciation their accounts would have earned since the Petition Date had their accounts not been stolen from them. No matter how much customers may recover under the Plan in these Chapter 11 Cases—100% of Petition Date value, or 129%, or 200%—that recovery will never be enough to give customers the true economic value of what they lost at the hands of the Debtors' criminal prepetition management.

5.      That's where the MDL comes in. It's a process under which criminally victimized customers may assert additional means of recovery and additional bases for damages that promises to bring customers far closer to complete economic recompense than the Debtors' Plan ever could. Customers in Class 5 cannot be expected to vote on the Plan without adequate disclosure of this economic reality, free of the Debtors' manipulation of values in the Disclosure Statement. Customers must be made aware that the Plan's "full recovery" is nothing of the sort. Bankruptcy Code § 1125 requires it.

## OBJECTION

### DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION

6.      A disclosure statement cannot be approved under Bankruptcy Code § 1125 for use in soliciting votes on a plan unless it contains "adequate information … of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, … that would enable … a hypothetical investor of the relevant class to make an informed judgment about the plan …."[2]

---

[2]     The standard is whether "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991). "[T]he importance of full and honest disclosure is critical and can not [sic] be overstated." *In re RADCO Properties, Inc*., 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009). A disclosure statement must set forth "'all those factors presently known to the plan proponent to bear upon the success or failure of the proposals contained in the plan.'" *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986), *quoting In re The*

7.    The Disclosure Statement fails to provide creditors with adequate information about matters of crucial concern and deprives creditors of the ability to vote on the Plan fully informed of its contents and its legal and economic implications. It should not be approved.

## A.    The MDL Should Be Described in the Disclosure Statement

8.    Despite how central the MDL is to a critical class of creditors under the Plan—and, by extension, all other classes—the Disclosure Statement does not adequately or even summarily describe the MDL. It should. At very least, the Disclosure Statement should include the following description:

> Since the MDL was established in June 2023, the MDL Plaintiffs have named 52 different non-Debtor defendants, served and reviewed hundreds of discovery requests, completed the review of hundreds of thousands of documents, and reached preliminary settlements with numerous insiders and promoters of FTX. The MDL Plaintiffs intend to provide full economic recovery to FTX victims by pursuing claims against non-Debtor third parties primarily relating to violations of applicable securities law (*e.g.,* aiding and abetting the sale of unregistered securities), unfair trade practices, and aiding and abetting fraud. Significantly, the claims asserted in the FTX MDL **do not include claims against the Debtors**. The defendants in the MDL include the Debtors' current and former banks, law firms, accountants, advertisers, domestic funds, international funds, and promoters including Temasek Holdings (Private) Limited, Tiger Global Management, LLC, Golden State Warriors LLC, Thoma Bravo L.P., Paradigm Operations LP, Sequoia Capital Operations LLC, Deltec Bank and Trust Company Limited, Softbank Group Corp., Prager Metis CPAs, LLC, Armanino, LLP, Major League Baseball, Mercedes-Benz Grand Prix Limited, Tom Brady, Stephen Curry, Shaquille O'Neal, Shohei Ohtani, and Sullivan & Cromwell.

9.    Such a description will help creditors understand why the Debtors are wrong to attempt to offset customer recoveries from the Estates under the Plan with any recoveries customers may receive in the MDL. *See* discussion of Anti-Double-Dip Provision below.

---

*Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981). In particular, a disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *See In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 507 (D.N.J. 2005) (the aim of a disclosure statement "is to provide creditors with relevant information on the likelihood and amount of eventual distributions"). *see also In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987).

**B.      The Disclosure Statement Misrepresents Real Recoveries**

10.      The Disclosure Statement never discloses that the percentage recoveries estimated for customers in Class 5—recoveries expressly depicted in the Disclosure Statement as payment in full with interest[3]—are based on the value of cryptocurrency *on the Petition Date*, not as of some later date—like the effective date of the Plan. Using Petition Date values and then attempting to persuade creditors that the Plan would pay them "in full" with interest misleads creditors because cryptocurrency is now worth a multiple of what it was worth on the Petition Date. For example, Bitcoin was valued at approximately $17,000 on the Petition Date; it is presently valued at approximately $70,000—more than three times higher. As currently drafted, the Disclosure Statement is silent in this regard, on page 12 (purporting to reflect a "Summary of Treatment of Claims and Interests and Estimated Recoveries") and everywhere else.

