IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | ) ) | Case No. 22-11068 (JTD) |
| Debtors. | ) ) ) ) | (Jointly Administered) |

**DECLARATION OF KENNETH
EHRLER IN SUPPORT OF THE CELSIUS LITIGATION
ADMINISTRATOR'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

I, Kenneth Ehrler, declare as follows under penalty of perjury:

1.  I am over the age of 18, and I am authorized to submit this declaration on behalf of Mohsin Y. Meghji in his capacity as Litigation Administrator (the "Celsius Litigation Administrator") for Celsius Network LLC and its affiliated debtors (collectively, "Celsius").

2.  I submit this declaration in support of *The Celsius Litigation Administrator's Motion for Relief from the Automatic Stay* (the "Motion") filed contemporaneously herewith in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "FTX Debtors").[2]

**I.    Professional Background**

3.  I am a Managing Director at M3 Advisory Partners, LP ("M3"), which serves as a financial advisor to the Celsius Litigation Administrator. I have over 15 years of experience advising clients on financial analysis, business plan development, operational improvement, cash

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288. Due to the large number of debtor entities in the Chapter 11 Cases, a complete list of the FTX Debtors, and the last four digits of their federal tax identification numbers, is not provided herein. A complete list of such information may be obtained on the website of the FTX Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Motion.

and liquidity management, and M&A engagements. Since joining M3, I have provided restructuring advice to companies both in chapter 11 and on an out-of-court basis, in the crypto, financial services, healthcare, energy, industrial, retail, and hospitality industries. I have advised creditors and companies in several recent major chapter 11 cases including, among others, Celsius Network LLC, BlockFi Inc., Seadrill Partners LLC, Neiman Marcus Group LTD LLC, Tailored Brands, Inc., CraftWorks Holdings, and Sears Holding Corporation. Prior to joining M3, I was a Senior Manager at EY focused on business transformation and strategy consulting and held comparable financial and operational advisory roles at Citigroup, Credit Suisse, and Capgemini. I received my bachelor's degree in electrical and computer engineering from Cornell University and an MBA with honors from the Wharton School at the University of Pennsylvania. I am a CFA Charterholder and Certified Insolvency and Restructuring Advisor.

4. M3 is a nationally recognized financial advisory firm, and its professionals have a wealth of experience in operational and financial restructurings, matters requiring expert opinions, and providing support for investigations and litigation in connection with financial restructurings. M3's professionals have extensive experience in turnarounds, corporate restructuring, and bankruptcy and corporate financing, including, but not limited to, company business plan viability and plan feasibility.

5. Pursuant to the Litigation Administrator Agreement, dated as of January 31, 2024, the Celsius Litigation Administrator is authorized to retain certain professional advisors to support in the performance of his duties. Accordingly, the Celsius Litigation Administrator retained M3 to assist with, among other things, the investigation, analysis, filing, prosecuting, and defending of certain causes of action, including actions involving the avoidance of certain transfers under

Sections 547 and 550 of the Bankruptcy Code. I have led the M3 team since the inception of the engagement.

6. Unless otherwise indicated, the statements set forth in this declaration are based on (i) my personal knowledge, (ii) information learned from my review of relevant documents, (iii) information I received from the Celsius Litigation Administrator and his other advisors, (iv) information received from the team at M3 and other advisors to the Celsius Litigation Administrator working under my supervision, or (v) my experience as a restructuring and financial professional. I am not being specifically compensated for this testimony other than through the compensatory payments M3 is or will be entitled to receive from Celsius's estates on account of its services as financial advisor to the Celsius Litigation Administrator. If called to testify, I could and would testify to each of the facts set forth herein based on my personal knowledge and experience.

## II. Overview of Investigated Transactions

7. In connection with M3's work with the Celsius Litigation Administrator, M3 and co-advisors identified and investigated a series of transfers between Celsius customer accounts and/or to and from the Celsius platform during the Celsius Preference Period to determine whether these transactions potentially constituted avoidable preferences and/or subsequent transfers, under Sections 547 and 550 of the Bankruptcy Code. This investigation included certain transfers we believe involve the FTX Debtors as initial and subsequent transferees.

