# EXHIBIT B

**Agreement**

EXECUTION VERSION

**PURCHASE AND SALE AGREEMENT**

**by and between**

**FTX JAPAN HOLDINGS K.K.**

**and**

**BITFLYER HOLDINGS, INC.**

**Dated as of June 19, 2024**

# TABLE OF CONTENTS

**Page**

## ARTICLE 1
### PURCHASE AND SALE OF INTERESTS

1.1   Purchase and Sale of Interests ................................................................. 2
1.2   Closing Payments ..................................................................................... 2
1.3   Closing ...................................................................................................... 2
1.4   Deliveries at Closing ................................................................................ 2
1.5   Withholding .............................................................................................. 2

## ARTICLE 2
### REPRESENTATIONS AND WARRANTIES

2.1   Representations and Warranties of Seller ................................................ 3
2.2   Representations and Warranties of Purchaser ......................................... 4

## ARTICLE 3
### COVENANTS

3.1   Interim Operations ................................................................................... 8
3.2   Tax Matters .............................................................................................. 9
3.3   Regulatory Matters ................................................................................ 12
3.4   Confidentiality ....................................................................................... 12
3.5   Information and Access ......................................................................... 13
3.6   Post-Closing Cooperation. .................................................................... 13
3.7   Maintenance of Books and Records ...................................................... 13
3.8   Intellectual Property Matters ................................................................. 14
3.9   Carve-Out Post-Closing Cooperation ................................................... 15
3.10  Repayment of Debtors' Exchange Balances ......................................... 16

## ARTICLE 4
### BANKRUPTCY MATTERS

4.1   Bankruptcy Court. ................................................................................. 16
4.2   Alternative Transaction ......................................................................... 17
4.3   Orders .................................................................................................... 17
4.4   Disclosure of Connections to Debtor Affiliates .................................... 17
4.5   Post-Closing KEIP Obligations ............................................................ 17

## ARTICLE 5
### CONDITIONS TO CLOSING

5.1   Mutual Conditions ................................................................................. 18
5.2   Conditions to the Obligation of Purchaser ............................................ 18
5.3   Conditions to the Obligation of Seller .................................................. 18

## ARTICLE 6
### TERMINATION

6.1 Grounds for Termination ........................................................................................ 19
6.2 Effect of Termination ............................................................................................ 20

## ARTICLE 7
### OTHER MATTERS

7.1 Waiver, Amendment .............................................................................................. 20
7.2 Remedies ................................................................................................................ 20
7.3 No Survival of Representations and Warranties or Covenants ............................. 20
7.4 Expenses ................................................................................................................ 20
7.5 Notices ................................................................................................................... 21
7.6 Specific Performance ............................................................................................ 22
7.7 Fiduciary Obligations ........................................................................................... 22
7.8 Entire Understanding; No Third-Party Beneficiaries .......................................... 22
7.9 Assignment ............................................................................................................ 23
7.10 Counterparts .......................................................................................................... 23
7.11 Severability ........................................................................................................... 23
7.12 No Presumption ..................................................................................................... 23
7.13 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ..................... 24
7.14 Damages ................................................................................................................ 24
7.15 Interpretation ......................................................................................................... 24

## EXHIBITS AND SCHEDULES

LIST OF EXHIBITS

| | | |
|---|---|---|
| Exhibit A | — | Definitions |
| Exhibit B | — | Form of Sale Order |
| Exhibit C | — | Form of Release Agreement |

LIST OF SCHEDULES

| | | |
|---|---|---|
| Schedule I | — | Interests |

This PURCHASE AND SALE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "Agreement"), dated as of June 19, 2024, is made by and between FTX JAPAN HOLDINGS K.K., a company incorporated under the Laws of Japan whose principal place of business is at 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo, Japan ( "Seller"), and bitFlyer Holdings, Inc., a company incorporated under the Laws of Japan whose registered office is at Midtown Tower 30F, 9-7-1 Akasaka, Minato-ku, Tokyo, Japan ("Purchaser"). The signatories to this Agreement are collectively referred to as the "Parties" and individually as a "Party".

## Recitals

WHEREAS, on November 11, 2022 and November 14, 2022, Seller and certain of its Affiliates (collectively, the "Debtors") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "Bankruptcy Code") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "Bankruptcy Proceeding");

WHEREAS, (i) Seller owns all of the outstanding equity interests in FTX Japan K.K. (the "Subject Company" and such interests, as set forth in Schedule I hereto, the "Interests") and desires to sell, assign and transfer to Purchaser the Interests pursuant to section 363 of the Bankruptcy Code and Purchaser desires to purchase the Interests from Seller, all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors or other applicable governing body of Seller has determined that it is advisable and in the best interests of Seller's estate and the beneficiaries of such estate to consummate the Transactions and has approved this Agreement;

WHEREAS, Seller intends to seek the entry of one or more Orders by the Bankruptcy Court approving this Agreement and authorizing Seller to consummate the Transactions upon the terms and subject to the conditions set forth herein and in such Orders; and

WHEREAS, the Parties acknowledge and agree that the Transactions are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of Seller or its Affiliates and Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the purchase by Purchaser.

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF INTERESTS

1.1　　<u>Purchase and Sale of Interests</u>. Pursuant to sections 105 and 363 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller agrees to sell, assign, convey, transfer and deliver to Purchaser, and Purchaser agrees to purchase and accept from Seller, all of Seller's right, title and interest in, to and under the Interests for an amount in cash equal to the Closing Consideration, which purchase shall be free and clear of any Liens other than Permitted Encumbrances.

1.2　　<u>Closing Payments</u>. The aggregate consideration payable by Purchaser for the Interests shall be JPY 4,500,000,000 (the "<u>Closing Consideration</u>").

1.3　　<u>Closing</u>. The closing of the Transactions (the "<u>Closing</u>") will take place at 9:00 a.m., Tokyo Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures on the day that is the fifth (5th) Business Day following the date on which all of the conditions to closing specified in <u>Article 5</u> are satisfied or waived, or at such other time as Purchaser and Seller shall agree in writing (the "<u>Closing Date</u>").

1.4　　<u>Deliveries at Closing</u>. At the Closing, upon satisfaction or waiver of the conditions set forth in <u>Article 5</u> hereof:

(a)　　Purchaser shall pay the Closing Consideration to Seller in accordance with <u>Section 1.2</u> by wire transfer of immediately available funds pursuant to the instructions delivered by Seller to Purchaser at least six (6) Business Days prior to the Closing Date;

(b)　　Purchaser shall deliver to Seller a counterpart to the Transfer Documents, duly executed by Purchaser;

(c)　　Seller shall deliver to Purchaser a counterpart to the Transfer Documents, duly executed by Seller;

(d)　　Purchaser shall deliver to Seller a certificate of a duly authorized officer of Purchaser dated the Closing Date certifying as to the matters set forth in <u>Sections 5.3(a)</u> and 5.3<u>(b)</u>;

(e)　　Seller shall deliver to Purchaser a certificate of a duly authorized officer of Seller dated the Closing Date certifying as to the matters set forth in <u>Sections 5.2(a)</u> and <u>5.2(b)</u>; and

(f)　　each of Seller and Purchaser shall deliver to the other Party such other documents and instruments required to be delivered pursuant to the terms of this Agreement or any Transfer Documents.

1.5　　<u>Withholding</u>. Notwithstanding any other provision of this Agreement, any payment under this Agreement shall be payable without any withholding or deduction. If

Purchaser reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to Seller hereunder under applicable Law, Purchaser shall notify Seller at least ten (10) Business Days before any such payment subject to withholding, and the Parties shall use commercially reasonable efforts to mitigate or eliminate any such withholding or deduction.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1    <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants to Purchaser that:

(a)    <u>Authorization</u>. Seller is an entity duly organized and validly existing under the Laws of Japan. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents to which Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, this Agreement and the Transfer Documents to which it is a party have been or, when executed, will be duly authorized, executed and delivered by it, and constitute or, when executed, will constitute a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

(b)    <u>Title to Interests</u>. Seller owns all right, title and interest in and to the Interests, free and clear of all Liens other than Permitted Encumbrances and Liens created by or through Purchaser or any of its Affiliates. These Interests constitute all of the outstanding equity interests of the Subject Company. There are no options, warrants or other securities convertible or exchangeable into equity interests of the Subject Company or subscription or other rights, agreements or commitments obligating the Subject Company to issue, transfer or sell any equity interests.

(c)    <u>No Conflicts</u>. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, the execution and delivery of this Agreement and the Transfer Documents to which Seller is a party and the performance or consummation of the Transactions by Seller do not conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Interests owned by Seller under the terms or provisions of (i) its organizational documents or (ii) any statute or any Order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to materially hinder, delay or impair the performance of Seller's obligations under this Agreement and the Transfer Documents.

(d)    <u>Broker's Fee; No Public Offering</u>. No Person acting on behalf of Seller or under the authority of Seller shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions, other than the financial advisors retained by Seller in the Bankruptcy Proceeding.

(e)    <u>Intercompany Payables</u>. No other amounts are owed by the Subject Company or any of its subsidiaries to Seller or its Affiliates other than the Intercompany Payables or amounts that will be released at Closing.

(f)    <u>Transaction Awards</u>. Neither the Subject Company nor any of its subsidiaries are obligated to pay any equity-based incentive awards or transaction bonuses or similar awards, change of control payments, retention payments or similar payments to any current or former employee, officer, director or other service provider of the Subject Company or its subsidiaries, other than the Transaction Awards.

(g)    <u>Security Breach</u>. The Subject Company has not experienced, since November 11, 2022, any Security Breach, except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the financial condition or results of operations of the Subject Company.

(h)    <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Section 2.1</u>, neither Seller nor any other Person (other than Purchaser) has made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Interests, Seller, the Subject Company, Purchaser or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of Seller's or its Affiliates' respective representatives.

2.2    <u>Representations and Warranties of Purchaser</u>. Purchaser hereby represents and warrants to Seller that:

(a)    <u>Authorization</u>. Purchaser is an entity duly organized and validly existing under the Laws of Japan. Purchaser has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents and to perform all of the obligations to be performed by it hereunder and thereunder. This Agreement and the Transfer Documents to which Purchaser is a party have been or, when executed, will be duly authorized, executed and delivered by Purchaser, and constitute or when executed, will constitute a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium Laws and other Laws of general application affecting enforcement of creditors' rights generally.

(b)    <u>No Conflicts</u>. The execution and delivery of this Agreement and the Transfer Documents to which Purchaser is a party and the performance or consummation of the Transactions by Purchaser do not (i) conflict with or result in a breach or violation of the terms or provisions of its organizational documents, (ii) result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which Purchaser is a party or by which Purchaser is bound or (iii) conflict with or result in a breach or violation of the terms or provisions of any statute or any Order, rule or regulation of any court or governmental agency or body having jurisdiction over Purchaser or its property, except, in each case, to the extent that such conflicts, violations, defaults or

4

accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of Purchaser's obligations under this Agreement and the Transfer Documents. The execution and delivery by Purchaser of this Agreement and the Transfer Documents to which it is a party and the performance by Purchaser of its obligations hereunder and thereunder will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, Order, writ, decree, permit or license, or any consent or approval of any other party to Purchaser's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon Purchaser, except for the approvals contemplated in <u>Section 4.1</u>.

