## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 4861, 4862, 4863, 14843, 15520, 15221, 16800, 16805, 16816, 16817, 16818, 16820, 16822, 16836, 16864, 16992, 16995, 17004 & 17428.** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION OF DEBTORS
FOR ENTRY OF AN ORDER (I) APPROVING THE ADEQUACY OF THE
DISCLOSURE STATEMENT; (II) APPROVING THE SOLICITATION PACKAGES;
(III) APPROVING THE FORMS OF BALLOTS; (IV) ESTABLISHING VOTING,
SOLICITATION AND TABULATION PROCEDURES;
AND (V) ESTABLISHING NOTICE AND OBJECTION PROCEDURES
<u>FOR THE CONFIRMATION OF THE PLAN</u>**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

REPLY ...................................................................................................................................3

I.   MDL Counsel Are Not Parties-In-Interest in These Chapter 11 Cases and Do Not Have Standing to Prosecute the MDL Objection.................................................4

    A.   MDL Counsel Is Not a Party-in-Interest in These Chapter 11 Cases ....................5

    B.   MDL Counsel Does Not Have Standing to Object to the Motion .........................7

II.   Parties Who Do Not Comply With Bankruptcy Rule 2019 Should Not Be Heard ............9

    A.   The MDL Counsel Have Not Complied with Bankruptcy Rule 2019.................. 10

    B.   The Kavuri Parties Have Violated Disclosure Obligations Under Bankruptcy Rule 2019 ........................................................................................ 10

III.   The Disclosure Statement Contains Adequate Information Under Section 1125 of the Bankruptcy Code....................................................................................................16

    A.   The Disclosure Statement Adequately Explains the Voluntary Subordination of the Governmental Authorities' Claims .................................... 18

    B.   The Disclosure Statement Adequately Describes the Universe of Significant Claims and Litigation Against the Debtors ....................................... 20

    C.   The Disclosure Statement Adequately Explains the Release Provisions and the Anti-Double Dip Provision in the Plan. .......................................................... 23

    D.   The Disclosure Statement Adequately Describes the Customer Property Settlement and the Estimation of Claims as of the Petition Date ........................ 25

    E.   The Disclosure Statement Adequately Describes the MAPS and OXY Litigation........................................................................................................... 26

    F.   The Remaining Kavuri Objections Should Be Overruled ................................... 27

IV.   The Plan Is Confirmable and the Remaining Objections Should Be Addressed at Plan Confirmation..........................................................................................................29

    A.   The Discharge and Opt-Out Provisions in the Plan Are Appropriate.................. 30

    B.   The Plan Does Not Discriminate Unfairly.......................................................... 32

C.      The Plan Was Proposed in Good Faith ................................................................ 35

D.      The Plan Satisfies Section 1129(a)(7) of the Bankruptcy Code. .......................... 37

E.      The Remaining MDL Counsel Objections Should Be Overruled ......................... 37

V.      The Remaining Objections Are Moot or Otherwise Fail.....................................................38

CONCLUSION........................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AAC Holdings, Inc.*,
  Case No. 20-11648 (JTD) (Bankr. D. Del. Sept. 1, 2020) ..........................................................8

*In re AbitibiBowater Inc.*,
  2010 WL 4823839 (Bankr. D. Del. Nov. 22, 2010) .................................................................8

*In re Am. Cap. Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012) .............................................................................................29, 30

*In re Breitburn Energy Partners LP*,
  582 B.R. 321 (Bankr. S.D.N.Y. 2018) ..................................................................................33

*In re Cardinal Congregate I*,
  121 B.R. 760 (Bankr. S.D. Ohio 1990) .................................................................................29

*In re CDECO Mar. Const. Inc.*,
  101 B.R. 499 (Bankr. N.D. Ohio 1989) .............................................................................21, 25

*In re Celsius Network LLC, et al.*,
  Case No. 22-10964 (MG) ...................................................................................................20

*In re Central Med. Ctr., Inc.*,
  122 B.R. 568 (Bankr. E.D. Mo. 1990) ..................................................................................33

*Century Glove, Inc.* v. *First Am. Bank of N.Y.*,
  860 F.2d 94 (3d Cir. 1988) .............................................................................................16, 37

*In re Cred Inc., et al.*,
  Case No. 20-12836 (JTD) (April 19, 2021) .............................................................................24

*In re Dakota Rail, Inc.*,
  104 B.R. 138 (Bankr. D. Minn. 1989) ...................................................................................29

*In re Delphi Corp.*,
  Case No. 05-44481 (Bankr. S.D.N.Y. Dec. 7, 2007) ..............................................................21

*In re E.S. Bankest, L.C.*,
  321 B.R. 590 (Bankr. S.D. Fla. 2005) ....................................................................................6

*In re Gawker Media LLC*,
  Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. Feb. 8, 2017) ...................................................10

*In re Genesis Global Holdco, LLC*,
    2024 WL 2264719 (Bankr. D. Del. May 17, 2024) ...............................................................8

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011) .................................................................................................5

*In re GOL Linhas Aereas Inteligentes S.A.*,
    2024 WL 1716490 (Bankr. S.D.N.Y. Apr. 22, 2024) ............................................................5

*In re Imerys Talc Am., Inc.*,
    Case No. 19-10289 (LSS) (Bankr. D. Del. Mar. 12, 2021) ...................................................8

*In re Indianapolis Downs LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) .....................................................................................8

*In re Ionosphere Clubs, Inc.*,
    101 B.R. 844 (Bankr. S.D.N.Y. 1989) ..................................................................................8

*In re James Wilson Assocs.*,
    965 F.2d 160 (7th Cir. 1992) ................................................................................................7

*Krystal Cadillac-Oldsmobile GMC Truck, Inc.* v. *Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003)..........................................................................................16, 22

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (Bankr. D.N.J. 2005) .....................................................................................17

*In re Dynegy, Inc.*
    770 F. 3d 1064 (2d Cir 2014)................................................................................................6

*In re Mallinckrodt PLC*
    Case No. 20-12522 (JTD) (Bankr. D. Del. 2020) ...............................................................17

*In re Mallinckrodt PLC*,
    Case No. 23-11258 (JTD) (Bankr. D. Del. Oct. 10, 2023) ..................................................24

*In re Monroe Well Serv.*,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ....................................................................................29

*Oneida Motor Freight, Inc.* v. *United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988)...........................................................................................17, 27

*In re PBS Brand Co.*,
    Case No. 20-13157 (JKS) (Apr. 28, 2021) ..........................................................................24

*In re PC Liquidation*,
    383 B.R. 856 (Bankr. E.D.N.Y. 2008) ................................................................................21

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................................17

*In re Quigley Co.*,
391 B.R. 695 (Bankr. S.D.N.Y. 2008) ...................................................................8

*In re RTI Holding Co.*,
Case No. 20-12456 (JTD) (Dec. 21, 2020) ..........................................................24

*In re Unichem Corp.*,
72 B.R. 95 (Bankr. N.D. Ill. ), *aff'd*, 80 B.R. 448 (N.D. Ill. 1987) ........................29

*In re Vantage Drilling Int'l*,
603 B.R. 538 (D. Del. 2019) ...................................................................................7

*In re Wash. Mut., Inc.*,
419 B.R. 271, 274 (Bankr. D. Del. 2009) .............................................................10

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) *aff'd*, 729 F.3d 332 (3d Cir. 2013) ............................33

**Statutes**

11 U.S.C. § 502 .........................................................................................................26

11 U.S.C. § 1109 ......................................................................................................5, 6

11 U.S.C. § 1123 ..............................................................................................32, 33, 35

11 U.S.C. § 1125 ....................................................... *passim*, 12, 16, 21, 23

11 U.S.C. § 1129 ...........................................................................................30, 35, 36, 37

11 U.S.C. § 1141 ..................................................................................................30, 31

**Other Authorities**

F.R.B.P. 2019 ...........................................................................2, 7, 9, 10, 11, 12, 15

F.R.B.P. 3016 ...........................................................................................................17

F.R.B.P. 7023 ...........................................................................................................6

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this reply (the "Reply") in support of the *Motion of Debtors for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation Packages; (III) Approving the Forms of Ballots; (IV) Establishing Voting, Solicitation and Tabulation Procedures; and (V) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. 4863] (the "Motion")[2] and in response to the objections, limited objections, letters, and reservations of rights (collectively, the "Objections", and the parties who filed the Objections, collectively, the "Objecting Parties") to the Motion and the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. its Affiliated Debtors and Debtors-in-Possession* [D.I. 15521] (as may be amended, supplemented or modified from time to time and including all appendices thereto, the "Disclosure Statement").  In further support of this Reply, the Debtors submit the concurrently filed *Declaration of Alexa J. Kranzley* (the "Kranzley Decl.").  The Debtors respectfully request that the Objections be overruled and the Motion granted.

## PRELIMINARY STATEMENT

1.      These Chapter 11 Cases are at a critical milestone where the Debtors are in position to solicit votes and seek confirmation of a Plan that is projected to fully satisfy the Allowed Claims of customers and other creditors.  To get here, the Debtors have worked closely alongside each of their key stakeholders in these Chapter 11 Cases, including the Official Committee of Unsecured Creditors, the Ad Hoc Committee of Non-U.S. Customers (the "Ad Hoc Committee"), the Joint Official Liquidators of FTX Digital Markets (the "JOLs") and the class action claimants in *Onusz, et al*. v. *West Realm Shires Inc., et al*., Adv. Pro. No. 22-50513

---

[2]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

(JTD) (the "Class Action Claimants"), to develop and propose a consensual chapter 11 Plan that maximizes recoveries to creditors. Each of these important stakeholders, along with many others including the Department of Justice on behalf of the Internal Revenue Service, and BlockFi Lending LLC and BlockFi International Ltd. (the Debtors' single largest creditor), support the consensual Plan.

