**Exhibit A—Supplemental Annotations**

| Location in Report | Original Language | Modified Language |
|---|---|---|
| Page 4, paragraph 1 | Investigations addressed in this section include inquiries into (1) corporate acquisitions by the FTX Group, (2) Bankman-Fried's family members, (3) charitable and political contributions by the FTX Group and affiliated individuals, (4) cryptocurrency tokens that the FTX Group held at third-party exchanges, (5) the collapse of FTX.US, (6) miscellaneous investigations, (7) political contributions by the FTX Group and affiliated individuals, (8) payments to foreign officials, and (9) the FTX Group's Venture Book. | Investigations addressed in this section include inquiries into (1) corporate acquisitions by the FTX Group, (2) Bankman-Fried's family members, (3) charitable and political contributions by the FTX Group and affiliated individuals, (4) cryptocurrency tokens that the FTX Group held at third-party exchanges, (5) the collapse of FTX.US, (6) miscellaneous investigations, **(7)** payments to foreign officials, and **(8)** the FTX Group's Venture Book. |
| Page 8, paragraph 1 | The Examiner requested initial briefings from the Debtors' primary counsel, S&C, and its conflicts counsel, Quinn Emanuel, as well as from Paul Hastings LLP, counsel for the Unsecured Creditors' Committee. | The Examiner requested initial briefings from the Debtors' primary counsel, S&C, and its conflicts counsel, Quinn Emanuel.  **He also requested a briefing** from Paul Hastings LLP, **which had undertaken a number of investigations—including review and verification of Quinn Emanuel's investigations—in its capacity as** counsel for the Unsecured Creditors' Committee. |
| Page 19, footnote 62 | The billings to any one client or the aggregate group is not material to the Firm;s revenues. | The billings to any one client or the aggregate group is not material to the **Firm's** revenues. |
| Page 74, footnote 309 | *See id*. at ¶ 29. | *Alameda Research LLC v. Friedberg*, **No. 23-ap-50419 (Bankr. D. Del.) (JTD), Dkt. No. 32** at ¶ 29. |
| Page 104, paragraph 3 | For example, in its investigation of Law Firm-1, Quinn Emanuel identified a December 2019 communication from Bankman-Fried to members of that firm in which Bankman-Fried acknowledged that "Alameda holds lots of FTT, which has a high market value but that market value could not be realized without crashing the market." | For example, in its investigation of Law Firm-1, Quinn Emanuel identified a December 2019 communication from **Joseph Bankman** to members of that firm in which **Joseph Bankman** acknowledged that "Alameda holds lots of FTT, which has a high market value but that market value could not be realized without crashing the market." |

| Location in Report | Original Language | Modified Language |
|---|---|---|
| Page 110, paragraph 3 | Quinn Emanuel's investigations further found that, at the instruction of the FTX Group's employees, Law Firm-1 created the Serum Foundation with systems that would allow certain employees of the FTX Group to continue to exercise control over the Serum Foundation and the SRM token. | Quinn Emanuel's investigations further found that, at the instruction of the FTX Group's employees, Law Firm-1 created the Serum Foundation with **a protocol** that would allow certain employees of the FTX Group to continue to exercise control over the Serum Foundation and the SRM token. |
| Page 119, paragraph 2 | Notably, however, Law Firm-1 frequently used ephemeral messaging platforms such as Signal to communicate with individuals at the FTX Group and, to date, has only produced 144 individual or group chats between Law Firm-1 and FTX Group employees.  Only 18 of those chats still contained messages; the remainder only showed that a group message had once existed, but did not contain any content.  As of May 2024, Law Firm-1's production and Quinn Emanuel's investigation remain ongoing. | Notably, however, Law Firm-1 frequently used ephemeral messaging platforms such as Signal to communicate with individuals at the FTX Group and, to date, has only produced **147** individual or group chats between Law Firm-1 and FTX Group employees.  Only **20** of those chats still contained messages; the remainder only showed that a group message had once existed, but did not contain any content.  As of **April** 2024, Law Firm-1's production and Quinn Emanuel's investigation **remained** ongoing. |
| Page 121, paragraph 1 | For example, Law Firm-1 attorneys were directly involved in the following:<br>• The FTX Group's issuance of "founder loans," which were used to move at least $2 billion in cash and assets among FTX Group entities, as well as directly into the personal accounts of FTX Group leadership for corporate acquisitions; | For example, Law Firm-1 attorneys were directly involved in, **or had knowledge of,** the following:<br>• The FTX Group's issuance of "founder loans," which were used to move at least $2 billion in cash and assets among FTX Group entities, as well as **through** the personal accounts of FTX Group leadership for corporate acquisitions; |
| Page 126, paragraph 2 | Quinn Emanuel served Bankruptcy Rule 2004 requests on Law Firm-6, and Law Firm-6 produced 3,599 documents in response | Quinn Emanuel **sent a client file request letter to** Law Firm-6, and Law Firm-6 produced **3,559** documents in response |
| Page 126, paragraph 2 | Quinn Emanuel discovered that, in responding to the SEC, Law Firm-6 did not produce a document that, according to a Law Firm-6 attorney's notes, raises | **Quinn Emanuel initially reported to the Examiner that:** |

