**<u>EXHIBIT 2</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION OF FTX TRADING LTD. AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION

SULLIVAN & CROMWELL LLP
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: dietdericha@sullcrom.com
    bromleyj@sullcrom.com
    gluecksteinb@sullcrom.com
    kranzleya@sullcrom.com

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
    mcguire@lrclaw.com
    brown@lrclaw.com
    pierce@lrclaw.com

*Counsel for the Debtors and Debtors-in-Possession*

Dated: ~~May 22~~June 23, 2024
        Wilmington, Delaware

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE CHAPTER 11 PLAN IT DESCRIBES HEREIN.  NO PERSON SHOULD USE OR RELY ON THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

NO PERSON SHOULD RELY ON ANY INFORMATION OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED BY REFERENCE HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED ANYONE TO PROVIDE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND DOCUMENTS RELATED THERETO AND STATUTORY PROVISIONS RELEVANT TO CONFIRMATION OF THE PLAN.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.

THE DEBTORS ARE PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF BASED ON CURRENTLY AVAILABLE INFORMATION AND BOOKS AND RECORDS, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO DUTY TO DO SO.  STAKEHOLDERS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL, STATE OR FOREIGN SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED TO PARTIES-IN-INTEREST AS A SETTLEMENT PROPOSAL AND IS THEREFORE SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND OTHER APPLICABLE RULES, AND DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER IN CONNECTION WITH ANY PENDING, THREATENED OR POTENTIAL LITIGATION, ARBITRATIONS OR DISPUTES.

# TABLE OF CONTENTS

1.   EXECUTIVE SUMMARY .......................................................................................1

  A.   Purposes of this Disclosure Statement ..............................................................3
  B.   The Main Challenges Faced in Developing this Plan .........................................4
  C.   A Collaborative Process of Stakeholder Engagement and Compromise ............6
  D.   The Debtors' Cash Position and Remaining Assets ...........................................6
  E.   Highlights of the Plan .......................................................................................7
  F.   The Supplemental Remission Fund ...................................................................9
  G.   Recovery Analysis and Treatment of Claims and Interests .............................10
  H.   Summary of Estimated Recoveries to Creditors .............................................21
  I.    Substantive Consolidation of Certain Debtors ................................................24
  J.    Making the Bahamas Opt-In Election ..............................................................25
  K.   Voting on the Plan ..........................................................................................26
  L.   Confirmation of the Plan .................................................................................28

2.   BACKGROUND ...................................................................................................29

  A.   The Silos .........................................................................................................29
  B.   Factors Leading to the Commencement of the Debtors' Chapter 11 Cases .....32

3.   SIGNIFICANT EVENTS AND BUSINESS INITIATIVES IN THESE
     CHAPTER 11 CASES ..........................................................................................36

  A.   Corporate Governance .....................................................................................36
  B.   Initial Case Objectives ....................................................................................38
  C.   First Day Relief and Administrative Matters ...................................................39
  D.   Strategic Considerations Relating to the FTX.com Exchange ..........................45
  E.   Sale Processes .................................................................................................49
  F.   Consensual Turnovers .....................................................................................55
  G.   Litigation ........................................................................................................56
  H.   Cooperation with Governmental Investigations ..............................................61
  I.    Other Recovery Efforts ...................................................................................62
  J.    Other Cryptocurrency Bankruptcies ................................................................64
  K.   Government Seizures .......................................................................................70
  L.   Non-Debtor Foreign Liquidation Proceedings .................................................70
  M.   FTX Digital Markets (Bahamas) ......................................................................71
  N.   Dismissals .......................................................................................................73
  O.   Interim Reports of John J. Ray III ...................................................................74
  P.   The Draft Plan, Creditor Meetings and the Settlement and Plan Support
       Agreement .......................................................................................................76
  Q.   U.S. Trustee's Request to Appoint Examiner ..................................................77
  R.   Digital Asset Estimation Motion .....................................................................78
  S.   Settlement with the IRS ...................................................................................78

-i-

T.      Potential Settlement of Claims by Governmental Authorities ................ 80

4.    SUMMARY OF THE PLAN .................................................................................... 82

A.      Considerations Regarding the Chapter 11 Plan ..................................... 82
B.      Rationale Underlying Plan Treatment of Claims .................................... 82
C.      Classification, Treatment and Voting of Claims and Interests ............... 87
D.      Implementation of the Plan ................................................................... 106
E.      Provisions Governing Distributions ...................................................... 111
F.      Record Date and Delivery of Distributions ........................................... 113
G.      Settlement, Release, Injunction and Related Plan Provisions ............... 119

5.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .......... 124

A.      The Confirmation Hearing ..................................................................... 124
B.      Confirmation Standards ......................................................................... 124
C.      Best Interests Test ................................................................................. 126
D.      Financial Feasibility .............................................................................. 129
E.      Acceptance by Impaired Classes ........................................................... 129
F.      Confirmation Without Acceptance by All Impaired Classes ................. 130

6.    VOTING PROCEDURES ....................................................................................... 132

A.      Parties-in-Interest Entitled to Vote ....................................................... 133
B.      Bahamas Claim Treatment for Customers ............................................. 133
C.      Amounts for Voting Purposes ................................................................ 134
D.      Convenience Claim Election .................................................................. 138
E.      Stipulated Amount for Voting, Allowance and Distribution .................. 138
F.      Voluntary Releases Under the Plan ........................................................ 139
G.      Classes Under the Plan .......................................................................... 139
H.      Solicitation Packages for Voting Classes .............................................. 140
I.      Solicitation Packages for Non-Voting Classes ...................................... 141
J.      Voting Procedures ................................................................................. 141

7.    ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING ............. 144

A.      Risks Related to the Debtors and These Chapter 11 Cases .................... 144
B.      Risks Related to the Plan ....................................................................... 144
C.      Additional Risks .................................................................................... 148

8.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
OF THE PLAN ....................................................................................................... 153

A.      U.S. Federal Income Tax Consequences to U.S. Holders ...................... 154
B.      U.S. Federal Income Tax Treatment of the Wind Down Entities and the
U.S. Holders of Customer Entitlement Claims ...................................... 155

C.      Withholding on Distributions and Information Reporting .................................157

9.     ALTERNATIVE TO CONFIRMATION OF THE PLAN .................................159

10.    DEBTORS' RECOMMENDATION .................................160

**Appendices**

Appendix A:  Chapter 11 Plan

Appendix B:  Solicitation Procedures Order

Appendix C:  Financial Projections

Appendix D:  Liquidation Analysis

Appendix E:  Digital Assets Conversion Table

## 1.  EXECUTIVE SUMMARY

The FTX Group collapsed precipitously 17 months ago, during the second week of November 2022.  At the time, the FTX Group was a disorganized jumble of over 100 legal entities in dozens of jurisdictions around the world.  The founder, Sam Bankman-Fried, ran the global business from The Bahamas with a group of young colleagues, without a functioning board of directors or any senior leader with significant business experience.  Using the FTX Group's trading platforms, Mr. Bankman-Fried had solicited billions of dollars in investments from customers, lenders, business partners, employees and stockholders, then spent the proceeds on bad or illiquid investments, vanity projects, celebrity endorsements, political donations, and lavish personal expenditures, including airplanes and luxury real estate.  Facing a run on the exchanges, a massive shortfall in customer assets, the absence of a functioning board of directors to step in and provide direction, involuntary insolvency filings in The Bahamas and Australia, the likelihood of other involuntary insolvency proceedings and regulatory seizures around the world, and Mr. Bankman-Fried's own imminent arrest in The Bahamas, Mr. Bankman-Fried—with advice from his multiple personal legal counsel—ceded control over the FTX Group to John J. Ray III, a restructuring executive with extensive experience in matters of similar scale, in the early morning hours of November 11, 2022.

Almost immediately after, with limited information but desperate need for the global automatic stay to stall the accelerating collapse and further dissipation of assets, on November 11 and November 14, 2022 (as applicable, the "Petition Date"), substantially all of the entities comprising the FTX Group filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

These chapter 11 cases have given FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") the breathing room necessary for new, experienced independent directors and management to assemble the remnants of the Debtors and amass their assets to repay customers and other stakeholders.  Over the past 17 months, under the protection of the Bankruptcy Court and the global reach of its orders, hundreds of stakeholders have worked with the Debtors on a lengthy process to establish corporate governance; stabilize the FTX Group businesses around the world; cooperate with regulators and criminal authorities; create appropriate custody arrangements for digital assets; painstakingly recreate missing financial and accounting records; investigate and report to governmental authorities, stakeholders and the public on how and why the FTX Group collapsed; maximize the value of the FTX Group's many diverse assets; explore going concern sales of various businesses, including the FTX.com exchange; commence and settle complex litigation disputes; develop protocols to coordinate with insolvency proceedings in The Bahamas and Australia, as well as criminal forfeiture proceedings in the Southern District of New York; and begin the daunting process of valuing, reconciling and resolving over 27.3 quintillion dollars of purported stakeholder claims.

With immense gratitude to the Bankruptcy Court, the United States Trustee for the District of Delaware (the "U.S. Trustee"), various other offices of the United States Department of Justice, the Commodity Futures Trading Commission (the "CFTC"), the United

States Internal Revenue Service and its counsel in the Tax Division of the Department of Justice (the "IRS"), the Joint Official Liquidators of FTX Digital Markets (the "Bahamas JOLs"), the Supreme Court of The Bahamas, the Securities Commission of The Bahamas, the Official Committee of Unsecured Creditors in these chapter 11 cases (the "Official Committee"), the Ad Hoc Committee of Non-U.S. Customers (the "Ad Hoc Committee") and the many other stakeholders and stakeholder representatives who have helped make this result possible, the Debtors are now ready to propose a chapter 11 plan of reorganization that resolves these chapter 11 cases. The Debtors today are filing their *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (as may be further amended, supplemented or modified from time to time, including the Plan Supplement, and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time, the "Plan").[2] A copy of the Plan is attached to this Disclosure Statement as Appendix A.

The Plan allocates value among competing claims based on the relative value of each creditor's claim at the Petition Date, as required by the Bankruptcy Code. Sharing among creditors in this manner is not within the discretion of the Debtors but a bedrock of bankruptcy law recognized by the Bankruptcy Court and the Supreme Court of the Bahamas, as well as by the Ad Hoc Committee, the Official Committee and the Bahamas JOLs. No other way to share recoveries is fair, especially on the facts of the FTX case.

However, the Plan does more than return Petition Date value to creditors: it includes potential incremental recoveries to compensate creditors for the time value of their money trapped at the FTX Group since the Petition Date. Indeed, the Debtors currently forecast that customers and digital asset loan creditors will recover between 119% and 143% of their Petition Date claim values. In order to accomplish this objective and to comply with the Bankruptcy Code and all applicable laws, the Plan is a complex document and stakeholders are cautioned to review this Disclosure Statement in its entirety, including the risks described in Section 7—*Additional Factors to Be Considered Prior to Voting*.

FTX can provide this level of recovery because of the reach and effectiveness of chapter 11 of the Bankruptcy Code. The Debtors and their stakeholders have had time to explore strategic options and runway to monetize illiquid and volatile investments gradually over time. Chapter 11 also has provided the Debtors with an arsenal of discovery, investigation and avoidance powers that have been used to locate and return billions of dollars of assets. These efforts are described in Section 3—*Significant Events and Business Initiatives in These Chapter 11 Cases*. In an alternative reality without chapter 11, when Bahamian authorities arrested Mr. Bankman-Fried and his fiefdom crumbled, the global creditors of the FTX Group would have been exposed to asset seizures, hacks, bank runs and conflicting orders in dozens of insolvency proceedings around the world—and could have suffered a near total loss at the end of a process that took significantly longer.

While creditors have suffered from the standpoint of losing access to their funds since November 2022, these chapter 11 cases have proceeded with remarkable alacrity given the

---

[2]    Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

challenges faced. Comparable cases such as Enron and Madoff took approximately three years before plan confirmation, in the case of Enron, or commencement of distributions, in the case of Madoff. And, in both of Enron and Madoff, it was many more years before distributions to creditors were completed (distributions to creditors continue in Madoff to this day). The independent directors of FTX from the beginning of these chapter 11 cases were intent on outperforming these historical examples. Their focus on speed and the time value of money for creditors has motivated the critical settlements and understandings underlying the Plan—such as the Debtors' proposed arrangements with the Bahamas JOLs, the Department of Justice, the CFTC and the IRS, as well as the resolution of customer property issues in early negotiations with the Ad Hoc Committee and other creditor representatives. The result has been a case that has been able to reach this point relatively quickly (among bankruptcies) because it has been free of major litigation between the Debtors and governmental authorities, non-U.S. liquidators or competing creditor groups. These settlements are not without their risks and costs, however, and stakeholders are encouraged to review the Disclosure Statement and consider the merits of each settlement carefully.

### A.    Purposes of this Disclosure Statement

The main purpose of this Disclosure Statement[3] is to provide the holders of claims who are entitled, and will be solicited, to vote on the Plan with adequate information to make an informed judgment about the Plan. Pursuant to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a bankruptcy court-approved written disclosure statement has been provided to each creditor or interest holder entitled to vote on the plan.

This Disclosure Statement also is intended to provide information to holders of claims with respect to certain elections that they may make in connection with the Plan, such as the Bahamas Opt-In Election (the election to have their Claims resolved and satisfied in the FTX DM Liquidation rather than in the Bankruptcy Court in the United States) or the convenience class election. Holders are asked to consider these elections carefully and to understand that, although the Debtors' board of directors, the Bahamas JOLs, the Ad Hoc Committee and the Class Action Claimants recommend approval of the Plan, no recommendation is made with respect to any of the ancillary elections available to holders of claims.

Finally, this Disclosure Statement provides substantial new public information about the Debtors. It does so in order to provide broader context to the holders of claims and to assist the Bankruptcy Court and stakeholders in connection with the process for confirming and implementing the Plan. This Disclosure Statement provides this information as part of a formal judicial process, as a document prepared by the Debtors based on their recreated books and

---

[3]    References to the "Disclosure Statement" mean this *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates*, as it may be further amended, supplemented or modified from time to time and all other exhibits and schedules thereto, in each case, as they may be further amended, modified or supplemented from time to time.

records, subject to comment and objection by all parties-in-interest and, ultimately, approval by the Bankruptcy Court after notice and public hearing.

### B.    The Main Challenges Faced in Developing this Plan

The extraordinary situation at the FTX Group raised significant and historic challenges for the prosecution of these chapter 11 cases. A brief overview of the most important challenges is useful to understand some of the strategic decisions reflected in the Plan.

*First*, the operations of the Alameda trading business and the FTX.com exchange had been managed centrally by a small group of insiders working directly with Mr. Bankman-Fried in The Bahamas. After the Petition Date, FTX had limited access to this group of insiders, all of whom (other than Mr. Bankman-Fried) pled guilty shortly after the chapter 11 cases commenced. Information about important transactions and the location of material financial assets often was not kept in reliable ledgers, but instead in informal documents and on disappearing messaging applications such as Signal. Root access to the software system that controlled private keys for digital assets was available to the group of insiders without clear records as to who was authorizing which transaction or why. Business practices sometimes appeared to be motivated by a desire for secrecy, and investments and trading positions were made in the name of employees, nominee owners or newly created special purpose vehicles. Tax and accounting audits were unreliable, especially with respect to the FTX.com exchange and its relationship with the Alameda trading business and the FTX Group's many investments in third parties. Accordingly, to create an evidentiary record sufficient to build a chapter 11 plan, it was necessary to first build—from scratch—a reliable balance sheet. The prioritization of this effort has been essential to accomplishing the objective of proposing a plan and making initial distributions in 2024.

*Second*, before the Petition Date, the FTX Group conducted various businesses through over 100 legal entities without proper corporate governance or accounting for intracompany transactions. After the Petition Date, the Debtors immediately created four "Silos" to manage FTX Group business activities. However, as described below, the Debtors have concluded that the factual record at the FTX Group is not clear enough for a conventional chapter 11 plan in which every individual asset and every individual claim is allocated with certainty to an individual Debtor entity. To attempt to do so would be inordinately expensive and risk years of potential litigation among stakeholders, with uncertain success. Instead, the Debtors require a restructuring solution that recognizes the FTX Group's internal structural deficiencies and informalities and yet still is in the best interests of all stakeholders. Substantive consolidation in the manner proposed herein is that solution, as described in more detail in Section 1.I—*Substantive Consolidation of Certain Debtors*.

*Third*, from the Debtors' perspective, the legal documentation for the FTX.com exchange was a self-contradictory mess. The FTX.com exchange user agreement included conclusory language stating that customers "owned" "their" digital assets, yet it did not include the other provisions necessary to create a conventional custody or trust relationship under applicable law. The user agreements also did not provide for the segregation of assets or the return of assets in specie to customers. Nor did such "ownership" language cover the billions in

fiat currency owed to customers. More fundamentally, behind the scenes at the FTX.com exchange, there had been no attempt to match customer positions with underlying assets attributable to customers. As described below and as previously disclosed, the FTX Group had only a small fraction of the digital assets in FTX.com exchange wallets that would have been necessary to cover customer positions on the Petition Date. Significantly, the shortfall in digital assets was not the result of a few large transfers of those assets out of FTX.com exchange wallets as the FTX Group collapsed; instead, there appeared *never* to have been reliable segregation nor reconciliation of customer entitlements to actual assets at the FTX.com exchange.

*Fourth*, the FTX Group was primarily a non-U.S. business, with both the Alameda trading business and the FTX.com exchange managed from The Bahamas. As of the Petition Date, only approximately 21.3% of the FTX Group's creditors were reportedly U.S. residents. These chapter 11 cases needed to recognize this reality and respect non-U.S. legal and regulatory processes, while still providing the benefits to creditors of an organized and centralized restructuring. In addition, special challenges were raised by the liquidation proceedings filed in The Bahamas and Australia, which created a substantial risk that the Debtors and non-U.S. liquidators would be ensnared in multi-jurisdiction litigation at creditors' expense for many years, as had been the case in other cross-border insolvencies.

*Fifth*, these chapter 11 cases started with a crime scene and coincided with law enforcement and regulatory investigations around the world. Some of these investigations were conducted by law enforcement or regulatory authorities who could recover assets beyond the reach of the Debtors, including assets seized by the Department of Justice and the Securities Commission of The Bahamas. Meanwhile, other regulators, such as the CFTC, were conducting their own investigations that could lead to large monetary penalties and decimate creditor recoveries.

*Sixth*, the array of potential claims against the Debtors was immense and included many duplicative and inflated claims, as well as claims whose valuation would be hotly contested. The Debtors knew they would not be able to pay distributions until they made progress resolving disputed claims and releasing associated reserves, a process still underway as of the date of this Disclosure Statement. These efforts are complicated by the FTX Group's shoddy books and records, especially as they relate to the FTX.com exchange. The claims trading market in the early days of these chapter 11 cases was essentially frozen by the inability to provide accurate account balance information and concerns about compliance with "Know Your Customer" rules, preference exposure and illegitimate accounts. Accordingly, there would be a premium in plan design on any steps that could be taken to accelerate liquidity for customers and creditors – especially the many holders of smaller claims – in addition to maximizing the quantum of their recoveries.

*Seventh*, the collapse of the FTX Group caused harm to individual investors around the world. Customers were rightly shocked, hurt and outraged. Encouraged by Mr. Bankman-Fried and his collaborators, who touted the FTX Group as a safe alternative to traditional financial institutions, many individuals had invested a large portion of their personal wealth in these companies. Any resolution of these chapter 11 cases would need to be sensitive

to the devastation caused and address as creatively as possible how to make injured parties whole in a manner consistent with the limitations imposed by the Bankruptcy Code and applicable law.

### C.     A Collaborative Process of Stakeholder Engagement and Compromise

The Debtors chose to address these challenges by emphasizing stakeholder involvement in all major decisions.  The Plan and Disclosure Statement are the result of extensive discussions and negotiations among the Debtors, governmental authorities, the Bahamas JOLs, the Ad Hoc Committee, the Class Action Claimants, the Official Committee and other stakeholders.  Stakeholders often had conflicting positions and priorities, and negotiations were hard-fought and at times contentious.

Throughout these chapter 11 cases, the Debtors have worked especially closely with the Bahamas JOLs, the Ad Hoc Committee and the Official Committee.  The Debtors and their advisors have diligently shared, among other pertinent details, over 700,000 files with these parties, including presentations, financial data, support schedules and source code documents to foster collaboration and to inform all parties as to complex and detailed matters in these chapter 11 cases.  Furthermore, the Debtors have coordinated a multitude of in-person and virtual meetings with these constituents for ongoing conversations and to garner support for various execution strategies.

Collaboration on the design of this Plan began in earnest in the summer of 2023, less than a year after the commencement of these chapter 11 cases.  Throughout this process, the Debtors maintained a robust, ongoing dialogue with the Ad Hoc Committee, the Official Committee and the Class Action Claimants via regular teleconferences, sustained information-sharing, and timely updates on significant Plan developments.  These Plan negotiations included collaboration, negotiation and compromise on a range of complex topics, including but not limited to, (i) the priority of distributions of customer entitlement claims; (ii) the treatment of intercompany claims; (iii) the composition of U.S. Customer Priority Assets; (iv) the composition of Dotcom Customer Priority Assets; (v) the composition of the General Pool; (vi) the valuation of digital assets; (vii) expense allocation; (viii) the use, amount and treatment of convenience claims; and (ix) the rate of postpetition interest, if any, to be recovered by creditors.

These spirited debates enabled all stakeholders to share their perspectives and to evaluate competing views.  Ultimately, the Debtors believe that this collaborative process has yielded a Plan that is in the best interests of the Debtors, their estates and their stakeholders.

### D.     The Debtors' Cash Position and Remaining Assets

A primary objective of the Debtors during these chapter 11 cases has been to monetize their assets until the Debtors have ensured a full recovery for customers and other creditors.  The monetization effort has been successful and the Debtors currently expect to have approximately $12.6 billion in cash as of the expected effective date of the Plan, enough to pay all non-governmental customers and creditors in full based on the Petition Date value of their claims, subject to the conditions and assumptions described in this Disclosure Statement.

Now that the Debtors have reached a situation where projected cash covers all non-governmental creditor claims, the Debtors intend to continue to gradually monetize their remaining assets in order to maximize the amount available for payment of supplemental amounts to creditors. Assets of material value likely to remain unsold as of the Effective Date are described in Section 1.H.1—*Projected Net Distributable Proceeds.*

The Debtors anticipate reducing all of these assets to cash opportunistically based on market prices and the timing of distributions, and certain assets may not be sold immediately but held for sale for some reasonable period of time based on the nature of the asset and market conditions.

### E.      Highlights of the Plan

The Plan provides that substantially all remaining assets of the Debtors will be held in a single "Consolidated Wind Down Trust." The Consolidated Wind Down Trust will conduct business only as appropriate for its business purpose: to liquidate its remaining assets and fund cash distributions to creditors. The Consolidated Wind Down Trust will hold all cash, all of the remaining assets described below and shares in certain subsidiaries that will be wound down outside of these chapter 11 cases under applicable law.

The Plan provides for the payment in cash in full over time of all non-governmental creditor and customer claims against the Debtors that are estimated by the Debtors to ultimately be Allowed (as defined by the Plan) and facilitates the same treatment for eligible FTX.com customers making the Bahamas Opt-In Election (as defined below) with admitted claims. In addition, to the extent that funds are available after paying these claims in full, the Plan also provides for supplemental interest payments to creditors. The rate of interest provided by the Plan for most creditors is 9.0% (the "Consensus Rate"), which results from negotiations with various governmental authorities and other stakeholders and corresponds to the pre-judgment interest rate in the State of Delaware as of the Petition Date. The Debtors believe the Consensus Rate is a remarkably favorable outcome for creditors, made possible only because of the voluntary subordination of claims by the Internal Revenue Service, the CFTC and potentially other governmental constituencies. Assuming that the effective date of the Plan is October 31, 2024, and the total estimated amount of allowable creditor claims is approximately $11.2 billion, the Consensus Rate could provide approximately $2.0 billion of incremental value to creditors to compensate them for the time value of their investments through the effective date of the Plan. After the effective date, creditors would continue to earn 9.0% interest on the unpaid portion of their claims from the Petition Date until paid in full, resulting in approximately $0.8 billion of incremental value to creditors. The Consensus Rate has not been approved by the Bankruptcy Court and is subject to change, as discussed in greater detail in Section 1.B—*Risks Related to the Plan.*

Consistent with prior drafts of the Plan and the previously-announced settlement of customer property litigation with the Ad Hoc Committee and the Class Action Plaintiffs, the Plan provides special treatment for customers versus other creditors. Customers of each of the FTX.com exchange and FTX.US exchange have a partial priority claim against the General Pool (as defined below) for the shared benefit of all of the customers of the applicable exchange.

These priority claims are referred to as the "Dotcom Intercompany Shortfall Claim" and the "US Intercompany Shortfall Claim," respectively.  As a result of these shared priority claims, customers of the FTX.com exchange and FTX.US exchange should receive distributions more quickly than non-customer creditors.  The Debtors continue to believe that this priority for customers is a reasonable settlement that is in the best interests of the Debtors' estates and their stakeholders, as described in more detail in Section 4.B.5—*The Customer Priority Settlement*.

Since it may take a substantial period of time before the Debtors are able to complete customer and other creditor distributions due to the substantial claims filed against the Debtors, which are in some cases duplicated or grossly inflated, the Debtors are taking a number of steps to accelerate distributions to creditors, including the following:

- The Debtors have filed 30 omnibus objections to over $26.8 quintillion of claims and early claims objections for several of their largest individual claims not yet settled.

- The Debtors moved separately for the Bankruptcy Court to estimate the Petition Date price of all digital assets, eliminating the need for additional reserves that would prevent distributions until valuation issues are resolved.

- The Debtors have reached a settlement with BlockFi and proposed settlements with the IRS and other large creditors as described in this Disclosure Statement.  These settlements remove substantial uncertainty and avoid the establishment of large reserves that would delay distributions.

- The Debtors also have requested that the CFTC subordinate its claims as well as agree to fund supplemental distributions to certain creditors.

- Creditors and customers with reconciled claim values of $50,000 or under will be classified in the Plan in "convenience classes" and receive payment with interest within 60 days of the effective date of the Plan, subject to completion of KYC and the necessary distribution information materials.  Through this convenience class mechanism, approximately 98% of customers by number will be eligible to receive early cash recoveries.

To resolve their series of disputes with the Bahamas JOLs, the Debtors and the Bahamas JOLs have designed a novel approach to conducting a dual-jurisdiction insolvency proceeding.  Customers holding claims in their capacity as former customers of the FTX.com exchange will have the option to elect to have their claims administered, reconciled and satisfied in the Supreme Court of The Bahamas, rather than in the Bankruptcy Court.  Customers electing to administer and reconcile claims in The Bahamas are expected to receive substantially identical treatment in terms of claim value, interest and the application of the Debtors' KYC requirements, and also will be required to comply with additional procedures and restrictions applicable to the

-12-

Bahamian proceeding that could delay or reduce recoveries.  More information about this election is described below and in the Bahamas Opt-In Election instruction letter contained in the Solicitation Package (the "Bahamas Process Letter"), each of which should be carefully reviewed by customers prior to making the applicable election.

In order to ensure fair treatment of creditors and minimize reserves, the Plan has an anti-double dip provision which allows the Plan Administrator to adjust the amount and timing of distributions on any claim in order to ensure that the holder of such claim does not receive more than similarly situated holders as a result of duplicative claims made for the same losses in another forum.  The Plan also contemplates an option for creditors to voluntarily assign to the Consolidated Wind Down Trust (as defined below) any claims made in another forum, which the Consolidated Wind Down Trust will manage for the benefit of all creditors.

Finally, in recognition of the harm caused to FTX creditors and policies that favor restitution to victims of financial crimes, the Plan subordinates claims by the IRS, the CFTC and potentially other governmental creditors to claims by non-governmental creditors, as well as interest on such claims at the Consensus Rate.  After creditors receive interest at the Consensus Rate, the Plan allocates residual distributions to pay these governmental creditors, with recoveries by the CFTC and other participating creditors being applied to fund the Supplemental Remission Fund described in Section 1.F—*The Supplemental Remission Fund*.

The Plan is supported by the Joint Official Liquidators of FTX Digital Markets, BlockFi and the Executive Committee of the Ad Hoc Committee of Non-U.S. Customers, which has informed the Debtors that it will recommend the Plan to the members of the Ad Hoc Committee, who together hold over $3.8 billion in FTX.com customer claims.  The individual members of the Ad Hoc Committee (other than those on the Executive Committee), the Official Committee of Unsecured Creditors, the CFTC and the Department of Justice are reviewing and have not yet taken a position on the Plan.

F.       **The Supplemental Remission Fund**

The Debtors have requested that the CFTC and will request that certain other governmental creditors settle their claims on the basis that the Debtors agree to create a special fund called the Supplemental Remission Fund, which would be administered by the Debtors for purposes of using funds otherwise payable to governmental creditors to make supplemental distributions by way of remission to (a) FTX.com customers, FTX.US customers and cryptocurrency lenders to Alameda and (b) FTX DM for the benefit of Holders of Eligible DM Customer Entitlement Claims.

The largest of these governmental claims has been made by the CFTC, which also filed litigation against the Debtors shortly after the Petition Date.  The CFTC complaint, dated December 21, 2022 (the "CFTC Complaint"), alleges fraud and material misrepresentations and seeks restitution, disgorgement, civil monetary penalties and pre-judgment interest, as well as injunctive relief.  On September 28, 2023, the CFTC filed proofs of claim against multiple Debtors attaching the CFTC Complaint.  On the applicable proof of claim forms, the CFTC estimated the amount of its claim for restitution as $8,700,000,000, not including interest or

-13-

other charges, which it agreed to subordinate to certain creditors.  The CFTC also filed proof of claim forms for its claim of disgorgement and civil penalties in the amount of $8,700,000,000 for each claim.

The Debtors have proposed to the CFTC a framework for a resolution of the CFTC Complaint and the CFTC's claims (the "~~Debtors'~~ Proposed CFTC Settlement").  From the Debtors' perspective, the ~~Debtors'~~ Proposed CFTC Settlement is premised on an understanding that exchange customers and digital asset lenders have incurred losses from the FTX Group's collapse that are not fully reflected in the value of their nominal customer entitlements and loan balances as of the Petition Date, such that the restitution ultimately awarded in a resolution of the CFTC Complaint and claim may be substantially in excess of the Petition Date balances.  Balances on the Petition Date arise from various relationships between the FTX Group and customers who used the FTX Group's platforms, including digital asset commodities, derivative contracts, and structured products.  From the Debtors' perspective, all exchange customers and cryptocurrency lenders of the Debtors were affected by the collapse of the FTX Group and have lost access to their funds and the corresponding ability to achieve a return on digital asset investments during these chapter 11 cases.~~–~~

As an approximation of those losses, the Debtors have proposed to the CFTC that the Debtors would settle the CFTC Complaint and the CFTC's claims by stipulating and allowing the CFTC a subordinated claim (the "Senior Subordinated Remission Claim") corresponding to an agreed amount of remission payments to be made by the Debtors on behalf of the CFTC to certain categories of creditors, which the Debtors have proposed should include exchange customers and digital asset lenders.  The Debtors anticipate that this Senior Subordinated Remission Claim will be based on a gross remission amount that is significantly in excess of the nominal customer entitlements and loan balances as of the Petition Date, and that as a part of a resolution of the CFTC's Complaint and claim, the amounts that the Debtors distribute to certain categories of creditors pursuant to the Plan (once confirmed) will operate as a set-off or credit to reduce the CFTC's Senior Subordinated Remission Claim payable by the Debtors.  Although the amount of the Senior Subordinated Remission Claim has not yet been determined, given the magnitude of the losses incurred in connection with the collapse of the FTX Group, the Debtors anticipate that the amount of the Senior Subordinated Remission Claim will greatly exceed the aggregate amount of proceeds projected to be distributable to pay Senior Subordinated Claims at the appropriate level of the General Pool waterfall.

The Debtors' Proposed CFTC Settlement has not been agreed to or authorized by the CFTC, or approved by the Bankruptcy Court.  The Debtors and the CFTC are continuing their discussions, as discussed in greater detail in Section 1.B—*Risks Related to the Plan*.

The Debtors also intend to request that other governmental creditors subordinate their claims alongside the CFTC on the same proposed terms.  There can be no ~~assurances~~assurance that the CFTC or any other governmental authority will agree to or authorize this arrangement, or that these governmental authorities will further subordinate any civil monetary penalties or other recoveries that could decrease distributions available to other stakeholders.  The Debtors may file additional information on the docket of these chapter 11

cases from time to time to update stakeholders on the progress of discussions with the CFTC and other governmental creditors.

### G.    Recovery Analysis and Treatment of Claims and Interests

The Plan organizes the Debtors' creditor and equity constituencies into groups called Classes. For each Class, the Plan describes (a) the underlying Claim or Interest; (b) whether the Class is Impaired under the Plan, meaning that each Holder will receive less than payment in full in cash on account of its Allowed Claim or Allowed Interest or that the rights of Holders under law will be altered in some way; and (c) the form of any recovery that Holders will receive on account of their respective Allowed Claims or Allowed Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify administrative claims as defined in section 503 of the Bankruptcy Code ("Administrative Claims") or 503(b)(9) Claims, which will generally be paid in Cash when approved by the Bankruptcy Court or in the ordinary course on or after the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Priority Tax Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3A | Secured Loan Claims | Impaired | Entitled to Vote |
| 3B | Other Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 5A | Dotcom Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5B | U.S. Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5C | NFT Customer Entitlement Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 6A | General Unsecured Claims | Impaired | Entitled to Vote |
| 6B | Digital Asset Loan Claims | Impaired | Entitled to Vote |
| 7A | Dotcom Convenience Claims | Impaired | Entitled to Vote |
| 7B | U.S. Convenience Claims | Impaired | Entitled to Vote |
| 7C | General Convenience Claims | Impaired | Entitled to Vote |
| 8A | PropCo Operating Expense Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 8B | Priority DM Claim | Impaired | Entitled to Vote |
| 8C | PropCo General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Cancelled Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 10A | Senior Subordinated IRS Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 10B | Senior Subordinated Governmental Claims | Impaired | Entitled to Vote |
| 10C | Junior Subordinated IRS Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 12 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 13 | Section 510(b) Preferred Equity Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 14 | Section 510(b) Other Equity Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 15 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 16 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 17 | FTT Claims and Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 18 | *De Minimis* Claims | Impaired | Not Entitled to Vote, Deemed to Reject |

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  This information is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, see Section 4—*Summary of the Plan*.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO MATERIAL CHANGE.**

**SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES[4]**

---

[4]    Figures are as of May 5, 2024 and are subject to material change.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 1 Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Priority Tax Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court. | $200[6] | 100% |
| Class 2 Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Other Priority Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court. | $0 | 100% |
| Class 3A Secured Loan Claims | In full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Loan Claim, each Holder of an Allowed Secured Loan Claim shall receive payment in Cash in an amount equal to 100% of such Allowed Secured Loan Claim *plus* interest accrued at the Federal Judgment Rate on such Allowed Secured Loan Claim from the Petition Date through the Effective Date. | $250 | 110% |

---

[5]  Estimated aggregate amount of claims currently asserted against or scheduled by the Debtors, incorporating provisions of the Plan and excluding the Debtors' assessment of duplicative claims.  Unless otherwise expressly stated herein, recovery estimates reflect the Debtors' estimate of recoveries to creditors over time (and not necessarily as of the Effective Date of the Plan).

[6]  Amount reflects IRS Settlement as described in Section 3.S—*Settlement with the IRS.*

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 3B Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator: (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired. | N/A | N/A |
| Class 4 Separate Subsidiary Claims | Except to the extent that a Holder of an Allowed Separate Subsidiary Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Separate Subsidiary Claim, each Holder of an Allowed Separate Subsidiary Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Initial Distribution Date; (ii) the date on which such Allowed Separate Subsidiary Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court. | $54 | 100% |
| Class 5A Dotcom Customer Entitlement Claims | Except to the extent that a Holder of an Allowed Dotcom Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Dotcom Customer Entitlement Claims, each Holder of an Allowed Dotcom Customer Entitlement Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed Dotcom Customer Entitlement Claim, *plus* (ii) interest at the Consensus Rate on such Allowed Dotcom Customer Entitlement Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with section 7.1 of the Plan, *plus* (iii) any proceeds from the Supplemental Remission Fund to which the Debtors determine such Holder is entitled pursuant to section 5.21 of the Plan; *provided* that no Holder of an Allowed Dotcom Customer Entitlement Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in sections 4.2.1 and 4.2.3 of the Plan. | $8,026 | 129% - 143% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 5B U.S. Customer Entitlement Claims | Except to the extent that a Holder of an Allowed U.S. Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed U.S. Customer Entitlement Claims, each Holder of an Allowed U.S. Customer Entitlement Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed U.S. Customer Entitlement Claim, *plus* (ii) interest at the Consensus Rate on such Allowed U.S. Customer Entitlement Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with section 7.1 of the Plan, *plus* (iii) any proceeds from the Supplemental Remission Fund to which the Debtors determine such Holder is entitled pursuant to section 5.21 of the Plan; *provided* that no Holder of an Allowed U.S. Customer Entitlement Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in sections 4.2.2 and 4.2.3 of the Plan. | $168 | 129% - 143% |
| Class 5C NFT Customer Entitlement Claims | Except to the extent that a Holder of an Allowed NFT Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed NFT Customer Entitlement Claim, each Holder of an Allowed NFT Customer Entitlement Claim shall receive the Available NFT associated with such Allowed NFT Customer Entitlement Claim. | N/A | 100% |

-19-

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 6A General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed General Unsecured Claim, *plus* (ii) interest at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Bankruptcy Court (or as otherwise agreed by the relevant parties) on such Allowed General Unsecured Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with section 7.1 of the Plan; *provided* that no Holder of an Allowed General Unsecured Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in section 4.2.3 of the Plan. | $1,133 | 125% |
| Class 6B Digital Asset Loan Claims | Except to the extent that a Holder of a Digital Asset Loan Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Digital Asset Loan Claims, each Holder of an Allowed Digital Asset Loan Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed Digital Asset Loan Claim, *plus* (ii) interest at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Bankruptcy Court (or as otherwise agreed by the relevant parties) on such Allowed Digital Asset Loan Claim from the Petition Date through the Distribution Date on which such Allowed Digital Asset Loan Claim is paid to the extent of available funds, *plus* (iii) any proceeds from the Supplemental Remission Fund to which the Debtors determine such Holder is entitled pursuant to section 5.21 of the Plan; *provided* that no Holder of an Allowed Digital Asset Loan Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in section 4.2.3 of the Plan. | $642 | 129% - 143% |

-20-

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 7A Dotcom Convenience Claims | In full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Dotcom Convenience Claim, each Holder of an Allowed Dotcom Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed Dotcom Convenience Claim *plus* postpetition interest at the Consensus Rate from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in section 4.2.1 of the Plan, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such Dotcom Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court. | $864 | 119% |
| Class 7B U.S. Convenience Claims | In full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed U.S. Convenience Claim, each Holder of an Allowed U.S. Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed U.S. Convenience Claim *plus* postpetition interest at the Consensus Rate from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in section 4.2.2 of the Plan, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such U.S. Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court. | $144 | 119% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 7C General Convenience Claims | In full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Convenience Claim, each Holder of an Allowed General Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed General Convenience Claim *plus* postpetition interest at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Bankruptcy Court (or as otherwise agreed by the relevant parties) from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in section 4.2.3 of the Plan, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such General Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court. | $3 | 119% |
| Class 8A PropCo Operating Expense Claims | Except to the extent that a Holder of an Allowed PropCo Operating Expense Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo Operating Expense Claim, each Holder of an Allowed PropCo Operating Expense Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Initial Distribution Date; (ii) the date on which such Allowed PropCo Operating Expense Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court. | $0 | 100% |
| Class 8B Priority DM Claim | Except to the extent that FTX DM agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Priority DM Claim, FTX DM shall receive payment in Cash in an amount equal to the Priority DM Claim, to be paid directly from the proceeds from the sale, disposition or other monetization of the Bahamas Properties in accordance with the waterfall priority set forth in section 4.2.4 of the Plan, until the Priority DM Claim is paid in full. | $256 | 46% - 51% |

-22-

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 8C PropCo General Unsecured Claims | Except to the extent that a Holder of an Allowed PropCo General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo General Unsecured Claim, each Holder of an Allowed PropCo General Unsecured Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the proceeds from the sale, disposition or other monetization of the Bahamas Properties available to pay PropCo General Unsecured Claims in accordance with the waterfall priority set forth in section 4.2.4 of the Plan. | N/A | N/A |
| Class 9 Cancelled Intercompany Claims | All Cancelled Intercompany Claims shall be cancelled, released or otherwise settled in full, and the Holders of Cancelled Intercompany Claims shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Claims under the Plan. | N/A | N/A |
| Class 10A Senior Subordinated IRS Claims | Except to the extent that a Holder of an Allowed Senior Subordinated IRS Claim agrees to less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for all Claims of the IRS against the Debtors arising from activities, transactions, liabilities or events after October 31, 2022, each Holder of an Allowed Senior Subordinated IRS Claim shall receive payment in Cash in an amount equal to such Holder's share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $[TBD] | [TBD]% |

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 10B Senior Subordinated Governmental Claims | Except to the extent that a Holder of an Allowed Senior Subordinated Governmental Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Senior Subordinated Governmental Claim, each Holder of an Allowed Senior Subordinated Governmental Claim shall receive payment in Cash in an amount equal to such Holder's share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan; *provided* that each Holder of such Allowed Senior Subordinated Governmental Claim may elect to contribute such payment to the Supplemental Remission Fund for the benefit of, and Distribution to, Holders of Allowed Dotcom Customer Entitlement Claims, Allowed U.S. Customer Entitlement Claims, and Allowed Digital Asset Loan Claims as contemplated by section 5.21 of the Plan. | $8,899[7] | 3% - 18% |
| Class 10C Junior Subordinated IRS Claim | Except to the extent that a Holder of an Allowed Junior Subordinated IRS Claim agrees to less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for all Claims of the IRS (other than the Priority IRS Tax Claim) against the Debtors arising from activities, transactions, liabilities or events on or preceding October 31, 2022, each Holder of an Allowed Junior Subordinated IRS Claim shall receive payment in Cash in an amount equal to such Holder's share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $685[8] | 0% |

---

[7]    Amount includes approximately $8.7 billion of claims filed by the CFTC and $199 million of claims filed by other governmental authorities; proceeds otherwise payable to the CFTC claim are assumed to be reallocated on a ratable basis to Holders of Allowed Claims in Classes 5A, 5B, and 6B, as further described in Section 1.F—*The Supplemental Remission Fund*. Discussions are ongoing with both the CFTC and other governmental authorities regarding the size and treatment of such claims; see section 3.T for additional disclosure regarding the Texas State Securities Board, the Texas Department of Banking and the State of Texas through the Consumer Protection Division of the office of the Texas Attorney General (collectively, "Texas"). While the Financial Projections have not been updated to reflect the Texas' amended claim, based on ongoing discussions with the CFTC and other governmental authorities, including Texas, the Debtors expect the eventual recoveries provided to creditors on account of the Supplemental Remission Fund will be materially consistent or better than those currently reflected in the Financial Projections.

[8]    Amount reflects IRS Settlement as described in Section 3.S—*Settlement with the IRS*.

-24-

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 11 Intercompany Interests | No Holder of an Intercompany Interest shall receive any Distributions on account of its Intercompany Interest. On and after the Effective Date, all Intercompany Interests shall, at the option of the Debtors, either be reinstated, set off, settled, addressed, distributed, contributed, merged or cancelled. | N/A | 0% |
| Class 12 Preferred Equity Interests | Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interest shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | $1,966[9] | 0% |
| Class 13 Section 510(b) Preferred Equity Claims | Except to the extent that a Holder of an Allowed Section 510(b) Preferred Equity Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Section 510(b) Preferred Equity Claim, each Holder of an Allowed Section 510(b) Preferred Equity Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | N/A | 0% |
| Class 14 Section 510(b) Other Equity Claims | Except to the extent that a Holder of an Allowed Section 510(b) Other Equity Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Section 510(b) Other Equity Claim, each Holder of an Allowed Section 510(b) Other Equity Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | N/A | 0% |

---

[9]    Such amount reflects the liquidation value reflected in the applicable Preferred Equity Interests.

| CLASS | TREATMENT | ESTIMATED ALLOWED CLAIMS[5] (IN MILLIONS) | ESTIMATED PERCENT RECOVERY |
|---|---|---|---|
| Class 15 Equitably Subordinated Claims | All Equitably Subordinated Claims shall be cancelled or released, and the Holders of Equitably Subordinated Claims shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Claims under the Plan. | N/A | 0% |
| Class 16 Other Equity Interests | Except to the extent that a Holder of an Allowed Other Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Equity Interest, each Holder of an Allowed Other Equity Interest shall receive its share equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan. | N/A | 0% |
| Class 17 FTT Claims and Interests | All Allowed FTT Claims and Interests shall be cancelled or released, and the Holders of Allowed FTT Claims and Interests shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Interests under the Plan. | N/A | 0 % |
| Class 18 *De Minimis* Claims | No Holder of a *De Minimis* Claim shall receive any Distributions on account of its *De Minimis* Claim. On and after the Effective Date, all *De Minimis* Claims shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | $2 | 0 % |

## H.    Summary of Estimated Recoveries to Creditors

As is customary in chapter 11 cases, the Debtors have attached to this Disclosure Statement as Appendix C Financial Projections and a Hypothetical Liquidation Analysis (as defined below). The Debtors provide below a summary of approximate recoveries to creditors based on information available and analyses performed to date in these chapter 11 cases (these "Chapter 11 Cases").

Subject to the conditions and assumptions discussed in this Disclosure Statement, as of the date of this Disclosure Statement, the Debtors currently anticipate making distributions to Holders of classes 3A, 5A, 5B, 6A, 6B, 7A, 7B and 7C of Claims equal to the entire amount of such Claims plus postpetition interest.

-26-

1. *Projected Net Distributable Proceeds*

As used in this Section 1.H—*Summary of Estimated Recoveries to Creditors*, "Net Distributable Proceeds" means (a) the gross amount available from the disposition of the Plan Assets (including digital assets) plus (b) the Wind Down Cash Proceeds, minus (c) the Wind Down Budget.

As of the date of this Disclosure Statement, the Debtors have projected an estimated total value of Net Distributable Proceeds between $14.7 and $16.5 billion.[10]  This estimate is composed of (1) the Debtors' projected cash on hand as of October 31, 2024, the projected effective date of the Plan (the "Assumed Effective Date"),[11] (2) proceeds to be monetized after the Assumed Effective Date, and (3) the projected costs of the Wind Down Budget.

The Debtors' projected cash on hand as of the Assumed Effective Date is approximately $12.6 billion.  This calculation is based on the Debtors having approximately $9.9 billion in cash on hand as of May 5, 2024, plus an estimated $2.7 billion in cash estimated to be received due to the anticipated monetization of digital assets and other assets prior to the Assumed Effective Date.

After the Assumed Effective Date, the Debtors expect to receive $2.5 to $4.3 billion in Net Distributable Proceeds from the monetization of all remaining assets, which is composed of the following:

- Approximately $1.2 to $2.0 billion of estimated proceeds related to the anticipated monetization of assets in the Ventures Silo (as defined below) (including over 200 equity investments, and dozens of fund, loan, and other investments);

- Approximately $0.5 to $1.4 billion of estimated proceeds from the sale of the remaining digital assets following the Assumed Effective Date;

- Approximately $0.5 billion of estimated residual proceeds from investments in subsidiaries after payment in full of all such subsidiaries' respective Claims; and

- Approximately $0.4 billion of estimated proceeds from the monetization or liquidation of other assets, including the prosecution or resolution of

---

[10]   Asset recovery estimates were derived from analyses conducted by the Debtors' advisors, including Alvarez & Marsal North America, LLC, Sullivan & Cromwell LLP, Perella Weinberg Partners LP, Galaxy Digital Capital Management LP and the Analysis Group, Inc. based on figures as of May 5, 2024.

[11]   The Assumed Effective Date is subject to change and adjustment pursuant to the Debtors' plan confirmation timeline.

Claims asserted against other entities and monetization of other assets and interest income on cash earned after the Assumed Effective Date.

2. *Estimated Claims*

As of May 5, 2024, the Debtors estimate approximately $11.2 billion in allowable (i) Class 3A Secured Loan Claims and Class 3B Other Secured Loan Claims, (ii) Class 5A Dotcom Customer Entitlement Claims, Class 5B U.S. Customer Entitlement Claims, Class 7A Dotcom Convenience Claims, and Class 7B U.S. Convenience Claims, and (iii) Class 6A General Unsecured Claims, Class 6B Digital Asset Loan Claims and Class 7C General Convenience Claims.

The Debtors and their advisors are reconciling filed proofs of claims against the Debtors' Schedules. The filed proofs of claim assert amounts in excess of $40.2 billion in Customer Entitlement Claims against the FTX.com Exchange (as defined below) and the FTX.US Exchange (as defined below) and amounts in excess of $332.9 billion in General Unsecured Claims against the Debtors. Of these asserted amounts, the Debtors' estimate Allowed Claims of approximately $11.2 billion.

As of May 5, 2024 the Debtors have successfully withdrawn, expunged or modified approximately $25 billion[12] of Customer Entitlement Claims and $101.2 billion of General Unsecured Claims. Resolution of Disputed Claims is predicated on the Debtors' successful objection and subsequent expungement, withdraw or modification of the remaining hundreds of thousands of unreconciled filed proofs of claims. This claims administration and reconciliation process is one of the primary factors in determining the timing and quantum of Distributions to creditors and customers. This process is expected to continue after the Assumed Effective Date.

Claims of Governmental Units are estimated to include $885 million of Allowed prepetition tax claims ($200 million of Allowed Priority IRS Tax Claims and $685 million of Allowed Junior Subordinated IRS Claims) and $8.9 billion of Subordinated Governmental Claims. These and any related settlements are preliminary, subject to ongoing discussions with the Governmental Units and could have a material impact on creditor and customer recoveries.

The Debtors' current estimate (as of May 5, 2024) of Allowed Claims by Class is as follows:

- Approximately $0.3 billion in Allowed Secured Claims;

---

[12]    In addition to the $25 billion, over $26.8 quintillion frivolous, duplicative and superseded claims have been objected to and expunged or modified to the Debtors' books and records.

- Approximately $8.0 billion in Allowed Dotcom Customer Entitlement Claims (inclusive of anticipated Eligible DM Customer Entitlement Claims);

- Approximately $0.2 billion U.S. Customer Entitlement Claims;

- Approximately $1.8 billion in Allowed General Unsecured Claims;

- Approximately $0.9 billion in Allowed Dotcom Convenience Claims;

- Approximately $0.1 billion in Allowed U.S. Convenience Claims; and

- Approximately $3 million in Allowed General Convenience Claims.

Then, the Debtors estimate that there will be approximately $2.0 billion in postpetition interest paid to certain classes of Allowed Claims, which is estimated based on accruals from the Petition Date through the Assumed Effective Date at the Consensus Rate, and an additional $0.8 billion in postpetition interest paid to certain classes of Allowed Claims, estimated based on accruals from the Assumed Effective Date through the applicable Distribution Dates.

### 3. *These Preliminary Figures are Subject to Material Change*

The projected distributions of the Net Distributable Proceeds and the estimated figures of Allowed Claims are subject to ongoing review and investigation and should not be considered final for any purpose. The Debtors provide these figures for illustrative purposes only, thereby providing an approximate snapshot of the financial projections to come at a later date. In particular, a substantial portion of the Debtors' yet unmonetized assets are subject to historically volatile digital asset market and other macroeconomic risk factors. In the event of a deterioration in current market conditions, it is possible that eventual Net Distributable Proceeds could be substantially lower than expected. In general, the figures discussed in this Section are subject to material change due to a range of factors, including but not limited to the Debtors' ongoing analysis, the claims reconciliation and KYC process, and prevailing market conditions. For more information regarding these risks and related considerations, consult Section 7—*Additional Factors to Be Considered Prior to Voting*.

## I. Substantive Consolidation of Certain Debtors

Pursuant to sections 105, 363, 365 and 1123 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and as an integral part of the Customer Priority Settlement (as defined below) pursuant to the Plan, the Plan shall be deemed a motion by the Debtors seeking the approval, effective as of the Effective Date, of the substantive consolidation of the Estates of the Consolidated Debtors into a single Entity formed as a Delaware trust (the "Consolidated Wind Down Trust") for the purposes of effectuating and implementing the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such substantive consolidation of the Estates of the Consolidated

Debtors, as well as findings by the Bankruptcy Court that such substantive consolidation is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and the Holders of Claims and Interests. FTX Bahamas PropCo shall not be substantively consolidated pursuant to the Plan and shall continue to exist as a separate legal entity.

Except as otherwise provided in the Plan and subject in all respects to the classification and treatment of Claims and Interests set forth in the Plan, as a result of the substantive consolidation of the Estates of the Consolidated Debtors: (a) all property of the Consolidated Debtors shall vest in, and constitute the property of, the Consolidated Wind Down Trust, free and clear of any and all Liens, charges or other encumbrances or interests pursuant to section 5.12 of the Plan; (b) all guarantees of any Consolidated Debtor of the payment, performance or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Wind Down Trust; (d) all Cancelled Intercompany Claims shall be deemed cancelled; and (e) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Consolidated Wind Down Trust.

Except as otherwise provided in the Plan, the substantive consolidation shall not: (i) affect the separate legal existence of the Consolidated Debtors for purposes other than implementation of the Plan pursuant to its terms; (ii) constitute or give rise to any defense, counterclaim or right of netting or setoff with respect to any Cause of Action vesting in the Consolidated Wind Down Trust that could not have been asserted against the Consolidated Debtors; or (iii) ~~constitute the transfer or assignment of, or~~ give rise to any right under~~,~~ any executory contract, insurance contract or other contract to which a Consolidated Debtor is party, except to the extent required by section 365 of the Bankruptcy Code in connection with the assumption of such contract by the applicable Debtors.

As explained in Section 2.A—*The Silos*, the Debtors consist of FTX Trading and 84 affiliates. Holders of Allowed Claims against or Allowed Interests in each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Allowed Interests in the applicable Class.

## J.    Making the Bahamas Opt-In Election

As part of the FTX DM Global Settlement among the Debtors and FTX DM, as explained more fully below in Section 3.~~N~~M—*FTX Digital Markets (Bahamas)*, Holders of Dotcom Customer Entitlement Claims or Dotcom Convenience Claims have the option to make the Bahamas Opt-In Election. Customers electing to administer and reconcile claims in The Bahamas are expected to receive substantially identical treatment in terms of claim value, interest and the application of the Debtors' KYC requirements, and also will be required to comply with additional procedures and restrictions applicable to the Bahamian proceeding.

If a Dotcom Customer wishes to elect to have its Dotcom Customer Entitlement Claim or its Dotcom Convenience Claim resolved and satisfied in the FTX DM Liquidation

Proceeding in The Bahamas, such holder must affirmatively make the Bahamas Opt-In Election, by submitting a Ballot in the Chapter 11 Cases or by submitting a Proof of Debt in the FTX DM Liquidation Proceeding, as described more fully in Section 6.~~B~~C—*Bahamas Claim Treatment for Customers* herein.

If a Holder of a Dotcom Customer Entitlement Claim or Dotcom Convenience Claim makes the Bahamas Opt-In Election, its Class 5A Dotcom Customer Entitlement Claim or its 7A Dotcom Convenience Claims will not be administered, reconciled, valued, settled, adjudicated, resolved or satisfied in these Chapter 11 Cases and such Holder will agree to forever, fully and finally release and discharge the Debtors with respect to its Class 5A Dotcom Customer Entitlement Claim or its Class 7A Dotcom Convenience Claim and forever, fully and finally withdraw with prejudice such Class 5A Dotcom Customer Entitlement Claim or Class 7A Dotcom Convenience Claim from these Chapter 11 Cases and will not be entitled to a distribution from the Debtors on account of such claim.

If a Holder of a Dotcom Customer Entitlement Claim or Dotcom Convenience Claim does not make the Bahamas Opt-In Election, its Class 5A Dotcom Customer Entitlement Claim or its Class 7A Dotcom Convenience Claim will be resolved and satisfied in these Chapter 11 Cases and such Holder will agree to forever, fully and finally release and discharge FTX DM with respect to its Class 5A Dotcom Customer Entitlement Claim or its Class 7A Dotcom Convenience Claim and will not be entitled to a distribution from FTX DM on account of such claim.

## K.      Voting on the Plan

### 1.      *Parties-in-Interest Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, refer to Section 4—*Summary of the Plan*.

-31-

Classes 1, 2, 3B, 4, 5C and 8A are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan, and are therefore not entitled to vote on the Plan.

Classes 3A, 5A, 5B, 6A, 6B, 7A, 7B, 7C, 8B, 8C, 10A, 10B and 12 are Impaired under, and entitled to vote to accept or reject, the Plan.  If a customer makes the Bahamas Opt-In Election, any vote on the Plan or any other election in the ballot submitted by such customer will be null and void.

Classes 9, 11, 13, 14, 15, 16, 17 and 18 are Impaired and not entitled to any recovery under, and deemed under section 1126(g) of the Bankruptcy Code to have rejected, the Plan, and are therefore not entitled to vote on the Plan.

Generally, the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each impaired class entitled to vote accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in such class that have voted to accept or reject the plan.  Holders of claims who fail to vote are deemed neither to accept nor to reject the Plan.  For a more detailed description of the requirements for confirmation of the Plan, refer to Section 5—*Statutory Requirements for Confirmation of the Plan*.

However, even if the Plan has not been accepted by all Impaired Classes entitled to vote, section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan; *provided* that the Plan has been accepted by at least one Impaired Class of creditors.  In such circumstances, the Plan can be confirmed by a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan.  For a more detailed description of the requirements for confirmation of a plan without the approval of every Impaired Class, refer to Section 5—*Statutory Requirements for Confirmation of the Plan*.

2.   *Submitting a Ballot*

Classes 3A, 5A, 5B, 6A, 6B, 7A, 7B, 7C, 8B, 8C, 10A, 10B and 12 are entitled to vote to accept or reject the Plan.  If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached appendices and the instructions accompanying your Ballot(s).  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot(s) and return the Ballot(s) to Kroll Restructuring Administration LLC (the "Notice and Claims Agent").  For further information, refer to Section 6—*Voting Procedures*, and the Solicitation Procedures Order (as defined below) attached to this Disclosure Statement as Appendix B.

Ballots cast by Holders in Classes entitled to vote must be received by the Notice and Claims Agent by **4:00 p.m. (prevailing Eastern Time)** on [•]August 16, **2024** (the "Voting Deadline").  For further information, refer to Section 6—*Voting Procedures*.

Ballots received after the Voting Deadline will not be counted, except in the Debtors' discretion.

The method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided in the Plan or Solicitation Procedures Order, delivery of a Ballot will be deemed made only when the Ballot is actually received by the Notice and Claims Agent.  Sufficient time should be allowed to ensure timely delivery.

Delivery of a Ballot to the Notice and Claims Agent by facsimile, email or any means not specifically described herein will not be accepted.  No Ballot should be sent to the Debtors or the Debtors' financial or legal advisors, agents or representatives (other than the Notice and Claims Agent), or to the Bahamas JOLs or the Bahamas JOLs' financial or legal advisors, agents or representatives and, if so sent, will not be counted.

3.  *Recommendation*

**The Debtors, the Executive Committee of the Ad Hoc Committee, the Class Action Claimants and the Bahamas JOLs each recommend that all Holders of Claims entitled to vote on the Plan vote to accept it.**

L.   **Confirmation of the Plan**

1.  *Plan Objection Deadline*

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be actually received on or before [•] [a/p].m4:00 p.m. **(prevailing Eastern Time)** on [•]August 16, **2024**.

Unless objections to Confirmation are timely served and filed in compliance with the Solicitation Procedures Order, they will not be considered by the Bankruptcy Court.  For further information, refer to Section 5—*Statutory Requirements for Confirmation of the Plan*.

2.  *Confirmation Hearing*

The Bankruptcy Court has scheduled the hearing to consider confirmation of the Plan (the "Confirmation Hearing") for [•]October 7, **2024 at [•] [a/p].m. (prevailing Eastern Time)**.  The Confirmation Hearing may be adjourned by the Bankruptcy Court or the Debtors without further notice other than by announcement in open court and/or notice(s) of adjournment filed on the docket with the Bankruptcy Court's permission.

-33-

## 2.    BACKGROUND

### A.    The Silos

The FTX Group operated two centralized digital asset exchanges:  the FTX.com exchange in non-U.S. jurisdictions (the "FTX.com Exchange") and its much smaller U.S. counterpart, FTX.US (the "FTX.US Exchange", and together with the FTX.com Exchange, the "FTX Exchanges").  Together, the FTX Exchanges were among the world's largest digital asset exchanges, where millions of customers bought, sold and traded certain digital assets.  Since their founding between 2019 to early 2020, the FTX Exchanges gained international prominence for their popularity among users, their high-profile acquisitions and celebrity endorsements, and the public image of Mr. Bankman-Fried, their co-founder and CEO, who was a vocal public figure in the cryptocurrency industry.  The FTX Group also operated a "crypto hedge fund", Alameda Research LLC ("Alameda Research"), which engaged in various trading activities and was used to make investments on behalf of the FTX Group in a wide array of businesses, ranging from digital asset startups to artificial intelligence.  As part of this activity, the FTX Group owned, invested in or operated a number of different businesses, ranging from drone manufacturing to video game development.

The Debtors operated their businesses through approximately 100 entities incorporated around the world (collectively, including non-Debtor affiliates, the "FTX Group"). For convenience, the Debtors' management separated these businesses and corresponding entities into four broad categories, or "Silos."  These Silos are: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries, which includes the businesses known as "FTX.US," "LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among other businesses (the "WRS Silo"); (b) a group composed of Debtor Alameda Research and its Debtor subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Paper Bird Inc., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) a group composed of Debtor FTX Trading and its Debtor and non-Debtor subsidiaries, including the exchange doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions (the "Dotcom Silo")  Prior to the Petition Date, each of these Silos were controlled by the FTX Group's co-founder and chief executive officers, Mr. Bankman-Fried.  Minority equity interests in the Silos were held by Zixiao "Gary" Wang and Nishad Singh, the co-founders of the business along with Mr. Bankman-Fried.  The WRS Silo and Dotcom Silo also have third-party equity investors, including investment funds, endowments, sovereign wealth funds and family offices.

The corporate structure chart below provides a general overview of the relationship between and among the Debtors, organized by Silo, as well as certain non-Debtor affiliates.

## ORGANIZATIONAL CHART (5/22/24)



* Percentages directly held by each of Sam Bankman-Fried, Gary Wang and Nishad Singh in individual entities varies.
** Indicates non-operational subsidiary entity.
*** 99% held by FTX Trading Ltd.
**** 80% held by FTX Trading Ltd.

1.  *WRS Silo*

The WRS Silo contained, among other businesses, the FTX.US Exchange. Founded in January 2020 by Messrs. Bankman-Fried, Wang and Singh, the FTX.US Exchange was incorporated in Delaware and intended to be available to both U.S. and non-U.S. users. The FTX.US Exchange allowed customers to, among other things, spot trade in certain digital assets. By November 2022, the FTX.US Exchange had over one million registered users, becoming one of the largest centralized digital asset exchanges available in the United States. FTX.US Exchange's spot exchange is registered with the United States Department of the Treasury (via the Financial Crimes Enforcement Network) as a money services business and held a series of state money transmission licenses in the United States. The WRS Silo also contained Embed Financial Technologies Inc. ("Embed"), which operated a clearing and custody platform that provided registered investment advisors, broker-dealers and other financial institutions with application program interfaces and brokerage services, as well as LedgerX LLC ("LedgerX"), a digital currency futures and options exchange and clearinghouse regulated by the CFTC.

2.  *Alameda Silo*

The Alameda Silo contained, among other businesses, Alameda Research, a "crypto hedge fund" that traded and speculated in certain digital assets and related loans and securities for the account of its owners, Messrs. Bankman-Fried (90%) and Wang (10%). Beginning in October 2021, Caroline Ellison acted as co-CEO (and later CEO) of Alameda Research. Alameda Research, through its affiliates, operated quantitative trading funds, whose strategies included, among other things, arbitrage, market making and yield farming. The Alameda Silo also offered over-the-counter trading services, and made and managed equity investments, limited partnerships and funds, token investments and loans, totaling billions in funded assets. Entities in the Alameda Silo ranged from funds in the Cayman Islands to market making operations in Turkey. The other Debtors in the Alameda Silo are organized in Delaware, Korea, Japan, the British Virgin Islands, Antigua, Hong Kong, Singapore, the Seychelles, the Cayman Islands, the Bahamas, Australia, Panama and Nigeria.

3.  *Ventures Silo*

The entities within the Ventures Silo invested in over 200 projects, paying billions of dollars. The investments in the Ventures Silo are wide-ranging across different industries, and are composed of equity investments, limited partnerships and funds, token investments and loans. An entity within the Ventures Silo, Debtor Paper Bird Inc., was utilized as the holding entity for the shares of FTX Trading Ltd. owned by Mr. Bankman-Fried.

4.  *Dotcom Silo*

The Dotcom Silo contained, among other businesses, the FTX.com Exchange. Founded in 2019 by Messrs. Bankman-Fried and Wang, the FTX.com Exchange was a centralized digital asset trading platform and exchange organized in Antigua and intended to be unavailable to U.S. users. The FTX.com Exchange allowed non-U.S. customers to, among other things, buy and sell certain spot digital assets, trade digital asset-based derivatives and tokenized

stocks, participate in peer-to-peer margin borrowing and lending and stake certain digital assets. The FTX.com Exchange was operated by Messrs. Bankman-Fried, Wang and Singh.  Mr. Singh had worked at Alameda Research and joined the FTX.com Exchange soon after it was launched. In September 2021, the international exchange relocated its headquarters from Hong Kong to the Bahamas where it sought compliance under the emerging digital assets and Registered Exchanges (DARE) Act established in 2020.  By November 2022, the FTX.com Exchange had more than seven million registered users, making it one of the largest centralized digital asset exchanges in the world.

The Dotcom Silo also includes other centralized digital asset exchanges that operated around the world, such as the platforms operated by Debtors FTX Japan K.K. ("FTX Japan") and Quoine Pte Ltd ("Quoine"), as well as ancillary investment services firms such as FTX EU Ltd ("FTX EU").

**B.    Factors Leading to the Commencement of the Debtors' Chapter 11 Cases**

     1.    *The Control Failures at the FTX Exchanges*

As detailed in the First Day Declarations[13] and the Debtors' *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges Cases* [D.I. 1242] (the "First Ray Report"), prepetition, the FTX Group lacked appropriate management, governance and organizational structure.  Control of the FTX Group was concentrated in Messrs. Bankman-Fried, Singh and Wang.  With a few limited exceptions, the FTX Group lacked independent or experienced finance, accounting, human resources, informational security, and cybersecurity personnel or leadership.  There was also no internal audit function, and virtually non-existent board oversight.  Despite its size and importance, the FTX Group had little to no capacity, expertise, or commitment to identifying, verifying, reporting or processing its financial business.  For almost all of the Debtors, as of the Petition Date, financial statements were either non-existent, limited, or completely unreliable.

Prepetition, the FTX Group also did not observe traditional formalities with respect to intercompany transactions.  Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation.  Alameda Research regularly provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda Research, for various other Debtors, or for non-Debtor FTX Digital Markets Ltd. ("FTX DM") and for venture investments or acquisitions whether for Alameda Research, various other Debtors or affiliates.

Furthermore, there were serious deficiencies in the FTX Group's controls related to digital asset management, information security and cybersecurity.  While the FTX Group

---

[13]    The "First Day Declarations" refer to the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

retained software developers, there was no dedicated personnel in cybersecurity or leadership in information security or other persons in such capacities engaged in activities that led to the prepetition control failures.  The FTX Group did not implement fundamental, widely accepted security controls to protect its significant digital assets, nor did it employ fundamental controls with respect to cloud and infrastructure security.  As a result of these control failures, the FTX Group exposed digital assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident.

2.  *The Commingling and Misuse of Customer Deposits at the FTX.com Exchange and Corporate Funds*

As detailed in Debtors' *Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704] (the "Second Ray Report"), Messrs. Bankman-Fried, Singh, Wang and others at their direction, commingled and misused FTX.com Exchange customer deposits.  At the direction of Messrs. Bankman-Fried, Singh and Wang, the FTX Group funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research and other affiliates.  At the same time, the FTX Group used its bank accounts for purposes not disclosed to the banks that hosted them, commingling and misusing vast sums of customer and corporate funds in the process.  This misuse continued since inception.  Based on the Debtors' analysis, at various points in 2022, more than $10 billion in net customer-deposited assets had been misappropriated from the FTX.com Exchange, the vast majority of which was in the form of cash and stablecoins.[14]  To facilitate this extensive scheme, Messrs. Bankman-Fried, Singh and Wang, with the assistance of internal staff and other insiders, lied to banks and auditors, executed false documents, and moved the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to The Bahamas, in a continual effort to avoid detection of their wrongdoing.

In part due to this misconduct, the FTX.com Exchange suffered serious liquidity challenges.  As of March 2022, internal documents suggest that the FTX.com Exchange had a cash deficit of over $10 billion.  Shortly after the Petition Date, the FTX.com Exchange owed customers a shortfall amount of approximately $9.2 billion.  This deficit is in the form of fiat currency and digital assets that had been misappropriated.

A diagram highlighting the intermingling of primary deposit accounts for U.S. dollars only is displayed below.  A full accounting of the billions of digital asset transactions is likely impossible.

---

[14]  The Debtors' analysis also suggests that by the Petition Date, in part because Alameda Research had returned some sums to FTX.com Exchange, the total sum of misappropriated customer-deposited assets at the FTX.com Exchange was approximately $9.2 billion.



### 3. *An Acute Liquidity Crisis*

In part due to the circumstances described above, the FTX Group suffered from an acute liquidity crisis beginning in early November 2022. On November 2, 2022, the cryptocurrency news site CoinDesk published an article that revealed that Alameda Research held a significant position in FTT, the FTX Group's native token, estimated at a value of approximately $4 billion, which represented almost one third of Alameda Research's total aggregate assets. The publication prompted questions about the FTX Group's undisclosed leverage and liquidity. After the article was published, the CEO of Binance, the largest centralized digital asset exchange, announced that it planned to sell its FTT holdings. The publicly announced plan to sell such a large amount of FTT—which partly is correlated with the value of the FTX Exchanges as a whole—led to a severe "run" on the FTX Exchanges as customers withdrew funds off the exchanges. On November 8, 2022, Binance announced that it had entered into a non-binding letter of intent to acquire the FTX.com Exchange but subsequently terminated the potential transaction on November 9, 2022. Between November 2, 2022 and the Petition Date, customers attempted withdrawals of several billions of dollars and many withdrawals were not fulfilled.

### 4. *Foreign Liquidation Proceedings*

On November 10, 2022, the Securities Commission of The Bahamas (the "SCB") petitioned the Supreme Court of The Bahamas (the "Bahamas Court") for the winding up and liquidation of FTX DM and the Bahamas JOLs were appointed. Around the same time and pursuant to authority granted by the Bahamas Court in connection with such winding up petition, the SCB took action to freeze assets of non-Debtor FTX DM.

In addition, in the early hours of November 11, 2022, the directors of non-Debtors FTX Express Pty Ltd and FTX Australia Pty Ltd., Australian subsidiaries in the Dotcom Silo, appointed voluntary administrators for a restructuring process under Australian law.

### 5. *Omnibus Corporate Authority*

On November 8, 2022, there were rumors that the FTX.com Exchange had stopped processing customer withdrawals. That same day, two members of the FTX Group's prepetition management, Can Sun and Ryne Miller, contacted Sullivan & Cromwell LLP ("S&C") about the dire situation at the FTX Group. Messrs. Sun and Miller engaged S&C to take steps to explore the possibility of chapter 11 proceedings in the event that rescue financing or some other transaction was not forthcoming. Given the exigent situation, S&C advised Messrs. Sun and Miller that it was common to immediately identify candidates to serve as a Chief Restructuring Officer; Messrs. Sun and Miller instructed S&C to consider possible recommendations and make confidential approaches as to availability. Four candidates were considered, each with experience in cases of substantial magnitude and complexity. Two candidates were not available. S&C provided the two other names and resumes to Messrs. Sun and Miller, including the name of Mr. Ray.

Shortly thereafter, Mr. Sun resigned. On the afternoon of November 10, 2022, Mr. Bankman-Fried had a videoconference with, among others, Mr. Miller, Mr. Bankman-Fried's multiple personal lawyers, and attorneys from S&C to discuss the strategic alternatives for the FTX Group. Then, because there was not time to hold over 100 board meetings for companies with incomplete records, S&C recommended and prepared a draft omnibus corporate authority ("Omnibus Corporate Authority"), which would appoint Mr. Ray CEO of all of the Debtors, transfer to him all of Mr. Bankman-Fried's corporate authority and authorize Mr. Ray to decide if and when the Debtors should commence Chapter 11 proceedings. Attorneys from S&C negotiated the terms of the Omnibus Corporate Authority with Mr. Bankman-Fried's personal attorneys and, in the early morning hours of November 11, 2022, counsel to Mr. Bankman-Fried relayed that Mr. Bankman-Fried intended to sign the Omnibus Corporate Authority.

At approximately 4:30 a.m. ET on Friday, November 11, 2022, S&C received a signed copy of the Omnibus Corporate Authority from counsel to Mr. Bankman-Fried. Mr. Bankman-Fried agreed to resign, resulting in the appointment of Mr. Ray as the Debtors' Chief Executive Officer. Mr. Ray was delegated by Mr. Bankman-Fried all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.

**3.    SIGNIFICANT EVENTS AND BUSINESS INITIATIVES IN THESE CHAPTER 11 CASES**

The following is a general summary of significant events in these Chapter 11 Cases, including a discussion of the Debtors' claims process, asset recovery initiatives and litigation efforts since the commencement of these Chapter 11 Cases.

**A.    Corporate Governance**

1.    *The Joint Board of Directors*

On Friday, November 11, 2022, Mr. Ray was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.  After the commencement of these Chapter 11 Cases, Mr. Ray promptly identified, interviewed and appointed five independent directors, who have served since such time.  These five independent directors are:

- **Judge Joseph Farnan (ret.)**:  Mr. Farnan served as a United States District Judge for the  District of Delaware from 1985 to 2010 and as Chief Judge from 1997 to 2001.  During his tenure, Mr. Farnan presided over numerous bench and jury trials involving complex commercial disputes.  Prior to his appointment to the federal bench, Mr. Farnan was appointed to several positions in local, state and the federal government.  After his appointment to the federal bench, Mr. Farnan returned to private practice in 2010 with the formation of Farnan LLP, a law firm focused on complex commercial matters, including chapter 11 proceedings, securities litigation, antitrust litigation and patent litigation.  Additionally, Mr. Farnan serves as an arbitrator, mediator, independent director and trustee of businesses contemplating or filing chapter 11 bankruptcy.

- **Matthew Doheny**:  Mr. Doheny is the President of North Country Capital LLC, an advisory and investment firm focused on challenging advisory assignments and investing private investment portfolios in special situation opportunities.  He has held this position since January 2011.  Mr. Doheny has served on the board of directors or as chief restructuring officer of numerous stressed and distressed companies, including Yellow Corp., MatlinPatterson, GMAC Rescap and Eastman Kodak.  He was also Managing Director and Head of Special Situations Investing at HSBC Securities Inc. from 2015 to 2017.  Previously, Mr. Doheny served as Portfolio Manager in Special Situations at Fintech Advisory Inc. from 2008 to 2010 and as Managing Director of the Distressed Products Group at Deutsche Bank Securities Inc. from 2000 to 2008.

- **Mitchell Sonkin**:  Mitchell Sonkin most recently served as a Senior Advisor to MBIA Insurance Corporation in connection with the restructuring of the firm's insured portfolio exposure of the Commonwealth of Puerto Rico's $72 billion of outstanding debt.  He is currently Chairman of the board of directors of the ResCap Liquidating Trust, successor to ResCap and GMAC Mortgage Corporations.  Before joining MBIA, Mr. Sonkin was a senior partner at the international law firm King & Spalding, where he was co-chair of King & Spalding's financial restructuring group and a member of the firm's policy committee.  He has over 40 years of experience in U.S. and international bond issuances, corporate reorganizations, bankruptcies and other debt restructurings and has served as a bankruptcy-court-appointed examiner. In particular, he has played a significant role in numerous municipal, utility, insurance, airline, healthcare debt and international debt restructurings, including the Anglo/French Euro Tunnel debt reorganization.

- **Matthew Rosenberg**:  Mr. Rosenberg is a partner at Lincoln Park Advisors, a financial advisory firm that he founded in 2014.  He has more than 25 years of restructuring, corporate finance, principal investing, operating and board experience.  Prior to founding Lincoln Park Advisors, he was a partner at the restructuring and investment banking firm Chilmark Partners, a partner in two private equity funds, the Zell/Chilmark Fund and Chilmark Fund II, the chief restructuring officer of The Wellbridge Company and a member of multiple corporate boards.  His restructuring advisory experience includes such companies as OSG, Supermedia, Nortel, Trinity Coal, USG Corporation, JHT Holdings, Inc., Covanta Energy, Sirva, Lodgian, Inc., ContiGroup Companies, Inc., Fruit of the Loom, Ltd. and Recycled Paper Greetings.

- **Rishi Jain**:  Mr. Jain is a Managing Director and Co-Head of the Western Region of Accordion, a financial and technology consulting firm focused on the private equity industry.  He has more than 25 years of experience supporting management teams and leading finance and operations initiatives in both stressed and distressed environments.  Prior to joining Accordion, Mr. Jain was part of Alvarez & Marsal North America, LLC's corporate restructuring and turnaround practice for over 10 years and served in a variety of senior financial operating roles.  His most notable assignments have included helping lead the restructuring, liquidation and wind down of Washington Mutual and its predecessor entity, WMI Liquidating Trust.  He also navigated the restructuring of Global Geophysical Services in its chapter 11 and eventually the liquidation and wind down in its second chapter 11 filing.

Each of the five independent directors serves as a director for only one of the four primary parent companies of the FTX Group:  Judge Farnan and Mr. Doheny serve as directors

for FTX Trading, Mr. Sonkin as director for West Realm Shires Inc., Mr. Rosenberg as director for Alameda Research and Mr. Jain as director for Clifton Bay Investments LLC. However, in light of the integrated nature of the Debtors, all five directors generally have met as a joint board of directors for the Debtors (the "Joint Board") and participated in deliberations with respect to material decisions. From November 2022 to July 2023, the Joint Board met weekly, and since August 2023, the Joint Board has met biweekly. Formal meetings of the directors of subsets of the primary parent companies have met as and when needed, in addition to the many informal meetings and discussions involving the independent directors throughout the process.

2.    <em>Management</em>

On September 9, 2023, the Bankruptcy Court approved the employment and retention of RLKS Executive Solutions LLC and appointment of Ms. Kathryn Schultea as the Debtors' Chief Administrative Officer, Ms. Mary Cilia as the Debtors' Chief Financial Officer and Mr. Raj Perubhatla as the Debtors Chief Information Officer, *nunc pro tunc* to November 15, 2022. Ms. Schultea is a Managing Partner, and Ms. Cilia and Mr. Perubhatla are each Senior Managing Directors of RLKS Executive Solutions LLC. They have provided a full range of crisis management services to under-performing and distressed companies, including interim management and debtor advisory work, bankruptcy preparation and management, litigation support, post-merger integration, and debt restructuring and refinancing.

**B.    Initial Case Objectives**

Management and the Joint Board identified five core objectives for these Chapter 11 Cases (collectively, the "Core Objectives"):

- **Implementation of Controls**: the implementation of accounting, audit, cash management, cybersecurity, human resources, risk management, data protection and other systems that did not exist, or did not exist to an appropriate degree, prior to Mr. Ray's appointment;

- **Asset Protection & Recovery**: locating and securing property of the estate, a substantial portion of which was suspected of being missing or stolen;

- **Transparency and Investigation**: the pending, comprehensive, transparent and deliberate investigation into claims against Mr. Bankman-Fried, the other co-founders of the Debtors and third parties, in coordination with regulatory stakeholders in the United States and around the world;

- **Efficiency and Coordination**: cooperation and coordination with insolvency proceedings of subsidiary companies in other jurisdictions; and

-43-

- **Maximization of Value**: the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and digital and physical property.

These Core Objectives were disclosed to the Bankruptcy Court at the initial hearing for these Chapter 11 Cases on November 22, 2022, and have informed all work of the Debtors since.

## C.    First Day Relief and Administrative Matters

### 1.    *First Day Relief*

Shortly after the Petition Date, the Debtors filed numerous motions seeking relief to stabilize the Debtors and to facilitate the consolidated administration of these Chapter 11 Cases (the "First Day Motions"). On November 22, 2022 and November 23, 2023, the Bankruptcy Court entered orders approving the First Day Motions (the "First Day Orders"), with certain approvals on an interim basis.

Among other things, the First Day Orders allowed the Debtors to administer these Chapter 11 Cases in a streamlined and consolidated manner and to continue certain activities not specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior court approval. In particular, the First Day Orders authorized the Debtors to:

- jointly administer these Chapter 11 Cases for procedural purposes;

- serve certain documents on parties-in-interest via email and to redact certain customer information from publicly filed documents;

- file a consolidated list of the Debtors' top 50 creditors in lieu of each Debtor filing a list of its 20 largest unsecured creditors;

- extend the time to prepare and file schedules of assets and liabilities and statements of financial affairs;

- establish notice and objection procedures for transfers of certain equity securities in the Debtors and claims of worthless stock deductions;

- pay prepetition claims of certain vendors and lienholders; and

- pay prepetition compensation and reimbursable expenses, pay and honor benefits and other programs and continue workforce obligations.

As part of the First Day Motions, the Debtors filed a motion for authorization to implement a cash management system, maintain and open bank accounts and retain business forms (the "Cash Management Motion") [D.I. 47]. As detailed in the Cash Management Motion,

-44-

as of the Petition Date, the postpetition Debtors and management did not yet know the total amount of cash because of historical cash management failures and deficiencies in documentation controls. Accordingly, to ensure that the Debtors could navigate the chapter 11 process in an orderly and efficient manner, the Debtors requested approval of a new postpetition payment system. The Bankruptcy Court approved the Cash Management Motion on an interim basis on November 23, 2022 [D.I. 143] and on a final basis on January 12, 2023 [D.I. 488]. The postpetition cash management system permits the Debtors to, among other things, make deposits, transfers and advances among the Debtors, to and from non-Debtors and between new bank accounts established as a cash pooling system. The cash management order was amended to address certain section 345 compliance agreements with the U.S. Trustee on June 26, 2023 [D.I. 1706] and January 3, 2024 [D.I. 5308].

The remainder of the First Day Motions approved on an interim basis were subsequently approved on a final basis by the Bankruptcy Court on January 9, 2023.

In addition, the commencement of these Chapter 11 Cases triggered the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions by creditors, the enforcement of all liens against property of the Debtors and the commencement or continuation of prepetition litigation against the Debtors. Subject to limited exceptions, the automatic stay will remain in effect until the Effective Date of the Plan.

### 2. *Retention of Debtor Professionals*

On November 17, 2022 and December 21, 2022, the Debtors filed applications to retain their restructuring professionals. These included applications to retain (a) Owl Hill Advisory, LLC as chief executive officer [D.I. 269]; (b) RLKS Executive Solutions LLC as certain chief officers [D.I. 276]; (c) Alvarez & Marsal North America, LLC as financial advisor [D.I. 273]; (d) Perella Weinberg Partners LP as investment banker [D.I. 275]; (e) AlixPartners, LLP as forensic investigation consultants [D.I. 277]; (f) Kroll Restructuring Administration LLC as administrative advisor [D.I. 279]; (g) Ernst & Young LLP as tax services provider [D.I. 284]; (h) Sullivan & Cromwell LLP as counsel to the Debtors [D.I. 270]; (i) Landis Rath & Cobb LLP as co-counsel to the Debtors [D.I. 272]; (j) Quinn Emanuel Urquhart & Sullivan, LLP as special counsel to the Debtors [D.I. 280]; and (k) certain ordinary course professionals [D.I. 282]. Each of the retention applications was approved [D.I. 132, 428, 437, 505, 534, 544, 546, 548, 553, 615].

On November 19, 2022, the Debtors also filed a motion to establish procedures for the compensation and reimbursement of expenses of the Debtors' and the Official Committee's professionals on a monthly basis [D.I. 286] (the "Interim Compensation Procedures Motion"). An order approving the Interim Compensation Procedures Motion was entered on January 9, 2023 [D.I. 435].

Additionally, on December 21, 2022, the Debtors filed a motion seeking to implement certain procedures to retain, compensate and reimburse professionals in the ordinary course of business [D.I. 282], which was approved by the Bankruptcy Court on January 9, 2023

[D.I. 432].  As of March 11, 2024, the Debtors employ 12 "tier 1" ordinary course professionals, six "tier 2" ordinary course professionals and 24 "tier 3" ordinary course professionals [D.I. 9014].

3.  *The Official Committee*

On December 15, 2022, the U.S. Trustee appointed the Official Committee [D.I. 231].  The Official Committee currently consists of the following: (a) Coincident Capital International, Ltd.; (b) Larry Qian; (c) Pulsar Global Ltd.; (d) Wincent Investment Fund PCC Ltd.; and (e) ~~Wintermute Asia Pte. Ltd.; and (f)~~ Zachary Bruch.  ~~Three~~Four initial members, Acaena Amoros Romero, GGC International Ltd.~~and~~, Octopus Information Ltd. and Wintermute Asia Pte. Ltd, have since resigned [D.I. 2212, n.5; 3685; 12036; 14460].  The Official Committee retained Paul Hastings LLP as lead counsel [D.I. 635], Young Conaway Stargatt & Taylor, LLP as co-counsel [D.I. 657], FTI Consulting, Inc. as financial advisor [D.I. 730], Epiq Corporate Restructuring, LLC as information agent [D.I. 633] and Jefferies LLC as investment banker [D.I. 729].

4.  *The Ad Hoc Committee of Non-U.S. Customers of FTX.com*

The Ad Hoc Committee is a creditors' committee representing a diverse group of international FTX.com Exchange customers.  The Ad Hoc Committee is not a fiduciary committee.  The Ad Hoc Committee retained Eversheds Sutherland (US) LLP ("Eversheds") as lead counsel and Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols") as co-counsel. Members of the executive committee of the Ad Hoc Committee (the "AHC Executive Committee"), Eversheds and Morris Nichols retained Rothschild & Co US Inc. as financial advisor and investment banker to the AHC Executive Committee, Eversheds and Morris Nichols.

On December 28, 2022, the Ad Hoc Committee commenced an adversary proceeding (the "AHC Adversary Proceeding") against the Debtors.  *See Ad Hoc Committee of Non-US Customers of FTX.com* v. *FTX Trading, Ltd., et al.*, Adv. Pro. No. 22-50514 (JTD) [D.I. 328].  The AHC Adversary Proceeding alleges, among other things, that non-U.S. customers of the FTX.com Exchange retained a property interest in certain fiat currency and digital assets held by the Debtors.  On August 21, 2023, the adversary proceeding was stayed pending discussions between the Debtors and the Ad Hoc Committee.  As detailed in Section 3.~~Q~~P —*The Draft Plan, Creditor Meetings and the Settlement and Plan Support Agreement*, on October 16, 2023, the Ad Hoc Committee entered into the PSA, which, among other things, settles the AHC Adversary Proceeding subject to effectiveness of a plan that is acceptable to the Official Committee, certain required members of the Ad Hoc Committee and certain required members of the Class Action Claimants.

On August 23, 2023, the Debtors filed a motion seeking authorization to reimburse the fees and expenses of the Ad Hoc Committee's professionals on a monthly basis [D.I. 2238].  On October 25, 2023, the Debtors filed an amended reimbursement motion reflecting the updated terms of reimbursement in accordance with the PSA [D.I. 3373].  Among other things, the Ad Hoc Committee professionals agree to comply with the interim

-46-

compensation procedures approved by the Bankruptcy Court.  An order approving the amended reimbursement agreement motion was entered on November 15, 2023 [D.I. 3928].

As of May 7, 2024, Eversheds has reported that members of the Ad Hoc Committee hold, in the aggregate, $3,765,222,737.61 of claims against the Debtors [D.I. 14224].

### 5. *The Class Action Claimants*

On December 27, 2022, certain claimants (the "Class Action Claimants") commenced an adversary proceeding (the "Class Action Adversary Proceeding") against the Debtors.  *See Onusz, et al*. v. *West Realm Shires Inc., et al*., Adv. Pro. No. 22-50513 (JTD) [D.I. 321].  The Class Action Adversary Proceeding alleges, among other things, that U.S. customers of the FTX Exchanges had, as of the Petition Date, a property interest in certain fiat currency and digital assets that the Debtors assert to be property of their Estates.  As detailed in Section 3.~~Q~~P—*The Draft Plan, Creditor Meetings and the Settlement and Plan Support Agreement*, on October 16, 2023, the Class Action Claimants entered into the PSA, which, among other things, settles the Class Action Adversary Proceeding subject to effectiveness of a plan that is acceptable to the Official Committee, certain required members of the Ad Hoc Committee and certain required members of the Class Action Claimants.

### 6. *Fee Examiner*

On March 8, 2023, the Bankruptcy Court appointed Katherine Stadler as the fee examiner (the "Fee Examiner") for these Chapter 11 Cases [D.I. 834].  On April 12, 2023, the Bankruptcy Court approved the Fee Examiner's motion to retain Godfrey & Kahn, S.C. as counsel to the Fee Examiner [D.I. 1268].  The Fee Examiner subsequently published its first report on professionals' interim fee applications on June 20, 2023 [D.I. 1663], its second report on September 5, 2023 [D.I. 2427], its third report on December 5, 2023 [D.I. 4495] ~~and~~, its fourth report on March 12, 2024 [D.I. 9157] and its fifth report on May 30, 2024 [D.I. 16172].

### 7. *341 Meetings and Schedules and SOFA*

On December 20, 2022, the U.S. Trustee conducted an initial meeting of creditors pursuant to section 341 of the Bankruptcy Code.

On March 14 and March 15, 2023, the Debtors filed their schedules of assets and liabilities and statements of financial affairs with the Bankruptcy Court [D.I. 865-954, 956-63, 966-1083].  On June 27, 2023, the Debtors filed amended schedules of assets and liabilities of certain Debtors [D.I. 1729-66].  On July 31, 2023, the Debtors filed unredacted versions of schedules and statements for certain Debtors [D.I. 1985-95, 1997-2031, 2033-42, 2045-97].  On August 31, 2023, the Debtors filed further amended schedules of assets and liabilities of certain Debtors [D.I. 2285-2408].  On December 5, 2023, the Debtors filed further amended schedules of assets and liabilities of certain Debtors [D.I. 4471] and again on January 23, 2024 [D.I. 6290-6324].

On March 12, 2024, the U.S. Trustee conducted and concluded the continued meeting of creditors pursuant to section 341 of the Bankruptcy Code.

8.      *Customer Redaction*

On November 19, 2022, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* [D.I. 45] (the "Original Redaction Motion").  Among other things, the Original Redaction Motion requested authority for the Debtors to redact (a) the names and all associated identifying information of the Debtors' customers pursuant to section 107(b)(1) of the Bankruptcy Code and (b) the addresses and email addresses of individual creditors or equity holders of the Debtors pursuant to section 107(c) of the Bankruptcy Code.  On November 23, 2022, the Bankruptcy Court granted the Original Redaction Motion on an interim basis [D.I. 157].  Prior to the final hearing on the Original Redaction Motion, the Debtors modified the relief requested in the Original Redaction Motion to seek authority to redact confidential information pursuant to section 107(b) of the Bankruptcy Code only for a limited period, subject to extension, and deferred their request to redact customer names pursuant to section 107(c).  On January 11, 2023, the Bankruptcy Court granted the Original Redaction Motion on a final basis [D.I. 545] and authorized the Debtors to redact customer names pursuant to section 107(b) of the Bankruptcy Code for an initial period of only 90 days, subject to extension.

On April 20, 2023, the Debtors and the Official Committee filed the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals* [D.I. 1324] (the "First Extension Motion").  The First Extension Motion requested, among other things, authority to redact (a) the names, addresses and email addresses of the Debtors' customers for an additional 90 days pursuant to section 107(b) of the Bankruptcy Code and (b) the names, addresses and email addresses of the Debtors' customers who are natural persons on a permanent basis pursuant to section 107(c).  On June 15, 2023, the Bankruptcy Court entered the *Order Authorizing Movants to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals* [D.I. 1643] (the "First Extension Order").  The First Extension Order authorized the Debtors and the Official Committee to permanently redact the names of all customers who are natural persons from filings with the Bankruptcy Court in which disclosure would indicate such person's status as a customer, pursuant to section 107(c) of the Bankruptcy Code.  The First Extension Order also authorized the Debtors and the Official Committee to redact the names, addresses and email addresses of all the Debtors' customers for an additional 90 days (such date, the "Extended Redaction Deadline") pursuant to section 107(b).

On June 23, 2023, Bloomberg L.P, Dow Jones & Company, Inc., The New York Times Company and the Financial Times Ltd. filed a notice of appeal regarding the First

Extension Order.  The appeal is fully briefed and currently pending before the United States District Court for the District of Delaware.

On September 13, 2023, the Debtors and the Official Committee filed the *Second Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers* [D.I. 2508] (the "Second Extension Motion").  On October 24, 2023, the Bankruptcy Court entered an order granting the Second Extension Motion [D.I. 3353] and further extending the Extended Redaction Deadline for an additional 90 days.

On January 22, 2024, the Debtors and the Official Committee filed the *Third Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers* [D.I. 6153] (the "Third Extension Motion").  On February 13, 2024, the Bankruptcy Court ~~entering~~entered an order granting the Third Extension Motion [D.I. 7315] and further extending the Extended Redaction Deadline for an additional 90 days, through May 13, 2024.

On May 13, 2024, the Debtors and the Official Committee filed the *Fourth Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers* [D.I. 14727] (the "Fourth Extension Motion").  On May 30, 2024, the Bankruptcy Court entered an order granting the Fourth Extension Motion [D.I. 16165] and further extending the Extended Redaction Deadline for an additional 90 days, through August 28, 2024.

9.  *Bar Date Claims Process*

The FTX Group had over 11 million customer accounts, approximately 2 million of which had net positive balances as of the Petition Date.  The FTX Group also had creditors who were non-customers, including vendors, service providers, government entities and celebrities who endorsed or advertised the FTX Group in exchange for a fee.  In order to streamline the claims process for holders of non-customer claims and Customer Entitlement Claims, the Debtors established two separate bar dates.  On May 19, 2023, the Bankruptcy Court entered an order setting June 30, 2023 as the bar date for non-customer proofs of claims and proofs of interest and September 29, 2023 as the governmental bar date [D.I. 1519].  On June 28, 2023, the Bankruptcy Court entered an order setting September 29, 2023 as the bar date for customer proofs of claims [D.I. 1793] (the "Customer Bar Date Order").

To facilitate the submission process of potentially millions of Customer Entitlement Claims, the Debtors developed an online claims portal for the submission and processing of Customer Entitlement Claims.  Holders of Customer Entitlement Claims could access the FTX customer claims portal at https://claims.ftx.com ("FTX Customer Portal") with their existing credentials in order to, among other things, submit their proof of claim, perform Know Your Customer ("KYC") procedures, access customer support personnel, view historical transactions, and view balances as of the Petition Date.

As set forth in the Customer Bar Date Order, in the event that a holder of a Customer Entitlement Claim did not initiate the requested KYC process by September 29, 2023, such claim is treated as "unverified." With respect to all unverified Customer Entitlement Claims, the Debtors reserved the right, in their sole discretion after consultation with the Official Committee, the Ad Hoc Committee and FTX DM (collectively, the "Supporting Parties"), either to (i) allow such claims without the requested KYC information or (ii) object to the allowance of such Customer Entitlement Claims' proofs of claim and scheduled claims on an omnibus basis, on notice to all such holders, including, among other bases, of insufficient documentation, and repeat the request such holders submit the requested KYC information at a later date. In the event of such objection, such holders of Customer Entitlement Claims have the additional opportunity to submit the requested KYC information to the Debtors to resolve the objection on such claim relating to the requested KYC information.

10. *Stay Relief*

During these Chapter 11 Cases, certain parties filed motions seeking relief from the automatic stay, including:

- On November 22, 2022, Miami-Dade County, a political subdivision of the State of Florida, filed a motion seeking relief from the automatic stay to terminate an agreement with a Debtor (the "Naming Rights Agreement") [D.I. 135]. On December 30, 2022, the Debtors filed an omnibus motion seeking the rejection of, among other things, the Naming Rights Agreement [D.I. 333]. On January 11, 2023, the Bankruptcy Court entered an agreed order authorizing the Debtors' rejection of the Naming Rights Agreement [D.I. 470].

- On December 15, 2022, North America League of Legends Championship Series, LLC ("Riot") filed a motion (i) compelling the rejection of an agreement with a Debtor (the "Strategic Sponsorship Agreement") or, in the alternative, (ii) seeking relief from the automatic stay for cause under section 362(d)(1) of the Bankruptcy Code to permit Riot to terminate the Strategic Sponsorship Agreement [D.I. 243]. On January 11, 2023, the Bankruptcy Court entered an agreed order authorizing the Debtors' rejection of the Strategic Sponsorship Agreement [D.I. 480].

- On March 15, 2023, Mr. Bankman-Fried filed a motion seeking relief from the automatic stay or, to the extent it does apply, lifting and modifying the automatic stay to the extent necessary to permit the advancement and/or reimbursement of defense, settlement and other costs covered by certain insurance policies [D.I. 964]. On March 29, 2023, the Official Committee filed an objection in response to Mr. Bankman-Fried's motion [D.I. 1183] and the Debtors filed a response explaining that the Debtors are contractually bound not to oppose efforts to seek relief from the automatic stay with respect to such insurance policies [D.I. 1184]. On April 7, 2023, Mr. Bankman-Fried filed a reply in further support of his

-50-

motion [D.I. 1239]. On April 17, 2023, after a hearing on the motion, the Bankruptcy Court entered an order denying the motion without prejudice [D.I. 1299].

- On June 14, 2023, Pyth Data Association filed a motion seeking relief from the automatic stay to take certain actions with respect to the Pyth protocol [D.I. 1632]. On June 23, 2023, the Bankruptcy Court entered an agreed order reflecting the parties' consensual resolution of the motion [D.I. 1693].

- On September 21, 2023, Island Air Capital and its beneficial owner, Paul F. Aranha, filed a motion seeking relief from the automatic stay to take certain actions regarding the use, maintenance and possible sale of certain aircraft [D.I. 2659]. The Debtors objected [D.I. 3002] and were joined by the Official Committee [D.I. 3017]. On March 26, 2024, Island Air Capital and Aranha withdrew this motion. [D.I. 10421].

- The Bahamas JOLs motion for relief from the automatic stay was resolved in connection with the broad settlement described in Section 3.NM—*FTX Digital Markets (Bahamas)*.

### D.        Strategic Considerations Relating to the FTX.com Exchange

One of the earliest questions asked by the Debtors during these Chapter 11 Cases was whether it would be possible to restart the FTX.com Exchange and distribute its going concern value to stakeholders. Prior to the bankruptcy and the public awareness of the rampant fraud committed by Mr. Bankman-Fried, the FTX.com Exchange had substantial market share, as well as a user interface and products that generally received favorable reviews. In addition, some customers and members of the broader cryptocurrency community (although not all) believed that the FTX Group had provided a useful alternative to other cryptocurrency exchanges and that the cryptocurrency industry would benefit if a rehabilitated FTX Group could become a strong, innovative and reliable competing exchange.

The Joint Board determined in early 2023 that the potential for a reorganization of the FTX.com Exchange should be taken very seriously and merited the expenditure of estate resources to explore deeply and thoroughly. An informal steering committee was formed, including the senior members of the main advisory teams, subject matter experts and a sub-committee of members of the Official Committee. This steering committee was very active, eventually meeting over a dozen times. After about August 31, 2023, the meetings included representatives of the Ad Hoc Committee, as well as those from the Official Committee. In light of the regulatory and other challenges a reboot would face, the Debtors were advised by leading financial technology regulatory lawyers, as well as experienced investment bankers, cybersecurity experts and other advisors.

The effort was called "FTX 2.0." The Debtors were aware that it would face certain challenges. Retail financial institutions that fail generally do not reorganize, and none of

the cryptocurrency financial institutions that had filed for bankruptcy before the FTX Group had reorganized successfully. The Debtors were also concerned with the specific history of other cryptocurrency chapter 11 cases, which filed for chapter 11 announcing that they would reorganize, only to end up disappointing creditors, inflating the value of associated tokens before they crashed, and delaying customer distributions. The Joint Board was determined to not build false expectations or mislead customers into thinking the FTX situation was better than it was.

As the FTX 2.0 process began in earnest, the Debtors and the consulting parties wrestled with two very serious challenges. The first challenge was the operating condition of the FTX.com Exchange. The business had a historical customer base, an attractive user interface and global brand recognition. These valuable assets were observable by the public. However, the public did not see how the exchange lacked operational systems necessary for sustained viability. The FTX.com Exchange was built quickly and managed horribly. At no point in its short lifespan did it have adequate security arrangements for digital assets or cash, regular practices for reconciling digital assets to user positions, reliable accounting systems, reliable books and records or appropriately trained operational or financial staff. Further, a "reboot" would require not only a new leadership team, but the development of new software code, code audits, building enhanced security arrangements and business practices, and the hiring of new employees at all levels of operations.

The second serious challenge was closely related to the first: the collapse of the FTX Group and Three Arrows Capital Ltd. ("Three Arrows"), as well as the collapse of feeder financial institutions such as Celsius, Voyager and Genesis, had changed the regulatory profile for cryptocurrency companies. For a business to be viable in the era of "Crypto 2.0," the Debtors believed that the business would need to take a more responsible approach to (i) customer asset segregation, security and custody, (ii) the separation of exchange operations from proprietary trading business, (iii) restrictions to prevent U.S. persons investing through the offshore exchange and (iv) compliance, anti-money-laundering and know-your-client procedures. Nor were these legal and regulatory challenges limited to the United States: the FTX.com Exchange was a global business, the reboot of which would require multiple regulatory approvals all around the world.

Faced with these challenges, the approach to FTX 2.0 was non-preclusive. The Debtors and the consulting stakeholders reached out to existing FTX creditors for ideas, as well as to crypto exchanges, traditional stock and commodity exchanges, venture capital firms and private equity firms, including both those who specialized in digital assets and those that did not have such experience but had made or expressed an interest in making cryptocurrency-related investments. In the first half of 2023, the Debtors entered into 15 non-disclosure agreements specific to the FTX 2.0 process and also conducted discussions with numerous other parties that were already subject to non-disclosure agreements in connection with the Debtors' other pending sale processes. In July 2023, the Debtors ultimately received 12 initial indications of interest in respect of the FTX 2.0 process.

None of the proposals involved any payment of material cash or other consideration to acquire the FTX.com Exchange as a going concern. Instead, the only proposals received that the Debtors and the consulting parties believed warranted serious consideration

involved the migration of the FTX.com Exchange customer relationships to an existing digital assets business. These customer migration proposals did not involve material upfront cash payments either, but instead offered various types of earn-out payments or the issuance to the Debtors of illiquid non-public equity in the existing company or a related joint venture.

Nevertheless, the Debtors, in consultation with the consulting parties, identified the two leading customer migration proposals and began to work seriously on improving them over the next months. Since the proposals to the Debtors included interests in a third party business (rather than only cash), work by the Debtors included significant "reverse" corporate, regulatory and cybersecurity diligence on these bidders as well as the negotiation of potential terms and transaction mechanics. By the late fall of 2023, the Debtors and the Debtors' advisors, in consultation with the Official Committee and the Ad Hoc Committee, advanced discussions with a bidder and extensively negotiated a customer migration transaction, including a stalking horse purchase agreement. The transaction structure contemplated the issuance by the bidder's exchange of a 'recovery rights token,' designed by the bidder and the Debtors, to be traded only on the bidder's exchange, the voluntary migration of the FTX.com Exchange customers to the bidder's exchange, and the payment of variable consideration to the Debtors based in part on resulting trading activity attributable to the volume of migrated FTX.com Exchange customers.

However, it became clear in these negotiations that a customer migration transaction as proposed by either bidder was not in the best interests of the estates. Material considerations with respect to the bidders included the following:

- Bidders attributed material value to the number of migrated customers and the quantum of assets and trading volumes related to such migrated FTX.com Exchange customers on the bidder's exchange. The magnitude of this anticipated trading activity depended on identifying what trading activity was attributable to FTX.com Exchange customers rather than incumbent customers of the bidder's exchanges and the parties could not agree on mutually acceptable commercial terms.

- Bidders also placed significant value on the creation of a novel and complicated claims trading mechanism, which injected material regulatory and execution risk and expense. The contemplated arrangement also may have significantly reduced the ability of customers to freely trade and monetize their claims and presented challenges to future distributions by the Debtors' estate post-emergence.

- The amount of consideration payable to the Debtors depended in substantial part on whether FTX.com Exchange customers elected to receive distributions on the bidder's exchange evidenced by the recovery rights tokens, which customers may not have desired. Moreover, as customer recoveries in these Chapter 11 Cases rose substantially in late 2023, the value of trading the recovery token to the bidder was severely

-53-

diminished, thereby further decreasing the transaction consideration to the bidder.

- The lead bidder required a series of complex and expensive operational undertakings by the Debtors, many of which were conditions to closing or the payment of meaningful consideration by the bidder.

- While the bidders had certain existing licenses, the FTX.com Exchange customer base may have required the bidder to obtain additional necessary regulatory approvals or exemptions to operate in certain jurisdictions around the world where the FTX.com Exchange had customers, reducing the value of the bidders' proposal substantially if trading volumes by such customers were excluded from the calculation of amounts due to the Debtors in the future.

- The lead bidder's proposal required implementation of a specific plan of reorganization, with complicated operational and regulatory requirements that could delay and increase the risk of the completion of these Chapter 11 Cases and distributions to creditors.

- The Debtors had invested substantial estate resources on the potential transaction, and continued discussions would mean more expenditures without assurances of success.

- The consideration payable to the Debtors was chiefly in the form of illiquid minority equity and/or earn-out interests paid over time, and the prospects of monetizing these interests in order to pay cash distributions to FTX creditors was uncertain. In addition, even if the consideration paid to the Debtors could be monetized successfully in the future, the potential value of that consideration was highly uncertain and was determined to be outweighed by the costs and risks to execution and implementation as well as the security of creditor assets following any potential distribution to the bidder platforms.

- Ultimately, no bidder proposal was supported by the Official Committee, the Ad Hoc Committee or any of the primary stakeholders with whom the Debtors were consulting.

Accordingly, in January 2024, the Debtors determined in their business judgment, in consultation with the Official Committee and the Ad Hoc Committee, to halt any further marketing and sale processes related to FTX 2.0 for the time being in order to allow the Debtors' estates to focus on implementation of the current Plan as expeditiously as possible.

The FTX 2.0 process was exhaustive and thorough, with the opportunity for stakeholders and highly sophisticated third parties to propose any structure they wished based on full information about the FTX.com Exchange. The Debtors continue to hold for sale the

-54-

software, customer lists, trademarks and other assets associated with the FTX.com Exchange. However, the Plan is not conditioned upon or built around the reboot of the FTX.com Exchange or the merger of the FTX.com Exchange with another exchange. Because the Plan contemplates cash distributions only, rather than the relaunch of the FTX.com Exchange, there is no significant regulatory risk or uncertainty about whether the Plan will or will not be consummated. And, under the Plan, all creditors will receive unrestricted cash distributions that they can re-invest in any manner they like, including in digital assets listed on any of the bidders' exchanges or anywhere else.

> ### E.    Sale Processes

By the Effective Date, the Debtors anticipate to have successfully sold the overwhelming majority of the assets of the Debtors for U.S. dollars to fund Distributions to creditors. The scale and pace of the asset monetization effort has been central in establishing the Debtors' cash position, which is projected to be $12.6 billion as of the Effective Date. The primary transactions entered into prior to the date of this Disclosure Statement are described below.

> #### 1.    *LedgerX, Embed, FTX Japan and FTX Europe*

On December 15, 2022, the Debtors filed a motion seeking approval of bid procedures (the "Bid Procedures") for sales processes for several businesses [D.I. 233]. Specifically, at that time, the Debtors contemplated selling the following businesses: (1) non-Debtor Embed; (2) LedgerX; (3) FTX Japan; and (4) FTX Europe. On January 12, 2023, the Bankruptcy Court granted the Debtors' motion, approving the Bid Procedures, the form and manner of notices for the sale of these businesses and assumption and assignment procedures, as well as scheduling auctions and sale hearings for these processes [D.I. 487].

In accordance with the Bid Procedures, the Debtors commenced sale processes for these four businesses. The Debtors initially hoped that the sales would yield significant recoveries to creditors because the FTX Group had spent over $1 billion in cash to purchase these businesses before the Chapter 11 Cases. However, it quickly became clear that none of the businesses were worth what the FTX Group had paid to acquire them. The Debtors considered litigation options relating to each historical acquisition and, in the case of Embed and FTX Europe, filed litigation actions against certain of the sellers and other parties. The Debtors' litigation activities are detailed in Section 3.G—*Litigation*. Ultimately, the Debtors reached a different strategic decision for each of the four businesses.

With respect to LedgerX, the Debtors received multiple qualified bids and ultimately selected M 7 Holdings, LLC as the successful bidder. On April 25, 2023, pursuant to the Bid Procedures, the Debtors filed a notice of this successful bid and a form of sale order for the sale of LedgerX to M 7 Holdings, LLC [D.I. 1342]. On May 4, 2023, the Bankruptcy Court entered an order approving the sale of LedgerX for an aggregate purchase price of $49.2 million [D.I. 1433].

With respect to Embed, the Debtors determined that liquidation was in the best interest of the Estates. The Debtors received 12 non-binding initial indications of interest, including an indication of interest from Michael Giles, the founder of Embed, to purchase Embed with an average value of approximately $35 million. Of the 12 potential bidders, and after conducting more comprehensive due diligence, only Mr. Giles and another bidder submitted a final bid, with Mr. Giles' $1 million as the higher bid price. Based on the terms of the final bids received, the Debtors decided to formalize a wind down plan for the liquidation of Embed beginning in May 2023. As part of this orderly liquidation, ten individuals (nine former Embed employees and one former Embed consultant) entered into short-term retention agreements through September 30, 2023 that included provisions settling their prior retention and other bonus obligations owed by Embed and Debtor West Realm Shires Services Inc. ("WRSS"). Embed's other 19 employees were terminated at that time and their claims for prior retention and other bonus payments remain outstanding. As of October 1, 2023, Embed has closed out of its customer relationships and has reduced its headcount to four employees. Substantially all Embed wind-down activities, including remaining regulatory and administrative matters, are concluded.

The Debtors have considered multiple options related to FTX Japan, including seeking to restart operations, the possibility of including the digital asset exchange of FTX Japan in a potential restart/reboot of the FTX international exchanges or a possible sale to interested investors. As part of these efforts and to retain the necessary personnel as part of these efforts, on April 26, 2023, the Debtors filed a motion seeking approval of FTX Japan's key employee incentive plan (the "Japan KEIP") [D.I. 1359]. The Japan KEIP provided for certain incentive payments to encourage staff with requisite skills and knowledge to continue working at FTX Japan through a restart and sale or reorganization. On June 8, 2023, the Bankruptcy Court entered an agreed order approving the Japan KEIP [D.I. 1589]. As of the date hereof, neither incentive program criteria have been met, and no awards have been granted on account of the Japan KEIP. ~~The Debtors are continuing to consider their options with respect to~~ In March 2023, the sales process for FTX Japan~~, including a renewed sale process~~ was postponed indefinitely.

The Debtors then designed a new process to market the interests held by the Debtors in FTX Japan and received multiple qualified bids. Ultimately, the Debtors selected bitFlyer Holdings, Inc. ("bitFlyer") as the successful bidder. On June 20, 2024, the Debtors filed a motion with the Bankruptcy Court seeking to consummate the sale of its interests in FTX Japan to bitFlyer and dismiss the chapter 11 case of FTX Japan effective upon the consummation of the sale [D.I. 17923].

FTX EU Ltd (formerly known as K-DNA Financial Services Ltd) ("FTX Cyprus") holds an investment firm license in Cyprus and was responsible for onboarding European customers to the FTX.com Exchange. FTX Cyprus was acquired by FTX Europe in September 2022 for approximately $2 million. On November 11, 2022, FTX Cyprus's license was suspended by the Cyprus Securities and Exchange Commission ("CySEC") and CySEC instructed it to begin returning funds to customers. Following an extensive reconciliation exercise with the support of the Debtors' advisers, it was determined that FTX Cyprus had not maintained sufficient segregated assets to repay its customer liabilities and faced a substantial

shortfall.  This substantial shortfall made it impossible to return segregated customer funds in the short term, a key requirement for CySEC lifting the suspension of the license.

The holding company for FTX Cyprus, FTX Europe AG ("FTX Europe"), a Swiss company, was in similarly abysmal financial condition.  FTX Europe was acquired by FTX Trading in a series of transactions completed in November 2021 for consideration of approximately $376 million in cryptocurrency, cash and stock (including $56 million in deferred consideration that had not yet been paid as of the Petition Date).  However, as the Debtors' pursued a potential sale of FTX Europe, it became apparent that legacy liabilities of more than $125 million would make a near-term sale impossible.  Prior to the Petition Date, FTX Europe had transferred all of its approximately $105 million in crypto assets to FTX.com, with uncertain prospects for immediate or long-term recovery, which, together with other accumulated losses, resulted in substantial balance sheet over-indebtedness under Swiss laws.  As a result, FTX Europe's board of directors, pursuant to its duties under Swiss law, filed a request with the District Court of Höfe, Switzerland (the "Swiss Court") to open provisional moratorium proceedings (the "Provisional Moratorium") with respect to FTX Europe on April 4, 2023.  On November 24, 2023, the Swiss Court granted a definitive moratorium until June 11, 2024 (the "Definitive Moratorium" and, together with the Provisional Moratorium, the "Moratorium").  Since the commencement of the Moratorium, FTX Europe has operated under the supervision of an independent third-party administrator appointed by the Swiss Court, Holenstein Brusa Ltd (the "Swiss Administrator"), as FTX Europe has sought to either restructure its debt or enter into a composition agreement with its creditors.  Management of FTX Europe and advisors to the Debtors have regularly consulted with the Swiss Administrator on operational and strategic matters with respect to FTX Europe and its subsidiaries, including FTX Cyprus.  Where appropriate, FTX Europe has sought and received the approval of the Swiss Administrator with respect to significant operational or strategic actions.

As a result of the foregoing issues, an advantageous sale of FTX Cyprus or FTX Europe to a bona fide third-party purchaser was not practical.  In addition to FTX Cyprus, which held a suspended regulatory license and faced a large shortfall in customer assets, FTX Europe did not own any other valuable assets and did not possess any valuable or protected IP.  The Debtors solicited potential third party interest in FTX Cyprus and/or FTX Europe but only received offers of questionable genuineness, for negligible value and with challenging execution prospects.

Despite these challenges, the Debtors, following a year of sustained efforts to facilitate the return of FTX Cyprus's customer funds and find a willing purchaser for the assets of FTX Europe, have entered into settlements and agreements that will result in the solvent resolution of FTX Europe and the return of significant value to the Estates of the Consolidated Debtors.  On March 18, 2024, the Bankruptcy Court approved FTX Europe's proposed sale of certain assets and the shares of certain subsidiaries (including FTX Cyprus) to certain former insiders of FTX Europe for $32.7 million, in connection with a broader settlement of adversary litigation against these parties (as described further in Section 3.G—*Litigation*), which sale closed on May 10, 2024.

In connection with the sale transaction, the Debtors have also negotiated agreements (the "Restructuring Agreements") to settle and release a web of asserted claims among FTX Europe, Alameda Research, FTX Trading and third parties CM-Equity AG and Binance (Switzerland) AG and result in a $14 million net reduction of claims against the Debtors. On April 19, 2024, the Swiss Court approved FTX Europe's sale transaction and the Restructuring Agreements. A motion requesting the approval of the Restructuring Agreements is currently pending before the Bankruptcy Court. Following Bankruptcy Court approval and completion of these transactions, the Debtors expect that FTX Europe will be able to successfully exit the Moratorium, pay back its third-party creditors in full to the extent of their reconciled claims, return approximately $30 million to FTX Trading and Alameda Research in satisfaction of existing intercompany claims and consideration, and proceed with an orderly, solvent liquidation.

## 2. *Private Sales*

Prior to the Petition Date, the Debtors routinely entered into and exited investments across a variety of asset categories, including interests in privately held companies, debt and equity securities in publicly traded companies, investments in certain digital assets, venture capital or other investment funds, and investments in coins, tokens and token platforms. A number of these assets were held for purposes of investment and, as a result, were meant to be monetized over time rather than integrated into the Debtors' core digital asset exchange businesses. As part of the effort to maximize the value of the Estates, the Debtors considered various strategic alternatives with respect to these assets:

On March 8, 2023, the Debtors filed a motion seeking approval of the sale of Debtor Clifton Bay Investments LLC's limited partnership interests in Sequoia Capital Fund, L.P. ("Sequoia") to Al Nawwar Investments RSC Limited ("Nawwar") for approximately $45 million [D.I. 839]. The Debtors had acquired the interests in Sequoia on March 11, 2022 with an aggregate capital commitment of approximately $100 million, of which Debtor Clifton Bay Investments LLC contributed approximately $50 million. After evaluating all bids submitted, the Debtors and Nawwar entered into that certain Purchase and Sale Agreement, dated as of March 8, 2023. On March 28, 2023, the Bankruptcy Court approved the sale [D.I. 1174].

On March 22, 2023, the Debtors filed a motion seeking approval of the sale of the Debtors' interests in Mysten Labs, Inc. ("Mysten") and Sui Token Warrants to Mysten for approximately $96.3 million [D.I. 1140]. The Debtors' interests consisted of 567,045 shares of Series B Preferred Stock in Mysten Labs, Inc. (the "Mysten Preferred Stock") and SUI Token Warrants to purchase 367,751,203 SUI Tokens. The SUI Tokens were subject to a one-to-four year rolling lockup period with a one-year cliff following public launch of the SUI Tokens. This lockup restricted the ability to sell or trade the SUI Tokens in the open market for an extended timeframe. On April 12, 2023, the Bankruptcy Court approved the sale [D.I. 1266].

On June 8, 2023, the Debtors filed a motion seeking approval of the sale of Debtor Maclaurin Investments Ltd.'s interests in SCHF Cayman, L.P. ("SCHF Cayman") to Liberty Mutual Investment Holdings LLC ("Liberty Mutual") for approximately $19.6 million [D.I. 1596, 1789]. The Debtors had acquired the interests in SCHF Cayman on July 1, 2022,

with an aggregate capital commitment of $100 million, only $25 million of which was funded as of the Petition Date. After evaluating all bids submitted, the Debtors and Liberty Mutual entered into that certain Purchase and Sale Agreement, dated as of June 8, 2023. SCHF Cayman is designed as an evergreen fund and therefore had no guaranteed exit timing or imminent monetization opportunity for the Debtors. On June 28, 2023, the Bankruptcy Court approved the sale [D.I. 1792].

On August 2, 2023, the Debtors filed a motion seeking an order authorizing the Debtors to enter into a settlement and share exchange agreement, pursuant to which, among other things, (i) the Debtors would transfer all shares of common stock of IEX Group, Inc. ("IEX"), other than 578,600 shares of IEX common stock (the "Retained Shares") which the Debtors would retain and have the ability to monetize; (ii) IEX would transfer to the Debtors all of the common shares of FTX Trading and all of the shares of class A common stock of WRSS that it had received in a prior transaction with the Debtors; (iii) IEX and the Debtors would release any claims or causes of action against each other arising out of the prior transaction; and (iv) IEX would waive all transfer restrictions related to the Retained Shares and cooperate with the Debtors in the monetization of the Retained Shares [D.I. 2110]. On August 18, 2023, the Bankruptcy Court approved the motion [D.I. 2204]. On January 4, 2024, the Debtors filed a motion seeking approval of the sale of the Retained Shares to the consortium of purchasers (the "IEX Purchasers") for an aggregate price of approximately $40 million [D.I. 5381, 6669]. The Debtors had acquired the interests in IEX on March 18, 2022, in exchange for shares of certain of the Debtor entities. After evaluating all bids submitted, the Debtors and IEX Purchasers entered into that certain Purchase and Sale Agreement, dated as of January 4, 2024. On January 29, 2024, the Bankruptcy Court approved the sale [D.I. 6731].

On January 4, 2024, the Debtors filed a motion seeking approval of the sale of a convertible promissory note in Dave Inc. (the "Dave Note") held by Debtor FTX Ventures Ltd. to Dave Inc. for $71 million with the potential for an additional $29 million payment following certain corporate events relating to Dave Inc., including a change in control thereof [D.I. 5382, 6630]. The Debtors had acquired the Dave Note on March 21, 2022, for an aggregate consideration of $100 million. After conducting a market check to confirm the price of the Dave Note, the Debtors and Dave Inc. entered into that certain Purchase and Sale Agreement, dated as of January 4, 2024. On January 26, 2024, the Bankruptcy Court approved the sale [D.I. 6685].

On January 4, 2024, the Debtors filed a motion seeking approval of the sale of a convertible promissory note (the "Helix Note") in Helix Nanotechnologies Inc. ("Helix") held by Debtor Clifton Bay Investments LLC to TVC Momentum Fund I, LP, TVC Momentum Fund II, LP, and TVC XLII, a Series of The Venture Collective Holdings LLC (collectively, the "Helix Purchasers") for approximately $5 million with the potential for an additional $3 million payment following certain corporate events relating to Helix, including the completion of an equity capital fundraising by Helix [D.I. 5383, 6630]. The Debtors had acquired the Helix Note on January 27, 2022 for an aggregate consideration of $10 million. After conducting a market check to confirm the price of the Helix Note, the Debtors and the Helix Purchasers entered into that certain Purchase and Sale Agreement, dated as of January 4, 2024. On January 26, 2024, the Bankruptcy Court approved the sale [D.I. 6663].

On February 2, 2024, the Debtors filed a motion seeking approval of procedures for the private sale or auction (the "Anthropic Sale Procedures") of shares of Anthropic, PBC ("Anthropic") held by the Debtors [D.I. 6950, 6952]. On February 23, 2024, the Bankruptcy Court granted the Debtors' motion, approving the Anthropic Sale Procedures, the form and manner of notice for the sale of the shares and the form of the proposed sale order for any sales completed pursuant thereto [D.I. 7908, 8215].

On March 22, 2024, in accordance with the Anthropic Sale Procedures, the Debtors entered into a Purchase and Sale Agreement by and among Debtor Clifton Bay Investments LLC and the purchaser set forth therein, for the sale of 29,465,891 shares of Anthropic for an aggregate price of approximately $884.1 million (the "Anthropic Sale"), a premium of over 267% above the original purchase price. Also on March 22, 2024, the Debtors filed a notice with the Bankruptcy Court seeking approval of the Anthropic Sale [D.I. 10241]. On March 25, 2024, the Debtors filed a revised notice for the Anthropic Sale to allow the Debtors to enter into a release of claims against Anthropic in connection with the Anthropic Sale [D.I. 10348]. The Bankruptcy Court approved, and the Debtors' closed, the Anthropic Sale on April 8, 2024.

### 3. *De Minimis Sales*

Prior to the Petition Date, the Debtors regularly entered into and exited relatively small investments across a variety of asset categories, including, among other investments, coins, tokens and token platforms and interests in privately held companies. The Debtors also routinely acquired controlling or minority interests in early-stage private companies with relatively small enterprise values. A number of these assets were held purely for investment purposes and, as a result, were meant to be monetized over time rather than integrated into the Debtors' core cryptocurrency exchange businesses.

On January 18, 2023, the Debtors filed a motion seeking approval of procedures for the sale or transfer of certain assets that were of relatively *de minimis* value compared to the Debtors' total asset base (the "De Minimis Assets") free and clear of liens, claims, interests and encumbrances [D.I. 525]. On February 13, 2023, the Bankruptcy Court entered an order approving the motion [D.I. 702] (the "De Minimis Assets Sale Order"). On February 16, 2024, the Bankruptcy Court entered an order approving an amendment to the De Minimis Assets Sale Order to increase the amount of funds available for the funding of capital calls issued by certain of the De Minimis Assets [D.I. 7540]. Since the entry of the De Minimis Assets Sale Order, the Debtors have filed monthly status reports describing the De Minimis Assets sold each month [D.I. 1254, 1473, 1608, 1859, 2441, 3035, 3717, 5326, 7161, 11504 and 14176] and proceeds to date are approximately $20.4 million in the aggregate.

### 4. *Coin Monetization*

On September 13, 2023, the Debtors filed a motion seeking Bankruptcy Court approval to sell, hedge and stake certain digital assets in accordance with certain investment guidelines, which motion was supported by the Official Committee and the Ad Hoc Committee [D.I. 2239]. On September 13, 2023, the Debtors received such Bankruptcy Court approval [D.I.

2505] (the "Coin Monetization Order").  Contemporaneously with the entry of the Coin Monetization Order, the Bankruptcy Court authorized the Debtors' entry into, and performance of its obligations under, that certain Investment Services Agreement, dated August 23, 2023 (the "IMA"), between the Debtors and Galaxy Digital Capital Management LP ("Galaxy") [D.I. 2504].  The IMA appointed Galaxy as an investment manager for the Debtors, and authorized Galaxy to sell, hedge and stake the Debtors' digital assets on behalf of the Debtors pursuant to the investment guidelines in the Coin Monetization Order.  On January 26, 2024, the Debtors and Galaxy entered into a letter agreement in connection with the IMA which was approved by the Bankruptcy Court on February 8, 2024 [D.I. 7136].

The Debtors are in the process of monetizing their digital assets in preparation for dollarized distributions to creditors after the effective date of the Plan.  Through May 5, 2024, the Debtors have sold certain of their digital assets for approximately $5.7 billion pursuant to the Coin Monetization Order.

While the Debtors were in the process of conducting digital asset sales, the Debtors, in consultation with the Official Committee and the Ad Hoc Committee, determined to conduct Bitcoin derivative trading and to generate yield on their digital assets portfolio.  The Debtors have executed options trading documentation with several counterparties and have executed hedging transactions with such counterparties.

### 5.  *Sale of Grayscale and Bitwise Trust Units*

The Debtors held units (the "Trust Assets") in five statutory trusts managed by Grayscale Investments, LLC (the "Grayscale Trusts") and one statutory trust managed by Bitwise Investment Advisors, LLC (the "Bitwise Trust", in a brokerage account at ED&F Man Capital Markets, Inc. (n/k/a Marex Capital Markets Inc.) and in a brokerage account at Deltec Bank and Trust Limited.  The Grayscale Trusts and Bitwise Trust allow investors to gain exposure to digital assets without owning the digital assets themselves.

On November 3, 2023, the Debtors entered into that certain Second Amended and Restated Investment Services Agreement (the "Second A&R IMA") to permit Galaxy to sell the Trust Assets on behalf of the Debtors.  The Debtors concurrently filed a motion seeking authorization for the Debtors to sell the Trust Assets pursuant to certain procedures described in the Second A&R IMA.  The motion was approved on November 29, 2023.  The Debtors have sold the majority of the Trust Assets, and expect to finalize the sale of the remaining Trust Assets in ~~May~~July 2024.

### F.    **Consensual Turnovers**

Since the Petition Date, the Debtors have engaged in an extensive effort to investigate and identify property of the estate that is in the possession or control of third parties.  Certain of those third parties consented to the turnover of such property conditioned upon an order of the Bankruptcy Court.  Accordingly, the Debtors filed the following consensual turnover motions:

- On January 25, 2023, the Debtors filed a motion seeking the turnover of approximately $348 million of assets held in brokerage accounts at Interactive Brokers LLC [D.I. 582].  On February 3, 2023, the motion was granted by the Bankruptcy Court [D.I. 616].

- On March 29, 2023, the Debtors filed a motion seeking the turnover of approximately $168 million of assets held in accounts by Aux Cayes FinTech Co. Ltd. and Okcoin USA, Inc. [D.I. 1189].  On April 10, 2023, the motion was granted by the Bankruptcy Court [D.I. 1245].

- On March 29, 2023, the Debtors filed a motion seeking the turnover of approximately $53 million of assets held by Deltec International Group [D.I. 1195].  On April 12, 2023, the motion was granted by the Bankruptcy Court [D.I. 1267].

- On August 2, 2023, the Debtors filed a motion authorizing the turnover of approximately $14 million of assets held by Stripe, Inc. and approximately $1 million of assets held by BiLira Teknoloji Anonim Şiirketi [D.I. 2107].  On August 18, 2023, the motion was granted by the Bankruptcy Court [D.I. 2203].

- On December 21, 2023, the Debtors filed a motion seeking the turnover of approximately $11 million in funds held by the Federal Deposit Insurance Corporation ("FDIC") as receiver for a Signature Bank account in the name of FTX Philanthropy [D.I. 5082].  After further conversations with the FDIC, the Debtors withdrew the motion on consent [D.I. 5592] and re-filed a motion seeking to designate WRSS as the payee for the FTX Philanthropy deposit claim against the FDIC as receiver for Signature Bridge Bank [D.I. 5597].  On January 26, 2024, the Bankruptcy Court approved the motion [D.I. 6683].

## G.    Litigation

As part of the ongoing investigation and asset recovery initiatives, the Debtors have initiated numerous legal actions against various parties, including former Insiders, former business partners of the Debtors and other parties.  These include:

1.    Three actions against Mr. Bankman-Fried and other former Insiders to recover funds wrongfully paid:

   i.    An adversary action against Messrs. Bankman-Fried, Wang, Singh and Ms. Ellison [D.I. 1886] (Adv. Pro. No. 23-50448).  The complaint alleges breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, waste of corporate assets, aiding and abetting waste of corporate assets, and conversion, among other claims.  The Debtors are further seeking to avoid significant

fraudulent transfers that were made for the benefit of the defendants.  The defendants' motions to dismiss or answers were due April 11, 2024.

ii.  An adversary action against FTX Group in-house counsel and Chief Compliance Office Daniel Friedberg [D.I. ~~1679~~1727] (Adv. Pro. No. 23-50419).  The complaint details Friedberg's facilitation of the routing of customer funds to former Insiders, failure to implement necessary internal controls, and silencing of whistleblowers who threatened to expose the FTX Group's wrongdoing.  The Debtors' claims against Friedberg include breaches of his fiduciary duties and aiding and abetting breaches by Messrs. Bankman-Fried, Wang, Ms. Ellison and other executives, legal malpractice, and corporate waste.  The Debtors seek to recover various transfers to Friedberg, including payment of an approximately $3 million bonus.  Friedberg filed his answer, partial motion to dismiss, and counterclaims in the adversary proceeding on October 23, 2023, asserting a right to indemnification and moving to dismiss portions of the Debtors' fraudulent transfer claims relating to Serum tokens and the Debtors' cause of action for disallowance of Friedberg's claims pursuant to section 502(d) of the Bankruptcy Code.  On January 18, 2024, the Debtors filed a First Amended Complaint against Friedberg [Adv. D.I. 32].  The Parties have proposed that any response or answer to the First Amended Complaint be filed by May 18, 2024.

iii.  An adversary action against Mr. Bankman-Fried's parents, Allan Joseph Bankman and Barbara Fried, detailing Bankman and Fried's exploitation of their access and influence within the FTX Group to enrich themselves and their chosen causes by millions of dollars [D.I. 2642] (Adv. Pro. No. 23-50584).  Among the transfers the Debtors seek to avoid is a $10 million gift and purchase of a $16.4 million luxury property in The Bahamas, both of which originated from Debtor funds and were transferred to Bankman and Fried for their personal benefit.  The complaint also alleges that Bankman breached his fiduciary duties to Alameda Research, Alameda Research Ltd., WRSS, and FTX Trading as a de facto officer, director, and/or manager of those entities, and that Fried aided and abetted former Insiders' breaches of fiduciary duties by providing advice to evade political contribution disclosure rules.  On January 15, 2024, Bankman and Fried filed a motion to dismiss the complaint.  On March 15, 2024, the Debtors filed a First Amended Complaint [Adv. D.I. 26].  Bankman and

Fried have until May 22, 2024 to move to dismiss or answer the First Amended Complaint.

2. An adversary action against Michael Giles, the founder and CEO of Embed, and various other former Embed equity holders, to recover approximately $292 million [D.I. 1503] (Adv. Pro. No. 23-50380). Briefing on the defendants' motions to dismiss completed on October 20, 2023 and oral argument was held on February 29, 2024. The Bankruptcy Court deferred a decision on the defendants' motion to dismiss pending the outcome of a mediation. Discovery is also stayed pending the outcome of that mediation.

3. An adversary action against (i) various owners and affiliates of K5 Global Holdings LLC, a venture capital company, including Michael Kives and Bryan Baum (the "K5 Defendants"), and (ii) SGN Albany Capital LLC ("SGN Albany"), an entity majority-owned by Messrs. Bankman-Fried, Wang, and Singh, to recover $700 million [D.I. 1679] (Adv. Pro. No. 23-50411). On September 26, 2023, the Bankruptcy Court granted plaintiffs' motion for default judgment against SGN Albany. On August 17, 2023, the K5 Defendants filed a motion to withdraw the reference, which the District Court denied on January 2, 2024. *Kives et al.* v. *Alameda Research Ltd. et al.*, No. 23-cv-00915 (D. Del. Jan. 2, 2024), [D.I. 9]. On September 11, 2023, the K5 Defendants filed a motion to stay the adversary proceeding and a motion to dismiss the complaint [Adv. D.I. 38]. The Bankruptcy Court denied the stay motion on February 21, 2024 [Adv. D.I. 77], and briefing on the motion to dismiss was completed on December 11, 2023. The parties currently expect to participate in mediation following the substantial completion of document discovery.

4. An adversary action against Lorem Ipsum UG, Patrick Gruhn, Robin Matzke, and Brandon Williams (the "LI Defendants"), former insiders of FTX Europe, to recover $323.5 million in connection with the Debtors' prepetition acquisition of FTX Europe and disallow any claims the LI Defendants filed in the Chapter 11 proceedings [D.I. 1866] (Adv. Pro. No. 23-50437). The LI Defendants filed motions to dismiss the adversary action on October 25 and October 27, 2023 [D.I. 3399, 3400]. On November 17, 2023, Marcel Lotscher, a former insider of FTX Europe, filed a motion to dismiss FTX Europe AG from these Chapter 11 Cases [D.I. 4037]. On January 4, 2024, the Debtors filed a motion seeking approval for the sale of the equity interests of FTX EU and FTX Switzerland GmbH to FTX Trading, and the dismissal of certain of the Debtors associated with FTX Europe [D.I. 8202]. On January 10, 2024, Martha Lambrianou, the sole remaining prepetition director of FTX EU, filed a motion to dismiss FTX EU from these Chapter 11 Cases [D.I. 5529]. To address the various motions filed by the LI Defendants, Lotscher, and Lambrianou, on January 24, 2024, the Debtors filed a

-64-

motion seeking to establish a comprehensive litigation schedule (the "Scheduling Motion") [D.I. 6520]. After the Debtors filed the Scheduling Motion, the Debtors, the LI Defendants, Lotscher, and Lambrianou commenced settlement discussions. After extensive negotiations, on January 29, 2024, the parties agreed to certain principles of cooperation which included, among other things, (i) a global settlement and withdrawal of the motions to dismiss by the LI Defendants, Lotscher, and Lambrianou and the adversary action brought by the Debtors [D.I. 11027, 11028, 11054, 11073, 11076, 11156, 11212], (ii) a sale of certain entities of FTX Europe to certain of the LI Defendants and the dismissal of related entities from the Chapter 11 Cases subject to certain conditions [D.I. 9585], (iii) the disallowance of certain proofs of claim filed by Patrick Gruhn, Lorem Ipsum UG, and by Martha Lambrianou on behalf of FTX EU; (iv) the allowance of certain customer claims in the proof of claim filed by Robin Matzke and (v) mutual releases among the Debtors and the LI Defendants, Lotscher, and Lambrianou (collectively, the "FTX Europe Settlement"). On February 22, 2024, the Debtors filed a motion seeking approval of the FTX Europe Settlement [D.I. 7853], which was approved by the Bankruptcy Court on March 20, 2024 [D.I. 9587].

5.      An adversary action against Platform Life Sciences Inc. ("Platform Life Sciences"), Latona Biosciences Group ("Latona"), Ross Rheingans-Yoo, Mr. Bankman-Fried, Nicholas Beckstead, and various small life sciences defendants, for approximately $72 million in fraudulent transfers [D.I. 1881] (Adv. Pro. No. 23-50444). On September 15, 2023, Platform Life Sciences moved to dismiss the complaint for lack of personal jurisdiction [Adv. D.I. 35]. Following oral argument on Platform Life Sciences' motion on November 15, 2023 [Adv. D.I. 71], the Bankruptcy Court denied Platform Life Sciences' motion on December 20, 2023 [Adv. D.I. 72]. Pursuant to a Stipulation and Order entered on November 1, 2023, the adversary proceeding was stayed as to the small life sciences defendants and Beckstead, and the small life sciences defendants agreed to facilitate the transfers to the Debtors of all rights and interests that Latona has in the small life sciences defendants if Latona consents to it or the Bankruptcy Court orders it [Adv. D.I. 62, 64]. Following negotiations with Platform Life Sciences, on January 26, 2024, the Debtors filed a motion seeking approval of a settlement pursuant to which Platform Life Sciences agreed to pay the Debtors $16 million [Adv. D.I. 82]. On February 13, 2024, the Bankruptcy Court approved the settlement with Platform Life Sciences [Adv. D.I. 89]. On March 27, 2024, Platform Life Sciences paid the Debtors $16 million and they were dismissed from the case on April 4, 2024. On January 25, 2024, the Debtors reached a settlement with Nick Beckstead pursuant to which he provided documents and information to the Debtors, sat for an interview, and agreed to be deposed in the adversary proceeding if necessary. On March 13, 2024, the Bankruptcy Court approved the settlement with Mr. Beckstead and on

March 14, 2024, the Debtors dismissed Mr. Beckstead from the case. Following extensive negotiations with the remaining defendants (other than Mr. Bankman-Fried), on April 26, 2024, the Debtors filed a motion seeking to approve a settlement with Latona, the remaining life sciences defendants and Ross Rheingans-Yoo, pursuant to which (i) Greenlight will pay the Debtors $420,918, (ii) Genetic Networks will pay the Debtors $450,000, (iii) 4J Therapeutics, Riboscience and Lumen Bioscience consent to Latona's transfer of its rights and interest in those life sciences defendants to the Debtors; and (iv) the Debtors will allow $180,000 of Rheingans-Yoo's compensation claim and defer for future determination by the Bankruptcy Court his claim for a $650,000 donation to a charity. On May 22, 2024, the Bankruptcy Court approved the settlement with Latona, the remaining life sciences defendants and Ross Rheingans-Yoo [Adv. D.I. 106]. On June 5, 2024, GreenLight paid the Debtors $420,918, and they were dismissed from the case on June 10, 2024 [Adv. D.I. 109]. On June 10, 2024, Bankman-Fried answered the complaint [Adv. D.I. 110]. On June 18, 2024, the Debtors and Bankman-Fried served initial disclosures for discovery.

6.  An adversary action against LayerZero Labs, Ltd. ("LayerZero"), Ari Litan, and Skip & Goose LLC to recover assets transferred to LayerZero through fire sale transactions negotiated on the eve of the commencement of these Chapter 11 Cases, as well as to recover approximately $41 million in preferential transfers to the defendants (Adv. Pro. No. 23-50492). Defendants did not move to dismiss the complaint. Defendants' answer was filed on December 22, 2023. The parties engaged in mediation on May 17, 2023, which ended without a resolution. [Adv. D.I. 45]. Discovery is ongoing.

7.  An adversary action against former FTX Group employees Michael Burgess, Huy Xuan "Kevin" Nguyen, Jing Yu "Darren" Wong, and Matthew Burgess, as well as certain related entities and individuals, to recover as fraudulent and/or preferential transfers approximately $157 million removed from the FTX Exchanges in the lead-up to the petition date [D.I. 2654] (Adv. Pro. No. 23-50585). On November 20, 2023, the defendants filed their motion to dismiss. Motion to dismiss briefing was completed March 12, 2024. Discovery is ongoing.

8.  An adversary action against Bybit Fintech Ltd., Mirana Corp., Time Research Ltd., and other affiliated persons seeking to recover fraudulent and preferential transfers of withdrawals valued at approximately $950 million (Adv. Pro. No. 23-50759). The Debtors are further seeking turnover of Debtor property, and damages from violations of the automatic stay caused by Bybit Fintech Ltd.'s depriving the Debtors of their assets, and otherwise taking steps to devalue Debtor property [D.I. 3722]. The defendants filed motions to dismiss on February 6, 2022. Motion to

dismiss briefing ~~is scheduled to be~~was completed on May 8, 2024. Discovery is ongoing.

9.      As further described in Section 3.J.1—*Voyager*, Alameda Research Ltd. filed an adversary action on January 30, 2023 against Voyager Digital, LLC and HTC Trading Inc. seeking to avoid repayments by Alameda Research Ltd. under the Voyager MLA Loans (as defined below) [D.I. 596] (Adv. Pro. No. 23-50084). On March 2, 2023, the Debtors filed an amended complaint adding FTX Trading as plaintiff and asserted additional preference claims against the defendants. In October 2023, the parties engaged in mediation to resolve the adversary action and other related disputes. On April 4, 2024, the parties entered into a global settlement, consensually resolving the parties' claims and disputes. The Debtors filed a motion seeking approval of the settlement on April 9, 2024 [D.I. 11548] and the motion was approved on April 29, 2024 [D.I. 13123].

10.     An adversary action against the named Plaintiffs in the multidistrict litigation styled *In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 23-md-03076 (S.D. Fla. 2023), as well as a motion for preliminary declaratory and injunctive relief enforcing the automatic stay and enjoining certain actions brought in the multidistrict litigation that Debtors assert are claims that are property of the Debtors' estates. The multidistrict litigation was formed in June 2023 to consolidate lawsuits filed by various plaintiffs in several jurisdictions against a broad range of defendants who had been connected to the FTX Group prior to the Petition Date, including various FTX insiders, investors, promoters and professionals.

11.     An adversary action filed May 13, 2024 against Center for Applied Rationality and related entities (Adv. Pro. No. 24-50066), which received $4,904,999.61 of debtor funds which they used to fund grants and operations, and to acquire and renovate a property in Berkeley, California.

Also, on March 22, 2023, the Debtors filed a motion seeking an order authorizing the Debtors to enter into a settlement agreement for approximately $460 million with Modulo Capital, Inc. and various affiliates (the "Modulo Parties") in connection with various claims the Debtors believed they had against the Modulo Parties, including fraudulent transfer and/or preferential transfer claims [D.I. 1133]. The settlement agreement required the Modulo Parties to pay approximately $406 million in cash to the Debtors, and release claims, valued at approximately $56 million, to assets held on the FTX.com Exchange [D.I. 1133]. On April 10, 2023, the Bankruptcy Court approved the motion [D.I. 1244]. In early May 2023, Modulo Capital, Inc. transferred approximately $406 million in cash to the Debtors.

### H.    Cooperation with Governmental Investigations

Since the commencement of these Chapter 11 Cases, the Debtors have provided substantial cooperation in investigations by various governmental authorities around the world. The Debtors determined that cooperation with these investigations was in the best interests of their estates because cooperation allowed the Debtors access to information concerning recoverable assets, helped governmental authorities seize assets beyond the reach of the Debtors that might ultimately be the source of incremental recovery for FTX creditors, avoided the indictment of the Debtor entities, facilitated the reasonable resolution of governmental claims against the Debtors (ultimately including the subordination arrangements contemplated by the Plan) and encouraged the potential distribution by the Debtors to creditors of assets forfeited in criminal proceedings against Mr. Bankman-Fried and others.  The Debtors faced numerous investigation challenges associated with their efforts to collect and preserve documents, including (i) the near-complete absence of trustworthy financial information and customary corporate records, (ii) FTX Group employees' extensive use of ephemeral messaging systems pre-petition, and (iii) the need to identify and collect devices and documents that were located in foreign jurisdictions.

From the filing of these Chapter 11 Cases through the completion of Mr. Bankman-Fried's criminal trial, the Debtors have responded to near-daily requests from domestic and international authorities for documents and data pertaining not only to Mr. Bankman-Fried and other FTX insiders, but also to various users of FTX Exchanges who may be the subject of investigations or been victims of criminal activity.  These efforts include:

- More than 400 requests from the Department of Justice and federal law enforcement agencies, including the Federal Bureau of Investigation, Department of Homeland Security, IRS and Drug Enforcement Administration;

- More than 300 requests from U.S. federal regulators, including the Securities and Exchange Commission and CFTC;

- Requests from Congressional committees; and

- Requests from non-U.S. regulators and criminal authorities.

All told, the Debtors and their advisors have provided law enforcement and regulatory authorities with more than 4.3 terabytes of data, including more than 1.4 million documents.

In particular, the Debtors and their advisors have cooperated with the Department of Justice in its ongoing criminal investigations, which have—to date—resulted in four Insiders pleading guilty and Mr. Bankman-Fried being convicted on seven counts following a jury trial and sentenced to 25 years in prison.  The Debtors and their advisors also have been cooperating

with the Department of Justice and other governmental authorities in connection with investigations into other potential criminal activity and misconduct.

The Debtors and their advisors also have engaged extensively with the Department of Justice and other authorities to coordinate asset recovery and asset forfeiture efforts in order to maximize recoveries for creditors and victims.

## I.    Other Recovery Efforts

### 1.    *Donation and Political Contribution Recoveries*

After extensive analysis of bank records and various internal records, the Debtors identified 84 high-value prepetition transfers to different non-profit entities or projects totaling approximately $158.4 million.  This set of transfers consists primarily of transfers above $500,000 and ranges up to $16,647,353.  The Debtors have coordinated closely with the Department of Justice and other authorities with respect to these transfers, and the Debtors have contacted each of the recipients of these larger dollar transfers to seek the return of these funds to the extent Debtors are the appropriate party to seek their return.  Examples of resolutions completed to date include:  (i) Effective Ventures Foundation USA, Inc. for $22.54 million; (ii) Stanford University for $5.7 million; (iii) Center for AI Safety for $5.2 million; (iv) Vanguard Charitable Endowment Program for $4.7 million; (v) New Venture Fund for $4.5 million; (vi) Effective Ventures Foundation UK for $4.2 million; (vii) The Working Policy Project for $2.9 million; and (viii) Ought Inc. for $3.5 million.  The Debtors also are reviewing potential lower-value prepetition transfers totaling $46.2 million to approximately 319 non-profit entities, projects or individuals, consisting primarily of transfers of $500,000 or less.  To date, after research, outreach and negotiation with transferees, the Debtors have recovered a total of approximately $~~72.8~~77.1 million from ~~58~~85 entities, projects or individuals.

The Debtors have also identified approximately $195 million in prepetition transfers to political entities across approximately 1,072 different contributions.  This includes transfers as large as $10 million, but the vast majority—900—are transfers of under $100,000, including hundreds of transfers of a few thousand dollars each.  The Debtors have coordinated closely with the Department of Justice and other authorities with respect to these transfers, and have agreed that the Department of Justice is the appropriate party to seek the return of the majority of these transfers.  To date, the Debtors have reached agreements to recover approximately $6 million from the recipients for which the Debtors are the appropriate party to seek the return of funds, which does not include amounts recovered by the Department of Justice.

### 2.    *Settlement Procedures Motion*

On September 11, 2023, the Bankruptcy Court entered the *Order Authorizing and Approving Procedures for Settling Certain Existing and Future Litigation Claims and Causes of Action* [D.I. 2487] (the "Settlement Procedures Order"), which streamlines the process for approving small dollar settlements.  Under the order, and with certain exclusions, claims with an estimated value of $3 million or less may be settled without a filing under Bankruptcy Rule

-69-

9019(a) by providing notice and a five-day objection period to representatives of the Official Committee, the Ad Hoc Committee, and the U.S. Trustee.  Where the estimated claim value is greater than $3 million and less than or equal to $15 million, and the settled value is $7 million or less, claims may be settled by filing a notice with the Bankruptcy Court and allowing a five-day period for objection for the Official Committee, the Ad Hoc Committee, and the U.S. Trustee.  The order also requires a monthly filing identifying the settling parties and settlement amounts for the prior month.

To date, the Debtors have utilized the Settlement Procedures Order to reach settlements without the need for motion practice with over 60 recipients of estate funds, including non-profit entities, universities, public policy and research institutes, individuals and defendants in the Debtors' contemplated and filed adversary actions, resulting in settlements in excess of $55 million.

### 3.  *Other Recovery Efforts*

The Debtors have coordinated closely with the Department of Justice in connection with the seizure and forfeiture of Bombardier Global and Embraer Legacy airplanes, which were purchased and improved with approximately $35 million of estate funds.  On March 22, 2024, the Debtors, the Department of Justice and Paul Aranha, who had claimed he owned the airplanes, submitted a stipulation for approval of the United States District Court in the Southern District of New York pursuant to which Aranha would return the Embraer Legacy to the Department of Justice and the United States Marshals would sell both planes.  The Bankruptcy Court entered that stipulation on March 22, 2024, and Aranha returned the Embraer Legacy to the Department of Justice on March 25, 2024.

On September 7, 2023, former Debtor insider Ryan Salame pleaded guilty to conspiracy to defraud the United States and willfully violate the Federal Election Campaign Act and conspiracy to operate an unlicensed money transmitting business.  Plea Tr. 24:10-25, Sept. 7, 2023, *United States* v. *Salame*, 22-cr-00673 (S.D.N.Y. 2023).  As a condition of his plea agreement, Salame was required to pay restitution to the Debtors in the amount of $5,593,177.91.  On May 1, 2024, the Debtors filed in the Bankruptcy Court a motion seeking approval of a settlement among the Debtors, Salame, the Department of Justice and the Bahamas JOLs, pursuant to which Salame will transfer legal title of an apartment he owns in the Bahamas that was recently appraised at $5.9 million to FTX DM, by the Bahamas JOLs, as nominee for the Debtors in satisfaction of the $5,593,177.91 in restitution that he owes the Debtors [D.I. 13631].  On May 22, 2024, the Bankruptcy Court approved the Debtors' motion [D.I. 15504].  On May 28, 2024, Salame was sentenced to an aggregate term of imprisonment of 7.5 years.  Min. Entry, May 28, 2024, *United States* v. *Salame*, 22-cr-00673 (S.D.N.Y. 2023).

In coordination with the Department of Justice, the Debtors have helped secure more than half a billion dollars of assets held on more than a dozen third-party platforms around the world, including a significant amount of Debtor assets held in accounts nominally registered in the name of non-Debtor entities or individuals.  The Debtors continue to work with third-party exchanges to secure additional Debtor assets held on those platforms.

The Debtors held a significant stake in an early-stage crypto project called the Pyth Network.  Following extensive discussions, on June 14, 2023, the Debtors filed a motion seeking approval of a settlement that granted the Pyth Network relief from the automatic stay to permit it to "re-mint" a replacement Pyth token and to deliver 1.12 billion replacement PYTH tokens to the Debtors.  The motion was approved by the Bankruptcy Court on June 23, 2023 and the Debtors received the replacement PYTH tokens.

The FTX Group held hundreds of diverse investments specializing in token development projects.  Through the comprehensive efforts to identify these investments, including extensive contract review, blockchain tracing, and outreach initiatives, the Debtors have successfully recovered over $1.6 billion in tokens.

By conducting asset tracing, the Debtors also identified $20 million in accounts at Signature Bank and Evolve Bank & Trust that were entirely funded through transfers from Debtor WRSS, Debtor North Dimension, Inc. and Debtor FTX Trading Ltd., ostensibly for the benefit of the FTX Foundation (n/k/a FTX Philanthropy).  The Debtors worked with the treasurer of the FTX Foundation, and coordinated with the FDIC and payment processor Wise to arrange for the return of the $20 million to the Debtors' estates.

The Debtors also issued over 50 Rule 2004 document requests, reviewed millions of pages of documents concerning FTX Group prepetition insiders, the FTX Groups' venture investments, and the professionals, consultants and financial institutions engaged by the FTX Group, and continue to analyze and consider all potential claims and causes of action.

### J.   Other Cryptocurrency Bankruptcies

#### 1.   *Voyager*

Before July 2022, certain Debtors and Voyager Digital, LLC ("Voyager") and each of Voyager's affiliated debtors (together with Voyager, the "Voyager Debtors") were involved in various financial engagements.  On June 21, 2022, Debtor Maclaurin Investments Ltd. (formerly known as Alameda Ventures, Ltd.) as lender, Voyager Digital Holdings, Inc. as borrower, and Voyager Digital, Ltd. ("Voyager TopCo"), as guarantor, entered into an agreement to establish a loan facility (the "Voyager Loan Facility").  At that time, Alameda Ventures, Ltd. and Debtor Alameda Research Ventures LLC were also the beneficial owners of several million shares of common stock of Voyager TopCo.  Plus, Voyager TopCo and HTC Trading Inc., a non-Debtor affiliate of the Voyager Debtors, were parties to a loan agreement pursuant to which a series of loans in cryptocurrency and cash were made to Debtor Alameda Research Ltd. (one of Alameda Research's subsidiaries in the Alameda Silo) (the "Voyager MLA Loans").

After the Voyager chapter 11 cases were commenced, but before the Petition Date, Debtor West Realm Shires Inc. ("WRS") submitted the winning bid in the Voyager Debtors' auction of their businesses, a central component of their reorganization proceedings. On September 27, 2022, Voyager TopCo and WRS entered into an asset purchase agreement, whereby WRS would acquire a substantial amount of the Voyager Debtors' assets.  The bankruptcy court overseeing the Voyager chapter 11 cases approved the Voyager Debtors' entry

into the asset purchase agreement (the "Voyager APA") on October 20, 2022, with the transaction contemplated to close pursuant to the Voyager Debtors' to be filed chapter 11 plan of reorganization.  As discussed below, the Voyager APA was terminated pursuant to stipulation between the parties before the transaction closed following the FTX Group's collapse.

In addition, various other Debtors also timely filed proofs of claim in the Voyager chapter 11 cases.  On October 3, 2022, Alameda Ventures, Ltd. filed proofs of claim against the Voyager Debtors, asserting certain claims for $75 million that were outstanding under the Voyager Loan Facility, plus certain additional claims for related damages.  Alameda Research Ventures LLC also filed a proof of claim for damages arising from the purchase of its shares of Voyager TopCo common stock.  The Voyager Debtors have also filed proofs of claim in these Chapter 11 Cases asserting claims related to the Voyager MLA Loans and the Voyager APA, including claims for no less than $130 million arising from the termination of the Voyager APA.

Following the Petition Date, the Debtors and the Voyager Debtors engaged in extensive negotiations and formal proceedings to resolve their outstanding business matters.

First, after the Petition Date, the Debtors and the Voyager Debtors agreed to terminate the Voyager APA.  A stipulation terminating that agreement was approved by the Bankruptcy Court on January 9, 2023 [D.I. 423] and by the bankruptcy court in the Voyager chapter 11 cases on January 10, 2023.

Second, on January 30, 2023, Alameda Research Ltd. filed a complaint in the Bankruptcy Court against Voyager Digital, LLC and HTC Trading Inc. (collectively, the "Voyager Preference Defendants") seeking to avoid repayments by Alameda Research Ltd. under the Voyager MLA Loans in September and October 2022 and related amounts as preferences under sections 547 and 550 of the Bankruptcy Code.  An amended complaint was filed on March 2, 2023 adding FTX Trading as a plaintiff and asserting additional preference claims arising from withdrawals by the Voyager Debtors from the FTX Exchanges (collectively with the Voyager MLA Loan repayments, the "Voyager Preference Claims").  The Debtors asserted that, because the Voyager Preference Claims arose after the Voyager chapter 11 cases commenced, they are recoverable by Alameda Research Ltd. on an administrative priority basis pursuant to sections 503 and 507 of the Bankruptcy Code.

Third, in connection with the Voyager Debtors' plan confirmation process, Alameda Research Ltd. and the Voyager Preference Defendants entered into a stipulation pursuant to which, among other things, (i) the Voyager Debtors agreed to reserve $445 million with respect to the Voyager Preference Claims; (ii) the Voyager Preference Claims would be litigated in the Bankruptcy Court; (iii) the Debtors would waive any claims arising from the Voyager Loan Facility; and (iv) the parties would submit to non-binding mediation in an effort to resolve all outstanding claims and disputes.  The stipulation was approved by the Bankruptcy Court on March 8, 2023 [D.I. 833] and by the bankruptcy court for the Voyager chapter 11 cases on April 6, 2023.

Finally, beginning in October 2023, the Debtors (and the Committee) and the Voyager Debtors engaged in non-binding mediation in connection with the various disputes

between them conducted by the Honorable Shelley C. Chapman (Ret.), through which the parties negotiated and agreed to the terms of a settlement of all claims and disputes between them.

On April 4, 2024, the Debtors and the Voyager Debtors entered into that certain global settlement agreement (the "Voyager Settlement Agreement"), consensually resolving the parties' claims and disputes. Pursuant to the Voyager Settlement Agreement, among other things, the parties agreed to waive and release all claims between them, including Voyager's claims filed in these Chapter 11 Cases seeking no less than $130 million in damages for, among other things, damages arising from Alameda's alleged fraudulent inducement and breach of the Voyager Loan Facility, and WRS's alleged breach of the Voyager APA.

The Debtors filed a motion seeking approval of the Voyager Settlement Agreement by the Bankruptcy Court on April 9, 2024 [D.I. 11548]. The motion was approved on April 29, 2024 [D.I. 13123].

2.    *Genesis Global Holdco, LLC*

On January 19, 2023, Genesis Global Holdco, LLC and its affiliates (collectively, the "Genesis Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Genesis Chapter 11 Cases"). Prior to January 2023, the Genesis Debtors offered a range of different digital asset services, including trading, lending and borrowing.

Prior to the Petition Date, various Debtors and the Genesis Debtors were engaged in certain business and financial arrangements, including various lending relationships.

After the Genesis Chapter 11 Cases were commenced, the Debtors took several actions to protect their interests. First, on May 3, 2023, the Debtors sought relief from the automatic stay in the Genesis Chapter 11 Cases to bring avoidance actions against the Genesis Debtors in relation to certain loan repayments, pledges of collateral, and withdrawals from the FTX Exchanges in the 90-day period prior to the Petition Date. The Debtors also later filed certain proofs of claim on the Genesis Debtors' claims register in connection with those same claims (the "Genesis Preference Claims"). In the aggregate, the Debtors asserted claims against the Genesis Debtors in a gross amount exceeding $3 billion. In response to the Debtors' stay relief motion, on June 1, 2023, the Genesis Debtors filed a motion in their own chapter 11 cases to establish procedures for the estimation of the Genesis Preference Claims. The Genesis Debtors and the Debtors subsequently engaged in litigation regarding the Genesis Debtors' estimation motion and the Debtors' stay relief motion.

In these Chapter 11 Cases, the Genesis Debtors also sought to protect their alleged prepetition interests. On or about June 30, 2023, certain Genesis Debtors filed proofs of claims asserting various claims against the Debtors that exceeded $180 million. In addition, non-Debtor affiliate GGC International Ltd. ("GGCI") filed a general unsecured claim against various Debtors for $176 million.

Beginning in early July 2023, the Debtors, GGCI and the Genesis Debtors engaged in settlement discussions to resolve the parties' various, interrelated disputes. The parties ultimately reached a consensual resolution of the parties' claims and disputes (the

-73-

"Genesis Settlement Agreement"). The Genesis Settlement Agreement provided for, among other things, the withdrawal and expungement of all Genesis Debtors' and GGCI's claims against the Debtors and an allowed general unsecured claim by Alameda Research against the Genesis Debtors in the amount of $175 million. The Genesis Settlement Agreement was approved by the Bankruptcy Court on September 6, 2023 [D.I. 2433] and the bankruptcy court in the Genesis Chapter 11 Cases on October 6, 2023.

### 3. *Emergent Fidelity Technologies Ltd.*

Emergent Fidelity Technologies Ltd. ("Emergent") is a company formed under the laws of Antigua and Barbuda that was closely held by Mr. Bankman-Fried. Despite its affiliation with Mr. Bankman-Fried and the Debtors, Emergent was not part of these Chapter 11 Cases as of the Petition Date. Mr. Bankman-Fried and Wang had formed Emergent to hold certain investments in Robinhood Markets, Inc. ("Robinhood"), a brokerage and cash management application platform. According to Emergent's governance documents, Mr. Bankman-Fried is Emergent's only director; Mr. Bankman-Fried and Wang owned 90% and 10% of Emergent, respectively. To capitalize Emergent, Mr. Bankman-Fried and Wang had borrowed approximately $546 million from Debtor Alameda Research.

Shortly after the Petition Date, on November 17, 2022, a third-party creditor of Emergent filed a petition with the Antiguan court seeking to impose a receivership over Emergent's shares. The next day, the Antiguan court granted the receivership request, appointing Angela Barkhouse and Toni Shukla of Quantuma (Cayman) Limited and Quantuma (BVI) Limited, respectively, as joint provisional liquidators. The Emergent joint provisional liquidators are tasked with overseeing the liquidation of Emergent in the Antiguan court proceedings.

Emergent's close affiliation with Mr. Bankman-Fried, coupled with its initial capital injection from Alameda Research, have led to its assets being subject to numerous competing claims. Emergent held its assets in a U.S. financial institution, Marex Capital Markets, Inc., in New York. On or around January 6, 2023, U.S. federal prosecutors seized Emergent's assets—approximately 55 million shares in Robinhood and $20.7 million in cash—in connection with the criminal prosecution of Mr. Bankman-Fried. The Robinhood shares have been monetized and the proceeds are held by the Department of Justice. The Debtors ~~will assert~~have asserted claims to those proceeds, which are also subject to other alleged claims by ~~one or more of Mr. Bankman-Fried and~~ Emergent and certain individuals purporting to act on behalf of a putative class of FTX Group customers.

On February 3, 2023, Emergent filed a petition for relief under chapter 11 of the Bankruptcy Code, under the direction of its joint provisional liquidators. In the accompanying first day declaration, Ms. Barkhouse asserted that Emergent required the protection of the Bankruptcy Court and the powers accorded to a debtor under the Bankruptcy Code because of the numerous competing parties claiming to be Emergent's creditors, the location of Emergent's assets in the United States, and the risk that certain parties may not comply with orders issued by

the Antiguan court.  The Bankruptcy Court granted interim and final approval for the joint administration of Emergent and the Debtors on April 10, 2023 and May 10, 2023, respectively.

4.  *BlockFi Inc.*

Shortly after the Petition Date, on November 28, 2022, BlockFi Lending LLC ("BlockFi Lending"), BlockFi International LLC ("BlockFi International"), BlockFi, Inc. ("BlockFi"), and their affiliated debtors and debtors-in-possession (collectively, the "BlockFi Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "BlockFi Chapter 11 Cases").  The BlockFi Debtors operated a financial services platform where retail clients could earn, borrow, trade and store certain digital assets.

Prior to the Petition Date, certain Debtors had multiple business relationships with the BlockFi Debtors.  In June 2022, following the BlockFi Debtors' experiencing a liquidity crisis, WRS agreed to provide a revolving credit facility in an amount up to $400 million (the "BlockFi Rescue Facility").  As part of that transaction, WRS also received an option to buy certain BlockFi Debtors' equity.  From July through October 2022, the BlockFi Debtors drew $275 million from the BlockFi Rescue Facility.

Alameda Research also periodically borrowed cryptocurrency and cash from BlockFi Lending and BlockFi International pursuant to several loan agreements (the "BlockFi Loan Agreements").  During the 90 days prior to the Petition Date, certain BlockFi Debtors received repayments under the BlockFi Loan Agreements in an aggregate amount of approximately $132 million.  Finally, the BlockFi Debtors also maintained several accounts on the FTX Exchanges.

In the days leading up to the Petition Date, reacting to speculation regarding Alameda Research's stability, the BlockFi Debtors took a series of actions.  First, BlockFi Lending and BlockFi International modified the BlockFi Loan Agreements to increase the required collateralization levels, which Alameda Research satisfied.  Certain BlockFi Debtors also withdrew certain assets from the FTX Exchanges.

In addition, on November 9, 2022—two days before the Petition Date—Alameda Research and BlockFi entered into a forbearance agreement, and BlockFi, BlockFi Lending and BlockFi International each entered into separate pledge agreements with Alameda Research and Emergent.  Pursuant to the terms of the pledge agreement with Emergent, Emergent purportedly granted BlockFi a security interest in all of Emergent's rights, titles and interests in its Robinhood investment to secure the obligations of Emergent, Alameda Research, and their affiliates to the BlockFi Debtors and their affiliates.  Likewise, under its pledge agreement with the BlockFi Debtors, Alameda Research purportedly granted BlockFi a security interest in all of its rights, titles and interests in, among other things, its shares of the Grayscale Trusts and the Bitwise Trust to secure the obligations of Alameda Research and its affiliates.  On November 10, 2022, BlockFi alleged that Alameda Research had breached the terms of its forbearance agreement with BlockFi and informed Emergent of its election to accelerate Emergent's obligations under its respective pledge agreement.

On November 14, 2022, the BlockFi Debtors attempted to foreclose on the Robinhood shares, but Emergent did not complete the transfer.  On November 28, 2022, the BlockFi Debtors commenced the BlockFi Chapter 11 Cases.  That same day, BlockFi commenced an adversary proceeding against Emergent in connection with its alleged rights to the Robinhood shares and certain proceeds thereof.

On March 31, 2023, the Debtors filed proofs of claim against the BlockFi Debtors' asserting that the loan repayments, collateral pledges and withdrawals from FTX Exchanges constitute avoidable preferences under sections 547 and 550 of the Bankruptcy Code (collectively, the "Debtors' BlockFi Claims").  On June 29, 2023, the BlockFi Debtors filed certain proofs of claim asserting claims related to certain assets purportedly held on the FTX Exchanges and for amounts outstanding under the BlockFi Loan Agreements, and in unliquidated amounts related to the pledge agreement with Emergent (the "BlockFi Affirmative Claims").

On or about September 25, 2023, the Debtors and the BlockFi Debtors entered into a stipulation (the "BlockFi Claims Stipulation") pursuant to which, among other things, (i) the Debtors received an allowed claim for $275 million arising out of the BlockFi Rescue Facility; (ii) the BlockFi Debtors agreed to lift the automatic stay to allow the litigation of the Debtors' BlockFi Claims in the Bankruptcy Court; and (iii) the Debtors' BlockFi Claims would otherwise be withdrawn from the BlockFi Chapter 11 Cases for the purposes of affirmative distributions from the BlockFi Chapter 11 Cases and such claims would be litigated in the Bankruptcy Court, including as defenses to or for the purpose of setoff against the BlockFi Affirmative Claims.  The court overseeing the BlockFi Chapter 11 Cases and the Bankruptcy Court approved the BlockFi Claims Stipulation on October 3, 2023 and October 19, 2023 [D.I. 3314], respectively.

On February 1, 2024, the Debtors, BlockFi and the Committee participated in a one-day non-binding mediation session conducted by the Honorable Craig T. Goldblatt that resulted in a global resolution of all claims among the Debtors and BlockFi.

On February 27, 2024, the Debtors and the BlockFi Debtors entered into a settlement agreement and release (the "BlockFi Settlement Agreement"), consensually resolving the parties' claims and disputes.  Pursuant to the BlockFi Settlement Agreement, the BlockFi Debtors agreed to release to the Debtors all rights in assets purportedly pledged by the Debtors, including over $600 million in proceeds from the sale of Robinhood Markets, Inc. Class A common stock and certain Solana tokens held in a joint custody account at Coinbase worth approximately $100 million at the time of entry into the BlockFi Settlement Agreement.  In addition, while BlockFi had asserted its over $1 billion loan claim as fully secured, through the settlement, BlockFi received (i) an allowed secured claim related to outstanding prepetition loans in the amount of $250 million and (ii) an allowed general unsecured claim related to outstanding prepetition loans in the amount of $439 million plus certain interest.  The settlement also favorably resolved for the Debtors the amount of BlockFi's asserted customer claim, which was allowed in the amount of $185 million on account of assets held by the BlockFi Debtors on the FTX Exchanges.  All other claims between the Debtors and the BlockFi Debtors were released, including all of BlockFi's asserted litigation claims against the Debtors, except for the Debtors'

-76-

allowed $275 million claim against the BlockFi Debtors.  As part of the settlement, BlockFi agreed to support the Plan.

The Debtors filed a motion seeking approval of the BlockFi Settlement Agreement by the Bankruptcy Court on March 6, 2024 [D.I. 8676], and the motion was approved by the Bankruptcy Court on March 25, 2024 [D.I. 10331] and became effective on March 28, 2024.

5.    *Three Arrows Capital, Ltd.*

On June 27, 2022, Three Arrows was placed into liquidation pursuant to an order of the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands.  On June 29, 2023, prior to the non-customer bar date, the joint liquidators of Three Arrows filed non-customer proofs of claims against certain of the Debtors.  All rights of the Debtors, their estates, the Three Arrows joint liquidators, Three Arrows, its estate, and all of their respective parties in interests are reserved with respect to these claims.

6.    *Celsius Network LLC*

Celsius Network LLC and its affiliates (collectively, the "Celsius Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code on July 13, 2022.  In late June 2023, the Celsius Debtors filed identical proofs of claim against 102 Debtors asserting claims related to disparaging statements allegedly made by FTX's prepetition officers, directors, employees, or agents regarding the Celsius Debtors' balance sheets and financial condition (the "Celsius Litigation Proofs of Claim").  In the Celsius Litigation Proofs of Claim, the Celsius Debtors noted that they were investigating causes of action against the FTX Debtors under chapter 5 of the Bankruptcy Code, including preference and fraudulent transfer actions.  The Celsius Debtors also filed a separate proof of claim against Alameda Research Ltd. asserting a right to payment related to a secured loan in the approximate amount of $14 million (the "Alameda Proof of Claim").  Finally, the Celsius Debtors filed customer claims against FTX Debtors for digital assets on the FTX Debtors' exchanges as of the Petition Date (collectively, the "Celsius Customer Proof of Claims," and together with the Celsius Litigation Proofs of Claims and the Alameda Proof of Claim, the "Celsius Proofs of Claim").  The Debtors dispute the validity of the claims asserted in the Celsius Proofs of Claim, believe they have valid defenses, and intend to object to such claims.

On June 5, 2024, Mohsin Y. Meghji, the Litigation Administrator for the Celsius Debtors, filed a motion for relief from the automatic stay [D.I. 16815] (the "Lift Stay Motion"), seeking to pursue in the U.S. Bankruptcy Court for the Southern District of New York overseeing the Celsius chapter 11 cases: (i) claims under sections 547 and 550 of the Bankruptcy Code against each of the FTX Debtors as subsequent transferees of withdrawals allegedly made by Celsius customers from the Celsius platform and deposited onto the FTX exchange, and (ii) claims under sections 547 and 550 of the Bankruptcy Code against FTX Debtor Quoine Pte Ltd. for withdrawals from the Celsius platform. With respect to claims against the FTX Debtors as subsequent transferees, through the Lift Stay Motion, the Celsius Debtors have represented they seek only a determination that any distributions on account of Class 5A and/or Class 5B

claimants (or any other applicable class) who were initial transferees of avoidable preferences from the Celsius Debtors should be redirected to the Celsius Debtors' estates.

The Celsius Debtors assert that the Celsius Proofs of Claim, including the preference claims set forth therein, constitute valid and allowable claims under the Plan and intend to vigorously defend those claims and prosecute the Lift Stay Motion. The FTX Debtors believe that the preference claims were not asserted in the Celsius Proofs of Claim and are barred by the Bar Date Order (whether asserted in this Court or any other court). The Debtors are continuing to review the Celsius Lift Stay Motion and intend to object to the requested relief. A hearing on this motion is scheduled for July 17, 2024. If the Celsius Lift Stay Motion is denied, and the Celsius Debtors are not allowed to file such complaints in their own bankruptcy proceeding, the Debtors understand that Celsius Debtors intend to file similar complaints in the FTX Debtors' bankruptcy cases, which the Debtors intend to contest, including on the grounds that such claims are barred by the Bar Date Order.

### K.    Government Seizures

Since the Petition Date, the Department of Justice has taken steps to seize and/or forfeit certain assets as to which the Debtors have asserted claims. The Debtors have coordinated closely with the Department of Justice with respect to these seizures and continue to engage with the Department of Justice as to the appropriate mechanism to distribute those seized assets to the victims of the frauds perpetrated by Mr. Bankman-Fried and others. The assets seized by the Department of Justice include, among other things, (i) approximately $626 million seized from accounts registered in the name of Emergent (representing the proceeds from the interlocutory sale of the Robinhood shares); (ii) fiat and digital assets secured from certain accounts on third-party cryptocurrency exchanges, valued at approximately $379 million as of the date of this Disclosure Statement; (iii) approximately $150 million in cash seized from accounts registered in the name of FTX DM; and (iv) two private planes that were purchased and improved prepetition using approximately $35 million of estate assets.

On March 28, 2024, the United States District Court for the Southern District of New York issued a Preliminary Order of Forfeiture/Money Judgment against Mr. Bankman-Fried and the assets seized by the Department of Justice (the "Preliminary Forfeiture Order"). On June 14, 2024, the Debtors and FTX DM filed a petition in the same Court to commence ancillary proceedings to establish that the Debtors and FTX DM had a superior interest to Mr. Bankman-Fried in the property subject to the Preliminary Forfeiture Order, and requesting that all this property be returned to the Debtors and/or FTX DM for distribution to FTX stakeholders in accordance with the Plan. The Debtors believe that the return of the property to the FTX stakeholders by the Debtors and FTX DM pursuant to the Plan will ensure that substantially all of the property recovered will be used to fund distributions to FTX creditors, without incremental delay or expense.

The recovery estimates provided in this Disclosure Statement assume that the Debtors or FTX DM, as applicable, are able to distribute to creditors all of the assets seized by the Department of Justice and subject to the Preliminary Forfeiture Order. However, as of the date of this Disclosure Statement, agreement with the Department of Justice has not yet been

reached, and it is not clear when or whether the Debtors will be permitted to distribute these assets.  In particular, the Department of Justice has informed the Debtors that it may insist that a portion of any property that is seized by and ultimately forfeited to the United States at the conclusion of any ancillary proceedings be set aside for the benefit of certain unaffiliated stockholders, who are not expected to receive any recovery under the Plan but nevertheless may be considered by the Department of Justice to be victims of the crimes committed by Mr. Bankman-Fried.  If the Debtors and FTX DM are not able to secure the return to their estates of all of the property subject to the Preliminary Forfeiture Order, recoveries to FTX creditors will be reduced accordingly, however, the Debtors do not believe the amount should materially impact recoveries.

In addition, certain foreign governmental authorities also have taken steps to freeze or seize certain assets as to which the Debtors have asserted claims in an amount of approximately $22 million.  The Debtors have sought to engage with those foreign governmental authorities or the Department of Justice, as appropriate, with respect to these assets.  As of the date of this Disclosure Statement, it is not clear when or whether the Debtors will be able to recover these assets.

L.    **Non-Debtor Foreign Liquidation Proceedings**

Certain non-Debtor affiliates have been subject to liquidation proceedings in their respective jurisdictions.

1.    *Australia*

On November 11, 2022, prior to the commencement of these Chapter 11 Cases, the directors of non-Debtors FTX Express Pty Ltd and FTX Australia Pty Ltd., both Australian entities, appointed Messrs. Scott Langdon, John Mouawad, and Rahul Goyal of KordaMentha Restructuring as the Australian administrators.

2.    *The Bahamas*

Non-Debtor FTX DM is an International Business Company that was incorporated in the Commonwealth of The Bahamas on July 22, 2021.  FTX DM is a wholly owned subsidiary of FTX Trading and was created around the time that the FTX.com Exchange moved its headquarters to The Bahamas.  On September 20, 2021, the SCB approved FTX DM's registration to operate as a Digital Asset Business under the Digital Assets and Registered Exchanges (DARE) Act, 2020 of The Bahamas.

On November 10, 2022, after it became clear that the FTX Group was facing a severe liquidity crisis, the SCB suspended registration of FTX DM under the Digital Assets and Registered Exchanges (DARE) Act and filed a petition for provisional liquidation of FTX DM (the "FTX DM Liquidation") with the Bahamas Court.  On the same day, the Bahamas Court granted the petition and appointed Brian C. Simms KC as provisional liquidator of FTX DM.  On November 14, 2022, the Bahamas Court appointed Messrs. Kevin G. Cambridge and Peter

Greaves of PricewaterhouseCoopers as additional joint provisional liquidators to serve alongside Mr. Simms.

On November 15, 2022, the Bahamas JOLs filed a petition for recognition of the FTX DM Liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, captioned *In re FTX Digital Markets Ltd. (in Provisional Liquidation)*, No. 22-BK-11516 (MEW) [D.I. 1] (the "Chapter 15 Case"). On November 28, 2022, the Bankruptcy Court entered an agreed order to transfer venue to the Bankruptcy Court [D.I. 131].

On February 15, 2023, the Bankruptcy Court in the Chapter 15 Case entered an order recognizing the FTX DM Liquidation as a foreign main proceeding under chapter 15 of the Bankruptcy Code [D.I. 129].

On November 10, 2023, the Bahamas Court entered an order, among other things, (a) appointing the Bahamas JOLs as joint official liquidators of FTX DM and (b) determining that FTX DM be wound up in accordance with The Bahamas' Companies Act (as amended by, *inter alia*, the Companies (Winding Up Amendment) Act, 2011).

### M.    FTX Digital Markets (Bahamas)

Since the commencement of these Chapter 11 Cases, the Debtors and FTX DM have vigorously disputed certain facts, conclusions of law and jurisdictional matters. On January 6, 2023, the Debtors and FTX DM sought to resolve their various disputes and executed a settlement and cooperation agreement (the "Bahamas Cooperation Agreement"). The Bahamas Cooperation Agreement sought to establish a framework for cooperation and coordination of their activities as fiduciaries for the benefit of their respective creditors, most of whom were claimed to be overlapping by each estate. On February 9, 2023, the Bankruptcy Court approved the Bahamas Cooperation Agreement [D.I. 683].

The disputes between the Debtors and FTX DM continued notwithstanding the Bahamas Cooperation Agreement. On March 19, 2023, the Debtors filed a complaint against FTX DM and the Bahamas JOLs, commencing the litigation captioned *Alameda Research LLC, et al.* v. *FTX Digital Markets Ltd., et al.*, Adv. Pro. No. 23-50145 (JTD) [D.I. 1119] (the "Bahamas Adversary Proceeding"). The Debtors sought a declaratory judgment from the Bankruptcy Court that FTX DM has no ownership interest in the Debtors' cryptocurrency, fiat currency, intellectual property or customer information. In the alternative, the Debtors sought a declaratory judgment that any transfers to or through FTX DM were fraudulent and avoidable and that the Debtors are entitled to avoid any fraudulent transfers and recover the avoidable transfers from FTX DM plus accrued interests and costs. On July 12, 2023, FTX DM and the Bahamas JOLs contested the Debtors' allegations by filing an answer and asserting their own counterclaims against the Debtors in the Bahamas Adversary Proceeding [Adv. Pro. D.I. 27].

On March 29, 2023, FTX DM filed a motion with the Bankruptcy Court seeking clarification that the Debtors' automatic stay does not apply or, in the alternative, for relief from the automatic stay to file an application in the FTX DM Liquidation to resolve certain legal

issues regarding FTX DM's relationship to the FTX.com Exchange and its customers [D.I. 1192]. On July 20, 2023, the Bankruptcy Court entered an order denying FTX DM's motion for relief from the automatic stay and directed the parties to mediation [D.I. 1883].

On or around June 30, 2023, FTX DM filed claims against various Debtors, asserting, among others, an approximately $7.7 billion fraudulent transfer claim, an approximately $1.1 billion indemnification claim, an approximately $47.6 million intercompany transactions claim, an approximately $256 million property expenses claim, an approximately $16.2 million corporate expenses claim, plus additional contingent and unliquidated amounts.

The Debtors and FTX DM commenced mediation regarding all of the issues in dispute between them, including those raised in the Bahamas Adversary Proceeding, and engaged in good faith, arm's-length discussions over a period of many months regarding the terms of a global settlement to resolve all disputed issues. As a result of productive good faith negotiations, on December 19, 2023, the Debtors and FTX DM entered into a global settlement (the "FTX DM Global Settlement Agreement"), subject to the approval of both the Bankruptcy Court and the Bahamas Court.

The FTX DM Global Settlement Agreement contemplates a joint distribution process in which customers of the FTX.com Exchange may elect which proceeding will govern the resolution and payment of their Claims: (a) mutual undertakings to support the other party's insolvency proceedings, (b) arrangements to enhance and optimize global recovery efforts and to monetize illiquid assets, (c) a bridge loan that will enable FTX DM to fund certain administrative expenses incurred in the FTX DM Liquidation, (d) an agreement by FTX DM to use commercially reasonable efforts to value FTX.com digital asset customer claims in U.S. dollars as of the petition date, (e) an agreement by FTX DM to implement the same KYC procedures as the Debtors, and (f) other provisions to facilitate the substantially identical treatment of Claims in both proceedings.

The FTX DM Global Settlement Agreement will become effective at the same time as the Debtors' Plan becomes effective. Plan effectiveness is a condition precedent to the parties' undertakings to (a) pool assets—including the significant assets whose ownership has been disputed by the parties—for distribution to FTX.com Exchange customers and other creditors, (b) make coordinated distributions in these Chapter 11 Cases and the FTX DM Liquidation to ensure that FTX.com Exchange customers receive substantially identical relative distributions at substantially identical times in these Chapter 11 Cases and the FTX DM Liquidation, (c) withdraw with prejudice the claims asserted in the Bahamas Adversary Proceeding, and (d) grant mutual releases that cover the significant claims asserted by FTX DM against the Debtors.

On December 19, 2023, as part of the FTX DM Global Settlement Agreement, the Debtors and FTX DM also entered into the Bahamas Properties Exclusive Sales Agency Agreement (the "Exclusive Sales Agency Agreement"), subject to approval of the Bankruptcy Court and sanction of the Bahamas Court. Pursuant to the Exclusive Sales Agency Agreement, FTX Bahamas PropCo agreed to appoint FTX DM as FTX Bahamas PropCo's exclusive agent with powers to conduct the management, preparation for sale, marketing and sale of 35 luxury

real estate properties owned by Debtor FTX Bahamas PropCo (the "Bahamas Properties"). The Exclusive Sales Agency Agreement also provides that FTX Bahamas PropCo has the sole and exclusive right to, in its sole discretion, approve a disposition of any of the Bahamas Properties to any person and the entry into any agreement for any disposition of any of the Bahamas Properties and that any purported disposition without the express prior written approval of FTX Bahamas PropCo will be null and void.

On January 4, 2024, the Debtors filed a motion with the Bankruptcy Court for the entry of an order authorizing and approving the Debtors' entry into, and performance of their obligations under, the FTX DM Global Settlement Agreement [D.I. 5380] and a separate motion for the entry of an order authorizing and approving the Exclusive Sales Agency Agreement [D.I. 5379]. On the same day, in the Chapter 15 Case, the Bahamas JOLs filed a motion with the Bankruptcy Court for entry of an order approving the FTX DM Global Settlement Agreement [Ch. 15 Case, Case No. 22-11217, D.I. 137]. On January 11, 2024, the Bahamas JOLs filed an application in the Bahamas Court for, among other things, an order sanctioning FTX DM to enter into the FTX DM Global Settlement Agreement and the Exclusive Sales Agency Agreement. On January 22, 2024, the Bahamas Court sanctioned FTX DM's entry into, among other things, the FTX DM Global Settlement Agreement and the Exclusive Sales Agency Agreement. On January 24 and January 29, 2024, the Bankruptcy Court granted the Debtors' respective motions regarding the FTX DM Global Settlement Agreement and the Bahamas Properties Exclusive Sales Agency Agreement [D.I. 6365, 6733].

So long as the FTX DM Global Settlement Agreement has not been terminated prior to the Effective Date, it will be incorporated into the Plan, and will remain in full force and effect in accordance with its terms from and after the Effective Date.

**N.    Dismissals**

On February 13, 2023, at each of these Debtors' respective requests, the Bankruptcy Court dismissed the cases of Debtors SNG Investments Yatirim Ve Danismanlik Anonim Sirketi (Case No. 22-11093) and FTX Turkey Teknoloji Ve Ticaret Anonim Sirketi (Case No. 22-11170) [D.I. 711]. On August 18, 2023, the Bankruptcy Court dismissed the case of FTX Exchange FZE (Case No. 22-11100) [D.I. 2207]. On November 13, 2023, the Bankruptcy Court dismissed the cases of Liquid Financial USA, Inc., LiquidEX, LLC, Zubr Exchange Limited and DAAG Trading, DMCC [D.I. 3739]. On March 18, 2024, the Bankruptcy Court dismissed the case of FTX Crypto Services Ltd. [D.I. 9585]. On April 19, 2024, the Bankruptcy Court dismissed the cases of FTX Products (Singapore) Pte Ltd., Liquid Securities Singapore Pte Ltd., Analisya Pte Ltd., Quoine Vietnam Co. Ltd., Alameda Aus Pty Ltd., Alameda Research Pte Ltd., Innovatia Ltd., FTX Japan Services K.K., and Quoine India Pte Ltd. [D.I. 12260]. Effective May 10, 2024, the cases of FTX Switzerland GmbH, FTX Certificates GmbH and FTX Structured Products AG were dismissed [D.I. 9585]. Effective [●]May 24, 2024, the cases case of FTX Trading GmbH was dismissed and effective [●], the case FTX EU Ltd. [D.I. ●] were was dismissed. Effective [●], the case of FTX Japan was dismissed.

O.    **Interim Reports of John J. Ray III**

In the interest of furthering the Core Objectives, the Debtors prepared and filed two interim reports.

1.    *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges*

On April 9, 2023, the Debtors filed the First Ray Report.  The First Ray Report detailed the lack of management, governance, accounting, and security controls at the prepetition FTX Group, and the consequences of those control failures.  Management and control of the FTX Group was largely consolidated with Messrs. Bankman-Fried, Singh, and Wang, who lacked the experience and ability necessary to adequately oversee the growing companies.  Among them, Mr. Bankman-Fried was viewed as having the final voice in all major decisions.  Key roles, such as a CFO, Chief Risk Officer, or Chief of Information Security, were missing at some or all critical entities.  Moreover, board oversight was virtually non-existent.  The First Ray Report explained that prepetition efforts to resolve these deficiencies and clarify corporate responsibilities were unwelcome and prompted retaliation.  For example, the president of the FTX.US Exchange resigned after extensive disagreement with Messrs. Bankman-Fried and Singh regarding the absence of appropriate reporting lines, formal management structure and key hires.  Likewise, less than three months after being hired, a lawyer that expressed similar concerns about Alameda Research was summarily terminated.

The First Ray Report also described the significant lack of appropriate accounting and financial records, associated controls and staff, despite the FTX Group's expansive global operations and control of tens of billions of dollars.  For instance, the FTX Group failed to hire professionals that could assist in accounting for assets and liabilities, hedge risk, and prepare financial reports.  Indeed, 49 entities within the FTX Group never produced financial statements of any kind.  Many of the other prepetition FTX Group utilized QuickBooks as their accounting system, and relied on a disorganized set of spreadsheets and shared drives to manage their assets and liabilities.  Moreover, corporate structure and form was frequently disregarded, and assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation.  As a result of these inadequacies, for almost all of the Debtors, as of the Petition Date, financial statements were either non-existent, limited, or completely unreliable.

The First Ray Report also explained that, despite the FTX Group's public statements regarding the importance of safeguarding digital assets, the FTX Group had extensive deficiencies in its controls with respect to digital assets management, cybersecurity and information security generally.  Especially with respect to its Digital Assets custody, the FTX Group did not implement industry-standard security controls.  Instead, the FTX Group maintained virtually all of its digital assets in "hot wallets," which left them susceptible to compromise.  These deficiencies, among other things, contributed to a November 2022 prepetition breach that drained approximately $431 million worth of assets on the date of the bankruptcy petition.

The First Ray Report also documented the favorable privileges Alameda Research was granted on the FTX.com Exchange.  These privileges included the exemption from auto-liquidation and the ability to "borrow" an unlimited amount of digital assets even when Alameda Research's account balance on the exchange was below zero or net-negative. Together, these privileges gave Alameda Research the unique ability to trade and withdraw virtually unlimited assets, regardless of the size of its account balance and without risk to its positions being liquidated.  The First Ray Report also explained how those privileges allowed the FTX Group to misappropriate customer funds, ultimately contributing to the FTX Group's collapse.

2.  *Second Interim Report of John J. Ray III to the Independent Directors:  The Commingling and Misuse of Customer Deposits at FTX.com*

On June 26, 2023, the Debtors filed the Second Ray Report.  Building on the findings of the First Ray Report, the Second Ray Report detailed the rampant commingling and misuse of customer assets at the FTX.com Exchange.  The Second Ray Report explained that the FTX Group represented publicly that, as is common in many industries, it separated customer and corporate funds.  Indeed, the FTX Group even published a document touting the importance of this and other controls to prevent the misuse of customer assets, in its *FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*.  Mr. Bankman-Fried repeatedly cited this publication in public statements and in testimony to the United States Congress.

However, despite these representations, the FTX Group regularly misappropriated customer assets, at the express direction of Mr. Bankman-Fried and others.  The Second Ray Report explained that, in part to avoid banks' restrictions related to digital assets, the FTX Group regularly funneled customer deposits and withdrawals of fiat currency through bank accounts of Alameda Research and its affiliates, misrepresenting the purpose of those funds to its banking partners.  At the same time, at the direction of Mr. Bankman-Fried and others, the FTX Group used those accounts for other purposes, commingling large sums of customer and corporate funds in the process.  The Second Ray Report provides a detailed overview of the process by which customers deposited assets on the FTX.com Exchange, which were principally on-ramped through bank accounts in the name of Alameda Research and its "subsidiary" North Dimension, Inc., before transitioning later to accounts nominally held by FTX DM.  As one former employee characterized it, the FTX Group made no meaningful distinction between funds of customers and funds of Alameda Research.  Those funds were then dispersed throughout the FTX Group and commingled with corporate assets.

Former FTX Group personnel attempted to justify the misuse of customer deposits by manufacturing a sham and doctored payment agreement which falsely claimed Alameda Research provided cash management services to the FTX.com Exchange.  In addition to the sham agreement, certain FTX Group personnel also took other actions to facilitate and cover up the FTX Group's commingling of customer and corporate funds, such as instructing employees to make false statements to banks.

As evidenced by correspondence and other records described in the Second Ray Report, Mr. Bankman-Fried and other FTX Group personnel knew that the sham agreement and

misrepresentations to banking partners were false.  Ultimately, as the Second Ray Report details, misappropriated and commingled customer deposits were used in part for speculative trading, venture investments, and the purchase of luxury properties, as well as for political and other donations designed to enhance their power and influence.  At the time of the Second Ray Report's publication, the Debtors' efforts to trace assets and maximize recoveries for stakeholders were ongoing.

### P.    The Draft Plan, Creditor Meetings and the Settlement and Plan Support Agreement

On July 31, 2023, the Debtors filed the *Draft Joint Plan of Reorganization* [D.I. 2100] (the "Draft Plan").  The Draft Plan contemplated a proposed global settlement and good-faith compromise of a large and complicated collection of claims, causes of actions and disputes involving the Debtors, including both claims against the Debtors and intercompany claims by various Debtors against other Debtors.  The Draft Plan was filed at a relatively early stage—before the expiration of the Customer Bar Date, the completion of pending investigations, the preparation of a disclosure statement, and meeting with key creditor constituents to discuss the structure and terms of the Draft Plan—in order to facilitate creditor feedback and the consensual resolution of certain open issues in the Draft Plan and accompanying term sheet.

On September 11 and 12, 2023, the Debtors arranged meetings with key creditor constituents in order to provide an update on the Debtors' progress in these Chapter 11 Cases and to achieve consensus among key creditor constituents with respect to the open items identified in the Draft Plan and term sheet.  Members of the Ad Hoc Committee, the Official Committee and the Class Action Claimants attended as well as their respective advisors.  The Debtors discussed, among other topics, coin monetization, the FTX Customer Portal, plan structure and estate assets, priority issues, venture investments, tax concerns and preliminary recovery analyses, as well as various other important plan issues at the meetings.  The Debtors achieved agreement in principle on several open issues and agreed to reconvene the following month to attempt to close out the remaining open items in the Draft Plan and accompanying term sheet.

On October 11 and 12, 2023, the Debtors met with members of the Ad Hoc Committee, the Official Committee and the Class Action Claimants, as well as representatives of the Bahamas JOLs and their respective advisors.  The Debtors discussed, among other things, claims reconciliation processes in the U.S. and the Bahamas, KYC policies, the customer shortfall priority percentage, the sale of the FTX Exchanges, the monetization of digital assets, financial and venture investments, the customer preference settlement policy and post-effective governance.  The Debtors achieved broad consensus on many of the remaining open items in the Draft Plan and accompanying term sheet.

Following the September and October meetings, on October 16, 2023, the Debtors, the Ad Hoc Committee, the Class Action Claimants and the Official Committee executed that certain Settlement and Plan Support Agreement (the "PSA") [D.I. 3291], which, among other things, settles the AHC Adversary Proceeding and Class Action Adversary

Proceeding subject to effectiveness of a plan that is acceptable to the Official Committee, certain required members of the Ad Hoc Committee and certain required members of the Class Action Claimants.  The PSA also establishes a preference policy to be implemented in such a plan and settles the treatment of the FTX Exchanges' customer shortfall claim in a plan.

### Q.    U.S. Trustee's Request to Appoint Examiner

On December 1, 2022, the U.S. Trustee moved to appoint an examiner in the Debtors' cases [D.I. 176], joined by a handful of state financial regulation agencies [D.I. 263, 600].  The U.S. Trustee argued that section 1104(c) of the Bankruptcy Code required the Bankruptcy Court to appoint an examiner because the Debtors' liquidated, unsecured debts exceed $5,000,000.  The Debtors, the Official Committee and Bahamas JOLs opposed the motion, arguing that the statute did not mandate the appointment of an examiner and that the appointment of an examiner would injure the interests of creditors and the Estates.  After a hearing, the Bankruptcy Court denied the U.S. Trustee's motion on February 15, 2023.  The U.S. Trustee appealed to the U.S. Court of Appeals for the Third Circuit (the "Third Circuit") using the direct certification mechanism from Bankruptcy Rule 8006(f).  *See Vara* v. *FTX Trading Ltd.*, No. 23-2297 (3d Cir. 2023).

On appeal, the U.S. Trustee argued that section 1104(c) of the Bankruptcy Code mandates the requirement of an examiner when the debt threshold is satisfied [Appeal D.I. 23].  It did not contest the Bankruptcy Court's factual findings that the appointment of an examiner would be costly and injure the interests of creditors and the Debtors.  The Debtors and the Official Committee argued that the appointment of an examiner is not mandatory under section 1104 of the Bankruptcy Code, but within the discretion of the Bankruptcy Court based on the facts and circumstances of each case [Appeal D.I. 44].  Oral argument was held on November 8, 2023.

On January 19, 2024, the Third Circuit issued its opinion.  The Third Circuit held that section 1104 requires the mandatory appointment of an examiner.  In light of the expenses that would result from an appeal, the Debtors chose not to appeal the decision of the Third Circuit.

On January 31, 2024, the Debtors, the Official Committee, and the U.S. Trustee jointly moved for the Third Circuit to issue its mandate immediately.  On February 13, 2024, the Third Circuit issued the mandate, thereby reversing the Bankruptcy Court's decision and remanding it to the Bankruptcy Court for further proceedings.

On February 23, 2024, the Bankruptcy Court approved the U.S. Trustee's motion to appoint an examiner [D.I. 7909].  On February 27, 2024, the U.S. Trustee appointed Robert J. Cleary to serve as the examiner, subject to the Bankruptcy Court's approval [D.I. 8047, 8048], which the Bankruptcy Court gave on March 20, 2024, and approved the terms of the examination as set forth in the *Order Approving Appointment of Examiner* [D.I. 9882].

The Report of Examiner Robert J. Cleary was released on May 23, 2024 (the "Cleary Report") [D.I. 15545].  As directed by the Bankruptcy Court, the Cleary Report (i)

"compiles[] and summarizes[] the completed and ongoing investigations, and the findings thereof . . . by the Debtors' counsel, by the Unsecured Creditors' Committee, and by any third parties (including government agencies)"; (ii) "makes[] recommendations for additional investigations," and (iii) addresses three specific issues identified by the Bankruptcy Court, which were: "(1) . . . the Debtors' application to employ Sullivan & Cromwell LLP . . .; (2) . . . investigations [of] fraud by the former and current employees of the Debtors; and (3) . . . the Debtors' use of . . . FTT to inflate the value of FTX Group entities." Cleary Report, at 1-4.

Broadly, with respect to investigations by the Debtors and others, the Examiner concluded that the completed and ongoing investigations have been sufficient to establish the facts concerning the FTX Group's conduct and to identify potential areas for asset recovery, with the exception of certain proposed areas for further investigation. With respect to the three specific issues, (1) the Examiner did not identify any error in the Bankruptcy Court's decision authorizing the Debtors to retain S&C, Cleary Report at 12, and did not find any "evidence to suggest that S&C knew about the fraud at the FTX Group prepetition", Cleary Report at 55-56; (2) the Examiner concluded that "the ongoing and completed investigations have established the facts surrounding fraud by former employees of the FTX Group and demonstrated with sufficient confidence that current employees of the Debtors were not likely complicit in the prepetition fraud"; and (3) the Examiner concluded that "investigations [to date] have been sufficient to identify the significant instances of [FTT] manipulation and the individuals who were principally involved, and that additional investigation . . . is not necessary." Cleary Report at 3. The Examiner proposed three areas for further investigation, including (i) "S&C's representation of Samuel Bankman-Fried in connection with his purchase of shares of Robinhood Markets, Inc."; (ii) "any potential claims the Debtors may have against non-released shareholders in the LedgerX parent company, LHI"; and (iii) the cause of the November 2022 hole at FTX.US, and the existence or causes of holes that may have existed at other times. Cleary Report at 2, 177.

**R.    Digital Asset Estimation Motion**

The FTX Group had over 2 million customer accounts with positive balances as of the Petition Date. On June 28, 2023, the Bankruptcy Court established September 29, 2023 as the bar date for Customer Entitlement Claims. In connection therewith, holders of Customer Entitlement Claims submitted proofs of claim setting forth, among other information, the number of units or quantity of each digital asset, fiat currency and/or derivative position held in their account(s) as of the Petition Date.

Because the Plan provides that the Debtors will make certain distributions to holders of Customer Entitlement Claims in cash it is necessary for the Debtors to estimate claims based on digital assets based on Petition Date prices of digital assets, fiat currencies and derivative positions held as of the Petition Date. Accordingly, on December 27, 2023, the Debtors filed a motion to estimate Claims based on digital assets, fiat currencies and derivative positions (the "Estimation Motion") [D.I. 5202], which attached the Digital Assets Conversion Table for approval by the Bankruptcy Court. In connection with the Estimation Motion, the Debtors filed the expert reports of Dr. Sabrina T. Howell [D.I. 5203] and Kevin Lu [D.I. 5204]. The Bankruptcy Court held an evidentiary hearing on the Estimation Motion on January 31, 2024 and, on February 7, 2024, entered an order approving the Digital Assets Conversion Table for the

vast majority of digital assets, fiat currencies and derivative positions [D.I. 7090]. In doing so, the Bankruptcy Court overruled over 100 objections to the Estimation Motion.

The Debtors agreed to a separate litigation schedule with respect to the estimation of certain Claims based on MAPS, OXY, SRM and BOBA digital assets, noted at "TBD" in the Digital Asset Conversion Table [D.I. 7090] (collectively, the "Objecting Claims"). The Debtors and holders of the Objecting Claims engaged in further expert discovery and briefing with certain objectorsas to the Petition Date value of these digital assets, as proposed in the Estimation Motion. On March 20, 25, and 26, 2024, the Bankruptcy Court held an evidentiary hearing on the Estimation Motion, with respect to the value of these digital assets. The Debtors and holders of the Objecting Claims presented further expert testimony from Professor Howell and, Mr. Lu, Mr. Fotios Konstantinidis, and Mr. Ioannis Gkatzimas. The Bankruptcy Court took the matter under advisement and a ruling is forthcoming.

As of the filing of the Disclosure Statement, the Digital Assets Estimation Order [D.I. 7090] does not include prices for the tokens MAPS, OXY, SRM, and BOBA. When the Court issues a ruling on the pricing of the tokens MAPS, OXY, SRM, and BOBA, the Debtors will disclose and publicly file a notice on the docket to provide notice of the pricing. If the Court does not issue such a ruling, such Objecting Claims shall be valued, for voting purposes consistent with the Solicitation Procedures Order.

## S.    Settlement with the IRS

On April 27 and 28, 2023, the IRS submitted proofs of claim to the Bankruptcy Court for income and employment tax of approximately $44 billion for the tax years prior to the commencement of these Chapter 11 Cases. These claims were listed as estimated. The Debtors believe that these proofs of claim are significantly overstated. The underlying claims, if allowed, would have a priority over other claims pursuant to section 507 of the Bankruptcy Code and could prevent any meaningful distributions to customers or other creditors until the claims are resolved. The Debtors determined that the viability of any plan requires resolution or estimation of these IRS claims as a condition to confirmation.

On November 29, 2023, therefore, the Debtors filed a motion with the Bankruptcy Court to estimate all IRS claims (relating to both income and employment tax) arising in periods preceding the bankruptcy filing (the "Prepetition Period") under section 502(c) of the Bankruptcy Code [D.I. 4204]. At roughly the same time, the IRS reduced its proofs of claim from approximately $44 billion to approximately $24 billion and presented the Debtors with substantive claims for approximately $8 billion of additional prepetition period tax liability relating to a variety of issues that it had identified on a preliminary basis. Because the IRS identification was preliminary in nature, the $8 billion of substantive tax claims was neither comprehensive (i.e., the IRS reserved its right to make additional claims as the audit continued) nor settled (i.e., the IRS was prepared to eliminate portions of these claims upon the receipt of further relevant information). Since that time, however, the Debtors have been negotiating a settlement with the Department of Justice, on behalf of the IRS, that would allow a portion of the

IRS claims under the Plan and eliminate the need to reserve for substantial unliquidated contingent tax liabilities for the Prepetition Period.

In this regard, both the Debtors and the IRS have agreed that the relevant tax issues are complicated, that both the relevant facts and the relevant law are unclear, that a full tax audit of the Prepetition Periods could take years to complete, that the outcome could involve extended litigation, and that none of this would be in the best interests of either the Debtors and their customers and stakeholders or the IRS.  In light of these circumstances, on April 17, 2024, the Debtors and the Department of Justice have now reached an agreement regarding IRS claims in connection with these proceedings, and the IRS is expected to support the treatment of their claims under the Plan on that basis.  The structure of the agreement takes into account numerous factors compromising positions of the Debtors and the IRS.  These factors include the fact that prepetition management conducted the Debtors' businesses without adequate consideration of the tax consequences of relevant transactions, that it failed to maintain adequate financial records, and that its misappropriation of depositors' funds has exposed the Debtors to substantial potential tax liability.  However, the settlement also reflects the need to protect and provide compensation to victims and the Debtors' arguments to the IRS that a court of equity, such as a Bankruptcy Court, would not readily support the IRS's use of arguments to assess or collect a tax in the absence of economic income that would consume a significant part of the recovery to victims, particularly where the relevant arguments effectively arose out of the malfeasance and incompetence of prepetition management no longer in control of the Debtors.  The settlement also reflects the fact that most of the business of the Debtors was conducted outside the United States and that claims for U.S. taxes would therefore be imposed primarily on U.S. holding companies that, absent creation of the Debtors' proposed substantively consolidated Plan, would have a subordinated shareholder status in relation to the entities that had conducted most of the Debtors' businesses and retained most of the relevant assets.

In light of the above, the settlement is designed to resolve two questions:  First, what position will tax claims of the IRS have in relation to those of creditors in the Debtors' proposed substantively consolidated recovery Plan (in lieu of the position that it would otherwise have in the absence of any such plan).  Second, what will the amount of the IRS's claim be with respect to tax liability arising in the Prepetition Period (the "Prepetition Tax Liability"), in lieu of a lengthy and expensive audit and litigation procedure.

Regarding the priority of the IRS claims relative to other creditors, the settlement grants the IRS a priority position with respect to $200 million of priority tax claims that will be paid in full within 1460 days of the Effective Date of the Plan and deemed non-refundable.  The settlement subordinates the remainder of any IRS claims – which amounts remain undetermined – for potential tax liability of the Debtors (whether arising in periods before or after the Petition Date) to creditor distributions (including the recovery of postpetition interest for customers).  The settlement proposal further subordinates such IRS claims to the claims of the CFTC and other relevant governmental entities to the extent of 75% of each dollar distributed by the Wind Down Entities after all such claims of creditors have been paid (i.e., such amounts will be distributed 25% to the IRS and 75% to the CFTC and other relevant governmental entities, until the claims of either the former or the latter have been fully paid).

Regarding the amount of the IRS prepetition claims, the settlement will settle all IRS claims for Prepetition Tax Liability in exchange for the receipt by the IRS of the following amounts:  First, the IRS will receive the $200 million allowed priority tax claim  described above.  Second, the IRS will receive an additional $685 million payment that will be subordinated to all other Allowed Claims, including the claims of customers and all other creditors, the CFTC, and other relevant governmental entities (i.e., the IRS will not receive this latter amount unless and until the claims of the CFTC and other relevant governmental entities have been fully satisfied).  Third, the settlement reflects an agreement that no purported losses arising in prepetition tax periods (i.e., arising in respect of activities conducted prior to November 1, 2022) can be carried forward to offset income or gains in post-petition periods (since prepetition income and tax liability will now effectively be settled at a positive amount).  The Debtors firmly believe that in light of the actions of prepetition management and the erroneous advice of Debtors' prepetition advisors and the resulting potential tax liabilities, this is a fair and reasonable settlement of potential Prepetition Tax Liability for the Debtors without regard to any agreement by the IRS to subordinate its claims to those of creditors or governmental entities.

Under the settlement, tax liabilities of the Debtors arising in periods after the filing of the bankruptcy (currently anticipated to be limited to the 2023 and 2024 taxable years) may be audited in the routine course, subject to the usual procedures for dispute resolution, including any potential appeal to the Bankruptcy Court.  However, any IRS claims for tax liability arising in these periods will be subordinated to those of creditors and those of the CFTC and other governmental entities (on a 75/25 basis) in the manner described above.  As noted below, the transfer by the Debtors of all of their assets to the Wind Down Entities on the Effective Date of the Plan will be treated for U.S. tax purposes as a fully taxable event in respect of which the Debtors recognize gain or loss.  The Debtors will file final liquidating tax returns for the year of such transfer (currently presumed to be 2024), and any resulting tax liability as finally determined will be added to the subordinated claims of the IRS against the Wind Down Entities.  Neither the Debtors nor the IRS will be able to rely in any manner on returns filed for the prepetition tax periods (including with regard to numerical assertions or elections contained therein) in determining tax liability for the post-petition period, and such returns will in this regard be treated as if they had never been filed.

On June 3, 2024, the Debtors filed the *Motion for Entry of an Order (A) Authorizing the Debtor's Entry Into, and Performance Under, the Settlement with the United States Department of the Treasury – Internal Revenue Service, (B) Approving the Settlement and (C) Granting Related Relief* [D.I. 16558] seeking Bankruptcy Court approval of the settlement.  The settlement provides much needed certainty to the uncertain tax issues described above, and will help enable prompt distributions to the Debtors' other creditors and customers.  On June 20, 2024, the Bankruptcy Court entered an order [D.I. 18036] approving the settlement.

### T.    Potential Settlement of Claims by Governmental Authorities

On September 28, 2023, the CFTC filed six proofs of claim against certain Debtors in the aggregate amount of $52.2 billion ($8.7 billion each).  The CFTC's claim is based

on the action the CFTC filed in the Southern District of New York against FTX Trading on December 21, 2022, alleging violations of the Commodity Exchange Act.

On September 28, 2023, the New Jersey Bureau of Securities (the "NJ Bureau") filed five proofs of claim against certain Debtors in the aggregate amount of $633 million ($126.6 million each). The NJ Bureau asserted a claim against the Debtors for purported violations of the New Jersey Uniform Securities Law and related regulations (collectively, the "NJ Securities Laws"). Specifically, the NJ Bureau alleged, among other things, that the Debtors' Earn program was in violation of the NJ Securities Laws and may have constituted a sale of unregistered securities.

On September 29, 2023, the Mississippi Secretary of State's Office, Securities Division (the "MS Division") filed five proofs of claim against certain Debtors in the aggregate amount of $323 million ($64.6 million each). The MS Division asserted a claim against the Debtors for purported violations of the securities laws of Mississippi, including, among other things, that the Debtors sold unregistered securities and materially misled investors in connection with the Debtors' Earn program. The MS Division noted in its proof of claim that it was not seeking distributions on its claim for its own benefit; rather the MS Division is hoping to increase recovery for victims of the Debtors.

On May 31, 2024, the Office of the Texas Attorney General representing the Texas State Securities Board, the Texas Department of Banking and the State of Texas through the Consumer Protection Division of the Office of the Texas Attorney General (collectively, "Texas") informed the Debtors of a clerical error in the estimated amount of Texas' filed non-customer proof of claim, which reflected a total asserted claim of at least $840,000, and should instead reflect a total asserted claim at least $840,000,000, as indicated in the attached supporting documentation of the original filed claim. The Debtors are engaged in ongoing discussions with Texas regarding their filed claim, including the validity of the amount asserted as well as the potential for Texas to reallocate recoveries on any Allowed Claim to the Supplemental Remission Fund. All rights of the Debtors and Texas are reserved with respect to Texas' filed claim.

The Debtors have requested that the CFTC agree to subordinate its claim, if Allowed, to the claims of other creditors as a "Senior Subordinated Claim" as provided in the Plan, with any distributions on the CFTC's claim being allocated to the Supplemental Remission Fund described in Section 4.B.7—*Supplemental Remission Fund*. The Debtors also intend to request that the other governmental authorities, including the NJ Bureau and the MS Division, agree to similar treatment. Neither the CFTC nor the other governmental authorities are, at the time of this Disclosure Statement, committed to doing so.

Although the Debtors have requested, and classified, the Claims of CFTC and the other governmental authorities, including the NJ Bureau, MS Division and Texas, as Senior Subordinated Claims, one or more governmental authorities may not agree to the classification or the Bankruptcy Court may otherwise rule that subordination of these Allowed Claims is improper. If these Allowed Claims are not voluntarily subordinated, then any such Allowed

Claims shall be *pari passu* with General Unsecured Claims.  All parties' rights with respect to the voluntary subordination of claims under the proposed Plan are reserved.

Notwithstanding any language to the contrary contained in the Disclosure Statement, the Plan, including any amendments thereto, and/or an Order confirming the Plan, no provision of the Plan or an Order confirming the Plan shall (i) preclude governmental units from enforcing its police or regulatory powers as permitted by the Bankruptcy Code; or (ii) enjoin, limit, impair or delay governmental units from commencing or continuing any claims, causes of action, proceedings or investigations against any nondebtor person or nondebtor entity in any forum.

**4.    SUMMARY OF THE PLAN**

This Section provides a summary of the structure and means for implementation of the Plan.  The Plan is attached to this Disclosure Statement as <u>Appendix A</u> and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

**A.    Considerations Regarding the Chapter 11 Plan**

The terms of the Plan are the result of extended analyses by the Debtors and their advisors as well as numerous meetings and intensive negotiations with multiple interested parties.  The Plan includes many settlements of claims by, against and among the Debtors that avoid protracted litigation on myriad issues relating to the Plan.  Although litigation regarding the Plan could produce different absolute or relative recoveries from those proposed by the Plan, such litigation would not be finally resolved for many years, delaying and potentially materially eroding the aggregate value of ultimate distributions for all creditors.

**B.    Rationale Underlying Plan Treatment of Claims**

1.    *Substantive Consolidation of the Debtors*

As part of the Customer Priority Settlement (as defined below), the Plan consolidates all Debtors other than the Separate Subsidiaries into a single entity of pooled assets and liabilities.  Separate Subsidiaries are entities that are expected to be fully solvent and historically maintained corporate separateness.  This is referred to as substantive consolidation.  The consequence of substantive consolidation is that claims of creditors against previously separate debtors become claims against the consolidated entity of pooled assets.

In *In re Owens Corning*, the Third Circuit established that a proponent of substantive consolidation is required to show that (i) prepetition, the debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.  *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005).  Cases subsequent to *In re Owens Corning* have held that fraud may be a type of compelling circumstance in which a court may disregard corporate separateness and substantively consolidate different entities.  *See, e.g.*, *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 778 (Bankr. D. Del. 2018).

Based on the facts of these Chapter 11 Cases, the Debtors determined that substantive consolidation is warranted under both prongs of *Owens Corning*.  The FTX Group often operated under the same name (FTX) and was tightly controlled by Mr. Bankman-Fried.  The Debtors also did not observe any discernable corporate formalities with respect to intercompany transactions.  Further, the FTX Group, which consisted of more than one hundred entities, relied on a hodgepodge of Google documents, Slack communications, shared drives,

Excel spreadsheets and other non-enterprise solutions to manage their assets and liabilities. Intercompany transactions were not properly documented and assets were extensively commingled. Copies of key documentation are incomplete, inaccurate, contradictory, or missing entirely. Since the commencement of these Chapter 11 Cases, the Debtors have spent considerable time and effort attempting to understand the most basic of facts, such as the number of employees the Debtors have, where the Debtors' assets are, and how money flowed between entities. Attempts have been made to identify intercompany transactions and the inability to do so comprehensively—let alone to analyze and settle all intercompany litigation claims—is supported by the record of the work so far. The Debtors' egregious record-keeping deficiencies and pervasive pattern of fraudulent activity, at the direction of Mr. Bankman-Fried, encompassing public misrepresentations, fraudulent financial reporting, and misappropriation of assets, significantly impede efforts to disentangle and reconstruct the Debtors' financial affairs.

Despite the morass of intermingled entities, there are certain limited entities that have historically been separate entities and operated independently. These entities will remain separate and their creditors will be unimpaired on account of their Allowed Claims.

### 2. *Waterfall Analysis and the Customer Shortfall Claim*

As part of the Customer Priority Settlement, the Debtors have established three primary sources of recovery: (1) the Dotcom Customer Priority Pool, (2) the U.S. Customer Priority Pool and (3) the General Pool. As more fully described in the Plan, the Dotcom Customer Priority Assets and the U.S. Customer Priority Assets generally consist of the assets that were attributable to the FTX.com Exchange and the FTX.US Exchange, respectively, as of the Petition Date. The General Pool contains other assets, including but not limited to, the FTX Group's investments and the Alameda U.S. Customer Claim. Holders of Class 5A and Class 5B claims each will receive the priority assets attributable to their respective FTX Exchange, and each FTX Exchange will retain a "shortfall claim" against the General Pool for the benefit of the Holders of Class 5A and Class 5B claims.

The Plan sets forth waterfalls that govern the application of proceeds from each of the Dotcom Customer Priority Pool, the U.S. Customer Priority Pool and the General Pool. Under the General Pool waterfall, the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim retain a priority over Allowed Class 6A General Unsecured Claims. Specifically, after proceeds in the General Pool are applied to pay Administrative Claims, Other Priority Claims, Priority Tax Claims and General Convenience Claims, 66% of the amounts next available for distribution from the General Pool will be applied to pay the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim on a pro rata basis. Then, the remaining shortfall claims will rank equally with Class 6A and 6B claims with respect to the remaining 34% of proceeds.

The primary legal basis for a substantial priority for holders of Class 5 claims is a potential right of the FTX Exchanges, on their own behalf or on behalf of customers, to impose a constructive trust on assets of the Alameda Silo, as well as other Debtors, under Delaware law.

Under Delaware law, a constructive trust is a flexible equitable remedy designed to prevent a defendant from benefitting as a result of its wrongful conduct. Where a person holds property in circumstances in which in equity and good conscience it should be held or enjoyed by another, he will be compelled to hold the property in trust for that other. A breach of trust by a trustee is a violation of a correlative right of the beneficiary, and gives rise to liability on the part of the trustee and a correlative cause of action on the part of the beneficiary for any loss to the trust estate. The fiduciary duties a trustee traditionally owes at common law include the duty of loyalty and the rule against self-dealing. *See McMahon* v. *New Castle Associates,* 532 A.2d 601, 608 (Del. Ch. 1987).

### 3. *Constructive Trust Remedy Against Assets of the Alameda Silo*

The Debtors' investigations indicate that, at the direction of Mr. Bankman-Fried and others, the FTX Group (i) funneled customer deposits and withdrawals in fiat currency through bank accounts of Alameda Research and its affiliates and (ii) used those accounts for many purposes, commingling and misusing vast sums of customer and corporate funds in the process. Over $9.2 billion of assets deposited in the FTX.com Exchange were misappropriated from the exchange in favor of Alameda Research. Alameda Research was in a position of trust with FTX Trading (among other reasons, because both entities were under the control of Mr. Bankman-Fried), and Alameda Research, at the direction of Mr. Bankman-Fried, abused such trust when it misappropriated at least $9.2 billion of FTX Trading assets. FTX Trading could have a meritorious argument that Alameda Research was unjustly enriched by abusing its position of trust with FTX Trading based on the following, among others: (i) Alameda Research was permitted to take assets deposited by customers on the FTX.com Exchange without any limit; (ii) to cover up the shortfall in excess of $9.2 billion created by the misappropriation of funds by Alameda Research, Messrs. Bankman-Fried, Wang and Singh created a sham customer account (known as the "Korean friend account") on the FTX.com Exchange reflecting an $8.8 billion amount payable from Alameda Research to FTX Trading; (iii) from the inception of FTX Trading, Messrs. Bankman-Fried, Wang and Singh had customers send their funds intended for the FTX.com Exchange to Alameda Research's bank accounts due to FTX Trading's inability to open bank accounts in the United States; and (iv) the FTX Group funneled money from these Alameda Research accounts through other FTX Group accounts and ultimately used the funds for a variety of illicit purposes, including to finance political contributions, venture investments and purchases of luxury real estate properties for senior FTX Group employees and others in The Bahamas.

### 4. *Constructive Trust Remedy Against Assets Outside of the Alameda Silo*

FTX Trading also has a basis to seek to extend the constructive trust over the assets of entities outside of the Alameda Silo through equitable tracing. Equitable tracing rules allow a court imposing a constructive trust to find that the trust attaches to commingled pools of assets and remains in effect even as new assets are added and removed to a commingled pool. Here, given the FTX Group's lack of books and records and extensive misappropriation of assets across all Debtors, assets may have been transferred to entities even outside the Alameda Silo. Accordingly, a court could expand a constructive trust to encompass assets of other Debtors.

However, given the strength of the arguments in favor of substantive consolidation, equitable tracing rules may not be necessary to effectuate the relative priorities of the shortfall claims against the General Pool.

### 5.   *The Customer Priority Settlement*

Purported customer property interests and entitlements in the Debtors' digital assets fiat currency is a central and highly controversial issue in these Chapter 11 Cases.

With respect to the FTX.com Exchange, the AHC Adversary Proceeding alleges, among other things, that an express trust under English law should be imposed in favor of customers of the FTX.com Exchange based upon the FTX.com Exchange terms of service.  The Debtors have argued, among other things, that the FTX.com Exchange terms of service are ambiguous with respect to whether a trust relationship was intended and that application of English law does not warrant imposition of an express trust.

With respect to the FTX.US Exchange, U.S. customers may argue, among other things, that WRSS held digital assets and fiat in a "bailment for keeping" capacity based on the language of the FTX.US Exchange user agreement.  If a bailment for keeping is established, WRSS would hold mere possessory interest in, but not legal title to, the digital assets and fiat associated with the FTX.US Exchange and, as a result, such assets and fiat would not constitute property of the Debtors.  On the other hand, the Debtors have argued, among other things, that the FTX.US Exchange user agreement is ambiguous and does not establish a bailment for keeping relationship.

In addition, customers of both the FTX.US Exchange and the FTX.com Exchange may assert an unjust enrichment claim and argue that a constructive trust should be imposed for their benefit.  However, a customer constructive trust action that seeks a priority over other customers will be difficult for any group of customers to prove.  The Debtors believe that, as an equitable remedy, a constructive trust should not be imposed where it would lead to disproportionate recoveries for similarly situated creditors.  Furthermore, funneling all assets to customers ignores the fact that many general unsecured claimants were victims of Alameda Research's fraudulent conduct as well.

Litigation over these issues with the Ad Hoc Committee or the Class Action Claimants would be time consuming and costly.  To consensually resolve these issues and avoid the unnecessary time and costs, the Debtors established priority claims and shortfall amounts for the benefit of customers against the General Pool.  The Debtors negotiated the priority claims and the shortfall amounts with key constituents at an early stage in these Chapter 11 Cases.  The result of these extensive negotiations led to the establishment of the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim and their relative priorities, as reflected in the terms of the PSA and the Plan, and as described in Section 4.C1.D—*Classification, Treatment and Voting of Claims and Interests* (the "Customer Priority Settlement").  The Debtors, the Official Committee, the Ad Hoc Committee and the Class Action Claimants believe that the Plan provides holders of claims with recoveries that reflect the relative

-96-

risks and benefits of their claims, and takes into account the costs and likelihood of prosecution to final judgment.

### 6. _Postpetition Interest_

The Debtors are not solvent and the Bankruptcy Code ordinarily would prevent payment of postpetition interest to customers and other unsecured creditors. However, the Debtors recognize that these Chapter 11 Cases have deprived creditors of their money since November 2022, and will continue to do so until distributions are paid. In effect, all customers and creditors of the Debtors have been forced to lend to the Debtors during these Chapter 11 Cases and, in the view of the Joint Board, deserve a fair rate of return.

Accordingly, the Debtors have approached the IRS and the CFTC and requested that these governmental authorities (and potentially others) enter into a settlement in which their claims are voluntarily subordinated to the claims of customers and certain creditors as well as to interest on these claims. The payment of interest on claims also has been an important element in obtaining the continuing support of the Plan by the Ad Hoc Committee, despite changes to the Plan and the case timetable since the PSA was initially agreed.

Based on these discussions, the Plan provides the payment of interest at the Consensus Rate from the Petition Date to the Distribution Date on which claims are paid. As to the rate of interest, the Debtors are proposing a Consensus Rate of 9.0% after consultation with many of the stakeholders who support the compromises set forth in the Plan, including the Bahamas JOLs, the IRS, the CFTC, the Department of Justice, the Ad Hoc Committee, the Official Committee and the Class Action Claimants. Factors considered by the Debtors when setting the Consensus Rate include: (i) the misappropriation of funds by Mr. Bankman-Fried and the applicable rate for prejudgment interest in the State of Delaware (which was 9.0% as of the Petition Date); (ii) the interest rate environment over the applicable period; (iii) the risks involved in lending to the Debtors during the Chapter 11 Cases; and (iv) the support for the Consensus Rate among all the supporting parties described above.

Interest at the Consensus Rate is paid only to the extent funds are available after paying allowed claims of all non-subordinated creditors in full. There can be no ~~assurances~~assurance that the Debtors' proposed Consensus Rate will be approved by the Bankruptcy Court or that the Debtors will have sufficient funds to pay interest at the Consensus Rate. Risks that could prevent payment of interest in full include changes in the price of assets of the Debtors and unexpectedly large customer or other creditor claims, as well as any delays in the confirmation of the Plan, the disposition of assets or the reconciliation of claims. See Section 7~~1.B~~ ~~Additional Factors to Be Considered Prior to Voting~~_Risks Related to the Plan_.

### 7. _Supplemental Remission Fund_

In addition to requesting that the CFTC subordinate its claims to customers and certain creditors, the Debtors have also requested that the CFTC agree to forego receiving a distribution on account of its claim and, instead, use such distribution to fund the Supplemental Remission Fund for supplemental payments to FTX.com customers, FTX.US customers,

cryptocurrency lenders to Alameda, FTX DM for the benefit of Holders of Eligible DM Customer Entitlement Claims and other creditors agreed with the CFTC. The Debtors also intend to request other governmental creditors to agree to the same treatment.

The Debtors recognize the CFTC and other governmental authorities are not required to apply funds they receive from the Chapter 11 Cases in strict accordance with the bankruptcy priority scheme. Accordingly, the Debtors have considered the appropriate allocation of funds in the Supplemental Remission Fund.

Ultimately, after discussions with the Official Committee and the Ad Hoc Committee, the Debtors determined that funds in the Supplemental Remission Fund—like all other Plan Distributions—should be allocated among eligible customers and creditors on a pro rata basis based on the value of claims as of the Petition Date, unless an alternative allocation is agreed among the Debtors and the applicable funding governmental authorities. Factors considered by the Debtors in adopting this pro rata approach include: (i) that the majority of trading volume on the FTX.com Exchange consisted of perpetual futures, which granted customers exposure to certain digital assets, but did not match the denomination of the underlying margin posted by such customers, and so there is no relationship between digital asset appreciation and the underlying fiat or stablecoin margins posted by such customers; (ii) claims against the Debtors have been trading on a fungible dollar-equivalent basis and changing expectations now would create a windfall for some claims buyers and unexpected losses for others; (iii) creditors have been exposed to the risk that the Debtors' assets could decline generally, but they have not been exposed to the risk that the value of the digital assets underlying their particular customer entitlement could decline, and so some customers should not benefit because their particular customer entitlements increased; (iv) the issue of postpetition appreciation is ultimately an inter-creditor issue, as the Debtors cannot allocate more value to some creditors without taking value away from other creditors; and (v) throughout these Chapter 11 Cases, all creditors have been equally exposed to the risk that the assets of the Debtors would not be sufficient to pay the Debtors' claims, and the risk that Distributions would be delayed by litigation or other factors. Since the risk of all creditors has been the same over this period, their rate of return should be the same as well.

Weighing all of these considerations, the Debtors have determined, in consultation the Ad Hoc Committee, the Class Action Claimants, the Bahamas JOLs and other stakeholders, that the Plan should allocate all funds in the Supplemental Remission Fund on a pro rata basis, unless another approach is specifically required by applicable governmental authorities.

There can be no assurance that the Bankruptcy Court will approve the Supplemental Remission Fund or that the CFTC or other governmental authorities will apply funds they receive from the Chapter 11 Cases to the Supplemental Remission Fund. See Section 71.B—*Risks Related to the Plan.*

## C.    Excluded Entities

As noted in Section 1.N—*Dismissals*, the Debtors dismissed several entities from these Chapter 11 Cases.  Such entities are considered "Excluded Entities" for purposes of the Plan and shall be excluded from the Plan for all purposes, and the assets and liabilities of the Excluded Entities shall not be transferred to, or vest in, any of the Wind Down Entities.

The Debtors may determine, prior to or in connection with Confirmation of the Plan, to exclude any other Debtor from the Plan and treat such Debtor as an Excluded Entity for any reason, including in the event that regulatory, tax or other Claims presented against such Debtor render the continued inclusion of such Debtor in the Plan impractical or adverse to the interests of other Debtors.

The Debtors may determine, no later than 180 days after the Confirmation Date of the Plan, to exclude Quoine from the Plan and treat Quoine as an Excluded Entity in the event that the Singapore International Commercial Court has not entered orders in form and substance reasonably acceptable to the Debtors (i) recognizing the Chapter 11 Case of Quoine in Singapore and (ii) granting full force and effect in Singapore to the Confirmation Order, the Digital Assets Estimation Order and the Claims Bar Date.

In the event the Debtors determine, no later than 180 days after the Confirmation Date of the Plan, to exclude Quoine from the Plan and treat Quoine as an Excluded Entity, Claims against Quoine will not be administered, reconciled, valued, settled, adjudicated, resolved or satisfied in these Chapter 11 Cases, Holders of Claims of creditors and customers of Quoine will not be entitled to any Distributions under the Plan on account of such Claims, and any ballots or elections made by of Holders of Claims of creditors or customers of Quoine will be deemed null and void.  In the event the Debtors do not make such determination within 180 days after the Confirmation Date, Holders of Claims of creditors or customers of Quoine will be treated as Holders of Claims in Class 5A Dotcom Customer Entitlement Claims, Class 6A General Unsecured Claims, Class 7A Dotcom Convenience Claims or Class 7C General Convenience Claims, as applicable.

### D.    ~~C.~~ Classification, Treatment and Voting of Claims and Interests

1. *Classification of Claims and Interests*

All Claims and Interests, except for Administrative Claims and 503(b)(9) Claims, are classified in the Classes set forth in article 4 of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed as a Claim or Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

2.   *Summary of Claims Classification and Treatment*

The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Tax Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3A | Secured Loan Claims | Impaired | Entitled to Vote |
| 3B | Other Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 5A | Dotcom Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5B | U.S. Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5C | NFT Customer Entitlement Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 6A | General Unsecured Claims | Impaired | Entitled to Vote |
| 6B | Digital Asset Loan Claims | Impaired | Entitled to Vote |
| 7A | Dotcom Convenience Claims | Impaired | Entitled to Vote |
| 7B | U.S. Convenience Claims | Impaired | Entitled to Vote |
| 7C | General Convenience Claims | Impaired | Entitled to Vote |
| 8A | PropCo Operating Expense Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 8B | Priority DM Claim | Impaired | Entitled to Vote |
| 8C | PropCo General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Cancelled Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 10A | Senior Subordinated IRS Claims | Impaired | Entitled to Vote |
| 10B | Senior Subordinated Governmental Claims | Impaired | Entitled to Vote |
| 10C | Junior Subordinated IRS Claims | Impaired | Entitled to Vote |
| 11 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 12 | Preferred Equity Interests | Impaired | Entitled to Vote |
| 13 | Section 510(b) Preferred Equity Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 14 | Section 510(b) Other Equity Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 15 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 16 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 17 | FTT Claims and Interests | Impaired | Not Entitled to Vote, |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| | | | Deemed to Reject |
| 18 | *De Minimis* Claims | Impaired | Not Entitled to Vote, Deemed to Reject |

3. *Distributions Waterfalls*

a. <u>Dotcom Customer Waterfall</u>

Proceeds in the Dotcom Customer Priority Pool shall be applied in the following manner:

(i)     *first*, to pay Case Expenses allocated to the Dotcom Customer Priority Assets pursuant to section 3.6 of the Plan;

(ii)    *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims allocated to the Dotcom Customer Priority Assets;

(iii)   *third*, to pay and perform obligations owed to FTX DM under the FTX DM Global Settlement Agreement;

(iv)    *fourth*, to pay Allowed Dotcom Convenience Claims and postpetition interest accrued at the Consensus Rate on Allowed Dotcom Convenience Claims from the Petition Date through the Initial Distribution Date;

(v)     *fifth*, to pay Allowed Dotcom Customer Entitlement Claims; and

(vi)    *sixth*, to transfer remaining proceeds to the General Pool.

b. <u>U.S. Customer Waterfall</u>

Proceeds in the U.S. Customer Priority Pool shall be applied in the following manner:

-101-

(i)      *first*, to pay Case Expenses allocated to the U.S. Customer Priority Assets pursuant to section 3.6 of the Plan;

(ii)     *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims allocated to the U.S. Customer Priority Assets;

(iii)    *third*, to pay Allowed U.S. Convenience Claims and postpetition interest accrued at the Consensus Rate on Allowed U.S. Convenience Claims from the Petition Date through the Initial Distribution Date;

(iv)     *fourth*, to pay Allowed U.S. Customer Entitlement Claims; and

(v)      *fifth*, to transfer remaining proceeds to the General Pool.

c.    General Pool Waterfall

Proceeds in the General Pool shall be applied in the following manner:

-102-

(i)     *first*, to pay Allowed Administrative Claims allocated to the General Pool pursuant to section 3.6 of the Plan;

(ii)    *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims, other than Allowed Priority Tax Claims and Allowed Other Priority Claims (i) allocated to the Dotcom Customer Priority Assets or U.S. Customer Priority Assets, (ii) against FTX Bahamas PropCo or (iii) against any Separate Subsidiary;

(iii)   *third*, to pay Allowed Secured Loan Claims and Allowed Other Secured Claims and any applicable interest accrued thereunder;

(iv)    *fourth*, to pay Allowed General Convenience Claims and postpetition interest accrued at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Bankruptcy Court (or as otherwise agreed by the relevant parties) on Allowed General Convenience Claims from the Petition Date through the Initial Distribution Date;

(v)     *fifth*, with respect to 66 percent of the amount next available for Distribution from the General Pool, to pay on a Pro Rata basis the Allowed Dotcom Intercompany Shortfall Claim and the Allowed U.S. Intercompany Shortfall Claim;

(vi)    *sixth*, to pay on a Pro Rata basis Allowed General Unsecured Claims and Allowed Digital Asset Loan Claims, any unpaid balance of the Allowed Dotcom Intercompany Shortfall Claim and any unpaid balance of the Allowed U.S. Intercompany Shortfall Claim;

(vii)   *seventh*, to pay on a Pro Rata basis any remaining portion of any Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims;

(viii)  *eighth*, to pay on a Pro Rata basis (i) postpetition interest accrued at the Consensus Rate on Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims and (ii) ~~the~~ postpetition interest accrued at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Court (or as otherwise agreed by the relevant parties) on Allowed General Unsecured Claims and Allowed Digital Asset Loan Claims from the Petition Date, in each case of clauses (i) and (ii) through the applicable Distribution Date in accordance with section 7.1 of the Plan;

(ix)  *ninth*, to pay Allowed Senior Subordinated IRS Claims and Allowed Senior Subordinated Governmental Claims as follows:  (i) 25 percent of the proceeds from the General Pool available for such payment shall be made available first to pay Allowed Senior Subordinated IRS Claims until such Allowed Senior Subordinated IRS Claims are paid in full, after which any remaining funds shall be used to pay in full any unpaid Allowed Senior Governmental Subordinated Claims; and (ii) the remaining 75 percent of the proceeds from the General Pool available for such payment shall be made available first to pay all Allowed Senior Subordinated Governmental Claims until all such Allowed Senior Subordinated Governmental Claims are paid in full, after which any remaining funds shall be used to pay in full any unpaid Allowed Senior Subordinated IRS Claims;

(x)  *tenth*, to pay Allowed Junior Subordinated IRS Claims;

(xi)  *eleventh*, to pay Allowed Preferred Equity Interests;

(xii)  *twelfth*, to pay Allowed Section 510(b) Preferred Equity Claims;

(xiii)  *thirteenth*, to pay Allowed Section 510(b) Other Equity Claims; and

(xiv)  *fourteenth*, to pay Allowed Other Equity Interests.

d.  <u>FTX Bahamas PropCo Waterfall</u>

Proceeds from the sale, disposition or other monetization of the Bahamas Properties shall be applied in the following manner:

-104-

(i)      *first*, to pay sale-related taxes and other charges or amounts owed by FTX Bahamas PropCo in respect of any Bahamas Property subject to any outstanding sale as of the Effective Date;

(ii)      *second*, to pay any reasonable, documented and customary real estate agent commissions related to any outstanding sale of any Bahamas Property as of the Effective Date;

(iii)      *third*, to pay the Administrative Expenses (as defined in the FTX DM Global Settlement Agreement) of FTX Bahamas PropCo pursuant to applicable Law in accordance with the FTX DM Global Settlement Agreement;

(iv)      *fourth*, to pay or reimburse the Debtors for the total amount of Allowed PropCo Operating Expense Claims;

(v)      *fifth*, to satisfy the Priority DM Claim;

(vi)      *sixth*, to pay Allowed PropCo General Unsecured Claims; and

(vii)      *seventh*, to transfer remaining proceeds to the Dotcom Customer Priority Pool.

e.      <u>Separate Subsidiaries Waterfall</u>

Proceeds from the sale, disposition or other monetization of property of any Separate Subsidiary shall be applied in the following manner:

(i)      *first*, to pay Case Expenses allocated to such Separate Subsidiary pursuant to section 3.6 of the Plan;

(ii)      *second*, to pay Allowed Priority Tax Claims and Allowed Other Priority Claims against such Separate Subsidiary;

(iii)      *third*, to pay Allowed Separate Subsidiary Claims against such Separate Subsidiary;

(iv)      *fourth*, to pay Allowed Separate Subsidiary Intercompany Claims; and

(v)      *fifth*, to transfer remaining proceeds to the General Pool.

4.      *<u>Supplemental Remission Fund</u>*

Proceeds, if any, contributed to the Supplemental Remission Fund from Holders

of Allowed Senior Subordinated Governmental Claims shall be paid on a Pro Rata basis to (a) Holders of Allowed Dotcom Customer Entitlement Claims, Allowed U.S. Customer Entitlement Claims, and Allowed Digital Asset Loan Claims, and (b) FTX DM for the benefit of Holders of Eligible DM Customer Entitlement Claims, in each case of clauses (a) and (b) unless an alternative allocation of such proceeds is established by the Debtors as, in consultation with the Supporting Parties, as further described in section 5.21 of the Plan.

5.   *Treatment of Claims and Interests*

    a.    <u>Class 1 – Priority Tax Claims</u>

        (i)    *Classification*:  Class 1 consists of all Allowed Priority Tax Claims.

        (ii)    *Treatment*:  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code or shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Priority Tax Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

        (iii)    *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of a Priority Tax Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. No Holder of a Priority Tax Claim is entitled to vote to accept or reject the Plan.

    b.    <u>Class 2 – Other Priority Claims</u>

        (i)    *Classification*:  Class 2 consists of all Other Priority Claims.

        (ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the earliest of (i) the Initial Distribution Date; (ii) the date on which such Other Priority Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

        (iii)    *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

No Holder of a Other Priority Claim is entitled to vote to accept or reject the Plan.

c.    <u>Class 3A – Secured Loan Claims</u>

(i)    *Classification*:  Class 3A consists of Secured Loan Claims.

(ii)    *Treatment:*  In full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Loan Claim, each Holder of an Allowed Secured Loan Claim shall receive payment in Cash in an amount equal to 100% of such Allowed Secured Loan Claim plus interest accrued at the Federal Judgment Rate on such Allowed Secured Loan Claim from the Petition Date through the Effective Date.

(iii)    *Voting:*  Claims in Class 3A are Impaired.  Each Holder of a Secured Loan Claim is entitled to vote to accept or reject the Plan.

d.    <u>Class 3B – Other Secured Claims</u>

(i)    *Classification:*  Class 3B consists of Other Secured Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator:  (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Other Secured Claim; or (iii) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

(iii)    *Voting:*  Claims in Class 3B are Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

e.    <u>Class 4 – Separate Subsidiary Claims</u>

(i)    *Classification:*  Class 4 consists of all Separate Subsidiary Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Separate Subsidiary Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Separate Subsidiary Claim, each Holder of an Allowed Separate Subsidiary Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Initial Distribution Date; (ii) the date on which such Allowed Separate Subsidiary Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)    *Voting:*  Claims in Class 4 are Unimpaired.  Each Holder of a Separate Subsidiary Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Separate Subsidiary Claim is entitled to vote to accept or reject the Plan.

f.    <u>Class 5A – Dotcom Customer Entitlement Claims</u>

-108-

(i)     *Classification*:  Class 5A consists of all Dotcom Customer Entitlement Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Dotcom Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Dotcom Customer Entitlement Claims, each Holder of an Allowed Dotcom Customer Entitlement Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed Dotcom Customer Entitlement Claim, *plus* (ii) interest at the Consensus Rate on such Allowed Dotcom Customer Entitlement Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with section 7.1 of the Plan, *plus* (iii) any proceeds from the Supplemental Remission Fund to which ~~the Debtors determine~~ such Holder is entitled pursuant to section 5.21 of the Plan; *provided* that no Holder of an Allowed Dotcom Customer Entitlement Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in sections 4.2.1 and 4.2.3 of the Plan.

(iii)   *Voting*:  Claims in Class 5A are Impaired.  Each Holder of a Dotcom Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

g.     Class 5B – U.S. Customer Entitlement Claims

(i)     *Classification*:  Class 5B consists of all U.S. Customer Entitlement Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed U.S. Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed U.S. Customer Entitlement Claims, each Holder of an Allowed U.S. Customer Entitlement Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed U.S. Customer Entitlement Claim, *plus* (ii) interest at the Consensus Rate on such Allowed U.S. Customer Entitlement Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with section 7.1 of the Plan, *plus* (iii) any proceeds from the Supplemental Remission Fund to which ~~the Debtors determine~~ such Holder is entitled pursuant to section 5.21 of the Plan; *provided* that no Holder of an Allowed U.S. Customer Entitlement Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in sections 4.2.2 and 4.2.3 of the Plan.

(iii)    *Voting*:  Claims in Class 5B are Impaired.  Each Holder of a U.S. Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

h.      Class 5C – NFT Customer Entitlement Claims

(i)     *Classification*:  Class 5C consists of all NFT Customer Entitlement Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed NFT Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed NFT Customer Entitlement Claim, each Holder of an Allowed NFT Customer Entitlement Claim shall receive the Available NFT associated with such Allowed NFT Customer Entitlement Claim.

(iii)   *Voting*:  Claims in Class 5C are Unimpaired.  Each Holder of an NFT Customer Entitlement Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an NFT Customer Entitlement Claim is entitled to vote to accept or reject the Plan.

i.      Class 6A – General Unsecured Claims

(i)     *Classification*:  Class 6A consists of all General Unsecured Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed General Unsecured Claim, *plus* (ii) interest at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Bankruptcy Court (or as otherwise agreed by the relevant parties) on such Allowed General Unsecured Claim from the Petition Date through the applicable Distribution Date to the extent of available funds in accordance with section 7.1 of the Plan; *provided* that no Holder of an Allowed General Unsecured Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in section 4.2.3 of the Plan.

-111-

(iii) *Voting*:  Claims in Class 6A are Impaired.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

j.      Class 6B – Digital Asset Loan Claims

(i) *Classification*:  Class 6B consists of all Digital Asset Loan Claims.

(ii) *Treatment:*  Except to the extent that a Holder of a Digital Asset Loan Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Digital Asset Loan Claims, each Holder of an Allowed Digital Asset Loan Claim shall receive payment in Cash in an amount equal to (i) 100% of such Allowed Digital Asset Loan Claim, *plus* (ii) interest at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Bankruptcy Court (or as otherwise agreed by the relevant parties) on such Allowed Digital Asset Loan Claim from the Petition Date through the Distribution Date on which such Allowed Digital Asset Loan Claim is paid to the extent of available funds, *plus* (iii) any proceeds from the Supplemental Remission Fund to which ~~the Debtors determine~~ such Holder is entitled pursuant to section 5.21 of the Plan; *provided* that no Holder of an Allowed Digital Asset Loan Claim shall be entitled to receive any payment except to the extent of funds available to make such payment in accordance with the waterfall priorities set forth in section 4.2.3 of the Plan.

(iii) *Voting:*  Claims in Class 6B are Impaired.  Each Holder of a Digital Asset Loan Claim is entitled to vote to accept or reject the Plan.

k.      Class 7A – Dotcom Convenience Claims

(i) *Classification*:  Class 7A consists of all Dotcom Convenience Claims.

(ii)     *Treatment:*  In full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Dotcom Convenience Claim, each Holder of an Allowed Dotcom Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed Dotcom Convenience Claim *plus* postpetition interest at the Consensus Rate from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in section 4.2.1 of the Plan, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such Dotcom Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)    *Voting*:  Claims in Class 7A are Impaired.  Each Holder of a Dotcom Convenience Claim is entitled to vote to accept or reject the Plan.

l.      Class 7B – U.S. Convenience Claims

(i)      *Classification*:  Class 7B consists of all U.S. Convenience Claims.

(ii)     *Treatment:*  In full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed U.S. Convenience Claim, each Holder of an Allowed U.S. Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed U.S. Convenience Claim *plus* postpetition interest at the Consensus Rate from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in section 4.2.2 of the Plan, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such U.S. Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)    *Voting*:  Claims in Class 7B are Impaired.  Each Holder of a U.S. Convenience Claim is entitled to vote to accept or reject the Plan.

m.     Class 7C – General Convenience Claims

-113-

(i)    *Classification*:  Class 7C consists of all General Convenience Claims.

(ii)    *Treatment:*  In full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Convenience Claim, each Holder of an Allowed General Convenience Claim shall receive payment in Cash in an amount equal to 100% of such Allowed General Convenience Claim *plus* postpetition interest at the lower of the Consensus Rate, the applicable contract rate or such other rate determined by the Bankruptcy Court (or as otherwise agreed by the relevant parties) from the Petition Date through the Initial Distribution Date in accordance with the waterfall priority set forth in section 4.2.3 of the Plan, payable in Cash on or as reasonably practical after the latest of (i) a date determined by the Plan Administrator that shall be no later than 60 days after the Effective Date; (ii) the date of which such General Convenience Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)    *Voting*:  Claims in Class 7C are Impaired.  Each Holder of a General Convenience Claim is entitled to vote to accept or reject the Plan.

n.    Class 8A – PropCo Operating Expense Claims

(i)    *Classification*:  Class 8A consists of all Allowed PropCo Operating Expense Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed PropCo Operating Expense Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo Operating Expense Claim, each Holder of an Allowed PropCo Operating Expense Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Initial Distribution Date; (ii) the date on which such Allowed PropCo Operating Expense Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(iii)    *Voting*:  Claims in Class 8A are Unimpaired.  Each Holder of a PropCo Operating Expense Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a PropCo Operating Expense Claim is entitled to vote to accept or reject the Plan.

o.    Class 8B – Priority DM Claim

(i)    *Classification*:  Class 8B consists of the Allowed Priority DM Claim.

(ii)    *Treatment:*  Except to the extent that FTX DM agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Priority DM Claim, FTX DM shall receive payment in Cash in an amount equal to the Priority DM Claim, to be paid directly from the proceeds from the sale, disposition or other monetization of the Bahamas Properties in accordance with the waterfall priority set forth in section 4.2.4 of the Plan, until the Priority DM Claim is paid in full.

(iii)    *Voting*:  The Priority DM Claim is Impaired.  FTX DM is entitled to vote to accept or reject the Plan.

-115-

p.    <u>Class 8C – PropCo General Unsecured Claims</u>

(i)    *Classification*:  Class 8C consists of all Allowed PropCo General Unsecured Claims.

(ii)    *Treatment*:  Except to the extent that a Holder of an Allowed PropCo General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed PropCo General Unsecured Claim, each Holder of an Allowed PropCo General Unsecured Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of the proceeds from the sale, disposition or other monetization of the Bahamas Properties available to pay PropCo General Unsecured Claims, in accordance with the waterfall priority set forth in section 4.2.4 of the Plan.

(iii)    *Voting*:  Claims in Class 8C are Impaired.  Each Holder of a PropCo General Unsecured Claim is entitled to vote to accept or reject the Plan.

q.    <u>Class 9 – Cancelled Intercompany Claims</u>

(i)    *Classification*:  Class 9 consists of all Cancelled Intercompany Claims.

(ii)    *Treatment:*  All Cancelled Intercompany Claims shall be cancelled, released or otherwise settled in full, and the Holders of Cancelled Intercompany Claims shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Claims under the Plan.

(iii)    *Voting*:  Claims in Class 9 are Impaired.  Each Holder of a Cancelled Intercompany Claim is conclusively deemed to have rejected the Plan.  No Holder of a Cancelled Intercompany Claim is entitled to vote to accept or reject the Plan.

r.    <u>Class 10A – Senior Subordinated IRS Claims</u>

(i)    *Classification:*  Class 10A consists of all Senior Subordinated IRS Claims.

-116-

(ii)     *Treatment*:  Except to the extent that a Holder of an Allowed Senior Subordinated IRS Claim agrees to less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for all Claims of the IRS against the Debtors arising from activities, transactions, liabilities or events after October 31, 2022, each Holder of an Allowed Senior Subordinated IRS Claim shall receive payment in Cash in an amount equal to such Holder's share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii)    *Voting:*  Claims in Class 10A are Impaired.  Each Holder of a Senior Subordinated IRS Claim is entitled to vote to accept or reject the Plan.

s.     Class 10B – Senior Subordinated Governmental Claims

(i)     *Classification*:  Class 10B consists of all Senior Subordinated Governmental Claims.

(ii)     *Treatment*:  Except to the extent that a Holder of an Allowed Senior Subordinated Governmental Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Senior Subordinated Governmental Claim, each Holder of an Allowed Senior Subordinated Governmental Claim shall receive payment in Cash in an amount equal to such Holder's share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan; *provided* that each Holder of such Allowed Senior Subordinated Governmental Claim may elect to contribute such payment to the Supplemental Remission Fund for the benefit of, and Distribution to, Holders of Allowed Dotcom Customer Entitlement Claims, Allowed U.S. Customer Entitlement Claims, and Allowed Digital Asset Loan Claims as contemplated by section 5.21 of the Plan.

(iii)    *Voting*:  Claims in Class 10B are Impaired.  Each Holder of a Senior Subordinated Governmental Claim is entitled to vote to accept or reject the Plan.

t.     Class 10C – Junior Subordinated IRS Claims

(i)     *Classification:*  Class 10C consists of all Junior Subordinated IRS Claims.

(ii) *Treatment*:  Except to the extent that a Holder of an Allowed Junior Subordinated IRS Claim agrees to less favorable treatment, and in full and final satisfaction, settlement and release of and in exchange for all Claims of the IRS (other than the Priority IRS Tax Claim) against the Debtors arising from activities, transactions, liabilities or events on or preceding October 31, 2022, each Holder of an Allowed Junior Subordinated IRS Claim shall receive payment in Cash in an amount equal to such Holder's share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii) *Voting:*  Claims in Class 10C are Impaired.  Each Holder of a Junior Subordinated IRS Claim is entitled to vote to accept or reject the Plan.

u.    Class 11 – Intercompany Interests

(i) *Classification*:  Class 11 consists of all Intercompany Interests.

(ii) *Treatment*:  No Holder of an Intercompany Interest shall receive any Distributions on account of its Intercompany Interest.  On and after the Effective Date, all Intercompany Interests shall, at the option of the Debtors, either be reinstated, set off, settled, addressed, distributed, contributed, merged or cancelled.

(iii) *Voting*:  Interests in Class 11 are Impaired.  Each Holder of an Intercompany Interest is conclusively deemed to have rejected the Plan.  No Holder of an Intercompany Interest is entitled to vote to accept or reject the Plan.

v.    Class 12 – Preferred Equity Interests

(i) *Classification*:  Class 12 consists of all Preferred Equity Interests.

(ii) *Treatment:*  Except to the extent that a Holder of an Allowed Preferred Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Preferred Equity Interest, each Holder of an Allowed Preferred Equity Interest shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

-118-

(iii)    *Voting*:  Interests in Class 12 are Impaired.  Each Holder of a Preferred Equity Interest is entitled to vote to accept or reject the Plan.

w.     <u>Class 13 – Section 510(b) Preferred Equity Claims</u>

(i)     *Classification*:  Class 13 consists of all Section 510(b) Preferred Equity Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Section 510(b) Preferred Equity Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Section 510(b) Preferred Equity Claim, each Holder of an Allowed Section 510(b) Preferred Equity Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii)   *Voting*:  Claims in Class 13 are Impaired.  Each Holder of a Section 510(b) Preferred Equity Claim is conclusively deemed to have rejected the Plan.  No Holder of a Section 510(b) Preferred Equity Claim is entitled to vote to accept or reject the Plan.

x.     <u>Class 14 – Section 510(b) Other Equity Claims</u>

(i)     *Classification*:  Class 14 consists of all Section 510(b) Other Equity Claims.

(ii)    *Treatment:*  Except to the extent that a Holder of an Allowed Section 510(b) Other Equity Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Section 510(b) Other Equity Claim, each Holder of an Allowed Section 510(b) Other Equity Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii)   *Voting*:  Claims in Class 14 are Impaired.  Each Holder of a Section 510(b) Other Equity Claim is conclusively deemed to have rejected the Plan.  No Holder of a Section 510(b) Other Equity Claim is entitled to vote to accept or reject the Plan.

y.     <u>Class 15 – Equitably Subordinated Claims</u>

(i)     *Classification*:  Class 15 consists of all Equitably Subordinated Claims.

-120-

(ii) *Treatment:*  All Equitably Subordinated Claims shall be cancelled or released, and the Holders of Equitably Subordinated Claims shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Claims under the Plan.

(iii) *Voting*:  Claims in Class 15 are Impaired.  Each Holder of an Equitably Subordinated Claim is conclusively deemed to have rejected the Plan.  No Holder of an Equitably Subordinated Claim is entitled to vote to accept or reject the Plan.

z.    Class 16 – Other Equity Interests

(i) *Classification*:  Class 16 consists of all Other Equity Interests.

(ii) *Treatment:*  Except to the extent that a Holder of an Allowed Other Equity Interest agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Equity Interest, each Holder of an Allowed Other Equity Interest shall receive its share equal to such Holder's Pro Rata share of Distributions from the General Pool in accordance with the waterfall priority set forth in section 4.2.3 of the Plan.

(iii) *Voting*:  Interests in Class 16 are Impaired.  Each Holder of an Other Equity Interest is conclusively deemed to have rejected the Plan.  No Holder of an Other Equity Interest is entitled to vote to accept or reject the Plan.

aa.   Class 17 – FTT Claims and Interests

(i) *Classification*:  Class 17 consists of all FTT Claims and Interests.

(ii) *Treatment*:  All Allowed FTT Claims and Interests shall be cancelled or released, and the Holders of Allowed FTT Claims and Interests shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Interests under the Plan.

(iii) *Voting*:  Claims in Class 17 are Impaired.  Each Holder of an FTT Claim or Interest is conclusively deemed to have rejected the Plan.  No Holder of an FTT Claim or Interest is entitled to vote to accept or reject the Plan.

bb.   Class 18 – *De Minimis* Claims

(i)      *Classification*:  Class 18 consists of all *De Minimis* Claims.

(ii)     *Treatment*:  No Holder of a *De Minimis* Claim shall receive any Distributions on account of its *De Minimis* Claim.  On and after the Effective Date, all *De Minimis* Claims shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(iii)    *Voting*:  Claims in Class 18 are Impaired.  Each Holder of a *De Minimis* Claim is conclusively deemed to have rejected the Plan.  No Holder of a *De Minimis* Claim is entitled to vote to accept or reject the Plan.

**E.**      ~~D.~~Implementation of the Plan

1.    *Operations Between the Confirmation Date and Effective Date*

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate as debtors-in-possession, subject to all applicable orders of the Bankruptcy Court.

2.    *Global Settlement of Claims and Interests*

In consideration of the classification, treatment, Distributions, releases and other benefits provided by the Debtors to their stakeholders under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of all Claims, Interests and Causes of Action against, by or among the Debtors, including without limitation:  (a) the actual or purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) any basis for the contractual, structural and legal subordination rights  of any Claim or Interest or any Distribution to be made on account of any Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) transactions among the Debtors prior to and on the Effective Date; (f) the allocation of corporate and administrative expenses across each of the Debtors; (g) the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (h) the Debtors' disregard for corporate separateness before the Petition Date; (i) any causes of action by a Debtor against other Debtors or the Insiders of other Debtors; (j) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of these Chapter 11 Cases; and (k) all Causes of Action relating to any of the foregoing.

In connection with the implementation of the Global Settlement pursuant to the Plan:  (a) the value of Claims in respect of Digital Assets shall be calculated pursuant to section 4.4 of the Plan; (b) the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim shall be recognized for the benefit of Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims; (c) the Alameda U.S.

-122-

Customer Claim shall be recognized as part of the General Pool; (d) Claims shall be classified and treated as set forth in article 4, which entitles Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims to recover against the (i) Dotcom Customer Priority Assets and the U.S. Customer Priority Assets, respectively, and (ii) General Pool, in accordance with the waterfall priorities set forth in section 4.2 of the Plan; (e) the Consolidated Debtors shall be substantively consolidated as set forth in section 5.7 of the Plan; (f) Cancelled Intercompany Claims, Equitably Subordinated Claims, FTT Claims and Interests and *De Minimis* Claims shall be cancelled; (g) Separate Subsidiary Intercompany Claims, Senior Subordinated IRS Claims, Senior Subordinated Governmental Claims, Junior Subordinated IRS Claims, Preferred Equity Interests, Section 510(b) Preferred Equity Claims and Section 510(b) Other Equity Claims shall be subordinated to Claims of other Holders, in accordance with the waterfall priorities set forth in section 4.2 of the Plan; (h) Holders of Other Equity Interests shall recover against the General Pool in accordance with the waterfall priorities set forth in section 4.2 of the Plan; (i) Distributions to customers and creditors shall be made in Cash (other than in Available NFTs) as set forth in articles 4 and 7 of the Plan; (j) all assets scheduled by the Debtors shall constitute property of the Debtors' Estates; (k) interest shall be paid at the applicable rate to Holders of certain Claims in accordance with section 7.1 of the Plan and the treatment set forth in section 4.3 of the Plan; and (l) interest shall be paid at the Consensus Rate to Holders of Holders of Allowed Dotcom Customer Entitlement Claims, Allowed U.S. Customer Entitlement Claims, Allowed Dotcom Convenience Claims and Allowed U.S. Convenience Claims in accordance with section 7.1 of the Plan and the treatment set forth in section 4.3 of the Plan.

The Plan shall be deemed a motion to approve the Global Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Bankruptcy Court that the Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests.

### 3. *FTX DM Global Settlement*

To the extent that the FTX DM Global Settlement Agreement is in full force and effect as of the Effective Date, the FTX DM Global Settlement Agreement will be incorporated into the Plan.  If the FTX DM Global Settlement Agreement is terminated pursuant to its terms, section 5.3 of the Plan shall become null and void and shall have no further force and effect.

Notwithstanding anything to the contrary in the Plan, no claims between the Debtors and FTX DM arising under the FTX DM Global Settlement Agreement or the Exclusive Sales Agency Agreement shall be cancelled or otherwise released or modified by the Plan and the FTX DM Global Settlement Agreement and the Exclusive Sales Agency Agreement shall remain in effect following the Effective Date pursuant to their terms.

4. *Setoff Against FTX DM*

On the Effective Date, the loan provided by FTX Trading to FTX DM in connection with the FTX DM Global Settlement Agreement shall be satisfied by setoff and reduction against any amount otherwise due to FTX DM by the Debtors under the FTX DM Global Settlement Agreement.  Such setoff shall be effective automatically upon the occurrence of the Effective Date and shall not require any action by the Debtors, the Plan Administrator, or FTX DM or further order of the Court.

5. *Waiver of Customer Preference Actions*

Effective upon the Effective Date, the Debtors and the Wind Down Entities ~~may~~shall waive and not prosecute any Customer Preference Action against any Holder of Dotcom Customer Entitlement Claims or U.S. Customer Entitlement Claims if such Holder duly executes and timely returns a valid Ballot by the Voting Deadline that (i) votes to accept the Plan, and (ii) consents and stipulates to the amount of such Dotcom Customer Entitlement or U.S. Customer Entitlement Claim as set forth in the applicable Ballot for voting, allowance and Distribution purposes; *provided* that notwithstanding anything provided in the Plan, the Debtors shall not waive and release any Excluded Customer Preference Action.

The Debtors shall not designate a Customer Preference Action as an Excluded Customer Preference Action unless the Debtors have determined there is a reasonable basis to conclude that, among other things:  (a) the recipient of the applicable preferential payment or transfer (i) was an Insider of any Debtor, (ii) was a current or former employee of the Debtors or of any current or former Affiliate of the Debtors, (iii) may have had actual or constructive knowledge of the commingling and misuse of Customer deposits and corporate funds, or (iv) either (x) changed its know your customer information to facilitate withdrawals from the applicable FTX Exchange or (y) received manual permission from the Debtors to facilitate withdrawals when withdrawals were otherwise halted from the FTX Exchange; or (b) any Debtor has a Cause of Action or a defense against the recipient of the applicable preferential payment or transfer (or a subsequent transferee of the applicable Customer Entitlement Claim) or any of its Affiliates other than a claim arising under a Customer Preference Action.  The Debtors shall include the list of Excluded Customer Preference Actions in the Plan Supplement.

6. *Substantive Consolidation*

As discussed in Section 1.C—*A Collaborative Process of Stakeholder Engagement and Compromise*, pursuant to sections 105, 363, 365 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and as an integral part of the Global Settlement pursuant to the Plan, the Plan shall be deemed a motion by the Debtors seeking the approval, effective as of the Effective Date, of the substantive consolidation of the Estates of the Consolidated Debtors into a single Entity formed as a Delaware trust for the purposes of effectuating and implementing the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such substantive consolidation of the Estates of the Consolidated Debtors, as well as findings by the Bankruptcy Court that such substantive consolidation is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and the Holders of Claims and Interests.  FTX

-124-

Bahamas PropCo shall not be substantively consolidated pursuant to the Plan and shall continue to exist as a separate legal entity.

Except as otherwise provided in the Plan and subject in all respects to the classification and treatment of Claims and Interests set forth in article 4 of the Plan, as a result of the substantive consolidation of the Estates of the Consolidated Debtors:  (a) all property of the Consolidated Debtors shall vest in, and constitute the property of, the Consolidated Wind Down Trust, free and clear of any and all Liens, charges or other encumbrances or interests, pursuant to section 5.12 of the Plan; (b) all guarantees of any Consolidated Debtor of the payment, performance or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Wind Down Trust; (d) all Cancelled Intercompany Claims shall be deemed cancelled; and (e) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Consolidated Wind Down Trust.

Except as otherwise provided in the Plan, the substantive consolidation set forth in section 5.7 of the Plan shall not:  (i) affect the separate legal existence of the Consolidated Debtors for purposes other than implementation of the Plan pursuant to its terms; (ii) constitute or give rise to any defense, counterclaim or right of netting or setoff with respect to any Cause of Action vesting in the Consolidated Wind Down Trust that could not have been asserted against the Consolidated Debtors; or (iii) ~~constitute the transfer or assignment of, or~~ give rise to any right under, any executory contract, insurance contract or other contract to which a Consolidated Debtor is party, except to the extent required by section 365 of the Bankruptcy Code in connection with the assumption of such contract by the applicable Debtors.

7.  *Wind Down Entities*

The purpose of the Wind Down Entities is to engage in business after the Effective Date for so long as may be necessary to monetize the Plan Assets and pay Distributions, in each case as promptly as reasonably practicable.  The Wind Down Entities shall manage and hold Plan Assets for sale; sell Plan Assets; administer, and close as necessary, these Chapter 11 Cases; administer, reconcile, resolve and settle claims; and liquidate the Debtors and their non-Debtor subsidiaries pursuant to the terms of the Plan Supplement.  The Plan Administrator shall be vested with all other powers and authority set forth in the Plan and the Plan Administration Agreement, shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections 704(a)(1), 704(a)(2) and 704(a)(5) of the Bankruptcy Code.

The Wind Down Entities are intended to qualify as "liquidating trusts" for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Wind Down Entities are intended to be structured to comply with such general criteria. In conformity with Revenue Procedure 94-45, all parties (including,

-125-

without limitation, the Debtors, the Wind Down Entities, the Plan Administrator, and Holders of Allowed Claims) shall treat, for U.S. federal income tax purposes, the Wind Down Entities as a grantor trust of which the Holders of Allowed Claims against the Wind Down Entities and eligible Holders who make the Bahamas Opt-In Election and receive payments in the FTX DM Liquidation are the owners and grantors. Taxable income, gain and losses of the Wind Down Entities shall be allocated among the deemed beneficiaries of such Wind Down Entities. However, the Debtors believe that only the "residual owners", and not the Holders of Claims, should be "allocated" any of the income, gains or losses that the Wind Down Entities may derive after the Effective Date. For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Wind Down Entities, the Plan Administrator, and all Holders of Allowed Claims) shall treat the transfer of the Plan Assets to the Wind Down Entities in accordance with the terms of the Plan; such transfer is treated as a deemed transfer to the Holders of Allowed Claims and eligible Holders who make the Bahamas Opt-In Election and receive payments in the FTX DM Liquidation, followed by a deemed transfer by such Holders to the Wind Down Entities. The Plan Administrator shall make a good faith valuation of Plan Assets as soon as it becomes relevant for tax reporting purposes.  All parties (including, without limitation, the Debtors, the Wind Down Entities, the Plan Administrator, and all Holders of Allowed Claims) shall use consistent valuation of the Plan Assets for all U.S. federal income tax purposes.

8. *Plan Funding Mechanism*

Distributions under the Plan shall be funded from (a) Cash on hand, (b) Available NFTs, (c) Wind Down Cash Proceeds, and (d) any other Plan Assets, except as expressly set forth herein.

9. *The Wind Down Board*

The initial Wind Down Board shall consist of the Plan Administrator, Brian C. Simms and Peter Greaves in their capacity as the Bahamas JOLs, and the incumbent members of the Debtors' board. The and one additional director to be identified in the Plan Supplement (the "Appointed Director").  The Appointed Director shall be jointly designated by the Ad Hoc Committee and the Official Committee, and be acceptable to the Debtors and the Bahamas JOLs. The Appointed Director shall also be a member of the Advisory Committee described in section 5.20 of the Plan and shall cease to serve as a member of the Wind Down Board when the Advisory Committee is disbanded.

shall The Wind Down Board shall manage the Consolidated Wind Down Trust and have the responsibility to review and advise the Plan Administrator with respect to the liquidation and Distribution of the Plan Assets.  In advising the Plan Administrator, the Wind Down Board, including the Appointed Director, shall maintain the same fiduciary responsibilities as the Plan Administrator.

In the event of a vacancy on the Wind Down Board, a majority of the Wind Down Board may appoint a replacement subject to the constitutive documents for the Consolidated Wind Down Trust as in effect from time to time; *provided* that any replacement for the

-126-

Appointed Director shall first be designated by the Advisory Committee from among its members.

10. *Plan Administrator and Plan Administration Agreement*

The Plan Administrator shall administer the Wind Down Entities after the Effective Date in accordance with the Plan Administration Agreement.  The appointment of the Plan Administrator and execution, delivery and performance of the Plan Administration Agreement by the Wind Down Entities shall be approved by the Bankruptcy Court in the Confirmation Order.  The Plan Administrator shall be a fiduciary of the Wind Down Entities and shall be compensated and reimbursed for expenses as set forth in the Plan Administration Agreement.  The Plan Administration Agreement shall provide for the exculpation and indemnification of the Plan Administrator, the Wind Down Board and their professionals, representatives and related persons with respect to all Causes of Action arising out of or relating to any act taken, or omission made, in connection with the affairs of the Wind Down Entities, except to the extent an act or omission is determined by a Final Order to have constituted gross negligence or willful misconduct.

11. *Vesting of Assets Free and Clear and No Successor Liability*

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Plan Assets irrevocably shall be transferred and assigned to and automatically vested in the Wind Down Entities, for the benefit of Holders of Claims, free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141363 of the Bankruptcy Code.  All property held for Distribution pursuant to the Plan shall be held in trust for the benefit of the Holders of Allowed Claims and Interests and to pay the expenses of the administration of the Wind Down Entities.  Upon the vesting of the Plan Assets in the Wind Down Entities, no Debtor, Consolidated Debtor or any Person or Entity holding a Claim or Interest shall (a) have an interest in, or any right with respect to, any Plan Asset except as provided by the Plan or (b) take, without the written consent of the Plan Administrator or order of the Bankruptcy Court, any action with respect to a Wind Down Entity or a Plan Asset if such action would not have been permitted to be taken by such Person or Entity with respect to a Debtor or its property under section 362 of the Bankruptcy Code.

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Effective Date, each of the Wind Down Entities (i) shall not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising of any event or occurrence taking place on or before the Effective Date, (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date, and (iii) shall not have any successor or transferee liability of any kind or character.

12. *Preservation of Causes of Action*

Except as otherwise provided in article 10 of the Plan or the other provisions of

-127-

the Plan, each Cause of Action that is a Plan Asset shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the Wind Down Entities as of the Effective Date.  For avoidance of doubt, any and all DM-Controlled Recovery Actions shall vest solely in FTX DM and shall not vest in the Wind Down Entities.  Any such Cause of Action against any Customer of the FTX.com Exchange or any of such Customer's successors or assigns shall constitute a Dotcom Customer Priority Asset, and any such Cause of Action against any customer of the FTX.US Exchange shall constitute a U.S. Customer Priority Asset.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Plan Administrator expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of Confirmation, the Plan, the vesting of such Cause of Action in the Wind Down Entities, any order of the Bankruptcy Court or these Chapter 11 Cases.  No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them or in which they asserted any interest as an indication that the Debtors or the Plan Administrator, as applicable, will not pursue such Cause of Action.

13. *Creditor Advisory Committee*

~~The Ad Hoc Committee and the Official Committee shall have the right to request that the Debtors form as of~~On the Effective Date ~~an advisory committee (the "~~, the Debtors shall establish the Advisory Committee~~") of three~~ consisting of the Appointed Director on the Wind Down Board and two other persons ~~mutually agreed~~reasonably acceptable to the Debtors and the Bahamas JOLs, to be jointly designated by the Ad Hoc Committee and the Official Committee~~, and reasonably acceptable to the Debtors~~.  The members of the Advisory Committee shall not be a current or former Holder of a Claim or Interest~~.  The Advisory Committee shall have a mandate to advise the Plan Administrator with respect to the administration, Allowance and reconciliation of Claims, the management of the Disputed Claims Reserve and such related matters as may be agreed with the Debtors and set forth in the Plan Administration Agreement.  The Advisory Committee shall have standing before the Bankruptcy Court with respect to issues within its mandate as if it were a creditor.  The Advisory Committee shall~~ (unless otherwise agreed to by the Debtors, the Official Committee, and the Ad Hoc Committee) and shall be subject to the same confidentiality, independence and trading restrictions as members of the Wind Down Board.  The members of the Advisory Committee shall have fiduciary duties to all creditors.

The Wind Down Board and the Plan Administrator shall consult with the Advisory Committee in good faith on all of its material decisions concerning the Wind Down Entities, the Plan Administrator and the Advisory Committee from time to time, including without limitation with respect to (i) reserves and the timing and amount of distributions, (ii) resolution or settlement of disputed unsecured claims, (iii) commencement, prosecution and settlement of litigation, (iv) disallowance of claims, (v) monetization of digital assets and venture investments, (vi) implementation of the Supplemental Remission Fund, (vii) modification of the Wind Down Budget and (viii) modification of the terms of employment or scope of authority of the Plan Administrator and any other officers of the Wind Down Entities, in each case of clauses (i) through (viii) subject to such parameters as may be agreed upon in good

faith by the Wind Down Board, the Plan Administrator and the Advisory Committee from time to time.  The members of the Advisory Committee other than the Appointed Director on the Wind-Down Board shall have the right to attend formal meetings of the Wind Down Board as non-voting observers (and receive all related board materials and reports), subject to such limitations as the Wind Down Board may set from time to time to address any actual or potential conflict of interest.  The Appointed Director shall have the opportunity to consult with the other members of the Advisory Committee prior to voting on any actions in its capacity as a member of the Wind Down Board.  Similarly, the Wind Down Board of Directors shall have the right to consult in executive session without the Advisory Committee members.

The members of the Advisory Committee shall receive reasonable and customary compensation, indemnification and exculpation.  The Advisory Committee may retain and employ Delaware counsel, one additional law firm and one financial advisory firm to assist the Advisory Committee in the performance of its duties, with the reasonable and documented fees and expenses of these professionals to be borne or reimbursed by the Wind Down Entities.  These professional firms shall be chosen by majority vote of the Advisory Committee and be acceptable to the Wind Down Board (such consent not to be unreasonably withheld).

If the Wind Down Board approves an action (i) that the Appointed Director has voted against in his or her capacity as a member of the Wind Down Board and (ii) to which a majority of the Advisory Committee (including the Appointed Director) also objects, the Appointed Director may send written notice explaining the basis for the Advisory Committee's objection to the Plan Administrator and the other members of the Wind Down Board within one business day of the vote of the Wind Down Board approving the proposed action (a "Notice of Objection").  Upon the Appointed Director's vote against a proposed action by the Wind Down Board, the Wind Down Entities shall refrain from taking the contested action unless a Notice of Objection is not timely provided; if a Notice of Objection is provided, the Wind Down Board shall not take the proposed action without either order of the Court or the expiration of a seven day waiting period. During this seven day waiting period, the Advisory Committee may file an objection to the proposed action with the Court, describing the basis therefor in reasonable detail. If no objection is filed with the Court within such seven day period, the Notice of Objection shall have no further effect, the Wind Down Entities may proceed with the proposed action and the Advisory Committee shall be deemed to have waived any right to challenge the proposed action.

If the Advisory Committee files a timely objection with the Court in accordance with the immediately preceding two paragraphs, the Court shall resolve the objection as a contested matter by applying the standard of review that would be applicable to an action proposed by a debtor over the objection of a general unsecured creditor under section 363(b) of the Bankruptcy Code or Rule 9109, as applicable.

The Advisory Committee shall have standing to enforce the Plan to the same extent as an individual creditor, as well as standing to enforce the Advisory Committee's own rights under the Plan.

The Advisory Committee shall continue until ~~undisputed~~such time as Allowed General Unsecured Claims have been paid 100% of their Allowed amounts plus interest at the

-129-

Consensus Rate as provided in the Plan, and then shall be disbanded.  In the event of a vacancy on the Advisory Committee, the other members of the Advisory Committee may appoint a replacement member reasonably acceptable to the Wind Down Board by written notice to the Court.

14. *Supplemental Remission Fund*

The Debtors, in consultation with the Supporting Parties, may establish a segregated fund (the "Supplemental Remission Fund") to receive any funds otherwise payable to the Holders of Allowed Senior Subordinated Governmental Claims (the "Remission Fund Sponsors").  The Plan Administrator may manage funds in the Supplemental Remission Fund on the same basis as any other funds of the Wind Down Entities.  The~~The~~If established, the Supplemental Remission Fund shall constitute property of the Wind Down Entities and part of their Cash; *provided* that the Plan Administrator shall (a) keep such Supplemental Remission Fund segregated, and (b) apply funds in the Supplemental Remission Fund only (i) to pay costs and expenses incurred in connection with the activities of the Supplemental Remission Fund, (ii) to make distributions of any available funds to (x) Holders of Allowed Dotcom Customer Entitlement Claims, Allowed U.S. Customer Entitlement Claims and Allowed Digital Asset Loan Claims and (y) FTX DM for the benefit of Holders of Eligible DM Customer Entitlement Claims, in each case, on a Pro Rata basis or as otherwise agreed between the Plan Administrator and the Remission Fund Sponsors, in consultation with the Advisory Committee or (iii) as ordered by the Bankruptcy Court.  The Plan Administrator shall file on the docket of these Chapter 11 Cases notices describing any agreement with any Remission Fund Sponsor to contribute to the Supplemental Remission Fund, as well as any agreed guidelines for distributions.  The Plan Administrator shall file periodic reports on the docket of these Chapter 11 Cases with respect to the balance in the Supplemental Remission Fund and its distribution activities.

15. *Disputed Claims Reserve*

On or prior to the Initial Distribution Date, the Plan Administrator may establish, if necessary, a reserve (the "Disputed Claims Reserve") (a) on account of Disputed Claims that may be subsequently Allowed after the Effective Date, and (b) to cover payments to FTX DM that may be required under the FTX DM Global Settlement Agreement. The Plan Administrator may (i) reserve, as necessary, cash on hand in a manner consistent with Section 4 of the Plan on account of the Disputed Claims Reserve in an amount that would otherwise be distributable to estimated Disputed Claims pursuant to the Plan, (ii) administer, adjust and maintain the Disputed Claims Reserve, and (iii) withhold in the Disputed Claims Reserve any amount to fund subsequent Distributions pursuant to the Plan or payments that may be under the FTX DM Global Settlement Agreement. The Plan Administrator may, but shall not be required to, seek estimation of any Disputed Claim by the Bankruptcy Court under section 502 of the Bankruptcy Code.

-130-

**F.** ~~E.~~ **Provisions Governing Distributions**

1. *Distributions Timing*

   a. Determination for Distributions to FTX DM. Before the Initial Distribution Date or any Distribution Date thereafter, the Plan Administrator shall determine, in accordance with the FTX DM Global Settlement Agreement, whether it needs to advance Cash to FTX DM to pay distributions to holders of DM Customer Entitlement Claims in accordance with the FTX DM Global Settlement Agreement.

   b. Initial Distribution Date. On the Initial Distribution Date, the Distribution Agent shall commence Distributions under the Plan on account of each Claim that is Allowed on or prior to the Effective Date.

   c. Subsequent Distributions. The Plan Administrator shall identify, in his or her ~~reasonable~~ discretion and in accordance with the Plan Administration Agreement, dates to be Subsequent Distribution Dates for the purpose of making additional Distributions under the Plan. Each Subsequent Distribution Date shall be a Business Day. On each Subsequent Distribution Date, the Plan Administrator shall direct the Distribution Agent to make Distributions with Cash on hand net of reserves, as determined by the Plan Administrator and the Wind Down Board.

   d. Distributions to Holders of Claims Allowed After the Effective Date. The Distribution Agent shall make Distributions to Holders of Claims Allowed after the Effective Date in accordance with the applicable provision of article 4 of the Plan on the first Subsequent Distribution Date after such Claim is Allowed. Unless the Plan Administrator otherwise agrees, no partial Distribution shall be made with respect to such Claim until all disputes in connection with such Claim have been resolved by Final Order of the Bankruptcy Court.

2. *Distributions to Holders of Customer Entitlement Claims*

a.      Distributions to FTX DM. In accordance with section 7.2.1 of the Plan, before the Initial Distribution Date or any Distribution Date thereafter, the Plan Administrator or the Distribution Agent shall make any distribution of Cash to FTX DM for the benefit of holders of DM Customer Entitlement Claims that have made the Bahamas Opt-In Election in accordance with the FTX DM Global Settlement Agreement.

b.      Distributions of Dotcom Customer Entitlement Claims, U.S. Customer Entitlement Claims and Allocations of Wind Down Cash Proceeds.  On any Distribution Date, the Plan Administrator may direct the Distribution Agent to Distribute to the Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims the Wind Down Cash Proceeds that the Plan Administrator in accordance with the Plan and the Plan Administration Agreement, determines are Wind Down Cash Proceeds that belong to the Dotcom Customer Priority Assets or U.S. Customer Priority Assets, respectively, in each case, in accordance with sections 4.3.6 and 4.3.7 of the Plan.

c.      Final Distribution at Closing of these Chapter 11 Cases.  On or prior to the closing of these Chapter 11 Cases, the Plan Administrator shall Distribute (such Distribution, the "Final Distribution") all remaining Wind Down Cash Proceeds in accordance with the waterfall priority set forth in section 4.2 of the Plan and the classification and treatment set forth in section 4.3 thereof.

**G.**      ~~F.~~ **Record Date and Delivery of Distributions**

1. *Record Date for Distributions*

In advance of each Distribution Date, the Plan Administrator shall establish a Distribution Record Date for purposes of determining the Holders of Allowed Claims entitled to receive a Distribution on such Distribution Date, which Distribution Record Date shall be no less than 45 and no more than 75 days prior to the corresponding Distribution Date.  On each Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on such Distribution Record Date.  If a Claim is transferred 45 or fewer days before the applicable Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

-132-

2.  *Delivery of Distributions in General*

Except as otherwise provided in the Plan, the Distribution Agent, at the direction of the Plan Administrator, shall make all Distributions required under the Plan to Holders of Allowed Claims.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the applicable Distribution Record Date by the Distribution Agent, as appropriate:  (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein; (b) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent; (c) at the address set forth in any notice of transfer that has become effective pursuant to Bankruptcy Rule 3001(e); or (d) at the address reflected in the Schedules if no Proof of Claim has been filed and the Notice and Claims Agent has not received a written notice of a change of address.  The Plan Administrator may, but shall not be required to, withhold any Distribution to a Holder of an Allowed Claim upon receipt of written notice to the Plan Administrator of pending litigation concerning an executed agreement by such Holder to sell such Allowed Claim in order to seek specific instructions of the Bankruptcy Court prior to making such Distribution. The Debtors, the Plan Administrator, the Distribution Agent, the Wind Down Entities and the Notice and Claims Agent shall not incur any liability whatsoever on account of the withholding or delivery of any Distributions under the Plan.

In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Allowed Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

3.  *Valuation of Claims*

Unless otherwise expressly provided in the Digital Assets Estimation Order, the value of a Claim in respect of a digital asset shall be calculated by converting the value of such digital asset into Cash as of the Petition Date utilizing the conversion rates set forth in the Digital Assets Conversion Table attached to this Disclosure Statement as Appendix E and pursuant to section 4.4 of the Plan.  For the avoidance of doubt, any claims that may arise pursuant to section 502(h) of the Bankruptcy Code following the conclusion of any adversary proceeding shall be treated in accordance with Paragraph 8 of the Digital Assets Estimation Order and shall not be valued in accordance with the conversion rates set forth in the Digital Assets Conversion Table.

4.  *Accrual of Postpetition Interest*

Unless otherwise provided in the Plan, to the extent that postpetition interest accrues on an Allowed Dotcom Customer Entitlement Claim, an Allowed U.S. Customer Entitlement Claim or an Allowed General Unsecured Claim pursuant to article 4 of the Plan, such postpetition interest shall accrue on any unpaid balance of such Allowed Claim from the Petition Date through the applicable Distribution Date on which such Allowed Claim is paid;

-133-

*provided* that, to the extent that a Disputed Claim becomes an Allowed Claim on which postpetition interest accrues pursuant to article 4 of the Plan, postpetition interest shall accrue on such Allowed Claim as if such Allowed Claim had been an Allowed Claim that received a Distribution on each date Distributions were previously made to Holders of the Allowed Claims classified in the applicable Class.

### 5. *Distribution Agent*

The Plan Administrator shall have the authority, ~~in its sole discretion,~~ to enter into an agreement with a Distribution Agent to facilitate the Distributions required under the Plan.  To the extent the Plan Administrator determines to utilize a Distribution Agent to facilitate the Distributions, such Distribution Agent would first be required to:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or Distributions required under the Plan; and (c) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the Distributions required under the Plan to be distributed by such Distribution Agent.

The <u>Debtors or the </u>Plan Administrator<u>, as applicable,</u> shall pay to the Distribution Agent all of its reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  The Distribution Agent shall submit detailed invoices to the Plan Administrator for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Plan Administrator shall pay those amounts that it, in its sole discretion, deems reasonable, and shall object to those fees and expenses, if any, that the Plan Administrator deems to be unreasonable.  In the event that the Plan Administrator objects to all or any portion of the amounts requested to be reimbursed in the Distribution Agent's invoice, the Plan Administrator and the Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Plan Administrator and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

The Debtors are currently in discussions with various parties to potentially serve as Distribution Agents and are exploring different distribution options, including, among other things, to potentially provide to customers in certain jurisdictions the option to receive Distributions in either Cash or stablecoin.

### 6. *Fractional and De Minimis Distributions*

Notwithstanding anything herein to the contrary, the Plan Administrator and the Distribution Agent shall not be required to make Distributions in Cash or payments of less than $10.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $10 shall be forever barred from asserting such Claim against the Debtors, the Estates, the Plan Administrator, the Wind Down Entities or any of their property.

-134-

7.  *Undeliverable Distributions*

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' or Notice and Claims Agent's records, no further Distribution to such Holder shall be made unless and until the Plan Administrator or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter. Undeliverable Distributions shall remain in the possession of the Plan Administrator or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the relevant Wind Down Entity or is cancelled pursuant to section 7.8 of the Plan and shall not be supplemented with any interest, dividends or other accruals of any kind. Nothing contained herein shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim whose Distribution is declared an undeliverable or Unclaimed Distribution.

8.  *Reversion*

Any Distribution under the Plan, including Distributions made by the Plan Administrator or the Distribution Agent in accordance with section 7.5 of the Plan, that is an Unclaimed Distribution for a period of six months thereafter, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the relevant Wind Down Entity as Plan Assets with respect to Unclaimed Distributions on account of Claims; *provided*, *however*, that the Plan Administrator and the Distribution Agent shall use commercially reasonable efforts to notify the Holder of such Unclaimed Distribution within three months of the applicable Distribution Date. The Plan Administrator and the Distribution Agent are deemed to have satisfied their use of commercially reasonable efforts by mailing a notice to the last known address of record known to the Claims Agent and emailing such notice to the last known email address of record known to the Claims Agent. Any Distribution that is not made pursuant to section 7.6 of the Plan shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the relevant Wind Down Entity as Plan Assets pursuant to section 7.8 of the Plan. Upon revesting pursuant to section 7.8 of the Plan, the Claim of any Holder or its successors and assigns with respect to such property shall be cancelled and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. If any Unclaimed Distribution revests in any Wind Down Entity as Plan Assets pursuant to section 7.8 of the Plan after the Final Distribution is made, the Plan Administrator shall not be required to make any subsequent Distributions to Holders of Allowed Claims or Interests under the Plan.

9.  *Surrender of Cancelled Instruments or Securities*

Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent. Subject to the foregoing sentence, regardless of any actual surrender of a Certificate, the deemed surrender shall have the same effect as if its Holder had actually surrendered such Certificate, and such Holder shall be deemed to have relinquished all rights, Claims and Interests with respect to such Certificate.

Notwithstanding the foregoing paragraph, section 7.9 of the Plan shall not apply to any Claims reinstated pursuant to the terms of the Plan.

### 10. *Setoffs*

Except as otherwise provided in the Plan, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, the Debtors may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or the Plan Administrator of any such Claims, rights and Causes of Action that such Debtor or the Plan Administrator may possess against such Holder.  In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or the Plan Administrator, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases by the applicable Claims Bar Date preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

### 11. *The Bahamas Opt-In Election*

All Bahamas Customers forever, fully and finally release and discharge the Debtors with respect to any Dotcom Customer Entitlement Claims and Dotcom Convenience Claims and forever, fully and finally withdraw with prejudice such Dotcom Customer Entitlement Claims and Dotcom Convenience Claims from these Chapter 11 Cases.  No Bahamas Customer who timely makes a valid Bahamas Opt-In Election shall receive any Distribution under the Plan on account of any Dotcom Customer Entitlement Claims or Dotcom Convenience Claims.  The Plan Administrator may require any Holder of any Claim to submit satisfactory evidence that such Holder has not submitted a proof of debt in the FTX DM Liquidation.

### 12. *Anti-Double-Dip*

To the extent any Holder has received payment in full on account of any Allowed Claim in accordance with section 4.3 of the Plan, such Allowed Claim shall be deemed satisfied and expunged from the claims registry without an objection to such Claim having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

To the extent that a Holder of an Allowed Claim receives payment from a party that is not a Debtor on account of such Claim, the Plan Administrator or the Distribution Agent on account of such Claim, such Holder shall, within 14 days of receipt thereof, transfer, repay or

return such payment to the Plan Administrator or the Distribution Agent to the extent such Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount that other similarly-situated Holders of such Claim received as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Plan Administrator annualized interest at the Consensus Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

The Plan Administrator may require any Holder of any Claim or Interest to submit satisfactory evidence that such Holder has not requested or received compensation for the same losses underlying such Claim or Interest in connection with any other judicial or administrative proceedings in any court other than the Bankruptcy Court, including, without limitation, (a) any proceedings with respect to FTX Australia, FTX Turkey, SNG Investments, FTX Europe AG, FTX EU Ltd., Quoine ~~PTE~~Pte Ltd., FTX DM or FTX Japan K.K., and (b) any proceedings in connection with the civil action captioned *In Re FTX Cryptocurrency Exchange Collapse Litigation*, Case No. 23-md-03076 (S.D.F.L.) pending in the United States District Court for the Southern District of Florida.  The Plan Administrator may, and may direct the Distribution Agent to, withhold any Distributions on such Claim or Interest until: (a) such time as the Plan Administrator determines it has received satisfactory evidence ~~is obtained~~ or appropriate arrangements are in place that ensure no Holder receives more than any other similarly-situated Holder under the Plan, taking into account potential recoveries of all Holders; or (b) the Bankruptcy Court so orders.  The Plan Administrator may also adjust the amount of such Claim or Interest to ensure that the Holder of such Claim or Interest does not receive more than any other similarly-situated Holder under the Plan.  As a condition to receiving any Distribution under the Plan, unless the Bankruptcy Court orders otherwise, the Plan Administrator may require Holders of Claims or Interests to irrevocably and unconditionally assign and transfer to the Plan Administrator all right, title and interest in any claim or Cause of Action for the same losses that has been or may be made or asserted in any of the foregoing proceedings.

### 13. *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, the Plan Administrator and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any tax law, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Plan Administrator and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms that are reasonable and appropriate.  For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable Holder.  The Plan Administrator reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to

other taxes and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

### 14. *Tax Identification, KYC and OFAC Certifications*

Any Holder entitled to receive any Distribution under the Plan shall, upon request, deliver to the Distribution Agent or such other Entity designated by the Plan Administrator:  (a) a completed IRS Form W-9 or appropriate IRS Form W-8, as applicable; (b) a true and accurate certification that the Holder is not a Person or Entity with whom it is illegal for a U.S. person to do business under Office of Foreign Assets Control sanctions regulations and/or the list of Specially Designated Nationals and Blocked Persons; and (c) know your customer information of the Holder of such Claim, which (i) for individuals, may include, among other things, full name including any alias, date of birth, address and proof of address, identification and identification-related documents, nationality, phone number, email address, occupation, bank account information or wallet address, social security number (for U.S. citizens) and facial liveness and (ii) for institutional Holders, may include, among other things, company name, registration information, tax identification number, principal business address and phone number, business email address, information on the nature of the business and principal business activity, entity size, source of wealth/source of funds, annual revenue/profit, authorized signer, identity of ultimate beneficial owners, identity of directors and/or members of management, bank account information or wallet address and, for any ultimate beneficial owners, directors or members of management, similar identification information and records as are collected for individual Holders who are natural Persons (collectively, the "Pre-Distribution Requirements"). If a request for Pre-Distribution Requirements has not been satisfied within 30 days thereafter, a second request shall be sent to such Holder.  If the Holder fails to comply with the Pre-Distribution Requirements before the date that is 60 days after a second request is made, such Holder shall be deemed to have forfeited its right to receive Distributions, and shall be forever barred and enjoined from asserting any right to Distributions made prior to the Plan Administrator receiving its executed Pre-Distribution Requirements.  Any Distributions that are forfeited pursuant to this provision shall revest in the Wind Down Entities as Plan Assets.  For all purposes related to section 7.14 of the Plan, the Plan Administrator and the Distribution Agent are entitled to conclusively rely on the delivery of the notice to the last known address and last known email address on file with the Claims Agent without obligation to verify such address and any such requests delivered to such address shall be deemed to be received.

### 15. *Distribution of Available NFTs*

Any Holder of an NFT Customer Entitlement Claim shall comply with the requirements and procedures that the Plan Administrator may establish in his or her reasonable discretion for the Distribution of Available NFTs.  If a Holder of NFT Customer Entitlement Claims fails to comply with such requirements or procedures by a date determined by the Plan Administrator in his or her reasonable discretion and noticed to all Holders of NFT Customer Entitlement Claims, such Holder shall be deemed to have forfeited its right to receive Distributions of Available NFTs, and shall be forever barred and enjoined from asserting any right to Distributions on account of its NFT Customer Entitlement Claim.  Any Distributions that are forfeited pursuant to section 7.15 of the Plan shall revest in the Wind Down Entities as Plan

Assets.  For all purposes related to section 7.15 of the Plan, the Plan Administrator and the Distribution Agent are entitled to conclusively rely on the delivery of the notice to the last known address and last known email address on file with the Claims Agent without obligation to verify such address and any such requests delivered to such address shall be deemed to be received.

### H.   ~~G.~~ Settlement, Release, Injunction and Related Plan Provisions

1.  *Subordinated Claims*

The Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination rights, except to the extent the Debtors have otherwise agreed in writing with the Holder of the applicable Allowed Claim or Interest.

2.  *Discharge of Claims and Termination of Interests*

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Interests in, the Debtors, any property of the Estates, the Plan Administrator or any property of the Wind Down Entities, including all Claims of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim or Proof of Interest based upon such Claim, debt, right, liability, obligation or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, liability, obligation or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim, liability, obligation or Interest has accepted the Plan.  Except as otherwise provided in the Plan, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.  For the avoidance of doubt, any Claims arising pursuant to section 502(h) of the Bankruptcy Code following the conclusion of any adversary proceeding shall not be discharged on or after the Effective Date.

3.  *Release of Liens*

**Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and cancelled, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Wind Down Entities and their successors and assigns.  Any Holder of such mortgage, deed of trust, Lien, pledge or other security interest (and the applicable agents for such holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such holder), and to take**

such actions as may be reasonably requested by the Plan Administrator to evidence such release, including the execution, delivery and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

4.  *Debtors' Release*

Except as otherwise specifically provided in the Plan with respect to the Preserved Potential Claims, for good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases and the implementation of the orderly liquidation contemplated by the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Released Parties are hereby conclusively, absolutely, unconditionally, irrevocably and forever released, waived and discharged by the Debtors, the Plan Administrator and the Estates, including any successor to, or assignee of the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, breach of contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the release of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, this Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act; *provided* that the release under this Section shall not apply to ~~any~~ (a) **any** Excluded Party, (b) Causes of Action to the extent arising out of conduct that occurred prior to the Petition Date, or (c) any Preserved Potential Claims to the extent such Preserved Potential Claims are brought by and for the benefit of the Wind Down Entities with the approval of the Plan Administrator~~, unless otherwise specifically provided in the Plan or the Plan Supplement~~.  Nothing in the Plan or Confirmation Order shall affect any

releases previously granted or approved by the Bankruptcy Court.

5. _Voluntary Release by Holders of Claims and Interests_

For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases, the implementation of the Plan, and the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, breach of contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Plan Administrator, FTX DM, the JOLs or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, FTX DM, the conduct of the businesses of the Debtors or FTX DM, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement, the FTX DM Global Settlement or this Disclosure Statement, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, this Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act.  Nothing in this Section shall cause the release of (a) any Excluded Party, (b) Causes of Action to the extent arising out of conduct that occurred prior to the Petition Date, or (c) any Preserved Potential Claims that are otherwise transferred to, and may be prosecuted by, the Wind Down Entity pursuant to the terms of the Plan.

6. _FTX DM and JOL Releases_

The releases in the FTX DM Global Settlement Agreement are hereby expressly incorporated and repeated herein.  Nothing in the Plan or Confirmation Order shall affect the releases previously granted or approved by the Bankruptcy Court pursuant to the order approving the FTX DM Global Settlement Agreement.

-141-

7.  *Scope of Releases*

**Each Person providing releases under the Plan, including the Debtors, the Plan Administrator, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.**

8.  *Exculpation*

**Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.**

**As of the Effective Date, to the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in section 10.4 or section 10.5 of the Plan, the Exculpated Parties shall neither have nor incur any liability to any Entity for any act or omission in connection with, related to, or arising out of these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) the administration and adjudication of Claims and Interests during these Chapter 11 Cases; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Plan, this Disclosure Statement, the Plan Supplement or any related contract, instrument, release or other agreement or document created or entered into in connection with these Chapter 11 Cases (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan, the trading or sale of cryptocurrencies and tokens in connection with these Chapter 11 Cases, the offer and issuance of any securities under or in connection with the Plan and the distribution of property, digital assets, or tokens under the Plan); or (d) any other transaction, agreement, event, or other occurrence related to these Chapter 11 Cases taking place on or before the Effective Date, other than liability resulting from any act or omission that is determined by Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act.  Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party.  Nothing in the Plan or Confirmation Order shall affect any exculpation orders previously granted or approved by the Bankruptcy Court.**

9.  *Injunction*

Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, the satisfaction and release pursuant to article 10 of the Plan shall also act as a permanent injunction against any Person who has held, holds or may hold Claims, Interests or Causes of Action from (a) commencing or continuing any action to collect, enforce, offset, recoup or recover with respect to any Claim, liability, obligation, debt, right, Interest or Cause of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Interests; and (d) asserting any right of setoff, subrogation or recoupment of any kind on account of or in connection with or with respect to any such Claim or Interest, notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise, against any Plan Asset, the Wind Down Entities, any Holder of a Claim or Interest or any initial or subsequent transferee.  Notwithstanding anything to the contrary in the Plan, all Holders of Claims, Interests or Causes of Action are enjoined from interfering with the Distributions contemplated by the Plan and from asserting any Claim or Cause of Action expressly preserved and vested exclusively in the Wind Down Entities as of the Effective Date.

10. *Limitations on Exculpations and Releases*

Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity:  (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post-Effective Date obligations, (b) arising under the FTX DM Global Settlement Agreement or (c) solely in the case of releases, expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, including the Preserved Potential Claims.

-143-

## 5.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the process of confirmation of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing at which the Debtors will seek confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**THE CONFIRMATION HEARING IS SCHEDULED TO BE HELD ON [•]OCTOBER 7, 2024 AT [•] [A/P].M. (ET) BEFORE THE HONORABLE JOHN T. DORSEY, UNITED STATES BANKRUPTCY JUDGE.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY ANNOUNCEMENT IN OPEN COURT AND/OR NOTICE(S) OF ADJOURNMENT FILED ON THE DOCKET WITH THE BANKRUPTCY COURT'S PERMISSION.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE APPLICABLE PARTIES SO AS TO BE ACTUALLY RECEIVED ON OR BEFORE 4:00 P.M. (PREVAILING EASTERN TIME) ON [•]AUGUST 16, 2024, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER.  UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The Debtors believe that section 1129 has been satisfied because, among other things:

1) the Plan complies with the applicable provisions of the Bankruptcy Code;

2) the Debtors, as plan proponents, have complied with the applicable provisions of the Bankruptcy Code;

3) the Plan has been proposed in good faith and not by any means forbidden by law;

4) any payment made or promised under the Plan for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in

-144-

connection with the Plan and incident to these Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

5) with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (see Section 5.C1.C—*Best Interests Test*);

6) each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to section 1129(b) of the Bankruptcy Code;

7) except to the extent that the Holder of a particular General Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed General Administrative Claims will be paid in full in Cash on the Effective Date;

8) except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement and release of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date; (ii) the date on which such Other Priority Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court;

9) on a substantively consolidated basis, at least one Class of Impaired Claims will vote in favor of the Plan, determined without including any vote in favor of the Plan by any insider holding a Claim;

10) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (see Section 5.D1.D—*Financial Feasibility*); and

11) all fees payable under section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

-145-

C.      **Best Interests Test**

1.   *Explanation of the Best Interests Test*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, Confirmation of the Plan requires that, with respect to each Class of Impaired Claims or Interests, each Holder of a Claim or Interest in such Class either (a) accepts the Plan or (b) receives or retains under the Plan on account of such Claim or Interest property of value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code (this latter clause is known as the "Best Interests Test").

To determine the probable distribution to Holders of Claims and Interests in each Impaired Class if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation.

The Debtors' chapter 7 liquidation value would consist primarily of the unencumbered and unrestricted cash held by the Debtors at the time of the conversion to a chapter 7 liquidation, the proceeds resulting from the sale of the Debtors' remaining unencumbered assets and properties by a chapter 7 trustee and Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised or settled.  The gross cash available for distribution would be reduced by the costs and expenses of the chapter 7 liquidation and any additional Administrative Claims that might arise as a result of the chapter 7 cases.  Costs and expenses incurred as a result of the chapter 7 liquidation would include, among other things, the fees payable to a trustee in bankruptcy and the fees payable to attorneys and other professionals engaged by such trustee.  Additional Administrative Claims could arise by reason of, among other things, the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of these Chapter 11 Cases.  Such Administrative Claims and any other Administrative Claims that might arise in a liquidation case or result from these Chapter 11 Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the Liquidation Proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a chapter 7 liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and Administrative Claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired Classes under the Plan.  If the hypothetical chapter 7 Liquidation Distribution to Holders of Claims or Interests in any non-consenting Impaired Class is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of the Holders of Claims or Interests in such Impaired Class.

2.   *Liquidation Analysis of the Debtors*

Amounts that a Holder of Claims and Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors

-146-

prepared by the Debtors' management with the assistance of their restructuring advisors, attached to this Disclosure Statement as <u>Appendix D</u> (the "<u>Liquidation Analysis</u>").

As more fully described in the Liquidation Analysis, underlying this analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.  The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change.  Actual results may vary materially from the estimates and projections set forth in the Liquidation Analysis.

The Liquidation Analysis was developed solely for purposes of the formulation and negotiation of the Plan and to enable Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner.  The Debtors do not intend and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events.  Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of actual future results.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

> 3.  *Application of the Best Interests Test to the Liquidation Analysis of the Debtors*

Notwithstanding the difficulties in quantifying with precision the recoveries to Holders of Claims and Interests, the Debtors believe that, based on a comparison between the recoveries under the Plan and the Liquidation Analysis, the Debtors' proposed Plan satisfies the requirements of the Best Interests Test.  As the following table indicates, non-consenting members of each Impaired Class will receive more (or no less) under the Plan than they would through a liquidation of the Debtors in a hypothetical chapter 7 case.

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
| --- | --- | --- | --- |
| | | PLAN | LIQUIDATION |
| 1 | Priority Tax Claims | 100% | 100% |
| 2 | Other Priority Claims | 100% | 100% |
| 3A | Secured Loan Claims | | 110% |

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
|---|---|---|---|
| | | PLAN | LIQUIDATION |
| | | 110% | |
| 3B | Other Secured Claims | N/A | N/A |
| 4 | Separate Subsidiary Claims | 100% | 100% |
| 5A | Dotcom Customer Entitlement Claims | 129% - 143% | 110% |
| 5B | U.S. Customer Entitlement Claims | 129% - 143% | 110% |
| 5C | NFT Customer Entitlement Claims | 100% | 100% |
| 6A | General Unsecured Claims | 125% | 110% |
| 6B | Digital Asset Loan Claims | 129% - 143% | 110% |
| 7A | Dotcom Convenience Claims | 119% | N/A |
| 7B | U.S. Convenience Claims | 119% | N/A |
| 7C | General Convenience Claims | 119% | N/A |
| 8A | PropCo Operating Expense Claims | 100% | 100% |
| 8B | Priority DM Claim | 46% - 51% | 26% - 29% |
| 8C | PropCo General Unsecured Claims | N/A | N/A |
| 9 | Cancelled Intercompany Claims | N/A | N/A |
| 10A | Senior Subordinated IRS Claims | [TBD]% | 100% |
| 10B | Senior Subordinated Governmental Claims | 3% - 18% | 4% - 14% |
| 10C | Junior Subordinated IRS Claims | 0% | 100% |
| 11 | Intercompany Interests | 0% | 0% |
| 12 | Preferred Equity Interests | 0% | 0% |
| 13 | Section 510(b) Preferred Equity Claims | 0% | 0% |
| 14 | Section 510(b) Other Equity Claims | 0% | 0% |
| 15 | Equitably Subordinated Claims | 0% | 0% |
| 16 | Other Equity Interests | 0% | 0% |
| 17 | FTT Claims and Interests | 0% | 0% |

| CLASS | DESCRIPTION | ESTIMATED RECOVERY | |
| --- | --- | --- | --- |
| | | PLAN | LIQUIDATION |
| 18 | *De Minimis* Claims | 0% | 0% |

Class 10B Senior Subordinated Governmental Claims consists of approximately $8.7 billion of claims filed by the CFTC and $199 million of claims filed by other governmental authorities.  The CFTC filed subordinated claims and such subordinated claims are estimated to receive 2 – 12% in a hypothetical chapter 7 liquidation.  The other governmental authorities' claims are assumed to be voluntarily subordinated pursuant to confirmation of the Plan, though such voluntary subordination has yet to be agreed to.  In a hypothetical chapter 7 case, such claims, to the extent Allowed, would rank as priority claims and receive a 100% recovery.  To the extent the other governmental authorities do not agree to subordination in the Plan, such claims would receive 100% recovery in the Plan.  The hypothetical chapter 7 liquidation recovery estimate of 4% - 14% is the consolidated recovery of both the CFTC subordinated claims and the other governmental authorities' priority claims.

Class 10C Junior Subordinated IRS Claims are subordinated pursuant to confirmation of the Plan; in a hypothetical chapter 7 liquidation, such claims, to the extent Allowed, would rank as priority claims, and receive 100% recovery.

Accordingly, the Debtors believe that the Plan will allow the realization of greater value for their respective Impaired Classes than a hypothetical liquidation.

## D.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation or reorganization is contemplated by the Plan.

The ability to make the distributions described in the Plan does not depend on future earnings or operations of the Debtors, but only on the orderly wind down of the Debtors' remaining assets.  Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

## E.    Acceptance by Impaired Classes

Generally, section 1129 of the Bankruptcy Code requires, as a condition to confirmation of the Plan, that each Impaired Class accept the Plan.  In Delaware, the requirements of section 1129 apply on a per-Debtor basis.  However, the substantive consolidation provisions under the Plan merge all Debtors other than the Separate Subsidiaries into one Debtor for the purposes of section 1129 of the Bankruptcy Code.  Accordingly, each Impaired Class will be treated as if their claims were against a single Debtor.

Holders of claims against Debtors that are not substantively consolidated will be paid in full satisfaction of their claims and are unimpaired.  A class of claims that is unimpaired

under the Plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Under section 1124 of the Bankruptcy Code, a class is impaired under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Holders of claims who fail to vote are deemed neither to accept nor to reject the plan.

## F.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, provided that the Plan has been accepted by at least one Impaired Class of creditors. Notwithstanding the failure of an Impaired Class to accept the Plan, the Plan will be confirmed in a procedure commonly known as cram-down, so long as the Plan does not "discriminate unfairly" and is "fair and equitable," for the purposes of the Bankruptcy Code, with respect to each Class of Claims or Interests on a substantively consolidated basis, that is Impaired under, and has not accepted, the Plan. Pursuant to section 11 of the Plan, the Debtors reserve the right to seek confirmation under section 1129(b) of the Bankruptcy Code, if necessary.

### 1.      _Unfair Discrimination_

The Plan does not "discriminate unfairly" for the purposes of section 1129 of the Bankruptcy Code if the Plan gives substantially equivalent treatment to each Class of equal rank; in determining whether a plan discriminates unfairly, courts take into account a number of factors, including the effect of applicable subordination agreements between parties.

### 2.      _Fair and Equitable_

The "fair and equitable" test applies to Classes of different priority and status and includes the general requirement that no Class of Claims receives more than 100% of the Allowed amount of the Claims in such Class. The condition that the Plan be fair and equitable also includes the following requirements, as applicable:

a.      with respect to a non-accepting Class of General Unsecured Claims, that either: (i) the Plan provides that each Claim Holder in such Class receive or retain, on account of such Claim, property of a value, as of the Effective Date, equal to the Allowed amount of such Claim or (ii) no Holder of any Claim or Interest that is junior to the Claims or Interests of such Class receives or retains any property under the Plan on account of such junior Claim or Interest; and

b.      with respect to a non-accepting Class of Interests, no Class of Interests junior to the non-accepting Class receives a distribution under the Plan.

3.   *Confirmation of the Plan Pursuant to Section 1129(b)*

The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class presumed to reject the Plan, and reserve the right to do so with respect to any other rejecting Class of Claims, and/or to modify the Plan. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by the acceptance of the Plan by at least one Class that is Impaired under the Plan.

The Debtors submit that the Plan does not "discriminate unfairly" for the purposes of section 1129(b) of the Bankruptcy Code because there are no Classes of equal rank that are receiving different treatment under the Plan.

The Debtors submit that the Plan is "fair and equitable" for the purposes of section 1129(b) of the Bankruptcy Code because, as set forth above and in the Plan, the Holders of Claims in Classes 1, 2, 3B, 4, 5C and 8A are Unimpaired and therefore deemed to have accepted the Plan. Further, no Class will receive more than 100% of the Allowed amount of the Claims in such Class under the Plan. The Holders of Claims or Interests in Classes 3A, 5A, 5B, 6A, 6B, 7A, 7B, 7C, 8B, 8C, 10A, 10B and 12 may not receive, and Holders of Claims or Interests in Classes 9, 11, 12, 13, 14, 15, 16, 17 and 18 will not receive, a distribution equal to the Allowed amount of their Claims or Interests, but no Holders of Claims or Interests junior to these Classes will receive a distribution under the Plan on account of such junior Claims or Interests.

Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the Debtors seek to cram down a rejecting Impaired Class.

## 6.    VOTING PROCEDURES

On [•] 2024, the Bankruptcy Court entered an order, among other things, approving the adequacy of this Disclosure Statement, establishing voting, solicitation and tabulation procedures in connection with Confirmation of the Plan, approving the form of the solicitation materials and documents included in the solicitation packages and various other notices, setting the voting record date, the Voting Deadline, the date of the Confirmation Hearing and other proposed confirmation timeline and establishing the relevant objection deadlines and procedures associated with Confirmation of the Plan (the "Solicitation Procedures Order") [D.I. [•]].

The Solicitation Procedures Order, a copy of which is attached to this Disclosure Statement as Appendix B, is hereby incorporated by reference as though fully set forth herein. The Solicitation Procedures Order should be read in conjunction with this Section 6—*Voting Procedures* of this Disclosure Statement.

If you have any questions about:  (a) the procedures for voting your Claim or Interest or with respect to materials that you have received or (b) the amount of your Claim or Interest, or wish to obtain (at no charge) an additional copy of the Plan, this Disclosure Statement or other solicitation documents, please contact:

> FTX Trading Ltd. Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11232
> Telephone: (888) 482-0049 (domestic toll-free) *or* +1 (646) 440-4176 (international)
> Email: FTXinfo@ra.kroll.com

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law and, under Bankruptcy Rule 3020(b)(2), it may make such a determination without receiving evidence if no objection is timely filed.

In particular, and as described in more detail below, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that:  (a) the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more of such Classes; (b) the Plan is "feasible," meaning there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan; and (c) the Plan is in the "best interests" of all Holders of Claims and Interests, meaning that all such Holders will receive at

least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

The Bankruptcy Court must find that all of the conditions mentioned above are met before it can confirm the Plan. Thus, even if all Classes of Impaired Claims and Interests accept the Plan by the requisite votes, the Bankruptcy Court must still make an independent finding that the Plan satisfies these requirements of the Bankruptcy Code, that the Plan is feasible and that the Plan is in the best interests of the Holders of Claims against and Interests in the Debtors.

UNLESS THE BALLOT BEING FURNISHED IS TIMELY RECEIVED BY THE SOLICITATION AGENT ON OR PRIOR TO [AUGUST 9]16, 2024 AT 4:00 P.M. (PREVAILING EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED TO BE SUBMITTED WITH SUCH BALLOT, THE DEBTORS MAY REJECT SUCH BALLOT AS INVALID AND, ACCORDINGLY, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN.  IN NO CASE SHOULD A BALLOT BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.

## A.    Parties-in-Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan.  Under section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a plan is deemed to have accepted the plan, and the plan proponent need not solicit such holder's vote.  Under section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, refer to Section 4—*Summary of the Plan*.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

**B.**     **Blocked Claims**

Certain Holders of Claims are subject to blocking sanctions imposed by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").  Pursuant to OFAC regulations, the Debtors have blocked and prohibited the transfer or sale of the Claims of such Holders (such Claims, "Blocked Claims") and have reported the Blocked Claims to OFAC. Unless authorized by OFAC, Holders of Blocked Claims will not be entitled to vote on any Plan proposed by the Debtors and will not be entitled to receive any distributions on account of their Blocked Claims.

**C.**     ~~B.~~ **Bahamas Claim Treatment for Customers**

In connection with the solicitation of the Plan, each Dotcom Customer has the right to irrevocably elect (the "Bahamas Opt-In Election") by the Voting Deadline to have their Dotcom Customer Entitlement Claims or Dotcom Convenience Claims, as applicable, administered in the FTX DM Liquidation rather than those in the Chapter 11 Cases.  Each Dotcom Customer may make the Bahamas Opt-in Election either by election on its timely filed, duly authorized and properly executed Ballot in the Chapter 11 Cases or by timely executing and filing a proof of debt in the FTX DM Liquidation, upon which its Dotcom Customer Entitlement Claim or Dotcom Convenience Claim shall constitute a Customer Entitlement Claim against FTX DM (each, a "DM Customer Entitlement Claim").  By validly making the Bahamas ~~Opt-in~~Opt-In Election, such Dotcom Customer will forever, fully and finally release and discharge the Debtors of all their claims against the Debtors and agree that it will not pursue any claim in the Chapter 11 Cases.  If a Dotcom Customer does not make the Bahamas Opt-In Election, such Dotcom Customer will forever, fully and finally release and discharge FTX DM of all their claims against FTX DM and agree that it will not pursue any claim in the FTX DM Liquidation.  Additionally, if a Holder of a Dotcom Customer Entitlement Claim or Dotcom Convenience Claim makes the Bahamas Opt-In Election on the Ballot and completes any other part of the respective Ballot or makes any other elections in the respective Ballot, (i) the Bahamas Opt-In Election will control, (ii) such Holder will be deemed to vote to accept the Plan, and (iii) any other elections made in the respective Ballot will be deemed null and void.

If a Dotcom Customer wishes to elect to have its Dotcom Customer Entitlement Claim or its Dotcom Convenience Claim resolved and satisfied in the FTX DM Liquidation Proceeding in The Bahamas, such holder must make the Bahamas Opt-In Election in respect of the entire amount of such Claim.  As explained further in the Bahamas Process Letter and respective Ballots, to make the Bahamas Opt-In Election such Holder must either:  (a)(1) check the box in Item 1 of their Class 5A or Class 7A Ballot, and (2) return the Ballot on or before the Voting Deadline; or (b)(1) take no action with respect to their Ballot or the voting and chapter 11 elections found on their FTX.com online portal and (2)(i) submit a proof of debt in the FTX DM Liquidation proceeding via the following link at https://digitalmarketsclaim.pwc.com (the "FTX DM Portal"), (ii) submit a confirmation via the FTX DM Portal that it has determined to have such proof of debt administered, reconciled, valued, settled, adjudicated, resolved and satisfied in the FTX DM Liquidation Proceeding, and (iii) complete all other required steps in the FTX DM Liquidation Proceeding (collectively (i) through (iii), the "Bahamas Requirements").

Making the Bahamas Opt-In Election on the Ballot is not sufficient for a Dotcom Customer to have its claim adjudicated in the FTX DM Liquidation Proceeding. Dotcom Customers must complete all of the Bahamas Requirements in order to have its claim be subject to the FTX DM Liquidation Proceeding.  If a Holder of a Dotcom Customer Entitlement Claim or Dotcom Convenience Claim does not make the Bahamas Opt-In Election, or makes the Bahamas Opt-In Election in its Ballot but fails to submit a proof of debt in the FTX DM Liquidation Proceeding and complete all other Bahamas Requirements in the FTX DM Liquidation Proceeding, its Class 5A Dotcom Customer Entitlement Claim or its Class 7A Dotcom Convenience Claim will, subject to effectiveness of the Plan, (i) forever, fully and finally release and discharge the Debtors with respect to such Claims, (ii) forever, fully and finally withdraw with prejudice such Claims from the Chapter 11 Cases and (iii) may not have your Claim administered, reconciled, valued, settled, adjudicated, resolved or satisfied the FTX DM Liquidation Proceeding.

A Holder of a Class 5A Dotcom Customer Entitlement Claim totaling more than $50,000 that makes the Bahamas Opt-In Election will be provided the right to make a Convenience Claim Election in the FTX DM Liquidation Proceeding via the FTX DM Portal.

Excluded Parties are not eligible to exercise the Bahamas Opt-in Election. "Excluded Party" means any (a) Control Person, Insider, or Affiliate of a Control Person or Insider, (b) holder or subsequent transferee of such holder of a Claim against any Debtor other than a Dotcom Customer Entitlement Claim or Dotcom Convenience Claim, (c) Person or any initial or subsequent transferee of such Person against whom the Debtors determine they have or may have any Claim (other than for withdrawals of cash or digital assets from the FTX.com Exchange), or (d) other person identified on a schedule to be provided by the Debtors to FTX DM.  Pursuant to the FTX DM Global Settlement Agreement, the Debtors will provide FTX DM with an initial list of Excluded Parties by no later than the mailing of ballots for the Plan.  The Debtors may supplement or modify such list from time to time up to the thirtieth (30th) day following the Bahamas Bar Date, at which time the list of Excluded Parties shall be final and binding on the Debtors and FTX DM.

FTX DM will administer, reconcile, value, settle, adjudicate, resolve or satisfy all DM Customer Entitlement Claims.  For the purposes of making distributions, the Debtors and FTX DM will coordinate the establishment of reserves and the timing and amount of distributions in the Chapter 11 Cases and FTX DM Liquidation.  Prior to distributions on Allowed Claims, both FTX DM and the Debtors will assess implied recoveries for Dotcom Customers and make equalizing distributions between one another to align recoveries. Customers who make the Bahamas Opt-in Election cannot, and will not, receive more than they would have received under the Plan.  Additionally, Customers who make the Bahamas Opt-in Election may recover less as their claims may be diluted by ineligible DM Customer Entitlement Claims, which would not have been allowed as a Dotcom Customer Entitlement Claim or Dotcom Convenience Claim under the Bankruptcy Code.

FTX DM will not admit or make any distributions on account of any DM Customer Entitlement Claims (whether an Eligible DM Customer Entitlement Claim or Ineligible DM Customer Claim) unless and until the holder of such DM Customer Entitlement

Claim has satisfied the Debtors' claims allowance process and distribution requirements as applied by FTX DM, including KYC procedures and requirements.

For all Bahamas Customers that make a valid and timely Bahamas Opt-In Election, FTX DM and the Bahamas JOLs will provide instructions with respect to all aspects of adjudicating such Holder's Claim via the following link at https://digitalmarketsclaim.pwc.com.

### **D.** ~~C.~~ Amounts for Voting Purposes

The amount for each Claim and Interest established in this subsection shall be used for voting purposes only and does not constitute the allowed amount of any claim or interest for any other purpose, including distributions under the Plan. In tabulating votes, the amount of the claim or interest, as applicable, associated with each holder's vote shall be determined as follows:

1. *Scheduled Claims Not Superseded by a Filed Proof of Claim or Preferred Equity Interest listed in the Equity List not Superseded by a Filed Proof of Interest*

   a. In the event a claim is not scheduled as contingent, unliquidated or disputed, the scheduled amount shall control for voting purposes.

   b. In the event a scheduled claim is scheduled as contingent, unliquidated or disputed, such claim shall be disallowed for voting purposes.

   c. In the event a Preferred Equity Interest is listed in the Equity List, the amount entitled to be paid out of the funds and assets of FTX Trading or West Realm Shires Inc., as applicable, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the corporation pursuant to its certificate of incorporation effective as of the Petition Date (such amount, the "Liquidation Amount").[15]

2. *Scheduled Claims Superseded by a Timely Filed Proof of Claim or listed Preferred Equity Interest superseded by a timely filed Proof of Interest*

   a. Subject to any Resolution Event (as defined below), in the event (i) a claim is not scheduled as contingent, unliquidated or

---

[15] The Liquidation Amount of a Preferred Equity Interest under the certificate of incorporation of FTX Trading or West Realm Shires Inc., as applicable, is generally defined as an amount equal to the greater of (i) one times the applicable original issuance price, plus any dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had all preferred shares been converted into common shares thereunder immediately prior to a liquidation event.

disputed and the holder of the claim timely filed a Proof of Claim (or an untimely Proof of Claim that has been allowed as timely by the Bankruptcy Court under applicable law on or before June 20, 2024 (the "Voting Record Date") or (ii) the Holder of the Preferred Equity Interest timely filed a Proof of Interest (or untimely Proof of Interest that has been allowed as timely by the Court under applicable law on or before the Voting Record Date), the asserted amount in the Proof of Claim or the Liquidation Amount of the asserted Preferred Equity Interests, as applicable, shall control for voting purposes; *provided* that if such Proof of Claim or Proof of Interest is filed as partially liquidated and partially unliquidated or contingent, such claim or Preferred Equity Interest will count for voting purposes only in the liquidated amount; *provided*, *further*, that if such Proof of Claim or Proof of Interest is subject to a pending objection or an assertion of disallowance under section 502 of the Bankruptcy Code from the Debtors or any other party-in-interest by the Solicitation Mailing Deadline, the scheduled amount or the Liquidation Amount of the Preferred Equity Interests listed in the Equity List shall then control for voting purposes.

b. Subject to any Resolution Event, in the event a scheduled claim is scheduled as contingent, unliquidated or disputed and the holder of the claim timely filed a Proof of Claim (or an untimely Proof of Claim that has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date), the asserted amount in the Proof of Claim shall control for voting purposes; *provided* that if such Proof of Claim is filed as partially liquidated and partially unliquidated or contingent, such claim shall count for voting purposes only in the liquidated amount; *provided*, *further*, that if (i) such Proof of Claim is wholly contingent, unliquidated, or disputed (based on the face of such Proof of Claim or as determined upon the reasonable review of the Debtors) or (ii) such Proof of Claim is subject to a pending objection or an assertion of disallowance under section 502 of the Bankruptcy Code from the Debtors or any other party-in-interest by the Solicitation Mailing Deadline, such claim shall count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 solely for the purposes of voting and satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; *provided*, *further*, that if the objection from the Debtors or any other party-in-interest is an objection to reduce the amount asserted

-157-

in such Proof of Claim, such claim shall count for voting purposes only in the reduced amount.

3. *A Filed Proof of Claim in Respect of an Unscheduled Claim or a Filed Proof of Interest in Respect of an Unlisted Preferred Equity Interest*

    a.    Subject to any Resolution Event, in the event that (i) a claim is not scheduled by the Debtors and the holder of the claim timely filed a Proof of Claim (or an untimely Proof of Claim that has been allowed as timely by the Bankruptcy Court under applicable law on or before Voting Record Date), or (ii) a Preferred Equity Interest is not listed in the Equity List and the holder of a Preferred Equity Interest timely filed a Proof of Interest (or an untimely Proof of Interest that has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date), the asserted amount in the Proof of Claim or the Liquidation Amount of the asserted Preferred Equity Interests, as applicable, shall control for voting purposes; *provided* that if such Proof of Claim or Proof of Interest is filed as partially liquidated and partially unliquidated or contingent, such claim or Preferred Equity Interest will count for voting purposes only in the liquidated amount; *provided*, *further*, that if (i) such Proof of Claim or Proof of Interest is wholly contingent, unliquidated, or disputed (based on the face of such Proof of Claim or Proof of Interest or as determined upon the reasonable review of the Debtors) or (ii) such Proof of Claim or Proof of Interest is subject to a pending objection or an assertion of disallowance under section 502 of the Bankruptcy Code from the Debtors or any other party-in-interest by the Solicitation Mailing Deadline, such claim or Preferred Equity Interest shall count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 solely for the purposes of voting and satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; *provided*, *further*, that if the objection from the Debtors or any other party-in-interest is an objection to reduce the amount asserted in such Proof of Claim or quantity of Preferred Equity Interests in such Proof of Interest, such claim or Preferred Equity Interests, as applicable, shall count for voting purposes only in the reduced amount.

4. *Resolution Event*

    a.    Notwithstanding the foregoing, with respect to all claims and Preferred Equity Interests in the Voting Classes, the Voting

Amount shall be the amount:  (i) settled and/or agreed upon by the Debtors and the applicable holder, as reflected in a document filed with the Bankruptcy Court; (ii) set forth in an order of the Bankruptcy Court; (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court and the applicable holder; or (iv) set forth in emailed instructions from the Debtors' counsel to the Solicitation Agent with the applicable holder copied (clauses (i) through (iv), the "Resolution Events").

Notwithstanding anything to the contrary:

a.      if a claim is scheduled as contingent, unliquidated or disputed and a Proof of Claim was not (i) filed by the applicable bar date for filing proofs of claim established by the Bankruptcy Court or (ii) deemed timely filed by an order of the Bankruptcy Court prior to the Voting Record Date, such claim shall be disallowed for voting purposes;

b.      holders of proofs of claim filed for $0.00 or zero cryptocurrency or other digital assets, as applicable, are not entitled to vote;

c.      holders of proofs of Preferred Equity Interests filed for $0.00 or zero Preferred Equity Interests are not entitled to vote;

d.      Claims that have been paid, scheduled to be paid in the ordinary course of business or otherwise satisfied are disallowed for voting purposes;

e.      Claims or Preferred Equity Interests that have been disallowed for voting or distribution purposes by an order of the Bankruptcy Court are disallowed for voting purposes;

f.      any creditor who has filed or purchased duplicate claims or Preferred Equity Interests within the same class shall, to the extent possible, be provided with only one Solicitation Package (as defined below) and one Ballot for voting a single claim or Preferred Equity Interest in such class, regardless of whether the Debtors have objected to such duplicate claims; and

g.      if a Proof of Claim or Proof of Interest is amended, the last filed Proof of Claim or Proof of Interest shall be subject to these procedures and will supersede any earlier filed Proof of Claim or Proof of Interest, and any earlier filed Proof of Claim or Proof of Interest will be disallowed for voting purposes.

### E.    ~~D.~~ Convenience Claim Election

Claim holders from Class 5A, Class 5B and Class 6A may irrevocably elect to have their respective Claims reduced to $50,000 and receive the treatment for Class 7A Dotcom Convenience Claims, Class 7B U.S. Convenience Claims or Class 7C General Convenience Claims, as applicable (this election, the "Convenience Claim Election").

Holders who make the Convenience Claim Election must vote to accept the Plan. Holders who make the Convenience Claim Election and otherwise indicate a vote to reject the Plan will be deemed to have voted to accept the Plan. Holders who make the Convenience Claim Election may receive a distribution that is less than the distribution such Holders would have received had they chosen not to make the Convenience Claim Election.

### F.    ~~E.~~ Stipulated Amount for Voting, Allowance and Distribution

Effective upon the Effective Date, the Debtors and Wind Down Entities may waive and not prosecute any Customer Preference Action (to the extent not designated by the Debtors as an Excluded Customer Preference Action) with respect to a Claim in Class 5A, Class 5B, Class 7A and Class 7B, if the holder of such Claim does not affirmatively make the Bahamas Election, and (i) votes to accept the Plan and (ii) agrees to a stipulated amount as set forth on its Ballot for voting, allowance and Distribution purposes. Pursuant to the terms of the FTX DM Global Settlement Agreement, FTX DM will have the right to manage and control the prosecution of any preference claim against any Holder of a DM Customer Entitlement Claim. The Debtors and the Wind Down Entities may still prosecute Customer Preference Actions in respect of a Claim in Class 5A, Class 5B, Class 7A and Class 7B, if the holder of such Claim agrees to the stipulated amount for voting, allowance and Distribution purposes but does not vote to accept the Plan, or votes to accept the Plan, but does not agree to the stipulated amount for voting, allowance and Distribution purposes. Excluded Customer Preference Actions are not waived by the Debtors or the Wind Down Entities regardless of whether the Claim holder agrees to the stipulated amount for voting, allowance and Distribution purposes. For the avoidance of doubt, any pending preference actions filed by the Debtors against any party shall be an Excluded Customer Preference Action, and the defendant of such action shall not be released from such action even if such holder properly agrees to the stipulated amount for voting, allowance and Distribution and votes in favor of the Plan. **IF A CLAIM HOLDER PROPERLY CONSENTS AND STIPULATES TO THE STIPULATED AMOUNT, THE STIPULATED AMOUNT WILL SUPERSEDE ANY FILED OR SCHEDULED CLAIM AND SUCH STIPULATED AMOUNT SHALL CONTROL FOR VOTING, ALLOWANCE AND DISTRIBUTION PURPOSES IN RESPECT OF THE APPLICABLE CLAIM.**

### G.    ~~F.~~ Voluntary Releases Under the Plan

The release and injunction language in section 10 of the Plan is described above in Section 4—*Summary of the Plan* of this Disclosure Statement.

**HOLDERS IN THE VOTING IMPAIRED CLASSES ~~AND NON-VOTING IMPAIRED CLASSES (OTHER THAN CLASS 9 CANCELLED INTERCOMPANY CLAIMS AND CLASS 11 INTERCOMPANY INTERESTS) WILL EITHER~~ WILL RECEIVE A BALLOT ~~OR ELECTION FORM, IN EACH CASE,~~ TO ALLOW SUCH HOLDERS UNDER CERTAIN CONDITIONS TO OPT OUT OF THE RELEASES CONTAINED IN SECTION 10.5 OF THE PLAN BY CLEARLY MARKING THE "OPT-OUT" BOX ON THE BALLOT ~~OR ELECTION FORM~~ PROVIDED TO SUCH HOLDER.  ASSUMING SUCH BALLOT ~~OR ELECTION FORM, AS APPLICABLE,~~ IS TIMELY RECEIVED AND IN PROPER FORM, APPLICABLE HOLDERS WHO CHECK THE "OPT-OUT" BOX ON THE BALLOT ~~OR ELECTION FORM~~ WILL NOT BE DEEMED RELEASING PARTIES FOR PURPOSES OF SECTION 10.5 OF THE PLAN.**

**HOLDERS IN THE NON-VOTING IMPAIRED CLASSES (OTHER THAN CLASS 9 CANCELLED INTERCOMPANY CLAIMS AND CLASS 11 INTERCOMPANY INTERESTS) WILL RECEIVE AN ELECTION FORM TO ALLOW SUCH HOLDERS TO OPT IN TO THE RELEASES CONTAINED IN SECTION 10.5 OF THE PLAN BY CLEARLY MARKING THE "OPT-IN" BOX ON THE ELECTION FORM PROVIDED TO SUCH HOLDER.  ASSUMING SUCH ELECTION FORM IS TIMELY RECEIVED AND IN PROPER FORM, APPLICABLE HOLDERS WHO CHECK THE "OPT-IN" BOX ON THE ELECTON FORM WILL BE DEEMED RELEASING PARTIES FOR PURPOSES OF SECTION 10.5 OF THE PLAN.**

### H. ~~G.~~ Classes Under the Plan

1. *Voting Impaired Classes*

Classes 3A, 5A, 5B, 6A, 6B, 7A, 7B, 7C, 8B, 8C, 10A, 10B and 12 are Impaired under, and entitled to vote to accept or reject, the Plan.  If a customer makes the Bahamas Opt-In Election, any vote on the Plan or any other election in the ballot submitted by such customer will be null and void.

2. *Unimpaired Classes of Claims*

Classes 1, 2, 3B, 4, 5C and 8A are Unimpaired under, and deemed under section 1126(f) of the Bankruptcy Code to have accepted, the Plan, and are therefore not entitled to vote on the Plan.

3. *Non-Voting Impaired Classes*

Classes 9, 11, 13, 14, 15, 16, 17 and 18 are Impaired and not entitled to any recovery under the Plan, and are therefore not entitled to vote on the Plan.

4. *Redesignation Reservation of Rights*

For any of the Voting Impaired Classes, the Debtors reserve the right to treat such Class as Unimpaired and conclusively deemed to accept the Plan.  In the event that the Debtors

exercise such right, the Debtors are authorized to disregard any Ballots previously submitted by Holders of such Claims and Interests in such affected Class.

**I.** ~~H.~~ **Solicitation Packages for Voting Classes**

As set forth in the Solicitation Procedures Order, the Debtors will distribute or cause to be distributed a solicitation package to each Holder of a Claim or Interests entitled to vote on the Plan (a "Solicitation Package"). The Solicitation Packages will contain:

(1)     the Cover Letter, which describes the contents of the Solicitation Package and recommends that all Holders of Claims and Interests in the Voting Classes vote to accept the Plan;

(2)     the Official Committee Letter, which states the Official Committee's recommendation to all Holders of General Unsecured Claims and Customer Entitlement Claims regarding voting on whether to accept the Plan;

(3)     To the extent the Ad Hoc Committee prepares a letter (which shall only be included in the Solicitation Package to be served on Holders of Class 5A Dotcom Customer Entitlement Claims and Class 7A Dotcom Convenience Claims);

(4)     The Bahamas JOLs Letter (which shall only be included in the Solicitation Package to be served on Holders of Class 5A Dotcom Customer Entitlement Claims and Class 7A Dotcom Convenience Claims);

(5)     the Solicitation and Voting Procedures;

(6)     the applicable form of Ballot;

(7)     this Disclosure Statement (and exhibits thereto, including the Plan);

(8)     the Solicitation Procedures Order (excluding exhibits);

(9)     the Confirmation Hearing Notice; and

(10)     any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims and/or Interests in the Voting Classes.

The Solicitation Package will be distributed via email in electronic format to all Holders of Claims and Interests in the Voting Classes to the email on file for such Holder, if any, and the email address listed on the filed Proof of Claim or Proof of Interest, as applicable, to the extent a Proof of Claim or Proof of Interest, as applicable, was filed and any email address other than the email address on file was used. If the message to either email address is returned as

undeliverable, or if the Debtors are not in possession of an email address for such Holders, the Solicitation Agent shall serve the Solicitation Package on such Holders in paper or electronic format (*i.e.*, USB flash drive format), via first-class mail to the extent a valid physical mailing address is known by the Debtors.  The Debtors and Solicitation Agent are not required to conduct any additional research for updated addresses or email addresses based on undeliverable Solicitation Packages.

**J.**    ~~I.~~ **Solicitation Packages for Non-Voting Classes**

1.    *Unimpaired Classes of Claims Not Eligible to Vote*

Holders of Claims who are not entitled to vote because they are unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive the *Notice of Non-Voting Status to Holders of Unimpaired Interests and Claims* and the Confirmation Hearing notice in electronic format.

2.    *Classes Not Eligible to Vote*

Holders of Claims or Interests (other than Class 9 Cancelled Intercompany Claims and Class 11 Intercompany Interests) who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Notice of (I) Non-Voting Status to Holders of Impaired Interests and Claims* and the Confirmation Hearing notice in electronic format.

**K.**    ~~J.~~ **Voting Procedures**

Ballots cast by Holders in Classes entitled to vote and Election Forms must be received by the Solicitation Agent by the Voting Deadline at the following address or, with respect to Ballots and Election Forms eligible to be cast electronically, through the electronic ballot ("E-Ballot") platform at the website below:

**If by First-Class Mail, Courier or Hand Delivery:**

FTX Trading Ltd. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**If Electronically by the E-Ballot Platform:**

Either (i) visit the Solicitation Agent's website at https://restructuring.ra.kroll.com/FTX/ and follow the instructions to submit your Ballot or (ii) visit the FTX Customer Portal and click on the "Vote – Proceed to Kroll" link, and follow the instructions set forth on the website to submit your Ballot or Election Form.

IF YOU HAVE ANY QUESTIONS ON THE VOTING PROCEDURES, PLEASE CALL THE SOLICITATION AGENT AT (888) 482-0049 (DOMESTIC

TOLL-FREE) *OR* +1 (646) 440-4176 (INTERNATIONAL), OR CONTACT THE
SOLICITATION AGENT AT FTXINFO@RA.KROLL.COM.

Ballots received after the Voting Deadline will not be counted or considered for
any purpose in determining whether the Plan has been accepted or rejected.  The method of
delivery of Ballots and Election Forms to be sent to the Solicitation Agent is at the election and
risk of each Holder of a Claim or an Interest.  Except as otherwise provided in the Plan, such
delivery will be deemed made only when the Ballot or Election Form is actually received by the
Solicitation Agent.  Sufficient time should be allowed to ensure timely delivery.  Ballots must be
signed and legible, must be clearly marked to either accept or reject the Plan (but not both) and
must clearly make the appropriate elections.  If a Ballot or Election Form is signed by a trustee,
executor, administrator, guardian, attorney-in-fact or other person acting in a fiduciary or
representative capacity, such person must indicate such capacity when signing the Ballot.
Delivery of a Ballot or Election Form to the Solicitation Agent by facsimile, email or any other
means not specifically provided for herein will not be accepted; *provided* that, for the avoidance
of doubt, a Ballot or Election Form may be submitted via the online E-Ballot portal.  No Ballot
or Election Form should be sent to the Debtors or the Debtors' financial or legal advisors, agents
or representatives (other than the Solicitation Agent) and, if so sent, will not be counted.

Any voter that has delivered a valid Ballot may not change its vote, except in
accordance with the Solicitation Procedures Order.  In the case where more than one timely,
properly completed Ballot voting the same Claim(s) or Interest(s) is received by the Solicitation
Agent, only the last properly executed Ballot timely received shall be counted unless the Holder
of the Claim or Interest receives Bankruptcy Court approval to have the Ballot that bears an
earlier date counted.

Subject to certain restrictions and requirements set forth in section 1127 of the
Bankruptcy Code and the restrictions on modifications set forth in the Plan, the Debtors or the
Plan Administrator, as applicable, may alter, amend or modify the Plan, without additional
disclosure pursuant to section 1127(b) of the Bankruptcy Code.  If the Debtors make changes in
the terms of the Plan materially adverse to any Holder of Claims or Interests or if the Debtors
waive a material condition to the effectiveness of the Plan described in article 11 of the Plan, the
Debtors will disseminate additional solicitation materials to such affected Class and will extend
the solicitation period, in each case to the extent directed by the Bankruptcy Court.  After the
Confirmation Date and prior to substantial consummation of the Plan, the Debtors may institute
proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to
remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure
Statement or the Confirmation Order with respect to such matters as may be necessary to carry
out the purposes of the Plan.

**7.**   **ADDITIONAL FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

**A.**   **Risks Related to the Debtors and These Chapter 11 Cases**

1.   *General*

It is impossible to predict with certainty the amount of time that it will take to wind down these Chapter 11 Cases or to assure parties in interest that the Plan will be confirmed. A delay in the bankruptcy proceedings to confirm the Plan will also involve additional expense.

2.   *The Debtors Will Be Subject to Risks and Uncertainties Associated with These Chapter 11 Cases*

For the remainder of these Chapter 11 Cases, the Debtors' ability to develop and execute a chapter 11 plan will be subject to the risks and uncertainties associated with chapter 11.  These risks include the following: (a) ability to develop, confirm and consummate the Plan; (b) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee or to convert these Chapter 11 Cases to chapter 7 proceedings; and (c) the actions and decisions of the Debtors' creditors and other third parties who have interests in these Chapter 11 Cases that may be inconsistent with the Debtors' objectives.  Because of the risks and uncertainties associated with these Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the remainder of these Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.   *Undue Delay in Confirmation May Result in Additional Costs*

If Confirmation and Consummation of the Plan do not occur expeditiously, these Chapter 11 Cases could result in, among other things, increased costs for professional fees and similar expenses.

-165-

### B.    Risks Related to the Plan

1.    *Holders of Claims and Interests May Object to the Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify claims against, and interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation and (b) to use the acceptances received from any Holder of Claims or Interests pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could materially adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

2.    *The Debtors May Fail to Satisfy the Solicitation Requirements Requiring a Re-Solicitation*

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Package to all Holders of Claims as of the voting record date in the Classes entitled to vote.  Accordingly, the Debtors believe that the solicitation is proper under section 1125 of the Bankruptcy Code.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the Confirmation of the Plan could be denied.  If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or to solicit votes from one or more Classes that were not previously solicited.  The Debtors cannot provide any ~~assurances~~assurance that such a re-solicitation would be successful.  Re-solicitation could delay or jeopardize confirmation of the Plan.  Non-confirmation of the Plan could result in protracted chapter 11 cases.

3.     _Certain Customers and Creditors May Bring Litigation Against the Debtors_

Certain of the Debtors' customers and creditors have and may continue to bring and prosecute litigation against the Debtors during these Chapter 11 Cases, the outcome of which is uncertain. In general, litigation can be expensive and time consuming to bring or defend against. Although the Debtors believe the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, customers, creditors and other parties-in-interest may bring objections to challenge Confirmation of the Plan. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors' estates, however, could be material.

4.     _Outcome of Current and Future Litigation Brought by the Debtors Is Uncertain_

As discussed in Section 3.~~G~~1.G—_Litigation_, the Debtors are currently engaged in ongoing litigation. Although the Debtors believe that they will succeed in the litigation, there is a risk that the Debtors may lose some or all of the issues, which, depending on the priority of the ultimate claims, could have substantial impact on the Debtors' estates and distributable assets.

5.     _The Bankruptcy Court May Not Grant the Debtors' Request for Nonconsensual Confirmation_

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, the Bankruptcy Court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan.

6.     _The Results of an Actual Chapter 7 Liquidation May Be Different from the Liquidation Analysis_

Conversion to chapter 7 liquidation would, in the Debtors' view, produce a less favorable outcome for Holders of Claims and Interests than would the Plan. However, underlying the Liquidation Analysis is the extensive use of estimates and assumptions that, although considered reasonable by the Debtors' management and advisors, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Actual results may vary materially from the

-167-

estimates and projections set forth in the Liquidation Analysis. Events and circumstances subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated.

7.    _Plan Releases, Injunctions and Exculpations May Not Be Approved_

There can be no assurance that the Plan releases, injunctions and exculpations, as provided in article 10 of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

8.    _The Plan May Not Be Confirmed_

The Debtors make no ~~assurances~~assurance that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.

Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests would receive with respect to their Allowed Claims or Allowed Interests in a subsequent plan of reorganization or liquidation.

9.    _Conditions Precedent to the Plan Becoming Effective May Not Be Satisfied_

There can be no assurance as to such timing or as to the occurrence of the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions precedent to the effectiveness of the Plan will be met or that the other conditions to Consummation, if any, will be satisfied or sufficiently waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

10.    _Continued Risk upon Confirmation and Potential Appeal of Confirmation_

Even if the Plan is consummated, there may be continued risks, including certain risks that are beyond the control of the Debtors, such as deterioration of general market conditions or other changes in economic conditions, changes in the digital asset industry, potential revaluing of assets due to other chapter 11 proceedings and increase in expenses. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals. Even if the Plan is confirmed, the Debtors will continue to face uncertainty. Specifically, it is possible that the Plan's confirmation is appealed and its implementation subsequently paused until further litigation takes place.

11.    *The Value of Preference, Avoidance and Litigation Proceeds Is Uncertain, Which May Affect the Value That Can Be Distributed to Holders of Claims Entitled to Receive Litigation Proceeds*

Pursuant to the Plan, distributions to holders of Allowed Claims will be funded in part by the proceeds of preference and avoidance actions as well as other litigation claims. Pursuant to the Plan, Holders of Claims entitled to litigation proceeds will receive periodic distributions on account of recoveries from these causes of action.  The Debtors do not offer any assurance that these actions and litigations will be successful.  Accordingly, it is impossible to predict with certainty the size or timing of any resulting distributions.

12.    *The Amount and Timing of Available Distributions, if Any, May Vary*

While the Debtors have attempted to project what they believe are likely Distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that Holders will receive the Distributions described in the Plan.  The projections will necessarily be affected by events with unknown or uncertain timing, including, among other things, recoveries generated in connection with the liquidation of all of the Debtors' remaining assets (including, without limitation, the recoveries, if any, on account of the Preserved Potential Claims and the proceeds from Avoidance Actions and litigation Claims, after the resolution of any pending appeals), the outcome of objections to Claims, and the cost and expenses of such actions and generally administration and winding down of the Wind Down Entities.  Additionally, the timing of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on account of Allowed Claims.

13.    *The Debtors May Determine to Treat Quoine as an Excluded Entity Prior to or After the Confirmation Date of the Plan, Which May Affect the Treatment of Claims Against Quoine*

As described in Section 1.C—*Excluded Entities*, the Debtors may determine, no later than 180 days after the Confirmation Date of the Plan, to exclude Quoine from the Plan and treat Quoine as an Excluded Entity in the event that the Singapore International Commercial Court has not entered orders in form and substance reasonably acceptable to the Debtors (i) recognizing the Chapter 11 Case of Quoine in Singapore and (ii) granting full force and effect in Singapore to the Confirmation Order, the Digital Assets Estimation Order and the Claims Bar Date.  There is no assurance that the Singapore International Commercial Court will recognize Quoine's Chapter 11 Case or grant full force and effect to any of the orders entered in these Chapter 11 Cases.  There is also no assurance that any orders entered by the Singapore International Commercial Court will be in form and substance reasonably acceptable to the Debtors.

In the event the Debtors determine to exclude Quoine from the Plan and treat Quoine as an Excluded Entity, (i) any votes cast by Holders of Claims against Quoine, including any elections, will not be counted and will be null and void and (ii) Claims held against Quoine will not receive any Distributions under the Plan and the Debtors may liquidate Quoine in

accordance with applicable local law.  Accordingly, in such event, the treatment and ultimate recoveries on account of Claims held against Quoine may be materially different from the treatment and ultimate recoveries on account of Claims held against the Consolidated Debtors.

14.     *The Consensus Rate Has Not Been Approved By the Bankruptcy Court and is Subject to Change*

As described in Section 1.E—*Highlights of the Plan*, the Debtors, various governmental authorities and other stakeholders have negotiated supplemental interest payments at the Consensus Rate to creditors.  The Consensus Rate and the settlements required to support the supplemental payments to creditors at the Consensus Rate have not been approved by the Bankruptcy Court, and the Bankruptcy Court may not approve the additional payments at the Consensus Rate or the settlements required to support such payments.

There can be no assurance that the Debtors will have sufficient funds to pay interest at the Consensus Rate.  Risks that could prevent payment of interest at the Consensus Rate include changes in the price of assets of the Debtors and unexpectedly large customer or other creditor claims, as well as any delays in the confirmation of the Plan, the disposition of assets or the reconciliation of claims.

Additionally, the Consensus Rate may be set at a lower rate—or removed—as agreed to by the Debtors and other relevant stakeholders or as determined by the Bankruptcy Court.

15.     *The Supplemental Remission Fund Has Not Been Approved By the Bankruptcy Court and is Subject to Change*

As described in Section 4.B.7—*Supplemental Remission Fund*, the Debtors have requested that the CFTC and other governmental agencies agree to establish the Supplemental Remission Fund and to use such fund to facilitate supplemental Distributions by way of remission to eligible creditors using funds otherwise payable to governmental creditors.  The CFTC and the other governmental agencies have not agreed to establish the Supplemental Fund or agreed to any settlement with respect to using any funds they would otherwise receive in the Chapter 11 Cases to supplement creditor distributions.

The Supplemental Remission Fund, the Proposed CFTC Settlement and any other settlements with other governmental agencies have not been approved by the Bankruptcy Court.  There is no assurance that the Bankruptcy Court will approve the Supplemental Remission Fund or any proposed settlement on their current terms.  Accordingly, there can be no assurance that the Supplemental Remission Fund will be established, that there will be any funds available in the Supplemental Remission Fund for Distribution to creditors or that if there are any Distributions, that such Distributions will be made pursuant to the terms described in this Disclosure Statement.

C.      **Additional Risks**

1.      _Digital Assets May Be Subject to Loss, Damage, Theft, or Restriction on Access.  Additionally, Incorrect or Fraudulent Digital Asset Transactions May Be Irreversible_

A substantial part of the Debtors' businesses—and the value they represent—involves the possession of or investment in digital assets.  There is a risk that part or all of the digital assets could be lost, stolen or destroyed.  Access to digital assets could be restricted by cybercrime, such as the theft of private keys.  Given the highly publicized Chapter 11 Cases, the Debtors, or a party in custody of their digital assets, could be an appealing target to hackers or malware distributors seeking to destroy, damage, or steal digital assets.  Hackers or malicious actors may attempt to steal the Debtors' digital assets, such as by an attack on the Debtors' networks' source code, third-party platforms, custodian's infrastructure and personnel, storage locations or software, general computer systems or networks.  Access to the Debtors' digital assets could also be restricted by other human actions (such as a terrorist attack) or by natural events (such as an earthquake or flood).  It is also possible that, through computer or human error, whether caused by the Debtors, their customers, its vendors, or otherwise, the Debtors' digital assets could be transferred in incorrect amounts or to unauthorized third parties or accounts.

In general, in the event of any such adverse event that affects the Debtors' control and/or possession of its customer digital assets, the Debtors may be unable to prevent loss, damage, or theft.  Furthermore, digital asset transactions are irrevocable.  Therefore, in any event described in this Section, the Debtors may have extremely limited or no effective means of recovering any lost, stolen or destroyed digital assets.  As a result, any of these events may also adversely affect the Debtors' operations and, consequently, the value of the Debtors.

2.      _The Debtors' Assets Are Highly Correlated to the Volatility of the Digital Asset Markets_

A substantial portion of the Debtors' assets are correlated to the historically volatile digital asset market.  Sudden downward movements in particular digital assets or the digital asset market as a whole are not uncommon.  Such movements could result from a range of factors, including but not limited to general macroeconomic conditions or specific events.  For example, during 2022, digital asset prices quickly deteriorated in response to certain events, including the Debtors' own bankruptcy filing.  A sudden decline in the value of the Debtors' digital assets may adversely affect the fair market value of the Debtors' assets, which could result in lower recoveries for Holders of Claims.

3.      _Digital Assets Are Not Subject to FDIC or SIPC Protections_

Digital assets are not typically held by a banking institution or a member of the FDIC or the Securities Investor Protection Corporation ("SIPC") and, therefore, digital assets are not typically subject to the protections provided to depositors with FDIC or SIPC member institutions.

-171-

4.      *The Debtors May Be Required to Obtain, and to Comply with, Government Permits and Approvals*

In order to conduct their businesses lawfully, the Debtors may be required to obtain, and to comply with, any necessary conditions, numerous permits and licenses from international governmental agencies.  The process of obtaining and renewing necessary permits and licenses can be lengthy and complex; they can also sometimes result in the establishment of conditions that make the project or activity for which the permit or license was sought unprofitable or otherwise unattractive.  In addition, such permits or licenses may be subject to denial, revocation or modification under various circumstances.  Failure to obtain or comply with the conditions of permits or licenses, or failure to comply with applicable laws or regulations, may result in the delay or temporary suspension of the Debtors' operations.

5.      *Claims Could Be More Than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of Distributions in one or more Classes to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the assumptions underlying the projected recoveries discussed in this Disclosure Statement, and the variation may be material.

6.      *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, given the poor condition of the Debtors' prepetition recordkeeping, as described in Sections 2.B.21.B.2—*The Commingling and Misuse of Customer Deposits at the FTX.com Exchange and Corporate Funds* and 3.PO—*Interim Reports of John J. Ray III* of this Disclosure Statement, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement is accurate.

7.      *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

-172-

8.      _No Representations Outside This Disclosure Statement Are Authorized_

No representations concerning or related to the Debtors, these Chapter 11 Cases, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

9.      _Forward-Looking Statements Are Not Assured, and Actual Results May Vary_

This Disclosure Statement contains forward-looking statements.  These forward-looking statements include factors that could cause actual results to differ materially, such as:  those factors described in this Section 7—_Additional Factors to Be Considered Prior to Voting_ of this Disclosure Statement; the Debtors' ability to obtain Bankruptcy Court approval with respect to motions in these Chapter 11 Cases; the effects of the Bankruptcy Court rulings in these Chapter 11 Cases and the outcome of the cases in general; the length of time the Debtors will remain in these Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of their interests in these Chapter 11 Cases; risks associated with third-party motions in these Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the increased administrative and restructuring costs related to these Chapter 11 Cases; and the payments of Allowed Claims and the amount of expenses projected to recognize recoveries and reconcile such Claims.

10.     _No Legal or Tax Advice Is Provided to You by This Disclosure Statement_

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of Claims and Interests against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such Holder's Claims and Interests.  Holders of Allowed Claims and Allowed Interests should carefully review Section 8—_Material United States Federal Income Tax Consequences of the Plan_ of this Disclosure Statement to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Debtors.  This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

11.     _Governmental Laws, Regulations and Actions Could Adversely Affect the Debtors_

The Debtors are subject to various federal, state and local laws, orders and regulations.  Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtors' profitability and have a material adverse effect on their

-173-

financial position, liquidity and cash flows.  Such laws and regulations may require more stringent and costly measures.

12.   *The Debtors Are Under Investigation by Federal, State and International Regulators and Such Investigations May Adversely Affect the Debtors*

The Debtors are subject to various investigations, inquiries, requests for information and informal and formal proceedings from federal, state and international authorities related to the FTX Group's prepetition conduct.  The Debtors have cooperated with the relevant authorities regarding these investigations and provided documents responsive to the requests, and continue to work with such authorities on investigations related to the businesses and prepetition conduct of the FTX Group.  At this time, it is impossible to estimate the impact of such investigations.

The Debtors continue to be subject to ongoing proceedings, as well as investigations of potential claims, and it is possible that parties may commence additional litigation against the Debtors.  In addition, as a result of these investigations, the Debtors could be subject to additional civil or criminal penalties or administrative sanctions, including fines, disgorgement, restitution, compliance orders and suspension of licenses, any of which could adversely affect the Debtors' financial condition and creditor recoveries.

13.   *Certain Claims Filed by Governmental Authorities May Adversely Affect the Debtors*

Certain governmental authorities have filed significant claims against the Debtors, which may jeopardize plan confirmation or reduce recoveries for creditors.

On September 28, 2023, the CFTC filed six proofs of claim against certain Debtors in the aggregate amount of $52.2 billion ($8.7 billion each).  The CFTC's claim is based on the action the CFTC filed in the Southern District of New York against FTX Trading on December 21, 2022, alleging violations of the Commodity Exchange Act.

On September 28, 2023, the NJ Bureau filed five proofs of claim against certain Debtors in the aggregate amount of $633 million ($126.6 million each).  The NJ Bureau asserted a claim against the Debtors for purported violations of the NJ Securities Laws.  Specifically, the NJ Bureau alleged, among other things, that the Debtors' Earn program was in violation of the NJ Securities Laws and may have constituted a sale of unregistered securities.

On September 29, 2023, the MS Division filed five proofs of claim against certain Debtors in the aggregate amount of $323 million ($64.6 million each).  The MS Division asserted a claim against the Debtors for purported violations of the securities laws of Mississippi, including, among other things, that the Debtors sold unregistered securities and materially misled investors in connection with the Debtors' Earn program.  The MS Division noted in its proof of

claim that it was not seeking distributions on its claim for its own benefit; rather the MS Division is hoping to increase recovery for victims of the Debtors.

The resolution of these claims may impact the Debtors and distributions to Holders of Allowed Claims. Although the Debtors may establish reserves as they deem necessary, the amounts that the Debtors reserve could vary significantly from any amounts the Debtors ultimately pay due to the inherent uncertainties in claims resolution and settlement. Additionally, any objections raised by the aforementioned governmental authorities may imperil or delay plan confirmation.

14. _The Debtors May Be Unable to Recover Assets Seized by Governmental Authorities_

The Debtors may be unable to recover any material amount of assets seized by various domestic and foreign governmental authorities. Further, there can be no assurance as to the timing or outcome of any adjudication of the ownership of any seized assets. While the Debtors will continue to cooperate in good faith with these various governmental authorities, the circumstances of these Chapter 11 Cases make it impossible to predict the resolution of proceedings regarding these assets or the timing thereof.

15. _No Admission Is Made_

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

8.    **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Wind Down Entities, and certain Holders entitled to vote on the Plan.  The following summary does not address the U.S. federal income tax consequences to Holders who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or those who have timely made the Bahamas Opt-In Election or Holders who will not receive any Distribution and are deemed to reject the Plan.  The Debtors intend to treat FTX DM as an intermediary for U.S. tax purposes, *i.e.*, Holders who make the Bahamas Opt-In Election and receive payments pursuant to the FTX DM Liquidation will in effect be receiving payments through an agent or intermediary.  In addition, Debtors believe that any such amount transferred by FTX DM to any such Holder will be treated for U.S. tax purposes as a payment made by the Wind Down Entities.  The U.S. federal income tax consequences described below should therefore apply to them as well.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury's interpretive regulations (the "Treasury Regulations"), judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income No opinion of counsel has been sought or obtained with respect to any tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRSPlan.  No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any of the tax aspects of the contemplated transactions. tax consequences of the Plan, and the discussion below is not binding on the IRS or other authorities.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. Holders are urged to consult their U.S. tax advisors.

–This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address theall aspects of U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, small business investment companies, regulated investment companiestaxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, real estate investment trusts, banks and other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims through,small business investment companies, regulated investment companies, tax-exempt entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, partnerships or other pass-through entities treated as pass-through vehicles for U.S. federal income tax purposes,

-176-

personscontrolled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, persons who received their Claims as compensation, dealers in securities or foreign currency, traders that elect to use the mark-to-market method of tax accounting for their securities, and persons whose Claims arecurrencies, U.S. expatriates, persons who hold Claims or who will hold any consideration received under the Plan as part of a straddle, hedging, constructive sale, orhedge, conversion transaction). In addition, this discussion does not address the Foreign Account Tax Compliance Act, the alternative minimum tax, the "Medicare" tax on net investment income, or U.S. federal taxes other than income taxes. Unless otherwise indicated, this discussion assumes that all Claims are held as "capital assets" (generally, property held for investment) within the meaning of, or other integrated investment, persons using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, and Holders that prepare an "applicable financial statement" (as defined in section 1221451 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their respective forms).

This summary assumes that each Holder holds its Claims as a "capital asset" within the meaning of section 1221 of the Tax Code. Additionally, this discussion does not address the implications of the alternative minimum tax, the base erosion and anti-abuse tax, or the "Medicare" tax on net investment income. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors or Holders based upon their particular circumstances. This summary does not discuss any tax consequences of the Plan that may arise under any laws other than U.S. federal income tax law, including under state, local, or non-U.S. tax law. Furthermore, this summary does not discuss any actions that a Holder may undertake with respect to its Claims, other than voting such Holder's Allowed Claim and receiving the consideration provided under the Plan, or with respect to any actions undertaken by a Holder subsequent to receiving any consideration under the Plan.

As used herein, the term "U.S. HolderPerson" means a beneficial owner of a Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a

valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments Claims, you should consult your own tax advisor.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.  All Holders are urged to consult their tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

THE FOLLOWING SUMMARY OF MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES APPLICABLE UNDER THE PLAN, INCLUDING THE IMPACT OF TAX LEGISLATION.

## A.    U.S. Federal Income Tax Consequences to ~~U.S. HOLDERS~~the Customers

~~The Debtors intend to take the position that Consummation of the Plan constitutes an exchange of a prepetition Claim for a meaningfully different Claim against one or more Wind-Down Entities and is a taxable event for U.S. tax purposes.  To the extent relevant for any reporting or other U.S. tax purposes, the Debtors also intend to take the position that no prior activity or decision of the Debtors (e.g., the filing of chapter 11 petitions) caused U.S. Holders to have a taxable event for U.S. tax purposes with respect to their claims.  The Debtors also intend to take the position that amounts denominated as Interest under the Plan should be treated as interest income for US Federal income tax purposes.  These conclusions are not clear under current law, however, and there can be no assurance that the IRS will agree with them.  U.S. Holders are urged to consult their own tax advisors regarding their validity.  The rest of this disclosure assumes their validity for purposes of reaching other conclusions.~~

Set out below is a discussion of the likely U.S. tax consequences of receiving Distributions pursuant to the Plan to individuals who were Customers of the FTX.US Exchange ("U.S. Customers") and individuals who were Customers of the FTX.com Exchange ("Non-U.S. Customers").  The discussion assumes that all U.S. Customers are U.S. Persons, and that no Non-U.S. Customers are U.S. Persons.  The discussion does not deal with any special categories of persons, such as traders or dealers in Claims, secondary-market purchasers or sellers, current or former employees, suppliers or lenders to one or more of the Debtors, other persons with special relationships with the Debtors, individuals who hold Claims in connection with their conduct of a trade or business, U.S. Persons who were customers of the FTX.com Exchange, non-U.S. Persons who were customers of the FTX.US Exchange, Holders with Disputed Claims, or individuals who have acquired their Claims from any of the persons described above.  People in such special categories are urged to consult their tax advisors regarding how their particular circumstances might affect the tax consequences of their receipt of Distributions under the Plan.

i.        *U.S. Customers*

The U.S. tax treatment of a U.S. Customer under the Plan is uncertain under current law, and it is therefore not possible for the Debtors to reach any conclusions in this regard.  However, the Debtors have endeavored in the discussion below to provide U.S. Customers with a view of the potential U.S. tax consequences of their treatment under the Plan. The discussion below is simplified for ease of understanding and is not intended to be a full discussion of their potential U.S. tax treatment.  The Debtors cannot be sure that the IRS will agree with any particular portion of this discussion, and no ruling or guidance has been sought by the Debtors with regard to the U.S. tax treatment of U.S. Customers.  U.S. Customers should therefore consult their own tax advisors regarding their treatment under the Plan and any associated uncertainties and risks.  The Debtors are not providing any tax advice with respect to the U.S. tax consequences of participating in the Plan.

The transfer by the Debtors of all of their assets to the Wind Down Entities on the Effective Date will be a taxable event for the Debtors, and it is expected to be treated as a taxable event for U.S. Customers (who will be deemed to have in effect exchanged their Claims against particular Debtors for claims against the Wind Down Entities).  As a result, U.S. Customers are expected to recognize gain or loss on the Effective Date equal to the difference between the tax basis of their Claims and the fair market value of their Claims on the Effective Date (not including any portion of such Claims that reflects the right to receive Consensus Interest, which is defined and discussed further below).  The Debtors expect that for most U.S. Customers, the fair market value of their Claims for this purpose should approximately equal the amount of U.S. Customer Entitlement Claim as set forth in the applicable Ballot (unless the Debtors and the U.S. Customer have agreed in writing to a different amount).  The Debtors cannot be certain that the IRS will ultimately agree with the Debtors' views regarding the likely fair market value of the Claims on the Effective Date, and U.S. Customers should consult their own tax advisors concerning the possibility of taking any different position, or the risk that the IRS might ultimately take a different position. U.S. Customers who do not believe that such amount on the Ballot accurately reflects the amount of their Claims should consult a U.S. tax advisor concerning the potential U.S. tax consequences of the relevant facts.

U.S. Customers who may receive additional distributions from a Supplemental Remission Fund should consult a U.S. tax advisor regarding the potential U.S. tax consequences of such potential receipt.  As discussed further below, the Debtors are unable to speculate on the potential receipt of amounts from a Supplemental Remissions Fund and the associated U.S. tax consequences.

The character of any such gain or loss is expected to be long-term capital gain or loss, assuming the relevant Claim has been held as a capital asset since the Petition Date.  As noted above, this discussion does not address special classes of investors, such as dealers, traders, lenders, secondary-market purchasers or sellers, suppliers, current or former employees, and other persons with special relationships with the Debtors, whose special circumstances could affect the character of their gains or losses.

-180-

Under the terms of the Plan, it is not clear whether amounts that U.S. Customers receive as interest at the Consensus Rate as set forth under section 7.1 of the Plan (such amounts, "Consensus Interest") should be treated as interest income for U.S. tax purposes. However, the Debtors believe that such treatment is the more likely view, and the Debtors therefore intend to take this position for purposes of meeting their tax reporting obligations. Under the terms of the Plan, however, only the U.S. Customers with Allowed Claims will receive such Consensus Interest; the determination of whether U.S. Customers are entitled to Allowed Claims will mostly occur only shortly before the receipt of cash Distributions. Moreover, until that point in time, it is likely that neither the Allowed amount of their Claims nor the amount of Consensus Interest that they will actually receive will be determined. In light of these facts, the Debtors intend to take the position that such Consensus Interest is includable as interest income when it is received. The Debtors intend to treat any cash payments received by a U.S. Customer as consisting partly of taxable interest income. For example, if a U.S. Customer receives a $127 Distribution three years after the Petition Date (i.e., on November 11, 2025),the Debtors will "discount" the amount received with respect to such U.S. Customer's Allowed Claims based on the Consensus Rate to $100; the Debtors will treat $27 of the Distribution as a payment of Consensus Interest. The Debtors will report this amount of interest income to the U.S. Customer on a Form 1099-INT that the U.S. Customer should receive in February of the following year. The Debtors cannot be certain that the IRS will ultimately agree with their views regarding the timing of income inclusion. U.S. Customers should consult their own tax advisors concerning the possibility of taking any different position, or the risk that the IRS might ultimately take a different position.

The Debtors believe that it is highly likely that any Allowed Claim, as well as any Consensus Interest associated with it, will be paid in full by the Wind Down Entities. Conversely, no U.S. Customer will receive any more from the Wind Down Entities than the full amount of such Allowed Claims plus the associated Consensus Interest, and the amount of Consensus Interest that a U.S. Customer receives in respect of a Claim should not be affected by the amount of income earned, or economic performance of, the Wind Down Entities after the Effective Date. In light of this fact, the Debtors do not intend to treat any U.S. Customers as "residual owners" of the Wind Down Entities, nor do the Debtors expect that the Plan Administrator will allocate to them a portion of the income, gains and losses that the Wind Down Entities may realize or recognize after the Effective Date (whether on account of change in the values of their assets after the Effective Date or on account of their temporary investment of distributable cash). As discussed above, in this regard, the Debtors realize that some U.S. Customers could ultimately receive payments from a Supplemental Remission Fund, and that the funds required to support such a Supplemental Remission Fund could ultimately come from the Wind Down Entities. However, the Debtors do not view this possibility as sufficient to treat such U.S. Customers as the residual owners of the assets of the Wind Down Entities at the time of the Effective Date. Moreover, the Wind Down Entities would not have a factual basis for allocating and reporting any such income to potential recipients of such payments. Rather, the Debtors anticipate that any U.S. Customers that ultimately receive such payments will likely include such payments in income at the time of receipt. U.S. Customers should be aware, however, that the IRS could disagree with these views and seek to tax U.S. Customers earlier than the date on which they actually receive such payments.

-181-

ii.        *Non-U.S. Customers*

For the reasons set out below, the Debtors do not currently anticipate that Non-U.S. Customers will be required to pay U.S. tax in respect of their receipt of Distributions under the Plan, and they likewise do not anticipate the Wind Down Entities will withhold on any portion of such Distributions in respect of U.S. taxes. Non-U.S. Customers should be aware, however, that this does not necessarily apply to any special classes of persons, as described above, and any such persons should consult their own tax advisors regarding the likely U.S. tax consequences of their participation in the Plan. In particular, a U.S. Person that acquires a Claim from a Non-U.S. Customer should be aware that such acquisition does not turn the U.S. Person into a non-U.S. Person for U.S. tax purposes or exempt such U.S. Person from the information reporting requirements described under section 7.14 of the Plan. Non-U.S. Customers may of course be subject to tax by other countries.

Although Non-U.S. Customers should in theory recognize capital gain or loss on the Effective Date in the manner described above with regard to U.S. Customers, Non-U.S. Customers are not generally subject to U.S. tax on gains and losses unless either (i) they are an individual who was present in the United States for 183 days or more during the taxable year in which the Effective Date occurs and certain other conditions are met or (ii) such gain or loss is effectively connected with the conduct of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Customer in the United States). With respect to the period following the Effective Date, the Debtors do not believe that the activities of the Wind Down Entities will create risk that Non-U.S. Customers are engaged in the conduct of a U.S. trade or business. First, the Wind Down Entities do not anticipate conducting any trade or business in the United States or otherwise earning income derived from such conduct (although the Debtors note that the Wind Down Entities may choose to contribute any incidental investment assets that might otherwise appear to give rise to effectively connected income to a wholly-owned domestic corporation). Moreover, even if the Wind Down Entities were considered to conduct a trade or business in the United States, the Debtors believe that such trade or business would not be attributed to the Non-U.S. Customers. Consistent with the reasons discussed above with respect to U.S. Customers, the Debtors currently believe that Non-U.S. Customers will not have any economic interest in the residual performance of the Wind Down Entities and are therefore not expected to be "allocated" any of the income, gains or losses that the Wind Down Entities may derive after the Effective Date.

At present, the Debtors do not anticipate that the Wind Down Entities will withhold on any portion of the Consensus Interest paid to a Non-U.S. Customer. The Debtors' rationale is based on the following: First, as noted above, the Consensus Interest may not be "interest" for U.S. tax purposes, but rather part of the Non-U.S. Customer's Allowed Claim that is received in the exchange for prior claims against a specific Debtor. Second, assuming that such Consensus Interest is interest income, it generally should not be treated as interest derived from U.S. sources, because it will not be paid by a U.S. person and it will not arise from any investment of debt capital in the United States. Third, even if the Consensus Interest received by Non-U.S. Customers were treated as U.S. source income, it should in any case be exempt from U.S. withholding tax pursuant to the so-called U.S. "portfolio interest exemption" under

the Tax Code.  In this regard, all Non-U.S. Customers will be required (as discussed under section 7.14 of the Plan) to complete and submit a valid Form W-8 before receipt of any Distribution.

~~Generally~~As noted above, however, the Debtors ~~intend to take the position that U.S. Holders should recognize gain or loss with respect to their Claims in an amount equal to the difference between (i) the amount of their Claims on the Petition Date and (ii) the adjusted tax basis of their prepetition Claims against one or more Debtors deemed exchanged therefor (other than the basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).  See the discussion below regarding General Tax Reporting by the Wind Down Entities.~~ cannot be certain that the IRS will agree with the reasoning above, and no ruling or other IRS guidance has been sought on this subject.  The Debtors are not in any case providing U.S. tax advice.  As noted above, moreover, the reasoning described above may not apply to special classes of persons.  Non-U.S. Customers who are in doubt about the reasoning above or otherwise concerned about specific facts relating to their own situations should consult their own U.S. tax advisors regarding their potential liability for U.S. taxes.

~~The character of gain or loss recognized by a U.S. Holder as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including (i) the tax status of the Holder; (ii) whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held and (iii) in the case of Claims that are debt instruments, whether the Claim was acquired at a market discount and whether and to what extent the Holder previously claimed a bad debt deduction.  This disclosure is providing no description, however, of the various tax rules that may be relevant to the holders of Claims that are debt instruments, and such holders are urged to consult their own tax advisors regarding the consequences of the exchange.~~

~~Because the Debtors intend to take the position that amounts denominated as Interest under the Plan should be treated as interest income for US Federal income tax purposes, the Debtors intend to report such amounts as interest income of the U.S. Holder on Form 1099 and other relevant tax reporting documents, with the result that a U.S. Holder should be required to include this amount in income for the taxable year of the Effective Date, and this amount will be taxable at ordinary income rates, including any relevant surcharge on net investment income.  See the discussion below regarding withholding on distributions and information reporting.~~

**~~B. U.S. Federal Income Tax Treatment of the Wind Down Entities and the U.S. Holders of Customer Entitlement Claims~~**

~~1.~~ *~~Classification of the Wind Down Entities~~*

~~The Wind Down Entities are intended to qualify as "liquidating trusts" for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, the liquidating trust beneficiaries are deemed to own the assets of the trust, and all of the trust's income and loss is taxed directly to the liquidating trust beneficiaries).  However, merely establishing a trust~~

as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Wind Down Entities will be structured to comply with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Plan Administrator and Holders of Claims) will be required to treat, for U.S. federal income tax purposes, the Wind Down Entities as a grantor trust of which the holders of Claims against the Wind Down Entities are the owners and grantors.  The Wind Down Entities are created for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Wind Down Entities.

The following discussion assumes that the Wind Down Entities will be so respected for U.S. federal income tax purposes.  However, no opinion of counsel has been requested, and the Wind Down Entities may or may not obtain a ruling from the IRS, concerning the tax status of the Wind Down Entities as grantor trusts.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully the classification of the Wind Down Entities, the U.S. federal income tax consequences to the Wind Down Entities could vary from those discussed herein (including the potential for imposition of tax on the net income of the Wind Down Entities at the entity level, rather than at the level of the holders of Claims against the Wind Down Entities).  If the Wind Down Entities were found to be carrying on a profit-making business, the U.S. federal income tax consequences to the Wind Down Entities, the U.S. Holders of Customer Entitlement Claims, and the Debtors could vary from those discussed herein.

2. *General Tax Reporting by the Wind Down Entities to U.S. Holders of Customer Entitlement Claims*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Wind Down Entities and all Holders of Claims) will be required to treat the transfer of the assets to the Wind Down Entities in accordance with the terms of the Plan.  Pursuant to the Plan, the U.S. Customer Priority Assets will be treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the recipients of U.S. Customer Entitlement Claims (with each beneficiary receiving an undivided interest in such assets) in exchange for their U.S. Customer Entitlement Claims, followed by the transfer by such holders of such assets (subject to any related liabilities) to the Wind Down Entities in exchange for their U.S. Customer Entitlement Claims.  All parties to the Wind Down Estates (including, without limitation, the Debtors, the Wind Down Entities and all Holders of Claims) shall use consistent valuation of the Plan Assets for all U.S. federal income tax purposes.

Accordingly, for U.S. federal income tax purposes all parties shall treat the Wind Down Entities as a grantor trust of which the holders of the U.S. Customer Entitlement Claims are the owners and grantors of the U.S. Customer Priority Assets, and treat such holders as the direct owners of an undivided interest of the Wind Down Entities, and, therefore, in the

U.S. Customer Priority Assets (such a holder, a "Beneficiary"). Such Beneficiary must report on its U.S. federal income tax return its pro rata allocable share of income, gain, loss, deduction and credit recognized or incurred by the Wind Down Estates. A Beneficiary must report on its U.S. federal income tax return the tax consequences of the sale or other disposition (or deemed disposition) of any assets of the Wind Down Estates, including its share of any gain or loss measured by the difference between (i) its share of the amount of Cash and/or the fair market value of any property received by the Wind Down Estates in exchange for the assets of the Wind Down Estates so sold or otherwise disposed of and (ii) such Beneficiaries' adjusted tax basis in its pro rata share of such assets of the Wind Down Estates. As noted below, the Plan Administrators will annually provide each Beneficiary a separate statement with information and instructions needed to report such income, gain, loss, deduction and credit recognized or incurred by the Wind Down Estates on such Beneficiary's U.S. federal income tax return.

Taxable income, gain or loss thereafter allocated to Holders of U.S. Customer Entitlement Claims will be treated as income, gain or loss with respect to each such Holder's undivided interest in the U.S. Customer Priority Assets, and not as income or loss with respect to its prior Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Holder. To the extent any Holder of Claims is (i) a U.S. Holder, and (ii) has or will receive a Distribution from the General Pool in accordance with the Plan, the U.S. federal income tax consequences for such U.S. Holder will be similar to those of a U.S. Holder of U.S. Customer Entitlement Claims.

The U.S. federal income tax obligations of a Beneficiary with respect to its claims against the Wind Down Entities are not dependent on the Wind Down Entities distributing any cash or other proceeds. Thus, Beneficiaries may incur a U.S. federal income tax liability with respect to its allocable share of Wind Down Entity income even if the Wind Down Entities do not make a concurrent distributions to the Beneficiaries. In general, a distribution of cash by the Wind Down Entities will not be separately taxable to Beneficiaries in the Wind Down Entities Trust, since Beneficiaries will already be regarded for U.S. federal income tax purposes as owning the underlying assets (and will have been taxed at the time the Cash was earned or received by the Wind Down Entities). Beneficiaries are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment if a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 is created.

The Plan Administrator will comply with all applicable governmental withholding requirements (see below). Thus, in the case of any Beneficiaries that are not U.S. Holders, the Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

The Plan Administrator will file with the IRS tax returns for the Wind Down Entities, including the Wind Down Trust, consistent with its classification as a grantor Trust pursuant to Treasury Regulation section 1.671-4(a). The Plan Administrator also will send annually to each Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the Wind Down Entities as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax

-185-

~~returns or to forward the appropriate information to such holders with instructions to utilize such information in preparing their U.S. federal income tax returns.  Such information will be provided each [February] with respect to the preceding calendar year.~~

iii.    ~~C.~~ *Withholding on Distributions* ~~AND INFORMATION REPORTING~~

All Distributions to ~~Holders of Customer Entitlement Claims~~Customers will be subject to any applicable U.S. tax withholding rules.  Under U.S. ~~federal income~~ tax law, ~~interest, dividends, and~~Consensus Interest and any other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate (currently 24%).~~-~~

Backup withholding generally applies if the ~~Holder~~Customer: (a) fails to furnish its social security number or other taxpayer identification number; (b) furnishes an incorrect taxpayer identification number; (c) fails properly to report interest or dividends; or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding~~(~~.  Such certification is generally in the form of a properly executed ~~IRS~~ Form W-9 for a U.S. ~~Holder~~Customer, and, for a Non-U.S. ~~Holder~~Customer, in the form of a properly executed applicable ~~IRS~~ Form W-8~~)~~.  (Consistent with the previous comments regarding Non-U.S. Customers who make the Bahamas Opt-In Election, they will be subject to these same withholding certification requirements because Debtors intend to treat payments to such persons as being made by the Wind Down Entities, with FTX DM acting as an intermediary.)

If the Debtors or the Plan Administrator, as applicable, cannot verify whether a ~~Holder of a~~ Customer ~~Entitlement Claim~~ is a U.S. ~~resident~~Person subject to an exemption~~, (x) for Distributions made by the Wind Down Trust on account of an Allowed Claim against a U~~ or a ~~non-U~~.S. ~~Debtor~~Person, the recipient of such Distribution generally shall be presumed to be a U.S. ~~non-exempt resident~~Person not subject to any exemption and such Distribution (or a portion of such Distribution) will be subject to withholding~~, (y) for Distributions made by the Wind Down Trust on account of an Allowed Claim against a non-U.S. Debtor to a recipient in the U.S., such recipient shall be presumed to be a U.S. non-exempt resident and such Distribution will be subject to withholding and (z) for Distributions made by the Wind Down Trust on account of an Allowed Claim against a non-U.S. Debtor to a recipient outside the U.S., such recipient shall be presumed not to be a U.S. resident and, accordingly, such Distribution will not be subject to any backup withholding~~.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  ~~Holders of Customer Entitlement Claims~~Customers are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the distributions they receive on their U.S. Customer Entitlement Claims and Dotcom Customer Entitlement Claims would be subject to these Treasury Regulations.~~-~~

-186-

### B.    U.S. Federal Income Tax Consequences to Employees, including Withholding on Distributions and Information Reporting

i.    *U.S. Employees*

All Distributions to Holders of claims for remuneration earned in the capacity of an FTX employee and/or as part of an FTX employment agreement (such claims, "U.S. Employee Claims"), will be subject to any applicable U.S employment tax rules and reporting including but not limited to all federal, state and local applicable income taxes.  Distributions on such claims will retain the characterization of wages and remain subject to the required federal income tax withholding, social security, and Medicare taxes, as well as any applicable state and local withholding taxes based on where the remuneration was earned and/ or any difference based on applicable current state and local residency if current residency is a different location than where the remuneration was earned.

For state and local withholding tax purposes, the required tax withholdings and reporting will be sourced to the jurisdiction(s) in which they were originally earned, and/or where the claimant currently resides.  Withholding taxes will be based on Form W-4 and state equivalent tax forms submitted by such Holders of U.S. Employee Claims including any additional withholding requested by such Holders.  The Debtors will provide each such Holder the opportunity to submit documentation to adjust withholdings via the individual Holder's Form W-4 elections.  There may be incremental distributions that occur over multiple years, with tax withholding and reporting required in each year of Distribution.  Distributions on the Allowed U.S. Employee Claim will be reported on a Form W-2, *Wage and Tax Statement,* for the calendar year in which distributions on the claim are paid.

ii.    *U.S. Employees who trade their U.S Employee Claim*

The Holders of U.S. Employee Claims may sell or have sold their rights to U.S. Employee Claims and the Distributions thereon to a third party in the business of buying such Claims arising out of bankruptcy (such third party, a "Claims Trader").  Such Holders will still receive a Form W-2 reporting the wages associated with the Distributions made to the Claims Trader.

As noted above, the Distributions that constitute wages retain their characterization of wages, and remain subject to federal income tax withholding, social security and Medicare taxes, as well as any applicable state and local withholding taxes upon Distribution, even if such Claim is held by a Claims Trader.  State and/or local withholding taxes will be based on where the original income was earned by the Holders of U.S. Employee Claims and possibly where such Holder currently resides, not where the Claims Trader is located.  Furthermore, withholding will be based on such Holder's Form W-4 and state equivalent tax forms submitted, including any additional withholding requested by such Holder.  The Debtors will provide each such Holder the opportunity to submit documentation to adjust withholdings via such Holder's Form W-4 elections.

-187-

The Distributions paid will be net of all required federal, social security, Medicare, state, and local withholding taxes relevant to the U.S. Employee Claim.  The net distribution will be paid directly to applicable Claims Trader and not to the Holders of U.S. Employee Claims.  The Holders of U.S. Employee Claims will only receive the tax reporting on those Distributions.

iii.    *Non-U.S. Employees*

The Debtors will evaluate claims for a Distribution earned in the capacity as an employee or contingent to an employment agreement with FTX either earned by a foreign national (non-U.S. citizen) or a non-U.S. resident (U.S. citizen) and working for a foreign based FTX entity with no connection or to the United States or services performed within the United States (such claims, the "Non-U.S. Employee Claims")based on individual circumstances and conditions as to whether there will be any required U.S. employment tax withholding and reporting including but not limited to applicable federal, state and local applicable income taxes in respect of their receipt of Distributions related to such Claims.  Distributions on such Claims will retain the characterization of wages and may be subject to tax and/or reporting requirements under the tax laws of other countries.

## C.    U.S. Federal Income Tax Consequences to Holders of Claims with Disputed Claims of Ownership

With respect to the assets of the Wind Down Entities that are subject to potential disputed claims of ownership or uncertain distributions, the Wind Down Entities may file a tax election with the IRS to treat such assets as contributed to a "disputed ownership fund", which is generally treated as a taxable C corporation unless certain exceptions apply.  The Liquidation Trustee will file separate tax returns with respect to any income attributable to such a disputed ownership fund, and any taxes imposed on such a disputed ownership fund will be paid out of the assets of the disputed ownership fund (and reductions will be made to amounts disbursed from the disputed ownership fund for the need to pay such taxes).  Any Holders of Disputed Claims should consult their own tax advisors concerning the federal, state, local, and other tax consequences of a disputed ownership fund.

In addition, a holder of Claims or a Beneficiary that is a not a U.S. Holder may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.  A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan.  As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders.  Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Plan Administrator.  The Debtors intend to take the position that the amounts denominated as Interest that are received by a non-U.S. Holder under the Plan should in general not constitute interest received from sources within the United States.  However, because a non-U.S. Holder will be required to complete a Form W-8 in order to receive a distribution, U.S. withholding tax should in any case not apply to interest that they receive from US sources.

## 9.    ALTERNATIVE TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest recovery on those Claims and Interests and is therefore in the best interests of such Holders.  If the Plan is not confirmed, a likely alternative near-future outcome for the Debtors is the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict with precision how the proceeds of the liquidation would be distributed among Holders of Allowed Claims against the Debtors.

The Debtors believe, however, that creditors would receive less value in the event that the Debtors are liquidated under chapter 7.  In addition, the Debtors believe that, in a liquidation under chapter 7, the value of the Debtors' estates will be substantially eroded before creditors receive any Distribution, as a result of additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees.  The assets available for Distribution to creditors will be reduced by such additional expenses and by Claims, some of which will be entitled to priority.

The Liquidation Analysis, prepared by the Debtors with their restructuring advisors, is premised upon a hypothetical liquidation in a chapter 7 case.  In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate estimated realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation would be the wind down and sale of individual assets.

Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for Distribution to creditors than that recoverable under the Plan.  Therefore, the Debtors submit that the projected recoveries available to Holders of Claims and Holders of Interests in a chapter 7 liquidation are likely to be lower than those available under the Plan.

## 10.    DEBTORS' RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the only other alternative described herein.  **Therefore, the Debtors recommend that all Holders of Claims entitled to vote on the Plan vote to accept it.**

Dated: ~~May 22~~June 23, 2024
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/*
_____
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*

-191-

**Appendix A**

**Chapter 11 Plan**

## **Appendix B**

**Solicitation Procedures Order**

## **Appendix C**

**Financial Projections**

**<u>Appendix D</u>**

**Liquidation Analysis**

**Appendix E**

**Digital Assets Conversion Table**