# Exhibit "A"

**SPONSORSHIP AGREEMENT**

This Agreement ("Agreement" or "Sponsorship Agreement") is made and entered into as of May 1, 2021 by and between:

(1) FTX Trading Limited, a company registered in Antigua and Barbuda with company number 17180 ("Sponsor"); and

(2) Play Magnus AS ("Play Magnus") a limited liability company incorporated in Norway with company number 912523802.

(Play Magnus and Sponsor are also individually referred to as a **"party"** and collectively the **"parties"**).

WHEREAS:

A. Play Magnus is a company within the Play Magnus Group. Play Magnus Group develops and sells chess-related digital programs and is a global supplier of world-class chess tournaments, chess broadcasting and chess entertainment online, via amongst others chess24.com and the organizer of the Meltwater Champions Chess Tour, a first of its kind season-long tour (the "**Champions Chess Tour**"). Play Magnus Group has secured certain broadcast rights to the World Chess Championship and will have activations surrounding this global event.

B. Sponsor would like to partner with Play Magnus on the unique opportunity to be an official sponsor of the Champions Chess Tour, bring the tour to chess fans all over the world, and activate around the Play Magnus broadcast of the World Chess Championship.

NOW, THEREFORE, in consideration of the mutual covenants and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1. **TERM**
   a. This Sponsorship Agreement shall be effective as of the date of full execution and shall continue until December 31, 2023 ("Term") unless sooner terminated under operation of law or as otherwise set forth herein.

2. **SPONSORSHIP RIGHTS**
   a. In consideration of the mutual covenants and obligations set forth herein, Play Magnus grants Sponsor the Sponsorship Rights, as set forth in Appendix 1, for the following events (the "**Events**"):
      i. Champions Chess Tour events during the Term;

   ii. The Play Magnus broadcast of the World Chess Championship in 2021 and 2023, which is tentatively scheduled to be held in November and December of such years.

3. **SPONSORSHIP FEE**
    a. In consideration of Sponsor's designation and the rights, benefits and license rights granted to Sponsor hereunder, Sponsor shall pay to Play Magnus the Fee specified in Appendix 2 attached hereto.

4. **PARTY REPRESENTATIVES**
    a. Upon executing this Sponsorship Agreement, each party shall appoint a representative authorized to act on behalf of such party in matters relating to the Sponsorship Agreement.

    b. Any notice under this Agreement shall be in writing and may be provided personally, by post, or by e-mail addressed to the party representative. A notice given by post shall be deemed to have been delivered (or served) ten (10) days after posting. Notice given in person or by e-mail shall be deemed to be delivered immediately provided, in the case of e-mail notices, the sender has received confirmation of successful transmission.

    The parties' representatives are:

|  | Play Magnus | Sponsor |
|---|---|---|
| Name | Arne Horvei | Arltan Ailant Kolaev |
| Title | Champions Chess Tour Director | FTX Business Development |
| E-mail address | arne@playmagnus.com | arltan@ftx.com |
| Phone number | +4790662249 | N/A |

5. **INTELLECTUAL PROPERTY**
    a. Trademark Licenses. Each Party shall grant to the other Party a non-transferable, limited, non-exclusive, royalty-free, revocable license to use such Party's service mark, trademark, trade name, logo(s), identifying slogan and other indicia (collectively "Marks"), respectively, in the form provided by such Party, during the Term solely in the manner and for the advertising, promotion or acknowledgement

purposes as set forth in Appendix 1.  Play Magnus and Sponsor each agrees it does not have, and will not claim, any right, title or interest, in or to any Mark of the other Party except as provided herein and that all uses of the other Party's Marks will inure to the benefit of that Party.  In furtherance of the foregoing, each Party agrees that any use of the Marks owned or licensed by the other Party will be in accordance with the applicable law and such other Party's then current Mark usage guidelines (as provided in writing by such other Party) and subject to the prior written approval of the other Party, not to be unreasonably withheld or delayed.  Notwithstanding anything contained in this Agreement to the contrary, upon the expiration or termination of this Agreement, all usage of such other Party's Marks shall cease.

b. Press Releases.  The contents of all press releases regarding Sponsor's designation shall be created and released at either Party's discretion provided that (i) it shall be subject to the other Party's prior approval, not to be unreasonably withheld or delayed, and (ii) the release shall portray the Other Party and/or its involvement with the other party or the Events in a positive light.  Each release shall be deemed approved if not disapproved in writing within forty-eight (48) hours of submission.

