# EXHIBIT D

Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice*)
Emily Gerrick
(*pro hac vice*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

James Crooks
(*pro hac vice*)
Michael Lieberman
(*pro hac vice*)
FAIRMARK PARTNERS, LLP
1499 Massachusetts Ave. NW, #113A
Washington, DC 20005
jamie@fairmarklaw.com
(619) 507-4182

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

AMANDA HOUGHTON, CHARLES DOUGLAS, and SUSAN FRANKLIN, on behalf of themselves and all others similarly situated,

        Plaintiffs,

    vs.

COMPOUND DAO, a California general partnership; ROBERT LESHNER; GEOFFREY HAYES; AH CAPITAL MANAGEMENT, LLC; POLYCHAIN ALCHEMY, LLC; BAIN CAPITAL VENTURES (GP), LLC; GAUNTLET NETWORKS, INC; PARADIGM OPERATIONS LP,

        Defendants.

Case No. 3:22-cv-7781-WHO

**FIRST AMENDED COMPLAINT**
**CLASS ACTION**
**JURY TRIAL DEMANDED**

**Date: March 31, 2023**

**Action Filed: Dec. 8, 2022**

**Before The Hon. William H. Orrick**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ 2

Preliminary Statement ................................................................................ 3

Parties ........................................................................................................ 4

Jurisdiction and Venue .............................................................................. 6

Background on Blockchains And Relevant Terminology ........................... 7

Compound Labs Creates the Compound Protocol ..................................... 8

Compound Labs Transfers Control to Compound DAO ........................... 10

Compound DAO Sells COMP to The Public But Maintains Control ......... 12

Compound DAO Is a General Partnership ................................................ 22

  *Partner Defendants' Expertise in Crypto Businesses* ...................... 22

  *Partner Defendants Make, Discuss, and Vote on Governance Proposals* ........ 25

  *Partner Defendants' Management Response to a Business Crisis* ................ 27

  *Leshner's and Hayes's Shadow Management through Compound Labs* ......... 28

  *Partner Defendants' Statements on the Compound Business Model* .............. 31

COMP Collapses in Value .......................................................................... 35

COMP Is a Security ................................................................................... 36

Class Action Allegations ............................................................................ 40

  *Numerosity* ...................................................................................... 41

  *Typicality* ........................................................................................ 41

  *Adequacy* ........................................................................................ 41

  *Predominance and Superiority* ........................................................ 42

Claims for Relief ....................................................................................... 42

Prayer for Relief ....................................................................................... 44

**AMENDED COMPLAINT**

1

## **Preliminary Statement**

2      1.      Compound is a business that allows users to borrow and lend crypto

3   assets, in much the same way that a traditional bank allows customers to borrow and

4   lend traditional assets. Like a traditional bank, Compound earns money on the

5   spread between the rate borrowers pay and the rate lenders earn. As of the date of

6   this filing, the aggregate loans made through Compound are worth a little under

7   three billion dollars.

8      2.      Compound was created in 2017 by Compound Labs, Inc., a corporation

9   headquartered in San Francisco. In May 2020, Compound Labs transferred control

10  over the Compound business to Defendant Compound DAO, a California general

11  partnership. Compound DAO is governed by the holders of a security called COMP.

12  In this respect, the DAO is analogous to a traditional company governed by its

13  shareholders, except in crypto terminology, a unit of COMP is referred as a "token"

14  instead of a "share." More than 50% of COMP tokens are controlled by fewer than ten

15  people, including Defendants here. As Compound Labs' general counsel put it when

16  the company passed control to Compound DAO, these people now "manage" the

17  Compound business.

18     3.      Shortly after Compound Labs transferred control of its business to

19  Compound DAO, the DAO began offering COMP tokens to the public. It did so

20  through a process known as "yield farming": Users who borrowed or loaned crypto

21  assets with Compound were provided with COMP proportional to the amount they

22  borrowed or loaned. COMP immediately exploded in value, creating a speculative

23  frenzy of users borrowing and lending assets not because they had a need for those

24  services, but solely to obtain COMP from the DAO with the expectation of making a

25  profit by immediately selling it on the secondary market. The price of COMP

26  skyrocketed—but has since plummeted.

27     4.      COMP is a security. Users purchase COMP to gain an ownership share

28

**AMENDED COMPLAINT**

in the Compound business, expecting to earn profits based on the efforts of the Partner Defendants and a handful of other people who together control and manage the business. No registration statements have been filed with the SEC or have been in effect with respect to the offering of COMP tokens.

5. Compound DAO and the Partner Defendants sell COMP directly to investors through the Compound protocol, in exchange for using the service and paying fees. Compound DAO and the Partner Defendants also solicit sales of COMP on the secondary market through their extensive promotion of COMP, their efforts to facilitate and encourage a robust secondary market for COMP, and their performance of other steps necessary to the widespread distribution of COMP to investors.

6. Because Compound DAO and the Partner Defendants offer and sell COMP to the public and solicit such sales without registration or qualification, Plaintiffs bring this class action for rescission or rescissory damages.

## **Parties**

7. Defendant Compound DAO is a general partnership headquartered in San Francisco, California. It is governed by the holders of COMP. As of December 8, 2022, when the original Complaint in this matter was filed, nine people controlled at least 51.56% of the COMP currently issued. Seven are Defendants here.

8. Defendant Robert Leshner is a co-founder of Compound Labs, which created the Compound protocol now owned by Compound DAO. He is domiciled in San Francisco and, on information and belief, engaged in the conduct alleged here while in the United States. As of December 8, 2022, he controlled at least 2.65% of the COMP votes issued and voted his shares at least 50 times.

9. Defendant Geoffrey Hayes is a co-founder of Compound Labs, which created the Compound protocol now owned by Compound DAO. He is domiciled in San Francisco and, on information and belief, engaged in the conduct alleged here while in the United States. As of December 8, 2022, he controlled at least 3.82% of

the COMP votes issued and voted his shares at least 26 times.

10. Defendant Bain Capital Ventures (GP) LLC (Bain) is a private-equity firm headquartered in Boston, Massachusetts. Bain manages its crypto businesses and investments, including Compound, from San Francisco. Both managing directors of its crypto division are based in the Bay Area and most of the employees of its crypto division work in California. On information and belief, it and its agents engaged in the conduct alleged here while in the United States. As of December 8, 2022, Bain controlled at least 9.71% of the COMP votes issued and voted its shares at least five times.

11. Defendant Polychain Alchemy LLC (Polychain) is an investment fund headquartered in San Francisco. On information and belief, it and its agents engaged in the conduct alleged here while in the United States. As of December 8, 2022, it controlled at least 11.58% of the COMP votes issued and has voted its shares at least 28 times.

12. Defendant AH Capital Management, LLC, doing business as Andreesen Horowitz, is a venture-capital and investment firm headquartered in Palo Alto, California. On information and belief, it and its agents engaged in the conduct alleged here while in the United States. As of December 8, 2022, it controlled at least 9.68% of the COMP votes issued and voted its shares at least 40 times.

13. Defendant Paradigm Operations LP is an investment firm headquartered in San Francisco. On information and belief, it and its agents engaged in the conduct alleged here while in the United States. As of December 8, 2022, it controlled at least 4.2% percent of the COMP votes issued and voted its shares at least five times.

14. Defendant Gauntlet Networks, Inc. (Gauntlet), is an investment firm headquartered in Brooklyn, New York. Two of three of its top executives are based in San Francisco, including its co-founder and Chief Technology Officer. On information

and belief, it and its agents engaged in the conduct alleged here while in the United States. As of December 8, 2022, it controlled at least 4.77% of the COMP votes issued and voted its shares at least 30 times.

15. Plaintiff Charles Douglas lives in San Ysidro, California. He purchased approximately $75 of COMP on the Coinbase exchange in January 2022 when the price was approximately $130. He sold some of his COMP at a loss and continues to hold some.

16. Plaintiff Amanda Houghton lives in Townsend, Delaware. She purchased approximately $3 worth of COMP in November 2022 on Coinbase when the price of COMP was approximately $42 and continues to hold that COMP. She previously was compensated with approximately $9 of COMP via Coinbase Earn (explained in more detail below) in February 2021 when the price of COMP was approximately $426 and continues to hold that COMP which is now worth less than $1.

