1                        UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF DELAWARE
2

3    IN RE:                        .  Chapter 11
                                   .  Case No. 22-11068 (JTD)
4    FTX TRADING LTD., *et al.,*   .
                                   .  (Jointly Administered)
5                                  .
                                   .  Courtroom No. 5
6                                  .  824 North Market Street
              Debtors.            .  Wilmington, Delaware 19801
7                                  .
                                   .  Tuesday, June 25, 2024
8    . . . . . . . . . . . . . . . 10:00 a.m.

9                        TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE JOHN T. DORSEY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Adam Landis, Esquire
                               LANDIS RATH & COBB LLP
13                             919 Market Street
                               Suite 1800
14                             Wilmington, Delaware 19801

15                             Brian Glueckstein, Esquire
                               Andrew Dietderich, Esquire
16                             Alexa Kranzley, Esquire
                               SULLIVAN & CROMWELL LLP
17                             125 Broad Street
                               New York, New York 10004
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Moskowitz Law
   Firm and Boies
3  Schiller Flexner:          Jason Rosell, Esquire
                              PACHULSKI STANG ZIEHL & JONES LLP
4                             One Sansome Street
                              Suite 3430
5                             San Francisco, California 94101

6  For Sunil Kavuri,
   Ahmed Abd El-Razek,
7  Pat Rabbitte:             David Adler, Esquire
                              MCCARTER & ENGLISH LLP
8                             Worldwide Plaza
                              825 Eighth Avenue
9                             31st Floor
                              New York, New York 10019

10
   For the Ad Hoc
11 Committee:                Matthew Harvey, Esquire
                              MORRIS, NICHOLS, ARSHT
12                              & TUNNELL LLP
                              1201 North Market Street, 16th Floor
13                            P.O. Box 1347
                              Wilmington, Delaware 19899

14
   For the Celsius
15 Litigation
   Administrator:            Seth Lieberman, Esquire
16                            PRYOR CASHMAN LLP
                              7 Times Square
17                            40th Floor
                              New York, New York 10036

18
   For Steadview Capital
19 Management:               Dylan Marker, Esquire
                              PROSKAUER ROSE LLP
20                            Eleven Times Square
                              Eighth Avenue & 41st Street
21                            New York, New York 10036

22 For LayerZero:            Stephen McNeill, Esquire
                              POTTER ANDERSON & CORROON LLP
23                            Hercules Plaza
                              1313 North Market Street, 6th Floor
24                            P.O. Box 951
                              Wilmington, Delaware 19801

25

1    APPEARANCES (CONTINUED):

2    For the Committee of
     Unsecured Creditors:        Kenneth Pasquale, Esquire
3                                PAUL HASTINGS LLP
                                 200 Park Avenue
4                                New York, New York 10166

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 4: Motion of Debtors for Entry of an Order          6
4            (I) Approving the Adequacy of the
             Disclosure Statement; (II) Approving
5            Solicitation Packages; (III) Approving
             the Forms and Ballots; (IV) Establishing
6            Voting, Solicitation and Tabulation
             Procedures; and (V) Establishing Notice
7            and Objection Procedures for the
             Confirmation of the Plan [D.I. 4863;
8            Filed December 16, 2023]

9            Court's Ruling:                                  81

10   Agenda
     Item 5: Motion of Debtors for Entry of an Order         81
11           Authorizing and Approving (I) the
             Repayment of Intercompany Payables by
12           FTX Japan and (II) the Release of the
             Claims Related to the Intercompany
13           Payables [D.I. 15654; Filed May 23, 2024]

14           Court's Ruling:                                 84

15
     DECLARATIONS:                                         PAGE
16
     1)   Steven Coverick - Docket 15654                     83
17
     2)   Steven Coverick - Docket 17173                     83
18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:03 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5               Mr. Landis.

6               MR. LANDIS:  Good morning, Your Honor.  May I

7    please the Court, Adam Landis from Landis Rath & Cobb on

8    behalf of FTX Trading Ltd., and its affiliated debtors.

9               Your Honor, we are here today with five matters on

10   the agenda.  We are going to just walk right through them if

11   it pleases the Court.

12              With respect to the first two matters, one and

13   two, those have been adjourned by agreement of the parties.

14   This is the Celsius Litigation Administrator's motion for

15   relief from the automatic stay to assert claims in the New

16   York Celsius proceeding.  The debtors, the JOL's and the

17   Celsius Litigation Administrator painstakingly negotiated a

18   tolling and scheduling agreement with respect to this matter

19   that we would expect to file under certification of counsel

20   hopefully later today after a couple of nits of picked on the

21   document itself.

22              We need to toll the statute of limitations by

23   agreement for the Celsius Litigation Administrator's

24   potential claims.  We have agreed to that in order to adjourn

25   the hearing to the July 17th hearing.  So, we expect to

1   submit that and schedule our -- the agreement also will have

2   scheduling provisions for our responses and for that matter,

3   the lift stay matter, going forward.  I think that covers

4   that.

5          With respect to matter number three we are

6   resolved. So, we need not dwell on that.  That will take us

7   into the disclosure statement matters.  Before we get to that

8   Mr. Dietderich would like to address the Court.

9          THE COURT:  Thank you.

10          Mr. Dietderich.

11          MR. DIETDERICH:  Good morning, Your Honor.  For

12   the record Andrew Dietderich, Sullivan & Cromwell.

13          Your Honor, our disclosure statement and

14   solicitation procedures presentation today will have three of

15   us talking.  I would like to give a little bit of background

16   of some general points about how we got here and where we are

17   going.  Mr. Glueckstein will address the objections that we

18   received and then Ms. Kranzley is prepared to walk the Court

19   through the solicitation procedures and detailed comments on

20   all of that.

21          THE COURT:  Okay.

22          MR. DIETDERICH:  So, Your Honor --

23          THE COURT:  I'm intimidated by the very large

24   binder you have sitting on your desk.

25          (Laughter)

1          MR. DIETDERICH:  The disclosure statement, at

2   least in the handheld version, is a document that, obviously,

3   has been a huge team effort by many, many people not just for

4   the debtors but for all of our supporting stakeholders. It

5   goes through unusual detail in explaining the background of

6   the decisions that underly the plan and that this process has

7   stakeholder input and collaboration that we followed from the

8   beginning of the case.  This includes not only plan

9   formation, but really consultation with all of our creditor

10  constituencies on every major decision we have taken in the

11  case.  And that more than anything else, I think, has allowed

12  us to be in this position where we're contemplating a largely

13  consensual process going forward with our key stakeholders.

14          There are a few elements of the plan and the

15  disclosure statement, Your Honor, that I think merit pointing

16  out to the Court this morning.  The first is substantive

17  consolidation. The plan consolidates the estates of most of

18  the debtors.  Now in the Third Circuit substantive

19  consolidation is an extraordinary remedy.  We are told we

20  should only do it when we really need to but I think the

21  debtors and all of the stakeholders are convinced that this

22  is the paranematic case where we do really need to

23  substantively consolidate the estates.

24          We estimate it would cost hundreds of millions of

25  dollars to disentangle FTX and create individual standalone

1    estates.  Even doing that will result in something arbitrary

2    and ultimately unsatisfactory.  We also believe that we

3    passed, I think, the ultimate test in case law substantive

4    consolidation in that everybody is better off because we're

5    doing it.  That remains a critical component of our plan.

6                Now, that relates to a corporate governance point.

7    We arranged our affairs at the beginning of the case with a

8    possibility of substantive consolidation.  Your Honor may

9    remember, but it bears pointing out, our unusual governance

10   structure for these estates.  We have separate independent

11   directors on the board of each of the top companies of each

12   of the four silos that we had at the beginning, but all of

13   the independent directors generally have met as a joint board

14   overseeing operations from the beginning.  We have had 56

15   meetings with the joint board of directors since the filing

16   of the case.

17               Each of the directors has therefore been involved

18   in supervision of the entire FTX business, not only the part

19   that relates to the entity for which they are nominally

20   responsible but for all the asset dispositions across the

21   capital structure.  That allows us, because decisions have

22   generally been made fully informed and unanimously by the

23   joint board, for everyone to be comfortable that everything

24   we have done has been at the interest of all the entities

25   regardless of which entity might, at the end of the day, have

1  a particular interest in, say, the sale proceeds.

2           I think that has built a very strong record as we

3  come into Court now focusing on a substantive consolidation

4  plan that everyone is comfortable with that, at least, from

5  the board of directors and from a governance perspective.  We

6  also have benefited, of course, from the fact that we have

7  had a single committee, a single committee representing all

8  of the creditors across all of the FTX debtors and been able

9  to consult with them and run things on a unified basis as

10 well.

11          The most important fact about the plan, of course,

12 is that its largely consensual. Mr. Glueckstein will address

13 the few objections that we have so far that we're

14 contemplating but the pertinent fact today is the

15 extraordinary absence of objections from any of the major

16 stakeholders with whom we have engaged.  That includes not

17 just the committee, it includes the ad hoc committee of non-

18 US customers representing about $4 billion of customer

19 claims; it includes all of the original adversary proceedings

20 of customer property that were filed against us, not the

21 newer one but the original actions; it includes all of the

22 Chapter 11 debtors that we had collisions with, debtor on

23 debtor collisions with, raising very difficult issues; it

24 includes BlockFi, one of our largest single creditor; it

25 includes all of the government constituencies with the

1  exception of some disclosure objections from a couple states

2  that we have resolved today, we hope consensually.

3          To do that we kind of -- that was a strategic

4  focus.  We recognize that on our fact patter plan litigation

5  would be very difficult and very, very expensive.  So, from

6  the beginning we thought about how do we build a plan process

7  that has as much consensus and buy-in as possible. To do that

8  we include in the plan several really important settlements.

9          The first, of course, is our settlement with the

10  joint official liquidators of FTX DM.  The settlement creates

11  a single economic unit so that creditors can receive an

12  economically equivalent distribution regardless of whether

13  they put in a claim under the US proceeding and the Bahamas

14  proceeding, but yet also includes precautions that allow us,

15  as the debtor, and the joint official liquidators, as

16  fiduciary, to make sure that any payments and distributions

17  are being made in a way that is consistent with, you know,

18  both sets of laws.  They have been a remarkable partner in

19  that effort.

20          I would have to say that we had a lot of concerns

21  about how to operationalize that and there still is work to

22  be done. It's not novel ground.  Nobody has quite done it

23  this way before, but the relationship is a strong working

24  relationship and everybody is pulling in the same direction.

25          The plan, of course, includes a settlement of one

1  of the central issues we have in our case which is the

2  balance of relative entitlements between customers and non-

3  customers.  We built consensus among the key customer

4  communities and the key non-customer communities on the

5  balance of that -- kind of the balance that we struck in the

6  plan.

7          Now the debtors expect this consensus approach to

8  continue.  We are not done making decisions.  We have agreed

9  with our major creditor groups on continuity of governance

10 going forward. The current board, the joint board will be

11 augmented by two representatives of the joint official

12 liquidators and one creditor appointee.  Creditor

13 constituencies will have additional input through our

14 creditor advisory committee.  All of this is explained in the

15 recent changes for the disclosure statement that we filed on

16 the docket recently.

17          Of course, the plan still needs to resolve the

18 customer property issue.  We have known that from the

19 beginning of the case.  It needs to do so because that issue

20 is relevant to so many people, millions of people. It needs

21 to do so in a uniform way that resolves all of the various

22 customer property litigation claims that we face.  We

23 continue to be committed to do that collectively in a plan

24 process.

25          Now here there is also a very strong consensus

1  view. Its not unanimous yet, but a very strong consensus view

2  certainly among everybody around the table as we were forming

3  the plan on what to do.  The answer is that customers are,

4  indeed, special. Something happened that requires a special

5  remedy for customers and that remedy is the customer priority

6  settlement that is described in the disclosure statement.

7  The settlement creates a priority intercompany claim from the

8  exchanges against the general pool for the benefit of not an

9  individual customer versus other customers, but the benefit

10  of all the customers in an exchange versus the general pool.

11         Under our current economic forecasts, we are

12  expecting to pay creditors in full in terms of petition time

13  value.  That priority settlement may not effect the amount of

14  the returns on the simple basis that everybody is going to be

15  paid, but it's still an important component of the plan

16  because it creates a downside priority in favor of customers

17  and it may speed the pace of distributions.  In other words,

18  it may be possible that that priority would conclude that we

19  can pay customers a little bit earlier than other creditors

20  to the extent we need to set up less reserves because of the

21  way the priority works.

