# **Exhibit B**

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10943-mew

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   VOYAGER DIGITAL HOLDINGS, INC.,

8

9            Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  January 24, 2023

17                  11:03 AM

18

19

20

21  B E F O R E :

22  HON MICHAEL E. WILES

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  KB

Page 2

1    HEARING re Motion by Celsius Network LLC lifting the

2    automatic stay and granting leave to file late proof of

3    claim Objections filed

4

5    HEARING re Second motion extending the Debtors' exclusive

6    periods to file a chapter 11 plan and solicit acceptances

7    thereof and granting related relief

8    ***CERTIFICATE OF NO OBJECTION FILED***

9

10   HEARING re Application authorizing the retention and

11   employment of Katten Muchin Rosenman LLP as special counsel

12   for Debtor on behalf of and at the sole direction of the

13   independent director, effective as of November 11, 2022

14   ***CERTIFICATE OF NO OBJECTION FILED***

15

16   HEARING re Application authorizing the retention and

17   employment of ArentFox Schiff LLP as special counsel

18   effective as of November 10, 2022

19   ***CERTIFICATE OF NO OBJECTION FILED***

20

21   HEARING re Application authorizing the retention and

22   employment of Potter Anderson & Corroon LLP as Delaware

23   counsel effective as of November 30, 2022

24   ***CERTIFICATE OF NO OBJECTION FILED***

25

1   HEARING re Final hearing RE: motion authorizing the Debtors

2   to continue to operate their cash management system, honor

3   certain prepetition obligations related thereto, maintain

4   existing business forms, and continue to perform

5   intercompany transactions, granting superpriority

6   administrative expense status to postpetition

7   intercompany balances, and granting related relief

8   Limited objection filed

9   Adjourned Reset for 02/07/2023 at 10:00 am

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

```
1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for the Debtor

5         601 Lexington Avenue

6         New York, NY 10022

7

8    BY:  ALLYSON SMITH

9

10   KATTEN MUCHIN ROSENMAN LLP

11        Attorneys for the Debtor

12        575 Madison Avenue

13        New York, NY, 10022

14

15   BY:  SHAYA ROCHESTER

16

17   UNITED STATES DEPARTMENT OF JUSTICE

18        Attorneys for the U.S. Trustee

19        201 Varick Street, Suite 1006

20        New York, NY 10014

21

22   BY:  RICHARD MORRISSEY

23

24

25
```

```
 1   ARENT FOX SCHIFF

 2        Attorneys for Scott Vogel, as the Independent Director

 3        of Voyager Digital Holdings, Inc.

 4        1301 Avenue of the Americas

 5        New York, NY, 10019

 6

 7   BY:  JEFFREY GLEIT

 8

 9   PAUL HASTINGS

10        Attorneys for Voyager Digital Holdings, Inc., et al.

11        71 South Wacker Drive

12        Chicago, IL, 60010

13

14   BY:  MATTHEW MURPHY

15        MICHAEL C. WHALEN

16

17   AKIN GUMP STRAUSS HAUER & FELD LLP

18        Attorneys for Celsius Network LLC

19        One Bryant Park

20        New York, NY 10036

21

22   BY:  MITCHELL P. HURLEY

23        DEAN CHAPMAN

24

25
```

```
 1   MCDERMOTT WILL & EMERY LLP

 2         Attorneys for Official Committee of Unsecured Creditors

 3         of Voyager Digital Holdings, Inc., et al.

 4         340 Madison Avenue

 5         New York, NY 10173

 6

 7   BY:  DARREN AZMAN

 8

 9   ALVAREZ AND MARSAL

10         Attorneys for Celsius Network LLC

11         540 West Madison Street

12         Chicago, IL, 60661

13

14   BY:  HOLDEN BIXLER

15

16   CHRIS FERRARO, Celsius

17

18   ALSO PRESENT TELEPHONICALLY:

19   DANIEL M. EGGERMANN

20   ETHAN TROTZ

21   ERIC REUBEL

22   LAUREN KELLY GREENBACKER

23   RICHARD COCHRANE

24   ANGELA HERRING

25   BENJAMIN NICKERSON
```

```
 1    GREGORY PESCE

 2    TOM ST. HENRY

 3    ADAM SWINGLE

 4    BENJAMIN BELLER

 5    DAVID TURETSKY

 6    RICK ARCHER

 7    STEVEN REISMAN

 8    MARTIN ALLOCATI

 9    LETICIA SANCHEZ

10    JEFF STAPLETON

11    COURTNEY STEADMAN

12    VICTOR UBIERNA DE LAS HERAS

13    JASON DIBATTISTA

14    CATHY TA

15    TAYLOR HARRISON

16    RANDALL PULMAN

17    ERIK HANNER

18    LUKE PORCARI

19    DUSTIN PETERSON

20    SUSAN GOLDEN

21    CHRISTINE OKIKE

22    CHRISTOPHER SAMIS

23    KATHERINE SCHERLING

24    JASON ROSELL

25    NACIF TAOUSSE
```

Page 8

1    JONATHAN WEICHSELBAUM

2    MICHAEL SLADE

3    NATALIE THOMPSON

4    MARCIO FERREIRA

5    MATTHEW CHERRY

6    LISA PROVINO

7    TRACY HENDERSHOTT

8    JACOB BALTAYTIS

9    KELLY MOYNIHAN

10   PAUL ROSENBLATT

11   JAMES NANI

12   CAROLINE ELLIS

13   JOSEPH EVANS

14   CHARLES GIBBS

15   GREGG STEINMAN

16   GRAYSON WILLIAMS

17   CRAIG RASILE

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Good morning, everybody.  Are the

 3     parties ready on the Voyager matter?

 4            MS. SMITH:  Good morning.  Yes, Your Honor.

 5            THE COURT:  (Indiscernible) --

 6            MS. SMITH:  For the record -- I apologize.  For

 7     the record, Allyson Smith from Kirkland and Ellis, counsel

 8     to the Debtors.  We only have a handful of matters on the

 9     agenda today, most of which are uncontested and for which we

10     filed certificates of no objection.  So unless Your Honor

11     prefers to proceed differently, I propose addressing those

12     first and then turning to the Celsius matter.

13            THE COURT:  Yes, I think that makes sense.

14            MS. SMITH:  Okay.  Great.  Thank you, Your Honor.

15     Skipping down then to Agenda Item Number 2, Debtor Voyager

16     Digital LTD's application to retain Katten as special

17     counsel on behalf of its independent director.  In support

18     of the application, three declarations were filed, the

19     original by Mr. Steve Reisman, one supplemental by him

20     disclosing rate changes, and one by Mr. Matt Ray.  We'd ask

21     that those three declarations be moved into evidence absent

22     objection.

23            THE COURT:  Are there any objections to the

24     admission of the declarations into evidence?  Does anyone

25     wish to cross-examine the declarants?  All right.  The
```

1    objections are -- excuse me, the declarations are admitted.

2          MS. SMITH:  Thank you.  We received no formal or

3    informal objections.  And as I noted, we did file the CNO on

4    Friday.  Unless the Court has any questions or concerns to

5    address, we would ask that this application be granted.

6          THE COURT:  As to the Katten Muchin application,

7    if I recall correctly, there were some Creditors of TopCo

8    who raised some issues in connection with the plan that was

9    previously proposed about how some of the arrangements would

10   be treated, and whether it was fair to TopCo.  Who were

11   those Creditors?  Can you remind me?

12          MS. SMITH:  I believe it may -- you may be

13   referred to the equity holders and --

14          THE COURT:  (Indiscernible).

15          MS. SMITH:  -- referencing the intercompany

16   obligations?

17          THE COURT:  Yeah, maybe it was equity holders.  I

18   can't remember.

19          MS. SMITH:  Yeah, and that's actually precisely

20   what Katten is being retained to assist in that analysis as

21   to whether certain intercompany obligations are more

22   properly categorized as capital contributions or loans.

23          THE COURT:  But the declaration says that Katten

24   also represents some people who hold debt of TopCo and may

25   continue to represent them in connection with trading

Page 11

1    activities involving such debt.  Is that right?

2           MS. SMITH:  I believe the declaration states they

3    just represent a trade Creditor that has a pre-petition

4    claim of less than 75,000, and they've implemented screening

5    measures to wall off those representations.

6           THE COURT:  Hang on.  I'm not sure that's exactly

7    -- was that Otter Anderson or was that Katten Muchin?

8    Katten Muchin just says that they have represented certain

9    holders of TopCo debt in connection -- and will -- may

10   represent them in connection with trading activity involving

11   such debt.  Is Katten on the phone?  They can tell us what

12   that is.

13          MR. ROCHESTER:  Yes, Your Honor.  For the record,

14   Shaya Rochester from Katten Muchin.  In the recent

15   declaration that was filed at Docket 718, there are specific

16   disclosures in Paragraph 25A.  And there's a reference to

17   representing a trade Creditor of TopCo that has a pre-

18   petition (indiscernible) as Ms. Smith said, and screening

19   procedures are put in place.  That is the only connection

20   other than that and then what was in B in terms of

21   representation of trade Creditors.

22          THE COURT:  And is there any matter other than

23   these intercompany matters for which Katten would be

24   retained?

25          MS. SMITH:  No, Your Honor.

22-10943 Case 22-10943-JT Filed Doc 397/23-2 Entered 01/08/24 07:17:12 1 of 108 Please see
Part2</b>Main Document    Pg 12 of 107

Page 12

```
 1              THE COURT:  Does TopCo have separate assets that

 2    would enable it to pay counsel here?

 3              MS. SMITH:  I believe they do have a limited

 4    number of assets.

 5              THE COURT:  Okay.  And it's only TopCo that would

 6    be obligated on this obviously, correct?

 7              MS. SMITH:  Correct.

 8              THE COURT:  All right.  Does the U.S. Trustee have

 9    any issue with this?

10              MR. MORRISSEY:  Your Honor, Richard Morrissey for

11    the U.S. Trustee.  The U.S. Trustee has reviewed all the

12    declarations and has no objection.  Thank you.

13              THE COURT:  Okay.  I think I would like the order

14    to be a little more specific as to just what Katten Muchin

15    is going to be doing because it's not at all clear.  It's a

16    rather vague description in the papers.  If it's going to be

17    looking at the intercompany claims, then it should

18    correspond to the more specific order that you had for

19    ArentFox in that regard.  Okay?

20              MS. SMITH:  Of course.  We can certainly revise

21    the order, Your Honor, and resubmit.

22              THE COURT:  As to ArentFox, that affidavit says

23    that ArentFox represents the National Women's Soccer League

24    in these --

25              MS. SMITH:  Yes.
```

1              THE COURT:  -- cases.  Is that correct?

2              MS. SMITH:  Yes, but my understanding is that they

3    obtained a conflict waiver from the Women's Soccer League.

4              THE COURT:  Does the U.S. Trustee have any issue

5    in that regard?  Mr. Morrissey?

6              MR. MORRISSEY:  I'm sorry, Your Honor.  I was on

7    mute.  The U.S. Trustee has no objection to that, and

8    accepts the fact that ArentFox did receive a waiver.

9              MR. GLEIT:  And Your Honor, it's Jeff Gleit from

10   ArentFox.  May I be heard?

11             THE COURT:  Yes.

12             MR. GLEIT:  Okay.  Your Honor, just in addition to

13   the waiver, we also have an ethical law.  So the attorneys

14   working on the Voyager matter on behalf of the independent

15   director are not involved with anything to do with the

16   National Women's Soccer League.

17             THE COURT:  All right.  Very good.  I'll approve

18   those two retentions, and I don't have any issue as to

19   Potter Anderson.  (Indiscernible) case, obviously you need

20   to have counsel there.

21             MS. SMITH:  Thank you, Your Honor.  We'll get the

22   revised Katten order submitted to you shortly after this

23   hearing.

24             THE COURT:  Okay.

25             MS. SMITH:  Moving then to the last item prior to

1    turning it over to Celsius is our exclusivity extension

2    motion.  The Debtors are seeking to extend the exclusivity

3    period another 60 days to March 3rd, which as you know is

4    right after our scheduled confirmation hearing on the 2nd.

5    We did negotiate this with the Committee prior to filing it

6    in December, and the filed document incorporated their

7    comments.  Otherwise, no objections or comments were

8    received, and a CNO was also filed on Friday.  So unless

9    Your Honor has any additional questions, we would ask that

10   this order be entered.

11            THE COURT:  Okay.  Is there anybody on the phone

12   that wishes to be heard on this?  Okay.  I'll enter the

13   order.  Just submit it to chambers.

14            MS. SMITH:  Thank you, Your Honor.  Will do.  With

15   that then, I am going to cede the podium to the Paul

16   Hastings team, who will be handling the remaining matter.

17            THE COURT:  Okay.

18            Thank you, Allyson.  Good morning, Your Honor.  My

19   name is Matt Murphy from Paul Hastings.  Before turning it

20   over to my colleague Mike Whelan, I just wanted to address

21   with the Court and the Office of the United States Trustee

22   it was my expectation to get our retention application on

23   file last week.  That obviously did not happen, and my

24   apologies to both Mr. Morrissey and the Court.  My

25   expectation is that that will be on file today.

```
1              It is -- as Your Honor may recall, we were

2     operating or have been operating as ordinary course

3     professional counsel.  Given the scope of our involvement,

4     we must at this point file a retention application to be

5     separately retained.  And the scope is as it relates to

6     special regulatory counsel and then conflicts counsel as it

7     relates to this discrete issue with Celsius.  I just wanted

8     the Court to be aware that -- and Mr. Morrissey to be aware

9     that that is forthcoming.

10             THE COURT:  All right.

11             MR. MURPHY:  Mike, I'll turn it over to you.

12             THE COURT:  I assume nobody on the phone has any

13    objection to Mr. Murphy speaking on behalf of Voyager.

14             MR. MORRISSEY:  Your Honor, Richard Morrissey for

15    the U.S. Trustee.  I have no particular objection, but I

16    think it would be helpful for the Court to know, and I don't

17    know one way or another right now not having seen a

18    retention application, whether Paul Hastings has represented

19    any entity or individual in connection with Celsius.  I just

20    want to make sure that there's conflict issue going in

21    before we hear the argument.  Thank you.

22             MR. MURPHY:  Yeah.  The retention application will

23    show that Paul Hastings represents certain individuals in

24    the C Suite I guess is how I'll say it as it relates to

25    ongoing investigations and civil litigation matters
```

```
 1    unrelated to this matter.

 2             MR. MORRISSEY:  Now, just to be clear, and I mean

 3    to address Your Honor but addressing Mr. Murphy, the C --

 4    this is the C Suite of Celsius?

 5             MR. MURPHY:  That's right.

 6             MR. MORRISSEY:  Okay.  The U.S. Trustee can't take

 7    a position on that, you know, not having seen the

 8    explanation, but it certainly is a concern.

 9             MR. MURPHY:  Understood and happy to discuss

10    further once we get the application on file.

11             THE COURT:  Mr. Hurley, were you about to say

12    something?

13             MR. HURLEY:  Good morning, Your Honor.  Mitch

14    Hurley with Akin Gump Strauss Hauer and Feld.  I wasn't -- I

15    guess I was going to wait until Your Honor was ready for me,

16    but I am ready to proceed whenever you want me to.

17             THE COURT:  Let me just ask as a preliminary

18    matter.  Do you both agree that any preference claims

19    against Voyager here would relate to transfers that pre-

20    dated Voyager's bankruptcy case and therefore would be

21    unsecured claims in the Voyager case?

22             MR. HURLEY:  So Celsius filed its bankruptcy case

23    about a week after Voyager's bankruptcy petition was filed.

