# EXHIBIT 1

**PARTNERSHIP AND ENDORSEMENT SERVICES AGREEMENT**

This PARTNERSHIP AND ENDORSEMENT SERVICES AGREEMENT (this "***Agreement***") is made and entered into this 11th day of August, 2021 (the "***Effective Date***"), by and between Blockfolio Inc. ("***Company***"), and SC30 Inc. ("***Consultant***") for the services of Stephen Curry ("***Talent***"), in connection with the advertisement, promotion and marketing of Company, its affiliates, and their products and services.

## RECITALS

WHEREAS, Talent is recognized and widely known as a highly-skilled basketball player and celebrity;

WHEREAS, Talent has authorized Consultant to enter into this Agreement for Talent's services and other rights and benefits provided herein; and

WHEREAS, Company desires to retain Consultant to, among other things, provide the personal services of Talent for Company, and Consultant agrees to cause Talent to perform certain promotional services on behalf of Company upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and mutual agreements and covenants herein set forth, the parties hereto agree as follows:

1.     **DEFINITIONS.** As used herein, the following terms shall be defined as set forth below:

     A.     "***Contract Territory***" shall mean the U.S. and worldwide.

     B.     "***Company Products and Services***" shall mean all Products and Services of Company, which are branded with the "***FTX***" brand ("***Brand***"), and Products and Services of pre-approved affiliates, such approval not to be unreasonably withheld, conditioned or delayed.

     C.     "***Governing Organization***" shall mean each authority and sports organization that has jurisdiction over Talent, including, but not limited to: (1) the National Basketball Association (the "***NBA***"); (2) Talent's then-current NBA team (the "***Team***"); (3) the International Olympic Committee ("***IOC***"); (4) the U.S. Olympic Committee ("***USOC***"); and (5) Talent's national governing body or bodies (e.g., USA Basketball).

     D.     "***PGA Event***" shall mean the PGA Tour Event which may be hosted by the Ayesha and Stephen Curry Foundation/Eat.Learn.Play (the "***Foundation***") each calendar year.

     E.     "***Products and Services***" (i) cryptocurrency exchanges and/or any other mediums used for buying and/or selling cryptocurrency; (ii) crypto-led

investment trading platform apps; and (iii) non-fungible tokes also known as NFTs ("**NFTs**").

**2.      GRANT OF NAME AND LIKENESS RIGHTS; APPROVALS.**

A.      Subject to the terms and conditions herein set forth, including, without limitation, Section 2.B below, Consultant hereby grants to Company the right, within the Contract Territory and during the Term (as defined in Section 3), to utilize Talent's name, nickname, image, likeness, endorsement, voice, picture and photograph, facsimile signature, avatar, biographical data and statements (collectively, the "**Talent Identification**") (with Talent Identification specially excluding any trademarks owned by or on behalf of Talent, including without limitation SC30™ and Underrated™) ) to promote Company, its affiliates (as approved by Talent) and/or the Company Products and Services, and, if applicable pursuant to Section 2.G. below, the NFTs and/or NFT Platform (as defined below), in all approved forms of advertising, promotion and marketing including and limited to all types of print, event promotional materials, press releases, internet-based digital media (including digital web browsers), social media (provided that any whitelisting execution of Company-created/branded social media posts which incorporate the Talent Identification is subject to pre-approval of Talent in each instance, with no whitelisting of Posts permitted hereunder), new media (including, but not limited to, distribution via mobile technology and podcasts), radio and television; provided, however, that any such use of the Talent Identification in connection with any of the foregoing shall be subject to the prior written approval of Consultant in accordance with Section 2.B below, such approval not to be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing and for the avoidance of doubt, without the prior written approval of Consultant, the Talent Identification shall not be used in gas station pump kiosks, value stores, dollar stores, off-price retailers, waste bins, airport bins, in-flight signage, in-theater media, DVD inserts, infomercials, cardboard standees or life-sized cut-outs/displays/posters/signage of Talent, transit (buses, taxis, etc.) or related transit areas (bus shelters, subway stations, etc.) or in connection with tabloids or pornographic publications, adult publications/sites, political sites, or any other site that would reasonably be considered offensive to a general audience, pop-ups, pop-downs, pop-unders, rich media, pre-roll ads, spam, direct mail materials, unsolicited emails, wallpaper, screensavers, packaging, coupons, hang tags, labels, stickers, cards, calendars, apparel, labels.  For avoidance of doubt, Company shall not be permitted to whitelist or otherwise push paid media behind any Posts hereunder.

B.      In connection with Consultant's engagement hereunder, Consultant shall have the right to approve in writing each and all of the following, such approval not to be unreasonably withheld, conditioned or delayed: concepts, scripts, storyboards, layouts, hair, makeup and wardrobe stylists, wardrobe decisions, photographers, directors, and elements associated with any Service Day, any and all BTS footage, photo-retouching, rough cuts, fine cuts and final cuts of any content or any other use of the Talent Identification including any other materials created hereunder.

Without limiting the foregoing, before Company may publish, broadcast, use, reuse, or disseminate materials containing the Talent Identification, including all materials created in connection with any Service Day and any use of the Posts by Company (collectively, "***Company Advertising***"), Company agrees to submit to Consultant for approval and review, all proposed uses of the Talent Identification and the mode of distribution for such Company Advertising (each, an "***Approval Request***"), such approval not to be unreasonably withheld, conditioned or delayed. If Consultant shall fail to reject or deny any Approval Request in accordance herewith within five (5) business days of receipt of any Approval Request, then the Approval Request shall be deemed approved for the submitted purposes. Notwithstanding the foregoing, tweets and social media posts that are consistent with (i) the creative vision, (ii) mutually agreed upon messaging (which was agreed in advance of any such tweet/social media post), and (iii) prior social media uses of the Talent Identification, may be released without prior approval. For the avoidance of doubt, the parties shall mutually approve the press release(s) and the PR plan (including, without limitation, the timing of all press releases) for the public announcement of this partnership.

A.     Company may not and may not permit any third party to take behind the scenes footage/photographs at times when Talent has a reasonable expectation of privacy nor will any use of the Talent Identification or any Company Advertising or other materials embodying the Talent Identification be pornographic or derogatory. Additionally, there shall be no use of a body double or dubbing of Talent, or any "blooper" footage featuring Talent, without Talent's prior written consent which may be withheld in his sole discretion.

B.     During the Term, Talent shall not: (i) publicly disavow use of, or disparage, the Company Products and Services or the Company or (ii) appear in any television, radio, digital or print advertisement within the Contract Territory for, nor endorse or render any advertising, publicity, or promotional services within the Contract Territory for, Products and Services other than for Company.  This restriction shall apply to, but not limited to: Coinbase, Robinhood, crypto.com, eToro, Cash App, Gemini, Webull, Krakken, Venmo, PayPal, blockchain.com, Voyager, Kucoin, Binance, Exodus, Stocktwits, Bitmart and Paxful ("***Competitors***"). For avoidance of doubt, major national banks and/or payment platforms shall not constitute Competitors for purposes of this Agreement, including, without limitation, Chase, Wells Fargo, Bank of America, Visa, MasterCard, etc. Notwithstanding the foregoing, nothing contained herein shall prohibit Talent from appearing in basketball or charity events and programs and the broadcast of basketball or charity events and programs (including any media related thereto) or from participating in the entertainment, news or information portion of any other event or program regardless of sponsorship, product placement or integrated media partner(s), provided, however, Talent does not specifically endorse any such third party's Products and Services.  Talent shall be permitted to privately invest, on a passive basis, in entities offering Products and Services, including, but not limited to, ETFs,

mutual funds, or VC funds, provided that Talent neither promotes nor is otherwise involved with such investments.

C. Notwithstanding anything herein to the contrary, Company agrees that (i) it shall abide by the rules, regulations, decisions, and directives of each Governing Organization; (ii) any action or omission of Talent pursuant to Talent's good faith and reasonable interpretation of a requirement of a Governing Organization shall not be deemed a breach of this Agreement.

D. Company acknowledges that Consultant shall be permitted to work with the Foundation and other third parties to procure sponsorships for the PGA Event (each, a "**PGA Event Sponsorship**"). Company further acknowledges that some PGA Event Sponsorships may be with Competitors and that Consultant and/or Talent may be required to perform certain promotional services in connection with the PGA Event and such PGA Event Sponsorships and Consultant's/Talent's performance thereunder shall not be deemed a breach of this Agreement; provided that Consultant shall use best efforts to ensure that no independent endorsement of any Competitor by Talent is permitted in connection with such PGA Event Sponsorships, and any such promotional services rendered by Talent shall be rendered only in connection with the PGA Event. In addition, and to the extent reasonably possible, Consultant agrees to use best efforts to provide Company with initial meaningful introductions to relevant PGA Event officials in connection with potential PGA Event Sponsorships by Company in the Exclusive Categories. Notwithstanding the foregoing, to the extent Consultant or Foundation is permitted to procure PGA Event Sponsors, (i) Consultant and/or Foundation shall first offer Company any such sponsorships in connection with the PGA Event and (ii) Consultant and/or Foundation shall permit Company to have a right of first refusal on any such sponsorship in connection with the PGA Event.

