## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  September 12, 2024 at 1:00 p.m. ET**<br>**Obj. Deadline:  August 12, 2024 at 4:00 p.m. ET** |

### DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY NORTH FIELD TECHNOLOGY LTD.

> **THIS OBJECTION OBJECTS TO CERTAIN CLAIMS.  THE CLAIMANT RECEIVING THIS OBJECTION SHOULD CAREFULLY REVIEW THIS OBJECTION AND, IF APPLICABLE, FILE A RESPONSE BY THE RESPONSE DEADLINE.**

Alameda Research LLC ("Alameda Research"), FTX Trading Ltd. ("FTX Trading"), Maclaurin Investments Ltd. ("Maclaurin"), West Realm Shires Financial Services Inc. ("WRSFS"), West Realm Shires Services Inc. ("WRSS") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor") hereby submit this objection (the "Objection"), pursuant to section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and rules 3001 and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to proofs of claim numbers 3285, 3310, 3321, 3328, 3357, 3496, and 3800 (collectively, the "Claims" and each a "Claim," filed by North Field Technology Ltd. (hereinafter referred to as "North Field").  In connection with this Objection, the Debtors submit the concurrently filed *Declaration of Steven P. Coverick* (the "Coverick Decl.") and the

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

exhibits attached thereto, and *Declaration of Bruno Requiao da Cunha* (the "Cunha Decl."). The Debtors seek to disallow and expunge in their entirety, as duplicative, proofs of claim numbers 3285, 3310, 3321, 3328, and 3800 (the "Duplicative Claims") and seek to disallow and expunge in their entirety proofs of claim numbers 3357 and 3496 (the "Remaining Claims"). In support of the Objection, the Debtors respectfully state as follows:

### Background

1.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128]. On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

2.      Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

3.      On May 19, 2023, the Court entered the *Order (I)(A) Establishing Deadlines for Filing Non-Customer and Government Proofs of Claim and Proofs of Interest and (B) Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [D.I. 1519] (the "Non-Customer Bar Date Order"). The Non-Customer Bar Date Order established,

among other things, the deadline of June 30, 2023 to file non-Customer Claims[2] against the Debtors.

4.      To date, approximately 3,430 non-Customer proofs of claim have been filed against the Debtors, asserting more than $483 billion.

5.      On June 26, 2023, North Field filed Claims 3310, 3321, 3328, and 3357 against Debtors WRSS, Maclaurin, Alameda Research, and FTX Trading, respectively, each for 685 Bitcoin ("BTC").  On June 26, 2023, North Field also filed Claims 3285, 3496, and 3800 against Debtors WRSFS, FTX Trading, and WRSS, respectively, each for a total of 34.595 BTC.

## Facts Specific to Relief Requested

### *The Cryptsy Litigation*

6.      On January 13, 2016, Plaintiffs Jinyao Liu, Brandon Leidel, and Michael Wilson, brought a class action suit, on behalf of themselves and all account holders of a cryptocurrency exchange called Cryptsy (collectively, the "Cryptsy Class"), against Paul Vernon, Cryptsy's CEO, and his ex-wife, Lorie Ann Nettles, in the case *Leidel* v. *Project Invs., Inc.*, No. 9:16-CV-80060-KAM before the United States District Court for the Southern District of Florida (the "Florida District Court"), for allegedly misappropriating funds held in Cryptsy accounts. None of the Debtors was a party to this litigation or had any connection to the conduct giving rise to the litigation.  On July 27, 2017, the Florida District Court entered a default judgment against

---

[2]      "Customer Claims" means a claim (as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, or federal or state law, rule or regulation, common law or otherwise) held by any person (as defined in section 101(41) of the Bankruptcy Code) or entity (as defined in section 101(15) of the Bankruptcy Code) against any of the Debtors, in each case, arising out of or related to (a) any cash, cryptocurrency, digital assets or other assets held by such person or entity in an account on any FTX exchange as of the Petition Date or (b) any other investment or trading activities on any FTX exchange.

Vernon authorizing the Cryptsy Class to recover, among other things, 11,325.0961 BTC allegedly stolen from Cryptsy customers on July 29, 2014.  Coverick Decl. Ex. 1 at ¶ 3.

