# EXHIBIT 1



## Mike Kayamori · 3rd

CEO ORO Bank, DK Bank, Office of His Majesty The King of Bhutan

- ORO Bank
- Harvard Business School

Singapore, Singapore · Contact info

500+ connections

Message    + Follow    More

## About

Specialties: Management, Business Development, Corporate Development, Venture Capital, Private equity, Start-ups, Fintech, Banking, IT, Clean tech, Retail

USA, Japan, Singapore, Bhutan, India, Korea, China, South East Asia

## Activity

3,435 followers

Mike Kayamori reposted this · 2w

Experience a whole new world of banking with ORO 🔵🟡🟠
Unlock the power of our cutting-edge app and enjoy seamless transactions and personalized offers tailored just for you! ✂ ...show more

👍 15                                                    4 reposts

Mike Kayamori reposted this · 3w

Excited to work with John and Finastra.
#orobank #finastra #fullreserve

Exclusive Interview with Mike Kayamori, CEO at ORO Bank and John ...
thedigitalbanker.com

👍 19

Mike Kayamori reposted this · 1mo

ORO Bank is excited to work with Finastra.

Thank you #johnguest #finastra

👍 9

Show all posts →

## Experience



**CEO**
ORO Bank · Permanent
Nov 2023 - Present · 9 mos
Bhutan - Singapore

ORO Bank is Asia's First Full Reserve Bank.

...



---

**CEO DK Limited**
Office of His Majesty The King of Bhutan · Full-time
May 2023 - Present · 1 yr 3 mos
Thimphu, Bhutan · Hybrid

---

 **Japan CEO**
FTX · Full-time
Apr 2022 - Sep 2022 · 6 mos
Tokyo, Japan

---

 **Co-Founder, CEO**
Liquid
May 2014 - Apr 2022 · 8 yrs
Singapore, Japan, Vietnam

Liquid is one of the leading Blockchain / Cryptocurrency companies in the world and is already the largest in Asia (excluding China). (attached below)...

---

 **Chief Investment Officer**
GungHo Asia Pacific
Jul 2015 - Mar 2016 · 9 mos
Singapore

Chief Investment Officer

---

Show all 10 experiences →

## Education

 **Harvard Business School**
Master, Business Administration
2001 - 2003

---

**The University of Tokyo**
BA, Law
1992 - 1996

## Skills

**Corporate Development**

Endorsed by 2 colleagues at Singtel

33 endorsements

---

**Private Equity**

 Endorsed by Daniel Arippol who is highly skilled at this

Endorsed by 2 colleagues at Singtel

38 endorsements

---

Show all 32 skills →

## Recommendations

**Received**    Given



**KEN AIHARA** · 3rd
Country Manager, Japan at PubMatic
March 8, 2011, KEN worked with Mike but they were at different companies

Mr. Kayamori is one of the best person who I worked with.
His intelligence and passion for business is derived from his integrity.
His business experience will help your business east and west.

## Languages

**English**
Native or bilingual proficiency

**Japanese**
Native or bilingual proficiency

## Interests

**Companies**    Groups    Schools

**LinkedIn**
27,075,584 followers
\+ Follow

**Google**
33,472,527 followers
\+ Follow

Show all companies →

Ad ···

Lisa, reactivate your Premium free trial today!

See who's viewed your profile in the last
365 days

Reactivate Trial

## Other similar profiles

**Katsuya Konno** · 3rd
Founder & CEO - FuelHash Inc.
View profile

**Kai Kono** · 2nd
Founder & CEO of Spring Digital | ex Google | ex Investment Banker
\+ Follow

**Ben Zhou** · 3rd
Co-Founder & CEO at Bybit.com



View profile

**Yolanda Lee** 3rd
Founder and CEO at Uncommon (iterative W22) - We're Hiring!

+ Follow

**Kei Shibata** · 3rd
Co-founder & CEO at Venture Republic & Trip101

View profile

Show all

### Grow your network
Premium peer suggestions

**Alexia Javelly** · 2nd
Associate at Fried Frank

Connect

**Markus Person** · 2nd
Associate at Financial Conduct Authority

Connect

### People you may know
From Mike's industry

**Matthew Hii**
Associate at Financial Conduct Authority

Connect

**Rahul Kumar**
Head of Strategy, Wealth and Trading at Liv. | Ex-Revolut

Connect

**Tristan Kane**
AML Consultant at Madison Consulting

Connect

**Quentin Yoshida**
AI Lab - Team Lead at Bpifrance

Connect

**Nick Soyer**
Honors Attorney at the Federal Deposit Insurance Corporation

Connect

Show all

### You might like
Pages for you

**Marks and Spencer**
Retail
571,429 followers



7 connections follow this page

+ Follow

**Ashurst**
Law Practice
121,505 followers

4 connections follow this page

+ Follow

Show all



# EXHIBIT 2

**Execution Version**

**KARIYA KAYAMORI**

**SETH MELAMED**

**JAFCO SV4 INVESTMENT LIMITED PARTNERSHIP**

**IDG CHINA VENTURE CAPITAL FUND V L.P.**

**IDG BITMAIN FUND L.P.**

**IDG CHINA V INVESTORS L.P.**

**FTX TRADING LTD.**

**LIQUID GROUP INC.**

---

**AGREEMENT FOR
THE SALE AND PURCHASE OF
SHARES, STOCK OPTIONS AND WARRANTS IN
LIQUID GROUP INC.
(MAJOR SHAREHOLDERS)**

---

# CONTENTS

**Clause**                                                                    **Page**

1.   Interpretation ................................................................................1
2.   Sale and Purchase .........................................................................11
3.   Management Agreements ..............................................................12
4.   Retained Consideration ................................................................12
5.   Conditions ....................................................................................13
6.   Completion ...................................................................................16
7.   Representations and Warranties ...................................................17
8.   The Purchaser's Remedies ...........................................................18
9.   The Sellers' Remedies ..................................................................20
10.  Limitations on the Sellers' Liability ...........................................21
11.  Undertakings by the Parties .........................................................22
12.  Confidential Information ..............................................................24
13.  Announcements ............................................................................25
14.  Costs .............................................................................................25
15.  General .........................................................................................26
16.  Entire Agreement .........................................................................27
17.  Assignment ...................................................................................27
18.  Notices ..........................................................................................27
19.  Governing Law and Jurisdiction ..................................................32
20.  Governing Language .....................................................................33
21.  Counterparts .................................................................................33
Schedule 1 Information on the Sellers .................................................34
Schedule 2 Allocation of Consideration ..............................................35
Schedule 3 Bank Account Information of the Sellers ...........................38
Schedule 4 Information on the Group Companies .................................40
Schedule 5 Completion Requirements ..................................................41
Schedule 6 Warranties...........................................................................44
Schedule 7 Seller Actions Pending Completion....................................58
Schedule 8 Disclosure Schedules..........................................................60

**THIS AGREEMENT** is made on November 19, 2021

**BETWEEN**:

(1)     **KARIYA KAYAMORI**, a Japanese national having his address at 8 Orange Grove Road #06-02, Singapore 258342 ("**Mr. Kayamori**");

(2)     **SETH MELAMED**, a U.S. national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 ("**Mr. Melamed**");

(3)     **JAFCO SV4 INVESTMENT LIMITED PARTNERSHIP**, a limited partnership incorporated in Japan whose principal place of business is at 1-23-1 Toranomon, Minato-ku, Tokyo 105-6324, Japan ("**JAFCO**");

(4)     **IDG CHINA VENTURE CAPITAL FUND V L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG China**");

(5)     **IDG BITMAIN FUND L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG Bitmain**");

(6)     **IDG CHINA V INVESTORS L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG Investors**", together with Mr. Kayamori, Mr. Melamed, JAFCO, IDG China and IDG Bitmain, the "**Sellers**" and each a "**Seller**");

(7)     **FTX TRADING LTD.**, a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda (the "**Purchaser**"); and

(8)     **LIQUID GROUP INC.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan (the "**Company**").

**THE PARTIES AGREE** as follows:

**1.     INTERPRETATION**

1.1     In this Agreement:

"**Accounts**" means the Company's financial statements as that term is defined in article 435, paragraph 2 of the Japanese Companies Act for the financial year ended on the Last Accounting Date, notes to those financial statements, the directors' report (*jigyou houkoku*) for that financial year, and the auditor's report (*kansa houkoku*) on those financial statements.

- 1 -

DocuSign Envelope ID: 17292B85-FF60-4B09-8AB9-0F6967BAD919

"**Affiliate**" means, with respect to any Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "**control**" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing. For the avoidance of doubt, none of Liquid Financial USA Inc. or any subsidiary thereof shall constitute an Affiliate of the Company or any of its Affiliates for purposes of this Agreement.

"**Agreement**" means this Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders), as amended or supplemented in accordance with the terms hereof from time to time.

"**Allocation List**" has the meaning given in Clause 5.1(l).

"**Applicable Exchange Rate**" means the median of the telegraphic transfer selling rate and the telegraphic transfer buying rate published on the website of MUFG Bank, Ltd. at  https://www.bk.mufg.jp/ippan/kinri/list_j/kinri/kawase.html as of the end of the Business Day that immediately precedes the date of this Agreement.

"**Anti-Social Forces**" means any organised crime group (*boryokudan*), organised crime group member (*boryokudan-in*), quasi-member of an organised crime group (*boryokudan jun koseiin*), any corporation related to an organised crime group (*boryokudan kankei kigyo*), corporate racketeer (*sokaiya*) or any other force generally considered to seek to achieve a specific political, religious or other philosophical or economical purpose by means of violence, coercion, intimidation, threat or any other socially unacceptable action.

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) of the Company.

"**Bankruptcy Proceeding**" has the meaning given to it under Paragraph 16.1 of Part A of Schedule 6.

"**Board of Directors**" means the board of directors of the Company.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cash Consideration**" has the meaning given in Clause 2.2(b).

"**Chief Executive Officer**" means the chief executive officer of the Company.

"**Class A Preference Shares**" means 6,000 class A preference shares (*A shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class B Preference Shares**" means 8,002 class B preference shares (*B shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class C-1 Preference Shares**" means 9,724 class C-1 preference shares (*C-1 shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class C-1 Preference Shares Warrants**" means 2,653 class C-1 preference shares warrants (*C-1 syu yusen kabushiki mokuteki gata shinkabu yoyakuken*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Common Shares**" means 26,704 ordinary shares (*futsu kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Completion**" means completion of the sale and purchase of the Target Security Interests in accordance with this Agreement.

"**Completion Date**" has the meaning given in Clause 6.1.

"**Condition**" means a condition set out in Clause 5.1 and "**Conditions**" means all those conditions.

"**Confidential Information**" means (i) the existence and the contents of this Agreement; (ii) all information relating to the Purchaser or any other Purchaser's Group Company which has not been made public by the Purchaser; and (iii) all information which is used in or otherwise relates to the Group's business, customers or financial or other affairs including, without limitation, information relating to:

(a)     the marketing of goods or services including, without limitation, customer names and lists and other details of customers, sales targets, sales statistics, market share statistics, prices, market research reports and surveys, and advertising or other promotional materials; or

(b)     Knowhow; or

(c)     future projects, business development or planning, commercial relationships and negotiations.

"**Consideration Shares**" means the ordinary shares in the capital of the Purchaser (adjusted to reflect fully the effect of any stock split, reverse stock split, combination, stock dividend (including any dividend or distribution of securities convertible into Purchaser common shares), or other distribution in respect of Purchaser common shares, reorganization, reclassifications or other like change with respect to Purchaser common shares occurring after the date hereof) to be allotted and issued in accordance with Schedule 2.

"**Conversion**" means the conversion of the Class A Preference Shares, Class B Preference Shares and Class C-1 Preference Shares constituting the Target Shares into Common Shares.

"**Crypto Asset Breach**" means the incident involving the unauthorised access to the warm wallet of the Group that took place on or around 19 August 2021.

"**Crypto-Asset Exchange Service Provider Registration**" means the crypto-asset exchange service provider registration with the Financial Services Agency to Quoine Corporation on 29 September 2017.

"**Crypto Consideration**" has the meaning given in Clause 2.2(c).

"**Data Protection Laws**" has the meaning given to it under Paragraph 18.1 of Part A of Schedule 6.

"**Disclosure Documents**" means all announcements and other information to be published in connection with the transactions contemplated under this Agreement in accordance with all applicable laws and regulations, and information supplied, procured or made available to the Financial Services Agency or any other regulatory authority as required by the Financial Services Agency or such other competent regulatory authority.

"**Disclosure Schedules**" means the disclosure schedules of the Sellers attached hereto as Schedule 8.

"**Due Diligence Review**" means the due diligence review on the Group's assets, Liabilities, legal, finance, operation, matters and other aspects which the Purchaser reasonably considers necessary or appropriate.

"**Encumbrance**" means a mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, third-party right or interest, assignment, deed of trust, other encumbrance or security interest of any kind, or another type of preferential arrangement (including, without limitation, a title transfer or retention arrangement) having similar effect, any proxy, power of attorney, voting trust arrangement, interest, right of first refusal or any adverse claim as to title, possession or use (other than those created under applicable laws, by the Purchaser or any of its Affiliates, or under the organizational documents of the Company).

"**Final Customer Balance Statement**" has the meaning given in Clause 5.1(q).

"**Financial Services Agency**" means the Financial Services Agency of Japan.

"**Gross-Up Amount**" has the meaning given in Clause 15.8.

"**Group**" means the Company and its Affiliates.

"**Group Company**" means the Company or a company which is, on the date of this Agreement, an Affiliate of the Company, and "**Group Companies**" means all of them.

"**IDG Entities**" means, collectively, IDG China, IDG Bitmain and IDG Investors, and "**IDG Entity**" means any of them.

"**Indemnification Obligations**" has the meaning given in Clause 8.3

"**Initial Cash Consideration**" has the meaning given in Clause 2.3.

"**Intellectual Property**" means:

(a)     patents, trade marks, service marks, registered designs, applications and rights to apply for any of those rights, trade, business and company names, internet domain names and e-mail addresses, unregistered trade marks and service marks, copyrights, database rights, rights in software, Knowhow, rights in designs and inventions;

(b)     rights under licences, consents, orders, statutes or otherwise in relation to a right in paragraph (a);

(c)     rights of the same or similar effect or nature as or to those in paragraphs (a) and (b) which now or in the future may subsist; and

(d)     the right to sue for past infringements of any of the foregoing rights.

"**Intellectual Property Rights**" means all Intellectual Property owned or used by the Company.

"**Japanese Companies Act**" means the Companies Act (*kaisha hou*) (Act No. 86 of 2005, as amended) in Japan.

"**JPY**" means Japanese yen, the lawful currency of Japan.

"**Knowhow**" means all technical information, knowledge and expertise (including, without limitation, trade secrets, information comprised in formulae, techniques, designs, specifications, drawings and associated data, design manuals, design rules, design standards, components, lists, manuals, instructions, catalogues, computation models, process descriptions, process manuals, recipes, ingredients, software (including object and source codes), inventions, trials, experiments, research and technology results, statistics and data) relating (without limitation) to the composition, formulation, design, development, production, manufacture, use, repair, maintenance, monitoring, recording, controlling, storage, delivery, sale or marketing of any product, process or service, including any such information relating to tooling design and quality control, but, in each case, excluding any information that is publicly available.

"**Last Accounting Date**" means 30 September 2020, provided, that, if the Company's financial statements as that term is defined in article 435, paragraph 2 of the Japanese Companies Act for the financial year ended on 30 September 2021, notes to those financial statements, the directors' report (*jigyou houkoku*) for that financial year, and the auditor's report (*kansa houkoku*) on those financial statements become available during the period between the date hereof and Completion, then "Last Accounting Date" means 30 September 2021.

"**Liabilities**" means any debt, obligation, duty or liability of any nature, regardless of whether such debt, obligation, duty or liability is immediately due and payable.

- 5 -

"**Longstop Date**" means 31 March 2022, or such later date as the parties may agree in writing.

"**Losses**" means all costs, losses, Liabilities, damages, claims, demands, proceedings, expenses, penalties and legal and other professional fees.

"**Major Shareholders**" means Mr. Kayamori, Mr. Melamed, JAFCO, IDG China, IDG Bitmain and IDG Investors.

"**Management Agreement**" means the management agreement to be entered into by each of the Management Shareholders with the Company effective as of Completion, and "**Management Agreements**" means all of them.

"**Management Shareholders**" means Mr. Kayamori and Mr. Melamed.

"**Material Adverse Effect**" means the occurrence of any matter or event (or series of matters or events) which is materially adverse to the financial condition, regulatory condition, or results of operations of a person or a group of persons taken as a whole; provided, however, that a "Material Adverse Effect" shall not include any matter or event (or series of matters or events) substantially arising out of, attributable to, or resulting from:

(a)     events or effects that generally affect the industries or segments in which the Group operates, including legal and regulatory conditions;

(b)     events or effects that generally affect business, economic or political conditions in which the Group operates;

(c)     events or effects affecting the financial, credit or securities markets in any country or region in which the Group operates, including changes in interest rates, foreign exchange rates, or credit ratings;

(d)     acts of armed hostility, sabotage, terrorism, national emergency or war (whether or not declared);

(e)     natural disasters, acts of God, or any force majeure events in any country or region in the world;

(f)     the COVID-19 pandemic;

(g)     material changes or modifications in U.S. or Japanese generally accepted accounting principles, other applicable accounting standards or applicable law or the interpretation or enforcement thereof; and

(h)     the negotiation, the announcement, the execution or the pendency of the transactions contemplated by this Agreement, or any actions taken in accordance with the terms of this Agreement or required hereunder, including the notification to the Monetary Authority of Singapore of the transactions contemplated by this Agreement,

DocuSign Envelope ID: 17292B85-FF60-4B00-8AB9-9F6967BAD818

except, in each case of clauses (a), (b) and (c) above, to the extent that such events or effects have a materially disproportionate effect on the Group, taken as a whole, as compared with other participants in the industries in which the Group operates, and except to the extent such events, circumstances, changes or effects are caused by the intentional or willful misconduct of the Company or the Sellers.

"**Minority Shareholders**" means, collectively, the holders of the Shares and the Stock Options of the Company (other than the Major Shareholders) as at the date of this Agreement.

"**Minority Shareholders SPA(s)**" means one or more sale and purchase agreement to be entered into as of or prior to Completion between the Purchaser, the Company and Minority Shareholders (whether executed by or on behalf of Minority Shareholders) for the sale and purchase of the Shares and the Stock Options held by such Minority Shareholders.

"**Notice**" has the meaning given in Clause 18.1.

"**Permit**" means:

(e)     a permit, licence, consent, approval, certificate, qualification, specification, registration or other authorisation (including provisional and temporary ones); and

(f)     a filing of a notification, report or assessment,

in each case necessary for the effective operation of the Company's business, its ownership, possession, occupation or use of an asset or the execution or performance of the transactions contemplated under this Agreement.

"**Person**" means any natural person, company, corporation, general partnership, limited partnership, proprietorship, joint venture, firm, trust, fund, union, government, statutory or public authority, or any entity or incorporated or unincorporated organization or association.

"**Proceeding**" has the meaning given to it under Paragraph 16.1 of Part A of Schedule 6.

"**Purchaser Fundamental Representations**" means the representations and warranties made by the Purchaser under Clause 7.2 with respect to the Warranties set out in Paragraphs 1 (Incorporation), 2 (Right, power, authority and action), 3 (Anti-Social Forces), 4 (Binding agreements), 5 (Funds) and 6 (Share Issuance) of Part B of Schedule 6.

"**Purchaser's Group Company**" means the Purchaser or a company which is, on the date of this Agreement, an Affiliate of the Purchaser.

"**Purchaser Indemnified Parties**" has the meaning given in Clause 8.3.

"**Purchaser's Solicitors**" means Anderson Mori & Tomotsune of Otemachi Park Building, 1-1-1 Otemachi, Chiyoda-ku, Tokyo, Japan, and any other affiliates thereof.

"**Purchaser's Warranty Claim**" means a claim by the Purchaser under or pursuant to Clause 7.1.

"**Quoine Corporation**" means Quoine Corporation, of which all of its equity interests are, as at the date of this Agreement, held by the Company.

"**Relevant Employee**" has the meaning given in Paragraph 13.1of Part A of Schedule 6.

"**Representative**" means, in relation to a party, the directors, officers, employees, representatives, agents, advisers, accountants and consultants of that party;

"**Retained Cash Consideration**" has the meaning given in Clause 2.4.

"**Retained Consideration**" means the Retained Cash Consideration and the Crypto Consideration.

"**Rules**" has the meaning given in Clause 19.2.

"**Scheme**" has the meaning given in Paragraph 13.2 of Part A of Schedule 6.

"**Seller Fundamental Representations**" means the representations and warranties made by the Sellers under Clause 7.1 with respect to the Warranties set out in Paragraphs 1 (Capacity and Authority), 3 (Shares and Affiliates), 6 (Tax) and 20 (Brokerage or Commissions) of Part A of Schedule 6.

"**Seller Indemnified Parties**" has the meaning given in Clause 9.3.

"**Seller's Warranty Claim**" means a claim by a Seller under or pursuant to Clause 7.2.

"**Shareholder**" means a shareholder of the Company.

"**Shareholders' Agreement**" means each of: (i) the investor rights agreement dated 12 December 2019 by and among the Company, the Major Shareholders and the other parties thereto; and (ii) the agreement among shareholders dated 1 March 2019 by and among the Company, the Major Shareholders and the other parties thereto (including the amendments and ancillary agreements thereto), and "**Shareholders' Agreements**" means all of them.

"**Shares**" means the Common Shares, the Class A Preference Shares, the Class B Preference Shares and the Class C-1 Preference Shares.

"**SIAC**" has the meaning given in Clause 19.2.

"**Squeeze-Out Procedure**" means any action under the Japanese Companies Act or pursuant to any of the Shareholders' Agreements that results in the Purchaser holding

100% of the Shares, Class C-1 Preference Shares Warrants and Stock Options of the Company.

"**Stock Options**" means (i) series 2 to 7, 9, 10, 12, 13, 15 to 19 stock options and (ii) series 1 and 2 officers' stock options issued by the Company to its employees and/or officer.

"**Sufficiency Representation**" has the meaning given in Paragraph 7.1(a) of Part A of Schedule 6.

"**Target Options**" means 180 series 3, 30 series 10 and 300 series 13 of Stock Options, which, as at the date of this Agreement, are held by Mr. Melamed, and "**Target Option**" means any of them.

"**Target Security Interests**" means the Target Shares, the Target Options and the Target Warrants.

"**Target Shares**" means the Common Shares, the Class A Preference Shares, the Class B Preference Shares and the Class C-1 Preference Shares held by the Sellers (the number of which is set out opposite each Seller's name in Schedule 1), and "**Target Share**" means any of them.

"**Target Warrants**" means 2,625 Class C-1 Preference Shares Warrants, which, as at the date of this Agreement, are held by the IDG Entities (the number of which is set out opposite each IDG Entity's name in Schedule 1), and "**Target Warrant**" means any of them.

"**Tax**" means any form of taxation and any levy, duty, charge, contribution, withholding or impose in the nature of taxation (including any related fine, penalty, interest).

"**Tax Authority**" means any government, state or municipality or any local, state, federal or other authority, body, or official anywhere in the world exercising a fiscal, revenue, customs or excise function.

"**Total Consideration**" has the meaning given to it in Clause 2.2.

"**Transfer Agent**" means the transfer agent of the Purchaser in Antigua and Barbuda.

"**Tribunal**" has the meaning given in Clause 19.3.

"**USD**" or "**$**" means United States dollars, the lawful currency of the United States of America.

"**U.S.**" means United States of America.

"**Warranty**" means a statement contained in Schedule 6 and "**Warranties**" means all those statements.

"**%**" means per cent.

1.2    In this Agreement, a reference to:

    (a)    a "**person**" includes a reference to any individual, firm, company, corporation or other body corporate, government, state or agency of a state or any joint venture, association or partnership, works council or employee representative body (whether or not having separate legal personality) and includes a reference to that person's legal personal representatives, successors and permitted assigns;

    (b)    a "**party**" or "**parties**", unless the context otherwise requires, is a reference to a party or parties to this Agreement and includes a reference to that party's legal personal representatives, successors and permitted assigns;

    (c)    a Clause, Paragraph, Schedule or Annex, unless the context otherwise requires, is a reference to a clause or paragraph of, or schedule or annex to, this Agreement;

    (d)    a statutory provision includes a reference to:

        (i)    the statutory provision as modified or re-enacted or both from time to time whether before or after the date of this Agreement; and

        (ii)    any subordinate legislation made under the statutory provision (as so modified or re-enacted) whether before or after the date of this Agreement;

    (e)    liability under, pursuant to or arising out of (or any analogous expression) any agreement, contract, deed or other instrument includes a reference to contingent liability under, pursuant to or arising out of (or any analogous expression) that agreement, contract, deed or other instrument;

    (f)    all warranties, representations, indemnities, covenants, agreements and obligations given or entered into by more than one Seller are, unless otherwise specified, given or entered into severally and not jointly among such Sellers, and as used in this Agreement, the word "severally" or "several" when applying to an obligation means that such obligation is several (i.e., *bunkatsu saimu*), and the phrase "not jointly" when applying to an obligation means that such obligation is not joint (i.e., not *rentai saimu*);

    (g)    a time of day is a reference to the time in Japan, unless a contrary indication appears;

    (h)    the singular includes the plural and *vice versa*; and

    (i)    one gender includes all genders.

1.3    The headings in this Agreement do not affect its interpretation.

1.4    The *ejusdem generis* principle of construction shall not apply to this Agreement. Accordingly, general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class of acts, matters or

things or by examples falling within the general words. Any phrase introduced by the terms "other", "including", "include" and "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

1.5     A reference in Schedule 6 to the Sellers' knowledge, information and belief means the knowledge, information and belief of the Sellers of a particular fact where the Sellers are actually aware of or should have been aware of such fact.

## 2.     SALE AND PURCHASE

2.1     Each of the Sellers agrees to sell and the Purchaser agrees to purchase the Target Security Interests held by such Seller and each right attaching to such Target Security Interests at Completion, free from any Encumbrance.

2.2     The aggregate purchase price for the Target Security Interests shall be USD 151,919,670.93 (the "**Total Consideration**"), representing a purchase price of USD 3,510.41 per Target Share (on an as converted basis), USD 3,509.54 per Target Option with respect to 180 of the Target Options, USD 3,103.16 per Target Option with respect to 30 of the Target Options, USD 3,180.15 per Target Option with respect to 300 of the Target Options (in each such case, being the net amount of the purchase price per Target Share minus the exercise price in USD applying the Applicable Exchange Rate for the Target Option) and USD 1,605.63 per Target Warrant (being the net amount of the purchase price per Target Share minus the applicable exercise price for the Target Warrant), of which:

(a)     USD 52,796,848.94 will be satisfied by the allotment and issue of 2,014,377 Consideration Shares to the Sellers as set out in Schedule 2, credited as fully paid at Completion;

(b)     USD 81,197,790.25 will be satisfied by the payment of cash (the "**Cash Consideration**") to the Sellers as set out in Schedule 2; and

(c)     USD 17,925,031.75 will be satisfied by the payment of the types and amounts of digital assets (the "**Crypto Consideration**") as set out in Schedule 2.

2.3     At Completion, the Purchaser shall pay the aggregate amount of USD 68,738,887.81 as part payment of the Cash Consideration (the "**Initial Cash Consideration**") to the Sellers as set out in Schedule 2 by transfer of funds to the bank account of the respective Sellers as set out in Schedule 3 (or in such other manner or to any other bank account designated by such Seller and notified to the Purchaser in writing no later than three (3) Business Days prior to Completion).

2.4     At Completion, the Purchaser shall withhold (a) the remainder of the Cash Consideration, being the amount of USD 12,458,902.44 (the "**Retained Cash Consideration**") and (b) the Crypto Consideration, in a manner to be agreed in good faith by the Purchaser and the Management Shareholders.

2.5     Each of the Sellers and the Company waives all rights of first refusal and other rights in respect of (including any liquidation preference of the Shares), or restrictions on

transfer on the Target Security Interests to which it may be entitled to under the Articles of Incorporation, the Shareholders' Agreements or otherwise in relation to the sale and purchase of the Target Security Interests pursuant to this Agreement and shall procure that all such rights conferred on any other person are waived no later than Completion so as to permit the sale and purchase of all of the Target Security Interests.

2.6    At Completion, the Shareholders' Agreements shall terminate in their entirety as between the Major Shareholders, the Minority Shareholders who complete the sale of their respective security interests of the Company to the Purchaser as of Completion, and the Company.

2.7    Any Tax incurred in connection with the consummation of the sale and purchase of the Target Security Interests under this Agreement shall be borne and paid by the party incurring such Tax in accordance with applicable laws and regulations. For the avoidance of doubt, any capital gain tax or other Tax of similar nature that any Seller may be subject to under the applicable laws and regulations in Japan or anywhere else in the world shall be borne by such Seller, and the Purchaser shall not be responsible for any such Tax.

## 3.    MANAGEMENT AGREEMENTS

3.1    On or before Completion, each of the Management Shareholders shall enter into a Management Agreement with the Company on the terms and conditions reasonably satisfactory to the Purchaser and the respective Management Shareholder, and which shall be effective from the date of Completion and include, subject to certain exceptions as provided therein, non-competition undertakings by the relevant Management Shareholder in favour of the Company, and such non-competition undertakings shall remain effective from the date of Completion throughout the term of the Management Agreement, and shall remain effective until the expiry of the following period (whichever is later):

(a)    one (1) year after termination of the Management Agreement of the relevant Management Shareholder; or

(b)    three (3) years from the date of Completion.

## 4.    RETAINED CONSIDERATION

4.1    The Retained Consideration shall be used to fund any payment obligations of the Sellers to the Purchaser in respect of a Purchaser's Warranty Claim and/or reasonably necessary to serve as partial security for any Indemnification Obligation.

4.2    On each of the dates falling on (i) the first anniversary and (ii) the second anniversary of the Completion Date, the Purchaser shall pay (1) 50% of the Retained Cash Consideration less any amounts paid pursuant to Clause 4.1 to the respective Sellers and (2) 50% of the Crypto Consideration less any amounts paid pursuant to Clause 4.1 to the Management Shareholders in accordance with instructions to be provided by the Management Shareholders.

4.3     Any portion of the Retained Cash Consideration or the Crypto Consideration held by the Purchaser with respect to a pending but unresolved Purchaser's Warranty Claim and/or Indemnification Obligation shall be released to the Sellers within ten (10) days following resolution of such Purchaser's Warranty Claim and/or Indemnification Obligation.

## 5.     CONDITIONS

5.1     Completion is conditional on the following Conditions being satisfied, or waived by the Sellers or the Purchaser (as the case may be), in accordance with this Agreement:

(a)     all corporate approvals of the Purchaser necessary for the completion of the transactions contemplated under this Agreement having been obtained;

(b)     all corporate approvals of the Sellers (if applicable) necessary for the completion of the transactions contemplated under this Agreement having been obtained;

(c)     the Board of Directors having passed a resolution approving the transfer of the Target Security Interests;

(d)     the representations and warranties made by the Sellers under Clause 7.1 (except for the Seller Fundamental Representations), without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all material respects and not misleading in any material respect as at Completion;

(e)     the Seller Fundamental Representations, without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all respects and not misleading in any respect as at Completion;

(f)     all covenants of the Sellers having been complied with in all material respects;

(g)     the representations and warranties made by the Purchaser under Clause 7.2 (except for the Purchaser Fundamental Representations), without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all material respects and not misleading in any material respect as at Completion;

(h)     the Purchaser Fundamental Representations, without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all respects and not misleading in any respect as at Completion;

(i)     all covenants of the Purchaser having been complied with in all material respects;

(j)     all consents, approvals, amendments and terminations as specified by the Purchaser based on its Due Diligence Review, the absence of which would have

a Material Adverse Effect on the Group taken as a whole and/or a material adverse effect on the ability of the parties to consummate the Completion, having been obtained, executed and/or effectuated;

(k) the Purchaser having made the filing to the relevant regulatory authorities (including but not limited to the Ministry of Economy, Trade and Industry) with respect to foreign direct investment in accordance with the Foreign Exchange and Foreign Trade Act of Japan, and the designated period for review by such regulatory authorities having lapsed and no such regulatory authorities having indicated, whether verbally or in writing, any objection to the transaction contemplated under this Agreement;

(l) the completion of a detailed spreadsheet setting out the allocation of the Total Consideration (the "**Allocation List**"), including the allocation of the Consideration Shares, the Initial Cash Consideration, the Retained Cash Consideration and the Crypto Consideration (as applicable) among the Sellers;

(m) the Conversion having been completed, or the waiver of the liquidation preference, right of first refusal and any other rights and consents required under the Articles of Incorporation, the Shareholders' Agreements and/or any other agreements among the Shareholders for the transfer of the Target Security Interests from the Major Shareholders to the Purchaser under this Agreement remaining effective;

(n) the Minority Shareholders SPA(s) having been executed on behalf of all the Minority Shareholders, or the Major Shareholders having exercised the drag-along rights under the Shareholders' Agreements;

(o) the Management Agreements with the Management Shareholders having been executed as of Completion;

(p) the employment agreements of at least 70% of the full-time employees of the Group remaining effective;

(q) the delivery by the Management Shareholders to the Purchaser of a certificate (the "**Final Customer Balance Statement**") setting forth a true and complete account, on a digital asset by digital asset basis (including all delisted digital assets), of all digital asset balances held by the customers of the Company (including any inactive, dormant, suspended, terminated or withdrawal-only accounts) as of the date that is two days prior to the Completion Date, which shall include a certification by the Chief Executive Officer that such Final Customer Balance Statement and the Sufficiency Representation is true and complete in all material respects;

(r) no Material Adverse Effect on the Group Companies taken as a whole having occurred and be continuing as of Completion, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take,

in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 5.1(r);

(s)     no regulatory authority (including but not limited to the Financial Services Agency) having notified, whether verbally or in writing that the Crypto-Asset Exchange Service Provider Registration will be suspended, cancelled, revoked or withdrawn after Completion, whether or not for reasons related to or arising from the transactions contemplated under this Agreement, except to the extent that any such suspension, cancellation, revocation or withdrawal arises substantially directly or indirectly as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement;

(t)     neither the Financial Services Agency nor the Kanto Local Financial Bureau of Japan having indicated, whether verbally or in writing, any objection to the transactions contemplated under this Agreement;

(u)     there being no applicable laws which shall, or which shall reasonably be expected to, forbid, restrict or impose conditions or restrictions on completion of the transactions contemplated under this Agreement; and

(v)     there being no pending or threatened injunctions or similar restraints applicable to the Completion, and no pending or threatened litigation seeking an injunction, restraint or material damages in connection with the transactions contemplated under this Agreement.

