# EXHIBIT 1

        

Home | My Network | Jobs | Messaging | Notifications | Me ▾ | For Business ▾

Grow your care with Premium



## Seth Melamed

Chief Operating Officer at FTX Japan


- FTX


- University of California, Davis

Tokyo, Japan · **Contact info**

500+ connections

Connect | **Message** | More

## About

Chief Operating Officer at FTX Japan- a leading crypto currency exchange & liquidity provider.
As COO work closely with the leadership team at FTX to facilitate strategy and business planning, execute 'stand-up' initiatives, design & build a robust t  ...see more

## Activity

5,626 followers

Posts | **Comments**

Seth Melamed posted this • 10mo

FTX Japan KK has released Proof of Solvency (PoS), a blockchain-based technology that demonstrates in an auditable, tamper proof manner, that the excha  ...show more

Proof of Solvency — Liquid Blog

blog.liquid.com

 70                                                          6 comments

Show all posts →

## Experience

 **Chief Operating Officer at FTX Japan**
FTX · Permanent
Apr 2022 - Present · 2 yrs 4 mos
Tokyo, Japan

 **Liquid**
6 yrs 11 mos

**Chief Operating Officer**
Nov 2019 - Present · 4 yrs 9 mos
Tokyo, Japan

**Global Head of Business Development & Sales**
Sep 2018 - Nov 2019 · 1 yr 3 mos
Tokyo, Japan

Global Head of Business Development & Sales - helping to bring blockchain and crypto to the next billion users and next million businesses



**Sr. Vice President and Head of Operations**
**Goldman Sachs**
Sep 2017 - Sep 2018 · 1 yr
Tokyo, Japan

**Vice President**
Oct 2016 - Sep 2017 · 1 yr
Salt Lake City

Department manager for Equities Derivatives Settlements Americas. Manage a 12 person team responsible for supporting settlements with clients tradi...

**Vice President**
Apr 2011 - Sep 2016 · 5 yrs 6 mos
Moscow, Russian Federation

Department Manager for Foreign Exchange, Treasury and cash management Operations for the Russia business. Responsible for funding & liquidity...

**Vice President**
Jan 2010 - Apr 2011 · 1 yr 4 mos
New York, NY

Manager for team doing settlements and trade confirmations of FX and derivatives trading. Client coverage of hedge funds and asset managers.

Show all 5 experiences →



**Associate**
Barclays Investment Bank
Jan 2005 - Sep 2006 · 1 yr 9 mos

Support for clients using FX electronic trading platform

## Education



**University of California, Davis**
1993 - 1996

## Licenses & certifications



**Cryptography I**
Coursera Course Certificates
Issued Aug 2016
Credential ID 3GACWTFDEXXQ

Show credential ⧉



**Learning How to Learn: Powerful mental tools to help you master tough subjects**
Coursera Course Certificates
Issued Jul 2016
Credential ID LK3A523EZLZL

Show credential ⧉



## Skills

### Financial Analysis
Endorsed by 2 colleagues at Goldman Sachs

👥 25 endorsements

### Risk Management
Endorsed by 3 colleagues at Goldman Sachs

👥 24 endorsements

Show all 13 skills →

## Recommendations

**Received**    Given

Nothing to see for now
Recommendations that Seth receives will appear here.

## Courses

CFA
Level 1

## Languages

**English**
Native or bilingual proficiency

**Japanese**
Full professional proficiency

Show all 3 languages →

## Interests

**Top Voices**    Companies    Groups    Newsletters    Schools

**Kathy Matsui** 🔗 · 2nd
General Partner, MPower Partners; Former Goldman Sachs Japan Vice Chair
and Chief Japan Equity Strategist; Womenomics advocate; Farmer's
daughter; Cancer survivor; Lucky mom of two
52,009 followers

+ Follow

**Keiko Honda** 🔗 · 3rd
Board Member + Columbia U
6,810 followers

+ Follow

Show all Top Voices →

## Causes

Environment • Science and Technology



Ad •••

Lisa, reactivate your Premium free trial today!

See who's viewed your profile in the last 365 days

Reactivate Trial

Other similar profiles

Patrick Gruhn, LL.M., MBA · 3rd
Entrepreneur and Lawyer
+ Follow

Brad Garlinghouse · 3rd
CEO at Ripple
View profile

Can Sun · 3rd
Web3 | Crypto | Legal & Regulatory
View profile

Constance W. · 3rd
Open to opportunities
+ Follow

Ryan Salame · 3rd
Previously Co - CEO FDM (FTX Digital Markets)
+ Follow

Show all

Grow your network
Premium peer suggestions

Alexia Javelly · 2nd
Associate at Fried Frank
Connect

Clive Luketo · 2nd
Assistant Specialist Underwriter | UK & Wholesale International Casualty | RSA Insurance
Connect

People you may know

Annie Rodriguez Rumsey
Senior Data Science Consultant at Ekimetrics



**Marina Bermejo**
Senior Manager at Ekimetrics

- Connect

**Shahir Iskander**
Astronomy MSc. | Data Analysis | Machine Learning

- Connect

**Benjamin DUCLOUX**
CFO

- Connect

**Hanna (Johanna) Smit**
Senior Technical Specialist, GBV & Safeguarding

- Connect

Show all

**You might like**
Pages for you



وظائف السعوديه - ترند الوظائف
Staffing and Recruiting
58,609 followers

+ Follow

**CORPREV SAC**
Business Consulting and Services
1,351 followers

+ Follow

Show all

Promoted •••

**Conference Speaking Icons**
Kruger Cowne for Bob Geldof, Elle Macpherson, Boris Becker & other icons

**Osgoode Common Law LLM**
Earn Your Professional LLM in Canadian Common Law in 1 Year. Learn more.

**Cloud QMS Software**
Efficient Quality Management Software for ISO 9001. Free cloud demos

# EXHIBIT 2

**Execution Version**

**KARIYA KAYAMORI**

**SETH MELAMED**

**JAFCO SV4 INVESTMENT LIMITED PARTNERSHIP**

**IDG CHINA VENTURE CAPITAL FUND V L.P.**

**IDG BITMAIN FUND L.P.**

**IDG CHINA V INVESTORS L.P.**

**FTX TRADING LTD.**

**LIQUID GROUP INC.**

---

**AGREEMENT FOR
THE SALE AND PURCHASE OF
SHARES, STOCK OPTIONS AND WARRANTS IN
LIQUID GROUP INC.
(MAJOR SHAREHOLDERS)**

---

4148-4958-4945.28

# CONTENTS

**Clause**                                                                             **Page**

| | | |
|---|---|---|
| 1. | Interpretation | 1 |
| 2. | Sale and Purchase | 11 |
| 3. | Management Agreements | 12 |
| 4. | Retained Consideration | 12 |
| 5. | Conditions | 13 |
| 6. | Completion | 16 |
| 7. | Representations and Warranties | 17 |
| 8. | The Purchaser's Remedies | 18 |
| 9. | The Sellers' Remedies | 20 |
| 10. | Limitations on the Sellers' Liability | 21 |
| 11. | Undertakings by the Parties | 22 |
| 12. | Confidential Information | 24 |
| 13. | Announcements | 25 |
| 14. | Costs | 25 |
| 15. | General | 26 |
| 16. | Entire Agreement | 27 |
| 17. | Assignment | 27 |
| 18. | Notices | 27 |
| 19. | Governing Law and Jurisdiction | 32 |
| 20. | Governing Language | 33 |
| 21. | Counterparts | 33 |
| | Schedule 1 Information on the Sellers | 34 |
| | Schedule 2 Allocation of Consideration | 35 |
| | Schedule 3 Bank Account Information of the Sellers | 38 |
| | Schedule 4 Information on the Group Companies | 40 |
| | Schedule 5 Completion Requirements | 41 |
| | Schedule 6 Warranties | 44 |
| | Schedule 7 Seller Actions Pending Completion | 58 |
| | Schedule 8 Disclosure Schedules | 60 |

**THIS AGREEMENT** is made on November 19, 2021

**BETWEEN**:

(1)    **KARIYA KAYAMORI**, a Japanese national having his address at 8 Orange Grove Road #06-02, Singapore 258342 ("**Mr. Kayamori**");

(2)    **SETH MELAMED**, a U.S. national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 ("**Mr. Melamed**");

(3)    **JAFCO SV4 INVESTMENT LIMITED PARTNERSHIP**, a limited partnership incorporated in Japan whose principal place of business is at 1-23-1 Toranomon, Minato-ku, Tokyo 105-6324, Japan ("**JAFCO**");

(4)    **IDG CHINA VENTURE CAPITAL FUND V L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG China**");

(5)    **IDG BITMAIN FUND L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG Bitmain**");

(6)    **IDG CHINA V INVESTORS L.P.**, a limited partnership incorporated in the Cayman Islands whose registered address is at Walkers Corporate Limited, Cayman Corporate Centre, 190 Elgin Avenue, George Town, Grand Cayman KY1-9008, Cayman Islands ("**IDG Investors**", together with Mr. Kayamori, Mr. Melamed, JAFCO, IDG China and IDG Bitmain, the "**Sellers**" and each a "**Seller**");

(7)    **FTX TRADING LTD.**, a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda (the "**Purchaser**"); and

(8)    **LIQUID GROUP INC.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan (the "**Company**").

**THE PARTIES AGREE** as follows:

**1.    INTERPRETATION**

1.1    In this Agreement:

"**Accounts**" means the Company's financial statements as that term is defined in article 435, paragraph 2 of the Japanese Companies Act for the financial year ended on the Last Accounting Date, notes to those financial statements, the directors' report (*jigyou houkoku*) for that financial year, and the auditor's report (*kansa houkoku*) on those financial statements.

- 1 -

"**Affiliate**" means, with respect to any Person, any other Person controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "**control**" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing. For the avoidance of doubt, none of Liquid Financial USA Inc. or any subsidiary thereof shall constitute an Affiliate of the Company or any of its Affiliates for purposes of this Agreement.

"**Agreement**" means this Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders), as amended or supplemented in accordance with the terms hereof from time to time.

"**Allocation List**" has the meaning given in Clause 5.1(l).

"**Applicable Exchange Rate**" means the median of the telegraphic transfer selling rate and the telegraphic transfer buying rate published on the website of MUFG Bank, Ltd. at https://www.bk.mufg.jp/ippan/kinri/list_j/kinri/kawase.html as of the end of the Business Day that immediately precedes the date of this Agreement.

"**Anti-Social Forces**" means any organised crime group (*boryokudan*), organised crime group member (*boryokudan-in*), quasi-member of an organised crime group (*boryokudan jun koseiin*), any corporation related to an organised crime group (*boryokudan kankei kigyo*), corporate racketeer (*sokaiya*) or any other force generally considered to seek to achieve a specific political, religious or other philosophical or economical purpose by means of violence, coercion, intimidation, threat or any other socially unacceptable action.

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) of the Company.

"**Bankruptcy Proceeding**" has the meaning given to it under Paragraph 16.1 of Part A of Schedule 6.

"**Board of Directors**" means the board of directors of the Company.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cash Consideration**" has the meaning given in Clause 2.2(b).

"**Chief Executive Officer**" means the chief executive officer of the Company.

"**Class A Preference Shares**" means 6,000 class A preference shares (*A shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class B Preference Shares**" means 8,002 class B preference shares (*B shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class C-1 Preference Shares**" means 9,724 class C-1 preference shares (*C-1 shu yusen kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Class C-1 Preference Shares Warrants**" means 2,653 class C-1 preference shares warrants (*C-1 syu yusen kabushiki mokuteki gata shinkabu yoyakuken*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Common Shares**" means 26,704 ordinary shares (*futsu kabushiki*) in the Company issued and outstanding at the time of execution of this Agreement.

"**Completion**" means completion of the sale and purchase of the Target Security Interests in accordance with this Agreement.

"**Completion Date**" has the meaning given in Clause 6.1.

"**Condition**" means a condition set out in Clause 5.1 and "**Conditions**" means all those conditions.

"**Confidential Information**" means (i) the existence and the contents of this Agreement; (ii) all information relating to the Purchaser or any other Purchaser's Group Company which has not been made public by the Purchaser; and (iii) all information which is used in or otherwise relates to the Group's business, customers or financial or other affairs including, without limitation, information relating to:

(a)     the marketing of goods or services including, without limitation, customer names and lists and other details of customers, sales targets, sales statistics, market share statistics, prices, market research reports and surveys, and advertising or other promotional materials; or

(b)     Knowhow; or

(c)     future projects, business development or planning, commercial relationships and negotiations.

"**Consideration Shares**" means the ordinary shares in the capital of the Purchaser (adjusted to reflect fully the effect of any stock split, reverse stock split, combination, stock dividend (including any dividend or distribution of securities convertible into Purchaser common shares), or other distribution in respect of Purchaser common shares, reorganization, reclassifications or other like change with respect to Purchaser common shares occurring after the date hereof) to be allotted and issued in accordance with Schedule 2.

"**Conversion**" means the conversion of the Class A Preference Shares, Class B Preference Shares and Class C-1 Preference Shares constituting the Target Shares into Common Shares.

"**Crypto Asset Breach**" means the incident involving the unauthorised access to the warm wallet of the Group that took place on or around 19 August 2021.

"**Crypto-Asset Exchange Service Provider Registration**" means the crypto-asset exchange service provider registration with the Financial Services Agency to Quoine Corporation on 29 September 2017.

"**Crypto Consideration**" has the meaning given in Clause 2.2(c).

"**Data Protection Laws**" has the meaning given to it under Paragraph 18.1 of Part A of Schedule 6.

"**Disclosure Documents**" means all announcements and other information to be published in connection with the transactions contemplated under this Agreement in accordance with all applicable laws and regulations, and information supplied, procured or made available to the Financial Services Agency or any other regulatory authority as required by the Financial Services Agency or such other competent regulatory authority.

"**Disclosure Schedules**" means the disclosure schedules of the Sellers attached hereto as Schedule 8.

"**Due Diligence Review**" means the due diligence review on the Group's assets, Liabilities, legal, finance, operation, matters and other aspects which the Purchaser reasonably considers necessary or appropriate.

"**Encumbrance**" means a mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, third-party right or interest, assignment, deed of trust, other encumbrance or security interest of any kind, or another type of preferential arrangement (including, without limitation, a title transfer or retention arrangement) having similar effect, any proxy, power of attorney, voting trust arrangement, interest, right of first refusal or any adverse claim as to title, possession or use (other than those created under applicable laws, by the Purchaser or any of its Affiliates, or under the organizational documents of the Company).

"**Final Customer Balance Statement**" has the meaning given in Clause 5.1(q).

"**Financial Services Agency**" means the Financial Services Agency of Japan.

"**Gross-Up Amount**" has the meaning given in Clause 15.8.

"**Group**" means the Company and its Affiliates.

"**Group Company**" means the Company or a company which is, on the date of this Agreement, an Affiliate of the Company, and "**Group Companies**" means all of them.

"**IDG Entities**" means, collectively, IDG China, IDG Bitmain and IDG Investors, and "**IDG Entity**" means any of them.

DocuSign Envelope ID: 17292B85-FF60-4B90-8AB9-9F6967BAD918

"**Indemnification Obligations**" has the meaning given in Clause 8.3

"**Initial Cash Consideration**" has the meaning given in Clause 2.3.

"**Intellectual Property**" means:

(a)     patents, trade marks, service marks, registered designs, applications and rights to apply for any of those rights, trade, business and company names, internet domain names and e-mail addresses, unregistered trade marks and service marks, copyrights, database rights, rights in software, Knowhow, rights in designs and inventions;

(b)     rights under licences, consents, orders, statutes or otherwise in relation to a right in paragraph (a);

(c)     rights of the same or similar effect or nature as or to those in paragraphs (a) and (b) which now or in the future may subsist; and

(d)     the right to sue for past infringements of any of the foregoing rights.

"**Intellectual Property Rights**" means all Intellectual Property owned or used by the Company.

"**Japanese Companies Act**" means the Companies Act (*kaisha hou*) (Act No. 86 of 2005, as amended) in Japan.

"**JPY**" means Japanese yen, the lawful currency of Japan.

"**Knowhow**" means all technical information, knowledge and expertise (including, without limitation, trade secrets, information comprised in formulae, techniques, designs, specifications, drawings and associated data, design manuals, design rules, design standards, components, lists, manuals, instructions, catalogues, computation models, process descriptions, process manuals, recipes, ingredients, software (including object and source codes), inventions, trials, experiments, research and technology results, statistics and data) relating (without limitation) to the composition, formulation, design, development, production, manufacture, use, repair, maintenance, monitoring, recording, controlling, storage, delivery, sale or marketing of any product, process or service, including any such information relating to tooling design and quality control, but, in each case, excluding any information that is publicly available.

"**Last Accounting Date**" means 30 September 2020, provided, that, if the Company's financial statements as that term is defined in article 435, paragraph 2 of the Japanese Companies Act for the financial year ended on 30 September 2021, notes to those financial statements, the directors' report (*jigyou houkoku*) for that financial year, and the auditor's report (*kansa houkoku*) on those financial statements become available during the period between the date hereof and Completion, then "Last Accounting Date" means 30 September 2021.

"**Liabilities**" means any debt, obligation, duty or liability of any nature, regardless of whether such debt, obligation, duty or liability is immediately due and payable.

"**Longstop Date**" means 31 March 2022, or such later date as the parties may agree in writing.

"**Losses**" means all costs, losses, Liabilities, damages, claims, demands, proceedings, expenses, penalties and legal and other professional fees.

"**Major Shareholders**" means Mr. Kayamori, Mr. Melamed, JAFCO, IDG China, IDG Bitmain and IDG Investors.

"**Management Agreement**" means the management agreement to be entered into by each of the Management Shareholders with the Company effective as of Completion, and "**Management Agreements**" means all of them.

"**Management Shareholders**" means Mr. Kayamori and Mr. Melamed.

"**Material Adverse Effect**" means the occurrence of any matter or event (or series of matters or events) which is materially adverse to the financial condition, regulatory condition, or results of operations of a person or a group of persons taken as a whole; provided, however, that a "Material Adverse Effect" shall not include any matter or event (or series of matters or events) substantially arising out of, attributable to, or resulting from:

(a)    events or effects that generally affect the industries or segments in which the Group operates, including legal and regulatory conditions;

(b)    events or effects that generally affect business, economic or political conditions in which the Group operates;

(c)    events or effects affecting the financial, credit or securities markets in any country or region in which the Group operates, including changes in interest rates, foreign exchange rates, or credit ratings;

(d)    acts of armed hostility, sabotage, terrorism, national emergency or war (whether or not declared);

(e)    natural disasters, acts of God, or any force majeure events in any country or region in the world;

(f)    the COVID-19 pandemic;

(g)    material changes or modifications in U.S. or Japanese generally accepted accounting principles, other applicable accounting standards or applicable law or the interpretation or enforcement thereof; and

(h)    the negotiation, the announcement, the execution or the pendency of the transactions contemplated by this Agreement, or any actions taken in accordance with the terms of this Agreement or required hereunder, including the notification to the Monetary Authority of Singapore of the transactions contemplated by this Agreement,

except, in each case of clauses (a), (b) and (c) above, to the extent that such events or effects have a materially disproportionate effect on the Group, taken as a whole, as compared with other participants in the industries in which the Group operates, and except to the extent such events, circumstances, changes or effects are caused by the intentional or willful misconduct of the Company or the Sellers.

"**Minority Shareholders**" means, collectively, the holders of the Shares and the Stock Options of the Company (other than the Major Shareholders) as at the date of this Agreement.

"**Minority Shareholders SPA(s)**" means one or more sale and purchase agreement to be entered into as of or prior to Completion between the Purchaser, the Company and Minority Shareholders (whether executed by or on behalf of Minority Shareholders) for the sale and purchase of the Shares and the Stock Options held by such Minority Shareholders.

"**Notice**" has the meaning given in Clause 18.1.

"**Permit**" means:

(e)     a permit, licence, consent, approval, certificate, qualification, specification, registration or other authorisation (including provisional and temporary ones); and

(f)     a filing of a notification, report or assessment,

in each case necessary for the effective operation of the Company's business, its ownership, possession, occupation or use of an asset or the execution or performance of the transactions contemplated under this Agreement.

"**Person**" means any natural person, company, corporation, general partnership, limited partnership, proprietorship, joint venture, firm, trust, fund, union, government, statutory or public authority, or any entity or incorporated or unincorporated organization or association.

"**Proceeding**" has the meaning given to it under Paragraph 16.1 of Part A of Schedule 6.

"**Purchaser Fundamental Representations**" means the representations and warranties made by the Purchaser under Clause 7.2 with respect to the Warranties set out in Paragraphs 1 (Incorporation), 2 (Right, power, authority and action), 3 (Anti-Social Forces), 4 (Binding agreements), 5 (Funds) and 6 (Share Issuance) of Part B of Schedule 6.

"**Purchaser's Group Company**" means the Purchaser or a company which is, on the date of this Agreement, an Affiliate of the Purchaser.

"**Purchaser Indemnified Parties**" has the meaning given in Clause 8.3.

"**Purchaser's Solicitors**" means Anderson Mori & Tomotsune of Otemachi Park Building, 1-1-1 Otemachi, Chiyoda-ku, Tokyo, Japan, and any other affiliates thereof.

"**Purchaser's Warranty Claim**" means a claim by the Purchaser under or pursuant to Clause 7.1.

"**Quoine Corporation**" means Quoine Corporation, of which all of its equity interests are, as at the date of this Agreement, held by the Company.

"**Relevant Employee**" has the meaning given in Paragraph 13.1of Part A of Schedule 6.

"**Representative**" means, in relation to a party, the directors, officers, employees, representatives, agents, advisers, accountants and consultants of that party;

"**Retained Cash Consideration**" has the meaning given in Clause 2.4.

"**Retained Consideration**" means the Retained Cash Consideration and the Crypto Consideration.

"**Rules**" has the meaning given in Clause 19.2.

"**Scheme**" has the meaning given in Paragraph 13.2 of Part A of Schedule 6.

"**Seller Fundamental Representations**" means the representations and warranties made by the Sellers under Clause 7.1 with respect to the Warranties set out in Paragraphs 1 (Capacity and Authority), 3 (Shares and Affiliates), 6 (Tax) and 20 (Brokerage or Commissions) of Part A of Schedule 6.

"**Seller Indemnified Parties**" has the meaning given in Clause 9.3.

"**Seller's Warranty Claim**" means a claim by a Seller under or pursuant to Clause 7.2.

"**Shareholder**" means a shareholder of the Company.

"**Shareholders' Agreement**" means each of: (i) the investor rights agreement dated 12 December 2019 by and among the Company, the Major Shareholders and the other parties thereto; and (ii) the agreement among shareholders dated 1 March 2019 by and among the Company, the Major Shareholders and the other parties thereto (including the amendments and ancillary agreements thereto), and "**Shareholders' Agreements**" means all of them.

