# EXHIBIT B

# TOKEN PURCHASE AGREEMENT

THE OFFER AND SALE OF THE INTERESTS (AS DEFINED BELOW) DESCRIBED HEREUNDER HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THIS OFFERING IS BEING MADE ONLY OUTSIDE THE UNITED STATES TO NON-U.S. PERSONS (AS DEFINED IN SECTION 902 OF REGULATION S UNDER THE SECURITIES ACT) (AND ONLY IN JURISDICTIONS WHERE SUCH OFFER AND SALE IS PERMITTED UNDER APPLICABLE LAW) IN RELIANCE ON REGULATION S UNDER THE SECURITIES ACT. THE INTERESTS MAY NOT BE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE AND FOREIGN SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**NOTICE TO RESIDENTS OF THE EUROPEAN ECONOMIC AREA ("EEA")**

IN RELATION TO EACH MEMBER STATE OF THE EEA, NO OFFER OF SECURITIES MAY BE MADE TO THE PUBLIC IN THAT MEMBER STATE EXCEPT: (A) TO ANY LEGAL ENTITY WHICH IS A QUALIFIED INVESTOR AS DEFINED IN THE PROSPECTUS DIRECTIVE; (B) TO FEWER THAN 150 NATURAL OR LEGAL PERSONS (OTHER THAN QUALIFIED INVESTORS AS DEFINED IN THE PROSPECTUS DIRECTIVE) AS PERMITTED UNDER THE PROSPECTUS DIRECTIVE; OR (C) UNDER ANY OTHER CIRCUMSTANCES FALLING WITHIN ARTICLE 3(2) OF THE PROSPECTUS DIRECTIVE, PROVIDED THAT NO SUCH OFFER OF SECURITIES WILL REQUIRE THE ISSUER TO PUBLISH A PROSPECTUS PURSUANT TO ARTICLE 3 OF THE PROSPECTUS DIRECTIVE, OR SUPPLEMENT A PROSPECTUS PURSUANT TO ARTICLE 16 OF THE PROSPECTUS DIRECTIVE.

THIS INSTRUMENT IS NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA. FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT AS DEFINED IN POINT.

(11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU ("**MIFID II**"); OR (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE 2002/92/EC, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN THE PROSPECTUS DIRECTIVE. CONSEQUENTLY NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "**PRIIPS REGULATION**") FOR OFFERING OR SELLING THIS INSTRUMENT OR OTHERWISE MAKING IT AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THIS INSTRUMENT OR OTHERWISE MAKING IT AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION. IT IS A CONDITION OF YOU RECEIVING AND RETAINING THIS DOCUMENT THAT YOU WARRANT THAT YOU ARE A QUALIFIED INVESTOR.

FOR THE PURPOSES OF THIS NOTICE, THE EXPRESSION AN "OFFER TO THE PUBLIC" IN RELATION TO ANY SECURITIES IN ANY MEMBER STATE MEANS THE COMMUNICATION

IN ANY FORM AND BY ANY MEANS OF SUFFICIENT INFORMATION ON THE TERMS OF THE OFFER AND THE INSTRUMENT BEING OFFERED SO AS TO ENABLE AN INVESTOR TO DECIDE TO PURCHASE THE INSTRUMENT, AS THE SAME MAY BE VARIED IN THAT MEMBER STATE BY ANY MEASURE IMPLEMENTING THE PROSPECTUS DIRECTIVE IN THAT MEMBER STATE. THE EXPRESSION "**PROSPECTUS DIRECTIVE**" MEANS DIRECTIVE 2003/71/EC (AS AMENDED, INCLUDING BY DIRECTIVE 2010/73/EU), AND INCLUDES ANY RELEVANT IMPLEMENTING MEASURE IN ANY MEMBER STATE.

**NOTICE TO RESIDENTS OF CANADA**

UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THE RIGHTS HEREUNDER MUST NOT TRADE THE RIGHTS HEREUNDER BEFORE THE DATE THAT THE ISSUER BECOMES A REPORTING ISSUER IN ANY PROVINCE OR TERRITORY.

**NOTICE TO RESIDENTS OF CHINA**

THE RIGHTS ARE NOT BEING OFFERED OR SOLD AND MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, WITHIN THE PEOPLE'S REPUBLIC OF CHINA (FOR SUCH PURPOSES, NOT INCLUDING THE HONG KONG AND MACAU SPECIAL ADMINISTRATIVE REGIONS OR TAIWAN), EXCEPT AS PERMITTED BY THE SECURITIES AND OTHER LAWS AND REGULATIONS OF THE PEOPLE'S REPUBLIC OF CHINA.

**NOTICE TO RESIDENTS OF THE UNITED KINGDOM**

IN THE UNITED KINGDOM THIS DOCUMENT IS BEING DISTRIBUTED ONLY TO, AND IS DIRECTED ONLY AT (AND ANY INVESTMENT ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH): (I) INVESTMENT PROFESSIONALS (WITHIN THE MEANING OF ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 AS AMENDED (THE "**FPO**")); (II) PERSONS OR ENTITIES OF A KIND DESCRIBED IN ARTICLE 49 OF THE FPO; (III) CERTIFIED SOPHISTICATED INVESTORS (WITHIN THE MEANING OF ARTICLE 50(1) OF THE FPO); AND (IV) OTHER PERSONS TO WHOM IT MAY OTHERWISE LAWFULLY BE COMMUNICATED (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS").

THIS DOCUMENT HAS NOT BEEN APPROVED BY AN AUTHORISED PERSON. ANY PURCHASE TO WHICH THIS DOCUMENT RELATES IS AVAILABLE ONLY TO (AND ANY FINANCIAL ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH) RELEVANT PERSONS. THIS DOCUMENT IS DIRECTED ONLY AT RELEVANT PERSONS AND PERSONS WHO ARE NOT RELEVANT PERSONS SHOULD NOT TAKE ANY ACTION BASED UPON THIS DOCUMENT AND SHOULD NOT RELY ON IT. IT IS A CONDITION OF YOUR RECEIVING AND RETAINING THIS DOCUMENT THAT YOU WARRANT TO THE COMPANY, ITS DIRECTORS, AND ITS OFFICERS THAT YOU ARE A RELEVANT PERSON.

