**Exhibit D-1**

**Anthropic Purchase and Sale Agreement**

15476581

## Exhibit 3

**Executed Purchase and Sale Agreement**

EXECUTION VERSION
CONFIDENTIAL

**PURCHASE AND SALE AGREEMENT**

**by and among**

**CLIFTON BAY INVESTMENTS LLC**

**and**

**THE PURCHASERS LISTED ON SCHEDULE A**

**Dated as of May 31, 2024**

This PURCHASE AND SALE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "<u>Agreement</u>"), dated as of May 31, 2024, is made by and between Clifton Bay Investments LLC (formerly known as Alameda Research Ventures LLC), a Delaware limited liability company ("<u>Seller</u>"), and the purchasers listed on <u>Schedule A</u> (each a "<u>Purchaser</u>" and together, "<u>Purchasers</u>"). The signatories to this Agreement are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>".

## Recitals

WHEREAS, on November 11, 2022 and November 14, 2022, Seller and certain of its Affiliates (collectively, the "<u>Debtors</u>") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "<u>Bankruptcy Code</u>") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "<u>Bankruptcy Proceeding</u>");

WHEREAS, on February 29, 2024, the Bankruptcy Court entered the Sale Procedures Order authorizing and approving, among other things, (a) the Sale Procedures (as defined in the Sale Procedures Order) for the sale or transfer of all or a portion of the Interests and (b) the sale(s) of the Interests in accordance with the Sale Procedures free and clear of any liens, claims, interests and encumbrances (other than Permitted Encumbrances);

WHEREAS, Seller holds the interests set forth on <u>Schedule A</u> (the "<u>Interests</u>") in or with the entity set forth on <u>Schedule B</u> (the "<u>Subject Company</u>") and desires to sell, assign and transfer to each Purchaser such amount of Interests as is set forth opposite such Purchaser's name on <u>Schedule A</u> pursuant to section 363 of the Bankruptcy Code, in accordance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors or other applicable governing body of Seller has determined that it is advisable and in the best interests of Seller's estate and the beneficiaries of such estate to consummate the Transactions pursuant to the Sale Procedures and Sale Order and has approved this Agreement;

WHEREAS, Seller intends to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Seller to consummate the Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, each Purchaser desires to purchase the Interests set forth opposite such Purchaser's name on <u>Schedule A</u> pursuant to section 363 of the Bankruptcy Code; and

WHEREAS, the Parties acknowledge and agree that the Transactions are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of Seller or its Affiliates and Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the purchases by Purchasers.

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF INTERESTS

1.1     Purchase and Sale of Interests. Pursuant to sections 105 and 363 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement, at the applicable Closing, Seller agrees to sell, assign, convey, transfer and deliver to each Purchaser, and each such Purchaser agrees to purchase and accept from Seller, all of Seller's right, title and interest in, to and under the Interests set forth opposite such Purchaser's name on Schedule A, as may be updated from time to time prior to the applicable Closing, for an amount in cash calculated pursuant to Section 1.2, which purchase shall be free and clear of any Liens other than Permitted Encumbrances.

1.2     Purchase Price. The aggregate purchase price for each Purchaser's respective Interests shall be an amount in cash equal to the number of such Interests set forth on Schedule A, as may be updated from time to time prior to the applicable Closing pursuant to this Agreement, multiplied by the applicable Per Share Price set forth on Schedule A (each such aggregate purchase price, an "Aggregate Purchase Price"), which shall be payable without any withholding or deduction.

1.3     Liabilities. From and after the applicable Closing Date, and upon the terms and subject to the conditions set forth in this Agreement and the Transfer Documents, any liabilities for Taxes, fees or other governmental charges attributable to the Interests or the ownership of such Interests by the applicable Purchaser shall be the responsibility of such Purchaser.

1.4     Closing. The closing of the Transactions in respect of a Purchaser (each such Closing, a "Closing") will take place at 9:00 a.m., Eastern Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures on the second (2nd) Business Day following the date on which all of the conditions to closing specified in Article 5 are satisfied or waived in respect of such Purchaser, or at such other time as such Purchaser and Seller shall agree in writing (each, a "Closing Date").

1.5     Deliveries at Closing. At each Closing, upon satisfaction or waiver of the conditions set forth in Article 5 hereof:

(a)     the applicable Purchaser shall pay its respective Aggregate Purchase Price to Seller in accordance with Section 1.2 by wire transfer of immediately available funds pursuant to the instructions delivered by Seller to such Purchaser prior to the applicable Closing Date;

(b)     the applicable Purchaser shall deliver to Seller a counterpart to the Transfer Documents, duly executed by such Purchaser or its applicable Affiliates party thereto;

2

(c)      Seller shall deliver to the applicable Purchaser a counterpart to the Transfer Documents, duly executed by Seller or its applicable Affiliates party thereto; and

(d)      Seller shall deliver to the applicable Purchaser, and such Purchaser shall deliver to Seller, each of the other documents and instruments required to be delivered pursuant to the terms of this Agreement or any Transfer Documents.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1      <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants to each Purchaser that:

(a)      <u>Authorization</u>. Seller is an entity duly organized and validly existing in good standing under the laws of Delaware. Subject to compliance with the Sale Procedures, entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents to which Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder. Subject to compliance with the Sale Procedures, entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, this Agreement and the Transfer Documents to which it is a party have been or, when executed, will be duly authorized, executed and delivered by it, and constitute or, when executed, will constitute a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

(b)      <u>Title to Interests</u>. Seller owns all right, title and interest in and to the Interests, free and clear of all Liens other than Permitted Encumbrances and Liens created by or through a Purchaser or any of its Affiliates.

(c)      <u>No Conflicts</u>. Subject to compliance with the Sale Procedures, entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, the execution and delivery of this Agreement and the Transfer Documents to which Seller is a party and the performance or consummation of the Transactions by Seller do not conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Interests owned by Seller under the terms or provisions of (i) its organizational documents, (ii) any contract that is material to the value of the Interests, or (iii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)      <u>Certain Conduct</u>. Seller has not (i) sold, assigned, transferred, delivered or otherwise disposed of all or any portion of the Interests held by Seller, (ii) converted, exchanged or redeemed all or any portion of the Interests, or (iii) agreed to do any of the foregoing.

(e)      <u>Broker's Fee; No Public Offering</u>. No Person acting on behalf of Seller or under the authority of Seller shall be entitled to any broker's, finder's, or similar fee or

3

commission in connection with the Transactions, other than the financial advisors retained by Seller in the Bankruptcy Proceeding.

(f)        No Other Representations or Warranties. Except for the representations and warranties contained in this Section 2.1, neither Seller nor any other Person (other than Purchasers) has made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Interests, Seller, the Subject Company, Purchasers or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of Seller's or its Affiliates' respective representatives or the Subject Company.

2.2        Representations and Warranties of Purchasers. Each Purchaser hereby represents and warrants to Seller that:

(a)        Authorization. Such Purchaser is an entity duly organized or formed and validly existing in good standing under the laws of its jurisdiction of organization. Such Purchaser has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents and to perform all of the obligations to be performed by it hereunder and thereunder. This Agreement and the Transfer Documents to which such Purchaser is a party have been or, when executed, will be duly authorized, executed and delivered by such Purchaser, and constitute or when executed, will constitute a valid and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other Laws of general application affecting enforcement of creditors' rights generally.

(b)        No Conflicts. The execution and delivery of this Agreement and the Transfer Documents to which such Purchaser is a party and the performance or consummation of the Transactions by such Purchaser do not (i) conflict with or result in a breach or violation of the terms or provisions of its organizational documents, (ii) result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which such Purchaser is a party or by which such Purchaser is bound or (iii) conflict with or result in a breach or violation of the terms or provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Purchaser or its property, except, in each case, to the extent that such conflicts, violations, defaults or accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Documents. The execution and delivery by such Purchaser of this Agreement and the Transfer Documents to which it is a party and the performance by such Purchaser of its obligations hereunder and thereunder and the consummation of the Transactions contemplated hereby and thereby will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, order, writ, decree, permit or license, or any consent or approval of any other party to such Purchaser's constituent documents, or any other contract, agreement, instrument, commitment or restriction binding upon such Purchaser, except for the Sale Order.

(c)        Independent Appraisal.

4

(i)       Such Purchaser acknowledges that Seller may be in possession of material, nonpublic information relating to the Subject Company. Such Purchaser further acknowledges and agrees that Seller has no obligation to disclose to such Purchaser any such material, nonpublic information except as may be required for a representation and warranty of Seller hereunder to be accurate and correct. Such Purchaser further acknowledges that (A) it is not relying on there having been disclosed any such material or potentially material information which is not disclosed, and (B) any such information may be materially adverse to such Purchaser's interests. Such Purchaser further acknowledges that it is prepared to purchase the applicable Interests from Seller on the foregoing basis and hereby waives any right to rescind or invalidate the purchase of the applicable Interests from Seller or to seek any damages or other remuneration from Seller based on the possession of any such material, nonpublic information by Seller.

(ii)      Such Purchaser acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the applicable Interests, and that it is responsible for making its own evaluation of any information about the applicable Interests, the Subject Company or Seller that it may receive either directly from the Subject Company or Seller, and that none of the Subject Company, Seller or any Affiliate, partner, employee, officer or director thereof (A) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement or (B) shall be under any obligation to provide access to or advise such Purchaser or any other Person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the applicable Interests, the Subject Company or Seller (or any assumptions upon which such information is based) supplied by it or by any Person or be otherwise liable to the Subject Company or Seller or any other Person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

(d)      Accredited Investor; Qualified Purchaser. Such Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933, as amended and a "qualified purchaser" within the meaning of Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended, and the rules promulgated thereunder.

