**Exhibit E-1**

**FTX Europe Share and Purchase Asset Agreement**

# EXHIBIT B

## Share and Asset Purchase Agreement

EXECUTION VERSION

**SHARE AND ASSET PURCHASE AGREEMENT**

**by and among**

**FTX Europe AG**

and

**the Purchaser Parties set forth herein**

**Dated as of February 7, 2024**

# TABLE OF CONTENTS

## ARTICLE 1

### PURCHASE AND SALE

1.1    Purchase and Sale of Transferred Interests ........................................................... 2
1.2    Purchase and Sale of Transferred Assets ............................................................. 2
1.3    Excluded Assets ................................................................................................... 2
1.4    Assumption of Liabilities ..................................................................................... 3
1.5    Purchase Price ...................................................................................................... 3
1.6    Closing ................................................................................................................. 3
1.7    Closing Deliveries ............................................................................................... 4
1.8    Non-Assignment of Assets .................................................................................. 4
1.9    Withholding .......................................................................................................... 5

## ARTICLE 2

### REPRESENTATIONS AND WARRANTIES

2.1    Representations and Warranties of Seller ............................................................ 5
2.2    Representations and Warranties of Purchaser Parties .......................................... 6

## ARTICLE 3

### COVENANTS

3.1    Interim Operations ............................................................................................. 10
3.2    Tax Matters ........................................................................................................ 10
3.3    Cyprus Regulatory Matters ................................................................................ 13
3.4    Confidentiality ................................................................................................... 13
3.5    Books and Records; Information ........................................................................ 14
3.6    Intellectual Property Matters ............................................................................. 15
3.7    Indemnification for Assumed Liabilities ........................................................... 16
3.8    Collateral Claim Settlement Agreement ............................................................ 17

## ARTICLE 4

### BANKRUPTCY AND MORATORIUM MATTERS

4.1    Bankruptcy Court Filings ................................................................................... 17
4.2    Swiss Court Filings ............................................................................................ 18
4.3    Alternative Transaction ...................................................................................... 19
4.4    Disclosure of Connections to Debtor Affiliates ................................................ 19

i

# ARTICLE 5

## CONDITIONS TO CLOSING

5.1 Mutual Conditions ........................................................................................................... 19
5.2 Conditions to Obligation of Purchaser Parties .............................................................. 20
5.3 Conditions to Obligation of Seller ................................................................................. 20

# ARTICLE 6

## TERMINATION

6.1 Grounds for Termination ................................................................................................ 20
6.2 Effect of Termination ..................................................................................................... 21

# ARTICLE 7

## OTHER MATTERS

7.1 Waiver, Amendment ....................................................................................................... 22
7.2 Remedies ......................................................................................................................... 22
7.3 No Survival of Representations and Warranties or Covenants ....................................... 22
7.4 Expenses .......................................................................................................................... 22
7.5 Notices ............................................................................................................................ 22
7.6 Specific Performance ...................................................................................................... 24
7.7 Fiduciary Obligations ..................................................................................................... 24
7.8 Entire Understanding; No Third-Party Beneficiaries .................................................... 24
7.9 Assignment ..................................................................................................................... 24
7.10 Counterparts .................................................................................................................... 25
7.11 Severability ..................................................................................................................... 25
7.12 No Presumption ............................................................................................................... 25
7.13 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ................................ 25
7.14 Damages ........................................................................................................................... 26
7.15 Interpretation ................................................................................................................... 26
7.16 Fulfillment of Obligations ............................................................................................... 26
7.17 No Set-Off ....................................................................................................................... 27

4861-4271-8881 v.6

## LIST OF EXHIBITS

EXHIBIT A  DEFINITIONS

EXHIBIT B  FORM OF RELEASE AGREEMENT

EXHIBIT C  FORM OF INTER-DEBTOR RESTRUCTURING AGREEMENT

EXHIBIT D  FORM OF COLLATERAL CLAIM SETTLEMENT AGREEMENT

EXHIBIT E-1  FORM OF FTX EU LTD SHARE TRANSFER DOCUMENTS

EXHIBIT E-2  FORM OF FTX SWITZERLAND GMBH SHARE TRANSFER DOCUMENTS

EXHIBIT E-3  FORM OF FTX TRADING GMBH SHARE TRANSFER DOCUMENTS

EXHIBIT E-4  FORM OF FTX CERTIFICATES GMBH SHARE TRANSFER DOCUMENTS

EXHIBIT E-5  FORM OF CONCEDUS DIGITAL ASSETS GMBH SHARE TRANSFER DOCUMENTS

EXHIBIT E-6  FORM OF CM-EQUITY AG SHARE TRANSFER DOCUMENTS

EXHIBIT E-7  FORM OF FTX STRUCTURED PRODUCTS AG SHARE TRANSFER DOCUMENTS

EXHIBIT F  FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

## LIST OF SCHEDULES

SCHEDULE A  TRANSFERRED INTERESTS

SCHEDULE B  OWNED BRANDS AND TRADE NAMES

SCHEDULE C  OWNED IT ASSETS

SCHEDULE D  CUSTOMER WITHDRAWAL LIABILITIES

This SHARE AND ASSET PURCHASE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "Agreement"), dated as of February 7, 2024, is made by and among FTX Europe AG, a Swiss stock corporation ("Seller"), on the one hand, and Patrick Gruhn, Robin Matzke, Lorem Ipsum RM UG, a German limited liability company (the "Purchaser Shareholders") and CredoMedia GmbH, a German limited liability company (the "Purchaser Entity", and, together with the Purchaser Shareholders, the "Purchaser Parties"), on the other hand. The signatories to this Agreement are collectively referred to as the "Parties" and individually as a "Party".

## Recitals

WHEREAS, on November 11, 2022 (the "Petition Date") and November 14, 2022, FTX Trading Ltd. ("FTX Trading") and certain of its Affiliates, including Seller and the Transferred Subsidiaries (collectively, the "Debtors") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "Bankruptcy Code") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases (the "Chapter 11 Cases") are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "Bankruptcy Proceeding");

WHEREAS, on April 11, 2023, Seller entered into moratorium proceedings under the Laws of Switzerland (the "Swiss Moratorium Proceeding") before the Composition Court of the District Court Höfe in Wollerau, Schwyz, Switzerland (the "Swiss Court");

WHEREAS, on the date hereof, counsel for certain affiliates of Seller, for certain of the Purchaser Parties and for certain other parties (such parties, together, the "Settlement Parties") have entered into a stipulation (the "Settlement Stipulation"), pursuant to which the Settlement Parties agreed, on the terms and subject to the conditions set forth therein, to finally settle and resolve certain claims and to withdraw certain motions (the "Settlement");

WHEREAS, Seller holds equity interests (the "Transferred Subsidiary Interests") in certain wholly owned Subsidiaries of Seller (the "Transferred Subsidiaries"), as further set forth on Part A of Schedule A;

WHEREAS, Seller holds minority equity interests (the "Transferred Minority Interests" and, together with the Transferred Subsidiary Interests, the "Transferred Interests") in CONCEDUS Digital Assets GmbH, a German limited liability company ("Concedus"), and CM-Equity AG, a German stock corporation ("CM Equity"), as further set forth on Part B of Schedule A;

WHEREAS, Seller desires to sell, assign, convey and transfer to the Purchaser Entity, and the Purchaser Parties desire, jointly and severally, to cause the Purchaser Entity and the Purchaser Entity desires to purchase, the Transferred Interests and the Transferred Assets and assume the Assumed Liabilities, pursuant to Section 363 of the Bankruptcy Code, all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors of Seller has determined that it is advisable and in the best interests of Seller's estate and the beneficiaries of such estate to consummate the Transactions and has approved this Agreement;

WHEREAS, Seller intends to seek the entry of one or more Orders of the Bankruptcy Court approving this Agreement and authorizing the Debtors to consummate the Transactions;

WHEREAS, Seller intends to seek the entry of one or more Orders of the Swiss Court approving this Agreement and authorizing Seller to consummate the Transactions; and

WHEREAS, the Parties acknowledge and agree that the Transactions are being made at arm's length and in good faith and acknowledge that the consideration to be paid is fair value and reasonably equivalent value for the purchase by the Purchaser Entity.

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## PURCHASE AND SALE

1.1     <u>Purchase and Sale of Transferred Interests</u>. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller agrees to sell, assign, convey, transfer and deliver to the Purchaser Entity, and the Purchaser Parties agree, jointly and severally, that the Purchaser Entity shall purchase and accept from Seller, all of Seller's right, title and interest in, to and under the Transferred Interests, which purchase shall be free and clear of any Liens other than restrictions on transfer arising solely under applicable Law ("<u>Permitted Liens</u>").

1.2     <u>Purchase and Sale of Transferred Assets</u>. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller agrees to sell, transfer, assign, convey and deliver to the Purchaser Entity, and the Purchaser Parties agree, jointly and severally, that the Purchaser Entity shall purchase and accept from Seller, all of Seller's right, title and interest in, to and under, as of the Closing, the Transferred Assets, free and clear of any Liens other than Permitted Liens. "<u>Transferred Assets</u>" means only the following properties, rights, interests and other assets of Seller, as of the Closing:

(a)     the Owned Business Know-How;

(b)     the Owned Brands and Trade Names;

(c)     the Owned IT Assets; and

(d)     the Transferred Books and Records.

1.3     <u>Excluded Assets</u>. Notwithstanding anything to the contrary set forth in this Agreement or in any Transaction Document, the Parties expressly acknowledge and agree that

2

Seller and its Affiliates (excluding the Transferred Subsidiaries) shall retain all of their existing rights, title and interest in, to and under, and nothing in this Agreement shall be construed to sell, transfer, assign or convey hereunder any assets, properties or rights of Seller and its Affiliates (excluding the Transferred Subsidiaries) other than the Transferred Assets and the Transferred Interests (all other assets, properties or rights of Seller and its Affiliates (excluding the Transferred Subsidiaries), the "Excluded Assets"). Seller and its Affiliates (excluding the Transferred Subsidiaries) shall retain all of their respective rights, title and interest in, to and under the Excluded Assets and the Purchaser Parties and the Purchaser Entity shall not acquire and shall have no rights with respect to the right, title and interest of Seller and its Affiliates (excluding the Transferred Subsidiaries) in, to and under the Excluded Assets.

1.4     Assumption of Liabilities. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser Entity shall assume and shall otherwise in a timely manner pay, perform and discharge, and be responsible for, in accordance with their respective terms, the following Liabilities of Seller and the Transferred Subsidiaries (collectively, the "Assumed Liabilities"):

(a)     all Liabilities arising out of the ownership, use or operation of the Transferred Assets, in each case, accruing or arising on or after the Closing; and

(b)     all other Liabilities, that the Purchaser Parties have expressly assumed or agreed to assume or be responsible for under this Agreement and the other Transaction Documents;

provided, for the avoidance of doubt, that the Assumed Liabilities shall not include the Customer Withdrawal Liabilities.

1.5     Purchase Price. The purchase price (the "Purchase Price") to be paid by the Purchaser Entity for the Transferred Assets and the Transferred Interests shall be comprised of:

(a)     ten million nine hundred thousand Dollars ($10,900,000) plus applicable Swiss Transfer Taxes (the "Closing Payment") to be paid to Seller at the Closing in accordance with Section 1.7(a)(i);

(b)     ten million nine hundred thousand Dollars ($10,900,000) plus applicable Swiss Transfer Taxes (the "First Deferred Payment") to be paid to Seller by no later than six (6) months after the Closing Date (the "First Deferred Payment Date"), by wire transfer of immediately available funds to a bank account designated by Seller in writing to the Purchaser Entity; and

(c)     ten million nine hundred thousand Dollars ($10,900,000) plus applicable Swiss Transfer Taxes(the "Second Deferred Payment") to be paid to Seller by no later than twelve (12) months after the Closing Date (the "Second Deferred Payment Date"), by wire transfer of immediately available funds to a bank account designated by Seller in writing to the Purchaser Entity.

1.6     Closing. The closing of the Transactions (the "Closing") will take place at 10:00 a.m., Central European Time, at the offices of Lenz & Staehelin, Brandschenkestrasse 24, CH-8027 Zurich, Switzerland, or remotely via electronic exchange of documents and signatures on the

3

third (3rd) Business Day following the satisfaction or waiver of the conditions to closing specified in <u>Article 5</u> (other than such conditions which by their nature may only be satisfied on the date of the Closing), or at such other time as the Purchaser Parties and Seller shall agree in writing (the date on which the Closing actually occurs being referred to as the "<u>Closing Date</u>").

1.7     <u>Closing Deliveries</u>.

(a)     At the Closing, upon satisfaction or waiver of the conditions set forth in <u>Article 5</u> hereof:

(i)     the Purchaser Entity shall pay to Seller the Closing Payment, by wire transfer of immediately available funds to a bank account to be designated by Seller in writing no later than two (2) Business Days prior to the Closing;

(ii)     Seller shall deliver to the Purchaser Entity counterparts of the Share Transfer Documentation (other than the Notarized Share Transfer Documentation) and the Bill of Sale and Assignment and Assumption Agreement, in each case duly executed by Seller, and the Purchaser Entity shall deliver to Seller counterparts of the Share Transfer Documentation (other than the Notarized Share Transfer Documentation) and the Bill of Sale and Assignment and Assumption Agreement, in each case duly executed by the Purchaser Entity;

(iii)     Seller shall deliver to the Purchaser Parties a counterpart or counterparts of the Release Agreement duly executed by Seller, the Transferred Subsidiaries and the other Debtors contemplated to be parties thereto, and the Purchaser Parties shall deliver to Seller a counterpart of the Release Agreement duly executed by the Purchaser Entity;

(iv)     the Purchaser Parties shall deliver a first demand bank guarantee or letter of credit issued by a financial institution of international standing acceptable to Seller, in a form acceptable to Seller, guaranteeing payment of the First Deferred Payment and the Second Deferred Payment; and

(v)     Seller shall deliver to the Purchaser Parties, and the Purchaser Parties shall deliver to Seller, each of the other documents and instruments required to be delivered pursuant to the terms of this Agreement and shall take all other actions necessary under applicable Law to effect the transfer of the Transferred Interests and the Transferred Assets and the assumption of the Assumed Liabilities.

(b)     At or within five (5) Business Days after the Closing, Seller and the Purchaser Entity shall enter into the Notarized Share Transfer Documentation before a duly sworn and commissioned German notary public selected by Seller.

1.8     <u>Non-Assignment of Assets</u>.

(a)     Notwithstanding any other provision of this Agreement to the contrary, to the extent that the transfer, assignment or conveyance to the Purchaser Entity of any Transferred Asset or Transferred Interest requires any Permits or Consents (other than the Sale Approvals),

4

and such Permits or Consents shall not have been obtained prior to the Closing (such Permit or Consent, a "<u>Necessary Consent</u>"), or such transfer, assignment or conveyance would reasonably be expected to constitute a breach, default or violation of any Law or Order, then the Closing shall nevertheless proceed without the transfer, assignment or conveyance of such Transferred Asset or Transferred Interest but with respect to the remainder of the Transferred Assets and Transferred Interests, and there shall be no adjustment or change to the amount or timing of payment of the Purchase Price. Without limiting the foregoing, the Parties acknowledge and agree that (i) the Purchaser Parties must obtain the CySEC Transfer Authorization prior to the transfer of the shares of FTX Cyprus (the "<u>FTX Cyprus Shares</u>"), (ii) the CySEC Transfer Authorization shall constitute a Necessary Consent, and (iii) unless the CySEC Transfer Authorization has been obtained prior to the Closing, the FTX Cyprus Shares shall not be transferred at the Closing, but the Closing shall otherwise proceed as contemplated in the prior sentence and in accordance with the remainder of this <u>Article 1</u>.

(b)    In the event the Closing takes place without a Transferred Asset or Transferred Interest having been transferred, assigned or conveyed due to the lack of any Necessary Consent in accordance with <u>Section 1.8(a)</u>, then, following the Closing and for twelve (12) months thereafter, the Purchaser Parties shall take all lawful action to promptly obtain such Necessary Consents, and Seller shall use its commercially reasonable efforts to cooperate with the Purchaser Parties and provide such reasonable information in its possession and other assistance as Purchaser Parties may reasonably require in connection therewith. If within such twelve (12)-month period any such Necessary Consent is obtained, then Seller shall promptly transfer, assign or convey such Transferred Asset or Transferred Interest in accordance with the terms of this Agreement without payment of additional consideration by the Purchaser Entity or adjustments to the Purchase Price, and the Parties will execute such documents or instruments of conveyance or assumption and take such further acts which are reasonably necessary or desirable to effect such transfer, assignment or conveyance. Notwithstanding anything to the contrary in this Agreement, if any Necessary Consent is not obtained by the date that is twelve (12) months following the Closing, Seller shall have no further obligation to transfer, assign or convey the Transferred Asset or Transferred Interest to which such Necessary Consent relates.

1.9    <u>Withholding</u>. Notwithstanding any other provision of this Agreement, any payment under this Agreement shall be payable without any withholding or deduction. If the Purchaser Entity reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to Seller hereunder under applicable Law, the Purchaser Entity shall notify Seller at least ten (10) Business Days before any such payment subject to withholding, and the Parties shall use commercially reasonable efforts to mitigate or eliminate any such withholding or deduction.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1    <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants to the Purchaser Parties that:

(a)    <u>Authorization</u>. Seller is an entity duly organized and validly existing under

5

the laws of Switzerland. Subject to entry of the Sale Approvals, the CySEC Transfer Authorization and any other Order entered by the Swiss Court and/or the Bankruptcy Court applicable to the Transactions, Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Transaction Documents to which Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder. Subject to entry of the Sale Approvals and any other Order entered by the Swiss Court and/or the Bankruptcy Court applicable to the Transactions, this Agreement and the Transaction Documents to which it is a party have been or, when executed, will be duly authorized, executed and delivered by it, and constitute or, when executed, will constitute a valid and binding obligation of Seller, enforceable against it in accordance with its terms, subject to limitations on enforceability of covenants and undertakings pursuant to applicable bankruptcy Laws.

(b)    <u>Title to Transferred Interests</u>. Seller owns, or will own as of the Closing, all right, title and interest in and to the Transferred Interests, free and clear of all Liens other than Permitted Liens.

(c)    <u>No Conflicts</u>. Subject to entry of the Sale Approvals, the CySEC Transfer Authorization and any other Order entered by the Swiss Court and/or the Bankruptcy Court applicable to the Transactions, the execution and delivery of this Agreement and the Transaction Documents to which Seller is a party and the performance or consummation of the Transactions by Seller do not conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Transferred Interests or Transferred Assets under the terms or provisions of (i) Seller's organizational documents, or (ii) any statute or any Order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to materially hinder, delay or impair consummation of the Transactions by Seller.

(d)    <u>Broker's Fee; No Public Offering</u>. No Person acting on behalf of Seller or under the authority of Seller shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions, other than the financial advisors retained by Seller in the Bankruptcy Proceeding.

(e)    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Section 2.1</u>, neither Seller nor any other Person (other than the Purchaser Parties) has made any other express or implied representation or warranty with respect to, or otherwise in connection with, the Transferred Assets, the Transferred Interests, the Assumed Liabilities, Seller, the Transferred Subsidiaries or any of their respective Affiliates, businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of Seller's or its Affiliates' respective Representatives.

2.2    <u>Representations and Warranties of Purchaser Parties</u>. Each of the Purchaser Parties hereby jointly and severally represents and warrants to Seller that:

(a)     <u>Authorization</u>. Each Purchaser Party which is a legal entity is an entity duly formed and validly existing under the laws of its jurisdiction of organization, and has the requisite power and authority to enter into, execute and deliver this Agreement or the Transaction Documents, as applicable, and to perform all of the obligations to be performed by it hereunder or thereunder, as applicable. The Purchaser Entity is, directly or indirectly, wholly owned beneficially and of record by the Purchaser Shareholders. This Agreement has been, and each other Transaction Document to which any Purchaser Party is contemplated to be a party will be, when executed, duly authorized, executed and delivered by such Purchaser Party, and constitute, or when executed, will constitute, a valid and binding obligation of such Purchaser Party, enforceable against such Purchaser Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other Laws of general application affecting enforcement of creditors' rights generally.

(b)     <u>No Conflicts</u>. The execution and delivery by each Purchaser Party of this Agreement and of the Transaction Documents to which such Purchaser Party is contemplated to be a party, and the performance or consummation of the Transactions by the Purchaser Parties (i) will not conflict with or result in a breach or violation of the terms or provisions of the organizational documents of any Purchaser Party which is a legal entity, (ii) result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which any Purchaser Party is a party or by which any Purchaser Party is bound, or (iii) conflict with or result in a breach or violation of the terms or provisions of any statute or any Order, rule or regulation of any court or governmental agency or body having jurisdiction over any Purchaser Party or its property, except, in each case, to the extent that such conflicts, violations, defaults or accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transaction Documents. The execution and delivery by each Purchaser Party of this Agreement and the Transaction Documents to which such Purchaser Party is contemplated to be a party, and the performance by the Purchaser Parties of their respective obligations hereunder and thereunder will not require any registration, filing, Consent or approval under any Law, rule, regulation, judgment, Order, writ, decree, permit or license, or any Consent or approval of any other party to the constituent documents of any Purchaser Party that is a legal entity, or any other contract, agreement, instrument, commitment or restriction binding upon any Purchaser Parties, except for the Sale Approvals, the CySEC Transfer Authorization, and any other Order entered by the Bankruptcy Court and/or the Swiss Court applicable to the Transactions.

