## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. No. 20300** |
| | **Hearing Date: August 15, 2024 at 1:00 p.m. (ET)** |

## DEBTORS' OBJECTION TO EDEN PROTOCOL LIMITED'S MOTION FOR ENTRY OF AN ORDER (I) GRANTING RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(D)(1), (II) WAIVING BANKRUPTCY RULE 4001, AND (III) GRANTING RELATED RELIEF

FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this objection (this "Objection"), to *Eden Protocol Limited's Motion for Entry of an Order (i) Granting Relief from the Automatic Stay Under 11 U.S.C. § 362(d)(1), (ii) Waiving Bankruptcy Rule 4001, and (iii) Granting Related Relief* [D.I. 20300] (the "Motion"). For the reasons set forth below, there is no cause to modify the automatic stay and the Motion should be denied. In support of their Objection, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

1. Eden Protocol Limited ("Eden Protocol") seeks relief from the automatic stay in furtherance of its plan to improperly terminate the Token Purchase Agreement (the "TPA") it signed with Maclaurin Investments Ltd. (f/k/a Alameda Ventures Ltd.) ("Maclaurin"). Eden

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Protocol is trying to reap a windfall at the expense of the Debtors' creditors through its ill-conceived gambit to recapture tokens that it is contractually obligated to deliver to Maclaurin in return for the investment that Maclaurin made in Eden Protocol several years ago.  Eden Protocol comes nowhere close to making out a *prima facie* case that there is cause to lift the automatic stay, and should be stopped in its tracks.  Eden Protocol will suffer no prejudice if it is required to fulfil its contractual obligations.  The Debtors will, however, be greatly prejudiced if they are stripped of their right to accept or reject the TPA pursuant to Section 365 of the Bankruptcy Code and are required to immediately litigate in another forum to protect their valuable estate property.

2.     In October 2021, Maclaurin paid $500,000 to Eden Protocol in exchange for the right to 16,666,667 MAGIC tokens (the "Tokens") that would be delivered if and when Eden Protocol developed and launched a network to support them.  For the past several years, Eden Protocol has been content to use the funds Maclaurin invested in order to grow and develop its business.  But now that Maclaurin's investment seems likely to pay off, Eden Protocol is requesting this Court provide relief from the automatic stay so that it can attempt to terminate the TPA based on specious arguments that Maclaurin breached the TPA and false cries that Eden Protocol will suffer reputational harm if it complies with the TPA.  These efforts must fail.

3.     As the movant seeking to lift the automatic stay, Eden Protocol has the burden to demonstrate, with evidence, that "cause" exists to lift the stay.  But Eden Protocol's desire to "obtain a windfall profit at the expense of the Debtor[s] and [their] creditors is not cause for relief from the stay."  *In re Mirant Corp.*, 303 B.R. 319, 331-32 (Bankr. N.D. Tex. 2003) (denying a party relief from the stay to declare a contractual default that would give rise to a claim against the debtor's estate).  Indeed, consideration of each of the three factors relevant to determination of whether cause exists demonstrates that the Motion should be denied.

4.      *First*, granting Eden Protocol relief from the automatic stay so that it can attempt to terminate the TPA would be highly prejudicial to the Debtors.  Regardless of the merits of Eden Protocol's new-found arguments that Maclaurin breached the TPA, granting Eden Protocol stay relief would prejudice the Debtors by vitiating the Debtors' right to assume or reject the TPA.  *See, e.g.*, *In re Broadstripe, LLC*, 402 B.R. 646, 656 (D. Del. 2009) ("[A] contract is not deemed terminated and no longer executory simply because the debtor has defaulted or breached the contract before the commencement of the bankruptcy case." (cleaned up)).  Further, the TPA specifies that "[a]ny dispute . . . arising out of or relating to [the] TPA . . . shall be settled by arbitration" and that "[t]he place of arbitration shall be Road Town, Tortola, British Virgin Islands unless the parties agree otherwise."  (TPA ¶ 7.6.)

