# EXHIBIT A

THE OFFER AND SALE OF THE INTERESTS (AS DEFINED BELOW) DESCRIBED HEREUNDER HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THIS OFFERING IS BEING MADE ONLY OUTSIDE THE UNITED STATES TO NON-U.S. PERSONS (AS DEFINED IN SECTION 902 OF REGULATION S UNDER THE SECURITIES ACT) (AND ONLY IN JURISDICTIONS WHERE SUCH OFFER AND SALE IS PERMITTED UNDER APPLICABLE LAW) IN RELIANCE ON REGULATION S UNDER THE SECURITIES ACT. THE INTERESTS MAY NOT BE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE AND FOREIGN SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**NOTICE TO RESIDENTS OF THE EUROPEAN ECONOMIC AREA ("EEA")**

IN RELATION TO EACH MEMBER STATE OF THE EEA, NO OFFER OF SECURITIES MAY BE MADE TO THE PUBLIC IN THAT MEMBER STATE EXCEPT: (A) TO ANY LEGAL ENTITY WHICH IS A QUALIFIED INVESTOR AS DEFINED IN THE PROSPECTUS DIRECTIVE; (B) TO FEWER THAN 150 NATURAL OR LEGAL PERSONS (OTHER THAN QUALIFIED INVESTORS AS DEFINED IN THE PROSPECTUS DIRECTIVE) AS PERMITTED UNDER THE PROSPECTUS DIRECTIVE; OR (C) UNDER ANY OTHER CIRCUMSTANCES FALLING WITHIN ARTICLE 3(2) OF THE PROSPECTUS DIRECTIVE, PROVIDED THAT NO SUCH OFFER OF SECURITIES WILL REQUIRE THE ISSUER TO PUBLISH A PROSPECTUS PURSUANT TO ARTICLE 3 OF THE PROSPECTUS DIRECTIVE, OR SUPPLEMENT A PROSPECTUS PURSUANT TO ARTICLE 16 OF THE PROSPECTUS DIRECTIVE.

THIS INSTRUMENT IS NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA. FOR THESE PURPOSES, A RETAIL INVESTOR MEANS A PERSON WHO IS ONE (OR MORE) OF: (I) A RETAIL CLIENT AS DEFINED IN POINT.

(11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU ("**MIFID II**"); OR (II) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE 2002/92/EC, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (III) NOT A QUALIFIED INVESTOR AS DEFINED IN THE PROSPECTUS DIRECTIVE. CONSEQUENTLY NO KEY INFORMATION DOCUMENT REQUIRED BY REGULATION (EU) NO 1286/2014 (THE "**PRIIPS REGULATION**") FOR OFFERING OR SELLING THIS INSTRUMENT OR OTHERWISE MAKING IT AVAILABLE TO RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED AND THEREFORE OFFERING OR SELLING THIS INSTRUMENT OR OTHERWISE MAKING IT AVAILABLE TO ANY RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE PRIIPS REGULATION. IT IS A CONDITION OF YOU RECEIVING AND RETAINING THIS DOCUMENT THAT YOU WARRANT THAT YOU ARE A QUALIFIED INVESTOR.

FOR THE PURPOSES OF THIS NOTICE, THE EXPRESSION AN "OFFER TO THE PUBLIC" IN RELATION TO ANY SECURITIES IN ANY MEMBER STATE MEANS THE COMMUNICATION

IN ANY FORM AND BY ANY MEANS OF SUFFICIENT INFORMATION ON THE TERMS OF THE OFFER AND THE INSTRUMENT BEING OFFERED SO AS TO ENABLE AN INVESTOR TO DECIDE TO PURCHASE THE INSTRUMENT, AS THE SAME MAY BE VARIED IN THAT MEMBER STATE BY ANY MEASURE IMPLEMENTING THE PROSPECTUS DIRECTIVE IN THAT MEMBER STATE. THE EXPRESSION "**PROSPECTUS DIRECTIVE**" MEANS DIRECTIVE 2003/71/EC (AS AMENDED, INCLUDING BY DIRECTIVE 2010/73/EU), AND INCLUDES ANY RELEVANT IMPLEMENTING MEASURE IN ANY MEMBER STATE.

**NOTICE TO RESIDENTS OF CANADA**

UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THE RIGHTS HEREUNDER MUST NOT TRADE THE RIGHTS HEREUNDER BEFORE THE DATE THAT THE ISSUER BECOMES A REPORTING ISSUER IN ANY PROVINCE OR TERRITORY.

**NOTICE TO RESIDENTS OF CHINA**

THE RIGHTS ARE NOT BEING OFFERED OR SOLD AND MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, WITHIN THE PEOPLE'S REPUBLIC OF CHINA (FOR SUCH PURPOSES, NOT INCLUDING THE HONG KONG AND MACAU SPECIAL ADMINISTRATIVE REGIONS OR TAIWAN), EXCEPT AS PERMITTED BY THE SECURITIES AND OTHER LAWS AND REGULATIONS OF THE PEOPLE'S REPUBLIC OF CHINA.

**NOTICE TO RESIDENTS OF THE UNITED KINGDOM**

IN THE UNITED KINGDOM THIS DOCUMENT IS BEING DISTRIBUTED ONLY TO, AND IS DIRECTED ONLY AT (AND ANY INVESTMENT ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH): (I) INVESTMENT PROFESSIONALS (WITHIN THE MEANING OF ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 AS AMENDED (THE "**FPO**")); (II) PERSONS OR ENTITIES OF A KIND DESCRIBED IN ARTICLE 49 OF THE FPO; (III) CERTIFIED SOPHISTICATED INVESTORS (WITHIN THE MEANING OF ARTICLE 50(1) OF THE FPO); AND (IV) OTHER PERSONS TO WHOM IT MAY OTHERWISE LAWFULLY BE COMMUNICATED (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "RELEVANT PERSONS").

THIS DOCUMENT HAS NOT BEEN APPROVED BY AN AUTHORISED PERSON. ANY PURCHASE TO WHICH THIS DOCUMENT RELATES IS AVAILABLE ONLY TO (AND ANY FINANCIAL ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH) RELEVANT PERSONS. THIS DOCUMENT IS DIRECTED ONLY AT RELEVANT PERSONS AND PERSONS WHO ARE NOT RELEVANT PERSONS SHOULD NOT TAKE ANY ACTION BASED UPON THIS DOCUMENT AND SHOULD NOT RELY ON IT. IT IS A CONDITION OF YOUR RECEIVING AND RETAINING THIS DOCUMENT THAT YOU WARRANT TO THE COMPANY, ITS DIRECTORS, AND ITS OFFICERS THAT YOU ARE A RELEVANT PERSON.

**NOTICE TO RESIDENTS OF FRANCE**

THIS DOCUMENT HAS NOT BEEN PREPARED, AND IS NOT DISTRIBUTED, IN THE CONTEXT OF A PUBLIC OFFERING OF FINANCIAL SECURITIES IN FRANCE WITHIN THE MEANING OF ARTICLE L. 411-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER. CONSEQUENTLY, NO FINANCIAL SECURITIES HAVE BEEN OFFERED OR SOLD OR WILL BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, TO THE PUBLIC IN FRANCE, AND ANY OFFERING MATERIAL MAY NOT BE, AND WILL NOT BE, DISTRIBUTED OR CAUSED TO BE DISTRIBUTED TO THE PUBLIC IN FRANCE OR USED IN CONNECTION WITH ANY OFFER TO THE PUBLIC IN FRANCE.

OFFERS, SALES AND DISTRIBUTIONS OF SECURITIES WILL BE MADE ONLY TO QUALIFIED INVESTORS (INVESTISSEURS QUALIFIÉS) ACTING FOR THEIR OWN ACCOUNT, ALL AS DEFINED IN, AND IN ACCORDANCE WITH, ARTICLES L. 411-2, D. 411-1, D. 744-1, D. 754-1, AND D. 764-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER AND APPLICABLE REGULATIONS THEREUNDER.

PROSPECTIVE INVESTORS ARE INFORMED THAT (I) NO PROSPECTUS HAS BEEN AND WILL BE SUBMITTED TO THE CLEARANCE OF THE FRENCH FINANCIAL MARKET AUTHORITY ("AMF"), (II) IN COMPLIANCE WITH ARTICLES L. 411-1, D. 411-1, D. 744-1, D. 754-1, AND D. 764-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER, ANY QUALIFIED INVESTOR SHOULD BE ACTING FOR ITS OWN ACCOUNT, AND (III) THE DIRECT OR INDIRECT DISTRIBUTION OR SALE TO THE PUBLIC OF SECURITIES MAY ONLY BE MADE IN COMPLIANCE WITH ARTICLES L. 411-1, L. 411-2, L. 412-1, AND L. 621-8 THROUGH L. 621- 8-3 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER.

**NOTICE TO RESIDENTS OF GERMANY**

IN THE FEDERAL REPUBLIC OF GERMANY THIS DOCUMENT IS DISTRIBUTED ONLY TO, AND IS DIRECTED ONLY AT, QUALIFIED INVESTORS WITHIN THE MEANING OF THE PROSPECTUS DIRECTIVE, THAT PROFESSIONALLY OR COMMERCIALLY PURCHASE OR SELL SECURITIES OR INVESTMENT PRODUCTS (VERMÖGENSANLAGEN) WITHIN THE MEANING OF THE GERMAN INVESTMENT PRODUCT ACT (VERMÖGENSANLAGENGESETZ) FOR THEIR OWN ACCOUNT OR FOR THE ACCOUNT OF OTHERS. NO SECURITIES PROSPECTUS (WERTPAPIERPROSPEKT) OR INVESTMENT PRODUCT PROSPECTUS (VERMÖGENSANLAGENVERKAUFSPROSPEKT) HAS BEEN OR WILL BE FILED WITH THE GERMAN FEDERAL FINANCIAL SUPERVISORY AUTHORITY (BAFIN) OR OTHERWISE PUBLISHED IN THE FEDERAL REPUBLIC OF GERMANY. NO PUBLIC OFFER OR DISTRIBUTION OF COPIES OF ANY DOCUMENT RELATING TO THE SI TOKENS INCLUDING THIS DOCUMENT, WILL BE MADE IN THE FEDERAL REPUBLIC OF GERMANY EXCEPT WHERE AN EXPRESS EXEMPTION FROM COMPLIANCE WITH THE PUBLIC OFFER RESTRICTIONS UNDER THE GERMAN SECURITIES PROSPECTUS ACT AND THE INVESTMENT PRODUCT ACT APPLIES.

**NOTICE TO RESIDENTS OF SWITZERLAND**

THIS DOCUMENT (AND ANY OTHER OFFERING OR MARKETING MATERIAL WITH RESPECT TO THE INVESTMENT ACTIVITY TO WHICH THIS DOCUMENT RELATES) MAY BE DISTRIBUTED OR MADE AVAILABLE IN, INTO OR FROM SWITZERLAND ONLY TO QUALIFIED INVESTORS WITHIN THE MEANING OF THE SWISS COLLECTIVE INVESTMENT SCHEMES ACT ("**CISA**"), ITS IMPLEMENTING ORDINANCE AND REGULATORY GUIDANCE (EACH SUCH PERSON A "**QUALIFIED INVESTOR**"). THIS DOCUMENT (NOR ANY OTHER OFFERING OR MARKETING MATERIAL WITH RESPECT TO THE INVESTMENT ACTIVITY TO WHICH THIS DOCUMENT RELATES) HAS NOT BEEN AND WILL NOT BE FILED WITH, OR APPROVED BY, ANY SWISS REGULATORY AUTHORITY. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER TO SUBSCRIBE FOR, BUY OR OTHERWISE ACQUIRE ANY TOKENS AND IT DOES NOT CONSTITUTE A PROSPECTUS PURSUANT TO THE CISA, THE SWISS CODE OF OBLIGATIONS OR THE LISTING RULES OF ANY TRADING VENUE IN SWITZERLAND. ANY INVESTMENT TO WHICH THIS DOCUMENT RELATES IS AVAILABLE ONLY TO (AND ANY INVESTMENT ACTIVITY TO WHICH IT RELATES WILL BE ENGAGED ONLY WITH) QUALIFIED INVESTORS.

**NOTICE TO RESIDENTS OF HONG KONG**

THE CONTENTS OF THIS DOCUMENT HAVE NOT BEEN REVIEWED OR APPROVED BY ANY REGULATORY AUTHORITY IN HONG KONG. YOU ARE ADVISED TO EXERCISE CAUTION IN RELATION TO THIS OFFER. IF YOU ARE IN ANY DOUBT ABOUT ANY OF THE CONTENTS OF THIS DOCUMENT, YOU SHOULD OBTAIN INDEPENDENT PROFESSIONAL ADVICE.

THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OR INVITATION TO THE PUBLIC IN HONG KONG TO ACQUIRE THE TOKENS BEING OFFERED HEREIN. ACCORDINGLY, UNLESS PERMITTED BY THE LAWS OF HONG KONG, NO PERSON MAY ISSUE OR HAVE IN ITS POSSESSION FOR THE

PURPOSES OF ISSUE, THIS DOCUMENT RELATING TO THE TOKENS BEING OFFERED, WHETHER IN HONG KONG OR ELSEWHERE, WHICH IS DIRECTED AT, OR THE CONTENTS OF WHICH ARE LIKELY TO BE ACCESSED OR READ BY, THE PUBLIC IN HONG KONG OTHER THAN IN CIRCUMSTANCES WHICH DO NOT RESULT IN THIS DOCUMENT CONSTITUTING A "PROSPECTUS" AS DEFINED IN THE COMPANIES (WINDING UP AND MISCELLANEOUS PROVISIONS) ORDINANCE OF HONG KONG (CAP. 32 OF THE LAWS OF HONG KONG) (THE "**C(WUMP)O**") OR WHICH DO NOT CONSTITUTE AN OFFER OR AN INVITATION TO THE PUBLIC FOR THE PURPOSES OF THE SECURITIES AND FUTURES ORDINANCE (CAP. 571 OF THE LAWS OF HONG KONG) OR THE C(WUMP)O. THE OFFER OF THE TOKENS IS PERSONAL TO THE PERSON TO WHOM THIS DOCUMENT HAS BEEN DELIVERED, AND THE TOKENS WILL ONLY BE ACCEPTED BY SUCH PERSON. NO PERSON TO WHOM A COPY OF THIS DOCUMENT IS ISSUED MAY ISSUE, CIRCULATE OR DISTRIBUTE THIS DOCUMENT IN HONG KONG OR MAKE OR GIVE A COPY OF THIS DOCUMENT TO ANY OTHER PERSON.

**NOTICE TO RESIDENTS OF SOUTH KOREA**

THIS AGREEMENT IS NOT, AND UNDER NO CIRCUMSTANCES IS TO BE CONSTRUED AS, AN OFFERING OF SECURITIES IN SOUTH KOREA UNDER THE FINANCIAL INVESTMENT SERVICES AND CAPITAL MARKETS ACT OF SOUTH KOREA (THE "**FISCMA**"). FOR THE PURPOSE OF THIS NOTICE, THE EXPRESSION "OFFERING" IN RELATION TO ANY SECURITIES UNDER FISCMA MEANS THE INVITATION OF SUBSCRIPTION FOR NEWLY ISSUED SECURITIES TO MORE THAN 50 RETAIL INVESTORS.

THIS INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE FISCMA, AND THIS INSTRUMENT MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED, DIRECTLY OR INDIRECTLY, OR OFFERED OR SOLD TO ANY PERSON FOR RE-OFFERING OR RE-SALE, DIRECTLY OR INDIRECTLY, IN SOUTH KOREA OR TO ANY RESIDENT OF SOUTH KOREA.

**NOTICE TO RESIDENTS OF AUSTRALIA**

THIS DOCUMENT IS NOT A "PRODUCT DISCLOSURE STATEMENT" OR "DISCLOSURE DOCUMENT" FOR THE PURPOSES OF THE AUSTRALIAN CORPORATIONS ACT 2001 (CTH) ("**CORPORATIONS ACT**") AND IS NOT REQUIRED TO BE LODGED WITH THE AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION ("**ASIC**"). THIS OFFER IS MADE IN CIRCUMSTANCES THAT WOULD NOT REQUIRE DISCLOSURE UNDER CHAPTER 6D OR CHAPTER 7 OF THE CORPORATIONS ACT. THIS DOCUMENT IS NOT REQUIRED TO, AND DOES NOT, CONTAIN ALL THE INFORMATION WHICH WOULD BE REQUIRED IN A DISCLOSURE DOCUMENT OR PRODUCT DISCLOSURE STATEMENT, OR ALL THE INFORMATION THAT A PROSPECTIVE INVESTOR MAY DESIRE OR SHOULD OBTAIN IN ORDER TO MAKE AN INFORMED INVESTMENT DECISION. BY ACCEPTING RECEIPT OF THIS DOCUMENT, YOU REPRESENT AND WARRANT THAT YOU ARE A "SOPHISTICATED INVESTOR" AS DEFINED UNDER SECTION 708(8) OF THE CORPORATIONS ACT OR A "PROFESSIONAL INVESTOR" UNDER SECTION 708(11) OF THE CORPORATIONS ACT AND A "WHOLESALE CLIENT" UNDER SECTION 761G OF THE CORPORATIONS ACT. THE ISSUER OF THIS DOCUMENT IS NOT REGISTERED AS A MANAGED INVESTMENT SCHEME UNDER THE CORPORATIONS ACT. ANY PERSON TO WHOM THIS DOCUMENT IS ISSUED MUST NOT, WITHIN 12 MONTHS AFTER SUCH ISSUE, OFFER, TRANSFER OR ASSIGN THIS DOCUMENT TO PERSONS IN AUSTRALIA EXCEPT IN CIRCUMSTANCES WHERE DISCLOSURE TO SUCH PERSONS IS NOT REQUIRED UNDER THE CORPORATIONS ACT.

**NOTICE TO RESIDENTS OF ISRAEL**

THIS DOCUMENT DOES NOT CONSTITUTE A PROSPECTUS UNDER THE ISRAELI SECURITIES LAW OF 1968 (THE "**ISRAELI SECURITIES LAW**"), AND HAS NOT BEEN REVIEWED, FILED WITH OR APPROVED BY THE ISRAELI SECURITIES AUTHORITY OR ANY OTHER ISRAELI GOVERNMENT OR REGULATORY BODY. THIS DOCUMENT, ANY INVESTMENT ACTIVITY TO WHICH IT RELATES AND ANY OFFERING OF THE TOKENS IN ISRAEL IS AND WILL BE EXCLUSIVELY DISTRIBUTED OR MADE TO, AND DIRECTED AT, QUALIFIED INVESTORS, AS DEFINED IN SCHEDULE 1 OF THE ISRAELI SECURITIES LAW. PERSONS WHO ARE NOT QUALIFIED INVESTORS SHOULD NOT TAKE ANY ACTION BASED UPON THIS DOCUMENT AND SHOULD NOT RELY ON IT.

