**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) |
| FTX TRADING LTD., et al., | ) Case No. 22-11068 (JTD) |
| | ) |
| Debtors. | ) (Jointly Administrated) |
| | ) |
| | ) Hearing Date: September 12, 2024 at 1:00 P.M. |
| | ) |
| _____ | ) Ref No. 19186 |

Attached hereto is Exhibit "1" Confidential Information Statement regarding issuance of common shares and FTT tokens.

# Exhibit "1"

THIS CONFIDENTIAL INFORMATION STATEMENT, THE INFORMATION PROVIDED HEREIN AND ANY ADDITIONAL INFORMATION OR MATERIALS PROVIDED TO YOU IN CONNECTION HEREWITH OR THE CONTEMPLATED TRANSACTION AND ANY ADDITIONAL COMMUNICATIONS RELATED TO THE CONTEMPLATED OFFERING ARE CONFIDENTIAL. BY ACCEPTING THESE DOCUMENTS, YOU AGREE TO HOLD THEM IN CONFIDENCE AND KEEP THEM CONFIDENTIAL. YOU CAN DISCUSS THE INFORMATION CONTAINED IN THIS DOCUMENT WITH YOUR LEGAL, TAX OR INVESTMENT ADVISORS AS DESCRIBED BELOW. YOU MAY NOT COPY THIS DOCUMENT (EXCEPT THAT YOU MAY MAKE COPIES FOR YOUR ADVISORS). YOU MAY USE THIS DOCUMENT ONLY TO EVALUATE THE CONTEMPLATED OFFERING. WE ARE NOT GIVING YOU ANY LEGAL, TAX OR INVESTMENT ADVICE. YOU SHOULD CONSULT YOUR OWN ADVISORS FOR SUCH ADVICE.

### FTX TRADING LTD.

#### Confidential Information Statement

#### September 10, 2020

#### COMMON SHARES

#### FTT TOKENS

This Confidential Information Statement (this "***Information Statement***") has been prepared by FTX Trading Ltd. (the "***Acquirer***" or "***we***") and Blockfolio, Inc. (the "***Company***") for use by prospective recipients to whom the Acquirer is offering (the "***Offering***") the opportunity to receive cash (solely in the case of stockholders that are not accredited investors) or certain cryptographic tokens with the symbol FTT (the "***Acquirer Tokens***") pursuant to that Stock Purchase Agreement, dated as of September 9, 2020, by and among the Company, Acquirer, the Company Stockholders party thereto and Fortis Advisors LLC, as the Equityholders' Representative (the "***Purchase Agreement***") in exchange for certain shares of the Company (the "***Stock Purchase***") and if and when the merger contemplated by that certain Stockholders' Agreement, dated as of September 9, 2020, by and among the Company, Acquirer and the Stockholders party thereto (the "***Stockholders' Agreement***") is consummated pursuant to the terms and conditions of that certain Merger Agreement, attached as Exhibit A hereto (the "***Merger Agreement***"), shares of the Acquirer (the "***Acquirer Shares***").

No accessible public market for the Acquirer Shares exists and may never exist. The Acquirer Tokens currently trade on FTX.com which is not available to U.S. Persons (as defined in as defined in Rule 902(k) of Regulation S under the Securities Act (as defined below)). The Acquirer Shares and Acquirer Tokens are subject to restrictions on transferability and resale and generally may not be transferred or resold except as specified herein and in the Purchase Agreement. Recipients of Acquirer Shares or Acquirer Tokens (each, a "***Recipient***") should be aware that they will be required to bear the financial risks of this transaction for an indefinite period of time.

---

#### SEE "STOCK PURCHASE AGREEMENT" FOR PRICING

NEITHER THE ACQUIRER SHARES OR ACQUIRER TOKENS (COLLECTIVELY, THE "***ACQUIRER INTERESTS***") HAVE BEEN NOR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), OR ANY OTHER LAW OR REGULATION GOVERNING THE OFFERING, SALE OR EXCHANGE OF SECURITIES IN THE UNITED STATES

OR ANY OTHER JURISDICTION. THIS OFFERING IS BEING MADE (1) INSIDE THE UNITED STATES ONLY TO "ACCREDITED INVESTORS" (AS DEFINED IN SECTION 501 OF THE SECURITIES ACT) AND (2) OUTSIDE THE UNITED STATES TO NON-U.S. PERSONS (AS DEFINED IN SECTION 902 OF REGULATION S UNDER THE SECURITIES ACT) IN JURISDICTIONS WHERE THE OFFER AND ISSUANCE OF THE ACQUIRER INTERESTS IS PERMITTED UNDER APPLICABLE LAW AND IN RELIANCE ON REGULATION S UNDER THE SECURITIES ACT. NON-ACCREDITED INVESTORS WILL RECEIVE CASH IN EXCHANGE FOR THEIR SHARES OF THE COMPANY AS DETAILED HEREIN.

THE ACQUIRER INTERESTS WILL BE OFFERED FOR ISSUANCE ONLY IN THOSE JURISDICTIONS WHERE THE OFFER AND ISSUANCE OF ACQUIRER INTERESTS IS PERMITTED UNDER APPLICABLE LAW.

---

**The Acquirer Shares and Acquirer Tokens involves a high degree of risk, are highly volatile and illiquid. A prospective recipient should thoroughly review the confidential information contained herein and the terms of the Purchase Agreement, and carefully consider whether receipt of the Acquirer Shares and Acquirer Tokens is suitable to its financial situation and goals.**

**See the section of this Information Statement titled "Risk Factors" on Page 8.**

**Neither the United States Securities and Exchange Commission, any state securities commission or any other governmental authority has approved or disapproved of this offering or passed upon the adequacy or accuracy of the information herein. Any representation to the contrary is a criminal offense.**

ACTIVE/104653288.13

ACQUIRER INTERESTS WILL BE ISSUED ONLY TO (1) ACCREDITED INVESTORS AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT; OR (2) NON-U.S. PERSONS AS DEFINED IN SECTION 902 OF REGULATION S UNDER THE SECURITIES ACT OUTSIDE THE UNITED STATES IN JURISDICTIONS WHERE THE OFFER AND ISSUANCE OF ACQUIRER INTERESTS IS PERMITTED UNDER APPLICABLE LAW. ONLY PERSONS OF ADEQUATE FINANCIAL MEANS WHO HAVE NO NEED FOR PRESENT LIQUIDITY WITH RESPECT TO THIS ISSUANCE SHOULD CONSIDER PURCHASING THE ACQUIRER INTERESTS ON THE TERMS SET FORTH IN THE PURCHASE AGREEMENT OR MERGER AGREEMENT, AS APPLICABLE, OFFERED IN CONNECTION HEREWITH BECAUSE: (I) RECEIPT OF THE ACQUIRER INTERESTS INVOLVES A NUMBER OF SIGNIFICANT RISKS (SEE "RISK FACTORS" BELOW); (II) NO ACCESSIBLE MARKET FOR THE ACQUIRER SHARES EXISTS AND MAY NEVER EXIST; AND (III) NO ACCESSIBLE MARKET FOR THE ACQUIRER TOKENS WITH RESPECT TO U.S. PERSONS (AS DEFINED IN SECTION 902 OF REGULATION S UNDER THE SECURITIES ACT) EXISTS AND MAY NEVER EXIST. THE PROPOSED ISSUANCE OF ACQUIRER INTERESTS IS A PRIVATE OFFERING THAT IS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NON-ACCREDITED INVESTORS WILL RECEIVE CASH IN EXCHANGE FOR THEIR SHARES OF THE COMPANY AS DETAILED HEREIN.

## TABLE OF CONTENTS

CERTAIN NOTICES ........................................................................................................... 6

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS ............................ 8

RISK FACTORS ............................................................................................................... 9

    Risks Related to the Transaction .................................................................................. 9

    Risks Related to Our Business ..................................................................................... 12

    Risks Related to Ownership of Our Common Stock ..................................................... 30

THE TRANSACTIONS ................................................................................................... 31

    Company Background and Reasons for the Transactions .............................................. 31

    The Transactions ........................................................................................................ 31

STOCK PURCHASE AGREEMENT .............................................................................. 33

    The Offer ................................................................................................................... 33

    Closing; Effective Time ............................................................................................. 33

    Stock Purchase Consideration .................................................................................... 33

    Treatment of Company Capital Stock .......................................................................... 33

    Treatment of Company Options .................................................................................. 34

    Holdback Amount; Expense Fund .............................................................................. 34

    Indemnification Obligations of the Indemnifying Holders ........................................... 35

    Period for Claims ....................................................................................................... 36

    Indemnification Obligations of the Acquirer ............................................................... 36

    Limitations on Indemnification .................................................................................. 37

    Representations and Warranties .................................................................................. 38

3

Conditions to the Stock Purchase...................................................................................... 38

Termination of the Purchase Agreement........................................................................ 39

Amendment of Purchase Agreement.............................................................................. 39

STOCKHOLDERS AGREEMENT AND MERGER AGREEMENT.................................................. 41

The Stockholders Agreement........................................................................................... 41

The Merger Agreement..................................................................................................... 43

INFORMATION ABOUT ACQUIRER............................................................................................ 45

General............................................................................................................................... 45

Financing History.............................................................................................................. 45

Management...................................................................................................................... 46

Legal Proceedings............................................................................................................. 46

Qualitative Disclosures About Market Risk................................................................... 46

Nature of Trading Markets............................................................................................... 47

Intercompany Agreements and Affiliated Transactions................................................ 48

Certain Financial Information.......................................................................................... 49

INFORMATION ABOUT COMPANY............................................................................................ 51

Overview............................................................................................................................ 51

Our Products and Services................................................................................................ 51

Technology........................................................................................................................ 51

Customers.......................................................................................................................... 51

Sales and Marketing......................................................................................................... 51

Competition....................................................................................................................... 51

Intellectual Property......................................................................................................... 51

Employees and Leadership............................................................................................... 52

Facilities............................................................................................................................. 52

Legal Proceedings............................................................................................................. 52

Acquisition Activity.......................................................................................................... 52

Information regarding Stockholders, Dividends, and Stock Price............................... 52

CERTAIN BENEFICIAL OWNERS OF SECURITIES.................................................................... 54

Security Ownership of Certain Beneficial Owners and Management of Acquirer............ 54

Security Ownership of Certain Beneficial Owners and Management of Company........... 54

MATERIAL CONTRACTS.............................................................................................................. 57

Stock Purchase Agreement.............................................................................................. 57

Stockholders' Agreement................................................................................................. 57

Commercial Agreement.................................................................................................... 57

Agreement and Plan of Merger and Reorganization..................................................... 57

4

DESCRIPTION OF ACQUIRER SHARES............................................................................ 58

    Authorized Capital............................................................................................................ 58

    Dividend Rights ................................................................................................................ 58

    Voting Rights.................................................................................................................... 58

    Liquidation Rights............................................................................................................ 58

    Directors........................................................................................................................... 58

    Calling of Special Meetings of Shareholders.................................................................... 59

    Shareholders' Derivative Actions...................................................................................... 59

    Dissenters Rights.............................................................................................................. 59

    Limitations of Liability and Indemnification of Officers and Directors............................ 59

    Limitations on Resale ...................................................................................................... 59

DESCRIPTION OF ACQUIRER TOKENS ....................................................................... 60

    Summary .......................................................................................................................... 60

    Market Information........................................................................................................... 60

    Utility .............................................................................................................................. 60

    Trading Information.......................................................................................................... 61

    Limitations on Resale ...................................................................................................... 61

COMPARISON OF THE RIGHTS OF COMPANY SHAREHOLDERS AND ACQUIRER
SHAREHOLDERS............................................................................................................. 62

MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTION............. 65

    U.S. Federal Income Tax Treatment of the Purchase Agreement...................................... 66

    Backup Withholding, Information Reporting and FATCA................................................. 69

    U.S. Federal Income Tax Treatment of the Acquirer Tokens for U.S. Holders ................. 70

    U.S. Federal Income Tax Treatment of the Call/Put Options and Stockholders' Agreement.............. 70

APPRAISAL RIGHTS ....................................................................................................... 73

EXHIBIT A – MERGER AGREEMENT............................................................................ 91

EXHIBIT B – PURCHASE AGREEMENT........................................................................ 92

EXHIBIT C – STOCKHOLDERS AGREEMENT ............................................................ 93

EXHIBIT D – AMENDED AND RESTATED.................................................................... 94

CERTIFICATE OF INCORPORATION OF THE COMPANY............................................ 94

EXHIBIT E – ACQUIRER ARTICLES OF INCORPORATION ....................................... 95

EXHIBIT F – ACQUIRER BYLAWS................................................................................ 96

ACTIVE/104653288.13

## CERTAIN NOTICES

This Information Statement shall be maintained in strict confidence. Each recipient hereof acknowledges and agrees that (i) the contents of this Information Statement constitute proprietary and confidential information, (ii) the Acquirer and its affiliates derive independent economic value from such confidential information not being generally known, and (iii) such confidential information is the subject of reasonable efforts to maintain its secrecy. The recipient further agrees that the contents of this Information Statement is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Acquirer. Any reproduction or distribution of this Information Statement, in whole or in part, or the disclosure of its contents, without the prior written consent of the Acquirer, other than to a recipient's legal, tax or investment advisors, is prohibited. Each person who has received this Information Statement is deemed to agree to return this Information Statement to the Acquirer upon request. The existence and nature of all conversations regarding the Acquirer and this opportunity must be kept confidential.

This Information Statement has been prepared in connection with a private issuance to recipients of Acquirer Tokens in return for a sale of such recipients' capital stock of the Company pursuant to the Purchase Agreement and Acquirer Shares pursuant to the Merger Agreement (if and when the Merger is consummated). Each recipient will be required to execute a counterpart signature page to the Purchase Agreement (as amended, restated and/or otherwise modified from time to time), a questionnaire and such other documents as may be reasonably required by the Acquirer to effect the issuance of Acquirer Interests.

This Information Statement contains a summary of the Purchase Agreement, the Merger Agreement, the Acquirer Shares, Acquirer Tokens and certain other documents referred to herein. However, the summaries in this Information Statement do not purport to be complete and are subject to and qualified in their entirety by reference to the actual text of the relevant document, copies of which have been provided to each prospective recipient in connection with the delivery of this Information Statement or will be provided to each prospective recipient upon request. Each prospective recipient should review the Purchase Agreement, Merger Agreement and such other documents for complete information concerning the rights, privileges and obligations of recipients. If any of the terms, conditions or other provisions of the Purchase Agreement, Merger Agreement or such other documents are inconsistent with or contrary to the descriptions or terms in this Information Statement, the Purchase Agreement, the Merger Agreement or such other documents shall control. The Acquirer reserves the right to modify the terms of the issuance, the Purchase Agreement, the Merger Agreement, and the Stockholders' Agreement (each in accordance with their terms) the Acquirer Shares, and Acquirer Tokens described in this Information Statement, and the Acquirer Interests are offered subject to the Acquirer's ability to reject any commitment in whole or in part.

The Acquirer Interests have not been and will not be registered under the Securities Act of 1933, as amended (the "*Securities Act*"), the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), or any United States state securities laws or the laws of any foreign jurisdiction. The Acquirer Interests will be offered and sold under the exemption provided by Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, or to non-U.S. Persons who are not purchasing for the account or benefit of a "U.S. Person" as defined under Regulation S under the Securities Act, and other exemptions of similar import in the laws of the states and other jurisdictions where the Offering will be made. The Acquirer will not be registered as an investment company under the United States Investment Company Act of 1940, as amended (the "*Investment Company Act*"). Consequently, recipients will not be afforded the protections of the Investment Company Act.

No person has been authorized to make any statement concerning the Acquirer or the issuance of the Acquirer Interests discussed herein other than as set forth in this Information Statement, and any such

ACTIVE/104653288.13

statements, if made, must not be relied upon, provided that the investor representative is authorized to provide information to certain investors who are not accredited.

Prospective recipients must make their own investigations and evaluations of the Acquirer Interests that will be delivered pursuant thereto, including the merits and risks involved in a receipt of such interests therein. Prior to any issuance, the Acquirer will give prospective recipients the opportunity to ask questions of and receive answers and additional information from it concerning the terms and conditions of this offering and other relevant matters to the extent the Acquirer possesses the same or can acquire it without unreasonable effort or expense. Prospective recipients should inform themselves as to the legal requirements applicable to them in respect of the acquisition, holding and disposition of the Acquirer Interests, and as to the income and other tax consequences to them of such acquisition, holding and disposition.

This Information Statement does not constitute an offer to sell, or a solicitation of an offer to buy, an interest in any jurisdiction in which it is unlawful to make such an offer or solicitation. Neither the United States Securities and Exchange Commission (the "***Commission***") nor any other federal, state or foreign regulatory authority has approved the offer to sell, or solicitation of an offer to buy or purchase of the Acquirer Interests. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Information Statement, nor is it intended that the foregoing authorities will do so. Any representation to the contrary is a criminal offense.

Prospective recipients are not to construe this Information Statement as investment, legal, tax, regulatory, financial, accounting or other advice, and this Information Statement is not intended to provide the sole basis for any evaluation of a purchase of an interest. Prior to acquiring Acquirer Interests, a prospective recipient should consult with its own legal, investment, tax, accounting, and other advisors to determine the potential benefits, burdens, and other consequences of such purchase.

7

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Information Statement contains estimates and forward-looking statements. All statements other than statements of historical fact are forward-looking statements. The words "may," "might," "will," "could," "would," "should," "expect," "plan," "anticipate," "intend," "seek," "believe," "estimate," "predict," "potential," "continue," "contemplate," "possible" and similar words are intended to identify estimates and forward-looking statements. Such forward-looking statements, including the intended actions and performance objectives of the Acquirer (as defined herein), are based largely on current expectations and projections about future events and trends.

These forward-looking statements are subject to a number of known and unknown risks, uncertainties, assumptions, and other important factors, including those described under the section of this Information Statement titled "*Risk Factors*", that could cause the actual results, performance, or achievements of the Acquirer to differ materially from any future results, performance, or achievements expressed or implied by such forward-looking statements.

Moreover, new risk factors and uncertainties emerge from time to time, and it is not possible to predict all risk factors and uncertainties, nor is it possible to assess the impact of all of these risk factors or the extent to which any risk factor, or combination of risk factors, may cause actual results to differ materially from those contained in any forward-looking statements.

All forward-looking statements in this Information Statement speak only as of the date hereof. The Acquirer expressly disclaims any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein to reflect any change in its expectation with regard thereto or any change in events, conditions, or circumstances on which any such statement is based.

8

## RISK FACTORS

### *Risks Related to the Transaction*

### *There is no assurance when or if the Transaction will be completed.*

The completion of the Share Purchase is subject to the satisfaction or waiver of a number of conditions as set forth in the Purchase Agreement, including, among others, the approval of the Purchase Agreement and the Transactions by Company stockholders and that no applicable law having been enacted that prohibits the consummation of the Transactions. There can be no assurance that the Acquirer and the Company will be able to satisfy the closing conditions or that closing conditions beyond their control will be satisfied or waived. For a discussion of the conditions to the completion of the Transaction, see the section titled "*The Purchase Agreement—Conditions to Completion of the Transaction*". Following the consummation of the Stock Purchase, it is anticipated that Acquirer will beneficially own a majority of the outstanding capital stock of the Company. If and when the Merger is consummated, the Company will become a wholly-owned subsidiary of Acquirer.

The completion of the Transaction is subject to the election to exercise the Put Option or Call Option in the Stockholders Agreement and the satisfaction or waiver of a number of conditions as set forth in the Merger Agreement, including, among others, the approval of the Merger Agreement and the Transaction by Company stockholders and that no applicable law having been enacted that prohibits the consummation of the Transaction. There can be no assurance that the Acquirer and the Company will be able to satisfy the closing conditions or that closing conditions beyond their control will be satisfied or waived. For a discussion of the conditions to the completion of the Transaction, see the section titled "*The Merger Agreement—Conditions to Completion of the Transaction*". If the Transaction and the integration of the companies' respective businesses are not completed within the expected time frame, such delay may materially and adversely affect the synergies and other benefits that the Acquirer and Company expect to achieve as a result of the Transaction and could result in additional transaction costs, loss of revenue or other effects associated with uncertainty about the Transaction.

### *There is no business value between stock purchase and exercise of put option or call option.*

The Company anticipates supporting its operations following the date of the Stock Purchase through the limited revenue derived from the Commercial Agreement (as defined below) as well as potential debt financing from the Acquirer or Affiliated Companies (as defined below). Following the date of the Stock Purchase, personnel and other assets may be transferred or licensed to the Acquirer or Affiliated Companies. Therefore, following the date of the Stock Purchase, there are no assurances provided that the Company will continue to have independent value separate from the Transaction consideration.

It is not anticipated that the Company stockholders will receive dividends or distributions following the Stock Purchase, and any profits or increase in value will remain in the Company until after exercise of the Put Option or the Call Option.

### *There is no assurance that the Put Option or the Call Option will be exercised.*

Contemporaneously with, and as a condition to, the closing of the Transaction, the Acquirer will enter into a Stockholders' Agreement with the Company stockholders. Under the Stockholders Agreement, the Acquirer will grant the Company a put right under which the Company may require the Acquirer to acquire all of the outstanding shares of capital stock of the Company from the Company stockholders through the

9

Merger, subject to certain conditions (the "**Put Option**"). Under the Stockholders Agreement, the Put Option Committee of the Board may exercise the Put Option at any time during the Put Option Period (as defined below).

Further, pursuant to the Stockholders Agreement, the Company will grant the Acquirer a call right under which the Acquirer may acquire all of the outstanding shares of capital stock of the Company through the Merger, subject to certain conditions (the "**Call Option**"). Under the Stockholders Agreement, the Acquirer may exercise the Call Option at any time during the Call Option Period (as defined below).

There is no assurance that either the Put Option or the Call Option will be exercised. For more information on the Put Option and the Call Option, see "*Material Contracts—Stockholders' Agreement.*"

### *There has been no public market for Company capital stock and the lack of a public market makes it difficult to determine the fair market value of the Company.*

The outstanding shares of Company capital stock are privately held and are not traded on any public market. The lack of a public market may make it more difficult to determine the fair market value of the Company than if the outstanding shares of the Company capital stock were traded publicly. The value ascribed to the Company's securities in other contexts, including in private valuations or financings, may not be indicative of the price at which the outstanding shares of the Company capital stock may have traded if they were traded on a public market. The merger consideration to be paid to Company stockholders in the Transaction was determined based on negotiations between the parties.

### *The Company's directors and executive officers have interests in the Transaction that may be different from, or in addition to, the interests of Company stockholders generally.*

In considering the recommendation of the Company Board of Directors (the "**Company Board**") that Company stockholders adopt and approve the Transaction Documents and the Transaction, Company stockholders should be aware and take into account the fact that certain Company directors and executive officers have interests in the Transaction that may be different from, or in addition to, the interests of Company stockholders generally and that may create, or be perceived to create, potential conflicts of interest. See "*Security Ownership of Certain Beneficial Owners and Management of Company*" for a more detailed description of these interests. The Company Board was aware of and carefully considered these interests, among other matters, in evaluating the terms and structure, and in overseeing the negotiation of, the Transaction, in approving the Merger Agreement and in recommending that Company stockholders adopt and approve the Transaction Documents and the Transaction.

### *The integration of the Acquirer and Company following the completion of the transaction may present significant challenges that may reduce the anticipated potential benefits of the transaction.*

Following the consummation of the Stock Purchase, it is anticipated that Acquirer will beneficially own a majority of the outstanding capital stock of the Company. If and when the Merger is consummated, the Company will become a wholly-owned subsidiary of Acquirer.

The Acquirer and Company may face significant challenges in consolidating functions and integrating the two companies' organizations, procedures and operations in a timely and efficient manner, as well as retaining key personnel. The principal challenges will include the following:

- integrating the Company's existing business
- preserving the Company's significant business relationships; and

- retaining the Company's key employees.

The Acquirer's management may have to dedicate substantial effort to integrating the businesses of during the integration process. These efforts could divert management's focus and resources from the Acquirer's business, corporate initiatives or strategic opportunities. If Acquirer is unable to integrate the organizations, procedures and operations in a timely and efficient manner, or at all, the anticipated benefits and cost savings of the transaction may not be realized fully, or at all, or may take longer to realize than expected. An inability to realize the full extent of the anticipated benefits of the transaction, as well as any delays encountered in the integration process, could also have an adverse effect upon the revenues, level of expenses and operating results of the Company.

### *The receipt of Acquirer Tokens pursuant to the Stock Purchase will be fully taxable to U.S. Holders*

For U.S. federal income tax purposes, the receipt of Acquirer Tokens pursuant to the Stock Purchase will generally be taxable to U.S. Holders (as defined below) as and when received under the installment method unless the U.S. Holder affirmatively elects out of or is otherwise ineligible for installment method reporting. Generally, the amount realized for shares of Company Stock sold pursuant to the Stock Purchase with respect to the receipt of Acquirer Tokens will equal the fair market value of the Acquirer Tokens at the time of receipt of such Acquirer Tokens. A U.S. Holder who receives Acquirer Tokens pursuant to the Stock Purchase will generally need to fund their tax liabilities with cash from personal sources and should therefore consider making the election to receive cash in lieu of some or all of their Acquirer Tokens pursuant to the Election Form (as defined in the Purchase Agreement) in accordance with the Purchase Agreement. See "Material U.S. Federal Income Tax Consequences of the Transaction" for more information.

### *Entering into the Put Option and Call Option may result in immediate U.S. federal income tax to U.S. Holders*

It is intended that the Put Option and Call Option will generally be treated as options on Company Stock for U.S. federal income tax purposes. However, if the Put Option and Call Option were not respected as options for U.S. federal income tax purposes, U.S. Holders could be treated as having sold their shares of capital stock of the Company in a fully taxable transaction. See "Material U.S. Federal Income Tax Consequences of the Transaction" for more information.

