**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) |
| FTX TRADING LTD., et al., | ) Case No. 22-11068 (JTD) |
| | ) |
| Debtors. | ) (Jointly Administrated) |
| | ) |
| | ) Hearing Date: September 12, 2024 at 1:00 P.M. |
| | ) |
| _____ | ) Ref No. 19186 |

Attached hereto is Exhibit "2" Stock Purchase Agreement (of Blockfolio by FTX).

# Exhibit "2"

BLOCKFOLIO, INC.

SERIES A-1 PREFERRED

STOCK PURCHASE AGREEMENT

July 11, 2019

ACTIVE/99161512.4

# TABLE OF CONTENTS

Page

1. Purchase and Sale of Stock .................................................................................1
   1.1   Sale and Issuance of Series A-1 Preferred Stock ...............................1
   1.2   Closing ...................................................................................................1
   1.3   Subsequent Sale of Series A-1 Preferred Stock ................................1
   1.4   Use of Proceeds ....................................................................................2

2. Representations and Warranties of the Company .............................................2
   2.1   Organization, Good Standing and Qualification...............................2
   2.2   Capitalization and Voting Rights.......................................................2
   2.3   Subsidiaries ..........................................................................................3
   2.4   Authorization ........................................................................................3
   2.5   Valid Issuance of Preferred and Common Stock ..............................4
   2.6   Governmental Consents ......................................................................4
   2.7   Offering.................................................................................................4
   2.8   Litigation...............................................................................................4
   2.9   Proprietary Information Agreements .................................................5
   2.10 Intellectual Property............................................................................5
   2.11 Compliance with Other Instruments .................................................5
   2.12 Agreements; Action .............................................................................6
   2.13 Related-Party Transactions .................................................................6
   2.14 Permits ..................................................................................................7
   2.15 Registration Rights...............................................................................7
   2.16 Corporate Documents..........................................................................7
   2.17 Title to Property and Assets ...............................................................7
   2.18 Financial Statements ...........................................................................7
   2.19 Changes.................................................................................................8
   2.20 Employee Benefit Plans ......................................................................9
   2.21 Tax Returns, Payments and Elections................................................9
   2.22 Insurance ............................................................................................10
   2.23 Minute Books......................................................................................10
   2.24 Labor Agreements and Actions; Employee Compensation ...........10
   2.25 Section 83(b) Elections ......................................................................10
   2.26 Real Property Holding Company .....................................................10

3. Representations and Warranties of the Investors ............................................11
   3.1   Authorization ......................................................................................11
   3.2   Purchase Entirely for Own Account ................................................11
   3.3   Disclosure of Information ..................................................................11
   3.4   Investment Experience ......................................................................11
   3.5   Accredited Investor ...........................................................................11
   3.6   Restricted Securities...........................................................................11
   3.7   Further Limitations on Disposition ..................................................12
   3.8   Legends ...............................................................................................12

|  | 3.9 | Exculpation Among Investors | 12 |
|  | 3.10 | Further Representations by Foreign Investors | 13 |
| 4. |  | Conditions of Investors' Obligations at Closing | 13 |
|  | 4.1 | Representations and Warranties | 13 |
|  | 4.2 | Performance | 13 |
|  | 4.3 | Compliance Certificate | 13 |
|  | 4.4 | Qualifications | 13 |
|  | 4.5 | Proceedings and Documents | 13 |
|  | 4.6 | Secretary's Certificate | 14 |
|  | 4.7 | Proprietary Information and Employee Stock Purchase Agreements | 14 |
|  | 4.8 | Board of Directors | 14 |
|  | 4.9 | Investors' Rights Agreement | 14 |
|  | 4.10 | Voting Agreement | 14 |
|  | 4.11 | Right of First Refusal and Co-Sale Agreement | 14 |
| 5. |  | Conditions of the Company's Obligations at Closing | 14 |
|  | 5.1 | Representations and Warranties | 14 |
|  | 5.2 | Payment of Purchase Price | 14 |
|  | 5.3 | Qualifications | 14 |
| 6. |  | Miscellaneous | 14 |
|  | 6.1 | Survival of Warranties | 14 |
|  | 6.2 | Successors and Assigns | 15 |
|  | 6.3 | Governing Law | 15 |
|  | 6.4 | Counterparts | 15 |
|  | 6.5 | Titles and Subtitles | 15 |
|  | 6.6 | Notices | 15 |
|  | 6.7 | Finder's Fee | 15 |
|  | 6.8 | Expenses | 16 |
|  | 6.9 | Amendments and Waivers | 16 |
|  | 6.10 | Severability | 16 |
|  | 6.11 | Corporate Securities Law | 16 |
|  | 6.12 | Aggregation of Stock | 16 |
|  | 6.13 | Entire Agreement | 16 |
|  | 6.14 | Waiver of Conflicts | 16 |

| SCHEDULE A | Schedule of Investors |
| EXHIBIT A | Restated Certificate |
| EXHIBIT B | Investors' Rights Agreement |
| EXHIBIT C | Voting Agreement |
| EXHIBIT D | Right of First Refusal and Co-Sale Agreement |

ACTIVE/99161512.4

## SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT

This SERIES A-1 PREFERRED STOCK PURCHASE AGREEMENT (the "Agreement") is made as of the 11th day of July, 2019, by and among Blockfolio, Inc., a Delaware corporation (the "Company"), and the investors listed on Schedule A hereto, each of which is herein referred to as an "Investor."

