**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Re:  Docket No. 22165** |

**OBJECTION OF LAYERZERO LABS LTD., ARI
LITAN, AND SKIP & GOOSE LLC TO CONFIRMATION
OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF FTX TRADING LTD. AND ITS DEBTOR AFFILIATES**

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT .................................................................................................. 1

SUMMARY OF RELEVANT PLAN PROVISIONS ..................................................................... 5

LAYERZERO GROUP CLAIMS AND THEIR TREATMENT ................................................... 9

OBJECTION ................................................................................................................................ 13

    I.     The Debtors' Plan Violates Section 1129(a)(1) of the Bankruptcy Code and Section 1123(a)(4) by Providing Unequal Treatment of Creditors within Classes 5A, 5B, 7A, and 7B ................................................................................. 13

    II.    The Plan Violates Section 1129(a)(3) by Failing to Treat Customers Fairly and Violating Applicable Nonbankruptcy Law ..................................................... 16

        A.    The Property Withdrawn from the FTX.com and FTX US Deposit Accounts Was Never Property of the Estate .......................................... 18

        B.    The Debtors Have Excluded the LayerZero Group From Participating in the Customer Preference Settlement for Leverage in the Adversary Proceeding ...................................................................... 19

    III.    The Plan Improperly Disallows Distributions Without a Judicial Determination ............................................................................................................ 20

RESERVATION OF RIGHTS ..................................................................................................... 22

CONCLUSION ............................................................................................................................. 22

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Braun v. Am.-CV Station Grp., Inc. (In re Am.-CV Station Grp., Inc.),*
  56 F.4th 1302 (11th Cir. 2023) ...................................................................................13

*Giuliano v. Mitsubishi Dig. Elecs. Am., Inc. (In re Ultimate Acquisition Partners, LP),*
  Nos. 11-10245 (MFW), 11-52663 (MFW), 2012 Bankr. LEXIS 1905 (Bankr. D. Del. May 1, 2012) ...........................................................................................21

*In re Am. Cap. Equip., LLC,*
  688 F.3d 145 (3d Cir. 2012).......................................................................................17

*In re Dana Corp.,*
  412 B.R. 53 (S.D.N.Y. 2008).....................................................................................15

*In re LATAM Airlines Grp. S.A.,*
  No. 20-11254, 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022),
  corrected, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022). ...............................17

*In re Lids Corp.,*
  260 B.R. 680 (Bankr. D. Del. 2001) ..........................................................................21

*In re Owens Corning,*
  419 F.3d 195 (3d Cir. 2005)........................................................................................20

*In re Quigley Co.,*
  377 B.R. 110 (Bankr. S.D.N.Y. 2007) .......................................................................14

*In re Tribune,*
  464 B.R. 126 (Bankr. D. Del. 2011) ..........................................................................17

*In re W.R. Grace & Co.,*
  475 B.R. 34 (D. Del. 2012),
  *aff'd,* 729 F.3d 332 (3d Cir. 2013) ...........................................................................14

*In re W.R. Grace & Co.,*
  729 F.3d 311 (3d Cir. 2013)........................................................................................15

*Schimmelpenninck v. Byrne (In re Schimmelpenninck),*
  183 F.3d 347 (5th Cir. 1999) .....................................................................................15

STATUTES

11 U.S.C. 502....................................................................................3, 4, 9, 12, 13, 21

11 U.S.C. § 547.................................................................................................................4, 14, 18

11 U.S.C. § 1123...........................................................................................................3, 13, 14, 15

11 U.S.C. § 1129.........................................................................................................1, 3, 4, 13, 17

**OTHER AUTHORITIES**

Tom Wilson & Angus Berwick, *Crypto exchange FTX saw $6 bln in withdrawals
    in 72 hours*, Reuters, https://www.reuters.com/business/finance/crypto-
    exchange-ftx-saw-6-bln-withdrawals-72-hours-ceo-message-staff-2022-11-08......................8

LayerZero Labs Ltd. ("LayerZero"), Ari Litan, and Skip & Goose LLC ("Skip & Goose", and collectively with LayerZero and Ari Litan, the "LayerZero Group")[2] hereby submit this objection (this "Objection") to confirmation of the *First Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [Docket No. 22165] (the "Plan")[3] filed by the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). In support of this Objection, the LayerZero Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors have proposed a Plan that they believe is in compliance with the strict dictates of section 1129 of the Bankruptcy Code and will pass the muster of the Court. Unfortunately, as designed, and as detailed below, the Plan fails miserably and, upon application of applicable law, the Plan must be denied confirmation. This is extremely troubling for the LayerZero Group has previewed these apparent flaws to the Debtors for a period of time and, by not heeding such advice, the Debtors will have continued the practice of incurring needless (and exorbitant) fees and expenses to the detriment of the Debtors' creditors. The recoveries projected in the Disclosure Statement attempt to portray a significant success and the greatest of possible recoveries. However, such amounts are belied by the systematic missteps throughout the Chapter 11 Cases, including, without limitation, the liquidation of valuable assets that, if retained, would have provided even greater returns. Now, with respect to the LayerZero Group, the Debtors try to leverage such creditors in connection with an ill-advised adversary proceeding by injecting

---

[2]     The LayerZero Group has filed the following proofs of claim: 5236, 5263, 5511, 85302, 85218, 85231, 85245, 85334, 85220, 85225, 85332, 85203, 85226, and 85338.