11.      Limiting customer claims to the amount of cryptocurrency as of the Petition Date—admittedly in accordance with the Court's *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [Docket No. 7090] (the "**Estimation Order**")—without also clarifying for all creditors that the Estimation Order "is without prejudice to claims asserted outside of these Chapter 11 Cases against non-Debtor third parties," misleads creditors. The Disclosure Statement should be amended so that customers being asked to vote on the Plan are aware that the Debtors' representations regarding Plan recoveries necessarily rely on cryptocurrency values determined on the Petition Date a year and a half ago and the Estimation Order that contains a critical limiting caveat. No disclosure statement should make creditors believe they are getting "paid in full" when they clearly are not.

---

[3]      The Disclosure Statement portrays the giving of interest on unsecured claims as some sort of concession for Bankman-Fried's crimes and other considerations. *See* Disclosure Statement at 86. But the Consensus Rate of interest applies only to the value of customer accounts *as of the Petition Date.* Because the value of cryptocurrencies have doubled or tripled since the Petition Date, a meager 9% interest factor hardly suffices to give defrauded customers anything resembling a full recovery.

**C.     The Disclosure Statement Should Describe Implications of Related Cases**

12.     The Disclosure Statement's current description of the MDL and *United States v. Samual Bankman Fried*, S.D.N.Y. Case No. 22 Cr. 673 (LAK) (the "**SBF Criminal Case**"), those cases' implications for these Chapter 11 Cases, and the critical interplay between orders entered in the SBF Criminal Case and the MDL on the one hand and these Chapter 11 Cases on the other hand is inadequate. There is no discussion of the MDL's position that it, and not the Debtors, should be vested with the right to distribute proceeds of forfeited assets to make customers truly whole. There is little to no discussion of the Debtors' positions with respect to the MDL and who has or may have the right to distribute forfeiture proceeds—and what that means for customer creditors, despite that this information is indispensable to customers considering how to vote on this Plan.

13.     The Disclosure Statement should describe and explain the interplay between the U.S. District Court's *Preliminary Order of Forfeiture/Money Judgment* entered in the SBF Criminal Case and the Debtors' own assertions regarding the assets constituting the Estates. As written, and without such an explanation, the Disclosure Statement does a poor job of laying out what cash and other assets the Estates actually have (both in their possession and within their legal control), what the Estates hope or expect to get from the federal government (through forfeiture or otherwise), and how the proposed but incomplete settlements with various federal governmental entities affect the amount and character of assets available for Distributions to creditors, creditor recoveries from all sources, and even the likelihood that the Debtors can predict any of this *before* deals with government entities are actually struck. None of the distribution "waterfalls" and anticipated recoveries contained in the Disclosure Statement indicates how various results from the SBF Criminal Case and its forfeiture proceedings will affect creditor recoveries under the Plan. No "sources and uses" analysis could ever provide

creditors with the kind of adequate information required under Bankruptcy Code § 1125 without accounting for the vicissitudes of what may ultimately occur in this Court and other courts with respect to what assets will ultimately be available in the Estates for Distributions.

**D.    Anti-Double Dipping Provision Is Inscrutable**

14.    How the Plan proposes to prevent double-dipping among creditors who may obtain recoveries from other sources, including the SBF Criminal Case and the MDL, is of critical importance to creditors entitled to vote on the Plan. Yet the Disclosure Statement buries its reference to the Plan's anti-double-dipping provision on page 117, slipped in as one of 15 subparagraphs describing both customary procedural niceties and core substantive Plan provisions directly affecting the interests of customers in Class 5, all under the vague (or even misleading) heading, "Record Date and Delivery of Distributions" beginning on page 113.