8. In connection with the investigation, M3 and its advisors assembled attribution data from multiple third-party blockchain analytics data providers to identify the individuals or entities associated with certain wallet addresses used to receive crypto assets transferred during the Celsius Preference Period. These services are commonly used by groups including law enforcement,

government regulators, and private blockchain forensics firms in connection with investigative and regulatory compliance matters. To the extent possible, these wallet attributions were checked across multiple sources or with other publicly available information to validate the identification of FTX Debtor wallets.

### A. The Earn and Custody Programs

9.      Prior to the Celsius Petition Date, Celsius's primary offering was the "Earn" program ("Earn Program"). The Earn Program allowed users to place digital assets on the Celsius platform in return for "rewards." Celsius's terms of use provided that when account holders transferred assets to Celsius as part of the Earn Program, they transferred ownership of those assets to Celsius. Specifically, the terms of use stated that Celsius held "all right and title to such Eligible Digital Assets, including ownership rights" in such assets. Pursuant to the terms of use, Celsius could "pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer" such assets "with all attendant rights of ownership" and "use or invest" the assets in Celsius's full discretion.

10.     During the Celsius Bankruptcy, the NY Celsius Bankruptcy Court addressed whether deposits in "Earn" accounts were assets of Celsius's estates. On January 4, 2023, the NY Celsius Bankruptcy Court issued a ruling (the "Earn Ruling") determining that when assets were deposited in "Earn" accounts, "the cryptocurrency assets became Celsius's property." A copy of the Earn Ruling is attached to this Declaration as **Exhibit A**.

11.     On April 15, 2022, in response to certain regulatory actions, Celsius launched the "Custody" program ("Custody Program") for customers in certain U.S. states. The Custody Program provided for accounts that were unlike the Earn Program in that customers retained title to the assets but could not generate rewards on their custody account balances. Specifically, the terms of services provided that "[t]itle . . . shall at all times remain with [the customer] and not transfer to Celsius." Under these terms, Celsius was not authorized to make investments using the

deposited custody assets, and customers no longer received interest payments in return for their custody deposits. The Custody Program was created within the Celsius Preference Period. Funds that were already held in Earn Program accounts were allowed to remain in the Earn Program regardless of accreditation status, however on and after April 15, 2022, only international-based users and U.S. accredited users could transfer funds to Earn accounts.

12. During the Celsius Bankruptcy, the NY Celsius Bankruptcy Court addressed whether deposits in "Custody" accounts constituted assets of Celsius's estates. On December 7, 2022, the NY Celsius Bankruptcy Court issued a bench ruling that digital assets in the "Custody" accounts are not property of Celsius's estates. An excerpt of the relevant transcript containing that ruling is attached to this Declaration as **Exhibit B**.

**B. Customer Transfers**

13. On June 12, 2022, in response to customer withdrawal demands and increasing volatility in the cryptocurrency markets, Celsius instituted a "pause" of account withdrawals and transfers, regardless of whether the assets were held in "Earn" accounts, "Custody" accounts, or other accounts. Prior to that pause, and during the Celsius Preference Period, certain Celsius customers received transfers off the Celsius platform through withdrawals. Certain of Celsius's assets were withdrawn from "Earn" or "Custody" customer accounts directly to wallets I believe to be associated with the FTX cryptocurrency exchange platform, and other assets were transferred after initially being transferred to other locations (together, the "Customer Transfers"). This analysis and identification of subsequent transfers remains ongoing.

14. A schedule identifying the (i) initial transferees of such Customer Transfers, (ii) net amounts of avoidable transfers made to each initial transferee ("Transfer Amount"), and (iii) total

amount of assets that were transferred from the initial transferee to an FTX entity[3] is attached as **Exhibit C** (the "Subsequent Transfers Schedule").