(c)     <u>Sufficiency of Funds</u>. Purchaser has, and will have as of the date hereof and as of the Closing, sufficient cash on hand to pay the Closing Consideration and otherwise perform its obligations hereunder. Purchaser has not incurred, and prior to the Closing will not incur, any obligation, commitment, restriction or liability that would impair or adversely affect such resources except as would not materially hinder, delay or impair the performance of Purchaser's obligations under this Agreement and the Transfer Documents.

(d)     <u>No Other Agreements</u>. None of Purchaser nor any of its Affiliates has entered into any other documents, agreements, arrangements, understandings or side letters with any other Person with respect to or relating to the Interests, the Subject Company or the Transactions except the engagement of any consultants, advisors, attorneys or financial advisors retained by Purchaser in connection with the Transactions and any agreements, arrangements, understandings or side letters entered into by Purchaser after the date hereof with employees or other service providers of the Subject Company relating to the terms of their post-Closing employment. Purchaser has accurately disclosed to the Debtors prior to the date hereof any connections between Purchaser and its respective Affiliates, on the one hand, and the Debtors (including Seller and the Subject Company) and any of their respective shareholders, directors, officers, employees, consultants, contractors or other insiders, on the other hand (the "<u>Interested Party Disclosure</u>") in all material respects. Purchaser has not discussed or entered into any agreements with Debtors' management or key employees regarding compensation or future employment. Purchaser has entered into this Agreement and the Transactions in good faith.

(e)     <u>Full Disclosure</u>. None of the information supplied by Purchaser in writing to the Debtors in connection with the Transactions contains any untrue statement of a material fact, or omits to state any material fact necessary in order to make the statements herein, in light of the circumstances under which they are made, not misleading.

(f)     <u>Independent Appraisal</u>.

(i)     Purchaser acknowledges that Seller may be in possession of material, nonpublic information relating to the Subject Company. Purchaser further acknowledges and agrees that Seller has no obligation to disclose to Purchaser any such material, nonpublic information except as may be required for a representation and warranty of Seller hereunder to be accurate and correct. Purchaser further acknowledges that (A) it is not relying on there having been disclosed any such material or potentially material information which is not disclosed, and (B) any such information may be materially adverse to Purchaser's interests. Purchaser further acknowledges that it is prepared to purchase the Interests from Seller on the foregoing basis and hereby waives

5

any right to rescind or invalidate the purchase of the Interests from Seller or to seek any damages or other remuneration from Seller based on the possession of any such material, nonpublic information by Seller.

(ii)    Purchaser acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the Interests, and that it is responsible for making its own evaluation of any information about the Interests, the Subject Company or Seller that it may receive either directly from the Subject Company or Seller, and that none of the Subject Company, Seller or any Affiliate, partner, employee, officer or director thereof (A) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement or (B) shall be under any obligation to provide access to or advise Purchaser or any other Person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the Interests, the Subject Company or Seller (or any assumptions upon which such information is based) supplied by it or by any Person or be otherwise liable to the Subject Company or Seller or any other Person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

(g)    Accredited Investor; Qualified Purchaser. Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933, as amended and a "qualified purchaser" within the meaning of Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended, and the rules promulgated thereunder.

(h)    No Resale. Purchaser's purchase of the Interests is for its own account for investment and not with a view to the distribution or resale thereof, except in compliance with the Securities Act of 1933, as amended, and applicable state securities Laws.

(i)    Broker's Fee. No Person acting on behalf of Purchaser or under the authority of Purchaser shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions.

(j)    Regulatory Compliance. Purchaser and its Affiliates have at all times conducted their business activities in Japan or in relation to residents of Japan in compliance with all applicable laws and regulations, except to the extent that any such non-compliance would not, individually or in the aggregate, materially hinder, delay or impair the performance of Purchaser's obligations under this Agreement and the Transfer Documents.

(k)    No Other Representations or Warranties.

(i)    Except for the representations and warranties contained in this Section 2.2, neither Purchaser nor any Affiliate of Purchaser or any of Purchaser's or its Affiliates' respective representatives has made any other express or implied

representation or warranty with respect to, or otherwise in connection with, the Interests, the Subject Company, Purchaser, Seller or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of Purchaser's or its Affiliates' respective representatives.

(ii)    Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.1, (A) neither Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to Purchaser in connection with the Transactions and Purchaser has not relied on any representation or warranty other than those expressly set forth in Section 2.1, (B) Purchaser has not executed or authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to Purchaser or any of its Affiliates, or any of its or their respective representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Subject Company, or its assets or liabilities; and (C) the Interests are being transferred "as is", "where is" and "with all faults". Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.1, Seller, on behalf of itself and its subsidiaries and Affiliates (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities, conditions (financial or otherwise) and prospects of the Subject Company or with respect to the Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or its or their respective representatives (including any opinion, information, projection or advice that may have been or may be provided to Purchaser by any representative of Seller or any of its Affiliates). Purchaser acknowledges and agrees that Seller has not made any representations or warranties to Purchaser regarding the probable success or profitability of the Subject Company.

(iii)    Purchaser acknowledges and agrees that the enforceability of this Agreement against Seller is subject to entry of the Sale Order and any other Order entered into by the Bankruptcy Court applicable to the Transactions.

## ARTICLE 3

## COVENANTS

3.1     <u>Interim Operations</u>.

(a)     From the date hereof until the Closing, Seller shall not, and shall cause the Subject Company not to, undertake any activities or to take any actions except in accordance with this Agreement and the Transfer Documents and as may be necessary or advisable to comply with applicable Law or with the Order or request of any Governmental Entity; <u>provided</u>, that, prior to the Closing, Seller and the Subject Company may undertake any actions necessary, required or advisable in order to (A) dividend, distribute, sell, assign, convey or otherwise transfer its interests into, or restructure, reorganize, completely or partially liquidate or otherwise wind-down Quoine Vietnam Company Limited and Quoine India Private Limited (the "<u>Carve-Out</u>") and (B) repay the Intercompany Payables.

(b)     From the date hereof until the Closing, without limiting the generality of the foregoing clause (a), except (x) as may be necessary or advisable to comply with applicable Law or with the Order or request of any Governmental Entity, (y) as otherwise expressly required by this Agreement or (z) with the prior written consent of Purchaser (not to be unreasonably withheld, conditioned, or delayed), Seller shall not, and shall cause the Subject Company not to:

(i)     with respect to the Subject Company, declare, set aside or pay any dividend or other distribution, whether cash or in-kind;

(ii)     with respect to the Subject Company or its subsidiaries, incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse such obligations of any other Person;

(iii)     issue, sell, assign, deliver, grant, pledge, encumber, dispose or otherwise transfer, directly or indirectly, (A) any assets of the Subject Company or (B) any equity interest in the Subject Company (including the Interests);

(iv)     voluntarily subject any assets of the Subject Company to any material Liens not in the ordinary course of business (except for Permitted Encumbrances);

(v)     with respect to the Subject Company or its subsidiaries, enter into any transaction with Seller or any of its Affiliates (other than the Subject Company or its subsidiaries);

(vi)     with respect to the Subject Company or its subsidiaries, acquire any corporation, partnership, limited liability company, other business organization or division thereof or any other material assets;

(vii)    with respect to the Subject Company, merge, demerge or consolidate with or into any legal entity or dissolve, liquidate or otherwise terminate its existence;

(viii)    amend the organizational documents of the Subject Company;

(ix)    with respect to the Subject Company or its subsidiaries, enter into any joint venture, business collaboration, distribution or similar agreement involving a sharing of revenues or profits;

(x)    terminate or modify the terms of employment of any employees of the Subject Company or its subsidiaries (except to the extent required pursuant to any side letters contemplated herein);

(xi)    initiate any Action or settle or compromise any Action by or against the Subject Company or its subsidiaries;

(xii)    voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a filing of the Subject Company in the Bankruptcy Proceeding or any other insolvency proceeding (except as already commenced), or the appointment of a trustee under Chapter 11 or Chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers in the Bankruptcy Proceeding (with respect to the Subject Company and except as already appointed in the Bankruptcy Proceeding);

(xiii)    take any action (other than any actions required by the Bankruptcy Court or applicable Law) in breach of the Sale Order; or

(xiv)    agree or commit to any of the foregoing.

provided, that, prior to the Closing, Seller and the Subject Company may undertake any actions necessary, required or advisable in order to (1) implement the Carve-Out and (2) repay the Intercompany Payables.

(c)    From the date hereof until the Closing, Seller shall, and shall cause the Subject Company to, (i) subject to applicable Law, use commercially reasonable efforts to repay the Intercompany Payables in full prior to the Closing Date and (ii) except as may be necessary to comply with applicable Law or with the Order or request of any Governmental Entity or with the prior written consent of Purchaser (not to be unreasonably withheld, conditioned, or delayed), use commercially reasonable efforts to avoid harm to the assets and properties of the Subject Company (including the occurrence of any Security Breach).

3.2    Tax Matters.

(a)    Tax Returns. Purchaser and Seller agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Subject Company and the Interests as is reasonably necessary for determining any liability for Taxes, the filing of

all Tax Returns, the making of any election relating to Taxes, the preparation for any audit and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this <u>Section 3.2</u> shall be borne by the Party requesting it. For the avoidance of doubt, this <u>Section 3.2</u> will not require the Parties or the Subject Company to take any actions that would reasonably be expected to prevent or delay the consummation of the Transactions.

(b)     <u>Cooperation</u>. Seller and Purchaser shall cooperate with each other in good faith in connection with Taxes with respect to the Subject Company and the Interests, including (i) with respect to the Tax treatment of the Transactions and (ii) using commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity as may be necessary to mitigate, reduce or eliminate any Tax (including withholding or deduction in respect of Taxes) that could be imposed with respect to the Transactions.

(c)     <u>Tax Elections</u>.

(i)     To the extent requested by Seller, Purchaser shall (i) make (and shall cause its relevant Affiliates to make) an election under Section 338(g) of the Code with respect to the Subject Company (the "<u>Section 338(g) Election</u>") and (ii) to the extent the Section 338(g) Election is not made and the Subject Company is eligible for the election under Treasury Regulations Section 1.245A-5(e)(3)(i) (and any comparable provisions of state or local tax Law), enter into, and cause its relevant Affiliates that are described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(2) to enter into, a binding agreement with Seller and its relevant Affiliates pursuant to Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(2) in a timely manner to enable Seller to make the election under Treasury Regulations Section 1.245A-5(e)(3)(i) (and any comparable provisions of state or local Tax Law) to close the taxable year as of the end of the day on the Closing Date of the Subject Company (the "<u>Section 245A Election</u>").

(ii)     If the Section 338(g) Election is made pursuant to <u>Section 3.2(c)(i)</u>, (i) Purchaser shall (A) deliver to Seller a copy of IRS Form 8023 and IRS Form 8883 and (B) cause itself to be classified as a corporation within the meaning of Treasury Regulations Section 301.7701-2 and otherwise to be eligible to make the Section 338(g) Election and (ii) Seller and Purchaser shall (A) cooperate (and cause their Affiliates to cooperate) with each other to take all actions necessary and appropriate (including entering into any agreements and filing such additional forms, returns, or other documents as may be required) to effect and preserve any such election in accordance with the relevant Treasury Regulations provisions (or any comparable provisions of state or local tax Law) and (B) prepare and file (and cause their Affiliates to file) all Tax Returns and any other filings in a manner consistent with any such election except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of state, local or foreign law).