2.      The support for the Plan and the adequacy of the Disclosure Statement is evident from the paucity of objections received despite this being one of the most complex Chapter 11 Cases in history and the Debtors having millions of stakeholders. A total of only 14 objections and other responses were received. The Debtors have and continue to work in good faith to resolve the Objections, with numerous changes made to the Disclosure Statement and the Solicitation Package to address expressed concerns that have or are expected to resolve many of the Objections.

3.      Nonetheless, a small number of parties have persisted in pursuing objections that lack merit and are designed to advance parochial interests in defending or pursuing litigation unrelated to the Motion or the Plan. Certain of the Objectors lack standing to even pursue their Objections, or should not be heard because of their failure to comply with Bankruptcy Rule 2019. The Court should reject all these efforts to interfere with the approval of the Disclosure Statement and solicitation of the Plan—critical steps in the Debtors' process of returning value to creditors.

4.      The Debtors seek approval of the Disclosure Statement, which provides significant and adequate information regarding the Plan, and approval of the Motion to, among other things, solicit and tabulate votes on the Plan. These Chapter 11 Cases are unique and complex, and the Debtors' diverse creditor body has varying levels of familiarity with

bankruptcy law and process.  Accordingly, the Debtors have tailored the Disclosure Statement to explain the Plan and what it means for customers and other creditors so they can make an informed decision regarding the Plan.

5.      The Debtors submit that there can be no serious dispute that the Disclosure Statement provides adequate information regarding the Plan and should be approved.  The Disclosure Statement is thorough and complete, beginning with an executive summary of over 25 pages that explains the key terms of the Plan, the rationale for certain decisions made with respect to the Plan and charts detailing the treatment and anticipated recoveries of each class of creditors under the Plan.  The Disclosure Statement also includes detailed information regarding the most controverted issues in these Chapter 11 Cases, such as the customer property settlement, The Bahamas liquidation proceeding, the sale of the Debtors' digital assets, the Debtors' diligent efforts alongside the UCC and the AHC to monetize assets and explore strategic alternatives, and the Court's estimation of claims based on digital assets.

6.      A number of the Objections were filed in the guise of inadequate disclosure, but are nothing more than premature Plan confirmation objections that are reserved and will be addressed by the Court at a later date.

7.      The Disclosure Statement satisfies the relevant standards for adequate disclosure under section 1125 of the Bankruptcy Code.  For these and the reasons discussed below, the Court should overrule any remaining objections, grant the Motion and approve the Disclosure Statement and Solicitation Package.

**REPLY**

8.      The Debtors received fourteen total Objections to the Motion, including three pro se letters that the Debtors are treating as Objections.  The Debtors were in discussions

with the U.S. Trustee prior to and after it filed its objection, and as a result of these discussions, have been able to consensually resolve the U.S. Trustee Objection with changes to the proposed Order approving the Motion, the proposed Solicitation Procedures and other materials in the Solicitation Package.[3]  The Debtors incorporated additional language in the Disclosure Statement where appropriate, and continue to work with the other Objecting Parties to resolve the remaining Objections consensually ahead of the hearing.  For ease of reference, the Debtors have prepared a summary of changes made to the Disclosure Statement and Plan in response to certain of the Objections, which is attached hereto as Exhibit 1 (the "Omnibus Reply Chart").  The Plan is confirmable, and the portions of the Objections interposing premature objections to the Plan are not ripe or before the Court at this time.

## I.    MDL Counsel Are Not Parties-In-Interest in These Chapter 11 Cases and Do Not Have Standing to Prosecute the MDL Objection.

9.    The Moskowitz Law Firm, PLLC and Boies Schiller Flexner LLP  are co-lead counsel ("MDL Counsel")  in the multi-district litigation captioned *In re FTX Cryptocurrency Exchange Collapse Litigation*, Case No. 23-md-03076 (the "MDL").  As detailed in the adversary proceeding the FTX Debtors were recently forced to file concerning certain purported settlements MDL Counsel has insisted on pursuing, the MDL has recovered no material value for creditors.[4]  Rather than create any independent value for FTX customers, for nearly a year MDL Counsel has maligned these Chapter 11 Cases and the Debtors in the apparent hope of diverting away from the Debtors' estate and the jurisdiction of this Court some of the substantial forfeiture proceeds the Department of Justice has recovered with the

---

[3]    The U.S. Securities and Exchange Commission filed a reservation of rights that raised a similar issue as one raised by the U.S. Trustee, and the Debtors understand that the changes to the proposed Solicitation Package similarly resolves this reservation of rights.

[4]    *See FTX Trading Ltd.* v. *Chernyavsky,* Adv. Pro. No. 24-50072.

cooperation of the Debtors.  In one recent submission, MDL Counsel endorsed the statement that the bankruptcy process is viewed "as second act of theft."  Diverting the forfeiture proceeds to the MDL (rather than to the Debtors) would allow the forfeiture proceeds to be distributed in a manner inconsistent with this Court's ruling about the valuation of digital assets, contrary to the consensual and pro rata creditor distribution waterfall provided by the Plan, and would allow MDL Counsel to assess substantial contingency fees at the expense of all creditors.

10.    While MDL Counsel have an economic interest in the fees it could earn through this strategy, MDL Counsel are not, themselves, a party-in-interest in these Chapter 11 Cases and do not have standing to make the MDL Objection.  Nothing in the Motion or the Debtors' Disclosure Statement directly affects the interests of MDL Counsel.  Indeed it is unclear who MDL Counsel are even purporting to represent in these Chapter 11 Cases, or how they could represent any creditor in these Chapter 11 Cases when their central objective is to divert forfeiture proceeds away from the Debtors' estates to the detriment of all creditors. Accordingly, MDL Counsel should not be heard with respect to the Motion.

**A.    MDL Counsel Is Not a Party-in-Interest in These Chapter 11 Cases.**

11.    Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).  In the Third Circuit, a "party in interest" is "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding" or "who has a sufficient stake in the proceeding so as to require representation."  *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) (internal citations omitted).  In general, an entity that does not hold a financial or legal stake in the case is

typically excluded from the definition of "party in interest."  7 COLLIER ON BANKRUPTCY, ¶ 1109.03, at 1 (Alan R. Resnick & Henry J. Sommer eds., 16th ed.).

12.    MDL Counsel, in their capacity as co-lead counsel in the MDL, are not themselves a party-in-interest in these Chapter 11 Cases pursuant to the plain language of section 1109(b).  They are not "a creditor, an equity security holder, or [an] indenture trustee," nor can they claim to be one.  *See* 11 U.S.C. § 1109(b).  Nor do they represent a *certified class* of FTX customers as they continue to misleadingly suggest; even if they did (they do not), nothing in the MDL Objection establishes that MDL Counsel represents anyone with respect to any FTX customer's individual claims against the FTX Debtors in these Chapter 11 Cases.

13.    Accordingly, even broadly interpreting section 1109(b), MDL Counsel lacks the "sufficient stake" or the "legally protected interest" in these Chapter 11 Cases to be treated as a party-in-interest.  *See In re Mallinckrodt*, 639 B.R. 837, 861 (Bankr. D. Del. 2022) (ruling putative class representative lacked standing to file objection on behalf of putative class because it never sought class certification under Bankruptcy Rule 7023); *E.S. Bankest, L.C.*, 321 B.R. 590, 595-96 (Bankr. S.D. Fla. 2005) (explaining that "only creditors with some interest in a distribution from the estate or those parties with equitable claims against the estate qualify as parties in interest") (collecting cases).  The MDL Objection fails to show why and how MDL Counsel have any recognized stake or interest that is directly and adversely affected by the Motion or the Disclosure Statement.  Accordingly, the MDL Objection fails to state on what basis the MDL Counsel has any legitimate interest in these Chapter 11 Cases, and the MDL Objection should therefore not be considered.[5]

---

[5]    It is black letter law that MDL Counsel cannot represent putative class members in these Chapter 11 Cases because no class has been certified by the MDL court, and no class has been recognized by this Court. *Smith* v. *Bayer Corp.*, 564 U.S. 299, 313 (2011) (holding "a nonnamed class member is [not] a party to the class-action litigation *before the class is certified*") (emphasis in original). *See also*; *see Lucas v. Dynegy,*

14.    Notably, MDL Counsel fail to identify any creditors who they represent with respect to claims against the FTX Debtors.  Nor could they without jeopardizing their status as unconflicted MDL counsel for the putative class of FTX customers whose interests MDL Counsel purport to serve.  In fact, MDL Counsel make clear in their objection that "the claims asserted in the FTX MDL **do not include claims against the Debtors**."  (MDL Obj. ¶ 8) (emphasis in original); *see also id.* ¶ 19 ("[R]ecoveries from the MDL would **not** duplicate customer recoveries in this case because, among other things, the Debtors are not defendants in the MDL and the claims asserted in the MDL . . . are asserted against non-Debtor defendants with their own liabilities, none of whom are being released under the Plan.")  (emphasis in original).  Thus, MDL Counsel lack the "sufficient stake" and the "legally protected interest" to be treated as a party in interest in these Chapter 11 Cases.  *See In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) (indicating "legally protected interest" in the bankruptcy proceeding is the claim against the debtor's estate).