2

| Location in Report | Original Language | Modified Language |
|---|---|---|
| | "[w]orry about market manipulation issues." Quinn Emanuel did not locate this document in either the documents produced by Law Firm-6 or in the FTX Group's own records. | **In the course of producing responsive documents to the SEC on behalf of Alameda and AR Ltd., [Law Firm-6] withheld a document that, according to [Law Firm-6's] notes from a call with [an FTX employee] on production strategy, raised '[w]orry about market manipulation issues.' Quinn Emanuel has been unable to locate the document withheld from Alameda's and AR Ltd.'s production to the SEC in either the documents produced by [Law Firm-6] or the Debtors' internal records.**<br><br>**Subsequent to the filing of the Report, Law Firm-6 informed the Examiner that it did not withhold the document in any attempt to obscure acts of misconduct. It characterized the referenced notes as a partial transcription of what FTX employees had said in the phone call, during which one FTX employee expressed concerns about a line in the email he thought could be misconstrued. Law Firm-6 further stated that the Alameda entities were not obligated to produce that email because, among other things, Alameda's entire production was voluntary and the email did not meaningfully address the subjects of SEC's investigation. Finally, Law Firm-6 also stated that it had, in fact, produced the email to Quinn Emanuel.** |

| Location in Report | Original Language | Modified Language |
|---|---|---|
| | | **Also after the Examiner filed his Report, Quinn Emanuel informed the Examiner that it ultimately had located the email in Law Firm-6's production, after resolving a technical issue.** |
| Page 128, paragraph 2 | Quinn Emanuel found that, shortly before the Petition Date, Skadden raised numerous concerns regarding undisclosed political contributions by FTX.US. | Quinn Emanuel found that, shortly before the Petition Date, Skadden **warned FTX.US about the risks associated with making** undisclosed political contributions to **501(c)(4)s**. |
| Page 130, paragraph 1 | Holland & Knight advised FTX Trading on a whistleblower's allegations, and various immigration matters. | Holland & Knight advised FTX Trading on a whistleblower's allegations, and various **employment** matters. |
| Page 131, paragraph 2 | Quinn Emanuel issued Bankruptcy Rule 2004 requests to Law Firm-8, which produced 66 documents in response | Quinn Emanuel issued Bankruptcy Rule 2004 requests to Law Firm-8, which produced **88** documents in response |
| Page 134, paragraph 2 | As reflected in Table 2, the FTX Group retained several Bahamian law firms, including Clement T. Maynard & Co, Brian Simms, and Lennox Patton.  Generally, these law firms were engaged in 2021 when the FTX Group formed FDM and began moving several employees and executives to the Bahamas. | As reflected in Table 2, the FTX Group **was advised by** several Bahamian law firms, including **Clement T. Maynard & Co and Lennox Patton**.  Generally, these law firms were engaged as **early as 2021** when the FTX Group formed FDM and began moving several employees and executives to the Bahamas. |
| Page 139, paragraph 1 | SVA initially did not satisfactorily comply with the requests, but Quinn Emanuel and the Unsecured Creditors' Committee jointly compelled production by issuing a subpoena under Bankruptcy Rule 2004. | SVA initially did not satisfactorily comply with the requests, but Quinn Emanuel and the Unsecured Creditors' Committee **moved to authorize** a subpoena under Bankruptcy Rule 2004**, after which SVA voluntarily completed its document production**. |
| Page 139, paragraph 2 | Quinn Emanuel additionally interviewed Robert Lee, RLA's founder, as its investigation revealed that RLA was the FTX Group's primary accountant. | Quinn Emanuel **and S&C jointly** interviewed Robert Lee, RLA's founder, as **Quinn Emanuel's** investigation revealed that RLA was the FTX Group's primary accountant. |