6. **LIABILITY AND WARRANTY**
   a. Each party represents and warrants that it (i) has full power, capacity, authority and right to execute and deliver this Sponsorship Agreement and to perform its obligations in this Agreement; (ii) holds and will maintain all necessary consents, approvals, authorizations and licenses required to exercise its rights and perform its obligations during the Term of this Agreement; and (iii) its entry in this Agreement, and its performance hereunder, does not and shall not violate any law, statute or regulation or any contractual obligation it has.

   b. Each party will indemnify the other party for any finally awarded cost, charge, damages, expense or loss whether foreseeable or not, howsoever arising from any third-party claim or litigation based on any actual or alleged breach of this Sponsorship Agreement, or any breaches of this Agreement.

   c. Sponsor will in any event and without undue delay (i) provide Play Magnus written notice of any third-party claim or any notice or correspondence in connection with alleged infringement by Play Magnus, specifying the nature of the claim or action in reasonable detail; (ii) refrain from admitting any liability, enter into any Agreement or compromise in relation to third party claims, without the prior written consent of Play Magnus (such consent not to be unreasonably conditioned, withheld or delayed); (iii) permit and enable Play Magnus to assume full control and conduct of the defense or settlement of any third party claim or any potential appeal; and (iv) provide all reasonable assistance to Play Magnus in the defense or settlement of such third party claim.

    d. Unless otherwise provided in this Sponsorship Agreement, no party shall be liable for any lost actual or anticipated revenues or profits, or any special, indirect or consequential loss or damage of any kind howsoever arising and whether caused by tort (including negligence), breach of contract or otherwise, irrespective if such loss or damage is foreseeable, foreseen or known.

    e. Subject to Section 6.f, a party's liability for claims associated with this Sponsorship Agreement will be limited to NOK 1,000,000.

    f. Nothing in this Sponsorship Agreement shall exclude or in any way limit the parties' liability (including indirect damages) for gross negligence, willful misconduct, fraud, or for death or personal injury.

7. **TERMINATION**
    a. Each party may terminate this Sponsorship Agreement (i) if the other party is in material breach of any obligations in this Agreement, provided the breaching party has not rectified its breach within thirty (30) days from receiving a written breach notice, or (ii) at its discretion, by providing written notice of termination to the other party, provided such notice must be sent to the other party by no later than 1 October in order for such termination to be effective for any subsequent calendar years remaining in the Term.
    b. The parties may also terminate this Agreement if the other party becomes subject to insolvency or other similar legal proceedings.
    c. Furthermore, if either Party is unable to perform its obligations hereunder due to any law, epidemic/pandemic, decision by an authority, event of war, sabotage, lack or delay in power supply, disruption to telecommunication connections or other communication and transport, strike, lockout, boycott, blockade or other similar circumstance where such events are not caused by either of the parties (cumulatively "Force Majeure"), the parties shall enter into good faith negotiations to provide substitute benefits of equal or greater value. Should parties be unable to identify such substitute benefits, Parties will mutually agree on a pro-rata reduction of the Fee.
    d. Any termination pursuant to this shall take immediate effect.
    e. The following provisions shall survive the expiration or termination of this Sponsorship Agreement: 5, 6, and 8.

8. **CONFIDENTIALITY**
    a. For the purposes of this Agreement "Confidential Information" means (i) the content of this Agreement; and (ii) any information which either party has received or will receive from or on behalf of the other party in connection with this Sponsorship Agreement prior to or after the signing of this Sponsorship Agreement. Confidential

Information shall however not include (i) information required to be disclosed by a party as a result of an order of a public authority having jurisdiction over its activities, (ii) information that was legitimately in the receiving party's possession or was legitimately known to the receiving party prior to receipt from the disclosing party in the form in which it was received from the disclosing party, (iii) information that is or becomes public knowledge without the fault of the receiving party, (iv) information that is independently developed by the receiving party without reference to the disclosing party's Confidential Information.

b. Each Party will (i) take measures to safeguard the Confidential Information of the other party, equivalent to the measures used to safeguard the own Confidential Information of that party, (ii) in any event take all commercially reasonable measures to safeguard the Confidential Information of the other party; and (iii) never divulge any Confidential Information to third parties without the other party's prior written consent, unless otherwise permitted by this Sponsorship Agreement.