17. Plaintiff Susan Franklin lives in Bismarck, Illinois. She purchased approximately $2 worth of COMP on the Coinbase exchange on December 26, 2021, when the price of COMP was about $230 and continues to hold that COMP. She also was compensated with approximately $9 of COMP via Coinbase Earn in July 2021 when the price of COMP was approximately $400 and continues to hold that COMP.

## **Jurisdiction and Venue**

18. This Court has subject-matter jurisdiction over this Action under 28 U.S.C. § 1331.

19. This Court has general personal jurisdiction over Compound DAO because it is headquartered in this District, and this Court has specific personal jurisdiction over the Partner Defendants because their partnership is headquartered here and because they have all conducted significant partnership business here.

20. This Court has general personal jurisdiction over Polychain, Andreesen

Horowitz, Leshner, and Hayes because they are domiciled in California.

21. Venue lies in this District because a substantial portion of the acts leading to this Action were done in this District and because the Defendant partnership and four Partner Defendants are headquartered in or residents of this District.

### Background on Blockchains And Relevant Terminology

22. A crypto asset is a form of digital asset. Crypto assets, at least right now, are not issued by central governments or authorities. Bitcoin is the most well-known type of crypto asset. The value of some crypto assets fluctuates with respect to the U.S. Dollar and all other fiat currencies. Other crypto assets, such as U.S. Dollar Coin, are so-called "stablecoins" because their value is designed to be pegged to a fiat currency—for U.S. Dollar Coin, the U.S. Dollar.

23. Crypto assets are typically designated by three- or four-letter symbols, as stocks are. Bitcoin's is BTC. U.S. Dollar Coin's is USDC. Compound's is COMP.

24. The network of computers that securely and publicly record transactions of crypto assets is called a "blockchain." A blockchain is essentially a ledger of transactions that, for all practical purposes, cannot be reversed or altered. There are several different blockchains that record transactions of a variety of different crypto assets. The blockchain at issue in this case—*i.e.*, the blockchain that records transactions of COMP—is called Ethereum. The nodes that validate transactions on the Ethereum blockchain are clustered more densely in the United States than in any other country.

25. A crypto asset "token" is a unit of a specific asset. These tokens are fungible and tradeable.

26. A "protocol" is computer code on the blockchain that is roughly analogous to software on a personal computer. The creators of a protocol write code that instructs the protocol how to operate. Compound is one such protocol; it is

programmed to operate Compound's savings-and-loan business. Protocols are designed to function autonomously, but human intervention remains necessary to alter, enhance, or improve the protocol.

27.    DeFi stands for "Decentralized Finance." DeFi uses blockchains ostensibly to remove third parties, like traditional banking institutions and regulators, from financial transactions. Thus, using DeFi protocols like Compound, users can transact in crypto assets, including lending or borrowing crypto assets, without interacting with traditional banks or other established, regulated intermediaries.

28.    DAO stands for "Decentralized Autonomous Organization." This is increasingly the organizational form that crypto businesses take, including the one at issue here. In a DAO, there is no formal corporate structure, no explicit liability protection, and no distinction between, say, managers and directors, or between general and limited partners. Instead, holders of specific tokens—such as the COMP token at issue here—have governance rights that allow them to suggest actions that the associated DAO will take. Those suggestions are then voted on and implemented if the required number of tokenholders support the actions. Actions include many of those typically done by corporate officers, boards, or employees, such as spending treasury funds to hire people; changing organizational goals and policies; and even distributing treasury assets to tokenholders, like how corporations can authorize distributions to owners. Holders of governance tokens thus may participate in the governance of a protocol and have a potential claim on its profits.

## Compound Labs Creates the Compound Protocol

29.    In 2017, Robert Leshner and Geoffrey Hayes founded Compound Labs. Their stated goal was "to establish properly functioning money markets for blockchain assets."

30.    To do this, Compound Labs created a protocol on the Ethereum

blockchain called Compound. Compound is essentially a savings-and-loan business. Through Compound, users can "lock" (essentially deposit) assets into a "pool" from which other users can borrow after posting sufficient collateral. Unlike a traditional savings-and-loan, though, Compound requires a collateral ratio of well above 100%. For example, a user with $15,000 worth of BTC can post her BTC in Compound as collateral and borrow approximately $10,000 of USDC at a market-determined interest rate, currently approximately 3.86% annual percentage rate ("APR"). Alternatively, a user with USDC can deposit it to Compound and get paid a market-determined interest rate for lending it out to the pool of collateralized borrowers, currently 2.19% APR. The required collateral ratios are not market-determined—they are set by whomever controls the Compound protocol.

31.     Compound loans are not executed on a peer-to-peer basis. Rather, depositors put their money into a "liquidity pool," as explained above. When they do so, they are issued "cTokens" in exchange.  These cTokens essentially track the depositor's earned interest: The "exchange rate" between cTokens and the underlying deposited assets is programmed to change over time (with updates applied approximately every 15 seconds), such that when depositors redeem their cTokens they get more of the underlying asset back than they put in. Depositors may cash in their cTokens at any time—Compound loans have no fixed maturity dates or pre-payment penalties—and the market balances itself out accordingly, resulting in a market-determined interest rate. cTokens are freely tradeable on the secondary market.

32.     The spread between the borrowing and lending APRs is collected and controlled by whomever controls the Compound protocol. As Salil Deshpande, a managing director at Bain put it, "[t]he owners of the protocol . . . collect a protocol-defined commission on each outstanding loan."

33.     The Compound protocol was built with an "admin key." Whoever

**AMENDED COMPLAINT**

controls the admin key is empowered to do whatever she wishes with the protocol.

34. In May 2018, Compound Labs raised $8.2 million in seed funding led by Bain, Andreesen Horowitz, Polychain, and Paradigm.

35. Compound Labs opened the Compound business to the public on September 27, 2018, initially allowing users to borrow and lend a handful of assets.

36. The vast majority of people who borrow and lend using Compound do so by accessing a website maintained by Compound Labs. This website is referred to in the DeFi world as Compound's "front-end interface." To borrow or lend with Compound, users navigate to compound.finance, link a crypto wallet (essentially an account on a blockchain) to Compound, and send their assets.

37. In November 2019, Compound Labs raised $25 million in a Series A funding round led by Bain, Andreesen Horowitz, Polychain, and Paradigm.

38. Throughout 2018 and 2019, Compound Labs ran the Compound business, evidently successfully. In 2019, Leshner wrote that he was "blown away" by the market's response to Compound.

**<u>Compound Labs Transfers Control to Compound DAO</u>**

39. On February 26, 2020, Leshner announced that he was beginning the process of transferring the Compound business from Compound Labs to a soon-to-be-formed DAO.

40. To facilitate this transition, Compound Labs created a crypto token called COMP. It described COMP as a "governance token," and said that "COMP empowers community governance—it isn't a fundraising device or investment opportunity." COMP was programmed so that only 10,000,000 COMP tokens may ever be issued.

41. Together, the holders of COMP would be tasked, as Compound Labs' then–general counsel Jake Chervinsky put it, with "manag[ing] the protocol."

42. As a technological matter, the holders of COMP were given all of the

powers previously held by whomever controlled the "admin key." Holders of COMP can together do with the protocol whatever they wish by majority vote.

43. Leshner announced the creation of COMP in a public message in February 2020, explaining that issuing COMP would help Compound achieve its "goal . . . to create financial infrastructure that applications and developers can rely on, *forever*." After touting Compound's long-term prospects, Leshner urged readers to obtain COMP, telling them that "[p]articipation" in the DAO "starts with the Compound governance token, COMP." Leshner told readers that owning the COMP token would "allow[] you to suggest, debate, and implement changes to Compound" and to "participate in shaping the direction of Compound." At the same time, Leshner made clear that individuals could purchase COMP without participating in community governance, explaining that "[i]n addition to being a standard ERC-20 asset, COMP allows the owner to delegate voting rights to the address of their choice."

44. In early 2020, the first COMP tokens were issued to Compound Labs' shareholders, including the Partner Defendants. These holders "trialed" the COMP governance process for a few months.