22         The other key assumption, or one of the other key

23  assumptions behind the plan, and a very obvious one, the

24  elephant in the room, is the subordination of government

25  creditors.  This is a critically important provision of the

 1  plan, indeed. FTX is not solvent.  We are not a solvent

 2  estate, far from it.  We are a long, long way away from

 3  solvency and no change in the market that we could ever

 4  anticipate would create a solvent FTX.  We owe government

 5  stakeholders billions and billions of dollars.

 6          Now, we have for over a year been in discussions

 7  with those government stakeholders on why they should

 8  subordinate voluntarily to non-governmental creditors.  And

 9  there is several bases for this under law.  Each of the

10  various government agencies, including around the world, have

11  principles and circumstances of criminal fraud that suggest

12  that the government authority should consider subordinating

13  to victims.  Unfortunately, for us none of those laws would

14  necessarily define a victim who are compatible in the same

15  way.

16          One of the central pieces we have been working on

17  for a very long time is the idea that really all creditors

18  are, to some extent, victims here and all creditors can be

19  treated as victims by the government constituencies.  That

20  allows us to coordinate the bankruptcy distribution scheme

21  with the distribution schemes for remission and restitution

22  and disgorgement under various systems of criminal law.

23  There is also a tax -- you know, informing the tax settlement

24  that Your Honor approved is also a concept under tax law of

25  some voluntary guidance to the IRS to consider subordination

1  to the victims of criminal fraud.

2           So, we have taken all of that and we have made a

3  proposal, first confidentially and now quite publicly, to all

4  of the governments involved to voluntarily subordinate to the

5  consensus rate of interest, which I will talk about in just a

6  moment, and also potentially to the extent there are

7  recoveries that exceed that 9 percent.  Although we have some

8  commitment if the IRS settlement is approved by the IRS, a

9  very, very important settlement.

10          We have, I think, an understanding, now approved

11  by the Bahamian Court, with the joint official liquidators

12  that it works under Bahamian law; we do not yet have the

13  agreement of the CFTC, the Department of Justice Southern

14  District of New York in the criminal proceeding, or any of

15  the states; however, I am pleased to state that those

16  conversations are very advanced and they are to a point where

17  I think the entire debtor team and all the consulting

18  professionals are confident that we are ready to launch.  And

19  we hope to be dotting the I's and crossing the T's of those

20  settlements, you know, relatively quickly.

21          Now let me talk a little bit about value.  You

22  know, the best headline we could possibly have is that 98

23  percent of our creditors are expected to receive 119 percent

24  of the petition time claims within 60 days of the effective

25  date.  That is the convenience class.  We have defined the

1    convenience class broadly to include, you know, at a recovery

2    level that does include 98 percent of the people. That is

3    important because its going to take a while to make

4    distributions here given the sheer number of claims that we

5    have and the need to do a claims reconciliation process.  We

6    think that is a fair convenience class treatment. We think

7    it's a sensible convenience class treatment and, you know, we

8    have, again the support of all of our stakeholders on those

9    convenience class levels.

10           With respect to our cash position, we do continue

11   to move our assets into cash.  As described in the disclosure

12   statement, very important to remember in our case that unlike

13   the other cryptocurrency cases our assets generally did not

14   consist of digital assets segregated in an exchange that had

15   any relationship with claims against the exchange.  The

16   segregated asset pools for the exchanges were very

17   significantly defeated, less the one percent of the bitcoin

18   that was supposed to be at the exchange was at the exchange.

19           So, our project has been a different project then

20   those other cryptocurrency cases.  Our assets that we needed

21   to monetize are a mind-blowingly diverse collection of

22   assets, of scattered assets, venture assets, coin positions,

23   digital assets of all shapes and flavors, of course

24   litigation assets, etc.  So, our job has been to monetize

25   this pool of assets.  And when we look at this pool of assets

1  the board of directors have been very focused on one central

2  observation which is these were purchased with

3  misappropriated money.  No one made a decision to invest in

4  these assets.  They made a decision to either lend money to

5  Alameda or they made a decision to invest in FTX.com or FTX

6  US.  So, everybody was an involuntary investor in this crazy

7  pool of assets.

8       Our job has been to turn them into cash.  We have

9  not done so -- we have so deliberately and we have done so

10  consistently and we have done so with really a nice runway

11  established by the bankruptcy.  We have been able to average

12  out a position and do it gradually and deliberately over

13  time.

14       When we filed the initial disclosure statement on

15  May 22nd our cash position was $9.9 billion.  Today its

16  approximately $11.4 billion.  That is Fiat cash in banks.  We

17  anticipate, as we say in the disclosure statement, being a

18  $12.6 billion in cash on the effective date assuming an

19  October 31st effective date.  Now crypto prices are

20  unpredictable, those numbers may change, but I can confirm

21  today, Your Honor, that we do continue to believe the DS

22  recovery projections, as of the date I stand here, are

23  reasonable projections.

24       I'd like to talk just very briefly about the

25  consensus rate.  This is really a lynchpin to the plan.  It

1   simultaneously resolves a number of the pending disputes we

2   have with stakeholders. It's important, in the first

3   instance, in the understanding we have with the customer

4   representatives and constituencies who continue to be

5   settling the customer property allegation or constructive

6   trust allegations in particular in connection with the plan.

7   So, we see the consensus rate is not justified by the -- in

8   the normal way of bankruptcy is a question of we're a solvent

9   debtor and we want to make an equity distribution.

10          We are not making an equity distribution.  We are

11  an insolvent debtor.  We see the consensus rate driven by

12  this network of settlements.  One with the customer property

13  advocates.  One with the IRS, this was an important component

14  of the IRS discussions, its been tabled in the discussions

15  with the CFTC and the SDNY and the other government

16  stakeholders as a fair level of ultimate recovery. It has

17  something to do with the balance of interest between

18  customers and non-customers because we have had the customers

19  agree that we can make this 9 percent consensus rate

20  available to non-customer creditors as well.

21          Now if somebody has a lower contract rate we

22  adjusted, but generally the 9 percent is available to all of

23  the creditors, again, on the basis assumption which we have

24  had to advocate for consistently in the case, but we believe

25  its true, that all creditors are, to some extent, a victim of

1  fraud.

2          You will note, Your Honor, that the consensus rate

3  also is -- would be the prejudgment rate on the date we filed

4  the petition for a constructive trust or a turnover action as

5  well.  Now we have more money than 9 percent potentially and

6  this is important for everybody to understand is that we are

7  not standing here guaranteeing anyone that there will be

8  recoveries greater then, you know, par 9 percent but our plan

9  does need to contemplate the possibility of incremental

10 recoveries.

11          What happens to these incremental recoveries is

12 not for us to decide unilaterally. Its mostly to be decided

13 by the government stakeholders who are allowing the

14 incremental recoveries to creditors by foregoing their own

15 distributions in the case.  There is a question buried here

16 which is what do you do with the extra money, who gets it.

17 We have wrestled with that question with all of our

18 constituencies, had many, many discussions about the right

19 approach and I think the consensus certainly of everyone who

20 has been most involved with the debtor in wrestling with

21 these discussions.

22          The consensus is that a pro rata approach

23 continues to be the fairest approach, that all creditors were

24 involuntary creditors to FTX, that ultimately claims are

25 traded in dollars since the petition time and that if we have

1   any excess recoveries or upside recoveries, we should be

2   sharing that with all customers equally.  Now, of course, not

3   everybody agrees on that.  Some people might have a position

4   that they want more of that then the creditor sitting next to

5   them, but I think the view of the debtors, the view of the

6   government stakeholders, again, their decision but, you know,

7   the growing consensus is reflected in the plan that this

8   money should be available to all creditors.

9           Now there is a little nuance there, because of the

10  nature of the government regulatory claims the -- although I

11  want to say a trade creditor, and we have very little trade,

12  Your Honor, but a general unsecured creditor would receive

13  interest at the consensus rate.  The general unsecured

14  creditor would not have access to the supplemental remission

15  fund that we proposed to the CFTC.  That would be available

16  only to customers and lenders that effectively have

17  cryptocurrency contracts.

18          Now ultimately, Your Honor, the plan is a complex

19  settlement and it includes all these settlements of all of

20  these potential disputes that would need to be resolved by

21  litigation.  So, we see it as a complex settlement and

22  although it is remarkably consensual already, we do -- we are

23  soliciting a vote and one of the purposes of the vote is to

24  get feedback from the creditors who have not been involved in

25  that settlement.  So, we are soliciting broadly, right,

1  despite the almost payment in full nature of the plan.

2        We will continue to press forward with that

3  approach.  The plan is structured, however, Your Honor, to be

4  fair and equitable to each class independently.  We are

5  proceeding with the absolute priority rule and so are options

6  at confirmation depending on the voting results are flexible.

7        I want to speak last about two points and these

8  are the two conditions to the plan.  So, there is two

9  settlements, two key settlements, that Your Honor has already

10 approved: the IRS settlement and the Bahamian settlement.

11 That was necessary because those settlements are really

12 existential.  Our plan does not work without the IRS

13 settlement and our plan does not work without the Bahama

14 settlement. So, we frontloaded that and had the Court approve

15 those settlements and the other parties approve those

16 settlements as well. So, they are done.

17        Now they're contingent upon the confirmation of

18 our plan. So, if our plan isn't confirmed we lose those

19 settlements and simultaneously if there was some problem with

20 the settlements, and we don't anticipate any problem, we

21 wouldn't be able to confirm the plan.  So, those are embedded

22 in the plan as essential conditions.

23        The ongoing discussions with the other governments

24 stakeholders, because the pace of some of those is uncertain,

25 are not embedded as specific settlements that are conditions

1  to the effectiveness of the plan.  The CFTC proposal may not

2  be accepted by the (indiscernible) in its current form, that

3  may change.  You know, the eligibility for the supplemental

4  enrichment fund may be tweaked, right, or they could have

5  different views on the calculation of something.  Again, we

6  don't expect material changes, but those are not inked.

7        Similarly, we do not yet have state buy-in among

8  the states to join the CODC in subordination. Its possible

9  that some states don't agree.  Again, we don't expect that to

10 have a material effect on recoveries, buts its possible. Then

11 finally the forfeiture proceeds with the SDNY.  We do not yet

12 have an agreement with the SDNY that they will give us all

13 the money.  We have asked for it.  We believe we have a

14 strong case for it. In fact, we believe that the amount of

15 those forfeiture proceeds has something to do with the

16 assistance the debtors have provided to the government, but

17 that isn't inked as well and so it's possible that there's

18 modifications to that, understanding that we don't get all

19 the proceeds that a portion is held back, etc.

20        Again, we don't expect that to have a material

21 effect on recovery, but I think it's important for everybody

22 to understand the exact nature of those unlike the other two

23 settlements are not conditions to the effectiveness of the

24 plan and the plan has, you know, kind of a pot plan element

25 to it, right, we will do as well as we can in those

1  circumstances and we think we're very competent with our

2  disclosure about where its trending but the results may be

3  slightly different just like we might sell an asset for a

4  little bit less or a little bit more than we had modeled or

5  very importantly, in our case, the claims pool may change

6  such that it has an influence on recoveries.

7          Again, as I stand here today, Your Honor, probably

8  the most important financial statement is just what I said

9  before which is that based on everything we know, and all the

10  moving pieces, and all the work that has been done, we think

11  the projections in the disclosure statement about recoveries,

12  the bottom line recoveries to customers, are fair and

13  reasonable, you know, as of the moment I stand here.

14          So, that is what I had, Your Honor.  Now I am

15  happy to answer general questions, but absent those I thought

16  I would turn over the podium to Mr. Glueckstein and he can

17  talk a little bit about the objections and our path forward.

18          THE COURT:  I don't have any comments or

19  questions.  Thank you very much.

20          Does anyone else -- let me just ask, because I

21  gave you the opportunity to speak generally, does anybody

22  else wish to make any general comments before we get to the

23  disclosure statement hearing?

24      (No verbal response)

25          THE COURT:  Having heard nothing, Mr. Glueckstein,

1  you're up.

2       MR. GLUECKSTEIN:  Thank you, Your Honor.  Good

3  morning again.  Brian Glueckstein for the debtors.

4       Your Honor, the broad support for the plan and the

5  disclosure statement that Mr. Dietderich highlighted are

6  illustrated today by the lack of objections filed in response

7  to relief that is before the Court this morning.  We received

8  only a grand total of 14 objections and other responses to

9  our motion seeking approval of the disclosure statement and

10  solicitation procedures.