24    It's -- I guess it's at least conceivable that a withdrawal

25    could've happened during the period after Voyager's petition
```

Page 17

1    was filed and before Celsius' was filed.  I confess I don't

2    have that information at my fingertips.  But to the extent

3    the withdrawals and the transfers were prior to Voyager

4    petition being filed, I would agree, Your Honor.

5            THE COURT:  Thank you.  I looked at your -- the

6    declarations you submitted in that regard and I think they

7    were all before the Voyager filing date, but I could be

8    wrong.

9            MR. WHALEN:  Yes, Your Honor.  Michael Whalen from

10   Paul Hastings on behalf of Voyager.  We would take that

11   position, and that's our understanding of the timing as

12   well.

13           THE COURT:  So we're talking about a potential

14   $5.9 million unsecured claim as well as I guess under 502(d)

15   an issue as to about -- potential issue as to about 1.1

16   million or so of items that remain with Celsius.  Is that

17   correct?

18           MR. WHALEN:  The total amount of the claim in the

19   90-day preference period, Your Honor, we understand is 7.7

20   million, but your numbers are obviously approximately right.

21           THE COURT:  Can somebody from Paul Hastings help

22   me out?  I thought I saw it was 5.9 that was withdrawn

23   because the total account was more like $7 million if I got

24   the numbers wrong.

25           MR. MURPHY:  Your Honor, we have a somewhat

22-10943 Case 22-10943-JTD Filed Doc 397-2 01/30/23 Entered 01/30/23 Page 129 of 198 Pg 17 of 108 Please see
Part2</b>Main Document    Pg 18 of 107

Page 18

1    different accounting internally, and it's our view on the

2    Voyager side that we would have to, you know, rectify that

3    if a claim is filed, but those numbers are approximately

4    right in the realm of 7.7.  There's some uncertainty as to

5    how Celsius is treating those figures from our end, which is

6    understandable.  We haven't seen their books and records,

7    they haven't seen ours, but we do contend that there's about

8    1.1 million still caught, for lack of a better word, on

9    Celsius' platform.

10           The remainder of any assets have made it into

11   Voyager's possession.  That 1.1 million is in what's called

12   a withhold account, and it's our understanding that it's

13   Celsius' position that we have right and title over those

14   funds, but there is 1.1 million that's sort of in a little

15   bit of a limbo.

16           THE COURT:  All right.  And in your papers on

17   behalf of Voyager, Mr. Murphy, you've argued that any such

18   claim would be a huge portion of Class 4A, but aren't the

19   recoveries for Class 4A under the pending plan calculated by

20   reference to the larger pool that includes other types of

21   customer claims?

22           MR. WHALEN:  This is Michael Whalen again, Your

23   Honor.  Yes, and that is a point that we would like to

24   clarify.  It is true we believe, and we don't believe that

25   Celsius has contested this, that their claim would fall into

1    Class 4A.  And yes, they will be treated in the aggregate

2    with Class 3, the account holder claims.  But the point that

3    we were trying to make is that they will constitute a large

4    portion of a class that could be subject to disparate

5    treatment.  They are not under the plan.  We don't

6    anticipate that that will be the case.

7         And we certainly don't think that will happen, but

8    it -- based on the negotiations and the understanding of the

9    relative creditor classes when this plan was formed, it was

10   a Class 4A that had about $14 million in claims, and now

11   that's going to go up to 21 and change.  So that was the

12   point that we were trying to make.  I think our overriding

13   point is that while that is a huge portion of Class 4A and

14   should be considered, there are other factors that go into

15   the prejudice equation as well.  So that's one piece of the

16   pie on prejudice.

17        THE COURT:  But in terms of what you need to do to

18   make distributions and things like that, that's a drop in

19   the bucket, isn't it?

20        MR. WHALEN:  It is a small amount relative to the

21   Class 3 size, but we think a law in the Southern District

22   and cases from Your Honor as well express the notion that

23   prejudice is not reduceable merely to the size of the claim,

24   and that there are other considerations, such as the

25   expectations of Creditors that did file by the bar date

1      that's also relevant.  But yes, Your Honor.

2            THE COURT:  Is there any other evidence on the

3      issues here that the parties think they need to gather and

4      to present to me, or that they would like to gather and

5      present to me?

6            MR. AZMAN:  Your Honor, it's Darren Azman from

7      McDermott Will and Emery from the Committee.  We would like

8      to cross all three of the declarants that submitted

9      declarations in support of the motion, but that's the only

10     additional evidence that we would like to introduce.

11           THE COURT:  Okay.  How about on behalf of the

12     Debtors or on behalf of Celsius?

13           MR. HURLEY:  Not on behalf of Celsius, Your Honor.

14           MR. MURPHY:  The Debtor -- Your Honor, with

15     respect to the Debtors, I think it's our position that

16     Celsius did not carry their burden to establish either form

17     of relief, but we'll be attentive to the cross and would

18     reserve our rights to participate in the cross, but we'll

19     allow the Committee to take the lead there.

20           THE COURT:  All right.  Well before I ask my own

21     questions about the underlying issues, maybe we should get

22     the evidentiary record set.  And so is it your intent to

23     offer the declarations into evidence, Mr. Hurley?

24           MR. HURLEY:  It is, Your Honor.

25           THE COURT:  All right.  Then maybe we should do

Page 21

1    that one by one, and we should hear the cross-examinations.

2              MR. HURLEY:  Okay.  So there are two fact witness

3    declarations, Mr. Bixler and Mr. Ferraro.  I also put in a

4    declaration.  I'm not sure if I correctly understood that

5    McDermott -- that the UCC counsel also wants to cross-

6    examine me, but why don't we start with the fact witnesses?

7    So Chris Ferraro is the acting CEO of Celsius and submitted

8    a declaration, and Mr. Ferraro is available and on this case

9    for cross-examination.  And Your Honor, we would offer his

10   declaration into evidence.

11             THE COURT:  Let's start with does anybody object

12   to the admission of the declaration into evidence?  All

13   right.  The declaration is admitted into evidence.  Is there

14   anybody other than the Committee who wishes to cross-examine

15   Mr. Ferraro?  All right.  Mr. Ferraro, I'm going to let the

16   Committee cross-examine you.  Do you understand that the

17   answers that you give to their questions are to be given by

18   you under oath.  And do you swear that the testimony you're

19   about to give is the truth, the whole truth, and nothing but

20   the truth?  Mr. Ferraro, are you there?  Is he on a speaking

21   line?  Is he muted?

22             MR. FERRARO:  -- mute.  Can you hear me, Your

23   Honor?

24             THE COURT:  I can now, yes.  I couldn't before.

25             MR. FERRARO:  Sorry.  I'm learning the Court

Page 22

1    Solutions site.  I apologize.

2             THE COURT:  No problem.  Do you swear that the

3    answers to the questions you're about to give will be the

4    truth, the whole truth, and nothing but the truth, so help

5    you God?

6             MR. FERRARO:  Yes, I do, Your Honor.

7             THE COURT:  All right.

8             MR. HURLEY:  Your Honor, before we begin, it's

9    Mitch Hurley again.  My partner Dean Chapman is on the line,

10   and Mr. Chapman is going to handle the cross, objections,

11   and any redirect if necessary with the Court's permission.

12            THE COURT:  Very good.

13            MR. CHAPMAN:  Good morning, Mr. --

14            THE COURT:  Go ahead.

15            MR. CHAPMAN:  Thank you, Your Honor.

16               CROSS-EXAMINATION OF CHRIS FERRARO

17   BY MR. CHAPMAN:

18   Q    Good morning, Mr. Ferraro.

19   A    Good morning.

20   Q    In Paragraph 8 of your declaration, you make a

21   conclusion that the bar date notice should've been provided

22   to Celsius US and Celsius EU instead of Celsius UK  Is that

23   right?

24   A    Yes, sir.

25   Q    And in Paragraphs 6 and 7, you acknowledge that the bar

Page 23

1   date notice was sent to Celsius UK, but you say that it was

2   an out-of-date address. That's right?

3   A    Yes, sir.

4   Q    When did Celsius UK move out of that address?

5   A    On March 20, 2020 we filed the change of registered

6   address to 1 Bartholomew Lane, London.

7   Q    And is that when -- sorry, was there more there, Mr.

8   Ferraro?

9   A    No.

10  Q    When did Celsius completely vacate that property?

11  A    To my understanding right around that time. I wasn't

12  with the company at that time.

13  Q    Okay. Can you tell me about the relationship between

14  Celsius US, Celsius EU, and Celsius UK?

15  A    Yeah. The parent company would be UK and subsidiaries

16  US and EU.

17  Q    And at the time that the bar date notice was sent to

18  what you described as the wrong address, and that was around

19  September 23, 2022, did Celsius US have any employees or

20  agents or any contractors who also performed functions for

21  either Celsius EU or Celsius UK?

22  A    I don't know the answer to that, sir. I mean, we work

23  across -- we have a pool of employees that work across the

24  EU entities.

25  Q    Okay. So it wouldn't surprise you if there were a

```
 1    number of employees at Celsius, you know, the global

 2    organization, that worked across Celsius U.S., Celsius EU,

 3    and UK?  That wouldn't surprise you?

 4    A    No, sir.

 5    Q    Okay.

 6    A    That wouldn't.

 7    Q    Do you know if there are any shared officers or

 8    directors between those three entities?

 9    A    I don't have that in front of me.  I apologize.

10    Q    Okay, but that's possible?

11    A    Yes, it's possible.

12    Q    Okay.  What do you believe is the correct address that

13    Voyager should've mailed the bar date notice to?

14    A    Our address in Hoboken, sir.

15    Q    And how would Voyager have known that this was the

16    correct address?

17    A    Well, as part of the addendum, you know, part of that

18    was assigning the rights to Celsius US from Celsius UK.  So

19    I would say disclosure and execution of the addendum would

20    raise that kind of knowledge.  Our address is listed on the

21    website.

22    Q    Okay.

23    A    Our Hoboken address.

24    Q    You are referring to the assignment agreement.  Is that

25    correct?
```

Page 25

1    A    Yes, sir.

2    Q    Is there any address that's -- to your knowledge that's

3    -- do you have that assignment agreement in front of you, by

4    the way?

5    A    I do not have it in front of me.  I did read through

6    it, but it's not in front of me.

7    Q    Okay.  Is there an address anywhere in that agreement?

8    A    Not that I remember offhand.

9    Q    Okay.  I'll represent to you and the Court that there

10   is no address in the assignment agreement.

11         MR. CHAPMAN:  And I believe that the Debtor has

12   uploaded a revised declaration shortly before the hearing

13   that has the unredacted versions of those agreements, Your

14   Honor.  So you should have those in full in front of you.

15         THE COURT:  Let me just ask Celsius' counsel do

16   you agree that the assignment agreement doesn't have a

17   revised address in it?

18         MR. HURLEY:  Your Honor, this is Mitch Hurley.

19   The assignment agreement references the terms of use, and

20   the terms of use include the address that was just

21   referenced by the witness.  But the assignment agreement

22   does not expressly state that address within the text of the

23   assignment agreement.

24         THE COURT:  Okay.

25   BY MR. CHAPMAN:

Page 26

1   Q    Mr. Ferraro, by referencing the terms of the use in the

2   assignment agreements --

3            MR. CHAPMAN:  You know what, Your Honor?  I'll

4   save this for argument later.  I don't think it's

5   appropriate for the witness right now.

6   BY MR. CHAPMAN:

7   Q    Mr. Ferraro, in Paragraph 9 of your declaration, you

8   say that to the best of your knowledge no Celsius agent or

9   employee ever received the notice of the bar date in

10  Voyager's bankruptcy.  How did you make that determination?

11  A    I checked in with the senior operations director who

12  handles kind of overseas mail and confirmed that there is no

13  record of any employee receiving such notice.

14  Q    Okay.  And did that individual speak with every

15  employee?

16  A    That individual did not speak with every employee of

17  the company, no.

18  Q    Do you know how many individuals that person spoke to?

19  A    No, I didn't -- no, sir.

20  Q    And do you know which individuals -- you know, who --

21  anyone that that person spoke to?

22  A    Usually that person monitors the mailboxes.  And there

23  is individuals that go and check the mail, and screen the

24  mail, and then kind of delegate the mail across the

25  organization.  So this would've been caught in the normal

Page 27

1    processes, sir.

2    Q    Okay.  Who is responsible for preparing the list of 90-

3    day transfers in the schedules that Celsius filed?

4    A    In our statements and schedules, sir?

5    Q    Yes.  Who was responsible for preparing specifically

6    the 90-day transfers that were in the schedules and

7    statements?

8    A    I can't speak -- yeah, sorry for talking over.  I can't

9    speak specifically to who's responsible for that.  It was a

10   collaboration between the internal team at Celsius and

11   Alvarez and Marsal led by Holden Bixler on that side with A

12   and M.  This was --

13   Q    Do you -- at --

14   A    -- quite a big activity for us.  We really had to

15   leverage across the entire organization starting really

16   before the petition and going all the way through when we

17   filed in October.

18   Q    Oh, I imagine it was quite an undertaking.  Did outside

19   counsel to Celsius have any involvement in preparing or

20   viewing the schedules?

21   A    They were part of the review discussions.

22   Q    And when you say they, what law firm are you referring

23   to?

24   A    At -- it would've been Kirkland and Ellis.

25   Q    Okay.  So Kirkland was responsible for reviewing the

22-10943Case 22-1ace-Dcb1068-1JT DoleD001-3097298-2EntFided 00/03/023 0 Page129 o-Page 29 of 108lease see
Part2</b>Main Document    Pg 28 of 107

Page 28

1   list of the 90-day transfers?

2   A    I'm not sure, sir, the (indiscernible) responsibility.

3   We worked predominantly with A and M on the exercise.  I

4   know that they were present in discussions.

5   Q    Okay.  But to the extent that outside counsel would've

6   been involved, it would've been Kirkland it sounds like.  Is

7   that right?

8   A    I don't want to speculate.  They're involved in kind of

9   the (indiscernible) on all legal items in the case.

10  Obviously this one's a little bit different as we identified

11  and engaged with Akin.  So...

12  Q    Okay.  And you're aware that the list of 90-day

13  transfers included all the Voyager withdrawals that are at

14  issue in this dispute?  Is that right?

15  A    Yeah.  To my understanding, yes.  When we filed the

16  statements and schedules, it was identified, yes.

17  Q    Okay.  So any of the professionals, whether Kirkland, A

18  and M, any of the professionals that would've been involved

19  in reviewing the schedules and statements would've been

20  aware that those transactions with Voyager were included on

21  the 90-day transfer schedule.  Is that right?

22          MAN:  Objection, foundation.

23          THE COURT:  Overruled.  Go ahead.

24  BY MR. CHAPMAN:

25  A    I don't want to speculate on what they did or did not

```
 1   know.  I will say this.  There's over 30,000 pages that we

 2   produced and 3 million lines of data, and we have 600,000

 3   Creditors.

 4   Q    Do you know what the purpose of the 90-day transfer

 5   schedule is?

 6   A    My understanding is to look at withdrawals within 90

 7   days and transfers within 90 days to look at preferential

 8   claims, preferential transfers and claims.

 9   Q    So if you see a particular person on that 90-day

10   transfer schedule, what does that mean to you?

11   A    I'm not the person -- I have many jobs in the company.

12   Looking at the 90-day transfers line by line is not one of

13   them, sir.

14   Q    Oh, I'm asking more generically.  If you were to see

15   somebody on the 90-day transfer schedule -- I think you

16   actually already answered it.  You indicated previously that

17   it would -- the purpose of the 90-day transfer schedule is

18   to identify potential preference actions.  Am I getting your

19   testimony correct on that?