E. The parties agree that as of the date hereof, Company shall not host or promote the Talent Identification in connection with any NFTs or platform on which NFTs are hosted (each, an "**NFT Platform**"). To the extent Talent elects to participate in NFTs or seeks to develop any white-label NFT Platform, then Consultant shall work with Company to develop such NFT Platform through and in conjunction with the Company and thereafter may mutually agree on marketing assets associated therewith, which may include the Talent Identification.

3. **TERM.** The term of this Agreement shall commence as of the Effective Date and shall continue until the date falling three years after Effective Date, unless terminated sooner in accordance with the terms and conditions hereof (the "**Term**"). "**Contract Year**" as used herein shall mean each consecutive twelve (12) month period during the Term commencing as of the Effective Date. Notwithstanding the foregoing, the Term may be extended for an additional two (2)-year period subject to mutual written agreement of the parties.

4.    **TALENT'S SERVICES.**

A.    <u>Service Days</u>. Consultant shall cause Talent to participate in a maximum of twenty (20) service hours, exclusive of initial travel time to service location, if any, but inclusive of all hair, makeup, other reasonable prep time, and any travel between service locations (collectively, the "***Service Hours***"), per Contract Year which may be used for Production Session(s), Personal Appearance(s), Media Day(s), Virtual Appearance(s), and/or other mutually agreed purpose (as each such term is defined below, and collectively referred to herein as "***Service Days***"). Each Service Day shall be scheduled on mutually agreed upon dates, times and locations subject to Talent's prior commitments. In connection with all in-person Service Days, Company shall be responsible for implementing and complying with all applicable COVID-19 safety regulations and protocols as further outlined below and Talent shall have the right to approve all such protocols, which shall be submitted to Talent prior to any in-person Service Day. The Service Hours may be used as follows:

    i.    "***Production Session(s)***" – a photo shoot/production session for the purposes of creating advertising materials (including photographs and film) pursuant to this Agreement, which may be requested and/or used by the Company (in no event to exceed eight (8) consecutive Service Hours, unless otherwise explicitly agreed in advance).

    ii.    "***Personal Appearance(s)***" – an in-person appearance, the nature of which shall be determined by Company in consultation with Talent and approved by Consultant (provided, however, autograph signing shall not be the primary purpose of any such Personal Appearance).

    iii.    "***Media Day(s)***" – a day of promotional media activities scheduled for the purposes of promoting Company and the Company Products and Services. Consultant shall have the right to pre-approve all journalists engaged, all questions to be asked and all press materials, press releases and media alerts created in connection with any Media Day.

    iv.    "***Virtual Appearance(s)***" – a virtual appearance (<u>e.g.</u>, for a mutually agreed upon purpose such as moderated Q&A, meet and greet, etc.) via Company webinar or virtual meeting platform (with Consultant having the right to pre-approve the moderator and all questions).

B.    <u>Social Media</u>. Each Contract Year, and as requested by Company, Consultant shall cause Talent to post twelve (12) social media posts (each, a "***Post***") on certain of his verified accounts (including Twitter, Instagram, and Facebook (each, a "***Platform***"); <u>provided</u> the majority (*e.g.*, more than six (6)) such Posts shall be to Twitter, and any "linked" Posts across multiple Platforms shall constitute multiple Posts for purposes of this Agreement. The content and timing of each Post shall be reasonably mutually agreed upon by Consultant and Company; <u>provided</u> Company acknowledges that in no event shall Talent be required to post (i) to any Platform

more than once per month during the Term; and (ii) or at any time during the NBA Playoffs. All such Posts shall include such disclosures as may be required pursuant to applicable law, rules and regulations (including any promulgated by the Federal Trade Commission) and/or Governing Organization, and communicated in advance by Company to Talent.

C.      <u>Autographed Memorabilia</u>. During the Term, Consultant shall cause Talent to autograph fifty (50) items per Contract Year (the "***Autographed Items***") to occur during an in-person Service Day, provided that the time spent signing such autographs shall not be included as part of the Service Hours. Moreover, such items shall be provided by Company at Company's sole cost and expense and pre-approved by Consultant. The Autographed Items shall not be offered for sale or re-sold to the public, unless such sales are in connection with a charitable auction or raising funds for charity, provided that all such cases shall be subject to Consultant's prior written approval.  Company agrees that to the extent any such items are in a category for which Talent has a then-existing endorsement agreement with any third party, Company shall supply items manufactured and branded by such third party.

D.      <u>Virtual Lunch & Learn</u>. In Contract Year 1, Consultant shall cause Talent to participate in one (1) virtual lunch and learn (lasting no longer than one (1) hour in duration) with Sina Nader (FTX.us Chief Operating Officer) for the purposes of Talent's education in the cryptocurrency industry and Company's history and place in the cryptocurrency market. Such lunch and learn shall be scheduled at a mutually agreed upon date and time in advance of the 2021-2022 NBA Season, subject to Talent's prior commitments.

E.      <u>Scheduling Service Days</u>. It is the responsibility of Company to request and schedule any of the personal services set forth in this <u>Section 4</u> with reasonable prior written notice to Talent.  If Company and Consultant mutually agree in writing in advance, up to five (5) Service Hours may be carried forward or backward to any Contract Year.

F.      <u>Security</u>. As reasonably requested in writing by Consultant in connection with any Services in which the public may be present, Company shall retain a security firm, at Company's expense, approved in writing by Consultant (the "***Security Firm***") to provide adequate around-the-clock security for Talent upon Talent's arrival in any Service location until Talent's departure therefrom. Company acknowledges that as of the Effective Date, Consultant's preferred Security Firm for any Services to be performed in the United States shall be Ralph Walker Security, 9370 Mountain Boulevard, Oakland, CA 94605, Attn: Ralph Walker, Phone: 510-290-9568, and Consultant may require Company to retain Ralph Walker Security as the Security Firm in connection with Services rendered in the United States; provided that Consultant may designate a different Security Firm with comparable costs, fees and expenses by notifying Company in writing (email shall be sufficient). Consultant shall use reasonable efforts to facilitate communications between Company and the

Security Firm, <u>provided</u> that Consultant shall not be required to contact either party on the other's behalf. Company shall work with the Security Firm to provide Consultant with detailed security information, including, without limitation, the number of required guards and/or vehicles, the Security Firm's specific plans, and the specific costs ("***Security Plan***") at least two (2) weeks before any applicable Services. Consultant and/or the Security Firm may require reasonable changes to the Security Plan and any such changes shall be provided by Company at Company's expense.

G.  <u>COVID-19 Compliance; Trailer</u>. As requested by Consultant hereunder, for all in-person Service Days hereunder, Company shall (i) comply with the Exhibit B, COVID-19 Compliance Rider, attached hereto, and (ii) provide a personal on-site trailer for Talent and Talent's guests, with details of such trailer to be mutually agreed in advance of any Service Day.

H.  <u>Unanimous Media Production</u>. Company shall invite Talent's production company, currently, Unanimous Media ("***Unanimous***") to pitch ideas/creative in connection with Production Sessions and materials created hereunder, including, without limitation a full bid in connection with production of such materials by Unanimous.

I.  <u>Basketball-Related Services</u>. To the extent any Service Hours include Talent participating in basketball or basketball-related activities (e.g. dribbling, shooting, etc.) then Company agrees to secure Talent's coach in connection with any such Service Hours, with the rate for Talent's coach (including any travel expenses) to be paid by Company directly.

**5.  COMPENSATION.**

A.  In consideration of the rights and services granted to Company by Consultant hereunder, Company agrees to pay to Consultant Twelve Million Dollars ($12,000,000) (the "***Cash Compensation***") payable in accordance with the following schedule:
  ● $4,000,000 due upon the execution hereof;
  ● $1,000,000 due one (1) year following the Effective Date; and
  ● $1,000,000 due every three (3) months thereafter during the Term until the full Cash Compensation is paid.