7.      On September 18, 2020, the Florida District Court approved the Cryptsy Class's motion to assign the default judgment against Vernon to North Field, granting North Field the right to enforce the default judgment.  *Id.*  North Field is an Antiguan International Business Corporation that Plaintiffs claim "has relationships with various technical services companies and the resources to attempt to recover the Stolen Bitcoin."  Coverick Decl. Ex. 2 at ¶ 5.

### *North Field's Attempt to Use the Cryptsy Default Judgment To Demand Assets From FTX and Ren*

8.      Long after obtaining the default judgment in the Cryptsy litigation, North Field contacted FTX Trading and asserted that certain assets that North Field believed were traceable to the 2014 Cryptsy theft had, nearly a decade later, been deposited to certain FTX Trading customer accounts.  North Field repeatedly "revised" its analysis to include additional transfers, ultimately asserting that there were a total of 34 BTC that were traceable to the 2014 Cryptsy theft and that purportedly had been deposited into various FTX Trading customer accounts.  Claim 3496 Exs. 1–9.

9.      North Field also initiated discussions with the Ren Project ("Ren"), a protocol developed by three foreign non-Debtor entities, Dappbase Pty Ltd., MPC Technologies Pte. Ltd., and Dappbase Ventures Ltd. (the "Ren Entities"), all three of which had been acquired by Debtor Maclaurin Investments (f/k/a Alameda Ventures Ltd.) in January 2021.  Claim 3357 Exs. 1–2.  The Ren Entities remain distinct legal entities and are not Debtors in these Chapter 11 Cases.  Coverick Decl. Exs. 3–4.  Even after acquisition, Ren maintained its own operations, retained its existing team, and worked towards its own set of distinct goals.  Coverick Decl. Ex. 3–4, 5.  The Ren Entities operated the RenBridge protocol ("RenBridge"), which allowed users

to transfer BTC to the Ethereum blockchain as "renBTC," a fungible token that was compatible with the Ethereum ecosystem.  Coverick Decl. Exs. 3–4.

10.     Similar to the assertions that North Field had made with respect to FTX Trading, North Field asserted to Ren that a total of 685 BTC that were purportedly traceable to the 2014 Cryptsy theft had, nearly a decade later, passed through the RenBridge application.

11.     At no point did representatives of FTX Trading, Alameda, or Ren agree that North Field had a claim to any assets of FTX Trading, Alameda, or Ren.

*North Field's Post-Petition Conduct and Chapter 11 Claims*

12.     On December 27, 2022, North Field filed a *Motion for Order to Show Cause Why Contempt Sanctions Should Not Be Imposed Against the Ren Project* that represented to the Florida District Court that "at least 685 BTC from the Stolen Bitcoin had been deposited on Ren's platform . . . ."  Claim 3357 Ex. 1 at 9.  The Ren Entities did not appear in the Florida District Court, and on February 17, 2023, the Florida District Court granted North Field's motion (the "Contempt Order"), and ordered, based on North Field's representations to the Court, the "Ren Project" to transfer to North Field the 685 BTC that North Field had represented was stolen in the 2014 Cryptsy theft, was subject to the default judgment, and was purportedly in the Ren Entities' possession.  Claim 3357 Exs. 1–2.

13.     On April 11, 2023, representatives of the Ren Project tweeted that the Debtors had directed Ren "to transfer of all [*sic*] cryptocurrency assets into the FTX Debtors' cold storage wallets for safeguarding, in advance of possible shutdowns of infrastructure and systems."  Coverick Decl. Ex. 6.  Ren's tweet states that Ren's assets would be held in "distinct segregated wallets cold storage wallets [*sic*] designated for these assets transferred by Ren, separate from the other Debtor cold storage wallets."  *Id.*

14.    On June 26, 2023, North Field filed Claims 3310, 3321, 3328, and 3357 against Debtors Maclaurin, WRSS, Alameda Research, and FTX Trading, respectively. These four claims are premised on same set of facts—the purported transfer of 685 stolen BTC to RenBridge. On June 26, 2023, North Field also filed Claims 3285, 3496, and 3800 against Debtors WRSFS, FTX Trading, and WRSS, respectively. These three claims are also premised on the same set of facts—the purported transfer of 34.595 stolen BTC to FTX.