5.2     The Purchaser shall use its reasonable endeavours to achieve satisfaction of each Condition set out in Clauses 5.1(a), 5.1(g), 5.1(h), 5.1(i), 5.1(k), and 5.1(o) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

5.3     Each Seller shall use its reasonable endeavours to achieve satisfaction of each Condition set out in Clauses 5.1(b), 5.1(c), 5.1(d), 5.1(e), 5.1(f), 5.1(j), 5.1(m), 5.1(n), 5.1(o), 5.1(p) and 5.1(q) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

5.4     If, at any time, the Sellers or the Purchaser becomes aware of a fact, matter or circumstance that might prevent a Condition from being satisfied, it shall inform the other parties in writing as soon as reasonably practicable.

5.5     At any time on or before 5:00 p.m. on the Longstop Date, the Purchaser may waive a Condition set out in Clauses 5.1(d), 5.1(e), 5.1(f), 5.1(j), 5.1(m), 5.1(n), 5.1(o), 5.1(p), 5.1(q) and 5.1(r) (or any part thereof) by Notice to the Sellers on any terms it decides.

5.6     At any time on or before 5:00 p.m. on the Longstop Date, the Sellers holding a majority of the Shares may waive a Condition set out in Clause 5.1(g), 5.1(h), 5.1(i), 5.1(k) and 5.1(o) (or any part thereof) by Notice from such Sellers to the Purchaser on any terms it decides.

5.7     If a Condition set out in Clause 5.1:

   (a)     has not been waived by (i) the Sellers or the Purchaser (as the case may be) pursuant to Clause 5.5 or 5.6 or (ii) agreement of all of the parties; and

   (b)     has not been satisfied by 5:00 p.m. on the Longstop Date,

   this Agreement shall automatically terminate with immediate effect.

5.8     The Longstop Date may be extended by mutual agreement of the Sellers and the Purchaser in writing, provided that the transaction shall be completed under the same terms and conditions hereunder.

5.9     Each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations as at the date of termination.

## 6.     COMPLETION

6.1     Upon the terms and subject to the conditions of this Agreement, Completion shall take place at the offices of the Purchaser's Solicitors, or if the parties agree otherwise, remotely via the electronic exchange of documents and signatures, on the date that is the fifth Business Day following the satisfaction or waiver of the Conditions (other than Conditions that by their nature are to be satisfied at Completion, and subject to the satisfaction or waiver of such Conditions), or such other time or location as agreed by the parties in writing (but in any event shall not be later than the Longstop Date nor sooner than 1 January 2022) (the date on which Completion occurs, the "**Completion Date**").

6.2     At Completion the Sellers and the Purchaser shall do all those things respectively required of them in Schedule 5. The Purchaser is not obliged to complete this Agreement unless:

   (a)     each Seller complies with all its respective obligations under Schedule 5;

   (b)     the purchase of: (i) all the Target Security Interests; and (ii) all the security interests to be purchased under the Minority Shareholders SPA(s) in accordance with the terms thereof are completed simultaneously; and

   (c)     the Major Shareholders having exercised the drag-along rights under the Shareholders' Agreement for those Minority Shareholders who have not executed the relevant Minority Shareholders SPA(s) and/or fails to complete transaction contemplated under the Minority Shareholders SPA(s).

6.3     The Sellers are not obliged to complete this Agreement unless:

   (a)     the Purchaser complies with all its obligations under Schedule 5;

- 16 -

(b)     the payments of consideration to purchase: (i) all the Target Security Interests; and (ii) all the security interests to be purchased under the Minority Shareholders SPA(s) in accordance with the terms thereof    completed simultaneously; and

(c)     the payment of consideration to purchase the security interests payable to the Minority Shareholders in connection with the exercise of the drag-along rights under the Shareholders' Agreements is made to the Company or its designee simultaneously.

6.4    If Completion does not take place on a contemplated Completion Date scheduled in accordance with the first sentence of Clause 6.1 because any of the Sellers fails to comply with any of its material obligations under Schedule 5, the Purchaser may by Notice to the Sellers and the Company:

(a)     proceed to Completion to the extent reasonably practicable; or

(b)     postpone Completion to such date as the Purchaser may specify (being a date not later than the Longstop Date).

6.5    If Completion does not take place on a contemplated Completion Date scheduled in accordance with the first sentence of Clause 6.1 because the Purchaser fails to comply with any of its obligations under Schedule 5, the Sellers may by Notice to the Purchaser:

(a)     proceed to Completion to the extent reasonably practicable; or

(b)     postpone Completion to such date as the Sellers may specify (being a date not later than the Longstop Date).

6.6    If the Purchaser postpones Completion to another date in accordance with Clause 6.4(b), or if the Sellers postpone Completion to another date in accordance with Clause 6.5(b), the provisions of this Agreement apply as if that other date is the Completion Date.

## 7.    REPRESENTATIONS AND WARRANTIES

7.1    Each of the Sellers, severally and not jointly, represents and warrants to the Purchaser that except as disclosed in the Disclosure Schedules, (i) and except any matter, circumstance or event arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement, each of the Warranties set out in Part A of Schedule 6 (other than the Seller Fundamental Representations) is true, accurate and not misleading at the date of this Agreement; and (ii) each of the Seller Fundamental Representations is true, accurate and not misleading at the date of this Agreement. Immediately before Completion, each Seller is deemed to represent and warrant to the Purchaser that each respective Warranty is true, accurate and not misleading by reference to the facts and circumstances as at Completion. For this purpose only, where there is an express or implied reference in a Warranty to the "date of this Agreement", that reference is to be construed as a reference to Completion.

7.2    The Purchaser represents and warrants to the Sellers that, (i) except any matter, circumstance or event arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by any of the Sellers or any of their respective Representatives, or any actions that any of the Sellers or any of their respective Representatives takes or, notwithstanding reasonable written request by the Purchaser, omits to take, in connection with the transactions contemplated by this Agreement, each of the Warranties set out in Part B of Schedule 6 (other than the Purchaser Fundamental Representations) is true, accurate and not misleading at the date of this Agreement; and (ii) each of the Purchaser Fundamental Representations is true, accurate and not misleading at the date of this Agreement. Immediately before Completion, the Purchaser is deemed to represent and warrant to the Sellers that each respective Warranty is true, accurate and not misleading by reference to the facts and circumstances as at Completion. For this purpose only, where there is an express or implied reference in a Warranty to the "date of this Agreement", that reference is to be construed as a reference to Completion.

7.3    Each of the parties represents and warrants to the other parties that, as of the date of this Agreement and the Completion Date, except for (i) this Agreement, (ii) the Minority Shareholders SPA(s), (iii) the Management Agreements, (iv) the mutual confidentiality agreement dated 26 August 2021 entered into between the Purchaser, the Company and the Management Shareholders, (v) the loan agreement dated 30 August 2021 entered into between the Purchaser and the Company, (vi) subject to Clause 2.6, the Shareholders' Agreements, (vii) the Side Letter Agreement to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated on or around the date hereof entered into between JAFCO, IDG China, IDG Bitmain, IDG Investors and the Purchaser, (viii) the Side Letter Agreement to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated on or around the date hereof entered into between Seth Melamed and the Purchaser, and any agreements expressly provided under or pursuant to the terms of any of the foregoing, there are no effective agreements or arrangements between such party and any of the other parties in connection with the transactions contemplated under this Agreement.

7.4    The Sellers agree and undertake to the Purchaser and to each person referred to in this Clause 7.4 that, except in the case of fraud, they will not make any claim against the Company or any director, officer, employee or agent of the Company on whom it may have relied before agreeing any term of this Agreement or any of the transactions contemplated by this Agreement which it may have in respect of a misrepresentation, inaccuracy or omission in or from information or advice provided by any such person for the purpose of assisting the Sellers to make a representation or give a Warranty.

7.5    Each Warranty is to be construed independently and (except where this Agreement provides otherwise) is not limited by a provision of this Agreement or another Warranty.

## 8.    THE PURCHASER'S REMEDIES

8.1    If, at any time before Completion:

(a)  any of the Sellers is materially in breach of any provision of this Agreement and such breach is not curable or, if curable, is not cured within the earlier of (i) 30 days after written notice thereof is given by the Purchaser to such Seller and (ii) the Longstop Date; or

(b)  the Purchaser becomes aware of any matter, fact or circumstance which in the Purchaser's opinion, acting reasonably, either alone or together with any other matter, fact or circumstance of which the Purchaser is aware that has a Material Adverse Effect on the Group taken as a whole, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 8.1(b),

then the Purchaser may by notice in writing to the Sellers elect to proceed to Completion or terminate this Agreement if the Purchaser is not, on the proposed date of termination, in material breach of this Agreement.

8.2  If the Purchaser terminates this Agreement pursuant to Clause 8.1, each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations at the date of termination.

8.3  If Completion takes place (whether or not pursuant to an election by the applicable parties under Clause 6.4 or 6.5), the Sellers shall, severally and not jointly, indemnify and hold the Purchaser and its Affiliates (including, after Completion, the Group, the "**Purchaser Indemnified Parties**") harmless from, against and in respect of any and all Losses incurred or suffered by any of the Purchaser Indemnified Parties resulting from, relating to or arising out of:

(a)  any breach of the representations and warranties made by the Sellers under Clause 7.1 or covenants of the Sellers under this Agreement;

(b)  any inaccuracies as to the calculation of (i) the Total Consideration between the Major Shareholders as reflected in the Allocation List and (ii) the consideration between the Minority Shareholders; and

(c)  any unpaid transaction expenses of the Company incurred for the transactions contemplated under this Agreement (to the extent not taken into account in the calculation of the Total Consideration),

(collectively, the "**Indemnification Obligations**").

8.4  With effect from Completion, the Sellers release the Company from all claims and demands of the Sellers against the Company and all Liabilities of the Company to the Sellers in respect of any period prior to Completion under the organizational documents of the Company or any agreements between the applicable Seller and the Company terminated prior to Completion.

8.5    The Purchaser acknowledges and agrees that it shall not make a claim under this Clause 8 in respect of any fact, matter or circumstance of which the Purchaser was aware as at the date of this Agreement based on the information provided by the Company or the Sellers for the purposes of the Purchaser's Due Diligence Review, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of the Sellers.

8.6    Except for the remedies stipulated under this Clause 8, the Purchaser shall not claim for any compensation from the Sellers in respect of any Purchaser's Warranty Claim, regardless of whatever grounds under any law or regulation, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of the Sellers.

8.7    Any Purchaser Indemnified Party shall take all commercially reasonable steps to mitigate its Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses that may be indemnifiable hereunder.

## 9.    THE SELLERS' REMEDIES

9.1    If, at any time before Completion,

(a)    the Purchaser is materially in breach of any provision of this Agreement and such breach is not curable or, if curable, is not cured within the earlier of (i) 30 days after written notice thereof is given by any Seller to the Purchaser and (ii) the Longstop Date; or

(b)    the Sellers become aware of any matter, fact or circumstance which in the Sellers' opinion, acting reasonably, either alone or together with any other matter, fact or circumstance of which the Sellers are aware that has a Material Adverse Effect on the Purchaser, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Sellers or any of their Representatives, or any actions that the Sellers or any of their Representatives take or, notwithstanding reasonable written request by the Purchaser, omit to take, in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 9.1(b),

then the Sellers may by notice in writing to the Purchaser elect to proceed to Completion or terminate this Agreement if the Sellers are not, on the proposed date of termination, in material breach of this Agreement.

9.2    If the Sellers terminate this Agreement pursuant to Clause 9.1, each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations at the date of termination.

9.3    If Completion takes place (whether or not pursuant to an election by the applicable parties under Clause 6.4 or 6.5), the Purchaser shall indemnify and hold harmless the Sellers and their Affiliates (the "**Seller Indemnified Parties**") from, against and in respect of any and all Losses incurred or suffered by any of the Sellers Indemnified Parties resulting from, relating to or arising out of any breach of the representations and warranties made by the Purchaser under Clause 7.2 or covenants of the Purchaser under this Agreement.

9.4    Each Seller acknowledges and agrees that it shall not make a claim under this Clause 9 in respect of any fact, matter or circumstance of which the Sellers were aware as at the date of this Agreement, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Purchaser Fundamental Representations, gross negligence, of the Purchaser.

9.5    Except for the remedies stipulated under this Clause 9, the Sellers shall not claim for any compensation from the Purchaser in respect of any Seller's Warranty Claim, regardless of whatever grounds under any law or regulation, other than in respect of any such fact, matter or circumstance arising as a result of any fraud intentional misrepresentation or wilful misconduct, or, solely with respect to the Purchaser Fundamental Representations, gross negligence, of the Purchaser.

9.6    Any Seller Indemnified Party shall take all commercially reasonable steps to mitigate its Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses that may be indemnifiable hereunder.

## 10.    LIMITATIONS ON THE SELLERS' LIABILITY

10.1    The Indemnification Obligations shall survive for a period of two (2) years from the Completion Date, except for claims arising out of, resulting from or in connection with:

    (a)    breaches of the Seller Fundamental Representations;

    (b)    breaches of Sellers' covenants; and

    (c)    Clause 8.3(b),

which shall survive Completion and subject to the relevant limitation period under the applicable laws.

10.2    The Sellers are not liable in respect of a Purchaser's Warranty Claim:

    (a)    unless the amount that would otherwise be recoverable from the Sellers (but for this Clause 10.2) in respect of that Purchaser's Warranty Claim exceeds JPY10,000,000. For this purpose, a number of claims arising out of the same, related or similar matters, facts or circumstances shall be aggregated and form a single claim; and

    (b)    unless and until the amount that would otherwise be recoverable from the Sellers (but for this Clause 10.2) in respect of that Purchaser's Warranty Claim,

when aggregated with any other amount or amounts recoverable or that would otherwise be recoverable (but for Clause 10.2(a)) in respect of other Purchaser's Warranty Claims, exceeds JPY100,000,000 and in the event that the aggregated amounts exceed JPY100,000,000, the Sellers shall be liable in respect of the total aggregate amounts and not the excess only.

10.3    Each Seller's total liability in respect of all Indemnification Obligations shall be limited to 20% of the amount of Total Consideration allocated to such Seller.

10.4    Nothing in this Clause 10 shall have the effect of limiting or restricting any liability of any Seller in respect of an Indemnification Obligation arising as a result of any fraud, intentional misrepresentation or wilful misconduct of that Seller, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of that Seller.

## 11.    UNDERTAKINGS BY THE PARTIES

11.1    Until Completion or earlier termination of this Agreement, the Management Shareholders shall, to the extent permitted by law:

(a)    remain liable to perform all of their obligations and to comply with all legal and regulatory requirements relating to the Group Companies;

(b)    exercise all rights and powers available to them with a view to procuring that no Group Companies shall depart in any material respect from the ordinary course of their day-to-day business except with the prior written consent of the Purchaser, other than any activities by any of the Group Companies in connection with the replacement or recovery of the digital assets that were lost in the Crypto Asset Breach;

(c)    provide material updates to the Purchaser regarding the businesses and affairs of the Group Companies;

(d)    procure the Group Companies and their respective Representatives to (i) cooperate reasonably with the Purchaser and its Representatives to enable the Purchaser and its Representatives to conduct the Due Diligence Review, (ii) grant access to the books and records of or relating to the Group Companies, including but not limited to the statutory books, minute books, contracts, title deeds, details of receivables, tax records, accounts and other documentations of the Group Companies as the Purchaser may reasonably request and (iii) provide such other documents and information about or relating to the Group Companies as the Purchaser may reasonably request; and

(e)    procure that the Purchaser and its Representatives are provided with reasonable opportunities to meet with the management, directors, officers and staff of the Group Companies.

11.2    Each Seller undertakes in favour of the Purchaser and the Company that it will make available and promptly supply, or procure to make available and promptly supply, to the Financial Services Agency or any other competent regulatory authority all

information in relation to such Sellers which may be required by the Financial Services Agency or any other competent regulatory authority.

11.3    Each Management Shareholder undertakes to the Purchaser that, no later than Completion, such Management Shareholder shall use reasonable efforts to procure all of the Minority Shareholders to enter into the Minority Shareholders SPA(s), failing which or if any Minority Shareholder does not sell its Shares or Stock Options in accordance with the Minority Shareholders SPA(s), then, after Completion, such Management Shareholder shall provide any reasonable assistance requested by the Purchaser to consummate the Squeeze-Out Procedure (including but not limited to the exercise of their drag-along rights under the Shareholders' Agreement).

11.4    Between the execution of this Agreement and Completion or until the earlier termination of this Agreement:

(a)    the Sellers shall cause the Company to comply with Schedule 6;

(b)    the Management Shareholders shall procure the Company to file an application to change its commercial registration in order to reflect its latest corporate, shares and options issuance status;

(c)    the Purchaser shall provide commercially reasonable cooperation to the Sellers and the Company to consummate Completion, including structuring incentive plans to the employees of the Group Companies applicable after Completion and accommodating inquiries from competent regulatory authorities made to any Group Company;

(d)    the Purchaser, on the one hand, and the Management Shareholders, on the other hand, shall use reasonable best efforts to cooperate with each other to retain any employees of the Group Companies specified by the Purchaser;

(e)    the Sellers shall notify the Purchaser as soon as reasonably practicable if they becomes aware of a matter, fact or circumstance which constitutes or which would or might constitute a breach of Clause 7.1 or which would or might cause a Warranty of the Sellers to be untrue, inaccurate or misleading if given in respect of the facts or circumstances at the relevant time between the time of execution of this Agreement and Completion; and

(f)    the Purchaser shall notify the Sellers as soon as reasonably practicable if it becomes aware of a matter, fact or circumstance which constitutes or which would or might constitute a breach of Clause 7.2 or which would or might cause a Warranty of the Purchaser to be untrue, inaccurate or misleading if given in respect of the facts or circumstances at the relevant time between the time of execution of this Agreement and Completion.

11.5    Between the execution of this Agreement and Completion or until the earlier termination of this Agreement, the Sellers shall not, directly or indirectly:

(a)    enter into or be involved in any discussion or negotiation with any person except the Purchaser in connection with the sale of the Company or the business or,

except in the usual course of business or to *de minimis* extents, any part of the business or the assets thereof;

(b)     enter into an agreement or arrangement with any person except the Purchaser or any person designated by the Purchaser in connection with the sale of the Company or the business or, except in the usual course of business or to *de minimis* extents, any part of the business or the assets thereof; or

(c)     other than in connection with the transactions contemplated under this Agreement, make available to any person except the Purchaser, its directors, officers, duly authorised representatives, advisers or agents, any information for the purpose of the sale of the Company or the business or, except in the usual course of business or to *de minimis* extents, any part of the business.

11.6    The Purchaser hereby unconditionally and irrevocably agrees to guarantee the full and complete performance by the Company of all of the terms and obligations of the Company contained in the respective Management Agreements upon execution of the respective Management Agreements.

11.7    Each undertaking in Clauses 11.1 to 11.6 constitutes an entirely independent undertaking and if one or more of the undertakings is held to be against the public interest or unlawful or in any way an unreasonable restraint of trade the remaining undertakings shall continue to bind the Sellers.

## 12.    CONFIDENTIAL INFORMATION

12.1    Each party undertakes to the other parties that before and after Completion it shall:

(a)     not use or disclose to any person Confidential Information it has or acquires; and

(b)     make every effort to prevent the use or disclosure of Confidential Information.

12.2    Clause 12.1 does not apply to disclosure of Confidential Information:

(a)     to the extent that it is generally known to the public not as a result of a breach of any duty of confidentiality;

(b)     to a director, officer or employee of the parties whose function requires him to have the Confidential Information;

(c)     with respect to JAFCO, IDG China, IDG Bitmain and IDG Investors, to any existing limited or general partner of such entity as required by law or under the terms of their respective partnership agreements, provided that the recipient is informed of the confidential nature of the Confidential Information and is directed to maintain such confidentiality;

(d)     to the extent that it is required to be disclosed by law, by a rule of a listing authority by which any party's shares or shares of any party's holding company are listed, by a stock exchange on which any party's shares or shares of any

party's holding company are listed or traded or by a governmental authority or other authority with relevant powers to which any party or any party's holding company is subject or submits, whether or not the requirement has the force of law provided that the disclosure shall be made after consultation with the other parties and after allowing the other parties the opportunity to contest such disclosure and after taking into account the other parties' requirements as to its timing, content and manner of making or despatch;

(e)     to an adviser for the purpose of advising the parties in connection with the transactions contemplated by this Agreement provided that such disclosure is essential for these purposes and is on the basis that Clause 12.1 applies to the disclosure by the adviser; or

(f)     as required or permitted by this Agreement (including the publication of any announcement or public disclosure made in accordance with the terms of Clause 13).

12.3    This Clause 12 shall survive the termination of this Agreement and the restriction on disclosure of Confidential Information shall continue to apply for a period of two years after the date of termination, except for information which ceases to be Confidential Information.

## 13.    ANNOUNCEMENTS

13.1    Subject to Clause 13.2, no party may, before or after Completion, make, issue or send a public announcement, communication or circular concerning the transactions referred to in this Agreement unless it has first consulted with the other parties and taken into account the requirements of the other parties as to its timing, content and manner of making or despatch.

13.2    Clause 13.1 does not apply to a public announcement, communication or circular required by law, by a rule of a listing authority by which any party's shares or shares of any party's holding company are listed, by a stock exchange on which any party's shares or shares of any party's holding company are listed or traded or by a governmental authority or other authority with relevant powers to which any party or any party's holding company is subject or submits, whether or not the requirement has the force of law, provided that the public announcement, communication or circular shall be made after consultation with the other parties and after taking into account the requirements of the other parties as to its timing, content and manner of making or despatch.

## 14.    COSTS

14.1    Except where this Agreement or the relevant document provides otherwise, each party shall pay its own costs relating to the negotiation, preparation, execution and performance by it of this Agreement and of each document referred to in it.

14.2    Any fees, charges, costs or commissions imposed by any bank, financial institution or intermediary on any payment by way of a bank or wire transfer under this Agreement shall be borne by the party making such transfer, provided that any fees, charges, costs

or commissions imposed by any bank, financial institution or intermediary of the party receiving such transfers shall be borne by the party receiving such payment.

## 15.    GENERAL

15.1    No amendment of this Agreement shall be valid unless it is in writing and duly executed by or on behalf of all of the parties to it.

15.2    No failure or delay by any party hereto in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. If either party breaches its obligations or its Warranties hereunder, the rights of the other parties shall be limited to the rights or remedies set forth in this Agreement.   Each party shall have no other entitlement, remedy or recourse, whether in contract, tort or otherwise, against the other parties with respect to the transactions contemplated by this Agreement, all of such other entitlements, remedies, and recourse being expressly waived by the parties to the fullest extent permitted by applicable law.

15.3    Except to the extent that they have been performed and except where this Agreement provides otherwise, the obligations contained in this Agreement remain in force after Completion.

15.4    If a party fails to pay a sum due from it under this Agreement on the due date of payment in accordance with the provisions of this Agreement, that party shall pay interest on the overdue sum from the due date of payment until the date on which its obligation to pay the sum is discharged at the rate of three (3) per cent per annum. Interest accrues and is payable from day to day.

15.5    All payments made by the Sellers or the Purchaser under Clauses 8 and 9 shall be made gross, free of right of counterclaim or set off and without deduction or withholding of any kind other than any deductions or withholding required by law.

15.6    Each of the parties agrees to perform (or procures the performance of) all such acts and things and/or to execute and deliver (or procure the execution and delivery of) all such documents, as may be required by law or as may be necessary or reasonably requested by the parties for giving full effect to this Agreement. Unless otherwise agreed, each party shall be responsible for its own costs and expenses incurred in connection with the provisions of this Clause 15.6.

15.7    Time shall be of the essence of this Agreement as regards any time or period specified herein or which may be varied with the agreement of all of the parties.

15.8    If any payment under this Agreement (except for the payment obligation under Clause 2) will be or has been subject to Tax, the Sellers or the Purchaser shall on demand from the Purchaser or the Sellers (as the case may be) pay to the Purchaser or the Sellers (as the case may be) the amount (after taking into account Tax payable in respect of the amount) (the "**Gross-Up Amount**") that will ensure that the Purchaser or the Sellers (as the case may be) receives and retains a net sum equal to the sum it would have received had the payment not been subject to Tax, provided, that, any Gross-Up

Amount paid shall count toward and be subject to the limitation of liability cap amount provided under Clause 10.3.

15.9    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.10    Any indemnity under this Agreement is independent and survives termination of this Agreement or Completion in accordance with the terms of this Agreement. Any other term by its nature intended to survive termination of this Agreement or Completion survives termination of this Agreement or Completion.

15.11    The parties agree that any indemnification payments made pursuant to this Agreement shall be treated for tax purposes as an adjustment to the Purchase Price, unless otherwise required by applicable laws and regulations.

## 16.    ENTIRE AGREEMENT

16.1    This Agreement constitutes the entire agreement between the parties. It supersedes any previous agreements relating to the subject matter of this Agreement, and sets out the complete legal relationship of the parties arising from or connected with that subject matter.

## 17.    ASSIGNMENT

17.1    Each of the parties to this Agreement shall not assign, transfer, declare a trust of the benefit of or in any other way alienate any of its rights under this Agreement, whether in whole or in part, without the prior written consent of each other party.

## 18.    NOTICES

18.1    A notice or other communication under or in connection with this Agreement (a "**Notice**") shall be:

(a)    in writing;

(b)    in English; and

(c)    delivered personally or sent by courier by an internationally recognised courier company or by email, to the party due to receive the Notice at its address set out in Clause 18.3 or to such other address, person or email address as the party may specify by not less than seven (7) days' written notice to the other party received before the Notice was despatched provided that if the Notice is delivered by email it must also be delivered by one of the other methods specified in this Clause 18.1(c).

18.2    In the absence of evidence of earlier receipt, a Notice shall be deemed to have been duly given if:

(a)    delivered personally, when left at the address referred to in Clause 18.1(c);

(b)     sent by courier, two Business Days after posting it; and

(c)     sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 18.2 within one (1) Business Day of sending the email.

18.3    The address and email address referred to in Clause 18.1(c) are:

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Sellers** | Kariya Kayamori<br>8 Orange Grove Road #06-02<br>Singapore 258342 | mike.kayamori @liquid.com | Kariya Kayamori |
| | Seth Melamed<br>2-3-7 Shimomeguro #510<br>Meguro-ku<br>Tokyo<br>Japan 153-0064 | seth@liquid.com | Seth Melamed |
| | JAFCO SV4 Investment Limited Partnership<br>c/o JAFCO Group Co., Ltd.<br>1-23-1 Toranomon, Minato-ku, Tokyo 105-6324, Japan | Shozo.isaka@jafco.c0.jp | Shozo Isaka |
| | IDG China Venture Capital Fund V L.P.<br>c/o IDG Capital Management (HK) Ltd.<br>Unit 5505, 55/F., The Center<br>99 Queen's Road Central, Hong Kong | simon_ho@idgcapital.com | Chi Sing HO |
| | With a copy to<br>Floor 6, Tower A, COFCO Plaza,<br>8 Jianguomennei Dajie<br>Beijing, 100005, P.R. China | lydia_li@idgcapital.com | Ms. Jing Li |

DocuSign Envelope ID: 17292B85-FF60-4B08-8AB0-9F6967BAD919

|  | IDG Bitmain Fund L.P.<br>c/o IDG Capital Management (HK) Ltd.<br>Unit 5505, 55/F., The Center<br>99 Queen's Road Central, Hong Kong | simon_ho@idg capital.com | Chi Sing HO |
|---|---|---|---|
|  | With a copy to<br>Floor 6, Tower A, COFCO Plaza,<br>8 Jianguomennei Dajie<br>Beijing, 100005, P.R. China | lydia_li@idgca pital.com | Ms. Jing Li |
|  | IDG China V Investors L.P.<br>c/o IDG Capital Management (HK) Ltd.<br>Unit 5505, 55/F., The Center<br>99 Queen's Road Central, Hong Kong | simon_ho@idg capital.com | Chi Sing HO |
|  | With a copy to<br>Floor 6, Tower A, COFCO Plaza,<br>8 Jianguomennei Dajie<br>Beijing, 100005, P.R. China | lydia_li@idgca pital.com | Ms. Jing Li |
| **The Purchaser** | FTX Trading Ltd<br>c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd<br>Saint John's<br>Antigua and Barbuda | sam@ftx.com | CEO |
|  | with a copy (which shall not constitute notice) to:<br>Anderson Mori & Tomotsune<br>Otemachi Park Building<br>1-1-1, Otemachi<br>Chiyoda-ku<br>Tokyo 100-8136<br>Japan | ken.kawai@am t-law.com | Ken Kawai |

| **The Company** | Liquid Group Inc.<br>Hirose Building 4F<br>3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan | mike.kayamori<br>@liquid.com | CEO |
| | with a copy (which<br>shall not constitute<br>notice) to:<br>Liquid Group Inc.<br>Hirose Building 4F<br>3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan | legal@liquid.c<br>om | Legal<br>Department |

## 19.    GOVERNING LAW AND JURISDICTION

19.1    This Agreement (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan.

19.2    Any dispute, controversy or claim arising in any way out of or in connection with this Agreement (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Agreement) shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre ("**SIAC**") in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the "**Rules**"), which Rules are deemed to be incorporated by reference into this Clause and as may be amended by the rest of this Clause. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential.

19.3    The arbitration tribunal ("**Tribunal**") shall consist of three arbitrators to be appointed in accordance with the Rules unless the parties separately agree to one arbitrator.

19.4    The seat and venue of the arbitration shall be Singapore. The arbitration agreement in this Clause 19 shall be governed by the laws of Singapore.

19.5    The language of the arbitration proceedings shall be English.

19.6    Any award of the Tribunal shall be made in writing and shall be final and binding on the parties from the day it is made. The parties undertake to carry out any award without delay.

19.7    Nothing in this Clause 19 shall be construed as preventing any party from seeking conservatory or interim relief from any court of competent jurisdiction.

**20.    GOVERNING LANGUAGE**

20.1    This Agreement is drawn up in the English language. If this Agreement is translated into another language, the English language text prevails.

20.2    Each Notice, demand, request, statement, instrument, certificate or other communication given, delivered or made by a party to any other party under or in connection with this Agreement shall be:

(a)    in English; or

(b)    if not in English, accompanied by an English translation made by a translator, and certified by such translator to be accurate in all material aspects.

20.3    The receiving party shall be entitled to assume the accuracy of and rely upon any English translation of any document provided pursuant to Clause 20.2(b).

**21.    COUNTERPARTS**

This Agreement may be executed in any number of counterparts, each of which when executed and delivered is an original and all of which together evidence the same agreement.