"**Shares**" means the Common Shares, the Class A Preference Shares, the Class B Preference Shares and the Class C-1 Preference Shares.

"**SIAC**" has the meaning given in Clause 19.2.

"**Squeeze-Out Procedure**" means any action under the Japanese Companies Act or pursuant to any of the Shareholders' Agreements that results in the Purchaser holding

100% of the Shares, Class C-1 Preference Shares Warrants and Stock Options of the Company.

"**Stock Options**" means (i) series 2 to 7, 9, 10, 12, 13, 15 to 19 stock options and (ii) series 1 and 2 officers' stock options issued by the Company to its employees and/or officer.

"**Sufficiency Representation**" has the meaning given in Paragraph 7.1(a) of Part A of Schedule 6.

"**Target Options**" means 180 series 3, 30 series 10 and 300 series 13 of Stock Options, which, as at the date of this Agreement, are held by Mr. Melamed, and "**Target Option**" means any of them.

"**Target Security Interests**" means the Target Shares, the Target Options and the Target Warrants.

"**Target Shares**" means the Common Shares, the Class A Preference Shares, the Class B Preference Shares and the Class C-1 Preference Shares held by the Sellers (the number of which is set out opposite each Seller's name in Schedule 1), and "**Target Share**" means any of them.

"**Target Warrants**" means 2,625 Class C-1 Preference Shares Warrants, which, as at the date of this Agreement, are held by the IDG Entities (the number of which is set out opposite each IDG Entity's name in Schedule 1), and "**Target Warrant**" means any of them.

"**Tax**" means any form of taxation and any levy, duty, charge, contribution, withholding or impose in the nature of taxation (including any related fine, penalty, interest).

"**Tax Authority**" means any government, state or municipality or any local, state, federal or other authority, body, or official anywhere in the world exercising a fiscal, revenue, customs or excise function.

"**Total Consideration**" has the meaning given to it in Clause 2.2.

"**Transfer Agent**" means the transfer agent of the Purchaser in Antigua and Barbuda.

"**Tribunal**" has the meaning given in Clause 19.3.

"**USD**" or "**$**" means United States dollars, the lawful currency of the United States of America.

"**U.S.**" means United States of America.

"**Warranty**" means a statement contained in Schedule 6 and "**Warranties**" means all those statements.

"**%**" means per cent.

DocuSign Envelope ID: 17292B85-FF60-4B08-8AB9-8F6967BAD818

1.2 In this Agreement, a reference to:

(a) a "**person**" includes a reference to any individual, firm, company, corporation or other body corporate, government, state or agency of a state or any joint venture, association or partnership, works council or employee representative body (whether or not having separate legal personality) and includes a reference to that person's legal personal representatives, successors and permitted assigns;

(b) a "**party**" or "**parties**", unless the context otherwise requires, is a reference to a party or parties to this Agreement and includes a reference to that party's legal personal representatives, successors and permitted assigns;

(c) a Clause, Paragraph, Schedule or Annex, unless the context otherwise requires, is a reference to a clause or paragraph of, or schedule or annex to, this Agreement;

(d) a statutory provision includes a reference to:

(i) the statutory provision as modified or re-enacted or both from time to time whether before or after the date of this Agreement; and

(ii) any subordinate legislation made under the statutory provision (as so modified or re-enacted) whether before or after the date of this Agreement;

(e) liability under, pursuant to or arising out of (or any analogous expression) any agreement, contract, deed or other instrument includes a reference to contingent liability under, pursuant to or arising out of (or any analogous expression) that agreement, contract, deed or other instrument;

(f) all warranties, representations, indemnities, covenants, agreements and obligations given or entered into by more than one Seller are, unless otherwise specified, given or entered into severally and not jointly among such Sellers, and as used in this Agreement, the word "severally" or "several" when applying to an obligation means that such obligation is several (i.e., *bunkatsu saimu*), and the phrase "not jointly" when applying to an obligation means that such obligation is not joint (i.e., not *rentai saimu*);

(g) a time of day is a reference to the time in Japan, unless a contrary indication appears;

(h) the singular includes the plural and *vice versa*; and

(i) one gender includes all genders.

1.3 The headings in this Agreement do not affect its interpretation.

1.4 The *ejusdem generis* principle of construction shall not apply to this Agreement. Accordingly, general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class of acts, matters or

things or by examples falling within the general words. Any phrase introduced by the terms "other", "including", "include" and "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms.

1.5    A reference in Schedule 6 to the Sellers' knowledge, information and belief means the knowledge, information and belief of the Sellers of a particular fact where the Sellers are actually aware of or should have been aware of such fact.

## 2.    SALE AND PURCHASE

2.1    Each of the Sellers agrees to sell and the Purchaser agrees to purchase the Target Security Interests held by such Seller and each right attaching to such Target Security Interests at Completion, free from any Encumbrance.

2.2    The aggregate purchase price for the Target Security Interests shall be USD 151,919,670.93 (the "**Total Consideration**"), representing a purchase price of USD 3,510.41 per Target Share (on an as converted basis), USD 3,509.54 per Target Option with respect to 180 of the Target Options, USD 3,103.16 per Target Option with respect to 30 of the Target Options, USD 3,180.15 per Target Option with respect to 300 of the Target Options (in each such case, being the net amount of the purchase price per Target Share minus the exercise price in USD applying the Applicable Exchange Rate for the Target Option) and USD 1,605.63 per Target Warrant (being the net amount of the purchase price per Target Share minus the applicable exercise price for the Target Warrant), of which:

(a)    USD 52,796,848.94 will be satisfied by the allotment and issue of 2,014,377 Consideration Shares to the Sellers as set out in Schedule 2, credited as fully paid at Completion;

(b)    USD 81,197,790.25 will be satisfied by the payment of cash (the "**Cash Consideration**") to the Sellers as set out in Schedule 2; and

(c)    USD 17,925,031.75 will be satisfied by the payment of the types and amounts of digital assets (the "**Crypto Consideration**") as set out in Schedule 2.

2.3    At Completion, the Purchaser shall pay the aggregate amount of USD 68,738,887.81 as part payment of the Cash Consideration (the "**Initial Cash Consideration**") to the Sellers as set out in Schedule 2 by transfer of funds to the bank account of the respective Sellers as set out in Schedule 3 (or in such other manner or to any other bank account designated by such Seller and notified to the Purchaser in writing no later than three (3) Business Days prior to Completion).

2.4    At Completion, the Purchaser shall withhold (a) the remainder of the Cash Consideration, being the amount of USD 12,458,902.44 (the "**Retained Cash Consideration**") and (b) the Crypto Consideration, in a manner to be agreed in good faith by the Purchaser and the Management Shareholders.

2.5    Each of the Sellers and the Company waives all rights of first refusal and other rights in respect of (including any liquidation preference of the Shares), or restrictions on

transfer on the Target Security Interests to which it may be entitled to under the Articles of Incorporation, the Shareholders' Agreements or otherwise in relation to the sale and purchase of the Target Security Interests pursuant to this Agreement and shall procure that all such rights conferred on any other person are waived no later than Completion so as to permit the sale and purchase of all of the Target Security Interests.

2.6    At Completion, the Shareholders' Agreements shall terminate in their entirety as between the Major Shareholders, the Minority Shareholders who complete the sale of their respective security interests of the Company to the Purchaser as of Completion, and the Company.

2.7    Any Tax incurred in connection with the consummation of the sale and purchase of the Target Security Interests under this Agreement shall be borne and paid by the party incurring such Tax in accordance with applicable laws and regulations. For the avoidance of doubt, any capital gain tax or other Tax of similar nature that any Seller may be subject to under the applicable laws and regulations in Japan or anywhere else in the world shall be borne by such Seller, and the Purchaser shall not be responsible for any such Tax.

## 3.    MANAGEMENT AGREEMENTS

3.1    On or before Completion, each of the Management Shareholders shall enter into a Management Agreement with the Company on the terms and conditions reasonably satisfactory to the Purchaser and the respective Management Shareholder, and which shall be effective from the date of Completion and include, subject to certain exceptions as provided therein, non-competition undertakings by the relevant Management Shareholder in favour of the Company, and such non-competition undertakings shall remain effective from the date of Completion throughout the term of the Management Agreement, and shall remain effective until the expiry of the following period (whichever is later):

(a)    one (1) year after termination of the Management Agreement of the relevant Management Shareholder; or

(b)    three (3) years from the date of Completion.

## 4.    RETAINED CONSIDERATION

4.1    The Retained Consideration shall be used to fund any payment obligations of the Sellers to the Purchaser in respect of a Purchaser's Warranty Claim and/or reasonably necessary to serve as partial security for any Indemnification Obligation.

4.2    On each of the dates falling on (i) the first anniversary and (ii) the second anniversary of the Completion Date, the Purchaser shall pay (1) 50% of the Retained Cash Consideration less any amounts paid pursuant to Clause 4.1 to the respective Sellers and (2) 50% of the Crypto Consideration less any amounts paid pursuant to Clause 4.1 to the Management Shareholders in accordance with instructions to be provided by the Management Shareholders.

4.3     Any portion of the Retained Cash Consideration or the Crypto Consideration held by the Purchaser with respect to a pending but unresolved Purchaser's Warranty Claim and/or Indemnification Obligation shall be released to the Sellers within ten (10) days following resolution of such Purchaser's Warranty Claim and/or Indemnification Obligation.

## 5.    CONDITIONS

5.1     Completion is conditional on the following Conditions being satisfied, or waived by the Sellers or the Purchaser (as the case may be), in accordance with this Agreement:

(a)     all corporate approvals of the Purchaser necessary for the completion of the transactions contemplated under this Agreement having been obtained;

(b)     all corporate approvals of the Sellers (if applicable) necessary for the completion of the transactions contemplated under this Agreement having been obtained;

(c)     the Board of Directors having passed a resolution approving the transfer of the Target Security Interests;

(d)     the representations and warranties made by the Sellers under Clause 7.1 (except for the Seller Fundamental Representations), without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all material respects and not misleading in any material respect as at Completion;

(e)     the Seller Fundamental Representations, without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all respects and not misleading in any respect as at Completion;

(f)     all covenants of the Sellers having been complied with in all material respects;

(g)     the representations and warranties made by the Purchaser under Clause 7.2 (except for the Purchaser Fundamental Representations), without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all material respects and not misleading in any material respect as at Completion;

(h)     the Purchaser Fundamental Representations, without giving effect to any Material Adverse Effect qualifications or materiality qualifications with respect thereto, remaining true and accurate in all respects and not misleading in any respect as at Completion;

(i)     all covenants of the Purchaser having been complied with in all material respects;

(j)     all consents, approvals, amendments and terminations as specified by the Purchaser based on its Due Diligence Review, the absence of which would have

a Material Adverse Effect on the Group taken as a whole and/or a material adverse effect on the ability of the parties to consummate the Completion, having been obtained, executed and/or effectuated;

(k)    the Purchaser having made the filing to the relevant regulatory authorities (including but not limited to the Ministry of Economy, Trade and Industry) with respect to foreign direct investment in accordance with the Foreign Exchange and Foreign Trade Act of Japan, and the designated period for review by such regulatory authorities having lapsed and no such regulatory authorities having indicated, whether verbally or in writing, any objection to the transaction contemplated under this Agreement;

(l)    the completion of a detailed spreadsheet setting out the allocation of the Total Consideration (the "**Allocation List**"), including the allocation of the Consideration Shares, the Initial Cash Consideration, the Retained Cash Consideration and the Crypto Consideration (as applicable) among the Sellers;

(m)    the Conversion having been completed, or the waiver of the liquidation preference, right of first refusal and any other rights and consents required under the Articles of Incorporation, the Shareholders' Agreements and/or any other agreements among the Shareholders for the transfer of the Target Security Interests from the Major Shareholders to the Purchaser under this Agreement remaining effective;

(n)    the Minority Shareholders SPA(s) having been executed on behalf of all the Minority Shareholders, or the Major Shareholders having exercised the drag-along rights under the Shareholders' Agreements;

(o)    the Management Agreements with the Management Shareholders having been executed as of Completion;

(p)    the employment agreements of at least 70% of the full-time employees of the Group remaining effective;

(q)    the delivery by the Management Shareholders to the Purchaser of a certificate (the "**Final Customer Balance Statement**") setting forth a true and complete account, on a digital asset by digital asset basis (including all delisted digital assets), of all digital asset balances held by the customers of the Company (including any inactive, dormant, suspended, terminated or withdrawal-only accounts) as of the date that is two days prior to the Completion Date, which shall include a certification by the Chief Executive Officer that such Final Customer Balance Statement and the Sufficiency Representation is true and complete in all material respects;

(r)    no Material Adverse Effect on the Group Companies taken as a whole having occurred and be continuing as of Completion, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take,

in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 5.1(r);

(s)    no regulatory authority (including but not limited to the Financial Services Agency) having notified, whether verbally or in writing that the Crypto-Asset Exchange Service Provider Registration will be suspended, cancelled, revoked or withdrawn after Completion, whether or not for reasons related to or arising from the transactions contemplated under this Agreement, except to the extent that any such suspension, cancellation, revocation or withdrawal arises substantially directly or indirectly as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement;

(t)    neither the Financial Services Agency nor the Kanto Local Financial Bureau of Japan having indicated, whether verbally or in writing, any objection to the transactions contemplated under this Agreement;

(u)    there being no applicable laws which shall, or which shall reasonably be expected to, forbid, restrict or impose conditions or restrictions on completion of the transactions contemplated under this Agreement; and

(v)    there being no pending or threatened injunctions or similar restraints applicable to the Completion, and no pending or threatened litigation seeking an injunction, restraint or material damages in connection with the transactions contemplated under this Agreement.

5.2    The Purchaser shall use its reasonable endeavours to achieve satisfaction of each Condition set out in Clauses 5.1(a), 5.1(g), 5.1(h), 5.1(i), 5.1(k), and 5.1(o) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

5.3    Each Seller shall use its reasonable endeavours to achieve satisfaction of each Condition set out in Clauses 5.1(b), 5.1(c), 5.1(d), 5.1(e), 5.1(f), 5.1(j), 5.1(m), 5.1(n), 5.1(o), 5.1(p) and 5.1(q) as soon as possible after the date of this Agreement and in any event not later than 5:00 p.m. on the Longstop Date.

5.4    If, at any time, the Sellers or the Purchaser becomes aware of a fact, matter or circumstance that might prevent a Condition from being satisfied, it shall inform the other parties in writing as soon as reasonably practicable.

5.5    At any time on or before 5:00 p.m. on the Longstop Date, the Purchaser may waive a Condition set out in Clauses 5.1(d), 5.1(e), 5.1(f), 5.1(j), 5.1(m), 5.1(n), 5.1(o), 5.1(p), 5.1(q) and 5.1(r) (or any part thereof) by Notice to the Sellers on any terms it decides.

5.6    At any time on or before 5:00 p.m. on the Longstop Date, the Sellers holding a majority of the Shares may waive a Condition set out in Clause 5.1(g), 5.1(h), 5.1(i), 5.1(k) and 5.1(o) (or any part thereof) by Notice from such Sellers to the Purchaser on any terms it decides.

5.7    If a Condition set out in Clause 5.1:

(a)    has not been waived by (i) the Sellers or the Purchaser (as the case may be) pursuant to Clause 5.5 or 5.6 or (ii) agreement of all of the parties; and

(b)    has not been satisfied by 5:00 p.m. on the Longstop Date,

this Agreement shall automatically terminate with immediate effect.

5.8    The Longstop Date may be extended by mutual agreement of the Sellers and the Purchaser in writing, provided that the transaction shall be completed under the same terms and conditions hereunder.

5.9    Each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations as at the date of termination.

## 6.    COMPLETION

6.1    Upon the terms and subject to the conditions of this Agreement, Completion shall take place at the offices of the Purchaser's Solicitors, or if the parties agree otherwise, remotely via the electronic exchange of documents and signatures, on the date that is the fifth Business Day following the satisfaction or waiver of the Conditions (other than Conditions that by their nature are to be satisfied at Completion, and subject to the satisfaction or waiver of such Conditions), or such other time or location as agreed by the parties in writing (but in any event shall not be later than the Longstop Date nor sooner than 1 January 2022) (the date on which Completion occurs, the "**Completion Date**").

6.2    At Completion the Sellers and the Purchaser shall do all those things respectively required of them in Schedule 5. The Purchaser is not obliged to complete this Agreement unless:

(a)    each Seller complies with all its respective obligations under Schedule 5;

(b)    the purchase of: (i) all the Target Security Interests; and (ii) all the security interests to be purchased under the Minority Shareholders SPA(s) in accordance with the terms thereof are completed simultaneously; and

(c)    the Major Shareholders having exercised the drag-along rights under the Shareholders' Agreement for those Minority Shareholders who have not executed the relevant Minority Shareholders SPA(s) and/or fails to complete transaction contemplated under the Minority Shareholders SPA(s).

6.3    The Sellers are not obliged to complete this Agreement unless:

(a)    the Purchaser complies with all its obligations under Schedule 5;

(b)     the payments of consideration to purchase: (i) all the Target Security Interests; and (ii) all the security interests to be purchased under the Minority Shareholders SPA(s) in accordance with the terms thereof    completed simultaneously; and

(c)     the payment of consideration to purchase the security interests payable to the Minority Shareholders in connection with the exercise of the drag-along rights under the Shareholders' Agreements is made to the Company or its designee simultaneously.

6.4     If Completion does not take place on a contemplated Completion Date scheduled in accordance with the first sentence of Clause 6.1 because any of the Sellers fails to comply with any of its material obligations under Schedule 5, the Purchaser may by Notice to the Sellers and the Company:

(a)     proceed to Completion to the extent reasonably practicable; or

(b)     postpone Completion to such date as the Purchaser may specify (being a date not later than the Longstop Date).

6.5     If Completion does not take place on a contemplated Completion Date scheduled in accordance with the first sentence of Clause 6.1 because the Purchaser fails to comply with any of its obligations under Schedule 5, the Sellers may by Notice to the Purchaser:

(a)     proceed to Completion to the extent reasonably practicable; or

(b)     postpone Completion to such date as the Sellers may specify (being a date not later than the Longstop Date).

6.6     If the Purchaser postpones Completion to another date in accordance with Clause 6.4(b), or if the Sellers postpone Completion to another date in accordance with Clause 6.5(b), the provisions of this Agreement apply as if that other date is the Completion Date.

## 7.     REPRESENTATIONS AND WARRANTIES

7.1     Each of the Sellers, severally and not jointly, represents and warrants to the Purchaser that except as disclosed in the Disclosure Schedules, (i) and except any matter, circumstance or event arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement, each of the Warranties set out in Part A of Schedule 6 (other than the Seller Fundamental Representations) is true, accurate and not misleading at the date of this Agreement; and (ii) each of the Seller Fundamental Representations is true, accurate and not misleading at the date of this Agreement. Immediately before Completion, each Seller is deemed to represent and warrant to the Purchaser that each respective Warranty is true, accurate and not misleading by reference to the facts and circumstances as at Completion. For this purpose only, where there is an express or implied reference in a Warranty to the "date of this Agreement", that reference is to be construed as a reference to Completion.

7.2 The Purchaser represents and warrants to the Sellers that, (i) except any matter, circumstance or event arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by any of the Sellers or any of their respective Representatives, or any actions that any of the Sellers or any of their respective Representatives takes or, notwithstanding reasonable written request by the Purchaser, omits to take, in connection with the transactions contemplated by this Agreement, each of the Warranties set out in Part B of Schedule 6 (other than the Purchaser Fundamental Representations) is true, accurate and not misleading at the date of this Agreement; and (ii) each of the Purchaser Fundamental Representations is true, accurate and not misleading at the date of this Agreement. Immediately before Completion, the Purchaser is deemed to represent and warrant to the Sellers that each respective Warranty is true, accurate and not misleading by reference to the facts and circumstances as at Completion. For this purpose only, where there is an express or implied reference in a Warranty to the "date of this Agreement", that reference is to be construed as a reference to Completion.

7.3 Each of the parties represents and warrants to the other parties that, as of the date of this Agreement and the Completion Date, except for (i) this Agreement, (ii) the Minority Shareholders SPA(s), (iii) the Management Agreements, (iv) the mutual confidentiality agreement dated 26 August 2021 entered into between the Purchaser, the Company and the Management Shareholders, (v) the loan agreement dated 30 August 2021 entered into between the Purchaser and the Company, (vi) subject to Clause 2.6, the Shareholders' Agreements, (vii) the Side Letter Agreement to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated on or around the date hereof entered into between JAFCO, IDG China, IDG Bitmain, IDG Investors and the Purchaser, (viii) the Side Letter Agreement to the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated on or around the date hereof entered into between Seth Melamed and the Purchaser, and any agreements expressly provided under or pursuant to the terms of any of the foregoing, there are no effective agreements or arrangements between such party and any of the other parties in connection with the transactions contemplated under this Agreement.

7.4 The Sellers agree and undertake to the Purchaser and to each person referred to in this Clause 7.4 that, except in the case of fraud, they will not make any claim against the Company or any director, officer, employee or agent of the Company on whom it may have relied before agreeing any term of this Agreement or any of the transactions contemplated by this Agreement which it may have in respect of a misrepresentation, inaccuracy or omission in or from information or advice provided by any such person for the purpose of assisting the Sellers to make a representation or give a Warranty.

7.5 Each Warranty is to be construed independently and (except where this Agreement provides otherwise) is not limited by a provision of this Agreement or another Warranty.

## 8. THE PURCHASER'S REMEDIES

8.1 If, at any time before Completion:

(a)    any of the Sellers is materially in breach of any provision of this Agreement and such breach is not curable or, if curable, is not cured within the earlier of (i) 30 days after written notice thereof is given by the Purchaser to such Seller and (ii) the Longstop Date; or

(b)    the Purchaser becomes aware of any matter, fact or circumstance which in the Purchaser's opinion, acting reasonably, either alone or together with any other matter, fact or circumstance of which the Purchaser is aware that has a Material Adverse Effect on the Group taken as a whole, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Purchaser or any of its Representatives, or any actions that the Purchaser or any of its Representatives takes or, notwithstanding reasonable written request by a Seller, omits to take, in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 8.1(b),

then the Purchaser may by notice in writing to the Sellers elect to proceed to Completion or terminate this Agreement if the Purchaser is not, on the proposed date of termination, in material breach of this Agreement.

8.2    If the Purchaser terminates this Agreement pursuant to Clause 8.1, each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations at the date of termination.