**NOTICE TO RESIDENTS OF FRANCE**

THIS DOCUMENT HAS NOT BEEN PREPARED, AND IS NOT DISTRIBUTED, IN THE CONTEXT OF A PUBLIC OFFERING OF FINANCIAL SECURITIES IN FRANCE WITHIN THE MEANING OF ARTICLE L. 411-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER. CONSEQUENTLY, NO FINANCIAL SECURITIES HAVE BEEN OFFERED OR SOLD OR WILL BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, TO THE PUBLIC IN FRANCE, AND ANY OFFERING MATERIAL MAY NOT BE, AND WILL NOT BE, DISTRIBUTED OR CAUSED TO BE DISTRIBUTED TO THE PUBLIC IN FRANCE OR USED IN CONNECTION WITH ANY OFFER TO THE PUBLIC IN FRANCE.

OFFERS, SALES AND DISTRIBUTIONS OF SECURITIES WILL BE MADE ONLY TO QUALIFIED INVESTORS (INVESTISSEURS QUALIFIÉS) ACTING FOR THEIR OWN ACCOUNT, ALL AS DEFINED IN, AND IN ACCORDANCE WITH, ARTICLES L. 411-2, D. 411-1, D. 744-1, D. 754-1, AND D. 764-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER AND APPLICABLE REGULATIONS THEREUNDER.

PROSPECTIVE INVESTORS ARE INFORMED THAT (I) NO PROSPECTUS HAS BEEN AND WILL BE SUBMITTED TO THE CLEARANCE OF THE FRENCH FINANCIAL MARKET AUTHORITY ("AMF"), (II) IN COMPLIANCE WITH ARTICLES L. 411-1, D. 411-1, D. 744-1, D. 754-1, AND D. 764-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER, ANY QUALIFIED INVESTOR SHOULD BE ACTING FOR ITS OWN ACCOUNT, AND (III) THE DIRECT OR INDIRECT DISTRIBUTION OR SALE TO THE PUBLIC OF SECURITIES MAY ONLY BE MADE IN COMPLIANCE WITH ARTICLES L. 411-1, L. 411-2, L. 412-1, AND L. 621-8 THROUGH L. 621- 8-3 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER.

**NOTICE TO RESIDENTS OF GERMANY**

IN THE FEDERAL REPUBLIC OF GERMANY THIS DOCUMENT IS DISTRIBUTED ONLY TO, AND IS DIRECTED ONLY AT, QUALIFIED INVESTORS WITHIN THE MEANING OF THE PROSPECTUS DIRECTIVE, THAT PROFESSIONALLY OR COMMERCIALLY PURCHASE OR SELL SECURITIES OR INVESTMENT PRODUCTS (VERMÖGENSANLAGEN) WITHIN THE MEANING OF THE GERMAN INVESTMENT PRODUCT ACT (VERMÖGENSANLAGENGESETZ) FOR THEIR OWN ACCOUNT OR FOR THE ACCOUNT OF OTHERS. NO SECURITIES PROSPECTUS (WERTPAPIERPROSPEKT) OR INVESTMENT PRODUCT PROSPECTUS (VERMÖGENSANLAGENVERKAUFSPROSPEKT) HAS BEEN OR WILL BE FILED WITH THE GERMAN FEDERAL FINANCIAL SUPERVISORY AUTHORITY (BAFIN) OR OTHERWISE PUBLISHED IN THE FEDERAL REPUBLIC OF GERMANY. NO PUBLIC OFFER OR DISTRIBUTION OF COPIES OF ANY DOCUMENT RELATING TO THE SI TOKENS INCLUDING THIS DOCUMENT, WILL BE MADE IN THE FEDERAL REPUBLIC OF GERMANY EXCEPT WHERE AN EXPRESS EXEMPTION FROM COMPLIANCE WITH THE PUBLIC OFFER RESTRICTIONS UNDER THE GERMAN SECURITIES PROSPECTUS ACT AND THE INVESTMENT PRODUCT ACT APPLIES.

**NOTICE TO RESIDENTS OF SWITZERLAND**

THIS DOCUMENT (AND ANY OTHER OFFERING OR MARKETING MATERIAL WITH RESPECT TO THE INVESTMENT ACTIVITY TO WHICH THIS DOCUMENT RELATES) MAY BE DISTRIBUTED OR MADE AVAILABLE IN, INTO OR FROM SWITZERLAND ONLY TO QUALIFIED INVESTORS WITHIN THE MEANING OF THE SWISS COLLECTIVE INVESTMENT SCHEMES ACT ("**CISA**"), ITS IMPLEMENTING ORDINANCE AND REGULATORY GUIDANCE (EACH SUCH PERSON A "**QUALIFIED INVESTOR**"). THIS DOCUMENT (NOR ANY OTHER OFFERING OR MARKETING MATERIAL WITH RESPECT TO THE INVESTMENT ACTIVITY TO WHICH THIS DOCUMENT RELATES) HAS NOT BEEN AND WILL NOT BE FILED WITH, OR APPROVED BY, ANY SWISS REGULATORY AUTHORITY. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER TO SUBSCRIBE FOR, BUY OR OTHERWISE ACQUIRE ANY TOKENS AND IT DOES NOT CONSTITUTE A PROSPECTUS PURSUANT TO THE CISA, THE SWISS CODE OF OBLIGATIONS OR THE LISTING RULES OF ANY TRADING VENUE IN SWITZERLAND. ANY INVESTMENT TO WHICH THIS DOCUMENT RELATES IS AVAILABLE ONLY TO (AND ANY INVESTMENT ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH) QUALIFIED INVESTORS.

**NOTICE TO RESIDENTS OF HONG KONG**

THE CONTENTS OF THIS DOCUMENT HAVE NOT BEEN REVIEWED OR APPROVED BY ANY REGULATORY AUTHORITY IN HONG KONG. YOU ARE ADVISED TO EXERCISE CAUTION IN RELATION TO THIS OFFER. IF YOU ARE IN ANY DOUBT ABOUT ANY OF THE CONTENTS OF THIS DOCUMENT, YOU SHOULD OBTAIN INDEPENDENT PROFESSIONAL ADVICE.

THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OR INVITATION TO THE PUBLIC IN HONG KONG TO ACQUIRE THE TOKENS BEING OFFERED HEREIN. ACCORDINGLY, UNLESS PERMITTED BY THE LAWS OF HONG KONG, NO PERSON MAY ISSUE OR HAVE IN ITS POSSESSION FOR THE

PURPOSES OF ISSUE, THIS DOCUMENT RELATING TO THE TOKENS BEING OFFERED, WHETHER IN HONG KONG OR ELSEWHERE, WHICH IS DIRECTED AT, OR THE CONTENTS OF WHICH ARE LIKELY TO BE ACCESSED OR READ BY, THE PUBLIC IN HONG KONG OTHER THAN IN CIRCUMSTANCES WHICH DO NOT RESULT IN THIS DOCUMENT CONSTITUTING A "PROSPECTUS" AS DEFINED IN THE COMPANIES (WINDING UP AND MISCELLANEOUS PROVISIONS) ORDINANCE OF HONG KONG (CAP. 32 OF THE LAWS OF HONG KONG) (THE "**C(WUMP)O**") OR WHICH DO NOT CONSTITUTE AN OFFER OR AN INVITATION TO THE PUBLIC FOR THE PURPOSES OF THE SECURITIES AND FUTURES ORDINANCE (CAP. 571 OF THE LAWS OF HONG KONG) OR THE C(WUMP)O. THE OFFER OF THE TOKENS IS PERSONAL TO THE PERSON TO WHOM THIS DOCUMENT HAS BEEN DELIVERED, AND THE TOKENS WILL ONLY BE ACCEPTED BY SUCH PERSON. NO PERSON TO WHOM A COPY OF THIS DOCUMENT IS ISSUED MAY ISSUE, CIRCULATE OR DISTRIBUTE THIS DOCUMENT IN HONG KONG OR MAKE OR GIVE A COPY OF THIS DOCUMENT TO ANY OTHER PERSON.

**NOTICE TO RESIDENTS OF SOUTH KOREA**

THIS AGREEMENT IS NOT, AND UNDER NO CIRCUMSTANCES IS TO BE CONSTRUED AS, AN OFFERING OF SECURITIES IN SOUTH KOREA UNDER THE FINANCIAL INVESTMENT SERVICES AND CAPITAL MARKETS ACT OF SOUTH KOREA (THE "**FISCMA**"). FOR THE PURPOSE OF THIS NOTICE, THE EXPRESSION "OFFERING" IN RELATION TO ANY SECURITIES UNDER FISCMA MEANS THE INVITATION OF SUBSCRIPTION FOR NEWLY ISSUED SECURITIES TO MORE THAN 50 RETAIL INVESTORS.

THIS INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE FISCMA, AND THIS INSTRUMENT MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED, DIRECTLY OR INDIRECTLY, OR OFFERED OR SOLD TO ANY PERSON FOR RE-OFFERING OR RE-SALE, DIRECTLY OR INDIRECTLY, IN SOUTH KOREA OR TO ANY RESIDENT OF SOUTH KOREA.

**NOTICE TO RESIDENTS OF AUSTRALIA**

THIS DOCUMENT IS NOT A "PRODUCT DISCLOSURE STATEMENT" OR "DISCLOSURE DOCUMENT" FOR THE PURPOSES OF THE AUSTRALIAN CORPORATIONS ACT 2001 (CTH) ("**CORPORATIONS ACT**") AND IS NOT REQUIRED TO BE LODGED WITH THE AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION ("**ASIC**"). THIS OFFER IS MADE IN CIRCUMSTANCES THAT WOULD NOT REQUIRE DISCLOSURE UNDER CHAPTER 6D OR CHAPTER 7 OF THE CORPORATIONS ACT. THIS DOCUMENT IS NOT REQUIRED TO, AND DOES NOT, CONTAIN ALL THE INFORMATION WHICH WOULD BE REQUIRED IN A DISCLOSURE DOCUMENT OR PRODUCT DISCLOSURE STATEMENT, OR ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE OR SHOULD OBTAIN IN ORDER TO MAKE AN INFORMED INVESTMENT DECISION. BY ACCEPTING RECEIPT OF THIS DOCUMENT, YOU REPRESENT AND WARRANT THAT YOU ARE A "SOPHISTICATED INVESTOR" AS DEFINED UNDER SECTION 708(8) OF THE CORPORATIONS ACT OR A "PROFESSIONAL INVESTOR" UNDER SECTION 708(11) OF THE CORPORATIONS ACT AND A "WHOLESALE CLIENT" UNDER SECTION 761G OF THE CORPORATIONS ACT. THE ISSUER OF THIS DOCUMENT IS NOT REGISTERED AS A MANAGED INVESTMENT SCHEME UNDER THE CORPORATIONS ACT. ANY PERSON TO WHOM THIS DOCUMENT IS ISSUED MUST NOT, WITHIN 12 MONTHS AFTER SUCH ISSUE, OFFER, TRANSFER OR ASSIGN THIS DOCUMENT TO PERSONS IN AUSTRALIA EXCEPT IN CIRCUMSTANCES WHERE DISCLOSURE TO SUCH PERSONS IS NOT REQUIRED UNDER THE CORPORATIONS ACT.

**NOTICE TO RESIDENTS OF ISRAEL**

THIS DOCUMENT DOES NOT CONSTITUTE A PROSPECTUS UNDER THE ISRAELI SECURITIES LAW OF 1968 (THE "**ISRAELI SECURITIES LAW**"), AND HAS NOT BEEN REVIEWED, FILED WITH OR APPROVED BY THE ISRAELI SECURITIES AUTHORITY OR ANY OTHER ISRAELI GOVERNMENT OR REGULATORY BODY. THIS DOCUMENT, ANY INVESTMENT ACTIVITY TO WHICH IT RELATES AND ANY OFFERING OF THE TOKENS IN ISRAEL IS AND WILL BE EXCLUSIVELY DISTRIBUTED OR MADE TO, AND DIRECTED AT, QUALIFIED INVESTORS, AS DEFINED IN SCHEDULE 1 OF THE ISRAELI SECURITIES LAW. PERSONS WHO ARE NOT QUALIFIED INVESTORS SHOULD NOT TAKE ANY ACTION BASED UPON THIS DOCUMENT AND SHOULD NOT RELY ON IT.