(e)      No Resale. Such Purchaser's purchase of the applicable Interests is for its own account for investment and not with a view to the distribution or resale thereof, except in compliance with the Securities Act of 1933, as amended, and applicable state securities laws.

(f)      Broker's Fee. No Person acting on behalf of such Purchaser or under the authority of such Purchaser shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions.

(g)    <u>Bidder Questionnaire</u>. Such Purchaser has completed the bidder questionnaire (as set forth in the Sale Procedures) and the responses provided therein are true and correct in all respects.

(h)    <u>No Other Representations or Warranties</u>.

(i)    Except for the representations and warranties contained in this <u>Section 2.2</u>, such Purchaser has not made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Interests, the Subject Company, any Purchaser, Seller or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and such Purchaser disclaims any other representations or warranties, whether made by such Purchaser, any Affiliate of such Purchaser or any of such Purchaser's or its Affiliates' respective representatives.

(ii)    Such Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Section 2.1</u>, (A) neither Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to such Purchaser in connection with the Transactions and such Purchaser has not relied on any representation or warranty other than those expressly set forth in <u>Section 2.1</u>, (B) such Purchaser has not executed or authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to such Purchaser or any of its Affiliates, or any of its or their respective representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Subject Company, or its assets or liabilities, including the Operative Documents, or any part thereof; and (C) the Interests are being transferred "as is", "where is" and "with all faults". Such Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Section 2.1</u>, Seller, on behalf of itself and its subsidiaries and Affiliates (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities, conditions (financial or otherwise) and prospects of the Subject Company or with respect to the Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to such Purchaser or its Affiliates or its or their respective representatives (including any opinion, information, projection or advice that may have been or may be provided to such Purchaser by any representative of Seller or any of its Affiliates). Such Purchaser acknowledges and agrees that Seller has not made any representations or warranties to such Purchaser regarding the probable success or profitability of the Subject Company.

(iii)    Such Purchaser acknowledges and agrees that the enforceability of this Agreement against Seller is subject to compliance with the Sale Procedures and entry

6

of the Sale Order and any other Order entered into by the Bankruptcy Court applicable to the Transactions.

## ARTICLE 3

## COVENANTS

3.1     <u>Tax Matters</u>. Seller and each Purchaser shall (i) cooperate with each other in good faith in connection with Taxes with respect to the Subject Company or the Interests and with respect to the Tax treatment of the Transactions and (ii) use commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity as may be necessary to mitigate, reduce or eliminate any Tax (including withholding or deduction in respect of Taxes) that could be imposed with respect to the Transactions. All Transfer Taxes, if any, incurred in connection with the consummation of the Transactions shall be borne by the applicable Purchaser(s). If any Purchaser reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to Seller hereunder under applicable Law, such Purchaser shall notify Seller at least ten (10) Business Days before any such payment subject to withholding.

3.2     <u>Confidentiality</u>. Seller and each Purchaser (a) acknowledge that, with respect to the Confidentiality Agreement with such Purchaser, (i) such agreement remains in full force and effect in accordance with its terms, (ii) such agreement shall not terminate due to this Agreement, and (iii) the terms of such agreement are incorporated herein by reference, and (b) agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full except that Seller shall be permitted to disclose the terms of this Agreement. For the avoidance of doubt, Seller is expressly permitted to disclose this Agreement, any Transfer Documents and, in each case, any exhibits and schedules thereto with the Bankruptcy Court as necessary or advisable in connection with the Transactions.

3.3     <u>Agreement to Be Bound</u>.  Each Purchaser agrees to accept and be bound by the terms and conditions of all the Operative Documents and the obligations and limitations of Seller under all of the Operative Documents as though such Purchaser was an original party thereto. Each Purchaser agrees to execute such additional documents as may be necessary to become a party to one or more of the Operative Documents, as may be requested by the Subject Company.

## ARTICLE 4

## BANKRUPTCY MATTERS

4.1     <u>Bankruptcy Court Filings</u>.

(a)     Seller or its applicable Debtor Affiliates shall (i) file with the Bankruptcy Court a written notice including the Sale Disclosures (as defined in the Sale Procedures Order), no later than two (2) Business Days after entering into this Agreement, pursuant to the Sale Procedures (the "<u>Sale Notice</u>") and (ii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Order.

7

(b)      Each Purchaser shall (i) appear in the Bankruptcy Court or furnish any affidavits, declarations or other documents or information for filing with the Bankruptcy Court, in each case, if reasonably requested by Seller or required by the Bankruptcy Court in connection with the Transactions and (ii) keep Seller reasonably apprised of the status of material matters related to this Agreement, including, promptly furnishing Seller with copies of notices or other communications received from the Bankruptcy Court or any Person with respect to the Transactions.

(c)      The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, the Sale Order.  Seller shall promptly provide each Purchaser and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the Sale Order, or related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to such Purchaser and its outside legal counsel. Seller shall not seek any modification to the Sale Order with respect to the Transactions by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Proceeding has been appealed that is materially adverse to the Purchasers, in each case, without the prior written consent of Purchasers (not to be unreasonably withheld, conditioned or delayed).

(d)      If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), Seller agrees to, and agrees to cause its Debtor Affiliates to, use their commercially reasonable efforts, to defend against such appeal, petition or motion, and each Purchaser agrees to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

4.2     <u>Alternative Transaction</u>.

(a)      Consummation of the Transactions are subject to approval by the Bankruptcy Court and the consideration by the Debtor Affiliates and the Bankruptcy Court of higher or better competing bids. From and after the date hereof until the date on which the Sale Order is entered (the "<u>Sale Process Date</u>"), Seller and the Debtor Affiliates shall be permitted to cause their respective representatives and Debtor Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchasers and their Affiliates, agents and representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers to purchase all or any part of the Subject Company and/or its assets (whether in combination with other assets of Seller and the Debtor Affiliates or otherwise) and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, any Order entered into by the Bankruptcy Court applicable to the Transactions or other applicable Law, including supplying information relating to the Subject Company and the assets of the Subject Company to prospective purchasers.

(b)      Seller shall have the right, at any time before the Sale Process Date, to sell Shares to one or more additional purchasers (each such Purchaser, an "<u>Additional Purchaser</u>") on the terms set forth herein (each such sale, an "<u>Additional Sale</u>"); <u>provided</u> that where the per

8

share price of the Shares to be purchased in an Additional Sale exceeds the Per Share Price of any of the Interests to be purchased by any of the existing Purchasers pursuant to this Agreement, (A) Seller may elect to allocate Shares to any such Additional Purchaser by reducing the Interests allocated to the Purchasers hereunder and (B) any such reduction pursuant to this Section 4.2(b) shall first reduce pro rata the Interests sharing the lowest Per Share Price, and then pro rata for the Interests sharing the next lowest Per Share Price, and so on, as applicable, until such time as the lowest Per Share Price of the remaining Interests is greater than the per share price of the Shares in the Additional Sale, whereupon the Additional Purchaser shall not be allocated any such remaining Interests; provided, however, that Seller will provide prior written notice to any Purchaser whose number of Interests will be reduced pursuant to this Section 4.2(b), and such existing Purchaser may elect to increase the Per Share Price for such Purchaser's Interests at any time prior to the joinder of the Additional Purchaser to this Agreement.  Each Additional Purchaser shall execute a joinder to this Agreement and the related Transfer Documents in the form set forth on Schedule B hereto, and upon delivery of such joinder agreement, (x) Seller shall update Schedule A to include such Additional Purchaser and the number of Shares such Additional Purchaser is purchasing, and any related reduction in the Interests to be purchased by the existing Purchasers pursuant to the preceding sentence, and (y) such Additional Purchaser shall be considered a "Purchaser" and the Shares to be purchased by such Additional Purchaser shall be considered "Interests" for all purposes under this Agreement and the other agreements contemplated hereby.

4.3     Sale Order.

(a)     Subject to Section 4.2 and Section 7.9, Seller and each Purchaser shall take all actions as may be reasonably necessary to cause the Sale Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Each Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by such Purchaser under this Agreement and, if applicable, demonstrating that such Purchaser is a "good faith" buyer under section 363(m) of the Bankruptcy Code.

(b)     The Sale Order shall, among other things, (i) approve, pursuant to sections 105 and 363 of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Interests to Purchasers on the terms set forth herein and free and clear of all Liens (other than Permitted Encumbrances), and (C) the performance by Seller of its obligations under this Agreement and (ii) find that each Purchaser is not a successor to Seller.  If requested by any Purchaser, and subject to delivery by such Purchaser of any applicable affidavits requested by Seller or set forth in the Sale Procedures in connection therewith, the Sale Order shall also include a finding that such Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant such Purchaser the protections related thereto.

9

# ARTICLE 5

## CONDITIONS TO CLOSING

5.1     <u>Mutual Conditions</u>. The respective obligations of Seller and each Purchaser to effect the applicable Closing are subject to the satisfaction or waiver by the other Party of the following conditions on or prior to the applicable Closing Date:

(a)     The Sale Notice shall have been filed in accordance with the terms of the Sale Procedures; and

(b)     The Bankruptcy Court shall have entered the Sale Order.