(c)     <u>Sufficiency of Funds</u>. The Purchaser Parties (i) have, and will have as of the date hereof and as of the Closing, sufficient cash on hand to cause the Purchaser Entity to make the Closing Payment and otherwise perform their obligations hereunder, and (ii) will have as of the First Deferred Payment Date and the Second Deferred Payment Date, as applicable, sufficient cash on hand to cause the Purchaser Entity to make the First Deferred Payment and the Second Deferred Payment. The Purchaser Parties have not incurred, and prior to the Closing will not incur, any obligation, commitment, restriction or liability that would impair or adversely affect such resources.

(d)     <u>No Other Agreements</u>. None of the Purchaser Parties nor any of their Affiliates has entered into any other documents, agreements, arrangements, understandings or side

7

letters with any other Person with respect to or relating to the Transferred Interests, the Transferred Subsidiaries, the Transferred Assets or the Transactions. The Purchaser Parties have accurately disclosed to the Debtors prior to the date hereof any connections between the Purchaser Parties and their respective Affiliates, on the one hand, and the Debtors (including Seller and the Transferred Subsidiaries) and any of their respective shareholders, directors, officers, employees, consultants, contractors or other insiders, on the other hand (the "Interested Party Disclosure"). None of the Purchaser Parties has discussed or entered into any agreements with Debtors' management or key employees regarding compensation or future employment. The Purchaser Parties have entered into this Agreement and the Transactions in good faith.

(e)     Disclosure. None of the information supplied by the Purchaser Parties to the Debtors in connection with the Transactions contains any untrue statement of a material fact, or omits to state any material fact necessary in order to make the statements herein, in light of the circumstances under which they are made, not misleading.

(f)     Independent Appraisal.

(i)     Each Purchaser Party acknowledges that Seller may be in possession of material, nonpublic information relating to Seller, the Transferred Interests, the Transferred Assets and the Assumed Liabilities. Each Purchaser Party further acknowledges and agrees that Seller has no obligation to disclose to Purchaser Parties any such material, nonpublic information except as may be required for a representation and warranty of Seller hereunder to be accurate and correct. Each Purchaser Party further acknowledges that (A) it is not relying on disclosure of any such material or potentially material information which is not disclosed, and (B) any such information may be materially adverse to such Purchaser Party's interests. Each Purchaser Party further acknowledges that it is prepared to purchase the Transferred Interests and acquire and assume the Transferred Assets and the Assumed Liabilities from Seller on the foregoing basis and hereby waives any right to rescind or invalidate the purchase of the Transferred Interests and the acquisition and assumption of the Transferred Assets and the Assumed Liabilities from Seller or to seek any damages or other remuneration from Seller based on the possession of any such material, nonpublic information by Seller.

(ii)     Each Purchaser Party acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that, in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the Transferred Interests and the Transferred Assets and that it is responsible for making its own evaluation of any information about the Transferred Interests, the Transferred Subsidiaries, the Transferred Assets, the Assumed Liabilities or Seller that it may receive, and that none of Seller or any Affiliate, partner, employee, officer or director thereof (A) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement, or (B) shall be under any obligation to provide access to or advise such Purchaser Party or any other Person of the existence of any additional information or to review, update or correct any

8

inaccuracy in any information about the Transferred Interests, the Transferred Subsidiaries, the Transferred Assets, the Assumed Liabilities or Seller (or any assumptions upon which such information is based) supplied by it or by any Person or be otherwise liable with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

(g)    Accredited Investor; Qualified Purchaser. Each Purchaser Party is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933, as amended and a "qualified purchaser" within the meaning of Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended, and the rules promulgated thereunder.

(h)    No Resale. The Purchaser Entity's purchase of the Transferred Interests is for its own account for investment and not with a view to the distribution or resale thereof, except in compliance with the Securities Act of 1933, as amended, and applicable state securities laws.

(i)    Broker's Fee. No Person acting on behalf of any Purchaser Parties or under the authority of any Purchaser Party is entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions.

(j)    Stake in CM Equity. At the Closing, the equity interests directly or indirectly held by the Purchaser Parties, together with the Transferred Minority Interests, will not in the aggregate equal or exceed ten percent (10%) of the capital or voting rights in CM Equity, or otherwise allow the Purchaser Parties, individually or as a group, to exercise significant influence over the management of CM Equity.

(k)    No Other Representations or Warranties.

(i)    Except for the representations and warranties expressly contained in this Section 2.2, none of the Purchaser Parties has made any other express or implied representation or warranty with respect to, or otherwise in connection with the Transferred Interests, the Transferred Subsidiaries, Seller or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, the Transferred Assets and the Assumed Liabilities, and each Purchaser Party disclaims any other representations or warranties, whether made by any Purchaser Party, any Affiliate of a Purchaser Party or any Purchaser Party's or its Affiliates' respective Representatives.

(ii)    Each Purchaser Party acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.1, (A) neither Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to such Purchaser Party in connection with the Transactions, and such Purchaser Party has not relied on any representation or warranty other than those expressly set forth in Section 2.1, (B) such Purchaser Party has not executed or authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or

9

omitted to be made to such Purchaser Party or any of its Affiliates, or any of its or their respective Representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Transferred Interests, the Transferred Subsidiaries or their business, assets or liabilities, or any part thereof, the Transferred Assets and the Assumed Liabilities, and (C) the Transferred Interests, the Transferred Subsidiaries, the Transferred Assets and the Assumed Liabilities and the business, assets and liabilities of the Transferred Subsidiaries are being transferred "as is", "where is" and "with all faults". Each Purchaser Party acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.1, Seller, on behalf of itself and its subsidiaries and Affiliates, (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities, conditions (financial or otherwise) and prospects of the Transferred Subsidiaries or with respect to the Transferred Interests, the Transferred Assets and the Assumed Liabilities (including any express or implied warranty of merchantability or fitness for a particular purpose), and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to such Purchaser Party or its Affiliates or its or their respective Representatives (including any opinion, information, projection or advice that may have been or may be provided to such Purchaser Party by any Representative of Seller or any of its Affiliates). Each Purchaser Party acknowledges and agrees that Seller has not made any representations or warranties to such Purchaser Party regarding the probable success or profitability of the Transferred Subsidiaries, Concedus or CM Equity.

(iii)    Each Purchaser Party acknowledges and agrees that the enforceability of this Agreement against Seller is subject to entry of the Sale Approvals and any other Order entered by the Swiss Court and/or the Bankruptcy Court applicable to the Transactions.

## ARTICLE 3

## COVENANTS

3.1    Interim Operations. Seller shall not take any action as shareholder of the Transferred Subsidiaries to cause the Transferred Subsidiaries to undertake any activities or to take any actions except in accordance with this Agreement and the Transaction Documents and as may be necessary or advisable to comply with applicable Law or with the Order or request of any Governmental Entity.

3.2    Tax Matters.

(a)    Tax Returns. The Purchaser Entity and Seller agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Transferred Assets, the Transferred Interests and the Transferred Subsidiaries as is reasonably necessary for determining any liability for Taxes, the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit and the prosecution or defense of any claim, suit or

proceeding relating to any Tax. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this <u>Section 3.1</u> shall be borne by the Party requesting it. For the avoidance of doubt, this <u>Section 3.1</u> will not require the Parties or the Transferred Subsidiaries to take any actions that would reasonably be expected to prevent or delay the consummation of the Transactions.

      (b)    <u>Cooperation</u>. Seller and the Purchaser Entity shall cooperate with each other in good faith in connection with Taxes with respect to the Transferred Assets, the Transferred Interest and the Transferred Subsidiaries, including (i) with respect to the Tax treatment of the Transaction and (ii) using commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity as may be necessary to mitigate, reduce or eliminate any Tax (including withholding or deduction in respect of Taxes) that could be imposed with respect to the Transactions.

      (c)    <u>Seller CTB Elections</u>.

      (i)    Seller and the Purchaser Entity shall cooperate with each other in good faith to cause any Seller CTB Elections to be valid and effective prior to the Closing Date. For the avoidance of doubt, Seller shall have complete and sole discretion whether the Seller CTB Elections shall be made with respect to each Transferred Subsidiary.

      (ii)    To the extent any Unchecked Subsidiary does not continue to be a "controlled foreign corporation" for U.S. federal income tax purposes after the Closing Date and is eligible for the election under Treasury Regulations Section 1.245A-5(e)(3)(i) (and any comparable provisions of state or local tax Law), Seller and the Purchaser Entity shall enter into, and each shall cause their relevant Affiliates that are described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(2) to enter into, a binding agreement pursuant to Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(2) in a timely manner to enable Seller to make the election under Treasury Regulations Section 1.245A-5(e)(3)(i) (and any comparable provisions of state or local Tax Law) to close the taxable year as of the end of the day on the Closing Date of such Unchecked Subsidiary. Seller and the Purchaser Entity shall cooperate (and cause their Affiliates to cooperate) with each other to take all actions necessary and appropriate (including entering into any agreements and filing such additional forms, returns, or other documents as may be required) to effect and preserve any such elections in accordance with the provisions of Treasury Regulations Section 1.245A-5(e)(3)(i) (or any comparable provisions of state or local tax Law). Seller and the Purchaser Entity shall file (and cause their Affiliates to file) all Tax Returns and any other filings in a manner consistent with any such elections.

      (d)    <u>Transfer Tax</u>. All Transfer Taxes, if any, incurred in connection with the consummation of the Transactions shall be borne by the Purchaser Entity. Such Transfer Taxes shall be paid to the applicable Governmental Entity at least three (3) days before the tax payment is due, as applicable. To the extent any Transfer Taxes were paid by the Seller, the Purchaser Entity shall reimburse the Seller within three (3) days after such payment. For the avoidance of doubt, the Purchaser Entity shall pay the applicable Swiss transfer stamp Taxes for the entire portion of the Purchase Price allocated to the Transferred Interests together with the Closing Payment.

(e)    <u>Covenants</u>. From and after the Closing Date, the Purchaser Entity shall not, and shall cause the Transferred Subsidiaries not to, except as otherwise expressly provided in this Agreement or required by applicable Law, in each case, without the prior written consent of Seller (not to be unreasonably withheld, conditioned, or delayed), to the extent such action could reasonably be expected to have an adverse impact on Seller, (i) amend or otherwise modify a Tax Return of any Transferred Subsidiary for a Pre-Closing Period, (ii) enter into, or cause or permit any Transferred Subsidiary to enter into, any voluntary disclosure or similar agreement or program with a Governmental Entity with respect to Taxes, (iii) make, amend or revoke any Tax election with respect to the Transferred Subsidiaries (including an election under Section 336 or Section 338 of the Code or any similar provision of foreign, state or local Law) that relates to, or is retroactive to, a Pre-Closing Period, except as contemplated by this Agreement with respect to Seller CTB Elections, (iv) if Seller CTB Elections are made, take or fail to take any action which action or failure to act may reasonably be expected to cause the Transactions to fail to be treated as a sale of the assets of the Checked Subsidiaries for U.S. federal income tax purposes, and (v) take any action relating to Taxes, or that could create a Tax liability, on the Closing Date or after the Closing that is outside the ordinary course of business.

(f)    <u>Purchase Price Allocation</u>. To the extent that an allocation of Purchase Price is necessary to be determined on or prior to the Closing Date for any applicable Tax purpose, including as necessary for Swiss transfer stamp Tax purposes, the parties shall cooperate in good faith and use their best efforts to agree on such allocation prior to the Closing Date (a "<u>Pre-Closing Allocation</u>"). To the extent any further allocation of Purchase Price is required for any applicable Tax purposes (including, without limitation, an allocation among the assets of any Transferred Subsidiary to the extent the sale of such Subsidiary is treated as an asset sale for applicable Tax purposes), within ninety (90) days following the Closing Date, Seller shall prepare a schedule allocating the Purchase Price among the Transferred Interests and Transferred Assets for applicable Tax purposes (the "<u>Allocation Statement</u>") and shall deliver the Allocation Statement (together with worksheets and backup information explaining such allocation in reasonable detail) to the Purchaser Entity for its review. The Allocation Statement shall, to the extent permitted by applicable Tax law, be consistent with any Pre-Closing Allocation. Without prejudice to the foregoing, the Parties agree to allocate a *de minimis* value to the Transferred Interests in FTX Trading GmbH for the purposes of the Pre-Closing Allocation and the Allocation Statement. Seller shall consider in good faith the Purchaser Entity's reasonable comments to the Allocation Statement that are provided to Seller within thirty (30) days of the Purchaser Entity's receipt thereof. Each Party agrees that it and the Purchaser Entity will (i) be bound by the Allocation Statement, (ii) report for Tax purposes the Transactions in a manner consistent with the Allocation Statement (including without limitation, to the extent such filing is required, the filing of IRS Form 8594 and any similar or corresponding form for state or local Tax purposes), and (iii) not take a position for Tax purposes that is inconsistent with the Allocation Statement on any Tax Return or in any proceeding before any taxing authority except with the prior written consent of the other Party. To the extent that the Purchase Price is adjusted, the Parties agree to revise and amend the Allocation Statement and, to the extent it is required, IRS Form 8594 (and any similar or corresponding form for state or local Tax purposes) in the same manner and according to the same procedure. In the event that the Allocation Statement is disputed by any taxing authority in writing, the Party receiving notice of such dispute will promptly notify the other Party, provided that the failure of the Party receiving such notice of dispute to promptly notify the other Party shall not

constitute a breach of this provision unless any such other Party is actually prejudiced by such failure.

3.3     Cyprus Regulatory Matters

(a)     Responsibilities of Purchaser Parties.

(i)     Each Purchaser Party acknowledges and agrees that, (i) subject to the terms of this Section 3.3, the Purchaser Parties shall jointly bear the sole responsibility for obtaining the CySEC Transfer Authorization, and (ii) the Transactions shall not be conditioned on, and none of Seller nor any of its Affiliates shall have any responsibility or obligation with respect to, the granting or reinstatement by CySEC of any license or authorization required to allow FTX Cyprus to undertake regulated activities or operations.

(ii)     The Purchaser Parties shall take all lawful action, and shall prepare and file as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and take any and all steps necessary or advisable to obtain as promptly as practicable the CySEC Transfer Authorization, including proposing, agreeing and committing to any structural or conduct undertaking in connection therewith; provided, that any such agreement and commitment may be conditioned on the occurrence of the Closing.

(b)     Pre-Closing Cooperation. Prior to the Closing, subject to applicable Law, Seller shall use its commercially reasonable efforts to cooperate with the Purchaser Parties to provide such reasonable information in its possession and other assistance as the Purchaser Parties may reasonably require in connection with the Purchaser Parties' obligations pursuant to Section 3.3(a)(ii).

(c)     Conduct of Interactions with CySEC. Subject to applicable Laws relating to the exchange of information, prior to the Closing, the Purchaser Parties shall, to the extent practicable, consult with Seller and consider in good faith the views of Seller in connection with all the information relating to Seller or FTX Cyprus, as the case may be, and any of their respective Affiliates, that appears in any filing made with, or written materials submitted to, CySEC in connection with the Transactions.

3.4     Confidentiality

(a)     Each Party acknowledges that Confidential Information has been, and in the future will be, provided in connection with this Agreement and the Transactions.

(b)     Each Purchaser Party acknowledges that nonpublic information relating to Seller, the Transferred Assets, the Assumed Liabilities, the Transferred Interests and the Transferred Subsidiaries are valuable and proprietary to Seller and its Affiliates. Each Purchaser Party agrees that, prior to the Closing, or for a period of three (3) years from the date hereof in case this Agreement is otherwise terminated in accordance with its terms, it shall not, and shall cause its Affiliates and Representatives not to, directly or indirectly, without the prior consent of Seller, disclose to any Person any Confidential Information relating to Seller and its Affiliates, the Transferred Assets, the Assumed Liabilities, the Transferred Interests or the Transferred

13

Subsidiaries; provided, that the foregoing shall not prohibit any disclosure (i) required by applicable Law or Order, (ii) in connection with a regulatory inquiry by a Governmental Entity, (iii) to each Purchaser Party's Representatives who need to know such information to carry out the Transactions or for the purposes of the Settlement and who have been informed of the confidential nature of the information and have been instructed to keep such information confidential, or (iv) as is reasonably necessary in connection with obtaining the CySEC Transfer Authorization.

(c)     Each Purchaser Party acknowledges and understands that this Agreement will be publicly filed in the Bankruptcy Court and further made available by Seller to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to the Purchaser Parties, whether pursuant to this Agreement or otherwise. Each Purchaser Party agrees that it will be responsible for any breach or violation of the provisions of this Section 3.4 by any of its Representatives. The provisions of this Section 3.4 will survive the termination of this Agreement.

3.5     Books and Records; Information.

(a)     After the Closing, each Purchaser Party and the Purchaser Entity shall until the later of (x) the end date of the statutory record-keeping period under applicable Law and (y) the sixth (6th) anniversary of the Closing, preserve, maintain and retain all books, records, other documents and electronically stored information of and relating to the Transferred Subsidiaries and their business, in existence on the Closing Date (collectively, the "Books and Records") and, subject to compliance with applicable Law, make the same available for inspection and copying by Seller, any of Seller's successors or assigns or any trustee in bankruptcy and, in each case, any of their respective Representatives upon reasonable notice and during normal business hours, for any reasonable business purpose or compliance with any obligation under any applicable Law, including for the purposes of (a) the preparation or amendment of Tax Returns, financial or court filings or reports of Seller and the Debtors, (b) responding to Orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Entities, (c) prosecuting and defending any Action or for other like purposes, including claims, objections and resolutions in the Swiss Moratorium Proceeding or Swiss bankruptcy proceedings or the Bankruptcy Proceeding and (d) as is necessary to administer, or satisfy their obligations in connection with, the Swiss Moratorium Proceeding or Swiss bankruptcy proceedings or the Bankruptcy Proceeding. In addition, Seller shall be permitted to retain a copy of the Books and Records for the foregoing purposes, it being understood, for the avoidance of doubt, that Seller and its Affiliates shall have no obligation to do so.

(b)     During the twelve (12)-month period following the Closing, subject to applicable Laws, and the Purchaser Parties and the Transferred Subsidiaries providing evidence of suitable data security and information technology arrangements, Seller shall use its commercially reasonable efforts to provide to FTX Cyprus any information in Seller's or its Affiliates' possession regarding customers of FTX Cyprus which is reasonably requested by FTX Cyprus to enable FTX Cyprus to comply with the Customer Claim Requirements.

14

3.6    <u>Intellectual Property Matters</u>.

(a)    Each Purchaser Party acknowledges and agrees that, for the avoidance of doubt, the Seller Marks are Excluded Assets. To the extent any Transferred Subsidiary owns or otherwise holds any right, title or interest in or to any Seller Marks or any other Intellectual Property not included in the Transferred Assets, effective immediately prior to the Closing, Seller, on behalf of such Transferred Subsidiary, hereby irrevocably assigns such Transferred Subsidiary's right, title or interest in such Intellectual Property and/or Seller Marks to Seller, together with, as applicable, (i) all goodwill associated therewith, (ii) all income, royalties, damages and payments now or hereafter due or payable with respect thereto and (iii) the rights to sue and recover damages and obtain equitable relief for past, present and future infringement, misappropriation or other violation thereof.

(b)    Except for the Owned Business Know-How and the Owned Brands and Trade Names and except as otherwise expressly authorized in <u>Sections 3.6(d)</u> and <u>3.6(e)</u>, (i) the Purchaser Parties and the Transferred Subsidiaries are not acquiring or otherwise obtaining any right, title or interest in or to any Intellectual Property owned by Seller or any of its Affiliates (other than the Transferred Subsidiaries), including the Seller Marks, and (ii) at all times following the Closing, the Purchaser Parties and the Purchaser Entity shall not, and shall cause the respective Affiliates of the Purchaser Parties (including, following the Closing, the Transferred Subsidiaries) not to, directly or indirectly, (A) use or otherwise exploit any Intellectual Property owned by Seller or any of its Affiliates, (B) challenge or interfere with Seller's or any of its Affiliates' ownership, use or other exploitation of such Intellectual Property, including efforts to apply for registration, maintain, defend or enforce such Intellectual Property, (C) take any action inconsistent with Seller's or any of its Affiliates' rights in their respective Intellectual Property, or (D) hold themselves out as having any affiliation or association with Seller or any of its Affiliates.