5.      Thus, granting Eden Protocol relief from the automatic stay would prejudice the Debtors both because it would force the Debtors immediately into litigation to preserve their rights under the TPA, and to potentially have to do so in the British Virgin Islands.  Such litigation would "be a distraction from the reorganization process" and "interfere[] with the orderly rehabilitation of the Debtors."  *In re W.R. Grace & Co.*, 2007 WL 1129170, at *2-3 (Bankr. D. Del. Apr. 13, 2007) (rejecting a motion for relief from the automatic stay to join debtors to a lawsuit as third party defendants).  Further, given the number of similar investments that Debtors made before the Petition Date, granting Eden Protocol relief from the automatic stay would "cause undue hardship and expense to the estate" by encouraging other similarly situated parties to "race to the courthouse."  *In re DBSI, Inc.*, 407 B.R. 159, 167 (Bankr. D. Del. 2009).

6.      *Second*, Eden Protocol has failed to identify any hardship that would arise from continuation of the automatic stay.  Eden Protocol summarily argues that if Debtors "were permitted to obtain the Tokens . . . , Eden Protocol's reputation and the success of the Network

Launch would be materially impacted due to an association with the [pre-petition Debtors'] illegal activities." (Mot. ¶ 22.) Eden Protocol has come forward with no evidence to back up this speculative assertion of future reputational harm, which is reason enough to deny the Motion. *See, e.g., In re Irish Bank Resolution Corp.*, 2019 WL 4740249, at *7 (D. Del. Sept. 27, 2019) ("[T]he movant must substantiate its case with an evidentiary showing of a factual and legal right to the relief it seeks."). Indeed, Eden Protocol's assertions of reputational harm are merely pretextual. One of the Debtors, Clifton Bay Investments LLC ("Clifton Bay"), owns an equity stake in Eden Protocol's parent Company, Euclid Labs, Inc. That equity stake both ensures the Debtors will remain associated with Euclid Labs and also provides Clifton Bay the right to separately receive a quantity of the MAGIC tokens at issue. (Declaration of Steven P. Coverick ("Coverick Decl.") ¶ 14; *see also* D.I. 1042 at 37 (Clifton Bay's Statement of Financial Affairs).) Thus, stay relief could not lead to the result Eden Protocol seeks (ridding itself of the Debtors).

7.      *Third*, Eden Protocol has failed to demonstrate any probability of success on the merits. In its Motion, Eden Protocol strains to find an excuse to terminate the TPA. (Mot. ¶¶ 23-24.) But all of Eden Protocol's assertions about why it can terminate the TPA are factually baseless because they are unsupported by evidence and legally meritless because they are contrary to the plain meaning of the TPA, and will be vigorously contested by the Debtors. Eden Protocol's arguments about the merits of its contract claims confirm that the Motion should be denied.

## RELEVANT BACKGROUND

### A.  The Debtors and Their Chapter 11 Cases

8.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

9.    Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

10.    Since the Petition Date, the Debtors have been reviewing and analyzing a multitude of executory contracts to which the Debtors are parties to determine whether to assume or reject them pursuant to 11 U.S.C. § 365.  At different points in these Chapter 11 Cases, the Debtors have determined, in their business judgment, that there is no longer a need for or benefit to the Debtors or their estates to maintain certain contracts, and this Court has issued several orders approving the rejection of those contracts.  (*See, e.g.*, D.I. 806.)  As is their right, the Debtors are still in the process of determining which of the many remaining contracts to assume or reject, including the TPA.  11 U.S.C. § 365(d)(2).

11.    On June 26, 2024, the Court entered an order, among other things, approving the adequacy of the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-in-Possession* (the "Disclosure Statement") and voting and solicitation procedures in connection with confirmation

of the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (as may be amended, modified or supplemented from time to time, the "Plan") [D.I. 19068].

12.     Plan solicitation is underway and the deadline both to vote and submit any objections to the Plan is August 16, 2024.  While the Debtors recommend all creditors support the Plan and will continue to build consensus with additional creditors, they recognize that some creditors may not support the Plan despite the substantial value that it is projected to deliver to satisfy allowed claims.  Objections to the Plan may include complex legal issues, including those related to customer property, and discovery on those issues.  The Debtors anticipate devoting substantial resources to the Plan confirmation process, claims reconciliation, and objections in the coming months.

### B.  Maclaurin's October 2021 Investment in Eden Protocol Through the Purchase of Future Tokens

13.     Prior to the Petition Date, the Debtors made investments in numerous different cryptocurrency ventures by means of equity investments, token purchases, and other transactions.  (Coverick Decl. ¶ 7.)  In October 2021, Alameda Ventures Ltd., which is now known as Maclaurin,[2] signed the TPA and paid Eden Protocol $500,000 for the right to receive 16,666,667 MAGIC tokens after Eden Protocol made the tokens available for use on the Eden Network (the "Network Launch").  (TPA at 17; Mot. Ex. C ¶ 5.)