**NOTICE TO RESIDENTS OF RUSSIA**

INFORMATION CONTAINED HEREIN IS NOT AN OFFER, OR AN INVITATION TO MAKE OFFERS, TO SELL, PURCHASE, EXCHANGE OR OTHERWISE TRANSFER SECURITIES OR FOREIGN FINANCIAL INSTRUMENTS IN THE RUSSIAN FEDERATION TO OR FOR THE BENEFIT OF ANY RUSSIAN PERSON OR ENTITY, EXCEPT "QUALIFIED INVESTORS" (AS DEFINED UNDER RUSSIAN SECURITIES LAWS) TO THE EXTENT PERMITTED UNDER RUSSIAN SECURITIES LAWS. THIS DOCUMENT IS NOT AN ADVERTISEMENT IN CONNECTION WITH THE "PLACEMENT" OR "PUBLIC CIRCULATION" (AS BOTH TERMS ARE DEFINED UNDER RUSSIAN SECURITIES LAW) OF ANY SECURITIES, AND ANY FINANCIAL INSTRUMENTS DESCRIBED HEREIN ARE NOT INTENDED FOR "PLACEMENT" OR "PUBLIC CIRCULATION" IN THE RUSSIAN FEDERATION, IN EACH CASE UNLESS OTHERWISE PERMITTED UNDER RUSSIAN SECURITIES LAWS. NEITHER ANY FINANCIAL INSTRUMENTS DESCRIBED HEREIN NOR A PROSPECTUS RELATING TO SUCH FINANCIAL INSTRUMENTS HAS BEEN OR WILL BE REGISTERED WITH THE CENTRAL BANK OF THE RUSSIAN FEDERATION.

**NOTICE TO RESIDENTS OF CUBA, IRAN, NORTH KOREA, SYRIA AND THE CRIMEA REGION**

THIS INSTRUMENT IS NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF OR ANY PERSON LOCATED OR DOMICILED IN CUBA, IRAN, NORTH KOREA, SYRIA, THE CRIMEA REGION OR ANY OTHER COUNTRY OR TERRITORY THAT IS SUBJECT OF COUNTRY-WIDE OR TERRITORY-WIDE SANCTIONS.

**General Notice**

THIS INSTRUMENT IS NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF OR ANY PERSON LOCATED OR DOMICILED WHERE SUCH OFFERING IS PROHIBITED, RESTRICTED OR UNAUTHORIZED IN ANY FORM OR MANNER WHETHER IN FULL OR IN PART UNDER THE LAWS, REGULATORY REQUIREMENTS OR RULES IN SUCH JURISDICTION.

.

**EDEN PROTOCOL LIMITED**

**TOKEN PURCHASE AGREEMENT**

THIS CERTIFIES THAT in exchange for the payment by you ("***you***" or the "***Purchaser***") of the Total Purchase Price on or about the Effective Date, Eden Protocol Limited, a British Virgin Islands company (the "***Company***"), hereby issues to you the right (the "***Future Token Interest***" and, collectively with any securities received in substitution or fulfillment of the Future Token Interest, or in replacement of the Future Token Interest, as may be applicable, the "***Interests***") to receive, automatically and without requiring any future payment, a number of Tokens (as defined below) equal to the Number of Tokens Purchased set forth on the signature page hereto, on the conditions and subject to the terms set forth hereunder.

OFFERING. This Token Purchase Agreement ("***TPA***") is issued by the Company in connection with the offering ("***Offering***") of Future Token Interests by the Company via a series of agreements on substantially similar terms to this TPA (collectively, the "***TPAs***"). Purchaser acknowledges that TPAs may be issued in a series of multiple closings to certain qualified persons and entities, all as determined from time to time by the Company in its sole discretion. If Purchaser is purchasing the Interests on behalf of an entity (such as its employer), Purchaser represents and warrants that it has the authority to bind such entity to this TPA. In that case, "Purchaser" will refer to that company or other legal entity.

**PURCHASER ACKNOWLEDGES, AGREES AND UNDERSTANDS THAT THE INTERESTS PURCHASED HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN THIS TPA AND THE DOCUMENTS REFERENCED HEREIN. BY PARTICIPATING IN THIS OFFERING, PURCHASER AGREES TO BE BOUND BY THIS TPA IN ALL RESPECTS.**

**IMPORTANT NOTICE REGARDING ARBITRATION: WHEN YOU AGREE TO THIS TPA, YOU ARE AGREEING TO RESOLVE ANY DISPUTE BETWEEN YOU AND THE COMPANY THROUGH BINDING, INDIVIDUAL ARBITRATION RATHER THAN IN COURT. PLEASE REVIEW CAREFULLY SECTION 7.6 "DISPUTE RESOLUTION" BELOW FOR DETAILS.**

OFFER AND SALE

2.1    **Purchase and Sale**. Purchaser hereby agrees to purchases that Number of Tokens Purchased for an aggregate purchase price equal to the Total Purchase Price, each as set forth on the signature page hereto.

2.2    **Purchaser Qualification**. Purchaser acknowledges and agrees that it is required to meet certain requirements in order to participate in this Offering, including the Purchaser's residency and citizenship requirements, as well as compliance with this TPA. Purchaser acknowledges and agrees that, in the event the Company determines that Purchaser does not meet the Company's requirements for purchasers hereunder (as determined by the Company in its sole discretion), the Company may immediately and without notice rescind or terminate, as applicable, this TPA, the Future Token Interests and the Tokens, notwithstanding Purchaser's compliance with this TPA, delivery of the Total Purchase Price to the Company, or that the Company may have previously accepted or delivered a signature page to this TPA.

2.3    **Payment**. Purchaser covenants and agrees to pay the Total Purchase Price to the Company on or about the Effective Date, and in any case no later than one business day after the Effective Date. Purchaser acknowledges and agrees that the Company may, in its sole discretion and without notice, rescind or terminate, as applicable, this TPA, the Future Token Interests and the Tokens in the event that Purchaser does not deliver to the Company its signature page to this TPA or the Total Purchase Price, in each case within one business day of the Effective Date.

2.4    **Form of Payment**. The Company agrees to accept payment for the Total Purchase Price via wire transfer of immediately available funds in United Stated Dollars (to a bank account designated in writing by the Company), Tether (USDT) or USD Coin (USDC); provided that the Company may elect to accept other methods or forms of payment on an as-converted to U.S. dollars basis in its sole discretion. The U.S. dollar exchange rate for any other form of payment shall be determined solely by the Company or its assignee or agent in accordance with reasonable and accepted market practices and additional transaction fees may apply.

## TOKEN DELIVERY

3.1    **Delivery**. In the event Network Launch occurs prior to the termination of this TPA, and subject to the terms and conditions set forth herein, the Company, its agents or representatives shall deliver to the Purchaser, in full satisfaction of this TPA, the Number of Tokens Purchased no later than the date of the Network Launch; provided, for the avoidance of doubt, such delivered Tokens shall remain subject to the terms of this TPA notwithstanding such delivery.

3.2    **Conditions to Token Delivery**. In connection with, as a condition to, and prior to each delivery of Tokens by the Company to the Purchaser pursuant to Section 3.1, and in each case unless waived in writing by the Company:

3.2.1    The Purchaser will execute and deliver to the Company any and all other transaction documents related to this TPA and the delivery of the Tokens as are reasonably requested by the Company, including documentation to verify Purchaser's citizenship and residency;

3.2.2    The Purchaser will provide to the Company, in writing, an SPL-compliant network wallet address ("***Wallet***") to which the Purchaser's Tokens will be delivered;

3.2.3    The Purchaser will complete and deliver all AML and KYC Forms (as defined below) requested by the Company from time to time, including after the Effective Date; and

3.2.4    The Purchaser shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the Company or the Foundation may reasonably request in order to carry out the intent and accomplish the restrictions set forth herein 3 and/or as shall be requested to comply with then applicable laws and regulations and/or as requested by a digital asset exchange in connection with the listing of the Token.

If the Purchaser fails to meet any of the conditions above, the Company or the Foundation may hold the Tokens deliverable hereunder in escrow until such conditions are met, and such escrow will constitute delivery of the applicable number of Tokens in accordance with this instrument notwithstanding that such Tokens remain in escrow.

3.3    **Lockup.** In addition to any other restrictions set forth herein and required under applicable law, Purchaser agrees that it will not, at any time, directly or indirectly, Transfer any Tokens that have not been delivered to the Purchaser in accordance with Section 3.1 and Exhibit A herein (such Tokens, the "***Undelivered Tokens***"), any options to purchase any Undelivered Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Undelivered Tokens, including this TPA and the Future Token Interests hereunder. To ensure compliance with the restrictions in this Section 3.3, Purchaser acknowledges that the Company may impose technological lockups or other restrictions on the Tokens.

## DEFINITIONS

**4.1** "**AML and KYC Forms**" means any and all forms, documents, processes and procedures, including, for the avoidance of doubt, any electronic verification system or process, which the Company determines are reasonably necessary for the Company to comply with applicable Money Laundering Laws and "know your customer" laws.

4.2 "**Eden Network**" means the blockchain-based non-fungible token marketplace located at *www.magiceden.io*.

4.3 "**Foundation**" means the Eden Protocol Foundation, a Panamanian foundation.

**4.4** "**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any entity exercising legislative, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

4.5 "**Money Laundering Laws**" means the applicable laws, rules and regulations of all jurisdictions in which the Purchaser is located, resident, organized or operates concerning or related to anti-money laundering, including but not limited to those contained in the Bank Secrecy Act of 1970 and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**Patriot Act**"), each as amended and including the rules and regulations thereunder, and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority.

4.6 "**Network Launch**" means the event whereby, following the deployment of the Eden Network to the Solana blockchain network, Tokens is made available for use on the Eden Network for its intended purposes as described, as determined by the Company in its sole discretion.

4.7 "**Person**" means any individual or legal entity, including a government or political subdivision or an agency or instrumentality thereof.

4.8 "**Tokens**" means the $MAGIC token, a unit of value for the Eden Network.

**4.9** "**Transfer**" means, with respect to any instrument, the direct or indirect assignment, sale, transfer, tender, pledge, charge, hypothecation, or the grant, creation or suffrage of a lien or encumbrance in or upon, or the gift, placement in trust, or other disposition of such instrument or any right, title or interest therein, or the record or beneficial ownership thereof, the offer to make such a sale, transfer or other disposition, and each agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing.

## PURCHASER REPRESENTATIONS

**5.1** **Authorization.** The Purchaser has full power and authority to enter into this TPA. This TPA, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

**5.2** **Purchase Entirely for Own Account.** This TPA is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this TPA, the Purchaser hereby confirms, that the Interests to be acquired by the Purchaser will be acquired for investment for

the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this TPA, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, Transfer or grant participations to such Person or to any third Person, with respect to any of the Interests.  The Purchaser has not been formed for the specific purpose of acquiring the Interests.

5.3    **Disclosure of Information.** The Purchaser has sufficient knowledge of and experience in business and financial matters to be able to evaluate the risks and merits of its purchase of this TPA and of the Interests and is able to bear the risks thereof. The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Interests with the Company's representatives. The Purchaser has not relied on any representations or warranties made by the Company outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper.

**5.4**    **Compliance with Securities Laws.** The Purchaser understands that the Interests have not been, and will not be, registered under the Securities Act of 1933, as amended ("***Securities Act***") or any applicable state securities laws, by reason of a specific exemption from the registration provisions of the Securities Act and other applicable state securities laws which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Interests may be deemed "restricted securities" under applicable United States federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Interests indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  The Purchaser acknowledges that neither the Foundation nor the Company has any obligation to register or qualify the Interests for resale, and exemptions from registration and qualification may not be available or may not permit the Purchaser to transfer all or any of the Interests in the amounts or at the times proposed by the Purchaser. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Interests, and on requirements relating to the Company or the Foundation which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

5.5    **No Public Market.** The Purchaser understands that no public market now exists for the Interests, and that neither the Company nor the Foundation has made any assurances that a public market will ever exist for the Interests and neither the Company nor the Foundation is under any obligation to register or qualify the Interests under the laws of any Governmental Authority.

5.6    **Legends.** The Purchaser understands that the Interests may be deemed to bear any one or more of the following legends: (a) any legend required by the securities laws of any state to the extent such laws are applicable to the Interests represented by the certificate so legended, and (b): the following legend (and even without such legend the following restrictions apply):

THE INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

In connection with any proposed transfer, the Company may require an opinion of counsel in form and

substance satisfactory to the Company to the effect that any such proposed transfer or resale of the Interests is in compliance with the Securities Act and any applicable state or foreign securities laws. Purchaser hereby agrees that, to enforce the restrictions set forth in this TPA, the Company may impose technological and other restrictions on the Wallet and the Tokens deliverable hereunder.

5.7 **Waiver of Warranties; Assumption of Risks.** THE RISK OF LOSS IN BUYING, HOLDING AND TRADING DIGITAL ASSETS AND RIGHTS THEREIN, INCLUDING THE INTERESTS, CAN BE IMMEDIATE AND SUBSTANTIAL. THERE IS NO GUARANTEE AGAINST LOSSES FROM PARTICIPATING IN THE OFFERING. PURCHASER SHOULD THEREFORE CAREFULLY CONSIDER WHETHER TRADING OR HOLDING VIRTUAL CURRENCY IS SUITABLE FOR THE PURCHASER IN LIGHT OF ITS FINANCIAL CONDITION. Purchaser understands that the  Interests and the Tokens involve risks, all of which the Purchaser fully and completely assumes, including, but not limited to, the risks that (i) the technology and economic models associated with the Eden Network will not function as intended; (ii) the Eden Network will fail to attract sufficient interest from users or fail to gain use and adoption; (iii) the Company, the Foundation and/or third parties involved in the development of the Eden Network may be subject to investigation and punitive actions from Governmental Authorities, (iv) the Eden Network and the Tokens are dependent on a decentralized community of validators and computer networks, including the underlying Solana network, for its operations, and if they do not operate as expected the Tokens may lose all functionality and value, (v) errors, failures, bugs or other weaknesses in the Eden Network or the Token smart contract could adversely affect the Eden Network and the Tokens, (vi) the Eden Network or the underlying Solana network may be subject to malicious cyberattacks or contain exploitable flaws in its code which results in security breaches and the loss or theft of Tokens, (vii) the regulatory regime governing the Eden Network and the Tokens is highly uncertain and new regulations or policies may adversely affect the Eden Network and the Tokens, and (viii) other Tokens may be sold by the Company from time to time, including via bounty programs, partnerships, airdrops and other sales at lower prices and less restrictive lockup schedules than that offered herein. Purchaser understands and expressly accepts that the Tokens will be created and delivered to the Purchaser at the sole risk of the Purchaser on an "AS IS" and "UNDER DEVELOPMENT" basis. NEITHER THE FOUNDATION NOR THE COMPANY MAKES ANY WARRANTY WHATSOEVER WITH RESPECT TO THE TOKENS, INCLUDING ANY (i) WARRANTY OF MERCHANTABILITY; (ii) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (iii) WARRANTY OF TITLE; OR (iv) WARRANTY AGAINST INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY; WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE. EXCEPT AS EXPRESSLY SET FORTH HEREIN, PURCHASER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE FOUNDATION, THE COMPANY, OR ANY OTHER PERSON ON THEIR BEHALF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ASSUMES ALL RISKS AND LIABILITIES FOR THE RESULTS OBTAINED BY THE USE OF ANY TOKENS AND REGARDLESS OF ANY ORAL OR WRITTEN STATEMENTS MADE BY THE COMPANY OR THE FOUNDATION, BY WAY OF TECHNICAL ADVICE OR OTHERWISE, RELATED TO THE USE OF THE TOKENS.

**5.8** **Other Applicable Law.** Purchaser represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with the purchase of the Interests, including (a) the legal requirements within the Purchaser's jurisdiction for the purchase of the Interests, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Interests. The Purchaser's purchase and payment for and continued beneficial ownership of the Interests will not violate any applicable laws of the Purchaser's jurisdiction.

**5.9** **Regulation S Representations and Restrictions.** Purchaser hereby agrees and represents to the Company as follows:

5.9.1    Purchaser is not a U.S. Person as defined in Rule 902(k) of Regulation S under the Securities Act. The offer and sale of the Interests herein was made in an offshore transaction (as defined in Rule 902(h) of Regulation S), no directed selling efforts (as defined in Rule 902(c) of Regulation S) were made in the United States, and the Purchaser is not acquiring the Interests for the account or benefit of any U.S. Person;

5.9.2    Purchaser will not, during the restricted period that is applicable to the Interests set forth in the legend set forth below (the "***Restricted Period***") and to any certificate representing the Interests, offer or sell any of the foregoing (or create or maintain any derivative position equivalent thereto) in the United States, to or for the account or benefit of a U.S. Person or other than in accordance with Regulation S, or engage in hedging transactions with regard to the Interests prior to the expiration of the Restricted Period; and

5.9.3    Purchaser will, after the expiration of the applicable Restricted Period, offer, sell, pledge or otherwise Transfer the Interests (or create or maintain any derivative position equivalent thereto) only pursuant to registration under the Securities Act or any available exemption therefrom and, in any case, in accordance with applicable state securities laws.

Purchaser acknowledges and agrees that the Interests will be deemed to bear the legend set forth below (in addition to any other legends required by applicable federal, state or foreign securities laws or provided in any other agreement with the Company):

*THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, AND NEITHER THE COMPANY NOR THE FOUNDATION INTENDS TO REGISTER THEM. PRIOR TO THE ONE-YEAR ANNIVERSARY OF THE DATE OF SALE, THE INTERESTS MAY NOT BE OFFERED OR SOLD (INCLUDING OPENING A SHORT POSITION IN SUCH INTERESTS) IN THE UNITED STATES OR TO U.S. PERSONS AS DEFINED BY RULE 902(k) ADOPTED UNDER THE ACT, OTHER THAN TO DISTRIBUTORS, UNLESS THE INTERESTS ARE REGISTERED UNDER THE ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT IS AVAILABLE. PRIOR TO THE ONE-YEAR ANNIVERSARY OF THE DATE OF SALE, YOU MAY RESELL SUCH INTERESTS ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT OR OTHERWISE IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S OF THE ACT, OR IN TRANSACTIONS EFFECTED OUTSIDE OF THE UNITED STATES PROVIDED THEY DO NOT SOLICIT (AND NO ONE ACTING ON THEIR BEHALF SOLICITS) PURCHASERS IN THE UNITED STATES OR OTHERWISE ENGAGE(S) IN SELLING EFFORTS IN THE UNITED STATES AND PROVIDED THAT HEDGING TRANSACTIONS INVOLVING THESE INTERESTS MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. A HOLDER OF THE INTERESTS WHO IS A DISTRIBUTOR, DEALER, SUB-UNDERWRITER OR OTHER SECURITIES PROFESSIONAL, IN ADDITION, CANNOT, PRIOR TO THE ONE YEAR ANNIVERSARY OF THE DATE OF SALE, RESELL THE INTERESTS TO A U.S. PERSON AS DEFINED BY RULE 902(k) OF REGULATION S UNLESS THE INTERESTS ARE REGISTERED UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT IS AVAILABLE.*

5.9.4    Neither the Purchaser nor any person acting on its behalf has engaged, or will engage, in any directed selling efforts to U.S. Persons with respect to the Interests. The purchase of the

Interests herein has not been pre-arranged with a buyer located in the United States or with a U.S. Person, and are not part of a plan or scheme to evade the requirements of the Securities Act.

5.9.5    Neither the Purchaser nor any person acting on its behalf has undertaken or carried out any activity for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the Interests. Purchaser agrees not to cause any advertising of the Interests to be published in any publication or posted in any public space and not to issue any circular relating to the Interests in the United States.

**5.10**    **OFAC.** Neither the Purchaser, nor, if applicable, any of its affiliates or direct or indirect beneficial owners; (i) appears on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**"), nor are they otherwise a party with which the Company is prohibited to deal under the laws of the United States; (ii) is a person identified as a terrorist organization on any other relevant lists maintained by any Governmental Authority; or (iii) unless otherwise disclosed in writing to the Company prior to the date of this TPA, is a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure. The Purchaser further represents and warrants that, if applicable, the Purchaser: (a) has conducted thorough due diligence with respect to all of its beneficial owners; (b) has established the identities of all direct and indirect beneficial owners and the source of each beneficial owners' funds; and (c) will retain evidence of those identities, any source of funds and any due diligence.