### *The Merger may not qualify as a "reorganization" within the meaning of Section 368(a) of the Code and may be a fully taxable transaction to U.S. Holders*

It is intended that, based on currently applicable U.S. federal income tax law, and is the expectation of Acquirer and the Company that, the Merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Code and that no U.S. Holder will recognize any gain as a result of Section 367(a)(1) of the Code in connection with the Merger. However, the Merger is not expected to occur, if at all, until at least two years following the Closing Date of the Purchase Agreement, and no guarantees or assurances can be made regarding the U.S. federal income tax consequences of the Merger. Further, U.S. Holders should be aware that it is not a requirement to the exercise by the Acquirer of the Call Option or the exercise by the Put Option Committee of the Board of the Put Option that the Merger qualify as a "reorganization" within the meaning of Section 368(a) of the Code. If the Merger did not qualify as a "reorganization" it would generally be a fully taxable transaction and U.S. Holders may be required to pay substantial federal income taxes based on the fair market value of the Acquirer Common Stock received in the Merger in excess of the tax basis in their shares of Company Stock surrendered in exchange therefor. In such a case, U.S. Holders would need to satisfy their tax liabilities arising from the Merger with cash from personal resources. See "Material U.S. Federal Income Tax Consequences of the Transaction" for more information.

11

***Risks Related to Our Business***

***We have a limited operating history, which makes it difficult to evaluate our business and future prospects, and we may not be able to achieve or maintain profitability in any given period.***

We began our operations in 2019 and since then, our business model has continued to evolve. Our revenues have grown significantly, but there is no assurance that this growth rate will continue in future periods and you should not rely on the revenue growth of any given prior quarterly or annual period as an indication of our future performance. We may not always generate sufficient revenues to achieve positive cash flow from operations or profitability in any given period, and our limited operating history may make it difficult for you to evaluate our current business and our future prospects. All of our revenues are dependent on the market for cryptocurrencies. Our market dependent revenues are extremely volatile.

We have encountered and will continue to encounter risks and difficulties as described in this section. If we do not manage these risks successfully, our business may be adversely impacted. If our growth rate were to decline significantly or become negative, it could adversely affect our financial condition and operating results. If we are not able to achieve or maintain positive cash flow from operations, our business may be adversely impacted and we may require additional financing, which may not be available on favorable terms or at all, or which would be dilutive to our stockholders.

***Our operating results have significantly fluctuated, and may continue to significantly fluctuate from quarter to quarter, which makes our future results difficult to predict.***

Substantially all of our revenues each quarter are generated from transactions occurring on the FTX exchange during that quarter. As a result, our operating and financial results have fluctuated significantly on a quarterly basis during our operating history and may continue to fluctuate significantly as a result of a variety of factors, many of which are unpredictable or are outside of our control, including:

- our ability to maintain and grow our customer base and customer engagement;

- dependence on offerings that are dependent on the cryptocurrency markets;

- changes in the legislative or regulatory environment, or actions by governments or regulators, including fines, orders, or consent decrees;

- our ability to diversify and grow our non-market dependent revenues;

- pricing for our products and services;

- general blockchain industry trends;

- macroeconomic conditions;

- adverse litigation, judgments, settlements, or other litigation-related costs;

- the development and introduction of existing and new products and services by us or our competitors;

- increases in marketing, sales, and other operating expenses that we may incur to grow and expand our operations and to remain competitive;

12

- system failure or outages;

- breaches of security or privacy;

- inaccessibility of FTX due to third-party actions;

- our ability to attract and retain customers; and

- our ability to compete with our competitors.

It is difficult for us to forecast accurately the level or source of our revenues or earnings in any given quarter. In view of the rapidly evolving nature of our business and the blockchain industry, period-to-period comparisons of our operating results may not be meaningful, and you should not rely upon them as an indication of future performance. Due to the inherent difficulty in forecasting revenues, it is also difficult to forecast expenses.

***We expect our operating expenses to increase significantly in the foreseeable future and may not be able to maintain profitability or positive cash flow from operations on a consistent basis, which may cause our business, financial condition, and operating results to be adversely impacted.***

We anticipate that our operating expenses will increase substantially in the foreseeable future as we continue to expand our sales and marketing efforts, develop additional products and services, expand our international business, and hire additional employees. These efforts may prove more expensive than we currently anticipate, and we may not succeed in increasing our revenues sufficiently to offset these higher expenses. Our revenue growth may slow or our revenues may decline for a number of other reasons, including reduced demand for our offerings, increased competition, a decrease in the growth or size of the blockchain industry, or any failure to capitalize on growth opportunities. Any failure to increase our revenues could prevent us from maintaining profitability. We cannot be certain that we will be able to maintain profitability or positive operating cash flow on any quarterly or annual basis. If we are unable to effectively manage these risks and difficulties as we encounter them, our business, financial condition, and operating results may suffer.

***Our revenues are substantially dependent on the volume of digital asset transactions conducted on the FTX exchange. If such volume declines, our business would be adversely affected.***

Substantially all of our revenues derive from transaction fees on the FTX exchange in connection with the purchase, sale, and trading of digital assets by our customers. We earn a transaction fee that is calculated as a percentage of the value of each transaction, which in turn depends on the amount of digital assets being traded. As such, any declines in the volume of digital asset transactions, or market liquidity generally may result in lower revenues to us.

The trading volume of any digital asset is subject to significant uncertainty and volatility, depending on a number of factors:

- market conditions across the blockchain industry;

- the price of digital assets that we support for trading, which we refer to as the "***Supported Digital Assets***" herein;

- changes in volume of market-making and trading activities;

- trading activities on other digital asset exchanges worldwide, many of which are unregulated, including manipulative and speculative activities;

13

- investment and trading activities of large users, speculators, miners, and investors;
- the speed and rate at which digital assets are able to gain adoption as a medium of exchange, store of value, or other consumptive asset worldwide, if at all;
- decreased user and investor confidence in digital assets and digital asset exchanges;
- negative publicity and events relating to the blockchain industry;
- the ability for digital assets to meet user and investor demands;
- consumer preferences and perceived value of digital assets and digital asset markets;
- increased competition from other payment services or digital assets;
- regulatory or legislative changes and updates affecting the blockchain industry;
- the characterization of digital assets as financial instruments under the laws of various jurisdictions around the world;
- the maintenance and development of the blockchain networks underlying digital assets, including by miners, validators, and developers worldwide;
- ongoing technological viability of digital assets, including security against hacks and scalability;
- fees and speed associated with processing digital asset transactions, including on the underlying blockchain networks and on digital asset exchanges;
- financial strength of market participants;
- the availability and cost of funding and capital;
- the liquidity of digital asset exchanges;
- interruptions in service from or failures of major digital asset exchanges;
- availability of an active derivatives market for various digital assets;
- availability of banking and payment services to digital asset-related projects;
- level of interest rates and inflation;
- monetary policies of governments, trade restrictions, and currency devaluations; and
- national and international economic and political conditions.

In the intermediate and long term, there is no assurance that any digital asset will maintain its value, or that there will be any meaningful levels of trading activities. In the event that the price of digital assets, or the demand for trading digital assets decline, our business would be adversely affected. We have not generated significant revenues from our non-market dependent offerings to date and, therefore, we would not be able to offset any decrease in revenues associated with reduced demand for trading digital assets with revenues from non-market dependent offerings.

***From time to time, we may encounter technical issues in connection with the integration of Supported Digital Assets and changes and upgrades to their underlying networks, which could adversely affect our business.***

In order to support any Supported Digital Asset, a variety of front and back-end technical and development work is required to implement our wallet, trading, staking and other solutions for our customers, and to integrate such Supported Digital Asset with our existing technical infrastructure. For certain digital assets, a significant amount of development work is required and there is no guarantee that we will be able to

integrate successfully with any existing or future digital asset. In addition, such integration may introduce software errors or weaknesses into our platform, including our existing infrastructure. Even if such integration is initially successful, any number of technical changes, software upgrades, soft or hard forks, cybersecurity incidents, or other changes to the underlying blockchain network may occur from time to time, causing incompatibility, technical issues, disruptions, or security weaknesses to our platform. If we are unable to identify, troubleshoot and resolve any such issues successfully, we may no longer be able to support such digital asset, our customers' assets may be frozen or lost, the security of our hot, warm, or cold wallets may be compromised, and our platform and technical infrastructure may be affected, all of which could adversely impact our business.

***The characteristics of digital assets have been, and may in the future continue to be, exploited to facilitate illegal activity such as fraud, money laundering, tax evasion and scams. If any of our customers do so or are alleged to have done so, or if our services are used for such illegal purposes, our business could be adversely affected.***

Digital assets and the blockchain industry are relatively new and, in many cases, lightly regulated or largely unregulated. Many types of digital assets have characteristics, such as the speed with which digital currency transactions can be conducted, the ability to conduct transactions without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, the irreversible nature of certain digital currency transactions and encryption technology that anonymizes these transactions, that make digital assets particularly susceptible to use in illegal activity such as fraud, money laundering, tax evasion and ransomware scams. U.S. and foreign regulators and law enforcement agencies, such as the SEC, Commodity Futures Trading Commission, and Federal Trade Commission, have, in the past, taken legal action against persons alleged to be engaged in fraudulent schemes involving digital currencies.

We cannot ensure that we will be able to detect all illegal activity on our platform. Because the speed, irreversibility and anonymity of certain digital currency transactions make them more difficult to track, fraudulent transactions may be more likely to occur. As such, our products and services may be susceptible to potentially illegal or improper uses, including money laundering, terrorist financing, illegal online gambling, fraudulent sales of goods or services, illegal sales of prescription medications or controlled substances, piracy of software, movies, music, and other copyrighted or trademarked goods including digital goods, bank fraud, child pornography, human trafficking, prohibited sales of alcoholic beverages or tobacco products, securities fraud, pyramid or ponzi schemes, or the facilitation of other illegal activity. In particular, we may from time to time support digital assets that incorporate privacy-enhancing features. These privacy-enhancing digital assets obscure the identities of sender and receiver, or prevent law enforcement officials from tracing the source of funds on the blockchain. Facilitating transactions in these digital assets may cause us to be at increased risk of liability arising out of anti-money laundering and economic sanctions laws and regulations.

We or our partners may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. The use of our exchange for illegal or improper purposes could subject us to claims, individual and class action lawsuits, and government and regulatory investigations, inquiries, or requests that could result in liability and reputational harm for us. Moreover, certain activity that may be legal in one jurisdiction may be illegal in another jurisdiction, and a user may be found responsible for intentionally or inadvertently violating the law, resulting in liability for us. Changes in law have also increased the penalties for money transmitters for certain illegal activities, and government authorities may consider additional proposals from time to time. Owners of intellectual property rights or government authorities may seek to bring legal action against money transmitters, including us, for involvement in the sale of infringing or allegedly infringing items. Any threatened or resulting claims could result in reputational harm, and any resulting liabilities, loss of transaction volume, or increased costs could harm our business.

15

*Due to unfamiliarity and negative publicity associated with digital asset exchanges, existing and potential customers may lose confidence in digital asset exchanges.*

Digital asset exchanges are relatively new. Many of our competitors are unlicensed, unregulated, operate without supervision by any governmental authorities, and do not provide the public with significant information regarding their ownership structure, management team, corporate practices, cybersecurity, and regulatory compliance. As a result, customers and the general public may lose confidence in digital asset exchanges.

Since the inception of the blockchain industry, numerous digital asset exchanges have been sued, investigated, or shut down due to fraud, manipulative practices, business failure and security breaches. In many of these instances, customers of these exchanges were not compensated or made whole for their losses. Larger exchanges like us are more appealing targets for hackers and malware, and may also be more likely to be targets of regulatory enforcement actions.

In addition, there have been reports that a significant amount of digital asset trading volume on digital asset exchanges are fabricated and false in nature, with a specific focus on unregulated exchanges located outside the United States. Such reports may indicate that the market for digital asset exchange activities is significantly smaller than expected.

Negative perception, a lack of stability and regulation in the blockchain industry, and the closure or temporary shutdown of digital asset exchanges due to fraud, business failure, hackers or malware, or government mandated regulation, and associated losses suffered by customers may reduce confidence in the blockchain industry and result in greater volatility of the prices of assets, including significant depreciations in value. Any of these events could harm an adverse impact on our business.

*If we fail to retain existing customers or add new customers, or if our customers decrease their level of engagement with our products and services, our revenues, financial results, and business may be significantly harmed.*

Our success depends on our ability to retain existing customers and attract new customers and to increase engagement with our products and services. To do so, we must continue to offer leading technologies and ensure that our products and services are secure, reliable, and engaging. We must also expand our products and services, and offer competitive prices in an increasingly crowded and price-sensitive market. There is no assurance that we will be able to continue to do so, that we will be able to retain our current customers or attract new customers, or keep our customers engaged. Any number of factors can negatively affect customer retention, growth, and engagement, including if:

- customers increasingly engage with competing products and services, including products and services that we are unable to offer due to regulatory reasons;

- we fail to introduce new and improved products and services or if we introduce new products or services that are not favorably received;

- there are changes in customer sentiment about the quality or usefulness of our products and services or concerns related to privacy, security, or other factors;

- there are adverse changes in our products and services that are mandated by legislation, regulatory authorities, or litigation;

16

- technical or other problems prevent us from delivering our products and services with the speed, functionality, security, and reliability that our customers expect;

- cybersecurity incidents that causes losses to us or our customers;

- we fail to provide adequate customer service to customers; or

- we or other companies in our industry are the subject of adverse media reports or other negative publicity.

From time to time, certain of these factors have negatively affected customer retention, growth, and engagement to varying degrees. If we are unable to maintain or increase our customer base and customer engagement, our revenues and financial results may be adversely affected. Any decrease in user retention, growth, or engagement could render our products and services less attractive to customers, which may have an adverse impact on our revenues, business, financial condition, and operating results. If our customer growth rate slows or declines, we will become increasingly dependent on our ability to maintain or increase levels of user engagement and monetization in order to drive growth of revenues.

***We operate in a highly competitive industry and we compete against many companies with substantially greater financial and other resources, and our business may be adversely affected if we are unable to respond to our competitors effectively.***

Since its inception, the blockchain industry has been highly innovative, rapidly evolving, and characterized by vigorous competition, changing customer needs, frequent introductions of new products and services, and subject to uncertain and evolving industry and regulatory requirements. We expect competition to further intensify in the future as existing and new competitors introduce new services or enhance existing services.

Our core exchange business competes against a significant number of companies. These existing competitors have, and our potential competitors are expected to have various competitive advantages over us, such as:

- greater name recognition, longer operating histories, larger customer bases, and larger market shares;
- larger sales and marketing budgets and organizations;
- more established marketing and banking relationships;
- greater customer support resources;
- greater resources to make acquisitions;
- lower labor, compliance, risk mitigation, and research and development costs;
- larger and more mature intellectual property portfolios; and
- substantially greater financial, technical, and other resources.

Many of our competitors are subject to less stringent regulatory and compliance requirements in their local jurisdictions. In addition, many of our competitors choose to remain unregulated or only regulated in a small number of lower compliance jurisdictions. Many of these competitors are also accessible to our customers, and we may be unable to retain existing customers or attract new customers as a result.

In addition, new innovative start-up companies, as well as larger companies that are making significant investments in research and development, have in the past and are expected to continue to invent similar or

17

superior products and technologies that compete with our products. Our current and potential competitors may also establish cooperative relationships among themselves or with third parties that may further enhance their resources.

We also compete against an increasing number of decentralized and noncustodial exchanges. On these exchanges, users can interact directly with a market-making smart contract or on-chain exchange mechanism to exchange one type of digital asset for another without any centralized intermediary. While these exchanges and platforms often do not have the speed or liquidity of centralized exchanges, various innovative models and incentives have been designed to bridge the gap. They are also increasingly favored by cryptocurrency enthusiasts by eliminating risks associated with centralized intermediaries such as cybersecurity incidents and hacks.

If we are unable to compete successfully, or if competing successfully requires us to take costly actions in response to the actions of our competitors, our business, financial condition, and operating results could be adversely affected.

***If we cannot keep pace with rapid industry changes to provide new and innovative products and services, the use of our products and services and, consequently, our revenues could decline and our business could be adversely impacted.***

Our industry has been characterized by many rapid, significant, and disruptive products and services in recent years. These include innovative programs to attract customers such as transaction fee mining programs, initiatives to attract traders such as trading competitions, airdrops and giveaways, and novel digital asset fundraising and distribution schemes, such as initial exchange offerings. We expect new services and technologies to continue to emerge and evolve, and may be superior to, or render obsolete, the products and services that we currently provide. We cannot predict the effects of new services and technologies on our business. However, our ability to grow our customer base and revenues will depend heavily on our ability to innovate and create successful new products and services, both independently and in conjunction with third-party developers. In particular, developing and incorporating new products and services into our business may require substantial expenditures, take considerable time, and ultimately may not be successful. Any new products or services could fail to attract customers, generate revenues, or perform or integrate well with third-party applications and platforms. In addition, our ability to adopt and compete with new products and services may be inhibited by regulatory requirements, constraints by our banking partners and payment processors, third-party intellectual property rights, or other factors. Moreover, we must continue to enhance our technical infrastructure and other technology offerings to remain competitive and maintain a trading platform that has the required functionality, performance, capacity, security, and speed to attract and retain customers, including large, institutional, high-frequency and high-volume traders. As a result, we expect to expend significant costs and expenses to develop and upgrade our technical infrastructure to meet the evolving needs of the blockchain industry. Our success will depend on our ability to develop and incorporate new offerings, and adapt to technological changes and evolving industry practices. If we are unable to do so in a timely or cost-effective manner, our business and our ability to successfully compete, to retain existing customers, and to attract new customers may be adversely affected.

***If we fail to develop, maintain, and enhance our brand and reputation cost-effectively, our business and financial condition may be adversely affected.***

Our brand and reputation are key assets and a competitive advantage. Maintaining, protecting, and enhancing our brand depends largely on the success of our marketing efforts, ability to provide consistent, high-quality, and secure products, services, features, and support, and our ability to successfully secure, maintain, and defend our rights to use the "FTX" mark and other trademarks important to our brand. We

18

believe that the importance of our brand will increase as competition further intensifies. Our brand as well as our founder's (as such term is defined below) brand, could be harmed if we fail to achieve these objectives or if our public image were to be tarnished by negative publicity, unexpected events, or actions by third parties. Unfavorable publicity about us, including our products, services, technology, customer service, personnel, and digital asset or digital asset exchanges generally could diminish confidence in, and the use of, our products and services. Such negative publicity also could have an adverse effect on the size and engagement of our customers and could result in decreased revenues, which could have an adverse effect on our business, financial condition, and operating results.

***We may be subject to claims, government investigations and inquiries and other proceedings from time to time that may have an affect our business and financial condition.***

We may be from time to time subject to claims, individual and class action lawsuits, government and regulatory investigations, inquiries, actions or requests, and other proceedings alleging violations of laws, rules, and regulations. The scope, determination, and impact of claims, lawsuits, government investigations, disputes, and proceedings to which we are subject cannot be predicted with certainty, and may include a variety of outcomes, including:

- substantial payments to satisfy judgments, fines, or penalties;
- additional compliance and licensure requirements;
- loss of existing licenses;
- prohibition from or delays in obtaining additional licenses required for our business;
- criminal sanctions or consent decrees;
- orders that restrict our business or prevent us from offering certain products or services;
- changes to our business model and practices;
- delays to planned transactions, product launches or improvements; and
- damage to our brand and reputation.

Regardless of the outcome, any such matters can have an adverse impact, which may be material, on our business, operating results, or financial condition because of legal costs, diversion of management resources, reputational damage, and other factors.

In addition, because our services are accessible worldwide and we facilitate the purchase and sale of digital assets and provide related services to customers worldwide, one or more jurisdictions may claim that we or our customers are required to comply with their laws. Laws regulating financial instruments and associated products often impose different, more specific, or even conflicting obligations on us, as well as broader liability. The complexity of international regulatory and enforcement regimes, coupled with the global scope of our operations and the evolving global regulatory environment, could result in investigations and legal and regulatory proceedings by multiple government authorities in different jurisdictions. Any of the foregoing could, individually or in the aggregate, harm our reputation, damage our brands and business, and adversely affect our operating results and financial condition.

***Regulation of the blockchain industry is subject to significant uncertainties. Future regulatory developments are impossible to predict and may adversely affect our business and financial condition.***

The regulation of digital assets, blockchain technologies and cryptocurrency exchanges is highly evolving, subject to a significant degree of uncertainty, and varies widely across jurisdictions. Various legislative and executive bodies around the world may adopt new laws and regulations or interpretations of existing laws and regulations, which may adversely impact the development and growth of the blockchain industry as a whole and our regulatory status in particular. For instance, the imposition of new regulations or rules on certain digital assets could affect the value, liquidity, and market price of such digital assets, limit customer

19

access to digital asset exchanges on which to trade such assets, and impose restrictions on the structure, rights, and transferability of such assets.

Recently proposed and enacted legislation related to financial services providers and consumer protection in various jurisdictions around the world has subjected and may continue to subject us to additional regulatory oversight, mandate additional recordkeeping requirements, or otherwise impact the manner in which we provide our services.

The evolving regulatory environment for digital assets may also impact the manner in which we operate our business and change the competitive landscape. Governments authorities may implement new laws, regulations or interpretations that prevent or delay us from offering certain products or services offered by our competitors, limit our ability to set fees or transaction spreads, require changes to our compliance and risk mitigation measures, impose new licensing or compliance requirements, or impose a total ban on certain digital asset transactions, as has occurred in certain jurisdictions. Changes in regulatory expectations, interpretations or practices could also increase the risk of regulatory enforcement actions, fines, and penalties.

Regulators frequently look at each other's approaches to the regulation of the financial services industry. Consequently, a development in any one country, state or region may influence regulatory approaches in other countries, states, or regions. Similarly, new laws and regulations in a country, state or region involving one service may cause lawmakers there to extend the regulations to another service. As a result, the risks created by any one new law or regulation are magnified by the potential they may be replicated, affecting our business in another place or involving another service. Conversely, if widely varying regulations come into existence worldwide, we may have difficulty adjusting our services, fees, foreign exchange spreads and other important aspects of our business, with the same effect. These risks are heightened as we face increased competitive pressure from other similarly situated businesses that may engage in regulatory arbitrage to avoid the compliance costs associated with regulatory changes. Further, political changes and trends such as populism, economic nationalism, protectionism, and negative sentiment towards multinational companies could result in laws or regulations that adversely impact our ability to conduct business in certain jurisdictions. Any legal or regulatory development could adversely affect our business, financial condition, operating results, and cash flows.

***Disputes with our customers could adversely impact our brand and business.***

From time to time, we may be subject to claims and disputes with our customers with respect to our products and services, such as regarding the execution and settlement of cryptocurrency trades, fraudulent or unauthorized transactions, account takeovers, deposits and withdrawals of digital assets, failures or malfunctions of our systems and services, or other issues relating to our products services. In particular, the ingenuity of criminal fraudsters, combined with susceptibility to fraud by many consumers, cause our customers to be subject to ongoing account takeovers and identity fraud issues. While we have taken measures to detect and reduce the risk of fraud, there is no guarantee that they will be successful and, in any case, require continuous improvement and optimization for continually evolving forms of fraud to be effective. There can be no guarantee that we will be successful in detecting and resolving these disputes or defending ourselves in any of these matters, and any failure may result in impaired relationships with our customers, damage to our brand and reputation, and substantial fines and damages. We could incur significant costs in compensating our customers, such as if a transaction was unauthorized, erroneous or fraudulent. We could also incur significant legal expenses resolving and defending claims, even those without merit.

While certain of our customer agreements contain arbitration provisions with class action waiver provisions that may limit our exposure to consumer class action litigation, there can be no assurance that we will be

successful in enforcing these arbitration provisions, including the class action waiver provisions, in the future or in any given case. Legislative, administrative, or regulatory developments may directly or indirectly prohibit or limit the use of pre-dispute arbitration clauses and class action waiver provisions. Any such prohibitions or limitations on or discontinuation of the use of, such arbitration or class action waiver provisions could subject us to additional lawsuits, including additional consumer class action litigation, and significantly limit our ability to avoid exposure from consumer class action litigation.

### *The loss of our founder, or our failure to attract and retain other highly qualified personnel in the future, could adversely impact our business, operating results, and financial condition.*

We believe that our future success is highly dependent on the talents and contributions of Samuel Bankman-Fried, our Chief Executive Officer and Founder (referred to herein as the "*founder*"). Our future success depends on our ability to attract, develop, motivate, and retain highly qualified and skilled employees. Due to the nascent nature of the blockchain industry, the pool of qualified talent is extremely limited, particularly with respect to executive talent, engineering, and risk management. We face intense competition for qualified individuals from numerous software and other technology companies. To attract and retain key personnel, we incur significant costs, including salaries and benefits and equity incentives. Even so, these measures may not be enough to attract and retain the personnel we require to operate our business effectively. The loss or unavailability of our founder would substantially and adversely impact our operating results and impair our ability to grow.

### *In the event of employee misconduct or error, our business may be adversely impacted.*

Employee misconduct or error could subject us to legal liability, financial losses and regulatory sanctions and could seriously harm our reputation and negatively affect our business. Such misconduct could include engaging in improper or unauthorized transactions or activities, failing to supervise other employees, improperly using confidential information, as well as improper trading activity such as spoofing, layering, wash trading, manipulation and front-running. Employee errors, including mistakes in executing, recording, or processing transactions for clients, could expose us to the risk of material losses even if the errors are detected. The risk of employee error or misconduct may be even greater for novel products and services. It is not always possible to deter misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. We could be subject to regulatory sanctions, financial penalties, restrictions on our activities for failure to properly identify, monitor and respond to potentially problematic activity and seriously damage our reputation. Our employees and agents could also commit errors that subject us to financial claims for negligence, as well as regulatory actions, or result in financial liability. Further, allegations by regulatory or criminal authorities of improper trading activities could affect our brand and reputation.

### *Our failure to manage our customers' funds could adversely impact our business.*

We hold digital asset reserves and cash balances belonging to our customers, including balances held in customer accounts and digital assets held as part of our cryptocurrency exchange operations as well as our custodial services. Such digital assets are not insured by governmental or other insurance. Our ability to manage and accurately account for the assets underlying our customer funds and comply with applicable liquid asset requirements requires a high level of internal controls. As our business continues to grow and we expand our product offerings, we must continue to strengthen our associated internal controls. Our success requires significant public confidence in our ability to properly manage our customers' balances and handle large and growing transaction volumes and amounts of customer funds. Any failure to maintain the necessary controls or to manage our customer digital assets and funds accurately could result in reputational harm, significant financial losses, lead customers to discontinue or reduce their use of our products, and result in significant penalties and fines and additional restrictions, which could adversely

21

impact our business.