THE PARTIES HEREBY AGREE AS FOLLOWS:

1.      Purchase and Sale of Stock.

1.1      Sale and Issuance of Series A-1 Preferred Stock.

(a)      The Company shall adopt and file with the Secretary of State of Delaware on or before the Closing (as defined below) the Amended and Restated Certificate of Incorporation in the form attached hereto as Exhibit A (the "Restated Certificate").

(b)      On or prior to the Closing (as defined below), the Company shall have authorized (i) the sale and issuance to the Investors of shares of its Series A-1 Preferred Stock (the "Shares") and (ii) the issuance of the shares of Common Stock to be issued upon conversion of the Shares (the "Conversion Shares"). The Shares and the Conversion Shares shall have the rights, preferences, privileges and restrictions set forth in the Restated Certificate.

(c)      Subject to the terms and conditions of this Agreement, each Investor agrees, severally and not jointly, to purchase at the Closing or pursuant to Section 1.3 and the Company agrees to sell and issue to each Investor at the Closing or pursuant to Section 1.3, that number of Shares set forth opposite such Investor's name on Schedule A hereto for $1.9782 per share (subject to appropriate adjustment for stock splits, combinations, dividends, recapitalizations and the like with respect to the Series A-1 Preferred Stock (as defined below)).

1.2      Closing. The purchase and sale of the Shares shall take place remotely, via the exchange of documents and signatures, on the date hereof, or at such other time and place as the Company and Investors acquiring in the aggregate a majority of the Shares sold pursuant to this Agreement agree upon orally or in writing (which time and place are designated as the "Closing"). At the Closing, the Company shall deliver to each Investor a certificate representing the Shares that such Investor is purchasing against payment of the purchase price therefor by check, wire transfer, cancellation of indebtedness, or any combination thereof.

1.3      Subsequent Sale of Series A-1 Preferred Stock. At any time on or before the date that is 150 days after the Closing, the Company may sell up to that number of additional Shares equal to 2,022,040 Shares less the number of Shares not issued and sold by the Company at the Closing to such persons as may be approved by the Board of Directors of the Company (the "Board"). All such purchases of Shares shall be made on the terms and conditions set forth in this Agreement, including, without limitation, satisfaction of the representations and

warranties by the Investors as set forth in Section 3.  Such purchases of Shares shall be made by each subsequent purchaser by executing counterpart signature pages to this Agreement and the Ancillary Agreements (as defined below), making such purchaser a party and bound by the terms and conditions of this Agreement and the Ancillary Agreements.  Any Shares sold pursuant to this Section 1.3 shall be deemed to be "Shares" for all purposes under this Agreement and any purchasers thereof shall be deemed to be "Investors" under this Agreement and each of the Ancillary Agreements.  Each sale of additional Shares pursuant to this Section 1.3 shall be deemed a "Subsequent Closing."  Schedule A to this Agreement shall be updated to reflect the number of Shares purchased at each Subsequent Closing and the parties purchasing such Shares.

1.4     Use of Proceeds.  In accordance with the directions of the Board, as it shall be constituted in accordance with the Voting Agreement, the Company will use the proceeds from the sale of Shares for working capital and other general corporate purposes.

2.     Representations and Warranties of the Company.  The Company hereby represents and warrants to each Investor that, except as set forth on a Schedule of Exceptions (the "Schedule of Exceptions") furnished each Investor, which exceptions shall be deemed to be representations and warranties as if made hereunder as of the Closing:

2.1     Organization, Good Standing and Qualification.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted and as presently proposed to be conducted.  The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

2.2     Capitalization and Voting Rights.  The authorized capital of the Company consists, or will consist immediately prior to the Closing, of:

(a)     Preferred Stock.  11,379,071 shares of Preferred Stock, par value $0.00001 (the "Preferred Stock"), (i) 3,351,028 of which have been designated Series Seed Preferred Stock, 3,531,028 of which are issued or outstanding prior to the Closing, (ii) 5,826,003 of which have been designated Series A Preferred Stock, all of which are issued and outstanding prior to the Closing and (iii) 2,022,040 of which have been designated Series A-1 Preferred Stock (the "Series A-1 Preferred Stock"), none of which are issued and outstanding prior to the Closing.  The rights, privileges and preferences of the Preferred Stock will be as stated in the Restated Certificate.

(b)     Common Stock.  27,696,137 shares of common stock, par value $0.00001 (the "Common Stock"), of which 11,923,839 shares are issued and outstanding.

(c)     The outstanding shares of Common Stock and, subject in part to the truth and accuracy of representations and warranties made by purchasers of such shares, Preferred Stock are all duly and validly authorized and issued, fully paid and nonassessable, and were issued in accordance with the registration or qualification provisions of the Securities Act of 1933, as amended (the "Act"), and any relevant state securities laws, or pursuant to valid exemptions therefrom.