[3]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

provisions into the Plan and limiting their entitled recovery, all in contravention of the express provisions of the Bankruptcy Code and applicable law.

2.      Prior to the Petition Date, the Debtors operated one of the world's largest digital asset exchanges and the Debtors advertised themselves as "the safest and easiest way to buy and sell crypto."[4]  That advertising led millions of customers to deposit tens of billions of dollars of cryptocurrency with the Debtors, more than $10 billion of which was fraudulently usurped by Alameda Research Ltd. ("Alameda Research").  Similar to several other "crypto cases", this case presented an extremely difficult challenge: determining ownership of and entitlement to the remaining assets between the millions of customers who deposited their assets with FTX.com or FTX US.  After over a year and a half, the Plan proposes a grand bargain for customers: if confirmed and consummated, the vast majority of customers of FTX.com and FTX US, regardless of claim currency denomination, will recover (a) approximately 129%-143% of the "Petition Date value" of the property they deposited with the applicable FTX exchange in dollars, and (b) a complete waiver of preference claims for customers who withdrew their assets prior to the Petition Date.  The Plan proposes this settlement to all creditors in Classes 5A, 5B, 7A, and 7B as recovery on account of such creditors' claims, with the arbitrary exception of a select few creditors, including the members of the LayerZero Group.  Ari Litan and Skip & Goose are victims of FTX's fraud just like all of its other customers and are being excluded from the customer preference waiver solely by their association with a company (LayerZero) for which Ari Litan is merely a former employee, even though the Causes of Action asserted against LayerZero are asserted by an unrelated Debtor from an unrelated silo for matters entirely unrelated to Ari Litan's and Skip &

---

[4]     *See Consent Order for Permanent Injunction and Other Equitable Relief Against Defendants FTX Trading Ltd. D/B/A FTX.com and Alameda Research LLC*, ¶ 40, *CFTC v. Bankman-Fried* (S.D.N.Y. Aug. 7, 2024) (No. 1:22-cv-10503-PKC), Docket 43.

Goose's deposit accounts. LayerZero is also being excluded in its capacity as a customer solely on account of unrelated Causes of Action asserted by an unrelated Debtor.

3.    The Plan cannot be confirmed because it violates sections 1129(a)(1) and (3) and 1123(a)(4) of the Bankruptcy Code by providing different distributions on account of claims in Classes 5A, 5B, 7A, and 7B by arbitrarily waiving Customer Preference Actions for most creditors and not others. The members of the LayerZero Group find themselves among the excluded minority to whom the Customer Preference Action waiver apparently does not apply. The members of the LayerZero Group are named defendants in an adversary proceeding, Adv. Proc. No. 23-50492 (JTD) (the "Adversary Proceeding"), that, among other things, seeks to avoid and recover certain allegedly preferential transfers pursuant to the Bankruptcy Code from the LayerZero Group's FTX.com and FTX US exchange accounts. Further, the Plan proposes to unjustifiably and indefinitely delay distributions to creditors pursuant to section 502(d) of the Bankruptcy Code without any judicial determination of liability in violation of this District's precedent.

4.    *First*, the Plan cannot be confirmed because it violates section 1129(a)(1) of the Bankruptcy Code by failing to comply with section 1123(a)(4) of the Bankruptcy Code. To resolve one of the most important issues of these Chapter 11 Cases—i.e., how to treat and fairly allocate customer property fraudulently misappropriated by the Debtors—the Debtors propose to dollarize the remaining assets of the estate, provide priority distributions, and waive preference causes of action against customers who agree to vote to accept the Plan and accept the dollarized amount of their claim. While the LayerZero Group is supportive of this resolution, the Debtors have excluded each member of the LayerZero Group and similarly situated creditors in Classes 5A, 5B, 7A, and 7B from the opportunity to receive the preference waiver portion of their recovery. The creditors

3

that were allowed to participate in the preference waiver may receive an aggregate of approximately $6 billion on account of voting to accept the Plan, which value will be denied to the members of the LayerZero Group in the same class.

5.      *Second*, the Plan violates section 1129(a)(3) of the Bankruptcy Code because the Debtors are violating section 547 of the Bankruptcy Code and applicable non-bankruptcy law by refusing to recognize that the Debtors never had an interest in the property of the FTX.com and FTX US customer deposits, and, therefore, could not bring preference causes of action against property in which the estates never had an interest.  Additionally, the Debtors do not have a good faith justification to treat the members of the LayerZero Group differently from other similarly situated creditors in Classes 5A, 5B, 7A, and 7B by refusing to offer the members of the LayerZero Group participation rights in the Customer Preference Settlement (as defined below).

6.      *Third*, the Plan improperly treats liquidated claims against the Debtors as Disputed Claims because of unrelated Causes of Action by unrelated Debtors and unjustly delays distributions on those claims.  It is undisputed that LayerZero has liquidated claims of $1,449,864 in Class 6A related to interest accrued in accordance with the terms of a loan agreement and $11,459,230 in claims in Class 5A for its Petition Date balance of its FTX.com deposit account. The Debtors have improperly classified such claims as Disputed Claims, asserting that such claims should be disallowed in the Adversary Proceeding pursuant to section 502(d) of the Bankruptcy Code.  However, the law in this District is clear and the Debtors cannot refuse to make distributions on otherwise allowed claims simply because it has brought a preference cause of action against a creditor without any judicial determination as to the creditor's liability.