15.    After describing, in mostly boilerplate language, such unremarkable matters such as the setting of a claims record date, the addresses to be used for distributions, the identity of the Distribution Agent, and the fact that *de minimis* checks won't be issued—all among the Plan's more mundane provisions—this large section also contains, almost as an afterthought, subparagraph 12 on page 117 (the "**Anti-Double-Dip Provision**"), describing how "[t]he Plan Administrator *may* require any Holder of Any Claim or Interest to *submit satisfactory evidence* that such Holder has not *requested or received compensation for the same losses* underlying such Claim or Interest in connection with any other judicial or administrative proceedings in any court other than the Bankruptcy Court, including" the MDL. In addition to the fundamental infirmity this provision represents for confirmation under Bankruptcy Code §§ 1123(a)(4) and 1129(a)(2) described below in this objection, the Disclosure Statement utterly fails to elucidate any of the words and phrases emphasized in italics immediately above. Under what circumstances will the Plan Administrator require or not require "satisfactory evidence"? What is "evidence" in this

context? What is "satisfactory" and who determines that? How does a Claim Holder submit this evidence? Why does a "request" for compensation have the same effect as actually "receiving" compensation? How can that be justified economically?

16.     Worse, the provision continues:

> The Plan Administrator may, and may direct the Distribution Agent to, withhold any Distributions on such Claim or Interest until: (a) such time as the Plan Administrator determines it has received satisfactory evidence is obtained [sic] or appropriate arrangements are in place that ensure no Holder receives more than any other similarly-situated Holder under the Plan, taking into account potential recoveries of all Holders . . . .

17.     Although it's difficult to parse the clumsy syntax, poor grammar, and prolixity, one assumes that the Debtors intend this provision to address the very infirmity this objection notes below regarding intraclass disparity in treatment that violates Bankruptcy Code § 1123(a)(4). But creditors shouldn't have to assume anything in a disclosure statement. Too much here remains unclear. For example, is there important meaning being expressed by including what looks like surplusage, "such time as" following the word "until"? If so, what is that meaning? What are "appropriate arrangements"—what "arrangements"?; "appropriate" to whom? And the phrase, "taking into account potential recoveries of all Holders" appears to be significant despite that it seems hopelessly out of context and remains inscrutable after repeated reading.

18.     Neither the MDL Plaintiffs nor any creditors should have to guess what the Debtors are getting at. The Anti-Double-Dip Provision—which addresses a topic all too important to both Class 5 creditors and other classes of creditors—is so poorly drafted and so poorly described in the Disclosure Statement that any reasonable creditor would be left with far more questions than answers after reading it. The Debtors should be required to rewrite this provision in plain English so that its meaning and legal effects are clear and unambiguous and so

creditors can be certain about whether the Plan Administrator will or will not prevent double-dipping by invoking this provision and even about what constitutes so-called "double-dipping" under this provision. As it exists now, the Anti-Double-Dip Provision appearing in both the Plan and the Disclosure Statement fails to provide adequate information to voting creditors and not just because it's all so conditional, frequently using the word "may."[4] The Debtors must explain to creditors how their participation in either or both of the SBF Criminal Case and the MDL could result in double-dipping under the Plan and what creditors can and must do under the Plan to help the Plan Administrator meet the laudable goal of ensuring that no creditor receives an actually impermissible double recovery for one Claim. Whatever the Disclosure Statement currently says on page 117 doesn't do that.

19.    More fundamentally, the Anti-Double-Dip Provision appears to take the indefensible position that recoveries in the MDL somehow duplicate recoveries from the Estates in this case. Not so. As described above (and as should be described in the Disclosure Statement), recoveries from the MDL would **not** duplicate customer recoveries in this case because, among other things, the Debtors are not defendants in the MDL and the claims asserted in the MDL for, among other things, violations of securities laws and aiding and abetting fraud, are asserted against non-Debtor defendants with their own liabilities, none of whom are being released under the Plan. The Debtors cannot justify barring customers from recovery any shortfall on their claims in these cases by prosecuting claims against the defendants in the MDL. The Debtors should be required to explain in the Disclosure Statement why the MDL is even mentioned in the Anti-Double-Dip Provision and why, substantively, the Plan would force customer recoveries in Class 5 to be offset by recoveries in the MDL from non-Debtor and non-

---

[4]    Perhaps the Debtors intend "may" to connote authority to do something rather than conditional discretion to do something. If so, a deft re-drafting of this Plan provision would resolve this obvious ambiguity.