15. A transferee's preference exposure in the Subsequent Transfers Schedule is primarily based upon deposits and withdrawals from an Earn account to an off-platform wallet (in the case of international customers), transfers between Earn and Custody accounts (in the case of U.S.-based customers), and other transactions as set forth in the Celsius disclosure statement. *See e.g. In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y. Jul. 13, 2022), D.I. 3332 at 76–81. As calculated solely for purposes of the schedule, this Transfer Amount represents the estimated value, as of May 7, 2024, of assets transferred from Celsius's estates net of new value (e.g., deposits) received and potential settlements entered.[4]

16. During the Celsius Bankruptcy, a settlement was offered to customers to resolve their preference exposure related to their Custody account balance ("Custody Preference Settlement"). Customers who accepted the Custody Preference Settlement agreed to resolve preference exposure related to their Custody assets that remained on the Celsius platform. To the

---

[3] The Subsequent Transfers Schedule includes identified claims against an FTX entity as a subsequent transferee which may be attributable to an FTX Debtor or an entity in the liquidation of FTX Digital Markets Ltd. (the "Bahamas Liquidation") and its corresponding chapter 15 proceeding. Based on his investigation (which remains ongoing), the Celsius Litigation Administrator cannot confirm at this time whether FTX wallets that received the avoidable transfers belong to an FTX Debtor or an entity in the Bahamas Liquidation. Accordingly, the Subsequent Transfers Schedule includes some claims that may not ultimately be attributable to an FTX Debtor and will continue, instead, against entities in the Bahamas Liquidation. The Motion only requests authority to lift the automatic stay with respect to the FTX Debtors. A complementary motion requesting the same relief with respect to the Bahamian entities was filed contemporaneously herewith in the chapter 15 proceeding. The Celsius Litigation Administrator intends to take necessary discovery following the initiation of Preference Actions in order to finalize the Subsequent Transfers Schedule and attribute FTX wallets against appropriate entities.

[4] The Celsius Litigation Administrator reserves all rights to amend the Draft Complaint and/or the Transfer Schedules (as defined below), including to add or remove transferees and/or transfers, and to revise, among other things, the calculation of a transferee's preference liability with respect to additional transfers and/or reductions of transfers based on any defenses.

extent customers accepted the Custody Preference Settlement, their preference liability was estimated by excluding those Custody assets that were resolved in such settlement.

17. During the Celsius Bankruptcy and after the effective date of the Celsius Plan, offers to settle remaining customer preference liability were provided to Celsius account holders ("Customer Preference Settlements"). To the best of my knowledge, none of the transferees included on the Subsequent Transfers Schedule accepted the Customer Preference Settlements.

18. The Subsequent Transfers Schedule reflects the considerable work that my team and other professionals retained by the Celsius Litigation Administrator have done to trace the Customer Transfers from Celsius's cryptocurrency platform.

19. In connection with our investigation and assessing the availability of relief to avoid the transfers as preferences under Section 547 of the Bankruptcy Code, my team and I also considered whether transferees might have received more value on account of the Customer Transfers than they would have received if Celsius had filed for bankruptcy under chapter 7 of the Bankruptcy Code and if the Customer Transfers had not been made. Based on Celsius's liquidation analysis, my team and I believe that the initial transferees likely obtained greater value on account of the Customer Transfers than each party would have obtained in a chapter 7 liquidation and the transfers had not occurred.

20. Additionally, based on my review of the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (as proposed and as it may be amended, the "FTX Plan") and knowledge of the Customer Transfers, I believe these initial transferees would likely qualify as creditors in Class 5A or 5B under the FTX Plan.[5]

---

[5] The Celsius Litigation Administrator intends to work cooperatively with the FTX Debtors' estates to confirm the appropriate subsequent transferee—an FTX Debtor or a Bahamian entity.

### C. The Quoine Transfers

21. Quoine was a customer of Celsius that held an "Earn" account. Celsius's records show that during the Celsius Preference Period, Quoine withdrew assets from the Celsius cryptocurrency exchange platform ("Quoine Transfers"). A schedule identifying the Quoine Transfers and amounts of avoidable transfers made to Quoine is attached as **Exhibit D** (the "Quoine Transfers Schedule" and, together with the Subsequent Transfers Schedule, the "Transfer Schedules").

22. In connection with our investigation, my team and I also considered whether Quoine may have received more value on account of the Quoine Transfers than they would have received if Celsius had filed for bankruptcy under chapter 7 of the Bankruptcy Code and if the Quoine Transfers had not been made. Based on Celsius's liquidation analysis, my team and I believe that Quoine likely obtained greater value on account of the Quoine Transfers than it would have obtained in a chapter 7 liquidation and the transfers had not occurred.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 5, 2024
Executed at New York, New York.

*Kenneth Ehrler*
Kenneth Ehrler
Managing Director
M3 Partners, LP