(iii)     If the Section 245A Election is made pursuant to <u>Section 3.2(c)(i)</u>, Seller and Purchaser shall (i) cooperate (and cause their Affiliates to cooperate) with each other to take all actions necessary and appropriate (including entering into any agreements and filing such additional forms, returns, or other documents as may be

10

required) to effect and preserve any such election in accordance with the provisions of Treasury Regulations Section 1.245A-5(e)(3)(i) (or any comparable provisions of state or local tax Law) and (ii) prepare and file (and cause their Affiliates to file) all Tax Returns and any other filings in a manner consistent with any such election except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of state, local or foreign law).

(d)     Transfer Tax. All Transfer Taxes, if any, incurred in connection with the consummation of the Transactions shall be borne by Purchaser. Such Transfer Taxes shall be paid to the applicable Governmental Entity at least three (3) days before the tax payment is due, as applicable. To the extent any Transfer Taxes were paid by Seller, Purchaser shall reimburse Seller for such amount within five (5) Business Days after receipt of written evidence of such payment.

(e)     Covenants. From and after the Closing Date, Purchaser shall not, and shall cause the Subject Company not to, except as required by applicable Law, in each case, without the prior written consent of Seller (not to be unreasonably withheld, conditioned, or delayed), to the extent such action could reasonably be expected to have an adverse impact on Seller, (i) amend or otherwise modify a Tax Return of the Subject Company for a Pre-Closing Period, (ii) enter into, or cause or permit the Subject Company to enter into, any voluntary disclosure or similar agreement or program with a Governmental Entity with respect to Taxes, (iii) make, amend or revoke any Tax election with respect to the Subject Company that relates to, or is retroactive to, a Pre-Closing Period, (iv) take any action relating to Taxes, or that could create a Tax liability, on the Closing Date or after the Closing that is outside the ordinary course of business, and (v) make a Section 338(g) Election or Section 245A Election, in each case, except as otherwise expressly provided in this Agreement.

(f)     Closing Consideration Allocation. To the extent an allocation of the Closing Consideration is required for any applicable Tax purposes, within ninety (90) days following the Closing Date, Seller shall prepare a schedule allocating the Closing Consideration among the assets of the Subject Company for applicable Tax purposes (the "Allocation Statement") and shall deliver the Allocation Statement (together with worksheets and backup information explaining such allocation in reasonable detail) to Purchaser for its review. Seller shall consider in good faith Purchaser's reasonable comments to the Allocation Statement that are provided to Seller within thirty (30) days of Purchaser's receipt thereof. Each Party agrees that it will (i) be bound by the Allocation Statement, (ii) report for Tax purposes the Transactions in a manner consistent with the Allocation Statement (including without limitation, to the extent such filing is required, the filing of IRS Form 8594 and any similar or corresponding form for state or local Tax purposes), and (iii) not take a position for Tax purposes that is inconsistent with the Allocation Statement on any Tax Return or in any proceeding before any taxing authority except with the prior written consent of the other Party. To the extent that the Closing Consideration is adjusted, the Parties agree to revise and amend the Allocation Statement and, to the extent it is required, IRS Form 8594 (and any similar or corresponding form for state or local Tax purposes) in the same manner and according to the same procedure. In the event that the Allocation Statement is disputed by any taxing authority in writing, the Party receiving notice of such dispute will promptly notify the other Party, provided that the failure of the Party receiving

such notice of dispute to promptly notify the other Party shall not constitute a breach of this provision unless any such other Party is actually prejudiced by such failure.

3.3     Regulatory Matters.

(a)     Responsibilities of Purchaser. Purchaser acknowledges and agrees that:

(i)     subject to the terms of this Section 3.3, Purchaser shall bear the sole responsibility for satisfying the Regulatory Condition;

(ii)     Purchaser shall, at its own expense, take all lawful action, and shall prepare and file as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and take any and all steps necessary or advisable to, as promptly as practicable, satisfy the Regulatory Condition and obtain any other required approvals, consents, waivers or actions or inactions of any kind in relation to any Governmental Entity in connection with the Transactions, including proposing, agreeing and committing to any structural or conduct undertaking in connection therewith; provided that the implementation of any such proposal, agreement or commitment may be conditioned on the occurrence of the Closing; and

(iii)     Purchaser shall, as promptly as practicable following the date of this Agreement, provide complete and correct disclosures to the Financial Services Agency of Japan and any other applicable Governmental Entity of any information required or requested regarding the conduct of its and its Affiliates' business activities in Japan or in relation to residents of Japan and compliance with all applicable laws and regulations in connection therewith.

(b)     Pre-Closing Cooperation. Prior to the Closing, subject to applicable Law, Seller shall use its commercially reasonable efforts to cooperate with Purchaser to provide such reasonable information in its possession and other assistance as Purchaser may reasonably require in connection with Purchaser's obligations pursuant to Section 3.3(a)(ii).

(c)     Conduct of Interactions with Governmental Entities. Subject to applicable Laws relating to the exchange of information, prior to the Closing, Purchaser shall, to the extent practicable, consult with Seller on and consider in good faith the views of the other in connection with, all the information relating to Seller or the Subject Company, as the case may be, and any of their respective Affiliates, that appears in any filing made with, or written materials submitted to, any Governmental Entity in connection with the Transactions.

(d)     Post-Closing Notification. As promptly as practicable following the Closing, each of Purchaser and Seller shall, and Purchaser shall cause the Subject Company to, file any respective notifications required under the Financial Instrument and Exchanges Act and the Payment Services Act in relation to the change of the shareholder of the Subject Company.

3.4     Confidentiality. Each of Seller and Purchaser acknowledges that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which terms are incorporated herein by reference, and agrees to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full except that Seller shall be

permitted to disclose the terms of this Agreement; provided, however, that upon occurrence of the Closing, the obligations of Purchaser and its Affiliates under the Confidentiality Agreement shall cease to be of effect with respect to Confidential Information (as such term is defined in the Confidentiality Agreement) of the Subject Company and its subsidiaries. For the avoidance of doubt, Seller is expressly permitted to disclose this Agreement, any Transfer Documents and, in each case, any exhibits and schedules thereto with the Bankruptcy Court as necessary or advisable in connection with the Transactions.

  3.5 <u>Information and Access</u>.

   (a) Subject to applicable Law, from the date hereof until the Closing, Seller shall, and shall cause its Affiliates to, provide information and documents relevant to the Subject Company reasonably requested by Purchaser, including any information related to Actions against the Subject Company or related to the services provided by, or customers of, Blockfolio, Inc.

   (b) Subject to applicable Law, from the date hereof until the Closing, Seller shall, and shall cause the Subject Company to, give Purchaser and its authorized representatives reasonable access to the Subject Company and permit Purchaser to make such inspections thereof as Purchaser may reasonably request; provided, however, that Purchaser shall give Seller reasonable notice in advance of any inspection, any such inspection shall be conducted during normal business hours and not interfere unreasonably with the operations of Seller or the Subject Company. Without limiting the generality of the foregoing, from the date hereof until the Closing, Seller shall use its commercially reasonable efforts to cause the Subject Company to give Purchaser access to employees or contractors of the Subject Company for purpose of discussing the terms of post-Closing retention and negotiating any related agreements with such employees or contractors (if applicable).

   (c) All information furnished or provided by Seller, its Affiliates or their respective representatives to Purchaser or its representatives (whether furnished before or after the hereof) shall be subject to the Confidentiality Agreement.

  3.6 <u>Post-Closing Cooperation.</u> After the Closing Date, Seller shall, and shall cause its Affiliates to, use commercially reasonable efforts to cooperate with Purchaser and the Subject Company with respect to any Actions against the Subject Company that relate to services provided by, or customers of, Seller or its Affiliates (including Blockfolio, Inc.).

  3.7 <u>Maintenance of Books and Records</u>. After the Closing Date, Purchaser shall, until the sixth (6th) anniversary of the Closing Date, preserve, maintain and retain all books, records, other documents and electronically stored information of and relating to the Subject Company and its business, in existence on the Closing Date (collectively, the "<u>Books and Records</u>") and, subject to compliance with applicable Law, make the same available for inspection and copying by Seller, any of Seller's successors or assigns or any trustee in bankruptcy and, in each case, any of their respective representatives upon reasonable notice and during normal business hours, for any reasonable business purpose or compliance with any obligation under any applicable Law, including for the purposes of (a) the preparation or amendment of Tax Returns, financial or court filings or reports of Seller and the Debtors, (b) responding to Orders, subpoenas or

inquiries, investigations, audits or other proceedings of Governmental Entities, (c) prosecuting and defending any Action or for other like purposes, including claims, objections and resolutions in the Bankruptcy Proceeding and (d) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Proceeding. In addition, Seller shall be permitted to retain a copy of the Books and Records for the foregoing purposes it being understood, for the avoidance of doubt, that Seller and its Affiliates shall have no obligation to do so.

3.8     Intellectual Property Matters.

(a)     Purchaser acknowledges and agrees that, for the avoidance of doubt, Seller and its Affiliates (excluding the Subject Company) shall retain all of their existing rights, title and interest in, to and under, and nothing in this Agreement shall be construed to sell, transfer, assign or convey hereunder any Seller Marks. To the extent the Subject Company owns or otherwise holds any right, title or interest in or to any Seller Marks or any other Intellectual Property, effective immediately prior to the Closing, Seller, on behalf of the Subject Company, hereby irrevocably assigns the Subject Company's right, title or interest in such Intellectual Property and/or Seller Marks to Seller, together with, as applicable, (i) all goodwill associated therewith, (ii) all income, royalties, damages and payments now or hereafter due or payable with respect thereto and (iii) the rights to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation or other violation thereof.

(b)     Purchaser and the Subject Company are not acquiring or otherwise obtaining any right, title or interest in or to any Intellectual Property owned by Seller or any of its Affiliates (other than the Subject Company), including the Seller Marks, and at all times following the Closing, Purchaser shall not, and shall cause its respective Affiliates (including, following the Closing, the Subject Company) not to, directly or indirectly, (A) use or otherwise exploit any Intellectual Property owned by Seller or any of its Affiliates, (B) challenge or interfere with Seller's or any of its Affiliates' ownership, use or other exploitation of such Intellectual Property, including efforts to apply for registration, maintain, defend or enforce such Intellectual Property, (C) take any action inconsistent with Seller's or any of its Affiliates' rights in their respective Intellectual Property, or (D) hold themselves out as having any affiliation or association with Seller or any of its Affiliates.

(c)     As promptly as practicable after the Closing Date, but in no event later than twenty (20) Business Days after the Closing, Purchaser shall, and shall cause the Subject Company to, (i) pass the requisite shareholders' or board resolutions, make all filings, pay all requisite fees and take all other actions (including amending bylaws or similar documents, licenses and registrations) necessary to change the legal name, corporate name and business name of the Subject Company to those that do not include or reference any Seller Marks and (ii) promptly take any and all follow-up actions that may be required or requested by any Governmental Entity to effect such changes.

(d)     As promptly as practicable after the Closing Date, but in no event later than twenty (20) Business Days after the Closing Date, Purchaser shall, and shall cause the Subject Company to, delete, destroy or otherwise dispose of all materials in possession or control of Purchaser or the Subject Company that bear the Seller Marks (including signage, advertising, promotional materials, electronic materials, stationery, business cards, website content, emails,

14

forms, training and service literature and materials, and other materials), or, as applicable, alter any such materials so as to remove the Seller Marks; provided, however, that the foregoing does not apply to the historical business records that contain the Seller Marks and are in possession of Purchaser or the Subject Company as of the Closing Date, so long as such records are retained and used solely for Purchaser's or the Subject Company's internal and archival purposes.