**B.    MDL Counsel Does Not Have Standing to Object to the Motion.**

15.    Even if MDL Counsel qualified as a party-in-interest in these Chapter 11 Cases (they do not), they would altogether lack standing to prosecute the arguments set forth in the MDL Objection.  Nothing in the Motion or the Disclosure Statement directly and adversely implicates the rights or interests of MDL Counsel or any of the named MDL class plaintiffs in their capacities as such.  *See In re Vantage Drilling Int'l*, 603 B.R. 538, 545 (D. Del. 2019) ("[B]ankruptcy standing is its own particular breed of standing" and requires a "statement of or identification of a pecuniary or an economic or property interest before [the] court that is

---

*Inc. (In re Dynegy, Inc.)*, 770 F.3d 1064, 1068 (2d Cir. 2014) ("[T]o the extent [a party] has fiduciary obligations as lead plaintiff in the [class action] litigation, those obligations do not 'confer on him the status of a class representative in the bankruptcy proceeding for a class that has never been designated.'").

susceptible to redress and as to which parties should be able and afforded an opportunity to address the Bankruptcy Court.").

16.     Courts have long held that "it is important that a bankruptcy court is not too facile in granting applications for standing.  Overly lenient standards may potentially over-burden the reorganization process by allowing numerous parties to interject themselves into the case on every issue, thereby thwarting the goal of a speedy and efficient reorganization."  *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850 (Bankr. S.D.N.Y. 1989) (internal citations omitted).

17.     As a result, courts frequently conclude that a party has standing to challenge relief sought by a debtor only to the extent that such relief adversely affects the direct interests of the objecting party.  *See, e.g.*, *In re Genesis Global Holdco, LLC*, 2024 WL 2264719 at *35 (Bankr. D. Del. May 17, 2024) (concluding that a party lacked standing to challenge distributions under the reorganization plan because it had "no direct economic interest in the manner in which value is being distributed" under the plan); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) ("In the context of a confirmation hearing, creditors 'have standing only to challenge those parts of a reorganization plan that affect their direct interests.'") (quoting *In re Orlando Investors, L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989)); *In re Mallinckrodt PLC*, 639 B.R. 837, 860-861 (Bankr. D. Del. 2022) (concluding that a party who had opted out of third-party releases did not have standing to object to such releases since it had no direct economic interest in the releases);  *In re Quigley Co.*, 391 B.R. 695, 705 (Bankr. S.D.N.Y. 2008) ("[A] 'party in interest' cannot assert third party rights defensively to defeat confirmation even if confirmation would directly and adversely affect its own rights.  Instead, the objecting party can only challenge the parts of the plan that directly implicate its own rights and interests."); *In re AbitibiBowater Inc.*, 2010 WL 4823839 at *8-9 (Bankr. D. Del.

Nov. 22, 2010) (concluding that objecting parties, who allege that a proposed plan discriminated

unfairly against employees of a non-debtor entity, did not have standing since "there is no plan

provision that directly or adversely affects the pecuniary interests of [those employees]").

Accordingly, standing determinations should be made on a particularized basis as to each

objection.

18.    The MDL Objection raises a litany of issues that do not implicate any

rights or interests of MDL Counsel or any of the named MDL class plaintiffs in that capacity.

For example, MDL Counsel falsely argues that the Plan "permit[s] unequal treatment among

creditors in the same class and does not appear to have been proposed in good faith . . . because,

among other things, the Plan proposes to completely exclude all creditors from representation on

the Wind Down Board of the Consolidated Wind Down Trust . . . ." (MDL Obj. ¶ 2).  MDL

Counsel also take the position that the "Plan centrally premised on (i) a forced settlement of a

central issue in these cases—whether customer cryptocurrency held by the Debtors constitutes

property of the Estates—and (ii) agreements with federal governmental entities that have not

been, and may never be, struck is [sic] at best premature and, worse, misleading to creditors

entitled to vote on the Plan."  (*Id.* ¶¶ 1-2.)

19.    MDL Counsel themselves concede they do not have claims against the

Debtors in that proceeding.  (*Id.* ¶ 1.)  Therefore, nothing about the Debtors' Plan's proposed

treatment of creditors or the Debtors' proposed settlements with creditors or governmental

agencies directly or adversely affects any of their rights or interests.  As such, MDL Counsel do

not have standing and the MDL Objection should be overruled.

## II.    Parties Who Do Not Comply With Bankruptcy Rule 2019 Should Not Be Heard.

20.    Pursuant to Bankruptcy Rule 2019, an entity, including a law firm, "that

represents[] multiple creditors . . . that are . . . acting in concert to advance their common

interests" by "tak[ing] a position before the court" is required to file a verified statement with

information about such creditors, including names and holdings.  *See, e.g.*, *In re Imerys Talc*

*Am., Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. Mar. 12, 2021) [D.I. 3088] (ordering law

firms representing creditors, including a law firm that filed an objection to a disclosure statement

on behalf of creditors, to file statements under Bankruptcy Rule 2019 within five days).  The rule

provides that the Court has discretion to remedy a failure to comply by refusing to permit the

entity or group to be heard.  Fed. R. Bank. P. 2019(e); *see In re Gawker Media LLC*, Case No.

16-11700 (SMB) (Bankr. S.D.N.Y. Feb. 8, 2017) [D.I. 743] (enjoining group from being heard

or intervening in chapter 11 case due to non-compliance with Rule 2019).

      A.     **The MDL Counsel Have Not Complied with Bankruptcy Rule 2019.**

      21.     The MDL Counsel do not identify a single person or entity they represent

*in its capacity as a creditor of the Debtors*.  If MDL Counsel do in fact represent anywhere from

two to "thousands of plaintiffs" (as they misleadingly trumpet) with respect to claims in these

Chapter 11 Cases, MDL Counsel have failed to file a compliant verified statement in accordance

with Bankruptcy Rule 2019(b)(1) despite being instructed to do so by the Debtors.  *See In re*

*Wash. Mut., Inc.*, 419 B.R. 271, 274 (Bankr. D. Del. 2009) (holding that Bankruptcy Rule 2019

requires disclosure from members of group representing more than one creditor).  Unless and

until they comply with Bankruptcy Rule 2019, the MDL Counsel should not be heard by this

Court with respect to the Motion.

      B.     **The Kavuri Parties Have Violated Disclosure Obligations Under Bankruptcy**
             **Rule 2019.**

      22.     Unlike MDL Counsel, the four parties identified in the Kavuri Objection:

Sunil Kavuri, Ahmed Abd El-Razek, Pat Rabbitte and Noia Capital SARL (collectively, the

"Kavuri Parties"), purport to be creditors of the Debtors.  It is indisputable that, as creditors, they

-10-

have been acting in concert to advance their interests in these Chapter 11 Cases.  They commenced an adversary proceeding against the Debtors on January 31, 2024 and have been filing various objections in these Chapter 11 Cases since early January 2024.  Counsel to the Kavuri Parties has flagrantly disregarded its Bankruptcy Rule 2019 mandatory disclosure obligations about each of the Kavuri Parties and its respective holdings.

23.    The confusion created by the lack of mandatory disclosure is compounded here because one or more of the Kavuri Parties purports to be acting on behalf of other undisclosed creditors.  Sunil Kavuri, an online personality and self-named "FTX Creditor Champion," has been promoting a so-called "FTX Customers Ad Hoc Committee" (the "<u>Kavuri Group</u>") on X (formerly known as Twitter) and through an unsanctioned website "ftxvote.com" (the "<u>Kavuri Voting Website</u>").  As discussed below, the Kavuri Voting Website has been soliciting "no" votes against the Plan under a lock-up mechanism in which creditors provide the Kavuri Parties a voting proxy.  To help with that solicitation, Mr. Kavuri has been representing through the Kavuri Voting Website that he has formed, and speaks on behalf of, a group with more than 1,700 (anonymous) customers that collectively hold approximately $890 million in claims against the Debtors.  *See FTX Customer and Ad Hoc Committee Website*, FTX VOTE.COM, https://ftxvote.com/en.[6]  The Debtors believe this statement to be false, but without compliance with Bankruptcy Rule 2019, the Debtors have no means to ascertain the truth of these assertions.

24.    Notwithstanding these public representations on the Kavuri Voting Website and in social media posts, the Kavuri Parties have failed to disclose to the Debtors or the Court *any* single other creditor that has actually joined their group of four creditors, or that they

---

[6]    Mr. Kavuri has made similar representations through related social media activities.  *See*, *e.g.*, @sunil_trades, X (April 3, 2024, 4:26 AM), https://x.com/sunil_trades/status/1775439837656469511 ("We are the largest voting bloc with 1415 claims and $700m claim.").  *See* Kranzley Decl. Ex. B.

-11-

speak on behalf of any such creditors.  The Kavuri Parties are sowing confusion online, and therefore it is imperative that they and their counsel comply with the disclosure requirements of Bankruptcy Rule 2019 and, if they fail to do so, their objection should not be considered by this Court.  Fed. R. Bank. P. 2019(e).

25.     The situation is further exacerbated because the Kavuri Parties are blatantly violating section 1125(b) of the Bankruptcy Code by openly soliciting customers to "join the FTX Customer Ad-Hoc Committee (CAHC) and Vote: NO" on the Plan.  *See FTX Customer and Ad Hoc Committee Website*, FTX VOTE.COM, https://ftxvote.com/en.  *See* Kranzley Dec. Ex. I.



26.     Solicitation of lock-up agreements prior to the approval of the Disclosure Statement is plainly impermissible and the Debtors reserve all rights and remedies, especially in light of the fact that many of the creditors solicited by Mr. Kavuri appear to be persons with smaller holdings who may not be familiar with chapter 11 proceedings.  *See* 11 U.S.C. § 1125

("rejection of a plan may not be solicited . . . unless, at the time of or before such solicitation, there is . . . a written disclosure statement approved, after notice and a hearing"); *see also Century Glove, Inc.* v. *First Am. Bank of New York*, 860 F.2d 94, 102 (3d Cir. 1988) (Section 1125 "bars the untimely solicitation of an acceptance or rejection" of a plan of reorganization.). Mr. Kavuri has also been soliciting votes and spreading misinformation about the Plan and these Chapter 11 Cases through his personal social media posts, including improperly soliciting creditors to "join [his group] to vote NO" to the Debtors' Plan[7] and declared that he would "vote NO to any plan and [stated that] FTX creditors should do the same."[8]  Mr. Kavuri also recently told creditors that they "have to **vote no** to the plan."[9] (emphasis in original).