| Location in Report | Original Language | Modified Language |
|---|---|---|
| Page 144, paragraph 1 | Nonetheless, Quinn Emanuel determined that Redwood followed accepted valuation procedures in conducting both valuations. | Nonetheless, Quinn Emanuel determined that Redwood followed accepted valuation procedures in conducting both valuations **of equity**. |
| Page 145, paragraph 2 | Quinn Emanuel determined that each of these consulting firms was involved in identifying acquisition targets, preparing license applications, and internal compliance matters. | Quinn Emanuel determined that each of these consulting firms was involved in identifying acquisition targets, preparing license applications, and**/or** internal compliance matters. |
| Page 147, paragraph 1 | including a $2.75 million bonus upon the completion of FTX Trading's business license applications in Singapore and the Bahamas. | including $2.75 million in **bonus payments** upon the completion of FTX Trading's **subsidiaries'** business license applications in Singapore and the Bahamas. |
| Page 147, paragraph 2 | ProCo provided additional consulting services on FTX.US's anti-money laundering services. | ProCo provided additional consulting services on FTX.US's anti-money laundering **policies**. |
| Page 150, paragraph 2 | Finally, Quinn Emanuel's investigation revealed that Salame on multiple occasions directed wire transfers from FTX-related entities to Bond's personal bank account, totaling approximately $1 million. | Finally, Quinn Emanuel's investigation revealed that Salame on multiple occasions directed wire transfers **of funds traceable to FTX-related entities** to Bond's personal bank account, totaling approximately $1 million. |
| Page 152, paragraph 1 | Quinn Emanuel investigated Vendors-1, -2, and -3 (together "the Consultants"), which were three sports, media, and corporate partnership consultants engaged by the FTX Group.  The Consultants helped negotiate many of the FTX Group's most visible marketing partnerships. | Quinn Emanuel investigated Vendors-1, -2, and -3, which were three sports, media, and corporate partnership consultants engaged by the FTX Group.  **Vendor-1 was retained by FTX Trading to provide film services and documentary content.  Vendors-2 and -3** helped negotiate many of the FTX Group's most visible marketing partnerships |
| Page 152, paragraph 2 | Quinn Emanuel did not find any completed work as specified in the three production agreements with Vendor-1.  In April 2022, WRSS terminated its contracts with the Consultants and agreed to pay them $12 million each over three years to accelerate commissions owed to them.  Alameda agreed to make these payments on | Quinn Emanuel did not find any completed work as specified in the three production agreements with Vendor-1.  In April 2022, WRSS terminated its contracts with **Vendors-2 and -3** and agreed to pay them $12 million each over three years to accelerate commissions owed to them.  Alameda agreed to make these payments |

| Location in Report | Original Language | Modified Language |
|---|---|---|
|  | FTX.US's behalf.  By the Petition Date, the Consultants were paid a total of $21.3 million.  Quinn Emanuel has recommended that the Debtors conduct further investigation and expert analysis regarding these three vendors. | on FTX.US's behalf.  By the Petition Date, **Vendors-2 and -3** were paid a total of $21.3 million.   Quinn Emanuel has recommended that the Debtors conduct further investigation and expert analysis regarding these three vendors. |
| Page 178, paragraph 3 | including Bankman-Fried, Ellison, Singh, FTX.US CEO Zach Dexter | including Bankman-Fried, Ellison, Singh, **LedgerX (then-d/b/a FTX.US Derivatives)** CEO Zach Dexter |