c. Notwithstanding Sections 8.a and 8.b, each party is entitled to disclose Confidential Information to (i) its auditors and professional advisers provided they are subjected to confidentiality and safeguarding obligations no less stringent than those contained in this Sponsorship Agreement; (ii) its employees and employees of companies belonging to the same group of companies to which the disclosing party belongs, provided (a) they are subjected to confidentiality obligations no less stringent than those contained in this Agreement, and (b) that such disclosure is reasonably necessary for the disclosing party to exercise its rights or comply with its obligations under this Agreement.

d. The confidentiality obligations shall survive the expiry or termination of this Sponsorship Agreement for whatever reason and apply for a period of one (1) subsequent year after its expiry or termination.

e. The parties shall immediately return or destroy all documents and materials belonging to the disclosing party upon expiration or termination of this Sponsorship Agreement.

9. **ENTIRE AGREEMENT**

    a. This Agreement constitutes the entire Agreement between the parties and supersedes and extinguishes all previous Agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.

    b. Each party acknowledges that in entering into this Agreement it does not rely on, and shall have no remedies in respect of, any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement.

    c. Each party agrees that it shall have no claim for innocent or negligent misrepresentation or negligent misstatement based on any statement in this Agreement.

    d. Nothing in this section shall limit or exclude any liability for fraud.

10. **VARIATION**

    a. No variation of this Agreement shall be effective unless it is in writing and signed by the parties (or their authorized representatives).

11. **WAIVER**

    a. No failure or delay by a party to exercise any right or remedy provided under this Agreement or by law will be deemed a waiver of that or any other right or remedy, nor will it prevent or restrict the further exercise of that or any other right or remedy.

    b. No single or partial exercise of such right or remedy will prevent or restrict the further exercise of that or any other right or remedy.

12. **SEVERANCE**

    a. If any provision of this Agreement is determined to be invalid, illegal, or unenforceable, it will not affect the enforceability of any other provision of this Agreement. Rather, the invalid, illegal, or unenforceable provision shall be modified so that it is valid, legal, and enforceable and to the fullest extent possible, reflects the intention of the parties.

13. **THIRD PARTIES AND INDEPENDENT CONTRACTOR**

    a. Nothing in this Sponsorship Agreement shall confer any benefit or right upon any third party.

    b. The Parties shall be deemed independent contractors. Unless otherwise agreed in writing by the Parties, neither Party shall make any express or implied Agreements, warranties, guarantees, commitments or representations, or incur any debt, in the name or on behalf of the other Party.

14. **GOVERNING LAW AND JURISDICTION**

    a. This Sponsorship Agreement shall in all respects be governed by and construed in accordance with the laws of Norway, without giving effect to the choice of law principles.

    b. Any dispute arising out of or in connection with this Sponsorship Agreement shall be amicably negotiated between the Parties and, failing resolution, shall be referred to and finally resolved by ordinary courts of Norway. Oslo shall be the venue for any dispute.

    c. Nothing in this Sponsorship Agreement shall limit either Party from seeking injunctive relief under any courts of any other jurisdiction in order to enforce its rights.

| PLAY MAGNUS AS: | FTX Trading Limited: |
|---|---|
| DocuSigned by: *Andreas Thome* <br> 268C5B11A5364F9... | DocuSigned by: *Samuel Bankman-Fried* <br> 672DA88132804B9... |
| Date: 5/2/2021 | Date: 5/2/2021 |
| Name: Andreas Thome <br> Title: CEO | Name: Samuel Bankman Fried <br> Title: CEO |

## APPENDIX 1 – SPONSORSHIP RIGHTS

**CHAMPIONS CHESS TOUR**

**Naming and Recognition**
- Sponsor shall be identified as the "Official Cryptocurrency Exchange Partner of the Champions Chess Tour" (the "Chess Tour Designation").

**Territory**
- Worldwide

**Promotional Rights**
- Champions Chess Tour logo and official Chess Tour Designation may be used for promotions and on Sponsor's owned and operated social media and digital channels (subject to Play Magnus' approval).
- Opportunity to create a Sponsor press release (subject to Play Magnus' approval).
- Sponsor shall be granted access to photographs of Champions Chess Tour for PR and social media use.