45. In April 2020, Leshner announced in a public message that "community governance has replaced the administrator of the Compound protocol." Leshner stated that COMP allows "Compound's most important stakeholders [to] share the ability to upgrade the protocol." Leshner again made clear that people could buy COMP without participating in community governance: "Possessing COMP and participating in Compound governance are not the same; COMP token-holders can delegate voting authority to any address." Leshner stated that after COMP is issued to tokenholders, "the protocol will truly be governed by the community, without any foundation, the original developers, or other centralized middleman in charge."

46. In May 2020, Leshner stated in a public message that he was "excited

to announce that Governance is ready to scale from our core team and shareholders, to the entire Compound ecosystem." He proclaimed that COMP would help "create unstoppable, upgradable financial infrastructure." He stated that "[a]llowing every user to participate in governance will be the most important milestone in Compound history" and that "COMP holders" would soon "have complete, censorship-resistant control over the protocol."

47. Despite these statements touting "community governance" and the attractiveness of COMP, Compound Labs' plan was always to ensure that insiders kept control of the business into the distant future. When COMP was first issued, Compound Labs released a planned "supply schedule." According to the initial supply schedule, "founders and team," "shareholders," and "future team members" will together hold 57.8% of the outstanding COMP supply when COMP is fully distributed. In another version of the schedule, this group would eventually hold very slightly less than 50% of the outstanding COMP, but given that the overwhelming majority of COMP holders predictably do not vote, that would be more than enough to exercise effective control indefinitely.

### **Compound DAO Sells COMP to The Public But Maintains Control**

48. Once the trial period was over, Compound Labs ostensibly turned the keys over to the holders of the COMP token (the majority of whom were insiders). Instead of selling tokens directly for cash or crypto assets in an Initial Coin Offering (which is analogous to a traditional company's Initial Public Offering), Compound Labs sold COMP to Compound's users in exchange for their use of the business and payment of the business's fees.

49. On June 10, 2020, Compound Labs announced that the trial governance period for Compound DAO would end on June 16, and that COMP would become available to the public on that day.

50. On June 16, 2020, the overwhelming majority of COMP—more than

65%—was held by the Partner Defendants and a few other Compound Labs shareholders.

51.     Those people voted to begin distributing COMP under the supply schedule, which provides that all 10,000,000 possible COMP would be distributed by 2026 or so.

52.     Compound DAO distributed COMP to the users of the Compound business in exchange for their use of the service and payment of fees to the DAO. These distributions are sometimes referred to as "emissions."

53.     This is an example of a strategy called "yield farming" or "liquidity mining," which Compound essentially pioneered. By providing "governance" tokens proportionally to deposited and borrowed assets—and, therefore, proportionally to the fees users pay—the protocol creates incentives for users to deposit or borrow funds, and to pay fees. One ostensible incentive is the so-called "governance rights" that the tokens provide its holders, and that Leshner and other defendants extensively promoted. But, as explained above, this benefit is an illusion in COMP's case: retail token holders will never meaningfully control the business.

54.     The real incentive is financial: Because COMP tokens (like shares in a traditional company) represent a claim on the DAO's future earnings, COMP tokens have value. And because Defendants took steps to ensure that COMP tokens are tradeable on secondary markets, those who received COMP tokens for using the protocol and paying fees were able to immediately turn around and sell their COMP tokens for a profit. The influx of users borrowing and lending assets on Compound so that they could obtain COMP and then immediately sell it, in turn, increased the value of COMP tokens on the secondary market, as those tokens represent a claim on the DAO's future earnings, and the rapid growth in the protocol's user base gave the impression of rapidly increasing demand. The increase in the value of COMP tokens on the secondary market, in turn, increased the realizable interest rates for

depositors (who receive COMP with each deposit they make), incentivizing them to deposit even more, which in turn increases the value of the tokens, and so on.

55.     Although the Compound DAO did not allow the public to exchange pure cash for COMP directly with Compound DAO—users instead purchased COMP by using the DAO's service and paying its fees—the tokens immediately became tradeable on the secondary market, through decentralized exchanges, which, like Compound, are governed by DAOs. Compound DAO actively solicited these secondary-market transactions and, as detailed below, soon took additional steps to ensure that COMP would be tradeable on centralized crypto exchanges as well.

56.     In the first week that COMP was available to the public, the total value of the assets in the Compound business and under the DAO's control increased from approximately $100 million to approximately $500 million. The price of COMP skyrocketed too in a speculative frenzy: In its first five days of trading, COMP increased in price from $93.30/token to $335.82/token. At those prices, the effective interest rate for lending assets in Compound was stratospheric, often above 50%. And the effective price of borrowing became negative for many assets.

57.     Traders very quickly—if not immediately—realized that so long as the value of COMP was high enough to make the distributed amount worth more than the fees paid for borrowing or lending, wash trading was profitable. Users quickly borrowed from one wallet address and loaned the same amount from another. Then they got more creative and began lending and borrowing the cTokens (effectively the receipts for deposits) in addition to the deposits themselves; using other protocols to borrow assets and send them through wash trades in Compound; borrowing on margin to lend and borrow with Compound; and buying perpetual futures and using large spot purchases to manipulate price increases, which was easy to do in COMP's early days, when the total supply was quite low.

58.     All this was great news for Compound DAO and the Partner Defendants

even though it resulted in transactions with no economic substance. As a news report at the time succinctly put it: "Lest this [distribution plan] sound too altruistic, keep in mind that the people who created it (the team and the investors) owned more than half of the equity. By giving away a healthy proportion to users, that was very likely to make it a much more popular place for lending. In turn, that would make everyone's stake worth much more."

59.    COMP, after all, represents an ownership share in a business that charged healthy fees on a very large volume of transactions. One major investor explained, as Bain had earlier, that "[g]iven that COMP represents a potential claim on future interest paid, as more collateral onboards to Compound, this should make COMP more valuable as more lenders/borrowers show up."

60.    This was, of course, the plan all along: Liquidity mining or yield farming works only if there is a robust secondary market for trading in the "governance" tokens distributed to users because absent such a market the governance tokens would have no ascribable value and would not contribute to the increased profitability of borrowing and lending on the platform.

61.    Gauntlet thus explained to the other Partner Defendants that the COMP distribution plan was created to, among other reasons, create "liquidity incentivization" and "recursive leverage." By "recursive leverage" Gauntlet means COMP's capacity to encourage investors to borrow and lend on Compound, which in turn increases the price of COMP, and so on.

62.    Compound quickly proved to be an extraordinarily good investment for the Partnership Defendants. In exchange for their relatively modest investment (by Silicon Valley standards, at least) in Compound Labs, the Partner Defendants, and the rest of the shareholders of the corporation were given 2,396,307 COMP tokens. At COMP's peak (in May 2021), that share was worth $2,047,189,033.

63.    About two weeks after COMP's launch to the public, its price took a

nosedive, dropping from about $372 per token to about $200 per token. In response, Compound DAO and, on information and belief, at least one of the Partner Defendants endeavored to persuade a major, regulated U.S.-based crypto asset exchange, Coinbase, Inc., to list COMP for trading.

64. Indeed, according to CoinDesk, a crypto news publication, this move "was one of the fastest Coinbase listings to date following the launch of a digital asset."

65. Because Coinbase is one of the largest "centralized" exchanges for crypto assets, a listing there almost always results in a significant increase in price and, perhaps more importantly, a deeper and more liquid market for the asset.

66. This speed was not surprising because Coinbase made a 2018 investment in Compound Labs. It thus was easily able to coordinate with the DAO and the other investor partners to quickly list the new digital asset.

67. Coinbase's website advertises a means by which "asset issuers" can "list, launch, and grow." On that page, Coinbase tells issuers that it will "[h]elp new customers learn about your asset . . . to help you reach and grow an audience." The page ends reading: "Trusted By . . . Compound."

68. Compound DAO, then, actively solicited purchasers of COMP by (among other things) working together with Coinbase shortly after beginning its liquidity-mining and yield-farming program to encourage and facilitate secondary-market purchases.

69. The plan worked: shortly after Coinbase announced that it would make COMP available on its trading platforms, the price increased more than 20%.