11       The debtors have worked with the objectors to

12  resolve the disclosure statement objections where possible

13  and have now resolved most of them with the objectors and all

14  other parties rights reserved with respect to plan

15  confirmation and any confirmation objections.  We currently

16  have only all or a portion of four objections remaining this

17  morning, Your Honor.  The objections filed by the MDL co-lead

18  counsel and by McCarter & English on behalf of Mr. Kavuri and

19  three other purported creditors, as well as, I understand,

20  the non-disclosure portions of objections from LayerZero and

21  Maps Vault.  That is all that is live before Your Honor this

22  morning.  We did address these and the other objections that

23  are now resolved in the debtors reply that was filed at

24  Docket No. 18083.

25       Your Honor, the debtors submit that the disclosure

1  statement contains more than adequate information as provided

2  in compliance with Section 1125(a)(1) based on the facts and

3  circumstances of this case.  Mr. Dietderich walked through a

4  number of elements that are highlighted in the disclosure

5  statement in his remarks.  I will address, Your Honor, some

6  threshold issues relating to each of the remaining objections

7  and then request to reserve some rebuttal until after any

8  objectors are heard by Your Honor this morning.

9        Your Honor, the first of our two objections that

10  remain pending in full is the objection that was filed by the

11  MDL co-lead counsel.  Your Honor, with respect to the MDL co-

12  lead counsel, as a threshold matter, the debtors submit that

13  MDL counsel lacks standing to object to the debtors

14  disclosure statement and plan of reorganization.  The debtors

15  have elsewhere documented, in filings with this Court, MDL

16  counsel's efforts to divert up to $1.2 billion in assets

17  forfeited by the Department of Justice to the MDL for

18  purposes of pocketing up to $400 million for themselves in

19  fees while depriving the estate and their creditors of those

20  funds.

21        Those fatally flawed efforts aside, MDL counsel

22  needs to establish standing to object to the debtors plan and

23  disclosure statement if they want to be heard in these

24  proceedings before Your Honor today and in the future.  We

25  submit they cannot do so.  The Third Circuit has made clear

1    that Section 1109(b) permits anyone with a legally protected

2    interest that could be effected by the bankruptcy proceeding

3    to be heard.  The Supreme Court's recent decision in Truck

4    Insurance confirms the debtors view.  There the Supreme Court

5    confirmed that even interpreting Section 1109(b) broadly, the

6    statute still requires a party to be "directly and adversely

7    effected by the bankruptcy proceedings."  The MDL are not

8    effected at all.

9            Of course, a party must still satisfy both the

10   constitutional and prudential limitations of standing.  In

11   this context, standing requires that a party actually have an

12   interest in these Chapter 11 proceedings.  MDL counsel, in

13   their capacity as such, have no personal stake in these

14   proceedings.  They are not creditors with claims and their

15   own objection makes clear that the putative class claims

16   being asserted in the MDL proceeding do not include any

17   claims against the debtors, nor, Your Honor, do they

18   represent a certified class of FTX customers as they

19   misleadingly suggest.  That would be impossible because there

20   is no certified class in the MDL.

21           They have not sought class status from this Court

22   pursuant to Bankruptcy Rule 7023 as would be required to

23   object on behalf of a putative class as this Court made clear

24   recently in Mallinckrodt.  Furthermore, MDL counsel do not

25   identify any creditors whom they represent with respect to

1  creditor claims in these Chapter 11 cases.  If they did, any

2  such representation would need to be disclosed pursuant to

3  Bankruptcy Rule 2019 before they are heard. They have not

4  done so.  Such disclosure and such representation would put

5  their status as impartial putative class counsel at risk.

6       MDL counsel here are further removed from any

7  interest in the debtors plan then those parties in recent

8  decisions, we cite in our papers, where creditors were

9  determined to lack standing including in the Genesis Global

10  case where out of the money equity holders were deemed to

11  lack standing to object to the plan because it had no direct

12  interest in the distributions being made under the plan.

13       The MDL objection itself raises a litany of issues

14  that do not implicate any rights or interest of MDL counsel

15  or any of the named MDL class plaintiffs in that capacity.

16  Courts have repeatedly held that an objecting party can only

17  challenge the parts of the plan that directly implicate their

18  own rights and interests.  Nothing in our plan prevents MDL

19  counsel from pursuing direct causes of action held by their

20  named plaintiffs in the MDL and to recover on any such claims

21  for their putative class there.  Of course, individual

22  creditors are free to decide whether to support or oppose the

23  plan the debtors are proposing as creditors in these Chapter

24  11 cases.  The MDL counsel cannot subsite their views for

25  those of creditors on a classified basis.

1          Now, Your Honor, with respect to the objection

2   itself that they filed the debtors did, nonetheless,

3   carefully review the arguments presented in that objection

4   and combined with the changes that have already been made to

5   the disclosure statement that was filed with the Court over

6   the weekend we do not believe there is any additional

7   disclosure required to address them in order to satisfy

8   Section 1125.

9          Although not required, the debtors did add a

10  description of the MDL proceedings in Section (g)(10) of the

11  disclosure statement.  The MDL objection also takes issue

12  with disclosure about the anti-double dip provision in

13  Section 7.12 of the plan.  There is no uncertainty or

14  ambiguity with respect to this provision which is

15  supplemented by the plain language disclosure on page 8 of

16  the disclosure statement.  The discretion to request

17  information in that provision is consistent with standard tax

18  and OFAC certifications required prior to making

19  distributions under a plan similar to Section 7.14 of this

20  plan and others confirmed by this and other Courts in the

21  district.

22          All creditors -- MDL counsel has also argued in

23  their objection, substantively, that the anti-double dip

24  provision, which is a focus of their objection, violates

25  Section 1123(a)(4) because it somehow unfairly discriminates

1  amongst customers.  We discussed this in our papers, but this

2  is untrue.  The case law is clear that differing recoveries

3  are not the same as disparate treatment for claims under a

4  plan.  All creditors are provided the same treatment as other

5  creditors in each class.  Any of those creditors can object

6  to the plan on the basis of the substance of that provision

7  and its impact, if they see fit, in connection with

8  confirmation.  That is not an issue for the disclosure

9  statement.

10         The MDL objection also argues there should be more

11  disclosure as to the implications of the customer property

12  issues while ignoring the four sections in the disclosure

13  statement dedicated to the customer property issues and this

14  proposed settlement that was entered into for the benefit of

15  stakeholders.  The other various issues raised in this

16  objection are plan objections to be addressed later, if

17  necessary, Your Honor.

18         The other objection that we have --

19         THE COURT:  Let's deal with --

20         MR. GLUECKSTEIN:  You want to do them one at a

21  time?

22         THE COURT:  Yeah, let's do one at a time.

23         MR. GLUECKSTEIN:  That's fine, Your Honor.

24         THE COURT:  Let's do the MDL plaintiffs' counsel

25  first.

1          MR. ROSELL:  Good morning, Your Honor.  Jason

2   Rosell, Pachulski Stang Ziehl & Jones, on behalf of the

3   Moskowitz Law Firm and Boies Schiller Flexner LLP in their

4   capacity as plaintiffs co-lead counsel in the FTX MDL which

5   is pending in the United States District Court for the

6   Southern District of Florida.  Joining me today in the

7   courtroom, Your Honor, is Adam Moskowitz of the Moskowitz Law

8   Firm.  We also have Marc Ayala at Boies Schiller, and Mr.

9   Robert Leaf who is also on the MDL leadership.

10          THE COURT:  Okay. Let's deal with the fundamental

11  question here.

12          MR. ROSELL:  Yes, Your Honor.

13          THE COURT:  How do you have standing?  These are -

14  - you represent a law firm. Your entry of appearance is for a

15  law firm, not on behalf of the individual plaintiffs in the

16  MDL action, correct?

17          MR. ROSELL:  That is correct, Your Honor. I think

18  it goes to the question what is -- who are we, what is the

19  MDL.  The MDL is a multi-district litigation. It is, for the

20  record, captioned *In Re FTX Cryptocurrency Exchange Collapse*

21  *Litigation*.  It consists of approximately 50 consolidated

22  class action securities actions and individual actions

23  globally.  We have together in excess of 100 individual

24  defendants and as a result of that and as a result of the

25  Moskowitz Law Firm and Boies Schiller being appointed the

1  plaintiffs co-lead counsel by the District Court in the

2  Southern District of Florida, they represent and speak for

3  those clients.  They are those clients.  Those 100

4  individuals are their clients.

5         THE COURT:  They're not the clients. They

6  represents the clients.  They don't have a claim against this

7  estate, correct?

8         MR. ROSELL:  We have not asserted a claim against

9  the estate -- well, but --

10         THE COURT:  And they are not here -- and you are

11  not here telling me that you represent any of those

12  individual claimants in the MDL action.

13         MR. ROSELL:  That's correct, Your Honor, but the

14  question is really are they a party in interest to be heard

15  today with respect to the disclosure statement.  That is all

16  this is.  We are not here objecting to, like in Mallinckrodt,

17  plan confirmation.  We are here on a disclosure statement

18  hearing asking and advocating for clarity in the disclosure

19  statement for the many.  At the end of the day our class

20  consists of all FTX customers which no one here in this room

21  is speaking for any longer.

22         THE COURT:  How is it any different that this is a

23  disclosure statement as opposed to confirmation.  You still

24  have to have standing.

25         MR. ROSELL:  Well, the question is whether or not,

1  under <u>Truck Insurance</u>, we are a party in interest and the

2  Supreme Court has recently said that courts should interpret

3  that very broadly.  The question is whether or not the

4  hearing or the disclosure statement potentially affects us.

5  Now, we can play games --

6          THE COURT:  Potentially affects the law firm

7  because they're the only party in front of me right now is

8  the law firm.  It doesn't affect the law firm.

9          MR. ROSELL:  And that's fine, Your Honor, because

10 the debtors have conceded and acknowledged that there is $400

11 million at stake for the law firms and the debtors plan --

12         THE COURT:  But that is not money coming from this

13 estate.

14         MR. ROSELL:  I think that is exactly what they are

15 arguing, right.  They are arguing that, and they have

16 submitted the forfeiture proceedings, competing forfeiture

17 proceedings in the criminal court before Judge Kaplan, saying

18 that the forfeiture property is property of the estate.  We

19 have done the same thing and said, no, its property of the

20 customers and should go directly to the customers.  Their

21 plan creates a remission fund that's going to be funded by

22 those proceeds.  Those proceeds would otherwise go through

23 the MDL and be part of the fees that counsel would

24 potentially calculate.

25         I hear laughter over here about, well, you know,

1   they're going to make a big deal that it's a money grab

2   somehow. It's a little bit like the pot calling the kettle

3   black, isn't it.  I mean we have got $400 million at stake

4   potentially.  They like to throw that around; oh, counsel,

5   this is just a money grab. Nothing has been set in stone.

6          We have to go through process all these cases, the

7   class actions, then at the very end of the day submit a

8   request for fees. The District Court Judge, Judge Moore, will

9   decide what our fees are.  This is coming from someone --

10  from a group that --

11         THE COURT:  That's outside the bankruptcy.  That

12  is not -- that has nothing to do with the bankruptcy.

13         MR. ROSELL:  But that bankruptcy plan specifically

14  addresses and seeks to have those funds put into the

15  bankruptcy and distributed.  That --

16         THE COURT:  Well, that is a separate fight.  You

17  have a fight over whether or not the funds being held in the

18  Southern District of New York are going to be transferred to

19  the MDL action or are going to be transferred to the debtors.

20  Either way, they're going to go to the creditors except for

21  the attorneys fees.  They go to either party.  But I am still

22  struggling with how that has any impact on this estate.  How

23  that creates an interest in the estate on behalf of the MDL

24  plaintiffs' counsel.  Their attorney's fees -- they wouldn't

25  have individual standing to argue about the disclosure

1  statement.

2          MR. ROSELL:  If counsel was no longer counsel for

3  the estate and they were a creditor.

4          THE COURT:  Then they would be owed money by the

5  estate.  You are not owed money by the estate.

6          MR. ROSELL:  Well, the question is not whether we

7  have an interest. The question that the Supreme Court has

8  espoused is does what is before the Court potentially

9  concern, potential concern or effect, the party who is

10  asserting standing.

11          THE COURT:  Well then you have got to tell me who

12  the party is that has the standing, it's not the law firm.