20   A    That's my understanding, sir.

21   Q    Okay.  So if you saw a particular person that 90-day

22   transfer schedule, wouldn't -- would that indicate to you

23   that there's a potential preference claim against that

24   person?

25   A    I -- it would indicate to me that it should be
```

1   reviewed, yes.

2   Q    Okay.  Did someone at Celsius review the schedules and

3   statements, and in particular the 90-day transfer schedule

4   before it was filed?

5   A    I can't speak to the review of individual statements.

6   As I mentioned, these are very voluminous.  I don't think

7   that it would be reasonable to think that all 3 million

8   lines of data were reviewed and analyzed one by one.  I

9   think there's processes and controls we have in place to

10  make sure that the statement schedules overall are

11  reasonable.

12  Q    Okay.  So even though they are signed under penalty of

13  perjury, you're saying that it's possible that no one had

14  reviewed the 90-day transfer schedule line by line.

15  A    I don't think that --

16        MAN:  Objection.

17  BY MR. CHAPMAN:

18  A    -- we're assigning -- sorry.  I don't believe that

19  individuals reviewed every line, every text of every single

20  statement and schedule.  They were produced and reviewed as

21  I mentioned.

22  Q    Okay.  If Celsius wanted to further investigate the 90-

23  day transfers, would the company have been able to do that

24  before the Voyager bar date?

25  A    Well, sir, we filed the statements and schedules on

1    October 5th.  My understanding is the bar date was on

2    October 3rd.

3    Q    Yes, but I -- when did you begin -- when did the

4    company AM begin preparing the schedules?

5    A    As I mentioned, we started kind of mobilizing for the

6    effort shortly before the petition date knowing it was a big

7    lift.

8    Q    Right.  So is it fair to say that most if not all of

9    the work was completed before the bar date in this case?

10   A    No, sir.  We had a lot of transfers, including from

11   insiders, that were being reviewed and rereviewed and

12   checked along with other items of statements and schedules.

13   We asked for two extensions and received two extensions from

14   the court.  We continued to work on populating really all

15   the way through kind of the timeline.

16   Q    Okay.  So again I'll ask if Celsius had wanted to

17   further investigate the 90-day transfers, would the company

18   have been able to do that before the Voyager bar date?

19   A    We were still working on our statements and schedules,

20   sir, and reviewing those.  So I think it would be hard to

21   identify this before we actually finalized the statements

22   and schedules.  It's a little bit of a chicken-before-the-

23   egg problem.

24   Q    Okay.  So was anyone at either Celsius or any of

25   Celsius' professionals aware of the Voyager withdrawals from

1    Celsius before the bar date?

2            MAN:  Objection, foundation.

3            THE COURT:  Overruled.

4    BY MR. CHAPMAN:

5    A    I don't know specifically, but to my understanding this

6    wasn't really identified until early November with regards

7    to the bar date and the claim.

8    Q    Well, just to be clear, you're aware that the schedules

9    were filed on October 5th and the bar date in this case was

10   October 3rd.  Are you saying that in that 48-hour period

11   that's when the Voyager transactions were discovered?

12   A    No, I said in early November, sir.

13   Q    But they were included in the schedules that were

14   filed, right?

15   A    Yeah.  I'm talking with relation to the bar date.

16   Q    Okay.  So I think what I'm hearing is that although

17   technically possible, it would've been difficult for Celsius

18   to have further investigated the Voyager withdrawals before

19   the Voyager bar date.  Is that right?

20   A    It's truly a needle in a haystack.  You know, 3 million

21   rows of data, 600,000 creditors.

22   Q    So -- oh, please continue.

23   A    No, that's it.

24   Q    So even if Celsius had received a bar date notice from

25   Voyager at what you believe is the correct address, we

Page 33

```
 1    would've been in the same position we are today.  Celsius
 2    still would not have been able to get a proof of claim on
 3    file.  Is that right?
 4    A    No, that would've connected the dots for us receiving
 5    the notice in my opinion.
 6    Q    Were you aware of Voyager's bankruptcy filing prior to
 7    the bar date?
 8    A    Yes, I was, sir.
 9    Q    When did you first become aware that Voyager had filed
10    for bankruptcy?
11    A    Right around when we were filing.  You know, I
12    remember, you know, hearing and reading about the case in
13    the run-up to our petition.
14    Q    Have you ever been involved in a bankruptcy filing
15    before Celsius?
16    A    No, sir.
17    Q    And in your discussions with professionals, did you
18    come to learn that there are bar dates that are established
19    in bankruptcy cases?
20    A    I have come to learn that, sir.
21    Q    Okay.
22           MR. CHAPMAN:  Your Honor, I have no more
23    questions.
24           THE COURT:  All right.  Anybody else wish -- does
25    anyone else wish to cross-examine?
```

22-10943Case 22-10943-MGO481JT FiledDoc 1397/23-2Entered 071/08/23 OP1ge125 ofilaPlease see Part2</b>Main Document Pg 34 of 107

Page 34

```
 1              MR. WHALEN:  Nothing from Voyager, Your Honor.

 2              THE COURT:  I'm sorry.  You do or you don't, Mr.

 3    --

 4              MR. WHALEN:  Nothing from Voyager, Your Honor.

 5    Thank you.  We do not.

 6              THE COURT:  I have some follow-up questions for

 7    the witness of my own.  Mr. Ferraro, in response to the

 8    questions about whether Celsius could have identified the

 9    Voyager information before October 3rd, you on several

10    occasions talked about how long it took to do the overall

11    schedules, but you didn't actually have to do the overall

12    schedules just to get the Voyager information, did you?

13              THE WITNESS:  No, we didn't.  But we were not on

14    the lookout for anything that was specific of Voyager, Your

15    Honor.

16              THE COURT:  But in terms of identifying just the

17    Voyager information, I presume that meant only looking at

18    the Voyager accounts.  It probably took no more than five

19    minutes, did it?

20              THE WITNESS:  Right, but we would've needed to

21    know to look at the Voyager account specifically in relation

22    to the bar date.  And that's what we didn't connect.

23              THE COURT:  In the Celsius case when Kirkland and

24    Ellis moved -- or excuse me, when Celsius moved for

25    permission to retain Kirkland and Ellis, there was an
```

Page 35

1    objection by a customer that was filed on July 28th that

2    alleged that there was a conflict because Kirkland and Ellis

3    also represented Voyager, and that Voyager had had dealings

4    with Celsius and was a customer of Celsius.  Were you aware

5    of that objection?

6            THE WITNESS:  I had just been the CFO of the

7    company.  I'm aware broadly of the conflict or the

8    perception of a conflict.  I did not read the objection,

9    Your Honor.

10           THE COURT:  All right.  I presume somebody at

11   Celsius had to make the decision as to whether that did or

12   did not constitute a conflict on behalf of Kirkland and

13   Ellis.  Who made that decision?

14           THE WITNESS:  I wasn't party to that discussion,

15   Your Honor.  I do not know.

16           THE COURT:  You don't know who made that decision.

17           THE WITNESS:  No, sir.

18           THE COURT:  So you don't also know what

19   information that person or persons might have had about

20   Voyager's dealings with Celsius.

21           THE WITNESS:  No, sir.  I was not in this role at

22   that time.  I do not have that information.

23           THE COURT:  Kirkland and Ellis filed a declaration

24   at the end of August in response to this objection that said

25   that Voyager had been a customer of Celsius, and that

1   Voyager had withdrawn most of what had been in its accounts.

2   Do you have any knowledge of where Kirkland got that

3   information?

4           THE WITNESS:  I do not, sir.  Kirkland and Alvarez

5   had access to voluminous amounts of data obviously in the

6   case.  I think it's important to note that, you know, we did

7   not connect the dots, but our advisors did not connect the

8   dots either, Your Honor.

9           THE COURT:  Well, do you know who at Celsius, if

10  anybody, provided that information to Kirkland?

11          THE WITNESS:  I do not know on that specific

12  declaration.  I do not know who provided that information,

13  Your Honor.

14          THE COURT:  Well, if you don't even know who

15  provided the information or who made the decision about

16  whether this constituted a conflict, how do you know whether

17  or anybody at Celsius connected the dots?

18          THE WITNESS:  Well, because it wasn't until early

19  November when this was kind of brought up to my attention as

20  well as to the special committee's attention.  So I'm basing

21  my understanding on that, Your Honor.

22          THE COURT:  Who brought it to your attention?

23          THE WITNESS:  I can't remember specifically.  I

24  remember having a conversation with -- I think it was our

25  general counsel who brought it to my attention.  I might've

```
 1    been also listening in on meetings with the special

 2    committee.  I can't remember.  It was likely one of those

 3    two.

 4              THE COURT:  It was either the general counsel or

 5    who?

 6              THE WITNESS:  Or me listening into the special

 7    committee meetings of the board.  And this would've been

 8    likely discussed there.  I can't remember where I first

 9    heard this.

10              THE COURT:  Okay.  How did they say that the issue

11    had come to their attention?

12              THE WITNESS:  Your Honor, I do not have that

13    information.  I do not recall.

14              THE COURT:  You don't actually know when -- if

15    somebody asked you to look at it or brought it up to you,

16    you don't actually know when that person learned of the

17    issue or how that person learned of the issue.  Is that

18    correct?

19              THE WITNESS:  No.  I only remember that it was,

20    you know, early November.

21              THE COURT:  Okay.  That's when they mentioned it

22    to you, but when they actually learned of the issue, you

23    have no idea.  Is that correct?