B.  Every Contract Year, Company shall pay to Consultant Five Hundred Thousand Dollars ($500,000) in the cryptocurrency or cryptocurrencies of Talent's choosing and deposited into Talent's FTX/Blockfolio account, subject to any applicable restrictions on such cryptocurrency or cryptocurrencies being transferred to Talent (the "***Crypto Compensation***"); <u>provided</u> to the extent Company cannot provide Crypto Compensation due to such applicable restrictions, Company shall provide an amount equal to such Crypto Compensation in cash, which shall be due with the next

installment of any Cash Compensation. The Crypto Compensation shall be due on the Effective Date for Contract Year One, and on the first day of each subsequent Contract Year in Contract Year Two and Contract Year Three. Notwithstanding the foregoing and for the avoidance of doubt, the Crypto Compensation paid in connection with each Contract Year shall remain in Talent's FTX/Blockfolio account for twelve (12) months following the initial deposit thereof and shall not be subject to forfeiture for any reason.

C. In addition to the Cash Compensation and Crypto Compensation Consultant shall be entitled to receive common shares of FTX TRADING LTD on the terms outlined in the attached Exhibit A, incorporated herein for reference (the "***Equity Compensation***").

D. The Cash Compensation shall be paid by wire transfer to the bank account designated by "SC30 Inc." and paid/wired as directed by invoice. The Cash Compensation shall be payable in U.S. Dollars, provided upon notice to Company, Consultant or Talent may request that Company make any payment due hereunder in the cryptocurrency or cryptocurrencies of Talent's choice into Talent's FTX/Blockfolio account subject to any applicable restrictions on such cryptocurrency or cryptocurrencies being transferred to Talent. Furthermore, if Consultant or Talent provides notice to the Company that Talent wants the Cash Compensation to be made to an alternate account, the Company shall follow such instructions of Consultant or Talent, as applicable.

E. To the extent any NFT Platform is developed hereunder and NFTs are sold thereon, the parties agree to share revenue in connection with such NFT-sales as follows, unless otherwise agreed: a minimum of 85% of Net NFT Revenue shall be payable to Consultant; and 15% of Net NFT Revenue shall be payable to Company. "***Net NFT Revenue***" shall mean all revenue earned by or on behalf of either party in connection with the sale of any NFTs less platform costs, transaction costs, any third party expenses, and other mutually agreed costs associated with such sales.

F. Time is of the essence with respect to Company's obligations contained in this <u>Section 5</u> and failure by Company to make any of the payments by their respective due dates shall be deemed a material breach of this Agreement. Any Cash Compensation payment not made within thirty (30) days after receipt of the applicable invoice pursuant to the terms hereunder shall accrue interest at a rate equal to the greater of (A) two percent (2%) per month compounded monthly, or (B) the maximum rate permitted by law.

6.    **CHARITABLE DONATION.** In recognition of the shared charitable intent of the parties, Company has separately made, or will make, a commitment to make certain charitable contributions (the "Charitable Donation") as further set forth in the pledge agreement attached hereto. The parties agree to coordinate on any media coverage or press releases regarding the Charitable Donation.

7.    **SERVICES EXPENSES.** The parties acknowledge that their mutual preference is to schedule each Service Day at Talent's then-current location. Notwithstanding the foregoing, if the parties mutually agree that Talent must travel in connection with any services rendered hereunder, then the following shall apply: Company shall make and pay

for first-class (or private, where appropriate and as discussed/agreed in advance) air travel for Talent and two (2) guests, first-class exclusive ground transportation for Talent and two (2) guests, a first-class suite at a hotel with a separate room at the same hotel for each of two (2) guests.  On each Service Day, Company will provide Talent with a hair stylist, makeup artist and wardrobe consultant, which personnel shall be subject to Talent's prior written approval, and, if applicable, an exclusive dressing facility with first class amenities, including a private bathroom (as set forth herein).

**8.**     **NO GRANT OF CERTAIN TRADEMARK RIGHTS.** Consultant in no way grants, or purports to grant, to Company any rights or uses of any names, logos, trademarks, service marks, etc. owned and/or controlled by any third party, including, without limitation, the National Basketball Association, the NBA Players' Association, or any NBA team. Accordingly, Company agrees that it shall make no use of the Talent Identification in connection with any of these entities' names, logos, trademarks or service marks unless Company first obtains written approval from the appropriate third-party with regard to such rights or uses.

**9.**     **INDEMNIFICATION.**

A.     Except with respect to claims arising out of Talent's or Consultant's breach hereunder, or for which Talent or Consultant is otherwise responsible for indemnifying Company hereunder, Company agrees to protect, defend, indemnify, save and hold harmless Consultant, Talent, and each of their respective officers, directors, shareholders, members, employees, representatives, agents, heirs, successors and assigns, as applicable, from and against any and all expenses, damages, claims, suits, actions, judgments, costs and expenses whatsoever (including reasonable attorney's fees; both those incurred in connection with the defense or prosecution of the indemnifiable claim and those incurred in connection with the enforcement of this provision), caused by, resulting from or arising out of: (i) any material inaccuracy or misrepresentation by Company in this Agreement; (ii) any material breach of this Agreement by Company; (iii) the development, production, distribution, exhibition, use and/or other exploitation of Company Advertising, including, without limitation, claims of false advertising; (iv) any of the Company Products and Services; (v) any acts or statements that Talent makes at Company's request, or that Talent makes in good faith reliance on other information provided to Talent by Company in connection with Talent's rendering the Services hereunder; (vi) any violations (or alleged violations) by Company of any federal securities laws and regulations, FTC laws and regulations, or FINRA regulations; and/or (vii) any infringement or alleged infringement of any third party rights by Company.  For the avoidance of doubt, Company's indemnification obligations shall not apply to Talent's or Consultant's intentional misconduct or gross negligence.

A.     Except with respect to claims arising out of Company's breach hereunder, or for which Company is otherwise responsible for indemnifying Consultant hereunder, Consultant agrees to protect, defend, indemnify, save and hold harmless Company,

and its respective officers, directors, shareholders, members, employees, representatives, agents, successors, assigns and affiliates from and against any and all expenses, damages, claims, suits, actions, judgments, costs and expenses whatsoever brought by a third party (including reasonable attorney's fees; both those incurred in connection with the defense or prosecution of the indemnifiable claim and those incurred in connection with the enforcement of this provision), caused by, resulting from or arising out of (i) any material inaccuracy or misrepresentation by Consultant in this Agreement; or (ii) any material breach of this Agreement by Consultant.  For the avoidance of doubt, Consultant's indemnification obligations shall not apply to Company's intentional misconduct or gross negligence.

10.    **REPRESENTATIONS AND WARRANTIES.**

A.    Consultant represents and warrants that (i) Consultant has the right, power and authority to enter into this Agreement and to fully perform all of its obligations hereunder on behalf of itself and Talent; (ii) Consultant is not subject to any obligation, legal disability or restriction which will prevent it from fully complying with its obligations hereunder or which will create any liability on the part of Company; (iii) Consultant owns all right, title and interest in and to, or has the right to license, the uses granted hereunder, and that the performance by Consultant of obligations herein (including Company's use of the Talent Identification in accordance with this Agreement) will not violate or infringe upon the rights of any third parties; and (iv) Consultant will comply with all applicable federal, state, and local laws, rules and regulations in connection with its performance hereunder.

B.    Company represents and warrants that (i) it has the right, power and authority to enter into this Agreement and to fully perform all of its obligations hereunder; (ii) Company is not nor will be subject to any obligation, legal disability or restriction which will or might prevent it from fully complying with its obligations hereunder or which will create any liability on the part of Consultant; (iii) the performance by Company of its obligations hereunder will not violate or infringe upon the rights of any third parties; and (iv) it will comply with all applicable federal, state, and local laws, rules and regulations in connection with its performance hereunder, including, without limitation, the Securities Act of 1933 and the Securities Exchange Act of 1934, and the rules and regulations thereunder, and the rules and regulations of the Federal Trade Commission and the Financial Industry Regulatory Authority, Inc.

11.    **TERMINATION BY COMPANY.**

A.  Company shall have the right to terminate this Agreement upon the occurrence of the following:

1.    In the event of Talent's death during the Term;

2.      In the event that Talent, at any time during the Term, is indicted, convicted of or pleads guilty or nolo contendere to any offense that is classified as a felony;

3.      In the event Talent commits any act which shocks or offends widely-held standards of public morality or becomes the subject of any widespread publicized scandal which in the judgment of a reasonable person would have a significant adverse effect upon the Talent's endorsement hereunder and/or Company's reputation and/or brand;

4.      In the event Talent breaches the terms set forth in Section 2.D hereof; and

5.      In the event Talent materially breaches this Agreement and has not cured such breach within thirty (30) days of receipt of written notice of such breach.

B.      If Company terminates this Agreement in accordance with this Section 11, the following conditions shall apply:

1.      Company shall provide written notice to Consultant specifying the provision of Section 11.A pursuant to which Company is exercising its right to terminate this Agreement and setting forth in reasonable detail the facts and circumstances relating to such termination.