<u>North Field's Tracing Analysis</u>

15.    The contempt motion that North Field filed on December 27, 2022, was accompanied by the *Declaration of Roman Bieda* (the "<u>12/27/22 Bieda Declaration</u>"), which purported to trace 685 of the Cryptsy BTC to the RenBridge application. Coverick Decl. Ex. 7. North Field Claims 3310, 3321, 3328, and 3357 do not attach the 12/27/22 Bieda Declaration, but are premised on the Contempt Order, which the Florida District Court had issued based on the tracing analysis set forth in that declaration. North Field Claims 3285, 3496, and 3800 are accompanied by the *Declaration of Roman Bieda* dated December 30, 2022 (the "<u>12/30/22 Bieda Declaration</u>" and, together with the 12/27/22 Bieda Declaration, the "<u>Bieda Declarations</u>"), which purported to trace 34.595 of the Cryptsy BTC to the FTX Trading exchange. Coverick Decl. Ex. 8.

16.    The Bieda Declarations contain charts showing that, beginning on or around April 30, 2022—before any stolen BTC was purportedly transferred to RenBridge or FTX Trading—Vernon began transferring the Cryptsy BTC to a cryptocurrency mixing service called ChipMixer. Coverick Decl. Exs. 7–8. ChipMixer was a darknet cryptocurrency "mixing" service based in Hanoi, Vietnam. Cunha Decl. ¶ 9. ChipMixer allowed customers to deposit BTC, which ChipMixer then mixed with other users' BTC, commingling funds in a way that made it difficult for law enforcement or others to trace its users' subsequent transactions. Cunha Decl. ¶¶ 9–10.

17.     To use ChipMixer, a user first sent the BTC they wanted mixed to ChipMixer and received several credits called "chips" that corresponded to pre-existing BTC wallets controlled by ChipMixer.  Cunha Decl. ¶ 9.  After receiving the corresponding ChipMixer chips, which would have a combined value equal to the amount initially sent, a user had the option to split the chips into even smaller-sized chips.  *Id.*  ChipMixer then commingled the BTC in the ChipMixer-controlled wallets with BTC received from other customers and sent them through a series of randomized transactions, effectively obfuscating the origins of any given portion of the user's BTC.  *Id.*  ChipMixer would provide its customers with a private key to certain BTC wallets allowing them to spend the commingled, and nearly untraceable, proceeds of their transactions. *Id.*

18.     The Bieda Declarations explain how Mr. Bieda's employer, Coinfirm, used a "Pro Rata Distribution by All Outputs" tracing methodology to purportedly trace 685 of the Cryptsy BTC through ChipMixer and then to the RenBridge, and 34.595 of the Cryptsy BTC through ChipMixer and then to FTX Trading.  Coverick Decl. Exs. 7–8.  The Bieda Declarations also state that his tracing analysis was supported by four other tracing methodologies—"First In First Out," "Last In First Out," "Pro Rata Distribution By Blocks," and "Taint Last."  *Id*.  The Bieda Declarations aver that Coinfirm's tracing algorithm was "the first of its kind," but do not otherwise describe the methods Mr. Bieda used to trace BTC through ChipMixer to RenBridge or FTX Trading.  *Id*.

### Jurisdiction and Venue

19.     The Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  This matter is a core proceeding

within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief sought are section 502 of the Bankruptcy Code and Bankruptcy Rules 3001 and 3007.  Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Objection if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**Basis for Relief**

20.     Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  Once an objection to a claim is filed, the Court, after notice and hearing, shall determine the allowed amount of the claim.  11 U.S.C. § 502(b).  Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b).

21.     While a properly filed proof of claim is *prima facie* evidence of the claim's allowed amount, when an objecting party presents evidence to rebut a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) ("Initially, the claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid.").  The burden of persuasion with respect to the claim is always on the claimant, *see id*. at 174, and the failure to allege facts and to provide adequate support for a claim eliminates the claim's *prima facie* validity. *See, e.g., In re Jorczak*, 314 B.R.

-8-

474, 481-82 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims).

22.     North Field's Claims seek a total of 2,843.785 BTC against the Debtors. For the following reasons and others that will be demonstrated following discovery and a hearing, the Court should disallow and expunge in their entirety, as duplicative, proofs of claim numbers 3285, 3310, 3321, 3328, and 3800 and disallow and expunge in their entirety proofs of claim numbers 3357 and 3496.