**SCHEDULE 1**
**INFORMATION ON THE SELLERS**

**SHARES, STOCK OPTIONS AND CLASS C-1 PREFERENCE SHARES WARRANTS HELD**

| Name | Common Shares | Class A Preference Shares | Class B Preference Shares | Class C-1 Preference Shares | Stock Options | | | Class C-1 Preference Shares Warrants |
|------|---------------|---------------------------|---------------------------|----------------------------|---------------|---|---|--------------------------------------|
| | | | | | Series 3 | Series 10 | Series 13 | |
| **Kariya Kayamori** | 12,800 | 50 | - | - | - | - | - | - |
| **Seth Melamed** | 12,203 | - | - | - | 180 | 30 | 300 | - |
| **JAFCO SV4 Investment Limited Partnership** | - | - | 5,778 (5,983 [Note 1]) | - | - | - | - | - |
| **IDG China Venture Capital Fund V L.P.** | 1,363 | - | - | 7,445 | - | - | - | 2,484 |
| **IDG Bitmain Fund L.P.** | 192 | - | - | 1,054 | - | - | - | - |
| **IDG China V Investors L.P.** | 79 | - | - | 429 | - | - | - | 141 |

*Note 1: As converted*

**SCHEDULE 2**
**ALLOCATION OF CONSIDERATION**

1.      **Total Consideration**

| Seller | Type of Target Security Interest | Number of Target Security Interests | Price per Target Security Interest | Total Consideration |
|---|---|---|---|---|
| **Kariya Kayamori** | Common Shares | 12,800 | $3,510.41 | $45,108,768.50 |
| | Class A Preference Shares | 50 | $3,510.41 | |
| **Seth Melamed** | Common Shares | 12,203 | $3,510.41 | $44,516,390.23 |
| | Stock Options | 180 | $3,509.54 | |
| | Stock Options | 30 | $3,103.16 | |
| | Stock Options | 300 | $3,180.15 | |
| **JAFCO SV4 Investment Limited Partnership** | Class B Preference Shares | 5,778 (5,983 [Note 1]) | $3,510.41 | $21,002,783.03 |
| **IDG China Venture Capital Fund V L.P.** | Common Shares | 1,363 | $3,510.41 | $34,908,076.20 |
| | Class C Preference Shares | 7,445 | $3,510.41 | |
| | Class C-1 Preference Shares Warrants | 2,484 | $1,605.63 | |
| **IDG Bitmain Fund L.P.** | Common Shares | 192 | $3,510.41 | $4,373,970.86 |
| | Class C Preference Shares | 1,054 | $3,510.41 | |
| **IDG China V Investors L.P.** | Common Shares | 79 | $3,510.41 | $2,009,682.11 |
| | Class C Preference Shares | 429 | $3,510.41 | |
| | Class C-1 Preference Shares Warrants | 141 | $1,605.63 | |

*Note 1: As converted*

2.      **Allocation of Total Consideration**

| Seller | Cash Consideration | Crypto Consideration | Consideration Shares |
|---|---|---|---|
| Kariya Kayamori | $10,000,000 | $9,021,753.70 | $26,087,014.80 |
| Seth Melamed | $8,903,278.05 | $8,903,278.05 | $26,709,834.14 |
| JAFCO SV4 Investment Limited Partnership | $21,002,783.03 | - | - |
| IDG China Venture Capital Fund V L.P. | $34,908,076.20 | - | - |
| IDG Bitmain Fund L.P. | $4,373,970.86 | - | - |
| IDG China V Investors L.P. | $2,009,682.11 | - | - |

3.      **Consideration Paid at Completion**

| Seller | Number of Consideration Shares | Initial Cash Consideration |
|---|---|---|
| Kariya Kayamori | 995,307 | $10,000,000.00 |
| Seth Melamed | 1,019,070 | $8,903,278.05 |
| JAFCO SV4 Investment Limited Partnership | - | $16,802,226.42 |
| IDG China Venture Capital Fund V L.P. | - | $27,926,460.96 |
| IDG Bitmain Fund L.P. | - | $3,499,176.69 |
| IDG China V Investors L.P. | - | $1,607,745.69 |

4.        **Retained Consideration**

| Seller | Retained Cash Consideration | Bitcoin (BTC) | Ether (ETH) | Solana (SOL) | FTX Token (FTT) |
|---|---|---|---|---|---|
| **Kariya Kayamori** | - | BTC 52.870 | ETH 757.25 | - | FTT 64,219 |
| **Seth Melamed** | - | BTC 39.132 | ETH 560.48 | SOL 11,884.98 | FTT 47,532 |
| **JAFCO SV4 Investment Limited Partnership** | $4,200,556.61 | - | - | - | - |
| **IDG China Venture Capital Fund V L.P.** | $6,981,615.24 | - | - | - | - |
| **IDG Bitmain Fund L.P.** | $874,794.17 | - | - | - | - |
| **IDG China V Investors L.P.** | $401,936.42 | - | - | - | - |

**SCHEDULE 3**
**BANK ACCOUNT INFORMATION OF THE SELLERS**

| Seller | Bank Account Details |
|---|---|
| **Kariya Kayamori** | [To be provided prior to Completion]<br><br>Bank Name      :<br>Branch         :<br>SWIFT Code    :<br>Address       :<br>Account No.    :<br>Account Name  : |
| **Seth Melamed** | Bank Name     :  JPMorgan Chase<br>Branch       :  Shattuck and Channing<br>Routing     :  124001545<br>SWIFT Code  :  CHASUS33XX<br>Address     :  2390 Shattuck Ave. Berkeley, CA<br>Account No.  :  895866890<br>Account Name :  Seth Melamed |
| **JAFCO SV4 Investment Limited Partnership** | Bank Name     :  Mizuho Bank, Ltd.<br>Branch       :  KABUTOCHO CORPORATE BANKING AND SECURITIES BUSINESS DEPARTMENT<br>SWIFT Code  :  MHCBJPJT<br>Address     :  6-7 Nihombashikabutocho, Chuo-ku, Tokyo 103-0026, Japan<br>Account No.  :  113- 5449987 (Branch No. - Account No.)<br>Account Name :  JAFCO SV4 Investment Limited Partnership |

| Seller | Bank Account Details |
|---|---|
| **IDG China Venture Capital Fund V L.P.** | Bank Name : Pacific Western Bank<br>Branch : Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code : SQARUS33<br>Address : 406 Blackwell Street, Suite 240, Durham, North Carolina, 27701<br>Account No. : 1001657806<br>Account Name : IDG China Venture Capital Fund V L.P. |
| **IDG Bitmain Fund L.P.** | Bank Name : Pacific Western Bank<br>Branch : Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code : SQARUS33<br>Address : 406 Blackwell Street, Suite 240, Durham, NC 27701<br>Account No. : 1001787223<br>Account Name : IDG Bitmain Fund L.P. |
| **IDG China V Investors L.P.** | Bank Name : Pacific Western Bank<br>Branch : Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code : SQARUS33<br>Address : 406 Blackwell Street, Suite 240, Durham, North Carolina, 27701<br>Account No. : 1001658945<br>Account Name : IDG China V Investors L.P. |

## SCHEDULE 4
### INFORMATION ON THE GROUP COMPANIES

| Name | Place of Incorporation | Date of Incorporation | Registered Office |
|---|---|---|---|
| **Liquid Group Inc.** | Japan | 1 March 2019 | 3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan |
| **Quoine Corporation** | Japan | 25 November 2014 | 3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan |
| **Liquid Securities Singapore Pte. Ltd.** | Singapore | 3 January 2019 | 30 Cecil Street #19-08<br>Prudential Tower<br>Singapore 049712 |
| **Quoine Pte. Ltd.** | Singapore | 15 May 2019 | 8 Orange Grove Road #06-02<br>Singapore 258342 |
| **Analisya Pte. Ltd.** | Singapore | 11 July 2013 | 8 Orange Grove Road #06-02<br>Singapore 258342 |
| **Quoine India Private Limited** | India | 29 November 2017 | F-143, Richmond Park<br>DLF City, Phase-4<br>Gurugram, Haryana-HR<br>Gurgaon, 122001<br>India |
| **Quoine Vietnam Company Limited** | Vietnam | 18 August 2017 | Floor 1st, Empress Tower<br>No 138-142 Hai Ba Trung Street<br>Da Kao Ward, District 1<br>Ho Chi Minh City<br>Vietnam |

SCHEDULE 5
COMPLETION REQUIREMENTS

1.      **Sellers' obligations**

1.1     At Completion, the Sellers shall deliver or procure to be delivered to the Purchaser:

(a)     evidence in a form reasonably satisfactory to the Purchaser of satisfaction of the Conditions set out in Clause 5.1;

(b)     with respect to each Seller that is not a natural person, as evidence of the authority of each person executing a document referred to in this Schedule 5 on such Seller's behalf (if applicable):

(i)     a copy of the relevant extract of the minutes of a duly held meeting of the directors of such Seller (or a duly constituted committee thereof) authorising the execution by such Seller of the document and, where such execution is authorised by a committee of the board of directors of such Seller, a copy of the relevant extract of the minutes of a duly held meeting of the directors constituting such committee; or

(ii)    a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the company secretary of such Seller.

(c)     the Final Customer Balance Statement, as certified by the Chief Executive Officer that such Final Customer Balance Statement and the Sufficiency Representation is true and complete in all material respects;

(d)     an application and any other document required to change the Company's shareholders register (*kabunushi meibo*) and stock option holders register (*shinkabu yoyaku ken genbo*) with the Sellers' signatures (including electronic signatures) or corporate seals to reflect the transfer of the Target Security Interests;

(e)     a certified copy of the shareholders register (*kabunushi meibo*) of the Company reflecting the sale and purchase of the Target Shares dated as of the Completion Date;

(f)     a certified copy of the stock option holders register (*shinkabu yoyaku ken genbo*) of the Company reflecting the sale and purchase of the Target Options and the Target Warrants dated as of the Completion Date;

(g)     the Minority Shareholders SPA(s) duly executed on behalf of the Minority Shareholders who provided a power of attorney to any Seller or any of the Group Companies, or any other Person agreed by the Purchaser, for such execution, or evidence in a form reasonably satisfactory to the Purchaser that the Shareholders required under the Shareholders' Agreements to exercise the

drag-along rights under the Shareholders' Agreements have exercised such rights;

(h)     a letter to the Company and Quoine Corporation from the below directors resigning their office (*jinin todoke*) as directors of each of the Company and Quoine Corporation with effect on or prior to the Completion Date:

(i)     Shozo Isaka; and

(ii)    Toh Li;

(i)     the Management Agreements between each of the Management Shareholders and the Company duly executed by the parties thereto; and

(j)     evidence in a form reasonably satisfactory to the Purchaser that the employment agreements of at least 70% of the full-time employees of the Group remain effective.

1.2     The Sellers shall procure that at or prior to Completion a meeting of the Board of Directors is held at which the directors approve:

(a)     the transfer of the Target Security Interests; and

(b)     the entering into the Agreement or the Minority Shareholders SPA(s) (as applicable), and

at Completion the Sellers shall deliver to the Purchaser a certified copy of the above resolutions.

## 2.     Purchaser's obligations

2.1     At Completion, the Purchaser shall deliver to the Sellers:

(a)     evidence in a form reasonably satisfactory to the Sellers of satisfaction of the Conditions set out in Clause 5.1; and

(b)     as evidence of the authority of each person executing a document referred to in this Schedule on the Purchaser's behalf:

(i)     a copy of the relevant extract of the minutes of a duly held meeting of the directors of the Purchaser (or a duly constituted committee thereof) authorising the execution by the Purchaser of the document and, where such execution is authorised by a committee of the board of directors of the Purchaser, a copy of the relevant extract of the minutes of a duly held meeting of the directors constituting such committee; or

(ii)    a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the secretary of the Purchaser.

2.2     At Completion, the Purchaser shall:

   (a)      allot and issue the Consideration Shares to the relevant Sellers; and

   (b)      subject to the provision by the relevant Sellers of applicable anti-money
            laundering and "know your customer" materials required by the Transfer Agent,
            provide a copy of the executed request to the Transfer Agent to effect the
            registration of the Consideration Shares, in the name of the relevant Sellers, in
            the register of members of the Purchaser; provided that if any such anti-money
            laundering and "know your customer" materials are not provided by the relevant
            Sellers on or prior to Completion, the Purchaser shall instruct the Transfer Agent
            to effect such registration promptly after such materials are provided by the
            relevant Sellers.

2.3     At Completion, the Purchaser shall:

   (a)      pay, in USD, the Initial Cash Consideration to the Company in accordance with
            Clause 2.3 of this Agreement;

   (b)      withhold, in USD, the Retained Cash Consideration in accordance with Clause
            2.4 of this Agreement; and

   (c)      withhold the Crypto Consideration in a manner to be agreed in good faith in
            accordance with Clause 2.4 of this Agreement.

## SCHEDULE 6
## WARRANTIES

### PART A
### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

**1.    CAPACITY AND AUTHORITY**

1.1    **Right, power, authority and action**

(a)    Such Seller has the right, power and authority, and has taken all action necessary, to execute, deliver and exercise its rights, and perform its obligations, under this Agreement and each document to be executed by such Seller at or before Completion in connection with the transactions contemplated under the Agreement.

(b)    The entry into and performance by such Seller of, and the transactions contemplated by, this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under this Agreement do not conflict with, or result in a breach of:

(i)    any law or regulation applicable to it; or

(ii)    any document which is binding upon it.

(c)    The Company has the right, power and authority to conduct its business as conducted at the date of this Agreement.

1.2    **Binding agreements**

Such Seller's obligations under this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement are, or when the relevant document is executed will be, enforceable in accordance with their terms.

1.3    **Anti-Social Force**

Such Seller is not, and does not have any dealings with, and is not otherwise related to, any Anti-Social Forces.

**2.    INFORMATION**

2.1    **The Agreement**

All information provided by or on behalf of such Seller and/or the Company (including any information provided by such Seller to the Purchaser via the Company) in the course of the Due Diligence Review conducted by or on behalf of the Purchaser and in the course of negotiations leading to this Agreement by or on behalf of such Seller, and

the information set out in this Agreement with respect to such Seller is true, accurate and not misleading in all material respects.

2.2    **Material information**

All information about the Shares, the Stock Options and the Class C-1 Preference Shares Warrants and the Group's business which might be material for disclosure to a Purchaser of the Shares, the Stock Options and the Class C-1 Preference Shares Warrants has been disclosed by or on behalf of such Seller (including by the Company for itself and for and on behalf of such Seller) to the Purchaser in writing.

2.3    **Information for disclosure**

All statements in the Disclosure Documents in relation to such Seller and all documents and information provided or made available by or on behalf of such Seller for the purpose of preparation of the Disclosure Documents are true, accurate and not misleading in all material respects and has not omitted any information the omission of which would make any statement in the Disclosure Documents misleading in any material respect.

3.    **SHARES AND AFFILIATES**

3.1    The Target Shares, the Target Options and the Target Warrants

(a)    Such Seller is the sole legal and registered owner of the number of the Target Shares, the Target Options and Target Warrants set out opposite such Seller's name in Schedule 1as applicable.

(b)    The Shares comprise the whole of the Company's allotted and issued share capital, have been properly allotted and issued and are fully paid or credited as fully paid.

(c)    Other than the Shareholders' Agreements, there is no Encumbrance, and there is no agreement, arrangement or obligation to create or give an Encumbrance, in relation to any of the Target Shares, the Target Options or the Target Warrants held by such Seller. No person has claimed to be entitled to an Encumbrance in relation to any of the Target Shares, the Target Options or the Target Warrants held by such Seller.

(d)    Other than the Stock Options, Class C-1 Preference Shares Warrants, this Agreement and the Shareholders' Agreements, there is no agreement, arrangement or obligation requiring the creation, allotment, issue, transfer, redemption or repayment of, or the grant to a person of the right (conditional or not) to require the allotment, issue, transfer, redemption or repayment of, a share in the capital of the Company (including, without limitation, an option or right of pre-emption or conversion).

3.2    **Affiliates**

    (a)    The Company does not have any subsidiaries other than the entities listed in Schedule 4.

    (b)    The Company has no interest in, and has not agreed to acquire an interest in or merge or consolidate with, a corporate body or any other person.

## 4.    ACCOUNTS

### 4.1    General

    (a)    The Accounts have been prepared and audited on a proper and consistent basis in accordance with the law and applicable standards, principles and practices generally accepted in Japan.

    (b)    The Accounts show a true and fair view of the assets, liabilities and state of affairs of the Company as at the Last Accounting Date and of the profits and losses of the Company for the financial year ended on the Last Accounting Date.

### 4.2    Provision for Tax

The Accounts reserve or provide in accordance with applicable standards, principles and practices generally accepted in Japan for all Tax liable to be assessed on the Company, or for which it is or may become accountable, for all periods commencing on or before the Last Accounting Date (whether or not the Company has or may have a right of reimbursement against another person) in all material respects.    The Accounts reserve in accordance with applicable standards, principles and practices generally accepted in Japan for all contingent or deferred Liabilities to Tax for all periods commencing on or before the Last Accounting Date in all material respects.

### 4.3    Accounting records

The Company's accounting records are up-to-date, in its possession or under its control and are properly completed in accordance with the law and applicable standards, principles and practices generally accepted in Japan in all material respects.

## 5.    CHANGES SINCE THE LAST ACCOUNTING DATE

### 5.1    General

Since the Last Accounting Date, other than in connection with the Crypto Asset Breach:

    (a)    the Group's business has been operated in the usual way in all material respects so as to maintain it as a going concern;

    (b)    no matter, event or incident with Material Adverse Effect on the Group has occurred; and

    (c)    no material change has occurred in the assets and Liabilities shown in the Accounts and there has been no reduction in the value of the net tangible assets of the Group on the basis of the valuations used in the Accounts.

5.2     **Specific**

Since the Last Accounting Date:

(a)     the Group has not, other than in connection with the Crypto Asset Breach:

      (i)     made, or agreed to make, capital expenditure exceeding in total JPY100,000,000; or

      (ii)     incurred, or agreed to incur, a commitment or commitments involving capital expenditure exceeding in total JPY100,000,000; and

(b)     no resolution of the Shareholders (other than ordinary business conducted at an annual general meeting or the resolutions contemplated in this Agreement) has been passed.

6.     **TAX**

6.1     **General**

(a)     The Company is and has at all times been subject to or assessed on Taxes in Japan only and each of the Group (other than the Company) is and has at all times been subject to or assessed on Taxes in the jurisdiction where it was incorporated, except where it would not have a Material Adverse Effect on the Group taken as a whole.

(b)     The Group has paid all Tax which it has become liable to pay and is not, and has not been, from the respective date of incorporation of each Group Company, liable to pay a penalty, surcharge, fine or interest in connection with Tax, except where it would not have a Material Adverse Effect on the Group taken as a whole.

6.2     **Tax Returns**

The Group has made all such returns, provided all such information and maintained all such records in relation to Tax as are required to be made or provided or maintained by it and to the knowledge of the Sellers, none of such returns is disputed by the Tax Authority concerned, except where it would not have a Material Adverse Effect on the Group taken as a whole.

6.3     **Disputes**

The Group is not, in relation to the business, involved in a dispute with any Tax Authority. To the best of such Seller's knowledge, information and belief, no Tax Authority has investigated or indicated that it intends to investigate the Tax affairs of the Group.

6.4     No Tax Authority has disputed the inclusion of taxable income from the Group in the Tax computations of the Group in respect of each of its financial years from the

respective date of incorporation of each Group Company. No such dispute is outstanding or pending and there are no circumstances known to such Seller which are likely to give rise to such dispute.

7. **ASSETS**

7.1 **Sufficiency of Assets**

(a)     The amounts of digital assets actually held and controlled by the Company are, on a digital asset-by-digital asset basis (including all delisted digital assets), at least equal to the aggregate balances held by all customers of the Group (including any inactive, dormant, suspended, terminated or withdrawal-only accounts) for each digital asset, other than up to USD 100,000,000 of deficiencies incurred in connection with the Crypto Asset Breach (measured at the time of such Crypto Asset Breach). The Company has good and valid title to all of such digital assets, free and clear of all Encumbrances (the "**Sufficiency Representation**").

(b)     The amounts of (i) the out of pocket costs of the Group to replace any of the crypto assets lost in the Crypto Asset Breach and not otherwise recovered by the Group as of or prior to Completion (the "**Lost Assets**"), including any premium paid by a Group Company for such replacement and (ii) the market value of any Lost Assets that are not replaced or recovered by the Group as of or prior to Completion, do not, in the aggregate, exceed USD100,000,000.

7.2 **Title and Condition**

(a)     Each material asset included in the Accounts or acquired by the Group since the Last Accounting Date (other than stock disposed of in the usual course of business) and each material asset used by the Group or which is in the reputed ownership of the Group is:

(i)     owned solely by the Group free from any Encumbrance;

(ii)     not subject to any agreement for lease, hire, hire purchase or sale on deferred, credit or conditional terms; and

(iii)     where capable of possession, in the possession or under the control of the Group.

(b)     The Company owns or has the right to use each asset necessary for the effective operation of its business.

7.3 **Debt**

(a)     No debt shown in the Accounts or the Group's accounting records greater than JPY100,000,000 is overdue by more than four weeks or is the subject of an arrangement.

(b)      The Group has not released a debt greater than JPY100,000,000 shown in the Accounts or its accounting records so that the debtor has paid or will pay less than the debt's book value. None of the debts greater than JPY100,000,000 shown in the Accounts or the Group's accounting records has been deferred, subordinated or written off or become irrecoverable to any extent.

## 8.      INTELLECTUAL PROPERTY

8.1    Each of the Intellectual Property Rights owned by the Group is:

(a)      valid and enforceable and nothing has been done or omitted to be done by which it may cease to be valid and enforceable;

(b)      owned by the Group alone, free from any licence, Encumbrance or restriction on use; and

(c)      to the best of such Seller's knowledge, information and belief, will not be, the subject of a claim or opposition from a person (including, without limitation, an employee of the Group) as to title, validity, enforceability, entitlement or otherwise.

8.2    Each of the Intellectual Property Rights used but not owned by the Group is validly licensed to the Group and which are not terminable as a result of any transaction contemplated in this Agreement, except where such termination would not have a Material Adverse Effect.

8.3    The Group has not granted and is not obliged to grant a licence, assignment, consent, undertaking, security interest or other right in respect of any of its material Intellectual Property Rights.

8.4    The Intellectual Property Rights comprise all the Intellectual Property necessary for the Group to operate its business as it has been operated before the date of this Agreement.

## 9.      AGREEMENT

### 9.1    Validity of Agreements

(a)      To the best of such Seller's knowledge, information and belief, no fact or circumstance exists which might invalidate or give rise to a ground for termination, avoidance or repudiation of an agreement to which any of the Group is a party, which would reasonably be likely to have a Material Adverse Effect on the Group, and no party to such an agreement has given notice of its intention to terminate, or has sought to repudiate or disclaim, such an agreement.

(b)      Neither the Group nor, to the best of such Seller's knowledge, information and belief, any party with whom any of the Group has entered into an agreement is in material breach of any such agreement, except where it would not have a Material Adverse Effect on the Group taken as a whole.

### 9.2    Material Agreements

(a)     To the best of such Seller's knowledge, information and belief, the Group is not a party to, and is not liable under, any material long-term, onerous or unusual agreement, arrangement or obligation including, without limitation:

    (i)     an agreement, arrangement or obligation entered into other than in the usual course of its business exceeding JPY100,000,000;

    (ii)     an agreement, arrangement or obligation entered into other than at arm's length negotiation exceeding JPY100,000,000; or

    (iii)     an agreement, arrangement or obligation restricting the Group's freedom to operate the whole or part of its business or to use or exploit any of its assets.

(b)     The Group is not a member of a joint venture or partnership.

## 10.     TERMS OF TRADE AND BUSINESS

### 10.1     Creditors

No debt owed by the Company exceeding JPY100,000,000 has been overdue for more than four weeks.

## 11.     EFFECT OF SALE

Neither the execution nor the performance of this Agreement or any document to be executed at or before Completion will result in the Company losing the benefit of any material asset, grant, subsidy, right or privilege which it enjoys at the date of this Agreement or will conflict with, result in a breach of, give rise to an event of default under, require the consent of a person under, enable a person to terminate or relieve a person from an obligation under any material agreement or arrangement to which any of the Group is a party or any legal or administrative requirement by which the Group is bound.

## 12.     EMPLOYEES

### 12.1     General

(a)     The Group has not given notice of termination or received notice of resignation from any key employees.

(b)     The Group owes no more than JPY10,000,000 in the aggregate to any of its present or former directors, other officers or employees (or any of their respective dependants) other than for accrued remuneration or reimbursement of business expenses.

(c)     The Group has maintained up-to-date and accurate records regarding the employment of each of its employees and termination of employment. There

are no unpaid wages or other payments owing to any former or current directors, officers and employees.

(d)    There is no agreement or arrangement between such Seller and any of the Group's employees providing for any payments or other benefits in connection with the transactions contemplated under this Agreement.

(e)    None of the Group's employees is currently subject to disciplinary or grievance proceedings.

## 12.2    Compliance With Law

(a)    The Group has complied with all material obligations imposed on it under applicable labor or employment laws and regulations.

(b)    To the best of such Seller's knowledge, information and belief, there is no investigation or enquiry outstanding or anticipated by the Labor Standards Supervision Office (*roudou kijun kantoku sho*) or other governmental organisation or statutory body in connection with the Group.

(c)    There are no active, pending or, to the best of such Seller's knowledge, information and belief, threatened court, tribunal or arbitration proceedings in respect of any existing or former employees of the Group.

(d)    The Company has maintained adequate insurance including employer's liability insurance in respect of its existing and former employees and has been and is in compliance with the Employment Insurance Act (Act No. 116 of 1974, as amended) in Japan, except where it would not have a Material Adverse Effect on the Group taken as a whole.

## 12.3    Incentive Schemes

Other than the Stock Options, the Group does not have and is not proposing to introduce a share incentive, share option, profit sharing, bonus or other incentive scheme for any of its directors, other officers or employees.

## 13.    PENSIONS

13.1    For the purpose of this Paragraph 13, "**Relevant Employee**" means a director or officer or employee or former director or officer or employee of the Company.

13.2    Except for those provided in the Work Rules (*shugyo kisoku*) or any equivalent rules (the "**Scheme**"), the Group is not under any liability or obligation, and is not a party to any ex-gratia arrangement or promise, to pay any retirement benefit, pension, gratuity, annuity, superannuation allowance or the like, or life assurance, medical insurance or permanent health payments or the like, to or for any Relevant Employees or their dependants or other person; and there are no retirement benefits, or pension or death benefits, provident funds or schemes, life assurance or health insurance or health protection, or similar schemes or arrangements in relation to, or binding on, the Group

or to which the Group contributes or has contributed or proposes to contribute, except where it would not have a Material Adverse Effect on the Group taken as a whole.

13.3 Neither the Group nor any of the Relevant Employees is a party to any legal, arbitration, administrative or other proceedings in relation to the Scheme. There are no pending or threatened claims, investigations, lawsuits or arbitrations which have been or may be asserted or instituted against either the Group or any of the Relevant Employees in relation to the Schemes.

## 14.    LIABILITIES

### 14.1    Indebtedness

Except as disclosed in the Accounts, the Group does not have outstanding and has not agreed to create or incur loan capital, borrowings or indebtedness in the nature of borrowings in excess of JPY100,000,000.

### 14.2    Guarantees and Indemnities

(a)    The Group is not a party to and is not liable under a guarantee, indemnity or other agreement to secure or incur a financial or other obligation with respect to another person's obligation exceeding JPY100,000,000.

(b)    No part of the loan capital, borrowings or indebtedness in the nature of borrowings of the Group exceeding JPY100,000,000 is dependent on the guarantee or indemnity of, or security provided by, another person.

### 14.3    Events of Default

No event has occurred or been alleged to have occurred which:

(a)    constitutes an event of default, or otherwise gives rise to an obligation to repay, under an agreement relating to borrowing or indebtedness in the nature of borrowing (or will do so with the giving of notice or lapse of time or both) exceeding JPY100,000,000; or

(b)    will lead to any material Encumbrance constituted or created in connection with borrowing or indebtedness in the nature of borrowing, a guarantee, an indemnity or other obligation of the Group becoming enforceable (or will do so with the giving of notice or lapse of time or both).

## 15.    PERMITS

15.1    The Group has obtained, and has materially complied with the terms and conditions of, each Permit.

15.2    Each Permit is in force and unconditional or subject only to a condition that has been satisfied. To the best of such Seller's knowledge, information and belief, no Permit will be revoked, suspended, cancelled, varied or not renewed.

15.3    Each action required for the renewal or extension of each Permit has been taken.

15.4    To the best knowledge of such Seller, no Permit will be revoked, suspended, cancelled, varied or not renewed as a result of the execution or performance of this Agreement or any document to be executed at or before Completion.

## 16.    INSOLVENCY, WINDING UP, ETC.

16.1    For the purpose of this Paragraph 16, "**Proceeding**" means any claim, action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private), provisional attachment (*kari-sashiosae*), attachment (*sashiosae*), preservative disposition (*hozen-shobun*), protective attachment (*hozen-sashiosae*), procedure for collection of tax delinquency (*tainou-shobun*), compulsory execution (*kyosei-shikko*), provisional injunction (*kari-shobun*), other judicial or administrative proceeding and any other formal or informal inquiry, investigation or inspection commenced or threatened to be commenced, brought, heard or otherwise conducted by or before any governmental authority or arbitrator, and "**Bankruptcy Proceeding**" means bankruptcy proceedings (*hasan*), corporate reorganization proceedings (*kaisha kosei*), civil rehabilitation proceedings (*minji saisei*), special liquidation (*tokubetsu seisan*), and other similar proceedings under applicable law or any rules or regulations of any governmental authority.

16.2    There is no pending Proceeding that has been commenced, or no threat of any Proceeding commencing, against the Group that challenges, or may prevent, delay or otherwise interfere with, the transaction contemplated under this Agreement.

16.3    No Bankruptcy Proceeding has been commenced, or no threat of any Bankruptcy Proceeding commencing, with respect to the Group, and the Group has not suspended its payments and is not insolvent.

## 17.    LITIGATION AND COMPLIANCE WITH LAW

17.1    **Litigation**

(a)    Neither the Group nor a person for whose acts or defaults the Group may be vicariously liable is involved, or has during the two years ending on the date of this Agreement been involved, in any material civil, criminal, arbitration, administrative or other proceeding. No material civil, criminal, arbitration, administrative or other proceeding is pending or, to the best of such Seller's knowledge, information and belief, threatened by or against the Group or a person for whose acts or defaults the Company may be vicariously liable.

(b)    To the best of the Sellers' knowledge, information and belief, no fact or circumstance exists which might give rise to any material civil, criminal, arbitration, administrative or other proceeding involving the Group or a person for whose acts or defaults the Group may be vicariously liable.

(c)     There is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or governmental agency against the Group or a person for whose acts or defaults the Group may be vicariously liable.

17.2    **Compliance With Law**

The Group has conducted its business and dealt with its assets in all material respects in accordance with all applicable laws and regulations and legal and administrative requirements.

17.3    **Investigations**

There is not and has not been any governmental or other enquiry or disciplinary proceeding concerning the Group and none is pending or threatened.   To the best of such Seller's knowledge, information and belief, no fact or circumstance exists which might give rise to an investigation, enquiry or proceeding of that type.

17.4    **Making Unlawful Payments**

To the best of Sellers' knowledge, neither the Group nor any person for whose acts or defaults the Company may be vicariously liable has paid, offered, promised, given or authorised the payment of money or anything of value directly or indirectly to any person:

(a)     intending to induce a person to improperly perform a function or activity or to reward a person for any such performance; or

(b)     while knowing or believing that the acceptance by that person would constitute the improper performance of a function or activity.

17.5    **Receiving Unlawful Payments**

To the best of Sellers' knowledge, neither the Group nor any person for whose acts or defaults the Group may be vicariously liable has directly or indirectly requested, agreed to receive or accepted money or anything of value:

(a)     as a reward for the improper performance of a function or activity by any person;

(b)     in circumstances which amount to an improper performance of a function or activity; or

(c)     intending that as a consequence of any such request, agreement to receive or acceptance a function or activity will be performed improperly.

18.     **DATA PROTECTION AND CYBERSECURITY**

18.1    The Group has complied with the Personal Data Protection Act (Law No. 57 of 2003, as amended) in Japan and all other applicable laws and regulations regulating data protection, privacy or the recording, monitoring or interception of communications (the

"**Data Protection Laws**"), except where it would not have a Material Adverse Effect on the Group taken as a whole.

18.2    Other than in connection with the Crypto-asset Breach, to the knowledge of such Seller, no other unauthorized party has access to or has had access to any hot, cold and warm wallets associated with any customer digital assets of the Group.

## 19.    ARTICLES OF INCORPORATION, REGISTERS AND RETURNS

### 19.1    Articles of Incorporation

The Group is operating and has always operated its business in all material respects in accordance with its Articles of Association or any constitutional documents at the relevant time.

### 19.2    Registers

Each register, minute book and other book which the Group is required by law to keep has been properly kept and contains a proper record of the matters which it is required by the relevant law to record, except where it would not have a Material Adverse Effect on the Group taken as a whole or the Purchaser. No notice has been received or allegation made that a register or book is incorrect or should be rectified.

### 19.3    Returns

All returns, particulars, resolutions and other documents required to be delivered by the Group to the Legal Affairs Bureau (*houmu kyoku*) or another governmental or other authority or agency have been properly prepared and delivered.

## 20.    BROKERAGE OR COMMISSIONS

No person is entitled to receive a finder's fee, brokerage or commission from the Group in connection with this Agreement.

## PART B
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

1.      **Incorporation**

The Purchaser is a company duly incorporated and validly existing under the laws of Antigua and Barbuda.

2.      **Right, power, authority and action**

(a)      The Purchaser has the right, power and authority, and has taken all action necessary, to execute, deliver and exercise its rights, and perform its obligations, under this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement.

(b)      The entry into and performance by the Purchaser of, and the transactions contemplated by this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement do not conflict with, or result in a breach of:

(i)      any law or regulation applicable to it;

(ii)      its constitutional documents (if applicable); or

(iii)      any document which is binding upon it.

(c)      The Purchaser has the right, power and authority to conduct its business as conducted at the date of this Agreement.

3.      **Anti-Social Forces**

The Purchaser is not, does not have any dealings with, and is not otherwise related to, any Anti-Social Forces.

4.      **Binding agreements**

The Purchaser's obligations under this Agreement and each document to be executed at or before Completion are, or when the relevant document is executed will be, enforceable in accordance with their terms.

5.      **Funds**

At Completion, the Purchaser will have adequate funds and assets sufficient to pay for the Initial Cash Consideration, the Retained Cash Consideration, the Crypto Consideration and other amounts to be paid by the Purchaser under this Agreement.