8.3    If Completion takes place (whether or not pursuant to an election by the applicable parties under Clause 6.4 or 6.5), the Sellers shall, severally and not jointly, indemnify and hold the Purchaser and its Affiliates (including, after Completion, the Group, the "**Purchaser Indemnified Parties**") harmless from, against and in respect of any and all Losses incurred or suffered by any of the Purchaser Indemnified Parties resulting from, relating to or arising out of:

(a)    any breach of the representations and warranties made by the Sellers under Clause 7.1 or covenants of the Sellers under this Agreement;

(b)    any inaccuracies as to the calculation of (i) the Total Consideration between the Major Shareholders as reflected in the Allocation List and (ii) the consideration between the Minority Shareholders; and

(c)    any unpaid transaction expenses of the Company incurred for the transactions contemplated under this Agreement (to the extent not taken into account in the calculation of the Total Consideration),

(collectively, the "**Indemnification Obligations**").

8.4    With effect from Completion, the Sellers release the Company from all claims and demands of the Sellers against the Company and all Liabilities of the Company to the Sellers in respect of any period prior to Completion under the organizational documents of the Company or any agreements between the applicable Seller and the Company terminated prior to Completion.

8.5    The Purchaser acknowledges and agrees that it shall not make a claim under this Clause 8 in respect of any fact, matter or circumstance of which the Purchaser was aware as at the date of this Agreement based on the information provided by the Company or the Sellers for the purposes of the Purchaser's Due Diligence Review, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of the Sellers.

8.6    Except for the remedies stipulated under this Clause 8, the Purchaser shall not claim for any compensation from the Sellers in respect of any Purchaser's Warranty Claim, regardless of whatever grounds under any law or regulation, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of the Sellers.

8.7    Any Purchaser Indemnified Party shall take all commercially reasonable steps to mitigate its Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses that may be indemnifiable hereunder.

## 9.    THE SELLERS' REMEDIES

9.1    If, at any time before Completion,

(a)    the Purchaser is materially in breach of any provision of this Agreement and such breach is not curable or, if curable, is not cured within the earlier of (i) 30 days after written notice thereof is given by any Seller to the Purchaser and (ii) the Longstop Date; or

(b)    the Sellers become aware of any matter, fact or circumstance which in the Sellers' opinion, acting reasonably, either alone or together with any other matter, fact or circumstance of which the Sellers are aware that has a Material Adverse Effect on the Purchaser, provided that any matter, event or circumstance arising substantially as a result of any actions or omissions that are requested in writing or consented to in writing by the Sellers or any of their Representatives, or any actions that the Sellers or any of their Representatives take or, notwithstanding reasonable written request by the Purchaser, omit to take, in connection with the transactions contemplated by this Agreement, shall be excluded from Material Adverse Effect for purposes of this Clause 9.1(b),

then the Sellers may by notice in writing to the Purchaser elect to proceed to Completion or terminate this Agreement if the Sellers are not, on the proposed date of termination, in material breach of this Agreement.

9.2    If the Sellers terminate this Agreement pursuant to Clause 9.1, each party's further rights and obligations cease immediately on termination, but termination does not affect a party's accrued rights and obligations at the date of termination.

9.3    If Completion takes place (whether or not pursuant to an election by the applicable parties under Clause 6.4 or 6.5), the Purchaser shall indemnify and hold harmless the Sellers and their Affiliates (the "**Seller Indemnified Parties**") from, against and in respect of any and all Losses incurred or suffered by any of the Sellers Indemnified Parties resulting from, relating to or arising out of any breach of the representations and warranties made by the Purchaser under Clause 7.2 or covenants of the Purchaser under this Agreement.

9.4    Each Seller acknowledges and agrees that it shall not make a claim under this Clause 9 in respect of any fact, matter or circumstance of which the Sellers were aware as at the date of this Agreement, other than in respect of any such fact, matter or circumstance arising as a result of any fraud, intentional misrepresentation or wilful misconduct, or, solely with respect to the Purchaser Fundamental Representations, gross negligence, of the Purchaser.

9.5    Except for the remedies stipulated under this Clause 9, the Sellers shall not claim for any compensation from the Purchaser in respect of any Seller's Warranty Claim, regardless of whatever grounds under any law or regulation, other than in respect of any such fact, matter or circumstance arising as a result of any fraud intentional misrepresentation or wilful misconduct, or, solely with respect to the Purchaser Fundamental Representations, gross negligence, of the Purchaser.

9.6    Any Seller Indemnified Party shall take all commercially reasonable steps to mitigate its Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses that may be indemnifiable hereunder.

## 10.    LIMITATIONS ON THE SELLERS' LIABILITY

10.1    The Indemnification Obligations shall survive for a period of two (2) years from the Completion Date, except for claims arising out of, resulting from or in connection with:

(a)    breaches of the Seller Fundamental Representations;

(b)    breaches of Sellers' covenants; and

(c)    Clause 8.3(b),

which shall survive Completion and subject to the relevant limitation period under the applicable laws.

10.2    The Sellers are not liable in respect of a Purchaser's Warranty Claim:

(a)    unless the amount that would otherwise be recoverable from the Sellers (but for this Clause 10.2) in respect of that Purchaser's Warranty Claim exceeds JPY10,000,000. For this purpose, a number of claims arising out of the same, related or similar matters, facts or circumstances shall be aggregated and form a single claim; and

(b)    unless and until the amount that would otherwise be recoverable from the Sellers (but for this Clause 10.2) in respect of that Purchaser's Warranty Claim,

when aggregated with any other amount or amounts recoverable or that would otherwise be recoverable (but for Clause 10.2(a)) in respect of other Purchaser's Warranty Claims, exceeds JPY100,000,000 and in the event that the aggregated amounts exceed JPY100,000,000, the Sellers shall be liable in respect of the total aggregate amounts and not the excess only.

10.3    Each Seller's total liability in respect of all Indemnification Obligations shall be limited to 20% of the amount of Total Consideration allocated to such Seller.

10.4    Nothing in this Clause 10 shall have the effect of limiting or restricting any liability of any Seller in respect of an Indemnification Obligation arising as a result of any fraud, intentional misrepresentation or wilful misconduct of that Seller, or, solely with respect to the Seller Fundamental Representations and the Sufficiency Representation, gross negligence, of that Seller.

## 11.    UNDERTAKINGS BY THE PARTIES

11.1    Until Completion or earlier termination of this Agreement, the Management Shareholders shall, to the extent permitted by law:

(a)    remain liable to perform all of their obligations and to comply with all legal and regulatory requirements relating to the Group Companies;

(b)    exercise all rights and powers available to them with a view to procuring that no Group Companies shall depart in any material respect from the ordinary course of their day-to-day business except with the prior written consent of the Purchaser, other than any activities by any of the Group Companies in connection with the replacement or recovery of the digital assets that were lost in the Crypto Asset Breach;

(c)    provide material updates to the Purchaser regarding the businesses and affairs of the Group Companies;

(d)    procure the Group Companies and their respective Representatives to (i) cooperate reasonably with the Purchaser and its Representatives to enable the Purchaser and its Representatives to conduct the Due Diligence Review, (ii) grant access to the books and records of or relating to the Group Companies, including but not limited to the statutory books, minute books, contracts, title deeds, details of receivables, tax records, accounts and other documentations of the Group Companies as the Purchaser may reasonably request and (iii) provide such other documents and information about or relating to the Group Companies as the Purchaser may reasonably request; and

(e)    procure that the Purchaser and its Representatives are provided with reasonable opportunities to meet with the management, directors, officers and staff of the Group Companies.

11.2    Each Seller undertakes in favour of the Purchaser and the Company that it will make available and promptly supply, or procure to make available and promptly supply, to the Financial Services Agency or any other competent regulatory authority all

information in relation to such Sellers which may be required by the Financial Services Agency or any other competent regulatory authority.

11.3    Each Management Shareholder undertakes to the Purchaser that, no later than Completion, such Management Shareholder shall use reasonable efforts to procure all of the Minority Shareholders to enter into the Minority Shareholders SPA(s), failing which or if any Minority Shareholder does not sell its Shares or Stock Options in accordance with the Minority Shareholders SPA(s), then, after Completion, such Management Shareholder shall provide any reasonable assistance requested by the Purchaser to consummate the Squeeze-Out Procedure (including but not limited to the exercise of their drag-along rights under the Shareholders' Agreement).

11.4    Between the execution of this Agreement and Completion or until the earlier termination of this Agreement:

(a)    the Sellers shall cause the Company to comply with Schedule 6;

(b)    the Management Shareholders shall procure the Company to file an application to change its commercial registration in order to reflect its latest corporate, shares and options issuance status;

(c)    the Purchaser shall provide commercially reasonable cooperation to the Sellers and the Company to consummate Completion, including structuring incentive plans to the employees of the Group Companies applicable after Completion and accommodating inquiries from competent regulatory authorities made to any Group Company;

(d)    the Purchaser, on the one hand, and the Management Shareholders, on the other hand, shall use reasonable best efforts to cooperate with each other to retain any employees of the Group Companies specified by the Purchaser;

(e)    the Sellers shall notify the Purchaser as soon as reasonably practicable if they becomes aware of a matter, fact or circumstance which constitutes or which would or might constitute a breach of Clause 7.1 or which would or might cause a Warranty of the Sellers to be untrue, inaccurate or misleading if given in respect of the facts or circumstances at the relevant time between the time of execution of this Agreement and Completion; and

(f)    the Purchaser shall notify the Sellers as soon as reasonably practicable if it becomes aware of a matter, fact or circumstance which constitutes or which would or might constitute a breach of Clause 7.2 or which would or might cause a Warranty of the Purchaser to be untrue, inaccurate or misleading if given in respect of the facts or circumstances at the relevant time between the time of execution of this Agreement and Completion.

11.5    Between the execution of this Agreement and Completion or until the earlier termination of this Agreement, the Sellers shall not, directly or indirectly:

(a)    enter into or be involved in any discussion or negotiation with any person except the Purchaser in connection with the sale of the Company or the business or,

- 23 -

except in the usual course of business or to *de minimis* extents, any part of the business or the assets thereof;

(b) enter into an agreement or arrangement with any person except the Purchaser or any person designated by the Purchaser in connection with the sale of the Company or the business or, except in the usual course of business or to *de minimis* extents, any part of the business or the assets thereof; or

(c) other than in connection with the transactions contemplated under this Agreement, make available to any person except the Purchaser, its directors, officers, duly authorised representatives, advisers or agents, any information for the purpose of the sale of the Company or the business or, except in the usual course of business or to *de minimis* extents, any part of the business.

11.6 The Purchaser hereby unconditionally and irrevocably agrees to guarantee the full and complete performance by the Company of all of the terms and obligations of the Company contained in the respective Management Agreements upon execution of the respective Management Agreements.

11.7 Each undertaking in Clauses 11.1 to 11.6 constitutes an entirely independent undertaking and if one or more of the undertakings is held to be against the public interest or unlawful or in any way an unreasonable restraint of trade the remaining undertakings shall continue to bind the Sellers.

## 12. CONFIDENTIAL INFORMATION

12.1 Each party undertakes to the other parties that before and after Completion it shall:

(a) not use or disclose to any person Confidential Information it has or acquires; and

(b) make every effort to prevent the use or disclosure of Confidential Information.

12.2 Clause 12.1 does not apply to disclosure of Confidential Information:

(a) to the extent that it is generally known to the public not as a result of a breach of any duty of confidentiality;

(b) to a director, officer or employee of the parties whose function requires him to have the Confidential Information;

(c) with respect to JAFCO, IDG China, IDG Bitmain and IDG Investors, to any existing limited or general partner of such entity as required by law or under the terms of their respective partnership agreements, provided that the recipient is informed of the confidential nature of the Confidential Information and is directed to maintain such confidentiality;

(d) to the extent that it is required to be disclosed by law, by a rule of a listing authority by which any party's shares or shares of any party's holding company are listed, by a stock exchange on which any party's shares or shares of any

party's holding company are listed or traded or by a governmental authority or other authority with relevant powers to which any party or any party's holding company is subject or submits, whether or not the requirement has the force of law provided that the disclosure shall be made after consultation with the other parties and after allowing the other parties the opportunity to contest such disclosure and after taking into account the other parties' requirements as to its timing, content and manner of making or despatch;

(e)     to an adviser for the purpose of advising the parties in connection with the transactions contemplated by this Agreement provided that such disclosure is essential for these purposes and is on the basis that Clause 12.1 applies to the disclosure by the adviser; or

(f)     as required or permitted by this Agreement (including the publication of any announcement or public disclosure made in accordance with the terms of Clause 13).

12.3    This Clause 12 shall survive the termination of this Agreement and the restriction on disclosure of Confidential Information shall continue to apply for a period of two years after the date of termination, except for information which ceases to be Confidential Information.

## 13.    ANNOUNCEMENTS

13.1    Subject to Clause 13.2, no party may, before or after Completion, make, issue or send a public announcement, communication or circular concerning the transactions referred to in this Agreement unless it has first consulted with the other parties and taken into account the requirements of the other parties as to its timing, content and manner of making or despatch.

13.2    Clause 13.1 does not apply to a public announcement, communication or circular required by law, by a rule of a listing authority by which any party's shares or shares of any party's holding company are listed, by a stock exchange on which any party's shares or shares of any party's holding company are listed or traded or by a governmental authority or other authority with relevant powers to which any party or any party's holding company is subject or submits, whether or not the requirement has the force of law, provided that the public announcement, communication or circular shall be made after consultation with the other parties and after taking into account the requirements of the other parties as to its timing, content and manner of making or despatch.

## 14.    COSTS

14.1    Except where this Agreement or the relevant document provides otherwise, each party shall pay its own costs relating to the negotiation, preparation, execution and performance by it of this Agreement and of each document referred to in it.

14.2    Any fees, charges, costs or commissions imposed by any bank, financial institution or intermediary on any payment by way of a bank or wire transfer under this Agreement shall be borne by the party making such transfer, provided that any fees, charges, costs

or commissions imposed by any bank, financial institution or intermediary of the party receiving such transfers shall be borne by the party receiving such payment.

## 15.    GENERAL

15.1    No amendment of this Agreement shall be valid unless it is in writing and duly executed by or on behalf of all of the parties to it.

15.2    No failure or delay by any party hereto in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. If either party breaches its obligations or its Warranties hereunder, the rights of the other parties shall be limited to the rights or remedies set forth in this Agreement.   Each party shall have no other entitlement, remedy or recourse, whether in contract, tort or otherwise, against the other parties with respect to the transactions contemplated by this Agreement, all of such other entitlements, remedies, and recourse being expressly waived by the parties to the fullest extent permitted by applicable law.

15.3    Except to the extent that they have been performed and except where this Agreement provides otherwise, the obligations contained in this Agreement remain in force after Completion.

15.4    If a party fails to pay a sum due from it under this Agreement on the due date of payment in accordance with the provisions of this Agreement, that party shall pay interest on the overdue sum from the due date of payment until the date on which its obligation to pay the sum is discharged at the rate of three (3) per cent per annum. Interest accrues and is payable from day to day.

15.5    All payments made by the Sellers or the Purchaser under Clauses 8 and 9 shall be made gross, free of right of counterclaim or set off and without deduction or withholding of any kind other than any deductions or withholding required by law.

15.6    Each of the parties agrees to perform (or procures the performance of) all such acts and things and/or to execute and deliver (or procure the execution and delivery of) all such documents, as may be required by law or as may be necessary or reasonably requested by the parties for giving full effect to this Agreement. Unless otherwise agreed, each party shall be responsible for its own costs and expenses incurred in connection with the provisions of this Clause 15.6.

15.7    Time shall be of the essence of this Agreement as regards any time or period specified herein or which may be varied with the agreement of all of the parties.

15.8    If any payment under this Agreement (except for the payment obligation under Clause 2) will be or has been subject to Tax, the Sellers or the Purchaser shall on demand from the Purchaser or the Sellers (as the case may be) pay to the Purchaser or the Sellers (as the case may be) the amount (after taking into account Tax payable in respect of the amount) (the "**Gross-Up Amount**") that will ensure that the Purchaser or the Sellers (as the case may be) receives and retains a net sum equal to the sum it would have received had the payment not been subject to Tax, provided, that, any Gross-Up

Amount paid shall count toward and be subject to the limitation of liability cap amount provided under Clause 10.3.

15.9 If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.10 Any indemnity under this Agreement is independent and survives termination of this Agreement or Completion in accordance with the terms of this Agreement. Any other term by its nature intended to survive termination of this Agreement or Completion survives termination of this Agreement or Completion.

15.11 The parties agree that any indemnification payments made pursuant to this Agreement shall be treated for tax purposes as an adjustment to the Purchase Price, unless otherwise required by applicable laws and regulations.

## 16.    ENTIRE AGREEMENT

16.1 This Agreement constitutes the entire agreement between the parties. It supersedes any previous agreements relating to the subject matter of this Agreement, and sets out the complete legal relationship of the parties arising from or connected with that subject matter.

## 17.    ASSIGNMENT

17.1 Each of the parties to this Agreement shall not assign, transfer, declare a trust of the benefit of or in any other way alienate any of its rights under this Agreement, whether in whole or in part, without the prior written consent of each other party.

## 18.    NOTICES

18.1 A notice or other communication under or in connection with this Agreement (a "**Notice**") shall be:

(a)    in writing;

(b)    in English; and

(c)    delivered personally or sent by courier by an internationally recognised courier company or by email, to the party due to receive the Notice at its address set out in Clause 18.3 or to such other address, person or email address as the party may specify by not less than seven (7) days' written notice to the other party received before the Notice was despatched provided that if the Notice is delivered by email it must also be delivered by one of the other methods specified in this Clause 18.1(c).

18.2 In the absence of evidence of earlier receipt, a Notice shall be deemed to have been duly given if:

(a)    delivered personally, when left at the address referred to in Clause 18.1(c);

(b)       sent by courier, two Business Days after posting it; and

(c)       sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 18.2 within one (1) Business Day of sending the email.

18.3    The address and email address referred to in Clause 18.1(c) are:

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Sellers** | Kariya Kayamori<br>8 Orange Grove Road<br>#06-02<br>Singapore 258342 | mike.kayamori@liquid.com | Kariya Kayamori |
| | Seth Melamed<br>2-3-7 Shimomeguro<br>#510<br>Meguro-ku<br>Tokyo<br>Japan 153-0064 | seth@liquid.com | Seth Melamed |
| | JAFCO SV4 Investment Limited Partnership<br>c/o JAFCO Group Co., Ltd.<br>1-23-1 Toranomon, Minato-ku, Tokyo 105-6324, Japan | Shozo.isaka@jafco.c0.jp | Shozo Isaka |
| | IDG China Venture Capital Fund V L.P.<br>c/o IDG Capital Management (HK) Ltd.<br>Unit 5505, 55/F., The Center<br>99 Queen's Road Central, Hong Kong | simon_ho@idgcapital.com | Chi Sing HO |
| | With a copy to<br>Floor 6, Tower A, COFCO Plaza,<br>8 Jianguomennei Dajie Beijing, 100005, P.R. China | lydia_li@idgcapital.com | Ms. Jing Li |

| | | | |
|---|---|---|---|
| | IDG Bitmain Fund L.P.<br>c/o IDG Capital Management (HK) Ltd.<br>Unit 5505, 55/F., The Center<br>99 Queen's Road Central, Hong Kong | simon_ho@idgcapital.com | Chi Sing HO |
| | With a copy to<br>Floor 6, Tower A, COFCO Plaza,<br>8 Jianguomennei Dajie Beijing, 100005, P.R. China | lydia_li@idgcapital.com | Ms. Jing Li |
| | IDG China V Investors L.P.<br>c/o IDG Capital Management (HK) Ltd.<br>Unit 5505, 55/F., The Center<br>99 Queen's Road Central, Hong Kong | simon_ho@idgcapital.com | Chi Sing HO |
| | With a copy to<br>Floor 6, Tower A, COFCO Plaza,<br>8 Jianguomennei Dajie Beijing, 100005, P.R. China | lydia_li@idgcapital.com | Ms. Jing Li |
| **The Purchaser** | FTX Trading Ltd<br>c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd<br>Saint John's<br>Antigua and Barbuda | sam@ftx.com | CEO |
| | with a copy (which shall not constitute notice) to:<br>Anderson Mori & Tomotsune<br>Otemachi Park Building<br>1-1-1, Otemachi<br>Chiyoda-ku<br>Tokyo 100-8136<br>Japan | ken.kawai@amt-law.com | Ken Kawai |

| **The Company** | Liquid Group Inc.<br>Hirose Building 4F<br>3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan | mike.kayamori<br>@liquid.com | CEO |
| --- | --- | --- | --- |
| | with a copy (which<br>shall not constitute<br>notice) to:<br>Liquid Group Inc.<br>Hirose Building 4F<br>3-17 Kanda Nishikicho<br>Chiyoda-ku<br>Tokyo 101-0054<br>Japan | legal@liquid.c<br>om | Legal<br>Department |

## 19.    GOVERNING LAW AND JURISDICTION

19.1    This Agreement (including a dispute relating to its existence, validity or termination) and any non-contractual obligation or other matter arising out of or in connection with it are governed by the laws of Japan.

19.2    Any dispute, controversy or claim arising in any way out of or in connection with this Agreement (including, without limitation: (i) any issue regarding contractual, pre-contractual or non-contractual rights, obligations or Liabilities; and (ii) any issue as to the existence, validity, breach or termination of this Agreement) shall be referred to and finally resolved by binding arbitration administered by the Singapore International Arbitration Centre ("**SIAC**") in accordance with the SIAC Rules in force when the Notice of Arbitration is submitted in accordance with such Rules (the "**Rules**"), which Rules are deemed to be incorporated by reference into this Clause and as may be amended by the rest of this Clause. The arbitration proceedings, all documents and all testimony, written or oral, produced in connection therewith, and the arbitration award shall be confidential.

19.3    The arbitration tribunal ("**Tribunal**") shall consist of three arbitrators to be appointed in accordance with the Rules unless the parties separately agree to one arbitrator.

19.4    The seat and venue of the arbitration shall be Singapore. The arbitration agreement in this Clause 19 shall be governed by the laws of Singapore.

19.5    The language of the arbitration proceedings shall be English.

19.6    Any award of the Tribunal shall be made in writing and shall be final and binding on the parties from the day it is made. The parties undertake to carry out any award without delay.

19.7    Nothing in this Clause 19 shall be construed as preventing any party from seeking conservatory or interim relief from any court of competent jurisdiction.

## 20.  GOVERNING LANGUAGE

20.1  This Agreement is drawn up in the English language. If this Agreement is translated into another language, the English language text prevails.

20.2  Each Notice, demand, request, statement, instrument, certificate or other communication given, delivered or made by a party to any other party under or in connection with this Agreement shall be:

(a)  in English; or

(b)  if not in English, accompanied by an English translation made by a translator, and certified by such translator to be accurate in all material aspects.

20.3  The receiving party shall be entitled to assume the accuracy of and rely upon any English translation of any document provided pursuant to Clause 20.2(b).

## 21.  COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which when executed and delivered is an original and all of which together evidence the same agreement.