**NOTICE TO RESIDENTS OF RUSSIA**

INFORMATION CONTAINED HEREIN IS NOT AN OFFER, OR AN INVITATION TO MAKE OFFERS, TO SELL, PURCHASE, EXCHANGE OR OTHERWISE TRANSFER SECURITIES OR FOREIGN FINANCIAL INSTRUMENTS IN THE RUSSIAN FEDERATION TO OR FOR THE BENEFIT OF ANY RUSSIAN PERSON OR ENTITY, EXCEPT "QUALIFIED INVESTORS" (AS DEFINED UNDER RUSSIAN SECURITIES LAWS) TO THE EXTENT PERMITTED UNDER RUSSIAN SECURITIES LAWS. THIS DOCUMENT IS NOT AN ADVERTISEMENT IN CONNECTION WITH THE "PLACEMENT" OR "PUBLIC CIRCULATION" (AS BOTH TERMS ARE DEFINED UNDER RUSSIAN SECURITIES LAW) OF ANY SECURITIES, AND ANY FINANCIAL INSTRUMENTS DESCRIBED HEREIN ARE NOT INTENDED FOR "PLACEMENT" OR "PUBLIC CIRCULATION" IN THE RUSSIAN FEDERATION, IN EACH CASE UNLESS OTHERWISE PERMITTED UNDER RUSSIAN SECURITIES LAWS. NEITHER ANY FINANCIAL INSTRUMENTS DESCRIBED HEREIN NOR A PROSPECTUS RELATING TO SUCH FINANCIAL INSTRUMENTS HAS BEEN OR WILL BE REGISTERED WITH THE CENTRAL BANK OF THE RUSSIAN FEDERATION.

**NOTICE TO RESIDENTS OF CUBA, IRAN, NORTH KOREA, SYRIA AND THE CRIMEA REGION**

THIS INSTRUMENT IS NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF OR ANY PERSON LOCATED OR DOMICILED IN CUBA, IRAN, NORTH KOREA, SYRIA, THE CRIMEA REGION OR ANY OTHER COUNTRY OR TERRITORY THAT IS SUBJECT OF COUNTRY-WIDE OR TERRITORY-WIDE SANCTIONS.

**General Notice**

THIS INSTRUMENT IS NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF OR ANY PERSON LOCATED OR DOMICILED WHERE SUCH OFFERING IS PROHIBITED, RESTRICTED OR UNAUTHORIZED IN ANY FORM OR MANNER WHETHER IN FULL OR IN PART UNDER THE LAWS, REGULATORY REQUIREMENTS OR RULES IN SUCH JURISDICTION.

.

# EDEN PROTOCOL LIMITED

# TOKEN PURCHASE AGREEMENT

THIS CERTIFIES THAT in exchange for the payment by you ("***you***" or the "***Purchaser***") of the Total Purchase Price on or about the Effective Date, Eden Protocol Limited, a British Virgin Islands company (the "***Company***"), hereby issues to you the right (the "***Future Token Interest***" and, collectively with any securities received in substitution or fulfillment of the Future Token Interest, or in replacement of the Future Token Interest, as may be applicable, the "***Interests***") to receive, automatically and without requiring any future payment, a number of Tokens (as defined below) equal to the Number of Tokens Purchased set forth on the signature page hereto, on the conditions and subject to the terms set forth hereunder.

OFFERING. This Token Purchase Agreement ("***TPA***") is issued by the Company in connection with the offering ("***Offering***") of Future Token Interests by the Company via a series of agreements on substantially similar terms to this TPA (collectively, the "***TPAs***"). Purchaser acknowledges that TPAs may be issued in a series of multiple closings to certain qualified persons and entities, all as determined from time to time by the Company in its sole discretion. If Purchaser is purchasing the Interests on behalf of an entity (such as its employer), Purchaser represents and warrants that it has the authority to bind such entity to this TPA. In that case, "Purchaser" will refer to that company or other legal entity.

**PURCHASER ACKNOWLEDGES, AGREES AND UNDERSTANDS THAT THE INTERESTS PURCHASED HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN THIS TPA AND THE DOCUMENTS REFERENCED HEREIN. BY PARTICIPATING IN THIS OFFERING, PURCHASER AGREES TO BE BOUND BY THIS TPA IN ALL RESPECTS.**

**IMPORTANT NOTICE REGARDING ARBITRATION: WHEN YOU AGREE TO THIS TPA, YOU ARE AGREEING TO RESOLVE ANY DISPUTE BETWEEN YOU AND THE COMPANY THROUGH BINDING, INDIVIDUAL ARBITRATION RATHER THAN IN COURT. PLEASE REVIEW CAREFULLY SECTION 7.6 "DISPUTE RESOLUTION" BELOW FOR DETAILS.**

OFFER AND SALE

2.1    **Purchase and Sale**. Purchaser hereby agrees to purchases that Number of Tokens Purchased for an aggregate purchase price equal to the Total Purchase Price, each as set forth on the signature page hereto.

2.2    **Purchaser Qualification**. Purchaser acknowledges and agrees that it is required to meet certain requirements in order to participate in this Offering, including the Purchaser's residency and citizenship requirements, as well as compliance with this TPA. Purchaser acknowledges and agrees that, in the event the Company determines that Purchaser does not meet the Company's requirements for purchasers hereunder (as determined by the Company in its sole discretion), the Company may immediately and without notice rescind or terminate, as applicable, this TPA, the Future Token Interests and the Tokens, notwithstanding Purchaser's compliance with this TPA, delivery of the Total Purchase Price to the Company, or that the Company may have previously accepted or delivered a signature page to this TPA.

2.3    **Payment**. Purchaser covenants and agrees to pay the Total Purchase Price to the Company on or about the Effective Date, and in any case no later than one business day after the Effective Date. Purchaser acknowledges and agrees that the Company may, in its sole discretion and without notice, rescind or terminate, as applicable, this TPA, the Future Token Interests and the Tokens in the event that Purchaser does not deliver to the Company its signature page to this TPA or the Total Purchase Price, in each case within one business day of the Effective Date.