5.2     <u>Conditions to the Obligation of Purchasers</u>. The obligation of each Purchaser to effect the applicable Closing is subject to the satisfaction or waiver by such Purchaser of the following additional conditions on or prior to the applicable Closing Date:

(a)     The representations and warranties of Seller contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect", contained therein) as of the applicable Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(b)     Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the applicable Closing Date.

5.3     <u>Conditions to the Obligation of Seller</u>. The obligation of Seller to each Purchaser to effect the applicable Closing is subject to the satisfaction or waiver by Seller of the following additional conditions on or prior to the applicable Closing Date:

(a)     The representations and warranties of such Purchaser contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect", contained therein) as of the applicable Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and

(b)     Such Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the applicable Closing Date.

# ARTICLE 6

# TERMINATION

6.1     <u>Grounds for Termination</u>. This Agreement may be terminated in its entirety at any time:

(a)      by mutual agreement of Seller, on the one hand, and Purchasers, on the other hand;

(b)      by Seller, on the one hand, or Purchasers, on the other hand, if there is in effect a Final Order of a Governmental Entity of competent jurisdiction, enjoining or otherwise prohibiting the consummation of the Transactions (it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal in accordance with their respective obligations under this Agreement unless and until this Agreement is terminated pursuant to this <u>Section 6.1</u>);

(c)      automatically, if Seller enters into one or more definitive agreements (other than this Agreement) with respect to an Alternative Transaction that results in the sale of all of the Interests; or

(d)      by Seller, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement could be inconsistent with its or such Person's or body's fiduciary duties.

6.2     <u>Termination of an Individual Purchaser</u>. This Agreement may be terminated with respect to the acquisition of the applicable Interests by any individual Purchaser (the "<u>Terminated Purchaser</u>"): (a) by mutual agreement of Seller, on the one hand, and such Purchaser, on the other hand; (b) by either Seller or such Purchaser if the applicable Closing has not occurred by within one hundred and twenty (120) days following the date hereof (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate such acquisition pursuant to this <u>Section 6.2(b)</u> shall not be available to a Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the applicable Closing to have occurred on or prior to the Termination Date; (c) by Seller with respect to any Purchaser, where the number of Interests to be sold to such Purchaser is reduced to zero pursuant to <u>Section 4.2(b)</u>; or (d) by Seller if such Purchaser shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.3</u> and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Seller to such Purchaser and (B) the Termination Date; <u>provided</u>, that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 6.2</u> if Seller is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in <u>Section 5.1</u> or <u>Section 5.2</u>.  Upon such termination, Seller shall update <u>Schedule A</u> accordingly to reflect such termination.

11

6.3     Effect of Termination. If this Agreement is terminated as permitted by Section 6.1 or Section 6.2:

(a)     no Party shall have any liability or further obligation to any other Party pursuant to this Agreement (or, with respect to Section 6.2, Seller and the Terminated Purchaser shall have no liability or further obligation to the other Party pursuant to this Agreement); provided, however, that (i) the agreements of Seller and the applicable Purchaser set forth in Section 3.2 (*Confidentiality*) and Section 7.6 (*Expenses*) shall survive such termination and (ii) no such termination shall relieve a Party of any liability or damages to any other Party resulting from any knowing and intentional material breach of this Agreement;

(b)     the applicable Purchaser shall return to Seller all documents, work papers and other material of Seller relating to the Transactions, whether obtained before or after the execution hereof or certify that such documents have been destroyed; and

(c)     the provisions of the Confidentiality Agreements will continue in full force and effect.

# ARTICLE 7

# OTHER MATTERS

7.1     Action by Purchasers. Any action to be taken by Purchasers pursuant to this Agreement, including such actions set forth in Section 4.1(c) and Sections 6.1, shall be effective upon the consent of Purchasers acquiring at least 50% of the Interests set forth on Schedule A, as of such time.

7.2     Waiver, Amendment. Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party or Parties that would have benefited by the provision had it not been waived.

7.3     Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by a Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.4     No Survival of Representations and Warranties or Covenants. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the latest Closing Date with respect to Seller, and the applicable Closing Date with respect to each Purchaser, except for covenants and agreements that by their terms are to be satisfied after the applicable Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms. In no event shall Seller or any Purchaser have any recourse against the other or the Purchaser Parties or the Seller Parties following the applicable Closing Date, respectively with respect to any representation, warranty, covenant or agreement made by Seller or such Purchaser, as applicable,

12

in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the applicable Closing Date.

7.5    Release. From and after the Closing, upon the terms and subject to the conditions set forth herein, each Purchaser shall be deemed to have waived, discharged, settled, compromised and released any and all claims, causes of actions, liens, rights and remedies it has, had or may have against the Seller Parties as of the Closing in respect of the acquisition or ownership of the Interests, including with respect to the terms of the Operative Documents and any alleged breach thereof, whether known or unknown, liquidated or unliquidated, contingent or non-contingent, except as set forth in this Agreement and to enforce the obligations set forth herein to effectuate the terms of this Agreement; provided, however, that nothing in this Agreement shall be construed as a release, waiver, compromise, or settlement of any other claims Purchaser may have against any Debtor Affiliates or their estates arising prior to the Bankruptcy Proceeding.  Purchaser Parties expressly waive and relinquish any and all provisions, rights, and benefits conferred by California Civil Code § 1542 or any similar law of any state or territory of the United States or any principle of common law that is similar, comparable or equivalent to California Civil Code § 1542.

7.6    Expenses. Except as otherwise provided in this Agreement or the Transfer Documents, each Party shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Transfer Documents and the Transactions.

7.7    Notices. All notices, requests and other communications under this Agreement to a Party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such Party at its address (or number) set forth below or on Schedule A, as applicable, or such other address (or number) as the Party may specify by notice to each other Party.

If to Seller:

> Clifton Bay Investments LLC
> 2600 South Shore Blvd, Suite 300
> League City, TX 77573
> Attention: Kathryn Schultea
> Email: kathyschultea@ftx.com
>
> *With a copy (which shall not constitute notice) to*:
>
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004

13

Attention:  Audra D. Cohen
            Rita-Anne O'Neill
Telephone: (212) 558-3275
           (310) 712-6698
Email:     cohena@sullcrom.com
           oneillr@sullcrom.com
           kranzleya@sullcrom.com
           wum@sullcrom.com

7.8     Specific Performance.

        (a)     Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement. Accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including specific performance of such covenants, promises or agreements (including to cause any Purchaser to consummate the Transactions and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 7.8 will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

        (b)     Each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by any Purchaser or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of any Purchaser or Seller, as applicable, under this Agreement all in accordance with the terms of this Section 7.8.

        7.9     Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.  For the avoidance of doubt, until the last Closing has occurred, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

        7.10    Entire Understanding; No Third-Party Beneficiaries. This Agreement, the Transfer Documents and the Confidentiality Agreements together set forth the entire understanding of the Parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the Parties with respect to the subject matter of this Agreement. In the event of any conflict between this Agreement and the Transfer Documents or the Operative Documents, the provisions of this Agreement shall prevail. No representation, warranty, inducement, promise, understanding or

14

condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities.

7.11    <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any purported assignment in violation of this <u>Section 7.11</u> will be void, except for the following assignments which shall not require any consent and will not be void: (a) assignment to an Affiliate of any Party (<u>provided</u> that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Parties) and (b) assignment by Seller to a succeeding entity following its emergence from the Bankruptcy Proceeding. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by each Party to this Agreement and its successors and permitted assigns.

7.12    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

7.13    <u>Severability</u>. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

7.14    <u>No Presumption</u>. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

7.15    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such Laws.

15

(b)      Without limiting a Party's right to appeal any order of the Bankruptcy Court, as between the Parties to this Agreement (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Interests, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 7.7; provided, however, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)      Each Party consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 7.7; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)      Each Party waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

7.16    Damages. No Party shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

7.17    Interpretation. (a) As used in this Agreement, references to:

(i)      the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)      the Preamble, Recitals, Sections or Exhibits refer to the Preamble, a Recital or a Section of, or an Exhibit to this Agreement unless otherwise indicated;

(iii)    this Agreement refers to this Agreement and the Exhibits to it; and

(iv)      all references to "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified.

(b)      Wherever this Agreement requires a Party to take an action, the requirement constitutes an undertaking by the Party to cause its subsidiaries, and to use its

16

commercially reasonable efforts to cause its other Affiliates, to take appropriate action in connection therewith.

(c)     Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(d)     The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

[Remainder of page intentionally left blank]

17

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**CLIFTON BAY INVESTMENTS LLC**

By:        _____

Name:   John J. Ray III

Title:   Authorized Signatory

**PURCHASER**:


**G SQUARED VI HOLDCO, LLC**


By:

Name: Larry Aschebrook
Title: Authorized Representative

Address:     180 N. Stetson Avenue, Suite 5100
             Chicago, IL 60601


Attention:   Jeffrey Barton
Email:       larry@gsquared.com /
             jefff@gsquared.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
**Manius Invest Co Ltd**

By: _____

Name: Essa M A A H Ibrahim
Title: Director

Address:      Craigmuir Chambers, Road Town,
                 Tortola, VG 1110, British Virgin Islands

Attention:    Sandip Bhatt
Email:         dico.invest@damacgroup.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:

**Scenic Management LLC**

By: _Michael Sobel_
DocuSigned by:
AB0283BFC81440E...