(c)    As promptly as practicable after the Closing Date, but in no event later than ten (10) days after the Closing (or, with respect to FTX Cyprus, such longer period as may be expressly required by CySEC), the Purchaser Parties shall, and shall cause the Transferred Subsidiaries to, (i) pass the requisite shareholders' or board resolutions, make all filings, pay all requisite fees and take all other actions (including amending their bylaws or similar documents, licenses and registrations) necessary to change the legal names, corporate names and business names of the Transferred Subsidiaries to those that do not include or reference any Seller Marks and (ii) promptly take any and all follow-up actions that may be required or requested by any Governmental Entity to effect such changes.

(d)    As promptly as practicable after the Closing Date, but in no event later than ten (10) days after the Closing Date (except to the extent necessary to comply with the Customer Claim Requirements), the Purchaser Parties shall, and shall cause the Transferred Subsidiaries to, delete, destroy or otherwise dispose of all materials in possession or control of any of the Purchaser Entity or the Transferred Subsidiaries that bear the Seller Marks (including signage, advertising, promotional materials, electronic materials, stationery, business cards, website content, emails, forms, training and service literature and materials, and other materials), or, as applicable, alter any such materials so as to remove the Seller Marks; <u>provided</u>, <u>however</u>, that the foregoing does not apply to the historical business records that contain the Seller Marks and are in possession of the Purchaser Parties or the Transferred Subsidiaries as of the Closing Date, so long as such records

15

are retained and used solely for the Purchaser Parties' or the Transferred Subsidiaries' internal and archival purposes.

(e)     Effective upon the Closing, Seller, on behalf of itself and its Affiliates, hereby grants to FTX Cyprus a non-exclusive, revocable, non-transferable, non-sublicensable license to (i) access and operate the website hosted at https://ftxeurope.eu/ (the "Domain Name"), solely as necessary, and solely during such period, to comply with the Customer Claim Requirements and (ii) use and display the Seller Marks, solely to the extent and in the manner displayed on such website as of the Closing Date, solely for the period during which such use and display is necessary to comply with the Customer Claim Requirements; provided that, if FTX Cyprus is required, for such compliance purposes, to use any Seller Marks in a reference to the former operations of the Transferred Subsidiaries in communications relating to the Customer Claim Requirements, then the Parties shall first agree on the form of such use, acting reasonably. All goodwill arising from the use or display of the Seller Marks by FTX Cyprus will inure to the sole benefit of Seller.

(f)     Immediately upon the date of expiration or termination of the license granted in Section 3.6(e), the Purchaser Parties shall, and shall cause FTX Cyprus to, except as expressly permitted in accordance with the proviso in Section 3.6(d), (i) cease and discontinue (A) all uses and displays of the Seller Marks and (B) all access to and operation of the Domain Name, (ii) delete, destroy or otherwise dispose all materials bearing the Seller Marks and (iii) as applicable, execute all documents, papers, forms, and authorizations, and take such other actions as are necessary to effectuate the transfer of full control of the Domain Name to Seller.

(g)     Effective upon the Closing, the Purchaser Parties, on behalf of themselves and the Releasing Purchaser Parties, hereby generally, irrevocably, forever, fully and unconditionally (i) release, waive and discharge the Released Seller Parties from and with respect to any and all Liabilities based on, related to or arising out of any purported direct or indirect (including induced or contributory) infringement, misappropriation or other violation of any Intellectual Property, and (ii) waive any benefits of, or reliance on, any applicable Laws that would provide, in sum or substance, that the foregoing release, acquittal or discharge will not extend to Liabilities in relation to Intellectual Property that, as of the Closing Date, the Purchaser Parties or other Releasing Purchaser Parties, do not know to exist, or do not expect to exist, in their favor.

(h)     At all times following the Closing, the Purchaser Parties shall not, and shall cause the Releasing Purchaser Parties not to, directly or indirectly, institute or prosecute any Actions against the Released Seller Parties based on, related to or arising out of any Liabilities described in Section 3.6(g).

(i)     As promptly as practicable following the Closing, the Purchaser Parties shall take all actions reasonably necessary to cause the Releasing Purchaser Parties to (i) effectuate the release, acquittal, discharge and waiver set forth in Section 3.6(g) and (ii) comply with Section 3.6(h), including by causing such parties to take any necessary corporate action.

3.7     Indemnification for Assumed Liabilities. Following the Closing, the Purchaser Parties shall jointly and severally indemnify, defend and hold harmless Seller, its Affiliates (other than the Transferred Subsidiaries) and their respective directors, officers, shareholders, partners,

members, attorneys, accountants, agents, Representatives and employees and their heirs, successors and permitted assigns, each in their capacity as such (the "Debtor Indemnified Parties"), from, against and in respect of any damages, losses, claims, charges, Liabilities, proceedings, payments, judgments, settlements, assessments, deficiencies, taxes, interest, penalties, and fees, costs and expenses (including reasonable attorneys' fees and other reasonable out-of-pocket disbursements) actually imposed on, sustained, incurred or suffered by any of the Debtor Indemnified Parties as a result of any of the Assumed Liabilities.

3.8    Collateral Claim Settlement Agreement. The Purchaser Parties shall use their best efforts to cause the Collateral Claim Settlement Agreement to be duly executed and delivered by the non-Debtor parties contemplated thereto.

# ARTICLE 4

# BANKRUPTCY AND MORATORIUM MATTERS

4.1    Bankruptcy Court Filings.

(a)    As promptly as possible, Seller or its applicable Debtor Affiliates shall: (i) file with the Bankruptcy Court one or more motions seeking entry of an Order (A) approving the sale of the Transferred Interests and the Transferred Assets to the Purchaser Entity free and clear of Liens other than Permitted Liens, (B) making findings that the Purchaser Parties are a good-faith purchaser entitled to the protections of Section 363(m) and (n) of the Bankruptcy Code, and (C) dismissing of the Chapter 11 Cases of the Transferred Subsidiaries effective upon the Closing (the "U.S. Sale Approval"); (ii) promptly following the signing of the Collateral Claim Settlement Agreement, file with the Bankruptcy Court one or more motions seeking entry of an Order approving the Restructuring Transactions (the "U.S. Restructuring Approval"); (iii) notify, as required by the Bankruptcy Code and the Bankruptcy Rules, all parties entitled to notice of such motions, and such additional parties as the Purchaser Parties may reasonably request; and (iv) use commercially reasonable efforts to cause the Bankruptcy Court to enter the U.S. Sale Approval and the U.S. Restructuring Approval.

(b)    Each Party shall (i) appear in the Bankruptcy Court and furnish affidavits or declarations if reasonably requested by the other Party or required by the Bankruptcy Court in connection with Bankruptcy Court approval of the Transactions or entry of U.S. Sale Approval and the U.S. Restructuring Approval, and (ii) keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received from the Bankruptcy Court or any other Person with respect to the Transactions.

(c)    The Parties shall consult with each other regarding pleadings that either of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the U.S. Sale Approval and the U.S. Restructuring Approval. Seller shall promptly provide the Purchaser Parties and their outside legal counsel with copies of all notices, filings and Orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the U.S. Sale Approval and the U.S. Restructuring Approval, or related to any of the Transactions, but only to

17

the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to the Purchaser Parties and their outside legal counsel.

(d)     If any Order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), Seller agrees to, and agrees to cause its Debtor Affiliates to, use their commercially reasonable efforts, to defend against such appeal, petition or motion, and each Purchaser Party agrees to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal, petition or motion.

(e)     Subject to Sections 4.3 and 7.7, each Purchaser Party shall take all actions as may be reasonably requested by Seller to cause the U.S. Sale Approval and the U.S. Restructuring Approval to be issued and entered, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Each Purchaser Party agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the U.S. Sale Approval and the U.S. Restructuring Approval, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser Parties under this Agreement and demonstrating that the Purchaser Parties are "good-faith" buyers under Section 363(m) of the Bankruptcy Code.

4.2     Swiss Court Filings.

(a)     Prior to or promptly following the entry of the U.S. Sale Approval by the Bankruptcy Court, Seller shall (i) file with the Swiss Court one or more motions (A) to request the approval of the sale of the Transferred Interests and the Transferred Assets to the Purchaser Entity pursuant to art. 298 para. 2 DEBA (the "Swiss Sale Approval", and, together with the "U.S. Sale Approval", the "Sale Approvals") and (B) to request the approval of the Restructuring Transactions pursuant to art. 298 para. 2 DEBA (the "Swiss Restructuring Approval"), and (ii) use commercially reasonable efforts to obtain the Swiss Sale Approval and the Swiss Restructuring Approval.

(b)     Each Party shall keep the other Party reasonably apprised of the status of material matters related to the Swiss Court filings, including, upon reasonable request, promptly furnishing the other Party with copies of notices or other communications received from the Swiss Court with respect to the Transactions.

(c)     The Parties shall consult with each other regarding pleadings that either of them intends to file with the Swiss Court in connection with, or which might reasonably affect, the Swiss Sale Approval and the Swiss Restructuring Approval.

(d)     Seller and the Purchaser Parties shall cooperate with each other and take such actions as are reasonably necessary to obtain the Swiss Sale Approval and the Swiss Restructuring Approval, including, with respect to the Purchaser Parties, voting in favor of or supporting the Transactions in any creditor committee vote, if applicable. If any Order of the Swiss Court relating to this Agreement shall be appealed by any Person, Seller agrees to use its

18

commercially reasonable efforts to defend against such appeal, petition or motion, and the Purchaser Parties agree to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

(e)     The Purchaser Parties shall, and shall cause the other Settlement Parties (other than Seller and its Affiliates) to (i) refrain from taking, causing, facilitating, coordinating with respect to, acting in concert in connection with, providing information for or encouraging in any manner any action to undermine Seller's efforts to obtain the Swiss Sale Approval and the Swiss Restructuring Approval, and (ii) take all lawful actions to ensure that no such actions are taken by any of their respective Affiliates, the other Settlement Parties (other than Seller and its Affiliates) or any person acting on behalf of or at the direction of, or in coordination or in concert with, any of the above.

4.3     Alternative Transaction. Consummation of the Transactions is subject to approval by the Bankruptcy Court and the consideration by the Debtor Affiliates and the Bankruptcy Court of higher or better competing bids. From and after the date of filing of the motion seeking the U.S. Sale Approval with the Bankruptcy Court until the third (3rd) Business Day before the hearing relating to the U.S. Sale Approval, as such date may be modified or extended, Seller and its Debtor Affiliates shall be permitted to cause their respective Representatives and Debtor Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser Parties and their Affiliates, agents and Representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers to purchase all or any part of the Transferred Assets, the Transferred Interests, the Transferred Subsidiaries and/or their assets, (whether in combination with other assets of Seller and the Debtor Affiliates or otherwise), and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, any Order entered into by the Bankruptcy Court applicable to the Transactions or other applicable Law, including supplying information relating to the Transferred Assets, Transferred Interests, the Transferred Subsidiaries and the assets of the Transferred Subsidiaries to prospective purchasers.

4.4     Disclosure of Connections to Debtor Affiliates. From the date hereof until the Closing, the Purchaser Parties shall promptly notify Seller in writing upon (i) the entry by Purchaser Parties or any of their Affiliates (including the Purchaser Entity) into any documents, agreements, arrangements, understandings or side letters with any other Person with respect to or relating to the Transferred Subsidiaries or the Transactions or (ii) any change in the accuracy or completeness of the Interested Party Disclosure.

# ARTICLE 5

## CONDITIONS TO CLOSING

5.1     Mutual Conditions. The respective obligations of each of Seller and the Purchaser Parties to effect the Closing are subject to the satisfaction or waiver (where legally permitted) by both Parties of the following conditions on or prior to the Closing Date:

(a)     the Swiss Sale Approval shall have been entered;

19

(b)     the U.S. Sale Approval shall have been entered; and

(c)     the Settlement shall have become effective in accordance with the terms of the Settlement Stipulation.

5.2     <u>Conditions to Obligation of Purchaser Parties</u>. The obligation of the Purchaser Parties to effect the Closing is subject to the satisfaction or waiver by the Purchaser Parties of the following additional conditions on or prior to the Closing Date:

(a)     The representations and warranties of Seller contained in this Agreement shall be true and correct on the date of this Agreement and as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and

(b)     Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date.

5.3     <u>Conditions to Obligation of Seller</u>. The obligation of Seller to effect the Closing is subject to the satisfaction or waiver by Seller of the following additional conditions on or prior to the Closing Date:

(a)     the representations and warranties of the Purchaser Parties contained in this Agreement shall be true and correct on the date of this Agreement and as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date);

(b)     the Purchaser Parties shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date;

(c)     the U.S. Restructuring Approval and the Swiss Restructuring Approval shall have been entered;

(d)     the Inter-Debtor Restructuring Agreement and the Collateral Claim Settlement Agreement shall have been duly executed and delivered by the Persons contemplated to be party thereto, and the assumptions and releases contemplated thereby are effective; and

(e)     no Settlement Party (other than Seller and its Affiliates) shall have breached its obligation under Section 3 of the Settlement Stipulation.

## ARTICLE 6

## TERMINATION

6.1     <u>Grounds for Termination</u>. This Agreement may be terminated at any time:

(a)     by mutual agreement of Seller and the Purchaser Parties;

(b)     by either Seller or the Purchaser Parties if the Closing has not occurred by May 7, 2024 (the "Termination Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 6.1(b) shall not be available to a Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the Closing to have occurred on or prior to the Termination Date;

(c)     by Seller if any Purchaser Party shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in Section 5.1 or Section 5.3, and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) Business Days after written notice thereof is given by Seller to the Purchaser Parties, and (B) the Termination Date; provided, that Seller shall not have the right to terminate this Agreement pursuant to this Section 6.1(c) if Seller is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in Section 5.1 or Section 5.2;

(d)     by the Purchaser Parties if Seller shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in Section 5.1 or Section 5.2, and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) Business Days after written notice thereof is given by the Purchaser Parties to Seller, and (B) the Termination Date; provided, that the Purchaser Parties shall not have the right to terminate this Agreement pursuant to this Section 6.1(d) if the Purchaser Parties are then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in Section 5.1 or Section 5.3;

(e)     automatically, if Seller enters into a definitive agreement with a third party with respect to an Alternative Transaction; or

(f)     by Seller, if Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the Transactions or failing to terminate this Agreement could be inconsistent with its or such Person's or body's fiduciary duties.

6.2     Effect of Termination. If this Agreement is terminated in accordance with Section 6.1:

(a)     except for the obligations set forth in Sections 3.4 and 3.7, no Party shall have any liability or further obligation to any other Party pursuant to this Agreement; provided, however, that no such termination shall relieve a Party of any liability or damages to the other Party resulting from any knowing and intentional material breach of this Agreement; and

21

(b)    the Purchaser Parties shall return to Seller all documents, work papers and other material of Seller relating to the Transactions, whether obtained before or after the execution hereof or certify that such documents have been destroyed.

## ARTICLE 7

## OTHER MATTERS

7.1    <u>Waiver, Amendment</u>. Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party that would have benefited from the provision had it not been waived.

7.2    <u>Remedies</u>. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by a Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.3    <u>No Survival of Representations and Warranties or Covenants</u>. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms. Following the Closing, in no event shall Seller or the Purchaser Parties have any recourse against the Purchaser Parties or Seller, respectively, with respect to any representation, warranty, covenant or agreement made by Seller or the Purchaser Parties, as applicable, in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the Closing Date.

7.4    <u>Expenses</u>. Except as otherwise provided in this Agreement or the Transaction Documents, each of the Purchaser Parties and Seller shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Transaction Documents and the Transactions.

7.5    <u>Notices</u>. All notices, requests and other communications under this Agreement to a Party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such Party at its address (or number) set forth below or such other address (or number) as the Party may specify by notice to the other Party.

If to Seller:

> FTX Europe AG
> Churerstrasse 135
> 8808 Pfäffikon SZ
> Switzerland
> Attention: Arturo Giovanoli
> Email: agiovanoli@matrixs.com

> *With a copy (which shall not constitute notice) to both*:

> Sullivan & Cromwell LLP
> 1 New Fetter Lane
> London EC4A 1AN
> United Kingdom
> Attention:  Evan S. Simpson
>             Oderisio de Vito Piscicelli
>             Alexa J. Kranzley
> Telephone: +44 20 7959 8426
>             +44 20 7959 8589
>             +1 212 558 7893
> Email:      simpsone@sullcrom.com
>             devitopiscicellio@sullcrom.com
>             kranzleya@sullcrom.com

> and

> Holenstein Brusa Ltd.
> Utoquai 29/31
> 8008 Zurich
> Switzerland
> Attention:  Thomas Zemp
>             Dusan Knezevic
> Telephone: +41 44 257 20 00
> Email:      Zemp@hol-law.ch
>             knezevic@hol-law.ch

If to the Purchaser Parties:

> The Daley Law Firm, LLC
> 4845 Pearl East Circle, Suite 101
> Boulder, Colorado 80304 USA
> Attention: Darrell M. Daley
> Telephone: +1 (303) 479-3500
> Email: darrell@daleylawyers.com

4861-4271-8881 v.6

7.6    <u>Specific Performance</u>.

(a)    Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement. Accordingly, each Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including specific performance of such covenants, promises or agreements (including to cause the Purchaser Parties to consummate the Transactions and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this <u>Section 7.6</u> will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    Each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by the Purchaser Parties or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of the Purchaser Parties or Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 7.6</u>.

7.7    <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require Seller or any of its directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, until the Closing has occurred, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate.

7.8    <u>Entire Understanding; No Third-Party Beneficiaries</u>. This Agreement and the Transaction Documents together set forth the entire understanding of the Parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the Parties with respect to the subject matter of this Agreement. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities, <u>provided</u>, that <u>Section 3.7</u> shall be enforceable by the Debtor Indemnified Parties.

7.9    <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by a Party (whether by operation of law or otherwise) without the prior written consent of the other Party, and any purported assignment in violation of this <u>Section 7.9</u> will be void, except for the following assignments which shall not require any Consent and will not be void: (a) assignment by Seller to an Affiliate of Seller (<u>provided</u>, that Seller remains liable jointly and severally with its assignee Affiliate for any assigned obligations to the Purchaser Parties) and (b) assignment by Seller to a succeeding entity following its emergence from the Bankruptcy Proceeding. Subject to the preceding sentence, this Agreement will be binding upon,

24

inure to the benefit of and be enforceable by each Party to this Agreement and its successors and permitted assigns.

7.10    Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

7.11    Severability. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction, and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

7.12    No Presumption. The Parties agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each Party represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

7.13    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such Laws.

(b)    Without limiting a Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transferred Interests, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 7.5; provided, however, that if the Bankruptcy Proceeding has been closed pursuant to Section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each

25

Party hereby irrevocably waives, to the fullest extent permitted by applicable Law, any objection which it may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)     Each Party consents to process being served by the other Party in any Action by delivery of a copy thereof in accordance with the provisions of <u>Section 7.5</u>; <u>provided</u>, <u>however</u>, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)     Each Party waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

7.14    <u>Damages</u>. Neither Party shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

7.15    <u>Interpretation</u>.

(a)     As used in this Agreement, references to:

(i)     the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)     the Preamble, Recitals, Sections or Exhibits refer to the Preamble, a Recital or a Section of, or an Exhibit to this Agreement unless otherwise indicated;

(iii)     this Agreement refers to this Agreement and the Exhibits to it; and

(iv)     all references to "Dollars", "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified.

(b)     Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation". Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(c)     The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

7.16    <u>Fulfillment of Obligations</u>. Whenever this Agreement requires the Purchaser Entity or an Affiliate of the Purchaser Parties to take any action such requirement shall be deemed to include a joint and several undertaking on the part of all the Purchaser Shareholders to cause the Purchaser Entity or such Affiliate to take such action. For the avoidance of doubt, the Purchaser

26

Shareholders shall be jointly and severally liable for, and shall guarantee the performance of, the obligations of the Purchaser Entity hereunder.

7.17    No Set-Off. All payments required to be made by the Purchaser Parties (or their respective Affiliates) hereunder or under any Transaction Documents shall be free and clear of all set-offs, netting, offset or recoupment, and each Purchaser Party hereby waives any such right that such Purchaser Party may otherwise have.