14.     The TPA specifies that Maclaurin, as "Purchaser," "is required to meet certain requirements to participate in th[e] Offering, including the Purchaser's residency and citizen requirements, as well as compliance with th[e] TPA."  (TPA § 2.2.)  The TPA specifies the "certain requirements to participate" by setting forth a series of "Purchaser Representations."

---

[2]     Coverick Decl. ¶ 12.

(TPA §§ 5.1-5.15.)  Thus, pursuant to the TPA, Maclaurin represented that it is "not . . . a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act" of 1933.  (TPA § 5.9.1.)  It also agreed to a standard anti-money laundering provision in the TPA that includes a catch-all statement that, among other things, "[n]o payment or other transfer of value to the Company [Eden Protocol] is or will be derived from, pledged for the benefit of, or related in any way to . . . directly or indirectly illegal activities."  (TPA § 5.11.2.)  The TPA provides that, "in the event that the Company determines that Purchaser does not meet the Company's requirements for purchasers hereunder (as determined by the Company in its sole discretion), the Company may immediately and without notice rescind or terminate, as applicable, this TPA."  (TPA § 2.2.)

15.    Separately, the TPA sets out several "Conditions to Token Delivery."  (TPA § 3.2.)  Thus, "prior to each delivery of Tokens by the Company to the Purchaser," Maclaurin must, among other things, (i) "provide to the Company, in writing, an SPL-compliant network wallet address . . . to which Purchaser's Tokens will be delivered," and (ii) "complete and deliver" all anti-money laundering ("AML") and know-your-customer ("KYC") forms "requested by the Company from time to time."  (TPA § 3.2.)  "If the Purchaser fails to meet any of [these] conditions," then "the Company or the Foundation [the Eden Protocol Foundation] may hold the Tokens deliverable hereunder in escrow until such conditions are met, and such escrow will constitute delivery of the applicable number of Tokens."  (TPA § 3.2.)  Exhibit A to the TPA specifies that Tokens are to be "delivered and released" to Maclaurin over the course of several months "following the one-year anniversary of the Network Launch Date" (TPA Ex. A; *see also* Mot. ¶ 6), which "has not yet occurred" (Mot. ¶ 12).

### C. Clifton Bay's Equity Stake in Eden Protocol's Parent Company Grants the Debtors Rights to Additional Tokens

16.     In June 2022, Eden Protocol announced that it had raised $130 million in a Series B funding round, valuing the company at $1.6 billion.  (Coverick Decl. ¶ 11.)  In August 2022, Clifton Bank (f/k/a Alameda Research Ventures LLC) entered into certain stock transfer agreements whereby it paid $10 million to purchase 860,192 shares of Eden Protocol's parent entity, Euclid Labs, Inc., in a secondary sale.  (*Id.* ¶ 12; *see also* D.I. 2301 at 52 (Clifton Bay's Statement of Financial Affairs).)  Through a side letter agreement executed contemporaneously with the stock transfer agreements, Clifton Bay is entitled to receive certain MAGIC tokens at launch, calculated as Clifton Bay's proportionate stake in Eden Protocol equity at launch multiplied by the total number of MAGIC tokens reserved for the "Company Allocation," defined to include all tokens allocated to Euclid Labs, Inc. or its insiders/shareholders.  (Coverick Decl. ¶ 14.)

### D. Eden Protocol's Newfound Discontent with the TPA

17.     For the last three years, Eden Protocol and its affiliates have been content to use the money that the Debtors invested to grow their business.  Public reports about Eden Protocol and its affiliates indicate that these efforts to date have been successful.  (*Id.* ¶ 11, 15.) Accordingly, the Debtors presently believe that their investments will return value to their estate because the Tokens likely will have value.  (*Id.*)

18.     On July 12, 2024, Eden Protocol filed the Motion seeking to deprive the Debtors and their creditors of that value because it apparently agrees with the Debtors that the Tokens will have value.  In the Motion, Eden Protocol argues that it should be granted relief from the stay to terminate the TPA and return Maclaurin's $500,000.  (Mot. ¶ 21.)  Without disclosing Clifton Bay's equity stake in Euclid Labs and its right to receive Tokens, the Motion insists that

Eden Protocol must immediately terminate the TPA or else "suffer significant reputational and economic harm given any association between the Debtors and the Tokens." (Mot. ¶ 18.) Further, although the facts surrounding the FTX group's failure have been in the public record since November 2022, the Motion only now asserts that Eden Protocol has a purported right to terminate the TPA. (Mot. ¶¶ 22-23.)