**5.11**    **Sources and Uses of Funds.** The Purchaser further represents, warrants and agrees as follows:

5.11.1    No payment or other transfer of value to the Company and no payment or other transfer of value to the Company shall cause the Company to be in violation of applicable U.S. federal or state or non-U.S. laws or regulations, including, without limitation, anti-money laundering, economic sanctions, anti-bribery or anti-boycott laws or regulations, the Patriot Act, or the various statutes, regulations and executive orders administered by OFAC ("**OFAC Regulations**").

5.11.2    No payment or other transfer of value to the Company is or will be derived from, pledged for the benefit of, or related in any way to, (i) the government of any country designated by the U.S. Secretary of State or other Governmental Authority as a country supporting international terrorism, (ii) property that is blocked under any OFAC Regulations or that would be blocked under OFAC Regulations if it were in the custody of a U.S. national, (iii) persons to whom U.S. nationals cannot lawfully export services, or with whom U.S. nationals cannot lawfully engage in transactions under OFAC Regulations, (iv) the government of any country that has been designated as a non- cooperative country or designated by the U.S. Secretary of the Treasury or other Governmental Authority as a money laundering jurisdiction or (v) directly or indirectly, any illegal activities. The Purchaser acknowledges that Money Laundering Laws may require the Company to collect documentation verifying the identity and the source of funds used to acquire the Interests before, and from time to time after, the date of this TPA.

5.11.3    All payments or other transfer of value to the Company by the Purchaser will be made through an account (or virtual currency public address whose associated balance, either directly or indirectly, has been funded by such an account) located in a jurisdiction that does not appear on the list of boycotted countries published by the U.S. Department of Treasury pursuant to § 999(a)(3) of the Code as in effect at the time of the payment or other transfer of value. In the event that the Purchaser is, receives deposits from, makes payments to or conducts transactions relating to a non-U.S. banking institution (a "**Non-U.S. Bank**") in connection with the acquisition of the Interests, the Non-U.S. Bank: (i) has a fixed address, other than an electronic address or a post office box, in a country in which it is authorized to conduct banking activities, (ii) employs one or more individuals on a full-time basis, (iii) maintains

operating records related to its banking activities, (iv) is subject to inspection by the banking authority that licensed it to conduct banking activities and (v) does not provide banking services to any other Non-U.S. Bank that does not have a physical presence in any country and that is not a registered affiliate.

5.12    **Additional Information.** The Purchaser will provide to the Company any information that the Company from time to time determines to be necessary or appropriate (a) to comply with Money Laundering Laws, anti-terrorism laws, rules and regulations and or any similar laws and regulations of any applicable jurisdiction and (b) to respond to requests for information concerning the identity and or source of funds of the Purchaser from any Governmental Authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update that information. The Purchaser understands and acknowledges that the Company may be required to report any action or failure to comply with information requests and to disclose the identity to Governmental Authorities, self-regulatory organizations and financial institutions, in certain circumstances without notifying the Purchaser that the information has been so provided. The Purchaser further understand and agrees that any failure on its part to comply with this Section 5.12 would allow the Company to terminate this TPA and require the forfeiture of any Tokens previously delivered to the Purchaser.

5.13    **Suspicious Activity Reports.** The Purchaser acknowledges and agrees that the Company, in complying with anti-money laundering statutes, regulations and goals, may file voluntarily or as required by law, a suspicious activity report ("***SAR***") or any other information with governmental and law enforcement agencies that identify transactions and activities that the Company reasonably determines to be suspicious, or is otherwise required by law. The Purchaser acknowledges that the Company is prohibited by law from disclosing to third parties, including the Purchaser, any SAR filing itself or the fact that a SAR has been filed.

**5.14    Voluntary Compliance.** The Purchaser understands and agrees that, even if the Company is not obligated to comply with any U.S. anti-money laundering requirements, the Company may nevertheless choose to voluntarily comply with such requirements as the Company deems appropriate in its sole discretion. The Purchaser agrees to cooperate with the Company as may be required in the reasonable opinion of the Company in connection with such compliance**.**

5.15    **Taxes.** PURCHASER ACKNOWLEDGES AND AGREES THAT IT MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF PURCHASING, HOLDING, EXCHANGING, SELLING, STAKING, TRANSFERRING OR OTHERWISE USING THE TOKENS IN ANY WAY. PURCHASER HEREBY REPRESENTS THAT (A) IT HAS CONSULTED WITH A TAX ADVISER THAT IT DEEMS ADVISABLE IN CONNECTION WITH ANY USE OF THE TOKENS, OR THAT IT HAS HAD THE OPPORTUNITY TO OBTAIN TAX ADVICE BUT HAVE CHOSEN NOT TO DO SO, (B) NEITHER THE COMPANY NOR THE FOUNDATION HAS PROVIDED PURCHASER WITH ANY TAX ADVICE, AND (C) PURCHASER AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM ANY PURCHASE, HOLDING, EXCHANGE, SALE, STAKING, TRANSFER OR OTHER USE OF THE TOKENS.

**DISCLAIMERS**

6.1    **Wallet**. You assume full responsibility and liability for any losses resulting from any intentional or unintentional misuse of your Wallet including, without limitation, any loss resulting from designating a wallet that is non-compliant with the Tokens for the receipt of the Tokens, or depositing one type of digital asset to a wallet intended for another type of digital asset. The Company assumes no responsibility or liability in connection with any such misuse.

6.2    **Indemnity**. NEITHER THE COMPANY NOR THE FOUNDATION SHALL BE LIABLE TO THE PURCHASER, AND THE PURCHASER WILL INDEMNIFY, DEFEND AND HOLD HARMLESS THE COMPANY, THE FOUNDATION AND THIER AGENTS AND ADVISORS, AND THE

SUCCESSORS AND ASSIGNS OF THE FOREGOING, FROM AND AGAINST, ALL OR ANY PART OF ANY THIRD PARTY CAUSES OF ACTION, CLAIMS, LIABILITIES, LOSSES, COSTS, DAMAGES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) (COLLECTIVELY "CLAIMS") FOR DAMAGES TO OR LOSS OF PROPERTY ARISING OUT OF OR RESULTING FROM THE TRANSACTIONS CONTEMPLATED HEREIN OR PURCHASER'S VIOLATION OF THE TPA, EXCEPT TO THE EXTENT SUCH CLAIMS ARISE FROM THE FRAUD OR INTENTIONAL MISCONDUCT OF THE COMPANY OR THE FOUNDATION; PROVIDED, HOWEVER, THAT PURCHASER'S AGGREGATE LIABILITY FOR CLAIMS UNDER THIS SECTION SHALL NOT EXCEED THE TOTAL PURCHASE PRICE (AS DENOMINATED IN USD).

6.3    **Limitation of Liability**. NEITHER THE COMPANY, THE FOUNDATION NOR ANY OTHER PARTY INVOLVED IN THE OFFERING WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE ACTIVITIES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS TPA OR THE PURCHASER'S PARTICIPATION IN, OR INABILITY TO PARTICIPATE IN, THE OFFERING, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE COMPANY, THE FOUNDATON, OR ANY OTHER PARTY HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY. EXCEPT FOR THE COMPANY'S FRAUD OR INTENTIONAL MISCONDUCT, IN NO EVENT WILL THE COMPANY'S AND THE FOUNDATION'S TOTAL LIABILITY TO THE PURCHASER ARISING OUT OF OR IN CONNECTION WITH THIS TPA OR FROM THE PURCHASER'S PARTICIPATION IN, OR INABILITY TO PARTICIPATE IN, THE OFFERING EXCEED THE TOTAL PURCHASE PRICE (AS DENOMINATED IN USD). THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE COMPANY AND THE PURCHASER.

**6.4    Class Action Waiver.** Any claim or dispute arising under this TPA will take place on an individual basis without resort to any form of class or representative action (the "***Class Action Waiver***"). THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM. Regardless of anything else in this TPA to the contrary, the validity and effect of the Class Action Waiver may be determined only by a court or referee and not by an arbitrator, and Purchaser acknowledges that this Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is non-severable from this TPA.

**7.    MISCELLANEOUS**

7.1    **Entire Agreement.** This TPA set forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral of written, between them. This TPA is one of a series of similar agreements entered into by the Company from time to time. Any provision of this TPA may be amended, waived or modified only upon the written consent of the Company and (a) the Purchaser, or (b) the holders of a majority, in the aggregate, of the Total Purchase Price paid to the Company with respect to all TPAs outstanding at the time of such amendment, waiver or modification, and any amendment, waiver or modification made in accordance with clause (b) shall be binding upon all Purchasers.

7.2 **Notices.** Any notice required or permitted by this TPA will be deemed sufficient when sent by email to the relevant address listed on the signature page hereto, as subsequently modified by written notice received by the appropriate Party.

7.3 **No Rights as Stockholder.** The Purchaser is not entitled, as a holder of this TPA, the Future Token Interests or the Tokens, to vote or receive dividends or be deemed an equityholder of the Company or the Foundation for any purpose, nor will anything contained herein be construed to confer on the Purchaser, as such, any of the rights of an equityholder or any right to vote for the election of directors or upon any matter submitted to the board of directors at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

7.4 **Transfers and Assigns.** Neither this TPA nor the rights contained herein may be Transferred, by operation of law or otherwise, by the Purchaser without the prior written consent of the Company. The Company may assign this TPA without the consent of the Purchaser.

**7.5** **Severability.** In the event any one or more of the provisions of this TPA is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this TPA operate or would prospectively operate to invalidate this TPA, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this TPA and the remaining provisions of this TPA will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

7.6 **Dispute Resolution**. This TPA and any action related thereto will be governed by the laws of the British Virgin Islands, without regard to its conflicts of law rules. Any dispute, controversy or claim arising out of or relating to this TPA, or the breach, termination or invalidity thereof, shall be settled by arbitration in accordance with the British Virgin Islands International Arbitration Centre (BVI IAC) Arbitration Rules. The number of arbitrators shall be one. The place of arbitration shall be Road Town, Tortola, British Virgin Islands unless the parties agree otherwise. The language to be used in the arbitral proceedings shall be English.

**7.7** **Additional Assurances.** The Purchaser shall, and shall cause its affiliates to, from time to time, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested by Company or are necessary for the Company, upon the advice of counsel, to carry out the provisions of this TPA and give effect to the transactions contemplated hereby, including, without limitation, to enable the Company to register the Interests, to enable the Interests to qualify for or maintain an exemption from registration (to the extent any such exemptions are available), to comply with Money Laundering Laws, or to otherwise complete the transactions contemplated hereby and to comply with applicable laws as then in effect.

7.8 **Force Majeure.** Without limitation of anything else in this TPA, neither the Company nor the Foundation shall be liable or responsible to the Purchaser, nor be deemed to have defaulted under or breached this TPA, for any failure or delay in fulfilling or performing any term of this instrument, including without limitation, launching the Eden Network and delivering the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected Party's reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest or instability; (d) changes to applicable law; or (e) action by any Governmental Authority.

[*signature page follows*]

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

| Number of Tokens Purchased: | 16,666,667 |
|---|---|
| Price Per Token (USD): | 0.03 USD |
| Total Purchase Price: | USD $  500,000 |

**SELLER:**

**EDEN PROTOCOL LIMITED**

By: _____

Name:  Diana Muñoz

Title:  President

Email:  team@gdeplaw.com

Effective Date: _____

**PURCHASER:**

|_|          Alameda Ventures
             Limited

By:

Its:

By: _____

Name: Lee Tin Ka

Title:  Partner

Email: ___brian.lee@alameda-research.com___

Notice Address: _____

___F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelle___

[*Signature Page to TPA*]

**<u>Exhibit A</u>**

**Lockup and Delivery Schedule**

The Number of Tokens Purchased shall be delivered and released to the Purchaser in accordance with the following schedule:

- [0%] of the Number of Tokens Purchased shall be released on the date of Network Launch

- [8.33%] of the Number of Tokens Purchased shall be released on the last day of each calendar month following the one-year anniversary of the Network Launch Date, such that all purchased Tokens will be released and delivered as of the last day of the [24th] month following the date of Network Launch.

In all cases, delivery of the applicable number of Tokens set forth above shall be deemed complete and to have complied with this TPA as long as it is completed within ten days of the applicable delivery date set forth above.

# EXHIBIT B

# Magic Eden Closes $130M Series B Round Co-Led by Electric Capital and Greylock at $1.6B Valuation



NEWS PROVIDED BY

**Magic Eden** ➞

Jun 21, 2022, 08:00 ET

*Funds will be used to expand its primary and secondary marketplace and explore multi-chain opportunities*

SAN FRANCISCO, June 21, 2022 /PRNewswire/ -- Magic Eden ("the Company"), the leading community-centric NFT marketplace, today announced the closing of a $130 million Series B funding round co-led by Electric Capital and Greylock, valuing the Company at $1.6 billion. Lightspeed Venture Partners also joins the round as a new anchor investor. Other participants include previous investors Paradigm and Sequoia Capital.

Funds from the Series B will be used to expand the Company's primary and secondary marketplaces, explore multi-chain opportunities, invest in the team as well as technology to enhance the user experience through improved insights, analytics, and trading tools. Magic Eden's goal is to define the future of NFTs by

supporting the next generation of digital creators and introducing the next billion users to web3. Since its inception in September 2021, Magic Eden has become the leading platform for users looking to create, discover, and collect unique NFTs. The marketplace receives an average of 22 million unique sessions per month and sees over 40,000 NFTs traded daily.

Jack Lu, CEO and co-founder of Magic Eden, commented on the news, "We know that NFTs are the best way to bring people onto the blockchain. NFTs are exciting, social, and cultural experiences that bring connectivity to the world. Since our inception, we've made the conscious decision to support both our creators and users through this tremendous era of growth for both the company and the industry. The best part is that we're just getting started."

Magic Eden's Launchpad is the leading primary NFT marketplace, with success in launching over 250 projects to date. Magic Eden offers ultimate customization, marketing support, and operational execution to new NFT collections coming onto the primary market. Complementing Launchpad is Magic Eden's active secondary NFT market, which allows creators and collectors alike to access added liquidity and gain entry to a wide breadth of NFT projects. The Company's secondary market covers over 7,000 listed collections and sees over 92% of all NFT volume on Solana. Magic Eden will also further its investments in partnerships with creators and brands to bring exciting drops and cultural moments to the platform.

As the host of a community-centric marketplace, Magic Eden will continuously invest in its relationships with top-tier collections to support their growth, including integration of their Solana Program Library (SPL) tokens for both minting and secondary sales, and the development of whitelabel marketplaces for collections and games such as Okay Bears, Mini Royale Nations, Genopets, and a marketplace partnership with Aurory. Magic Eden's team will also play an active role in category development and expansion, such as gaming. Since introducing Eden Games, a games discovery portal, in March 2022, Magic Eden has launched 50+ games and metaverse projects and seen 90% of all gaming NFT volume on Solana traded on its marketplace.

Zhuoxun Yin, COO and co-founder of Magic Eden, concluded "At Magic Eden, we take pride in building innovative products that are taken from our passionate community. We were the first to innovate in a number of areas: such as pairing NFT minting capabilities via Launchpad with a secondary marketplace, embedding gameplay with NFT games directly on the platform, and creating a Decentralized Autonomous

Organization (DAO) to empower greater involvement within the Magic Eden community. We're thrilled to have the continued support of our investors and community and look forward to delivering on Solana and beyond."

**Investor Quotes**

Mike Duboe, Partner at Greylock, said, "Magic Eden is one of those top 1% teams that is just firing on all cylinders — product execution, community growth, transaction volume — and the velocity in less than one year of existence has been exceptional. We believe Magic Eden is the most interesting and durable offering for creators and collectors alike — from its primary NFT launchpad, to its embedded marketplace API empowering projects to host their own secondary transactions. The team listens and lives with its communities, and it shows in the product, metrics, and feedback."

Avichal Garg, Co-founder and Managing Partner at Electric, commented, "Magic Eden's ability to keep pace and drive innovation in a rapidly evolving NFT market is extremely impressive. They are one of the fastest moving and most user-centric companies in Web3. The team anticipates ecosystem pain points and is able to address them through thoughtful, user-centric solutions. Platform enhancements are community-tested and shipped at an unparalleled speed — which has enabled the company to earn an active and sticky user base. We are excited to support Magic Eden as it continues to iterate and scale."

Ravi Mhatre, Founding Partner at Lightspeed commented, "Magic Eden was founded with a 'Creators and Community-First' principle in mind. The team has truly built one of the most feature-rich experiences and continues to move fast with the exponentially growing NFT ecosystem. Working closely with artists, collections, and game developers, Magic Eden is leading the frontier for next generation Web3 application adoption across the masses. We are excited to be joining the round to support Magic Eden's continued innovation and growth."

**About Magic Eden**

Magic Eden is the leading community-centric NFT marketplace driving the next billion users to Web3. Led by former crypto, tech, and hospitality leaders, Magic Eden is building a user-friendly platform powered by market-leading minting and trading solutions. Magic Eden brings dynamic cultural moments onto the blockchain, empowering users across thousands of digital communities to create, discover and collect unique NFTs. For more information, please visit **www.magiceden.io**

**Media Contact**

Peter Padovano

M Group Strategic Communications (on behalf of Magic Eden)

646-859-5953

**press@magiceden.io**


SOURCE Magic Eden

EXHIBIT C

## STOCK TRANSFER AGREEMENT

This Stock Transfer Agreement (this "***Agreement***") is made and entered into as of August 2, 2022 (the "***Effective Date***") by and among the party listed on the Schedule of Purchasers attached to this Agreement as <u>Schedule A</u> ("***Purchaser***"), Tan Lu (the "***Seller***"), and Euclid Labs, Inc., a Delaware corporation (the "***Company***").

## RECITALS

WHEREAS, Seller acquired certain shares of the Company's Common Stock (the "***Purchased Shares***") pursuant to that certain Founder's Restricted Stock Purchase Agreement dated as of January 14, 2022 by and between the Company and Seller (the "***Acquisition Agreement***").

WHEREAS, the Purchased Shares held by Seller is subject to that certain Stockholders Agreement by and between the Company, Seller and certain other stockholders of the Company, dated January 11, 2022 (the "***Stockholders Agreement***"), that certain Amended and Restated First Refusal and Co-Sale Agreement by and between the Company, Seller and certain other stockholders of the Company, dated June 15, 2022 (the "***Co-Sale Agreement***") and that certain Amended and Restated Voting Agreement by and between the Company, Seller and certain other stockholders of the Company, dated June 15, 2022 (the "***Voting Agreement***" together with the Stockholders Agreement and Co-Sale Agreement, the "***Related Agreements***").

WHEREAS, the Company and certain stockholders of the Company have waived any transfer restrictions with respect to the transfer herein and following the transfer, the Shares shall not be subject to any rights of first refusal under the Acquisition Agreement or the Related Agreements, but shall remain subject to the applicable limitations on transfer set forth in the Bylaws of the Company, as may be amended from time to time (the "***Bylaws***").

WHEREAS, on the terms and conditions set forth in this Agreement, Seller desires to sell and transfer to Purchaser, and Purchaser desires to purchase from Seller, a portion of the Purchased Shares, for consideration, as indicated below.

**NOW, THEREFORE**, the parties hereby agree as follows:

1.      **SALE AND PURCHASE OF SHARES.**   On the Effective Date and subject to the terms and conditions of this Agreement, Seller hereby sells and transfers 452,693 of the Purchased Shares (the "***Shares***") to Purchaser at a price per share of $11.6253 (the "***Per Share Price***") and for an aggregate purchase price equal to $5,262,691.93 (the "***Purchase Price***"), in such amounts as set forth on <u>Schedule A</u>.  As used in this Agreement, "Shares" shall include all the Shares transferred under this Agreement and all securities received (a) in replacement of the Shares, (b) as a result of stock dividends or stock splits in respect of the Shares and (c) as substitution for the Shares in a recapitalization, merger, reorganization or the like.