***Depositing and withdrawing digital assets into and from our platform involve risks, which could result in loss of customer assets, customer disputes and other liabilities, which could adversely impact our business.***

In order to own, transfer and use digital assets on its underlying blockchain network, a person must have a private and public key pair associated with a network address, commonly referred to as a "wallet". Each wallet is associated with a unique "public key" and "private key" pair, each of which is a string of alphanumerical characters. To deposit digital assets held by a customer onto our FTX exchange, a customer must "sign" a transaction that consists of the private key of the wallet from where the customer is transferring digital assets, the public key of a wallet that we control which we provide to the customer, and broadcast the deposit transaction onto the underlying blockchain network. Similarly, to withdraw digital assets from our exchange, the customer must provide us with the public key of the wallet that the digital assets are to be transferred to, and we would be required to "sign" a transaction authorizing the transfer. In addition, some digital asset networks require additional information to be provided in connection with any transfer of digital assets to or from our platforms. A number of errors can occur in the process of depositing or withdrawing digital assets into or from our platform, such as typos, mistakes, or the failure to include the required information required by the blockchain network. For instance, a user may incorrectly enter our wallet's public key or the desired recipient's public key when depositing and withdrawing from our platforms, respectively. Alternatively, a user may transfer digital assets to a wallet address that he does not own, control or holds the private keys to. In addition, each wallet address is only compatible with the underlying blockchain network on which it is created. For instance, a Bitcoin wallet address can only be used to send and receive Bitcoins. If any Ether or other digital asset is sent to a Bitcoin wallet address, or if any of the foregoing errors occur, all of the customer's digital assets will be permanently and irretrievably lost with no means of recovery. We have encountered and expect to continue to encounter similar incidents with our customers. Such incidents could result in customer disputes, damage to our brand and reputation, legal claims against us, and financial liabilities, any of which could adversely affect our business.

***The loss or destruction of a private key required to access any digital asset held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any digital assets, it could cause regulatory scrutiny, reputational harm, and other losses.***

Digital assets are controllable only by the possessor of the unique private key relating to the digital wallet in which the digital assets are held. While blockchain protocols requires a public key relating to a digital wallet to be published when used in a transaction, private keys must be safeguarded and kept private in order to prevent a third party from accessing the digital assets held in such wallet. To the extent that any of the private keys relating to our hot or cold wallets containing digital assets held for our own account or for our customers is lost, destroyed, or otherwise compromised or unavailable, and no backup of the private key is accessible, we will be unable to access the digital assets held in the related wallet. Further, we cannot provide assurance that our wallet will not be hacked or compromised. Cryptocurrencies and blockchain technologies, have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store our customers' digital assets could adversely affect our customers' ability to access or sell their digital assets and subject us to significant financial losses in addition to losing customer trust in us and our products. As such, any loss of private keys due to a hack, employee misconduct or error, or other compromise by third parties could hurt our brand and reputation, result in significant losses, and adversely impact our business.

22

***Any significant disruption in our services or in our information technology systems could result in a loss of customers and adversely impact our business.***

Our reputation and ability to attract and retain customers and grow our business depends on our ability to operate our service at high levels of reliability, scalability, and performance, including the ability to process and monitor, on a daily basis, a large number of transactions that occur at high volume and frequencies across multiple systems. Our systems and those of our service providers and partners have experienced from time to time, and may experience in the future service interruptions or degradation because of hardware and software defects or malfunctions, distributed denial-of-service and other cyberattacks, insider threats, break-ins, sabotage, human error, vandalism, earthquakes, hurricanes, floods, fires, and other natural disasters, power losses, disruptions in telecommunications services, fraud, military or political conflicts, terrorist attacks, computer viruses or other malware, or other events. In addition, extraordinary trading volumes or site usage could cause our computer systems to operate at an unacceptably slow speed or even fail. Some of our systems, including systems of companies we have acquired, are not fully redundant, and our disaster recovery planning may not be sufficient for all possible outcomes or events.

If any of our systems, or those of our third-party providers, are disrupted for any reason, our products and services may fail, resulting in unanticipated disruptions, slower response times and delays in our customers' trade execution and processing, failed settlement of trades, incomplete or inaccurate accounting, recording or processing of trades, unauthorized trades, loss of customer information, customer claims, complaints with regulatory organizations, lawsuits, or enforcement actions. A prolonged interruption in the availability or reduction in the availability, speed, or functionality of our products and services could harm our business. Frequent or persistent interruptions in our services could cause current or potential customers or partners to believe that our systems are unreliable, leading them to switch to our competitors or to avoid or reduce the use of our products and services, and could permanently harm our reputation and brands. Moreover, if any system failure or similar event results in damages to our customers or their business partners, these customers or partners could seek significant compensation or contractual penalties from us for their losses, and those claims, even if unsuccessful, would likely be time-consuming and costly for us to address. Problems with the reliability or security of our systems would harm our reputation, and damage to our reputation and the cost of remedying these problems could negatively affect our business, financial condition, and operating results.

***Cyberattacks and security breaches of our services, or those of our customers or third parties, could adversely impact our reputation, business, and financial condition.***

Our business involves the collection, storage, processing, and transmission of confidential information, customers' personal data, as well as information required to access customer assets.

The techniques used to obtain unauthorized, improper, or illegal access to systems and information (including customers' personal data and digital assets), disable or degrade service, or sabotage systems are constantly evolving and have become increasingly complex and sophisticated, may be difficult to detect quickly, and often are not recognized or detected until after they have been launched against a target. Unauthorized parties have attempted, and we expect that they will continue to attempt, to gain access to our systems and facilities, as well as those of our customers, partners and third party service providers, through various means, including, but not limited to, hacking, social engineering, phishing, and attempting to fraudulently induce customers of our systems (including employees and our customers) into disclosing user names, passwords, payment card information, or other sensitive information, which may in turn be used to access our information technology systems and customers' digital assets. Threats can come from a variety of sources, including criminal hackers, hacktivists, state-sponsored intrusions, industrial espionage, and insider threats. Certain efforts may be supported by significant financial and technological resources, making them even more sophisticated and difficult to detect.

23

Numerous and evolving cybersecurity threats, including advanced and persisting cyberattacks, cyberextortion, spear phishing and social engineering schemes, the introduction of computer viruses or other malware, and the physical destruction of all or portions of our information technology and infrastructure could compromise the confidentiality, availability, and integrity of the data in our systems. Although we have developed systems and processes designed to protect data we manage, prevent data loss and other security breaches, and effectively respond to known and potential risks, and expect to continue to expend significant resources to bolster these protections, there can be no assurance that these security measures will provide absolute security or prevent breaches or attacks.

Our and our customers' information technology and infrastructure may be vulnerable to cyberattacks or security breaches, and third parties may be able to access our and our customers' personal or proprietary information as well as digital assets. We have experienced from time to time, and may experience in the future, breaches of our security measures due to human error, malfeasance, insider threats, system errors or vulnerabilities, or other irregularities. Actual or perceived breaches of our security could, among other things:

- interrupt our operations;
- result in our systems or services being unavailable;
- result in improper disclosure of data and violations of applicable privacy and other laws;
- harm our reputation and brand;
- result in significant regulatory scrutiny, investigations, fines, penalties, and other legal and financial exposure;
- cause us to incur significant remediation costs;
- lead to irretrievable loss of our or our customers' digital assets;
- reduce customer confidence in, or decreased use of, our products and services;
- divert the attention of management from the operation of our business;
- administrative and regulatory investigations, penalties, sanctions, and fines;
- result in significant compensation or contractual penalties from us to our customers as a result of losses to them or claims by them; and
- adversely affect our business and operating results.

***We obtain and process a large amount of sensitive customer data. Any real or perceived improper use of, disclosure of, or access to such data could harm our reputation, as well as have an adverse effect on our business.***

We obtain and process large amounts of sensitive customer data, including data related to our customers and their transactions, including their names and email addresses. We face risks, including to our reputation, in the handling and protection of this data, and these risks will increase as our business continues to expand. Laws and regulations governing privacy, data protection, and e-commerce transactions require us to safeguard our customers' personal information. We have administrative, technical, and physical security measures in place, and have policies and procedures in place to implement and maintain appropriate security measures. However, our security measures may be inadequate or are breached as a result of third-party action, employee error, malfeasance, malware, phishing, hacking attacks, system error, trickery, or otherwise, and, as a result, someone may be able to obtain unauthorized access to sensitive information, including personally identifiable information, on our systems. Further, advances in computer capabilities, new discoveries in the field of cryptography, inadequate facility security or other developments may result

24

in a compromise or breach of the technology we use to protect customer information.

If the sensitive information is lost or improperly disclosed or threatened to be disclosed, we could incur significant liability and be subject to regulatory scrutiny and penalties, including costs associated with remediating the breach. Additionally, if our own confidential business information were improperly disclosed, our business could be adversely affected. Additionally, a party who circumvents our security measures could, among other effects, appropriate customer information or other proprietary data, cause interruptions in our operations, or expose customers to hacks, viruses and other disruptions. Actual or perceived vulnerabilities could lead to claims against us.

To the extent that the measures we or our third-party business partners have taken prove to be insufficient or inadequate, we may become subject to litigation, breach notification obligations, or regulatory or administrative sanctions, which could result in significant fines, penalties, damages harm to our reputation, or loss of customers. Any perceived or actual breach of security could have a significant impact on our reputation, cause us to lose existing customers, prevent us from obtaining new customers, require us to expend significant funds to remedy problems caused by breaches and to implement measures to prevent further breaches, and expose us to legal risk and potential liability. Further, any actual or perceived breach or cybersecurity attack directed at other financial institutions or digital asset companies, whether or not we are impacted, could lead to a general loss of customer confidence in us, which could negatively impact us, including the market perception of the effectiveness of our security measures and technology infrastructure.

***Changes in laws or regulations relating to privacy or the protection, collection, storage, processing, transfer, or use of personal data, or any actual or perceived failure by us to comply with such laws and regulations or our privacy policies, could adversely affect our business.***

Various local, state, federal, and international laws, directives, and regulations apply to our collection, use, retention, protection, disclosure, transfer, and processing of personal data. These data protection and privacy laws and regulations are subject to uncertainty and continue to evolve. Various federal, state, and foreign legislative or regulatory bodies may enact new or additional laws or regulations concerning privacy and data protection that could adversely impact our business. Complying with these varying requirements have caused, and may continue to cause us to incur substantial costs, and may also require us to change our business practices, either of which could adversely affect our business and operating results.

For example, the European Union adopted a new law regarding data practices called the General Data Protection Regulation, or GDPR, which became effective in May 2018, and supersedes previous EU data protection legislation. The GDPR imposes stringent EU data protection requirements, which could increase the risk of non-compliance and the costs of providing our products and services in a compliant matter. The GDPR provides for penalties for noncompliance of up to the greater of €20 million or 4% of total worldwide annual turnover.

Changing definitions of personal data and information may also limit or inhibit our ability to operate or expand our business, including limiting strategic partnerships that may involve the sharing of data. Also, some jurisdictions require that certain types of data be retained on servers within these jurisdictions. Despite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection and information security, it is possible that our practices, offerings, or platform could be inconsistent with, or fail or be alleged to fail to meet all requirements of, such laws, regulations, or obligations. For instance, the overall regulatory framework governing the application of privacy laws to blockchain technology is still currently highly undeveloped, uncertain, and likely to evolve. Our failure, or the failure by our third-party providers or partners, to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security, or any compromise of security that results in unauthorized access to, or use or release of personally identifiable information or other driver

25

or rider data, or the perception that any of the foregoing types of failure or compromise has occurred, could damage our reputation, discourage new and existing customers or result in fines or proceedings by governmental agencies and private claims and litigation, any of which could adversely affect our business, financial condition and operating results. Even if not subject to legal challenge, the perception of privacy concerns, whether or not valid, may harm our reputation and brand and adversely affect our business, financial condition, and operating results.

### Unfavorable media coverage could negatively affect our business.

We receive a high degree of media coverage in the blockchain industry and around the world. Unfavorable publicity regarding, for example, our product changes, product quality, litigation or regulatory activity, privacy practices, terms of service, the use of our products or services for illicit or objectionable ends, the actions of our customers, or the actions of other companies that provide similar services to ours, has in the past, and could in the future, adversely affect our reputation. Any such negative publicity could have an adverse effect on the size, activity, and loyalty of our customers and result in decreased revenues.

### We currently rely on a small number of third-party service providers for our operations, and any interruptions in services provided by these third parties may impair our ability to support our customers.

We rely on third parties in connection with many aspects of our business, including payment processors, banks, and payment gateways to process transactions; cloud computing services and data centers that provide facilities, infrastructure, components, and services, including data center facilities and cloud computing; as well as third parties that provide outsourced customer service, compliance support and product development functions, which are critical to our operations. Because we rely on third parties to provide these services and to facilitate certain of our business activities, we face increased operational risks. We do not control the operation of any of these third-parties, including the data center facilities we use. These third parties may be subject to financial, legal, regulatory, and labor issues, cybersecurity incidents, break-ins, computer viruses, denial-of-service attacks, sabotage, acts of vandalism, privacy breaches, service terminations, disruptions, interruptions, and other misconduct. They are also vulnerable to damage or interruption from human error, power loss, telecommunications failures, fires, floods, earthquakes, hurricanes, tornadoes, pandemics and similar events. In addition, these third parties may breach their agreements with us, disagree with our interpretation of contract terms or applicable laws and regulations, refuse to continue or renew these agreements on commercially reasonable terms or at all, fail or refuse to process transactions or provide other services adequately, take actions that degrade the functionality of our services, impose additional costs or requirements on us or our customers, or give preferential treatment to competitive services. There can be no assurance that third parties who provide services to us or our customers on our behalf will continue to do so on acceptable terms, or at all. If any third parties do not adequately or appropriately provide their services or perform their responsibilities to us or our customers on our behalf, such as if third-party service providers to close their data center facilities without adequate notice, are unable to restore operations and data, fail to perform as expected, or experience other unanticipated problems, we may be unable to procure alternatives in a timely and efficient manner and on acceptable terms, or at all, and we may be subject to business disruptions, losses or costs to remediate any of the deficiencies, customer dissatisfaction, reputational damage, legal or regulatory proceedings, or other adverse consequences which could harm our business.

### We currently support, and expect to continue to support, certain smart contract-based digital assets. If the underlying smart contracts for these digital assets do not operate as expected, they could lose value and our business could be adversely affected.

We currently support, and expect to continue to support, various digital assets that represent units of value on smart contracts deployed on a third party blockchain. Smart contracts are programs that stores value and

26

executes automatically when certain conditions are met. Since smart contracts typically cannot be stopped or reversed, vulnerabilities in their programming can have damaging effects. If any such vulnerabilities come to fruition, smart contract-based digital assets may suffer negative publicity, be exposed to security vulnerabilities, decline in value, and lose liquidity over a short period of time. Any such events could adversely impact our business.

We also support certain crypto-collateralized stablecoins on our platform, and expect to continue to identify additional crypto-collateralized stablecoins for trading and support. Crypto-collateralized stablecoins rely on a smart contract to hold a pool of assets, with each such stablecoin representing a claim to a portion of the pool of assets, typically no less than $1 U.S. dollar. The smart contract operates by self-executing a set of code to allow for lending into and borrowing from the pool, and relies on market input to determine the applicable rate of interest and underlying value of the asset pool. In the event of large market movements, the smart contract facilitates the liquidation of the underlying pool of assets and distributes the liquidated proceeds to its lenders. However, these smart contracts have in the past, and are likely to continue to, experience glitches, flaws, and weaknesses. In the event of crashes, smart contract glitches or security weaknesses in the underlying smart contracts, such digital-asset backed stablecoins could lose value, experience volatility, lose liquidity, and adversely impact our business.

***We might require additional capital to support business growth, and this capital might not be available.***

In the event that we require additional capital, financing may not be available on terms favorable to us, if at all. If we incur additional debt, the debt holders would have rights senior to holders of common stock to make claims on our assets, and the terms of any debt could restrict our operations, including our ability to pay dividends on our common stock. Furthermore, if we issue additional equity securities, stockholders will experience dilution, and the new equity securities could have rights senior to those of our common stock. In addition, a slowdown or other sustained adverse downturn in the general economic or digital asset markets could adversely affect our business and the value of our common stock. Because our decision to raise capital in the future will depend on numerous considerations, including factors beyond our control, we cannot predict or estimate the amount, timing, or nature of any future issuances of securities. As a result, our stockholders bear the risk of future issuances of debt or equity securities reducing the value of our common stock and diluting their interests. Our inability to obtain adequate financing or financing on terms satisfactory to us, when we require it, could significantly limit our ability to continue supporting our business growth and responding to business challenges.

***Our business and operations have experienced significant growth, and if we do not effectively manage our growth, or are unable to improve our systems and processes, our operating results will be negatively affected.***

We have significantly expanded our operations in recent years, both in terms of employee headcount as well as the number of customers. We expect such growth to continue for the foreseeable future. As we grow, our business becomes increasingly complex. To effectively manage and capitalize on our growth, we must continue to expand our information technology and financial, operating, and administrative systems and controls, and continue to manage headcount, capital, and processes efficiently. Our continued growth could continue to strain our existing resources, and we could experience ongoing operating difficulties in managing our business as it expands across numerous jurisdictions, including difficulties in hiring, training, and managing a diffuse and growing employee base. Failure to scale and preserve our company culture with growth could harm our future success, including our ability to retain and recruit personnel and to effectively focus on and pursue our corporate objectives. If we do not adapt to meet these evolving challenges, or if our management team does not effectively scale with our growth, we may experience erosion to our brand, the quality of our products and services may suffer, and our company culture may be harmed. Moreover, the failure of our systems and processes could undermine our ability to provide accurate,

27

timely, and reliable reports on our financial and operating results, including the financial statements provided herewith, and could impact the effectiveness of our internal controls over financial reporting. In addition, our systems and processes may not prevent or detect all errors, omissions, or fraud. Any of the foregoing operational failures could lead to noncompliance with laws, loss of operating licenses, and/or loss of bank relationships that could substantially impair or even suspend company operations.

Successful implementation of our growth strategy will also require significant expenditures before any substantial associated revenues are generated and we cannot guarantee that these increased investments will result in corresponding and offsetting revenue growth. Because we have a limited history operating our business at its current scale, it is difficult to evaluate our current business and future prospects, including our ability to plan for and model future growth. Our limited operating experience at this scale, combined with the rapidly evolving nature of the digital asset market in which we operate, substantial uncertainty concerning how these markets may develop, and other economic factors beyond our control, reduces our ability to accurately forecast quarterly or annual revenues. Failure to manage our future growth effectively could have an adverse effect on our business, financial condition, and operating results.

### *We may be sued by third parties for alleged infringement of their proprietary rights.*

In recent years, there has been considerable patent, copyright, trademark, domain name, trade secret and other intellectual property development activity in the blockchain industry, as well as litigation, based on allegations of infringement or other violations of intellectual property, including by large financial institutions. Furthermore, individuals and groups can purchase patents and other intellectual property assets for the purpose of making claims of infringement to extract settlements from companies like ours. Our use of third-party intellectual property rights also may be subject to claims of infringement or misappropriation. We cannot guarantee that our internally developed or acquired technologies and content do not or will not infringe the intellectual property rights of others. From time to time, our competitors or other third parties may claim that we are infringing upon or misappropriating their intellectual property rights, and we may be found to be infringing upon such rights. Any claims or litigation could cause us to incur significant expenses and, if successfully asserted against us, could require that we pay substantial damages or ongoing royalty payments, prevent us from offering our products or services or using certain technologies, force us to implement expensive work-arounds, or impose other unfavorable terms. We expect that the occurrence of infringement claims is likely to grow as the digital asset market grows and matures. Accordingly, our exposure to damages resulting from infringement claims could increase and this could further exhaust our financial and management resources. Further, during the course of any litigation, we may make announcements regarding the results of hearings and motions, and other interim developments. Even if intellectual property claims do not result in litigation or are resolved in our favor, these claims, and the time and resources necessary to resolve them, could divert the resources of our management and require significant expenditures. Any of the foregoing could prevent us from competing effectively and could have an adverse effect on our business, financial condition, and operating results.

### *Our platform contains third-party open source software components, and failure to comply with the terms of the underlying open source software licenses could harm our business.*

Our platform contains software modules licensed to us by third-party authors under "open source" licenses. Use and distribution of open source software may entail greater risks than use of third-party commercial software, as open source licensors generally do not provide support, warranties, indemnification or other contractual protections regarding infringement claims or the quality of the code. In addition, the public availability of such software may make it easier for others to compromise our platform.

Although we monitor our use of open source software to avoid subjecting our platform to conditions we do not intend, the terms of many open source licenses have not been interpreted by courts, and there is a risk

28

that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to provide or distribute our platform. From time to time, there have been claims challenging the ownership of open source software against companies that incorporate open source software into their solutions. As a result, we could be subject to lawsuits by parties claiming ownership of what we believe to be open source software. Moreover, we cannot assure you that our processes for controlling our use of open source software in our platform will be effective. If we are held to have breached or failed to fully comply with all the terms and conditions of an open source software license, we could face litigation, infringement or other liability, or be required to seek costly licenses from third parties to continue providing our offerings on terms that are not economically feasible, to re-engineer our platform, to discontinue or delay the provision of our offerings if re-engineering could not be accomplished on a timely basis or to make generally available, in source code form, our proprietary code, any of which could adversely affect our business, financial condition and operating results.

### *Future developments regarding the treatment of digital assets for tax purposes could adversely impact our business.*

Due to the new and evolving nature of digital assets and the absence of comprehensive legal guidance with respect to digital assets, many significant aspects of the tax treatment of digital assets are uncertain, and it is unclear what guidance on the treatment of digital assets for tax purposes may be issued in the future.

There can be no assurance that the tax authorities will not alter their positions with respect to digital assets in the future or that a court would uphold any such treatments. It is also unclear what additional guidance on the treatment of digital assets for purposes tax regulations may be issued in the future. Any such alteration of positions or additional guidance could result in adverse tax consequences for holders of digital assets and could have an adverse effect on the value of digital assets and the broader digital asset markets. Future developments that may arise with respect to digital currencies may increase the uncertainty with respect to the treatment of digital currencies tax purposes. Any such developments could adversely affect our business.

### *Changes in tax laws, as well as the application of such laws, could adversely impact our financial position and operating results.*

We are subject to complex tax laws and regulations around the world. Certain jurisdictions have in the past and may in the future make changes to their corporate income tax rates and other income tax laws which could increase our future income tax provision.

Our future income tax obligations could be affected by earnings that are lower than anticipated in jurisdictions where we have lower statutory rates and by earnings that are higher than anticipated in jurisdictions where we have higher statutory rates, by changes in the valuation of our deferred tax assets and liabilities, changes in the amount of unrecognized tax benefits, or by changes in tax laws, regulations, accounting principles, or interpretations thereof, including changes with possible retroactive application or effect.

Our determination of our tax liability is subject to review and may be challenged by tax authorities. Any adverse outcome of such challenge could harm our operating results and financial condition. The determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment and, in the ordinary course of business, there are many transactions and calculations where the ultimate tax determination is complex and uncertain. Moreover, as a multinational business, we engage in many intercompany transactions in a variety of tax jurisdictions where the ultimate tax determination is complex and uncertain. Our existing corporate structure and intercompany arrangements have been implemented in a manner we believe is in compliance with current prevailing tax laws. Furthermore, as we

29

operate in multiple taxing jurisdictions, the application of tax laws can be subject to diverging and sometimes conflicting interpretations by tax authorities of these jurisdictions. It is not uncommon for taxing authorities in different countries to have conflicting views with respect to, among other things, the characterization and source of income or other tax items, the manner in which the arm's-length standard is applied for transfer pricing purposes, or with respect to the valuation of intellectual property. The taxing authorities of the jurisdictions in which we operate may challenge our tax treatment of certain items or the methodologies we use for valuing developed technology or intercompany arrangements, which could impact our worldwide effective tax rate and harm our financial position and operating results.

We are also subject to non-income taxes, such as payroll, sales, use, value-added, net worth, property, and goods and services taxes in various jurisdictions. Tax authorities may disagree with certain positions we have taken. As a result, we may have exposure to additional tax liabilities that could have an adverse effect on our operating results and financial condition.

In addition, our future effective tax rates could be favorably or unfavorably affected by changes in tax rates, changes in the valuation of our deferred tax assets or liabilities, the effectiveness of our tax planning strategies, or changes in tax laws or their interpretation. Such changes could have an adverse impact on our financial condition.

As a result of these and other factors, the ultimate amount of tax obligations owed may differ from the amounts recorded in our financial statements and any such difference may harm our operating results in future periods in which we change our estimates of our tax obligations or in which the ultimate tax outcome is determined.

### Risks Related to Ownership of Our Common Stock

### We do not intend to pay dividends for the foreseeable future.

We have never declared or paid any cash dividends on our common stock and do not intend to pay any cash dividends in the foreseeable future. We anticipate that for the foreseeable future we will retain all of our future earnings for use in the development of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of the Acquirer's board of directors. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investments.

30

## THE TRANSACTIONS

*The following is a description of the material aspects of the Stock Purchase and the Merger. Although the Acquirer and the Company believe that the following description covers the material terms of the Stock Purchase and Merger, the description may not contain all of the information important to you. You are encouraged to read carefully this Information Statement in its entirety, including the Purchase Agreement, which is included in this Information Statement as Exhibit B, the Stockholders' Agreement, which is included in this information Statement as Exhibit C and the Merger Agreement, which is included in this Information Statement as Exhibit A, for a more complete understanding of the Stock Purchase and the Merger.*

### Company Background and Reasons for the Transactions

In reaching its decision to approve the Transactions (as defined below) and the Stock Purchase Agreement, Stockholders' Agreement, and Merger Agreement (such documents, the "***Transaction Agreements***") and to recommend that the Stockholders vote to adopt the Transaction Agreements and approve the transactions contemplated thereby (the "***Transactions***"), the Board of Directors of the Company (the "***Board***") consulted with senior management and other advisors and independently considered the proposed Transaction Agreements and the Transactions. The following factors, among others, were considered by the Board in making such decision:

a. current economic, industry and market factors and the competitive advantages of partnering with the Acquirer;
b. the Company's prospects if it were to remain independent, including the risks inherent in remaining independent;
c. the Company's capital requirements and need to secure additional financing, including the dilutive impact of a future equity financing; and
d. current consumer interest in cryptocurrency and the Acquirer's position in the cryptocurrency market and ability to leverage that interest.