2

(d)     Except for (i) the conversion privileges of the Preferred Stock and (ii) the rights provided in Section 2.4 of that certain Amended and Restated Investors' Rights Agreement in the form attached hereto as <u>Exhibit B</u> (the "<u>Investors' Rights Agreement</u>"), there are not outstanding any options, warrants, rights (including conversion or preemptive rights) or agreements for the purchase or acquisition from the Company of any shares of its capital stock. The Company has reserved 5,362,632 shares of Common Stock for purchase upon exercise of options to be granted in the future under the Company's 2018 Stock Option and Grant Plan. Other than that certain Amended and Restated Voting Agreement in the form attached hereto as <u>Exhibit C</u> (the "<u>Voting Agreement</u>"), the Company is not a party or subject to any agreement or understanding, and, to the Company's knowledge, there is no agreement or understanding between any persons and/or entities, which affects or relates to the voting or giving of written consents with respect to any security or by a director of the Company.

(e)     All outstanding securities of the Company, including, without limitation, all outstanding shares of the capital stock of the Company, all shares of the capital stock of the Company issuable upon the conversion or exercise of all convertible or exercisable securities and all other securities that the Company is obligated to issue, are subject to a one hundred eighty (180) day "market stand-off" restriction upon an initial public offering of the Company's securities pursuant to a registration statement filed with the Securities and Exchange Commission ("<u>SEC</u>") pursuant to the Act in a form substantially identical to Section 1.13 of the Investors' Rights Agreement.

(f)     No stock plan, stock purchase, stock option or other agreement or understanding between the Company and any holder of any securities or rights exercisable or convertible for securities provides for acceleration or other changes in the vesting provisions or other terms of such agreement or understanding as the result of the occurrence of any event.

2.3     <u>Subsidiaries</u>.  The Company does not presently own or control, directly or indirectly, any interest in any other corporation, association, or other business entity. The Company is not a participant in any joint venture, partnership, or similar arrangement.

2.4     <u>Authorization</u>.  All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement, the Investors' Rights Agreement, the Voting Agreement and that certain Amended and Restated Right of First Refusal and Co-Sale Agreement in the form attached hereto as <u>Exhibit D</u> (the "<u>Right of First Refusal and Co-Sale Agreement</u>" and, together with the Investors' Rights Agreement and the Voting Agreement, the "<u>Ancillary Agreements</u>"), the performance of all obligations of the Company hereunder and thereunder, and the authorization, issuance (or reservation for issuance), sale and delivery of the Shares being sold hereunder and the Conversion Shares has been taken or will be taken prior to the Closing, and this Agreement and the Ancillary Agreements constitute valid and legally binding obligations of the Company, enforceable in accordance with their respective terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, and (c) to the

3

extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

       2.5     Valid Issuance of Preferred and Common Stock. The Shares being purchased by the Investors hereunder, when issued, sold and delivered in accordance with the terms of this Agreement for the consideration expressed herein, will be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer other than restrictions on transfer under this Agreement and the Ancillary Agreements and under applicable state and federal securities laws. The Conversion Shares have been duly and validly reserved for issuance and, upon issuance in accordance with the terms of the Restated Certificate, will be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer other than restrictions on transfer under this Agreement and the Ancillary Agreements and under applicable state and federal securities laws.

       2.6     Governmental Consents.   No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority on the part of the Company is required in connection with the consummation of the transactions contemplated by this Agreement, except (a) the filing of the Restated Certificate with the Secretary of State of the State of Delaware; (b) the filing pursuant to Section 25102(f) or 25102.1 of the California Corporate Securities Law of 1968, as amended, and the rules thereunder; (c) the filings required by applicable state "blue sky" securities laws, rules and regulations; or (d) such other post-closing filings as may be required.

       2.7     Offering.   Subject in part to the truth and accuracy of each Investor's representations set forth in Section 3 of this Agreement, the offer, sale and issuance of the Shares as contemplated by this Agreement are exempt from the registration requirements of any applicable state and federal securities laws, and neither the Company nor any authorized agent acting on its behalf will take any action hereafter that would cause the loss of such exemption.

       2.8     Litigation.   There is no action, suit, proceeding or investigation pending or, to the Company's knowledge, currently threatened in writing against the Company that questions the validity of this Agreement or any Ancillary Agreement, or the right of the Company to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that might result, either individually or in the aggregate, in any material adverse changes in the assets, condition or affairs of the Company, financially or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing.   The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers.   The Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by the Company currently pending or that the Company intends to initiate.

4

2.9     Proprietary Information Agreements.  Each employee and officer of the Company has executed a Proprietary Information and Inventions Agreement, and each consultant to the Company has executed a Consulting Agreement, in substantially the forms provided to special counsel for the Investors.  The Company is not aware that any of its present employees, officers or consultants are in violation thereof, and the Company will use its commercially reasonable efforts to prevent any such violation.