7.      At bottom, the Plan cannot be confirmed because it contains serious infirmities that violate the Bankruptcy Code and applicable law.  Until the Debtors propose a Plan that treats all

similarly situated creditors in the same Class equally in compliance with the Bankruptcy Code and respects the customer entitlements over their property, confirmation of the Plan must be denied.

### SUMMARY OF RELEVANT PLAN PROVISIONS

8.　　Prior to the Petition Date, the Debtors operated one of the world's largest digital asset exchanges where millions of customers bought, sold and traded digital assets. *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Affiliated Debtors and Debtors-In-Possession* [Docket No. 19143] (the "Disclosure Statement"), § 2.A. In the Debtors' own words, "these chapter 11 cases started with a crime scene" and $10 billion of customer assets, including the assets of the LayerZero Group, were misappropriated by the Debtors in favor of a small group of insiders. Disclosure Statement §§ 1.B and 2.B.2. Customers believed, and FTX's documents showed, that the digital assets that each customer held were its property and these customers believed their property to be safe. *See, e.g.*, *Declaration of Jordan E. Sazant in Support of Objection of LayerZero Labs Ltd., Ari Litan, and Skip & Goose LLC to Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* (the "Sazant Declaration"), at Ex. D § 8.2.6 ("Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading."); and Sazant Declaration, at Ex. E § 6 ("Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.").

9.　　Settling the controversy of what to do with the remaining assets is a key component to the Plan. Disclosure Statement, § 4.B.5. The Disclosure Statement notes that "[p]urported customer property interests and entitlements in the Debtors' digital assets fiat currency is a central and highly controversial issue in these Chapter 11 Cases." *Id.* In that regard, parties in interest have argued that an express trust pursuant to English law should be imposed in favor of customers to the FTX.com Exchange based upon the FTX.com Exchange terms of services. *Id.* Similarly,

in the Disclosure Statement and in other pleadings filed in these Chapter 11 Cases, the Debtors admit such position in regard to the FTX.US Exchange, "U.S. customers may argue, among other things, that WRSS held digital assets and fiat in a 'bailment for keeping' capacity based on the language of the FTX.US Exchange user agreement.  If a bailment for keeping is established, WRSS would hold mere possessory interest in, but not legal title to, the digital assets and fiat associated with the FTX.US Exchange and, as a result, such assets and fiat would not constitute property of the Debtors." *Id.*[5]

10.    To resolve this highly controversial customer property issue, the Debtors have entered into a grand bargain (i.e., the customer property settlement) whereby the Debtors gave their customers priority claims and shortfall amounts for the benefit of customers against the General Pool.  *Id.*  A key component of this settlement is that, pursuant to the Plan, the Debtors propose settling preference actions and "the Debtors and Wind Down Entities shall waive and not prosecute any Customer Preference Action against any Holder of Dotcom Customer Entitlement Claims or U.S. Customer Entitlement Claims if such Holder duly executes and timely returns a valid Ballot by the Voting Deadline that (i) votes to accept the Plan, and (ii) consents and stipulates

---

[5]    Parties in interest have raised the customer property issue in these Chapter 11 Cases and in the related adversary proceedings.  *See, e.g.*, *Memorandum of Law in Support of Time Research Ltd.'s Motion to Dismiss Complaint*, at 2, *In re FTX Trading Ltd.* (Bankr. D. Del. Feb. 6, 2024) (Adv. Proc. No. 23-50759-JTD), Docket No. 32  ("Terms of Service make clear that title to the digital assets on the FTX.com platform remained at all times with the customer and did not transfer to FTX.com."); *Joinder and Separate Response of Sunil Kavuri, Ahmed Abd El Razek, Noia Capital Sàrl and Pat Rabbitte To (I) Application of The United States Trustee for Order Approving Appointment of Robert J. Cleary, Esq. as Examiner; (II) Motion for Entry of an Order (A) Establishing the Scope, Cost, Degree and Duration of the Initial Phase of the Examination and (B) Granting Related Relief; and (III) Motion to File Certain Information Regarding Potential Parties in Interest Under Seal*, ¶ 13, *In re FTX Trading Ltd.* (Bankr. D. Del. Mar. 13, 2024) (Adv. Proc. No. 22-11068-JTD), Docket No. 9282 ("It is Respondents' view that the Digital Assets held by the Debtors are not property of the Debtors' estates. Under the terms of service between the customer and FTX, the customer continued to hold legal title."); *Opening Brief in Support of The Ad Hoc Committee of Non-Us Customers of Ftx.com's Motion for Partial Summary Judgment*, ¶ 6, *In re FTX Trading, Ltd.* (Bankr. D. Del. Mar. 24, 2023) (Adv. Proc. No. 22-50514-JTD), Docket No. 11 ("The Terms of Service are clear and unambiguous that title to all Digital Assets on the FTX.com platform remained at all times with the FTX.com customer and did not transfer to FTX Trading Ltd. . . . or any other Debtor in these cases.").

to the amount of such Dotcom Customer Entitlement or U.S. Customer Entitlement Claim as set forth in the applicable Ballot for voting, allowance and Distribution purposes; *provided* that notwithstanding anything provided herein, the Debtors shall not waive and release any Excluded Customer Preference Action" (collectively, the "Customer Preference Settlement").  Plan, § 5.5.

11.    As authorized by this Court in connection with the Plan solicitation process, the Debtors included the option to participate in the Customer Preference Settlement as part of the ballots for Classes 5A, 5B, 7A, and 7B, but only if the claimholder checked a box to accept the amount of its claim for voting, allowance, and distribution and voted to accept the Plan.  *See Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation Packages; (III) Approving the Forms of Ballots; (IV) Establishing Voting, Solicitation and Tabulation Procedures; and (V) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [Docket No. 19068] (the "DS Order"), at Exhibits 3B, 3C, 3F, and 3G.