released defendants, under different causes of action, and based on different damages theories. More fundamentally, because the Plan purports to cap customer claims at the value of their accounts as of the Petition Date, the Debtors should be required to disclose and clarify if the Anti-Double-Dip Provision precludes creditors from obtaining recoveries in other proceedings from other sources over and above the Petition-Date value the Plan imposes on creditors. If the Debtors do not intend such a result, then the Anti-Double-Dip Provision should be amended and clarified. And if the Anti-Double-Dip Provision would so preclude creditors, the Disclosure Statement must explain why that's appropriate. Stated simply, the Debtors should explain how recoveries in the MDL purportedly duplicate recoveries from the Estates in this case. It is a mystery to the MDL Plaintiffs how they would.

E.    **Scope of Releases**

20.    The Disclosure Statement merely repeats verbatim Sections 10.4 and 10.5 of the Plan—the sections containing critical releases by the Debtors and Holders of Claims—without any explanation or analysis that would assist non-lawyer creditors in understanding the meaning and practical effects of releases expressed in such dense, verbose language. Section 10.4 of the Plan is 37 lines long and features one sentence comprising 495 words; Section 10.5 of the Plan is 34 lines long and features one sentence comprising 417 words. Both sections require creditors to navigate a maze of defined terms to acquire even a vague sense of who and what are being released—"Excluded Party," "Causes of Action," "Preserved Potential Claims," etc.

21.    Simplifying and clarifying these types of provisions is what any effective, adequate disclosure statement should do—and what § 1125 requires. This is especially true here because neither Sullivan & Cromwell nor any other of the Debtors' professionals are included in the defined term "Excluded Party," despite that the MDL Plaintiffs have sued 52 different non-Debtor defendants including Sullivan & Cromwell and other FTX professionals for prepetition

misconduct. Creditors likely have no idea, even after reading a half-page, single-spaced provision that resembles a logic game on the LSAT, whether the releases in Section 10.5 of the Plan affect the claims made in the MDL against entities who are not "Excluded Parties."

22.     Assessing the "what" and "who" of the releases is difficult enough without having also to struggle with the "when." Section 10.5 (as simply repeated verbatim and without explanation in the Disclosure Statement at page 120) appears to release claims arising from events "taking place on or before the Effective Date of the Plan"—which encompasses the pre-Petition Date period—then provides five lines later that "Causes of Action … arising out of conduct that occurred prior to the Petition Date" are *not* being released. This is needlessly confusing and leaves creditors to wonder whether prepetition wrongdoing either by Excluded Parties or by other parties such as the Debtors' prepetition professionals is or is not being released. Simply, the Debtors should be required to specifically identify the parties who would be released under the Plan. Lists of parties subject to and not subject to the Plan's releases, as well as date ranges for the applicable releases, would do wonders to clarify what is now arcane. Bankruptcy Code § 1125 requires nothing less.

23.     Clarifications in this regard should also be incorporated into the Ballots to be used by creditors to opt out of the releases. As currently constructed, the Ballots simply repeat the Plan provisions pertaining to the releases verbatim without explanation or simplification. Leaving aside all the other legal jargon and ponderous syntax of the Ballots that could easily flummox even the most sophisticated creditor,[5] the Ballots should explain in plain English what

---

[5]   The form ballot at Official Form B314 is intentionally written in plain English to maximize understanding by non-lawyer creditors and reduce the need for creditors to hire counsel just to understand their ballot. The MDL Plaintiffs appreciate that the Ballots to be used in this case must depart significantly from the Official Form. But that doesn't mean that the Ballots should abandon the Official Form's preference for plain English. The Debtors' proposed Ballot for Class 5A, for example, is **16** pages long and filled with jargony words and phrases that most customers will likely not understand. For example, does "Your Scheduled Amount is as listed in this Item 1" mean something different from "Your Schedule Amount is listed below"? Does "shall" mean

the releases do and who are and are not released rather than simply repeat language creditors are instructed on the Ballot to read in the Plan and Disclosure Statement themselves.