(e)     Effective upon the Closing, Purchaser, on behalf of itself and the Purchaser Parties, hereby generally, irrevocably, forever, fully and unconditionally (i) release, waive and discharge the Released Seller Parties from and with respect to any and all liabilities based on, related to or arising out of any purported direct or indirect (including induced or contributory) infringement, misappropriation or other violation of any Intellectual Property, and (ii) waive any benefits of, or reliance on, any applicable Laws that would provide, in sum or substance, that the foregoing release, acquittal or discharge does not extend to liabilities in relation to Intellectual Property that, as of the Closing Date, Purchaser or other Purchaser Parties, do not know to exist, or do not expect to exist, in their favor.

(f)     At all times following the Closing, Purchaser shall not, and shall cause the Purchaser Parties not to, directly or indirectly, institute or prosecute any Actions against the Released Seller Parties based on, related to or arising out of any liabilities described in Section 3.8(e).

(g)     As promptly as practicable following the Closing, to the extent reasonably requested by Seller, Purchaser shall take all actions reasonably necessary to cause the Purchaser Parties to (i) effectuate the release, acquittal, discharge and waiver set forth in Section 3.8(e) and (ii) comply with Section 3.8(f), including by causing such parties to take any necessary corporate action.

3.9     Carve-Out Post-Closing Cooperation. Subject to applicable Law, after the Closing Date, Purchaser shall, and shall cause the Subject Company and any of its subsidiaries and their respective Representatives to, at Seller's sole cost and expense, use commercially reasonable efforts to cooperate with Seller and its Affiliates and their respective Representatives in connection with taking any actions necessary, required or advisable in order to implement the Carve-Out, so that the Carve-Out can be implemented as promptly as reasonably practicable following the Closing (to the extent not implemented prior to the Closing), which cooperation shall include using commercially reasonable efforts to, upon Seller's request: (i) provide information, copies of agreements and materials as may reasonably be requested and instruct appropriate members of senior management, other personnel, and advisors of the Subject Company and its subsidiaries to participate in meetings (it being understood that such meetings may occur telephonically or by videoconferencing) in connection with the Carve-Out; (ii) assist Seller in the preparation of customary documentation required in connection with the implementation of the Carve-Out; and (iii) transfer or cause to be transferred the Subject Company's interests into Quoine Vietnam Company Limited and Quoine India Private Limited to one or more Affiliates of Seller on terms designated by Seller. Each of Purchaser and Seller acknowledges and agrees that Purchaser and Seller's obligations to consummate the Transactions are not subject to the consummation of the Carve-Out.

3.10    Repayment of Debtors' Exchange Balances. Within five (5) Business Days of the date hereof, Purchaser shall, or shall procure that its subsidiaries, repay all crypto and fiat balances of Debtors on exchanges of the Purchaser or its subsidiaries (the "Exchange Balances"), including, for the avoidance of doubt, the crypto-asset exchange operated by bitFlyer, Inc. (the "bitFlyer Exchange"); provided, that such deadline shall be discussed by the Parties acting reasonably and in good faith to the extent Purchaser or its subsidiaries are unable to complete such repayment within five (5) Business Days despite using commercially reasonable efforts to do so. Exchange Balances which are BTC and ETH shall be transferred directly to wallet addresses specified by the Debtors prior to the date hereof. Exchange Balances which are other crypto shall be converted into JPY fiat and then to BTC at the prevailing market price for such transactions available on the "Buy/Sell" service of the bitFlyer Exchange (the "Spot Rate") and such BTC shall be transferred to wallet addresses specified by the Debtors prior to the date hereof. Exchange Balances which are JPY fiat shall be converted into BTC at the Spot Rate and such BTC shall be transferred to wallet addresses specified by the Debtors prior to the date hereof.

## ARTICLE 4

## BANKRUPTCY MATTERS

4.1    Bankruptcy Court.

(a)    As promptly as possible, Seller or its applicable Debtor Affiliates shall (i) seek approval by the Bankruptcy Court of the motion filed by the Debtors on May 23, 2024 to authorize the payment by the Subject Company of the Intercompany Payables in an amount equal to JPY 10,966,000,000; (ii) file with the Bankruptcy Court one or more motions, along with the proposed Sale Order, (A) seeking approval of the sale of the Interests to Purchaser and (B) fixing the time, date and location of the hearing to approve the consummation of the Transactions (the "Sale Hearing"); (iii) notify, as required by the Bankruptcy Code and the Bankruptcy Rules, all parties entitled to notice of such motions and Orders, as modified by Orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court, and such additional parties as such Purchaser may reasonably request; and (iv) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Order.

(b)    Each Party shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with Bankruptcy Court approval of the Transactions, and (ii) keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received from the Bankruptcy Court or any other Person with respect to the Transactions.

(c)    The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order. Seller shall promptly provide Purchaser and its outside legal counsel with copies of all notices, filings and Orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the Sale Order (including, for the avoidance of doubt, any objections or comments received from any party in

interest), or related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser and its outside legal counsel.

(d)     If any Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), Seller agrees to, and agrees to cause its Debtor Affiliates to, use their commercially reasonable efforts, to defend against such appeal, petition or motion, and Purchaser agrees to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

4.2     <u>Alternative Transaction</u>. Consummation of the Transactions is subject to approval by the Bankruptcy Court and the consideration by the Debtor Affiliates and the Bankruptcy Court of higher or better competing bids. From and after the date hereof until three (3) days before the Sale Hearing, as such date may be modified or extended, Seller and its Debtor Affiliates shall be permitted to cause their respective representatives and Debtor Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers to purchase all or any part of the Subject Company and/or its assets (whether in combination with other assets of Seller and the Debtor Affiliates or otherwise) and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, any Order entered into by the Bankruptcy Court applicable to the Transactions or other applicable Law, including supplying information relating to the Subject Company and the assets of the Subject Company to prospective purchasers.

4.3     <u>Orders</u>. Subject to <u>Section 4.2</u> and <u>Section 7.6</u>, each of Seller and Purchaser shall take all actions as may be reasonably necessary to cause the Sale Order to be issued and entered including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" buyer under section 363(m) of the Bankruptcy Code.

4.4     <u>Disclosure of Connections to Debtor Affiliates</u>. From the date hereof until the Closing, Purchaser shall promptly notify Seller in writing upon (i) the entry by Purchaser or any of their Affiliates into any documents, agreements, arrangements, understandings or side letters with any other Person with respect to or relating to the Subject Company or the Transactions or (ii) any change in the accuracy or completeness of the Interested Party Disclosure.

4.5     <u>Post-Closing KEIP Obligations</u>. Following the Closing, Purchaser shall, or shall procure that the Subject Company shall, pay any applicable Transaction Awards to any applicable KEIP Participants within sixty (60) calendar days of the Closing and otherwise in accordance with the terms and conditions set forth in the KEIP Order. Neither Seller nor any of

its Affiliates shall have any obligations for any payments contemplated by the KEIP Order in connection with the Transactions.

# ARTICLE 5

## CONDITIONS TO CLOSING

5.1    <u>Mutual Conditions</u>. The respective obligations of each of Seller and Purchaser to effect the Closing are subject to the satisfaction or waiver by the other Party of the following conditions on or prior to the Closing Date:

(a)    The Bankruptcy Court shall have entered the Sale Order; and

(b)    the Regulatory Condition shall have been satisfied.

5.2    <u>Conditions to the Obligation of Purchaser</u>. The obligation of Purchaser to effect the Closing is subject to the satisfaction or waiver by Purchaser of the following additional conditions on or prior to the Closing Date:

(a)    the representations and warranties of Seller contained in this Agreement shall be true and correct as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date);

(b)    Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date (without regard to <u>Section 7.7</u>); and

(c)    the Release Agreement shall have been duly executed and delivered by Seller and FTX Trading Ltd.

5.3    <u>Conditions to the Obligation of Seller</u>. The obligation of Seller to effect the Closing is subject to the satisfaction or waiver by Seller of the following additional conditions on or prior to the Closing Date:

(a)    the representations and warranties of Purchaser contained in this Agreement shall be true and correct as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date);

(b)    Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date;

(c)    the Release Agreement shall have been duly executed and delivered by Purchaser;

(d)      the Intercompany Payables shall have been repaid in full by the Subject Company; and

(e)      the Exchange Balances shall have been repaid in full as set forth in Section 3.10.

## ARTICLE 6

## TERMINATION

6.1      <u>Grounds for Termination</u>. This Agreement may be terminated at any time:

(a)      by mutual agreement of Seller and Purchaser;

(b)      by either Seller or Purchaser if the Closing has not occurred by September 17, 2024 (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate this Agreement pursuant to this <u>Section 6.1(b)</u> shall not be available to a Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the Closing to have occurred on or prior to the Termination Date;

(c)      by Seller if Purchaser shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.3</u> and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Seller to Purchaser and (B) the Termination Date; <u>provided</u>, that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 6.1(c)</u> if Seller is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.2</u>;

(d)      by Purchaser if Seller shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.2</u>, and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Purchaser to Seller and (B) the Termination Date; <u>provided</u>, that Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 6.1(d)</u> if Purchaser is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.3</u>;

(e)      automatically, if Seller enters into a definitive agreement with a third party with respect to an Alternative Transaction; or

(f)      by Seller, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement could be inconsistent with its or such Person's or body's fiduciary duties; or

(g)    by Purchaser, if the Bankruptcy Proceeding is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code.

6.2    Effect of Termination. If this Agreement is terminated as permitted by Section 6.1:

(a)    no Party shall have any liability or further obligation to any other Party pursuant to this Agreement, except that Article 7 and this Section 6.2 shall remain in full force and survive any termination of this Agreement; provided, however, no such termination shall relieve a Party of any liability or damages to the other Party resulting from any knowing and intentional material breach of this Agreement; and

(b)    Purchaser shall return to Seller all documents, work papers and other material of Seller relating to the Transactions, whether obtained before or after the execution hereof or certify that such documents have been destroyed; and

(c)    the provisions of the Confidentiality Agreement will continue in full force and effect.

## ARTICLE 7

## OTHER MATTERS

7.1    Waiver, Amendment. Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party that would have benefited from the provision had it not been waived.

7.2    Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by a Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.3    No Survival of Representations and Warranties or Covenants. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms. Following the Closing, in no event shall Seller or Purchaser have any recourse against the other or the Purchaser Parties or Seller Parties, respectively with respect to any representation, warranty, covenant or agreement made by Seller or Purchaser, as applicable, in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the Closing Date.

7.4    Expenses. Except as otherwise provided in this Agreement or the Transfer Documents, each of Purchaser and Seller shall bear its own costs and expenses (including

brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Transfer Documents and the Transactions.

       7.5    <u>Notices</u>. All notices, requests and other communications under this Agreement to a Party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile or electronic transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such Party at its address (or number or email) set forth below or such other address (or number or email) as the Party may specify by notice to the other Party.