**Sunil (FTX Creditor Champion)** ✔
@sunil_trades

**FTX voting block**

**FTX plan** due to filed on 7 May
1) S&C likely include clauses to absolve their liability for crimes
2) S&C puppet John Ray secure position for himself
3) Property rights not recognised

**1500 members** we are the largest voting block vs. Eversheds (40 claim buyer members)

We are the **customer ad hoc** - the real victims of FTX fraud

Join us to vote **NO** and **maximise recovery** for customers, hold **fraud co-conspirators** liable

ftxvote.com/en

---

[7]    @sunil_trades, X (May 5, 2024, 7:32 AM), https://x.com/sunil_trades/status/1787083028612673694.  *See* Kranzley Dec. Ex. C.

[8]    @sunil_trades, X (April 28, 2024, 3:31 AM), https://x.com/sunil_trades/status/1784485644154057160.  *See* Kranzley Dec. Ex. D.

[9]    @sunil_trades, X (June 8, 2024, 11:13 AM), https://x.com/sunil_trades/status/1799459701014294568.  *See* Kranzley Dec. Ex. E.



**Sunil (FTX Creditor Champion)** ✔
@sunil_trades

You have to vote **no** to the plan. I talk about FTT holder losses –even included it in my victim impact statement.

FTT is the same as every crypto holder. FTT should be given back if they still hold it.

Furthermore class action lawsuits aim to recover losses

27.     The Kavuri Voting Website further invites creditors to "make [their] voice heard" by joining the Kavuri Group and agreeing to abide by the Kavuri Group's Bylaws (the "Bylaws"), which purport to require members to lockup their vote and "vote against any proposed plan in the Restructuring unless the Chairman and Steering Committee have assessed such plan and recommended that members vote in favour." (Bylaws § 7).   *See* Kranzley Dec. Ex. J.  This is precisely the type of activity that violates section 1125(b).  *See, e.g.*, *In re GOL Linhas Aereas Inteligentes S.A.*, 2024 WL 1716490 (Bankr. S.D.N.Y. Apr. 22, 2024) (holding plan vote lockup provision impermissible).[10]

28.     The Kavuri Voting Website expressly states that the Kavuri Parties' counsel at McCarter & English represents the so-called ad hoc committee of 1,700.[11]  This confusion should be cleared up as well.  Through his personal social media posts, Mr. Kavuri has led question and answer sessions on the Debtors' proposed Plan and provided incorrect, misleading and inaccurate information regarding the Debtors' proposed Plan and these Chapter 11 Cases.  *See, e.g.*, @arush, X (Jun. 17, 2024, 9:59 AM),

---

[10]   Mr. Kavuri's impermissible negative solicitation efforts attracted attention from the press.  *See, e.g.*, Nina Bambysheva, "Why FTX's Generous Bankruptcy Payouts Still Leave Some Creditors Cold," Forbes,  (Jun. 10, 2024) (available online at Why FTX's Generous Bankruptcy Payouts Still Leave Some Creditors Cold (forbes.com)) (noting that "Kavuri and Sehgal, who are leading the Customer Ad-Hoc group, are urging creditors to vote against it"); Abdelaziz Fathi, "FTX creditors to receives 118 cents on dollar, call for crypto payouts," Finance Feeds,  (May 8, 2024) (available online at FTX creditors to receives 118 cents on dollar, call for crypto payouts | FinanceFeeds (noting that Mr. Kavuri has "advised against supporting the reorganization plan").

[11]   http://www.ftxvote.com/en.  *See* Kranzley Dec. Ex. I.

-14-

https://x.com/arush/status/1802702682458608054.  *See* Kranzley Dec. Ex. F.  In many

circumstances, he provides advice on legal matters that is clearly incorrect, presumably without

consulting McCarter & English, despite naming them as counsel and creating the impression he

speaks in reliance upon their advice.

29.     Mr. Kavuri's inappropriate conduct does not end there.  He has been

intercalating his incorrect, misleading and inaccurate social media posts about events in these

Chapter 11 Cases with other inappropriate, inflammatory, and offensive posts.  *See*, *e.g.*,

@sunil_trades, X (May 22, 2024, 11:22 AM),

https://x.com/sunil_trades/status/1793301307446411683 (stating that "John Ray [is] not acting in

interests of FTX customers") (*See* Kranzley Dec. Ex. G); @sunil_trades, X (April 30, 2024, 5:21

PM), https://x.com/sunil_trades/status/1785238100693647814 (replying to a post from another

account stating that the relationship between Sullivan & Cromwell, Rothschild & Co.,

Wasserman and Paradigm was "[q]uite a Zionist circle, just like Celsius," Mr. Kavuri noted

"[a]bsolutely. Zionists are satanic")  (*See* Kranzley Dec. Ex. I).

30.     The Debtors have used social media only sparingly in these Chapter 11

Cases.  The Debtors' speech is largely contained in their submissions to this Court or references

pointing interested parties to the docket, where false statements have consequences.  The Kavuri

Parties' social media antics aside, if they are going to act in concert *in these proceedings*—

whether it be the four on whose behalf the Kavuri Objection was filed or some larger group—the

Kavuri Parties and their counsel must first comply with Bankruptcy Rule 2019.  If they fail to do

so, the Court should not hear from them with respect to the Motion.  *See, e.g.*, *In re Gawker*

*Media LLC*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. Feb. 8, 2017) [D.I. 743] (enjoining

group from being heard or intervening in chapter 11 case due to non-compliance with Rule

2019); *In re Motors Liquidation Co.*, Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Feb. 23, 2011) [D.I. 9405] (ordering group of noteholders to timely comply with the requirements of Rule 2019 or "the Group's submission will not be considered").

### III. The Disclosure Statement Contains Adequate Information Under Section 1125 of the Bankruptcy Code.

31.    Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding such plan to holders of impaired claims and interests entitled to vote on such plan. 11 U.S.C. § 1125.  Specifically, section 1125(a)(1) of the Bankruptcy Code provides, in relevant part, as follows:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

32.    As detailed in the Motion, the primary purpose of a disclosure statement is to provide adequate information such that creditors and interest holders affected by a proposed plan can make an informed decision regarding whether or not to vote for the plan.  *See, e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc.* v. *Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (providing that a disclosure statement must contain "adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); *Century Glove, Inc.* v. *First Am. Bank of N.Y.*, 860 F.2d at 100 ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

33.     "Adequate information" is a flexible standard, based on the facts and circumstances of each case.  11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records. . . ."); *see also Oneida Motor Freight, Inc.* v. *United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (Bankr. D.N.J. 2005) ("The information required will necessarily be governed by the circumstances of the case.").

34.     In defining the contours of "adequate information," courts have identified categories of information that generally should be included in a disclosure statement.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (listing 19 general categories, yet noting that the categories of information required in any specific case is a fact-specific determination).  Importantly, as this Court has stated in *In re Mallinckrodt*, Case No. 20-12522 (JTD) (Bankr. D. Del. 2020), the information in a "disclosure statement only has to provide general descriptions; it doesn't have to provide detailed information." *Hr'g Tr.* 59:18-21, June 2, 2021.

35.     Here, the Disclosure Statement is approximately 161 pages long, excluding exhibits.  It contains general descriptions of—and in many cases detailed information about—categories of information necessary for creditors to make an informed decision, including:

- an executive summary of the Plan and the Disclosure Statement, which provides a summary of the challenges faced in developing the Plan, the highlights of the Plan and the rationale for each major decision made in proposing the Plan (§ 1.A-L);

- the Debtors' corporate history, structure and business operations (§ 2.A);

- factors leading to the commencement of these Chapter 11 Cases, including a detailed description of the control failures that led to the collapse of the FTX exchanges (§ 2.B);

- significant events in these Chapter 11 Cases, including a description of the settlement with The Bahamas, the settlement of the customer property dispute and the settlement with the Department of Justice regarding the Internal Revenue Service's tax claims (§ 3.A-T);

- a summary of the Plan, which includes classification and treatment of claims and interests under the Plan and provisions governing distributions and implementation of the Plan (§ 4.A-G);

- information regarding the statutory requirements for confirmation of a plan, certain important effects of confirmation of the Plan and how to vote on the Plan (§§ 5-6);

- certain risk factors that holders of claims should consider before voting to accept or reject the Plan and information regarding alternatives to confirmation of the Plan (§§ 7 and 9); and

- a summary of certain material U.S. federal income tax consequences of the Plan (§ 8).

36.    As detailed in the Motion and for the reasons set forth below, the Debtors submit that the Disclosure Statement more than provides "adequate information" necessary to allow all creditors to make an informed decision to vote on the Plan, and all Objections to the Motion on the basis of a lack of adequate information in the Disclosure Statement should be overruled.