**Platforms**
- <u>Annual Bitcoin Battle Tournament</u>: Sponsor shall be the founding and presenting partner of the Bitcoin Battle, which is a flagship event on the Championship Chess Tour. In connection with the Bitcoin Battle, Play Magnus will provide Sponsor with the following benefits:
    - Mutually agreed upon title of the Platform;
    - Create a special logo with Sponsor denoted as the founding partner of the Bitcoin Battle;
    - Joint press announcement;
    - Brand recognition as mutually agreed upon during the Bitcoin Battle; and

- Broadcast integrations as set forth below or otherwise mutually agreed upon.

· <u>Bitcoin Battle Real-Time Prize Fund (working title)</u>: In connection with the Bitcoin Battle, Parties will announce a Bitcoin Prize Fund for the winner, fluctuating in real time with the value of bitcoin. Sponsor benefits will include:
  - Mutually agreed upon title of the platform;
  - Sponsor recognition as presenting the Prize Fund to winner (prize value incremental of the Fee);
  - Joint press announcement (shared with the Bitcoin Battle announcement);
  - Integration to the broadcast of the Bitcoin Battle through a Sponsor branded live value ticker and as otherwise set forth herein;
  - Promotion of the Prize Fund value leading up to the Bitcoin Battle across the Champions Chess Tour's social and digital channels; and
  - Opportunity to highlight the Bitcoin Battle and Prize Fund on Sponsor's website and social channels as mutually agreed upon.

· <u>FTX Exchange of the Day (working title)</u>: Parties will introduce and integrate a new broadcast segment into the Champions Chess Tour's broadcasts focused on analyzing strategy, positioning and reasoning behind an exceptional exchange in a match. The segment title will be mutually agreed upon, and the segment will include a replay of the exchange, expert commentary and analysis, and other mutually agreed upon elements.

**PLAY MAGNUS BROADCAST OF THE WORLD CHESS CHAMPIONSHIP**

**Naming and Recognition**
· Sponsor shall be identified as the "Official Presenting Partner of Play Magnus Group's Broadcast of the World Chess Championship" (the "Broadcast Designation").

**Territory**
· Worldwide

**Promotional Rights**
· Broadcast Designation may be used for promotions and on Sponsor's owned and operated social media and digital channels (subject to Play Magnus approval)
· Opportunity to create a Sponsor press release (subject to Play Magnus' approval).

**Platforms**
· <u>FTX Exchange of the Match (working title)</u>: Capitalizing on the Champions Chess Tour segment branding, Play Magnus shall implement the segment into its broadcast of the World Chess Championship. The segment title will be mutually agreed upon and will include a replay of the move, expert analysis and other mutually agreed upon elements.

**BROADCAST INTEGRATION**

Sponsor will be integrated into the Champions Chess Tour broadcast and the Play Magnus World Chess Championship broadcast as follows:

**In-Broadcast Rotating Logo**

The In-Broadcast rotating logo will be displayed during the broadcast of the Champions Chess Tour and Play Magnus World Chess Championship Broadcast.
Creative shall be mutually agreed and must fit within the billboard spec provided by Play Magnus and may include full-color logo, call-to-action, accompanying QR code, etc.

**Summary of Broadcast Elements**

| **Key Broadcast Elements** | **Sponsored Events** | **Broadcast Feeds** | **Length** | **Frequency** |
| --- | --- | --- | --- | --- |
| Bitcoin Battle Real Time Prize Fund | Bitcoin Battle Tournament of the Champions Chess Tour | Main Global Broadcast of CCT | 30-60 Sec | At least five times per tournament day |
| FTX Exchange of the Match | Champions Chess Tour | Main Global Broadcast of CCT | 60-90 Sec | At least twice per tournament |
|  | Play Magnus Broadcast of the World Chess Championship | Play Magnus Main Global Broadcast | 60-90 Sec | At least once every three match days |
| In-Broadcast Rotating Logo | Champions Chess Tour | All Champions Chess Tour Broadcasts | 30 Sec | At least ten times per tournament day |
|  | Play Magnus Broadcast of the World Chess Championship | Play Magnus Main Global Broadcast | 30 Sec | At least ten times per tournament day |

**APPENDIX 2 – PAYMENT SCHEDULE**

**PARTNERSHIP FEE**

In consideration of the rights and benefits granted to Sponsor herein, Sponsor shall pay to Play Magnus a Partnership Fee equal to Three Million Two Hundred Fifty Thousand US Dollars ($3,250,000 USD) (the "Fee").