70. With the help of Compound Labs, Coinbase also added COMP to a feature called "Earn" where users of Coinbase would receive COMP in exchange for watching an advertisement promoting the Compound protocol. Coinbase explained the "Earn" program in its public disclosures as follows: "We provide asset issuers with

**AMENDED COMPLAINT**

a platform to engage with our users through education videos and tasks where users can earn crypto assets that they learned about. We earn a commission based on the amount of crypto assets distributed to our users." Thus, Compound Labs and/or one or more Partner Defendants agreed to pay Coinbase a commission to sell or provide COMP to its investors, to encourage those investors to invest in COMP through "education videos" created by or at the direction of one or more Partner Defendants, to encourage investors to use the Compound protocol and thereby obtain more COMP, and to ensure a robust secondary market for COMP. Leshner also personally encouraged others to "try" this program to gain COMP.

71. The Coinbase webpage on which users could access the "education videos" about COMP listed the amount of COMP they could "earn" by watching the videos in terms of the value of those COMP tokens in U.S. dollars: "Earn $3 COMP." The same webpage also listed the price, market capitalization, and recent market activity for COMP on the secondary market, and provided a link for users to "[v]iew price charts, get live market data, and trade Compound."

72. Users who store their COMP tokens on Coinbase cannot exercise governance rights or vote on any governance proposals because Coinbase formally holds those tokens itself and distributes those tokens to investors only when the investors withdraw the tokens from Coinbase.

73. One of the educational videos on Coinbase Earn states that "100 years from now, Compound hopes for the protocol and its interest rates to be integrated into many applications around the globe, enabling entirely new products to come to life across a wide range of industries and use cases."

74. By August 2020, the price of COMP evidently was not where the DAO wanted it to be. And so, led by Gauntlet, the Compound DAO debated a proposal to reduce the rate of COMP distributed to Compound users. The debate over this proposal highlights the true purpose of distributing COMP to the public: making

money for the Partner Defendants.

75.     At the beginning of August 2020, Gauntlet released Compound Proposal 22, by which the Compound DAO would "systematically reduce [the] emission quantity" of COMP. Gauntlet contended that its goal in doing this was to (a) free up more COMP for other purposes (paying people to help with the protocol, for example), (b) encouraging more "real" borrowing activity, and (c) to "incentivize long-term holding of COMP." The purpose of incentivizing long-term holding is supposedly to encourage increased governance participation.

76.     But in August 2020 the Partner Defendants and other insiders controlled at least 65% of the outstanding COMP. Nothing they did could possibly encourage meaningful "governance" participation by anyone other than themselves, as they well knew.

77.     Furthermore, as Forbes has reported, for COMP holders "who store their . . . tokens on exchanges like Coinbase [on which the Compound DAO had just actively worked to list COMP] there isn't even a mechanism to allow voting."

78.     One user, with the username sbarinov, explained to Gauntlet, Leshner, and the other Partner Defendants: "With COMP a basic question remains—why would anyone keep COMP? . . . . As I see it now, the current answer is to govern the protocol by an elite few and the majority is on for the ride, for whom it won't matter anyway as we cannot get enough of it to voice our point of view." Instead, wrote another user, "Gauntlet's ill-considered proposal seems like nothing more than a thinly veiled attempt to cause a short term pump in COMP prices" by restricting the released supply.

79.     Meanwhile, of course, slowing down the rate of COMP distribution would slow down the schedule by which the Partner Defendants could even theoretically fear no longer holding a majority of COMP tokens. Another user, going by Sirokko, explained that "decreasing emission is just a way to preserve [the] current

status-quo, delay transition to community governance[,] and hold voting power by initial voters, who probably should vote yes." Sirokko further explained to Leshner and the Partner Defendants that "[i]t's worth noting that pretty much none of [the] controlling entities actually got their voting power from 'user distribution.'" Sirokko encouraged the community to "pay close attention to who will vote yes . . . ."

80.   Andreesen Horowitz, Polychain, and Gauntlet all voted yes. None of the Partner Defendants voted no. And on August 29, 2020, the proposal passed and the rate of COMP distribution was cut.

81.   Again the plan worked: On August 26, 2020, COMP traded at approximately $165 per token; on September 1, 2020, it traded at approximately $245 per token.

82.   Partner Defendants also worked to enable easier trading of COMP tokens. For example, in 2021, in response to a Compound user asking for a solution "to enable low-cost trading of COMP" on a different platform called Arbitrum, Leshner wrote that "I've reached out to the Arbitrum team to add COMP as a supported asset."

83.   COMP is currently listed on several major cryptocurrency exchanges,

**AMENDED COMPLAINT**

including Coinbase,[1] Kraken,[2] Robinhood,[3] Uphold,[4] Nexo,[5] Binance,[6] KuCoin,[7] and more.

84.     Until recently, COMP was also listed for trading with FTX. On June 18, 2020, FTX's founder, Sam Bankman-Fried, announced on Twitter that "Compound spot markets are going live!" Bankman-Fried touted COMP in a 20-tweet Twitter thread, noting that the value of COMP would be tied to the success of the Compound protocol: "COMP has also skyrocketed in price; it's now the highest market cap DeFi token (if you look at fully diluted value), having surpassed MKR. Will it sustain that? I don't know! I guess a lot of it comes down to whether it's going to set the new standard for DeFi lending." Similarly, the former CEO of Alameda Research, a crypto hedge fund associated with FTX, quoted Bankman-Fried's Twitter thread and tweeted that "COMP's future will mostly come down to whether the people who think DeFi (and COMP) are the future turn out to be correct."

85.     Crypto exchanges generally do not list a new token or asset on their exchanges without the cooperation or intervention of the developers of that token or

---

[1] Coinbase is owned and operated by Coinbase, Inc. and Coinbase Global, Inc., which are Delaware corporations headquartered in New York.

[2] Kraken's exchange is operated by Payward Ventures, Inc., which is a Delaware corporation headquartered in California. Payward Ventures, Inc.'s parent corporation is Payward, Inc., which is a Delaware corporation headquartered in California.

[3] Robinhood is operated by several entities incorporated in Delaware and headquartered in California.

[4] Uphold's exchange is operated by Uphold HQ Inc., a corporation formed in South Carolina and with offices in New York and California.

[5] Nexo's exchange is operated by Nexo Capital Inc., a Cayman Islands corporation with its principal place of business in the Cayman Islands. Since 2018, Nexo has conducted a crypto asset business globally and in the United States through Nexo's public website and through a mobile application, both of which are accessible from within the United States.

[6] Binance's U.S. exchange is operated by BAM Trading Services Inc., which is a Delaware corporation headquartered in California.

[7] KuCoin is owned and operated by Mek Global Limited, which is based in the Republic of Seychelles, and PhoenixFin PTE Ltd., which is based in Singapore. KuCoin is available to investors in the United States.

asset. For example, Binance's website has a page titled "How to Get Your Coin Listed on Binance.com" that links to an application for listing on Binance. Similarly, Kraken's website has a page titled "New coin listing requests" through which developers can submit a listing request. The website also notes that Kraken "will reach out to the project developers" before listing a new crypto asset on the exchange.

86.     On information and belief, one or more of the Partner Defendants took actions to ensure that COMP would be available for trading on the above-listed exchanges and several other exchanges, including directly contacting the exchanges, requesting that COMP be listed on those exchanges, and/or compensating those exchanges.

87.     On June 25, 2020—the same day that COMP was first listed on Binance for trading—a wallet associated with Compound Labs and/or one or more of the Partner Defendants transferred approximately 62,498 COMP tokens to a wallet associated with Binance.  At the time of the transfer, those tokens were worth approximately $14.4 million.

88.     Investors who purchase COMP on the secondary market do so with a reasonable expectation that COMP will be a profitable investment. Investors frequently discuss COMP as an investment asset on social media, in the official Compound Discord server, and in other crypto forums, repeatedly sharing their expectation that owning the COMP token will be profitable for them personally.

89.     Because of the Partner Defendants' extensive efforts to promote COMP and Compound and tout them as revolutionary products, investors reasonably expected that the value of COMP would appreciate over time and that they would make a profit on their investment.

90.     Retail COMP purchasers generally have not fared well. The value of COMP peaked in May 2021 at nearly $500 per token, which created a total market capitalization of about $4 billion. It soon halved in value, and in the fall of 2021,

**AMENDED COMPLAINT**

COMP's market capitalization was a little more than $2 billion. In the year preceding the filing of this Action, COMP has fallen in value by another 90%. Its market capitalization is approximately $330 million.

### Compound DAO Is a General Partnership

91.     Compound is a business: It charges fees to facilitate borrowing and lending of crypto assets. No entity that has ever registered with any state authority for any type of limited liability controls Compound.