13  So, if it's the individual claimants in the MDL action then

14  you have got two problems with that.  One, you haven't

15  disclosed it under 2019, which is required, and, two, you

16  only have a putative class.  You don't have an actual class

17  that has been certified by the Court yet.

18          MR. ROSELL:  Your Honor, if the Court wants to

19  interpret our objection as an objection based on the named

20  plaintiffs, then that is certainly fine as well.  This --

21          THE COURT:  I don't. I'm just telling you that if

22  that's position you are taking you have a problem.

23          MR. ROSELL:  Well, Rule 2019 there is an exception

24  there.  The Rule 2019(b)(2) --

25          THE COURT:  For class actions, correct, but there

1  is no class action yet.  You only have a putative class

2  action that hasn't been approved.

3         MR. ROSELL:  Well, there are fiduciary duties

4  though and I believe in, I think it was Mallinckrodt, Your

5  Honor I don't think got into the fiduciary duties owed.

6  Under Florida law the MDL counsel owe a fiduciary duty to a

7  pre-certified putative class.  The only reason why its not

8  certified right now is because the debtors are attempting to

9  block the certification.  There is -- there are several

10 pending settlement motions with Judge Moore right now that

11 once they go out and get noticed its going to certify the

12 preliminary certified class on those issues. Its just a

13 matter of timing.

14        THE COURT:  But the timing is what matters.  It's

15 not certified yet.

16        MR. ROSELL:  Your Honor, we had the Supreme Court

17 decision in Truck espousing that it should be read broadly.

18 That if it potentially affects the concerns of a party, they

19 should have a right to be heard under 1109(b) of the

20 Bankruptcy Code. If the fees of MDL counsel aren't sufficient

21 and the fact that the plan provides an anti-dip provision

22 that essentially coerces the creditors voting into giving up

23 the MDL because, otherwise, the debtors are going to withhold

24 their distributions sending that 60 days window -- you know,

25 the 60 day promised window for recovery out the window, how

1  do we not have standing to be heard today to be able to

2  advocate for the millions of customers that have no one else

3  left with the.

4           They have cut deals with the ad hoc group.  Well,

5  the ad hoc group, yes, in the very beginning had about $800

6  million of retail. The ad hoc group now holds $4 billion made

7  of claims traders.  Claims traders have been buying claims

8  throughout the bankruptcy on the eve of the disclosure

9  statement being revised with new receivers.  There is nobody

10 left.  The committee is conflicted.  They're hardly heard of

11 in this case.

12          THE COURT:  Well, that is a serious allegation,

13 sir, very serious allegation and you better have some

14 evidence to back it up.

15          MR. ROSELL:  Sorry, Your Honor, I'm talking with

16 respect, of course, to just the FTX customers who is speaking

17 on behalf of just the FTX customers right now.  We are asking

18 for the opportunity today, Your Honor, to be heard and to

19 advocate for them and to protect their rights in the MDL.  We

20 have tried to stay clear of this bankruptcy court, Your

21 Honor.  We have been focused on the MDL, but the debtors have

22 appeared in the MDL. The debtors have even initiated

23 adversary proceedings in this Court asking to stay against

24 the named plaintiffs who we represent.  We should have an

25 opportunity to be heard, Your Honor.

1          THE COURT:  All right.  Well, I -- my view is you

2    do not have standing. This is a law firm that is appearing

3    before me, its not the underlying individual claimants.  Your

4    papers even say you don't have any claims against the estate.

5    You are claiming against third parties. You are trying to

6    recover against these third parties.  You named them in your

7    motion paper who you are going after. That is not part of

8    this estate.  Those are separate issues.

9          Now there may be some tension between whether or

10   not those causes of action are property of the estate or

11   property of the individuals, that issue is not before me on

12   this disclosure statement.  So, if you are going to appear

13   here on behalf of creditors you have to have a creditor.  You

14   don't have a creditor.  You have a law firm who is not a

15   creditor of this estate and, therefore, they do not have

16   standing to press any objections on the disclosure statement.

17         MR. ROSELL:  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         Whenever you are ready, Mr. Glueckstein.

20         MR. GLUECKSTEIN:  Thank you very much, Your Honor.

21         Our other remaining disclosure objection that was

22   filed is the objection that was filed on behalf of Mr. Kavuri

23   and three other creditors by McCarter & English.  As detailed

24   in our reply this group of creditors, led by Mr. Kavuri, have

25   been acting in concert and representing that they are

1  speaking on behalf of numerous other creditors through social

2  media and through an unsanctioned website, FTXVote.com, that

3  has been improperly soliciting no votes on the plan prior to

4  approval of any disclosure statement by this Court.

5          The Kavuri voting website solicits votes against

6  the plan with a lockup mechanism in which creditors purport

7  to provide the Kavuri parties a voting proxy.  These

8  purported 1,700 no votes are being locked up without these

9  small claimants having the information necessary to evaluate

10  the plan and what they are actually going to receive pursuant

11  to it or whether the current plan is better or worse than any

12  perceived alternative.

13          The solicitation of votes prior to approval of the

14  disclosure statement is plainly impermissible under Section

15  1125(b) of the Bankruptcy Code. The debtors reserve all

16  rights and remedies, including to enjoin and vacate this

17  activity, and to designate the votes of all participants in

18  this activity.

19          After we demanded compliance with Bankruptcy Rule

20  2019, McCarter & English finally filed a Rule 2019 disclosure

21  late yesterday afternoon.  That disclosure is illuminate and

22  confirms what the debtors suspected. The Kavuri group

23  actually represents none of the purported customers they

24  misleadingly claim to represent online.  In fact, the Rule

25  2019 disclosure reveals that the Kavuri group has now shrunk

1  to there members down from before who actually filed the

2  objection.

3        The misinformed activity of these three purported

4  creditors is unfortunate but needs to be accurately put into

5  context.  This is three customers trying to allocate more

6  value to themselves at the expense of every other stakeholder

7  of these debtors, nothing more. If these three customers want

8  to object to the customer property settlement and assert

9  property rights or object to the plan on any other legitimate

10  basis, their rights are preserved to do so at the appropriate

11  time. As to their actual disclosure issues raised in the

12  objection, the debtors do not believe there are any further

13  changes that need to be made in response to the Kavuri

14  parties objection, but I reserve the right to respond to any

15  actual disclosure issues that are raised today by counsel.

16        With that, I will turn it over to counsel for Mr.

17  Kavuri.

18        THE COURT:  All right.

19        MR. ADLER:  Good morning, Your Honor.  David Adler

20  from McCarter & English on behalf of Sunil Kavuri, Ahmed Abd

21  El-Razek, and Pat Rabbitte.

22        We did file a 2019 statement yesterday and I want

23  to make it perfectly clear to the Court that from McCarter &

24  English's perspective at the present moment we only represent

25  three creditors.  I did put in the 2019 statement that we had

1  been contacted, we received a list of 1,700 people, we have

2  not been retained yet.  I want to lay that out first thing.

3  We represent three creditors, three direct creditors.  Those

4  were the creditors who filed the adversary proceeding and

5  that is who we are here for today.  We are not here on behalf

6  of anyone else.

7          THE COURT:  Has Mr. Kavuri been soliciting proxies

8  for the --

9          MR. ADLER:  Not to my knowledge, Your Honor, but I

10 have to say that I do not know exactly what he is doing

11 exactly and I take issue with what Mr. Glueckstein said about

12 a lockup because I have heard nothing about that.

13         THE COURT:  Well, what are the 1,700 additional

14 potential customers.

15         MR. ADLER:  My understanding, Your Honor, is that

16 there is a group of original FTX customers, people who have

17 not sold their claims, and Mr. Kavuri has sought to try and

18 get them into a group so that these issues that are

19 particular to the original holders can be brought in some

20 coordinated fashion before this Court.

21         THE COURT:  Well, he has been soliciting, maybe

22 not proxies, customers.

23         MR. ADLER: I don't know if he's been soliciting. I

24 don't know the answer to that, Your Honor.  I don't know

25 exactly what he has done. I know that I have received a list.

1  I don't know how I got that list, but we do not represent

2  them today. I do represent the three other individuals and I

3  am here to make the disclosure statement objection on their

4  behalf.

5            THE COURT:  Okay.

6            MR. ADLER: I do believe that, first off, Your

7  Honor, the disclosure statement is woefully inadequate in

8  describing what the basis for these releases and exculpation

9  provisions are.  Everyone in the world is getting a release

10  under this plan.  There is no disclosure about why these

11  releases are necessary.  There is no disclosure of what

12  potential value that those releases have and it is -- I

13  understand, Your Honor, that a lot of plan objections --

14  well, a lot of objections to disclosure statements that go to

15  the merits of the plan are deferred, but I think we're in a

16  particularly unique period here and I say that, you know,

17  expecting to have come down here today having seen the Purdue

18  decision and I don't know what Purdue is going to say about

19  these types of releases, if anything.

20            I do think that there is a serious questions here

21  about on a plan related issue sending a ballot out to someone

22  and, you know, requiring them to respond in order to opt-out.

23  The way that I read the cases, Your Honor, is that mere

24  silence does not equate to an acceptance when there is no

25  duty to respond.

1           THE COURT:  I have ruled otherwise.

2           MR. ADLER:  Say again.

3           THE COURT:  I have ruled otherwise in

4    Mallinckrodt.

5           MR. ADLER:  You are, obviously, not the first,

6    Your Honor, but I think in this case there are particularly

7    larger circumstances because we're all over the world. I

8    don't know anything about how this information is being

9    conveyed in Thailand, in China, and every other place in the

10   world about how -- you know, what the consequences are for

11   not returning a form.  To me it seems to be non-consensual

12   when there is no duty to speak, but I will leave it at that

13   because I believe that, well, perhaps the Supreme Court will

14   address that issue this week, Monday, whenever they release

15   Purdue.

16          THE COURT:  Well, it will definitely be out before

17   the confirmation hearing.  So, and this is really a

18   confirmation hearing issue.

19          MR. ADLER:  That is true, Your Honor. I would -- I

20   mean, if they say something that is clear that this type of

21   duty to respond is not permissible it would be an awful waste

22   of money and time to sort have gone through the disclosure

23   statement. I think maybe --

24          THE COURT:  You might not get that in this case

25   though because I think Purdue is non-consensual third-party

1 releases, not consensual.

2          MR. ADLER:  Correct.  That is absolutely correct.

3 And the question before the Supreme Court is whether non-

4 consensual releases are permissible and I'm not sure that

5 they are going to go into what is consent versus non-consent.

6 We are all sitting here waiting to see what they say about

7 that issue, but you are correct, Your Honor, they may just

8 say non-consensual releases are impermissible and then it's

9 for us to figure out whether these releases are non-

10 consensual or not.

11          I do believe though that it may be wise to not

12 commence the solicitation process. I'm not even sure it could

13 begin prior to the issuance of that decision because we just

14 don't know what they are going to say. I don't think that is

15 going to impact anything because its going to be out, I'm

16 guessing, in the next five to seven days. That was one point

17 that we raised and I understand, Your Honor, that it's a plan

18 objection, but I do see it as a disclosure statement issue

19 here to the extent that any information is coming at us that

20 could potentially suggest that this type of release is not

21 permissible.

22          I do think there should be disclosure and why

23 exculpated parties need releases as well.  I mean, I am used

24 to see exculpation provisions. I am not used to seeing

25 exculpation provisions and then the exculpated party is also

1  getting a release.  I don't know why that is required here

2  and I think it's something that requires more disclosure.

3          Separately, Your Honor, I do think -- we did raise

4  a number of straight disclosure issues about certain items

5  that had to be addressed in the disclosure statement, I think

6  particularly the IRS settlement. I think that the debtors

7  addressed that.  We did raise that there should be more

8  disclosure on tax related issues.

9          In the crypto cases that I've been involved with

10 there's generally a strong desire that the customers receive

11 the crypto back in kind because if they don't get it back in

12 kind it's a disposition event or people believe that it may

13 be a disposition event under US tax law.  So, you know, when

14 we're looking at issues here this sort of goes to best

15 interest. If there were a trustee who was prepared to

16 distribute in kind versus a debtor that is not willing to

17 distribute in kind that might make a big difference in this

18 case to some people who may have a huge tax bill if they're

19 getting cash rather than in kind.

20         THE COURT:  I think Mr. Dietderich explained that

21 situation that the debtors could do that in this case because

22 the exchanges didn't have the crypto, it was gone.