24              THE WITNESS:  Yeah, I don't know, Your Honor.

25              THE COURT:  All right.  Celsius filed papers on
```

22-10943Case 22-10943-1JT Filed 01/30/23-2Entered 01/30/23 07:19:29 Page 39 of 108Please see
Part2</b>Main Document    Pg 38 of 107

Page 38

1    September 16th in its case asking for an additional

2    extension of time to file its schedules, but indicated in

3    that motion that it had compiled the schedules.  It just

4    couldn't put them in final form until Judge Glenn had ruled

5    on the issue of what information would be disclosed.  Was

6    that your understanding at the time, that the schedules had

7    --

8              THE WITNESS:  Yes.

9              THE COURT:  -- otherwise been compiled by

10   September 16th?

11             THE WITNESS:  Compiled but not finalized, Your

12   Honor.  We were still working on items, you know, especially

13   reviewing insider transactions.

14             THE COURT:  So the final formatting was done, and

15   documents were filed on the 5th, but the information was

16   compiled sometime before that, right?

17             THE WITNESS:  We started pulling the information,

18   yeah, a month before the filing date on October 5th.

19             THE COURT:  When Celsius filed and the Voyager

20   case had filed, was somebody -- was anybody -- to your

21   knowledge, was anybody at Celsius tasked with monitoring the

22   Voyager docket or developments that might also be relevant

23   to Celsius?

24             THE WITNESS:  No one that I know of, Your Honor.

25             THE COURT:  Do you know if the general counsel of

1  Celsius did so?

2            THE WITNESS:  Not that I know of, Your Honor.

3            THE COURT:  Who is the general counsel of Celsius?

4            THE WITNESS:  Ron Deutsch.

5            THE COURT:  And how big a staff is there in the

6  general counsel's office?

7            THE WITNESS:  I think there's around five in-house

8  lawyers on the team.

9            THE COURT:  Okay.  Have you yourself asked the

10  general counsel if the general counsel knew of these issues

11  prior to the Voyager bar date?

12            THE WITNESS:  In my conversations leading up to my

13  declaration as well as preparing for today, I did talk with

14  the general counsel.  And I also heard that he kind of

15  became aware of this in early November.  I don't know

16  specifically the date or how he was made aware.

17            THE COURT:  Okay.  And your counsel has said that

18  -- has cited to your declaration and others, which say that

19  you didn't receive the -- or you don't have record of

20  receiving the bar date notice.  I didn't actually see any

21  statement in your declaration that you personally were

22  actually unaware of the Voyager bar date.  Were you unaware

23  of it?

24            THE WITNESS:  Yeah, I was unaware of the Voyager

25  bar date.

1           THE COURT:  And you testified about what you did

2     to check with the mail departments about whether the

3     remembered the bar date notice having been received.  What

4     did you do by way of canvassing people within Celsius, if

5     you did anything, to determine whether people inside Celsius

6     knew of the bar date?

7           THE WITNESS:  In talking with the general counsel

8     and in talking with the operations lead as I discussed

9     before.  I can't remember specifically who else I canvassed

10    to understand, but if the operations lead didn't have record

11    of the mail, that's kind of where it starts and stops, Your

12    Honor.  We were obviously busy compiling our statements and

13    schedules.  We've had a lot of reduction in staffing.

14    People are doing multiple jobs, so I don't think that there

15    was internal knowledge in following of the Voyager case.

16          THE COURT:  As to the mail department records,

17    does the mail -- do the people there actually keep logs of

18    mail that's coming in?

19          THE WITNESS:  I don't know of any formal logs that

20    are kept, Your Honor.

21          THE COURT:  Do you know what the volume of mail

22    that comes in on a given day is?

23          THE WITNESS:  No, I do not.

24          THE COURT:  Do you have any rough sense of it?  Is

25    it more than 1,000 items?

22-10943Case 22-11086-JT Filed Doc 397/23-2 Entered 01/30/24 07:31e:42 of 108Please see
Part2</b>Main Document    Pg 41 of 107

Page 41

1              THE WITNESS:  No, Your Honor, I do not.

2              THE COURT:  So it could be more than 1,000 items?

3              THE WITNESS:  It could be one, it could be 1,000.

4    I do not know.

5              THE COURT:  It could be 10,000 so far as you

6    know?'

7              THE WITNESS:  I wouldn't want to venture to guess,

8    Your Honor.  I could look into this, but I do not know.

9              THE COURT:  So when you talked to the people in

10   the -- who oversee the mail, essentially what you're asking

11   them is whether they remembered seeing something from --

12   seeing an envelope from Voyager out of however many thousand

13   pieces of mail Celsius receives.  Is that what it comes down

14   to?

15             THE WITNESS:  I don't know how they track the

16   mail, Your Honor, so I was just asking whether or not they

17   knew of any bar date received.

18             THE COURT:  Okay.  And when Celsius changed its

19   address in March, did it send a change of address notice to

20   Voyager?

21             THE WITNESS:  I do not know that -- the answer to

22   that, Your Honor.

23             THE COURT:  The assignment agreement, the initial

24   contract before the assignment agreement, the initial

25   contract with Voyager had a notice address in it, didn't it?

1          THE WITNESS:  It did, Your Honor, yeah.  35 Gray

2     Street.

3          THE COURT:  Did the assignment agreement amend

4     that notice address?

5          THE WITNESS:  To my knowledge it did not

6     explicitly state the notice address.  It referred to terms

7     and service which had the address for the U.S. entity is my

8     understanding, Your Honor.

9          THE COURT:  Okay.  When Celsius changed its

10    address in the UK, did it do something in the UK that's the

11    equivalent of what we would do here by way of giving the

12    post office a forwarding address?

13         THE WITNESS:  Absolutely, Your Honor.  There's a

14    thing called in the UK the company's house, which is a

15    public record about companies', including Celsius, address.

16    It is there for the enjoyment of anybody who wants to go and

17    look it up.

18         THE COURT:  Well, my -- I'm not sure that answered

19    my question.  My question was more with the postal

20    authorities, whether they're given notice of your new

21    address so that if any mail comes in at the old address they

22    will forward it to the new address.

23         THE WITNESS:  We have mail forwarding at the 1

24    Bartholomew address.  I do not know of any mail forwarding

25    at the 35 Gray Street address.

22-10943 Case 22-10943-JTD Doc 1397-2 Filed 07/38/23-2 Entered 07/38/28 07:17:14 of 108 Please see Part2</b>Main Document    Pg 43 of 107

Page 43

1              THE COURT:  And why wouldn't Celsius have put in a

2     mail forwarding address at the -- from the old address to

3     make sure that it continued to receive any mail that might

4     be sent there?

5              THE WITNESS:  I don't know, Your Honor.  That was

6     over two years ago.  I don't have an answer to that.

7              THE COURT:  Okay.  Do you know one way or the

8     other whether there was a forwarding address given to the

9     postal authorities?

10             THE WITNESS:  I do not, Your Honor.

11             THE COURT:  Okay.  All right.  Is there any other

12     questions that anybody wishes to ask of Mr. Ferraro?

13             MR. CHAPMAN:  Your Honor, this is Dean Chapman.

14     Can I ask just a quick redirect question of the witness?

15             THE COURT:  Yep.  Yes.

16     BY MR. CHAPMAN:

17     Q    And again, good morning, Mr. Ferraro.  Dean Chapman,

18     Akin Gump Strauss Hauer and Feld.  On this question of mail

19     forwarding, can you just explain to the Court the different

20     addresses associated with Celsius in the UK?

21     A    Yeah.  The address and the dates?

22     Q    Sure.

23     A    Okay.  On February 9, 2018, we incorporated the entity,

24     and the registered address was 35 Gray Street in London.  On

25     March 20, 2020, we filed a change of registered address for

Page 44

1   1 Bartholomew Lane, London.  On May 11, 2021, we changed --

2   filed a change of register.  Again on May 11, 2021, we filed

3   a change of the registered address to 77-79 New Cavendish

4   Street, London, which is our current address.

5   Q    Got it.  So the address to which Voyager prefers to

6   have sent notice was the address that Celsius occupied in

7   London two addresses ago.  Is that correct?

8   A    That's correct.

9   Q    Okay.  One other question, Mr. Ferraro.  You testified

10  that you didn't become aware of the potential claim against

11  Voyager until early November of 2022.  Is that right?

12  A    Yes.  That's what I recall.

13  Q    And can you explain to the Court what steps you took

14  upon becoming aware of the potential claim?

15  A    Well, we engaged Akin Gump to handle this matter.

16  Q    Anything else?

17  A    Nothing else off of memory.  I remember having that

18  conversation and talking about the conflict that Kirkland

19  has and talking with the GC Ron Deutsch about effectively

20  engaging with Akin Gump to handle this matter.

21  Q    Do you remember how much time passed between becoming

22  aware of the potential claim (indiscernible) of Akin Gump?

23  A    I recall a very little amount of time.  I don't know

24  exactly how much.  I think this all happened pretty quick in

25  early to mid-November.

1    Q    Okay.  Nothing further.  Thank you.

2         THE COURT:  Okay.  Thank you, Mr. Ferraro.  You

3    are excused.  Do you have another witness, Mr. Hurley?

4         MR. HURLEY:  I do, Your Honor.  Thank you.  Again,

5    Mitch Hurley with Akin Gump for the record.  The Celsius'

6    next witness is Holden Bixler, the managing director at

7    Alvarez and Marsal.  And I believe Mr. Bixler is on the line

8    and available for cross-examination, and we would therefore

9    offer his declaration into evidence.

10        THE COURT:  Any objections to the admission of Mr.

11   Bixler's declaration into evidence?  All right.  It's

12   admitted into evidence.  I understand that the Committee

13   wishes to cross-examine?

14        MR. AZMAN:  Yes, Your Honor.  It's Darren Azman

15   again from McDermott for the Committee.  Did you need to

16   swear Mr. Bixler?  Maybe I missed it.  Sorry.

17        THE COURT:  Hang on one second.  Just making a

18   note to myself.  Thank you.  I'm so absorbed.  How could I

19   have forgotten that.

20        Mr. Bixler, do you swear that the testimony you

21   are about to give will be the truth, the whole truth, and

22   nothing but the truth, so help you God?

23        MR. BIXLER:  I do.

24            CROSS-EXAMINATION OF HOLDEN BIXLER

25   BY MR. AZMAN:

22-10943Gase 22-D11D6B1JTFiledDoc10ct/39/7283-2EnterFieed0OT/30/W28 07:27e147 of 1088lease see Part2</b>Main Document    Pg 46 of 107

Page 46

1   Q    Good almost afternoon, Mr. Bixler.  In Paragraph 13 of

2   your declaration, you see that four weeks -- and I'm just

3   quoting here, four weeks after the filing of the schedules

4   and statements, A and M was asked about Voyager's

5   withdrawals of crypto assets in the 90 days prior to the

6   filing of Celsius' Chapter 11 bankruptcy petition.  I want

7   to focus on the three words that I emphasized, "A and M was

8   asked."  Who specifically asked A and M about this?

9   A    Kirkland and Ellis sent an email to us on November 2nd

10  I believe asking for a summary of the various places in

11  which Voyager appeared in the statements and schedules.

12  Q    When was the first time that anyone at A and M

13  discussed Voyager's withdrawals either internally among A

14  and M personnel or externally with anyone else?

15  A    It would've been --

16          MR. HURLEY:  Objection.

17          THE COURT:  I'm sorry.  What was the objection?

18          MR. HURLEY:  Foundation.

19          THE COURT:  Overruled.

20  BY MR. AZMAN:

21  A    It would've been right around that time, around

22  November 2nd.

23  Q    So no one ever at Celsius that you're aware of or at A

24  and M ever discussed Voyager's withdrawals before November.

25  A    Not that I'm aware of.

1   Q    Okay.  But you're aware of the supplemental declaration

2   from Kirkland and Ellis that references the Voyager

3   withdrawals, right?

4   A    I am not.

5   Q    Okay.  Was A and M generally aware of the Voyager

6   bankruptcy filing at any time prior to the Voyager bar date?

7   A    Yeah, we were.  We were aware of the Voyager filing

8   coming into our engagement in the case.

9   Q    Okay.  It sounds like it took quite a lot of time for

10  your team to put together the schedules from Celsius.  Is

11  that right?

12  A    That is absolutely correct, yeah.

13  Q    When exactly did you start preparing the schedules?

14  A    So some of our initial data requests would've gone out

15  pre-petition.  So you know, maybe early July.

16  Q    And are you familiar with the 90-day transfer section

17  the schedules?

18  A    Yes, I am.

19  Q    And that identifies a number of withdrawals that were

20  made by Voyager during the 90-day pre-petition period.  Is

21  that right?

22  A    Correct.

23  Q    Can you help me understand how exactly your team

24  compiled the list of 90-day transfers?

25  A    I'll do my best.  So Celsius maintains an internal log

22-10943 Case 22-10943 JTD Doc 1397-2 Entered 07/30/23 01:47:14 Filed 01/08/24 Page 49 of 108 Please see Part2</b>Main Document    Pg 48 of 107

Page 48

1    of transfers, and we requested the data that would be

2    responsive to that question in the Statement of Financial

3    Affairs, SOFA 3, from the company.  They provided us

4    initially with files containing approximately 25 and a half

5    million rows of transaction data within that period.  And

6    then A and M kind of cleaned and formatted and aggregated

7    that information into what was ultimately reported in the

8    SOFA through a sort of iterative process.  We got multiple

9    pools of the information, and then you know, ultimately

10   filed what's on the docket today.

11   Q    Okay.  How many different people at Celsius and A and M

12   would you say were involved in preparing the Celsius

13   schedules?  Just roughly.

14   A    It was a substantial team.  On the A and M side, we

15   probably had four or five folks involved in the statements

16   and schedules workstream.  On the company's side, it

17   would've exceeded 10 or 15 in some capacity.  Not all

18   directly related to the 90-day payments, but that's the, you

19   know, kind of broad statement schedule workstream team.

20   Q    And you're aware that the Voyager bar date was October

21   3rd, right?

22   A    Yes.

23   Q    So several months before the bar date in this case,

24   your team prepared a schedule that identified the

25   withdrawals by Voyager that are issue in this dispute.  Is

1    that right?

2    A    I don't know.  I can tell you that we got our initial

3    provision of this transaction history data on August 31st,

4    and then we subsequently received additional iterations of

5    this data all the way up through October 4th just before we

6    filed the statements and schedules.

7    Q    Okay.  When would you think that the Voyager

8    withdrawals first showed up in some form on the schedules

9    that were being prepared?

10   A    I don't know.  We had parties coming on and off of

11   those data sets through that.  One of the reasons for the

12   iteration is, you know, sort of an ongoing cleaning and QC

13   process.  So we -- the data sets were in flux throughout

14   that process.  And I wouldn't know specifically with respect

15   to Voyager.

16   Q    Okay.  So you knew about the Voyager bankruptcy filing,

17   and -- strike that.  Would you agree that at least weeks

18   before the bar date the Voyager withdrawals were in some

19   form included in the draft schedules that were being

20   prepared?

21   A    Again, I don't know.  It wasn't something that I looked

22   for specifically then, so I don't know at what point those

23   appeared in our data set.

24   Q    Okay.

25   A    They may have been in the very first data set, but I

1    just don't know the answer to that.

2    Q    Okay.  And so notwithstanding that these withdrawals

3    appeared at some point in the schedules that you were

4    preparing before the bar date in this case, and

5    notwithstanding that the A and M and Celsius teams were

6    aware of the Voyager bankruptcy filing, did anyone

7    prioritize looking at whether there might be preference

8    claims against Voyager?

9    A    Not on the A and M team.

10    Q    Why not?

11    A    Well, at the time we -- our mandate was to prepare the

12    statements and schedules, which was sort an all-consuming

13    process.  And we were solely focused on aggregating,

14    cleaning, and processing the data that the company was

15    providing in order to, you know, report as accurately as

16    possible.  We didn't engage any analysis of the data at that

17    time.  Leading up to the deadline for filing the statements

18    and schedules, the focus was solely on ensuring that we

19    prepared those in the most accurate form possible.  Analysis

20    would typically follow.

21    Q    In Paragraph 12 of your declaration, you say that other

22    than in GKA preference actions, Celsius had not undertaken

23    any generalized effort to identify potential preference

24    actions.  Is that right?

25    A    That's right.

1    Q    What do you mean by generalized effort?

2    A    I mean that at that point there'd been no workstream

3    stood up to conduct a preference analysis and evaluate, you

4    know, potential claims that may be -- potential preference

5    claims that may be contained within that 90-day payment

6    file.

7    Q    Okay.  If Celsius wanted to further investigate the 90-

8    day transfers, would A and M or Celsius have been able to do

9    that before the Voyager bar date?

10   A    So I can tell you that the teams that were tasked with

11   preparing the statements and schedules during that time did

12   not have additional bandwidth.  We were pretty maxed out

13   across the boards.  So I don't really know what would've

14   happened had that request come across.

15   Q    Okay.  So even if Celsius had received a bar date

16   notice from Voyager at the correct address and A and M had

17   been asked to do this, it sounds like you guys wouldn't have

18   had the bandwidth to do it.  Is that right?

19   A    Again, I don't know.  Maybe we could've brought

20   additional people on to address that issue.  It's hard for

21   me to say what could've happened at that time.

22   Q    Okay.

23         MR. AZMAN:  Your Honor, I have no additional

24   questions.

25         THE COURT:  Does anyone else wish to cross-examine

Page 52

1    Mr. Bixler?  I have some questions.  Mr. Bixler, you said

2    that Kirkland and Ellis asked you to look at the Voyager

3    issues in November.  Is that correct?

4            THE WITNESS:  They sent an email on November 2nd

5    asking for detail on the places in which Voyager appeared in

6    Celsius' Statement of Financial Affairs and schedules of

7    assets and liabilities.

8            THE COURT:  And who from Kirkland made that

9    request?

10           THE WITNESS:  I don't recall offhand, though I

11   could check my email now if you'd like me to.

12           THE COURT:  But you don't recall as you sit here

13   right now?

14           THE WITNESS:  I don't, no.

15           THE COURT:  All right.  And to whom was the

16   request made?  Just you or a broader group?

17           THE WITNESS:  It would've come to the team, but

18   probably me.  You know, me with a CC to my team.

19           THE COURT:  Did Kirkland explain what had prompted

20   the request?

21           THE WITNESS:  No.  As I recall, it would've been a

22   very simple -- it was a very simple sort of one-liner email

23   saying can you please send a summary of, you know, the

24   places in which Voyager appears in statements and schedules.

25           THE COURT:  What was it about that that alerted

22-10943 Case 22-10943-JT Filed Doc 1397 23-2 Entered 07/08/24 07:37:54 of 108 Please see Part2</b>Main Document    Pg 53 of 107

Page 53

1     you to the possibility that Celsius might have a preference

2     claim?

3                 THE WITNESS:  I don't know that that necessarily

4     did alert me to that fact.  I think that when I saw the

5     summary, I did see that Voyager appeared in the section

6     where we were detailing the SOFA 3 information, the negative

7     payment information.  So that probably would've signaled to

8     me, ah, there might be a preference claim here.

9                 THE COURT:  So knowing that voyager had received

10    withdrawals was enough to signal to you that there was a

11    possible preference claim?

12                THE WITNESS:  A possible preference claim, yes,

13    though, you know, I haven't done a preference action in a

14    crypto case and don't have a full understanding of, you

15    know, what the kind of rules of the road are for those

16    withdrawals.  But certainly potential seeing their -- that

17    summary of those payments in that -- you know, in that

18    document we provided to Kirkland would've signaled to me

19    that there was a potential preference claim.

20                THE COURT:  When did you first learn that Voyager

21    had had accounts at Celsius?

22                THE WITNESS:  I don't recall when I first -- I

23    certainly became aware in response to the email in November

24    when we sent the summary to Kirkland.  I don't recall prior

25    to that when I became aware.

1         THE COURT:  But do you know whether you had been

2 aware before that time that Voyager had accounts at Celsius?

3         THE WITNESS:  I suspect I was aware before that

4 time Voyager had accounts at Celsius.

5         THE COURT:  And why do you suspect that you knew

6 that?

7         THE WITNESS:  I think I knew that there were

8 conflicts issues with Voyager and Celsius.  And so that

9 probably signaled to me that there was a connection there,

10 but I don't really have a very specific recollection of

11 that.

12         THE COURT:  How did you know that there were

13 conflicts issues?

14         THE WITNESS:  I don't recall.

15         THE COURT:  Do you recall when you knew that there

16 were conflicts issues?

17         THE WITNESS:  No, I don't, Your Honor.

18         THE COURT:  Do you know who was involved in

19 assessing those conflicts issues from the perspective of

20 Celsius?

21         THE WITNESS:  No, I don't, Your Honor.

22         THE COURT:  Do you have any knowledge as to what

23 information or issues were addressed by anybody on behalf of

24 Celsius in deciding whether there were conflicts issues that

25 -- and how they needed to be addressed?

1            THE WITNESS:  No, I don't, Your Honor.

2            THE COURT:  I had asked Mr. Ferraro, I assume you

3    were on the line, about the objection that was filed in July

4    and about the K and E declaration that was filed in August.

5    Do you have any knowledge of where Kirkland and Ellis got

6    the information that was disclosed in that objection

7    regarding the fact that Voyager had accounts at Celsius and

8    that Voyager had made withdrawals from those accounts?

9            THE WITNESS:  Yeah, I heard your transaction with

10   Mr. Ferraro.  I do not know where Kirkland got that detail,

11   Your Honor.

12           THE COURT:  Were you aware of that declaration?

13           THE WITNESS:  No, I was not.

14           THE COURT:  And when you say you knew that there

15   were conflicts issues, do you know if that was at the time

16   of this declaration, or if it was later, or if it was

17   earlier?  Do you know one way or the other?

18           THE WITNESS:  No, I don't recall.  I was sort of

19   vaguely aware of conflicts issues, you know, at some point

20   in the matter, but it wasn't something that was directly

21   related to any workstream I was on.

22           THE COURT:  All right.  You said Kirkland and

23   Ellis raised the issue in November about Voyager's accounts.

24   Did you think it was their responsibility to alert people at

25   Celsius if there was a potential preference claim?

Page 56

1           THE WITNESS:  I think that counsel would typically

2    take the lead on pursuing that sort of claim.

3           THE COURT:  Okay.  And is there any question in

4    your mind but that Kirkland and Ellis knew at the end of

5    August that Voyager had made withdrawals and that in the

6    Voyager case there was a bar date?

7           THE WITNESS:  At the end of August?

8           THE COURT:  Yeah.

9           THE WITNESS:  I don't know.  I don't know when

10   Kirkland and Ellis would've become aware of that

11   information.

12          THE COURT:  Well, they're the same counsel for

13   Voyager and Celsius, so they knew about the Voyager bar

14   date, right?

15          THE WITNESS:  I would assume so.  As counsel for

16   those Debtors, I would assume they're aware of the bar date.

17          THE COURT:  Okay.  Have you spoken to anybody at

18   Celsius about communications they had with Kirkland and

19   Ellis about the Voyager accounts?

20          THE WITNESS:  I have not.

21          THE COURT:  So you don't know what information

22   other people at Celsius may have had from talking to

23   Kirkland and Ellis about potential claims against Voyager.

24          THE WITNESS:  No, I don't.

25          THE COURT:  Okay.  All right.  Thank you.  That's

1    all I have.

2            MR. CHAPMAN:  Briefly on redirect.  Dean Chapman,

3    Akin Gump Strauss Hauer and Feld.

4            REDIRECT EXAMINATION OF HOLDEN BIXLER

5    BY MR. CHAPMAN:

6    Q    Mr. Bixler, how many rows of data were in the

7    spreadsheet evidencing transfers in the 90 days prior to

8    Celsius' petition?

9    A    So the filed 90-day payment schedule contained about 3

10   million rows.  The source information for that, you know,

11   prior to aggregation was in excess of 25 million rows.

12   Q    Got it.  And of the 3 million rows that were included,

13   how many of those rows approximately involved transfers to

14   Voyager?

15   A    I don't know offhand, but I can say it's, you know,

16   comfortably under 50 rows.

17   Q    Under 50 rows out of approximately 3 million total?

18   A    Yeah.  I think that's right.

19   Q    And how many different customers, individual customers,

20   would've been reflected in those 3 million rows?

21   A    I don't know offhand.

22   Q    Would the number be greater than 100,000?

23   A    I don't know offhand.  You know, the company has

24   600,000 customers, and I suspect many or most of them were

25   transacting in that window.

1   Q    Okay.  You were also asked at one point that you were

2   aware of the October 3rd bar date, correct?

3   A    Yes.

4   Q    And when did you become aware of that bar date?

5   A    I don't know specifically.  I think I became aware of

6   it certainly by, you know, early November when this issue

7   was raised.  I don't know that I was aware of it in advance

8   of that.

9   Q    Okay.  Nothing further.  Thank you.

10            THE COURT:  Okay.  Anything else?

11            MR. HURLEY:  So Your Honor, the final declaration

12   that Celsius submitted in support of the motion is from me,

13   and we would offer that into evidence as well.

14            THE COURT:  And I'll excuse Mr. Bixler and thank

15   him for his testimony.  You're offering your declaration,

16   Mr. Hurley?

17            MR. HURLEY:  Yes, Your Honor.

18            THE COURT:  Is there any objection to the

19   admission of Mr. Hurley's declaration?  Does anybody wish to

20   cross-examine?

21            MR. AZMAN:  Yes, Your Honor.  Darren Azman for the

22   Committee.

23            THE COURT:  Okay.  Please proceed.

24            MR. AZMAN:  Your Honor, I'm mindful that Mr.

25   Hurley is counsel for Celsius, so I'm going to keep this

22-10943Case 22-10943 JT Filed Doc 1307-2 Entered 07/30/23 07:27:10 Page 60 of 108 Please see Part2</b>Main Document    Pg 59 of 107

Page 59