2.      Neither Company nor Consultant or Talent shall have any further rights, duties, or obligations under this Agreement, except those listed in this Section 11.B.

3.      Company shall no longer have any rights in and to the Talent Identification, and all such rights shall automatically, immediately and irrevocably revert back to Consultant.

4.      Company shall have no further obligation to Consultant including, but not limited to, obligations pursuant to Section 5 hereof, except that Company shall remain obligated to pay Consultant any sums or compensation which become due prior to the effective date of Company's termination of this Agreement, including, for the avoidance of doubt, any Cash Compensation, Crypto Compensation, and vested shares of the Equity Compensation, earned (not paid) on a pro rata basis, as of the date of such termination. If Consultant has received any compensation that it has not yet earned due to an accelerated payment schedule, Consultant shall repay such amounts to Company as soon as possible, but no later than thirty (30) days after the effective date of such termination.

5.     Company's termination of this Agreement shall not preclude its recovery of any other damages to which it is entitled under law or equity, except as limited by <u>Section 25</u> hereof.

## 12.    TERMINATION BY CONSULTANT.

A.     Company agrees that Consultant shall have the right to terminate this Agreement upon the occurrence of any of the following:

1.     In the event Company is adjudged, declares, or files for bankruptcy;

2.     Company breaches its obligation to pay Consultant any portion of the Cash Compensation, Crypto Compensation, or Equity Compensation in accordance with <u>Section 5</u> above, and has not cured such breach within fourteen (14) days of receipt of written notice of such breach;

3.     In the event Company (or its Chief Executive Officer) commits any act which shocks or offends widely-held standards of public morality or becomes the subject of any widespread publicized scandal which in the judgment of a reasonable person would have a significant adverse effect upon Talent's reputation, brand or endorsement hereunder; or

4.     In the event Company materially breaches this Agreement (other than failure to make payment when due which is governed by clause (2) above) and Company has not cured such breach within thirty (30) days of receipt of written notice of such breach.

B.     If Consultant terminates this Agreement in accordance with this <u>Section 11</u>, the following conditions shall apply:

1.     Consultant shall provide written notice to Company specifying the provision of <u>Section 11.A</u> pursuant to which Consultant is exercising its right to terminate this Agreement and setting forth in specific detail the facts and circumstances relating to such termination.

2.     Neither Company nor Consultant or Talent shall have any further rights, duties, or obligations under this Agreement, except those listed in this <u>Section 11.B</u>.

3.     Company shall no longer have any rights in and to the Talent Identification, and all such rights shall automatically, immediately and irrevocably revert back to Consultant.  Company shall immediately takedown and remove from circulation all materials (including, without limitation, any Company Advertising) that include any aspect of the Talent Identification.

DocuSign Envelope ID: A4593CDE-7E5F-4328-88B4-03BE7BC2DB7A

   4. As of the date of termination, Consultant shall be entitled to retain all vested shares of the Equity Compensation and shall be entitled to 50% of the not yet earned (on a pro rata basis) Cash Compensation and Crypto Compensation.

   5. Consultant's termination of this Agreement shall not preclude its recovery of any other damages to which it is entitled under law or equity, except as limited by <u>Section 25</u> hereof.

 C. If materials bearing the Talent Identification are impermissibly used by Company after the termination or expiration of this Agreement, Consultant must first provide written notice to Company of such use and Company shall have seven (7) business days to cure.  In the event that Company does not cure the impermissible use, Company will pay to Consultant a pro-rated portion of the Cash Compensation for the period that such unauthorized materials are used following the cure period. The receipt of such sum shall not constitute a waiver of any of Consultant's rights or restrict Consultant in any way.

**13.** **NOTICES.** All notices, waivers, consents, approvals and other communications required or permitted by this Agreement shall be in writing and shall be sent as follows to the following address (or to such other address as a party may designate by notice to the other party), (a) by personal delivery, in which case notice shall be deemed to have been given on the date of delivery; (b) by United States certified mail, return receipt requested, in which case notice shall be deemed to have been given three (3) days after deposit of such notice in the mail; (c) by UPS, FedEx, DHL or other nationally-recognized overnight delivery service, in which case notice shall be deemed to have been given the day after deposit of such notice with such service; or (d) by electronic mail, in which case notice shall be deemed to have been given on the day of the electronic mail transmission as set forth in the body of such electronic mail transmission:

  If to COMPANY:   BLOCKFOLIO INC.
           c/o FTX.com
           88 Queensway
           Two Pacific Place – 35th Floor – Unit 3532
           ADMIRALTY, Hong Kong

           With a copy of such notice by email to all of the following: dan@ftx.com; sam@ftx.com; sina@ftx.com and legal@ftx.com

If to CONSULTANT:      SC30, Inc.
1875 S. Grant Street, Suite 120
San Mateo, CA 94402
Attn: Hilary Awad (hilary@sc30.com)

with copies to:      Octagon, Inc.
7950 Jones Branch Dr., Suite 700N
McLean, VA 22107
Attn: Jeff Austin (jeff.austin@octagon.com)
Attn: David Schwab (david.schwab@octagon.com)

Octagon, Inc.
7950 Jones Branch Dr., Suite 700N
McLean, VA 22107
Attn: General Counsel
(general.counsel@octagon.com)

14.    **ARBITRATION; GOVERNING LAW.** This Agreement shall be governed by the laws of the state of California, as such laws apply to contracts made and performed entirely within the state of California. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be first determined by an informal mediation between the parties and their representatives over the course of seven (7) days.  If such mediation is unsuccessful, then determined exclusively by private and confidential arbitration in Vancouver, Canada before one (1) JAMS arbitrator to be selected by the then-current JAMS case manager. Any arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures, provided the parties are permitted to participate via videoconference, or by any other set of commercial arbitration rules mutually agreed-upon by the parties. The parties agree that judgment on the arbitration award may be entered in the state and federal courts located in Delaware or any other court having jurisdiction over the parties.

15.    **CONFIDENTIALITY.** None of the parties shall disclose (or permit any third party to disclose) the financial or other material terms of this Agreement, with the exception only of such party's agents, attorneys, accountants, representatives or employees and except as may be required by law. In addition, each party and its representatives and/or agents shall not disclose any non-public information provided by the other party during the Term (or which were disclosed during the negotiation of this Agreement) which the disclosing party reasonably deems proprietary in nature.

16.    **MUTUAL NONDISPARAGEMENT**.  During the Term, and for a period of two years thereafter, Consultant agrees that neither Talent nor Consultant will make any voluntary statements, written or oral, or cause or encourage others to make any such statements that defame, disparage or in any way criticize the personal and/or business reputations,

practices or conduct of Company or any of its affiliates. Similarly, during the Term, and for a period of two years thereafter, Company agrees that its officers, directors and senior executives will not make any voluntary statements, written or oral, or cause or encourage others to make any such statements that defame, disparage or in any way criticize the personal and/or business reputations, practices or conduct of Consultant or Talent.

17.    **INDEPENDENT CONTRACTOR.** Nothing contained in this Agreement shall be construed to create an employer/employee, joint venture, partnership, or principal-agent relationship between the parties. Consultant's and Talent's performance of services for Company hereunder is as an independent contractor. Further, to the extent that Company's production or use of any advertising materials using the Talent Identification should fall under the jurisdiction of a collective bargaining agreement, Company shall be responsible for complying with all rules and regulations of such collective bargaining agreement and paying any required talent related fees, on behalf of Consultant, including without limitation, the standard Pension & Health contributions and handling fees required by SAG-AFTRA. Company acknowledges that Talent is currently a Fee Paying Non-Member (a/k/a Financial Core (Fi-Core) Member) of SAG-AFTRA.

18.    **TAX WITHHOLDING.** Consultant shall be solely responsible for the payment of all taxes on compensation received under this Agreement. Accordingly, Company shall make no deductions for tax purposes from any consideration transferred to Consultant.

19.    **FORCE MAJEURE.** Neither party shall be responsible for damages to the other party to the extent that a breach of this Agreement (or failure to perform) by such party is due to an act of god, accident, lockout, strike or other labor dispute, war, terrorist activity or anticipated terrorist activity, riot, civil disorder, act of public enemy, embargo, fire, flood, adverse weather conditions, epidemic, pandemic (or the worsening of the existing COVID-19 (or future) pandemic), enactment, rule, order or act of any government or governmental instrumentality, failure of technical facilities, failure or delay of transportation facilities, or any other occurrence of a similar nature beyond the reasonable control of such party (collectively, "*Force Majeure*"). During any delay in performance due to an event of Force Majeure, the disabled party shall use its reasonable efforts and due diligence to resolve the cause of the delay and to minimize the effects thereof. If any of the obligations of any of the parties is hindered or prevented, in whole or in substantial part, because of a Force Majeure event, then all other obligations of the parties shall continue. Delays or non-performance excused by this provision shall not excuse performance of any other obligation which is outstanding at the time of occurrence. Notwithstanding the preceding, in the event such Force Majeure continues for a period of three (3) months, either party shall have the right, but not the obligation, to terminate this Agreement, in full with no further obligations to the other party, except as set forth in Section 10.B.4.