**I.    The Claims Are Duplicative And Would Result In Almost A Fourfold Recovery.**

23.     North Field filed Claims 3310, 3321, 3328, and 3357 against Debtors WRSS, Maclaurin, Alameda Research, and FTX Trading, respectively, each for a total amount of 685 BTC based on the same set of facts.  North Field also filed Claims 3285, 3496, and 3800 against Debtors WRSFS, FTX Trading, and WRSS, respectively, each for a total of 34.595 BTC based on the same set of facts.

24.     Bankruptcy Rule 3007(d) provides that a debtor may object to a claim on an omnibus basis where the claim "duplicate[s] other claims." Fed. R. Bankr. P. 3007(d)(1).  *See In re Mallinckrodt PLC*, 639 B.R. 837, 900 (Bankr. D. Del. 2022) ("[W]hile the [claimant] filed proofs of claim against all or nearly all Debtors, they only asserted facts sufficient to support claims against [some]. All other proofs of claim were therefore dismissed."); *In re Hub Holding Corp*, 2009 WL 8519808, at 2 (Bankr. D. Del. May 27, 2009) (expunging and disallowing duplicative claims).  A claimant is not entitled to multiple recoveries for the same liability against a debtor since a claimant is entitled only to a single satisfaction, if at all, of any particular claim of liability against a debtor.  *See, e.g.*, *In re Handy Andy Home Improvement Ctrs. Inc.*, 222 B.R. 571, 575 (Bankr. N.D. Ill. 1998) ("[I]t is axiomatic that one cannot recover for the same debt twice."); *In re Vanguard Nat. Res., LLC*, 2021 WL 220697, at *27 (Bankr. S.D. Tex. Jan. 21,

2021) (ordering "no further payment" on the claim since allowing the claim would constitute an impermissible double-recovery on a satisfied claim); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) ("In bankruptcy, multiple recoveries for an identical injury are generally disallowed."); *In re Vanguard Nat. Res., LLC*, 2021 WL 220697, at *28 (Bankr. S.D. Tex. Jan. 21, 2021) (ordering "no further payment" on the claim, since allowing the claim would constitute an impermissible double-recovery on a satisfied claim); *In re Cont'l Airlines Corp.*, 57 B.R. 845, 853 (Bankr. S.D. Tex. Oct. 1, 1985) ("[T]he Bankruptcy Code does not permit the presentation of two claims and the recovery of double damages for what is essentially one legally compensable claim.").

25.    As set forth in the Coverick Declaration, the Debtors have determined that the seven Claims filed by North Field are duplicative.  Coverick Decl. ¶ 7.  Accordingly, to avoid the possibility of multiple recoveries and to maintain an accurate claims register, the Debtors submit that proofs of claim numbers 3285, 3310, 3321, 3328, and 3800 should be disallowed and expunged in their entirety from the claims registry.

## II.    The Claims Should Be Disallowed Because They Are Not Entitled to *Prima Facie* Validity.

26.    A proof of claim states a claim and benefits from *prima facie* validity if it "alleges facts sufficient to support a legal liability." *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  A claimant carries the initial burden of alleging facts sufficient to support the legal liability asserted in its proof of claim.  Fed. R. Bankr. P. 3001(f).  "[C]laims can be disallowed for failure to support the claim with sufficient evidence." *In re Mallinckrodt Plc*, 2022 WL 3545583, at *4 (D. Del. Aug. 18, 2022) (quoting *In re Minbatiwalla*, 424 B.R. 104, 119 (Bankr. S.D.N.Y. 2010)).

27.    "The debtor . . . 'has no evidentiary burden to overcome' in objecting to a claim that is not *prima facie* valid." *In re Gilbreath*, 395 B.R. 356, 364 (Bankr. S.D. Tex. 2008) (citing *In re Tran*, 369 B.R. 312, 318 (Bankr. S.D. Tex. 2007) (holding that debtors' objections alone are sufficient to shift the burden back to claimant when proof of claim had insufficient documentation).  And section 502(b)(1) "is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of Am.* v. *Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007).