6.      **Share Issuance**

At Completion, the Purchaser completes all necessary procedures to issue and allot the Consideration Shares to the Sellers in compliance with the applicable laws, regulations and rules. Upon issuance, the Consideration Shares are fully paid or credited as fully paid and free from all Encumbrances together with all rights attaching thereto.

7.    **Information**

All statements in the Disclosure Documents in relation to the Purchaser and all documents and information provided or made available by or on behalf of the Purchaser for the purpose of preparation of the Disclosure Documents are true, accurate and not misleading in all material respects and has not omitted any information the omission of which would make any statement in the Disclosure Documents misleading in any material respect.

8.    **Completeness of Disclosure**

All information contained in this Agreement and all other information furnished by or on behalf of the Purchaser to the Sellers or the Sellers' advisers before and during the negotiation leading up to this Agreement is true and accurate in all material respects.

## SCHEDULE 7
## SELLER ACTIONS PENDING COMPLETION

Unless otherwise directed or approved in advance by the Purchaser in writing or contemplated under this Agreement, the Sellers shall ensure that each Group Company will:

**1.**      not amend, or agree to amend, the Articles of Incorporation;

**2.**      not approve a transfer of Shares by any Shareholder except for the transfers contemplated under this Agreement and the Minority Shareholders SPA except for certain contemplated transfers as provided in the Disclosure Schedules;

**3.**      not create, allot, issue, acquire, repay or redeem any share or loan capital or agree, arrange or undertake to do any of those things or acquire or agree to acquire, an interest in a corporate body or merge or consolidate with a corporate body or any other person, enter into any demerger transaction or participate in any other type of corporate reconstruction;

**4.**      not pass any resolution for its dissolution, winding up or liquidation or enter into any composition, reconstruction or arrangement with its creditors generally;

**5.**      excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not acquire or dispose of, or agree to acquire or dispose of, any revenues, assets, business or undertakings exceeding in total JPY100,000,000;

**6.**      excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not to assume or incur, or agree to assume or incur, a liability, obligation or expense (actual or contingent) exceeding in total JPY100,000,000;

**7.**      excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not make, or agree to make, capital expenditure exceeding in total JPY100,000,000 (or its equivalent at the time) or incur, or agree to incur, a commitment or commitments involving capital expenditure exceeding in total JPY100,000,000 (or its equivalent at the time);

**8.**      not declare, pay or make a dividend or distribution or any reduction of capital;

**9.**      not create, or agree to create or amend, an Encumbrance over any property or asset or redeem, or agree to redeem, an existing Encumbrance over any property or asset;

**10.**      not enter into a long-term, onerous, unusual or material agreement, arrangement or obligation in each case, involving consideration, expenditure or Liabilities in excess of JPY500,000,000 other than in the ordinary course of business;

**11.**      not amend or terminate a material agreement, arrangement or obligation to which it is a party or terminate any contract or commitment which is not capable of being terminated without compensation or which is not in the ordinary course of business or which involves or may involve total annual expenditure of JPY500,000,000;

12.    not amend the terms and conditions of employment or engagement of a director or officer or provide, or agree to provide, a gratuitous payment or benefit to a director or officer (or any of their dependants);

13.    not amend, or agree to amend, the terms of its borrowing or indebtedness in the nature of borrowing or create, incur, or agree to create or incur, borrowing or indebtedness in the nature of borrowing, in each case involving an amount of greater than JPY100,000,000;

14.    not give, or agree to give, a guarantee, indemnity or other agreement to secure, or incur financial or other obligations with respect to, another person's obligation;

15.    not make any material changes to its accounting or book-keeping practices or policies;

16.    not commence any claim or litigation or arbitration proceedings, nor compromise, settle, release, discharge or compound any claim or litigation or arbitration proceedings or any action, demand or dispute or waive a right in relation to any claim or litigation or arbitration proceedings;

17.    conduct its business in all material respects in accordance with all applicable legal and administrative requirements in any jurisdiction;

18.    not carry out any activities or actions which are likely to cause a Material Adverse Effect; and

19.    co-operate with the Purchaser to:

    (a)    allow the Purchaser and its agents, upon reasonable request, access to, and to take copies of, the books and records of the Company to a reasonable extent; and

    (b)    ensure the efficient continuation of management and operations of the Company after Completion.

**SCHEDULE 8**
**DISCLOSURE SCHEDULES**

These Disclosure Schedules (the "***Disclosure Schedules***") have been prepared and delivered in connection with the Agreement for the Sale and Purchase of Shares in Liquid Group Inc. (Major Shareholders) (the "***Agreement***"), dated as of November 19, 2021 among FTX Trading Ltd., Liquid Group Inc., IDG China Venture Capital Fund V L.P., IDG Bitmain Fund L.P., IDG China V Investors L.P., JAFCO SV4 Investment Limited Partnership, Kariya Kayamori, and Seth Melamed. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

In disclosing the information provided in these Disclosure Schedules, the Sellers expressly do not waive any attorney-client privilege associated with such information.

The information contained in any clause or paragraph of these Disclosure Schedules shall be deemed to be disclosed in any other clause or paragraph of these Disclosure Schedules to the extent the relevance of such information to such other clause or paragraph is reasonably apparent.

The inclusion of an item in these Disclosure Schedules as an exception to a representation or warranty made by any of the Sellers in the Agreement shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would have a Material Adverse Effect or that such item is required to be listed therein.

No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

Certain agreements and other matters are listed in these Disclosure Schedules for informational purposes only and in no event shall the listing of such agreements or other matters be deemed or interpreted to broaden or otherwise amplify the scope of the representations and warranties or covenants of any of the Sellers in the Agreement.

Headings have been inserted in these Disclosure Schedules for convenience of reference only and shall not be deemed to modify or influence the interpretation of information contained in these Disclosure Schedules.

When a contract, agreement, instrument or other document is referred to herein and copies of such contract, agreement instrument or other document have been made available to the Purchaser, the disclosure contained herein shall be qualified in their entirety by reference to the terms thereof.

**Paragraph 2.2 of Part A of Schedule 6**

1.  Quoine Pte. Ltd. is the issuer of the QASH token, which it sold between 6 November 2017 and 8 November 2017 on the QRYPTOS exchange pursuant to the LIQUID by QUOINE Whitepaper in substantially the form disclosed to the Purchaser ("**Token Sale**").  Quoine Pte. Ltd. announces developments to the features and utilities of the QASH token via its blog located at https://blog.liquid.com/.  Quoine Pte. Ltd. may have ongoing obligations to the purchasers and/or holders of the QASH token in connection with the Token Sale and the ongoing development of the QASH token and the Liquid exchange.

**Paragraph 3.1 of Part A of Schedule 6**
**The Target Shares, the Target Options and the Target Warrants**

**3.1(a)**

1.    Mr. Melamed has proposed to make some or all of the following share transfers prior to the Completion:

      a.    500 Common Shares to four individuals, including three members of the Group's management team and a former employee of the Group who currently provides blockchain services as an independent service provider; and

      b.    2400 Common Shares to immediate family members.

**3.1(d)**

1.    Each of the holders of the Company's Series A preferred stock has the right to purchase up to its pro rata share of any new shares proposed to be issued by the Company, pursuant to a stock subscription agreement dated May 25, 2016 by and between the Company and each such shareholder.

DocuSign Envelope ID: 17292B85-FF50-4B00-8AB9-9F6967AAD918

**Paragraph 3.2 of Part A of Schedule 6**
**Affiliates**

**3.2(b)**

1.     The Group has engaged in discussions with Chinh Nguyen, formerly an employee of Quoine Vietnam Company Limited and currently providing blockchain services to the Group as an independent service provider through an entity controlled by him, regarding the potential establishment of a new entity whose business would focus primarily on the development of a decentralized finance wallet product, among other things.  It is anticipated that the entity's management team, including Mr. Nguyen, would hold a minority ownership interest in the entity and that the remaining ownership interests would be held by the Group.

**Paragraph 5.1 of Part A of Schedule 6**
**Changes Since the Last Accounting Date – General**

**5.1(b)**

1.      Reference is made to the Crypto Asset Breach.

**Paragraph 5.2 of Part A of Schedule 6**
**Changes Since the Last Accounting Date – Specific**

**5.2(b)**

1. At the second ordinary general meeting of Shareholders held on December 30, 2020, the Shareholders approved resolutions on the following matters:
   a. approval of financial statements for the Company's second fiscal year;
   b. reappointment of five directors;
   c. delegation of authority to issue stock options to employees;
   d. partial amendment to the Articles of Incorporation; and
   e. appointment of independent auditors.

2. At a class meeting of holders of Common Shares held on December 30, 2020, the holders of Common Shares approved resolutions on the following matter:
   a. delegation of authority to issue stock options to employees.

**Paragraph 6.1 of Part A of Schedule 6**
**General**

**6.1(a)**

1.      Quoine Pte. Ltd. received a letter dated August 27, 2021 from a law firm representing the City of Philadelphia providing notice that anyone engaged in a business, profession, or other for-profit activity in Philadelphia must file and pay Business Income & Receipts Tax returns.   The letter does not provide an assessment of whether Quoine Pte. Ltd. is in fact required to file annual returns or make any tax payments to the City of Philadelphia.   Quoine Pte. Ltd. is evaluating the requirements to determine if any such annual returns or tax payments may be necessary.

**6.1(b)**

1.      The Group has deferred certain tax payments in accordance with the deferred tax payment schedule disclosed to the Purchaser.   The deferred amounts that remain outstanding are JPY 444,879,669 for Quoine Corporation and SGD 685,357 for Quoine Pte. Ltd., and the Group has sufficient cash on hand to pay such amounts.   Such amounts are subject to revision upon completion of audited financial statements.   The reason for this deferment is largely based on the necessity for the advance pricing agreement calculation to determine the percentage of transfer tax allocation to Quoine Corporation and Quoine Pte. Ltd.   This cannot be completed until the financial audit of Quoine Pte. Ltd. is completed.   More recently, the Group has taken advantage of the tax deferment allowed in Japan due to the COVID-19 pandemic.

**Paragraph 7.1 of Part A of Schedule 6**
**Assets – Sufficiency of Assets**

**7.1(a)**

1.   The Group intentionally has taken a short position on USDT.  As of November 17, 2021, the aggregate customer balance of USDT is 19,195,176.76 and the amount controlled by the Group (including wallets controlled directly by the Group and accounts at external exchanges is USDT 18,522,001.31, corresponding to a deficit of USDT 673,175.45.  The USDT deficit is offset by an excess of USDC, for which the amount controlled by the Group exceeds the aggregate customer balance by USDC 8,114,905.35.

**Paragraph 8.3 of Part A of Schedule 6**

1.  Quoine Pte. Ltd. has granted a license to Liquid Financial USA Inc. to access Quoine Pte. Ltd.'s digital asset trading and exchange platform under the License and Support Agreement dated April 13, 2019 (the "**US License Agreement**") and to allow U.S. citizens and residents to engage in transactions supported by the System, all in accordance with the terms of such agreement.

**Paragraph 9.1 of Part A of Schedule 6**
**Validity of Agreements**

**9.1(b)**

1.  Quoine Pte. Ltd. and Salesforce.com Singapore Pte. Ltd. are parties to Contract 2360897 governed by Salesforce.com's standard Master Services Agreement.   Quoine Pte. Ltd. has not paid an outstanding balance of USD 1,046,001.16 under invoices 17534416 and 18134420 issued thereunder.   A settlement has been reached whereby Quoine Pte. Ltd. will pay 12 monthly payments of USD 37,500 beginning June 15, 2021 followed by 3 monthly payments of USD 50,000, for a total of USD 600,000 (the "**Settlement Amount**").   Pending the execution of a definitive settlement deed, the parties have agreed by email that "The entire unpaid Settlement Amount is accelerated and immediately due and payable in the event of a change in control or in the event Quoine is able to raise USD 20 million or more in additional capital or loan funding." Quoine Pte. Ltd. has not repaid the entire remainder of the Repayment Amount, but has continued to pay the agreed installments, following the Company's receipt of a loan in the amount of USD 120 million from the Purchaser and Quoine Pte. Ltd.'s subsequent capital increase of approximately USD 90 million through the allotment of shares to the Company.   The Group has sufficient cash on hand to pay the remainder of the Settlement Amount upon the Completion.

2.  The objectives of the joint venture described in paragraph 9.2(b) have not been achieved. The likelihood and validity of any potential breach of contract claims by Liquid Financial USA Inc. against Quoine Pte. Ltd. under the US License Agreement or by Venture Capital Partners against the Company under the Stockholders Agreement dated April 13, 2019 cannot be ruled out have not been assessed by the Group.

3.  Quoine Pte. Ltd. has contracted for annual licenses for Oracle ERP cloud services for the five-year period ending September 14, 2023 pursuant to a Statement of Work with Quoine Pte. Ltd. for Oracle ERP Cloud Implementation & Support dated October 16, 2018 and Master Services Agreement dated October 15, 2018 between Tech Mahindra Limited and Quoine Pte. Ltd.   Quoine Pte. Ltd. has not paid the annual license fee of USD 130,274 for each of the years beginning September 15, 2020, September 15, 2021, and September 15, 2022.   The Group ceased using the Oracle ERP cloud services in February 2021, except as necessary for the confirmation of audit adjustments, and expects to cease all usage after November 30, 2021.

## Paragraph 9.2 of Part A of Schedule 6
## Material Agreements

**9.2(a)**

1.    During the term of the US License Agreement, without the prior written consent of Liquid Financial USA Inc., Quoine Pte. Ltd. is not permitted to allow, authorize, license or permit any third party to use any of its trademarks, or use or access Quoine's existing digital asset trading and exchange platform, for the purpose of making available or providing to U.S. persons any asset trading or related services that are directly competitive to the business of Liquid Financial USA Inc. For the avoidance of doubt, the aforementioned restrictions in the US License Agreement does not prevent the Purchaser from licensing or making available (directly or indirectly) its own digital asset trading and exchange platform and associated technologies to any U.S. persons.

2.    Group Companies are parties to the following agreements with terms of at least two years:
    a.    The US License Agreement
    b.    Settlement Agreement dated 29 September 2020 between Quoine Pte. Ltd. and B2C2 Limited.
    *c.*    Statement of Work for Oracle ERP Cloud Implementation & Support dated October 16, 2018 between Tech Mahindra Limited and Quoine Pte. Ltd.
    d.    Order Form dated August 7,2020 between Quoine Corporation and Cloudflare, Inc.
    e.    Lease Agreement dated March 16, 2020 between Quoine Corporation and 株式会社 Mega (Fortinet)
    f.    Lease Agreement dated June 1, 2018 between Quoine Corporation and Fuji Xerox Tokyo Corporation
    g.    Order Form dated May 26, 2021 between Quoine Corporation and Reciprocity, Inc. (Zen GRC)
    h.    Order Form dated July 16, 2020 between Quoine Corporation and Sumo Logic, Inc.
    i.    Lease Agreement dated October 20, 2021 between Quoine Corporation and Plaza Home Corporation.
    j.    Agreement dated March 1, 2020 between Quoine Corporation and SOMPO Himawari Life Insurance Corporation.
    k.    Order Form date July 30,2019 between Quoine Vietnam and Nam Truong Son Integration Corp (Sophos)
    l.    Order Form dated August 1, 2020 between Quoine Pte Ltd and Intercom R&D Unlimited Company
    m.    Order Form dated April 1, 2020 between Quoine Pte and IVXS Technology SG Pte Ltd (Comply Advantage)
    n.    License Agreement dated December 15, 2018 as amended March 7, 2021 between Quoine Pte. Ltd. and Unbound Tech Ltd

       o.      Service Agreement dated January 1, 2019 between Quoine Pte. Ltd. and Pay Asia Pte Ltd

3.      Quoine Pte. Ltd. has sold to OP Sasco LLC ("**OP**") the underlying claim relating to BitSpread Ltd disclosed in item 1 of Paragraph 17.1(a) of Part A of Schedule 6 in exchange for a share of any amounts that may be recovered by OP from Bitspread Ltd., pursuant to an Assignment Agreement dated October 26, 2021.

**9.2(b)**

1.  The Company and Virtual Currency Partners, L.P. ("**VCP**") each own 50% of the shares of Liquid Financial USA Inc., an entity established for the purpose of operating a business (either itself or through a wholly-owned subsidiary) through which certain features of the Liquid exchange would be made available to users located in the U.S. Liquid Financial USA Inc. is not operational and is in the process of winding down. Under the Liquid Financial USA Inc. Stockholders Agreement dated April 13, 2019 by and among VCP, the Company, and Liquid Financial USA Inc., upon the occurrence of certain events Liquid USA is required to redeem a number shares of Liquid Financial USA Inc. calculated in accordance with the provisions of such agreement. To the Company's knowledge, Liquid Financial USA Inc. has not effected such redemption notwithstanding that the specified events requiring redemption have occurred.

**Paragraph 11 of Part A of Schedule 6**
**Effect of Sale**

1.      Reference is made to the disclosures in item 1 of Paragraph 9.1(b) of Part A of Schedule 6.

2.      Reference is made to the disclosures in item 1 of Paragraph 15.4 of Part A of Schedule 6.

3.      The Monetary Authority of Singapore (the "**MAS**") has not been notified of the Agreement or the transactions contemplated thereby.   It is possible that the execution or the performance of the Agreement may negatively impact the license application (the "**Application**") submitted by Quoine Pte. Ltd. under the Payment Services Act 2019 (No. 2 of 2019) (the "**PS Act**"), which may result in the loss of Quoine Pte. Ltd.'s exemption under the Payment Services (Exemption for Specified Period) Regulations 2019 to operate part or all of its business in Singapore.   In particular, the case officer responsible for Quoine Pte. Ltd.'s Application has previously indicated that he expects that approval by the MAS is required under section 28 of the PS Act before there is any change in an applicant's controlling shareholders.   We also understand that this change of ownership constitutes a material change in Quoine Pte. Ltd.'s business plan.   It is uncertain whether the execution of this Agreement prior to obtaining approval from MAS may be deemed a breach of such requirement.

**Paragraph 12.1 of Part A of Schedule 6**
**General**

**12.1(d)**

1.  Due to perceived limitations in the Company's ability to amend the terms of its Stock Options, the Management Shareholders and certain holders of Stock Options entered into a Stock Options Equalization Agreement dated December 20, 2019. The Management Shareholders agreed to make certain payments to such holders in connection with certain change of control transactions in accordance with the terms of such agreement.

**Paragraph 12.2 of Part A of Schedule 6**
**Compliance With Law**

**12.2(c)**

1.  By letter dated December 4, 2020, Quoine Corporation offered three available roles to a member of the Trading Technology team who was then on medical leave. The employee informed the company of his resignation on or around December 15, 2020 and, in an email to all Group personnel, alleged that Quoine Corporation had violated his employment contract. The employee has not made any claim against Quoine Corporation since his resignation.

2.  Three employees of Quoine Pte. Ltd. or Quoine Vietnam Company Limited were the subject of internal investigations due to suspicious account activities and personal behavior in connection with the Crypto Asset Breach:

    a.  An employee of Quoine Vietnam Company Limited under investigation agreed to resign from his position as a DevOps Engineer effective October 15, 2021. The Company intends to submit a denouncement of the employee to the Department of Cybersecurity and High-Tech Crime Prevention and Fighting (A05) under the Ministry of Public Security and Ho Chi Minh City Police for their verification and investigation under the Criminal Procedure Code.

    b.  An employee of Quoine Vietnam Company Limited under investigation will leave his position as Developer due to the expiration of his employment contract effective October 18, 2021. The Company is assessing whether to initiate a criminal investigation.

    c.  An employee of Quoine Pte. Ltd. serving as Head of Product (Japan) was notified of the termination of her employment for cause, effective October 7, 2021, for failure to comply with management's instructions in connection with its investigation of the Crypto Asset Breach. The Company is assessing whether to file criminal charges against the employee. The Company anticipates that the employee may threaten the Group Companies with one or more claims, including for breach of the employment contract and breach of agreements pertaining to share subscription rights (i.e., stock options) held by the employee.

**Paragraph 12.3 of Part A of Schedule 6**
**Incentive Schemes**

1.    In March 2021 the Group announced to employees a revised compensation structure to be effective April 2022, which will contain a base salary component and a component based on individual performance as described in the Salary Policy provided to the Purchaser.

2.    On July 9, 2021, the Group announced to employees via a townhall meeting a one-time bonus in connection with the achievement of certain regulatory milestones, independent of annual performance bonuses that may be paid in the ordinary course of business. Only those employees with full-time employment status as of July 1, 2021 are eligible for the bonus.   The amount of the one-time bonus has been fixed at one month of salary per employee and currently is anticipated to be paid in March 2022.   The Group has made a provision of JPY 48,000,000 for the bonus payments.

3.    On July 27, 2021, the Company's board of directors approved amendments to the terms applicable to the Stock Options and to new stock option grants in substantially the form disclosed to the Purchaser.   Holders of Stock Options who are currently employed by the Group Companies have entered into amendment agreements reflecting such amended terms.

4.    In April 2019, QASH retention awards were granted to Group employees such that QASH tokens would be distributed in four annual installments beginning April 2020. A maximum of 892,500 QASH tokens remain to be distributed in April 2022, and 892,500 QASH tokens remain to be distributed in April 2023, subject in each case to the applicable employees being employed by the Group at the time of distribution.

5.    Quoine Corporation has received notice of resignation from the Group's Head of Middle Office and Treasury Management, effective November 21, 2021.

**Paragraph 13.2 of Part A of Schedule 6**

1.    Quoine Pte. Ltd. provides private health insurance to current employees who are Singapore residents.

2.    Quoine Vietnam Company Limited provides private health insurance and annual health check-ups to current employees in Vietnam.

3.    Quoine Corporation maintains a defined contribution plan, provides private insurance (*Himawari seimei*), and pays a work from home allowance and a transportation allowance for employees in Japan.

**Paragraph 14.1 of Part A of Schedule 6**
**Indebtedness**

1.    The Purchaser extended a loan in the principal amount of USD 120,000,000 to the Company pursuant to the Loan Agreement between the Purchaser and the Company dated August 30, 2021.

2.    Quoine Pte. Ltd. borrowed GYEN stablecoins in the principal amount of GYEN 300,000,000 from GMO-Z.com Wyoming LLC pursuant to a Master Loan Agreement and Loan Borrower Request dated June 29, 2021, as amended.   The principal amount and corresponding loan fee are due and payable in GYEN on November 30, 2021.

**Paragraph 15.1 of Part A of Schedule 6**

1.   Quoine Corporation maintains a crypto asset exchange operator license issued by the
     Financial Services Agency.   In June 2018 the Financial Services Agency issued
     business improvement orders to several licensed crypto asset exchange operators,
     including Quoine Corporation.   Quoine Corporation was required to provided monthly
     reports to the Financial Services Agency in connection with improvement efforts in
     specified business areas.   The Financial Services Agency notified Quoine Corporation
     on 30 June 2021 that it would no longer be subject to monthly reporting requirements.

2.   The Financial Services Agency issued a reporting order (報告徴求命令) to Quoine
     Corporation on 7 September 2021 in connection with the Crypto Asset Breach.

3.   Quoine Pte. Ltd. previously permitted residents of the U.S. to open accounts and trade
     on its cryptocurrency exchange. Quoine Pte. Ltd. does not hold any Permits from any
     U.S. state or national governmental authority. There are no longer any U.S. residents
     authorized to trade on its cryptocurrency exchange.

4.   Quoine Pte. Ltd. received a notice from the Korea Financial Intelligence Unit
     ("**KoFIU**") indicating that virtual asset service providers ("**VASP**") operating
     businesses in Korea should register with the KoFIU under the Act on Reporting and
     Using Specified Financial Transaction Information no later than 24 September 2021
     and that the Group's business is deemed to meet the definition of a VASP outlined by
     such Act.   The Group has not registered with the KoFIU but has taken steps intended
     to take the Group out of the scope of the registration requirements in Korea, including
     to remove its Korean language materials.

5.   Quoine Pte. Ltd. operates globally and has not assessed the requirements, if any, for
     Permits in all jurisdictions where its customers may be located, domiciled, incorporated,
     or organized.

6.   Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of
     Schedule 6.

7.   Quoine Pte. Ltd. offers a crypto-asset contracts-for-difference trading product referred
     to as Liquid Infinity.   In the Consultation Response on MAS' consultation on the
     Proposed Regulatory Approach for Derivatives Contracts on Payment Tokens, the
     MAS defined "Payment Token Derivatives" as derivatives contracts that reference
     payment tokens as underlying assets and indicated that "The PS Act's requirements are
     right-sized to cover the risks posed by the payment activities of payment service
     providers. PS Act licensees therefore should not offer Payment Token Derivatives
     under its suite of activities as the risks associated with Payment Token Derivatives are
     not intended to be addressed by the PS Act."   Quoine Pte. Ltd. is currently evaluating
     options and may cease offering Liquid Infinity in light of these regulatory restrictions.

8.      Quoine Pte. Ltd. lends crypto assets and fiat currency to users for the purpose of margin trading.   We understand that there may be some regulatory restrictions in the scope of such offerings, and in particular, section 20(1) of the PS Act requires that "A licensee must not carry on a business of granting any credit facility to any individual in Singapore."   Quoine Pte. Ltd. is evaluating and may cease offering margin trading to individual customers in Singapore.

DocuSign Envelope ID: 17292B85-FF60-4B09-8AB0-0F6967BAD918

**Paragraph 15.2 of Part A of Schedule 6**

1.      Quoine Pte. Ltd. operates its business in Singapore under an exemption from holding a license under the Payment Services (Exemption for Specified Period) Regulations 2019 of Singapore.  The exemption will cease on the date that Quoine Pte. Ltd.'s license application under the Payment Services Act 2019 is approved or rejected by the Monetary Authority of Singapore or withdrawn by the applicant.

2.      Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

**Paragraph 15.4 of Part A of Schedule 6**

1.      The Financial Services Agency has informed the Group and the Purchaser that the Purchaser must satisfy certain conditions, including with respect to its compliance with applicable laws, prior to the completion of the transactions contemplated by the Agreement.   The Financial Services Agency may revoke, suspend, cancel, or vary a Type I Financial Instruments Business Operation license (the "**Type I License**") or the Crypto-Asset Exchange Service Provider Registration held by Quoine Corporation or decline to grant a Type I License to Quoine Corporation if such conditions are not satisfied prior to the Completion.

2.      Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

## Paragraph 17.1 of Part A of Schedule 6
## Litigation

**17.1(a)**

1.  On 25 March 2019, Quoine Pte. Ltd. commenced a legal action against BitSpread Ltd in the Singapore High Court with case reference number HC/S 317/2019 claiming repayment of certain fiat currency and cryptocurrency loans and/or credit lines (plus interest and costs) previously extended to Bitspread Ltd for purposes of their trading activity on Quoine Pte. Ltd.'s exchange. On 11 September 2020 default judgment was entered against BitSpread Ltd for the Claim Amount.

2.  On 7 January 2021 Quoine Pte. Ltd. filed a criminal complaint to the Delhi Cyber Crime Cell against Flying Saucer E-Commerce Private Limited ("**Flying Saucer**") and its directors, which has subsequently registered under FIR No. 98/2021. The complaint related to Flying Saucer's failure to pay to Quoine Pte. Ltd. amounts in INR deposited by Indian customers to bank accounts controlled by Flying Saucer on Quoine Pte. Ltd.'s behalf. On 23 June 2021 Flying Saucer and Quoine Pte. Ltd. entered into a settlement agreement under which Flying Saucer and its directors would pay a settlement amount of INR 330,070,000 to Liquid Group's Indian subsidiary, Quoine India Private Limited. Payments of the settlement amount were completed on or around 2 July 2021. Pending Quoine India Private Limited's application to the Reserve Bank of India for the cross-border transfer of funds, Quoine India Private Limited has been unable to transfer the proceeds of the settlement to Quoine Pte. Ltd. Approval of such transfer is subject to the discretion of the Reserve Bank of India and, if successful, is anticipated to take at least six months.

3.  Court proceedings were commenced by B2C2 Limited ("**B2C2**") against Quoine Pte. Ltd. in the Singapore High Court on 18 May 2017 with case reference number SIC/S 7/2017. Those proceedings related to B2C2's claim that in April 2017 Quoine Pte. Ltd. had wrongfully reversed certain trades involving B2C2 which were carried out on its virtual currency exchange, QUOINEX. On 9 October 2020 Quoine Pte. Ltd. and B2C2 entered into a Settlement Agreement whereby B2C2 received a sum of USD 3,250,000 out of the sum of USD 4,000,000 previously paid into the court by Quoine Pte. Ltd. and Quoine Pte. Ltd. received the remainder of USD 750,000. Such payments have been completed. In addition, B2C2 is entitled to a refund of all trading fees it pays Quoine Pte. Ltd. in connection with its trading activities on the exchange platform operated by QE for a period of two years starting from 9 October 2020, up to a maximum amount of USD 250,000 or its equivalent. The action in SIC/S 7/2017 has been discontinued. B2C2 has not incurred any trading fees since such time, and no payments are owed to B2C2.

4.  A customer filed suit against Quoine Corporation alleging that following the plaintiff's instructions around April 12, 2017 for a withdrawal of BTC 41.91165919, Quoine Corporation erroneously transferred such BTC to a recipient other than the plaintiff.

The plaintiff sought the retransmission of BTC 41.91165919 to a wallet designated by the Plaintiff. The parties settled the dispute for JPY 42 million, and such payment has been completed.

5.   Quoine Pte. Ltd. received a Notice of Default and Termination dated 22 November 2019 from a law firm representing SUKU Global in connection with the hosting, on Liquid, of an IEO and Listing for the SUKU Digital Asset. The letter demands a full refund of fees paid to Quoine Pte. Ltd. in the amount of USD 150,000, contains various allegations and claims against Quoine, and asserts SUKU Global's intent "to bring any necessary enforcement action in the United States and assert jurisdiction over you." Quoine Pte. Ltd. delivered a reply to the law firm dated 4 December 2019 in which it rejected the assertion of any U.S. court's jurisdiction over Quoine Pte. Ltd. and denied each allegation and claim set out in the 22 November 2019 letter. There have been no further communications from the law firm since December 2019.

6.   In December 2017 a customer informed Quoine Pte. Ltd. that a third party allegedly gained unauthorized access to the email account associated with the customer's account login ID on the Qryptos exchange operated by Quoine Pte. Ltd. Upon gaining control of the customer's Qryptos account, the third party sold QASH 140,143 for ETH 26.38360149 and BTC 3.99850070 and withdrew such amounts. The customer alleged that Quoine Pte. Ltd. was negligent in the performance of its duties, including by allowing the bad actor to reset the account password and disable two-factor authentication. Demand was made for USD 243,746.43 or, alternatively, ETH 26.38360149 and BTC 3.99850070. On 19 May 2021, an agreement was reached whereby Quoine Pte. Ltd. would pay USD 50,000 in USDT in full settlement of the matter. Such payment was completed on 26 May 2021.

7.   In May 2021 a customer made various allegations including that stop loss orders purportedly placed by him on the Liquid exchange disappeared and were not triggered as expected, and that another position was incorrectly liquidated. The customer's estimation of losses was approximately SGD 130,000 and 0.45 BTC as of 21 July 2021. The customer has threatened to contact media outlets and to bring legal action against Quoine Pte. Ltd. Quoine Pte. Ltd. denies all of the allegations, and the parties are in discussions to resolve amicably.

8.   Quoine Pte. Ltd. received a letter dated 13 November 2020 containing various allegations against Quoine Pte. Ltd. in connection with the customer's claim of having been defrauded by a third party and requesting reimbursement of USD 87,964. Quoine Pte. Ltd. received a subsequent letter from the customer dated 13 January 2020 reasserting the allegations and the request for USD 87,964.

9.   Quoine Pte. Ltd. received a letter dated 23 July 2020 from Pepperstone Group alleging that Quoine Pte. Ltd. had come into possession of a list of Pepperstone Group's clients and used such information to solicit such clients' business without consent, and threatening legal action against Quoine Pte. Ltd. Quoine Pte. Ltd. denied such

allegations.  There have been no communications with Pepperstone Group since 31 July 2020.

10. Quoine Pte. Ltd. and Quoine Corporation receive complaints from customers in the ordinary course of business involving amounts in controversy of less than the equivalent of USD 100,000.  Various complaints have been settled through direct discussions with the respective customer or, in the case of Quoine Corporation, alternative dispute resolution procedures.

11. A former employee of Quoine Corporation raised a claim for wrongful termination following his May 2020 dismissal.  Quoine corporation paid an amount of JPY 5 million in settlement of such claim.

12. Quoine Pte. Ltd. experienced a personal data breach in November 2020.  Quoine Pte. Ltd. has entered into an Expedited Decision Agreement with the Singapore Personal Data Protection Commission ("**PDPC**"), under which Quoine Pte. Ltd. has acknowledged a prima facie breach of the Personal Data Protection Act and the PDPC is expected to expedite its review of the incident and reduce the amount of any penalty assessed.

## 17.1(b)

1. Reference is made to the matters regarding Salesforce.com Singapore Pte. Ltd. described in item 1 of Paragraph 9.1(b) of Part A of Schedule 6.

2. Reference is made to the matters regarding Liquid Financial USA Inc. described in item 2 of Paragraph 9.1(b) of Part A of Schedule 6.

3. Quoine Pte. Ltd. experienced a personal data breach in November 2020.  The Group reported such breach to the data privacy authorities in various jurisdictions. Authorities in certain jurisdictions have not confirmed whether any investigation has been or will be conducted.