## SCHEDULE 1
## INFORMATION ON THE SELLERS

**SHARES, STOCK OPTIONS AND CLASS C-1 PREFERENCE SHARES WARRANTS HELD**

| Name | Common Shares | Class A Preference Shares | Class B Preference Shares | Class C-1 Preference Shares | Stock Options | | | Class C-1 Preference Shares Warrants |
|---|---|---|---|---|---|---|---|---|
| | | | | | Series 3 | Series 10 | Series 13 | |
| **Kariya Kayamori** | 12,800 | 50 | - | - | - | - | - | - |
| **Seth Melamed** | 12,203 | - | - | - | 180 | 30 | 300 | - |
| **JAFCO SV4 Investment Limited Partnership** | - | - | 5,778 (5,983 Note 1) | - | - | - | - | - |
| **IDG China Venture Capital Fund V L.P.** | 1,363 | - | - | 7,445 | - | - | - | 2,484 |
| **IDG Bitmain Fund L.P.** | 192 | - | - | 1,054 | - | - | - | - |
| **IDG China V Investors L.P.** | 79 | - | - | 429 | - | - | - | 141 |

*Note 1: As converted*

**SCHEDULE 2**
**ALLOCATION OF CONSIDERATION**

1.      **Total Consideration**

| Seller | Type of Target Security Interest | Number of Target Security Interests | Price per Target Security Interest | Total Consideration |
|---|---|---|---|---|
| **Kariya Kayamori** | Common Shares | 12,800 | $3,510.41 | $45,108,768.50 |
| | Class A Preference Shares | 50 | $3,510.41 | |
| **Seth Melamed** | Common Shares | 12,203 | $3,510.41 | $44,516,390.23 |
| | Stock Options | 180 | $3,509.54 | |
| | Stock Options | 30 | $3,103.16 | |
| | Stock Options | 300 | $3,180.15 | |
| **JAFCO SV4 Investment Limited Partnership** | Class B Preference Shares | 5,778 (5,983 [Note 1]) | $3,510.41 | $21,002,783.03 |
| **IDG China Venture Capital Fund V L.P.** | Common Shares | 1,363 | $3,510.41 | $34,908,076.20 |
| | Class C Preference Shares | 7,445 | $3,510.41 | |
| | Class C-1 Preference Shares Warrants | 2,484 | $1,605.63 | |
| **IDG Bitmain Fund L.P.** | Common Shares | 192 | $3,510.41 | $4,373,970.86 |
| | Class C Preference Shares | 1,054 | $3,510.41 | |
| **IDG China V Investors L.P.** | Common Shares | 79 | $3,510.41 | $2,009,682.11 |
| | Class C Preference Shares | 429 | $3,510.41 | |
| | Class C-1 Preference Shares Warrants | 141 | $1,605.63 | |

*Note 1: As converted*

2.      **Allocation of Total Consideration**

| Seller | Cash Consideration | Crypto Consideration | Consideration Shares |
|---|---|---|---|
| Kariya Kayamori | $10,000,000 | $9,021,753.70 | $26,087,014.80 |
| Seth Melamed | $8,903,278.05 | $8,903,278.05 | $26,709,834.14 |
| JAFCO SV4 Investment Limited Partnership | $21,002,783.03 | - | - |
| IDG China Venture Capital Fund V L.P. | $34,908,076.20 | - | - |
| IDG Bitmain Fund L.P. | $4,373,970.86 | - | - |
| IDG China V Investors L.P. | $2,009,682.11 | - | - |

3.      **Consideration Paid at Completion**

| Seller | Number of Consideration Shares | Initial Cash Consideration |
|---|---|---|
| Kariya Kayamori | 995,307 | $10,000,000.00 |
| Seth Melamed | 1,019,070 | $8,903,278.05 |
| JAFCO SV4 Investment Limited Partnership | - | $16,802,226.42 |
| IDG China Venture Capital Fund V L.P. | - | $27,926,460.96 |
| IDG Bitmain Fund L.P. | - | $3,499,176.69 |
| IDG China V Investors L.P. | - | $1,607,745.69 |

4.    **Retained Consideration**

| Seller | Retained Cash Consideration | Bitcoin (BTC) | Ether (ETH) | Solana (SOL) | FTX Token (FTT) |
|---|---|---|---|---|---|
| **Kariya Kayamori** | - | BTC 52.870 | ETH 757.25 | - | FTT 64,219 |
| **Seth Melamed** | - | BTC 39.132 | ETH 560.48 | SOL 11,884.98 | FTT 47,532 |
| **JAFCO SV4 Investment Limited Partnership** | $4,200,556.61 | - | - | - | - |
| **IDG China Venture Capital Fund V L.P.** | $6,981,615.24 | - | - | - | - |
| **IDG Bitmain Fund L.P.** | $874,794.17 | - | - | - | - |
| **IDG China V Investors L.P.** | $401,936.42 | - | - | - | - |

**SCHEDULE 3**
**BANK ACCOUNT INFORMATION OF THE SELLERS**

| Seller | Bank Account Details |
|---|---|
| **Kariya Kayamori** | [To be provided prior to Completion]<br><br>Bank Name      :<br>Branch          :<br>SWIFT Code    :<br>Address         :<br>Account No.    :<br>Account Name  : |
| **Seth Melamed** | Bank Name      :  JPMorgan Chase<br>Branch          :  Shattuck and Channing<br>Routing        :  124001545<br>SWIFT Code    :  CHASUS33XX<br>Address         :  2390 Shattuck Ave. Berkeley, CA<br>Account No.    :  895866890<br>Account Name  :  Seth Melamed |
| **JAFCO SV4 Investment Limited Partnership** | Bank Name      :  Mizuho Bank, Ltd.<br>Branch          :  KABUTOCHO CORPORATE BANKING AND SECURITIES BUSINESS DEPARTMENT<br>SWIFT Code    :  MHCBJPJT<br>Address         :  6-7 Nihombashikabutocho, Chuo-ku, Tokyo 103-0026, Japan<br>Account No.    :  113- 5449987 (Branch No. - Account No.)<br>Account Name  :  JAFCO SV4 Investment Limited Partnership |

| Seller | Bank Account Details |
|---|---|
| **IDG China Venture Capital Fund V L.P.** | Bank Name     :   Pacific Western Bank<br>Branch     :   Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code     :   SQARUS33<br>Address     :   406 Blackwell Street, Suite 240, Durham, North Carolina, 27701<br>Account No.     :   1001657806<br>Account Name     :   IDG China Venture Capital Fund V L.P. |
| **IDG Bitmain Fund L.P.** | Bank Name     :   Pacific Western Bank<br>Branch     :   Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code     :   SQARUS33<br>Address     :   406 Blackwell Street, Suite 240, Durham, NC 27701<br>Account No.     :   1001787223<br>Account Name     :   IDG Bitmain Fund L.P. |
| **IDG China V Investors L.P.** | Bank Name     :   Pacific Western Bank<br>Branch     :   Square 1 Bank, a division of Pacific Western Bank<br>SWIFT Code     :   SQARUS33<br>Address     :   406 Blackwell Street, Suite 240, Durham, North Carolina, 27701<br>Account No.     :   1001658945<br>Account Name     :   IDG China V Investors L.P. |

**SCHEDULE 4**
**INFORMATION ON THE GROUP COMPANIES**

| Name | Place of Incorporation | Date of Incorporation | Registered Office |
|------|------------------------|-----------------------|-------------------|
| **Liquid Group Inc.** | Japan | 1 March 2019 | 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan |
| **Quoine Corporation** | Japan | 25 November 2014 | 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan |
| **Liquid Securities Singapore Pte. Ltd.** | Singapore | 3 January 2019 | 30 Cecil Street #19-08 Prudential Tower Singapore 049712 |
| **Quoine Pte. Ltd.** | Singapore | 15 May 2019 | 8 Orange Grove Road #06-02 Singapore 258342 |
| **Analisya Pte. Ltd.** | Singapore | 11 July 2013 | 8 Orange Grove Road #06-02 Singapore 258342 |
| **Quoine India Private Limited** | India | 29 November 2017 | F-143, Richmond Park DLF City, Phase-4 Gurugram, Haryana-HR Gurgaon, 122001 India |
| **Quoine Vietnam Company Limited** | Vietnam | 18 August 2017 | Floor 1st, Empress Tower No 138-142 Hai Ba Trung Street Da Kao Ward, District 1 Ho Chi Minh City Vietnam |

## SCHEDULE 5
## COMPLETION REQUIREMENTS

**1.      Sellers' obligations**

1.1    At Completion, the Sellers shall deliver or procure to be delivered to the Purchaser:

(a)    evidence in a form reasonably satisfactory to the Purchaser of satisfaction of the Conditions set out in Clause 5.1;

(b)    with respect to each Seller that is not a natural person, as evidence of the authority of each person executing a document referred to in this Schedule 5 on such Seller's behalf (if applicable):

(i)     a copy of the relevant extract of the minutes of a duly held meeting of the directors of such Seller (or a duly constituted committee thereof) authorising the execution by such Seller of the document and, where such execution is authorised by a committee of the board of directors of such Seller, a copy of the relevant extract of the minutes of a duly held meeting of the directors constituting such committee; or

(ii)    a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the company secretary of such Seller.

(c)    the Final Customer Balance Statement, as certified by the Chief Executive Officer that such Final Customer Balance Statement and the Sufficiency Representation is true and complete in all material respects;

(d)    an application and any other document required to change the Company's shareholders register (*kabunushi meibo*) and stock option holders register (*shinkabu yoyaku ken genbo*) with the Sellers' signatures (including electronic signatures) or corporate seals to reflect the transfer of the Target Security Interests;

(e)    a certified copy of the shareholders register (*kabunushi meibo*) of the Company reflecting the sale and purchase of the Target Shares dated as of the Completion Date;

(f)     a certified copy of the stock option holders register (*shinkabu yoyaku ken genbo*) of the Company reflecting the sale and purchase of the Target Options and the Target Warrants dated as of the Completion Date;

(g)    the Minority Shareholders SPA(s) duly executed on behalf of the Minority Shareholders who provided a power of attorney to any Seller or any of the Group Companies, or any other Person agreed by the Purchaser, for such execution, or evidence in a form reasonably satisfactory to the Purchaser that the Shareholders required under the Shareholders' Agreements to exercise the

drag-along rights under the Shareholders' Agreements have exercised such rights;

(h)    a letter to the Company and Quoine Corporation from the below directors resigning their office (*jinin todoke*) as directors of each of the Company and Quoine Corporation with effect on or prior to the Completion Date:

    (i)    Shozo Isaka; and

    (ii)    Toh Li;

(i)    the Management Agreements between each of the Management Shareholders and the Company duly executed by the parties thereto; and

(j)    evidence in a form reasonably satisfactory to the Purchaser that the employment agreements of at least 70% of the full-time employees of the Group remain effective.

1.2    The Sellers shall procure that at or prior to Completion a meeting of the Board of Directors is held at which the directors approve:

(a)    the transfer of the Target Security Interests; and

(b)    the entering into the Agreement or the Minority Shareholders SPA(s) (as applicable), and

at Completion the Sellers shall deliver to the Purchaser a certified copy of the above resolutions.

## 2.    Purchaser's obligations

2.1    At Completion, the Purchaser shall deliver to the Sellers:

(a)    evidence in a form reasonably satisfactory to the Sellers of satisfaction of the Conditions set out in Clause 5.1; and

(b)    as evidence of the authority of each person executing a document referred to in this Schedule on the Purchaser's behalf:

    (i)    a copy of the relevant extract of the minutes of a duly held meeting of the directors of the Purchaser (or a duly constituted committee thereof) authorising the execution by the Purchaser of the document and, where such execution is authorised by a committee of the board of directors of the Purchaser, a copy of the relevant extract of the minutes of a duly held meeting of the directors constituting such committee; or

    (ii)    a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the secretary of the Purchaser.

2.2     At Completion, the Purchaser shall:

    (a)     allot and issue the Consideration Shares to the relevant Sellers; and

    (b)     subject to the provision by the relevant Sellers of applicable anti-money laundering and "know your customer" materials required by the Transfer Agent, provide a copy of the executed request to the Transfer Agent to effect the registration of the Consideration Shares, in the name of the relevant Sellers, in the register of members of the Purchaser; provided that if any such anti-money laundering and "know your customer" materials are not provided by the relevant Sellers on or prior to Completion, the Purchaser shall instruct the Transfer Agent to effect such registration promptly after such materials are provided by the relevant Sellers.

2.3     At Completion, the Purchaser shall:

    (a)     pay, in USD, the Initial Cash Consideration to the Company in accordance with Clause 2.3 of this Agreement;

    (b)     withhold, in USD, the Retained Cash Consideration in accordance with Clause 2.4 of this Agreement; and

    (c)     withhold the Crypto Consideration in a manner to be agreed in good faith in accordance with Clause 2.4 of this Agreement.

**SCHEDULE 6**
**WARRANTIES**


**PART A**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

1.      **CAPACITY AND AUTHORITY**

1.1     **Right, power, authority and action**

(a)     Such Seller has the right, power and authority, and has taken all action necessary, to execute, deliver and exercise its rights, and perform its obligations, under this Agreement and each document to be executed by such Seller at or before Completion in connection with the transactions contemplated under the Agreement.

(b)     The entry into and performance by such Seller of, and the transactions contemplated by, this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under this Agreement do not conflict with, or result in a breach of:

(i)      any law or regulation applicable to it; or

(ii)     any document which is binding upon it.

(c)     The Company has the right, power and authority to conduct its business as conducted at the date of this Agreement.

1.2     **Binding agreements**

Such Seller's obligations under this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement are, or when the relevant document is executed will be, enforceable in accordance with their terms.

1.3     **Anti-Social Force**

Such Seller is not, and does not have any dealings with, and is not otherwise related to, any Anti-Social Forces.

2.      **INFORMATION**

2.1     **The Agreement**

All information provided by or on behalf of such Seller and/or the Company (including any information provided by such Seller to the Purchaser via the Company) in the course of the Due Diligence Review conducted by or on behalf of the Purchaser and in the course of negotiations leading to this Agreement by or on behalf of such Seller, and

- 44 -

the information set out in this Agreement with respect to such Seller is true, accurate and not misleading in all material respects.

## 2.2 Material information

All information about the Shares, the Stock Options and the Class C-1 Preference Shares Warrants and the Group's business which might be material for disclosure to a Purchaser of the Shares, the Stock Options and the Class C-1 Preference Shares Warrants has been disclosed by or on behalf of such Seller (including by the Company for itself and for and on behalf of such Seller) to the Purchaser in writing.

## 2.3 Information for disclosure

All statements in the Disclosure Documents in relation to such Seller and all documents and information provided or made available by or on behalf of such Seller for the purpose of preparation of the Disclosure Documents are true, accurate and not misleading in all material respects and has not omitted any information the omission of which would make any statement in the Disclosure Documents misleading in any material respect.

## 3. SHARES AND AFFILIATES

3.1 The Target Shares, the Target Options and the Target Warrants

(a) Such Seller is the sole legal and registered owner of the number of the Target Shares, the Target Options and Target Warrants set out opposite such Seller's name in Schedule 1as applicable.

(b) The Shares comprise the whole of the Company's allotted and issued share capital, have been properly allotted and issued and are fully paid or credited as fully paid.

(c) Other than the Shareholders' Agreements, there is no Encumbrance, and there is no agreement, arrangement or obligation to create or give an Encumbrance, in relation to any of the Target Shares, the Target Options or the Target Warrants held by such Seller. No person has claimed to be entitled to an Encumbrance in relation to any of the Target Shares, the Target Options or the Target Warrants held by such Seller.

(d) Other than the Stock Options, Class C-1 Preference Shares Warrants, this Agreement and the Shareholders' Agreements, there is no agreement, arrangement or obligation requiring the creation, allotment, issue, transfer, redemption or repayment of, or the grant to a person of the right (conditional or not) to require the allotment, issue, transfer, redemption or repayment of, a share in the capital of the Company (including, without limitation, an option or right of pre-emption or conversion).

## 3.2 Affiliates

(a)     The Company does not have any subsidiaries other than the entities listed in Schedule 4.

(b)     The Company has no interest in, and has not agreed to acquire an interest in or merge or consolidate with, a corporate body or any other person.

## 4.     ACCOUNTS

### 4.1     General

(a)     The Accounts have been prepared and audited on a proper and consistent basis in accordance with the law and applicable standards, principles and practices generally accepted in Japan.

(b)     The Accounts show a true and fair view of the assets, liabilities and state of affairs of the Company as at the Last Accounting Date and of the profits and losses of the Company for the financial year ended on the Last Accounting Date.

### 4.2     Provision for Tax

The Accounts reserve or provide in accordance with applicable standards, principles and practices generally accepted in Japan for all Tax liable to be assessed on the Company, or for which it is or may become accountable, for all periods commencing on or before the Last Accounting Date (whether or not the Company has or may have a right of reimbursement against another person) in all material respects.    The Accounts reserve in accordance with applicable standards, principles and practices generally accepted in Japan for all contingent or deferred Liabilities to Tax for all periods commencing on or before the Last Accounting Date in all material respects.

### 4.3     Accounting records

The Company's accounting records are up-to-date, in its possession or under its control and are properly completed in accordance with the law and applicable standards, principles and practices generally accepted in Japan in all material respects.

## 5.     CHANGES SINCE THE LAST ACCOUNTING DATE

### 5.1     General

Since the Last Accounting Date, other than in connection with the Crypto Asset Breach:

(a)     the Group's business has been operated in the usual way in all material respects so as to maintain it as a going concern;

(b)     no matter, event or incident with Material Adverse Effect on the Group has occurred; and

(c)     no material change has occurred in the assets and Liabilities shown in the Accounts and there has been no reduction in the value of the net tangible assets of the Group on the basis of the valuations used in the Accounts.

5.2     **Specific**

Since the Last Accounting Date:

(a)     the Group has not, other than in connection with the Crypto Asset Breach:

    (i)     made, or agreed to make, capital expenditure exceeding in total JPY100,000,000; or

    (ii)    incurred, or agreed to incur, a commitment or commitments involving capital expenditure exceeding in total JPY100,000,000; and

(b)     no resolution of the Shareholders (other than ordinary business conducted at an annual general meeting or the resolutions contemplated in this Agreement) has been passed.

## 6.     TAX

6.1     **General**

(a)     The Company is and has at all times been subject to or assessed on Taxes in Japan only and each of the Group (other than the Company) is and has at all times been subject to or assessed on Taxes in the jurisdiction where it was incorporated, except where it would not have a Material Adverse Effect on the Group taken as a whole.

(b)     The Group has paid all Tax which it has become liable to pay and is not, and has not been, from the respective date of incorporation of each Group Company, liable to pay a penalty, surcharge, fine or interest in connection with Tax, except where it would not have a Material Adverse Effect on the Group taken as a whole.

6.2     **Tax Returns**

The Group has made all such returns, provided all such information and maintained all such records in relation to Tax as are required to be made or provided or maintained by it and to the knowledge of the Sellers, none of such returns is disputed by the Tax Authority concerned, except where it would not have a Material Adverse Effect on the Group taken as a whole.

6.3     **Disputes**

The Group is not, in relation to the business, involved in a dispute with any Tax Authority. To the best of such Seller's knowledge, information and belief, no Tax Authority has investigated or indicated that it intends to investigate the Tax affairs of the Group.

6.4     No Tax Authority has disputed the inclusion of taxable income from the Group in the Tax computations of the Group in respect of each of its financial years from the

respective date of incorporation of each Group Company. No such dispute is outstanding or pending and there are no circumstances known to such Seller which are likely to give rise to such dispute.

7.    **ASSETS**

7.1    **Sufficiency of Assets**

(a)    The amounts of digital assets actually held and controlled by the Company are, on a digital asset-by-digital asset basis (including all delisted digital assets), at least equal to the aggregate balances held by all customers of the Group (including any inactive, dormant, suspended, terminated or withdrawal-only accounts) for each digital asset, other than up to USD 100,000,000 of deficiencies incurred in connection with the Crypto Asset Breach (measured at the time of such Crypto Asset Breach). The Company has good and valid title to all of such digital assets, free and clear of all Encumbrances (the "**Sufficiency Representation**").

(b)    The amounts of (i) the out of pocket costs of the Group to replace any of the crypto assets lost in the Crypto Asset Breach and not otherwise recovered by the Group as of or prior to Completion (the "**Lost Assets**"), including any premium paid by a Group Company for such replacement and (ii) the market value of any Lost Assets that are not replaced or recovered by the Group as of or prior to Completion, do not, in the aggregate, exceed USD100,000,000.

7.2    **Title and Condition**

(a)    Each material asset included in the Accounts or acquired by the Group since the Last Accounting Date (other than stock disposed of in the usual course of business) and each material asset used by the Group or which is in the reputed ownership of the Group is:

(i)    owned solely by the Group free from any Encumbrance;

(ii)    not subject to any agreement for lease, hire, hire purchase or sale on deferred, credit or conditional terms; and

(iii)    where capable of possession, in the possession or under the control of the Group.

(b)    The Company owns or has the right to use each asset necessary for the effective operation of its business.

7.3    **Debt**

(a)    No debt shown in the Accounts or the Group's accounting records greater than JPY100,000,000 is overdue by more than four weeks or is the subject of an arrangement.

(b)      The Group has not released a debt greater than JPY100,000,000 shown in the Accounts or its accounting records so that the debtor has paid or will pay less than the debt's book value. None of the debts greater than JPY100,000,000 shown in the Accounts or the Group's accounting records has been deferred, subordinated or written off or become irrecoverable to any extent.

## 8.      INTELLECTUAL PROPERTY

8.1      Each of the Intellectual Property Rights owned by the Group is:

(a)      valid and enforceable and nothing has been done or omitted to be done by which it may cease to be valid and enforceable;

(b)      owned by the Group alone, free from any licence, Encumbrance or restriction on use; and

(c)      to the best of such Seller's knowledge, information and belief, will not be, the subject of a claim or opposition from a person (including, without limitation, an employee of the Group) as to title, validity, enforceability, entitlement or otherwise.

8.2      Each of the Intellectual Property Rights used but not owned by the Group is validly licensed to the Group and which are not terminable as a result of any transaction contemplated in this Agreement, except where such termination would not have a Material Adverse Effect.

8.3      The Group has not granted and is not obliged to grant a licence, assignment, consent, undertaking, security interest or other right in respect of any of its material Intellectual Property Rights.

8.4      The Intellectual Property Rights comprise all the Intellectual Property necessary for the Group to operate its business as it has been operated before the date of this Agreement.

## 9.      AGREEMENT

9.1      **Validity of Agreements**

(a)      To the best of such Seller's knowledge, information and belief, no fact or circumstance exists which might invalidate or give rise to a ground for termination, avoidance or repudiation of an agreement to which any of the Group is a party, which would reasonably be likely to have a Material Adverse Effect on the Group, and no party to such an agreement has given notice of its intention to terminate, or has sought to repudiate or disclaim, such an agreement.