2.4     **Form of Payment**. The Company agrees to accept payment for the Total Purchase Price via wire transfer of immediately available funds in United Stated Dollars (to a bank account designated in writing by the Company), Tether (USDT) or USD Coin (USDC); provided that the Company may elect to accept other methods or forms of payment on an as-converted to U.S. dollars basis in its sole discretion. The U.S. dollar exchange rate for any other form of payment shall be determined solely by the Company or its assignee or agent in accordance with reasonable and accepted market practices and additional transaction fees may apply.

TOKEN DELIVERY

3.1     **Delivery**. In the event Network Launch occurs prior to the termination of this TPA, and subject to the terms and conditions set forth herein, the Company, its agents or representatives shall deliver to the Purchaser, in full satisfaction of this TPA, the Number of Tokens Purchased no later than the date of the Network Launch; provided, for the avoidance of doubt, such delivered Tokens shall remain subject to the terms of this TPA notwithstanding such delivery.

3.2     **Conditions to Token Delivery**. In connection with, as a condition to, and prior to each delivery of Tokens by the Company to the Purchaser pursuant to Section 3.1, and in each case unless waived in writing by the Company:

3.2.1   The Purchaser will execute and deliver to the Company any and all other transaction documents related to this TPA and the delivery of the Tokens as are reasonably requested by the Company, including documentation to verify Purchaser's citizenship and residency;

3.2.2   The Purchaser will provide to the Company, in writing, an SPL-compliant network wallet address ("*Wallet*") to which the Purchaser's Tokens will be delivered;

3.2.3   The Purchaser will complete and deliver all AML and KYC Forms (as defined below) requested by the Company from time to time, including after the Effective Date; and

3.2.4   The Purchaser shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the Company or the Foundation may reasonably request in order to carry out the intent and accomplish the restrictions set forth herein 3 and/or as shall be requested to comply with then applicable laws and regulations and/or as requested by a digital asset exchange in connection with the listing of the Token.

If the Purchaser fails to meet any of the conditions above, the Company or the Foundation may hold the Tokens deliverable hereunder in escrow until such conditions are met, and such escrow will constitute delivery of the applicable number of Tokens in accordance with this instrument notwithstanding that such Tokens remain in escrow.

3.3     **Lockup.** In addition to any other restrictions set forth herein and required under applicable law, Purchaser agrees that it will not, at any time, directly or indirectly, Transfer any Tokens that have not been delivered to the Purchaser in accordance with Section 3.1 and Exhibit A herein (such Tokens, the "*Undelivered Tokens*"), any options to purchase any Undelivered Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Undelivered Tokens, including this TPA and the Future Token Interests hereunder. To ensure compliance with the restrictions in this Section 3.3, Purchaser acknowledges that the Company may impose technological lockups or other restrictions on the Tokens.

**DEFINITIONS**

<u>**4.1**</u>    "***AML and KYC Forms***" means any and all forms, documents, processes and procedures, including, for the avoidance of doubt, any electronic verification system or process, which the Company determines are reasonably necessary for the Company to comply with applicable Money Laundering Laws and "know your customer" laws.

4.2    "***Eden Network***" means the blockchain-based non-fungible token marketplace located at *www.magiceden.io*.

4.3    "***Foundation***" means the Eden Protocol Foundation, a Panamanian foundation.

**4.4**    "***Governmental Authority***" means any nation or government, any state or other political subdivision thereof, any entity exercising legislative, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

4.5    "***Money Laundering Laws***" means the applicable laws, rules and regulations of all jurisdictions in which the Purchaser is located, resident, organized or operates concerning or related to anti-money laundering, including but not limited to those contained in the Bank Secrecy Act of 1970 and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "***Patriot Act***"), each as amended and including the rules and regulations thereunder, and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority.

4.6    "***Network Launch***" means the event whereby, following the deployment of the Eden Network to the Solana blockchain network, Tokens is made available for use on the Eden Network for its intended purposes as described, as determined by the Company in its sole discretion.

4.7    "***Person***" means any individual or legal entity, including a government or political subdivision or an agency or instrumentality thereof.

4.8    "***Tokens***" means the $MAGIC token, a unit of value for the Eden Network.

**4.9**    "***Transfer***" means, with respect to any instrument, the direct or indirect assignment, sale, transfer, tender, pledge, charge, hypothecation, or the grant, creation or suffrage of a lien or encumbrance in or upon, or the gift, placement in trust, or other disposition of such instrument or any right, title or interest therein, or the record or beneficial ownership thereof, the offer to make such a sale, transfer or other disposition, and each agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing.

**PURCHASER REPRESENTATIONS**

**5.1**    <u>**Authorization.**</u> The Purchaser has full power and authority to enter into this TPA. This TPA, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

**5.2**    <u>**Purchase Entirely for Own Account.**</u> This TPA is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this TPA, the Purchaser hereby confirms, that the Interests to be acquired by the Purchaser will be acquired for investment for

the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this TPA, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, Transfer or grant participations to such Person or to any third Person, with respect to any of the Interests. The Purchaser has not been formed for the specific purpose of acquiring the Interests.

5.3     **Disclosure of Information.** The Purchaser has sufficient knowledge of and experience in business and financial matters to be able to evaluate the risks and merits of its purchase of this TPA and of the Interests and is able to bear the risks thereof. The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Interests with the Company's representatives. The Purchaser has not relied on any representations or warranties made by the Company outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper.

5.4     **Compliance with Securities Laws.** The Purchaser understands that the Interests have not been, and will not be, registered under the Securities Act of 1933, as amended ("***Securities Act***") or any applicable state securities laws, by reason of a specific exemption from the registration provisions of the Securities Act and other applicable state securities laws which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Interests may be deemed "restricted securities" under applicable United States federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Interests indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that neither the Foundation nor the Company has any obligation to register or qualify the Interests for resale, and exemptions from registration and qualification may not be available or may not permit the Purchaser to transfer all or any of the Interests in the amounts or at the times proposed by the Purchaser. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Interests, and on requirements relating to the Company or the Foundation which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

5.5     **No Public Market.** The Purchaser understands that no public market now exists for the Interests, and that neither the Company nor the Foundation has made any assurances that a public market will ever exist for the Interests and neither the Company nor the Foundation is under any obligation to register or qualify the Interests under the laws of any Governmental Authority.