Michael Sobel
Managing Partner
Scenic Co-Invest Anthropic LLC

Address:
  915 Battery Street
  San Francisco, CA 94111

Attention: sobel@scenicadvisement.com
Email: sobel@scenicadvisement.com

[*Signature Page to Anthropic Purchase and Sale Agreement*]

**PURCHASER**:

**Scenic Co-Invest Anthropic LLC**

By:  *Michael Sobel*
_____
     Michael Sobel
     Managing Partner
     Scenic Co-Invest Anthropic LLC
Address:
     915 Battery Street
     San Francisco, CA 94111

Attention:  sobel@scenicadvisement.com
Email:  sobel@scenicadvisement.com

[*Signature Page to Anthropic Purchase and Sale Agreement*]

**PURCHASER**:

**Elysium VC (N) LLC**

**Elysium Management LLC, Managing Member**

By:

        Name:  Barry J. Cohen
        Title: President

Address:  445 Park Ave., 1401, New York, NY 10022

Attention:    Barry J. Cohen
Email:        bcohen@elysllc.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
Fund SCVC-PV-LXVI, a series of SCVC Advisors, LP


By: _____

Name: Amrit Saxena
Title: Managing Partner

Address: 84
Malta Drive,
San
Francisco,
CA 94131



Attention:
Amrit
Saxena
Email:
amrit@saxec
ap.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
Fund XLVIII, a series of SCVC Advisors, LP

By:

Name: Amrit Saxena
Title: Managing Partner

Address: 84
Malta Drive,
San
Francisco,
CA 94131

Attention:
Amrit
Saxena
Email:
amrit@saxec
ap.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:

**KOREA INVESTMENT PARTNERS CO., LTD.**
**KIP Re-Up II Fund**

By: _____
          Name: Mahn Soon Hwang
          Title: Chief Executive Officer

Address:          10F Asem Tower, 517 Yeongdong-daero,
                       Gangnam-gu, Seoul 06164, Republic of
                       Korea
Attention:
Email:              minq.kim@koreainvestment.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:  GA-IP Opportunities II, LLC

By:

Name:   Ish S. Dugal

Title:
    General Partner

Address:

50 W. Broadway Suite 333, PMB 17942,
Salt Lake City, Utah 84101

Attention:  Ish Dugal and Patrick Flynn

Email:

Ish@goldenarccap.com, pflynn@ironpineventures.com

**PURCHASER**:

By:     *Lawrence Bancroft*
              2192FAC5D64243F...
            Name: Lawrence P. Bancroft
            Title: Managing Member

Address:    601 Montgomery Street, Suite 1212
             San Francisco, CA  94111

Attention:   Greenbook Ventures
Email:       [lawrence@greenbookventures.com](mailto:lawrence@greenbookventures.com)

[*Signature Page to Anthropic Purchase and Sale Agreement*]

**PURCHASER**:

By: _____

DocuSigned by:

*adam crawley*

53A3155ED2C84C3

Name:  Adam Crawley

Title:  Manager

Address: 1204 San Antonio St
Floor 2
Austin, Texas 78701

Attention: Adam Crawley

Email:  adam@augment.market

**PURCHASER**:
**MW LSVC ANTHROPIC, LLC**

_____
By:  MWSI VC Manager, LLC, Manager

By: Lorenzo Esparza, Manager

Address:  1999 Avenue of the Stars
Suite 2500
Los Angeles, CA 90067

Attention: Lorenzo Esparza
Email:       LEsparza@manhattanwest.com

[_Signature Page to Anthropic Purchase and Sale Agreement_]

**PURCHASER:**

TELESOFT – 2020, LP

By:

Name:  Arjun Gupta

Title:  Executive Manager of the General Partner

Address: 400 E Main Street, Suite 2

           Aspen, CO 81611, USA

Attention: Arjun Gupta

Email: Arjun@telesoftvc.com

**PURCHASER:**

Telesoft Capital, LLC

By: _____

Name:  Arjun Gupta

Title:  Managing Member

Address: 400 E Main Street, Suite 2
           Aspen, CO 81611, USA


Attention: Arjun Gupta


Email: Arjun@telesoftvc.com

PURCHASER: A.G.P Alternative Investment Fund X series I

By: _Zachary Grodko_____

Name: Zachary Grodko

Title: Manager

Address: 590 Madison Ave 28TH FL

NY, NY, 10022

Attention: Zachary Grodko

Email: zgrodk@allianceag.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER:** A.G.P Alternative Investment Fund IV-
                                                    series 4

By:    _Zachary Grodko_
       Name: Zachary Grodko
       Title: Manager

Address: 590 madison Ave 21st Fl
           NY, NY 10022

Attention: Zachary Grodko
Email: zgrodko@allianceg.com

*[Signature Page to Anthropic Purchase and Sale Agreement]*

**PURCHASER**:
CONSTITUTIONAL AI GOVERNANCE FUND 2 LLC

By: LTA Advisors LLC, Its General Partner

By:  *Ryan Logue*
                  Name: Ryan Logue
                  Title: Managing Member

Address: 2810 N Church St
           Wilmington, DE 19802


Attention: Ryan Logue
Email:    ryan@ltse.com

**PURCHASER**: CONSTITUTIONALAI FUND, A
SERIES OF ABUNDANCE MASTER FUND LLC

By: LTA Advisors LLC, Its Organizer


By:        *Ryan Logue*
          _____
          Name: Ryan Logue
          Title: Managing Member

Address: 2810 N Church St
         Wilmington, DE 19802


Attention: Ryan Logue
Email:     ryan@ltse.com

**PURCHASER**:

Fund FG-BLU, a series of Forge Investments LLC

By: _Grant George_
DocuSigned by:
8AFF1AD5752C38F...

Name: Grant George
Title: Principal, Forge Global Advisors
LLC

Address:    4 Embarcadero Center, Floor 15
            San Francisco, CA 94111


Attention:  Investment Team
Email:      fundadmin@forgeglobal.com

[*Signature Page to Anthropic Purchase and Sale Agreement*]

**PURCHASER**:

Fund FG-AGV, a series of Forge Investments LLC

By: _Grant George_ _____

Name: Grant George
Title: Principal, Forge Global Advisors
LLC

Address:    4 Embarcadero Center, Floor 15
San Francisco, CA 94111


Attention:    Investment Team
Email:        fundadmin@forgeglobal.com

**PURCHASER**: Gemini IDF 2, LLC

By:

Name: Michael Miller

Title: President

Address:

  12021 Wilshire Blvd #509, Los Angeles, CA 90025

Attention: Michael Miller

Email: geminiidfllc@gmail.com

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Action" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"Additional Purchaser" has the meaning set forth in Section 4.2(b).

"Additional Sale" has the meaning set forth in Section 4.2(b).

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such Person.

"Aggregate Purchase Price" has the meaning set forth in Section 1.2.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means one or more sales, transfers or other dispositions of the Interests or other Shares in a transaction with a purchaser or transferee other than Purchasers and/or their respective Affiliates.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York are authorized or required by statute to close.

"Closing" has the meaning set forth in Section 1.4.

"Closing Date" has the meaning set forth in Section 1.4.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Confidentiality Agreement between each Purchaser and FTX Trading Ltd., West Realm Shires Inc., Alameda Research LLC, Clifton Bay Investments LLC, Paper Bird Inc. and their respective subsidiaries.

"Debtor Affiliates" means the Debtors and their respective wholly owned subsidiaries.

"<u>Debtors</u>" has the meaning set forth in the Recitals.

"<u>Final Order</u>" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"<u>Governmental Entity</u>" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the U.S. Securities and Exchange Commission and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors, any Purchaser or the Subject Company.

"<u>Interests</u>" has the meaning set forth in the Recitals.

"<u>Law</u>" or "<u>Laws</u>" means any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"<u>Lien</u>" means any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation, usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude, restrictive covenant or condition, encroachment, claim, interest, restriction or any other encumbrance of any kind.

"<u>Material Adverse Effect</u>" means any change, development, circumstance, fact or effect that, individually or taken together with any other changes, developments, circumstances, facts or effects is, or would reasonably be expected to be, materially adverse to the financial condition, assets, liabilities, business operations or results of operations of the Subject Company; <u>provided</u>, <u>however</u>, that none of the following, either alone or in combination, shall be deemed to constitute a Material Adverse Effect that is occurring, has occurred or would reasonably be expected to occur: (a) changes, developments, circumstances or facts in or with respect to the economy, credit, capital, securities, digital asset or financial markets or political, regulatory or business conditions in the geographic markets in which the Subject Company has operations or its products or services are sold, (b) changes, developments, circumstances, facts or effects generally affecting the industries, markets or geographical areas in which the Subject Company operates, (c) any change in the price or relative value of any digital currency or cryptocurrency, or any other blockchain-based tokens or assets, (d) any change in existence or legality of any digital currency or cryptocurrency, or any other blockchain-based token or asset, or any halt or suspension in trading of any such digital currency or cryptocurrency on any exchange, (e) changes, events and occurrences in the industries in which the Subject Company operates

A-2

generally, (f) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, any change, development or effect resulting from acts of war (whether or not declared), sabotage, terrorism, military actions or the escalation of any of the foregoing, whether perpetrated or encouraged by a state or non-state actor or actors (other than cyberattacks), any weather or natural disaster, or any outbreak of illness or other public health event (or any measures taken in response thereto) or any other *force majeure* event (except to the extent causing any damage or destruction to or rendering unusable any material facility or property of the Subject Company), whether or not caused by any Person (other than the Subject Company or any of its Affiliates or representatives), (g) changes in law, generally accepted accounting principles or official interpretations of the foregoing, (h) compliance with this Agreement, including any effect on Seller resulting from failure to take any action to which any Purchaser refused consent under this Agreement, (i) the Transactions or any announcement hereof or the identity of any Purchaser, (j) the pendency of the Bankruptcy Proceeding and any action approved by, or motion made before, the Bankruptcy Court, or (k) matters known to or reasonably foreseeable by a Purchaser, taking into account the financial condition, business and operations of Seller, the fact that Seller is involved in the Bankruptcy Proceeding and the circumstances giving rise to such Bankruptcy Proceeding; it being understood that the failure of the Subject Company to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect.