[Remainder of page intentionally left blank]

27

IN WITNESS WHEREOF, the Parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLER:**

**FTX EUROPE AG**

By: _____

     Name:    Arturo Giovanoli
     Title:     Sole Member of the Board

**APPROVAL OF SWISS ADMINISTRATOR TO SELLER TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD.** *(not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval)*

By: _____

     Name:    Dusan Knezevic

By: _____

     Name:    Thomas P. Zemp

IN WITNESS WHEREOF, the Parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

SELLER:

FTX EUROPE AG

By: _____

        Name:   Arturo Giovanoli
        Title:    Sole Member of the Board


**APPROVAL OF SWISS ADMINISTRATOR TO SELLER TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD.** *(not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval)*

By: _____

        Name:   Dusan Knezevic

By: _____

        Name:   Thomas P. Zemp

*[Signature Page to Share and Asset Purchase Agreement]*

**PURCHASER PARTIES**:

**LOREM IPSUM RM UG**

By: _____
    Name:
    Title:


**CREDOMEDIA GMBH**

By: _____
    Name: Patrick Gruhn
    Title: Geschäftführer


**PATRICK GRUHN**

_____


**ROBIN MATZKE**

_____


*[Signature Page to Share and Asset Purchase Agreement]*

**PURCHASER PARTIES**:

**LOREM IPSUM RM UG**

By:    _____

      Name: Robin Matzke

      Title: Managing Director

**CREDOMEDIA GMBH**

By:    _____

      Name:

      Title:

**PATRICK GRUHN**

_____

**ROBIN MATZKE**

_____

[*Signature Page to Share and Asset Purchase Agreement*]

# EXHIBIT A

# DEFINITIONS

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Action" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such Person, as of the date on which, or at any time during the period for which, the determination of affiliation is being made.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2(f).

"Alternative Transaction" means the sale, transfer or other disposition of the Transferred Interests and/or the Transferred Assets in a transaction with a purchaser or transferee other than the Purchaser Parties and/or their Affiliates.

"Assumed Liabilities" has the meaning set forth in Section 1.4.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

"Bill of Sale and Assignment and Assumption Agreement" means an agreement in all material respects in the form attached hereto as Exhibit F.

"Books and Records" has the meaning set forth in Section 3.5.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York, New York, or Zurich, Switzerland are authorized or required by statute to close.

"Chapter 11 Cases" has the meaning given in the Recitals.

"Checked Subsidiary" means a Transferred Subsidiary that Seller has made a Seller CTB Election.

"Closing" has the meaning set forth in Section 1.6.

"Closing Date" has the meaning set forth in <u>Section 1.6</u>.

"Closing Payment" has the meaning set forth in <u>Section 1.5(a)</u>.

"CM Equity" has the meaning set forth in the Recitals.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Claim Settlement Agreement" means an agreement in all material respects in the form attached hereto as <u>Exhibit D</u>.

"Concedus" has the meaning set forth in the Recitals.

"Confidential Information" means any information relating to the business, financial or other affairs (including future plans and targets) of either Party or any of its Affiliates; <u>provided</u>, <u>however</u>, that "Confidential Information" will not include any information that (i) is or becomes (other than as a result of disclosure by either Party or any of its Affiliates in violation of this Agreement) generally available to, or known by, the public, (ii) is independently developed by a Party or any of its Affiliates without use of or reference to information that would be "Confidential Information" but for the exclusions set forth in this proviso or (iii) is received by a Party or any of its Affiliates from a third party not known by such receiving Party or any of its Affiliates after reasonable inquiry to be bound by a duty of confidentiality to such other Party or any of its Affiliates with respect to such information.

"Consent" means any notice, authorization, qualification, registration, filing, notification, permit, waiver, Order, consent, right of first refusal or similar right, or approval to be obtained from, filed with or delivered to, a Governmental Entity or other Person.

"Customer Claim" means any right to payment of a customer of FTX Cyprus in respect of such customer's trading activity through or deposit of funds with FTX Cyprus as of the Petition Date.

"Customer Claim Requirements" means any requirement imposed by CySEC or applicable Law for FTX Cyprus to satisfy the Customer Claims, and any Order of CySEC in connection therewith.

"Customer Withdrawal Liabilities" means the Customer Claims against FTX Trading and its Affiliates relating to the withdrawal of crypto assets from the FTX.com platform by customers of FTX Cyprus pending as of the Petition Date set forth on <u>Schedule D</u>

"CySEC" means the Cyprus Securities and Exchange Commission.

"CySEC Transfer Authorization" means any Consents, clearances, registrations, approvals, permits, waivers and authorizations or other approvals that may be required by CySEC to permit the transfer of the FTX Cyprus Shares at the Closing.

"Debtors" has the meaning set forth in the Recitals.

"<u>Debtor Affiliates</u>" means the Debtors and their respective wholly owned subsidiaries.

"<u>Debtor Indemnified Parties</u>" has the meaning set forth in <u>Section 3.7</u>.

"<u>Domain Name</u>" has the meaning set forth in <u>Section 3.6(e)</u>.

"<u>Excluded Assets</u>" has the meaning set forth in <u>Section 1.3</u>.

"<u>First Deferred Payment</u>" has the meaning set forth in <u>Section 1.5(b)</u>.

"<u>First Deferred Payment Date</u>" has the meaning set forth in <u>Section 1.5(b)</u>.

"<u>FTX Cyprus</u>" has the meaning set forth in <u>Schedule A</u>.

"<u>FTX Cyprus Shares</u>" has the meaning set forth in <u>Section 1.8(a)</u>.

"<u>FTX Trading</u>" has the meaning set forth in the Recitals.

"<u>Governmental Entity</u>" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the U.S. Securities and Exchange Commission, CySEC and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors, the Purchaser Entity or the Transferred Subsidiaries.

"<u>Intellectual Property</u>" means all rights anywhere in the world in or to: (a) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, all applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby, including all renewals of same (collectively, "<u>Trademarks</u>"), (b) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues, (c) trade secrets and other confidential or proprietary information or know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists, (d) published and unpublished works of authorship, whether copyrightable or not (including databases and other compilations of information, mask rights and computer software), copyrights therein, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof, (e) data and databases, and (f) any other intellectual property or proprietary rights.

"<u>Inter-Debtor Restructuring Agreement</u>" means an agreement in all material respects in the form attached hereto as <u>Exhibit C</u>.

"<u>Interested Party Disclosure</u>" has the meaning set forth in <u>Section 2.2(d)</u>.

"<u>Law</u>" or "<u>Laws</u>" means any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement,

Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"<u>Liabilities</u>" means, as to any Person, any and all debts, adverse claim, liabilities, duty, responsibility, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any contract or tort based on negligence or strict liability).

"<u>Lien</u>" means any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation, usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude, restrictive covenant or condition, encroachment, claim, interest, restriction or any other encumbrance of any kind.

"<u>Necessary Consent</u>" has the meaning set forth in <u>Section 1.8(a)</u>.

"<u>Notarized Share Transfer Documentation</u>" means the documentation to effect the transfer of the Transferred Interests of FTX Trading GmbH and Concedus, in all material respects in the forms attached hereto as <u>Exhibit E-3</u> and <u>E-5.</u>

"<u>Order</u>" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbitrator, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceeding and the Swiss Court in the Swiss Moratorium Proceeding.

"<u>Owned Brands and Trade Names</u>" means the Trademarks listed in <u>Schedule B</u>.

"<u>Owned Business Know-How</u>" means the know-how that is owned by Seller and that is related exclusively to the businesses of the Transferred Subsidiaries as conducted immediately prior to the Petition Date; <u>provided</u> that the Owned Business Know-How excludes any know-how related to the exchanges operated by FTX Trading and its current or former Affiliates (including the Transferred Subsidiaries) under the name of "FTX.com" or "FTX.US".

"<u>Owned IT Assets</u>" means the information technology assets listed in <u>Schedule C</u>.

"<u>Party</u>" or "<u>Parties</u>" has the meaning set forth in the Preamble.

"<u>Permit</u>" means all permits, licenses, franchises, variances, exemptions, Orders, certifications, registrations and other authorizations, Consents and approvals of all Governmental Entities necessary to conduct business.

"<u>Permitted Liens</u>" has the meaning set forth in <u>Section 1.1</u>.

"<u>Person</u>" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Petition Date" has the meaning given in the Recitals.

"Pre-Closing Allocation" has the meaning set forth in Section 3.2(f).

"Pre-Closing Period" means (i) all taxable years or other taxable periods (or portions thereof) that end on or before the Closing and (ii) for any taxable period beginning on or before, and, ending after the Closing Date, the portion ending on the Closing Date.

"Purchaser Entity" has the meaning set forth in the Preamble.

"Purchaser Parties" has the meaning set forth in the Preamble.

"Purchase Price" has the meaning set forth in Section 1.5.

"Purchaser Shareholders" means Patrick Gruhn, Robin Matzke and Lorem Ipsum RM UG, a German limited liability company.

"Release Agreement" means an agreement in all material respects in the form attached hereto as Exhibit B.

"Releasing Purchaser Parties" means, collectively, (a) the Purchaser Parties, (b) each of their respective current or former Affiliates (including, following the Closing, the Transferred Subsidiaries), (c) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (a) or clause (b) of this definition and (d) each of the current or former Affiliates of any of the Persons described in clause (c) of this definition.

"Released Seller Parties" means, collectively, Seller, the Debtors (excluding the Transferred Subsidiaries), and each of their current or former Affiliates (excluding the Transferred Subsidiaries), and each of their respective current or former officers, directors, employees, agents representatives, customers, users, licensees, distributors, resellers, suppliers, manufacturers and service providers and each such Person's respective successors and assigns.

"Representative" of a Person means any officer, director or employee of such Person or any investment banker, attorney, accountant or other advisor, agent or representative of such Person.

"Restructuring Transactions" means the transactions contemplated by the Inter-Debtor Restructuring Agreement and the Collateral Claim Settlement Agreement.

"Sale Approvals" has the meaning set forth in Section 4.2(a).

"Second Deferred Payment" has the meaning set forth in Section 1.5(c).

"Second Deferred Payment Date" has the meaning set forth in Section 1.5(c).

"Seller" has the meaning set forth in the Preamble.

"<u>Seller CTB Election</u>" means an entity classification election pursuant to Treasury Regulations Section 301.7701-3(c) (and analogous U.S. state or local income Tax Law) with respect to an applicable Transferred Subsidiary to be classified as an entity "disregarded as separate from its owner" within the meaning of Treasury Regulations Section 301.7701-3(c) effective no later than the Closing Date.

"<u>Seller Marks</u>" means, (a) all Trademarks that incorporate, contain or comprise the term "FTX" or the image of the "F" logo or elements thereof, (b) any other variations, derivatives, translations, transliterations and stylizations of any of the foregoing, and (c) any other Trademark confusingly similar to any of the foregoing.

"<u>Settlement</u>" has the meaning set forth in the Recitals.

"<u>Settlement Parties</u>" has the meaning set forth in the Recitals.

"<u>Settlement Stipulation</u>" has the meaning set forth in the Recitals.

"<u>Share Transfer Documentation</u>" means the documentation to effect the transfer of the Transferred Interests in all material respects in the forms attached hereto as <u>Exhibit E-1</u>, <u>E-2</u>, <u>E-3</u>, <u>E-4</u>, <u>E-5</u>, <u>E-6</u> and <u>E-7</u>.

"<u>Swiss Administrator</u>" means the administrator of Seller in the Swiss Moratorium Proceeding.

"<u>Swiss Court</u>" has the meaning set forth in the Recitals.

"<u>Swiss Moratorium Proceeding</u>" has the meaning set forth in the Recitals.

"<u>Swiss Restructuring Approval</u>" has the meaning set forth in <u>Section 4.2</u>.

"<u>Swiss Sale Approval</u>" has the meaning set forth in <u>Section 4.2</u>.

"<u>Taxes</u>" means any tax or similar duty, fee, charge or assessment thereof imposed by a Governmental Entity, in each case in the nature of a tax, including any interest, penalties and additions imposed with respect to such amount.

"<u>Tax Return</u>" means any returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns, and any amendments thereto) or any other document supplied or required to be supplied, filed or maintained with respect to any Taxes.

"<u>Termination Date</u>" has the meaning set forth in <u>Section 6.1(b)</u>.

"<u>Trademarks</u>" has the meaning set forth in the definition of "<u>Intellectual Property</u>".

"<u>Transaction Documents</u>" means this Agreement, the Release Agreement, the Share Transfer Documentation and the Bill of Sale and Assignment and Assumption Agreement, and any other documents or instruments required to be entered into pursuant hereto or thereto.

"Transactions" means the transactions contemplated by this Agreement and the Transaction Documents.

"Transferred Assets" has the meaning set forth in Section 1.2.

"Transferred Books and Records" means all current and historical files, reports, samples, plans, books and records (including extracts thereof) under ownership or in the possession or control of Seller as of the Closing, in whatever form kept, including electronic form, (A) if and only if used in or related exclusively to the Transferred Subsidiaries and the Transferred Assets, and (B) related exclusively to the period prior to the Petition Date; provided, however, that the Transferred Books and Records shall not include (x) books or records that are Excluded Assets, (y) books or records that are subject to restrictions on transfer pursuant to any applicable Law, and (z) Tax Returns of Seller or any related documentation or records.

"Transferred Interests" has the meaning set forth in the Recitals.

"Transferred Minority Interests" has the meaning set forth in the Recitals.

"Transferred Subsidiaries" has the meaning set forth in the Recitals.

"Transferred Subsidiary Interests" has the meaning set forth in the Recitals.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges including any interest, penalties and additions imposed with respect to such amount.

"Treasury Regulations" means the United States Treasury Regulations promulgated under the Code.

"Unchecked Subsidiary" means a Transferred Subsidiary with respect to which no Seller CTB Election is made.

"U.S. Restructuring Approval" has the meaning set forth in Section 4.1(a).

"U.S. Sale Approval" has the meaning set forth in Section 4.1(a).

[Remainder of page intentionally left blank]

**EXHIBIT B**

**FORM OF RELEASE AGREEMENT**

Agreed Form

## RELEASE AND INDEMNITY AGREEMENT

This RELEASE AND INDEMNITY AGREEMENT (this "Agreement") is made as of [•], 2024, by and among FTX Europe AG, a Swiss stock corporation ("FTX Europe"); FTX Trading Ltd., an Antigua company ("FTX Trading"); West Realm Shires Inc., a Delaware corporation ("WRS"); Patrick Gruhn, Robin Matzke, Lorem Ipsum RM UG, a German limited liability company (the "Purchaser Shareholders") and CredoMedia GmbH, a German limited liability company (the "Purchaser Entity", and, together with the Purchaser Shareholders, the "Purchaser Parties"); FTX EU Ltd, a Cyprus limited company ("FTX Cyprus"); FTX Switzerland GmbH, a Swiss limited liability company ("FTX Switzerland"); FTX Certificates GmbH, a Swiss limited liability company ("FTX Certificates"); FTX Structured Products AG, a Liechtenstein stock corporation ("FTX Structured Products"); and FTX Trading GmbH, a German limited liability company ("FTX Trading GmbH"). Capitalized terms used, but not otherwise defined herein, have the meanings given to such terms in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, on February [•], 2024, FTX Europe and the Purchaser Parties entered into a certain share and asset purchase agreement (the "Purchase Agreement"), pursuant to which FTX Europe agreed to sell, at the Closing, *inter alia*, the equity interests of each of FTX Cyprus, FTX Switzerland, FTX Certificates, FTX Structured Products and FTX Trading GmbH (collectively, the "Transferred Subsidiaries") to the Purchaser Entity; and

WHEREAS, in connection with the transactions contemplated by the Purchase Agreement, the Parties desire to grant the releases, and provide the indemnities, set forth in this Agreement.

NOW, THEREFORE the parties hereto agree as follows:

Section 1.     Release by FTX Debtor Releasors

Subject to and effective upon the occurrence of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the date hereof, each of FTX Trading, WRS and FTX Europe, on behalf of themselves and their Affiliates, and each such Person's respective successors and assigns (collectively, the "FTX Debtor Releasors"), to the fullest extent permitted by Law, hereby generally, irrevocably, forever, fully and unconditionally release, waive and discharge each of the Transferred Subsidiaries together with their respective successors and assigns from and with respect to any and all claims, obligations, rights, suits, damages, causes of actions, remedies and liabilities, of any kind, nature or description ("Claims"), whether known or unknown, contingent or not contingent, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, perfected or unperfected, subordinated or unsubordinated, joint or several, vested or unvested, executory, determined determinable or otherwise, whether or not the same is required to be accrued on the financial statements of any Person and howsoever arising, whether based on any Law or right of

action, and whether arising under any contract, agreement, arrangement, commitment or undertaking or in tort, which the FTX Debtor Releasors, or any of them, ever had or now has or can have or shall or may hereafter have against the Transferred Subsidiaries (the "FTX Debtor Released Matters").  The releases contemplated herein are intended to be as broad as permitted by Law and are intended to, and do, extinguish all Claims of any kind whatsoever, whether at Law or in equity or otherwise, that are based on or relate to facts, conditions, actions or omissions (known or unknown) with respect to the FTX Debtor Released Matters that have existed or occurred at any time prior to and including the date hereof.

Section 2.    Release by Transferred Subsidiaries.

Subject to and effective upon the occurrence of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, as of the date hereof, the Transferred Subsidiaries on behalf of themselves and their respective successors and assigns, to the fullest extent permitted by Law, hereby generally, irrevocably, forever, fully and unconditionally release, waive and discharge, each of FTX Trading, WRS, FTX Europe and their Affiliates (but excluding the Transferred Subsidiaries), together with their respective officers, directors, employees, agents, advisors and representatives, and each such Person's respective successors and assigns successors and assigns (collectively the "FTX Debtor Releasees") from and with respect to any Claims, whether known or unknown, contingent or not contingent, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or unsuspected, liquidated or not liquidated, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, perfected or unperfected, subordinated or unsubordinated, joint or several, vested or unvested, executory, determined determinable or otherwise, whether or not the same is required to be accrued on the financial statements of any Person and howsoever arising, whether based on any Law or right of action, and whether arising under any contract, agreement, arrangement, commitment or undertaking or in tort, which the Transferred Subsidiaries, or any of them, ever had or now has or can have or shall or may hereafter have against the FTX Debtor Releasees (the "Transferred Subsidiary Released Matters").  The releases contemplated herein are intended to be as broad as permitted by Law and are intended to, and do, extinguish all Claims of any kind whatsoever, whether at Law or in equity or otherwise, that are based on or relate to facts, conditions, actions or omissions (known or unknown) with respect to the Transferred Subsidiary Released Matters that have existed or occurred at any time prior to and including the date hereof.

Section 3.    California Civil Code Waiver.

Each of the parties hereto hereby expressly waives to the fullest extent permitted by Law the provisions, rights and benefits of California Civil Code Section 1542 (or any similar Law), which provides:

*A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.*

-2-

Section 4.    <u>Customer Shortfall Indemnity.</u>

(a)    FTX Trading agrees to reimburse the Purchaser Parties in accordance with the following sentence for amounts paid by FTX EU Ltd ("<u>FTX Cyprus</u>") in satisfaction of European Customer Claims (as defined below) to the extent such payments exceed in the aggregate forty six million four hundred eighty one thousand seven hundred fourteen Euros (€46,481,714), with such excess amount to be converted into and paid in Dollars at the Reference Exchange Rate (the "<u>Excess Amount</u>"), provided that such reimbursement by FTX Trading is subject to a maximum amount of seven million seven hundred thousand Dollars ($7,700,000).  From time to time following the date hereof and prior to the expiration of the applicable statute of limitations with respect to European Customer Claims under the laws of Cyprus, the Purchaser Entity may provide to FTX Trading a written statement (the "<u>European Customer Claim Statement</u>") setting forth an itemized list of the European Customer Claims (as defined below) which have been validated and paid by FTX Cyprus, together with know-your-customer, customer due diligence or similar information required to be collected, or customarily collected by financial intermediaries to comply with applicable law ("<u>KYC Information</u>") with respect to each European Customer Claim reflected on the European Customer Claim Statement, bank statements or other documentation providing proof that such payments have been made, and identifying the Excess Amount to be reimbursed. No later than fifteen (15) business days following delivery of a European Customer Claim Statement, and provided that the KYC Information and other evidence provided with the European Customer Claim statement is true, complete and correct, FTX Trading shall pay to the Purchaser Entity the Excess Amount identified therein. Such payment shall be made by wire transfer of immediately available funds to a bank account notified in writing to FTX Trading by the Purchaser Entity.

(b)    FTX Trading agrees that the Customer Withdrawal Liabilities shall be reconciled, and distributions in respect thereof made, by the Debtors pursuant to a plan of reorganization adopted in the Bankruptcy Proceeding. For the avoidance of doubt, none of the Debtors shall have any liability of any kind whatsoever to any of the Purchaser Parties or the Transferred Subsidiaries in respect of the Customer Withdrawal Liabilities.

(c)    FTX Trading shall indemnify, defend and hold harmless FTX Cyprus from and against and in respect of the Further Claim (as defined below), up to a maximum amount of twenty million Dollars ($20,000,000).

(d)    In the event that the Further Claim (as defined below) is prosecuted against or sought to be collected from FTX Cyprus, FTX Cyprus shall promptly, but in no event more than five (5) Business Days following receipt of such claim or demand, notify FTX Trading in writing of such claim or demand and the amount asserted thereunder, any other remedy sought thereunder, any relevant time constraints relating thereto and, to the extent practicable, any other material details pertaining thereto (a "<u>Claim Notice</u>"). FTX Trading shall thereafter have fifteen (15) Business Days (or such fewer number of days set forth in the Claim Notice as may be required by court proceeding in the event of a litigated matter) after receipt of the Claim Notice (the "<u>Notice Period</u>") to notify FTX Cyprus that it desires to defend FTX Cyprus against such Further Claim.