## ARGUMENT

19.    The automatic stay set forth in section 362(a) of the Bankruptcy Code applies to the "commencement" of an action that "was or could have been commenced" before the filing of a Chapter 11 case. 11 U.S.C. § 362(a)(1). The automatic stay is one of the "fundamental" protections afforded to the Debtors under the Bankruptcy Code. *Midlantic Nat'l Bank* v. *New Jersey Dep't of Env't Prot*., 474 U.S. 494, 503 (1986).

20.    The automatic stay shields debtors from harassment and a multiplicity of litigation at a time when the debtors should be focusing on their restructuring efforts. *See, e.g.*, *In re THG Holdings LLC*, 604 B.R. 154, 160 (Bankr. D. Del. 2019) (Dorsey, J.) ("Clearly, the stay is designed to halt all collection efforts in order to allow the debtor time to reorganize."). In particular, it is "designed to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *In re Advanced Elecs., Inc*., 283 F. App'x 959, 965 (3d Cir. 2008) (quoting *Borman* v. *Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991)).

21.    Section 362(d) allows a party to obtain stay relief only "for cause." 11 U.S.C. § 362(d)(1). The party moving for relief from the automatic stay has the "initial burden . . . to make a *prime facie* showing of cause sufficient to support the party's request for

relief from the stay." *In re Scalera*, 521 B.R. 513, 517 (Bankr. W.D. Pa. 2014). If the moving party makes a *prima facie* showing, the burden then "shifts to the debtor to rebut the creditor's prima facie case." *In re Donaghy*, 2019 WL 1504334, at *3 (Bankr. E.D. Pa. Apr. 4, 2019).

22.    Because the term "cause" is not defined in Section 362(d), "[c]ourts in the Third Circuit consider three factors when balancing competing interests of debtors and movants" to determine if cause exists:

> (1) whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of the civil suit; (2) whether the hardship to the nonbankruptcy party by maintenance of the stay considerably outweighs the hardship on the debtor; and (3) the probability of the creditor prevailing on the merits.

*In re Town Sports Int'l*, 2023 WL 8827193, at *5 (D. Del. Dec. 21, 2023) (cleaned up). "To establish cause, the party seeking stay relief must show that the balance of hardships from not obtaining relief tips significantly in [its] favor." *Id.*

23.    The Motion should be denied because Eden Protocol has failed to carry the burden necessary for it to present a *prima facie* case for stay relief. *See, e.g.*, *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006), *aff'd*, 359 F. App'x 352 (3d Cir. 2010) ("Failure to prove a prima facie case requires denial of the requested relief."). Each of the three relevant factors weighs heavily against lifting the automatic stay so that Eden Protocol can attempt to violate the Debtors' contractual rights and force the Debtors into litigation outside of this Court. Indeed, even if Eden Protocol could be found to have presented a *prima facie* case (and it has not), the Debtors have rebutted it for the reasons set forth below.

## I.    The Debtors Will be Greatly Prejudiced If the Automatic Stay is Lifted

24.    In determining whether to lift the automatic stay, the "most important factor considered by courts is prejudice to the bankruptcy estate." *Town Sports*, 2023 WL 8827193, at *5. Eden Protocol claims that Maclaurin "would not be prejudiced by lifting the stay because,

assuming the Proposed Order is entered, it will receive the entirety of the Purchase Price" and because Maclaurin is "not contractually entitled" to the Tokens.  (Mot. ¶ 21.)  Both of these arguments defy logic.  Eden Protocol is offering to return $500,000 to Maclaurin only because Eden Protocol now believes that the Tokens to which Maclaurin is entitled will be worth more. But Eden Protocol has no right to reap a windfall at the expense of the Debtors' creditors by running roughshod over the Debtors' rights.  Granting Eden Protocol relief from the automatic stay would prejudice the Debtors because it would vitiate the Debtors' right to accept or reject the TPA pursuant to 11 U.S.C. § 365, and compel the Debtors to immediately commence litigation against Eden Protocol to protect its contractual rights at a time when the Debtors are focused on confirming their Plan.