2.      **CLOSING**.

      2.1      **Deliveries by Seller.**  Seller hereby delivers to the Company or is causing to be delivered to the Company on Seller's behalf (a) authorization to the Company and Carta to

remove any stock certificates representing the Shares for cancellation and reissuance to Purchaser, (b) a Stock Power and Assignment Separate from Stock Certificate, in substantially the form attached hereto as <u>Exhibit A</u> (a "***Stock Power***") for the transfer of Shares to Purchaser and (c) an executed copy of this Agreement.

       **2.2**    **Deliveries by Purchaser.**  Purchaser hereby delivers to (a) Seller and the Company a duly authorized and executed copy of this Agreement, (b) Seller, the Purchase Price in immediately available funds, pursuant to the wire transfer instructions to an account or accounts as may be designated by Seller, and (c) if Purchaser is not already a party thereto, the Company, an executed adoption agreement to the Voting Agreement in the form attached hereto as <u>Exhibit B</u>.

       **2.3**    **Deliveries of Stock Certificate.**  Seller hereby instructs the Company to: (a) cancel any stock certificates issued to Seller representing the Shares; (b) issue a duly executed stock certificate to Purchaser evidencing the Shares purchased by Purchaser via Carta, and (c) issue a duly executed stock certificate evidencing the number of Purchased Shares remaining, if any, after the transfer contemplated by this Agreement.

       **3.**    **REPRESENTATIONS AND WARRANTIES OF PURCHASER**. Purchaser represents and warrants to Seller and the Company as follows:

       **3.1**    **Purchase for Own Account for Investment.**  Purchaser is purchasing the Shares for its own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***").  Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Shares to be transferred to Purchaser and upon transfer of the Shares to Purchaser no one other than Purchaser will have any beneficial ownership of any of the Shares.  Purchaser was not formed for the specific purpose of acquiring the Shares.

       **3.2**    **Authority**.  Purchaser has full legal right, power and authority to enter into and perform its obligations under this Agreement and to acquire the Shares under this Agreement.  Purchaser has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization as the type of entity that it purports to be and all corporate or other entity actions necessary to authorize the transactions contemplated by this Agreement have been duly taken.  The person(s) executing and delivering this Agreement on behalf of Purchaser are duly authorized to do so.  This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

       **3.3**    **Accredited Investor.**  Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act.

       **3.4**    **Access to Information.**  Purchaser has received all the information Purchaser considers necessary or appropriate for deciding whether to enter into this Agreement.

Purchaser further represents that Purchaser has had an opportunity to ask questions and receive full answers from the Company concerning, among other things, its financial condition, its management, its prior activities and any other information which Purchaser considers relevant or appropriate in connection with entering into this Agreement.

**3.5**     **Understanding of Risks.**     Purchaser is fully aware of (a) the highly speculative nature of the Shares, (b) the financial hazards involved, (c) the lack of liquidity of the Shares and the restrictions on transferability of the Shares, (d) the qualifications and backgrounds of the management of the Company and (e) the tax consequences of acquiring the Shares.

**3.6**     **Purchaser's Qualifications.**     Purchaser is aware of the character, business acumen and general business and financial circumstances of the company.  By reason of Purchaser's business or financial experience, Purchaser is capable of evaluating the merits and risks of this acquisition, has the capacity to protect its own interests in this transaction, and is financially capable of bearing a total loss of the Shares.

**3.7**     **No General Solicitation.**     At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television, Internet or other form of general advertising or solicitation in connection with the Shares.

**3.8**     **Compliance with Securities Laws.**     Purchaser understands and acknowledges that, in reliance upon the representations and warranties made by Purchaser herein, the Shares are not being registered with the Securities and Exchange Commission ("**SEC**") under the 1933 Act or being qualified under the California Corporate Securities Law of 1968, as amended (the "**Law**"), but instead are being transferred under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and the Law or other applicable securities laws which impose certain restrictions on Purchaser's ability to transfer the Shares.

**3.9**     **Securities Law Restrictions on Transfer.**     Purchaser understands that Purchaser may not transfer any Shares unless such Shares are registered under the 1933 Act or qualified under the Law or other applicable securities laws or unless, in the opinion of counsel to the Company, exemptions from such registration and qualification requirements are available. Purchaser understands that only the Company may file a registration statement with the SEC or the California Commissioner of the Department of Business Oversight or other applicable securities commissioners and that the Company is under no obligation to do so with respect to the Shares.  Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Shares in the amounts or at the times proposed by Purchaser.

**3.10**     **Rule 144.**     Purchaser acknowledges that, because the Shares have not been registered under the 1933 Act, the Shares must be held indefinitely unless subsequently registered under the 1933 Act or unless an exemption from such registration is available. Purchaser is aware of the provisions of Rule 144 promulgated under the 1933 Act.

**3.11**     **Tax Matters.**     Purchaser expressly acknowledges and agrees that other than as expressly stated in this Agreement, neither Seller, the Company, nor any of their

respective agents has made any representation to Purchaser with respect to the tax or other financial treatment of the transactions contemplated by this Agreement.

      **3.12**   <u>**Claims and Legal Proceedings.**</u> There is no claim, action, suit, arbitration, criminal or civil investigation or proceeding pending or involving or, to Purchaser's knowledge, threatened against Purchaser before or by any court or governmental or non-governmental department, commission, board, bureau, agency or instrumentality, or any other person or entity, that questions the validity of this Agreement or any action taken or to be taken by Purchaser pursuant to this Agreement or in connection with the transactions contemplated hereby.

      **3.13**   <u>**No Conflicts.**</u> The execution, delivery and performance of this Agreement by Purchaser, and the consummation of the transactions contemplated hereby, will not (a) constitute a violation (with or without the giving of notice or lapse of time, or both) of any provision of any law or any judgment, decree, order, regulation or rule of any court, agency or other governmental authority applicable to Purchaser, (b) require any consent, approval or authorization of, or declaration, filing or registration with, any person or entity, (c) result in a default (with or without the giving of notice or lapse of time, or both) under, violation, acceleration or termination of, or the creation in any party of the right to accelerate, terminate, modify or cancel, any agreement, lease, note or other restriction, encumbrance, obligation or liability to which Purchaser is a party or by which it is bound or to which any assets of Purchaser are subject, or (d) conflict with Purchaser's organization documents.

      **3.14**   <u>**Sophisticated Purchaser.**</u> Purchaser (a) is a sophisticated entity familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Shares and (c) has independently and without reliance upon Seller or the Company, and based on such information and the advice of such advisors as Purchaser has deemed appropriate, made its own analysis and decision to enter into this Agreement. Purchaser acknowledges that (i) Seller and the Company currently may have, and later may come into possession of, information with respect to the Company that is not known to Purchaser and that may be material to a decision to sell the Shares ("***Purchaser Excluded Information***"), (ii) Purchaser has determined to purchase the Shares notwithstanding its lack of knowledge of Purchaser Excluded Information and (iii) neither Seller nor the Company shall have any liability to Purchaser, and Purchaser waives and releases any claims that it might have against Seller and the Company whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Purchaser Excluded Information, in each case in connection with the sale of the Shares and the transactions contemplated by this Agreement. Purchaser acknowledges and understands that the Shares may decrease in value after the date hereof and that Purchaser may suffer losses in value with respect to the Shares. Purchaser understands that Seller and the Company will rely on the accuracy and truth of the foregoing representations, and Purchaser hereby consents to such reliance.

      **3.15**   <u>**Purchase Price**</u>. The Purchase Price agreed to by Seller and Purchaser is a purchase price negotiated solely between Seller and Purchaser, and does not necessarily reflect the actual fair market value of the Shares, and is considered fair to Purchaser.

4. **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to the Company and Purchaser as follows:

4.1 **Transfer for Own Account.** Seller is selling the Shares for Seller's own account only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the 1933 Act.

4.2 **Title to Shares.** Seller is the sole beneficial and record owner of the Shares and has valid marketable title to the Shares, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest or other restrictions other than pursuant to the Acquisition Agreement, the Related Agreements or the Bylaws. Upon the sale and transfer of the Shares, and payment therefor, in accordance with the provisions of this Agreement, Purchaser will acquire valid marketable title to the Shares being acquired by Purchaser hereunder, free and clear of any pledge, lien, security interest, encumbrance, claim, contractual rights, equitable interests or other restrictions other than pursuant to this Agreement or other documents described in Section 5 below.

4.3 **Authority.** Seller has full legal right, power and authority to enter into and perform Seller's obligations under this Agreement and to transfer the Shares under this Agreement, and Seller is not obligated to transfer the Shares to any other person or entity. The person(s) executing and delivering this Agreement on behalf of Seller are duly authorized to do so. This Agreement has been duly and validly authorized, executed and delivered by, and constitutes the valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

4.4 **No General Solicitation.** At no time has Seller presented Purchaser or any other party with or solicited Purchaser or any other party through any publicly issued or circulated newspaper, mail, radio, television, Internet or other form of general advertisement or solicitation in connection with the Shares.

4.5 **No Broker-Dealer.** Seller has not effected this transfer of Shares by or through a broker-dealer in any public offering.

4.6 **Consents.** All consents, approvals, authorizations and orders required for the execution and delivery of this Agreement and the transfer of the Shares under this Agreement have been obtained and are in full force and effect, including any consents or waivers from the Company or its stockholders required under the Related Agreements, the Acquisition Agreement and the Bylaws. Other than the Acquisition Agreement, the Related Agreements, the Bylaws, and the United States and any non-United States securities law restrictions on transfer, there are no restrictions on Seller's ability to transfer the Shares, nor will there be any additional restrictions by which Purchaser or the Shares will be obligated or by which Purchaser will be bound immediately following the Effective Date.

4.7    **Sophisticated Seller.**    Seller (a) is a sophisticated individual or entity familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Shares and (c) has independently and without reliance upon Purchaser or the Company, and based on such information and the advice of such advisors as Seller has deemed appropriate, made Seller's own analysis and decision to enter into this Agreement.  Seller acknowledges that neither Purchaser nor any affiliate thereof is acting as a fiduciary or financial or investment advisor to Seller, and has not given Seller any investment advice, opinion or other information on whether the sale of the Shares is prudent.  Seller acknowledges that (i) Purchaser and the Company currently may have, and later may come into possession of, information with respect to the Company that is not known to Seller and that may be material to a decision to sell the Shares ("***Seller Excluded Information***"), (ii) Seller has determined to sell the Shares notwithstanding Seller's lack of knowledge of Seller Excluded Information, and (iii) neither Purchaser nor the Company shall have any liability to Seller, and Seller waives and releases any claims that it might have against Purchaser and the Company whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information or otherwise, in each case in connection with the sale of the Shares and the transactions contemplated by this Agreement.  Seller acknowledges and understands that the Shares may increase in value after the date hereof and that Seller shall not realize the upside potential with respect to the Shares.  Seller understands that Purchaser and the Company will rely on the accuracy and truth of the foregoing representations, and Seller hereby consents to such reliance.

4.8    **Access to Information.**    Seller has received all the information Seller's considers necessary or appropriate for deciding whether to enter into this Agreement.  Seller further represents that Seller has had an opportunity to ask questions and receive full answers from the Company concerning, among other things, its financial condition, its management, its prior activities and any other information which Seller considers relevant or appropriate in connection with entering into this Agreement.

4.9    **Tax Matters.**    Seller expressly acknowledges and agrees that neither Purchaser nor the Company, nor any of their respective agents has made any representation to Seller with respect to the tax or other financial treatment of the transactions contemplated by this Agreement.  Seller shall be solely responsible for the payment of any and all income, transfer, and other taxes, filing and recording fees and similar charges relating to the transactions contemplated herein. Seller further agrees to indemnify and hold the Company, each Purchaser and their respective agents harmless from any taxes, claims, demands, deficiencies, penalties, interest, assessments, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of (i) Seller's failure to pay or delayed payment of any taxes due in connection with transactions contemplated by this Agreement, (ii) any income, withholding or other taxes or related obligations incurred with respect to payments made to Seller pursuant to this Agreement and or (iii) any and all loss, claim, liability, obligation, demand, action, cause of action, cost, damage, deficiency, tax, penalty, fine or expense.

4.10    **Claims and Legal Proceedings.**    There is no claim, action, suit, arbitration, criminal or civil investigation or proceeding pending or involving or, to Seller's knowledge, threatened against Seller before or by any court or governmental or non-governmental

department, commission, board, bureau, agency or instrumentality, or any other person or entity, that questions the validity of this Agreement or any action taken or to be taken by Seller pursuant to this Agreement or in connection with the transactions contemplated hereby.

**4.11** **No Conflicts.** The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, will not (a) constitute a violation (with or without the giving of notice or lapse of time, or both) of any provision of any law or any judgment, decree, order, regulation or rule of any court, agency or other governmental authority applicable to Seller, (b) other than any consent or waiver required under the Related Agreements, the Acquisition Agreement, and the Bylaws (which consent or waiver will be obtained prior to the Effective Time), require any consent, approval or authorization of, or declaration, filing or registration with, any person or entity, (c) result in a default (with or without the giving of notice or lapse of time, or both) under, violation, acceleration or termination of, or the creation in any party of the right to accelerate, terminate, modify or cancel, any agreement, lease, note or other restriction, encumbrance, obligation or liability to which Seller is a party or by which Seller's is bound or to which any assets of Seller are subject, (d) to the extent that Seller is an entity, conflict with Seller's organization documents, or (e) result in the creation of any lien or encumbrance upon the assets of such Seller or upon any such Shares. If Seller is not a United States person (as defined by applicable tax law and regulation), Seller represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with the sale of the Shares under this Agreement, including (i) the legal requirements within its jurisdiction for the sale of the Shares, (ii) any governmental or other consents that may need to be obtained, and (iii) the income tax and other tax consequences, if any, that may be relevant to the sale or transfer of the Shares.

**4.12** **Purchase Price**. The Purchase Price agreed to by Seller and Purchaser is a purchase price negotiated solely between Seller and Purchaser, and does not necessarily reflect the actual fair market value of the Shares, and is considered fair to Seller.

## 5. RIGHTS AND OBLIGATIONS UNDER VOTING AGREEMENT; COMPLIANCE WITH BYLAWS TRANSFER RESTRICTIONS; MARKET STAND-OFF AGREEMENT.

**5.1** **Rights and Obligations under Voting Agreement**. Purchaser expressly agrees that the Shares shall be subject to the Voting Agreement, including Section 3 (Drag Along Right) thereunder. Purchaser agrees to execute a copy of the Voting Agreement. Purchaser acknowledges that Purchaser has received a copy of, and has read and understood, the Voting Agreement.

**5.2** **Restrictions in Bylaws**. Purchaser agrees to be bound by and comply with any applicable limitations on transfer contained in the Bylaws. Purchaser hereby acknowledges that Purchaser has received a copy of, and has read and understood, the Bylaws.

**5.3** **Market Stand-Off Agreement**. Purchaser hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Company's first firm commitment underwritten public offering of the Company's Common Stock ("**Common Stock**") or other equity securities

to the public under Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "***Initial Offering***") and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock held immediately before the effective date of the registration statement for the Initial Offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise.  The foregoing provisions of this Section 5.3 shall apply only to the Initial Offering, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement or the sale of any shares that are acquired by any stockholder in the Initial Offering or in the open market following the Initial Offering. The underwriters in connection with the Initial Offering are intended third-party beneficiaries of this Section 5.3 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Purchaser agrees to execute such agreements as may be reasonably requested by the underwriters in the Initial Offering that are consistent with this Section 5.3 or that are necessary to give further effect thereto.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Shares until the end of such period.

6.      **COMPLIANCE WITH LAWS AND REGULATIONS.**  The transfer of the Shares will be subject to and conditioned upon compliance by the Company and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any stock exchange or automated quotation system on which the Company's Common Stock may be listed or quoted at the time of such issuance or transfer.

7.      **NO RELIANCE.**  Each of Seller and Purchaser acknowledges and agrees that neither the Company, nor any of its stockholders, officers, directors, employees, or agents (other than Seller and Purchaser acting in their capacity as such) have (a) acted as an agent, finder or broker for Seller or Purchaser or their respective agents with respect to the offer, purchase and/or sale of the Shares, (b) made any representations or warranties of any kind, express or implied, to Seller or Purchaser or their respective agents in connection with the offer, purchase and/or sale of the Shares, including regarding the tax treatment or benefit of the transfer described herein or (c) have at any time had any duty to Seller or Purchaser or their respective agents to disclose any information relating to the Company, its business, or financial condition or relating to any other matters in connection with the offer, purchase and/or sale of the Shares. In making its decision to transfer the Shares, Seller is relying solely on Seller's own knowledge and experience (and that of its professional advisors) and the representations and warranties of Purchaser (and not on any information provided by the Company or its agents).  In making its decision to acquire the Shares, Purchaser is relying solely on its own knowledge and experience (and that of its professional advisors) and the representations and warranties of Seller (and not on any information provided by the Company or its agents).

8.      **RESTRICTIVE LEGENDS AND STOP-TRANSFER ORDERS**.

**8.1**    **Legends.** Purchaser understands and agrees that the Company will place the legends set forth below or similar legends on any stock certificate(s) evidencing the Shares, together with any other legends that may be required by state or federal securities laws, the Company's Amended and Restated Certificate of Incorporation, as may be amended from time to time or any other agreement affecting the Shares between Seller and the Company, including but not limited to the Voting Agreement, or between Seller and any third party, or any other agreement applicable to Purchaser:

THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REPRESENTED HEREBY MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK UP PERIOD OF UP TO 180-DAYS FOLLOWING THE EFFECTIVE DATE OF CERTAIN REGISTRATION STATEMENTS OF THE COMPANY FILED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH LOCK UP PERIOD IS BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER AS PROVIDED IN THE BYLAWS OF THE CORPORATION.

**8.2**    **Stop-Transfer Instructions.** Purchaser agrees that, in order to ensure compliance with the restrictions imposed by this Agreement, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company transfers

its own securities, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (b) to treat as owner of such Shares, or to accord the right to vote or pay dividends, to any purchaser or other purchaser to whom such Shares have been so transferred. Purchaser further understands and agrees that the Company may require written assurances, in form and substance satisfactory to counsel for the Company (which may include a requirement that Purchaser's counsel provide a legal opinion acceptable to the Company), before the Company effects any future transfers of the Shares.

9.    **WAIVER AND RELEASE.**

      **9.1**    **Acknowledgement and Release of Claims.** In consideration of the Company facilitating the transfer of the Shares hereunder and the payment of the Purchase Price, the sufficiency of which are hereby acknowledged, to the fullest extent permitted by law, Seller ("**Releasor**"), for itself and on behalf of each of its affiliates, and its and their representatives, agents, estates, heirs, successors and assigns, hereby irrevocably, unconditionally and fully and forever acquits, releases, waives and discharges, and further covenants and each agrees that it will not assert any claims, other than claims resulting from willful misconduct of any Released Party (as defined below), against the Company and Purchaser and any of their respective officers, directors, employees, agents, attorneys, divisions, affiliated corporations, affiliated non-corporation entities, representatives, successors, predecessors and assigns (individually and collectively, the "**Released Parties**") from any and all past, present and future debts, losses, costs, bonds, suits, actions, causes of action, liabilities, contributions, attorneys' fees, interest, damages, punitive damages, expenses, claims, potential claims, counterclaims, crossclaims, or demands, in law or in equity, asserted or unasserted, express or implied, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever, that the Releasor had, presently has or may hereafter have or claim or assert to have against any of the Released Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has occurred or existed at any time from the beginning of time up to and including the date hereof, in each case, that arise solely from or out of the transfer of the Shares hereunder (the "**Released Matters**").