In evaluating the Transaction Agreements and the Transactions, the Board also considered the following factors:

a. the amount and form of consideration to be received by the Stockholders in the Transactions pursuant to the Transaction Agreements;
b. the terms of the Transaction Agreements, including the Company's representations, warranties and covenants and the Stockholders' obligations to indemnify Acquirer;
c. the likelihood that the proposed Transactions would be consummated, in light of the experience, reputation and financial capabilities of Acquirer;
d. the proposed timing of the Transactions and whether it was advisable to proceed with the Transactions given current economic, industry and market conditions; and
e. the potential impact of the Transactions on the Company's employees and customers.

### The Transactions

Upon the consummation of the Stock Purchase, the Acquirer will purchase shares of capital stock of the Company (the "***Purchased Shares***") from each Stockholder that agrees to sell their shares in the Offer and become a party to the Purchase Agreement, directly or through the joinder (each such stockholder, a "***Selling Stockholder***," and collectively, the "***Selling Stockholders***"), such that following the Stock Purchase, it is expected that the Acquirer will be the beneficial owner of at least a majority of the outstanding capital stock of the Company. As consideration for the Stock Purchase, each Stockholder and

31

Company Optionholder (as defined in the Purchase Agreement) that is not an accredited investor shall receive an amount in cash in respect of the Purchased Shares or vested Company Options (as defined in the Purchase Agreement) held by such Stockholder or Company Optionholder, and each Stockholder that is an accredited investor shall receive an amount in Acquirer Tokens in respect of the Purchased Shares held by such stockholder. As a condition to participating in the Stock Purchase and tendering its shares in the Offer, each Selling Stockholder shall deliver a joinder to the Stockholders Agreement and become a party thereto.

As of the closing of the Stock Purchase, the certificate of incorporation of the Company shall be amended and restated to read as set forth in the form attached hereto as Exhibit D. Further, on or about the closing of the Stock Purchase the Company and/or Acquirer may offer revised terms of employment to the Company's employees. In connection with the Transactions, certain of the stockholders of the Company may enter into side letter agreements with the Company for purposes of their compliance and reporting obligations.

Pursuant to the Stockholders' Agreement, the Selling Stockholders are granting the Acquirer the Call Option, upon the exercise of which the Acquirer may acquire all of the outstanding shares of capital stock of the Company through the Merger, subject to certain conditions (described below under "*Material Agreements—Stockholders Agreement*"). The Call Option may be exercised during the Call Option Period (as defined below under "*Material Agreements—Stockholders Agreement*"), which shall not occur earlier than two years after the consummation of the Stock Purchase.

Further, the Acquirer is granting the Company the Put Option, upon the exercise of which the Company may require the Acquirer to acquire all of the outstanding shares of capital stock of the Company from the Company stockholders through the Merger, subject to certain conditions (described below under "*Material Agreements—Stockholders Agreement*"). The Put Option may be exercised following the expiration of the Call Option Period and during the Put Option Period (as defined below under "*Material Agreements—Stockholders Agreement*").

If and when the Acquirer exercises the Call Option, and the applicable conditions are met, the Company and Acquirer shall effect the Merger, pursuant to which the Acquirer shall acquire all of the outstanding shares of capital stock of the Company. The purchase price payable by the Acquirer shall be the Call Option Purchase Price (as defined below under "*Material Agreements—Stockholders Agreement*"). The Call Option Purchase Price may be offset by unpaid indemnifiable damages for which stockholders are liable pursuant to the Purchase Agreement, in the amount of the Holdback Reduction Amount (as defined below under "*Material Agreements—Stockholders Agreement*").

If and when the Company exercises the Put Option, and the applicable conditions are met, the Company and Acquirer shall effect the Merger, pursuant to which the Acquirer shall acquire all of the outstanding shares of capital stock of the Company. The purchase price payable by the Acquirer shall be the Put Option Purchase Price (as defined below under "*Material Agreements—Stockholders Agreement*").

ACTIVE/104653288.13

## STOCK PURCHASE AGREEMENT

*The following section summarizes material provisions of the Purchase Agreement, which is included in this Information Statement as Exhibit B. The summary of the material provisions of the Purchase Agreement below and elsewhere in this Information Statement is qualified in its entirety by reference to the Purchase Agreement. This summary does not purport to be complete and may not contain all of the information about the Purchase Agreement that is important to you. The rights and obligations of the Company and the Acquirer are governed by the Purchase Agreement and not by this summary or any other information contained in or incorporated by reference herein.*

### The Offer

The Acquirer is making this Offer to effect the Stock Purchase. This Offer shall expire twenty (20) business days after the commencement thereof, or such later date as the Acquirer, the Company and the other parties to the Purchase Agreement shall agree. The obligation of the Acquirer to accept for payment, and to pay for, any Purchased Shares validly tendered shall be subject to certain conditions (the "*Offer Conditions*") described in "—*Conditions to the Stock Purchase*."

### Closing; Effective Time

The closing of the Stock Purchase (the "*Closing*") shall take no later than the third Business Day following the date on which all of the conditions to closing set forth in the Purchase Agreement have been satisfied or waived, or such other time as the Acquirer and the Company agree. The date on which the Closing occurs is referred to as the "*Closing Date*" and the time at which the Closing occurs and becomes effective is referred to herein as the "*Effective Time*". The Closing Date will occur on or as promptly as practicable after the expiration of the Offer, but any shares tendered in the Offer shall be owned by the Acquirer as of the Effective Time.

### Stock Purchase Consideration

The aggregate consideration for the Stock Purchase (the "*Total Stock Purchase Consideration*") shall be in the form of cash and Acquirer Tokens.   The Total Stock Purchase Consideration shall be calculated as:

- $4,260,977 (the "*Total Cash Consideration*") *plus*
- A dollar amount corresponding to 23,398,579 Acquirer Tokens, less Acquirer Tokens issuable to the Company's financial advisors pursuant to the Purchase Agreement, based on a price per Token equivalent to $3.30 per Acquirer Token (the "*Token Price*"), *minus*
- Outstanding transaction expenses unpaid as of the Closing, *minus*
- Outstanding Company debt unpaid as of the Closing, *minus*
- The amount by which the Company Net Working Capital Amount set forth in the Company Closing Financial Certificate is less than the Company Net Working Capital Target, if any.

### Treatment of Company Capital Stock

Upon the Closing, the Selling Stockholders shall be entitled to the following consideration as consideration for their Purchased Shares:

●       *Accredited Investors*: Each Accredited Selling Stockholder shall be entitled to receive, with respect to the Purchased Shares owned by such Accredited Selling Stockholder, an amount in the form

33

of Acquirer Tokens (with the number of Acquirer Tokens being calculated based on the Token Price) equal to the pro rata share of the Total Stock Purchase Consideration; provided that an amount shall be subject to holdback to partially secure such Accredited Selling Stockholder's indemnity obligations and an amount shall be withheld to fund such Accredited Selling Stockholder's portion of the Expense Fund Amount (as defined below under "—*Holdback Amount; Expense Fund*"), rounded down to the nearest whole cent).

      o    *Vesting Schedule*: The Acquirer Tokens issued in the Stock Purchase shall be issued ratably on a monthly basis over a two-year period beginning on the first day of the first full month following the six-month anniversary of the Closing (the "*First Vesting Date*" and the first day of each month thereafter for such two-year period, each a "*Vesting Date*" and the Tokens to be issued on such Vesting Date, the "*Monthly Vested Tokens*")

      o    *Cash Election*: On any Vesting Date, a Selling Stockholder may elect to receive, in lieu of such Monthly Vested Tokens, an amount in cash equal to ninety percent (90%) of the value of such Monthly Vested Tokens (based on the market price of a Token as of the applicable Vesting Date) due to be issued to such Selling Stockholder on such Vesting Date by delivering written notice of such election in the form provided in the Purchase Agreement.

•    *Non-Accredited Investors*: Each Selling Stockholder that is not an Accredited Selling Stockholder shall be entitled to receive, with respect to the Purchased Shares owned by the Selling Stockholder, an amount of cash equal to the pro rata share of the Total Stock Purchase Consideration; provided that an amount shall be subject to holdback to partially secure such Selling Stockholder's indemnity obligations and an amount shall be withheld to fund such Selling Stockholder's portion of the Expense Fund Amount. Such cash payment will be due and payable promptly after the Closing.

**Treatment of Company Options**

•    *Accredited Selling Stockholders*: As of the date of the Purchase Agreement, except for certain unvested Company Options described in the Purchase Agreement, each Accredited Selling Stockholder has been given the right to early exercise the Company Options held by such Accredited Selling Stockholder and has exercised such right. As of the closing of the Stock Purchase, except with respect to such unvested Company Options, each Accredited Selling Stockholder shall hold shares of Company Common Stock and no Company Options, and shall receive the Acquirer Token consideration as described above in consideration for Company Common Stock that is tendered by the Accredited Selling Stockholder pursuant to this Offer. Such unvested Company Options shall be cancelled without any cash payment being made in respect thereof.

•    *Non-Accredited Selling Stockholders*: As of the date of the Purchase Agreement, the vesting of each Company Option held by a Company Optionholder that is not an Accredited Selling Stockholder has been accelerated in full. At the Effective Time, all such Company Options held by a such Company Optionholders shall be cancelled and converted into the right to receive an amount in cash for each share of Company Common Stock subject to such Company Option equal to the amount payable to the holders of Company Capital Stock that are not Accredited Selling Stockholders (described above), *less* the per share exercise price with respect to such Company Option, and subject to further reduction for applicable withholding obligations.

**Holdback Amount; Expense Fund.**

      The Acquirer shall withhold from the consideration payable to Company Equityholders a dollar amount (the "*Stock Purchase Holdback Amount*") equal to the product obtained by multiplying (i)

34

$15,000,000 (the "***Holdback Fund***") by (ii) such Company Equityholder's Holdback Percentage. The Stock Purchase Holdback Amount shall constitute partial recourse for the benefit of the Acquirer (on behalf of itself or any other Indemnified Person) and together with the remainder of the Holdback Fund after deducting the Stock Purchase Holdback Amount (the "***Remainder Holdback Amount***") constitute the sole source of recourse for Acquirer, subject to the exceptions set forth in the Purchase Agreement, with respect to the indemnification obligations of the Company Indemnifying Holders under the Purchase Agreement in respect of a breach of representation and warranty.

Further, the Acquirer shall cause $200,000 (the "***Expense Fund Amount***") to be deposited with the Equityholders' Representative. The Expense Fund Amount shall be used by the Equityholders' Representative for the payment of the Equityholders' Representative Expenses incurred by it in performing its duties set forth in the Purchase Agreement (the "***Expense Fund***").

### *Indemnification Obligations of the Indemnifying Holders*

The Company Equityholders shall severally but not jointly indemnify, and hold harmless the Acquirer from and against, losses, liabilities and damages (collectively, "***Indemnifiable Damages***"), arising out of, resulting from or in connection with:

• any failure of any representation or warranty made by the Company under the Purchase Agreement or in the Company Disclosure Letter (including any exhibit or schedule to the Company Disclosure Letter) to be true and correct (A) as of the date of the Purchase Agreement (or such other applicable date) or (B) as of the Closing Date (as of such other applicable date);

• any breach of, or default in connection with, any of the covenants of the Company under the Purchase Agreement;

• any outstanding transaction expenses not taken into account in the calculation of the Total Stock Purchase Consideration or inaccuracies in the closing spreadsheet or the Company closing financial certificate;

• any claims by (A) any then-current or former holder or alleged then-current or former holder of any equity interests of the Company (including any predecessors), arising out of, resulting from or in connection with (I) the Transactions (including, if and when consummated, the Merger or the Purchase Agreement or the Stockholders Agreement, or (II) such Person's status or alleged status as a holder of equity interests of the Company or its subsidiary (including any predecessors) at any time at or prior to the Closing, whether for breach of fiduciary duty or otherwise, (B) any Person to the effect that such Person is entitled to any equity interest of the Acquirer or the Company or its subsidiary or any payment in connection with the Transactions other than as specifically set forth on the closing spreadsheet or (C) any Person with respect to any Company option plan or any other plan, policy or Contract providing for compensation to any Person in the form of equity interests;

• third-party claims or regulatory sanctions or penalties (including reasonable cost of counsel and settlement costs actually incurred in connection with regulatory inquiries relating to potential regulatory sanctions or penalties), arising from the Company's conduct of its business prior to the Closing;

• third-party claims arising from certain specified matters listed on <u>Schedule 9.2(a)(vi)</u> to the Purchase Agreement;

• to the extent the Merger (as defined in the Stockholder Agreement) is consummated, any

35

demand for appraisal rights to the extent of any amounts paid to a Company Equityholder in excess of the applicable merger consideration such holder would have otherwise received under the Merger Agreement; and

• any fraud or intentional misrepresentation by or on behalf of the Company or such Company Indemnifying Holder.

Further, each Company Equityholder shall severally but not jointly indemnify and hold harmless the Acquirer Indemnified Persons from and against any and all Indemnifiable Damages arising out of (i) any failure of any representation or warranty made by such Company Equityholder in the Purchase Agreement, in an Investor Rep Letter, in a Joinder Document, or in the Stockholder Agreement to be true and correct as of the date of execution of such document or as of the Closing Date or such other applicable date), (ii) any breach of or default in connection with any of the covenants, agreements or obligations made by such Company Equityholder in the Purchase Agreement or in any other agreements contemplated by the Purchase Agreement or the Stock Purchase and (iii) any fraud or intentional misrepresentation by such Company Equityholder.

### *Period for Claims*

Except as otherwise set forth in the Purchase Agreement, the period (the "***Claims Period***") during which claims may be made (a) against the Holdback Fund for Indemnifiable Damages arising out of, resulting from or in connection with the matters arising from breach of representations and warranties (other than with respect to any of the Special Representations (defined below)) shall commence at the Closing and terminate at 11:59 p.m. local time on the applicable Holdback Release Date and (b) against Company equityholders for Indemnifiable Damages arising out of, resulting from or in connection with all other matters, including Special Claims (defined below), shall commence at the Closing and terminate at 11:59 p.m. local time on the date that is thirty (30) days following (i) in the case of claims for Indemnifiable Damages arising out of, resulting from or in connection with the failure of any of the representations and warranties made by the Company in Section 2.11 of the Purchase Agreement (Taxes) to be true and correct as aforesaid, the date that is six (6) years following the Closing Date, (ii) in the case of claims for Indemnifiable Damages arising out of, resulting from or in connection with third-party claims arising from the matters listed in Schedule 9.2(a)(vi) of the Purchase Agreement, the date that is five (5) years following the Closing Date and (iii) in all other cases, the expiration of the applicable statute of limitations and (c) against the Acquirer for Indemnifiable Damages as described below under "—*Indemnification Obligations of the Acquirer*", shall commence at the Closing and terminate thirty (30) days following the applicable date upon which such payment was due.

### *Release of the Holdback Amount*

The Acquirer shall hold the Stock Purchase Holdback Amount until, and the Acquirer's right to offset against the Remainder Holdback Amount shall terminate at, 11:59 p.m. local time on the date that is the 12-month anniversary of the Closing Date (in the case of the Stock Purchase Holdback Amount) and the date that is the earlier of (x) the purchase of the Company Capital Stock pursuant to the Stockholders Agreement or (y) the date that is the 36-month anniversary of the Closing (in the case of the Remainder Holdback Amount) (such applicable date, the "***Holdback Release Date***").

### *Indemnification Obligations of the Acquirer*

Subject to the limitations set forth in the Purchase Agreement, from and after the Closing, the Acquirer shall severally but not jointly indemnify, and hold harmless the Company Equityholders and their

36

respective officers, directors, agents and employees and each Person, if any, who controls or may control any Company Equityholder within the meaning of the Securities Act from and against, and shall compensate and reimburse each Company Indemnified Person for, any and all Indemnifiable Damages arising out of the failure of the Acquirer to make the payments, and issue the Acquirer Tokens, required under and in accordance with the Purchase Agreement or, if and when applicable, make the payments, and issue the equity consideration, required under and in accordance the Merger Agreement.

### *Limitations on Indemnification*

Acquirer's indemnification rights under the Purchase Agreement are subject to certain limitations described in greater detail in the Purchase Agreement, which include:

- With respect to Indemnifiable Damages arising out of breaches of the representations and warranties of the Company (other than claims arising out of (i) fraud or intentional misrepresentation and (ii) any failure of any of <u>Sections 2.1(a)</u> (Organization, Standing, Power and Subsidiaries), <u>Section 2.2</u> (Capital Structure), <u>Section 2.3(a)</u> (Authority), <u>Section 2.10</u> (Intellectual Property), <u>Section 2.11</u> (Taxes) or <u>Section 2.12</u> (Employee Benefit Plans and Employee Matters) of the Purchase Agreement or (B) any Company Indemnifying Holder in <u>Article III</u> of the Purchase Agreement, an Investor Rep Letter, the Stockholders Agreement or any Joinder Document (collectively, the "***Special Representations***") to be true and correct):

  o a "tipping basket" of $1,000,000 which has to be exceeded before any Indemnifiable Damages are payable, but after which Acquirer may receive the full amount of any Indemnifiable Damages, and

  o the Holdback Fund as the sole and exclusive remedy for the indemnity obligations of each Company Indemnifying Holder under the Purchase Agreement.

- The first source of recovery for the Acquirer shall be the amounts held in the Holdback Fund.

The total aggregate liability of a Company equityholder shall be limited to the total amount of consideration actually received by such Company Indemnifying Holder as described in "—*Treatment of Company Capital Stock*" (on a gross basis, not net of taxes and assuming for this purpose that the full amount of the Stock Purchase Holdback Amount is released to such Company Indemnifying Holder).

No Company equityholder shall be liable for any breach of or default in connection with any of the covenants, agreements or obligations made by another Company Indemnifying Holder in the Purchase Agreement or in any other agreements contemplated by the Purchase Agreement or the Stock Purchase or any fraud or intentional misrepresentation by another Company Indemnifying Holder in their individual capacity and not on behalf of the Company.

No limitation of liability shall apply in the case of fraud or intentional misrepresentation by or on behalf of such Company equityholder, or in the case of fraud or intentional misrepresentation by or on behalf of the Company, of which such Company equityholder had actual knowledge.

Following recovery from the Holdback Fund, Acquirer shall be entitled to set-off against any Acquirer Tokens or other value held by Acquirer (in customer accounts or otherwise) to settle any indemnity claims to the extent Acquirer is entitled to recover Indemnifiable Damages in accordance with the Purchase Agreement and following the processes set forth thereunder.

37

***Representations and Warranties***

Each of the Company, the Selling Stockholders and the Acquirer makes a number of representations and warranties in the Purchase Agreement regarding their authority to enter into the Purchase Agreement and consummate the Transactions, and with respect to the Company, with regard to certain aspects of the Company's respective business, financial condition, structure, and other facts pertinent to the Stock Purchase and the other Transactions. The representations and warranties made by the Company are qualified by the statements in the Company Disclosure Letter delivered in connection with the Purchase Agreement.

***Conditions to the Stock Purchase***

*Conditions to Obligations of Both Parties.*

The respective obligations of each party to the Stock Purchase to consummate the Transactions shall be subject to the satisfaction, at or prior to Closing, of the following conditions:

• No Order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition preventing the consummation of the Stock Purchase shall be in effect, and no action shall have been taken by any Governmental Entity seeking any of the foregoing, and no Applicable Law or Order shall have been enacted, entered, enforced or deemed applicable to the Stock Purchase that makes the consummation of the Stock Purchase illegal.

• The Acquirer shall have irrevocably accepted for payment all the shares of Company Capital Stock validly tendered and not validly withdrawn pursuant to the Offer.

*Conditions to Obligations of the Acquirer.*

The obligations of the Acquirer to accept for payment for any Shares validly tendered and not validly withdraw in the Offer shall be subject to the satisfaction or waiver at or prior to the Closing of each of the following conditions:

• The representations and warranties made by the Company and the Company Equityholders in the Purchase Agreement shall be true and correct in all material respects

• The Company and the Company Equityholders shall have performed and complied in all material respects with all covenants, agreements and obligations required to be performed and complied with by the Company and the Company Equityholders at or prior to the Closing.

• The Acquirer shall have received certain closing deliverables specified in the Purchase Agreement.

• No order issued by any court of competent jurisdiction or other legal or regulatory restraint or prohibition limiting or restricting the Acquirer's ownership of the Purchased Shares following the Closing shall be in effect.

• No governmental entity or other person shall have commenced or threatened to commence any legal proceeding challenging or seeking the recovery of a material amount of damages in connection with the Stock Purchase or the other transactions or seeking to prohibit or limit the exercise by Acquirer of

38

any material right pertaining to ownership of shares of the Company.

- There shall not have occurred a Material Adverse Effect with respect to the Company and its subsidiary as a whole that is continuing.

- The Stockholders Agreement shall remain in full force in accordance with its terms (subject to the effectiveness thereof commencing upon the Closing).

- There shall have been validly tendered and received (and not withdrawn) a number of Shares that, when added to the Purchased Shares tendered or sold to Acquirer prior to the launch of the Offer represents at least 50% of the fully-diluted Company Common Stock as of the expiration of the Offer.

- Acquirer and the Company shall have timely obtained from each governmental entity all approvals, waivers and consents, if any, necessary for consummation of, or in connection with, the Stock Purchase.

- Certain domain names shall have been assigned to the Company, and the accounts with the corresponding domain name registrars shall have been updated accordingly.

### *Termination of the Purchase Agreement*

At any time prior to the Closing, this Agreement may be terminated and the Stock Purchase abandoned by authorized action taken by the terminating party:

- by mutual written consent duly authorized by Acquirer and the Board;

- by either Acquirer or the Company, by written notice to the other, if the Closing shall not have occurred on or before the date that is sixty (60) days following the Agreement Date or such other date that Acquirer and the Company may agree upon in writing (the "*Termination Date*"); provided that this right to terminate the Purchase Agreement under this shall not be available to any party whose breach of any covenant, agreement or obligation hereunder will have been the principal cause of, or will have directly resulted in, the failure of the Closing to occur on or before the Termination Date;

- by either the Acquirer or the Company, by written notice to the other, if any order of a governmental entity of competent authority preventing the consummation of the Stock Purchase shall have become final and non-appealable;

- by the Acquirer, by written notice to the Company, if (i) there is an uncured breach, (ii) there shall have been a Material Adverse Effect with respect to the Company and its subsidiary as a whole, (iii) the Company or any Company equity holder shall have breached their covenant regarding solicitation of acquisition proposals or (iv) Acquirer shall have failed to achieve the condition related to obtaining the Minimum Tender Shares.

- by the Company, by written notice to Acquirer, if there shall have been an uncured breach.

### *Amendment of Purchase Agreement*

Subject to applicable law, Acquirer and the Company may amend the Purchase Agreement by authorized action at any time pursuant to an instrument in writing signed on behalf of each of Acquirer and the Company; provided that any amendment approved by the Company shall not be binding on a

Company Equityholder until such Company Equityholder has consented thereto. To the extent permitted by applicable law, Acquirer and the Equityholders' Representative may cause the Purchase Agreement to be amended at any time after the Closing by execution of an instrument in writing signed on behalf of Acquirer and the Equityholders' Representative.

40

## STOCKHOLDERS AGREEMENT AND MERGER AGREEMENT

*The following section summarizes material provisions of the Stockholders Agreement and the Merger Agreement, which are included in this Information Statement as Exhibit C and Exhibit A, respectively, and are incorporated by reference herein in its entirety. The summary of the material provisions of the Stockholders Agreement and the Merger Agreement below and elsewhere in this Information Statement is qualified in its entirety by reference to the Stockholders Agreement and the Merger Agreement. This summary does not purport to be complete and may not contain all of the information about the Stockholders Agreement and the Merger Agreement that is important to you. The rights and obligations of the Company and the Acquirer are governed by the Stockholders Agreement and (when entered into) the Merger Agreement and not by this summary or any other information contained in or incorporated by reference herein.*

### *The Stockholders Agreement*

Concurrently with the execution of the Purchase Agreement, the Company, Acquirer and the initial Selling Stockholders have entered into the Stockholders Agreement in the form attached hereto as Exhibit C.

The Stockholders' Agreement includes terms governing the size and composition of the Company's board of directors following the Stock Purchase, which shall be set at three directors, two of which shall be designated by Acquirer (the "***FTX Designees***") and one of which shall be designated by the Company stockholders following the Stock Purchase (other than Acquirer) (the "***Stockholder Designee***"). The FTX Designees shall initially be Samuel Bankman-Fried and Luk Wai Chain (known as Jen Chan). The Stockholder Designee shall initially be Edward Moncada.

The Stockholders Agreement contains certain protective provisions that require that the Company will not take the following actions without the written consent of the holders of the Company common stock (other than Acquirer) (the "***Minority Stockholders***") who then hold at least a majority of the shares of Company Capital Stock then held by all of the Minority Stockholders:

● Liquidating, dissolving or winding up the business and affairs of the Company or consent to do so;

● Initiating or effecting any sale of the Company, including any merger or consolidation, or consent to do so; or

● Amending any provision of the Certificate of Incorporation, the Company's bylaws as amended, or any similar document in respect of the Company or the subsidiary, in each case in a manner that would reasonably be expected to be disproportionately adverse to the Minority Stockholders.

The Stockholders Agreement also includes terms governing the shares of Company stock held by the Minority Stockholders and Acquirer and the rights and restrictions with respect to such shares of stock, including certain restrictions on transfer, drag along rights, voting agreements and covenants. Each Minority Stockholder shall have delivered to Acquirer a voting proxy, subject to certain exceptions including the exercise of the Put Option.

### *Call Option*

Pursuant to the Stockholders Agreement, the Company has granted Acquirer the Call Option. The

41

Call Option shall be exercisable at any time during the Call Option Period, subject to the satisfaction of the Exercise Conditions.

As used in this section:

- "***Call Option Period***" means the period beginning on the later of (i) the two-year anniversary of the Effective Date of the Stock Purchase and (ii) the date on which all Exercise Conditions have been satisfied, and ending thirty (30) days thereafter;

- "***Exercise Conditions***" means (1) the waiting period applicable to the Merger under the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "***HSR Act***"), and any other applicable antitrust law shall have expired or been terminated, and (2) the Board shall have met and conferred regarding the Call Option and Put Option.