2.10     Intellectual Property.  To its knowledge with respect to patents, trademarks, services marks and trade names only (but without having conducted any special investigation or patent or trademark search), the Company has sufficient rights to use all patents, trademarks, service marks, trade names, domain names, copyrights, trade secrets, information, proprietary rights and processes ("Intellectual Property") used in or necessary for its business as now conducted and as proposed to be conducted ("Company Intellectual Property") without any violation or infringement of, or other conflict with, the rights of others, except for such items as have yet to be conceived or developed or that are expected to be available for licensing on reasonable terms from third parties.  Section 2.10 of the Schedule of Exceptions contains a complete list of applications and registrations for Company Intellectual Property owned by, or exclusively licensed to, the Company. There are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership of interests of any kind relating to Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other person or entity, except, in either case, for agreements referenced in the exclusion to 2.12(b)(ii). The Company has not received any communications alleging that the Company has violated or, by conducting its business as proposed, would violate any of the Intellectual Property rights of any other person or entity, and the Company is not aware of any specific reason to believe that such an allegation may be forthcoming.  To the Company's knowledge, none of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of the Company or that would conflict with the Company's business as presently conducted or as proposed to be conducted. Neither the execution nor delivery of this Agreement or the Ancillary Agreements, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as proposed, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any of such employees is now obligated. The Company does not believe it is or will be necessary to utilize any inventions of any of its employees made prior to or outside the scope of their employment by the Company. To the extent the Company uses any "open source" or "copyleft" software in its products or services or is a party to "open" or "public source" or similar licenses, the Company is in compliance with the terms of any such licenses, and the Company is not required under any such license to (a) make or permit any disclosure or to make available any source code for its (or any of its licensors') proprietary software or (b) distribute or make available any of the Company's proprietary software or intellectual property (or to permit any such distribution or availability).

2.11     Compliance with Other Instruments.  The Company is not in violation, default, conflict or breach in any material respect of any provision of its Restated Certificate or Bylaws, or in any material respect of any instrument, judgment, order, writ, decree,

ACTIVE/99161512.4

privacy policy or contract to which it is a party or by which it is bound, or, to its knowledge, of any provision of any federal or state statute, rule or regulation applicable to the Company (including, without limitation, those related to privacy, personally identifiable information or export control), the violation, default, conflict or breach of which would reasonably be expected to have a material adverse effect on the Company's business.  The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not result in any such violation, default, conflict or breach, nor will such consummation constitute, with or without the passage of time and giving of notice, an event that results in (a) the creation of any lien, charge or encumbrance upon any assets of the Company or (b) the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization, or approval applicable to the Company, its business or operations or any of its assets or properties.

2.12    Agreements; Action.

(a)    Except for agreements explicitly contemplated hereby and by the Ancillary Agreements, there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, affiliates, or any affiliate thereof.

(b)    There are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or by which it is bound that may involve (i) obligations (contingent or otherwise) of, or payments to the Company in excess of, $50,000, or (ii) any material license of any Intellectual Property to or from the Company (other than (A) the nonexclusive license of the Company's software and products in object code form in the ordinary course of business pursuant to standard end-user agreements the forms of which have been provided to special counsel for the Investors or (B) the nonexclusive license to the Company of standard, generally commercially available, "off-the-shelf" third party products that are not and will not to any extent be part of, or any product, service or intellectual property offering of the Company), or (iii) provisions materially restricting the development, manufacture or distribution of the Company's products or services.

(c)    The Company has not (i) declared or paid any dividends or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or any other liabilities individually in excess of $50,000 or, in the case of indebtedness and/or liabilities individually less than $50,000, in excess of $100,000 in the aggregate, (iii) made any loans or advances to any person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business.

(d)    For the purposes of subsections (b) and (c) above, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same person or entity (including persons or entities the Company has reason to believe are affiliated therewith) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsections.

2.13    Related-Party Transactions.  No employee, officer, or director of the Company (a "Related Party") or member of such Related Party's immediate family, or any

6

corporation, partnership or other entity in which such Related Party is an officer, director or partner, or in which such Related Party has significant ownership interests or otherwise controls, is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to any of them.  To the Company's knowledge, none of such persons has any direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company, except that employees, officers, or directors of the Company and members of such Related Party's immediate families may own stock in publicly traded companies that may compete with the Company.  No Related Party or member of their immediate family is directly or indirectly interested in any material contract with the Company.

2.14    Permits.  The Company has all franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which could materially and adversely affect the business, properties, prospects or financial condition of the Company, and the Company believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as planned to be conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses, or other similar authority.

2.15    Registration Rights.  Except as provided in the Investors' Rights Agreement, the Company has not granted or agreed to grant any registration rights, including piggyback rights, to any person or entity.

2.16    Corporate Documents.  The Restated Certificate and Bylaws of the Company are in the form previously provided to special counsel for the Investors.

2.17    Title to Property and Assets.  The Company owns its property and assets free and clear of all mortgages, liens, loans and encumbrances, except such encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets.  With respect to the property and assets it leases, the Company is in compliance with such leases and, to its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances.

2.18    Financial Statements.  The Company has delivered to each Investor its unaudited financial statements (balance sheet and income and cash flow statements, including notes thereto) at December 31, 2018 and for the fiscal year then ended, and its unaudited financial statements (balance sheet and income statement) as at and for the period ended February 28, 2019 (the "Financial Statements").  The Financial Statements fairly present the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject in the case of the unaudited Financial Statements to normal year-end audit adjustments.  Except as set forth in the Financial Statements, the Company has no material liabilities, contingent or otherwise, other than (a) liabilities incurred in the ordinary course of business subsequent to February 28, 2019 (the "Financial Statement Date") and (b) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in the Financial Statements, which, in both cases, individually or in the aggregate, are not material to the financial condition or operating results of the Company.  Except as disclosed in the Financial Statements, the

7

Company is not a guarantor or indemnitor of any indebtedness of any other person, firm or corporation. The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with generally accepted accounting principles.