12.    The Debtors and their adversaries have always treated the Customer Preference Settlement as integral to the settlement of customer property disputes, because they are one and the same.  *See Notice of Proposed Settlement of Customer Property Disputes*, Ex. A to Ex. A at p. 2 [Docket No. 3291] (describing the customer property settlement in part as "an agreement among the Parties to the Plan Support Agreement with respect to (a) the resolution of the open issues identified by the Debtors when the Initial Draft Plan was filed on July 31, 2023 and (b) ***a global approach to FTX.com and FTX.US preferences***.") (emphasis added).

13.    The Customer Preference Settlement settles claims by the Debtors related to approximately $6 billion in customer withdrawals that occurred in the days leading up to the

Petition Date.[6]  This value is approximately 50% of the total cash projected to be available for

distributions on the effective date.  *See* Disclosure Statement, § 1.D ("the monetization effort has

been successful and the Debtors currently expect to have approximately $12.6 billion in cash as of

the expected effective date of the Plan, enough to pay all non-governmental customers and

creditors in full based on the Petition Date value of their claims . . ."; Transcript of June 25, 2024

Hearing before Honorable John T. Dorsey, *In re FTX* (No. 22-11068) (the "DS Hearing

Transcript"), at 16:16-19 ("We anticipate, as we say in the disclosure statement, being a[t] $12.6

billion in cash on the effective date assuming an October 31st effective date.").

14.     At the Disclosure Statement Hearing, counsel for the Debtors emphasized that the

Plan "needs to resolve the customer property issue. We have known that from the beginning of the

case.  It needs to do so because that issue is relevant to so many people, millions of people.  It

needs to do so in a uniform way that resolves all of the various customer property litigation claims

that we face."  *See* DS Hearing Transcript, at 11:17-22.  However, the Plan fails to resolve the

customer property issue with respect to the "Excluded Customer Preference Actions" and excludes

a small minority of the Debtors' customers from fully participating in the grand bargain that the

Debtors have offered to satisfy their claims.  The Plan purports to provide fixed criteria for

excluding customers from the full benefits from this grand bargain and states that:

> The Debtors shall not designate a Customer Preference Action as an Excluded Customer
> Preference Action unless the Debtors have determined there is a reasonable basis to
> conclude that, among other things: (a) the recipient of the applicable preferential payment
> or transfer (i) was an Insider of any Debtor, (ii) was a current or former employee of the
> Debtors or of any current or former Affiliate of the Debtors, (iii) may have had actual or
> constructive knowledge of the commingling and misuse of Customer deposits and
> corporate funds, or (iv) either (x) changed its know your customer information to facilitate
> withdrawals from the applicable FTX Exchange or (y) received manual permission from

---

6   Tom Wilson & Angus Berwick, *Crypto exchange FTX saw $6 bln in withdrawals in 72 hours*, Reuters,
    https://www.reuters.com/business/finance/crypto-exchange-ftx-saw-6-bln-withdrawals-72-hours-ceo-message-
    staff-2022-11-08/

the Debtors to facilitate withdrawals when withdrawals were otherwise halted from the FTX Exchange; or (b) any Debtor has a Cause of Action or a defense against the recipient of the applicable preferential payment or transfer (or a subsequent transferee of the applicable Customer Entitlement Claim) or any of its Affiliates other than a claim arising under a Customer Preference Action.

Plan, § 5.5.

15.     The Debtors have listed "All defendants or named plaintiffs in any pending litigations brought by any Debtor" as an Excluded Preference Action.  Plan Supplement, Ex. 5. This list includes the members of the LayerZero Group, against whom the Debtors have brought the Adversary Proceeding.

16.     The Plan also excludes all claims "subject to disallowance under section 502(d)" from being Allowed.  *See* Plan, § 2.1.8.  Any claim is not Allowed is a Disputed Claim.  *See* Plan, § 2.1.57.  The Debtors will not make any distributions on claims that are Disputed Claims unless the Disputed Claim becomes an Allowed Claim or is otherwise settled or resolved.  *See* Plan, § 8.6.

## LAYERZERO GROUP CLAIMS AND THEIR TREATMENT

17.     On September 8, 2023, the Debtors filed the *Complaint for Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 105, 544, 547, 548 and 550, Del. Code Ann. Tit. 6, §§ 1304 And 1305, and for Disallowance of Claims Pursuant To 11 U.S.C. § 502* (Adv. Proc. 23-50492-JTD), Docket No. 1 (the "Complaint").  Therein, the Debtors have brought claims and causes of action against members of the LayerZero Group relating to alleged preferences associated with withdrawals from each member's FTX.com or FTX US deposit account and preference and fraudulent transfer claims, and separate causes of action against LayerZero related to a cancellation of debt owed to LayerZero in exchange for a return of Alameda Ventures' LayerZero equity stake.

18.     LayerZero entered into a series of transactions with Maclaurin Investments Ltd., f/k/a/ Alameda Ventures Ltd. ("Alameda Ventures"), in early 2022, including approximately $70 million of investments by Alameda Ventures in LayerZero in exchange for (a) equity in LayerZero

and (b) warrants for digital tokens that LayerZero may elect to issue in the future.  LayerZero also provided Alameda Research (Alameda Ventures' parent company) with a $45 million loan. Complaint, ¶¶ 3-4.