24.     Surprisingly, the Debtors have not amended the Disclosure Statement to include any discussion of the *Report of Robert J. Cleary, Examiner* [Docket No. 15545] (the "**Examiner Report**"), despite that the examiner's report notes several potential causes of action and open questions compelling additional investigation.[6] It should be assumed that creditors have read the Examiner Report and are now wondering whether any of the potential causes of action and other investigations are affected by the Plan's releases or exculpation provisions. The Disclosure Statement should not leave creditors wondering.[7]

25.     The MDL Plaintiffs assume that nothing in the Plan contemplates a release of prepetition claims against the Debtors (or others) in a way that would violate either Bankruptcy Code § 1141(d)(3)—by discharging a debtor that is liquidating and not engaging in post-confirmation business—or applicable bankruptcy law regarding non-debtor, third-party releases.[8] But neither the MDL Plaintiffs nor any other creditors should have to assume anything after

---

something different from "will" when both words are used interchangeably and when "shall" is also used to mean two or three other things? The phrase "preference exposure" appears several times, yet nothing in the Ballot explains what a preference is or what "exposure" means despite that creditors must make a critical election regarding the Customer Preference Settlement using the Ballot. Customers have lost enough from FTX as it is without their having to pay counsel to help them understand even the basics of the Ballot.

[6]  The Examiner Report suggests further specific investigations, some of which may ultimately reveal non-waivable conflicts affecting Sullivan & Cromwell. The Examiner Report also states frequently that Mr. Cleary has relied on the independence of the investigations undertaken by Quinn Emanuel because Quinn Emanuel maintains that it is counsel to the FTX Independent Directors. But the Disclosure Statement should make clear that Quinn Emanuel was retained by, and directly reports to, Mr. John Ray.

[7]  Similarly, the Disclosure Statement and Plan describe the Hacking Incident arguably in enough detail to at least identify that there may be claims associated with the Hacking Incident but, because neither the Plan nor the Disclosure Statement indicate whether the Hacking Incident remained ongoing after the Petition Date such that certain claims may be affected by the Plan's exculpation in Plan Section 10.8. Again, creditors should not be left in the dark about whether claims associated with the Hacking Incident (especially claims arising postpetition) will or will not be released or affected by the Plan's exculpation.

[8]  Applicable bankruptcy law pertaining to non-debtor, third-party releases—famously now before the U.S. Supreme Court—may also be implicated by the Plan's releases. The MDL Plaintiffs preserve all arguments in that regard for later consideration at the Confirmation Hearing. Further, if the Plan's releases *do* release prepetition claims in a way that violates one or more provisions of the Bankruptcy Code, the MDL Plaintiffs also preserve their right to raise those objections in connection with the Confirmation Hearing.

reading the Disclosure Statement. Provisions this rhetorically inaccessible must be deconstructed and explained in clear, plain English so that all creditors understand what these releases mean and how these releases affect creditors' interests.

**F.      Implications of Property of the Estate Question**

26.      As discussed above, the issue of whether customer cryptocurrency accounts constituted property of the Estates or whether customers owned the cryptocurrency the Debtors held on their behalf—the issue that the Debtors presume to make the subject of the Plan's "Global Settlement" —remains central to the operation of the Plan, to creditor recoveries, and to customer rights in connection with claims made and currently being litigated in the SBF Criminal Case and the MDL. By only obliquely mentioning this issue, the Debtors fail to provide adequate information in the Disclosure Statement to educate creditors about, among other things, the implications that would follow from this Court's finding that customers' cryptocurrency was *not* property of the Estates. For example, the Debtors' liquidation analysis, included in the Disclosure Statement to address the "best interests of creditors" test in Bankruptcy Code § 1129(a)(7) of the Bankruptcy Code ignores the possibility of just such a ruling by this Court and fails to discuss whether that test could ever be met if customer cryptocurrency were found not to constitute property of the Estates.

27.      More broadly, the Disclosure Statement is silent regarding what happens to the Plan generally if the property-of-the-estate question is resolved against the Debtors' position. The Disclosure Statement should begin with noting that the Debtors' position is diametrically opposed to the findings—beyond a reasonable doubt—of SBF Criminal Case's jury that Mr. Bankman-Fried had misappropriated *customer funds*.[9] Can this Plan or any like it ever be

---

[9]      The Debtors' position also appear indefensible in light of the unambiguous provisions in the FTX Terms of Use:

confirmed if the Debtors' position does not prevail? Should the Debtors' prevailing on that question be made a condition precedent to the Plan going effective? Can the estate even remain administratively solvent?