If to Seller:

       FTX Japan Holdings K.K.
       3-17 Kanda Nishikicho,
       Chiyoda-ku, Tokyo, 101-0054
       Japan
       Attention:  Kurt Knipp, Director
       Email:     kurtsknipp@gmail.com

       *With a copy (which shall not constitute notice) to*:

       Sullivan & Cromwell LLP
       1 New Fetter Lane
       London EC4A 1AN
       United Kingdom
       Attention:  Evan S. Simpson
                  Alexa J. Kranzley
       Telephone: +44 20 7959 8426
              +1 212 558 7893
       Email:     simpsone@sullcrom.com
                kranzleya@sullcrom.com

If to Purchaser:

       bitFlyer Holdings, Inc.
       Midtown Tower 30F
       9-7-1 Akasaka, Minato-ku, Tokyo 107-6230
       Japan
       Attention:   Ryota Sasaki
       Telephone: +81 3 6447 4924
       Email:     ryota.sasaki@bitflyer.com

       *With a copy (which shall not constitute notice) to*:

       Davis Polk & Wardwell
       Izumi Garden Tower 33F

1-6-1 Roppongi, Minato-ku, Tokyo 106-6033
Japan
Attention:   Ken Lebrun
             Timothy Graulich
Telephone: +81 3 5574 2631
             +1 212 450 4639
Email:       ken.lebrun@davispolk.com
             timothy.graulich@davispolk.com

7.6   Specific Performance.

(a)      Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement. Accordingly, each Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including specific performance of such covenants, promises or agreements (including to cause Purchaser to consummate the Transactions and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 7.6 will be in addition to any other rights which a Party may have at Law or in equity pursuant to this Agreement.

(b)      Each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this Section 7.6.

7.7   Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, until the Closing has occurred, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate. For purposes of the condition to Purchaser's obligation to effect the Closing set forth in Section 5.2(b) and termination by Purchaser for breach by Seller pursuant to Section 6.1(d), whether or not Seller has performed the obligations required to be performed by it under this Agreement shall be determined without reference to this Section 7.7.

7.8   Entire Understanding; No Third-Party Beneficiaries. This Agreement, the Transfer Documents and the Confidentiality Agreement together set forth the entire understanding of the Parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the Parties with

respect to the subject matter of this Agreement. In the event of any conflict between this Agreement and the Transfer Documents, the provisions of this Agreement shall prevail. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities; provided that (i) the applicable KEIP Participants shall be third-party beneficiaries of and may enforce the obligations set forth in Section 4.5 and (ii) the counterparties to the Intercompany Payables shall be third-party beneficiaries of and may enforce the condition set forth in Section 5.3(d).

7.9    Assignment. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by a Party (whether by operation of Law or otherwise) without the prior written consent of the other Party, and any purported assignment in violation of this Section 7.9 will be void, except for the following assignments which shall not require any consent and will not be void: (a) assignment to an Affiliate of Seller (provided that Seller remains liable jointly and severally with its assignee Affiliate for the assigned obligations to Purchaser) and (b) assignment by Seller to a succeeding entity following its emergence from the Bankruptcy Proceeding. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by each Party to this Agreement and its successors and permitted assigns.

7.10    Counterparts. This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement. Any such counterpart, to the extent delivered by fax or .pdf, .tif, .gif, .jpg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery"), will be treated in all manner and respects as an original executed counterpart and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No Party may raise the use of an Electronic Delivery to deliver a signature, or the fact that any signature or agreement or instrument was transmitted or communicated through the use of an Electronic Delivery, as a defense to the formation of a contract, and each Party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

7.11    Severability. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

7.12    No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights

and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

7.13    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of Law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such Laws.

(b)    Without limiting a Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Interests, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 7.5; provided, however, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    Each Party consents to process being served by the other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 7.5; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)    Each Party waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

7.14    Damages. Neither Party shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

7.15    Interpretation. (a) As used in this Agreement, references to:

24

(i)      the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)     the Preamble, Recitals, Sections, Exhibits and Schedules refer to the Preamble, a Recital or a Section of, Exhibit to or Schedule to this Agreement unless otherwise indicated;

(iii)    this Agreement refers to this Agreement and the Exhibits and Schedules to it;

(iv)     all references to "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified; and

(v)      all references to "JPY" are to Japanese Yen unless otherwise specified.

(b)      Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation". Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(c)      The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**FTX JAPAN HOLDINGS K.K.**

By: _____

    Name:  Kurt Knipp
    Title:    Director

**PURCHASER**:

**BITFLYER HOLDINGS, INC.**

By: _____

    Name:
    Title:

*[Signature Page to Purchase and Sale Agreement]*

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**FTX JAPAN HOLDINGS K.K.**


By:  _____
               Name:
               Title:




**PURCHASER**:

**BITFLYER HOLDINGS, INC.**

By:  _____
               Name: Yuzo Kano
               Title: CEO

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Action" means any litigation, action, suit, charge, binding arbitration or similar alternative dispute resolution proceeding, or other legal, administrative or judicial proceeding.

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such Person.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2(f).

"Alternative Transaction" means the sale, transfer or other disposition of the Interests in a transaction with a purchaser or transferee other than Purchaser and/or its Affiliates.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

"bitFlyer Exchange" has the meaning set forth in Section 3.10.

"Books and Records" has the meaning set forth in Section 3.7.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York or Tokyo are authorized or required by statute to close.

"Carve-Out" has the meaning set forth in Section 3.1(a).

"Closing" has the meaning set forth in Section 1.3.

"Closing Consideration" has the meaning set forth in Section 1.2.

"Closing Date" has the meaning set forth in Section 1.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the confidentiality agreement, dated March 14, 2024, entered into between FTX Trading Ltd. and Purchaser.

"<u>Debtor Affiliates</u>" means the Debtors and their respective wholly owned subsidiaries.

"<u>Debtors</u>" has the meaning set forth in the Recitals.

"<u>Electronic Delivery</u>" has the meaning set forth in <u>Section 7.10.</u>

"<u>Exchange Balances</u>" has the meaning set forth in <u>Section 3.10</u>.

"<u>Governmental Entity</u>" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the U.S. Securities and Exchange Commission and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors, Purchaser or the Subject Company.

"<u>Intellectual Property</u>" means all rights anywhere in the world in or to: (a) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of same (collectively, "<u>Trademarks</u>"), (b) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues, (c) trade secrets and other confidential or proprietary information or know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists, (d) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of information, mask rights and computer software), copyrights therein, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof, (e) data and databases, and (f) any other intellectual property or proprietary rights.

"<u>Intercompany Payables</u>" means the following intercompany payables owed by the Subject Company to Seller and certain of its Affiliates (whose aggregate amount, for the avoidance of doubt, shall be equal to JPY 10,966,000,000):

| Intercompany Payables Counterparty | Balance as of April 30, 2024 | |
| --- | --- | --- |
| | JPY (millions) | USD (thousands) |
| FTX Japan Holding K.K. | 626 | 3,967 |
| FTX Trading Ltd. | 8,671 | 54,968 |
| Alameda Research Ltd. | 1,266 | 8,027 |
| Quoine Pte Ltd. | 169 | 1,070 |
| West Realm Shires Services Inc. | 252 | 1,600 |
| West Realm Shires Inc. | 13 | 81 |
| **Total** | **10,996** | **69,712** |

"Interested Party Disclosure" has the meaning set forth in Section 2.2(d).

"Interests" has the meaning set forth in the Recitals.

"IT Systems" means any information technology and computer systems, servers, networks, databases, computer hardware and equipment used to process, store, generate, analyze, maintain and operate data or information.

"KEIP Order" means the *Order Authorizing Implementation of a Key Employee Incentive Plan* entered by the Bankruptcy Court on June 8, 2023 (Docket 1589).

"KEIP Participants" has the meaning set forth in the KEIP Order.

"Law" or "Laws" means any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"Lien" means any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation, usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude, restrictive covenant or condition, encroachment, claim, interest, restriction or any other encumbrance of any kind.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbitrator, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceeding.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Permitted Encumbrance" means a restriction on transfer arising solely under applicable federal and state securities Laws or any applicable Laws and any transfer restrictions set forth in the Subject Company's organizational documents.

"Person" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Pre-Closing Period" means (i) all taxable years or other taxable periods (or portions thereof) that end on or before the Closing and (ii) for any taxable period beginning on or before, and, ending after the Closing Date, the portion ending on the Closing Date.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Parties" means, collectively, (i) Purchaser, (ii) each of the current or former Affiliates of Purchaser (including, following the Closing, the Subject Company), and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of

any of the Persons described in clause (i) or clause (ii) of this definition, and (iv) each of the Affiliates of any of the Persons described in clause (iii) of this definition.

"Regulatory Condition" means either of the following conditions with respect to the change of ownership of the Subject Company in connection with the Transactions: (i) none of the Financial Services Agency of Japan and the Kanto Local Finance Bureau of the Ministry of Finance of Japan having provided notice to Seller or Purchaser of its objection to the change of ownership in the Subject Company in connection with the Transactions within thirty (30) calendar days of the date of this Agreement or (ii) all such objections having been resolved at any time.

"Release Agreement" means an agreement by and between the Subject Company, Seller and Purchaser in all material respects in the form attached hereto as Exhibit C.

"Released Seller Parties" means, collectively, Seller, the Debtors (excluding the Subject Company), and each of their current or former Affiliates (excluding the Subject Company), and each of their respective current or former officers, directors, employees, agents representatives, customers, users, licensees, distributors, resellers, suppliers, manufacturers and service providers and each such Person's respective successors and assigns.

"Sale Hearing" has the meaning set forth in Section 4.1(a).

"Sale Order" means an Order entered by the Bankruptcy Court or other court of competent jurisdiction that includes the provisions set forth in Exhibit B hereto, subject to (a) immaterial modifications or clarifications or (b) such other changes to which Purchaser consents (such consent not to be unreasonably withheld, conditioned or delayed).

"Section 245A Election" has the meaning set forth in Section 3.2(c).

"Section 338(g) Election" has the meaning set forth in Section 3.2(c).

"Security Breach" means any security breach or unauthorized access of the IT Systems or data of the Subject Company (including any private keys to digital assets held by the Subject Company on its own behalf or on behalf of its customers), including any successful phishing incident or ransomware attack.

"Seller" has the meaning set forth in the Preamble.

"Seller Marks" means (a) all Trademarks that incorporate, contain or comprise the term "FTX" or the image of the "F" logo or elements thereof, (b) any other variations, derivatives, translations, transliterations and stylizations of any of the foregoing, and (c) any other Trademark confusingly similar to any of the foregoing.

"Seller Parties" means, collectively, (i) Seller, (ii) each of the current or former Affiliates of Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Spot Rate" has the meaning set forth in <u>Section 3.10</u>.

"Subject Company" has the meaning set forth in the Recitals.

"Taxes" means any tax or similar duty, fee, charge or assessment thereof imposed by a Governmental Entity, in each case in the nature of a tax, including any interest, penalties and additions imposed with respect to such amount.

"Tax Return" means any returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns, and any amendments thereto) or any other document supplied or required to be supplied, filed or maintained with respect to any Taxes.

"Termination Date" has the meaning set forth in <u>Section 6.1(b)</u>.

"Trademarks" has the meaning set forth in the definition of "<u>Intellectual Property</u>".

"Transaction Awards" has the meaning set forth in the KEIP Order.