**A.    The Disclosure Statement Adequately Explains the Voluntary Subordination of the Governmental Authorities' Claims.**

37.    The Texas State Securities Board, the Texas Department of Banking and the State of Texas through the Consumer Protection Division of the Office of the Texas Attorney

-18-

General (the "Texas SSB"),[12] and MDL Counsel argue that the Disclosure Statement does not discuss the material impact on distributions or creditor recoveries in the event the Debtors are unable to reach agreements with governmental agencies to subordinate their claims.  (Texas SSB Obj. ¶ 9; MDL Obj. ¶ 40).  This is inaccurate.  The Disclosure Statement explains, in sections 1.G, 3.T, and 7.C.13, that there is no assurance that governmental authorities will agree to subordinate their claims, or on what terms such governmental authorities will agree to subordinate their claims.  In addition, section 7.C.13 of the Disclosure Statement explains that refusal by governmental authorities to subordinate their claims could decrease distributions available to other stakeholders, and may require the Debtors to reserve amounts on account of such claims, which could impact or delay distributions.  Nevertheless, to accommodate the Texas SSB and the NJ BOS, the Debtors have included additional language in the Disclosure Statement as noted in the Omnibus Reply Chart, further clarifying the potential risks to the Plan in the event the Debtors are unable to reach agreements with governmental agencies to subordinate their claims and the fact that, absent subordination, any such Allowed Claims would be *pari passu* with General Unsecured Claims.

38.     The Texas SSB also argues that the Debtors' estimations for subordinated governmental claims do not include the Texas SSB's $840 million claim.  (Texas SSB Obj. ¶ 7).  This is correct because the proof of claim form as filed by the Texas SSB listed $840,000, and not $840 million, as the claim amount.  The Texas SSB asserts that their claim is $840 million rather than $840,000 and the amount reflected on the claim form is a clerical error.  The Debtors dispute and reserve all rights with respect to the claim.  In any event, an objection to the

---

[12]   The New Jersey Bureau of Securities (the "NJ BOS") filed a reservation of rights [D.I. 16805] to the Disclosure Statement with respect to the proposed subordination of its claims against the Debtors.  Following discussions with the NJ BOS, the Debtors understand that the NJ BOS shares the Texas SSB's objection with respect to the Disclosure Statement's alleged lack of disclosure regarding governmental claims.

adequacy of the Disclosure Statement is not the proper place to litigate the amount of the Texas

SSB claim.  To accommodate the Texas SSB, the Debtors have inserted additional language as

noted in the Omnibus Reply Chart, providing that creditor recoveries may be impacted if the

Court ultimately allows the SSB claim in the amount of $840 million.

39.    The Texas SSB further argues that the "Debtors have not explained why

the estimated recovery for the Subordinated Governmental Claims is only between 3% and 18%,

compared to, for example, 125% recovery for General Unsecured Claims and 129% - 143% for

Digital Asset Loan Claims."  *See id.*  Again, this is inaccurate.  The Debtors spend several pages

and sections in the Disclosure Statement describing how, if the Debtors reach agreement with

various governmental authorities to subordinate their claims, those governmental authorities will

forego a certain percentage of their recoveries, and customers and certain creditors will be

eligible for distributions from the Supplemental Remission Fund from amounts otherwise

distributable on account of Senior Subordinated Governmental Claims.  *See* Disclosure

Statement sections 1.E; 4.B.6.

**B.      The Disclosure Statement Adequately Describes the Universe of Significant
          Claims and Litigation Against the Debtors.**

40.    Mohsin Meghji, as Litigation Administrator for Celsius Network LLC and

its affiliated debtors (the "Celsius Administrator") alleges that, while the Debtors dedicate

several pages to discuss other cryptocurrency bankruptcies, the Debtors do not mention the

pending Celsius chapter 11 proceedings, *In re Celsius Network LLC, et al.*, Case No. 22-10964

(MG) ("Celsius"), or certain actions the Celsius Administrator is attempting to pursue against the

Debtors, namely:  (i) the 103 proofs of claim filed by Celsius against the Debtors under various

theories of law; and (ii) the preference actions the Celsius Administrator "inten[ds] to

commence" against certain Debtors (such actions, the "<u>Celsius Preference Actions</u>").  (Celsius Obj. ¶ 2).

41.    Additionally, MDL Counsel propose a paragraph for inclusion in the Disclosure Statement to describe the MDL proceeding in furtherance of a potential Plan objection to "help creditors understand why the Debtors are wrong to attempt to offset customer recoveries from the Estates under the Plan with any recoveries customers may receive in the MDL."  (MDL Obj. ¶¶ 8-9).[13]

42.    Contrary to these objectors' assertions, nothing in section 1125 of the Bankruptcy Code mandates the Debtors to include any specific disclosures for any particular claimant, filed proof of claim against the Debtors or any particular ancillary action.  The fundamental purpose of the Disclosure Statement—to provide adequate information—is not served by requiring the Debtors to include reference to specialized creditor claims or interests, litigation positions, or potential plan objections.  *See In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. Dec. 7, 2007), *Hr'g Tr.* 160:11-161:16 [D.I. 11870] (objections that unduly sought to "put[] in the debtors' document the objectors' litigation positions" were "overkill"); *In re PC Liquidation*, 383 B.R. 856, 861, 865-66 (Bankr. E.D.N.Y. 2008) (affirming bankruptcy court's finding that there is no "significant benefit from [trying to reach some consensual text with [the objecting creditor] regarding the parties' respective litigation positions]") (first alteration in original); *see also In re CDECO Mar. Const. Inc.*, 101 B.R. 499, 501 (Bankr. N.D.

---

[13]    Russell Crumpler and Christopher Farmer (the "<u>3AC Liquidators</u>"), in their joint capacities as the joint liquidators of Three Arrows Capital, Ltd. ( "<u>Three Arrows</u>"), filed a limited objection and reservation of rights raising similar arguments regarding the existence of potential claims by Three Arrows against the Debtors and the ongoing investigation process by the 3AC Liquidators with respect to such claims.  (3AC Obj. ¶¶ 3-4).  The 3AC Liquidator also argued that the Disclosure Statement fails to disclose whether a reserve for disputed claims will be established and how the amount of any reserve will be determined.  (3AC Obj. ¶¶ 6-7).  The Debtors have been in discussions with the 3AC Liquidators and have been able to consensually resolve this limited objection with additional language in the Disclosure Statement.

Ohio 1989) ("A disclosure statement is simply not the place to argue various theories of recovery or to demonstrate results of 'what if' kinds of proof.").

43.    The mere existence of "facts that may be the basis" for certain claims against the Debtors does not rise to the level of information that a hypothetical investor would consider in "maki[ng] an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).  *See Krystal Cadillac-Oldsmobile GMC Truck*, 337 F.3d at 323 (noting that courts "do not require debtors to list hypothetical claims that are so tenuous as to be fanciful").

44.    Likewise, the mere existence of a filed proof of claim does not warrant particular mention in this Disclosure Statement.  The Debtors are reconciling and assessing the validity of over 25 quintillion dollars of purported stakeholder claims filed by thousands of creditors against the various Debtors, including those claims filed by Celsius.  Accordingly, the Debtors do not believe any further disclosure is required or necessary to aid creditors in making an informed judgment about the Plan other than a general risk factor that allowed claims may be more than projected (*see* Disclosure Statement section 7.C.5).[14]

45.    The Celsius Objection and much of the MDL Objection are nothing more than thinly veiled attempts to stake their own self-interested litigation positions in the Debtors' Disclosure Statement.  This is not appropriate or required.  Accordingly, the Debtors maintain that no disclosure regarding the Celsius Preference Actions or the Celsius proofs of claim and the language proposed by the MDL Counsel are necessary in the Disclosure Statement and each objection should be overruled.  Nevertheless, to accommodate certain issues raised by the

---

[14]    As conceded by the Celsius Administrator, the bulk of the Celsius Preference Actions do not seek to recover funds from the Debtors, nor do they impact most customers of the Debtors.  (Celsius Obj. ¶ 12).  The Debtors also object to Celsius Administrator's attempts to pursue those claims against the Debtors.  The Debtors therefore do not believe additional disclosure with respect to the Celsius litigation or treatment of Celsius's potential claims is necessary in the Plan or the Disclosure Statement (*Id.* ¶ 3).  Such contorted contingencies do not need to be accounted for in the Disclosure Statement.

Celsius Plan Administrator and the MDL Counsel, the Debtors have inserted additional language in the Disclosure Statement, in each case as noted in Omnibus Reply Chart.

  **C. The Disclosure Statement Adequately Explains the Release Provisions and the Anti-Double Dip Provision in the Plan.**

  46. MDL Counsel allege that the Disclosure Statement does not adequately explain the release provisions in sections 10.4 and 10.5 of the Plan, and that the Debtors are required under section 1125 of the Bankruptcy Code to "simplify[]" and "clarify[]" the release provisions.  (MDL Obj. ¶¶ 20-22).

  47. MDL Counsel are wrong.  MDL Counsel do not—and cannot—cite a case in support for the proposition that section 1125 requires a detailed explanation of the release provisions in a plan, and for good reason:  release provisions in large and complex chapter 11 cases are precisely drafted and heavily negotiated.  An attempt to summarize such provisions can raise inconsistencies between the simplified language and the more precise language contained in plans.

  48. Instead, as required by Bankruptcy Rule 3016(c) and as noted in the Motion, the Debtors have described the release provisions in conspicuous bold or capitalized language in both the Plan and the Disclosure Statement.  The Plan provides, among other things, that the release under Article 10 of the Plan acts as a permanent injunction against any person who has held, holds or may hold Claims, Interests or Causes of Action from commencing or continuing any action with respect to any Claim, Interest or Cause of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code and that "all Holders of Claims, Interests or Causes of Action are enjoined from interfering with the Distributions contemplated by the Plan and from asserting any

Claim or Cause of Action expressly preserved and vested exclusively in the Wind Down Entities as of the Effective Date." *See* Plan section 10.9.