The Fee shall be allocated as follows:

|  | **2021** | **2022** | **2023*** |
|---|---|---|---|
| Champions Chess Tour & PMG's World Championship Broadcast | $650,000 USD | $800,000 USD | $1,200,000 USD |
| Bitcoin Battle Prize Fund | $100,000 USD | $200,000 USD | $300,000 USD |

* The Champions Chess Tour/PMG's World Chess Championship Broadcast Fee and Bitcoin Battle Prize Fund (i.e., $1,500,000 USD) (collectively the "Tour and Fund Fee") for 2023 shall be subject to average viewership of the Champions Chess Tour growing at a CAGR of 22.5% in 2021 and 2022, measured as of the end of the 2022 season. Should the CAGR be less than 22.5%, the increase from 2022 to 2023 for the Tour and Fund Fee (i.e., $500,000) shall be discounted pro-rata, but in no event be less than the 2022 Tour and Fund Fee.  By way of example only, if the CAGR is 11.25% (implying a 50% miss on target CAGR) the 2023 fee shall be $1,250,000 (i.e., $500,000 increase in fee from 2022 to 2023, multiplied by 50%). Average viewership shall be defined as the number of hours watched across the season divided by the number of hours broadcast during the season.

The Fee shall be applicable and paid as follows:

- **2021 -** Seven Hundred Fifty Thousand US Dollars ($750,000 USD) payable:
    o Three Hundred Fifty Thousand US Dollars ($350,000 USD) upon signature of this Agreement;
    o Two Hundred Thousand US Dollars ($200,000 USD) no later than July 1, 2021; and
    o Two Hundred Thousand US Dollars ($200,000 USD) no later than October 1, 2021.

- **2022 –** One Million US Dollars ($1,000,000 USD) payable:
    o Two Hundred Fifty Thousand US Dollars ($250,000 USD) no later than January 1, 2022;
    o Two Hundred Fifty Thousand US Dollars ($250,000 USD) no later than April 1, 2022;
    o Two Hundred Fifty Thousand US Dollars ($250,000 USD) no later than July 1, 2022; and
    o Two Hundred Fifty Thousand US Dollars ($250,000 USD) no later than October 1, 2022.

- **2023 –** One Million Five Hundred Thousand US Dollars ($1,500,000 USD), except as otherwise set forth herein, payable:
    - Three Hundred Seventy-Five Thousand US Dollars ($375,000 USD) no later than January 1, 2023;
    - Three Hundred Seventy-Five Thousand US Dollars ($375,000 USD) no later than April 1, 2023;
    - Three Hundred Seventy-Five Thousand US Dollars ($375,000 USD) no later than July 1, 2023; and
    - Three Hundred Seventy-Five Thousand US Dollars ($375,000 USD) no later than October 1, 2023.

Should the 2023 Tour and Fund Fee be reduced as set forth above, the 2023 payments outlined herein shall be reduced equally.

## Addendum to Sponsorship Agreement

This Addendum (the "Addendum") to the Sponsorship Agreement dated May 1, 2021 is made and entered into on this March 31, 2022 by and between:

1) FTX Trading Limited, a company registered in Antigua and Barbuda with company number 17180 (the "Sponsor"); and
2) Play Magnus AS, a limited liability company incorporated in Norway with company number 912523802 ("Play Magnus").

(Play Magnus and Sponsor are also individually referred to as a "party" and collectively the "parties").

Whereas:

A) Play Magnus is producing the FTX Crypto Cup as a physical event in Miami with FTX as sponsor between August 12 - 20, 2022. Parties have agreed to an additional fee to cover costs of organizing and production of the event by Play Magnus and a series of promotional activations to drive awareness and sign ups for Sponsor's platform executed by Play Magnus.