92.     As of December 8, 2022, the Partner Defendants, plus one other person or entity, collectively controlled more than 50% of the COMP voting power outstanding.  They use that power to operate Compound jointly as a business for profit. They accordingly have created a general partnership (or an unincorporated association, which is materially identical) under California law and are jointly and severally liable for illegally selling unregistered securities.

93.     Each of the Partner Defendants has actively and publicly participated in the governance of the Compound business. They talk openly about the Compound business model, and they use their expertise to coordinate to run the business the way they see fit.

*Partner Defendants' Expertise in Crypto Businesses*

94.     Each of the Partner Defendants has deep expertise in crypto business and brings that knowledge to the partnership. This type of expertise was crucial for the growth and management of Compound, which at its peak was a $4 billion business.

95.     Leshner and Hayes initially sought out Bain, Andreesen Horowitz, Paradigm, and Polychain as investors in Compound Labs because these companies are some of the largest and most experienced investors in crypto. In fact, Forbes recently described these firms as "among a handful of big hedge funds and [venture

capital firms] . . . which, behind the scenes, centrally control many of the biggest decentralized platforms."

96. As Paradigm's website explains, it "take[s] a deeply hands-on approach to help projects reach their full potential, from the technical (mechanism design, smart contract security, engineering) to the operational (recruiting, regulatory strategy)."

97. Bain advertises its active governance participation as a key "advantage." According to its website, "Crypto protocols require a dedicated level of active participation on topics related to code contribution, risk parameter adjustment, DAO organization, and management. We participate actively in these ecosystems." Bain can do this because its crypto team is comprised of "a dedicated team of hackers, tinkerers, and builders, powered by a deeply technical, collaborative approach from the earliest stages."

98. Andreesen Horowitz's crypto fund advertises that it supports the businesses it invests in with its "research organization," "[e]ngineering and security teams," "[l]egal and regulatory teams," "[g]o-to-market expertise," "[r]ecruiting services," "[e]ducational content," and a "Crypto Startup School."

99. Polychain's C.E.O. has stated that his team was "definitely involved in the high-level design of the entire Compound token system."

100. Defendant Gauntlet, meanwhile, not only invests in and co-controls large governing shares in crypto businesses like Compound, it is also a large "risk management" company for those businesses. Gauntlet, Polychain, Andreesen Horowtiz, and Bain have all voted to pay Gauntlet for providing this service for Compound.

101. In September 2022, Gauntlet's Protocol Program Manager, Paul Lei, described Gauntlet's ongoing contributions to developing, improving, and enhancing Compound as follows: "For the past three years, Gauntlet has worked with Compound

to maximize the protocol's capital efficiency given an acceptable level of market risk. Over the past year, Gauntlet has . . . [p]rovided 16 sets of parameter recommendations, including 45 total parameter changes to 13 total assets, . . . initial risk parameter recommendations to support the launch of Compound III[,] . . . [b]uilt Risk Dashboard 14 to provide insight on risk and capital efficiency for the community[,] [u]pdated the community on risk developments during Compound Developer Calls[,] [p]ublished educational resources including VaR/LaR Deepdive, Model Methodology, Parameter Recommendation Methodology, and CMA/ES[,] . . . [c]ontinuously monitored market risk including publishing 2 Market Downturn Reports (May 2022 and January 2022)[,] [p]rovided analysis and recommendations on critical initiatives including ETH Merge, Reserve Factors, Asset Listing Framework, and MKR Borrow Cap[,] [p]rovided analysis for Compound's S&P rating, the first credit rating in DeFi history." Lei stated that over the past year, "Gauntlet increased collateral factors for the majority of assets while incurring no major insolvencies despite large market crashes. As a result, borrowers increased their utilization, which generated an additional $5.15m of borrow interest income and an additional $96m+ in total borrow."

102.    The Partner Defendants continue to make governance proposals for the improvement of the protocol and to vote on those proposals. Gauntlet, for example, has made several such proposals in 2023, including on January 30, February 27, and March 7. Underscoring the extent to which Gauntlet's operations are intertwined with Compound's, those proposals state as follows: "By approving this proposal, you agree that any services provided by Gauntlet shall be governed by the terms of service available at gauntlet.network/tos." In these terms, Gauntlet refers to the decision to purchase tokens as "investment" decisions.

103.    Gauntlet, using proprietary technology and data modeling, regularly proposes adjustments to collateral factors and borrowing caps for different assets.

These periodic adjustments are essential to keeping the Compound protocol functioning properly. Gauntlet has described its work on Compound as "continuous market risk management to maximize capital efficiency while minimizing the risk of insolvency and liquidations to create long-term sustainable growth." Without Gauntlet's efforts to continuously update and improve the protocol, the Compound protocol would be less reliable, less useful, and less profitable for the Partner Defendants.

*Partner Defendants Make, Discuss, and Vote on Governance Proposals*

104. Each of the Partner Defendants has also actively and publicly participated in the governance of the Compound business, working together to make crucial decisions for the business.

105. Often, Partner Defendants publicly discuss governance decisions with each other on the Compound forum.

106. For example, in August 2020, Leshner, Polychain, and Gauntlet publicly discussed a proposal to reduce the number of COMP that would issue to Compound users, as discussed above. All three argued on the Compound forum that the proposal should pass and wrote lengthy posts in support.

107. Overall, it was clear from the forum conversations that the "community" (i.e., ordinary COMP holders interested in governance but without millions of dollars to spend) did not like the proposal. This did not matter; the vote passed 1,119,629 to 195,969. Polychain, Gauntlet, and Andreesen Horowitz alone accounted for nearly 800,000 votes, which were worth over $150 million at the time.

108. Partner Defendants also frequently discuss and vote on business details like which crypto assets to add to the protocol and whether to change parameters in the markets of particular assets. For example, in December 2021, a proposal passed changing the parameters governing some markets, with Hayes, Gauntlet, and

Andreesen Horowitz alone accounting for 58 percent of the total votes cast. Before the vote, Leshner asked some questions about the proposal on the forum, which Gauntlet answered.

109.  Similarly, in September 2021, three assets were added to the Compound marketplace, with Leshner, Andreesen Horowitz, Polychain, and Gauntlet accounting for 62 percent of the total vote. Polychain proposed the addition of the three assets, and before the assets were added, Leshner, Gauntlet, and Polychain signaled their support on the forum, with Leshner and Gauntlet writing detailed posts about their support.

110.  Partner Defendants rarely disagree. But when they do, they often discuss their disagreements publicly. For example, in July 2020, Paradigm, Andreesen Horowitz, and Leshner publicly debated a proposal involving changing the parameters of certain crypto assets and reducing COMP distributions to users. Leshner, Paradigm, and Andreesen Horowitz came out voting on opposite sides, but agreed that in the future proposals like this one should be split into multiple proposals. The proposal passed 1,198,438 to 189,177, with Andreesen Horowitz, Polychain, and Leshner accounting for 65 percent of the yes votes and Paradigm and Gauntlet accounting for 80 percent of the no votes.

111.  Another contentious vote occurred in March 2021. This proposal would liquidate a large portion of certain crypto assets. On the public forum, some argued that liquidating some Compound users' positions would drive people away from the platform. Gauntlet, Polychain, and Andreesen Horowitz all argued for the proposal. Polychain wrote, "While this may end up liquidating users who don't adjust collateral in time, this is a tradeoff we should be willing to make to ensure protocol security." Andreesen Horowitz agreed, and thanked Gauntlet for "rightly elevating this risk to a vote." Seeing this, one forum member noted that, with Polychain and Andreesen Horowitz supporting it, the proposal "looks like it's a pass regardless." This turned

out to be true: even with Leshner opposing, for reasons he also outlined in the public forum, the proposal passed 952,359 to 411,686.

112.    In addition to publicly discussing governance with one another, Partner Defendants also work together to control Compound behind the scenes. As Andre Cronje, a crypto leader whose work, according to an industry profile, helped "shape the world of decentralized finance" has explained, "[a] decision does not pass on . . . Compound unless it is approved by the founding team. . . . As much as there is talk of decentralization, unless it is back-channeled there will be no approval."