23         MR. ADLER:  Correct, Your Honor. I mean they are

24 sitting with cash but there are other crypto cases out there,

25 I believe BlockFi may be one, where they're sitting with cash

1  too and on the way out the door its going through a third

2  party and being converted into crypto at the prevailing rate

3  so that the distribution the customer receives is actually

4  crypto in kind rather then cash.

5           So, in other words, if you had 10 bitcoin on the

6  platform, and you're getting a recovery, let's say, $80,000

7  or whatever, on the way out the door it may pass through

8  Coinbase or PayPal or some other third party so that the

9  customer actually receives bitcoin back rather then cash.  I

10  don't really understand what the logical issues are why that

11  can't be done here, but it would save people who have

12  potential tax bills enormous sums of money, okay, to get

13  distribution in kind rather then in cash.

14           THE COURT:  Well, again, that sounds like a

15  confirmation issue.

16           MR. ADLER:  I'll throw another one on, Your Honor,

17  1141(d)(3).  This debtor is liquidating.  1141(d)(3) says the

18  liquidating debtor is not entitled to a discharge.

19           Here, the debtor is getting a discharge and in

20  addition to the discharge, everyone else is getting a release

21  and exculpated, but, you know, it all flows from that, you

22  know, if the debtor is not entitled to a discharge, why is

23  everyone else getting releases and exculpation provisions?  I

24  know that's a confirmation issue, Your Honor, but I thought

25  I'd highlight it.

1         I do think that there should be further

2   disclosure.  I listened to the debtors' counsel about the

3   customer property issue.  I don't think they really go

4   through in much detail, and I certainly don't see anything in

5   there that talking about the terms and conditions of what the

6   agreements were between the customers and FTX regarding the

7   property at the time it was deposited.  I know the debtors

8   probably don't want to say that, but, you know, for purposes

9   of disclosure, it probably should be said that various

10  parties take the position that the property that the debtor

11  is holding on to is customer property.  You know, they can

12  disagree with it if they want or they can say whatever they

13  want about it, but I do think there should be some statement

14  in there that explicitly references the terms and conditions

15  of the agreement between the customers and FTX.

16         We had some other related issues, with respect to

17  the timing on the solicitation.  I think that we have to

18  object.  The creditors have to object to any plan supplement

19  one week prior to the voting deadline.

20         Your Honor, it's been my experience that a lot of

21  these plan supplements come trickling in and I would suggest

22  that the language be revised that the creditors are given at

23  least one week to object to any plan supplement that gets

24  filed.  That's more of a solicitation issue, but I did want

25  to highlight that for the Court.

1           I think we raised some issues about the

2    liquidation analysis being inconsistent and what we said was

3    in Appendix C, it's unclear why there are more assets

4    available in a Chapter 7 than in a Chapter 11.  I don't know,

5    frankly, if that issue has been addressed or not in the

6    latest iteration that was filed, but we did flag that for the

7    Court.

8           We also thought there should be more disclosure on

9    the pending adversary proceedings that have been filed in the

10   court, specifically, the Kavuri action, the MDL action, as

11   well, and any other litigation or any other adversary

12   proceeding that's been filed since the case was commenced.

13          With those -- and I do want to point out a couple

14   other things.  We did file a joinder to the MDL objection

15   this morning.  So we join in those objections and I think

16   from my perspective as a bankruptcy lawyer -- and I'm not

17   involved at all in the MDL proceeding -- you know, we think

18   that the customers, obviously, should have, you know, a

19   choice of or not be precluded from recovery in the MDL

20   proceeding if they're, you know, if they're participating in

21   this matter.  I do recognize, Your Honor, that that's a

22   confirmation issue, as well, so I'm going to leave it at that

23   for the time being, but I just want to note it for the

24   record.

25          I think that's pretty much it, Your Honor, in

1  terms of what I wanted to -- I think, obviously, any

2  supplemental reports adduced by the examiner should be --

3  there should be a mechanism for disclosure of that to the

4  creditor base.  I don't know when, exactly, that report is

5  coming out, but --

6             THE COURT:  It's already out, right?

7             MR. ADLER:  The supplemental?

8             THE COURT:  Oh the supplemental one?  I didn't

9  hear you say supplemental.

10            MR. ADLER:  Okay.  I was talking about the

11 supplemental report and how that gets transmitted, if it

12 comes out during the solicitation process and, you know, it

13 could be, I guess, another mass solicitation.  I imagine that

14 the solicitation is going to be a fortune, to put it mildly,

15 and I don't know if it makes better economies of scales -- I

16 don't know what the timetable is for that, if there is a

17 timetable, but, obviously, to the extent it comes out during

18 the solicitation, it should be conveyed to all creditors.

19            THE COURT:  Well, it would be put on the docket,

20 for sure.

21            MR. ADLER:  I do just want to finish with the

22 point about taxes, because I do think that this is a big

23 issue for a lot of original customers.  There are situations

24 that I've seen -- not in this case, but in other cases --

25 where creditors were offered cash and that cash would be

1   basically a disposition of the original crypto position.  And

2   some examples that I've seen result in the creditor not only

3   having to give up all the distribution to the tax

4   authorities, but to pay even more than the distribution,

5   depending on how it gets configured.

6           So I do think that in terms of looking out for the

7   customers' best interests, that the distribution in kind

8   seems to me to be something that's easily solved.  You know,

9   I doesn't even have to be through FTX; it could from a

10  third party going on when it's going out the door.  But, you

11  know, creditors have been waiting nearly two years and it's -

12  - I think it should be relatively easy to solve this problem

13  and I think it would generate more support among creditors if

14  they're getting a distribution.  And instead of having to pay

15  a capital gains tax on it, they're able to look to the loss,

16  you know, of their property when it resided at FTX, which

17  does remind me that there should be more disclosure in the

18  disclosure statement about customers, whether the customer --

19  whether it is the debtors' position that the customers, the

20  distribution could be characterized as a theft loss or

21  another type of loss.  There's no discussion in the

22  disclosure statement about that.

23          Now, I realize that that is often times an

24  individual tax decision, but in this case, you know, the

25  debtor surely formed an opinion about whether this amounts to

1  a theft loss or not.

2          THE COURT:  Well, can the debtors make that

3  decision on behalf of an individual?

4          MR. ADLER:  They don't have to make it on behalf

5  of all of them.  They can say, "It's our view."

6          THE COURT:  I don't know how much weight that

7  would carry, but, all right.

8          MR. ADLER:  All right.  Your Honor --

9          THE COURT:  Thank you.

10          MR. ADLER:  -- thank you.

11          MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein,

12  again, for the record.  Just very briefly on a couple of

13  these points.  I'm not going to go through the laundry list

14  of points, most of which Mr. Adler acknowledged are

15  confirmation issues.  But just on a couple of points so the

16  record is clear, Your Honor asked a question with respect to

17  Mr. Kavuri's activity online with respect to solicitation and

18  lockup.  Mr. Adler claims not to have knowledge of it.

19          But we did submit, in connection with our reply

20  papers, information about the website, including under a

21  declaration from Ms. Kranzley, an excerpt of the cover

22  homepage of the website on which Mr. Adler's firm is listed

23  as counsel.  And it walks through what is happening here,

24  with respect to the solicitation of votes.

25          So the debtors will address this issue.  We'll

1  make a motion, Your Honor, to deal with this -- obviously,

2  it's not before Your Honor today -- but the suggestion that

3  somehow these three creditors are acting independently of

4  what's happening and what Mr. Kavuri is doing online is -- we

5  do not believe is credible.

6  The -- to be clear, on his question and the

7  argument about releases, there is nothing in the releases

8  that are proposed in this plan, which, of course, is a plan

9  confirmation issue, it is a classic plan confirmation

10  issue -- it comes up in almost every case -- there's nothing

11  about these releases that is a nonconsensual release that is

12  going to turn on the decision that is pending before the

13  Supreme Court in Purdue.

14  The releases are limited to activities with

15  respect to these cases.  We're not giving prepetition conduct

16  releases for prepetition conduct of the debtors or seeking

17  them.  And we did, importantly, make a change in the round of

18  comments that were -- and changes that were filed with the

19  Court most recently after consultation with our stakeholders

20  and the United States Trustee's Office to make clear that the

21  non-voting classes are opt-in releases only.  So there is no

22  nonconsensual release component to the releases that are

23  proposed, so I don't want that to be misconstrued coming out

24  of the hearing today.

25  We've addressed, and Mr. Dietderich has addressed,

1   we've addressed at length, the issues around inability from

2   day one of these cases, to provide in-kind distributions of

3   digital assets to customers.  That issue has been discussed.

4   The entirety of the case has revolved around the idea and the

5   reality is that the debtors here need to monetize -- recover,

6   monetize assets and make distributions to creditors in non-

7   digital asset currency.

8           THE COURT:  Should there be a disclosure about the

9   tax issue?

10          MR. GLUECKSTEIN:  On the tax issue, Your Honor, so

11  let me address that.  On the tax issue, there's been

12  significant revisions, as Your Honor will see in the redline

13  to the tax disclosure in Section 8 of the disclosure

14  statement.  That disclosure was vetted extensively with the

15  Official Committee, with the Ad Hoc Committee, with our tax

16  advisors to expand, significantly, the disclosures around

17  tax.

18          I would submit, Your Honor, this idea that the

19  debtor should take a position, which it sounds like,

20  effectively, give tax advice into the disclosure statement on

21  some type of worldwide basis, we don't think would be

22  appropriate.  But we do think the expanded tax disclosure

23  addresses a number of the points and we think is more than

24  sufficient for purposes of the disclosure statement on the

25  (indiscernible).

1          Similarly, on the issues of customer property,

2    again, there's extensive disclosure.  Mr. Kavuri's adversary

3    proceeding is disclosed in the disclosure statement.  The

4    idea that there are arguments that have been asserted and are

5    being asserted is not new and the settlement of the customer

6    property issues with those whom -- with whom we are proposing

7    to settle and those being put forth to voting creditors to

8    the plan is extensively discussed in the disclosure

9    statement.

10         With respect to the plan supplement, Your Honor,

11   this is important, and we agree that there needs to be

12   sufficient time for creditors, prior to the voting deadline,

13   to review the information that's in the plan supplement and

14   we have revised the materials to make clear that we will be

15   filing that plan supplement two weeks prior to the objection

16   deadline.  So I think Mr. Adler was asking the creditors

17   should have a week to review.  They're actually going to have

18   two, at a minimum, to review information in the plan

19   supplement.

20         And, finally, Your Honor, with respect to the

21   examiner report, we added disclosure in the most recent round

22   of changes, with respect to the examiner's report that was

23   filed and the disclosure statement makes clear that there is

24   the potential for a supplemental report to be issued.  As

25   Your Honor knows, that report will be on the docket of the

1  Court.  We do not think there would be a need to serve out

2  that report to creditors in the way that was just suggested.

3         But, certainly, the creditors, in reviewing the

4  disclosure statement, will be made aware of the fact, not

5  only of the examiner's report and his findings, but the

6  possibility of a supplemental report to be issued in the

7  future.  And we don't believe there's anything in that

8  report, Your Honor, that would -- the scope of that report

9  that's been requested by Mr. Cleary that would do anything to

10 change the plan or the issues before the Court or before the

11 creditors on a voting basis.

12        THE COURT:  While I'm thinking of it, this is off

13 the objections, where does that stand?  Has the U.S. Trustee

14 -- is the U.S. Trustee here?

15        MR. GLUECKSTEIN:  Right there, Your Honor.

16        THE COURT:  Have you -- what are we doing with the

17 proposed supplemental investigation by the examiner?

18        MR. GLUECKSTEIN:  So, Your Honor, I'm happy to

19 address it, but I'll let Ms. Richenderfer.

20        MS. RICHENDERFER:  Your Honor, just to be clear,

21 the United States Trustee is in agreement with the request

22 and so you're not going to be hearing from us individually

23 about it and I believe it's listed for an upcoming here.

24        THE COURT:  Okay.  I just want to make sure it's

25 on somebody's radar that it's going to be on --

1           MS. RICHENDERFER:  Oh, yes, Your Honor.  It's

2  moving forward.  It was filed by counsel for the examiner

3  himself.  We have already reviewed it.  I believe other

4  parties that are sitting here in front of you, parties in

5  interest, have also reviewed it and I don't believe that I've

6  seen any objections to it yet.

7           THE COURT:  Okay.

8           MR. GLUECKSTEIN:  And, Your Honor, that's correct.

9  The examiner did file a motion to authorize the scope and the

10  budget and timing of that supplemental piece.  The objection

11  deadline on that was actually, I believe, was yesterday, and

12  so our understanding is that a CNO is going to be submitted

13  later today to Your Honor for the Court's review.