```
 1    short and try to keep this narrow.

 2                    CROSS-EXAMINATION OF MITCH HURLEY

 3    BY MR. AZMAN:

 4    Q    Mr. Hurley, in Paragraph 4 of your declaration, you

 5    state that Akin was retained as conflicts counsel.  Is that

 6    right?

 7    A    That's correct.

 8    Q    When is the first time that someone at Celsius or

 9    Kirkland mentioned anything to Akin about potentially

10    handling issues related to Voyager?

11    A    I believe it was November 5th.  It certainly was early

12    November.

13    Q    Hmm.  In Paragraph 4 of your declaration, you also say

14    that Akin investigated the Voyager transactions and

15    considered Celsius' potential claims.  Is that right?

16    A    Correct.

17    Q    And you're aware that the 90-day transfer schedule that

18    was prepared well in advance of the Voyager bar date listed

19    these very transactions that are at issue, right?

20    A    You're asking me if I'm aware of that now?

21    Q    Yes.

22    A    Certainly.

23    Q    Okay.  What additional investigation did you determine

24    -- strike that.  What additional investigation did you do to

25    determine that Celsius had potential preference claims
```

22-10943 Case 22-10943-JT Filed Doc 1397/23-2 Entered 07/38/24 0 Pg 101 of 198 Please see
Part2</b>Main Document    Pg 60 of 107

Page 60

1    against Voyager?

2    A    I mean, I'm going to approach this very generally

3    mindful as you pointed out that I want to be careful around

4    attorney-client privilege.  We coordinated with A and M with

5    respect to identifying timing of transfers and considered

6    what kinds of legal arguments would exist with respect to

7    potential claims, including based on the information that we

8    received about the timing of transfers.

9    Q    Is the very existence of the 90-day transfers

10   sufficient to know that there is a potential preference

11   claim against someone who received transfers during that

12   period of time?

13   A    Well, as the objectors point out in their papers,

14   there's a legal issue that has to be confronted as well, and

15   that had not been determined at that time by Judge Glenn.

16   So I don't think it is as simple as that, but certainly the

17   timing of the transfers is an important component.

18   Q    And in your experience as a bankruptcy practitioner,

19   have you ever filed a -- what is referred to as a

20   placeholder proof of claim where you're not sure whether

21   your client in fact has a claim but they might and you want

22   to preserve their rights?  Are you familiar with that

23   concept?

24   A    So I confess that I'm not.  I am primarily a litigator.

25   Though I appear pretty regularly in bankruptcy court, I have

1    not been involved in a process of the kind you just

2    described.

3    Q    All right.  Well, you had me fooled.

4              MR. AZMAN:  Your Honor, that's all the questions I

5    have for Mr. Hurley.

6              THE COURT:  All right there any other parties that

7    wish to question Mr. Hurley?  Mr. Hurley, when did Akin Gump

8    first become conflicts counsel in general to Celsius?

9              MR. HURLEY:  So -- and this is actually something

10   I was going to address in my argument.  Akin Gump is acting

11   as conflicts counsel currently with respect to two matters.

12   One is the Voyager matter, and another is a matter related

13   to a company called Rhodium.  And there was a retention

14   application that was filed that relates to both of those

15   matters.

16              And as one of the objecting parties correctly

17   points out, that retention application was effective as of

18   October 14, 2022, but that's because it related to both

19   Rhodium and Voyager.  Akin Gump's work as conflict counsel

20   with respect to Rhodium did in fact begin in October, but

21   Akin Gump did not bill any time or -- and was not involved

22   as conflicts counsel with respect to Rhodium after November

23   5th.

24              THE COURT:  Were you doing any work for Celsius in

25   August of 2022?

1          MR. HURLEY:  Yes, but not related to Voyager.

2          THE COURT:  All right, but you were conflicts

3    counsel of some kind in August of 2022?

4          MR. HURLEY:  Your Honor, we were retained

5    originally as special litigation counsel because Akin Gump

6    had been representing Celsius in some litigation matters

7    pre-petition.  So we were specifically retained to handle

8    those two litigation matters.  We were then later asked to

9    take on the conflict role when first the Rhodium matter

10   arose and then the Voyager matter arose.  But in August, we

11   were not retained as conflicts counsel per se.

12         THE COURT:  Okay.  So when Kirkland and Ellis

13   filed a supplemental declaration saying that it would not be

14   involved in any issues between Celsius and Voyager that was

15   filed in August of 2022, had anybody approached you at that

16   point to ask you to be involved in issues between Celsius

17   and Voyager?

18         MR. HURLEY:  Not at that point, Your Honor.

19         THE COURT:  It wasn't until November that somebody

20   did so?

21         MR. HURLEY:  It was not until November that we

22   were asked to handle the Voyager matters, correct.

23         THE COURT:  Okay.  I have nothing further.

24         MR. HURLEY:  Okay.  So Your Honor, I guess that

25   brings us to the argument unless there's any other business

```
 1    you want to take care of first or questions you have before

 2    we move onto that.

 3              THE COURT:  Is there any other evidence that any

 4    of the parties wish to introduce?

 5              MR. AZMAN:  Your Honor, I thought that the Debtors

 6    would move into evidence the omnibus wallet agreement and

 7    the assignment agreement.  I don't believe they've been

 8    entered yet, have they?

 9              THE COURT:  No.

10              MR. AZMAN:  I guess I will move to admit them into

11    evidence.

12              THE COURT:  Any objections?

13              MR. HURLEY:  No objection from Celsius, Your

14    Honor.

15              MAN:  No objection from the Debtors, and we agree

16    with moving them in evidence.

17              THE COURT:  All right.  They're admitted into

18    evidence.  I don't have an explanation anywhere as to why

19    notice was sent to Celsius UK as late as it was on September

20    23rd.  What's the reason for that?

21              MR. WHALEN:  Your Honor, Michael Whalen from Paul

22    Hastings.  Celsius was identified by Voyager on an amended

23    Schedule G, which is the disclosure of executory contract.

24    So we were identifying the wallet agreement with Celsius as

25    a potential asset of the estate.  They were not identified
```

Page 64

```
1    as a Creditor, and we still took the step of sending notice

2    of the bar date to Celsius.  We did not believe then,

3    frankly we don't believe now that they're properly a

4    creditor, though that is an issue for later.

5            So you know, it accords with our view as Debtors

6    and as Debtor counsel as we do in most cases that more

7    notice is better.  But our view here, you know, we think the

8    issue of actual notice is secondary because, particularly in

9    light of the testimony we just received, it seems abundantly

10   clear to the Debtors that Celsius, with respect to this

11   preference claim, was an unknown Creditor, and thus did not

12   need and was not entitled to actual notice.

13           THE COURT:  We'll get to argument in a second.  My

14   question was why notice wasn't sent until September 23rd.

15           MR. WHALEN:  Yes, Your Honor.  And that was just a

16   function of when we identified those contracts and we

17   amended the schedules shortly before that, I believe

18   September 15th, and then we got notice packets together as

19   promptly as possible and sent them out thereafter after

20   identifying those contract counterparties so that we could

21   get notice to them.

22           THE COURT:  And do I know one way or the other

23   whether the notice was returned as undeliverable?

24           MR. WHALEN:  No, Your Honor.  We can identify

25   that.  I don't believe -- well, I won't say anymore, but we
```

22-10943Case 22-10943-JT Doc 1307-28-2 Entered 01/08/24 07:17:06 Pg 65 of 107 Please see
Part2</b>Main Document    Pg 65 of 107

Page 65

1    can identify that.

2              THE COURT:  Well, we've got the evidentiary record

3    today, so we don't know is basically what the answer is.

4              MR. WHALEN:  Yes, Your Honor.

5              THE COURT:  Anything else for the evidentiary

6    record?  All right.  We'll close the evidentiary record

7    then.  We'll have argument, but first we'll take a five-

8    minute recess, okay?

9              MR. WHALEN:  Yes, Your Honor.

10             (Recess)

11             THE COURT:  All right.  I have returned.  I

12   thought I put my phone on mute, but somehow my entire

13   connection was divert, but I'm back.  Are the parties ready

14   to proceed?

15             MR. HURLEY:  Yes, Your Honor.

16             THE COURT:  All right.  Mr. Hurley, I have to tell

17   you that much of your argument is that it would've been

18   unreasonable for Voyager to -- or excuse me, for Celsius to

19   have stumbled upon this claim on its own by the process of

20   preparing its schedules because there was such voluminous

21   information, and it's just not reasonable to say that

22   anybody could've filtered out and found this particular

23   claim just based on the preparation of the schedules.

24             But that all assumes, I think, that Celsius --

25   that nobody at Celsius knew or should've known about the

1    Voyager bar date.  Because isn't it the whole point of a bar

2    date that you're supposed to separately figure out whether

3    you have a claim against that particular Debtor?  You know,

4    we don't ordinarily, for example, let people come in and get

5    relief from the bar date just by saying that, well, that's

6    not information I would've ordinarily come across in the

7    ordinary course of my business, or I didn't look at it

8    because the statute of limitations wasn't imminent, or

9    things like that.

10            The whole point is if you know or should've known

11    about the bar date, you're supposed to accelerate your quest

12    to find out if you have a claim against the particular

13    Debtor.  Isn't that right?

14            MR. HURLEY:  If you know or should've known about

15    the bar date?  I think that certainly makes sense to me,

16    Your Honor.  You know, obviously here Celsius has said, you

17    know, uniformly that it was not aware of the bar date until

18    after the bar date passed.

19            THE COURT:  Well, that's not -- you know, you keep

20    saying that, but your declarations fall far short of that

21    mark.  You have one witness who says he didn't know.  That's

22    Mr. Ferraro.  You have another witness who says that, well,

23    he knew about it in November.  He might've known about it

24    before then.  He's not sure.  And you don't have any

25    testimony as to whether anybody else knew about it.  You

1    keep saying that you have testimony that nobody knew, but

2    all your real testimony is, is that one of those guys didn't

3    know and that the mailroom didn't remember seeing the

4    notice.

5            MR. HURLEY:  It'd be fair that there are limits to

6    our ability to prove the negative, but certainly based on

7    the inquiries that we made and that the remaining Celsius

8    personnel made, the answer that we've gotten back is that no

9    one was aware of the bar date.  I certainly --

10           THE COURT:  I have no evidence that any such

11   inquiries were made.  Mr. Ferraro said he asked about the

12   mail, and that was the sum and substance of what he did.

13   Mr. -- the other witness said he didn't speak to general

14   counsel about what they knew and when they knew it, for

15   example.

16           MR. HURLEY:  Mm-hmm.

17           THE COURT:  Which is the place where I definitely

18   would've gone to ask these questions.

19           MR. HURLEY:  Mm-hmm.

20           THE COURT:  You haven't put in any information

21   about that.  I have no declarations from the general

22   counsel.  So --

23           MR. HURLEY:  That --

24           THE COURT:  -- there's a gigantic hole in your

25   showing, isn't it?

```
1          MR. HURLEY:  It certainly is a case you don't have

2     a declaration from the general counsel.  We could provide

3     one.  We did communicate with the general counsel's office

4     about this issue.  I acknowledge we didn't put it in a

5     declaration.  If that would be helpful, Your Honor, we can

6     certainly prepare one and provide it.  Then --

7          THE COURT:  No, I'm not asking to reopen the

8     hearing.  We've just had our evidentiary hearing.  And look,

9     you know, the Committee raised in its opposition the entire

10    fact that there was an objection in the Celsius case to the

11    retention of Kirkland and Ellis on the theory that it had a

12    conflict because of its representation of Voyager, and that

13    there would be conflicts between Voyager and Celsius.