20.    **NO AGENCY FEES.** Company shall not be liable for any brokers and/or agent's fees and/or commissions in connection with this Agreement.

21.    **UNIQUE SERVICES.** Each party acknowledges that certain of the rights and privileges granted to the other party hereunder may be of a special, unique, unusual, extraordinary

DocuSign Envelope ID: A4593CDE-7E5E-4328-8BB4-03BE7BC2DB7A

and intellectual character which gives a peculiar value, the loss of which cannot reasonably or adequately be compensated for in damages in an action at law, and that, in the event of a breach of any of the provisions hereof, the non-breaching party shall be entitled to such injunctive and other equitable relief as the law provides for to prevent such breach. The foregoing provisions shall not constitute a waiver by either party of any right which it may have to damages or other relief and shall be in addition to such rights.

22.    **NO WAIVER.** The failure of Company or Consultant at any time or times, to demand strict performance by the other of any of the terms, covenants or conditions set forth herein shall not be construed as a continuing waiver or relinquishment thereof and either may at any time demand strict and complete performance by the other of said terms, covenants and conditions.

23.    **SEVERABILITY.** If any provision of this Agreement or the application thereof shall be invalid or unenforceable to any extent, the remainder of this Agreement or the application thereof shall not be affected, and each remaining provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

24.    **SIGNIFICANCE OF SECTION HEADINGS.** Section headings contained herein are solely for the purpose of aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of this Agreement. Accordingly, in case of any question with respect to the construction of this Agreement, it is to be construed as though section headings had been omitted.

25.    **DAMAGES.** In no event shall Consultant be liable to Company or Company to Consultant for exemplary, punitive, incidental, or consequential damages, including lost profits or wages, arising out of this Agreement, or the breach of any term, covenant, representation, warranty, or obligations contained herein, except for intellectual property infringement claims. EXCEPT WHERE THIS PROVISION IS PROHIBITED BY LAW, EACH PARTY'S MAXIMUM, AGGREGATE, CUMULATIVE LIABILITY TO THE OTHER RELATING TO THIS AGREEMENT SHALL NOT EXCEED THE CASH COMPENSATION PAID OR PAYABLE TO CONSULTANT UNDER THIS AGREEMENT.  The foregoing limitations on damages shall not apply to the parties' respective indemnification obligations set forth in <u>Section 9</u> above.

26.    **CONSTRUCTION.** Each of the parties have participated in the negotiation and preparation of this Agreement and therefore waive any rule of law or judicial precedent that provides that contractual ambiguities are to be construed against the party who shall have drafted the contract in question.

27.    **ENTIRE AGREEMENT.** Time is of the essence in this Agreement. This Agreement and all exhibits and attachments hereto constitutes the entire understanding between Company and Consultant and cannot be altered or modified except by an agreement in writing signed by both Company and Consultant. Upon its execution, this Agreement shall supersede all prior negotiations, understandings, and agreements, whether oral or written, and such prior agreements shall thereupon be null and void and without further legal effect.

DocuSign Envelope ID: A4593CDE-7E6E-4328-8B84-03BE7BC2DB7A

28.    **NO ASSIGNMENT.** No party may assign this Agreement, in whole or in part, without first obtaining the non-assigning party's written approval; provided however, that in the event of any consolidation or merger of the Company with a third party or the sale, license, lease or transfer of all or substantially all of the assets of Company (collectively, a "***Company Sale***"), the Company may assign its rights under this Agreement to its acquirer or successor in connection with a Company Sale, upon notice to Consultant.

29.    **COUNTERPARTS.** This Agreement may be executed in any number of counterparts and by PDF email attachment or other electronic means, each of which when executed and delivered shall have the same legal effect as an original and all of which counterparts when taken together shall constitute but one and the same instrument.

30.    **ATTORNEYS' FEES**. In any litigation related to the recovery of compensation due under this Agreement, the prevailing party shall be entitled to recover all reasonable costs incurred in such litigation, including staff time, court costs, attorneys' fees, and all other related expenses.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

**SC30 INC.**

By:_____
Name: Stephen Curry
Title:

**BLOCKFOLIO INC.**

By:_____
Name: Samuel Bankman-Fried
Title: Chief Executive Officer

DocuSign Envelope ID: A4593CDE-7E5E-4328-88B4-03BE7BC2DB7A

# EXHIBIT A
## Equity Compensation Terms

On the Effective Date, Talent will receive from FTX TRADING LTD. (the "Issuer") 572,301 shares of the common stock of Issuer (the "***Shares***").

For purposes of calculating the number of Shares issued to Talent, Issuer will divide $15 million by the per share price paid by investors for shares of preferred stock in Issuer's current financing round ($17 billion pre-money fully diluted valuation).

Vesting. One third (1/3) of the Shares will be vested upon issuance, one sixth (1/6) of the Shares shall vest one year from the Effective Date, and the remaining one half (1/2) of the Shares will vest ratably on a daily basis over the first three years of the Term. Except as otherwise set forth in the Award Agreement or determined by the Issuer, the Shares may not be transferred until vested, and vesting will cease and any then-unvested Shares (after taking into account any accelerated vesting, if any, that occurs in connection with such termination) will be cancelled upon termination of the Agreement prior to expiration of the initial 3-year term.

In the event of a change of control of the Company during the Term, including but not limited to a SPAC transaction, all of the then-unvested Shares will automatically vest, if and only if the Company or its successor terminates this Agreement in violation of the permitted terminations pursuant to the Agreement as outlined in Section 11 of this Agreement.

Talent acknowledges that the issuance of the Shares to Talent will have tax consequences and Talent is responsible for paying any taxes for which he is liable under applicable law with respect to the Shares.

The Shares will be subject to the terms set forth in an award agreement between Issuer and Talent, in a form mutually agreed upon by Issuer and Talent (the "***Award Agreement***").

**EXHIBIT B**
**COVID-19 Compliance Rider**

Company acknowledges the circumstances around the recent novel coronavirus pandemic (COVID-19) and has agreed to the following in connection with any in-person Services (each as reasonably requested in writing by Consultant/Talent):

1. Services must be in compliance with local applicable laws rules and regulations, including ensuring that the number of people present does not exceed any guidelines promulgated by applicable governmental authorities as well as any Team Guidelines (as defined below).

2. Company must provide a private trailer for Talent and Talent's guests, with details of such trailer to be mutually agreed in advance of any Service Day.

3. Production will be held outdoors, if at all possible, on a closed set with only necessary production related personnel (the "**Production Team**"), and no opportunity for paparazzi to the extent reasonably feasible.

4. Each member of the Production Team must come with proof of a negative COVID-19 test received within forty-eight (48) hours of the shoot, and must also be tested on site. Company (or its production company) must provide the on-site testing (*e.g.*, not just temperature checks). If requested, Company shall help secure rapid tests for Production Team on-site or any such Production Team personnel having trouble securing their own test in the forty-eight (48) hours leading up to the shoot.

5. All Production Team personnel must verbally confirm that they are not under quarantine orders per local, state, or national regulation.

6. All food and drinks provided will be sealed and/or in enclosed containers; and there will be no open food or containers.

7. Production Team to wear N-95 masks (or equivalent), a face shield, and gloves (where reasonably feasible) while on set, with exact precautions to be mutually agreed in advance..

8. In-person interaction with Talent shall be limited to that which is necessary to deliver the Services, and all Production Team to exercise appropriate cautions, including social distance guidelines.

Company acknowledges that the foregoing may be updated based on guidelines and requirements of the Team (or other Governing Organization) (the "**Team Guidelines**"), and Company agrees to comply with any such Team Guidelines as thereafter required.

EXHIBIT 2



# SC30 Inc.

Spectator Sports · Bay Area, California · 8K followers · 11-50 employees

Follow     Message   

Home    **About**    Posts    Jobs    People

---

## Overview

SC30 Inc. is the off-court presence of four-time NBA Champion and two-time MVP, Stephen Curry, which prioritizes endeavors spanning brand partnerships, media, investments and philanthropy. With a focus of aligning purpose and profit, SC30 Inc. exists to deliver unparalleled products, experiences, content and opportunities. Launched in 2018, the nine-time NBA All-Star and founder set out to expand his footprint and impact beyond the game of basketball. An emerging figure in the Bay Area, the athlete's brand touts a number of innovative and progressive consumer, entertainment and non-profit entities, such as Unanimous Media, which features award-winning media projects; Eat. Learn. Play. Foundation with wife Ayesha; and UNDERRATED, an inspiring lifestyle brand committed to providing equity, access and opportunity to underrepresented communities.