### A.    The Claims Should Be Disallowed Because North Field Fails To Establish That Any Stolen BTC Was Transferred To The Ren Entities Or FTX.

28.    A claimant carries the initial burden of alleging facts sufficient to support the legal liability asserted in its proof of claim. Fed. R. Bankr. P. 3001(f). "[C]laims can be disallowed for failure to support the claim with sufficient evidence." *In re Mallinckrodt Plc*, 2022 WL 3545583, at *4 (D. Del. Aug. 18, 2022).  North Field's Claims with respect to the purported transfer of 685 of the Cryptsy BTC to RenBridge should be disallowed because North Field has not carried its initial burden of "alleg[ing] facts sufficient to support a legal liability." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

29.    All of North Field's Claims are based on the tracing exercises in the Bieda Declarations.  But as discussed in the Cunha Declaration, which accompanies this Objection, the Bieda Declarations are entirely conclusory and provide no basis to find that North Field successfully traced BTC from the 2014 Cryptsy theft through ChipMixer and then to RenBridge or to FTX Trading nearly a decade later.  Cunha Decl. ¶¶ 11–12.  The Bieda Declarations assert that Coinfirm used a "Pro Rata Distribution by All Outputs" tracing methodology, but provide no explanation of how that methodology works.  Cunha Decl. ¶ 12.  The Bieda Declarations also

assert that Coinfirm used four "supporting" methodologies but similarly fail to provide any detail. Cunha Decl. ¶ 17.  A detailed explanation of any purported tracing methodology is especially critical because North Field purports to have traced BTC through a mixing service that was specifically designed to thwart such tracing, and which was subsequently shut down by international law enforcement authorities for precisely that reason.  Cunha Decl. ¶ 10.  It is therefore impossible to assess the reliability of North Field's purported tracing exercise. Consequently, North Field's Claims fall short of the requirements of Fed. R. Bankr. P. 3001(f) to "support the claim with sufficient evidence." *In re Mallinckrodt Plc*, 2022 WL 3545583, at *4.

30.     Moreover, several aspects of Coinfirm's tracing exercise suggest that its tracing methodology is unsound.  *First*, based on how it named its methodologies, Coinfirm appears to use an accounting convention that is inappropriate to tracing digital assets through mixing services.  Cunha Decl. ¶ 17.  *Second*, the timeframe of outgoing ChipMixer transactions that Coinfirm identified as stolen Cryptsy BTC is unreasonably long given that ChipMixer exchanged BTC immediately and users had every incentive to move assets quickly out of ChipMixer.  Cunha Decl. ¶ 18.

31.     Moreover, with respect to the purported RenBridge transfers that are the subject of Claims 3310, 3321, 3328 and 3357, Mr. Bieda identified transfers to an administrative wallet address that was not available to RenBridge users.  Cunha Decl. ¶ 20.  Mr. Bieda also arbitrarily identified two transfers of 8.191 BTC as stolen Cryptsy funds but did not identify three other transfers of the same amount that occurred within the same half hour as being Cryptsy funds. Cunha Decl. ¶ 21.  Further, even if any of the Cryptsy BTC had ever been transferred to RenBridge—and to be clear, there is no evidence that it was—it would have been exchanged almost immediately for renBTC tokens, as North Field acknowledged in its Contempt Motion.

Claim 3357 Ex. 1 at 7 (acknowledging that Vernon would have received "an equivalent amount of Ethereum-based tokens ('Ren BTC')" upon transferring any BTC to RenBridge); *see also* Cunha Decl. ¶¶ 22–23.  Yet North Field apparently seeks from the Debtors what it claims are BTC transferred to RenBridge rather than the tokens that Ren would have issued to Vernon (assuming that Vernon in fact was involved with any the purported transfers).  In addition, North Field does not even attempt to provide any support for its implicit assumption that any BTC transferred to RenBridge in March and April 2022 would have been among the remaining assets of the Ren Entities that were transferred to cold storage in April 2023.  Cunha Decl. ¶¶ 24–25. The fact that the Florida District Court issued the Contempt Order based on the 12/27/22 Bieda Declaration also does not establish the soundness of Coinfirm's tracing analysis—the Ren Entities did not appear in that proceeding and North Field failed to mention in its papers that the BTC it purported to trace to the Ren Entities had been sent through ChipMixer—a service designed specifically to avoid tracing.