4. Reference is made to item 1 of the disclosures in Paragraph 18.2 of Part A of Schedule 6.  The Group reserves the right to pursue criminal or other proceedings against the former employee in question.

5. In or around January 2017, Quoine Pte. Ltd. suspended the account of a customer and former employee for violation of the terms and conditions of the QUOINEX exchange. Quoine Pte. Ltd. received a letter dated 3 May 2018 from a law firm representing the customer, which demanded removal of the suspension and remittance of the account balance and threatened legal action in the case of Quoine Pte. Ltd.'s failure to comply. Following discussions in which Quoine Pte. Ltd. asserted claims against the customer for recovery of profits due to improper trading activities, a settlement offer was discussed but not agreed by the parties.  In June 2021, the customer contacted Quoine Pte. Ltd.'s customer support inquiring to reinstate the account.  As of 26 October 2021,

the customer's balance was equal to the equivalent of USD 326,806.61. The parties have agreed on a settlement whereby Quoine Pte. Ltd. would return USD 98,000 to the customer and retain the remainder. Quoine Pte. Ltd. has liquidated the customer's balance, completed the payment of USD 98,000, and retained the remaining balance.

6.  Reference is made to the disclosures in item 3 of Paragraph 9.1(b) of Part A of Schedule 6.

7.  Reference is made to the disclosures in item 1 of Paragraph 12.2(c) of Part A of Schedule 6.

8.  Reference is made to the disclosures in item 2 of Paragraph 12.2(c) of Part A of Schedule 6.

9.  In connection with the Crypto Asset Breach, the Group may in its discretion pursue civil, criminal, arbitration, administrative or other proceedings and the Group may be the subject of civil, criminal, arbitration, administrative or other proceedings.

**Paragraph 17.2 of Part A of Schedule 6**
**Compliance With Laws**

1.      Reference is made to the disclosures in item 3 of Paragraph 15.1 of Part A of Schedule 6.

2.      Reference is made to the disclosures in item 4 of Paragraph 15.1 of Part A of Schedule 6.

3.      Reference is made to the disclosures in item 7 of Paragraph 15.1 of Part A of Schedule 6.

4.      Reference is made to the disclosures in item 8 of Paragraph 15.1 of Part A of Schedule 6.

5.      Reference is made to the disclosures in item 5 of Paragraph 17.3 of Part A of Schedule 6.

6.      Reference is made to the disclosures in item 2 of Paragraph 18.1 of Part A of Schedule 6.

7.      Quoine Pte. Ltd. permits residents of China to open accounts and trade on its cryptocurrency exchange notwithstanding announcements from Chinese authorities characterizing cryptocurrency-related business activities as illegal financial activities.

8.      With respect to stock options awarded to employees by the Company, Quoine Vietnam Company Limited has not registered with the State Bank of Vietnam any stock option award program or offshore employee share ownership program ("**ESOP**") or complied with other requirements that may be applicable to an ESOP under Vietnamese law.

9.      Quoine Pte. Ltd. operates globally and has not assessed the laws and regulations, including requirements, if any, for Permits, in all jurisdictions where its customers may be located, domiciled, incorporated, or organized.

**Paragraph 17.3 of Part A of Schedule 6**
**Investigations**

1.    Reference is made to the disclosures made under Paragraph 15.1 of Part A of Schedule 6.

2.    Reference is made to the disclosures made in item 12 under Paragraph 17.1(a) of Part A of Schedule 6 and item 3 under Paragraph 17.1(b) of Part A of Schedule 6.

3.    Reference is made to the disclosures made in item 8 under Paragraph 17.2 of Part A of Schedule 6.

4.    Reference is made to the disclosures made in item 9 under Paragraph 17.2 of Part A of Schedule 6.

5.    Quoine Pte. Ltd. offers crypto asset rewards to users subscribed to its Liquid Earn product.  Quoine Pte. Ltd. acquires the crypto assets used to pay such rewards by pooling the crypto assets of users subscribed to its Liquid Earn product, depositing these assets with Celsius Network LLC ("**Celsius**"), and earning crypto asset rewards from Celsius on such assets.  U.S. residents are not permitted to use Quoine Pte. Ltd.'s services, including Liquid Earn.  Quoine Pte. Ltd. received a letter dated October 8, 2021, from the Texas State Securities Board in connection with an enforcement act against Celsius and its affiliates, providing notice that Quoine Pte. Ltd. is required to comply with the Securities Act, Tex. Rev. Civ. Stat. Ann. Arts. 581-1-581-45.  Quoine Pte. Ltd. also received a letter dated October 26, 2021, from the Kentucky Public Protection Cabinet, Department of Financial Institutions, Division of Securities, Enforcement Branch, in connection with an Emergency Order to Cease and Desist against Celsius (the "**Order**"), providing notice that Quoine Pte. Ltd. is required to comply with the Securities Act of Kentucky, KRS Chapter 292 and the Order.

## Paragraph 18.1 of Part A of Schedule 6

1.      Reference is made to the disclosures made in item 12 under Paragraph 17.1(a) of Part A of Schedule 6 and item 3 under Paragraph 17.1(b) of Part A of Schedule 6.

2.      The Group has not conducted an analysis of all Data Protection Laws in each jurisdiction from which customers may have provided personal data, and there may be deficiencies with respect to compliance with applicable Data Protection Laws.

**Paragraph 18.2 of Part A of Schedule 6**

1.      In May 2021 Group staff discovered the unauthorized withdrawal of BTC from dormant
client accounts that had occurred in April 2021.   All affected accounts were with
Quoine Pte. Ltd.   During the course of an internal investigation, the Group's Head of
DevOps admitted responsibility for the withdrawals and returned all missing assets.
The employee was terminated for cause.

**Paragraph 19.3 of Part A of Schedule 6**
**Returns**

1.    The following items have not yet been registered with the Legal Affairs Bureau (*houmu kyoku*):

   a.        the Company's issuance of the 18th, 19th, and 20th Stock Options; and

   b.        the Company's extinguishment of certain Stock Options following the departure of Group employees.

2.    Quoine Pte. Ltd. has not filed annual returns or financial statements with the Accounting and Corporate Regulatory Authority of Singapore for the fiscal years that ended March 31, 2019 and March 31, 2020.

[END]

**EXECUTED** by the parties:

**Sellers**

Signed by **KARIYA KAYAMORI**    )

DocuSigned by:
AF51D8AA2A454C9...

Signed by **SETH MELAMED**    )

DocuSigned by:
*Seth Melamed*
AB51C4F394AE497...

| | |
|---|---|
| Signed by Chi Sing HO | ) |
| as duly authorised representative of | ) |
| and for and on behalf of | ) |
| **IDG CHINA VENTURE** | ) |
| **CAPITAL FUND V L.P.** | ) |
| By: IDG China Venture | ) |
| Capital Fund V Associates L.P., | ) |
| its General Partner | ) |
| By: IDG China Venture Capital | ) |
| Fund GP V Associates Ltd., | ) |
| its General Partner | ) |

DocuSigned by:
*Simon Ho*
DC2E464F9D444FD...

| | |
|---|---|
| Signed by Chi Sing HO | ) |
| as duly authorised representative of | ) |
| and for and on behalf of | ) |
| **IDG BITMAIN FUND L.P.** | ) |
| By: IDG Bitmain Fund Associates L.P., | ) |
| its General Partner | ) |
| By: IDG Bitmain Fund GP | ) |
| Associates Ltd., | ) |
| its General Partner | ) |

DocuSigned by:
*Simon Ho*
DC2E464F9D444FD...

| | |
|---|---|
| Signed by Chi Sing HO | ) |
| as duly authorised representative of | ) |
| and for and on behalf of | ) |
| **IDG CHINA V INVESTORS L.P.** | ) |
| By: IDG China Venture Capital Fund | ) |
| GP V Associates Ltd. | ) |
| its General Partner | ) |

DocuSigned by:
*Simon Ho*
DC2E464F9D444FD...

Signed by Shinichi Fuki                    )
as duly authorised representative of       )
and for and on behalf of                   )
JAFCO Group Co., Ltd.                      )
as General Partner of                      )
**JAFCO SV4 INVESTMENT**                   )
**LIMITED PARTNERSHIP**                    )

DocuSigned by:

Shinichi Fuki

4B65754D3CAE46D...

**<u>Purchaser</u>**

| | |
|---|---|
| Signed by Sam Bankman-Fried | ) |
| as duly authorised representative of | ) |
| and for and on behalf of | ) |
| **FTX TRADING LTD.** | ) |

DocuSigned by:

*Sam Bankman-Fried*

672DA88132804B9...

Signature Page for Purchaser
(Major Shareholders SPA)

**Company**

Signed by Kariya Kayamori      )
as the representative director of   )
and for and on behalf of       )
**LIQUID GROUP INC.**        )

DocuSigned by:

AF51D8AA2A454C9...

EXHIBIT 3

**<u>EXECUTION VERSION</u>**

**LIQUID GROUP INC.**

AND

**KARIYA KAYAMORI**

---

**MANAGEMENT AGREEMENT**

---

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Appointment | 4 |
| 3. | Executive's Duties and Responsibilities | 4 |
| 4. | Remuneration and Other Benefits | 5 |
| 5. | Indemnification | 6 |
| 6. | Expenses | 8 |
| 7. | Deductions; Return of Materials | 8 |
| 8. | Confidentiality | 8 |
| 9. | Intellectual Property Rights | 9 |
| 10. | Executive's Warranties and Undertakings | 9 |
| 11. | Termination | 11 |
| 12. | Notice | 12 |
| 13. | Legal Representation | 13 |
| 14. | Entire Agreement | 13 |
| 15. | Miscellaneous | 13 |
| 16. | Governing Law and Jurisdiction | 14 |

**THIS AGREEMENT** is made on _____3/31/2022_____ .

**BETWEEN**:

(1)    **LIQUID GROUP INC.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan (the "**Company**"); and

(2)    **KARIYA KAYAMORI**, a Japanese national having his address at 8 Orange Grove Road #06-02, Singapore 258342 (the "**Executive**").

**WHEREAS**:

(A)    The Company is a subsidiary of FTX Trading Ltd., a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda ("**FTX**").

(B)    The Company has agreed to appoint the Executive and the Executive has agreed to serve the Company as a Representative Director and CEO of the Company on the terms and conditions set out hereinafter.

**THE PARTIES AGREE** as follows:

**1.    INTERPRETATION**

1.1    **Definitions**

In this Agreement:

"**Accrued Amounts**" means, collectively, the items set forth in Clause 11.5.

"**Affiliate**" means, with respect to any person, any other person controlling, controlled by or under common control with such specified person. For the purposes of this definition, "**control**" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing.

"**Agreement**" means this Management Agreement, as amended or supplemented in accordance with the terms hereof from time to time.

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) of the Company.

"**Board of Directors**" means the board of directors (*torishimariyakukai*) of the Company.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cause**" means any of the following: (a) the Executive willfully engages in conduct that is in bad faith and materially injurious to the Company, including but not limited to, misappropriation of trade secrets, fraud or embezzlement; (b) the Executive commits a material breach of this Agreement, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach; (c) the Executive willfully refuses to implement or follow a reasonable and lawful directive by the Board of Directors, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the Company; (d) the Executive engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with his position, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the Company; (e) is disqualified from serving as a director under any applicable law; (f) the Executive engages in a course of vexatious comment or conduct towards employees or consultants of the Company, that is known or ought reasonably to be known to be unwelcome, and such course of comment or conduct persists despite warnings from the Company; or (g) the Executive resigns from his position as a Representative Director and/or CEO without the prior approval of the Board of Directors.

"**CEO**" means the chief executive officer of the Company.

"**Childcare Allowance**" has the meaning given in Clause 4.1.

"**Companies Act**" means the Companies Act of Japan (Act No. 86 of 2005), as amended from time to time.

"**Confidential Information**" means any information including, but not limited to, trade secrets, disclosed to the Executive or known by the Executive as a consequence of or through his performance of services hereunder, concerning the business or finances of any member of the Group or any of its dealings, transactions or affairs, including without limitation, lists or details of customers, suppliers, information relating to the working of any process of invention carried on or used by the Company or any member of the Group, information relating to research projects, know-how, technology, trade secrets, prototypes, prices, discounts, mark-ups, future business strategy, marketing and price-sensitive information.

"**Crypto Trading Business**" means the development and operations of an exchange trading platform for the sale and purchase of crypto-assets, crypto asset-based derivatives, margin lending, non-fungible tokens, and other crypto asset-based financial products, as carried on by the Company or any member of the Group from time to time.

"**Directors' and Officers' Insurance**" has the meaning given in Clause 5.6.

"**Effective Date**" means the Completion Date as provided for and defined in the Major Shareholders SPA.

"**Expenses**" has the meaning give in Clause 5.1.

"**FTX Board of Directors**" means the board of directors of FTX.

"**FTX Common Shares**" means shares of the common stock of FTX.

"**Good Reason**" means any of the following actions by the Company without the written prior consent of the Executive: (a) a material reduction in the Executive's duties or responsibilities that is inconsistent with the Executive's position, provided that a mere change of title alone shall not constitute such a material reduction; (b) a greater than 10% aggregate reduction (that is, a material reduction) by the Company in the Services Fee or a material reduction in his employee benefits (namely, the Housing Allowance, the Childcare Allowance, medical, dental, insurance, short-term and long-term disability insurance and retirement plan benefits, collectively, the "**Employee Benefits**") to which such Executive is entitled immediately prior to such reduction (other than in connection with a general decrease in the salary or Employee Benefits of substantially all employees of the Company); (c) a relocation of the Executive's principal office to a location that increases the Executive's commute by more than 80 kilometers, except for required travel by the Executive on business for the Company, an Affiliate of the Company, or any other member of the Group; or (d) a failure to maintain the Executive's concurrent appointment as both Representative Director and CEO at any time during the Term.

"**Group**" means FTX and its Affiliates from time to time and "**member(s) of the Group**" shall be construed accordingly.

"**Housing Allowance**" has the meaning given in Clause 4.1.

"**Intellectual Property Rights**" means all rights in or to any patent, copyright, database rights, registered design or other design right, utility model, trade mark, brand name, service mark, trade name, eligible layout right, chip topography right, trade secrets, know-how and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registrable or not and wherever existing, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights.

"**Major Shareholders SPA**" means the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated 19 November 2021 entered into between the Executive, the Company and certain other parties thereto, as amended by that certain First Amendment to Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated as of March 31, 2022.

"**Notice**" has the meaning given in Clause 12.1.

"**Option**" has the meaning given in Clause 4.4.

"**Proceeding**" has the meaning given in Clause 5.1.

"**Representative Director**" means a representative director (*daihyo torishimariyaku*) of the Company.

"**Services Fee**" has the meaning given in Clause 4.1.

"**SGD**" means Singapore dollars, the lawful currency of Singapore.

"**Shareholders**" means the shareholders of the Company.

"**Term**" has the meaning given in Clause 2.2.

"**USD**" means United States dollars, the lawful currency of the United States of America.

1.2    **References to certain general terms**

    (a)    References herein to Clauses are to Clauses in this Agreement.

    (b)    Headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

    (c)    References to this Agreement are to this management agreement as amended, varied, modified or supplemented from time to time.

    (d)    Unless the context requires otherwise, words importing the singular only shall include the plural and vice versa and words importing natural persons shall include corporations and unincorporated associations and words importing the masculine gender only shall include the feminine gender and the neuter gender and vice versa.

    (e)    The expressions the "Company" and the "Executive" shall, where the context permits, include their respective successors, personal representations, executors, administrators, estates and permitted assigns.

## 2.    APPOINTMENT

2.1    The Company shall appoint the Executive and the Executive shall serve the Company concurrently as a Representative Director and CEO, subject to the terms and conditions of this Agreement.

2.2    This Agreement shall be effective as of the Effective Date and continue until such time as this Agreement is terminated in accordance with Clause 11 (the "**Term**").

2.3    The Company shall take all necessary procedures to promptly effect, and maintain during the Term of this Agreement, the Executive's appointment as a Representative Director and CEO in accordance with the Companies Act, the Articles of Incorporation, and other organizational documents of the Company.

## 3.    EXECUTIVE'S DUTIES AND RESPONSIBILITIES

3.1    The Executive shall, during the Term of this Agreement:

    (a)    serve the Company as a Representative Director and CEO and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors or the Companies Act in pursuance of his duties hereunder, perform such services for the Company, which duties, authority, and responsibilities are consistent with the Executive's position, and (without further remuneration unless otherwise agreed) accept such offices and positions as the Board of Directors may from time to time reasonably require, and he will perform those duties at such place or places as the Board of Directors may from time to time reasonably determine;

(b)    comply with and conform to any lawful instructions or directions from time to time given or made by the Board of Directors, and:

    (i)    maintain the confidentiality of all Confidential Information he acquires by virtue of his appointment;

    (ii)    carry out his responsibilities with care, skill and diligence which the Company is reasonably entitled to expect from someone of his experience and expertise;

    (iii)    act in good faith and diligently serve the Company and use his best endeavours to promote the business and interests thereof;

    (iv)    to act at all times for the proper purposes of the Company; and

(c)    to act only with the proper authority of the Board of Directors;

(d)    keep the Board of Directors promptly and fully informed (in writing if so requested) of his conduct of the business or affairs of the Company or the Group and provide such explanations as the Board of Directors may require in connection therewith;

(e)    carry out his duties and exercise his powers jointly and collectively with any other director or executive of the Company as shall from time to time be appointed by the Board of Directors; and

(f)    comply with (and use his best endeavours to procure the Company's compliance with) the Articles of Incorporation and all laws, rules, regulations and guidelines which are applicable to the Company or the Executive from time to time.

**4.    REMUNERATION AND OTHER BENEFITS**

4.1    During the Term of this Agreement, the Executive shall be entitled to the following remuneration and allowances:

(a)    a monthly services fee of USD42,000.00 (the "**Services Fee**");

(b)    a monthly housing allowance of SGD7,700.00 (the "**Housing Allowance**"); and

(c)    a monthly childcare allowance of USD6,000.00 (the "**Childcare Allowance**"),

payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that the Services Fee, the Housing Allowance and the Childcare Allowance shall be prorated for any partial month of services during the Term of this Agreement. All payments made pursuant to this Section 4.1 shall be made in the corresponding currencies set forth in this Section, or such other currency as the parties may agree upon from time to time. In the event another currency is so agreed upon, then the amount to be paid shall be calculated using the foreign exchange selling rate for that other currency for the Business Day preceding the payment due date as published in the Wall Street Journal, or such other method as the parties may agree upon from time to time.

4.2    During the Term of this Agreement, the Board of Directors may, within the limits of the amounts approved by the Shareholders at the general meeting of the Company, at its sole and absolute discretion, pay the Executive an annual bonus (the "**Bonus**") with a target amount equal to 100% of the annual Services Fee, which shall be prorated for any partial year of services during the Term of this Agreement, and subject to such conditions as the Board of Directors may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and the Company and such other factors as the Board of Directors may in its sole and absolute discretion consider necessary or appropriate.

4.3    During the Term of this Agreement, the Executive shall be entitled to the Employee Benefits, including the benefits under any medical insurance scheme and any employee benefit plan adopted by the Company for its directors and employees from time to time.

4.4    As soon as practicable following the Effective Date, the Company shall recommend to the FTX Board of Directors that the Executive be granted an option (the "**Option**") to purchase 28,000 shares of the FTX Common Shares under FTX's 2020 Equity Incentive Plan, as amended from time to time. The Option shall be subject to monthly vesting over four years with a one-year cliff, and shall be evidenced by FTX's standard form of option agreement. The exercise price of the Option shall be the fair market value of the FTX Common Shares on the date of grant, as determined by the FTX Board of Directors in its sole and absolute discretion.

## 5.    INDEMNIFICATION

5.1    Subject to Clause 5.4, to the fullest extent permitted by applicable law, in the event that the Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**") by reason of the fact that the Executive is or was a director or officer of the Company, any Affiliate of the Company, or any other member of the Group, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, the Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses reasonably incurred in defence of any Proceeding (including attorneys' fees) (collectively, the "**Expenses**").

5.2    The Expenses reasonably incurred by the Executive in defence of the Proceeding shall be paid by the Company in advance of the final disposition of such litigation upon receipt by the Company from time to time of:

(a)    a written request for payment;

(b)    appropriate documentation evidencing the incurrence, amount, and nature of the Expenses for which payment is being sought; and

(c)    an undertaking adequate under applicable law made by or on behalf of the Executive to repay the Company:

> (i)　　all amounts paid by the Company if it shall ultimately be determined that the Executive is not entitled to be indemnified by the Company under this Agreement; and
>
> (ii)　　all amounts paid to or recovered by the Executive from any person (including but not limited to the insurance carrier under the Directors' and Officers' Insurance) with respect to the Proceeding.

5.3　　No determination as to entitlement to indemnification (including in respect of advanced payments) under this Agreement shall be required to be made prior to the final disposition of a Proceeding.

5.4　　Notwithstanding any provision in this Agreement to the contrary, the Company shall not be obligated to indemnify the Executive for Expenses:

> (a)　　to the extent prohibited by any applicable laws and regulations;
>
> (b)　　to the extent such Expenses have been paid directly to the Executive by the insurance carrier under the Directors' and Officers' Insurance and/or any other person;
>
> (c)　　in respect of a Proceeding initiated by the Executive or the Company related to any contest or dispute between the Executive and the Company or any of its Affiliates with respect to this Agreement or the Executive's performance of services under this Agreement;
>
> (d)　　in respect of any liabilities relating to any taxation payable by the Executive in connection with his remuneration or other payments or benefits received from the Company;
>
> (e)　　in respect of any liabilities incurred by, or any Proceeding made against, the Executive arising from the Executive's fraud, wilful default, wilful misconduct or gross negligence; or
>
> (f)　　in respect of any liabilities arising out of, relating to or in connection with any actions taken or inactions by the Executive prior to the Effective Date (except to the extent that any Expenses incurred thereto are recoverable from the insurance carrier under the Directors' and Officers' Insurance by the Company).

5.5　　The Company shall, at the sole and absolute discretion of the Board of Directors, be entitled to (i) participate in the Proceeding and/or (ii) assume the defence of the Proceeding; provided, however, that the Company shall be required to obtain the Executive's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant the Executive a complete release of liability, (2) would impose any penalty or limitation on the Executive, or (3) would admit any liability or misconduct by the Executive.

5.6　　During the Term of this Agreement and for a period of six (6) years thereafter, the Company or any successor to the Company shall use commercially reasonable efforts to maintain, at its own expense, directors' and officers' liability insurance (the "**Directors' and Officers' Insurance**") providing coverage to the Executive in amounts and on terms reasonable and customary for similarly situated companies.

5.7    The Executive shall fully assist, at the Company's sole expense, the Company to the extent reasonably necessary in any claims or lawsuits between the Company and the insurance carrier under the Directors' and Officers' Insurance in respect to a Proceeding.

5.8    In the event any Expenses paid by the Company to the Executive are recovered by the Executive from the insurance carrier under the Directors' and Officers' Insurance, the Executive shall repay the Company such recovered amounts.

5.9    For the avoidance of doubt, the provisions of this Clause 5 shall survive the termination or expiration of this Agreement.

## 6.    EXPENSES

The Company shall reimburse the Executive for all reasonable expenses properly incurred in the performance of his duties hereunder and the Executive shall, if so required, provide the Company with receipts or other evidence of the payment of such expenses.

## 7.    DEDUCTIONS; RETURN OF MATERIALS

7.1    The Company shall be entitled at any time to deduct from the Executive's remuneration hereunder (including but not limited to the Services Fee, the Housing Allowance, the Childcare Allowance and the Bonus) any monies due from him to the Company for outstanding loans, advances and any other monies lent to him by the Company.

7.2    The Executive will return all equipment that he borrowed from the Company in the same condition (other than for normal wear and tear) in which it was received within five (5) days after the termination or expiration of this Agreement, however occurring.

## 8.    CONFIDENTIALITY

8.1    The Executive shall not during or after the Term of this Agreement use or divulge to any person any Confidential Information which may have come to his knowledge.

8.2    Clause 8.1 does not apply to any use or disclosure of Confidential Information:

(a)    as required during the Term of this Agreement in performance of the Executive's authorized duties to the Company (such disclosures to be made within the limits and to the extent of such duties);

(b)    to the extent that such Confidential Information is generally known to the public not as a result of a breach of the Executive's duty of confidentiality to a member of the Group;

(c)    to the extent that such Confidential Information is required to be disclosed by law, provided that to the extent permitted by law (i) the disclosure shall be made after consultation with the Company and after allowing the Company, at the Company's sole cost and expense, the opportunity to contest such disclosure and after taking into account the Company's requirements as to its timing, content and manner of disclosure, (ii) such disclosure shall only be made to the extent legally required, and (iii) following such disclosure such disclosed

- 8 -

Confidential Information shall continue to be treated as Confidential Information hereunder; or

(d)     as permitted by the Company's prior written consent.

## 9.     INTELLECTUAL PROPERTY RIGHTS

9.1     The Executive acknowledges that as between the Company and the Executive any and all Intellectual Property Rights which are owned by the Company at the Effective Date and/or which are created or developed from time to time in connection with the Executive's service hereunder and the business or the operation of the Company are owned by the Company. The Executive:

(a)     hereby assigns, and agrees to assign, all such Intellectual Property to the Company, and undertakes to, forthwith and from time to time both during and after the Term of this Agreement and at the request of the Company, at the Company's sole cost and expense, render all reasonable assistance to the Company (or any other member of the Group as the case may be) for obtaining letters patent or other protection or registration for any such Intellectual Property Rights and shall vest such letters patent or other protection in the Company (or any other member of the Group as the case may be) or its nominees; and

(b)     irrevocably authorises the Company and any member of the Group for the purposes aforesaid to make use of the name of the Executive and execute any document or do anything on his behalf. The Executive agrees to confirm and ratify all such acts and instruments.

9.2     The Executive shall not during or after the Term of this Agreement, directly or indirectly, except with the prior written consent of the Company or in the ordinary course of the Company's business:

(a)     use the name "Liquid", "Quoine" or "FTX" or any name similar to that of the Company, FTX or any member of the Group or any colourable imitation thereof in connection with any business; and

(b)     use any Intellectual Property Rights of the Group in connection with any business not belonging to the Group.

## 10.     EXECUTIVE'S WARRANTIES AND UNDERTAKINGS

10.1    The Executive represents, warrants and undertakes during the Term of this Agreement that:

(a)     he is not bound by or subject to any court order, agreement, arrangement or undertaking which in any way restricts or prohibits him from entering into this Agreement or from performing his duties hereunder;

(b)     to the Executive's knowledge there is no circumstance in respect of which there is, or is likely to be, a conflict of interest between the Executive or any of his Affiliates and the Company; and

(c)    he shall notify the Company promptly in writing of any change to the information referred to in Clause 10.1.

10.2    Subject to Clause 10.3 and Clause 10.5, the Executive shall not, unless he acts on behalf of the Company or any other member of the Group, (i) at any time during the Term of this Agreement, and for a period of one (1) year following termination of this Agreement, or (ii) for a period of three (3) years following the Effective Date (whichever is longer), either on his own or in conjunction with or on behalf of any body corporate, partnership, joint venture or other contractual agreement, whether directly or indirectly, whether for profit or not:

(a)    carry on or be engaged or interested in or assist a business in Japan, Singapore, and Vietnam, which competes, directly or indirectly, with the Crypto Trading Business as operated during the Term of this Agreement;

(b)    make, publish, or communicate, whether verbally or in any written format, to any person or entity any defamatory or untrue disparaging remarks, comments, or statements concerning the Group, the Group's products, services, directors, officers, or employees;

(c)    solicit, contact, attempt to contact, or meet a current customer or former customer of a member of the Group located in Japan, Singapore, and Vietnam, for the purposes of offering or accepting goods or services similar to or competitive with those offered by any members of the Group;

(d)    engage, employ, solicit or contact with a view to his engagement or employment by another person, a director, officer, employee or manager of the Company or any other member of the Group or a person who was a director, officer, employee or manager of the Company or any other member of the Group at any time in the six (6) month period preceding such engagement, employment or solicitation, provided, however, that the restrictions contained in this Clause 10.2(d) shall not apply to general solicitation or contact not specifically directed to any person mentioned above; or

(e)    solicit, motivate aid, abet, or otherwise encourage a third party to do any of the foregoing.

10.3    In the event of the termination of this Agreement by the Company without Cause or by the Executive for Good Reason, the restrictive covenants set forth in Clause 10.2 shall remain effective for a period of four (4) months from the date of termination of this Agreement, but shall otherwise cease to have any force or effect upon expiry of such four-month period.

10.4    The Company shall compensate the Executive during the non-compete period established in Clause 10.3 at a rate equal to the monthly Services Fee effective as of immediately before the date of termination, payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that such compensation shall be prorated for any partial month during the non-compete period established in Clause 10.3.

10.5    Notwithstanding any provision in this Agreement to the contrary, the Executive may;

    (a)    own, directly or indirectly, solely as an investment, up to three percent (3%) of any class of "publicly traded securities" of any business that competes with any of the members of the Group; or

    (b)    own securities, solely as a passive investment, in any venture capital, private debt or equity investment fund or similar investment entity that holds securities in an entity that may compete with any of the members of the Group.

## 11.    TERMINATION

11.1    Subject to Clause 11.2 and Clause 11.3, either the Company or the Executive may terminate this Agreement by three (3) month's prior notice in writing to the other party.

11.2    Notwithstanding Clause 11.1, the Company may terminate this Agreement immediately upon written notice to the Executive:

    (a)    for Cause;

    (b)    if the Executive is convicted of any criminal offence involving his integrity or honesty; or

    (c)    if the Executive is declared of bankruptcy or makes any arrangements or composition with his creditors generally.

11.3    Notwithstanding Clause 11.1, the Executive may terminate this Agreement for Good Reason immediately upon written notice to the Company.

11.4    In the event of the termination of this Agreement, the Executive shall:

    (a)    where he serves as a director of the Company and/or as a director of any other member of the Group, forthwith resign from such directorship(s) and acknowledges that he has no claims against the Company or as the case may be, the relevant member of the Group for loss of office;

    (b)    deliver to the Company or as the Company may direct all documents (including books, records, document, papers, accounts, correspondence, lists of customers, notes, memoranda, plans, drawing and other documents of whatsoever nature) credit cards, models or samples and other property concerning the business, finances or affairs of any member of the Group which may then be in his possession or control;

    (c)    not at any time thereafter represent himself to be connected with the Group; and

    (d)    cease to be entitled to any further benefits or payments under this Agreement other than those set forth in this Clause 11, Clause 5 and Clause 10.4.

11.5    In the event of the termination of this Agreement for Cause or without Good Reason, the Executive shall be entitled to receive:

    (a)    any accrued but unpaid Services Fees;

- 11 -

(b)     any Bonus with respect to any completed fiscal year immediately preceding the termination date that has been awarded to him in writing by the Board of Directors but remains unpaid as at the termination date;

(c)     reimbursement for unreimbursed business expenses properly incurred by the Executive; and

(d)     such Employee Benefits, if any, to which the Executive may be entitled under the Company's benefit plans as of the date of termination.

11.6    In the event of the termination of this Agreement without Cause or for Good Reason:

(a)     the Executive shall be entitled to receive the Accrued Amounts; and

(b)     with respect to the Option granted to the Executive following the Effective Date, 100% of the outstanding unvested Options shall become fully vested and exercisable for the remainder of their full term.

11.7    Any termination of this Agreement shall be communicated by a written notice of termination specifying: (i) the termination provision of this Agreement relied upon; (ii) to the extent applicable, the facts and circumstances claimed to provide the basis for termination; and (iii) the applicable termination date.

## 12.   NOTICE

12.1    Each notice, demand or other communication given or made under this Agreement (a "**Notice**") shall be in writing and delivered or sent to the relevant party at its address and email address set out below (or such other address or email address as the addressee has by seven (7) days' prior written notice specified to the other party):

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Company** | Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | sam@ftx.com | N/A |
| | with a copy (which shall not constitute notice) to: FTX Trading Ltd. c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd Saint John's Antigua and Barbuda | can@ftx.com | General Counsel |

- 12 -

| **The Executive** | Hirose Building 4F | mike.kayamori | Kariya |
| | 3-17 Kanda Nishikicho | @liquid.com | Kayamori |
| | Chiyoda-ku | | |
| | Tokyo 101-0054 | | |
| | Japan | | |

12.2    Any Notice so addressed to the relevant party shall be deemed to have been delivered (a) if sent by courier, two (2) Business Days after the date of posting; (b) if given by personal delivery, when actually delivered to the relevant address; and (c) if sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 12.2 within one (1) Business Day of sending the email.

**13.    LEGAL REPRESENTATION**

The Executive hereby acknowledges that the Executive has been duly advised to seek independent legal advice and to obtain separate legal representation.

**14.    ENTIRE AGREEMENT**

14.1    This Agreement, as well as the Major Shareholders SPA, and the agreements referred to therein, constitutes the entire agreement and understanding of the parties hereto relating to the subject matter hereof and shall be in substitution for any subsisting agreement or arrangement (oral or otherwise) made between the Company and the Executive which shall be deemed to have been terminated by mutual consent as of the Effective Date.

14.2    The terms of this Agreement may only be varied in writing (excluding email) signed by the Executive and a duly appointed representative of the Company.