(b)      Neither the Group nor, to the best of such Seller's knowledge, information and belief, any party with whom any of the Group has entered into an agreement is in material breach of any such agreement, except where it would not have a Material Adverse Effect on the Group taken as a whole.

9.2      **Material Agreements**

(a) To the best of such Seller's knowledge, information and belief, the Group is not a party to, and is not liable under, any material long-term, onerous or unusual agreement, arrangement or obligation including, without limitation:

    (i) an agreement, arrangement or obligation entered into other than in the usual course of its business exceeding JPY100,000,000;

    (ii) an agreement, arrangement or obligation entered into other than at arm's length negotiation exceeding JPY100,000,000; or

    (iii) an agreement, arrangement or obligation restricting the Group's freedom to operate the whole or part of its business or to use or exploit any of its assets.

(b) The Group is not a member of a joint venture or partnership.

## 10. TERMS OF TRADE AND BUSINESS

### 10.1 Creditors

No debt owed by the Company exceeding JPY100,000,000 has been overdue for more than four weeks.

## 11. EFFECT OF SALE

Neither the execution nor the performance of this Agreement or any document to be executed at or before Completion will result in the Company losing the benefit of any material asset, grant, subsidy, right or privilege which it enjoys at the date of this Agreement or will conflict with, result in a breach of, give rise to an event of default under, require the consent of a person under, enable a person to terminate or relieve a person from an obligation under any material agreement or arrangement to which any of the Group is a party or any legal or administrative requirement by which the Group is bound.

## 12. EMPLOYEES

### 12.1 General

(a) The Group has not given notice of termination or received notice of resignation from any key employees.

(b) The Group owes no more than JPY10,000,000 in the aggregate to any of its present or former directors, other officers or employees (or any of their respective dependants) other than for accrued remuneration or reimbursement of business expenses.

(c) The Group has maintained up-to-date and accurate records regarding the employment of each of its employees and termination of employment. There

are no unpaid wages or other payments owing to any former or current directors, officers and employees.

(d)    There is no agreement or arrangement between such Seller and any of the Group's employees providing for any payments or other benefits in connection with the transactions contemplated under this Agreement.

(e)    None of the Group's employees is currently subject to disciplinary or grievance proceedings.

**12.2    Compliance With Law**

(a)    The Group has complied with all material obligations imposed on it under applicable labor or employment laws and regulations.

(b)    To the best of such Seller's knowledge, information and belief, there is no investigation or enquiry outstanding or anticipated by the Labor Standards Supervision Office (*roudou kijun kantoku sho*) or other governmental organisation or statutory body in connection with the Group.

(c)    There are no active, pending or, to the best of such Seller's knowledge, information and belief, threatened court, tribunal or arbitration proceedings in respect of any existing or former employees of the Group.

(d)    The Company has maintained adequate insurance including employer's liability insurance in respect of its existing and former employees and has been and is in compliance with the Employment Insurance Act (Act No. 116 of 1974, as amended) in Japan, except where it would not have a Material Adverse Effect on the Group taken as a whole.

**12.3    Incentive Schemes**

Other than the Stock Options, the Group does not have and is not proposing to introduce a share incentive, share option, profit sharing, bonus or other incentive scheme for any of its directors, other officers or employees.

**13.    PENSIONS**

13.1    For the purpose of this Paragraph 13, "**Relevant Employee**" means a director or officer or employee or former director or officer or employee of the Company.

13.2    Except for those provided in the Work Rules (*shugyo kisoku*) or any equivalent rules (the "**Scheme**"), the Group is not under any liability or obligation, and is not a party to any ex-gratia arrangement or promise, to pay any retirement benefit, pension, gratuity, annuity, superannuation allowance or the like, or life assurance, medical insurance or permanent health payments or the like, to or for any Relevant Employees or their dependants or other person; and there are no retirement benefits, or pension or death benefits, provident funds or schemes, life assurance or health insurance or health protection, or similar schemes or arrangements in relation to, or binding on, the Group

or to which the Group contributes or has contributed or proposes to contribute, except where it would not have a Material Adverse Effect on the Group taken as a whole.

13.3    Neither the Group nor any of the Relevant Employees is a party to any legal, arbitration, administrative or other proceedings in relation to the Scheme. There are no pending or threatened claims, investigations, lawsuits or arbitrations which have been or may be asserted or instituted against either the Group or any of the Relevant Employees in relation to the Schemes.

## 14.    LIABILITIES

### 14.1    Indebtedness

Except as disclosed in the Accounts, the Group does not have outstanding and has not agreed to create or incur loan capital, borrowings or indebtedness in the nature of borrowings in excess of JPY100,000,000.

### 14.2    Guarantees and Indemnities

(a)    The Group is not a party to and is not liable under a guarantee, indemnity or other agreement to secure or incur a financial or other obligation with respect to another person's obligation exceeding JPY100,000,000.

(b)    No part of the loan capital, borrowings or indebtedness in the nature of borrowings of the Group exceeding JPY100,000,000 is dependent on the guarantee or indemnity of, or security provided by, another person.

### 14.3    Events of Default

No event has occurred or been alleged to have occurred which:

(a)    constitutes an event of default, or otherwise gives rise to an obligation to repay, under an agreement relating to borrowing or indebtedness in the nature of borrowing (or will do so with the giving of notice or lapse of time or both) exceeding JPY100,000,000; or

(b)    will lead to any material Encumbrance constituted or created in connection with borrowing or indebtedness in the nature of borrowing, a guarantee, an indemnity or other obligation of the Group becoming enforceable (or will do so with the giving of notice or lapse of time or both).

## 15.    PERMITS

15.1    The Group has obtained, and has materially complied with the terms and conditions of, each Permit.

15.2    Each Permit is in force and unconditional or subject only to a condition that has been satisfied. To the best of such Seller's knowledge, information and belief, no Permit will be revoked, suspended, cancelled, varied or not renewed.

15.3    Each action required for the renewal or extension of each Permit has been taken.

15.4    To the best knowledge of such Seller, no Permit will be revoked, suspended, cancelled, varied or not renewed as a result of the execution or performance of this Agreement or any document to be executed at or before Completion.

## 16.    INSOLVENCY, WINDING UP, ETC.

16.1    For the purpose of this Paragraph 16, "**Proceeding**" means any claim, action, arbitration, audit, examination, investigation, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private), provisional attachment (*kari-sashiosae*), attachment (*sashiosae*), preservative disposition (*hozen-shobun*), protective attachment (*hozen-sashiosae*), procedure for collection of tax delinquency (*tainou-shobun*), compulsory execution (*kyosei-shikko*), provisional injunction (*kari-shobun*), other judicial or administrative proceeding and any other formal or informal inquiry, investigation or inspection commenced or threatened to be commenced, brought, heard or otherwise conducted by or before any governmental authority or arbitrator, and "**Bankruptcy Proceeding**" means bankruptcy proceedings (*hasan*), corporate reorganization proceedings (*kaisha kosei*), civil rehabilitation proceedings (*minji saisei*), special liquidation (*tokubetsu seisan*), and other similar proceedings under applicable law or any rules or regulations of any governmental authority.

16.2    There is no pending Proceeding that has been commenced, or no threat of any Proceeding commencing, against the Group that challenges, or may prevent, delay or otherwise interfere with, the transaction contemplated under this Agreement.

16.3    No Bankruptcy Proceeding has been commenced, or no threat of any Bankruptcy Proceeding commencing, with respect to the Group, and the Group has not suspended its payments and is not insolvent.

## 17.    LITIGATION AND COMPLIANCE WITH LAW

17.1    **Litigation**

(a)    Neither the Group nor a person for whose acts or defaults the Group may be vicariously liable is involved, or has during the two years ending on the date of this Agreement been involved, in any material civil, criminal, arbitration, administrative or other proceeding. No material civil, criminal, arbitration, administrative or other proceeding is pending or, to the best of such Seller's knowledge, information and belief, threatened by or against the Group or a person for whose acts or defaults the Company may be vicariously liable.

(b)    To the best of the Sellers' knowledge, information and belief, no fact or circumstance exists which might give rise to any material civil, criminal, arbitration, administrative or other proceeding involving the Group or a person for whose acts or defaults the Group may be vicariously liable.

(c)     There is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or governmental agency against the Group or a person for whose acts or defaults the Group may be vicariously liable.

## 17.2    Compliance With Law

The Group has conducted its business and dealt with its assets in all material respects in accordance with all applicable laws and regulations and legal and administrative requirements.

## 17.3    Investigations

There is not and has not been any governmental or other enquiry or disciplinary proceeding concerning the Group and none is pending or threatened.   To the best of such Seller's knowledge, information and belief, no fact or circumstance exists which might give rise to an investigation, enquiry or proceeding of that type.

## 17.4    Making Unlawful Payments

To the best of Sellers' knowledge, neither the Group nor any person for whose acts or defaults the Company may be vicariously liable has paid, offered, promised, given or authorised the payment of money or anything of value directly or indirectly to any person:

(a)     intending to induce a person to improperly perform a function or activity or to reward a person for any such performance; or

(b)     while knowing or believing that the acceptance by that person would constitute the improper performance of a function or activity.

## 17.5    Receiving Unlawful Payments

To the best of Sellers' knowledge, neither the Group nor any person for whose acts or defaults the Group may be vicariously liable has directly or indirectly requested, agreed to receive or accepted money or anything of value:

(a)     as a reward for the improper performance of a function or activity by any person;

(b)     in circumstances which amount to an improper performance of a function or activity; or

(c)     intending that as a consequence of any such request, agreement to receive or acceptance a function or activity will be performed improperly.

## 18.    DATA PROTECTION AND CYBERSECURITY

18.1    The Group has complied with the Personal Data Protection Act (Law No. 57 of 2003, as amended) in Japan and all other applicable laws and regulations regulating data protection, privacy or the recording, monitoring or interception of communications (the

DocuSign Envelope ID: 17292B85-FF60-4B08-8AB9-9F6967BAD918

"**Data Protection Laws**"), except where it would not have a Material Adverse Effect on the Group taken as a whole.

18.2 Other than in connection with the Crypto-asset Breach, to the knowledge of such Seller, no other unauthorized party has access to or has had access to any hot, cold and warm wallets associated with any customer digital assets of the Group.

## 19. ARTICLES OF INCORPORATION, REGISTERS AND RETURNS

### 19.1 Articles of Incorporation

The Group is operating and has always operated its business in all material respects in accordance with its Articles of Association or any constitutional documents at the relevant time.

### 19.2 Registers

Each register, minute book and other book which the Group is required by law to keep has been properly kept and contains a proper record of the matters which it is required by the relevant law to record, except where it would not have a Material Adverse Effect on the Group taken as a whole or the Purchaser. No notice has been received or allegation made that a register or book is incorrect or should be rectified.

### 19.3 Returns

All returns, particulars, resolutions and other documents required to be delivered by the Group to the Legal Affairs Bureau (*houmu kyoku*) or another governmental or other authority or agency have been properly prepared and delivered.

## 20. BROKERAGE OR COMMISSIONS

No person is entitled to receive a finder's fee, brokerage or commission from the Group in connection with this Agreement.

## PART B
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

1.    **Incorporation**

The Purchaser is a company duly incorporated and validly existing under the laws of Antigua and Barbuda.

2.    **Right, power, authority and action**

(a)    The Purchaser has the right, power and authority, and has taken all action necessary, to execute, deliver and exercise its rights, and perform its obligations, under this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement.

(b)    The entry into and performance by the Purchaser of, and the transactions contemplated by this Agreement and each document to be executed at or before Completion in connection with the transactions contemplated under the Agreement do not conflict with, or result in a breach of:

(i)    any law or regulation applicable to it;

(ii)    its constitutional documents (if applicable); or

(iii)    any document which is binding upon it.

(c)    The Purchaser has the right, power and authority to conduct its business as conducted at the date of this Agreement.

3.    **Anti-Social Forces**

The Purchaser is not, does not have any dealings with, and is not otherwise related to, any Anti-Social Forces.

4.    **Binding agreements**

The Purchaser's obligations under this Agreement and each document to be executed at or before Completion are, or when the relevant document is executed will be, enforceable in accordance with their terms.

5.    **Funds**

At Completion, the Purchaser will have adequate funds and assets sufficient to pay for the Initial Cash Consideration, the Retained Cash Consideration, the Crypto Consideration and other amounts to be paid by the Purchaser under this Agreement.

6.    **Share Issuance**

At Completion, the Purchaser completes all necessary procedures to issue and allot the Consideration Shares to the Sellers in compliance with the applicable laws, regulations and rules. Upon issuance, the Consideration Shares are fully paid or credited as fully paid and free from all Encumbrances together with all rights attaching thereto.

7.    **Information**

All statements in the Disclosure Documents in relation to the Purchaser and all documents and information provided or made available by or on behalf of the Purchaser for the purpose of preparation of the Disclosure Documents are true, accurate and not misleading in all material respects and has not omitted any information the omission of which would make any statement in the Disclosure Documents misleading in any material respect.

8.    **Completeness of Disclosure**

All information contained in this Agreement and all other information furnished by or on behalf of the Purchaser to the Sellers or the Sellers' advisers before and during the negotiation leading up to this Agreement is true and accurate in all material respects.

## SCHEDULE 7
## SELLER ACTIONS PENDING COMPLETION

Unless otherwise directed or approved in advance by the Purchaser in writing or contemplated under this Agreement, the Sellers shall ensure that each Group Company will:

1. not amend, or agree to amend, the Articles of Incorporation;

2. not approve a transfer of Shares by any Shareholder except for the transfers contemplated under this Agreement and the Minority Shareholders SPA except for certain contemplated transfers as provided in the Disclosure Schedules;

3. not create, allot, issue, acquire, repay or redeem any share or loan capital or agree, arrange or undertake to do any of those things or acquire or agree to acquire, an interest in a corporate body or merge or consolidate with a corporate body or any other person, enter into any demerger transaction or participate in any other type of corporate reconstruction;

4. not pass any resolution for its dissolution, winding up or liquidation or enter into any composition, reconstruction or arrangement with its creditors generally;

5. excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not acquire or dispose of, or agree to acquire or dispose of, any revenues, assets, business or undertakings exceeding in total JPY100,000,000;

6. excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not to assume or incur, or agree to assume or incur, a liability, obligation or expense (actual or contingent) exceeding in total JPY100,000,000;

7. excluding items in the ordinary course of business or in connection with the Crypto Asset Breach, not make, or agree to make, capital expenditure exceeding in total JPY100,000,000 (or its equivalent at the time) or incur, or agree to incur, a commitment or commitments involving capital expenditure exceeding in total JPY100,000,000 (or its equivalent at the time);

8. not declare, pay or make a dividend or distribution or any reduction of capital;

9. not create, or agree to create or amend, an Encumbrance over any property or asset or redeem, or agree to redeem, an existing Encumbrance over any property or asset;

10. not enter into a long-term, onerous, unusual or material agreement, arrangement or obligation in each case, involving consideration, expenditure or Liabilities in excess of JPY500,000,000 other than in the ordinary course of business;

11. not amend or terminate a material agreement, arrangement or obligation to which it is a party or terminate any contract or commitment which is not capable of being terminated without compensation or which is not in the ordinary course of business or which involves or may involve total annual expenditure of JPY500,000,000;

12.    not amend the terms and conditions of employment or engagement of a director or officer or provide, or agree to provide, a gratuitous payment or benefit to a director or officer (or any of their dependants);

13.    not amend, or agree to amend, the terms of its borrowing or indebtedness in the nature of borrowing or create, incur, or agree to create or incur, borrowing or indebtedness in the nature of borrowing, in each case involving an amount of greater than JPY100,000,000;

14.    not give, or agree to give, a guarantee, indemnity or other agreement to secure, or incur financial or other obligations with respect to, another person's obligation;

15.    not make any material changes to its accounting or book-keeping practices or policies;

16.    not commence any claim or litigation or arbitration proceedings, nor compromise, settle, release, discharge or compound any claim or litigation or arbitration proceedings or any action, demand or dispute or waive a right in relation to any claim or litigation or arbitration proceedings;

17.    conduct its business in all material respects in accordance with all applicable legal and administrative requirements in any jurisdiction;

18.    not carry out any activities or actions which are likely to cause a Material Adverse Effect; and

19.    co-operate with the Purchaser to:

(a)    allow the Purchaser and its agents, upon reasonable request, access to, and to take copies of, the books and records of the Company to a reasonable extent; and

(b)    ensure the efficient continuation of management and operations of the Company after Completion.

## SCHEDULE 8
## DISCLOSURE SCHEDULES

These Disclosure Schedules (the "*Disclosure Schedules*") have been prepared and delivered in connection with the Agreement for the Sale and Purchase of Shares in Liquid Group Inc. (Major Shareholders) (the "*Agreement*"), dated as of November 19, 2021 among FTX Trading Ltd., Liquid Group Inc., IDG China Venture Capital Fund V L.P., IDG Bitmain Fund L.P., IDG China V Investors L.P., JAFCO SV4 Investment Limited Partnership, Kariya Kayamori, and Seth Melamed. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

In disclosing the information provided in these Disclosure Schedules, the Sellers expressly do not waive any attorney-client privilege associated with such information.

The information contained in any clause or paragraph of these Disclosure Schedules shall be deemed to be disclosed in any other clause or paragraph of these Disclosure Schedules to the extent the relevance of such information to such other clause or paragraph is reasonably apparent.

The inclusion of an item in these Disclosure Schedules as an exception to a representation or warranty made by any of the Sellers in the Agreement shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would have a Material Adverse Effect or that such item is required to be listed therein.

No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

Certain agreements and other matters are listed in these Disclosure Schedules for informational purposes only and in no event shall the listing of such agreements or other matters be deemed or interpreted to broaden or otherwise amplify the scope of the representations and warranties or covenants of any of the Sellers in the Agreement.

Headings have been inserted in these Disclosure Schedules for convenience of reference only and shall not be deemed to modify or influence the interpretation of information contained in these Disclosure Schedules.

When a contract, agreement, instrument or other document is referred to herein and copies of such contract, agreement instrument or other document have been made available to the Purchaser, the disclosure contained herein shall be qualified in their entirety by reference to the terms thereof.

**Paragraph 2.2 of Part A of Schedule 6**

1.    Quoine Pte. Ltd. is the issuer of the QASH token, which it sold between 6 November 2017 and 8 November 2017 on the QRYPTOS exchange pursuant to the LIQUID by QUOINE Whitepaper in substantially the form disclosed to the Purchaser ("**Token Sale**").   Quoine Pte. Ltd. announces developments to the features and utilities of the QASH token via its blog located at https://blog.liquid.com/.   Quoine Pte. Ltd. may have ongoing obligations to the purchasers and/or holders of the QASH token in connection with the Token Sale and the ongoing development of the QASH token and the Liquid exchange.

**Paragraph 3.1 of Part A of Schedule 6**
**The Target Shares, the Target Options and the Target Warrants**

**3.1(a)**

1.      Mr. Melamed has proposed to make some or all of the following share transfers prior to the Completion:

      a.      500 Common Shares to four individuals, including three members of the Group's management team and a former employee of the Group who currently provides blockchain services as an independent service provider; and

      b.      2400 Common Shares to immediate family members.

**3.1(d)**

1.      Each of the holders of the Company's Series A preferred stock has the right to purchase up to its pro rata share of any new shares proposed to be issued by the Company, pursuant to a stock subscription agreement dated May 25, 2016 by and between the Company and each such shareholder.

DocuSign Envelope ID: 17292B85-FF50-4B00-8AB0-8F6967BAD818

**Paragraph 3.2 of Part A of Schedule 6**
**Affiliates**

**3.2(b)**

1.    The Group has engaged in discussions with Chinh Nguyen, formerly an employee of Quoine Vietnam Company Limited and currently providing blockchain services to the Group as an independent service provider through an entity controlled by him, regarding the potential establishment of a new entity whose business would focus primarily on the development of a decentralized finance wallet product, among other things.  It is anticipated that the entity's management team, including Mr. Nguyen, would hold a minority ownership interest in the entity and that the remaining ownership interests would be held by the Group.

**Paragraph 5.1 of Part A of Schedule 6**
**Changes Since the Last Accounting Date – General**

**5.1(b)**

1.      Reference is made to the Crypto Asset Breach.

**Paragraph 5.2 of Part A of Schedule 6**
**Changes Since the Last Accounting Date – Specific**

**5.2(b)**

1.    At the second ordinary general meeting of Shareholders held on December 30, 2020, the Shareholders approved resolutions on the following matters:

    a.    approval of financial statements for the Company's second fiscal year;
    b.    reappointment of five directors;
    c.    delegation of authority to issue stock options to employees;
    d.    partial amendment to the Articles of Incorporation; and
    e.    appointment of independent auditors.

2.    At a class meeting of holders of Common Shares held on December 30, 2020, the holders of Common Shares approved resolutions on the following matter:

    a.    delegation of authority to issue stock options to employees.

**Paragraph 6.1 of Part A of Schedule 6**
**General**

**6.1(a)**

1.    Quoine Pte. Ltd. received a letter dated August 27, 2021 from a law firm representing the City of Philadelphia providing notice that anyone engaged in a business, profession, or other for-profit activity in Philadelphia must file and pay Business Income & Receipts Tax returns.  The letter does not provide an assessment of whether Quoine Pte. Ltd. is in fact required to file annual returns or make any tax payments to the City of Philadelphia.  Quoine Pte. Ltd. is evaluating the requirements to determine if any such annual returns or tax payments may be necessary.

**6.1(b)**

1.    The Group has deferred certain tax payments in accordance with the deferred tax payment schedule disclosed to the Purchaser.  The deferred amounts that remain outstanding are JPY 444,879,669 for Quoine Corporation and SGD 685,357 for Quoine Pte. Ltd., and the Group has sufficient cash on hand to pay such amounts.  Such amounts are subject to revision upon completion of audited financial statements.  The reason for this deferment is largely based on the necessity for the advance pricing agreement calculation to determine the percentage of transfer tax allocation to Quoine Corporation and Quoine Pte. Ltd.  This cannot be completed until the financial audit of Quoine Pte. Ltd. is completed.  More recently, the Group has taken advantage of the tax deferment allowed in Japan due to the COVID-19 pandemic.

**Paragraph 7.1 of Part A of Schedule 6**
**Assets – Sufficiency of Assets**

**7.1(a)**

1.  The Group intentionally has taken a short position on USDT.  As of November 17, 2021, the aggregate customer balance of USDT is 19,195,176.76 and the amount controlled by the Group (including wallets controlled directly by the Group and accounts at external exchanges is USDT 18,522,001.31, corresponding to a deficit of USDT 673,175.45.  The USDT deficit is offset by an excess of USDC, for which the amount controlled by the Group exceeds the aggregate customer balance by USDC 8,114,905.35.