5.6     **Legends.** The Purchaser understands that the Interests may be deemed to bear any one or more of the following legends: (a) any legend required by the securities laws of any state to the extent such laws are applicable to the Interests represented by the certificate so legended, and (b): the following legend (and even without such legend the following restrictions apply):

> THE INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

In connection with any proposed transfer, the Company may require an opinion of counsel in form and

substance satisfactory to the Company to the effect that any such proposed transfer or resale of the Interests is in compliance with the Securities Act and any applicable state or foreign securities laws. Purchaser hereby agrees that, to enforce the restrictions set forth in this TPA, the Company may impose technological and other restrictions on the Wallet and the Tokens deliverable hereunder.

        5.7    **Waiver of Warranties; Assumption of Risks.** THE RISK OF LOSS IN BUYING, HOLDING AND TRADING DIGITAL ASSETS AND RIGHTS THEREIN, INCLUDING THE INTERESTS, CAN BE IMMEDIATE AND SUBSTANTIAL. THERE IS NO GUARANTEE AGAINST LOSSES FROM PARTICIPATING IN THE OFFERING. PURCHASER SHOULD THEREFORE CAREFULLY CONSIDER WHETHER TRADING OR HOLDING VIRTUAL CURRENCY IS SUITABLE FOR THE PURCHASER IN LIGHT OF ITS FINANCIAL CONDITION. Purchaser understands that the Interests and the Tokens involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risks that (i) the technology and economic models associated with the Eden Network will not function as intended; (ii) the Eden Network will fail to attract sufficient interest from users or fail to gain use and adoption; (iii) the Company, the Foundation and/or third parties involved in the development of the Eden Network may be subject to investigation and punitive actions from Governmental Authorities, (iv) the Eden Network and the Tokens are dependent on a decentralized community of validators and computer networks, including the underlying Solana network, for its operations, and if they do not operate as expected the Tokens may lose all functionality and value, (v) errors, failures, bugs or other weaknesses in the Eden Network or the Token smart contract could adversely affect the Eden Network and the Tokens, (vi) the Eden Network or the underlying Solana network may be subject to malicious cyberattacks or contain exploitable flaws in its code which results in security breaches and the loss or theft of Tokens, (vii) the regulatory regime governing the Eden Network and the Tokens is highly uncertain and new regulations or policies may adversely affect the Eden Network and the Tokens, and (viii) other Tokens may be sold by the Company from time to time, including via bounty programs, partnerships, airdrops and other sales at lower prices and less restrictive lockup schedules than that offered herein. Purchaser understands and expressly accepts that the Tokens will be created and delivered to the Purchaser at the sole risk of the Purchaser on an "AS IS" and "UNDER DEVELOPMENT" basis. NEITHER THE FOUNDATION NOR THE COMPANY MAKES ANY WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (i) WARRANTY OF MERCHANTABILITY; (ii) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (iii) WARRANTY OF TITLE; OR (iv) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE FOUNDATION, THE COMPANY, OR ANY OTHER PERSON ON THEIR BEHALF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ASSUMES ALL RISKS AND LIABILITIES FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE COMPANY OR THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

        5.8    **Other Applicable Law.** Purchaser represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with the purchase of the Interests, including (a) the legal requirements within the Purchaser's jurisdiction for the purchase of the Interests, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Interests. The Purchaser's purchase and payment for and continued beneficial ownership of the Interests will not violate any applicable laws of the Purchaser's jurisdiction.

        5.9    **Regulation S Representations and Restrictions.** Purchaser hereby agrees and represents to the Company as follows:

5.9.1   Purchaser is not a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act. The offer and sale of the Interests herein was made in an offshore transaction (as defined in Rule 902(h) of Regulation S), no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States, and the Purchaser is not acquiring the Interests for the account or benefit of any U.S. Person;

5.9.2   Purchaser will not, during the restricted period that is applicable to the Interests set forth in the legend set forth below (the "***Restricted Period***") and to any certificate representing the Interests, offer or sell any of the foregoing (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S, or engage in hedging transactions with regard to the Interests prior to the expiration of the Restricted Period; and

5.9.3   Purchaser will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise Transfer the Interests (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws.

Purchaser acknowledges and agrees that the Interests will be deemed to bear the legend set forth below (in addition to any other legends required by applicable federal, state or foreign securities laws or provided in any other agreement with the Company):

> *THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND NEITHER THE COMPANY NOR THE FOUNDATION INTENDS TO REGISTER THEM. PRIOR TO THE ONE-YEAR ANNIVERSARY OF THE DATE OF SALE, THE INTERESTS MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH INTERESTS) IN THE UNITED STATES OR TO U.S. PERSONS AS DEFINED BY RULE 902(k) ADOPTED UNDER THE ACT, OTHER THAN TO DISTRIBUTORS, UNLESS THE INTERESTS ARE REGISTERED UNDER THE ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. PRIOR TO THE ONE-YEAR ANNIVERSARY OF THE DATE OF SALE, YOU MAY RESELL SUCH INTERESTS ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES PROVIDED THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PURCHASERS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE INTERESTS MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. A HOLDER OF THE INTERESTS WHO IS A DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT, PRIOR TO THE ONE YEAR ANNIVERSARY OF THE DATE OF SALE, RESELL THE INTERESTS TO A U.S. PERSON AS DEFINED BY RULE 902(k) OF REGULATION S UNLESS THE INTERESTS ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.*

5.9.4   Neither the Purchaser nor any person acting on its behalf has engaged, or will engage, in any directed selling efforts to U.S. Persons with respect to the Interests. The purchase of the

Interests herein has not been pre-arranged with a buyer located in the United States or with a U.S. Person, and are not part of a plan or scheme to evade the requirements of the Securities Act.

5.9.5   Neither the Purchaser nor any person acting on its behalf has undertaken or carried out any activity for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the Interests. Purchaser agrees not to cause any advertising of the Interests to be published in any publication or posted in any public space and not to issue any circular relating to the Interests in the United States.