"Operative Documents" means, with respect to the Subject Company, the documents and agreements set forth in Schedule B and any other shareholders agreements, management agreements, bylaws, side letters and other documents and agreements governing the rights and obligations of Seller as an investor in the Subject Company, in each case as amended and/or restated to date.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbitor, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceeding.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Per Share Price" means the per share price set forth opposite the applicable Purchaser's name on Schedule A.

"Permitted Encumbrance" means a restriction on transfer arising solely under applicable federal and state securities Laws and any transfer restrictions set forth in the Operative Documents or the legends on certificates of the Interests.

"Person" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Purchaser" or "Purchasers" has the meaning set forth in the Preamble.

"Purchaser Parties" means, collectively, (i) each Purchaser, (ii) each of the current or former Affiliates of such Purchaser, and (iii) each of the current or former officers, directors,

A-3

employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Sale Disclosures" has the meaning set forth in the Sale Procedures Order.

"Sale Notice" has the meaning set forth in Section 4.1(a).

"Sale Order" means an order entered by the Bankruptcy Court or other court of competent jurisdiction substantially in the form attached as Exhibit 1 to the Sale Procedures Order, subject to (a) immaterial modifications or clarifications or (b) such other changes to which Purchasers consent (such consent not to be unreasonably withheld, conditioned or delayed), in each case, solely to the extent permitted by or in compliance with the Sale Procedures.

"Sale Procedures" has the meaning set forth in the Sale Procedures Order.

"Sale Procedures Order" means the *Order Authorizing and Approving (I) Procedures for Sale of Debtors' Equity Interests in Anthropic, PBC; and (II) Sale(s) of Such Equity Interests in Accordance With Such Procedures Free and Clear of Any Liens, Claims, Interests and Encumbrances* [D.I. 8215].

"Sale Process Date" has the meaning set forth in Section 4.2(a).

"Seller" has the meaning set forth in the Preamble.

"Seller Parties" means, collectively, (i) Seller, (ii) each of the current or former Affiliates of Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Shares" means the Series B Preferred Stock of the Subject Company.

"Subject Company" has the meaning set forth in the Recitals.

"Subject Company Consent" means the consent of, and any other action as required under the terms of the Operative Documents by, the Subject Company to the sale, assignment and transfer of the Interests to Purchasers and any admission of Purchasers as shareholders of the Subject Company.

"Taxes" means any tax or similar duty, fee, charge or assessment thereof imposed by a Governmental Entity, in each case in the nature of a tax, including any interest, penalties and additions imposed with respect to such amount.

"Termination Date" has the meaning set forth in Section 6.2.

A-4

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Documents" means any assignment and assumption agreement and any other instruments of transfer to be executed by Seller and each Purchaser at the applicable Closing, the agreement among Seller, such Purchaser and the Subject Company which relates to the sale, assignment and transfer of the Interests to such Purchaser, the admission or joinder (in respect of the applicable Interests) of such Purchaser under the Operative Documents and the Subject Company Consent, in a form reasonably satisfactory to Seller and such Purchaser.

"Terminated Purchaser" has the meaning set forth in Section 6.2.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges including any interest, penalties and additions imposed with respect to such amount.

[Remainder of page intentionally left blank]

A-5

**SCHEDULE A**

| Name of Purchaser | Interests (Number of Shares) | Per Share Price |
|---|---|---|
| G Squared VI Holdco, LLC | 4,499,325 | $30.0045 |
| Fund FG-BLU, a Series of Forge Investments LLC | 2,266,141 | $30.0045 |
| Fund SCVC-PV-LXVI, a series of SCVC Advisors, LP (Quickscope Investments) | 1,666,416 | $30.0045 |
| Manius Invest Co Ltd (Damac Capital) | 1,666,416 | $30.0045 |
| Constitutional AI Fund, a Series of Abundance Master Fund LLC (Collab LTSE) | 1,067,760 | $30.0045 |
| Augment Collective, LLC Series Anthropic PBC 1 | 833,208 | $30.0045 |
| Gemini Ventures 1, LLC | 416,604 | $30.0045 |
| MW LSVC Anthropic, LLC (Manhattan West) | 386,000 | $30.0045 |
| Constitutional AI Governance Fund 2 LLC | 371,430 | $30.0045 |
| GA-IP Opportunities II, LLC | 333,284 | $30.0045 |
| Elysium VC(N) LLC | 333,283 | $30.0045 |
| KIP Re-Up II Fund (Korea Investment Partners Co., Ltd.) | 333,283 | $30.0045 |
| A.G.P Alternative Investment Fund V- Series 1 LLC (Headwall) | 283,058 | $30.0045 |
| Fund FG-AGV, a Series of Forge Investments LLC | 132,734 | $30.0045 |
| TeleSoft-2020, LP | 103,317 | $30.0045 |
| TeleSoft Capital, LLC | 103,317 | $30.0045 |
| Green Book Ventures Horizon III LLC | 93,952 | $30.0045 |
| Scenic Co-Invest Anthropic LLC | 73,322 | $30.0045 |
| Scenic Private Access Fund I, L.P. | 66,656 | $30.0045 |
| Fund XLVIII, a series of SCVC Advisors, LP (Quickscope Investments) | 23,822 | $30.0045 |
| A.G.P Alternative Investment Fund IV- Series 4 LLC | 20,021 | $30.0045 |

A-1

## SCHEDULE B

| Subject Company | Anthropic, PBC |
| --- | --- |
| **Operative Documents** | M-SAFE Purchase Agreement, dated October 5, 2021 as amended by that certain Amendment to M-SAFE Purchase Agreement dated March 4, 2022 and that certain Amendment No. 2 to M-SAFE Purchase Agreement dated date as of April 27, 2022.<br><br>M-SAFE, dated October 5, 2021.<br><br>Amended and Restated Certificate of Incorporation of Anthropic, PBC, dated January 29, 2024.<br><br>Amended and Restated Bylaws of Anthropic, PBC, effective March 30, 2023.<br><br>Amended and Restated Investors' Rights Agreement, dated January 30, 2024.<br><br>Amended and Restated Right of First Refusal and Co-Sale Agreement, dated January 30, 2024.<br><br>Amended and Restated Voting Agreement, dated January 30, 2024. |

B-1

**Exhibit D-2**

**List of Purchasers**

**Exhibit 1**

**List of Purchasers, Number of Shares and Aggregate Purchase Price**

| Purchaser | Number of Shares | Aggregate Purchase Price |
|---|---|---|
| G Squared VI Holdco, LLC | 4,499,325 | $134,999,997 |
| Fund FG-BLU, a Series of Forge Investments LLC | 2,266,141 | $67,994,428 |
| Fund SCVC-PV-LXVI, a series of SCVC Advisors, LP (Quickscope Investments) | 1,666,416 | $49,999,979 |
| Manius Invest Co Ltd (Damac Capital) | 1,666,416 | $49,999,979 |
| Constitutional AI Fund, a Series of Abundance Master Fund LLC (Collab LTSE) | 1,067,760 | $32,037,605 |
| Augment Collective, LLC Series Anthropic PBC 1 | 833,208 | $24,999,989 |
| Gemini Ventures 1, LLC | 416,604 | $12,499,995 |
| MW LSVC Anthropic, LLC (Manhattan West) | 386,000 | $11,581,737 |
| Constitutional AI Governance Fund 2 LLC | 371,430 | $11,144,571 |
| GA-IP Opportunities II, LLC | 333,284 | $10,000,020 |
| Elysium VC(N) LLC | 333,283 | $9,999,990 |
| Korea Investment Partners Co., Ltd. - KIP Re-Up II Fund | 333,283 | $9,999,990 |
| A.G.P Alternative Investment Fund V- Series 1 LLC (Headwall) | 283,058 | $8,493,014 |
| Fund FG-AGV, a Series of Forge Investments LLC | 132,734 | $3,982,617 |
| TeleSoft-2020, LP | 103,317 | $3,099,975 |
| TeleSoft Capital, LLC | 103,317 | $3,099,975 |
| Green Book Ventures Horizon III LLC | 93,952 | $2,818,983 |
| Scenic Co-Invest Anthropic LLC | 73,322 | $2,199,990 |
| Scenic Private Access Fund I, L.P. | 66,656 | $1,999,980 |
| Fund XLVIII, a series of SCVC Advisors, LP (Quickscope Investments) | 23,822 | $714,767 |
| A.G.P Alternative Investment Fund IV- Series 4 LLC | 20,021 | $600,720 |
| **Total** | **15,073,349** | **$452,268,300** |