(e)    In the event that FTX Trading notifies FTX Cyprus within the Notice Period that it desires to defend FTX Cyprus against the Further Claim, FTX Trading shall be entitled to

-3-

defend FTX Cyprus by appropriate proceedings and shall have the power to direct and control such defense at its expense. FTX Cyprus shall be entitled to, but not have any obligation to, participate in any such defense and to employ separate counsel of its choosing at its sole expense. FTX Trading shall not, without the prior written consent of FTX Cyprus, settle, compromise or offer to settle or compromise any Further Claim on a basis that would result in (i) the imposition of an Order that would materially restrict or otherwise materially adversely affect the future activity or conduct of FTX Cyprus or any of its Affiliates, (ii) a finding or admission of a violation of Law by FTX Cyprus or any of its Affiliates, (iii) any monetary liability of FTX Cyprus that will not be fully and promptly indemnified hereunder by FTX Trading, or (iv) FTX Cyprus not being completely and unconditionally released from such Further Claim.

(f)     FTX Cyprus shall not settle, compromise or offer to settle or compromise any Further Claim without the written consent of FTX Trading.

(g)     FTX Cyprus and FTX Trading shall cooperate reasonably in the defense of a Further Claim, including by providing reasonable access to each other's relevant information, business records and other documents, and employees.

(h)     For the purposes of this Section 4:

(i)     "European Customer Claims" shall mean the claims of customers of FTX Cyprus in respect of such customers' trading activity through or deposit of funds with FTX Cyprus as of the Petition Date as identified and in the amounts set forth on Schedule A hereto (which, for the avoidance of doubt, excludes the Further Claim).

(ii)     "Further Claim" shall mean the claim identified in Schedule B hereto.

(iii)     "Reference Exchange Rate" shall mean the rate of USD 1.0837 per EUR 1.00.

Section 5.     Miscellaneous.

(a)     This Agreement and the Purchase Agreement together set forth the entire understanding of the parties hereto relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the parties hereto with respect to the subject matter of this Agreement. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the parties hereto or their respective successors, any rights, remedies, obligations or liabilities; provided, that Section 2 of this Agreement shall be enforceable by any FTX Debtor Releasee.

(b)     Any provision of this Agreement may be amended or waived, but only if the amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party that would have benefited from the provision had it not been waived.

-4-

(c)     This Agreement will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Party shall be determined in accordance with such laws.

(d)     Without limiting a Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and each Party hereby consents to and submits to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 5(f); provided, however, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such legal, administrative or judicial proceedings, in the Delaware Court of Chancery, for the resolution of any such claim or dispute. Each Party hereby irrevocably waives, to the fullest extent permitted by applicable laws, any objection which it may now or hereafter have to the laying of venue of any such action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Party consents to process being served by the other Party in any legal, administrative or judicial proceedings by delivery of a copy thereof in accordance with the provisions of Section 5(f); provided, however, that such service will not be effective until the actual receipt thereof by the Party being served. Each Party waives any right to trial by jury in any legal, administrative or judicial proceedings regarding this Agreement or any provision hereof.

(e)     As used in this Agreement, references to (i) the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement, (ii) the Preamble, Recitals or Sections refer to the Preamble, a Recital or a Section of this Agreement unless otherwise indicated and (iii) all references to "Dollars", "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified. Whenever the words "include", "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the person referred to may require. The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

(f)     All notices, requests and other communications under this Agreement to a Party will be in writing and will be deemed given (a) on the Business Day (defined as any day other than a Saturday or Sunday or a day on which banks located in New York, New York or Zurich, Switzerland are authorized or required by statute to close) sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day

-5-

following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such Party at its address (or number) set forth below or such other address (or number) as the Party may specify by notice to the other Party.

If to FTX Europe:

> FTX Europe AG
> Churerstrasse 135
> 8808 Pfäffikon SZ
> Switzerland
> Attention: Arturo Giovanoli
> Email: agiovanoli@matrixs.com
>
> *With a copy (which shall not constitute notice) to both*:
>
> Sullivan & Cromwell LLP
> 1 New Fetter Lane
> London EC4A 1AN
> United Kingdom
> Attention:  Evan S. Simpson
>             Oderisio de Vito Piscicelli
>             Alexa J. Kranzley
> Telephone: +44 20 7959 8426
>            +44 20 7959 8589
>            +1 212 558 7893
> Email:    simpsone@sullcrom.com
>           devitopiscicellio@sullcrom.com
>           kranzleya@sullcrom.com
>
> and
>
> Holenstein Brusa Ltd
> Utoquai 29 / 31
> 8008 Zurich
> Switzerland
> Attention:  Thomas Zemp
>             Dusan Knezevic
> Telephone: +41 44 257 20 00
> Email:    Zemp@hol-law.ch
>           Knezevic@hol-law.ch

If to FTX Trading and/or WRS:

> Sullivan & Cromwell LLP
> 125 Broad Street

-6-

New York, NY 10004
Attention: John J. Ray III
Email: jray@greylockpartnersllc.com

*With a copy (which shall not constitute notice) to*:

Sullivan & Cromwell LLP
1 New Fetter Lane
London EC4A 1AN
United Kingdom
Attention:  Evan S. Simpson
                     Oderisio de Vito Piscicelli
                     Alexa J. Kranzley
Telephone: +44 20 7959 8426
                    +44 20 7959 8589
                    +1 212 558 7893
Email:        simpsone@sullcrom.com
                   devitopiscicellio@sullcrom.com
                   kranzleya@sullcrom.com

If to any Purchaser Party and/or any Transferred Subsidiaries:

The Daley Law Firm, LLC
4845 Pearl East Circle, Suite 101
Boulder, Colorado 80304 USA
Attention: Darrell M. Daley
Telephone: +1 (303) 479-3500
Email:  darrell@daleylawyers.com

  (g)  This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

*[Signatures Appear on the Following Page]*

-7-

4858-3143-5937 v.5

**FTX EUROPE AG**

By: _____

Name:

Title:


**FTX TRADING LTD.**

By: _____

Name:


**PATRICK GRUHN**

_____


**ROBIN MATZKE**

_____


**LOREM IPSUM RM UG**

By: _____

Name:


**CREDOMEDIA GMBH**

By: _____

Name:

Title:

**WEST REALM SHIRES INC.**

By:

_____
Name:
Title:

**FTX EU LTD**

By:

_____
Name:
Title:

**FTX SWITZERLAND GMBH**

By:

_____
Name:
Title

**FTX CERTIFICATES GMBH**

By:

_____
Name:
Title:

**FTX STRUCTURED PRODUCTS AG**

By:

_____
Name:
Title:

**FTX TRADING GMBH**

By:

_____
Name:
Title:

**APPROVAL OF SWISS ADMINISTRATOR TO FTX EUROPE TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD** *(not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval)*

By: _____
      Name:

By: _____
      Name:

**SCHEDULE A**

**EUROPEAN CUSTOMER CLAIMS**

**SCHEDULE B**

**FURTHER CLAIM**

**FTX**

**Overview of US Customer Claim**

## Notes

1. Customer numbers are as designated in filed schedules and statements

| Overview of US Customer Claim | |
| --- | --- |
| **Customers** | **Customer Liabilities (USD)** |
| 05629853 | 18,135,482.41 |

**EXHIBIT C**

**FORM OF INTER-DEBTOR RESTRUCTURING AGREEMENT**

**EXHIBIT D**

**FORM OF COLLATERAL CLAIM SETTLEMENT AGREEMENT**

**EXHIBIT E-1**

**FORM OF FTX EU LTD SHARE TRANSFER DOCUMENTS**

Agreed Form

## <u>INSTRUMENT OF TRANSFER</u>

WE          **FTX EUROPE AG**
of          […]

(hereinafter called the "**Transferor**")

in exchange of good and valuable consideration received by us by

Name        **CredoMedia GmbH**
Of         […]

(hereinafter called the "**Transferee**")

do hereby transfer to the said Transferee the shares shown in the schedule hereto held by us in the undertaking called

### **FTX EU LTD**

to hold unto the said Transferee their executors, administrators and assigns.

AND WE the said Transferee do hereby agree to take the said shares in the aforementioned undertaking subject to the conditions aforesaid.

Date: […]

## <u>SCHEDULE</u>

No of share(s)        [258,811]

Serial No of share(s), from    [1] - [258,811]

Nominal value of each share    [EUR 1.00]

Share Certificate No.    [46]

**THE TRANSFEROR**          **THE TRANSFEREE**

_____    _____
Executed for and on behalf of:    Executed for and on behalf of:

**FTX EUROPE AG**          **CREDOMEDIA GMBH**
Represented by:          Represented by: […]
Title:          Title:

Witness to the signature of Transferor    Witness to the signature of Transferee

......................................................    ......................................................

**FTX EU LTD**
(the "**Company**")

**WRITTEN RESOLUTION OF THE SOLE DIRECTOR OF THE COMPANY DATED […]**

**A.    DECLARATION OF INTEREST OF THE DIRECTORS**

The sole Director, by her sole signature hereto, declares that, pursuant to Section 191 of the Companies Law, Cap. 113 of the Laws of Cyprus, as amended and the articles of association of the Company, she has no direct or indirect interest whatsoever in the subject matter of the below resolutions.

**B.    WRITTEN RESOLUTIONS**

By a written resolution of the sole Director of the Company, it is hereby resolved as follows:

(1)  To approve of the following transfer of shares:

  (a)  [258,811] fully paid shares serial no. [1] – [258,811]

  from **FTX EUROPE AG** (the "**Transferor**")

  to **CredoMedia GmbH**
  with address in Kirchstraße 10, 88145 Opfenbach, Germany (the "**Transferee**")

(2)  That share certificate No. [46] reflecting the above mentioned shares of the Company formerly held by the Transferor be and is hereby cancelled.

(3)  That share certificate No. […] in the name of the Transferee for […] shares of the Company numbered from […] to […] (both inclusive) be issued under the seal of the Company to be affixed in the presence of the sole Director and the secretary of the Company.

(4)  The board of directors of the Company hereby instructs the secretary of the Company to take all appropriate steps to implement the above resolutions and to effect the aforesaid transfer, including, *inter alia*, (i) to record the relevant entries into the register of members of the Company to give effect to the above resolutions, (ii) to cancel share certificate No. [46], (iii) to issue the new relevant share certificate(s) No. […] in the name of the Transferee as described above, and (iv) to proceed with the necessary filings and notifications to the Registrar of Companies within the time prescribed by Cyprus Law.


………..……………………………………..
[MARTHA LAMBRIANOU]
Director of the Company

**EXHIBIT E-2**

**FORM OF FTX SWITZERLAND GMBH SHARE TRANSFER DOCUMENTS**

Agreed Form

# Stammanteile-Abtretungsvertrag

## *Quota Assignment Agreement*

vom/

*dated* _____

zwischen/between     FTX Europe AG

Churerstrasse 135, CH-8808 Pfäffikon SZ

(die **Verkäuferin** / *the Seller*)

und/

*and*

CredoMedia GmbH

Kirchstraße 10, DE-88145 Opfenbach

(die **Käuferin** und zusammen mit der Verkäuferin, die **Parteien** / *the Purchaser and collectively with the Seller, the Parties*)

betreffend Abtretung sämtlicher Stammanteile der FTX Switzerland GmbH

*regarding the assignment of all quotas in FTX Switzerland LLC*

## Vorbemerkungen / *Recitals*

A.  FTX Switzerland GmbH (die "**Gesellschaft**") ist eine Gesellschaft mit beschränkter Haftung nach Schweizer Recht mit Sitz in Freienbach. Die

Agreed Form

Gesellschaft ist unter der Firmennummer CHE-268.689.958 im Handelsregister des Kantons Schwyz eingetragen. Das Kapital der Gesellschaft beträgt CHF 20'000 eingeteilt in 200 Stammanteile mit einem Nennwert von je CHF 100 (die "**Stammanteile**").

*FTX Switzerland LLC (the "**Company**") is a Swiss limited liability company with registered office in Freienbach. The Company is registered under the Company number CHE-268.689.958 with the commercial register of the Canton of Schwyz. The quota capital of the Company amounts to CHF 20,000 and is divided into 200 quotas with the par value of CHF 100 each (the "**Quotas**").*

B.  Die Verkäuferin ist Eigentümerin aller 200 Stammanteile der Gesellschaft.

*The Seller is the owner of all 200 quotas in the Company.*

Dies vorausgeschickt vereinbaren die Parteien Folgendes:

*Now, therefore, the Parties agree as follows:*

## 1   Übertragung der Stammanteile / *Transfer of Quotas*

Gemäss dem Kaufvertrag über Aktien und Vermögenswerte (in der jeweils geänderten, neu gefassten, modifizierten oder ergänzten Fassung, der der "**Kaufvertrag**") zwischen der Verkäuferin und der Käuferin sowie Patrick Gruhn, Robin Matzke und Lorem Ipsum RM UG hat sich die Verkäuferin verpflichtet, an die Käuferin sämtliche Stammanteile an der Gesellschaft und alle damit zusammenhängenden Rechte und Pflichten an die Käuferin zu übertragen und tritt hiermit sämtliche Stammanteile an die Käuferin ab. Die Käuferin nimmt hiermit die Abtretung aller Stammanteile der Gesellschaft mit allen damit zusammenhängenden Rechten und Pflichten an.

*Pursuant to the Share and Asset Purchase Agreement (as the same may be amended, restated modified or supplemented from time to time, the "**Purchase Agreement**") by and among the Seller and the Purchaser as well as Patrick Gruhn, Robin Matzke and Lorem Ipsum RM UG, the Seller agreed to transfer to the Purchaser all quotas of the Company and any ancillary rights and obligations thereto and hereby assigns all quotas to the Purchaser. The Purchaser herewith accept the transfer of all quotas in the Company and any ancillary rights and obligations thereto.*

## 2   Gegenleistung und Bedingungen / *Compensation and Conditions*

Die Gegenleistungen und die Zahlungsbedingungen sowie unter anderem die Gewährleistung und Zusicherungen wurden im Kaufvertrag geregelt.

Agreed Form

*The consideration and the payment conditions as well as, among others, the representations and warranties are documented in the Purchase Agreement.*

## 3 Dividendenberechtigung / *Dividend Rights*

Sämtliche bis zum heutigen Tag nicht ausgeschütteten Gewinne der Gesellschaft stehen der Käuferin zu.

*The Purchaser shall be entitled to all profits of the Company which have not been distributed as of the date hereof.*

## 4 Eintragung ins Anteilbuch / *Entry in the Quota Register*

Die Käuferin ist in das Anteilbuch der Gesellschaft einzutragen.

*The Purchaser shall be registered into the quota register of the Company.*

## 5 Statutarische Rechte und Pflichten / *Members' Rights and Obligations according to the Articles of Association*

Die Statuten der Gesellschaft sehen weder Nachschuss- noch Nebenleistungspflichten der Gesellschafter vor.

Gemäss Art. 26 Abs. 2 der Statuten der Gesellschaft dürfen die Geschäftsführer sowie Dritte, die mit der Geschäftsführung befasst sind, Tätigkeiten ausüben, die gegen das gesetzliche Konkurrenzverbot verstossen, sofern alle Gesellschafter schriftlich zustimmen.

Über die vorgenannte Bestimmung hinaus enthalten die Statuten keine Vorkaufs-, Vorhand-, oder Kaufsrechte der Gesellschafter oder der Gesellschaft sowie keine Konventionalstrafen.

*The articles of association of the Company do not provide for an obligation of the quotaholders to make additional contributions nor do the quotaholders have any other additional obligations.*

*According to art. 26 para. 2 of the articles of association of the Company, the managing directors and other persons engaged with the management of the company may perform activities that violate the statutory non-competition obligation, provided that all quotaholders agree in writing with such activities.*

*Beyond the aforementioned provision, the articles of association do not contain any first option, pre-emptive and purchase rights of the quotaholders or of the Company, nor do they provide for liquidated damages.*

## 6 Handelsregisteranmeldung / *Application with the Commercial Register*

Die Geschäftsführung wird die Käuferin als neue Gesellschafterin im Handelsregister zur Eintragung anmelden.

*The managing directors shall register the Purchaser as new quotaholder with the commercial register.*

## 7 Verschiedenes / *Miscellaneous*

### 7.1 Vertragsänderungen / *Amendment*

Änderungen und Ergänzungen dieses Abtretungsvertrages bedürfen zu ihrer Rechtswirksamkeit der Schriftform und der Zustimmung sämtlicher Parteien.

*This Assignment Agreement may only be modified and completed by an instrument in writing executed by all Parties hereto.*

### 7.2 Verzicht / *Waiver*

Verzichtet eine Partei darauf, eine Bestimmung dieses Abtretungsvertrages oder ein Recht, das ihr aus diesem Abtretungsvertrag zusteht, im Einzelfall durchzusetzen, so kann dies nicht als genereller Verzicht auf derartige Bestimmungen oder Rechte betrachtet werden oder als Beeinträchtigung der Gültigkeit dieses Abtretungsvertrages. Ein Verzicht einer Partei ist nur wirksam, wenn dieser Verzicht schriftlich erfolgt und von der verzichtenden Partei gehörig unterzeichnet ist.

*A Party's failure to exercise any of the provisions of this Assignment Agreement or any rights with respect to this Assignment Agreement shall not operate as waiver of such provisions or rights, nor in any way affect the validity of this Assignment Agreement. A Party's waiver must be in writing and duly signed by the Party against whom the waiver is being enforced.*

### 7.3 Salvatorische Klausel / *Severability*

Sollten einzelne Bestimmungen dieses Abtretungsvertrages aus irgendeinem Grund ungültig oder nicht vollstreckbar sein oder werden, so sind sie, wenn möglich, durch eine gültige oder vollstreckbare Bestimmung zu ersetzen, deren Zweck im weitest möglichen Umfang dem ursprünglich verfolgten Zweck und der wirtschaftlichen Absicht der Parteien am nächsten kommt. Die Nichtigkeit oder Änderung jeglicher Bestimmung dieses Abtretungsvertrages berührt die Gültigkeit oder Vollstreckbarkeit jeglicher anderer Bestimmung dieses Abtretungsvertrages nicht.

*If any provision of this Assignment Agreement is held to be or becomes invalid or unenforceable for any reason, such provision shall, if possible, be adjusted by a valid or enforceable provision, in order to achieve a result, which corresponds to the fullest possible extent to the original intention and economical purpose of the Parties. The nullity or adjustment of any provision of this Assignment Agreement shall not affect the validity and enforceability of any other provision of this Assignment Agreement.*

Agreed Form

8    Anwendbares Recht und Gerichtsstand / *Applicable Law and Jursidiction*

Dieser Abtretungsvertrag untersteht materiellem Schweizer Recht unter Ausschluss der Normen des internationalen Privatrechts und des Übereinkommens der Vereinten Nationen vom 11. April 1980 über Verträge über den internationalen Warenkauf (Wiener Übereinkommen). Für alle Streitigkeiten aus oder im Zusammenhang mit diesem Abtretungsvertrag sind die ordentlichen Gerichte in Freienbach, Kanton Schwyz, ausschliesslich zuständig.

*This Assignment Agreement shall be subject to and governed by substantive Swiss law excluding the provisions of the private international law and the United Nations Convention on Contracts for the International Sale of Goods dated 11 April 1980 (CISG), Any disputes arising out of or in connection with this Assignment Agreement shall be subject to the exclusive jurisdiction of the ordinary courts of Freienbach, Canton of Schwyz.*

9    Interpretation / *Interpretation*

Bei allfälligen Widersprüchen zwischen der deutschen und der englischen Fassung dieses Abtretungsvertrags geht die deutsche Fassung vor.

*In case of any inconsistencies between the German and the English version of this Assignment Agreement the German version shall prevail.*

(Unterschriftenseite folgt / *signature page follows*)

Agreed Form

Die Verkäuferin / *the Seller*:

FTX Europe AG

_____

Arturo Giovanoli

Die Käuferin / *the Purchaser*:

CredoMedia GmbH

_____

Patrick Gruhn

Zustimmung der schweizerischen Sachwalterin der Verkäuferin zum Abschluss dieses Vertrages / *Approval of Swiss Administrator to Seller to enter into this Agreement*:

HOLENSTEIN BRUSA AG (nicht im eigenen Namen, sondern als gerichtlich bestellte Sachwalterin und vorbehältlich der Genehmigung durch das schweizerische Gericht / *not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval*)

_____

Dusan Knezevic

_____

Thomas P. Zemp

**EXHIBIT E-3**

**FORM OF FTX TRADING GMBH SHARE TRANSFER DOCUMENTS**

Agreed Form

**Agreement on the Assignment (*Abtretungsvereinbarung*)**

**of all Shares in FTX Trading GmbH**

(the "**Agreement**")

between

1.     **FTX Europe AG,** a Swiss stock corporation with its registered office in Pfäffikon, Switzerland, registered with the commercial register office of the Canton of Schwyz in Switzerland under registration number CHE-175.231.191 (the "**Transferor**"); and

2.     **CredoMedia GmbH**, a German limited liability company with its registered office at Kirchstraße 10, 88145 Opfenbach, Germany, registered under HRB 77860 at the Court in Cologne (the "**Transferee**", and together with the Transferor the "**Parties**" and each a "**Party**").