25.    As an initial matter, the Debtors will be prejudiced if Eden Protocol is granted relief from the automatic stay because the TPA is an executory contract that the Debtors have not yet assumed or rejected.  It is well established that "a debtor has until confirmation of a plan . . . to either assume or reject an executory contract."  *In re Board of Directors of Compañía General de Combustibles S.A.*, 269 B.R. 104, 113 (Bankr. S.D.N.Y. 2001).  Pending a debtor's decision to assume or reject an executory contract, "the contract is enforceable by the debtor but not against the debtor."  *Broadstripe*, 402 B.R. at 656 (cleaned up).  Thus, any purported breach of the TPA is irrelevant to the Debtors' rights to assume or reject the TPA, which would be lost if Eden Protocol is granted relief from the automatic stay and Eden Protocol purports to terminate it. *Id.* ("[A] contract is not deemed terminated and no longer executory simply because the debtor has

defaulted or breached the contract before the commencement of a bankruptcy case." (cleaned

up)).[3]

26.    Furthermore, if Eden Protocol is granted relief from the stay, the Debtors

will be compelled to initiate burdensome and distracting litigation against Eden Protocol because

Eden Protocol has made clear that it intends to violate Maclaurin's contractual rights by

terminating the TPA.  (*See* Mot. ¶ 21.)  This is compounded by the fact that the TPA is "governed

by the laws of the British Virgin Islands" and specifies that "[a]ny dispute . . . arising out of or

relating to [the] TPA . . . shall be settled by arbitration" and that "[t]he place of arbitration shall be

Road Town, Tortola, British Virgin Islands unless the parties agree otherwise." (TPA ¶ 7.6.)  Thus,

granting the Motion would likely enmesh the Debtors in litigation in another forum outside of this

Court's jurisdiction.  Until the Debtors exercise their rights to assume or reject the TPA, Eden

Protocol should not be allowed to put an end to the "breathing spell" created by the automatic stay,

which exists to, among other things, "forestall the depletion of the debtor's assets" through "legal

costs." *Borman*, 946 F.2d at 1036 (cleaned up); *see also In re Windhaven Top Ins. Holdings, LLC*,

636 B.R. 596, 605 (Bankr. D. Del. 2021) (denying relief from the automatic stay because litigation

in another forum would "add significant costs for the Trustee").

27.    Moreover, in all likelihood, the burden and costs resulting from granting

Eden Protocol relief from the stay would not be limited to disputes with Eden Protocol.  The

Debtors are party to various token contracts similar to the TPA.  (Coverick Decl. ¶¶ 7-8.)  To the

extent similar investments may be poised to pay off, counterparties have an incentive to attempt

to extract value from the Debtors' estates by terminating contracts or otherwise trying to cheat the

---

[3]    If, and when, the Debtors determine that it is in the best interests of the Debtors' estate to assume the TPA, the
Debtors will demonstrate that the requirements under section 365 of the Bankruptcy Code are satisfied.  11 U.S.C.
§ 365(f).

Debtors out of a fair return on their investments. (*See id*. ¶ 8.) Thus, granting Eden Protocol relief

from the stay will "encourage a race to the courthouse by parties seeking similar orders, which will

cause undue hardship and expense to the estate," *In re DBSI*, 407 B.R. at 167, and would create an

"unnecessary drain on the Debtors'—and the Court's—resources," *In re Celsius Network LLC*,

642 B.R. 497, 504 (Bankr. S.D.N.Y. 2022) (denying a lift stay motion because, among other

reasons, granting it would "invite other lift stay motions").

## II.    Eden Protocol Will Not Face Any Hardship if the Automatic Stay Remains in Place

28.    To show cause supporting stay relief, Eden Protocol must show that "the

balance of hardships from not obtaining relief tips significantly in its favor." *Town Sports*, 2023

WL 8827193, at *6 (cleaned up).  Eden Protocol has, however, failed to demonstrate that it will

suffer *any* hardship at all if the stay remains in place.  Eden Protocol argues that if Debtors "were

permitted to obtain the Tokens . . ., Eden Protocol's reputation and the success of the Network

Launch would be materially impacted due to an association with the [pre-petition Debtors'] illegal

activities."  (Mot. ¶ 22.)  But Eden Protocol has come forward with no evidence to support this

"bald statement[] of prejudice" which is "not enough to create a showing of even a slight economic

or strategic hardship."  *In re Windhaven*, 636 B.R. at 606.