      **9.2**    **Waiver of Unknown Future Claims**. The releases contained herein are intended to be complete, global and all-encompassing and specifically includes claims that are known, unknown, fixed, contingent or conditional with respect to the Released Matters. Releasor hereby expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with a Released Party, including, without limitation, the following provisions of California Civil Code Section 1542:

      "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

10. **GENERAL PROVISIONS**.

**10.1** **Successors and Assigns; Assignment.** Except as otherwise provided in this Agreement, this Agreement and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

**10.2** **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to that body of laws pertaining to conflict of laws.

**10.3** **Dispute Resolution**. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

**10.4** **Notices.** Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following: (a) at the time of personal delivery, if delivery is in person; (b) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States; or (c) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by express courier. All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto. A "***business day***" shall be a day, other than Saturday or Sunday, when the banks in the city of San Francisco are open for business.

10.5    **Further Assurances**.    The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

10.6    **Titles and Headings.**    The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.    Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

10.7    **Entire Agreement**.    This Agreement and the documents referred to herein, including but not limited to the Voting Agreement, constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.    This Agreement shall not be effective until signed by all parties hereto, including the Company.

10.8    **Severability.**    If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto.    If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.    Notwithstanding the forgoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

10.9    **Amendment and Waivers.**    This Agreement may be amended only by a written agreement executed by each of the parties hereto.    No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought.    Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns.    No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.    No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

10.10    **Confidentiality**.    Each of Seller and Purchaser hereby agrees that it will keep confidential and will not disclose or use for any purpose any information about the terms of this Agreement and the transactions contemplated hereby and any confidential information obtained from the Company in connection herewith, unless any such information (a) is known or becomes known to the public in general (other than as a result of a breach of this Agreement by the disclosing party), or (b) is or has been made known or disclosed to the disclosing party by a third party without a breach of any confidentiality obligations by such third party; provided, however, that either Seller or Purchaser may disclose such information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services

12

in connection with the transfer and ownership of the Shares (or a portion thereof), provided that such persons agree to maintain the confidentiality of such information in accordance herewith; (ii) to any affiliate (including any of its partners) in the ordinary course of business, provided that such affiliate agrees to maintain the confidentiality of such information in accordance herewith; or (iii) as may be required by law, provided that the disclosing party promptly notifies the other parties hereto in advance of such disclosure and agrees to cooperate to take reasonable steps to minimize the extent of any such required disclosure.

      10.11  **<u>Counterparts; Electronic Signatures</u>.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by electronic signature and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party. The Company hereby executes this Agreement to acknowledge its consent to the transfer and sale of the Shares subject to the terms of this Agreement.

[S<small>IGNATURE</small> P<small>AGE</small> F<small>OLLOWS</small>]

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

COMPANY:

**EUCLID LABS, INC.**


By: _____
Name:  Tan Lu
Title: Chief Executive Officer

      **IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

SELLER:

**TAN LU**

_____

Address: 27/F Flat B2
         The Fortune Gargens, Hong Kong

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

PURCHASER:

**ALAMEDA RESEARCH VENTURES LLC**


By: _Samuel Bankman-Fried_____
Name: Samuel Bankman-Fried
Title: Founder

## SCHEDULE A

### SCHEDULE OF PURCHASERS

| Name and Address of Purchaser | Number of Shares of Common Stock Purchased | Aggregate Purchase Price |
|---|---|---|
| Alameda Research Ventures LLC<br>2000 Center St, 4th Floor<br>Berkeley, CA 94704<br>sam@ftx.com | 452,693 | $5,262,691.93 |

**<u>EXHIBIT A</u>**

**STOCK POWER AND ASSIGNMENT
SEPARATE FROM STOCK CERTIFICATE**

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement dated as of August 2, 2022, (the "***Agreement***"), the undersigned Seller hereby sells, assigns and transfers unto Alameda Research Ventures LLC (the "***Purchaser***"), 452,693 shares of the Common Stock of Euclid Labs, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No. CS-01 delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company.

Dated: August 2, 2022

**Tan Lu**

By: _____

Name: _Tan Lu_____

Title: _____

**EXHIBIT B**

**ADOPTION AGREEMENT**

This Adoption Agreement ("**Adoption Agreement**") is executed on August 2, 2022, by the undersigned (the "**Holder**") pursuant to the terms of that certain Amended and Restated Voting Agreement dated as of June 15, 2022 (the "**Agreement**"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows:

1.1    <u>Acknowledgement</u>. Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "**Stock**"), for one of the following reasons (Check the correct box):

[_]    As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

[_]    As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

[_]    As a new "Investor" in accordance with <u>Section 7.1(a)</u> of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

[X]    In accordance with <u>Section 7.1(b)</u> of the Agreement, as a new party who is not a new "Investor," in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2    <u>Agreement</u>. Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3    <u>Notice</u>. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:**                                ACCEPTED AND AGREED:

**ALAMEDA RESEARCH VENTURES LLC**          **EUCLID LABS, INC.**

By: _Samuel Bankman-Fried_____          By: _____
Name: _Samuel Bankman-Fried____          Name: _____
Title: __Founder_____          Title: _____

<u>**EXHIBIT B**</u>

**ADOPTION AGREEMENT**

This Adoption Agreement ("**Adoption Agreement**") is executed on August 2, 2022, by the undersigned (the "**Holder**") pursuant to the terms of that certain Amended and Restated Voting Agreement dated as of June 15, 2022 (the "**Agreement**"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows:

1.1     <u>Acknowledgement</u>. Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "**Stock**"), for one of the following reasons (Check the correct box):

[ _ ]     As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

[ _ ]     As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

[ _ ]     As a new "Investor" in accordance with <u>Section 7.1(a)</u> of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

[X]     In accordance with <u>Section 7.1(b)</u> of the Agreement, as a new party who is not a new "Investor," in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2     <u>Agreement</u>. Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3     <u>Notice</u>. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:**                                                   ACCEPTED AND AGREED:

**ALAMEDA RESEARCH VENTURES LLC**      **EUCLID LABS, INC.**

By: _____            By: _____
Name: _____            Name: _Tan Lu_____
Title: _____            Title: _Chief Executive Officer____

# EXHIBIT D

## STOCK TRANSFER AGREEMENT

This Stock Transfer Agreement (this "***Agreement***") is made and entered into as of August 2, 2022 (the "***Effective Date***") by and among the party listed on the Schedule of Purchasers attached to this Agreement as <u>Schedule A</u> ("***Purchaser***"), Zhuojie Zhou (the "***Seller***"), and Euclid Labs, Inc., a Delaware corporation (the "***Company***").

## RECITALS

WHEREAS, Seller acquired certain shares of the Company's Common Stock (the "***Purchased Shares***") pursuant to that certain Founder's Restricted Stock Purchase Agreement dated as of January 14, 2022 by and between the Company and Seller (the "***Acquisition Agreement***").

WHEREAS, the Purchased Shares held by Seller is subject to that certain Stockholders Agreement by and between the Company, Seller and certain other stockholders of the Company, dated January 11, 2022 (the "***Stockholders Agreement***"), that certain Amended and Restated First Refusal and Co-Sale Agreement by and between the Company, Seller and certain other stockholders of the Company, dated June 15, 2022 (the "***Co-Sale Agreement***") and that certain Amended and Restated Voting Agreement by and between the Company, Seller and certain other stockholders of the Company, dated June 15, 2022 (the "***Voting Agreement***" together with the Stockholders Agreement and Co-Sale Agreement, the "***Related Agreements***").

WHEREAS, the Company and certain stockholders of the Company have waived any transfer restrictions with respect to the transfer herein and following the transfer, the Shares shall not be subject to any rights of first refusal under the Acquisition Agreement or the Related Agreements, but shall remain subject to the applicable limitations on transfer set forth in the Bylaws of the Company, as may be amended from time to time (the "***Bylaws***").

WHEREAS, on the terms and conditions set forth in this Agreement, Seller desires to sell and transfer to Purchaser, and Purchaser desires to purchase from Seller, a portion of the Purchased Shares, for consideration, as indicated below.

**NOW, THEREFORE**, the parties hereby agree as follows:

1.      **SALE AND PURCHASE OF SHARES.**   On the Effective Date and subject to the terms and conditions of this Agreement, Seller hereby sells and transfers 407,499 of the Purchased Shares (the "***Shares***") to Purchaser at a price per share of $11.6253 (the "***Per Share Price***") and for an aggregate purchase price equal to $4,737,298.13 (the "***Purchase Price***"), in such amounts as set forth on <u>Schedule A</u>.  As used in this Agreement, "Shares" shall include all the Shares transferred under this Agreement and all securities received (a) in replacement of the Shares, (b) as a result of stock dividends or stock splits in respect of the Shares and (c) as substitution for the Shares in a recapitalization, merger, reorganization or the like.

2.      **CLOSING**.

2.1      **Deliveries by Seller.**  Seller hereby delivers to the Company or is causing to be delivered to the Company on Seller's behalf (a) authorization to the Company and Carta to

remove any stock certificates representing the Shares for cancellation and reissuance to Purchaser, (b) a Stock Power and Assignment Separate from Stock Certificate, in substantially the form attached hereto as <u>Exhibit A</u> (a "***Stock Power***") for the transfer of Shares to Purchaser and (c) an executed copy of this Agreement.

**2.2    Deliveries by Purchaser.**  Purchaser hereby delivers to (a) Seller and the Company a duly authorized and executed copy of this Agreement, (b) Seller, the Purchase Price in immediately available funds, pursuant to the wire transfer instructions to an account or accounts as may be designated by Seller, and (c) if Purchaser is not already a party thereto, the Company, an executed adoption agreement to the Voting Agreement in the form attached hereto as <u>Exhibit B</u>.

**2.3    Deliveries of Stock Certificate.**  Seller hereby instructs the Company to: (a) cancel any stock certificates issued to Seller representing the Shares; (b) issue a duly executed stock certificate to Purchaser evidencing the Shares purchased by Purchaser via Carta, and (c) issue a duly executed stock certificate evidencing the number of Purchased Shares remaining, if any, after the transfer contemplated by this Agreement.

**3.    REPRESENTATIONS AND WARRANTIES OF PURCHASER**.  Purchaser represents and warrants to Seller and the Company as follows:

**3.1    Purchase for Own Account for Investment.**  Purchaser is purchasing the Shares for its own account, for investment purposes only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the Securities Act of 1933, as amended (the "***1933 Act***").  Purchaser has no present intention of selling or otherwise disposing of all or any portion of the Shares to be transferred to Purchaser and upon transfer of the Shares to Purchaser no one other than Purchaser will have any beneficial ownership of any of the Shares.  Purchaser was not formed for the specific purpose of acquiring the Shares.

**3.2    Authority**.  Purchaser has full legal right, power and authority to enter into and perform its obligations under this Agreement and to acquire the Shares under this Agreement.  Purchaser has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization as the type of entity that it purports to be and all corporate or other entity actions necessary to authorize the transactions contemplated by this Agreement have been duly taken.  The person(s) executing and delivering this Agreement on behalf of Purchaser are duly authorized to do so.  This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

**3.3    Accredited Investor.**  Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the 1933 Act.

**3.4    Access to Information.**  Purchaser has received all the information Purchaser considers necessary or appropriate for deciding whether to enter into this Agreement.

Purchaser further represents that Purchaser has had an opportunity to ask questions and receive full answers from the Company concerning, among other things, its financial condition, its management, its prior activities and any other information which Purchaser considers relevant or appropriate in connection with entering into this Agreement.

**3.5**   **Understanding of Risks**.   Purchaser is fully aware of (a) the highly speculative nature of the Shares, (b) the financial hazards involved, (c) the lack of liquidity of the Shares and the restrictions on transferability of the Shares, (d) the qualifications and backgrounds of the management of the Company and (e) the tax consequences of acquiring the Shares.

**3.6**   **Purchaser's Qualifications**.   Purchaser is aware of the character, business acumen and general business and financial circumstances of the company.   By reason of Purchaser's business or financial experience, Purchaser is capable of evaluating the merits and risks of this acquisition, has the capacity to protect its own interests in this transaction, and is financially capable of bearing a total loss of the Shares.

**3.7**   **No General Solicitation**.   At no time was Purchaser presented with or solicited by any publicly issued or circulated newspaper, mail, radio, television, Internet or other form of general advertising or solicitation in connection with the Shares.

**3.8**   **Compliance with Securities Laws**.   Purchaser understands and acknowledges that, in reliance upon the representations and warranties made by Purchaser herein, the Shares are not being registered with the Securities and Exchange Commission ("*SEC*") under the 1933 Act or being qualified under the California Corporate Securities Law of 1968, as amended (the "*Law*"), but instead are being transferred under an exemption or exemptions from the registration and qualification requirements of the 1933 Act and the Law or other applicable securities laws which impose certain restrictions on Purchaser's ability to transfer the Shares.

**3.9**   **Securities Law Restrictions on Transfer**.   Purchaser understands that Purchaser may not transfer any Shares unless such Shares are registered under the 1933 Act or qualified under the Law or other applicable securities laws or unless, in the opinion of counsel to the Company, exemptions from such registration and qualification requirements are available. Purchaser understands that only the Company may file a registration statement with the SEC or the California Commissioner of the Department of Business Oversight or other applicable securities commissioners and that the Company is under no obligation to do so with respect to the Shares.   Purchaser has also been advised that exemptions from registration and qualification may not be available or may not permit Purchaser to transfer all or any of the Shares in the amounts or at the times proposed by Purchaser.

**3.10**   **Rule 144**.   Purchaser acknowledges that, because the Shares have not been registered under the 1933 Act, the Shares must be held indefinitely unless subsequently registered under the 1933 Act or unless an exemption from such registration is available. Purchaser is aware of the provisions of Rule 144 promulgated under the 1933 Act.

**3.11**   **Tax Matters**.   Purchaser expressly acknowledges and agrees that other than as expressly stated in this Agreement, neither Seller, the Company, nor any of their

respective agents has made any representation to Purchaser with respect to the tax or other financial treatment of the transactions contemplated by this Agreement.

        **3.12**  <u>**Claims and Legal Proceedings**</u>. There is no claim, action, suit, arbitration, criminal or civil investigation or proceeding pending or involving or, to Purchaser's knowledge, threatened against Purchaser before or by any court or governmental or non-governmental department, commission, board, bureau, agency or instrumentality, or any other person or entity, that questions the validity of this Agreement or any action taken or to be taken by Purchaser pursuant to this Agreement or in connection with the transactions contemplated hereby.

        **3.13**  <u>**No Conflicts**</u>. The execution, delivery and performance of this Agreement by Purchaser, and the consummation of the transactions contemplated hereby, will not (a) constitute a violation (with or without the giving of notice or lapse of time, or both) of any provision of any law or any judgment, decree, order, regulation or rule of any court, agency or other governmental authority applicable to Purchaser, (b) require any consent, approval or authorization of, or declaration, filing or registration with, any person or entity, (c) result in a default (with or without the giving of notice or lapse of time, or both) under, violation, acceleration or termination of, or the creation in any party of the right to accelerate, terminate, modify or cancel, any agreement, lease, note or other restriction, encumbrance, obligation or liability to which Purchaser is a party or by which it is bound or to which any assets of Purchaser are subject, or (d) conflict with Purchaser's organization documents.

        **3.14**  <u>**Sophisticated Purchaser**</u>. Purchaser (a) is a sophisticated entity familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Shares and (c) has independently and without reliance upon Seller or the Company, and based on such information and the advice of such advisors as Purchaser has deemed appropriate, made its own analysis and decision to enter into this Agreement. Purchaser acknowledges that (i) Seller and the Company currently may have, and later may come into possession of, information with respect to the Company that is not known to Purchaser and that may be material to a decision to sell the Shares ("***Purchaser Excluded Information***"), (ii) Purchaser has determined to purchase the Shares notwithstanding its lack of knowledge of Purchaser Excluded Information and (iii) neither Seller nor the Company shall have any liability to Purchaser, and Purchaser waives and releases any claims that it might have against Seller and the Company whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Purchaser Excluded Information, in each case in connection with the sale of the Shares and the transactions contemplated by this Agreement. Purchaser acknowledges and understands that the Shares may decrease in value after the date hereof and that Purchaser may suffer losses in value with respect to the Shares. Purchaser understands that Seller and the Company will rely on the accuracy and truth of the foregoing representations, and Purchaser hereby consents to such reliance.

        **3.15**  <u>**Purchase Price**</u>. The Purchase Price agreed to by Seller and Purchaser is a purchase price negotiated solely between Seller and Purchaser, and does not necessarily reflect the actual fair market value of the Shares, and is considered fair to Purchaser.

4.     **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to the Company and Purchaser as follows:

4.1     **Transfer for Own Account.**  Seller is selling the Shares for Seller's own account only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the 1933 Act.

4.2     **Title to Shares.**  Seller is the sole beneficial and record owner of the Shares and has valid marketable title to the Shares, free and clear of any pledge, lien, security interest, encumbrance, claim or equitable interest or other restrictions other than pursuant to the Acquisition Agreement, the Related Agreements or the Bylaws.  Upon the sale and transfer of the Shares, and payment therefor, in accordance with the provisions of this Agreement, Purchaser will acquire valid marketable title to the Shares being acquired by Purchaser hereunder, free and clear of any pledge, lien, security interest, encumbrance, claim, contractual rights, equitable interests or other restrictions other than pursuant to this Agreement or other documents described in Section 5 below.

4.3     **Authority.**  Seller has full legal right, power and authority to enter into and perform Seller's obligations under this Agreement and to transfer the Shares under this Agreement, and Seller is not obligated to transfer the Shares to any other person or entity.  The person(s) executing and delivering this Agreement on behalf of Seller are duly authorized to do so.  This Agreement has been duly and validly authorized, executed and delivered by, and constitutes the valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

4.4     **No General Solicitation.**  At no time has Seller presented Purchaser or any other party with or solicited Purchaser or any other party through any publicly issued or circulated newspaper, mail, radio, television, Internet or other form of general advertisement or solicitation in connection with the Shares.

4.5     **No Broker-Dealer.**  Seller has not effected this transfer of Shares by or through a broker-dealer in any public offering.

4.6     **Consents.**  All consents, approvals, authorizations and orders required for the execution and delivery of this Agreement and the transfer of the Shares under this Agreement have been obtained and are in full force and effect, including any consents or waivers from the Company or its stockholders required under the Related Agreements, the Acquisition Agreement and the Bylaws.  Other than the Acquisition Agreement, the Related Agreements, the Bylaws, and the United States and any non-United States securities law restrictions on transfer, there are no restrictions on Seller's ability to transfer the Shares, nor will there be any additional restrictions by which Purchaser or the Shares will be obligated or by which Purchaser will be bound immediately following the Effective Date.

**4.7    Sophisticated Seller.**    Seller (a) is a sophisticated individual or entity familiar with transactions similar to those contemplated by this Agreement, (b) has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Shares and (c) has independently and without reliance upon Purchaser or the Company, and based on such information and the advice of such advisors as Seller has deemed appropriate, made Seller's own analysis and decision to enter into this Agreement.  Seller acknowledges that neither Purchaser nor any affiliate thereof is acting as a fiduciary or financial or investment advisor to Seller, and has not given Seller any investment advice, opinion or other information on whether the sale of the Shares is prudent.  Seller acknowledges that (i) Purchaser and the Company currently may have, and later may come into possession of, information with respect to the Company that is not known to Seller and that may be material to a decision to sell the Shares ("***Seller Excluded Information***"), (ii) Seller has determined to sell the Shares notwithstanding Seller's lack of knowledge of Seller Excluded Information, and (iii) neither Purchaser nor the Company shall have any liability to Seller, and Seller waives and releases any claims that it might have against Purchaser and the Company whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information or otherwise, in each case in connection with the sale of the Shares and the transactions contemplated by this Agreement.  Seller acknowledges and understands that the Shares may increase in value after the date hereof and that Seller shall not realize the upside potential with respect to the Shares.  Seller understands that Purchaser and the Company will rely on the accuracy and truth of the foregoing representations, and Seller hereby consents to such reliance.