The purchase price payable by the Acquirer for the acquisition of the shares of Company capital stock held by the Minority Stockholders through the Merger upon the exercise of the Call Option shall be an aggregate number of shares of common stock of Acquirer equal to the result of the following formula (the resulting calculation, the "***Call Option Purchase Price***"):

(i)    the sum of: (A) $150 million; *minus* (B) the Aggregate SPA Amount; *minus* (C) an amount equal to the Holdback Reduction Amount; *minus* (D) an amount equal to any unreimbursed or unrecovered special claims under the Purchase Agreement (items (C) and (D), the "***Price Adjustment***"); *divided by*

(ii)    the Acquirer Stock Price.

As used in this section:

- "***Aggregate SPA Amount***" shall mean the aggregate value of the Total Cash Consideration and the Total Token Consideration (as defined in the Purchase Agreement and described in the section of this information statement entitled "*The Stock Purchase Agreement*"). For purposes of calculating such aggregate value, consideration in the form of Acquirer Tokens shall be valued at the Token Price (as defined in the Purchase Agreement and described in the section of this information statement entitled "*The Stock Purchase Agreement*").

- "***Holdback Reduction Amount***" shall mean the amount of Indemnifiable Damages (as defined in the Purchase Agreement and described in the section of this information statement entitled "*The Stock Purchase Agreement*"), less any amounts due to Special Claims, not fully recovered from the amounts held in the Holdback Fund (as defined in the Purchase Agreement and described in the section of this information statement entitled "*The Stock Purchase Agreement*") prior to the date of the exercise of the Call Option or the Put Option. The Holdback Reduction Amount shall not exceed the Remainder Holdback Amount.

- "***Acquirer Stock Price***" shall mean $1.7780.

*Put Option*

Acquirer has granted to the Company the Put Option, which shall be exercisable at any time during the Put Option period, upon the terms and subject to the conditions set forth in the Stockholders Agreement. At any time during the Put Option Period, the Company may elect to exercise the Put Option by an action of either: (i) the Put Option Committee of the Board, which is comprised solely of the Stockholder

42

Designee; or (ii) any combination of two or more of Pantera Venture Fund III LP, A-Fund II, L.P., and/or FF Pathfinder VI LLC.

● "***Put Option Period***" shall mean the period beginning on the first day of the 6th calendar month beginning after the end of the Call Option Period and ending ninety (90) days thereafter (the "***Put Option Expiration Time***").

The purchase price payable by the Acquirer for the acquisition of the shares of Company capital stock held by the Minority Stockholders through the Merger following the exercise of the Put Option shall be based on the then-fair market value of the Company determined by a nationally recognized, independent valuation expert that is engaged by the Put Option Committee of the Board (the "***Put Value***") and shall be an aggregate number of shares of common stock of Acquirer resulting from the following formula:

(i)       the product of (A) the Put Value; *minus* the Price Adjustment; *multiplied by* (B) the Percentage of Total Shares; *divided by*

(ii)      the Acquirer Stock Price (such price, the "***Put Option Purchase Price***"); provided that in no event shall the Put Option Purchase Price be less than 90% or more than 110% of the Call Option Purchase Price.

As used in this section:

● "***Percentage of Total Shares***" means 47.62%, or such other percentage representing the aggregate ownership percentage held by the Minority Stockholders immediately following the consummation of the Stock Purchase.

### *The Merger Agreement*

If and when Acquirer exercises the Call Option or the Company exercises the Put Option, in each case pursuant to and in accordance with the Stockholders Agreement (including the satisfaction of the applicable Exercise Conditions), Acquirer and the Company shall effect the Merger in the manner provided in the Merger Agreement.

*Merger Consideration*

The aggregate purchase price in the Merger (the "***Merger Consideration***") will be calculated as product obtained by multiplying (i) the Call Option Purchase Price or Put Option Purchase Price, as applicable, by (ii) $1.7780 (the "***Acquirer Stock Price***").

*Treatment of Company Capital Stock; Company Options*

Upon the terms and subject to the conditions set forth in the Merger Agreement, at the effective time of the Merger:

● Company Capital Stock:

o  *Accredited Investors*:  Each share of Company Capital Stock held by a Company stockholder that is an Accredited Investor immediately prior to the effective time of the Merger (other than dissenting shares, shares that are owned by the Company as treasury stock and shares owned by Acquirer) shall be cancelled and automatically converted into the right to receive, a number of shares of the Acquirer

43

common stock equal to the Per Share Stock Consideration.

       o    *Non-Accredited Investors:*  Each share of Company Capital Stock held by a Company Stockholder that is not an Accredited Investor immediately prior to the Effective Time (other than dissenting shares, shares that are owned by the Company as treasury stock and shares owned by Acquirer) shall be cancelled and automatically converted into the right to receive an amount in cash equal to the Per Share Amount.

       o    *Company Capital Stock Owned by the Company and the Acquirer:*  all shares of Company Capital Stock that are owned by the Company as treasury stock, and any shares of Company Capital Stock owned by the Acquirer, immediately prior to the Effective Time shall be cancelled and extinguished without any conversion thereof or payment of any cash or other property or consideration therefor and shall cease to exist.

As used in this section:

- "***Per Share Amount***" means the quotient obtained by dividing (i) the Merger Consideration by (ii) the Fully-Diluted Company Common Stock.

- "***Per Share Stock Consideration***" means the quotient obtained by dividing (i) the Per Share Amount by (ii) the Acquirer Stock Price.

- "***Fully-Diluted Company Common Stock***" means: (a) the aggregate number of shares of Company Capital Stock that are issued and outstanding immediately prior to the Closing, less (b) the number of Company Capital Stock that are owned by the Acquirer.

44

## INFORMATION ABOUT ACQUIRER

### *General*

The Acquirer was incorporated in 2019 under the laws of Antigua and Barbuda. The Acquirer's registered agent is Corporate & Trust Services (Caribbean) Limited, whose office is situated at Lower Factory Road, in the city of St. John's, Antigua and Barbuda.

The Acquirer operates a digital asset exchange (the "*Exchange Platform*") that offers traders innovative products including industry-first derivatives, options, volatility products and leveraged tokens.

The Acquirer is expected to compete with a variety of other digital asset exchanges. The market for digital asset exchanges is in its early stages and is highly competitive and is subject to rapidly evolving technology and changing user needs. The Acquirer faces and will continue to face competition from a broad spectrum of other exchanges. The basis of this competition may be based on a range of factors including functionality, ease of use, reputation, user and developer adoption, reliability, scalability, cost and security.

The Acquirer is the parent of the following wholly-owned subsidiaries: LT Baskets Ltd., corporation incorporated under the laws of Seychelles ("*Baskets*"), FTX OTC Ltd., a corporation incorporated under the laws of Seychelles, FTX Equity Record Holder Ltd., a corporation incorporated under the laws of Seychelles ("*FTX Record Holder*").

### *Financing History*

#### *Series A Preferred Financing*

On November 27, 2019, the Acquirer and Binance Capital Management Co. Ltd., a company established under the laws of the British Virgin Islands ("*Binance Capital*") entered into that certain Series A Preferred Share Purchase Agreement pursuant to which the Acquirer issued and sold to Binance 96,456,750 shares of its Series A Preferred Shares (the "*Series A Preferred Stock*") in exchange for Binance Coins and various commercial agreements between the parties (the "*Series A Preferred Stock Financing*"). Both parties are in compliance with the ongoing commercial agreements.

#### *Common Stock Financing*

From February 25, 2020 through June 5, 2020, the Acquirer sold 3,183,008 shares of Acquirer common stock to certain non-U.S. purchasers on the Exchange Platform at a price of $2.00 per share. These shares are held by the FTX Record Holder in nominee as further described in the section titled "—*Intercompany Agreements and Affiliated Transactions—Nominee and Voting Agreement.*"

In April 2020, the Acquirer and Pulsar Global Limited ("*Pulsar*") entered into that certain Common Stock Purchase Agreement pursuant to which Pulsar purchased 1,500,000 shares of Acquirer common stock at a price of $2.00 per share.

The Acquirer has reserved an additional 15 million shares for a potential investment of $30 million.

### *Employees*

The Acquirer currently contracts with service providers in Hong Kong and the United States that

45

are under common control by the founder.

### *Management*

#### *Samuel Bankman-Fried*

Samuel Bankman-Friend serves as the Acquirer's Chief Executive Officer. Mr. Bankman-Fried also serves as the sole member of the Acquirer's Board of Directors. He graduated from Massachusetts Institute of Technology with a degree in physics.

#### *Gary Wang*

Zixiao Wang (Gary Wang) serves as the Acquirer's Chief Technology Officer. Mr. Wang graduated from Massachusetts Institute of Technology with a degree in computer science.

#### *Dan Friedberg*

Dan Friedberg serves as the Acquirer's General Counsel. Mr. Friedberg received his J.D. and M.B.A. from the University of Wisconsin.

#### *Nishad Singh*

Nishad Singh serves as the Acquirer's Head of Engineering. Mr. Singh graduated summa cum laude from the University of California Berkeley with a degree in Electrical Engineering and Computer Science.

### *Legal Proceedings*

From time to time, the Acquirer may be involved in legal proceedings. The results of such legal proceedings and claims cannot be predicted with certainty, and regardless of the outcome, legal proceedings could have a material adverse impact on the Acquirer's business or the development of the Acquirer's products because of defense and settlement costs, diversion of resources and other factors.

### *Qualitative Disclosures About Market Risk*

A portion of our accounts are held in foreign currencies. Adverse changes in foreign currency exchange rates would lower the value of those accounts. Certain assets under management also have exposure to foreign currency fluctuations in various markets, which could impact their valuation and thus the revenue received by the Company.

A portion of our accounts are held in various cryptocurrencies. Adverse changes in cryptocurrency prices would lower the value of those accounts. Certain assets under management also have exposure to cryptocurrency fluctuations in various markets, which could impact their valuation and thus the revenue received by the Company.

#### *Liquidity Risk*

Certain digital assets or financial instruments that the Acquirer holds may be difficult to sell or illiquid, particularly during times of market turmoil. Markets for digital assets or financial instruments could be disrupted by a number of events, including, but not limited to, a financial crisis, cryptocurrency market

ACTIVE/104653288.13

downturns, natural disasters, new legislation or regulatory changes around the world. Illiquid assets may be difficult to value, especially in changing or volatile markets. If Acquirer is forced to sell an illiquid asset at an unfavorable time or price, it may incur a loss. There is no assurance that a digital asset or financial instrument that is deemed liquid when purchased will continue to be liquid. Additionally, because certain instruments are leveraged, a minor adverse change in the value of underlying digital asset should be expected to have a substantial adverse impact on a Token.

Although we try to limit liquidation, losses may otherwise occur. Like most liquidation engines, the engine used by the Exchange Platform starts by detecting when a specific trader has dropped below a specified maintenance margin. Unlike many other platforms it chooses intelligent, efficient values when choosing to liquidate. The Exchange Platform sends reasonable, volume-limited liquidation orders to close down positions that drop below maintenance margin (which starts at 4.5% and increases with position size). The Exchange Platform doesn't sell positions so quickly that the liquidation orders themselves will crash the market.

However, these measures may not be enough to prevent a margin call. For example, if there's a large liquidation — a long position (referred to here as "position B") needs to get sold off — and markets are moving downward too quickly, it might become clear that the normal liquidation orders in the Exchange Platform's orderbooks are unlikely to successfully close down position B before the account goes bankrupt. In that case, the backstop liquidity provider system is initiated. In this situation, liquidity providers who have opted in to the system will internalize position B, taking over the whole obligation and collateral. These liquidity providers do this before the account goes bankrupt so that the account holder has a chance to successfully manage the position. The liquidity providers then go hedge their books on other exchange platforms. This process effectively allows the backstop liquidity providers to instantly inject liquidity from other exchanges into the Exchange Platform in an emergency, removing the dangerous account's position from the Exchange Platform's books and preventing a likely bankruptcy of the account. However, despite the additional measures implemented by the Exchange Platform to prevent margin calls, certain losses may otherwise occur in volatile market conditions.

*Counterparty Risk*

Counterparty risk is the risk that a counterparty is unwilling or unable to make timely payments to meet its contractual obligations. From time to time, the Acquirer enters into derivatives transactions, such as futures contracts, with counterparties to achieve its investment objectives. Any such instrument may be negatively impacted if a counterparty becomes bankrupt or otherwise fails to perform its obligations under such a contract, or if any collateral posted by the counterparty for the benefit of Acquirer is insufficient or there are delays in Acquirer's ability to access such collateral. If the counterparty becomes bankrupt or defaults on its payment obligations, the Acquirer may experience significant delays in obtaining any recovery, may obtain only a limited recovery or obtain no recovery. The Acquirer may also not be able to exercise remedies, such as the termination of transactions, netting of obligations and realization on collateral, if such remedies are stayed or eliminated under special resolutions adopted in various jurisdictions. The rules and regulations of certain jurisdictions intervene when a counterparty is experiencing financial difficulties and could reduce or eliminate a counterparty's obligations.

### Nature of Trading Markets

On the Exchange Platform, the Acquirer Token is freely tradable against the United States Dollar (USD), Tether (USDT) and Bitcoin (BTC). Outside of the Exchange Platform, the Acquirer Token may be listed and tradeable on other exchanges. The listing the Acquirer Token as of the date hereof is not a guarantee that it will continue to be listed at any time in the future.

47

***Intercompany Agreements and Affiliated Transactions***

The Acquirer from time to time enters into commercial transactions with other affiliated companies that are commonly controlled by the Company's majority beneficial shareholder ("***Affiliated Companies***" and such companies and the transactions described herein, the "***Affiliated Transactions***"). The Affiliated Companies include the operator of ftx.us, which is a cryptocurrency platform which provides services to certain United States residents as well as customers outside of the United States. The Affiliated Companies also include trading companies and investment companies. Shareholders of the Company have no ownership or rights in these Affiliated Companies by virtue of their ownership of the Company, the Acquirer Token, or the Acquirer.

The Acquirer generally is in the business of operating a cryptocurrency platform tailored towards professionals and not in certain jurisdictions such as the United States. The Acquirer typically does not engage in cryptocurrency transactions for its own account or otherwise invest in cryptocurrency although that is part of the business of the Affiliated Companies. The Acquirer is not entitled to participate in business opportunities of the Affiliated Companies.

Loan transactions commonly occur between the Acquirer and/or Affiliated Companies and the interest rate can vary though typically currently marked to 10% per annum. Personnel commonly perform services for both the Acquirer and Affiliated Companies. Key personnel devote varied amounts of time and resources to the Acquirer and Affiliated Companies, depending upon needs from time to time.

*Software License, Tokenization, and Co-Marketing Agreement*

The Acquirer and Cottonwood Grove Limited, a Hong Kong company (herein referred to as "***Cottonwood***") entered into a Software License, Tokenization and Co-Marketing Agreement on April 15, 2019, pursuant to which the Acquirer, among other things, licensed the Exchange Platform from Cottonwood (the "***Software License Agreement***").

Pursuant to the terms of the Software License Agreement, the Acquirer is permitted to use the Exchange Platform anywhere in the world except as follows: (i) the United States of America; (ii) any state, country or other jurisdiction that is embargoed by the United States of America; (iii) a jurisdiction where it would be illegal according to Applicable Law for any person to access or use the Exchange or Cottonwood Platform; or (iv) where the publication or availability of the Exchange or Cottonwood Platform is prohibited or contrary to local law or regulation, or could subject Licensor, Licensee, or any of their Affiliates to any local registration or licensing requirements.

Further, the Acquirer will pay to Cottonwood (i) thirty-three percent (33%) of fees generated on the Exchange Platform, (ii) ten percent (10%) of net additions to the insurance fund and (iii) five percent (5%) of fees earned from other uses on the Exchange Platform, all less promotional discounts, payment processor fees, referral fees and third-party costs associated with such revenue. These payments are used to fund the FTT Burn (as defined below).

*Intercompany Loan Agreement*

The Acquirer and Alameda Research, Ltd., a company organized under the laws of the British Virgin Islands (herein referred to as "***Alameda BVI***") entered into that certain Intercompany Loan Agreement on November 27, 2019, pursuant to which Alameda BVI loaned the Acquirer 2,723,288 cryptographic tokens with the symbol 'BNB' (the "***Loaned Amount***" and the agreement referred to herein as the "***Intercompany Loan Agreement***").

ACTIVE/104653288.13

Pursuant to the terms of the Intercompany Loan Agreement, the Acquirer shall pay to Alameda BVI a loan fee amount equal to ten percent (10%) of the outstanding Loaned Amount each year. The Acquirer may prepay the unpaid principal and interest due under the Intercompany Loan Agreement at any time, without penalty, in whole or in part. Each prepayment will be applied as follows: (i) first to the payment of accrued interest, and (ii) second, to the extent that the amount of such prepayment exceeds the amount of all such accrued interest, to the payment of principal on the Intercompany Loan Agreement.

The Acquirer will be deemed to be in default of the Intercompany Loan Agreement if: (a) Acquirer fails to pay Alameda BVI the full amount due under this Loan on or before the date such payment is due; and Acquirer does not cure this failure to pay within sixty calendar days after such failure to pay, or (b) Acquirer files for or goes into any bankruptcy or insolvency proceeding. Upon Acquirer's default of the Intercompany Loan Agreement, Alameda BVI may declare all of Acquirer's obligations to Alameda BVI, whether evidenced by the Intercompany Loan Agreement or otherwise, immediately due and payable without notice or demand on the part of Alameda BVI, and Alameda BVI will have full recourse against any real, personal or intangible asset of the Acquirer, and may pursue any legal or equitable remedies that are available.

*Nominee and Voting Agreement*

On July 20, 2020, the Acquirer and FTX Record Holder entered into that certain Nominee and Voting Agreement pursuant to which the Acquirer designated FTX Record Holder to serve as the record holder of the Tokenized Shares sold in the Common Stock Financing. (the "***Nominee and Voting Agreement***").

The Nominee and Voting Agreement provides that FTX Record Holder is to hold legal title to the Tokenized Shares in constructive trust for the benefit of the purchasers in the Common Stock Financing (the "***Token Holders***"). The Token Holders shall continue to all of the beneficial rights to and burdens of ownership of the Tokenized Shares, including, but not limited to, the rights to any economic appreciation or the risk of loss for any depreciation in the value of the Tokenized Shares.

Further, pursuant to the Nominee and Voting Agreement, FTX Record Holder agrees to deliver any stockholder consent, proxies, or other instruments or documents and to take all such further action, including voting the Shares at any annual or special meeting of the shareholders, in each case, as requested by the Acquirer's Chief Executive Officer.

The Nominee and Voting Agreement shall terminate and be of no further force or effect upon the earliest to occur of (i) the date that FTX Record Holder no longer holds any Shares on behalf of Token Holders or (ii) by the Acquirer at any time, for any reason or for no reason.

### ***Certain Financial Information***

The following tables summarize the amount of trading volume and revenue on the FTX trading platform between May 1, 2019 and May 31, 2020.

These financial data have been prepared based on information available to management as of July 31, 2020, and have not been prepared in accordance with U.S. generally accepted accounting principles. Historical results are not necessarily indicative of the results that may be expected for any future period, and the results displayed herein are not necessarily indicative of the results to be expected for any future period.

49



ACTIVE/104653288.13

## INFORMATION ABOUT COMPANY

*Overview*

The Company was founded in 2014 as a California limited liability company by Edward Moncada, Charlie Mason, and Peter Lau. In 2018, the Company converted to a Delaware corporation. The Company has one wholly owned subsidiary named, "Balance Trading LLC." The Company offers the world's most popular mobile-based crypto portfolio tracking app with over 5,500,000 downloads, with an average of 268,000 daily active users.

*Our Products and Services*

The Company's product is the complete solution for mobile crypto investing. The Blockfolio app provides users with mobile portfolio and price tracking; news, research, and information; and direct token team updates via Blockfolio Signal. In 2018, the Company launched the first token team communication platform called Blockfolio Signal. Blockfolio Signal allows token teams to broadcast project updates directly within the Blockfolio app.

*Technology*

As a high-growth technology venture-backed startup, the Company invests substantial resources in research and development to enhance its products, develop new end market specific solutions, conduct software and quality assurance testing and improve its core technology.

*Customers*

The Company's user is diverse and engaged and mixed between traders and "hodlers." The average Blockfolio user has 4.4 daily sessions and 18.7 daily page views. The app has a 61% day 30 retention rate.

The Company also provides advertisement opportunities to advertise in the Blockfolio app though the use of chart banners, portfolio announcements, and download presets.

*Sales and Marketing*

The Company's sales and marketing efforts are targeted toward advertisers for enterprises to increase ad revenue and potential users to grow the Company's user base.

*Competition*

The Company's competition consists of other technology startup companies. The Company is significantly larger than its next competitor.

*Intellectual Property*

The Company has developed its proprietary software in-house. The Company relies on confidentiality procedures and contractual provisions to protect its proprietary technology. The Company also enters into confidentiality agreements with its employees, consultants, and other third parties. The Company controls access to proprietary technology.

The Company has not applied for any patents and although the Company owns the copyright in its software, its copyrights are not registered with the U.S. Copyright Office.

51

In the normal course of business the Company may provide its intellectual property to third parties through standard licensing agreements. The purposes of these agreements are to provide for the Company's continued ownership in any intellectual property and data furnished and to define the extent and duration of any third party usage rights. The Company's employees and independent contractors are required to sign agreements requiring employees to assign to the Company any ownership that they may claim in the inventions and intellectual property they create on behalf of the Company.

### Employees and Leadership

The Company has approximately 24 full-time employees. None of the Company's employees are currently represented by a labor union, and there have been no work stoppages or strikes at any of its sites. The Company considers its relations with its employees to be good and is committed to maintaining a good relationship with all of its employees.

The Company's board of directors is composed of Edward Moncada, who also serves as the Company's Chief Executive Officer, Peter Lau, and Paul Veradittakit. Eric Schwartz serves as the Company's Treasurer and Harold Boo serves as the Company's Secretary.

### Facilities

The Company does not own or lease real property.

### Legal Proceedings

The Company is not currently involved in litigation.

### Acquisition Activity

The Company is not the subject of any other acquisition offers and, other than as described herein, is not seeking or negotiating for further investment at this time.

Those who are eligible to participate in the Transactions (such participants, "**Eligible Participants**") should not rely on any portion of the Company's website or on any other information available regarding the Company other than the information set forth herein (and all exhibits, schedules and annexes thereto, including those incorporated by reference) in deciding whether to participate in the Transactions.

Additional information regarding the Company and the Transactions, is set forth below. **YOU ARE URGED TO READ THIS INFORMATION CAREFULLY BEFORE MAKING YOUR DECISION TO PARTICIPATE IN THE TRANSACTIONS.**

### Information regarding Stockholders, Dividends, and Stock Price

The Company, immediately prior to the consummation of the Transactions, had seventy-three (73) common and preferred stockholders. The Company has three (3) series of Preferred Stock: (i) Series Seed Preferred Stock, par value $0.00001, issued at an original per share price of $0.8875 per share; (ii) Series A Preferred Stock, par value $0.00001, issued at an original per share price of $1.9782; and (iii) Series A-1 Preferred Stock, par value $0.00001, issued at an original per share price of $1.9782.

The Company has never and is under no obligation to declare or pay any cash dividend on its capital stock. The Company has no intention of declaring a dividend, but in the event that the Company does so, the holders of shares of Preferred Stock shall be entitled to receive, out of any assets legally available

52

therefor, prior and in preference to any declaration or payment of any dividend on the Common Stock (payable other than in Common Stock or other securities and rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common stock of the Company), dividends on such shares of Preferred Stock of the Company at the applicable dividend rate. The applicable dividend rate means (i) $0.0523 per annum for each share of Series Seed Preferred Stock; (ii) $0.1187 per annum for each share of Series A Preferred Stock; and (iii) $0.1187 per annum for each share of Series A-1 Preferred Stock.

After payment of such dividends, any additional dividends or distributions shall be distributed among all holders of Common Stock and Preferred Stock in proportion to the number of shares of Common Stock that would be held by each such holder if all shares of Preferred Stock were converted to Common Stock at the then effective conversion rate.

53

## CERTAIN BENEFICIAL OWNERS OF SECURITIES

### *Security Ownership of Certain Beneficial Owners and Management of Acquirer*

The following table sets forth information regarding the beneficial ownership of Acquirer common stock immediately prior to the Transaction by:

- each person known by Acquirer to be the beneficial owner of more than 5% of Acquirer's outstanding shares of common stock either on the record date or after the consummation of the Transactions;
- each of Acquirer's current executive officers and directors; and
- all of Acquirer's current executive officers and directors as a group.

| Beneficial Owner | Number and Nature of Shares Beneficially Owned | Approximate Percentage of Outstanding Shares of Common Stock |
|---|---|---|
| *Acquirer Directors and Executive Officers*: | | |
| Samuel Bankman-Fried[1] | 385,827,000 | 65.3336% |
| Gary Wang[1] | - | - |
| Dan Friedberg | - | - |
| Nishad Singh | - | - |
| All directors and officers as a group | 385,827,000 | 65.3336% |
| *Acquirer Five Percent Holders*: | | |
| Binance Capital Management Co. Ltd. | 96,456,750 | 16.3334% |

[1] The shares are held by Paper Bird, Inc., a Delaware corporation ("***Paper Bird***"). Samuel Bankman-Fried is the sole shareholder of Paper Bird and is deemed to be the beneficial owner of the shares. Gary Wang holds a warrant to purchase 24.9% of the shares of common stock of Paper Bird from Samuel Bankman-Fried.

### *Security Ownership of Certain Beneficial Owners and Management of Company*

In your evaluation of the Transaction Agreements and Transactions, you should be aware that certain members of the Board and the Company's executive officers have certain interests in the Transactions contemplated by the Transaction Agreements. The Board was aware of these interests and took them into consideration, among other matters, in approving the Transactions and the Transaction Agreements.

The following table sets forth the beneficial ownership, as of August 27, 2020, of the officers and directors of the Company and the holders of more than five percent (5%) of the outstanding shares of the Company capital stock.