2.19    Changes. Since the Financial Statement Date there has not been:

(a)    any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not been, in the aggregate, materially adverse;

(b)    any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operating results, prospects or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(c)    any waiver by the Company of a valuable right or of a material debt owed to it;

(d)    any satisfaction or discharge of any lien, claim or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and that is not material to the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted);

(e)    any material change or amendment to a material contract or arrangement by which the Company or any of its assets or properties is bound or subject;

(f)    any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

(g)    any sale, assignment or transfer of any patents, trademarks, copyrights, trade secrets or other intangible assets;

(h)    any resignation or termination of employment of any key officer of the Company; and the Company, to its knowledge, does not know of the impending resignation or termination of employment of any such officer or key employee;

(i)    receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(j)    any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

8

(k)     any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(l)     any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase or other acquisition of any of such stock by the Company;

(m)    to the Company's knowledge, any other event or condition of any character that might materially and adversely affect the assets, properties, financial condition, operating results or business of the Company (as such business is presently conducted and as it is proposed to be conducted); or

(n)     any agreement or commitment by the Company to do any of the things described in this Section 2.19.

2.20    <u>Employee Benefit Plans</u>.    The Company does not have any Employee Benefit Plan as defined in the Employee Retirement Income Security Act of 1974.

2.21    <u>Tax Returns, Payments and Elections</u>.    The Company has filed all tax returns and reports (including information returns and reports) as required by law. These returns and reports are true and correct in all material respects except to the extent that a reserve has been reflected on the Financial Statements in accordance with generally accepted accounting principles. The Company has paid all taxes and other assessments due, except those contested by it in good faith that are listed on the Schedule of Exceptions and except to the extent that a reserve has been reflected on the Financial Statements in accordance with generally accepted accounting principles. The provision for taxes of the Company as shown in the Financial Statements is adequate for taxes due or accrued as of the date hereof. The Company has not elected pursuant to the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") to be treated as a Subchapter S corporation or a collapsible corporation pursuant to Section 1362(a) or Section 341(f) of the Code, nor has it made any other elections pursuant to the Code (other than elections that relate solely to methods of accounting, depreciation or amortization) that would have a material effect on the Company, its financial condition, its business as presently conducted or as presently proposed to be conducted or any of its properties or material assets. The Company has never had any tax deficiency proposed or assessed against it and has not executed any waiver of any statute of limitations on the assessment or collection of any tax or governmental charge. None of the Company's federal income tax returns and none of its state income or franchise tax or sales or use tax returns has ever been audited by governmental authorities. Since the Financial Statement Date, the Company has not incurred any taxes, assessments or governmental charges other than in the ordinary course of business and the Company has made adequate provisions on its books of account for all taxes, assessments and governmental charges with respect to its business, properties and operations for such period. The Company has withheld or collected from each payment made to each of its employees, the amount of all taxes (including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) required to be withheld or collected therefrom, and has paid the same to the proper tax receiving officers or authorized depositories. The Company is not a party to any contract and/or has not granted any compensation, equity or award that could be deemed

9

deferred compensation subject to the additional twenty percent (20%) tax under Section 409A of the Code, and neither the Company nor any person that is a member of the same controlled group as the Company or under common control with the Company within the meaning of Section 414 of the Code has any liability or obligation to make any payments or to issue any equity award or bonus that could be deemed deferred compensation subject to the additional twenty percent (20%) tax under Section 409A of the Code.

2.22    Insurance.  The Company has in full force and effect fire and casualty insurance policies, with extended coverage, sufficient in amount (subject to reasonable deductibles) to allow it to replace any of its properties that might be damaged or destroyed.

2.23    Minute Books.  The minute books of the Company provided to the Investors contain a record of all meetings of directors and stockholders since the time of incorporation.

2.24    Labor Agreements and Actions; Employee Compensation.  The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the Company's knowledge, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, that could have a material adverse effect on the assets, properties, financial condition, operating results, or business of the Company (as such business is presently conducted and as it is proposed to be conducted), nor is the Company aware of any labor organization activity involving its employees. The Company is not aware that any officer or key employee, or that any group of key employees, intends to terminate their employment with the Company, nor does the Company have a present intention to terminate the employment of any of the foregoing. The employment of each officer and employee of the Company is terminable at the will of the Company. To its knowledge, the Company has complied in all material respects with all applicable state and federal equal employment opportunity and other laws related to employment. The Company is not a party to or bound by any currently effective employment contract, deferred compensation agreement, bonus plan, incentive plan, profit sharing plan, retirement agreement, or other employee compensation agreement. The Company is not obligated to pay severance or any other additional compensation upon the termination of any employee.

2.25    Section 83(b) Elections.  To the Company's knowledge, all elections and notices under Section 83(b) of the Code have been timely filed by all individuals who have purchased shares of the Company's Common Stock subject to a right of repurchase in favor of the Company.