19.     The warrants relate to the rights to purchase two different tokens, Stargate Tokens ("STG Tokens") and LayerZero Tokens ("ZRO Tokens").  The warrants to purchase STG Tokens and ZRO Tokens contain a one-year lock up from the dates that the STG Tokens and ZRO Tokens were issued and a 24-month vesting period thereafter.  *See* Sazant Declaration, at Ex. F and G, § 3.2 ("The Holder's Portion and the Tokens issuable upon exercise of this Warrant shall be subject to a lockup and restriction on Transferability as follows: (i) no Tokens shall be Transferable for a period of one year after the Token Launch and (ii) thereafter 1/24th shall become Transferable on a monthly basis (i.e., the Token's shall be "locked up" in accordance with the foregoing schedule) . . .").

20.     In November 2022, LayerZero and Alameda Ventures entered into two agreements (the Share Transfer Agreement and Cancellation and Recission Agreement), which combined to forgive the $45 million principal amount of the loan obligations in exchange for the cancellation of Alameda Ventures' interest in LayerZero equity and the token warrants (collectively, the "Cancellation and Recission Agreement").  *See* Sazant Declaration, at Ex. H and I.

21.     Pursuant to the Complaint, the Debtors are seeking to avoid the Cancellation and Recission Agreement pursuant to the theory that the transaction was a preference or fraudulent transfer, contentions which the LayerZero Group disputes.

22.     At the time the Cancellation and Recission Agreement was entered into, the transfer rights pursuant to the warrants had not vested.  The right to sell or transfer the STG Tokens pursuant to the STG Token warrant commenced in March 2023, four months after entry into the

Cancellation and Recission Agreement.  ZRO Tokens were launched recently in June 2024 with the sale or transfer rights pursuant to the corresponding the ZRO Token warrants commencing in June 2025. <u>Sazant Declaration</u>, ¶¶ 6-7.

23.     The LayerZero equity is also subject to transfer restrictions and LayerZero has unilateral discretion to determine whether and to whom its shares can be transferred pursuant to its BVI Memorandum and Articles of Association. <u>Sazant Declaration</u>, at Ex. J § 7.4 of the Territory of the British Virgin Islands the BVI Business Companies Act (as Amended) Company Limited by Shares Articles of Association of LayerZero Labs Ltd. (the "<u>Articles of Association</u>") ("Shares are transferable subject to the approval of the Directors by resolution who may, save with respect to Permitted Transfers, in their absolute discretion, decline to register any transfer of Shares without giving any reason.").  In accordance with the plain language of the warrants, LayerZero also has full discretion to refuse to issue the STG Tokens or ZRO Tokens to any holder if "such exercise would constitute a violation of any applicable laws or regulations, including applicable federal or state laws or other regulations, as determined by the Directors of the Company upon the advice of counsel." <u>Sazant Declaration</u>, at Ex. F and G, § 2.4.  LayerZero believes that, in the event the Cancellation and Recission Agreement were avoided, LayerZero may have the right to refuse to issue the warrants to Alameda Ventures due to its criminal activity.

24.     LayerZero is confident that it will be able to establish in the Adversary Proceeding that, through the combination of, among other things, the present market prices of ZRO Tokens and STG Tokens, the transfer restrictions and illiquidity of LayerZero equity and warrants, and the value of the LayerZero equity and warrants in November 2022, the Cancellation and Recission Agreement was entered into at fair value, and, as a consequence, LayerZero intends to rigorously defend itself against the allegations brought by the Debtors in the Adversary Proceeding.

25.     However, even if the Debtors were successful at avoiding the Cancellation and Recission Agreement, LayerZero would have an additional $45 million Class 6A General Unsecured Claim in accordance with section 502(h) of the Bankruptcy Code.  *See* 11 U.S.C. 502(h) ("A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section . . . the same as if such claim had arisen before the date of the filing of the petition.").  The projected recovery for Class 6A is 125%.  Disclosure Statement, § 1.G.

26.     In addition to the preference and fraudulent transfer claims against LayerZero relating to the Cancellation and Rescission Agreement entered into with Alameda Ventures, the Debtors have brought customer preference claims against each member of the LayerZero Group. The claims and causes of action brought against Ari Litan and Skip & Goose relate to alleged preferential transfers with respect to their FTX US deposit accounts.  *See* Complaint, ¶¶ 120-141. The Debtors estimate Ari Litan's preference exposure is $13,069,622.  Complaint, Ex. B.  The Debtors estimate that Skip & Goose's preference exposure is $6,646,989.  Complaint, Ex. C.  The Debtors also brought preference causes of action against LayerZero related to withdrawals from its FTX.com deposit accounts.  *See* Complaint, ¶¶ 109-119.  The Debtors estimate LayerZero preference exposure to be $21,374,037.  Complaint, Ex. A.

27.     Ari Litan and Skip & Goose were provided ballots for Classes 7B and 5B.  Sazant Declaration, ¶¶ 2-3 and Exs. A-B.  However, they are not entitled to participate in the Customer Preference Settlement because the Debtors have designated them as a party to an Excluded Preference Action.  *See* Plan Supplement, at Ex. 5.  LayerZero was provided ballots for Class 5B for its remaining balance in its FTX.com deposit account in the amount of $11,459,230 and for Class 6A for unpaid interest on its loan to Alameda in the amount of $1,449,864.  Like Mr. Litan

and Skip & Goose, it also is deemed to be part of the Excluded Customer Preference Actions.  *See*

Sazant Declaration, ¶ 4 and Ex. C.