28.     The Disclosure Statement identifies some 27 risk factors creditors should consider pertaining to confirmation of the Plan, yet not one of them even mentions the possibility that this Court or an appellate court could ultimately rule that billions of dollars in customer cryptocurrency are not now nor ever were the Debtors' property. Omitting such critical information and an assessment of the implications of such a ruling deprives creditors of adequate information required to be included in the Disclosure Statement under Bankruptcy Code § 1125.

### PLAN IS FACIALLY UNCONFIRMABLE

29.     The Debtors seek this Court's approval of a disclosure statement for a Plan that is patently unconfirmable. The Third Circuit Court of Appeals cautions that "'if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.'"[10] Further, a "plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting

---

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. … (B) … FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading. (C) You control the Digital Assets held in your Account. At any time, … you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

FTX Terms of Use at 8.2.6. Compare these provisions to the unambiguous provisions contained in the terms of use in the Celsius or Coinbase cases, where the terms of use were clear that title to cryptocurrency assets was never held the customer. Just as those terms of use were dispositive in the Celsius and Coinbase cases, so, too, should FTX's Terms of Use be dispositive here.

[10]     *In re Am. Capital Equip., LLC,* 688 F.3d 145, 154 (3d Cir. 2012), *quoting In re Larsen*, No. 09-02630, 2011 Bankr. LEXIS 1621, 2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011).

results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'"[11]

30.    The Plan here suffers from just such "defects" that can't be overcome by creditor votes and that are the indisputable result of Plan provisions concerning Class 5, not disputed facts or other matters that require further development at the Confirmation Hearing.

## G.    Disparate Treatment of Claims in Same Class

31.    No matter how creditors vote, the Plan cannot be confirmed as written because the Plan violates the requirement in Bankruptcy Code § 1123(a)(4) that a plan "shall … provide the same treatment for each claim or interest of a particular class …."

32.    The Anti-Double-Dip Provision—Plan Section 7.12 at page 62—appears permissive rather than mandatory, and is so ambiguously and inscrutably drafted that it remains unclear if the Plan will actually avoid double-dipping. Section 7.12 of the Plan provides:

> The Plan Administrator **may** require any Holder of Any Claim or Interest to **submit satisfactory evidence** that such Holder has not **requested or received compensation for the same losses** underlying such Claim or Interest in connection with any other judicial or administrative proceedings in any court other than the Bankruptcy Court, including . . . [the MDL]. The Plan Administrator **may** … withhold any Distributions on such Claim of Interest until: (a) such time as the Plan Administrator determines it has received satisfactory evidence is obtained [sic] or appropriate arrangements are in place that ensure no Holder receives more than any other similarly-situated Holder under the Plan, taking into account potential recoveries of all Holders …."[12]

33.    Because this provision leaves it to the Plan Administrator's discretion to even inquire about certain customer creditors in Class 5 having received recoveries from other sources such as the MDL, the Plan leaves open at least the possibility that some members of Class 5 will be able to double-dip and others will not, meaning that some creditors in Class 5 will receive

---

[11]    *In re Am. Capital Equip., LLC,* 688 F.3d at 154–5, *quoting In re Monroe Well Serv., Inc.,* 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

[12]    Plan at 62 (emphasis added).

higher overall recoveries under the Plan than others. And, of course, the Plan Administrator may, without violating the Anti-Double-Dip Provision as currently drafted, require some Claim Holders to "submit satisfactory evidence" while excusing other Claim Holders from that requirement, with the practical effect that some Claim Holders may be precluded from double-dipping while others are permitted to. Again, that makes possible disparate recoveries among Claim Holders in the same class, flatly violating the mandates of Bankruptcy Code § 1123(a)(4).

34.     Further, why does the Anti-Double-Dip Provision appear to provide that a "request" for compensation has the same practical effect as actually "receiving" compensation? As currently drafted, the Anti-Double-Dip Provision would preclude a creditor from receiving Distributions even if all that creditor had done is "request" compensation by, for example, signing on as a plaintiff in the MDL. That would be absurd for the reasons discussed above, but that absurdity would be compounded by potentially giving rise to a scenario in which one creditor in the same class, in choosing not to make such a "request," would receive Distributions while another identically-situated creditor in that same class would not, even when the first creditor has yet to receive any recovery from any source. That type of disparate treatment plainly violates Bankruptcy Code § 1123(a)(4).