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Documents" means the Release Agreement and any instruments of transfer to be executed by Seller and Purchaser at the Closing which are necessary under applicable Laws to effect the sale, assignment and transfer of the Interests to Purchaser in a form reasonably satisfactory to Seller and Purchaser.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges including any interest, penalties and additions imposed with respect to such amount.

"Treasury Regulations" means the United States Treasury Regulations promulgated under the Code.

[<em>Remainder of page intentionally left blank</em>]

**EXHIBIT B**

**FORM OF SALE ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. ____** |

**ORDER (I) AUTHORIZING AND APPROVING SALE OF DEBTORS' INTERESTS IN FTX JAPAN K.K. FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING FTX JAPAN HOLDING K.K.'S ENTRY INTO, AND PERFORMANCE UNDER, THE PURCHASE AND SALE AGREEMENT; (III) DISMISSING THE CHAPTER 11 CASE OF FTX JAPAN K.K. EFFECTIVE AS OF CLOSING; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Sale Order"), pursuant to sections 105(a), 305(a), 349, 363 and 1112(b) of the Bankruptcy Code, Bankruptcy Rules 1017, 2002, 6004, 9007, 9008 and 9014 and Local Rules 1017-2, 2002-1, 6004-1 and 9006-1, among other things, (a) authorizing and approving the sale (the "Sale Transaction") of all of the outstanding equity interests (the "Interests") held by Debtor FTX Japan Holdings K.K. ("Seller") in Debtor FTX Japan K.K. (the "FTX Japan") to bitFlyer Holdings. Inc. ("Purchaser"), free and clear of all liens, claims, interests and encumbrances in accordance with the terms and conditions set forth in the Agreement, (b) authorizing and approving Seller's entry into, and

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

performance under, the Purchase and Sale Agreement, dated as of June 19, 2024, a copy of which is attached as Exhibit B to the Motion (together with all exhibits and schedules thereto, the "Agreement"), between Seller and Purchaser, (c) dismissing the Chapter 11 Case of FTX Japan, effective upon the transfer of the Interests; and (d) granting related relief; the Court having held a hearing to approve the Sale Transaction pursuant to the terms of the Agreement (the "Sale Hearing") to review and consider (i) the Motion with respect to the Sale Transaction and all relief related thereto, (ii) the Agreement, (iii) the *Declaration of Bruce Mendelsohn in Support of the Sale Transaction* and the *Declaration of Yuzo Kano in Support of the Sale Transaction*, and (iv) any objections thereto that were not resolved prior to the start of the Sale Hearing; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and objections (if any) to the Motion, with respect to the sale of the Interests, having been withdrawn or overruled on the merits; and after due deliberation and good cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      Jurisdiction and Venue.  This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Interests to be sold, transferred or conveyed pursuant to the Agreement, pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This Court may issue a final order on the Motion consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* FED. R. BANKR. P. 7052.

B.     <u>Statutory and Rule Predicates</u>.  The statutory and other legal predicates for the relief requested in the Motion and for the approvals and authorization herein are sections 105(a), 305(a), 349, 363 and 1112(b) of the Bankruptcy Code, Bankruptcy Rules 1017, 2002, 6004, 9007, 9008 and 9014 and Local Rules 1017-2, 2002-1, 6004-1 and 9006-1.

C.     <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedures, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein and authorizes Seller's entry into, and performance under, the Agreement and Seller's, FTX Japan's and FTX Trading Ltd.'s entry into, and performance under, the Release Agreement (as defined in the Agreement) without regard to any stay or delay in their implementation.

D.     <u>Sale Notice</u>.  As shown by the affidavits of service filed with this Court and the representations or proffers made on the record at the Sale Hearing, (a) the Debtors have provided due, good, proper, timely, reasonable, adequate, appropriate and sufficient notice of, and sufficient opportunity to object to, the Motion and the relief requested therein, including, among other things, the Sale Transaction, the dismissal of FTX Japan's Chapter 11 Case effective upon the transfer of the Interests and the entry of this Sale Order in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, (b) such notice was adequate and sufficient under the circumstances of these Chapter 11 Cases, and (c) no other or further notice is necessary or shall be required.

E.      <u>Opportunity to Object</u>.  A fair and reasonable opportunity to object or be heard regarding the relief granted by this Sale Order has been afforded to all interested parties.

F.      <u>No Collusion</u>.  Purchaser is not an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code.  The Agreement and the Sale Transaction were negotiated, proposed and entered into by Seller and Purchaser without collusion or fraud, in good faith and from arm's-length bargaining positions, and are substantively and procedurally fair to all parties.  Neither the Debtors nor Purchaser has engaged in any conduct that would cause or permit the Agreement or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtors nor Purchaser has violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, Purchaser has not acted in a collusive manner with any person and the Closing Consideration (as defined in the Agreement) was not controlled by any agreement among bidders.  The Sale Transaction may not be avoided, and no damages may be assessed against Purchaser or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

G.      <u>Good Faith of Purchaser</u>.  Purchaser is purchasing the Interests in good faith and for value, and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  Purchaser is therefore entitled to all of the protections afforded under section 363(m) and any other applicable or similar bankruptcy or non-bankruptcy law, and otherwise has proceeded in good faith in all respects in connection with this proceeding, the Sale Transaction and the Agreement, in that, *inter alia*: (a) Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Interests; (b) Purchaser in no way induced or caused the filing of these Chapter 11 Cases by the Debtors; (c) all payments to be made, and all

other material agreements or arrangements entered into or to be entered into, by Purchaser in connection with the Sale Transaction have been disclosed; (d) Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (e) the negotiation and execution of the Agreement were at arm's length and in good faith, and at all times each of the Purchaser and Seller were represented by competent counsel of their choosing; and (f) the Purchaser has not acted in a collusive manner with any person.  Purchaser will be acting in good faith within the meaning of section 363(m) in closing the transactions as found and authorized by this Sale Order and contemplated by the Agreement.

H.    <u>Highest and Best Offer</u>.  The Debtors and their advisors, including, without limitation, Perella Weinberg Partners LP, have appropriately marketed the Interests, and a reasonable opportunity has been given to any interested party to make a higher or better offer for the Interests.  No other person or entity or group of entities has offered to purchase the Interests for higher or otherwise better value to the Debtors' estates than Purchaser.  The offer to purchase the Interests made by Purchaser, under the terms and conditions set forth in the Agreement: (a) was made in good faith; (b) is the highest or otherwise best offer obtained for the Interests and will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative; (c) is for fair, adequate and sufficient consideration that constitutes reasonably equivalent value for the Interests being conveyed to Purchaser; (d) is fair and reasonable; (e) is in the best interests of the Debtors' estates; and (f) would not have been made by Purchaser absent the protections afforded to Purchaser by this Sale Order.

I.    <u>Reasonable Exercise of the Debtors' Business Judgment.</u>  The Debtors' determination that the Sale Transaction, pursuant to the Agreement, provides the highest or otherwise best offer for the Interests, and their related decision to sell the Interests, constitute a

reasonable exercise of the Debtors' business judgment.  The facts and circumstances described in the Motion and the evidence adduced in connection with the Sale Hearing demonstrate the Debtors' business judgment to sell the Interests to Purchaser at this time, and the Debtors have articulated sound business reasons for consummating the Sale Transaction and for selling the Interests outside of a chapter 11 plan.  Moreover, the sale of the Interests outside of a chapter 11 plan pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor dictates the terms of any chapter 11 plan.  The Sale Transaction does not constitute a *sub rosa* chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver and consummate the Sale Transaction, subject to this Sale Order.

J.      Fair Consideration.  The Closing Consideration provided by Purchaser pursuant to the Agreement (a) is fair and reasonable, (b) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and (c) constitutes fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

K.      No Successor or Other Derivative Liability.  As a result of any action taken in connection with the Sale Transaction, the Agreement, or this Sale Order: (a) Purchaser is not a successor to, mere continuation of, alter ego of, or substantial continuation of the Debtors or their estates and there is no continuity of enterprise between Purchaser and the Debtors; and (b) Purchaser shall not be deemed to be holding itself out to the public as a continuation of the Debtors based on the Sale Transaction, this Sale Order or the Agreement.  Purchaser is not, and shall not be, considered a successor in interest to any of the Debtors or their estates, by reason of any theory of law or equity, and the Sale Transaction, this Sale Order or the Agreement do not

amount to, separately or together, a consolidation, succession, merger, or de facto merger of

Purchaser and the Debtors and/or the Debtors' estates.  Purchaser would not have entered into

the Agreement if the sale of the Interests were not made free and clear of any successor liability

of Purchaser.  Except as expressly provided for in this Sale Order or the Agreement, Purchaser

shall not have any liability, responsibility or other obligation to the Debtors or their estates

arising under or related to the Interests prior to the Closing.  Without limiting the generality of

the foregoing, Purchaser shall not, by virtue of the Sale Transaction, be liable for any claims

against the Debtors or any of their predecessors or affiliates, and Purchaser shall have no

successor or vicarious liabilities of any kind or character, including, but not limited to, under any

theory of antitrust, environmental (subject to paragraph 17 below), successor or transferee

liability, securities law, tax law, labor law, products liability law, employment law, pension law,

ERISA law, de facto merger, mere continuation, alter ego, veil piercing, escheat, continuity of

enterprise or substantial continuity, or other applicable law, rule or regulation, or theory of

liability, whether known or unknown as of the Closing Date, now existing or hereafter arising,

whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether

liquidated or unliquidated, including, but not limited to, liabilities on account of warranties,

environmental liabilities (subject to paragraph 17 below) and any taxes arising, accruing or

payable under, out of, in connection with, or in any way relating to the operation of any of the

Interests prior to the Closing (collectively, the "Successor or Other Liabilities").

      L.    Corporate Power and Authority.  As set forth in Sections 2.1(a) and 2.2(a)

of the Agreement, each of Purchaser and Seller (a) has the requisite power and authority to enter

into, execute and deliver the Agreement and all other documents contemplated thereby, (b) has

(with respect to Seller, upon entry of this Sale Order) the requisite power and authority to

perform all of the obligations to be performed under the Agreement, including the Sale

Transaction, and (c) has taken all corporate action and formalities necessary to authorize, execute

and deliver the Agreement and the consummation of the Sale Transaction.  Seller's sale of the

Interests has been duly and validly authorized by all necessary corporate action.  No consents or

approvals, other than this Sale Order and those expressly provided for in the Agreement, are

required for Seller to consummate the Sale Transaction.

      M.     <u>No Fraudulent Conveyance or Fraudulent Transfer Claims.</u>  The

Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors

under the Bankruptcy Code or under the laws of the United States, any state, territory, possession

or the District of Columbia.  Neither the Debtors nor Purchaser are entering into the Sale

Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance

and fraudulent transfer claims.

      N.     <u>Title to Assets</u>.  The transfer of the Seller's rights, titles and interests to the

Interests to Purchaser will be, as of the Closing (as defined in the Agreement), a legal, valid and

effective transfer of such rights, titles and interests in the Interests, which transfer vests or will

vest Purchaser with all rights, titles and interests of the Seller to the Interests free and clear of

any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation,

usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude,

restrictive covenant or condition, encroachment, claim, interest, restriction or any other

encumbrance of any kind ("<u>Liens</u>"), other than restrictions on transfer arising solely under

applicable federal and state securities laws or any applicable laws and any transfer restrictions set

forth in the FTX Japan's organizational documents ("<u>Permitted Encumbrances</u>").  The

Agreement is a valid and binding contract between Seller and Purchaser and shall be enforceable according to its terms.