49. This Court has approved disclosure statements under section 1125 of the Bankruptcy Code notwithstanding the fact that the descriptions of the release provisions contained in such disclosure statements were verbatim or closely mirrored their respective chapter 11 plans. *See, e.g.*, *In re Mallinckrodt PLC*, Case No. 23-11258 (JTD) (Bankr. D. Del. Oct. 10, 2023), [D.I. 522]; *In re RTI Holding Co.*, Case No. 20-12456 (JTD) (Bankr. D. Del. Dec. 21, 2020) [D.I. 759]; *In re Cred Inc., et al.*, Case No. 20-12836 (JTD) (Bankr. D. Del. Apr. 19, 2021) [D.I. 730].

50. Additionally, MDL Counsel allege that the "anti-double dip" provision in section 7.12 of the Plan—carefully designed to ensure creditors do not receive two recoveries on account of the same claim—is "inscrutable." (MDL Obj. ¶¶ 14-18). To the contrary, there is no uncertainty or ambiguity with respect to this provision. The Plan provision in the Disclosure Statement is buttressed by a plain language description on page 8 that clearly states that the plan administrator shall have discretion to best determine how and what information to request from certain claimants to ensure that the same claimant does not recover twice on account of the same Allowed Claim. *See* Disclosure Statement section 1.E. This discretion is not a novel concept and is consistent with standard tax and OFAC certification processes prior to distributions, similar to section 7.14 of the Plan and other plans confirmed by this Court and other courts, both inside and outside of Delaware. *See*, *e.g.*, *In re Mallinckrodt PLC*, Case No. 23-11258 (JTD) (Bankr. D. Del. Oct. 10, 2023) [D.I. 522] (vesting the reorganized debtors and distribution agent with discretion to request and verify tax forms prior to making distributions); *In re PBS Brand Co.*, Case No. 20-13157 (JKS) (Bankr. D. Del. Apr. 28, 2021) [D.I. 552] (same).

51.     Furthermore, to the extent the MDL Counsel have substantive objections to the release or "anti-double dip" provisions in the Plan, such objections are properly raised at the Confirmation Hearing and are in any case inapposite, as described below.  Accordingly, the Debtors submit that no changes or additional disclosure is required and these objections should be overruled.

**D.     The Disclosure Statement Adequately Describes the Customer Property Settlement and the Estimation of Claims as of the Petition Date.**

52.     The Center for Applied Rationality, Lightcone Infrastructure, Inc. and Lightcone Rose Garden LLC (collectively, the "CAR Parties"), the Kavuri Parties, and MDL Counsel each argue that the Disclosure Statement does not contain adequate information regarding the customer property arguments advanced by certain creditors.  (CAR Obj. ¶¶ 16-22; Kavuri Obj. ¶¶ 53-61; MDL Obj. ¶¶ 26-28).  These Objections simply ignore the four pages and four separate sections devoted exclusively to the customer property settlement and its resolution for the benefit of all creditors and stakeholders.  *See* Disclosure Statement sections 4.B.1–4.B.5.

53.     Contrary to the Kavuri Parties' assertions, (Kavuri Obj. ¶ 59), the Debtors do, in fact, disclose the "precise resolution" of the customer property issue.  As described at length in section 4.B.5 of the Disclosure Statement, the Debtors reached a settlement with the Official Committee of Unsecured Creditors, the Ad Hoc Committee and the Class Action Claimants regarding the customer property disputes.  As part of the settlement, customers of the FTX exchanges were granted a special priority ahead of general unsecured creditors, which is detailed in section 4.B.2 of the Disclosure Statement.

54.     The CAR Objection similarly alleges that the Debtors fail to address why the legal maxim of *nemo dat quod non habet* does not apply to the digital assets in the Debtors' estates.  (CAR Obj. ¶¶ 16-22).  However, the CAR Parties simply ignore sections 4.B.2-4.B.5 in

the Disclosure Statement that contain several paragraphs discussing the legal merits of a

constructive trust, equitable tracing, a bailment for keeping and the FTX terms of service.

Moreover, the Debtors are not required to describe each potential legal theory that may be

applicable in determining whether digital assets are property of the Debtors' estates.  *See In re*

*CDECO Mar. Constr. Inc.*, 101 B.R. at 501 ("A disclosure statement is simply not the place to

argue various theories of recovery or to demonstrate results of 'what if' kinds of proof").

       55.     To the extent that these or any other creditor seek to litigate customer

property rights, their rights are reserved to object to Plan confirmation on that basis, and the issue

will be adjudicated in connection with the Confirmation Hearing.  Accordingly, these Objections

should be overruled.

       56.     MDL Counsel also assert that the Disclosure Statement is "mislead[ing]"

because it makes creditors "believe they are getting paid in full when they clearly are not"

(internal quotations omitted).  (MDL Obj. ¶ 11).  Yet, as MDL Counsel themselves

acknowledge, the issue of valuation of the Debtors' digital assets is settled by the multi-day

crypto-estimation hearings and is detailed in section 3.R in the Disclosure Statement.  The

Debtors are therefore correct that creditors are getting paid in full based on the Petition Date

value of their claims, as this Court determined is required, and any statement to the contrary in

the Disclosure Statement would be misleading and contrary to the ruling of this Court and

section 502 of the Bankruptcy Code.

    **E.**    **The Disclosure Statement Adequately Describes the MAPS and OXY**
           **Litigation.**

       57.     The nearly identical MAPS and OXY Objections allege that the Debtors

painted a "one-sided" picture of the ongoing litigation between the Debtors and the MAPS and

OXY Parties by not disclosing in the Disclosure Statement that the MAPS and OXY Parties

engaged in expert discovery and provided further expert testimony in support of their claims. (MAPS and OXY Obj. ¶¶ 27-28). The MAPS and OXY Objections also allege that the Debtors imply that the value of the MAPS and OXY tokens will be set by reference to the initial digital assets conversion table, while in fact paragraph nine of the *Order Granting Motion of Debtors to Estimate Claims Based on Digital Assets* [D.I. 7090] (the "Estimation Order") explicitly reserved the parties' rights and did not determine such values. (MAPS and OXY Obj. ¶¶ 29-33). To address the MAPS and OXY Parties' concerns, the Debtors have inserted additional clarifying language in the Disclosure Statement as noted in the Omnibus Reply Chart. Accordingly, these Objections should be overruled to the extent any portion of them are still outstanding.

**F.      The Remaining Kavuri Objections Should Be Overruled.**

58.     The Kavuri Parties argue that the Debtors should disclose certain litigation claims the Debtors may bring against parties, such as Binance, in the Notes to the Financial Projections attached as an exhibit to Financial Projections appendix of the Disclosure Statement. (Kavuri Obj. ¶¶ 9; 46-49).

59.     However, the Debtors are not required to list each potential cause of action that they *may* assert, only those that are "*likely* to arise." *Oneida Motor Freight, Inc.* v. *United Jersey Bank*, 848 F.2d at 416 (emphasis added). The Debtors are continuing to investigate and evaluate potential causes of action to bring against certain parties, and requiring the Debtors to disclose these investigation efforts not only does nothing to assist creditors in making an informed decision about the Plan but could, in fact, be detrimental to the Debtors' estates by prematurely disclosing the Debtors' litigation strategy.

60.     The case cited by the Kavuri Parties, *Krystal Cadillac-Oldsmobile GMC Truck, Inc*. v. *Gen. Motors Corp*., does not support the Kavuri Parties' contention that all potential litigation claims must be disclosed. *Krystal Cadillac* involved a situation where the

debtors intentionally omitted certain claims from their disclosure statement in an effort to conceal planned litigation against a counterparty. *See id.* at 323. By contrast, the Debtors are still determining whether and what claims to bring against certain counterparties. To that end, the Debtors have reserved their rights in the Plan and the Disclosure Statement to add Preserved Potential Claims to the Plan Supplement, which will list the actions the Debtors intend to pursue against various counterparties and be filed prior to the Voting Deadline.

61.     The Kavuri Parties also argue that the Disclosure Statement is "inconsistent" because the Debtors project $102 million more in assets than they allocate to creditors. (Kavuri Obj. ¶¶ 9; 51-52). It appears that the Kavuri Parties attempted to add up the distributable proceeds to each class but failed to include the $102 million of recovery for Class 10A: Senior Subordinated IRS Claims, as described in detail in the Financial Projections appendix to the Disclosure Statement.

62.     The Kavuri Parties further argue that the chapter 7 liquidation analysis described in Appendix D to the Disclosure Statement fails to include any recoveries for convenience classes. (Kavuri Obj. ¶¶ 9; 51). This is correct because convenience classes (7A-C) are an aspect of the Debtors' proposed Plan and are not a statutory creditor class in chapter 7 proceedings. Accordingly, a comparison of convenience classes is not required in a chapter 7 liquidation analysis. The Debtors disclose that the Plan, but not the chapter 7 liquidation analysis, takes into consideration convenience class recoveries in footnote 1 and footnote 2 of the Comparison to Plan Summary attached to the chapter 7 liquidation analysis and in note F thereto.

63.     Finally, the Kavuri Parties object that the data provided by the Debtors shows that the Debtors would have $377 million more in a chapter 7 liquidation when compared to the proposed chapter 11 Plan. (Kavuri Obj. ¶¶ 9; 51-52). The Kavuri Parties, however, are

focusing on Gross Distributable Proceeds, which fail to include the additional Wind Down Costs associated with the chapter 7 liquidation analysis deducted from Net Distributable Proceeds. Net Distributable Proceeds are $152 million greater in the Chapter 11 Plan financial projections than the Chapter 7 liquidation analysis. Simply put, the Kavuri Parties have missed the trees for the forest.