Now, therefore, the Parties agree as follows:

1. **FTX Crypto Cup 2022**
    1.1. Play Magnus shall be responsible and bear costs to organize the FTX Crypto Cup as a physical major of the 2022 Meltwater Champions Chess Tour in Miami, Florida between Aug 12 - Aug 20 2022.
    1.2. Play Magnus shall be responsible and bear costs for the venue for the FTX Crypto Cup, opening party and closing ceremony (the "**Events**"). Play Magnus will scout and recommend venues to the Sponsor that are suitable for organizing the Events. If the Sponsor requests specific alternate venues that are higher in cost than those recommended by Play Magnus, the Sponsor has the right to determine the venue(s) provided Play Magnus agrees they are suitable for the Events and the Sponsor covers any and all incremental costs associated with the venue(s).
    1.3. Play Magnus shall organize and produce an opening party and closing ceremony as part of the activities in and around the FTX Crypto Cup and bear all costs including venue, food & beverage and entertainment. If FTX requests specific add-ons to the opening party or closing ceremony, Play Magnus shall accommodate such requests provided they are reasonable and FTX bears any incremental costs associated with such requests.
    1.4. As part of the opening ceremony or at another mutually agreed suitable time, Play Magnus shall organize a celebrity tournament whereby the participating chess players (provided by Play Magnus) shall be paired with four celebrities (provided by Sponsor mutually agreed upon by Play Magnus) in a promotional event for the Sponsor and the FTX Crypto Cup.

1.4.1. Both Play Magnus and the Sponsor shall make best efforts to secure the participation of mutually agreed celebrities based on who Sponsor is already in contract with. It is assumed any expense associated with bringing any celebrity to Miami for the event will be borne by Play Magnus.

1.5. The Sponsor shall have the right to activate additional promotional activities such as a drone chess match show, basketball half-time show, or other agreed activities provided they are reasonable and possible to be executed by Play Magnus, and FTX bears any and all costs associated with such incremental promotional activities.

1.6. Play Magnus shall produce all creative assets and execute its normal activities for the promotion of the FTX Crypto Cup and collaborate with the Sponsor to further promote the FTX Crypto Cup where possible.

1.6.1. Any paid activities (e.g. digital or physical advertisements, PR and media activities beyond Play Magnus' standard activities, or other promotional activities), shall be borne by the Sponsor.

1.6.2. Play Magnus shall provide the Sponsor with any creative assets required for paid activities.

1.7. Play Magnus shall organize a series of promotional activities before and during the FTX Crypto Cup in collaboration with the Sponsor to attract new signups to the Sponsor's platform.

1.7.1. Unless both parties agree on a different activation, the activities shall include creating an NFT/key solely acquirable on the Sponsor's platform which will provide benefits to holders to incentivize signups.

1.7.2. The distribution and acquisition method of the NFT to consumers shall be determined at a later date.

1.7.3. The Net Revenue from initial release and any secondary market trading of the numbered collection of additional NFTs shall be split seventy percent (70%) to Play Magnus and thirty per cent (30%) to the Company, in addition to adhering to the Company's standard NFT marketplace terms and conditions.

1.7.4. The Parties have agreed upon a minimum goal of ten thousand (10,000) new signups on the Sponsor's platform.

2. **Partnership Fee**

2.1. In consideration of the deliverables and benefits granted to the Sponsor in this addendum, the Sponsor shall pay to Play Magnus an additional Partnership Fee equal to one million US dollars ($1,000,000 USD).

2.2. The Parties agree that up to one hundred thousand US dollars of the "Bitcoin Battle Prize Fund" related fee in the current contract (two hundred thousand US dollars [$200,000 USD]) ("APPENDIX 2 – PAYMENT SCHEDULE, PARTNERSHIP FEE") may be reallocated towards campaigns further incentivizing signups on the Sponsors platform.

2.3. The Sponsor retains the right to add additional funds to incentivize signups on the Sponsors platform.

2.4. The Fee shall be paid as follows

    a) Five hundred thousand US dollars ($500,000 USD) no later than June 1, 2022;

    b) Five hundred thousand US dollars ($500,000 USD) no later than Sep 1, 2022;

**3. Miscellaneous**

3.1. Except as expressly modified by this Addendum, all terms and provisions of the Sponsorship Agreement shall remain in full force and effect and unaltered.

*****

**Play Magnus AS:**                                                **FTX Trading Limited:**

DocuSigned by: *Andreas Thome*                    DocuSigned by: *Samuel Bankman Fried*

268C5B11A5364F9...                                           872DA88132804B9...

Date: March 31, 2022                                    Date: March 31, 2022

Name: Andreas Thome                                 Name: Sam Bankman-Fried

Title: CEO                                                                               Title: CEO