113.    Forbes reported that, as it relates to Compound, "[Polychain CEO Olaf] Carlson-Wee openly admits that his team works with founders on all major proposals." The founders of Compound are Leshner and Hayes. And Carlson-Wee stated "I think that we plan to be and have been, frankly, in Compound and other systems quite engaged in the governance and decision making around the design of those systems."

*Partner Defendants' Management Response to a Business Crisis*

114.    That Defendants see themselves as managers for Compound even beyond official governance voting procedures was apparent during a business crisis in Fall 2021.

115.    In September 2021, a routine update to Compound's software was put up for a vote. In the forum discussion, Gauntlet wrote that "Gauntlet has reviewed the [update] and will be voting FOR." The proposal passed, with Gauntlet and Polychain accounting for 59 percent of the total votes.

116.    Unfortunately, the update introduced a bug that accidentally gave away additional COMP to users of the protocol. Because under governance procedures a new proposal to fix the bug could not be passed for at least seven days, the bug ultimately gave away about $90 million in COMP to various users.

**AMENDED COMPLAINT**

117. Leshner, Compound's founder and effective leader, immediately went into crisis mode. He took to social media and began doing press interviews.

118. On Twitter, Leshner released a statement attempting to strike a deal with the users who had accidentally received COMP. He wrote "Please return it to the Compound Timelock. . . . Keep 10% as a white-hat [i.e., a reward]." He then added "[o]therwise, it's being reported as income to the IRS, and most of you are doxed [i.e., have your identities revealed to Compound and, therefore, Leshner]."

119. Users viewed this as a threat to force users to pay income taxes, in an allusion to the fact that crypto investors frequently attempt to hide income generated by trades—on average, they pay less than half of the taxes they owe to the United States government.

120. This threat outraged the crypto community. As one user put it, "[t]elling your user base that you can dox [expose] them to the IRS at will seems like a great way to scare off customers." Leshner quickly apologized for the comment.

121. Meanwhile, other Defendants jumped into action. The same day the bug was executed, Gauntlet posted on the Compound forum that "[t]he current plan is to temporarily disable COMP claims until a full patch can be tested. More info coming soon."

122. The proposal to fix the bug and temporarily disable COMP claims passed unanimously, with Gauntlet, Andreesen Horowitz, and Leshner accounting for more than half the total votes.

*Leshner's and Hayes's Shadow Management through Compound Labs*

123. In addition to regularly participating in Compound's official governance, Leshner and Hayes founded and continue to lead Compound Labs, with Leshner serving as the C.E.O. and Hayes as the C.T.O.

124. Compound Labs is the entity responsible for running Compound's front-

**AMENDED COMPLAINT**

end interface, which is the website through which the overwhelming majority of users—who generally lack the technological sophistication to send assets to smart contracts directly—interact with the Compound protocol.

125.   Through Compound Labs, Leshner and Hayes continue to manage various aspects of Compound behind the scenes. Compound Labs has over 20 employees, many of whom work on tweaking and improving the protocol's codebase and making sure that the front-end interface functions properly, which is crucial to the success of Compound DAO and, in turn, COMP.

126.   In June 2021, Compound Labs released a new product designed to pump liquidity into the protocol, thereby increasing its size and value. The product was called "Compound Treasury."

127.   Compound Treasury operates like a bond: institutions and sufficiently wealthy individuals (but not regular people) can invest their money and Compound Labs guarantees a four percent fixed interest rate—far higher than average savings account returns were at the time. Compound Labs does this by funneling the money into the Compound protocol. If the returns are higher than 4 percent, Compound Labs pockets the difference; if they are lower, Compound Labs pays out the difference.

128.   Compound Labs did not share any information about its plans for Compound Treasury on the Compound forum in advance of its release. In fact, there were no posts about Compound Treasury at all until months after its release.

129.   However, Compound Labs did issue a statement on Medium.com about Compound Treasury on June 28, 2021.

130.   That same day, the trade volume of the Compound protocol jumped from $81.5 million the previous day to over $2 billion.

131.   The price of COMP also began to surge. On June 28, 2021, COMP was worth $250. One week later, it was worth $462.

132.   In June 2022, Compound Labs announced its creation of Compound III.

**AMENDED COMPLAINT**

Through its vice president, it stated that it was "excited to release a code repository to the Compound community, which we hope can form the basis of a multi-chain deployment strategy: comet, which the community has been referring to as Compound III. Compound III is designed with borrowers in mind, to be capital efficient, gas efficient, safe, and simple to govern." In a public post in August 2022, Leshner described Compound III as "a next-generation collateralized borrowing protocol, designed for security, capital efficiency, low gas costs, and streamlined governance." In another post in August 2022, Leshner touted Compound III as "the most effective tool for borrowers in DeFi" and described the ways in which Compound III was an improvement on prior versions of the protocol. In August and September 2022, an anonymous individual who, on information and belief, was Leshner or an individual acting at the direction of Leshner, created multiple successful governance proposals to initialize and implement Compound III. Each of these proposals was accompanied by a lengthy public message from Leshner describing the proposal and the underlying business strategy.

133.    In September 2022, Compound Labs announced another financial product: a lending service for financial institutions, allowing "[a]ccredited institutions" to borrow U.S. dollars by depositing crypto assets as collateral, "with fixed interests rate starting at 6% APR."

134.    Compound Labs told a news publication that the product was being offered "in response to recent market volatility, which has created a more robust demand for liquidity."

135.    As Compound Labs' Vice President and General Manager explained in a statement, "Compound Treasury can now address demand for liquidity with a simple, reliable borrowing solution, while continuing to provide the same trusted service we've delivered to clients earning interest over the past year."

136.    It is unclear whether the lending product was popular or whether it

**AMENDED COMPLAINT**

1    successfully led to a significant boost to trade volume or the price of COMP.

2    *Partner Defendants' Statements on the Compound Business Model*

3    137.   Defendants manage Compound because they view it as a business run

4    for profit.

5    138.   Indeed, the Defendants, together and individually, have frequently

6    promoted COMP tokens as assets that are good investments—at times explicitly

7    noting the similarity of owning COMP tokens to owning shares of stock in public

8    companies. For partners, the value of a COMP token is directly tied to its value on

9    the secondary market as a speculative asset and to the success of the protocol itself.

10   139.   A senior investor at Andreesen Horowitz, for example, has explained on

11   its website that COMP tokens "are an instrument for effectively distributing the

12   fundamental value of [the Compound business], including a fee stream."

13   140.   A section of an Andreesen Horowitz presentation titled "Compound Case

14   Study" outlined how the firm viewed the Compound "Business Model" as one where

15   "Governance Token Holders" can "Capture a Revenue Stream."



25   141.   Likewise, the C.E.O. of Polychain has said that COMP tokens are an

26   "attempt to extract revenues from [the Compound protocol] in some manner and

27   basically apply what we would traditionally think of as like a business model to an

28

31

**AMENDED COMPLAINT**

underlying smart contract system." Separately, the C.E.O. of Polychain promoted COMP tokens as a "reward" for those contributing capital to the protocol: "in two of the cases we talked about, Compound and Uniswap, both of those have network-mining systems, where if you contribute capital into those pools . . . you're rewarded with some of the DAO tokens."

142. The C.E.O. and founder of Gauntlet has said that all DAO votes are "tied to future [expected] cash flows."

143. Leshner and the Partner Defendants also recognize that most COMP holders will treat COMP as a passive investment, and Partner Defendants are very motivated by the value of COMP on the secondary market.

144. In June 2021, Leshner wrote on Twitter that people should stop complaining to him about the falling price of COMP, because he "too would be happier if it were higher."

145. Similarly, Polychain CEO Olaf Carlson-Wee stated "we're running a fund, we want these tokens to be as valuable as possible."

146. Leshner stated that "all of the returns" for protocol users come from either the interest they earn for lending their assets or "from the distribution of governance tokens."

147. In 2020, Leshner explained his rationale for creating COMP tokens: "We were also inspired by a lot of like what I'll call, like, traditional real world use cases so you know everyone owns shares of stock. How many people are voting on those shares of stock? And how many people actually want to exert governance over the companies that they're investors in? Very few, right, like you probably hold stock and you probably don't vote your stock. Instead people essentially appoint others you know to have their back and to represent them. This happens with board of directors that's, you know, the one governance use case of stock is to appoint other people to manage the system on your behalf. And so that was one of the primary motivations

**AMENDED COMPLAINT**

for us as, you know, we basically looked and said well how do people use real-world voting assets right, like? Most people aren't showing up at the shareholder meetings, they're not voting the proxies. They're just trying to find people who are smart and paying attention and are focused on maximizing the outcome. And so that was a big design decision for us is enabling that exact behavior. It's directly related to participation rates but we anticipate that over time most token holders don't want to be in the business of voting. They want to find the people that do want to be in the business of voting, who care the most, who spend the most time, who put in the best research to helping to guide the protocol forward."