14           THE COURT:  Okay.

15           MR. GLUECKSTEIN:  But the debtor also had no

16  objection to what was requested.

17           THE COURT:  All right.  And as long as we're

18  talking about plan supplements, I will apologize to all the

19  parties about the time it has taken me to get to the opinion

20  on the estimation of certain cryptocurrencies that were

21  presented to the Court back in March, I think it was.  But I

22  will be issuing an opinion on that this week, so that will

23  come out this week.  There was a lot of stuff there to go

24  through.

25           (Laughter)

1          MR. GLUECKSTEIN:  Thank you, Your Honor.

2          I do believe that does takes us, and is very

3  helpful, Your Honor.  We have two other objections, with

4  respect to --

5          THE COURT:  Well, I can probably rule on this.

6  Let me see if there's any response.  Mr. Adler, did you

7  want --

8          MR. GLUECKSTEIN:  Oh, I'm sorry.

9          THE COURT:  -- did you want a chance to respond?

10          MR. ADLER:  David Adler from McCarter & English.

11          Your Honor, just with respect to the comments

12  about the solicitation, I'll say it again.  I don't know

13  anything about it, okay.  I literally don't know anything

14  about it.  But it will be dealt with and I forgot to note

15  that we have been asked by the people that we do represent to

16  file a motion to certify a class within the bankruptcy and I

17  expect that we will do so in some short period of time.

18          THE COURT:  Certify a class in what?

19          MR. ADLER:  Of original customers in this case.

20          THE COURT:  Certify it for what purpose?  There's

21  no adversary proceeding.

22          MR. ADLER:  For confirmation purposes.

23          THE COURT:  You've got to have an adversary to

24  certify a class.

25          MR. ADLER:  Well, we have a pending adversary.

1          THE COURT:  Okay.

2          MR. ADLER:  That's number one.

3          Number two, I did forget to mention that we noted

4    that there should be more disclosure on Binance in terms of

5    causes of action.  With that, Your Honor, I don't have

6    anything else further, unless you had some questions for me?

7          THE COURT:  Mr. Glueckstein, what about the

8    Binance disclosure?

9          MR. GLUECKSTEIN:  Your Honor, Binance is one of

10   many potential targets of litigation in this case.  We don't

11   believe we have disclosure obligation, nor would it be

12   prudent to disclose, you know, all potential causes of action

13   that the debtor might be investigating or pursuing.

14         We have an extensive discussion and disclosure

15   statement with respect to the litigation claims that are

16   pending and, of course, as we note there, and as we made

17   clear on the record, the debtor continues to investigate

18   other claims.  We don't believe there's any specific

19   disclosure with respect to Binance that is necessary, but

20   what, you know, what's discussed, with respect to litigation

21   claims, generally.

22         THE COURT:  Okay.  Thank you.

23         On these objections, I'll overrule the objections

24   and, obviously, Mr. Adler, your rights are reserved to raise

25   any or all of these issues at the final confirmation.  I

1  think almost all of these were confirmation-type issues.  The

2  ones that weren't, it seems the debtor has addressed those

3  and updated the disclosure statement to address those

4  concerns.  So I will overrule the objection.

5          MR. GLUECKSTEIN:  All right.  Thank you, Your

6  Honor.

7          I believe, and I'm sure folks in the courtroom

8  will correct me if I'm wrong, but my understanding is that's

9  the scope of the disclosure objections that we have that were

10  still outstanding that the Court has now addressed.  There

11  are portions, at least coming into this hearing, of two other

12  objections that we understood parties were intending to

13  pursue before Your Honor.  The first of which, I think Your

14  Honor just addressed by informing the parties to expect in

15  the near term, a decision on the further estimation

16  proceeding on the MAPS and OXY tokens.  There was an

17  objection that is unresolved from Maps Vault, who is one such

18  party.  We worked with counsel to resolve their disclosure

19  objections.

20          There is a dispute between the parties as to how

21  their claim will be treated for voting purposes in the event

22  that the Court had not ruled by the voting deadline.  I think

23  that issue, based on Your Honor's announcement a few moments

24  ago is moot, but I will turn it over to Mr. O'Donnell to see

25  if he still has issues he would like to address.

1          THE COURT:  All right.  Thank you.

2          Mr. O'Donnell?

3          MR. O'DONNELL:  Your Honor, Dennis O'Donnell of

4    DLA Piper, on behalf of MAPS and OXY Vault, here, with

5    respect to the limited objection we raised, which may well

6    have been fully resolved by your indication that a decision

7    will be issued this week.

8          Our concern, as Mr. Glueckstein said, was not with

9    we understand that whatever your decision says will control

10   our voting amount for purposes of, you know, voting on the

11   plan.  The concern was what if we didn't have a decision.  I

12   think if that decision, in fact, issues this week, the

13   problem is resolved and the rest of our objection can go away

14   with a reservation of rights.  Clearly, if there are some

15   complications we can't foresee at this point, we would retain

16   the right to come before the Court presumably on a 3018.

17          You know I have some issues with whether it would

18   apply.  There is no pending objection, but to the extent we

19   needed to come back to the Court in some shape or form after

20   that decision issued as to voting rights, we can do it then.

21   But I think given what you've told us, for the moment, we can

22   stand-down.

23          THE COURT:  Okay.  Thank you.

24

25          MR. GLUECKSTEIN:  Thank you, Your Honor.

1          And the debtors would just reserve rights on that

2   issue.  It sounds like we're not going to need to address it.

3          The last pending objection, as we understand it,

4   that's still pending this morning is the objection that was

5   filed by the LayerZero parties.  And with respect to the

6   LayerZero, the debtors have agreed to make certain changes to

7   the disclosure statement and corresponding changes to the

8   plan to provide some further clarifying language that, one,

9   claims arising under Section 502(h) of the Bankruptcy Code

10  are not being discharged on the effective date and, two, that

11  the disputed claims reserve, which is contemplated in the

12  plan, will, in fact, be established.

13          Specifically, in addition to the changes that

14  were, certain of these changes were reflected in the redlines

15  that were filed with the Court over the weekend, we will be

16  adding the "avoidance of doubt" language that appears in the

17  disclosure statement into plan Sections 4.4 and 10.2 and

18  tweaking the language of Section 8.5 of the plan itself,

19  consistent with the disclosure to provide some further

20  clarification.  With those changes, our understanding is that

21  LayerZero's disclosure statement objections are resolved.

22  We, nonetheless, understand them to be pursuing some form of

23  a patently unconfirmable objection this morning and I'll turn

24  it over to them.

25          THE COURT:  Okay.  Just the -- I did receive a

1   redline this morning.  These changes are not included in that

2   redline?

3           MR. GLUECKSTEIN:  No, we will update these changes

4   and if there was anything that came out of the hearing today,

5   and file one further redline after the hearing today.

6           THE COURT:  Okay.  Thank you.

7           MR. MCNEILL:  Good morning, Your Honor.  Steve

8   McNeill from Potter Anderson & Corroon, here on behalf of the

9   LayerZero Group.  I wanted to introduce Your Honor to Dylan

10  Marker from Proskauer Rose, my co-counsel, who will be

11  addressing this matter.  He is admitted *pro hac*.

12          THE COURT:  Okay.  Thank you.

13          MS. MARKER:  Your Honor, may I please the Court?

14  Dylan Marker of Proskauer Rose, on behalf of LayerZero Labs

15  Ltd., Ari Litan, and Skip & Goose LLC, whom I will refer to

16  as the "LayerZero Group."

17          Before I begin, I want to acknowledge that we were

18  able to resolve our disclosure-related objections

19  consensually with the debtors with the representations that

20  the debtors just made on the record; however, the disclosure

21  statement should not be approved today because the Court is

22  being asked to approve a disclosure statement for a plan that

23  is drafted as patently unconfirmable.

24          As the Third Circuit found in, In re American

25  Capital Equipment LLC, at 688 F.3d 145:

1           "If it is obvious that a plan described in the

2    disclosure statement is patently unconfirmable, the

3    Bankruptcy Court can address the issue of plan confirmation

4    and deny approval of the disclosure statement."

5           The plan cannot be confirmed under Sections

6    1129(a)(1) and (a)(3), which requires that the plans comply

7    with the applicable provisions of the Bankruptcy Code and be

8    proposed in good faith.  The requirements of Sections

9    1129(a)(1) and (a)(3) cannot be satisfied here because the

10   plan violates Section 1123(a)(4) of the Bankruptcy Code and

11   is not being proposed in good faith.

12          The plan violates Section 1123(a)(4) by treating

13   the LayerZero Group's claims in Classes 5(a) and 5(b) worse

14   than almost every other creditor in Classes 5(a) and 5(b),

15   without any member of the LayerZero Group's consent.  Equal

16   treatment is one of the bedrock, equitable principles that

17   Section 1123(a)(4) protects.

18          If you'll indulge me, Your Honor, we think it

19   would be helpful to provide some background on the claims in

20   the adversary proceeding and how those claims are being

21   treated to make clear to the Court how this plan harms our

22   clients and other similarly situated creditors.  The

23   LayerZero Group consists of LayerZero Labs, a Web3 startup

24   focused on interoperability solutions between different block

25   chains; Ari Litan, one of LayerZero's former COO; and Skip &

1  Goose LLC, an investment vehicle controlled by Ari Litan.

2          Prepetition, Alameda was an investor in LayerZero

3  and LayerZero was one of Alameda's funded debt creditors.

4  LayerZero also used exchange accounts on FTX.com to store

5  crypto tokens needed for its business.  Ari Litan and Skip &

6  Goose used FTX U.S. Exchange accounts just like all of the

7  debtors' other customers to invest in cryptocurrencies.

8          The debtors have brought an adversary proceeding

9  against the LayerZero Group consisting of causes of action in

10  two different buckets.  The first bucket seeks to undo

11  transactions between LayerZero Labs and Alameda, related to

12  an exchange of $45 million in debt claims that LayerZero held

13  against Alameda for equity, interest, and warrants that

14  Alameda held against LayerZero.

15          The first bucket only has causes of action against

16  LayerZero Labs.  Note that this bucket involves the debtors

17  and the Alameda silo, and the relationship between LayerZero

18  and Alameda.

19          The second bucket seeks to avoid, as preferential

20  transfers, withdrawals from FTX.com and FTX U.S. Exchange

21  accounts by each member of the LayerZero Group that occurred

22  90 days before the petition date.  This second bucket of

23  causes of action are the same customer preference claims the

24  debtors are waiving under Section 5.5 of the plan.  If a

25  customer in Classes 5(a) and 5(b) votes to accept the plan

1    and agrees to the amount of their claim.

2          What the debtors appear to be doing is to

3    designate preference claims in bucket 2 and exclude a

4    preference action solely because of the cause of action

5    against LayerZero Labs in bucket 1.  Even though these are

6    unrelated causes of action there unrelated debtors.  This

7    treatment violates Section 1123(a)(4) of the Bankruptcy Code.

8          Section 1123(a)(4) provides that a plan shall

9    provide the same treatment for each claim or interest of a

10   particular class unless the holder of a particular claim or

11   interest agrees to less favorable treatment of such

12   particular claim or interest.

13         It is uncontroverted that "equal treatment" means

14   that all members of the class must receive equal value and

15   pay the same consideration for their distributions.  The

16   Court in W.R. Grace, 475 B.R. 34, has also noted that equal

17   treatment means that all class members are subject to the

18   same process for claim satisfaction and that all claims in a

19   class must receive equal value through the same pro rata

20   distributions or payment procedures to all claims.

21         Where the debtors have deviated from this

22   requirement is by offering to waive valuable preference

23   causes of action in exchange for a vote to accept the plan

24   for virtually all customers, but a select few.  In looking at

25   this issue, the Court must look at the value the customers

1  are receiving from a preference waiver, which cannot be

2  separated from the distributions that Class 5(a) and 5(b)

3  creditors will receive.  These preference waivers are

4  extremely valuable to Class 5(a) and 5(b) creditors because

5  these are the classes of creditors, who, as the debtors have

6  described in their disclosure statement, attempted to

7  withdraw billions of dollars of assets from their deposit

8  account on the eve of the Chapter 11 filing.