14         Quite clear from Kirkland's response in August

15    that got from somebody the information that Voyager had had

16    an account and had withdrawn most of what was in that

17    account.  And the committee said that, look, this means that

18    Kirkland, which obviously knew of the bar date, also knew

19    about the withdrawals.  Your own witnesses have said that

20    just knowing that there were withdrawals was enough to alert

21    a sophisticated bankruptcy party that there are potential

22    preference issues.

23         The whole point of this in the context of the

24    Kirkland retention was whether there are -- were conflicts

25    between Celsius and Voyager, and your own witness says that
```

```
1    Kirkland should've told -- probably had an obligation to

2    tell Celsius if there was a bar date and if there was a

3    potential claim.  So how do I -- and in response to all

4    that, in response to that issue being surfaced, you put in

5    no further information about who worked on the Kirkland and

6    Ellis retention issues, who at Celsius made the decision

7    about whether there was a conflict, what information they

8    looked at to determine whether there was a conflict, whether

9    they actually had communications with Kirkland about the

10   issue and about what kinds of claims Celsius might have

11   against Voyager, and who would pursue them, and when they

12   should be pursued.

13           You didn't respond to any of those obvious points.

14   And why shouldn't I just infer that the reason you didn't is

15   that the answers are all bad for you?

16           MR. HURLEY:  So, two things, Your Honor.  First,

17   the August 30th submission you're referring to, that

18   submission did not state that there were withdrawals made

19   during the preference period.  It only said that Voyager had

20   -- that had an account balance at Celsius and had drawn down

21   pre-petition substantially on its accounts, but that same

22   thing could be said about literally hundreds of thousands of

23   other customers.