Motivated to challenge the status quo, SC30 Inc.'s ultimate vision is to inspire by Elevating the Underrated.

**Website**
https://sc30.com/

**Industry**
Spectator Sports

**Company size**
11-50 employees
17 associated members ℹ

# EXHIBIT 3

**FORBES** › **BUSINESS** › **SPORTSMONEY**

# Can Stephen Curry Revolutionize The Investment Game?

**Patrick Murray** Former Contributor ⓘ

*I focus on the strategy, salary cap and business side of the Warriors.*

🔖                                                                    Oct 14, 2019, 08:30am EDT

🕐 **This article is more than 4 years old.**



SAN FRANCISCO, CALIFORNIA - OCTOBER 02: (L-R) SC30 Inc. President Bryant Barr and SC30 Inc. Founder ... [+]  GETTY IMAGES FOR TECHCRUNCH

"Our earning potential is a very short window, but how can you leverage that into opportunities that set you up for post-career?" Stephen Curry told a TechCrunch Disrupt panel session on his

entry into the investment world earlier this month. It's a question many athletes grapple with after their playing days are done. In recent years, though, more and more players have gotten involved in areas like investment and technology earlier in their careers, a movement spearheaded in part by Curry's former teammate Andre Iguodala.

**The genesis of SC30 Inc.**

To answer this very question, Curry and his team set up SC30 Inc. last year, bringing together all his off-court interests. Bryant Barr, a former teammate and roommate of Curry's at Davidson, heads up SC30 Inc. Barr told me on a call recently that after he moved to the Bay Area to study at Stanford, the company was born from "a series of conversations over three or four years around how could Stephen think about his off-court business from a much longer-term, more strategic perspective. So instead of just thinking about his playing days and his career, how could he think about the next 20 or 30 years?"

SC30 Inc. includes Curry's work to build his own brand through projects like the Underrated Tour. Then there's his burgeoning media production company, Unanimous Media, which is responsible for movies such as *Breakthrough*, *Emanuel* and *Jumpshot*, and programming such as his recent *Stephen vs The Game* series on Facebook Watch. Then there are his philanthropic endeavors through the Eat. Learn. Play. Foundation, which he and Ayesha Curry launched in the summer.

The final pillar of SC30 Inc. is investment. But this is Stephen Curry we're talking about, a man who has revolutionized an entire sport with his long-range shooting ability and managed to "ruin the game," to quote the phrase SC30 Inc. has picked up and run with.

He may be at the start of his investment journey, but it's already clear that he's not just about a normal investment strategy.

Just as Curry has changed the game of basketball, his team are thinking about how they can change the world through his presence in the investment space as well. Barr sets out the aim underlying all of the work of SC30 Inc. as "not just to make money so you can sit on it and have nice things and continue to build wealth, but what could you do with that wealth that drives an impact in a really material way?"

---

MORE FOR YOU

**New Mass Gmail Rejections To Start April 2024, Google Says**

**Super Bowl Earns Record 123 Million Viewers—Most-Watched TV Event Since Apollo 11**

**JetBlue Stock Spikes After Billionaire Carl Icahn Reveals Nearly 10% Stake**

---

## The partnership with Guild Education

That aspiration has been realized in their latest investment in Guild Education, a venture-backed tech company that partners with businesses, colleges, and students to offer "education as benefit" and help more people go back to college. If it sounds like there's a tie in with Curry's philanthropic work, that's because there is, as Barr concurs "it was clear right off the bat that there was clear alignment with the foundation. It was mission-aligned quite perfectly."

---

**SportsMoney Playbook: Sign up for SportsMoney Playbook for the latest sports news and analysis of valuations, signings, gambling and billionaire owners.**

| Email address | Sign Up |
|---|---|

By signing up, you accept and agree to our Terms of Service (including the class action waiver and arbitration provisions), and Privacy Statement.

But Guild is set specifically as a business and seeks venture capital for a reason, as Rachel Carlson, the company's founder explains. "For Guild, the impetus for that is that there are 64 million Americans today who need what we do. They either need access to complete their college degree or they need to earn a skill-certificate... the only way we're going to be successful in making a dent in that problem is by rapidly scaling. So that's why we've sought out being a venture-backed company."

For SC30, Inc. it's important that there is a return to be made, as Barr sets out. "We want to make sure it's a good financial investment, and if it's not there's no way we're going to invest. We made a decision very early on that we're not going to invest in things just because they're brand-accretive to Stephen. That's great if that's true, but first and foremost we need to believe that we can generate our target return here." But the added value of the alignment with the foundation meant that investing in, and partnering with, Guild is "a home run" according to Barr.

**A step into impact investing**

It's a step into a new world of impact investing. Guild has made SC30, Inc. think differently already, as Barr admits. "What Guild has started to make us think about is "where are there other opportunities for investment that align with our philanthropic interests?" I don't think social impact investing needs to just be completely philanthropic in nature. Guild is a fantastic business. They're crushing it right now. We're very excited about what the

future holds for them. We believe it's going to be a great investment for our overall portfolio. But it is incredibly helpful and exciting to have something that aligns so much with what we're doing philanthropically and allows us to really lean in on it from a value-add perspective. "

Carlson is at the forefront of this world. "I think differently about investment. When we're fundraising at Guild we're thinking about how do we bring people around the table who share conviction in our double-bottom line. One of those lines is our eventual profit line... The other is your mission. How do you ensure your margin reinforces your mission, and your mission reinforces your margin?"

One of the most important elements in answering that question is how you measure the return both financially and in terms of social impact. At the moment SC30, Inc. has concentrated on the financial return, but Barr says "that's actually starting to change." He's been out meeting with other investors to learn more about this space. Barr is exploring the intricacies involved. "How do you balance the two, and what are the certain KPIs and metrics that you're looking at to understand if you're really driving impact or not... we're continuing to develop a hypothesis, test it, and go back to iterate and evolve. As we start looking at businesses like Guild and investing in them to go beyond just the financial success... how do we align purpose and profit?"

With Guild, there's a clear methodology. The company is certified as a B-Corp. It's a rigorous process where the company measures and reports on impact metrics in the same way they report on their financial metrics. Carlson sets out what that looks like for Guild. "Key indicators for us are how many students are successfully progressing through their programs in order to graduate, our loan

avoidance rate — our primary employers offer either fully-funded degrees whereby the employee can go back to college debt-free, or dramatically reduced where the employee pays a small amount — so we measure how much debt we're helping avoid for our student population. We measure other metrics directly with our universities related to underrepresentation such as graduation rates for a single mom."

With Guild the data isn't just collected and reported on though. Carlson explains that the company's business model is that they only get paid when students are successful. "In effect we put all of our revenue at risk. And so measuring those outcomes is actually paramount as they are key performance indicators that will let us know if our business is going to be successful."

**Adding value**

Just as Guild is adding value to SC30, Inc. by helping them explore this path, so too is Curry able to add value beyond a normal investor. Barr stresses that "Stephen is not simply a celebrity, customer-acquisition vehicle. We are looking to truly add value as an investor."

Carlson pinpoints Curry's authenticity and connection with their students and potential students as something that is already paying dividends. "With our students it's constantly challenging the status quo, it's saying just because you're a working adult, just because you're in your 30s or 40s and haven't gone to college yet, just because you're a parent, just because you're low income doesn't mean you're not capable of achieving a college degree or achieving your higher education goals and aspirations. And that's something that's an authentic position that Stephen takes in his philanthropic work, but also as role model, as an athlete. There's been this

connection with... our student's path to challenging the status quo when college today is designed for wealthy 18-year olds."

Developing the point, Carlson elaborates the difference between Curry and a more traditional set of investors. "As a tech company, the reasons we normally get pointed towards the East Bay or Silicon Valley is because of tech Luminati, or famous technical founders. What's interesting is that those folks don't necessarily create role models for our students in the way that Stephen is capable of. His background, his ability to overcome those obstacles, and then his commitment both to topics like gender equality and education... it's special that he's investing. If you told me you've got to find ten investors that meet that profile I don't know where I'd start."

## Changing the tech and investment world

One element that both sides stress is the common mission to change the worlds they're operating in. Guild is one of a small number of female-founded venture-backed companies, while Curry has long been a champion for gender equality. In fact, this bond helped build the partnership in the first place, as Carlson explains. "We share a passion for the work that Guild is doing but we also share a lot of commonalities in terms of our position in the venture capital and impact landscape as a female CEO and a black investor."