32.     With respect to the 34.595 BTC that were supposedly transferred to FTX Trading and are the subject of Claims 3285, 3496 and 3800, Mr. Bieda's analysis not only fails to establish any successful tracing through ChipMixer for the foregoing reasons, but also falls short for additional reasons.  Only a small number of the purported transfers to FTX Trading are traceable to *any* outgoing ChipMixer transaction, let alone a transaction traceable through ChipMixer and back to the Cryptsy BTC stolen in 2014.  Cunha Decl. ¶ 27.  "This immense inconsistency invalidates Mr. Bieda's hypothesis that the 34 BTC deposited to FTX represents BTC sourced from the Cryptsy incident and transferred through ChipMixer." *Id.*  Moreover, "the 34 BTC that Mr. Bieda purported to trace to FTX was deposited into 39 distinct user accounts with no obvious connection to Paul Vernon, which further suggests that the 34 BTC does not

constitute assets stolen from Cryptsy." Cunha Decl. ¶ 28. The pre-petition correspondence between counsel for North Field and FTX Trading that North Field attached to its Claims also does not support North Field's claims, and does little more than reflect North Field's requests to freeze allegedly stolen BTC.

33.     For all of these reasons, North Field fails to meet its burden of alleging facts sufficient to support a legal liability. *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir. 1992).

**B.      Debtors Are Not Liable For Any Of Claim 3321—Or For Duplicative Claims 3310, 3328, And 3357—Because Any Stolen BTC Was Transferred To The Ren Entities And Remains In Their Legal Custody, And The Ren Entities Are Not Debtor Entities.**

34.     "[T]he general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity . . . into play." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). Delaware courts, in particular, "take the corporate form and corporate formalities very seriously." *Culverhouse* v. *Paulson & Co. Inc.*, 133 A.3d 195, 199 (Del. 2016) (citation omitted). "It is only the exceptional case where a court will disregard the corporate form." *Sears, Roebuck & Co.* v. *Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990). In the Third Circuit, "there is a presumption that a corporation, even when it is a wholly owned subsidiary of another, is a separate entity." *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 643 (3d Cir. 1991); *Wenske* v. *Blue Bell Creameries, Inc.,* 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018).

35.     North Field's initial tracing exercise purported to trace 685 of the Cryptsy BTC to RenBridge, which is owned by the Ren Entities. None of the Ren Entities are Debtors in these Chapter 11 Cases. The fact that the Ren Entities may be owned by a Debtor does not transform their liabilities into Debtor liabilities. *See Mellon Bank, N.A.*, 945 F.2d at 643; *Wenske*,

2018 WL 5994971, at *5.  The same reasoning applies to the extent that North Field's Claims are based on the Contempt Order, which applies only to the "Ren Project" and not to any Debtor. Because the Ren Entities are legally distinct from any of the Debtors, the Florida District Court's Contempt Order is enforceable, if at all, against the Ren Entities.

36.     The fact that certain assets of the Ren Entities were transferred in April 2023 to "distinct segregated [] cold storage wallets" controlled by the Debtors does not mean that North Field's Claims are valid as against any Debtor.  *Barbey* v. *Cerego, Inc.*, 2023 WL 6366055, at *9 (Del. Ch. 2023) ("Mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity.") (quotations and citation omitted).

## **Reservation of Rights**

37.     This Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtors to object to any claim on any grounds whatsoever. The Debtors expressly reserve all further substantive or procedural objections.  Nothing contained herein is intended or should be construed as:  (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

## **Notice**

38.     Notice of this Objection has been provided to:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal

Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the District of Delaware; (g) counsel for the Ad Hoc Committee; (h) to the extent not listed herein, those parties requesting notice pursuant to rule 2002 of the Federal Rules of Bankruptcy Procedure; and (i) counsel to North Field.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## <u>Conclusion</u>

For the foregoing reasons, the Court should enter the Order, substantially in the form attached hereto as <u>Exhibit A</u>, disallowing and expunging North Field's Claims in their entirety.

Dated: July 10, 2024
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
         brown@lrclaw.com
         pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
E-mail: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com
        crokej@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*