**15.    MISCELLANEOUS**

15.1    Nothing in this Agreement shall be construed as creating among the parties hereto an employment, partnership, agency, or similar relationship. The provision of services by the Executive shall not be governed by the Labour Contract Act (Act No.128 of 2007, as amended), the Labour Standards Law (Act No. 49 of 1947, as amended) and other laws of Japan otherwise applicable to employees in their capacity as employees.

15.2    The rights and remedies of the parties under this Agreement are not exclusive of or limited by or in limitation of any other rights or remedies (including without limitation any right of set-off) which each party may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative.

15.3    No failure or delay by any party hereto in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

15.4    The expiration or termination of this Agreement howsoever arising shall not operate to affect such of the provisions hereof as in accordance with their terms are expressed to operate or have effect thereafter.

15.5    In the event of any variation of the remuneration payable to the Executive hereunder being made by consent of the parties hereto such variation shall not constitute a new agreement but (subject to any express agreement to the contrary) the appointment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

15.6    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.7    The parties to this Agreement shall pay their own legal professional and other costs in connection with the preparation and completion of this Agreement.

15.8    No party to this Agreement shall assign, transfer or create any trust in respect of, or purport to assign, transfer or create any trust in respect of, any of its rights or obligations under this Agreement.

15.9    The Company's rights and obligations under this Agreement shall inure to the benefit of and shall be binding upon the Company's successors and assigns.

15.10   This Agreement may be executed in any number of counterparts each of which is an original and all of which together evidence the same agreement.

**16.    GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by the laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement.

*[Signature Page Follows]*

**EXECUTED** by the parties:

**<u>Company</u>**

| | |
|---|---|
| Signed by Kariya Kayamori | ) |
| as the representative director of | ) |
| and for and on behalf of | ) |
| **LIQUID GROUP INC.** | ) |

**<u>Executive</u>**

Signed by **KARIYA KAYAMORI**          )

EXHIBIT 4

New Consensus Dates and Locations Added   Learn More



**Consensus Magazine**

# How Not to Run a Cryptocurrency Exchange

At Japan's Liquid exchange, recently acquired by FTX, warnings were ignored, breaches unreported and employees berated and cursed at, insiders say.

By **Lavender Au**   🕐 May 16, 2022 at 9:04 p.m. EDT   Updated May 11, 2023 at 2:08 p.m. EDT    Layer 2



CEO Mike Kayamori "could not stand failing," said a source close to Liquid. (Photo: World Economic Forum, modified by CoinDesk)

SPONSORED

**10 years of crypto trading and counting**

Join 30M users to discuss ideas and strategies before you buy or sell top cryptoassets.



Join eToro

Up

# The Takeaway:

From the outside, Japanese exchange Liquid looks like a crypto success story. Trading powerhouse FTX recently acquired it for an undisclosed price estimated to be somewhere between $140 million and $200 million.

But former Liquid employees describe a chaotic workplace (even by crypto standards) with questionable security and compliance.

For example, sources say that executives downplayed some information security breaches, did not disclose others, failed to adequately address low-level insider theft and prematurely stopped investigations into last year's $90 million hack.

Liquid bought its own QASH token to maintain the price through part of the 2018 bear market and double-counted trades when reporting its volumes, former employees said.

Senior management offered IOUs for Telegram's never-issued GRAM tokens and, according to sources, ignored internal compliance team concerns. Liquid lost millions on the offering.

The December 2018 company Christmas party was awkward, to say the least, for employees of the Japanese cryptocurrency exchange known as Liquid.

Mike Kayamori, co-founder and CEO, wore a Santa Claus suit to the party, held at Liquid's office, about five minutes from Tokyo Station. About 50 employees were at the party, some of them with their children. A Black employee dressed up as a reindeer.

Kayamori asked the employee, whose wife was in attendance, to get on his hands and knees. The CEO then mounted him like a horse.

People stood with their drinks and watched. Holiday music played in the background.

"He obviously didn't look happy. He was trying to do his best," an eyewitness said of the employee.

Shortly afterward, Kayamori apologized to colleagues.

"I wanted a reindeer to cheer up the crowd with me," he wrote in a message posted on the company's Slack on Dec. 20, 2018, reviewed by CoinDesk. "I had not even realized what a terrible thing I [had] done until this was brought up to me later." Kayamori added that he had apologized directly to the employee (who soon left the company).

"I preach diversity and unity," Kayamori continued. "I will always remember today as the humbling day I let everyone down and that I need to grow as a human being."

The incident speaks to management problems that long bubbled under the surface at Liquid.

"Of all the things Mike did, I don't think that was the worst thing," the eyewitness said. "This was minor."



**mike.kayamori** 18:04
Dear Quoine Japan

December 20th, 2018 ⌄

Thank you for attending and bringing your family to our Holiday Party today.
We had a great time and I was able to meet, speak, and take pictures with each and everyone of you.
And thank you to all the people who did an amazing job to prepare and then clean up after the party.

However, I had unintentionally made a big mistake that I regret and would like to apologize.

As I was entering the party as Santa Claus, in the holiday spirit, I wanted a reindeer to cheer up the crowd with me.
███████ was next to me as the party MC, and without his approval, I spontaneously forced him to become my reindeer and went on top.

This was insensitive, inappropriate and absolutely not acceptable.
I had not even realized what a terrible thing I done until this was brought up to me later.

I have since spoken and apologized to ████ but no words will erase the mistake that I have done.

As CEO of Quoine, I preach diversity and unity.
We have people from 28 nationalities and I am proud of what we have achieved together.
But I will always remember today as the humbling day I let everyone down and that I need to grow as a human being.

I would like to apologize to ████ and everyone at the party.
I am sorry.

Mike Kayamori (edited)

 13    16   

*Mike Kayamori apologizes for mounting employee*

# A chaotic workplace

From the outside, Liquid looks like a crypto success story, albeit with some bumps along the road. It was one of the first exchanges to be licensed in Japan, which boasts some of the world's toughest regulations for crypto.

Like many exchanges, Liquid weathered hacks, including a $90 million theft last August that forced it to get an emergency loan from crypto derivatives exchange powerhouse FTX. Led by billionaire Sam Bankman-Fried, FTX later agreed to buy Liquid, legally known as Quoine (pronounced "coin"), for an undisclosed price in a deal that closed on April 4 of this year.

Over the past five weeks, CoinDesk interviewed more than a dozen former Liquid employees and other individuals familiar with the exchange's inner workings. Nearly all of them asked for anonymity for fear of reprisal.

Taken together, the interviews and internal documents reviewed by CoinDesk paint a picture of a chaotic workplace, even by the standards of a global crypto industry known for its hard-charging personalities and loosey-goosey corporate cultures.

Kayamori's management decisions and casual attitude toward information security may have led to security breaches, more than one of which were not adequately disclosed to customers, four former employees said. Employees were berated and cursed at, and their concerns about regulatory, cybersecurity and business risks were ignored.

While some employees tried to do right by users, management was known to dismiss their efforts.

"There are forces of order and good trying to make things happen, but the existing culture has an immune system seeking out and destroying them," a former employee said.

CoinDesk emailed Kayamori for comment on whether Liquid complied with regulatory expectations, and whether he had anything to say to former employees who expressed their unhappiness with the company's work culture and his leadership. He did not respond.

# Auspicious beginnings

In 2017, Japan was one of the most active places in the world for crypto. It was one of the first countries to regulate cryptocurrency exchanges, requiring them to register with the Japanese Financial Services Agency (JFSA). Japan also introduced a legal definition of "virtual currency" in its Payment Services Act.

"There was huge retail interest, progressive regulators and huge potential for the country to become a real leader in the space," said Steve Lee, an investment director and head of the Asia-Pacific region at BlockTower Capital.

Liquid was in the pole position. Founded as Quoine in 2014, the exchange pitched itself as a company that did things by the book. It was among the first batch of companies to receive a license and ran one of the country's largest exchanges. Besides Japan, it had a presence in Singapore and teams based in the Philippines and Vietnam.

The company initially operated two exchanges: Quoinex, which facilitated trading between fiat currency and bitcoin (BTC), and Qryptos, which handled only crypto-to-crypto trades. It later merged the two, rebranding under the name Liquid.

Kayamori had a prestigious resume, having studied at Harvard Business School and the University of Tokyo and worked at SoftBank, the Japanese investment conglomerate. Co-founder Mario Gomez Lozada had worked at financial giants Merrill Lynch and Credit Suisse (CS). Kayamori dealt with the business while Lozada handled the technology and development of financial products.

An early employee remembers working out of a small office consisting of one large room that could fit 10 people comfortably and three meeting rooms, one of which became an extension of the office due to the lack of space.

"Mike was a reasonable leader when times were good," another former employee said.

# Kayamori's grand vision

Kayamori talked a lot about high-level concepts such as "financial inclusion" and "democratizing finance," the same former employee said. "He had a vague vision, but it was largely detached from reality."

Then, as now, crypto was an illiquid market compared with traditional stocks or bonds, meaning a large order to buy or sell a coin could be hard to fill and could mightily sway market prices. Kayamori claimed Liquid could solve this problem through a pooling system he called the "World Book."

There are hundreds of crypto exchanges around the world, each with its own order book, or list of offers to buy or sell a given coin at a specific price. Kayamori wanted to aggregate orders from global exchanges into one order book. An offer to sell a token on the U.S. exchange Coinbase (COIN), for example, could be matched with a buy offer on Liquid if both listed the asset.



*World Book roadmap*

Investors believed in the vision. The company raised roughly $105 million worth of the
cryptocurrency ether (ETH) by distributing its native QASH token in an initial coin offering
(ICO) in November 2017.

At its peak, Liquid's community of followers, across the main group in the Telegram messaging app, the subreddit forum on Reddit and social channels ran into the tens of thousands. Many of these were QASH holders.

As an exchange token, QASH could be used to pay trading fees on the issuer's platform. In a video from the time, Lozada said that other crypto exchanges were willing to adopt QASH and that banks and financial institutions would benefit from doing so. But only a handful of other crypto exchanges listed it.

QASH was created as an ERC-20 standard token running on the Ethereum network, but the project's white paper (something between a prospectus and a manifesto) called for the creation of a brand-new blockchain by the second quarter of 2019. Migrating to its own blockchain would boost QASH's value, Lozada said in the video.

Even in Liquid's glory days, things weren't quite as they seemed. Kayamori claimed publicly in March 2018 that the company was connected with more than 17 other exchanges. However, in internal Slack messages reviewed by CoinDesk, an employee wrote that "none of the 17 exchanges ever agreed to be part of the external" World Book and that Liquid could access Coinbase's liquidity only by paying the U.S. company a fee. "We have no official agreement from them," this employee said.

That year, the U.S. Securities and Exchange Commission (SEC) went after many token issuers for selling unregistered securities to American buyers, but Liquid appears to have not been on its radar. Internal records reviewed by CoinDesk show that 217 individuals from the U.S. bought QASH tokens in the ICO. Those U.S. citizens who took part in the sale bought 10,294,721 tokens at a price of 24 cents each, for a total of $2 million.

# Flush with cash

The ICO's success meant that Liquid had a native token and a road map. The token didn't tank right after its debut, as many others did. The company had cash to spend.

"It meant that Mike was promising all these things," said a former employee, who called the ICO "a blessing and a curse." QASH reached an all-time high of $2.45 on Jan. 14, 2018.

That same month, hackers made off with $520 million in funds from Japanese exchange Coincheck. The hack had reverberations for every exchange in Japan.

"It scared off institutional investors as well as retail investors, slowed down crypto development and brought tougher regulation," Lee said. "The crypto market in Japan is still struggling to recover from that hack."

Liquid found itself operating in one of the world's most tightly regulated jurisdictions for crypto. The JFSA launched a round of inspections and stiffened the rules.

To secure user funds, the regulator stipulated that most customers' assets be held in cold wallets – with the private keys, or passwords, stored in a hardware device disconnected from the internet or written on a piece of paper locked in a safe.

The last major crypto bear market began in early 2018. Liquid's financial health was "dented by the crypto market but solvent to the point where they could run for another year and a half at that burn rate," a former employee said. The company had "at least tens of millions of dollars," this person said.

The exchange was growing, with staff numbers across offices ballooning from around 50 in 2017 to over 300 in 2018. Senior management decided it was time to move to an office that reflected the company's future.

In June 2018, Japan employees moved to Kyobashi Edogrand, a glass-and-steel building in one of Tokyo's most expensive districts. The company occupied a space of over 6,500 square feet, paying around $200,000 per month in rent, two former employees said. The rate was double the city's average.

During this period, Liquid followed best security practices, two former employees recalled. The office featured a heavily secured "signing room" for crypto transfers. Fingerprints were needed to enter the air-gapped room (where the network was isolated from unsecured ones) and cameras watched from inside and outside. Large withdrawals required sign-off from one employee in Japan and another in the Vietnam office, and these were processed every few hours.

# Executive in-fighting

On June 22, 2018, Japanese regulators handed out business improvement orders to the Liquid exchange and five other crypto companies, requiring them to improve their risk management practices. Liquid's improvement order hindered efforts to do new business in Japan, where half of its client base resided.

Kayamori didn't address the compliance issues, and instead blamed employees for not generating more revenue in Japan, four former employees said.

The co-founders started feuding. Liquid informally split into two teams as each founder tried to push the other out, six former employees said.

"Their flaws almost balanced each other out in the beginning," a source close to Liquid said. "It got to the point where they couldn't even be in the same room."

"Mario had grown frustrated by the slow pace of development and the repeated failures," one former employee explained. Lozada believed that Kayamori had put the wrong people in key positions, another said.

Lozada wanted to create Qryptos, a crypto-to-crypto exchange, to supplement the exchange's primary offering of facilitating trades between crypto and fiat currencies, the former employee explained. Kayamori decided to put a young and inexperienced staff member in charge of the project, who took a week-long vacation two weeks before the launch.

It was the "right time, wrong person," the former employee said, noting that Binance launched around the same time and became a wildly successful crypto-to-crypto exchange.

Read more: The Unbelievable Brilliance of Binance (2019)

While Lozada understood technical matters better than Kayamori, he was not particularly strong at execution, another former employee said. Lozada often yelled at junior staff and ridiculed people for making mistakes, he said.

Kayamori did the same, former employees said. "He was good and humble when he talked to me," said one source, but he also shouted at employees in team calls, rhetorically asking why everyone was stupid and didn't do their job well.

People broke into open infighting in public Slack channels. "They would just go nuts on Slack," a source close to Liquid recalled. Abusive language was pervasive. Team leads referred to employees as "f**king idiots," "childish," and to their work as "garbage."

# 'Bizarre favoritism'

Liquid was highly unmeritocratic, two former employees said. There were standards but it didn't seem to matter if you met them. Managers awarded discretionary bonuses to those close to them.

Kayamori showed "bizarre favoritism," another former employee said, citing as an example the appointment of fellow SoftBank alumnus Katsuya Konno to Chief Financial Officer.

This person recounted an incident in spring 2018 when Konno was working on the launch of the Japan-focused Liquid mobile app. According to this former employee, Konno spent freely on banner ads, yet there was scant monitoring of ad performance or ad targeting.

At one point, Liquid was notified that its Google advertising accounts were at risk of being shut down for failure to pay about $300,000 in bills. A wire transfer from a bank would take too long to save the account. So a marketing department employee spent most of her day at a convenience store, making one small payment after another until the total amount owed was sent to Google.

Given that the convenience store transfer limit is usually around 250,000 yen (about $2,000), the marketing employee likely spent five hours making 150 transfers, this person estimated.

That same year, Liquid sold a large proportion of ether raised in the ICO at what turned out to be the bottom of the market, two former employees said.

"They held onto it, hedged none of it," one said, "then panic sold."

Konno did not respond to a request for comment.



CFO Katsuya Konno responds to compliance concerns.

# 'Hail Mary projects'

The feud between the co-founders not only divided the company, but it meant that staff worked on a huge range of initiatives and products.

"When Mike and Mario were feuding over the company, there were various, crazy 'hail Mary' projects that they attempted," a former employee said.

Among Lozada's pet projects was a 100x leveraged contract-for-difference (CFD) derivative product called Liquid Infinity, introduced in April 2019 for non-Japanese customers. Such highly leveraged contracts are generally a risky investment, and Liquid's own limitations made it moreso.

"The exchange's thin liquidity meant that any medium-large buy or sell could spike or crash the market," one former employee explained. As a result of those dramatic swings, traders' highly leveraged positions were more likely to be liquidated, two former employees said.

Also in April 2019, Liquid announced a U.S. venture called Liquid USA. A person with knowledge of the venture said that Liquid management insisted Liquid USA allow "basic" accounts, which did not require know-your-customer (KYC) screening, even though such accounts generated little revenue and were likely to be frowned upon by U.S. regulators.

**Read more:** *What Is KYC and Why Does It Matter For Crypto?*

The venture relied on Liquid's technology, which this person described as a "huge albatross." The flagship Japanese exchange sometimes crashed, the person said, and management seemed to prioritize fancy layers of tech over getting the fundamentals right. In late 2020, the U.S. venture was called off.



*An employee flags bugs in Liquid's system.*

Throughout its history, Liquid hemorrhaged talented people responsible for core products, five former employees said.

"The good people left and you have people in roles that probably feel a bit too large for them," said Norbert Gehrke, founder of Tokyo FinTech, a non-profit organization of Japan fintech enthusiasts. Gehrke invited Kayamori to speak to Tokyo FinTech members in 2017 and is familiar with other Liquid staff.

# Double-counting trades

Liquid kept up appearances. QASH held its value in November and early December 2018 even as bitcoin and ether, the crypto market's bellwethers, tumbled.

It did so thanks, at least in part, to the company buying its own token to sustain the price at 21 cents, Slack messages reviewed by CoinDesk show. It does not appear that Liquid disclosed these purchases publicly.



*QASH held steady through November and early December 2018 even as crypto bellwethers BTC and ETH tanked. (TradingView)*

In other messages, employees discussed the company's practice of double-counting trades. While the industry norm is to count a trade only once, Liquid's system recorded each trade twice, once for the buy order and again for the sell order. So, for instance, a trade of 1 BTC was recorded as 2 BTC. This reporting practice inflated the exchange's trade volume, making it look more successful than it was.

Liquid continued to brand itself "the world's most secure exchange" through 2019, although four former employees said that by this time security had deteriorated.

Two of those employees described an incident in which a customer service employee took advantage of a loophole on the back end to create bogus accounts, using administrator privileges to withdraw small amounts of BTC and XRP from company wallets. The employee made off with around $30,000 worth of crypto.

Liquid's now-porous security frustrated some of its employees. One of them ran a "pentest," or penetration test, which attained exchange funds on a thumb drive, and delivered the drive to senior management to demonstrate how easy it was to breach security, two former employees said. Pentests are a form of white-hat, or benevolent, hacking, akin to testing your front door after locking it.

During this period, Kayamori's priority was dressing up Liquid for sale. In April 2019, announcing a Series C funding round of undisclosed size, he declared Liquid a unicorn, one of only two billion-dollar companies on Japan's startup scene.

"The raise was structured solely to get that billion number out there," a source close to Liquid said. The round was done in two parts; Liquid raised a larger amount of money at a lower valuation, and then a small amount of money at the unicorn valuation, the source said, calling this decision "a sign of the hubris of Mike Kayamori."

# IEO for an IOU

Kayamori and Konno spent roughly $5 million worth of Liquid's ICO funds buying allocations of GRAM tokens, which were meant to be the native tokens for messaging app provider Telegram's ambitious blockchain project, the TON network.




*CEO Mike Kayamori stresses the importance of the GRAM IEO.*

"Please work on this as if our survival depends on the success of the Gram IEO because it really does," Kayamori told employees on Slack. (IEO stands for initial exchange offering, a token sale managed by an exchange, which was a fashionable way to distribute new crypto assets at the time.)

*Read more: Initial Exchange Offerings Are Providing Big Returns, But Why? (2019)*

Traders in private markets were buying and selling IOUs for GRAM even though Telegram's token agreement prohibited buyers from selling their allocations until the network went live.

Liquid purchased the allocations not from Telegram itself but from an entity known as Gram Asia, two former employees said. Gram Asia, in turn, had bought allocations from another party, and so on.

*Read more: Early Investors in Telegram Crypto See 400% Returns – But Buyers Risk It All (2019)*

Compliance staff raised questions about delivery risk, operational risk and reputation risk, according to an internal document. On balance, senior management wanted to generate quick revenue.

**Compliance**

| # | Question | Answer | Notes |
|---|----------|--------|-------|
| 1 | Will GRAM need to go through the normal QLRC or RMC review process? Specifically, do we need to do full KYC on the ultimate beneficiaries (sellers) of the GRAMs - both locked & unlocked? | We are putting it through normal RMC process. Follow-up call with Mike and Katsu on this | |
| 2 | **Need clarity on delivery risk**<br><br>If buyer of "pre-orders" won't be able to buy the actual tokens in October, **we may bear the responsibility to deliver.**<br><br>=> As escrow agent, Quoine is not liable for delivery of the purchase. Participants may make noise on eg, social media but we are clear from any responsibility even if purchase does not get executed successfully. | | |
| 3 | **Need clarity on operational risk**<br><br>We need to set up a segregated account as escrow to maintain funds separately once we receive by selling the "pre-orders".<br><br>Once the actual tokens are delivered to the buyers and transaction is deemed settled, those funds may be transferred to Quoine and accounted for.<br><br>**We have the risk of not being prepared to handle segregated accounts from both operations and accounting perspectives**<br><br>=> TBD Ops and Accounting to confirm | | |
| 4 | **AML compliance risk**<br><br>If we find out that the actual owners of tokens behind Gram Asia are nefarious actors (ie, anonymous individual owners of tokens behind SpaceManagement, etc), our ability to execute the appropriate KYC activity will be questioned. This is in context of heightened AML requirements under FATF.<br><br>=> TBD Sagar finding evidence regarding MAS requirements on token seller-side KYC. How far does the KYC process need to go (ie as far as understanding the beneficiary ownership of the entities, etc) | | |
| 5 | **Reputational risk**<br><br>If any of the risks above actually happens and goes public, our reputation will be damaged. Exposure of this Gram IEO makes big news and it could go either way - positive or negative. If it goes negative, it will expose us in a big way. | | |

*Internal compliance concerns over GRAM IEO*

In October 2019, the SEC sued Telegram, citing violation of U.S. securities law, and the tokens never got minted. Liquid didn't sell anywhere close to the amount of GRAM tokens it bought, nor did it recoup the funds sent to Gram Asia, three former employees said.

Liquid canceled the GRAM sale in January 2020 and refunded the money to investors. The exchange lost money on the IEO, at least $5 million, three former employees said.

# Downgrading offices

In 2020, Liquid cut costs by moving its Tokyo headquarters into a fourth-floor office, which is usually the cheapest, due to the number four's inauspicious similarity to the Japanese word for death.

The new office, where the company remains, was less than a quarter of the size of the previous office. Unlike the previous headquarters, the new digs had no beds, no cafe and no private rooms; employees worked in an open-plan office.

The signing room was now a thing of the past. By this time, Liquid had started using the services of a cryptographic key management company called Unbound, which relies on a method called multi-party computation (MPC), or "warm wallet" technology.

Crypto exchanges balance business interests against security risks. Users want fast withdrawals, and also expect their funds to be secure. Cold, or offline, wallets are safe from hackers but slow down withdrawals. Hot wallets, connected to the internet, are riskier yet make withdrawals easy. In 2019, MPC technology was a popular middle option, a former Liquid employee recalled.

*Read more: MPC Explained: The Bold New Vision for Securing Crypto Money (2019)*

Spending by the C-suite continued despite the office downgrade.

"They were just blowing through all the money in the ICO on stupid things," a former employee said, citing executives taking first-class flights between Vietnam and Japan.

There was pressure to make Liquid quickly profitable, which may have driven Kayamori to leap from shiny thing to shiny thing, four former employees said.

# Listing fees

Liquid took five- and six-figure token listing fees as high as $250,000 from projects, an internal document reviewed by CoinDesk shows. Their tokens were usually listed on the global part of the exchange, unavailable to Japanese customers. (The document shows one pending deal with a U.S.-based project that would pay an extra $100,000 for a "Japan listing" on top of its $150,000 fee.)

Liquid came close to listing the SHOPIN token before the SEC charged the project's CEO, Eran Eyal, with fraud. The company also onboarded the ARE token, only to delist it less than a year later.

Yet, at the same time, Liquid declined to list projects that management acknowledged were of high quality if they refused to pay listing fees, according to Slack messages reviewed by CoinDesk. (The absence of listing fees would not necessarily make listing a token unprofitable for the exchange, if it could make money over time on trading fees.)



**Seth**

Last thing im ever going to write about BNC:

I was at a crypto dinner last night with a bunch of exchanges including Binance.

Binance guy asked me, " so how did BNC go?  We looked at them but we passed for Launchpad because the token economics didnt make any sense." (edited)

 4    1   

3 replies



**jon.myers** 💻

It does beg the question though, how did they pass our DD then?



**Seth**

They seemed credible and they were willing to pay us fees. To be clear, Binance guy said they were thinking about investing in the company and like the Pro Terminal.  They just did not like the token economics.



**jon.myers** 💻

Yeah, fair enough. Think BNC established a new litmus test, *The Franny Test*

*Slack conversation on token listing standards*

When asked by CoinDesk whether he refused to list high-quality tokens favoring more dubious tokens instead, Seth Melamed, who headed business development at Liquid up to November 2019, before becoming chief operating officer, described listing digital assets as a "multi-faceted process." Considerations included due diligence, timing and costs of technology implementation, among other factors, he said.

Liquid also allowed U.S. citizens to take part in dozens of ICOs and IEOs, even though these were not registered as securities and thus risked putting the company in the SEC's crosshairs, said a former employee.



| Liquid | TOP 10 Countries as % of Global (ex-JP) volumes | | |
|---|---|---|---|

Ten countries account for majority of Global volumes

| 2019 August | | | | 2019 September | | |
|---|---|---|---|---|---|---|
| | Country | Trade Volume | Ratio | Country | Trade Volume | Ratio |
| 1 | Singapore | 318,125,967 | 46% | Singapore | 324.05M | 32% |
| 2 | Andorra | 60,671,863 | 9% | United States* | 124.82M | 12% |
| 3 | China | 57,628,979 | 8% | Korea, Republic of | 111.82M | 11% |
| 4 | Hong Kong | 57,105,147 | 8% | Cayman Islands | 87.54M | 9% |
| 5 | India | 42,025,763 | 6% | Hong Kong | 75.92M | 7% |
| 6 | Russian Federation | 35,199,510 | 5% | Andorra | 60.22M | 6% |
| 7 | Marshall Islands | 32,131,179 | 5% | Russian Federation | 59.45M | 6% |
| 8 | Cayman Islands | 30,961,877 | 5% | China | 28.22M | 3% |
| 9 | United States* | 30,466,419 | 4% | United Kingdom | 17.71M | 2% |
| 10 | United Arab Emirates | 22,801,473 | 3% | Marshall Islands | 14.32M | 1% |
| | Top10 Total | 687,118,177 | 79% | Top10 Total | 904.07M | 89% |
| | Global Total | 865,007,537 | 100% | Global Total | 1.02 B | 100% |

Volumes exclude self-match and MMO double counted. Data source: Liquidity Dashboard. Up to end of Sept 29th

Liquid's U.S. users

"There's still the question of whether the offer and sale of the tokens in question qualify as securities transactions, but it's definitely going to put the exchange on the SEC's radar if it wasn't there already," said Grant Gulovsen, an attorney in private practice who represents clients involved in crypto.

All the while, building the company's own QASH blockchain continued at a snail's pace.

"It didn't get enough attention or manpower," a former employee said, recalling that six to seven developers spent a week each month building the QASH blockchain.

To become a successful layer 1, or base, blockchain, this person said, QASH needed at least double the number of developers as well as to put together a marketing campaign and a plan to persuade people to use the chain.

According to internal Slack messages from the second half of 2019, management realized Liquid was not going to deliver on ICO investor expectations, such as the proprietary blockchain for QASH and the World Book.

# Leak-driven marketing

Also during this period, Liquid took steps to capitalize on another company's mistake.

In November 2019, Bitmex, a high-flying crypto derivatives exchange known for its leveraged futures contracts, disclosed that it had accidentally revealed tens of thousands of customer email addresses in the "cc" field of a mass mailing.

*Read more: BitMEX Says Quality Check 'Failure' Led to Email Privacy Breach*

Liquid got a hold of these addresses and cross-referenced them with those of its own users, according to a former employee and Slack messages reviewed by CoinDesk.

A Liquid marketing manager wrote a plan to court existing customers who had accounts at Bitmex, the former employee said, because these traders were likely to be users of leverage. Liquid aimed to become their preferred place for leveraged trading.

Targeting Bitmex customers who didn't already have Liquid accounts would have been too risky, the former employee explained.

It is unclear whether Liquid ever followed through on the plan.

# Personal laptops for work

In early 2020 employees began working remotely due to the coronavirus pandemic. Kayamori was known not to turn on his camera for online meetings; employees only heard his voice. He appeared to some to leave day-to-day management to Chief Operating Officer Melamed.

From April to June 2020, some employees had to use their personal laptops for work.

"It was a red flag because this is a financial company" that should have provided staff with secure devices, a former employee said. Liquid eventually solved the problem by reallocating laptops from departing employees to those who remained, this person said.

"Instead of taking calculated risks, executives cut the company to pieces at the expense of individual employees," another former employee said. The company didn't spend money to capitalize on bull runs or the so-called DeFi summer of 2020, when decentralized finance protocols rewarded users with generous yields for lending their tokens, this person said.

Kayamori persuaded the board to vote Lozada out in the middle of 2020.

When asked about his departure by CoinDesk, Lozada said that it was "amicable." He did not respond to questions about his performance as co-founder, nor the products and practices he introduced.

# Security holes

A higher-than-usual proportion of customer service employees had access to the user accounts at a level that meant they could change user details, view wallet addresses and view funds, a former employee said.



**Seth Melamed** @CooLiquid · 03 Nov 20

With news of hacks & halted withdrawals, at un-regulated & unlicensed crypto exchanges, we re-iterate: @Liquid_Global uses threshold #MPC technology to secure crypto assets that we custody.
Under MPC, no entity has the private keys.
Most crypto withdrawals sent < 90 seconds 24/7

💬 4          ↻ 5          ♡ 17          ⤴

On Nov. 13, 2020, Liquid was hacked. The exchange blamed security lapses at domain registrar and web hosting company GoDaddy (GDDY).

The vendor "incorrectly transferred control of the account and domain to a malicious actor," Kayamori wrote at the time. GoDaddy did not respond to CoinDesk's request for comment.

Kayamori claimed that client funds were accounted for, and remained safe and secure. But two former employees said the full extent of the November 2020 hack was never disclosed. Customer assets and a trove of personal data were stolen, they said.

"Insofar as Mike ever considered security at all, he thought of it as a product that he could buy," a former employee said sardonically. "Yep, we bought ourselves a security. Got one, don't need to waste any more cash on another 'security.'"

# A tale of two Liquids

Rival Japanese exchanges Coincheck and bitFlyer were beating Liquid domestically. JFSA lifted the business improvement order in 2021, enabling Liquid to do new business in Japan, but the company needed capital.

Two stories about Liquid's financial health circulated. Earnings posted in public channels and announced in weekly calls made Liquid look like it was doing well, two former ground-level employees said. The company earned most of its money from listing new tokens, making $200,000 to $600,000 in good months, they said.

But two former senior staffers with knowledge of the company's finances said that Liquid was only profitable for a few months in its lifetime, even with the bull runs of 2020 and 2021.

A source close to Liquid said that management stopped reporting metrics just months after new product launches if the numbers didn't look good.

"This isn't only for board decks, this is their own internal data," the source said. "Mike could not stand failing."

# The $90M hack

On Aug. 19 2021, Liquid suspended withdrawals and deposits. It claimed that it had been hacked again. The size of the hack was later reported to be $90 million.

The hack brought down Liquid's valuation, three former employees said. It was no longer a unicorn. A week after the hack, FTX extended a $120 million loan to the Japanese exchange.

Liquid said the money would go toward "accelerating new capital generation projects and providing critical liquidity." (FTX has built its reputation on its derivatives offering and leverage products.)

Within two months, the JFSA awarded Liquid a Type 1 license, which allowed it to offer derivatives in the Japan market. Without a Type 1 license, exchanges can only offer spot trading. Without the loan from FTX, Liquid likely would not have obtained the Type 1 license, a former employee said.

There is still no official explanation for what happened in the hack. Liquid called in security teams, including crisis management firm Blackpanda, to investigate.

"Blackpanda has noted that to respect the confidentiality of all clients (past and prospective) in the crypto industry, it has declined to comment on the matter at hand," CEO Gene Yu said.

# Cold case

Forensic investigations into the August 2021 hack have stopped, two former employees said.

"Pausing a security review before a full report is made is effectively the same as not getting one," said Josh Smith, founder of Blockwell, which has been a vendor and external token auditor for Liquid for five years.

Liquid held non-Japanese users' assets in "warm" MPC wallets managed by Unbound because Singapore, which regulated that part of the business, does not require exchanges to hold assets in cold wallets.

A former employee said that before the hack, and without her knowledge, her access had been changed so that she could move funds out of wallets, a task well outside her job description. When she learned this had happened, the employee said, she worried she would be made a scapegoat for the hack.

A different employee would later claim in court papers that's exactly what happened to *her*.