**Paragraph 8.3 of Part A of Schedule 6**

1.     Quoine Pte. Ltd. has granted a license to Liquid Financial USA Inc. to access Quoine Pte. Ltd.'s digital asset trading and exchange platform under the License and Support Agreement dated April 13, 2019 (the "**US License Agreement**") and to allow U.S. citizens and residents to engage in transactions supported by the System, all in accordance with the terms of such agreement.

## Paragraph 9.1 of Part A of Schedule 6
## Validity of Agreements

**9.1(b)**

1.  Quoine Pte. Ltd. and Salesforce.com Singapore Pte. Ltd. are parties to Contract 2360897 governed by Salesforce.com's standard Master Services Agreement.   Quoine Pte. Ltd. has not paid an outstanding balance of USD 1,046,001.16 under invoices 17534416 and 18134420 issued thereunder.   A settlement has been reached whereby Quoine Pte. Ltd. will pay 12 monthly payments of USD 37,500 beginning June 15, 2021 followed by 3 monthly payments of USD 50,000, for a total of USD 600,000 (the "**Settlement Amount**").   Pending the execution of a definitive settlement deed, the parties have agreed by email that "The entire unpaid Settlement Amount is accelerated and immediately due and payable in the event of a change in control or in the event Quoine is able to raise USD 20 million or more in additional capital or loan funding."   Quoine Pte. Ltd. has not repaid the entire remainder of the Repayment Amount, but has continued to pay the agreed installments, following the Company's receipt of a loan in the amount of USD 120 million from the Purchaser and Quoine Pte. Ltd.'s subsequent capital increase of approximately USD 90 million through the allotment of shares to the Company.   The Group has sufficient cash on hand to pay the remainder of the Settlement Amount upon the Completion.

2.  The objectives of the joint venture described in paragraph 9.2(b) have not been achieved. The likelihood and validity of any potential breach of contract claims by Liquid Financial USA Inc. against Quoine Pte. Ltd. under the US License Agreement or by Venture Capital Partners against the Company under the Stockholders Agreement dated April 13, 2019 cannot be ruled out have not been assessed by the Group.

3.  Quoine Pte. Ltd. has contracted for annual licenses for Oracle ERP cloud services for the five-year period ending September 14, 2023 pursuant to a Statement of Work with Quoine Pte. Ltd. for Oracle ERP Cloud Implementation & Support dated October 16, 2018 and Master Services Agreement dated October 15, 2018 between Tech Mahindra Limited and Quoine Pte. Ltd.   Quoine Pte. Ltd. has not paid the annual license fee of USD 130,274 for each of the years beginning September 15, 2020, September 15, 2021, and September 15, 2022.   The Group ceased using the Oracle ERP cloud services in February 2021, except as necessary for the confirmation of audit adjustments, and expects to cease all usage after November 30, 2021.

**Paragraph 9.2 of Part A of Schedule 6**
**Material Agreements**

**9.2(a)**

1.  During the term of the US License Agreement, without the prior written consent of Liquid Financial USA Inc., Quoine Pte. Ltd. is not permitted to allow, authorize, license or permit any third party to use any of its trademarks, or use or access Quoine's existing digital asset trading and exchange platform, for the purpose of making available or providing to U.S. persons any asset trading or related services that are directly competitive to the business of Liquid Financial USA Inc. For the avoidance of doubt, the aforementioned restrictions in the US License Agreement does not prevent the Purchaser from licensing or making available (directly or indirectly) its own digital asset trading and exchange platform and associated technologies to any U.S. persons.

2.  Group Companies are parties to the following agreements with terms of at least two years:
    a.  The US License Agreement
    b.  Settlement Agreement dated 29 September 2020 between Quoine Pte. Ltd. and B2C2 Limited.
    ***c.***  Statement of Work for Oracle ERP Cloud Implementation & Support dated October 16, 2018 between Tech Mahindra Limited and Quoine Pte. Ltd.
    d.  Order Form dated August 7,2020 between Quoine Corporation and Cloudflare, Inc.
    e.  Lease Agreement dated March 16, 2020 between Quoine Corporation and 株式会社 Mega (Fortinet)
    f.  Lease Agreement dated June 1, 2018 between Quoine Corporation and Fuji Xerox Tokyo Corporation
    g.  Order Form dated May 26, 2021 between Quoine Corporation and Reciprocity, Inc. (Zen GRC)
    h.  Order Form dated July 16, 2020 between Quoine Corporation and Sumo Logic, Inc.
    i.  Lease Agreement dated October 20, 2021 between Quoine Corporation and Plaza Home Corporation.
    j.  Agreement dated March 1, 2020 between Quoine Corporation and SOMPO Himawari Life Insurance Corporation.
    k.  Order Form date July 30,2019 between Quoine Vietnam and Nam Truong Son Integration Corp (Sophos)
    l.  Order Form dated August 1, 2020 between Quoine Pte Ltd and Intercom R&D Unlimited Company
    m.  Order Form dated April 1, 2020 between Quoine Pte and IVXS Technology SG Pte Ltd (Comply Advantage)
    n.  License Agreement dated December 15, 2018 as amended March 7, 2021 between Quoine Pte. Ltd. and Unbound Tech Ltd

o. Service Agreement dated January 1, 2019 between Quoine Pte. Ltd. and Pay Asia Pte Ltd

3. Quoine Pte. Ltd. has sold to OP Sasco LLC ("**OP**") the underlying claim relating to BitSpread Ltd disclosed in item 1 of Paragraph 17.1(a) of Part A of Schedule 6 in exchange for a share of any amounts that may be recovered by OP from Bitspread Ltd., pursuant to an Assignment Agreement dated October 26, 2021.

**9.2(b)**

1.  The Company and Virtual Currency Partners, L.P. ("**VCP**") each own 50% of the shares of Liquid Financial USA Inc., an entity established for the purpose of operating a business (either itself or through a wholly-owned subsidiary) through which certain features of the Liquid exchange would be made available to users located in the U.S. Liquid Financial USA Inc. is not operational and is in the process of winding down. Under the Liquid Financial USA Inc. Stockholders Agreement dated April 13, 2019 by and among VCP, the Company, and Liquid Financial USA Inc., upon the occurrence of certain events Liquid USA is required to redeem a number shares of Liquid Financial USA Inc. calculated in accordance with the provisions of such agreement.  To the Company's knowledge, Liquid Financial USA Inc. has not effected such redemption notwithstanding that the specified events requiring redemption have occurred.

**Paragraph 11 of Part A of Schedule 6**
**Effect of Sale**

1.      Reference is made to the disclosures in item 1 of Paragraph 9.1(b) of Part A of Schedule 6.

2.      Reference is made to the disclosures in item 1 of Paragraph 15.4 of Part A of Schedule 6.

3.      The Monetary Authority of Singapore (the "**MAS**") has not been notified of the Agreement or the transactions contemplated thereby.   It is possible that the execution or the performance of the Agreement may negatively impact the license application (the "**Application**") submitted by Quoine Pte. Ltd. under the Payment Services Act 2019 (No. 2 of 2019) (the "**PS Act**"), which may result in the loss of Quoine Pte. Ltd.'s exemption under the Payment Services (Exemption for Specified Period) Regulations 2019 to operate part or all of its business in Singapore.   In particular, the case officer responsible for Quoine Pte. Ltd.'s Application has previously indicated that he expects that approval by the MAS is required under section 28 of the PS Act before there is any change in an applicant's controlling shareholders.   We also understand that this change of ownership constitutes a material change in Quoine Pte. Ltd.'s business plan.   It is uncertain whether the execution of this Agreement prior to obtaining approval from MAS may be deemed a breach of such requirement.

**Paragraph 12.1 of Part A of Schedule 6**
**General**

**12.1(d)**

1.      Due to perceived limitations in the Company's ability to amend the terms of its Stock Options, the Management Shareholders and certain holders of Stock Options entered into a Stock Options Equalization Agreement dated December 20, 2019.   The Management Shareholders agreed to make certain payments to such holders in connection with certain change of control transactions in accordance with the terms of such agreement.

**Paragraph 12.2 of Part A of Schedule 6**
**Compliance With Law**

**12.2(c)**

1.    By letter dated December 4, 2020, Quoine Corporation offered three available roles to a member of the Trading Technology team who was then on medical leave.  The employee informed the company of his resignation on or around December 15, 2020 and, in an email to all Group personnel, alleged that Quoine Corporation had violated his employment contract.  The employee has not made any claim against Quoine Corporation since his resignation.

2.    Three employees of Quoine Pte. Ltd. or Quoine Vietnam Company Limited were the subject of internal investigations due to suspicious account activities and personal behavior in connection with the Crypto Asset Breach:

    a.    An employee of Quoine Vietnam Company Limited under investigation agreed to resign from his position as a DevOps Engineer effective October 15, 2021.  The Company intends to submit a denouncement of the employee to the Department of Cybersecurity and High-Tech Crime Prevention and Fighting (A05) under the Ministry of Public Security and Ho Chi Minh City Police for their verification and investigation under the Criminal Procedure Code.

    b.    An employee of Quoine Vietnam Company Limited under investigation will leave his position as Developer due to the expiration of his employment contract effective October 18, 2021.  The Company is assessing whether to initiate a criminal investigation.

    c.    An employee of Quoine Pte. Ltd. serving as Head of Product (Japan) was notified of the termination of her employment for cause, effective October 7, 2021, for failure to comply with management's instructions in connection with its investigation of the Crypto Asset Breach.  The Company is assessing whether to file criminal charges against the employee.  The Company anticipates that the employee may threaten the Group Companies with one or more claims, including for breach of the employment contract and breach of agreements pertaining to share subscription rights (i.e., stock options) held by the employee.

**Paragraph 12.3 of Part A of Schedule 6**
**Incentive Schemes**

1.    In March 2021 the Group announced to employees a revised compensation structure to be effective April 2022, which will contain a base salary component and a component based on individual performance as described in the Salary Policy provided to the Purchaser.

2.    On July 9, 2021, the Group announced to employees via a townhall meeting a one-time bonus in connection with the achievement of certain regulatory milestones, independent of annual performance bonuses that may be paid in the ordinary course of business. Only those employees with full-time employment status as of July 1, 2021 are eligible for the bonus.   The amount of the one-time bonus has been fixed at one month of salary per employee and currently is anticipated to be paid in March 2022.   The Group has made a provision of JPY 48,000,000 for the bonus payments.

3.    On July 27, 2021, the Company's board of directors approved amendments to the terms applicable to the Stock Options and to new stock option grants in substantially the form disclosed to the Purchaser.   Holders of Stock Options who are currently employed by the Group Companies have entered into amendment agreements reflecting such amended terms.

4.    In April 2019, QASH retention awards were granted to Group employees such that QASH tokens would be distributed in four annual installments beginning April 2020. A maximum of 892,500 QASH tokens remain to be distributed in April 2022, and 892,500 QASH tokens remain to be distributed in April 2023, subject in each case to the applicable employees being employed by the Group at the time of distribution.

5.    Quoine Corporation has received notice of resignation from the Group's Head of Middle Office and Treasury Management, effective November 21, 2021.

**Paragraph 13.2 of Part A of Schedule 6**

1.    Quoine Pte. Ltd. provides private health insurance to current employees who are Singapore residents.

2.    Quoine Vietnam Company Limited provides private health insurance and annual health check-ups to current employees in Vietnam.

3.    Quoine Corporation maintains a defined contribution plan, provides private insurance (*Himawari seimei*), and pays a work from home allowance and a transportation allowance for employees in Japan.

**Paragraph 14.1 of Part A of Schedule 6**
**Indebtedness**

1.      The Purchaser extended a loan in the principal amount of USD 120,000,000 to the Company pursuant to the Loan Agreement between the Purchaser and the Company dated August 30, 2021.

2.      Quoine Pte. Ltd. borrowed GYEN stablecoins in the principal amount of GYEN 300,000,000 from GMO-Z.com Wyoming LLC pursuant to a Master Loan Agreement and Loan Borrower Request dated June 29, 2021, as amended.   The principal amount and corresponding loan fee are due and payable in GYEN on November 30, 2021.

**Paragraph 15.1 of Part A of Schedule 6**

1.  Quoine Corporation maintains a crypto asset exchange operator license issued by the Financial Services Agency.   In June 2018 the Financial Services Agency issued business improvement orders to several licensed crypto asset exchange operators, including Quoine Corporation.   Quoine Corporation was required to provided monthly reports to the Financial Services Agency in connection with improvement efforts in specified business areas.   The Financial Services Agency notified Quoine Corporation on 30 June 2021 that it would no longer be subject to monthly reporting requirements.

2.  The Financial Services Agency issued a reporting order (報告徴求命令) to Quoine Corporation on 7 September 2021 in connection with the Crypto Asset Breach.

3.  Quoine Pte. Ltd. previously permitted residents of the U.S. to open accounts and trade on its cryptocurrency exchange. Quoine Pte. Ltd. does not hold any Permits from any U.S. state or national governmental authority. There are no longer any U.S. residents authorized to trade on its cryptocurrency exchange.

4.  Quoine Pte. Ltd. received a notice from the Korea Financial Intelligence Unit ("**KoFIU**") indicating that virtual asset service providers ("**VASP**") operating businesses in Korea should register with the KoFIU under the Act on Reporting and Using Specified Financial Transaction Information no later than 24 September 2021 and that the Group's business is deemed to meet the definition of a VASP outlined by such Act.   The Group has not registered with the KoFIU but has taken steps intended to take the Group out of the scope of the registration requirements in Korea, including to remove its Korean language materials.

5.  Quoine Pte. Ltd. operates globally and has not assessed the requirements, if any, for Permits in all jurisdictions where its customers may be located, domiciled, incorporated, or organized.

6.  Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

7.  Quoine Pte. Ltd. offers a crypto-asset contracts-for-difference trading product referred to as Liquid Infinity.  In the Consultation Response on MAS' consultation on the Proposed Regulatory Approach for Derivatives Contracts on Payment Tokens, the MAS defined "Payment Token Derivatives" as derivatives contracts that reference payment tokens as underlying assets and indicated that "The PS Act's requirements are right-sized to cover the risks posed by the payment activities of payment service providers. PS Act licensees therefore should not offer Payment Token Derivatives under its suite of activities as the risks associated with Payment Token Derivatives are not intended to be addressed by the PS Act."   Quoine Pte. Ltd. is currently evaluating options and may cease offering Liquid Infinity in light of these regulatory restrictions.

8.      Quoine Pte. Ltd. lends crypto assets and fiat currency to users for the purpose of margin trading.   We understand that there may be some regulatory restrictions in the scope of such offerings, and in particular, section 20(1) of the PS Act requires that "A licensee must not carry on a business of granting any credit facility to any individual in Singapore."   Quoine Pte. Ltd. is evaluating and may cease offering margin trading to individual customers in Singapore.

**Paragraph 15.2 of Part A of Schedule 6**

1.    Quoine Pte. Ltd. operates its business in Singapore under an exemption from holding a license under the Payment Services (Exemption for Specified Period) Regulations 2019 of Singapore.   The exemption will cease on the date that Quoine Pte. Ltd.'s license application under the Payment Services Act 2019 is approved or rejected by the Monetary Authority of Singapore or withdrawn by the applicant.

2.    Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

**Paragraph 15.4 of Part A of Schedule 6**

1.   The Financial Services Agency has informed the Group and the Purchaser that the Purchaser must satisfy certain conditions, including with respect to its compliance with applicable laws, prior to the completion of the transactions contemplated by the Agreement.   The Financial Services Agency may revoke, suspend, cancel, or vary a Type I Financial Instruments Business Operation license (the "**Type I License**") or the Crypto-Asset Exchange Service Provider Registration held by Quoine Corporation or decline to grant a Type I License to Quoine Corporation if such conditions are not satisfied prior to the Completion.

2.   Reference is made to the disclosures made in item 3 under Paragraph 11 of Part A of Schedule 6.

## Paragraph 17.1 of Part A of Schedule 6
## Litigation

**17.1(a)**

1. On 25 March 2019, Quoine Pte. Ltd. commenced a legal action against BitSpread Ltd in the Singapore High Court with case reference number HC/S 317/2019 claiming repayment of certain fiat currency and cryptocurrency loans and/or credit lines (plus interest and costs) previously extended to Bitspread Ltd for purposes of their trading activity on Quoine Pte. Ltd.'s exchange.   On 11 September 2020 default judgment was entered against BitSpread Ltd for the Claim Amount.

2. On 7 January 2021 Quoine Pte. Ltd. filed a criminal complaint to the Delhi Cyber Crime Cell against Flying Saucer E-Commerce Private Limited ("**Flying Saucer**") and its directors, which has subsequently registered under FIR No. 98/2021.   The complaint related to Flying Saucer's failure to pay to Quoine Pte. Ltd. amounts in INR deposited by Indian customers to bank accounts controlled by Flying Saucer on Quoine Pte. Ltd.'s behalf.   On 23 June 2021 Flying Saucer and Quoine Pte. Ltd. entered into a settlement agreement under which Flying Saucer and its directors would pay a settlement amount of INR 330,070,000 to Liquid Group's Indian subsidiary, Quoine India Private Limited. Payments of the settlement amount were completed on or around 2 July 2021.   Pending Quoine India Private Limited's application to the Reserve Bank of India for the cross-border transfer of funds, Quoine India Private Limited has been unable to transfer the proceeds of the settlement to Quoine Pte. Ltd.   Approval of such transfer is subject to the discretion of the Reserve Bank of India and, if successful, is anticipated to take at least six months.

3. Court proceedings were commenced by B2C2 Limited ("**B2C2**") against Quoine Pte. Ltd. in the Singapore High Court on 18 May 2017 with case reference number SIC/S 7/2017.  Those proceedings related to B2C2's claim that in April 2017 Quoine Pte. Ltd. had wrongfully reversed certain trades involving B2C2 which were carried out on its virtual currency exchange, QUOINEX. On 9 October 2020 Quoine Pte. Ltd. and B2C2 entered into a Settlement Agreement whereby B2C2 received a sum of USD 3,250,000 out of the sum of USD 4,000,000 previously paid into the court by Quoine Pte. Ltd. and Quoine Pte. Ltd. received the remainder of USD 750,000.   Such payments have been completed.   In addition, B2C2 is entitled to a refund of all trading fees it pays Quoine Pte. Ltd. in connection with its trading activities on the exchange platform operated by QE for a period of two years starting from 9 October 2020, up to a maximum amount of USD 250,000 or its equivalent. The action in SIC/S 7/2017 has been discontinued. B2C2 has not incurred any trading fees since such time, and no payments are owed to B2C2.

4. A customer filed suit against Quoine Corporation alleging that following the plaintiff's instructions around April 12, 2017 for a withdrawal of BTC 41.91165919, Quoine Corporation erroneously transferred such BTC to a recipient other than the plaintiff.

The plaintiff sought the retransmission of BTC 41.91165919 to a wallet designated by the Plaintiff.   The parties settled the dispute for JPY 42 million, and such payment has been completed.

5.   Quoine Pte. Ltd. received a Notice of Default and Termination dated 22 November 2019 from a law firm representing SUKU Global in connection with the hosting, on Liquid, of an IEO and Listing for the SUKU Digital Asset. The letter demands a full refund of fees paid to Quoine Pte. Ltd. in the amount of USD 150,000, contains various allegations and claims against Quoine, and asserts SUKU Global's intent "to bring any necessary enforcement action in the United States and assert jurisdiction over you." Quoine Pte. Ltd. delivered a reply to the law firm dated 4 December 2019 in which it rejected the assertion of any U.S. court's jurisdiction over Quoine Pte. Ltd. and denied each allegation and claim set out in the 22 November 2019 letter.   There have been no further communications from the law firm since December 2019.

6.   In December 2017 a customer informed Quoine Pte. Ltd. that a third party allegedly gained unauthorized access to the email account associated with the customer's account login ID on the Qryptos exchange operated by Quoine Pte. Ltd.   Upon gaining control of the customer's Qryptos account, the third party sold QASH 140,143 for ETH 26.38360149 and BTC 3.99850070 and withdrew such amounts.   The customer alleged that Quoine Pte. Ltd. was negligent in the performance of its duties, including by allowing the bad actor to reset the account password and disable two-factor authentication.   Demand was made for USD 243,746.43 or, alternatively, ETH 26.38360149 and BTC 3.99850070.   On 19 May 2021, an agreement was reached whereby Quoine Pte. Ltd. would pay USD 50,000 in USDT in full settlement of the matter.   Such payment was completed on 26 May 2021.

7.   In May 2021 a customer made various allegations including that stop loss orders purportedly placed by him on the Liquid exchange disappeared and were not triggered as expected, and that another position was incorrectly liquidated.   The customer's estimation of losses was approximately SGD 130,000 and 0.45 BTC as of 21 July 2021. The customer has threatened to contact media outlets and to bring legal action against Quoine Pte. Ltd.   Quoine Pte. Ltd. denies all of the allegations, and the parties are in discussions to resolve amicably.

8.   Quoine Pte. Ltd. received a letter dated 13 November 2020 containing various allegations against Quoine Pte. Ltd. in connection with the customer's claim of having been defrauded by a third party and requesting reimbursement of USD 87,964.   Quoine Pte. Ltd. received a subsequent letter from the customer dated 13 January 2020 reasserting the allegations and the request for USD 87,964.

9.   Quoine Pte. Ltd. received a letter dated 23 July 2020 from Pepperstone Group alleging that Quoine Pte. Ltd. had come into possession of a list of Pepperstone Group's clients and used such information to solicit such clients' business without consent, and threatening legal action against Quoine Pte. Ltd.   Quoine Pte. Ltd. denied such

allegations.  There have been no communications with Pepperstone Group since 31 July 2020.

10.    Quoine Pte. Ltd. and Quoine Corporation receive complaints from customers in the ordinary course of business involving amounts in controversy of less than the equivalent of USD 100,000.  Various complaints have been settled through direct discussions with the respective customer or, in the case of Quoine Corporation, alternative dispute resolution procedures.

11.    A former employee of Quoine Corporation raised a claim for wrongful termination following his May 2020 dismissal.  Quoine corporation paid an amount of JPY 5 million in settlement of such claim.

12.    Quoine Pte. Ltd. experienced a personal data breach in November 2020.  Quoine Pte. Ltd. has entered into an Expedited Decision Agreement with the Singapore Personal Data Protection Commission ("**PDPC**"), under which Quoine Pte. Ltd. has acknowledged a prima facie breach of the Personal Data Protection Act and the PDPC is expected to expedite its review of the incident and reduce the amount of any penalty assessed.

## 17.1(b)

1.    Reference is made to the matters regarding Salesforce.com Singapore Pte. Ltd. described in item 1 of Paragraph 9.1(b) of Part A of Schedule 6.

2.    Reference is made to the matters regarding Liquid Financial USA Inc. described in item 2 of Paragraph 9.1(b) of Part A of Schedule 6.