**5.10**   **OFAC.** Neither the Purchaser, nor, if applicable, any of its affiliates or direct or indirect beneficial owners; (i) appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("***OFAC***"), nor are they otherwise a party with which the Company is prohibited to deal under the laws of the United States; (ii) is a person identified as a terrorist organization on any other relevant lists maintained by any Governmental Authority; or (iii) unless otherwise disclosed in writing to the Company prior to the date of this TPA, is a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure. The Purchaser further represents and warrants that, if applicable, the Purchaser: (a) has conducted thorough due diligence with respect to all of its beneficial owners; (b) has established the identities of all direct and indirect beneficial owners and the source of each beneficial owners' funds; and (c) will retain evidence of those identities, any source of funds and any due diligence.

**5.11**   **Sources and Uses of Funds.** The Purchaser further represents, warrants and agrees as follows:

5.11.1   No payment or other transfer of value to the Company and no payment or other transfer of value to the Company shall cause the Company to be in violation of applicable U.S. federal or state or non-U.S. laws or regulations, including, without limitation, anti-money laundering, economic sanctions, anti-bribery or anti-boycott laws or regulations, the Patriot Act, or the various statutes, regulations and executive orders administered by OFAC ("***OFAC Regulations***").

5.11.2   No payment or other transfer of value to the Company is or will be derived from, pledged for the benefit of, or related in any way to, (i) the government of any country designated by the U.S. Secretary of State or other Governmental Authority as a country supporting international terrorism, (ii) property that is blocked under any OFAC Regulations or that would be blocked under OFAC Regulations if it were in the custody of a U.S. national, (iii) persons to whom U.S. nationals cannot lawfully export services, or with whom U.S. nationals cannot lawfully engage in transactions under OFAC Regulations, (iv) the government of any country that has been designated as a non- cooperative country or designated by the U.S. Secretary of the Treasury or other Governmental Authority as a money laundering jurisdiction or (v) directly or indirectly, any illegal activities. The Purchaser acknowledges that Money Laundering Laws may require the Company to collect documentation verifying the identity and the source of funds used to acquire the Interests before, and from time to time after, the date of this TPA.

5.11.3   All payments or other transfer of value to the Company by the Purchaser will be made through an account (or virtual currency public address whose associated balance, either directly or indirectly, has been funded by such an account) located in a jurisdiction that does not appear on the list of boycotted countries published by the U.S. Department of Treasury pursuant to § 999(a)(3) of the Code as in effect at the time of the payment or other transfer of value. In the event that the Purchaser is, receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "***Non-U.S. Bank***") in connection with the acquisition of the Interests, the Non-U.S. Bank: (i) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities, (ii) employs one or more individuals on a full-time basis, (iii) maintains

operating records related to its banking activities, (iv) is subject to inspection by the banking authority that licensed it to conduct banking activities and (v) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate.

5.12     **Additional Information.** The Purchaser will provide to the Company any information that the Company from time to time determines to be necessary or appropriate (a) to comply with Money Laundering Laws, anti-terrorism laws, rules and regulations and or any similar laws and regulations of any applicable jurisdiction and (b) to respond to requests for information concerning the identity and or source of funds of the Purchaser from any Governmental Authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update that information. The Purchaser understands and acknowledges that the Company may be required to report any action or failure to comply with information requests and to disclose the identity to Governmental Authorities, self-regulatory organizations and financial institutions, in certain circumstances without notifying the Purchaser that the information has been so provided. The Purchaser further understand and agrees that any failure on its part to comply with this Section 5.12 would allow the Company to terminate this TPA and require the forfeiture of any Tokens previously delivered to the Purchaser.

5.13     **Suspicious Activity Reports.** The Purchaser acknowledges and agrees that the Company, in complying with anti-money laundering statutes, regulations and goals, may file voluntarily or as required by law, a suspicious activity report ("*SAR*") or any other information with governmental and law enforcement agencies that identify transactions and activities that the Company reasonably determines to be suspicious, or is otherwise required by law. The Purchaser acknowledges that the Company is prohibited by law from disclosing to third parties, including the Purchaser, any SAR filing itself or the fact that a SAR has been filed.

5.14     **Voluntary Compliance.** The Purchaser understands and agrees that, even if the Company is not obligated to comply with any U.S. anti-money laundering requirements, the Company may nevertheless choose to voluntarily comply with such requirements as the Company deems appropriate in its sole discretion. The Purchaser agrees to cooperate with the Company as may be required in the reasonable opinion of the Company in connection with such compliance**.**

5.15     **Taxes.** PURCHASER ACKNOWLEDGES AND AGREES THAT IT MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF PURCHASING, HOLDING, EXCHANGING, SELLING, STAKING, TRANSFERRING OR OTHERWISE USING THE TOKENS IN ANY WAY. PURCHASER HEREBY REPRESENTS THAT (A) IT HAS CONSULTED WITH A TAX ADVISER THAT IT DEEMS ADVISABLE IN CONNECTION WITH ANY USE OF THE TOKENS, OR THAT IT HAS HAD THE OPPORTUNITY TO OBTAIN TAX ADVICE BUT HAVE CHOSEN NOT TO DO SO, (B) NEITHER THE COMPANY NOR THE FOUNDATION HAS PROVIDED PURCHASER WITH ANY TAX ADVICE, AND (C) PURCHASER AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM ANY PURCHASE, HOLDING, EXCHANGE, SALE, STAKING, TRANSFER OR OTHER USE OF THE TOKENS.

**DISCLAIMERS**

6.1     **Wallet**. You assume full responsibility and liability for any losses resulting from any intentional or unintentional misuse of your Wallet including, without limitation, any loss resulting from designating a wallet that is non-compliant with the Tokens for the receipt of the Tokens, or depositing one type of digital asset to a wallet intended for another type of digital asset. The Company assumes no responsibility or liability in connection with any such misuse.