**<u>Exhibit D-3</u>**

**Anthropic Sale Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 8215** |

**ORDER (I) AUTHORIZING AND APPROVING SALE OF ANTHROPIC SHARES FREE AND CLEAR OF ANY LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING ENTRY INTO, AND PERFORMANCE UNDER, THE PURCHASE AND SALE AGREEMENT; AND (III) GRANTING RELATED RELIEF**

Upon (i) the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated

debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Sale

Order"), pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§

101 *et seq*. (the "Bankruptcy Code"), rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and rules 2002-1, 6004-1 and 9006-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), authorizing and approving (a) procedures (the "Sale Procedures")

for the sale of all or a portion of the shares of Series B Preferred Stock (the "Anthropic Shares")

held by Debtor Clifton Bay Investments LLC in Anthropic, PBC, a Delaware public benefit

corporation, (b) the sale(s) of the Anthropic Shares in accordance with the Sale Procedures free

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

and clear of any liens, claims, interests and encumbrances, and (c) redaction and filing under seal of certain confidential commercial information, (ii) this Court's order approving the Motion [D.I. 8215] (the "Sale Procedures Order"), and (iii) the Purchase and Sale Agreement (the "Purchase and Sale Agreement", and the transactions contemplated thereby, the "Sale Transaction"), dated as of May 31, 2024, a copy of which is attached as Exhibit 3 to the Sale Disclosures notice in accordance with the Sale Procedures, between Clifton Bay Investments LLC (together with the other Debtors, "Seller") and the purchasers listed on Schedule A to the Purchase and Sale Agreement (each, a "Purchaser" and together, "Purchasers"); and this Court having jurisdiction to consider the approval of the Purchase and Sale Agreement in accordance with the Sale Procedures pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of these Chapter 11 Cases and this matter in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that notice of the Purchase and Sale Agreement and the relief requested therein has been provided in accordance with the Sale Procedures, Bankruptcy Rules and the Local Rules; and that, except as otherwise ordered herein, no other or further notice is necessary; and objections (if any) to the relief requested having been withdrawn, resolved or overruled on the merits; and upon the record of all of the proceedings had before this Court; and this Court having found and determined that the legal and factual bases establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over this matter and over the property of the Debtors' estates pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This Court may issue a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.      <u>Statutory and Rule Predicates</u>.  The statutory and other legal predicates for the approvals and authorization herein are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1 and 9006-1.

C.      <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rule 6004(h), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedures, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein and authorizes the closing of the Sale Transaction contemplated hereby without regard to any stay or delay in its implementation.

D.      <u>Compliance with the Sale Procedures</u>.  The Sale Procedures provided a full, fair and reasonable opportunity for any party to make an offer to purchase the Anthropic Shares.  The disclosures made by the Debtors with respect to the Purchase and Sale Agreement

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* FED. R. BANKR. P. 7052.

and the Sale Transaction were good, complete and adequate.  The Debtors (including Seller), Purchasers and their respective counsel and other advisors have complied, in good faith, with the Sale Procedures Order and the Sale Procedures in all respects.  Through marketing efforts and a competitive sale process conducted in accordance with the Sale Procedures, the Debtors (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Anthropic Shares, (ii) provided potential purchasers sufficient information to enable them to make an informed judgment on whether to bid on the Anthropic Shares and (iii) considered any bids properly submitted in accordance with the Sale Procedures on or before the deadline for bidding.

      E.    <u>No Collusion</u>.  No Purchaser is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  The Purchase and Sale Agreement and the Sale Transaction were negotiated, proposed and entered into by Seller and each Purchaser without collusion or fraud, in good faith and from arm's-length bargaining positions, and are substantively and procedurally fair to all parties.  Neither the Debtors nor any Purchaser has engaged in any conduct that would cause or permit the Purchase and Sale Agreement or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtors nor any Purchaser has violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, no Purchaser has acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.  The Sale Transaction may not be avoided, and no damages may be assessed against any Purchaser or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

F.    <u>Good Faith of Purchasers</u>.  Each Purchaser is purchasing its respective portion of the Anthropic Shares in good faith and for value, and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  Each Purchaser is therefore entitled to all of the protections afforded under section 363(m) and any other applicable or similar bankruptcy or non-bankruptcy law, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) each Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Anthropic Shares; (b) each Purchaser complied with the provisions in the Sale Procedures Order; (c) each Purchaser in no way induced or caused the filing of these Chapter 11 Cases by the Debtors; (d) all payments to be made, and all other material agreements or arrangements entered into or to be entered into, by each Purchaser in connection with the Sale Transaction have been disclosed; (e) no Purchaser has violated section 363(n) of the Bankruptcy Code by any action or inaction; (f) the negotiation and execution of the Purchase and Sale Agreement were at arm's length and in good faith, and at all times each Purchaser and Seller were represented by competent counsel of their choosing; and (g) no Purchaser has acted in a collusive manner with any person.  Each Purchaser will be acting in good faith within the meaning of section 363(m) in closing the transactions contemplated by the Purchase and Sale Agreement.

G.    <u>Highest and Best Offer</u>.  The Debtors and their advisors, including, without limitation, Perella Weinberg Partners LP, have appropriately marketed the Anthropic Shares and conducted the related sale process contemplated by the Sale Procedures Order, and a reasonable opportunity has been given to any interested party to make a higher or better offer for the Anthropic Shares.  No other person or entity or group of entities has offered to purchase the Anthropic Shares for higher or otherwise better value to the Debtors' estates than Purchasers.

5

The offer to purchase the Anthropic Shares made by each Purchaser, under the terms and conditions set forth in the Purchase and Sale Agreement: (a) was made in good faith and complied in all respects with the Sale Procedures Order; (b) is the highest or otherwise best offer obtained for the Anthropic Shares and will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative; (c) is for fair, adequate and sufficient consideration that constitutes reasonably equivalent value for the Anthropic Shares being conveyed to such Purchaser; (d) is fair and reasonable; (e) is in the best interests of the Debtors' estates; and (f) would not have been made by such Purchaser absent the protections afforded to such Purchaser by this Sale Order.

H.      The Debtors' determination that the Sale Transaction, pursuant to the Purchase and Sale Agreement, provides the highest or otherwise best offer for the Anthropic Shares, and their related decision to sell the Anthropic Shares, constitute a reasonable exercise of the Debtors' business judgment.  The facts and circumstances demonstrate the Debtors' business judgment to sell the Anthropic Shares to Purchasers at this time, and the Debtors have articulated sound business reasons for consummating the Sale Transaction and for selling the Anthropic Shares outside of a chapter 11 plan.  Moreover, the sale of the Anthropic Shares outside of a chapter 11 plan pursuant to the Purchase and Sale Agreement neither impermissibly restructures the rights of the Debtors' creditors nor dictates the terms of any chapter 11 plan.  The Sale Transaction does not constitute a *sub rosa* chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver and consummate the Sale Transaction, subject to this Sale Order.

I.      <u>Fair Consideration</u>.  The consideration provided by each Purchaser pursuant to the Purchase and Sale Agreement constitutes reasonably equivalent value (as those

terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent

Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession or the

District of Columbia.

    J.  <u>No Successor or Other Derivative Liability</u>.  As a result of any action

taken in connection with the Sale Transaction, the Purchase and Sale Agreement, or this Sale

Order: (a) no Purchaser is a successor to or mere continuation of or substantial continuation of

the Debtors or their estates and there is no continuity of enterprise between any Purchaser and

the Debtors; and (b) no Purchaser shall be deemed to be holding itself out to the public as a

continuation of the Debtors based on the Sale Transaction.  No Purchaser is, or shall be,

considered a successor in interest to any of the Debtors or their estates, by reason of any theory

of law or equity, and the Sale Transaction does not amount to a consolidation, succession,

merger, or de facto merger of any Purchaser and the Debtors and/or the Debtors' estates.  No

Purchaser would have entered into the Purchase and Sale Agreement if the sale of the Anthropic

Shares were not made free and clear of any successor liability of such Purchaser.

    K.  <u>Corporate Power and Authority</u>.  As set forth in section 2.1 of the

Purchase and Sale Agreement, Seller (a) has full corporate power and authority to execute and

deliver the Purchase and Sale Agreement and all other documents contemplated thereby, (b) has

all corporate authority necessary to consummate the Sale Transaction, and (c) has taken all

corporate action and formalities necessary to authorize and approve the Purchase and Sale

Agreement and the consummation of the Sale Transaction.  Seller's sale of the Anthropic Shares

has been duly and validly authorized by all necessary corporate action of the Debtors.  No

consents or approvals, other than those expressly provided for in the Purchase and Sale

Agreement, are required for Seller to consummate the Sale Transaction.

L.     The Purchase and Sale Agreement was not entered into for the purpose of

hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the

United States, any state, territory, possession or the District of Columbia.  Neither the Debtors

nor any Purchaser is entering into the Sale Transaction fraudulently for the purpose of statutory

and common law fraudulent conveyance and fraudulent transfer claims.

M.     Title to Assets.  The transfer of the Debtors' rights, titles and interests to

the Anthropic Shares to each Purchaser will be, as of the Closing Date (as defined in the

Purchase and Sale Agreement), a legal, valid and effective transfer of such rights, titles and

interests in such Anthropic Shares, which transfer vests or will vest such Purchaser with all

rights, titles and interests of the Debtors to such Anthropic Shares free and clear of any Liens (as

defined below and in the Purchase and Sale Agreement), other than the permitted encumbrances

set forth in the Purchase and Sale Agreement (including restrictions arising under applicable

securities laws or as set forth in the Company Documents or the legends on certificates of the

Anthropic Shares) (such encumbrances, "Permitted Encumbrances").  The Purchase and Sale

Agreement is a valid and binding contract between Seller and each Purchaser and shall be

enforceable according to its terms.