**RECITALS**

(A)     The Transferor is the only shareholder of FTX Trading GmbH, a German limited liability company, with registered seat in Hannover, Germany, registered with the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Hannover under no. HRB 220867and with registered business address at Kampsriede 6a, 30659 Hannover, Germany (the "**Company**").

(B)     The registered share capital (*Stammkapital*) of the Company amounts to EUR 25,000 (in words: twenty five thousand Euro), divided into 1 share with the current docket number (*laufende Nummer*) 1 and with the nominal value of EUR 25,000, held by the Transferor (the Transferor's overall shareholding in the Company amounting to 100% of the shares; the "**Sold Shares**").

(C)     On February [●], 2024, the Transferor and Patrick Gruhn, Robin Matzke, Lorem Ipsum RM UG, and the Transferee, on the other hand, entered into the Share and Asset Purchase Agreement (as the same may be amended, restated modified or supplemented from time to time, the "**SAPA**"), which contemplates, among other things, the sale of the Sold Shares from Transferor to the Transferee. The Closing in accordance with the SAPA occurred on the date of this Agreement.

(D)     The Parties agreed in the SAPA that, at the closing of the transactions contemplated by the SAPA, the Parties shall enter into a share transfer agreement providing for the transfer (*Abtretung*) with effect in rem (*mit dinglicher Wirkung*) of the Sold Shares from Transferor to the Transferee. To effect such transfer, the Parties intend to enter into this Agreement.

The Parties, therefore, agree as follows:

**1.     ASSIGNMENT OF THE TRANSFEROR SOLD SHARES**

The Transferor hereby assigns (*tritt ab*) the Sold Shares to the Transferee with immediate effect *in rem* on [●], 2024. The Transferee hereby accepts such assignment.

The Sold Shares are transferred to Transferee with all rights and obligations pertaining thereto, in particular the right to any profits not yet distributed on or prior to the date of this Agreement.

**2.     PURCHASE PRICE**

The portion of the Purchase Price (as defined in the SAPA) pertaining to the Sold Shares amounts to USD [●] (the "**German Shares Consideration**").

3.    **NO REPRESENTATIONS AND WARRANTIES**

The Transferee acknowledges and agrees that under or in connection with this Agreement, the Transferor neither makes any representations or warranties nor provides any indemnities with respect to the Company or the Sold Shares and the Parties agree that no representation, warranty, indemnity or other right of recovery of the Transferee shall be created, implied or construed, by entering into this Agreement or by operation of any law under any jurisdiction. This Agreement merely serves to implement the transactions contemplated by the SAPA in Germany and all representations, warranties or indemnities in relation to the transactions contemplated under the SAPA are exclusively set forth in the SAPA.

4.    **MISCELLANEOUS**

4.1    For the avoidance of doubt, the subject matter of this Agreement is only the assignment (*Abtretung*) and not the purchase (*Kauf*) of the Sold Shares; any statutory, contractual, quasi-contractual or other rights or claims against the other Party with respect to the sale and transfer of the Sold Shares are solely governed by the SAPA.

4.2    Any costs and expenses in connection with this Agreement (including notarial fees) shall be borne by the Transferee.

4.3    All payments made under this Agreement shall be made gross, free of any right of counterclaim or set-off (except to the extent expressly provided for in this Agreement) and without deduction or withholding of any kind other than any deduction or withholding required by law.

4.4    This Agreement shall be governed by and construed in accordance with the laws of Germany, excluding its conflicts of laws rules and excluding the United Nations Convention on Contracts for the International Sale of Goods (CISG).

4.5    All disputes arising under or in connection with this Agreement or its validity shall be exclusively settled by the courts of Frankfurt am Main, Germany.

4.6    If any individual terms of this Agreement are or should become invalid, the other terms shall nevertheless remain valid. By mutual agreement, invalid terms are to be replaced by such provisions which come as close as possible to the intended commercial outcome. The same shall apply with regard to the filling of any gaps in the Agreement.

\*       \*       \*

4856-6826-0258 v.2

**EXHIBIT E-4**

**FORM OF FTX CERTIFICATES GMBH SHARE TRANSFER DOCUMENTS**

Agreed Form

# Stammanteile-Abtretungsvertrag

## *Quota Assignment Agreement*

vom/

*dated* _____

zwischen/between     FTX Europe AG

Churerstrasse 135, CH-8808 Pfäffikon SZ

(die **Verkäuferin** / *the Seller*)

und/

*and*

CredoMedia GmbH

Kirchstraße 10, DE-88145 Opfenbach

(die **Käuferin** und zusammen mit der Verkäuferin, die **Parteien** / *the Purchaser and collectively with the Seller, the **Parties***)

betreffend Abtretung sämtlicher Stammanteile der FTX Certificates GmbH

*regarding the assignment of all quotas in FTX Certificates LLC*

## Vorbemerkungen / *Recitals*

A. FTX Certificates GmbH (die "**Gesellschaft**") ist eine Gesellschaft mit beschränkter Haftung nach Schweizer Recht mit Sitz in Freienbach. Die

Gesellschaft ist unter der Firmennummer CHE-162.267.877 im Handelsregister des Kantons Schwyz eingetragen. Das Kapital der Gesellschaft beträgt CHF 20'000 eingeteilt in 200 Stammanteile mit einem Nennwert von je CHF 100 (die "**Stammanteile**").

*FTX Certificates LLC (the "**Company**") is a Swiss limited liability company with registered office in Freienbach. The Company is registered under the Company number CHE-162.267.877 with the commercial register of the Canton of Schwyz. The quota capital of the Company amounts to CHF 20,000 and is divided into 200 quotas with the par value of CHF 100 each (the "**Quotas**").*

B.  Die Verkäuferin ist Eigentümerin aller 200 Stammanteile der Gesellschaft.

*The Seller is the owner of all 200 quotas in the Company.*

Dies vorausgeschickt vereinbaren die Parteien Folgendes:

*Now, therefore, the Parties agree as follows:*

## 1      Übertragung der Stammanteile / *Transfer of Quotas*

Gemäss dem Kaufvertrag über Aktien und Vermögenswerte (in der jeweils geänderten, neu gefassten, modifizierten oder ergänzten Fassung, der "**Kaufvertrag**") zwischen der Verkäuferin der Käuferin sowie Patrick Gruhn, Robin Matzke und Lorem Ipsum RM UG hat sich die Verkäuferin verpflichtet, an die Käuferin sämtliche Stammanteile an der Gesellschaft und alle damit zusammenhängenden Rechte und Pflichten an die Käuferin zu übertragen und tritt hiermit sämtliche Stammanteile an die Käuferin ab. Die Käuferin nimmt hiermit die Abtretung aller Stammanteile der Gesellschaft mit allen damit zusammenhängenden Rechten und Pflichten an.

*Pursuant to Share and Asset Purchase Agreement (as the same may be amended, restated modified or supplemented from time to time, the "**Purchase Agreement**") by and among the Seller and the Purchaser, as well as Patrick Gruhn, Robin Matzke and Lorem Ipsum RM UG, the Seller agreed to transfer to the Purchaser all quotas of the Company and any ancillary rights and obligations thereto and hereby assigns all quotas to the Purchaser. The Purchaser herewith accepts the transfer of all quotas in the Company and any ancillary rights and obligations thereto.*

## 2      Gegenleistung und Bedingungen / *Compensation and Conditions*

Die Gegenleistungen und die Zahlungsbedingungen sowie unter anderem die Gewährleistung und Zusicherungen wurden im Kaufvertrag geregelt.

Agreed Form

*The consideration and the payment conditions as well as, among others, the representations and warranties are documented in the Purchase Agreement.*

## 3 Dividendenberechtigung / *Dividend Rights*

Sämtliche bis zum heutigen Tag nicht ausgeschütteten Gewinne der Gesellschaft stehen der Käuferin zu.

*The Purchaser shall be entitled to all profits of the Company which have not been distributed as of the date hereof.*

## 4 Eintragung ins Anteilbuch / *Entry in the Quota Register*

Die Käuferin ist in das Anteilbuch der Gesellschaft einzutragen.

*The Purchaser shall be registered into the quota register of the Company.*

## 5 Statutarische Rechte und Pflichten / *Members' Rights and Obligations according to the Articles of Association*

Die Statuten der Gesellschaft sehen weder Nachschuss- noch Nebenleistungspflichten der Gesellschafter vor.

Gemäss Art. 26 Abs. 2 der Statuten der Gesellschaft dürfen die Geschäftsführer sowie Dritte, die mit der Geschäftsführung befasst sind, Tätigkeiten ausüben, die gegen das gesetzliche Konkurrenzverbot verstossen, sofern alle Gesellschafter schriftlich zustimmen.

Über die vorgenannte Bestimmung hinaus enthalten die Statuten keine Vorkaufs-, Vorhand-, oder Kaufsrechte der Gesellschafter oder der Gesellschaft sowie keine Konventionalstrafen.

*The articles of association of the Company do not provide for an obligation of the quotaholders to make additional contributions nor do the quotaholders have any other additional obligations.*

*According to art. 26 para. 2 of the articles of association of the Company, the managing directors and other persons engaged with the management of the company may perform activities that violate the statutory non-competition obligation, provided that all quotaholders agree in writing with such activities.*

*Beyond the aforementioned provision, the articles of association do not contain any first option, pre-emptive and purchase rights of the quotaholders or of the Company, nor do they provide for liquidated damages.*

## 6 Handelsregisteranmeldung / *Application with the Commercial Register*

Die Geschäftsführung wird die Käuferin als neue Gesellschafterin im Handelsregister zur Eintragung anmelden.

*The managing directors shall register the Purchaser as new quotaholder with the commercial register.*

## 7 Verschiedenes / *Miscellaneous*

### 7.1 Vertragsänderungen / *Amendment*

Änderungen und Ergänzungen dieses Abtretungsvertrages bedürfen zu ihrer Rechtswirksamkeit der Schriftform und der Zustimmung sämtlicher Parteien.

*This Assignment Agreement may only be modified and completed by an instrument in writing executed by all Parties hereto.*

### 7.2 Verzicht / *Waiver*

Verzichtet eine Partei darauf, eine Bestimmung dieses Abtretungsvertrages oder ein Recht, das ihr aus diesem Abtretungsvertrag zusteht, im Einzelfall durchzusetzen, so kann dies nicht als genereller Verzicht auf derartige Bestimmungen oder Rechte betrachtet werden oder als Beeinträchtigung der Gültigkeit dieses Abtretungsvertrages. Ein Verzicht einer Partei ist nur wirksam, wenn dieser Verzicht schriftlich erfolgt und von der verzichtenden Partei gehörig unterzeichnet ist.

*A Party's failure to exercise any of the provisions of this Assignment Agreement or any rights with respect to this Assignment Agreement shall not operate as waiver of such provisions or rights, nor in any way affect the validity of this Assignment Agreement. A Party's waiver must be in writing and duly signed by the Party against whom the waiver is being enforced.*

### 7.3 Salvatorische Klausel / *Severability*

Sollten einzelne Bestimmungen dieses Abtretungsvertrages aus irgendeinem Grund ungültig oder nicht vollstreckbar sein oder werden, so sind sie, wenn möglich, durch eine gültige oder vollstreckbare Bestimmung zu ersetzen, deren Zweck im weitest möglichen Umfang dem ursprünglich verfolgten Zweck und der wirtschaftlichen Absicht der Parteien am nächsten kommt. Die Nichtigkeit oder Änderung jeglicher Bestimmung dieses Abtretungsvertrages berührt die Gültigkeit oder Vollstreckbarkeit jeglicher anderer Bestimmung dieses Abtretungsvertrages nicht.

*If any provision of this Assignment Agreement is held to be or becomes invalid or unenforceable for any reason, such provision shall, if possible, be adjusted by a valid or enforceable provision, in order to achieve a result, which corresponds to the fullest possible extent to the original intention and economical purpose of the Parties. The nullity or adjustment of any provision of this Assignment Agreement shall not affect the validity and enforceability of any other provision of this Assignment Agreement.*

8    Anwendbares Recht und Gerichtsstand / *Applicable Law and Jursidiction*

Dieser Abtretungsvertrag untersteht materiellem Schweizer Recht unter Ausschluss der Normen des internationalen Privatrechts und des Übereinkommens der Vereinten Nationen vom 11. April 1980 über Verträge über den internationalen Warenkauf (Wiener Übereinkommen). Für alle Streitigkeiten aus oder im Zusammenhang mit diesem Abtretungsvertrag sind die ordentlichen Gerichte in Freienbach, Kanton Schwyz, ausschliesslich zuständig.

*This Assignment Agreement shall be subject to and governed by substantive Swiss law excluding the provisions of the private international law and the United Nations Convention on Contracts for the International Sale of Goods dated 11 April 1980 (CISG), Any disputes arising out of or in connection with this Assignment Agreement shall be subject to the exclusive jurisdiction of the ordinary courts of Freienbach, Canton of Schwyz.*

9    Interpretation / *Interpretation*

Bei allfälligen Widersprüchen zwischen der deutschen und der englischen Fassung dieses Abtretungsvertrags geht die deutsche Fassung vor.

*In case of any inconsistencies between the German and the English version of this Assignment Agreement the German version shall prevail.*

(Unterschriftenseite folgt / *signature page follows*)

Agreed Form

Die Verkäuferin / *the Seller*:

FTX Europe AG

_____

Arturo Giovanoli

Die Käuferin / *the Purchaser*:

CredoMedia GmbH

_____

Patrick Gruhn

Zustimmung der schweizerischen Sachwalterin der Verkäuferin zum Abschluss dieses Vertrages / *Approval of Swiss Administrator to Seller to enter into this Agreement*:

HOLENSTEIN BRUSA AG (nicht im eigenen Namen, sondern als gerichtlich bestellte Sachwalterin und vorbehältlich der Genehmigung durch das schweizerische Gericht / *not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval*)

_____

Dusan Knezevic

_____

Thomas P. Zemp

**EXHIBIT E-5**

**FORM OF CONCEDUS DIGITAL ASSETS GMBH SHARE TRANSFER DOCUMENTS**

Agreement on the Assignment (*Abtretungsvereinbarung*)

of all Shares in CONCEDUS Digital Assets GmbH

(the "**Agreement**")

between

1.      **FTX Europe AG,** a Swiss stock corporation with its registered office in Pfäffikon, Switzerland, registered with the commercial register office of the Canton of Schwyz in Switzerland under registration number CHE-175.231.191 (the "**Transferor**); and

2.      **CredoMedia GmbH**, a German limited liability company with its registered office at Kirchstraße 10, 88145 Opfenbach, Germany, registered under HRB 77860 at the Court in Cologne (the "**Transferee**", and together with the Transferor the "**Parties**" and each a "**Party**").

**RECITALS**

(A)     The Transferor is a shareholder of CONCEDUS Digital Assets GmbH, a German limited liability company, with registered seat in Fürth, Germany, registered with the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Fürth under registration number HRB 17516 and with registered business address at Schlehenstraße 6, 90542 Eckental (the "**Company**"). The shareholders' meeting on November 22, 2023, has resolved the change of the company name to KYT Custody GmbH. The name change has not been registered with the commercial register so far.

(B)     The registered share capital (*Stammkapital*) of the Company amounts to EUR 25,000 (in words: twenty five thousand Euro). The Transferor holds shares with the current docket number (*laufende Nummer*) 16,362 to 17,586 and 23,762 to 25,011, each share with a nominal value of EUR 1.00 (the Transferor's overall shareholding in the Company amounting to 9,9% of the shares; the "**Sold Shares**").

(C)     On February [●], 2024, the Transferor, on the one hand, and Patrick Gruhn, Robin Matzke, Lorem Ipsum RM UG, and the Transferee, on the other hand, entered into the Share and Asset Purchase Agreement (as the same may be amended, restated modified or supplemented from time to time, the "**SAPA**"), which contemplates, among other things, the sale of the Sold Shares from Transferor to the Transferee. The Closing in accordance with the SAPA occurred on the date of this Agreement.

(D)     The parties to the SAPA that, at the closing of the transactions contemplated by the SAPA, the Parties shall enter into a share transfer agreement providing for the transfer (*Abtretung*) with effect in rem (*mit dinglicher Wirkung*) of the Sold Shares from Transferor to the Transferee. To effect such transfer, the Parties intend to enter into this Agreement.

The Parties, therefore, agree as follows:

**1.      ASSIGNMENT OF THE TRANSFEROR SOLD SHARES**

The Transferor hereby assigns (*tritt ab*) the Sold Shares to the Transferee with immediate effect *in rem* on [●], 2024. The Transferee hereby accepts such assignment.

The Sold Shares are transferred to Transferee with all rights and obligations pertaining thereto, in particular the right to any profits not yet distributed on or prior to the date of this Agreement.

2. **PURCHASE PRICE**

The portion of the Purchase Price (as defined in the SAPA) pertaining to the Sold Shares amounts to USD [●] (the "**German Shares Consideration**").

3. **NO REPRESENTATIONS AND WARRANTIES**

The Transferee acknowledges and agrees that under or in connection with this Agreement, the Transferor neither makes any representations or warranties nor provides any indemnities with respect to the Company or the Sold Shares and the Parties agree that no representation, warranty, indemnity or other right of recovery of the Transferee shall be created, implied or construed, by entering into this Agreement or by operation of any law under any jurisdiction. This Agreement merely serves to implement the transactions contemplated by the SAPA in Germany and all representations, warranties or indemnities in relation to the transactions contemplated under the SAPA are exclusively set forth in the SAPA.

4. **SHAREHOLDERS' CONSENT**

4.1   A resolution of the Company's shareholders approving the sale and transfer of the Sold Shares is attached to this Agreement as Annex 4.1 .

5. **MISCELLANEOUS**

5.1   For the avoidance of doubt, the subject matter of this Agreement is only the assignment (*Abtretung*) and not the purchase (*Kauf*) of the Sold Shares; any statutory, contractual, quasi-contractual or other rights or claims against the other Party with respect to the sale and transfer of the Sold Shares are solely governed by the SAPA.

5.2   Any costs and expenses in connection with this Agreement (including notarial fees) shall be borne by the Transferee.

5.3   All payments made under this Agreement shall be made gross, free of any right of counterclaim or set-off (except to the extent expressly provided for in this Agreement) and without deduction or withholding of any kind other than any deduction or withholding required by law.

5.4   This Agreement shall be governed by and construed in accordance with the laws of Germany, excluding its conflicts of laws rules and excluding the United Nations Convention on Contracts for the International Sale of Goods (CISG).

5.5   All disputes arising under or in connection with this Agreement or its validity shall be exclusively settled by the courts of Frankfurt am Main, Germany.

5.6   If any individual terms of this Agreement are or should become invalid, the other terms shall nevertheless remain valid. By mutual agreement, invalid terms are to be replaced by such provisions which come as close as possible to the intended commercial outcome. The same shall apply with regard to the filling of any gaps in the Agreement.

*       *       *

4858-9737-3858 v.2

**Annex 4.1**
**Shareholder Consent**

4858-9737-3858 v.2

**EXHIBIT E-6**

**FORM OF CM-EQUITY AG SHARE TRANSFER DOCUMENTS**

Agreed Form

**Agreement on the Assignment (*Abtretungsvereinbarung*)**

**of all Shares in CM-Equity AG**

(the "**Agreement**")

between

1.      **FTX Europe AG,** a Swiss stock corporation with its registered office in Pfäffikon, Switzerland, registered with the commercial register office of the Canton of Schwyz in Switzerland under registration number CHE-175.231.191 (the "**Transferor**); and

2.      **CredoMedia GmbH**, a German limited liability company with its registered office at Kirchstraße 10, 88145 Opfenbach, Germany, registered under HRB 77860 at the Court in Cologne (the "**Transferee**", and together with the Transferor the "**Parties**" and each a "**Party**").

**RECITALS**

(A)      The Transferor is a shareholder of CM-Equity AG, a German stock corporation, with registered seat in Munich, Germany, registered with the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Munich under registration no. HRB 143533 and with registered business address at Kaufingerstraße 20, 80331 München (the "**Company**").

(B)      The registered share capital (*Stammkapital*) of the Company amounts to EUR 500,000 (in words: five hundred thousand Euro). The share capital is divided in 500,000 uncertificated bearer shares with no par value (*auf den Inhaber lautende unverbriefte nennwertlose Stückaktien*).The Transferor holds 49,999 shares (the Transferor's overall shareholding in the Company amounting to 9,9% of the shares; the "**Sold Shares**").