29.    The party seeking stay relief "bears the initial burden to *produce evidence*

that cause exists to grant relief from the automatic stay."  *In re DBSI*, 407 B.R. at 166 (emphasis

added); *see also Matter of Northtown Mall Assocs*., 3 F.3d 436 (5th Cir. 1993) (party moving for

relief from the automatic stay "must present evidence before the court regarding any potential

harmful effects").  Eden Protocol has offered nothing more than self-serving *ipse dixit*.  The only

support for the assertions of harm made in the Motion is a declaration of an Eden Protocol director

that contains a conclusory assertion that "[i]f Maclaurin, any Debtor entity, or any of their affiliates

were permitted to obtain any of the Tokens, Eden Protocol's reputation and the success of the

Network Launch would be negatively impacted as a result of any association with the Debtors and their conduct." (Mot. Ex. C ¶ 10.) Such a conclusory statement is insufficient to plausibly allege prejudice, let alone prove it. It also belies the facts. These Chapter 11 Cases have publicly documented the fact that the Debtors have, since the Petition Date, been run by independent fiduciaries who removed all of the FTX group's prepetition insiders. Indeed, a "hypothetical and speculative" claim of future harm is insufficient to show cause. *In re Velo Holdings, Inc.*, 475 B.R. 367, 377, 386 (Bankr. S.D.N.Y. 2012). Thus, the Motion should be rejected because it is not supported by evidence of prejudice to Eden Protocol sufficient to make out a *prima facie* case for stay relief. *See, e.g.*, *In re Irish Bank*, 2019 WL 4740249, at \*6-7 (affirming rejection of stay relief because the movant failed to "substantiate its case with an evidentiary showing"); *RNI Wind Down*, 348 B.R. at 299-300 (movant failed to make out a *prima facie* case for stay relief where it "did not submit any evidence in support of its Stay Relief Motion").

30.     Regardless, Eden Protocol's protestations can be further disregarded given the Debtors' (through Clifton Bay) partial ownership of Eden Protocol's parent company, Euclid Labs, which could enable Clifton Bay to obtain even more Tokens than Maclaurin is entitled to receive pursuant to the TPA. (*See* Coverick Decl. ¶¶ 12, 14.) Granting the Motion will do nothing to eliminate Clifton Bay's equity stake in Euclid Labs—which has long been public knowledge because it is listed in Clifton Bay's Statement of Financial Affairs. [D.I. 1042 at 37; D.I. 2301 at 52.] Thus, it is clear that any assertions about reputational harm due to the TPA are without merit and merely offered as justification for Eden Protocol's attempted value grab.

### III.     Eden Protocol Cannot Show Any Likelihood of Success on the Merits Because it has No Right to Terminate the TPA

31.     The Motion should also be denied because Eden Protocol has not demonstrated any likelihood of success on the merits. Grasping at straws, Eden Protocol advances

several arguments about why it can supposedly terminate the TPA.  (Mot. ¶¶ 23-24.)  But the plain language of the TPA shows that these arguments all fail, and therefore would be vigorously contested by the Debtors in litigation.

32.     *First*, Eden Protocol claims that Maclaurin must have violated Section 7.4 of the TPA, which bars transfer of the "TPA" and the "rights contained herein," because Maclaurin does not have the same name as the entity that signed the TPA, Alameda Ventures.  (Mot. ¶¶ 16, 23.)  But Eden Protocol has come forward with no evidence to show Alameda Ventures "assigned, transferred, or sold its assets to Maclaurin without informing or getting the consent of Eden Protocol" in violation of Section 7.4 because no such thing ever occurred.  (*Id*.)  Rather, as Eden Protocol well knows (Mot. Ex. C ¶ 1 n.3), Alameda Ventures merely changed its name to Maclaurin (Case No. 22-11087 [D.I. 1]).  A name change effects no transfer of anything from one company to another so it does not implicate Section 7.4 of the TPA.