**4.8    Access to Information.**    Seller has received all the information Seller's considers necessary or appropriate for deciding whether to enter into this Agreement.  Seller further represents that Seller has had an opportunity to ask questions and receive full answers from the Company concerning, among other things, its financial condition, its management, its prior activities and any other information which Seller considers relevant or appropriate in connection with entering into this Agreement.

**4.9    Tax Matters.**    Seller expressly acknowledges and agrees that neither Purchaser nor the Company, nor any of their respective agents has made any representation to Seller with respect to the tax or other financial treatment of the transactions contemplated by this Agreement.  Seller shall be solely responsible for the payment of any and all income, transfer, and other taxes, filing and recording fees and similar charges relating to the transactions contemplated herein. Seller further agrees to indemnify and hold the Company, each Purchaser and their respective agents harmless from any taxes, claims, demands, deficiencies, penalties, interest, assessments, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of (i) Seller's failure to pay or delayed payment of any taxes due in connection with transactions contemplated by this Agreement, (ii) any income, withholding or other taxes or related obligations incurred with respect to payments made to Seller pursuant to this Agreement and or (iii) any and all loss, claim, liability, obligation, demand, action, cause of action, cost, damage, deficiency, tax, penalty, fine or expense.

**4.10    Claims and Legal Proceedings.**    There is no claim, action, suit, arbitration, criminal or civil investigation or proceeding pending or involving or, to Seller's knowledge, threatened against Seller before or by any court or governmental or non-governmental

department, commission, board, bureau, agency or instrumentality, or any other person or entity, that questions the validity of this Agreement or any action taken or to be taken by Seller pursuant to this Agreement or in connection with the transactions contemplated hereby.

      **4.11**   **No Conflicts.**  The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, will not (a) constitute a violation (with or without the giving of notice or lapse of time, or both) of any provision of any law or any judgment, decree, order, regulation or rule of any court, agency or other governmental authority applicable to Seller, (b) other than any consent or waiver required under the Related Agreements, the Acquisition Agreement, and the Bylaws (which consent or waiver will be obtained prior to the Effective Time), require any consent, approval or authorization of, or declaration, filing or registration with, any person or entity, (c) result in a default (with or without the giving of notice or lapse of time, or both) under, violation, acceleration or termination of, or the creation in any party of the right to accelerate, terminate, modify or cancel, any agreement, lease, note or other restriction, encumbrance, obligation or liability to which Seller is a party or by which Seller's is bound or to which any assets of Seller are subject, (d) to the extent that Seller is an entity, conflict with Seller's organization documents, or (e) result in the creation of any lien or encumbrance upon the assets of such Seller or upon any such Shares. If Seller is not a United States person (as defined by applicable tax law and regulation), Seller represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with the sale of the Shares under this Agreement, including (i) the legal requirements within its jurisdiction for the sale of the Shares, (ii) any governmental or other consents that may need to be obtained, and (iii) the income tax and other tax consequences, if any, that may be relevant to the sale or transfer of the Shares.

      **4.12**   **Purchase Price**.  The Purchase Price agreed to by Seller and Purchaser is a purchase price negotiated solely between Seller and Purchaser, and does not necessarily reflect the actual fair market value of the Shares, and is considered fair to Seller.

    **5.**   **RIGHTS AND OBLIGATIONS UNDER VOTING AGREEMENT; COMPLIANCE WITH BYLAWS TRANSFER RESTRICTIONS; MARKET STAND-OFF AGREEMENT.**

      **5.1**   **Rights and Obligations under Voting Agreement**.  Purchaser expressly agrees that the Shares shall be subject to the Voting Agreement, including Section 3 (Drag Along Right) thereunder. Purchaser agrees to execute a copy of the Voting Agreement. Purchaser acknowledges that Purchaser has received a copy of, and has read and understood, the Voting Agreement.

      **5.2**   **Restrictions in Bylaws**. Purchaser agrees to be bound by and comply with any applicable limitations on transfer contained in the Bylaws. Purchaser hereby acknowledges that Purchaser has received a copy of, and has read and understood, the Bylaws.

      **5.3**   **Market Stand-Off Agreement**. Purchaser hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Company's first firm commitment underwritten public offering of the Company's Common Stock ("**Common Stock**") or other equity securities

to the public under Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "***Initial Offering***") and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock held immediately before the effective date of the registration statement for the Initial Offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise.  The foregoing provisions of this Section 5.3 shall apply only to the Initial Offering, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement or the sale of any shares that are acquired by any stockholder in the Initial Offering or in the open market following the Initial Offering. The underwriters in connection with the Initial Offering are intended third-party beneficiaries of this Section 5.3 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Purchaser agrees to execute such agreements as may be reasonably requested by the underwriters in the Initial Offering that are consistent with this Section 5.3 or that are necessary to give further effect thereto.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Shares until the end of such period.

6.     **COMPLIANCE WITH LAWS AND REGULATIONS.**  The transfer of the Shares will be subject to and conditioned upon compliance by the Company and Purchaser with all applicable state and federal laws and regulations and with all applicable requirements of any stock exchange or automated quotation system on which the Company's Common Stock may be listed or quoted at the time of such issuance or transfer.

7.     **NO RELIANCE.**  Each of Seller and Purchaser acknowledges and agrees that neither the Company, nor any of its stockholders, officers, directors, employees, or agents (other than Seller and Purchaser acting in their capacity as such) have (a) acted as an agent, finder or broker for Seller or Purchaser or their respective agents with respect to the offer, purchase and/or sale of the Shares, (b) made any representations or warranties of any kind, express or implied, to Seller or Purchaser or their respective agents in connection with the offer, purchase and/or sale of the Shares, including regarding the tax treatment or benefit of the transfer described herein or (c) have at any time had any duty to Seller or Purchaser or their respective agents to disclose any information relating to the Company, its business, or financial condition or relating to any other matters in connection with the offer, purchase and/or sale of the Shares. In making its decision to transfer the Shares, Seller is relying solely on Seller's own knowledge and experience (and that of its professional advisors) and the representations and warranties of Purchaser (and not on any information provided by the Company or its agents).  In making its decision to acquire the Shares, Purchaser is relying solely on its own knowledge and experience (and that of its professional advisors) and the representations and warranties of Seller (and not on any information provided by the Company or its agents).

8.     **RESTRICTIVE LEGENDS AND STOP-TRANSFER ORDERS**.

**8.1**     **Legends.** Purchaser understands and agrees that the Company will place the legends set forth below or similar legends on any stock certificate(s) evidencing the Shares, together with any other legends that may be required by state or federal securities laws, the Company's Amended and Restated Certificate of Incorporation, as may be amended from time to time or any other agreement affecting the Shares between Seller and the Company, including but not limited to the Voting Agreement, or between Seller and any third party, or any other agreement applicable to Purchaser:

THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REPRESENTED HEREBY MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK UP PERIOD OF UP TO 180-DAYS FOLLOWING THE EFFECTIVE DATE OF CERTAIN REGISTRATION STATEMENTS OF THE COMPANY FILED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH LOCK UP PERIOD IS BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED HEREBY ARE SUBJECT TO A VOTING AGREEMENT, AS MAY BE AMENDED FROM TIME TO TIME (A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST FROM THE COMPANY), AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF THAT VOTING AGREEMENT, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND OWNERSHIP SET FORTH THEREIN.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER AS PROVIDED IN THE BYLAWS OF THE CORPORATION.

**8.2**     **Stop-Transfer Instructions.** Purchaser agrees that, in order to ensure compliance with the restrictions imposed by this Agreement, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company transfers

its own securities, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (b) to treat as owner of such Shares, or to accord the right to vote or pay dividends, to any purchaser or other purchaser to whom such Shares have been so transferred. Purchaser further understands and agrees that the Company may require written assurances, in form and substance satisfactory to counsel for the Company (which may include a requirement that Purchaser's counsel provide a legal opinion acceptable to the Company), before the Company effects any future transfers of the Shares.

## 9. **WAIVER AND RELEASE.**

**9.1    Acknowledgement and Release of Claims.** In consideration of the Company facilitating the transfer of the Shares hereunder and the payment of the Purchase Price, the sufficiency of which are hereby acknowledged, to the fullest extent permitted by law, Seller ("*Releasor*"), for itself and on behalf of each of its affiliates, and its and their representatives, agents, estates, heirs, successors and assigns, hereby irrevocably, unconditionally and fully and forever acquits, releases, waives and discharges, and further covenants and each agrees that it will not assert any claims, other than claims resulting from willful misconduct of any Released Party (as defined below), against the Company and Purchaser and any of their respective officers, directors, employees, agents, attorneys, divisions, affiliated corporations, affiliated non-corporation entities, representatives, successors, predecessors and assigns (individually and collectively, the "*Released Parties*") from any and all past, present and future debts, losses, costs, bonds, suits, actions, causes of action, liabilities, contributions, attorneys' fees, interest, damages, punitive damages, expenses, claims, potential claims, counterclaims, crossclaims, or demands, in law or in equity, asserted or unasserted, express or implied, known or unknown, matured or unmatured, contingent or vested, liquidated or unliquidated, of any kind or nature or description whatsoever, that the Releasor had, presently has or may hereafter have or claim or assert to have against any of the Released Parties by reason of any act, omission, transaction, occurrence, conduct, circumstance, condition, harm, matter, cause or thing that has occurred or existed at any time from the beginning of time up to and including the date hereof, in each case, that arise solely from or out of the transfer of the Shares hereunder (the "*Released Matters*").

**9.2    Waiver of Unknown Future Claims**. The releases contained herein are intended to be complete, global and all-encompassing and specifically includes claims that are known, unknown, fixed, contingent or conditional with respect to the Released Matters. Releasor hereby expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it must have materially affected its settlement with a Released Party, including, without limitation, the following provisions of California Civil Code Section 1542:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF

KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

**10.**     **GENERAL PROVISIONS**.

    **10.1**   **Successors and Assigns; Assignment.**  Except as otherwise provided in this Agreement, this Agreement and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this Agreement.  No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

    **10.2**   **Governing Law.**  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to that body of laws pertaining to conflict of laws.

    **10.3**   **Dispute Resolution**.  The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the Northern District of California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the Northern District of California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

    **10.4**   **Notices.**  Any and all notices required or permitted to be given to a party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed to provide such party sufficient notice under this Agreement on the earliest of the following:  (a) at the time of personal delivery, if delivery is in person; (b) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States; or (c) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries.  All notices for delivery outside the United States will be sent by express courier.  All notices not delivered personally will be sent with postage and/or other charges prepaid and properly addressed to the party to be notified at the address set forth below the signature lines of this Agreement or at such other address as such other party may designate by one of the indicated means of notice herein to the other party hereto.  A "***business day***" shall be a day, other than Saturday or Sunday, when the banks in the city of San Francisco are open for business.

10.5   **Further Assurances**.   The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

10.6   **Titles and Headings.**   The titles, captions and headings of this Agreement are included for ease of reference only and will be disregarded in interpreting or construing this Agreement.   Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

10.7   **Entire Agreement**.   This Agreement and the documents referred to herein, including but not limited to the Voting Agreement, constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.   This Agreement shall not be effective until signed by all parties hereto, including the Company.

10.8   **Severability.**   If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto.   If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.   Notwithstanding the forgoing, if the value of this Agreement based upon the substantial benefit of the bargain for any party is materially impaired, which determination as made by the presiding court or arbitrator of competent jurisdiction shall be binding, then both parties agree to substitute such provision(s) through good faith negotiations.

10.9   **Amendment and Waivers.**   This Agreement may be amended only by a written agreement executed by each of the parties hereto.   No amendment of or waiver of, or modification of any obligation under this Agreement will be enforceable unless set forth in a writing signed by the party against which enforcement is sought.   Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns.   No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.   No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

10.10  **Confidentiality**.   Each of Seller and Purchaser hereby agrees that it will keep confidential and will not disclose or use for any purpose any information about the terms of this Agreement and the transactions contemplated hereby and any confidential information obtained from the Company in connection herewith, unless any such information (a) is known or becomes known to the public in general (other than as a result of a breach of this Agreement by the disclosing party), or (b) is or has been made known or disclosed to the disclosing party by a third party without a breach of any confidentiality obligations by such third party; provided, however, that either Seller or Purchaser may disclose such information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services

in connection with the transfer and ownership of the Shares (or a portion thereof), provided that such persons agree to maintain the confidentiality of such information in accordance herewith; (ii) to any affiliate (including any of its partners) in the ordinary course of business, provided that such affiliate agrees to maintain the confidentiality of such information in accordance herewith; or (iii) as may be required by law, provided that the disclosing party promptly notifies the other parties hereto in advance of such disclosure and agrees to cooperate to take reasonable steps to minimize the extent of any such required disclosure.

      **10.11** **Counterparts; Electronic Signatures.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  This Agreement may be executed and delivered by electronic signature and upon such delivery the facsimile signature will be deemed to have the same effect as if the original signature had been delivered to the other party.  The Company hereby executes this Agreement to acknowledge its consent to the transfer and sale of the Shares subject to the terms of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

13

     **IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

COMPANY:

**EUCLID LABS, INC.**


By: _____
Name: Tan Lu
Title: Chief Executive Officer

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Sellers and Purchaser have each executed this Agreement, as of the Effective Date.

SELLER:

**ZHUOJIE ZHOU**

*Zhuojie Zhou*
_____

Address: 460 Diller Street
          Alameda, CA 94501

**IN WITNESS WHEREOF**, the Company has caused this Stock Transfer Agreement to be executed by its duly authorized representative and Seller and Purchaser have each executed this Agreement, as of the Effective Date.

PURCHASER:

**ALAMEDA RESEARCH VENTURES LLC**

By: _Samuel Bankman-Fried_ _____
Name: Samuel Bankman-Fried
Title: Founder

## SCHEDULE A

### SCHEDULE OF PURCHASERS

| Name and Address of Purchaser | Number of Shares of Common Stock Purchased | Aggregate Purchase Price |
|---|---|---|
| Alameda Research Ventures LLC<br>2000 Center St, 4th Floor<br>Berkeley, CA 94704<br>sam@ftx.com | 407,499 | $4,737,298.13 |

**<u>EXHIBIT A</u>**

**STOCK POWER AND ASSIGNMENT
SEPARATE FROM STOCK CERTIFICATE**

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement dated as of August 2, 2022, (the "***Agreement***"), the undersigned Seller hereby sells, assigns and transfers unto Alameda Research Ventures LLC (the "***Purchaser***"), 407,499 shares of the Common Stock of Euclid Labs, Inc., a Delaware corporation (the "***Company***"), standing in the undersigned's name on the books of the Company represented by Certificate No. CS-04 delivered herewith, and does hereby irrevocably constitute and appoint the Secretary of the Company as the undersigned's attorney-in-fact, with full power of substitution, to transfer said stock on the books of the Company.

Dated: August 2, 2022

**Zhuojie Zhou**

By: _____

Name: __Zhuojie Zhou_____

Title: _____

<u>**EXHIBIT B**</u>

**ADOPTION AGREEMENT**

This Adoption Agreement ("**Adoption Agreement**") is executed on August 2, 2022, by the undersigned (the "**Holder**") pursuant to the terms of that certain Amended and Restated Voting Agreement dated as of June 15, 2022 (the "**Agreement**"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows:

1.1     <u>Acknowledgement</u>. Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "**Stock**"), for one of the following reasons (Check the correct box):

[_]     As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

[_]     As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

[_]     As a new "Investor" in accordance with <u>Section 7.1(a)</u> of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

[X]     In accordance with <u>Section 7.1(b)</u> of the Agreement, as a new party who is not a new "Investor," in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2     <u>Agreement</u>. Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3     <u>Notice</u>. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:**                                          ACCEPTED AND AGREED:

**ALAMEDA RESEARCH VENTURES LLC**      **EUCLID LABS, INC.**

By: _Samuel Bankman-Fried_____            By: _____
Name: _Samuel Bankman-Fried___            Name: _____
Title: __Founder_____                Title: _____

## EXHIBIT B

## ADOPTION AGREEMENT

This Adoption Agreement ("**Adoption Agreement**") is executed on August 2, 2022, by the undersigned (the "**Holder**") pursuant to the terms of that certain Amended and Restated Voting Agreement dated as of June 15, 2022 (the "**Agreement**"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows:

1.1     Acknowledgement. Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "**Stock**"), for one of the following reasons (Check the correct box):

[__]     As a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

[__]     As a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

[__]     As a new "Investor" in accordance with Section 7.1(a) of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

[X]     In accordance with Section 7.1(b) of the Agreement, as a new party who is not a new "Investor," in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2     Agreement. Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3     Notice. Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

**HOLDER:**                                                ACCEPTED AND AGREED:

**ALAMEDA RESEARCH VENTURES LLC**          **EUCLID LABS, INC.**

By: _____               By: _____
Name: _____                Name:  Tan Lu_____
Title: _____              Title:  Chief Executive Officer_____

EXHIBIT E

# EUCLID LABS, INC.

August 2, 2022

Alameda Research Ventures LLC
2000 Center St, 4th Floor
Berkeley, CA 94704

**Re: Side Letter Agreement (Tokens)**

To Whom It May Concern:

Reference is made to (i) that certain Stock Transfer Agreement dated on or about the same date hereof by and among Euclid Labs, Inc., a Delaware corporation (the "**Company**"), Alameda Research Ventures LLC ("**Investor**"), and Tan Lu (the "**Tan Transfer Agreement**"); and (ii) that certain Stock Transfer Agreement dated on or about the same date hereof by and among the Company, Investor and Zhuojie Zhuo (the "**Zhuojie Transfer Agreement**", and together with the Tan Transfer Agreement, each a "**Transfer Agreement**", and together the "**Transfer Agreements**").

## RECITALS

**WHEREAS**, Investor is purchasing shares of Common Stock of the Company from the Sellers pursuant to the Transfer Agreements (the "**Shares**"), and in connection with such purchase the Company desires to grant Investor certain contractual rights.

**NOW, THEREFORE**, the parties hereto hereby agree that this side letter agreement (the "**Agreement**") confirms their agreement that pursuant to and effective as of Investor's purchase of the Shares pursuant to the Transfer Agreements, the undersigned Investor shall be entitled to the following contractual rights.

1.  <u>Defined Terms Used in this Agreement</u>.

    1.1    In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

    (a)    "**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or under common control with such Person. As used in this definition, "control", "controlled by" and "under common control with" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

    (b)    "**Applicable Percentage**" shall mean, with respect to Investor, the percentage, calculated as of the date on which any Tokens or Future Token Interests are allocated, whether by contract, in the genesis block, or any other means of Token allocation (without duplication and to the extent applicable as of the date of determination), equal to the proportion that (x) the aggregate number of shares of Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Shares and/or other Derivative Securities then-held by Investor or its Affiliates bears to (y) the total number of shares of Common Stock of the Company then-outstanding (assuming full conversion and/or exercise, as applicable, of all Preferred Stock and other Derivative Securities then-outstanding, and including for such purpose, any shares of Common Stock reserved for issuance under the Company's 2021 Stock Option Plan duly adopted by the Board of Directors of the Company and approved by the Company stockholders).