54

| Beneficial Owner | Number of shares of Common Stock | Percentage ownership of Common Stock | Number of Shares of Preferred Stock | Percentage Ownership of Preferred Stock | Number of Shares Subject to Options to Purchase | Total Percentage of Ownership on a Fully Diluted Basis. |
|---|---|---|---|---|---|---|
| *Company Directors and Executive Officers*: | | | | | | |
| Edward Moncada | 3,300,000 | 27.69% | 0 | 0 | 1,145,606 | 16.51% |
| Peter Lau | 3,300,000 | 27.69% | 0 | 0 | 572,803 | 14.38% |
| Charles Mason | 2,677,710 | 22.47% | 0 | 0 | 0 | 9.94% |
| Eric Schwartz | 0 | 0 | 0 | 0 | 101,970 | 0.38% |
| Harold Boo | 71,415 | 0.60% | 0 | 0 | 15,585 | 0.33% |
| *Company Five Percent Holders*: | | | | | | |
| Pantera Capital [1] | 0 | 0 | 2,104,006 | 19.77% | 0 | 7.81% |
| A-Fund [2] | 0 | 0 | 1,429,654 | 13.43% | 0 | 5.31% |
| **Total** | **9,439,125** | **55.98%** | **3,533,660** | **33.2%** | **1,835,964** | **54.66%** |

[1] Pantera Capital consists of: Pantera Venture Fund II LP, Pantera Venture Fund III A LP, Pantera Venture Fund III LP.

[2] A-Fund consists of: A-Fund II, L.P. and A-Fund II Affiliates Fund, L.P.

Edward Moncada ("*Mr. Moncada*") is a Co-Founder, Chief Executive Officer, and a director of the Company. As of the date of the Transaction Agreements, Mr. Moncada held 3,300,000 shares of the Company's Common Stock and 1,145,606 Company Options. Mr. Moncada held 16.51% of the fully-diluted capitalization of the Company as of the date of the Transaction Agreements. In connection with his ownership of Common Stock of the Company and Company Options, Mr. Moncada will be entitled to receive a portion of the consideration paid to the Company's stockholders (the "*Stockholders*") in connection with the consummation of the Transactions (such consideration referred to herein as the "*Transaction Consideration*").

Peter Lau ("*Mr. Lau*") is a Co-Founder and a director of the Company. As of the date of the Transaction Agreements, Mr. Lau held 3,300,000 shares of the Company's Common Stock and 572,803 Company Options. Mr. Lau held 14.38% of the fully diluted capitalization of the Company as of the date of the Transaction Agreements. In connection with his ownership of Common Stock of the Company and Company Options, Mr. Lau will be entitled to receive a portion of the Transaction Consideration.

Charles Mason ("*Mr. Mason*") is a Co-Founder and an advisor of the Company. As of the date of the Transaction Agreements, Mr. Mason held 2,677,710 shares of the Company's Common Stock. Mr. Mason held 9.94% of the fully diluted capitalization of the Company as of the date of the Transaction Agreements. In connection with his ownership of Common Stock of the Company, Mr. Mason will be entitled to receive a portion of the Transaction Consideration.

Paul Veradittakit ("*Mr. Veradittakit*") is a director of the Company and a partner of Pantera Capital. As of the date of the Transaction Agreements, Pantera Capital and certain funds affiliated with Pantera Capital (collectively, "*Pantera*") held, in the aggregate, 107,301 shares of the Company's Series A-1 Preferred Stock and 1,996,705 shares of the Company's Series A Preferred Stock. Pantera held 7.81% of the fully diluted capitalization of the Company as of the date of the Transaction Agreements. In connection with Pantera's ownership of Series A-1 Preferred Stock and Series A Preferred Stock of the Company, Pantera will be entitled to receive a portion of the Transaction Consideration.

ACTIVE/104653288.13

Eric Schwartz (*"**Mr. Schwartz**"*) is the Treasurer of the Company. As of the date of the Transaction Agreements, Mr. Schwartz held 101,970 Company Options. Mr. Schwartz held 0.38% of the fully diluted capitalization of the Company as of the date of the Transaction Agreements. In connection with his ownership of Company Options, Mr. Schwartz will be entitled to receive a portion of the Transaction Consideration.

Harold Boo (*"**Mr. Boo**"*) is the Secretary of the Company. As of the date of the Transaction Agreements, Mr. Boo held 71,415 shares of the Company's Common Stock and 18,585 Company Options. Mr. Boo held 0.33% of all fully diluted shares of the Company. In connection with his ownership of the Common Stock of the Company and Company Options, Mr. Boo will be entitled to receive a portion of the Transaction Consideration.

Certain stockholders of the Company, including members of the management team, beneficially hold FTT or other tokens or products that may be available on the FTX Exchange or through its affiliated entities, including through public and private sales or other similar transactions.

56

## MATERIAL CONTRACTS

### Stock Purchase Agreement

The Company and the Acquirer have entered into the Purchase Agreement. For more details on the Purchase Agreement, see the sections of this Information Statement titled "*The Transactions*" and "*Stock Purchase Agreement*."

### Stockholders' Agreement

Concurrently with the execution of the Purchase Agreement, the Company, Acquirer and the initial Selling Stockholders have entered into the Stockholders Agreement in the form attached hereto as Exhibit C. For more details on the Stockholders' Agreement, see the sections of this Information Statement titled "*The Transactions*" and "*Stockholders Agreement And Merger Agreement — Stockholders' Agreement*."

### Commercial Agreement

Following the Closing Date, the Company will provide services and/or will license certain of its properties to the Acquirer and Affiliated Companies. The Company and the Acquirer have entered into a Commercial Agreement (the "*Commercial Agreement*") pursuant to which the Company will provide the Acquirer with certain marketing and advertising services. Pursuant to the Commercial Agreement, the Acquirer will pay to the Company $175,000 per month as compensation for the services provided thereunder. An Affiliated Company is anticipated to engage in a similar agreement with the Company and receive $25,0000 per month as compensation for the services provided thereunder. The Company may enter into other such commercial agreements following the Closing Date at its discretion.

### Agreement and Plan of Merger and Reorganization

The Company and the Acquirer contemplate potentially entering into the Merger Agreement in the form attached hereto as Exhibit A. For more details on the Merger Agreement, see the sections of this Information Statement titled "*The Transactions*" and "*Stockholders Agreement And Merger Agreement — Merger Agreement*."

ACTIVE/104653288.13

## DESCRIPTION OF ACQUIRER SHARES

*The following is a summary of the material provisions of Acquirer's articles of incorporation (the "**Acquirer's Articles of Incorporation**") and Acquirer's Bylaws (the "**Acquirer Bylaws**"), each as will be in effect upon the consummation of the Transaction. Because the following is only a summary, it may not contain all the information that is important to you. The following summary is qualified by reference to the laws of Antigua and Barbuda and the full text of Articles of Incorporation, the form of which is attached as Exhibit E hereto, Acquirer's bylaws, the form of which is attached as Exhibit F hereto. This summary should also be read in conjunction with the section titled "Comparison of the Rights of Company Shareholders and Acquirer Shareholders" beginning on page 62.*

### Authorized Capital

Under the Acquirer's Articles of Incorporation, the authorized shares consist of 635,457,069 shares of common stock, par value US$0.000026 per share (the "**common stock**"), and 96,456,750 shares of preferred stock, par value US$0.000026 per share (the "**preferred stock**").

### Dividend Rights

Under the Acquirer's Articles of Incorporation, the Common Stock may receive dividends if declared by the Board of Directors, which, other than those years in which the Acquirer is not profitable, shall be on an annual basis, paid to holders of common stock only after holders of preferred stock have received dividends and in accordance with the provisions of International Business Corporations Act 1982 (the "**IBCA**") affecting the payment of distributions to shareholders.

### Voting Rights

The holders of the common stock are entitled to one vote for each share of common stock held at all meetings of stockholders (and written actions in lieu of meetings).

### Liquidation Rights

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Acquirer or Deemed Liquidation Event (as defined in the Acquirer's Articles of Incorporation), after the payment of all preferential amounts required to be paid to the holders of preferred stock in accordance with the terms thereto, the remaining assets of the Acquirer available for distribution to its shareholders shall be distributed among the holders of shares of common stock, pro rata based on the number of shares held by each such holder.

### Directors

The holders of record of the common stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Company (the "**Common Holder Director**"). The Common Holder Director may be removed without cause by, and only by, the affirmative vote of the holders of common stock, given either at a special meeting of such shareholders duly called for that purpose or pursuant to a written consent of shareholders.

The Acquirer's articles of incorporation further provide that in connection with an investment in the equity capital of the Acquirer from a third-party unaffiliated with the Acquirer, if any investor designee is

ACTIVE/104653288.13

elected to serve on the Board, then the holders of record of the Series A Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Acquirer.

### *Calling of Special Meetings of Shareholders*

The Acquirer Bylaws provide that the directors shall on the requisition of the holders of not less than five percent (5%) of the issued shares of the Acquirer that carry a right to vote at the meeting requisitioned, forthwith convene a meeting of shareholders.

### *Shareholders' Derivative Actions*

Under the IBCA, any of the Acquirers' shareholders may bring an action in the Acquirer's name to procure a judgment in the Acquirer's favor, also known as a derivative action, provided that the shareholder bringing the action provide reasonably notice to the directors of the Acquirer of his or her intention to bring a derivative action.

### *Dissenters Rights*

Pursuant to the IBCA, shareholders have the right to dissent from various corporate actions, including (i) any merger or consolidation (ii) sale of all or substantially all of the company's assets not made in the usual course of business (iii) or an amendment to the articles of incorporation to add, change or remove any restriction upon international trades of businesses the a company can carry on, and receive payment of the fair value of their shares.

### *Limitations of Liability and Indemnification of Officers and Directors*

The IBCA authorizes corporations to limit or eliminate the personal liability of directors and officers to corporations and their shareholders for monetary damages provided that the director or officer acted honestly and in good faith with a view to the best interests of the corporation and, in the case of criminal or administrative action that is enforced by a monetary penalty, had reasonably grounds to believe that the conduct was lawful. The Acquirer's Articles of Incorporation include a provision that eliminates the personal liability of directors or officers for monetary damages for actions taken as a director or officer to the fullest extent permitted by law.

### *Limitations on Resale*

The Acquirer Shares are be deemed "restricted securities" and have not been registered under applicable U.S. federal securities laws and, pursuant to these laws, you shall hold the Acquirer Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by the applicable authorities, or an exemption from such registration and qualification requirements is available. The Acquirer has no obligation to register or qualify the Acquirer Shares for resale.

59

## DESCRIPTION OF ACQUIRER TOKENS

### *Summary*

The Acquirer Tokens are an ERC-20 compliant tokens deployed on the Ethereum public blockchain and operate within the Exchange Platform. Details of the Acquirer Tokens can be found at https://ftx.com/ftt.

### *Market Information*

Outside of the Exchange Platform, the Acquirer Token is currently listed and tradeable on third party exchanges. As of August 27, 2020, there are 95,455,258 Acquirer Tokens in circulation and a total supply of 344,355,946 Acquirer Tokens, which can also be found at https://ftx.com/ftt.

### *Utility*

#### *Trading Fee Discounts*

The Acquirer charges its customers certain transaction fees in connection with the buying and selling of assets, options or other derivatives on the Exchange Platform (the "***Transaction Fees***"). To incentivize customers to purchase Acquirer Tokens, the Acquirer provides holders of Acquirer Tokens with discounts on the Transaction Fees. The discounts are tiered and determined by the USD equivalent of Acquirer Tokens that a given user holds on their Exchange Platform account and are as follows:

| Acquirer Token Holdings (USD) | Fee Discount |
|---|---|
| $100 | 3% |
| $1,000 | 5% |
| $5,000 | 10% |
| $10,000 | 15% |
| $50,000 | 20% |
| $100,000 | 25% |
| $200,000 | 30% |
| $500,000 | 35% |
| $1,000,000 | 40% |
| $2,500,000 | 50% |
| $5,000,000 | 60% |

#### *Burning Mechanism*

"***Burning***" a token means that the token is transferred to an address that is a "blackhole"—one that is not owned by any entity and for which determining or guessing the applicable private key is effectively impossible using current computers based on known mathematical principles. This effectively destroys the token by making it unavailable for future use and decreases the total number of tokens available from that point forward.

The Acquirer buys Acquirer Tokens (the "***Repurchased Tokens***"), on a weekly basis, in an amount equal to (i) one-third of all exchange fees, (ii) ten percent (10%) of net additions to the insurance fund (as described below) and (iii) five percent (5%) of fees earned form other uses on the Exchange Platform (the

60

"***FTT Burn***"). The Repurchase Tokens will be burned on a weekly basis in accordance with a schedule adopted by the Acquirer. The following are the three most recent FTT Burn transactions, which can also be found at https://ftx.com/ftt:

1. On 8/24/2020, a total of 91,006 FTT were burned as represented by Transaction ID 0x177418b6c7dbf5930223f8724d049353 11e52d468b63f32be6d5dbf02d04bfc1
2. On 8/18/2020, a total of 113,959 FTT were burned as represented by Transaction ID 0xb1e4f1c3d2ffa01332b4d8995142da99b704dce0af79a81583f83264ab75f8eb
3. On 8/13/2020, a total of 120,482 FTT were burned as represented by Transaction ID 0x0409bab2e7f7d5c9092aa4c09b988c907e80a615783d09caa1b912f4e1470e58

### *Trading Information*

#### *Historical Prices*

For the periods indicated, the following table sets forth the high and low prices per Acquirer Token, trading volume and market cap as indicated on https://coinmarketcap.com/currencies/ftx-token/ year to date (as of August 27, 2020):



#### *Number of Holders*

Per etherscan.io, there are 1,061 unique wallet addresses that hold Acquirer Tokens as of August 27, 2020. This number may not accurately reflect the number of individuals who hold Acquirer Tokens in pooled accounts such as on cryptocurrency exchanges.

### *Limitations on Resale*

The Acquirer Tokens may be deemed "restricted securities" and have not been registered under applicable U.S. federal securities laws and, pursuant to these laws, you may not sell or transfer the Acquirer Tokens unless they are registered with the Securities and Exchange Commission and qualified by the applicable authorities, or an exemption from such registration and qualification requirements is available. The Acquirer has no obligation to register or qualify the Acquirer Tokens for resale.

ACTIVE/104653288.13

## COMPARISON OF THE RIGHTS OF COMPANY SHAREHOLDERS AND ACQUIRER SHAREHOLDERS

The corporate affairs of the Acquirer are governed by its Articles of Incorporation and Bylaws and the provisions of applicable Antigua and Barbuda law, including the IBCA. The corporate affairs of the Company are governed by its certificate of incorporation, its bylaws and Delaware General Corporation Law (the "*DGCL*"). The IBCA differs from the DGCL and other laws applicable to United States corporations and their stockholders. Set forth below is a summary of some significant differences between the provisions of the IBCA that are applicable to the Acquirer and the laws applicable to the Company and its stockholders. We cannot predict whether Antigua and Barbuda courts would reach the same conclusions based on a particular set of facts as the U.S. courts would be expected to reach. Thus, you may have more difficulty in protecting your interests in the face of actions by the management, directors or controlling stockholders than would stockholders of a corporation incorporated in a United States jurisdiction, such as Delaware, which has developed a substantial body of case law.

The following table provides a comparison between the statutory provisions of the IBCA and the provisions of the IBCA, Articles of Incorporation and Bylaws and the DGCL relating to stockholders' rights. However, the summaries below do not purport to be complete and are subject to and qualified in their entirety by reference to the actual text of the IBCA and DGCL, respectively.

| ANTIGUA AND BARBUDA | DELAWARE |
|---|---|
| **Shareholder Meetings** | |
| Held at a time as determined by the board of directors | May be held at such time or place as designated in the charter or the bylaws, or if not so designated, as determined by the board of directors. |
| Must be held at the place within Antigua and Barbuda provided in the by-laws or, in the absence of any such provision, at the place within Antigua and Barbuda that the board of directors determines. | May be held within or outside of Delaware |
| Notice of the time and place of a meeting of shareholders must be sent no less than 21 days nor more than 50 days before the meeting. Notice must be sent to each shareholder and the auditor of the company. | Whenever shareholders are required to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, and the means of remote communication, if any. |
| The holders of not less than 5% of the issued shares of a corporation that carry the right to vote at a meeting sought to be held by them may requisition the directors to call a meeting of shareholders for the purposes stated in the requisition. | Special meetings of the shareholders may be called by such person or persons as may be authorized by the certificate of incorporation or by the bylaws. |
| **Stockholders' Voting Rights** | |
| Any person authorized to vote may be represented at a meeting by a proxy who may speak and vote on behalf of the shareholder. | Any person authorized to vote may authorize another person or persons to act for him by proxy. |
| Quorum is fixed by our Articles of Incorporation and Bylaws, to consist of the holder or holders present in person or by proxy entitled to exercise at least 50 percent of the voting rights of the shares of each class or series of shares entitled to vote as a | For stock corporations, the charter or bylaws may specify the number to constitute a quorum but in no event shall a quorum consist of less than one-third of shares entitled to vote at a meeting. In the absence of such specifications, a majority of shares |

62

ACTIVE/104653288.13

class or series thereon.

Subject to any rights or restrictions attached to any shares, at any general meeting on a show of hands every shareholder who is present in person (or, in the case of a shareholder being a corporation, by its duly authorized representative) or by proxy shall have one vote and on a poll every shareholder present in person (or, in the case of a shareholder being a corporation, by its duly appointed representative) or by proxy shall have one vote for each share which such shareholder is the holder.

A resolution put to the vote of the meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman demands a poll, or any other shareholder or shareholders present in person or by proxy demand a poll.

Unless the articles, bylaws or an unanimous shareholder agreement otherwise provide, the directors of a corporation may by resolution make, amend, or repeal any bylaws for the regulation of the business or affairs of the corporation.

The directors of a corporation must submit a bylaw, or any amendment or repeal of a bylaw, to the shareholders of the corporation at the next meeting of shareholders after the making, amendment or repeal of the by-law; and the shareholders may, by a majority of the votes cast by the shareholders who voted in respect of that resolution (such vote, referred to as "*Ordinary Resolution*"), confirm, amend or reject the bylaw, amendment or repeal.

The articles of a corporation may, by Special Resolution, be amended to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares, whether issued or unissued. "*Special Resolution*" means a resolution that (i) is passed is passed by a majority of not less than two-thirds of the votes cast by the shareholders who voted in respect of the resolution or (ii) is signed by all the shareholders entitled to vote on the resolution.

Cumulative voting in the election of directors is not provided for.

shall constitute a quorum

Except as provided in the charter documents, changes in the rights of stockholders as set forth in the charter documents require approval of a majority of its stockholders.

The certificate of incorporation may provide for cumulative voting.

63

| | |
|---|---|
| All other matters to be decided upon by the shareholders require Ordinary Resolution, unless the IBCA requires Special Resolution. | |
| **Directors** | |
| Board must consist of at least one director but it need not be a natural person. | Board must consist of at least one director |
| Maximum and minimum number of directors can be changed by an amendment to the articles of association, with such amendment being passed by Special Resolution. | Number of board members shall be fixed by the bylaws, unless the charter fixes the number of directors, in which case a change in the number shall be made only by amendment of the charter. |
| The shareholders of a corporation may, by Ordinary Resolution at a special meeting, remove any directors from office. | Directors do not have to be independent. |
| Where the holders of any class or series of shares of a corporation have an exclusive right to elect one or more directors, a director so elected may only be removed by an Ordinary Resolution at a meeting of the shareholders of that class or series of shares. | |
| **Fiduciary Duties** | |
| Directors and officers owe fiduciary duties at both common law and under statute which include, without limitation, the duty to act honestly and in good faith with a view to the best interests of the corporation and to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. | Directors and officers must act in good faith, with the care of a prudent person, and in the best interest of the corporation. |
| | Directors and officers must refrain from self-dealing, usurping corporate opportunities and receiving improper personal benefits. |
| So long as a director has disclosed any interests in a transaction entered into or to be entered into by the company to the board he/she may vote on a matter relating to the transaction. | Decisions made by directors and officers on an informed basis, in good faith and in the honest belief that the action was taken in the best interest of the corporation will generally be protected by the "business judgment rule." |
| | Directors may vote on a matter in which they have an interest so long as the director has disclosed any interests in the transaction. |

64

## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTION

The information below is provided by the Company for purposes of informing its shareholders. The Acquirer assumes no liability regarding the information below.

The following discussion describes certain material U.S. federal income tax consequences of certain aspects of the transactions pursuant to the Purchase Agreement and the Call/Put Option and Stockholders' Agreement that are generally applicable to Stockholders that are U.S. Holders (as defined below) and Non-U.S. Holders (as defined below), and the U.S. federal income tax consequences of owning and disposing of the Acquirer Tokens by U.S. Holders (as defined below). This discussion is based upon the Internal Revenue Code of 1986, as amended ("*Code*"), Treasury regulations promulgated thereunder ("*Treasury Regulations*"), Internal Revenue Service ("*IRS*") rulings and judicial decisions in effect as of the date of this Information Statement and all of which are subject to change (possibly with retroactive effect) or different interpretations. Any such change, which may or may not be retroactive, could alter the tax consequences described herein.

The tax consequences set forth in the following discussion are not binding on the IRS or the courts, and no assurance can be given that contrary positions will not be successfully asserted by the IRS or adopted by a court.

This discussion does not address all U.S. federal income tax considerations that may be relevant to Stockholders in light of their particular circumstances, such as tax-exempt organizations, individual retirement accounts and other tax-deferred accounts, financial institutions, regulated investment companies or real estate investments trusts, dealers or brokers in securities or foreign currency, traders that use a mark-to-market method of tax accounting, certain former citizens or residents of the United States, persons whose functional currency is not the U.S. dollar, persons holding their Company Stock (as defined below) as a hedge or as part of a hedging, straddle or other risk reduction strategy, persons subject to the application of the income accrual rules set forth in Section 451(b) of the Code, or persons who acquired their Company Stock (as defined below) in connection with stock option or stock purchase plans or in other compensatory transactions. This discussion assumes the shares of Company capital stock ("*Company Stock*") and Acquirer Tokens received pursuant to the Purchase Agreement (if any) are held as capital assets within the meaning of Section 1221 of the Code. With respect to U.S. Holders (as defined below) whose Company Stock was subject to vesting restrictions at the time such Company Stock was acquired, if any, this discussion assumes that a valid and timely Code Section 83(b) election was made with respect to such Company Stock.

This summary does not address the U.S. federal income tax consequences of the Purchase Agreement or Call/Put Option and Stockholders' Agreement to optionholders or the tax consequences of any transactions other than the aspects of the Purchase Agreement or Call/Put Option and Stockholders' Agreement discussed herein (such as, for example, this summary does not discuss the tax consequences of any sale or exchange of the Put Option (as defined below) except in the case of an exercise of the Put Option). In addition, the following discussion does not address any tax consequences under foreign, state or local, estate or gift tax laws, nor does it address alternative minimum tax, net investment income tax, or "qualified small business stock" or "qualified opportunity fund" considerations or any tax considerations relating to the ownership or disposition of the Acquirer Tokens by Non-U.S. Holders (as defined below).

For purposes of this discussion, the term "*U.S. Holder*" means a beneficial owner of Company Stock that is any of the following:

65

- a citizen or individual resident of the United States or someone treated as a United States citizen or resident for U.S. federal income tax purposes;

- a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source;

- a trust if a United States court can exercise primary supervision over the trust's administration and one or more United States persons are authorized or have the authority to control all substantial decisions of the trust, or a trust that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person under the Code.

If a partnership (or an entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds Company Stock, the tax treatment of a partner in such partnership will generally depend on the status of the partner and the activities of the partnership. Accordingly, partnerships (and entities or arrangements treated as partnerships for U.S. federal income tax purposes) and partners of partnerships holding Company Stock should consult their own tax advisors regarding the Purchase Agreement and Call/Put Option and Stockholders' Agreement.

A "***Non-U.S. Holder***" is a beneficial owner of Company Stock (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder. Special rules may apply to certain Non-U.S. Holders. Consequently, Non-U.S. Holders should consult their tax advisors to determine the U.S. federal, state, local, non-U.S. and other tax consequences that may be relevant to them in light of their particular circumstances.

**STOCKHOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES TO THEM OF THE PURCHASE AGREEMENT AND CALL/PUT OPTION AND STOCKHOLDERS' AGREEMENT, INCLUDING THE APPLICABLE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES, AND AS TO ANY TAX REPORTING REQUIREMENTS OF THE PURCHASE AGREEMENT AND CALL/PUT OPTION AND STOCKHOLDERS' AGREEMENT AND RELATED TRANSACTIONS IN LIGHT OF THEIR OWN RESPECTIVE TAX SITUATIONS.**

### *U.S. Federal Income Tax Treatment of the Purchase Agreement*

*U.S. Holders*

For U.S. federal income tax purposes, the payment of cash and/or Acquirer Tokens in exchange for Company Stock pursuant to the Purchase Agreement will be a fully taxable transaction in which gain or loss generally will be recognized in an amount equal to the difference, if any, between (i) the amount realized for such Company Stock, and (ii) the U.S. Holder's adjusted tax basis in the Company Stock exchanged. A U.S. Holder's adjusted tax basis generally will equal the price the U.S. holder paid for such shares. Generally, the amount realized for shares of Company Stock with respect to the receipt of Acquirer Tokens will equal the fair market value of the Acquirer Tokens at the time of receipt of such Acquirer Tokens. The amount and timing of such gain or loss will depend, in part, upon whether the installment method of reporting is applied to the portion, if any, of the cash and/or Acquirer Tokens received after the close of the taxable year in which the Closing Date (as defined in the Purchase Agreement) occurs (as discussed below under "*Installment Sale Method of Reporting Gain*"). Except as described below under "*Imputed Interest*," any such gain or loss will be capital gain or loss. Such capital gain or loss will be long-term capital gain or loss if the holding period for Company Stock is greater than one year as of the Closing

66

Date. Long-term capital gains of non-corporate U.S. Holders are eligible for preferential rates of taxation. Short-term capital gains are taxed at ordinary income rates. The deductibility of capital losses is subject to limitations. Gain or loss must be calculated separately for each block of Company Stock (*i.e.*, Company Stock acquired at the same time and at the same price in a single transaction). **U.S. Holders who own separate blocks of Company Stock should consult their own tax advisors with respect to these rules.**

A U.S. Holder may make an express designation of the specific shares of Company Stock exchanged pursuant to the Purchase Agreement in its letter of transmittal. U.S. Holders should consult with, and must rely on, their tax advisors with respect to the availability or advisability, including any benefits or risks, of making (or not making) an express designation in their letter of transmittal, and whether any such designation will be respected by the IRS or other applicable taxing authorities.