2.26    Real Property Holding Company.  The Company is not currently, and has not been during the prior five (5) years, a United States real property holding corporation within the meaning of Section 897 of the Code, and the Company has filed with the Internal Revenue Service all statements, if any, with its United States income tax returns which are required under Section 1.897-2(h) of the Treasury Regulations.

10

3.     Representations and Warranties of the Investors. Each Investor, severally and not jointly, hereby represents and warrants that:

3.1     Authorization. Such Investor has full power and authority to enter into this Agreement and the Ancillary Agreements, and each such Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (c) to the extent the indemnification provisions contained in the Investors' Rights Agreement may be limited by applicable federal or state securities laws.

3.2     Purchase Entirely for Own Account. This Agreement is made with such Investor in reliance upon such Investor's representation to the Company, which by such Investor's execution of this Agreement such Investor hereby confirms, that the Shares to be received by such Investor and the Conversion Shares (collectively, the "Securities") will be acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the distribution of any part thereof, and that such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, such Investor further represents that such Investor does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities.

3.3     Disclosure of Information. Such Investor believes it has received all the information it considers necessary or appropriate for deciding whether to purchase the Shares. Such Investor further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Shares and the business, properties, prospects and financial condition of the Company. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Investors to rely thereon.

3.4     Investment Experience. Such Investor is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares. If other than an individual, Investor also represents it has not been organized for the purpose of acquiring the Shares.

3.5     Accredited Investor. Such Investor is an "accredited investor" within the meaning of SEC Rule 501 of Regulation D, as presently in effect.

3.6     Restricted Securities. Such Investor understands that the Securities will be characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances. In this connection, such Investor represents

11

that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

3.7    Further Limitations on Disposition. Without in any way limiting the representations set forth above, such Investor further agrees not to make any disposition of all or any portion of the Securities unless and until:

(a)    There is then in effect a Registration Statement under the Act covering such proposed disposition and such disposition is made in accordance with such Registration Statement; or

(b)    (i) Such Investor shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by the Company, such Investor shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company that such disposition will not require registration of such shares under the Act. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 except in unusual circumstances.

(c)    Notwithstanding the provisions of subsections (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by an Investor that is a partnership to a partner of such partnership or a retired partner of such partnership who retires after the date hereof, or to the estate of any such partner or retired partner or the transfer by gift, will or intestate succession of any partner to his or her spouse or to the siblings, lineal descendants or ancestors of such partner or his or her spouse, if the prospective transferee agrees in all such instances in writing to be subject to the terms hereof to the same extent as if he or she were an original Investor hereunder.

3.8    Legends. It is understood that the certificates evidencing the Securities may bear one or all of the following legends:

(a)    "These securities have not been registered under the Securities Act of 1933, as amended. They may not be sold, offered for sale, pledged or hypothecated in the absence of a registration statement in effect with respect to the securities under such Act or an opinion of counsel satisfactory to the Company that such registration is not required or unless sold pursuant to Rule 144 of such Act."

(b)    Any legend required by applicable state "blue sky" securities laws, rules and regulations.

(c)    The Company shall be obligated to reissue promptly unlegended certificates at the request of any holder thereof if the Company has completed its initial public offering under the Act and the holder shall have obtained an opinion of counsel (which counsel may be counsel to the Company) to the effect that the securities proposed to be disposed of may lawfully be so disposed without registration, qualification and legend.

3.9    Exculpation Among Investors. Each Investor acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and

12

directors, in making its investment or decision to invest in the Company. Each Investor agrees that no Investor nor the respective controlling persons, officers, directors, partners, agents, or employees of any Investor shall be liable to any other Investor for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Securities.

3.10    Further Representations by Foreign Investors. If an Investor is not a United States person, such Investor hereby represents that he or she has satisfied himself or herself as to the full observance of the laws of his or her jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (a) the legal requirements within his or her jurisdiction for the purchase of the Securities, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Securities. Such Investor's subscription and payment for, and his or her continued beneficial ownership of the Securities, will not violate any applicable securities or other laws of his or her jurisdiction.

4.    Conditions of Investors' Obligations at Closing. The obligations of each Investor under subsection 1.1(c) of this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions, the waiver of which shall not be effective against any Investor who does not consent thereto, except that Sections 4.1, 4.3, 4.6 and 4.10 need not be fulfilled for subsequent sales of the Shares pursuant to Section 1.3 hereof.

4.1    Representations and Warranties.    The representations and warranties of the Company contained in Section 2 shall be true on and as of the initial Closing.

4.2    Performance. The Company shall have performed and complied with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

4.3    Compliance Certificate.    The President of the Company shall deliver to each Investor at the Closing a certificate stating that the conditions specified in Sections 4.1 and 4.2 have been fulfilled and stating that there shall have been no material adverse change in the business, affairs, operations, properties, assets or condition of the Company since the date of the Financial Statements.

4.4    Qualifications. All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be duly obtained and effective as of the Closing.

4.5    Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the special counsel for the Investors, and they shall have received all such counterpart original and certified or other copies of such documents as they may reasonably request.

13

4.6     Secretary's Certificate.    The Secretary of the Company shall deliver to each Investor at the Closing a certificate stating that the copies of the Company's Restated Certificate and Bylaws and the Board and stockholder resolutions relating to the sale of the Shares attached thereto are true and complete copies of such documents and resolutions.