28.    While the Debtors have allowed LayerZero to vote its claims as part of the Plan,

the Debtors will not allow any distributions for any of LayerZero's claim (or any member of the

LayerZero Group) because it asserts that the LayerZero Group's claims are subject to disallowance

pursuant to section 502(d) of the Bankruptcy Code.  *See* Complaint, ¶¶ 142-144.

## OBJECTION

### I.    The Debtors' Plan Violates Section 1129(a)(1) of the Bankruptcy Code and Section 1123(a)(4) by Providing Unequal Treatment of Creditors within Classes 5A, 5B, 7A, and 7B

29.    Section 1129(a)(1) of the Bankruptcy Code requires that a Plan "complies with the

applicable provisions of this title."  Simply stated, the Plan cannot be confirmed because it violates

section 1123(a)(4) of the Bankruptcy Code by denying the LayerZero Group and a minority of

other creditors the opportunity to participate in the full monetary benefit of the Customer

Preference Settlement with similarly situated customers and receive the same recoveries as the

remainder of their Class.  *See Braun v. Am.-CV Station Grp., Inc. (In re Am.-CV Station Grp.,*

*Inc.)*, 56 F.4th 1302, 1312 (11th Cir. 2023) (finding that a plan was improperly confirmed pursuant

to section 1129(a)(1) because it did not comply with section 1123(a)(4)).

30.    As stated above, the Plan is premised on a grand bargain with victims of the

Debtors' prepetition fraud, but inexplicably denies the members of the LayerZero Group and a

select few creditors the right to participate in the full monetary distributions pursuant to the Plan

that all other similarly situated creditors are provided.  The Customer Preference Settlement

provides approximately $6 billion in value to similarly situated creditors in Classes 5A, 5B, 7A,

and 7B.  This settlement is a key component of the customer property settlement and implicates

the same issues.  If the digital tokens held by customers were never property of the Debtors, then

the Debtors cannot dollarize the tokens for distributions nor can the Debtors claw back property pursuant to section 547 of the Bankruptcy Code that was never property of their estates.  The Customer Preference Settlement (and customer property settlement) is value that is being provided to other creditors similarly situated to the LayerZero Group, including those in the same Class, but is not even offered to members of the LayerZero Group without the Debtors' consent in violation of section 1123(a)(4) of the Bankruptcy Code.

31.    Section 1123(a)(4) of the Bankruptcy Code provides that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). "This equal treatment" provision requires that "all members of the class must receive equal value [and] each member of the class must pay the same consideration for its distribution. *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012) (internal citation omitted) ("Federal case law construing [section 1123(a)(4)] has interpreted equal treatment to mean that: (1) all class members must be subject to the same process for claim satisfaction; (2) all class members' claims must be of 'equal value' through the application of the same pro rata distribution or payment percentage procedures to all claims."), *aff'd*, 729 F.3d 332 (3d Cir. 2013). Thus, section 1123(a)(4) of the Bankruptcy Code ensures that a fundamental tenet of bankruptcy law—equal treatment of similarly situated claimants—is upheld. *See Schimmelpenninck v. Byrne (In re Schimmelpenninck)*, 183 F.3d 347, 355 (5th Cir. 1999) (noting general bankruptcy policy of "ensuring equal distribution of the debtor's assets to similarly-situated creditors.").

32.    By classifying creditors in the same class where the Debtors are waiving extremely valuable Customer Preference Actions for nearly all Dotcom Customer Entitlement Claims and

U.S. Customer Entitlement Claims, while denying the LayerZero Group an opportunity to participate and continuing to pursue such claims against members of the LayerZero Group and a minority of similarly situated creditors, the Debtors are providing disparate treatment and gerrymandering class acceptance.  Courts in the Third Circuit have interpreted section 1123(a)(4) as requiring that "all claimants in a class must have 'the same opportunity' for recovery." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) (quoting *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008)). "What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims." *Id.*  The members of the LayerZero Group must be afforded the opportunity to receive the same value for the customer property settlement that almost every other creditor in their class receives and the Debtors have not provided any justification for why the LayerZero Group should be excluded from the Customer Preference Settlement.

33.     The Debtors have not provided any justification for treating the members of the LayerZero Group differently from other similarly situated creditors and violating this fundamental tenet of bankruptcy law.  The Debtors have listed a set of criteria in Section 5.5 of the Plan for excluding a customer from the ability to participate in the Customer Preference Settlement such as "the recipient of the applicable preferential payment or transfer (i) was an Insider of any Debtor, (ii) was a current or former employee of the Debtors or of any current or former Affiliate of the Debtors, (iii) may have had actual or constructive knowledge of the commingling and misuse of Customer deposits and corporate funds, or (iv) either (x) changed its know your customer information to facilitate withdrawals from the applicable FTX Exchange or (y) received manual permission from the Debtors to facilitate withdrawals when withdrawals were otherwise halted from the FTX Exchange." Plan, § 5.5.  None of these apply to any member of the LayerZero

Group, nor have the Debtors presented any evidence that any member of the LayerZero Group meets these categories. Without even opining as to the permissibility of the exceptions, it is clear that they are no more than pretense if the Debtors are not required to abide by them in determining the parties to be excluded from the Customer Preference Settlement offer. It is clear, at least in the case of the LayerZero Group, the exclusion is no more than an effort to apply undue leverage in connection with the Adversary Proceeding.