35.     The Anti-Double-Dip Provision also allows the Plan Administrator to unilaterally deem evidence to be "satisfactory" or not, without reference to any objective standard, prescribed procedures, or this Court's review. The potential for abuse, inconsistency, and capriciousness abounds. One creditor's evidence may be deemed satisfactory while another's is not, entitling the first creditor to Distributions while depriving the second creditor of Distributions, all at the Plan Administrator's whim. This, too, creates a significant likelihood, if

not near certainty, that similarly-situated creditors within the same class will receive different treatment. That is intolerable under Bankruptcy Code § 1123(a)(4).

36.     "[T]he most conspicuous inequality that section 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."[13] Thus, the Plan is facially unconfirmable under Bankruptcy Code § 1129(a)(2) because the Debtors have not "complied with the applicable provisions" of the Bankruptcy Code—specifically, § 1123(a)(4). Because the Plan is facially unconfirmable in this regard, approval of the Disclosure Statement is inappropriate.[14]

## H.     Threshold Property of the Estate Question Must Be Resolved

37.     The question of whether customers' cryptocurrency accounts constitute property of the Estates has hung like a storm cloud over these Chapter 11 Cases since their inception. The Plan (at Section 5.2, page 47) includes a "Global Settlement" that, among other things, resolves that question by deeming all "assets held by the FTX.com Exchange and the FTX.US Exchange" as constituting "property of the Debtors' Estates …." Whether that is appropriate, whether creditors agree, or whether that fundamental question will need to be litigated as part of confirmation should be made the subject of specific procedures adopted by the Court and elucidated in the Disclosure Statement. The Plan presumes the unjust result that a vote for the Plan necessarily is a vote to accept this "Global Settlement" without providing creditors with any information pertaining to, among other things:

> (a)     whether a creditor may vote for the Plan but still object to confirmation on this basis or initiate or participate in litigation regarding whether customer cryptocurrency is property of the Estates;
>
> (b)     how a creditor may initiate such litigation where the Bankruptcy Rules technically require the commencement of an adversary proceeding

---

[13]    *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986).
[14]    *In re Am. Capital Equip., LLC,* 688 F.3d at 154.

but where innumerable adversary proceedings on the same topic would be unwieldy for the Court to handle, to say the least;[15]

(c)    why it makes sense that Samuel Bankman-Fried was convicted on multiple felony counts and sentenced to 25 years in prison for misappropriating FTX *customer funds*—not FTX's assets—yet the "Global Settlement" baked into the Plan purports to resolve the issue of property of the Estates in a way directly contradicting a federal jury's finding beyond a reasonable doubt that funds misappropriated by Mr. Bankman-Fried *belonged to customers* and not the Debtors.

38.     But, by forcing creditors to accept a Global Settlement—thereby effectively surrendering their rights (and even their assets) to the Estates—simply by accepting a Plan that would bring some closure to this sordid affair or, worse, by *not* accepting the Plan but being outvoted by a preponderance of creditors in one accepting, impaired Class, the Debtors purport to deprive creditors of their property without sufficient due process. It's worse than an unenforceable adhesion contract because creditors will be bound by a confirmed Plan containing the "Global Settlement" whether they vote or not and whether they vote to reject the Plan or not. Thus, proposing to resolve the core question lying at the foundation of these Chapter 11 Cases by the expedient of Plan confirmation—without litigation, with serious consequences for, among other things, the MDL—is a cynical ploy by the Debtors to propose a plan not in good faith. Bankruptcy Code § 1129(a)(3) precludes such a plan from being confirmed.