O.    <u>Satisfaction of Section 363(f) Standards</u>.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full, and upon entry of this Sale Order, the Debtors are authorized to transfer all of their rights, titles and interests in and to the Interests free and clear of any interest in the property, other than Permitted Encumbrances.  The Debtors may sell the Interests free and clear of all Liens because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each holder with a Lien on the Interests to be transferred pursuant to the Agreement: (a) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented; (b) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; or (c) otherwise falls within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  Holders of Liens against the Debtors, their estates or the Interests who did not object, or who withdrew their objections, to the Sale Transaction or the Motion, with respect to the sale of the Interests (except with respect to Permitted Encumbrances), are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All other holders of Liens are adequately protected by having their Liens, if any, in each instance against the Debtors, their estates or the Interests, attach to the net cash proceeds of the Sale Transaction ultimately attributable to the Interests in which such creditor alleges a Lien, in the same order of priority, with the same validity, force and effect that such Liens had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

P.     <u>Transfer of the Interests Free and Clear of Liens.</u>  Purchaser would not have entered into the Agreement and would not consummate the Sale Transaction if the sale of the Interests to Purchaser were not free and clear of all Liens (other than Permitted Encumbrances), or if Purchaser or any of the Purchaser Parties (as defined in the Agreement) would, or in the future could, be liable for any such Lien.  The Closing Consideration to be provided under the Agreement reflects Purchaser's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to, interest in and possession of the Interests free and clear of all Liens (other than Permitted Encumbrances).  Not transferring the Interests free and clear of all Liens (other than Permitted Encumbrances) would adversely impact the Debtors' efforts maximize the value of the estates, and the transfer of the Interests other than pursuant to a transfer that is free and clear of all Liens (other than Permitted Encumbrances) would be of substantially less benefit to the Debtors' estates.

Q.     <u>Waiver of Bankruptcy Rules 6004(h) and 6006(d).</u>  Good and sufficient reasons for approval of the Agreement and the Sale Transaction have been articulated.  The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale Transaction other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates.  Accordingly, there is cause to waive or lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with respect to the Sale Transaction.  To maximize the value of the Interests, it is essential that the Sale Transaction occur within the time constraints set forth in the Agreement.  Time is of the essence in consummating the Sale Transaction and the Debtors and Purchaser

intend to close the Sale Transaction as soon as practicable.  Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Closing Consideration under the Agreement, the proposed Sale Transaction should be approved.

R.     <u>Compliance of the Sale Transaction with the Bankruptcy Code.</u>  The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

S.     <u>Dismissal of FTX Japan's Chapter 11 Case upon the Transfer of the Interests</u>.  The Debtors have demonstrated that there is cause to dismiss FTX Japan's Chapter 11 Case upon the transfer of the Interests and that such dismissal is in the best interest of the creditors and the Debtors' estates.

T.     <u>Personally Identifiable Information</u>.  The Sale Transaction does not involve the sale of any personally identifiable information.  Thus, the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

U.     <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and the evidence adduced in connection with the Sale Hearing establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their estates.

IT IS HEREBY ORDERED THAT:

**A.     General Provisions**

1.      The sale of the Interests and the other relief requested in the Motion is granted as set forth herein, and the Agreement and the provisions thereof and the Sale Transaction are approved in their entirety as set forth herein.

2.      All objections, responses, reservations of rights and requests for any continuances concerning the Motion are resolved in accordance with the terms of this Sale Order as set forth in the record of the Sale Hearing.  To the extent any such objections, responses, reservations of rights or requests for any continuances were not otherwise withdrawn, waived, settled, or resolved, such are hereby overruled and denied on the merits.  All interested parties that failed to timely object to the Motion, with respect to the Sale Transaction, are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      Notice of the Motion, the Agreement, the sale of the Interests free and clear of all Liens, except Permitted Encumbrances, the Sale Transaction and the dismissal of FTX Japan's Chapter 11 Case upon the transfer of the Interests was fair, equitable, proper, and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, 9008, 9014 and Local Rules 2002-1, 6004-1 and 9006-1.

**B.     Approval of the Agreement**

4.      The Agreement and all of the terms and conditions thereof, including the Release Agreement, are hereby authorized and approved in all respects.  The failure to specifically include or make reference to any particular provision of the Agreement in this Sale

Order shall not impair the effectiveness of such provision, as it is the intent of this Court that the Agreement and the Sale Transaction are authorized and approved in their entirety.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction to Purchaser in accordance with the terms and conditions of the Agreement, (b) close the Sale Transaction as contemplated in the Agreement and this Sale Order, and (c) execute and deliver, perform under, consummate and implement the Agreement and the Release Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale Transaction. Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order; provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

6.      This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors of and holders of equity interests in, the Debtors, any holders of Liens in, against or on all or any portion of the Interests (whether known or unknown), Purchaser and all successors and assigns of Purchaser, the Interests and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to Chapter 7 under the Bankruptcy Code of these Chapter 11 Cases.  This Sale Order, the Agreement and the Release Agreement shall inure to the benefit of the Debtors, their estates and creditors, Purchaser and the respective successors and assigns of each of the foregoing.

C.      **Consummation of the Sale Transaction**

7.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer all of their rights, titles and interests to the Interests to Purchaser on the Closing Date (as defined in the Agreement) and such transfer shall constitute a legal, valid, binding and effective transfer of such rights, titles and interests in the Interests and shall vest Purchaser with all of the Debtors' rights, titles and interests in the Interests and, upon the Debtors' receipt of the Closing Consideration, shall be free and clear of all liens, claims, interests and encumbrances, including but not limited to, Successor or Other Liabilities, any other successor or successor-in-interest liability, or any tax liens or mechanic's liens asserted against the Interests, except Permitted Encumbrances, with all Liens to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such Liens now have against the Interests, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.  The provisions of this Sale Order authorizing and approving the transfer of the Interests free and clear of all Liens (other than Permitted Encumbrances) shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

8.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record except Permitted Encumbrances.

9.      If any person or entity which has filed statements or other documents or agreements evidencing Liens in, against or on all or any portion of the Interests shall not have

delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to all or any portion of the Interests, the Debtors, Purchaser and each of their respective officers, employees and agents are hereby authorized and empowered to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Interests.

10.     This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens existing as to the Interests prior to the Closing Date, except Permitted Encumbrances, shall have been unconditionally released, discharged and terminated from the Interests, and that the conveyances described herein have been effected without any further action required by the Purchaser.  This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

**D.     <u>Prohibition of Actions Against Purchaser</u>**

11.     Except as expressly provided for in this Sale Order or the Agreement, Purchaser shall not have any liability, responsibility or other obligation to the Debtors or their

estates arising under or related to the Interests (a) prior to the Closing or (b) from or after the Closing but which arise out of or relate to any act, omission, circumstance, breach, default or other event occurring prior to the Closing.  Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity (including, without limitation, any Successor or Other Liabilities).  Without limiting the generality of the foregoing, Purchaser shall not, by virtue of the Sale Transaction, be liable for any claims against the Debtors or any of their predecessors or affiliates, and Purchaser shall have no Successor or Other Liabilities or vicarious liabilities of any kind or character.  The Sale Transaction does not amount to a consolidation, succession, merger or de facto merger of Purchaser, on the one hand, and the Debtors, the Debtors' affiliates and/or the Debtors' estates, on the other hand, and there is not substantial continuity between Purchaser, on the one hand, and the Debtors or their affiliates, on the other hand, and Purchaser is not a mere continuation or alter ego of the Debtors or their estates, and Purchaser does not constitute a successor to the Debtors or their estates.  For purposes of paragraphs 11 to 14 of this Sale Order, all references to Purchaser shall include the Purchaser Parties.

12. Except as expressly otherwise set forth in the Agreement and this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants and other creditors, holding Liens (other than permitted Encumbrances) against or in all or any portion of the Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors or the Interests prior to the Closing or the transactions contemplated by the Agreement, including the transfer of the Interests to Purchaser, hereby are forever barred,

estopped and permanently enjoined from asserting against Purchaser, its affiliates, its successors or assigns, their property or the Interests, such persons' or entities' Liens (other than Permitted Encumbrances) with respect to the Interests, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Purchaser, its affiliates, its successors, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against Purchaser, its affiliates, its successors, assets or properties; (c) creating, perfecting or enforcing any Liens against Purchaser, its affiliates, its successors, assets or properties; (d) asserting any unexercised set-off or right of subrogation against any obligation due Purchaser, its affiliates or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate FTX Japan, except with respect to the Permitted Encumbrances.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens (other than Permitted Encumbrances) in or on the Interests, if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

13.      All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere (a) with the ability of the Debtors and/or Seller to sell and transfer the Interests to Purchaser in accordance with the terms of the Agreement and this Sale Order, and (b) with the ability of Purchaser to acquire and take possession of the Interests in accordance with the terms of the Agreement and this Sale Order.

14.     Purchaser has given substantial consideration under the Agreement for the benefit of the Debtors and their estates.  The Closing Consideration given by Purchaser shall constitute valid and valuable consideration for the sale being free and clear of any potential liens, claims, interests, and encumbrances, including any Liens, as to the Interests pursuant to this Sale Order, except with respect to the Permitted Encumbrances, and free and clear of any potential claims of successor liability against the Purchaser.  The Closing Consideration provided by Purchaser for the Interests under the Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

**E.     Dismissal of FTX Japan's Chapter 11 Case upon the transfer of the Interests**

15.     Pursuant to sections 105(a), 305(a) and 1112(b) of the Bankruptcy Code, FTX Japan's Chapter 11 Case is dismissed effective upon the transfer of the Interests.

16.     Notwithstanding section 349 of the Bankruptcy Code, references in prior orders of this Court to "the Debtors" or "the Chapter 11 Cases" or similar references shall apply to FTX Japan with respect to periods on and including the date of this Order, but shall not apply to FTX Japan with respect to periods after this Order.

**F.     Other Provisions**

17.     Nothing in this Sale Order or the Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property following the Closing. In addition, nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law, including the jurisdiction to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

18.     Further, nothing in this Sale Order or Agreement authorizes the transfer or assignment of any governmental license, permit, registration, authorization or approval, or the

discontinuation of any obligation thereunder, if such transfer or assignment would not be in compliance with all applicable legal requirements and approvals under police or regulatory law as appropriate.

19.     Notwithstanding anything to the contrary in the Motion, this Sale Order, or any findings announced at the Sale Hearing, nothing in the Motion, this Sale Order, or announced at the Sale Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

20.     The Closing Consideration provided by Purchaser to the Debtors pursuant to the Agreement for the Interests (a) is fair and reasonable, (b) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, its equivalents, and section 548 of the Bankruptcy Code) and (c) constitutes fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

21.     The sale of the Interests does not include the sale of any causes of action held by any of the Debtors against any person or entity, including but not limited to causes of action against Samuel Bankman-Fried, Gary Wang, Nishad Singh, Caroline Ellison or any person known by the Debtors to have a familial relationship with any of the foregoing persons.

22.     The Sale Transaction is undertaken by Purchaser without collusion and in good faith, within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction, unless such authorization and

such Sale Transaction were duly stayed pending such appeal at the time of the Closing.

Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code

and, as such, is entitled to the full rights, benefits, privileges and protections of section 363(m) of

the Bankruptcy Code.  The Debtors and Purchaser will be acting in good faith if they proceed to

consummate the Sale Transaction at any time after the entry of this Order.

23.     As a good faith purchaser of the Interests, Purchaser has not entered into

an agreement with any other potential bidders, and has not colluded with any other bidders,

potential bidders, or any other parties interested in the Interests, and therefore, neither the

Debtors nor any successor-in-interest to the Debtors' estates shall be entitled to bring an action

against Purchaser, and the Sale Transactions may not be avoided pursuant to section 363(n) of

the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to

section 363(n) in respect of the Agreement or Sale Transaction.

24.     Nothing contained in any plan of reorganization or liquidation, or order of

any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent Chapter 7 case into

which these Chapter 11 Cases may be converted or (c) any related proceeding subsequent to

entry of this Sale Order, shall conflict with or derogate from the provisions of the Agreement or

the Release Agreement or the terms of this Sale Order.  In the event there is a conflict between

this Sale Order and the Agreement (or any ancillary agreements executed in connection

therewith), this Sale Order shall control and govern.  Likewise, all of the provisions of this Sale

Order are non-severable and mutually dependent.  To the extent that this Sale Order is

inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11

Cases, the terms of this Sale Order shall control.

25.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Sale

Order shall be effective and enforceable immediately upon entry, the Debtors and Purchaser are

authorized to close the Sale Transaction immediately upon entry of this Sale Order, and the 14-

day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall

not apply.

26.     The failure specifically to include any particular provision of the

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of this Court that the Agreement be authorized and approved in its entirety;

provided, however, that this Sale Order shall govern if there is any inconsistency between the

Agreement (including all ancillary documents executed in connection therewith) and this Sale

Order.

27.     The Agreement and any related agreements, documents or other

instruments may be modified, amended or supplemented by the parties thereto and in accordance

with the terms thereof, without further order of this Court, provided that any such modification,

amendment or supplement does not have a material adverse effect on the Debtors' estates or any

of the Debtors' creditors.  If the Agreement is modified, the Debtors shall file the modified

version with the Court.

28.     Pursuant to the terms of and subject to the conditions contained in the

Agreement, following the Closing, Seller, its successors and assigns and any trustee in

bankruptcy, and, in each case, any of their respective representatives, will have access to the

books and records related to the Interests subject to the terms of, and for the specified purposes

set forth in, and in accordance with, Section 3.7 of the Agreement.

29.     This Court shall retain exclusive jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

30.     The Agreement and the Release Agreement shall be in full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

31.     No bulk sales law, bulk transfer law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes (as defined in the Agreement)) shall apply to the Debtors' conveyance of the Interests or this Sale Order.

32.     The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

33.     Nothing in this Sale Order shall affect the obligations, if any, of the Debtors, Purchaser, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

34.     Nothing in this Sale Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impairing or diminishing any right (including any right of recoupment), claim, chose in action, cause of action, defense, offset or

counterclaim in respect of any asset that is not the Interests, except as provided in the Release

Agreement.

        35.     All time periods set forth in this Sale Order shall be calculated in

accordance with Bankruptcy Rule 9006(a).

Dated: _____

              Wilmington, Delaware

                                                The Honorable John T. Dorsey
                                              United States Bankruptcy Judge

**EXHIBIT C**

**FORM OF RELEASE AGREEMENT**

## RELEASE AGREEMENT

This RELEASE AGREEMENT (this "Agreement") is made as of _____, 2024, by and among FTX Japan K.K., a company incorporated under the laws of Japan ("FTX Japan"); bitFlyer Holdings, Inc., a company incorporated under the Laws of Japan ("Purchaser"); FTX Trading Ltd., an Antigua company ("FTX Trading"); and FTX Japan Holdings K.K., a company incorporated under the laws of Japan ("Seller"). Capitalized terms used, but not otherwise defined herein, have the meanings given to such terms in the Purchase Agreement (as defined below).

### RECITALS

WHEREAS, on June 19, 2024, Seller and Purchaser entered into that certain share purchase agreement (the "Purchase Agreement"), pursuant to which Seller agreed to sell, at the Closing, all of the outstanding equity interests in FTX Japan to Purchaser; and

WHEREAS, in connection with the transactions contemplated by the Purchase Agreement, the parties desire to grant the releases set forth in this Agreement.

NOW, THEREFORE the parties hereto agree as follows:

Section 1.        Release by Purchaser and FTX Japan.

Subject to and effective upon the occurrence of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the date hereof, Purchaser and FTX Japan on behalf of themselves, their Affiliates and their respective successors and assigns, to the fullest extent permitted by Law, hereby generally, irrevocably, forever, fully and unconditionally release, waive and discharge, each of FTX Trading, Seller and their Affiliates (but excluding FTX Japan), together with their respective officers, directors, employees, agents, advisors and representatives, and each such Person's respective successors and assigns (collectively the "FTX Debtor Releasees"), from and with respect to any and all claims, obligations, rights, suits, damages, causes of actions, choses in actions, remedies and liabilities, of any kind, nature or description ("Claims"), whether known or unknown, contingent or not contingent, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, perfected or unperfected, subordinated or unsubordinated, joint or several, vested or unvested, executory, determined determinable or otherwise, whether or not the same is required to be accrued on the financial statements of any Person and howsoever arising, whether based on any Law or right of action, and whether arising under any contract, agreement, arrangement, commitment or undertaking or in tort, which Purchaser and FTX Japan, each on behalf of themselves and their Affiliates, or any of them, ever had or now has or can have or shall or may hereafter have against the FTX Debtor Releasees (the "FTX Japan Released Matters"). The releases contemplated herein are intended to be as broad as permitted by Law and are intended to, and do, extinguish all Claims of any kind whatsoever, whether at Law or in equity or otherwise, that are based on or relate to facts, conditions, actions or omissions (known or unknown) with respect to the FTX Japan Released Matters that have existed or occurred at any time prior to and including the date hereof, other than any Claims of Purchaser arising out of the Purchase Agreement and the Transactions contemplated thereby.

Section 2.    <u>Release by Seller and FTX Trading.</u>

Subject to and effective upon the occurrence of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the date hereof, Seller and FTX Trading on behalf of themselves, their Affiliates and their respective successors and assigns, to the fullest extent permitted by Law, hereby generally, irrevocably, forever, fully and unconditionally release, waive and discharge, FTX Japan and its subsidiaries as of the Closing, together with their successors and assigns (the "<u>FTX Japan Releasees</u>"), from and with respect to any and all Claims, whether known or unknown, contingent or not contingent, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, perfected or unperfected, subordinated or unsubordinated, joint or several, vested or unvested, executory, determined determinable or otherwise, whether or not the same is required to be accrued on the financial statements of any Person and howsoever arising, whether based on any Law or right of action, and whether arising under any contract, agreement, arrangement, commitment or undertaking or in tort, which Seller and FTX Trading, each on behalf of themselves and their Affiliates, or any of them, ever had or now has or can have or shall or may hereafter have against FTX Japan Releasees (the "<u>FTX Debtors Released Matters</u>"). The releases contemplated herein are intended to be as broad as permitted by Law and are intended to, and do, extinguish all Claims of any kind whatsoever, whether at Law or in equity or otherwise, that are based on or relate to facts, conditions, actions or omissions (known or unknown) with respect to the FTX Debtors Released Matters that have existed or occurred at any time prior to and including the date hereof, other than any Claims of Seller arising out of the Purchase Agreement and the Transactions contemplated thereby.

Section 3.    <u>California Civil Code Waiver.</u>

Each of the parties hereto hereby expressly waives to the fullest extent permitted by Law the provisions, rights and benefits of California Civil Code Section 1542 (or any similar Law), which provides:

*A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.*

Section 4.    <u>Miscellaneous.</u>

(a)    This Agreement and the Purchase Agreement together set forth the entire understanding of the parties hereto relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the parties hereto with respect to the subject matter of this Agreement. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the parties hereto or their respective successors, any rights, remedies, obligations or liabilities; <u>provided</u>, that <u>Section 1</u> of this Agreement shall be enforceable by any FTX Debtor Releasee and that <u>Section 2</u> of this Agreement shall be enforceable by any FTX Japan Releasee.

(b)     Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each party or, in the case of a waiver, by the party that would have benefited from the provision had it not been waived.

(c)     This Agreement will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each party shall be determined in accordance with such laws.

(d)     Without limiting a party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 4(f); provided, however, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, each party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such legal, administrative or judicial proceedings, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each party hereby irrevocably waives, to the fullest extent permitted by applicable laws, any objection which it may now or hereafter have to the laying of venue of any such action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each party consents to process being served by the other party in any legal, administrative or judicial proceedings by delivery of a copy thereof in accordance with the provisions of Section 4(f); provided, however, that such service will not be effective until the actual receipt thereof by the party being served. Each party waives any right to trial by jury in any legal, administrative or judicial proceedings regarding this Agreement or any provision hereof.

(e)     As used in this Agreement, references to (i) the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement, and (ii) the Preamble, Recitals or Sections refer to the Preamble, a Recital or a Section of this Agreement unless otherwise indicated. Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the person referred to may require. The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

(f)     All notices, requests and other communications under this Agreement to a party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile or electronic transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered

by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such party at its address (or number or email) set forth below or such other address (or number or email) as the party may specify by notice to the other parties.

If to Seller and/or FTX Trading:

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Attention: John J. Ray III
Email: jray@greylockpartnersllc.com

*With a copy (which shall not constitute notice) to*:

Sullivan & Cromwell LLP
1 New Fetter Lane
London EC4A 1AN
United Kingdom
Attention:  Evan S. Simpson
            Alexa J. Kranzley
            Nirav N. Mehta
Telephone: +44 20 7959 8426
            +1 212 558 7893
            +81 3 3213 6142
Email:      simpsone@sullcrom.com
            kranzleya@sullcrom.com
            mehtan@sullcrom.com

If to Purchaser and/or FTX Japan:

bitFlyer Holdings, Inc.
Midtown Tower 30F
9-7-1 Akasaka, Minato-ku, Tokyo 107-6230
Japan
Attention:  Ryota Sasaki
Telephone: +81 3 6447 4924
Email:      ryota.sasaki@bitflyer.com

*With a copy (which shall not constitute notice) to*:

Davis Polk & Wardwell
Izumi Garden Tower 33F
1-6-1 Roppongi, Minato-ku, Tokyo 106-6033
Japan
Attention:  Ken Lebrun
            Timothy Graulich
Telephone: +81 3 5574 2631
            +1 212 450 4639
Email:      ken.lebrun@davispolk.com
            timothy.graulich@davispolk.com

(g)    This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

[*Signatures Page Follows*]

**FTX JAPAN K.K.**

By: _____

    Name:
    Title:

**BITFLYER HOLDINGS, INC.**

By: _____

    Name:
    Title:

**FTX TRADING LTD.**

By: _____

    Name:
    Title:

**FTX JAPAN HOLDINGS K.K.**

By: _____

    Name:
    Title:

**SCHEDULE I**

**INTERESTS**

| Name of Seller | FTX Japan Holdings K.K. |
|---|---|
| Interests | 43,148 shares consisting of:<br><br>• 28,846 ordinary shares,<br><br>• 6,000 Class A preferred shares,<br><br>• 8,002 Class B preferred shares, and<br><br>• 300 Class C preferred shares. |
| Subject Company | FTX Japan K.K. |