**IV.    The Plan Is Confirmable and the Remaining Objections Should Be Addressed at Plan Confirmation.**

64.    In an effort to pull forward confirmation issues under the pretense of an objection to the Disclosure Statement, several Objectors claim that the Plan is "patently unconfirmable." These Objectors have failed to demonstrate that such a drastic conclusion is appropriate and in any event, the Debtors contend, and will demonstrate at the Confirmation Hearing, that the Plan is patently confirmable.

65.    In the Third Circuit, a proposed plan is patently unconfirmable only where "it is obvious at the disclosure statement stage that a later confirmation hearing would be futile." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). Other courts have similarly established that, unless the disclosure statement "describes a plan of reorganization which is so fatally flawed that confirmation is impossible," the Court should approve a disclosure statement that otherwise adequately describes the chapter 11 plan at issue. *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990); *see also In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. ), *aff'd*, 80 B.R. 448 (N.D. Ill. 1987) (courts should disapprove the adequacy of a disclosure statement on confirmability grounds "where it is *readily apparent* that the plan accompanying the disclosure statement could *never* legally be confirmed") (emphasis added).

66.    Bankruptcy courts also consistently state that such action "must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing." *In re*

*Monroe Well Serv.*, 80 B.R. 324, 332–33 (Bankr. E.D. Pa. 1987); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("Only where the disclosure statement on its face relates to a plan that cannot be confirmed" is it appropriate to dismiss a proposed plan prior to the solicitation of votes; "otherwise, confirmation issues are left for later consideration.").

67.     Because dismissing a plan at the disclosure statement approval stage is such an extreme measure, doing so is appropriate only where "(1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Am. Capital Equip., LLC*, 688 F.3d at 154-55 (internal quotations and citation omitted). Thus, issues bearing on class treatment, releases, digital asset property disputes and the requirements for confirmation of a plan under section 1129 of the Bankruptcy Code are not properly raised in opposition to the Disclosure Statement.

68.     MDL Counsel, the LayerZero Group and the Kavuri Parties each attempt to argue that the Plan is patently unconfirmable for a variety of reasons. As explained below, none of the Objections come close to rendering the Plan unconfirmable, and at best, are more appropriately dealt with in connection with the Confirmation Hearing. The Objectors will have ample opportunity to prosecute their confirmation objections then, to the extent these issues remain disputed, and those objections will be addressed by the Debtors and considered by the Court at the Confirmation Hearing. Accordingly, such Objections should be overruled.

A.     **The Discharge and Opt-Out Provisions in the Plan Are Appropriate.**

69.     The Kavuri Parties devote pages of their objection to the discharge and release provisions in the Plan. Each of their objections is meritless, not properly considered at this stage in any event, and should be overruled.

70.     First, the Kavuri Parties argue that the Plan is patently unconfirmable because the discharge provisions in the Plan do not comport with section 1141(d)(3) of the Bankruptcy Code (Kavuri Obj. ¶¶ 25-29).  This Court has previously recognized that the question of whether a Debtor is entitled to a discharge under section 1141(d)(3) of the Bankruptcy Code is a question of fact and is properly considered at confirmation.  *See, e.g.*, *In re AAC Holdings, Inc.*, Case No. 20-11648 (JTD) (Bankr. D. Del. Sept. 1, 2020) [D.I. 516] (sustaining objection to the disclosure statement on the basis of section 1141(d)(3) after debtors argued that such objection was a confirmation objection).

71.     Next, the Kavuri Parties argue that the Plan improperly vests this Court with jurisdiction to grant third-party releases and injunctions.  (Kavuri Obj. ¶¶ 30-31).  However, this Court has previously approved plans containing third-party releases.  *See In re Mallinckrodt PLC*, 639 B.R. at 877-78; *In re SiO2*, Case No. 23-10366 (JTD) (Bankr. D. Del. Jun. 9, 2020) [D.I. 378].  *See also In re Millenium Lab Holdings II, LLC*, 945 F.3d 126, 137 (3d Cir. 2019) (in appeal from confirmation of plan containing non-consensual third-party releases, holding that "[t]he Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan"*); In re AOV Indus., Inc.*, 792 F.2d 1140, 1145 (D.C. Cir. 1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law . . . [a]lthough the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings.").[15]

72.     The Kavuri Parties then argue that the release provisions in the Plan are too broad and should not be allowed to include all claims "existing or hereafter arising."  (Kavuri

---

[15]     Without limiting the foregoing, the Debtors reserve all of rights regarding the Plan's third-party releases pending the U.S. Supreme Court's decision in the *Purdue Pharma, L.P.* matter.

Obj. ¶¶ 31-34).  The Debtors dispute that the release provisions are overly broad, and maintain

that they are necessary and appropriate.  In any case, this objection is a quintessential plan

confirmation objection and does not render the Plan patently unconfirmable.

73.     The Kavuri Parties go on to assert that the Plan release provisions and the

"opt-in" and "opt-out" mechanisms are "non-consensual."  (Kavuri Obj. ¶¶ 35-39).  Following

discussions with the U.S. Trustee and the Securities and Exchange Commission, the Debtors

have revised the Solicitation Procedures to provide for an "opt-in" release for classes that are

non-voting and deemed to reject the Plan.  With respect to the voting classes, this Court has

approved an "opt-out" mechanism where extensive noticing procedures were in place, as is the

case here, and again, this is an issue to be addressed at the Confirmation Hearing.  *See In re*

*Tricida, Inc.*, Case No. 23-10024 (JTD) (Bankr. D. Del.) *Conf. Hr'g Tr.*, May 19, 2023 at 143-

47; *In re Wardman Hotel Owner, LLC*, Case No. 21-10023 (JTD) (Bankr. D. Del. Sept. 20,

2021) [D.I. 358];  *In re Sientra Inc.*, Case No. 24-10245 (JTD) (Bankr. D. Del. June 18, 2024)

[D.I. 450]; *In re CarbonLite Holdings LLC*, Case No. 21-10527 (JTD) (Bankr. D. Del. Sept. 7,

2021) [D.I. 895].

74.     Finally, the Kavuri Parties argue that "no valid consideration is being

offered by the Released Parties for this release" given that they "have been handsomely rewarded

for these services to date."  (Kavuri Obj. ¶ 37).  The Kavuri Parties offer no basis for this claim

(as voting classes and classes deemed to accept the Plan are receiving distributions under the

Plan), and to the extent this is an objection at all, it should be considered in connection with the

Confirmation Hearing.

## B.    The Plan Does Not Discriminate Unfairly.

75.     MDL Counsel and the LayerZero Group each allege that the Plan

discriminates unfairly, in violation of section 1123(a)(4) of the Bankruptcy Code.  MDL Counsel

alleges that the Plan unfairly discriminates because the "anti-double dip" provision of the Plan

may result in certain creditors receiving more than other creditors in the same class (MDL Obj.

¶¶ 31-36), while the LayerZero Group argues that section 5.5 of the Plan may result in only

certain creditors being eligible for the customer preference settlement.  (LayerZero Obj.

¶¶ 21-24).  These objections are premature, and, in any case, the Plan does not discriminate

unfairly.

76.     Disparate *recoveries* are not the same as disparate *treatment*.  Case law

construing section 1123(a)(4) of the Bankruptcy Code has interpreted equal treatment to mean

that: (1) all class members must be subject to the same process for claim satisfaction; (2) all class

members' claims must be of "equal value" through the application of the same pro rata

distribution or payment percentage procedures to all claims; and (3) all class members must give

up the same degree of consideration for their distribution under the plan.  However, perfect or

precise equality is not required—only approximate equality.  *In re W.R. Grace & Co.*, 475 B.R.

34, 121 (D. Del. 2012) (internal citation omitted), *aff'd*, 729 F.3d 332 (3d Cir. 2013); *In

re Breitburn Energy Partners LP*, 582 B.R. 321 (Bankr. S.D.N.Y. 2018) (reiterating view that

section 1123(a)(4) requires equality of treatment, not outcome, and finding that proposed chapter

11 plan that provided all members within class an opportunity to subscribe to rights offering did

not violate section 1124(a)(4) even though class members that elected not to subscribe would

receive nothing under plan); *In re Central Med. Ctr., Inc.*, 122 B.R. 568, 574-75 (Bankr. E.D.

Mo. 1990) (section 1123(a)(4) is not violated by reorganization plan containing "lottery system"

that subjects each member of class to same process for claims determination but that does not

yield same pecuniary result for every class member).

-33-

77.     With respect to MDL Counsel's objection, creditors in classes subject to the "anti-double dip" provision in the Plan are each provided with the same treatment as the other creditors in such class.  No claimant is subject to a different process than other claimants within a class.  To the extent MDL Counsel has issues with the substance of the provision, and to the extent MDL Counsel even has standing to assert such an objection, the proper time to file an objection is in connection with the Confirmation Hearing, not in connection with the adequacy of the Disclosure Statement.

78.     LayerZero Group's unfair discrimination arguments are misguided.  The Debtors' proposed waiver of Customer Preference Actions is not a *plan* or *claim* treatment.  Contrary to their allegations, the proposed waiver of Customer Preference Action is not on account of each customer's Customer Entitlement Claim.  Rather, the Debtors are making an offer to agree to waive and not prosecute Customer Preference Actions (other than any Excluded Customer Preference Action) against any Holder of Dotcom Customer Entitlement Claims or U.S. Customer Entitlement Claims if such Holder duly executes and timely returns a valid Ballot by the Voting Deadline that, in return, (i) votes to accept the Plan and (ii) consents and stipulates to the amount of such Dotcom Customer Entitlement or U.S. Customer Entitlement Claim for voting, allowance and Distribution purposes.  The Debtors are using the plan voting and Balloting process to effectuate this settlement offer, but not in exchange of plan treatment or on account of any creditors' claim against the Debtors.