148.    In Leshner's view, most holders would be passive investors, trusting others to run the business, and treat the COMP tokens just like they would any other security.

149.    Indeed, many COMP tokenholders were even less involved than holders of shares in public companies, and by design. As Forbes reported, with COMP tokens, "unlike voting for common stocks, there is no mandate to notify token holders of upcoming votes, and for those who store their DeFi tokens on exchanges like Coinbase there isn't even a mechanism to allow voting." The implication is that holders of COMP tokens on those platforms can do little more than hold their tokens as assets or trade them to others for value.

150.    Others involved in the protocol confirmed this approach. Polychain CEO Olaf Carlson-Wee agreed with an interviewer that holding COMP tokens is a way "to have ownership and get part of the revenue that the platform is generating." He called this idea "very similar to many traditional web businesses" and compared the growth model of Compound to that of Facebook. He continued the analogy and elsewhere said that "instead of owning shares in a legal entity, [holders] are now owners of Compound tokens."

151.    Carlson-Wee continued to make the comparison between the DAO and

**AMENDED COMPLAINT**

a corporation, and between COMP tokens and shares in corporations. "That base [of COMP tokenholders] looks and feels a bit like a corporation that owns a financial product, but both the corporation itself and all the relationships between the people, as well as the financial products itself, are defined not with pen and paper legal contracts, but with pure software contracts embedded in the blockchain," he said. At that point, he touted that the "Compound DAO [was] worth over a billion dollars."

152.  Carlson-Wee further promoted the Compound product by comparing it to other established corporations. "[O]ne way that startups bootstrap growth is to basically hand out equity or cash," he noted. He continued that "the blockchain version of it is you actually have the protocol give out programmatically future ownership of that underlying system to the users of the system [i.e., COMP tokens], basically pro rata, based on the amount of capital they contribute." So, in his view, the "Compound token represents . . . ownership over that lending pool. It is like giving, I think a crude metaphor is it is like giving equity grants to early users of your service in order to bootstrap use."

153.  Carlson-Wee later confirmed his belief that COMP tokens were a part of an "asset class" that "represent an ownership stake in that underlying financial product."

154.  In 2021, Leshner compared the distribution of COMP tokens to the distribution of ownership shares in Nike. "If Nike was giving out ownership of the Nike-everything to its customers with every shoe purchased, that would be sort of akin to distributing ownership and control to the users," he stated. He continued by saying that because COMP tokens are tied to "an important and valuable product"— that is, Compound lending marketplace—they could work similarly.

155.  On the Compound Discord site—Discord is a social-media service that DAOs often use to discuss business issues—when users indicate an interest in discussing COMP as a speculative investment, Leshner regularly shares with them

a link to a forum that Leshner explains can be used "for speculative discussion."

156.   The value of COMP is fundamentally tied to the efforts of others to develop a product that grows in usage thus increasing fees and revenue streams, in a way indistinguishable from how the value of a share of a publicly listed company is tied to the future earnings stream of the underlying company and reliant on its management to achieve those earnings.

157.   In 2020, Leshner said that, for users to want tokens, there "has be something of value there in the first place." That is, "at the end of the day," the Compound marketplace "has to be an important and valuable product" for the COMP tokens to have any value.

158.   In 2020, while speaking to potential investors at an "AMA" event, Leshner publicly stated: "I think there's a lot of use cases [for the Compound protocol] that open up when you start to have stablecoins and multiple currencies that we just haven't seen yet and we're still sort of waiting for Compound to support multiple currencies, but when you start having more assets, and more functional assets, the use cases for Compound actually go up non-linearly, they go up very fast… When the assets inside of Compound are like many different currency stablecoins and Bitcoin and five years from now when it's like financial securities, bonds, and stocks, and stuff like that…."

## COMP Collapses in Value

159.   The eighteen months ending in December 2022 were not kind to the passive holders of COMP whom Defendants have convinced to invest in their security.

160.   On May 11, 2021, the value of a COMP token was $854, and the total market capitalization was over $4 billion.

161.   Six weeks later, COMP experienced its first crash. The value of a token fell to $222 on June 25, 2021, and the total market capitalization was $1.18 billion.

162.   The price of COMP then experienced substantial volatility for the next

**AMENDED COMPLAINT**

year or so. Its value recovered somewhat and the market capitalization was about $2.8 billion on September 6, 2021.

163.  Since November 2021, it has experienced a consistent decline in value. The market capitalization was $1.33 billion on January 1. It was $1.06 billion on April 1. It was $423 million August 1. On November 1, 2022, it was $360 million.  On December 1, 2022, it was $276 million.

## COMP Is a Security

164.  Gary Gensler, the Chair of the SEC, recently stated that, other than Bitcoin, all crypto "tokens are securities because there's a group in the middle [between the tokens and investors] and the public is anticipating profits based on that group."

165.  Gensler recently stated, with respect to crypto tokens that are not registered as securities, that "the path forward is well-trodden… We have tens of thousands of [non-crypto] registrants that properly in good faith comply, they register, they make the proper disclosures.  It's time for this group to do so.  The runway is getting awfully short, and we're here to try to protect the investing public."

166.  Gensler recently stated: "There's nothing incompatible [between] crypto and our securities laws. Our securities laws were brought about to protect the investing public against fraud and schemes and manipulation. And it was through this idea of full, fair, and truthful disclosure, registering with the SEC when you're raising money from the public and the public's anticipating a profit."

167.  The securities laws define the term "security" to include any "investment contract."

168.  Under the Supreme Court's decision in *SEC v. WJ Howey Co.*, 328 U.S. 293 (1946), an investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

169.   The SEC's Strategic Hub for Innovation and Financial Technology has published the Framework for 'Investment Contract' Analysis of Digital Assets ("SEC Framework"), which provides guidance for assessing whether a crypto token is a security under federal law.

170.   The SEC Framework states that the first prong of the *Howey* test—an investment of money—"is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

171.   Investors in COMP use various forms of money, including various forms of crypto assets, to make their investments. Some investors obtained their COMP tokens in exchange for borrowing or lending cryptocurrencies through the Compound protocol, and for fees they paid to engage in such transactions. Some investors obtained their COMP tokens on the secondary market in exchange for cash or various cryptocurrencies or other digital assets. Some investors obtained their COMP tokens by participating in programs like Coinbase Earn.

172.   The SEC Framework states that "a 'common enterprise' typically exists" with respect to "digital assets."

173.   COMP is no exception. Investors who purchase COMP tokens are investing in a common enterprise—the Compound DAO and the Compound protocol—and the value of their COMP tokens are interwoven with and dependent upon the success of the DAO and the protocol, as well as the efforts of those who control the DAO and the protocol.

174.   Partner Defendants each own or control a substantial share of COMP, such that they share a common financial interest in the COMP token with Plaintiffs and the members of the class.

175.   Increases in the value of the COMP token make the Compound protocol

**AMENDED COMPLAINT**

more attractive to users (because receipt of a more valuable COMP token reduces the effective cost of borrowing and increases the return for lending). In this respect as well, Partner Defendants have a financial stake in COMP.

176.    With respect to the element of "reasonable expectation of profits," the SEC Framework states that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

177.    As detailed more fully above, investors in COMP, including Plaintiffs, make their investment with a reasonable expectation of profit.

178.    The COMP token represents a claim on the DAO's future earnings, and COMP tokenholders can authorize distributions and thereby share in the DAO's income and profits.

179.    There is a robust secondary market for COMP, which is traded on multiple major crypto exchanges. This secondary market allows COMP tokenholders to sell their COMP tokens and realize gains if the price of COMP increases.

180.    COMP is designed in a way that allows investors to hold the token without participating in governance, facilitating investors' use of COMP solely as an investment asset.

181.    The widespread availability of COMP on the secondary market allows investors to purchase COMP even if they do not use, and do not plan to ever use, the Compound protocol to borrow or lend crypto assets.