9       While the debtors have not disclosed exactly how

10 much money was withdrawn shortly before the petition date, we

11 understand from public reportings that roughly $6 billion was

12 withdrawn in November 2022.  Either way, the value of these

13 preference waivers are being denied to the LayerZero Group,

14 but billions of dollars of value is being provided to

15 similarly situated creditors in the same class.

16      As an example, Bitcoin is currently trading at

17 approximately $70,000 per Bitcoin, but the debtors are

18 estimating one Bitcoin at approximately $17,000.  Any

19 creditor who withdrew one Bitcoin in the preference period

20 is, thus, receiving approximately $53,000 in value.

21 Creditors that sold their Bitcoin around $17,000 per coin

22 risk potentially losing $53,000 if the debtors were

23 successful in all of their arguments and forced the customer

24 to purchase a new Bitcoin in the open market for the debtors.

25      The debtors attempt to obfuscate the issue by

1  arguing that the preference waiver is separate from treatment

2  on behalf of a customer entitled to a claim.  It is not.  The

3  waiver is being offered in exchange for a vote to accept the

4  plan and only to customers in Classes 5(a) and 5(b).  It is,

5  by definition, being offered on account of a creditor's claim

6  in exchange for a vote to accept the plan; an opportunity

7  that is being denied to the LayerZero Group for treatment of

8  its claims.

9          The debtors say that all holders of dot com

10  customer entitlement claims and U.S. entitlement claims will

11  receive the same kind of treatment, but then also say that

12  some of these holders are deemed to be excluded customer

13  preference actions, which completely cuts against the

14  argument that all holders of dot com customer entitlement

15  claims and U.S. customer entitlement claims are being treated

16  the same.

17          The debtors cite, In re Breitburn Energy, 582 B.R.

18  321, which notes that as long as all creditors had the same

19  opportunity to participate in the rights offering, equal

20  treatment was not violated.

21          Here, the debtors are specifically excluding the

22  LayerZero Group from an opportunity to participate in the

23  preference waiver.  While the LayerZero Group can choose not

24  to participate in the preference waiver, just like creditors

25  can choose not to participate in a rights offering, the

1  opportunity is being denied to them and not similarly

2  situated creditors in their class.

3         We agree with the debtors that 1123(a)(4) requires

4  equal treatment, not equal outcome.  When you *carte blanche*

5  denied opportunity to participate in a settlement because of

6  litigation relating to unrelated claims against three

7  creditors, this is relation to treatment and not outcome.

8  The LayerZero Group is being denied an opportunity to receive

9  value on account of its claims that virtually every other

10 creditor in Classes 5(a) and 5(b) receives.

11        Because the plan provides these valuable

12 preference waivers to almost all creditors except the

13 LayerZero Group, the plan violates equal treatment.  Although

14 the disclosure statement does not say who is entitled to

15 participate in the preference waiver and notes that a plan

16 supplement will detail all of the excluded customer

17 preference actions, the only other active litigation we find

18 where customers are being excluded are preferences against

19 former employees and insiders or customers who allegedly

20 jumped the queue and received manual withdrawals ahead of

21 other customers.

22        The debtors have not brought any similar

23 allegations of wrongdoing against any member of the LayerZero

24 Group.  While 1123(a)(4) is the problematic Code provision

25 that the debtors are violating in their plan, we also want to

1  highlight that the plan also violates Section 502(d).

2  Section 2.1.8(d) of the plan provides that a plan will not be

3  allowed if it is subject to risk of disallowance under

4  Section 502(d), even if a creditor has otherwise filed a

5  valid and timely proof of claim and will, therefore, not

6  receive a distribution.  The claim will be deemed a disputed

7  claim and not receive a distribution under Section 8.8 of the

8  plan.

9          Unfortunately, this flies in the face of

10  applicable Delaware case law.  Judge Walrath, in, In re Lids,

11  260 B.R. 680, held that a debtor could not avail itself to

12  the benefits of Section 502(d) without a judicial

13  determination against a creditor.  Judge Walrath said, and I

14  quote:

15          "To disallow a claim under Section 502(d) requires

16  a judicial determination that the claimant is liable,

17  therefore a debtor wishing to avail itself of the benefits of

18  Section 502(d) must first obtain a judicial determination on

19  the preference complaint."

20          Here, the debtor has merely commenced an adversary

21  proceeding.  That is not enough to determine that a creditor

22  is liable.  The debtors cannot hold up distributions to

23  members of the LayerZero Group or other customers on claims

24  that should have been allowed merely because of an adversary

25  proceeding, where there's not been a judicial determination.

1          Lastly, the disclosure statement should not be

2     approved because the plan was not proposed in good faith in

3     violation of Section 1129(a)(3).  Treatment for Classes 5(a)

4     and 5(b) depends on whether the debtors have unrelated causes

5     of action against the customer.  While not defined, the plan

6     provides a variety of factors of whether a customer is the

7     subject to an excluded preference action.  These include

8     where a customer was an employee, insider, acknowledged of

9     the commingling and misuse of corporate and customer funds or

10    changed its "know-your-customer" information to facilitate

11    withdrawals or received manual information for withdrawals,

12    where said withdrawals were otherwise halted.

13         It also provides, and this is more relevant to the

14    LayerZero Group's claims, where any debtor has a cause of

15    action or a defense against the recipient of the applicable

16    preferential payment or transfer or a subsequent transferee

17    of the applicable customer entitlement claim or any of its

18    affiliates, other than a claim arising under a customer

19    preference action.  While not drafted particularly clearly,

20    this appears to mean that the debtors can exclude any

21    customer from receiving equal treatment on its deposit

22    account claims because of an unrelated cause of action by or

23    against unrelated debtors.

24         This exclusion for unrelated causes of action

25    means that creditors like Mr. Litan and Skip & Goose, who the

1  debtors have only brought causes of action relating to

2  customer preference claims are being excluded from

3  participating in the same distributions as all other

4  similarly situated creditors because of the bucket 1 causes

5  of action against LayerZero, an entity where Mr. Litan only

6  has an equity interest.

7          LayerZero is also being excluded from receiving a

8  distribution on its customer entitlement claims for unrelated

9  causes of action against an unrelated debtor, i.e., causes of

10  action by Alameda against LayerZero.  The only basis for this

11  treatment is leverage in the adversary proceeding and to

12  force a settlement, rather than a legitimate good faith

13  bankruptcy purpose.  If the debtors had a good faith

14  bankruptcy purpose, they would seek to give the LayerZero

15  Group equal treatment with other creditors in Classes 5(a)

16  and 5(b).

17          For all the reasons stated, the disclosure

18  statement should not be approved because the plan is patently

19  unconfirmable and the relief requested by the debtors should

20  denied.

21          Does Your Honor have any questions?

22          THE COURT:  No questions, but there was a lot of

23  facts in there for which I have no evidence.

24          Let me hear from Mr. Glueckstein.

25          MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian

1 Glueckstein for the debtors.

2          I think it is clear LayerZero is unhappy that

3 they've been sued and that the debtor is seeking to recover

4 amounts from them through an avoidance action.  That

5 adversary proceeding is pending.

6          I find the last statement particularly

7 interesting, accusing the debtor of not proposing its plan of

8 reorganization, and it's entirely in good faith because of

9 their inability to participate, and it's not just them --

10 I'll get to that in a moment -- in the offer to resolve

11 preference actions.  Their reaction, apparently, to the

12 litigation that they don't like is to try to stop this plan

13 in its tracks.

14          But, Your Honor, with respect to the merits of

15 this objection, everything that you heard, to the extent it's

16 relevant to the plan process at all -- I'm not going to get

17 into the adversary proceeding; those matters will come before

18 Your Honor at the appropriate time -- the issues, with

19 respect to the operation of the plan provisions is a plan

20 confirmation issue.  There's nothing about the way this plan

21 is drafted that in any way, shape or form, would rise to the

22 level of this plan being -- having (indiscernible).

23          The debtors, in Section 5.5 of the plan, and this

24 is explained in the disclosure statement, are offering to

25 settle and waive certain customer preference actions through

1  the plan balloting process.  The debtors' offer to settle and

2  waive those actions is not being made on account of these

3  customer entitlement claims, so we submit that the cited

4  provision under 1123(a)(4) is not applicable to this offer in

5  any event.

6          The debtors are making this offer to waive and not

7  prosecute customer preference actions against holders of

8  customer entitlement claims who consent to and stipulate to

9  the amount of their claim and vote to accept the plan.  Each

10  creditor's choice to do that, to accept that offer is

11  voluntary.  The debtors, of course, are using the plan voting

12  and balloting process to effectuate the settlement offer,

13  given the number of people at issue, but it is not in

14  exchange for plan treatment or on account of claims against

15  the debtors.

16          The debtor benefits from expediting and reducing

17  the costs of claims administration and reconciliation with

18  respect to ordinary course preference actions, but not every

19  potential defendant is similarly situated and, thus, not

20  every customer is eligible for the waiver of the customer

21  preference actions.  Not every customer is in a position

22  where the debtor can determine to forego those actions on

23  these terms and that is very clear in Section 5.5 of the plan

24  and the related disclosure as to what the debtors are

25  considering with respect to whether that settlement offer is

1  available or not.  The suggestion that this is somehow

2  singling out LayerZero or that substantially all of the

3  creditors are going to get this treatment is simply not based

4  on any facts that are before the Court, and counsel is

5  correct, we are going to be making clear, the list of

6  excluded customer preference actions in connection with the

7  plan supplement.  And the inclusion of that list is one of

8  the reasons why we can move forward with the disclosure of

9  the plan supplement and it includes that, amongst other

10  information, to 14 days prior to the -- to no later than 14

11  days prior to the proposed objection deadline.  So the

12  creditors will be able to see if they are eligible to elect

13  in to the preference settlement.  But there's nothing about

14  that settlement offer that is being done on account of the

15  treatment of the claim that the customer is seeking to

16  recover on against the estate.

17         LayerZero argued and asserted that there were

18  ambiguities about this and we did add language clarifying

19  that, one, any ending preference action, including the action

20  against LayerZero, will be on the list of excluded customer

21  preference actions and that those Defendants are not eligible

22  for a release.  As I mentioned, the debtors will include the

23  list of excluded customer preference actions in the plan

24  supplement, which we filed no later than two weeks before the

25  proposed voting deadline.  And we made clear that for those,

1   where the offer is made and accepted, that the debtors shall

2   waive and not pursue those actions, so that once the offer is

3   made by the debtor and accepted by the creditor, that that

4   shall be the outcome, that it shall be waived, and we've

5   added some clarifying language about that.

6            So we submit, Your Honor, there's nothing about

7   the inclusion of these provisions in the plan that is

8   problematic, but that issue is not before the Court today;

9   that's potentially a confirmation issue.

10           The only question before the Court today is

11  whether the inclusion of this provision, Section 5.5 of the

12  plan, somehow renders the plan patently unconfirmable and we

13  certainly submit that it does not.

14           THE COURT:  Okay.  Thank you.

15           Any response, Mr. Marker?

16           MS. MARKER:  Dylan Marker of Proskauer Rose, on

17  behalf of the LayerZero Group.

18           Your Honor, I think what's important to look at is

19  who is this opportunity being provided to and why is it being

20  given?  Six billion of customer preferences, of potential

21  customer preference claims, the debtors could have asserted

22  in these cases.  That's half of the cash that they say they

23  have -- that they will have for confirmation.  This is a

24  tremendous amount of value that is being provided to customer

25  preferences.

1          You can say it's for a settlement.  You can try

2   and frame it however you want, but the fact is that this is

3   value of the estate that is not being provided to our

4   clients, and for those reasons, we submit that the Court

5   should not approve the disclosure statement because the plan

6   is patently unconfirmable on that issue.

7          THE COURT:  All right.  Well, as I said, you gave

8   me a lot of information, a lot of facts for which I have no

9   evidence, which is why in a disclosure statement hearing,

10  it's difficult to raise issues, especially bad faith.  You've

11  got to have something that gives me something to hang on to,

12  and I have nothing to hang on to.

13          I mean, they've presented their plan.  They're

14  arguing it is proposed in good faith.  You're telling me it's

15  not proposed in good faith.  It's a fact issue.  It's an

16  issue for confirmation.  So I'm going to overrule your

17  disclosure statement objection and you obviously have the

18  right to raise whatever objections you want to when you get

19  to confirmation, but come with evidence.

20          MS. MARKER:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MR. GLUECKSTEIN:  Okay.  Your Honor, by the

23  debtors' count, that is the scope of the objections that need

24  to be dealt with this morning, but I should probably pause

25  there as to whether anybody else thinks I'm mistaken.