24           So, I don't think any of the Witnesses suggested

25   that just the information in the August 30th submission
```

1   would have been enough for anyone to conclude that there

2   was, or likely would be a preference claim against Voyager,

3   any more than with respect to any of those many thousands of

4   other creditors that you could say exactly the same thing

5   about.

6           THE COURT:  But the whole point of the

7   supplemental declaration was to address the question of

8   whether there were conflicts, (indiscernible) being

9   conflicting interests between Celsius and Voyager.  So, I --

10  isn't that something that ought to have been looked at at

11  the time, and discussed at the time?

12          MR. HURLEY:  Well, so -- Kirkland made clear in

13  that document and in other statements to the Court that it

14  did not then perceive there to be any actual conflict

15  between Celsius and Voyager.

16          THE COURT:  (overlapping conversation) No, no, no,

17  it said that there -- Kirkland wasn't going to handle any

18  issues between Celsius and Voyager.  That's what it said.

19          MR. HURLEY:  Kirkland also indicated at the

20  hearing in connection with that matter that it believed

21  there were no conflicts between Celsius and Voyager, which,

22  I think that hearing was in September.

23          THE COURT:  If Voyager had a customer claim, how

24  could that possibly be the case?  And you know, you might

25  quibble about what was said in the Kirkland declaration, but

22-10943Case 22-10943-JTD Doc 1397-2 Entered 07/30/24 OneDoc Filed 07/30/24 Page 72 of 108Please see Part2</b>Main Document    Pg 71 of 107

Page 71

1   you offered nothing.  You offered -- you didn't respond to

2   that entire allegation at all.  You didn't come forward with

3   where did the information come from, any information as to

4   whether there was anybody at Celsius who was involved in the

5   decision, so who at Celsius made the decision about whether

6   there was a conflict or not, 'cause that had to be made by

7   Celsius.  I have to believe that somebody in the Director's

8   offices probably advised by General Counsel had to have been

9   involved.

10          I've heard from none of those people.  This entire

11  -- this -- the entire question of what did that tell

12  Celsius, and when did it tell it was just raised by the

13  Committee, but ignored by you in your papers.

14          MR. HURLEY:  So, Your Honor, the information that,

15  to this day I understand to be the only information

16  suggesting that there is a conflict is the 90-day preference

17  withdrawals, and the evidence we put forward was that

18  Celsius wasn't aware, and I understand Your Honor's concern

19  about the limits of what our evidence shows in that regard,

20  but that Celsius wasn't aware of those transfers until

21  November.

22          And so, the -- it -- so, the issue wasn't being

23  viewed as an active conflict, but rather there was awareness

24  obviously, because of the objection and for other reasons

25  that Kirkland was representing both companies, but there

1    wasn't, to our knowledge, any actually issue that had become

2    concrete and arisen that caused anybody at Celsius to

3    consider okay, we have a conflict that has to be addressed

4    now.  That didn't happen until November.

5            THE COURT:  (indiscernible) so you think Kirkland

6    might have known that there were withdrawals, but not when

7    they occurred?  If --

8            MR. HURLEY:  (overlapping conversation)

9            THE COURT:  If that's your answer, wasn't it your

10   obligation to come forward with some evidence on the point?

11           MR. HURLEY:  I -- so Your Honor, I -- obviously I

12   don't know exactly what Kirkland knew, but in the document

13   that we're talking about, the August 3rd submission, they

14   provided information only related to -- sorry, that

15   disclosed only that Voyager was a customer and had made

16   withdrawals, not that there were withdrawals during the

17   period that would cause Celsius to believe that it should

18   investigate those withdrawals as (indiscernible).

19           THE COURT:  But you're the one who has the burden

20   of showing that there is an excuse for the delay here.  You

21   don't do that just by saying well, that evidence isn't 100

22   percent an answer as to when Kirkland knew.  All you're

23   doing is raising a question.  You didn't go to Kirkland, you

24   didn't ask them what they knew, you didn't find out if they

25   knew about the timing, you didn't find out if they actually

1    appreciated that there was a preference issue, you didn't

2    ask them did you tell that to anybody.

3            You didn't ask them why -- if so why -- if you

4    didn't, why didn't you tell that to anybody.  And your own

5    Witnesses have said that Kirkland should have told people.

6    So, whether the -- it seems to me you've got the burden

7    here.  You don't satisfy it just by raising questions as to

8    whether the evidence is open and shut, dead set proof

9    against you.  You've ignored the issue and given me nothing

10   on it.

11           MR. HURLEY:  So, Kirkland is obviously in an

12   awkward position here, because it represents Celsius and

13   Voyager.  And it -- we -- you're right, we did not get a

14   declaration from Kirkland with respect to exactly what they

15   knew.  But it is certainly our understanding that they did

16   not become aware of the preference transfers until November,

17   and maybe I can provide a little color on that, Your Honor,

18   because what I understand did happen is that in early

19   November, a Celsius creditor flagged an issue related to

20   Voyager for Kirkland, and I believe that's what caused

21   Kirkland to ask A&M to look at the schedules and find out

22   hey, are there Voyager transfers we should be concerned

23   about?

24           And then -- and when the information came back

25   from an A&M, that's when they referred it to Akin Gump.

Page 74

1              THE COURT:  Who was the creditor, and why don't I

2      have any evidence of this?

3              MR. HURLEY:  I -- Your Honor I don't have an

4      excuse, I would be happy to provide it to you, I understand

5      the evidence is closed, but if Your Honor would like to see,

6      we certainly can provide it.  The creditor is a gentleman

7      named Mr. (Frishburg), I believe is his name.  But that

8      happened, as I said, in early November and I -- my

9      understanding is that is what spurred the communication from

10     Kirkland to A&M.

11             THE COURT:  On the excuse of (indiscernible)

12     neglect factors on the notice issue, you never actually --

13     you did give Voyager an address and never actually sent

14     notice to Voyager to change that address for notice

15     purposes, isn't that correct?

16             MR. HURLEY:  So, the address was included in the

17     2020 original (indiscernible) agreement, and then in 2021,

18     it was amended.  The amendment assigned all the rights from

19     Celsius U.K. to Celsius U.S. and E.U.  And in that

20     agreement, it doesn't actually repeat the Celsius U.K.

21     address, which I think there was some confusion about in

22     some of the objections.  What it provides is that the

23     services to be provided by Celsius U.S. are going to be

24     rendered subject to the terms of use.

25             And it includes a link to the terms of use, and

1   then that --

2           THE COURT:  Is there a provision in the wallet

3   agreement, the original one, that says that communications

4   and notices between the parties are to be sent to the

5   following addresses?

6           MR. HURLEY:  In the original wallet agreement,

7   yes.

8           THE COURT:  Yes.  And does that have the address

9   that Voyager used?

10          MR. HURLEY:  It does, though the notice that was

11  provided by Voyager actually is not consistent with that

12  agreement.  So, that agreement requires, let me just get

13  this for you so I get it right.  That notices have to be in

14  writing and given in person by registered mail, by an

15  overnight courier service which obtains a receipt to

16  evidence delivery, or by facsimile or email transmission,

17  with written confirmation of receipt.

18          So, the method of notice here of course was just

19  ordinary U.S. mail, and as Your Honor pointed out, I don't

20  think there was any information provided by the Debtor about

21  whether, either it was any receipt or other information from

22  the required methods of delivery.

23          THE COURT:  Well that's -- (indiscernible) let's

24  break that down.  The bar date notice is sent by mail,

25  because that's what my order authorized.  It's not

22-10943 Case 22-10943-1JTW Doc 1397-2 Entered 01/30/23 Filed 01/30/23 17:27:27 Page 127 of 198 Please see Part2</b>Main Document    Pg 76 of 107

Page 76

1    ineffective just because it failed to comply with con --

2    extra contractual requirements about notice, right?

3              MR. HURLEY:  That's fair, Your Honor.  I was just

4    pointing out that the contractual provision we were

5    referring to is -- does require a different method of

6    delivery.

7              THE COURT:  So, the agreement said send notices to

8    this address, and when the -- you talked about the terms of

9    use, but there's no provision in the addendum, in the

10   assignment agreement that alters what the provision of the

11   agreement that says where notices are to be sent.  Right?

12             MR. HURLEY:  Certainly not expressly, Your Honor.

13   There is a link to the terms of use, which includes the

14   address for the new counterparty, but it's not expressly

15   described in the amendment.

16             THE COURT:  And you don't have any evidence or you

17   haven't given me any that anybody gave or ever gave Voyager

18   notice of a change in the address?

19             MR. HURLEY:  That is correct, Your Honor.

20             THE COURT:  And how do -- we usually presume that

21   when mailings are sent that they're received, at least if

22   they're correctly addressed.  I don't really know how long a

23   change of address lasts on the U.K. system.  Do you -- I

24   haven't been given any evidence of that.  But, as to actual

25   receipt, all I have is hearsay testimony that somebody in

1   the mail department didn't remember seeing it.  But, I don't

2   -- it's not like any human being possibly remembers the

3   details of every single piece of mail that comes through for

4   a big enterprise, is it?

5              MR. HURLEY:  That's certainly fair, Your Honor.

6   And again, there's limits to our ability to prove the

7   negative, here.

8              THE COURT:  Yeah, I know that.

9              MR. HURLEY:  Yeah.

10             THE COURT:  I understand.  But even so, I mean,

11  the mail department was asked, but I don't know how wide a

12  canvassing -- it doesn't sound like much canvassing was done

13  to anybody else.  Who would the mailroom normally have sent

14  it to?  Were those people canvassed to see if they actually

15  saw it?  Didn't sound like that was done.

16             MR. HURLEY:  You know, I have -- with respect to

17  the communications of the mail room, only the testimony that

18  was elicited moments ago by Mr. Ferraro.  I certainly had

19  separate conversations with the general counsel's office

20  about the issue, but again, as you pointed out, that isn't

21  in evidence, but that -- we did what we thought we

22  reasonably could to confirm what we believed to be true,

23  which is that this notice, which was sent to an address in

24  London that hasn't been in use by Celsius for like, I guess

25  well over a year, didn't actually wind up being received by

1  anyone at Celsius.  And that is our understanding.

2          THE COURT:  Okay.  And I don't really have any

3  testimony as to whether people did or didn't see the

4  publication notice.  Right?

5          MR. HURLEY:  You are correct.

6          THE COURT:  Then, usually -- it's odd --

7          MR. HURLEY:  (overlapping conversation) back up

8  actually, Your Honor, on that answer?

9          THE COURT:  Yeah.

10          MR. HURLEY:  I guess we do have evidence that Mr.

11  Ferraro didn't, at least not until after the bar date,

12  because Mr. Ferraro said, very clearly, I think, that he

13  didn't know about the bar date until November.

14          THE COURT:  You know, we had two different

15  cryptocurrency cases filed within a short period in the

16  Southern District of New York.  There hadn't been very many

17  filings in that industry, everybody was interested.  It's

18  hard for me to believe that there weren't people at Celsius

19  who were charged with monitoring the docket in the Voyager

20  case, just to see what was happening, because that obviously

21  might shed light on what was going to happen in the Celsius

22  case.  Wasn't anybody tasked with that responsibility?

23          MR. HURLEY:  Not to my knowledge, Your Honor.

24          THE COURT:  Okay.  Again though, I don't have any

25  evidence of that, do I?

1          MR. HURLEY:  I -- maybe I'm not remembering

2     clearly, and I'm sure I'm not, but I thought that Mr.

3     Ferraro had indicated that he also didn't believe anyone was

4     tasked with that role.

5          THE COURT:  All right, on the Debtor's side I have

6     arguments about whether Celsius was a known or an unknown

7     creditor.  Aren't your own arguments about why Celsius

8     should have known that it had a claim kind of undercutting

9     your own position as to whether Voyager should have known

10    that Celsius had a claim?

11         MR. HURLEY:  I certainly understand the point.

12    One of the focuses that we provide in our reply is on the

13    fact that, unlike the cases that the objectors rely on,

14    Celsius was not a truly unknown entity, like a tort claimant

15    or an employment discrimination claimant would be and was in

16    some of the cases they cited.  There was an ongoing

17    commercial relationship, and we are on their schedules.  And

18    then the Debtors I think argued, paragraph 21, that there

19    was no way they could have predicted that there would be a

20    preference claim, because they all -- they couldn't have

21    predicted that Celsius would take the position that

22    deposited assets are a state property.

23         And we point out that Voyager, I understand, took

24    a similar position in its own case.  And presumably had

25    records of its withdrawals during the period, and it's

1    certainly putting that information together.  We think that

2    it's plausible to argue that these are -- that Celsius was

3    ascertainable as a creditor of wager.

4         THE COURT:  Yeah, let me ask the same question of

5    Mr. Murphy or whoever's going to speak for the Debtor on

6    this.  It seems to me all of your arguments about why

7    Celsius should have known that it had a claim undercut your

8    position that Voyager didn't know that Celsius had a claim.

9    So, you can't have it both ways, can you?

10        MR. WHALEN:  Yes, Your Honor, Michael Whalen on

11   behalf of Voyager.  I think that there's a key distinction

12   here, which is that as is evident from Celsius' filings and

13   declarations, there was an ongoing commercial relationship

14   between Voyager and Celsius, and the very nature of the

15   preference claim is that Celsius has taken a position that

16   assets that they believe are assets of the estate have

17   exited the estate.  But, in the course of their commercial

18   relationship prior to Celsius making the preference claim,

19   we were engaged in ordinary course transactions, which

20   included withdrawing those funds.

21        So, the fact that they existed in our commercial

22   relationship would give Voyager every reason to believe that

23   Celsius viewed those assets to be property of Voyager, that

24   Voyager could withdraw, indeed did withdraw.  Celsius also

25   has taken a slightly different position than Voyager.  While

22-10943 Case 22-10943-JT Doc 1397-2 Filed 01/30/23 Entered 01/30/23 Page 82 of 108 Please see Part2</b>Main Document    Pg 81 of 107

Page 81

1    it is true that Voy --

2           THE COURT:  Let me stop you.  Let me stop you.

3    While you -- while the Voyager assets were in the earned

4    accounts, right?  (overlapping conversation) Saying that

5    they belong to Celsius and not to Voyager, and that

6    Voyager's claim was an unsecured creditor claim is exactly

7    akin to the same position that Voyager itself took with

8    respect to its own equivalent of the earn accounts, isn't

9    it?

10           MR. WHALEN:  Yes, Your Honor, but we think that

11   the added distinction of Celsius' position as to title in

12   the withhold accounts is relevant and also the, again,

13   ordinary course of the commercial relationship, these are

14   defenses that we would obviously raise if and when we get to

15   a preference action, but it was entirely reasonable for

16   Voyager to believe that, unless asserted, or at least even

17   noticed, that there was no claim from Celsius with respect

18   to these amounts.

19           THE COURT:  Well, isn't there a claim of

20   preference based on the dates of transfers from the earn

21   accounts to the withhold accounts, rather than the dates of

22   withdrawals from the withhold accounts?

23           MR. WHALEN:  I -- yes, Your Honor, but there was

24   even some uncertainty in Celsius' own papers initially when

25   they filed, that they at least raised the possibility in one

22-10943 Case 22-10943-JT Filed Doc 397233-2 Entered 07/38/28 of 17:23:3 of 198 Please see Part2</b>Main Document    Pg 82 of 107

Page 82

1    of their first-day motions that they could assert ownership

2    over withhold account amounts as well.  That has since come

3    out differently, after some litigation in front of Judge

4    Glenn, but at least initially they had even taken that

5    position.

6              So, there was a lot of uncertainty around the

7    position that they were ultimately going to assert.

8              THE COURT:  Well, the withhold accounts didn't

9    exist before the preference period, is that right?

10             MR. WHALEN:  To be candid, Your Honor, we are not

11   entirely sure of the date at which the withhold accounts

12   came into effect.  We, on our end, had a long period of

13   engaging with the platforms where there was only one

14   account, and then at some point we noticed that there was an

15   additional account, an additional step involved in

16   withdrawing them, but we did in fact observe that and use

17   that pathway to take our funds off, and some did, in fact,

18   come off during the preference period that's alleged by

19   Celsius.

20             THE COURT:  Okay.  You know, on many of the -- let

21   me ask the Debtors and the Committee.  On many of the

22   factors here, it seems to me, whether there would be a

23   significant impact on the proceedings, whether there would

24   be significant prejudice, whether there is good faith, I

25   don't see that there's really much to say for the Debtors

22-10943 Case 22-11068-JTD Doc 1 Filed 01/30/23 Entered 01/30/23 Page 84 of 108 Please see
Part2</b>Main Document    Pg 83 of 107

Page 83

1   and the Committee's position.  The argument about prejudice

2   is built on cases that have said well, even if this is a

3   small one, I might get a gigantic influx of other claims

4   from other people.  Given the nature of this claim and the

5   circumstances, how could that possibly be a worry?

6           MR. AZMAN:  Your Honor, it's Darren Azman from

7   McDermott for the Committee.  We now have several additional

8   crypto Chapter 11 cases that have been filed since Voyager.

9   I don't think it's without -- outside the realm of

10  possibility that other of these estates that are out there

11  could take a similar position here.  I actually am very

12  concerned about it.

13          And you -- Your Honor's aware of certain arguments

14  that FTX and its affiliates have raised about claims that

15  they may have in these cases.  They may very well be coming

16  to Your Honor shortly to ask for inexcusable neglect to file

17  a crypto claim.

18          THE COURT:  FTX didn't even have any right to

19  recover preferences until it filed its own case, which was

20  after the Voyager bar date, right?

21          MR. AZMAN:  Your Honor, I'm hesitant to speak on

22  that issue, because it's under investigation, but that's --

23  doesn't sound wrong.

24          THE COURT:  Yeah, I'm not -- you know, the idea of

25  whether I would get a claim from another cryptocurrency or

1    other Debtor that might have a preference claim, it just

2    seems ludicrous to suggest that that's going to open the

3    floodgates and raise a lot of issues.  I might have claims

4    from later filing cryptocurrency cases that might raise bar

5    date issues about whether they should be fairly held to the

6    bar date when they didn't -- weren't in bankruptcy, and

7    therefore didn't have a preference claim at the time, those

8    to me seem entirely different issues.

9              MR. AZMAN:  That's fair, Your Honor.  I mean, the

10   other thing I'd mention is that if you look at the Second

11   Circuit case law on this, it's not just whether there's a

12   significant impact on creditor recoveries or comparing the

13   size of the claim to the total creditor pool, but if you

14   look at cases like Northwest Airlines, Northwest Airlines

15   says that the argument that a claim is de minimis, when

16   viewed in the context of an entire case, was rejected by the

17   Second Circuit in the Enron case.

18              So, that -- just because it's a small drop in the

19   bucket, and nobody can (indiscernible) that, right,

20   $7,000,000 here is a small drop in the bucket in their

21   creditor's claims pool, but that's not the test.  The test

22   is that de minimis doesn't make it not important.  And

23   $7,000,0000 --

24              THE COURT:  Let me push back on that.  If the rule

25   were as you say, then every single motion for relief from

22-10943Case 22-10943-JTD Doc 1078-2 Entered 01/30/23 Filed 01/08/24 Page 86 of 108Please see
Part2</b>Main Document    Pg 85 of 107

Page 85

1   the bar date would be deemed to be prejudicial, and it

2   wouldn't even be a factor for the Court to consider.

3            MR. AZMAN:  Oh, I don't agree.  So, I guess I --

4   let me finish my point, so my point was Court should and do

5   look at the aggregate dollar amount as a whole number,

6   whether it's a lot.  I think we all agree that $7,000,000 is

7   a big number.  $50,000, not so much.  $100,000, not so much

8   in a complex Chapter 11 case, but by any measurement,

9   $7,000,000 is a lot of money.  I think most of the creditors

10  who lost their life savings in this case would agree that

11  $7,000,000 is a lot of money.

12           THE COURT:  By the way, I actually don't think

13  that prejudice is supposed to be measured by the size of the

14  claim.  It seems to me prejudice is supposed to be measured

15  by whether the late filing, as opposed to a timely filing,

16  is prejudicial to you.  And I don't see how a late filing of

17  this particular claim would make any difference to you in

18  terms of whether it's filed now or whether it had been filed

19  on October 1st.  Tell me where I'm wrong.

20           MR. AZMAN:  Well, I guess I would go back to the

21  fact that that is not the most important factor that Courts

22  consider in determining whether excusable neglect has been

23  satisfied.  It's the reason -- I know that's not answering

24  your question directly, but I take Your Honor's point.

25           THE COURT:  Okay.

22-10943Case 22-10943-JTD Doc 1097/3923-2Entered 07/30/28 Filed 01/30/24 Page 127 of 128 Please see
Part2</b>Main Document    Pg 86 of 107

Page 86

1         MR. WHALEN:  And Your Honor, Michael Whalen for

2    the Debtors.  We would agree.  You know, we would highlight,

3    as Mr. Azman did, that the predominant point is the excuse,

4    and that if there's no sufficient excuse that can overcome

5    even favorable factors elsewhere, but we do agree with Your

6    Honor's reading, but we think that it's a bit of a balance

7    between timing and amount and it's something inequitable

8    between (indiscernible), but this does relate somewhat back

9    to the plan negotiation point, and that we are approaching,

10   you know, we're closing in on a month from the confirmation

11   hearing.

12         So, there would be some administrative burden, but

13   even if we were to agree with Your Honor, we would go back

14   to the point that we think excuse is the main -- the key

15   issue here.

16         THE COURT:  Okay.  Anything else anybody wishes to

17   argue or to raise on the excusable neglect issue?

18         MR. HURLEY:  Your Honor, it's Mitch Hurley.  If I

19   could just make a couple of points on excusable neglect.

20   And I think what I really want to do is kind of zoom out and

21   make a bigger picture point, which is that the kind of

22   timeframe that we're talking about, in terms of the delay

23   from the bar date until when this motion is filed, in the

24   spectrum of cases that have been cited by all the parties,

25   is really very brief.

1          So, the bar date was October 3rd, we filed our

2    motion on December 13th.  And if you measure the delay from

3    the date of discovery of the claim in early November, the

4    period shorter, and then this, I just want to make sure this

5    is clear to Your Honor, that much of the time between when

6    Akin Gump was retained in November until we filed in

7    December was because we were working with the Debtors to see

8    if we could come to a resolution that wouldn't require this

9    motion practice.

10          So, we actually contacted them, basically to

11   request the relief we're seeking on the motion now,

12   consensually, on November 15th, and then they -- we

13   contacted Kirkland, and Kirkland told us on that call that

14   Quinn Emanuel was going to handle the conflict issue.  Took

15   some time for us to be able to get on the phone with Quinn,

16   they weren't available right away.  They then asked us, I

17   think it was -- our call was on November 28th, I believe,

18   our first one.  Sorry, on December 1st.

19          They asked us to put our request in writing, which

20   we did and sent over on December 2nd.  And then on December

21   6th, Quinn actually told us that Paul Hastings was going to

22   be handling the matter for Voyager, and so we then spoke to

23   Paul Hastings on December 8th, and again on the 12th, and

24   they indicated that they were -- had to discuss it with UCC

25   counsel, and at that point, we hadn't given up hope on a

22-10943Case 22-10943-JTD Doc 1397-2 Enter Filed 01/30/23 07:17:19 Page 89 of 108 Please see
Part2</b>Main Document    Pg 88 of 107

Page 88

1    negotiated resolution.

2          But that's when we filed, the next day.  So, the

3    period of time is brief, even I think if you include that

4    settlement period, and even shorter if you don't.  And from

5    our perspective, if you look at the cases cited by the

6    parties, and there were dozens, there really aren't any

7    cases where the period of delay is as short as what I just

8    described.  And where you have a situation here, like here,

9    where the Claimant has not said -- you can almost -- all

10   those other cases, the Claimants actually expressly admitted

11   that it was aware it had the claim before the bar date

12   passed, and that it was aware of the bar date.  In almost

13   all of those cases.

14          So, a situation like this one, where we've put in

15   evidence, I know Your Honor has questions about whether more

16   evidence could have been supplied, but we put in evidence

17   that Celsius wasn't aware of the claim before the bar date

18   passed and wasn't aware of the bar date itself until after

19   it passed, and then couple that with the relatively short

20   delay, and I really do submit, this case is just different

21   than all of the other cases that are relied on by the

22   Objectors in those particular regards.

23          And in addition, in the se -- because the motion

24   obviously was filed before there was a confirmed plan, as

25   you were just discussing.  So -- but that's, I guess kind of

1    the big picture point I would want to make with respect to

2    excusable neglect.  I really do think this is, in terms of

3    sort of the spectrum of use kinds of cases, is very far on

4    the side of a comparatively short delay where you have this

5    circumstance of the actual lack of knowledge of the claim

6    and of the bar date before the bar date passed, which is, in

7    their cases, in almost every one, there's not even a dispute

8    about whether the Claimant knew about the existence of the

9    claim, and in many cases knew about the existence of the bar

10   date.  So, I do think it's a very different case, and more

11   favorable for Celsius on excusable neglect.

12           THE COURT:  Is there anything else?

13           MR. AZMAN:  Your Honor, I apologize, I just --

14   it's Darren Azman again, I just wanted to make two brief

15   points, but I'm not sure if Mr. Hurley was done.

16           MR. HURLEY:  Go.  Go ahead.

17           MR. AZMAN:  Okay.  Your Honor, on the excusable

18   neglect standard, I take Mr. Hurley's point on this not

19   being a year delay and there not being significant prejudice

20   in terms of the overall creditor body here.  I get all that,

21   but if you read all of the case law collectively, what you

22   come away with is that those are elements that can taint

23   your excusable neglect claim, if you waited two years or if

24   there's significant prejudice.

25           But they aren't elements that can satisfy the test

1    alone.  Those are elements that Courts look to to

2    (indiscernible) the claim, if you otherwise satisfied the

3    remaining elements, including the most important one, which

4    is the reason for the delay.  And so, I think it's a bit of

5    a distraction to say well, it's not as bad as it could have

6    been.  Because I agree, it's not as bad as it could have

7    been.  They did act relatively quickly within a couple of

8    months, that's undisputed.  But that doesn't solve the

9    shortcomings that we've brought out through testimony today,

10   through all of the Witnesses.

11          And so, on excusable neglect, I just -- I don't

12   think those el -- other elements, they carry the day.  They

13   cannot carry the day for satisfying excusable neglect

14   standard when the most important element here is not

15   satisfied.  The other point I want to make, which we've

16   touched on a little bit, is that Celsius was not a known

17   creditor.  Celsius has tried to distinguish the XO

18   Communications case on a number of grounds in their

19   briefing, and I agree, there are differences in the facts,

20   but none of those distinctions alter the conclusion.

21          A preference claim, particularly under these

22   unique and novel circumstances, is not a known claim.  Judge

23   Gonzalez stated in the World Comm case, which is cited by

24   Celsius, this Court found in in re: XO Communications that

25   an entity that holds a preference claim is not generally

Page 91

1    considered to be a known creditor of a Debtor based solely

2    on the preference.

3           And this is continuing to quote, in that case,

4    meaning XO Communications, it was the -- it was determined

5    that constructive notice through newspaper publication, as

6    was provided here, would be proper.  Your Honor, Celsius can

7    distinguish the XO case all it wants, but the holding's

8    clear.  A Debtor with a preference claim is not a known

9    creditor, and as such, Voyager's notice by publication alone

10   was sufficient.  Your Honor, that's all I have to add.

11           MR. WHALEN:  Your Honor, Michael Whalen for the

12   Debtors.  I would just echo the points that Mr. Azman made,

13   particularly with respect to the differences between the

14   time of the delay and the reasons for the delay, which are

15   distinct pioneer factors, and it's certainly a -- not news

16   to Your Honor as you have referred to these points multiple

17   times, but a Second Circuit has repeatedly taken a hard line

18   approach to the pioneer factors and held that the Second

19   Circuit itself continues to expect that a party claiming

20   excusable neglect will, in the ordinary course, lose under

21   the pioneer test.

22           So, while it may be seemingly a harsh result or a

23   unique case, this is exactly how the pioneer test was

24   crafted, and we have nothing else from our end.

25           MR. AZMAN:  May I respond very briefly, Your

Page 92

1    Honor?

2              THE COURT:  Go ahead.

3              MR. AZMAN:  Okay.  So, the cases though, and the

4    facts of the cases that the objectives rely on, and again I

5    mentioned this before, but their cases were, usually the

6    delay is measured in years, sometimes in decades.  Not in

7    every case.  There's a couple they cited where the delay is

8    shorter, and I guess arguably more comparable to the period

9    of time we're talking about here, but they're otherwise

10   distinguishable.  So, XO for instance, in that case the

11   motion for lead to file the lay claim was made about seven

12   months after the bar date.

13             So, obviously that period's longer than the one

14   here, but the facts are also different for really the

15   reasons I just identified, Your Honor.  So, in that case,

16   the Claimant, Trilegiant, appears to have been aware it had

17   a preference claim against XO before the bar date ran.

18   Trilegiant had filed for bankruptcy more than a year before

19   the XO bar date, which means of course, that its preference

20   claim arose more than a year before the bar date.

21             According to the Court, the record, and this is a

22   quote, the record reflected that Trilegiant was aware that

23   it had preference claims, and not only that, that it was

24   aware of the amount of the preference claim against XO,

25   because the Court said it was large enough that the size of

22-10943 Case 22-10943-JT Filed Doc 397/23-2 Entered 07/30/24 07:17:24 of 108 Please see
Part2</b>Main Document    Pg 93 of 107

Page 93

1    that preference claim should have caused Trilegiant to make

2    further inquiries that would have led to discovering the

3    time of the bar date.  But not only did Trilegiant not make

4    those inquiries, it chose to wait.  It made what the Court

5    described as an informed decision, notwithstanding knowing

6    about its claim, not to pursue preference claims until after

7    Trilegiant's own bankruptcy was finished.

8             In contrast here, Celsius is only just a little

9    bit more than two and a half months into its bankruptcy

10   proceeding by the time the Voyager bar date passed.  We put

11   in evidence that in fact, it's not typical on a complex case

12   for there to be a preference analysis, in that period of

13   time, at the beginning of a case, and to their credit,

14   Voyager doesn't dispute that.  They acknowledge that that's

15   right.  And I think that raises another important

16   distinction.  On -- in (indiscernible), it at least appeared

17   that the preference claim against XO was one of like, a

18   comparative handful, but as you heard from the testimony

19   here, just based on the nature of Celsius' business, there

20   were literally hundreds of thousands of potential preference

21   Defendants.

22           600,000 mo -- or more customers with balances on

23   the platform.  Most of whom probably made withdrawals at

24   various times, and certainly thousands of them, as -- would

25   have done so during the preference period.  So, there's

1   really -- there's no reason to think, unlike in the XO case,

2   that the wager information should have stood out to Celsius

3   the way the large amount of the XO claim did in

4   (indiscernible).  And the other sort of short timeframe case

5   they cite, Your Honor, is Eagle-Picher, that's a 1993 case

6   from the Southern District of Ohio.

7           And it's really the same grounds that can

8   distinguish them and most of the other cases from ours.  In

9   that case, the Claimant admitted it received actual notice

10  of the bar date a full three months before the bar date

11  expired, and the Claimant did not dispute that it was fully

12  aware that whole time of the existence of its claim against

13  the Debtor.  Instead, it just tried to justify its failure

14  to file by the known bar date because its other duties and

15  priorities took precedence.  The Court read that and said

16  that specifically in the opinion, it's expressing

17  indifference to the requirement to comply with known Court

18  ordered -- a known Court ordered bar date.

19          And that the Claimant had just flouted the bar

20  date, even though the Claimant knew about its claim and knew

21  about the bar date.  And that is another factor that we

22  submit just distinguishes this case from all the ones that

23  are relied on by the objectors, and we haven't seen a case

24  with similar circumstances that result in a request for a

25  leave to file a late claim being denied.  Thank you, Your

Page 95

Honor.

          THE COURT:  All right, I think we're starting to

get repetitive, so I'm ready to make a ruling unless there's

something new that anybody wishes to add.  All right.  The

parties have argued as to whether relief from the bar date

should be granted in favor of Celsius to file a preference

claim against Voyager.  The Voyager debtors and the

Committee have made arguments about whether or not, for

example, Celsius was a known creditor or not, and what kind

of notice it was entitled to, and there have been arguments

about the notice that was sent.

          I do not think those really are decisive at all in

regard to the excusable neglect inquiry.  They might have

been decisive if we had a due process contention here, but I

don't believe we do.  Celsius admittedly had signed an

agreement with Voyager that had a contractual provision in

it as to where notice was to be sent, and while Celsius

argues that Voyager maybe could have figured out that a

different address was appropriate, there is no evidence that

Celsius ever notified Voyager of a new address, or that the

subsequent agreement that they entered into made any change

to the contractual provision, which said that notices were

to be sent to that address.

          I therefore don't think there's any due process

issue as to the addressing of the notice, and where it was

22-10943 Case 22-10943-JTD Doc 1307-2 Filed 01/30/23 Entered 01/30/23 17:19:27 Page 127 of 138 Please see
Part2</b>Main Document    Pg 96 of 107

Page 96

1    sent, and it was supplemented by publication notice.  I'm

2    not at all convinced by Voyager's arguments about whether

3    Celsius was or was not a known creditor, because as I said

4    during the argument, so much of what Voyager and the

5    Committee are arguing as to why Celsius allegedly should

6    have known that it had a preference claim against Voyager

7    kind of cuts the other way as well, in terms of whether

8    Voyager ought to have known that Celsius had a claim against

9    Voyager.

10            The argument that it's an unknown claim just

11    because sometimes people don't pursue preferences, I realize

12    that's in one reported decision, I don't find that

13    persuasive at all.  The arguments that the Celsius parties

14    have made about how gosh, they couldn't have been expected

15    to find this needle in a haystack regarding Voyager because

16    they were putting together such huge schedules might have

17    some effect if there was no reason to think that Celsius

18    actually knew, or should have known about the bar date

19    itself, and the theory there would be that the only thing

20    that alerted them they had a claim was their own review of

21    their own business records in their own bankruptcy case.

22            I understand that argument, but it's all premised

23    on something that the evidence failed to establish, which

24    was the notion that Celsius did not know, and had no reason

25    to know of the bar date.  And of the need to find out

1    whether it had a claim against Voyager, and to pursue that

2    within the time that had been -- that -- the deadline that

3    had been set by the Court.  One of the Witnesses, Mr.

4    Ferraro, said that he wasn't aware of the bar date, but it

5    doesn't appear that he made any inquiry of others, he didn't

6    testify as to any inquiry of others.

7            His inquiry was focused on whether he could find

8    anybody who remembered receiving a notice that had been

9    mailed to Celsius U.K.  He didn't find anybody in the mail

10   room, mail department who remembered seeing the notice,

11   which is not particularly strong evidence, in my regard,

12   even on the issue of whether Celsius U.K. actually received

13   the notice that might have been forwarded to it.  But beyond

14   that, in terms of whether anybody actually knew at Celsius

15   U.K. or anywhere else within Celsius, I only have Mr.

16   Ferraro's testimony that he didn't know, and I have

17   equivocal testimony, quite frankly, by the other Witness,

18   Mr. Bixler, who says that well, he certainly knew about it

19   in November.

20           Might have known about it before then, but he

21   isn't sure.  In terms of an enterprise claiming that it

22   didn't know about the bar date, that's a pretty thin

23   (indiscernible), to say the least.  But, of greater concern

24   to me is the fact that Celsius' counsel, Kirkland & Ellis,

25   are the same attorneys, not just the same law firm, but for

1    heaven's sake, the same attorneys who represent Voyager, and

2    who made the bar date motion in the Voyager case.

3            The idea that Celsius' own counsel wasn't aware of

4    the Voyager bar date is a non-starter.  Of course they knew

5    about it.  Celsius argued in its papers that somehow that

6    wasn't within the scope of Kirkland & Ellis' employment for

7    Celsius, but its own Witnesses agreed during testimony today

8    that Kirkland & Ellis, if it knew about a bar date and knew

9    about preference issue, had an obligation to tell that to

10   Celsius.

11           Furthermore, what is particularly troubling to me

12   is that these issues should have been looked at when a

13   customer of Celsius objected to the retention of Kirkland &

14   Ellis, specifically on the ground that there were potential

15   conflicts between Voyager and Celsius, and therefore that

16   Kirkland & Ellis was in a conflict position, because it

17   represented Voyager and was proposed to represent Celsius.

18   Any bankruptcy professional knows that one source of

19   potential conflict is a preference claim, and it appears

20   that some review of the Voyager records with Celsius was

21   done, and that Kirkland & Ellis then filed a supplemental

22   declaration on August 30th, more than a month before the

23   Voyager bar date, that acknowledged that Voyager had been a

24   customer of Celsius, and that Voyager had made withdrawals.

25           Doesn't explicitly say when the re -- withdrawals

Page 99

1    occurred, but I have no reason to think that Kirkland &

2    Ellis wasn't aware of those dates.  More importantly, I

3    can't -- I will not assume that only Kirkland & Ellis was

4    making the decisions as to whether it was conflicted.

5    Somebody at Celsius had to make a decision as to whether

6    there was a conflict, and whether Kirkland & Ellis should be

7    retained in light of whatever the Voyager issues were.

8    Somebody had to be providing the information, should have

9    been, at least, looking at it from the point of view of

10   Celsius.

11          I would assume somebody, some Director or some

12   higher level officer who was working with Kirkland and

13   making the hiring decisions, perhaps the general counsel,

14   perhaps both.  Somebody, when that objection was made on

15   behalf of Celsius, should have been looking at it and

16   asking, well, what are the potential issues?  And again, the

17   testimony was that Kirkland & Ellis, if it saw a potential

18   preference issue, should have told Celsius.

19          Well, I find it hard to understand in August, once

20   Kirkland & Ellis knew that there were -- had been

21   withdrawals and knew obviously, of the Voyager bar date, why

22   under Celsius' own testimony, that doesn't mean that

23   Kirkland -- that seems to me that means under Celsius' own

24   testimony that Kirkland should have explicitly said Celsius,

25   here it is.  You know, I'm your counsel, and here's

1   something you need to look at, because there's a bar date

2   out there.

3           There can't be any question that Kirkland & Ellis

4   itself knew about the bar date.  I am especially troubled

5   that after the Committee and the Debtor raised the issue

6   about Kirkland's statements and about how somebody had

7   obviously looked at some aspect of this in August, Celsius

8   ignored the issue completely, made no further declarations,

9   offered no further evidence as to who at Celsius might have

10  worked with Kirkland on that issue, might have been aware of

11  the issue, what communications they had with Kirkland about

12  the issue.

13          Absolutely nothing on that point.  And while the

14  two Witnesses who were proposed, Mr. Bixler and Mr. Ferraro

15  said that they weren't asked until November to look into

16  these issues, and one of them, Mr. Bixler said it was

17  Kirkland that asked him, there's no indication that anybody

18  tracked backwards to see who else at -- in the counsel

19  department at Celsius or any of their Directors of any of

20  the other people who'd communicated with Kirkland, what

21  questions they had had, and what discussions they had had

22  about the -- these issues.

23          If, as Mr. Hurley agreed during argument the test

24  is whether Celsius knew or should have known about the bar

25  date, should have had actual knowledge, no question that its

1    counsel had actual knowledge.  And there's no question under

2    the circumstances in my mind that it should have been

3    discussed.  So, in the absence of any reason -- any evidence

4    as to whether it was discussed, or any explanation as to why

5    -- if it wasn't discussed, why it wasn't and why that should

6    excuse Celsius, I'm required, I think, to find on the

7    evidence that there's insufficient showing that there was a

8    valid reason for the delay.

9            I think on the other factors, if I were -- on the

10   length of time on the delay, it seems to me that there was a

11   one-month delay before the issue was raised with Voyager,

12   and a two-month delay before the motion was actually filed.

13   That's not a particularly long period of time.  If I were

14   completely convinced that Celsius had had no prior reason

15   even to know that there was a preference claim or a bar date

16   in the Voyager case, that might be persuasive.

17           But, in the context here, it's not enough, it

18   seems to me, if Celsius should have known, for Celsius to

19   say well, you know, we shouldn't be required to do anything

20   earlier than we -- then it took us to compile the full

21   schedule.  The whole point of a bar date notice, whether

22   it's delivered to a Debtor or to anybody else, is that

23   you're supposed to prioritize in your efforts to figure out

24   whether you have a claim, and to get it filed before the

25   deadline.