The statistics don't lie. In 2018 just 2.2% of the $130 billion total in venture capital money invested went to female-founded companies. All-male teams got 76%, or $109.36 billion. Companies with at least one female founder received $15.76 billion, or 12%, of last year's venture capital. Even if the picture is improving, with women now making up a record-high number of CEOs at top-grossing companies, it's starting from a low base. That high is only 6.6%.

Changing that is a major priority for SC30, Inc. as Barr explains. "We want to find more female founders to invest in. We're actively looking at how do we increase the number of female-founded companies that we're adding to the beginning of the funnel. But one thing that's equally as important is making sure that we're investing in teams that are prioritizing that gender-equity across the board… Even with our male-founded companies it's how are you thinking about females on your board, how are you thinking about women on your executive team?"

Indeed SC30, Inc. just did a data collection exercise across all their portfolio companies, totalling around 1000 employees. That showed that the profile was 46% female. Barr says that this is just the start. "As we look at companies that we want to invest in, it's not just what are they doing, it's how they're going about doing that."

So can SC30 Inc. be pioneers for other athletes in the impact investment world, as Iguodala has been for the tech space? Barr admits they're early on in the journey. "I'd be lying if I told you that we had all the answers and it's crystal clear on our end. But the north star for us is to be purpose-driven and to align purpose with profit." Judging by what Curry has done on the court, you wouldn't bet against him changing the game off it too.

*Follow me on* [Twitter](#).

 **Patrick Murray**

I focus on the strategy, salary cap and business side of the Golden State Warriors. Before joining Forbes in the summer of 2018 I wrote about the…

**Read More**

# EXHIBIT 4



# Steph Curry's Under Armour agreement touted as 'lifetime deal'

By NICK DEPAULA
March 30, 2023, 10:09 AM

[Golden State Warriors](#) star [Stephen Curry](#) has signed a new long-term extension with Under Armour that will extend beyond his playing days and into his retirement.

While exact terms were not disclosed, the new agreement could be one of the richest-ever endorsement deals in sports once annual base pay, stock equity, royalties on signature products and on-court incentive bonuses are tallied together.

Curry, who first signed with Under Armour in 2013 and launched the Curry Brand in 2020, is being given the title of president of Curry Brand and will receive additional resources to grow his namesake brand.

Advertisement

 Top Stories

00:21                                                                        00:36

**Republicans work to recruit female and minority candidates even as they criticize diversity progra...**

"We started with the signature business, and with the opportunity to deepen the partnership, with an expectation of it going past my playing days and the added investment in the great things that we both bring to the table, it's an exciting time to strengthen that partnership," said Curry, who is currently on his [10th signature sneaker with Under](#)

Armour. "We understand that it's a mutually beneficial venture to do some great things, build a great roster, build more scale to the business and create great storytelling."

The growth potential of the stock awarded and expected annual compensation could see Curry earn more from the Under Armour extension than his NBA contracts, which will total more than $473 million through the 2025-26 season.



Cardiologist: Add This To Yo
Turn On Fat Burning Mode

WellnessGuide

Curry will also be named a founding member of Under Armour's newly formed Athlete Advisory Board, providing input and strategy on all of the brand's categories and products.

"There's always been a continuation [in mind] with Stephen," Under Armour founder Kevin Plank said. "I couldn't imagine Under Armour without Stephen, or Stephen without Under Armour."

Plank said that specified performance-based revenue targets would trigger clauses to continually extend Curry's contract, saying it has the potential to be a "lifetime deal."

Recent Stories from ABC News

 Top Stories

00:35                                                                                          00:36

Law enforcement in schools dominates 1st day of the Minnesota Legislature's 2024 session

Phil De Picciotto, the Octagon agency president and founder who negotiated on behalf of Curry, framed the structure as a "really comprehensive deal" that is "meant to stand the ages."

"Belief is a big part of who I am on and off the court," Curry said. "I believe in Under Armour and Curry Brand, the team now in place, and what we're doing together. We share a vision for a big future ahead."

Recent Stories from ABC News



abc Top Stories

00:05                                                                                    00:36

Super Bowl goes into overtime with Chiefs and
49ers tied at 19-19

Said Plank: "Why equity was such an important part of this is that Curry Brand and Under Armour are meant to help each other equally throughout this. We're going to build a kick-ass, long-term, foundational brand with Curry."

Negotiations toward an extension began over a year ago, well ahead of the 2024 expiration of Curry's prior deal. To sign the finalized contract, Plank and Curry met in person last week in Dallas, ahead of the Warriors' road win over the Mavericks.

"The fact that KP has led the charge from his mom's basement [in 1996] to what Under Armour is today, and there's a reinvigorated energy around what we can do together, it was important to have that shaking-of-the-hands moment," Curry said.

Said Plank: "It begins with the person. One of the best things about Stephen that makes this deal so easy is that he truly is a better person than he is a basketball player. And man, he's the best in the world at one of those, so that's a pretty big statement."

This season, Curry became the ninth player in league history to have a signature sneaker series reach a 10th consecutive model. Of the NBA's 22 current signature shoe lines, the Curry series is one of the top five highest-grossing signature businesses annually.

"I took a chance on trying to partner with them," Curry said. "It sounds crazy, but in 2013 they were still an up-and-coming threat to the sportswear industry and building the basketball category. We've been attached at the hip ever since. The good, the bad and the learning lessons of all of it are part of trying to do great things in business."

With Curry's new deal set to extend beyond his playing career, there will also be a focus on signing athletes to be Curry Brand endorsers. Over a year ago, Curry's SC30 Inc. company signed UConn women's basketball star Azzi Fudd to an NIL deal. The agreement designated her as a Curry Brand ambassador and provides the 20-year-old with on- and off-court mentorship from Curry.

"I do have a lot left to accomplish on the court, however long I am playing. Hopefully, it's no time soon that I'm thinking about calling it quits," said Curry, who turned 35 earlier this month. "We're going to have an investment in the roster of athletes -- men and women, from various sports -- that want to be a part of the UA and Curry Brand family. That's where I think the biggest growth can come."

After more than a year of poring over the contract's nuances and clauses, the two sides are looking forward to the future for Under Armour and Curry Brand together.

"We had 10 great years and it taught us a lot, but we are truly just getting started," said Plank. "We have yet to play our best game with Curry Brand, and what people are going to expect to see from a product standpoint, from a story standpoint and from an inspiration standpoint, we're going to build something awesome."

Said Curry: "A lot of work goes into what we do daily and thinking about how we can make it even bigger and broader. I'm just proud that we've gotten to this point. Now, the real work begins."



Promoted Links by Taboola

This Is The Highest Rated Hearing Aid In The US
hear.com

Amazon Hates When You Do This, But They Can't Stop You
Online Shopping Tools

Chuck Norris: This 2 Minute Routine Transformed Our Health
Roundhouse Provisions

Destroyed Jackie Robinson statue: Man charged in theft, other suspects still sought

Usher and girlfriend Jennifer Goicoechea say 'Yeah!' to marriage

'Modern-day powerhouse' Brittany Mahomes named Sports Illustrated Swimsuit rookie: See the looks

New Electric SUVs Come with Tiny Price Tags (Take a Look)
CommonSearches

New 2024 Range Rovers Are Game Changing ( Take a Peek)
MySearches

Unwind With Top-Tier Cruises At Low Prices
SearchTopics

Learn More

ABC News Network | About Nielsen Measurement | Children's Online Privacy Policy | Contact Us | Do Not Sell or Share My Personal Information | Interest-Based Ads | Privacy Policy
Terms of Use | Your US State Privacy Rights
© 2024 ABC News

# EXHIBIT 5

# Stephen Curry Nearing $1B Deal With Under Armour

Stephen Curry could be a billionaire soon as Under Armour looks to lock the star down for life

C.J. PETERSON • SEP 16, 2022 12:39 AM EDT

Stephen Curry is a business mogul.

From crypto currency to television shows, the Warriors star has amassed a fortune near the the $160 million according to celebritynetworth.com.

But that number will be a vast underestimate soon as Curry and Under Armour are "nearly locked" on a lifetime deal that would be worth more than $1 billion according to Matt Sullivan of Rolling Stone Magazine — and yes, that is a "B."

Curry joined Under Armour in 2013, landing a signature shoe deal and merchandising deal. His first sneaker dropped in 2015 as the "Under Armour Curry 1." Since then, Curry has become the face of the corporation, even creating his own sub-brand named the "Curry Brand."

But that doesn't mean that things have always been smooth with the Davidson product and Under Armour. According to Sullivan, there was significant friction between Curry and Under Armour founder Kevin Plank.

"There wasn't quite an understanding of what it took to run a business like that properly," Curry said. "So, yeah, I got mad."