# Wrongful-termination suit

On March 28, 2022, Liquid's former head of product and marketing in Japan, Marisa McKnight, filed a wrongful termination suit against Quoine, the official legal entity, claiming that she was "scapegoated" for the hack.

*Read more: Ex-Employee Claims Liquid Global Exchange 'Scapegoated' Her for $90M Hack*

According to documents McKnight filed in Singapore's High Court, she initially enjoyed a positive and close working relationship with Liquid's senior management but later became "increasingly excluded and isolated."

The documents claim that after McKnight resigned in September 2021 (the month after the hack), senior management at Liquid told her she was a suspect in the breach and requested she fly to Japan.

McKnight claims she refused to travel there because of the serious nature of management's allegations, the two-week quarantine for travelers during COVID-19 and the fact the company did not book her a hotel or return flight. She also said in her claim that Kayamori threatened her. Even though she had resigned, Liquid terminated her with cause in October 2021.

*Read more: Ex-Employee Claims Liquid Global Exchange 'Scapegoated' Her for $90M Hack*

She is suing the company for the loss of 60 shares, worth $210,000, plus loss of reputation and loss of future employment opportunities. On April 19, Quoine issued its defense against McKnight's claim, denying most of the allegations. She filed a reply on May 4 and the case is pending.

# MPC wallets

Five other former employees said they thought it highly unlikely McKnight was involved in the hack.

According to Smith, the Liquid vendor, it was "nigh impossible" that McKnight hacked the exchange given her job title, the level of access it provides and the fact that she worked remotely at the time. Smith's first job in crypto was shutting down an ICO hack mid-sale without a dollar lost, and he has consulted on over a dozen hacks professionally.

Were Unbound's keys circumvented? Or did Liquid undermine Unbound's work with wallets whose entire private keys could be compromised?

"Nothing in Unbound's MPC protection mechanism was compromised, and the theft was not due in any way, shape or form by a weakness in Unbound's system," Unbound CEO Yehuda Lindell told CoinDesk. Lindell added that he was "unable to disclose what the cause of the theft was."

A veteran Liquid vendor said details of previous hacks indicate Liquid at least partly disregarded a fundamental aspect of a secure system, which is having distinct identities for different staff members so the company knows exactly who is accessing internal systems and when.

If that sounds too abstract, consider the bank card in your wallet. Even if you have a joint account with a family member, each of you has a unique card and PIN so your monthly statement shows exactly who made each ATM withdrawal or purchase. But if you shared your card and your PIN with a bunch of people, you'd have no way of knowing which one of them made which transaction.

"It doesn't matter how secure Unbound is if a single set of credentials into the Unbound account is shared around," the Liquid vendor said.

# Inside job?

A source close to Liquid at the time of the hack said that, in his opinion, it couldn't have been carried out by someone who wasn't directly involved in the implementation of the platform.

This source explained that a team called "DevOps" ran and maintained Liquid's systems and servers. The DevOps staff had built a system only they knew how to operate. They were unafraid of managers who asked them to make changes.

Whoever did the hack "had to be someone who built it or worked with it frequently, because they had one chance to get this right … and they got it right," the source opined.

When asked to describe what happened in the form of a bank robbery analogy, this source said:

> *"Two bank security guards decide that they want to rob the place. In the middle of the night, they open up a seldom-used side door that leads to the outside. They toss many bundles of cash out that side door, then one ties up the other and beats him up. They are trying to make it look like an intruder came in that side door, caught the guard unawares, took his keys, grabbed the cash and fled to Neptune."*

Asked what Liquid should do to protect the assets of current users, this source said: "Suspend operations for 90 days, immediately fire anyone even tangentially involved with the design, construction or operation of the existing trading platform, and rebuild from scratch with untainted servers and engineers."

# FTX acquires Liquid

Five months after the hack, FTX announced it was acquiring Liquid Group. It intended to buy all shares, stock options and warrants from shareholders, according to contracts reviewed by CoinDesk. The dates on the contracts are blacked out.

A Liquid competitor, Japan crypto exchange bitFlyer, was recently valued at up to $370 million. Gehrke said that Liquid was likely sold at a discount to bitFlyer's value as a result of the hack, so possibly around $200 million. "From an FTX perspective, it's a bargain, right?" he said.

Another source close to Liquid said the company had around 40,000 shares. McKnight's lawsuit and a shareholder document reviewed by CoinDesk indicate the per-share price was $3510.41, so on the basis of that share count, the company would have sold for roughly $140 million.

FTX declined to comment on Liquid's compliance and security issues and did not answer questions about its own due diligence on the acquisition.

By acquiring Liquid, FTX gained the ability to offer derivatives in the Japan market and picked up licenses on the cheap. Japan has been more cautious about approving new licenses for crypto exchanges over the last few years. Even Nasdaq-listed Coinbase, one of the world's most successful exchanges, did not get a Japanese license until June 2021, three years after it announced plans to do business there.

On May 1, Kayamori emailed shareholders from FTX's office in the Bahamas, confirming that the acquisition had closed and that Liquid would now operate under the name FTX Japan. FTX plans to migrate its Japanese customers to Liquid's platform. Investors can swap Liquid's QASH token for FTX's FTT.

In his email, Kayamori said his vision for Liquid had been to provide financial services for all.

"We knew it was not going to be easy but, to be honest, I never thought it would be this difficult either," he wrote. "But as the 19th century German philosopher Friedrich Nietzsche once said, what doesn't kill you only makes you stronger. And we were able to withstand all challenges to become part of the FTX family."



Liquid IEO / Token Listing ... by CoinDesk



[Liquid Token Listing Fees](#) by [CoinDesk](#)

[11 20220328 HC S 258 of 2022 Statement of Claim - 202211445](#) by [CoinDesk](#) on Scribd



[12 Liquid defence 20220419 HC S 258 of 2022 - Defence - 202211444](#) by [CoinDesk](#) on Scribd



13 20220504 Reply S 259 by CoinDesk on Scribd



Newsletter →        Archived

# Money *Reimagined*

Sign up for Money Reimagined, was a weekly newsletter exploring the transformation of value in the digital age.

Enter your Email                                                                    Sign Up

*By clicking 'Sign Up', you agree to receive newsletter from CoinDesk as well as other partner offers and accept our* terms of services *and* privacy policy*.*

**DISCLOSURE**

*Please note that our* privacy policy*,* terms of use*,* cookies*, and* do not sell my personal information *has been updated.*

*CoinDesk is an* award-winning *media outlet that covers the cryptocurrency industry. Its journalists abide by a* strict set of editorial policies*. In November 2023,* CoinDesk was acquired *by the Bullish group, owner of* Bullish*, a regulated, digital assets exchange. The Bullish group is majority-owned by* Block.one*; both companies have* interests *in a variety of blockchain and digital asset businesses and significant holdings of digital assets, including bitcoin. CoinDesk operates as an independent subsidiary with an editorial committee to protect journalistic independence. CoinDesk employees, including journalists, may receive options in the Bullish group as part of their compensation.*



### Lavender Au

Lavender Au is a CoinDesk reporter with a focus on regulation in Asia. She holds BTC, ETH, NEAR, KSM and SAITO.

Follow @lavender_au on Twitter

## Read more about

Japan     Exchange Tokens     Regulation     Singapore     FTX     Liquid Exchange

Liquid



## About

About

Masthead

Careers

## Stay Updated

Consensus

CoinDesk Studios

Newsletters

CoinDesk News

Follow

## Get In Touch

Contact Us

Advertise

Accessibility Help

Sitemap

## The Fine Print

Ethics Policy

Privacy

Terms Of Use

Update My Cookie Consent

Do Not Sell My Personal Information

Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.

CoinDesk is an award-winning media outlet that covers the cryptocurrency industry. Its journalists abide by a strict set of editorial policies. In November 2023, CoinDesk was acquired by the Bullish group, owner of Bullish, a regulated, digital assets exchange. The Bullish group is majority-owned by Block.one; both companies have interests in a variety of blockchain and digital asset businesses and significant holdings of digital assets, including bitcoin. CoinDesk operates as an independent subsidiary with an editorial committee to protect journalistic independence. CoinDesk employees, including journalists, may receive options in the Bullish group as part of their compensation.

©2024 CoinDesk

English

EXHIBIT 5

# SEPARATION AND RELEASE OF CLAIMS AGREEMENT

This Separation and Release of Claims Agreement ("**Agreement**") is entered into by and between FTX Japan Holdings K.K., a Japanese *kabushiki kaisha* (f.k.a. Liquid Group Inc., the "**Company**"), on behalf of itself, the Parent (as defined below) and its and their subsidiaries, and other corporate affiliates, and each of their respective present and former employees, officers, directors, owners, shareholders, and agents, individually and in their official capacities (collectively referred to as the "**FTX Group**"), and Kariya Kayamori (the "**Executive**"), residing at 8 Orange Grove Rd 06-02, Singapore 258342 (the FTX Group and the Executive are collectively referred to as the "**Parties**") as of September 9, 2022 (the "**Execution Date**").

**WHEREAS**, the Executive and FTX Trading Ltd., an Antigua and Barbuda corporation (the "**Parent**"), and certain other parties entered into that certain Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated November 19, 2021, as amended by that certain First Amendment to Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated as of March 31, 2022 (as amended, the "**SPA**"), whereby the Executive sold and transferred 12,800 shares of Common Shares of the Company and 50 shares of Class A Preference Shares of the Company to the Parent for certain consideration as set forth therein, including 995,307 shares of Common Stock of the Parent, valued at USD$26,087,014.80 in total and approximately USD$26.21 per share (the "**Consideration Shares**");

**WHEREAS**, pursuant to the SPA, the Executive entered into that certain Side Letter with the Parent dated March 31, 2022 ("**Side Letter**") pursuant to which the Consideration Shares were encumbered by a certain right of first refusal as set forth in Section 5 thereof ("**ROFR**") and granted the Parent a certain proxy over the Consideration Shares pursuant to that certain Proxy Agreement with the Parent dated April 4, 2022 ("**Proxy Agreement**");

**WHEREAS**, pursuant to the SPA, the Executive entered into a certain Management Agreement with the Company dated March 31, 2022, annexed to this Agreement as <u>Exhibit A</u> (the "**Management Agreement**"), whereby the Executive agreed to provide certain services to the Company for an indefinite period (the "**Services**");

**WHEREAS**, pursuant to the Management Agreement, the Company agreed to provide the following consideration in exchange for the Services: (i) a monthly service fee of USD$42,000.00 ("**Services Fees**"), (ii) a monthly housing allowance of SGD$7,700.00, and (iii) a monthly childcare allowance of USD$6,000 ("**Childcare Allowance**"), in each case prorated for an incomplete month;

**WHEREAS**, since November 19, 2019 and continuing through the effective date of the Management Agreement until the present, the Executive has received USD$12,500 each month (prorated for any incomplete month) pursuant to, and in accordance with, the Quoine Employment Agreement (as defined in <u>Exhibit B</u>) ("**Employment Payment**") as well as an allowance for rent in Singapore, such allowance paid directly to the Executive's landlord;

**WHEREAS**, the sum of the total Services Fees and Childcare Allowance owed under the Management Agreement minus the Employment Payments paid as of September 9, 2022 equals USD$191,082.25 ("**Management Fees Shortfall**");

WHEREAS, for a period of time commencing on May 20, 2022 and concluding at the end of the Advisory Period (as defined below), the Parent has instructed and has continued to instruct the Executive to provide certain transition services despite the Executive's limited access to the employees, managers, directors, clients and customers, and information systems and networks of the FTX Group ("**Transition Period**"), such services including, without limitation, the execution of various documents on behalf of the FTX Group in the Executive's capacity as an officer, director and/or representative of members of the FTX Group ("**Transition Services**"); and

WHEREAS, the Parties desire to terminate the Services under the covenants, terms, and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    <u>Separation</u>. Subject to Sections 2 and 7 of this Agreement, the Management Agreement, the Services and any other engagement between the Executive and the FTX Group will terminate on September 9, 2022 (the "**Termination Date**") in their entirety; provided, however, that (i) Clause 10.2 of the Management Agreement will remain in full force and effect during the duration of the Advisory Period (as defined below), following which it will terminate, and (ii) Clauses 5, 8 and 9.2 of the Management Agreement will survive the termination of the Management Agreement. After the Termination Date, the Executive will not represent himself as being an employee, advisor, or officer of the FTX Group for any purpose, except with the express prior approval of the FTX Group during the Advisory Period; provided, however, that the Executive may represent himself as being as an employee of Quoine Pte. Ltd. strictly as necessary to: (A) maintain his visa status in the Republic of Singapore during the Advisory Period; (B) enable the Executive to complete any tax filings or similar obligations under applicable law; or (C) otherwise comply with applicable law. Except as otherwise set forth in this Agreement, the Termination Date is the termination date for the Executive for all purposes, meaning the Executive is not entitled to any further compensation, monies, or other benefits from the FTX Group (other than as set forth in the Advisor Agreement, as defined below), including coverage under any benefit plans or programs sponsored by the FTX Group, after the Termination Date.

2.    <u>Advisory Role</u>. The FTX Group will engage the Executive as an advisor under the terms set forth in an advisor agreement attached hereto as <u>Exhibit B</u> ("**Advisor Agreement**"), such advisory services to continue for a period of time commencing from the day immediately following the Termination Date and concluding on the Employment Termination Date (as defined in the Advisor Agreement) ("**Advisory Period**").

3.    <u>Return of Property</u>. The Executive represents and warrants that, to his knowledge, the Executive has returned all FTX Group property, including identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, and any other FTX Group property in the Executive's possession. The Executive further acknowledges and agrees that Executive no longer has access to and does not claim ownership of any of FTX Group's cloud storage or social media accounts.

2

4.    Executive Representations. The Executive specifically represents, warrants, and confirms that the Executive:

(a)    has not filed any claims, complaints, or actions of any kind against the FTX Group with any court or government or administrative agency;

(b)    has been properly paid for all services (including the Services) he has provided to the FTX Group, and has received all salary, wages, commissions, bonuses, and other compensation due to the Executive, with the exception of (i) the Management Fees Shortfall, which will be paid by the earlier of the next regularly scheduled payroll date and September 16, 2022; (ii) the payments under Section 5 of this Agreement; and (iii) the Executive's salary under the Advisor Agreement for the remainder of the term during which the Executive remains an employee of Quoine Pte. Ltd.

5.    Separation Benefits. As consideration for the Executive's execution of and compliance with this Agreement, including the Executive's waiver and release of claims in Section 6 and other post-termination obligations, the FTX Group agrees to provide the following benefits:

(a)    A lump sum payment of USD$252,000.00, less all relevant taxes and other withholdings, which shall be paid within thirty (30) days of the Termination Date;

(b)    Payment of USD$29,500.00 per month for the duration of the Advisory Period (prorated for an incomplete month of employment with Quoine Pte. Ltd.), less all relevant taxes and other withholdings, which shall be payable in arrears no later than the fifth (5th) day following the end of each month, and is in addition to the salary that the Executive will receive from Quoine Pte. Ltd. pursuant to the Advisor Agreement; provided, however, that in the event that Quoine Pte. Ltd. elects to unilaterally terminate the Executive's employment pursuant to Section 2 of the Advisor Agreement, the FTX Group shall pay the Executive a sum equal to USD$138,113.64 minus the payments that have already been paid pursuant to this Subsection 5(b), less all relevant taxes and other withholdings, within five (5) days of the termination of the Executive's employment pursuant to the Advisor Agreement.

(c)    A lump sum payment of USD$420,000.00, less all relevant taxes and other withholdings, which shall be paid within thirty (30) days of the conclusion of the Advisory Period;

(d)    A lump sum payment of USD$904,400.00, less all relevant taxes and other withholdings, commensurate with the value of 28,000 shares of Common Stock of the Parent, which shall be paid within thirty (30) days of the Termination Date; and

(e)    The FTX Group will purchase 114,460 Consideration Shares from the Executive at a price per share of USD$26.21 (i.e., USD$2,999,996.60), which will be paid to the Executive in a lump sum within thirty (30) days of the Termination Date.

Further, the FTX Group hereby irrevocably waives the ROFR in respect to the remaining Consideration Shares held by the Executive, provided, however, that the Executive will not be permitted to transfer any Consideration Shares to a Proposed Transferee (as defined in the Side Letter) in any of the following circumstances:

(i)    the Proposed Transferee is a Competitor;

(ii)    the transfer of any such Consideration Shares to the Proposed Transferee would violate any applicable laws or regulations, including without limitation the Securities Act of 1933, the Securities and Exchange Act of 1934, the rules and regulations of the Securities Exchange Commission of the United States, or similar regulations under the laws of Antigua and Barbuda or the primary residence of the Proposed Transferee, anti-money laundering regulations enacted under the Bank Secrecy Act of 1970 or similar regulations under the laws of Antigua and Barbuda, or Office of Foreign Assets Control-enforced sanctions;

(iii)    the transfer of any such Consideration Shares to the Proposed Transferee would damage the public reputation of the FTX Group (as reasonably determined by the FTX Group, such determination, and the basis of such determination, to be communicated to the Executive in writing as soon as reasonably practicable); or

(iv)    the Proposed Transferee fails to pass the know-your-customer, anti-money laundering, or other reasonable due diligence requirements of the FTX Group or its transfer agent.

For the purposes of this Section, "**Competitor**" means any person or entity engaged in the business of providing cryptocurrency exchange services and includes, without limitation: Binance Holdings Limited, Changpeng Zhao, Coinbase Global, Inc., Payward, Inc., and Gate Technology Inc. A Competitor includes any person or entity which, individually or jointly with others, whether for its own account or for that of any other person or entity, owns, or holds any ownership or voting interest in any person or entity that is itself a Competitor; provided, however, that a Competitor does not include a person or entity that only owns securities, as a passive investment, in any venture capital, private debt or equity investment fund or similar investment entity that holds securities in a Competitor.

6.    Release.

(a)    The Executive's General Release and Waiver of Claims

In exchange for the consideration provided in this Agreement, the Executive irrevocably and unconditionally fully and forever waives, releases, and discharges the FTX Group, including each member of the FTX Group's subsidiaries, affiliates, predecessors, successors, and assigns, and each of its and their respective officers, directors, employees, shareholders, trustees, and partners in their corporate and individual capacities (collectively, the "**Released Parties**"), from any and all claims, demands, actions, causes of actions, judgments, rights, fees, damages, debts, obligations, liabilities, and expenses (inclusive of attorneys' fees) of any kind whatsoever, whether known or unknown (collectively, "**Claims**") arising at any time through and including the date of the Executive's execution of this Agreement; provided, however, that this general release and waiver of claims excludes, and the Executive does not waive, release, or discharge: (i) Claims that cannot be waived by law; (ii) Claims resulting from or connected with a breach of any terms and conditions of this

4

DocuSign Envelope ID: 2DFB8C45-B552-4CFB-9648-F42085EAB584

Agreement; and (iii) indemnification rights the Executive has against the Company, including pursuant to the Management Agreement and this Agreement.

(b)    FTX Group Release of Executive

In exchange for the Executive's waiver and release of claims against the Released Parties, the FTX Group irrevocably and unconditionally fully and forever waives, releases and discharges any and all Claims against the Executive that may be waived and released by law with the exception of Claims arising out of or attributable to: (i) events, acts, or omissions taking place after the Parties' execution of the Agreement; (ii) the Executive's breach of any terms and conditions of the Agreement; and (iii) the Executive's criminal activities or willful or intentional misconduct occurring during the Executive's provision of services to the FTX Group.

(c)    Execution of Addendum

Within thirty (30) days of the conclusion of the Advisory Period, the Executive and the Company will execute the Addendum to Separation and Release of Claims Agreement (Supplemental Release) annexed to this Agreement as Exhibit C ("**Addendum**").

7.    Cooperation. During the Advisory Period, to the extent reasonably requested by the Company and/or in accordance with the Advisor Agreement, the Executive shall cooperate with the FTX Group regarding matters arising out of or related to the Executive's services to the FTX Group, provided that the FTX Group shall make reasonable efforts to minimize disruption of the Executive's other activities.  Such cooperation includes, but is not limited to: (a) the execution and delivery of such further instruments and documents as may be reasonably necessary or desirable to perform all of the provisions and purposes of this Agreement, including the Executive's resignation or removal from all positions in the members of the FTX Group; (b) the continued provision of Transition Services in the Executive's capacity as an officer, director, and/or representative of members of the FTX Group pending the Executive's resignation or removal from such capacities; and (c) the giving of evidence in any litigation, potential litigation, internal investigation, or administrative, regulatory, judicial, or other quasi-judicial proceedings involving the FTX Group in connection with which the Executive has knowledge, experience, or information, provided, however, that the Executive may decline to provide any of the foregoing services in the event that the Executive is, or may be (as determined on the advice of the Executive's outside counsel), an adverse party in proceedings involving the FTX Group, whether administrative, regulatory, judicial, or other quasi-judicial proceedings.

8.    Mutual Non-Disparagement.

(a)    The Executive agrees and covenants that the Executive shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, or disparaging remarks, comments, or statements concerning the FTX Group or its businesses, or any of its employees, officers, or directors and their existing and prospective customers, suppliers, investors, and other associated third parties, now or in the future.

(b)    The FTX Group agrees and covenants that the FTX Group shall not at any time make, publish, or communicate to any person or entity or in any public forum

any defamatory, or disparaging remarks, comments, or statements concerning the Executive now or in the future.

This Section does not in any way restrict or impede the Executive or the FTX Group from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

9.    <u>Indemnification for Transition Services</u>. Without limiting the indemnification rights the Executive has against the Company, including pursuant to the Management Agreement, the Company shall indemnify, defend, and hold the Executive harmless, at the Company's own expense, from and against any and all losses, liability, obligations, damages, third-party claims, suits, judgements, demands, causes of action, costs and expenses of whatever form or nature, including reasonable outside attorney's fees and other costs of legal defense, arising out of or related to the Executive's performance of the Transition Services during the Transition Period in good faith.

10.    <u>Confidentiality of Agreement</u>. The FTX Group and the Executive agree and covenants that it or he shall not disclose any of the negotiations of, terms of, or amount paid under this Agreement to any individual or entity; provided, however, that it or he will not be prohibited from making disclosures to attorneys, tax advisors, family (in respect to the Executive) or as may be required by law.

11.    <u>Remedies</u>. The Parties mutually agree that this Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

12.    <u>Authority to bind the FTX Group</u>. The Company represents and warrants to the Executive that it has the authority to enter into this Agreement on behalf of the FTX Group and is otherwise responsible for ensuring the FTX Group's performance of its obligations hereunder.

13.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors (including any corporation deemed to be a successor corporation of any member of the FTX Group by operation of law) and assigns, but neither this Agreement nor any right or obligation set forth in any provision hereof may be transferred or assigned (except by operation of law) by any Party without the prior written consent of the other Party, and any purported transfer or assignment in violation of this Section shall be void and of no effect.

14.    <u>Governing Law, Jurisdiction, and Venue</u>. This Agreement and all matters arising out of or relating to this Agreement and the Executive's termination, whether sounding in contract, tort, or statute, for all purposes shall be governed by and construed in accordance with the laws of Japan without regard to any conflicts of laws principles that would require the laws of any other jurisdiction to apply. Any action or proceeding by either of the Parties to enforce this Agreement shall be brought only in the District Court of Tokyo. The Parties hereby irrevocably submit to the exclusive jurisdiction of these courts and waive the defense of inconvenient forum to the maintenance of any action or proceeding in such venue.

DocuSign Envelope ID: 2DFB8C45-B552-4CEB-8648-E42085EAB584

15.     Entire Agreement. Unless specifically provided herein, this Agreement contains all of the understandings and representations between the FTX Group and the Executive relating to the subject matter hereof and supersedes all prior and contemporaneous understandings, discussions, agreements, representations, and warranties, both written and oral, regarding such subject matter; provided, however, that nothing in this Agreement modifies, supersedes, voids, or otherwise alters the SPA, Side Letter, or Proxy Agreement.

16.     Modification and Waiver. No provision of this Agreement may be amended or modified unless the amendment or modification is agreed to in writing and signed by the Executive and by an authorized representative of the Company. No waiver by either Party of any breach by the other party of any condition or provision of this Agreement to be performed by the other Party shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either Party in exercising any right, power, or privilege under this Agreement operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

17.     Severability. If any provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, or enforceable only if modified, such finding shall not affect the validity of the remainder of this Agreement, which shall remain in full force and effect and continue to be binding on the Parties.

The Parties further agree that any such court is expressly authorized to modify any such invalid, illegal, or unenforceable provision of this Agreement instead of severing the provision from this Agreement in its entirety, whether by rewriting, deleting, or adding to the offending provision, or by making such other modifications as it deems necessary to carry out the intent and agreement of the Parties as embodied in this Agreement to the maximum extent permitted by law. Any such modification shall become a part of and treated as though originally set forth in this Agreement. If such provision or provisions are not modified, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth in it. The Parties expressly agree that this Agreement as so modified by the court shall be binding on and enforceable against each of them.

18.     Interpretation. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph. Moreover, this Agreement shall not be construed against either Party as the author or drafter of the Agreement.

19.     Counterparts. The Parties may execute this Agreement in counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document has the same effect as delivery of an executed original of this Agreement.

20.     No Admission of Liability. Nothing in this Agreement shall be construed as an admission by the Executive or the FTX Group of any wrongdoing, liability, or noncompliance with any rule, ordinance, statute, law, or other legal obligation.

21.     Press Release. Notwithstanding Section 10, neither the FTX Group or the Executive shall issue any press release or public announcement relating to the subject matter of this Agreement or the termination of the Services without the prior written approval of the other Party; provided, however, that either Party may make any public disclosure it believes in good faith is required by applicable law or regulations (in which case the disclosing Party shall use reasonable efforts to advise the other Party and provide them with a copy of the proposed disclosure prior to making the disclosure).

22.     Legal Fee Reimbursement. The Company agrees to pay the Executive's reasonable legal fees actually incurred in connection with the negotiation and execution of this Agreement upon receiving invoices for such services. Such reimbursement shall not exceed the equivalent of USD$15,000.

23.     Notices. All notices under this Agreement must be given in writing by email at the addresses indicated in this Agreement or any other address designated in writing by either Party.

Notice to FTX Group:

| | |
|---|---|
| Address: | FTX Trading Ltd. |
| | c/o Corporate & Trust Services (Caribbean) Limited |
| | Lower Factory Rd |
| | Saint John's |
| | Antigua and Barbuda |
| Attn: | General Counsel |
| Email: | can@ftx.com |

Notice to the Executive:

| | |
|---|---|
| Address: | 8 Orange Grove Rd 06-02, Singapore 258342 |
| Email: | kayamori@gmail.com |

[SIGNATURE PAGE FOLLOWS]

8

The Parties have executed this Agreement as of the Execution Date above.

FTX JAPAN HOLDINGS K.K. on behalf of the FTX GROUP

By _Seth Melamed_____

Name: Seth Melamed

Title: Representative Director

EXECUTIVE

Signature: _____

Print Name: Kariya Kayamori

Date: 9/8/2022 _____

9

**EXHIBIT A**

**MANAGEMENT AGREEMENT**

DocuSign Envelope ID: 2DEB8C45-BEE2-4C5B-9648-E42085EAB56A

**LIQUID GROUP INC.**

AND

**KARIYA KAYAMORI**

---

**MANAGEMENT AGREEMENT**

---

## CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Appointment | 4 |
| 3. | Executive's Duties and Responsibilities | 4 |
| 4. | Remuneration and Other Benefits | 5 |
| 5. | Indemnification | 6 |
| 6. | Expenses | 8 |
| 7. | Deductions; Return of Materials | 8 |
| 8. | Confidentiality | 8 |
| 9. | Intellectual Property Rights | 9 |
| 10. | Executive's Warranties and Undertakings | 9 |
| 11. | Termination | 11 |
| 12. | Notice | 12 |
| 13. | Legal Representation | 13 |
| 14. | Entire Agreement | 13 |
| 15. | Miscellaneous | 13 |
| 16. | Governing Law and Jurisdiction | 14 |

**THIS AGREEMENT** is made on _____.

**BETWEEN**:

(1)     **LIQUID GROUP INC.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan (the "**Company**"); and

(2)     **KARIYA KAYAMORI**, a Japanese national having his address at 8 Orange Grove Road #06-02, Singapore 258342 (the "**Executive**").

**WHEREAS**:

(A)     The Company is a subsidiary of FTX Trading Ltd., a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda ("**FTX**").

(B)     The Company has agreed to appoint the Executive and the Executive has agreed to serve the Company as a Representative Director and CEO of the Company on the terms and conditions set out hereinafter.

**THE PARTIES AGREE** as follows:

**1.     INTERPRETATION**

1.1     **Definitions**

In this Agreement:

"**Accrued Amounts**" means, collectively, the items set forth in Clause 11.5.

"**Affiliate**" means, with respect to any person, any other person controlling, controlled by or under common control with such specified person. For the purposes of this definition, "**control**" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing.

"**Agreement**" means this Management Agreement, as amended or supplemented in accordance with the terms hereof from time to time.

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) of the Company.

"**Board of Directors**" means the board of directors (*torishimariyakukai*) of the Company.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cause**" means any of the following: (a) the Executive willfully engages in conduct that is in bad faith and materially injurious to the Company, including but not limited to, misappropriation of trade secrets, fraud or embezzlement; (b) the Executive commits a material breach of this Agreement, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach; (c) the Executive willfully refuses to implement or follow a reasonable and lawful directive by the Board of Directors, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the Company; (d) the Executive engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with his position, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the Company; (e) is disqualified from serving as a director under any applicable law; (f) the Executive engages in a course of vexatious comment or conduct towards employees or consultants of the Company, that is known or ought reasonably to be known to be unwelcome, and such course of comment or conduct persists despite warnings from the Company; or (g) the Executive resigns from his position as a Representative Director and/or CEO without the prior approval of the Board of Directors.

"**CEO**" means the chief executive officer of the Company.

"**Childcare Allowance**" has the meaning given in Clause 4.1.

"**Companies Act**" means the Companies Act of Japan (Act No. 86 of 2005), as amended from time to time.

"**Confidential Information**" means any information including, but not limited to, trade secrets, disclosed to the Executive or known by the Executive as a consequence of or through his performance of services hereunder, concerning the business or finances of any member of the Group or any of its dealings, transactions or affairs, including without limitation, lists or details of customers, suppliers, information relating to the working of any process of invention carried on or used by the Company or any member of the Group, information relating to research projects, know-how, technology, trade secrets, prototypes, prices, discounts, mark-ups, future business strategy, marketing and price-sensitive information.

"**Crypto Trading Business**" means the development and operations of an exchange trading platform for the sale and purchase of crypto-assets, crypto asset-based derivatives, margin lending, non-fungible tokens, and other crypto asset-based financial products, as carried on by the Company or any member of the Group from time to time.

"**Directors' and Officers' Insurance**" has the meaning given in Clause 5.6.

"**Effective Date**" means the Completion Date as provided for and defined in the Major Shareholders SPA.

"**Expenses**" has the meaning give in Clause 5.1.

"**FTX Board of Directors**" means the board of directors of FTX.

"**FTX Common Shares**" means shares of the common stock of FTX.

"**Good Reason**" means any of the following actions by the Company without the written prior consent of the Executive: (a) a material reduction in the Executive's duties or responsibilities that is inconsistent with the Executive's position, provided that a mere change of title alone shall not constitute such a material reduction; (b) a greater than 10% aggregate reduction (that is, a material reduction) by the Company in the Services Fee or a material reduction in his employee benefits (namely, the Housing Allowance, the Childcare Allowance, medical, dental, insurance, short-term and long-term disability insurance and retirement plan benefits, collectively, the "**Employee Benefits**") to which such Executive is entitled immediately prior to such reduction (other than in connection with a general decrease in the salary or Employee Benefits of substantially all employees of the Company); (c) a relocation of the Executive's principal office to a location that increases the Executive's commute by more than 80 kilometers, except for required travel by the Executive on business for the Company, an Affiliate of the Company, or any other member of the Group; or (d) a failure to maintain the Executive's concurrent appointment as both Representative Director and CEO at any time during the Term.

"**Group**" means FTX and its Affiliates from time to time and "**member(s) of the Group**" shall be construed accordingly.

"**Housing Allowance**" has the meaning given in Clause 4.1.

"**Intellectual Property Rights**" means all rights in or to any patent, copyright, database rights, registered design or other design right, utility model, trade mark, brand name, service mark, trade name, eligible layout right, chip topography right, trade secrets, know-how and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registrable or not and wherever existing, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights.

"**Major Shareholders SPA**" means the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated 19 November 2021 entered into between the Executive, the Company and certain other parties thereto, as amended by that certain First Amendment to Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated as of March 31, 2022.

"**Notice**" has the meaning given in Clause 12.1.

"**Option**" has the meaning given in Clause 4.4.

"**Proceeding**" has the meaning given in Clause 5.1.

"**Representative Director**" means a representative director (*daihyo torishimariyaku*) of the Company.

"**Services Fee**" has the meaning given in Clause 4.1.

"**SGD**" means Singapore dollars, the lawful currency of Singapore.

"**Shareholders**" means the shareholders of the Company.

"**Term**" has the meaning given in Clause 2.2.

"**USD**" means United States dollars, the lawful currency of the United States of America.

1.2    **References to certain general terms**

(a)    References herein to Clauses are to Clauses in this Agreement.

(b)    Headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

(c)    References to this Agreement are to this management agreement as amended, varied, modified or supplemented from time to time.