3.    Quoine Pte. Ltd. experienced a personal data breach in November 2020.  The Group reported such breach to the data privacy authorities in various jurisdictions. Authorities in certain jurisdictions have not confirmed whether any investigation has been or will be conducted.

4.    Reference is made to item 1 of the disclosures in Paragraph 18.2 of Part A of Schedule 6.  The Group reserves the right to pursue criminal or other proceedings against the former employee in question.

5.    In or around January 2017, Quoine Pte. Ltd. suspended the account of a customer and former employee for violation of the terms and conditions of the QUOINEX exchange. Quoine Pte. Ltd. received a letter dated 3 May 2018 from a law firm representing the customer, which demanded removal of the suspension and remittance of the account balance and threatened legal action in the case of Quoine Pte. Ltd.'s failure to comply. Following discussions in which Quoine Pte. Ltd. asserted claims against the customer for recovery of profits due to improper trading activities, a settlement offer was discussed but not agreed by the parties.   In June 2021, the customer contacted Quoine Pte. Ltd.'s customer support inquiring to reinstate the account.   As of 26 October 2021,

the customer's balance was equal to the equivalent of USD 326,806.61.   The parties have agreed on a settlement whereby Quoine Pte. Ltd. would return USD 98,000 to the customer and retain the remainder.   Quoine Pte. Ltd. has liquidated the customer's balance, completed the payment of USD 98,000, and retained the remaining balance.

6.      Reference is made to the disclosures in item 3 of Paragraph 9.1(b) of Part A of Schedule 6.

7.      Reference is made to the disclosures in item 1 of Paragraph 12.2(c) of Part A of Schedule 6.

8.      Reference is made to the disclosures in item 2 of Paragraph 12.2(c) of Part A of Schedule 6.

9.      In connection with the Crypto Asset Breach, the Group may in its discretion pursue civil, criminal, arbitration, administrative or other proceedings and the Group may be the subject of civil, criminal, arbitration, administrative or other proceedings.

**Paragraph 17.2 of Part A of Schedule 6**
**Compliance With Laws**

1.    Reference is made to the disclosures in item 3 of Paragraph 15.1 of Part A of Schedule 6.

2.    Reference is made to the disclosures in item 4 of Paragraph 15.1 of Part A of Schedule 6.

3.    Reference is made to the disclosures in item 7 of Paragraph 15.1 of Part A of Schedule 6.

4.    Reference is made to the disclosures in item 8 of Paragraph 15.1 of Part A of Schedule 6.

5.    Reference is made to the disclosures in item 5 of Paragraph 17.3 of Part A of Schedule 6.

6.    Reference is made to the disclosures in item 2 of Paragraph 18.1 of Part A of Schedule 6.

7.    Quoine Pte. Ltd. permits residents of China to open accounts and trade on its cryptocurrency exchange notwithstanding announcements from Chinese authorities characterizing cryptocurrency-related business activities as illegal financial activities.

8.    With respect to stock options awarded to employees by the Company, Quoine Vietnam Company Limited has not registered with the State Bank of Vietnam any stock option award program or offshore employee share ownership program ("**ESOP**") or complied with other requirements that may be applicable to an ESOP under Vietnamese law.

9.    Quoine Pte. Ltd. operates globally and has not assessed the laws and regulations, including requirements, if any, for Permits, in all jurisdictions where its customers may be located, domiciled, incorporated, or organized.

## Paragraph 17.3 of Part A of Schedule 6
## Investigations

1. Reference is made to the disclosures made under Paragraph 15.1 of Part A of Schedule 6.

2. Reference is made to the disclosures made in item 12 under Paragraph 17.1(a) of Part A of Schedule 6 and item 3 under Paragraph 17.1(b) of Part A of Schedule 6.

3. Reference is made to the disclosures made in item 8 under Paragraph 17.2 of Part A of Schedule 6.

4. Reference is made to the disclosures made in item 9 under Paragraph 17.2 of Part A of Schedule 6.

5. Quoine Pte. Ltd. offers crypto asset rewards to users subscribed to its Liquid Earn product.  Quoine Pte. Ltd. acquires the crypto assets used to pay such rewards by pooling the crypto assets of users subscribed to its Liquid Earn product, depositing these assets with Celsius Network LLC ("**Celsius**"), and earning crypto asset rewards from Celsius on such assets.  U.S. residents are not permitted to use Quoine Pte. Ltd.'s services, including Liquid Earn.  Quoine Pte. Ltd. received a letter dated October 8, 2021, from the Texas State Securities Board in connection with an enforcement act against Celsius and its affiliates, providing notice that Quoine Pte. Ltd. is required to comply with the Securities Act, Tex. Rev. Civ. Stat. Ann. Arts. 581-1-581-45.  Quoine Pte. Ltd. also received a letter dated October 26, 2021, from the Kentucky Public Protection Cabinet, Department of Financial Institutions, Division of Securities, Enforcement Branch, in connection with an Emergency Order to Cease and Desist against Celsius (the "**Order**"), providing notice that Quoine Pte. Ltd. is required to comply with the Securities Act of Kentucky, KRS Chapter 292 and the Order.

**Paragraph 18.1 of Part A of Schedule 6**

1.      Reference is made to the disclosures made in item 12 under Paragraph 17.1(a) of Part A of Schedule 6 and item 3 under Paragraph 17.1(b) of Part A of Schedule 6.

2.      The Group has not conducted an analysis of all Data Protection Laws in each jurisdiction from which customers may have provided personal data, and there may be deficiencies with respect to compliance with applicable Data Protection Laws.

**Paragraph 18.2 of Part A of Schedule 6**

1.    In May 2021 Group staff discovered the unauthorized withdrawal of BTC from dormant client accounts that had occurred in April 2021.  All affected accounts were with Quoine Pte. Ltd.  During the course of an internal investigation, the Group's Head of DevOps admitted responsibility for the withdrawals and returned all missing assets. The employee was terminated for cause.

**Paragraph 19.3 of Part A of Schedule 6**
**Returns**

1.      The following items have not yet been registered with the Legal Affairs Bureau (*houmu kyoku*):

    a.      the Company's issuance of the 18th, 19th, and 20th Stock Options; and

    b.      the Company's extinguishment of certain Stock Options following the departure of Group employees.

2.      Quoine Pte. Ltd. has not filed annual returns or financial statements with the Accounting and Corporate Regulatory Authority of Singapore for the fiscal years that ended March 31, 2019 and March 31, 2020.

[END]

**EXECUTED** by the parties:

**<u>Sellers</u>**

Signed by **KARIYA KAYAMORI**          )

DocuSigned by:
AF51D8AA2A454C9...

Signed by **SETH MELAMED**          )

DocuSigned by:
_Seth Melamed_
AB51C4F394AE497...

Signed by Chi Sing HO          )
as duly authorised representative of          )
and for and on behalf of          )
**IDG CHINA VENTURE**          )
**CAPITAL FUND V L.P.**          )
By: IDG China Venture          )
Capital Fund V Associates L.P.,          )
its General Partner          )
By: IDG China Venture Capital          )
Fund GP V Associates Ltd.,          )
its General Partner          )

DocuSigned by:
_Simon Ho_
DC2E464F9D444FD...

Signed by Chi Sing HO          )
as duly authorised representative of          )
and for and on behalf of          )
**IDG BITMAIN FUND L.P.**          )
By: IDG Bitmain Fund Associates L.P.,          )
its General Partner          )
By: IDG Bitmain Fund GP          )
Associates Ltd.,          )
its General Partner          )

DocuSigned by:
_Simon Ho_
DC2E464F9D444FD...

Signed by Chi Sing HO          )
as duly authorised representative of          )
and for and on behalf of          )
**IDG CHINA V INVESTORS L.P.**          )
By: IDG China Venture Capital Fund          )
GP V Associates Ltd.          )
its General Partner          )

DocuSigned by:
_Simon Ho_
DC2E464F9D444FD...

Signature Page for Sellers
(Major Shareholders SPA)

Signed by Shinichi Fuki )
as duly authorised representative of )
and for and on behalf of )
JAFCO Group Co., Ltd. )
as General Partner of )
**JAFCO SV4 INVESTMENT** )
**LIMITED PARTNERSHIP** )

DocuSigned by:

*Shinichi Fuki*

4B65754D3CAE46D...

## **Purchaser**

Signed by Sam Bankman-Fried )
as duly authorised representative of )
and for and on behalf of )
**FTX TRADING LTD.** )

DocuSigned by:

*Sam Bankman-Fried*

672DA88132804B9...

**Company**

Signed by Kariya Kayamori )
as the representative director of )
and for and on behalf of )
**LIQUID GROUP INC.** )

AF51D8AA2A454C9...

Signature Page for Company
(Major Shareholders SPA)

# EXHIBIT 3

**FTX JAPAN HOLDINGS K.K.**


AND


**SETH MELAMED**


---

**AMENDED AND RESTATED**

**MANAGEMENT AGREEMENT**

---

# CONTENTS

**Clause**                                                                                          **Page**

1.   Interpretation ...................................................................................................... 1
2.   Appointment ....................................................................................................... 4
3.   Executive's Duties and Responsibilities .......................................................... 4
4.   Remuneration and Other Benefits ................................................................... 6
5.   Indemnification ................................................................................................... 8
6.   Expenses ............................................................................................................. 10
7.   Deductions; Return of Materials ................................................................... 10
8.   Confidentiality ................................................................................................. 10
9.   Intellectual Property Rights ........................................................................... 11
10.  Executive's Warranties and Undertakings .................................................. 12
11.  Termination ...................................................................................................... 13
12.  Notice ................................................................................................................. 14
13.  Legal Representation ...................................................................................... 15
14.  Entire Agreement ............................................................................................ 15
15.  Miscellaneous ................................................................................................... 15
16.  Governing Law and Jurisdiction ................................................................... 16

**THIS AGREEMENT** is made on ___10/19/2022___.

**BETWEEN**:

(1)   **FTX JAPAN HOLDINGS K.K.**, a company incorporated in Japan whose principal place of business is at Hirose Building 4F, 3-17 Kanda Nishikicho, Chiyoda-ku, Tokyo 101-0054, Japan and which was formerly named Liquid Group Inc. (the "**Company**"), on behalf of itself and its wholly owned subsidiary FTX Japan K.K. ("**FTX Japan**"); and

(2)   **SETH MELAMED**, a United States of America national having his address at 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 (the "**Executive**").

**WHEREAS**:

(A)   The Company is a subsidiary of FTX Trading Ltd., a company incorporated in Antigua and Barbuda whose registered office is at Lower Factory Road, St. John's, Antigua and Barbuda ("**FTX**").

(B)   The Company and the Executive previously entered into a Management Agreement dated March 31, 2022 (the "**Prior Agreement**") pursuant to which the Company agreed to appoint the Executive and the Executive agreed to serve the Company as a Representative Director and COO of the Company on the terms and conditions set out in the Prior Agreement.

(C)   The Company and the Executive wish to clarify the terms of certain concurrent appointments of the Executive to FTX Japan and Quoine Pte. Ltd. ("**FTX Singapore**"), a subsidiary of the Company, and have agreed to amend and restate the Prior Agreement on the term and conditions set out below.

**THE PARTIES AGREE** as follows:

**1.   INTERPRETATION**

**1.1   Definitions**

In this Agreement:

"**Accrued Amounts**" means, collectively, the items set forth in Clause 11.5.

"**Affiliate**" means, with respect to any person, any other person controlling, controlled by or under common control with such specified person. For the purposes of this definition, "**control**" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "**controlling**" and "**controlled**" have the meanings correlative to the foregoing.

"**Agreement**" means this Management Agreement, as amended or supplemented in accordance with the terms hereof from time to time.

DocuSign Envelope ID: FDB05FB6-5A72-4BB1-AB43-5E9DBACDB1E5

"**Articles of Incorporation**" means the articles of incorporation (*teikan*) or other analogous constitutional documents of the applicable member of the Group.

"**Board of Directors**" means the board of directors (*torishimariyakukai*, in the case of the Company or FTX Japan) of the applicable member of the Group.

"**Business Day**" means a day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in Tokyo, Japan.

"**Cause**" means any of the following: (a) the Executive willfully engages in conduct that is in bad faith and materially injurious to the Company or a member of the Group, including but not limited to, misappropriation of trade secrets, fraud or embezzlement; (b) the Executive commits a material breach of this Agreement, which breach is not cured within thirty (30) days after receipt of written notice describing in detail such breach; (c) the Executive willfully refuses to implement or follow a reasonable and lawful directive by the Board of Directors of a member of the Group to which the Executive provides services under this Agreement, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the applicable member of the Group; (d) the Executive engages in material misfeasance or malfeasance demonstrated by a continued pattern of material failure to perform the essential job duties associated with his position, which breach is not cured within thirty (30) days after receipt of written notice of such breach from the applicable member of the Group; (e) the Executive becomes disqualified from serving as a director under any applicable law; (f) the Executive engages in a course of vexatious comment or conduct towards employees or consultants of the Company or any member of the Group, that is known or ought reasonably to be known to be unwelcome, and such course of comment or conduct persists despite warnings from the Company or the applicable member of the Group; or (g) the Executive resigns from any position to which he is appointed under Clause 3.1 without the prior approval of the applicable Board of Directors.

"**Childcare Allowance**" has the meaning given in Clause 4.1.

"**Companies Act**" means the Companies Act of Japan (Act No. 86 of 2005), as amended from time to time.

"**Confidential Information**" means any information including, but not limited to, trade secrets, disclosed to the Executive or known by the Executive as a consequence of or through his performance of services hereunder, concerning the business or finances of any member of the Group or any of its dealings, transactions or affairs, including without limitation, lists or details of customers, suppliers, information relating to the working of any process of invention carried on or used by the Company or any member of the Group, information relating to research projects, know-how, technology, trade secrets, prototypes, prices, discounts, mark-ups, future business strategy, marketing and price-sensitive information.

"**COO**" means the chief operating officer of the Company.

"**Crypto Trading Business**" means the development and operations of an exchange trading platform for the sale and purchase of crypto-assets, crypto asset-based derivatives, margin lending, non-fungible tokens, and other crypto asset-based financial products, as carried on by the Company or any member of the Group from time to time.

- 2 -

"**Directors' and Officers' Insurance**" has the meaning given in Clause 5.6.

"**Effective Date**" means the Completion Date as provided for and defined in the Major Shareholders SPA.

"**Expenses**" has the meaning give in Clause 5.1.

"**FTX Board of Directors**" means the board of directors of FTX.

"**FTX Common Shares**" means shares of the common stock of FTX.

"**Good Reason**" means any of the following actions by the Group without the written prior consent of the Executive: (a) a material reduction in the Executive's duties or responsibilities that is inconsistent with the Executive's position, provided that a mere change of title alone shall not constitute such a material reduction; (b) a greater than 10% aggregate reduction (that is, a material reduction) in the Services Fee and his employee benefits (namely, the Housing Allowance, the Childcare Allowance, medical, dental, insurance, short-term and long-term disability insurance and retirement plan benefits, collectively, the "**Employee Benefits**") to which such Executive is entitled immediately prior to such reduction (other than in connection with a general decrease in the salary or Employee Benefits of substantially all employees of the applicable member of the Group); (c) a relocation of the Executive's principal office to a location that increases the Executive's commute by more than 80 kilometers, except for required travel by the Executive on business for the Company, an Affiliate of the Company, or any other member of the Group; (d) a failure to maintain the Executive's concurrent appointment as both Representative Director and COO at any time during the Term; (e) a requirement for the Executive have or adopt a principal place of work, residence or principal residence that, in the opinion of Executive's counsel, would materially increase Executive's tax liability to any nation or jurisdiction, or would cause Executive's total collective tax liability to exceed that which would exist were the Executive a resident of Japan; or (f) a requirement for the Executive to work in a place other than where his spouse and children are located for more than 6 months in total in any period of twelve consecutive months.

"**Group**" means FTX and its Affiliates from time to time and "**member(s) of the Group**" shall be construed accordingly.

"**Housing Allowance**" has the meaning given in Clause 4.1.

"**Intellectual Property Rights**" means all rights in or to any patent, copyright, database rights, registered design or other design right, utility model, trade mark, brand name, service mark, trade name, eligible layout right, chip topography right, trade secrets, know-how and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registrable or not and wherever existing, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights.

"**Major Shareholders SPA**" means the Agreement for the Sale and Purchase of Shares, Stock Options and Warrants in Liquid Group Inc. (Major Shareholders) dated 19 November 2021 entered into between the Executive, the Company and certain other parties thereto.

"**Notice**" has the meaning given in Clause 12.1.

"**Option**" has the meaning given in Clause 4.6.

"**Proceeding**" has the meaning given in Clause 5.1.

"**Representative Director**" means a representative director (*daihyo torishimariyaku*) of the Company.

"**Services Fee**" has the meaning given in Clause 4.1.

"**Shareholders**" means the shareholders of the Company.

"**Term**" has the meaning given in Clause 2.2.

1.2  **References to certain general terms**

    (a)    References herein to Clauses are to Clauses in this Agreement.

    (b)    Headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

    (c)    References to this Agreement are to this management agreement as amended, varied, modified or supplemented from time to time.

    (d)    Unless the context requires otherwise, words importing the singular only shall include the plural and vice versa and words importing natural persons shall include corporations and unincorporated associations and words importing the masculine gender only shall include the feminine gender and the neuter gender and vice versa.

    (e)    The expressions the "Company" and the "Executive" shall, where the context permits, include their respective successors, personal representations, executors, administrators, estates and permitted assigns.

2.  **APPOINTMENT**

2.1  The Company shall appoint the Executive and the Executive shall serve the Company concurrently as a Representative Director and COO, subject to the terms and conditions of this Agreement.

2.2  This Agreement shall be effective as of the Effective Date and continue until such time as this Agreement is terminated in accordance with Clause 11 (the "**Term**").

2.3  The Company shall take all necessary procedures to promptly effect, and maintain during the Term of this Agreement, the Executive's appointment as a Representative Director and COO in accordance with the Companies Act, the Articles of Incorporation, and other organizational documents of the Company.

3.  **EXECUTIVE'S DUTIES AND RESPONSIBILITIES**

3.1  The Executive shall, during the Term of this Agreement:

(a)     serve the Company as a Representative Director and COO and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors or the Companies Act in pursuance of his duties hereunder, perform such services for the Company, which duties, authority, and responsibilities are consistent with the Executive's position, and (without further remuneration unless otherwise agreed) accept such offices and positions as the Board of Directors may from time to time reasonably require, and he will perform those duties at such place or places as the Board of Directors may from time to time reasonably determine;

(b)     for so long as requested by the Company, serve as a representative director and the chief operating officer of FTX Japan and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors or the Companies Act in pursuance of his duties hereunder, and perform such services for FTX Japan, which duties, authority, and responsibilities are consistent with the Executive's position;

(c)     for so long as requested by the Company, serve as a director of FTX Singapore and, in such capacity, perform the duties and exercise the powers from time to time assigned to or vested in him by the Board of Directors, the constitutional documents of FTX Singapore, or the Companies Act 1967 of Singapore in pursuance of his duties hereunder, and perform such services for FTX Singapore, which duties, authority, and responsibilities are consistent with the Executive's position;

(d)     serve as a director or officer of any other Affiliate of the Company or any other member of the Group and perform such services as requested by such member's board of directors, in each case subject to (i) the prior approval of the Board of Directors of the Company, (ii) the written consent of the Executive, and (iii) the Executive's appointment as a director or officer of such member of the Group in accordance with applicable law;

(e)     comply with and conform to any lawful instructions or directions from time to time given or made by the Board of Directors of the applicable member of the Group, and:

   (i)     maintain the confidentiality of all Confidential Information he acquires by virtue of his appointment;

   (ii)     carry out his responsibilities with care, skill and diligence which the Company or the applicable member of the Group is reasonably entitled to expect from someone of his experience and expertise;

   (iii)     act in good faith and diligently serve the Company and each member of the Group, as applicable, and use his best endeavours to promote the business and interests thereof;

   (iv)     to act at all times for the proper purposes of the Company and each member of the Group, as applicable; and

(f)     to act only with the proper authority of the Board of Directors of the applicable member of the Group;

(g)     keep the Board of Directors of the applicable member of the Group promptly and fully informed (in writing if so requested) of his conduct of the business or affairs of the Company or the Group and provide such explanations as the Board of Directors of the applicable member of the Group may require in connection therewith;

(h)     carry out his duties and exercise his powers jointly and collectively with any other director or executive of the Company or applicable member of the Group as shall from time to time be appointed by the Board of Directors of the applicable member or the Group; and

(i)     comply with (and use his best endeavours to procure the Company's or the applicable member of the Group's compliance with) the Articles of Incorporation and all laws, rules, regulations and guidelines which are applicable to the Company, the applicable member of the Group, or the Executive from time to time.

3.2     Without prejudice to Clause 3.1, the Executive's responsibilities shall also include directing on behalf of the Company and each of its subsidiaries:

(a)     the development of wallet management;

(b)     new product development;

(c)     the integration of existing products into the FTX ecosystem; and

(d)     business development.

**4.     REMUNERATION AND OTHER BENEFITS**

4.1     During the Term of this Agreement, the Executive shall be entitled to the following remuneration and allowances:

(a)     a monthly services fee of USD37,500.00 (the "**Services Fee**");

(b)     a monthly housing allowance of USD3,500.00 (the "**Housing Allowance**"); and

(c)     a monthly childcare allowance of USD6,000.00 (the "**Childcare Allowance**"),

payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that the Services Fee, the Housing Allowance and the Childcare Allowance shall be prorated for any partial month of services during the Term of this Agreement. All payments made pursuant to this Section 4.1 shall be made in the corresponding currencies set forth in this Section, or such other currency as the parties may agree upon from time to time. In the event another currency is so agreed upon, then the amount to be paid shall be calculated using the foreign exchange selling rate for that other currency for the Business Day preceding the payment due date as published in the Wall Street Journal, or such other method as the parties may agree upon from time to time.

4.2     Notwithstanding Clause 4.1, with effect from September 1, 2022 and for so long as the Executive performs services:

(a)     to FTX Japan as a representative director in accordance with Clause 3.1(b), FTX Japan shall pay the Executive in respect of such role thirty percent (30%) of the Services Fees and one hundred percent (100%) of the Housing Allowance and Childcare Allowance, in each case payable monthly in arrears;

(b)     to FTX Singapore as a director in accordance with Clause 3.1(c), the Company shall cause FTX Singapore to pay to the Executive in respect of such role seventy percent (70%) of the Services Fees, payable monthly in arrears; and

(c)     to any other member of the Group as a director or officer in accordance with Clause 3.1(d), the Company and the Executive may agree separately to cause such member of the Group to pay to the Executive in respect of such role(s) any portion or all of the Services Fees, the Housing Allowance, or the Childcare Allowance, and to adjust the amounts paid by FTX Japan and FTX Singapore under Clauses 4.2(a) and 4.2(b) accordingly.