6.2     **Indemnity**. NEITHER THE COMPANY NOR THE FOUNDATION SHALL BE LIABLE TO THE PURCHASER, AND THE PURCHASER WILL INDEMNIFY, DEFEND AND HOLD HARMLESS THE COMPANY, THE FOUNDATION AND THIER AGENTS AND ADVISORS, AND THE

SUCCESSORS AND ASSIGNS OF THE FOREGOING, FROM AND AGAINST, ALL OR ANY PART OF ANY THIRD PARTY CAUSES OF ACTION, CLAIMS, LIABILITIES, LOSSES, COSTS, DAMAGES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) (COLLECTIVELY "CLAIMS") FOR DAMAGES TO OR LOSS OF PROPERTY ARISING OUT OF OR RESULTING FROM THE TRANSACTIONS CONTEMPLATED HEREIN OR PURCHASER'S VIOLATION OF THE TPA, EXCEPT TO THE EXTENT SUCH CLAIMS ARISE FROM THE FRAUD OR INTENTIONAL MISCONDUCT OF THE COMPANY OR THE FOUNDATION; PROVIDED, HOWEVER, THAT PURCHASER'S AGGREGATE LIABILITY FOR CLAIMS UNDER THIS SECTION SHALL NOT EXCEED THE TOTAL PURCHASE PRICE (AS DENOMINATED IN USD).

6.3     **Limitation of Liability**. NEITHER THE COMPANY, THE FOUNDATION NOR ANY OTHER PARTY INVOLVED IN THE OFFERING WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE ACTIVITIES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS TPA OR THE PURCHASER'S PARTICIPATION IN, OR INABILITY TO PARTICIPATE IN, THE OFFERING, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE COMPANY, THE FOUNDATON, OR ANY OTHER PARTY HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY. EXCEPT FOR THE COMPANY'S FRAUD OR INTENTIONAL MISCONDUCT, IN NO EVENT WILL THE COMPANY'S AND THE FOUNDATION'S TOTAL LIABILITY TO THE PURCHASER ARISING OUT OF OR IN CONNECTION WITH THIS TPA OR FROM THE PURCHASER'S PARTICIPATION IN, OR INABILITY TO PARTICIPATE IN, THE OFFERING EXCEED THE TOTAL PURCHASE PRICE (AS DENOMINATED IN USD). THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE COMPANY AND THE PURCHASER.

6.4     **Class Action Waiver.** Any claim or dispute arising under this TPA will take place on an individual basis without resort to any form of class or representative action (the "*Class Action Waiver*"). THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM. Regardless of anything else in this TPA to the contrary, the validity and effect of the Class Action Waiver may be determined only by a court or referee and not by an arbitrator, and Purchaser acknowledges that this Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is non-severable from this TPA.

7.     MISCELLANEOUS

7.1     **Entire Agreement.** This TPA set forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral of written, between them. This TPA is one of a series of similar agreements entered into by the Company from time to time. Any provision of this TPA may be amended, waived or modified only upon the written consent of the Company and (a) the Purchaser, or (b) the holders of a majority, in the aggregate, of the Total Purchase Price paid to the Company with respect to all TPAs outstanding at the time of such amendment, waiver or modification, and any amendment, waiver or modification made in accordance with clause (b) shall be binding upon all Purchasers.

7.2 **Notices.** Any notice required or permitted by this TPA will be deemed sufficient when sent by email to the relevant address listed on the signature page hereto, as subsequently modified by written notice received by the appropriate Party.

7.3 **No Rights as Stockholder.** The Purchaser is not entitled, as a holder of this TPA, the Future Token Interests or the Tokens, to vote or receive dividends or be deemed an equityholder of the Company or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of an equityholder or any right to vote for the election of directors or upon any matter submitted to the board of directors at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

7.4 **Transfers and Assigns.** Neither this TPA nor the rights contained herein may be Transferred, by operation of law or otherwise, by the Purchaser without the prior written consent of the Company. The Company may assign this TPA without the consent of the Purchaser.

**7.5** **Severability.** In the event any one or more of the provisions of this TPA is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this TPA operate or would prospectively operate to invalidate this TPA, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this TPA and the remaining provisions of this TPA will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

7.6 **Dispute Resolution**. This TPA and any action related thereto will be governed by the laws of the British Virgin Islands, without regard to its conflicts of law rules. Any dispute, controversy or claim arising out of or relating to this TPA, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the British Virgin Islands International Arbitration Centre (BVI IAC) Arbitration Rules. The number of arbitrators shall be one. The place of arbitration shall be Road Town, Tortola, British Virgin Islands unless the parties agree otherwise. The language to be used in the arbitral proceedings shall be English.

7.7 **Additional Assurances.** The Purchaser shall, and shall cause its affiliates to, from time to time, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested by Company or are necessary for the Company, upon the advice of counsel, to carry out the provisions of this TPA and give effect to the transactions contemplated hereby, including, without limitation, to enable the Company to register the Interests, to enable the Interests to qualify for or maintain an exemption from registration (to the extent any such exemptions are available), to comply with Money Laundering Laws, or to otherwise complete the transactions contemplated hereby and to comply with applicable laws as then in effect.

7.8 **Force Majeure.** Without limitation of anything else in this TPA, neither the Company nor the Foundation shall be liable or responsible to the Purchaser, nor be deemed to have defaulted under or breached this TPA, for any failure or delay in fulfilling or performing any term of this instrument, including without limitation, launching the Eden Network and delivering the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected Party's reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest or instability; (d) changes to applicable law; or (e) action by any Governmental Authority.

[*signature page follows*]

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

| Number of Tokens Purchased: | 16,666,667 |
|---|---|
| Price Per Token (USD): | 0.03 USD |
| Total Purchase Price: | USD $ 500,000 |

**SELLER:**

**EDEN PROTOCOL LIMITED**

By: _[signature]_

Name: Diana Muñoz

Title: President

Email: team@gdeplaw.com

Effective Date: _____


**PURCHASER:**

[_] Alameda Ventures Limited

By:
Its:
By: _[signature]_
Name: Lee Tin Ka
Title: Partner

Email: brian.lee@alameda-research.com

Notice Address: _____

F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelle

[*Signature Page to TPA*]

**Exhibit A**

**Lockup and Delivery Schedule**

The Number of Tokens Purchased shall be delivered and released to the Purchaser in accordance with the following schedule:

- [0%] of the Number of Tokens Purchased shall be released on the date of Network Launch

- [8.33%] of the Number of Tokens Purchased shall be released on the last day of each calendar month following the one-year anniversary of the Network Launch Date, such that all purchased Tokens will be released and delivered as of the last day of the [24th] month following the date of Network Launch.

In all cases, delivery of the applicable number of Tokens set forth above shall be deemed complete and to have complied with this TPA as long as it is completed within ten days of the applicable delivery date set forth above.

[*Signature Page to TPA*]