N.     Satisfaction of Section 363(f) Standards.  The conditions of section 363(f)

of the Bankruptcy Code have been satisfied in full, and upon entry of this Sale Order, the

Debtors are authorized to transfer all of their rights, titles and interests in and to the Anthropic

Shares free and clear of any interest in the property, other than Permitted Encumbrances.  The

Debtors may sell the Anthropic Shares free and clear of any liens (statutory or otherwise),

charges, pledges, mortgages, leases, easements, hypothecations, usufructs, deeds of trust, security interests, options, rights of use, first offer or first refusal, servitudes, restrictive covenants or conditions, encroachments, claims, interests, restrictions, or any other encumbrances of any kind (collectively, "Liens"), other than Permitted Encumbrances, against the Debtors, their estates or the Anthropic Shares because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Each holder with a Lien on the Anthropic Shares to be transferred pursuant to the Purchase and Sale Agreement: (a) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented; (b) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; or (c) otherwise falls within one or more of the other subsections of section 363(f) of the Bankruptcy Code. Holders of Liens against the Debtors, their estates or the Anthropic Shares who did not object, or who withdrew their objections, to the Sale Transaction (except with respect to Permitted Encumbrances), are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Liens are adequately protected by having their Liens, if any, in each instance against the Debtors, their estates or the Anthropic Shares, attach to the net cash proceeds of the Sale Transaction ultimately attributable to the Anthropic Shares in which such creditor alleges a Lien, in the same order of priority, with the same validity, force and effect that such Liens had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

O.     No Purchaser would have entered into the Purchase and Sale Agreement or would consummate the Sale Transaction if the sale of the Anthropic Shares to such Purchaser were not free and clear of any Liens (other than Permitted Encumbrances), or if such Purchaser

9

or any of the applicable Purchaser Parties (as defined in the Purchase and Sale Agreement) would, or in the future could, be liable for any such Lien. The total consideration to be provided by each Purchaser under the Purchase and Sale Agreement reflects such Purchaser's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to, interest in and possession of the Anthropic Shares free and clear of any Liens (other than Permitted Encumbrances). Not transferring the Anthropic Shares free and clear of any Liens (other than Permitted Encumbrances) would adversely impact the Debtors' efforts to maximize the value of the estates, and the transfer of the Anthropic Shares other than pursuant to a transfer that is free and clear of any Liens (other than Permitted Encumbrances) would be of substantially less benefit to the Debtors' estates.

P.     Release. The entry into a release by Seller on behalf of itself, and on behalf of its predecessors and successors, past and present agents, representatives, partners, directors, officers, attorneys, employees, shareholders, affiliates, subsidiaries, heirs, executors, administrators and assigns, as well as any person acting by, through, under or in concert with any of the foregoing (collectively, the "Releasors") in favor of Anthropic, PBC, and its predecessors and successors, past and present agents, representatives, partners, directors, officers, attorneys, employees, shareholders, affiliates, subsidiaries, heirs, executors, administrators and assigns, as well as any person acting by, through, under or in concert with any of the foregoing, (collectively, the "Releasees") in respect of any and all claims, demands, causes of action, obligations, damages, losses, liabilities, contracts, agreements, promises, debts, costs and expenses of any kind whatsoever, whether at law or in equity, asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims"), which such party ever had, now has, or may claim to have against Anthropic, PBC, arising from the Sale

10

Transaction, but excluding any other Claims that the Releasors may have against Anthropic, PBC, including (a) any Claims arising out of Seller's acquisition or ownership of the Anthropic Shares, (b) any Claims arising in any Releasor's capacity as a shareholder of Anthropic, PBC and unrelated to the Sale Transaction and (c) any claims arising after the date the Sale Transaction is consummated (such release, the "<u>Release</u>") is approved in full.  Anthropic, PBC would not have consented to the Sale Transaction in the absence of such releases, and therefore the releases are supported by adequate consideration and are reasonable.  *See* Mendelsohn Declaration ¶ 21.

> Q.    <u>Waiver of Bankruptcy Rule 6004(h)</u>.  Good and sufficient reasons for

approval of the Purchase and Sale Agreement and the Sale Transaction have been articulated. The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale Transaction other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates and progress these Chapter 11 Cases.  Accordingly, there is cause to waive or lift the stay contemplated by Bankruptcy Rule 6004(h) with respect to the Sale Transaction.  To maximize the value of the Anthropic Shares, it is essential that the Sale Transaction occur within the time constraints set forth in the Purchase and Sale Agreement.  Time is of the essence in consummating the Sale Transaction and the Debtors and Purchasers intend to close the Sale Transaction as soon as practicable.  Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Aggregate Purchase Prices under the Purchase and Sale Agreement, the proposed Sale Transaction should be approved.

R.     The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f) and 363(m), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

S.     <u>Personally Identifiable Information</u>.  The Sale Transaction does not involve the sale of any personally identifiable information.  Thus, the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

T.     <u>Legal and Factual Bases</u>.  The legal and factual bases establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their estates.

IT IS HEREBY ORDERED THAT:

**A.     General Provisions**

1.     The sale of the Anthropic Shares and the other relief requested is granted as set forth herein, and the Purchase and Sale Agreement and the provisions thereof and the Sale Transaction are approved in their entirety as set forth herein.

2.     All objections, responses, reservations of rights and requests for any continuances concerning the Sale Transaction are resolved in accordance with the terms of this Sale Order.  To the extent any such objections, responses, reservations of rights or requests for any continuances were not otherwise withdrawn, waived, settled, or resolved, such are hereby overruled and denied on the merits.  All interested parties that failed to timely object to the Sale Transaction are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

12

3.      Notice of the Purchase and Sale Agreement and the sale of the Anthropic

Shares free and clear of any Liens, except Permitted Encumbrances, was fair, equitable, proper,

and sufficient under the circumstances and complied in all respects with the Sale Procedures and

the Sale Procedures Order.

**B.      Approval of the Purchase and Sale Agreement**

4.      The Purchase and Sale Agreement and all of the terms and conditions

thereof are hereby authorized and approved in all respects.  The failure to specifically include or

make reference to any particular provision of the Purchase and Sale Agreement in this Sale

Order shall not impair the effectiveness of such provision, it being the intent of this Court that

the Purchase and Sale Agreement and the Sale Transaction are authorized and approved in their

entirety.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors

are authorized and empowered to take any and all actions necessary or appropriate to

(a) consummate the Sale Transaction to Purchasers in accordance with the terms and conditions

of the Purchase and Sale Agreement, (b) close the Sale Transaction as contemplated in the

Purchase and Sale Agreement and this Sale Order, and (c) execute and deliver, perform under,

consummate and implement the Purchase and Sale Agreement, together with all additional

instruments and documents that may be reasonably necessary or desirable to implement the

Purchase and Sale Agreement and the Sale Transaction.  No Purchaser shall be required to seek

or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any

of its remedies under the Purchase and Sale Agreement or any other sale-related document.  The

automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent

necessary to implement the preceding sentence and the other provisions of this Sale Order;

provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

6.        This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors of and holders of equity interests in, the Debtors, any holders of Liens in, against or on all or any portion of the Anthropic Shares (whether known or unknown), Purchasers and all successors and assigns of Purchasers, the Anthropic Shares and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to Chapter 7 under the Bankruptcy Code of these Chapter 11 Cases.  This Sale Order and the Purchase and Sale Agreement shall inure to the benefit of the Debtors, their estates and creditors, Purchasers and the respective successors and assigns of each of the foregoing.

## C.        **Consummation of the Sale Transaction**

7.        Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer all of their rights, titles and interests to each Purchaser's respective Anthropic Shares to such Purchaser on the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such rights, titles and interests in such Anthropic Shares and shall vest such Purchaser with all of the Debtors' rights, titles and interests in such Anthropic Shares and, upon the Debtors' receipt of the applicable Aggregate Purchase Price, shall be free and clear of any Liens, including but not limited to, successor or successor-in-interest liability or, any tax liens or mechanic's liens asserted against such Anthropic Shares, except Permitted Encumbrances, with any Liens to attach to the net cash proceeds (or any Debtor's rights against any other Debtor under the Amended Final Order (I) Authorizing the Debtors to (A) Operate a Postpetition Cash Management System, (B) Maintain Existing Business Forms and (C) Perform Intercompany Transactions, (II) Granting A Partial Waiver of the Deposit Guidelines Set Forth in Section 345(b) and (III) Granting Certain Related Relief [D.I. 1706]) ultimately attributable to the

14

property against or in which such Liens are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such Liens now have against such Anthropic Shares, subject to any rights, claims and defenses the Debtors or their estates and all interested parties, as applicable, may possess with respect to any such asserted liens, claims, encumbrances and interests.   The provisions of this Sale Order authorizing and approving the transfer of the Anthropic Shares free and clear of any Liens (other than Permitted Encumbrances) shall be self-executing, and neither the Debtors nor any Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.   The Release is approved in full.

8.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record except Permitted Encumbrances.

9.      If any person or entity which has filed statements or other documents or agreements evidencing Liens in, against or on all or any portion of the Anthropic Shares shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and any other documents necessary for the purpose of documenting the release of any Liens which the person or entity has or may assert with respect to all or any portion of the Anthropic Shares, the Debtors, Purchasers and each of their respective officers, employees and agents are hereby authorized and empowered to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Anthropic Shares.