(C)      On February [●], 2024, the Transferor, on the one hand, and Patrick Gruhn, Robin Matzke, Lorem Ipsum RM UG, and the Transferee, on the other hand, entered into the Share and Asset Purchase Agreement (as the same may be amended, restated modified or supplemented from time to time, the "**SAPA**"), which contemplates , among other things, the sale of the Sold Shares from Transferor to the Transferee. The Closing in accordance with the SAPA occurred on the date of this Agreement.

(D)      The parties to the SAPA agreed that, at the closing of the transactions contemplated by the SAPA, the Parties shall enter into a share transfer agreement providing for the transfer (*Abtretung*) with effect in rem (*mit dinglicher Wirkung*) of the Sold Shares from Transferor to the Transferee. To effect such transfer, the Parties intend to enter into this Agreement.

(E)      Neither Party currently holds or will hold after the assignment of the Sold Shares as contemplated by this Agreement a significant participation (*bedeutende Beteiligung*) within in the meaning of Sec. 2(23) of the German Securities Institutions Act (*Wertpapierinstitutsgesetz*) in the Company.

The Parties, therefore, agree as follows:

**1.      ASSIGNMENT OF THE TRANSFEROR SOLD SHARES**

The Transferor hereby assigns (*tritt ab*) the Sold Shares to the Transferee with immediate effect *in rem* on [●], 2024. The Transferee hereby accepts such assignment.

The Sold Shares are transferred to Transferee with all rights and obligations pertaining thereto,

in particular the right to any profits not yet distributed on or prior to the date of this Agreement.

**2.     PURCHASE PRICE**

The portion of the Purchase Price (as defined in the SAPA) pertaining to the Sold Shares amounts to USD [●] (the "**German Shares Consideration**").

**3.     NO REPRESENTATIONS AND WARRANTIES**

The Transferee acknowledges and agrees that under or in connection with this Agreement, the Transferor neither makes any representations or warranties nor provides any indemnities with respect to the Company or the Sold Shares and the Parties agree that no representation, warranty, indemnity or other right of recovery of the Transferee shall be created, implied or construed, by entering into this Agreement or by operation of any law under any jurisdiction. This Agreement merely serves to implement the transactions contemplated by the SAPA in Germany and all representations, warranties or indemnities in relation to the transactions contemplated under the SAPA are exclusively set forth in the SAPA.

**4.     MISCELLANEOUS**

4.1     For the avoidance of doubt, the subject matter of this Agreement is only the assignment (*Abtretung*) and not the purchase (*Kauf*) of the Sold Shares; any statutory, contractual, quasi-contractual or other rights or claims against the other Party with respect to the sale and transfer of the Sold Shares are solely governed by the SAPA.

4.2     The Parties shall notify the Company as necessary to reflect the assignment of the Sold Shares to the Transferee in the shares record of the Company (*Aktienregister*).

4.3     Any costs and expenses in connection with this Agreement (including charges incurred from changes to the shares record) shall be borne by the Transferee.

4.4     All payments made under this Agreement shall be made gross, free of any right of counterclaim or set-off (except to the extent expressly provided for in this Agreement) and without deduction or withholding of any kind other than any deduction or withholding required by law.

4.5     This Agreement shall be governed by and construed in accordance with the laws of Germany, excluding its conflicts of laws rules and excluding the United Nations Convention on Contracts for the International Sale of Goods (CISG).

4.6     All disputes arising under or in connection with this Agreement or its validity shall be exclusively settled by the courts of Frankfurt am Main, Germany.

4.7     If any individual terms of this Agreement are or should become invalid, the other terms shall nevertheless remain valid. By mutual agreement, invalid terms are to be replaced by such provisions which come as close as possible to the intended commercial outcome. The same shall apply with regard to the filling of any gaps in the Agreement.

*[Signature pages to follow]*

2

**TRANSFEROR:**

**FTX EUROPE AG**

By:  _____
Name:
Title:

**APPROVAL OF SWISS ADMINISTRATOR TO TRANSFEROR TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD** *(not its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval, as defined in the SAPA)*

By:  _____
Name:

By:  _____
Name:

[*Signature Page to Assignment Agreement*]

**TRANSFEREE**:

**CredoMedia GmbH**

By: _____

Name:

Title:

**EXHIBIT E-7**

**FORM OF FTX STRUCTURED PRODUCTS AG SHARE TRANSFER DOCUMENTS**

Agreed Form

# SALE AND PURCHASE AGREEMENT

Pursuant to, and in accordance with, Section 1.7.(a)(ii) of the Share and Asset Purchase Agreement, dated as of February [●], 2024, by and among FTX Europe AG, on the one hand, and Patrick Gruhn, Robin Matzke, Lorem Ipsum RM UG, and CredoMedia GmbH, a German limited liability company (the "Purchaser Entity"), on the other hand (as the same may be amended, restated modified or supplemented from time to time, the "SAPA"), FTX Europe AG (the "Transferor") hereby agrees to sell, assign and transfer 150,000 (one hundred and fifty thousand) registered shares (the "Shares") of FTX Structured Products AG, a stock company (*Aktiengesellschaft*) organized under Liechtenstein law with its registered seat in Ruggell, Liechtenstein, registered with the Liechtenstein Commercial Register under register no. FL-0002.660.620-3 (the "Company"), to the Purchaser Entity against payment of a purchase price of USD 1.00 (one United States dollar) and hereby assigns and transfers such Shares to the Purchaser Entity, and the Purchaser Entity hereby agrees to purchase, acquire and accept such Shares from the Transferor against payment of a purchase price of USD 1.00 (one United States dollar) and hereby acquires and accepts such Shares from the Transferor. Such sale, assignment and transfer is governed by the laws of Liechtenstein and is effected by the Transferor on the date hereof and shall be duly recorded in the share register of the Company. The Transferor undertakes to use its reasonable best efforts to deliver to the Purchaser Entity, as soon as reasonably practicable after the execution of this agreement, any and all share certificates that may exist representing all or any part of the Shares duly endorsed in the name of the Purchaser Entity. The Transferor gives no representations or warranties of any kind under this agreement with respect to the Shares, the Company, or any assets or liabilities of the Company, and any

such representations or warranties are specifically disclaimed (without limiting the representations and warranties in the SAPA). The application of § 934 of the Liechtenstein Civil Code (*Allgemeines Bürgerliches Gesetzbuch*) is expressly excluded. Nothing in this agreement, express or implied, is intended to or shall be construed to supersede, modify, replace, amend, rescind, waive, expand or limit in any way the rights of the parties under, and the terms of, the SAPA. In the event that any provision of this agreement is construed to conflict with a provision in the SAPA, the parties agree that the provision in the SAPA shall be controlling.

Dated: [●], 2024

**FTX Europe AG**

By: _____
     Name:
     Title:

**Purchaser Entity**

By: _____
     Name:
     Title:

**APPROVAL OF SWISS ADMINISTRATOR TO FTX EUROPE AG TO ENTER INTO THIS AGREEMENT:**


**HOLENSTEIN BRUSA LTD** (not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval)



By: _____
     Name:


By: _____
     Name:

**EXHIBIT F**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

Agreed Form

# BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of [●], 2024, is made by and among FTX Europe AG, a Swiss stock corporation ("Seller"), Patrick Gruhn, Robin Matzke and Lorem Ipsum RM UG (the "Purchaser Shareholders"), and CredoMedia GmbH, a German limited liability company (the "Purchaser Entity", and, together with the Purchaser Shareholders, the "Purchaser Parties"). Capitalized terms used, but not otherwise defined herein, have the meanings given to such terms in the SAPA (as defined below).

## RECITALS

**WHEREAS**, Seller and the Purchaser Parties are parties to that certain share and asset purchase agreement, dated as of February [●], 2024 (as the same may be amended, restated modified or supplemented from time to time, the "SAPA"), pursuant to which, among other things, at the Closing, (a) Seller will sell, assign, convey transfer and deliver to the Purchaser Entity, and the Purchaser Entity will purchase, acquire and accept from Seller all of Seller's right, title and interest in, to and under the Transferred Assets free and clear of all Liens and encumbrances other than Permitted Liens, and (b) the Purchaser Entity will assume and will otherwise in a timely manner pay, perform and discharge, and be responsible for, in accordance with their respective terms, the Assumed Liabilities, in each case, subject to the terms and conditions set forth in the SAPA.

**NOW, THEREFORE**, pursuant to the SAPA, and in consideration of the mutual promises, covenants and agreements therein and hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.    Effective as of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller on its behalf hereby sells, assigns, conveys, transfers and delivers to the Purchaser Entity, and the Purchaser Entity hereby purchases, acquires and accepts from the Seller all right, title and interest of Seller in, to and under the Transferred Assets described on **Exhibit A** attached hereto and made a part hereof, free and clear of all Liens other than Permitted Liens.

Section 2.    Effective as of the Closing, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby assigns to the Purchaser Entity, and the Purchaser Entity hereby assumes and agrees to otherwise in a timely manner, pay, perform and discharge and be responsible for, in accordance with their respective terms, the Assumed Liabilities described on **Exhibit B** attached hereto and made a part hereof.

Section 3.    This Agreement is intended to evidence the consummation of certain transactions contemplated by the SAPA. The sale and the assignment and assumption of the Transferred Assets described on **Exhibit A** and the Assumed Liabilities described on **Exhibit B** are required pursuant to the terms of the SAPA, and are not intended (nor shall they be construed) to defeat, limit, alter, impair, enhance or enlarge any assignments and assumptions through

operation of Law which are effected at the Closing Date. This Agreement is made without representation or warranty (without limiting the representations and warranties in the SAPA).

Section 4.    This Agreement is being entered into pursuant to the provisions of the SAPA and the sale, assignment, conveyance, transfer, and assumption of the Transferred Assets described on **Exhibit A** and Assumed Liabilities described in **Exhibit B** hereunder are made subject to the terms and conditions of the SAPA and shall be construed consistently therewith. Nothing in this Agreement, express or implied, is intended to or shall be construed to supersede, modify, replace, amend, rescind, waive, expand or limit in any way the rights of the Parties under, and the terms of, the SAPA. In the event that any provision of this Agreement is construed to conflict with a provision in the SAPA, the Parties agree that the provision in the SAPA shall be controlling.

Section 5.    The following Sections of the SAPA are incorporated into this Agreement by reference herein, *mutatis mutandis*:    Section 7.1 (*Waiver, Amendment*); Section 7.9 (*Assignment*); Section 7.10 (*Counterparts*); Section 7.11 (*Severability*); Section 7.13 (*Governing Law; Submission to Jurisdiction; Waiver of Jury Trial*); and Section 7.15 (*Interpretation*).

*[Signatures Appear on the Following Pages]*

2

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

<u>**SELLER:**</u>

**FTX EUROPE AG**

By: _____
      Name:
      Title:

<u>**PURCHASER PARTIES**</u>:

**LOREM IPSUM RM UG**

By: _____
      Name:
      Title:

**PATRICK GRUHN**

_____

**ROBIN MATZKE**

_____

**CREDOMEDIA GMBH**

By: _____
      Name:
      Title:

*[Signature Page to Bill of Sale and Assignment and Assumption Agreement]*

**APPROVAL OF SWISS ADMINISTRATOR TO FTX EUROPE TO ENTER INTO THIS AGREEMENT:**

**HOLENSTEIN BRUSA LTD** (not in its own name, but solely as Swiss Court appointed Administrator and subject to the Swiss Court Approval)

By: _____
    Name:

By: _____
    Name:

**EXHIBIT A**

**LIST OF TRANSFERRED ASSETS**

## **EXHIBIT B**

### **LIST OF ASSUMED LIABILITIES**

**SCHEDULE A**

**TRANSFERRED INTERESTS**

| Entity | Number of shares or quotas transferred | Percentage of the entity transferred |
|---|---|---|
| **PART A** | | |
| FTX EU Ltd. ("<u>FTX Cyprus</u>") | 258,811 | 100% |
| FTX Switzerland GmbH | 200 | 100% |
| FTX Trading GmbH | 1 | 100% |
| FTX Certificates GmbH | 200 | 100% |
| FTX Structured Products AG | 150,000 | 100% |
| **PART B** | | |
| CONCEDUS Digital Assets GmbH | 2,475 | 9.9% |
| CM-Equity AG | 49,999 | 9.9% |

**SCHEDULE B**

**OWNED BRANDS AND TRADE NAMES**

None.

**SCHEDULE C**

**OWNED IT ASSETS**

None.

# SCHEDULE D

# CUSTOMER WITHDRAWAL LIABILITIES

**Exhibit E-2**

**FTX Europe Sale Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 8202 & 9377** |

**ORDER AUTHORIZING AND APPROVING (I) ENTRY INTO, AND PERFORMANCE UNDER, THE SHARE AND ASSET PURCHASE AGREEMENT; (II) THE SALE OF THE SHARES OF THE TRANSFERRED SUBSIDIARIES, SHARES OF THE MINORITY ENTITIES AND TRANSFERRED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; AND (III) DISMISSING THE CHAPTER 11 CASES OF THE FTX EUROPE SUBSIDIARIES**

Upon the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (this "Order") authorizing and approving (i) the entry by Debtor FTX Europe AG, a Swiss stock corporation ("FTX Europe" or "Seller"), into, and its performance under, the Share and Asset Purchase Agreement, dated as of February 7, 2024 (including all exhibits and ancillary documents thereto (including the Release Agreement), and as may be amended or supplemented from time to time, the "Share and Asset Purchase Agreement") between Seller, on the one hand, and Patrick Gruhn, Robin Matzke, Lorem Ipsum RM UG (collectively, the "Purchasers") and CredoMedia GmbH (the "Purchaser Entity" and together with the Purchasers, the "Purchaser Parties") on the other hand; (ii) the sale (the "Sale Transaction") by Seller to the Purchaser Entity of (a) 100% of the

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

share capital (the "Transferred Subsidiary Interests") of each of Debtors FTX EU Ltd. ("FTX Cyprus"), FTX Switzerland GmbH, FTX Trading GmbH, FTX Certificates GmbH and FTX Structured Products AG (collectively, the "Transferred Subsidiaries"), (b) 9.9% of the share capital of non-Debtor CONCEDUS Digital Assets GmbH and 9.9% of the share capital of non-Debtor CM Equity-Equity AG (collectively, the "Minority Entities") (together with the Transferred Subsidiary Interests, the "Shares") and (c) certain other assets as set forth in the Share and Asset Purchase Agreement (the "Transferred Assets"), in each case free and clear of all liens, claims, interests and encumbrances ("Liens") other than Permitted Liens (as defined in the Share and Asset Purchase Agreement); and (iii) the dismissal of the Chapter 11 Cases of (a) the Transferred Subsidiaries effective upon the transfer of the Shares pursuant to the Sale Transaction (the "Closing") and (b) FTX Crypto Services Ltd. ("FTX Crypto Services" and together with the Transferred Subsidiaries, the "FTX Europe Subsidiaries") effective upon entry of this Order; and this Court having held a hearing (the "Hearing") to review and consider (i) the Motion with respect to the relief requested therein, (ii) the Share and Asset Purchase Agreement (including all exhibits and ancillary documents thereto), (iii) the Declarations of Steven P. Coverick, Dominique Müller and Stylianos A. Triantafyllides, (iv) any other evidence presented at the Hearing, and (v) objections thereto that were not resolved prior to the start of the Hearing and upon the record of the Hearing and all of the proceedings had before this Court; and objections (if any) to the Motion having been withdrawn or overruled on the merits; and after due deliberation and good cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.     Jurisdiction and Venue.  This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Shares and Transferred Assets to be sold, transferred or conveyed pursuant to the Share and Asset Purchase Agreement, pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This Court may issue a final order on the Motion consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.     Statutory and Rule Predicates.  The statutory and other legal predicates for the relief requested in the Motion and for the approvals and authorization herein are sections 105(a), 305(a), 349, 363 and 1112(b) of Bankruptcy Code, Bankruptcy Rules 1017, 2002 and 6004, and Local Rules 1017-2, 2002-1 and 6004-1.

C.     Final Order.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rule 6004(h), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedures, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein and authorizes entry into, and performance under, the Share and Asset Purchase Agreement and the ancillary documents thereto and the transactions contemplated thereby, without regard to any stay or delay in its implementation.

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* FED. R. BANKR. P. 7052.

D.      Notice.  As shown by the affidavits of service filed with this Court and the
representations or proffers made on the record at the Hearing (a) the Debtors have provided due,
good, proper, timely, reasonable, adequate, appropriate and sufficient notice of, and sufficient
opportunity to object to, the Motion and the relief requested therein, including, among other
things, the Sale Transaction, the dismissal of the Chapter 11 Cases of the FTX Europe
Subsidiaries and the proposed entry of this Order in compliance with all applicable requirements
of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, (b) such notice was
adequate and sufficient under the circumstances of these Chapter 11 Cases, and (c) no other or
further notice is necessary or shall be required.

E.      Opportunity to Object.  A fair and reasonable opportunity to object or be
heard regarding the relief granted by this Order has been afforded to all interested parties.

F.      No Collusion.  No Purchaser Party is an "insider" of the Debtors, as that
term is defined in section 101(31) of the Bankruptcy Code.  Notwithstanding determination of
the foregoing, the Share and Asset Purchase Agreement and the Sale Transaction were
negotiated, proposed and entered into by Seller and Purchaser without collusion or fraud, in good
faith and from arm's-length bargaining positions, and are substantively and procedurally fair to
all parties.  None of the Debtors, including Seller, has engaged in any conduct that would cause
or permit the Share and Asset Purchase Agreement or the Closing to be avoided, or costs or
damages to be imposed under section 363(n) of the Bankruptcy Code by any action or inaction.
The Sale Transaction may not be avoided, and no damages may be assessed against Purchaser or
any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy
or non-bankruptcy law.

G.     Good Faith of Purchaser.  The Purchaser Parties, their officers, directors, employees, agents and representatives, each acted in good faith in connection with the Sale Transaction, and all matters related thereto.  The Purchaser Parties are purchasing the Shares and Transferred Assets in good faith and for value and are each good-faith buyers within the meaning of section 363(m) of the Bankruptcy Code.  The Purchaser Parties are therefore entitled to all of the protections afforded under section 363(m) and any other applicable or similar bankruptcy or non-bankruptcy law with respect to all aspects of the transactions contemplated by the Sale Transaction, and otherwise have proceeded in good faith in all respects in connection with this proceeding in that, among other things, (a) all payments to be made, and all other material agreements and arrangements entered into or to be entered into, by the Purchaser Parties in connection with the Sale Transaction have been disclosed; (b) the Purchaser Parties have not violated section 363(n) of the Bankruptcy Code by any action or inaction; (c) the negotiation and execution of the Agreement were at arm's length and in good faith; and (d) the Purchaser Parties have not acted in a collusive manner with any person.  The Purchaser Parties will be acting in good faith within the meaning of section 363(m) in closing the transactions contemplated by the Share and Asset Purchase Agreement.

H.     Fair Price and Fair Dealing.  The sale of the Shares and Transferred Assets achieved a fair price and employed a substantively and procedurally fair process that properly accounted for fiduciary duties and is in the best interests of the Debtors' estates.

I.     Highest and Best Offer.  The Debtors and their advisors have appropriately marketed the Shares and Transferred Assets.  No other person or entity or group of entities has offered to purchase the Shares or Transferred Assets for higher or otherwise better value to the Debtors' estates than the Purchaser Parties.  The offer to purchase the Shares and

Transferred Assets made by the Purchaser Parties, under the terms and conditions set forth in the Share and Asset Purchase Agreement: (a) was made in good faith; (b) is the highest or otherwise best offer obtained for the Shares and Transferred Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative; (c) is for fair, adequate and sufficient consideration that constitutes reasonably equivalent value for the Shares and Transferred Assets being conveyed to the Purchaser Parties; (d) is fair and reasonable; (e) is in the best interests of the Debtors' estates; and (f) would not have been made by the Purchaser Parties absent the protections afforded to each Purchaser Party by this Order.

J.     The Debtors' determination that the Sale Transaction, pursuant to the Share and Asset Purchase Agreement, provides the highest or otherwise best offer for the Shares and Transferred Assets, and their related decision for Seller to sell constitute a reasonable exercise of the Debtors' business judgment.  The facts and circumstances described in the Motion and the evidence adduced in connection with the Sale Hearing demonstrate the Debtors' business judgment for Seller to sell the Shares and Transferred Assets at this time, and the Debtors have articulated sound business reasons for consummating the Sale Transaction and for purchasing and selling the Shares outside of a chapter 11 plan.  Moreover, the sale of the Shares and Transferred Assets outside of a chapter 11 plan pursuant to the Share and Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor dictates the terms of any chapter 11 plan.  The Sale Transaction does not constitute a *sub rosa* chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver and consummate the Sale Transaction, subject to this Order.

K.     Fair Consideration.  The Purchase Price (as defined in the Share and Asset Purchase Agreement) provided by the Purchaser Parties pursuant to the Share and Asset

Purchase Agreement (a) is fair and reasonable, and (b) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

L.     No Successor or Other Derivative Liability.  The Purchaser Parties are not, or shall not be, considered a successor in interest to Seller or its estates, by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, succession, merger, or de facto merger of the Purchaser Parties (as applicable) and Seller and/or their respective estates.