33.     *Second*, Eden argues that it can terminate the TPA because Maclaurin breached its representations and warranties that (i) its "purchase and payment for . . . the Interests will not violate any applicable laws of the Purchaser's jurisdiction," and (ii) "[n]o payment or other transfer of value to the Company is or will be derived from . . . or related in any way to . . . directly or indirectly, any illegal activities."  (Mot. ¶ 23; TPA §§ 5.8, 5.11.2.)  But Eden Protocol has come forward with no evidence that the $500,000 payment made in relation to the TPA derived from anything other than legitimate sources or otherwise violated these boilerplate provisions.  Indeed, there is no basis to assume that such a relatively small sum *must have* come from illegal activity given the large size of FTX group and its various sources of income.  (Coverick Decl. ¶ 10.)

34.     *Third*, Eden Protocol argues that Section 2.2 of the TPA gives it the right to terminate the TPA "in the event the Company determines that Purchaser does not meet the

Company's requirements for purchasers hereunder." (Mot. ¶ 7.) Eden Protocol does not, however, point to any failure to comply with relevant "residency and citizenship requirements" or other terms in the TPA. (*See* TPA § 2.2.) Thus, Eden has no right to terminate pursuant to Section 2.2. And, without a legitimate justification for termination, any contractual language purporting to give Eden Protocol the right to terminate the TPA in its "sole discretion" is irrelevant in any event. *See In re Broadstripe*, 402 B.R. at 657 (finding that the ability to terminate contractual rights in the party's sole discretion "provides no safe haven" from violation of automatic stay).

35.    *Lastly*, Eden Protocol argues that Maclaurin has failed to satisfy certain of the "Conditions to Token Delivery" in Section 3.2 of the TPA. (Mot. ¶ 24.) The TPA, however, sets no deadlines for satisfaction of the conditions in Section 3.2 other than specifying that they must be satisfied "prior to each delivery of Tokens." (TPA § 3.2.) And there is plenty of time on the clock prior to "delivery of Tokens" because that cannot take place until one year after the Network Launch (Mot. ¶ 6; TPA Ex. A), which has not yet occurred (Mot. ¶ 12). Regardless, even if Maclaurin had somehow failed to comply with the conditions in Section 3.2, Eden's exclusive remedy would be to place relevant tokens in escrow, not seek termination of the TPA. (TPA § 3.2 ("If the Purchaser fails to meet any of the conditions above, the Company or the Foundation may hold the Tokens deliverable hereunder in escrow until such conditions are met, and such escrow will constitute delivery . . . .").)

## IV.    The Proposed Order Could Never Be Entered

36.    As detailed herein, the Motion should be denied. In the event the Court was inclined to provide any relief to Eden Protocol (it should not), the proposed order cannot be entered.

37.    *First*, Eden Protocol argues that the Court should waive the 14-day stay imposed pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3). (Mot. ¶ 26; Mot. Ex. A ¶

5.) There is no basis to do so.  The purpose of Bankruptcy Rule 4001(a)(3) is to "provide sufficient time for a party to request a stay pending appeal of an order granting relief from an automatic stay before the order is enforced or implemented."  Fed. R. Bankr. P. 4001, Advisory Committee's Note to 1999 Amendment.  Eden Protocol advanced no reason to depart from the rule or its purpose.  The fourteen-day stay should be waived only where there is "a clear showing by the movant of equitable reasons that warrant the waiver."  *In re Henderson*, 395 B.R. 893, 904-05 (Bankr. D.S.C. 2008).  In other words, the burden is on Eden Protocol to demonstrate cause to depart from the standard fourteen-day stay.  *See In re Topfer*, 587 B.R. 622, 637 (Bankr. M.D. Pa. 2018) ("I find that insufficient cause has been stated to waive the fourteen-day stay imposed by Fed. R. Bankr. P. 4001(a)(3). Waiver will therefore be denied.").  It has not even attempted to do so here.  Thus, the Court should not waive Bankruptcy Rule 4001(a)(3).

38.    *Second*, the proposed order goes well beyond the issues before the Court. Stay relief would not provide Eden Protocol authorization to actually terminate the TPA, and it would not affirm that Eden Protocol has the contractual right to terminate that it asserts.  The Debtors dispute that Eden Protocol has any termination right and intend to vigorously contest any such efforts.  As a result, paragraph 2 of the proposed order must be stricken in the event, *arguendo*, that any stay relief were to be provided.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court deny the Motion.

Dated:  July 26, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware  19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
E-mail:  landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY  10004
Telephone: (212) 558-4000
Facsimile:  (212) 558-3588
E-mail:  dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*