    (c)    "**Autonomously Generated Network Tokens**" means Tokens that may be

created and issued or are reserved for issuance following a Token Launch Event pursuant to staking, rewards, inflationary or dilutive controls on a Company Platform; <u>provided</u> that the creation and issuance of any such Tokens shall dilute all Tokens equally and any approval process for the creation and issuance of any such Tokens shall (i) be issued in accordance with the governance protocol or consensus algorithm of the Company Platform, (ii) not be effected (including by any votes) by the Company, its Affiliates, or any Token Issuer, prior to the thirty (30) days following the expiration of any applicable lockup provisions (iii) not be at the sole discretion of the Company, its Token Affiliates or the Founders, and (iv) Investor are allowed to participate in any such staking or rewards process on the same basis as other participants

(d)    "**Business Day**" means a weekday on which banks are open for general banking business in San Francisco, California.

(e)    "**Common Stock**" means the Company's Common Stock, $0.00001 par value per share.

(f)    "**Company Allocation**" means, with respect to any Token, (i) the number of such Tokens allocated to or reserved for the Company, any of the Company's Founders, officers, directors, employees, consultants, advisors, shareholders (including holders of Derivative Securities), or each of their respective Affiliates (collectively, the "**Insiders**") and (ii) any Tokens that are issued to such Insiders pursuant to any Inflationary Event created at the direction of the Company, its Affiliates or the Founders, or the Token Issuer and its Affiliates.

(g)    "**Company Platform**" means any blockchain-based network protocol or application operated, developed or managed by, or based upon, or incorporating material portions of any intellectual property developed, owned or licensed by, a Token Issuer.

(h)    "**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly), Common Stock, including options and warrants.

(i)    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(j)    "**Excluded Token**" means (a) an Autonomously Generated Network Token, (b) any Token issued or created by the Company solely for testing and/or experimental purposes and which is not expected to accrue any value, and (c) any Token that represents unique or limited edition intellectual property assets or artwork, including non-fungible cryptographic tokens, collectibles, avatars, wares, or other similar objects or items, developed in the ordinary course of business, useable or accessible in or through any blockchain-based game or application deployed by a Token Issuer, the Company, or their respective Affiliates, or deployed on the Company Platform, or that may be used, created, generated, or licensed by third-party companies or end user consumers in or through any such game or application, and (d) any Token that is issued or distributed to third parties (excluding Insiders) for no or nominal consideration as part of a promotional or marketing effort that is not (i) expected to accrue any material value and (ii) designed for primary use on the Company Platform in the ordinary course of business; *provided that* no such disposition shall be to any Insider unless Investor have the opportunity to participate in any such disposition on the same basis as other participants or the terms of this letter apply with respect such disposition as if such Token were not an Excluded Token (it being understood that the acquisition of Tokens (including non-fungible tokens) that are available to the public generally by Insiders on the same basis as is applicable to members of the public generally (e.g. the purchase of non-fungible tokens on a Company or third party platform) shall not be considered a disposition of such Tokens to Insiders for this purpose and such Tokens shall constitute Excluded Tokens for purposes hereof).

(k)    "**Founder**" means, as the case may be, Tan Lu, Sida Zhang, Zhuoxun Yin, and Zhuojie Zhou.

(l)    "**Future Token Interests**" means any instrument that grants a right to receive

future Tokens (such as a warrant, SAFT, Future Token Interest Subscription Agreement or other pre-sale instrument).

(m)     "**Governmental Authority**" means any (i) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (ii) federal, state, local, municipal, foreign or other government; or (iii) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

(n)     "**Inflationary Event**" means with respect to any class or series of Tokens, any of the same class or series of Tokens created, issued and/or distributed by any Token Issuer in addition to the Total Token Pool, to be created as part of or after the Token Generation Event, but excluding any Autonomously Generated Network Tokens.

(o)     "**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act.

(p)     "**Law**" means any federal, state, provincial, local, municipal, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

(q)     "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(r)     "**Preferred Stock**" means the Company's preferred stock, whether currently authorized and issued as of the date hereof or yet to be authorized and issued.

(s)     "**Sellers**" means, collectively, Tan Lu and Zhuojie Zhou.

(t)     "**Token**" means any cryptocurrency, decentralized application tokens, protocol tokens, blockchain-based assets, cryptoassets, cryptofinance tokens, fungible tokens, coins or similar blockchain-based, crypto, or digital assets generated by a Token Issuer and utilized on any Company Platform, whether or not currently authorized, in each case, other than an Excluded Token.

(u)     "**Token Affiliate**" means (i) any Affiliate of the Company, (ii) any subsidiary or parent entity of the Company, or (iii) any other Person (including any foundation responsible for issuing any Token) that (a) receives a license or assignment of any material intellectual property from the Company (including, without limitation, any trademarks owned by the Company) and uses such intellectual property to effect a sale or other issuance of Future Token Rights or Tokens (as such term is defined below); (b) uses intellectual property that the Company has released under any free software or open source license to effect a sale or other issuance of Future Token Rights or Tokens, and any Insider is rendering (or has rendered) material services to such Person or (if an entity), any Insider owns a direct or indirect interest in such Person of at least 2%; or (c) is designated or otherwise granted rights by the Company or an Affiliate to the Company to administrate, manage or operate (in lieu of the Company or such Affiliate) any Company Platform. For the avoidance of doubt, if the issuance of Tokens is completed by an anonymous or unidentified person or is agreed upon by a decentralized group of validators, the Token Affiliate shall be deemed to be the person described in the immediately preceding sentence that has either (a) nominated the genesis block of the blockchain protocol, or (b) been the primary developer of the differentiated intellectual property that is utilized by or in connection with the Network. Further, any foundation or non-profit organization unaffiliated with the Company will be deemed a Token Affiliate to the extent it allocates a material portion of the Total Token Pool to any insider, as reasonably determined by the Company's Board of Directors.

(v)    "**Token Issuer**" means (i) the Company or any Token Affiliate, or (ii) a third-party entity that is a contractual counterparty of the Company or any Affiliate thereof (including a licenseeof any free or open-source software released by such Persons), that is issuing, or has issued, any Tokens. For theavoidance of doubt, if the issuance of Tokens is completed by an anonymous or unidentified person or the genesisblock of the Tokens is agreed upon by a decentralized group of validators, the Token Issuer shall be deemed to bethe person described in the immediately preceding sentence that has either (y) nominated, created or generated the genesis block of theblockchain protocol, or (z) developed a material portion of the intellectual property that is utilized by or in connection with the Tokens. Further, any foundation unaffiliated with the Company will be deemed a Token Issuer to the extent it allocates a material portion of its Total Token Pool to the Insiders as a result of such Insider's relationship with the Company or any Token Affiliate.

(w)    "**Total Token Pool**" means, with respect to any Company Platform, the total number of Tokens of any class or series to be issued on such Company Platform.

1.2    <u>Future Token Interests</u>.

(a)    <u>Initial Token Grants</u>.  Subject to applicable Law, in the event a Token Issuer sells, issues, creates, distributes or contributes to the development of any Tokens or Future Token Interests (the first to occur of such event, the "**Token Generation Event**"), Investor shall be entitled to simultaneously receive for no consideration or nominal consideration (provided, with respect to the "Magic Eden" fungible token or the replacement thereto or successor thereof, the consideration shall equal the lower of (a) fair market value thereof and (b) the consideration paid by any Insider not receiving Tokens or Future Token Interests in connection with providing services), a number of such Tokens or Future Token Interests, as applicable, equal to their respective Applicable Percentage of the Company Allocation. For the avoidance of doubt, if Investor purchases or is given the opportunity to purchase a Future Token Interest pursuant to this Section 1.2(a), the rights set forth in this Section 1.2(a) shall not apply to any Token delivered in fulfilment of such Future Token Interest.

(b)    <u>Commercially Reasonable Efforts</u>. If the Token Issuer is a third party entity, the Company will use its commercially reasonable efforts to ensure that that such third party Token Issuer reserves the maximum number of Tokens issuable under this Section 1.2.

(c)    <u>Release of Lock-up Schedules</u>. All Future Token Interests shall be non-transferable and all Tokens shall be subject to lockup restrictions designed to ensure compliance with applicable Laws, as determined by the Company in good faith and in consultation with outside legal counsel; provided, however, (i) that such restrictions shall in all cases be no more onerous than the restrictions applicable to Tokens held by the Insiders (including any entity in which any of the foregoing have an equity interest, including the Company); (ii) that any such lockup restrictions shall not prohibit any token holder from participating in the Company Platform's governance or staking mechanism (solely to the extent as such staking does not result in a deemed "offer to sell" or "sale" of such Tokens); (iii) that any restrictive provisions shall provide that any discretionary waiver or termination of the restrictions applicable to Future Token Interests or the Tokens that are provided to the Insiders (including any entity in which any of the foregoing have an equity interest, including the Company) shall also apply to Investor, pro rata, based on the number of Tokens held by Investor;  (iv) that no transfer of Tokens held by Investor shall be subject a right of first refusal by any Insider; and (v) that such restrictions shall not apply to transfers to Affiliates.

(d)    <u>Token Issuer Obligations</u>. Investor acknowledges that the creation and issuance of any Future Token Interests and Tokens may be contingent upon issuances and other actions by a third-party entity that the Company may contract with, and the Company cannot guarantee that it will enter into any contract with such third-party entity, that it will control that entity, or that it will be able to compel such third party entity to comply with the terms of this Agreement or any agreement with such entity, <u>provided</u>, <u>however</u>, that the Company shall not in participate in nor purchase any Tokens in an applicable network launch or Tokenn Generation Event without including provisions ensuring the fulfillment of the terms and conditions of this Agreement for the benefit of Investor and, subject to applicable Law, ensuring that the Token Issuer complies with the provisions of Section 1.2.

(e)    <u>Further Assurances</u>. Without limiting subsection (c) of this Section 1.2 above, the Company, the Founders and Investor shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested to carry out the provisions of this Agreement and give effect to the transactions contemplated by this Agreement, including, without limitation, to enable the delivery of the Tokens to a custodial wallet and comply with applicable Laws and, subject to subsection (e) of this Section 1.2 below, any other customary documents that other unaffiliated third parties who are otherwise acquiring Future Token Interests or Tokens from the market shall be required to execute and deliver.

(f)    <u>No Liability</u>.

(i)    The Company shall have no obligation to launch a Company Platform, to serve as or seek to work with a third-party Token Issuer or to create or facilitate the creation of any Future Token Interests, or Tokens. The Company makes no warranty of any nature regarding the value or the timing of the creation of any Future Token Interests, or Tokens. The Company does not warrant that there will be any Future Token Interests, or Tokens. THE FUTURE TOKEN INTERESTS, AND THE TOKENS PROVIDED, IF ANY, ARE FURNISHED AS IS, WHERE IS, WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR ANY PARTICULAR PURPOSE.

(ii)    Investor understand and expressly accept that the Future Token Interests and the Tokens, if any, will involve risks, all of which Investor will fully and completely assume as a condition to receipt of such Future Token Interests and Tokens, including, but not limited to, the risk that (A) the technology associated with any Company Platform will not function as intended; (B) any Company Platform may not be completed; (C) any Company Platform will fail to attract sufficient interest from key stakeholders; and (D) the Company may be subject to investigation and punitive actions from Governmental Authorities.

(iii)    Investor represents, warrants and acknowledges, as appropriate, as follows: Investor (A) is a sophisticated individual or entity familiar with transactions similar to those contemplated by this Agreement; (B) has been advised that any Future Token Interests and Tokens may be considered a security and that the offers and sales of the Future Token Interests and/or Tokens may not been registered under any country's securities laws; and (C) except for the information to be provided by the Company to Investor as specifically provided for in this Agreement, will not rely on the Company or any Token Issuer for any information regarding the Company, the Token Issuer, Tokens, or the value, if any, of the Tokens.

2.    <u>Miscellaneous</u>.

2.1    <u>Valuation</u>. Following the execution of this Agreement, the Company shall engage an independent valuation service provider to provide a valuation report determining the fair market value of the fungible Token that the Company intends to purchase and integrate for use in connection with the Company's non-fungible token marketplace known as the "Magic Eden" Platform, and provide notice to Investor at least five (5) days' prior to engaging the independent valuation service provider to conduct such valuation.

2.2    <u>Termination</u>. The covenants set forth in <u>Section 1.2</u> shall terminate and be of no further force or effect (a) immediately before the consummation of the IPO, (b) upon a Deemed Liquidation Event, as such term is defined in the Company's Amended and Restated Certificate of Incorporation, as may be further amended and/or restated from time to time, or (c) upon mutual agreement of (i) the Company and the holders of a majority of the shares of Preferred Stock of the Company, including Paradigm Fund L.P. and Electric Capital Venture Fund II, LP (the "**Requisite Holders**").

2.3    <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except

as expressly provided in this Agreement. Except as expressly set forth herein, neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise by Investor without the prior written consent of the Company, and any such assignment without such prior written consent shall be null and void, except that, upon written notice delivered to the Company, Investor may assign his, her or its rights under this Agreement without the prior consent of the Company to an Affiliate of Investor in connection with a transfer of Shares to such Affiliate.

2.4     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws.

2.5     Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

2.6     Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

2.7     Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next Business Day, (c) five (5) Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next Business Day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this Section 2.7.

2.8     Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of (a) the Company and (b) the Requisite Holders. Any amendment or waiver effected in accordance with this Section 2.8 shall be binding upon Investor and each transferee of the Shares (or Preferred Stock, other securities or other assets issued or issuable upon conversion or exchange thereof), each future holder of all such securities, and the Company.

2.9     Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

2.10    Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

2.11    Entire Agreement. This Agreement, together with the Transfer Agreements and the other documents referred to in the Transfer Agreements, constitutes the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to

the subject matter hereof existing between the parties is expressly canceled.

2.12    <u>Dispute Resolution</u>.  The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the federal or state courts located in the State of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the federal or state courts located in the State of Delaware, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that a party is not subject to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution based upon judgment or order of such court(s), that any suit, action or proceeding arising out of or based upon this Agreement commenced in the federal or state courts located in the State of Delaware is brought in an inconvenient forum, that the venue of such suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.  Should any party commence a suit, action or other proceeding arising out of or based upon this Agreement in a forum other than the federal or state courts located in the State of Delaware, or should any party otherwise seek to transfer or dismiss such suit, action or proceeding from such court(s), that party shall indemnify and reimburse the other party for all legal costs and expenses incurred in enforcing this provision.

[*Signature Pages Follow*]

5

IN WITNESS WHEREOF, the parties have executed this Side Letter Agreement as of the date firstwritten above.

COMPANY:

**EUCLID LABS, INC.**

By:_____
Name: Tan Lu

Title: Chief Executive Officer
Address:
Email:

**FOUNDERS:**

_____
Tan Lu


_____
Sida Zhang


_____
Zhuoxun Yin


_____
Zhuojie Zhou

IN WITNESS WHEREOF, the parties have executed this Side Letter Agreement as of the date firstwritten above.

**COMPANY:**

**EUCLID LABS, INC.**

By:_____
Name: Tan Lu

Title: Chief Executive Officer
Address:
Email:

**FOUNDERS:**

_____
Tan Lu

_____
Sida Zhang

_____
Zhuoxun Yin

_____
Zhuojie Zhou

IN WITNESS WHEREOF, the parties have executed this Side Letter Agreement as of the date firstwritten above.

**COMPANY:**

**EUCLID LABS, INC.**

By:_____
Name: Tan Lu

Title: Chief Executive Officer
Address:
Email:

**FOUNDERS:**

_____
Tan Lu

_____
Sida Zhang

_____
Zhuoxun Yin

_____
Zhuojie Zhou

IN WITNESS WHEREOF, the parties have executed this Side Letter Agreement as of the date firstwritten above.

**COMPANY:**

**EUCLID LABS, INC.**

By:_____
Name: Tan Lu

Title: Chief Executive Officer
Address:
Email:

**FOUNDERS:**

_____
Tan Lu

_____
Sida Zhang

_____
Zhuoxun Yin

_____
Zhuojie Zhou

IN WITNESS WHEREOF, the parties have executed this Side Letter Agreement as of the date first written above.

**INVESTOR:**

**ALAMEDA RESEARCH VENTURES LLC**

By:      *Samuel Bankman-Fried*
Name:    Samuel Bankman-Fried
Title:   Founder

# EXHIBIT F



☑ NEWSLETTER

LATKA - B2B SaaS Blog

SaaS Database   AI   Business Software   Customer Experience   Data/Analytics   Dev   Finance   Industry Solutions   Marketing   Productivity   Securi

Home  >  Finance & Fintech

# They sold $400m in NFTs last month, made $8m, broke $200m valuation during Series A

by Nathan Latka   —   May 24, 2024   in Finance & Fintech   6 min read                     💬 0



**2.4k**
VIEWS

☐ Share on Facebook          🐦 Share on Twitter          ➤

After monitoring the crypto space and recognizing its potential, particularly on Solana, Jack Lu, Co-founder of NFT marketplace exchange Magic Eden, decided to fill a need he saw in the market. Co-Founder Lu recently sat down with the GetLatka team to share the details backing up his claim that his community-focused interactive NFT ecosystem and marketplace Magic Eden is one of the fastest-growing companies in crypto.

The former crypto exchange executive Lu shared how long it took to launch Magic Eden and how they collaborate with high-performance blockchain Solana. Co-founder LU also shared how long it took the company to double its GMV from $200m to $400m and what's next for the NFT marketplace juggernaut that hasn't yet reached its first business anniversary.

- Launched in September 2021
- Team of 100 with 40 engineers and 30 former NFT artists/collection creators
- 30,000 unique buyers per month
- Second largest NFT marketplace in the world, launched 7 months ago



They Sold $400m in NFTs last month, made $8m, broke $200m valuation during Series A

SaaS Database    AI    Business Software    Customer Experience    Data/Analytics    Dev    Finance    Industry Solutions    Marketing    Productivity    Securi

### Table of Contents

1. Launched in 14 days
2. Two keys to growth
3. 25% equal equity split
4. Nearly 10,000 NFT collections
5. Two business lines, 80/20 revenue
6. 95% of Solana's NFT business
7. 2.5m Pre-seed Round
8. Raised $27m in Series A funding in February at a $220m pre-money valuation
9. $8m in revenue in April on $400m GMV
10. Growth from Creators and Use Cases, not Chain Technology
11. Lu explains the popularity of digital collectibles
12. 2mm NFT transactions per month
13. Internet version of an exclusive club
14. How would he respond to a $1B offer?
15. Famous Five

## Launched in 14 days

The co-founder startled Latka by revealing that he and his three co-founders launched the marketplace just 14 days after writing the first line of code. "The first one was sticky-taped together. We wanted to launch fast to let the market tell us what we were doing right and wrong." The approach paid off as the company's growth skyrocketed.

## Two keys to growth

Lu credits market timing and skillset synergies with his founding partners as the two most significant contributors to Magic Eden's phenomenal growth. "In Q1 and Q2 of last year, Ethereum took off as NFTs because of a cultural zeitgeist," Lu explained. "Then, in Q3 and Q4, Solana boomed in interest with NFT activity. We caught that tailwind," he added. But Lu also credits Magic Eden's success to the synergistic skillsets of his other three founding partners. He believes that together they had a collective intuition about what to build.

## 25% equal equity split

Co-founder Lu indicated that he, the CTO, COO, and Chief Engineer founders split company equity equally. He attributes their early success to the four having a balance of experience in crypto exchanges and consumer marketplaces. He and his COO founder came from currency exchanges, while his technical founders came from a giant consumer marketplace, UberEats. "Our business model is a crypto exchange, but the features look like a consumer marketplace," Lu explained.