*Installment Sale Method of Reporting Gain*

Under the Purchase Agreement, payments of cash and/or Acquirer Tokens (including the Stock Purchase Holdback Amount) are expected to be received by U.S. Holders after the close of the taxable year in which the Closing Date occurs. Such payments should generally be eligible for installment method reporting unless the U.S. Holder affirmatively elects out of or is otherwise ineligible for installment method reporting. A U.S. Holder may elect out of the installment method by timely filing the appropriate form with his, her or its tax return for the tax year in which the Closing occurs. The installment method does not apply to any U.S. Holder who will otherwise recognize a loss upon the sale of such U.S. Holder's Company Stock. Please see the discussion below under "

*U.S. Holders Recognizing Loss or Electing out of the Installment Method.*" **U.S. Holders should consult their own tax advisors as to the application, and the desirability of electing out, of the installment method.**

Under the installment method, if applicable, a U.S. Holder generally would not recognize the portion of any gain attributable to the payments of cash and/or Acquirer Tokens (including the Stock Purchase Holdback Amount) that are received by the U.S. Holder after the close of the taxable year in which the Closing Date occurs until such time as the U.S. Holder actually receives a payment of cash and/or Acquirer Tokens with respect thereto. Generally, the amount of gain recognized upon each payment of cash and/or Acquirer Tokens (including the payment received at the Closing) would be equal to the amount of cash and/or fair market value of Acquirer Tokens at the time of receipt *minus* the portion of such payment that is treated as imputed interest (if any), as described below, *minus* the amount of the U.S. Holder's adjusted tax basis allocated to such payment under the installment method reporting rules. **The basis recovery rules under the installment method are complex and U.S. Holders should consult their own tax advisors regarding the application of such rules.**

*Imputed Interest*

Under Section 483 of the Code, a portion of any payment of cash and/or Acquirer Tokens (including the Stock Purchase Holdback Amount) received by the U.S. Holder later than six months after the Closing Date and after the close of the taxable year in which the Closing Date occurs will be treated as interest income taxable at ordinary income rates when received, and will reduce the amount of gain (or increase the amount of loss) otherwise recognizable. The portion of any such payment treated as interest income will be determined by discounting the actual amount of the payment (for Acquirer Tokens, the amount of the payment for tax purposes being equivalent to the Acquirer Tokens' fair market value as of the date of payment), using the appropriate applicable federal rate, from the Closing Date until the date of payment . The discounted amount will then be subtracted from the actual amount of the payment, and the difference will be the portion of the payment treated as interest income. *U.S. Holders should consult with their own*

*tax advisors as to the application of the imputed interest rules to their particular circumstances.*
*Interest on Deferred Taxes*

Under Section 453A of the Code, additional annual interest charges may be imposed on the portion of a U.S. Holder's tax liability that is deferred by the installment method in connection with the installment sale of any property (including Company Stock) with a sales price greater than $150,000, to the extent that the aggregate face amount of all installment receivables held by such U.S. Holder, which arise from installment sales during the year that remain outstanding as of the close of the year, exceeds $5 million. *U.S. Holders should consult their own tax advisors as to the application of these deferred interest charge rules under their particular circumstances.*

*U.S. Holders Recognizing Loss or Electing Out of the Installment Method*

Each U.S. Holder recognizing a loss, and each U.S. Holder electing out of or otherwise ineligible for the installment method, generally will be required to recognize gain or loss currently with respect to such U.S. Holder's Company Stock equal to the difference between the basis of such shares and the sum of (i) the amount of cash and fair market value of any Acquirer Tokens received in connection with the Closing in respect of such shares and (ii) the fair market value of such U.S. Holder's right to receive any future payments of cash and/or Acquirer Tokens in respect of such shares, in each case in the manner prescribed by the Treasury Regulations. To the extent that a payment relating to any rights to receive such future payments of cash and/or Acquirer Tokens is more or less than the amount previously taken into income with respect to such rights, a U.S. Holder will be required to recognize additional gain or loss. As described above under "*Imputed Interest*," a portion of any payment received after the close of the taxable year in which the Closing Date occurs may be treated as interest income taxable at ordinary income rates when received.

*Tax Treatment of Equityholders' Representative Expense Amount*

For U.S. federal income tax purposes the entire amount of the Equityholders' Representative Expense Amount will be deemed to be received at Closing and voluntarily set aside by all Stockholders. Accordingly, the amount contributed to the Equityholders' Representative Expense Amount will not be eligible for installment method reporting but instead will be treated as part of the payment received at Closing. To the extent that the Equityholders' Representative's costs and expenses are actually paid from the Equityholders' Representative Expense Amount, a U.S. Holder may be entitled to claim a deduction or loss in the year such expenses are incurred. Any such deduction or loss may be subject to significant limitations.

*Non-U.S. Holders*

Subject to the discussions below under "*Backup Withholding, Information Reporting and FATCA—Non-U.S. Holders,*" a Non-U.S. Holder generally will not be subject to any U.S. federal income tax on any gain realized upon such Non-U.S. Holder's sale or other taxable disposition of Company Stock unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and, if an applicable income tax treaty so provides, is attributable to a permanent establishment or a fixed-base maintained by such Non-U.S. Holder's in the United States, in which case the Non-U.S. Holder's generally will be taxed on a net income basis at the graduated U.S. federal income tax rates applicable to United States persons (as defined in the Code) and, if the Non-U.S. Holder is a foreign corporation, an additional "branch profits tax" at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty between the United States and such holder's country of residence) may also apply;

- the Non-U.S. Holder is a nonresident alien individual who is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met, in which case the Non-U.S. Holder will be subject to a 30% tax (or such lower rate as may be specified by an applicable income tax treaty between the United States and such holder's country of residence) on the net gain derived from the disposition, which may be offset by certain U.S. source capital losses of the Non-U.S. Holder, if any (even though the individual is not considered a resident of the United States), provided that the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses; or

- we are, or have been, at any time during the five-year period preceding the Closing of the Purchase Agreement, a "U.S. real property holding corporation". Generally, a corporation is a U.S. real property holding corporation only if the fair market value of its U.S. real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests plus its other assets used or held for use in a trade or business. Although there can be no assurance, we do not believe that we are, or have been, a U.S. real property holding corporation, or that we are likely to become one in the future.

### *Backup Withholding, Information Reporting and FATCA*

#### *U.S. Holders*

In order to avoid backup withholding of U.S. federal income tax on payments to U.S. Holders, each U.S. Holder may be required, unless an exception applies, to provide such U.S. Holder's correct taxpayer identification number ("**TIN**") on IRS Form W-9 (or, if appropriate, a substitute or successor form) and certify under penalties of perjury that such number is correct and that such U.S. Holder is not subject to backup withholding. A Form W-9 will be provided to U.S. Holders. If a U.S. Holder fails to provide the correct TIN or certification, certain payments received may be subject to backup withholding (currently at a 24% rate). Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of U.S. Holders subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund may generally be obtained from the IRS; provided that the required information is properly and timely furnished to the IRS.

#### *Non-U.S. Holders*

Information reporting and backup withholding will generally apply to the proceeds of a disposition of Company Stock by a Non-U.S. Holder effected by or through the U.S. office of any broker, unless the Non-U.S. Holder certifies its status as a Non-U.S. Holder and satisfies certain other requirements, or otherwise establishes an exemption. Non-U.S. Holders should consult their tax advisors regarding the application of the information reporting and backup withholding rules to them. Copies of information returns may be made available to the tax authorities of the country in which the Non-U.S. Holder resides or is incorporated under the provisions of a specific treaty or agreement. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to a Non-U.S. Holder can be refunded or credited against the Non-U.S. Holder's U.S. federal income tax liability, if any, provided that an appropriate claim is filed with the IRS in a timely manner.

Provisions of the Code commonly referred to as the Foreign Account Tax Compliance Act, or FATCA, generally imposes a U.S. federal withholding tax at a rate of 30% on payments of dividends on Company Stock paid to a foreign entity unless (i) if the foreign entity is a "foreign financial institution," such foreign entity undertakes certain due diligence, reporting, withholding, and certification obligations, (ii) if the

69

foreign entity is not a "foreign financial institution," such foreign entity identifies certain of its U.S. investors, if any, or (iii) the foreign entity is otherwise exempt under FATCA. Under applicable U.S. Treasury regulations, withholding under FATCA currently applies to payments of dividends on Company Stock. Currently proposed U.S. Treasury Regulations provide that FATCA withholding does not apply to gross proceeds from the disposition of property of a type that can produce U.S. source dividends or interest; however, prior versions of the rules would have made such gross proceeds subject to FATCA withholding. Taxpayers (including withholding agents) can currently rely on the proposed Treasury Regulations. Under certain circumstances, a Non-U.S. Holder may be eligible for refunds or credits of this withholding tax. An intergovernmental agreement between the United States and an applicable foreign country may modify the requirements described in this paragraph. Non-U.S. Holders should consult their tax advisors regarding the possible implications of this legislation on holding Company Stock and the entities through which they hold Company Stock, including, without limitation, the process and deadlines for meeting the applicable requirements to prevent the imposition of the 30% withholding tax under FATCA.

### *U.S. Federal Income Tax Treatment of the Acquirer Tokens for U.S. Holders*

The tax treatment of the Acquirer Tokens and transactions involving the Acquirer Tokens and similar property is uncertain in many circumstances, and the discussion herein is intended to provide only a general summary of certain potential U.S. federal tax consequences of owning and disposing the Acquirer Tokens received in connection with the Purchase Agreement in respect of such U.S. Holder's shares of Company Stock. Future tax guidance from the IRS or a court could clarify the manner in which the Acquirer Tokens and/or similar property are taxed on a prospective or retroactive basis, and thus could adversely impact owners of the Acquirer Tokens.

Recognizing that the U.S. federal income tax treatment of the Acquirer Tokens is not entirely clear, the expected tax treatment of the Acquirer Tokens for U.S. Holders, generally, will be governed by the principles of IRS Notice 2014-21, which treats "convertible virtual currencies" as property for U.S. federal income tax purposes. If the Acquirer Tokens are so treated, then any sale, conversion, exchange or other disposition of a Token by a U.S. Holder generally would be a taxable event and would produce long-term or short-term capital gain or loss depending on the U.S. Holder's holding period in such Token. Such a taxable event may include, for example, an exchange of a Token for cash, or for other digital assets or cryptocurrencies. A U.S. Holder's holding period in a Token acquired pursuant to the Purchase Agreement is expected to begin on the day after the Token is received.

Capital gains of non-corporate U.S. Holders (including individuals) derived in respect of capital assets held for more than one year are currently eligible for reduced rates of U.S. federal income taxation. The deductibility of capital losses is subject to limitations.

Prospective investors should be aware that like-kind exchange treatment under Code Section 1031 will not be available with respect to exchanges involving a Token and/or other digital assets. Accordingly, any such exchange generally will be a tax recognition event for U.S. federal income tax purposes, and prospective U.S. Holders should plan accordingly.

*U.S. Holders should consult their own tax advisors as to the U.S. federal, state and local tax consequences of the ownership and disposition of Acquirer Tokens received in connection with the Purchase Agreement in respect of such U.S. Holder's shares of Company Stock.*

### *U.S. Federal Income Tax Treatment of the Call/Put Options and Stockholders' Agreement*

70

It is intended that the call options and put options granted in the Call/Put Option and Stockholders' Agreement with respect to shares of Company Stock (the "**Call Option**" and "**Put Option**" and together, the "**Call/Put Options**") will generally be treated as options on such Company Stock for U.S. federal income tax purposes. If the Call/Put Options were not respected as options for U.S. federal income tax purposes, U.S. Holders could be treated as having sold their shares of Company Stock underlying the Call/Put Options at the closing of the Purchase Agreement, for taxable consideration that would generally be treated in the manner as described above with respect to the transactions effected under the Purchase Agreement. Although the matter is not free from doubt, the following discussion assumes that the Call/Put Options contained in Call/Put Option and Stockholders' Agreement will be treated as options for U.S. federal income tax purposes.

*U.S. Holders*

U.S. Holders are not expected to incur any immediate recognition of taxable income for U.S. federal income tax purposes with respect to the Call/Put Options until exercise, if any, of the Call/Put Options. In addition, U.S. Holders are not expected to have any taxable income or loss upon the lapse or expiration of the Call/Put Options.

If the Call Option granted by a U.S. Holder is exercised by Acquirer, or the Put Option granted by FTX is exercised by the Put Option Committee of the Board, the U.S. Holder will generally have capital gain or loss upon the future closing of the Merger pursuant to the Merger Agreement, unless the Merger qualifies as a "reorganization" within the meaning of Section 368(a) of the Code. It is intended that, based on currently applicable U.S. federal income tax law, and is the expectation of Acquirer and the Company that, the Merger will qualify as a "reorganization" within the meaning of Section 368(a) of the Code and that no U.S. Holder will recognize any gain as a result of Section 367(a)(1) of the Code in connection with the Merger. However, the Merger is not expected to occur, if at all, until at least two years following the Closing Date of the Purchase Agreement, and no guarantees or assurances can be made regarding the U.S. federal income tax consequences of the Merger.

Based on currently applicable U.S. federal income tax law:

- In the event that the Merger qualifies as a "reorganization" under Section 368(a) of the Code , then the tax consequences described in this bullet generally will apply.  Stockholders that receive only Acquirer Common Stock in exchange for their Company Stock generally will not recognize gain or loss.  Any Stockholder that receives cash or other property in addition to Acquirer Common Stock generally will recognize gain (but not loss) with respect to the exchange of Company Stock for the merger consideration in an amount equal to the lesser of (1) the amount by which the sum of the fair market value of the Acquirer Common Stock and cash or property received by a Stockholder exceeds such holder's adjusted tax basis in its Company Stock, and (2) the amount of cash or property received by such holder of Company Stock.  The aggregate basis of the Acquirer Common Stock received by a Stockholder in the Merger will be the same as the aggregate basis of the Company Stock for which it is exchanged, decreased by the amount of cash and/or property received in the Merger, if any, and increased by the amount of gain recognized in the Merger, if any.  The holding period of Acquirer Common Stock received in the Merger will include the period during which the Stockholder held Company Stock surrendered in exchange therefor.

- In the event that the Merger does not qualify as a "reorganization" under Section 368(a) of the Code, the exchange of Company Stock for shares of Acquirer Common Stock, cash and/or property in the Merger will be a fully taxable transaction to the Stockholders, in which case gain or loss will be recognized by the Stockholders. Accordingly, the Stockholders may be required to pay substantial federal income taxes.

71

- In the event that the Merger does not qualify as a "reorganization" under Section 368(a) of the Code, by reason of the application of Code Section 367(a)(1), the exchange of Company Stock for shares of Acquirer Common Stock, cash and/or property in the Merger will be treated as a transaction in which gain but not loss is recognized by the Stockholders. As a result, the Stockholders may be required to pay substantial federal income taxes.

It is expected that, in the event the Merger is consummated, the Stockholders will be informed of the material U.S. federal income tax consequences of the Merger based on the then existing U.S. federal income tax law in a future information statement or similar document describing the terms and conditions and expected U.S. federal income tax treatment of the Merger.

**U.S. Holders should be aware that it is not a requirement to the exercise by the Acquirer of the Call Option or the exercise by the Put Option Committee of the Board of the Put Option that the Merger qualify as a "reorganization" within the meaning of Section 368(a) of the Code. If the Merger were a fully taxable transaction to the Stockholders, the Stockholders may be required to pay substantial federal income taxes based on the fair market value of the Acquirer Common Stock received in the Merger in excess of the tax basis in their shares of Company Stock surrendered in exchange therefor. In such a case, U.S. Holders would need to satisfy their tax liabilities arising from the Merger with cash from personal resources.**

*Non-U.S. Holders*

Based on currently applicable U.S. federal income tax law, Non-U.S. Holders are generally not expected to be subject to any U.S. federal income tax on any gain realized upon such Non-U.S. Holders' exercise, lapse, expiration or other taxable disposition of the Call/Put Options, including a future disposition of any shares of Company Stock not sold pursuant to the Purchase Agreement, except as described under "*U.S. Federal Income Tax Treatment of the Purchase Agreement—Non-U.S. Holders.*"

**THE FOREGOING DISCUSSION IS NOT INTENDED TO BE A COMPLETE ANALYSIS OR DESCRIPTION OF ALL POTENTIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN. IN ADDITION, THE DISCUSSION DOES NOT ADDRESS TAX CONSEQUENCES WHICH MAY VARY WITH, OR ARE CONTINGENT ON, A STOCKHOLDER'S INDIVIDUAL CIRCUMSTANCES OR WHICH APPLY TO CERTAIN TYPES OF STOCKHOLDERS MENTIONED ABOVE. MOREOVER, THE DISCUSSION DOES NOT ADDRESS ANY NON-INCOME TAX OR ANY STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN. ACCORDINGLY, EACH STOCKHOLDER IS STRONGLY URGED TO CONSULT WITH SUCH STOCKHOLDER'S OWN TAX ADVISOR TO DETERMINE THE PARTICULAR TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN TO SUCH STOCKHOLDER.**

ACTIVE/104653288.13

## APPRAISAL RIGHTS

Any Stockholder who does not wish to accept the consideration provided in the Merger Agreement may have the right, pursuant to the DGCL, as further described below, to not consent to the Merger and to instead exercise appraisal rights in connection with the Merger. Stockholders who wish to exercise appraisal rights and who perfect these rights under the DGCL may be entitled to receive a cash payment equal to the appraised fair market value of such Stockholders' shares of Company Stock. The fair value of Company Stock may be determined to be more than, the same as or less than, the value of the consideration to be paid to other Stockholders in connection with the Merger and pursuant to the terms of the Merger Agreement.

Additionally, Stockholders who do not wish to accept the consideration provided in the Transaction Agreements may have certain dissenter's rights under the California Corporations Code, which are further described in the section of this Information Statement entitled "Dissenters' Rights."

If the Put Option or Call Option is exercised and the Merger is completed, any holder of Company Stock as of the closing of the Merger may, by complying with the provisions of the DGCL, have the fair value of his or her shares of Company Stock judicially determined. The fair value will be determined exclusive of any appreciation or depreciation as a consequence of the proposed Merger.

**Stockholders who are considering exercising appraisal rights should consult their legal advisors. The statutory right of appraisal under the DGCL requires strict compliance with the procedures set forth in Section 262 of the DGCL. Failure to follow any of these procedures may result in a termination or waiver of appraisal rights under the DGCL. The applicable provisions of the DGCL are summarized below. Stockholders who choose to exercise appraisal rights under the DGCL must fully comply with the requirements of Section 262 of the DGCL.**

A Stockholder may be entitled to have the value of his, her or its Company Stock appraised by the Delaware Court of Chancery solely in connection with the consummation of the Merger that will be triggered by the exercise of the Put Option or the Call Option (and not in connection with any other transactions contemplated by the Transaction Agreements) if such Stockholder:

1. does not consent, by written consent or otherwise, to the adoption of the Stockholders' Agreement or the Merger Agreement;

2. continuously holds his or her Company Stock through the exercise of the Put Option or Call Option and the closing of the Merger; and

3. is the holder of record of such Company Stock on the date of the making of a demand for appraisal.

A Stockholder may request an appraisal of his, her or its shares by delivering a written demand fully and correctly, as such holder's name appears on the Stockholder's certificates evidencing shares of Company Stock to the Company within twenty (20) days of receiving notice of the exercise of the Put Option or Call Option. If the shares of Company Stock are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, the demand should be made in that capacity, and if the shares are owned of record by more than one person, as in a joint tenancy or tenancy in common, the demand must be made by or for all owners of record. An authorized agent, including one or more joint owners, may execute the demand for appraisal for a holder of record; however, such agent must identify the record owner or owners and expressly disclose in such demand that the agent is acting as agent for the record owner or

73

owners of such shares. The written demand must identify the Stockholder and his, her or its mailing address and clearly express such Stockholder's demand for appraisal. Even if you vote against the Merger, you must still make the written demand to the Company as described above in order to exercise your appraisal rights.

A record holder, such as a broker who holds shares of Company Stock as a nominee for beneficial owners, some or all of whom desire to demand appraisal, must exercise appraisal rights on behalf of such beneficial owners with respect to the shares held for such beneficial owners. In such case, the written demand for appraisal should set forth the number of shares covered by such demand. Unless a demand for appraisal specifies a number of shares, such demand will be presumed to cover all shares held in the name of such record owner.

On or within ten (10) days after the Merger, the Company will send a notice to those who may continue to be eligible for appraisal rights notifying such former Stockholders of the Merger.

Within one hundred twenty (120) days of the completion of the Merger, upon request, Stockholders who have duly delivered demands for appraisal will be entitled to receive from the Company a statement setting forth:

1.    the total number of shares that did not consent to the adoption of the Stockholders' Agreement or the Merger Agreement and with respect to which Stockholders have demanded an appraisal; and

2.    the total number of holders of such shares.

The statement will be mailed within ten (10) days after the later of: (i) receipt of a written request for such information or (ii) expiration of the period for delivery of demands for appraisal.

Within 120 days of the completion of the Merger, a Stockholder who has delivered a demand to the Company in accordance with the requirements of Section 262 may commence an appraisal proceeding by filing a petition in the Delaware Court of Chancery demanding an appraisal of the fair value of the Company Stock. Such Stockholder must also furnish the Company with a copy of the petition. The Company may also file a petition in the Delaware Court of Chancery demanding determination of the fair value of the Company Stock. The Company, however, is under no obligation to and has no present intention to file such a petition. Accordingly, it is the obligation of the holders of capital stock to initiate all necessary action to perfect their appraisal rights within the time prescribed in Section 262. Such Stockholder may, within sixty (60) days of the completion of the Merger, withdraw its demand for appraisal and accept the consideration offered in connection with the Transactions. Any attempt to withdraw demand made more than sixty (60) days after the completion of the Merger will require the written approval of the Company, and, once a petition for appraisal has been filed, the appraisal proceeding may not be dismissed as to any holder absent court approval.

After the filing of the petition with the Delaware Court of Chancery, the Company will have twenty (20) days to file a list containing the names and addresses of all stockholders who have demanded payment for their shares. The Delaware Register in Chancery, upon a court order, will then give notice, by registered or certified mail, of the time and place fixed for a hearing of such petition. The notice will also be given by one or more general publications published in the city of Wilmington, Delaware or such other publication the court deems advisable at least one week prior to the date of the hearing. All costs associated with the production and distribution of the notice will be borne by the Company.

At the hearing, the court will determine which dissenting Stockholders are entitled to appraisal

74

rights. Each such Stockholder who has made a demand for appraisal may be required to submit his, her or its stock certificates to the Delaware Register in Chancery for notation of the pendency of the appraisal proceedings. Failure to submit such stock certificates may result in a loss of appraisal rights.

After determining which Stockholders are entitled to appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Delaware Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding the court will determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the Merger, together with interest, if any, to be paid upon the amount determined to be the fair value. The costs of the proceedings may be determined by the court and shared by the parties as the court deems equitable under the circumstances.

Any payment received by Stockholders who exercise their appraisal rights may result in the recognition of gain or loss for such Stockholders for Federal income tax purposes. Further, such Stockholders may not exercise their rights to receive the Merger consideration payable pursuant to the Merger Agreement unless they withdraw their demand for appraisal.

You will effectively lose your right to appraisal if: (a) you vote, or execute and deliver a written consent voting in favor of either the exercise of the Put Option or the Merger triggered by the exercise of the Put Option; (b) no petition for appraisal is filed by you within 120 days after the consummation of the Merger; or (c) you withdraw your demand for appraisal within sixty (60) days after the Effective Time. You may also lose your right to appraisal if you fail to comply with the Delaware Court of Chancery's direction to submit your stock certificates to the Delaware Register in Chancery.

Under Sections 228(e) and 262(d)(2) of the DGCL, the Company is required to mail to each holder of Company Capital Stock who has not consented in writing to the adoption and approval of the Merger and Merger Agreement and the transactions contemplated thereby a notice of corporate action taken without a meeting and notice of availability of appraisal rights. The notice of corporate action taken without a meeting, notice of availability of appraisal rights and a copy of Section 262 of the DGCL must be delivered to the applicable stockholders by the Company or Merger Sub following receipt of the requisite approval of the adoption and approval of the Merger, Merger Agreement and the transactions contemplated thereby and before the effective date of the Merger, or by the Company within ten (10) days following the effective date of the Merger. Such notice, if given on or after the effective date of the Merger, must also notify the stockholders of the effective date of the Merger. Any stockholder entitled to appraisal rights may, on or before twenty (20) days after the date of mailing of the notice of corporate action taken without a meeting and notice of availability of appraisal rights, demand in writing from the Company an appraisal of his, her or its shares of Company Capital Stock. Such demand will be sufficient if it reasonably informs the Company of the identity of the stockholder and that the stockholder intends to demand an appraisal of the stockholder's shares. Failure to make such a demand on or before the expiration of such 20-day period will foreclose a stockholder's rights to appraisal. **Please note that the 20-day time period begins on the date the notice of the exercise of the Put Option or Call Option was mailed, not on the date you received it.** If the notice of corporate action taken without a meeting did not notify the stockholders of the effective date of the Merger, then either (i) the Company must send a second notice before the effective date of the Merger notifying each stockholder entitled to appraisal rights of the effective date of the Merger or (ii) the Company must send such second notice to each stockholder entitled to appraisal rights on or within ten (10) days after the effective date of the Merger, *provided, however*, that if such second notice is sent more than twenty (20) days following the sending of the first notice, such second notice need only be sent to each of those stockholders entitled to appraisal rights and who has demanded appraisal rights of his, her or its shares in accordance with Section 262(d) of the DGCL.

ACTIVE/104653288.13

THE FOREGOING SUMMARY DOES NOT PURPORT TO BE A COMPLETE STATEMENT OF THE PROVISIONS OF SECTION 262 OF THE DELAWARE GENERAL CORPORATION LAW AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH SECTION, A COPY OF WHICH IS ATTACHED HERETO AS <u>APPENDIX A</u>. STOCKHOLDERS WHO WISH TO EXERCISE APPRAISAL RIGHTS SHOULD CONSULT THEIR LEGAL ADVISORS.

ACTIVE/104653288.13

## DISSENTERS' RIGHTS

**STOCKHOLDERS ATTEMPTING TO MAINTAIN THEIR DISSENTERS' RIGHTS UNDER CALIFORNIA LAW MUST FOLLOW THE REQUIRED PROCEDURES SET FORTH IN CHAPTER 13 OF CALIFORNIA LAW EXACTLY OR ANY DISSENTERS' RIGHTS UNDER CHAPTER 13 OF CALIFORNIA LAW MAY BE LOST.**

In addition to appraisal rights under the DGCL, Stockholders may be entitled to exercise dissenters' rights under California Law and request appraisal of their Company Stock instead of receiving the consideration provided for in each of the Transaction Agreements. Such rights and the procedures for obtaining them differ significantly from the Delaware appraisal rights described above.

The following discussion is not a complete statement of California Law relating to dissenters' rights, and is qualified in its entirety by reference to Chapter 13 of the California Corporations Code (the "*CCC*") attached as Appendix B to this Information Statement and incorporated herein by reference. You should review this summary and Chapter 13 of the CCC carefully if you wish to exercise dissenters' rights or if you want to preserve your right to do so in the future, because failure to comply with the required procedures within a certain timeframe will result in the loss of your dissenters' rights.

According to Chapter 13 of the CCC, a Stockholder who does not vote in favor of or consent to the approval of the Transactions and adoption of the Transaction Agreements or waive their dissenters' rights and comply with the procedures prescribed in Chapter 13 of the CCC may be entitled to a judicial appraisal of the fair market value of their shares, which, for the purposes of the exercise of dissenters rights under the CCC, is determined as of the day before the first announcement of the terms of the proposed Transactions, excluding any appreciation or depreciation resulting from the Merger, and to require the Company to purchase Stockholder's shares for cash at such fair market value.

In order to exercise dissenters' rights under the CCC, a holder of Company Stock must be entitled to vote on the proposal to approve the Transactions, or be a transferee of record of Shares held by such a Stockholder. Under Chapter 13 of the CCC, if applicable, dissenters' rights can only be exercised with respect to the shares of Company Stock that are outstanding on the record date for the determination of holders of Company Stock entitled to vote on the proposed Transactions.

Stockholders who wish to exercise their dissenters' rights under Chapter 13 of the CCC must satisfy each of the following conditions:

*Notice*. Within ten (10) days after approval of the Transactions and the Transaction Agreements by the Stockholders, the Company must mail a notice of such approval (the "*California Approval Notice*") to all Stockholders who did not vote in favor of the approval of the Transactions (the "*Non-Approving Stockholders*"), together with a statement of the price determined by the Company to represent the fair market value of the dissenting shares, a brief description of the procedures to be followed in order for the stockholder to pursue his or her dissenters' rights, and a copy of California Law Sections 1300-1304. The statement of price by the Company constitutes an offer by the Company to purchase all dissenting shares at the stated amount. **THIS CONFIDENTIAL INFORMATION STATEMENT CONSTITUTES THAT NOTICE.**

*Written Demand*. A Stockholder electing to exercise dissenters' rights must demand in writing from the Company the purchase of its shares of Company Stock for cash at their fair market value and such demand must be received by the Company within thirty (30) days after the date on which the California Approval Notice was mailed to the Non-Approving Stockholders. The demand should specify such Stockholder's name and mailing address, the number and class of shares of Company Stock held of record

by such Stockholder, and include a statement that such Stockholder is demanding purchase of its shares and payment at fair market value. Such demand must also contain a statement as to what the Stockholder claims to be the fair market value of such shares as of the day before the first announcement of the terms of the proposed Transactions. Such statement of the fair market value of the shares of Company Stock constitutes an offer by the Stockholder to sell the dissenting shares held by such Stockholder at that price.  If the stockholder's demand is not received by the Company within this 30-day period, then the stockholder will forfeit his, her, or its appraisal rights

*Submission of Stock Certificates.* Within 30 days after the date on which the California Approval Notice was mailed to the Non-Approving Stockholders, the dissenting stockholder must also submit the certificates representing the dissenting shares to the Company for endorsement as dissenting shares. If the Company and the Stockholder agree that the shares are dissenting shares and agree upon the purchase price of the shares, the dissenting stockholder is entitled to the agreed-upon price with interest thereon at the legal rate on judgments from the date of such agreement. Payment for the dissenting shares must be made within 30 days after the later of the date of such agreement or the date on which all statutory and contractual conditions to the Transactions are satisfied, whichever is later, and is subject to surrender to the Company of the certificates representing the dissenting shares.

If the Company denies that the shares are dissenting shares or if the Company and the Stockholder fail to agree upon the fair market value of the shares of Company Stock, then within six months after the date on which the California Approval Notice was mailed to the Non-Approving Stockholders, any Stockholder who has made a valid written purchase demand and who has not voted in favor of approval and adoption of the Transaction Agreements may file a complaint in the superior court of the proper county requesting a determination as to whether the shares are dissenting shares or as to the fair market value of such holder's shares of Company Stock or both, or may intervene in any pending action brought by any other Stockholder in such regard. If the status of shares as dissenting shares is at issue, the court shall first determine that issue. If the fair market value of the dissenting shares is at issue, the court shall determine, or the court may appoint one or more impartial appraisers to determine, the fair market value of such dissenting shares.

Except as expressly limited by Chapter 13 of the CCC, holders of dissenting shares continue to have all the rights and privileges incident to their shares, until the fair market value of their shares is agreed upon or determined. A Stockholder who is entitled to dissenters' rights may withdraw a demand for appraisal by delivering a written withdrawal of the demand and acceptance of the Transaction consideration to which such Stockholder would otherwise be entitled to under the Transaction Agreements; provided, however, that the Company must consent to any withdrawal request.

Shares lose their status as dissenting shares, and dissenting stockholders cease to be entitled to require the Company to purchase their shares, if:

- the Transactions are abandoned;

- the shares are transferred prior to their submission to the Company for the required endorsement;

- the dissenting stockholder and the Company do not agree upon the status of the shares as dissenting shares or do not agree on the purchase price, but neither the Company nor the stockholder files a complaint or intervenes in a pending action within six months after mailing of the California Approval Notice; or

- **with the Company's consent**, the holder delivers to the Company a written withdrawal of

such holder's demand for purchase of his, her or its shares.

**If a stockholder signs and returns the Joinder Documents and thereby approves the proposed Transactions and adopts the Merger Agreement, then he, she or it will not be entitled to appraisal rights.**

If a Stockholder demands appraisal of Company Stock under Chapter 13 of the CCC and fails to perfect, withdraws or loses the dissenters' right, Company Stock will be converted into the right to receive the Transaction consideration to which such Stockholder would otherwise be entitled to receive under the Transaction Agreements.

Dissenting stockholders should be aware that the fair market value of their shares of the Company capital stock, as determined under Chapter 13 of the CCC, could be more than, the same as or less than the amount that would be paid to them pursuant to the Transaction Agreements.

If the stockholder and the Company agree that the shares of Company Stock as to which the stockholder is seeking appraisal rights are dissenting shares, and also agree on the price to be paid to purchase the shares, then the dissenting stockholder is entitled to the agreed price with interest thereon at the legal rate on judgments under the CCC from the date of the Merger Agreement. Any agreements fixing the fair market value of any dissenting shares as between the Company and any dissenting stockholder must be filed with the secretary of the Company.

If the Court is requested to determine the fair market value of the shares, it will appoint one or more impartial appraisers to determine the fair market value of the shares. Within 10 days of their appointment, the appraisers, or a majority of them, will make and file a report with the Court. If the Court finds the report reasonable, the Court may confirm it. However, if the appraisers cannot determine the fair market value within 10 days of their appointment, or within a longer time determined by the Court or the report is not confirmed by the Court, then the Court will determine the fair market value. If the Court determines that the stockholder's shares qualify as dissenting shares, then, following determination of their fair market value, the Company will be obligated to pay the dissenting stockholder the fair market value of the shares, as so determined, together with interest thereon at the legal rate from the date on which judgment is entered. Payment on this judgment will be due upon the endorsement and delivery to the Company of the certificates for the shares as to which the appraisal rights are being exercised.

**IF YOU FAIL TO COMPLY STRICTLY WITH THE PROCEDURES SET FORTH ABOVE, YOU MAY LOSE YOUR APPRAISAL RIGHTS OR DISSENTERS' RIGHTS. CONSEQUENTLY, IF YOU WISH TO EXERCISE SUCH RIGHTS, WE STRONGLY URGE YOU TO CONSULT A LEGAL ADVISOR BEFORE ATTEMPTING TO EXERCISE SUCH RIGHTS.**

**THE FOREGOING SUMMARY DOES NOT PURPORT TO BE A COMPLETE STATEMENT OF THE PROVISIONS OF CHAPTER 13 OF THE CCC AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH CHAPTER, A COPY OF WHICH IS ATTACHED HERETO AS <u>APPENDIX B</u>. STOCKHOLDERS WHO WISH TO EXERCISE DISSENTERS' RIGHTS SHOULD CONSULT THEIR LEGAL ADVISORS.**

**BOARD OF DIRECTORS' RECOMMENDATION:**

**THE BOARD HAS UNANIMOUSLY APPROVED THE TRANSACTION AGREEMENTS AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE TRANSACTIONS. ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU CONSENT TO THE TRANSACTIONS PROPOSAL PURSUANT TO THE WRITTEN CONSENT TO BE**

## APPENDIX A

### SECTION 262 OF THE DGCL
### (APPRAISAL RIGHTS)

    **(a)**    Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in 1 or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

    **(b)**    Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to § 251 (other than a merger effected pursuant to § 251(g) of this title), § 252, § 254, § 255, § 256, § 257, § 258, § 263 or § 264 of this title:

    **(1)**    Provided, however, that, no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of the meeting of stockholders to act upon the agreement of merger or consolidation (or, in the case of a merger pursuant to § 251(h), as of immediately prior to the execution of the agreement of merger), were either: (i) listed on a national securities exchange or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in § 251(f) of this title.

    **(2)**    Notwithstanding paragraph (b)(1) of this section, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to §§ 251, 252, 254, 255, 256, 257, 258, 263 and 264 of this title to accept for such stock anything except:

    a.    Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

    b.    Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or held of record by more than 2,000 holders;

    c.    Cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a. and b. of this section; or

    d.    Any combination of the shares of stock, depository receipts and cash in

lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a., b. and c. of this section.

(3)    In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under § 253 or § 267 of this title is not owned by the parent immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

(4)    [Repealed]

(c)    Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the provisions of this section, including those set forth in subsections (d), (e), and (g) of this section, shall apply as nearly as is practicable.

(d)    Appraisal rights shall be perfected as follows:

(1)    If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for notice of such meeting (or such members who received notice in accordance with § 255(c) of this title) with respect to shares for which appraisal rights are available pursuant to subsection (b) or (c) of this section that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Each stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder's shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

(2)    If the merger or consolidation was approved pursuant to § 228, § 251(h), § 253, or § 267 of this title, then either a constituent corporation before the effective date of the merger or consolidation or the surviving or resulting corporation within 10 days thereafter shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of giving such notice or, in the case of a merger approved pursuant to § 251(h) of this title,

within the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days after the date of giving such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder's shares. If such notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each such constituent corporation shall send a second notice before the effective date of the merger or consolidation notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice or, in the case of a merger approved pursuant to § 251(h) of this title, later than the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

**(e)**    Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) of this section hereof and who is otherwise entitled to appraisal rights, may commence an appraisal proceeding by filing a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within 60 days after the effective date of the merger or consolidation, any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) of this section hereof, upon request given in writing (or by electronic transmission directed to an information processing system (if any) expressly designated for that purpose in the notice of appraisal), shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation (or, in the case of a merger approved pursuant to § 251(h) of this title, the aggregate number of shares (other than any excluded stock (as defined in § 251(h)(6)d of this title)) that were the subject of, and were not tendered into, and accepted for purchase or exchange in, the offer referred to in § 251(h)(2)), and, in either case, with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such statement shall be given to the stockholder within 10 days after such stockholder's request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) of this section hereof, whichever is later. Notwithstanding subsection (a) of this section, a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition or request from the corporation the statement described in this subsection.

**(f)**     Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list.  The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein stated.  Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable.  The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

**(g)**     At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights.  The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder. If immediately before the merger or consolidation the shares of the class or series of stock of the constituent corporation as to which appraisal rights are available were listed on a national securities exchange, the Court shall dismiss the proceedings as to all holders of such shares who are otherwise entitled to appraisal rights unless (1) the total number of shares entitled to appraisal exceeds 1% of the outstanding shares of the class or series eligible for appraisal, (2) the value of the consideration provided in the merger or consolidation for such total number of shares exceeds \$1 million, or (3) the merger was approved pursuant to § 253 or § 267 of this title.

**(h)**     After the Court determines the stockholders entitled to an appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings.  Through such proceeding the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.  Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment.  At any time before the entry of judgment in the proceedings, the surviving corporation may pay to each stockholder entitled to appraisal an amount in cash, in which case interest shall accrue thereafter as provided herein only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Court, and (2) interest theretofore accrued, unless paid at that time. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the stockholders entitled to an appraisal.  Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

**(i)**     The Court shall direct the payment of the fair value of the shares, together with interest, if

any, by the surviving or resulting corporation to the stockholders entitled thereto. Payment shall be so made to each such stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j)     The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k)     From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease. Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just; provided, however that this provision shall not affect the right of any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation within 60 days after the effective date of the merger or consolidation, as set forth in subsection (e) of this section.

(l)     The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation.

**APPENDIX B**

**CHAPTER 13 OF THE CCC
(DISSENTERS' RIGHTS)**

CHAPTER 13.  Dissenters' Rights

1300.  (a) If the approval of the outstanding shares (Section 152) of a corporation is required for a reorganization under subdivisions (a) and (b) or subdivision (e) or (f) of Section 1201, each shareholder of the corporation entitled to vote on the transaction and each shareholder of a subsidiary corporation in a short-form merger may, by complying with this chapter, require the corporation in which the shareholder holds shares to purchase for cash at their fair market value the shares owned by the shareholder which are dissenting shares as defined in subdivision (b). The fair market value shall be determined as of the day of, and immediately prior to, the first announcement of the terms of the proposed reorganization or short-form merger, excluding any appreciation or depreciation in consequence of the proposed reorganization or short-form merger, as adjusted for any stock split, reverse stock split, or share dividend that becomes effective thereafter.

(b) As used in this chapter, "dissenting shares" means shares to which all of the following apply:

(1) That were not, immediately prior to the reorganization or short-form merger, listed on any national securities exchange certified by the Commissioner of Business Oversight under subdivision (o) of Section 25100, and the notice of meeting of shareholders to act upon the reorganization summarizes this section and Sections 1301, 1302, 1303, and 1304; provided, however, that this provision does not apply to any shares with respect to which there exists any restriction on transfer imposed by the corporation or by any law or regulation; and provided, further, that this provision does not apply to any shares where the holder of those shares is required, by the terms of the reorganization or short-form merger, to accept for the shares anything except: (A) shares of any other corporation, which shares, at the time the reorganization or short-form merger is effective, are listed on any national securities exchange certified by the Commissioner of Business Oversight under subdivision (o) of Section 25100; (B) cash in lieu of fractional shares described in the foregoing subparagraph (A); or (C) any combination of the shares and cash in lieu of fractional shares described in the foregoing subparagraphs (A) and (B).

(2) That were outstanding on the date for the determination of shareholders entitled to vote on the reorganization and (A) were not voted in favor of the reorganization or, (B) if described in paragraph (1), were voted against the reorganization, or were held of record on the effective date of a short-form merger; provided, however, that subparagraph (A) rather than subparagraph (B) of this paragraph applies in any case where the approval required by Section 1201 is sought by written consent rather than at a meeting.

(3) That the dissenting shareholder has demanded that the corporation purchase at their fair market value, in accordance with Section 1301.

(4) That the dissenting shareholder has submitted for endorsement, in accordance with Section 1302.

(c) As used in this chapter, "dissenting shareholder" means the recordholder of dissenting shares and includes a transferee of record.

1301.  (a) If, in the case of a reorganization, any shareholders of a corporation have a right under Section 1300, subject to compliance with paragraphs (3) and (4) of subdivision (b) thereof, to require the

corporation to purchase their shares for cash, that corporation shall mail to each of those shareholders a notice of the approval of the reorganization by its outstanding shares (Section 152) within 10 days after the date of that approval, accompanied by a copy of Sections 1300, 1302, 1303, and 1304 and this section, a statement of the price determined by the corporation to represent the fair market value of the dissenting shares, and a brief description of the procedure to be followed if the shareholder desires to exercise the shareholder's right under those sections. The statement of price constitutes an offer by the corporation to purchase at the price stated any dissenting shares as defined in subdivision (b) of Section 1300, unless they lose their status as dissenting shares under Section 1309.

(b) Any shareholder who has a right to require the corporation to purchase the shareholder's shares for cash under Section 1300, subject to compliance with paragraphs (3) and (4) of subdivision (b) thereof, and who desires the corporation to purchase shares shall make written demand upon the corporation for the purchase of those shares and payment to the shareholder in cash of their fair market value. The demand is not effective for any purpose unless it is received by the corporation or any transfer agent thereof (1) in the case of shares described in subdivision (b) of Section 1300, not later than the date of the shareholders' meeting to vote upon the reorganization, or (2) in any other case, within 30 days after the date on which the notice of the approval by the outstanding shares pursuant to subdivision (a) or the notice pursuant to subdivision (h) of Section 1110 was mailed to the shareholder.

(c) The demand shall state the number and class of the shares held of record by the shareholder which the shareholder demands that the corporation purchase and shall contain a statement of what the shareholder claims to be the fair market value of those shares as determined pursuant to subdivision (a) of Section 1300. The statement of fair market value constitutes an offer by the shareholder to sell the shares at that price.

1302.   Within 30 days after the date on which notice of the approval by the outstanding shares or the notice pursuant to subdivision (h) of Section 1110 was mailed to the shareholder, the shareholder shall submit to the corporation at its principal office or at the office of any transfer agent thereof, (a) if the shares are certificated securities, the shareholder's certificates representing any shares which the shareholder demands that the corporation purchase, to be stamped or endorsed with a statement that the shares are dissenting shares or to be exchanged for certificates of appropriate denomination so stamped or endorsed or (b) if the shares are uncertificated securities, written notice of the number of shares which the shareholder demands that the corporation purchase. Upon subsequent transfers of the dissenting shares on the books of the corporation, the new certificates, initial transaction statement, and other written statements issued therefor shall bear a like statement, together with the name of the original dissenting holder of the shares.

1303.   (a) If the corporation and the shareholder agree that the shares are dissenting shares and agree upon the price of the shares, the dissenting shareholder is entitled to the agreed price with interest thereon at the legal rate on judgments from the date of the agreement. Any agreements fixing the fair market value of any dissenting shares as between the corporation and the holders thereof shall be filed with the secretary of the corporation.

(b) Subject to the provisions of Section 1306, payment of the fair market value of dissenting shares shall be made within 30 days after the amount thereof has been agreed or within 30 days after any statutory or contractual conditions to the reorganization are satisfied, whichever is later, and in the case of certificated securities, subject to surrender of the certificates therefor, unless provided otherwise by agreement.

1304.   (a) If the corporation denies that the shares are dissenting shares, or the corporation and the shareholder fail to agree upon the fair market value of the shares, then the shareholder demanding purchase of such shares as dissenting shares or any interested corporation, within six months after the date on which

notice of the approval by the outstanding shares (Section 152) or notice pursuant to subdivision (h) of Section 1110 was mailed to the shareholder, but not thereafter, may file a complaint in the superior court of the proper county praying the court to determine whether the shares are dissenting shares or the fair market value of the dissenting shares or both or may intervene in any action pending on such a complaint.

(b) Two or more dissenting shareholders may join as plaintiffs or be joined as defendants in any such action and two or more such actions may be consolidated.

(c) On the trial of the action, the court shall determine the issues. If the status of the shares as dissenting shares is in issue, the court shall first determine that issue. If the fair market value of the dissenting shares is in issue, the court shall determine, or shall appoint one or more impartial appraisers to determine, the fair market value of the shares.

1305. (a) If the court appoints an appraiser or appraisers, they shall proceed forthwith to determine the fair market value per share. Within the time fixed by the court, the appraisers, or a majority of them, shall make and file a report in the office of the clerk of the court. Thereupon, on the motion of any party, the report shall be submitted to the court and considered on such evidence as the court considers relevant. If the court finds the report reasonable, the court may confirm it.

(b) If a majority of the appraisers appointed fail to make and file a report within 10 days from the date of their appointment or within such further time as may be allowed by the court or the report is not confirmed by the court, the court shall determine the fair market value of the dissenting shares.

(c) Subject to the provisions of Section 1306, judgment shall be rendered against the corporation for payment of an amount equal to the fair market value of each dissenting share multiplied by the number of dissenting shares which any dissenting shareholder who is a party, or who has intervened, is entitled to require the corporation to purchase, with interest thereon at the legal rate from the date on which judgment was entered.

(d) Any such judgment shall be payable forthwith with respect to uncertificated securities and, with respect to certificated securities, only upon the endorsement and delivery to the corporation of the certificates for the shares described in the judgment. Any party may appeal from the judgment.

(e) The costs of the action, including reasonable compensation to the appraisers to be fixed by the court, shall be assessed or apportioned as the court considers equitable, but, if the appraisal exceeds the price offered by the corporation, the corporation shall pay the costs (including in the discretion of the court attorneys' fees, fees of expert witnesses and interest at the legal rate on judgments from the date of compliance with Sections 1300, 1301 and 1302 if the value awarded by the court for the shares is more than 125 percent of the price offered by the corporation under subdivision (a) of Section 1301).

1306. To the extent that the provisions of Chapter 5 prevent the payment to any holders of dissenting shares of their fair market value, they shall become creditors of the corporation for the amount thereof together with interest at the legal rate on judgments until the date of payment, but subordinate to all other creditors in any liquidation proceeding, such debt to be payable when permissible under the provisions of Chapter 5.

1307. Cash dividends declared and paid by the corporation upon the dissenting shares after the date of approval of the reorganization by the outstanding shares (Section 152) and prior to payment for the shares by the corporation shall be credited against the total amount to be paid by the corporation therefor.

1308. Except as expressly limited in this chapter, holders of dissenting shares continue to have

all the rights and privileges incident to their shares, until the fair market value of their shares is agreed upon or determined. A dissenting shareholder may not withdraw a demand for payment unless the corporation consents thereto.

1309. Dissenting shares lose their status as dissenting shares and the holders thereof cease to be dissenting shareholders and cease to be entitled to require the corporation to purchase their shares upon the happening of any of the following:

(a) The corporation abandons the reorganization. Upon abandonment of the reorganization, the corporation shall pay on demand to any dissenting shareholder who has initiated proceedings in good faith under this chapter all necessary expenses incurred in such proceedings and reasonable attorneys' fees.

(b) The shares are transferred prior to their submission for endorsement in accordance with Section 1302 or are surrendered for conversion into shares of another class in accordance with the articles.

(c) The dissenting shareholder and the corporation do not agree upon the status of the shares as dissenting shares or upon the purchase price of the shares, and neither files a complaint or intervenes in a pending action as provided in Section 1304, within six months after the date on which notice of the approval by the outstanding shares or notice pursuant to subdivision (h) of Section 1110 was mailed to the shareholder.

(d) The dissenting shareholder, with the consent of the corporation, withdraws the shareholder's demand for purchase of the dissenting shares.

1310. If litigation is instituted to test the sufficiency or regularity of the votes of the shareholders in authorizing a reorganization, any proceedings under Sections 1304 and 1305 shall be suspended until final determination of such litigation.

1311. This chapter, except Section 1312, does not apply to classes of shares whose terms and provisions specifically set forth the amount to be paid in respect to such shares in the event of a reorganization or merger.

1312. (a) No shareholder of a corporation who has a right under this chapter to demand payment of cash for the shares held by the shareholder shall have any right at law or in equity to attack the validity of the reorganization or short-form merger, or to have the reorganization or short-form merger set aside or rescinded, except in an action to test whether the number of shares required to authorize or approve the reorganization have been legally voted in favor thereof; but any holder of shares of a class whose terms and provisions specifically set forth the amount to be paid in respect to them in the event of a reorganization or short-form merger is entitled to payment in accordance with those terms and provisions or, if the principal terms of the reorganization are approved pursuant to subdivision (b) of Section 1202, is entitled to payment in accordance with the terms and provisions of the approved reorganization.

(b) If one of the parties to a reorganization or short-form merger is directly or indirectly controlled by, or under common control with, another party to the reorganization or short-form merger, subdivision (a) shall not apply to any shareholder of such party who has not demanded payment of cash for such shareholder's shares pursuant to this chapter; but if the shareholder institutes any action to attack the validity of the reorganization or short-form merger or to have the reorganization or short-form merger set aside or rescinded, the shareholder shall not thereafter have any right to demand payment of cash for the shareholder's shares pursuant to this chapter. The court in any action attacking the validity of the reorganization or short-form merger or to have the reorganization or short-form merger set aside or

rescinded shall not restrain or enjoin the consummation of the transaction except upon 10 days' prior notice to the corporation and upon a determination by the court that clearly no other remedy will adequately protect the complaining shareholder or the class of shareholders of which such shareholder is a member.

(c) If one of the parties to a reorganization or short-form merger is directly or indirectly controlled by, or under common control with, another party to the reorganization or short-form merger, in any action to attack the validity of the reorganization or short-form merger or to have the reorganization or short-form merger set aside or rescinded, (1) a party to a reorganization or short-form merger which controls another party to the reorganization or short-form merger shall have the burden of proving that the transaction is just and reasonable as to the shareholders of the controlled party, and (2) a person who controls two or more parties to a reorganization shall have the burden of proving that the transaction is just and reasonable as to the shareholders of any party so controlled.

1313.  A conversion pursuant to Chapter 11.5 (commencing with Section 1150) shall be deemed to constitute a reorganization for purposes of applying the provisions of this chapter, in accordance with and to the extent provided in Section 1159.

## EXHIBIT D – AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION OF THE COMPANY

**EXHIBIT E – ACQUIRER ARTICLES OF INCORPORATION**