4.7     Proprietary Information and Employee Stock Purchase Agreements. Each employee of the Company shall have entered into a Proprietary Information and Inventions Agreement, and each consultant to the Company shall have entered into a Consulting Agreement, substantially in the form previously provided or made available to the Investors.

4.8     Board of Directors.    The directors of the Company shall be Peter Lau, Edward Moncada and Paul Veradittakit.

4.9     Investors' Rights Agreement.    The Company and each Investor shall have entered into the Investors' Rights Agreement in the form attached as Exhibit B.

4.10    Voting Agreement.    The Company, each Investor and each Common Holder listed on Schedule A thereto shall have entered into the Voting Agreement in the form attached hereto as Exhibit C.

4.11    Right of First Refusal and Co-Sale Agreement.    The Company, each Investor and each Common Holder listed on Schedule A thereto shall have entered into the Right of First Refusal and Co-Sale Agreement in the form attached hereto as Exhibit D.

5.     Conditions of the Company's Obligations at Closing.    The obligations of the Company to each Investor under this Agreement are subject to the fulfillment on or before the Closing, or Subsequent Closing, as applicable, of each of the following conditions by that Investor:

5.1     Representations and Warranties.    The representations and warranties of the Investors contained in Section 3 shall be true on and as of the Closing or Subsequent Closing, as applicable.

5.2     Payment of Purchase Price.    The Investor shall have delivered the purchase price specified in Section 1.1(c).

5.3     Qualifications.    All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be duly obtained and effective as of the Closing or Subsequent Closing, as applicable.

6.     Miscellaneous.

6.1     Survival of Warranties.    The warranties, representations and covenants of the Company and Investors contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and shall in no way be

14

affected by any investigation of the subject matter thereof made by or on behalf of the Investors or the Company.

6.2    Successors and Assigns.  Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including transferees of any Securities). Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

6.3    Governing Law.  This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

6.4    Counterparts.  This Agreement may be executed and delivered by facsimile or electronic signature and in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one (1) and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.5    Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.6    Notices.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given:  (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the respective parties at the addresses set forth on the signature pages attached hereto (or at such other addresses as shall be specified by notice given in accordance with this Section 6.6).

6.7    Finder's Fee.  Each party represents that it neither is nor will be obligated for any finders' fee or commission in connection with this transaction.  Each Investor agrees to indemnify and to hold harmless the Company and each other Investor from any liability for any commission or compensation in the nature of a finders' fee (and the costs and expenses of defending against such liability or asserted liability) for which such Investor or any of its officers, partners, employees, or representatives is responsible.

The Company agrees to indemnify and hold harmless each Investor from any liability for any commission or compensation in the nature of a finders' fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

15

6.8    Expenses.  Each party shall bear its own expenses and legal fees incurred with respect to the transactions contemplated by this Agreement.

6.9    Amendments and Waivers.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the holders of a majority of the Conversion Shares issued or issuable upon conversion of the Shares purchased hereunder.  Any amendment or waiver effected in accordance with this section shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities are convertible), each future holder of all such securities, and the Company.

6.10    Severability.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

6.11    Corporate Securities Law.  THE SALE OF THE SECURITIES THAT ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION FOR SUCH SECURITIES PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

6.12    Aggregation of Stock.  All shares of the Preferred Stock held or acquired by affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

6.13    Entire Agreement.  This Agreement and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations, or covenants except as specifically set forth herein or therein.

6.14    Waiver of Conflicts.  Each party to this Agreement acknowledges that Goodwin Procter LLP ("Goodwin"), counsel for the Company, has in the past and may continue to perform legal services for certain of the Investors in matters unrelated to the transactions described in this Agreement, including the representation of such Investors in venture capital financings and other matters.  Accordingly, each party to this Agreement hereby (a) acknowledges that they have had an opportunity to ask for information relevant to this disclosure;  (b) acknowledges that Goodwin represented the Company in the transaction contemplated by this Agreement and has not represented any individual Investor or any individual stockholder or employee of the Company in connection with such transaction; and (c) gives its informed written consent to Goodwin's representation of certain of the Investors in such

16

unrelated matters and to Goodwin's representation of the Company in connection with this Agreement and the transactions contemplated hereby.

*[Remainder of page intentionally left blank]*

17

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**COMPANY**

**BLOCKFOLIO, INC.**

By: _Edward Moncada_

Name: _Edward Moncada_

Title: _Chief Executive Officer_

Address: _____

_____

DocuSign Envelope ID: D68F189F-7E72-47EE-AD4A-7C2FFD3F0FB5

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

FF Pathfinder VI, LLC

By: _Napoleon Ja_

Name: Napoleon Ta

Title: Partner

Address: 1 Letterman Dr Bdg D 5th Floor

San Francisco, CA 94129

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

HashKey Blockchain Investment Fund

By: _Deng Chao_

Name: Deng Chao

Title: Director

Address:

89 Nexus Way, Camana Bay

Grand Cayman, KY1-9009, Cayman Islands

DocuSign Envelope ID: B080C3C4-B010-4EB1-AC4A-EF09E16AE64F

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

Tezos Foundation

By: _Ryan Jesperson_      _Hubertus Thonhauser_
9E7DDC5A63CD427...      28B41F0F8BB54D2

Name: Ryan Jesperson      Hubertus Thonhauser

Title: President      Board Member

Address:  Dammstrasse 16

6300 Zug, Switzerland

DocuSign Envelope ID: D934C05D-D41E-42CB-BF46-87AAFCA0CB06

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

K&R CONSULTING LIMITED

By: __kaimin Hu_____

Name: Kaimin Hu_____

Title: Director_____

Address: 338 Portrero Avenue, Unit 807

San Francisco, CA 94103_____

DocuSign Envelope ID: AE95A9F4-9FBD-4DBC-BA75-2B5D7A46F288

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

INVESTOR:

Pantera Venture Fund II LP

Pantera Venture Fund III A LP

Pantera Venture Fund III LP

By: Ryan Davis

Name: Ryan Davis

Title: Chief Financial Officer

Address: 3000 Sand Hill Rd, 1-240

Menlo Park, CA 94025

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

By: Xinxi Wang
DocuSign by:
9D8D91DAD79A4D4

Name: Xinxi Wang

Title: Dr.

Address: 334A Pasir Panjang Road

#03-21, Singapore

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

imToken Ventures Ltd.

By: _Bin He_
_____

Name: Bin He
_____

Title: Director
_____

Address: Genesis Building, 5th Floor, Genesis Close, PO Box 446,
Cayman Islands
_____

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

                    **INVESTOR:**

                    Weissman & Weissman 401K PSP FBO Robert A. Weissman

                    DocuSigned by:

                    *Robert A Weissman*

By:    ~~705F90D0EE49429~~

Name:   Robert A Weissman

Title:   President

Address:   2660 Townsgate Road, Suite 350

                    Westlake Village, CA 91361

DocuSign Envelope ID: C49C734E-D82F-4786-AA34-3C74F3BFFB15

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

By: _____

Name: Scott James Price

Title: Mr

Address: 26 Northend, Batheaston, Bath, BANES,

BA1 7EN, United Kingdom

DocuSign Envelope ID: 52030892-28A2-4483-9946-A2FBC2C26853

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**INVESTOR:**

By: _____

Name: John Cynn _____

Title: _____

Address: 3750 S Las Vegas Blvd. Unit 2605 _____

Las Vegas, NV 89158 _____

DocuSign Envelope ID: 87B55AE7-FCE7-464F-A298-BC759CA00FA6

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

INVESTOR:

By: _____

Name: Marina Titova
_____

Title: Ms Marina Titova
_____

Address: Flat 5, 43 Tedworth Square
_____
London, SW3 4DW, United Kingdom

SIGNATURE PAGE TO SERIES A-1 PREFERRED STOCK PURCHASE
AGREEMENT FOR BLOCKFOLIO, INC.

Schedule A

Schedule of Investors

| Name | Cash Investment Amount | Number of Shares Purchased |
|------|------------------------|----------------------------|
| **Hashkey Blockchain Investment Fund**<br>89 Nexus Way, Camana Bay<br>Grand Cayman, KY1-9009 | $999,999.88 | 505,510 |
| **Tezos Foundation**<br>Dammstrasse 16<br>6300 Zug, Switzerland | $899,999.89 | 454,959 |
| **FF Pathfinder VI, LLC**<br>1 Letterman Drive, Bldg 5<br>San Francisco, CA 94129 | $99,999.99 | 50,551 |
| **Pantera Venture Fund II LP**<br>3000 Sand Hill Road, 1-240<br>Menlo Park, CA 94025 | $87,173.74 | 33,957 |
| **Pantera Venture Fund A II LP**<br>3000 Sand Hill Road, 1-240<br>Menlo Park, CA 94025 | $35,753.99 | 18,074 |
| **Pantera Venture Fund III LP**<br>3000 Sand Hill Road, 1-240<br>Menlo Park, CA 94025 | $109,335.11 | 55,270 |
| **Xinxi Wang**<br>334A Pasir Panjang Road<br>#03-21, Singapore | $50,000.98 | 25,276 |

S-1

| | | |
|---|---|---|
| **imToken Ventures Ltd.**<br>Genesis Building, 5th Floor<br>Close, PO Box 446<br>Cayman Islands | $99,999.99 | 50,551 |
| **Weissman & Weissman 401k**<br>**PSP FBO Robert A. Weissman**<br>2660 Townsgate Road, Suite 350<br>Westlake Village, CA 91361 | $74,999.50 | 37,913 |
| **K&R Consulting Limited**<br>338 Portrero Avenue, Unit 807<br>San Francisco, CA 94103 | $50,000.98 | 25,276 |
| **Scott James Price**<br>26 Northend<br>Batheaston, Bath<br>BA1 7EN, United Kingdom | $39,999.20 | 20,220 |
| **John Cynn**<br>3750 South Las Vegas Boulevard,<br>Unit 2605<br>Las Vegas, NV 89158 | $9,999.80 | 5,055 |
| **Marina Titova**<br>Flat 5, 43 Tedworth Square<br>London, SW3 4DW<br>United Kingdom | $7,499.36 | 3,791 |
| TOTAL | **$2,564,762.41** | **1,286,403** |

ACTIVE/99161512.4

## **EXHIBIT D**

Right of First Refusal and Co-Sale Agreement