34.    At best, the only possible category that the LayerZero Group could fit into is that "any Debtor has a Cause of Action or a defense against the recipient of the applicable preferential payment or transfer (or a subsequent transferee of the applicable Customer Entitlement Claim) or any of its Affiliates other than a claim arising under a Customer Preference Action." Plan, § 5.5. However, the only Cause of Action that the Debtors have against Ari Litan and Skip & Goose is related to the alleged preferential withdrawals on their FTX US deposit accounts and not any other Causes of Action. The Debtors cannot treat Ari Litan and Skip & Goose differently from other similarly situated creditors without justification.

35.    While the Debtors have also brought Causes of Action against LayerZero for claims that do not arise pursuant to a Customer Preference Action, these Causes of Action are being brought by unrelated Debtors, and it is not justified to treat LayerZero differently than other holders of Dotcom Customer Entitlement Claims for unrelated Causes of Action by unrelated Debtors.

**II.    The Plan Violates Section 1129(a)(3) by Failing to Treat Customers Fairly and Violating Applicable Nonbankruptcy Law**

36.    The Plan cannot be confirmed because it was not "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); *see In re Tribune*, 464 B.R. 126, 154 (Bankr. D. Del. 2011) (citations omitted) (finding the "good faith standard" requires the plan to be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be

16

effected with results consistent with the objectives and purposes of the Bankruptcy Code"); *see also In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 WL 2206829, at *33 (Bankr. S.D.N.Y. June 18, 2022) (a plan is not proposed in good faith, as required by section 1129(a)(3), if "on its face, the plan violates applicable law") (collecting cases), corrected, WL 2541298 (Bankr. S.D.N.Y. July 7, 2022).  While the Bankruptcy Code does not define good faith, the Third Circuit has instructed that "the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (citations omitted).  The Third Circuit further noted that the objectives of the Bankruptcy Code include discouraging debtor misconduct and "achieving fundamental fairness and justice."  *Id.*

37.     The Plan violates section 1129(a)(3) of the Bankruptcy Code because it fails to comply with applicable law by distributing the proceeds of digital assets that are not, and never were, property of the estate without resolving the customer property dispute as to *all* creditors. Further, the failure to allow the LayerZero Group and other similarly situated creditors a right to participate in the Customer Preference Settlement does not serve a good faith bankruptcy purpose and, in the case of the LayerZero Group, is likely being inappropriately used as leverage in the Adversary Proceeding.  Absent a settlement, even if the Debtors were successful in avoiding the Cancellation and Recission Agreement (which the LayerZero Group does not think they will be), the result still leaves the Debtors embroiled in litigation when they seek to sell LayerZero's equity and warrants without its consent due to the transfer restrictions pursuant to the Articles of Association.  A similar fate could result if the Debtors seek to exercise the warrants for STG Tokens and ZRO Tokens if LayerZero determines that such exercise would violate any applicable law or regulation due to the criminal conduct of Alameda Ventures.  The Debtors would also need

17

to make more than $45 million in additional distributions to LayerZero on account of its loan claim that would be outstanding if the Cancellation and Recission Agreement were voided (approximately $60 million at current projected recovery rates). These issues will be litigated if and when appropriate in the Adversary Proceeding, but the Debtors cannot use the Plan's distribution mechanics to provide the LayerZero Group with unequal treatment in the hopes to resolve them.

### A. The Property Withdrawn from the FTX.com and FTX US Deposit Accounts Was Never Property of the Estate.

38.     To avoid a transfer of property pursuant to section 547 of the Bankruptcy Code, there must be an "interest of the debtor in property". The Debtors never had an interest in the customer deposit accounts the FTX.com and FTX US, so the Debtors cannot seek to avoid transfers of property in which they never held an interest.

39.     The FTX.com deposit account terms of service contain the following language making it clear that the digital assets are property of the customer and not the debtor:

> **Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.** As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account. **None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.**
>
> **You control the Digital Assets held in your Account.** At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

*See* Sazant Declaration, at Ex. D.

40.     Similarly, Section 6 of the FTX.US User Agreement states that "Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall

not transfer to FTX.US." *See* <u>Sazant Declaration</u>, at Ex. E.  It is clear by the plain language of the terms of service that the digital assets were never property of the Debtors.

41.     The Debtors have avoided litigating these issues thus far by offering the customer property settlement to the substantial majority of creditors.   While the LayerZero Group acknowledges that the Debtors needed to find an equitable solution because the Debtors do not have enough customer property to return to each customer in kind, these issues are defenses to the preference Causes of Action against the members of the LayerZero Group, and must be litigated to conclusion prior to any distributions being issued.

**B. The Debtors Have Excluded the LayerZero Group From Participating in the Customer Preference Settlement for Leverage in the Adversary Proceeding**

42.     The Debtors have not provided any explanation for why they are excluding the LayerZero Group from the Customer Preference Settlement and the only likely reason is for leverage in the Adversary Proceeding, particularly where, as here, the Plan is projected to pay more than 100 cents on the dollar to the majority of creditors.  Section 5.5 of the Plan provides the criteria for types of creditors that are Excluded Customer Preference Action, none of which appear (or, indeed, have been alleged to be) applicable to Ari Litan or Skip & Goose.  The Debtors' only claims against Ari Litan and Skip & Goose are preference claims related to their customer deposit accounts.  The Debtors have not brought any allegations that Ari Litan and Skip & Goose (i) were Insiders of any Debtor, (ii) were current or former employee of the Debtors or of any current or former Affiliate of the Debtors, (iii) may have had actual or constructive knowledge of the commingling and misuse of Customer deposits and corporate funds, or (iv) either (x) changed their know your customer information to facilitate withdrawals from the applicable FTX Exchange or (y) received manual permission from the Debtors to facilitate withdrawals when withdrawals were otherwise halted from the FTX Exchange.

43.    The Debtors have not offered any explanations for why Ari Litan and Skip & Goose are different than other similarly situated holders of US Customer Entitlement Claims to justify different treatment.  The Debtors have no other Causes of Actions against Ari Litan or Skip & Goose and they should be included in the Customer Preference Settlement pursuant to its express terms.  The likely justification for refusing to comply with express terms of the Customer Preference Settlement is to extract value from LayerZero for the Debtors' non-customer related Causes of Action (which we also believe do not have merit) against another entity.

44.    While the Debtors have also failed to offer any justification for the exclusion of LayerZero from the Customer Preference Settlement, presumably it is because the Debtors have unrelated Causes of Action from the Alameda silo for alleged fraudulent transfers relating to the valuable exchange of outstanding debt obligations owed to LayerZero for equity that Alameda held in LayerZero.  None of these Causes of Action relate to LayerZero being a customer with Dotcom Customer Entitlement Claims.  While the Debtors have proposed a substantive consolidation plan blurring the legal formalities between the Alameda silo and WRS silo, substantive consolidation "may not be used  . . . to disadvantage tactically a group of creditors or to alter creditor rights."  *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).  The Debtors are improperly using claims held by one Debtor to invalidate claims against another rather than to remedy harms caused by the Debtors.  It is not a good faith bankruptcy purpose to use substantive consolidation to punish a creditor for the relationship between that creditor and a wholly different debtor, and Plan confirmation must therefore be denied.

### III.    The Plan Improperly Disallows Distributions Without a Judicial Determination

45.    The Plan also cannot be confirmed because it improperly delays distributions on claims based on mere allegations of preference causes of action.  A debtor cannot prevent distributions to otherwise allowed and liquidated claims simply because it has alleged that a claim

should be disallowed because of an alleged preference. *See In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001) ("To disallow a claim under section 502(d) requires a *judicial determination that a claimant is liable.*") (emphasis added); *see also Giuliano v. Mitsubishi Dig. Elecs. Am., Inc. (In re Ultimate Acquisition Partners, LP)*, Nos. 11-10245 (MFW), 11-52663 (MFW), 2012 Bankr. LEXIS 1905 (Bankr. D. Del. May 1, 2012) (finding a trustee's section 502(d) claim should be dismissed and the creditor's claim should be allowed because there has not been any determination for the creditor's preference liability.).

46.    LayerZero has significant claims against the Debtors' estates that are not being allowed because of the alleged section 502(d) claims that the Debtors have asserted in the Adversary Proceeding.  LayerZero has, among others, liquidated claims of $11,459,230 in Class 5A and $1,449,864 in Class 6A.  However, in accordance with the Plan, the LayerZero Group will not receive any distribution until the Adversary Proceeding is resolved, which could happen, at the earliest, in mid-2025 based on the current case management order.  *See Amendment to Second Amended Case Management Plan and Scheduling Order* [Adversary Proceeding, Docket No. 43] (Replies in support of summary judgment are due July 25, 2025).  This is particularly problematic where the customer property issue has been contested in these Chapter 11 Cases, and, if the Court were to rule in favor of objecting customers on the customer property issue, there would be no preference.  The Debtors cannot hold up distributions to claims that they have not objected to solely because of allegations in an adversary proceeding without a judicial determination for their merits.

*      *      *

47.    For the foregoing reasons, the Plan cannot be confirmed because it fails to comply with the Bankruptcy Code and applicable law by singling out the LayerZero Group and other

similarly situated creditors and denying them full participation rights in the customer property settlement. Accordingly, the LayerZero Group respectfully submits that the Court should not approve the Plan.

## **RESERVATION OF RIGHTS**

48.     The LayerZero Group reserves all rights to supplement this Objection based upon further amendments that may be made to the Plan or any objections to the confirmation order. The LayerZero Group has also filed the *Motion of LayerZero Labs Ltd., Ari Litan, and Skip & Goose LLC to Extend the Voting and Preference Election Deadline Set Forth in Confirmation Scheduling Order* and if this Court grants the requested relief herein, the LayerZero Group reserves the right to submit a new ballot to accept the Customer Preference Settlement.

## **CONCLUSION**

49.     For the foregoing reasons, the LayerZero Group respectfully requests that the Court deny confirmation of the Plan and grant the LayerZero Group such other and further relief as is just.

*[Remainder of the Page Intentionally Left Blank]*

Dated: August 16, 2024
      Wilmington, Delaware

    *s/ R. Stephen McNeill*
M. Blake Cleary (No. 3614)
R. Stephen McNeill (No. 5210)
Sameen Rizvi (No. 6902)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: bcleary@potteranderson.com
      rmcneill@potteranderson.com
      srizvi@potteranderson.com

-and-

Brian S. Rosen, Esq.
Dylan J. Marker, Esq.
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email:  brosen@proskauer.com
      dmarker@proskauer.com

  -and-

Jordan E. Sazant (DE Bar No. 6515)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Telephone: (312) 962-3550
Email: jsazant@proskauer.com

*Counsel to LayerZero Group*

23