39.     Considering these issues begs a more fundamental question of timing: why should these Estates incur the expense of soliciting votes on this Plan now, before this Court can determine the fundamental question of whether customer cryptocurrency constitutes property of the Estates or not? The MDL Plaintiffs respectfully urge the Court to consider scheduling appropriate litigation to resolve this fundamental question *before* a Plan is finalized and votes are

---

[15]    Not every creditor that wishes the Court to rule on this issue should be required to commence an adversary proceeding. The MDL Plaintiffs respectfully suggest that a simple objection to Confirmation on this explicit basis should suffice to join the issue.

solicited from hundreds of thousands of creditors. The choices voting creditors would face would be far more straightforward and far more certain if the plan reflected the resolution of the property-of-the-estate question.

40.    Moreover, the Plan relies heavily on the assumption that several governmental entities will agree to subordinate their own astronomical claims to the claims of customers and other non-governmental creditors. Yet, apparently, none of those agreements has yet been reached, begging the question of whether soliciting votes on this Plan now—before there is even an indication that governmental entities will eventually agree to subordinate their claims—makes any sense at all. The MDL Plaintiffs believe that these settlements with governmental entities should be completed and documented *before* a Plan is finalized and before solicitation so that creditors have a far better understanding of the financial implications of those settlements (or lack of them) on creditor recoveries. As it is, the Disclosure Statement contains no information regarding what creditor recoveries would look like if one (or more) of the governmental entities identified in the Disclosure Statement refuses to subordinate some or all of its claim.

## I.    Lack of Creditor Representation Evidences Debtors' Lack of Good Faith

41.    The Plan would create a Consolidated Wind Down Trust, the beneficiaries of which would be the Debtors' unsecured creditors and the operation of which would be governed by the Wind Down Board. But the Plan proposes to empanel a Wind Down Board devoid of any creditor representation even though it is the Debtors' creditors' interests, not the Debtors', that must remain paramount. *See* Plan Section 5.11 at page 50, where the Wind Down Board comprises the Plan Administrator, Messrs. Simms and Greaves as joint official liquidators in the Bahamas, and the Debtors' incumbent board.

42.    Although Section 5.20 of the Plan provides that the Ad Hoc Committee and the Official Committee may "request" that the Debtors form an Advisory Committee to represent the

interests of unsecured creditors in "advising" the Plan Administrator, nothing in Section 5.20 ensures that the Advisory Committee will ever be formed. The Debtors could simply refuse the "request." And even if the Debtors accede to the request and form the Advisory Committee, there is no indication in the Plan that the Advisory Committee will ever be more than a "fifth column," forever at odds with, and subjugated by, the Wind Down Board on which creditors have no representation.

43.    The MDL Plaintiffs are aware of no effort by the Debtors, their board, or their professionals to discuss the inclusion of creditor representation on the Wind Down Board with any creditor constituency in these cases or even to assess whether the proposed members of the Wind Down Board have the creditors' trust and confidence. Certainly, the MDL Plaintiffs have not been consulted in this regard at any point. Given that the Debtors' lead bankruptcy counsel, Sullivan & Cromwell, is a defendant in the MDL, it is hardly unreasonable for one to assume that FTX customers and other creditors may have serious misgivings regarding the Debtors' choice of members of the Wind Down Board.

44.    Blithely disregarding the preferences of creditors and depriving creditors of the ability to select their own fiduciaries further betrays the Debtors' lack of good faith as Plan proponents. In this regard, as well, the Plan cannot be confirmed because the Debtors have not proposed it in good faith as required under Bankruptcy Code § 1129(a)(3).

[*Remainder of Page Intentionally Blank*]

## CONCLUSION

For the reasons stated above, the Disclosure Statement should not be approved under Bankruptcy Code § 1125. This Court should deny approval of the Disclosure Statement and not undertake the Debtors' proposed solicitation process unless and until the facial infirmities in the Plan are corrected and the Disclosure Statement amended and expanded to provide creditors with adequate information.

Dated: June 5, 2024            **PACHULSKI STANG ZIEHL & JONES LLP**

           */s/ Mary F. Caloway*
           Jordan A. Kroop (admitted *pro hac vice*)
           Jason H. Rosell (admitted *pro hac vice*)
           Mary F. Caloway (DE Bar No. 3059)
           919 North Market Street, 17th Floor
           P.O. Box 8705
           Wilmington, Delaware 19899 (Courier 19801)
           Telephone:    (302) 652-4100

           *Counsel to FTX MDL Co-Lead Counsel*