79.     The consent and stipulation to the amount of the claims for voting, allowance and Distribution purposes is meaningful to the Debtors—it expedites and significantly reduces costs for claims administration and reconciliation.  But not every potential preference defendant is similarly situated and, as a result, not every customer is eligible for waiver of

-34-

Customer Preference Actions.  However, since the preference settlement is outside the scope of Plan treatment, there is no unfair discrimination and section 1123(a)(4) is inapplicable.  All Holders of Dotcom Customer Entitlement Claims and U.S. Customer Entitlement Claims will receive the same plan treatment.

80.     To address any perceived ambiguities regarding the Debtors' waiver of Customer Preference Actions, the Debtors have added the following clarifications to the Disclosure Statement and Plan:  (i) the Debtors will include the list of Excluded Customer Preference Actions in the Plan Supplement filing, which will be filed on August 2, 2024, two weeks before the proposed August 16, 2024 Voting Deadline and Plan Objection Deadline; (ii) the Debtors shall waive and not prosecute Customer Preference Actions, other than Excluded Customer Preference Actions, if the Holder follows the requirements set forth in the Ballot; and (iii) any pending preference actions filed by the Debtors against any party shall be an Excluded Customer Preference Action and the defendant of such action shall not be released from such action even if such Holder follows the requirements set forth in the Ballot.

### C.    The Plan Was Proposed in Good Faith.

81.     MDL Counsel and the LayerZero Group also argue that the Plan is patently unconfirmable because it was not proposed in good faith.  (MDL Obj. ¶¶ 38; 41-44; LayerZero Obj. ¶ 25).  Specifically, MDL Counsel wrongly argues that there is no creditor representative on the wind down board, and the LayerZero Group argues that the customer preference settlement involves "coercing creditors" into accepting an entirely voluntary settlement.  (LayerZero Obj. ¶ 25).  These objections are either moot or, at best, premature Plan objections that should be overruled at this stage.

82.     "A plan must be proposed "in good faith" under section 1129(a)(3) of the Bankruptcy Code.  Although "good faith" is not defined in the Bankruptcy Code, a plan will be

found in good faith if it "fairly achieve[s] a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000); *see also In re Am. Cap. Equip., LLC*, 688 F.3d at 156-57 (noting that the objectives underlying the Bankruptcy Code include "maximizing property available to satisfy creditors," "discourag[ing] debtor misconduct" and "the expeditious liquidation and distribution of the bankruptcy estate to its creditors") (internal quotations and citations omitted).  Courts also consider whether the plan "has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected" and "[exhibited] a fundamental fairness in dealing with the creditors . . . ." *In re W.R. Grace & Co.*, 475 B.R. 34 at 87-88 (internal quotations and citations omitted).

83.     The Plan was proposed in good faith.  The Debtors have worked diligently since the beginning of these Chapter 11 Cases with key stakeholders to reach a value-maximizing resolution to the Chapter 11 Cases that provides a comprehensive path to effectiveness and distributions.  Additionally, with respect to MDL Counsel's argument, the Debtors have negotiated with properly represented constituencies to create and appoint certain creditor representatives to a creditor advisory body, as reflected in the revised Plan and Disclosure Statement and as noted in the Omnibus Reply Chart.

84.     The LayerZero Group's arguments are at most a premature Plan objection.  But there is nothing coercive about permitting customers to *voluntarily* settle their preference exposure.  Any customer is free to decline the settlement offer or otherwise choose to object to the Plan.  This issue is of course irrelevant to the LayerZero Group who, as clarified through the revised Disclosure Statement language, has been sued by the Debtors and those claims shall be an Excluded Customer Preference Action.

-36-

D.    **The Plan Satisfies Section 1129(a)(7) of the Bankruptcy Code.**

85.    The Kavuri Parties assert another plan objection by attempting to argue that the Plan does not satisfy the "best interests" test under section 1129(a)(7) of the Bankruptcy Code because the Debtors do not provide for "in kind" distributions.  (Kavuri Obj. ¶¶ 40-41.)  Beyond the confusion created by Mr. Kavuri's propaganda which ignores the fact that due to the prepetition actions of the insiders, the Debtors did not have the actual digital assets to provide "in-kind" distributions on the Petition Date, this argument falls flat because it fails to explain what "in kind" distributions have to do with the best interests test under section 1129(a)(7).  But more fundamentally, in order for a court to find that a plan is patently unconfirmable at this stage, it must be patently unconfirmable as a matter of law, notwithstanding the existence or particular outcome of any dispute.  No such circumstances exist.

E.    **The Remaining MDL Counsel Objections Should Be Overruled.**

86.    MDL Counsel argue that the Debtors fail to provide information on what they allege is a "fundamental" issue—whether customers retain a property interest in the digital assets held by the Debtors.  (MDL Obj. ¶ 37).  Specifically, MDL Counsel argue that the Debtors do not provide information regarding whether a creditor may vote for the Plan but still object to confirmation of the Plan or initiate an adversary proceeding related to customer property issues.  (*Id.*)  As noted above, the Debtors have provided adequate disclosure with respect to the customer property arguments and the customer property settlement.  These issues, to the extent even applicable, are premature.  Any party with standing will remain free to object to confirmation of the Plan on the basis of customer property or any other grounds.

87.    MDL Counsel also urge the Court to consider the customer property arguments prior to the Court's approval of the Motion.  (MDL Obj. ¶ 39).  This makes no sense, and MDL Counsel have done nothing to advance such litigation (nor do they have standing to do

so).  As the Debtors have argued in their motion to stay the adversary proceeding commenced by

the Kavuri Parties, resolution of any customer claims to property should necessarily be

considered once as part of the Plan confirmation process, where every customer has the ability to

consider the Plan terms implementing the customer property settlement and decide whether to

support or object to Plan.  *See Kavuri, et al.* v. *FTX Trading Ltd., et al.*, Adv. Pro. No. 24-50012

(JTD) [D.I. 13].  In contrast, stand-alone litigation binding only a small number of customers

who are parties to such litigation would both unnecessarily delay Plan confirmation and

distributions to creditors and generate expense borne by all creditors, while doing nothing to

avoid the issue still needing to be addressed at the Confirmation Hearing.

**V.      The Remaining Objections Are Moot or Otherwise Fail.**

88.     Certain of the other Objections are mooted by the revised Disclosure

Statement or are otherwise deficient and should be overruled.

- The MDL Parties argue that the Debtors should include a description of *United States* v. *Samuel Bankman Fried*, S.D.N.Y. Case No. 22 Cr. 673 (LAK) and allege that the Debtors do a "poor job" of describing the assets and liabilities of the Debtors.  (MDL Obj. ¶¶ 12-13).  The criminal trial is largely irrelevant to these Chapter 11 Cases and is irrelevant to the treatment of customer claims under the proposed Plan.  Additionally, the Debtors devote entire sections on describing the current assets and liabilities of the Debtors.  *See* Disclosure Statement sections 1.D (*The Debtors' Cash Position and Remaining Assets*), 1.G (*Recovery Analysis and Treatment of Claims and Interests*) and Appendix C (*Financial Projections*).

- The LayerZero Group argues that the Plan is unclear with respect to whether 502(h) claims will be discharged prior to their being allowed. (LayerZero Group Obj. ¶¶ 15-18).  However, the treatment of claims in section 4.3.6 of the Plan with respect to Dotcom Customer Entitlement Claims and section 4.3.7 of the Plan with respect to U.S. Customer Entitlement Claims both include section 502(h) claims, as the definition of both U.S. and Dotcom Customer Entitlement Claims include "Preference Replacement Claim."  Accordingly, the discharge provision in section 10.2 of the Plan, which excludes claims that are treated in accordance with

-38-

other provisions of the Plan, does not discharge these claims as they are treated pursuant to section 4 of the Plan.

- The LayerZero Group argues that the Disclosure Statement does not clarify whether the Plan overrides the Estimation Order with respect to the value of 502(h) claims. (LayerZero Group Obj. ¶¶ 19-20). However, section 4.4 of the Plan expressly preserves, and does not override, anything in the Estimation Order.

- MDL Counsel and the Kavuri Parties each argue that the Disclosure Statement should include a discussion of the *Report of Robert J. Cleary, Examiner* [D.I. 15545] (the "Examiner Report"). (MDL Obj. ¶ 24; Kavuri Obj. ¶¶ 42-43). The Debtors have added a description of the Examiner Report to the Disclosure Statement. *See* Omnibus Reply Chart.

- The Kavuri Parties argue that the Debtors should disclose an update with respect to the agreement reached with the Department of Justice in respect of the Internal Revenue Service's claims filed against the Debtors (the "IRS Settlement"). (Kavuri Obj. ¶ 44). This is incorrect, because the Debtors did disclose additional information in the Disclosure Statement with respect to the IRS Settlement once it was agreed. *See* Disclosure Statement section 3.S. Nevertheless, the Debtors have added additional information to the Disclosure Statement with respect to the motions that were filed to approve the IRS Settlement after the Disclosure Statement was filed. *See* Omnibus Reply Chart.

- The Kavuri Parties argue that the plan supplement should not be permitted to be filed after the voting deadline. (Kavuri Obj. ¶ 62). Prior to the filing of the Kavuri Objection, the Debtors filed a revised proposed Order [D.I. 17004], which notes that the Plan Supplement Filing Deadline is August 9, 2024 and has now been moved up further to August 2, 2024 following discussions with the U.S. Trustee, while the Voting Deadline is August 16, 2024.

- The Debtors received four letters from *pro se* claimants, each of which contains claims not relevant to the Disclosure Statement or the Plan. *See* Omnibus Reply Chart.

## CONCLUSION

For the reasons stated above, the Court should overrule the Objections and grant

the Motion.

Dated: June 20, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*