182.    The functionality of the token as a governance mechanism is illusory, as the Partner Defendants control the majority of tokens and ordinary investors like Plaintiffs are unable to exert any meaningful influence on governance issues.

183.    Investors reasonably expect that the efforts of the Partner Defendants and other insiders will result in appreciation of the COMP token and that they will therefore be able to earn a return on their investment.

**AMENDED COMPLAINT**

184. Some or all of the Partner Defendants have promoted COMP in terms that indicate it is an investment and that the value of the investment will increase with the success of the Compound DAO and the Compound protocol.

185. The SEC Framework explains that the "reliance on the efforts of others" prong focuses on two key issues: "Does the purchaser reasonably expect to rely on the efforts of [a promoter]?" And are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?

186. As detailed more fully above, the success of the DAO, and the profits that Plaintiffs reasonably expected to derive from investing in COMP, are dependent on essential technical, entrepreneurial, and managerial efforts of the Partner Defendants and their agents and employees.

187. The value of COMP is derived from or influenced by the value, operability, and success of the Compound protocol and its effective implementation of DeFi.

188. Plaintiffs reasonably expect the Partner Defendants and their employees to provide significant managerial efforts, to develop and improve the protocol, to make governance proposals for the improvement of the protocol, to promote the DAO in public forums, and to get COMP listed on several exchanges. The Partner Defendants have made multiple modifications, upgrades, and improvements to the Compound protocol and related products since its launch, and investors reasonably expect them to continue to do so. No major changes can realistically be made to the protocol or the business model without the participation and approval of the Partner Defendants.

189. The Partner Defendants play the lead role in the ongoing development of the protocol and of the COMP token.

190. The governance proposals through which the Partner Defendants and

**AMENDED COMPLAINT**

their employees propose, vote on, and execute modifications, upgrades, and improvements to the protocol are all available on the Compound website at https://compound.finance/governance/. Partner Defendants have proposed, voted on, and otherwise influenced all or substantially all changes to the protocol, and investors reasonably expect them to do so given that they control the majority of COMP shares and stand to personally benefit from the success of the DAO business.

191.    Until recently, the only members of the "community" who could directly create a live governance proposal were those who owned or were delegated at least 100,000 COMP. Partner Defendants were among the small number of individuals and entities who met that threshold. Indeed, most governance proposals have been created by the Partner Defendants and their agents or employees. Accordingly, investors reasonably expected that the Partner Defendants would make governance proposals to continue to improve the protocol and thereby enhance the value of COMP, and Partner Defendants in fact did so on many occasions.

192.    The Partner Defendants have taken actions to limit the supply of COMP or to ensure the scarcity of COMP, including by proposing or casting deciding votes on proposals to decrease COMP emissions.

193.    Partner Defendants play a continuing managerial role in making decisions and exercising judgment about the protocol, the COMP token, and the DAO business.

## Class Action Allegations

194.    Plaintiffs propose to move and certify the following class: All people who purchased or obtained COMP on or after December 8, 2021. Excluded from the class are Defendants; corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

**AMENDED COMPLAINT**

195.   The proposed class meets Federal Rule of Civil Procedure 23's requirements, called respectively numerosity, commonality, typicality, adequacy, predominance, and superiority.

*Numerosity*

196.   The class is so large that joinder of all parties would be impracticable.

197.   There are approximately 7.3 million COMP tokens in circulating supply. While many of those tokens are held by the Partner Defendants, thousands of other investors hold COMP tokens, and they trade hundreds of thousands of tokens each day.

198.   The class likely contains thousands of members and therefore satisfies the numerosity requirement.

199.   There are questions of law and fact common to members of the class, including, without limitation: whether COMP is a security; whether Defendants' offerings, sales, and solicitations, of COMP violate the registration provisions of the Securities Act; whether Defendants sold or solicited sales of COMP; and whether Defendants are liable to the class members for rescissory damages.

*Typicality*

200.   The Plaintiffs each received COMP tokens for value, even though Defendants did not register COMP tokens as a security. The claims of the named Plaintiffs are, therefore, typical of—indeed identical to—the claims of all the unnamed class members.

*Adequacy*

201.   As explained above, the named Plaintiffs' claims are identical to the claims of other class members, and there are no known conflicts of interest with any other class member.
The named Plaintiffs will adequately protect the interests of absent class members.

**AMENDED COMPLAINT**

This Court recently concluded that the named Plaintiffs' "appear to satisfy Fed. R. Civ. Proc. 23 requirements" (Doc. 73 at 1) and, therefore, appointed named Plaintiffs as lead plaintiffs under the Private Securities Litigation Reform Act (PSLRA).

202.    Plaintiffs propose Gerstein Harrow, LLP, and Fairmark Partners, LLP, as class counsel. This Court recently "approved of Plaintiffs' selection of Gerstein Harrow LLP and Fairmark Partners LLP as Lead Counsel." (*Id.*)

203.    Class counsel will fairly and adequately represent the interests of the class.

*Predominance and Superiority*

204.    The questions of fact and law common to the class predominate in this Action over any questions affecting only individual members of the class.

205.    The classes in this case will be easily managed and ascertained. COMP transactions are recorded on the Ethereum blockchain or in the blockchains or transaction logs used by the secondary-market exchanges on which COMP is bought and sold. Accordingly, although Defendants may not know the legal identities of all COMP investors, those investors can be communicated with (to ensure the provision of notice), the amounts of money the investors spent on COMP tokens is easily ascertainable, and the investors can easily be made whole through the accounts associated with the transactions.

## **Claims for Relief**

### *Count One:*
### *Unregistered Offer and Sale of Securities in Violation of Sections 5 and 12(a)(1) of the Securities Act of 1933 (Against All Defendants)*

206.    Plaintiffs incorporate all prior paragraphs by reference.

207.    15 U.S.C. § 77*l*(a)(1) provides that "any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."

208.  15 U.S.C. § 77e(a) (Section 5(a) of the '33 Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

209.  15 U.S.C. § 77e(c) (Section 5(c) of the '33 Act) states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

210.  When issued, COMP tokens were securities within the meaning of Section 2(a)(1) of the '33 Act, 15 U.S.C. § 77b(a)(1).

211.  During the Class Period, Defendants sold COMP tokens to Plaintiff and the Class members.

212.  Defendants sold COMP tokens both by transferring title to COMP tokens directly to class members and/or by soliciting the purchase of COMP tokens by Plaintiffs and the class members with a self-interested financial motive.

213.  Defendants therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

214. No registration statements have been filed with the SEC or have been in effect with respect to the offering of COMP tokens.

215. Accordingly, Defendants violated Section 5 of the '33 Act, 15 U.S.C. §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), 15 U.S.C. § 77l(a)(1).

216. As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and members of the class have suffered damages in connection with their respective purchases of COMP.

## **Prayer for Relief**

Plaintiffs respectfully request that the Court:

- Certify the proposed class, the named Plaintiffs as class representatives, and the undersigned counsel as class counsel, and allow Plaintiffs and the class to have trial by jury;

- Enter judgment against all Defendants, jointly and severally, and in favor of Plaintiffs and the class, awarding rescission or rescissory damages as defined by relevant law;

- Award reasonable attorneys' fees, costs, expenses, prejudgment and postjudgment interest, to the extent allowable by law;

- Award equitable, injunctive, and declaratory relief, including but not limited to declaring that COMP is a security and that Defendants joined a general partnership that sold COMP without registration, and enjoining Defendants from continuing to sell COMP without registration;

- Award any other relief deemed just and proper.


Respectfully submitted,

*/s/ Jason Harrow*
Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

1

2  Charles Gerstein
   (*pro hac vice*)
3  Emily Gerrick
   (*pro hac vice*)
4  GERSTEIN HARROW LLP
   810 7th Street NE, Suite 301
5  Washington, DC 20002
   charlie@gerstein-harrow.com
6  (202) 670-4809

7
   James Crooks
8  (*pro hac vice*)
   Michael Lieberman
9  (*pro hac vice*)
   FAIRMARK PARTNERS, LLP
10 1499 Massachusetts Ave. NW, #113A
   Washington, DC 20005
11 jamie@fairmarklaw.com
   (619) 507-4182
12

13 *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED COMPLAINT**