1              THE COURT:  I think there were two -- weren't

2    there two pro se objections to the disclosure statement?

3              MR. GLUECKSTEIN:  I think we -- we certainly

4    disclosed that we had received certain correspondence from

5    the *pro ses*.  I don't think we characterized them as raising

6    disclosure issues, but, you're correct, Your Honor, they're

7    not resolved.

8              THE COURT:  Right.  Well, let me just ask if there

9    is any *pro se* claimant online who wishes to be heard on the

10   disclosure statement?

11        (No verbal response)

12             THE COURT:  Okay.  I've heard nothing.

13             I did see the two pro se claimant filings and I

14   agree with debtors' counsel, they didn't really raise any

15   issues regarding disclosure, so those two objections are

16   overruled, as well.

17             MS. GAMBALE:  Alexis Gambale from Pashman Stein on

18   behalf of the joint liquidators of Three Arrows Capital.

19             I have with me Rebecca Pressley from Latham &

20   Watkins.  She just wants to be heard on the matter.

21             THE COURT:  Okay.

22             MS. PRESSLEY:  Good morning, Your Honor.

23             For the record, Rebecca Pressley of Latham &

24   Watkins on behalf of the joint liquidators of Three Arrows

25   Capital.

1          We just wanted to state for the record, we had

2    filed a limited objection to the disclosure statement and we

3    worked with the debtors to resolve that objection, but we

4    just wanted to note that we have a remaining issue with the

5    plan, which is that the debtors should required to create a

6    reserve in an amount determined with approval of the Court,

7    as opposed to the more discretionary nature of the reserve

8    that's built into the plan.  However, we're going to reserve

9    that argument for the plan confirmation stage, but we just

10   wanted to note that for the record.

11          THE COURT:  Okay.

12          MS. PRESSLEY:  With that, unless you have any

13   questions, nothing further from me.

14          THE COURT:  No questions, thank you.

15          MS. PRESSLEY:  Thank you.

16          MR. HACKMAN:  Good morning, Your Honor.

17          May I please the Court?  Ben Hackman for the U.S.

18   Trustee.

19          Our office filed a limited objection and

20   reservation of rights at Docket Item 17428, and I rise to

21   confirm that that objection is resolved.  There was one issue

22   we had discussed with debtors' counsel yesterday into this

23   morning.  I understand the debtors will add a small, a

24   relatively short provision to Section 3(c) of the disclosure

25   statement addressing the Kroll data breach.

1          The language is acceptable to the U.S. Trustee and

2    so we thank counsel for working with us to resolve our

3    concerns.  I would reserve the U.S. Trustee's rights and

4    objections regarding plan confirmation.

5          Unless Your Honor has any questions, that's all I

6    have.

7          THE COURT:  No questions, thank you.

8          MR. HACKMAN:  Thank you.

9          MR. GLUECKSTEIN:  Your Honor, I can confirm, we

10   did agree with the United States Trustee's Office, as I

11   mentioned earlier, on the language that Mr. Hackman is

12   referring to, and that will appear in the further redline

13   that we submit of the disclosure statement.

14         THE COURT:  All right.  Thank you.

15         MR. LIEBERMAN:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. LIEBERMAN:  Seth Lieberman of Pryor Cashman,

18   LLP, counsel to the Celsius litigation administrator.

19         I'm here today with my colleague Andrew Richmond,

20   along with our co-counsel from Cole Schotz.  Patrick Reilley

21   of Cole Schotz is here with me, as well.

22         We filed the disclosure statement objection, Your

23   Honor, on June 5th.  That can be found at Docket 16820.  And

24   I'm pleased to report that consistent with the amended

25   agenda, that that disclosure statement objection has, in

 1  fact, been resolved.  It's been resolved by the inclusion of

 2  additional language in the disclosure statement itself, which

 3  can be found at Docket 18537.

 4          In particular, Your Honor, the redline at 18538,

 5  there's language which begins on page 77 of that document.

 6  That is what has helped to resolve our disclosure statement

 7  objection.

 8          And while I'm happy to report that we worked

 9  constructively and in good faith with the debtors'

10  professionals in resolving this disclosure statement

11  objection, like some of the others that just appeared before

12  me, we, too, reserve our rights with respect to confirmation

13  of this plan.  We have raised certain claims and causes of

14  action in the disclosure statement objection, which I

15  understand that the debtors here vehemently object to, as

16  they put it, however, we remain hopeful and optimistic that

17  this can be resolved in advance of confirmation.

18          Nonetheless, Your Honor, I rise to reserve our

19  rights in connection with confirmation.  Thank you.

20          THE COURT:  Okay.  Thank you.

21          Anyone else?

22      (No verbal response)

23          THE COURT:  All right.  Well, that resolves all of

24  the objections to the plan and disclosure statement and I

25  will ask counsel to submit a -- you'll be submitting a

1  revised order.

2          MR. GLUECKSTEIN:  We will and Ms. Kranzley can

3  briefly address the solicitation in the order, and we will,

4  as I said, Your Honor, address with a further revised draft

5  of the plan and disclosure statement, reflecting the

6  incremental changes discussed this morning.

7          MR. PASQUALE:  Your Honor, this seems to be the

8  right time.

9          THE COURT:  All right.

10          MR. PASQUALE:  Ken Pasquale for the Official

11  Committee of Unsecured Creditors from Paul Hastings.

12          Your Honor, there were a couple of things said

13  earlier.  I know Your Honor has already overruled the

14  objections, but I'd be remiss if I didn't stand and address

15  just a couple of those comments.

16          First, our Committee is very proud of the fact

17  that we have not, but for an exception or two, had to be

18  before Your Honor to air our dirty laundry.  Our advocacy has

19  taken place in the negotiations that Mr. Dietderich

20  mentioned.  We have vigorously advocated our positions and,

21  as I said, we are very pleased to be standing here now in

22  support of the plan for confirmation, without having had to

23  come to the Court very often to complain.  We think that's

24  commendable, not subject to criticism.

25          There was also a comment that our committee is

1  conflicted in representing customers.  It's certainly the

2  case that we have a fiduciary duty do all creditors across

3  the various silos, but there's no conflict in how our

4  Committee has operated and I think that's proven, again, by

5  the plan that is now before the Court.

6          There are a number of things in the plan that the

7  Committee was instrumental in negotiating and that includes

8  the post-effective date governance agreement that was just

9  reached, as well as components, such as the consensus

10  interest rate and what is now being called, as it developed

11  from negotiations, the supplemental remission fund concept.

12         What you see in the plan is the subject of

13  successful negotiations.  That doesn't mean that the

14  Committee got everything that it wanted, that the debtors or

15  other stakeholders got everything they initially negotiated.

16  This was true negotiation, as should be, in the bankruptcy

17  setting.

18         So, Your Honor, without burdening the record more,

19  I did just want to stand up and say those couple of things.

20         THE COURT:  Okay.  Thank you, Mr. Pasquale.

21         MR. PASQUALE:  Thank you.

22         MS. KRANZLEY:  Good morning, Your Honor.  Alexa

23  Kranzley from Sullivan & Cromwell.

24         With respect to the solicitation procedures, the

25  related materials and the proposed form of order, I'm pleased

1  to inform the Court that everything is fully consensual.

2  We've worked it through with all the objecting parties, the

3  U.S. Trustee, the UCC, and the Ad Hoc Committee.

4          I would note, Your Honor, that we've had a couple

5  of changes since the version that was filed on Sunday.  This

6  is to add in that the publication notice will be with the New

7  York Times national and international editions and CoinDesk,

8  and then there's a few additional other cleanup changes.

9          Your Honor, I'm happy to walk through any of the

10  solicitation dates, materials, packages, ballots, or answer

11  any questions that you have.

12          THE COURT:  No, I reviewed them.  I appreciate it.

13  Thank you.

14          MS. KRANZLEY:  Thank you very much, Your Honor.

15          Then we ask that that be entered, and we'll

16  submit -- similar to the plan and disclosure statement, we'll

17  submit the revised version, as well, with the appropriate

18  redlines.

19          THE COURT:  Let me just confirm there's no

20  objection?

21      (No verbal response)

22          THE COURT:  Okay.  It's approved.

23          MS. KRANZLEY:  Thank you very much, Your Honor.

24          THE COURT:  Submit a revised form of order.

25          MS. KRANZLEY:  Your Honor, I think that leaves one

1  item on the agenda, Item No. 5 is the debtors motion for

2  authorization for repayment of intercompany payables by

3  debtor FTX Japan and the related release of claims that was

4  filed at Docket 15654.

5        Just to give the Court some brief background and

6  context for this motion, the debtors are looking for

7  authorization for the payment by debtor Japan KK to its

8  debtor parent Japan Holdings KK and other debtor affiliates

9  to satisfy certain pre and post-petition intercompany claims

10 totaling approximately $69.7 million.  The repayment is

11 necessary now as the debtors are exploring a sale of FTX

12 Japan.

13       Last week, on June 20th, the debtors filed a

14 motion at Docket No. 17923 seeking authorization to sell the

15 equity interest of debtor Japan KK.  The repayment of the

16 intercompany payables is a closing condition of that proposed

17 sale and was factored in by the purchaser determining the

18 purchase price that was offered.  After the repayment of

19 these intercompany payables the debtors anticipate that FTX

20 Japan will have cash and cash equivalents of approximately

21 $33.5 million in excess of its liabilities.

22       Your Honor, we received two pro se objections to

23 the motion and we filed a reply at Docket No. 17170.  Both of

24 these pro se claimants are alleging claims against FTX Japan

25 and various other debtors in various amounts, and argue that

1 the debtors motion should be denied until resolution of their

2 respective claims.  Your Honor, the debtors are not seeking

3 to adjudicate their claims in connection with this motion.

4 They are not prejudicing the adjudication of their claims and

5 anticipate having significant cash in excess to satisfy those

6 claims to the extent that they're allowed.

7 Your Honor, there were two declarations submitted

8 by Mr. Steven Coverick from Alvaraz & Marsal in support.  One

9 filed with the motion at Exhibit B to Docket 15654 and a

10 supplemental declaration in support of the reply at Docket

11 No. 17173.  We ask that these declarations be admitted into

12 evidence and Mr. Coverick is in the courtroom today.

13 THE COURT:  Is there any objection?

14 (No verbal response)

15 THE COURT:  They're admitted without objection.

16 (Coverick declarations received into evidence)

17 MS. KRANZLEY:  Your Honor, unless you have

18 questions for me I am happy to hear if either of the

19 objectors are on the line to be heard.

20 THE COURT:  Okay.  Let's see if anyone wants to

21 object to the motion for authorization of intercompany

22 payments regarding FTX Japan.  There were two objections

23 filed, right?

24 MS. KRANZLEY:  That is correct, Your Honor.

25 THE COURT:  Are either of the objectors on the

1  line?

2       (No verbal response)

3            THE COURT:  Okay.  I have heard nothing.  I did

4  review the objections and the response from the debtors. I

5  think the debtors are correct, to the extent there is a

6  ballot objection they can be dealt with separately and

7  there's going to be sufficient funds remaining at FTX Japan

8  to pay those two objectors who have raised the objections.

9  So, there is no prejudice to them in approving it. So, I will

10 approve the order.

11           MS. KRANZLEY:  Thank you very much, Your Honor.  I

12 believe those are the only items we have the agenda for

13 today.

14           THE COURT:  Okay.  Anything else before we

15 adjourn?

16           MR. HARVEY:  Good morning, Your Honor, almost

17 afternoon.  For the record Matthew Harvey from Morris,

18 Nichols, Arsht & Tunnell on behalf of the ad hoc committee of

19 non-US customers of FTX.com.

20           Ms. Kranzley beat me up here before I could

21 address -- stand to address our support of the disclosure

22 statement approval. Our group, which is nearly $5 billion in

23 claims now with approximately 75 percent of our members being

24 original holders, like the creditors committee, has worked

25 behind the scenes in order to get to the result we are today.

1   We think this is an important step in milestone in getting to

2   plan solicitation in getting to the point where we can make

3   distributions to customers as soon as possible. For those

4   reasons, Your Honor, we support approval of the disclosure

5   statement and the start of solicitation.

6           THE COURT:  Thank you.

7           MR. HARVEY:  Thank you, Your Honor.

8           THE COURT:  Anything else?

9       (No verbal response)

10          THE COURT:  Thank you all very much.  We are

11  adjourned.

12      (Proceedings concluded at 11:59 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    June 25, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    June 25, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25