```
 1              So, the fact that it didn't surface in the
 2     ordinary course of the Celsius proceedings would only be an
 3     excuse if there was no other reason, and no other actual
 4     knowledge of the bar date.  But I am -- as I said, Celsius'
 5     primary bankruptcy counsel obviously knew about the bar
 6     date, so the argument that there was no actual knowledge
 7     that was or should have been com -- submitted to Celsius
 8     itself seems to be missing here.
 9              So, I am going to deny the motion, but without
10     prejudice.  It's tempting to say we've had our factual
11     hearing today, but I want to be perfectly fair to all the
12     parties, if Celsius wants to renew the motion because it
13     thinks it can actually excuse what happened or that there's
14     actually explanations for what happened with Kirkland or
15     better reasons why I should find that the issues that were
16     clearly surfaced in connection with the Kirkland retention
17     somehow didn't and shouldn't have alerted Celsius to the
18     existence of the claim and the need to take action, then
19     they can try to convince me today of that.
20              But, based on the record that I have so far, they
21     have not done so.  And so, the primary factor that I have to
22     consider is whether there is a valid reason for the delay
23     they have failed to meet.  And there is some delay, there is
24     some prejudice, they're not particularly onerous to the
25     point where they would overcome and -- other factors, but I
```

22-10943 Case 22-10943-JTD Doc 1130 Filed 01/30/23 Entered 07/08/23 07:12:14 of 108 see Part2</b>Main Document   Pg 103 of 107

Page 103

1   think the primary factor of the Second Circuit

2   (indiscernible) to look at is not satisfied here.

3           And you can't, if you have failed to satisfy that

4   factor, you can't get relief just by saying that it's only a

5   short period of time, or just by saying that it's not

6   particularly prejudicial.  Those are factors to be weighed,

7   but we're the primary factor.  So, plainly, it's not met.  I

8   think on this record it isn't, here.  And I think I have to

9   deny the request for relief of the party.

10          Let me make another point.  This is not a

11  particularly huge claim or a huge amount at issue.  I worry

12  about how much effort has already gone into it, and how much

13  money that the parties are spending on it.  How much, in

14  light of the amount that's at stake, that really makes sense

15  in the grand scheme of things.  Perhaps the parties ought to

16  sit down with Kirkland & Ellis and find out what it knew and

17  what it said and if it didn't say anything, why it didn't

18  say anything.  And make some reasonable judgements among

19  themselves as to what it's fair to do under these

20  circumstances.

21          I am not going to get to the question of whether

22  stay relief should be granted, because since there's no

23  claim that can be pursued, there's no reason for stay

24  relief.  But, I will say to alert the parties on this point

25  that, to the extent that the Debtors have implied that they

1   wish to make arguments about the withhold accounts and

2   whether they were or were not property and whether prior

3   transfers to the withhold accounts should be treated as

4   preferences, those are issues Judge Glenn is going to be

5   deciding as to many customers, and if it -- if those are

6   going to be issues, or were to be issues in opposition to a

7   claim, and if I were to allow a late claim, then there is no

8   way I would entertain a separate litigation of those issues

9   in my Court.

10          If there are other defenses, then I'm not 100

11  percent convinced that the -- they would need to be decided

12  by Judge Glenn as opposed to by me, or that it would be

13  appropriate to do so, but we'll deal with that if and when

14  we ever get up to a point where submitting a late claim

15  should (indiscernible).  All right?  Is there anything else

16  I need to rule on?  Did I forget anything?

17          MR. HURLEY:  Not from Celsius' perspective, Your

18  Honor.

19          THE COURT:  Okay.  All right, and you agree on the

20  form of an order, please, and submit it?

21          MR. HURLEY:  Certainly.

22          MR. AZMAN:  Yes, Your Honor.

23          THE COURT:  Is there anything else to be done

24  today?  Okay.  Thank you very much.  In that case, we are

25  adjourned.  Thank you.

Page 105

1            MR. HURLEY:  Thank you, Your Honor.

2            MR. AZMAN:  Thank you, Your Honor.

3            (Whereupon these proceedings were concluded at

4    1:36 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2

3                         RULINGS

4                                        Page        Line

5

6     Motion denied without prejudice          102          9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  January 27, 2023