According to Sullivan, Curry had an issue with Plank's support of President Donald Trump, who he called an "asset" to the United States. This was enough to make Curry consider leaving the company in 2018. But after discussion as well as allowing Curry to launch the "Curry Brand," things have been smoothed over.

"I don't have to raise my voice to get mad," Curry says. "That's the best part about it."

Curry's current contract with Under Armour runs through 2024 but that is expected to change as he'll likey become a lifelong parter with the company before that.

# EXHIBIT 6

## Post

**Thirty Ink**
@ThirtyInk

We're locked in 🔒

Congratulations to our CEO @StephenCurry30 for his new contract extension with @UnderArmour. Stay tuned to see this partnership unfold and the impact we'll have on our community in The Bay 🙌.



👤 Stephen Curry and 2 others

12:44 PM · Mar 30, 2023 · **116.2K** Views

**239** Reposts    **25** Quotes    **2,089** Likes    **11** Bookmarks

New to X?

Sign up now to get your own timeline!

A  Sign in as Arnold
zahnarnold10@gm

🍎 Sign u

Create

By signing up, you ag
and Privacy Policy, in

Relevant pe

Thirty Ink
@ThirtyIn
Elevate th

Trends are una

Terms of Service    P
Cookie Policy    Acce
More ···    © 2024 X

Don't miss what's happening
People on X are the first to know.

Log in

# EXHIBIT 7

Terms of Use    Privacy Policy    Your US State Privacy Rights    Children's Online Privacy Policy    Interest-Based Ads
About Nielsen Measurement    Do Not Sell or Share My Personal Information    Contact Us    Disney Ad Sales Site    Work for ESPN
Corrections

ESPN BET is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2024 ESPN Enterprises, Inc. All rights reserved.

GOLDEN STATE WARRIORS  32d  - Nick DePaula

**Sources: Suns finalizing deal with forward Young**

PHOENIX SUNS  4h  - Adrian Wojnarowski

# Stephen Curry signs new long-term Under Armour agreement



**Nick DePaula, ESPN**
Mar 30, 2023, 10:00 AM ET

 **Share**

Golden State Warriors star Stephen Curry has signed a new long-term extension with Under Armour that will extend beyond his playing days and into his retirement.

Although exact terms were not disclosed, the new agreement could be one of the richest-ever endorsement deals in sports once annual base pay, stock equity, royalties on signature products and on-court incentive bonuses are tallied.

Curry, who first signed with Under Armour in 2013 and launched the Curry Brand in 2020, will have the title of president of Curry Brand and will receive additional resources to grow his namesake brand.

"We started with the signature business, and with the opportunity to deepen the partnership, with an expectation of it going past my playing days and the added investment in the great things that we both bring to the table, it's an exciting time to strengthen that partnership," said Curry, who is on his 10th signature sneaker with Under Armour. "We understand that it's a mutually beneficial venture to do some great things, build a great roster, build more scale to the business and create great storytelling."

Terms of Use   Privacy Policy   Your US State Privacy Rights   Children's Online Privacy Policy   Interest-Based Ads

About Nielsen Measurement   Do Not Sell or Share My Personal Information   Contact Us   Disney Ad Sales Site   Work for ESPN

Corrections

ESPN BET is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2024 ESPN Enterprises, Inc. All rights reserved.



Stephen Curry signed his new Under Armour endorsement contract alongside company founder Kevin Plank before last week's win over the Mavericks. Courtesy Under Armour

The growth potential of the stock awarded and expected annual compensation could see Curry earn more from the Under Armour extension than from his NBA contracts, which will total more than $473 million through the 2025-26 season.

"There's always been a continuation [in mind] with Stephen," Under Armour founder Kevin Plank said. "I couldn't imagine Under Armour without Stephen, or Stephen without Under Armour."

Plank said that specified performance-based revenue targets would trigger clauses to continually extend Curry's contract, saying it has the potential to be a lifetime deal.

Phil de Picciotto, the Octagon agency president and founder who negotiated on behalf of Curry, framed the structure as a "really comprehensive deal" that is "meant to stand the ages."

"Belief is a big part of who I am on and off the court," Curry said. "I believe in Under Armour and Curry Brand, the team now in place, and what we're doing together. We share a vision for a big future ahead."

Said Plank: "Why equity was such an important part of this is that Curry Brand and Under Armour are meant to help each other equally throughout this. We're going to build a kick-ass, long-term, foundational brand with Curry."

Terms of Use    Privacy Policy    Your US State Privacy Rights    Children's Online Privacy Policy    Interest-Based Ads

About Nielsen Measurement    Do Not Sell or Share My Personal Information    Contact Us    Disney Ad Sales Site    Work for ESPN

Corrections

ESPN BET is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2024 ESPN Enterprises, Inc. All rights reserved.



**NBA MVP straw poll: Just when you thought this race couldn't get any closer ...**

124d • Tim Bontemps



**NBA play-in tournament 2023: Schedule, projections, standings**

305d

Negotiations toward an extension began over a year ago, well ahead of the 2024 expiration of Curry's previous deal. To sign the finalized contract, Plank and Curry met in person last week in Dallas, ahead of the Warriors' road win over the Mavericks.

"The fact that KP has led the charge from his mom's basement [in 1996] to what Under Armour is today, and there's a reinvigorated energy around what we can do together, it was important to have that shaking-of-the-hands moment," Curry said.

Said Plank: "It begins with the person. One of the best things about Stephen that makes this deal so easy is that he truly is a better person than he is a basketball player. And man, he's the best in the world at one of those, so that's a pretty big statement."

This season, Curry became the ninth player in league history to have a signature sneaker series reach a 10th consecutive model. Of the NBA's 22 current signature shoe lines, the Curry series is one of the top five highest-grossing signature businesses annually.

"I took a chance on trying to partner with them," Curry said. "It sounds crazy, but in 2013 they were still an up-and-coming threat to the sportswear industry and building the basketball category. We've been attached at the hip ever since. The good, the bad and the learning lessons of all of it are part of trying to do great things in business."

Terms of Use    Privacy Policy    Your US State Privacy Rights    Children's Online Privacy Policy    Interest-Based Ads

About Nielsen Measurement    Do Not Sell or Share My Personal Information    Contact Us    Disney Ad Sales Site    Work for ESPN

Corrections

ESPN BET is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2024 ESPN Enterprises, Inc. All rights reserved.



Stephen Curry entered a select company this season with the launch of his 10th signature shoe.
Noah Graham/NBAE via Getty Images

With Curry's new deal set to extend beyond his playing career, there will also be a focus on signing athletes as Curry Brand endorsers. More than a year ago, Curry's SC30 Inc. company signed UConn women's basketball star Azzi Fudd to an NIL deal. The agreement designated her as a Curry Brand ambassador and provides the 20-year-old with on- and off-court mentorship from Curry.

"I do have a lot left to accomplish on the court, however long I am playing. Hopefully, it's no time soon that I'm thinking about calling it quits," said Curry, who turned 35 earlier this month. "We're going to have an investment in the roster of athletes -- men and

Terms of Use    Privacy Policy    Your US State Privacy Rights    Children's Online Privacy Policy    Interest-Based Ads

About Nielsen Measurement    Do Not Sell or Share My Personal Information    Contact Us    Disney Ad Sales Site    Work for ESPN

Corrections

ESPN BET is owned and operated by PENN Entertainment, Inc. and its subsidiaries ('PENN'). ESPN BET is available in states where PENN is licensed to offer sports wagering. Must be 21+ to wager. If you or someone you know has a gambling problem and wants help, call 1-800-GAMBLER.

Copyright: © 2024 ESPN Enterprises, Inc. All rights reserved.

"We had 10 great years and it taught us a lot, but we are truly just getting started," Plank said. "We have yet to play our best game with Curry Brand, and what people are going to expect to see from a product standpoint, from a story standpoint and from an inspiration standpoint, we're going to build something awesome."

Said Curry: "A lot of work goes into what we do daily and thinking about how we can make it even bigger and broader. I'm just proud that we've gotten to this point. Now, the real work begins."

# Sources: Suns finalizing deal with free agent Thaddeus Young



**Adrian Wojnarowski, ESPN**
Feb 13, 2024, 11:34 AM ET



⬆ Share    ♡ Like                              ❤️🔥😍 224

Free agent forward Thaddeus Young is finalizing a deal to sign with the Phoenix Suns for the rest of the season, sources told ESPN on Tuesday.

Young brings a mature and able presence to the Suns' bench for the stretch and playoff runs this season. After spending the past two-plus seasons with the Toronto Raptors, Young landed with Brooklyn in a trade deadline deal before getting waived and becoming a free agent.

Phoenix needs the bench help on a top-heavy roster built around Devin Booker, Kevin Durant and Bradley Beal.