(d)    Unless the context requires otherwise, words importing the singular only shall include the plural and vice versa and words importing natural persons shall include corporations and unincorporated associations and words importing the masculine gender only shall include the feminine gender and the neuter gender and vice versa.

(e)    The expressions the "Company" and the "Executive" shall, where the context permits, include their respective successors, personal representations, executors, administrators, estates and permitted assigns.

**2.    APPOINTMENT**

2.1    The Company shall appoint the Executive and the Executive shall serve the Company concurrently as a Representative Director and CEO, subject to the terms and conditions of this Agreement.

2.2    This Agreement shall be effective as of the Effective Date and continue until such time as this Agreement is terminated in accordance with Clause 11 (the "**Term**").

2.3    The Company shall take all necessary procedures to promptly effect, and maintain during the Term of this Agreement, the Executive's appointment as a Representative Director and CEO in accordance with the Companies Act, the Articles of Incorporation, and other organizational documents of the Company.

**3.    EXECUTIVE'S DUTIES AND RESPONSIBILITIES**

3.1    The Executive shall, during the Term of this Agreement:

(a)    serve the Company as a Representative Director and CEO and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors or the Companies Act in pursuance of his duties hereunder, perform such services for the Company, which duties, authority, and responsibilities are consistent with the Executive's position, and (without further remuneration unless otherwise agreed) accept such offices and positions as the Board of Directors may from time to time reasonably require, and he will perform those duties at such place or places as the Board of Directors may from time to time reasonably determine;

DocuSign Envelope ID: 2DEB8C45-BEE2-4C5B-8648-E42985EAB58A

(b)    comply with and conform to any lawful instructions or directions from time to time given or made by the Board of Directors, and:

   (i)    maintain the confidentiality of all Confidential Information he acquires by virtue of his appointment;

   (ii)    carry out his responsibilities with care, skill and diligence which the Company is reasonably entitled to expect from someone of his experience and expertise;

   (iii)    act in good faith and diligently serve the Company and use his best endeavours to promote the business and interests thereof;

   (iv)    to act at all times for the proper purposes of the Company; and

(c)    to act only with the proper authority of the Board of Directors;

(d)    keep the Board of Directors promptly and fully informed (in writing if so requested) of his conduct of the business or affairs of the Company or the Group and provide such explanations as the Board of Directors may require in connection therewith;

(e)    carry out his duties and exercise his powers jointly and collectively with any other director or executive of the Company as shall from time to time be appointed by the Board of Directors; and

(f)    comply with (and use his best endeavours to procure the Company's compliance with) the Articles of Incorporation and all laws, rules, regulations and guidelines which are applicable to the Company or the Executive from time to time.

## 4.    REMUNERATION AND OTHER BENEFITS

4.1    During the Term of this Agreement, the Executive shall be entitled to the following remuneration and allowances:

(a)    a monthly services fee of USD42,000.00 (the "**Services Fee**");

(b)    a monthly housing allowance of SGD7,700.00 (the "**Housing Allowance**"); and

(c)    a monthly childcare allowance of USD6,000.00 (the "**Childcare Allowance**"),

payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that the Services Fee, the Housing Allowance and the Childcare Allowance shall be prorated for any partial month of services during the Term of this Agreement. All payments made pursuant to this Section 4.1 shall be made in the corresponding currencies set forth in this Section, or such other currency as the parties may agree upon from time to time. In the event another currency is so agreed upon, then the amount to be paid shall be calculated using the foreign exchange selling rate for that other currency for the Business Day preceding the payment due date as published in the Wall Street Journal, or such other method as the parties may agree upon from time to time.

4.2     During the Term of this Agreement, the Board of Directors may, within the limits of the amounts approved by the Shareholders at the general meeting of the Company, at its sole and absolute discretion, pay the Executive an annual bonus (the "**Bonus**") with a target amount equal to 100% of the annual Services Fee, which shall be prorated for any partial year of services during the Term of this Agreement, and subject to such conditions as the Board of Directors may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and the Company and such other factors as the Board of Directors may in its sole and absolute discretion consider necessary or appropriate.

4.3     During the Term of this Agreement, the Executive shall be entitled to the Employee Benefits, including the benefits under any medical insurance scheme and any employee benefit plan adopted by the Company for its directors and employees from time to time.

4.4     As soon as practicable following the Effective Date, the Company shall recommend to the FTX Board of Directors that the Executive be granted an option (the "**Option**") to purchase 28,000 shares of the FTX Common Shares under FTX's 2020 Equity Incentive Plan, as amended from time to time. The Option shall be subject to monthly vesting over four years with a one-year cliff, and shall be evidenced by FTX's standard form of option agreement. The exercise price of the Option shall be the fair market value of the FTX Common Shares on the date of grant, as determined by the FTX Board of Directors in its sole and absolute discretion.

## 5.     INDEMNIFICATION

5.1     Subject to Clause 5.4, to the fullest extent permitted by applicable law, in the event that the Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**") by reason of the fact that the Executive is or was a director or officer of the Company, any Affiliate of the Company, or any other member of the Group, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, the Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses reasonably incurred in defence of any Proceeding (including attorneys' fees) (collectively, the "**Expenses**").

5.2     The Expenses reasonably incurred by the Executive in defence of the Proceeding shall be paid by the Company in advance of the final disposition of such litigation upon receipt by the Company from time to time of:

(a)     a written request for payment;

(b)     appropriate documentation evidencing the incurrence, amount, and nature of the Expenses for which payment is being sought; and

(c)     an undertaking adequate under applicable law made by or on behalf of the Executive to repay the Company:

        (i)     all amounts paid by the Company if it shall ultimately be determined that the Executive is not entitled to be indemnified by the Company under this Agreement; and

        (ii)    all amounts paid to or recovered by the Executive from any person (including but not limited to the insurance carrier under the Directors' and Officers' Insurance) with respect to the Proceeding.

5.3    No determination as to entitlement to indemnification (including in respect of advanced payments) under this Agreement shall be required to be made prior to the final disposition of a Proceeding.

5.4    Notwithstanding any provision in this Agreement to the contrary, the Company shall not be obligated to indemnify the Executive for Expenses:

        (a)    to the extent prohibited by any applicable laws and regulations;

        (b)    to the extent such Expenses have been paid directly to the Executive by the insurance carrier under the Directors' and Officers' Insurance and/or any other person;

        (c)    in respect of a Proceeding initiated by the Executive or the Company related to any contest or dispute between the Executive and the Company or any of its Affiliates with respect to this Agreement or the Executive's performance of services under this Agreement;

        (d)    in respect of any liabilities relating to any taxation payable by the Executive in connection with his remuneration or other payments or benefits received from the Company;

        (e)    in respect of any liabilities incurred by, or any Proceeding made against, the Executive arising from the Executive's fraud, wilful default, wilful misconduct or gross negligence; or

        (f)    in respect of any liabilities arising out of, relating to or in connection with any actions taken or inactions by the Executive prior to the Effective Date (except to the extent that any Expenses incurred thereto are recoverable from the insurance carrier under the Directors' and Officers' Insurance by the Company).

5.5    The Company shall, at the sole and absolute discretion of the Board of Directors, be entitled to (i) participate in the Proceeding and/or (ii) assume the defence of the Proceeding; provided, however, that the Company shall be required to obtain the Executive's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant the Executive a complete release of liability, (2) would impose any penalty or limitation on the Executive, or (3) would admit any liability or misconduct by the Executive.

5.6    During the Term of this Agreement and for a period of six (6) years thereafter, the Company or any successor to the Company shall use commercially reasonable efforts to maintain, at its own expense, directors' and officers' liability insurance (the "**Directors' and Officers' Insurance**") providing coverage to the Executive in amounts and on terms reasonable and customary for similarly situated companies.

5.7    The Executive shall fully assist, at the Company's sole expense, the Company to the extent reasonably necessary in any claims or lawsuits between the Company and the insurance carrier under the Directors' and Officers' Insurance in respect to a Proceeding.

5.8    In the event any Expenses paid by the Company to the Executive are recovered by the Executive from the insurance carrier under the Directors' and Officers' Insurance, the Executive shall repay the Company such recovered amounts.

5.9    For the avoidance of doubt, the provisions of this Clause 5 shall survive the termination or expiration of this Agreement.

**6.    EXPENSES**

The Company shall reimburse the Executive for all reasonable expenses properly incurred in the performance of his duties hereunder and the Executive shall, if so required, provide the Company with receipts or other evidence of the payment of such expenses.

**7.    DEDUCTIONS; RETURN OF MATERIALS**

7.1    The Company shall be entitled at any time to deduct from the Executive's remuneration hereunder (including but not limited to the Services Fee, the Housing Allowance, the Childcare Allowance and the Bonus) any monies due from him to the Company for outstanding loans, advances and any other monies lent to him by the Company.

7.2    The Executive will return all equipment that he borrowed from the Company in the same condition (other than for normal wear and tear) in which it was received within five (5) days after the termination or expiration of this Agreement, however occurring.

**8.    CONFIDENTIALITY**

8.1    The Executive shall not during or after the Term of this Agreement use or divulge to any person any Confidential Information which may have come to his knowledge.

8.2    Clause 8.1 does not apply to any use or disclosure of Confidential Information:

(a)    as required during the Term of this Agreement in performance of the Executive's authorized duties to the Company (such disclosures to be made within the limits and to the extent of such duties);

(b)    to the extent that such Confidential Information is generally known to the public not as a result of a breach of the Executive's duty of confidentiality to a member of the Group;

(c)    to the extent that such Confidential Information is required to be disclosed by law, provided that to the extent permitted by law (i) the disclosure shall be made after consultation with the Company and after allowing the Company, at the Company's sole cost and expense, the opportunity to contest such disclosure and after taking into account the Company's requirements as to its timing, content and manner of disclosure, (ii) such disclosure shall only be made to the extent legally required, and (iii) following such disclosure such disclosed

Confidential Information shall continue to be treated as Confidential Information hereunder; or

(d)    as permitted by the Company's prior written consent.

## 9.    INTELLECTUAL PROPERTY RIGHTS

9.1    The Executive acknowledges that as between the Company and the Executive any and all Intellectual Property Rights which are owned by the Company at the Effective Date and/or which are created or developed from time to time in connection with the Executive's service hereunder and the business or the operation of the Company are owned by the Company. The Executive:

(a)    hereby assigns, and agrees to assign, all such Intellectual Property to the Company, and undertakes to, forthwith and from time to time both during and after the Term of this Agreement and at the request of the Company, at the Company's sole cost and expense, render all reasonable assistance to the Company (or any other member of the Group as the case may be) for obtaining letters patent or other protection or registration for any such Intellectual Property Rights and shall vest such letters patent or other protection in the Company (or any other member of the Group as the case may be) or its nominees; and

(b)    irrevocably authorises the Company and any member of the Group for the purposes aforesaid to make use of the name of the Executive and execute any document or do anything on his behalf. The Executive agrees to confirm and ratify all such acts and instruments.

9.2    The Executive shall not during or after the Term of this Agreement, directly or indirectly, except with the prior written consent of the Company or in the ordinary course of the Company's business:

(a)    use the name "Liquid", "Quoine" or "FTX" or any name similar to that of the Company, FTX or any member of the Group or any colourable imitation thereof in connection with any business; and

(b)    use any Intellectual Property Rights of the Group in connection with any business not belonging to the Group.

## 10.    EXECUTIVE'S WARRANTIES AND UNDERTAKINGS

10.1    The Executive represents, warrants and undertakes during the Term of this Agreement that:

(a)    he is not bound by or subject to any court order, agreement, arrangement or undertaking which in any way restricts or prohibits him from entering into this Agreement or from performing his duties hereunder;

(b)    to the Executive's knowledge there is no circumstance in respect of which there is, or is likely to be, a conflict of interest between the Executive or any of his Affiliates and the Company; and

(c)    he shall notify the Company promptly in writing of any change to the information referred to in Clause 10.1.

10.2    Subject to Clause 10.3 and Clause 10.5, the Executive shall not, unless he acts on behalf of the Company or any other member of the Group, (i) at any time during the Term of this Agreement, and for a period of one (1) year following termination of this Agreement, or (ii) for a period of three (3) years following the Effective Date (whichever is longer), either on his own or in conjunction with or on behalf of any body corporate, partnership, joint venture or other contractual agreement, whether directly or indirectly, whether for profit or not:

(a)    carry on or be engaged or interested in or assist a business in Japan, Singapore, and Vietnam, which competes, directly or indirectly, with the Crypto Trading Business as operated during the Term of this Agreement;

(b)    make, publish, or communicate, whether verbally or in any written format, to any person or entity any defamatory or untrue disparaging remarks, comments, or statements concerning the Group, the Group's products, services, directors, officers, or employees;

(c)    solicit, contact, attempt to contact, or meet a current customer or former customer of a member of the Group located in Japan, Singapore, and Vietnam, for the purposes of offering or accepting goods or services similar to or competitive with those offered by any members of the Group;

(d)    engage, employ, solicit or contact with a view to his engagement or employment by another person, a director, officer, employee or manager of the Company or any other member of the Group or a person who was a director, officer, employee or manager of the Company or any other member of the Group at any time in the six (6) month period preceding such engagement, employment or solicitation, provided, however, that the restrictions contained in this Clause 10.2(d) shall not apply to general solicitation or contact not specifically directed to any person mentioned above; or

(e)    solicit, motivate aid, abet, or otherwise encourage a third party to do any of the foregoing.

10.3    In the event of the termination of this Agreement by the Company without Cause or by the Executive for Good Reason, the restrictive covenants set forth in Clause 10.2 shall remain effective for a period of four (4) months from the date of termination of this Agreement, but shall otherwise cease to have any force or effect upon expiry of such four-month period.

10.4    The Company shall compensate the Executive during the non-compete period established in Clause 10.3 at a rate equal to the monthly Services Fee effective as of immediately before the date of termination, payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that such compensation shall be prorated for any partial month during the non-compete period established in Clause 10.3.

- 10 -

10.5    Notwithstanding any provision in this Agreement to the contrary, the Executive may;

    (a)    own, directly or indirectly, solely as an investment, up to three percent (3%) of any class of "publicly traded securities" of any business that competes with any of the members of the Group; or

    (b)    own securities, solely as a passive investment, in any venture capital, private debt or equity investment fund or similar investment entity that holds securities in an entity that may compete with any of the members of the Group.

## 11.    TERMINATION

11.1    Subject to Clause 11.2 and Clause 11.3, either the Company or the Executive may terminate this Agreement by three (3) month's prior notice in writing to the other party.

11.2    Notwithstanding Clause 11.1, the Company may terminate this Agreement immediately upon written notice to the Executive:

    (a)    for Cause;

    (b)    if the Executive is convicted of any criminal offence involving his integrity or honesty; or

    (c)    if the Executive is declared of bankruptcy or makes any arrangements or composition with his creditors generally.

11.3    Notwithstanding Clause 11.1, the Executive may terminate this Agreement for Good Reason immediately upon written notice to the Company.

11.4    In the event of the termination of this Agreement, the Executive shall:

    (a)    where he serves as a director of the Company and/or as a director of any other member of the Group, forthwith resign from such directorship(s) and acknowledges that he has no claims against the Company or as the case may be, the relevant member of the Group for loss of office;

    (b)    deliver to the Company or as the Company may direct all documents (including books, records, document, papers, accounts, correspondence, lists of customers, notes, memoranda, plans, drawing and other documents of whatsoever nature) credit cards, models or samples and other property concerning the business, finances or affairs of any member of the Group which may then be in his possession or control;

    (c)    not at any time thereafter represent himself to be connected with the Group; and

    (d)    cease to be entitled to any further benefits or payments under this Agreement other than those set forth in this Clause 11, Clause 5 and Clause 10.4.

11.5    In the event of the termination of this Agreement for Cause or without Good Reason, the Executive shall be entitled to receive:

    (a)    any accrued but unpaid Services Fees;

(b)    any Bonus with respect to any completed fiscal year immediately preceding the termination date that has been awarded to him in writing by the Board of Directors but remains unpaid as at the termination date;

(c)    reimbursement for unreimbursed business expenses properly incurred by the Executive; and

(d)    such Employee Benefits, if any, to which the Executive may be entitled under the Company's benefit plans as of the date of termination.

11.6    In the event of the termination of this Agreement without Cause or for Good Reason:

(a)    the Executive shall be entitled to receive the Accrued Amounts; and

(b)    with respect to the Option granted to the Executive following the Effective Date, 100% of the outstanding unvested Options shall become fully vested and exercisable for the remainder of their full term.

11.7    Any termination of this Agreement shall be communicated by a written notice of termination specifying: (i) the termination provision of this Agreement relied upon; (ii) to the extent applicable, the facts and circumstances claimed to provide the basis for termination; and (iii) the applicable termination date.

## 12.    NOTICE

12.1    Each notice, demand or other communication given or made under this Agreement (a "**Notice**") shall be in writing and delivered or sent to the relevant party at its address and email address set out below (or such other address or email address as the addressee has by seven (7) days' prior written notice specified to the other party):

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Company** | Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | sam@ftx.com | N/A |
| | with a copy (which shall not constitute notice) to: FTX Trading Ltd. c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd Saint John's Antigua and Barbuda | can@ftx.com | General Counsel |

| **The Executive** | Hirose Building 4F | mike.kayamori | Kariya |
| | 3-17 Kanda Nishikicho | @liquid.com | Kayamori |
| | Chiyoda-ku | | |
| | Tokyo 101-0054 | | |
| | Japan | | |

12.2    Any Notice so addressed to the relevant party shall be deemed to have been delivered (a) if sent by courier, two (2) Business Days after the date of posting; (b) if given by personal delivery, when actually delivered to the relevant address; and (c) if sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 12.2 within one (1) Business Day of sending the email.

**13.    LEGAL REPRESENTATION**

The Executive hereby acknowledges that the Executive has been duly advised to seek independent legal advice and to obtain separate legal representation.

**14.    ENTIRE AGREEMENT**

14.1    This Agreement, as well as the Major Shareholders SPA, and the agreements referred to therein, constitutes the entire agreement and understanding of the parties hereto relating to the subject matter hereof and shall be in substitution for any subsisting agreement or arrangement (oral or otherwise) made between the Company and the Executive which shall be deemed to have been terminated by mutual consent as of the Effective Date.

14.2    The terms of this Agreement may only be varied in writing (excluding email) signed by the Executive and a duly appointed representative of the Company.

**15.    MISCELLANEOUS**

15.1    Nothing in this Agreement shall be construed as creating among the parties hereto an employment, partnership, agency, or similar relationship. The provision of services by the Executive shall not be governed by the Labour Contract Act (Act No.128 of 2007, as amended), the Labour Standards Law (Act No. 49 of 1947, as amended) and other laws of Japan otherwise applicable to employees in their capacity as employees.

15.2    The rights and remedies of the parties under this Agreement are not exclusive of or limited by or in limitation of any other rights or remedies (including without limitation any right of set-off) which each party may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative.

15.3    No failure or delay by any party hereto in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

15.4    The expiration or termination of this Agreement howsoever arising shall not operate to affect such of the provisions hereof as in accordance with their terms are expressed to operate or have effect thereafter.

15.5    In the event of any variation of the remuneration payable to the Executive hereunder being made by consent of the parties hereto such variation shall not constitute a new agreement but (subject to any express agreement to the contrary) the appointment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

15.6    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.7    The parties to this Agreement shall pay their own legal professional and other costs in connection with the preparation and completion of this Agreement.

15.8    No party to this Agreement shall assign, transfer or create any trust in respect of, or purport to assign, transfer or create any trust in respect of, any of its rights or obligations under this Agreement.

15.9    The Company's rights and obligations under this Agreement shall inure to the benefit of and shall be binding upon the Company's successors and assigns.

15.10   This Agreement may be executed in any number of counterparts each of which is an original and all of which together evidence the same agreement.

**16.    GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by the laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement.

*[Signature Page Follows]*

DocuSign Envelope ID: 2DEB8C45-BEE2-4C5B-8648-E42085EAB58A

**EXECUTED** by the parties:

<u>**Company**</u>

| | |
|---|---|
| Signed by Kariya Kayamori | ) |
| as the representative director of | ) |
| and for and on behalf of | ) |
| **LIQUID GROUP INC.** | ) |

**<u>Executive</u>**

Signed by **KARIYA KAYAMORI**           )

DocuSign Envelope ID: 2DFB8C45-B552-4CFB-8648-E42085EAB584

**EXHIBIT B**

**ADVISOR AGREEMENT**

This Advisor Agreement (this "Advisor Agreement") is made on, and comes into effect on, September 10, 2022 ("Effective Date") by and between Quoine Pte. Ltd., a Singapore private limited company (the "Company"), and Kariya Kayamori ("Employee").

The parties agree that, on and from the Effective Date, the Employee's employment with the Company shall be amended as follows:

1.     **Term of Employment**. Save as expressly provided in this Advisor Agreement, the Employee shall continue to be employed by the Company in accordance with the employment agreement made on 1 February 2015, as subsequently amended from time to time ("Quoine Employment Agreement"), and the last day of the Employee's employment with the Company ("Employment Termination Date") shall be the earlier of (a) January 31, 2023, or (b) the date that the Employee's employment is earlier terminated in accordance with this Advisor Agreement. All benefits provided by the Company to the Employee shall cease on the Employment Termination Date. In addition, save as expressly provided in this Advisor Agreement and in Section 5 and Section 9 of the Separation and Release of Claims Agreement dated September 9, 2022 ("Release Agreement"), the Employee shall not be entitled to any further payment from the Company after the Employment Termination Date.

2.     **Fixed Employment Period.** The parties acknowledge and agree that the intention is for the Employee's employment to continue up until and including January 31, 2023. Accordingly, the employment may only be terminated earlier by the mutual written agreement of the parties. Notwithstanding the foregoing, the Company may, for any reason and at any time upon forty-five (45) days' advance written notice to the Employee, terminate the Employee's employment earlier than the date specified aforesaid (in which case the Company will pay the Employee a sum equal to the Employee's gross salary in respect of the remainder of the period that the Employee would otherwise have served).

3.     **Services and Job Title**.  The Employee agrees to remain readily contactable, and to provide such advice and assistance to the Company as may be mutually agreed or as set forth in Section 7 of the Release Agreement (collectively, the "Services") until the Employment Termination Date. Further, the Employee's title shall be changed to that of "Advisor".

4.     **Compensation**.  The Employee shall continue to be entitled to receive the Employee's usual salary (which, for the avoidance of doubt, is USD\$12,500.00 per month (gross), prorated for an incomplete month) and employment benefits until the Employment Termination Date. For the avoidance of doubt, such payments are not conditioned on the provision of any specific services during the term of the employment.

5.     **Cost of Repatriation**. The Employee consents and agrees to bear and be liable for any and all costs associated or connected with the Employee's repatriation from Singapore, upon the termination of the Employee's employment with the Company.

6.     **Work Pass and Withholdings**.

(a)     Notwithstanding anything in this Advisor Agreement, all amounts payable by the Company to the Employee shall be subject to any deductions or withholdings which the Company may be entitled or required to make under applicable laws.

(b)     Without prejudice to paragraph 6(a) of this Advisor Agreement, as the Employee is neither a citizen nor permanent resident of Singapore:

(i)     the Company is required to notify the Comptroller of Income Tax, generally no later than 1 month prior to the Employment Termination Date, that the Employee is about to cease being employed by the Company;

(ii)     the Company is required to withhold, until thirty (30) days after the receipt by the Comptroller of Income Tax of the aforesaid notification, all sums that the Company has in its possession which may be payable to the Employee; and

(iii)     the Employee's work pass will need to be cancelled on or about the Employment Termination Date, and the Employee is required to cooperate with the Company to effect such cancellation.

7.     **Nondisclosure of Confidential Information**.

(a)     **Agreement Not to Disclose.** Without prejudice to the confidentiality obligations as set out in the Quoine Employment Agreement and Section 10 of the Release Agreement, the Employee agrees not to use any Confidential Information (as defined below) disclosed to Employee by the Company for Employee's own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Services.  Employee shall not disclose or permit disclosure of any Confidential Information of the Company to third parties.  Employee agrees to take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information of the Company in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Advisor Agreement to have any such information.  Employee further agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of the Company's Confidential Information which may come to Employee's attention.

(b)     **Definition of Confidential Information.**  "Confidential Information" means any information, technical data or know-how (whether disclosed before, on or after the date of this Advisory  Agreement), including, but not limited to, information relating to business and product or service plans, financial projections, customer lists, business forecasts, sales and merchandising, human resources, patents, patent applications, computer object or source code, research, inventions, processes, designs, drawings, engineering, marketing or finance that is marked or designated in writing as confidential or proprietary, or if given orally, is confirmed in writing as having been disclosed as confidential or proprietary within a reasonable time (not to exceed thirty (30) days) after the oral disclosure, or which information would (even if not marked, designated, or confirmed in writing), under the circumstances, appear to a reasonable person to be confidential or proprietary.  Confidential Information does not include information, technical data or know-how which: (i) is in the possession of Employee at the time of disclosure, as shown by Employee's files and records immediately prior to the time of disclosure; or (ii) becomes part of the public knowledge or literature, not as a direct or indirect result of any improper inaction or action of Employee.

(c)     **Exceptions.**  Notwithstanding the above, Employee shall not have liability to the Company or any of its subsidiaries with regard to any Confidential Information of the Company which Employee can prove:

(i)     is disclosed with the prior written approval of the Company; or

-2-

(ii)    is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that Employee shall (to the extent permitted by applicable law) provide prompt notice of such court order or requirement to the Company to enable the Company or its appropriate subsidiary to seek a protective order or otherwise prevent or restrict such disclosure.

8.    **No Duplication; Return of Materials**.  Employee agrees, except as otherwise expressly authorized by the Company, not to make any copies or duplicates of any of the Company's Confidential Information.  Without prejudice to the requirement in clause 4(B)(iv) of the Quoine Employment Agreement to return all confidential information upon the termination of the employment, any materials or documents that have been furnished by the Company to Employee in connection with the Services shall be promptly returned by Employee to the Company, accompanied by <u>all</u> copies of such documentation (a) no later than the Employment Termination Date or (b) immediately upon written demand by the Company, whichever is the earlier.

9.    **No Rights Granted**.  Nothing in this Advisor Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of the Company, nor shall this Advisor Agreement grant Employee any rights in or to the Company's Confidential Information, except the limited right to use the Confidential Information in connection with the Services.

10.    **Miscellaneous**.  Any term of this Advisor Agreement may be amended or waived only with the written consent of the parties.  This Advisor Agreement, the Release Agreement, and the documents and agreements referenced in the Release Agreement, constitute the sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof.  Any notice required or permitted by this Advisor Agreement shall be in writing and shall be deemed sufficient upon delivery, when delivered personally or by overnight courier or sent by e-mail (with confirmation of receipt), addressed to the party to be notified at such party's address or fax number as set forth on the signature page herein, or as subsequently modified by written notice.  This Advisor Agreement shall be governed in all respects by the laws of Japan (including its validity, interpretation, construction and performance), without giving effect to the principles of conflict of laws. Further, the parties hereby irrevocably submit to the exclusive jurisdiction of the District Court of Tokyo in respect of all disputes arising from or in connection with (a) the Quoine Employment Agreement, (b) this Advisor Agreement and/or (c) the termination of the Employee's employment, and the parties agree not to settle disputes by arbitration (notwithstanding clause 15 of the Quoine Employment Agreement). This Advisor Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

11.    **Without Prejudice; Termination of Non-Compete**. The termination of employment shall not affect the continued existence and validity of the rights and obligations of the parties under the provisions of the Quoine Employment Agreement that are expressed or intended to survive termination of the employment; provided, however, that upon the termination of employment hereunder, clause 7 of the Quoine Employment Agreement will terminate and the non-compete provisions found therein shall cease to have any force or effect. Further, this Advisor Agreement does not constitute any admission of liability whatsoever by the Company and is entered into without prejudice to the rights of the Company.

*[Signature Page Follows]*

4131-2273-0043.9

DocuSign Envelope ID: 2DFB8C45-B552-4CFB-8648-E42085EAB584

The parties have executed this Advisor Agreement as of the date first written above.

**THE COMPANY:**

QUOINE PTE. LTD.

By: _Seth Melamed_
    FB8DD985AAA84EA...

(Signature)

Name:  Seth Melamed

Title:  Director

For and on behalf of Quoine Pte. Ltd.

Address: Marina Bay Financial Centre
Tower 1, #11-18, 8 Marina Boulevard,
Singapore 018981

**ADVISOR:**

KARIYA KAYAMORI

_(signature)_
9739CD1FC20E436...
(Signature)

Address: 8 Orange Grove Rd 06-02,
Singapore 258342

Email: kayamori@gmail.com

4131-2273-0043.9

EXHIBIT C

**Addendum to Separation and Release of
Claims Agreement (Supplemental Release)**

This Addendum to Separation and Release of Claims Agreement ("**Addendum**")
supplements the Separation and Release of Claims Agreement, dated September 9, 2022
("**Release Agreement**"), between the FTX Group and the Executive (both as defined in the
Release Agreement, and collectively referred to as the "**Parties**").

Unless otherwise specified, capitalized terms in this Addendum have the same meaning as
defined in the Release Agreement, and those definitions are incorporated by reference.

     1.    <u>Release Agreement</u>. The terms of the Release Agreement, which are
incorporated by reference into this Addendum as though set forth in full, remain in full force
and effect.

     2.    <u>Separation Date</u>. The Executive's Advisory Services terminated on the
Employment Termination Date (as defined in the Advisor Agreement). The Executive
acknowledges and agrees that except as otherwise provided in this Addendum and the
Release Agreement, the Executive has received full payment for all hours worked and all
services performed for the FTX Group in any capacity, and that the Executive is not owed
anything else from the FTX Group.

     3.    <u>General Release and Waiver of Claims</u>.

        (a)    The Executive irrevocably and unconditionally fully and forever
waives, releases, and discharges the Released Parties, from any and all Claims, each
as defined in the Release Agreement, arising at any time through and including the
date of the Executive's execution of this Addendum; provided, that, however, the
general release and waiver of Claims excludes, and the Executive does not waive,
release, or discharge: (i) the Executive's rights to enforce the terms of the Release
Agreement and this Addendum, (ii) claims that cannot be waived by law, and (iii)
indemnification rights the Executive has against the FTX Group, including pursuant
to the Management Agreement and the Release Agreement.

        (b)    The Company, on behalf of itself and the FTX Group, irrevocably and
unconditionally fully and forever waives and releases any and all Claims against the
Executive that may be waived and released by law with the exception of Claims
arising out of or attributable to: (i) events, acts, or omissions taking place after the
Parties' execution of the Addendum; (ii) the Executive's breach of any terms and
conditions of the Release Agreement or Addendum; and (iii) the Executive's criminal
activities or intentional misconduct occurring during the Executive's provision of
services to the FTX Group.

     4.    <u>No Existing Suit or Charge</u>. The Executive represents, warrants, and confirms
that the Executive has not filed any claim, complaint, or action of any kind against the FTX
Group with any court of law or government or agency.

The Parties have executed this Addendum as of the date shown below.

**FTX JAPAN HOLDINGS K.K.** on behalf of the FTX GROUP

By_____

Name: Seth Melamed

Title: Representative Director

**EXECUTIVE**

Signature:_____

Print Name: Kariya Kayamori

Date: _____

4131-2273-0043.9

# EXHIBIT 6

# Civil Code (Part I, Part II and Part III)

Act No. 89 of April 27, 1896

Part III Claims
Chapter I General Provisions
Section 2 Effects of Claims
Subsection 1 Liability for Non-Performance
(Compensation for Loss or Damage Due to Non-Performance)

Article 415    (1)    If an obligor fails to perform consistent with the purpose of the obligation or the performance of an obligation is impossible, the obligee may claim compensation for loss or damage arising from the failure; provided, however, that this does not apply if the failure to perform the obligation is due to grounds not attributable to the obligor in light of the contract or other sources of obligation and the common sense in the transaction.

(2)    If the obligee is entitled to claim compensation for loss or damage pursuant to the provisions of the preceding paragraph, and any of the following cases applies, the obligee may claim compensation for loss or damage in lieu of the performance of the obligation:

(i)    the performance of the obligation is impossible;

(ii)    the obligor manifests the intention to refuse to perform the obligation; or

(iii)    the obligation has arisen from a contract, and the contract is cancelled or the obligee acquires the right to cancel the contract on the ground of the obligor's failure to perform the obligation.

# EXHIBIT 7

## Civil Code (Part I, Part II and Part III)

Act No. 89 of April 27, 1896

Part III Claims
    Chapter I General Provisions
        Section 2 Effects of Claims
            Subsection 1 Liability for Non-Performance

(Scope of Compensation for Loss or Damage)

Article 416   (1)   The purpose of the claim for compensation for the loss or damage for failure to perform an obligation is to have the obligor to pay the compensation for loss or damage which would ordinarily arise from the failure.

(2)   The obligee may also claim the compensation for damage which has arisen from any special circumstances if the party did foresee, or should have foreseen, the circumstances.

# EXHIBIT 8

# Civil Code (Part I, Part II and Part III)

Act No. 89 of April 27, 1896

Part III Claims
  Chapter I General Provisions
    Section 2 Effects of Claims
      Subsection 1 Liability for Non-Performance
  Chapter V Torts
(Compensation for Loss or Damage in Torts)
Article 709   A person that has intentionally or negligently infringed the rights or legally protected interests of another person is liable to compensate for damage resulting in consequence.