For the avoidance of doubt, all fees set forth in this Clause 4.2, once paid to the Executive in respect to a given month during the Term of this Amendment by FTX Japan and/or FTX Singapore, will offset the corresponding Services Fees, Housing Allowance, and Childcare Allowance payable by the Company to the Executive during such month.

4.3     During the Term of this Agreement, the Board of Directors may, within the limits of the amounts approved by the Shareholders at the general meeting of the Company, at its sole and absolute discretion, pay the Executive an annual bonus (the "**Bonus**") in one or more installments with an aggregate target amount equal to 100% of the annual Services Fee, which shall be prorated for any partial year of services during the Term of this Agreement, and subject to such conditions as the Board of Directors may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and the Company and such other factors as the Board of Directors may in its sole and absolute discretion consider necessary or appropriate.

4.4     Notwithstanding Clause 4.3, for so long as the Executive performs services:

(a)     to FTX Japan as a representative director in accordance with Clause 3.1(b), FTX Japan may, within the limits of the amounts approved at a general meeting of the shareholders of FTX Japan, at its sole and absolute discretion, pay the Executive any portion or all of the Bonus specified in Clause 4.3 in respect of the Executive's role as a director, and subject to such conditions as the board of directors of FTX Japan may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and FTX Japan and such other factors as the board of directors of FTX Japan may in its sole and absolute discretion consider necessary or appropriate;

(b)     to FTX Singapore as its director in accordance with Clause 3.1(c), FTX Singapore may, at its sole and absolute discretion, subject to the prior approval by the Company as shareholder of FTX Singapore, pay the Executive any portion or all of the Bonus specified in Clause 4.3 in respect of the Executive's

role as director, and subject to such conditions as the board of directors of FTX Singapore may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and FTX Singapore and such other factors as the board of directors of FTX Singapore may in its sole and absolute discretion consider necessary or appropriate; and

(c)     to any other member of the Group as a director or officer in accordance with Clause 3.1(d), such member of the Group may, at its sole and absolute discretion, pay the Executive any portion or all of the Bonus specified in Clause 4.3 in respect of the Executive's role as a director or officer, and subject to such conditions as the board of directors of such member of the Group may in its sole and absolute discretion determine from time to time, taking into account the performance of the Executive and such member of the Group and other such factors as the board of directors of such member of the group may in its sole and absolute discretion consider necessary or appropriate.

For the avoidance of doubt, it is the parties' intention that any Bonus payments made to the Executive under Clause 4.4 will be in place of, not in addition to, corresponding payments under Clause 4.3, such that there is no increase to the target amount of the Bonus specified in Clause 4.3.

4.5     During the Term of this Agreement, the Executive shall be entitled to the Employee Benefits, including the benefits under any medical insurance scheme and any employee benefit plan adopted by the Company or the applicable member of the Group for its directors and employees from time to time.

4.6     As soon as practicable following the Effective Date, the Company shall recommend to the FTX Board of Directors that the Executive be granted an option (the "**Option**") to purchase 28,000 shares of the FTX Common Shares under FTX's 2020 Equity Incentive Plan, as amended from time to time. The Option shall be subject to monthly vesting over four years with a one-year cliff, and shall be evidenced by FTX's standard form of option agreement. The exercise price of the Option shall be the fair market value of the FTX Common Shares on the date of grant, as determined by the FTX Board of Directors in its sole and absolute discretion.

## 5.     INDEMNIFICATION

5.1     Subject to Clause 5.4, to the fullest extent permitted by applicable law, in the event that the Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**") by reason of the fact that the Executive is or was a director or officer of the Company, any Affiliate of the Company, or any other member of the Group, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, the Executive shall be indemnified and held harmless by the Company (or other member of the Group designated by the Company) (the "**Indemnifying Party**") from and against any liabilities, costs, claims, and expenses, including all costs and expenses reasonably incurred in defence of any Proceeding (including attorneys' fees) (collectively, the "**Expenses**").

5.2    The Expenses reasonably incurred by the Executive in defence of the Proceeding shall be paid by the Indemnifying Party in advance of the final disposition of such litigation upon receipt by the Indemnifying Party from time to time of:

    (a)    a written request for payment;

    (b)    appropriate documentation evidencing the incurrence, amount, and nature of the Expenses for which payment is being sought; and

    (c)    an undertaking adequate under applicable law made by or on behalf of the Executive to repay the Indemnifying Party:

        (i)    all amounts paid by the Indemnifying Party if it shall ultimately be determined that the Executive is not entitled to be indemnified by the Indemnifying Party under this Agreement; and

        (ii)    all amounts paid to or recovered by the Executive from any person (including but not limited to the insurance carrier under the Directors' and Officers' Insurance) with respect to the Proceeding.

5.3    No determination as to entitlement to indemnification (including in respect of advanced payments) under this Agreement shall be required to be made prior to the final disposition of a Proceeding.

5.4    Notwithstanding any provision in this Agreement to the contrary, the Indemnifying Party shall not be obligated to indemnify the Executive for Expenses:

    (a)    to the extent prohibited by any applicable laws and regulations;

    (b)    to the extent such Expenses have been paid directly to the Executive by the insurance carrier under the Directors' and Officers' Insurance and/or any other person;

    (c)    in respect of a Proceeding initiated by the Executive or the Indemnifying Party related to any contest or dispute between the Executive and the Indemnifying Party or any of its Affiliates with respect to this Agreement or the Executive's performance of services under this Agreement;

    (d)    in respect of any liabilities relating to any taxation payable by the Executive in connection with his remuneration or other payments or benefits received from the Indemnifying Party;

    (e)    in respect of any liabilities incurred by, or any Proceeding made against, the Executive arising from the Executive's fraud, wilful default, wilful misconduct or gross negligence; or

    (f)    in respect of any liabilities arising out of, relating to or in connection with any actions taken or inactions by the Executive prior to the Effective Date (except to the extent that any Expenses incurred thereto are recoverable from the insurance carrier under the Directors' and Officers' Insurance by the Indemnifying Party).

5.5 The Indemnifying Party shall, at the sole and absolute discretion of its board of directors, be entitled to (i) participate in the Proceeding and/or (ii) assume the defence of the Proceeding; provided, however, that the Indemnifying Party shall be required to obtain the Executive's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant the Executive a complete release of liability, (2) would impose any penalty or limitation on the Executive, or (3) would admit any liability or misconduct by the Executive.

5.6 During the Term of this Agreement and for a period of six (6) years thereafter, the Company or any successor to the Company shall use commercially reasonable efforts to maintain, at its own expense, directors' and officers' liability insurance (the "**Directors' and Officers' Insurance**") providing coverage to the Executive in amounts and on terms reasonable and customary for similarly situated companies.

5.7 The Executive shall fully assist, at the Group's sole expense, the applicable member of the Group to the extent reasonably necessary in any claims or lawsuits between the applicable member of the Group and the insurance carrier under the Directors' and Officers' Insurance in respect to a Proceeding.

5.8 In the event any Expenses paid by the Group to the Executive are recovered by the Executive from the insurance carrier under the Directors' and Officers' Insurance, the Executive shall repay the applicable member of the Group such recovered amounts.

5.9 For the avoidance of doubt, the provisions of this Clause 5 shall survive the termination or expiration of this Agreement.

**6. EXPENSES**

The Company or the applicable member of the Group shall reimburse the Executive for all reasonable expenses properly incurred in the performance of his duties hereunder and the Executive shall, if so required, provide the Company or the applicable member of the Group with receipts or other evidence of the payment of such expenses.

**7. DEDUCTIONS; RETURN OF MATERIALS**

7.1 The Company or the applicable member of the Group shall be entitled at any time to deduct from the Executive's remuneration hereunder (including but not limited to the Services Fee, the Housing Allowance, the Childcare Allowance and the Bonus) any monies due from him to the Company or the applicable member of the Group for outstanding loans, advances and any other monies lent to him by the Company or the applicable member of the Group.

7.2 The Executive will return all equipment that he borrowed from the Company or the applicable member of the Group in the same condition (other than for normal wear and tear) in which it was received within five (5) days after the termination or expiration of this Agreement, however occurring.

**8. CONFIDENTIALITY**

8.1 The Executive shall not during or after the Term of this Agreement use or divulge to any person any Confidential Information which may have come to his knowledge.

8.2     Clause 8.1 does not apply to any use or disclosure of Confidential Information:

(a)     as required during the Term of this Agreement in performance of the Executive's authorized duties to the Company or an applicable member of the Group (such disclosures to be made within the limits and to the extent of such duties);

(b)     to the extent that such Confidential Information is generally known to the public not as a result of a breach of the Executive's duty of confidentiality to a member of the Group;

(c)     to the extent that such Confidential Information is required to be disclosed by law, provided that to the extent permitted by law (i) the disclosure shall be made after consultation with the Company or the applicable member of the Group and after allowing the Company or the applicable member of the Group, at the Company's or applicable member of the Group's sole cost and expense, the opportunity to contest such disclosure and after taking into account the Company's or applicable member of the Group's requirements as to its timing, content and manner of disclosure, (ii) such disclosure shall only be made to the extent legally required, and (iii) following such disclosure such disclosed Confidential Information shall continue to be treated as Confidential Information hereunder; or

(d)     as permitted by the Company's prior written consent.

## 9.    INTELLECTUAL PROPERTY RIGHTS

9.1     The Executive acknowledges that as between the Company or any member of the Group, on the one hand, and the Executive, on the other hand, any and all Intellectual Property Rights which are owned by the Company or such member of the Group at the Effective Date and/or which are created or developed from time to time in connection with the Executive's service hereunder and the business or the operation of the Company or a member of the Group are owned by the Company or the applicable member of the Group. The Executive:

(a)     hereby assigns, and agrees to assign, all such Intellectual Property to the Company or the applicable member of the Group, and undertakes to, forthwith and from time to time both during and after the Term of this Agreement and at the request of the Company or the applicable member of the Group, at the Company's or the applicable member of the Group's sole cost and expense, render all reasonable assistance to the Company (or any other member of the Group as the case may be) for obtaining letters patent or other protection or registration for any such Intellectual Property Rights and shall vest such letters patent or other protection in the Company (or any other member of the Group as the case may be) or its nominees; and

(b)     irrevocably authorises the Company and any member of the Group for the purposes aforesaid to make use of the name of the Executive and execute any document or do anything on his behalf. The Executive agrees to confirm and ratify all such acts and instruments.

9.2     The Executive shall not during or after the Term of this Agreement, directly or indirectly, except with the prior written consent of the Company or in the ordinary course of the Company's or the Group's business:

    (a)     use the name "Liquid", "Quoine" or "FTX" or any name similar to that of the Company, FTX or any member of the Group or any colourable imitation thereof in connection with any business; and

    (b)     use any Intellectual Property Rights of the Group in connection with any business not belonging to the Group.

## 10.     EXECUTIVE'S WARRANTIES AND UNDERTAKINGS

10.1    The Executive represents, warrants and undertakes during the Term of this Agreement that:

    (a)     he is not bound by or subject to any court order, agreement, arrangement or undertaking which in any way restricts or prohibits him from entering into this Agreement or from performing his duties hereunder;

    (b)     to the Executive's knowledge there is no circumstance in respect of which there is, or is likely to be, a conflict of interest between the Executive or any of his Affiliates and the Company; and

    (c)     he shall notify the Company promptly in writing of any change to the information referred to in Clause 10.1.

10.2    Subject to Clause 10.3 and Clause 10.5, the Executive shall not, unless he acts on behalf of the Company or any other member of the Group, (i) at any time during the Term of this Agreement, and for a period of one (1) year following termination of this Agreement, or (ii) for a period of three (3) years following the Effective Date (whichever is longer), either on his own or in conjunction with or on behalf of any body corporate, partnership, joint venture or other contractual agreement, whether directly or indirectly, whether for profit or not:

    (a)     carry on or be engaged or interested in or assist a business in Japan, Singapore, and Vietnam, which competes, directly or indirectly, with the Crypto Trading Business as operated during the Term of this Agreement;

    (b)     make, publish, or communicate, whether verbally or in any written format, to any person or entity any defamatory or disparaging remarks, comments, or statements concerning the Group, the Group's products, services, directors, officers, employees, or advisers;

    (c)     solicit, contact, attempt to contact, or meet a current customer or former customer of a member of the Group located in Japan, Singapore, and Vietnam, for the purposes of offering or accepting goods or services similar to or competitive with those offered by any members of the Group;

    (d)     engage, employ, solicit or contact with a view to his engagement or employment by another person, a director, officer, employee or manager of the Company or any other member of the Group or a person who was a director, officer,

employee or manager of the Company or any other member of the Group at any time in the six (6) month period preceding such engagement, employment or solicitation, provided, however, that the restrictions contained in this Clause 10.2(d) shall not apply to general solicitation or contact not specifically directed to any person mentioned above; or

(e)     solicit, motivate aid, abet, or otherwise encourage a third party to do any of the foregoing.

10.3    In the event of the termination of this Agreement by the Company without Cause or by the Executive for Good Reason, the restrictive covenants set forth in Clause 10.2 shall remain effective for a period of four (4) months from the date of termination of this Agreement, but shall otherwise cease to have any force or effect upon expiry of such four-month period.

10.4    The Company shall compensate the Executive during the non-compete period established in Clause 10.3 at a rate equal to the monthly Services Fee effective as of immediately before the date of termination, payable in arrears in accordance with the standard payroll practices of the Company, but in no event later than the first (1st) day of each month; provided, however, that such compensation shall be prorated for any partial month during the non-compete period established in Clause 10.3.

10.5    Notwithstanding any provision in this Agreement to the contrary, the Executive may;

(a)     own, directly or indirectly, solely as an investment, up to three percent (3%) of any class of "publicly traded securities" of any business that competes with any of the members of the Group; or

(b)     own securities, solely as a passive investment, in any venture capital, private debt or equity investment fund or similar investment entity that holds securities in an entity that may compete with any of the members of the Group.

## 11.    TERMINATION

11.1    Subject to Clause 11.2 and Clause 11.3, either the Company or the Executive may terminate this Agreement by three (3) month's prior notice in writing to the other party.

11.2    Notwithstanding Clause 11.1, the Company may terminate this Agreement immediately upon written notice to the Executive:

(a)     for Cause;

(b)     if the Executive is convicted of any criminal offence involving his integrity or honesty; or

(c)     if the Executive is declared of bankruptcy or makes any arrangements or composition with his creditors generally.

11.3    Notwithstanding Clause 11.1, the Executive may terminate this Agreement for Good Reason immediately upon written notice to the Company.

11.4    In the event of the termination of this Agreement, the Executive shall:

(a)     where he serves as a director of the Company and/or as a director of any other member of the Group, forthwith resign from such directorship(s) and acknowledges that he has no claims against the Company or as the case may be, the relevant member of the Group for loss of office;

(b)     deliver to the Company or as the Company may direct all documents (including books, records, document, papers, accounts, correspondence, lists of customers, notes, memoranda, plans, drawing and other documents of whatsoever nature) credit cards, models or samples and other property concerning the business, finances or affairs of any member of the Group which may then be in his possession or control;

(c)     not at any time thereafter represent himself to be connected with the Group; and

(d)     cease to be entitled to any further benefits or payments under this Agreement other than those set forth in this Clause 11, Clause 5 and Clause 10.4.

11.5     In the event of the termination of this Agreement for Cause or without Good Reason, the Executive shall be entitled to receive:

(a)     any accrued but unpaid Services Fees;

(b)     any Bonus with respect to any completed fiscal year immediately preceding the termination date that has been awarded to him in writing by the applicable Board of Directors but remains unpaid as at the termination date;

(c)     reimbursement for unreimbursed business expenses properly incurred by the Executive; and

(d)     such Employee Benefits, if any, to which the Executive may be entitled under the Company's or any member of the Group's benefit plans as of the date of termination.

11.6     In the event of the termination of this Agreement without Cause or for Good Reason:

(a)     the Executive shall be entitled to receive the Accrued Amounts; and

(b)     with respect to the Option granted to the Executive following the Effective Date, 100% of the outstanding unvested Options shall become fully vested and exercisable for the remainder of their full term.

11.7     Any termination of this Agreement shall be communicated by a written notice of termination specifying: (i) the termination provision of this Agreement relied upon; (ii) to the extent applicable, the facts and circumstances claimed to provide the basis for termination; and (iii) the applicable termination date.

## 12.    NOTICE

12.1     Each notice, demand or other communication given or made under this Agreement (a "**Notice**") shall be in writing and delivered or sent to the relevant party at its address

and email address set out below (or such other address or email address as the addressee has by seven (7) days' prior written notice specified to the other party):

| Name of party | Address | Email address | Marked for the attention of |
|---|---|---|---|
| **The Company; FTX Japan** | Hirose Building 4F 3-17 Kanda Nishikicho Chiyoda-ku Tokyo 101-0054 Japan | sam@ftx.com | N/A |
| | with a copy (which shall not constitute notice) to: FTX Trading Ltd. c/o Corporate & Trust Services (Caribbean) Limited Lower Factory Rd Saint John's Antigua and Barbuda | can@ftx.com | General Counsel |
| **The Executive** | 2-3-7 Shimomeguro #510, Meguro-ku, Tokyo, Japan 153-0064 | seth@liquid.com and check_raize@yahoo.com | Seth Melamed |

12.2   Any Notice so addressed to the relevant party shall be deemed to have been delivered (a) if sent by courier, two (2) Business Days after the date of posting; (b) if given by personal delivery, when actually delivered to the relevant address; and (c) if sent by email, when the email is sent, provided that a copy of the Notice is sent by another method referred to in this Clause 12.2 within one (1) Business Day of sending the email.

**13.   LEGAL REPRESENTATION**

The Executive hereby acknowledges that the Executive has been duly advised to seek independent legal advice and to obtain separate legal representation.

**14.   ENTIRE AGREEMENT**

14.1   This Agreement, as well as the Major Shareholders SPA and agreements referred to therein, constitutes the entire agreement and understanding of the parties hereto relating to the subject matter hereof and shall be in substitution for any subsisting agreement or arrangement (oral or otherwise) made between the Company, FTX Japan, or FTX Singapore, on the one hand, and the Executive, on the other hand, which shall be deemed to have been terminated by mutual consent as of the Effective Date.

14.2   The terms of this Agreement may only be varied in writing (excluding email) signed by the Executive and a duly appointed representative of the Company.

**15.   MISCELLANEOUS**

15.1    Nothing in this Agreement shall be construed as creating among the parties hereto an employment, partnership, agency, or similar relationship. The provision of services by the Executive shall not be governed by the Labour Contract Act (Act No.128 of 2007, as amended), the Labour Standards Law (Act No. 49 of 1947, as amended) and other laws of Japan otherwise applicable to employees in their capacity as employees.

15.2    The rights and remedies of the parties under this Agreement are not exclusive of or limited by or in limitation of any other rights or remedies (including without limitation any right of set-off) which each party may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative.

15.3    No failure or delay by any party hereto in exercising any right or remedy provided by law under or pursuant to this Agreement shall impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

15.4    The expiration or termination of this Agreement howsoever arising shall not operate to affect such of the provisions hereof as in accordance with their terms are expressed to operate or have effect thereafter.

15.5    In the event of any variation of the remuneration payable to the Executive hereunder being made by consent of the parties hereto such variation shall not constitute a new agreement but (subject to any express agreement to the contrary) the appointment of the Executive hereunder shall continue subject in all respects to the terms and conditions of this Agreement with such variation as aforesaid.

15.6    If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.7    The parties to this Agreement shall pay their own legal professional and other costs in connection with the preparation and completion of this Agreement.

15.8    No party to this Agreement shall assign, transfer or create any trust in respect of, or purport to assign, transfer or create any trust in respect of, any of its rights or obligations under this Agreement.

15.9    The Company's rights and obligations under this Agreement shall inure to the benefit of and shall be binding upon the Company's successors and assigns.

15.10   This Agreement may be executed in any number of counterparts each of which is an original and all of which together evidence the same agreement.

## 16.    GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by the laws of Japan and the Tokyo District Court shall be the court of first instance having the exclusive jurisdiction over any dispute that may arise out of or in relation to this Agreement.

*[Signature Page Follows]*

**EXECUTED** by the parties:

**<u>Company</u>**

| | |
|---|---|
| Signed by Samuel Bankman-Fried | ) |
| as representative director of | ) |
| and for and on behalf of | ) |
| **FTX JAPAN HOLDINGS K.K. and** | ) |
| **FTX JAPAN K.K.,** | ) |

DocuSigned by:

*Samuel Bankman-Fried*

672DA88132804B9...

Signature Page for the Company
(Amended and Restated Management Agreement)

**Executive**

Signed by **SETH MELAMED**            )

# EXHIBIT 4

Civil Code (Part I, Part II and Part III)

Act No. 89 of April 27, 1896

Part III Claims
  Chapter I General Provisions
    Section 2 Effects of Claims
      Subsection 1 Liability for Non-Performance
(Compensation for Loss or Damage Due to Non-Performance)
Article 415　(1)　If an obligor fails to perform consistent with the purpose of the obligation or the performance of an obligation is impossible, the obligee may claim compensation for loss or damage arising from the failure; provided, however, that this does not apply if the failure to perform the obligation is due to grounds not attributable to the obligor in light of the contract or other sources of obligation and the common sense in the transaction.

(2)　If the obligee is entitled to claim compensation for loss or damage pursuant to the provisions of the preceding paragraph, and any of the following cases applies, the obligee may claim compensation for loss or damage in lieu of the performance of the obligation:

(i)　the performance of the obligation is impossible;

(ii)　the obligor manifests the intention to refuse to perform the obligation; or

(iii)　the obligation has arisen from a contract, and the contract is cancelled or the obligee acquires the right to cancel the contract on the ground of the obligor's failure to perform the obligation.

EXHIBIT 5

## Civil Code (Part I, Part II and Part III)

Act No. 89 of April 27, 1896

Part III Claims

Chapter I General Provisions

Section 2 Effects of Claims

Subsection 1 Liability for Non-Performance

(Scope of Compensation for Loss or Damage)

Article 416   (1)   The purpose of the claim for compensation for the loss or damage for failure to perform an obligation is to have the obligor to pay the compensation for loss or damage which would ordinarily arise from the failure.

(2)   The obligee may also claim the compensation for damage which has arisen from any special circumstances if the party did foresee, or should have foreseen, the circumstances.

EXHIBIT 6

# Civil Code (Part I, Part II and Part III)

Act No. 89 of April 27, 1896

Part III Claims
    Chapter I General Provisions
       Section 2 Effects of Claims
          Subsection 1 Liability for Non-Performance
    Chapter V Torts
(Compensation for Loss or Damage in Torts)

Article 709    A person that has intentionally or negligently infringed the rights or legally protected interests of another person is liable to compensate for damage resulting in consequence.