10. This Sale Order is and shall be effective as a determination that, on the Closing Date, any Liens existing as to the Anthropic Shares prior to the Closing Date, except Permitted Encumbrances, shall have been unconditionally released, discharged and terminated from the Anthropic Shares, and that the conveyances described herein have been effected. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

**D.**     **Prohibition of Actions Against Purchasers**

11. Except as expressly provided for in this Sale Order or the Purchase and Sale Agreement, no Purchaser shall have any liability or other obligation or responsibility of the Debtors arising under or related to its respective Anthropic Shares prior to the Closing. No Purchaser is a "successor" to the Debtors or their estates by reason of any theory of law or equity. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Purchase and Sale Agreement, no Purchaser shall be liable for any claims against the Debtors or any of their predecessors or affiliates, and no Purchaser shall have any successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental (subject to paragraph 15 below), successor or transferee liability, securities law, tax law, labor law, de facto merger, mere continuation or substantial

16

continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, environmental liabilities (subject to paragraph 15 below), and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to any of such Purchaser's respective Anthropic Shares prior to the Closing.  The Sale Transaction does not amount to a consolidation, merger or de facto merger of any Purchaser, on the one hand, and the Debtors, the Debtors' affiliates and/or the Debtors' estates, on the other hand, and there is not substantial continuity between any Purchaser, on the one hand, and the Debtors or their affiliates, on the other hand, and no Purchaser is a mere continuation of the Debtors or their estates, and no Purchaser constitutes a successor to the Debtors or their estates.  For purposes of paragraphs 11 to 14 of this Sale Order, all references to a Purchaser shall include its respective Purchaser Parties.

12.     Except as expressly otherwise set forth in the Purchase and Sale Agreement and this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants and other creditors, holding Liens against or in all or any portion of the Anthropic Shares (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors or the Anthropic Shares prior to the Closing Date or the Sale Transaction, including the transfer of the Anthropic Shares to Purchasers, hereby are forever barred, estopped and permanently enjoined from asserting against any Purchaser, its Affiliates, its successors or assigns, their

17

property or the Anthropic Shares, such persons' or entities' Liens with respect to the Anthropic

Shares, including, without limitation, the following actions: (a) commencing or continuing in any

manner any action or other proceeding against any Purchaser, its Affiliates, its successors, assets

or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment,

award, decree or order against any Purchaser, its Affiliates, its successors, assets or properties;

(c) creating, perfecting or enforcing any Liens against any Purchaser, its Affiliates, its

successors, assets or properties; (d) asserting any unexercised set-off or right of subrogation

against any obligation due with respect to any Purchaser, its Affiliates or its successors;

(e) commencing or continuing any action, in any manner or place, that does not comply or is

inconsistent with the provisions of this Sale Order, or the agreements or actions contemplated or

taken in respect thereof or (f) to the extent provided in section 525 of the Bankruptcy Code,

revoking, terminating or failing or refusing to transfer or renew any license, permit or

authorization to operate the businesses of Anthropic, subject to paragraph 16 below.  On the

Closing Date, each creditor is authorized and directed to execute such documents and take all

other actions as may be necessary to release Liens in or on the Anthropic Shares (except

Permitted Encumbrances), if any, as provided for herein, as such Liens may have been recorded

or may otherwise exist.

13.     All persons and entities are hereby forever prohibited and enjoined from

taking any action that would adversely affect or interfere (a) with the ability of the Debtors to

sell and transfer the Anthropic Shares to any Purchaser in accordance with the terms of the

Purchase and Sale Agreement and this Sale Order, and (b) with the ability of any Purchaser to

acquire and take possession of the Anthropic Shares in accordance with the terms of the

Purchase and Sale Agreement and this Sale Order.

14.     Each Purchaser has given substantial consideration under the Purchase and Sale Agreement for the benefit of the Debtors and their estates.  The consideration given by each Purchaser shall constitute valid and valuable consideration for the sale being free and clear of any potential liens, claims, interests, and encumbrances, including any Liens, as to the Anthropic Shares pursuant to this Sale Order, except with respect to the Permitted Encumbrances, and free and clear of any potential claims of successor liability against such Purchaser.  The consideration provided by Purchasers for the Anthropic Shares under the Purchase and Sale Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

**E.      Other Provisions**

15.     Nothing in this Sale Order or the Purchase and Sale Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order.  In addition, nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law, including the jurisdiction to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

16.     Further, nothing in this Sale Order or Purchase and Sale Agreement authorizes the transfer or assignment of any governmental license, permit, registration, authorization or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law as appropriate.  Nothing in this Sale Order authorizes any sale or transfer of the Anthropic Shares, or permits the Sale Transaction to close, unless the Debtors comply with all applicable laws and regulations and obtain all necessary governmental approvals.

17.     Notwithstanding anything to the contrary in this Sale Order, nothing in this Sale Order constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

18.     The consideration provided by each Purchaser to the Debtors pursuant to the Purchase and Sale Agreement for the Anthropic Shares constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

19.     The sale of the Anthropic Shares does not include the sale of any causes of action held by any of the Debtors against any person or entity, and the sale of the Anthropic Shares and the Release do not include the sale or release of any causes of action held by any of the Debtors against Samuel Bankman-Fried, Gary Wang, Nishad Singh, Caroline Ellison or any person known by the Debtors to have a familial relationship with any of the foregoing persons.

20.     The Sale Transaction is undertaken by each Purchaser without collusion and in good faith, within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction unless such authorization and such Sale Transaction were duly stayed pending such appeal at the time of the Closing.  Each Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full rights, benefits, privileges and protections of

section 363(m) of the Bankruptcy Code.  The Debtors and Purchasers will be acting in good faith if they proceed to consummate the Sale Transaction at any time after the entry of this Order.

21.     As a good faith purchaser of the Anthropic Shares, each Purchaser has not entered into an agreement with any other potential bidders, and has not colluded with any other bidders, potential bidders, or any other parties interested in the Anthropic Shares, and therefore, neither the Debtors nor any successor-in-interest to the Debtors' estates shall be entitled to bring an action against such Purchaser, and the Sale Transaction may not be avoided pursuant to section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) in respect of the Purchase and Sale Agreement or Sale Transaction.

22.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent Chapter 7 case into which these Chapter 11 Cases may be converted or (c) any related proceeding subsequent to entry of this Sale Order shall conflict with or derogate from the provisions of the Purchase and Sale Agreement or the terms of this Sale Order.  In the event there is a conflict between this Sale Order and the Purchase and Sale Agreement (or any ancillary agreements executed in connection therewith), this Sale Order shall control and govern.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.  To the extent that this Sale Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, the terms of this Sale Order shall control.  Except as expressly provided herein, nothing contained in this Sale Order shall modify, amend or waive any provision of any Company Document.

23.     Pursuant to Bankruptcy Rules 7062, 9014 and 6004(h), this Sale Order shall be effective and enforceable immediately upon entry, the Debtors and Purchasers are authorized

to close the Sale Transaction immediately upon entry of this Sale Order, subject to all the required

governmental approvals having been obtained, and the 14-day stay provided in Bankruptcy Rule

6004(h) is hereby expressly waived and shall not apply.

24.     The failure specifically to include any particular provision of the Purchase

and Sale Agreement in this Sale Order shall not diminish or impair the effectiveness of such

provision, it being the intent of this Court that the Purchase and Sale Agreement be authorized

and approved in its entirety; provided, however, that this Sale Order shall govern if there is any

inconsistency between the Purchase and Sale Agreement (including all ancillary documents

executed in connection therewith) and this Sale Order.

25.     The Purchase and Sale Agreement and any related agreements, documents

or other instruments may be modified, amended or supplemented by the parties thereto and in

accordance with the terms thereof, without further order of this Court, with prior written notice

to the Committee, provided that any such modification, amendment or supplement does not have

a material adverse effect on the Debtors' estates or any of the Debtors' creditors.  If the Purchase

and Sale Agreement is modified, the Debtors shall file the modified version with the Court.

26.     This Court shall retain jurisdiction to, among other things, interpret,

implement and enforce the terms and provisions of this Sale Order and the Purchase and Sale

Agreement, all amendments thereto and any waivers and consents thereunder and each of the

agreements executed in connection therewith to which the Debtors are a party, and to adjudicate,

if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

Nothing contained herein shall be deemed a submission by Anthropic to the jurisdiction of the

Bankruptcy Court.

27.     The Purchase and Sale Agreement shall be in full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

28.     No bulk sales law, bulk transfer law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes (as defined in the Purchase and Sale Agreement)) shall apply to the Debtors' conveyance of the Anthropic Shares or this Sale Order.  Nothing in this Sale Order establishes a tax exemption under section 1146(a) of the Bankruptcy Code.

29.     The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

30.     Each Purchaser is a party-in-interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order, the Sale Transaction and any issues related to or otherwise connected to the Purchase and Sale Agreement and the Sale Transaction.

31.     Subject to the Release, nothing in this Sale Order shall affect the obligations, if any, of the Debtors, Purchasers, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

32.     Nothing in this Sale Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impairing or diminishing any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not the Anthropic Shares.

33.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Dated: June 13th, 2024                    JOHN T. DORSEY
Wilmington, Delaware                      UNITED STATES BANKRUPTCY JUDGE