M.     Corporate Power and Authority.  The Purchaser Parties and Seller each (a) has full corporate power and authority to execute and deliver the Share and Asset Purchase Agreement and the ancillary documents thereto, (b) has all corporate authority necessary to consummate the transactions contemplated by the Share and Asset Purchase Agreement and the ancillary documents thereto, and (c) has taken all corporate action and formalities necessary to authorize and approve the Share and Asset Purchase Agreement and the ancillary documents thereto, and the consummation of the transactions contemplated thereby.  The Sale Transaction and all related transactions under the Share and Asset Purchase Agreement and the ancillary documents thereto have been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Share and Asset Purchase Agreement and the ancillary documents thereto, are required for the Debtors to consummate the Sale Transaction and the other transactions contemplated by the Share and Asset Purchase Agreement and the ancillary documents thereto.

N.      The Share and Asset Purchase Agreement and the ancillary documents
thereto (including the Release Agreement) were not entered into for the purpose of hindering,
delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United
States, any state, territory, possession or the District of Columbia.  Neither Seller nor the
Purchaser Parties are entering into the transactions contemplated by the Share and Asset
Purchase Agreement or the ancillary documents thereto (including the Release Agreement)
fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent
transfer claims.

O.      <u>Title to Assets</u>.  The transfer of Seller's rights, titles and interests to the
Shares and Transferred Assets to the Purchaser Parties will be, as of the Closing Date (as defined
in the Share and Asset Purchase Agreement), a legal, valid and effective transfer of such rights,
titles and interests in the Shares and Transferred Assets, which transfer vests or will vest the
Purchaser Entity with all rights, titles and interests of Seller to the Shares and Transferred Assets
free and clear of all Liens but subject to all Permitted Liens (as defined in the Share and Asset
Purchase Agreement).  The Share and Asset Purchase Agreement is a valid and binding contract
between Seller and the Purchaser Parties and shall be enforceable according to its terms.

P.      <u>Satisfaction of Section 363(f) Standards</u>.  The conditions of section 363(f)
of the Bankruptcy Code have been satisfied in full, and upon entry of this Order, Seller is
authorized to transfer all of its right, title and interest in and to the Shares and Transferred Assets
free and clear of any interest in the property, other than Permitted Liens.  Seller may sell the
Shares and Transferred Assets free and clear of all Liens other than Permitted Liens because, in
each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code
has been satisfied.  Each holder with a Lien on the Shares and Transferred Assets to be

transferred pursuant to the Share and Asset Purchase Agreement: (a) has, subject to the terms and conditions of this Order, consented to the Sale Transaction or is deemed to have consented; (b) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; or (c) otherwise falls within one or more of the other subsections of section 363(f) of the Bankruptcy Code. Holders of Liens who did not object, or who withdrew their objections, to the Sale Transaction or the Motion, with respect to the sale of the Shares and Transferred Assets, are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Liens are adequately protected by having their Liens, if any, in each instance against Seller, its estate or the Shares and Transferred Assets, attach to the net cash proceeds of the Sale Transaction ultimately attributable to the Shares and Transferred Assets in which such creditor alleges a Lien, in the same order of priority, with the same validity, force and effect that such Liens had prior to the Sale Transaction, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

Q. The Purchaser Parties would not have entered into the Share and Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Shares and Transferred Assets to the Purchaser Parties were not free and clear of all Liens other than Permitted Liens, or if the Purchaser Parties would, or in the future could, be liable for any such Lien. The Purchase Price to be provided under the Share and Asset Purchase Agreement reflects the Purchaser Parties' reliance on this Order to provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to, interest in and possession of the Shares and Transferred Assets free and clear of all Liens other than Permitted Liens.

R. <u>Waiver of Bankruptcy Rule 6004(h)</u>. Good and sufficient reasons for approval of the Share and Asset Purchase Agreement and the ancillary documents thereto

(including the Release Agreement), and the Sale Transaction have been articulated.  The Debtors

have demonstrated that (a) good, sufficient and sound business purposes and justifications and

(b) compelling circumstances for the Sale Transaction other than in the ordinary course of

business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11

plan, in that, among other things, the prompt consummation of the Sale Transaction is necessary

and appropriate to maximize the value of the Debtors' estates.  Accordingly, there is cause to lift

the stay contemplated by Bankruptcy Rules 6004(h) with respect to the transactions

contemplated by this Order.  To maximize the value of the Shares and Transferred Assets, it is

essential that the Sale Transaction occur within the time constraints set forth in the Share and

Asset Purchase Agreement.  Time is of the essence in consummating the Sale Transaction, and

Seller and the Purchaser Parties intend to close the Sale Transaction as soon as practicable.

Given all of the circumstances of these Chapter 11 Cases, and the adequacy and fair value of the

Purchase Price, the proposed sale by Seller and purchase by the Purchaser Parties of the Shares

and Transferred Assets should be approved.

        S.     The consummation of the Sale Transaction is legal, valid and properly

authorized under all applicable provisions of the Bankruptcy Code, including, without limitation,

sections 105(a), 363(b), 363(f), 363(m), and all of the applicable requirements of such sections

have been complied with in respect of the transaction.

        T.     <u>Dismissal of the FTX Europe Subsidiaries' Chapter 11 Cases</u>.  The

Debtors have demonstrated that there is cause to dismiss the Chapter 11 Cases of (a) the

Transferred Subsidiaries effective upon the Closing and (b) FTX Crypto Services effective upon

entry of this Order, and that such dismissals are, in each case, in the best interest of the creditors

and the estates.

U.    Personally Identifiable Information.  The Sale Transaction does not involve the sale of any personally identifiable information.  Thus, the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

V.    Legal and Factual Bases.  The legal and factual bases set forth in the Motion and the evidence adduced in connection with the Hearing establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates.

IT IS HEREBY ORDERED THAT:

**A.    General Provisions**

1.    The Sale Transaction, including the sale by Seller and purchase by the Purchaser Parties of the Shares and Transferred Assets and the Share and Asset Purchase Agreement and the ancillary documents thereto (including the Release Agreement) and the transactions contemplated thereby are hereby approved in their entirety as set forth herein.

2.    All objections, responses, reservations of rights, or requests for any continuances concerning the Motion are resolved in accordance with the terms of this Order as set forth in the record at the Hearing.  To the extent any such objections, responses, reservations of rights or requests for any continuances were not otherwise withdrawn, waived, settled or resolved, such are hereby overruled and denied on the merits.  All interested parties that failed to timely object to the Motion, with respect to the Sale Transaction, are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

3.    Notice of the Motion, the Share and Asset Purchase Agreement and the ancillary documents thereto (including the Release Agreement), the purchase and sale of the Shares and Transferred Assets, the sale of the Shares and Transferred Assets free and clear of all

Liens other than Permitted Liens, the Sale Transaction and the dismissal of the Chapter 11 Cases

of the FTX Europe Subsidiaries was fair, equitable, proper and sufficient under the

circumstances and complied in all respects with section 102(1) of the Bankruptcy Code,

Bankruptcy Rules 2002, 6004, 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1 and 9006-

1.

**B.      Approval of the Share and Asset Purchase Agreement**

        4.      The Share and Asset Purchase Agreement and all ancillary documents

executed in connection therewith (including the Release Agreement), all other ancillary

documents related to the Sale Transaction, and all of the terms and conditions thereof, are hereby

authorized and approved in all respects.  The Sale Transaction is substantively and procedurally

fair to all parties.  The failure to specifically include or make reference to any particular

provision of the Share and Asset Purchase Agreement and all related ancillary documents in this

Order shall not impair the effectiveness of such provision, it being the intent of this Court that

the Share and Asset Purchase Agreement and all related ancillary documents, the Sale

Transaction and the transactions contemplated therein or in connection therewith are authorized

and approved in their entirety.

        5.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the

Debtors are authorized and empowered to take any and all actions necessary or appropriate to

(a) consummate the Sale Transaction to the Purchaser Parties pursuant to and in accordance with

the terms and conditions of the Share and Asset Purchase Agreement and the related ancillary

documents and this Order, (b) close the Sale Transaction as contemplated in the Share and Asset

Purchase Agreement and the related ancillary documents, and this Order and (c) execute and

deliver, perform under, consummate and implement the Share and Asset Purchase Agreement

and the related ancillary documents, together with all additional instruments and documents that

may be reasonably necessary or desirable to implement the Share and Asset Purchase Agreement and the related ancillary documents and the Sale Transaction.

6.      This Order shall be binding in all respects upon the Debtors, their estates, all creditors of and holders of equity interests in, the Debtors, any holders of Liens in, against or on all or any portion of the Shares and Transferred Assets (whether known or unknown), the Purchaser Parties and all successors and assigns of the Purchaser Parties with respect to the Shares, Transferred Assets and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of these Chapter 11 Cases. This Order and the Share and Asset Purchase Agreement shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser Parties and the respective successors and assigns of each of the foregoing.

**C.      Consummation of the Sale Transaction**

7.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, Seller is authorized to transfer all of its rights, titles and interests to the Shares and Transferred Assets to the Purchaser Parties and the Purchaser Parties are authorized to purchase all of Seller's rights, titles and interests to the Shares and Transferred Assets on the Closing Date, in accordance with and subject to the terms of the Share and Asset Purchase Agreement, and such transfer and purchase shall constitute a legal, valid, binding and effective transfer and purchase of such rights, title and interests in the Shares and Transferred Assets and shall vest the Purchaser Parties with all of Seller's rights, title and interests in the Shares and Transferred Assets and, upon Seller's receipt of the Purchase Price, shall be free and clear of all liens, claims, interests and encumbrances, including but not limited to, successor or successor-in-interest liability or, any tax liens or mechanic's liens asserted against the Shares and Transferred Assets, other than Permitted Liens, with all Liens to attach to the net cash proceeds ultimately attributable to the property

against or in which such Liens are asserted, subject to the terms thereof, with the same validity,

force and effect, and in the same order of priority, which such Liens now have against the Shares

and Transferred Assets, subject to any rights, claims and defenses the Debtors or their estates, as

applicable, may possess with respect thereto.  The provisions of this Order authorizing and

approving the transfer of the Shares and Transferred Assets free and clear of all Liens other than

Permitted Liens shall be self-executing, and neither Seller nor the Purchaser Parties shall be

required to execute or file releases, termination statements, assignments, consents, or other

instruments in order to effectuate, consummate, and implement the provisions of this Order.

8.      A certified copy of this Order may be filed with the appropriate clerk

and/or recorded with the recorder to act to cancel any liens and other encumbrances, except

Permitted Liens.

9.      If any person or entity which has filed statements or other documents or

agreements evidencing Liens in, against or on all or any portion of the Shares shall not have

delivered to Seller prior to the Closing, in proper form for filing and executed by the appropriate

parties, termination statements, instruments of satisfaction, releases of Liens and any other

documents necessary for the purpose of documenting the release of all Liens which the person or

entity has or may assert with respect to all or any portion of the Shares, Seller, the Purchaser

Parties and each of its respective officers, employees and agents are hereby authorized and

empowered to execute and file such statements, instruments, releases and other documents on

behalf of such person or entity with respect to the Shares and Transferred Assets.

10.     This Order is and shall be effective as a determination that, on the Closing

Date, any Liens existing as to the Shares and Transferred Assets prior to the Closing Date, other

than Permitted Liens, shall have been unconditionally released, discharged and terminated from

the Shares and Transferred Assets, and that the conveyances described herein have been effected.
This Order is and shall be binding upon and govern the acts of all persons and entities, including,
without limitation, all filing agents, filing officers, title agents, title companies, recorders of
mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental
departments, secretaries of state, federal, state and local officials and all other persons and
entities who may be required by operation of law, the duties of their office, or contract, to accept,
file, register or otherwise record or release any documents or instruments, or who may be
required to report or insure any title or state of title in or to any lease; and each of the foregoing
persons and entities is hereby directed to accept for filing any and all of the documents and
instruments necessary and appropriate to consummate the Sale Transaction.

**D.      Prohibition of Actions Against Purchaser**

        11.      Except as expressly provided for in this Order, the Share and Asset
Purchase Agreement, or the Stipulation, the Purchaser Parties shall not have any liability or other
obligation of Seller arising under or related to the Shares or Transferred Assets prior to the
Closing.  Without limiting the generality of the foregoing, and except as otherwise specifically
provided herein, in the Share and Asset Purchase Agreement or in the Stipulation, the Purchaser
Parties shall not, by virtue of the Sale Transaction, be liable for any claims against Seller or any
of its predecessors or affiliates, and the Purchaser Parties shall have no successor or vicarious
liabilities of any kind or character, including, but not limited to, under any theory of antitrust,
environmental (subject to paragraph 19 below), successor or transferee liability, securities law,
tax law, labor law, de facto merger, mere continuation or substantial continuity, whether known
or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent,
whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated,
including, but not limited to, liabilities on account of warranties, environmental liabilities

(subject to paragraph 19 below), and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Shares or the Transferred Assets prior to the Closing. The Sale Transaction does not amount to a consolidation, merger or de facto merger of any of the Purchaser Parties, on the one hand, and Seller and/or Seller's estate, on the other hand, and there is not substantial continuity between the Purchaser Parties, on the one hand, and Seller, on the other hand, and the Purchaser Entity is not a mere continuation of Seller or its estate, and none of the Purchaser Parties constitute a successor to Seller or its estate.

12.     Except as expressly otherwise set forth in the Share and Asset Purchase Agreement and this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants and other creditors, holding Liens against or in all or any portion of the Shares and Transferred Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to Seller, the Shares, Transferred Assets or the transactions contemplated by the Share and Asset Purchase Agreement, hereby are forever barred, estopped and permanently enjoined from asserting against Purchaser, its affiliates, its successors or assigns, their property or the Shares and the Transferred Assets, such persons' or entities' Liens with respect to the Shares and Transferred Asset, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Purchaser, its affiliates, its successors, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Purchaser Parties, its affiliates, its successors,

assets or properties; (c) creating, perfecting or enforcing any Lien against the Purchaser Parties, its affiliates, its successors, assets, or properties; (d) asserting any unexercised setoff or right of subrogation against any obligation due by the Purchaser Parties, its affiliates or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order, or the agreements or actions contemplated or taken in respect thereof; or (f) to the extent provided in section 525 of the Bankruptcy Code, revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate Seller. On the Closing Date, each creditor is authorized to execute such documents and take all other actions as may be necessary to release Liens in or on the Shares and Transferred Assets, except Permitted Liens, if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

13. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of Seller to sell and transfer the Shares and Transferred Assets to the Purchaser Parties and the ability of Purchaser Parties to purchase the Shares and Transferred Assets from Seller, in each case in accordance with the terms and subject to the conditions of the Share and Asset Purchase Agreement and this Order.

14. The Purchaser Parties have given substantial consideration under the Share and Asset Purchase Agreement for the benefit of the Debtors and their estates. The consideration given by the Purchaser Parties shall constitute valid and valuable consideration for the sale being free and clear of any potential liens, claims, interests, and encumbrances, including any Liens, as to the Shares and Transferred Assets pursuant to this Order, except with respect to the Permitted Liens, and free and clear of any potential claims of successor liability against the

Purchaser Parties.  The consideration provided by the Purchaser Parties for the Shares and

Transferred Assets under the Share and Assets Purchase Agreement is fair and reasonable and

may not be avoided under section 363(n) of the Bankruptcy Code.

**E.** **Dismissal of the FTX Europe Subsidiaries' Chapter 11 Cases**

15.     Pursuant to sections 105(a), 305(a) and 1112(b) of the Bankruptcy Code,

the dismissal of the Chapter 11 Cases of the (a) Transferred Subsidiaries effective upon the

Closing and (b) FTX Crypto Services effective upon entry of this Order, is hereby approved.

16.     Notwithstanding section 349 of the Bankruptcy Code, references in prior

orders of this Court to "the Debtors" or "the Chapter 11 Cases" or similar references shall apply

to (i) the Transferred Subsidiaries with respect to periods on and including the date of the

Closing when the Chapter 11 Cases of the Transferred Subsidiaries will be dismissed, but shall

not apply to the Transferred Subsidiaries with respect to periods after the date of the Closing and

(ii) FTX Crypto Services with respect to periods on and including the date of this Order, but shall

not apply to FTX Crypto Services with respect to periods after this Order.

17.     Following the dismissals of the Chapter 11 Cases of the Transferred

Subsidiaries effective upon the Closing and FTX Crypto Services effective upon entry of this

Order, Kroll Restructuring Administration LLC, the Debtors' authorized claims agent, shall be

authorized to remove and expunge all proofs of claim and proofs of interest filed against the

Transferred Subsidiaries and FTX Crypto Services from the claims registry and shall comply

with Local Rule 2002-1(f)(ix).

**F.** **Other Provisions**

18.     Nothing in this Order or the Share and Asset Purchase Agreement

releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a

governmental unit that any entity would be subject to as the post-sale owner or operator of

property after the date of entry of this Order.  In addition, nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law, including the jurisdiction to interpret this Order or to adjudicate any defense asserted under this Order.

19.     Further, nothing in this Order or the Share and Asset Purchase Agreement authorizes the transfer or assignment of any governmental license, permit, registration, authorization or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law as appropriate.

20.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

21.     The consideration provided by the Purchaser Parties to Seller pursuant to the Share and Asset Purchase Agreement for the Shares and the Transferred Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

22.     The sale of the Shares and Transferred Assets does not include the sale of any causes of action held by any of the Debtors against any person or entity, including but not limited to causes of action against Samuel Bankman-Fried, Gary Wang, Nishad Singh, Caroline

Ellison or any person known by the Debtors to have a familial relationship with any of the foregoing persons.

23. The Sale Transaction is undertaken by the Purchaser Parties without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction, unless such authorization and such Sale Transaction were duly stayed pending such appeal at the time of the Closing. The Purchaser Parties are good faith buyers within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy Code. Seller and the Purchaser Parties will be acting in good faith if they proceed to consummate the Sale Transaction at any time after the entry of this Order.

24. As a good faith purchaser of the Shares and Transferred Assets, the Purchaser Parties have not entered into an agreement with any other potential bidders, or colluded with any other bidders, potential bidders, or any other parties interested in the Shares or Transferred Assets, and therefore, neither the Debtors nor any successor-in-interest to Seller's estate shall be entitled to bring an action against the Purchaser Parties, and the Sale Transaction may not be avoided pursuant to section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) in respect of the Share and Asset Purchase Agreement or the Sale Transaction.

25. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent chapter 7 cases into which these Chapter 11 Cases may be converted or (c) any related proceeding subsequent to

entry of this Order, shall conflict with or derogate from the provisions of the Share and Asset

Purchase Agreement, or the terms of this Order.  In the event there is a conflict between this

Order and the Share and Asset Purchase Agreement (or any ancillary agreements executed in

connection therewith), this Order shall control and govern.  Likewise, all of the provisions of this

Order are non-severable and mutually dependent.  To the extent that this Order is inconsistent

with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms

of this Order shall control.

26.     Pursuant to Bankruptcy Rules 7062, 9014 and 6004(h), this Order shall be

effective and enforceable immediately upon entry, Seller and the Purchaser Parties are

authorized to close the Sale Transaction immediately upon entry of this Order, and the 14-day

stay provided in Bankruptcy Rule 6004(h) is hereby expressly waived and shall not apply.

27.     The failure specifically to include any particular provision of the Share

and Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of

such provision, it being the intent of this Court that the Share and Asset Purchase Agreement be

authorized and approved in its entirety; provided, however, that this Order shall govern if there is

any inconsistency between the Share and Asset Purchase Agreement (including all ancillary

documents executed in connection therewith) and this Order.

28.     The Share and Asset Purchase Agreement and any related agreements,

documents or other instruments may be modified, amended or supplemented by the parties

thereto and in accordance with the terms thereof, without further order of this Court, provided

that any such modification, amendment or supplement does not have a material adverse effect on

the Debtors' estates or any of the Debtors' creditors.  If the Share and Asset Purchase Agreement

is modified, the Debtors shall file the modified version with this Court.

29.     This Court shall retain jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Order and the Share and Asset Purchase Agreement, and all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

30.     The Share and Asset Purchase Agreement and the related ancillary documents shall be in full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

31.     No bulk sales law, bulk transfer law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes (as defined in the Share and Asset Purchase Agreement)) shall apply to the Debtors' conveyance of the Shares and Transferred Assets or this Order.

32.     The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.  Nothing in this Order shall authorize the sale, lease or transfer of any personally identifiable information (as defined in section 101(41A) of the Bankruptcy Code).

33.     Nothing in this Order shall affect the obligations, if any, of the Debtors, Seller, the Purchaser Parties and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency or the examiner appointed in these Chapter 11 Cases.

34.     Nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impairing or diminishing any right

(including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not the Shares, the Transferred Assets or any part thereof.

35.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

**Dated: March 18th, 2024**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**