## Nearly 10,000 NFT collections

Magic Eden has already grown to feature over 10,000 NFT collections. The creator of one of their first NFT collections, CyberTrolls, eventually became an employee. "He is integral to our founding story," quipped Lu. The co-founder passionately reiterated that NFT artists and collection creators are the lifeblood of the company, proudly noting that one-third of their full-time employees are artists or collection creators. Their job is not to create company-owned NFTs, Lu clarified for Latka.

## Two business lines, 80/20 revenue

Magic Eden generates revenue from two distinct but connected lines of revenue. First is Launchpad, the business endeavor that helps artists create their first NFT. This portion of the business generates 20% of the total revenue. 80% of revenue is generated by the secondary trading market, where collectors buy and sell NFTs regularly. This collector community drove $400m in GMV in April, of which Magic Eden takes a flat 2% transaction fee.

## 95% of Solana's NFT business



Magic Eden raised $8m, made $400m in GMV, broke $200m valuation during Series A - ...

## 2.5m Pre-seed Round

Magic Eden received a small pre-seed round of $2.5m in October 2021 to help with the initial launch. The quick-moving marketplace then signed a term sheet in November at a time when they owned about 30% of Solana's NFT market share.

## Raised $27m in Series A funding in February at a $220m pre-money valuation

By the time the $27m Series A deal closed in February, the company had already grown significantly, but Lu wasn't interested in renegotiating. "We've doubled in revenue every two months since February," he said, noting that their valuation today would be significantly higher. He and his co-founders sold approximately 10-15% of the company in that round.

## $8m in revenue in April on $400m GMV

The revenue-generative business currently takes 2% of all transaction volume, consistent with other marketplaces. Last month's $400m in GMV delivered $8m in revenue for Magic Eden.

## Growth from Creators and Use Cases, not Chain Technology

Pressed about the source of future growth for Magic Eden, Lu quickly noted that NFT market growth would come from creators, not from the technology. NFTs are a new asset class, according to Lu. "The creators create use cases for NFTs. Chains just provide technology for where it lives," he explained. Lu believes that new categories will be created for NFTs beyond the current digital collectibles. "We are very bullish on gaming going forward," as Lu noted that in-game assets and purchases are a tried and true industry that's been around for a decade. "We want to serve game developers," he added.

## Lu explains the popularity of digital collectibles

"Why are (NFT) OK Bears so popular?" queried Latka. The Magic Eden co-founder explained that what makes an NFT take off is branding and a community with fundamental value. The NFT itself, like the OK Bears profile photo, is an example of internet personal branding, like a Rolex or Nike bag. He adds that the successful NFT collections lean in to build their communities over time. "OK Bears built and grew their community over 6 months. They showed up, pounded the pavement, and did the hard work. And it shows," explained an admiring Lu. Others who shortcut the process by hiring a bunch of influencers and don't put in the work don't see their NFTs take off.

## 2mm NFT transactions per month

The average sale price for an NFT on Magic Eden is $200-$300. Co-Founder Lu shared that they process about 2m transactions per month from at least 30,000 unique daily traders. He noted that NFTs have some whales who buy a ton like other collectible spaces, but most sales are spread among individual traders.

## Internet version of an exclusive club

Co-founder Lu explained that NFTs can reward members with different experiences. Each NFT collection, like OK Bears, has a roadmap where the creators use the funds generated to mint a virtual world and create a curated experience for the NFT owners. "It's the internet version of an exclusive club. You like the people, so you hang out together in the club," noted Lu.

## How would he respond to a $1B offer?

When asked if he would accept a billion-dollar offer from a creative organization like CAA, Lu quickly responded no. Instead, the co-founder is interested in experimenting and seeing where the market goes, noting that this is still the early days. "The DNA for Magic Eden is crypto-native. We want to explore and push the boundaries and would only consider partnering with others who share that vision," he bluntly noted.

Case 22-11068-JTD    Doc 21663-1    Filed 07/26/24    Page 83 of 99

Today, Magic Eden Co-Founder Jack Lu's favorite book is [The Wind-Up Bird Chronicle](#) by Haruki Murakami. He closely follows Crypto exchange FTX CEO Sam Bankman-Fried. Jack's go-to tool for Magic Eden is Telegraph. "It's a must-have for crypto communities," he quipped. Jack sleeps roughly 6 hours per night. He is 32, married with no children. When asked what he wished he had known at 20, Jack replied, "At 20, I was in law school. I should've gone into computer science."

Tags:    Marketplace



SaaS Database    AI    Business Software    Customer Experience    Data/Analytics    Dev    Finance    Industry Solutions    Marketing    Productivity    Securi

Home › Business Software

# She Hit $6m Bootstrapped for HR Tool, Will Place 200,000 Candidates This Year

by Nathan Latka    —    May 24, 2024    in Business Software    6 min read                    💬 0



**2.4k**
VIEWS

[f  Share on Facebook]    [🐦  Share on Twitter]    [↗]

Bootstrapped CEO and co-founder Barb Hyman of Sapia.ai recently sat down with the GetLatka team to discuss how her startup B2B SaaS tool is helping to unlock people's true potential. Discover how her ai-driven enterprise SaaS recently surpassed $6m and how it plans to compete in the noisy HR tech space going forward.

Former HR executive, now CEO and co-founder Hyman shares how building technology to work with smaller datasets has made Sapia.ai uniquely suited to dominate the structured interview market. The CEO also shared the importance of eliminating bias, how she is building on her 200% YOY growth with enterprise businesses, the role of data scientists in her organization, and what her immediate plans are for expansion.

- 50 enterprise customers in AUS, US, EU
- 80,000 successful placements last year
- Team of 54: 16 engineers, 7 sales

| Table of Contents | ☰ |
|---|---|



3. 1.8m interviews over 3 years
4. Proprietary first-party data responses push 1b words
5. 2018 launch, 18 months to build product
6. 50 enterprise customers at an ACV of $110,000
7. US expansion to fuel growth, push top ACV toward $1m
8. 120% Net Dollar Retention
9. 200,000 hires this year from 3-4m interviews; attribution through integration
10. Ideal for customers who hire less than 10% of application pool
11. 6m run rate, 200%+ YoY Growth
12. Searching for strategic US partner to fund $10-15m VC round
13. No interest in acquisition
14. Famous Five

# New science that 10,000 Google PhDs working on NLP haven't cracked

Sapia has been product-led from the beginning, with a focus on being able to understand people from a short conversation. Google and IBM Watson have unsuccessfully attempted to do what she's doing. Sapai.ai has some unique capabilities that have fueled its continued innovation. Sapai's integrated vertical system is a new science built on proprietary machine learning. CEO Hyman proclaimed, "If you don't have a team of data scientists, you don't really have AI going on." "We don't use any open source or third-party algorithms," Hyman explained.

## Full-time team of 16 engineers plus data scientists

At Sapia's Australian headquarters, their internal team of machine learning and AI PhDs work in their FireLabs innovation machine, with a directive to help unlock human potential with machine learning by identifying strengths through data interview insights.

## 1.8m interviews over 3 years

CEO Hyman's SaaS is scaling the science of structured interviews. Hyman cited the rigorous, laborious interview process that companies like Google and Amazon use, measuring all interviewees against the same rubric of leadership principles. Human interviews are costly and subject to bias, so how can you use technology to retain the rigors of the interviews while also removing the human bias? That's what Sapia.ai is doing, having already conducted 1.8m interviews totaling 800m words over the last 3 years.

## Proprietary first-party data responses push 1b words

From the beginning, Sapia began collecting data in 15 languages across 47 countries in the last three years. As Hyman explained, this will continue to make the predictive models better over time as the data crosses 1b words.

## 2018 launch, 18 months to build product

Sapia launched in 2018, but CEO Hyman explained that the product wasn't available for nearly two years, as it took 18 months to build the product. "For machine learning, you have to capture data, do research, and most importantly do bias testing," she explained. Co-founder Hyman noted that when companies hire incumbents and/or off CV data, they risk amplifying existing biases. The company started with machine learning models that eliminated bias. The Sapia.ai model is a clean dataset. "It's just words. No demographics. Not even the question. That's what makes this a purer way to understand people," shared an enthusiastic Hyman.

## 50 enterprise customers at an ACV of $110,000

Sapia focuses on enterprise customers in specific markets, all of which sign multi-year annual contracts. ACV values average $110,000. "We don't do any mid-market or SMBs," clarified Hyman. Sapia is already working with trusted Australian brands like Qantas Group, Bunnings, and Woolworths. "Everyone on the AS (Australian Stock Exchange) is either working with us or has heard of us," Hyman quipped.

Sapia's current plan for continued growth is to continue to dominate its current business vertical. "Our ambition is to take the incredible product microfit we have here in Australia… and bring it to the US," CEO Hyman explained. She added, "Our focus is to be focused. Today we see value in expansion vs. new product creation." Sapia's full stack of assessments aligns with specific markets like retail, as Hyman eyes US enterprise employers like The Home Depot, Walmart, HEB, and Albertson's.

## 120% Net Dollar Retention

CEO Hyman boasts a 100% retention rate for existing direct customers over the last three years, with a 20% expansion. "Customers pay for performance, by the hire, not the interview," she explained. In Australia, employers pay $1000-$2000 per hire for recruitment process outsourcing (RPO). That figure drops to $20 with Sapia's technology. CEO Hyman recognizes that Sapia is a disruptor to the entire RPO industry.

## 200,000 hires this year from 3-4m interviews; attribution through integration

Instead of being concerned about candidate attribution, Sapia's technology integrates directly into a customer's HR tech, like Workday and SAP SuccessFactors. "It's a closed data loop that delivers higher and higher accuracy over time," Co-founder Hyman noted. She added that she expects to cross 200,000 hires this year at a 2-3% yield rate on average.

## Ideal for customers who hire less than 10% of application pool

Co-founder Hyman explained that Sapia is ideal for customers currently hiring less than 10% of their application pool. These customers are best suited to leverage the tech to optimize the hiring process. She admits that the yield rate depends partly on the industry: high volume retail employers may see lower rates than tech companies. But, she added, "customers pay by the hire, not the interview."

## 6m run rate, 200%+ YoY Growth

Over the last two years, Sapia has realized a 200%+ YoY growth rate. This year's 6mm eclipses last year's 2.5m run rate. "We are very capital-efficient," noted Hyman. The Co-founder invested $500,000 of her own money to bootstrap the company. "I'm a regular person. That's a lot of money; it's a second mortgage," revealed Hyman. She added that the company had several high net-worth individuals in Australia back her in a pre-seed round but wouldn't reveal financial details, except that they got a quick ROI, a 6-month payback.

## Searching for strategic US partner to fund $10-15m VC round

Co-founder Hyman is currently spending her time in Seattle and San Francisco looking for the right VC partner. Her ideal VC partner is an expert GTM founder with experience cutting through the noise in HR tech. She's not in a hurry, as capital-efficient Sapia has runway through the middle of next year. Hyman is looking for the financial resources to accelerate growth by building a bigger sales team supported by marketing.

## No interest in acquisition

After being pressed by Latka on several occasions, Hyman reiterated that she has no desire to be acquired by stating, "This is the early stage of the journey. It is world-changing. We are raising the collective self-awareness of humanity with our tech because it helps you learn about yourself and your strengths and where you can go with your career. Imagine what you can do with that!" Hyman concluded, "This is the best job I've ever had. Every day I'm learning and am surrounded by people smarter than me."

## Famous Five

Sapia CEO and Co-founder Barb Hyman's current favorite book is Founder Brand by Dave Gerhardt. "I'm absolutely loving it right now," she exclaimed. Inspired by the book, Barb has rejoined Twitter and encouraged those interested in connecting to reach out to her @BarbHyman1 or on LinkedIn. The CEO Barb currently follows is Microsoft's Satya Nadella. Barb's favorite tool for building Sapia is Loom. "I am obsessed with Loom and how you can connect on a human level," she gushed. She considers getting 5-6 hours of sleep a "good night," admitting that it's often less. Barb is 52 with three older children, a partner, and a dog. The CEO wishes she had known at 20 that she was so good at sales. "I would have gone into sales much earlier and made way more money," she exclaimed.

SaaS Database    AI    Business Software    Customer Experience    Data/Analytics    Dev    Finance    Industry Solutions    Marketing    Productivity    Securi

Tags:    bootstrapped    SaaS

## Recommended



### How he Bootstrapped to $4m In Real Estate SaaS Space

**BUSINESS SOFTWARE**

⏱ 12 MONTHS AGO



### How a Channel-First Strategy Grew Coro to $100M in Revenue

**SECURITY & COMPLIANCE**

⏱ 6 DAYS AGO

| Trending | Latest |
| --- | --- |

### How ClickFunnels Built a $160m Revenue Empire, $5 Billion+ Exit in 2023?

**CUSTOMER EXPERIENCE**

⏱ MAY 24, 2024

### 16 Steps Outreach.io Took To Build a $1.1 Billion SaaS Company

**MARKETING & SALES**

⏱ MAY 24, 2024



### Top SaaS Companies in Canada By Revenue in 2019

**DATA & ANALYTICS**

⏱ MAY 26, 2024



### Top 100 San Francisco SaaS Companies

⏱ MAY 26, 2024

## Popular Posts

What Is ARR? 2020 Guide

15 Types Of Revenue Models

Run Rate: Why Is It Important?

How Do You Increase ARPU?

What Is Burn Rate?

Venture Debt: 50+ Options

How To Calculate Revenue Growth

Rule Of 40 For SaaS

## SaaS By City

San Francisco

Boston

Chicago

New York

San Diego

Los Angeles

SEE ALL

## SaaS By Industry

Analytics

Collaboration & Productivity

Content Management

CRM

ERP

HR

Healthcare

Marketing

SEE ALL

## Learn More

SaaS Database

Community

Podcast

Magazine

Book



© Nathan Latka, Inc. Palo Alto, CA

EXHIBIT G



Open in app ↗

Sign up    Sign in

**Medium**    Search    ✎ Write

# Eden is Dominating the NFT Market

GhostWriter · Follow

2 min read · Apr 23, 2024

👏 1    💬

## Introduction:

The NFT industry has witnessed exponential growth in recent years, with various platforms vying for a slice of the market. Among them, Magic Eden has emerged as a standout leader, particularly within the Solana ecosystem. This article explores how Magic Eden is approaching a monopolistic status in the NFT market and the implications for traders and creators.



## Development:

### 1. Growth and Expansion:

Magic Eden began as a modest platform on the Solana blockchain and quickly established itself as the predominant marketplace, surpassing competitors like OpenSea in daily transaction volume on the Solana blockchain. The platform recently expanded its operations to include Ethereum-based NFTs, attracting even more users and increasing its trading volume.

### 2. Market Strategies:

Magic Eden's approach has been aggressive and innovative. With programs like MagicDAO and several funding rounds that have significantly increased its market value, the company has shown a unique ability to adapt and

Case 22-11068-JTD    Doc 21663-1    Filed 07/26/24    Page 92 of 99

respond to market trends. Additionally, its low transaction fees and streamlined user experience have been crucial to its success and growth.

## 3. Impact on the NFT Ecosystem:

Magic Eden's dominant position raises questions about the competitiveness of the NFT market. With a large portion of Solana transactions going through its platform, Magic Eden has significant influence over which projects get greenlit and how they are marketed. This could limit diversity and innovation, as smaller projects may not receive the same attention.

## Conclusion:

Magic Eden's trajectory highlights the potential and dangers of a concentrated market. While it offers efficiency and ease for users, market control can restrict competition and innovation. It is vital for the NFT ecosystem to maintain an environment that encourages diversity and innovation, ensuring that new creators and collectors can participate fairly and equitably.

## Call to Action:

We encourage readers to explore further how market dynamics affect innovation in the NFT space and to consider supporting platforms and projects that promote diversity and inclusion within this rapidly growing ecosystem.

Magic Eden    Web3    Web3 News    Blockchain    Magic Eden Nft Platform



# Written by GhostWriter

64 Followers

 Follow 

Cryptocurrency and Chinese market specialist, with 4+ years of experience, leading communities and trend analysis.

---

## More from GhostWriter



 GhostWriter

### Exploring "The Backwoods": A New Adventure on Solana's Blockchain

Introduction to The Backwoods

May 4   👏 7   💬 1



 GhostWriter

### Particle Network: A Deep Dive into the Testnet Airdrop Tutorial

Particle Network is making waves in the blockchain industry by redefining cross-chai…

May 6





 GhostWriter

 GhostWriter

### $ZAAR Airdrop Extravaganza is Here! A New Era of Art Trading

The Ordzaar platform is ushering in a new era of art trading by providing an unparalleled...

Jun 21 

### Pirate Nation Lança Sistema de Pontos Após Arrecadar $33...

Pirate Nation Lança Sistema de Pontos Após Arrecadar $33 Milhões

Apr 12  1 

See all from GhostWriter

## Recommended from Medium



The Rise of a Giant: How Magic Eden is Dominating the NFT Market | GhostWrt | Medium



Blockchain Lycan

Alexander Nguyen in Level Up Coding

## Justin Sun Announces Launch of a Gas-Free Stablecoin on Tron by...

Crypto billionaire Justin Sun is set to introduce a gas-free stablecoin by the end of...

Jul 7  👏 1

## The resume that got a software engineer a $300,000 job at Google.

1-page. Well-formatted.

May 31  👏 13.3K  💬 190

---

## Lists



### My Kind Of Medium (All-Time Faves)
89 stories · 421 saves



### MODERN MARKETING
172 stories · 733 saves



### Generative AI Recommended Reading
52 stories · 1207 saves

---



 Metafighter

## GAMETY and Runes Protocol: Pioneering the Future of...

Introduction to GAMETY

Mar 18  👏 112  💬 2



 0xAnn in Crypto 24/7

## Trading the CPI announcement for Bitcoin and Crypto

It is that time of the month.

Jul 9  👏 92  💬 5



mitmoney_crypto

## Introduction to Pepeboost SOL Bot. DEFI crypto trading

CyberPunkMetalHead

## My Cryptocurrency Tier List for 2024 (from F to S)

I ranked the top 20 coins by marketcap. Here is my list.

4d ago

✦  Jul 6    🖐 305    💬 10

See more recommendations

# EXHIBIT H

**BE IT KNOWN THAT I, SERGE ROUILLON,** of Suite 14, First Floor, Kingsgate House, Victoria, Mahé, Seychelles, **NOTARY PUBLIC,** duly appointed and sworn, residing and practicing in the **REPUBLIC OF SEYCHELLES,** having seen the original of the following document for **Maclaurin Investments Ltd.,** with Company Number **217617:** -

❖ **Certificate of Incorporation of Change of Name**

**DO HEREBY CERTIFY THAT** the document attached hereto represents a true copy of the original.

**Dated this 10ᵗʰ day of May 2023**



Mr Serge Jean-Luc Rouillon B.A  L.L.B  (Linc's
Attorney-at-Law and Notary Public
Suite 14, Kingsgate House  P O Box 1075
Victoria, Mahe, Republic of Seychelles
Tel  +(248) 422 52 76 / +(248) 422 51 57
Fax  +(248) 422 58 46 Email  director@sergerouillon.com
Email  manager@sergerouillon.com

**Serge Rouillon**
**Notary Public & Attorney at Law**
**Suite 14, First Floor**
**Kingsgate House, Victoria**
**Mahé, Seychelles**

**Tel: + (248) 4 22 52 76   + (248) 4 22 51 57**
**Fax: + (248) 4 22 58 46**







**Republic of Seychelles**

INTERNATIONAL BUSINESS COMPANIES ACT, 2016

(Act 15 of 2016)

*Certificate of Incorporation of Change of Name*

THIS IS TO CERTIFY that,

**Alameda Ventures Ltd**

has changed its name and is now incorporated under the name of

**Maclaurin Investments Ltd.**

on this **26**th day of **September 2022**

Given at Victoria, Seychelles.

*Company No:* 217617

for REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES